**BEFORE THE UNITED STATES JUDICIAL PANEL**
**ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| _____ ) | |
| ) | |
| **IN RE: BLUE CROSS BLUE** ) | |
| **SHIELD ANTITRUST** ) | **MDL No.: _____** |
| **LITIGATION** ) | |
| ) | |
| _____ ) | |

**MEMORANDUM OF LAW IN SUPPORT OF GC ADVERTISING, LLC**
**AND CB ROOFING, LLC'S MOTION FOR TRANSFER OF ACTIONS TO THE**
**NORTHERN DISTRICT OF ALABAMA PURSUANT TO 28 U.S.C.§ 1407 FOR**
**COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

## INTRODUCTION

Coordination and Transfer of the pending BCBS Cases under 28 U.S.C. § 1407 is proper because the cases all arise from the same factual context and involve the same facts and core legal issue – whether Defendant Blue Cross and Blue Shield Association ("BCBSA") and its member Blue Cross and Blue Shield licensees (the "Blues") have improperly entered into agreements illegally restraining trade in the sale and provision of health insurance in violation of the antitrust laws. Pretrial proceedings, including discovery, class certification, and pre-trial motion practice in all of the BCBS Cases will involve the same evidence and arguments addressing and directed toward resolving the parties' positions relative to the central issue in all of the cases – the licensing agreements and internal policies between and among the Defendants.

All nine cases filed to date involve substantially the same alleged facts and claims, namely that: (1) the Blues enjoy unrivaled market dominance in their respective service areas across the United States; (2) the Blues are independently owned and operated licensees of BCBSA that conduct business in distinct geographical regions; (3) the Blues enter into licensing agreements under the auspices of BCBSA that allocate geographic markets for health insurance by limiting each Blue's activity outside of designated service areas, thereby preventing competition among the Blues; (4) these licensing agreements effectively obstruct entry by non-BCBS insurers by, among other things, preventing the sale or transfer of established networks to non-Blue entities; (5) these licensing agreements have insulated the Blues from competition by both other Blues and non-Blues in each of their respective service areas; (6) these agreements operate as restraints on competition, have no sufficient economic justification aside from protecting BCBSA and the Blues from competition; (7) by these agreements, the Blues have

2

been able to acquire and maintain a grossly disproportionate market share for health insurance products in the United States, benefiting from inflated surpluses and increased underwriting margins; (8) the Blues and BCBSA have engaged in a common course of illegal conduct to increase their profits to the detriment of subscribers in violation of the antitrust laws; and (9) the Blues and BCBSA face liability for damages resulting from their illegal conduct.

Having one transferee court preside over one consolidated MDL case will promote orderly pretrial proceedings, and result in consistent rulings on discovery, class certification motions, and ultimately the critical issue of Defendants' illegal conduct, all of which are consistent with this Panel ordering consolidation under 28 U.S.C § 1407(a). The BCBS cases are best served by transfer to the Honorable R. David Proctor, United States District Judge for the Northern District of Alabama. Of the nine pending BCBS cases, seven are before Judge Proctor, and are already consolidated with both a provider track and a subscriber track. Moreover, Judge Proctor is currently working to coordinate the litigation by appointing interim lead counsel and has already held a status conference to address current issues to move the case forward. The two remaining cases, one in North Carolina and one in Tennessee, allege almost the same factual allegations as the seven Alabama cases- an ongoing conspiracy among the thirty eight Blues in violation of the Sherman Act.

## A. FACTUAL BACKGROUND

The BCBS cases involve the same common facts, and the operation of Blue Cross and Blue Shield represents a coordinated effort by health insurers to create a national brand with separate companies in local areas. Today, thirty-eight (38) separate health insurance plans all operating under Blue Cross and Blue Shield trademarks and trade names provide health insurance to approximately 100 million subscribers.

