# U.S. District Court
## Northern District of Alabama (Southern)
## CIVIL DOCKET FOR CASE #: 2:12-cv-02525-RDP

| | |
|---|---|
| GC Advertising LLC et al v. Blue Cross and Blue Shield of Alabama et al | Date Filed: 07/24/2012 |
| | Jury Demand: Plaintiff |
| Assigned to: Judge R David Proctor | Nature of Suit: 410 Anti-Trust |
| Lead case: 2:12-cv-01133-RDP | Jurisdiction: Federal Question |
| Member case: (View Member Case) | |
| Cause: 28:1337 Sherman-Clayton Act | |

**Plaintiff**

**GC Advertising LLC**                    represented by   **Gregory L Davis**
DAVIS & TALIAFERRO LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
334-832-9080
Fax: 334-409-7001
Email: gldavis@knology.net
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CB Roofing LLC**                         represented by   **Gregory L Davis**
*on behalf of themselves and all others*                   (See above for address)
*similarly situated*                                       *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blue Cross and Blue Shield of**          represented by   **Carl S Burkhalter**
**Alabama**                                                MAYNARD COOPER & GALE PC
AmSouth Harbert Plaza, Suite 2400
1901 6th Avenue North
Birmingham, AL 35203-2618
254-1000
Email:
cburkhalter@maynardcooper.com
*ATTORNEY TO BE NOTICED*

**James L Priester**
MAYNARD COOPER & GALE PC
2400 Regions/Harbert Plaza

Case MDL No. 2406    Document 2-4    Filed 09/07/12    Page 2 of 41

1901 Sixth Avenue N
Birmingham, AL 35203
205-254-1000
Fax: 205-254-1999
Email: jpriester@maynardcooper.com
*ATTORNEY TO BE NOTICED*

**Pamela B Slate**
HILL HILL CARTER FRANCO COLE
& BLACK PC
425 S Perry Street
Montgomery, AL 36104
334-834-7600
Fax: 334-386-4381
Email: pslate@hillhillcarter.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Blue Cross and Blue Shield
Association**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/24/2012 | 1 | COMPLAINT (with certified mail request) against Blue Cross and Blue Shield Association, Blue Cross and Blue Shield of Alabama, filed by GC Advertising LLC, CB Roofing LLC.(SAC ) (Entered: 07/24/2012) |
| 07/24/2012 | | Filing Fee: Filing fee $ 350, receipt_number 1126-1716895/ ALND receipt#: B4601035612. related document 1 COMPLAINT (with certified mail request) against Blue Cross and Blue Shield Association, Blue Cross and Blue Shield of Alabama, filed by GC Advertising LLC, CB Roofing LLC.(SAC ). (Davis, Gregory) Modified on 7/25/2012 (SAC, ). (Entered: 07/24/2012) |
| 07/25/2012 | | Minute Entry for proceedings held before Judge R David Proctor: Status Conference held on 7/25/2012. The court will enter a separate order outlining the deadlines as indicated on the record. (Court Reporter Anita McCorvey.) Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP(KLL) (Entered: 07/27/2012) |
| 07/27/2012 | 2 | ORDER-By agreement of the parties, it is ORDERED that case 2:12-cv-2525-KOB, be consolidated with case 2:12-cv-1133-RDP. In the future, all other documents should be electronically filed only in the lead case 2:12-CV-1133-RDP. Signed by Judge R David Proctor on 7/27/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv- |

| | | |
|---|---|---|
| | | 02185-RDP, 2:12-cv-02525-RDP(AVC) (Entered: 07/27/2012) |
| 07/27/2012 | 3 | ORDER-By agreement of the parties, it is ORDERED that case 2:12-cv-2537-TMP will be consolidated with 2:12-cv-1133-RDP. In the future, all other documents should be electronically filed only in the lead case 2:12-CV-01133-RDP. Signed by Judge R David Proctor on 7/27/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 07/27/2012) |
| 07/27/2012 | 4 | ORDER -It is the courts intent to appoint Interim Lead Class Counsel pursuant to Federal Rule of Civil Procedure 23(g)(3) in these consolidated cases. Applications and/or nominations for the Interim Lead Class Counsel position must be filed with the Clerks Office electronically on or before Tuesday, September 4, 2012. Signed by Judge R David Proctor on 7/27/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 07/27/2012) |
| 07/31/2012 | 5 | Transcript of Proceedings held on 7/25/2012, before Judge R. David Proctor. Court Reporter/Transcriber Anita McCorvey, Telephone number 205-278-2063. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local /court forms/transcripts/Transcript Redaction Policy.pdf) See Transcript Redaction Policy Redaction Request due 8/21/2012. Redacted Transcript Deadline set for 8/31/2012. Release of Transcript Restriction set for 10/29/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02537-RDP(AVC) (AVC, ). (Entered: 07/31/2012) |
| 08/02/2012 | 6 | Amended Transcript of Proceedings held on 7/25/2012, before Judge R. David Proctor. Court Reporter/Transcriber Anita McCorvey, Telephone number 205-278-2063. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. NOTICE: The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. (A copy can be obtained at http://www.alnd.uscourts.gov/local/court forms/transcripts/Transcript Redaction Policy.pdf) See Transcript Redaction Policy Redaction Request due 8/23/2012. Redacted Transcript Deadline set for 9/4/2012. Release of Transcript Restriction |

