## U.S. District Court
## Middle District of Louisiana (Baton Rouge)
## CIVIL DOCKET FOR CASE #: 3:12-cv-00421-JJB-SCR

Jarreau v. Louisiana Health Service & Indemnity Company         Date Filed: 07/13/2012
Assigned to: Judge James J. Brady                               Jury Demand: None
Referred to: Magistrate Judge Stephen C. Riedlinger            Nature of Suit: 791 Labor: E.R.I.S.A.
Case in other court: 18th JDC, Parish of Pointe Coupee,        Jurisdiction: Federal Question
      44666
Cause: 29:1001 E.R.I.S.A.: Employee Retirement

### Plaintiff

**Hilda Jarreau**                                 represented by  **Nicholas R. Rockforte**
*Individually and on behalf of all others*                       Pendley, Baudin & Coffin, LLP
*similary situated*                                              P.O. Drawer 71
                                                                 24110 Eden St.
                                                                 Plaquemine, LA 70764-0071
                                                                 225-687-6396
                                                                 Fax: 225-687-6398
                                                                 Email: nrockforte@pbclawfirm.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Christopher L. Coffin**
                                                                 Pendley, Baudin & Coffin, LLP
                                                                 P.O. Drawer 71
                                                                 24110 Eden St.
                                                                 Plaquemine, LA 70764-0071
                                                                 225-687-6396
                                                                 Fax: 225-687-6398
                                                                 Email: ccoffin@pbclawfirm.com
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Patrick Wayne Pendley**
                                                                 Pendley, Baudin & Coffin, LLP
                                                                 P.O. Drawer 71
                                                                 24110 Eden St.
                                                                 Plaquemine, LA 70764-0071
                                                                 225-687-6396
                                                                 Fax: 225-687-6398
                                                                 Email: pwpendley@pbclawfirm.com
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Stanley P. Baudin**
                                                                 Pendley, Baudin & Coffin, LLP
                                                                 P.O. Drawer 71
                                                                 24110 Eden St.
                                                                 Plaquemine, LA 70764-0071
                                                                 225-687-6396

Fax: 225-687-6398
Email: sbaudin@pbclawfirm.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Louisiana Health Service &**              represented by  **Charles A. O'Brien , III**
**Indemnity Company**                                       P.O. Box 98029
*doing business as*                                         5525 Reitz Avenue
Blue Cross Blue Shield Of Louisiana                         Baton Rouge, LA 70898-9029
                                                            225-295-2454
                                                            Fax: 225-297-2760 FAX
                                                            Email: andy.o'brien@bcbsla.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Tony Clayton**
                                                            Clayton & Fruge
                                                            607 North Alexander Avenue
                                                            Port Allen, LA 70767
                                                            225-344-7000
                                                            Fax: 225-383-7631
                                                            Email: tclaytonlaw@aol.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Allison Nunley Pham**
                                                            5525 Reitz Avenue
                                                            Baton Rouge, LA 70809
                                                            225-295-2199
                                                            Email: allison.pham@bcbsla.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Michael Paul Fruge'**
                                                            Clayton and Fruge
                                                            3741 Highway 1 South
                                                            Port Allen, LA 70767
                                                            225-344-7000
                                                            Fax: 225-383-7631
                                                            Email:
                                                            michaelfruge@claytonfrugelaw.com
                                                            *ATTORNEY TO BE NOTICED*

**Movant**

**The Blue Cross and Blue Shield**         represented by  **John Stone Campbell , III**
**Association**                                             Taylor, Porter, Brooks & Phillips
                                                            P. O. Box 2471
                                                            Baton Rouge, LA 70821
                                                            225-387-3221

Fax: 225-346-8049 FAX
Email:
johnstone.campbell@taylorporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Edward Laytin**
Kirkland and Ellis, LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000
Email: daniel.laytin@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David John Zott**
Kirkland and Ellis, LLP
300 North LaSalle Street
Chicago, IL 60654
312-862-2000
*PRO HAC VICE*

**Ian Robert Conner**
Kirkland & Ellis LLP
655 Fifteenth Street
N.W. Washington, D. 20005
202-879-5000
*PRO HAC VICE*

**L. Adam Thames**
Taylor, Porter, Brooks & Phillips
P. O. Box 2471
Baton Rouge, LA 70821
225-381-0272
Fax: 225-346-8049
Email: adam.thames@taylorporter.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 07/13/2012 | 1 | NOTICE OF REMOVAL from 18th JDC, Parish of Pointe Coupee, Case Number 44,666. (Filing fee $ 350 receipt number 053N-840837), filed by Louisiana Health Service & Indemnity Company. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit State Court Pleadings)(O'Brien, Charles) (Entered: 07/13/2012) |
| 07/13/2012 | 7 | MOTION to Intervene by The Blue Cross and Blue Shield Association. (Originally filed in State Court proceeding on July 9, 2012, still pending at the time of removal) (Attachments: # 1 Memorandum in Support)(JDL) (Entered: 07/17/2012) |

| 07/16/2012 | 2 | Letter to Attorney Don Barrett who is Co-Counsel for plaintiff. Attorney is not admitted to practice in LAMD. (JDL) (Entered: 07/16/2012) |
|---|---|---|
| 07/16/2012 | 3 | Letter to Attorney Gordon Ball who is Co-Counsel for plaintiff. Attorney is not admitted to practice in LAMD. (JDL) (Entered: 07/16/2012) |
| 07/16/2012 | 4 | Letter to Attorney Thomas S. Scott, Jr. who is Co-Counsel for plaintiff. Attorney is not admitted to practice in LAMD. (JDL) (Entered: 07/16/2012) |
| 07/16/2012 | 5 | Letter to Attorney Christopher T. Cain who is Co-Counsel for plaintiff. Attorney is not admitted to practice in LAMD. (JDL) (Entered: 07/16/2012) |
| 07/16/2012 | 6 | AMENDED NOTICE OF REMOVAL against Hilda Jarreau, filed by Louisiana Health Service & Indemnity Company. (Attachments: # 1 Civil Cover Sheet)(O'Brien, Charles) (Entered: 07/16/2012) |
| 07/17/2012 | | MOTION(S) REFERRED: 7 MOTION to Intervene. This motion is now pending before the USMJ. (JDL) (Entered: 07/17/2012) |
| 07/23/2012 | 8 | Consent MOTION for Extension of Time to File Answer by Louisiana Health Service & Indemnity Company. (Attachments: # 1 Proposed Pleading; Order) (O'Brien, Charles) (Entered: 07/23/2012) |
| 07/23/2012 | 9 | Corporate Disclosure Statement by Louisiana Health Service & Indemnity Company. (O'Brien, Charles) (Entered: 07/23/2012) |
| 07/23/2012 | 10 | ORDER granting 8 Motion for Extension of Time to File Responsive Pleadings to 1 Notice of Removal (Petition for Damages). Louisiana Health Service & Indemnity Company answer due 8/30/2012. Signed by Magistrate Judge Stephen C. Riedlinger on 7/23/2012. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 07/23/2012) |
| 08/01/2012 | 11 | MOTION for David John Zott to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-846704) by The Blue Cross and Blue Shield Association. (Attachments: # 1 Affidavit of David John Zott, # 2 Attachment Zott Certificate of Good Standing, # 3 Proposed Pleading; Order for Admission of Visiting Attorney -- Zott)(Campbell, John) (Entered: 08/01/2012) |
| 08/01/2012 | 12 | MOTION for Daniel Edward Laytin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-846709) by The Blue Cross and Blue Shield Association. (Attachments: # 1 Affidavit of Daniel Edward Laytin, # 2 Attachment Laytin Certificate of Good Standing, # 3 Proposed Pleading; Laytin Order for Admission)(Campbell, John) (Entered: 08/01/2012) |
| 08/01/2012 | | MOTION(S) REFERRED: 12 MOTION for Daniel Edward Laytin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-846709) MOTION for Daniel Edward Laytin to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-846709), 11 MOTION for David John Zott to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-846704) MOTION for David John Zott to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-846704). This motion is now pending before the USMJ. (NLT) (Entered: 08/01/2012) |
| | | |

| 08/01/2012 | 13 | ORDER granting 11 Motion for David John Zott to Appear Pro Hac Vice for The Blue Cross and Blue Shield Association. Signed by Magistrate Judge Stephen C. Riedlinger on 8/1/2012. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 08/01/2012) |
|---|---|---|
| 08/01/2012 | 14 | ORDER granting 12 Motion for Daniel Edward Laytin to Appear Pro Hac Vice for The Blue Cross and Blue Shield Association. Signed by Magistrate Judge Stephen C. Riedlinger on 8/1/2012. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.)(Riedlinger, Stephen) (Entered: 08/01/2012) |
| 08/02/2012 | 15 | ORDER as to the 7 MOTION to Intervene filed by The Blue Cross and Blue Shield Association, that, by 8/10/2012, proposed intervenor Blue Cross and Blue Shield Association shall file a supplemental supporting memorandum citing relevant applicable provisions of the FRCP and federal cases. FURTHER ORDERED that all other parties shall have until 8/31/2012 to file any opposition or other response to the Motion to Intervene. Signed by Magistrate Judge Stephen C. Riedlinger on 8/2/2012. (JDL) (Entered: 08/02/2012) |
| 08/09/2012 | 16 | Supplemental MEMORANDUM in Support of 7 MOTION to Intervene filed by The Blue Cross and Blue Shield Association. (Attachments: # 1 Exhibit Exhibit A, # 2 Proposed Pleading; Proposed Order)(Laytin, Daniel) (Entered: 08/09/2012) |
| 08/10/2012 | 17 | MOTION to Remand by All Plaintiffs. (Attachments: # 1 Memorandum in Support, # 2 Exhibit)(Pendley, Patrick) (Attachment 2 replaced on 8/10/2012) (SMG). (Entered: 08/10/2012) |
| 08/10/2012 | | MOTION(S) REFERRED: 17 MOTION to Remand. This motion is now pending before the USMJ. (SMG) (Entered: 08/10/2012) |
| 08/10/2012 | 18 | MEMORANDUM in Support of 7 MOTION to Intervene filed by Louisiana Health Service & Indemnity Company. (O'Brien, Charles) (Entered: 08/10/2012) |
| 08/13/2012 | 19 | MOTION for Ian Robert Conner to Appear Pro Hac Vice (Filing fee $100.00, Receipt Number 053N-850297) by The Blue Cross and Blue Shield Association. (Attachments: # 1 Affidavit of Ian Robert Conner, # 2 Exhibit A - - Certificate of Good Standing, # 3 Proposed Pleading; Order for Admission of Visiting Attorney)(Campbell, John) (Entered: 08/13/2012) |
| 08/14/2012 | 20 | ORDER granting 19 Motion for Admission of Visiting Attorney. Robert Conner to appear pro hac vice for the Blue Cross and Blue Shield Association. Signed by Magistrate Judge Stephen C. Riedlinger on 8/14/2012. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 08/14/2012) |
| 08/28/2012 | 21 | Joint MOTION for Extension of Time to File Opposition to Plaintiffs' Motion to Remand, Opposition or Other Response to Motion to Intervene of The Blue Cross and Blue Shield Association, Motions under FRCP 12(b), and Responsive Pleadings by All Parties. (Attachments: # 1 Proposed Pleading; |

