

# Case Assignment
# Standard Civil Assignment

Case number **3:12CV-636-S**

Assigned : Judge Charles R. Simpson III
Judge Code : 4411

Designated Magistrate Judge : Dave Whalin
Magistrate Judge Code : 44AP

Assigned on 10/09/2012

[ Request New Judge ] ..... [ Return ]

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION
## CASE NO. 3-12-cv-636-S

| | | |
|---|---|---|
| DONALD RIDGE, individually and on behalf of a Class of persons similarly situated, | ) ) ) ) ) | PLAINTIFFS |
| v. | ) ) ) | |
| ANTHEM HEALTH PLANS OF KENTUCKY, INC., | ) ) ) | |
| BLUE CROSS AND BLUE SHIELD ASSOCIATION, and | ) ) ) | |
| WELLPOINT, INC. | ) | DEFENDANTS |

\* \* \* \* \* \* \* \*

## CLASS ACTION COMPLAINT

Plaintiffs, Donald Ridge ("Ridge"), by counsel, for their Complaint against the Defendants Anthem Health Plans of Kentucky, Inc. ("Anthem"), Blue Cross and Blue Shield Association ("BCBSA" or the "Association"), and Wellpoint, Inc. ("Wellpoint"), state as follows:

## INTRODUCTION

1.      According to BCBSA's website, the Association provides health insurance coverage for 100 million individuals, through its 38 local companies, including Anthem Health Plans of Kentucky, Inc.

2.      As set forth in this Complaint, Anthem enjoys unrivaled market power in Kentucky.  The dominant market share of Anthem is the direct result of an illegal agreement between Anthem and its members, in which dozens of the nation's largest

health insurance companies have agreed that they will restrict competition among themselves through the establishment of exclusive territories in exchange for the right to use the BCBSA marks, services, benefits, and brands. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans (collectively, the "Blues" or the "Blue entities"), and each individual Blue licensee, including Anthem. Through the terms of these *per se* illegal license agreements, the Blue entities, including Anthem, have explicitly agreed not to compete with one another, in direct violation of Section 1 of the Sherman Act. By so agreeing, they have perpetuated and strengthened the dominant market position that each Blue entity has historically enjoyed in its specifically defined geographic market. Indeed, the Blue entities collectively are the largest health insurers, as measured by number of subscribers, in 44 states.

3.    The members of the Blue entities, including Anthem, while operating as independent economic entities, are all licensees of the BCBSA. This licensure has entitled Anthem to certain rights within the BCBSA scheme, such as exclusive use of the "Blue Cross" or "Blue Shield" emblem within its defined territory. Importantly, BCBSA members elect a board of directors composed exclusively of members of Blue entities. The board of directors in turn establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive territories. There is no pro-competitive justification for these licensing agreements and restrictions on competition in exclusive territories. Instead, they are naked restraints on trade, are not ancillary to the legitimate and competitive purposes of Anthem, and have profound anticompetitive

2

effects.

4.     The Defendants' illegal conspiracy has furthered Anthem's market power and, in turn, contributed to skyrocketing premiums.  In a truly competitive market for health insurance, and absent the illegal agreement between Anthem and the other Blues to divide markets and eliminate competition, such inflated premiums would not be possible. In addition, the agreement among the Blue entities prohibits the sale or transfer of provider networks to non-Blue entity members and thus, further restrains competition. It has been recognized that the acquisition of a provider network is perhaps the most significant barrier to entry for health insurers considering entering a new geographic market, and that the cost of internally developing rather than acquiring such a network is often considered prohibitive. As a result, the contractual restrictions established through BCBSA and agreed to by the Blue entities create an immense barrier to entry into the market for health insurance in the states dominated by BCBSA.  Fair competition is not possible so long as Anthem and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of health insurance companies from competing in certain territories.

5.     As further described below, this arrangement between Anthem, BCBSA, and the Blue entities constitutes a naked territorial restraint on competition in the market for health insurance. The contracts, combinations, and conspiracies in restraint of trade alleged herein, are illegal under Section 1 of the Sherman Act, 15 U.S.C. §1.

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton

Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBSA and Anthem for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court also has jurisdiction over the claims asserted under the Kentucky Revised Statutes, pursuant to 28 U.S.C. § 1337(a), 28 U.S.C. 1367(a).

