# Exhibit A

# UPMC's First Amended Complaint

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UPMC, UPMC HEALTH PLAN, INC.,
AND PRODIGO SOLUTIONS, LLC,

       Plaintiffs,

v.

HIGHMARK, INC., WEST PENN
ALLEGHENY HEALTH SYSTEM, INC.,
PROTOCO PPI LLC, PROTOCO SUPPLY
CHAIN SERVICES LLC, AND HMPG
PHARMACY LLC,

       Defendants.

Case No. 2:12-cv-00692-JFC

Judge Joy Flowers Conti

*Electronically Filed*

Related to Case No. 2:09-cv-00480-JFC

## FIRST AMENDED COMPLAINT

1.　　Defendant Highmark, Inc. ("Highmark") is both a monopolistic seller of health insurance and a monopsonistic purchaser of healthcare services and, leveraging these roles to its full advantage, has held the region's insurance consumers and healthcare providers subservient to its demands for more than a decade. Unable to compete with other insurers on the merits of its services, Highmark has maintained a stranglehold on Western Pennsylvania's health insurance market through a course of unlawful, malicious, and unabashedly anticompetitive conduct intended to crush even the slightest hint of competition. Indeed, much of Highmark's decision making over the past 15 years has been driven by its desire to perpetuate its own monopoly-monopsony position.

2.　　As a monopolist and a monopsonist, Highmark has been uniquely positioned to control both the selling and purchasing sides of Western Pennsylvania's healthcare market. Highmark the monopolist decides what corporations and individuals will pay for health insurance premiums, increasing them regularly and with impunity. Highmark the monopsonist

decides what reimbursement rates healthcare providers will receive and therefore which hospitals live and which die. Highmark has used its unchecked power over reimbursement rates to punish and/or extinguish those providers who have dared to challenge its monopoly-monopsony by, among other things, attempting to support other insurers. By dominating both the selling and purchasing sides of the healthcare market in Western Pennsylvania, Highmark has insulated itself from market forces, blocked any significant entry by competing health insurers, squelched innovation, and reaped the benefits of more than a decade of monopoly rents, all to the detriment of the citizens of Western Pennsylvania.

3.      The principal target and victim of Highmark's unchecked anticompetitive conduct has been UPMC and its Health Plan, UPMC Health Plan, Inc. ("UPMC Health Plan or Health Plan"). Recognizing the threat that a successful UPMC armed with its own insurance division would pose to Highmark's monopoly-monopsony power, Highmark hatched and executed a plan to destroy UPMC as a negotiating entity, starve UPMC Health Plan of the revenues necessary to emerge as a significant insurance competitor, and stifle competition from other insurers. Under this plan, Highmark leveraged its monopoly-monopsony power to steer patients away from UPMC and into West Penn Allegheny Health System, Inc. ("WPAHS"), drained UPMC of revenues through extremely low reimbursement payments so it could not fund its Health Plan, and launched a broad campaign to disparage UPMC management and UPMC's business model. Flush with a multi-billion dollar war chest of reserves amassed on the backs of overcharged employers and subscribers, Highmark has committed hundreds of millions of dollars implementing this plan. And it has been successful. Neither UPMC Health Plan, nor any other insurer, has been able to put a significant dent in Highmark's insurance monopoly over the past 15 years.

4.     A central element of Highmark's plan to preserve and strengthen its monopoly-monopsony has been a conspiracy between and among Highmark, certain of its consultants, and its co-defendant WPAHS. Highmark created WPAHS around 2000 from the bankruptcy of the then largest statewide integrated provider, Allegheny Health Education and Research Foundation ("AHERF"). Although WPAHS was destined for financial collapse from its creation, Highmark has artificially propped it up throughout its history with cash infusions, grants, "loans," after-the-fact reimbursement adjustments and other sweetheart deals. In exchange for Highmark's direct and indirect largesse, WPAHS has agreed to assist Highmark in manipulating the healthcare and health insurance markets, damaging UPMC and its Health Plan, and maintaining Highmark's health insurance monopoly.

5.     The conspiracy works as follows. WPAHS—disregarding its own economic interests in maintaining capacity and expenses commensurate with demand—has agreed to maintain excess capacity along with the pretense that it is an independently run organization in exchange for Highmark's infusions of cash, assurances that it would keep the dismally performing WPAHS out of bankruptcy, and an agreement to give WPAHS better financial treatment than other providers, including UPMC. The excess capacity that WPAHS agreed to maintain has allowed Highmark and its consultants to threaten providers who seek increased reimbursement from Highmark, who support or partner with UPMC, or who otherwise challenge Highmark's dominance with the specter of redirecting their patient volumes (and thus their revenues) to WPAHS. To ensure that Highmark's stranglehold on the insurance market and hence support of WPAHS would not dissipate, WPAHS also agreed to refuse to offer any national insurers reimbursement rates as favorable as those it offered Highmark. It did so despite its excess capacity and need for increased patient admissions.

-3-

6.     Thus, Highmark has deployed its creation, WPAHS, not as a competitive alternative to benefit patients, but rather as a weapon in its war on insurance competition.  Even though WPAHS has higher overall costs and lower quality services than UPMC, Highmark has continued to steer patients to WPAHS to their detriment.

7.     Among other anticompetitive effects, Highmark's conduct has raised significant barriers to entry for potential insurance competitors.  Holding local hospitals hostage to its unique ability to supply or withhold significant patient volume, Highmark the monopsonist has driven down reimbursement far below the rates paid for similar services in similar markets and to the point where UPMC and other non-colluding hospitals had no choice but to charge other insurers higher rates.  In this sense, Highmark has leveraged its monopsony power over reimbursement rates to preserve its monopoly.  Combined with WPAHS's agreement to refuse to contract with any national insurers at rates as favorable as those it offered Highmark, and the Defendants' broader course of anticompetitive conduct, these supracompetitive rates to outside insurers have created significant barriers to entry in the relevant insurance markets.  As a result, Highmark's monopoly and monopsony remain unchallenged to date.

8.     While Highmark has intended to and has successfully foreclosed competition in the relevant insurance market, Highmark's overarching goal has always been to eliminate the Health Plan as a possible threat to Highmark's insurance monopoly.  To that end, Highmark has intentionally starved UPMC of reimbursement rates so it would not have the funds necessary to finance the Health Plan's entry into the insurance market and threatened to steer more patients away from UPMC if it attempted to compete as an insurer.  Indeed, as a monopsonist, Highmark controls the rates paid to UPMC, and, consequently, has had free reign to deprive UPMC of the capacity to build a competitive insurer.

-4-

9.      To be sure, Highmark's "monopsonist pricing" could have benefited the region's consumers of healthcare had Highmark used its cost savings to reduce insurance premiums. But such benevolence was never part of Highmark's plan to crush UPMC, its Health Plan, and competition generally. Instead, exploiting the absence of competition created by its unlawful conduct, Highmark has steadily increased insurance premiums charged to employers and used its ill-gotten gains on the provider and consumer sides of the market to amass an amazing hoard of excess reserves, now exceeding $5 billion. Highmark has also, by its own admission, been "ineffective" at controlling utilization of healthcare and at collaborating with providers to develop new, more cost-efficient models of care, resulting in additional costs to its subscribers. None of this is surprising; monopolists such as Highmark face little or no competitive pressure to encourage innovation or reduce costs, since they can recover even excessive costs and a large profit in any event, which is precisely what Highmark has done.

10.     Highmark, more recently, has sought to streamline its conspiracy by entering into an "Affiliation Agreement" with WPAHS. The principal goals of this agreement have been to coerce UPMC into long-term renewal of its Highmark contracts and, ultimately, to continue to exclude competition from outside insurers. Since the affiliation has been announced, Highmark, its consultants and its co-conspirator, WPAHS, have only stepped up their illegal threats and coercive tactics, including threatening to eliminate patient volume to independent healthcare providers that have contracted with or have entertained contracting with UPMC or its Health Plan, and denying providers patient volume unless the provider hires the services of Defendants Protoco PPI LLC, Protoco Supply Chain Services LLC, and HMPG Pharmacy LLC, Highmark's new supply chain business, and other consultants. The continued objective has been to preserve Highmark's monopsony rates to providers, and to sustain the high barriers to entry which have

impeded or prevented real health insurance competition in Western Pennsylvania for more than a decade. To that end, Highmark recently indicated that it will expend at least $1 billion of its inflated premiums and ill-gotten reserves to formally acquire provider networks, physicians, and hospitals, all of which it will use to further solidify its monopoly-monopsony position.

11.     This continuing conspiracy and campaign of predation—on employers, consumers, providers, and its particular focus on crippling UPMC—has almost certainly cost UPMC and the citizens of Western Pennsylvania billions of dollars over the years, dollars that went into Highmark's bloated reserves or into the pockets of its co-conspirators.

12.     This Court's intervention is necessary to remedy the harms to competition which have resulted from Highmark's and WPAHS's conduct, described in further detail below, and to compensate UPMC for the great damage already done. The anticompetitive conduct must also be brought to a halt, necessitating an award of appropriate equitable relief.

## PARTIES

13.     Plaintiff UPMC is a 501(c)(3) not-for-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.

14.     Plaintiff UPMC Health Plan, Inc. is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.

15.     Plaintiff Prodigo Solutions, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania. Prodigo Solutions is a wholly-owned, for-profit subsidiary of UPMC.

16.     Defendant Highmark Inc. is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business in Pittsburgh, Pennsylvania.

17.     Defendant WPAHS is a 501(c)(3) not-for-profit corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

18.     Defendant Protoco PPI, LLC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business in Pittsburgh, Pennsylvania.  Protoco PPI is a Highmark company and provides group purchasing of pharmaceuticals and physician preference items.

19.     Defendant Protoco Supply Chain Services LLC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business in Pittsburgh, Pennsylvania.  Protoco Supply Chain Services is a Highmark company and provides supply chain management services, group purchasing, and distribution of all items other than pharmaceuticals and physician preference items.

20.     Defendant HMPG Pharmacy LLC is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business in Pittsburgh, Pennsylvania.  HMPG Pharmacy is a Highmark company and provides pharmacy distribution services.

## JURISDICTION & VENUE

21.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction), § 1337(a) (Antitrust), and § 1338(a), (b) (Trademark) because the causes of action asserted herein arise under Sections 1 and 2 of the Sherman Act, 15

-7-

U.S.C. §§ 1, 2, Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 39 of the Lanham

Act, 15 U.S.C. § 1051 *et seq.* This Court has jurisdiction over the claims in this action that arise

under the laws of the Commonwealth of Pennsylvania pursuant to 28 U.S.C. § 1367(a), because

the state law claims form part of the same case or controversy and derive from a common

nucleus of operative facts.

22.     This Court has personal jurisdiction over Defendants Highmark, WPAHS,

Protoco PPI, LLC, Protoco Supply Chain Services LLC, and HMPG Pharmacy LLC as they have

ongoing and continuous contacts with this judicial district.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because

UPMC, as well as Defendants Highmark, WPAHS, Protoco PPI, LLC, Protoco Supply Chain

Services LLC, and HMPG Pharmacy LLC, maintain their headquarters in this district and a

substantial part of the events or omissions giving rise to the claims asserted herein occurred

within this judicial district.

24.     The conduct alleged herein was committed in and affected interstate commerce.

## RELEVANT MARKETS

25.     The provision of commercial health insurance is a relevant product market.

Health insurance is essential to accessing healthcare, as very few individuals can afford the risk

of financing health services on their own to any significant degree. Government-financed health

insurance programs for the Veteran's Administration health system and Medicare/Medicaid are

not included in the product market for purposes of this litigation. Those programs have specific

eligibility requirements based on age, income, veteran status, and other factors, and are not

accessible to the ordinary consumer of health insurance services. Nor do those programs provide

a meaningful competitive constraint on the market for commercial health insurance.

26.    There is no adequate substitute for commercial health insurance available to businesses and individual consumers.  Commercial health insurance is so important that the Patient Protection and Affordable Care Act requires all individuals to purchase a minimum level of insurance coverage beginning in 2014.

27.    The provision of Medicare Advantage plans is an additional relevant product market.  The provision of Medicare Advantage plans constitutes a market separate from the provision of commercial health insurance plans because Medicare Advantage is available only to individuals who are disabled or elderly.  Those who qualify for Medicare Advantage would not find it cost-effective to switch to commercial health insurance.  Thus, Medicare Advantage insurance is not a substitute for commercial health insurance.

28.    Medicare Advantage is also distinguished from other government-financed health insurance programs, such as Medicare and Medicaid.  It constitutes a separate relevant product market because the rates for Medicare Advantage are negotiated between each insurer and provider, rather than set by the government.  As a result, the terms of Medicare Advantage can be much more beneficial for consumers.  (Hereinafter, the term "relevant insurance markets" refers to both the markets for the provision of commercial health insurance and the provision of Medicare Advantage plans.)

29.    The provision of inpatient hospital services ("inpatient services/care" or "provider market") is also a relevant product market.  Inpatient services consist of inpatient surgical, medical, and supporting services provided in a hospital setting to patients.  This market excludes outpatient services.  The choice of inpatient, as opposed to outpatient, services is largely determined by physicians, and is based on the medical needs of the patient, not on the relative

cost of the services.  Thus, inpatient services and outpatient services are not substitutes for one another.  The relevant product market, however, is no narrower than all inpatient services.

30.     The purchase of healthcare provider services by insurance companies on behalf of commercial insureds is another relevant product market.  Generally speaking, patients do not purchase services directly from healthcare providers.  Patients purchase commercial health insurance products from health insurance companies, which purchase services from healthcare providers.

31.     Another relevant product market is the purchase of provider services by insurance companies on behalf of Medicare Advantage insureds.  Those who are eligible for Medicare Advantage do not purchase services directly from healthcare providers.  Eligible patients purchase Medicare Advantage products from insurance companies, which purchase services from healthcare providers. (Hereinafter, the term "relevant purchase markets" refers to both the markets for the purchase of provider services by insurance companies on behalf of commercial insureds and the purchase of provider services by insurance companies on behalf of Medicare Advantage insureds.)

32.     The relevant geographic market for each of the relevant product markets is Western Pennsylvania, which includes Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre, Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland counties.  Healthcare markets are generally regional as, for most types of treatment, consumers only travel a limited distance to obtain the services they need.  Although for many subspecialties, the geographic markets are far broader, Western Pennsylvania is the appropriate geographic market for addressing the claims in this Complaint.

