BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDSTRICT LITIGATION

| | | |
|---|---|---|
| In re Blue Cross Blue Shield Antitrust Litigation } | | No. 2406 |
| } | | |
| } | | |
| _____ } | | |

## INTERESTED PARTY RESPONSE IN SUPPORT OF CENTRALIZATION OF THE LIFEWATCH ACTION

To: Clerk of the Panel
Judicial Panel on Multidistrict Litigation
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Room G-255, North Lobby
Washington, D.C. 20002-8004

Pursuant to Rule 6.2(e), defendants Horizon Blue Cross Blue Shield of New Jersey, Blue Cross Blue Shield of South Carolina, Blue Cross Blue Shield of Minnesota, and WellPoint, Inc., file this response in support of the Blue Cross Blue Shield Association's Notice of Related Action[1] regarding *LifeWatch Services, Inc. v. Highmark, Inc. et al.*, 2:12-cv-05146 (E.D. Pa.) ("*LifeWatch*"), joining BCBSA in the position that this action should be centralized with the Honorable R. David Proctor in the Northern District of Alabama for coordinated pretrial proceedings.

**LifeWatch Alleges the Same Conspiracy Claimed in the Related Cases**

*LifeWatch* and the 17 other related actions under consideration for centralization in *In re Blue Cross Blue Shield Antitrust Litigation*, No. 2406, all allege the same nationwide antitrust conspiracy and challenge the validity of the same license agreements between the Blue Cross

---
[1] MDL Dkt. No. 96.

Blue Shield Association and each of its 38 member Plans.[2] Like the plaintiffs in the related cases, LifeWatch claims that the 38 Blue Plans are otherwise would-be competitors who have conspired, through the BCBSA and its license agreements, not to compete in violation of the antitrust laws, and thereby obtain market dominance in their own exclusive territories. In fact, the *LifeWatch* Complaint names dozens of Blue Plans as alleged "unsued co-conspirators," *LifeWatch* Compl. September 10, 2012 ("*LifeWatch* Compl.") ¶ 21 (2:12-cv-05146, E.D. Pa., Dkt. 1); twenty-five of those same Blue Plans are named as Defendants and purported co-conspirators in *Conway*. *See Conway* Compl. July 24, 2012 ("*Conway* Compl.") ¶¶ 20-60 (No. 12-cv-2532, S.D. Ala., Dkt. 1). And, consistent with the allegations in the other cases, the very first sentence of the *LifeWatch* Complaint alleges: "This complaint is being filed to challenge a nationwide conspiracy among the thirty-eight (38) Blue Cross Blue Shield plans to substantially and unlawfully reduce competition among these plans." *LifeWatch* Compl. ¶ 1. And the first five pages of the "Factual Allegations" Section of the Complaint complain about the "Power of Blue Cross Plans" and "The Conspiracy: Allocation of Territories and National Accounts." *Id*. at pp. 11-15. Like the allegations in the 17 other actions that charge BCBSA and various Blue Plans with an unlawful conspiracy to restrain trade, these allegations in *LifeWatch* also attack the exclusive service areas in the BCBSA license agreements and the purported anti-competitive effect of these licenses. *Id.*

As in *Conway*--the lead provider case noticed for transfer to the proposed MDL--LifeWatch alleges that the Blue Plans have market power over providers and that this is somehow illegal. *Compare LifeWatch* Compl. ¶ 83 ("The Blue Cross Plans have substantial power over firms like LifeWatch who sell MCOT services, including the power to set sub-

---

[2] Defendants contest all allegations regarding the existence of a conspiracy or violation of the antitrust laws.

competitive prices for their services." "[I]f a medical service firm discontinues its relationship with a Blue Cross Plan, or is excluded from a Blue Cross Plan as a result of an illegal horizontal conspiracy, as is the case here, the firm would expect to lose a significant share of its Blue Cross patients."); ¶¶ 77-80 (discussing Blue Plans' substantial market power) *with Conway* Compl. ¶ 6 ("Given the lack of competition in the healthcare market and the Blues' resulting dominant market power, the BCBS Defendants have the unfettered power to force healthcare providers into…either acquiescing to anticompetitive rates and terms or foregoing access to a dominant portion of healthcare subscribers."). These complex antitrust claims are precisely the type of involved claims that are particularly well-suited to centralization. *See, e.g., In re Hydrogen Peroxide Antitrust Litig.*, 374 F. Supp. 2d 1345, 1346 (J.P.M.L. 2005); *In re Circular Thermostat Antitrust Litig.*, 370 F. Supp. 2d 1355, 1356−57 (J.P.M.L. 2005).

