# Exhibit A

# U.S. District Court
# Northern District of Florida (Panama City)
# CIVIL DOCKET FOR CASE #: 5:12-cv-00370-RS-GRJ

DAVIDSON v. BLUE CROSS AND BLUE SHIELD OF ALABAMA et al
Assigned to: JUDGE RICHARD SMOAK
Referred to: MAGISTRATE JUDGE GARY R JONES
Cause: 15:1 Antitrust Litigation

Date Filed: 11/15/2012
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**JENNIFER RAY DAVIDSON**
*ON BEHALF OF HERSELF AND ALL OTHERS SIMILARLY SITUATED*

represented by **LEE MCARTHUR SCOTT**
602 HARRISON AVE
STE III
PANAMA CITY, FL 32401
850-819-7833
Fax: 850-784-7706
Email: nscott0418@aol.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF ALABAMA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF FLORIDA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF TENNESSEE**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA**

**Defendant**

**ANTHEM INC**

**Defendant**

**PREMERA BLUE CROSS OF**

**ALASKA**

**Defendant**

**ARKANSAS BLUE CROSS AND BLUE SHIELD**

**Defendant**

**ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT**

**Defendant**

**HIGHMARK BLUE CROSS AND BLUE SHIELD OF DELAWARE**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF GEORGIA**

**Defendant**

**HAWAII MEDICAL SERVICE ASSOC**
*doing business as*
BLUE CROSS AND BLUE SHIELD OF HAWAII

**Defendant**

**HEALTH CARE SERVICE CORP**
*doing business as*
BLUE CROSS AND BLUE SHIELD OF ILLINOIS

**Defendant**

**ANTHEM BLUE CROSS AND BLUE SHIELD OF INDIANA**

**Defendant**

**WELLMARK INC**
*doing business as*
BLUE CROSS AND BLUE SHIELD OF IOWA

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF KANSAS**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF LOUISIANA**

**Defendant**

**ANTHEM HEALTH PLANS OF MAINE**

**Defendant**

**CAREFIRST BLUE CROSS AND BLUE SHIELD OF MARYLAND**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MICHIGAN**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MINNESOTA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MISSISSIPPI**

**Defendant**

**ANTHEM BLUE CROSS AND BLUE SHIELD OF MISSOURI**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF KANSAS CITY**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF NEBRASKA**

**Defendant**

**ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW HAMPSHIRE**

**Defendant**

**HORIZON BLUE CROSS AND BLUE SHIELD OF NEW JERSEY**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF NEW MEXICO**

**Defendant**

**EXCELLUS BLUECROSS BLUESHIELD OF NEW YORK**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF OKLAHOMA**

**Defendant**

**BLUE CROSS OF NORTHEASTERN PENNSYLVANIA - WILKES-BARRE**

**Defendant**

**HIGHMARK INC**

**Defendant**

**INDEPENDENCE BLUE CROSS**

**Defendant**

**TRIPLE S - SALUD INC**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF RHODE ISLAND**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF TEXAS**

**Defendant**

**WELLMARK OF SOUTH DAKOTA**
*doing business as*
WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF VERMONT**

**Defendant**

**ANTHEM BLUE CROSS AND BLUE SHIELD OF VIRGINIA INC**

**Defendant**

**HIGHMARK BLUE CROSS BLUE**

**SHIELD OF WEST VIRGINIA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD ASSOCIATION**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/15/2012 | 1 | COMPLAINT against Jennifer R Davidson ( Filing fee $ 350 receipt number 1129-2461953.), filed by Jennifer R Davidson. (SCOTT, LEE) (Entered: 11/15/2012) |
| 11/16/2012 | 2 | DOCKET ANNOTATION BY COURT: Re 1 Complaint filed by JENNIFER R DAVIDSON. In accordance with N.D. Fla. Loc. R. 5.1(E), The completed Civil Cover Sheet (JS-44, Rev. 9/11) is to be filed as a separate pleading. Therefore, please file the civil cover sheet using the event selection "Civil Cover Sheet" which is found under "Other Filings" under "Other Documents". (jcw) (Entered: 11/16/2012) |
| 11/16/2012 | 3 | DOCKET ANNOTATION BY COURT: Re 1 Complaint filed by JENNIFER R DAVIDSON. The parties named in the referenced documents were added to the docket incorrectly and will be corrected by the clerk. For future reference: Please review the procedure for adding/creating new parties in the "Style Guide for Electronic Case Filing" and/or Chapter 10 of the "CM/ECF Attorney User's Guide" (both available on the clerk's website). (jcw) (Entered: 11/16/2012) |

Case 5:12-cv-00370-RS-GRJ Document 1 Filed 11/15/12 Page 1 of 48

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

Jennifer Ray Davidson, on behalf of herself and all Others similarly situated )
)
)
Plaintiff )
)
v. )
)
Blue Cross and Blue Shield of Alabama, ) Anthem, Inc., Premera Blue Cross of ) Alaska, Arkansas Blue Cross and Blue ) Shield, Anthem Blue Cross and Blue Shield ) of Connecticut, Highmark Blue Cross and ) Blue Shield of Delaware, Blue Cross and ) Blue Shield of Florida, Blue Cross and Blue ) Shield of Georgia, Hawaii Medical Service ) Assoc. d/b/a Blue Cross and Blue ) Shield of Hawaii, Health Care Service ) Corp. d/b/a/ Blue Cross and Blue Shield ) of Illinois, Anthem Blue Cross and Blue ) Shield of Indiana, Wellmark, Inc. d/b/a ) Blue Cross and Blue Shield of Iowa, Blue ) Cross and Blue Shield of Kansas, Blue ) Cross and Blue Shield of Louisiana, ) Anthem Health Plans of Maine, CareFirst ) Blue Cross and Blue Shield of Maryland, ) Blue Cross and Blue Shield of ) Massachusetts, Blue Cross and Blue Shield ) of Michigan, Blue Cross and Blue Shield of ) Minnesota, Blue Cross and Blue Shield of ) Mississippi, Anthem Blue Cross and Shield ) of Missouri, Blue Cross and Blue Shield of ) Kansas City, Blue Cross and Blue ) Shield of Nebraska, Anthem Blue ) Cross and Blue Shield of New Hampshire, ) Horizon Blue Cross and Blue Shield of New ) Jersey, Blue Cross and Blue Shield of New ) Mexico, Excellus BlueCross BlueShield of ) New York, Blue Cross and Blue Shield of ) North Carolina, Blue Cross and Blue Shield ) Of Oklahoma, Blue Cross of Northeastern )

