# EXHIBIT B

Samuel A. Diddle, ISB #4967
**EBERLE, BERLIN, KADING, TURNBOW
& McKLVEEN, CHARTERED**
1111 West Jefferson Street, Suite 530
P. O. Box 1368
Boise, ID 83701
Telephone:     (208) 344-8535
Facsimile:     (208) 344-8542

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| MELISSA ALLEN, Individually, and on behalf of All Others Similarly Situated,<br><br>             PLAINTIFFS,<br><br>v.<br><br>BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an Idaho Corporation,<br><br>             DEFENDANT. | Case No. _____<br><br>Ada County<br>Case No. CV-OC-2012-20817<br><br>**NOTICE OF REMOVAL FROM STATE COURT** |

PLEASE TAKE NOTICE THAT defendant Blue Cross of Idaho Health Service, Inc.

("BCI"), by its attorneys and pursuant to 28 U.S.C. §§ 14441(a) and 1446, hereby removes this

action from the District Court of the Fourth Judicial District of the State of Idaho, in and for the

County of Ada, to the United States District Court for the District of Idaho, and states its grounds

for removal as follows:

      1.     On or about November 13, 2012, plaintiff Melissa Allen commenced this action

in the District Court of the Fourth Judicial District of the State of Idaho, in and for the County of

Ada, in a case captioned *Melissa Allen, et al. v. Blue Cross of Idaho Health Services, Inc.*, Case

No. CV-OC-2012-20817 (the "State Court Action").

---

**NOTICE OF REMOVAL FROM STATE COURT - 1**

2.    The State Court Action alleges that BCI, the Blue Cross Blue Shield Association ("BCBSA"), and thirty-eight co-conspirator Blue Cross Blue Shield plans from around the country have violated the Idaho Antitrust Act, Idaho Code §§ 48-101 *et seq.*, through market allocation and licensing agreements. *See* Compl. ¶ 1, 3 (Exhibit 1).

## DIVERSITY JURISDICTION UNDER THE CLASS ACTION FAIRNESS ACT

3.    Enacted to expand federal jurisdiction over purported class actions, the Class Action Fairness Act ("CAFA") provides that a class action may be removed in accordance with 28 U.S.C. § 1446 if: (a) membership in the class is not less than 100; (b) any member of the plaintiff class is a citizen of a foreign country or a state different from any defendant; and (c) the aggregate amount in controversy exceeds $5,000,000. *See* 28 U.S.C. §§ 1453(b) and 1332(d).

4.    CAFA's first requirement, that class membership be no less than 100 (28 U.S.C. § 1332(d)(5)(B)), is satisfied on the face of the Complaint, as plaintiff alleges that "there are tens of thousands of Class members . . . ." Compl. ¶ 13.

5.    CAFA's second requirement is satisfied because BCBSA, which is headquartered in Chicago, Illinois, is a necessary and indispensable party to this action and is a citizen of a different state (Illinois) than plaintiff and the putative members of the class (Idaho). BCBSA is party to a number of virtually identical putative class action cases filed in various jurisdictions since February 2012. *See, e.g., Cervin v. Blue Cross & Blue Shield of N.C.*, No. 5:12-cv-17 (W.D.N.C. filed Feb. 12, 2012). One of the plaintiffs in this string of class action lawsuits recently moved to centralize almost all of the pending cases before the Judicial Panel of Multidistrict Litigation. *See In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406 (filed Sept. 6, 2012). On December 12, 2012, the Panel ordered that the cases be centralized in the United States District Court for the Northern District of Alabama. *See* Exhibit 2.

6.    Although plaintiff omitted BCBSA from this lawsuit in an effort to avoid minimal

diversity under CAFA, BCBSA has moved to intervene in this action as an indispensable party.
*See* Exhibit 3; Fed. R. Civ. P. 19. For diversity purposes, courts consider the citizenship of
indispensable parties that have not been made parties to the litigation. *See, e.g., Takeda v. N.W.*
*Nat'l Life Ins. Co.*, 765 F.2d 815, 819 (9th Cir. 1985) (motion to remand); *Campbell v. Pac. Fruit*
*Express Co.*, 148 F. Supp. 209, 201-11 (D. Idaho 1957).

7.      CAFA's third requirement, that the aggregate amount in controversy exceeds
$5,000,000, exclusive of interest and costs (28 U.S.C. § 1332(d)(2)), also is satisfied. Although BCI
disputes that it owes any type of damages, and it disputes each and every asserted remedy or theory
of recovery advanced in the Complaint, it is evident that plaintiff places more than $5,000,000 at
issue in this action, as explained below.

8.      Plaintiff seeks compensatory damages for four counts of alleged violations of Idaho's
Antitrust Act (Compl. ¶¶ 136, 144, 150, 156), treble damages for the same alleged violations (*id.* ¶¶
137, 145, 151, 157), restitution under the theory of "unjust enrichment" (*id.* ¶ 161), and attorneys'
fees. *Id.*

9.      The class definition includes "[a]ll persons and entities who paid health insurance
premiums to BCI for individual or small group full-service commercial health insurance [for any
plan not governed by the Employee Retirement Income Security Act of 1974 ("ERISA")] at any time
since November 13, 2008, and who were domiciled in the state of Idaho on November 13, 2012."
Compl. ¶ 12. BCI currently has more than 46,380 members domiciled in Idaho and enrolled in
individual insurance plans, which are not governed by ERISA. Declaration of Dennis Warren, ¶ 2
(Exhibit 4). Since 2008, the start of the class period, there were at least 41,749 BCI members per
year that fit the class definition. With at least 41,749 potential class members, if plaintiff's proposed
class were to prevail, compensatory damages of $40 for each class member for "inflated premiums"

over the four-year class period, after trebling, would exceed the $5,000,000 jurisdictional threshold.[1]

And these numbers do not take into account the restitution and attorneys' fees claimed by plaintiff,

which would add to the amount in controversy.

### PROCEDURAL REQUIREMENTS UNDER REMOVAL STATUTE

10.     The procedural requirements set forth in 28 U.S.C. § 1446 are satisfied here. Section

(a) of that statute requires the removing party to file a notice of removal "in the district court of the

United States for the district and division within which such action is pending," which BCI does with

this filing. Section (a) also requires a moving party to provide a copy to the district court of all

process, pleadings, and orders served on defendants in the state action. BCI has attached copies of

all pleadings, process, and orders served on BCI in this action. *See* Exhibits 1 (Complaint) and 5

(Summons).

11.     This Notice of Removal is timely under 28 U.S.C. § 1446(b), which provides that

"[t]he notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt

by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim

for relief upon which such action or proceeding is based . . . ." 28 U.S.C. § 1446(b).

12.     The summons and Complaint in the State Court Action were delivered to BCI on or

about November 14, 2012. The date of this Notice of Removal is within thirty days of receipt of the

Complaint by BCI.

13.     Pursuant to 28 U.S.C. § 1446(d), copies of this Notice of Removal are being served

upon counsel of record for plaintiff and will be filed with the clerk of the District Court of the Fourth

Judicial District of the State of Idaho, in and for Ada County. Exhibit 6.

14.     By filing this Notice of Removal, BCI does not waive any defense, argument, or

---

[1] $40 x 41,749 class members = $1,669,960 x 3 (treble damages) = $5,009,880.

principle of equity which may be available to it.

     15.    Based upon the foregoing, BCI respectfully states that this Court has diversity

jurisdiction under 28 U.S.C. §§ 1332, 1441, 1446, and 1453 and that the procedural requirements of

28 U.S.C. § 1446 are met. As such, this action is properly removable to federal court.

     **WHEREFORE,** defendant requests that the above-entitled action pending against it in the

District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County, be

removed to this Court.

DATED this 13th day of December, 2012.

                                 EBERLE, BERLIN, KADING, TURNBOW
                                 & McKLVEEN, CHARTERED

                                 By_____ /s/_____
                                   Samuel A. Diddle, of the firm
                                   Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was served upon the following attorneys this 13th day of December 2012, as indicated below and addressed as follows:

Bruce C. Jones
Eric B. Swartz
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808

[ ] U.S. Mail
[ ] Hand Delivery
[ ] Overnight Mail
[ ] Fax  208-765-6895
[ ] Electronic Mail

Patrick W. Pendley
Nicholas R. Rockforte
PENDLEY, BAUDIN & COFFIN, L.L.P.
24110 Eden Street
P.O. Drawer 71
Plaquemine, LA 70765

Gordon Ball
BALL & SCOTT LAW OFFICES
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902

Attorneys for Plaintiffs

                                    /s/
                            _____
                            Samuel A. Diddle

# EXHIBIT 1

Served 11/14/12 @ 2:45 p.m.

NO. _____
A.M. _____ FILED _____ P.M.

**NOV 13 2012**

CHRISTOPHER D. RICH, Clerk
By ANNAMARIE MEYER
DEPUTY

**COPY**

**Bruce C. Jones, ISB #3177**
**Eric B. Swartz, ISB #6396**
**JONES & SWARTZ PLLC**
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808
Telephone: (208) 489-8989
Facsimile: (208) 489-8988
Email: bruce@jonesandswartzlaw.com
eric@jonesandswartzlaw.com

**Patrick W. Pendley, LSB #14021 [PHV application to be submitted]**
**Nicholas R. Rockforte, LSB #31305 [PHV application to be submitted]**
**PENDLEY, BAUDIN & COFFIN, L.L.P.**
24110 Eden Street
P.O. Drawer 71
Plaquemine, LA 70765
Telephone: (225) 687-6396

**Gordon Ball, TN BPR #1135 [PHV application to be submitted]**
**BALL & SCOTT LAW OFFICES**
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902
Telephone: (865) 525-7028

**Attorneys for Plaintiffs**

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| MELISSA ALLEN, Individually, and on behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an Idaho corporation,<br><br>Defendant. | Case No. **CV OC 1220817**<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |

COMES NOW Melissa Allen, by and through her attorneys of record herein, and alleges and complains as follows:

## I. NATURE OF ACTION

1.      This is a class action brought on behalf of subscribers of Blue Cross of Idaho Health Service, Inc. (hereinafter "BCID") for damages and restitution.  Specifically, this action seeks to recover damages in the form of a refund of inflated premiums that BCID has charged Idaho subscribers as a result of an ongoing conspiracy in violation of Idaho Code §§ 48-101, *et seq.*, between BCID and the thirty-eight (38) other Blue Cross Blue Shield Association ("BCBSA") member health plans, and as a result of anti-competitive conduct BCID has engaged in to establish and maintain monopoly power throughout Idaho.

2.      BCID is by far the largest health insurance company operating in Idaho, and currently exercises market power in the commercial health insurance market throughout Idaho. According to the American Medical Association's 2011 study, 52% of the Idaho residents who subscribe to full-service commercial health insurance (group plans and individual policies) are subscribers of BCID – vastly more than the next largest full-service commercial insurer, Regence Blue Shield of Idaho, which carries just 22% of such subscribers.

3.      The dominant market share enjoyed by BCID is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with BCID, and that BCID will have the exclusive right to do business in the state of Idaho, so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas.  These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans,

and each individual Blue Cross and Blue Shield licensee, including BCID. Through the terms of these *per se* illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCID, have explicitly agreed not to compete with one another, in direct violation of Idaho's antitrust and anti-monopoly laws, specifically Idaho Code §§ 48-101, *et seq*. By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.     BCID's illegal conspiracy has perpetuated its monopoly power throughout Idaho, which has resulted in skyrocketing premiums for Idaho BCID enrollees for over a decade. BCID's anti-competitive behavior, and the lack of competition BCID faces because of its monopoly power and anti-competitive behavior, has led to higher costs, resulting in higher premiums charged to BCID customers. As a result of these inflated premiums, as of 2010, BCID had more than $415.5 million in capital and surplus.

5.     These inflated premiums would not be possible if the market for health insurance in Idaho were truly competitive. Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as BCID and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Idaho.

## II.     JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action and venue is proper pursuant to Idaho Code §§ 5-404, 5-514, 48-113, and 48-118 because, *inter alia*: (1) Plaintiff entered into contracts with BCID for health insurance in the county of Ada; (2) Plaintiff received inflated premium bills from BCID in the county of Ada; (3) Plaintiff paid BCID's inflated premium bills in the

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL – 3

county of Ada; (4) Plaintiff paid a thing not owed to BCID in the county of Ada in the form of inflated premium bills from BCID; and (5) BCID's principal place of business is in the county of Ada.

### III.   PARTIES

**A.      Plaintiff**

7.      Plaintiff Melissa Allen is domiciled in the county of Ada, state of Idaho. Plaintiff had individual health insurance coverage with, and paid premiums to, BCID beginning in at least 2008. Plaintiff is also presently paying premiums to BCID.

**B.      Defendant**

8.      Defendant BCID is an Idaho corporation, with its principal place of business in the county of Ada. BCID is the health insurance plan operating under the Blue Cross and Blue Shield Association trademarks and trade names in Idaho. Like other Blue Cross and Blue Shield plans nationwide, BCID is the largest health insurer in the state of Idaho, as measured by number of subscribers within its service area, which is defined as the state of Idaho.

**C.      Co-Conspirators**

9.      BCBSA is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-eight (38) health insurance plans, including BCID, that operate under the "Blue Cross and Blue Shield" trademarks and trade names. BCID was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million -- or one in three -- Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL – 4

## IV.   TRADE AND COMMERCE

10.     BCID and the 37 other health plans that own and control BCBSA are engaged in
interstate commerce and in activities substantially affecting interstate commerce, and the conduct
alleged herein substantially affects interstate commerce.  BCBSA enters into agreements with
health insurance companies throughout the country that specify the geographic areas in which
those companies can compete.

11.     The conduct of BCID has substantial effects on trade and commerce in the state of
Idaho.

## V.   CLASS ACTION ALLEGATIONS

12.     This action is brought and maintained as a class action pursuant to the provisions
of Idaho Rule of Civil Procedure 23.  The Plaintiff brings this action on behalf of herself, and on
behalf of all others similarly situated, as representative of the following proposed class:

> All persons and entities who paid health insurance premiums to
> BCID for individual or small group full-service commercial health
> insurance at any time since November 13, 2008, and who were
> domiciled in the state of Idaho on November 13, 2012.  A small
> group full-service commercial health insurance plan is defined as
> any plan which provides health insurance benefits for a group
> consisting of 3-199 persons or employees.

> Specifically excluded from the class are all members of the
> judiciary, their spouses, and their immediate family members.
> Excluded from the class is the Defendant, any entity in which
> Defendant has a controlling interest or which has a controlling
> interest of Defendant, and Defendant's legal representatives,
> assigns or successors.  Also excluded from the class are all persons
> and entities who paid health insurance premiums to BCID for any
> policies governed by The Employee Retirement Income Security
> Act of 1974 ("ERISA").

Plaintiff reserves the right to amend the class definition as appropriate after class discovery is
completed..

13.     The Class is so numerous and geographically dispersed in the state of Idaho that

joinder of all members is impracticable. While Plaintiff does not know the number and identity

of all members of the Class, Plaintiff believes that there are tens of thousands of Class members,

the exact number and identities of which can be obtained from BCID.

