JURY,MDL

# U.S. District Court
## District of South Carolina (Columbia)
## CIVIL DOCKET FOR CASE #: 3:12-cv-03519-MDL
### Internal Use Only

Shred 360 LLC v. Blue Cross and Blue Shield of South Carolina et al

Assigned to: Unassigned - MDL

Cause: 15:15 Antitrust Litigation

Date Filed: 12/13/2012
Jury Demand: Plaintiff
Nature of Suit: 410 Anti-Trust
Jurisdiction: Federal Question

**Plaintiff**

**Shred 360 LLC**
*on behalf of itself and all others similarly situated*

represented by **Janet Brooks Holmes**
McKay Cauthen Settana and Stubley
1303 Blanding Street
Columbia, SC 29201
803-256-4645
Fax: 803-465-1839
Email: janetholmes1@mac.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Temus C Miles , Jr**
McKay Cauthen Settana and Stubley
1303 Blanding Street
Columbia, SC 29201
803-256-4645
Email: tmiles@mckayfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*



A TRUE COPY
ATTEST: LARRY W. PROPES, CLERK

BY:

DEPUTY CLERK

V.

**Defendant**

**Blue Cross and Blue Shield of South Carolina**
*on behalf of itself and all others similarly situated*

**Defendant**

**Blue Cross and Blue Shield Association**

| Date Filed | # | Docket Text |
|------------|---|-------------|
|            |   |             |

| 12/13/2012 | | 1 | COMPLAINT against Blue Cross and Blue Shield Association, Blue Cross and Blue Shield of South Carolina ( Filing fee $ 350 receipt number 0420-4458661.), filed by Shred 360 LLC. (Attachments: # 1 transfer order) (asni, ) (Entered: 12/14/2012) |
| 12/13/2012 | | 2 | Local Rule 26.01 Answers to Interrogatories by Shred 360 LLC.(asni, ) (Entered: 12/14/2012) |
| 12/13/2012 | | 3 | Summons Issued as to Blue Cross and Blue Shield of South Carolina. (asni, ) (Entered: 12/14/2012) |
| 12/13/2012 | | 4 | Summons Issued as to Blue Cross and Blue Shield Association. (asni, ) (Entered: 12/14/2012) |
| 12/13/2012 | 🔒 🔒 | 5 | (Court only) CIVIL COVER SHEET - Private Entry. (asni, ) (Entered: 12/14/2012) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| Shred 360, LLC, *on behalf of itself and all others similarly situated,* Plaintiffs, <br><br> v. <br><br> Blue Cross and Blue Shield of South Carolina and Blue Cross and Blue Shield Association, Defendants | **CLASS ACTION COMPLAINT** <br><br><br> JURY TRIAL DEMANDED <br><br> Case No. _____ |

**CLASS ACTION COMPLAINT**

Plaintiff, Shred 360, LLC, on behalf of itself and all others similarly situated, for their Complaint against Defendants, Blue Cross and Blue Shield of South Carolina ("BCBS-SC") and the Blue Cross and Blue Shield Association ("BCBSA"), allege as follows:

**NATURE OF THE CASE**

1. This is a class action brought on behalf of subscribers of BCBS-SC to recover damages and restitution. Specifically, this action seeks to recover damages in the form of inflated premiums that BCBS-SC has charged South Carolina subscribers as a result of this ongoing illegal conspiracy, and as a result of anticompetitive conduct it has taken in its illegal efforts to establish and maintain monopoly power throughout South Carolina.

2. BCBS-SC is by far the largest health insurance company operating in South Carolina, and currently exercises dominant market power in the commercial health insurance market throughout South Carolina. According to the American Medical Association ("AMA"), over 60 percent of the South Carolina residents who subscribed to full-service commercial health

1

insurance in 2010 (whether through individual, small group, or large group plans) were subscribers of BCBS-SC – more than double the next largest full-service commercial insurer, Cigna, which carried only 15 percent of all subscribers.  BCBS-SC currently has a greater than 60 percent share of full-service commercial health insurance enrollees in all 7 of the major metropolitan health insurance markets in the State, and an almost 70 percent share in the Sumter market.  Furthermore, according to the South Carolina Department of Insurance ("SCDOI"), in 2010 South Carolina's largest insurer (BCBS-SC) actually controlled over 62 percent of the full service commercial health insurance market when considering only individual and small group policies.

3.   The dominant market share enjoyed by BCBS-SC is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with BCBS-SC, and that BCBS-SC will have the exclusive right to do business in the state of South Carolina, so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas.  These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including BCBS-SC.  Through the terms of these per se illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCBS-SC, have explicitly agreed not to compete with one another, in direct violation of Section 1 of the Sherman Act.  By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

2

4.  This illegal conspiracy to divide markets and to eliminate competition extends beyond the use of the Blue Cross and Blue Shield brand names.  Many of the Blue Cross and Blue Shield affiliates have developed substantial non-Blue brands that could compete in South Carolina.  However, the illegal conspiracy includes a per se illegal agreement that the Blue Cross and Blue Shield licensees will not compete with one another through the use of their non-Blue brands, beyond a relatively *de minimis* extent.  But for the illegal agreements not to compete with one another, these entities could and would use their non-Blue brands to compete with BCBS-SC throughout South Carolina, which would result in greater competition and lower premiums for subscribers.

5.  The Defendants' illegal conspiracy has perpetuated BCBS-SC's monopoly power throughout South Carolina, which has resulted in skyrocketing premiums for South Carolina BCBS-SC enrollees for over a decade.   BCBS-SC's anticompetitive behavior, and the lack of competition BCBS-SC faces because of its monopoly power and anticompetitive behavior, have led to higher costs, resulting in higher premiums charged to BCBS-SC customers.  As a result of these inflated premiums, BCBS-SC now has a surplus of reserves over $1.7 billion.

