# EXHIBIT A

JJV

**U.S. District Court**
**Eastern District of Arkansas (Little Rock)**
**CIVIL DOCKET FOR CASE #: 4:12-cv-00773-JMM**

Sosebee v. USAble Mutual Insurance Company | Date Filed: 12/13/2012
Assigned to: Judge James M. Moody | Jury Demand: Plaintiff
Case in other court: Circuit Court of Pulaski County, 60CV- | Nature of Suit: 410 Anti-Trust
12-05368 | Jurisdiction: Federal Question
Cause: 28:1446 Petition for Removal-ERISA

**Plaintiff**

**William Lee Sosebee**                    represented by  **Mitchell Lloyd Berry**
*Individually and on behalf of all others*                 Eichenbaum Liles P.A.
*similarly situated*                                       Union National Plaza
                                                           124 West Capitol Avenue
                                                           Suite 1900
                                                           Little Rock, AR 72201-3736
                                                           (501) 376-4531
                                                           Email: mberry@elhlaw.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Patrick Pendley**
                                                           Pendley, Baudin & Coffin, LLP
                                                           Post Office Drawer 71
                                                           Plaquemine, LA 70765-0071
                                                           (225) 687-6396
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USAble Mutual Insurance Company**
*doing business as*
Arkansas Blue Cross and Blue Shield

| Date Filed | # | Docket Text |
|---|---|---|
| 12/13/2012 | 1 | NOTICE OF REMOVAL by USAble Mutual Insurance Company from the Circuit Court of Pulaski County, case number 60CV-2012-5368. Filing fee of $350 paid, receipt #LIT037353. (Attachments: # 1 Civil Cover Sheet).(dmn) (Docket entry modified on 12/14/2012 to correct the file date.) (thd). (Entered: 12/14/2012) |
| 12/13/2012 | 2 | COMPLAINT with Jury Demand against USAble Mutual Insurance Company |

| | | |
|---|---|---|
| | | filed by William Lee Sosebee.(dmn) (Entered: 12/14/2012) |
| 12/14/2012 | | NOTICE OF DOCKET CORRECTION re: 1 Notice of Removal. CORRECTION: The docket entry was modified to correct the file date to 12/13/2012, as marked on the document. (thd) (Entered: 12/14/2012) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/15/2012 17:25:29 | | |
| **PACER Login:** ke1159 | **Client Code:** | 20098-0203/43911 |
| **Description:** Docket Report | **Search Criteria:** | 4:12-cv-00773-JMM |
| **Billable Pages:** 1 | **Cost:** | 0.10 |

ELECTRONICALLY FILED
2012-Nov-14  15:45:34
60CV-12-5368

## IN THE CIRCUIT COURT OF PULASKI, ARKANSAS
## _____ DIVISION

WILLIAM LEE SOSEBEE, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED                                                    PLAINTIFFS

V.                              CASE NO. _____

USABLE MUTUAL INSURANCE COMPANY D/B/A
ARKANSAS BLUE CROSS AND BLUE SHIELD                   DEFENDANTS

### COMPLAINT

COMES now, William Lee Sosebee ("Plaintiff"), individually and on behalf of all others similarly situated, by and through the undersigned counsel, Eichenbaum Liles P.A., and for his cause of action against, USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield ("AR-BCBS"), states:

### I.      NATURE OF ACTION

1.      This is a class action brought on behalf of subscribers of USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield for damages and restitution. Specifically, this action seeks to recover damages in the form of a refund of inflated premiums that AR-BCBS has charged Arkansas subscribers as a result of an ongoing conspiracy in violation of the "Arkansas Deceptive Trade Practices Act," Ark. Code Ann. § 4-88-101, *et seq.*, and the "Trade Practices Act" regarding trade practices in the business of insurance, Ark. Code Ann. § 23-66-201, *et seq.* between the thirty-seven (37) other Blue Cross Blue Shield Association ("BCBSA") member health plans, and as a result of anti-competitive conduct AR-BCBS has engaged in to establish and maintain monopoly power throughout Arkansas.

