# EXHIBIT 1

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF PENNSYLVANIA

LIFEWATCH SERVICES, INC,

        Plaintiff,

v.

HIGHMARK INC., BLUE CROSS AND BLUE SHIELD
ASSOCIATION, WELLPOINT, INC., HORIZON BLUE
CROSS BLUE SHIELD OF NEW JERSEY, BLUE CROSS
BLUE SHIELD OF SOUTH CAROLINA, and BLUE
CROSS BLUE SHIELD OF MINNESOTA

        Defendants.
_____/

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

### INTRODUCTION

1.    This complaint is being filed to challenge a nationwide conspiracy among the

thirty-eight (38) Blue Cross Blue Shield plans to substantially and unlawfully reduce competition

among these plans.  Most of the Blue Cross plans are the dominant commercial insurers in their

markets, and, were it not for this conspiracy, their greatest competition would come from other

Blue Cross plans.  The conspiracy reduces geographic expansion by Blue Cross plans; eliminates

competition between the plans for the business of large national corporations who could

otherwise choose between them; and (most relevant to this case) eliminates free choice in the use

of medical procedures and devices in order to substantially reduce competition in health care

quality.

1

11133557.37

2.     Most importantly, the Blue Cross plans have adopted a largely uniform set of medical policies which cut off coverage for life-saving technologies in order to reduce their competition with one another.  This harms providers and patients while enriching the Blue Cross plans.

3.     This conspiracy has caused serious harm to the Plaintiff, LifeWatch Services, Inc. ("LifeWatch").  LifeWatch offers a "mobile cardiac outpatient telemetry" ("MCOT") device which provides potentially lifesaving information about patients with serious heart problems. LifeWatch's LifeStar Ambulatory Cardiac Telemetry ("ACT") product provides remote cardiac monitoring which rapidly detects, and notifies the patient's doctor concerning, heart rhythm abnormalities.  LifeWatch's ACT product and other MCOT devices have saved many lives.  By denying coverage for MCOT services, the Blue Cross plans are depriving their subscribers of the only real time ambulatory event monitors that provide continuous, around-the-clock monitoring services, and, therefore, are potentially putting many lives at risk.

4.     Medicare, such national insurers as Aetna, Humana and Coventry, and more than 300 other health care plans all provide insurance coverage for ACT, as well as other suppliers' MCOT services.  But 34 of the 38 Blue Cross plans do not, pursuant to an agreement among the plans to substantially follow their joint, conspiratorial decisions on medical policies made through the national Blue Cross Blue Shield Association.[1]  If a Blue Cross plan does not comply with most of those conspiratorial decisions, it is subject to significant fines.  As a result of this conspiracy, the Blue Cross plans have virtually eliminated any competition between them to provide the latest and best medical technology.

5.     Defendant Highmark, the Blue Cross plan for much of Pennsylvania, pays for MCOT services for its own members.  Highmark has also handled such claims which LifeWatch

---

[1] The conspiracy requires that medical policies be largely, but not completely, uniform.

2

submitted through its Pennsylvania call center for members of other Blue Cross plans. Effective
in March, 2010, Highmark began to enforce the decisions of the conspiracy regarding MCOT
services and refuses to pay for such services for members of the 34 plans that do not cover the
treatment. Highmark has therefore acted to enforce the conspiracy's decisions against
LifeWatch and other MCOT suppliers. The result is to deny most Blue Cross subscribers with
heart problems the significant benefits of MCOT services, even though Highmark itself
acknowledges those benefits.

6.      As a result, LifeWatch and other providers of MCOT services have been severely
damaged, health care quality has been significantly compromised, and tens of thousands of
cardiac patients have been deprived of the services they need. This substantial reduction of
competition between what should be independent purchasers of health care products and services
unreasonably restrains trade and violates the federal antitrust laws.

## THE PARTIES

7.      LifeWatch is a corporation organized under the laws of Delaware and
headquartered in Chicago, Illinois. LifeWatch provides remote, ambulatory telemetry cardiac
monitoring devices for detecting arrhythmias as well as devices for home sleep testing for the
diagnosis of obstructive sleep apnea. LifeWatch has facilities located in Philadelphia, Chicago
and San Francisco, from which LifeWatch employees and/or contractors analyze the data output
from LifeWatch's cardiac and sleep monitoring devices.

8.      Defendant Blue Cross Blue Shield Association ("BCBSA") is an Illinois
corporation headquartered in Chicago, Illinois. BCBSA is the national federation of the thirty-
eight (38) health insurance plans, including Highmark, that operate under the Blue Cross and
Blue Shield trademarks (the "Blue Cross Plans"). BCBSA was created by these plans and is
owned and controlled by them. BCBSA licenses its trademarks and trade names to the Blue

3

Cross Plans. The Blue Cross Plans in turn provide health insurance coverage (including

extensive administrative services and health care provider contracting for self-insured customers)

for millions of Americans. Health insurance plans operating under the Blue Cross and Blue

Shield trade names provide health insurance coverage for approximately 100 million Americans.

9.      Defendant Highmark Inc. ("Highmark") is a non-profit corporation organized

under the laws of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania.

Highmark is a health insurer that offers and administers health insurance benefit plans in

Pennsylvania. Highmark is an independent licensee of BCBSA and operates under the Blue

Cross and Blue Shield trademarks and trade names in western and central Pennsylvania and the

Lehigh Valley in Pennsylvania, as well as in West Virginia and Delaware. Highmark has an

approximately 60% share of the commercial health insurance market and 3.1 million members in

western Pennsylvania. Highmark and its affiliates serve 4.9 million health plan members in

Pennsylvania, West Virginia and Delaware.

10.      Highmark also administers claims for Independence Blue Cross, which is

headquartered in Philadelphia, Pennsylvania and which provides health insurance for 2.2 million

members across southeastern Pennsylvania, southern New Jersey and Delaware. In 2011,

Highmark processed 84.7 million health care claims.

11.      Highmark handles claims for thousands of Blue Cross subscribers that obtain

health care services in states outside of Highmark's geographic service area. Highmark does this

through the Blue Card Program, which enables Blue Cross and Blue Shield subscribers to obtain

health care services while traveling or living in another Blue Cross and Blue Shield Plans'

service area.

12.      Defendant WellPoint, Inc. ("WellPoint") is an independent licensee of BCBSA.

WellPoint has its corporate headquarters in Indianapolis, Indiana.

4

13.     WellPoint operates under the Blue Cross and Blue Shield trademarks and trade names, and (often) also under the Anthem name, including Anthem Blue Cross and Blue Shield plans serving: Colorado, Connecticut, Indiana, Kentucky, Maine, most of Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, Ohio, most of Virginia, and Wisconsin; Anthem Blue Cross and Anthem Blue Cross Life and Health Insurance Company serving California; Blue Cross and Blue Shield of Georgia; and Empire Blue Cross Blue Shield (or Empire Blue Cross in select upstate New York counties) in portions of New York. According to its website, WellPoint's Blue Cross Plans serve nearly 34 million members.

