# Attachment

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(GREENBELT DIVISION)**

| | | |
|---|---|---|
| **ADVANCED SURGERY CENTER** | ) | |
| **OF BETHESDA, LLC** | ) | |
| | ) | |
| **6430 Rockledge Dr., Suite 160** | ) | |
| **Bethesda, MD  20817** | ) | |
| | ) | |
| **BETHESDA CHEVY CHASE** | ) | **Civil Action No.**_____ |
| **SURGERY CENTER, LLC** | ) | |
| | ) | |
| **6931 Arlington Road, Suite E** | ) | |
| **Bethesda, MD  20814** | ) | |
| | ) | |
| **DEER POINTE SURGICAL** | ) | |
| **CENTER, LLC** | ) | |
| | ) | |
| **6503 Deer Point Drive, Suite A** | ) | |
| **Salisbury, MD  21804** | ) | |
| | ) | |
| **HAGERSTOWN SURGERY CENTER,** | ) | **JURY TRIAL DEMANDED** |
| **LLC** | ) | |
| | ) | |
| **11236 Robinwood Drive, Suite 201** | ) | |
| **Hagerstown, MD  21742** | ) | |
| | ) | |
| **LEONARDTOWN SURGERY** | ) | |
| **CENTER, LLC** | ) | |
| | ) | |
| **40900 Merchants Lane, Suite 200** | ) | |
| **Leonardtown, MD  20650** | ) | |
| | ) | |
| **MAPLE LAWN SURGERY CENTER,** | ) | |
| **LLC** | ) | |
| | ) | |
| **7625 Maple Lawn Blvd., Suite 110** | ) | |
| **Fulton, MD  20759** | ) | |
| | ) | |
| **PICCARD SURGERY CENTER, LLC** | ) | |
| | ) | |
| **1330 Piccard Drive, Suite 102** | ) | |
| **Rockville, MD  20850** | ) | |

1

|   |   |
|---|---|
| **RIVA ROAD SURGCENTER, LLC** | ) |
|   | ) |
| **2635 Riva Road, Suite 118** | ) |
| **Annapolis, MD  21401** | ) |
|   | ) |
| **SURGCENTER OF BEL AIR, LLC** | ) |
|   | ) |
| **209 Thomas Street** | ) |
| **Bel Air, MD  21014** | ) |
|   | ) |
| **SURGCENTER OF  GLEN BURNIE,** | ) |
| **LLC** | ) |
|   | ) |
| **308 Hospital Drive, Suite 102** | ) |
| **Glen Burnie, MD  21061** | ) |
|   | ) |
| **SURGCENTER OF  GREENBELT, LLC** | ) |
|   | ) |
| **7300 Hanover Drive, Suite 102** | ) |
| **Greenbelt, MD  20770** | ) |
|   | ) |
| **SURGCENTER AT NATIONAL** | ) |
| **HARBOR, LLC** | ) |
|   | ) |
| **125 Potomac Passage, Suite 200** | ) |
| **National Harbor, MD  20745** | ) |
|   | ) |
| **SURGCENTER OF  SILVER SPRING,** | ) |
| **LLC** | ) |
|   | ) |
| **8710 Cameron Street, Suite 100** | ) |
| **Silver Spring, MD  20910** | ) |
|   | ) |
| **SURGCENTER OF SOUTHERN** | ) |
| **MARYLAND, LLC** | ) |
|   | ) |
| **9001 Woodyard Road, Suite B** | ) |
| **Clinton, MD  20735** | ) |
|   | ) |
| **SURGCENTER OF WESTERN** | ) |
| **MARYLAND, LLC** | ) |
|   | ) |
| **12252 Williams Road SE, Suite 103** | ) |
| **Cumberland, MD  21502** | ) |
|   | ) |

| | |
|---|---|
| **SURGENTER OF WHITE MARSH, LLC** | ) |
| | ) |
| **11605 Crossroad Circle, Suite A** | ) |
| **Baltimore, MD  21220** | ) |
| | ) |
| **TIMONIUM SURGERY CENTER, LLC** | ) |
| | ) |
| **1954 Greenspring Drive, Suite LL18** | ) |
| **Lutherville-Timonium, MD  21093** | ) |
| | ) |
| **WESTMINSTER SURGERY CENTER, LLC** | ) |
| | ) |
| **826 Washington Road, Suite 131** | ) |
| **Westminister, MD  21157** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **CAREFIRST OF MARYLAND, INC.,** | ) |
| | ) |
| **10455 Mill Run Circle** | ) |
| **Owings Mills, MD  21117** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiffs, Advanced Surgery Center of Bethesda, LLC; Bethesda Chevy Chase Surgery Center, LLC; Deer Pointe Surgical Center, LLC; Hagerstown Surgery Center, LLC; Leonardtown Surgery Center, LLC; Maple Lawn Surgery Center, LLC; Piccard Surgery Center, LLC; Riva Road SurgCenter, LLC; SurgCenter of Bel Air, LLC; SurgCenter of Glen Burnie, LLC; SurgCenter of Greenbelt, LLC; SurgCenter at National Harbor, LLC; SurgCenter of Silver Spring, LLC; SurgCenter of Southern Maryland, LLC; SurgCenter of Western Maryland, LLC; SurgCenter of White Marsh, LLC; Timonium Surgery Center, LLC; and Westminster Surgery Center, LLC (collectively, "Plaintiffs") bring this action for damages and injunctive relief under

3

the antitrust laws of the United States and the under the antitrust laws of Maryland against Defendant CareFirst of Maryland, Inc. ("CareFirst") and allege as follows:

## NATURE OF THE CASE

1.      Plaintiffs are ambulatory care facilities who have not contracted with CareFirst and are therefore out-of-network providers.

2.      CareFirst wants Plaintiffs to become members of CareFirst's network at below market rates in order to bolster CareFirst's network and to save CareFirst money.

3.      CareFirst, however, has refused to negotiate in any meaningful sense and instead it insists on achieving the anti-competitive rock bottom rates it desires.

4.      CareFirst has therefore resorted to, and continues to utilize, illegal means to achieve its goal.

5.      In order to coerce Plaintiffs and to extort contractual concessions or to put the facilities out of business altogether, CareFirst has utilized its market power to threaten, intimidate, and even terminate in-network healthcare providers who utilize Plaintiffs' facilities.

6.      In addition, CareFirst has violated the federal antitrust laws by explicitly agreeing with its fellow Blue Cross and Blue Shield entities (the "Blues") not to compete with one another.  CareFirst and the Blues conspired to divide the healthcare market in the United States into geographically defined regions in order to allow each Blues plan an exclusive, competition-free slice of the healthcare market.

7.      The Defendants' market allocation agreement constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

8.     The Defendants' conduct has harmed competition and has directly injured healthcare providers as well as healthcare consumers in a manner the antitrust laws were enacted to prohibit.

9.     The illegal conspiracy between CareFirst and its fellow Blues has perpetuated and strengthened the dominant market position each Blue plan enjoys in its specifically defined geographic market, including CareFirst's market in Maryland.

10.    Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans.  In fact, a BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

11.    Given the lack of competition in the healthcare market and the Blues' resulting dominant market position, the Blues, including CareFirst, have the unfettered power to force healthcare providers into a quintessential Catch-22 situation of either acquiescing to anticompetitive rates and terms or foregoing access to a dominant portion of healthcare subscribers.

12.    Because CareFirst and its fellow Blues have agreed not to compete and have established and solidified their dominant market position, healthcare providers have virtually no bargaining power.  The Blues have, in fact, rigged the deck to be certain that they hold all the cards.  As a result, healthcare providers are subject to much lower rates and less favorable terms than they would be absent the Blues' agreement not to compete.

13.    On the other hand, a healthcare provider that opts not to accept the dismal contract terms offered by the provider's geographically dominant Blue necessarily operate in a severely limited market. CareFirst maintains a dominant market share in Maryland.  In the

Baltimore-Towson Metropolitan Statistical Area, for instance, CareFirst maintains a 64 pct share of the Preferred Provider Organization ("PPO") market.  Other Blues also enjoy unrivaled market share in their respective states or within areas of their states. For example, BCBS Alabama controls access to 93% of subscribers in the State of Alabama. This is made possible because of the plan restrictions.  CareFirst does not face competition in Maryland from Highmark Blue Cross which operates in three bordering states. Nor does CareFirst face competition in Maryland or Washington, D.C. from Independence Blue Cross which operates in the bordering state of Pennsylvania or from the for profit WellPoint which operates one of the Blue Cross Plans in Virginia.  Most healthcare providers simply cannot survive economically as out-of-network providers given the dominant market position the Blues have achieved through their conspiracy not to compete.  Providers such as Plaintiffs who do manage to operate outside a Blues network receive far less income than they would absent the Blues' conduct.

14.    These limitations would not be possible if the market for health insurance was truly competitive and if the Blues were not conspiring to divide markets and eliminate competition. As a result, the contractual restrictions established through Blue Cross Blue Shield Association (the "BCBSA") and agreed to by member Blues create an immense barrier to entry into the market for health insurance in the states dominated by the Blues, such as CareFirst.  The agreements created amongst the Blues  not only create constraints for providers in negotiating with a Blue plan like CareFirst, but also create an immense barrier to entry into the market for health insurance in the states occupied by a Blue plan.  Fair competition is not possible so long as the Blues and the BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of health insurance companies from competing in certain territories.

15.     As CareFirst and its fellow Blues are no doubt aware, free competition would lessen the disparity in power between the Blues and healthcare providers and would, therefore, result in higher rates, better terms and more equitable treatment of healthcare providers.  Lack of free competition has also resulted in skyrocketing premiums.