3

Through agreements with one another, these 38 Blue Cross and Blue Shield plans (Blues) have effectively captured dominant market shares in their respective local service areas. The Blues created the Blue Cross and Blue Shield Association (BCBSA); this association acts and operates as the licensor for the Blues. BCBSA itself does not provide health services and does not contract with physicians for the provisions of services, rather it operates to create and ensure consistency and cooperation among the 38 Blues. It is owned and controlled by the Blues and is governed by a board of directors, two-thirds of which must be composed of either Blues chief executive officers, or Blues board members. The 38 Blues fund BCBSA. The 38 Blues, through their association, the BCBSA, have created License Agreements, and Membership Standards and Guidelines, which effectively restrain trade. The 38 Blues are independent health insurance companies and, but for any agreement to the contrary, they could and would compete with one another. Instead, working together with and through the BCBSA, they have divided and allocated among themselves health insurance markets throughout the United States to eliminate competition.

Through the License Agreements, each of the Blues agree that neither it, nor its subsidiaries, will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." Moreover, through the Guidelines and Membership Standards, the Blues each agree that at least 80% of the annual revenue, that it or its subsidiaries generate, from within its designated Service Area (excluding Medicare and Medicaid) will be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. The Blues further agree that at least two-thirds of the annual revenue generated by them or their subsidiaries, from either inside or outside of their designated Service Areas (excluding Medicare and Medicaid), will be attributable to services offered under

4

the licensed Blue Cross and Blue Shield trademarks and trade names.  The foregoing constitute agreements to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

**B.     The BCBS Cases Should Be Transferred to a Single District- the Northern District of Alabama- for Pretrial Coordination.**

The Panel may transfer cases to a single judicial district for pretrial coordination or consolidation if: (1) they involve "common questions of fact"; (2) transfer would be convenient for the parties and witnesses; and (3) transfer would "promote the just and efficient conduct" of the cases. 28 U.S.C. § 1407(a). "The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." Manual for Complex Litigation, Fourth, § 20.131 (2004).

#### The BCBS Cases Involve Common Questions of Fact

Section 1407 authorizes the transfer and coordination of cases that involve "common questions of fact." 28 U.S.C. § 1407(a). The relevant inquiry is whether the actions "arise from a common factual core." Id.  The BCBS Cases easily meet that test.  As detailed above, all of these cases allege the same principal facts and raise the same core legal claim and theory.

Clearly, the BCBS Cases are nearly identical, exceeding the requirements of Section 1407(a), and making transfer and consolidation of the actions highly appropriate. See *In re Maxim Integrated Prods.*, MDL No. 2354, 2012 U.S. Dist. LEXIS 79496, at *4 (J.P.M.L. June 8, 2012) ("[t]ransfer under Section 1407(a) does not require a complete identity or even majority of common factual or legal issues as a prerequisite to transfer."); *In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, MDL. No. 2226, 2012 U.S. Dist. LEXIS 81394, at *2

5

(J.P.M.L. June 12, 2012) ("Furthermore, while these actions may involve some unique issues of fact, the majority of claims are virtually identical to claims already pending in the MDL. Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer."); *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 710 F. Supp. 2d 1378, 1380 (J.P.M.L. 2010) (transfer and consolidation proper for 29 actions involving state sales taxes filed in 28 districts); *In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d 1359, 1360-1361 (J.P.M.L. 2008) (actions which plead claims under different state statutory and common law are appropriate for transfer because "the presence of additional or differing legal theories is not significant when the actions still arise from a common factual core").