| | | set for 10/31/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/02/2012) |
|---|---|---|
| 08/06/2012 | 7 | Summons Issued as to Blue Cross and Blue Shield Association, Blue Cross and Blue Shield of Alabama; mailed certified mail. (AVC) (Entered: 08/06/2012) |
| 08/07/2012 | 8 | ORDER-This matter is before the court on the Provider Pltfs' Motion to Consolidate and Establish Seperate Track (#2 in 2:12-cv-02532-LSC). By agreement of the parties and over no objection from others, it is ORDERED that the motion is GRANTED, and that case 2:12-cv-2532-LSC, be consolidated with case 2:12-cv-1133-RDP. In the future, all other documents should be electronically filed only in the lead case, Richards, et al. v. Blue Cross and Blue Shield of Alabama, et al., 2:12-CV-01133-RDP. Signed by Judge R David Proctor on 8/6/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/07/2012) |
| 08/09/2012 | 9 | SUMMONS Returned Executed Blue Cross and Blue Shield of Alabama served on 8/7/2012, answer due 8/28/2012. (AVC) (Entered: 08/09/2012) |
| 08/10/2012 | 10 | NOTICE of Appearance by James L Priester on behalf of Blue Cross and Blue Shield of Alabama. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Priester, James) Modified on 8/10/2012 (AVC). (Entered: 08/10/2012) |
| 08/16/2012 | 11 | NOTICE of Appearance by Carl S Burkhalter on behalf of Blue Cross and Blue Shield of Alabama. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Burkhalter, Carl) Modified on 8/16/2012 (AVC). (Entered: 08/16/2012) |
| 08/17/2012 | 12 | STIPULATION *(Agreed)* of the Conway Parties by Blue Cross and Blue Shield Association. filed by Blue Cross and Blue Shield Association Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(West, Kimberly) (Entered: 08/17/2012) |
| 08/17/2012 | 13 | NOTICE of Appearance by Pamela B Slate on behalf of Blue Cross and Blue Shield of Alabama, Blue Cross and Blue Shield of Alabama Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Slate, Pamela) (Entered: 08/17/2012) |
| 08/20/2012 | 14 | SUMMONS Returned Executed Blue Cross and Blue Shield Association served on 8/10/2012, answer due 8/31/2012. (AVC) (Entered: 08/20/2012) |

| 08/20/2012 | 15 | MOTION for Leave to Appear pro hac vice *of Charles R. Watkins* by Chris Bajalieh, Consumer Financial Education Foundation of America Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Guin, David) (Entered: 08/20/2012) |
| --- | --- | --- |
| 08/20/2012 | 16 | MOTION for Leave to Appear pro hac vice *of John R. Wylie* by Chris Bajalieh, Consumer Financial Education Foundation of America Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Guin, David) (Entered: 08/20/2012) |
| 08/21/2012 | 17 | ORDER-Before the court is the Motion for Admission Pro Hac Vice of Charles R. Watkins (59 in 2:12-cv-01133-RDP). The motion is CONDITIONALLY GRANTED. By 8/27/2012, Attorney Watkins SHALL: pay the $50 filing fee, and Certify to the court that he has read and understands: any local rules applicable in this District; the Alabama State Bar Pledge of Professionalism; this court's CM/ECF requirements. Signed by Judge R David Proctor on 8/21/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/21/2012) |
| 08/21/2012 | 18 | MOTION for Leave to Appear pro hac vice *of John R. Wylie* by Chris Bajalieh, Consumer Financial Education Foundation of America Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Guin, David) (Entered: 08/21/2012) |
| 08/21/2012 | 19 | CERTIFICATE of Counsel *of Charles R. Watkins in support of Motion to Appear Pro Hac Vice* by David J Guin on behalf of Chris Bajalieh, Consumer Financial Education Foundation of America Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Guin, David) (Entered: 08/21/2012) |
| 08/21/2012 | | PHV Fee paid: $100.00, Receipt# B4601036372 for Attorneys Charles R. Watkins and John R. Wylie. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/21/2012) |
| 08/21/2012 | 20 | ORDER-Before the court is Motion for Admission Pro Hac Vice of John R. Wylie (62 in 2:12-cv-01133-RDP). The Motion is CONDITIONALLY GRANTED. By 8/27/2012, Attorney Wylie SHALL: pay the $50 filing fee, and Certify to the court that he has read and understands: any local rules applicable in this District; the Alabama State Bar Pledge of Professionalism; and this court's CM/ECF requirements. Signed by Judge R David Proctor on 8/21/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv- |

| | | 02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/21/2012) |
|---|---|---|
| 08/27/2012 | 21 | NOTICE of Appearance by J Bentley Owens, III on behalf of Premera Blue Cross of Alaska Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Owens, J) (Entered: 08/27/2012) |
| 08/27/2012 | 22 | MOTION for Leave to Appear Pro Hac Vice *for Gwendolyn C. Payton* by Premera Blue Cross of Alaska. (Attachments: # 1 Exhibit A)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Owens, J) (Entered: 08/27/2012) |
| 08/27/2012 | 23 | MOTION for Leave to Appear Pro Hac Vice *for Erin M. Wilson* by Premera Blue Cross of Alaska. (Attachments: # 1 Exhibit A)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Owens, J) (Entered: 08/27/2012) |
| 08/27/2012 | | PHV Fee paid: $50, Receipt# 1126-1743094 (ALND# B4601036526). Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Owens, J) Modified on 8/30/2012 (AVC). (Entered: 08/27/2012) |
| 08/27/2012 | | PHV Fee paid: $50, Receipt# 1126-1743100 (ALND# B4601036527). Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Owens, J) Modified on 8/30/2012 (AVC). (Entered: 08/27/2012) |
| 08/27/2012 | 24 | NOTICE of Appearance by John M Johnson on behalf of Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Johnson, John) (Entered: 08/27/2012) |
| 08/27/2012 | 25 | NOTICE of Appearance by Brian P Kappel on behalf of Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Kappel, Brian) (Entered: 08/27/2012) |
| 08/27/2012 | 26 | MOTION for Limited Admission *(Pro Hac Vice of Kathleen Taylor Sooy)* by Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska. (Attachments: # 1 Exhibit 1)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv- |