| | | |
|---|---|---|
| | | Order)(Campbell, John) (Entered: 08/28/2012) |
| 08/29/2012 | 22 | ORDER granting 21 Joint Motion to Extend Upcoming Deadlines. Responses to 7 Motion to Intervene and 17 Motion to Remand due by 9/7/2012. Signed by Magistrate Judge Stephen C. Riedlinger on 8/29/2012. (This is a TEXT ENTRY ONLY. There is no hyperlink or PDF document associated with this entry.) (Riedlinger, Stephen) (Entered: 08/29/2012) |
| 09/06/2012 | 23 | 90-DAY CONFERENCE ORDER: Scheduling Conference set for 11/1/2012 at 10:00 AM in chambers before Magistrate Judge Stephen C. Riedlinger. Status Report due by 10/18/2012. Signed by Magistrate Judge Stephen C. Riedlinger on 9/6/12. (BNW) (Entered: 09/06/2012) |
| 09/07/2012 | 24 | RESPONSE in Opposition to 17 MOTION to Remand filed by Louisiana Health Service & Indemnity Company. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(O'Brien, Charles) (Entered: 09/07/2012) |
| 09/07/2012 | 25 | MOTION for Extension of Time to File Response to 7 MOTION to Intervene by All Plaintiffs. (Baudin, Stanley) (Entered: 09/07/2012) |
| 09/07/2012 | 26 | Joint MOTION for Extension of Time Deadlines by Louisiana Health Service & Indemnity Company. (Pham, Allison) (Entered: 09/07/2012) |
| 09/10/2012 | | MOTION(S) REFERRED: 25 MOTION for Extension of Time to File Response to 7 MOTION to Intervene. This motion is now pending before the USMJ. (LH) (Entered: 09/10/2012) |
| 09/10/2012 | | MOTION(S) REFERRED: 26 First MOTION for Extension of Time Deadlines. This motion is now pending before the USMJ. (SMG) (Entered: 09/10/2012) |
| 09/10/2012 | 27 | ORDER granting 25 Motion for Extension of Time to File Response to Blue Cross and Blue Shield Association's Motion to Intervene.. Signed by Magistrate Judge Stephen C. Riedlinger on 9/10/2012. (LH) (Entered: 09/10/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/10/2012 10:44:15 | | |
| **PACER Login:** | ke1159 | **Client Code:** | 20098-0208/43911 |
| **Description:** | Docket Report | **Search Criteria:** | 3:12-cv-00421-JJB-SCR |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Hilda Jarreau, Individually, and on Behalf of All Others Similarly Situated | Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana |

| (b) County of Residence of First Listed Plaintiff    Point Coupee Parish | County of Residence of First Listed Defendant _____ |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY)<br><br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c) Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |
|---|---|
| See Attachment "A" | See Attachment "A" |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☒ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding    ☒ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
1.) 29 USC 1001, et seq.; 2.) 15 USC 1, et seq.

Brief description of cause:
1.) Employee Welfare Benefit Plan; 2.) Sherman Anti-Trust Act

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint.
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions)

JUDGE _____ DOCKET NUMBER _____

DATE
7/3/12

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## ATTACHMENT "A"

### Counsel for Plaintiff:

Nicholas R. Rockforte (LA Bar No. 31305)
Patrick W. Pendley (LA Bar No. 14021)
Stan P. Baudin (LA Bar No. 22937)
Christopher L. Coffin (LA Bar No. 27902)
PENDLEY, BAUDIN & COFFIN, L.L.P.
P.O. Drawer 71
Plaquemine, LA 70765
Telephone: (225) 687-6396
Facsimile:  (225) 687-6398
pwpendley@pbclawfirm.com

Don Barrett
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, MS 39095-0927
Telephone:  (662) 834-9168
Facsimile:  (662) 834-2628
dbarrett@barrettlawgroup.com

Gordon Ball (TN BPR No. 1135)
gball@ballandscott.com
Thomas S. Scott, Jr. (TN BPR No. 1086)
scott@ballandscott.com
Christopher T. Cain (TN BPR No. 19997)
cain@ballandscott.com
BALL & SCOTT LAW OFFICES
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902
Telephone:  (865) 525-7028
Facsimile:  (865) 525-4679

### Counsel for Defendant, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana:

A.M. "Tony" Clayton (#21191)
Michael P. Frugé (#26287)
CLAYTON, FRUGÉ & WARD
3741 La. Highway 1 South
Port Allen, Louisiana 70767
Telephone: (225) 344-7000
Facsimile: (225) 383-7631
tclaytonlaw@aol.com
michaelfruge@claytonfrugelaw.com

Charles A. O'Brien, III (LA Bar No. 10143)
Allison N. Pham (LA Bar No. 29369)
5525 Reitz Avenue (70809)
Post Office Box 98029
Baton Rouge, Louisiana 70898-9029
Telephone:   (225) 295-2454
Facsimile:    (225) 297-2760
Andy.O'Brien@bcbsla.com
Allison.Pham@bcbsla.com

**Counsel for Intervenor, The Blue Cross and Blue Shield Association:**

John Stone Campbell, III (LA Bar No. 23674)
L. Adam Thames (LA Bar No. 32722)
TAYLOR, PORTER, BROOKS & PHILLIPS LLP
P.O. Box 2471
Baton Rouge, LA 70821
Telephone:  (225) 387-3211
Facsimile:  (225) 215-8704

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**
**BATON ROUGE DIVISION**

| | | |
|---|---|---|
| **HILDA JARREAU, et al,** | * | **CIVIL ACTION NO. 12-421** |
| **Plaintiffs** | | |
| | * | |
| **VERSUS** | | **SECTION " "** |
| | * | |
| **LOUISIANA HEALTH SERVICE &** | | **JUDGE** _____ |
| **INDEMNITY COMPANY D/B/A** | * | |
| **BLUE CROSS BLUE SHIELD OF** | | |
| **LOUISIANA,** | * | |
| **Defendant** | | |
| | * | **MAGISTRATE** _____ |

\*     \*     \*     \*     \*     \*

**NOTICE OF REMOVAL**

NOW INTO COURT, through undersigned counsel, comes Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBSLA") and files this Notice of Removal of this case from the 18ʰ Judicial District Court, Parish of Pointe Coupee, State of Louisiana, in which it is now pending, to the United States District Court, Middle District of Louisiana, Baton Rouge Division.   In support of this Notice of Removal, Defendant BCBSLA states:

1.

On June 6, 2012, Plaintiff Hilda Jarreau, individually and on behalf of all others similarly situated, commenced the civil action entitled *Hilda Jarreau, Individually and on Behalf of All Others Similarly Situated versus Louisiana Health Service & Indemnity Company d/b/a Blue Cross Blue Shield of Louisiana,* in the 18ʰ Judicial District Court for the Parish of Pointe Coupee, State of Louisiana, bearing Case Number 44666, Division "C". The 18ʰ Judicial District Court for the Parish of Pointe Coupee is

within the jurisdiction of the Middle District of Louisiana.  Defendant BCBSLA was served with a copy of the Class Action Petition for Damages on June 13, 2012.

2.

Pursuant to 28 U.S.C. § 1446(a), a copy of all pleadings, process, and orders that have been served on Defendant are attached hereto as Exhibit "A."

3.

In support of this Notice of Removal, Defendant BCBSLA states this Notice of Removal has been filed by Defendant within thirty days of service of the Class Action Petition for Damages, as required by 28 U.S.C. § 1446(b).

4.

This class action lawsuit generally arises out of Plaintiff's allegations that BCBSLA wrongfully inflated premiums charged to Louisiana subscribers as a result of an ongoing conspiracy.  Plaintiff alleges that BCBSLA, 37 other Blue Cross Blue Shield member health plans, and the Blue Cross and Blue Shield Association ("BCBSA") engaged in anti-competitive conduct to establish and maintain monopoly power throughout Louisiana.  BCBSA is named as a co-conspirator only; the 37 other Blue Plans, though described as co-conspirators, are not otherwise joined or named; and the Association and other Blue Plans were clearly intentionally not made parties to this suit to attempt to avoid federal jurisdiction.

5.

Plaintiff alleges that BCBSLA and BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce.[1]  Specifically, Plaintiff alleges that Defendant and BCBSA have committed unfair trade practices, constituting a

---

[1] Class Action Petition for Damages, p. 3.