7.     This action is also instituted to secure injunctive relief against BCBSA and Anthem to prevent them from further violations of Sections 1 and 2 of the Sherman Act and the relevant chapters of the Kentucky Revised Statutes as hereinafter alleged.

8.     Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

## PARTIES

9.     Plaintiff Donald Ridge is a resident of Jefferson County, Kentucky, and a subscriber to Anthem.

10.     During the Class Period, Ridge contracted with and paid premiums directly to Anthem for health insurance for its employees.

11.     Defendant BCBSA is a corporation organized under the state of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled by thirty-eight (38) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names, including Defendant Anthem. BCBSA was created by these plans and operates as a licensor. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million—or one in three—Americans. BCBSA itself

4

does not provide health services and does not contract with physicians for the provisions of services, but it operates to create consistency and cooperation among its 38 members. It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members.  The 38 plans fund Defendant BCBSA.

12.     Defendant Anthem is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kentucky.  Anthem is by far the largest provider of healthcare benefits in Kentucky, collecting $326 million in premiums annually. The state's next largest insurer, Humana, collects just $27 million, or less than 10 percent as much as Anthem. The principal headquarters for Anthem is located at 13550 Triton Park Blvd., Louisville, Kentucky 40223.  Anthem does business in each county in the Commonwealth of Kentucky.

13.     Defendant Wellpoint, Inc., is a foreign corporation licensed to do business in Kentucky.   Its principal office is located at 120 Monument Circle, Indianapolis, Indiana  46268.

14.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, and had a substantial effect on, interstate commerce.

**FACTUAL ALLEGATIONS**

15.     Anthem enjoys unrivaled market dominance within the Commonwealth of Kentucky. For example, Anthem commands 85 percent of the market for individual health insurance plans, with nearly 127,000 customers. The next largest carrier, Humana, has less than 12 percent of the market, demonstrating the complete lack of meaningful competition within this market. A 2007 study published by the American Medical

Association shows Anthem's statewide market share for PPO plans was 66 percent. However, in Owensboro it was 73 percent and in Bowling Green the market share was 79 percent. Those figures represent a steep increase from earlier years. For example, data submitted to the U.S. Securities and Exchange Commission show Anthem's overall market share in Kentucky in 1993 was just 38 percent.

16.    The situation in Kentucky, while extraordinary, is not unique however, as the Blue entities, as BCBSA participants, all reap similar benefits in their respective service areas across the United States.

17.    Anthem's market dominance in Kentucky is the result of a systematic and longstanding agreement between and among Anthem and the remaining insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in Kentucky and the United States and to obstruct the entry of non-Blue entity insurers, thereby eliminating competition.

18.    This illegal restraint is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with Defendant BCBSA. As detailed herein, the member health insurance plans of BCBSA have each entered into licensing arrangements with BCBSA that allocate the geographic markets for health insurance by limiting each Blue's activity outside of a designated service area, thereby preventing competition among BCBS companies. Moreover, these agreements effectively obstruct entry by non-BCBS insurers by, among other things, preventing the sale or transfer of established networks to non-Blue entities.

19.    These provisions have insulated Anthem and the other Blues from

competition by both Blues and non-Blues in each of their respective service areas.

20.     These provisions of the BCBS agreements operate as effective restraints on competition, and have no sufficient economic justification aside from protecting Anthem and other Blues entities from competition.

21.     It is well recognized that competition drives down prices and this is true in health insurance as it is in other markets.

22.     Defendants' anticompetitive practices, by eliminating competition and reducing the choices available to health insurance consumers, have raised the premiums that residents in Kentucky must pay to obtain health insurance.

23.     This has further allowed Anthem to collect supra-competitive profits, higher than they would have experienced had there been unimpeded competition in the states in question.

24.     Indicia of supra-competitive profits include high medical loss ratios, high underwriting margins, and surpluses well above statutory requirements.

25.     Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

26.     Anthem's anticompetitive practices have a direct adverse effect on its subscribers.

27.     As an example, an agreed order dated December 17, 2010 between Anthem and the Kentucky Department of Insurance stated that Anthem delayed claim processing for benefits, failed to provide clear explanations about why it denied claims, failed to retain records, and violated a number of state insurance laws.  Anthem also agreed to pay a $500,000 civil penalty as part of the order.  These practices and others

would not exist or would be severely undermined if true competition existed in the Commonwealth of Kentucky.

28.     By and through their agreement with the other Blues, Anthem has been able to acquire and maintain a grossly disproportionate market share for health insurance products in Kentucky.