**FACTS**

**I.**   **HIGHMARK'S UNCHECKED DOMINANCE LEADS TO THE CREATION OF THE UPMC HEALTH PLAN.**

33.     Highmark was formed in 1996 by the merger of Blue Cross of Western Pennsylvania ("BCWPA") with Pennsylvania Blue Shield. Then-Attorney General Tom Corbett recognized presciently in reviewing the proposed merger that Highmark "would be in a particularly good position to forestall competitive entry." Highmark could "accomplish this by refusing to contract with buyers who contract with new entrants, or as BCWPA has done in the past, seek most favored nations-clauses from all providers." Moreover, Attorney General Corbett recognized that even if Highmark did not require formal most-favored-nations clauses from providers, Highmark could use its monopoly power to extract de facto most-favored-nations clauses that would give Highmark a cost advantage and forestall competitive entry: "With between 65%-85% of the commercial market, [Highmark] will be a monopoly buyer and could punish physicians or hospitals choosing to deal with competitors by dropping them as participating providers or forcing them to accept below cost prices in the hope that they will extract higher prices from BCWPA/Pennsylvania Blue Shield's competitors." Highmark used both of these anticompetitive tools and then some over the next decade and a half to preclude real competition in the relevant insurance markets.

34.     Immediately after its formation in 1996, Highmark sought to preserve and exploit its newly established monopoly power by forcing extremely low reimbursement rates on providers, including UPMC. At that time, UPMC was just a fraction of the size it is today. UPMC's revenues were less than 10 percent of its current revenues. With a negative net operating income of close to $60 million, UPMC also stood on shaky financial footing and was

in no position to resist Highmark's demands for monopsonist pricing. As a result, Highmark held all the cards in the 1996 network-provider contract negotiations.

35.     When UPMC initially balked at accepting Highmark's artificially low reimbursement rates, Highmark, following what would become a well-worn tactic, threatened to cut off patient volumes and to destroy UPMC. Because UPMC depended upon the patient volume that only Highmark the monopolist could provide, the threat was real. Faced with the legitimate prospect of its own financial destruction, UPMC was coerced into accepting Highmark's contractual demands.

36.     The 1996 Highmark-UPMC contracts provided for extremely low reimbursement rates, and to the extent there were rate increases for a given year—and for certain years there were none—the increases did not keep pace with inflation. Health care costs increased by an average of 18 percent per year between 1997 and 2002. By the end of the contract, when adjusted for medical inflation, Highmark's reimbursement rates were 20 percent lower than the original 1996 rates. This payment level equates to UPMC's reimbursement being reduced by approximately $260 million during the duration of the 1996 contracts. Highmark knew that forcing UPMC, as well as other providers, to accept low reimbursement rates in turn would require UPMC to charge outside insurers substantially higher rates. This, of course, insulated Highmark's monopoly from serious competition as other insurers could not penetrate the relevant insurance markets while paying substantially higher reimbursement rates. Yet, the higher reimbursement rates that Highmark forced UPMC to charge outside insurers did not come close to generating income sufficient to overcome Highmark's subcompetitive rates and UPMC lost significant income as a result.

37.    Highmark thus began a practice of bleeding both ends of the insurance market to its financial benefit.   Highmark the monopolist would consistently raise premiums on subscribers—typically by double digits every year and well above national averages—while Highmark the monopsonist would keep reimbursement rates to providers, including UPMC, largely flat and well below national averages.   Indeed, in 2011, Highmark's Chief Financial Officer admitted that its subscribers had experienced "double-digit [premium] hikes in recent years" while, at same time, Highmark's 2010 profits grew by 146 percent.   Highmark never passed on the savings created by its artificially depressed rates to consumers through lower premiums.   Instead, it stockpiled huge financial reserves which it continually "reinvests" into the unlawful preservation of its own monopoly-monopsony.   By 2003, Highmark's rate increases had allowed it to accumulate over $2.5 billion in financial reserves.   Just seven years later, those reserves had nearly doubled, leaving Highmark with an over $4.5 billion war chest.   Today, Highmark's reserves sit at over $5 billion, which well exceeds any commercially reasonable amount and is telltale evidence of Highmark's monopoly conduct.

38.    A boon for Highmark, the 1996 contracts were a financial disaster for UPMC. The lack of any increase in the rates paid for the substantial volume of Highmark subscribers year after year was debilitating.   Although UPMC's costs rose with inflation, Highmark's subcompetitive reimbursement rates did not come close to keeping pace.   As a result, UPMC's net operating income remained negative from 1996 through 2002, with UPMC losing hundreds of millions of dollars from its operations.

39.    UPMC recognized that Highmark's monopoly-monopsony would lead to UPMC's ultimate destruction.   Accordingly, UPMC developed a two-prong strategy in an attempt to survive Highmark's brutish anticompetitive behavior: (1) grow its provider-side

operations through acquisition and merger to enhance its bargaining position, and (2) develop an insurance division to curtail UPMC's complete dependence upon Highmark's patient volumes.

40.     As for the acquisition strategy, UPMC added six hospitals to its network in 1996 and 1997 alone.  While these acquisitions further drained UPMC's resources and increased its debt, they ultimately positioned UPMC for substantial future growth.  UPMC also increased its efficiencies and developed economies of scale by consolidating administrative functions, including supply chain, information technology, billing and collections, legal, marketing, planning, and human resources.  This extensive effort took years of hard work and it was not until after UPMC's hospitals began to operate in a fully integrated manner that UPMC experienced positive operating income.

41.     UPMC has boldly and directly challenged Highmark's insurance monopoly by developing its own insurance division.  In the mid-1990s, UPMC created a consortium of hospitals and providers that would eventually evolve into the UPMC Health Plan.  The Health Plan would offer a "narrow network" plan designed to achieve cost savings by only covering services provided by select in-network providers.

42.     Through the aggregation of hospitals and advent of the Health Plan, UPMC became an Integrated Delivery and Finance System (IDFS).  The principal purpose of an IDFS is to integrate provider and insurance offerings so that consumers are offered the highest quality care at the lowest cost possible.  Since UPMC's emergence as an IDFS in the late 1990s, at a time when the concept was innovative and bold, the IDFS concept has gained national recognition as a leading approach to healthcare solutions.

43.     From its inception, UPMC annually invested millions of dollars into the Health Plan.  Despite these investments, however, the Health Plan failed to wrestle away any significant

market share from Highmark and failed to become profitable until 2004. Between 1998 and 2002, the Health Plan had negative operating income of approximately $40 million, yet it secured just 258,000 new commercial and Medicare subscribers. In the commercial insurance and Medicare Advantage markets, Highmark decided what accounts it would choose to maintain and had the power to preclude the UPMC Health Plan from gaining any traction in those markets. Even as the Health Plan began to become profitable in 2004, it still struggled to secure market share in the relevant insurance markets. This is so despite the fact that the Health Plan increased its marketing expenditures nearly five fold in 2005 (and held marketing expenditures at that approximate level in subsequent years) and continued to receive support from UPMC.

44.    Only in the last three years, despite a decade of aggressive marketing and price competition, has the UPMC Health Plan been able to gain any significant subscriber base in these markets. The Health Plan's market share even today is minimal and pales in comparison to Highmark's.

## II.    HIGHMARK'S CAMPAIGN TO CRIPPLE UPMC.

45.    Highmark recognized immediately the direct threat that a growing and successful UPMC IDFS, and UPMC Health Plan, in particular, posed to its monopoly-monopsony. Indeed, an integrated UPMC, which could eliminate the need for Western Pennsylvania consumers to purchase Highmark insurance in order to access UPMC, was Highmark's worst case scenario. Accordingly, Highmark adopted a comprehensive and anticompetitive strategy aimed at diminishing UPMC and destroying its fledgling Health Plan.

46.    Highmark's strategy was simple: starve UPMC of the revenues necessary to establish the Health Plan as a viable competitor in the relevant insurance markets. Highmark initially implemented this strategy through Community Blue, a low-priced insurance product which it launched in 1997. Highmark effectively excluded UPMC from Community Blue by

conditioning UPMC's participation on further deep cuts to its reimbursement rates, cuts that Highmark knew UPMC could not afford. Highmark thus was able to exclude UPMC from the product and use it to steer patients away from UPMC. Community Blue's simple purpose was to destroy UPMC and the Health Plan by siphoning away its patients. Upon information and belief, Highmark never intended Community Blue to be profitable and, indeed, it never was. Highmark enhanced the anticompetitive effects of Community Blue by marketing it with predatory pricing.

47.     Community Blue was just one aspect of Highmark's anticompetitive conduct. In the late 1990s, Highmark's most senior executives commissioned development of a full-blown plan to destroy UPMC and prevent it from creating the Health Plan. Highmark budgeted millions of dollars to develop and implement this plan, which called for Highmark to leverage its monopoly-monopsony to limit UPMC's patient volumes, exert continued financial pressure on UPMC through extremely low reimbursement payments, and launch a massive public relations campaign to tarnish UPMC and the Health Plan.

48.     Highmark's plan was not just idle strategy. Highmark immediately and willfully launched an all-out offensive against UPMC. It directed referrals away from UPMC; increased co-pays for patients choosing care at UPMC facilities; expanded and aggressively marketed Community Blue; paid physicians additional compensation for referring patients to non-UPMC facilities; compensated insurance brokers for steering their clients to Highmark products and keep them from seriously shopping for other insurance products and negotiating low rates; publicly disparaged UPMC as an IDFS by questioning its financial model, its methods of delivering healthcare, and comparing it to failed institutions; launched public attacks against UPMC executives; excessively audited UPMC hospitals and physicians; substantially lowered the price of certain Highmark products only to recoup such losses through other Highmark

products; and implemented underwriting policies that restricted the abilities of insurance rivals to offer competing health plan products to employees that would pose a threat to Highmark's insurance monopoly.

49.     Highmark engaged in these unlawful and anticompetitive activities with the express purpose of forcing UPMC out of the insurance business.  While it did not succeed in that regard, it did cause UPMC and its Health Plan to suffer millions of dollars in lost revenues and, until very recently, neither the Health Plan nor the national insurers have been able to put a dent in Highmark's monopoly.  This has been so despite UPMC's steady multi-million dollar investments in the Health Plan.

### III.    HIGHMARK CREATED WPAHS TO FURTHER SOLIDIFY ITS MONOPOLY-MONOPSONY.

50.     When AHERF, which had been Pennsylvania's largest statewide provider network, went bankrupt in 1998, Highmark seized the opportunity as part of its larger strategy to destroy UPMC and its Health Plan, creating WPAHS out of AHERF's ashes.  In approximately 2000, Highmark provided a subordinated loan of $125 million—with promises of additional aid going forward—to support the formation of WPAHS from the merger of West Penn Hospital and Allegheny General Hospital ("AGH").  As Highmark itself explained: "[G]reat efforts were made to preserve AGH . . . . With significant financial support from Highmark in the form of a $125 million loan, WPAHS and Suburban General Hospital combined with AGH and other former AHERF hospitals to form [WPAHS].  This loan made it possible for WPAHS to '[rise] from the ashes' of the failed AHERF."

51.     Highmark's financial support of WPAHS was not borne out of any desire to benefit consumers, nor did it make any economic sense.  Indeed, due to its gross

mismanagement, WPAHS has never served as an efficient competitor to UPMC based on either quality or cost.

52.     Rather, Highmark conditioned the initial loan and promises of additional aid to WPAHS on WPAHS's agreement to protect and strengthen Highmark's monopoly and monopsony and to assist its efforts to destroy UPMC.  WPAHS agreed to maintain its excess capacity to invigorate Highmark's threats to providers of significant declines in patient volume. WPAHS also agreed to refuse to contract on as favorable terms with other insurers with national coverage so as to preclude those insurers from successfully entering the relevant insurance markets.  Moreover, acting in concert with Highmark, WPAHS agreed to perpetuate the pretense that it was an independently run organization to minimize the risk that its patron Highmark would be held responsible for WPAHS's financial liabilities, which would balloon to roughly $1 billion.

53.     Since its creation, WPAHS was and has been at all relevant times the second-largest medical provider in Western Pennsylvania.  WPAHS has at all relevant times consisted of at least five separate hospitals and has held a significant share of the provider market.  Thus, it provides Highmark with a substantial threat in the provider market.

54.     On its end of the conspiracy, Highmark agreed to support WPAHS with more favorable financial treatment than other providers, including UPMC, and to keep WPAHS from failing.  Highmark also agreed to steer patients from UPMC to WPAHS, even though WPAHS would cost more and patients would receive lower quality care.

55.     Pursuant to this conspiracy, WPAHS became the major beneficiary of Highmark's Community Blue product, which both steered patients away from UPMC and assisted Highmark in propping up WPAHS as its alternative provider.  Highmark's internal

-18-

strategy also reflected its agreement with WPAHS. Specifically, its plan was to "aggressively market and sell Community Blue" to steer patients to its then "unofficial" affiliate, WPAHS. It was clear that Highmark viewed UPMC as a competitor and enemy. One Highmark memorandum stated that: "UPMC is not our ally and is not neutral . . . . Therefore, they are a competitor." Thus, both WPAHS *and* Highmark saw UPMC as an enemy, and their agreement aimed to target and victimize UPMC and its Health Plan for their mutual gain.

56.   Highmark's agreement to favor WPAHS over UPMC was also intended to amplify Highmark's unilateral efforts to maintain its monopolies by marginalizing UPMC and its Health Plan. Specifically, Highmark and WPAHS knew that depriving UPMC of patients and associated market-driven reimbursements on the provider side necessarily would limit UPMC's ability to invest in the Health Plan as a meaningful competitor to Highmark's monopoly-monopsony. Highmark and WPAHS, exploiting WPAHS's artificially preserved excess capacity, successfully employed that precise strategy.

57.   More broadly, Highmark and WPAHS used the threat of WPAHS's excess capacity to drain providers of the resources needed to fund outside insurers and punish those providers that supported either UPMC as a provider or non-Highmark insurance companies. The Highmark-WPAHS conspiracy thus barred additional entry into both the provider and relevant health insurance markets.