### Centralizing *LifeWatch* Promotes Efficient Resolution of Common Allegations

Centralizing *LifeWatch* along with the other 17 cases claiming the same antitrust conspiracy will allow one court to address the underlying claim of conspiracy and the legality of the BCBSA license agreements. All of the defendants in *LifeWatch* are also defendants in many of the other cases, brought by both healthcare providers and subscribers, in which centralization is sought. If *LifeWatch* were not centralized along with the other actions challenging the purported existence of a nationwide antitrust conspiracy, there would be a very real potential for conflicting rulings between federal courts on the existence of the alleged nationwide conspiracy and the validity of the BCBSA's license agreements. The JPML consistently has held that the potential for inconsistent rulings is a significant factor warranting centralization. *See In re Lipitor Antitrust Litig.,* 856 F.Supp. 2d 1355, 1356 (J.P.M.L. 2012) (ordering centralization to "prevent inconsistent pretrial rulings on class certification, discovery, and other pretrial issues");

*In re Countrywide Financial Corp. Mortgage-Backed Securities Litig.*, 812 F.Supp. 2d 1380, 1383 (J.P.M.L. 2011) (granting centralization which will "prevent[] conflicting rulings"); *In re Telephone Charge Antitrust Litig.*, 341 F. Supp. 771, 772 (J.P.M.L 1972) ("Although plaintiffs are apparently cooperating with one another in asserting these claims, we cannot leave the complexities of the overlapping class allegations to the voluntary coordination of the parties. We have frequently held that the possibility of duplicative discovery resulting from common fact questions and the threat of inconsistent judicial decisions of discovery, class and other issues requires transfer of multidistrict litigation to a single judge under Section 1407."). As in *In re Lipitor Antitrust Litig.*, that factor by itself heavily weighs in favor of transferring and centralizing *LifeWatch*. It would defeat the goal of avoiding inconsistent rulings to centralize only some of the antitrust conspiracy cases but allow *LifeWatch* to proceed independently, with all the attendant risks of inconsistent rulings on the core allegations regarding the existence of a conspiracy and the validity of the license agreements.

### Centralizing *LifeWatch* Promotes the Convenience of the Parties

Centralizing *LifeWatch* along with the other cases making the same allegations will avoid the prospect of duplicative discovery being sought both from the defendants in this action and the dozens of other Blue Plans that are allegedly members of the purported nationwide antitrust conspiracy (despite not being named as defendants in *LifeWatch*). The JPML has repeatedly held that a potential for parties to be subject to duplicative discovery is a factor that warrants transfer. *See In re Lipitor Antitrust Litig.,* 856 F.Supp. 2d 1355, 1356 (J.P.M.L. 2012) (ordering centralization which "will eliminate duplicative discovery"); *In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978) (in granting transfer order, noting "TVA and Westinghouse will have to depose many of the same witnesses, examine many of the same

documents, and make many similar pretrial motions in order to prove their conspiracy allegations. The benefits of having a single judge supervise this pretrial activity are obvious."); *In re Cross-Fla. Barge Canal Litig.*, 329 F. Supp. 543, 544 (J.P.M.L. 1971) (ordering centralization where "[p]retrial coordination or consolidation will eliminate the likelihood of repetitive discovery[.]").

The discovery in all of these actions will focus on the alleged "rules" or "guidelines" which are supposedly implemented by BCBSA licenses and imposed upon the various Blue Plans: exclusive service areas[3]; the "80% Rule"[4]; and the "Two-Thirds Rule."[5] The so-called "Medical Policy Rule" alleged in *LifeWatch* is just another example of a BCBSA policy supposedly used to enforce the claimed conspiracy. *See LifeWatch* Compl. ¶¶ 37-47. Absent transfer and centralization of *LifeWatch* with the related actions, the *LifeWatch* defendants (whose principal places of business are spread across the country) will likely have to issue discovery responses, produce documents, and provide deposition testimony about the same factual issues in both *LifeWatch* and in the other actions raising the same issues. Moreover, because a nationwide conspiracy of all Blue Plans is alleged in *LifeWatch* and in the other cases in which centralization is sought, without transfer of *LifeWatch*, dozens of other Blue Plans would likely face third-party discovery in *LifeWatch* that would greatly overlap with discovery they could be required to provide in other actions.