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Case MDL No. 2406 Document 125-3 Filed 11/28/12 Page 9 of 55

Pennsylvania – Wilkes-Barre, Highmark, Inc., Independence Blue Cross, Triple S – Salud, Inc., Blue Cross and Blue Shield of Rhode Island, Blue Cross and Blue Shield of South Carolina, Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, Blue Cross and Blue Shield of Tennessee, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Vermont, Anthem Blue Cross and Blue Shield of Virginia, Inc., Highmark Blue Cross, Blue Shield of West Virginia and Blue Cross and Blue Shield Association,

Defendants.

**CLASS ACTION COMPLAINT**

Plaintiff, Jennifer Ray Davidson, on behalf of herself and all others similarly situated, brings this Complaint for damages and restitution against Defendants, Blue Cross and Blue Shield of Alabama, Anthem, Inc., Premera Blue Cross and Blue Shield of Alaska, Arkansas Blue Cross and Blue Shield, Anthem Blue Cross and Blue Shield of Connecticut, Highmark Blue Cross and Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Blue Cross and Blue Shield of Georgia, Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, Health Care Service Corporation d/b/a/ Blue Cross and Blue Shield of Illinois, Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of

Louisiana, Anthem Health Plans of Maine, CareFirst Blue Cross and Blue Shield of Maryland, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Michigan, Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of Mississippi, Anthem Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and Blue Shield of New Hampshire, Horizon Blue Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, Excellus BlueCross BlueShield of New York, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of Oklahoma, Blue Cross of Northeastern Pennsylvania – Wilkes-Barre, Highmark, Inc., Independence Blue Cross, Triple S – Salud, Inc., Blue Cross and Blue Shield of Rhode Island, Blue Cross and Blue Shield of South Carolina, Wellmark, Inc. of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, Blue Cross and Blue Shield of Tennessee, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Vermont, Anthem Blue Cross and Blue Shield of Virginia, Highmark Blue Cross and Blue Shield of West Virginia (collectively, "BCBS Defendants") and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants"), and alleges violations of antitrust laws as follows:

## INTRODUCTION

1. As set forth in this complaint, the BCBS Defendants enjoy unrivaled market power in their respective territories and/or regions. The dominant market share of the BCBS Defendants is the direct result of an illegal agreement between BCBSA and the BCBS Defendants, in which dozens of the nation's largest health insurance companies have agreed that they will restrict competition among themselves through the establishment of exclusive

Case 5:12-cv-00370-RS-GRJ Document 1 Filed 11/13/12 Page 4 of 48

territories in exchange for the right to use the BCBSA marks, services, benefits and brands.

2. The BCBS Defendants have violated the federal antitrust laws by explicitly agreeing not to compete with each other. Instead, Defendants have conspired to divide the healthcare market in the United States into geographically defined regions in order to allow each BCBS Defendant an exclusive, competition-free slice of the healthcare market.

3. These market allocation agreements are implemented through Blue Cross and Blue Shield "license" agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans (the "Blues") -- the BCBS Defendants.

4. Through the terms of these per se illegal license agreements, the BCBS Defendants have explicitly agreed not compete with one another, in direct violation of Sections 1 and 2 of the Sherman Act. By so agreeing, they have perpetuated and strengthened the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market. The Defendants' market allocation agreement constitutes a per se violation of Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2.

5. BCBS licensees, the BCBS Defendants, operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans. In fact, a BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

6. The BCBS Defendants, including BCBS-FL, while operating as independent economic entities, are all licensees of the BCBSA. This licensure has entitled the BCBS Defendants to certain rights within the BCBSA scheme, such as exclusive use of the "Blue

Cross" or "Blue Shield" emblem with its defined territory. Significantly, the BCBS Defendants elect a board of directors composed exclusively of member Blues.

7. In turn, this board of directors establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive territories. There is no procompetitive justification for these licensing agreements and restrictions on competition in exclusive territories. This arrangement via BCBSA is a naked territorial restrain on competition in the market for health insurance.

8. The Defendants' illegal conspiracy has perpetuated and strengthened the dominant market position each BCBS Defendant enjoys in its specifically defined geographic market and has contributed to skyrocketing premiums. Given the lack of competition in the healthcare market and the Defendants' resulting dominant market position, the BCBS Defendants have the unfettered power to force subscribers into an inescapable situation of either acquiescing to anticompetitive rates and terms or foregoing access to a dominant portion of healthcare subscribers.

9. In a truly competitive market for health insurance, and absent the illegal agreement between the BCBS Defendants to divide markets and eliminate competition, such inflated premiums would not be possible.

10. Further, the agreement among the Defendants prohibits the sale or transfer of provider networks to non-Blue members and, thereby, further restrains competition. It has been recognized that the acquisition of a provider network is perhaps the most significant barrier to entry for health insurers considered entering a new geographic market, and that the cost of internally developing rather than acquiring such a network is often considered prohibitive.