14.     There are questions of law or fact common to the Class, including but not limited

to:

> a.  Whether the restrictions set forth in the BCBSA license
>     agreements are *per se* violations of Idaho Code §§ 48-101,
>     *et seq.*, or are otherwise prohibited under Idaho Code §§ 48-
>     101, *et seq.*;
>
> b.  Whether, and the extent to which, premiums charged by BCID
>     to class members have been artificially inflated as a result of
>     the illegal restrictions in the BCBSA license agreements;
>
> c.  Whether the use of Most Favored Nation ("MFN") provisions
>     in the BCID provider agreements is anti-competitive, by
>     raising barriers of entry and by increasing the costs of care and
>     insurance;
>
> d.  Whether, and the extent to which, premiums charged by BCID
>     have been artificially inflated as a result of the anti-competitive
>     practices adopted by BCID;
>
> e.  Whether the restrictions set forth in the BCBSA license
>     agreements are *per se* violations of Idaho Code §§ 48-101,
>     *et seq.*

15.     The questions of law or fact common to the members of the Class predominate

over any questions affecting only individual members, including legal and factual issues relating

to liability and damages.

16.     Plaintiff is a member of the Class; Plaintiff's claims are typical of the claims of

the members of the Class; and Plaintiff will fairly and adequately protect the interests of the

members of the Class. Plaintiff was a direct purchaser of individual or small group full-service

commercial health insurance from BCID, and her interests coincide with and are not antagonistic to other members of the Class. In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

17. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCID.

18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which BCID has records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would produce. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## VI.  FACTUAL BACKGROUND

### A.   General Background and Summary of Allegations

19. BCID enjoys unrivaled market dominance within Idaho, enrolling approximately 52% of the subscribers of full-service commercial health insurance plans. When considering full-service preferred provider organization ("PPO") subscribers alone, BCID's market dominance is even greater, as nearly 54% of full-service PPO plan subscribers statewide are enrolled with BCID.

20.    BCID's market dominance in Idaho is the result of a conspiracy between BCID and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States.    That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA.    As detailed herein, the member health insurance plans of BCBSA, including BCID, entered into a series of licensing agreements that have insulated BCID and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

21.    This series of agreements has enabled BCID to acquire and maintain a grossly disproportionate market share for health insurance products in Idaho, where BCID enjoys market and monopoly power.    The situation in Idaho is not unique, however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

22.    BCID has used its market and monopoly power in Idaho to engage in a number of anti-competitive practices.    For example, upon information and belief, BCID has required key healthcare providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with BCID.    These clauses ensure that BCID receives the best pricing for healthcare services in the market.    If a healthcare provider does not agree to the MFN, that provider will not remain in or become a part of BCID's network, which is generally an unacceptable result because BCID controls the vast majority of subscribers in Idaho.    Faced with this prospect, providers capitulate to BCID's demands, including MFNs.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL -- 8

23.     The MFNs restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

24.     Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCID's MFNs ensures that its competitors may not negotiate lower healthcare provider costs, BCID faces little pressure to constrain its own costs. The MFNs, by limiting the ability of an insurer to compete with BCID, thus also compound the exclusion of BCID's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products. With few other health insurance plan options to compete with, BCID can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan. The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by BCID with healthcare providers.

25.     Upon information and belief, because BCID has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, healthcare providers have responded by increasing prices to cover the discounts that BCID receives through its MFNs. Thus, what was supposed to be a discount turns out to be a premium to providers, thereby artificially raising prices for healthcare services. Again, consumers lose.

26.     BCID's anti-competitive practices, by reducing the *choices* available to health insurance consumers and increasing the *cost* of health care in Idaho, have raised the *premiums* that Idaho residents must pay to obtain health insurance. BCID's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Idaho market must pay significantly higher rates to healthcare providers.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL – 9

27.     The skyrocketing cost of BCID health insurance coverage in Idaho tells the story of BCID's abuse of its market and monopoly power at the expense of healthcare consumers in Idaho.

**B.      History of the Blue Cross and Blue Shield Plans and of BCBSA**

28.     The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for healthcare coverage. While originally structured as non-profit organizations since the 1980s, these local "Blue" plans have increasingly operated as for-profit entities, either by formally converting to for-profit status, or by generating substantial surpluses.

29.     The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

**C.      Development of the Blue Cross Plans**

30.     In 1934, an administrator named E.A. von Steenwyck helped develop a pre-paid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform bearing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a healthcare plan. Within the year, other pre-paid hospital plans began independently using the Blue Cross symbol.

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL – 10

31.    In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American

Hospital Association ("AHA") officials announced that pre-paid hospital plans meeting certain

standards of approval would receive institutional membership in the AHA.  In 1938, the

Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid

hospital plans.  One such principle was that the plans would not compete with each other.  When

the approval program went into effect, there were already 38 independently formed prepaid

hospital plans with a total of 1,365,000 members.

32.    In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid

hospital plans that received the approval of the AHA.

33.    In 1941, the Committee on Hospital Service, which had changed its name to the

Hospital Service Plan Committee, introduced a new standard:  that approval would be denied to

any plan operating in another plan's service area.  Contrary to the principles that plans would not

compete and that plans would not operate in each others' service areas, the independently formed

pre-paid hospital plans, now operating under the Blue Cross name, engaged in fierce competition

with each other and often entered each others' territories.  The authors of *The Blues: A History of

the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior

to publication, describe the heated competition between the various Blue Cross plans at that

time:

> The most bitter fights were between intrastate rivals ... . Bickering
> over nonexistent boundaries was perpetual between Pittsburgh and
> Philadelphia, for example. ... John Morgan, who directed a Plan
> . in Youngstown, Ohio, for nearly twenty-five years before going on
> to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio,
> New York, and West Virginia, we were knee deep in Plans." At
> one time or another, there were Plans in Akron, Canton, Columbus,
> Cleveland,   Cincinnati,   Lima,   Portsmouth,   Toledo,   and
> Youngstown. ... By then there were also eight Plans in New York
> and four in West Virginia. ... Various reciprocity agreements

CLASS ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL – 11

between the Plans were proposed, but they generally broke down
because the Commission did not have the power to enforce them.

34.   For many years, Cross-on-Cross competition continued, as described in Odin

Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by

the Blue Cross Association, a predecessor to BCBSA.   Anderson points to Illinois and

North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was

fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to

overlap service territories," such competition was "tolerated by the national Blue Cross agency

for lack of power to insist on change."

35.   By 1975, the Blue Cross plans had a total enrollment of 84 million.

**D.   Development of the Blue Shield Plans**

36.   The development of what became the Blue Shield plans followed, and imitated,

the development of the Blue Cross plans.   These plans were designed to provide a mechanism for

covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for

covering the cost of hospital care.   Similarly, the Blue Cross hospital plans were developed in

conjunction with the AHA (which represents hospitals), while the Blue Shield medical society

plans were developed in conjunction with the American Medical Association ("AMA") (which

represents physicians).

37.   Like the Blue Cross symbol, the Blue Shield symbol was developed by a local

medical society plan, and then proliferated as other plans adopted it.

38.   In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a

national body intended to coordinate and "approve" the independent Blue Shield plans.   When

the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was

"approved," the AMA responded, "It is inconceivable to us that any group of state medical

society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

39.     By 1975, the Blue Shield plans had a total enrollment of 73 million.

E.     **Creation of the Blue Cross and Blue Shield Association**

40.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

41.     However, by the late 1940s, the Blue plans faced growing competition, not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million. While the Blues remained dominant in most markets, this growth of competition was a threat. In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

42.     From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

43.     Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war.  As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements.  Rivalries, animosities, some days ... pure, unadulterated hatred of each other."

44.     To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

45.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

46.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

47.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

48.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

49.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today. However, the goals did not end competition between Blue plans. In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

50.     During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses. In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

51.     In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities. As a result, many member plans converted to for-profit status. One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures. While nominally still characterized as not-for-profit, BCID and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

52.     From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from

non-Blue subsidiaries of Blue plans, increased substantially. As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

53. Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

54. At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

F. **Allegations Demonstrating Control of BCBSA By Member Plans**

55. BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

56. BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one

another. On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

57.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

58.     The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current chairman of the Board of Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue Shield of Michigan. The Board of Directors of BCBSA meets at least annually.

**G.     License Agreements and Restraints on Competition**

59.     The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three independent members.

60.     The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant ... must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

61.    The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to a brief BCBSA filed during litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

62.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

63.    Under the terms of the License Agreements, a plan "agrees ... to comply with the Membership Standards." The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective ... unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely

reviews" the Membership Standards and Guidelines "to ensure that ... all requirements (standards and guidelines) are appropriate, adequate and enforceable."

64.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

65.     The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," and "Sanctions" – each of which is administered by the PPFSC and could result in the termination of a member plan's license.

66.     The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards, ... PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject,

or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

**H.     Horizontal Agreements**

67.     The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

68.     Each BCBSA licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

69.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States. The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen (15) of the twenty-five (25) largest health insurance companies in the country are BCBSA licensees. On its website, BCBSA asserts that its members together provide "coverage for more than 99 million individuals -- one-in-three Americans" and "contract[] with more hospitals and physicians than

any other insurer." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

70.     In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other -- and each other's parent Blue Plans -- in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed ....

71.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages ...."

72.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

**I.     The Horizontal Agreements Not to Compete in the Licensing Arrangements Between BCBSA and Member Plans, Including BCID, Are *Per Se* Violations of Idaho Anti-Monopoly and Antitrust Laws, Idaho Code §§ 48-101, *et seq.***

73.     The rules and regulations of BCBSA, including but not limited to the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a *per se* violation of Idaho Code §§ 48-101, *et seq.* – the Idaho anti-monopoly and antitrust laws.

74.     Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

75.     Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived

from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

76. Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66⅔% of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

77. The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business

outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

78.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

79.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Idaho Code §§ 48-101, *et seq.* – Idaho anti-monopoly and antitrust laws.

80.     More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions.  For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

81.     The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business.  Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain

requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66⅔% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

82.    Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) healthcare plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our healthcare operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

83.    Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible. When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business .... The rules on what the plans do in this regard are contained in the license. However, the license terms

themselves are proprietary to BCBSA, and ... we would prefer not to share such trade secrets with BCBSA's competitors."

84.     The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

85.     In sum, a terminated licensee would: (a) lose the brand through which it derived the majority of its revenue; and (b) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

86.     It is not surprising, then, that most member plans do not operate outside of their Service Areas. The territorial restrictions have therefore barred all competition by all of the Blue plans (other than BCID) from the Idaho commercial health insurance market.

87.     Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth -- exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31,

1999, that approximately 70% of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California.  In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67%.  In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78% of its total medical membership was in its Blue-licensed subsidiaries.  By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states.  For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them.  This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17%, UniCare experienced growth of only 1.4% in Texas.  During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17%.  Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire Blue Cross Blue Shield) did not increase, despite an overall 25% growth rate for health insurers in the state during the same period.  In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10%, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).

88.    In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South

Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4% of Independence Blue Cross's total commercial health insurance enrollment.

89.     Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**J.      The Anti-Competitive Acquisition Restrictions in BCBSA Licensing Agreements**

90.     In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCID and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

91.     First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

92.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate *automatically*: (1) if any institutional investor becomes beneficially entitled to 10% or more of the voting power of the member plan; (2) if any non-institutional investor becomes beneficially entitled to 5% or more of the voting power of the member plan; (3) if any person becomes beneficially entitled to 20% or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10% or more of the voting power, no non-institutional investor is beneficially entitled to 5% or more of the voting power, and no person is beneficially entitled to 20% or more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

93.    These acquisition restraints reduce competition in violation of Idaho Code §§ 48-101, *et seq.*, Idaho anti-monopoly and antitrust laws, because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing

business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and, in some instances, eliminating competition.

94.    Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

95.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.    The net effect is to tend to lessen or to lessen competition and higher premium costs for consumers, including enrollees of BCID.

K.    The BCBSA Licensing Agreements Have Reduced Competition In Idaho

96.    BCID, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License

Agreements and Guidelines. Many of the member plans with which BCID has conspired would otherwise be significant competitors of BCID in Idaho.

97.     For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding cities, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in Idaho in competition with BCID. Such competition would have resulted in lower healthcare costs and premiums paid by BCID enrollees such as Plaintiff herein.

98.     Over 55% of Mississippi residents who subscribe to full-service commercial health insurance (whether through group plans or individual policies) are subscribers of Blue Cross Blue Shield of Mississippi – vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Mississippi would be likely to offer its health insurance services and products in Idaho in competition with BCID. Such competition would result in lower healthcare costs and premiums paid by BCID enrollees.

99.     Likewise, approximately 53% of Arkansas residents who subscribe to full-service commercial insurance (whether through group plans or individual policies) are subscribers of Blue Cross Blue Shield of Arkansas – vastly more than the next largest full-service commercial

insurer. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Arkansas would be likely to offer its health insurance services and products in Idaho in competition with BCID. Such competition would result in lower healthcare costs and premiums paid by BCID enrollees.

100.    Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93% share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Idaho in competition with BCID. Such competition would result in lower healthcare costs and premiums paid by BCID enrollees.

101.    In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Idaho but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans. If all of these plans, together with all other BCBSA members, were able to compete in Idaho, the result would have been lower costs and thus lower premiums paid by BCID enrollees, including Plaintiff.

**L.      The Widespread Use by BCBSA Licensees of Anti-Competitive Most Favored Nation Clauses**

102.    Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

103.    MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's

competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN-plus" clauses, and typically require the amount to be higher by a specified percentage.

104.   Upon information and belief, BCID's use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged. The MFNs thus reduce competition by eliminating an incentive for BCID to reduce overhead prices.

105.   Second, MFNs limit competition by preventing other health insurers in Idaho from achieving lower costs with providers and thereby becoming significant competitors to BCID. MFNs establish a price floor below which providers will not sell services to BCID's competitors; indeed, MFNs enable BCID to raise that price floor. This deters cost competition among health insurers in Idaho. By reducing the ability of BCID's competitors to compete against BCID, MFNs ensure that BCID can substantially raise premiums while maintaining, or even increasing, its market share.

106.   Moreover, upon information and belief, if BCID is certain that no insurer will pay less to a provider than it will, BCID will be willing to pay more to that provider than it would otherwise. The more BCID agrees to pay that provider, the more BCID's competitors must pay that provider. And by raising the price floor, BCID keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums. As a result, and because of its market power, BCID can pass its own higher costs on to consumers through higher premiums

without fearing that its competitors will be able to reduce premiums and draw consumers from BCID.

107.   Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant BCID, the provider has a strong incentive not to lower prices.  Without the ability to compete on price, a new competitor will be unable to price below BCID, and thus will be unable to survive.

108.   Upon information and belief, the independent Blue Cross and Blue Shield licensees, including BCID, use MFNs to exploit the monopoly power they hold in their respective Service Areas.  The independent Blue Cross and Blue Shield licensees, including BCID, have coordinated their use of MFNs with other Blue entities.