6.  These inflated premiums would not be possible if the market for health insurance in South Carolina were truly competitive.  Full and fair competition is the only answer to artificially inflated prices, and competition is not possible so long as BCBS-SC and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in South Carolina.

3

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, restitution, and costs of suit, including reasonable attorneys' fees, against BCBSA and BCBS-SC for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.  This Court also has pendant and ancillary jurisdiction over the claims under Section 39-3-10 of the South Carolina Code of Laws, pursuant to 28 U.S.C. § 1337(a).

8. Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

## PARTIES

### Plaintiffs

9. Plaintiff Shred 360, LLC:  Plaintiff is a small business operating and existing in the State of South Carolina.  During all relevant times, Plaintiff has employed approximately ten (10) individuals.  During this time, Plaintiff purchases and pays fifty percent (50%) of its employees' health insurance premiums, as well as such for its employees' covered spouse or dependent children.   Plaintiff Shred 360, LLC is a business with its principal address at 7001 St. Andrews Road, Columbia, South Carolina.

10. Plaintiff Shred 360, LLC is a business with ten full time employees. Plaintiff Shred 360, LLC, has purchased BCBS-SC health insurance to cover some of its employees, and Plaintiff has paid fifty percent (50%) of these monthly premium payments, through September 2011.

11. During all relevant times, Plaintiff attempted to purchase group health insurance to cover its

4

employees, as well as their spouse(s) and/or children as dependent insureds.  Plaintiff sought

such group health insurance from BCBS-SC.  Due to the prohibitively high cost of monthly

premiums for such coverage – specifically from BCBS-SC, Plaintiff was unable to afford to

purchase such group health insurance.  Therefore, Plaintiff has been forced to provide the

health insurance for its employees (its employees' covered spouse or dependent children)

through individual health insurance policies that are individual for each employee and also

separate individual policies for each employee's covered spouse or dependent children.

Plaintiff pays fifty percent (50%) of these premium payments each month.  Several of these

policies have been through and/or from BCBS-SC.  The premiums for these BCBS-SC

individual health insurance policies also have become so inflated that Plaintiff had to

discontinue its employees' individual policies (as Plaintiff's had agreed with its employees to

pay fifty percent (50%) of these monthly premium payments) after September 2011.

### Defendants

12. Defendant BCBSA is a corporation organized under the state of Illinois and headquartered in

Chicago, Illinois.  It is owned and controlled by thirty-eight (38) health insurance plans that

operate under the Blue Cross and Blue Shield trademarks and trade names.  BCBSA was

created by these plans and operates as a licensor for these plans.  Health insurance plans

operating under the Blue Cross and Blue Shield trademarks and trade names provide health

insurance coverage for approximately 100 million – or one in three – Americans.  A BCBSA

licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44)

states.

13. BCBSA has contacts with the State of South Carolina by virtue of its agreements and

contacts with BCBS-SC.  In particular, BCBSA has entered into a series of license

5

agreements with BCBS-SC that control the geographic areas in which BCBS-SC can operate. These agreements are a subject of this Complaint.

14. Defendant BCBS-SC is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Carolina.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-SC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of South Carolina.

15. The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, SC  29219.  BCBS-SC does business in each county in the state of South Carolina.

## TRADE AND COMMERCE

16. BCBS-SC and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.  BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.  BCBS-SC provides commercial health insurance that covers South Carolina residents when they travel across state lines, purchases health care in interstate commerce when South Carolina residents require health care out of state, and receives payments from employers outside of South Carolina on behalf of South Carolina residents.

## CLASS ACTION ALLEGATIONS

17. Plaintiffs bring this action on behalf of themselves individually and on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "South Carolina Class") defined as:

> All persons or entities who, from December 13, 2008 to the present (the
> "Class Period"), have paid health insurance premiums to BCBS-SC for
> individual or small group full-service commercial health insurance.

18. The Class is so numerous and geographically dispersed that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are thousands of Class members, the exact number and identities of which can be obtained from BCBSA and BCBS-SC.

19. There are questions of law or fact common to the Class, including but not limited to:

   a. Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Section 1 of the Sherman Act, or are otherwise prohibited under Section 1 of the Sherman Act;

   b. Whether, and the extent to which, premiums charged by BCBS-SC to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

   c. Whether the use of Most Favored Nation ("MFN") provisions in the BCBS-SC provider agreements is anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance;

   d. Whether, and the extent to which, premiums charged by BCBS-SC have been artificially inflated as a result of the anticompetitive practices adopted by BCBS-SC.

20. The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

21. Plaintiffs are members of the Class; their claims are typical of the claims of the members of the Class; and Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs and the South Carolina Class are direct purchasers of individual or small group full-service commercial health insurance from BCBS-SC, and their interests are coincident with and not antagonistic to other members of the Class.  In addition, Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

22. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and BCBS-SC.

23. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is ones for which BCBSA and BCBS-SC have records.   Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

### General Background and Summary of Allegations

24. BCBS-SC enjoys unrivaled market dominance within South Carolina.  In 2010, BCBS-SC enrolled 60 percent of the subscribers of full-service commercial health insurance plans, whether offered through a health maintenance organization ("HMO") or through a preferred provider organization ("PPO") plan.  When considering full-service PPO subscribers alone, BCBS-SC's market dominance is even greater: over 82 percent of full-service PPO plan subscribers statewide are enrolled with BCBS-SC.  Furthermore, according to the SCDOI, in 2010 South Carolina's largest insurer (BCBS-SC) controlled over 62 percent of the full service commercial health insurance market when considering only individual and small group policies.