2.      AR-BCBS is by far the largest health insurance company operating in Arkansas, and currently exercises market power in the commercial health insurance market throughout

Arkansas. According to the American Medical Association, 53 percent of the Arkansas residents who enroll in commercial health insurance (group plans and individual policies) are subscribers of AR-BCBS - vastly more than the next largest full-service commercial insurer, United Healthcare Insurance Company, which carries just 23 percent of such subscribers. In some areas of Arkansas, the market concentration for AR-BCBS is as high as 69 percent.

3.     The dominant market share enjoyed by AR-BCBS is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with AR-BCBS, and that AR-BCBS will have the exclusive right to do business in the State of Arkansas, so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including AR-BCBS. Through the terms of these *per se* illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including AR-BCBS, have explicitly agreed not to compete with one another, in direct violation of Arkansas Law, specifically Ark. Code Ann. § 4-88-101, *et seq.* and § 23-66-101, *et seq.* By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.     AR-BCBS's illegal conspiracy has perpetuated its monopoly power throughout Arkansas, which has resulted in skyrocketing premiums for Arkansas AR-BCBS enrollees for over a decade. AR-BCBS's anti-competitive behavior, and the lack of competition AR-BCBS faces because of its monopoly power and anti-competitive behavior, has led to higher costs,

resulting in higher premiums charged to AR-BCBS customers. As a result of these inflated premiums, AR-BCBS now has a surplus of more than $580 million.

5.       These inflated premiums would not be possible if the market for health insurance III Arkansas were truly competitive. Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as AR-BCBS and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Louisiana.

## II.       JURISDICTION AND VENUE

6.       This Court has jurisdiction over this action and venue is proper because Plaintiff, inter alia: (1) entered into contracts with AR-BCBS for health insurance in this County; (2) Plaintiff received inflated premium bills from AR-BCBS in this County; (3) Plaintiff paid AR-BCBS's inflated premium bills in this County; and (4) Plaintiff unjustly enriched AR-BCBS in this County in the form of inflated premium bills from AR-BCBS.

## III.       PARTIES

### A.       Plaintiffs

7.       Plaintiff, William Lee Sosebee, is a citizen and resident of Pulaski County, Arkanas. Plaintiff had an individual health insurance policy with, and paid premiums to AR-BCBS from 1998 until 2012.

### B.       Defendants

8.       Defendant AR-BCBS, is a domestic corporation, which may be served through its registered agent for service of process with the Arkansas Insurance Department, Lee Douglas, P.O. Box 2181, Little Rock, Arkansas 72203-2181. AR-BCBS is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arkansas. Like

other Blue Cross and Blue Shield plans nationwide, AR-BCBS is the largest health insurer in the State of Arkansas, as measured by number of subscribers, within its service area, which is defined as the state of Arkansas. AR-BCBS's service area encompasses all 75 counties in Arkansas.

### C.    Co-conspirators

9.    Blue Cross Blue Shield Association ("BCBSA") is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-eight (38) health insurance plans, including BSBS-LA, that operate under the "Blue Cross and Blue Shield" trademarks and trade names. AR-BCBS was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million -or one in three - Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

### IV.    TRADE AND COMMERCE

10.    AR-BCBS and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.

11.    The conduct of AR-BCBS has substantial effects on trade and commerce in the State of Arkansas.

## V.   CLASS ACTION ALLEGATIONS

12.     This action is brought and maintained as a class action pursuant to the provisions

of Ark. R. Civ. P. 23. The Plaintiff brings this action on behalf of herself, and on behalf of all

others similarly situated, as representative of the following proposed class:

> All persons and entities who paid health insurance premiums to
> AR-BCBS for individual or small group full-service commercial
> health insurance at any time since June 6, 2002. A small group
> full-service commercial health insurance plan is defined as any
> plan which provides health insurance benefits for a group
> consisting of 3-199 persons or employees.

Plaintiff reserves the right to amend the class definition as appropriate after class discovery is

completed.

13.     The Class is so numerous and geographically dispersed in the State of Arkansas

that joinder of all members is impracticable. While Plaintiff does not know the number and

identity of all members of the Class, Plaintiff believes that there are tens of thousands of Class

members, the exact number and identities of which can be obtained from AR-BCBS.