14.     WellPoint directs its subsidiary Blue Cross Plans' actions in compliance with the BCBSA license agreements and conspiracy described herein as set forth below.  This includes the use of common medical policies by the Blue Cross Plans owned by WellPoint.  Since March, 2010, over 2,000 WellPoint subscribers have used LifeWatch's ACT services, which include the services provided by LifeWatch's monitoring station located in Philadelphia, Pennsylvania.  As a result of WellPoint's conspiratorially set medical policy regarding MCOT services, these claims have been denied in an amount of over $2 million.

15.     Defendant Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a non-profit corporation organized under the laws of New Jersey with a principal place of business in Newark, New Jersey.  Defendant Horizon is a non-profit health insurer that offers and administers health insurance benefit plans in New Jersey.  Horizon operates under the Blue Cross and Blue Shield trademarks and trade names in New Jersey.  Horizon has approximately 3.6 million members and has an approximately 46% share of the commercial health insurance market in New Jersey.

16.     Since March, 2010, over 400 Horizon subscribers have used LifeWatch's ACT services, which include the services provided by LifeWatch's monitoring station located in

Philadelphia, Pennsylvania. As a result of Horizon's conspiratorially set medical policy regarding MCOT services, these claims have been denied in an amount of over $400,000.

17.      Defendant Blue Cross Blue Shield of South Carolina ("BCBS of South Carolina") is a non-profit corporation organized under the laws of South Carolina with a principal place of business in Columbia, South Carolina. Defendant BCBS of South Carolina is a non-profit health insurer that offers and administers health insurance benefit plans in South Carolina. BCBS of South Carolina operates under the Blue Cross and Blue Shield trademarks and trade names in South Carolina. BCBS of South Carolina serves a total of 21.5 million people across the United States and around the world through private business and government contracts.

18.      Since March, 2010, over 400 BCBS of South Carolina subscribers have used LifeWatch's ACT services, which include the services provided by LifeWatch's monitoring station located in Philadelphia, Pennsylvania. As a result of BCBS of South Carolina's conspiratorially set medical policy regarding MCOT services, these claims have been denied in an amount of over $400,000.

19.      Defendant Blue Cross Blue Shield of Minnesota ("BCBS of Minnesota") is a non-profit corporation organized under the laws of Minnesota with a principal place of business in Eagan, Minnesota. Defendant BCBS of Minnesota is a non-profit health insurer that offers and administers health insurance benefit plans in Minnesota. BCBS of Minnesota operates under the Blue Cross and Blue Shield trademarks and trade names in Minnesota. BCBS of South Minnesota has approximately 2.7 million members and has an approximately 47% share of the commercial health insurance market in Minnesota.

20.      Since March, 2010, more than 250 BCBS of Minnesota subscribers have used LifeWatch's ACT services, which include the services provided by LifeWatch's monitoring station located in Philadelphia, Pennsylvania. As a result of BCBS of Minnesota's

6

conspiratorially set medical policy regarding MCOT services, these claims have been denied in an amount of over $250,000.

21.     Unsued co-conspirators include the other Blue Cross Plans: Blue Cross and Blue Shield of Alabama, Premera Blue Cross Blue Shield, Blue Cross and Blue Shield of Arizona, Blue Cross and Blue Shield of Arkansas, Blue Shield of California, CareFirst Blue Cross Blue Shield, Blue Cross and Blue Shield of Florida, Hawaii Medical Service Association, Blue Cross of Idaho, Regence BlueShield of Idaho, Blue Cross and Blue Shield of Illinois, WellPoint, Inc., Wellmark Blue Cross and Blue Shield, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Louisiana, Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Michigan, Blue Cross and Blue Shield of Mississippi, BlueCross and BlueShield of Kansas City, Blue Cross and Blue Shield of Montana, Blue Cross and Blue Shield of Nebraska, Blue Cross and Blue Shield of New Mexico, BlueCross & BlueShield of Western New York, BlueShield of Northeastern of New York, Excellus BlueCross BlueShield, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of North Dakota, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Blue Cross of Northeastern Pennsylvania, Capital BlueCross, Independence Blue Cross, Triple-S Salud, Inc., Blue Cross and Blue Shield of Rhode Island, Blue Cross and Blue Shield of Tennessee, Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross and Blue Shield of Vermont, Regence BlueShield and Blue Cross and Blue Shield of Wyoming.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

23.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391, and the Court has personal jurisdiction over the Defendants.  Highmark transacts

substantial business in this district through, among other things, its processing of claims for Independence Blue Cross, its provision of health insurance coverage to subscribers who reside in Berks, Lancaster and Northampton counties and a portion of Lehigh county, and its transactions with LifeWatch through LifeWatch's Philadelphia call center.

24.     BCBSA has transacted substantial business in this District through its communications with Independence Blue Cross and Highmark, its administration, control and licensing of the Blue Cross and Blue Shield trademarks throughout the United States, including this District; its marketing of, and negotiation of benefits and premiums for, health insurance (the Blue Cross and Blue Shield Service Benefit Plan) to 4.6 million federal employees and their family members nationwide, including thousands within this District; and its establishment of medical policies affecting subscribers and providers (including LifeWatch) in this District.

25.     WellPoint, BCBS of South Carolina, BCBS of Minnesota and Horizon all have transacted substantial business in this District through their transactions with LifeWatch through LifeWatch's Philadelphia call center and through their substantial utilization of providers in this District through the BlueCard Program.  The BlueCard Program is a national program that enables members of one Blue Cross Plan to obtain healthcare services while traveling or living in another Blue Cross Plan's service area.  The BlueCard Program allows providers to submit claims for patients from other Blue Cross Plans to their local Blue Cross Plan.  For these claims, the local Blue Cross Plan is the sole contact for claims payment, problem resolution and adjustments.

26.     The number of Blue Cross subscribers living in or utilizing providers in another Blue Cross Plan's service area, such as this District, is substantial.  For example, according to the Fall 2010 issue of "Inside IPP", Independence Blue Cross estimates that "about 18 percent of Blue Plan members residing in Southeastern Pennsylvania are out-of-area members of other Blue

8

Plans." Since Independence Blue Cross has over $9 billion in revenues, this indicates that tens or hundreds of millions of dollars in BlueCard transactions occur in this District. An October 2008 issue of "Blue Review states that "[e]ach year, Horizon hosts approximately 775,000 members on behalf of other Blue Plans – a number equivalent to the entire population of the city of San Francisco!" Horizon also notes that "[t]hrough the BlueCard Program, [it] processes millions of claims for these other Blue Plan members."

27.    All Blue Cross Plans participate in the BlueCard Program. As a result, the Blue Cross Plans' participation in this program involve deliberate choices by the Blue Cross Plans to engage in long-term business with all of the other Blue Cross Plans and creates continuing relationships and obligations between out of state Blue Cross Plans and local Blue Cross Plans. This includes such relationships between the defendant Blue Cross Plans on the one hand and Independence Blue Cross and Highmark on the other in this District. Additionally, each of the defendant Blue Cross Plans obtained for their subscribers substantial (at least hundreds of thousands of dollars of) ACT services from LifeWatch provided from this District prior to March, 2010.