16.     This arrangement via the BCBSA is a naked territorial restrain on competition in the market for health insurance.  Defendants' conspiracy has harmed competition and, absent injunctive relief, Defendants' practices will continue unabated to the detriment of competition and to the harm of healthcare providers such as Plaintiff.

17.     As a result of its agreement with the other Blues not to compete with one another, and as a result of other actions taken by CareFirst, CareFirst has monopoly power within the State of Maryland, the Baltimore-Towson and Salisbury Metropolitan Statistical Areas ("MSAs"), as defined by the United States Office of Management and Budget. CareFirst's actions to gain, maintain, extend and exercise its monopoly power have violated federal antitrust laws as well as the antitrust laws of Maryland.

18.     CareFirst's illegal conduct has resulted in harm to competition and has also caused antitrust injury to Plaintiffs.

19.     Absent injunctive relief, CareFirst's violations will continue unabated, resulting in greater harm to competition and escalating injury to Plaintiffs.

## JURISDICTION AND VENUE

20.     Plaintiffs' federal antitrust claims are instituted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  Plaintiffs' state antitrust claims are instituted under the Maryland Antitrust Act, Maryland

Code Annotated, Commercial Law, § 11-204. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

21.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, because a significant port of the events, act and omissions giving rise to this action occurred in the District and because CareFirst resides, transacts business or is found within this District.

## INTERSTATE COMMERCE

22.     The activities of CareFirst that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

23.     Communications between CareFirst and representatives of the Plaintiffs often occurred through interstate communications.

24.     Many employers remit substantial payments across state lines to CareFirst. Further, many CareFirst insureds and contracted providers reside in jurisdictions other than Maryland, such as Virginia and the District of Columbia.

25.     Plaintiffs and many of the healthcare providers that utilize Plaintiffs' facilities have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines, for use in providing healthcare services to individuals in Maryland and in the Baltimore-Towson and Salisbury MSAs.

## PARTIES

26.     Plaintiff Advanced Surgery Center of Bethesda, LLC is a Maryland limited liability company with its principal place of business in Bethesda, Maryland.  Plaintiff Advanced Surgery Center of Bethesda, LLC is utilized by healthcare providers who provide professional services to persons insured by CareFirst on an in-network basis and has suffered or in all

8

likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

27.     Plaintiff Bethesda Chevy Chase Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Bethesda, Maryland.   Plaintiff Bethesda Chevy Chase Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

28.     Plaintiff Deere Point Surgical Center, LLC is a Maryland limited liability company with its principal place of business in Salisbury, Maryland, which is within the Salisbury MSA.   Plaintiff Deere Point Surgical Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

29.     Plaintiff Hagerstown Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Hagerstown, Maryland.   Plaintiff Hagerstown Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

30.     Plaintiff Leonardtown Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Leonardtown, Maryland.   Plaintiff Leonardtown Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured

by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

31.   Plaintiff Maple Lawn Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Fulton, Maryland, which is within the Baltimore-Towson MSA.   Plaintiff Maple Lawn Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered and, in all likelihood, will continue to suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

32.   Plaintiff Piccard Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Rockville, Maryland.   Plaintiff Piccard Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

33.   Plaintiff Riva Road Surgical Center, LLC is a Maryland limited liability company with its principal place of business in Annapolis, Maryland, which is within the Baltimore-Towson MSA. Plaintiff Riva Road Surgical Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

34.     Plaintiff SurgCenter of Bel Air, LLC is a Maryland limited liability company with its principal place of business in Bel Air, Maryland, which is within the Baltimore-Towson MSA.   Plaintiff SurgCenter of Bel Air, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

35.     Plaintiff SurgCenter of Glen Burnie, LLC is a Maryland limited liability company with its principal place of business in Glen Burnie, Maryland, which is within the Baltimore-Towson MSA.   Plaintiff SurgCenter of Bel Air, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will continue to suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

36.     Plaintiff SurgCenter of Greenbelt, LLC is a Maryland limited liability company with its principal place of business in Greenbelt, Maryland.  Plaintiff SurgCenter of Greenbelt, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

37.     Plaintiff SurgCenter at National Harbor, LLC is a Maryland limited liability company with its principal place of business in National Harbor, Maryland.  Plaintiff SurgCenter at National Harbor, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer

antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

38.     Plaintiff SurgCenter of Silver Spring, LLC is a Maryland limited liability company with its principal place of business in Silver Spring, Maryland.   Plaintiff SurgCenter of Silver Spring, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

39.     Plaintiff SurgCenter of Southern Maryland, LLC is a Maryland limited liability company with its principal place of business in Clinton, Maryland.   Plaintiff SurgCenter of Southern Maryland, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

40.     Plaintiff SurgCenter of Western Maryland, LLC is a Maryland limited liability company with its principal place of business in Cumberland, Maryland.  Plaintiff SurgCenter of Western Maryland, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

41.     Plaintiff SurgCenter of White Marsh, LLC is a Maryland limited liability company with its principal place of business in White Marsh, Maryland, which is within the Baltimore-Towson MSA.   Plaintiff SurgCenter of White Marsh, LLC is utilized by healthcare

providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

42.    Plaintiff Timonium Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Timonium, Maryland, which is within the Baltimore-Towson MSA.  Plaintiff Timonium Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered or in all likelihood will suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

43.    Plaintiff Westminster Surgery Center, LLC is a Maryland limited liability company with its principal place of business in Westminster, Maryland, which is within the Baltimore-Towson MSA.  Plaintiff Westminster Surgery Center, LLC is utilized by healthcare providers who provide services to persons insured by CareFirst on an in-network basis and has suffered and in all likelihood will continue to suffer antitrust injury as a result of CareFirst's anticompetitive activities, including but not limited to decreased utilization and/or decreased revenues.

44.    Defendant CareFirst of Maryland, Inc., ("CareFirst") a health service plan licensed under Title 14 of the Insurance Article, Annotated Code of Maryland, provides health insurance to individuals and groups through various contracts, including traditional indemnity, preferred provider networks, and point of service arrangements.  CareFirst of Maryland, Inc. does business as CareFirst Blue Cross Blue Shield. The company's principal place of business is 10455 Mill Run Circle in Owings Mills, Maryland.

**FACTUAL ALLEGATIONS**

13

45.     CareFirst is the largest health insurer in the state of Maryland.  During 2009, the company wrote direct premiums totaling approximately $1.48 billion.

46.     **Relevant Geographic Market**--The relevant geographic market for assessing CareFirst's monopoly power is the state of Maryland where CareFirst controls over seventy percent of the market for Individual and Small Group Health Insurance in Maryland according to the Kaiser Family Foundation. A 2012 American Medical Association ("AMA") study found that CareFirst enjoys a sixty-four percent share of the total PPO market in the state of Maryland. Their closest competitor had less than half that share.   With this large share of the market, CareFirst has monopoly power in the state of Maryland.

47.     On information and belief, CareFirst views the relevant geographic as Maryland and remits payment uniformly for out-of-network surgery centers the same regardless of where in the state of Maryland the service is rendered.

48.     Alternatively, the relevant geographic markets are the Baltimore-Towson MSA, where CareFirst enjoys a seventy percent share of the total PPO market according to the 2012 AMA study, and the Salisbury MSA, where CareFirst enjoys a sixty-nine percent share of the total PPO market according to the 2012 AMA study.  CareFirst likewise has monopoly power, including monopsony pricing power, in the Baltimore-Towson and Salisbury MSAs for PPO products.

49.     In addition, given CareFirst's high market share, the market for PPO products in the State of Maryland and the Baltimore-Towson and Salisbury MSAs is highly concentrated. Market concentration is also useful indicator of market power.

50.     By virtue of the benefit design differences, pricing differentials, and other factors, PPOs and indemnity plans are not reasonable substitutes for HMO and HMO-POS products.

Neither employers nor employees view HMOs and PPOs as the same product, and enrollees who leave an HMO disproportionately select another HMO, rather than a PPO, for their next plan.

51.   **Relevant Product Market-** There are no purchasers to whom healthcare providers can sell their services other than individual patients or the commercial and government health insurers who purchase healthcare providers' services on their behalf. Simply put, healthcare providers have no good alternatives to these buyers. A small but significant decrease in the prices paid to healthcare providers by these buyers would not cause healthcare providers to seek other purchasers of their services or to otherwise change their activities (away from providing healthcare providers services towards other uses or leisure) in numbers sufficient to make such a price reduction unprofitable. Healthcare providers' services, therefore, constitute the relevant product market within which to assess the likely effects of the transactions at issue.

52.   CareFirst's market power in the market for PPO plans acts to give CareFirst monopsony power in the input market for healthcare providers and other healthcare services, as it is the primary purchaser of these services in the relevant geographic market.

53.   CareFirst's monopsony power over the provision of healthcare in Maryland and the Baltimore-Towson and Salisbury MSAs acts to reduce the quantity and/or quality of healthcare provided below competitive levels.

54.   Significant barriers exist with regard to entry to both the PPO and the market for healthcare provider services in Maryland and the Baltimore-Towson MSA and Salisbury MSAs. CareFirst's market power is aided and protected by significant barriers to entry with regard to both markets. These barriers to entry include state regulatory requirements; brand name acceptance of the already-established insurers such as CareFirst; contending with CareFirst as an already-established insurance company that has build long-term relationships with employers

and other consumers; the provider cost-advantage already enjoyed by CareFirst; and the cost of developing a health care provider network. It is often very difficult for out of state or national insurers to enter a market with an established state "Blue" plan such as CareFirst. *See* "Improving Health Care: A Dose of Competition, Federal Trade Commission and Department of Justice" (July 2004) at pp. 8-11. In addition, as described in more detail below, the policies of the BCBSA and its agreements with its members, such as CareFirst, are themselves also a barrier to entry. Because of territorial restrictions, no other Blues entity can or will enter the Maryland market to offer services.  Anticompetitive actions that depress CareFirst's costs to below market levels also act to increase barriers to competition because they create an environment where potential competitors know they cannot compete because they lack the market power to leverage providers into their network at below market costs.   Because they cannot compete with CareFirst's below market costs, they choose not to enter the market at all as competition on those terms would be futile.