Consolidation and transfer is appropriate even where each group of plaintiffs asserted different individual legal claims against particular Defendants. *See In re Celotex Corp. "Technifoam" Prods. Liab. Litig.*, 424 F. Supp. 1077, 1078-79 (J.P.M.L. 1977) ("The fact that [an action] may also involve parties and issues not present in the other actions . . . is no obstacle to transfer."). Nor does it matter if one group of plaintiffs has asserted different or additional legal claims. Indeed, "where actions share factual questions, the Panel has long held that the presence of disparate legal theories is not a basis to deny transfer." *In re MF Global Holdings Ltd. Inv. Litig.*, MDL No. 2338, 2012 U.S. Dist. LEXIS 58792, at *4 (J.P.M.L. Apr. 23, 2012).; *see also In re Merscorp Inc., et al., Real Estate Settlement Procedures Act (RESPA) Litig.*, 560 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008) (where plaintiffs opposed transfer citing "unique state law claims," Panel found that transfer was proper because "[t]ransfer under Section 1407. . . does not require a complete identity or even a majority of common factual or legal issues as prerequisite to transfer."). Rather, the relevant question for Section 1407 purposes is whether the related cases share common questions of fact, which here, they all clearly do. The nine related

cases currently pending in Alabama, Tennessee, and North Carolina all allege an ongoing conspiracy among the thirty-eight Blues in violation of the Sherman Act.

### The BCBS Cases Should be Transferred to the Northern District of Alabama

Seven of the nine current cases are pending in the Northern District of Alabama before Judge Proctor. All seven cases have been consolidated by Judge Proctor and he has established two tracks, a provider track and a subscriber track, allowing the cases to proceed as one consolidated, coordinated case. In so doing, Judge Proctor has already recognized that these cases involve common issues of fact and should therefore proceed as one case on two tracks. Judge Proctor consolidated the seven Alabama cases and is considering motions for the appointment of interim lead counsel.

The seven Alabama cases currently consolidated and pending before the Honorable Judge Proctor are some of the earliest filed in the country and are the most advanced among the various related action filed to date, making the Northern District of Alabama the most appropriate transferee court for all of the BCBS cases. *See In re MI Windows and Doors, Inc. Prods. Liab. Litig.,* MDL No. 2333, 2012 U.S. Dist. LEXIS 58791, at * (J.P.M.L. Apr. 23, 2012) (transferring actions to district of the "earliest filed and most advanced actions"); *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litig.,* 746 F. Supp. 2d 1359, 1360 (J.P.M.L. 2010) (transferring case to district of one of the first-filed actions).

In addition, the Northern District of Alabama is "a major metropolitan court" that possesses the "necessary resources to be able to devote the substantial time and effort to pretrial matters" that these proceedings will require. *See in re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 173 F. Supp. 2d 1377, 1380 (J.P.M.L. 2001) (citing major metropolitan nature of transferee court in effecting transfer). The docket for the Northern District of Alabama is well

run by its seven District Judges, four Senior District Judge, five Magistrate Judges and Chief Judge Sharon L. Blackburn.[1]  Additionally, the Northern District of Alabama is not overburdened with MDL proceedings: as of July 2012, there was only one MDL action pending in the Northern District, and it is not before Judge Proctor.[2]  The availability and efficiency of the court and its judges has led the Panel to favor transfer to the Northern District of Alabama in prior proceedings.  *See In re Chantix (Varenicline) Products Liab. Litig.,* MDL. 2092, 655 F.Supp. 2d 1346 (J.P.M.L. 2009) ("The Northern District of Alabama, is favored by a clear majority of plaintiffs, and currently is home to only one pending multidistrict litigation proceeding." (Chantix MDL-2092)).  Furthermore, Judge Proctor has proven his ability to effectively handle complex MDL matters.  (*See In re: Total Body Formula Product Liability Litigation (*MDL 1985)).  Through Judge Proctor's efforts, MDL 1985 was handled very efficiently.  As noted in media reports, Judge Proctor's guidance fostered unprecedented cooperation among the parties and their counsel, and discovery coordination between federal and state courts.[3]

---

[1] United States District Court for the Northern District of Alabama, District Court Judicial Index, http://www.alnd.uscourts.gov/Local/DC_judicial_officers.htm (last accessed August 17, 2012).

[2] United States Judicial Panel on Multidistrict Litigation, Current and Pending MDL Cases, http://www.jpml.uscourts.gov/pending-mdls-0 (last accessed August 17, 2012).