| | | |
|---|---|---|
| | | 02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Johnson, John) (Entered: 08/27/2012) |
| 08/27/2012 | | PHV Fee paid: $50, Receipt# 1126-1743195 (ALND# B4601036529). Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Johnson, John) Modified on 8/30/2012 (AVC). (Entered: 08/27/2012) |
| 08/27/2012 | 27 | MOTION for Limited Admission (*Pro Hac Vice of Tracy A. Roman*) by Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska. (Attachments: # 1 Exhibit 1)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Johnson, John) (Entered: 08/27/2012) |
| 08/27/2012 | | PHV Fee paid: $50, Receipt# 1126-1743214 (ALND# B4601036530). Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Johnson, John) Modified on 8/30/2012 (AVC). (Entered: 08/27/2012) |
| 08/29/2012 | 28 | ORDER: 70 and 71 , Motions for Leave to Appear PHV for Kathleen Taylor Sooy and Tracy Roman are GRANTED; 66 and 67 , Motions for Leave to Appear Pro Hac Vice for Gwendolyn Payton and Erin Wilson are CONDITIONALLY GRANTED, as further set out in order. Signed by Judge R David Proctor on 08/29/12. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(CVA) Modified on 8/29/2012 (CVA). (Entered: 08/29/2012) |
| 08/30/2012 | 29 | NOTICE of Appearance by Cavender C Kimble on behalf of Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Kimble, Cavender) (Entered: 08/30/2012) |
| 08/30/2012 | 30 | MOTION for Leave to Appear Pro Hac Vice *Craig A. Hoover* by Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of |

| | | |
|---|---|---|
| | | Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Kimble, Cavender) (Entered: 08/30/2012) |
| 08/30/2012 | 31 | MOTION for Leave to Appear Pro Hac Vice *J. Robert Robertson* by Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02537-RDP(Kimble, Cavender) (Entered: 08/30/2012) |
| 08/30/2012 | 32 | MOTION for Leave to Appear Pro Hac Vice *Emily M. Yinger* by Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Kimble, Cavender) (Entered: 08/30/2012) |
| 08/30/2012 | 33 | MOTION for Leave to Appear Pro Hac Vice *E. Desmond Hogan* by Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue |

| | | |
|---|---|---|
| | | Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Kimble, Cavender) (Entered: 08/30/2012) |
| 08/30/2012 | 34 | NOTICE of Appearance by D Keith Andress on behalf of Blue Cross and Blue Shield of Tennessee Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Andress, D) (Entered: 08/30/2012) |
| 08/30/2012 | 35 | MOTION for Leave to Appear Pro Hac Vice *N. Thomas Connally* by Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Blue Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Kimble, Cavender) (Entered: 08/30/2012) |
| 08/30/2012 | 36 | NOTICE of Appearance by Kevin R Garrison on behalf of Blue Cross and Blue Shield of Tennessee Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Garrison, Kevin) (Entered: 08/30/2012) |
| 08/30/2012 | 37 | NOTICE of Appearance by Emily M Yinger on behalf of Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Tennessee, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Yinger, Emily) (Entered: 08/30/2012) |

| 08/30/2012 | [38](#) | NOTICE of Appearance by N Thomas Connally, III on behalf of Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Tennessee, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Connally, N) (Entered: 08/30/2012) |
|---|---|---|
| 08/30/2012 | [39](#) | NOTICE of Appearance by E Desmond Hogan on behalf of Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Tennessee, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Hogan, E) (Entered: 08/30/2012) |
| 08/30/2012 | [40](#) | NOTICE of Appearance by Craig A Hoover on behalf of Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Tennessee, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Hoover, Craig) (Entered: 08/30/2012) |

| | | |
|---|---|---|
| 08/31/2012 | 41 | NOTICE of Appearance by J Robert Robertson on behalf of Anthem Blue Cross and Blue Shield of Connecticut, Anthem Blue Cross and Blue Shield of Indiana, Anthem Blue Cross and Blue Shield of New Hampshire, Anthem Blue Cross and Blue Shield of Virginia Inc, Anthem Blue Cross and Shield of Missouri, Anthem Health Plans of Maine, Anthem Inc, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Tennessee, Hawaii Medical Service Assoc, Horizon Blue Cross and Blue Shield of New Jersey, Wellmark of South Dakota Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Robertson, J) (Entered: 08/31/2012) |
| 08/31/2012 | 42 | ORDER-Before the court are Motions for Admission Pro Hac Vice on behalf of Craig A. Hoover 74 , J. Robert Robertson 75 , Emily M. Yinger 76 , E. Desmond Hogan 77 , and N. Thomas Connally 79 . The motions are CONDITIONALLY GRANTED. By 9/7/2012, the Attorneys seeking admission SHALL pay the $50 pro hac vice fee; and Certify to the court that they have read and understand: any local rules applicable in this District; the Alabama State Bar Pledge of Professionalism; this court's CM/ECF requirements. Signed by Judge R David Proctor on 8/30/2012. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/31/2012) |
| 08/31/2012 | | PHV Fee paid: $250.00, Receipt# B4601036604, for Attorneys Craig A. Hoover, J. Robert Robertson, Emily M. Yinger, E. Desmond Hogan and N. Thomas Connally. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(AVC) (Entered: 08/31/2012) |
| 09/04/2012 | 43 | NOTICE of Compliance re: Attorneys Gwendolyn C. Payton and Erin M. Wilson by Premera Blue Cross of Alaska re (31 in 2:12-cv-02532-RDP)(Attachments: # 1 Exhibit Application and Declaration of Gwendolyn C. Payton in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit Application and Declaration of Erin M. Wilson in Support of Motion for Admission Pro Hac Vice)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Owens, J) Modified on 9/4/2012 (AVC). (Entered: 09/04/2012) |
| 09/04/2012 | 44 | MOTION to be Appointed Lead Counsel in the Provider Track by Jerry L Conway. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Whatley, Joe) |