- 2 -

scheme to defraud involving the use of interstate commerce as provided for in the Sherman Anti-Trust Act, 15 U.S.C. §§ 1-7 ("Sherman Act"). These allegations have a federal law basis. Plaintiff's suit arises under the Constitution and the laws of the United States within the meaning of 28 U.S.C. § 1331 and § 1337(a), conferring jurisdiction in a United States District Court because Plaintiff's statement of her own cause of action in her pleadings shows that it arises under the Sherman Act by basing this cause of action on the impact on the regulation of interstate commerce against restraints and monopolies. Plaintiff's claims are wrapped entirely into questions of federal law and policy. These close ties are likely to cause confusion by the overlap of divergent legal theories of relief.

6.

Plaintiff's allegations involve those of restricting interstate commerce and violations of both antitrust and anti-monopoly laws. Plaintiff alleges that BCBSLA acted in conspiracy with BCBSA, located in Chicago, Illinois. BCBSLA does not own the licensed Blue Marks; BCBSA owns them. Further, BCBSA is the common party to all other allegedly co-conspiring Blue Plans by virtue of their respective licensing agreements. BCBSA therefore has an interest relating to the subject of this action and its absence as a defendant herein, as a practical matter, impedes its ability to protect that interest. Accordingly, BCBSA has been improperly omitted as a defendant from this lawsuit. Had BCBSA been properly named as a defendant, the parties would be minimally diverse, and removal would be proper under 28 U.S.C. § 1332(d). BCBSA's motion to intervene as a defendant in this action is pending. If and when that motion is granted, BCBSA intends to join in removal and explain further why removal under 28 U.S.C. § 1332(d) is appropriate.

- 3 -

7.

Though Plaintiff's petition purports to exclude certain participants to avoid federal jurisdiction, those specifically included in the purported class encompasses all persons and entities who paid health insurance premiums to BCBSLA for individual or small group full-service commercial health insurance at any time since June 6, 2002. These small group plans are predominately employee welfare benefits plans within the meaning of Section 3(1), 29 U.S.C. §1002(1), of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq*.

8.

Plaintiff's claim(s) arising from the small group plans arises under Section 502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B), and is completely preempted by ERISA. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S. Ct. 1549 (1987).

9.

Plaintiff's claim(s) is necessarily federal, and therefore removable by Defendant, under the "complete preemption" doctrine. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S. Ct. 1549, 1552, 1557-58 (1987); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S. Ct. 1542, 1546-48 (1987).

10.

The district courts of the United States have original jurisdiction over claims brought under ERISA and the Sherman Anti-Trust Act. *See* ERISA Section 502(e), 29 U.S.C. § 1132(e); Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7; 28 U.S.C. § 1331; and 28 U.S.C. § 1337.

- 4 -

11.

Because this action arises under the Court's federal question jurisdiction (see *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 107 S. Ct. 1542 (1987)), this action is properly removable from the 18th Judicial District Court for the Parish of Pointe Coupee, State of Louisiana, to the United States District Court for the Middle District of Louisiana, Baton Rouge Division pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337.

12.

Additionally, considering that at least BCBSA, if not all 37 Blue Plans, rightfully should and likely will be party to this litigation, the real parties at interest are diverse and this matter is removable pursuant to 28 U.S.C. § 1332(d).

13.

This notice is executed pursuant to Federal Rule of Civil Procedure 11.

WHEREFORE, Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana prays that this action proceed in this Court as an action properly removed hereto from the 18th Judicial District Court for the Parish of Pointe Coupee, State of Louisiana.

Respectfully Submitted:


By:    A.M. "Tony" Clayton (#21191)
       Michael P. Frugé (#26287)
       CLAYTON, FRUGÉ & WARD
       3741 La. Highway 1 South
       Port Allen, Louisiana 70767
       Telephone: (225) 344-7000
       Facsimile: (225) 383-7631
       tclaytonlaw@aol.com
       michaelfruge@claytonfrugelaw.com

       *and*

       /s/ Charles A. O'Brien

       _____

       Charles A. O'Brien, III (LA Bar No. 10143)
       Allison N. Pham (LA Bar No. 29369)
       5525 Reitz Avenue (70809)
       Post Office Box 98029
       Baton Rouge, Louisiana 70898-9029
       Telephone:   (225) 295-2454
       Facsimile:    (225) 297-2760
       Andy.O'Brien@bcbsla.com
       Allison.Pham@bcbsla.com

       Attorneys for Defendant Louisiana Health Service &
       Indemnity Company d/b/a Blue Cross and Blue
       Shield of Louisiana

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing **NOTICE OF REMOVAL** has been served on all counsel of record by depositing a copy of same in the United States Mail, postage prepaid and properly addressed, to his last known addresses as follows:

Nicholas R. Rockforte
Patrick W. Pendley
Stan P. Baudin
Christopher L. Coffin
PENDLEY, BAUDIN & COFFIN, L.L.P.
P.O. Drawer 71
Plaquemine, Louisiana 70765

Don Barrett
BARRETT LAW GROUP, P.A.
404 Court Square North
Lexington, Mississippi 39095-0927

Gordon Ball
Thomas S. Scott, Jr.
Christopher T. Cain
BALL & SCOTT LAW Offices
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902

Baton Rouge, Louisiana, this 13th day of July, 2012.

/s/ Charles A. O'Brien

_____

Charles A. O'Brien

-7-

# CITATION

18TH JUDICIAL DISTRICT COURT
PARISH OF POINTE COUPEE
STATE OF LOUISIANA

LEGAL AFFAIRS

JUN 13 2012

**HILDA JARREAU**

**VERSUS 44666C**

**LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY ET AL**

STATE OF LOUISIANA AND SAID COURT TO:

**LOUISIANA HEALTH SERVICES & INDEMNITY COMPANY**
**D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA**
**THROUGH ITS REGISTERED AGENT:**
**MS. MICHELE S. CALANDRO**
**5525 REITZ AVENUE**
**BATON ROUGE, LA 70809**

YOU ARE HEREBY SUMMONED TO COMPLY WITH THE DEMANDS CONTAINED IN THE

**CLASS ACTION PETITION FOR DAMAGES**

**FILED BY HILDA JARREAU**

IN THE ABOVE ENTITLED AND NUMBERED CAUSE, A COPY OF WHICH ACCOMPANIES THIS
CITATION, OR FILE YOUR ANSWER OR OTHER PLEADINGS IN THE OFFICE OF THE CLERK OF
COURT OF THE 18TH JUDICIAL DISTRICT COURT, FOR THE SAID PARISH, AT THE CITY OF NEW
ROADS, LOUISIANA, WITHIN FIFTEEN (15) DAYS AFTER SERVICE HEREOF. YOUR FAILURE TO
COMPLY HEREWITH WILL SUBJECT YOU TO THE PENALTY OF DEFAULT JUDGMENT AGAINST
YOU.

WITNESS THE HONORABLE JUDGES FOR THE 18TH JUDICIAL DISTRICT COURT AT NEW ROADS,
LOUISIANA, JUNE 6, 2012.

LANELL SWINDLER LANDRY
CLERK OF COURT
P.O. DRAWER 38
NEW ROADS, LA  70760

BY: _____
DEPUTY CLERK OF COURT

**EXHIBIT**

A

18TH JUDICIAL DISTRICT COURT

PARISH OF POINTE COUPEE

STATE OF LOUISIANA

DOCKET NO.: 44(dele                                    DIVISION: C

**HILDA JARREAU, INDIVIDUALLY,
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**

**VERSUS**

**LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY
D/B/A BLUE CROSS BLUE SHIELD OF LOUISIANA**

---

## CLASS ACTION PETITION FOR DAMAGES

**NOW INTO COURT** comes the Plaintiff, Hilda Jarreau ("Plaintiff"), individually, in her capacity as surviving spouse and heir by Judgment of Possession of the Estate of Edward J. Jarreau, and on behalf of all others similarly situated, through undersigned counsel, who brings this action for damages and restitution pursuant to Louisiana law.

### I.   NATURE OF ACTION

1.      This is a class action brought on behalf of subscribers of Louisiana Health Service & Indemnity Company D/B/A Blue Cross Blue Shield of Louisiana (hereinafter "BCBS-LA") for damages and restitution.  Specifically, this action seeks to recover damages in the form of a refund of inflated premiums that BCBS-LA has charged Louisiana subscribers as a result of an ongoing conspiracy in violation of Louisiana Revised Statutes 51:122, *et seq.* BCBS-LA and the thirty-seven (37) other Blue Cross Blue Shield Association ("BCBSA") member health plans, and as a result of anti-competitive conduct BCBS-LA has engaged in to establish and maintain monopoly power throughout Louisiana.

2.      BCBS-LA is by far the largest health insurance company operating in Louisiana, and currently exercises market power in the commercial health insurance market throughout Louisiana.  According to the Louisiana Department of Insurance, 54 percent of the Louisiana residents who subscribe to full-service commercial health insurance (group plans and individual policies) are subscribers of BCBS-LA – vastly more than the next largest full-service commercial insurer, United Healthcare Insurance Company, which carries just 9 percent of such subscribers.

3.      The dominant market share enjoyed by BCBS-LA is the direct result of an illegal

–1–

conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with BCBS-LA, and that BCBS-LA will have the exclusive right to do business in the State of Louisiana, so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas.   These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including BCBS-LA.   Through the terms of these *per se* illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCBS-LA, have explicitly agreed not to compete with one another, in direct violation of Louisiana's antitrust and anti-monopoly laws, specifically La. R.S. 51:122, *et seq*.   By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.   BCBS-LA's illegal conspiracy has perpetuated its monopoly power throughout Louisiana, which has resulted in skyrocketing premiums for Louisiana BCBS-LA enrollees for over a decade.   BCBS-LA's anti-competitive behavior, and the lack of competition BCBS-LA faces because of its monopoly power and anti-competitive behavior, has led to higher costs, resulting in higher premiums charged to BCBS-LA customers.   As a result of these inflated premiums, BCBS-LA now has a surplus of more than $620 million.