29.     Consequently, Anthem has benefited from inflated surpluses and increased underwriting margins, and has exploited the decreased medical loss ratios in the allocated market to the resulting detriment and antitrust injury of health insurance subscribers in Kentucky.

30.     The Defendants' co-conspirators include other Blues that are not Defendants in this action.

31.     Anthem and the other Blues are all independently owned and operated licensees of the BCBSA that conduct business in distinct geographical regions.

32.     The Blues have engaged in a common course of illegal conduct to increase their profits to the detriment of subscribers.

### History of the Blue Cross and Blue Shield Plans and of BCBSA

33.     BCBS represents a coordinated effort by health insurers to create a national brand with separate companies in local areas.

34.     From inception, the Blue companies have quickly captured dominant market shares in their local service areas.

35.     The history of BCBSA demonstrates that the geographic restrictions in its trademark licenses originated in an effort to avoid competition between the various Blues, and to ensure that each Blue would retain a dominant position within its local

service areas.

36.    In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.

37.    In 1938, the Committee on Hospital Service adopted a set of principles to guide its approval of prepaid hospital plans.  One such principle was that the plans would not compete with each other.

38.    The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.

39.    Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

40.    In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and approve the independent Blue Shield plans.

41.    When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

42.    In 1960, the AMCP changed its name to the National Association of Blue

9

Shield Plans, which in 1976 changed its name to the Blue Shield Association.

43.     Initially, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

44.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.

45.     From 1947-48, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans to be called "Blue Cross and Blue Shield Health Service, Inc.," but the proposal failed.  One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

46.     Instead, to address competition from commercial insurers and competition from other Blue plans, and to ensure national cooperation among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.

47.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.

48.     In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

49.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the "Blue Shield Association" in 1976.

50. In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.

51. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

52. That same year, BCBSA's member plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.

53. As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.

54. In 1987, the member plans of BCBSA held an "Assembly of Plans"— a series of meetings held for the purpose of determining how they would and would not compete against each other.

55. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.

56. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans, an increasing problem that had caused complaints from many Blue plans.

57. Subsequently, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as

well as the ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

58.     Although Blue Cross and Blue Shield plans were originally set up as not-for-profit entities, during the 1980s and afterwards, they began to operate less like charitable entities and more like for-profit corporations.

59.     Thus, in 1986, Congress revoked the Blues' tax-exempt status, leading to the formation of for-profit subsidiaries. When this process unfolded in Kentucky, the state's Attorney General filed suit against the company alleging that Anthem policyholders were the victims of gouging and excessive costs.

60.     Anthem settled the case with Kentucky Attorney General Ben Chandler in 1999 for $45 million.

61.     Since then, the majority of the Blues converted to for-profit status, and they still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

62.     Anthem has been hugely profitable in Kentucky in recent years. The company's cumulative net income soared 441 percent during the period between 2005 and 2011, when it earned $663.2 million.

## The BCBSA and Blue Entities

63.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade

12

association for the Blue Cross Blue Shield companies."

64.     The Association is a separate legal entity and it purports to promote the common interests of the independent Blue entities.

65.     Defendant BCBSA and the Blue entities cover a large percentage of the subscribers in the managed care market in most states and in some local areas, and they also include a large percentage of doctors and hospitals in their network of contracted providers.

66.     BCBSA states that over 100 million individuals are enrolled with Anthem and co-conspirator Blue plans, approximately one in three individuals nationwide.

67.     The Blue licensees include many of the largest health insurance companies in the United States who would be potential competitors.  Indeed, 15 of the 25 largest health insurance companies in the country are BCBSA licensees.

68.     Absent the Association's licensing agreements with each of the Blues, these companies would compete against each other in the market for commercial health insurance.

69.     BCBSA's member plans are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

70.     Instead, with and through the Association, the Blues have divided health insurance markets throughout the United States to eliminate competition.

71.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common

direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."

72.     BCBSA not only requires each individual Blue plan to agree to the territorial restrictions in the licensing agreements, but also serves as the epicenter for the Blues' communications and arrangements in furtherance of the anticompetitive agreements.

73.     As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commission of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."

74.     One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS member companies…works cooperatively in a number of ways that create significant market advantages…."

75.     BCBSA, as a separate legal entity, is a convenient vehicle for anticompetitive agreements between and among the otherwise economically independent Blues, termed "Member Plans."