**IV.   HIGHMARK AND WPAHS SOUGHT TO FURTHER THEIR CONSPIRACY BY EXTORTING UPMC TO WPAHS'S BENEFIT.**

58.   As 2002 approached, UPMC's hospitals remained in Highmark's networks (excluding Community Blue) pursuant to the 1996 contracts and their subcompetitive reimbursement rates. Negotiations to renew the contracts, however, reached an impasse as UPMC demanded reasonable reimbursement rates. Highmark, determined to preserve its market

dominance at any cost, refused.  Highmark again threatened to deprive UPMC of its patient

volume if UPMC refused to accept Highmark's subcompetitive reimbursement rates.  Consistent

with the plan it had developed to destroy UPMC and its Health Plan, Highmark bolstered its

threats by inflaming the community about supposedly losing "access" to UPMC and exerted

extreme public and political pressure on UPMC to accede to a new long-term contract.

59.     In a competitive insurance market, UPMC could have rejected Highmark's

unreasonable proposed contract and relied instead on its fledgling Health Plan or other insurers

to provide patient volumes.  But, due to Highmark's monopoly-monopsony, the market was not

competitive, far from it, and Highmark ensured that rejecting its proposed contract was not a

viable option for UPMC, which at that time was not financially strong.  Indeed, Highmark had

decimated UPMC financially with its 1996 contracts and UPMC could not survive without the

patient volumes that only Highmark, the monopolist insurer, could provide.  UPMC was still

operating at a loss and its Health Plan had yet to put any significant dent into Highmark's

dominant market share.

60.     Bowing to both financial reality and the crushing public pressure fomented by

Highmark, in June 2002, UPMC capitulated to Highmark's demands and signed new ten-year

hospital contracts with Highmark (collectively the "2002 Agreement.").   While the 2002

Agreement granted UPMC a modest single-digit reimbursement rate increase over Highmark's

then-existing subcompetitive reimbursement rates, which UPMC desperately needed, it also

froze those rates—apart from general inflation—for the duration of the 2002 Agreement.

61.     The 2002 Agreement also sought to ensure that UPMC remained dependent upon

Highmark's patient volumes.  Highmark and WPAHS also knew that, as a result of the 2002

Agreement, UPMC would not receive the reimbursements necessary to fund a significant

insurance competitor, nor could UPMC afford to charge remotely comparable rates to national insurers attempting to enter the relevant insurance markets. WPAHS further contributed to the conspiracy by agreeing that it would not provide the national insurers rates as favorable as Highmark's rates. This most-favored nations arrangement ensured that Highmark would have lower rates than the national insurers for a significant portion of the provider market. As a result of the WPAHS conspiracy and the 2002 Agreement, the ability of many of Highmark's most significant potential insurance competitors to penetrate the relevant insurance markets was significantly hampered.

62.     Consumers again paid the price for Highmark's anticompetitive treatment of UPMC. While UPMC's reimbursement rates under the 2002 Agreement had only inflationary increases, Highmark regularly imposed double-digit annual premium increases on its subscribers. Indeed, because Highmark lacked any real insurance competition in the relevant insurance markets, Highmark has used its monopoly power during the duration of the 2002 Agreement to force employers and individuals to pay steadily increasing and supracompetitive insurance premiums for Highmark products. With its market dominance established, Highmark simply had no incentive to deliver a low cost product like Community Blue. Accordingly, by 2004, Highmark scrapped Community Blue outright.

63.     Highmark also shared its monopoly-monopsony plunder with WPAHS in furtherance of their conspiracy. As Highmark told this Court, it provided "continuing support for WPAHS throughout the past decade." This "continuing support" included, but was not limited to:

- "[A]mendments to the 1996 Agreements [in 1999] . . . provid[ing] for increased rates and an annual index adjustment" coincident with its $125 million loan to support WPAHS's formation;

- "[F]urther amendments to the 1996 Agreements [in 2002] including new increased rates . . . retroactive to . . . 2001";

- "[A] $42 million grant to WPAHS in 2002 . . . [a purpose of which was] to support physician recruitment activities of WPAHS"; and

- Further contract amendments between 2002 and 2008, in which "specific reimbursement rates were increased . . . [including] a $1.5 million grant for the recruitment and retention of anesthesiologists and nurse anesthetists at AGH."

64.     Not surprisingly, UPMC, the target and victim of the conspiracy, received nothing in the way of similar reimbursement rate increases or contract reopeners so as to inhibit the emergence of its Health Plan.

## V.     HIGHMARK'S CASH INFUSIONS MASKED WPAHS'S INABILITY TO SUCCESSFULLY COMPETE ON THE MERITS.

65.     Even with Highmark's unflagging financial support and steering of patients, WPAHS's mismanagement still left it strapped for cash—more than Highmark could provide to WPAHS without exposing the conspiracy. In the early 2000s, Highmark thus began to provide undisclosed cash infusions to mask WPAHS's rapidly declining finances, services, and patient admissions from the community, rating agencies, and investors. While the extent of this financial support has not been consistently disclosed or otherwise properly accounted for on the financial statements of either WPAHS or Highmark, WPAHS's financial statements reveal mysterious and unexplained cash infusions.

66.     Highmark, of course, was fully aware of the depth of WPAHS's financial needs and its precipitous deterioration.

67.     Highmark's undisclosed cash infusions ensured that WPAHS did not have to publicly reveal its more serious financial deterioration. Highmark, however, was fully aware of WPAHS's condition. In late 2003, Highmark began to write down its $125 million loan to WPAHS as unlikely to be repaid.

68.     WPAHS's cash-hemorrhage became difficult to cover-up.  In mid-2006, WPAHS found itself confronting a substantial capital expenditure shortfall, a large and accumulating unfunded pension obligation, increasing costs, and negative revenue.  WPAHS, with Highmark's ongoing and largely covert financial assistance, returned to the capital markets for another loan.  But WPAHS did not reveal its impending financial disaster—which Highmark already understood—to potential bond investors.  To the contrary, just before its May 2007 bond offering, WPAHS urged potential investors to participate in its refinancing with misrepresentations of significant growth and financial recovery.  At the same time, WPAHS concealed from the public its quarterly financial statements from November 2006 until after the bond issue.  Through this series of misrepresentations and nondisclosures, WPAHS was able to refinance $758 million in debt and repay in full the $125 million loan from its co-conspirator, Highmark.  All of these actions were aided and abetted by Highmark, which was assuming measures of de facto control over WPAHS.

69.     In addition to ameliorating Highmark's burden in propping up WPAHS, the refinancing also strengthened the overall conspiracy.  Under the terms of the refinancing, WPAHS secured lower cash on hand requirements and only had to meet the bond covenants once a year, as opposed to twice a year as was the case for its previous debt.  Easing these restrictions allowed Highmark to more readily and covertly pump cash into WPAHS so it could purport to meet its debt covenants and avoid a default.  Highmark, as a controlling lender, could thus continue to deploy its co-conspirator as necessary, while trying to mask its control over WPAHS and avoid ultimate responsibility for WPAHS's massive financial liabilities.

70.     By mid-2008, this scheme was partially disclosed.  WPAHS management was forced to inform bond investors that the financial representations that undergirded its massive

bond offering were demonstrably false, and that WPAHS had to reduce its 2008 fiscal earnings

by $73 million as a result of past inflated earnings. The Securities and Exchange Commission,

upon disclosure of the overstatement, opened an investigation into WPAHS's bond offering,

which is ongoing.

71.    In April 2009, WPAHS filed a lawsuit against its patron Highmark, and UPMC,

contending that they were conspiring to destroy WPAHS. (2:09-cv-480 W.D. Pa.). But while

the lawsuit posited Highmark and WPAHS as adversaries, the litigation, in reality, was a sham

that further solidified the continuing conspiracy, provided a vehicle for Highmark to continue to

prop up WPAHS—paying $200 million as consideration for, inter alia, a dismissal with

prejudice—and forced UPMC to divert assets to something other than building up the Health

Plan. Indeed, Highmark provided WPAHS with a $50 million grant and a covert $25 million

"advance" *at the same exact time* that WPAHS was arguing in a petition to the U.S. Supreme

Court that it was being disadvantaged by Highmark.

72.    Highmark's agreement to favor WPAHS over UPMC in terms of financial

support has not wavered over the course of the litigation. Nor has WPAHS entered into any

contract with any national insurer on more favorable rates than it was receiving from Highmark

over the course of the litigation. Simply put, the WPAHS lawsuit was not a reflection of a

legitimate dispute with Highmark but a sham—just one more anticompetitive action in the litany

of anticompetitive actions taken in furtherance of the conspiracy aimed at preserving Highmark's

health insurance monopoly.

73.    WPAHS has essentially been a reprise of its failed predecessor, AHERF, with one

large exception: While AHERF crumbled under its own mismanagement and inefficiency,

Highmark will not allow WPAHS to fail so long as WPAHS agrees to further Highmark's goal of preserving its monopoly-monopsony in perpetuity, which is precisely what WPAHS has done.

## VI.    THE CONSPIRACY CONTINUES: HIGHMARK SEEKS TO RENEW THE 2002 AGREEMENT.

74.    As the 2002 Agreement approached the end of its term, the UPMC IDFS had gained sufficient financial strength through aggregation, sound management, planning and capturing economies of scale, to attempt a dramatic change of course.  UPMC sought to establish a level playing field on which all insurers, including Highmark, could compete.

75.    Accordingly, in 2010, UPMC advised Highmark as part of contract-renewal discussions that any new renewal would have to be at rates at which all insurers could compete, not the subcompetitive rates that Highmark had been paying for years.  At the same time, UPMC, in furtherance of its level-playing field approach, began negotiating with Cigna, HealthAmerica, Aetna, and United to reach agreements that would put all UPMC facilities in their respective networks at market rates, *i.e.*, rates consistent with what insurers paid for similar services in other parts of the country.  These rates were substantially lower than the rates UPMC had been getting from those insurers up to that point, but higher than the subcompetitive rates Highmark had been imposing on UPMC.

76.    Faced for the first time in its history with a viable threat of insurance competition, in January 2011, Highmark entered into confidential discussions with its co-conspirator, WPAHS, about Highmark formally acquiring WPAHS and converting itself into an IDFS like UPMC.  One month later, Highmark engaged Alvarez & Marsal, a consultant, to advise it on an acquisition price for WPAHS.

77.    By April 2011, the news had broken that Highmark was going to acquire WPAHS and transform itself into an IDFS.  With that revelation, UPMC decided that if Highmark

followed through on that plan, it could not renew the 2002 Agreement and would instead let it expire. UPMC understood that if Highmark became an IDFS that could offer in-network access to UPMC, Highmark would use every lever in its monopoly toolbox to steer substantial volumes of patients—including those who purchased Highmark insurance in order to access UPMC—away from UPMC and into the Highmark system.

78.     By mid-2011, UPMC finalized agreements with the national insurers at market rates. While UPMC's attempt to jump start insurance competition in the face of Highmark's monopoly-monopsony was necessary to its long-term survival, it was not without risk. UPMC had agreed to accept reduced reimbursement rates from the very insurers whose higher rates had been keeping it afloat in the face of the subcompetitive rates it has always received from Highmark. So unless those outside insurers—who then and now possess little market share—are able to capture significant market share away from Highmark and thereby break its monopoly-monopsony stranglehold, the outcome for UPMC will simply be reduced rates for the same and perhaps fewer patients. To be sure, these outside insurers face an uphill battle. In a market where virtually everyone who wants and can afford health insurance already has it (with Highmark), these outside insurers—still facing costs higher than Highmark's—cannot be expected to instantaneously draw patients away from Highmark. Indeed, Highmark, employing its monopoly-monopsony power, manipulates reimbursement rates and its premiums precisely so this cannot occur. The outside insurers are also hampered by their inability to bring significantly more customers into the market.

79.     On June 28, 2011, Highmark and WPAHS announced their "capital partnership," pursuant to which Highmark would invest $475 million in WPAHS and form an IDFS. They also announced that WPAHS's president and CEO would step down immediately and join

Highmark as a consultant.  This "partnership" confirmed that Highmark would steer all of its insurance subscribers away from UPMC to WPAHS if UPMC did not accede to its long-term contract demands.

80.     The announcement was also timed to avoid another event that posed a threat to Highmark's monopoly-monopsony, a WPAHS bankruptcy, which would preclude Highmark from deploying WPAHS as it has since 2000 as a cudgel to keep providers, including UPMC, in line.  Indeed, pursuant to the capital partnership, Highmark made an unrestricted grant of $50 million to WPAHS on June 28, 2011, just two days before WPAHS's deadline to satisfy the debt covenants on its bond obligations.

81.     Moreover, Highmark's comments to the WPAHS bondholders in the days, weeks and months following the announcement were targeted to keep the bondholders from throwing WPAHS into bankruptcy.  At the June 28, 2011 announcement of the "capital partnership," Highmark's then-CEO, Dr. Kenneth Melani, stated that Highmark would be taking "responsibility for . . . [WPAHS's] pensions and the bonds[.]"  One month later, a Highmark spokesman told the media that "Highmark will assume responsibility for WPAHS debt/pension obligations and that Highmark was not considering a bankruptcy filing for West Penn Allegheny."  Indeed, by early 2012, even after it had become clear that Highmark was trying to backpedal away from the previous announcements that it was assuming responsibility for the debt, Mr. Melani assuaged bondholders by stating that: "With us involved, I guarantee [WPAHS] won't trip the covenants."

82.     In October 2011, Highmark and WPAHS executed their $475 million Affiliation Agreement, pursuant to which WPAHS yielded to Highmark a variety of aspects of control, including its ability to declare voluntary bankruptcy.  At that same time, Highmark provided

WPAHS with an additional $50 million grant and a $50 million loan and WPAHS dismissed its 2009 claims against Highmark with prejudice.   In addition, it was announced that Highmark's consultant, Alvarez & Marsal, would be assuming management control over WPAHS.   Upon closing, Highmark would assume operational control of WPAHS, while trying to avoid responsibility for WPAHS's bond obligations or unfunded pension liabilities, which collectively totaled roughly $1 billion.

83.     Highmark documents filed with public authorities acknowledge that its Affiliation Agreement strategy is to steer patients from UPMC to WPAHS.   According to Highmark, Western Pennsylvania consumers have been making the wrong healthcare choices by going to UPMC for care instead of WPAHS, and that going forward Highmark will "assist" its insureds to make the "right" healthcare choices.   UPMC is regarded as one of the top ten health care systems in the nation.   WPAHS is not.