Any argument that centralization is not necessary because overlapping discovery can be managed among various district courts suggests that various district courts should involve themselves in managing overlapping party and third-party discovery among dozens of parties

---

[3] *LifeWatch* Compl. ¶ 33(a); *Conway* Compl. ¶¶ 65, 73, 98; *Cerven* Compl. February 7, 2012 ("*Cerven* Compl.") ¶¶ 30, 83 (5:12-cv-17, W.D.N.C., Dkt. 1); *Morrissey* Compl. May 11, 2012 ("*Morrissey* Compl.") ¶ 76 (2:12-cv-02359, W.D.Tenn., Dkt. 1).
[4] *LifeWatch* Compl. ¶33(b); *Conway* Compl. ¶ 99; *Cerven* Compl. ¶ 84; *Morrissey* Compl. ¶ 77.
[5] *LifeWatch* Compl. ¶33(c); *Conway* Compl. ¶ 100; *Cerven* Compl. ¶ 85; *Morrissey* Compl. ¶ 78.

and third-parties from around the country. There is simply no justification for introducing such complication into the process. It would be significantly more efficient for one district court to become familiar with key discovery issues such as the appropriate scope of discovery, the burdens associated with production, and the HIPAA-related confidentiality issues that naturally come along with similar lawsuits filed against many of the nation's health insurance companies.

### LifeWatch's State Law Claim and Medical Policy Claims Do Not Weigh Against Transfer

While the *LifeWatch* complaint does include a single state law claim against one of the defendants, Count I is a Sherman Act claim aimed at the supposed antitrust conspiracy among the 38 Blue Plans and the BCBSA. Section 1407 does not require a complete identity or even majority of common issues as a prerequisite to centralization, and the presence of different nuances does not negate the existence of some common questions that warrant transfer. *See, e.g.*, *In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d 1359, 1360−61 (J.P.M.L. 2008). That is especially true where, as here, it is indisputable that *LifeWatch* and the 17 related actions will require resolution of the legal issue regarding whether the BCBSA and the Blue Plans have conspired to unreasonably restrain trade.

Additionally, while it is true that no other plaintiffs are currently claiming that the Blue Plans have used their allegedly ill-gotten market dominance to deny coverage for LifeWatch's particular medical service (mobile cardiac outpatient telemetry), LifeWatch has still chosen to base its claims on a theory of conspiracy and illegally obtained market dominance.[6] Having

---

[6] *See, e.g.*, *LifeWatch* Compl. at ¶ 1 ("[t]he conspiracy reduces geographic expansion by Blue Cross Plans); ¶¶30-36 (cataloging the "Power of Blue Cross Plans" and "The Conspiracy: Allocation of Territories and National Accounts," including BCBSA Licensing Agreements, the "Service Area Rule," the "80% Rule," and the "Two-Thirds Rule"); ¶38 (alleging Blue Plan conspiracy to avoid "creating competitive points of difference" between the plans); ¶41 (alleging that "Medical Policy Rule" "further insulates the Blue Cross Plans from any form of competition among one another"); ¶45 (Blue Cross Plans "have agreed to severely restrict the ability of any

6

made that strategic choice to base its case on those same conspiracy allegations asserted in the related cases (many of which were filed prior to *LifeWatch*), LifeWatch can hardly complain about having to litigate in an MDL.

Thus, for all these reasons, the *LifeWatch* action should be transferred and centralized with the other related cases.


Dated: November 21, 2012                                  Respectfully submitted,


                                                                                   /s/ Craig A. Hoover
Craig A. Hoover
J. Robert Robertson
E. Desmond Hogan
Elizabeth Jose
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, District of Columbia 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
robby.robertson@hoganlovells.com
desmond.hogan@hoganlovells.com
elizabeth.jose@hoganlovells.com

*Counsel for Horizon Blue Cross Blue Shield of New Jersey, Blue Cross Blue Shield of South Carolina, Blue Cross Blue Shield of Minnesota, and WellPoint, Inc.*

---

Blue Cross plan to compete with other Blue Cross Plans."); ¶47 (alleging that the "Service Area Rule," "80% Rule" and "Two-Thirds Rule," among others, "are in furtherance of a conspiracy not to compete"); ¶¶77-80 (stating that Blue Plans have substantial market power amounting to monopsony).

## CERTIFICATE OF SERVICE

I certify that on November 21, 2012, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Craig A. Hoover_____
Craig A. Hoover