11. As a result, the contractual restrictions established through BCBSA and agreed to by the BCBS Defendants create an immense barrier to entry into the market for health insurance in the states dominated by BCBS. The agreements created amongst the BCBSA entities not only create constraints for providers in negotiating with BCBS Defendants, but also create an immense barrier to entry into the market for health insurance in the states occupied by BCBS Defendants. Fair competition is not possible so long as the BCBS Defendants and BCBSA are permitted to enter into agreements that have actual and intended effect of restricting the ability of health insurance companies from competing in certain territories.

12. Because the BCBS Defendants have agreed not to compete and have established and solidified their dominant market position, subscribers have virtually no bargaining power. Defendants have, in fact, rigged the deck to be certain that BCBS Defendants hold all the cards. As a result, BCBS subscribers such as Plaintiff and the purported Class are subject to much higher premiums and rates and less favorable terms than they would be absent the Defendants' agreements not to compete.

13. As the Defendants are no doubt aware, free competition would lessen the disparity in power between the BCBS Defendants and BCBS subscribers such as Plaintiff and the Class and would, therefore, result in lower premiums and better terms. To the contrary, lack of free competition has resulted in skyrocketing premiums.

14. Defendants' conspiracy has harmed competition and, absent injunctive relief, Defendants' practices will continue unabated to the detriment of competition and to the harm of subscribers such as Plaintiff.

**JURISDICTION AND VENUE**

15. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiff brings her claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBS-FL and BCBS Defendants for the injuries sustained by Plaintiff and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

16. This action is also instituted to secure injunctive relief against BCBS-FL and the BCBS Defendants to prevent them from further violations of Sections 1 and 2 of the Sherman Act.

17. Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

**PARTIES**

**Plaintiff**

18. Plaintiff, Jennifer Ray Davidson, is domiciled in Bay County, Florida, at 623 Timbers Crossing, Lynn Haven, Florida. Plaintiff purchased an individual health insurance policy with, and paid premiums to BCBS-FL from April of 2012 through the present.

**Defendants**

19. Defendant Blue Cross and Blue Shield of Alabama is the health insurance plan

operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare benefits in Alabama, providing coverage to more than three million people. The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama. Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

20. Defendant Anthem, Inc. is an Indiana corporation with its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana. Through its subsidiary Anthem Insurance Companies, Inc., also an Indiana corporation, Anthem, Inc. provides healthcare benefits through Blue Cross and Blue Shield plans in fourteen states. Anthem, Inc., its subsidiaries, and health care plans are collectively referred to as "Anthem" in this Complaint.

21. Defendant Premera Blue Cross of Alaska is an Alaska corporation with its corporate headquarters located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503. Premera is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million members in various health care plans. Premera Blue Cross of Alaska, its subsidiaries, and health care plans are collectively referred to as "Blue Cross of Alaska" or "BC-AK" in this Complaint. BC-AK exercises market dominance in the state of Alaska or within areas of the state.

22. Defendant Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 860,000 enrollees in various health care plans in Arkansas. Arkansas Blue Cross and Blue Shield,

its subsidiaries and health care plans are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint. BCBS-AR exercises market dominance in the state of Arkansas or within areas of the state.

23. Anthem Blue Cross and Blue Shield of Connecticut is a Connecticut corporation with its corporate headquarters located at 370 Bassett Road, North Haven, Connecticut 06473. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.2 million enrollees in various health care plans in Connecticut. Anthem Blue Cross and Blue Shield of Connecticut, its subsidiaries and health plans are collectively referred to as "Blue Cross and Blue Shield of Connecticut" or "BCBS-CT." BCBS-CT exercises market dominance in the state of Connecticut or within areas of the state.

24. Defendant Highmark Blue Cross and Blue Shield of Delaware is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark Blue Cross and Blue Shield of Delaware provides health care services to approximately 396,000 members in various health care plans in Delaware. Highmark Blue Cross and Blue Shield of Delaware, its subsidiaries, and health care plans are collectively referred to as "Highmark Blue Cross and Blue Shield of Delaware" or "BCBS-DE". BCBS-DE exercises market dominance in the state of Delaware or within areas of the state.

25. Defendant Blue Cross and Blue Shield of Florida is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 7 million enrollees in various health care plans in Florida. Blue Cross and Blue Shield of Florida, its subsidiaries and health care plans are collectively referred to as "Blue Cross

and Blue Shield of Florida" or "BCBS-FL" in this Complaint. BCBS-FL exercises market dominance in the state of Florida or within areas of the state.

26. Defendant Blue Cross and Blue Shield of Georgia is a Georgia corporation with its corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.1 million enrollees in various health care plans in Georgia. Blue Cross and Blue Shield of Georgia, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint. BCBS-GA exercises dominance in the state of Georgia or within areas of the state.

27. Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 676,000 members in various health care plans in Hawaii. Hawaii Medical Service Association, its subsidiaries, and health care plans are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint. BCBS-HI exercises market dominance in the state of Hawaii or within areas of the state.

28. Defendant Health Care Service Corp. d/b/a Blue Cross and Blue Shield of Illinois is a Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, Illinois 60601. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 6.5 million members in various health care plans in Illinois. Health Care Service Corp. is a customer-owned health benefits company that purports to focus on

improving the health and wellness of its members and communities. Blue Cross and Blue Shield of Illinois, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint. BCBS-IL exercises market dominance in the state of Illinois or within areas of the state.

29. Defendant Anthem Blue Cross and Blue Shield of Indiana is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Indiana. Blue Cross and Blue Shield of Indiana, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint. BCBS-IN exercises market dominance in the state of Indiana or within areas of the state.

30. Defendant Wellmark, Inc. d/b/a Blue Cross and Blue Shield of Iowa. Together, Wellmark and its subsidiaries provide health care services to approximately 1.4 million members in Iowa. Defendant Blue Cross and Blue Shield of Iowa is an Iowa corporation with its corporate headquarters located at 1331 Grand Avenue, Des Moines, Iowa 50306. BCBS-IA exercises market dominance in the state of Iowa or within areas of the state.