**M.   BCID Market Power in Relevant Idaho Markets**

109.   BCID has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Idaho.

**VII.   RELEVANT PRODUCT MARKET**

110.   The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

111.   To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product. The characteristics of different products are important factors in determining their substitutability.   For a health insurance product, important characteristics include:

Case MDL No. 2406   Document 132-4   Filed 12/14/12   Page 43 of 113
Case 1:12-cv-00619-REB   Document 1-1   Filed 12/13/12   Page 36 of 47

112.   <u>Commercial versus government health insurance</u>:   Unlike commercial health insurance products, *government* health insurance programs, such as Medicare and Medicaid, and privately operated government health insurance programs, such as Medicare Advantage, are available only to individuals who are disabled, elderly, or indigent.   Therefore, commercial health insurance and government health insurance programs are not substitutes.

113.   <u>Full-service versus single-service health insurance</u>:   *Full*-service health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other healthcare providers.   In contrast, *single*-service health insurance provides narrow coverage restricted to a specific type of healthcare, *e.g.*, dental care.   Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of healthcare, *e.g.*, dental care.   Thus, full-service health insurance and single-service health insurance are not substitutes.

114.   <u>Full-service commercial health insurance includes *HMO* products and PPO products, among others</u>.   Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers.   Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their healthcare provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors.   Economic research suggests that HMO and PPO health insurance products *are* substitutes.

115.   Fully-insured health insurance versus ASO products:   When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' healthcare claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers. In contrast, when a consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only. Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

116.   Individual, small group, and large group consumers:   Consumers of health insurance products include both *individuals* and *groups,* such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, *small group* and *large group,* based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees, and large firms as those with 200 or more employees.

117.   For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms

offering ASO products.  For example, across the United States, 84% of small group consumers

do not self-insure, while 83% of large group consumers do self-insure.  Even apart from the

prevalence of ASO products in each market, individual, small group, and large group product

markets are distinct because health insurers can set different prices for these different consumers.

Thus, pricing in the large group market would not impact competition in the small group market,

and vice versa.

118.    Data on enrollment in full-service commercial health insurance:  According to the

American Medical Association, although Idaho licenses twelve companies to offer some type of

health insurance in Idaho, Blue Cross had 52% of the commercial market share while its nearest

competitor, Regence Blue Shield of Idaho, carries just 22% of such subscribers.

### VIII.   RELEVANT GEOGRAPHIC MARKETS

119.    In defining a geographic market, it is important to focus on an essential part of a

full-service commercial health insurer's product: its provider network.  An insurer's provider

network is composed of the healthcare providers with which it contracts.  Enrollees in both HMO

and PPO full-service commercial health insurance products pay less for an "in-network"

provider's healthcare services than they would for the same services from an "out-of-network"

provider. ·As a result, health insurance consumers pay special attention to an insurer's provider

network when choosing a health insurance product, preferring insurers with networks that

include local providers.   This suggests that health insurers compete in distinct geographic

markets.

120.    There are a number of different ways to analyze the geographic markets for the

sale of full-service commercial health insurance to individual and small group consumers in

Idaho.  The potentially relevant geographic markets could be defined alternatively as (a) the

entire state of Idaho; (b) the six regions, known as "Metropolitan Statistical Areas," or (c) the eight "Micropolitan Statistical Areas," into which the U.S. Office of Management and Budget divides Idaho. However the geographic market is defined, the result is the same: BCID has the dominant market position, and exercises market power.

121. BCID does business throughout the state of Idaho, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Idaho, and has agreed with the other member plans of BCBSA that only BCID will do business in Idaho under the Blue brand. Therefore, the state of Idaho can be analyzed as a relevant geographic market within which to assess the effects of BCID's anti-competitive conduct.

122. BCID's powerful market share is far from the only evidence of its market power. As alleged below, BCID's market power has significantly raised costs, resulting in skyrocketing premiums for BCID enrollees.

123. Moreover, BCID's statewide share of the relevant product market has increased each year despite its substantial premium increases. BCID's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

## IX. INFLATED PREMIUMS CHARGED BY BCID

124. For at least the past ten years, BCID's illegal anti-competitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased healthcare costs in Idaho, leading to artificially-inflated and supra-competitive premiums for individuals and small groups purchasing BCID's full-service commercial health insurance in the relevant geographic market(s). Upon information and belief, BCID's market power and its use of MFNs and other anti-competitive practices in Idaho have reduced the

amount of competition in the market and ensured that BCID's few competitors face higher costs than BCID does. Without competition, and with the ability to increase premiums without losing customers, BCID faces little pressure to keep costs low.

125. Over the past decade, BCID generally raised individual and small group premiums by amounts greater than the national average. In 2008, for example, BCID raised individual premiums more than 10% in some instances.

126. These rising premiums have enabled BCID to grow its surplus in excessive amounts, which is an unusual practice for a self-described non-profit organization.

## X.  CAUSES OF ACTION

### COUNT ONE

**(Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Idaho Code §§ 48-101, *et seq.* -- Idaho anti-monopoly and antitrust laws.)**

127. Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

128. The License Agreements, Membership Standards, and Guidelines agreed to by BCID and BCBSA represent horizontal agreements entered into between BCID and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

129. Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCID represents a contract, combination, and conspiracy within the meaning of Idaho Code § 48-104.

130. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCID have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA

members. By so doing, BCID and the other BCBSA members have conspired to restrain trade in violation of Idaho Code §§ 48-101, *et seq*. These market allocation agreements are *per se* illegal under Idaho Code § 48-104.

131.   The market allocation agreements entered into between BCID and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anti-competitive.

132.   BCID has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

133.   Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

      a.   Reducing the number of health insurance companies competing with BCID throughout Idaho;

      b.   Unreasonably limiting the entry of competitor health insurance companies into Idaho;

      c.   Allowing BCID to maintain and enlarge its market power throughout Idaho;

      d.   Allowing BCID to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

      e.   Depriving consumers of health insurance of the benefits of free and open competition.

134.   The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

135.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Idaho Code §§ 48-101, *et seq*.

136.    As a direct and proximate result of BCID's continuing violations of Idaho Code §§ 48-101, *et seq.*, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCID than they would have paid with increased competition and but for the violations of Idaho Code §§ 48-101, *et seq.*

137.    Plaintiff and the Class seek treble damages pursuant to Idaho Code § 48-113 from BCID for their *per se* or intentional violations of Idaho Code §§ 48-101, *et seq.*

## COUNT TWO

### (MFNs; Violation of Idaho Code §§ 48-101, *et seq.*)

138.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

139.    BCID has market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

140.    The provider agreements BCID entered into between BCID and healthcare providers in Idaho that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of Idaho Code § 48-104.

141.    Each of the BCID provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

         a.  Raising the prices of healthcare services to commercial health insurers in competition with BCID;

         b.  Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurers in competition with BCID from obtaining competitive pricing from healthcare providers;

         c.  Unreasonably restricting the ability of healthcare providers to offer to BCID's competitors or potential competitors reduced

prices for services that the healthcare providers and insurers
consider to be in their mutual interest;

d.  Depriving consumers of healthcare services and health
insurance of the benefits of free and open competition.

142.    The pro-competitive benefits, if any, of the BCID provider agreements containing

MFN provisions do not outweigh the anti-competitive effects of the agreements.

143.    Each agreement between BCID and a healthcare provider that contains an MFN

unreasonably restrains trade in violation of Idaho Code §§ 48-101, *et seq.*

144.    As a direct and proximate result of BCID's continuing violations of Idaho Code

§§ 48-101, *et seq.*, Plaintiff and other members of the Class have suffered injury and damages in

an amount to be proven at trial.  These damages consist of having paid higher health insurance

premiums to BCID than they would have paid but for the violations of Idaho Code §§ 48-101,

*et seq.*

145.    Plaintiff and the Class seek treble damages pursuant to Idaho Code § 48-113 from

BCID for their *per se* or intentional violations of Idaho Code §§ 48-101, *et seq.*

## COUNT THREE

### (Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Idaho Code §§ 48-101, *et seq.*)

146.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if

fully set forth herein.

147.    BCID has monopoly power in the individual and small group full-service

commercial health insurance market in Idaho.  This monopoly power is evidenced by, among

other things:

a.  BCID's ability, upon information and belief, to enter into MFN
agreements with providers, which evidences BCID's ability to
control prices and exclude competitors;

    b.  BCID's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

148.    BCID has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

149.    BCID's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Idaho Code § 48-105.

150.    As a direct and proximate result of BCID's continuing violations of Idaho Code §§ 48-101, *et seq.*, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCID than they would have paid but for these violations.

151.    Plaintiff and the Class seek treble damages pursuant to Idaho Code § 48-113 from BCID for their *per se* or intentional violations of Idaho Code §§ 48-101, *et seq.*

## COUNT FOUR

### (Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of Idaho Code §§ 48-101, *et seq.*)

152.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

153.    BCID has acted with the specific intent to monopolize the relevant markets.

154.    There was and is a dangerous possibility that BCID will succeed in its attempt to monopolize the relevant markets because BCID already controls a large percentage of those markets. Further success by BCID in excluding competitors from those markets will confer a monopoly on BCID in violation of Idaho Code § 48-105.

155.   BCID's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Class. Premiums charged by BCID have been higher than they would have been in a competitive market.

156.   As a direct and proximate result of BCID's continuing violations of Idaho Code §§ 48-101, *et seq.*, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCID than they would have paid but for these violations.

157.   Plaintiff and the Class seek treble damages pursuant to Idaho Code § 48-113 from BCID for their *per se* or intentional violations of Idaho Code §§ 48-101, *et seq.*

### COUNT FIVE

### UNJUST ENRICHMENT

158.   Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

159.   BCID has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the other Class members.

160.   It would be inequitable for BCID to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by BCID.

161.   In equity, BCID should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and Class members.

### DEMAND FOR ATTORNEY FEES

As a result of BCID's conduct complained of herein, Plaintiff, on her own behalf and on behalf of others similarly situated, has been required to retain the services of legal counsel to

represent their interests in this matter. Pursuant to Idaho Code §§ 12-120, 12-121, and 48-113, Idaho Rule of Civil Procedure 54, and all other applicable laws, Plaintiff is entitled to an award of reasonable attorney fees and costs incurred herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.    That the Court determine that this action may be maintained as a class action under Idaho Rule of Civil Procedure 23, and appoint the Plaintiff as representative of the Class.

B.    That the Court adjudge and decree that BCID has violated Idaho Code §§ 48-101, *et seq.*, and award Plaintiff and the Class appropriate damages and relief resulting from the various acts of wrongdoing under the statutory laws of Idaho, in such amounts as represent the losses reasonably suffered by Plaintiff and the Class, as well as any treble damages available under Idaho law.

C.    That the Court award Plaintiff her reasonable costs and attorney fees, or $5,000 in attorney fees should judgment be taken by default.

D.    That the Court render judgment that BCID has been unjustly enriched by its wrongful conduct, and award restitution to Plaintiff and the Class.

E.    That the Court award Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity.

F.    That the Court orders such other, further and general relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of at least twelve (12) members on all issues.

///

///

DATED this 13th day of November, 2012.

JONES & SWARTZ PLLC

By _____
BRUCE C. JONES
ERIC B. SWARTZ

PATRICK W. PENDLEY
NICHOLAS R. ROCKFORTE
PENDLEY, BAUDIN & COFFIN, L.L.P.

GORDON BALL
BALL & SCOTT LAW OFFICES

*Counsel for Plaintiffs*

# EXHIBIT 2

## UNITED STATES JUDICIAL PANEL
### on
## MULTIDISTRICT LITIGATION

IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION          MDL No. 2406

## TRANSFER ORDER

**Before the Panel:** Pursuant to 28 U.S.C. § 1407, plaintiffs in the Northern District of Alabama *GC Advertising* action move to centralize this litigation in the Northern District of Alabama. This antitrust litigation concerns the licensing agreements between and among the Blue Cross Blue Shield Association (BCBSA) and its 38 licensees (Blue Plans) and currently consists of seven actions pending in the Northern District of Alabama and an action each in the Western District of Tennessee and the Western District of North Carolina, as listed on Schedule A.[1]

According to defendants, BCBSA is a coordinated effort by health insurers to create a national brand with separate companies in local areas. In total, 38 separate Blue Plans operate under Blue Cross Blue Shield trademarks and trade names, providing health insurance to approximately 100 million subscribers. Plaintiffs contend that the 38 Blue Plans are independent health insurance companies that, but for any agreement to the contrary, could and would compete with one another. Instead, working together with and through the BCBSA, they have allegedly divided and allocated among themselves health insurance markets throughout the nation to eliminate competition. Plaintiffs variously contend that this conduct violates Sections 1 and 2 of the Sherman Antitrust Act, as well as various related state laws.

---

[*] All Panel members have interests that would normally disqualify them under 28 U.S.C. § 455 from participating in the decision of this matter; they have renounced any interest in the underlying litigation. Additionally, the Panel invoked the Rule of Necessity and all Panel members participated in the decision of this matter in order to provide the forum created by the governing statute, 28 U.S.C. § 1407. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 273 F. Supp. 2d 1353 (J.P.M.L. 2003) ; *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 170 F. Supp. 2d 1356 (J.P.M.L. 2001).

[1] The Panel has been notified of twelve additional related actions pending in twelve districts. These actions and any other related actions are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1 and 7.2. Further, various parties to the Eastern District of Pennsylvania *LifeWatch* action presented argument as to whether that action should be included in the centralized proceedings, as did plaintiff in the Western District of Pennsylvania *UPMC* action, which opposed inclusion of its action. Because those actions are not on this motion, and thus not squarely before us, such arguments are best presented as opposition to a conditional transfer order covering the respective actions, if issued.

- 2 -

Plaintiffs in the Northern District of Alabama *Conway* action, the Western District of Tennessee *Morrissey* action and three potential tag-along actions support the plaintiffs' motion in its entirety, as do responding defendants.[2] Plaintiffs in three Northern District of Alabama actions — *Carter*, *Richards* and *American Electric Motor* – oppose centralization. Plaintiffs in the Northern District of Alabama *Bajalieh* and *One Stop Environmental* actions and the Western District of North Carolina *Cerven* action also oppose centralization and, alternatively, suggest centralization in the Northern District of Alabama or the Western District of North Carolina.