25. BCBS-SC's market dominance in South Carolina is the result of a conspiracy between BCBS-SC and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States.  That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with Defendant BCBSA.  As detailed herein, the member health insurance plans of BCBSA, including BCBS-SC, have entered into a series of licensing arrangements that have insulated BCBS-SC and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

26. This series of agreements has enabled BCBS-SC to acquire and maintain a grossly disproportionate market share for health insurance products in South Carolina, where BCBS-SC enjoys market and monopoly power.  The situation in South Carolina is not unique,

9

however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

27. BCBS-SC has used its market and monopoly power in South Carolina to engage in a number of anticompetitive practices.  For example, BCBS-SC has required key health care providers to agree to most favored nation clauses ("MFNs") in their contracts with BCBS-SC.  These clauses ensure that BCBS-SC receives the best pricing for health care services in the market. If a health care provider does not agree to the MFN, that provider will not remain in or become a part of BCBS-SC's network, which is generally an unacceptable result because BCBS-SC controls the vast majority of subscribers in South Carolina.  Faced with this prospect, providers capitulate to BCBS-SC's demands, including MFNs.

28. The MFNs restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

29. Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCBS-SC's MFNs ensure that its competitors may not negotiate lower health care provider costs, BCBS-SC faces little pressure to constrain its own costs.  The MFN, by limiting the ability of an insurer to compete with BCBS-SC, thus also compounds the exclusion of BCBS-SC's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products.  With few other health insurance plan options to compete with, BCBS-SC can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan.  The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by BCBS-SC with health care providers.

10

30. Further, because BCBS-SC has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, health care providers have responded by increasing prices to cover the discounts that BCBS-SC receives through its MFNs. Thus, what was supposed to be a discount turns out to be a premium to providers, thereby artificially raising prices for health care services. Again, consumers lose.

31. Defendants' anticompetitive practices, by reducing the *choices* available to health insurance consumers and increasing the *cost* of health care in South Carolina, have raised the *premiums* that South Carolina residents must pay to obtain health insurance. BCBS-SC's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the South Carolina market must pay significantly higher rates to health care providers.

32. The skyrocketing cost of BCBS-SC health insurance coverage in South Carolina tells the story of BCBS-SC's abuse of its market and monopoly power at the expense of health care plan consumers in South Carolina.

**History of the Blue Cross and Blue Shield Plans and of BCBSA**

33. The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage. While originally structured as non-profit organizations, since the 1980s these local Blue plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

11

34. The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

### Development of the Blue Cross Plans

35. In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

36. In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

37. In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

38. In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any

12

plan operating in another plan's service area.  Contrary to the principles that plans would not compete and that plans would not operate in each others' service areas, the independently formed prepaid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each others' territories.  The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals . . . .  Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans."  At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

39. For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the Blue Cross Association, one predecessor to BCBSA.  Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

40. By 1975, the Blue Cross plans had a total enrollment of 84 million.

## Development of the Blue Shield Plans

41. The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans.  These plans were designed to provide a mechanism for

13

covering the cost of physician care; just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

42. Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

43. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."  In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

44. By 1975, the Blue Shield plans had a total enrollment of 73 million.

### Creation of the Blue Cross and Blue Shield Association

45. Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

46. However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the

Blue plans and were now entering the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies.  While the Blues remained dominant in most markets, this growth of competition was a threat.  In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

47. From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

48. Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war.  As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate.  Two boards; two sets of managements.  Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

49. To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

15

50. Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

51. Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

52. During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

53. In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA.  At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

54. In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.  As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.  However, the goals did not end competition between Blue plans.  In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

55. During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

56. In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities.  As a result, many member plans converted to for-profit status.  One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures.  Others attempted to convert to for-profit status but failed; for example, from 2001 to 2003, BCBS-NC spent $18 million attempting such a conversion, but ultimately withdrew its plan after three separate reports commissioned by state officials recommended against the plan.  However, while nominally still characterized as not-for-profit, BCBS-SC and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

57. From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year.  At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.  As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -- a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

17

58. Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

59. At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans.  These illegal restraints are discussed below.

**Allegations Demonstrating Control of BCBSA By Member Plans**

60. BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

61. BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.  On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

62. As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

18

63. The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.  In a

pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its

Board of Directors consists of "the chief executive officer from each of its Member Plans and

BCBSA's own chief executive officer."   The current chairman of the Board of Directors,

Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue Shield of

Michigan.  David Pankau, the current President and CEO of BCBS-SC, serves on the Board

of Directors of BCBSA.   The Board of Directors of BCBSA meets at least annually,

including from November 3-4, 2010 in Chicago, IL.

**License Agreements and Restraints on Competition**

64. The  independent  Blue  Cross  and  Blue  Shield  licensees  also  control  BCBSA's  Plan

Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the

BCBSA  Board  of  Directors  that  is  composed  of  nine  member  Plan  CEOs  and  three

independent members.

65. The independent Blue Cross and Blue Shield licensees control the entry of new members into

BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA

admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of

[BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks

will not fall into the hands of a stranger the Association has not approved."

66. The independent Blue Cross and Blue Shield licensees control the rules and regulations that

all members of BCBSA must obey.  According to a brief BCBSA filed during litigation in

the  Sixth  Circuit  Court  of  Appeals,  these  rules  and  regulations  include  the  Blue  Cross

License  Agreement  and  the  Blue  Shield  License  Agreement  (collectively,  the  "License

19

Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

67. The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

68. Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards."  The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

69. The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a

20

recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

70. The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply— "Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

71. The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice –

first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

### Horizontal Agreements

72. The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

73. Each BCBSA licensee is an independent legal organization.  In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence."  In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

74. The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States.  The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee.  Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees.  On its website, BCBSA asserts that its members together provide "coverage for more than 98 million individuals – one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer."  Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

75. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity

22

of national coordination."   The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace.  Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market.  New forms of competition were springing up at every turn, and market share was slipping year by year.  Survival was at stake.  The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."   One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

76. As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

**The Horizontal Agreements Not To Compete In The Licensing Arrangements
Between BCBSA And Its Member Plans, Including BCBS-SC, Are Per Se Violations Of
The Sherman Act**

77. The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.  As such, they are a *per se* violation of Section 1 of the Sherman Act.

78. Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."  The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

79. Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business.  This provision also thereby limits the ability of each plan

24

to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

80. Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.  It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

81. The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area.  To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap.  Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area.  Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

82. In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

83. The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

84. More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions.  For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

85. The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business.  Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed,

26

administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

86. Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

87. Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible. When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license. However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

27

88. The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

89. In sum, a terminated licensee would (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area.  These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

90. It is unsurprising, then, that most member plans do not operate outside of their Service Areas.  Thus, while there are numerous Blue plans, and non-Blue businesses owned by such plans, that could and would compete effectively in South Carolina but for the territorial restrictions, at present there are no Blue plans other than BCBS-SC, and no non-Blue affiliates of any Blue plans, competing in the commercial health insurance market in South Carolina.  The territorial restrictions have therefore barred all competition by all of the Blue plans (other than BCBS-SC) and all of their non-Blue branded business lines from the South Carolina commercial health insurance market.

91. Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under

28

control by preventing growth – exactly the opposite of how they would normally operate.
The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative
example.  WellPoint reported in its Form 10-K for the year ending December 31, 1999 that
approximately 70 percent of its total medical membership was sold by its Blue-licensed
subsidiary, Blue Cross of California.  In its Form 10-K for the year ending December 31,
2000, this percentage decreased to approximately 67 percent.  In its Form 10-K for the year
ending December 31, 2001, after WellPoint had acquired the BCBSA member plans
operating in Georgia and part of Missouri, it reported that approximately 78 percent of its
total medical membership was in its Blue-licensed subsidiaries.  By the time WellPoint filed
its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in
fourteen states.  For the first time, it admitted the existence of the territorial restrictions in the
BCBSA licenses and stated that it was in compliance with them.  This may explain why,
from 1999 to 2002, while other Texas health insurers experienced average revenue growth of
17 percent, UniCare experienced growth of only 1.4 percent in Texas.  During those same
years, UniCare experienced virtually no growth in the state of Washington, while overall
health insurance revenue in the state grew by 17 percent.  Similarly, in New Jersey from
2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of
WellPoint and known as Empire BlueCross BlueShield) did not increase, despite an overall
25 percent growth rate for health insurers in the state during the same period.  In Mississippi,
between 2001 and 2002, premium revenue earned by most health insurance companies
increased by more than 10 percent, but revenue for the non-Blue business of out-of-state
Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now
part of WellPoint).

29

92. In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

93. Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**The Anticompetitive Acquisition Restrictions In The BCBSA Licensing Agreements**

94. In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBS-SC and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

95. First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as

30

alleged above, the member plans control the entry of new members into BCBSA.  Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

96. Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired).  These include four situations in which a member plan's license will terminate *automatically*:    (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities.    These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans.  These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

97. These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.  Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region.  By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

98. Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans:  in 1996, there were 62 Blue licensees; at present, there are only 38.

99. By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.   The net effect is less competition and higher premium costs for consumers, including enrollees of BCBS-SC.

### The BCBSA Licensing Agreements
### Have Reduced Competition In South Carolina

100.    BCBS-SC, as a licensee, member, and part of the governing body of BCBSA, has

conspired with the other member plans of BCBSA to create, approve, abide by, and enforce

the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the

License Agreements and Guidelines.  Many of the member plans with which BCBS-SC has

conspired would otherwise be significant competitors of BCBS-SC in South Carolina.

101.    For example, WellPoint is the largest health insurer in the country by total medical

enrollment, with approximately 34 million enrollees.  It is the Blue Cross and Blue Shield

licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue

Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the

Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10

New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue

Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers

throughout the country through its non-Blue brand subsidiary, UniCare.  But for the illegal

territorial restrictions summarized above, WellPoint would be likely to offer its health

insurance services and products in South Carolina in competition with BCBS-SC.  Such

competition would result in lower health care costs and premiums paid by BCBS-SC

enrollees.

102.    Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer

in the country by total medical enrollment, with approximately 3.5 million enrollees.  Blue

Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for

commercial HMO and PPO health insurance in its Service Area of Alabama.  But for the

illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in South Carolina in competition with BCBS-SC.  Such competition would result in lower health care costs and premiums paid by BCBS-SC enrollees.

103.    CareFirst BlueCross BlueShield is the fourteenth largest health insurer in the country by total medical enrollment, with approximately 3.33 million enrollees.  It is the largest health care insurer in the Mid-Atlantic region:  its Service Area consists of Maryland, the District of Columbia, and portions of Virginia.  But for the illegal territorial restrictions summarized above, CareFirst BlueCross BlueShield would be likely to offer its health insurance services and products in South Carolina in competition with BCBS-SC.  Such competition would result in lower health care costs and premiums paid by BCBS-SC enrollees.

104.    BlueCross BlueShield of Tennessee is the twenty-second largest health insurer in the country by total medical enrollment, with approximately 2.5 million enrollees.  BlueCross BlueShield of Tennessee's Service Area encompasses all 95 counties in Tennessee.  But for the illegal territorial restrictions summarized above, BlueCross BlueShield of Tennessee would be likely to offer its health insurance services and products in South Carolina in competition with BCBS-SC.  Such competition would result in lower health care costs and premiums paid by BCBS-SC enrollees.