14.     There are questions of law or fact common to the Class, including but not limited

to:

> a. Whether the restrictions set forth in the BCBSA license agreements are *per se*
> violations of Ark. Code Ann. § 4-88-101, *et seq..* or are otherwise prohibited
> under Ark. Code Ann. § 23-66-201, *et seq.*;
>
> b. Whether, and the extent to which, premiums charged by AR-BCBS to class
> members have been artificially inflated as a result of the illegal restrictions in the
> BCBSA license agreements;
>
> c. Whether the use of Most Favored Nation ("MFN") provisions in the AR-BCBS
> provider agreements is anti-competitive, by raising barriers of entry and by
> increasing the costs of care and insurance;
>
> d. Whether, and the extent to which, premiums charged by AR-BCBS have been
> artificially inflated as a result of the anti-competitive practices adopted by AR-
> BCBS.

5

15.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

16.     Plaintiff is a member of the Class; Plaintiffs claims are typical of the claims of the members of the Class; and, Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff was a direct purchaser of individual or small group full-service commercial health insurance from AR-BCBS, and his interests coincide with and are not antagonistic to other members of the Class. In addition, Plaintiff has retained and is represented by counsel who are competent, experienced, and will fairly and adequately represent the interests of the class.

17.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for AR-BCBS.

18.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which AR-BCBS has records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would produce. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

6

## VI.    FACTUAL BACKGROUND

### A.    General Background and Summary of Allegations

19.    AR-BCBS enjoys unrivaled market dominance within Arkansas, enrolling approximately 53 percent of the subscribers of full-service commercial health insurance plans. When considering full-service preferred provider organization ("PPO") subscribers alone, AR-BCBS's market dominance is also 53 percent.    When considering full-service Health Maintenance Organization ("HMO") subscribers only, AR-BCBS market dominance is even greater, as nearly 68 percent of full-service HMO plan subscribers statewide are enrolled with AR-BCBS.

20.    AR-BCBS's market dominance in Arkansas is the result of a conspiracy between AR-BCBS and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States. That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA. As detailed herein, the member health insurance plans of BCBSA, including AR-BCBS, entered into a series of licensing arrangements that have insulated AR-BCBS and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

21.    This series of agreements has enabled AR-BCBS to acquire and maintain a grossly disproportionate market share for health insurance products in Arkansas, where AR-BCBS enjoys market and monopoly power. The situation in Arkansas is not unique, however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

7

22.     AR-BCBS has used its market and monopoly power in Louisiana to engage in a number of anti-competitive practices. For example, upon information and belief, AR-BCBS has required key health care providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with AR-BCBS. These clauses ensure that AR-BCBS receives the best pricing for health care services in the market. If a health care provider does not agree to the MFN, that provider will not remain in or become a part of AR-BCBS's network, which is generally an unacceptable result because AR-BCBS controls the vast majority of subscribers in Louisiana. Faced with this prospect, providers capitulate to AR-BCBS's demands, including MFNs.

23.     The MFN s restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

24.     Because the BCBSA licensing agreements exclude rival health insurance plans from the market and AR-BCBS's MFNs ensures that its competitors may not negotiate lower health care provider costs, AR-BCBS faces little pressure to constrain its own costs. The MFN, by limiting the ability of an insurer to compete with AR-BCBS, thus also compounds the exclusion of AR-BCBS's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products. With few other health insurance plan options to compete with, AR-BCBS can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan. The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by AR-BCBS with health care providers.

25.     Upon information and belief, because AR-BCBS has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, health care providers have responded by increasing prices to cover the discounts that AR-BCBS

8

receives through its MFNs. Thus, what was supposed to be a discount turns out to be a premium

to providers, thereby artificially raising prices for health care services. Again, consumers lose.

26.     AR-BCBS's anti-competitive practices, by reducing the *choices* available to

health insurance consumers and increasing the *cost* of health care in Arkansas, have raised the

*premiums* that Arkansas residents must pay to obtain health insurance. AR-BCBS's rival health

insurance plans are excluded from the market, and the few rival plans that have broken into the

Louisiana market must pay significantly higher rates to health care providers.