28.    Horizon also transacts substantial business in this District through its provision of health insurance coverage to subscribers who live near the border of New Jersey and Pennsylvania and travel to Philadelphia or other cities within this District to obtain health care services from physicians who are part of Horizon's provider network. This involves, for example, at least 150 primary care physicians located in this District who are in the Horizon network and millions of dollars of claims.

## TRADE AND COMMERCE

29.    Highmark, BCBSA and the other Blue Cross Plans are substantially engaged in interstate commerce and in activities substantially affecting interstate commerce:

9

(a)     BCBSA executes, administers and controls licensing agreements with Blue Cross Plans throughout the United States, which in turn provide health insurance coverage for tens of millions of Americans.

(b)     Highmark provides health insurance plans that cover thousands of Pennsylvania, Delaware and West Virginia residents that need health care in other states and who travel across state lines.

(c)     Highmark administers and markets services to its Delaware and West Virginia members from sites in Pennsylvania.

(d)     Highmark receives substantial payments from employers outside of Pennsylvania with Pennsylvania employees.

(e)     Highmark administers claims for MCOT services for Blue Cross and Blue Shield patients located throughout the United States.

(f)     The conspiracy challenged herein involves Blue Cross Plans across the United States, and the actions in furtherance of the conspiracy set forth herein, including BCBSA audits and fines involving other Blue Cross Plans, have taken place in interstate commerce.

(g)     The Blue Cross Plans all participate substantially in the BlueCard Program on an interstate basis.

(h)     All Blue Cross Plans travel in interstate commerce to meet through the BCBSA Medical Policy Panel to set medical policies with national applicability, as described below.

(i)     WellPoint administers claims and makes payments across at least 14 states.

(j)     The conspiratorial actions challenged here have substantially reduced and will continue to substantially reduce purchases of mobile cardiac telemetry services made in

10

11133557.37

interstate commerce. These actions have substantially reduced and will continue to substantially reduce the quality of health care throughout the United States and the output of mobile cardiac outpatient telemetry services, as well as other medical services, throughout the United States, as explained more fully below.

## FACTUAL ALLEGATIONS

### Power Of Blue Cross Plans

30.    Blue Cross Plans provide health care insurance for approximately 50% of all Americans who are commercially insured. Blue Cross Plans are also the dominant health insurance providers in a majority of states. In 2009, a Blue Cross Plan was the largest commercial health insurer, measured by number of subscribers, in forty out of forty-seven states surveyed by the American Medical Association ("AMA"). Furthermore, according to the AMA study, in 27 states, a Blue Cross Plan enrolled at least 40% of all subscribers of full-service commercial health insurance plans, whether offered through a health maintenance organization or through a preferred provider organization plan.

31.    Blue Cross Plans possess similar dominance in the provision of administrative services and provider contracting for self-insured employers. Self-insured employers pay their employees' insured medical costs, so a large portion of that risk is borne by the employer (often subject to stop-loss insurance). Employers that self-insure usually contract with a health insurance company to obtain access to a health care provider network, including hospitals and physicians, at favorable prices, and for administrative services such as claims processing.

32.    Blue Cross Plans have the broadest networks of hospitals and physicians across the United States. According to the Blue Cross Blue Shield Association website, Blue Cross Plans have "contracts with more hospitals and physicians than any other insurer." In fact,

11

according to the Independence Blue Cross website, the Blue Cross national network includes "90% of hospitals and 80% of doctors" throughout the United States.

### The Conspiracy: Allocation of Territories and National Accounts

33.     The continuing conspiracy engaged in by Blue Cross plans includes the following elements, all designed to effectively allocate markets among the Blue Cross Plans. In order to obtain a license to use the Blue Cross and Blue Shield trademarks and trade names, a member plan must enter into a licensing agreement with the BCBSA ("Licensing Agreement"). Each Licensing Agreement allows one of the thirty-eight Blue Cross Plans the right to use the Blue Cross and Blue Shield trademarks and trade names, but only within a designated service area. BCBSA also imposes rules on the Blue Cross Plans to limit their ability to compete outside their defined geographic service area, and has adopted policies to ensure that there is as little ability or incentive as possible for potential subscribers or employers to "shop" among Blue Cross plans. These rules, which the Blue Cross Plans created, control and enforce, include the following:

(a)     An agreement that none of the Blue Cross Plans nor any of their subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of their designated geographic service areas (the "Service Area Rule"). As explained in the 2012 form 10-K filing of WellPoint, the Blue Cross Plans have "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products." 2012 WellPoint 10-K at p. 16. This agreement prevents any competition among the Blue Cross Plans under the powerful and well-recognized Blue Cross and Blue Shield trademarks and trade names.

(b)     An agreement that limits each Blue Cross Plan from developing substantial business within its designated geographic service areas which is not under the Blue Cross Blue Shield trademark. Under this agreement, at least 80% of a Blue Cross Plan's annual

combined net revenue (not including Medicaid or Medicare) attributable to health benefit plans within its designated service area must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield trademarks or trade names (the "80% Rule"). The WellPoint 10-k explains that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans must be sold, marketed administered or underwritten under the BCBS names and marks." 2012 WellPoint 10-K at p. 31.

(c)     An agreement that significantly reduces the ability of any Blue Cross Plan to compete outside its designated geographic service area by limiting the revenue it can generate outside this area from business which is not under the Blue Cross Blue Shield trademark. Under this agreement, at least $66^{2/3}$% of a Blue Cross Plan's annual combined national revenue (excluding Medicare and Medicaid) must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield trade names or trademarks (the "Two-Thirds Rule"). The Two-Thirds Rule is also explained in WellPoint's 2011 Form 10-K, which states that there is "a requirement that at least $66^{2/3}$% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks." 2012 WellPoint 10-K at p. 31.

(d)     These rules collectively make it impossible for Blue Cross plans to engage in more than very limited competitive activity in the territories of other Blue Cross plans. The plans cannot operate under the Blue Cross and Blue Shield trademarks outside of their territory, and can only do limited business either inside or outside of their territory under other names or trademarks. As a result, the Blue Cross plans are severely restricted in their ability to compete outside of their territories.

13

34.     Another rule implementing the conspiracy restricts competition among Blue Cross Plans for "national accounts," large corporations operating in the territories of multiple Blue Cross Plans.  But for this rule, these corporations would otherwise be the most likely focus of competition between Blue Cross Plans, both because of their volume of business and their accessibility to multiple Blue Cross Plans.

35.     The Rule automatically designates as a "control plan" for large, national accounts (or, in some cases, for their subsidiaries or branch offices) the Blue Cross Plan whose designated territory includes the national account's primary headquarters.  This rule (the "Control Plan Rule") is explained below:

(a)     "National Accounts" are defined on the WellPoint website  as "multi-state employer groups ... with 5,000 or more eligible employees, of which at least 5% are located outside the headquarter state."  Under this agreement, the "Control Plan" is the Blue Cross Plan that "[g]enerally serves the geographic area in which the corporate headquarters of a national account is based."  For example, according to an April 1, 2005 Anthem "Network Update", "Anthem is the Control Plan for national accounts headquartered in Connecticut" (within Anthem's designated service area).  As the Control Plan, a Blue Cross Plan "[u]nderwrites or administers the account and may perform all or part of the claims processing services, as well as customer service and institutional relations functions."  Because the Control Plan is the Blue Cross Plan that is licensed to provide health insurance under the Blue Cross and Blue Shield trademarks and trade names in the geographic area where the national account is headquartered, the designation of a control panel virtually eliminates competition among the Blue Cross Plans for these accounts.