55.     CareFirst markets itself to potential members, enrollees, plan administrators and employers in Maryland based on the size, scope and coverage of its healthcare provider network and its in-network healthcare facilities. No competitor can match CareFirst within the relevant markets with respect to these features.

56.     CareFirst does not have an agreement with the Plaintiffs.   Accordingly, Plaintiffs are out-of-network facilities.

57.     Consumers benefit from competition between hospital-based and ambulatory care centers.  Ambulatory care facilities provide significant benefits to consumers including lower fixed costs and lower infection rates than in-hospital surgical facilities. There are a number of

reasons why a CareFirst member might choose an out-of-network ambulatory care facility over a hospital facility in the same area.  These include reduced wait time and reduced risk of infection.

58.     In order to attain these benefits, patients who are treated at out-of-network facilities pay more out-of-pocket monies than they would pay for in-network services.

59.     During the four-year period preceding the filing of this Complaint, CareFirst has sought to gain, maintain, extend and illegally exercise its monopoly in Maryland and in particular in the Baltimore-Towson and Salisbury MSAs.

60.     Because CareFirst has monopoly power in Maryland and in the Baltimore-Towson and Salisbury MSAs, CareFirst has the ability to exercise and abuse that power through intimidation and coercion of healthcare providers. CareFirst has used that monopoly power to attempt to force out-of-network ambulatory surgery centers into its network, or to choke off their business.

61.     During 2010, CareFirst and the Plaintiffs began a dialogue regarding a potential in-network facility relationship.

62.     During the same time frame that CareFirst was initiating negotiations with the Plaintiffs, CareFirst began a campaign of intimidation, coercion and exclusion against providers who utilize ambulatory surgical facilities in order to coerce and pressure these facilities (including the Plaintiffs) to enter an agreement whereby Plaintiffs would become in-network providers at below market rates.

63.     CareFirst's threats and intimidation of Dr. Hugo Torres and Dr. Vajira Gunawardane, physicians who practice medicine as shareholders in Maryland Pain & Spine, LLC, is illustrative of CareFirst's coercion of other in-network healthcare providers who were utilizing out-of-network facilities.   Upon information and belief, CareFirst sent the same

correspondence that was sent to Maryland Pain & Spine prior to July 7, 2011 as set forth herein many other providers who utilize outof-network ambulatory surgical centers, including the Plaintiffs' facilities.

64.     Drs. Torres and Gunawardane of Maryland Pain and Spine, physicians specializing in Anesthesiology and Pain Medicine, are among the highest utilizers of Plaintiffs Westminster Surgery Center and Maple Lawn Surgery Center.

65.     On or about May 17, 2010, Penny Reynolds, Manager of Provider Relations at CareFirst, sent Maryland Pain & Spine as well as other providers that utilize Plaintiffs and other out-of-network facilities a letter stating that the physicians' use of out-of-network facilities (specifically Maple Lawn Surgery Center) was a breach of contract.   The letter stated, in pertinent part, "This letter shall serve as written notification that CareFirst BlueCross BlueShield and CareFirst BlueChoice (collectively "CareFirst") has identified a business practice of referring CareFirst Members, your patients, for surgical services to be rendered at Freestanding Ambulatory Surgical Centers (ASCs) that are non-participating with CareFirst...."   CareFirst requested a "business action plan" within thirty days to rectify the breach and warned that failure to submit the plan or "unsuccessful implementation of the plan" would result in termination on August 17, 2010.

66.     Similar correspondence was sent to Chesapeake Orthopaedic and Sports Medicine ("Chesapeake Ortho"). Some members of the Chesapeake Ortho practice utilized Plaintiff SurgCenter of Glen Burnie.

67.     Alson Martin with the law firm of Lathrop & Gage, acting as legal counsel for many of the provider groups who received correspondence from CareFirst, wrote to Penny Reynolds to explain that the healthcare providers use of ambulatory surgical centers did not

violate the providers contracts with CareFirst and to point out that CareFirst's "insureds have the right to decide if and where they have surgery."

68.     On or about July 20, 2010, Andrea Pomykala, Contract Manager with CareFirst, contacted Plaintiffs Westminster Surgery Center and Maple Lawn Surgery Center and then forwarded a rate proposal.  The rate proposal was dated March 1, 2010.

69.     On or about August 6, 2010, Leigh Whitmore, Manager of Professional Contracting for CareFirst, sent a letter to Maryland Pain & Spine as well as other in-network providers who utilize Plaintiff and other related out-of-network facilities, indicating that no attempts had been made to correct the breach set forth in the May 17 correspondence but that "[i]n the best interest of all parties, CareFirst is extending the effective date of your termination…until September 30, 2010."

70.     On or about September 29, 2010, Ms. Whitmore sent another letter extending terminations of the practices until November 30, 2010.

71.     Despite the correspondence being sent to Maryland Pain & Spine, CareFirst added the Westminster Surgery Center and Maple Lawn Surgery Center to Maryland Pain & Spine's credentialing effective on or before October 1, 2010.

72.     On or about November 11, 2010, Ms. Whitmore again sent a letter to Maryland Pain & Spine and other physicians extending termination until January 31, 2011.   The letter specifically referenced, and implied contingency with, CareFirst's negotiations with the Plaintiffs.

73.     On or about December 10, 2010, Terri Welter of ECG Management Consultants sent a letter to Andrea Pomykala on behalf of the Plaintiffs.   The letter indicated that their intent "is to work with CareFirst BlueCross BlueShield on defining and implementing new contracts

19

for its surgery centers in Maryland, beginning first with the Westminster Surgery Center."   The letter contained a counterproposal with regard to the Westminster facility.   As the letter indicated, CareFirst's proposal would result in an unacceptably drastic rate decrease for the facilities.

74.     On or about January 11, 2010, Ms. Whitmore sent yet another letter to Maryland Pain & Spine and other providers extending termination until March 31, 2011.  The letter again referenced CareFirst's negotiations with the Plaintiffs.

75.     On or about January 13, 2011, Andrea Pomykala communicated with ECG Management Consultants to indicate that CareFirst's analysts were continuing to review the proposal and hoped to provide a response within a few weeks.

76.     On or about February 3, 2011, Andrea Pomykala emailed Terri Welter to indicate that she hoped to provide a response to the Plaintiffs' counterproposal by March 1.

77.     On or about March 22, 2011, Ms. Whitmore extended the termination deadline for Maryland Pain & Spine and other providers until July 31, 2011, again referencing CareFirst's ongoing negotiations with the Plaintiffs.

78.     On or about April 5, 2011, Andrea Pomykala sent a counterproposal for Westminster and requested a proposal for Maple Lawn, SurgCenter of Southern Maryland and SurgCenter of Glen Burnie.

79.     In June 2011, representatives of the Plaintiffs indicated that they would not proceed with negotiations unless CareFirst ceased its coercion of the healthcare providers who utilized Plaintiff's facilities and instead dealt directly with legal counsel for the healthcare providers with regard to any contract issues.

80.     On or about June 14, 2011, Andrea Pomykala emailed TerriWelter of ECG consulting stating that CareFirst intended to make a decision on July 1 and inquiring as to the status of the counterproposal.

81.     On or about June 22, 2011, Katie Fellin of ECG Management Consulting emailed Andrea Pomykala to inform her that the Plaintiffs were reviewing the counterproposal and that Terri Welter would contact Stacey Breidenstein to discuss the next steps.

82.     On or about July 7, 2011, Craig Haberer, Director of Professional Contracting for CareFirst, sent a letter to Alson Martin of Lathrop & Gage, indicating that CareFirst would not extend the termination of Maryland Pain & Spine beyond July 31, 2011, and that, accordingly, Maryland Pain & Spine's termination would be effective August 1, 2011.  CareFirst did not communicate this information directly to Maryland Pain & Spine.

83.     On or about July 22, 2011, Leigh Whitmore sent a letter to other providers who had received the earlier termination notices, including Chesapeake Ortho, indicating that the notice of termination was being rescinded but warning that CareFirst would continue to monitor the providers' use of out-of-network facilities and that continued use of non-participating ASCs "may result in fewer patients referred to your practice by the primary care healthcare providers or network termination by CareFirst." The late notice of rescinding the termination seemed designed to maximize CareFirst's leverage over the out-of-network facilities.

84.     On or about July 25, 2011, Stacey Breidenstein, Associate Vice President of Provider Contracting & Reimbursement Implementation for CareFirst, emailed Terri Welter of ECG Management Consultants noting the lack of "movement in regards to the various ASC negotiations" and indicating that CareFirst assumed that  there was no interest in a CareFirst agreement.  Breidenstein added, "[a]s a result we are going to move forward in working our

other strategies."   Ms. Welter responded that the facilities were awaiting agreement that CareFirst would contact legal counsel for the providers with regard to contracting matters rather than contacting the healthcare providers directly.

85.     On or about August 15, 2011, Dr. Torres and Dr. Gunawardane sent a letter to Penny Reynolds of CareFirst, indicating that CareFirst had rejected claims submitted to CareFirst and had indicated that the physicians were no longer credentialed as of July 31, 2011, but that the practice had received no communication to this effect.

86.     CareFirst sent letters to patients of Drs. Torres and Gunawardane advising them that the physicians were no longer participating in the CareFirst network.

87.     On or about September 23, 2011, CareFirst informed counsel for Maryland Pain & Spine that CareFirst would not reinstate the practice.