[3] *See http://www.law.com/jsp/article.jsp?id=1202470897664.*  In this August 23, 2010 article, Dekalb County Georgia, State Court Judge Wong noted that Judge Proctor actively promoted cross-jurisdictional cooperation that allowed the lawyers and judges to avoid redundancies in the discovery process and invited him to participate in the mass mediation that resulted in a settlement of cases consolidated in the MDL and some of the

According to court statistics, the Northern District of Alabama ranks among the top twenty for time from filing of civil actions to trial best in fewest number of civil cases more than three years old.[4]

The availability of an experienced, capable judge weighs in favor of transferring a case to a district. *See, for example, In re Hawaiian Hotel Rate Antitrust Litig.,* 438 F. Supp. 935, 936 (Jud. Pan. Mult. Lit. 1977); *In re Ampicillin Antitrust Litig.,* 315 F. Supp. 317, 319 (Jud. Pan. Mult. Lit. 1970). The experience and knowledge of a particular judge is one of the factors that may be considered in determining the appropriated transferee forum. *See, for example, In re Factor VIII or IX Concentrate Blood Prod. Litig., 835 F.* Supp. 454, 455 (Jud. Pan. Mult. Lit. 1993); *In re Silicone Gel Breast Implants Prods. Litig.,* 793 F. Supp. 1098, 1101 (Jud. Pan Mult. Lit. 1992); *In re Data General Corp. Antitrust Litig.,* 470 F. Supp. 855, 859 (J.P.M.L. 1979).

### Transfer Would Be Convenient for the Parties and Witnesses

Transferring the BCBS Cases to a common Court—the Northern District of Alabama— would be convenient for the parties and witnesses. The BCBSA is a primary defendant named in each of the currently pending related BCBS Cases listed on Schedule A. Certainly, from BCBSA's perspective, transferring the cases to a single court would be far more convenient than simultaneously litigating the same issues in courts in various states including Alabama, Tennessee, North Carolina and any other districts where subsequently related cases may be filed.

---

cases pending in various state courts. The article noted that the lawyers appreciated the electronic document repository that the federal court created for all pending cases, whether filed in federal court or state court.

[4] *See http://www.uscourts.gov/cgi-bin/cmsd2008.*

Because all of the underlying cases are so similar, pretrial coordination of these actions in any single district is more appropriate than allowing the cases to proceed individually. It simply makes sense for one judge to "structure pretrial proceedings to accommodate all parties' legitimate discovery needs while ensuring that the common party and witnesses are not subjected to discovery demands that duplicate activity that will or has occurred in other actions." *In re Method of Processing Ethanol Byproducts and Related Subsystems ('858) Patent Litig.*, 730 F. Supp. 2d 1379, 1380 (J.P.M.L. 2010).  Without centralization, BCBSA would be subjected to different district judges' decisions on the timing and scope of discovery, class certification, and other important pretrial issues.   Allowing different related cases to proceed in different jurisdictions would create needless inconvenience, disruption and burden, even for individual member Blues, whose relationship with BCBSA would likely draw them into pretrial proceedings in multiple BCBS Cases.

Plaintiffs, too, will benefit from pretrial centralization. Instead of proceeding individually, they can "combine their forces and apportion the workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned." *In re Baldwin-United Corp. Litig.*, 581 F. Supp. 739, 741 (J.P.M.L. 1984).  It would be a highly wasteful exercise for different groups of plaintiffs' lawyers to engage in redundant pretrial activities when the work can and should easily be divided in a coordinated proceeding in a more efficient and effective manner.