| | | Modified on 9/4/2012 (AVC). (Entered: 09/04/2012) |
|---|---|---|
| 09/04/2012 | 45 | Brief re(50 in 2:12-cv-01133-RDP) Order,, *Application to Appoint Cohen Milstein as Interim Class Counsel and John D. Saxon as Interim Liaison Counsel.* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Small, Daniel) (Entered: 09/04/2012) |
| 09/04/2012 | 46 | JOINT Application of Boies, Schiller & Flexner LLP, Donaldson & Guin, LLC, and Pittman, Dutton & Hellums, PC to Serve as Interim co-Lead Counsel by Nicholas A Layman, One Stop Environmental, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Hellums, Christopher) Modified on 9/5/2012 (AVC). (Entered: 09/04/2012) |
| 09/04/2012 | 47 | MOTION to Appoint Counsel Greg Davis Interim Lead Class Counsel in the Subscriber Track by GC Advertising LLC. Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Davis, Gregory) Modified on 9/5/2012 (AVC). (Entered: 09/04/2012) |
| 09/05/2012 | 48 | CERTIFICATION of Emily M. Yinger Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Yinger, Emily) Modified on 9/6/2012 (AVC). (Entered: 09/05/2012) |
| 09/05/2012 | 49 | CERTIFICATION of N. Thomas Connally Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Connally, N) Modified on 9/6/2012 (AVC). (Entered: 09/05/2012) |
| 09/05/2012 | 50 | CERTIFICATION of E. Desmond Hogan Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Hogan, E) Modified on 9/6/2012 (AVC). (Entered: 09/05/2012) |
| 09/05/2012 | 51 | CERTIFICATION of Craig A. Hoover Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Hoover, Craig) Modified on 9/6/2012 (AVC). (Entered: 09/05/2012) |
| 09/05/2012 | 52 | CERTIFICATIION of J. Robert Robertson Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Robertson, J) |

| | | Modified on 9/6/2012 (AVC). (Entered: 09/05/2012) |
|---|---|---|
| 09/06/2012 | 53 | SUPPLEMENT to the Application to Appoint Cohen Milstein as Interim Class Counsel and John D. Saxon as Interim Liason Counsel (89 in 2:12-cv-01133-RDP) by Thomas A Carder, Jr, Industrial Sales & Service LLC, American Electric Motor Services Inc, Fred R Richards, Richards and Sons Construction Company Inc Associated Cases: 2:12-cv-01133-RDP, 2:12-cv-01910-RDP, 2:12-cv-02169-RDP, 2:12-cv-02185-RDP, 2:12-cv-02525-RDP, 2:12-cv-02532-RDP, 2:12-cv-02537-RDP(Small, Daniel) Modified on 9/7/2012 (AVC). (Entered: 09/06/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/07/2012 08:41:04 | | |
| PACER Login: | gd0814 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 2:12-cv-02525-RDP |
| Billable Pages: | 9 | Cost: | 0.90 |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| GC ADVERTISING, LLC; CB ROOFING, LLC, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BLUE CROSS AND BLUE SHIELD OF ALABAMA, and BLUE CROSS AND BLUE SHIELD ASSOCIATION, <br><br> Defendants. | Case No.: <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMAND |

## PREAMBLE

*"100 million covered.*
*83 years strong.*
*38 local companies.*
*Connected by 1 Association."*

- Blue Cross and Blue Shield Association website

Plaintiffs GC Advertising, LLC and CB Roofing, LLC (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, in their complaint against Defendants Blue Cross and Blue Shield of Alabama ("BCBS-AL"), and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association"), allege violations of antitrust laws as follows:

1.     As set forth in this complaint, the BCBS-AL Defendant enjoys unrivaled market power in Alabama.  The dominant market share of BCBS-AL is the direct result of an illegal agreement between the BCBSA and its members, in which dozens of the nation's largest health insurance companies have agreed that

they will restrict competition among themselves through the establishment of exclusive territories in exchange for the right to use the BCBSA marks, services, benefits, and brands.   These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans (collectively, the "Blues"), and each individual Blue Cross and Blue Shield licensee, including the BCBS-AL Defendant.   Through the terms of these *per se* illegal license agreements, the independent Blue Cross and Blue Shield entities to include BCBS-AL throughout the country have explicitly agreed not to compete with one another, in direct violation of Section 1 of the Sherman Act.   By so agreeing, they have perpetuated and strengthened the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.   Indeed, BCBS licensees collectively are the largest health insurers, as measured by number of subscribers, in 44 states.

2.      The member Blues, including BCBS-AL, while operating as independent economic entities, are all licensees of the BCBSA.   This licensure has entitled BCBS-AL to certain rights within the BCBSA scheme, such as exclusive use of the "Blue Cross" or "Blue Shield" emblem within its defined territory. Importantly, BCBSA members elect a board of directors composed exclusively of member Blues.   The board of directors in turn establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive territories.   There is no procompetitive justification for these licensing agreements and restrictions on competition in exclusive territories.   Instead, they are naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the BCBS-AL, and have profound anticompetitive effects.