5.   These inflated premiums would not be possible if the market for health insurance in Louisiana were truly competitive.   Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as BCBS-LA and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Louisiana.

## II.   JURISDICTION AND VENUE

6.   This Court has jurisdiction over this action and venue is proper because Plaintiff and her deceased husband, Edward Jarreau, inter alia: (1) entered into contracts with BCBS-LA for health insurance in this Parish; (2) Plaintiff and her late husband received inflated premium bills from BCBS-LA in this Parish; (3) Plaintiff and her late husband paid BCBS-LA's inflated premium bills in this Parish; and (4) Plaintiff and her late husband paid a thing not owed to

–2–

BCBS-LA in this Parish in the form of inflated premium bills from BCBS-LA.

### III.   PARTIES

#### A.   Plaintiff

7.   Plaintiff, Hilda Jarreau, is domiciled in Pointe Coupee Parish, Louisiana.   Plaintiff and her late husband had an individual health insurance policy with, and paid premiums to BCBS-LA from 2001 until 2008.

#### B.   Defendant

8.   Defendant Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBS-LA"), is a domestic corporation, which may be served through its registered agent for service of process, Ms. Michele S. Calandro, 5525 Reitz Avenue, Baton Rouge, Louisiana, 70809.   BCBS-LA is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Louisiana.   Like other Blue Cross and Blue Shield plans nationwide, BCBS-LA is the largest health insurer in the State of Louisiana, as measured by number of subscribers, within its service area, which is defined as the state of Louisiana. BCBS-LA is the thirty-fifth largest health insurer in the country by total medical enrollment, with approximately 1.1 million enrollees.   BCBS-LA's service area encompasses all 64 parishes in Louisiana.

#### C.   Co-conspirators

9.   Blue Cross Blue Shield Association ("BCBSA") is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois.   It is owned and controlled by thirty-eight (38) health insurance plans, including BSBS-LA, that operate under the "Blue Cross and Blue Shield" trademarks and trade names.   BCBS-LA was created by these plans and operates as a licensor for these plans.   Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans.   A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

### IV.   TRADE AND COMMERCE

10.   BCBS-LA and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.   BCBSA enters into agreements

–3–

with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.

11.     The conduct of BCBS-LA has substantial effects on trade and commerce in the State of Louisiana.

## V.   CLASS ACTION ALLEGATIONS

12.     This action is brought and maintained as a class action pursuant to the provisions of Louisiana Code of Civil Procedure, art. 591, *et seq.*  The Plaintiff brings this action on behalf of herself, and on behalf of all others similarly situated, as representative of the following proposed class:

> All persons and entities who paid health insurance premiums to BCBS-LA for individual or small group full-service commercial health insurance at any time since June 6, 2002, and who were domiciled in the State of Louisiana on June 6, 2012.  A small group full-service commercial health insurance plan is defined as any plan which provides health insurance benefits for a group consisting of 3-199 persons or employees.

> Specifically excluded from the class are all members of the judiciary, their spouses, and their immediate family members. Excluded from the class is the Defendant, any entity in which Defendant has a controlling interest or which has a controlling interest of Defendant, and Defendant's legal representatives, assigns or successors.  Also excluded from the class are all persons and entities who paid health insurance premiums to BCBS-LA for any policies governed by The Employee Retirement Income Security Act of 1974 ("ERISA").

Plaintiff reserves the right to amend the class definition as appropriate after class discovery is completed.

13.     The Class is so numerous and geographically dispersed in the State of Louisiana that joinder of all members is impracticable.  While Plaintiff does not know the number and identity of all members of the Class, Plaintiff believes that there are tens of thousands of Class members, the exact number and identities of which can be obtained from BCBS-LA.

14.     There are questions of law or fact common to the Class, including but not limited to:

> a.     Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of La. R.S. 51:122, *et seq.*, or are otherwise prohibited under La. R.S. 51:122, *et seq.*;

> b.     Whether, and the extent to which, premiums charged by BCBS-LA to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

–4–

c.   Whether the use of Most Favored Nation ("MFN") provisions in the BCBS-LA provider agreements is anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance;

d.   Whether, and the extent to which, premiums charged by BCBS-LA have been artificially inflated as a result of the anti-competitive practices adopted by BCBS-LA;

e.   Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of La. R.S. 51:122, *et seq*.

15.   The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

16.   Plaintiff is a member of the Class; Plaintiff's claims are typical of the claims of the members of the Class; and, Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff was a direct purchaser of individual or small group full-service commercial health insurance from BCBS-LA, and her interests coincide with and are not antagonistic to other members of the Class.  In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

17.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBS-LA.

18.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which BCBS-LA has records.  Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would produce.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action does not present any difficulties of management that would preclude its maintenance as a class action.

–5–

## VI.   FACTUAL BACKGROUND

### A.   General Background and Summary of Allegations

19.   BCBS-LA enjoys unrivaled market dominance within Louisiana, enrolling approximately 54 percent of the subscribers of full-service commercial health insurance plans. When considering full-service preferred provider organization ("PPO") subscribers alone, BCBS-LA's market dominance is even greater, as nearly 60 percent of full-service PPO plan subscribers statewide are enrolled with BCBS-LA.

20.   BCBS-LA's market dominance in Louisiana is the result of a conspiracy between BCBS-LA and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States.   That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA.   As detailed herein, the member health insurance plans of BCBSA, including BCBS-LA, entered into a series of licensing arrangements that have insulated BCBS-LA and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

21.   This series of agreements has enabled BCBS-LA to acquire and maintain a grossly disproportionate market share for health insurance products in Louisiana, where BCBS-LA enjoys market and monopoly power.   The situation in Louisiana is not unique, however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

22.   BCBS-LA has used its market and monopoly power in Louisiana to engage in a number of anti-competitive practices.   For example, upon information and belief, BCBS-LA has required key health care providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with BCBS-LA.   These clauses ensure that BCBS-LA receives the best pricing for health care services in the market.   If a health care provider does not agree to the MFN, that provider will not remain in or become a part of BCBS-LA's network, which is generally an unacceptable result because BCBS-LA controls the vast majority of subscribers in Louisiana. Faced with this prospect, providers capitulate to BCBS-LA's demands, including MFNs.

23.   The MFNs restrict competition by preventing competitors from negotiating for

–6–

lower costs and thus raising the prices other health insurers must pay to providers.

24.     Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCBS-LA's MFNs ensures that its competitors may not negotiate lower health care provider costs, BCBS-LA faces little pressure to constrain its own costs.  The MFN, by limiting the ability of an insurer to compete with BCBS-LA, thus also compounds the exclusion of BCBS-LA's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products.  With few other health insurance plan options to compete with, BCBS-LA can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan.  The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by BCBS-LA with health care providers.

25.     Upon information and belief, because BCBS-LA has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, health care providers have responded by increasing prices to cover the discounts that BCBS-LA receives through its MFNs.  Thus, what was supposed to be a discount turns out to be a premium to providers, thereby artificially raising prices for health care services.  Again, consumers lose.

26.     BCBS-LA's anti-competitive practices, by reducing the *choices* available to health insurance consumers and increasing the *cost* of health care in Louisiana, have raised the *premiums* that Louisiana residents must pay to obtain health insurance.  BCBS-LA's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Louisiana market must pay significantly higher rates to health care providers.

27.     The skyrocketing cost of BCBS-LA health insurance coverage in Louisiana tells the story of BCBS-LA's abuse of its market and monopoly power at the expense of health care consumers in Louisiana.

**B.     History of the Blue Cross and Blue Shield Plans and of BCBSA**

28.     The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage. While originally structured as non-profit organizations since the 1980s, these local "Blue" plans

–7–

have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses.

29.     The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

### C.     Development of the Blue Cross Plans

30.     In 1934, an administrator named E.A. von Steenwyck helped develop a pre-paid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other pre-paid hospital plans began independently using the Blue Cross symbol.

31.     In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that pre-paid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

32.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

33.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Contrary to the principles that plans would not compete and that plans would not operate in each others' service areas, the independently formed pre-paid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each others' territories. The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior

–8–

to publication, describe the heated competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

34.     For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust,* which was funded by the Blue Cross Association, a predecessor to BCBSA. Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

35.     By 1975, the Blue Cross plans had a total enrollment of 84 million.

**D.     Development of the Blue Shield Plans**

36.     The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

37.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

38.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term,

–9–

name, symbol, or product."   In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

39.   By 1975, the Blue Shield plans had a total enrollment of 73 million.

### E.   Creation of the Blue Cross and Blue Shield Association

40.   Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.   During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.   Cross-on-Cross and Shield-on-Shield competition also flourished.

41.   However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.   Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies.   While the Blues remained dominant in most markets, this growth of competition was a threat.   In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

42.   From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.   One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

43.   Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war.   As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements.   Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

–10–

44.    To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were  otherwise actual or potential competitors, "recognized the necessity of national cooperation."

45.    Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

46.    Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

47.    During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

48.    In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.  At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

49.    In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.  As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.  However, the goals did not end competition between Blue plans.  In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

50.    During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986,

–11–

Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

51.    In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities.  As a result, many member plans converted to for-profit status.  One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures.  While nominally still characterized as not-for-profit, BCBS-LA and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

52.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year.  At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.  As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

53.    Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

54.    At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans.  These illegal restraints are discussed below.

F.    **Allegations Demonstrating Control of BCBSA By Member Plans**

55.    BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

56.    BCBSA is entirely controlled by its member plans, all of whom are independent

–12–

health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

57.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

58.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current chairman of the Board of Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue Shield of Michigan. The Board of Directors of BCBSA meets at least annually.

G.     **License Agreements and Restraints on Competition**

59.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three independent members.