76.     The Association's board of directors consists of the chief executive officer from each of the Blues and BCBSA's own chief executive officer.

77.     The board of directors holds meetings to discuss the administration and management of BCBSA and its Member Plans, while smaller committee meetings address specific health insurance issues.

78.     These meetings provide a forum for representatives of the Blues to share information on such issues, and that information is later disseminated to all 38 members.

79.     In addition, BCBSA includes numerous committees governed by the Blues; it sponsors various meetings, seminars, and conferences attended by the Blues;

and produces manuals, reports, list serves, and other correspondence to the Blues, all in furtherance of the conspiracy.

80.     Furthermore, BCBSA has strict rules and regulations that all members of BCBSA must obey concerning the Licensing Agreements members must adhere to and the guidelines proposed members must adhere to prior to joining the Association.[1]  Those regulations provide for amendment with a three-fourths vote of the Blues.

81.     The Association polices the compliance of all members of BCBSA with its rules and regulations. The Guidelines state that the Association's Plan Performance and Financial Standards Committee (the "PPFSC") "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."

82.     In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."

83.     In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

84.     The Association controls and administers the disciplinary process for

---

[1] These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a Member Plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a Member Plan's license.

85. The Association controls the termination of existing members from BCBSA. According to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

86. As the foregoing demonstrates, BCBSA not only enters into anticompetitive agreements with the Blue entities to allocate markets, but also facilitates the cooperation and communications between the Blues to suppress competition within their respective areas of operation.

87. BCBSA is a convenient organization through which the Blue entities can enter into patently illegal territorial restraints between and among themselves.

**The Horizontal Agreements Not to Compete In the Licensing Arrangements Between BCBSA and its Member Plans, Including Anthem are *Per Se* Violations of the Sherman Act and Its Kentucky Equivalent**

88. The rules and regulations of BCBSA, including but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between would-be competitors, the Blue licensees, to divide the geographic market for health insurance. As such, they are a *per se* violation of Section 1 of the Sherman Act.

89. Through the License Agreements, each Blue licensee agrees that neither it

nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

90.     Through the Guidelines and Membership Standards, each Blue licensee agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.

91.     This provision directly limits the ability of each Blue plan to generate revenue from non-Blue business.

92.     This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

93.     Through the Guidelines and Membership Standards, each Blue licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.

94.     The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business.

95.     This provision directly limits the ability of each Blue plan to generate

revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

96.     Therefore, each Blue licensee has agreed with the Association that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.

97.     The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

98.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

99.     BCBSA and the Blues admit to the existence of territorial market divisions and the consequences of violating them.

100.    For example, the former Blue licensee in Ohio has publicly stated that the BCBSA Member Plans agreed to include territorial restrictions in the Guidelines in order to block the sale of one member plan to a non-member plan as that would create increased competition.

101.    Blue licensee, Defendant WellPoint, describes the restrictions on its ability to do business in its February 22, 2012 Form 10-K filed with the United States Securities and Exchange Commission, stating that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell

18

BCBS products," and that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the [BCBS] names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue . . . attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the [BCBS] names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national net revenue . . . attributable to health benefit plans must be sold, marketed, administered or underwritten under the[BCBS] names and marks."

102.   The Association imposes harsh penalties on those that violate the territorial restrictions.

103.   According to the Guidelines, a licensee who violates one of the territorial restrictions could face "[l]icense and membership termination."

104.   If a Member Plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."

105.   In addition, in the event of termination, a plan must pay a fee to BCBSA.

106.   According to WellPoint's February 22, 2012 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee which would "allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

107.   There are numerous Blue plans and non-Blue businesses owned by such plans that could and would compete effectively in designated service areas, but for the territorial restrictions.

108.   Instead, the BCBS Defendants in those areas dominate the markets. The

territorial restrictions have therefore barred competition from the respective commercial health insurance markets.

109. For example, with approximately 34 millions enrollees, WellPoint is the largest health insurer in the country by total medical enrollment, and is the BCBSA licensee for 14 states including Kentucky.

110. Wellpoint also serves the entire nation through its non-Blue brand subsidiary, UniCare.

111. Wellpoint operates in Kentucky through a Blue subsidiary known as Anthem Health Plans of Kentucky. However, but for the illegal territorial restrictions described herein, Wellpoint, through UniCare, would likely offer its health insurance products in Kentucky and would compete with its Blue subsidiary. Such competition would result in lower health care costs and premiums paid by affected enrollees.