84.     The announcement of this "Affiliation Agreement" affirmed WPAHS's and Highmark's status as co-conspirators in an effort to protect each other from competition, especially competition with UPMC.   Indeed, the "Affiliation Agreement" merely formalized the parties' long-standing collusive agreements aimed at perpetrating Highmark's monopoly-monopsony position and WPAHS's favored status.

85.     The Affiliation Agreement also sought to cover up the Highmark-WPAHS conspiracy and to protect Highmark, its directors, and its officers from lender liability for unpaid bond and pension obligations and fraud claims when WPAHS inevitably fails.   Over time, as WPAHS became more dependent on Highmark's cash infusions, Highmark had begun to assert control over WPAHS's business decisions and strategic direction as evidenced by Highmark's

appointment of its consultant to run WPAHS even before closing, and Highmark's securing

control over WPAHS's ability to declare bankruptcy.

## VII.    THE CONSPIRACY CONTINUES TODAY.

### A.    Highmark Threatens To Steer Patients Away From UPMC And Providers Who Dare To Conduct Business With UPMC.

86.    Faced with UPMC's decision to let the 2002 Agreement expire on June 30, 2012

(with a one-year-run-off period for certain services), Highmark deployed the same tactics it had

used in 2002 to bludgeon UPMC into a deal: punitive economic counterattacks and a withering

public relations assault.

87.    For example, UPMC was scheduled to open a $250 million state-of-the-art

hospital in Monroeville, Pennsylvania, UPMC East, on July 1, 2012.  Even though the 2002

Agreement would end effective June 30, 2013, UPMC offered a UPMC East contract to

Highmark that would run from the new hospital's July 1, 2012 opening date through June 30,

2013.  Highmark rejected such a contract, however, insisting instead on a long-term, system-

wide contract.  Highmark's implicit threat to UPMC was clear: capitulate on a long-term,

system-wide contract or UPMC's $250 million investment would open empty.  Highmark would

steer all of its subscribers away from UPMC's newest facility and toward the directly

competitive WPAHS facility, Forbes Hospital, which stood roughly one mile away.  Highmark

escalated its threat by also announcing that it would steer not only commercial subscribers from

UPMC East, but subscribers to its Medicare Advantage products as well.

88.    Highmark's approach to an urgent care center ("UCC") at Washington Hospital

("Washington UCC"), an independent community hospital, tells the same story.  In November

2011, the Washington UCC entered into a joint venture with UPMC.  For the four years prior,

the Washington UCC and Highmark had a profitable relationship.  As the newly formed joint

venture triggered a change in the Washington UCC's tax status, it requested that its payers assent to the change going forward. Although every other insurer consented, Highmark refused, contending that the parties' relationship "has been placed on hold as part of the larger Highmark/UPMC discussions." Highmark was employing the same tactic: unless the Washington Hospital and its UCC severed their ties with UPMC, Highmark would destroy it by steering its insureds away from them and toward WPAHS's directly competitive facility, Canonsburg Hospital.

89.     In March 2012, Highmark, attempting to exert further pressure, announced that neither its commercial subscribers nor its Medicare Advantage subscribers would have in-network access to the Washington UCC—the same tactic Highmark had used for UPMC East. When UPMC pointed out that these decisions, as to both UPMC East and the Washington UCC, could not be squared with Highmark's December 2011 assurances to the citizens of Western Pennsylvania that Medicare Advantage patients would not be affected by the commercial dispute, Highmark left no ambiguity: It would address access for Medicare Advantage patients to UPMC East and the Washington UCC only "as part of the broader discussions of in-network access to UPMC community assets and services for all Highmark members." Highmark's implicit threats to steer its commercial and Medicare Advantage insureds to WPAHS if its contract demands were not met were made pursuant to its ongoing conspiracy with WPAHS.

90.     Highmark's refusal to renew its existing and profitable contract with the Washington UCC can only be explained as an attempt to punish a UPMC business partner, to the benefit of WPAHS, as a means of coercing UPMC into an exclusionary contract. Highmark's refusal occurred only after learning that the Washington UCC had entered into a joint venture with UPMC. Highmark executives confirmed with Washington Hospital that the reason

-30-

Highmark refused to continue their relationship is that it would compromise its strategy vis–à–vis UPMC.  And Highmark made clear that it would agree to a contract with Washington Hospital if it was no longer associated with UPMC, and guaranteed referrals to Highmark's provider facilities.

91.      Highmark has similarly refused to enter into a contract or negotiate with any new facility that UPMC itself opens.  In July 2012, for example, Highmark denied UPMC's request for a contract consistent with the UPMC-Highmark relationship for the newly-opened Wexford Urgent Care Center.

92.      More Highmark threats to community hospitals that do not agree to partner with Highmark were revealed in a recent hearing before the Pennsylvania Senate Majority Policy Committee.  The Chairman of the Board of Trustees of Excela Health ("Excela"), a three-hospital health system located in Westmoreland County, testified that Highmark intended to buy or affiliate with independent practices in Excela's area in retaliation for Excela declining to partner with Highmark.  The Chairman's account illustrates both the workings of the conspiracy and the lengths that Highmark is willing to go to preserve its monopoly-monopsony: "Highmark has made its intent crystal clear: It will use its monopoly position to benefit the West Penn Allegheny.  It intends to 'steer' patients to West Penn Allegheny facilities."  Impact of Changes in the Health Care Marketplace on Community Health Systems: Hearing Before S. Majority Policy Comm. (Aug. 1, 2012) (testimony of Jim Breisinger, Chairman of the Board of Trustees of Excela) available at http://www.pasenatepolicy.com/Testimony/Health%20Care%20Marketplace/Excela-Testimony.pdf (last visited Sept. 20, 2012).  The Chairman continued, "The threat was clear – if Excela did not enter into an acquisition or affiliation with it, Highmark would use its monopoly position to destroy Excela." *Id.*  A Highmark executive later confirmed

to Excela's Chief Executive Officer that Highmark was hiring physicians and acquiring provider systems in Westmoreland County precisely to ensure that Excela could not start its own insurer network and to preserve Highmark's leverage to insist upon low reimbursement rates.

93.     Highmark's threats have not been limited to UPMC or independent hospitals. Former CEO Dr. Kenneth Melani made similar threats to physicians.  In a 2012 meeting, Dr. Melani informed physicians employed by WPAHS and independent physicians with WPAHS privileges that if the doctors took any action supportive of UPMC or adverse to Highmark (such as seeking UPMC employment or referring cases to UPMC), Highmark would jeopardize their economic well-being.

94.     Highmark has made its intentions clear.  Highmark recently conceded that it needs to increase WPAHS's admissions by 20,000 per year just to make WPAHS financially viable and that Highmark "absolutely" intends to take all of these 20,000 admissions from UPMC, presumably without regard to patient choice and the inefficiencies, high costs, and poor care that plague WPAHS.

95.     At the same time Highmark is engaging in threats to UPMC on the provider side, Highmark is using predatory pricing whenever faced with competition on the insurance side.  For example, Highmark recently provided a bonus program to insurance brokers wherein Highmark—without any Highmark underwriting—would beat UPMC Health Plan quotes by 10%. This program is yet another predatory practice and is not based on Highmark's actual costs or risks; it exists solely to injure UPMC's Health Plan and other competition until competition no longer exists.

96.     Again, WPAHS's participation was essential to the success of this strategy, as WPAHS is—by design—Highmark's provider alternative allowing Highmark to make good on

its monopsonist threats of decreased patient volumes and thereby preserve Highmark's monopoly-monopsony regime. This is a major reason why WPAHS has never provided effective quality or cost competition in the provider market: Highmark, by design, has kept WPAHS barely financially afloat solely to serve its anticompetitive purposes, and not to preserve a true healthcare option for patients in Western Pennsylvania.

**B.    Highmark Has Invested Its Monopolist Subscriber Premiums To Purchase Healthcare Facilities To Threaten UPMC And Other Providers With Loss Of Patient Volumes.**

97.    To step up its threats to UPMC, Highmark recently announced plans to invest $1 billion of its ill-gotten reserves in a new network of doctors, community hospitals, ambulatory care, medical malls, and other out-patient locations. The purpose of these acquisitions—like Highmark's deployment of WPAHS—is to further pressure UPMC into capitulating to a long term contract that will preserve Highmark's monopoly and monopsony and otherwise punish providers who refuse to accede to Highmark's anticompetitive conduct. Highmark's avowed goal is to steer UPMC patients into these newly acquired provider assets and thereby stunt the growth of the UPMC Health Plan. Indeed, so long as Highmark's monopoly-monopsony is preserved, Highmark's expenditures are irrelevant; Highmark's monopoly-monopsony is self-enriching, providing it with a permanent state of excess profits that it can simply "reinvest" to perpetuate its own existence.

98.    In August 2012, Highmark agreed to acquire Jefferson Regional Medical Center ("Jefferson"), which is located roughly 15 miles from Excela. In contrast to Highmark's "affiliation" with WPAHS, for which it attempts to avoid overall financial responsibility while still controlling WPAHS through life support loans and other subsidies, Highmark agreed to assume all debts and liabilities, including Jefferson's pension liabilities, and paid in hundreds of millions of dollars in cash. Since acquiring Jefferson, Highmark has not only steered patients

-33-

away from UPMC and into Jefferson, but has also ensured that Jefferson's referrals for tertiary care have gone to WPAHS or other Highmark-affiliated providers, rather than UPMC.

99.   In addition, Highmark has been using its ill-gotten reserves to surreptitiously acquire real estate in close proximity to independent community hospitals, with the explicit or implicit threat of opening "medical malls" in their backyards.  Even the modest diversion of admissions that these malls would assuredly draw would leave these hospitals—which are already grappling with operating losses, declining inpatient use, and reduced Medicare and Medicaid payments—in grave condition.  When confronted with such threats, the community hospitals face potential financial ruin unless they capitulate to Highmark's demands.

100.   All of these acquisitions served to bolster Highmark's ability to steer its patients away from noncompliant hospitals and were by the design of Highmark's and WPAHS's conspiracy to destroy UPMC, its Health Plan, and competition at large.

### C.   Highmark Has Conspired With Its Consultant To Further Preserve Its Monopoly-Monopsony.

101.   WPAHS is not Highmark's only co-conspirator.   One of the Highmark "executives" behind the threats to Washington Hospital and Excela is not a Highmark executive at all, but is called an independent consultant, presumably to conceal actions, expenditures, and the nature of expenses.  This is also an attempt to avoid imputation of such actions to Highmark while he duplicitously acts for Highmark.  Although this consultant carries the titles of Division President, Integrated Delivery System and Executive Vice President of Highmark, he remains an independent consultant to Highmark and he and his companies are entities independent of Highmark.  Accordingly, in this capacity, the consultant has served as an independent co-conspirator with Highmark and WPAHS in threats to community hospitals and Highmark's complementary provider strategy (discussed below) more generally.

-34-

102.    This same consultant has attempted, on behalf of Highmark, to recruit physicians employed by UPMC pursuant to contracts with offers of above-market compensation and bonuses.  He has encouraged former UPMC physicians now employed by Highmark or WPAHS to breach non-solicitation agreements with UPMC and solicit their former co-workers.

103.    Highmark's efforts at UPMC East, Washington Hospital, and Excela were made pursuant to its conspiracy with WPAHS and the consultant to disadvantage UPMC and its Health Plan and coerce UPMC into a long-term exclusionary contract.  Highmark and WPAHS's further conspiracy with the consultant served to accomplish the threats to at least Washington Hospital for this purpose.  Thus, Highmark, employing its monopsony power, has exploited WPAHS's excessive capacity to achieve the conspiracy's anticompetitive ends, including steering patients away from UPMC and pressuring UPMC into a long-term, unfavorable contract.  In 2011, the consultant bluntly asked a UPMC executive when UPMC was "going to give Highmark a contract, so I can [expletive] retire?"

104.    Indeed, the pressure tactics at these locations could not succeed but for WPAHS's maintenance of excessive capacity against its financial interests and efforts to foreclose the relevant insurance markets to outside insurers.  Of course, WPAHS's excess capacity has had no redeeming pro-competitive effect, such as increasing competition in the relevant insurance markets or lowering insurance premiums to consumers.  Rather than pass along the savings on reimbursement rates secured by its coercive contracts with UPMC to its consumers through decreased insurance premiums, Highmark has added the savings to its bloated reserves while simultaneously increasing insurance premiums.

105.    Pursuant to the conspiracy, the consultant, in his role as Division President of Highmark's "Integrated Delivery System," has anonymously purchased property through shell

corporations in specific suburban locations where Highmark will create new WPAHS surgical centers or medical malls, typically not far from an existing UPMC or community hospital facility.

106.   The consultant has also been involved with Highmark's management of "Protoco PPI, LLC" ("Protoco"), a supply chain management and group purchasing organization that was created to compete with UPMC's supply chain management company, "Prodigo Solutions LLC" ("Prodigo").  UPMC created Prodigo in early 2008, four years before Highmark created Protoco, when supply chain management leaders at UPMC teamed with UPMC's internal venture group to launch a supply chain management company focused primarily on the healthcare industry. Since then, UPMC and Prodigo have become well known throughout the United States and elsewhere as a source of high quality supply chain management software solutions and services (the "PRODIGO goods and services").

107.   In March 2012, Highmark—in a flagrant attempt to confuse consumers and misappropriate the goodwill that UPMC has developed through its PRODIGO brand—changed the name of its supply chain management and group purchasing company from Trinity Supply Chain Services LLC, the name it registered in November 2011, to Protoco PPI, LLC.  Around the same time, Highmark also formed Protoco Supply Chain Services LLC under Pennsylvania law.  Highmark's creation of these companies demonstrates the extent to which Highmark has sought to compete unfairly with UPMC.

108.   Highmark and its co-conspirator consultant also have used Highmark's monopoly power to insist that providers and suppliers use Protoco's services in order to continue doing business with Highmark-related entities.  As the Chairman of Excela's Board of Directors recently testified, "[w]hen negotiating a provider contract with Excela last year, Highmark

required Excela to join its group purchasing organization (GPO) as a condition to an increase. We refused, but were compelled to agree to a consulting agreement with Highmark's GPO." In addition, WPAHS and other Highmark-affiliated hospitals have informed medical supply companies that the companies must agree to use Protoco's services if they wish to continue to provide supplies to the hospitals. Highmark and the co-conspirator consultant have used these types of relationships as tools through which to demand obedience from independent hospitals and providers and to prevent them from doing business with UPMC so as to starve UPMC Health Plan. The actions relating to Protoco violate the Lanham Act and constitute an unfair trade practice.