31. Defendant Blue Cross and Blue Shield of Kansas is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629. Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries that provide health care services to approximately 880,000 members in various health care plans in Kansas. Blue Cross and Blue Shield of Kansas, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS." BCBS-KS

exercises market dominance in the state of Kansas or within areas of the state.

32. Defendant Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 858,000 enrollees in various health care plans Louisiana. Blue Cross and Blue Shield of Louisiana, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint. BCBS-LA exercises market dominance in the state of Louisiana or within areas of the state.

33. Defendant Anthem Health Plans of Maine is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 140,000 enrollees in various health care plans in Maine. Anthem Health Plans of Maine, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint. BCBS-ME exercises market dominance in the state of Maine or within areas of the state.

34. Defendant CareFirst Blue Cross and Blue Shield of Maryland is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Maryland. CareFirst Blue Cross and Blue Shield of Maryland, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Maryland" or "BCBS-MD" in this Complaint. BCBS-MD exercises market dominance in the state of Maryland or within areas of the state.

35. Defendant Blue Cross and Blue Shield of Massachusetts is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts 02215. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.4 million enrollees in various health care plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint. BCBS- MA exercises market dominance in the state of Massachusetts or within areas of the state.

36. Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 4.8 million enrollees in various health care plans in Michigan. Blue Cross and Blue Shield of Michigan, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint. BCBS-MI exercises market dominance in the state of Michigan or in areas of the state.

37. Defendant Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2 million enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint. BCBS-MN exercises market dominance in the state of Minnesota or in areas of the state.

38. Defendant Blue Cross and Blue Shield of Mississippi is a Mississippi

corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1 million enrollees in various health care plans in Mississippi. Blue Cross and Blue Shield of Mississippi, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Mississippi" or "BCBS-MS" in this Complaint. BCBS-MS exercises market dominance in the state of Mississippi or within areas of the state.

39. Defendant Anthem Blue Cross and Blue Shield of Missouri is a Missouri Corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in a various health care plans in Missouri. Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint. BCBS-MO exercises market dominance in the state of Missouri or within areas of the state.

40. Defendant Blue Cross and Blue Shield of Kansas City is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 805,000 enrollees in various health care plans in Missouri. Blue Cross and Blue Shield of Kansas City, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint. BCBS-Kansas City exercises market dominance in the state of Missouri or within areas of the state.

41. Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation

Case 5:12-cv-00370-RS-GRJ Document 1 Filed 11/15/12 Page 15 of 48

with its corporate headquarters located at 1919 Aksarban Drive, Omaha, Nebraska 68180. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 620,000 enrollees in various health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint. BCBS-NE exercises market dominance in the state of Nebraska or within areas of the state.

42. Defendant Anthem Blue Cross and Blue Shield of New Hampshire is a New Hampshire corporation with its corporate headquarters located at 300 Goffs Falls Road, Manchester, New Hampshire 03111. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in New Hampshire. Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint. BCBS-NH exercises market dominance in the state of New Hampshire or within areas of the state.

43. Defendant Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2 million enrollees in various health care plans New Jersey. Horizon Blue Cross and Blue Shield of New Jersey, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint. BCBS-NJ exercises market dominance within the state of New Jersey or within areas of the state.

44. Defendant Blue Cross and Blue Shield of New Mexico is a New Mexico

corporation with its corporate headquarters located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 236,000 enrollees in various health care plans in New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint. BCBS-NM exercises market dominance within the state of New Mexico or within areas of the state.

45. Defendant Excellus Blue Cross Blue Shield of New York is a New York corporation with its corporate headquarters located at 333 Butternut Drive, Syracuse, New York 13214-1803. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in the State of New York. Excellus Blue Cross Blue Shield of New York, its subsidiaries and health care plans are collectively referred to as "Excellus Blue Cross and Blue Shield of New York" or "BCBS-NY-Excellus" in this Complaint. BCBS-NY-Excellus exercises market dominance in the state of New York or within areas of the state.

46. Defendant Blue Cross and Blue Shield of North Carolina is a North Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina 27707. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.6 million members in various health care plans in North Carolina. Blue Cross and Blue Shield of North Carolina, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC." BCBS-NC exercises market dominance in the state of North Carolina or within areas of the state.

47. Defendant Blue Cross and Blue Shield of Oklahoma is an Oklahoma corporation with its corporate headquarters located at 1400 South Boston, Tulsa, Oklahoma 74119. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint. BCBS-OK exercises market dominance within the state of Oklahoma or within areas of the state.

48. Defendant Blue Cross of Northeastern Pennsylvania – Wilkes-Barre is a Pennsylvania corporation with its corporate headquarters located at 19 North Main Street, Wilkes-Barre, Pennsylvania 18711. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 570,000 enrollees in various health care plans in Pennsylvania. Blue Cross of Northeastern Pennsylvania – Wilkes-Barre, its subsidiaries and health care plans are collectively referred to as "Blue Cross of Northeastern Pennsylvania – Wilkes Barre" or "BCBS-NE PA-Wilkes Barre" in this Complaint. BCBS-NE PA – Wilkes- Barre exercises market dominance in the state of Pennsylvania or within areas of the state.

49. Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.9 million enrollees in Pennsylvania. Highmark, Inc., its subsidiaries and health care plans are collectively referred to as "Highmark" in this Complaint. Highmark exercises market dominance in the state of Pennsylvania or within areas of the state.

50. Defendant Independence Blue Cross is a Pennsylvania corporation with its

corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103. It is the parent corporation of a number of subsidiaries that provide health care services to more than 3 million enrollees in Pennsylvania. Independence Blue Cross, its subsidiaries and health care plans are collectively referred to as "Independence Blue Cross" in this Complaint. Independence Blue Cross exercises market dominance in the state of Pennsylvania or within areas of the state.