The primary arguments advanced against centralization are that there are too few pending actions, discovery will focus on each Blue Plan's activity in a specific market, and several potentially-dispositive state-specific issues will be prominent in each action.    We disagree that these considerations weigh against centralization here. Though only nine actions pending in three districts were included on the motion for centralization, this litigation has since grown to encompass potentially 21 actions involving allegations of complex anticompetitive behavior pending in fourteen districts.  The Panel has, in the past, centralized antitrust cases involving allegations of concerted anticompetitive activity in the insurance market. *See, e.g.*, MDL No. 767 – *In re: Commercial Gen. Liab. Ins. Antitrust Litig.*, Aug. 30, 1988, Transfer Order at 2 ("The complaints in all actions contain similar allegations of conspiracies, involving essentially the same groups of defendants, to manipulate the availability of commercial general liability insurance, in violation of federal antitrust laws."). Transfer under Section 1407 does not require a complete identity of common factual issues as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant when the actions still arise from a common factual core.  Here, the actions involve substantial common questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions. All of the Blue Plans are alleged to be co-conspirators, even

---

[2]  Anthem Blue Cross and Blue Shield of Connecticut; Anthem Blue Cross and Blue Shield of Indiana; Anthem Blue Cross and Blue Shield of New Hampshire; Anthem Blue Cross and Blue Shield of Virginia Inc.; Anthem Blue Cross and Shield of Missouri; Anthem Health Plans of Maine; Anthem Inc.; Arkansas Blue Cross and Blue Shield; Blue Cross and Blue Shield Association (BCBSA); Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida; Blue Cross and Blue Shield of Georgia; Blue Cross and Blue Shield of Kansas; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Louisiana; Blue Cross and Blue Shield of Massachusetts; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of Minnesota; Blue Cross and Blue Shield of Mississippi; Blue Cross and Blue Shield of Nebraska; Blue Cross and Blue Shield of North Carolina; Blue Cross and Blue Shield of South Carolina; Blue Cross and Blue Shield of Tennessee; Blue Cross Blue Shield of Tennessee, Inc.; Blue Cross and Blue Shield of New Mexico; Blue Cross and Blue Shield of Oklahoma; Blue Cross and Blue Shield of Texas; CareFirst Blue Cross and Blue Shield of Maryland; Excellus BlueCross BlueShield of New York; Hawaii Medical Service Assoc.; Health Care Service Corp.; Horizon Blue Cross and Blue Shield of New Jersey; Independence Blue Cross; Premera Blue Cross of Alaska; Triple S - Salud Inc.; Wellmark; Inc.; and Wellmark of South Dakota Inc.

- 3 -

though some Blue Plans are named as defendants only in actions in their respective state. Centralizing these actions under Section 1407 will ensure streamlined resolution of this litigation to the overall benefit of the parties and the judiciary.

For all these reasons, on the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization of all actions in the Northern District of Alabama will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification;[3] and conserve the resources of the parties, their counsel, and the judiciary.

Weighing all factors, we have selected the Northern District of Alabama as the transferee district for this litigation. Seven related actions are pending in this district, and these actions include claims on behalf of both Blue Plan subscribers and healthcare providers. Further, the Honorable R. David Proctor, to whom we assign this litigation, is an experienced transferee judge who is already familiar with the contours of the litigation and has taken preliminary steps to organize the litigation.

IT IS THEREFORE ORDERED that pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Northern District of Alabama are transferred to the Northern District of Alabama and, with the consent of that court, assigned to the Honorable R. David Proctor for coordinated or consolidated pretrial proceedings with the action pending there.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

Kathryn H. Vratil          W. Royal Furgeson, Jr.
Paul J. Barbadoro         Marjorie O. Rendell
Charles R. Breyer          Lewis A. Kaplan

---

[3] All actions are purported statewide and/or nationwide class actions brought against BCBSA and one or more Blue Plan defendants.

**IN RE: BLUE CROSS BLUE SHIELD**
**ANTITRUST LITIGATION**

MDL No. 2406

### SCHEDULE A

#### Northern District of Alabama

Fred R. Richards, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
    C.A. No. 2:12-01133
One Stop Environmental, LLC, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
    C.A. No. 2:12-01910
American Electric Motor Services, Inc. v. Blue Cross and Blue Shield of Alabama, et al.,
    C.A. No. 2:12-02169
Chris Bajalieh, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
    C.A. No. 2:12-02185
GC Advertising, LLC, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
    C.A. No. 2:12-02525
Jerry L. Conway v. Blue Cross and Blue Shield of Alabama, et al., C.A. No. 2:12-02532
Thomas A. Carder, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
    C.A. No. 2:12-02537

#### Western District of North Carolina

Thomas A. Cerven, Jr., et al. v. Blue Cross and Blue Shield of North Carolina, et al.,
    C.A. No. 5:12-00017

#### Western District of Tennessee

Mary Morrissey v. Blue Cross Blue Shield of Tennessee, Inc., C.A. No. 2:12-02359

# EXHIBIT 3

NO._____
A.M._____ FILED _____
P.M._____

**DEC 1 2 2012**

CHRISTOPHER D. RICH, Clerk
By CHELSIE PINKSTON
DEPUTY

Please Conform and Return

Eugene A. Ritti, ISB No. 2156
Jason D. Scott, ISB No. 5615
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5256
E-mail: eritti@hawleytroxell.com
        jscott@hawleytroxell.com

David J. Zott, P.C.
Daniel E. Laytin
Ian R. Conner
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-mail: david.zott@kirkland.com
        daniel.laytin@kirkland.com
        ian.conner@kirkland.com

Attorneys for Blue Cross and Blue Shield Association

### IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

### OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| Melissa Allen, individually, and on behalf of all others similarly situated, | Case No. CV OC 1220817 |
| Plaintiffs, | BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO |
| vs. | INTERVENE |
| Blue Cross of Idaho Health Service, Inc., an Idaho corporation, | Fee Category I(1) Fee $66.00 |
| Defendant. | |

The Blue Cross and Blue Shield Association ("BCBSA") moves to intervene under I.R.C.P. 24(a) and 24(b). In support of this motion, BCBSA will show that:

1. Plaintiff's complaint challenges the way BCBSA licenses the Blue Cross and Blue Shield service names and marks (collectively, the "Blue Marks") in Idaho. According to plaintiff, BCBSA's granting Defendant Blue Cross of Idaho Health Service, Inc. ("Blue Cross of Idaho") an exclusive license to use the Blue Marks in Idaho is somehow illegal under Idaho's antitrust law. (Compl. ¶ 3.)

2. I.R.C.P. 24(a)(2) provides that "[u]pon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

3. BCBSA has a substantial legal interest in defending the use and licensing of its Blue Marks. BCBSA's ability to protect its interests will necessarily be impaired by an unfavorable disposition of this action.

4. Blue Cross of Idaho may not adequately represent BCBSA's interests because BCBSA is the sole owner and licensor of the Blue Marks.

5. Allowing BCBSA to intervene will not unduly delay the adjudication of the rights of the original parties, nor will it prejudice any of the original parties.

6. In the alternative, the Court should permit BCBSA to intervene under the Court's independent discretion under I.R.C.P. 24(b)(2). Under that rule, permissive intervention is allowed "when an applicant's claim or defense and the main action have a question of law or fact in common." I.R.C.P. 24(b)(2).

7.      Plaintiff implicates BCBSA as an alleged co-conspirator with Blue Cross of Idaho;

thus, the parties' defenses would raise common issues of law and fact. Also, BCBSA is a party to the

Licensing Agreements in dispute, a factor that weighs in favor of permissive intervention.

8.      This motion is supported by the accompanying memorandum of facts and law.

WHEREFORE, BCBSA requests that its motion to intervene be granted.

DATED THIS 12th day of December, 2012.

KIRKLAND & ELLIS LLP

HAWLEY TROXELL ENNIS & HAWLEY LLP

By _____
Jason D. Scott, ISB No. 5615

Attorneys for Blue Cross and Blue Shield Association

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of December, 2012, I caused to be served a true copy of the foregoing BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE by the method indicated below, and addressed to each of the following:

Bruce C. Jones
Eric B. Swartz
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200
P.O. Box 7808
Boise, ID 83707-7808
[Attorneys for Plaintiffs]

  ✓ U.S. Mail, Postage Prepaid
  ____ Hand Delivered
  ____ Overnight Mail
  ____ E-mail
  ____ Telecopy

Patrick W. Pendley
Nicholas R. Rockforte
PENDLEY, BAUDIN & COFFIN LLP
Post Office Drawer 71
Plaquemine, LA 70765
[Attorneys for Plaintiffs]

  ✓ U.S. Mail, Postage Prepaid
  ____ Hand Delivered
  ____ Overnight Mail
  ____ E-mail
  ____ Telecopy

Gordon Ball
BALL & SCOTT LAW OFFICES
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902
[Attorneys for Plaintiffs]

  ✓ U.S. Mail, Postage Prepaid
  ____ Hand Delivered
  ____ Overnight Mail
  ____ E-mail
  ____ Telecopy

Samuel A. Diddle
Eberle Berlin Kading Turnbow & McKlveen
Boise Plaza, 1111 W. Jefferson St., Suite 530
Boise, ID 83702
[Attorneys for Defendant Blue Cross of Idaho Health Service, Inc.]

  ✓ U.S. Mail, Postage Prepaid
  ____ Hand Delivered
  ____ Overnight Mail
  ____ E-mail
  ____ Telecopy

Kathleen Taylor Sooy
Andrew Kaplan
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
[Attorneys for Defendant Blue Cross of Idaho Health Service, Inc.]

  ✓ U.S. Mail, Postage Prepaid
  ____ Hand Delivered
  ____ Overnight Mail
  ____ E-mail
  ____ Telecopy

Jason D. Scott

NO.
A.M.        FILED
            P.M.

**DEC 1 2 2012**

CHRISTOPHER D. RICH, Clerk
By CHELSIE PINKSTON
DEPUTY

Please Conform and Return

Eugene A. Ritti, ISB No. 2156
Jason D. Scott, ISB No. 5615
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5256
E-mail: eritti@hawleytroxell.com
       jscott@hawleytroxell.com

David J. Zott, P.C.
Daniel E. Laytin
Ian R. Conner
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
E-mail: david.zott@kirkland.com
       daniel.laytin@kirkland.com
       ian.conner@kirkland.com

Attorneys for Blue Cross and Blue Shield Association

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| Melissa Allen, Individually, and on behalf of All Others Similarly Situated, | Case No. CV OC 1220817 |
| Plaintiffs, | Memorandum in Support of Blue Cross and Blue Shield Association's |
| vs. | Motion to Intervene |
| **Blue Cross of Idaho Health Service, Inc.,** an Idaho corporation, | |
| Defendant. | |

**Table of Contents**

Page

I. Introduction ................................................................................................................................... 1

II. Background .................................................................................................................................... 2

A.      The Blue System. ................................................................................................................... 2

B.      Plaintiff's complaint challenges the Blue System. ............................................................ 3

C.      This case is a copycat of other cases challenging the Blue System. .............................. 4

III. Argument ..................................................................................................................................... 5

A.      BCBSA is entitled to intervene as a matter of right under I.R.C.P. 24(a) ................... 6
        1.      BCBSA's application is timely. .............................................................................. 7
        2.      BCBSA has a legal interest in defending the use and licensing of its Blue
                Marks under its Licensing Agreements, including one with Blue Cross of
                Idaho. ......................................................................................................................... 8
        3.      BCBSA's interests could be impaired by the disposition of this action. .......... 9
        4.      Blue Cross of Idaho may not adequately represent BCBSA's interests. ........... 9

B.      In the alternative, BCBSA should be permitted to intervene under I.R.C.P. 24(b). ............... 11

IV. Conclusion .................................................................................................................................. 12

Pursuant to I.R.C.P. 7(b)(3), Blue Cross and Blue Shield Association ("BCBSA") submits this memorandum in support of its motion to intervene in this action.

## I. INTRODUCTION

Plaintiff's complaint challenges the way that BCBSA licenses the Blue Cross and Blue Shield service names and trademarks (collectively, the "Blue Marks") throughout Idaho. According to plaintiff, BCBSA's decision to grant Defendant Blue Cross of Idaho Health Service Inc. ("Blue Cross of Idaho") an exclusive license to use the Blue Cross and Blue Shield names and marks throughout Idaho violates Idaho's antitrust laws. (Compl. ¶¶ 3, 5.) Yet plaintiff's allegations implicate BCBSA's entire licensing system—not just its license in Idaho. (*Id.* ¶¶ 1, 3, 5, 73.) Despite this challenge to BCBSA's licensing practices, plaintiff chose not to sue BCBSA in this lawsuit, a tactic plaintiff's counsel employed in six nearly identical suits filed across the country.[1]

Accordingly, BCBSA seeks to intervene in this case as a defendant under I.R.C.P. 24. A straightforward application of Rule 24, which is modeled after Federal Rule of Civil Procedure 24, reveals that BCBSA has a significant interest in protecting its rights to the Blue Marks and its license

---

[1]      See *Morrissey v. Blue Cross & Blue Shield of Tenn.*, No. 2:12-cv-02359 (W.D. Tenn. May 11, 2012) (omitting BCBSA and alleging nearly identical claims under federal and Tennessee antitrust laws); *Jarreau v. La. Health Serv. & Indemn. Co. (d.b.a. Blue Cross & Blue Shield of La.)*, No. 3:12-cv-00421 (M.D. La. June 6, 2012) (omitting BCBSA and asserting nearly identical claims under Louisiana law); *Piercy v. Health Care Serv. Corp.*, No. 12-L-28 (Ill. Cir. Ct. Aug. 21, 2012) (omitting BCBSA and alleging nearly identical claims under Illinois law); *Ray v. Wellpoint, Inc.*, No. 1:12-cv-1576 (S.D. Ind. Sept. 28, 2012) (omitting BCBSA and asserting nearly identical claims under Indiana law); *McCumber v. Blue Cross & Blue Shield of Miss.*, No. 3:12-cv-00684 (S.D. Miss. Oct. 2, 2012) (omitting BCBSA and alleging nearly identical claims under the federal antitrust laws). A day after this suit was filed, plaintiff's counsel filed *Sosebee v. USAble Mutual Insurance Co. (d/b/a Arkansas Blue Cross & Blue Shield)*, No. 60-cv-2012-5368 (Ark. Cir. Ct. Nov. 14, 2012), which likewise omits BCBSA and alleges nearly identical claims under Arkansas law.

These plaintiffs' counsel have named BCBSA as a defendant in most of those cases that they filed in federal court. *See, e.g., Watts v. Blue Cross & Blue Shield of Tx.*, No. 3:12-cv-04256 (N.D. Tex. Oct. 22, 2012) (naming BCBSA and alleging nearly identical claims under the federal antitrust laws); *Ray Davidson v. Blue Cross & Blue Shield of Ala.*, No. 5:12-cv-00370 (N.D. Fla. Nov. 15, 2012) (same); *Godwin v. Blue Cross & Blue Shield of Ala.*, No. 2:12-cv-04053 (N.D. Ala. Dec. 7, 2012) (same).

agreements, and that Blue Cross of Idaho, a licensee of BCBSA's Blue Marks, may not adequately protect BCBSA's interests here. Indeed, that was the conclusion of an Illinois state court just a week ago, and a federal court just a few months ago, in granting BCBSA's motion to intervene in a case in which the plaintiffs' allegations were identical to plaintiff's here. The Illinois court held that BCBSA was entitled to intervene as of right because it had a sufficient legal interest in the underlying litigation and the local Blue Plan may not adequately represent BCBSA's interests. (Order Granting Motion to Intervene, *Piercy v. Health Care Serv. Corp.*, No. 12-L-28 (Ill. Cir. Ct. Dec. 5, 2012) (attached as Exhibit 1).) And the federal district court in the Western District of Tennessee likewise granted BCBSA's motion to intervene so that BCBSA could defend the legality of its Licensing Agreements. (Order Granting Motion to Intervene, *Morrissey v. Blue Cross & Blue Shield of Tenn., Inc.*, No. 2:12-cv-02359 (W.D. Tenn. Aug. 1, 2012) (attached as Exhibit 2).) This Court should do the same.