105.    BlueCross BlueShield of North Carolina is the twenty-fifth largest health insurer in the country by total medical enrollment, with approximately 3.7 million enrollees.  But for the illegal territorial restrictions summarized above, BlueCross BlueShield of North Carolina would be likely to offer its health insurance services and products in South Carolina in

competition with BCBS-SC. Such competition would result in lower health care costs and premiums paid by BCBS-SC enrollees.

106.    In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in South Carolina but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in South Carolina, the result would be lower costs and thus lower premiums paid by BCBS-SC enrollees.

## The Widespread Use By BCBSA Licensees Of
## Anticompetitive Most Favored Nation Clauses

107.    Over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

108.    MFNs (also known as "most favored customer," "most favored pricing," "most favored discount" or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN-plus" clauses, and typically require the amount to be higher by a specified percentage.

109.    BCBS-SC's use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged. The

MFNs thus reduce competition by eliminating an incentive for BCBS-SC to reduce overhead prices.

110.    Second, MFNs limit competition by preventing other health insurers in South Carolina from achieving lower costs with providers and thereby becoming significant competitors to BCBS-SC.  MFNs establish a price floor below which providers will not sell services to BCBS-SC's competitors; indeed, MFNs enable BCBS-SC to raise that price floor.  This deters cost competition among health insurers in South Carolina.  By reducing the ability of BCBS-SC's competitors to compete against BCBS-SC, MFNs ensure that BCBS-SC can substantially raise premiums while maintaining, or even increasing, its market share.

111.    Moreover, if BCBS-SC is certain that no insurer will pay less to a provider than it will, BCBS-SC will be willing to pay more to that provider than it would otherwise.  The more BCBS-SC agrees to pay that provider, the more BCBS-SC's competitors must pay that provider.  And by raising the price floor, BCBS-SC keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums.  As a result, and because of its market power, BCBS-SC can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from BCBS-SC.

112.    Third, MFNs raise barriers to entry in the market for commercial health insurance.  If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant BCBS-SC, the provider has a strong incentive not to lower prices.  Without the ability to compete on price, a new competitor will be unable to price below BCBS-SC, and thus will be unable to survive.

113.    The independent Blue Cross and Blue Shield licensees, including BCBS-SC, use MFNs

to exploit the monopoly power they hold in their respective Service Areas.  The independent

Blue Cross and Blue Shield licensees, including BCBS-SC, have coordinated their use of

MFNs with other Blue entities.

114.    Use of MFNs and related techniques is widespread and pervasive among Blue plans.  The

member plans of BCBSA have discussed the legality and usefulness of MFNs at BCBSA

gatherings, such as the BCBSA 41st Annual Lawyers Conference, held May 3, 2007 in

Miami, Florida.  There, a presenter informed representatives of the member plans that "DOJ

and FTC have focused on potential anticompetitive character of MFN clauses, particularly on

exclusionary impact" and that "[w]here [an] MFN has overall exclusionary effect on

competition and entrenches market power, it could be actionable."

115.    On October 18, 2010, the U.S. Department of Justice and the Attorney General of

Michigan filed a joint complaint in the United States District Court for the Eastern District of

Michigan, accusing Blue Cross Blue Shield of Michigan ("BCBS-Michigan") of engaging in

a widespread anticompetitive use of MFNs.  In the complaint, the Department of Justice

alleges that BCBS-Michigan "currently has agreements containing MFNs or similar clauses

with at least 70 of Michigan's 131 general acute care hospitals" and that these MFNs were

sought and obtained "in exchange for increases in prices [the insurer] pays for the hospitals'

services," "likely raising prices for health insurance in Michigan."  On March 25, 2011, the

*Wall Street Journal* reported that the U.S. Department of Justice expanded its probe into the

use of MFNs by the member plans of BCBSA to include BCBS-SC, as well as the member

plans operating in the District of Columbia, Kansas, Missouri, Ohio, North Carolina, and

West Virginia.

116.    Like its fellow member plans of BCBSA, BCBS-SC uses MFNs in its contracts with providers.  In a recent *Post and Courier* article, a BCBS-SC spokesman admitted that the insurer's use of MFNs are intended "to ensure that our customers get the best possible pricing for their health care services" and "reflect our intention to obtain the best value for our customers as we possibly can."  Instead, BCBS-SC's use of MFNs has raised the costs of its competitors, protected it from competition (and thereby protected its ever-growing market share), and contributed to the artificial inflation of its health insurance premiums in South Carolina.

In 2006, the South Carolina Legislature repealed a decades-old insurance code, stripping the State's authority to regulate provider contracts between insurers and health care providers.  This deletion allows BCBS-SC to feely negotiate and execute provider contracts that include MFNs, with no review or approval required from the SCDOI.  Since provider agreements or BCBS-SC's use of MFNs are not regulated in South Carolina, these agreements are not filed with the SCDOI and, thus, are not a matter of public record.

### BCBS-SC Market Power In Relevant South Carolina Markets

117.    BCBS-SC has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of South Carolina.

### Relevant Product Market:

118.    The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

119.    To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one

another, i.e., whether, in a competitive market, an increase in the price of one product would increase demand for the second product.  The characteristics of different products are important factors in determining their substitutability.  For a health insurance product, important characteristics include:

120.    Commercial versus government health insurance:  Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent.  Therefore, commercial health insurance and government health insurance programs are not substitutes.

121.    Full-service versus single-service health insurance:    *Full-service* health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers.   In contrast, *single-service* health insurance provides narrow coverage restricted to a specific type of health care, e.g., dental care.  Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, e.g., dental care.  Thus, full-service health insurance and single-service health insurance are not substitutes.

122.    Full-service commercial health insurance includes *HMO* products and *PPO* products, among others.  Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers.  Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees'

39

out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors.  Economic research suggests that HMO and PPO health insurance products *are* substitutes.