27.     The skyrocketing cost of AR-BCBS health insurance coverage in Arkansas tells

the story of AR-BCBS's abuse of its market and monopoly power at the expense of health care

consumers in Arkansas.

**B.     History of the Blue Cross and Blue Shield Plans and of BCBSA**

28.     The history of the Blue Cross and Blue Shield plans demonstrates that the plans

arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a

coordinated effort to create a national brand that each would operate within its local area, and

that they quickly developed into local monopolies in the growing market for health care

coverage. While originally structured as non-profit organizations since the 1980s, these local

"Blue" plans have increasingly operated as for-profit entities: either by formally converting to

for-profit status, or by generating substantial surpluses.

29.     The history of BCBSA demonstrates that it was created by the local Blue plans

and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the

origin of the geographic restrictions in its trademark licenses was an effort to avoid competition

between the various Blue plans, and to ensure that each Blue plan would retain a dominant

position within its local service area.

C.     **Development of the Blue Cross Plans**

30.     In 1934, an administrator named E.A. von Steenwyck helped develop a pre-paid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other pre-paid hospital plans began independently using the Blue Cross symbol.

31.     In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that pre-paid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

32.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

33.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Contrary to the principles that plans would not compete and that plans would not operate in each others' service areas, the independently formed pre-paid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each others' territories. The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior

10

to publication, describe the heated competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals.... Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example....John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown.... By then there were also eight Plans in New York and four in West Virginia.... Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

34.     For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust,* which was funded by the Blue Cross Association, a predecessor to BCBSA. Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

35.     By 1975, the Blue Cross plans had a total enrollment of 84 million.

**D.      Development of the Blue Shield Plans**

36.     The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society

11

plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

37.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

38.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

39.     By 1975, the Blue Shield plans had a total enrollment of 73 million.

**E.     Creation of the Blue Cross and Blue Shield Association**

40.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

41.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies. While the Blues remained dominant in most markets, this growth of competition

was a threat. In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

42.     From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

43.     Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war. As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days ... pure, unadulterated hatred of each other."

44.     To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names. In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

45.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

46.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

47.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

48.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

49.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today. However, the goals did not end competition between Blue plans. In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

50.     During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses. In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

14

51.     In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities. As a result, many member plans converted to for-profit status. One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures. While nominally still characterized as not-for-profit, AR-BCBS and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses -often in the multi-million dollar range.

52.     From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially. As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans -an increasing "problem" that had caused complaints from many Blue plans.

53.     Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

54.     At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as

15

the ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

**F.    Allegations Demonstrating Control of BCBSA by Member Plans**

55.    BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

56.    BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

57.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass 'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

58.    The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current chairman of the Board of Directors, Daniel J. Locpp, is also the current President and CEO of Blue Cross Blue Shield of Michigan. The Board of Directors of BCBSA meets at least annually.

**G.    License Agreements and Restraints on Competition**

59.    The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three independent members.

60.    The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [ an] applicant ... must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

61.    The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to a brief BCBSA filed during litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

62.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state

17

that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

63.     Under the terms of the License Agreements a plan "agrees ... to comply with the Membership Standards." The Guidelines state that the Membership Standards and the Guidelines "were developed by the PPFSC and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective. " unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

64.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan

18

CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

65.    The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and "Sanctions" -each of which is administered by the PPFSC and could result in the termination of a member plan's license.

66.    The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice -first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

**H.    Horizontal Agreements**

67.    The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and

regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

68.     Each BCBSA licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

69.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States. The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen (15) of the twenty-five (25) largest health insurance companies in the country are BCBSA licensees. On its website, BCBSA asserts that its members together provide "coverage for more than 99 million individuals -one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

70.     In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other -and each other's parent Blue Plans -in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and

> saturated market. New forms of competition were springing up at every turn and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed ....

71.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 1O-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages ...."