(b)     The Blue Cross Blue Shield of Kansas website similarly defines a "control plan" as a "Blue Cross and Blue Shield Plan that has entered into an agreement to administer a

14

National Account. The National Account is usually headquartered in the Control Plan area." The Blue Cross and Blue Shield of Alabama website defines a "National Account" as an account that "is usually administered by the Plan nearest the Home Office but is served by the Plans in the areas of the subsidiaries." The Blue Cross Blue Shield Excellus website defines a "control plan" as a "local Plan responsible for determining rates, benefits and method of administering a national account group with employees or members located in more than one Plan territory."

36.    The "control plan's" medical policy determines whether a procedure, service or device is covered. For example, a February 4, 2010 memorandum from the Internal Revenue Service responding to a ruling request by a Blue Cross plan, repeated as the facts provided to it by such plan the following: "[I]n general, if a BCBSA organization is acting as a "Host" [or participating] plan, it collects the initial claims data and forwards it to the Home [or control] plan for a determination whether the claim is covered by the policy issued by the Home plan. The Host plan does not make any determination regarding the scope of coverage or the subscriber's eligibility for coverage." Michigan Blue Cross Blue Shield's description of the Chrysler Group LLC Health Care Benefits Plan for Salaried Non-Represented Retirees notes that coverage for several treatments will be "as approved by Blue Cross Blue Shield of Michigan Control Plan program standards."

### The Conspiracy: Medical Policies

37.    The Blue Cross Plans have also agreed as part of their continuing conspiracy since at least 1995 to limit competition with each other with regard to the medical services they cover, by collectively deciding on their medical policies governing such services. These agreements serve to make the product offerings of the Blue Cross Plans far more uniform, and eliminate a basis upon which employers and insureds might find a reason to select one Blue Cross plan over another. Additionally, such agreements serve to substantially reduce any

independent decisions by, and any competition between, Blue Cross Plans as purchasers of medical services.

38.     If Blue Cross Plans varied significantly in their overall willingness to cover health care services, this would create competitive points of difference which could result in sophisticated purchasers, including large, national employers, focusing on these differences as reasons to choose one Blue Cross Plan over another or to question why a particular Blue Cross Plan did not cover services offered by another.  In response, Blue Cross Plans would need to either accept business from corporations whose primary headquarters was in another plan's territory, contrary to their conspiracy, or to refuse the business, risking the exposure of their conspiracy and potential antitrust complaints or actions.  To avoid these kinds of differences, the Blue Cross Plans have tried to the extent possible to minimize the differences between them with regard to the coverage of health care services, and to reduce the coverage of those services on a common basis.

39.     Each Blue Cross Plan has medical policies that act as the individual plan's guidelines for health care benefit coverage decisions.  The medical policies determine whether and when a certain procedure, service or medical device may be considered "medically necessary", and therefore covered under the plan, or whether the procedure, service or device is considered either "not medically necessary" or "investigational", and, therefore, not covered under the plan.

40.     The Blue Cross Plans' individual medical policies are substantially determined by the BCBSA's national medical policies, which are established pursuant to the conspiracy among the Blue Cross Plans.  The BCBSA national policies are established collectively by the Blue Cross Plans, through the BCBSA Medical Policy Panel.  The Medical Policy Panel meets generally at a Chicago hotel several times a year.  Until approximately four years ago, the Panel

met four times a year, with each meeting lasting approximately four hours.  Since then, the Panel

meets ten times a year, with each meeting lasting approximately two hours.  Each Blue Cross

Plan participates in the Panel meetings either in person or by phone.   There are two separate

phone lines, one for listeners and one for voting. Each plan possesses one vote as to whether a

particular service, procedure or medical device will be covered under the national policy and, if

so, under what conditions.  Representatives of each of the Defendant Blue Cross Plans regularly

attended the Medical Policy Panel and voted on medical policies.  BCBS of Minnesota in the

past was represented by Bill Minier, who has since retired.  Horizon was represented by Van

Harris, generally in person and occasionally by phone.  Ashby Jordan represented BCBS of

South Carolina.  Alan Rosenberg represented and still represents Well Point.  Previously Dr.

Brent O'Connell and more recently Dr. Virginia Calega, have represented Highmark on the

medical policy panel.  The vast majority of the individual medical policies of each Blue Cross

Plan must follow the medical policies established by the BCBSA (the "Medical Policy Rule").

  41. The Medical Policy Rule was implemented as a means to enforce virtual

uniformity among the Blue Cross Plans so that they do not compete with each other on quality.

As described above, this further insulates the Blue Cross Plans from any form of competition

among one another.

  42. The Medical Policy Rule is enforced by BCBSA through a periodic audit of each

Blue Cross Plan's medical policy.  In its audits, BCBSA chooses a number of random medical

policies for audit.  If a Blue Cross Plan's medical policies are not sufficiently in compliance with

the BCBSA medical policies, then that Blue Cross Plan will either be warned or fined for lack of

compliance.  As a result, BCBSA's national policies are adopted by the great majority of Blue

Cross Plans.

43.     In fact, in many cases, the Blue Cross Plans simply "cut and paste" from BCBSA's national policy in forming their own medical policies.  For example, the medical policies rejecting coverage for MCOT for Blue Cross Blue Shield of Montana, Blue Cross Blue Shield of Wyoming, and Blue Cross of Idaho all have the *exact same*, word-for-word, lengthy rationale as the BCBSA national policy.  Regence, Blue Cross Blue Shield of Alabama and Horizon each have language regarding the rationale for denial of coverage for MCOT services that, but for a few deleted paragraphs, are verbatim identical to the national policy.

44.     The centralized nature of these conspiratorial decisions is reflected in the fact that most Blue Cross Plans have significantly reduced their staffs devoted to medical policies because of their reliance on the conspiratorial decisions.  At Highmark, the staff devoted to these issues has been reduced from approximately 30 personnel to less than 10.  The South Carolina and Mississippi Blue Cross Plans each employ only two people with responsibility for hundreds of medical policies, an indication of their reliance on the conspiracy to make these decisions for them.

45.     The net effect of the operation of these rules is that Blue Cross Plans have effectively allocated the national health insurance market among themselves, and have agreed to severely restrict the ability of any Blue Cross plan to compete with other Blue Cross plans.  The Service Area Rule, 80% Rule and Two-Thirds rule severely limit the degree to which a Blue Cross Plan can operate outside of its assigned territory.  The Control Plan Rule substantially prevents Blue Cross plans from competing with other plans for national corporations whose primary headquarters (or the primary headquarters of major branches) are outside of their territories.  The Medical Policy Rule enforces the uniformity of the plans' offerings.  The result is that no Blue Cross Plan need fear substantial competition from other Blue Cross Plans.