88.     Healthcare providers who had previously referred patients to Maryland Pain & Spine are now referring their patients to providers other than Drs. Torres and Gunawardane since becoming aware of the group's loss of in-network status.  This damages not only the doctor's practice but the surgery centers as they lose business as well.

89.     While CareFirst has not yet terminated other providers, CareFirst has nonetheless continued its campaign of coercion against the other providers who utilize out-of-network facilities including the Plaintiffs.

90.     Around November 3, 2011, Dorothy Woods with Provider Relations at CareFirst contacted Dr. Peterson and Dr. Bender's office and had told them that the agreement did not allow them to use out-of-network facilities.  Consequently, Drs. Peterson and Bender informed those facilities that it would no longer be utilizing Plaintiffs' facilities for CareFirst patients.

91.     Around February 6, 2012 CareFirst told another provider, Dr. Roberta Rothen, that it was refusing to allow her to utilize an out-of-network facility for her patients and was instead forcing her to utilize an in-network facility.   CareFirst threatened Dr. Rothen with termination should she fail to comply.

92.     CareFirst's attacks against provider who treat patients at out-of-network ambulatory surgery centers continue to the present.   In May of 2012, CareFirst threatened Dr. Somashekhar Bellary with termination of his Participation Agreement if he continued to treat patients at Plaintiff facility SurgCenter of Western Maryland.

93.     Shortly after the attempted termination of Maryland Pain & Spine, CareFirst sought to continue negotiations of an in-network relationship with the Plaintiffs and other related facilities. The parties sought to negotiate but CareFirst never offered competitive rates to the Plaintiffs.

94.     After some back and forth, on June 7, 2012, Andrea Pomykala of CareFirst informed representatives of the Plaintiffs that if its offer was not accepted they would begin another round of threats and intimidation against doctors who utilized the Plaintiffs.   After further negotiations, CareFirst still only offered rates that were significantly below market rates for facility reimbursements.

95.     Despite CareFirst's negotiating tactics, Plaintiffs continued their efforts to negotiate a contract with reasonable market rates so that Plaintiffs would not have to file this action.  Finally, in December of 2012, CareFirst made a final proposal and said it would not pay any higher rates to Plaintiffs.  The rates proposed by CareFirst, including in its final proposal, were well below any reasonable market rates.  The rates proposed by CareFirst were well below rates that other health insurance companies that do not have CareFirst's monopsony power are

prepared to pay in Maryland. The rates proposed by CareFirst are also well below the rates paid in comparable markets that have more competition among health insurance companies.

96.     According to CareFirst, each and every agreement entered into by CareFirst with providers requires that the providers "take" or "refer" patients/insureds only to other contracted in-network providers. According to CareFirst, these provisions explicitly prohibit contracted in-network from "taking" or "referring" any patients to out-of-network Providers. CareFirst's view is that it, along with each individual provider, have agreed to boycott and exclude out-of-network providers, and those in-network providers have agreed to only refer CareFirst business among one another.

97.     CareFirst's in-network providers are, for the most part, unwilling co-conspirators due to CareFirst's market power and its threats and enforcement of its view of these Agreements.

98.     As demonstrated above, CareFirst has sought to enforce these agreements and conspiracy by threatening physicians with termination of the agreements for cause, depriving them of their in- network status.

99.     In Plaintiffs' view, the CareFirst provider agreements contain no provision explicitly prohibiting referrals to or use of out-of-network facilities. Further, any such provision would violate Maryland law.

100.    Despite this, on information and belief, CareFirst is gearing up for another round of attempted and threatened terminations of healthcare providers who provide services at out-of-network facilities in Maryland, including the Plaintiffs.

101.    There is no pro-competitive justification for CareFirst's conduct with regard to providers who utilize the Plaintiffs or other out-of-network facilities.

102.    CareFirst has abused its market power by threatening, intimidating and by eventually terminating Maryland Pain & Spine in order to coerce Plaintiffs, out-of-network ambulatory care facilities heavily utilized by Maryland Pain & Spine providers, to become an in-network provider at below market rates.  While CareFirst may claim that it returns those lower rates to consumers, this is simply not true, and CareFirst has recently enacted large premium increases in hopes of increasing its "surplus" (what the not-for-profit world calls profits). Further, CareFirst's scheme limits consumer choice at the facility and physician level and its practices threaten the long term viability of the underlying medical practices, out-of- network surgery centers and health care providers in general.

103.    Absent market power, CareFirst's ploys would not only have failed but would have resulted in economic repercussions for CareFirst.  Given CareFirst's market power, however, Plaintiffs have suffered and continue to suffer significant injuries to their business and property.

104.    Consumers and competition have likewise been harmed. Consumer choices are limited when CareFirst limits its network and forces providers out of its network and out of business altogether. Further, even if CareFirst succeeds in forcing the out-of-network surgery centers into network through its coercive tactics, it will do so on terms that its competitors can never match or compete with due to their lack of market power and leverage over the healthcare providers.

105.    As alleged, Plaintiffs were damaged, and the damage caused was the direct and intended outcome of CareFirst's abuse of its monopoly power and the harm to competition.

### CAREFIRST'S AGREEMENTS TO ALLOCATE MARKETS REINFORCE
### ITS MARKET POWER

106.    CareFirst's market dominance is the result of a systematic and longstanding agreement between and among the various Blues entities and the remaining insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States, thereby eliminating competition.   This illegal restraint is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with the BCBSA.   As detailed herein, the member health insurance plans of BCBSA that allocate the geographic markets for health insurance by limiting each Blue plan's activity outside of a designated service area, thereby preventing competition among Blues plans.   Moreover, these agreements effectively obstruct entry by non-Blue insurers by, among other things, preventing the sale or transfer of established networks to non-Blue entities.   These provisions have insulated CareFirst and the other Blues from competition by both Blues and non-Blues in each of their respective service areas.   These provisions of the Blues agreements operate as effective restraints on competition, and have no sufficient economic justification aside from protecting the Blues from competition.

107.    CareFirst's anticompetitive practices, by eliminating competition and reducing the choices available to health insurance consumers, have raised the premiums that residents must pay to obtain health insurance.   This has further allowed CareFirst to collect supracompetitive profits, higher than they would have experienced had there been unimpeded competition in the states in question.   Indicia of supracompetitive profits include high medical loss ratios, high underwriting margins, and surpluses well above statutory requirements.

108.    By and through their anticompetitive agreements, CareFirst has been able to acquire and maintain a grossly disproportionate market share for health insurance products in

26

Maryland and the Baltimore-Towson and Salisbury MSAs. Consequently, CareFirst has benefitted from inflated surpluses and increased underwriting margins, and has exploited its decreased medical loss ratios to the resulting detriment and antitrust injury of health insurance subscribers.

109. CareFirst's anticompetitive practices, by reducing the options available to healthcare providers, have also significantly lowered the rates paid to healthcare providers. Given the market dominance of CareFirst and the other Blues, rival health insurance plans are effectively excluded from the market.

110. CareFirst has not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

111. CareFirst's co-conspirators include other Blues, as well as the BCBSA, who are not defendants in this action.

112. CareFirst and the other Blues agree not to compete as licensees of the BCBSA who operate in distinct geographical regions. CareFirst has engaged in a conspiracy to allocate the Maryland market, to reduce competition and to increase their profits at the expense of healthcare providers, such as Plaintiffs, in Maryland.

113. The member Blues, including CareFirst, are all licensees of the BCBSA which entitles them to certain rights within the BCBSA, such as use of the "blue cross" or "blue shield" emblems. BCBSA members elect a Board of Directors, composed exclusively of member Blues. That Board of Directors in turn establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive territories. The agreement is a per se violation of the antitrust laws. In addition, there is no pro-competetive justification for these licensing agreements and restrictions on competition in exclusive territories. Instead, they are

naked restraints on trade, are not ancillary to the legitimate and competitive purposes of the CareFirst, and have profound anticompetitive effects.

### History and Background of the Blue Cross and Blue Shield Plans and of BCBSA

114.    Blue Cross and Blue Shield Plans undertook a coordinated effort to create a national brand and then to allocate the market in which each Blue Plan would operate free of competition from other Blue Plans which has resulted in monopolies within the allocated geographic regions.   The history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

115.    In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.   In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.

116.    The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans.  These plans were designed to provide a mechanism for covering the cost of healthcare, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

117.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."   In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

118.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

119.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market.

120.     From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

121.     Instead, to address competition from commercial insurers and competition from other Blue plans, and to ensure national cooperation among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.

122.    Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.  Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

123.    In 1977 and 1978, the two Associations had consolidated.  By 1982, the process of the merger to form BCBSA had been completed.  In September of 1982, the board of directors of the combined BCBSA adopted a Long Term Business Strategy under which the Blue Plans agreed not to compete with each other.  The Association was told by at least one of its licenses at the time that the Association was violating the Antitrust laws.  At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.  That same year, BCBSA's Member Plans agreed to two propositions:  (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan.  As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 38 today.

124.    In 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition

from non-Blue subsidiaries of Blue plans, an increasing "problem" that had caused complaints from many Blue plans.

125.    Subsequently, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.  These illegal restraints are discussed below.

126.    Although Blue Cross Blue Shield plans were originally set up as not-for profit entities, during the 1980s and afterwards, they began to operate less like charitable entities and more like for-profit corporations.  Thus, in 1986, Congress revoked the Blues' tax-exempt status and they thus formed for-profit subsidiaries.  Consequently, the majority of the Blues converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

## The BCBSA and Blues Entities

127.    BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."   The Association is a separate legal entity and it purports to promote the common interests of the independent Blues entities.  BCBSA and the Bluescover a large percentage of the subscribers in the managed care market in most states and in some local areas, and they also include a large percentage of doctors and hospitals in their network of contracted providers.   BCBSA states that over 100 million individuals are enrolled with CareFirst and co-conspirator Blues, approximately one in three individuals nationwide.