Consolidation will also enable a single judge to establish a pretrial program that will minimize expenses to the parties. These savings are precisely the types of savings that this Panel has traditionally used to justify the consolidation of actions in different jurisdictions. *See In re*

*Chrysler LLC 2.7 Liter V-6 Engine Oil Sludge Prods. Liab. Litig.*, 598 F. Supp. 2d 1372, 1373 (J.P.M.L. 2009) (finding that "[c]entralization w[ould] enable one judge to streamline pretrial proceedings and make consistent rulings on discovery disputes, dispositive motions, and issues relating to experts" where the proposed classes did not overlap, but where the actions were "nearly identical in terms of the facts alleged"); *In re Polychloroprene Rubber Antitrust Litig.*, 360 F. Supp. 2d 1348, 1350-1351 (J.P.M.L. 2005) ("Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary.").

### Transfer Would Promote the Just and Efficient Conduct of this Litigation

Transfer to a single district also would "promote the just and efficient conduct" of the BCBS Cases. 28 U.S.C. § 1407.  In light of the nearly identical factual allegations, transfer under Section 1407 will save judicial time and resources. *See AT&T Mobility*, 710 F. Supp. 2d at 1380 ("centralization will save considerable judicial time," because "discovery. . . will undoubtedly overlap and many of the legal issues will turn on similar facts and law."); *In re European Rail Pass Antitrust Litig.*, MDL No. 1386, 2001 U.S. Dist. LEXIS 1417, at *3 (J.P.M.L. Feb. 7, 2001) (ordering cases transferred to a single district to "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.").

As explained above, there are presently nine cases pending in three separate district courts.  Seven of these related cases—77% of the litigated cases nationwide—are pending in the Northern District of Alabama.  All of these seven cases have already been consolidated before

Judge Proctor, and he is therefore the only district judge currently handling multiple BCBS cases. Furthermore, these seven BCBS cases pending in the Northern District of Alabama before Judge Proctor are as far advanced, or more advanced, than either of the cases pending in the Western District of Tennessee or in the Western District of North Carolina. Therefore Judge Proctor is as familiar, if not more familiar, with the claims, allegations and issues involved in the BCBS cases, especially since he has already consolidated all seven of the cases now before him.

When an opportunity presents itself, as it has here, it makes sense to coordinate these actions from the start, and ensure that all parties can benefit from the MDL tag-along procedures in the likely event that similar cases are subsequently filed. See United States Judicial Panel on Multidistrict Litigation, Rules 7.1 and 7.2; *In re Metoprolol Succinate Patent Litig.*, 329 F. Supp. 2d 1368, 1370 (J.P.M.L. 2004) ("Section 1407 will have the salutary effect of assigning the present actions and any future tag-along actions to a single judge who can formulate a pretrial program that ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties and the courts.").

Transfer would ensure consistent pretrial rulings on dispositive motions and class certification. *See, e.g., In re Baycol Prods. Liab. Litig.*, 180 F. Supp. 2d 1378, 1380 (J.P.M.L. 2001) (centralization promotes the just and efficient conduct of litigation where it "prevent[s] inconsistent pretrial rulings, including with respect to class certification"); *In re Cygnus Telcoms. Tech., LLC Patent Litig.*, 177 F. Supp. 2d 1375, 1376 (J.P.M.L. 2001) ("And while we applaud every cooperative effort undertaken by parties to any litigation, we observe that transfer under Section 1407 has the benefit of placing all actions in this docket before a single judge who can structure pretrial proceedings to consider all parties' legitimate discovery needs while ensuring that common parties and witnesses are not subjected to discovery demands which duplicate

activity that has already occurred or is occurring in other actions"). It would be inefficient for three (3) Judges (or more) to address, consider and decide potentially conflicting merits and class certification issues and motions in putative nationwide class actions against the same defendant (the BCBSA) for the same core conduct. *See, e.g., In re Pharmacy Benefit Managers*, 452 F. Supp. 2d 1352, 1353 (J.P.M.L. 2006) (where the defendants in the actions differed, but the allegations all focused on the same conduct, finding that centralization was "desirable" in order to "prevent inconsistent or repetitive pretrial rulings (especially on the issue of class certification)"); *In re Natural Res. Fund, Inc. Sec. Litig.*, 372 F. Supp. 1403, 1404 (J.P.M.L. 1974) ("[T]he potential for conflicting class determinations by the transferor courts" is a "highly persuasive if not compelling reason for transfer.").