3.      The Defendants' illegal conspiracy has furthered BCBS-AL market power and, in turn, contributed to skyrocketing premiums.   In a truly competitive

market for health insurance, and absent the illegal agreement between BCBS-AL Defendant and the other Blues to divide markets and eliminate competition, such inflated premiums would not be possible. In addition, the agreement among the BCBSA entities prohibits the sale or transfer of provider networks to non-Blue members and, thereby, further restrains competition. It has been recognized that the acquisition of a provider network is perhaps the most significant barrier to entry for health insurers considering entering a new geographic market, and that the cost of internally developing rather than acquiring such a network is often considered prohibitive. As a result, the contractual restrictions established through BCBSA and agreed to by member Blues create an immense barrier to entry into the market for health insurance in the states dominated by BCBS. Fair competition is not possible so long as BCBS-AL and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of health insurance companies from competing in certain territories.

4.    Further described below, this arrangement via the BCBSA is a naked territorial restraint on competition in the market for health insurance. The contracts, combinations, and conspiracies in restraint of trade alleged herein, are illegal under Section 1 of the Sherman Act, 15 U.S.C. §1.

## JURISDICTION AND VENUE

5.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBSA and BCBS-AL for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of Sections 1 of the Sherman Act, 15 U.S.C. §1.

6.     This action is also instituted to secure injunctive relief against BCBSA and BCBS-AL to prevent them from further violations of Sections 1 of the Sherman Act.

7.     Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391.

## PARTIES

### Plaintiffs

8.     Plaintiff GC Advertising, LLC is an Alabama limited liability company with its principal place of business in Montgomery, Alabama.  During the Class Period, GC Advertising, LLC contracted with and paid premiums directly to BCBS-AL for health insurance for its employees.

9.     Plaintiff CB Roofing, LLC is an Alabama limited liability company with its principal place of business in Chelsea, Alabama.  During the Class Period, CB Roofing, LLC contracted with and paid premiums directly to BCBS-AL for health insurance for its employees.

### Defendants

10.     Defendant BCBS-AL is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama.  BCBS-AL is by far the largest provider of healthcare benefits in Alabama, providing coverage to more than three million people.   The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244.

11.     Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601.  It is owned and controlled by 38 health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names.  BCBSA was created by these plans and operates as the licensor.  Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance

3

coverage for approximately 100 million subscribers—or one in three—Americans. BCBSA itself does not provide health services and does not contract with physicians for the provisions of services, but it operates to create consistency and cooperation among its 38 members.  It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members.  The 38 plans fund Defendant BCBSA.

12.    The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

## FACTUAL ALLEGATIONS

13.    BCBS-AL enjoys unrivaled market dominance within the State of Alabama.  BCBS-AL insures over 80% of the subscribers covered by small and mid-size group plans in Alabama; demonstrating the complete lack of meaningful competition within this market.  For example, in 2008, BCBS-AL enrolled 96% of subscribers of full service commercial health insurance plans in the Alabama small group market, whether the insurance was offered through a health maintenance organization ("HMO") or through a preferred provider organization ("PPO") plan. This is the highest share of the small group insurance market achieved by any health insurance carrier in any state in the country.

14.    The situation in Alabama, while extraordinary, is not unique, however, as the BCBSA participants all reap similar benefits in their respective service areas across the United States.  For example, according to certain data reported by the U.S. Government Accountability Office, BCBS-AL enjoys 96% market share in Alabama; BCBS-AL's  market dominance in Alabama is the result of a systematic and longstanding agreement between and among  BCBS-AL  and the remaining insurance companies that license the Blue Cross and/or Blue Shield

brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the Alabama and the United States and to obstruct the entry of non-BCBS insurers, thereby eliminating competition. This illegal restraint is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with Defendant BCBSA. As detailed herein, the member health insurance plans of BCBSA have each entered into licensing arrangements with BCBSA that allocate the geographic markets for health insurance by limiting each Blue's activity outside of a designated service area, thereby preventing competition among BCBS companies. Moreover, these agreements effectively obstruct entry by non-BCBS insurers by, among other things, preventing the sale or transfer of established networks to non-Blue entities. These provisions have insulated BCBS-AL and the other Blues from competition by both Blues and non-Blues in each of their respective service areas. These provisions of the BCBS agreements operate as effective restraints on competition, and have no sufficient economic justification aside from protecting BCBS-AL and other Blues entities from competition.

15.     It is well recognized that competition drives down prices and this is true in health insurance as it is in other markets. Defendants' anticompetitive practices, by eliminating competition and reducing the choices available to health insurance consumers, have raised the premiums that residents in Alabama must pay to obtain health insurance. This has further allowed BCBS-AL to collect supracompetitive profits, higher than they would have experienced had there been unimpeded competition in the states in question. Indicia of supracompetitive profits include high medical loss ratios, high underwriting margins, and surpluses well above statutory requirements. Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

16.     By and through their agreement, BCBS-AL has been able to acquire and maintain a grossly disproportionate market share for health insurance products in Alabama. Consequently, BCBS-AL has benefited from inflated surpluses and increased underwriting margins, and has exploited the decreased medical loss ratios in the allocated market to the resulting detriment and antitrust injury of health insurance subscribers in Alabama.

17.     The Defendants' co-conspirators include other Blues that are not Defendants in this action.

18.     BCBS-AL and the other Blues are all independently owned and operated licensees of the BCBSA that conduct business in distinct geographical regions.   The Blues have engaged in a common course of illegal conduct to increase their profits to the detriment of subscribers.