60.     The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

61.     The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to a brief BCBSA filed during litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the

–13–

"Membership   Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

62.     The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

63.     Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards."  The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

64.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance

–14–

letter has been distributed to all Plan Board Members."

65.     The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," and "Sanctions" – each of which is administered by the PPFSC and could result in the termination of a member plan's license.

66.     The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA.  The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."   However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In a brief filed during litigation in the Sixth Circuit  Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement  between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each  Plan's vote counting equally, and then with the votes weighted primarily according to the  number of subscribers."

## H.     Horizontal Agreements

67.     The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

68.     Each BCBSA licensee is an independent legal organization.   In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence."   In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

69.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States.  The largest health insurance company in the

–15–

nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen (15) of the twenty-five (25) largest health insurance companies in the country are BCBSA licensees. On its website, BCBSA asserts that its members together provide "coverage for more than 99 million individuals – one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

70.     In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other – and each other's parent Blue Plans – in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

71.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

72.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

I.     **The Horizontal Agreements Not to Compete in the Licensing Arrangements Between BCBSA and Member Plans, Including BCBS-LA, Are *per Se* Violations of Louisiana Anti-Monopoly and Antitrust Laws, La. R.S. 51:122, *et seq*.**

73.     The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.   As such, they are a *per se* violation of La. R.S. 51:122, *et seq*. -- the Louisiana anti-monopoly and antitrust laws.

74.     Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."   The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

75.     Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and  trade names. This provision directly limits the ability of each Blue plan to generate revenue  from non-Blue branded business.   This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.   It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

76.     Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business.   This provision

–17–

directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

77.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

78.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

79.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of La. R.S. 51:122, *et seq.* -- Louisiana anti-monopoly and antitrust laws.

80.     More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions. For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

81.     The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is

required by the SEC rules to describe the restrictions on its ability to do business.  Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

82.     Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and   at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

83.     Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible.  When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license.  However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

84.     The member plans of BCBSA have agreed to impose harsh penalties on those that

–19–

violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

85.   In sum, a terminated licensee would: (a) lose the brand through which it derived the majority of its revenue; and (b) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

86.   It is unsurprising, then, that most member plans do not operate outside of their Service Areas. The territorial restrictions have therefore barred all competition by all of the Blue plans (other than BCBS-LA) from the Louisiana commercial health insurance market.

87.   Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth – exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California. In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent. In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries. By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states. For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them. This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only

–20–

1.4 percent in Texas. During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire Blue Cross Blue Shield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period. In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).

88.     In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

89.     Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-- Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

## J.     The Anti-competitive Acquisition Restrictions In BCBSA Licensing Agreements

90.     In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBS-LA and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

91.     First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-

–21–

member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

92.     Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate *automatically*: (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of  the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

93.     These acquisition restraints reduce competition in violation of La. R.S. 51:122, *et seq.*, Louisiana anti-monopoly and antitrust laws, because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from

–22–

ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

94. Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

95. By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is to tend to lessen or to lessen competition and higher premium costs for consumers, including enrollees of BCBS-LA.

### K. The BCBSA Licensing Agreements Have Reduced Competition In Louisiana

96. BCBS-LA, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines. Many of the member plans with which BCBS-LA has conspired would otherwise be significant competitors of BCBS-LA in Louisiana.

97. For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding cities, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions

–23–

summarized above, WellPoint would be likely to offer its health insurance services and products in Louisiana in competition with BCBS-LA. Such competition would have resulted in lower health care costs and premiums paid by BCBS-LA enrollees such as Plaintiff herein.

98.    Over 55 percent of Mississippi residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of Mississippi – vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Mississippi would be likely to offer its health insurance services and products in Louisiana in competition with BCBS-LA. Such competition would result in lower health care costs and premiums paid by BCBS-LA enrollees.

99.    Likewise, approximately 53 percent of Arkansas residents who subscribe to full-service commercial insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of Arkansas – vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Arkansas would be likely to offer its health insurance services and products in Louisiana in competition with BCBS-LA. Such competition would result in lower health care costs and premiums paid by BCBS-LA enrollees.

100.    Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Louisiana in competition with BCBS-LA. Such competition would result in lower health care costs and premiums paid by BCBS-LA enrollees.

101.    In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Louisiana but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue: if all of these plans, together with all other BCBSA members, were able to compete in Louisiana, the result would have been lower costs and thus lower premiums paid by BCBS-LA enrollees, including

–24–

Plaintiff.

### I.    The Widespread Use By BCBSA Licensees of Anti-competitive Most Favored Nation Clauses

102.    Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

103.    MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services.  MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN plus" clauses, and typically require the amount to be higher by a specified percentage.

104.    Upon information and belief, BCBS-LA's use of MFNs unreasonably reduces competition for a number of reasons.  First, MFNs establish that the dominant market provider will be charged the lowest  prices charged, thus making the dominant provider indifferent to the actual price charged.  The MFNs thus reduce competition by eliminating an incentive for BCBS-LA to reduce overhead prices.

105.    Second, MFNs limit competition by preventing other health insurers in Louisiana from achieving lower costs with providers and thereby becoming significant competitors to BCBS-LA.  MFNs establish a price floor below which providers will not sell services to BCBS-LA's competitors; indeed, MFNs enable BCBS-LA to raise that price floor.  This deters cost competition among health insurers in Louisiana.  By reducing the ability of  BCBS-LA's competitors to compete against BCBS-LA, MFNs ensure that BCBS-LA can substantially raise premiums while maintaining, or even increasing, its market share.

106.    Moreover, upon information and belief, if BCBS-LA is certain that no insurer will pay less to a provider than it will, BCBS-LA will be willing to pay more to that provider than it would otherwise.  The more  BCBS-LA agrees to pay that provider, the more BCBS-LA's competitors must pay that provider. And by raising the price floor, BCBS-LA keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums.  As a result, and because of its market power, BCBS-LA can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and

–25–

draw consumers from BCBS-LA.

107.  Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant BCBS-LA, the provider has a strong incentive not to lower prices.  Without the ability to compete on price, a new competitor will be unable to price below BCBS-LA, and thus will be unable to survive.

108.  Upon information and belief, the independent Blue Cross and Blue Shield licensees, including BCBS-LA, use MFNs to exploit the monopoly power they hold in their respective Service Areas.  The independent Blue Cross and Blue Shield licensees, including BCBS-LA, have coordinated their use of MFNs with other Blue entities.

## M.   BCBS-LA Market Power In Relevant Louisiana Markets

109.  BCBS-LA has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the State of Louisiana.

## VII.   RELEVANT PRODUCT MARKET

110.  The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

111.  To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product.  The characteristics of different products are important factors in determining their substitutability.  For a health insurance product, important characteristics include:

112.  Commercial versus government health insurance: Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent.  Therefore, commercial health insurance and government health insurance programs are not substitutes.

113.  Full-service versus single-service health insurance:  *Full-service* health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers.  In contrast, *single-service* health insurance provides

–26–

narrow coverage restricted to a specific type of health care, *e.g.*, dental care.  Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, *e.g.*, dental care.  Thus, full-service health insurance and single-service health insurance are not substitutes.

114.   Full-service commercial health insurance includes *HMO* products and PPO products, among others.  Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers.  Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors.  Economic research suggests that HMO and PPO health insurance products *are* substitutes.

115.   Fully-insured health insurance versus ASO products:   When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers.  In contrast, when a consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

116.   Individual, small group, and large group consumers:   Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums.  Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group.  The Kaiser Family Foundation, which publishes an influential

–27–

yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees.

117.   For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market.  In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products.  For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.  Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are   distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

118.   Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although Louisiana licenses 15 companies to offer some type of health insurance in Louisiana, Blue Cross had 54% of the commercial market share.  In Lafayette, Louisiana, for example, BCBS-LA has 63 percent of the commercial market; while its nearest competitor, United Healthcare, has 19 percent.

## VIII.   RELEVANT GEOGRAPHIC MARKETS

119.   In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network.  An insurer's provider network is composed of the health care providers with which it contracts.  Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider.  As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers.  This suggests that health insurers compete in distinct geographic markets.

120.   There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in

Louisiana. The potentially relevant geographic markets could be defined alternatively as (a) the entire state of Louisiana; (b) the eight regions, known as "Metropolitan Statistical Areas," or seventeen "Micropolitan Statistical Areas," into which the U.S. Office of Management and Budget divides Louisiana. However the geographic market is defined, the result is the same: BCBS-LA has the dominant market position, and exercises market power.

121.    BCBS-LA does business throughout the State of Louisiana, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the State of Louisiana, and has agreed with the other member plans of BCBSA that only BCBS-LA will do business in Louisiana under the Blue brand. Therefore, the State of Louisiana can be analyzed as a relevant geographic market within which to assess the effects of BCBS-LA's anti-competitive conduct.

122.    The U.S. Office of Management and Budget divides the parishes of the state of Louisiana into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of Louisiana's eight Metropolitan Statistical Areas, seventeen Micropolitan Statistical Areas, and the remaining parishes that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-LA's anti-competitive conduct.

123.    BCBS-LA's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-LA's market power has significantly raised costs, resulting in skyrocketing premiums for BCBS-LA enrollees.

124.    Moreover, BCBS-LA's statewide share of the relevant product market has increased each year despite its substantial premium increases. BCBS-LA's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

## IX.    INFLATED PREMIUMS CHARGED BY BCBS-LA

125.    For at least the past ten years, BCBS-LA's illegal anti-competitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Louisiana, leading to artificially-inflated and

–29–

supra-competitive premiums for individuals and small groups purchasing BCBS-LA's full-service commercial health insurance in the relevant geographic market(s). Upon information and belief, BCBS-LA's market power and its use of MFNs and other anti-competitive practices in Louisiana have reduced the amount of competition in the market and ensured that BCBS-LA's few competitors face higher costs than BCBS-LA does. Without competition, and with the ability to increase premiums without losing customers, BCBS-LA faces little pressure to keep costs low.