112. Similarly, Blue Cross and Blue Shield of Florida is the 15th largest health insurer in the country by total medical enrollment with more than seven million enrollees. But for the illegal territorial restrictions, it could offer its health insurance services and products in Kentucky and other states and compete with Anthem. Such competition would result in lower health care costs and premiums paid by Anthem enrollees.

113. Therefore, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing Member Plans from competing with each other and with non-Blue subsidiaries owned and operated by Blue licensees.

114. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition

were permitted.

### The Anticompetitive Acquisition Restrictions in the BCBSA Licensing Agreements

115.    In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any Member Plan.

116.    These provisions create a significant barrier to entry for companies that are not BCBSA members or their affiliates.

117.    As such, they further restrain competition by helping BCBS companies to capture and maintain high market shares and elevate prices.

118.    First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."

119.    Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee."  However, as alleged above, the Member Plans control the entry of new members into BCBSA.

120.    Should a non-member attempt to join BCBSA in order to obtain control or to acquire a substantial portion of the assets of a Member Plan, the Association—and through it, the Member Plans—could easily block its membership.

121.    Moreover, such a new member would be immediately limited by the BCBSA license's territorial restrictions.

122.    Such a new member would be forbidden from operating as a Blue entity in

a service area already inhabited by a Blue entity, yet it would be required to make at least 66.7% of its revenue under the BCBS name.

123.    For many potential acquirers with a pre-existing footprint in the U.S. health insurance market, these two conditions would be impossible to meet.

124.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired).

125.    These include four situations in which a Member Plan's license will terminate ***automatically***: (1) if any institutional investor becomes beneficially entitled to 10% or more of the voting power of the Member Plan; (2) if any non-institutional investor becomes beneficially entitled to 5% or more of the voting power of the Member Plan; (3) if any person becomes beneficially entitled to 20% or more of the Member Plan's then outstanding common stock or equity securities; or (4) if the Member Plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the Member Plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10% or more of the voting power, no non-institutional investor is beneficially entitled to 5% or more of the voting power, and no person is beneficially entitled to 20% or more of the then outstanding common stock or equity securities.

126.    These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Member Plans and of a majority weighted vote of the disinterested Member Plans.

127.    These restraints effectively preclude the sale of a BCBSA member to a non-member entity absent special approval.

128.    These acquisition restraints reduce competition by substantially reducing the ability of non-member insurance companies to expand their business.

129.    In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area or to acquire a network by buying some or all of an existing plan in that area.

130.    Through the acquisition restrictions, BCBSA and the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.

131.    Blue provider networks may be the most cost effective due to historical tax breaks, favorable legislation, and long-term presence in a region.

132.    In fact, national insurers rarely enter a new regional market without purchasing a large local firm.

133.    By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

134.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the Member Plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency and protect themselves and each other from competition.  The net effect is less competition and

higher premium costs for consumers.

**The BCBSA Licensing Agreements Have Reduced Competition in Designated Areas**

135.    Anthem, as licensee, member, and parts of the governing body of BCBSA, has conspired with the other Member Plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.

136.    Many of the Member Plans with which Anthem has conspired would otherwise be significant competitors of Anthem, and they likewise would be competitors of each other.

137.    As noted above, without the illegal territorial restrictions on competition, WellPoint, the largest health insurer in the country by total medical enrollment, would likely offer health insurance services and products in competition with Anthem in Kentucky, through its non-Blue brand subsidiary, UniCare.

138.    Likewise, but for the illegal territorial restrictions summarized above, other Blue entities, such as Blue Cross and Blue Shield of Florida (the 15th largest health insurer in the country by total medical enrollment with more than seven million enrollees) would be likely to offer health insurance services and products in competition with Anthem in Kentucky. Such competition would result in lower health care costs and premiums paid by affected enrollees.

139.    Instead, there are just five health plans in Kentucky, including Anthem, that control 99 percent of the state's health insurance market.

140.    In addition to the foregoing example, there are dozens of other Blue plans that would and could compete in the designated areas but for the illegal territorial

restrictions.

141.    In addition, Anthem could compete with other Blue members but for the illegal territorial restrictions.

142.    As alleged above, 15 of the 25 largest health insurance companies in the country are Blue plans.

143.    If all of these plans, together with all other BCBSA members, were able to compete in each other's territories, the result would be lower costs and thus, lower premiums paid by enrollees.