## VIII.   THE RECENT HIGHMARK-UPMC AGREEMENT.

109.   On May 2, 2012, UPMC and Highmark announced that they had reached an agreement in principle to provide for in-network access to all UPMC hospitals and physicians for Highmark commercial and Medicare Advantage members until December 31, 2014. On July 3, 2012, UPMC and Highmark signed a definitive agreement implementing these terms. This agreement sets December 31, 2014 as the date certain by which the UPMC-Highmark commercial relationship will end save identified facilities and services, and for Highmark members in a continuing course of treatment at UPMC.

110.   The new agreement has not ended the anticompetitive scheme of WPAHS, Highmark, and its consultants, but instead reinvigorated it. Indeed, Highmark has made public its plans to re-introduce Community Blue, the anticompetitive tool that excludes most of UPMC's facilities and services to WPAHS's benefit. Highmark, moreover, as detailed above, has continued to threaten community hospitals, refused to contract with facilities that are affiliated with or potentially affiliated with UPMC, encouraged former UPMC physicians to breach their non-solicitation agreements, and provided financial incentives to doctors to refer

-37-

patients away from UPMC facilities and recalcitrant community hospitals. Indeed, many of these actions occurred after the signing of a definitive agreement and are not covered by the agreement.

111.   Highmark also has continued to funnel non-Affiliation money under the table to WPAHS to stave off a bankruptcy and the bondholders. WPAHS chairman Jack Isherwood recently reported to employees that, despite a decline in admissions during the winter of 2011, WPAHS nevertheless experienced a $24 million increase in net patient revenue for the same time period. The only plausible explanation for this event is an undisclosed rate increase to WPAHS from Highmark, confirming that Highmark's and WPAHS's agreement regarding discriminatory compensation continues to this day. Highmark, moreover, appears to have provided WPAHS an additional $8 million grant during the second quarter of 2012, so that WPAHS could once again avoid tripping the debt covenants and continue to serve as Highmark's anticompetitive weapon.

112.   Notwithstanding its increasingly coercive tactics, Highmark continues to seek a long-term contract with UPMC, the linchpin to its preservation of its monopoly-monopsony position, and just recently in filings with the Pennsylvania Insurance Department has stated that it will continue to press UPMC for a new contract following the current contract's December 31, 2014 expiration.

## IX.   THE EFFECT OF A COERCED LONG-TERM CONTRACT.

113.   A primary purpose of the Highmark-WPAHS-consultant conspiracy, as well as Highmark's complementary provider strategy executed pursuant to it, has been to pressure UPMC into a long-term, system-wide contract that would both preserve Highmark's monopsony rates and maintain the high barriers to entry to outside insurers created, in part, by the existing contract. The long-term contract desired by Highmark would continue to hinder UPMC's competitiveness as an IDFS by continuing to starve it of resources, and with the help of WPAHS,

deny Highmark's other insurance rivals of the comparable reimbursement rates and scale they need to successfully enter and expand in the relevant insurance markets.

114.    By taking the bold step of announcing that it would allow its agreements with Highmark to expire at the end of 2014, UPMC's actions have presented the first chance for real competition in the relevant insurance markets ever.   Once UPMC is no longer captive to Highmark, employers will be able to choose between (i) the integrated Highmark/WPAHS payor-provider system offering Highmark insurance and the WPAHS/Premier Medical Associates facilities and services; (ii) the integrated system of UPMC facilities and insurance; or (iii) insurance from major national and regional insurers with both UPMC and WPAHS in-network, assuming WPAHS agrees to such contracts.   With this separation, and assuming that insurance competition evolves, Highmark will no longer be able to use its monopsony power to force depressed rates on providers (including UPMC), and its monopolist insurance premiums to consumers will be eroded by competition from other insurance alternatives, including the UPMC Health Plan.

## HIGHMARK AND THE CONSPIRACY'S MARKET DOMINANCE

115.    Highmark is uniquely positioned as both a monopolist and a monopsonist.   With more than 65% of the market for the provision of commercial health insurance, and more than 50% of the market for the provision of health insurance through Medicare Advantage plans, no other insurer possesses market share even approaching that of Highmark.   As a monopsonist purchaser of health care services, Highmark unilaterally decides the reimbursement rates for Western Pennsylvania providers, often forcing smaller community hospitals into 10-year agreements which lock in below-market reimbursement rates.   As a monopolist seller of health

insurance, Highmark unilaterally controls the health insurance premiums paid by Western Pennsylvania's employers and individuals.

116.   As Highmark has remained a monopoly-monopsony health insurer, it has had unique and ample power to unleash anticompetitive effects.  It is using that power to make good on its threats both on the insurance side through reduced reimbursements in its take-it-or-leave-it contract renewals to providers, denials of coverage, and steering of patients, and now on the provider side as well via threats of parking Highmark/WPAHS doctors, medical malls, or other Highmark/WPAHS facilities on the doorstep of hospitals that do not immediately accede to its anticompetitive demands.  Those actions, fueled by a $1 billion commitment, have been used to thwart providers' efforts to contract with national insurers on the sorts of financial terms that would allow them to establish a significant foothold in the relevant insurance markets.  Until that real presence is established, Highmark and its co-conspirators hold all the cards.

117.   Because Highmark lacks any real insurance competition, it can continue to finance its anticompetitive tactics by raising rates on policyholders with impunity.  Highmark has used this power to force employers and individuals to pay steadily increasing and supracompetitive insurance premiums to participate in Highmark plans.  Highmark recently requested rate increases between 9% and 10% for one of its small group plans and tens of its individual plans. As Pennsylvania State Senator Jim Ferlo recently stated, "When adding up the level of reserves, the requested increases, along with the takeover of WPAHS and other land grabs, one has the impression that Highmark is fleecing its policy holders for the sake of company expansion, not providing quality healthcare."

118.   Highmark's conduct has created barriers to entry and/or expansion into the relevant insurance and purchase markets that have guarded its rates from challenge by

competitors.   Potentially competitive insurers, including all the major national insurers and UPMC Health Plan, cannot bring new patients into the relevant insurance markets and—as a direct result of Highmark's conduct—they have not been able to take any significant market share away from Highmark to date.   Further, businesses and individual consumers have no adequate substitute for commercial health insurance and thus must deal with Highmark on its terms.

119.   This power to exclude competition and to raise and control prices establishes that Highmark has monopoly power in the relevant insurance markets.   Highmark's demonstrated ability to keep reimbursement rates at subcompetitive levels since its formation also establishes that it has monopsony power.

120.   The combined effect of extracting monopoly prices from consumers and their employers and forcing low monopsony rates upon healthcare providers as a result of its anticompetitive agreements has enabled Highmark to accumulate in excess of $5 billion in reserves. This level of reserves far exceeds any commercially reasonable amount.

121.   Highmark and WPAHS, through their conspiracy, also produced actual anticompetitive effects in the relevant provider, insurance, and purchase markets.   Specifically, the conspiracy directly produced depressed reimbursement rates for all Western Pennsylvania providers, deprived patients in Western Pennsylvania of the most effective treatments, enabled Highmark to steer significant numbers of patients to an inefficient and incompetently managed provider in WPAHS, and foreclosed competition from outside insurers.

122.   WPAHS has significant market power through its conspiracy with Highmark, including the power to exclude outside insurers from the relevant insurance markets.  WPAHS is the second largest hospital system in Western Pennsylvania and controls a significant portion of

the provider market.  Besides UPMC, no other provider rivals WPAHS's share of the provider market.

123.     While Highmark independently possesses monopoly and monopsony power, the conspiracy has amplified and fortified those powers.  The conspiracy has invoked the collective market power of WPAHS and Highmark to erect significant barriers to entry for outside insurers. It has done so by guaranteeing Highmark exceedingly low reimbursement rates from Western Pennsylvania's two largest providers and taking steps to hobble UPMC and its ability to support outside insurers attempting to cut into Highmark's dominant market share in the relevant insurance markets.

124.     By agreeing to refuse to offer any national insurers reimbursement rates as favorable as those it offers Highmark, WPAHS has effectively foreclosed its significant portion of the provider market to national insurers.  WPAHS furthered ensured UPMC's dependence on Highmark's patient volume and precluded outside insurers from being able to enter the relevant insurance markets by agreeing to maintain excess capacity so that Highmark can threaten hospitals, doctors, and other providers with decreased patient volume if they take any steps favorable to UPMC.

125.     By consistently favoring WPAHS over UPMC in reimbursement rates, Highmark has forced UPMC to charge outside insurers higher reimbursement rates just to remain in business.  The course of the overall conspiracy between WPAHS and UPMC has furthered these efforts to hinder UPMC's and other providers' abilities to support outside insurers attempting to wrestle market share away from Highmark.

126.     As a result, the conspiracy has significantly raised the costs to outside insurers attempting to enter the relevant insurance markets and successfully prevented any insurer,

including UPMC Health Plan, from wrestling any significant market share away from Highmark. Accordingly, Highmark's monopolistic and monopsonist rates remain immune from the challenges they would face in a competitive market.

## INJURY TO COMPETITION FROM HIGHMARK'S CONDUCT AND CONSPIRACY WITH WPAHS

127.    The harm to consumers that has resulted from Highmark's exclusionary conduct of steering patients away from UPMC and other providers, depressed reimbursement rates to providers, and Highmark's monopoly power in selling health insurance is palpable.  Put simply, competing insurers are blocked from the market while employers pay more for their health insurance plans because Highmark, with the assistance of its co-conspirators, has perpetuated its monopoly-monopsony.  Highmark's "Strategic Vision" document confirms that it has had the power to impose whatever premium increases it wants on subscribers so long as it maintains its position as the monopolist insurer.  As Highmark admits in the document, "[i]n the last decade alone, health insurance premiums in [W]estern Pennsylvania have increased at a rate greater than 6% per year while wages and salaries have only increased 2-3% per year."  Such rate increases, which were far in excess of Highmark's inflationary increases to providers, do not reflect a competitive market.  Were Highmark able to continue its relationship with UPMC beyond 2014, its unilateral control of insurance premiums would continue unchecked.

128.    Virtually every action that Highmark has taken over the course of the past 15-years, including its conspiracy with WPAHS and the independent consultant, has been an attempt to unlawfully perpetrate its monopoly-monopsony.  Using that unique power, Highmark has targeted and victimized providers, insureds, and UPMC and its Health Plan with a host of anticompetitive effects.

## HARM TO THE RELEVANT INSURANCE AND PURCHASE MARKETS

129.    Highmark's conspiracy with WPAHS and the consultant, and their scheme to cripple UPMC, have had the effect of retarding the growth of UPMC Health Plan, which would benefit consumers, and foreclosing the entry and expansion of outside insurance competition. Highmark purposefully depressed UPMC's reimbursement rates in order to starve its fledging Health Plan. If UPMC's reimbursement rates had not been artificially limited by Highmark's conduct, it could have invested more in its Heath Plan and charged outside insurers competitive rates, providing an efficient alternative to consumers.   It takes a significant investment to establish a foothold in the relevant insurance markets and the Health Plan's expansion is dependent on market-driven reimbursements on the provider side. Also, had WPAHS been free to pursue contracts with outside national insurers that were more advantageous than those it had with Highmark, that also would have facilitated the entry and expansion of those outside competitors.  A prime objective of the conspiracy has been for Highmark to utilize WPAHS to help in blocking outside insurance entry.  Also, despite Highmark's public claims, WPAHS's role as an anticompetitive vehicle rather than a truly viable provider also had negative effects on the provider side of competition, as addressed in the section below.

130.    In the absence of the Highmark-WPAHS conspiracy and broad-ranging scheme to foreclose outside insurance competition, Highmark's insurance competitors would have been able to enter and/or expand in the relevant insurance and purchase markets.  The resulting competition would have had a myriad of benefits to consumers and providers.  Just a few examples of resulting pro-competitive effects would have been increased insurance plan options to consumers, lower premiums for those options, increased reimbursements to providers which

would be invested in better treatments, better control of underlying costs, increased innovation, and greater customer service to both providers and consumers.

131.    The consolidation of Highmark's monopoly-monopsony position, through its conduct and agreements with the consultant and WPAHS, has allowed it to extract monopoly rents on both ends of its business—supracompetitive monopoly rates from consumers, and subcompetitive monopsony rates for providers.

132.    Specifically, Highmark has been able to freely raise prices on its insurance products above competitive levels, causing employers and their employees to pay more for healthcare.  It has likewise forced persons not purchasing insurance through an employer to pay more.  In the purchase market, Highmark has been able to exercise monopsony power to drive reimbursements to physicians, hospitals, and other care providers down to barely-sustainable levels.  This rate manipulation has discouraged new innovative providers from establishing themselves in Western Pennsylvania, driven existing efficient providers out of the relevant insurance and purchase markets, and reduced the quality of care available to consumers.  In the absence of such a blatant restraint on competition, neither phenomena would have been sustainable.  The law recognizes such damage to customers and suppliers as cognizable antitrust injuries.

133.    Just a few of the benefits that would have resulted in the absence of foreclosed competition (apart from competitive reimbursement rates) include more innovative payment structures, better customer service, and increased transparency as to payor processes affecting providers.  As UPMC has seen most recently in the case of Highmark's threats to steer patients away from providers who do not comply with its demands, these effects of Highmark's monopsonization of the relevant purchase markets are significant.  With competition having been

-45-

artificially cut off, there is little motivation for Highmark, the dominant payor, to improve or even to be effective as an insurer. The ultimate result of these types of constraints is that providers are hindered from offering the best and most efficient healthcare solutions to consumers.

134.    No plausible pro-competitive efficiencies have counter-balanced this harm to competition as a result of Highmark's, WPAHS's, and the consultant's conduct.