51. Defendant Triple S – Salud, Inc. is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that provide health care services to more than 600,000 enrollees in Puerto Rico. Triple S – Salud, Inc., its subsidiaries and health care plans are collectively referred to as "Triple-S of Puerto Rico" in this Complaint. Triple-S of Puerto Rico exercises market dominance in Puerto Rico or within areas of Puerto Rico.

52. Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 15 LaSalle Square, Providence, Rhode Island 02903. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and Blue Shield of Rhode Island, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint. BCBS-RI exercises market dominance in the state of Rhode Island or within areas of the state.

53. Defendant Blue Cross and Blue Shield of South Carolina is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29223. It is the parent corporation of a number of subsidiaries that provide health care services to approximately one million members in various health care plans in South Carolina.

Blue Cross and Blue Shield of South Carolina, its subsidiaries, and health care plans are collectively referred to as “Blue Cross and Blue Shield of South Carolina” or “BCBS-SC.” BCBS-SC exercises market dominance in the state of South Carolina or within parts of the state.

54. Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 250,000 enrollees in South Dakota. Blue Cross and Blue Shield of South Dakota, its subsidiaries and health care plans are collectively referred to as “Blue Cross and Blue Shield of South Dakota” or “BCBS-SD” in this Complaint. Blue Cross and Blue Shield of South Dakota exercises market dominance in the state of South Dakota or within areas of the state.

55. Defendant Blue Cross and Blue Shield of Tennessee is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.3 million members in various health care plans in Tennessee. Blue Cross and Blue Shield of Tennessee, its subsidiaries, and health care plans are collectively referred to as “Blue Cross and Blue Shield of Tennessee” or “BCBS-TN.” BCBS-TN exercises market dominance in the state of Tennessee or within areas of the state.

56. Defendant Blue Cross and Blue Shield of Texas is a Texas corporation with its corporate headquarters located at 1001 E. Lookout Drive, Richardson, Texas 75082. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.9 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas,

its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint. BCBS-TX exercises market dominance in the state of Texas or within areas of the state.

57. Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in the state of Vermont. Blue Cross and Blue Shield of Vermont, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint. BCBS-VT exercises market dominance in the state of Vermont or within areas of the state.

58. Defendant Anthem Blue Cross and Blue Shield of Virginia, Inc. is a Virginia corporation with its corporate headquarters located at 2235 Staples Mill Road, Suite 401,Richmond, Virginia 23230. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.2 million enrollees in various health care plans in Virginia. Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint. BCBS-VA exercises market dominance in the state of Virginia or within areas of the state.

59. Defendant Highmark Blue Cross and Blue Shield of West Virginia is a West Virginia corporation with its corporate headquarters located at 700 Market Square, Parkersburg, West Virginia 26101. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 250,000 enrollees in various health care plans in West Virginia.

Highmark Blue Cross and Blue Shield of West Virginia, its subsidiaries and health care plans are collectively referred to as "Highmark Blue Cross and Blue Shield of West Virginia" or "BCBS-WV" in this Complaint. BCBS-WA exercises market dominance in the state of West Virginia or in areas of the state.

60. Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled by 38 health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as the licensor. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million—or one in three—Americans. BCBSA itself does not provide health services or sell health insurance to subscribers, but it operates to create consistency and cooperation among its 38 members. It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members. The 38 plans fund Defendant BCBSA.

61. BCBSA has contacts with the state of Florida by virtue of its agreements and contacts with BCBS-FL.

**INTERSTATE COMMERCE**

62. Defendants and their activities were within the flow of and substantially affected interstate commerce.

63. BCBSA and its co-conspirators, the BCBS Defendants, operate on a nationwide basis. Health insurers operating under the Blue Cross and Blue Shield trademarks and trade

names provide health insurance operate throughout the United States providing coverage for approximately 100 million – or one in three – Americans. BCBSA enters into agreements with each of these insurers. Each BCBS Defendant provides health insurance coverage to subscribers in its defined geographical area and also throughout the United States when the plan's insureds travel outside of their home states. Moreover, communications between Defendants have occurred through interstate communications. Accordingly, BCBSA and the BCBS Defendants are engaged in interstate commerce.

64. Defendants' illegal agreements and conspiracy have had a direct, substantial, and reasonably foreseeable effect on commerce between the states.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action on behalf of herself and on behalf of a class of plaintiffs. Plaintiff brings this action seeking damages on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "National Class") defined as:

> All persons or entities who paid health insurance premiums to at least one of the BCBS Defendants for full-service commercial health insurance.
>
> All persons or entities
>
> Specifically excluded from the class are all members of the judiciary, their spouses, and their immediate family members. Excluded from the class are the Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest of Defendants, and Defendants' legal representatives, assigns or successors.

66. The Class is so numerous and geographically dispersed that joinder of all members is impractical. While Plaintiff does not know the number and identity of all members of the Class, Plaintiff believes that there are millions of Class members, the exact number and identities of which can be obtained from the BCBS Defendants.

67. There are questions of law or fact common to the Class, including but not limited to:

a. Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Sections 1 and 2 of the Sherman Act, or are otherwise prohibited under Sections 1 and 2 of the Sherman Act;

b. Whether, and the extent to which, premiums charged by the BCBS Defendants to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

c. Whether, and the extent to which, premiums charged by the BCBS Defendants has been artificially inflated as a result of the anticompetitive practices adopted by the BCBS Defendants.

69. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

70. Plaintiff is a member of the National Class; her claims are typical of the claims of the members of the Class; and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and the National Class are direct purchasers of individual or small group full-service commercial health insurance from the BCBS Defendants, and their

interests are coincident with and not antagonistic to other members of the Class. In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

71. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and the BCBS Defendants.

72. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which the BCBS Defendants have records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

73. The BCBS Defendants all enjoy market dominance within their respective states or areas of their states. In some cases this share approaches 100%, demonstrating the complete lack of meaningful competition within these markets. For example, in 2008, BCBS-AL enrolled 96% of subscribers of full-service commercial health insurance plans in the Alabama

small group market, whether the insurance was offered through a health maintenance organization ("HMO") or through a preferred provider organization ("PPO") plan. BCBS-AL thus has the highest share of the small group insurance market achieved by any health insurance carrier in any state in the country.

74. The situation in Alabama, is not unique, however, as the BCBS Defendants all reap similar benefits in their respective service areas across the United States. For example, according to certain data reported by the U.S. Government Accountability Office, Premera Blue Cross of Alaska enjoys a 77% market share in Alaska; BlueCross Blue Shield of North Carolina has 65% of the market in North Carolina; and Blue Cross Blue Shield of Tennessee enjoys 68% of that state's health insurance market.

75. BCBS-LA enjoys unrivaled market dominance within Louisiana, enrolling approximately 54 percent of the subscribers of full-service commercial health insurance plans. When considering full-service preferred provider organization ("PPO") subscribers alone, BCBS-LA's market dominance is even greater, as nearly 60 percent of full-service PPO plan subscribers statewide are enrolled with BCBS-LA – vastly more than the next largest full-service commercial insurer, United Healthcare Insurance Company, which carries just 9 percent of such subscribers.

76. The BCBS Defendants' market dominance is the result of a systematic and longstanding agreement between and among the BCBS Defendants and the remaining insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States, thereby eliminating competition. This illegal restraint is implemented through the Blue Cross and Blue

Shield license agreements that each licensee has entered into with Defendant BCBSA. As detailed herein, the member health insurance plans of BCBSA that allocate the geographic markets for health insurance by limiting each Blue's activity outside of a designated service area, thereby preventing competition among BCBS companies. Moreover, these agreements effectively obstruct entry by non-BCBS insurers by, among other things, preventing the sale or transfer of established networks to non-Blue entities. These provisions have insulated BCBS Defendants and the other Blues from competition by both Blues and non-Blues in each of their respective service areas. These provisions of the BCBS's agreements operate as effective restraints on competition, and have no sufficient economic justification aside from protecting BCBS entities from competition.

77. Defendants' anticompetitive practices, by eliminating competition and reducing the choices available to health insurance consumers, have raised the premiums that BCBS subscribers must pay to obtain health insurance. This has further allowed BCBS Defendants to collect inflated profits, higher than they would have experienced had there been unimpeded competition. As a result of these inflated premiums, BCBS-LA now has a surplus of more than $620 million.

78. By and through their agreement, each of the BCBS Defendants has been able to acquire and maintain a grossly disproportionate market share for health insurance products in their respective states and/or geographical regions or territories. Consequently, each of the BCBS Defendants has benefitted from inflated surpluses in their respective allocated markets to the resulting detriment and antitrust injury of BCBS subscribers.

79. Defendants' anticompetitive practices, by reducing the options available to

BCBS subscribers, have also significantly increased the rates and premiums paid by subscribers. Given the market dominance of the BCBS Defendants, BCBS Defendants' rival health insurance plans are effectively excluded from the market.

80. Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

81. The Defendants' co-conspirators include other Blue Plans who are not Defendants in this Action.

82. The Defendants and the other Blue Plans are not competitors; rather they are all licensees of the BCBS who operate in distinct geographical regions. The Defendants have engaged in a conspiracy to allocate markets, to reduce competition, and to increase their profits at the expense of the Plaintiff and other BCBS subscribers as Class Members.

83. The member Blues, including BCBS Defendants, are all licensees of the BCBSA which entitles them to certain rights within the BCBSA, such as use of the "blue cross" or "blue shield" emblem. BCBSA members elect a Board of Directors, composed exclusively of member Blues. That Board of Directors in turn establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive territories. There is no procompetitive justification for these licensing agreements and restrictions on competition in exclusive territories. Instead, they are naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the BCBS Defendants, and have profound anticompetitive effects.

**<u>History and Background of the Blue Cross and Blue Shield Plans and of BCBSA</u>**

84. Blue Cross and Blue Shield Plans undertook a coordinated effort to create

a national brand and then to allocate the market in which each Blue Plan would operate free of competition from other Blue Plans which has resulted in monopolies within the allocated geographic regions. The history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

85. In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other.

86. The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

87. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, “It is inconceivable to us that any group

of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

88. Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

89. However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.

90. From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

91. Instead, to address competition from commercial insurers and competition from other Blue plans, and to ensure national cooperation among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.

92. Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association. Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue

Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

93. In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans. That same year, BCBSA's Member Plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 38 today.

94. In 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans, an increasing "problem" that had caused complaints from many Blue plans.

95. Subsequently, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans. These illegal restraints are discussed below.

96. Although Blue Cross Blue Shield plans were originally set up as not-for profit

entities, during the 1980s and afterwards, they began to operate less like charitable entities and more like for-profit corporations. Thus, in 1986, Congress revoked the Blues' tax-exempt status and they thus formed for-profit subsidiaries. Consequently, the majority of the Blues converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

**<u>The BCBSA and Blues Entities</u>**

97. BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies." The Association is a separate legal entity and it purports to promote the common interests of the independent Blues entities. Defendant BCBSA and the Blue entities cover a large percentage of the subscribers in the managed care market in most states and in some local areas, and they also include a large percentage of doctors and hospitals in their network of contracted providers. BCBSA states that over 100 million individuals are enrolled with Defendants and co-conspirator Blue Plans, approximately one in three individuals nationwide.

98. The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States who would be potential competitors. Indeed, the largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees. Absent the Association's licensing agreements with each of the Blues, these companies would compete against each other in the market for

commercial health insurance.

99. BCBSA's Member Plans are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. Instead, with and through the Association the Blues have divided health insurance markets throughout the United States, to eliminate competition in those markets. On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."