## II. BACKGROUND

### A.    The Blue System.

Plaintiff's complaint includes many allegations relating to how BCBSA licenses its Blue Marks to individual Blue Plans. Plaintiff alleges that the development of the Blue Plans began with the creation of "Blue Cross Plans," which were designed to cover the cost of hospital care in various parts of the country. (Compl. ¶ 30.) Plaintiff alleges that Blue Cross Plans began in the 1930s serving individual hospitals, with each Blue Cross Plan serving the local area surrounding those hospitals. (*Id.* ¶¶ 30, 31.) Plaintiff also alleges that Blue Cross Plans were followed by the development of "Blue Shield Plans" which provided "a mechanism for covering the cost of physician care." (*Id.* ¶ 36.) In addition, plaintiff alleges that the "Blue Shield plans followed, and imitated, the development of the Blue Cross plans," except offering complementary services. (*Id.*)

In the early 1980s, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. (*Id.* ¶ 48.) Today, BCBSA is a not-for-profit corporation that owns the Blue Marks.

Memorandum in Support of Blue Cross and Blue Shield Association's Motion to Intervene

(*Id.* ¶¶ 9, 45, 48.) BCBSA does not underwrite health insurance itself. Rather, BCBSA licenses the Blue Marks to 38 individual health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. (*Id.* ¶ 3.) BCBSA licenses the right to use the Blue Marks to individual Blue Plans through License Agreements. (*Id.* ¶¶ 3, 56.) If Plans do not meet certain standards or guidelines, or otherwise run afoul of the License Agreement, then BCBSA can terminate the Plan's license. (*Id.* ¶ 66.)

**B.     Plaintiff's complaint challenges the Blue System.**

Blue Cross of Idaho, the current defendant in this case, is the BCBSA licensee in Idaho, offering health insurance under the Blue Marks throughout Idaho pursuant to a Licensing Agreement with BCBSA. (Compl. ¶¶ 1, 3.) Plaintiff alleges that the Licensing Agreement between BCBSA and Blue Cross of Idaho constitutes an unreasonable restraint on trade in violation of Idaho's antitrust laws because BCBSA has licensed the Blue Marks to Blue Cross of Idaho on an exclusive basis in Idaho—that is, other Blue Plans are not allowed to sell Blue-branded health insurance in Idaho. (*Id.* ¶¶ 3, 56, 127-135.) In addition, plaintiff claims that all of BCBSA's rules and regulations, not just those imposed on Blue Cross of Idaho, "restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan," and are therefore anticompetitive. (*Id.* ¶ 90.) Thus, this action directly challenges BCBSA's conduct and will affect BCBSA's interests in its Licensing Agreements and use of its Blue Marks.

Not only does this action challenge BCBSA's Licensing Agreements and the Blue Marks it owns, it also alleges that BCBSA is a part of an on-going conspiracy with Blue Cross of Idaho and other Blue Plans. (*Id.* ¶¶ 1, 3.) In fact, plaintiff alleges that all 38 "market allocation agreements ... implemented through Blue Cross and Blue Shield license agreements executed between BCBSA ... and each individual Blue Cross and Blue Shield licensee" are anticompetitive. (*Id.* ¶ 3.) The complaint is thus broader than an attack on Blue Cross of Idaho's use of the Blue Marks; it alleges

Memorandum in Support of Blue Cross and Blue Shield Association's Motion to Intervene

that the entire Blue System is anticompetitive. Plaintiff is attempting to sue one licensee of the Blue System without suing the licensor of that system. BCBSA also has a significant legal interest in this case because plaintiff asserts that all license agreements at issue were "executed through" the licensing conduct of BCBSA itself. (*Id.*)

## C.   This case is a copycat of other cases challenging the Blue System.

This case is one of many alleging a similar conspiracy by the Blue System, and plaintiff's counsel already has unsuccessfully employed this tactic of suing one Blue licensee without naming BCBSA in at least two other suits. *See* Exhibit 3 (listing related actions); *see also* Exhibit 1 (order granting BCBSA's intervention in Illinois case); Exhibit 2 (order granting BCBSA's intervention in Tennessee case). On February 7, 2012, a lawsuit was filed against BCBSA in federal court in the Western District of North Carolina alleging a conspiracy between BCBSA and Blue Cross & Blue Shield of North Carolina in violation of the Sherman Act. The North Carolina complaint, like the present complaint, challenges the Licensing Agreements between BCBSA and its licensee in North Carolina, BCBSNC, under the antitrust laws. Between April 17, 2012 and July 24, 2012, seven complaints were filed against BCBSA in the Northern District of Alabama alleging similar causes of action regarding the Licensing Agreements and Blue System.

Plaintiff's counsel himself filed a new copycat suit nearly every month between May and December 2012: in Tennessee, Louisiana, Indiana, Mississippi, Texas, Illinois, Arkansas, Florida, and Alabama. In all of those suits, the plaintiff alleged similar facts and causes of action, and in six of those suits, the plaintiff, like this complaint, omitted BCBSA as a defendant. This action is plaintiff's counsel's latest suit alleging the same conspiracy, but targeting a different alleged conspirator and omitting BCBSA. In every case, other than the six cases brought by plaintiff's counsel, BCBSA is named as a defendant. And BCBSA has already moved to intervene or plans to do so in each of plaintiff's counsel's cases. On December 5, 2012, an Illinois state court granted BCBSA's motion to

– 4 –

intervene as of right under the state-law equivalent to Federal Rule of Civil Procedure 24, concluding that BCBSA has a sufficient interest in the litigation and that the local Blue Plan may not adequately represent that interest. *See* Exhibit 1. On August 1, 2012, the Western District of Tennessee granted BCBSA's motion to intervene under Federal Rule of Civil Procedure 24, concluding that BCBSA should be a party in that action to defend the legality of its contracts.[2] *See* Exhibit 2.

Recognizing that these multiple actions make similar factual allegations and raise duplicative legal questions, one of the plaintiffs in those federal suits moved to centralize the federal cases in the Northern District of Alabama for coordinated pretrial proceedings under 28 U.S.C. § 1407. *In re Blue Cross Blue Shield Antitrust Litig.*, MDL 2406 (Dkt. No. 1 filed Sept. 6, 2012). Several of the suits filed by plaintiff's counsel were removed to federal court and noticed to the Judicial Panel on Multidistrict Litigation (the "Panel") as potential tag-along actions for the proposed MDL. (*Id.* Dkt. Nos. 5, 91, 125.) The Panel heard oral argument on November 29, 2012. (*Id.* Dkt. No. 78.)

### III. ARGUMENT

I.R.C.P. 24 is nearly identical to Federal Rule of Civil Procedure 24, and therefore, the case law interpreting that rule is persuasive. *See In re SRBA Case No. 39576 (Idaho v. United States)*, 134 Idaho 106, 109, 996 P.2d 806, 809 (2000) (relying on federal law to interpret I.R.C.P. 24); *Duff v. Draper*, 96 Idaho 299, 303, 527 P.2d 1257, 1261 (1974) (same). The "central purpose" of Rule 24 is "to allow intervention by those who might be practically disadvantaged by the disposition of the action." *Kleissler v. U.S. Forest Servs.*, 157 F.3d 964, 970 (3d Cir. 1998) (interpreting Fed. R. Civ. P. 24) (internal citations omitted); *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010)

---

[2]      BCBSA's intervention motion in Louisiana is pending, but that matter, and *Ray* (Indiana), are also currently stayed pending a decision by the Judicial Panel on Multidistrict Litigation whether to centralize those suits under 28 U.S.C. § 1407.

Memorandum in Support of Blue Cross and Blue Shield Association's Motion to Intervene

(stating that intervention is guided by "practical and equitable considerations"). Unless BCBSA is allowed to intervene in this case, that is exactly what will happen here. Plaintiff's suit challenges the cornerstone of BCBSA's licensing strategy—to license the Blue Marks to Plans in exclusive territories to allow Plans to build broad subscriber bases and deep provider networks, and allow the otherwise-regional Blue Plans to compete against national competitors like Aetna, United Healthcare, and Cigna. A ruling that BCBSA's exclusive-service-area system violates Idaho antitrust law would deprive BCBSA of a significant right in its ownership of the Blue Marks—its right to license its intellectual property in the way it believes best maintains the high standards associated with the Blue Marks. BCBSA has a right, therefore, to intervene in this litigation to defend that system.

A.      **BCBSA is entitled to intervene as a matter of right under I.R.C.P. 24(a).**

I.R.C.P. 24(a) provides that upon a timely motion, a party shall be permitted to intervene when it "claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." I.R.C.P. 24(a). The Idaho Supreme Court consistently adheres to the view that intervention statutes should be liberally construed as they were intended to shorten trials, avoid technicalities, and promote the administration of justice. *See, e.g., Herzog v. City of Pocatello,* 82 Idaho 505, 509, 356 P.2d 54, 55 (1960). "If there is any doubt as to whether intervention is appropriate, a motion to intervene should usually be granted." *City of Boise v. Ada County,* 147 Idaho 794, 803, 215 P.3d 514, 523 (2009). Idaho law applies a four-part test to determine if this standard is met: (1) the application must be timely; (2) the applicant must have an interest in the underlying litigation; (3) that disposition of the action may practically impair that interest; and (4) the original

parties do or may not adequately represent the applicant's interest. *See, e.g., State v. United States,* 134 Idaho at 110, 996 P.2d at 810 (citing I.R.C.P. 24(a)). Each standard is easily met here.

### 1.   BCBSA's application is timely.

The timeliness requirement for intervention is clearly satisfied here. Idaho courts explain that I.R.C.P. 24's tardiness bar should not be employed as a tool to sanction would-be-intervenors, but rather it is intended to insure that the original parties should not be prejudiced by intervention. *Duff,* 96 Idaho at 302, 527 P.2d at 1260 ("Whether or not the applicant has been dilatory is not the test of timeliness, but the extent of prejudice which any delay resulting from the granting of the application will cause to the existing parties."). Timeliness is a discretionary determination that depends entirely upon the facts of the case at hand. *See, e.g., Cummings v. United States,* 704 F.2d 437, 440-41 (9th Cir. 1983) (reversing district court's decision that intervention was untimely because district judge did not consider all facts at hand).

Here, BCBSA's motion to intervene exhibits "traditional features of a timely motion." *See Citizens for Balanced Use v. Montana Wilderness Ass'n,* 647 F.3d 893, 897 (9th Cir. 2011). BCBSA filed the motion less than a month after plaintiff filed her complaint. Thus, there was no delay on BCBSA's part. *See Herzog,* 82 Idaho at 510, 356 P.2d at 56 (intervention timely when filed before defendant's answer to amended complaint); *see also Citizens for Balanced Use,* 647 F.3d at 897 (intervention timely less than 3 months after the complaint and 2 weeks after the answer); Exhibit 1 (concluding that BCBSA's intervention filed shortly after the original complaint was timely). Moreover, the litigation has not progressed substantially in the past month; no responsive pleading has yet been filed. Under these circumstances, no party could be prejudiced by BCBSA's intervention in this case at this early stage. *See, e.g., Herzog,* 82 Idaho at 501, 356 P.2d at 56; *see also Cummings,* 704 F.2d at 440-41 (intervention timely even though discovery was almost closed because intervention would not introduce new issues).

Memorandum in Support of Blue Cross and Blue Shield Association's Motion to Intervene

2.     **BCBSA has a legal interest in defending the use and licensing of its Blue Marks under its Licensing Agreements, including one with Blue Cross of Idaho.**

A proposed intervenor must demonstrate a "sufficient interest" in the underlying litigation. *Citizens for Balanced Use*, 647 F.3d at 897. Whether the applicant has demonstrated a sufficient interest is a practical inquiry. *Id.* So long as the intervenor has an interest in the proceedings that is immediate and direct, that interest is sufficient for intervention. *See, e.g., Sw. Center for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001); *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988). Here, BCBSA clearly has a direct interest in the underlying litigation. This case is about how BCBSA licenses its Blue Marks to Blue Plans. Plaintiff asserts that licensing Blue Marks in exclusive territories violates Idaho's prohibition on unreasonable restraints of trade, which echoes federal antitrust concerns. *See, e.g., State ex rel. Wasden v. Daicel Chemical Indus. Ltd.*, 141 Idaho 102, 106, 106 P.3d 428, 432 (2005) (explaining that the Idaho antitrust law is "patterned" after the federal Sherman Act). Plaintiff seeks to strike down the long-standing Blue System of exclusive territories. BCBSA is the sole owner and licensor of the Blue Marks. It is also the only entity that is a party to the Licensing Agreements with all 38 Plans. BCBSA's interest in how and whether BCBSA licenses its Blue Marks in Idaho and throughout the entire Blue System is clearly direct and relates to the subject of this action.

Moreover, the mere fact that BCBSA is a party to the Licensing Agreement with Blue Cross of Idaho that is at issue in this case confers on BCBSA a legally cognizable interest sufficient to invoke a right to intervene under I.R.C.P. 24. It is established that an intervenor has a sufficient interest in litigation when its contractual rights could be directly affected by the litigation. *See, e.g., Sw. Center for Biological Diversity*, 268 F.3d at 820 ("Contract rights are traditionally protectable interests" for intervention purposes). Here, BCBSA has an interest in protecting the use of the Blue Marks that it owns and in protecting its Licensing Agreements with Blue Plans nationwide. For these

— 8 —

reasons, then, the second requirement of the test is met. *See also* Order Granting Motion to

Intervene, *Piercy*, Exhibit 1; Order Granting Motion to Intervene, *Morrissey*, Exhibit 2.

### 3.   BCBSA's interests could be impaired by the disposition of this action.

As just noted, plaintiff seeks to invalidate BCSBA's entire system of licensing its Blue Marks,

including its Licensing Agreement with Blue Cross of Idaho. If plaintiff succeeds, the result would

be a ruling that BCBSA's licensing system and its Licensing Agreement with Blue Cross of Idaho are

unlawful. Such a ruling obviously would impair BCBSA's interests. The third requirement of the test

therefore is met.

### 4.   Blue Cross of Idaho may not adequately represent BCBSA's interests.

BCBSA's burden to demonstrate that its interests may not be adequately protected by

existing parties is "minimal." *W. Watersheds Project v. U.S. Forest Serv.*, No. 09-0629, 2010 WL

1816254, at *1 (D. Idaho May 4, 2010). BCBSA is not required to show that the representation will

in fact be inadequate. Rather, the requirement of Rule 24(a) is satisfied if the applicant shows that

representation of his interest "may be" inadequate. *Duff*, 96 Idaho at 302, 527 P.2d at 1260. The

court will consider whether the intervenor offers "a perspective which differs materially from that of

the present parties to this litigation." *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir.