123.  <u>Fully-insured health insurance versus ASO products</u>:  When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, e.g., processes medical bills and negotiates discounted prices with providers.  In contrast, when a consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, i.e., able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

124.  <u>Individual, small group, and large group consumers</u>:  Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums.  Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group.  The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees.

125.  For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance

product market.  In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products.  For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure.  Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers.  Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

126.    Data on enrollment in full-service commercial health insurance:    According to the American Medical Association, although 26 companies market and sell individual or small group health insurance in South Carolina, BCBS-SC had 60 percent of the commercial market share.  In Anderson, BCBS-SC has 61 percent of the commercial market.  In Charleston-North Charleston, BCBS-SC has 62 percent of the commercial market.  In Columbia, BCBS-SC has 61 percent of the commercial market.  In Florence, BCBS-SC has 63 percent of the commercial market.  In Greenville, BCBS-SC has 53 percent of the commercial market. In Myrtle Beach-Conway-North Myrtle Beach, BCBS-SC has 65 percent of the commercial market. In Sumter, BCBS-SC has 73 percent. Finally, in Spartanburg, BCBS-SC has 64 percent of the commercial market.

127.    Further, using AMA's data to determine BCBS-SC's share of the relevant product market would only overstate BCBS-SC's market share if BCBS-SC had a disproportionately large share of the large group market.  This is unlikely.  The other major sellers of full-service commercial health insurance in South Carolina are large national insurers, which target

41

consumers that are large national employers and would be large group consumers in South

Carolina.  Furthermore, in 2011, a report from the SCDOI indicates that South Carolina's

largest health insurer (BCBS-SC) actually controls over 62 percent of the relevant market

when considering only individual and small group policies.

128.    Unless otherwise noted, Plaintiffs rely on AMA's enrollment data to calculate BCBS-

SC's share of the relevant product market.  The most recent data available from AMA measures

enrollment as of January 1, 2009.

## Relevant Geographic Markets:

129.    In defining a geographic market, it is important to focus on an essential part of a full-

service commercial health insurer's product: its provider network.  An insurer's provider

network is composed of the health care providers with which it contracts.  Enrollees in both

HMO and PPO full-service commercial health insurance products pay less for an "in-

network" provider's health care services than they would for the same services from an "out

of network" provider.  As a result, health insurance consumers pay special attention to an

insurer's provider network when choosing a health insurance product, preferring insurers

with networks that include local providers.  This suggests that health insurers compete in

distinct geographic markets.

130.    There are a number of different ways to analyze the geographic markets for the sale of

full-service commercial health insurance to individual and small group consumers in South

Carolina.  The potentially relevant geographic markets could be defined alternatively as (a)

the entire state of South Carolina; (b) the eight regions into which AMA market study divides

South Carolina; and (c) the ten regions, known as "Metropolitan Statistical Areas,"  or

thirteen "Micropolitan Statistical Areas," into which the U.S. Office of Management and

42

Budget divides South Carolina.  However the geographic market is defined, the result is the same:  BCBS-SC has the dominant market position, and exercises its market power.

131.    BCBS-SC does business throughout the state of South Carolina, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of South Carolina, and has agreed with the other member plans of BCBSA that only BCBS-SC will do business in South Carolina under the Blue brand.  Therefore, the state of South Carolina can be analyzed as a relevant geographic market within which to assess the effects of BCBS-SC's anticompetitive conduct.

132.    In analyzing the market for commercial health insurance in South Carolina, AMA divides the State into the following seven geographic regions:    Anderson, Charleston-North Charleston, Columbia, Florence, Greenville, Myrtle Beach-Conway-North Myrtle Beach, and Spartanburg.

133.    The U.S. Office of Management and Budget divides the counties of the state of South Carolina into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data.  It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."  Therefore, each of South Carolina's 10 Metropolitan Statistical Areas, 13 Micropolitan Statistical Areas, and the remaining counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-SC's anticompetitive conduct.

43

134.    BCBS-SC's powerful market share is far from the only evidence of its market power.  As alleged below, BCBS-SC's market power has significantly raised costs, resulting in skyrocketing premiums for BCBS-SC enrollees.

135.    Moreover, BCBS-SC's statewide share of the relevant product market has increased each year despite its substantial premium increases.  BCBS-SC's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

### Inflated Premiums Charged By BCBS-SC

136.    BCBS-SC's illegal anticompetitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in South Carolina, leading to artificially inflated and supra-competitive premiums for individuals and small groups purchasing BCBS-SC's full-service commercial health insurance in the relevant geographic markets.  BCBS-SC's market power and its use of MFNs and other anticompetitive practices in South Carolina have reduced the amount of competition in the market and ensured that BCBS-SC's few competitors face higher costs than BCBS-SC does.  Without competition, and with the ability to increase premiums without losing customers, BCBS-SC faces little pressure to keep costs low.

137.    These rising premiums have enabled BCBS-SC to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization.  In 2010, at least three BCBS-SC executives took home $1 million or more in salary, bonuses, and other compensation—then President and CEO M. Edward Sellers (approximately $2.26 million), Senior Vice President Stephen Wiggins (approximately $1.0 million), and Chief Financial Officer Robert Leichtle (approximately $1.3 million).

44

Furthermore, each of the nine members of the BCBS-SC board of directors doubled their reported pay since 2009, according to compensation reports filed with the SCDOI.  Some members increased their pay by as much as 163 percent in one year.  All of the members of the board earned between $100,000 and $160,000 in 2010 for their limited board duties.

## VIOLATIONS ALLEGED

### Count One
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, § 1)

138.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

139.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-SC and BCBSA represent horizontal agreements entered into between BCBS-SC and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

140.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-SC represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

141.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-SC have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-SC) have conspired to restrain trade in violation of Section 1 of the Sherman Act.  These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

142.    The market allocation agreements entered into between BCBS-SC and the thirty-seven

other BCBSA member plans (executed through the BCBSA License Agreements and related

Membership Standards and Guidelines) are anticompetitive.