72.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

I.      **The Horizontal Agreements Not to Compete in the Licensing Arrangements Between BCBSA and Member Plans, Including AR-BCBS, are *per se* Violations of the Arkansas "Trade Practices Act" that Regulate Trade Practices in the Business of Insurance, Ark. Code Ann. § 22-66-201, *et seq.* and the Arkansas "Deceptive Trade Practices Act," Ark. Code Ann. § 4-88-101, *et seq.***

73.     The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the

geographic market for health insurance. As such, they are a *per se* violation of the Arkansas "Trade Practices Act" that Regulate Trade Practices in the Business of Insurance, Ark. Code Ann. § 22-66-201, *et seq.* and the Arkansas "Deceptive Trade Practices Act," Ark. Code Ann. § 4-88-101, *et seq.*

74.    Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

75.    Through the Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

76.    Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding

22

Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

77.   The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

78.   In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive *none* of its revenue from services offered under the Blue brand outside of that area, and will derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be

further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

79.    The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore result for unreasonable restraint of, or monopoly in, the business of insurance.  Ark. Code Ann. § 23-66-205 provides that no person shall engage in any trade practice which is defined or determined to be an unfair method of competition or an unfair or (deceptive act) or practice in business of insurance.  Ark. Code Ann. § 23-66-206 then states that the following are defined as unfair methods of competition and unfair or "deceptive acts or practices" in the business of insurance: "entering into any agreement to commit or, by any concerted action, committing any act of boycott, coercion, or intimidation resulting in or intending to result in unreasonable restraint of, or monopoly in, the business of insurance [.]" Thus, the Blue Plans, including ARBCBS, deceptive acts or practices in the business of insurance.  The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.* prohibits engaging in any unconscionable, false or deceptive act or practice in business, commerce, or trade.  Ark. Code Ann. § 4-88-107(a)(10).  Furthermore, Ark. Code Ann. § 4-88-107(b) provides that other statutes of this state may define what trade practices are considered deceptive and unconscionable.  Since Ark. Code Ann. § 23-66-206(1) has already defined the monopolistic acts of ARBCBS as "deceptive," those acts are also deemed deceptive under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.*  Section 4-88-113(f) of the Arkansas Deceptive Trade Practices Act provides that if any person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter has a cause of action to recover actual damages, if appropriate, and reasonable attorneys' fees.  Thus,

the Plaintiff, on his own behalf an on the behalf of all other similarly situated, brings this private cause of action.

80.    More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions. For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

81.    The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business. Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

82.    Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed,

administered, or underwritten through use of the Blue Cross Blue Shield name and mark."
Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which
we will be able to expand our health care operations, whether through acquisitions of existing
managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue
Cross Blue Shield name and mark is already present."

83.     Despite these public admissions, both BCBSA and its member plans have
attempted to keep the territorial restrictions as secret as possible. When asked by the Insurance
Commissioner of Pennsylvania to "[p ]lease describe any formal or informal limitations that
BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of
subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA
licensed companies may compete anywhere with non-Blue branded business .... The rules on
what the plans do in this regard are contained in the license. However, the license terms
themselves are proprietary to BCBSA, and ... we would prefer not to share such trade secrets
with BCBSA's competitors."

84.     The member plans of BCBSA have agreed to impose harsh penalties on those that
violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the
territorial restrictions could face "[l]icense and membership termination." If a member plan's
license and membership are terminated, it loses the use of the Blue brands, which BCBSA
admits on its website are "the most recognized in the health care industry." In addition, in the
event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17,
2011 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of
December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield
presence in the vacated service area."

26

85.     In sum, a terminated licensee would: (a) lose the brand through which it derived the majority of its revenue; and (b) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

86.     It is unsurprising, then, that most member plans do not operate outside of their Service Areas. The territorial restrictions have therefore barred all competition by all of the Blue plans (other than AR-BCBS) from the Arkansas commercial health insurance market.

87.     Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth -exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California. In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent. In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries. By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states. For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them. This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas. During those same years, UniCare experienced virtually no

growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire Blue Cross Blue Shield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period. In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of Well Point).