11133557.37

Especially for those Blue Cross Plans who are dominant in their local markets, this eliminates the most likely check on their ability to exercise monopoly power.

46.     As further described below, this continuing conspiracy has been implemented by numerous overt acts within the last few years, including numerous meetings, audits, and postings and reaffirmations of medical policies as well as denials of claims, described below.  The continuing conspiracy has caused substantial injury to LifeWatch and to competition within the last four years.

47.     None of these rules that have been adopted as a result of the national conspiracy among Blue Cross Plans (including without limitation the Service Area Rule, the 80% Rule, the Two-Thirds Rule, the Control Plan Rule and the Medical Policy Rule) transfer or spread a policy holder's risk.  These rules are in furtherance of a conspiracy not to compete that is unrelated to liability, and does not involve any restriction on the type of coverage offered or affect the transfer of the risk among the Blue Cross Plans.  The agreements and understandings do not involve rating schedules or rating classification differences.  In particular, the Medical Policy Rule is a boycott of MCOT services and other medical products and services.  There is nothing about these agreements that is particular to the business of insurance as defined by the McCarran–Ferguson Act.

### Mobile Cardiac Outpatient Telemetry Services

48.     Arrhythmia monitoring refers to tests physicians use to identify the type and the cause of irregular heart rhythms. These tests include electrocardiographic ("ECG") testing and electrophysiology ("EP") testing. Arrhythmias are changes in the heart's normal rate or rhythm and are classified by their location in the heart and by their speed or rhythm. When symptoms occur, patients use an arrhythmia monitoring device to record an ECG.

49.     There are two main types of arrhythmia monitoring devices that patients wear for ECG testing. The first are, holter monitors or ambulatory holter electrocardiography devices. Holters are used to continuously record ECG over an extended period of time, typically 24 to 48 hours, to evaluate symptoms suggestive of cardiac arrhythmias, *i.e.*, palpitations, dizziness, or syncope. Holter monitors, however, are ineffective if a patient experiences infrequent symptoms. In those cases, ambulatory event monitors ("AEMs") are used. These devices were developed to provide longer periods of monitoring. In this technique, the recording device is either worn continuously and activated only when the patient experiences symptoms, or carried by the patient and applied and activated when symptoms are present. The recorded ECGs are then stored for future analysis or transmitted by telephone to a receiving station, *e.g.*, a doctor's office, hospital, or cardiac monitoring service, where the ECGs can then be analyzed. AEMs can be used for extended periods of time, typically up to a month.

50.     Mobile Cardiac Outpatient Telemetry ("MCOT") devices are a more sophisticated and advanced type of AEM. An MCOT service is an automatically activated system that requires no patient intervention to either capture or transmit an arrhythmia when it occurs. In contrast to other AEMs that store the recorded data and then ultimately transmit it to either a physician's office or central recording station, MCOTs provide real time monitoring and analysis. Upon arrhythmia detection, the system automatically utilizes the bluetooth connected cellular phone to transmit the ECG waveform to a patient monitoring center, which operates around-the-clock (24/7/365), and analyzes the ECG. The patient's physician is notified of the arrhythmia based on pre-determined notification criteria prescribed by the patient's physician.

51.     LifeWatch's LifeStar ACT system is an example of an MCOT service. The LifeStar device is a fully automatic, real time, three channel cardiac arrhythmia detection and alarm system which has been designed to operate in a mobile environment. It operates as a "real

11133557.37

time alert system" for the heart, providing cardiac monitoring with rapid notification of rhythm abnormalities.

52.     LifeWatch's product, and other MCOT services, differ from other kinds of ambulatory "event monitors" which only document arrhythmias when a patient feels something and can respond, or more recent versions that auto detect and auto transmit but only send ECG strips and not robust clinical reports.  For example, LifeWatch's LifeStar ACT system monitors and labels ECG patterns, automatically detects any rhythm abnormality based on diagnostic algorithms without any patient intervention, and automatically transmits the data via cellular telephone transmissions to a central monitoring station.  As occurrences of arrhythmias are detected, transmitted and displayed at the central monitoring station, they are viewed immediately by monitoring staff, who store the data for trend analysis, and will promptly contact a patient's physician in cases in which the device indicates a potential life-threatening situation or other serious abnormality.  This monitoring also allows a report to be prepared for any past 24-48 hour period that the patient is on the system.  The LifeStar system has the capability of taking up to 30 days of cardiac data and processing it through specialized scanning software that allows clinicians to review the full amount of the processed data.

53.     MCOT services are cheaper and more effective than telemetry in a hospital.  The mobile devices allow patients to go about their daily business and exert themselves.  This is superior to inpatient telemetry that occurs with a patient in a hospital bed, because in the latter event, there are no activities to exercise the heart.

54.     MCOT services are also superior to Holter monitoring.  Studies have shown that telemetry data yields a diagnosis approximately 50% of the time, versus 3-5% for Holter monitoring.

11133557.37

55.     Studies have also shown that MCOT services provide more effective detection of infrequent cardiac arrhythmias than other AEM devices.  One retrospective analysis of 26,438 patients utilizing the LifeWatch ACT device found that 21% of the patients "had arrhythmic events meeting physician notification criteria during a mean monitoring period of 21 days."  Of those patients, "262 (1%) had arrhythmic events that could be potentially classified as … life-threatening arrhythmic events…."  The authors concluded that, as a result of this study, "[a]mbulatory cardiac telemetry could be potentially lifesaving in this group of patients."  One of the authors further noted that:

> "Clearly the ACT system supported by the Atrial Fibrillation Post Ablation Patient Care Program is a useful tool in the management of symptomatic and more importantly asymptomatic arrhythmias….  The ACT system truly empowers disease state management because of its superior accuracy.  The system also allows for safe and cost effective outpatient monitoring and follow-up because of the immediate response protocol…."

56.     Many physicians agree that MCOT services "are not considered investigational and experimental", but rather are "well studied and clinically appropriate in carefully selected situations."  Clinix Healthcare Letter dated April 4, 2011.  This has been confirmed in a number of cases in which LifeWatch has successfully appealed a denial of coverage by a Blue Cross Plan.  For example, in a March 4, 2011 letter overturning a denial by Anthem Blue Cross Blue Shield, Clinix Healthcare, an organization authorized by the State of Kentucky Department of Insurance to provide independent reviews of denials by Kentucky insurers, stated that LifeWatch's ACT device "is not experimental.  This device is standard of care in the medical community and has multiple peer reviewed published studies establishing itself as clinically effective."

57.     Another independent review organization for the state of North Carolina, MPRO, stated in an August 11, 2011 letter overturning a denial by Blue Cross Blue Shield of North Carolina that the "finding on the MCOT directly led to a therapeutic intervention (the

22

pacemaker).  Based on the record provided the MCOT was medically appropriate, clinically

necessary, and in fact an ideal cost-effective study to have been selected."