128.     The independent Blues include many of the largest health insurance companies in the United States who would be potential competitors.   Indeed, the largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees.   Absent the Association's licensing agreements with each of the Blues, these companies would compete against each other in the market for commercial health insurance.

129.     BCBSA's Member Plans are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.   Instead, with and through the Association the Blues have divided health insurance markets throughout the United States, to eliminate competition in those markets. On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."

130.     The Association not only requires each individual Blue plan to agree to the territorial restrictions in the licensing agreements, but also serves as the epicenter for the Blues' communications and arrangements in furtherance of the their agreements not to compete. As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages ...."

131.     The Association, as a separate legal entity, is a convenient vehicle for anticompetitive agreements between and among the otherwise economic independent Blues, termed "Member Plans".   The Association's board of directors consists of the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer.  The board of directors holds meetings to discuss the administration and management of BCBSA and its Member Plans, while smaller committee meetings address specific health insurance issues. These meetings provide a forum for representatives of Member Plans to share information on such issues, and that information is later disseminated to all 38 members.

132.     In addition, BCBSA includes numerous committees governed by the Member Plans; it sponsors various meetings, seminars, and conferences attended by the Member Plans; and it produces manuals, reports, list serves, and other correspondence to the Member Plans, all in furtherance of the conspiracy.

133.     Furthermore, the Association has strict rules and regulations that all members of BCBSA must obey concerning members' Licensing Agreements and the guidelines proposed members must adhere to prior to joining the Association.[1]   Those regulations provide for amendment with a vote of three fourths of the Blues.

134.     The Association polices the compliance of all members of BCBSA with its rules and regulations.  The Guidelines state that the Association's Plan Performance and Financial Standards Committee (the "PPFSC") "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that

---

[1]      These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards.  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

135.    The Association controls and administers the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply "Immediate Termination," "Mediation and Arbitration," and "Sanctions" -each of which is administered by the PPFSC and could result in the termination of a member plan's license.

136.    The Association controls the termination of existing members from BCBSA. According to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

137.    As the foregoing demonstrates, BCBSA not only enters into anticompetitive agreements with the Blues entities to allocate markets, but also facilitates the cooperation and communications between the Blues to suppress competition within their respective areas of operation. BCBSA is a convenient organization through which the Blues entities can enter into patently illegal territorial restraints between and among themselves.

34

**The Horizontal Agreements Not To Compete In The Licensing Arrangements Between BCBSA And Its Member Plans, Including CareFirst, Are *Per Se* Violations of The Sherman Act**

138.    The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a *per se* violation of Section 1 of the Sherman Act.

139.    Through the License Agreements each Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area.   "The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

140.    Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue business.  This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

141.    Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield

trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business.  This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

142.    Therefore, each Blue Cross and Blue Shield licensee, including CareFirst, has agreed with the Association that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

143.    The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

144.    BCBSA and the Blues admit to the existence of territorial market divisions and the consequences of violating them. For example, the former Blue Cross licensee in Ohio has publicly stated that the BCBSA Member Plans agreed to include territorial restrictions in the Guidelines in order to block the sale of one member plan to a non-member plan as that would create increased competition.

145.    The largest Blue licensee, WellPoint, describes the restrictions on its ability to do business.  In its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, WellPoint stated that it had "no right to market products and services

using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 and 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

146.    The Association imposes harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee which would "allow the BCBSA to 're establish" a Blue Cross and/or Blue Shield presence in the vacated service area."

147.    Thus while there are numerous Blue plans, and non-Blue businesses owned by such plans that could and would compete effectively in designated service areas but for the territorial restrictions, CareFirst and the other Blue Cross entities those areas dominate the markets.  The territorial restrictions have therefore barred competition from the respective commercial health insurance markets.

148.    For example, with approximately 34 million enrollees, Anthem is the largest health insurer in the country by total medical enrollment and is the BCBSA licensee for 14

states, and also serves the entire nation through its non-Blue brand subsidiary, UniCare. However, Anthem does not have a presence in any of the other states, including Maryland. But for the illegal territorial restrictions described herein, Anthem would likely offer its health insurance products and services in Maryland and compete with CareFirst. Such competition would lessen the disparity in power between the Blues and healthcare providers and, would, therefore, result in higher rates and better terms. CareFirst would no longer be able to abuse their market power. Greater competition would result in more options and greater access to patients for healthcare providers who opt not to be in-network with a particular Blue plan. Greater competition would also result in lower health care costs and premiums by affected enrollees. Accordingly, all healthcare providers and healthcare consumers would benefit from a healthier, more competitive healthcare environment.

149.     Similarly, Blue Cross and Blue Shield of Florida is the 15th largest health insurer in the country by total medical enrollment with more than seven million enrollees. But for the illegal territorial restrictions, it would likely offer its health insurance services and products in other states, including Maryland, and compete with CareFirst. Such competition would lessen the disparity in power between the Blues and healthcare providers and, would, therefore, result in higher rates and better terms. CareFirst and other Blue Cross entities would no longer be able to abuse their market power. Greater competition would result in more options and greater access to patients for healthcare providers who opt not to be in-network with CareFirst. Greater competition would also result in lower health care costs and premiums paid by CareFirst enrollees. Accordingly, all healthcare providers and healthcare consumers would benefit from a healthier, more competitive healthcare environment.

150.    Therefore, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing Member Plans from competing with each other and with non-Blue plans.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**The Anticompetitive Acquisition Restrictions In The BCBSA Licensing Agreements**

151.    In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any Member Plan.  These provisions create a significant barrier to entry for companies that are not BCBSA members or their affiliates.  As such, they further restrain competition by helping BCBS companies to capture and maintain high market shares and elevate prices.

152.    First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."  Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee."  However, as alleged above, the Member Plans control the entry of new members into BCBSA.  Should a non-member attempt to join BCBSA in order to obtain control of or to acquire a substantial portion of the assets of a member plan, the Association – and through it, the Member Plans – could easily block its membership.  Moreover, such a new member would be immediately limited by the BCBSA license's territorial restrictions.  It would be forbidden from operating as a BCBS entity in a service area already inhabited by a BCBS entity, yet it would be

required to make at least 66.7% of its revenue under the BCBS name.  For many potential acquirers with a pre-existing footprint in the U.S. health insurance market, these two conditions would be impossible to meet.

153.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired).  These include four situations in which a member plan's license will terminate ***automatically***: (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities.  These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Member Plans and also of a majority weighted vote of the disinterested Member Plans.  These restraints effectively preclude the sale of a BCBSA member to a non-member entity absent special approval.

154.    These acquisition restraints reduce competition by substantially reducing the ability of non-member insurance companies to expand their business. In order to expand into a

new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan in that area.  Through the acquisition restrictions, BCBSA and the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan.  Blue provider networks may be the most cost effective due to historical tax breaks, favorable legislation, and long-term presence in a region. In fact, national insurers rarely enter a new regional market without purchasing a large local firm. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

155.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition.  The net effect is less competition, lower rates for healthcare providers and higher premium costs for consumers.

## The BCBSA Licensing Agreements Have Reduced Competition

156.    CareFirst, as a licensee, members, and part of the governing body of BCBSA, has conspired with the other Member Plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.  Many of the Member Plans with which CareFirst has conspired would otherwise be significant competitors.

157.    In addition to the foregoing example, there are dozens of other Blue plans that would and could compete in the designated areas but for the illegal territorial restrictions.  In addition, CareFirst and other Blue Cross entities could compete with each other.  As alleged above, 15 of the 25 largest health insurance companies in the country are Blue plans. If all of these plans, together with all other BCBSA members, were able to compete in each other's territories, the result would be greater competition. Such competition would lessen the disparity in power between the Blues and healthcare providers and, would, therefore, result in higher rates and better terms.    Greater competition would result in more options and greater access to patients for healthcare providers who opt not to be in-network with a CareFirst. Greater competition would also result in lower health care costs and premiums paid by affected enrollees.   All healthcare providers as well as healthcare consumers would benefit from a healthier, more competitive healthcare environment.

## The Blue Card Program

158.    Further, by virtue of their illegal agreement not to compete with other Blues CareFirst has agreed to participate in the "Blue Card" program with BCBSA and other Blues. The Blue Card Program was launched in 1994.

159.    The Blue Card Program is a national program that enables members of one Blues plan (the "Home Plan") to obtain health care services while traveling or living in another Blues plan's service area. The program links participating health care providers with the independent Blues plans across the country through a single electronic network for claims processing and reimbursement.    Plaintiffs regularly treat members of Blues plans other than CareFirst. However, because of the price fixing agreement implemented through the Blue Card Program,

Plaintiffs cannot negotiate an agreement with other Blues plans, even those whose service areas border on the State of Maryland.

160.     Through the national Blue Card program, Blues plan members who live or travel outside their home state can get medical care from any of the more than 85 percent of all U.S. doctors and hospitals that participate with Blue plans.

161.     The Blue Card Program links one Blues plan's (such as CareFirst's) participating health care providers with all the other Blues plans across the country and around the world through a single electronic network for claims processing and reimbursement.

162.     The Blue Card Program also allows plan members who are away from (traveling or living) their Home Plan's service area to receive medical care from participating providers wherever services may be required and in many instances, to receive the same level of benefits they would receive if the services were rendered in their Home Plan's service area.

163.     As publicly described, the Blue Card program allows providers to submit claims for Blues plan members from other Blues plans, including international Blues plans, directly to the provider's local plan (the "Host Plan"). That plan will be the provider's contact for claims filing, claims payment, adjustments, inquiries, and problem resolution.

164.     The reality is that under the Blue Card Program, locally operating Blues plans agree to link up their provider networks, making their discounts available to all other Blues plans who participate in the Blue Card Program.  It is by design a price fixing conspiracy.