In a consolidated or coordinated proceeding under Section 1407 where class actions are involved – as here – the presiding district judge is likely to appoint highly qualified interim class counsel under Fed. R. Civ. P. 23(g)(3). See Ten Steps to Better Case Management: A Guide for Multidistrict Litigation Transferee Judges (2009) ("It is often necessary in complex MDLs to select lead, liaison, and/or administrative counsel. This is one of your first and most important decisions."). Appointed interim class counsel can then make decisions on behalf of the putative class, including the drafting and filing of a consolidated amended complaint, and meeting and conferring with defense counsel on all pre-trial matters, including scheduling and discovery. Having the litigation led by court-appointed lead counsel creates great efficiencies for the parties and the judiciary and ensures an orderly process.

Conversely, in the absence of pretrial centralization, plaintiffs would likely vie for conflicting interim class counsel appointments in multiple judicial districts and seek different pretrial schedules and make different discovery demands, all of which would seriously

undermine judicial economy and efficiency, adding enormous additional, unnecessary cost and expense, among other wasteful practices. *See, e.g., In re Plumbing Fixture Cases*, 298 F. Supp. 484, 493 (J.P.M.L. 1968) ("It is in the field of class action determinations in related multidistrict civil actions that the potential for conflicting, disorderly, chaotic judicial action is the greatest."). That procedural morass can be avoided by ordering the BCBS Cases transferred to a single district under Section 1407 and it will confer benefits upon the plaintiffs, defendants and the judiciary. *See In re Tribune Co. Fraudulent Conveyance Litig.*, MDL No. 2296, 2011 U.S. Dist. LEXIS 146375, *1-5 (J.P.M.L. Dec. 20, 2011) (transfer and consolidation will conserve resources of judiciary, the parties, and their counsel).

**Access to the Court will be efficient and straightforward for any necessary in-person appearances.**

Birmingham is a major city located in the south central region of the country, with relatively easy access by air, in no small part because of the Birmingham-Shuttlesworth International Airport's ongoing $200 million dollar expansion and modernization. Where the actions, subject to a transfer motion, are geographically dispersed, the Panel traditionally has sought to identify a location that maximizes accessibility and convenience for the parties and their counsel. *See, e.g., In re Methyl Methacrylate (MMA) Antitrust Litig.,* 435 F. Supp. 2d 1345, 1347 (J.P.M.L June 20, 2006) (weighing geographic convenience in transfer decision).

Finally, it also bears noting that the escalating costs of health insurance over the past several years have affected some communities in the country more than others. Employer premiums as a percentage of median household income in Alabama, on average, have gone up over 45% between 2003 and 2009 alone. Thus the District has a genuine interest in overseeing

14

the parties' dispute. *See, e.g., In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 626 F.

Supp. 2d 1346, 1347 (J.P.M.L. 2009).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Panel transfer the BCBS

Cases, listed in the attached Schedule of Actions, to the United States District Court for the

Northern District of Alabama, for coordinated or consolidated pretrial proceedings pursuant to

28 U.S.C. § 1407 before the Honrable  R. David Proctor.

Respectfully submitted on this the 6th day of September 2012.


/s/ Greg L. Davis
Attorney for GC Advertising. LLC and
CB Roofing, LLC

OF COUNSEL:

Greg L. Davis
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
(334) 832-9080/telephone
(334) 409-7001/facsimile
gldavis@knology.net

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this the 6th day of September 2012, a copy of foregoing Memorandum Brief In Support of GC Advertising, LLC and CB Roofing, LLC Transfer and Coordination Or Consolidation was electronically filed with the Judicial Panel on Multidistrict Litigation by using the CM/ECF system which will send notice of electronic filing to all parties of record.

/s/ Greg L. Davis
OF COUNSEL

16