## History and Background of the Blue Cross and Blue Shield Plans and BCBSA

19.     Blue Cross and Blue Shield represents a coordinated effort by health insurers to create a national brand with separate companies in local areas.  From inception, Blues companies have quickly captured dominant market shares in their local service areas.   The history of BCBSA demonstrates that the geographic restrictions in its trademark licenses originated in an effort to avoid competition between the various Blues, and to ensure that each Blue would retain a dominant position within its local service area.

20.     In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the Committee on Hospital Service adopted a set of principles to guide its approval of prepaid hospital plans.  One such principle was that the plans would not compete with each other.

6

21.     The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans.  These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (representing hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (representing physicians).

22.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and approve the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."  In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

23.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

24.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.

25.     From 1947-48, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans to be called "Blue Cross and Blue Shield Health Service, Inc.," but the proposal failed.  One reason given for its

failure was the AMA's fear that a restraint of trade action might result from such cooperation.

26.     Instead, to address competition from commercial insurers and competition from other Blue plans, and to ensure national cooperation among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.

27.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association. Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the "Blue Shield Association" in 1976.

28.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans. That same year, BCBSA's member plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.

29.     In 1987, the member plans of BCBSA held an "Assembly of Plans"— a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.

However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans an increasing problem that had caused complaints from many Blue plans.

30.     Subsequently, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans.  These illegal restraints are discussed below.

31.     Although Blue Cross and Blue Shield plans were originally set up as not-for-profit entities, during the 1980s and afterwards, they began to operate less like charitable entities and more like for-profit corporations.  Thus, in 1986, Congress revoked the Blues' tax-exempt status, leading to the formation of for-profit subsidiaries.  Consequently, the majority of the Blues converted to for-profit status, and they still operate as such today.  Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

## The BCBSA and Blues Entities

32.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."  The Association is a separate legal entity and it purports to promote the common interests of the independent Blues entities.  Defendant BCBSA and the Blue entities cover a large percentage of the subscribers in the managed care market in most states and in some local areas, and they also include a large percentage of doctors and hospitals in their network of contracted providers.  BCBSA states that over 100 million individuals are enrolled with BCBS-AL and co-conspirator Blue plans, approximately one in three individuals nationwide.

9

33.    The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States who would be potential competitors.  Indeed, the largest health insurance company in the nation by some measures is WellPoint, Inc., a BCBSA licensee.  Similarly, 15 of the 25 largest health insurance companies in the country are BCBSA licensees.  Absent the Association's licensing agreements with each of the Blues, these companies would compete against each other in the market for commercial health insurance.

34.    BCBSA's member plans are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.  Instead, with and through the Association, the Blues have divided health insurance markets throughout the United States to eliminate competition.  On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."

35.    BCBSA not only requires each individual Blue plan to agree to the territorial restrictions in the licensing agreements, but also serves as the epicenter for the Blues' communications and arrangements in furtherance of the anticompetitive agreements.  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS member companies . . . works cooperatively in a number of ways that create significant market advantages. . . ."

36.    BCBSA, as a separate legal entity, is a convenient vehicle for anticompetitive agreements between and among the otherwise economically

independent Blues, termed "Member Plans." The Association's board of directors consists of the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer. The board of directors holds meetings to discuss the administration and management of BCBSA and its Member Plans, while smaller committee meetings address specific health insurance issues. These meetings provide a forum for representatives of Member Plans to share information on such issues, and that information is later disseminated to all 38 members.

37.    In addition, BCBSA includes numerous committees governed by the Member Plans; it sponsors various meetings, seminars, and conferences attended by the Member Plans; and produces manuals, reports, list serves, and other correspondence to the Member Plans, all in furtherance of the conspiracy.

38.    Furthermore, BCBSA has strict rules and regulations that all members of BCBSA must obey concerning the Licensing Agreements members must adhere to and the guidelines proposed members must adhere to prior to joining the Association.[1]  Those regulations provide for amendment with a three-fourths vote of the Blues.

39.    The Association polices the compliance of all members of BCBSA with its rules and regulations. The Guidelines state that the Association's Plan Performance and Financial Standards Committee (the "PPFSC") "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that

---

[1]    These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

"BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

40.    The Association controls and administers the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a Member Plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a Member Plan's license.

41.    The Association controls the termination of existing members from BCBSA.  According to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

42.    As the foregoing demonstrates, BCBSA not only enters into anticompetitive agreements with the Blues entities to allocate markets, but also facilitates the cooperation and communications between the Blues to suppress competition within their respective areas of operation.  BCBSA is a convenient organization through which the Blues entities can enter into patently illegal territorial restraints between and among themselves.

12

## The Horizontal Agreements Not to Compete in the Licensing Arrangements Between BCBSA and Its Member Plans, Including BCBS-AL, Are *Per Se* Violations of the Sherman Act

43.　The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between would-be competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a *per se* violation of Section 1 of the Sherman Act.

44.　Through the License Agreements, each Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

45.　Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

46.　Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for

13

annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

47.    Therefore, each Blue Cross and Blue Shield licensee has agreed with the Association that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

48.    The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

49.    BCBSA and the Blues admit to the existence of territorial market divisions and the consequences of violating them.  For example, the former Blue Cross licensee in Ohio has publicly stated that the BCBSA Member Plans agreed to include territorial restrictions in the Guidelines in order to block the sale of one member plan to a non-member plan as that would create increased competition.

50.    Blue licensee, WellPoint, describes the restrictions on its ability to do business in its February 22, 2012 Form 10-K filed with the United States Securities and Exchange Commission, stating that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that the "license agreements with the BCBSA

contain certain requirements and restrictions regarding our operations and our use of the [BCBS] names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue . . . attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the [BCBS] names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national net revenue . . . attributable to health benefit plans must be sold, marketed, administered or underwritten under the[BCBS] names and marks."