126.   Over the past decade, BCBS-LA generally raised individual and small group premiums by amounts greater than the national average. In 2008, for example, BCBS-LA raised individual premiums more than 20 percent in some instances.

127.   These rising premiums have enabled BCBS-LA to grow its surplus in excessive amounts, which is an unusual practice for a self-described nonprofit organization.

## X.   CAUSES OF ACTION

### COUNT ONE

**(Contract, Combination, or Conspiracy in Restraint of Trade in Violation of La. R.S. 51:122, *et seq.* -- Louisiana anti-monopoly and antitrust laws.)**

128.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

129.   The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-LA and BCBSA represent horizontal agreements entered into between BCBS-LA and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

130.   Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-LA represents a contract, combination, and conspiracy within the meaning of La. R.S. 51:122.

131.   Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-LA have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, BCBS-LA and the other BCBSA members have conspired to restrain trade in violation of La. R.S. 51:122. These market allocation agreements are *per se* illegal under La. R.S. 51:122.

132.   The market allocation agreements entered into between BCBS-LA and the thirty-

–30–

-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anti-competitive.

133.    BCBS-LA has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

134.    Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

      a.    Reducing the number of health insurance companies competing with BCBS-LA throughout Louisiana;

      b.    Unreasonably limiting the entry of competitor health insurance companies into Louisiana;

      c.    Allowing BCBS-LA to maintain and enlarge its market power throughout Louisiana;

      d.    Allowing BCBS-LA to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

      e.    Depriving consumers of health insurance of the benefits of free and open competition.

135.    The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

136.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of La. R.S. 51:122.

137.    As a direct and proximate result of BCBS-LA's continuing violations of La. R.S. 51:122, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-LA than they would have paid with increased competition and but for the violations of La. R.S. 51:122.

138.    Plaintiff and the Class seek treble damages from BCBS-LA for their violations of La. R.S. 51:122.

### COUNT TWO

### (MFNs; Violation of La. R.S. 51:122)

139.    Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

140.    BCBS-LA has market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

–31–

141.   The provider agreements BCBS-LA entered into between BCBS-LA and health care providers in Louisiana that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of La. R.S. 51:122.

142.   Each of the BCBS-LA provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

   a.   Raising the prices of health care services to commercial health insurers in competition with BCBS-LA;

   b.   Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition    with BCBS-LA from obtaining competitive pricing from health care   providers;

   c.   Unreasonably restricting the ability of health care providers to offer to BCBS-LA's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

   d.   Depriving consumers of health care services and health insurance of the benefits of free and open competition.

143.   The pro-competitive benefits, if any, of the BCBS-LA provider agreements containing MFN provisions do not outweigh the anti-competitive effects of the agreements.

144.   Each agreement between BCBS-LA and a health care provider that contains an MFN unreasonably restrains trade in violation of La. R.S. 51:122, *et seq.*

145.   As a direct and proximate result of BCBS-LA's continuing violations of La. R.S. 51:122, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial.   These damages consist of having paid higher health insurance premiums to BCBS-LA than they would have paid but for the violations of La. R.S. 51:122.

146.   Plaintiff and the Class seek treble damages from BCBS-LA for its violations of La. R.S. 51:122.

## COUNT THREE

**(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of La. R.S. 51:123)**

147.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

148.   BCBS-LA has monopoly power in the individual and small group full-service commercial health insurance market in Louisiana.   This monopoly power is evidenced by, among other things:

–32–

a.   BCBS-LA's ability, upon information and belief, to enter into MFN agreements with providers, which evidences BCBS-LA's ability to control prices and exclude competitors;

b.   BCBS-LA's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

149.   BCBS-LA has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

150.   BCBS-LA's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of La. R.S. 51:123.

151.   As a direct and proximate result of BCBS-LA's continuing violations of La. R.S. 51:123, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial.   These damages consist of having paid higher health insurance premiums to BCBS-LA than they would have paid but for these violations.

152.   Plaintiff and the Class seek treble damages from BCBS-LA for its violations of La. R.S. 51:123.

**COUNT FOUR**

**(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of La. R.S. 51:123)**

153.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

154.   BCBS-LA has acted with the specific intent to monopolize the relevant markets.

155.   There was and is a dangerous possibility that BCBS-LA will succeed in its attempt to monopolize the relevant markets because BCBS-LA already controls a large percentage of those markets.   Further success by BCBS-LA in excluding competitors from those markets will confer a monopoly on BCBS-LA in violation of La. R.S. 51:123.

156.   BCBS-LA's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Class.   Premiums charged by BCBS-LA have been higher than they would have been in a competitive market.

157.   Plaintiff and the Class have been damaged as the result of BCBS-LA's attempted monopolization of the relevant markets and seek treble damages.

–33–

### COUNT FIVE

### UNJUST ENRICHMENT

158.    Plaintiff incorporates and re-alleges each of the foregoing paragraphs.

159.    BCBS-LA has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the other Class members.

160.    It would be inequitable for BCBS-LA to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by BCBS-LA.

161.    By reason of its unlawful conduct, BCBS-LA must make restitution to Plaintiff and the Class.  Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

162.    In equity, BCBS-LA should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and Class members.

### COUNT SIX

### PAYMENT OF A THING NOT OWED

163.    Plaintiff incorporates and re-alleges each of the foregoing paragraphs.

164.    Due to BCBS-LA's violations of Louisiana's antitrust and anti-monopoly laws, Plaintiff and the Class have paid a thing not owed to BCBS-LA in the form of inflated premiums for health insurance, which damages are recoverable under La. Civil Code article 2299.

165.    By reason of its unlawful conduct and being the recipient of payment of a thing not owed, BCBS-LA is bound to restore the premiums charged to Plaintiff and the Class members that have been higher than they would have been in a competitive market.

166.    In equity, BCBS-LA should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution in the form of treble damages and pre-judgment interest to Plaintiff and Class members.

–34–

## XI.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.    That the summons be issued and that BCBS-LA be duly served with a copy of this Petition and required to answer same, and that this Court decree and enter judgment;

B.    That the Court determine that this action may be maintained as a class action under La. Code of Civil Procedure 591, *et seq.* and appoint the Plaintiff as representative of the Class;

C.    That the Court adjudge and decree that BCBS-LA has violated both La. R.S. 51:122 and La. R.S. 51:123 and award Plaintiff and Class appropriate damages and relief;

D.    That the Court award compensatory damages to Plaintiff and Class resulting from the various acts of wrongdoing under the statutory laws of Louisiana, in such amounts as represent the losses reasonably suffered by Plaintiff and Class, as well as any treble damages available under Louisiana law;

E.    That the Court award Plaintiff her reasonable costs;

F.    That the Court render judgment that BCBS-LA has been unjustly enriched by its wrongful conduct, and award restitution to Plaintiff and the Class;

G.    That the Court render judgment that Plaintiff and the Class Members have paid a thing not owed to BCBA-LA in the form of inflated premiums during the class period, and award restitution to the Plaintiff and the Class;

H.    That the Court awards Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity;

I.    That the Court orders such other, further and general relief as is just and proper.

SUBMITTED BY ATTORNEYS:

Nicholas R. Rockforte (#31305)
Patrick W. Pendley (#14021)
Stan P. Baudin (#22937)
Christopher L. Coffin (#27902)
**PENDLEY, BAUDIN & COFFIN, L.L.P.**
Post Office Drawer 71
Plaquemine, Louisiana 70765
Telephone:    225-687-6396
Facsimile:    225-687-6398
pwpendley@pbclawfirm.com

–35–

Don Barrett
**BARRETT LAW GROUP, P.A.**
404 Court Square North
Lexington, MS 39095-0927
Tel: 662.834.9168
dbarrett@barrettlawgroup.com

Gordon Ball (TN BPR# 1135)
Email: gball@ballandscott.com
Thomas S. Scott, Jr. (TN. BPR# 1086)
Email: scott@ballandscott.com
Christopher T. Cain (TN BPR# 19997)
Email: cain@ballandscott.com
**BALL & SCOTT LAW OFFICES**
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
Tel: 865.525.7028
Fax: 865.525.4679

<u>PLEASE SERVE:</u>

**Louisiana Health Services & Indemnity Company D/B/A**
**Blue Cross and Blue Shield of Louisiana**
Through its registered agent:
Ms. Michele S. Calandro
5525 Reitz Avenue
Baton Rouge, Louisiana 70809

## 18TH JUDICIAL DISTRICT COURT

## PARISH OF POINTE COUPEE

## STATE OF LOUISIANA

| | |
|---|---|
| HILDA JARREAU, individually, and on behalf ) <br> Of all other similarly situated, ) <br> ) <br> Plaintiff, ) <br> ) <br> VERSUS ) <br> ) <br> BLUE CROSS AND BLUE SHIELD ) <br> OF LOUISIANA, INC., ) <br> ) <br> Defendant. ) | Docket No.:  44666 <br><br> CLASS ACTION |

---

### MOTION TO INTERVENE

---

NOW INTO COURT, comes The Blue Cross and Blue Shield Association ("BCBSA"), through undersigned counsel, and pursuant to Louisiana Civil Procedure Code Article 1091 moves to intervene in this action. In support of this motion, BCBSA will show that:

1.     Plaintiff Jarreau's complaint challenges the way BCBSA licenses the Blue Cross and Blue Shield service names and marks (collectively, the "Blue Marks") in Louisiana. According to plaintiff, BCBSA's granting Blue Cross and Blue Shield of Louisiana ("BCBS-LA") an exclusive license to use the Blue Marks in Louisiana is somehow *per se* illegal under the Louisiana antitrust laws. (Compl. ¶ 3).