## CLASS ACTION ALLEGATIONS

144.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of similarly situated persons.

145.    Plaintiffs bring this action seeking damages and permanent injunctive relief on behalf of a class of plaintiffs pursuant to the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "Class") defined as:

> All persons or entities who, from October 8, 2007, to the present (the "Class Period"), have paid health insurance premiums, all or in part, to Anthem for individual health insurance or for small group full-service commercial health insurance.

> Additionally, Plaintiffs seek a class on behalf of:

> All persons or entities who, from October 8, 2007, to the present (the "Class Period"), have paid health insurance premiums, all or in part, to any BCBSA licensee for individual health insurance or for small group full-service commercial health insurance.

146.    Plaintiffs are members of the Class, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.

147.     Plaintiffs are represented by counsel competent and experienced in the prosecution of class action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.

148.     The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class members.

149.     The Class members are so numerous that joinder of all members is impracticable.

150.     Defendants' relationships with the Class members and Defendants' anticompetitive conduct have been substantially uniform.

151.     Common questions of law and fact will predominate over any individual questions of law and fact.

152.     Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class members, thereby making appropriate final injunctive relief with respect to Class members as a whole.

153.     There will be no extraordinary difficulty in the management of this class action.

154.     Common questions of law and fact exist with respect to all Class members and predominate over any questions solely relating to individual members.

155.     Among the questions of law and fact common the Class members, many of which cannot be validly disputed, are the following:

a.  Whether the BCBSA and its members Blues including Anthem, entered into agreements to divide geographic markets for health insurance;

b.  Whether such agreements constitute a contract, combination, or conspiracy pursuant to Section 1 of the Sherman Act;

c. Whether such agreements constitute illegal restraints of trade in violation of Section 1 of the Sherman Act;

d. Whether virtually all Class members have suffered injury or are threatened to suffer injury flowing directly from such agreements to divide geographic markets for health insurance alleged herein;

e. The proper measure of damages sustained by the Class as a result of the agreements alleged herein; and

f. The appropriate injunctive relief to enjoin Defendants' illegal conduct.

156. These and other questions of law and fact are common to Class members and predominate over any issues affecting only individual Class member.

157. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and Anthem.

158. This class action is superior to other available methods for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.

159. The damages suffered by many Class members are small in relation to the expense and burden of individual litigation and, therefore, it is highly impractical for such Class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## COUNT I

**(Contract, Combination, or Conspiracy in Restraint of Trade—*Per se* and Rule of Reason Violation of Section 1 of the Sherman Act)**

160. Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as

if set forth herein.

161.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities—including Defendants Anthem and Wellpoint—represent a contract, combination, and conspiracy to unreasonably restrain trade within the meaning of Section 1 of the Sherman Act.

162.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members, or Blues.  By so doing, the Blues—including Defendants—have agreed to suppress competition and increase prices for individual and small group health insurance sold in their respective territories in violation of Section 1 of the Sherman Act.

163.    These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

164.    As a direct and proximate result of Anthem's continuing violations of Section 1 of the Sherman Act, Plaintiffs and other members of the Class have suffered injury and damages of the type that the federal antitrust laws were designed to prevent.

165.    Such injury flows directly from that which makes Defendants' conduct unlawful.

166.    These damages consist of having paid higher health insurance premiums to Anthem than they would have paid with increased competition and but for the anticompetitive agreement.

167.    As Anthem's parent entity, Defendant Wellpoint directly benefits from its role in the conspiracy to restrain competition.

168.     Plaintiffs and the Class seek monetary damages from Anthem, Wellpoint and BCBSA for their violations of Section 1 of the Sherman Act.

169.     The Defendants' unlawful conduct threatens to continue to injure the Plaintiffs and the Class members.

170.     Plaintiffs and the Class seek a permanent injunction prohibiting Anthem, Wellpoint and BCBSA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

**COUNT II**

**(Violation of KRS Chapter 367)**

171.     Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if set forth herein.

172.     KRS 367.110(2) provides that "'Trade' and 'commerce' means the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth."

173.     KRS 367.170(1) declares unlawful all "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce … ."

174.     KRS 367.175(1) provides that "[e]very contract, combination in the form of trust and otherwise, or conspiracy, in restraint of trade or commerce in this Commonwealth shall be unlawful."

175.     KRS 367.175(4) declares the above practice illegal, subjecting participants

to a Class C Felony in addition to civil remedies, fines and penalties.