135.    The end of the UPMC-Highmark commercial relationship, coupled with UPMC's agreements with outside insurers and Highmark's Affiliation Agreement with WPAHS, have combined to create a unique opportunity for competition in healthcare in Western Pennsylvania. If permitted, the market would benefit from the competition provided by: (i) Highmark/WPAHS, offering medical care and insurance in direct competition with UPMC; (ii) UPMC offering both medical care and insurance (from its own Health Plan) as an IDFS, in direct competition with Highmark and WPAHS; and (iii) various outside insurers, with all or some offering plans including *both* UPMC and WPAHS services and facilities in-network. When all this comes to pass, there will be at least five effective insurance competitors, all vying for the business of area customers with a wide variety of competitive offerings. The long-run effect on area customers will be tremendously positive. If, on the other hand, this potential progress is artificially stunted as a result of Highmark's and WPAHS's conduct, and if Highmark is allowed to try again in 2014 to force a contract renewal on UPMC, this opportunity for competition will be lost for the indefinite future.

## HARM TO THE PROVIDER MARKET

136.    Highmark's threats to physicians, community hospitals and other providers, made possible by WPAHS's and the consultant's coordinated support, have served to foreclose

competition in the provider market. With no real challenger to threaten Highmark's present monopoly in the relevant insurance markets, it has been able to threaten harm to providers who do not comply with its demands to cease any and all relations with UPMC. WPAHS's true purpose, by the design of the conspiracy, has been to serve as the viable threat to independent providers that Highmark manufactured, rather than a well-run and efficient competitor for consumers.

137.    The result of such threats is that Highmark, pursuant to its conspiracy with WPAHS and the consultant, has been able to restrain trade unreasonably in the provider market. Consumers' access to provider services has decreased, or at the least, the cost consumers have paid to secure those services has increased. As one example, if a patient's primary physician is an independent doctor, and that doctor normally refers the patient to UPMC for in-patient care at the patient's request, in the face of Highmark's threats to the primary physician, the independent doctor is no longer free to do so. So, the consumer either would have to endure the cost of switching to a primary physician who is not subject to such threats, or alternatively switch to a non-preferred provider. There are a multitude of such examples, as they relate to how physicians and/or patients have preferred to use UPMC facilities (whether via referral, specialized use, or payment options) in the absence of any such improper threats. It is well-recognized that this type of consumer harm is an actionable antitrust injury.

138.    As a result of Highmark's threats made with WPAHS's support and the consultant's assistance, providers have no longer been free to distinguish themselves based on their relationships with one or more hospital systems because they must now favor Highmark's provider assets or else suffer the consequences. Consequently, consumers of healthcare have not reaped the benefits that free competition between providers would bring. Such benefits can

-47-

come in a multitude of ways, including but not limited to quality based referrals between physicians, payment options for treatments not fully covered by insurance, and access to the most effective treatments available for a given condition.

139.    Highmark has also taken a no-negotiation position with physicians, simply imposing on them its desired rates.  These monopsony rates have both driven physicians from the provider market and discouraged quality physicians from entering the market.

140.    Accordingly, with no presently viable competition to challenge Highmark's insurance monopoly-monopsony, Highmark has been able to continue threatening providers with financial harm if they do not comply with Highmark's demands.  As a result, Highmark, the consultant, and WPAHS have been able to effectively dictate where a significant portion of consumers can effectively go for healthcare.

141.    Moreover, because of the conspiracy, WPAHS, an inefficient and incompetently run provider, has been propped up artificially.  One effect has been the maintenance of inefficient excess capacity in the provider market.  Healthcare consumers have had to pay for these unnecessary costs.  Had Highmark not interjected and instead allowed market forces to play their normal role, it would have saved costs and the quality provided to patients would have increased.  WPAHS would have been a stronger long-run competitor had it been permitted to shrink its capacity to levels dictated by the market, rather than Highmark.

142.    In addition, reimbursement rates have also been depressed for all Western Pennsylvania providers as a direct consequence of Highmark's monopsonistic conduct which co-conspirator WPAHS has aided through its actions.  Highmark's artificial maintenance of its insurance monopoly has also resulted in sub-optimal output in the provider market because healthcare providers have received artificially depressed reimbursement rates and were unable to

invest more in healthcare solutions, which could have further saved consumers time and money and provided them with better care.

143.    With Highmark in the position of controlling one Western Pennsylvania hospital system (WPAHS) and controlling another through long-term reimbursement rates (UPMC), it has achieved the power to coordinate pricing at both the provider level and in the sale of insurance.    This has enabled Highmark artificially to drive down reimbursement rates to healthcare providers while maintaining premiums to consumers at monopoly price levels.   Area providers and consumers have suffered accordingly.   The Center for Medicare & Medicaid Services ("CMS") has already recognized the harm to competition which has resulted from Highmark being permitted to consolidate its monopoly power.   Upon learning that Highmark intended to acquire WPAHS, CMS mandated that Highmark divest its Medicare processing intermediary, recognizing, as even Highmark's CEO had to concede, the "conflict of interest" inherent in being both a competing provider and a claims manager for the wider market.

## INJURY TO UPMC FROM HIGHMARK'S AND WPAHS'S CONDUCT

144.    This injury to competition has harmed and threatens further direct harm to UPMC, coincident with the harms to competition described above.

145.    In the relevant insurance and purchase markets, UPMC has sustained harm as a result of the hindered entry and expansion of outside insurers.   In the absence of Highmark's conspiracies with WPAHS, outside insurance entry and expansion would have occurred and UPMC would have had the opportunity to get the benefits of a competitive insurance market, including higher market-based reimbursement rates.   UPMC has been and continues to be the target and victim of the classic evils of improperly wielded monopsony power, including

hindered entry and expansion of outside insurers, because provider output has been artificially restrained.

146.   Highmark's conspiracy with the consultant and WPAHS to foreclose insurance competition, as well as their long-standing campaign to cripple UPMC as an IDFS, has resulted in a direct injury to UPMC, including the receipt of artificially depressed reimbursement rates for over a decade.   In the absence of this conduct, UPMC would likely have received greater reimbursements from insurers, would have been able to enhance output on the provider side, and would not have been artificially stunted in its progress as an IDFS.   Indeed, one of the overriding purposes of Highmark's conspiracy with WPAHS and the consultant is to starve UPMC of resources on the provider side in order to destroy its Health Plan.   While UPMC has made the best of its circumstances through efficient management, its competitive potential has been substantially hindered as a result of this overall course of unlawful conduct.

147.   Highmark's threats to physicians, community hospitals, and other providers, in tandem with WPAHS's and the consultant's participation, have resulted and continue to result in direct injury to UPMC in the provider market.   Threatened providers have been hindered from being able to refer or otherwise treat patients at UPMC.   UPMC has suffered and continues to suffer both financial losses and a loss of good will in the community as a result of these tactics.

148.   In addition, if Highmark, in tandem with WPAHS, is successful in improperly maintaining its insurance monopolies, national insurers Aetna (which has announced its intention to acquire Coventry, the parent of regional insurer, HealthAmerica), Cigna, and United will be precluded from expanding in the relevant purchase and insurance markets, which will mean direct losses to UPMC as a result of its newly negotiated provider agreements.   If the national insurers are unable to get a significant foothold in the relevant insurance and purchase markets,

UPMC will suffer losses that will undermine its ability to remain a world-class medical institution. Consumers undoubtedly will suffer as a result of UPMC's inability to maintain its standards.

149.    The injuries to UPMC from Highmark's and WPAHS's overall course of conduct are antitrust injuries because they directly stem from that which makes the activities unlawful. The explicit purpose and effect of the Highmark-WPAHS conspiracy as well as Highmark's other conduct to cripple UPMC was to extinguish UPMC's IDFS as a potential insurance competitor for the purpose of improperly maintaining Highmark's insurance monopolies, and the concerted threats to providers have impaired competition in the provider market at UPMC's expense as well.

150.    The future harm that UPMC has ample reason to expect from Highmark's and WPAHS's anticipated conduct requires injunctive relief from this Court. The Defendants should be enjoined from continuing their wide-ranging abusive tactics, including but not limited to concerted threats, demands, or public campaigns that are designed to retain Highmark's monopolies in the relevant insurance and purchase markets, or harm competition in the relevant provider market. Self-help is unlikely to be sufficient for UPMC to evade Highmark's and WPAHS's anticompetitive tactics. To that end, any efforts by Highmark and its co-conspirators to coerce renewal of Highmark's agreement with UPMC beyond 2014 should also be enjoined.

## CLAIMS

**Count I:  Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (*UPMC and UPMC Health Plan v. Highmark*) (insurance and purchase markets of commercial health insurance, *see supra* ¶¶ 25-26, 30)**

151.    Plaintiffs UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

152.    Highmark holds monopoly power over the market for the provision of commercial health insurance in Western Pennsylvania and monopsony power over the market for the purchase of provider services on behalf of commercial health insurance subscribers in Western Pennsylvania (herein "commercial health insurance market"). This power is evidenced by, among other things:

a.   Highmark's 65% share of Western Pennsylvania's commercial health insurance market;

b.   Highmark's ability to coerce providers to accept extremely low reimbursement rates;

c.   Highmark's ability to impose price increases on other insurers and/or effectively exclude them from the commercial health insurance market of Western Pennsylvania; and

d.   Highmark's ability to impose premium price increases on purchasers of commercial insurance products.

153.    Highmark has engaged and continues to engage in anticompetitive conduct with the object of maintaining, preserving, and extending its monopoly and monopsony power. This anticompetitive conduct has included, but is not limited to, a multi-faceted scheme to cripple UPMC and UPMC Health Plan rather than competing on the merits, steering of patients away from UPMC and other providers and to WPAHS, threats against providers that fail to accede to Highmark's demands, the purchase of healthcare facilities, predatory pricing, depressed reimbursement rates to providers, and targeted efforts to preclude the entry and/or expansion of other insurers in the market for commercial health insurance in Western Pennsylvania, including UPMC Health Plan.

154.   Highmark has used a combination of agreements with providers and depressed reimbursement rates to create artificial barriers to entry and/or expansion in the market for commercial health insurance in Western Pennsylvania.

155.   This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS.   Highmark's conduct continues to threaten injury to competition in Western Pennsylvania's commercial health insurance market and UPMC and UPMC Health Plan in their business or property.

156.   Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

157.   Highmark's conduct is continuing and the expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

158.   An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive health insurance and purchase markets.

### Count II:  Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (*UPMC and UPMC Health Plan v. Highmark*) (insurance and purchase markets of Medicare Advantage plans, *see supra* ¶¶ 27-28, 31)

159.   Plaintiffs UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

160.   Highmark holds monopoly power over the market for the provision of Medicare Advantage plans in Western Pennsylvania and monopsony power over the market for the purchase of provider services on behalf of Medicare Advantage subscribers in Western

Pennsylvania (herein "market for Medicare Advantage plans"). This power is evidenced by, among other things:

      a.  Highmark's 50% share of the market for Medicare Advantage plans in Western Pennsylvania;

      b.  Highmark's ability to coerce providers to accept extremely low reimbursement rates;

      c.  Highmark's ability to impose price increases on other insurers and/or effectively exclude them from the market for Medicare Advantage plans in Western Pennsylvania; and

      d.  Highmark's ability to impose premium price increases on purchasers of Medicare Advantage plans.

161.   Highmark has engaged and continues to engage in anticompetitive conduct with the object of maintaining, preserving, and extending its monopoly and monopsony power. This anticompetitive conduct has included, but is not limited to, a multi-faceted scheme to cripple UPMC and UPMC Health Plan rather than competing on the merits, steering of patients away from UPMC and other providers and to WPAHS, threats against providers that fail to accede to Highmark's demands, the purchase of healthcare facilities, predatory pricing, depressed reimbursement rates to providers, and targeted efforts to preclude the entry and/or expansion of other insurers in the market for Medicare Advantage plans in Western Pennsylvania, including UPMC Health Plan.

162.   Highmark has used a combination of agreements with providers and depressed reimbursement rates to create artificial barriers to entry and/or expansion in the market for Medicare Advantage plans in Western Pennsylvania.

163.    This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS.  Highmark's conduct continues to threaten injury to competition in the market for Medicare Advantage plans in Western Pennsylvania and UPMC and UPMC Health Plan in their business or property.

164.    Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

165.    Highmark's conduct is continuing and the expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

166.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive health insurance and purchase markets.

### Count III:  Attempted Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (*UPMC and UPMC Health Plan v. Highmark*) (insurance and purchase markets of commercial health insurance, *see supra* at ¶¶ 25-26, 30)

167.    Plaintiff UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

168.    Defendant Highmark has engaged and continues to engage in anticompetitive and predatory conduct.  This anticompetitive conduct has included, but is not limited to, a multi-faceted scheme to cripple UPMC and UPMC Health Plan rather than competing on the merits, steering of patients away from UPMC and other providers and to WPAHS, threats against providers that fail to accede to Highmark's demands, the purchase of healthcare facilities, predatory pricing, depressed reimbursement rates to providers, and targeted efforts to preclude

the entry and/or expansion of other insurers in the commercial health insurance market, (*see supra* ¶ 152), in Western Pennsylvania, including UPMC Health Plan.

169.   Highmark has used a combination of agreements with providers and depressed reimbursement rates to create artificial barriers to entry and/or expansion in the commercial health insurance market in Western Pennsylvania.

170.   This conduct has been undertaken with the specific intent of monopolizing and monopsonizing the commercial health insurance market in Western Pennsylvania. In engaging in this conduct, Highmark has not been predominantly motivated by legitimate business aims.

171.   Due to its relentless campaign of coercion, retribution, excessive compensation, unlawful contracts, public pressure, and creation of barriers to entry, Highmark's scheme has had a dangerous probability of success. This is especially so in light of its already dominant position in the market, controlling over 65% of the Western Pennsylvania commercial health insurance market, facing no major competitor, and selling its products to consumers that have no viable options to commercial health insurance.

172.   This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS. Highmark's conduct continues to threaten injury to competition in the commercial health insurance market in Western Pennsylvania and UPMC and UPMC Health Plan in their business or property.

173.   Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

174.    Highmark's conduct is continuing and the expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

175.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive health insurance and purchase markets.

### Count IV: Attempted Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2 (*UPMC and UPMC Health Plan v. Highmark*) (insurance and purchase markets of Medicare Advantage plans, *see supra* ¶¶ 27-28, 31)

176.    Plaintiffs UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

177.    Defendant Highmark has engaged and continues to engage in anticompetitive and predatory conduct.  This anticompetitive conduct has included, but is not limited to, a multi-faceted scheme to cripple UPMC and UPMC Health Plan rather than competing on the merits, steering of patients away from UPMC and other providers and to WPAHS, threats against providers that fail to accede to Highmark's demands, the purchase of healthcare facilities, predatory pricing, depressed reimbursement rates to providers, and targeted efforts to preclude the entry and/or expansion of other insurers in the market for Medicare Advantage plans, (*see supra* ¶ 160), in Western Pennsylvania, including UPMC Health Plan.