100. The Association not only requires each individual Blue plan to agree to the territorial restrictions in the licensing agreements, but also serves as the epicenter for the Blues' communications and arrangements in furtherance of the their agreements not to compete. As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages ...."

101. The Association, as a separate legal entity, is a convenient vehicle for anticompetitive agreements between and among the otherwise economic independent Blues, termed "Member Plans". The Association's board of directors consists of the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer. The board of

directors holds meetings to discuss the administration and management of BCBSA and its Member Plans, while smaller committee meetings address specific health insurance issues. These meetings provide a forum for representatives of Member Plans to share information on such issues, and that information is later disseminated to all 38 members.

102. In addition, BCBSA includes numerous committees governed by the Member Plans; it sponsors various meetings, seminars, and conferences attended by the Member Plans; and it produces manuals, reports, list serves, and other correspondence to the Member Plans, all in furtherance of the conspiracy.

103. Furthermore, the Association has strict rules and regulations that all members of BCBSA must obey concerning members' Licensing Agreements and the guidelines proposed members must adhere to prior to joining the Association. Those regulations provide for amendment with a vote of three fourths of the Blues.

104. The Association polices the compliance of all members of BCBSA with its rules and regulations. The Guidelines state that the Association's Plan Performance and Financial Standards Committee (the "PPFSC") "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plain's compliance with the License Agreements and Membership Standards. In response, "[t]he Plan CEO or Corporate Secretary

must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

105. The Association controls and administers the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply "Immediate Termination," "Mediation and Arbitration," and "Sanctions" -each of which is administered by the PPFSC and could result in the termination of a member plan's license.

106. The Association controls the termination of existing members from BCBSA. According to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

107. As the foregoing demonstrates, BCBSA not only enters into anticompetitive agreements with the Blues entities to allocate markets, but also facilitates the cooperation and communications between the Blues to suppress competition within their respective areas of operation. BCBSA is a convenient organization through which the Blues entities can enter into patently illegal territorial restraints between and among themselves.

**The Horizontal Agreements Not To Compete In The Licensing Arrangements Between BCBSA And Its Member Plans, Including BCBS Defendants, Are *Per Se* Violations of The Sherman Act**

108. The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a *per se* violation of Section 1 of the Sherman Act.

109. Through the License Agreements each Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." "The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

110. Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. This provision directly limits the ability of each Blue plan to generate revenue from non- Blue business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

111. Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside ***or outside*** of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with

Blue plans.

112. Therefore, each Blue Cross and Blue Shield licensee, BCBS Defendants, has agreed with the Association that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

113. The foregoing restrictions on the ability of the BCBS Defendants to generate revenue outside of their service areas constitute agreements to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

114. BCBSA and the BCBS Defendants admit to the existence of territorial market divisions and the consequences of violating them. For example, the former Blue Cross licensee in Ohio has publicly stated that the BCBSA Member Plans agreed to include territorial restrictions in the Guidelines in order to block the sale of one member plan to a non-member plan as that would create increased competition.

115. The largest Blue licensee, WellPoint, describes the restrictions on its ability to do business. In its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, WellPoint stated that it had “no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products,” and that “[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a

Case 5:12-cv-00370-RS-GRJ Document 1 Filed 11/15/12 Page 37 of 48

requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 and 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

116. The Association imposes harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[I]icense and membership termination." If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K, there was a "re- establishment fee" of $98.33 per enrollee which would "allow the BCBSA to 're establish" a Blue Cross and/or Blue Shield presence in the vacated service area."

117. Thus while there are numerous Blue plans, and non-Blue businesses owned by such plans that could and would compete effectively in designated service areas but for the territorial restrictions, the BCBS Defendants in those areas dominate the markets. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets.

118. For example, with approximately 34 million enrollees, Anthem is the largest health insurer in the country by total medical enrollment and is the BCBSA licensee for 14 states, and also serves the entire nation through its non-Blue brand subsidiary, UniCare. However, Anthem does not have a presence in any of the other BCBS Defendants'

states. But for the illegal territorial restrictions described herein, Anthem would likely offer its health insurance products and services in those states and compete with the other BCBS Defendants. Such competition would lessen the disparity in power between the BCBS Defendants and subscribers and, would, therefore, result in lower premiums and better terms. The BCBS Defendants would no longer be able to abuse their market power which would result in drastically reduced premiums paid by BCBS subscribers.

119. Similarly, Blue Cross and Blue Shield of Florida is the 15th largest health insurer in the country by total medical enrollment with more than seven million enrollees. But for the illegal territorial restrictions, it would likely offer its health insurance services and products in other BCBS Defendants' states and compete with other BCBS Defendants. Such competition would lessen the disparity in power between the Blues and subscribers and, would, therefore, result in lower premiums and better terms. The BCBS Defendants would no longer be able to abuse their market power.

120. Therefore, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing the BCBS Defendants from competing with each other and with non- Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**<u>The Anticompetitive Acquisition Restrictions In The BCBSA Licensing Agreements</u>**

121. In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, also include provisions that restrict the ability of non-members

of BCBSA to acquire or obtain control over any Member Plan. These provisions create a significant barrier to entry for companies that are not BCBSA members or their affiliates. As such, they further restrain competition by helping BCBS companies to capture and maintain high market shares and elevate prices.

122. First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the Member Plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of or to acquire a substantial portion of the assets of a member plan, the Association – and through it, the Member Plans – could easily block its membership. Moreover, such a new member would be immediately limited by the BCBSA license's territorial restrictions. It would be forbidden from operating as a BCBS entity in a service area already inhabited by a BCBS entity, yet it would be required to make at least 66.7% of its revenue under the BCBS name. For many potential acquirers with a pre-existing footprint in the U.S. health insurance market, these two conditions would be impossible to meet.

123. Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a BCBS Defendants' license will terminate ***automatically:*** (1) if any institutional investor

become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Member Plans and also of a majority weighted vote of the disinterested Member Plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity absent special approval.

124. These acquisition restraints reduce competition by substantially reducing the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan in that area. Through the acquisition restrictions, BCBSA and the BCBS Defendants have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may be

the most cost effective due to historical tax breaks, favorable legislation, and long-term presence in a region. In fact, national insurers rarely enter a new regional market without purchasing a large local firm. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

125. By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is less competition, higher premiums costs for BCBS subscribers such as Plaintiff and the Class.

## CAUSES OF ACTION

### COUNT ONE

(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)

126. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 125.

127. The License Agreements, Membership Standards, and Guidelines agreed to by BCBS Defendants and BCBSA represent horizontal agreements entered into between the BCBSA and the thirty-eight (38) other BCBS Defendants, all of whom are competitors or potential competitors in the market for commercial health insurance.

128. Each of the License Agreements, Membership Standards, and Guidelines entered

into between BCBSA and the BCBS Defendants represents a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act.

129. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, the BCBS Defendants have conspired to restrain trade in violation of Section 1 of the Sherman Act. These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

130. The market allocation agreements entered into between the BCBSA and the thirty-eight BCBS Defendants (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

131. The BCBS Defendants have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

132. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a. Reducing the number of health insurance companies competing with each BCBS Defendant plan throughout their respective regions or territories, including throughout Louisiana;

b. Unreasonably limiting the entry of competitor health insurance companies into the geographic regions and territories controlled by each BCBS Defendant;

c. Allowing BCBS to maintain and enlarge its market power throughout the nation and the respective regions controlled by each BCBS Defendant;

d. Allowing the BCBS Defendants to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts;

e. Depriving consumers of health insurance of the benefits of free and open competition.

133. The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

134. The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

135. As a direct and proximate result of BCBSA and the BCBS Defendants continuing violations of Section 1 of the Sherman Act, Plaintiff and other members of the National Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-FL and the other BCBS Defendants than they would have paid with increased competition and but for the Sherman Act violations.

136. Plaintiffs and the National Class seek money damages from the 38 BCBS Defendants and BCBSA for their violations of Section 1 of the Sherman Act.

**COUNT TWO**

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Sherman Act, Section 2)

137. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 136.

138. BCBS Defendants have monopoly power in the individual and small group full-service commercial health insurance market in their respective states, regions or territories. This monopoly power is evidenced by, among other things, the BCBS Defendants' high market share of the commercial health insurance market in their respective regions, including its increasing market share even as it has raised premiums.

139. The BCBS Defendants have abused and continue to abuse their monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers such as BCBS subscribers.

140. The BCBS Defendants' conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

141. As a direct and proximate result of the BCBS Defendants continuing violations of Section 2 of the Sherman Act, Plaintiff and other members of the National Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to the BCBS Defendants than they would have paid but for the Sherman Act violations.

142. Plaintiff and the National Class seek money damages from the BCBS Defendants and BCBSA for their violations of Section 2 of the Sherman Act.

**COUNT THREE**

(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

143. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 142.

144. The BCBS Defendants have acted with the specific intent to monopolize the relevant markets.

145. There was and is a dangerous possibility that the BCBS Defendants will succeed in its attempt to monopolize the relevant markets because the BCBS Defendants control a large percentage of those markets already, and further success by BCBS Defendants in excluding competitors from those markets will confer a monopoly on the BCBS Defendants in violation of Section 2 of the Sherman Act.

146. The BCBS Defendants attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the National Class. Premiums charged by the BCBS Defendants have been higher than they would in a competitive market.

147. Plaintiff and the National Class have been damaged as the result of the BCBS Defendants' attempted monopolization of the relevant markets

**COUNT FOUR**

**UNJUST ENRICHMENT**

148. Plaintiff incorporates and re-alleges each of the foregoing paragraphs.

149. BCBS-FL has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the other Class members.

Case 5:12-cv-00376-RS-GRJ Document 1 Filed 11/15/12 Page 46 of 48

160. It would be inequitable for BCBS-FL to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by BCBS-FL.

161. By reason of its unlawful conduct, BCBS-FL must make restitution to Plaintiff and the Class. Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that this Court:

a. Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Adjudge and decree that BCBSA and BCBS Defendants have violated Section 1 of the Sherman Act;

c. Permanently enjoin BCBSA and BCBS Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

d. Award Plaintiff and the Class damages in the form of three times the amount of damages suffered by Plaintiff and members of the Class as proven at trial;

e. Award costs and attorneys' fees to Plaintiff;

f. For a trial by jury; and

g. Award any such other and further relief as may be just and proper.

**JURY TRIAL DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands

Case 5:12-cv-00370-RS-GRJ Document 1 Filed 11/15/12 Page 47 of 48

a trial by jury on all issues.

**SUBMITTED BY ATTORNEY:**

______________________________

Lee McArthur Scott (#0875643)
Attorney at Law
602 Harrison Avenue, Suite III
Panama City, Florida 32401
Telephone: 850-819-7833
Facsimile: 850-784-7706

**OF COUNSEL:**

M. Stephen Dampier (ASB-6125-A55M)
The Dampier law Firm, P.C.
55 N. Section Street
Fairhope, AL 36532
(251) 929.0900 voice
(251) 929.0800 fax

Patrick W. Pendley (LSBA 10421)
Nicholas R. Rockforte (LSBA 31305)
Stan P. Baudin (LSBA 22937)
Christopher L. Coffin (LSBA 27902)
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, Louisiana 70765
225-687-6396 voice
225-687-6398 fax

Gordon Ball (TN BPR# 1135)
Thomas S. Scott, Jr. (TN BPR # 1086)
Christopher T. Cain (TN BPR# 19997)
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
865-525-7028 voice
865-525-4679 fax