1983). For example, in *Western Watersheds Project v. U.S. Forest Service*, a watersheds conservation group

sued the U.S. Forest Service, claiming that it violated various environmental laws by failing to

consider the impact of sheep grazing on the environment. A wool growers' association and two

holders of grazing permits moved to intervene. The court granted their intervention as of right

because even though the Forest Service and the intervenors shared the same goal of showing that no

environmental laws were broken, the intervenors had a different "incentive": to defend current

levels of grazing. 2010 WL 1816254, at *2; *see also Sagebrush Rebellion*, 713 F.2d at 528 (nonprofit

organization was entitled to intervene in action by another nonprofit challenging actions of Secretary of Interior because intervenor had unique "expertise" and different "perspective").

Just as intervention was appropriate for the wool growers' association and the permit owners in *Western Watersheds Project*, so too is intervention appropriate here for BCBSA. In this case, although Blue Cross of Idaho and BCBSA both want to protect the strength of the Blue Marks and promote the Blue Plan's ability to compete for national business, BCBSA has an incentive and perspective different from the named defendant. BCBSA is the owner and licensor of all Blue Marks; and BCBSA is uniquely positioned to defend the terms on which it licenses the Blue Marks to others. As one of the 38 licensees, Blue Cross of Idaho is not in the best position to defend BCBSA's interests as licensor. Rather, BCBSA has the right to and is best positioned to defend a suit claiming that BCBSA's own actions are in violation of Idaho's antitrust laws. Because BCBSA, as the licensor, has a different incentive to uphold the validity of the License Agreements than Blue Cross of Idaho, BCBSA is entitled to intervene in this case as of right. *See Western Watersheds Project*, 2010 WL 1816265, at *2; *see also Citizens for Balanced Use*, 647 F.3d at 898-99 (conservation organization was not adequately represented by U.S. government in action to uphold environmental regulation because organization sought "broadest possible restrictions on recreational uses" but U.S. government sought narrower restrictions); *Kleissler*, 157 F.3d at 973–74 (permitting intervention when the intervenor's contractual interest derived from a different perspective than the subject of the litigation).

* * *

In sum, BCBSA should be allowed to intervene as of right because it filed a timely motion, it has a sufficient interest in the underlying litigation, its interest could be impaired by the disposition of this action, and Blue Cross of Idaho may not adequately represent BCBSA's interest.

**B.** **In the alternative, BCBSA should be permitted to intervene under I.R.C.P. 24(b).**

In the alternative, the Court should permit BCBSA to intervene under I.R.C.P. 24(b). Permissive intervention is allowed on timely motion by a non-party whose "claim or defense and the main action have a question of law or fact in common." I.R.C.P. 24(b)(2). Permissive intervention is appropriate if the presence of intervenors would assist the Court in its orderly procedures leading to the resolution of the case. *Greater Yellowstone Coalition v. Timchak,* No. CV-08-388, 2008 WL 4911410, at *5 (D. Idaho Nov. 13, 2008).

Permissive intervention requires that BCBSA raise questions of law and defenses in common with those already before the Court. I.R.C.P. 24(b). Courts do not require that all questions of fact or law raised by the dispute be common. *See Venegas v. Skaggs,* 867 F.2d 527, 530-31 (9th Cir. 1989). In *Venegas,* for example, the plaintiff filed a civil-rights case against police officers for unlawfully detaining him. The plaintiff's former attorney sought to intervene to confirm a lien for attorneys' fees. The Ninth Circuit said that permissive intervention was appropriate because the merits of the attorney's suit overlapped with the merits of the plaintiff's. *Id.*

Here, that BCBSA will raise questions of law and defenses common to those already raised in the pending suit is apparent. *See* Exhibit 1. BCBSA is a party to the Licensing Agreements in dispute, a factor that weighs in favor of permissive intervention. *See Amalgamated Sugar Co. v. Johanns,* No. 06-167, 2006 WL 2583706, at *1-*2 (D. Idaho Sept. 7, 2006) (permitting a party who was a party to a transaction challenged by plaintiff to intervene). In addition, not only has plaintiff implicated BCBSA as an alleged co-conspirator with Blue Cross of Idaho in this case, but in the several other suits that make nearly identical allegations regarding BCBSA's license agreements, BCBSA has already been named as a defendant. *See* Exhibit 3. That BCBSA is already defending the validity of the way it licenses its intellectual property in several other courts further demonstrates the connection between BCBSA's interests and the current litigation. At bottom, as other courts and

– 11 –

Memorandum in Support of Blue Cross and Blue Shield Association's Motion to Intervene

plaintiffs' counsel have recognized, it is undeniable that BCBSA's legal interest in its licensing system

is sufficiently connected to the allegations here to merit inclusion of BCBSA as a defendant. *See*

Exhibit 1.

## IV. CONCLUSION

For these reasons, BCBSA respectfully requests this Court to grant its motion and allow it to

intervene as a defendant in this matter.[3]

Jason D. Scott
HAWLEY TROXELL
877 Main Street
Suite 1000
Boise, ID 83702
Telephone: (208) 344-6000
Telecopier: (208) 954-5262

David J. Zott, P.C.
Daniel E. Laytin
Ian R. Conner
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Telecopier: (312) 862-2200

*Counsel for Blue Cross & Blue Shield Association*

---

[3]     I.R.C.P. 24(c) requires that a motion to intervene be accompanied by a pleading setting forth the claim or defense for which intervention is sought. A Rule 24(c) attachment is not required "where ... the movant describes the basis for intervention with sufficient specificity to allow the district court to rule." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 475 (9th Cir. 1992). In accordance with I.R.C.P. 24(c), BCBSA states that it is requesting permission to intervene to defend against all the allegations and claims in plaintiff's complaint. Blue Cross of Idaho's motion to dismiss (or answer) is not yet due, so a dismissal brief from BCBSA with its intervention motion would be premature. To the extent the Court desires a formal filing, BCBSA requests leave to file a motion to dismiss at a time this Court deems appropriate. *See* Exhibit 1, pg. 2 (concluding that BCBSA's motion to intervene is procedurally sufficient under the state-law equivalent of Rule 24(c)).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of December, 2012, I caused to be served a true copy of the foregoing MEMORANDUM IN SUPPORT OF BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE by the method indicated below, and addressed to each of the following:

Bruce C. Jones
Eric B. Swartz
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200
P.O. Box 7808
Boise, ID 83707-7808
[Attorneys for Plaintiffs]

   ✓ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ E-mail
_____ Telecopy

Patrick W. Pendley
Nicholas R. Rockforte
PENDLEY, BAUDIN & COFFIN LLP
Post Office Drawer 71
Plaquemine, LA 70765
[Attorneys for Plaintiffs]

   ✓ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ E-mail
_____ Telecopy

Gordon Ball
BALL & SCOTT LAW OFFICES
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902
[Attorneys for Plaintiffs]

   ✓ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ E-mail
_____ Telecopy

Samuel A. Diddle
Eberle Berlin Kading Turnbow & McKlveen
Boise Plaza, 1111 W. Jefferson St., Suite 530
Boise, ID 83702
[Attorneys for Defendant Blue Cross of Idaho Health Service, Inc.]

   ✓ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ E-mail
_____ Telecopy

Kathleen Taylor Sooy
Andrew Kaplan
Crowell & Moring LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
[Attorneys for Defendant Blue Cross of Idaho Health Service, Inc.]

   ✓ U.S. Mail, Postage Prepaid
_____ Hand Delivered
_____ Overnight Mail
_____ E-mail
_____ Telecopy

Jason D. Scott

– 13 –

Memorandum in Support of Blue Cross and Blue Shield Association's Motion to Intervene



# Exhibit 1

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
UNION COUNTY, ILLINOIS

Deborah Piercy and Lisa Tomazolli, on      )
Behalf of Themselves and All Others        )
Similarly Situated,                        )
                                           )
    Plaintiffs,       )
                                           )
    vs.               )      NO. 12-L-28
                                           )
HEALTH CARE SERVICE CORPORATION            )
D/B/A BLUE CROSS BLUE SHIELD OF            )
ILLINOIS,                                  )
                                           )
    Defendant.         )

REMINDER DATE_____
DUE DATE_____

DEC 0 7 2012

INITIALS_____ *Ked.*

FILED

DEC 0 5 2012

*Lonais M. Garland*
CLERK OF THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
UNION COUNTY, ILLINOIS

## ORDER

THIS CAUSE coming on for consideration on the following pleadings:

  1)  Blue Cross and Blue Shield Association's MOTION TO INTERVENE
     and BRIEF IN SUPPORT thereof;

  2)  Plaintiffs, Deborah Piercy and Lisa Tomazolli, PLAINTIFFS'
     OPPOSITION TO PROPOSED INTERVENOR BLUE CROSS AND
     BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE;

  3)  Blue Cross and Blue Shield Association's REPLY BRIEF IN SUPPORT
     OF BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION
     TO INTERVENE; and

  4)  Defendant Health Care Service Corporation's JOINDER BY
     DEFENDANT HEALTH CARE SERVICE CORPORATION IN THE
     MOTION TO INTERVENE OF BLUE CROSS AND BLUE SHIELD
     ASSOCIATION.

    After considering the pleadings and the current statutory and case law, the Court does

hereby FIND:

    1.    The Court must first address the procedural issues argued by the parties. The

Plaintiffs argue that the movant, Blue Cross and Blue Shield Association's ("BCBSA")

MOTION TO INTERVENE should be denied for its failure to comply with the procedural

requirements of 735 ILCS 5/2-408(e) which states:

1

> A person desiring to intervene shall present a petition setting forth the grounds for
> the intervention, accompanied by the initial pleading or motion which he or she
> proposes to file. In cases in which the allowance of intervention is discretionary,
> the court shall consider whether the intervention will unduly delay or prejudice the
> adjudication of the rights of the original parties.

Both the Plaintiffs and BCBSA cite the case of Soyland Power Co-op. v. Ill. Power Co.,
213 Ill.App3d 916, 572 N.E.2d 462 (Ill. App. 4th Dist. 1991), *appeal denied* 162 Ill.Dec. 509, 580
N.E.2d 135 (Ill. 1991), as well as several other Illinois and Federal cases in support of their
respective positions on this issue. In Soyland, the 4th District Appellate Court held:

> The purpose of section 2-408(e) of the Code is to give both the trial court and any
> opposing party a clear indication of the relief the potential intervenor will be
> seeking if his petition to intervene is granted. This purpose is achieved by the
> requirement that the potential intervenor's initial pleading he proposes to file be
> attached to the petition to intervene. Only when the goals of the potential
> intervenor are revealed in this fashion can the trial court and any opposing party
> assess the appropriateness of the petition to intervene. Indeed, the very case before
> us, with the confusion we have already cited as to the goals of the potential
> intervenors, demonstrates the wisdom of the policy underlying the requirement of
> section 2-408(e) of the Code that the intervenor's proposed initial pleading be
> attached to the petition to intervene.

Soyland, 213 Ill.App3d at 920, 572 N.E.2d at 465.

The Plaintiffs argue that a strict reading of §5/2-408(e) requires BCBSA to provide the
Court and opposing counsel with a proposed pleading along with its motion to intervene.
BCBSA contends that both the Illinois courts and the Federal courts in construing Federal Rule
of Civil Procedure 24(c) have taken a more flexible approach in dealing with the issue. In
rendering its decision, the Court considers BCBSA's entire MOTION TO INTERVENE and
BRIEF IN SUPPORT thereof. Those pleadings give the Court and opposing counsel in-depth
factual and legal reasoning as to why the Court should allow the intervention. It is the Court's
opinion that the MOTION TO INTERVENE and BRIEF IN SUPPORT thereof are procedurally
sufficient to indicate to the Court and opposing counsel BCBSA's reasons to request intervention
and, accordingly, it denies the Plaintiffs' request to dismiss the MOTION TO INTERVENE
pursuant to §5/2-408(e).

2

2.    Turning to the substantive arguments regarding the proposed intervention, BCBSA contends that it should be permitted to intervene in this action as a matter of right based upon 735 ILCS 5/2-408(a) which states in pertinent part:

> (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action.

Counsel for both the Plaintiffs and BCBSA cite the various elements the Court must consider in rendering its decision and numerous cases in support of their respective positions. As argued by BCBSA, the basic tenet of the intervention statute is that it is remedial and should be liberally construed; however, a movant (BCBSA) is required to allege specific facts that demonstrate that it has a right to intervene. Warbucks Investments Ltd. Partnership v. Rosewell, 241 Ill.App.3d 814, 609 N.E.2d 832 (Ill. App. 1st Dist. 1993). In order to allow intervention as a matter of right, the Court must determine: (1) the application is timely; (2) the movant must have a sufficient interest in the underlying litigation; and (3) that the original parties do or may not adequately represent the movant's interest. City of Chicago v. John Hancock Mut. Life Ins. Co., 127 Ill.App.3d 140, 468 N.E.2d 428 (Ill. App. 1st Dist. 1984), appeal denied. The Court must also note its consideration of the similar state court and predominantly federal court cases filed in numerous jurisdictions throughout the United States involving these same parties.

Based upon the Court's consideration of the pleadings and relevant statutory and case law, the Court's opinion is that BCBSA's MOTION TO INTERVENE was filed shortly after the original COMPLAINT was filed and is, therefore, timely. Based upon BCBSA's in-depth reasoning on the issue, the Court's opinion is that BCBSA has a sufficient legal interest in the underlying litigation. Further, based upon BCBSA's contentions and the JOINDER BY DEFENDANT HEALTH CARE SERVICE CORPORATION IN THE MOTION TO INTERVENE OF BLUE CROSS AND BLUE SHIELD ASSOCIATION, the Court's opinion is that the original defendant in this action does not or may not adequately represent BCBSA's interests. Therefore, the Court's opinion is that BCBSA has established and met the criteria for intervention pursuant to §5/2-408(a)(2).

3

3.    In the alternative, BCBSA contends that the Court should exercise its independent discretion and  permit it to intervene in this action pursuant to 735 ILCS 5/2-408(b) which states:

> Upon timely application anyone may in the discretion of the court be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

Under §5/2-408(b), the Court may exercise its discretion upon timely application and grant permissive intervention when a statute confers the conditional right to intervene or when a movant's claim in the main action concerns a common question of law or fact. In re Estate of Mueller, 275 Ill.App.3d 128, 655 N.E.2d 1040 (Ill. App. 1st Dist. 1995), appeal denied 164 Ill.2d 564, 660 N.E.2d 1269.  When considering whether discretionary intervention should be authorized, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.  University Square, Ltd. v. City of Chicago, 73 Ill.App.3d 872, 392 N.E.2d 136 (Ill. App. 1st Dist. 1979).