143.    BCBS-SC has market power in the sale of full-service commercial health insurance to

individuals and small groups in each relevant geographic and product market alleged herein.

144.    Each of the challenged agreements has had substantial and unreasonable anticompetitive

effects in the relevant markets, including but not limited to:

   a. Reducing the number of health insurance companies competing with BCBS-

      SC throughout South Carolina;

   b. Unreasonably limiting the entry of competitor health insurance companies

      into South Carolina;

   c. Allowing BCBS-SC to maintain and enlarge its market power throughout

      South Carolina;

   d. Allowing BCBS-SC to raise the premiums charged to consumers by

      artificially inflated, unreasonable, and supra-competitive amounts;

   e. Depriving consumers of health insurance of the benefits of free and open

      competition.

145.    The procompetitive benefits, if any, of the market allocation agreements alleged above do

not outweigh the anticompetitive effects of those agreements.

146.    The market allocation agreements in the License Agreements, Membership Standards,

and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

147.    As a direct and proximate result of BCBS-SC's continuing violations of Section 1 of the

Sherman Act, Plaintiffs and other members of the South Carolina Class have suffered injury

and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-SC than they would have paid with increased competition and but for the Sherman Act violations.

148.    Plaintiffs and the Class seek money damages from BCBS-SC and BCBSA for their violations of Section 1 of the Sherman Act.

**Count Two**
(MFNs; Violation of Sherman Act, § 1)

149.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

150.    BCBS-SC has market power in the sale of commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

151.    The provider agreements BCBS-SC entered into between BCBS-SC and health care providers in South Carolina which contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of Section 1 of the Sherman Act.

152.    Each of the BCBS-SC provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

      a.    Raising the prices of health care services to commercial health insurers in competition with BCBS-SC;

      b.    Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBS-SC from obtaining competitive pricing from health care providers;

c.  Unreasonably restricting the ability of health care providers to offer to BCBS-SC's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

d.  Depriving consumers of health care services and health insurance of the benefits of free and open competition.

153.   The procompetitive benefits, if any, of the BCBS-SC provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

154.   Each agreement between BCBS-SC and a health care provider that contains an MFN unreasonably restrains trade in violation of Section 1 of the Sherman Act.

155.   As a direct and proximate result of BCBS-SC's continuing violations of Section 1 of the Sherman Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial.   These damages consist of having paid higher health insurance premiums to BCBS-SC than they would have paid but for the Sherman Act violations.

156.   Plaintiffs and the Class seek money damages from BCBS-SC for its violations of Section 1 of the Sherman Act.

### Count Three
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, § 2)

157.   Plaintiffs repeat and reallege the allegations in all Paragraphs above.

a.  BCBS-SC has monopoly power in the individual and small group full-service commercial health insurance market in South Carolina.  This monopoly power is evidenced by, among other things:BCBS-SC's ability to enter into MFN

agreements with providers, which evidences BCBS-SC's ability to control prices and exclude competitors;

b.  BCBS-SC's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

158.    BCBS-SC has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

159.    BCBS-SC's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act.

160.    As a direct and proximate result of BCBS-SC's continuing violations of Section 2 of the Sherman Act, Plaintiffs and other members of the South Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to BCBS-SC than they would have paid but for the Sherman Act violations.

161.    Plaintiffs and the South Carolina Class seek money damages from BCBS-SC for its violations of Section 2 of the Sherman Act.

**Count Four**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, § 2

162.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

163.    BCBS-SC has acted with the specific intent to monopolize the relevant markets.

164.    There was and is a dangerous possibility that BCBS-SC will succeed in its attempt to monopolize the relevant markets because BCBS-SC already controls a large percentage of

those markets.  Further success by BCBS-SC in excluding competitors from those markets will confer a monopoly on BCBS-SC in violation of Section 2 of the Sherman Act.

165.    BCBS-SC's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Class.  Premiums charged by BCBS-SC have been higher than they would have been in a competitive market.

166.    Plaintiffs and the South Carolina Class have been damaged as the result of BCBS-SC's attempted monopolization of the relevant markets.

**Count Five**
(Arrangement, Agreement, Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of South Carolina Code of Laws, § 39-3-10)

167.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

168.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-SC and BCBSA represent horizontal agreements entered into between BCBS-SC and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

169.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-SC represents a contract, arrangement, agreement, trust combination, or conspiracy within the meaning of South Carolina Code of Laws, § 39-3-10.

170.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-SC have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members.  By so doing, the BCBSA members (including BCBS-SC) have conspired to restrain trade in violation of South Carolina Code of Laws, § 39-3-10.  These market allocation agreements are *per se* illegal under South Carolina Code of Laws, § 39-3-10.

50

171.    The market allocation agreements entered into between BCBS-SC and the thirty-seven

other BCBSA member plans (executed through the BCBSA License Agreements and related

Membership Standards and Guidelines) are anticompetitive.

172.    BCBS-SC has market power in the sale of full-service commercial health insurance to

individuals and small groups in each relevant geographic and product market alleged herein.

173.    Each of the challenged agreements has had substantial and unreasonable anticompetitive

effects in the relevant markets, including but not limited to:

      a.  Reducing the number of health insurance companies competing with BCBS-

SC throughout South Carolina;

      b.  Unreasonably limiting the entry of competitor health insurance companies

into South Carolina;

      c.  Allowing BCBS-SC to maintain and enlarge its market power throughout

South Carolina;

      d.  Allowing BCBS-SC to raise the premiums charged to consumers by

artificially inflated, unreasonable, and supra-competitive amounts;

      e.  Depriving consumers of health insurance of the benefits of free and open

competition.

174.    The procompetitive benefits, if any, of the market allocation agreements alleged above do

not outweigh the anticompetitive effects of those agreements.

175.    The market allocation agreements in the License Agreements, Membership Standards,

and Guidelines unreasonably restrain trade in violation of South Carolina Code of Laws, §

39-3-10.

176.    As a direct and proximate result of BCBS-SC's continuing violations of South Carolina Code of Laws, § 39-3-10, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of reduced competition and higher health insurance premiums than otherwise would have been available with increased competition, but for the South Carolina Code of Laws, § 39-3-10 violations.

177.    Plaintiffs and the South Carolina Class seek money damages from BCBS-SC and BCBSA for their violations of South Carolina Code of Laws, § 39-3-10.

### Count Six
(MFNs; Violation of South Carolina Code of Laws, § 39-3-10)

178.    Plaintiffs repeat and reallege the allegations in  all Paragraphs above.

179.    BCBS-SC has market power in the sale of commercial health insurance to individuals and small groups in each relevant geographic market alleged herein.

180.    The provider agreements BCBS-SC entered into between BCBS-SC and health care providers in South Carolina that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of South Carolina Code of Laws, § 39-3-10.

181.    Each of the BCBS-SC provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.    Raising the prices of health care services to commercial health insurers in competition with BCBS-SC;

    b.    Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBS-SC from obtaining competitive pricing from health care providers;

52

c.  Unreasonably restricting the ability of health care providers to offer to BCBS-SC's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

d.  Depriving consumers of health care services and health insurance of the benefits of free and open competition.

183.  The procompetitive benefits, if any, of the BCBS-SC provider agreements containing MFN provisions do not outweigh the anticompetitive effects of the agreements.

184.  Each agreement between BCBS-SC and a health care provider that contains an MFN unreasonably restrains trade in violation of South Carolina Code of Laws, § 39-3-10.

185.  As a direct and proximate result of BCBS-SC's continuing violations of South Carolina Code of Laws, § 39-3-10, Plaintiffs and other members of the South Carolina Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to BCBS-SC than they would have paid but for the South Carolina Code of Laws, § 39-3-10 violations.

186.  Plaintiffs and the South Carolina Class seek money damages from BCBS-SC for its violations of South Carolina Code of Laws, § 39-3-10.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

a.  Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23;

b.  Adjudge and decree that BCBSA and BCBS-SC have violated both Section 1 and Section 2 of the Sherman Act;

c.      Reform any agreements between BCBS-SC and health care providers so as to strike any MFN clauses as void and unenforceable;

d.      Decree that BCBS-SC has violated South Carolina Code of Laws § 39-3-10 and award Plaintiffs and Class appropriate damages and relief;

e.      Award Plaintiffs and Class damages in the form of three times the amount by which premiums charged by BCBS-SC have been artificially inflated above their competitive levels during the Class Period;

f.      Award compensatory damages to Plaintiff and Class resulting from the various wrongful acts under the statutory laws of South Carolina, in such amounts as represent the losses reasonably suffered by Plaintiffs and Class;

g.      Decree that BCBS-SC has been unjustly enriched by its wrongful conduct, and award restitution to Plaintiffs and Class;

h.      Award Plaintiffs and Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity.

i.      Award costs and attorneys' fees to Plaintiffs;

j.      Award any such other and further relief as may be just and proper.

This 13th day of December, 2012.

*SIGNATURES NEXT PAGE*

54

Respectfully submitted,

*/s/ Janet Brooks Holmes*

Janet Brooks Holmes (Fed. ID No. 4822)
Temus C. Miles, Jr. (Fed. ID No 10753)
**MCKAY, CAUTHEN, SETTANA & STUBLEY, P.A.**
1303 Blanding Street,
P.O. Drawer 7217
Columbia, SC 29202
(803) 256-4645
Email: *janetholmes1@mac.com*

Columbia, South Carolina          Email: *tmiles@mckayfirm.com*
December 13, 2012                  *Attorneys for Plaintiffs and the Proposed Class*

**OF COUNSEL:**

Chris T. Hellums, Esquire
**PITTMAN, DUTTON & HELLUMS, P.C.**
2001 Park Place North
1100 Park Place Tower
Birmingham, Alabama 35203
(205) 322-8880
Email: *chrish@pittmandutton.com*
*Attorneys for Plaintiffs and the Proposed Class*

William A. Isaacson, Esquire
**BOIES, SCHILLER & FLEXNER, LLP**
5301 Wisconsin Avenue NW
Washington, DC 20015
Telephone: 202-237-2727
Fax: 202-237-6131
Email: *wisaacson@bsfllp.com*
*Attorneys for Plaintiffs and the Proposed Class*

Edgar D. Gankendorff, Esquire
**PROVOSTY & GANKENDORFF, L.L.C.**
Attorneys and Counselors at Law
650 Poydras Street, Suite 2700
New Orleans, LA  70130
Telephone: (504) 410-2795
Fax: (504) 410-2796
*Attorneys for Plaintiffs and the Proposed Class*



A TRUE COPY
ATTEST: LARRY W. PROPES, CLERK

BY:

DEPUTY CLERK

55

Ben Gordon, Esquire
**LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY & PROCTOR, P.A.**
316 S. Baylen Street, Suite 600
Pensacola, FL  32502
Telephone: (850) 435-7000
Email: _bgordon@levinlaw.com_
*Attorneys for Plaintiffs and the Proposed Class*

Cy Smith, Esquire
**ZUCKERMAN SPAEDER, LLP**
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Telephone: (410) 949-1145
Email: *csmith@zuckerman.com*
*Attorneys for Plaintiffs and the Proposed Class*