88.     In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

89.     Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

## J.     The Anti-competitive Acquisition Restrictions in BCBSA Licensing Agreements

90.     In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which AR-BCBS and the other independent Blue Cross and Blue

Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

91.    First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

92.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i. e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate automatically: (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to

29

5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

93.     These acquisition restraints reduce competition in violation of Ark. Code Ann. § 23-66-5201, *et seq.* and § 4-88-101, *et seq.,* Louisiana anti-monopoly and antitrust laws, because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

94.     Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the

period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

95.     By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is to tend to lessen or to lessen competition and higher premium costs for consumers, including enrollees of AR-BCBS.

**K.     The BCBSA Licensing Agreements Have Reduced Competition in Arkansas**

96.     AR-BCBS, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines. Many of the member plans with which AR-BCBS has conspired would otherwise be significant competitors of AR-BCBS in Arkansas.

97.     For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding cities, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products

in Arkansas in competition with AR-BCBS. Such competition would have resulted in lower health care costs and premiums paid by AR-BCBS enrollees such as Plaintiff herein.

98.     Over 55 percent of Mississippi residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of. Mississippi -vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Arkansas would be likely to offer its health insurance services and products in Louisiana in competition with AR-BCBS. Such competition would result in lower health care costs and premiums paid by AR-BCBS enrollees.

99.     Likewise, approximately 54 percent of Louisiana residents who subscribe to full-service commercial insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of Louisiana - vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Louisiana would be likely to offer its health insurance services and products in Arkansas in competition with AR-BCBS. Such competition would result in lower health care costs and premiums paid by AR-BCBS enrollees.

100.     Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Arkansas in competition with AR-

BCBS. Such competition would result in lower health care costs and premiums paid by AR-BCBS enrollees.

101.    In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Louisiana but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in Louisiana, the result would have been lower costs and thus lower premiums paid by AR-BCBS enrollees, including Plaintiff.

L.    **The Widespread Use by BCBSA Licensees of Anti-competitive Most Favored Nation Clauses**

102.    Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

103.    MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFN s that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN plus" clauses, and typically require the amount to be higher by a specified percentage.

104.    Upon information and belief, AR-BCBS's use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged. The MFNs thus reduce competition by eliminating an incentive for AR-BCBS to reduce overhead prices.

33

105.    Second, MFNs limit competition by preventing other health insurers in Arkansas from achieving lower costs with providers and thereby becoming significant competitors to AR-BCBS. MFNs establish a price floor below which providers will not sell services to AR-BCBS's competitors; indeed, MFNs enable AR-BCBS to raise that price floor. This deters cost competition among health insurers in Arkansas. By reducing the ability of AR-BCBS's competitors to compete against AR-BCBS, MFNs ensure that AR-BCBS can substantially raise premiums while maintaining, or even increasing, its market share.

106.    Moreover, upon information and belief, if AR-BCBS is certain that no insurer will pay less to a provider than it will, AR-BCBS will be willing to pay more to that provider than it would otherwise. The more AR-BCBS agrees to pay that provider, the more AR-BCBS's competitors must pay that provider. And by raising the price floor, AR-BCBS keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums. As a result, and because of its market power, AR-BCBS can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from AR-BCBS.

107.    Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant AR-BCBS, the provider has a strong incentive not to lower prices. Without the ability to compete on price, a new competitor will be unable to price below AR-BCBS, and thus will be unable to survive.

108.    Upon information and belief, the independent Blue Cross and Blue Shield licensees, including AR-BCBS, use MFNs to exploit the monopoly power they hold in their

34

respective Service Areas. The independent Blue Cross and Blue Shield licensees, including AR-BCBS, have coordinated their use of MFNs with other Blue entities.

**M.    AR-BCBS Market Power in Relevant Louisiana Markets**

109.    AR-BCBS has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the State of Arkansas.

**VII.    RELEVANT PRODUCT MARKET**

110.    The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

111.    To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.,* whether, in a competitive market, an increase in the price of one product would increase demand for the second product. The characteristics of different products are important factors in determining their substitutability. For a health insurance product, important characteristics include:

112.    <u>Commercial versus government health insurance</u>: Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent. Therefore, commercial health insurance and government health insurance programs are not substitutes.