     58.    In another external review of a denial of a claim by a Blue Cross plan, dated

October 11, 2011, the independent physician reviewer for National Medical Reviews, Inc. stated

the following in overturning the denial:

> "The decision of the carrier to deny coverage of Mobile Cardiac Output
> Telemetry (MCOT) is incorrect and should be overturned.  MCOT is not
> experimental/investigational for the treatment of this member's condition and is
> medically necessary for the treatment of this member's condition....
>
> In reviewing the available medical literature, there's sufficient data in the current
> medical literature to establish the superior efficacy of an MCOT compared to the
> other external monitors in managing patients with syncope."

     59.    LifeWatch has received letters from customers and family members of customers

telling LifeWatch's ACT product and its real-time monitoring service saved lives.  For

example, one letter from a customer states:  "After receiving the alert signal from the monitoring

system, I was taken by medic to the Presbyterian Hospital....  Through all of this time I was

unconscious....  I consider that the LifeWatch monitoring system undoubtedly saved my life."

Another customer states that "[o]n my sixth day of wearing the monitor, I was contacted by you

with an alert that my heart was 'acting up' and a little later my doctor called telling me my heart

had stopped twice.  He sent me directly to the hospital and inserted a pacemaker the next

morning.  I feel you have saved my life."   In a letter from the wife of another customer, she

explains how LifeWatch's ACT services helped save her husband's life:

> "I appreciate all your help monitoring and report to the doctors.  We've tried to
> tell the doctor what's happening with his heart, now because of you all, the doctor
> has captured the true picture.  You have been our lifeline....  As far as I'm
> concerned you've helped save my husband's life."

     60.    Medicare, such major national insurers as Aetna, Humana and Coventry, and

more than 300 other health care plans all provide insurance coverage for MCOT products.

61.     Highmark's own medical policy covers the use of MCOT services for a wide variety of patients, including "[p]atients who require monitoring for known, non- life-threatening arrhythmias, such as atrial fibrillation, other supra-ventricular arrhythmias, evaluations of various bradyarrhythmias and intermittent bundle branch lock." Highmark also covers these devices for patients "recovering from cardiac surgery who have had documented atrial arrhythmias" and those "with symptomatic underlying structural disease." Nevertheless, since March 2010, Highmark has refused to pay for claims for subscribers of the 34 Blue Cross Plans who adhere to the conspiracy with regard to MCOT services.

## Implementation of The Blue Cross Conspiracy To Exclude MCOT Services

62.     That is because BCBSA's national medical policy regarding AEM states that MCOT services, referred to as outpatient cardiac telemetry, are either "not medically necessary," or "investigational." Both categories are denied coverage under Blue Cross polices.

63.     According to the BCBSA national medical policy on "Ambulatory Event Monitors and Mobile Cardiac Outpatient Telemetry":

> "Outpatient cardiac telemetry (also known as mobile cardiac outpatient telemetry or MCOT) is considered not medically necessary as a diagnostic alternative in patients who experience infrequent symptoms (less frequently than every 48 hours) suggestive of cardiac arrhythmias (i.e., palpitations, dizziness, presyncope, or syncope); this is considered not medically necessary because the clinical (health) outcomes with this technology have not been shown to be superior to other available approaches, yet outpatient cardiac telemetry is generally more costly than those alternative approaches. (See Benefit Application section for contractual items that may impact use in this condition.)

> Other uses of ambulatory event monitors, including outpatient cardiac telemetry, are considered investigational, including but not limited to monitoring effectiveness of antiarrhythmic therapy and detection of myocardial ischemia by detecting ST segment changes."

64.     The vast majority of Blue Cross Plans have followed the BCBSA policy. For example, the language in Horizon's medical policy denying coverage for MCOT services is

almost identical to BCBSA's policy. BCBS of Minnesota follows BCBSA's policy of denying coverage for MCOT services through its medical policy, which considers the use of MCOT services under any circumstances to be "investigational". BCBS of South Carolina's medical policy denies coverage for MCOT services by claiming they are "not medically necessary" in some situations and "investigational" in all others. Well Point's medical policy states that MCOT services "are considered investigational and not medically necessary for all indications." As part of the continuing conspiracy between the Blue Cross Plans, their policies denying coverage are still posted, and still effective today. Such actions have denied the ability to utilize these services to tens of millions of Blue Cross Plan subscribers.

65.     The Defendant Blue Cross Plans have explicitly relied on their conspiratorial set medical policies when denying patients coverage for MCOT Services. For example, Horizon has denied coverage for MCOT services, by claiming that the "charges are not covered. Treatment, services or supplies that do not meet our guidelines are not covered under the member's plan." BCBS of Minnesota has denied coverage of MCOT Services by claiming either that "[p]rocedures determined to be investigational are not covered under the patient's coverage." Well Point has denied coverage by, among other things, claiming that "this service is considered to be not medically necessary."

66.     In the absence of this concerted behavior, individual Blue Cross Plans would have been subject to market forces of competition, creating incentives for them to comply with the desires of patients and their physicians. Absent the conspiracy, each Blue Cross Plan would therefore have its own individual interest in purchasing medical devices and services that provide the highest possible quality, subject to price constraints. As a result, in the absence of this agreement among Blue Cross Plans, many Blue Cross plans would have unilaterally decided to

25

cover MCOT services, as have Medicare and more than 300 commercial payors. They have not done so because of the effects of the conspiracy.

67.     The conspiracy has effectively superseded individual decisions by Blue Cross Plans on price and quality with regard to MCOT services and other products. The conspiracy amounts to a refusal to compete with regard to MCOT services, among others. It is a horizontal agreement among Blue Cross Plans to withhold from their customers services that many customers and their physicians would desire.

68.     Until March, 2010, LifeWatch was still able to make ACT claims through Highmark for patients throughout the United States. This ended in March, 2010, when Highmark began enforcing the national conspiracy with respect to MCOT services. However, even before March, 2010, under the policies of the vast majority of Blue Cross Plans that denied MCOT coverage, and pursuant to the continuing conspiracy described herein, physicians located within the territories of those plans were not compensated for the "professional component" in connection with MCOT products. In covering health care products like MCOT services, there are two components, a professional component (paid to the physician) and a technical component (paid to the providers such as LifeWatch). Both are necessary for the service to be provided, and therefore the effects of a refusal to pay either of these components (to physicians or to facilities such as LifeWatch) is inextricably intertwined with the effects on the other. In this case, many physicians did not prescribe ACT devices, and the demand for ACT devices was severely depressed below what it would have been had the Blue Cross Plans acted competitively.

69.     The failure by an insurer to provide coverage for, and therefore to pay for, MCOT services, substantially reduces the orders of MCOT services by physicians and the decisions to utilize MCOT services by patients. Because of the substantial cost of health care, including in particular the substantial cost to patients with significant health problems, such as cardiac

26

problems, patients are unlikely to pay themselves for services which their insurer does not cover. If a service is not covered by a patient's insurer, the patient's physician is not likely to recommend it or prescribe it, and the patient is not likely to choose it.