165.     CareFirst's website describes the program this way:

**Key terms**
Host Plan
Also called the local plan, where the actual medical service is provided; CareFirst is the Host Plan when a BCBS member from another Blue Plan service area obtains healthcare services from a CareFirst provider

43

Home Plan

The contracted BlueCross BlueShield Plan where the insured member is enrolled; The logo of the Home plan can be found on the member's BCBS insurance card.

Out-of-Area-Insured

An insured individual who is enrolled in a Blue Cross and Blue Shield other than CareFirst.

**Example**

When you see an out-of-area insured patient like Julie Gilbert, submit your claims to CareFirst - the local or Host Plan. CareFirst then coordinates the claims process for you through the BlueCard program.



As the Host Plan, CareFirst receives your claim, codes and prices it according to contracted provider agreements, then sends an electronic submission to Julie's Seattle-based Home Plan.

When the Seattle-based Home Plan receives the information, the claim is processed by applying the Plan's medical policy, claim adjudication edits, and the member's benefit exclusions or limitations. The BCBS Plan then sends an electronic disposition back to the Host Plan, with instructions for paying the claim according to the Plan fee-schedule.

CareFirst then generates a voucher, pays you, and notifies the Home plan how the claim was paid.

166.    For instance, a Washington-based insured travels to Maryland and requires hospitalization.  The provider is contracted with CareFirst.  The provider submits this claim directly to CareFirst, and the Home Plan remits payment at the rates at which CareFirst has contracted with the provider, rather than going out and attempting to contract with the provider at its own rates.

167.    Of course, this agreement among the various Blues plans amounts to price fixing with the out of state plan choosing to rely on the rates negotiated by the dominant Host Plans, such as CareFirst. Both the Home Plan and Host Plan (CareFirst) benefit from the Blue Card transaction.

168.    The Blue Card Program is administered through a single electronic claims processing network and platform, NASCO, which is owned through a partnership of Blues.

169.     CareFirst's immense market power enables the other Blues plans to achieve the same sub-competitive rates CareFirst has leverage its in-state monopoly to receive.  Thus, all the Bluesbenefit from CareFirst's lack of competition in Maryland.

170.     According to press releases, CareFirst saves over 300 million dollars a year through the Blue Card Program. In 2002, the BCBSA estimated the savings from the Blue Card Program at approximately 9 billion dollars for members' plans. Approximately 250 million claims a year are processed using this price fixing agreement.

## THE IMPACT OF CAREFIRST'S IMPROPER CONDUCT

171.     CareFirst's illegal activities have resulted in harm to competition. CareFirst's monopoly or attempted monopoly and CareFirst's abuse of its monopoly power have allowed CareFirst to suppress competition with regard to the facilities available for the provision of surgical and medical procedures, depriving patients of choices in the marketplace both with regard to surgical care facilities and with regard to medical providers.  Moreover, CareFirst's activities have been undertaken with the aim of forcing Plaintiffs to choose between non-competitive rates or being put out of business, through coercion.

172.     CareFirst's illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' facilities by providers intimidated by CareFirst and in threatened future harm to Plaintiffs' business and property.

173.     If CareFirst's actions are not enjoined, harm to competition and injury to Plaintiffs will continue. CareFirst has articulated further imminent threats to terminate the network status of healthcare providers utilizing the Plaintiffs' facilities.

## COUNT I

**Contract, Combination, or Conspiracy in Restraint of Trade**
**In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (The Territorial Conspiracy)**

174.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 174as
though set forth herein.

175.    The License Agreements, Membership Standards, and Guidelines entered into
between BCBSA and the Blue – including CareFirst – represent a contract, combination, and
conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

176.    Through the License Agreements, Membership Standards, and Guidelines, Care
First, BCBSA, and the other Blue Cross entities have agreed to divide and allocate the
geographic markets for the sale of commercial health insurance into a series of exclusive areas
for each of the 38 BCBSA members. By so doing, the BCBSA members -including CareFirst-
have agreed to suppress competition and to increase their profits by increasing prices for
individual and small group health insurance sold in their respective territories and by decreasing
the rates paid to healthcare providers in violation of Section 1 of the Sherman Act. Due to the
lack of competition which results from CareFirst's illegal conduct, healthcare providers who
choose not to be in-network have an extremely limited market for the healthcare services they
provide.  CareFirst's market allocation agreements are *per se* illegal under Section 1 of the
Sherman Act.

177.    As a direct and proximate result of CareFirst's continuing violations of Section 1
of the Sherman Act, Plaintiff has suffered and continue to suffer injury and damages of the type
that the federal antitrust laws were designed to prevent. Such injury flows directly from that
which makes CareFirst's conduct unlawful.  These damages consist of having been paid lower
rates, having been forced to accept far less favorable terms, and/or having access to far fewer

46

patients than they would have with increased competition and but for CareFirst's anticompetitive agreement.

178.    Plaintiff seeks money damages from CareFirst for their violations of Section 1 of the Sherman Act.

179.    CareFirst's unlawful conduct threatens to continue to injure Plaintiff. Plaintiff seeks a permanent injunction prohibiting CareFirst from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## COUNT II

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of the Maryland Antitrust Act, Md. Code Ann. Com. Law § 11-204
### (The Territorial Conspiracy)

180.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 180 as though set forth herein.

181.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities–including CareFirst–represent a contract, combination, and conspiracy within the meaning of Md. Code Ann., Com. Law § 11–204(a)(1).

182.    Through the License Agreements, Membership Standards, and Guidelines, Care First, BCBSA, and the other Blue Cross entities have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members. By so doing, the BCBSA members -including CareFirst- have agreed to suppress competition and to increase their profits by increasing prices for individual and small group health insurance sold in their respective territories and by decreasing the rates paid to healthcare providers in violation of Md. Code Ann., Com. Law § 11–204(a)(1). Due to the lack of competition which results from CareFirst's illegal conduct, healthcare

providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.  CareFirst's market allocation agreements are *per se* illegal under the Maryland Antitrust Act.

183.    As a direct and proximate result of CareFirst's continuing violations of the Maryland Antitrust Act Plaintiffs have suffered and continue to suffer injury and damages of the type that the Maryland Antitrust Act was designed to prevent. Such injury flows directly from that which makes CareFirst's conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for CareFirst's anticompetitive agreement.

184.    Plaintiffs seek money damages from CareFirst for its violations of Md. Code Ann., Com. Law § 11–204(a) (1).

185.    CareFirst's unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting CareFirst from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which Blues plans may compete.

### COUNT III

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (The In-Network Conspiracy)

186.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 186as though set forth herein.

187.    CareFirst has combined, conspired and/or agreed with each other, with their network of Providers, to unreasonably restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1. CareFirst combined, conspired and/or agreed with its networks of Providers

engage in numerous horizontal schemes that seek to artificially lower, fix or maintain the price at which CareFirst will reimburse Plaintiffs for the medical services rendered to insureds, to steer business among those in-network providers, and to jointly refuse to deal with out-of-network providers, notably Plaintiffs.

188.    According to CareFirst, each and every agreement entered into by CareFirst with providers requires that the providers "take" or "refer" patients/insureds only to other contracted in-network providers. According to CareFirst, these provisions explicitly prohibit contracted in-network from "taking" or "referring" any patients to out-of-network Providers.

189.    The above agreement and/or conspiracy is a *per se* violation of Section 1 of the Sherman Act, which operates at the expense of out-of-network surgery centers such as the Plaintiffs resulting in lower reimbursement rates for services, rendered and business being steered away from out-of-network providers and to participating contracted in-network providers.  The above agreement and/or conspiracy illegally restrains competition in a number of ways, including:

a.      Setting reimbursement rates for out-of-network Plaintiffs at unconscionable and punitively low levels which are far below the level that would exist in a true competitive market;

b.      Unfairly diverting Plaintiffs' patients to in-network hospitals, facilities and providers who have accepted CareFirst's below market reimbursement rates;

c.      Preventing Plaintiffs from competing with CareFirst's in-network hospitals and surgery centers equal footing by: (i) forcing out-of-network providers to charge higher co-pays to patients, while charging lower co-pays for in-network treatment; and (ii)

refusing to honor assignments for out-of-network providers, paying insureds' directly and forcing out-of-network providers to chase their patients' for the reimbursement checks.

190.    The above "price fixing" scheme has squeezed the Plaintiffs' profit margins below competitive levels for CareFirst cases.  Because of the overwhelming market power that CareFirst maintains in the relevant geographic markets that the Plaintiffs operate in, and because of the conspiracy and/or agreements with other Providers to refuse to deal with these out-of-network providers, there is no alternative supply of business for the Plaintiffs.  Because of the conspiracy with its network of participating Providers, CareFirst maintains and enhances its monopoly and "squeeze" Plaintiffs' margins to unconscionably low levels.

191.    All of the aforementioned agreements and/or conspiracies affect interstate commerce and have resulted in antitrust injuries to the Plaintiffs.

192.    The Plaintiffs are entitled to damages under 15 U.S.C. § 15, *et seq.*

193.    As a result of the illegal agreements and/or conspiracies, CareFirst has caused the Plaintiffs to suffer financial loss in that CareFirst, with its monopolistic market strength: (i) forces out-of-network Providers to accept reimbursement rates that are set at unconscionably low levels; (ii) boycotted, along with all its networks of co-conspirators, out-of-network Providers including the Plaintiffs; (iii) refuse to give out-of-network surgical facilities like the Plaintiffs access to the market of patients whose claims are reimbursable by insurance except on terms and reimbursement prices that leave no economic margin for the facilities' survival; (iv) steer health plan members to in-network hospitals, providers and facilities who are accepting less than competitive market rates, by requiring all referrals to be to in-network providers and prohibiting out-of-network referrals, (v) take healthcare providers out of the medical care equation by either

limiting, or altogether removing, their discretion; and (vi) imposing unreasonable and unnecessary additional costs on Plaintiffs.