51.    The Association imposes harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a Member Plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 22, 2012 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee which would "allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

52.    There are numerous Blue plans and non-Blue businesses owned by such plans that could and would compete effectively in designated service areas, but for the territorial restrictions.  Instead, the BCBS Defendants in those areas dominate the markets.   The territorial restrictions have therefore barred competition from the respective commercial health insurance markets.

53.    For example, with approximately 34 millions enrollees, WellPoint is the largest health insurer in the country by total medical enrollment, and is the BCBSA licensee for 14 states, and also serves the entire nation through its non-Blue brand subsidiary, UniCare.  However, WellPoint does not have a presence in

any of the BCBS Defendants' states.   But for the illegal territorial restrictions described herein, WellPoint would likely offer its health insurance products and services in those states and compete with BCBS Defendants.   Such competition would result in lower health care costs and premiums paid by affected enrollees.

54.      Similarly, Blue Cross and Blue Shield of Florida is the 15th largest health insurer in the country by total medical enrollment with more than seven million enrollees.   But for the illegal territorial restrictions, it could offer its health insurance services and products in   Alabama and other states and compete with BCBS-AL.    Such competition would result in lower health care costs and premiums paid by BCBS-AL enrollees.

55.      Therefore, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing Member Plans from competing with each other and with non-Blue plans.   These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

### The Anticompetitive Acquisition Restrictions in the BCBSA Licensing Agreements

56.      In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any Member Plan.   These provisions create a significant barrier to entry for companies that are not BCBSA members or their affiliates.   As such, they further restrain competition by helping BCBS companies to capture and maintain high market shares and elevate prices.

57.      First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member]

Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the Member Plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control or to acquire a substantial portion of the assets of a Member Plan, the Association—and through it, the Member Plans—could easily block its membership. Moreover, such a new member would be immediately limited by the BCBSA license's territorial restrictions. It would be forbidden from operating as a BCBS entity in a service area already inhabited by a BCBS entity, yet it would be required to make at least 66.7% of its revenue under the BCBS name. For many potential acquirers with a pre-existing footprint in the U.S. health insurance market, these two conditions would be impossible to meet.

58.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a Member Plan's license will terminate *automatically*: (1) if any institutional investor becomes beneficially entitled to 10% or more of the voting power of the Member Plan; (2) if any non-institutional investor becomes beneficially entitled to 5% or more of the voting power of the Member Plan; (3) if any person becomes beneficially entitled to 20% or more of the Member Plan's then outstanding common stock or equity securities; or (4) if the Member Plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the Member Plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to

17

10% or more of the voting power, no non-institutional investor is beneficially entitled to 5% or more of the voting power, and no person is beneficially entitled to 20% or more of the then outstanding common stock or equity securities.  These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Member Plans and of a majority weighted vote of the disinterested Member Plans.  These restraints effectively preclude the sale of a BCBSA member to a non-member entity absent special approval.

59.    These acquisition restraints reduce competition by substantially reducing the ability of non-member insurance companies to expand their business.  In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area or to acquire a network by buying some or all of an existing plan in that area.   Through the acquisition restrictions, BCBSA and the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  Blue provider networks may be the most cost effective due to historical tax breaks, favorable legislation, and long-term presence in a region.  In fact, national insurers rarely enter a new regional market without purchasing a large local firm.  By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

60.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the Member Plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency,

18

and protect themselves and each other from competition. The net effect is less competition and higher premium costs for consumers.

## The BCBSA Licensing Agreements Have Reduced Competition in Designated Areas

61.    BCBS-AL, as licensee, member, and parts of the governing body of BCBSA, has conspired with the other Member Plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines. Many of the Member Plans with which BCBS-AL t has conspired would otherwise be significant competitors of BCBS-AL, and they likewise would be competitors of each other.

62.    As noted above, WellPoint is the largest health insurer in the country by total medical enrollment. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross and Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross and Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in competition with BCBS-AL . Such competition would result in lower health care costs and premiums paid by affected enrollees.

63.    In addition to the foregoing example, there are dozens of other Blue plans that would and could compete in the designated areas but for the illegal territorial restrictions. In addition, the BCBS-AL could compete with others. As alleged above, 15 of the 25 largest health insurance companies in the country are

Blue plans.  If all of these plans, together with all other BCBSA members, were able to compete in each other's territories, the result would be lower costs and, thus, lower premiums paid by enrollees.

## CLASS ACTION ALLEGATIONS

64.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of similarly situated persons.  Plaintiffs bring this action seeking damages and permanent injunctive relief on behalf of a class of plaintiffs pursuant to the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Class") defined as:

> All persons or entities who, from March 1, 2008, to the present (the "Class Period"), have paid health insurance premiums, all or in part, to BCBS-AL for individual health insurance or for small group full-service commercial health insurance.

> Additionally, Plaintiffs seek a class on behalf of:

> All persons or entities who, from March 1, 2008, to the present (the "Class Period"), have paid health insurance premiums, all or in part, to any BCBSA licensee for individual health insurance or for small group full-service commercial health insurance.

65.    The Plaintiffs are members of the Class, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are represented by counsel competent and experienced in the prosecution of class action antitrust litigation.   Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

66.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class members.  The Class members are so numerous that joinder of all members is impracticable.

67.     Defendants' relationships with the Class members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.

68.     Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class members, thereby making appropriate final injunctive relief with respect to Class members as a whole.