2.     Louisiana Code of Civil Procedure Article 1091 provides that a third party "having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties . . . ." Article 1091 specifies three ways a third party may intervene: (a) joining with plaintiff and demanding the same or similar relief against the defendant; (b) uniting with defendant in resisting the plaintiff's demands; or (c) opposing plaintiff and defendant. *Id.*

3.     BCBSA has a justiciable interest in defending the use of its Marks and Licensing Agreements.

4.     BCBSA's justiciable interest in the use of its Marks and Licensing Agreements are directly connected to the current litigation.

5.     Allowing BCBSA to intervene will not unduly delay the adjudication of the rights of the original parties, nor will it prejudice any of the original parties.

6.     Plaintiff implicates BCBSA as a co-conspirator with defendant BCBS-LA; thus the parties' defenses would raise common issues of law and fact. Also, BCBSA is a party to the Licensing Agreements in dispute.

7.     This motion is supported by the accompanying memorandum in support.

WHEREFORE, The Blue Cross and Blue Shield Association, prays that it be allowed to intervene in the above captioned and numbered action.

Respectfully submitted,

Taylor, Porter, Brooks & Phillips LLP

BY: _____

John Stone Campbell, III, #23674
L. Adam Thames, #32722
Post Office Box 2471
Baton Rouge, Louisiana 70821
Telephone: (225) 387-3221
Telecopier: (225) 215-8704

*Counsel for Blue Cross and
Blue Shield Association*

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing was this date served on the following via U.S. Mail, postage prepaid and properly addressed:

Nicholas R. Rockforte
Patrick W. Pendley
Stan P. Baudin
Christopher L. Coffin
**PENDLEY, BAUDIN
& COFFIN, L.L.P**
Post Office Drawer 71
Plaquemine, Louisiana 70765

*Attorneys for Plaintiffs*

Tony Clayton
Clayton & Fruge
3741 Hwy 1
Port Allen, Louisiana 70767

*Attorney for Defendant Blue Cross
Blue Shield of Louisiana*

Baton Rouge, Louisiana, this _____ day of July, 2012.

_____
John Stone Campbell, III

2

18TH JUDICIAL DISTRICT COURT

PARISH OF POINTE COUPEE

STATE OF LOUISIANA

| | |
|---|---|
| HILDA JARREAU, individually, and on behalf )<br>Of all other similarly situated, )<br>                                                                  )<br>                                                                  )<br>                               Plaintiff,               )<br>                                                                  )<br>VERSUS                                                  )<br>                                                                  )<br>BLUE CROSS AND BLUE SHIELD              )<br>OF LOUISIANA, INC.,                               )<br>                                                                  )<br>                               Defendant.           ) | Docket No.:  44666<br><br>CLASS ACTION |

## RULE TO SHOW CAUSE

CONSIDERING THE ABOVE AND FOREGOING MOTION TO INTERVENE:

IT IS ORDERED that plaintiffs, Hilda Jarreau, individually, and on behalf of all other

similarly situated, appear and show cause on the _____ day of _____, 2012 at _____

o'clock _____.m. why the Motion to Intervene filed on behalf of The Blue Cross and Blue Shield

Association should not be granted, allowing the Blue Cross and Blue Shield Association to

intervene in the above captioned and numbered cause.

New Roads, Louisiana, this _____ day of _____, 2012.


_____
Judge, 18th Judicial District Court


PLEASE SERVE:

Plaintiffs, Hilda Jarreau, individually, and on behalf of all other similarly situated,

Through their counsel of record:

Nicholas R. Rockforte
Patrick W. Pendley
Stan P. Baudin
Christopher L. Coffin
PENDLEY, BAUDIN & COFFIN, L.L.P
24110 Eden Street
Plaquemine, LA 70765

3

**18TH JUDICIAL DISTRICT COURT**

**PARISH OF POINTE COUPEE**

**STATE OF LOUISIANA**

| | |
|---|---|
| HILDA JARREAU, individually, and on behalf ) | Docket No.: 44666 |
| Of all other similarly situated, ) | |
| ) | CLASS ACTION |
| Plaintiff, ) | |
| ) | |
| VERSUS ) | |
| ) | |
| BLUE CROSS AND BLUE SHIELD ) | |
| OF LOUISIANA, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM IN SUPPORT OF BLUE CROSS & BLUE SHIELD
ASSOCIATION'S MOTION TO INTERVENE**

Proposed Intervenor, Blue Cross and Blue Shield Association ("BCBSA"), moves this

Court for an order allowing it to intervene in this case under Louisiana Code of Civil Procedure

Article 1091. In support of its motion, BCBSA submits the following:

**INTRODUCTION**

Plaintiff Jarreau's complaint challenges the way that BCBSA licenses the Blue Cross and

Blue Shield service names and marks (collectively, the "Blue Marks") in Louisiana. According

to Plaintiff, BCBSA's decision to grant Blue Cross Blue Shield of Louisiana ("BCBS-LA") an

exclusive license to use the Blue Marks in Louisiana is somehow "*per se* illegal" under the

Louisiana antitrust laws. (Compl. ¶ 3.) Plaintiff's allegations implicate the entire Blue Cross and

Blue Shield licensing system, which is controlled by BCBSA and extends well beyond

Louisiana. Despite these facts, Plaintiff chose not to sue BCBSA. As a result, BCBSA moves to

intervene in this action as a matter of right pursuant to Louisiana Code of Civil Procedure Article

1091. BCBSA has a substantial legal interest in defending the use of its Marks and Licensing

Agreements which are at the heart of this case. Accordingly, BCBSA has a right to intervene and

defend its licensing system.

**BACKGROUND**

**1.    The Blue System**

Plaintiff's complaint includes many allegations relating to how BCBSA licenses its Blue

Marks to individual Blue Plans. Plaintiff alleges that the development of Blue Plans began with

the creation of "Blue Cross Plans," which were designed to cover the cost of hospital care.

(Compl. ¶ 30.) Plaintiff alleges that Blue Cross Plans began in the 1930s serving individual

hospitals, with each Blue Cross Plan serving the geography surrounding those hospitals. (*Id.*) Blue Cross Plans were developed in conjunction with the American Hospital Association ("AHA"). (*Id.* ¶ 31.) Much like BCBSA today, AHA set standards for individual Blue Cross Plans. (*Id.*) Since as early as 1937, according to Plaintiff, AHA's standards for Blue Cross membership codified the local nature of Blue Cross Plans—"that the plans would not compete with each other." (*Id.*) Plaintiff also alleges that Blue Cross Plans were followed by the development of "Blue Shield Plans" which were "designed to provide a mechanism for covering the cost of physician care." (*Id.* ¶ 36.) Individual physician medical societies formed Blue Shield Plans "in conjunction with the American Medical Association." (*Id.*) These Blue Shield Plans were also inherently local, bounded by the geography of the medical society and the state itself. (*Id.* ¶¶ 37, 38.)

In 1982, BCBSA was formed when the Blue Cross Association and the Blue Shield Association merged. BCBSA is a not-for-profit corporation that owns the rights to the Blue Marks. BCBSA does not underwrite health insurance itself. Rather, BCBSA licenses the Blue Marks to 38 individual health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. (Compl. ¶¶ 55, 56) BCBSA licenses the right to use the Blue Marks to individual Blue Plans through a License Agreement. The License Agreement sets out certain "rules and regulations that all members of BCBSA must obey." (*Id.* ¶ 61.) If Plans do not meet those standards or guidelines, or otherwise run afoul to the License Agreement, then BCBSA can terminate the Plan's license. (*Id.* ¶¶ 65, 66)

## II.   The plaintiff's complaint challenges the Blue System.

CBS-LA, the defendant in this case, offers health insurance under the Blue Marks in the state of Louisiana pursuant to a Licensing Agreement with BCBSA. (Compl. ¶ 3.) Plaintiff alleges that the Licensing Agreement between BCBSA and BCBS-LA violates Louisiana Revised Statues 51:122 and 51:123 because BCBSA has licensed the Blue Marks to BCBS-LA on an exclusive basis in Louisiana — that is, other Blue Plans are not allowed to sell Blue-branded health insurance in Louisiana. (*Id.* ¶¶ 1, 3, 4, 150, 151) In addition, Plaintiff claims that the rules and regulations of BCBSA "restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan," and are therefore anticompetitive. (*Id.* ¶ 90) Thus, this action directly challenges BCBSA's actions and will affect BCBSA's interests in its Licensing Agreements and use of its Blue Marks.

2

Plaintiff's complaint is broader, however, than just an attack on BCBS-LA's use of the Blue Marks; it alleges that the entire Blue System is anticompetitive. In particular, it alleges that BCBSA is a part of an on-going conspiracy with BCBS-LA and 37 other Blue Plans. (Compl. ¶ 1.) The complaint devotes fifteen pages to allegations relating to this alleged conspiracy by BCBSA and the Plans to allocate healthcare insurance markets. (*Id.* ¶¶ 28–101.) In that section, the Louisiana Plan is mentioned in passing only three times. (*Id.* ¶¶ 51, 90, 93.) Yet the plaintiff omits BCBSA, the licensor and hub of the alleged licensing conspiracy, and instead chose to sue one licensee of the Blue System.

## III. The plaintiff's complaint copies other cases challenging the Blue System and suing BCBSA.

This case is one of many alleging a similar conspiracy by the Blue System. On February 7, 2012, a lawsuit was filed against BCBSA in the Western District of North Carolina alleging a conspiracy between BCBSA and BCBSNC in violation of the Sherman Act. The North Carolina complaint also alleges that the Licensing Agreements between BCBSA and BCBSNC are *per se* illegal under the antitrust laws. On April 17, 2012 and May 17, 2012, complaints were filed against BCBSA in the Northern District of Alabama alleging similar causes of action regarding the Licensing Agreements and Blue System. In addition, plaintiffs in Tennessee filed a complaint against Blue Cross Blue Shield of Tennessee alleging similar facts and causes of action.