176.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities—including Defendants Anthem and Wellpoint—represent a contract, combination, and conspiracy to unreasonably restrain trade within the meaning of KRS 367.175.

177.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities—including Defendants Anthem and Wellpoint—represent unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce within the meaning of KRS 367.170.

178.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members, or Blues.  By so doing, the Blues—including Defendants—have agreed to suppress competition and increase prices for individual and small group health insurance sold in their respective territories in violation the above-referenced statutes.

179.    These market allocation agreements are *per se* illegal under the above-referenced statutes.

180.    As a direct and proximate result of Anthem's continuing violations of the above-referenced statutes. Plaintiffs and other members of the Class have suffered injury and damages of the type that the laws were designed to prevent.

181.    Such injury flows directly from that which makes Defendants' conduct unlawful.

182.    These damages consist of having paid higher health insurance premiums

to Anthem than they would have paid with increased competition and but for the anticompetitive agreement.

183.    As Anthem's parent entity, Defendant Wellpoint directly benefits from its role in the conspiracy to restrain competition.

184.    Plaintiffs and the Class seek monetary damages from Anthem, Wellpoint and BCBSA for their violations of the above-referenced statutes.

185.    The Defendants' unlawful conduct threatens to continue to injure the Plaintiffs and the Class members.

186.    Plaintiffs and the Class seek a permanent injunction prohibiting Anthem, Wellpoint and BCBSA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## COUNT III

### (Violation of KRS Chapter 304)

187.    Plaintiffs repeat and reallege the allegations of the foregoing paragraphs as if set forth herein.

188.    KRS 304.12-010 provides that "[n]o person shall engage in this state in any practice which is prohibited in this subtitle, or which is defined therein as, or determined pursuant thereto to be, an unfair method of competition or any unfair or deceptive act or practice in the business of insurance."

189.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities—including Defendants Anthem and Wellpoint—represents an unfair method of competition or an unfair or deceptive act or

practice in the business of insurance within the meaning of KRS 304.12-010.

190.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members, or Blues.  By so doing, the Blues—including Defendants—have agreed to suppress competition and increase prices for individual and small group health insurance sold in their respective territories in violation the above-referenced statutes.

191.    These market allocation agreements are *per se* illegal under the above-referenced statute.

192.    As a direct and proximate result of Anthem's continuing violations of the above-referenced statutes. Plaintiffs and other members of the Class have suffered injury and damages of the type that the law was designed to prevent.

193.    Such injury flows directly from that which makes Defendants' conduct unlawful.

194.    These damages consist of having paid higher health insurance premiums to Anthem than they would have paid with increased competition and but for the anticompetitive agreement.

195.    As Anthem's parent entity, Defendant Wellpoint directly benefits from its role in the conspiracy to restrain competition and engage in these illegal acts.

196.    Plaintiffs and the Class seek monetary damages from Anthem, Wellpoint and BCBSA for their violations of the above-referenced statute.

197.    The Defendants' unlawful conduct threatens to continue to  injure  the Plaintiffs and the Class members.

198.    Plaintiffs and the Class seek a permanent injunction prohibiting Anthem, Wellpoint and BCBSA from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

A.    Determine that this action may be maintained as a class action under Federal Rule of Civil Procedure Rule 23;

B.    Adjudge and decree that BCBSA, Anthem and Wellpoint have violated Section 1 of the Sherman Act and/or have engaged in unlawful acts pursuant to KRS Chapter 367 and 304;

C.    Permanently enjoin BCBSA and Anthem from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

D.    Award Plaintiffs and the Class damages in the form of three times the amount by which premiums charged by Anthem have been artificially inflated above their competitive levels during the Class Period;

E.    The restoration of money received by Defendants as a result of their unlawful practices and/or acts;

F.    Award costs and attorneys' fees to Plaintiffs;

G.    For a trial by jury; and

H.    Award any such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b), Plaintiffs hereby demand a

trial by jury on all issues.

Respectfully submitted,

**JONES WARD PLC**
Lawrence L. Jones II
A.  Layne Stackhouse
Alex C. Davis


/s/ Lawrence L. Jones II_____
Marion E. Taylor Building
312 S. Fourth Street, 6th Floor
Louisville, Kentucky 40202
Telephone: (502) 882-6000
larry@jonesward.com
layne@jonesward.com
alex@jonesward.com