178.    Highmark has used a combination of agreements with providers and depressed reimbursement rates to create artificial barriers to entry and/or expansion in the market for Medicare Advantage plans in Western Pennsylvania.

179.    This conduct has been undertaken with the specific intent of monopolizing and monopsonizing the market for Medicare Advantage plans in Western Pennsylvania.  In engaging in this conduct, Highmark has not been predominantly motivated by legitimate business aims.

180.    Due to its relentless campaign of coercion, retribution, excessive compensation, unlawful contracts, public pressure, and creation of barriers to entry, Highmark's scheme has had a dangerous probability of success.  This is especially so in light of its already dominant position in the market, controlling over 50% of the market for Medicare Advantage plans in Western Pennsylvania and facing no major competitor.

181.    This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS.  Highmark's conduct continues to threaten injury to competition in the market for Medicare Advantage plans in Western Pennsylvania and UPMC and UPMC Health Plan in their business or property.

182.    Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

183.    Highmark's conduct is continuing and the expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

184.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive health insurance and purchase markets.

**Count V:  Conspiracy in Unreasonable Restraint of Trade in Violation of Sherman Act § 1, 15 U.S.C. § 1 (*UPMC and UPMC Health Plan v. Highmark and WPAHS*) (relevant insurance and purchase markets, *see supra* ¶¶ 25-28, 30-31)**

185.    Plaintiffs UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

186.    Defendants Highmark and WPAHS, the consultant, and others have engaged in a continuing conspiracy with the purpose and effect of maintaining Highmark's monopolies in the relevant insurance markets and monopsonies in the relevant purchase markets.  Among other things, Highmark has agreed to favor WPAHS over UPMC in terms of compensation and other financial treatment, including reimbursement rates, and has steered patients to WPAHS, notwithstanding WPAHS's higher costs and lower quality.  In return, WPAHS has siphoned patients away from UPMC, has not contracted with any outside national insurer on more favorable terms than Highmark, and has maintained capacity at levels contrary to its economic interests.  Further, both Highmark and WPAHS benefited significantly from the workings of the conspiracy and thus had a motive to enter it.  WPAHS received cash infusions, patients that it would not otherwise have received, and weakened its only legitimate rival in the provider market.  Highmark fortified its monopolies and monopsonies, secured significant cost savings on reimbursement rates, increased insurance premiums to noncompetitive levels, and amassed outrageous reserves.

187.    Highmark's financial support of WPAHS is conditioned on its continued adherence to the purposes of the conspiracy; the maintenance of excess capacity is against WPAHS's economic interests; WPAHS is mismanaged, inefficient, and was never intended to compete with UPMC on the merits of its services; Highmark's steering of patients has been engendered by unlawful threats and has no procompetitive justification; and Highmark has acknowledged that its purpose for WPAHS was to siphon away patients from other providers.

188.    The actions pursuant to the conspiracy are illegal.

189.    The purpose and probable effect of the continuing conspiracy is to raise the cost of insurance to Western Pennsylvania consumers, produce depressed reimbursement rates for

providers, including UPMC, eliminate or marginalize all competitors, deprive patients of the most effective and efficient healthcare, and raise barriers to entry in the relevant insurance and purchase markets.

190.    This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS.   Highmark's and WPAHS's conduct continues to threaten injury to competition in the relevant insurance and purchase markets and UPMC in its business or property.

191.    Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.  These damages include, but are not limited to, the increased reimbursement rates UPMC would have received in the absence of the anticompetitive conduct, profits related to patients Highmark steered to WPAHS, and the profits which would have resulted had UPMC Health Plan not been artificially hindered.

192.    Highmark's and WPAHS's conduct is continuing and the expected injury from Defendants' future conduct would not be redressible by money damages and would therefore be irreparable.

193.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive health insurance and purchase markets.

-60-

**Count VI:  Conspiracy in Unreasonable Restraint of Trade in Violation of Sherman Act § 1, 15 U.S.C. § 1 (*UPMC and UPMC Health Plan v. Highmark and WPAHS*) (provider market, *see supra* at ¶ 29)**

194.    Plaintiffs UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

195.    Defendants Highmark and WPAHS, the consultant, and others have engaged in a continuing conspiracy with the purpose and effect of restraining competition unreasonably in the provider market.  Highmark has engaged in intimidation and harassment tactics to threaten providers that if they do not comply with its demands, particularly with regard to their treatment of UPMC, they will suffer financial harm.  Highmark has made these threats to benefit both itself and WPAHS.  Highmark has also retained a consultant and used Highmark-affiliated hospitals to execute these threats.  In return, WPAHS has siphoned patients away from UPMC, has not contracted with any outside national insurer on more favorable terms than Highmark, and has maintained capacity at levels contrary to its economic interests.  Further, both Highmark and WPAHS benefited significantly from the workings of the conspiracy and thus had a motive to enter it.  WPAHS received cash infusions, patients that it would not otherwise have received, and weakened its only legitimate rival in the provider market.  Highmark fortified its monopolies and monopsonies, secured significant cost savings on reimbursement rates, increased insurance premiums to noncompetitive levels, and amassed outrageous reserves.

196.    Highmark's financial support of WPAHS is conditioned on its continued adherence to the purposes of the conspiracy; the maintenance of excess capacity is against WPAHS's economic interests; WPAHS is mismanaged, inefficient, and was never intended to compete with UPMC on the merits of its services; Highmark's steering of patients has been engendered by unlawful threats and has no procompetitive justification; and Highmark has acknowledged that its purpose for WPAHS was to siphon away patients from other providers.

197.    As one example, Highmark, through the consultant, threatened UCC Washington that if it does not terminate its joint venture with UPMC, it will steer its insureds to other WPAHS providers, such as Canonsburg Hospital.  Highmark has made similar threats to Excela and has refused to contract with UCCs that also contract with UPMC.  The consultant, on behalf of Highmark, has also encouraged former UPMC physicians now employed by Highmark or WPAHS to violate their non-solicitation provisions.

198.    The actions pursuant to the conspiracy are illegal.

199.    The purpose and probable effect of these continuing conspiracies is to raise the cost of inpatient care to Western Pennsylvania consumers, produce depressed reimbursement rates for providers, including UPMC, eliminate or marginalize all competitors, deprive patients of the most effective and efficient healthcare, steer patients to an inefficient and ineffective provider in WPAHS, and raise barriers to entry in the provider and relevant insurance markets.

200.    This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS.  Highmark's and WPAHS's conduct continues to threaten injury to competition in the provider market and relevant insurance markets and UPMC and UPMC Health Plan in their business or property.

201.    Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

202.    Highmark's and WPAHS's conduct is continuing and the expected injury from Defendants' future conduct would not be redressible by money damages and would therefore be irreparable.

203.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive provider and health insurance markets.

### Count VII: Conspiracy to Monopolize in Violation of Sherman Act § 2, 15 U.S.C. § 2 (*UPMC and UPMC Health Plan v. Highmark and WPAHS*) (relevant insurance and purchase markets, *see supra* ¶¶ 25-28, 30-31)

204.    Plaintiff UPMC and UPMC Health Plan incorporate and reallege paragraphs 1 through 150 by reference.

205.    Defendants Highmark and WPAHS, the consultant, and others have engaged in a continuing conspiracy with the purpose and effect of maintaining Highmark's monopolies in the relevant insurance markets and monopsonies in the relevant purchase markets.  Among other things, Highmark has agreed to favor WPAHS over UPMC in terms of compensation and other financial treatment, including reimbursement rates, and has steered patients to WPAHS, notwithstanding WPAHS's higher costs and lower quality.  In return, WPAHS has siphoned patients away from UPMC, has not contracted with any outside national insurer on more favorable terms than Highmark, and has maintained capacity at levels contrary to its economic interests.  Further, both Highmark and WPAHS benefited significantly from the workings of the conspiracy and thus had a motive to enter it.  WPAHS received cash infusions, patients that it would not otherwise have received, and weakened its only legitimate rival in the provider market.  Highmark fortified its monopolies and monopsonies, secured significant cost savings on reimbursement rates, increased insurance premiums to noncompetitive levels, and amassed outrageous reserves.

206.    Highmark's financial support of WPAHS is conditioned on its continued adherence to the purposes of the conspiracy; the maintenance of excess capacity is against WPAHS's economic interests; WPAHS is mismanaged, inefficient, and was never intended to compete with UPMC on the merits of its services; Highmark's steering of patients has been engendered by unlawful threats and has no procompetitive justification; and Highmark has acknowledged that its purpose for WPAHS was to siphon away patients from other providers.

207.    In furtherance of the continuing conspiracy, Defendants have engaged in a broad range of conduct, including but not limited to the creation of Community Blue, and threatening UPMC that if it does not comply with Highmark's demands, its insureds will be steered to WPAHS's facilities.  This and other conduct has been undertaken with the specific intent of monopolizing the relevant insurance markets and monopsonizing the relevant purchase markets. In engaging in this conduct, Defendants have not been predominantly motivated by legitimate business aims.

208.    Due to its relentless campaign of coercion, retribution, excessive compensation, unlawful contracts, public pressure, and creation of barriers to entry, Highmark's scheme has had a dangerous probability of success.  This is especially so in light of Highmark's already dominant position in the relevant insurance and purchase markets, controlling over 65% of the market for commercial health insurance in Western Pennsylvania, and over 50% of the Western Pennsylvania market for Medicare Advantage plans, and the absence of any viable insurance competitors.

209.    The purpose and probable effect of these continuing conspiracies is to raise the cost of inpatient care to Western Pennsylvania consumers, produce depressed reimbursement rates for providers, including UPMC, eliminate or marginalize all competitors, deprive patients

of the most effective and efficient healthcare, steer patients to an inefficient and ineffective provider in WPAHS, and raise barriers to entry in the relevant insurance and purchase markets.

210.    This conduct has directly injured UPMC and UPMC Health Plan by coercing UPMC into low reimbursement rates, denying UPMC of profits related to patients Highmark steered to WPAHS, stunting the growth of UPMC Health Plan, and denying UPMC and UPMC Health Plan of profits which would have resulted had UPMC not been artificially and unlawfully hindered as an IDFS.  Highmark's conduct continues to threaten injury to competition in the relevant insurance and purchase markets and UPMC and UPMC Health Plan in their business or property.

211.    Accordingly, UPMC and UPMC Health Plan seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

212.    Defendants' conduct is continuing and the expected injury from Defendants' future conduct would not be redressible by money damages and would therefore be irreparable.

213.    An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC and UPMC Health Plan, and further the public interest in competitive health insurance and purchase markets.

### Count VIII: Intentional Interference with Existing and Prospective Business Relations in Violation of Pennsylvania Law (*UPMC v. Highmark*)

214.    Plaintiff UPMC incorporates and realleges paragraphs 1 through 150 by reference.

215.    Highmark has intentionally sought to interfere with existing contractual relationships, including joint venture contracts that UPMC has with numerous hospitals in Western Pennsylvania.   Highmark has brazenly threatened to destroy these hospitals by

eliminating their patient volumes and building facilities next door unless these hospitals relent to Highmark's demands and breach their joint venture contracts with UPMC.

216.    As one example, Highmark, through the consultant, threatened Washington UCC that if it does not terminate its joint venture with UPMC, it will steer its insureds to other WPAHS providers, such as Canonsburg Hospital. The consultant, on behalf of Highmark, has also encouraged former UPMC physicians now employed by Highmark to violate their non-solicitation provisions.

217.    Highmark has also intentionally sought to interfere with UPMC's prospective contractual relationships. In a 2012 meeting, for example, Highmark's former CEO informed WPAHS employed physicians as well as independent physicians with WPAHS privileges that if the doctors took any action supportive of UPMC or adverse to Highmark (such as seeking UPMC employment or referring cases to UPMC), Highmark would jeopardize their economic well-being.

218.    UPMC's prospective contractual agreements would have been consummated but for Highmark's unlawful conduct.

219.    Highmark took these and other actions with the specific intent of preventing the contractual or prospective contractual relationships from occurring and to thereby cause harm to UPMC.

220.    Highmark had no privilege or justification to interfere with these existing or prospective business relationships.

221.    This conduct has and continues to harm UPMC by reducing the number of patients referred to its facilities and perpetuating both Highmark's monopoly in the relevant insurance markets and monopsony in the relevant purchase markets.

222.     Accordingly, UPMC seeks damages, and costs of suit, including reasonable attorneys' fees.

223.     Highmark's conduct is outrageous, malicious, wanton, willful, and oppressive. UPMC is therefore entitled to an appropriate award of punitive damages.

224.     Highmark's conduct is continuing and the expected injury from Highmark's future conduct would not be redressible by money damages and would therefore be irreparable.

225.     An injunction is appropriate to remedy the continuing violation, prevent irreparable harm to UPMC, and further the public interest in competitive healthcare markets.

**Count IX:  Trademark Infringement in Violation of 15 U.S.C. §§ 1114, 1125 (*UPMC and Prodigo Solutions, LLC v. Highmark, Protoco PPI, LLC, Protoco Supply Chain Services LLC, and HMPG Pharmacy LLC*)**

226.     Plaintiffs incorporate and reallege paragraphs 1 through 150 by reference.

227.     Prodigo's PRODIGO goods and services are designed to improve its customers' supply chain management operations and increase efficiency by enhancing contract compliance, automating the requisition process, and, through a user-friendly online shopping portal, helping drive end-user compliance.  The PRODIGO goods and services drive automation and savings with a suite of managed services including e-procurement, supplier content management, business-to-business transaction services, and supply chain consulting.

228.     UPMC has adopted, uses, and owns the trademark PRODIGO SOLUTIONS® in connection with "computer software for performing electronic commerce business transactions and electronic data transformations in the field of procurement and supply chain management"; "business consulting services related to electronic supply chain management"; and "design of computer software for others in the field of supply chain management."  The PRODIGO SOLUTIONS trademark has been used continuously since at least as early as 2008 by UPMC, its

related companies, and/or its licensees. These rights are embodied, in part, in U.S. Trademark Registration No. 3,873,844, a true and correct copy of which is attached hereto as Exhibit A and, by this reference, incorporated herein.