As stated above, the Court's opinion is that BCBSA's MOTION TO INTERVENE is timely.  Further, based upon the pleadings and relevant statutory and case law, the Court's opinion is that BCBSA has established that a common question of law or fact exists in this matter and that granting the MOTION TO INTERVENE will not unduly delay or prejudice the rights of the original parties.  Therefore, the Court's opinion is that BCBSA has also established and met the criteria for permissive intervention pursuant to §5/2-408(b)(2).

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.    Blue Cross and Blue Shield Association's MOTION TO INTERVENE is granted.

2.    Blue Cross and Blue Shield Association is granted 28 days to file responsive pleadings.

DATED this __5th__ day of December, 2012.

PRESIDING CIRCUIT JUDGE



# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |
|---|---|
| MARY MORRISSEY, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF TENNESSEE, INC.,<br><br>    Defendant. | No. 12-2359 |

## ORDER GRANTING MOTION TO INTERVENE

Before the Court is the Blue Cross and Blue Shield Association's ("BCBSA") June 12, 2012 motion to intervene. (Mot., ECF No. 7.) Plaintiff Mary Morrissey ("Morrisey") responded in opposition on June 29, 2012 (Resp., ECF No. 13), and BCBSA replied on July 25, 2012. (Reply, ECF No. 25.) For the following reasons, the Court GRANTS BCBSA's Motion.

The gravamen of Morrissey's complaint is that Blue Cross and Blue Shield of Tennessee, Inc. ("BCBS-TN") has inflated premiums as a result of a conspiracy in violation of the Sherman Antitrust Act between BCBS-TN and other Blue Cross and Blue Shield entities that are acting in concert through BCBSA. (Am. Compl. ¶ 1.) Morrissey alleges that BCBSA was created to coordinate the plans of Blue Cross and Blue Shield entities in

1

Case 2:12-cv-02359-SHM-cgc   Document 28   Filed 08/01/12   Page 2 of 2   PageID 266

thirty-eight states.   (Id. ¶ 11.)   She alleges that the market share allocation agreements between BCBS-TN and BCBSA, reflecting this coordination, are illegal.   (Id. ¶¶ 2, 6.)

BCBSA moves to intervene to defend the legality of contracts to which it is a party.   For good cause shown, the motion to intervene is GRANTED.

So ordered this 30th day of July, 2012.

/s Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE



# Exhibit 3

| List of Related Cases | | | |
|---|---|---|---|
| **Case Captions** | **Court** | **Civil Action No.** | **Judge** |
| *Cerven v. Blue Cross & Blue Shield of N.C.* (filed Feb. 2, 2012)<br>**Plaintiffs:**<br>Kelli R. Cerven, Keith O. Cerven, Teresa M. Cerven, CFW Vending LLC, and SHGI Corp.<br><br>**Defendants:**<br>Blue Cross & Blue Shield of North Carolina, and Blue Cross & Blue Shield Association | U.S. District Court for the Western District of North Carolina, Statesville Division | 5:12-cv-00017-RLV | Honorable Richard L. Voorhees<br><br>Honorable Magistrate David C. Keesler |
| *Richards v. Blue Cross & Blue Shield of Ala.* (filed Apr. 17, 2012)<br>**Plaintiffs:**<br>Fred R. Richards, and Richards & Sons Construction Co.<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama, and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-01133-RDP | Honorable R. David Proctor |
| *Morrissey v. Blue Cross & Blue Shield of Tenn.* (filed May 11, 2012)<br>**Plaintiffs:**<br>Mary Morrissey | U.S. District Court for the Western District of Tennessee | 2:12-cv-02359 | Honorable John T. Fowlkes |

| List of Related Cases | | | |
|---|---|---|---|
| **Case Captions** | **Court** | **Civil Action No.** | **Judge** |
| Defendants:<br>Blue Cross & Blue Shield of Tennessee<br><br>Intervenor:<br>Blue Cross & Blue Shield Association | | | |
| *One Stop Emt'l LLC v. Blue Cross & Blue Shield of Ala.* (filed May 17, 2012)<br>**Plaintiffs:**<br>One Stop Environmental LLC and Nicholas A. Layman<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama, and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-01910-JEO | Honorable R. David Proctor |
| *Jarreau v. La. Health Serv. Indem. Co.* (filed June 6, 2012)<br>**Plaintiffs:**<br>Hilda Jarreau<br><br>**Defendants:**<br>Louisiana Health Service & Indemnity Co. (d.b.a. Blue Cross Blue Shield of Louisiana) | U.S. District Court for the Middle District of Louisiana | 3:12-cv-00421 | Honorable James J. Brady<br>Honorable Magistrate Stephen C. Riedlinger |

– 2 –

| List of Related Cases | | | |
|---|---|---|---|
| **Case Caption** | **Court** | **Civil Action No.** | **Judge** |
| *Am. Elec. Motor Servs., Inc. v. Blue Cross & Blue Shield of Ala.* (filed June 6, 2014)<br>**Plaintiffs:**<br>American Electric Motor Services, Inc.<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama, and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-02169 | Honorable R. David Proctor |
| *Bajalieh v. Blue Cross & Blue Shield of Ala.* (filed June 15, 2012)<br>**Plaintiffs:**<br>Chris Bajalich and Consumer Financial Education Foundation of America, Inc.<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama, and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-02185 | Honorable R. David Proctor |
| *Conway v. Blue Cross & Blue Shield of Ala.* (filed July 24, 2012)<br>**Plaintiffs:**<br>Jerry L. Conway | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-02532 | Honorable R. David Proctor |

| List of Related Cases | | | |
|---|---|---|---|
| **Case Captions** | **Court** | **Civil Action No.** | **Judge** |
| **Defendants:**<br>Blue Cross & Blue Shield of Alabama; Anthem Inc.;<br>Premera Blue Cross of Alaska; Arkansas Blue Cross and<br>Blue Shield; Anthem Blue Cross & Blue Shield of<br>Connecticut; Highmark Blue Cross & Blue Shield of<br>Delaware; Blue Cross & Blue Shield of Florida; Blue<br>Cross & Blue Shield of Georgia; Hawaii Medical Service<br>Association (d.b.a. Blue Cross & Blue Shield of Hawaii);<br>Health Care Service Corp (d.b.a. Blue Cross & Blue<br>Shield of Illinois); Anthem Blue Cross & Blue Shield of<br>Indiana; Wellmark, Inc. (d.b.a. Blue Cross & Blue Shield<br>of Iowa); Blue Cross & Blue Shield Kansas; Blue Cross<br>& Blue Shield of Louisiana; Anthem Health Plans of<br>Maine; Carefirst Blue Cross & Blue Shield of Maryland;<br>Blue Cross & blue Shield of Massachusetts; Blue Cross<br>& Blue Shield of Michigan; Blue Cross & Blue Shield of<br>Minnesota; Blue Cross & Blue Shield of Mississippi;<br>Anthem Blue Cross & Blue Shield of Missouri; Blue<br>Cross & Blue Shield of Kansas City; Blue Cross & Blue<br>Shield of Nebraska; Anthem Blue Cross & Blue Shield<br>of New Hampshire; Horizon Blue Cross & Blue Shield<br>of New Jersey; Blue Cross & Blue Shield of New | | | |

– 4 –

Case 1:12-cv-00619-REB   Document 1-2   Filed 12/13/12   Page 39 of 48

| List of Related Cases | | | |
|---|---|---|---|
| Case Caption | Court | Civil Action No. | Judge |
| Mexico; Excellus BlueCross BlueShield of New York; Blue Cross & Blue Shield of North Carolina; Blue Cross & Blue Shield of Oklahoma; Blue Cross of Northeastern Pennsylvania; Highmark, Inc.; Independence Blue Cross; Triple S - Salud Inc.; Blue Cross & Blue Shield of Rhode Island; Blue Cross & Blue Shield of South Carolina; Wellmark of South Dakota; Blue Cross & Blue Shield of Tennessee; Blue Cross & Blue Shield of Texas; Blue Cross & Blue Shield of Vermont; Anthem Blue Cross & Blue Shield of Virginia, Inc.; Highmark Blue Cross & Blue Shield of West Virginia; and Blue Cross & Blue Shield Association | | | |
| *GC Adver. LLC v. Blue Cross & Blue Shield of Ala.* (filed July 24, 2012)<br>**Plaintiffs:**<br>GC Advertising, LLC, and CB Roofing, LLC<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama; and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-02525 | Honorable R. David Proctor |

| List of Related Cases | | | |
|---|---|---|---|
| Case Captions | Court | Civil Action No. | Judge |
| *Carder v. Blue Cross & Blue Shield of Ala.* (filed July 24, 2012)<br>**Plaintiffs:**<br>Thomas A. Carder, Jr.<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama, and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Alabama, Southern Division | 2:12-cv-02537 | Honorable R. David Proctor |
| *LifeWatch Serv. Inc. v. Highmark Inc.* (filed Sept. 10, 2012)<br>**Plaintiffs:**<br>LifeWatch Services, Inc.<br><br>**Defendants:**<br>Blue Cross & Blue Shield Association; HighMark Inc.; WellPoint, Inc.; Horizon Blue Cross Blue Shield of New Jersey; Blue Cross Blue Shield of South Carolina; and Blue Cross Blue Shield of Minnesota. | U.S. District Court for the Eastern District of Pennsylvania | 2:12-cv-05146 | Honorable Eduardo C. Robreno |
| *Ray v. WellPoint, Inc.* (filed Sept. 28, 2012)<br>**Plaintiffs:**<br>Ryan Ray | U.S. District Court for the Southern District of Indiana | 1:12-cv-01576 | Honorable Jane Magnust-Stinson |

– 6 –

| List of Related Cases | | | |
|---|---|---|---|
| Case Captions | Court | Civil Action No. | Judge |
| **Defendants:**<br>WellPoint Inc. (d/b/a Anthem Insurance Companies) | | | |
| *Plessy v. Blue Cross & Blue Shield of Ala.* (filed Oct. 1, 2012)<br>**Plaintiffs:**<br>Audrey Plessy<br><br>**Defendants:**<br>Blue Cross & Blue Shield of Alabama; Anthem Inc.; Premera Blue Cross of Alaska; Arkansas Blue Cross and Blue Shield; Anthem Blue Cross & Blue Shield of Connecticut; Highmark Blue Cross & Blue Shield of Delaware; Blue Cross & Blue Shield of Florida; Blue Cross & Blue Shield of Georgia; Hawaii Medical Service Association (d.b.a. Blue Cross & Blue Shield of Hawaii); Health Care Service Corp (d.b.a. Blue Cross & Blue Shield of Illinois); Anthem Blue Cross & Blue Shield of Indiana; Wellmark, Inc. (d.b.a. Blue Cross & Blue Shield of Iowa); Blue Cross & Blue Shield Kansas; Blue Cross & Blue Shield of Louisiana; Anthem Health Plans of Maine; Carefirst Blue Cross & Blue Shield of Maryland; Blue Cross & blue Shield of Massachusetts; Blue Cross & Blue Shield of Michigan; Blue Cross & Blue Shield of | U.S. District Court for the Eastern District of Louisiana | 2:12-cv-02410 | Honorable Martin L.C. Feldman |

– 7 –

| List of Related Cases | | | |
|---|---|---|---|
| **Case Captions** | **Court** | **Civil Action No.** | **Judge** |
| Minnesota; Blue Cross & Blue Shield of Mississippi; Anthem Blue Cross & Blue Shield of Missouri; Blue Cross & Blue Shield of Kansas City; Blue Cross & Blue Shield of Nebraska; Anthem Blue Cross & Blue Shield of New Hampshire; Horizon Blue Cross & Blue Shield of New Jersey; Blue Cross & Blue Shield of New Mexico; Excellus BlueCross BlueShield of New York; Blue Cross & Blue Shield of North Carolina; Blue Cross & Blue Shield of Oklahoma; Blue Cross of Northeastern Pennsylvania; Highmark, Inc.; Independence Blue Cross; Triple S - Salud Inc.; Blue Cross & Blue Shield of Rhode Island; Blue Cross & Blue Shield of South Carolina; Wellmark of South Dakota; Blue Cross & Blue Shield of Tennessee; Blue Cross & Blue Shield of Texas; Blue Cross & Blue Shield of Vermont; Anthem Blue Cross & Blue Shield of Virginia, Inc.; Highmark Blue Cross & Blue Shield of West Virginia; and Blue Cross & Blue Shield Association | | | |
| *McCumber v. Blue Cross & Blue Shield of Miss.* (filed Oct. 2, 2012) <br> **Plaintiffs:** | U.S. District Court for the Southern District of Mississippi | 3:12-cv-00684 | Honorable Henry T. Wingate |

– 8 –

Case 1:12-cv-00619-REB   Document 1-2   Filed 12/13/12   Page 42 of 48

| List of Related Cases | | | |
|---|---|---|---|
| Case Captions | Court | Civil Action No. | Judge |
| Harry M. McCumber<br><br>Defendants:<br>Blue Cross & Blue Shield of Mississippi | | | |
| *Ridge v. Anthem Health Plans of Ky. Inc.* (filed Oct. 8, 2012)<br>Plaintiffs:<br>Donald Ridge<br><br>Defendants:<br>Anthem Health Plans of Kentucky, Inc.; WellPoint, Inc.; and Blue Cross & Blue Shield Association | U.S. District Court for the Western District of Kentucky, Louisville Division | 3:12-cv-00636 | Honorable Charles R. Simpson III |
| *Lawrence Cohn LLC v. HMSA BSH,* (filed Oct. 19, 2012)<br>Plaintiffs:<br>Lawrence Cohn LLC<br><br>Defendants:<br>HMSA BSH (d/b/a Blue Cross & Blue Shield of Hawaii); and Blue Cross & Blue Shield Association | U.S. District Court for the Northern District of Illinois, Eastern Division | 1:12-cv-08448 | Honorable John Tharp |
| *Watts v. Blue Cross & Blue Shield of Tex.* (filed Oct. 22, 2012)<br>Plaintiffs:<br>Brett Watts and Dale Ward | Northern District of Texas, Dallas Division | 3:12-cv-04256 | Honorable Reed C. O'Connor |

| List of Related Cases | | | |
|---|---|---|---|
| Case Caption | Court | Civil Action No. | Judge |
| Defendants:<br>Blue Cross & Blue Shield of Texas; and Blue Cross & Blue Shield Association | | | |
| *Thompson v. Blue Cross Blue Shield of Mich.* (filed Nov. 11, 2012)<br>Plaintiffs:<br>John G. Thompson<br><br>Defendants:<br>Blue Cross Blue Shield of Michigan; and Blue Cross & Blue Shield Association | Western District of Michigan | 2:12-cv-00420 | Honorable Judge R. Allan Edgar |
| *Galactic Funk Touring, Inc. v. Blue Cross & Blue Shield of La.* (filed Nov. 13, 2012)<br>Plaintiffs:<br>Galactic Funk Touring Inc. and Renee Allie<br><br>Defendants:<br>Blue Cross & Blue Shield of Louisiana; and Blue Cross & Blue Shield Association | Middle District of Louisiana | 3:12-cv-00709 | Honorable Brian A. Jackson |
| *Ray Davidson v. Blue Cross & Blue Shield of Ala.*<br>Plaintiffs:<br>Jennifer Ray Davidson | Northern District of Florida | 5:12-cv-00370 | Honorable Richard Smoak |