113.    <u>Full-service versus single-service health insurance</u>: *Full-service* health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers. In contrast, *single-service* health insurance provides

35

narrow coverage restricted to a specific type of health care, *e.g.*, dental care. Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, *e.g.*, dental care. Thus, full-service health insurance and single-service health insurance are not substitutes.

114. Full-service commercial health insurance includes *HMO* products and PPO products, among others. Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers. Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors. Economic research suggests that HMO and PPO health insurance products *are* substitutes.

115. Fully-insured health insurance versus ASO products: When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers. In contrast, when a consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only. Therefore, fully-insured health insurance products and ASO products are only substitutes for

those consumers able to self-insure, *i.e.,* able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

116.   Individual, small group, and large group consumers: Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees.

117.   For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products. For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure. Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

118.   Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although Arkansas licenses numerous companies to offer some type of health insurance in Arkansas, Blue Cross had 53 percent of the commercial market share.

37

In Jonesboro and Pine Bluff, Arkansas, for example, AR-BCBS has 69 percent of the commercial market; while its nearest competitor, United Healthcare, has 14 percent.

## VIII.   RELEVANT GEOGRAPHIC MARKETS

119.    In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network. An insurer's provider network is composed of the health care providers with which it contracts. Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider. As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers. This suggests that health insurers compete in distinct geographic markets.

120.    There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in Arkansas. The potentially relevant geographic markets could be defined alternatively as (a) the entire state of Arkansas; (b) the eight regions, known as "Metropolitan Statistical Areas," or seventeen "Micropolitan Statistical Areas," into which the U.S. Office of Management and Budget divides Arkansas. However the geographic market is defined, the result is the same: AR-BCBS has the dominant market position, and exercises market power.

121.    AR-BCBS does business throughout the State of Arkansas, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the State of Arkansas, and has agreed with the other member plans of BCBSA that only AR-BCBS will do business in

38

Arkansas under the Blue brand. Therefore, the State of Arkansas can be analyzed as a relevant geographic market within which to assess the effects of AR-BCBS's anti-competitive conduct.

122.    The U.S. Office of Management and Budget divides the counties of the State of Arkansas into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of Arkansas's six Metropolitan Statistical Areas, seventeen Micropolitan Statistical Areas, and the remaining counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of AR-BCBS's anti-competitive conduct.

123.    AR-BCBS's powerful market share is far from the only evidence of its market power. As alleged below, AR-BCBS's market power has significantly raised costs, resulting in skyrocketing premiums for AR-BCBS enrollees.

124.    Moreover, AR-BCBS's statewide share of the relevant product market has increased each year despite its substantial premium increases. AR-BCBS's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

## IX.    INFLATED PREMIUMS CHARGED BY AR-BCBS

125.    For at least the past ten years, AR-BCBS's illegal anti-competitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Arkansas, leading to artificially-inflated and supra-competitive premiums for individuals and small groups purchasing AR-BCBS's full-service

commercial health insurance in the relevant geographic market(s). Upon information and belief, AR-BCBS's market power and its use of MFNs and other anti-competitive practices in Arkansas have reduced the amount of competition in the market and ensured that AR-BCBS's few competitors face higher costs than AR-BCBS does. Without competition, and with the ability to increase premiums without losing customers, AR-BCBS faces little pressure to keep costs low.

126.    These rising premiums have enabled AR-BCBS to grow its surplus in excessive amounts, which is an unusual practice for a self-described nonprofit organization.

## X.    CAUSES OF ACTION

## COUNT ONE

### (Arkansas Deceptive Trade Practices Act)

127.    Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

128.    The License Agreements, Membership Standards, and Guidelines agreed to by AR-BCBS and BCBSA represent horizontal agreements entered into between AR-BCBS and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

129.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and AR-BCBS have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, AR-BCBS and the other BCBSA members have entered into an agreement to commit or, by concerted action, have committed an act of boycott coercion, or intimidation resulting in or tending to result in unreasonable restraint or, or monopoly in, the business of insurance in violation of Ark. Code Ann. § 23-66-206. Thus, they have committed an unfair method of competition and "unfair or deceptive acts of practice in the business of

insurance" in violation of Ark. Code Ann. § 23-66-205 and §206. Because such acts are defined as "deceptive acts or practices" in business, such acts are actionable pursuant to Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq*. Ark. Code Ann. § 4-88-107(a)(10) makes all deceptive acts or practices in business unlawful. Ark. Code Ann. § 4-88-107(b) state that "other statutes of this state" can define what particular acts are deceptive. Thus, a violation of Ark. Code Ann. § 23-66-206 is actionable under Ark. Code Ann. § 4-88-101, *et seq*. Ark. Code Ann. § 4-88-113(f) provides that any person who suffers actual damages or injury as a result of a deceptive act or practice in business has a cause of action to recover actual damages and reasonable attorneys' fees. These market allocation agreements are illegal under Arkansas law.

130.  The market allocation agreements entered into between AR-BCBS and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) constitute unreasonable restraint of trade or a monopoly in the business of insurance.

131.  AR-BCBS has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

132.  Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

  a.  Reducing the number of health insurance companies competing with AR-BCBS throughout Arkansas;

  b.  Unreasonably limiting the entry of insurance companies into Arkansas;

  c.  Allowing AR-BCBS to maintain and enlarge its market power throughout Arkansas;

41

d. Allowing AR-BCBS to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

e. Depriving consumers of health insurance of the benefits of free and open competition.

133.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Arkansas Law.

134.    As a direct and proximate result of AR-BCBS's continuing violations of Arkansas Law, Plaintiff and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to AR-BCBS than they would have paid with increased competition and but for the violations of Arkansas Law.

135.    Plaintiff and the Class seek their actual damages from AR-BCBS and reasonable attorneys' fees.

## COUNT TWO

### (Unjust Enrichment)

136.    Plaintiff incorporates and re-alleges each of the foregoing paragraphs.

137.    AR-BCBS has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the other Class members.  AR-BCBS has unjustly enriched itself at the expense of the Plaintiff and the Class members.

138.    It would be inequitable for AR-BCBS to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by AR-BCBS.

139.    By reason of its unlawful conduct, AR-BCBS must make restitution to Plaintiff and the Class.

140.    In equity, AR-BCBS should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiff and Class members.

## XI.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays:

A.    That the Court determine that this action may be maintained as a class action under Ark. R. Civ. P. 23, *et seq.* and appoint the Plaintiff as representative of the Class;

B.    That the Court adjudge and decree that AR-BCBS has violated both Ark. Code Ann. § 23-66-201, *et seq.* and § 4-88-101, *et seq.* and award Plaintiff and Class appropriate damages and relief;

C.    That the Court award compensatory damages to Plaintiff and Class resulting from the various acts of wrongdoing under the statutory laws of Arkansas, in such amounts as represent the losses reasonably suffered by Plaintiff and Class (said amounts exceeding the amount required for Federal Diversity Jurisdiction), as well as any reasonable attorneys' fees available under Arkansas Law;

D.    That the Court award Plaintiff his reasonable costs;

E.    That the Court render judgment that AR-BCBS has been unjustly enriched by its wrongful conduct, and award restitution to Plaintiff and the Class;

F.    That the Court awards Plaintiff and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity;

G.    Plaintiff demands a trial by jury; and

H.    That the Court order such other, further and general relief as is just and proper.

43

Respectfully submitted,

EICHENBAUM LILES P.A.
124 W. Capitol Ave., Suite 1900
Little Rock, AR 72201-3717
Ph: 501-376-4531 – Fax: 501-376-8433
mberry@elhlaw.com

By: _____
Mitchell L. Berry, ABN 99088

And

Patrick W. Pendley
Nicholas R. Rockforte
Gordon Ball
Pendley, Baudin & Coffin, L.L.P.
Post Office Drawer 71
Plaquemine, LA 70765
Ph: 225-687-6396 – Fax: 225-687-6398
pwpendley@pbclawfirm.com

*Attorneys for Plaintiffs*