### Highmark Enforced the Conspiracy

70.     Highmark's refusal to pay for claims relating to subscribers of those Blue Cross Plans whose medical policies do not cover MCOT services was an affirmative act by Highmark to enforce the illegal horizontal conspiracy by and among the Blue Cross Plans and BCBSA. This conspiracy, and Highmark's actions to enforce it, have reduced patient choices and the quality of care.  Even though Highmark provided coverage to its subscribers for MCOT services, it was implementing and enforcing the denial of coverage of others.  Moreover, Highmark is jointly and severally responsible for all the effects of the conspiracy, including the effects of other Blue Cross Plans not paying the professional component in the states they cover because of the Medical Policy Rule.  This is a foreseeable effect of the overall conspiracy, even if Highmark did pay the doctors located within its geographic service area.

71.     Highmark's decision to provide coverage for MCOT services for its own subscribers, and the similar decisions by more than 300 health care plans and by Medicare, including such major insurers as Aetna, Coventry, Humana and others, demonstrates that the decision by the vast majority of the Blue Cross Plans to not provide coverage for MCOT services was against their unilateral self-interest, and is further evidence of their anticompetitive conspiracy.

72.     In response to Highmark's refusal to pay for ACT claims of subscribers of other Blue Cross plans, LifeWatch began enrolling patients who would otherwise have received ACT to its cardiac event monitoring ("CEM") product.  While this product was the best available alternative for the patient, it lacks certain key functionalities found in the MCOT product.  For

27

example, unlike the MCOT product, the CEM product does not provide real-time monitoring and does not provide physicians with as robust a clinical report of the patient's data. Therefore, as a result of Highmark's refusal to cover the claims, the quality of care available to Blue Cross patients was decreased. Furthermore, LifeWatch suffered lesser profits because it receives a lesser gross margin for CEM devices as compared to MCOT services.

73.     Highmark's actions taken to enforce the illegal horizontal conspiracy and the actions taken by Highmark, BCSBA and the Blue Cross Plans in creating, carrying out and enforcing the conspiracy do not involve "interpretations" of the contract between Highmark and LifeWatch. Nor do these actions involve "administrative determinations made by Highmark under" that agreement. LifeWatch's antitrust claims set forth herein do not arise under any agreement between Highmark and LifeWatch.

<u>Relevant Market And Competition</u>

74.     The relevant market is the market for MCOT services sold to or through commercial health plans. Given the significant clinical advantages MCOT services have over holter monitors and other AEMs, these products are not reasonable substitutes for MCOT services, and no patient would switch to one of these lesser products because of a small but significant change in price.

75.     The relevant market does not include MCOT services paid for by Medicare or Medicaid, because these government programs fix their fees and therefore do not compete for these services. A firm offering MCOT services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled or underprivileged. Medicare and Medicaid typically pay significantly lower rates than do commercial insurers and, therefore, are not an alternative to them.

11133557.37

76.     The relevant geographic market for MCOT services is national.  MCOT services can be monitored and handled remotely, so buyers can utilize firms anywhere in the United States.  Similarly, firms anywhere in the United States can sell MCOT services nationally.

77.     The Blue Cross Plans possess monopsony power in the alleged relevant market in part because effective entry into commercial health insurance markets (and therefore into the purchase of health care services such as MCOT services) is quite difficult.  Effective entry or expansion in commercial health insurance markets requires that a health insurer contract with broad physician and hospital networks and obtain hospital and physician prices that are at least competitive with the market's leading incumbents.

78.     In order to effectively compete in the provision of health insurance, an insurer needs a broad provider network, including, among others, hospitals and physicians.  Convincing hospitals and physicians to contract with a new insurer, which does not have significant volume to bring to the provider, is often difficult.  Insurers can take years to build up significant provider networks in an area, or may never be able to do so.  Often, the insurers face a "chicken and egg" problem, in which hospitals and physicians are unwilling to contract unless the insurer has significant volume, and the insurer cannot obtain the volume without possessing competitive hospital and physician rates.  These problems do not exist for Blue Cross Plans, which have long, historical relationships with the physicians and hospitals in their markets, and generally have near universal coverage among physicians and hospitals.

79.     Another significant barrier to entry relates to the need for name recognition among potential subscribers.  The Blue Cross Plans have widespread name recognition among consumers, because of their long existence and broad historical coverage in many markets.  For a new plan to enter an area and to gain similar recognition involves expensive advertising which

11133557.37

can in turn only be justified by a significant prospective market share. This is often not attainable for many prospective entrants.

80.     The Blue Cross Plans have substantial market power in the relevant market. According to the U.S. Census Bureau, there were approximately 300 million people living in the United States in 2010. According to the Census Bureau, of those people, approximately 64% had some type of private health insurance. Therefore, there were approximately 200 million commercially-insured individuals in the United States in 2010. According to the BCBSA's own numbers, the Blue Cross Plans provide health insurance coverage for approximately 100 million Americans. Therefore, approximately 50% of all commercially-insured people in America belong to one of the Blue Cross Plans. Based on LifeWatch's use rate calculations, were it not for the conspiracy, Blue Cross Plans would purchase approximately 60% of MCOT services purchased by commercial insurers.

81.     The Blue Cross Plans have the ability to, and have, reduced the output of mobile cardiac outpatient telemetry services as well as other medical devices and services. Most BCBS subscribers are employers who subscribe with a Blue Cross Plan to provide health insurance coverage for anywhere from a few dozen to thousands of employees. Employers tend to choose health insurance plans based on costs and the number of hospitals and doctors a health insurance company offers. If an employer has contracted with a Blue Cross Plan with a broad hospital and doctor network and national coverage, it is unlikely to give that up just because the plan's medical policy does not cover a single product or service such as MCOT services.

82.     The switching costs involved in changing health insurance plans are significant. Whenever an employer considers changing health insurance, it must go through a time-consuming process of assessing the quality, breadth of coverage and provider network, costs and possible disruption in the treatment of its employees associated with any new health insurance

30

plan. Such an assessment involves significant time and money that would not be justified simply because the current plan did not provide coverage for a single service, such as MCOT services. Individual Blue Cross subscribers are very unlikely to switch from a Blue Cross Plan to another insurer because the plan does not cover a particular medical device or service, because of the costs involved in such switching, (frequently) the inability of subscribers to switch health insurers except at a designated time annually, the unavailability of any alternative insurers within some employers' plans, and the many other factors that will influence a subscriber's decision, including whether other plans contract with the subscriber's physicians and preferred hospitals. As a result, BCBS subscribers will not shift plans in response to the refusal to cover many medical services, including MCOT services.

83.    The Blue Cross Plans have substantial power over firms like LifeWatch who sell MCOT services, including the power to set sub-competitive prices for their services. As described above, a firm selling medical devices or services, such as MCOT services, has virtually no ability to encourage patients to switch health insurance plans. Therefore, if a patient wants access to a medical device or service that is not covered under the patient's insurance plan, the patient either has to switch to another employer-sponsored plan which covers the device (which might not be an option) or pay considerably higher out-of-pocket costs, by absorbing the total cost of the device as an unreimbursed medical expense. As a result, if a medical service firm discontinues its relationship with a Blue Cross Plan, or is excluded from a Blue Cross Plan as a result of an illegal horizontal conspiracy, as is the case here, the firm would expect to lose a significant share of its Blue Cross patients.

84.    Because of these factors, market power as a purchaser in the relevant market (monopsony power) can be achieved at a relatively low share of total market purchases, substantially lower than what is in fact possessed by the conspiring Blue Cross Plans. Providers

of MCOT services would accept a small but significant and non-transitory decrease in the price they charge rather than even a moderate decline in the quantity of product which is sold, because the loss of such quantities of business will have a substantial impact on profitability. A provider of MCOT services cannot shift its sales efforts to subscribers of other insurance plans, since these providers are already attempting to attract all patients who can benefit from the device.

85.    This power is aggregated, and thereby increased, by the conspiracy among Blue Cross Plans described herein. The cost of replacing Blue Cross patients will be greater the larger Blue Cross' share of all patients nationwide. As a result, Blue Cross Plans, combined, on a nation-wide scale, have significant market power over MCOT service firms like LifeWatch.

## Anticompetitive Harm and Damages

86.    As a result of the conspiracy, MCOT services, among many other medical services, have not been covered under the majority of Blue Cross Plans. This caused the vast majority of physicians within the territories of the conspiring Blue Cross Plans to not prescribe, and Blue Cross subscribers to not choose, MCOT services. As a result, the output of these services was substantially restricted.

87.    In fact, a comparison of the rates of use of ACT services per Blue Cross subscriber in Highmark's territory versus the rest of the United States in 2009 reveals that the use rate outside of Highmark's territory (where the vast majority of subscribers were not covered by their Blue Cross plans) was 80% lower than within Highmark's territory (where coverage was available). This reflects a dramatic 40% market wide reduction in output due to the conspiracy, even prior to Highmark's denial of payments to LifeWatch and other providers of MCOT services. This agreement not to cover these products led to a substantial reduction in the quality of care and choices available to Blue Cross and Blue Shield subscribers.

32

88.   As result of the conspiracy by and among the Blue Cross Plans and the BCBSA, MCOT services are not available to a substantial portion of the market, including the vast majority of the 100 million Blue Cross subscribers. These Blue Cross Plans would cover these products and many physicians within their networks would prescribe them but for the conspiracy.

89.   The anticompetitive effects of this conspiracy include the following:

(a)   It reduces the quality of cardiac monitoring, and deprives patients in the relevant market the benefit of quality competition.

(b)   It reduces the output of MCOT services in the relevant market.

(c)   It substantially inhibits research and development, innovation and future competition to improve the quality of MCOT services.

90.   The conspiracy by and among the Blue Cross Plans and BCBSA have caused substantial monetary damages to LifeWatch within the last four years to date, in, among other, the following ways:

(a)   As a result of current payments that are due and are being withheld by Highmark due to Blue Cross Plan medical policies, at least $7,336,202 in damages.

(b)   As a result of LifeWatch having to submit claims for its other products (CEM/Holter) to Highmark because Highmark began denying MCOT service claims in March 2010: $4.2 million.

(c)   As a result of foregone physician orders because the Blue Cross Plans did not cover MCOT services, estimated by comparing Pennsylvania enrollments per member with U.S. enrollments per member: at least $55 million from mid-2008 to the present, with additional damages to be calculated.

11133557.37

91.     Similarly, harm has been caused to other firms providing MCOT services, including MedNet, AMI, BioMedical Systems, eCardio, Wireless Dx, Medicomp, Cardionet, BioWatch Medical, Scottcare, and MedTel24.

### COUNT I
### CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF SHERMAN ACT, SECTION 1

92.     LifeWatch restates and realleges the allegations of paragraphs 1 – 91 above hereof, as if fully restated herein.

93.     Highmark, BCBSA, and 37 other Blue Cross Plans have engaged in a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

94.     Pursuant to the conspiracy, the Blue Cross Plans' denials of coverage have substantially reduced the output of MCOT services in the relevant market, and substantially reduced the quality of the health care services they provide.

95.     The conspiracy has caused substantial anticompetitive effects.

96.     The conspiracy unreasonably restrains trade in violation of Section 1 of the Sherman Act.

97.     As a direct and proximate result of Highmark and the Blue Cross Plans' continuing violations of Section 1 of the Sherman Act, LifeWatch has suffered injury and damages in an amount of at least $66 million, before trebling, to be fully proven at trial.

98.     This is a continuing conspiracy and the anticompetitive effects and damage will continue unless enjoined.

### COUNT II
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

99.     LifeWatch restates and realleges the allegations of paragraphs 1 – 91 above hereof, as if fully restated herein.

34

11133557.37

100.   LifeWatch has an ongoing relationship with thousands of physicians who believe in the utility of, and have regularly prescribed, LifeWatch's MCOT services for, among others, their patients who are Blue Cross Plan subscribers in areas other than Highmark's territories.

101.   LifeWatch has a reasonable business expectancy of obtaining thousands of additional patients based on the decisions by such physicians.

102.   Highmark is aware of these relationships and this expectancy.

103.   Highmark knowingly interfered with LifeWatch's prospective economic relationship with such Blue Cross subscribers without privilege or justification through the acts described above.  Highmark undertook its actions in order to forward a conspiracy between Blue Cross Plans as described above, and not to serve any proper business or societal purpose.  This interfered not only with LifeWatch's prospective economic advantage, but the interests in patient care of the physicians and patients whom LifeWatch has sought to serve.  Highmark's decision to deny claims based solely on the conspiratorial medical policies of other Blue Cross Plans, where it had routinely paid such claims prior to that time, was completely unjustified.

104.   Highmark's intentional and improper interference has damaged LifeWatch.

## RELIEF REQUESTED

105.   WHEREFORE, LifeWatch Services, Inc. prays this Court to grant the following relief:

(a)   Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict coverage for MCOT services.

(b)   Award LifeWatch three times its damages, plus its reasonable attorneys' fees, against defendants, jointly and severally.

(c)   Award such other relief as this Court finds just.

35

11133557.37

## JURY DEMAND

106.    LifeWatch Services, Inc., hereby demands a trial by jury on all issues so triable.


Dated: September 10, 2012              By:    *Michael J. McCarrie*
                                              Michael J. McCarrie
                                              PA I.D. # 57671
                                              Artz Health Law
                                              Centre Square – West Tower
                                              1500 Market Street, Suite 4100
                                              Philadelphia, PA 19102
                                              Office: 267-886-1852
                                              Fax: 215-735-1714
                                              mjm@artzhealthlaw.com

                                              and

                                              Charles I. Artz
                                              PA I.D. #55747
                                              Artz Health Law
                                              200 North Third Street, Suite 12-B
                                              Harrisburg, PA 17101
                                              Phone: (717) 238-9905
                                              cia@artzhealthlaw.com

                                              David A. Ettinger (P26537)
                                              Peter E. Boivin (P62043)
                                              Lara Fetsco Phillip (P67353)
                                              Honigman Miller Schwartz & Cohn LLP
                                              2290 First National Building
                                              660 Woodward Avenue
                                              Detroit, MI 48226
                                              (313) 465-7368 (p)
                                              (313) 465-7369 (f)
                                              dettinger@honigman.com

11133557.37