194.    As a consequence of CareFirst's illegal agreements and/or conspiracies, Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of their business.  Among other things, Plaintiffs were reimbursed substantially less they would have been in the absence of these illegal restraints and have lost and will continue to lose further business.    Plaintiffs are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees.  Plaintiffs further seek injunctive relief in the form of order prohibiting CareFirst from engaging in the anti-competitive, discriminatory and otherwise wrongful behavior described above.

## COUNT IV

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of the Maryland Antitrust Act, Md. Code Ann. Com. Law § 11-204
### (The In- Network Conspiracy)

195.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 195as though set forth herein.

196.    CareFirst has combined, conspired and/or agreed with each other, with their network of Providers, to unreasonably restrain trade in violation of Section One of the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11–204(a)(1). CareFirst combined, conspired and/or agreed with its networks of providers to engage in numerous horizontal schemes that seek to artificially lower, fix or maintain the price at which CareFirst will reimburse Plaintiffs for the medical services rendered to insureds, to steer business among those in-network providers, and to jointly refuse to deal with out-of-network providers, notably Plaintiffs.

197.    According to CareFirst, each and every agreement entered into by CareFirst with providers requires that the providers "take" or "refer" patients/insureds only to other contracted

in-network providers. According to CareFirst, these provisions explicitly prohibit contracted in-network from "taking" or "referring" any patients to out-of-network providers.

198.    The above agreement and/or conspiracy is a *per se* violation of the Maryland Antitrust Act, which operates at the expense of out-of-network surgery centers such as the Plaintiffs resulting in lower reimbursement rates for services, rendered and business being steered away from out-of-network providers and to participating contracted in-network providers.  The above agreement and/or conspiracy illegally restrains competition in a number of ways, including:

      a.    Setting reimbursement rates for out-of-network Plaintiffs at unconscionable and punitively low levels which are far below the level that would exist in a true competitive market;

      b.    Unfairly diverting Plaintiffs' patients to in-network hospitals, facilities and providers who have accepted CareFirst's below market reimbursement rates;

      c.    Preventing Plaintiffs from competing with CareFirst's in-network hospitals and surgery centers equal footing by: (i) forcing out-of-network providers to charge higher co-pays to patients, while charging lower co-pays for in-network treatment; and (ii) refusing to honor assignments for out-of-network providers, paying insureds' directly and forcing out-of-network providers to chase their patients' for the reimbursement checks.

199.    The above "price fixing" scheme has squeezed the Plaintiffs' profit margins below competitive levels.  Because of the overwhelming market power that CareFirst maintains in the relevant geographic markets that the Plaintiffs operate in, and because of the conspiracy and/or agreements with other Providers to refuse to deal with these out-of-network providers, there is no alternative supply of business for the Plaintiffs.  Because of the conspiracy with its

network of Providers, CareFirst maintain and enhances its monopoly and "squeeze" Plaintiffs' margins to unconscionably low levels.

200.    All of the aforementioned agreements and/or conspiracies have resulted in antitrust injury to the Plaintiffs.

201.    The Plaintiffs are entitled to damages under the Maryland Antitrust Act.

202.    As a result of the illegal agreements and/or conspiracies, CareFirst has caused the Plaintiffs to suffer financial loss in that CareFirst, with its monopolistic market strength: (i) forces out-of-network providers to accept reimbursement rates that are set at unconscionably low levels; (ii) boycotted, along with all its networks of co-conspirators, out-of-network providers including the Plaintiffs; (iii) refuse to give out-of-network surgical facilities like Plaintiffs access to the market of patients whose claims are reimbursable by insurance except on terms and reimbursement prices that leave no economic margin for the facilities' survival; (iv) steer health plan members to in-network hospitals, providers and facilities who are accepting less than competitive market rates, by requiring all referrals to be to in-network providers and prohibiting out-of-network referrals, (v) and take healthcare providers out of the medical care equation by either limiting, or altogether removing, their discretion.

203.    As a consequence of CareFirst's illegal agreements and/or conspiracies, Plaintiffs have suffered and will continue to suffer financial loss and have been injured and will continue to be injured in the pursuit of their business.  Among other things, Plaintiffs were reimbursed substantially less they would have been in the absence of these illegal restraints and have lost and will continue to lose further business.    Plaintiffs are entitled to recover such actual damages as the jury may find, threefold, plus costs, expenses and attorneys fees.  Plaintiffs further seek

injunctive relief in the form of order prohibiting CareFirst from engaging in the anti-competitive,

discriminatory and otherwise wrongful behavior described above.

### COUNT V

**Contract, Combination, or Conspiracy in Restraint of Trade
In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (The Blue Card Conspiracy)**

204.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 204as

though set forth herein.

205.    The Blue Card Program, in addition to the The License Agreements, Membership

Standards, and Guidelines entered into between CareFirst, BCBSA and the Blues, represents a

contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

206.    Through the Blue Card Program License Agreements, Membership Standards,

and Guidelines, Care First, BCBSA, and the other Blues have agreed to fix reimbursement rates

for providers among themselves by agreeing to accept the "host plan" reimbursement rate

through the Blue Card Program. By so doing, the BCBSA members -including CareFirst - have

agreed to suppress competition by fixing, and maintaining the rates paid to healthcare providers

at less than competitive levels in violation of Section 1 of the Sherman Act. Due to the lack of

competition which results from CareFirst's illegal conduct, healthcare providers who choose not

to be in-network have an extremely limited market for the healthcare services they provide.

CareFirst's price fixing agreement through the Blue Card Program is *per se* illegal under Section

1 of the Sherman Act.

207.    As a direct and proximate result of CareFirst's continuing violations of Section 1

of the Sherman Act, Plaintiff has suffered and continue to suffer injury and damages of the type

that the federal antitrust laws were designed to prevent. Such injury flows directly from that

which makes CareFirst's conduct unlawful.  These damages consist of having been paid lower

rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for CareFirst's anticompetitive agreement.

208.     Plaintiff seeks money damages from CareFirst for their violations of Section 1 of the Sherman Act.

209.     CareFirst's unlawful conduct threatens to continue to injure Plaintiff. Plaintiff seeks a permanent injunction prohibiting CareFirst from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## COUNT VI

**Contract, Combination, or Conspiracy in Restraint of Trade
In Violation of the Maryland Antitrust Act, Md. Code Ann. Com. Law § 11-204
(The Blue Card Conspiracy)**

210.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 210as through set forth herein.

211.     The Blue Card Program, License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blue entities–including CareFirst–represent a contract, combination, and conspiracy within the meaning of Md. Code Ann., Com. Law § 11–204(a)(1).

212.     Through the License Agreements, Membership Standards, and Guidelines, Care First, BCBSA, and the other Blue Cross entities have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members. By so doing, the BCBSA members -including CareFirst-have agreed to suppress competition and to increase their profits by fixing the rates paid to healthcare providers in violation of Md. Code Ann., Com. Law § 11–204(a)(1). Due to the lack

of competition which results from CareFirst's illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide. CareFirst's price fixing agreements are *per se* illegal under Section 1 of the Sherman Act.

213.    As a direct and proximate result of CareFirst's continuing violations of Section 1 of the Sherman Act, Plaintiff has suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes CareFirst's conduct unlawful.  These damages consist of having been paid lower rates they would have with increased competition and but for CareFirst's anticompetitive agreement.

214.    Plaintiffs seeks money damages from CareFirst for its violations of Md. Code Ann., Com. Law § 11–204(a) (1).

215.    CareFirst's unlawful conduct threatens to continue to injure Plaintiff. Plaintiff seeks a permanent injunction prohibiting CareFirst from entering into, or from honoring or enforcing, any agreements that fix the price that all Blues plans will reimburse the Plaintiffs.

## COUNT VII

**Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

216.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 216as though set forth herein.

217.    CareFirst has willfully and wrongfully acquired, maintained and exercised its monopoly in the PPO market in the Maryland and in the Baltimore-Towson and Salisbury MSAs in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  This offense is likely to continue to recur unless the relief requested is granted.

218.    For the purpose, and the actual effect, of maintaining, extending and exercising its monopoly in Maryland and in the Baltimore-Towson and Salisbury MSAs, CareFirst has threatened and intimidated healthcare providers who utilize Plaintiffs' facilities with termination and, in fact, did terminate Maryland Pain & Spine from the CareFirst network in order to coerce Plaintiffs to become in-network facilities at below market rates.

219.    CareFirst's acts and practices and CareFirst's continuing course of conduct have harmed consumers and competition in Maryland and in the Baltimore-Towson and Salisbury MSAs.

220.    CareFirst's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injured to Plaintiffs of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiffs will continue to suffer injury for which there is no adequate remedy at law.

## COUNT VIII

### Monopolization in Violation of the Maryland Antitrust Act,
### Md. Code Ann., Com. Law § 11-204

221.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 173 as through set forth herein.

222.    CareFirst has willfully and wrongfully acquired, maintained and exercised its monopoly in the PPO market in the Maryland and in the Baltimore-Towson and Salisbury MSAs in violation of the Maryland Antitrust Act.  This offense is likely to continue to recur unless the relief requested is granted.

223.    For the purpose, and the actual effect, of maintaining, extending and exercising its monopoly in Maryland and in the Baltimore-Towson and Salisbury MSAs, CareFirst has threatened and intimidated healthcare providers who utilize Plaintiffs' facilities with termination

and, in fact, did terminate Maryland Pain & Spine from the CareFirst network in order to coerce Plaintiffs to become in-network facilities at below market rates.

224.    CareFirst's acts and practices and CareFirst's continuing course of conduct have harmed consumers and providers and competition in Maryland and in the Baltimore-Towson and Salisbury MSAs.

225.    CareFirst's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injury to Plaintiffs of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiffs will continue to suffer injury for which there is no adequate remedy at law.

## COUNT IX

### Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

226.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 226as though set forth herein.

227.    CareFirst has willfully attempted to monopolize the PPO market in Maryland and in the Baltimore-Towson and Salisbury MSAs in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  This offense is likely to continue or recur unless the relief requested is granted.

228.    With the specific intent and the dangerous probability of monopolizing the PPO market in Maryland and in the Baltimore-Towson and Salisbury MSAs, CareFirst has threatened and intimidated healthcare providers who utilize Plaintiffs' facilities with termination and, in fact, did terminate Maryland Pain & Spine from the CareFirst network in order to coerce Plaintiffs to become in-network facilities at below market rates.

229.     CareFirst's acts and practices and CareFirst's continuing course of conduct have harmed consumers and competition in Maryland and in the Baltimore-Towson and Salisbury MSAs.

230.     CareFirst's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injured to Plaintiffs of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiffs will continue to suffer injury for which there is no adequate remedy at law.

## COUNT X

**Attempted Monopolization in Violation of the Maryland Antitrust Act,
Md. Code Ann., Com. Law § 11-204**

231.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 231as though set forth herein.

232.     CareFirst has willfully attempted to monopolize the PPO market in Maryland and in the Baltimore-Towson and Salisbury MSAs in violation of the Maryland Antitrust Act.  This offense is likely to continue or recur unless the relief requested is granted.

233.     With the specific intent and the dangerous probability of monopolizing the PPO market in Maryland and in the Baltimore-Towson and Salisbury MSAs, CareFirst has threatened and intimidated healthcare providers who utilize Plaintiffs' facilities with termination and, in fact, did terminate Maryland Pain & Spine from the CareFirst network in order to coerce Plaintiffs to become in-network facilities at below market rates.

234.     CareFirst's acts and practices and CareFirst's continuing course of conduct have harmed consumers and competition in Maryland and in the Baltimore-Towson and Salisbury MSAs.

235.     CareFirst's anticompetitive, exclusionary and coercive conduct has directly and proximately caused injured to Plaintiffs of a type the antitrust laws are intended to prohibit and unless the activities complained of are enjoined, Plaintiffs will continue to suffer injury for which there is no adequate remedy at law.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek the following relief:

(a)     A declaration that, by maintaining or attempting to maintain a monopoly and by wrongfully exercising its monopoly power, CareFirst violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-204.

(b)     A declaration that, by interpreting its provider agreements to require only in-network referrals and prohibit out-of-network referrals, CareFirst and its co-conspirators violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-204.

(c)     An injunction restraining and prohibiting CareFirst from, in any manner, continuing, maintaining or renewing the conduct alleged herein or from engaging in any other conduct having the same effect as the alleged violations.

(d)     An injunction restraining and prohibiting CareFirst from, in any manner, continuing, maintaining or enforcing the portions of its provider agreements which it claims prohibit out-of-network referrals.

(e)      An injunction restraining and prohibiting CareFirst from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any Blues plan may compete;

(f)     An injunction restraining and prohibiting CareFirst from entering into or enforcing any agreements to boycott out-of-network healthcare providers;

(g)     Adjudge and decree that CareFirst has violated Section 1 of the Sherman Act, 15 U.S.C. § 1 and Md. Code Ann., Com. Law §11-204 ;

(h)     An award to Plaintiffs of actual damages, trebled pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15 and the Maryland Antitrust Act, Md. Code Ann., Com. Law § 11-209, along with interest on such damages.

(i)     An award to Plaintiffs of their costs, including reasonable attorneys' fees, as provided in Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26 and the Maryland Antitrust Act., Md. Code Ann., Com. Law § 11-209.

(j)     Such other relief as the nature of the case may require and may be deemed just and proper.


## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  March 12, 2013


                                        *s/Mark J. Murphy*
                                        Mark J. Murphy (Bar No. 16534)
                                        Mooney, Green, Saindon,
                                        Murphy & Welch, P.C.
                                        1920 L Street NW, Suite 400
                                        Washington, DC 20036
                                        (202) 783-0010 tel.
                                        (202) 783-6088 fax
                                        mmurphy@mooneygreen.com

Joe R. Whatley, Jr.
W. Tucker Brown
WHATLEY KALLAS, LLC
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1200
Fax:  (800) 922-4851
Email:  jwhatley@whatleykallas.com
          tbrown@whatleykallas.com

Edith M. Kallas
Patrick J. Sheehan
WHATLEY KALLAS, LLC
380 Madison Avenue, 23rd Floor
New York, NY 10017
Tel:  (212) 447-7060
Fax:  (800) 922-4851
Email:  ekallas@whatleykallas.com
          psheehan@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLC
1068 Virginia Ave, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email:  dwinegard@whatleykallas.com

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Advanced Surgery Center of Bethesda, LLC et al. | CareFirst of Maryland, Inc. |

**(b)** County of Residence of First Listed Plaintiff  <u>Montgomery County</u>
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Mark J. Murphy, Mooney, Green, Saindon, Murphy & Welch, P.C.
1920 L. Street, N.W., Suite 400, Wash. D.C. 20036
(202) 783-0010

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. Sections 1-2 (Sherman Act) and 15 U.S.C. Sections 15 and 26 (Clayton Act)

Brief description of cause:
Violations of applicable federal and state antitrust statues with respect to the provision of medical services

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE *injunctive/declaratory monetary -TBD*   DOCKET NUMBER

DATE  *3-12-13*

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

U.S. District Court
District of Maryland (Baltimore)
CIVIL DOCKET FOR CASE #: 1:13-cv-00769-JFM

| | |
|---|---|
| Advanced Surgery Center of Bethesda, LLC et al v. CareFirst of Maryland, Inc. | Date Filed: 03/12/2013 |
| | Jury Demand: Plaintiff |
| Assigned to: Judge J. Frederick Motz | Nature of Suit: 410 Anti-Trust |
| Cause: 28:1337 Sherman-Clayton Act | Jurisdiction: Federal Question |

Plaintiff

Advanced Surgery Center of
Bethesda, LLC

represented by   Mark J Murphy
Mooney Green Saindon Murphy and
Welch PC
1920 L St NW Ste 400
Washington, DC 20036
12027830010
Fax: 12027836088
Email: mmurphy@mooneygreen.com
ATTORNEY TO BE NOTICED

Plaintiff

Bethesda Chevy Chase Surgery
Center, LLC

represented by   Mark J Murphy
(See above for address)
ATTORNEY TO BE NOTICED

Plaintiff

Deer Pointe Surgical Center, LLC

represented by   Mark J Murphy
(See above for address)
ATTORNEY TO BE NOTICED

Plaintiff

Hagerstown Surgery Center, LLC

represented by   Mark J Murphy
(See above for address)
ATTORNEY TO BE NOTICED

Plaintiff

Leonardtown Surgery Center, LLC

represented by   Mark J Murphy
(See above for address)
ATTORNEY TO BE NOTICED

Plaintiff

Maple Lawn Surgery Center, LLC

represented by   Mark J Murphy
(See above for address)
ATTORNEY TO BE NOTICED

Plaintiff

Piccard Surgery Center, LLC                represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

Riva Road Surgery Center, LLC              represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of Bel Air, LLC                 represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of Glen Burnie, LLC             represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of Greenbelt, LLC               represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter at National Harbor, LLC         represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of Silver Spring, LLC           represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of Southern Maryland,           represented by Mark J Murphy
LLC                                                       (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of Western Maryland,            represented by Mark J Murphy
LLC                                                       (See above for address)
                                                          ATTORNEY TO BE NOTICED

Plaintiff

SurgCenter of White Marsh, LLC             represented by Mark J Murphy
                                                          (See above for address)
                                                          ATTORNEY TO BE NOTICED

Case MDL No. 2406   Document 174-3   Filed 03/13/13   Page 67 of 67

Plaintiff

Timonium Surgery Center, LLC          represented by   Mark J Murphy
                                                       (See above for address)
                                                       ATTORNEY TO BE NOTICED

Plaintiff

Westminster Surgery Center, LLC       represented by   Mark J Murphy
                                                       (See above for address)
                                                       ATTORNEY TO BE NOTICED

.

Defendant

CareFirst of Maryland, Inc.

| Date Filed | # | Docket Text |
|---|---|---|
| 03/12/2013 | 1 | C  MPLAINT against CareFirst of Maryland, Inc. ( Filing fee   3  0 receipt number 0416-3993380.), filed by SurgCenter of Greenbelt, LLC, Piccard Surgery Center, LLC, Timonium Surgery Center, LLC, Bethesda Chevy Chase Surgery Center, LLC, Advanced Surgery Center of Bethesda, LLC, Westminster Surgery Center, LLC, SurgCenter of White Marsh, LLC, SurgCenter of Silver Spring, LLC, Maple La  n Surgery Center, LLC, Deer Pointe Surgical Center, LLC, SurgCenter of Bel Air, LLC, SurgCenter at National   arbor, LLC, SurgCenter of Southern Maryland, LLC, SurgCenter of Western Maryland, LLC,   iva  oad Surgery Center, LLC,   agersto  n Surgery Center, LLC, SurgCenter of Glen Burnie, LLC, Leonardto  n Surgery Center, LLC. (Attachments:  1 Civil Cover Sheet,  2 Supplement Summons)(Murphy, Mark) (Entered: 03/12/2013) |
| 03/13/2013 | 2 | Summons Issued 21 days as to CareFirst of Maryland, Inc.. (apls, Deputy Clerk) (Entered: 03/13/2013) |