69.     There will be no extraordinary difficulty in the management of this class action.  Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class members, many of which cannot be seriously disputed, are the following:

    i.     whether the BCBSA and its member Blues including BCBS-AL, entered into agreements to divide geographic markets for health insurance;

    ii.    whether such agreements constitute a contract, combination, or conspiracy pursuant to Section 1 of the Sherman Act;

    iii.   whether such agreements constitute illegal restraints of trade in violation of Section 1 of the Sherman Act;

    iv.   whether virtually all Class members have suffered injury or are threatened to suffer injury flowing directly from such agreements to divide geographic markets for health insurance alleged herein;

    v.    the proper measure of damages sustained by the Class as a result of the agreements alleged herein; and

    vi.   the appropriate injunctive relief to enjoin Defendants' illegal conduct.

70.     These and other questions of law and fact are common to Class members and predominate over any issues affecting only individual Class members.

71.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

72.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class members are small in relation to the expense and burden of individual litigation and, therefore, it is highly impractical for such Class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## VIOLATIONS ALLEGED

### Count One
(Contract, Combination, or Conspiracy in Restraint of Trade—*Per Se*
and Rule of Reason Violation of Section 1 of the Sherman Act)

73.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if set forth herein.

74.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities—including BCBS-AL Defendant—represent a contract, combination, and conspiracy to unreasonably restrain trade within the meaning of Section 1 of the Sherman Act.

75.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-AL Defendant have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members.  By so doing, the BCBSA members—including BCBS-AL Defendant—have agreed to suppress competition and increase prices for individual and small group health insurance sold in their respective territories in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

76.   As a direct and proximate result of BCBS-AL's continuing violations of Section 1 of the Sherman Act, Plaintiffs and other members of the Class have suffered injury and damages of the type that the federal antitrust laws were designed to prevent.   Such injury flows directly from that which makes Defendants' conduct unlawful.   These damages consist of having paid higher health insurance premiums to BCBS-AL's than they would have paid with increased competition and but for the anticompetitive agreement.

77.   Plaintiffs and the Class seek monetary damages from BCBS-AL and BCBSA for their violations of Section 1 of the Sherman Act.

78.   The Defendants' unlawful conduct threatens to continue to injure the Plaintiffs and the Class members.   Plaintiffs and the Class seek a permanent injunction prohibiting BCBS-AL and BCBSA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

A.   Determine that this action may be maintained as a class action under Federal Rule of Civil Procedure Rule 23;

B.   Adjudge and decree that BCBSA and BCBS-AL have violated Section 1 of the Sherman Act;

C.   Permanently enjoin BCBSA and BCBS-AL from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

D.   Award Plaintiffs and the Class damages in the form of three times the amount by which premiums charged by BCBS-AL have been artificially inflated above their competitive levels during the Class Period;

E.   Award costs and attorneys' fees to Plaintiffs;

23

F.     For a trial by jury; and

G.     Award any such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiff hereby demands a trial by jury on all issues.


Respectfully submitted this 24th day of July, 2012.


*/s/ Greg L. Davis*
Greg L. Davis
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, Alabama 36117
Telephone:  (334) 832-9080
gldavis@knology.net


## REQUEST FOR SERVICE

Pursuant to FRCP 4.1 and 4.2, Plaintiffs request service of the foregoing Complaint by certified mail.

*/s/ Greg L. Davis*
Of Counsel

<u>PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:</u>

BLUE CROSS AND BLUE SHIELD OF ALABAMA
Attn: Legal Department
450 Riverchase Parkway East
Birmingham, AL 35244-2858

BLUE CROSS AND BLUE SHIELD ASSOCIATION
Attn: Legal Department
225 North Michigan Avenue
Chicago, IL 60601

*/s/ Greg L. Davis*
OF COUNSEL

# EXHIBIT 1

Exhibit 1: Market Share of Blue Cross and Blue Shield Entities in 2008, 2010, and 2011

| STATE | All Commercial Insurance (PPO + HMO) 2011 AMA Comprehensive Study[2] | October 2011 Kaiser Family Foundation Small Group / Individual Insurance Market for 2010[3] | Blue Cross and Blue Shield Market Share for Small Group Health Insurance Carriers (2008 Survey by GAO)[4] |
|---|---|---|---|
| Alabama | 90 | 96 / 86 | 96 |
| Alaska | 74 | 71 / 59 | 77 |
| Delaware | 70 | 57 / 50 | 58 |
| Hawaii | 62 | 67 / 52 | N/A |
| Illinois | 55 | 52 / 66 | 51 |
| Iowa | 56 | 62 / 84 | 60 |
| Kansas | 53 | 62 / 46 | N/A |
| North Carolina | 59 | 64 / 81 | 65 |
| South Carolina | 55 | 67 / 54 | 56 |
| Tennessee | 59 | 70 / 36 | 68 |

[2] AMERICAN MEDICAL ASSOCIATION, COMPETITION IN HEALTH INSURANCE: A COMPREHENSIVE STUDY OF U.S. MARKETS (2011), *available at* https://catalog.ama-assn.org/Catalog/product/product_detail.jsp?productId=prod1940016 (subscription required).

[3] THE HENRY J. KAISER FAMILY FOUNDATION, FOCUS ON HEALTH REFORM: HOW COMPETITIVE ARE STATE INSURANCE MARKETS (2011), *available at* http://www.kff.org/healthreform/upload/8242.pdf.

[4] U.S. GOVERNMENT ACCOUNTABILITY OFFICE, PRIVATE HEALTH INSURANCE: 2008 SURVEY RESULTS ON NUMBER AND MARKET SHARE OF CARRIERS IN THE SMALL GROUP HEALTH INSURANCE MARKET (2009), *available at* http://www.gao.gov/new.items/d09363r.pdf.