The complaint in this action is strikingly similar to several of the complaints. In fact, the vast majority of the complaint in this action is identical to the North Carolina complaint, except replacing BCBSNC with BCBS-LA and North Carolina and federal law with Louisiana law. Each action names BCBSA as a defendant–except for this case and the case filed in Tennessee, which were both brought by the same plaintiff's counsel. And BCBSA has moved to intervene in the Tennessee action, just as it is doing here.

### ARGUMENT

Louisiana Code of Civil Procedure Article 1091 provides that a third party "having an interest therein may intervene in a pending action to enforce a right related to or connected with the object of the pending action against one or more of the parties . . . ." A third party may intervene by: (a) joining with a plaintiff and demanding the same or similar relief against the defendant; (b) uniting with a defendant in resisting a plaintiff's demands; or (c) opposing a plaintiff and a defendant. LA. CODE CIV. PROC. art. 1091. In interpreting Article 1091, Louisiana courts have explained that its intent is "to increase[] the usefulness of the remedy of intervention.

3

No longer is it essential that the intervenor have such a direct interest in the pending action that he will obtain immediate gain or suffer immediate loss." *Amoco Prod. Co. v. Columbia Gas Transmission Corp.*, 455 So. 2d 1260, 1264 (La. App. Ct. 1984) (quoting *Bellow v. N.Y. Fire & Marine Underwriters, Inc.*, 215 So. 2d 350, 353 (La. App. Ct. 1968)).

BCBSA easily meets the requirements. The heart of the plaintiff's suit challenges the cornerstone of BCBSA's licensing strategy — to license its intellectual property, the Blue Marks, to Plans in exclusive territories in order to allow Plans to build broad subscriber bases and deep provider networks, and allow the otherwise regional Blue Plans to compete as a federation against national competitors like Aetna, United Healthcare, and Cigna. A ruling that BCBSA's exclusive-service-area system violates Louisiana antitrust laws would undermine BCBSA's ability to license its intellectual property in the way that it believes best maintains the high standards associated with the Blue Marks. BCBSA has a direct interest, therefore, in this pending action and a right to defend its licensing system in the present matter.

### IV.   BCBSA is entitled to intervene as a matter of right.

Article 1091 provides that BCBSA may intervene as a defendant to join resisting a plaintiff's demands so long the defendant has a "justiciable interest in, and a connexity to, the principle action." *Livingston Downs Racing Ass'n, Inc. v. State, Through Edwards*, 96-1988, p. 6 (La. App. 1 Cir. 9/23/97); 700 So. 2d 1021, 1023; *see also Hall v. Folger Coffee Co.*, 2000-0668, p. 3 (La. App. 4 Cir. 2/7/01); 781 So. 2d 620, 622. BCBSA easily meets this two-part standard.

#### A.   BCBSA has a justiciable right.

A "justiciable right" under Article 1091 is a "right of a party to seek redress or a remedy against either plaintiff or defendant in the original action, or both, and where those parties have a real interest in opposing it." *Amoco Prod. Co.*, 455 So. 2d at 1264. BCBSA's interest in the case far exceeds this standard. The complaint asserts that how BCBSA licenses its Blue Marks violates Louisiana antitrust laws. Plaintiff seeks compensation based on an alleged harm from the long-standing Blue System of exclusive territories. BCBSA is the sole owner and licensor of the Blue Marks. It is also the only entity that is a party to the Licensing Agreements with all 38 Plans. The mere fact that BCBSA is a party to the License Agreement that is being challenged here confers on BCBSA a substantial enough to invoke a right to intervene.

Take *Livingston Downs Racing Ass'n v. State Through Edwards,* 96-1988 (La. App. 1 Cir. 9/23/97); 700 So. 2d 1021, as but one example supporting BCBSA's justiciable right to

4

intervene here. In that case, a licensed horse-racing association moved to intervene in an action between a competing association and the state where the competing association challenged the constitutionality of an off-track wagering law. *Id.* at p. 3–5, 700 So. 2d at 1022–23. That law allowed only certain racing associations to obtain a license for off-track betting; the intervenor was one of those associations. *Id.* at p. 3, 700 So. 2d 1022. The district court denied intervention but was reversed on appeal. The appellate court held that the association could intervene under Article 1091 because it had a justiciable right to preserve the way it conducts business under the law. *Id.* at p. 6–8, 700 So. 2d at 1023. Numerous other cases likewise recognize that a litigant has a right to intervene when the challenged conduct directly relates to the intervenor's ability to do business. *See, e.g., Transworld Drilling Co. v. Tex. Gen. Res., Inc.*, 552 So. 2d 454, 457 (La. App. Ct. 1989) (permitting a third party to intervene by uniting with the defendant because the plaintiff's assertions with respect to the intervenor's rights under a joint-operating agreement "certainly" had "a direct impact on [the intervenor's] rights"); *see also Mangano Consultants, Inc. v. Bob Dean Enter., Inc.*, 05-449, p. 7–8 (La. App. 5 Cir. 1/17/06); 921 So. 2d 1081, 1085 (holding that a third party interested in recovering from one of the original parties had a justiciable right under Article 1091). Likewise, this case could hinder BCBSA's ability to license its Marks in Louisiana; accordingly, BCBSA has a justiciable interest in the outcome of this case.

Moreover, BCBSA's right to intervene is apparent from the fact that its interests could be impaired by an unfavorable disposition of this action. BCBSA's rights under the Licensing Agreement and its ability to freely license the use of the Blue Marks are at the core of the present action and would be jeopardized by a finding against the defendant in this case. Louisiana courts have ruled that where litigation challenges a non-party's ability to enforce its contracts or the validity of a system in which the non-party has an interest, that non-party is entitled to intervene as of right. *Amoco Prod. Co.*, 455 So. 2d at 1265 (holding that third-party beneficiaries of a contract had sufficient justiciable interests related to the contract in dispute to allow intervention). Thus, BCBSA is entitled to intervene to defend its Licensing Agreements against Plaintiff's antitrust challenge.

**B.     BCBSA's substantial legal interest in the use of its Blue Marks and licensing agreements, and its ability to protect its interests, are connected to this action.**

Louisiana courts also require that the third party's justiciable right be "so related or connected to the facts or object of the principal action that a judgment on the principal action will have a direct impact on the intervenor's rights." *Amoco Prod. Co.*, 455 So. 2d at 1264. That a judgment against BCBS-LA would directly impact BCBSA's rights is beyond question. A judgment would void BCBSA's license agreement and irreparably impair BCBSA's national licensing strategy. These direct effects far exceed the threshold for establishing a "direct impact" under Article 1091. For example, in *Amoco Production Co.*, 455 So. 2d at 1264–65, the court allowed royalty owners under certain mineral contracts to intervene in a contracts dispute because the outcome of that dispute would directly effect the royalty owner's rights. Just as a third-party beneficiary to a contract has an interest in a contract dispute, so too does BCBSA have an interest in defending its entire licensing structure. In fact, BCBSA's interest is even stronger—BCBSA is not a third party to the licensing arrangement under attack; it's the other party. Other cases similarly establish that the effect that BCBSA would face here from a judgment is suitably direct to allow it to intervene. *See, e.g., Niemann v. Am. Gulf Shipping, Inc.*, 96-687, p. 7–8 (La. App. 5 Cir. 1/15/97); 688 So. 2d 42, 45 (holding that a former lawyer may intervene in an action where he may be entitled to legal fees); *Livingston*, 700 So. 2d at 1024 (holding that a racing association's interest in defending the statutory scheme under which it conducted business was connected to a suit challenging the constitutionality of that scheme).

Furthermore, BCBSA is a defendant in five cases strikingly similar to the one before this Court, further demonstrating the connection between BCBSA's interests and the current litigation. *See Cerven v. Blue Cross & Blue Shield of N.C.*, No. 5:12-cv-17 (W.D.N.C. Feb. 7, 2012) (asserting nearly identical claims under federal antitrust law and North Carolina law); *Richards v. Blue Cross & Blue Shield of Al.*, No. 2:12-cv-01133-RDP (N.D. Al. Apr. 17, 2012) (challenging under the antitrust laws the licensing agreements between BCBSA and BCBS-Alabama as being anticompetitive); *One Stop Envtl. v. Blue Cross & Blue Shield of Al.*, No. 2:12-cv-01910 (N.D. Al. May 17, 2012) (same); *Am. Elec. Motor Servs., Inc. v. Blue Cross & Blue Shield of Al.*, No. 2:12-cv-02169 (N.D. Al. June 6, 2012) (same); *Bajalieh v. Blue Cross & Blue Shield of Al.*, No. 2:12-cv-02185 (N.D. Al. June 15, 20212) (same). At bottom, as other plaintiffs' counsel have recognized, it is undeniable that BCBSA's legal interest in its licensing

system is sufficiently connected to the allegations here to merit inclusion of BCBSA as a defendant.

## CONCLUSION

For these reasons, BCBSA respectfully requests this Court to grant its Motion and allow it to intervene as a defendant in this matter.

Taylor, Porter, Brooks & Phillips LLP

BY: _____

John Stone Campbell, III, #23674
L. Adam Thames, #32722
Post Office Box 2471
Baton Rouge, Louisiana 70821
Telephone: (225) 387-3221
Telecopier: (225) 215-8704

*Counsel for Blue Cross and Blue Shield Association*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was this date served on the following via U.S. Mail, postage prepaid and properly addressed:

Nicholas R. Rockforte
Patrick W. Pendley
Stan P. Baudin
Christopher L. Coffin
**PENDLEY, BAUDIN & COFFIN, L.L.P**
Post Office Drawer 71
Plaquemine, Louisiana 70765

Tony Clayton
Clayton & Fruge
3741 Hwy 1
Port Allen, Louisiana 70767

*Attorney for Defendant Blue Cross Blue Shield of Louisiana*

*Attorneys for Plaintiffs*

Baton Rouge, Louisiana, this _____ day of July, 2012

_____
John Stone Campbell, III

7