229.   The trademark reflected in Exhibit A is valid, legally protectable, and has not been licensed to Defendants for use in any manner whatsoever.

230.   UPMC has adopted, uses, and owns the trademark PRODIGO™ in connection with "business consulting services related to electronic supply chain management"; and "design of computer software for others in the field of supply chain management; application service provider featuring software for use in the field of supply chain management." The PRODIGO trademark has been used continuously since at least as early as 2008 by UPMC, its related companies, and/or its licensees. These rights are embodied, in part, in U.S. Trademark Application No. 85/603,690, a true and correct copy of which is attached hereto as Exhibit B and, by this reference, incorporated herein.

231.   The trademark reflected in Exhibit B is valid, legally protectable, and has not been licensed to Defendants for use in any manner whatsoever.

232.   UPMC has adopted, uses, and owns the trademark PRODIGO SOLUTIONS & Design™ in connection with "business consulting services related to electronic supply chain management"; and "design of computer software for others in the field of supply chain management; application service provider featuring software for use in the field of supply chain management." The PRODIGO SOLUTIONS & Design trademark has been used continuously since at least as early as 2008 by UPMC, its related companies, and/or its licensees. These rights are embodied, in part, in U.S. Trademark Application No. 85/621,329, a true and correct copy of which is attached hereto as Exhibit C and, by this reference, incorporated herein.

233.    The trademark reflected in Exhibit C is valid, legally protectable, and has not been licensed to Defendants for use in any manner whatsoever.

234.    The trademarks described in paragraphs 228 through 233, are referred to herein collectively as the "PRODIGO Trademarks."

235.    The PRODIGO Trademarks are inherently distinctive and signify to members of the consuming public that goods and services that come from UPMC and Prodigo are of the highest standard of quality.

236.    In an effort to compete with UPMC in the supply chain management business, Highmark, upon information and belief, formed Trinity Supply Chain Services LLC under Pennsylvania law in November 2011.

237.    Upon information and belief, in March 2012, Trinity Supply Chain Services LLC changed its name to Protoco PPI, LLC.

238.    Upon information and belief, Highmark formed Protoco Supply Chain Services LLC under Pennsylvania law in March 2012.

239.    Since April, 2012, Defendants Highmark, Protoco PPI, LLC, Protoco Supply Chain Services LLC, and HMPG Pharmacy LLC (collectively, "the Protoco Defendants") have been using the marks PROTOCO and PROTOCO & Design (the "PROTOCO Trademarks") in connection with their group purchasing and supply chain management services.

240.    The Protoco Defendants willfully and deliberately adopted the PROTOCO Trademarks because of their confusing similarity to UPMC's PRODIGO Trademarks, and the Protoco Defendants have begun promoting and continue to promote their group purchasing and supply chain management services under the PROTOCO Trademarks in violation of UPMC's trademark rights.

241.    The Protoco Defendants' group purchasing and supply chain management services are promoted and sold in the same channels of trade to the same consumers as are UPMC's PRODIGO goods and services.

242.    The Protoco Defendants' use of the PROTOCO Trademarks in connection with their group purchasing and supply chain management services was intended to cause confusion, mistake, and deception among the public concerning the source of their services and to create a false impression that the PROTOCO Trademarks originate from UPMC or a company that is affiliated, connected, or associated with UPMC or that Protoco's group purchasing and supply chain management services originate from, are sponsored by, or are approved by UPMC.

243.    The Protoco Defendants' use of the PROTOCO Trademarks is likely to cause, and has in fact caused, confusion, mistake, or deception in the mind of the public as to the affiliation, connection, or association of Defendants with UPMC or as to the origin, sponsorship, or approval of the Protoco Defendants' PROTOCO services by UPMC.  As a result, UPMC has lost the ability to control its reputation and image with the consuming public, resulting in damage to the goodwill associated with UPMC's PRODIGO Trademarks.

244.    The Protoco Defendants' acts constitute trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

245.    UPMC owns the exclusive rights to the PRODIGO Trademarks.  UPMC's use of the PRODIGO Trademarks in the United States predates the Protoco Defendants' use of the PROTOCO Trademarks.

246.    Notwithstanding UPMC's well known and prior common law and statutory rights in the PRODIGO Trademarks, the Protoco Defendants have, with actual and constructive notice of UPMC's federal and common law rights, and long after UPMC established its rights in the

PRODIGO Trademarks, adopted and used the PROTOCO Trademarks in connection with the displaying, marketing, promoting, distributing, offering for sale, selling, and rendering of group purchasing and supply chain management services in interstate commerce.

247.    The Protoco Defendants' use of each of the PROTOCO Trademarks as a mark for services identical or closely related to those provided by UPMC under the PRODIGO Trademarks, without the authorization of UPMC, is likely to deceive and cause confusion, mistake, or deception among consumers or potential consumers as to the source or origin of the Protoco Defendants' services and the sponsorship or endorsement of those services by UPMC.

248.    The Protoco Defendants' use of the PROTOCO Trademarks without the authorization of UPMC is likely to deceive and cause confusion, mistake, or deception among consumers or potential consumers as to the source or origin of UPMC's services and the sponsorship or endorsement of those services by the Protoco Defendants.

249.    Such confusion, mistake, or deception has occurred as a direct result of the Protoco Defendants' use of the PROTOCO Trademarks in connection with the displaying, marketing, promoting, distributing, offering for sale, selling, and rendering of group purchasing and supply chain management services.

250.    Despite the fact that the Protoco Defendants had actual knowledge of UPMC's rights in and to the PRODIGO Trademarks, the Protoco Defendants have used, and upon information and belief, will continue to use the PROTOCO Trademarks in complete disregard of UPMC's rights.

251.    The Protoco Defendants have misappropriated UPMC's substantial rights in and to the PRODIGO Trademarks, as well as the goodwill associated therewith.  Unless restrained and enjoined by this Court, such conduct will permit the Protoco Defendants to gain an unfair

competitive advantage over UPMC, enjoy the selling power of the PRODIGO Trademarks, improperly blunt and interfere with UPMC's continued promotion and expansion of the PRODIGO Trademarks, and palm off their services as those being produced, sponsored, or authorized by UPMC.

252.   Upon information and belief, the acts of the Protoco Defendants alleged in paragraphs 106 through 108 and 236 through 251 above have been willful and/or with a wanton and reckless disregard for UPMC's rights.

253.   The Protoco Defendants' infringing activities will continue to cause irreparable injury to UPMC's business, reputation, and goodwill if the Protoco Defendants are not restrained by the Court from further violation of UPMC's rights.  Accordingly, an injunction is appropriate to remedy the continuing violation and prevent irreparable harm to UPMC.  As a direct and proximate result of the Protoco Defendants' unlawful infringement, UPMC has suffered damages and will continue to suffer damages in an amount that is not presently ascertainable, but will be proven at trial.

**Count X:  Unfair Competition and False Designation of Origin in Violation of 15 U.S.C. §1125(a) (*UPMC and Prodigo Solutions, LLC v. Highmark, Protoco PPI, LLC, Protoco Supply Chain Services LLC, and HMPG Pharmacy LLC*)**

254.   Plaintiffs incorporate and reallege paragraphs 1 through 150 and paragraphs 226 through 253 by reference.

255.   The Protoco Defendants' acts constitute unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

256.   The Protoco Defendants' use of the PROTOCO Trademarks in connection with group purchasing and supply chain management services, without the authorization of UPMC, is likely to deceive and cause confusion, mistake, or deception among consumers or potential

consumers as to affiliation, connection, or association of Highmark with UPMC, or as to the origin, sponsorship, or approval of the Protoco Defendants' services by UPMC.

257.   Such confusion, deception, or mistake has occurred as a direct result of the Protoco Defendants' use of the PROTOCO Trademarks in connection with the displaying, advertising, promotion, sale, and rendering of group purchasing and supply chain management services in interstate commerce.

258.   Despite the fact that the Protoco Defendants had actual knowledge of UPMC's rights in and to the PRODIGO Trademarks, the Protoco Defendants have used, and upon information and belief, will continue to use the PROTOCO Trademarks in complete disregard of UPMC's rights.

259.   The Protoco Defendants have misappropriated UPMC's substantial rights in and to the PRODIGO Trademarks, as well as the goodwill associated therewith.  Unless restrained and enjoined by this Court, such conduct will permit the Protoco Defendants to gain an unfair competitive advantage over UPMC, enjoy the selling power of the PRODIGO Trademarks, improperly blunt and interfere with UPMC's continued promotion and expansion of the PRODIGO Trademarks, and palm off their services as those being produced by, sponsored, or authorized by UPMC.

260.   Upon information and belief, the acts of the Protoco Defendants alleged in paragraphs 106 through 108, 236 through 251, and 255 through 259 above have been willful and/or with a wanton and reckless disregard for UPMC's rights.

261.   The Protoco Defendants' infringing activities will continue to cause irreparable injury to UPMC's business, reputation, and goodwill if the Protoco Defendants are not restrained by the Court from further violation of UPMC's rights.  Accordingly, an injunction is appropriate

to remedy the continuing violation and prevent irreparable harm to UPMC.  As a direct and proximate result of the Protoco Defendants' unlawful infringement, UPMC has suffered damages and will continue to suffer damages in an amount that is not presently ascertainable, but will be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs UPMC, UPMC Health Plan, and Prodigo Solutions LLC respectfully request that this Court:

a.      Adjudge and decree that the above-described conduct encompassed by Counts I-IV and VII above violates and continues to threaten a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.      Award UPMC and UPMC Health Plan damages in the form of three times the amount by which they were injured pursuant to Counts I-IV and VII;

c.      Issue an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, prohibiting and restraining Defendants Highmark and WPAHS from engaging in any future initiative to cripple UPMC or UPMC Health Plan while attempting to avoid competition on the merits;

d.      Order Defendants Highmark and WPAHS to pay UPMC's and UPMC Health Plan's reasonable costs and attorneys' fees in bringing and maintaining Counts I-IV and VII of this action pursuant to 15 U.S.C. § 26;

e.      Adjudge and decree that the above-described conduct encompassed by Counts V-VI above violates and continues to threaten a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

f.      Award UPMC and UPMC Health Plan damages in the form of three times the

amount by which they were injured pursuant to Counts V-VI;

g.      Issue an injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26,

prohibiting and restraining Defendants Highmark and WPAHS from:

        i.      Agreeing to favor WPAHS over UPMC in its compensation and other

            financial treatment;

        ii.     Threatening UPMC, implicitly or explicitly, that, if it does not comply

            with Highmark's demands, patients will be steered to Highmark's provider

            assets;

        iii.    Contracting with UPMC beyond the expiration of Highmark's and

            UPMC's current contracts on December 31, 2014, except with regard to

            specific facilities and patients already identified in the parties' preliminary

            agreement; and

        iv.     Engaging in any conduct pursuant to their conspiracy, the purpose or

            effect of which is to impair competition in the markets for health insurance

            or provider services;

h.      Order Defendants Highmark and WPAHS to pay UPMC's and UPMC Health

Plan's reasonable costs and attorneys' fees in bringing and maintaining Counts V-VI of this

action pursuant to 15 U.S.C. § 26;

i.      Adjudge and decree that the above-described conduct encompassed by Count VIII

constituted intentional interference with existing and prospective business relations in violation

of Pennsylvania law;

j.      Award UPMC damages that it suffered as a result of Highmark's conduct in violation of Pennsylvania law;

k.      Award UPMC punitive damages;

l.      Issue an injunction prohibiting and restraining Highmark, its officers, agents, servants, employees, and all those in active concert or participation with it from further interfering with UPMC's existing or prospective contractual relations, including joint ventures;

m.      Permanently enjoin Defendants, their officers, agents, servants, employees, and all those in active concert or participation with them, from:

        i.      further infringing the PRODIGO Trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying or otherwise disposing of any goods or services not authorized by UPMC bearing any simulation, reproduction, counterfeit, copy or colorable imitation of the PRODIGO® Trademarks;

        ii.      making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any products or services originating from Defendants are in any manner associated with, endorsed, or are sponsored by or connected with UPMC;

        iii.      engaging in any other activity constituting unfair competition with UPMC, or constituting an infringement of UPMC's PRODIGO Trademarks;

iv.     effecting assignments or transfers, forming new entities or association or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in Subparagraphs (a) through (d); and

v.      aiding, abetting, contributing to or otherwise assisting anyone in infringing upon UPMC's PRODIGO Trademarks.

n.      Direct Defendants to deliver for destruction all infringing materials including any unauthorized goods and/or all labels, signs, prints, packages, dyes, wrappers, receptacles and advertisements relating thereto in their possession or under their control bearing the PRODIGO Trademarks or any simulation, reproduction, counterfeit, copy or colorable imitations thereof.

o.      Direct such other relief as the Court may deem appropriate to prevent the trade and public from gaining the erroneous impression that any goods or services manufactured, sold or otherwise circulated or promoted by Defendants are authorized by UPMC, or related in any way to UPMC's products or services.

p.      Award UPMC three times UPMC's damages there from and three times Defendants' profits there from, after an accounting, pursuant to 15 U.S.C. §§ 1125(a) and 1117.

q.      Award UPMC its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

r.      Award any further relief it may deem just and proper.

## DEMAND FOR JURY TRIAL

UPMC demands a trial by jury on all issues triable by jury.

Dated: September 20, 2012                    Respectfully submitted,


                                             /s/ Paul M. Pohl
                                             Paul M. Pohl (Pa. No. 21625)
                                             Leon F. DeJulius, Jr. (Pa. No. 90383)

Rebekah B. Kcehowski (Pa. No. 90219)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Tel: (412) 391-3939
Fax: (412) 394-7959
pmpohl@jonesday.com
lfdejulius@jonesday.com
rbkcehowski@jonesday.com

Joe Sims (*Pro Hac Vice* granted)
Kathy Fenton (*Pro Hac Vice* granted)
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001-2113
Tel: (202) 879-3939
Fax: (202) 626-1700
jsims@jonesday.com
kmfenton@jonesday.com

Paul H. Titus (Pa. No. 01399)
SCHNADER HARRISON SEGAL &
LEWIS LLP
Fifth Avenue Place, Suite 2700
Pittsburgh, PA  15222-3001
Tel: (412) 577-5200
Fax: (412) 765-3858
ptitus@schnader.com

*Attorneys for Plaintiffs*