Case 1:12-cv-00619-REB   Document 1-2   Filed 12/13/12   Page 45 of 48

| List of Related Cases | | | |
|---|---|---|---|
| Case Captions | Court | Civil Action No. | Judge |
| **Defendants:**<br>Blue Cross & Blue Shield of Alabama; Anthem Inc.; Premera Blue Cross of Alaska; Arkansas Blue Cross and Blue Shield; Anthem Blue Cross & Blue Shield of Connecticut; Highmark Blue Cross & Blue Shield of Delaware; Blue Cross & Blue Shield of Florida; Blue Cross & Blue Shield of Georgia; Hawaii Medical Service Association (d.b.a. Blue Cross & Blue Shield of Hawaii); Health Care Service Corp (d.b.a. Blue Cross & Blue Shield of Illinois); Anthem Blue Cross & Blue Shield of Indiana; Wellmark, Inc. (d.b.a. Blue Cross & Blue Shield of Iowa); Blue Cross & Blue Shield Kansas; Blue Cross & Blue Shield of Louisiana; Anthem Health Plans of Maine; Carefirst Blue Cross & Blue Shield of Maryland; Blue Cross & blue Shield of Massachusetts; Blue Cross & Blue Shield of Michigan; Blue Cross & Blue Shield of Minnesota; Blue Cross & Blue Shield of Mississippi; Anthem Blue Cross & Blue Shield of Missouri; Blue Cross & Blue Shield of Kansas City; Blue Cross & Blue Shield of Nebraska; Anthem Blue Cross & Blue Shield of New Hampshire; Horizon Blue Cross & Blue Shield of New Jersey; Blue Cross & Blue Shield of New Mexico; Excellus BlueCross BlueShield of New York; | | | |

Case 1:12-cv-00619-REB Document 1-2 Filed 12/13/12 Page 46 of 48

| List of Related Cases | | | |
|---|---|---|---|
| Case Captions | Court | Civil Action No. | Judge |
| Blue Cross & Blue Shield of North Carolina; Blue Cross & Blue Shield of Oklahoma; Blue Cross of Northeastern Pennsylvania; Highmark, Inc.; Independence Blue Cross; Triple S – Salud Inc.; Blue Cross & Blue Shield of Rhode Island; Blue Cross & Blue Shield of South Carolina; Wellmark of South Dakota; Blue Cross & Blue Shield of Tennessee; Blue Cross & Blue Shield of Texas; Blue Cross & Blue Shield of Vermont; Anthem Blue Cross & Blue Shield of Virginia, Inc.; Highmark Blue Cross & Blue Shield of West Virginia; and Blue Cross & Blue Shield Association | | | |
| *Piercy v. Health Care Serv. Corp.* (filed Aug. 21, 2012) Plaintiffs: Deborah Piercy and Lisa Tomazolli  Defendants: Health Care Service Corp. (d/b/a Blue Cross Blue Shield of Illinois) | Circuit Court for the First Judicial Circuit, Union County, Illinois | 12-L-28 | Honorable Mark Boie |
| *Allen v. Blue Cross of Idaho Health Serv. Inc.* (filed Nov. 13, 2012) Plaintiffs: Melissa Allen  Defendants: Blue Cross of Idaho Health Service, Inc. | District Court of the Fourth Judicial District of Idaho, in the County of Ada | cv-oc-1220817 | Honorable Richard D. Greenwood |

– 12 –

Case 1:12-cv-00619-REB   Document 1-2   Filed 12/13/12   Page 47 of 48

| List of Related Cases | | | |
|---|---|---|---|
| **Case Captions** | **Court** | **Civil Action No.** | **Judge** |
| *Sosebee v. USAble Mut. Ins. Co.* (filed Nov. 16, 2012) <br> **Plaintiffs:** William Lee Sosebee <br><br> **Defendants:** USAble Mutual Insurance Co. (d/b/a Arkansas Blue Cross & Blue Shield) | Circuit Court of Pulaski, Arkansas, 9th Division | 60-cv-2012-5368 | Honorable Mary McGowan |
| *Godwin v. Blue Cross & Blue Shield of Ala.,* (filed Dec. 7, 2012) <br> **Plaintiffs:** Cynthia W. Godwin <br><br> **Defendants:** <br> Blue Cross & Blue Shield of Alabama; Anthem Inc.; Premera Blue Cross of Alaska; Arkansas Blue Cross and Blue Shield; Anthem Blue Cross & Blue Shield of Connecticut; Highmark Blue Cross & Blue Shield of Delaware; Blue Cross & Blue Shield of Florida; Blue Cross & Blue Shield of Georgia; Hawaii Medical Service Association (d.b.a. Blue Cross & Blue Shield of Hawaii); Health Care Service Corp (d.b.a. Blue Cross & Blue Shield of Illinois); Anthem Blue Cross & Blue Shield of Indiana; Wellmark, Inc. (d.b.a. Blue Cross & Blue Shield of Iowa); Blue Cross & Blue Shield Kansas; Blue Cross & Blue Shield of Louisiana; Anthem Health Plans of Maine; Carefirst Blue Cross & Blue Shield of Maryland; | U.S. District Court for the Northern District of Alabama | 2:12-cv-04053 | Honorable Magistrate Judge Harwell G. Davis III |

| List of Related Cases | | | |
|---|---|---|---|
| Case Caption | Court | Civil Action No. | Judge |
| Blue Cross & blue Shield of Massachusetts; Blue Cross & Blue Shield of Michigan; Blue Cross & Blue Shield of Minnesota; Blue Cross & Blue Shield of Mississippi; Anthem Blue Cross & Blue Shield of Missouri; Blue Cross & Blue Shield of Kansas City; Blue Cross & Blue Shield of Nebraska; Anthem Blue Cross & Blue Shield of New Hampshire; Horizon Blue Cross & Blue Shield of New Jersey; Blue Cross & Blue Shield of New Mexico; Excellus BlueCross BlueShield of New York; Blue Cross & Blue Shield of North Carolina; Blue Cross & Blue Shield of Oklahoma; Blue Cross of Northeastern Pennsylvania; Highmark, Inc.; Independence Blue Cross; Triple S - Salud Inc.; Blue Cross & Blue Shield of Rhode Island; Blue Cross & Blue Shield of South Carolina; Wellmark of South Dakota; Blue Cross & Blue Shield of Tennessee; Blue Cross & Blue Shield of Texas; Blue Cross & Blue Shield of Vermont; Anthem Blue Cross & Blue Shield of Virginia, Inc.; Highmark Blue Cross & Blue Shield of West Virginia; and Blue Cross & Blue Shield Association | | | |

# EXHIBIT 4

Samuel A. Diddle, ISB #4967
**EBERLE, BERLIN, KADING, TURNBOW**
**& McKLVEEN, CHARTERED**
1111 West Jefferson Street, Suite 530
P. O. Box 1368
Boise, ID 83701
Telephone:    (208) 344-8535
Facsimile:     (208) 344-8542

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| MELISSA ALLEN, Individually, and on behalf of All Others Similarly Situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an Idaho Corporation,<br><br>DEFENDANT. | Case No. _____<br><br>Ada County<br>Case No. CV-OC-2012-20817<br><br>**DECLARATION OF DENNIS WARREN IN SUPPORT OF REMOVAL FROM STATE COURT** |

I, Dennis Warren, declare the following:

1.     I have been employed by Blue Cross of Idaho Health Service, Inc. ("BCI") for 9 years. Currently, I am the Interim Vice President of the Sales Department for BCI. I have personal knowledge of the matters stated herein.

2.     As of November 30, 2012, BCI had 46,842 members enrolled in its individual commercial insurance plans, which are not governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Of these members, approximately 46,380 are domiciled in Idaho.

3.     BCI had an average of 45,218 members enrolled in individual commercial insurance plans in 2008.

DECLARATION OF DENNIS WARREN IN SUPPORT OF REMOVAL NOTICE - 1

4.    BCI had an average of 41,749 members enrolled in individual commercial insurance plans in 2009.

5.    BCI had an average of 44,580 members enrolled in individual commercial insurance plans in 2010.

6.    BCI had an average of 46,578 members enrolled in individual commercial insurance plans in 2011.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 13, 2012

_Dennis Warren_
Dennis Warren

# EXHIBIT 5

*Served 11/14/12 @ 2:45 p.m.*

NO. _____
A.M. _____ PM. _____

PICHARD D. GREENWOOD

**Bruce C. Jones, ISB #3177**
**Eric B. Swartz, ISB #6396**
**JONES & SWARTZ** PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808
Telephone: (208) 489-8989
Facsimile: (208) 489-8988
Email: bruce@jonesandswartzlaw.com
        eric@jonesandswartzlaw.com

NOV 1 9 2012

**CHRISTOPHER D. RICH, Clerk**
By ANNAMARIE MEYER
DEPUTY

**Patrick W. Pendley, LSB #14021 [PHV application to be submitted]**
**Nicholas R. Rockforte, LSB #31305 [PHV application to be submitted]**
**PENDLEY, BAUDIN & COFFIN, L.L.P.**
24110 Eden Street
P.O. Drawer 71
Plaquemine, LA 70765
Telephone: (225) 687-6396

**Gordon Ball, TN BPR #1135 [PHV application to be submitted]**
**BALL & SCOTT LAW OFFICES**
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902
Telephone: (865) 525-7028

**Attorneys for Plaintiffs**

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| MELISSA ALLEN, Individually, and on behalf of All Others Similarly Situated, | Case No. **CV OC 1220817** |
| **Plaintiffs,** | |
| vs. | **SUMMONS** |
| BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an Idaho corporation, | |
| **Defendant.** | |

SUMMONS – 1

**NOTICE: YOU HAVE BEEN SUED BY THE ABOVE-NAMED PLAINTIFFS.** THE
COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE
UNLESS YOU RESPOND WITHIN TWENTY (20) DAYS. **READ THE INFORMATION
BELOW.**

TO:   **BLUE CROSS OF IDAHO HEALTH SERVICE, INC.**
      c/o Steven J. Tobiason, Registered Agent
      3000 E. Pine Avenue
      Meridian, ID 83642

        You are hereby notified that in order to defend this lawsuit, an appropriate written
response must be filed with the above designated Court within twenty (20) days after service of
this Summons on you. If you fail to so respond, the Court may enter judgment against you as
demanded by the Plaintiffs in the Complaint.

        A copy of the Complaint is served with this Summons. If you wish to seek the advice or
representation by an attorney in this matter, you should do so promptly so that your written
response, if any, may be filed in time and other legal rights protected.

        An appropriate written response requires compliance with Rule 10(a)(1) and other Idaho
Rules of Civil Procedure and shall also include:

        1.   The title and number of this case.

        2.   If your response is an Answer to the Complaint, it must contain admissions or
             denials of the separate allegations of the Complaint and other defenses you may
             claim.

        3.   Your signature, mailing address and telephone number, <u>or</u> the signature, mailing
             address and telephone number of your attorney.

        4.   Proof of mailing or delivery of a copy of your response to Plaintiffs' attorney, as
             designated above.

        To determine whether you must pay a filing fee with your response, contact the Clerk of
the above-named Court.

        DATED this ___13th___ day of November, 2012.

                                        CHRISTOPHER D. RICH, CLERK
                                        ADA COUNTY DISTRICT COURT

                                        **ANNAMARIE MEYER**

                                    By: _____
                                        **DEPUTY CLERK**

SUMMONS – 2

# EXHIBIT 6

Samuel A. Diddle, ISB #4967
**EBERLE, BERLIN, KADING, TURNBOW**
**& McKLVEEN, CHARTERED**
1111 West Jefferson Street, Suite 530
P. O. Box 1368
Boise, ID 83701
Telephone:     (208) 344-8535
Facsimile:     (208) 344-8542

Attorneys for Defendant

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE
## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| MELISSA ALLEN, Individually, and on behalf of All Others Similarly Situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>BLUE CROSS OF IDAHO HEALTH SERVICE, INC., an Idaho Corporation,<br><br>DEFENDANT. | **NOW FED CIV**<br><br>Case No. CV-OC-2012-20817<br><br>**NOTICE OF REMOVAL TO FEDERAL COURT** |

TO:     Plaintiff above named and his counsel of record; and to the Clerk of the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County:

**PLEASE TAKE NOTICE** that Blue Cross of Idaho Health Service, Inc. ("BCI") filed, on

the 13th day of December, 2012, Notice of Removal from State Court of the above-entitled cause

from the District Court of Fourth Judicial District of the State of Idaho, in and for Ada County, to

the United States District Court for the District of Idaho, and said District Court of the Fourth

Judicial District of the State of Idaho, in and for Ada County, shall proceed no further unless the

case is remanded.

A true and correct copy of the Notice of Removal from State Court is attached hereto as

**NOTICE OF REMOVAL TO FEDERAL COURT - 1**

Exhibit 1, and by this reference incorporated herein as if set forth in full.

DATED this 13th day of December, 2012.

EBERLE, BERLIN, KADING, TURNBOW
& McKLVEEN, CHARTERED

By

Samuel A. Diddle, of the firm
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was served upon the following attorneys this 13th day of December, 2012, as indicated below and addressed as follows:

Bruce C. Jones
Eric B. Swartz
JONES & SWARTZ PLLC
1673 W. Shoreline Drive, Suite 200 [83702]
P.O. Box 7808
Boise, ID 83707-7808

[X] U.S. Mail
[ ] Hand Delivery
[ ] Overnight Mail
[ ] Fax  208-879-6672
[ ] Electronic Mail

Patrick W. Pendley
Nicholas R. Rockforte
PENDLEY, BAUDIN & COFFIN, L.L.P.
24110 Eden Street
P.O. Drawer 71
Plaquemine, LA 70765

Gordon Ball
BALL & SCOTT LAW OFFICES
Bank of America Center, Suite 601
550 Main Street
Knoxville, TN 37902

Attorneys for Plaintiffs

_____
Samuel A. Diddle

JS 44   (Rev. 09/11)

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Melissa Allen, individually, and on behalf of All Others Similarly Situated

## DEFENDANTS
Blue Cross of Idaho Health Service, Inc.

**(b)** County of Residence of First Listed Plaintiff   **Ada**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **Ada**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Bruce C. Jones, JONES & SWARTZ PLLC, 1673 W. Shoreline Dr., Ste. 200 [83702], P.O. Box 7808, Boise, ID 83707-7808

Attorneys *(If Known)*
Samuel A. Diddle, EBERLE, BERLIN, KADING, TURNBOW & McKLVEEN 111 W. Jefferson St., Ste. 530, Boise, ID 83701

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | **Habeas Corpus:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. §§ 1441(a) and 1446
Brief description of cause:
ALLEGED VIOLATION OF IDAHO ANTITRUST STATUTE

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Judicial Panel on Multidistrict Litigation
DOCKET NUMBER   MDL No. 2406

DATE
12/13/12

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE