# Exhibit 3

MITCHELL,_MR

# U.S. District Court
## Western District of Oklahoma[LIVE] (Oklahoma City)
## CIVIL DOCKET FOR CASE #: 5:13-cv-00294-D

| | |
|---|---|
| Johnston et al v. Blue Cross & Blue Shield of Oklahoma et al | Date Filed: 03/27/2013 |
| | Jury Demand: Defendant |
| Assigned to: Honorable Timothy D. DeGiusti | Nature of Suit: 410 Anti-Trust |
| Demand: $5,000,000 | Jurisdiction: Federal Question |
| Case in other court:  District Court of Logan County | |
| Oklahoma, CJ-13-00017 | |
| Cause: 28:1441 Petition for Removal | |

**Plaintiff**

| | | |
|---|---|---|
| **Clint Johnston** | represented by | **Benjamin L Barnes** |
| *individually* | | Benjamin L Barnes Attorney @ Counselor at Law |
| | | 2575 Kelley Pointe Parkways |
| | | Suite 100 |
| | | Edmond, OK 73013 |
| | | 405-330-9860 |
| | | Fax: 405-231-4701 |
| | | Email: bb@bbarneslaw.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C Cowan** |
| | | 4144 N Central Expressway |
| | | Suite 370 |
| | | Dallas, TX 75204 |
| | | 214-826-1900 |
| | | Fax: 214-826-8900 |
| | | Email: chris@cowanlaw.net |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Clint Johnston** | represented by | **Benjamin L Barnes** |
| *as representative of those similarly situated* | | (See above for address) |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Robert C Cowan** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Janeen Goodin** | represented by | **Benjamin L Barnes** |

*indivually*                                        (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert C Cowan**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Janeen Goodin**              represented by    **Benjamin L Barnes**
*as representative of those similarly*              (See above for address)
*situated*                                          *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert C Cowan**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marla Sharp**                represented by    **Benjamin L Barnes**
*individually*                                      (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert C Cowan**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marla Sharp**                represented by    **Benjamin L Barnes**
*as representative of those similarly*              (See above for address)
*situated*                                          *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Robert C Cowan**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blue Cross & Blue Shield of**   represented by   **D Kent Meyers**
**Oklahoma**                                        Crowe & Dunlevy-OKC
                                                    20 N Broadway Ave
                                                    Suite 1800
                                                    Oklahoma City, OK 73102
                                                    405-235-7729
                                                    Fax: 405-272-5245
                                                    Email: meyersd@crowedunlevy.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Barnett LaBauve**
Crowe & Dunlevy-OKC
20 N Broadway Ave
Suite 1800
Oklahoma City, OK 73102
405-239-6608
Fax: 405-272-5247
Email:
elizabeth.labauve@crowedunlevy.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Health Care Service Corporation**          represented by   **D Kent Meyers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Barnett LaBauve**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Blue Cross & Blue Shield Association**          represented by   **David J Zott**
Kirkland & Ellis-CHICAGO
300 N LaSalle St
Chicago, IL 60654
312-861-2000
Fax: 312-861-2200
Email: dzott@kirkland.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**D Kent Meyers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth Barnett LaBauve**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**HCSC Insurance Services Company**          represented by   **D Kent Meyers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Barnett LaBauve**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GHS Property and Casualty Insurance Company**          represented by    **D Kent Meyers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Barnett LaBauve**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**GHS Health Maintenance Organization Inc**          represented by    **D Kent Meyers**
*doing business as*                                                    (See above for address)
BlueLincs HMO                                                         *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth Barnett LaBauve**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/27/2013 | 1 | NOTICE OF REMOVAL from District Court of Logan County Oklahoma, case number CJ-2013-17 filed by HCSC Insurance Services Company, Health Care Service Corporation, GHS Property and Casualty Insurance Company, Blue Cross & Blue Shield of Oklahoma, Blue Cross & Blue Shield Association, GHS Health Maintenance Organization Inc. (Attachments: # 1 Exhibit 1 - James Anderson Declaration, # 2 Exhibit 2 - First Amended Petition - Class Action CJ-2013-17, # 3 Exhibit 3 - Class Action Complaint in Godwin v BCBS 12-4053 from Northern District of Alabama, # 4 Exhibit 4 - Original Petition CJ-2013-17, # 5 Exhibit 5 - Summones for Defendants, # 6 Exhibit 6 - Docket Sheet form District Court of Logan County Oklahoma CJ-2013-17, # 7 Civil Cover Sheet)(pw) (Entered: 03/27/2013) |
| 03/28/2013 | 2 | Receipt for Money Received from All Defendants in the amount of $350.00, receipt number OKW500031492 regarding 1 Notice of Removal, (ap) (Entered: 03/28/2013) |
| 03/28/2013 | 3 | ENTRY of Appearance by D Kent Meyers on behalf of Blue Cross & Blue Shield Association, Blue Cross & Blue Shield of Oklahoma, GHS Health Maintenance Organization Inc, GHS Property and Casualty Insurance Company, HCSC Insurance Services Company, Health Care Service Corporation (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 4 | ENTRY of Appearance by Elizabeth Barnett LaBauve on behalf of Blue Cross & Blue Shield Association, Blue Cross & Blue Shield of Oklahoma, GHS Health Maintenance Organization Inc, GHS Property and Casualty Insurance |

| | | Company, HCSC Insurance Services Company, Health Care Service Corporation (LaBauve, Elizabeth) (Entered: 03/28/2013) |
|---|---|---|
| 03/28/2013 | 5 | DISCLOSURE STATEMENT - CORPORATE by Health Care Service Corporation . (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 6 | DISCLOSURE STATEMENT - CORPORATE by Blue Cross & Blue Shield Association . (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 7 | DISCLOSURE STATEMENT - CORPORATE by HCSC Insurance Services Company . (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 8 | DISCLOSURE STATEMENT - CORPORATE by GHS Property and Casualty Insurance Company . (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 9 | DISCLOSURE STATEMENT - CORPORATE by GHS Health Maintenance Organization Inc *d/b/a BlueLincs HMO*. (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 10 | UNOPPOSED MOTION for Extension of Time *to Answer or Otherwise Respond to Plaintiffs' Petition* by Blue Cross & Blue Shield Association, Blue Cross & Blue Shield of Oklahoma, GHS Health Maintenance Organization Inc, GHS Property and Casualty Insurance Company, HCSC Insurance Services Company, Health Care Service Corporation. (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 11 | NOTICE OF RELATED OR COMPANION CASE by Blue Cross & Blue Shield Association, Blue Cross & Blue Shield of Oklahoma, GHS Health Maintenance Organization Inc, GHS Property and Casualty Insurance Company, HCSC Insurance Services Company, Health Care Service Corporation (Meyers, D) (Entered: 03/28/2013) |
| 03/28/2013 | 12 | ENTRY of Appearance by Robert C Cowan on behalf of All Plaintiffs (Cowan, Robert) (Entered: 03/28/2013) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/28/2013 15:35:54 | | |
| **PACER Login:** | ke1159 | **Client Code:** | 20892-0572/43911 |
| **Description:** | Docket Report | **Search Criteria:** | 5:13-cv-00294-D Start date: 1/1/1970 End date: 3/28/2013 |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. CLINT JOHNSTON; <br> 2. JANEEN GOODIN; and <br> 3. MARLA SHARP, as individuals and as <br> representatives of those similarly situated, <br><br>     Plaintiffs, <br><br> v. <br><br> 1. BLUE CROSS AND BLUE SHIELD OF <br> OKLAHOMA; <br> 2. HEALTH CARE SERVICE <br> CORPORATION; <br> 3. BLUE CROSS BLUE SHIELD <br> ASSOCIATION; <br> 4. HCSC INSURANCE SERVICES <br> COMPANY; <br> 5. GHS PROPERTY AND CASUALTY <br> INSURANCE COMPANY; and <br> 6. GHS HEALTH MAINTENANCE <br> ORGANIZATION, INC. d/b/a BLUELINCS <br> HMO, <br><br>     Defendants. | Case No. CIV-13-294-D <br><br> Jury Trial Demanded <br><br> District Court of Logan County, <br> Oklahoma, Case No. CJ-2013-17 |

## <u>NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE THAT Defendants Blue Cross and Blue Shield
Association ("BCBSA"); Health Care Service Corporation, including its division Blue
Cross and Blue Shield of Oklahoma ("HCSC"); HCSC Insurance Services Company
("HISC"); GHS Property and Casualty Insurance Company ("GHS"); and GHS Health
Maintenance Organization, Inc. d/b/a/ BlueLincs HMO ("BlueLincs"), pursuant to 28
U.S.C. §§ 1332(d), 1441(a), 1446, and 1453, hereby remove Case Number CJ-2013-17

from the District Court of Logan County, Oklahoma to the United States District Court for the Western District of Oklahoma on the following grounds:

1.     On January 18, 2013, Plaintiffs Clint Johnston, Janeen Goodin, and Marla Sharp commenced this purported class action in the District Court of Logan County, Oklahoma, in a case captioned *Clint Johnston, et al. v. Blue Cross and Blue Shield of Oklahoma, et al.*, Case No. CJ-2013-17 (the "State Court Action").  On February 1, 2013, Plaintiffs filed a First Amended Petition.

2.     HCSC, GHS, and BlueLincs were served with a summons and the First Amended Petition in the State Court Action on March 13, 2013.  (Ex. 1, Declaration of James Anderson ¶ 10).  HCSC's legal department in Texas received a summons and the First Amended Petition in the State Court Action directed to HISC on March 15, 2013. (*Id.*).  BCBSA was served with a summons and the First Amended Petition in the State Court Action on March 18, 2013.  The earliest date any Defendant obtained a copy of the petition in the State Court Action was February 26, 2013, when HCSC's counsel downloaded the First Amended Petition from the Oklahoma State Courts Network.  (*See* Ex. 1, Anderson Decl. ¶ 10).

3.     The State Court Action alleges that Defendants have violated the Oklahoma Antitrust Reform Act, 79 Okla. Stat. §§ 203 *et seq.*, by entering into licensing agreements that provide for exclusive service areas and through other allegedly anticompetitive conduct.  (*See* Ex. 2, First Am. Pet. ¶¶ 1, 3).

4.     The State Court Action is removable because this Court has diversity jurisdiction under the Class Action Fairness Act ("CAFA").

2

**DIVERSITY JURISDICTION UNDER THE CLASS ACTION FAIRNESS ACT**

5.      Just days ago, the Supreme Court of the United States reaffirmed that CAFA's "primary objective" is "ensuring '[f]ederal court consideration of interstate cases of national importance.'"  *Standard Fire Ins. Co. v. Knowles*, No. 11-1450, 2013 WL 1104735, at *5 (U.S. Mar. 19, 2013).  Enacted to expand federal jurisdiction over purported class actions, CAFA provides that a class action may be removed in accordance with 28 U.S.C. § 1446 if: (a) the purported class includes at least 100 members; (b) any purported class member is a citizen of a state that is different from any defendant; and (c) the aggregate amount in controversy exceeds $5,000,000.  *See* 28 U.S.C. §§ 1332(d), 1453(b).    This standard is easily met here.

6.      Plaintiffs concede that the first requirement for removal under CAFA—that the proposed class includes at least 100 members—is satisfied here.  *See* 28 U.S.C. § 1332(d)(5)(B).  Plaintiffs brought their putative class action on behalf of "[a]ll persons and entities who paid health insurance premiums to [Defendants HCSC, HISC, GHS, and BlueLincs] for individual or group full-service commercial health insurance at any time since five (5) years prior to commencement of this action and were domiciled in Oklahoma and solely residents of Oklahoma on January 15, 2013." (*See* Ex. 2, First Am. Pet. ¶ 16).  Plaintiffs represent that they "believe that there are tens of thousands of Class members…." (*Id.* ¶ 18).  In fact, the number of purported class members is far greater. HCSC insured or administered the health insurance plans for approximately 190,000 to

247,000 Oklahoma subscribers through BCBS-OK and BlueLincs in each year from 2008 to 2013.  (*See* Ex. 1, Anderson Decl. ¶¶ 8-9).[1]

7.     The face of the petition also confirms that the second requirement for removal under CAFA—that one member of the purported class is a citizen of a different state than any one defendant—is met here.  All of Plaintiffs' proposed class members are Oklahoma citizens.  (Ex. 2, First Am. Pet. ¶ 16).  Thus, removal is appropriate if one Defendant is not an Oklahoma citizen.  Here, there are three Defendants that are not Oklahoma citizens.  Defendant BCBSA is a "not-for-profit corporation organized under the state of Illinois and headquartered in Chicago, Illinois."  (*Id.* ¶ 10).  Defendant HISC also is "a corporation organized under the state of Illinois and headquartered at … Chicago, Illinois …." (*Id.* ¶ 11).  Defendant HCSC likewise is a mutual legal reserve company organized under Illinois law that has its headquarters and principal place of business in Chicago, Illinois.[2]  (*See* Ex. 1, Anderson Decl. ¶ 3).  A corporation is deemed

---

[1]     This Court may consider evidence offered by Defendants with their removal notice to establish federal jurisdiction.  *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 759 (11th Cir. 2010); *see also Coffey v. Freeport-McMoran Copper & Gold Inc.*, 623 F. Supp. 2d 1257, 1263-64 (W.D. Okla. 2009) (court considered affidavit attached to Notice of Removal when determining defendant's principal place of business)*, aff'd*, 581 F.3d 1240 (10th Cir. 2010).

[2]     Plaintiffs are incorrect that Blue Cross and Blue Shield of Oklahoma ("BCBS-OK") is an Oklahoma citizen for diversity purposes.  BCBS-OK is an unincorporated division of HCSC. (Ex. 1, Anderson Decl. ¶ 4).  Therefore, it assumes the citizenship of its corporate owner; in this case, Illinois.  *Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir. 1986) ("Although a division may, if state law permits, sue and be sued in its own name, see Fed. R. Civ. P. 17(b), the state of which it is a citizen for purposes of determining diversity is the state of which the corporation that owns the division is a citizen."), *holding modified by Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1192 (2010); *see also Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 284 (6th Cir. 1990) ("A division of a corporation does not possess the formal separateness upon which the general

4

a citizen of the state in which it has been incorporated and of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). Therefore, BCBSA, HCSC and HISC are Illinois citizens, and CAFA's minimal diversity requirement is satisfied. *See id.* § 1332(d)(2)(A).

8. CAFA's third requirement—that the aggregate amount in controversy exceed $5,000,000, exclusive of interest and costs—also is satisfied here. *See* 28 U.S.C. § 1332(d)(2). Indeed, Plaintiffs indicate as much in their Prayer for Relief by asking that the Court "award compensatory damages … in such amounts in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code." (Ex. 2, First Am. Pet. ¶ 162(d)). While Defendants disagree that they owe any damages to Plaintiffs and dispute every asserted remedy or theory of recovery advanced in the Petition, it is evident that Plaintiffs have placed more than $5,000,000 at issue in this action.

9. To invoke federal jurisdiction, Defendants must show by a preponderance of the evidence that the amount in controversy may exceed $5,000,000. *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1247 (10th Cir. 2012). The amount in controversy is "an estimate of the amount that will be put at issue in the course of the

---

rule is based, and thus is not an independent entity for jurisdictional purposes"). Plaintiffs likewise err in stating that BCBS-OK is an unincorporated association. (Ex. 2, First Am. Pet. ¶ 8). As noted above, BCBS-OK is an unincorporated division of HCSC, an Illinois mutual legal reserve company. Therefore, it is not considered an unincorporated association under federal law. *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 77 F. Supp. 2d 71, 77 (D.D.C. 1999) (holding that "the federal law definition of an unincorporated association does not encompass an unincorporated division of a corporation"), *aff'd*, 254 F.3d 315 (D.C. Cir. 2000).

litigation," rather than proof of the amount plaintiff will recover. *McPhail v. Deere & Co.*, 529 F.3d 947, 956 (10th Cir. 2008). The defendant may introduce evidence about how much it would cost to satisfy the plaintiffs' demands. *Frederick*, 683 F.3d at 1247. "Once a defendant meets this burden, remand is appropriate only if the plaintiff can establish that it is legally impossible to recover more than $5,000,000." *Id.*

10. Plaintiffs request compensatory damages under Oklahoma's Antitrust Reform Act in the amount by which premiums paid by class members over a five-year period allegedly were inflated due to anticompetitive conduct, which they then seek to have trebled. Plaintiffs also seek restitution for any unjust enrichment of Defendants and attorneys' fees. (Ex. 2, First Am. Pet. ¶¶ 126, 136-137, 144-145, 150-151, 156, 161, 162(e), 162(f)).

11. As of January 31, 2013, HCSC insured or administered the plans for 247,000 subscribers in Oklahoma through BCBS-OK and BlueLincs. (Ex. 1, Anderson Decl. ¶¶ 8-9). The lowest number of subscribers in any year in the purported class period was in 2008, when HCSC insured or administered the plans for approximately 190,000 subscribers in Oklahoma through BCBS-OK and BlueLincs. (*Id.*). To estimate the amount in controversy, Defendants conservatively have used the number of purported class members in 2008 (the lowest year) for each of the five years in the class period. If Plaintiffs were to prevail (which they should not) and the class be awarded damages of approximately $5.27 in premium overpayment per purported class member per year, the damages would exceed the $5,000,000 federal jurisdiction threshold. If those damages were trebled, Plaintiffs would need to establish approximately $1.76 in premium

overpayment per purported class member per year to satisfy the federal jurisdictional amount.  Further, these numbers do not take into account the restitution and attorneys' fees claimed by Plaintiffs or the increase in subscribers during the class period, which add to the amount in controversy.

12.     Nor do any of the exceptions apply under CAFA.[3]  The local-controversy exception does not apply because, among other reasons, numerous class actions have been filed during the last three years against BCBSA and HCSC asserting the same or similar factual allegations.[4]  28 U.S.C. § 1332(d)(4)(A).  Indeed, Plaintiffs' counsel in this action has filed nearly identical complaints in six earlier purported class actions against at least one of the defendants here.[5]  Further, the putative class of Oklahoma

---

[3]     Plaintiffs seeking remand have the burden of showing that one of the CAFA exceptions applies.  *Coffey*, 623 F. Supp. 2d at 126; *see also Frazier v. Pioneer Americas LLC*, 455 F.3d 542, 546 (5th Cir. 2006) ("We hold that plaintiffs have the burden to show the applicability of the §§ 1332(d)(3)-(5) exceptions when jurisdiction turns on their application.").

[4]     In addition, the local-controversy exception does not apply because the Plaintiffs are not seeking "significant relief" from BlueLincs or GHS (collectively, the "Oklahoma Defendants") and the Oklahoma Defendants' conduct does not form a "significant basis for the claims" asserted by the Plaintiffs.  28 U.S.C. § 1332(d)(4)(A)(i)(II)(bb).  The Oklahoma Defendants' conduct must be significant when compared to the alleged conduct of BCBSA, HCSC, and HISC, and the relief sought against the Oklahoma Defendants must be a significant portion of the entire relief sought by the class. *Coffey*, 581 F.3d at 1244-45. As of January 31, 2013, over 97% of putative class members had health insurance plans insured or administered by HCSC d/b/a BCBS-OK, while just over 2% had plans insured or administered by BlueLincs.  (*See* Ex. 1, Anderson Decl. ¶¶ 8-9).  Further, GHS, the second Oklahoma Defendant, did not underwrite, administer, or market any type of health insurance plan at any point in the last five years.

[5]     Plaintiffs' counsel named BCBSA and/or HCSC as defendants in the following cases filed prior to January 18, 2013: *Piercy v. Health Care Serv. Corp.*, No. 12-L-28 (Cir. Ct. Union Cnty., Ill. Aug. 21, 2012); *Plessy v. Blue Cross & Blue Shield of Ala.*, No. 2:12-cv-02410 (E.D. La. Oct. 1, 2012); *Lawrence Cohn LLC v. HMSA BSH*, No. 1:12-cv-

plaintiffs is included in the nationwide subscriber class actions Plaintiffs' counsel filed against HCSC and BCBSA in *Plessy*, *Davidson*, and *Godwin*. (*See, e.g.*, Ex. 3, Godwin Compl. ¶ 65). The home-state exception likewise does not apply because it requires that all "primary defendants" be citizens of the state in which the suit was brought. 28 U.S.C. § 1332(d)(4)(B). Here, the two primary Defendants—BCBSA and HCSC—are Illinois citizens. BCBSA and HCSC are plainly the primary targets of Plaintiffs' complaint. BCBSA's licensing agreements are the centerpiece of Plaintiffs' antitrust theories. HCSC division BCBS-OK insures or administers the plans for more subscribers than BlueLincs, GHS, and HISC combined. In fact, GHS does not have any health care subscribers, as that company provides only property and casualty insurance. (Ex. 1, Anderson Decl. ¶ 7).

13. Thus, this Court has original jurisdiction over the State Court Action under CAFA. Therefore, removal is proper.

## PROCEDURAL REQUIREMENTS UNDER THE REMOVAL STATUTE

14. The procedural requirements in 28 U.S.C. § 1446 are satisfied here. Section (a) of that statute requires the removing party to file a notice of removal, signed pursuant to Rule 11 of the Federal Rules of Civil Procedure, "in the district court of the United States for the district and division within which such action is pending," which Defendants have done with this filing. Section (a) also requires a moving party to

---

08448 (N.D. Ill. Oct. 19, 2012); *Watts v. Blue Cross & Blue Shield of Tex.*, No. 3:12-cv-04256 (N.D. Tex. Oct. 22, 2012); *Davidson v. Blue Cross & Blue Shield of Ala.*, No. 5:12-cv-00370 (N.D. Fla. Nov. 15, 2012); and *Godwin v. Blue Cross & Blue Shield of Ala.* No. 2:12-cv-04053 (N.D. Ala. Dec. 7, 2012). Plaintiffs' motion for voluntary dismissal is pending in *Plessy*.

provide to the District Court a copy of all process, pleadings, and orders served on defendants in the state action. Defendants have attached a copy of the First Amended Petition that was served on them, as well as summonses, the original Petition, and a copy of the docket sheet from the State Court Action as per LCvR81.2(a). (*See* Exs. 2, 4-6).

15.     This Notice of Removal is timely under 28 U.S.C. § 1446(b). That section provides that "[t]he notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based…." 28 U.S.C. § 1446(b). Defendants did not obtain a copy of any pleading in this action until February 26, 2013. (*See* Ex. 1, Anderson Decl. ¶ 10). HCSC, GHS, and BlueLincs were served with the First Amended Petition on March 13, 2013. (*Id.*). HCSC's legal department in Texas received the summons and the First Amended Petition directed to HISC on March 15, 2013. (*Id.*). BCBSA was served with the First Amended Petition on March 18, 2013. Thus, this Notice of Removal has been filed within thirty days of receipt of the initial pleading by Defendants.

16.     Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiffs and filed with the Clerk of the District Court of Logan County, Oklahoma, thereby effecting removal of the State Court Action to this Court.

17.     There are no pending motions or discovery requests in the State Court Action. *See* LCvR81.2(b)-(c).

18.     Defendants remove this action in good faith, and all Defendants hereby join and consent to removal.

19.     By filing this Notice of Removal, Defendants do not waive any defense, argument, or principle of equity which may be available to them.

20.     Based on the foregoing, this Court has diversity jurisdiction under 28 U.S.C. §§ 1332, 1441, and 1453, and the procedural requirements under 28 U.S.C. § 1446 have been met.  As such, this action is properly removable to federal court.

## JURY TRIAL DEMAND

Pursuant to Federal Rules of Civil Procedure Rule 38(b) and LCvR81.1, Defendants hereby demand a trial by jury on all issues.

## CONCLUSION

WHEREFORE, Defendants request that this action be removed to the United States District Court for the Western District of Oklahoma.

Respectfully submitted,

s/D. Kent Meyers

D. KENT MEYERS, OBA #6168
ELIZABETH BARNETT LABAUVE, OBA #21102
Crowe & Dunlevy
A Professional Corporation
20 North Broadway Ave., Suite 1800
Oklahoma City, Oklahoma  73102
(405) 235-7700
(405) 239-6651 (Facsimile)
kent.meyers@crowedunlevy.com
elizabeth.labauve@crowedunlevy.com

**ATTORNEYS FOR DEFENDANTS**

-AND-

**OF COUNSEL**
Helen E. Witt, P.C.
Jeffrey Zeiger

Margaret Pepple
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendants Health Care Service Corporation, including its division Blue Cross and Blue Shield of Oklahoma; HCSC Insurance Services Company; GHS Property and Casualty Insurance Company; and GHS Health Maintenance Organization, Inc. d/b/a BlueLincs HMO*

David J. Zott, P.C.
Daniel E. Laytin, P.C.
Ian R. Conner
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Defendant Blue Cross and Blue Shield Association*

11

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2013, a copy of the above and foregoing was mailed by U.S. Mail to the following counsel for Plaintiffs:

Benjamin L. Barnes
BENJAMIN L. BARNES, Attorney
  & Counselor at Law
Centennial Plaza
2575 Kelley Pointe Parkway, Suite 100
Edmond, Oklahoma 73103

Nicholas R. Rockforte
Patrick W. Pendley
Stan P. Baudin
Christopher L. Coffin
PENDLEY, BAUDIN & COFFIN, L.L.P.
Post Office Drawer 71
Plaquemine, Louisiana 70765

R. Christopher Cowan
THE COWAN LAW FIRM
209 Henry Street
Dallas, Texas 75226

Gordon Ball
Thomas S. Scott, Jr.
Christopher T. Cain
BALL & SCOTT LAW OFFICES
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902

s/D. Kent Meyers
_____

12

# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CLINT JOHNSTON; JANEEN GOODIN; and MARLA SHARP, as individuals and as representatives of those similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. CIV-13-_____-___ |
| v. | ) | |
| | ) | Jury Trial Demanded |
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA; HEALTH CARE SERVICE CORPORATION; BLUE CROSS BLUE SHIELD ASSOCIATION; HCSC INSURANCE SERVICES COMPANY; GHS PROPERTY AND CASUALTY INSURANCE COMPANY; and GHS HEALTH MAINTENANCE ORGANIZATION, INC. d/b/a BLUELINCS HMO, | ) ) ) ) ) ) ) ) ) ) | District Court of Logan County, Oklahoma, Case No. CJ-2013-17 |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF JAMES ANDERSON IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1746, I, James Anderson, declare as follows:

1.      I am over 21 years of age and am competent to testify to the matters stated herein.  I have personal knowledge of the following facts and could testify thereto if called as a witness.

2.      I am Vice President, Service Delivery and Operations, at Health Care Service Corporation ("HCSC").  Between 2007-2012, I had oversight responsibilities for HCSC's Tulsa, Oklahoma Full Service Unit, which processes health insurance claims and fields member inquiries.

**EXHIBIT 1**

3.     Defendant HCSC is an Illinois mutual legal reserve company that is incorporated under the laws of Illinois.  HCSC has its headquarters and principal place of business at 300 East Randolph Street, Chicago, Illinois.

4.     Defendant Blue Cross and Blue Shield of Oklahoma ("BCBS-OK") is an unincorporated division of HCSC.  Through BCBS-OK, HCSC underwrites risk and administers health benefit plans in Oklahoma.

5.     Defendant HCSC Insurance Services Company ("HISC") is a wholly-owned subsidiary of HCSC.  HISC is incorporated in Illinois and has its headquarters and principal place of business in Chicago, Illinois.  Through HISC, HCSC insures and administers Medicare Part D prescription drug benefits.  HISC currently does not have any subscribers who have paid premiums for individual or group full-service commercial health insurance plans and has not had any such subscribers at any point in the last five years.[1]

6.     Defendant GHS Health Maintenance Organization, Inc. d/b/a BlueLincs HMO ("BlueLincs") is a wholly-owned subsidiary of HCSC.  BlueLincs is incorporated in Oklahoma and has its headquarters and principal place of business in Oklahoma. Through BlueLincs, HCSC underwrites risk and administers health maintenance organization ("HMO") plans in Oklahoma.

7.     Defendant GHS Property and Casualty Insurance Company ("GHS") is a wholly-owned subsidiary of HCSC.  GHS is incorporated in Oklahoma and has its

---

[1]     As used in my declaration, the term "subscribers" refers to policyholders and does not include dependents on the policy.

headquarters and principal place of business in Oklahoma.  GHS provides property and casualty insurance.  GHS does not currently underwrite, administer, or market any type of health insurance plan, and has not done so at any time during the last five years.

8.      As of January 31, 2013, HCSC, through its division BCBS-OK, had approximately 242,000 subscribers in Oklahoma with individual or group full-service commercial health insurance plans.  For the other years in the purported class period, HCSC had the following number of Oklahoma subscribers with individual or group full-service commercial health insurance plans through BCBS-OK: approximately 186,000 in 2008; approximately 198,000 in 2009; approximately 213,000 in 2010; approximately 223,000 in 2011; and approximately 238,000 in 2012.    The subscriber data cited in this paragraph were gathered from HCSC's internal databases, sources which I believe to be accurate and reliable.

9.      As of January 31, 2013, BlueLincs had approximately 5,000 subscribers in Oklahoma with individual or group full-service commercial health insurance plans.  For the other years in the purported class period, BlueLincs had the following number of Oklahoma subscribers with individual or group full-service commercial health insurance plans:  approximately 4,000 in 2008; approximately 9,000 in 2009; approximately 6,500 in 2010; approximately 6,000 in 2011; and approximately 5,000 in 2012.   The subscriber data cited in this paragraph were gathered from HCSC's internal databases, sources which I believe to be accurate and reliable.

10.      Based on my work with the legal department in preparing this declaration, I have learned that HCSC, GHS, and BlueLincs were served with a summons and the First

Amended Petition in the Oklahoma state court case captioned *Johnston v. Blue Cross and Blue Shield of Oklahoma*, Case No. CJ-2013-17 (the "State Court Action") on March 13, 2013. HCSC's legal department in Texas received a summons and the First Amended Petition directed to HISC on March 15, 2013. HCSC first obtained a copy of the petition in the State Court Action on February 26, 2013, when HCSC's counsel downloaded the First Amended Petition from the Oklahoma State Courts Network.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 26, 2013, in Chicago, Illinois.

James Anderson *

*I certify that I have signed the original of this document, which is being retained by counsel and is available for inspection at any time by the Court or a party to this action.

5



IN THE DISTRICT COURT OF LOGAN COUNTY
STATE OF OKLAHOMA

CLINT JOHNSTON, JANEEN GOODIN and §
MARLA SHARP, as individuals and as §
representatives of those similarly situated, §
§
        Plaintiffs, §
§
vs. §
§
BLUE CROSS AND BLUE SHIELD OF §
OKLAHOMA, HEALTH CARE SERVICE §
CORPORATION, BLUE CROSS §
BLUE SHIELD ASSOCIATION, HCSC §
INSURANCE SERVICES COMPANY, §
GHS PROPERTY AND CASUALTY §
INSURANCE COMPANY, GHS HEALTH §
MAINTENANCE ORGANIZATION, INC. d/b/a §
BLUELINCS HMO, §
§
        Defendants §



Case No. CJ – 2013 – 17



## FIRST AMENDED PETITION – CLASS ACTION

NOW COMES Plaintiffs, Clint Johnston, Janeeen Goodin and Marla Sharp, and bring

this action on behalf of themselves and all others similarly situated against Defendants, Blue

Cross and Blue Shield of Oklahoma, a division of Health Care Service Corporation, a Mutual

Legal Reserve Company, an independent licensee of the Blue Cross and Blue Shield Association,

HCSC Insurance Services Company, GHS Property and Casualty Insurance Company, GHS

Health Maintenance Organization, Inc. d/b/a BlueLincs HMO for damages and restitution.

### FACTS

1.    Plaintiffs, Clint Johnston, Janeeen Goodin and Marla Sharp, (hereinafter "Plaintiffs")

    bring this action on behalf of themselves and other subscribers of Blue Cross and Blue

    Shield of Oklahoma, ("BCBSOK") a division of Health Care Service Corporation

First Amended Petition – Page 1

## EXHIBIT 2

("HCSC"), a Mutual Legal Reserve Company, an independent licensee of the Blue Cross

and Blue Shield Association ("BCBSA"), HCSC Insurance Services Company

("HCSCIS"), GHS Property and Casualty Insurance Company ("GHS"), GHS Health

Maintenance Organization, Inc. d/b/a BlueLincs HMO ("BlueLincs") for damages and

restitution. Specifically, this action seeks to recover damages in the form of a refund of

inflated premiums that BCBSOK, HCSCIS, GHS, and BlueLincs charged Oklahoma

subscribers as a result of (i) restraining trade in violation of the Oklahoma Antitrust

Reform Act, Okla. Stat. Tit. 79 - §203(A), which prohibits restraint of trade; and (ii) a

violation of Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(B), ("[i]t is

unlawful for any person to monopolize, attempt to monopolize, or conspire to

monopolize any part of trade or commerce in a relevant market within this state") by

Defendants individually, and in concert with each other, along with the thirty-seven (37)

BCBSA member health plans, and as a result of anti-competitive conduct Defendants

engaged to establish and maintain monopoly power throughout Oklahoma.

2.    BCBSOK, HCSCIS, GHS, and BlueLincs are related subsidiaries and collectively are the

largest health insurers operating in Oklahoma and currently exercises dominant market

power in the commercial health insurance market throughout Oklahoma. Their website

states: "As the state's oldest and largest private health insurer, Blue Cross and Blue Shield

of Oklahoma and related subsidiaries in Oklahoma provide benefit plans for more than

600,000 Oklahomans." See: http://www.bcbsok.com/company_info/index.html

(emphasis added). As of January 1, 2009, 50% of the Oklahoma residents who subscribe

to full-service commercial health insurance (group plans and individual policies) are

subscribers of BCBSOK, HCSCIS, GHS, and BlueLincs – vastly more than the next

largest full-service commercial insurer, Aetna, which carried just 19% of such

subscribers. Yet, three years later, the Oklahoma Insurance Department Annual Report

for 2012 reported BCBSOK, HCSCIS, and BlueLincs grew their holdings to 70.004% of

the individual comprehensive market share of business for 2011. The next competitor

only held 25.877%. In the group coverage plans, BCBSOK, HCSCIS, and BlueLincs

commanded 56.116% – the next competitor had 19.976%. The Medicare supplement

coverage offered by HCSC dominated and controlled 97.926% of the market.

3.      The dominant market share enjoyed by BCBSOK, HCSCIS, GHS, and BlueLincs is, in

part, the result of an illegal conspiracy in which thirty-seven of the nation's largest health

insurance companies have agreed that they will not compete with BCBSOK, HCSCIS,

GHS, and BlueLincs, and that the Defendants will have the exclusive right to do business

in the State of Oklahoma, so long as it limits its competition with any of its thirty-seven

co-conspirators in each of their assigned geographic areas. These market allocation

agreements are implemented through Blue Cross and Blue Shield license agreements

executed between BCBSA, a licensing vehicle that is owned and controlled by all of the

Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield

licensee, including BCBSOK, HCSCIS, GHS, and BlueLincs. Through the terms of these

per-se illegal license agreements, the independent Blue Cross and Blue Shield entities

throughout the country, including the BCBSOK, HCSCIS, GHS, and BlueLincs quartet,

have explicitly agreed not to compete with those outside their assigned geographic areas,

in direct violation of Okla Stat. Tit. 79 §203, which declares unlawful "[e]very act,

agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce." By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.  Defendants' illegal conspiracy has perpetuated BCBSOK, HCSCIS, GHS, and BlueLincs monopoly power throughout Oklahoma, which has resulted in skyrocketing premiums for the Defendants' enrollees for over a decade. Defendants' anti-competitive behavior, and the lack of competition BCBSOK, HCSCIS, GHS, and BlueLincs face because of their monopoly power and anti-competitive behavior, has led to higher costs, resulting in higher premiums charged to their customers. In fact, when HCSC purchased Oklahoma's Blue Cross plan in 2005, it has expanded its business substantially. BCBSOK went from about 518,000 customers in 2005 to 668,000 customers as of December 2011, according to the Oklahoma Insurance Department, and nearly doubled its premium revenue from $956 million to $1.8 billion. As a result of these inflated premiums, HCSC now has a surplus of more than $620 million.

5.  These inflated premiums would not be possible if the market for health insurance in Oklahoma were truly competitive. Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as BCBSOK, HCSCIS, GHS, and BlueLincs and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Oklahoma.

## PARTIES, JURISDICTION AND VENUE

6. Plaintiffs are all residents of the State of Oklahoma. Specifically, Clint Johnston is a resident of Logan County, Janeeen Goodin is a resident of Oklahoma County, and Marla Sharp is a resident of Oklahoma County. Plaintiff Clint Johnston, Janeeen Goodin and Marla Sharp each have individual health insurance policies underwritten by BCBSOK, HCSCIS, GHS, and/or BlueLincs. Plaintiff Johnston holds policy number YUP800459327and group number Y09HS2. Plaintiff Goodin holds policy number YUP800210626 and group number Y07355. Plaintiff Sharp holds policy number 807881006 and group number 0011. All Plaintiffs individually and the proposed class members paid premiums to BCBSOK, HCSCIS, GHS, and/or BlueLincs.

7. All members of the Class are residents of only Oklahoma, and include members in Logan County.

8. Defendant Health Care Service Corporation (also "HCSC") d/b/a Blue Cross and Blue Shield of Oklahoma ("BCBSOK"), is a statewide customer-owned health insurer in Oklahoma with its Headquarters at 1400 S Boston Ave., Tulsa, Oklahoma 74119 which may be served through the Oklahoma Insurance Department, Legal Division, P.O. Box 53408, Oklahoma City, OK 73152-3408. BCBSOK is not a corporation, but rather it is an unincorporated association owned by its Oklahoma customers, including members in Logan County. The membership of an unincorporated association, such as BCBSOK here, for purposes of diversity jurisdiction, is the citizenship of all of its members, in this case Oklahomans. *See Arbuthnot v. State Automobile Ins. Ass'n,* 264 F.2d 260, 261-62 (10th Cir.1959). Because Plaintiffs and the class members as well as BCBSOK are all

First Amended Petition – Page 5

subscribers and citizens of Oklahoma, complete diversity is lacking, and the federal courts have no power to hear this case. *See Owen Equip. and Erection Co. v. Kroger,* 437 U.S. 365, 373-74 (1978) (requirement of complete diversity). HCSC also does not have third-party investors, but is a non-investor owned company, which also includes Oklahomans further destroying diversity.

9.    BCBSOK is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oklahoma. Like other Blue Cross and Blue Shield plans nationwide, BCBSOK is the largest health insurer in the State of Oklahoma, as measured by number of subscribers, within its service area, which is defined as the state of Oklahoma. HCSC is the fourth largest health insurer in the country by total medical enrollment, with more than 13 million members in Texas, Illinois, Oklahoma, and New Mexico.

10.    Blue Cross Blue Shield Association is a not-for profit corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-eight (38) health insurance plans, including BCBSOK, that operate under the "Blue Cross and Blue Shield" trademarks and trade names. BCBSOK was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states. BCBSA may be served through its registered agent for service of process, Roger G. Wilson, 225 N. Michigan Ave., Chicago, IL 60601.

11.   HCSC Insurance Services Company ("HCSCIS") is a corporation organized under the state of Illinois and headquartered at 300 E Randolph, Chicago, Illinois 60601-5099. HCSCIS may be served through its registered agent for service of process: HCSC Insurance Services Company, 1001 East Lookout Drive, Richardson TX 75082-4144.

12.   GHS Property and Casualty Insurance Company, ("GHS") is an Oklahoma domestic for profit corporation providing, in part, accident and health insurance coverage to Oklahomans, with its principal place of business at 3401 Northwest 63rd Street, Oklahoma City OK 73116-3707. As an Oklahoma citizen, complete diversity is lacking, and the federal courts have no power to hear this case. 28 U.S.C. §1441(b)(2); 28 U.S.C. §1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business"); *Gadlin v. Sybron Int'l Corp.*, 222 F. 3d 797, 799 (10th Cir. 2000); *Shell Rocky Mountain Prod. LLC v. Ultra Res. Inc.*, 415 F. 3d 1158, 1163 (10th Cir. 2005); *Needham v. Wedtech, Inc.*, 918 F. Supp 353, 356 (N.D. OK 1996). GHS may be served through its registered agent for service of process: Corporation Service Company, 115 S.W. 89th Street, Oklahoma City, OK 73139.

13.   GHS Health Maintenance Organization, Inc. d/b/a BlueLincs HMO ("BlueLincs") is an Oklahoma domestic for profit business corporation. As an Oklahoma corporate citizen, complete diversity is lacking, and the federal courts have no power to hear this case. 28 U.S.C. §1441(b)(2); 28 U.S.C. §1332(c)(1) ("a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business"); *see also:* 28 U.S.C. §1332(d)(4)(A); *Johnson v. Advance*

*America*, 549 F.3d 932, 938 (4th Cir. 2008) (citing Sen. Rep. No. 109-14, at 6 (2005)) (Congress "did not give federal courts jurisdiction over all class actions, specifically excluding those consisting of 'primarily local matters.'"). BlueLincs may be served through its registered agent for service of process: Corporation Service Company, 115 S.W. 89th Street, Oklahoma City, OK 73139.

## TRADE AND COMMERCE

14. BCBSOK, HCSCIS, GHS, and/or BlueLincs and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.

15. The conduct of the Defendants has substantial effects on trade and commerce in the State of Oklahoma, as well. BCBSOK, HCSCIS, GHS, and BlueLincs have collectively conspired with each other to establish and maintain monopoly power throughout Oklahoma.

## CLASS ACTION ALLEGATIONS

16. Pursuant to 12 O.S. §2023, Plaintiffs bring this action individually and on behalf of the members of the following proposed Class:

> All persons and entities who paid health insurance premiums to BCBSOK, HCSCIS, GHS, and/or BlueLincs for individual or group full-service commercial health insurance at any time since five (5) years prior to commencement of this action and were domiciled in Oklahoma and solely residents of Oklahoma on January 15, 2013.

First Amended Petition – Page 8

17. Excluded from the Class are: (i) Defendants, any entity in which Defendants have a controlling interest, and Defendants legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendants employees, officers, directors, agents and representatives and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family. Plaintiffs reserve the right to amend the class definition as appropriate after class discovery is completed.

18. The Class is so numerous and geographically dispersed in the State of Oklahoma that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are tens of thousands of Class members, the exact number and identities of which can be obtained from BCBSOK, HCSCIS, GHS, and/or BlueLincs.

19. There are questions of law or fact common to the Class and such questions predominate over questions affecting individual members. The common legal and factual questions include, but are not limited to, the following:

   a. Whether the restrictions set forth in the BCBSA license agreements are per se violations of the Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(A) and Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(B) or are otherwise prohibited thereunder;

   b. Whether, and the extent to which, premiums charged by BCBSOK, HCSCIS, GHS, and/or BlueLincs to the class members were artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

   c. Whether the use of Most Favored Nation ("MFN") provisions in the BCBSOK, HCSCIS, GHS, and/or BlueLincs provider agreements are anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance; and

   d. Whether, and the extent to which, premiums charged by BCBSOK, HCSCIS, GHS, and/or BlueLincs were artificially inflated as a result of the anti-competitive practices adopted by BCBSOK, HCSCIS, GHS, and/or BlueLincs.

First Amended Petition – Page 9

20. Plaintiffs' claims are typical of the claims of the members of the Class, because each Plaintiff purchased full-service commercial health insurance products from BCBSOK, HCSCIS, GHS, and/or BlueLincs in the same manner as members of the Class, and their interests coincide with and are not antagonistic to other members of the Class.

21. Plaintiffs will fairly and adequately protect the interests of the members of the Class because it is in Plaintiffs' best interest to prosecute the claims alleged herein to obtain full compensation for the unfair and illegal conduct complained of.

22. Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation. Plaintiffs are willing and prepared to serve the Court and the Class members in a representative capacity with all of the obligations and duties material thereto and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

23. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for Defendants.

24. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which BCBSOK has records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual

actions would produce. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

25.   BCBSOK, HCSCIS, GHS, and BlueLincs enjoy unrivaled market dominance within Oklahoma, enrolling more than half of the market of non-elderly subscribers of full-service commercial health insurance plans and 97% of the Medicare Supplements.

26.   BCBSOK, HCSCIS, GHS, and BlueLincs' market dominance in Oklahoma is, in part, the result of a conspiracy between BCBSOK, HCSCIS, GHS, and BlueLincs and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States. That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA. As detailed herein, the member health insurance plans of BCBSA, including BCBSOK, HCSCIS, GHS, and BlueLincs, entered into a series of licensing arrangements that have insulated BCBSOK, HCSCIS, GHS, and BlueLincs and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

27.   This series of agreements has enabled BCBSOK, HCSCIS, GHS, and BlueLincs to acquire and maintain a grossly disproportionate market share for health insurance products in Oklahoma, where the BCBSOK, HCSCIS, GHS, and BlueLincs enjoy market

and monopoly power.  The situation in Oklahoma is not unique, however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

28.  BCBSOK, HCSCIS, GHS, and/or BlueLincs have used its market and monopoly power in Oklahoma to engage in a number of anti-competitive practices.  For example, upon information and belief, BCBSOK, HCSCIS, GHS, and/or BlueLincs have collectively conspired to require key health care providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with BCBSOK, HCSCIS, GHS, and BlueLincs.  These clauses ensure that BCBSOK, HCSCIS, GHS, and BlueLincs receive the best pricing for health care services in the market.  If a health care provider does not agree to the MFN, that provider will not remain in or become a part of BCBSOK, HCSCIS, GHS, and BlueLincs' network, which is generally an unacceptable result because as a foursome, BCBSOK, HCSCIS, GHS, and BlueLincs, control the vast majority of subscribers in Oklahoma.  Faced with this prospect, providers capitulate to BCBSOK, HCSCIS, GHS, and BlueLincs' demands, including MFNs.  The MFNs restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

29.  Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCBSOK, HCSCIS, GHS, and/or BlueLincs' MFNs insure that its competitors may not negotiate lower health care provider costs, BCBSOK, HCSCIS, GHS, and/or BlueLincs face little pressure to constrain their own costs.  The MFN, by limiting the ability of an insurer to compete with BCBSOK, HCSCIS, GHS, and/or

BlueLincs, also compounds the exclusion of competitive rival health insurance plans
from the market and the deprivation of consumers' choice in health insurance products.
With few other health insurance plan options to compete with, BCBSOK, HCSCIS, GHS,
and/or BlueLincs can raise premiums (and thereby recoup its costs) without any concern
that its subscribers may switch to a rival insurance plan. The few consumers who
subscribe to rival insurance plans face higher premiums as well, as these plans pass on to
their subscribers the high costs set by BCBSOK, HCSCIS, GHS, and/or BlueLincs with
health care providers.

30.     Upon information and belief, because BCBSOK, HCSCIS, GHS, and BlueLincs have
implemented MFNs to insure that as a group they receive the best rates in the market
without the risk of low cost competition, health care providers have responded by
increasing prices to cover the discounts that BCBSOK, HCSCIS, GHS, and/or BlueLincs
receives through its MFNs. Thus, what was supposed to be a discount turns out to be a
premium to providers, thereby artificially raising prices for health care services. Again,
consumers lose.

31.     Defendants' anti-competitive practices, by reducing the choices available to health
insurance consumers and increasing the cost of health care in Oklahoma, have raised the
premiums that Oklahoma residents must pay to obtain health insurance. BCBSOK,
HCSCIS, GHS, and/or BlueLincs' rival health insurance plans are excluded from the
market, and the few rival plans that have broken into the Oklahoma market must pay
significantly higher rates to health care providers.

32.     The skyrocketing cost of BCBSOK, HCSCIS, GHS, and/or BlueLincs health insurance

First Amended Petition – Page 13

coverage in Oklahoma tells the story of BCBSOK, HCSCIS, GHS, and/or BlueLincs' abuse of market and monopoly power at the expense of Oklahoma health care consumers.

### HISTORY OF THE BLUE CROSS AND BLUE SHIELD PLANS AND OF BCBSA

33.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage. While originally structured as non-profit organizations since the 1980s, these local "Blue" plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses.

34.    The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

35.    In 1934, an administrator named E.A. von Steenwyck helped develop a pre-paid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other pre-paid hospital plans began independently using the Blue Cross symbol.

36.    In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital

First Amended Petition – Page 14

Association ("AHA") officials announced that pre-paid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

37.    In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

38.    In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Contrary to the principles that plans would not compete and that plans would not operate in each others' service areas, the independently formed pre-paid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each others' territories. The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example.... John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown .... By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements

First Amended Petition – Page 15

between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

39. For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the Blue Cross Association, a predecessor to BCBSA. Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

40. By 1975, the Blue Cross plans had a total enrollment of 84 million.

41. The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

42. Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

43. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state

First Amended Petition – Page 16

medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

44. By 1975, the Blue Shield plans had a total enrollment of 73 million.

45. Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

46. However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies. While the Blues remained dominant in most markets, this growth of competition was a threat. In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

47. From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

48. Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war. As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

49. To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names. In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

50. Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

51. Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

52. During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the

Blue Cross Association and the National Association of Blue Shield Plans (now called
the Blue Shield Association) consolidated their staffs, although they retained separate
boards of directors.

53.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form
BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and
Blue Shield trademarks and trade names that had previously been owned by the local
plans.

54.     In November 1982, after heated debate, BCBSA's member plans agreed to two
propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans
should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by
the end of 1985, all Blue plans within a state should further consolidate, ensuring that
each state would have only one Blue plan. As a result of these goals, the number of
member plans went from 110 in 1984, to 75 in 1989, to 38 today. However, the goals did
not end competition between Blue plans. In the early 1980s, for example, Blue Cross of
Northeastern New York and Blue Shield of Northeastern New York competed
head-to-head.

55.     During the 1980s and afterwards, the plans began to operate less like charitable entities
and more like for-profit corporations, accumulating substantial surpluses. In 1986,
Congress revoked the Blues' tax-exempt status, freeing them to form for-profit
subsidiaries.

56.     In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-
for-profit entities. As a result, many member plans converted to for-profit status. One

such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures. While nominally still characterized as not-for-profit, BCBSOK and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

57.     From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially. As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

58.     Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

59.     At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

60.    BCBSA calls itself "a national federation of 38 independent, community-based and
       locally operated Blue Cross and Blue Shield companies" and "the trade association for the
       Blue Cross Blue Shield companies."

61.    BCBSA is entirely controlled by its member plans, all of whom are independent health
       insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade
       names, and that, but for any agreements to the contrary, could and would compete with
       one another. On its website, BCBSA admits that in its "unique structure," "the Blue
       Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its]
       governing Board."

62.    As at least one federal court has recognized, BCBSA "is owned and controlled by the
       member plans" to such an extent that "by majority vote, the plans could dissolve the
       Association and return ownership of the Blue Cross and Blue Shield names and marks to
       the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n,*
       711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

63.    The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a
       pleading it filed during litigation in the Northern District of Texas, BCBSA admitted that
       its Board of Directors consists of "the chief executive officer from each of its Member
       Plans and BCBSA's own chief executive officer." The current chairman of the Board of
       Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue
       Shield of Michigan. The Board of Directors of BCBSA meets at least annually.

64.    The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan
       Performance and Financial Standards Committee (the "PPFSC"), a standing committee of

the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three independent members.

65.    The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant ... must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

66.    The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to a brief BCBSA filed during litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

67.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

68.     Under the terms of the License Agreements a plan "agrees . . . to comply with the

Membership Standards." The Guidelines state that the Membership Standards and the

Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in

November 1994 and initially became effective as of December 31, 1994;" that the

Membership Standards "remain in effect until otherwise amended by the Member Plans;"

that revisions to the Membership Standards "may only be made if approved by a

three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised

[G]uidelines shall not become effective . . . unless and until the Board of Directors

approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and

Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate,

adequate and enforceable."

69.     The independent Blue Cross and Blue Shield licensees police the compliance of all

members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that

the PPFSC "is responsible for making the initial determination about a Plan's compliance

with the license agreements and membership standards. Based on that determination,

PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept,

reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA

shall send a triennial membership compliance letter to each [member] Plan's CEO,"

which includes, among other things, "a copy of the Membership Standards and

Guidelines, a report of the Plan's licensure and membership status by Standard, and

PPFSC comments or concerns, if any, about the Plan's compliance with the License

Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate

Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

70. The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," and "Sanctions" – each of which is administered by the PPFSC and could result in the termination of a member plan's license.

71. The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice- first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

72. The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and

regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

73. Each BCBSA licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

74. The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States. The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen (15) of the twenty-five (25) largest health insurance companies in the country are BCBSA licensees. On its website, BCBSA asserts that its members together provide "coverage for more than 99 million individuals – one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

75. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other – and each other's
> parent Blue Plans – in the marketplace. Inter-Plan competition had
> been a fact of life from the earliest days, but a new set of
> conditions faced the Plans in the 1980s, now in a mature and
> saturated market. New forms of competition were springing up at
> every turn, and market share was slipping year by year. Survival
> was at stake. The stronger business pressure became, the stronger
> the temptation was to breach the service area boundaries for which
> the Plans were licensed . . . .

76.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities,

business objectives and corporate culture conflict, it is our job to help them develop a

united vision and strategy" and that it "[e]stablishes a common direction and cooperation

between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel,

Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's

39 [now 38] independent licensed companies compete as a cooperative federation against

non-Blue insurance companies." One BCBSA member plan admitted in its February 17,

2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a

number of ways that create significant market advantages . . . ."

77.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance

companies to enter into agreements that restrain competition. Because BCBSA is owned

and controlled by its member plans, any agreement between BCBSA and one of its

member plans constitutes a horizontal agreement between and among the member plans

themselves.

### THE HORIZONTAL AGREEMENTS NOT TO COMPETE IN THE LICENSING ARRANGEMENTS BETWEEN BCBSA AND MEMBER PLANS, INCLUDING BCBSOK, HCSCIS, GHS, AND/OR BLUELINCS, ARE PER SE VIOLATIONS OF OKLA STAT. TIT. 79 §203

78.    The rules and regulations of BCBSA, including, but not limited to, the License

Agreements, the Membership Standards, and the Guidelines, constitute horizontal

agreements between competitors, the independent Blue Cross and Blue Shield licensees,

to divide the geographic market for health insurance. As such, they are a per se violation

of Okla Stat. Tit. 79 §203.

79.    Through the License Agreements, which the independent Blue Cross and Blue Shield

licensees created, control, and enforce, each independent Blue Cross and Blue Shield

licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue

Cross and Blue Shield trademarks and trade names outside of a designated "Service

Area." The License Agreement defines each licensee's Service Area as "the geographical

area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted

a subsequent license."

80.    Through the Guidelines and Membership Standards, which the independent Blue Cross

and Blue Shield licensees created, control, and enforce, and with which each licensee

must agree to comply as part of the License Agreements, each independent Blue Cross

and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its

subsidiaries generate from within its designated Service Area (excluding Medicare and

Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue

Shield trademarks and trade names. This provision directly limits the ability of each Blue

plan to generate revenue from non-Blue branded business. This provision also thereby

limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

81.     Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66 ⅔ percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

82.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside

of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

83. In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

84. The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are per se violations of Okla Stat. Tit. 79 §203.

85. More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions. For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

86. The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business. Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA

contain certain requirements and restrictions regarding our operations and our use of the

BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's

annual combined net revenue attributable to health benefit plans within its service area

must be sold, marketed, administered or underwritten under the BCBS names and marks"

and "a requirement that at least 66 ⅔% of a licensee's annual combined national revenue

attributable to health benefit plans must be sold, marketed, administered or underwritten

under the BCBS names and marks."

87.     Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for

Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least

80% of the revenue that we earn from health care plans and related services in [its Service

Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the

enrollment for) health care plans and related services both in [and outside its Service

Area], must be sold, marketed, administered, or underwritten through use of the Blue

Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the

territorial restrictions "may limit the extent to which we will be able to expand our health

care operations, whether through acquisitions of existing managed care providers or

otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield

name and mark is already present."

88.     Despite these public admissions, both BCBSA and its member plans have attempted to

keep the territorial restrictions as secret as possible. When asked by the Insurance

Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations

that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use

of subsidiaries that do not use the mark," BCBSA's general counsel responded that
"BCBSA licensed companies may compete anywhere with non-Blue branded business . . .
The rules on what the plans do in this regard are contained in the license. However, the
license terms themselves are proprietary to BCBSA, and ... we would prefer not to share
such trade secrets with BCBSA's competitors."

89.    The member plans of BCBSA have agreed to impose harsh penalties on those that violate
the territorial restrictions. According to the Guidelines, a licensee that violates one of the
territorial restrictions could face "[l]icense and membership termination." If a member
plan's license and membership are terminated, it loses the use of the Blue brands, which
BCBSA admits on its website are "the most recognized in the health care industry." In
addition, in the event of termination, a plan must pay a fee to BCBSA. According to
WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was
$98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a
Blue Cross and/or Blue Shield presence in the vacated service area."

90.    In sum, a terminated licensee would: (a) lose the brand through which it derived the
majority of its revenue; and (b) fund the establishment of a competing health insurer that
would replace it as the Blue licensee in its local area. These penalties essentially threaten
to put out of existence any Blue member plan that breaches the territorial restrictions.

91.    It is unsurprising, then, that most member plans do not operate outside of their Service
Areas. The territorial restrictions have therefore barred all competition by all of the Blue
plans (other than BCBSOK, HCSCIS, GHS, and/or BlueLincs) from the Oklahoma
commercial health insurance market.

First Amended Petition – Page 31

92. Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth – exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California. In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent. In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries. By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states. For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them. This may explain why, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas. During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint and known as Empire Blue Cross Blue Shield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period. In Mississippi,

between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem, now part of WellPoint).

93.     In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an enrollment of only approximately 130,000, or 4 percent of independence Blue Cross's total commercial health insurance enrollment.

94.     Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

95.     In addition to the per se illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBSOK, HCSCIS, GHS, and/or BlueLincs and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or

obtain control over any member plan.

96.  First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled
     Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed
     Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled
     Affiliate or to acquire a substantial portion of its assets related to licensable services."
     Should a non-member wish to obtain such control or assets, it "is invited to apply to
     become a licensee." However, as alleged above, the member plans control the entry of
     new members into BCBSA. Should a non-member attempt to join BCBSA in order to
     obtain control of, or to acquire a substantial portion of, the assets of a member plan, the
     other member plans could block its membership by majority vote.

97.  Second, the License Agreements contain a number of acquisition restrictions applicable
     to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would
     otherwise be capable of having their shares acquired). These include four situations in
     which a member plan's license will terminate automatically: (1) if any institutional
     investor become beneficially entitled to 10 percent or more of the voting power of the
     member plan; (2) if any non-institutional investor become beneficially entitled to 5
     percent or more of the voting power of the member plan; (3) if any person become
     beneficially entitled to 20 percent of more of the member plan's then-outstanding
     common stock or equity securities; or (4) if the member plan conveys, assigns, transfers,
     or sells substantially all of its assets to any person, or consolidates or merges with or into
     any person, other than a merger in which the member plan is the surviving entity and in
     which, immediately after the merger, no institutional investor is beneficially entitled to 10

First Amended Petition – Page 34

percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

98.  These acquisition restraints reduce competition in violation of The Oklahoma Antitrust Reform Act, because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

99.  Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue
     Cross or Blue Shield licensees have been acquisitions by other member plans. During the
     period from 1996 to the present, there has been a wave of consolidation among the Blue
     plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

100. By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue
     licensees, the member plans of BCBSA raise the costs their rivals must incur to expand
     their networks and areas of practice, reduce efficiency, and protect themselves and each
     other from competition. The net effect is to tend to lessen or to lessen competition and
     higher premium costs for consumers, including enrollees of BCBSOK, HCSCIS, GHS,
     and/or BlueLincs.

101. BCBSOK, HCSCIS, GHS, and/or BlueLincs, as a licensee, member, and part of the
     governing body of BCBSA, has conspired with the other member plans of BCBSA to
     create, approve, abide by, and enforce the rules and regulations of BCBSA, including the
     per se illegal territorial restrictions in the License Agreements and Guidelines. Many of
     the member plans with which BCBSOK, HCSCIS, GHS, and/or BlueLincs has conspired
     would otherwise be significant competitors of BCBSOK, HCSCIS, GHS, and/or
     BlueLincs in Oklahoma.

102. For example, WellPoint is the largest health insurer in the country by total medical
     enrollment, with approximately 34 million enrollees. It is the Blue Cross and Blue Shield
     licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue
     Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in
     the Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield

in 10 New York City metropolitan and surrounding cities, and as Blue Cross or Blue

Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also

serves customers throughout the country through its non-Blue brand subsidiary, UniCare.

But for the illegal territorial restrictions summarized above, WellPoint would be likely to

offer its health insurance services and products in Oklahoma in competition with

BCBSOK, HCSCIS, GHS, and/or BlueLincs. Such competition would have resulted in

lower health care costs and premiums paid by BCBSOK, HCSCIS, GHS, and/or

BlueLincs enrollees such as Plaintiffs herein.

103.    Over 55 percent of Mississippi residents who subscribe to full-service commercial health

insurance (whether through group plans or through individual policies) are subscribers of

Blue Cross Blue Shield of Mississippi – vastly more than the next largest full-service

commercial insurer.  But for the illegal territorial restrictions summarized above, Blue

Cross and Blue Shield of Mississippi would be likely to offer its health insurance services

and products in Oklahoma in competition with BCBSOK, HCSCIS, GHS, and/or

BlueLincs.  Such competition would result in lower health care costs and premiums paid

by BCBSOK, HCSCIS, GHS, and/or BlueLincs enrollees.

104.    Likewise, approximately 53 percent of Arkansas residents who subscribe to full-service

commercial insurance (whether through group plans or through individual policies) are

subscribers of Blue Cross Blue Shield of Arkansas – vastly more than the next largest

full-service commercial insurer.  But for the illegal territorial restrictions summarized

above, Blue Cross Blue Shield of Arkansas would be likely to offer its health insurance

services and products in Oklahoma in competition with BCBSOK, HCSCIS, GHS, and/or

First Amended Petition – Page 37

BlueLincs. Such competition would result in lower health care costs and premiums paid by BCBSOK, HCSCIS, GHS, and/or BlueLincs enrollees.

105. Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Oklahoma in competition with BCBSOK, HCSCIS, GHS, and/or BlueLincs. Such competition would result in lower health care costs and premiums paid by BCBSOK, HCSCIS, GHS, and/or BlueLincs enrollees.

106. In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Oklahoma but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in Oklahoma, the result would have been lower costs and thus lower premiums paid by BCBSOK, HCSCIS, GHS, and/or BlueLincs enrollees, including Plaintiffs.

107. Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

108. MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's

competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN plus" clauses, and typically require the amount to be higher by a specified percentage.

109.    Upon information and belief, BCBSOK, HCSCIS, GHS, and BlueLincs' use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged. The MFNs thus reduce competition by eliminating an incentive for BCBSOK, HCSCIS, GHS, and/or BlueLincs to reduce overhead prices.

110.    Second, MFNs limit competition by preventing other health insurers in Oklahoma from achieving lower costs with providers and thereby becoming significant competitors to BCBSOK, HCSCIS, GHS, and/or BlueLincs. MFNs establish a price floor below which providers will not sell services to BCBSOK, HCSCIS, GHS, and/or BlueLincs' competitors; indeed, MFNs enable BCBSOK, HCSCIS, GHS, and BlueLincs to raise that price floor. This deters cost competition among health insurers in Oklahoma. By reducing the ability of Defendants' competitors to compete against BCBSOK, HCSCIS, GHS, and BlueLincs, MFNs ensure that Defendants can substantially raise premiums while maintaining, or even increasing, its market share.

111.    Moreover, upon information and belief, if BCBSOK, HCSCIS, GHS, and/or BlueLincs is certain that no insurer will pay less to a provider than it will, BCBSOK, HCSCIS, GHS,

and/or BlueLincs will be willing to pay more to that provider than it would otherwise. The more BCBSOK, HCSCIS, GHS, and/or BlueLincs agree to pay that provider, the more their competitors must pay that provider. And by raising the price floor, BCBSOK, HCSCIS, GHS, and/or BlueLincs keep other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums. As a result, and because of their market power, BCBSOK, HCSCIS, GHS, and/or BlueLincs can pass their own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from BCBSOK, HCSCIS, GHS, and/or BlueLincs.

112. Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant BCBSOK, HCSCIS, GHS, or BlueLincs the provider has a strong incentive not to lower prices. Without the ability to compete on price, a new competitor will be unable to price below Defendants and thus is unable to survive.

113. Upon information and belief, the independent Blue Cross and Blue Shield licensees, including BCBSOK, HCSCIS, GHS, and/or BlueLincs, use MFNs to exploit the monopoly power they hold in their respective Service Areas. The independent Blue Cross and Blue Shield licensees, including BCBSOK, HCSCIS, GHS, and BlueLincs have collectively conspired to coordinate their use of MFNs with other Blue entities.

114. BCBSOK, HCSCIS, GHS, and BlueLincs have conspired as a group to use their collective market power in the sale of full-service commercial health insurance to

individuals and small groups in relevant geographic markets throughout Oklahoma.

## RELEVANT PRODUCT MARKET

115.    The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

116.    To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product. The characteristics of different products are important factors in determining their substitutability. For a health insurance product, important characteristics include:

    a.    Commercial versus government health insurance: Unlike commercial health insurance products, government health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent. Therefore, commercial health insurance and government health insurance programs are not substitutes.

    b.    Full-service versus single-service health insurance: Full-service health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers. In contrast, single-service health insurance provides narrow coverage restricted to a specific type of health care, *e.g.*, dental care. Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, e.g., dental care. Thus, full-service health insurance and single-service health insurance are not substitutes. Full-service commercial health insurance includes HMO products and PPO products, among others. Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers. Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation,

among other factors. Economic research suggests that HMO and PPO health insurance products are substitutes.

c. Fully-insured health insurance versus ASO products: When a consumer purchases a fully-insured health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers. In contrast, when a consumer purchases an administrative services only ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only. Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

d. Individual, small group, and large group consumers: Consumers of health insurance products include both individuals and groups, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, small group and large group, based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees. For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products. For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure. Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

e. Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although Oklahoma licenses companies to offer some type of health insurance in Oklahoma, Blue Cross had 50% of the commercial market share statewide. In certain markets, BCBSOK, HCSCIS, GHS, and BlueLincs command in excess of half the market. In Oklahoma City, it controls 58%, while its nearest competitor, United Healthcare, has 20 percent.

## RELEVANT GEOGRAPHIC MARKETS

117.   In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network. An insurer's provider network is composed of the health care providers with which it contracts. Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider.  As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers.  This suggests that health insurers compete in distinct geographic markets.

118.   There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in Oklahoma. The potentially relevant geographic markets could be defined alternatively as (a) the entire state of Oklahoma; (b) the 2 combined statistical areas, 4 metropolitan statistical areas, and 17 micropolitan statistical areas in the State of Oklahoma into which the U.S. Office of Management and Budget divides Oklahoma.  However the geographic market is defined, the result is the same: BCBSOK, HCSCIS, GHS, and BlueLincs have the dominant market position, and exercises market power.  In the 2 markets studied by the American Medical Association, Defendants dominated all the regions.

119.   BCBSOK, HCSCIS, GHS, and BlueLincs do business throughout the State of Oklahoma, are licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the State of Oklahoma, and have agreed with the other member plans of

First Amended Petition – Page 43

BCBSA that only BCBSOK, HCSCIS, GHS, and BlueLincs will do business in Oklahoma under the Blue brand. Therefore, the State of Oklahoma can be analyzed as a relevant geographic market within which to assess the effects of Defendants' anti-competitive conduct.

120. The U.S. Office of Management and Budget divides the counties of the state of Oklahoma into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of Oklahoma's 2 combined statistical areas, 4 metropolitan statistical areas, and 17 micropolitan statistical areas, and the remaining counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of Defendants' anti-competitive conduct.

121. Defendants' powerful market share is far from the only evidence of its market power. As alleged below, Defendants' market power has significantly raised costs, resulting in skyrocketing premiums for BCBSOK, HCSCIS, GHS, and BlueLincs enrollees.

122. Moreover, BCBSOK, HCSCIS, GHS, and BlueLincs' statewide share of the relevant product market has increased each year despite its substantial premium increases. BCBSOK, HCSCIS, GHS, and BlueLincs' ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

**INFLATED PREMIUMS CHARGED BY BCBSOK, HCSCIS, GHS, AND/OR BLUELINCS**

123.    For at least the past ten years, BCBSOK, HCSCIS, GHS, and BlueLincs' illegal

anti-competitive conduct, including its territorial market division agreements with the

thirty-seven other members of BCBSA, has increased health care costs in Oklahoma,

leading to artificially-inflated and supra-competitive premiums for individuals and small

groups purchasing BCBSOK, HCSCIS, GHS, and BlueLincs' full-service commercial

health insurance in the relevant geographic market(s). Upon information and belief,

BCBSOK, HCSCIS, GHS, and BlueLincs' collective market power and their use of

MFNs and other anti-competitive practices in Oklahoma has reduced the amount of

competition in the market and ensured that BCBSOK, HCSCIS, GHS, and BlueLincs'

few competitors face higher costs than BCBSOK, HCSCIS, GHS, and BlueLincs do.

Without competition, and with the ability to increase premiums without losing customers,

BCBSOK, HCSCIS, GHS, and BlueLincs face little pressure to keep costs low.

124.    Over the past decade, BCBSOK, HCSCIS, GHS, and BlueLincs generally raised

individual and small group premiums by amounts greater than the national average. Most

states regulate what companies charge their residents for health insurance. But Oklahoma

has prior approval authority to approve or reject rates before they go into effect for HMOs

only. OK Ins. Code §6916. Rate increases for commercial accident and health policies

may be used as soon as they are filed with the state. OK. Ins. Code §4402. For nonprofit

insurers, premium rates are filed and deemed approved if they are not disapproved by the

Insurance Commissioner 60 days after filing. Ok Ins. Code §2606. For HMOs, premium

rates may not be "excessive, inadequate, or unfairly discriminatory." HMO rates are

deemed approved if they are not disapproved by the Insurance Commissioner 30 days after filing. Ok Ins. Code §6916. These rates are "confidential and not subject to public disclosure." Ok Ins. Code §6916(A). Rate increases for "standard health benefit plans," must be filed for informational purposes only. A "standard health benefit plan" is an accident and health insurance policy issued to individuals under age 40 that does not provide state-mandated health benefits, but does provide creditable coverage. Ok Ins. Code §4415.

125. These rising premiums have enabled BCBSOK, HCSCIS, GHS, and BlueLincs to grow its surplus in excessive amounts, which is an unusual practice for a self-described nonprofit organization.

## CAUSES OF ACTION

126. **COUNT ONE.** (Okla. Stat. Tit. 79 §203(A) Trust in restraint of trade ("Every act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal") and (B) Monopoly of trade ("It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state."). Plaintiffs repeat and re-alleges the allegations in the foregoing paragraphs.

127. The License Agreements, Membership Standards, and Guidelines agreed to by BCBSOK, HCSCIS, GHS, and/or BlueLincs and BCBSA represent horizontal agreements entered into between BCBSOK, HCSCIS, GHS, and/or BlueLincs and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the

market for commercial health insurance.

128. Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBSOK, HCSCIS, GHS, and/or BlueLincs represent a contract, combination, and conspiracy within the meaning of The Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 §§201 - 212.

129. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBSOK, HCSCIS, GHS, and/or BlueLincs have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, BCBSOK, HCSCIS, GHS, and/or BlueLincs and BCBSA (and its members) have conspired to restrain trade in violation of The Oklahoma Antitrust Reform Act. These market allocation agreements are per se illegal under the aforesaid provisions.

130. The market allocation agreements entered into between BCBSOK, HCSCIS, GHS, and/or BlueLincs and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anti-competitive.

131. BCBSOK, HCSCIS, GHS, and/or BlueLincs have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

132. Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

   a.     Reducing the number of health insurance companies competing with BCBSOK, HCSCIS, GHS, and/or BlueLincs throughout Oklahoma;

    b.      Unreasonably limiting the entry of competitor health insurance companies into Oklahoma;

    c.      Allowing BCBSOK, HCSCIS, GHS, and/or BlueLincs to maintain and enlarge its market power throughout Oklahoma;

    d.      Allowing BCBSOK, HCSCIS, GHS, and/or BlueLincs to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

    e.      Depriving consumers of health insurance of the benefits of free and open competition.

133.    The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

134.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of The Oklahoma Antitrust Reform Act.

135.    As a direct and proximate result of Defendants continuing violations of The Oklahoma Antitrust Reform Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBSOK, HCSCIS, GHS, and/or BlueLincs than they would have paid with increased competition and but for the violations of The Oklahoma Antitrust Reform Act.

136.    Plaintiffs and the Class seek treble damages from Defendants for their violations of The Oklahoma Antitrust Reform Act.

137.    **COUNT TWO**. (Most Favored Nation ("MFN") provisions (Okla. Stat. Tit. 79 §203(A) and (B)).

138. Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

139. BCBSOK, HCSCIS, GHS, and BlueLincs have market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

140. BCBSOK, HCSCIS, GHS, and BlueLincs have conspired with each other to obtain provider agreements with Oklahoma health care providers that contain MFN provisions. The MFN provisions constitute an act, agreement, contract, or combination in the form of a trust, or otherwise, or an additional conspiracy in restraint of trade or commerce within the meaning of The Oklahoma Antitrust Reform Act, as well fixes a price charged therefor, or discount from, such price, on the condition, agreement, or understanding that the provider shall not use less favorable terms with a BCBSOK, HCSCIS, GHS, or BlueLincs competitor substantially lessening the competition or tending to create a monopoly. Each of the BCBSOK, HCSCIS, GHS, and BlueLincs provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a.  Raising the prices of health care services to commercial health insurers in competition with BCBSOK, HCSCIS, GHS, and/or BlueLincs;

b.  Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBSOK, HCSCIS, GHS, and/or BlueLincs from obtaining competitive pricing from health care providers;

c.  Unreasonably restricting the ability of health care providers to offer to BCBSOK, HCSCIS, GHS, and/or BlueLincs' competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

d. Depriving consumers of health care services and health insurance of the benefits of free and open competition.

141. The pro-competitive benefits, if any, of the BCBSOK, HCSCIS, GHS, and BlueLincs provider agreements containing MFN provisions do not outweigh the anti-competitive effects of the agreements.

142. Each agreement between BCBSOK, HCSCIS, GHS, and BlueLincs and a health care provider that contains an MFN unreasonably restrains trade in violation of The Oklahoma Antitrust Reform Act.

143. As a direct and proximate result of BCBSOK, HCSCIS, GHS, and BlueLincs' continuing violations of The Oklahoma Antitrust Reform Act, Plaintiffs and the members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBSOK, HCSCIS, GHS, and/or BlueLincs than they would have paid but for the violations of The Oklahoma Antitrust Reform Act.

144. Plaintiffs and the Class seek treble damages from BCBSOK, HCSCIS, GHS, and/or BlueLincs for its violations of The Oklahoma Antitrust Reform Act.

145. **COUNT THREE**. (Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Okla. Stat. Tit. 79 §203(B) Monopoly of trade)).

146. Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

147. BCBSOK, HCSCIS, GHS, and BlueLincs together have monopoly power in the individual and small group full-service commercial health insurance market in Oklahoma. This monopoly power is evidenced by, among other things:

a. BCBSOK, HCSCIS, GHS, and/or BlueLincs' ability, upon information and belief, to enter into MFN agreements with providers, which evidences BCBSOK, HCSCIS, GHS, and/or BlueLincs' ability to control prices and exclude competitors;

b. BCBSOK, HCSCIS, GHS, and/or BlueLincs' high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

c. BCBSOK, HCSCIS, GHS, and/or BlueLincs have abused and continue to abuse their monopoly power in order to maintain and enhance their market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

148. BCBSOK, HCSCIS, GHS, and BlueLincs' conduct constitutes unlawful monopolization and is unlawful anti-competitive conduct in the relevant markets in violation of Okla. Stat. Tit. 79 §203(B).

149. As a direct and proximate result of BCBSOK, HCSCIS, GHS, and BlueLincs' continuing violations of The Oklahoma Antitrust Reform Act, Plaintiffs and the members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBSOK, HCSCIS, GHS, and BlueLincs than they would have paid but for these violations.

150. Plaintiffs and the Class seek treble damages from BCBSOK, HCSCIS, GHS, and/or BlueLincs for violations of the Oklahoma Antitrust Reform Act.

151. **COUNT FOUR.** (Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of Okla. Stat. Tit. 79 §203(B) Monopoly of trade).

152. Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

153. BCBSOK, HCSCIS, GHS, and BlueLincs have acted with the specific intent to monopolize the relevant markets.

154. There was and is a dangerous possibility that BCBSOK, HCSCIS, GHS, and BlueLincs will succeed in their attempt to monopolize the relevant markets because BCBSOK, HCSCIS, GHS, and BlueLincs already control a large percentage of those markets. Further success by BCBSOK, HCSCIS, GHS, and BlueLincs in excluding competitors from those markets is an attempt to monopolize, or attempt to combine or conspire to monopolize, will confer a monopoly on BCBSOK, HCSCIS, GHS, and BlueLincs in violation of Okla. Stat. Tit. 79 §203(B).

155. BCBSOK, HCSCIS, GHS, and BlueLincs' attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Class. Premiums charged by BCBSOK, HCSCIS, GHS, and BlueLincs have been higher than they would have been in a competitive market.

156. Plaintiffs and the Class have been damaged as the result of BCBSOK, HCSCIS, GHS, and BlueLincs' attempted monopolization of the relevant markets and seek treble damages.

157. **COUNT FIVE.** (Unjust Enrichment). Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

158. BCBSOK, HCSCIS, GHS, and/or BlueLincs have benefitted from their unlawful acts through the overpayments for health insurance premiums by Plaintiffs and the other Class members.

159. It would be inequitable for BCBSOK, HCSCIS, GHS, and/or BlueLincs to retain the benefit of the overpayments that were conferred by Plaintiffs and the Class.

160. By reason of its unlawful conduct, BCBSOK, HCSCIS, GHS, and/or BlueLincs must

First Amended Petition – Page 52

make restitution to Plaintiffs and the Class. Further, any action which might have been

taken by Plaintiffs to pursue administrative remedies would have been futile.

161.    In equity, BCBSOK, HCSCIS, GHS, and/or BlueLincs should not be allowed to retain the

economic benefit derived from said improper conduct and should be ordered to pay

restitution and pre-judgment interest to Plaintiffs and Class members.

### PRAYER FOR RELIEF

162.    WHEREFORE, Plaintiffs pray:

    a.    That the summons be issued and that Defendants be duly served with a copy of
          this Complaint and required to answer same, and that this Court decree and enter
          judgment;

    b.    That the Court determine that this action may be maintained as a class action
          under 12 O.S. §2023 and appoint Plaintiffs representatives of the Class;

    c.    That the Court adjudge and decree that Defendants have violated The Oklahoma
          Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(A) and Oklahoma Antitrust
          Reform Act, Okla. Stat. Tit. 79 - §203(B) and award Plaintiffs and the Class
          appropriate damages and relief;

    d.    That the Court award compensatory damages to Plaintiffs and the Class resulting
          from the various acts of wrongdoing under The Oklahoma Antitrust Reform Act,
          and in accordance with Okla Stat. Tit. 12 §2008(A)(2), in such amounts in excess
          of the amount required for diversity jurisdiction pursuant to Section 1332 of Title
          28 of the United States Code to represent the losses reasonably suffered by
          Plaintiffs and the Class, as well as any treble damages available;

    e.    That the Court award Plaintiffs reasonable attorney fees and costs;

    f.    That the Court render judgment that Defendants have been unjustly enriched by its
          wrongful conduct, and award restitution to Plaintiffs and the Class;

    g.    That the Court award Plaintiffs and the Class all available pre-judgment and
          post-judgment interest, to the fullest extent available under law or equity;

    h.    That the Court orders such other, further and general relief as is just and proper.

Respectfully submitted,

Benjamin L. Barnes
Oklahoma Bar No. 16173
BENJAMIN L. BARNES, Attorney & Counselor at Law
Centennial Plaza
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
405/330-9860
405/231-4701
bb@bbarneslaw.com

**THE COWAN LAW FIRM**

R. Christopher Cowan
Oklahoma Bar No. 20129
209 Henry Street
Dallas, Texas 75226-1819
214/826-1900
214/826-8900 Fax
chris@cowanlaw.net

**PENDLEY, BAUDIN & COFFIN, L.L.P.**

Nicholas R. Rockforte (LA Bar #31305)
Patrick W. Pendley (LA Bar #14021)
Stan P. Baudin (LA Bar #22937)
Christopher L. Coffin (LA Bar # 27902)
Post Office Drawer 71
Plaquemine, Louisiana 70765
225/687-6396
225/687-6398
pwpendley@pbclawfirm.com

and

**BALL & SCOTT LAW OFFICES**

Gordon Ball (TN BPR# 1135)
gball@ballandscott.com
Thomas S. Scott, Jr. (TN. BPR# 1086)
scott@ballandscott.com
Christopher T. Cain (TN BPR# 19997)
cain@ballandscott.com
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
865/525-7028
865/525-4679

**ATTORNEYS FOR PLAINTIFFS**

ATTORNEY LIEN CLAIMED

**FILED**

2012 Dec-07  PM 05:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| Cynthia W. Godwin, on behalf of herself and all Others similarly situated | ) | |
| | ) | |
| | ) | |
| Plaintiff | ) | CLASS ACTION COMPLAINT |
| | ) | |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Blue Cross and Blue Shield of Alabama, | ) | |
| Anthem, Inc., Premera Blue Cross of | ) | |
| Alaska, Arkansas Blue Cross and Blue | ) | |
| Shield, Anthem Blue Cross and Blue Shield | ) | |
| of Connecticut, Highmark Blue Cross and | ) | |
| Blue Shield of Delaware, Blue Cross and | ) | |
| Blue Shield of Florida, Blue Cross and Blue | ) | |
| Shield of Georgia, Hawaii Medical Service | ) | |
| Assoc. d/b/a Blue Cross and Blue Shield of | ) | |
| Hawaii, Health Care Service Corp. d/b/a/ | ) | |
| Blue Cross and Blue Shield of Illinois, | ) | |
| Anthem Blue Cross and Blue Shield of | ) | |
| Indiana, Wellmark, Inc. d/b/a Blue Cross | ) | |
| and Blue Shield of Iowa, Blue Cross and | ) | |
| Blue Shield of Kansas, Blue Cross and Blue | ) | |
| Shield of Louisiana, Anthem Health Plans | ) | |
| of Maine, CareFirst Blue Cross and Blue | ) | |
| Shield of Maryland, Blue Cross and Blue | ) | |
| Shield of Massachusetts, Blue Cross and | ) | |
| Blue Shield of Michigan, Blue Cross and | ) | |
| Blue Shield of Minnesota, Blue Cross and | ) | |
| Blue Shield of Mississippi, Anthem Blue | ) | |
| Cross and Shield of Missouri, Blue Cross | ) | |
| and Blue Shield of Kansas City, Blue Cross | ) | |
| and Blue Shield of Nebraska, Anthem Blue | ) | |
| Cross and Blue Shield of New Hampshire, | ) | |
| Horizon Blue Cross and Blue Shield of New | ) | |
| Jersey, Blue Cross and Blue Shield of New | ) | |
| Mexico, Excellus BlueCross BlueShield of | ) | |
| New York, Blue Cross and Blue Shield of | ) | |
| North Carolina, Blue Cross and Blue Shield | ) | |
| Of Oklahoma, Blue Cross of Northeastern | ) | |

**EXHIBIT 3**

1

Pennsylvania – Wilkes-Barre, Highmark,   )
Inc., Independence Blue Cross, Triple S –   )
Salud, Inc., Blue Cross and Blue Shield of   )
Rhode Island, Blue Cross and Blue Shield   )
of South Carolina, Wellmark of South   )
Dakota, Inc. d/b/a Wellmark Blue Cross   )
and Blue Shield of South Dakota, Blue   )
Cross and Blue Shield of Tennessee, Blue   )
Cross and Blue Shield of Texas, Blue Cross )
and Blue Shield of Vermont, Anthem Blue   )
Cross and Blue Shield of Virginia, Inc.,   )
Highmark Blue Cross, Blue Shield of West   )
Virginia and Blue Cross and Blue Shield   )
Association,   )
   )
Defendants   )

---

## CLASS ACTION COMPLAINT

Plaintiff, Cynthia W. Godwin, on behalf of h e r s e l f and all others similarly situated,

brings this Complaint for damages and restitution against Defendants, Blue Cross and Blue

Shield of Alabama, Anthem, Inc., Premera Blue Cross and Blue Shield of Alaska, Arkansas

Blue Cross and Blue Shield, Anthem Blue Cross and Blue Shield of Connecticut, Highmark Blue

Cross and Blue Shield of Delaware, Blue Cross and Blue Shield of Florida, Blue Cross and Blue

Shield of Georgia, Hawaii Medical Service  Association d/b/a Blue  Cross  and  Blue  Shield

of  Hawaii,   Health   Care   Service Corporation d/b/a/ Blue Cross and Blue Shield of Illinois,

Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Blue Cross and Blue

Shield of Iowa, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of

Louisiana, Anthem Health Plans of Maine, CareFirst Blue Cross and Blue Shield of Maryland,

Blue Cross and Blue Shield of Massachusetts, Blue Cross and Blue Shield of Michigan, Blue

Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of Mississippi, Anthem Blue

2

Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and Blue Shield of New Hampshire, Horizon Blue Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, Excellus BlueCross BlueShield of New York, Blue Cross and Blue Shield of North Carolina, Blue Cross and Blue Shield of Oklahoma, Blue Cross of Northeastern Pennsylvania – Wilkes-Barre, Highmark, Inc., Independence Blue Cross, Triple S – Salud, Inc., Blue Cross and Blue Shield of Rhode Island,  Blue Cross and Blue Shield of South Carolina, Wellmark, Inc. of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, Blue Cross and Blue Shield of Tennessee, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of Vermont, Anthem Blue Cross and Blue Shield of Virginia, Highmark Blue Cross and Blue Shield of West Virginia (collectively, "BCBS Defendants") and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants"), and alleges violations of antitrust laws as follows:

## INTRODUCTION

1.    As set forth in this complaint, the BCBS-AL Defendants enjoy unrivaled market power in their respective territories and/or regions.  The dominant market share of the BCBS Defendants is the direct result of an illegal agreement between BCBSA and the BCBS Defendants, in which dozens of the nation's largest health insurance companies have agreed that they will restrict competition among themselves through the establishment of exclusive territories in exchange for the right to use the BCBSA marks, services, benefits and brands.

2.    The BCBS Defendants have violated the federal antitrust laws by explicitly agreeing not to compete with each other.  Instead, Defendants have conspired to divide the healthcare market

3

in the United States into geographically defined regions in order to allow each BCBS Defendant an exclusive, competition-free slice of the healthcare market.

3.      These market allocation agreements are implemented through Blue Cross and Blue Shield "license" agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans (the "Blues") --  the BCBS Defendants.

4.      Through the terms of these per se illegal license agreements, the BCBS Defendants have explicitly agreed not to compete with one another, in direct violation of Sections 1 and 2 of the Sherman Act.  By so agreeing, they have perpetuated and strengthened the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.  The Defendants' market allocation agreement constitutes a per se violation of Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1 and 2.

5.      BCBS licensees, the BCBS Defendants, operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans.  In fact, a BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

6.      The BCBS Defendants, including BCBS-AL, while operating as independent economic entities, are all licensees of the BCBSA.  This licensure has entitled the BCBS Defendants to certain rights within the BCBSA scheme, such as exclusive use of the "Blue Cross" or "Blue Shield" emblem with its defined territory.  Significantly, the BCBS Defendants elect a board of directors composed exclusively of member Blues.

4

7.     In turn, this board of directors establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive regions or territories. There is no procompetitive justification for these licensing agreements and restrictions on competition in exclusive territories.   This arrangement via BCBSA is a naked territorial restrain on competition in the market for health insurance.

8.     The Defendants' illegal conspiracy has perpetuated and strengthened the dominant market position each BCBS Defendant wrongfully enjoys in its specifically defined geographic market and has contributed to skyrocketing premiums.  Given the lack of competition in the healthcare market and the Defendants' resulting dominant market position, the BCBS Defendants have the unfettered power to force subscribers into an inescapable situation of either acquiescing to anticompetitive rates and terms or foregoing access to a dominant portion of healthcare subscribers.

9.     In a truly competitive market for health insurance, and absent the illegal agreement between the BCBS Defendants to divide markets and eliminate competition, such inflated premiums would not be possible.

10.     Further, the agreement among the Defendants prohibits the sale or transfer of provider networks to non-Blue members and, thereby, further restrains competition.   It has been recognized that the acquisition of a provider network is perhaps the most significant barrier to entry for health insurers considered entering a new geographic market, and that the cost of internally developing rather than acquiring such a network is often considered prohibitive.

11.     As a result, the contractual restrictions established through BCBSA and agreed to by the BCBS Defendants create an immense barrier to entry into the market for health insurance in the

5

states dominated by BCBS. The agreements created amongst the BCBSA entities not only create constraints for providers in negotiating with BCBS Defendants, but also create an immense barrier to entry into the market for health insurance in the states occupied by BCBS Defendants. Fair competition is not possible so long as the BCBS Defendants and BCBSA are permitted to enter into agreements that have actual and intended effect of restricting the ability of health insurance companies from competing in certain territories.

12.     Because the BCBS Defendants have agreed not to compete and have established and solidified their dominant market position, subscribers have virtually no bargaining power. Defendants have, in fact, rigged the deck to be certain that BCBS Defendants hold all the cards. As a result, BCBS subscribers such as Plaintiff and the purported Class are subject to much higher premiums and rates and less favorable terms than they would be absent the Defendants' agreements not to compete.

13.     As the Defendants are no doubt aware, free competition would lessen the disparity in power between the BCBS Defendants and BCBS subscribers such as Plaintiff and the Class and would, therefore, result in lower premiums and better terms. To the contrary, lack of free competition has resulted in skyrocketing premiums.

14.     Defendants' conspiracy has harmed competition and, absent injunctive relief, Defendants' practices will continue unabated to the detriment of competition and to the harm of subscribers such as Plaintiff.

## JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiff brings her claims under Sections 4 and 16 of the Clayton Act,

6

15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against BCBS-FL and BCBS Defendants for the injuries sustained by Plaintiff and the Class by reason of the violations, as hereinafter alleged, of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

16.     This action is also instituted to secure injunctive relief against BCBS-AL and the BCBS Defendants to prevent them from further violations of Sections 1 and 2 of the Sherman Act.

17.     Venue is proper in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.


## PARTIES

### Plaintiff

18.     Plaintiff, Cynthia W. Godwin, is domiciled in Mobile County, Alabama, at 4951 Rocky Run, Eight Mile, AL 36613. Plaintiff has a health insurance policy with and pays/paid premiums to BCBS-AL from approximately 2000 to the present.

### Defendants

19.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare benefits in Alabama, providing coverage to more than three million people. The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama. Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

20.      Defendant Anthem, Inc. is an Indiana corporation with its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana.  Through its subsidiary Anthem Insurance Companies, Inc., also an Indiana corporation, Anthem, Inc. provides healthcare benefits through Blue Cross and Blue Shield plans in fourteen states. Anthem, Inc., its subsidiaries, and health care plans are collectively referred to as "Anthem" in this Complaint.

21.      Defendant Premera Blue Cross of Alaska is an Alaska corporation with its corporate  headquarters located at 2550 Denali Street, Suite 1404, Anchorage, AK  99503. Premera is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million members in various health care plans. Premera Blue Cross of Alaska, its subsidiaries, and health care plans are collectively referred to as "Blue Cross of Alaska" or "BC-AK" in this Complaint.  BC-AK exercises market dominance in the state of Alaska or within areas of the state.

22.      Defendant Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 860,000 enrollees in various health care plans in Arkansas. Arkansas Blue Cross and Blue Shield, its subsidiaries and health care plans are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.  BCBS-AR exercises market dominance in the state of Arkansas or within areas of the state.

23.      Anthem Blue Cross and Blue Shield of Connecticut is a Connecticut corporation with its corporate headquarters located at 370 Bassett Road, North Haven, Connecticut 06473.  It is the parent corporation of a number of subsidiaries that provide health care services to

8

approximately 1.2 million enrollees in various health care plans in Connecticut. Anthem Blue Cross and Blue Shield of Connecticut, its subsidiaries and health plans are collectively referred to as "Blue Cross and Blue Shield of Connecticut" or "BCBS-CT." BCBS-CT exercises market dominance in the state of Connecticut or within areas of the state.

24.     Defendant Highmark Blue Cross and Blue Shield of Delaware is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark Blue Cross and Blue Shield of Delaware provides health care services to approximately 396,000 members in various health care plans in Delaware.  Highmark Blue Cross and Blue Shield of Delaware, its subsidiaries, and health care plans are collectively referred to as "Highmark Blue Cross and Blue Shield of Delaware" or "BCBS-DE".  BCBS-DE exercises market dominance in the state of Delaware or within areas of the state.

25.     Defendant Blue Cross and Blue Shield of Florida is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 7 million enrollees in various health care plans in Florida.  Blue Cross and Blue Shield of Florida, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint.  BCBS-FL exercises market dominance in the state of Florida or within areas of the state.

26.     Defendant Blue Cross and Blue Shield of Georgia is a Georgia corporation with its corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.1 million enrollees in various health care plans in Georgia.  Blue Cross and Blue Shield of

Case MDL No. 02406 Document 187-3 Filed 08/29/13 Page 98 of 197
Case 2:13-cv-02294-D Document 1-3 Filed 08/29/13 Page 10 of 47
Case 2:12-cv-04053-HGD Document 1 Filed 12/07/12 Page 10 of 47

Georgia, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint. BCBS-GA exercises dominance in the state of Georgia or within areas of the state.

27.     Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 676,000 members in various health care plans in Hawaii. Hawaii Medical Service Association, its subsidiaries, and health care plans are collectively referred to as "Hawaii  Medical Service Association" or "BCBS-HI" in this Complaint. BCBS-HI exercises market dominance in the state of Hawaii or within areas of the state.

28.     Defendant Health Care Service Corp. d/b/a Blue Cross and Blue Shield of Illinois is a Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, Illinois 60601. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 6.5 million members in various health care plans in Illinois. Health Care Service Corp. is a customer-owned health benefits company that purports to focus on improving the health and wellness of its members and communities. Blue Cross and Blue Shield of Illinois, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint. BCBS-IL exercises market dominance in the state of Illinois or within areas of the state.

29.     Defendant Anthem Blue Cross and Blue Shield of Indiana is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees

in various health care plans in Indiana. Blue Cross and Blue Shield of Indiana, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint. BCBS-IN exercises market dominance in the state of Indiana or within areas of the state.

30.     Defendant Wellmark, Inc. d/b/a Blue Cross and Blue Shield of Iowa. Together, Wellmark and its subsidiaries provide health care services to approximately 1.4 million members in Iowa. Defendant Blue Cross and Blue Shield of Iowa is an Iowa corporation with its corporate headquarters located at 1331 Grand Avenue, Des Moines, Iowa 50306. BCBS-IA exercises market dominance in the state of Iowa or within areas of the state.

31.     Defendant Blue Cross and Blue Shield of Kansas is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629. Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries that provide health care services to approximately 880,000 members in various health care plans in Kansas. Blue Cross and Blue Shield of Kansas, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS." BCBS-KS exercises market dominance in the state of Kansas or within areas of the state.

32.     Defendant Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 858,000 enrollees in various health care plans Louisiana. Blue Cross and Blue Shield of Louisiana, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint. BCBS-LA exercises

11

Case MDL No. 2406 Document 187-3 Filed 03/29/13 Page 90 of 197
Case 2:13-cv-00294-D Document 1-3 Filed 03/27/13 Page 90 of 197
Case 2:12-cv-04053-HGD Document 1 Filed 12/07/12 Page 12 of 47

market dominance in the state of Louisiana or within areas of the state.

33.     Defendant Anthem Health Plans of Maine is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 140,000 enrollees in various health care plans in Maine. Anthem Health Plans of Maine, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.  BCBS-ME exercises market dominance in the state of Maine or within areas of the state.

34.     Defendant CareFirst Blue Cross and Blue Shield of Maryland is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Maryland. CareFirst Blue Cross and Blue Shield of Maryland, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Maryland" or "BCBS-MD" in this Complaint. BCBS-MD exercises market dominance in the state of Maryland or within areas of the state.

35.     Defendant Blue Cross and Blue Shield of Massachusetts is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts 02215.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.4 million enrollees in various health care plans in Massachusetts.  Blue Cross and Blue Shield of Massachusetts, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.  BCBS- MA exercises market dominance in the state of Massachusetts or within areas of the

state.

36.     Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 4.8 million enrollees in various health care plans in Michigan. Blue Cross and Blue Shield of Michigan, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.  BCBS-MI exercises market dominance in the state of Michigan or in areas of the state.

37.     Defendant Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2 million enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint. BCBS-MN exercises market dominance in the state of Minnesota or in areas of the state.

38.     Defendant Blue Cross and Blue Shield of Mississippi is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1 million enrollees in various health care plans in Mississippi. Blue Cross and Blue Shield of Mississippi, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Mississippi" or "BCBS-MS" in this Complaint. BCBS-MS exercises market dominance in the state of Mississippi or within areas of the state.

39.    Defendant Anthem Blue Cross and Blue Shield of Missouri is a Missouri Corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in a various health care plans in Missouri. Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint. BCBS-MO exercises market dominance in the state of Missouri or within areas of the state.

40.    Defendant Blue Cross and Blue Shield of Kansas City is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 805,000 enrollees in various health care plans in Missouri. Blue Cross and Blue Shield of Kansas City, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint. BCBS-Kansas City exercises market dominance in the state of Missouri or within areas of the state.

41.    Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarban Drive, Omaha, Nebraska 68180. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 620,000 enrollees in various health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint. BCBS-NE exercises market dominance in the state of Nebraska or within areas of the state.

14

42.     Defendant Anthem Blue Cross and Blue Shield of New Hampshire is a New Hampshire corporation with its corporate headquarters located at 300 Goffs Falls Road, Manchester, New Hampshire 03111. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in New Hampshire. Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint. BCBS-NH exercises market dominance in the state of New Hampshire or within areas of the state.

43.     Defendant Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2 million enrollees in various health care plans New Jersey. Horizon Blue Cross and Blue Shield of New Jersey, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint. BCBS-NJ exercises market dominance within the state of New Jersey or within areas of the state.

44.     Defendant Blue Cross and Blue Shield of New Mexico is a New Mexico corporation with its corporate headquarters located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 236,000 enrollees in various health care plans in New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in

15

this Complaint. BCBS-NM exercises market dominance within the state of New Mexico or within areas of the state.

45.     Defendant Excellus Blue Cross Blue Shield of New York is a New York corporation with its corporate headquarters located at 333 Butternut Drive, Syracuse, New York 13214-1803. It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in the State of New York. Excellus Blue Cross Blue Shield of New York, its subsidiaries and health care plans are collectively referred to as "Excellus Blue Cross and Blue Shield of New York" or "BCBS-NY-Excellus" in this Complaint. BCBS-NY-Excellus exercises market dominance in the state of New York or within areas of the state.

46.     Defendant Blue Cross and Blue Shield of North Carolina is a North Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina 27707. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.6 million members in various health care plans in North Carolina. Blue Cross and Blue Shield of North Carolina, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC." BCBS-NC exercises market dominance in the state of North Carolina or within areas of the state.

47.     Defendant Blue Cross and Blue Shield of Oklahoma is an Oklahoma corporation with its corporate headquarters located at 1400 South Boston, Tulsa, Oklahoma 74119. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and health care plans are collectively referred to as "Blue Cross and

16

Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint. BCBS-OK exercises market dominance within the state of Oklahoma or within areas of the state.

48.     Defendant Blue Cross of Northeastern Pennsylvania – Wilkes-Barre is a Pennsylvania corporation with its corporate headquarters located at 19 North Main Street, Wilkes-Barre, Pennsylvania 18711. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 570,000 enrollees in various health care plans in Pennsylvania. Blue Cross of Northeastern Pennsylvania – Wilkes-Barre, its subsidiaries and health care plans are collectively referred to as "Blue Cross of Northeastern Pennsylvania – Wilkes Barre" or "BCBS-NE PA-Wilkes Barre" in this Complaint. BCBS-NE PA – Wilkes- Barre exercises market dominance in the state of Pennsylvania or within areas of the state.

49.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.9 million enrollees in Pennsylvania. Highmark, Inc., its subsidiaries and health care plans are collectively referred to as "Highmark" in this Complaint. Highmark exercises market dominance in the state of Pennsylvania or within areas of the state.

50.     Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103. It is the parent corporation of a number of subsidiaries that provide health care services to more than 3 million enrollees in Pennsylvania. Independence Blue Cross, its subsidiaries and health care plans are collectively referred to as "Independence Blue Cross" in this Complaint. Independence Blue Cross exercises market dominance in the state of Pennsylvania or within areas of the state.

17

Case MDL No. 02406 Document 187-3 Filed 03/29/13 Page 96 of 197
Case 3:13-cv-00294-D Document 1-3 Filed 03/29/13 Page 18 of 47
Case 2:12-cv-04053-HGD Document 1 Filed 12/07/12 Page 18 of 47

51.     Defendant Triple S – Salud, Inc. is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that provide health care services to more than 600,000 enrollees in Puerto Rico. Triple S – Salud, Inc., its subsidiaries and health care plans are collectively referred to as "Triple-S of Puerto Rico" in this Complaint. Triple-S of Puerto Rico exercises market dominance in Puerto Rico or within areas of Puerto Rico.

52.     Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 15 LaSalle Square, Providence, Rhode Island 02903. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and Blue Shield of Rhode Island, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint. BCBS-RI exercises market dominance in the state of Rhode Island or within areas of the state.

53.     Defendant Blue Cross and Blue Shield of South Carolina is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29223. It is the parent corporation of a number of subsidiaries that provide health care services to approximately one million members in various health care plans in South Carolina. Blue Cross and Blue Shield of South Carolina, its subsidiaries, and health care plans are collectively referred to as "Blue Cross and Blue Shield of South Carolina" or "BCBS-SC." BCBS-SC exercises market dominance in the state of South Carolina or within parts of the state.

54.     Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601

18

W. Madison, Sioux Falls, South Dakota 57104. It is the parent corporation of a number of

subsidiaries that provide health care services to approximately 250,000 enrollees in South

Dakota. Blue Cross and Blue Shield of South Dakota, its subsidiaries and health care plans are

collectively referred to as "Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this

Complaint. Blue Cross and Blue Shield of South Dakota exercises market dominance in the state

of South Dakota or within areas of the state.

55.     Defendant Blue Cross and Blue Shield of Tennessee is a Tennessee corporation with

its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is

the parent corporation of a number of subsidiaries that provide health care services to

approximately 2.3 million members in various health care plans in Tennessee. Blue Cross and

Blue Shield of Tennessee, its subsidiaries, and health care plans are collectively referred to as

"Blue Cross and Blue Shield of Tennessee" or "BCBS-TN." BCBS-TN exercises market

dominance in the state of Tennessee or within areas of the state.

56.     Defendant Blue Cross and Blue Shield of Texas is a Texas corporation with its

corporate headquarters located at 1001 E. Lookout Drive, Richardson, Texas 75082. It is the

parent corporation of a number of subsidiaries that provide health care services to approximately

2.9 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of

Texas, its subsidiaries and health care plans are collectively referred to as "Blue Cross and

Blue Shield of Texas" or "BCBS-TX" in this Complaint. BCBS-TX exercises market

dominance in the state of Texas or within areas of the state.

57.     Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its

corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602. It is the parent

corporation of a number of subsidiaries that provide health care services to enrollees in the state of Vermont. Blue Cross and Blue Shield of Vermont, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint. BCBS-VT exercises market dominance in the state of Vermont or within areas of the state.

58.      Defendant Anthem Blue Cross and Blue Shield of Virginia, Inc. is a Virginia corporation with its corporate headquarters located at 2235 Staples Mill Road, Suite 401,Richmond, Virginia 23230. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.2 million enrollees in various health care plans in Virginia. Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint. BCBS-VA exercises market dominance in the state of Virginia or within areas of the state.

59.      Defendant Highmark Blue Cross and Blue Shield of West Virginia is a West Virginia corporation with its corporate headquarters located at 700 Market Square, Parkersburg, West Virginia 26101. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 250,000 enrollees in various health care plans in West Virginia. Highmark Blue Cross and Blue Shield of West Virginia, its subsidiaries and health care plans are collectively referred to as "Highmark Blue Cross and Blue Shield of West Virginia" or "BCBS-WV" in this Complaint. BCBS-WA exercises market dominance in the state of West Virginia or in areas of the state.

20

Case MDL No. 2406 Document 187-3 Filed 08/29/13 Page 99 of 197
Case 3:13-cv-00294-D Document 1-3 Filed 08/23/13 Page 21 of 47
Case 2:12-cv-04053-HGD Document 1 Filed 12/07/12 Page 21 of 47

60.     Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled by 38 health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as the licensor. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million—or one in three—Americans. BCBSA itself does not provide health services or sell health insurance to subscribers, but it operates to create consistency and cooperation among its 38 members. It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members. The 38 plans fund Defendant BCBSA.

61.     BCBSA has contacts with the state of Alabama by virtue of its agreements and contacts with BCBS-AL.


**INTERSTATE COMMERCE**

62.     Defendants and their activities were within the flow of and substantially affected interstate commerce.

63.     BCBSA and its co-conspirators, the BCBS Defendants, operate on a nationwide basis. Health insurers operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance operate throughout the United States providing coverage for approximately 100 million – or one in three – Americans. BCBSA enters into agreements with each of these insurers. Each BCBS Defendant provides health insurance coverage to

21

subscribers in its defined geographical area and also throughout the United States when the plan's insureds travel outside of their home states. Moreover, communications between Defendants have occurred through interstate communications. Accordingly, BCBSA and the BCBS Defendants are engaged in interstate commerce.

64. Defendants' illegal agreements and conspiracy have had a direct, substantial, and reasonably foreseeable effect on commerce between the states.

## CLASS ACTION ALLEGATIONS

65. Plaintiff brings this action on behalf of herself and on behalf of a class of plaintiffs. Plaintiff brings this action seeking damages on behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure, with such class (the "National Class") defined as:

> All persons or entities who paid health insurance premiums to at least one of the BCBS Defendants for health insurance.
>
> All persons or entities
>
> Specifically excluded from the class are all members of the judiciary, their spouses, and their immediate family members. Excluded from the class are the Defendants, any entity in which Defendants have a controlling interest or which has a controlling interest of Defendants, and Defendants' legal representatives, assigns or successors and any employee of the Defendant. Plaintiff reserves the right to define or redefine the class following full and complete discovery.

66. The Class is so numerous and geographically dispersed that joinder of all members is impractical. While Plaintiff does not know the number and identity of all members of the Class, Plaintiff believes that there are millions of Class members, the exact number and

identities of which can be obtained from the BCBS Defendants.

67.     There are questions of law or fact common to the Class, including but not limited to:

      (a)     Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Sections 1 and 2 of the Sherman Act, or are otherwise prohibited under Sections 1 and 2 of the Sherman Act;

      (b)     Whether, and the extent to which, premiums charged by the BCBS Defendants to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

      (c)     Whether, and the extent to which, premiums charged by the BCBS Defendants has been artificially inflated as a result of the anticompetitive practices adopted by the BCBS Defendants.

68.     The questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

69.     Plaintiff is a member of the National Class; her claims are typical of the claims of the members of the Class; and Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and the National Class are direct purchasers of individual or small group full-service commercial health insurance from the BCBS Defendants, and their interests are coincident with and not antagonistic to other members of the Class. In addition, Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

23

70.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and the BCBS Defendants.

71.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which the BCBS Defendants have records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

72.     The BCBS Defendants all enjoy market dominance within their defined, non-competitive region or territory. In some cases this share approaches 100%, demonstrating the complete lack of meaningful competition within these markets. For example, in 2008, BCBS-AL enrolled 96% of subscribers of full-service commercial health insurance plans in the Alabama small group market, whether the insurance was offered through a health maintenance organization ("HMO") or through a preferred provider organization ("PPO") plan. BCBS-AL thus has the highest share of the small group insurance market achieved by any health insurance carrier in any state in the country.

73.     The situation in Alabama, is not unique, however, as the BCBS Defendants all reap similar benefits in their respective service areas across the United States. For example, according to certain data reported by the U.S. Government Accountability Office, Premera Blue Cross of Alaska enjoys a 77% market share in Alaska; BlueCross Blue Shield of North Carolina has 65% of the market in North Carolina; and Blue Cross Blue Shield of Tennessee enjoys 68% of that state's health insurance market.

74.     BCBS-AL enjoys unrivaled, non-competitive market dominance within Alabama.

75.     The BCBS Defendants' market dominance is the result of a systematic and longstanding agreement between and among the BCBS Defendants and the remaining insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States, thereby eliminating competition. This illegal restraint is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with Defendant BCBSA. As detailed herein, the member health insurance plans of BCBSA that allocate the geographic markets for health insurance by limiting each Blue's activity outside of a designated service area, thereby preventing competition among BCBS companies. Moreover, these agreements effectively obstruct entry by non-BCBS insurers by, among other things, preventing the sale or transfer of established networks to non-Blue entities. These provisions have insulated BCBS Defendants and the other Blues from competition by both Blues and non-Blues in each of their respective service areas. These provisions of the BCBS's agreements operate as effective restraints on competition, and have no sufficient economic justification aside from protecting BCBS entities from competition.

25

76.     Defendants' anticompetitive practices, by eliminating competition and reducing the choices available to health insurance consumers, have raised the premiums that BCBS subscribers must pay to obtain health insurance. This has further allowed BCBS Defendants to collect inflated profits, higher than they would have experienced had there been unimpeded competition.   As a result of these inflated premiums, BCBS-AL now has a surplus of more than $620 million.

77.     By and through their agreement, each of the BCBS Defendants has been able to acquire and maintain a grossly disproportionate market share for health insurance products in their respective states and/or geographical regions or territories. Consequently, each of the BCBS Defendants has benefitted from inflated surpluses in their respective allocated markets to the resulting detriment and antitrust injury of BCBS subscribers.

78.     Defendants' anticompetitive practices, by reducing the options available to BCBS subscribers, have also significantly increased the rates and premiums paid by subscribers. Given the market dominance of the BCBS Defendants, BCBS Defendants' rival health insurance plans are effectively excluded from the market.

79.     Defendants have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy.

80.     The Defendants' co-conspirators include other Blue Plans who are not Defendants in this Action.

81.     The Defendants and the other Blue Plans are not competitors; rather they are all licensees of the BCBS who operate in distinct geographical regions. The Defendants have engaged in a conspiracy to allocate markets, to reduce competition, and to increase their profits

at the expense of the Plaintiff and other BCBS subscribers as Class Members.

82.     The member Blues, including BCBS Defendants, are all licensees of the BCBSA which entitles them to certain rights within the BCBSA, such as use of the "blue cross" or "blue shield" emblem.  BCBSA members elect a Board of Directors, composed exclusively of member Blues.  That Board of Directors in turn establishes rules that require licensing agreements and an agreement not to compete in each other's exclusive territories. There is no procompetitive justification  for  these licensing agreements and  restrictions on competition in exclusive territories.  Instead, they are naked restraints on trade, are not ancillary to the legitimate and  competitive  purposes  of  the  BCBS  Defendants, and  have  profound anticompetitive effects.

## History and Background of the Blue Cross and Blue Shield Plans and of BCBSA

83.     Blue  Cross  and  Blue  Shield  Plans  undertook  a  coordinated  effort  to  create  a national brand and then to allocate the market in which each Blue Plan would operate free of competition from other Blue Plans which has resulted in monopolies within the allocated geographic regions.  The history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

84.     In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans with certain standards of approval would receive institutional membership in the AHA.  In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid

hospital plans. One such principle was that the plans would not compete with each other.

85.     The development of what became the Blue Shield plans followed, and imitated, the development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

86.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

87.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

88.     However, by the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of

28

the Blue plans and were now entering the market.

89.     From 1947-1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

90.     Instead, to address competition from commercial insurers and competition from other Blue plans, and to ensure national cooperation among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.

91.     Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association. Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

92.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans. That same year, BCBSA's Member Plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 38 today.

93.     In 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and would not compete against each other.  During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans, an increasing "problem" that had caused complaints from many Blue plans.

94.     Subsequently, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans. These illegal restraints are discussed below.

95.     Although Blue Cross Blue Shield plans were originally set up as not-for profit entities, during the 1980s and afterwards, they began to operate less like charitable entities and more like for-profit corporations.  Thus, in 1986, Congress revoked the Blues' tax-exempt status and they thus formed for-profit subsidiaries.  Consequently, the majority of the Blues converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.


**The BCBSA and Blues Entities**

96.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue

30

Cross Blue Shield companies." The Association is a separate legal entity and it purports to promote the common interests of the independent Blues entities. Defendant BCBSA and the Blue entities cover a large percentage of the subscribers in the managed care market in most states and in some local areas, and they also include a large percentage of doctors and hospitals in their network of contracted providers. BCBSA states that over 100 million individuals are enrolled with Defendants and co-conspirator Blue Plans, approximately one in three individuals nationwide.

97.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States who would be potential competitors. Indeed, the largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees. Absent the Association's licensing agreements with each of the Blues, these companies would compete against each other in the market for commercial health insurance.

98.     BCBSA's Member Plans are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. Instead, with and through the Association the Blues have divided health insurance markets throughout the United States, to eliminate competition in those markets. On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies."

31

99.     The Association not only requires each individual Blue plan to agree to the territorial restrictions in the licensing agreements, but also serves as the epicenter for the Blues' communications and arrangements in furtherance of the their agreements not to compete. As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages ...."

100.    The Association, as a separate legal   entity, is a convenient vehicle   for anticompetitive agreements between and among the otherwise economic independent Blues, termed "Member Plans".   The Association's board of directors consists of the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer. The board of directors holds meetings to discuss the administration and management of BCBSA and its Member Plans, while smaller committee meetings address specific health insurance issues. These meetings provide a forum for representatives of Member Plans to share information on such issues, and that information is later disseminated to all 38 members.

101.    In addition, BCBSA includes numerous committees governed by the Member Plans; it sponsors various meetings, seminars, and conferences attended by the Member Plans; and it produces manuals, reports, list serves, and other correspondence to the Member Plans, all in furtherance of the conspiracy.

102.    Furthermore, the Association has strict rules and regulations that all members of BCBSA must obey concerning members' Licensing Agreements and the guidelines proposed members must adhere to prior to joining the Association.   Those regulations provide for

amendment with a vote of three fourths of the Blues.

103.    The Association polices the compliance of all members of BCBSA with its rules and regulations.    The Guidelines state that the Association's Plan Performance and Financial Standards Committee (the "PPFSC") "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.    Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."    In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plain's compliance with the License Agreements and Membership Standards.    In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

104.    The Association controls and administers the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply "Immediate Termination," "Mediation and Arbitration," and "Sanctions" -each of which is administered by the PPFSC and could result in the termination of a member plan's license.

105.    The Association controls the termination of existing members from BCBSA. According to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

33

106.    As the foregoing demonstrates, BCBSA not only enters into anticompetitive agreements with the Blues entities to allocate markets, but also facilitates the cooperation and communications between the Blues to suppress competition within their respective areas of operation. BCBSA is a convenient organization through which the Blues entities can enter into patently illegal territorial restraints between and among themselves.

### The Horizontal Agreements Not To Compete In The Licensing Arrangements Between BCBSA And Its Member Plans, Including BCBS Defendants, Are *Per Se* Violations of The Sherman Act

107.    The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance.  As such, they are a *per se* violation of Section 1 of the Sherman Act.

108.    Through the License Agreements each Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."  "The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

109.    Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.  This provision directly limits the ability of each Blue plan to generate

34

revenue from non- Blue business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

110.  Through the Guidelines and Membership Standards, each Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans.

111.  Therefore, each Blue Cross and Blue Shield licensee, BCBS Defendants, has agreed with the Association that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

112.  The foregoing restrictions on the ability of the BCBS Defendants to generate revenue outside of their service areas constitute agreements to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

35

Case MDL No. 04054 Document 1871-3 Filed 08/28/13 Page 114 of 197
Case 2:13-cv-00294 Document 113 Filed 09/27/13 Page 36 of 47
Case 2:12-cv-04053-HGD   Document 1   Filed 12/07/12   Page 36 of 47

113.    BCBSA and the BCBS Defendants admit to the existence of territorial market divisions and the consequences of violating them. For example, the former Blue Cross licensee in Ohio has publicly stated that the BCBSA Member Plans agreed to include territorial restrictions in the Guidelines in order to block the sale of one member plan to a non-member plan as that would create increased competition.

114.    The largest Blue licensee, WellPoint, describes the restrictions on its ability to do business. In its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 and 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

115.    The Association imposes harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan

36

must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K, there was a "re- establishment fee" of $98.33 per enrollee which would "allow the BCBSA to 're establish" a Blue Cross and/or Blue Shield presence in the vacated service area."

116. Thus while there are numerous Blue plans, and non-Blue businesses owned by such plans that could and would compete effectively in designated service areas but for the territorial restrictions, the BCBS Defendants in those areas dominate the markets. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets.

117. For example, with approximately 34 million enrollees, Anthem is the largest health insurer in the country by total medical enrollment and is the BCBSA licensee for 14 states, and also serves the entire nation through its non-Blue brand subsidiary, UniCare. However, Anthem does not have a presence in any of the other BCBS Defendants' states. But for the illegal territorial restrictions described herein, Anthem would likely offer its health insurance products and services in those states and compete with the other BCBS Defendants. Such competition would lessen the disparity in power between the BCBS Defendants and subscribers and, would, therefore, result in lower premiums and better terms. The BCBS Defendants would no longer be able to abuse their market power which would result in drastically reduced premiums paid by BCBS subscribers.

118. Similarly, Blue Cross and Blue Shield of Florida is the 15th largest health insurer in the country by total medical enrollment with more than seven million enrollees. But for the illegal territorial restrictions, it would likely offer its health insurance services and products in other BCBS Defendants' states and compete with other BCBS Defendants. Such competition would

lessen the disparity in power between the Blues and subscribers and, would, therefore, result in lower premiums and better terms. The BCBS Defendants would no longer be able to abuse their market power.

119. Therefore, the territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing the BCBS Defendants from competing with each other and with non- Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

### The Anticompetitive Acquisition Restrictions In The BCBSA Licensing Agreements

120. In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any Member Plan. These provisions create a significant barrier to entry for companies that are not BCBSA members or their affiliates. As such, they further restrain competition by helping BCBS companies to capture and maintain high market shares and elevate prices.

121. First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non- member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the Member Plans control the entry of new members into BCBSA.

38

Should a non-member attempt to join BCBSA in order to obtain control of or to acquire a substantial portion of the assets of a member plan, the Association – and through it, the Member Plans – could easily block its membership. Moreover, such a new member would be immediately limited by the BCBSA license's territorial restrictions. It would be forbidden from operating as a BCBS entity in a service area already inhabited by a BCBS entity, yet it would be required to make at least 66.7% of its revenue under the BCBS name. For many potential acquirers with a pre-existing footprint in the U.S. health insurance market, these two conditions would be impossible to meet.

122.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a BCBS Defendants' license will terminate *automatically:* (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities.

These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested Member Plans and also of a majority weighted vote of the disinterested Member Plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity absent special approval.

123.   These acquisition restraints reduce competition by substantially reducing the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan in that area. Through the acquisition restrictions, BCBSA and the BCBS Defendants have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may be the most cost effective due to historical tax breaks, favorable legislation, and long-term presence in a region. In fact, national insurers rarely enter a new regional market without purchasing a large local firm. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

124.   By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is less competition, higher premiums costs for BCBS

40

subscribers such as Plaintiff and the Class.

## CAUSES OF ACTION
### COUNT ONE
(Contract, Combination, or Conspiracy in Restraint of
Trade in Violation of Sherman Act, Section 1)

125.  Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 124.

126.  The License Agreements, Membership Standards, and Guidelines agreed to by BCBS Defendants and BCBSA represent horizontal agreements entered into between the BCBSA and the thirty-eight (38) other BCBS Defendants, all of whom are competitors or potential competitors in the market for commercial health insurance.

127.  Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the BCBS Defendants represents a contract, combination and conspiracy within the meaning of Section 1 of the Sherman Act.

128.  Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, the BCBS Defendants have conspired to restrain trade in violation of Section 1 of the Sherman Act. These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

129.  The market allocation agreements entered into between the BCBSA and the thirty-eight BCBS Defendants (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

130.  The BCBS Defendants have market power in the sale of full-service commercial health

insurance to individuals and small groups in each relevant geographic and product market alleged herein.

131.  Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

>  (a)  Reducing the number of health insurance companies competing with each BCBS Defendant plan throughout their respective regions or territories, including throughout Alabama;

>  (b)  Unreasonably limiting the entry of competitor health insurance companies into the geographic regions and territories controlled by each BCBS Defendant;

>  (c)  Allowing BCBS to maintain and enlarge its market power throughout the nation and the respective regions controlled by each BCBS Defendant;

>  (d)  Allowing the BCBS Defendants to raise the premiums charged to consumers by artificially inflated, unreasonable, and supra-competitive amounts;

>  (e)  Depriving consumers of health insurance of the benefits of free and open competition.

132.  The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

133.  The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act.

134.  As a direct and proximate result of BCBSA and the BCBS Defendants continuing violations of Section 1 of the Sherman Act, Plaintiff and other members of the National

Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-AL and the other BCBS Defendants than they would have paid with increased competition and but for the Sherman Act violations.

135. Plaintiffs and the National Class seek money damages from the 38 BCBS Defendants and BCBSA for their violations of Section 1 of the Sherman Act.

## COUNT TWO

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

136. Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 135.

137. BCBS Defendants have monopoly power in the individual and small group full-service commercial health insurance market in their respective states, regions or territories. This monopoly power is evidenced by, among other things, the BCBS Defendants' high market share of the commercial health insurance market in their respective regions, including its increasing market share even as it has raised premiums.

138. The BCBS Defendants have abused and continue to abuse their monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers such as BCBS subscribers.

139. The BCBS Defendants' conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive

43

relief is granted.

140.    As a direct and proximate result of the BCBS Defendants continuing violations of Section 2 of the Sherman Act, Plaintiff and other members of the National Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to the BCBS Defendants than they would have paid but for the Sherman Act violations.

141.    Plaintiff and the National Class seek money damages from the BCBS Defendants and BCBSA for their violations of Section 2 of the Sherman Act.


## COUNT THREE

(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)

142.    Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 141.

143.    The BCBS Defendants have acted with the specific intent to monopolize the relevant markets.

144.    There was and is a dangerous possibility that the BCBS Defendants will succeed in its attempt to monopolize the relevant markets because the BCBS Defendants control a large percentage those markets already, and further success by BCBS Defendants in excluding competitors from those markets will confer a monopoly on the BCBS Defendants in violation of Section 2 of the Sherman Act.

145.    The BCBS Defendants attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the National Class. Premiums charged by the BCBS Defendants have been higher than they would in a competitive

44

market.

146.    Plaintiff and the National Class have been damaged as the result of the BCBS Defendants' attempted monopolization of the relevant markets

## UNJUST ENRICHMENT
## COUNT FOUR

147.    Plaintiff incorporates and re-alleges each of the foregoing paragraphs.

148.    BCBS-AL has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiff and the other Class members.

149.    It would be inequitable for BCBS-AL to be permitted to retain the benefit of these overpayments that were conferred by Plaintiff and the Class and retained by BCBS-AL.

150.    By reason of its unlawful conduct, BCBS-AL must make restitution to Plaintiff and the Class. Further, any action which might have been taken by Plaintiff to pursue administrative remedies would have been futile.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court:

(a)    Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Adjudge and decree that BCBSA and BCBS Defendants have violated Section 1 of the Sherman Act;

(c)    Permanently enjoin BCBSA and BCBS Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which

Case MDL No. 2406 Document 187-3 Filed 08/28/13 Page 124 of 197
Case 5:13-cv-00264-D Document 1-3 Filed 08/27/13 Page 46 of 47
Case 2:12-cv-04053-HGD   Document 1   Filed 12/07/12   Page 46 of 47

any BCBSA member plan may compete;

(d)      Award Plaintiff and the Class damages in the form of three times the amount of damages suffered by Plaintiff and members of the Class as proven at trial;

(e)      Award costs and attorneys' fees to Plaintiff;

(f)      For a trial by jury; and

(g)      Award any such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues.

**SUBMITTED BY ATTORNEYS:**

David J. Hodge (asb-4617-i71h)
Morris, King & Hodge
200 Pratt Ave. NE
Huntsville, AL 35801
(256) 536-0588 voice
(256) 533-1504 fax
dhodge@alinjurylaw.com

M. Stephen Dampier (DAMPM6125)
The Dampier Law Firm, P.C.
55 N. Section Street
Fairhope, AL  36532
(251) 929.0900 voice
(251) 929.0800 fax
**stevedampier@dampierlaw.com**

46

Case MDL No. 2406 Document 187-3 Filed 08/28/13 Page 125 of 197
Case 5:13-cv-00294-D Document 1-3 Filed 03/27/13 Page 47 of 47

Case 2:12-cv-04053-HGD   Document 1   Filed 12/07/12   Page 47 of 47

**OF COUNSEL:**

Patrick W. Pendley (LSBA 10421)
pwpendley@pbclawfirm.com
Stan P. Baudin (LSBA 22937)
sbaudin@pbclawfirm.com
Christopher L. Coffin (LSBA 27902)
ccoffin@pbclawfirm.com
Nicholas R. Rockforte (LSBA 31305)
nrockforte@pbclawfirm.com
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, Louisiana 70765
225-687-6396 voice
225-687-6398 fax


Gordon Ball (TN BPR# 1135)
Thomas S. Scott, Jr. (TN BPR # 1086)
Christopher T. Cain (TN BPR# 19997)
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
865-525-7028 voice
865-525-4679 fax
**gball@ballandscott.com**

IN THE DISTRICT COURT OF LOGAN COUNTY
STATE OF OKLAHOMA                    2013 JAN 18  PM 1:06

CLINT JOHNSTON, JANEEN GOODIN and §
MARLA SHARP as individuals &       §
as representatives of those        §
similarly situated,                §
                                   §
                                   §
        Plaintiffs,                §
                                   §   Case No. CJ- 2013- 17
vs.                                §
                                   §
BLUE CROSS AND BLUE SHIELD OF      §   
OKLAHOMA, HEALTH CARE SERVICE      §
CORPORATION, AND BLUE CROSS        §   * 1 0 2 0 4 1 5 8 8 4 *
BLUE SHIELD ASSOCIATION            §
                                   §
        Defendants                 §

### PETITION – CLASS ACTION

NOW COMES Plaintiff, Clint Johnston, Janeeen Goodin and Marla Sharp, and bring this

action on behalf of themselves and all others similarly situated against Defendant, Blue Cross

and Blue Shield of Oklahoma, a division of Health Care Service Corporation, a Mutual Legal

Reserve Company, an independent licensee of the Blue Cross and Blue Shield Association, for

damages and restitution.

### FACTS

1.     Plaintiff, Clint Johnston, Janeeen Goodin and Marla Sharp, (hereinafter "Plaintiff") bring

this action on behalf of themselves and other subscribers of Blue Cross and Blue Shield

of Oklahoma, ("BCBSOK") a division of Health Care Service Corporation ("HCSC"), a

Mutual Legal Reserve Company, an independent licensee of the Blue Cross and Blue

Shield Association ("BCBSA") for damages and restitution.  Specifically, this action

Complaint – Page 1

**EXHIBIT 4**

seeks to recover damages in the form of a refund of inflated premiums that BCBSOK has

charged Oklahoma subscribers as a result of restraining trade in violation of the

Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(A), which prohibits restraint

of trade and a violation of Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(B),

("[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to

monopolize any part of trade or commerce in a relevant market within this state") by

BCBSOK individually with the thirty-seven (37) BCBSA member health plans, and as a

result of anti-competitive conduct Defendants have engaged in to establish and maintain

monopoly power throughout Oklahoma.

2.   BCBSOK is by far the largest health insurance company operating in Oklahoma and

currently exercises market power in the commercial health insurance market throughout

Oklahoma. Its website states: "We are the largest and most experienced health insurance

company in Oklahoma, providing more than 680,000 members with reliable and

affordable health plans." See: http://www.bcbsok.com/index.html. As of January 1,

2009, 50% of the Oklahoma residents who subscribe to full-service commercial health

insurance (group plans and individual policies) are subscribers of BCBSOK -- vastly more

than the next largest full-service commercial insurer, Aetna, which carries just 19% of

such subscribers.

3.   The dominant market share enjoyed by BCBSOK is, in part, the result of an illegal

conspiracy in which thirty-seven of the nation's largest health insurance companies have

agreed that they will not compete with BCBSOK, and that BCBSOK will have the

exclusive right to do business in the State of Oklahoma, so long as it limits its

competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including BCBSOK. Through the terms of these per se illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCBSOK, have explicitly agreed not to compete with one another, in direct violation of Okla Stat. Tit. 79 § 203, which declares unlawful "[e]very act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce." By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

4.  Defendants' illegal conspiracy has perpetuated BCBSOK monopoly power throughout Oklahoma, which has resulted in skyrocketing premiums for BCBSOK enrollees for over a decade. BCBSOK's anti-competitive behavior, and the lack of competition BCBSOK faces because of its monopoly power and anti-competitive behavior, has led to higher costs, resulting in higher premiums charged to BCBSOK customers. In fact, when HCSC purchased Oklahoma's Blue Cross plan in 2005, it has expanded its business substantially. BCBSOK went from about 518,000 customers in 2005 to 668,000 customers as of December 2011, according to the Oklahoma Insurance Department, and nearly doubled its premium revenue from $956 million to $1.8 billion. As a result of

Complaint – Page 3

these inflated premiums, HCSC now has a surplus of more than $620 million.

5. These inflated premiums would not be possible if the market for health insurance in Oklahoma were truly competitive. Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as BCBSOK and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Oklahoma.

## PARTIES, JURISDICTION AND VENUE

6. Plaintiff, Clint Johnston, Janeeen Goodin and Marla Sharp, include residents of Logan County and the State of Oklahoma. Plaintiff Clint Johnston, Janeeen Goodin and Marla Sharp each have a BCBSOK individual health insurance policy number. Plaintiff Johnston specifically being policy number YUP800459327and group number Y09HS2. Plaintiff Goodin specifically being policy number YUP800210626 and group number Y07355. Plaintiff Sharp specifically being policy number 807881006 and group number 0011. All paid premiums to BCBSOK.

7. All members of the Class are residents of only Oklahoma, and include members in Logan County.

8. Defendant Health Care Service Corporation (also "HCSC") d/b/a Blue Cross and Blue Shield of Oklahoma ("BCBSOK"), is a statewide customer-owned health insurer in Oklahoma with its Headquarters at 1400 S Boston Ave., Tulsa, Oklahoma 74119 which may be served through the Oklahoma Insurance Department, Legal Division, P.O. Box 53408, Oklahoma City, OK 73152-3408. BCBSOK is not a corporation, but rather it is

Complaint – Page 4

an unincorporated association owned by its Oklahoma customers, including members in Logan County. The membership of an unincorporated association, such as BCBSOK here, for purposes of diversity jurisdiction, is the citizenship of all of its members, in this case Oklahomans. *See Arbuthnot v. State Automobile Ins. Ass'n,* 264 F.2d 260, 261-62 (10th Cir.1959). Because Plaintiff and the class members are BCBSOK subscribers and are citizens of Oklahoma, complete diversity is lacking, and the federal courts have no power to hear this case. *See Owen Equip. and Erection Co. v. Kroger,* 437 U.S. 365, 373-74 (1978) (requirement of complete diversity). HCSC also does not have third-party investors, but is a non-investor owned company, which also includes Oklahomans further destroying diversity.

9.   BCBSOK is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oklahoma. Like other Blue Cross and Blue Shield plans nationwide, BCBSOK is the largest health insurer in the State of Oklahoma, as measured by number of subscribers, within its service area, which is defined as the state of Oklahoma. HCSC is the fourth largest health insurer in the country by total medical enrollment, with more than 13 million members in Texas, Illinois, Oklahoma, and New Mexico.

10.  Blue Cross Blue Shield Association is a not-for profit corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-eight (38) health insurance plans, including BCBSOK, that operate under the "Blue Cross and Blue Shield" trademarks and trade names. BCBSOK was created by these plans and operates as a licensor for these plans. Health insurance plans operating under

Complaint – Page 5

the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million -- or one in three – Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states. BCBSA may be served through its registered agent for service of process, Roger G. Wilson, 225 N. Michigan Ave., Chicago, IL 60601.

## TRADE AND COMMERCE

11.    BCBSOK and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.

12.    The conduct of the Defendants has substantial effects on trade and commerce in the State of Oklahoma.

## CLASS ACTION ALLEGATIONS

13.    Pursuant to 12 O.S. §2023, Plaintiff brings this action individually and on behalf of the members of the following proposed Class:

> All persons and entities who paid health insurance premiums to BCBSOK for individual or group full-service commercial health insurance at any time since five (5) years prior to commencement of this action and were domiciled in Oklahoma and solely residents of Oklahoma on January 15, 2013.

14.    Excluded from the Class are: (i) Defendants, any entity in which Defendants have a controlling interest, and Defendants legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendants employees, officers, directors, agents

Complaint – Page 6

and representatives and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family. Plaintiff reserves the right to amend the class definition as appropriate after class discovery is completed.

15.     The Class is so numerous and geographically dispersed in the State of Oklahoma that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are tens of thousands of Class members, the exact number and identities of which can be obtained from BCBSOK.

16.     There are questions of law or fact common to the Class and such questions predominate over questions affecting individual members. The common legal and factual questions include, but are not limited to, the following:

a.      Whether the restrictions set forth in the BCBSA license agreements are per se violations of the Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(A) and Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(B) or are otherwise prohibited thereunder;

b.      Whether, and the extent to which, premiums charged by BCBSOK to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

c.      Whether the use of Most Favored Nation ("MFN") provisions in the BCBSOK provider agreements are anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance; and

d.      Whether, and the extent to which, premiums charged by BCBSOK have been artificially inflated as a result of the anti-competitive practices adopted by BCBSOK.

17.     Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff purchased full-service commercial health insurance products from BCBSOK in the same

Complaint – Page 7

manner as members of the Class, and their interests coincide with and are not antagonistic to other members of the Class.

18. Plaintiff will fairly and adequately protect the interests of the members of the Class because it is in Plaintiff's best interest to prosecute the claims alleged herein to obtain full compensation for the unfair and illegal conduct complained of.

19. Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation. Plaintiff is willing and prepared to serve the Court and the Class members in a representative capacity with all of the obligations and duties material thereto and is determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

20. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for Defendants.

21. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which BCBSOK has records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would produce. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present

Complaint – Page 8

any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

22.    BCBSOK enjoys unrivaled market dominance within Oklahoma, enrolling approximately half of the market of non-elderly subscribers of full-service commercial health insurance plans.

23.    BCBSOK's market dominance in Oklahoma is, in part, the result of a conspiracy between BCBSOK and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States. That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA. As detailed herein, the member health insurance plans of BCBSA, including BCBSOK, entered into a series of licensing arrangements that have insulated BCBSOK and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

24.    This series of agreements has enabled BCBSOK to acquire and maintain a grossly disproportionate market share for health insurance products in Oklahoma, where BCBSOK enjoys market and monopoly power. The situation in Oklahoma is not unique, however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

25.    BCBSOK has used its market and monopoly power in Oklahoma to engage in a number of anti-competitive practices. For example, upon information and belief, BCBSOK has

required key health care providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with BCBSOK. These clauses ensure that BCBSOK receives the best pricing for health care services in the market. If a health care provider does not agree to the MFN, that provider will not remain in or become a part of BCBSOK's network, which is generally an unacceptable result because BCBSOK controls the vast majority of subscribers in Oklahoma. Faced with this prospect, providers capitulate to BCBSOK's demands, including MFNs. The MFNs restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

26. Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCBSOK's MFNs ensures that its competitors may not negotiate lower health care provider costs, BCBSOK faces little pressure to constrain its own costs. The MFN, by limiting the ability of an insurer to compete with BCBSOK, thus also compounds the exclusion of BCBSOK's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products. With few other health insurance plan options to compete with, BCBSOK can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan. The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by BCBSOK with health care providers.

27. Upon information and belief, because BCBSOK has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, health care

Complaint – Page 10

providers have responded by increasing prices to cover the discounts that BCBSOK receives through its MFNs. Thus, what was supposed to be a discount turns out to be a premium to providers, thereby artificially raising prices for health care services. Again, consumers lose.

28. Defendants' anti-competitive practices, by reducing the choices available to health insurance consumers and increasing the cost of health care in Oklahoma, have raised the premiums that Oklahoma residents must pay to obtain health insurance. BCBSOK's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Oklahoma market must pay significantly higher rates to health care providers.

29. The skyrocketing cost of BCBSOK health insurance coverage in Oklahoma tells the story of BCBSOK's abuse of its market and monopoly power at the expense of health care consumers in Oklahoma.

## HISTORY OF THE BLUE CROSS AND BLUE SHIELD PLANS AND OF BCBSA

30. The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage. While originally structured as non-profit organizations since the 1980s, these local "Blue" plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses.

31. The history of BCBSA demonstrates that it was created by the local Blue plans and is

Complaint -- Page 11

entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

32.    In 1934, an administrator named E.A. von Steenwyck helped develop a pre-paid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other pre-paid hospital plans began independently using the Blue Cross symbol.

33.    In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that pre-paid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

34.    In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

35.    In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Contrary to the principles that plans

Complaint – Page 12

would not compete and that plans would not operate in each others' service areas, the

independently formed pre-paid hospital plans, now operating under the Blue Cross name,

engaged in fierce competition with each other and often entered each others' territories.

The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which

BCBSA sponsored and its officers reviewed prior to publication, describe the heated

competition between the various Blue Cross plans at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example.... John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown .... By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

36.     For many years, Cross-on-Cross competition continued, as described in Odin Anderson's

*Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the

Blue Cross Association, a predecessor to BCBSA. Anderson points to Illinois and North

Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was

fierce," as particular examples, and explains that though "Blue Cross plans were not

supposed to overlap service territories," such competition was "tolerated by the national

Blue Cross agency for lack of power to insist on change."

37.     By 1975, the Blue Cross plans had a total enrollment of 84 million.

38.     The development of what became the Blue Shield plans followed, and imitated, the

Complaint – Page 13

development of the Blue Cross plans. These plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

39. Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

40. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

41. By 1975, the Blue Shield plans had a total enrollment of 73 million.

42. Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

43. However, by the late 1940s, the Blue plans faced growing competition not just from each

Complaint – Page 14

other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies. While the Blues remained dominant in most markets, this growth of competition was a threat. In particular, unlike the Blue plans, these commercial insurance companies were able to offer uniform nationwide contracts, which were attractive to large employers or unions with members located in different cities and states.

44. From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

45. Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war. As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

46. To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names. In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield

Complaint – Page 15

names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

47. Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

48. Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

49. During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

50. In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

51. In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and that by

the end of 1985, all Blue plans within a state should further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today. However, the goals did not end competition between Blue plans. In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

52. During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses. In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

53. In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities. As a result, many member plans converted to for-profit status. One such plan, now called WellPoint, has grown to become the largest health insurance company in the country, at least by some measures. While nominally still characterized as not-for-profit, BCBSOK and other non-profit Blue plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

54. From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially. As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would and

would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

55. Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased, and they continued to compete with Blue plans. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

56. At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

57. BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

58. BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

59. As at least one federal court has recognized, BCBSA "is owned and controlled by the

Complaint – Page 18

member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

60. The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a pleading it filed during litigation in the Northern District of Texas, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current chairman of the Board of Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue Shield of Michigan. The Board of Directors of BCBSA meets at least annually.

61. The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three independent members.

62. The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant ... must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

63. The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to a brief BCBSA filed during

litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

64. The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

65. Under the terms of the License Agreements a plan "agrees . . . to comply with the Membership Standards." The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate,

Complaint – Page 20

adequate and enforceable."

66. The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

67. The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," and "Sanctions" – each of which is administered by the PPFSC and could result in the termination of a member plan's license.

68. The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial

Complaint – Page 21

determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice- first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

69.    The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

70.    Each BCBSA licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." In fact, the License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

71.    The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States. The largest health insurance company in the nation by some measures is WellPoint, a BCBSA licensee. Similarly, fifteen (15) of the

Complaint – Page 22

twenty-five (25) largest health insurance companies in the country are BCBSA licensees. On its website, BCBSA asserts that its members together provide "coverage for more than 99 million individuals – one-in-three Americans" and "contract[] with more hospitals and physicians than any other insurer." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

72.    In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other – and each other's parent Blue Plans – in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

73.    On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's

Complaint – Page 23

39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages . . . ."

74. As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

### THE HORIZONTAL AGREEMENTS NOT TO COMPETE IN THE LICENSING ARRANGEMENTS BETWEEN BCBSA AND MEMBER PLANS, INCLUDING BCBSOK, ARE PER SE VIOLATIONS OF OKLA STAT. TIT. 79 § 203

75. The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a per se violation of Okla Stat. Tit. 79 § 203.

76. Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service Area as "the geographical

Complaint – Page 24

area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted

a subsequent license."

77.     Through the Guidelines and Membership Standards, which the independent Blue Cross

and Blue Shield licensees created, control, and enforce, and with which each licensee

must agree to comply as part of the License Agreements, each independent Blue Cross

and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its

subsidiaries generate from within its designated Service Area (excluding Medicare and

Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue

Shield trademarks and trade names. This provision directly limits the ability of each Blue

plan to generate revenue from non-Blue branded business. This provision also thereby

limits the ability of each plan to develop non-Blue brands that could and would compete

with Blue plans. It further discourages and disincentivizes each plan from developing any

non-Blue branded businesses.

78.     Through the Guidelines and Membership Standards, each independent Blue Cross and

Blue Shield licensee further agrees that at least two-thirds of the annual revenue

generated by it or its subsidiaries from either inside or outside of its designated Service

Area (excluding Medicare and Medicaid) shall be attributable to services offered under

the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that

national enrollment can be substituted for annual revenue, making the alternative

restriction that a plan will derive no less than 66 ⅔ percent of its national enrollment

from its Blue-brand business. This provision directly limits the ability of each Blue plan

to generate revenue from non-Blue branded business, and thereby limits the ability of

Complaint – Page 25

each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

79.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

80.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that in exchange for having the exclusive right to use the Blue brand within a designated geographic area, it will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

81.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are per se violations of Okla Stat. Tit. 79 § 203.

Complaint – Page 26

82. More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions. For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

83. The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business. Thus, in its Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 ⅔% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

84. Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service

Complaint – Page 27

Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

85. Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible. When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . The rules on what the plans do in this regard are contained in the license. However, the license terms themselves are proprietary to BCBSA, and ... we would prefer not to share such trade secrets with BCBSA's competitors."

86. The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a member plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K filing, that "Re-establishment Fee," which was

Complaint – Page 28

$98.33 per enrollee as of December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield presence in the vacated service area."

87. In sum, a terminated licensee would: (a) lose the brand through which it derived the majority of its revenue; and (b) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

88. It is unsurprising, then, that most member plans do not operate outside of their Service Areas. The territorial restrictions have therefore barred all competition by all of the Blue plans (other than BCBSOK) from the Oklahoma commercial health insurance market.

89. Even in the relatively rare instance, in other states, in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth – exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California. In its Form 10-K for the year ending December 31,2000, this percentage decreased to approximately 67 percent. In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries. By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states. For the first

time, it admitted the existence of the territorial restrictions in the BCBSA licenses and
stated that it was in compliance with them. This may explain why, from 1999 to 2002,
while other Texas health insurers experienced average revenue growth of 17 percent,
UniCare experienced growth of only 1.4 percent in Texas. During those same years,
UniCare experienced virtually no growth in the state of Washington, while overall health
insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to
2002, the number of out-of-Service-Area enrollees of WellChoice (now part of WellPoint
and known as Empire Blue Cross Blue Shield) did not increase, despite an overall 25
percent growth rate for health insurers in the state during the same period. In Mississippi,
between 2001 and 2002, premium revenue earned by most health insurance companies
increased by more than 10 percent, but revenue for the non-Blue business of out-of-state
Blue plans was either flat (in the case of UniCare) or negative (in the case of Anthem,
now part of WellPoint).

90.    In another example, one Pennsylvania Blue plan, Independence Blue Cross, has 2.4
million Blue-brand commercial health insurance enrollees in its service area of
Southeastern Pennsylvania, and has close to 1 million non-Blue brand Medicare and
Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana,
Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health
insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, has an
enrollment of only approximately 130,000, or 4 percent of independence Blue Cross's
total commercial health insurance enrollment.

91.    Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain

competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

92.     In addition to the per se illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBSOK and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

93.     First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

94.     Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate automatically: (1) if any institutional

investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

95. These acquisition restraints reduce competition in violation of The Oklahoma Antitrust Reform Act, because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those

Complaint – Page 32

competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may often be the most cost-effective due to historical tax breaks, favorable legislation, and long-term presence in a region. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

96.   Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

97.   By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is to tend to lessen or to lessen competition and higher premium costs for consumers, including enrollees of BCBSOK.

98.   BCBSOK, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the per se illegal territorial restrictions in the License Agreements and Guidelines. Many of the member plans with which BCBSOK has conspired would otherwise be significant competitors of BCBSOK

in Oklahoma.

99. For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding cities, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in Oklahoma in competition with BCBSOK. Such competition would have resulted in lower health care costs and premiums paid by BCBSOK enrollees such as Plaintiff herein.

100. Over 55 percent of Mississippi residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Blue Cross Blue Shield of Mississippi – vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Mississippi would be likely to offer its health insurance services and products in Oklahoma in competition with BCBSOK. Such competition would result in lower health care costs and premiums paid by BCBSOK enrollees.

101. Likewise, approximately 53 percent of Arkansas residents who subscribe to full-service commercial insurance (whether through group plans or through individual policies) are

Complaint – Page 34

subscribers of Blue Cross Blue Shield of Arkansas – vastly more than the next largest full-service commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Arkansas would be likely to offer its health insurance services and products in Oklahoma in competition with BCBSOK. Such competition would result in lower health care costs and premiums paid by BCBSOK enrollees.

102.   Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Oklahoma in competition with BCBSOK. Such competition would result in lower health care costs and premiums paid by BCBSOK enrollees.

103.   In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Oklahoma but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in Oklahoma, the result would have been lower costs and thus lower premiums paid by BCBSOK enrollees, including Plaintiff.

104.   Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

Complaint – Page 35

105.   MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN plus" clauses, and typically require the amount to be higher by a specified percentage.

106.   Upon information and belief, BCBSOK's use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged. The MFNs thus reduce competition by eliminating an incentive for BCBSOK to reduce overhead prices.

107.   Second, MFNs limit competition by preventing other health insurers in Oklahoma from achieving lower costs with providers and thereby becoming significant competitors to BCBSOK. MFNs establish a price floor below which providers will not sell services to BCBSOK's competitors; indeed, MFNs enable BCBSOK to raise that price floor. This deters cost competition among health insurers in Oklahoma. By reducing the ability of BCBSOK's competitors to compete against BCBSOK, MFNs ensure that BCBSOK can substantially raise premiums while maintaining, or even increasing, its market share.

108.   Moreover, upon information and belief, if BCBSOK is certain that no insurer will pay less to a provider than it will, BCBSOK will be willing to pay more to that provider than it would otherwise. The more BCBSOK agrees to pay that provider, the more BCBSOK's

Complaint – Page 36

competitors must pay that provider. And by raising the price floor, BCBSOK keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums. As a result, and because of its market power, BCBSOK can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from BCBSOK.

109. Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges market-dominant BCBSOK, the provider has a strong incentive not to lower prices. Without the ability to compete on price, a new competitor will be unable to price below BCBSOK, and thus will be unable to survive.

110. Upon information and belief, the independent Blue Cross and Blue Shield licensees, including BCBSOK, use MFNs to exploit the monopoly power they hold in their respective Service Areas. The independent Blue Cross and Blue Shield licensees, including BCBSOK, have coordinated their use of MFNs with other Blue entities.

111. BCBSOK has market power in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the State of Oklahoma.

### RELEVANT PRODUCT MARKET

112. The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups.

113. To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for

Complaint – Page 37

one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product. The characteristics of different products are important factors in determining their substitutability. For a health insurance product, important characteristics include:

a. Commercial versus government health insurance: Unlike commercial health insurance products, government health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent. Therefore, commercial health insurance and government health insurance programs are not substitutes.

b. Full-service versus single-service health insurance: Full-service health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers. In contrast, single-service health insurance provides narrow coverage restricted to a specific type of health care, *e.g.*, dental care. Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, e.g., dental care. Thus, full-service health insurance and single-service health insurance are not substitutes. Full-service commercial health insurance includes HMO products and PPO products, among others. Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers. Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors. Economic research suggests that HMO and PPO health insurance products are substitutes.

c. Fully-insured health insurance versus ASO products: When a consumer purchases a fully-insured health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers. In contrast, when a consumer purchases an administrative services only ("ASO") product, sometimes

known as "no risk," the entity from which the consumer purchases that product provides administrative services only. Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

d.      Individual, small group, and large group consumers: Consumers of health insurance products include both individuals and groups, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, small group and large group, based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees. For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products. For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure. Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

e.      Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although Oklahoma licenses companies to offer some type of health insurance in Oklahoma, Blue Cross had 50% of the commercial market share statewide. In certain markets, BCBSOK commands in excess of half the market. In Oklahoma City, it controls 58%, while its nearest competitor, United Healthcare, has 20 percent.

## RELEVANT GEOGRAPHIC MARKETS

114.    In defining a geographic market, it is important to focus on an essential part of a

full-service commercial health insurer's product: its provider network. An insurer's

provider network is composed of the health care providers with which it contracts.

Enrollees in both HMO and PPO full-service commercial health insurance products pay

less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider. As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers. This suggests that health insurers compete in distinct geographic markets.

115.    There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in Oklahoma. The potentially relevant geographic markets could be defined alternatively as (a) the entire state of Oklahoma; (b) the 2 combined statistical areas, 4 metropolitan statistical areas, and 17 micropolitan statistical areas in the State of Oklahoma into which the U.S. Office of Management and Budget divides Oklahoma. However the geographic market is defined, the result is the same: BCBSOK has the dominant market position, and exercises market power. In the 2 markets studied by the American Medical Association, BCBSOK dominated all the regions.

116.    BCBSOK does business throughout the State of Oklahoma, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the State of Oklahoma, and has agreed with the other member plans of BCBSA that only BCBSOK will do business in Oklahoma under the Blue brand. Therefore, the State of Oklahoma can be analyzed as a relevant geographic market within which to assess the effects of BCBSOK's anti-competitive conduct.

117.    The U.S. Office of Management and Budget divides the counties of the state of Oklahoma into Metropolitan Statistical Areas and Micropolitan Statistical Areas

according to published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core." Therefore, each of Oklahoma's 2 combined statistical areas, 4 metropolitan statistical areas, and 17 micropolitan statistical areas, and the remaining counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBSOK's anti-competitive conduct.

118. BCBSOK's powerful market share is far from the only evidence of its market power. As alleged below, BCBSOK's market power has significantly raised costs, resulting in skyrocketing premiums for BCBSOK enrollees.

119. Moreover, BCBSOK's statewide share of the relevant product market has increased each year despite its substantial premium increases. BCBSOK's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

## INFLATED PREMIUMS CHARGED BY BCBSOK

120. For at least the past ten years, BCBSOK's illegal anti-competitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Oklahoma, leading to artificially-inflated and supra-competitive premiums for individuals and small groups purchasing BCBSOK's full-service commercial health insurance in the relevant geographic market(s). Upon information and belief, BCBSOK's market power and its use of MFNs and other

Complaint – Page 41

anti-competitive practices in Oklahoma has reduced the amount of competition in the market and ensured that BCBSOK's few competitors face higher costs than BCBSOK does. Without competition, and with the ability to increase premiums without losing customers, BCBSOK faces little pressure to keep costs low.

121.    Over the past decade, BCBSOK generally raised individual and small group premiums by amounts greater than the national average. Most states regulate what companies charge their residents for health insurance. But Oklahoma has prior approval authority to approve or reject rates before they go into effect for HMOs only. OK Ins. Code § 6916. Rate increases for commercial accident and health policies may be used as soon as they are filed with the state. OK. Ins. Code § 4402. For nonprofit insurers, premium rates are filed and deemed approved if they are not disapproved by the Insurance Commissioner 60 days after filing. Ok Ins. Code § 2606. For HMOs, premium rates may not be "excessive, inadequate, or unfairly discriminatory." HMO rates are deemed approved if they are not disapproved by the Insurance Commissioner 30 days after filing. Ok Ins. Code § 6916. These rates are "confidential and not subject to public disclosure." Ok Ins. Code § 6916(A). Rate increases for "standard health benefit plans," must be filed for informational purposes only. A "standard health benefit plan" is an accident and health insurance policy issued to individuals under age 40 that does not provide state-mandated health benefits, but does provide creditable coverage. Ok Ins. Code § 4415.

122.    These rising premiums have enabled BCBSOK to grow its surplus in excessive amounts, which is an unusual practice for a self-described nonprofit organization.

## CAUSES OF ACTION

Complaint – Page 42

123. **COUNT ONE.** (Okla. Stat. Tit. 79 § 203(A) Trust in restraint of trade ("Every act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state is hereby declared to be against public policy and illegal") and (B) Monopoly of trade ("It is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state."). Plaintiffs repeat and re-alleges the allegations in the foregoing paragraphs.

124. The License Agreements, Membership Standards, and Guidelines agreed to by BCBSOK and BCBSA represent horizontal agreements entered into between BCBSOK and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

125. Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBSOK represents a contract, combination, and conspiracy within the meaning of The Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 §§ 201 - 212.

126. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBSOK have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, BCBSOK and BCBSA (and its members) have conspired to restrain trade in violation of The Oklahoma Antitrust Reform Act. These market allocation agreements are per se illegal under the aforesaid provisions.

127. The market allocation agreements entered into between BCBSOK and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and

Complaint – Page 43

related Membership Standards and Guidelines) are anti-competitive.

128. BCBSOK has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

129. Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

    a.  Reducing the number of health insurance companies competing with BCBSOK throughout Oklahoma;

    b.  Unreasonably limiting the entry of competitor health insurance companies into Oklahoma;

    c.  Allowing BCBSOK to maintain and enlarge its market power throughout Oklahoma;

    d.  Allowing BCBSOK to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

    e.  Depriving consumers of health insurance of the benefits of free and open competition.

130. The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

131. The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of The Oklahoma Antitrust Reform Act.

132. As a direct and proximate result of Defendants continuing violations of The Oklahoma Antitrust Reform Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher

Complaint – Page 44

health insurance premiums to BCBSOK than they would have paid with increased competition and but for the violations of The Oklahoma Antitrust Reform Act.

133. Plaintiff and the Class seek treble damages from Defendants for their violations of The Oklahoma Antitrust Reform Act.

134. **COUNT TWO**. (MFNs; (Okla. Stat. Tit. 79 § 203(A) and (B)).

135. Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

136. BCBSOK has market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

137. The provider agreements BCBSOK entered into between BCBSOK and health care providers in Oklahoma that contain MFN provisions constitute an act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within the meaning of The Oklahoma Antitrust Reform Act, as well fixes a price charged therefor, or discount from, such price, on the condition, agreement, or understanding that the provider shall not use less favorable terms with a BCBSOK competitor substantially lessening the competition or tending to create a monopoly. Each of the BCBSOK provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

   a. Raising the prices of health care services to commercial health insurers in competition with BCBSOK;

   b. Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with BCBSOK from obtaining competitive pricing from health care providers;

   c. Unreasonably restricting the ability of health care providers to offer to BCBSOK's competitors or potential competitors reduced prices for services that the health

care providers and insurers consider to be in their mutual interest;

d.    Depriving consumers of health care services and health insurance of the benefits of free and open competition.

138.    The pro-competitive benefits, if any, of the BCBSOK provider agreements containing MFN provisions do not outweigh the anti-competitive effects of the agreements.

139.    Each agreement between BCBSOK and a health care provider that contains an MFN unreasonably restrains trade in violation of The Oklahoma Antitrust Reform Act.

140.    As a direct and proximate result of BCBSOK's continuing violations of The Oklahoma Antitrust Reform Act, Plaintiff and the members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBSOK than they would have paid but for the violations of The Oklahoma Antitrust Reform Act.

141.    Plaintiff and the Class seek treble damages from BCBSOK for its violations of The Oklahoma Antitrust Reform Act.

142.    **COUNT THREE.** (Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Okla. Stat. Tit. 79 § 203(B) Monopoly of trade)).

143.    Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

144.    BCBSOK has monopoly power in the individual and small group full-service commercial health insurance market in Oklahoma. This monopoly power is evidenced by, among other things:

a.    BCBSOK's ability, upon information and belief, to enter into MFN agreements with providers, which evidences BCBSOK's ability to control prices and exclude

Complaint – Page 46

competitors;

b.  BCBSOK's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

c.  BCBSOK has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

145. BCBSOK's conduct constitutes unlawful monopolization and is unlawful anti-competitive conduct in the relevant markets in violation of Okla. Stat. Tit. 79 § 203(B).

146. As a direct and proximate result of BCBSOK's continuing violations of The Oklahoma Antitrust Reform Act, Plaintiff and the members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBSOK than they would have paid but for these violations.

147. Plaintiff and the Class seek treble damages from BCBSOK for its violations of Oklahoma Antitrust Reform Act.

148. **COUNT FOUR.** (Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of Okla. Stat. Tit. 79 § 203(B) Monopoly of trade).

149. Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

150. BCBSOK has acted with the specific intent to monopolize the relevant markets.

151. There was and is a dangerous possibility that BCBSOK will succeed in its attempt to monopolize the relevant markets because BCBSOK already controls a large percentage of those markets. Further success by BCBSOK in excluding competitors from those

markets is an attempt to monopolize, or attempt to combine or conspire to monopolize, will confer a monopoly on BCBSOK in violation of Okla. Stat. Tit. 79 § 203(B).

152. BCBSOK's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Class. Premiums charged by BCBSOK have been higher than they would have been in a competitive market.

153. Plaintiffs and the Class have been damaged as the result of BCBSOK's attempted monopolization of the relevant markets and seek treble damages.

154. **COUNT FIVE.** (Unjust Enrichment). Plaintiffs incorporate and re-allege each of the foregoing paragraphs.

155. BCBSOK has benefitted from its unlawful acts through the overpayments for health insurance premiums by Plaintiffs and the other Class members.

156. It would be inequitable for BCBSOK to be permitted to retain the benefit of these overpayments that were conferred by Plaintiffs and the Class and retained by BCBSOK.

157. By reason of its unlawful conduct, BCBSOK must make restitution to Plaintiffs and the Class. Further, any action which might have been taken by Plaintiffs to pursue administrative remedies would have been futile.

158. In equity, BCBSOK should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and Class members.

**PRAYER FOR RELIEF**

159. WHEREFORE, Plaintiffs pray:

    a.    That the summons be issued and that Defendants be duly served with a copy of

Complaint – Page 48

this Complaint and required to answer same, and that this Court decree and enter judgment;

b.    That the Court determine that this action may be maintained as a class action under 12 O.S. §2023 and appoint Plaintiffs a representative of the Class;

c.    That the Court adjudge and decree that Defendants have violated The Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(A) and Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 - §203(B) and award Plaintiff and the Class appropriate damages and relief;

d.    That the Court award compensatory damages to Plaintiffs and the Class resulting from the various acts of wrongdoing under The Oklahoma Antitrust Reform Act, in such amounts in excess of $75,000.00 and represent the losses reasonably suffered by Plaintiffs and the Class, as well as any treble damages available;

e.    That the Court award Plaintiffs reasonable attorney fees and costs;

f.    That the Court render judgment that Defendants have been unjustly enriched by its wrongful conduct, and award restitution to Plaintiffs and the Class;

g.    That the Court award Plaintiffs and the Class all available pre-judgment and post-judgment interest to the fullest extent available under law or equity;

h.    That the Court orders such other, further and general relief as is just and proper.

Respectfully submitted,

Benjamin L. Barnes
Oklahoma Bar No. 16173
BENJAMIN L. BARNES, Attorney & Counselor at Law
Centennial Plaza
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
405/330-9860
405/231-4701
ben@barneslaw.com

### THE COWAN LAW FIRM

R. Christopher Cowan
Oklahoma Bar No. 20129
209 Henry Street
Dallas, Texas 75226-1819
214/826-1900
214/826-8900 Fax
chris@cowanlaw.net

### PENDLEY, BAUDIN & COFFIN, L.L.P.

Nicholas R. Rockforte (LA Bar #31305)
Patrick W. Pendley (LA Bar #14021)
Stan P. Baudin (LA Bar #22937)
Christopher L. Coffin (LA Bar # 27902)
Post Office Drawer 71
Plaquemine, Lousiana 70765
225/687-6396
225/687-6398
mpendley@pbclawfirm.com

### BALL & SCOTT LAW OFFICES

Gordon Ball (TN BPR# 1135)
gball@ballandscott.com
Thomas S. Scott, Jr. (TN. BPR# 1086)
scott@ballandscott.com
Christopher T. Cain (TN BPR# 19997)
cain@ballandscott.com
Bank of America Center, Suite 601
550 Main Street
Knoxville, Tennessee 37902
865/525-7028
865/525-4679

### ATTORNEYS FOR PLAINTIFFS

ATTORNEY LIEN CLAIMED

Complaint – Page 50



# IN THE DISTRICT COURT OF LOGAN COUNTY
## STATE OF OKLAHOMA

CLINT JOHNSTON, JANEEN GOODIN and   §
MARLA SHARP as individuals and as   §
representatives of those similarly situated,   §
  §
  §
    Plaintiffs,   §
  §
vs.   §  Case No.   CJ-2013-17
  §
BLUE CROSS AND BLUE SHIELD OF   §
OKLAHOMA, HEALTH CARE SERVICE   §
CORPORATION, BLUE CROSS   §
BLUE SHIELD ASSOCIATION, HCSC   §
INSURANCE SERVICES COMPANY,   §
GHS PROPERTY AND CASUALTY   §
INSURANCE COMPANY, GHS HEALTH   §
MAINTENANCE ORGANIZATION, INC. d/b/a   §
BLUELINCS HMO,   §
  §
    Defendants   §



\* 1 0 2 0 4 2 0 3 3 4 \*

## **SUMMONS**

To the above-named Defendant:   BLUE CROSS AND BLUE SHIELD OF OKLAHOMA

    You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

    Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this ___1st___ day of ___February___, 2013.

        REJEANIA ZMEK
        _____, COURT CLERK

        By _____
           Deputy Court Clerk

(Seal)

# EXHIBIT 5

Attorney(s) for Plaintiff(s):

Benjamin L. Barnes, OBA #16173
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
Telephone: (405) 330-9860
Facsimile: (405) 231-4701

This summons was served on _____

(date of service)

_____
Signature of person serving summons

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH
THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO
THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.



# IN THE DISTRICT COURT OF LOGAN COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| CLINT JOHNSTON, JANEEN GOODIN and MARLA SHARP as individuals and as representatives of those similarly situated, | §<br>§<br>§<br>§<br>§ |
| Plaintiffs, | §<br>§ |
| vs. | §<br>§ |
| BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, HEALTH CARE SERVICE CORPORATION, BLUE CROSS BLUE SHIELD ASSOCIATION, HCSC INSURANCE SERVICES COMPANY, GHS PROPERTY AND CASUALTY INSURANCE COMPANY, GHS HEALTH MAINTENANCE ORGANIZATION, INC. d/b/a BLUELINCS HMO, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |
| Defendants | §<br>§ |

Case No.    CJ-2013-17


* 1 0 2 0 4 2 0 3 3 5 *

## SUMMONS

To the above-named Defendant:    HEALTH CARE SERVICE CORPORATION

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this ___ day of _____, 2013.

REJEANIA ZMEK

_____, COURT CLERK

By _____

Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff(s):

Benjamin L. Barnes, OBA #16173
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
Telephone: (405) 330-9860
Facsimile: (405) 231-4701

This summons was served on _____

(date of service)

_____
Signature of person serving summons

     YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.



# IN THE DISTRICT COURT OF LOGAN COUNTY
## STATE OF OKLAHOMA

| | |
|---|---|
| CLINT JOHNSTON, JANEEN GOODIN and MARLA SHARP as individuals and as representatives of those similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, HEALTH CARE SERVICE CORPORATION, BLUE CROSS BLUE SHIELD ASSOCIATION, HCSC INSURANCE SERVICES COMPANY, GHS PROPERTY AND CASUALTY INSURANCE COMPANY, GHS HEALTH MAINTENANCE ORGANIZATION, INC. d/b/a BLUELINCS HMO,<br><br>     Defendants | § § § § § § § § § § § § § § § § § § § § |

Case No.  CJ-2013-17



*1 0 2 0 4 2 0 3 3 6 *

## SUMMONS

To the above-named Defendant:  **BLUE CROSS BLUE SHIELD ASSOCIATION**

  You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

  Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this ___ day of _____, 2013.

REJEANIA ZMEK
            , COURT CLERK

By _____
    Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff(s):

Benjamin L. Barnes, OBA #16173
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
Telephone: (405) 330-9860
Facsimile: (405) 231-4701

This summons was served on _____
(date of service)

_____
Signature of person serving summons

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

# BENJAMIN L. BARNES
### Attorney & Counselor at Law
Centennial Plaza
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013

RECEIVED

MAR 15 2013

Texas Legal

Benjamin "Ben" L. Barnes

Telephone:   405-330-9860
Facsimile:   405-231-4701
Email:   bb@bbarneslaw.com

March 11, 2013

**VIA REGISTERED MAIL**

HCSC Insurance Services Company
1#001 East Lookout Dr.
Richardson, TX 75082-4144

Re:   *CLINT JOHNSTON, JANEEN GOODIN and MARLA SHARP, as individuals and as representatives of all of those similarly situated vs. BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, et al*
Case No. CJ-2013-17

    *Service

Dear HCSC Insurance Services Company:

Please find enclosed all documents required for service upon the **Defendant HCSC Insurance Services Company**.

Thank you for your cooperation and attention herein.  Should you have any questions do not hesitate to contact me.

Sincerely,

Benjamin L. Barnes

BLB/atsk
enc.



IN THE DISTRICT COURT OF LOGAN COUNTY
STATE OF OKLAHOMA

CLINT JOHNSTON, JANEEN GOODIN and §
MARLA SHARP as individuals and as §
representatives of those similarly situated, §
§
§
Plaintiffs, §
§
vs. §     Case No.    CJ-2013-17
§
BLUE CROSS AND BLUE SHIELD OF §
OKLAHOMA, HEALTH CARE SERVICE §
CORPORATION, BLUE CROSS §
BLUE SHIELD ASSOCIATION, HCSC §
INSURANCE SERVICES COMPANY, §
GHS PROPERTY AND CASUALTY §
INSURANCE COMPANY, GHS HEALTH §
MAINTENANCE ORGANIZATION, INC. d/b/a §
BLUELINCS HMO, §
§
Defendants §

ORIGINAL
PLEASE RETURN

**SUMMONS**

To the above-named Defendant:    **HCSC INSURANCE SERVICES COMPANY**

You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this 1st day of February, 2013.

REJEANNA ZMEK, COURT CLERK

By _____
Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff(s):

Benjamin L. Barnes, OBA #16173
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
Telephone: (405) 330-9860
Facsimile: (405) 231-4701

This summons was served on _____

(date of service)

_____
Signature of person serving summons

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

# BENJAMIN L. BARNES

### *Attorney & Counselor at Law*
#### Centennial Plaza
#### 2575 Kelley Pointe Parkway, Suite 100
#### Edmond, OK 73013

Benjamin "Ben" L. Barnes

Telephone:   405-330-9860
Facsimile:    405-231-4701
Email:  bb@bbarneslaw.com

March 11, 2013

**VIA REGISTERED MAIL**

GHS Property and Casualty Insurance Company
R.A. Corporation Service Company
115 S.W. 89th Street
Oklahoma City, OK 73139

     Re:   *CLINT JOHNSTON, JANEEN GOODIN and MARLA SHARP, as individuals and as representatives of all of those similarly situated vs. BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, et al*
           Case No. CJ-2013-17

        \*Service

Dear R.A. Corporation Service Company:

     Please find enclosed all documents required for service upon the **Defendant GHS Property and Casualty Insurance Company**.

     Thank you for your cooperation and attention herein. Should you have any questions do not hesitate to contact me.

                    Sincerely,

                    Benjamin L. Barnes

BLB/atsk
enc.

IN THE DISTRICT COURT OF LOGAN COUNTY
STATE OF OKLAHOMA

CLINT JOHNSTON, JANEEN GOODIN and     §
MARLA SHARP as individuals and as     §
representatives of those similarly situated,     §
                                      §
                                      §
        Plaintiffs,                   §
                                      §
vs.                                   §        Case No.      CJ-2013-17
                                      §
BLUE CROSS AND BLUE SHIELD OF         §
OKLAHOMA, HEALTH CARE SERVICE         §
CORPORATION, BLUE CROSS               §
BLUE SHIELD ASSOCIATION, HCSC         §
INSURANCE SERVICES COMPANY,           §
GHS PROPERTY AND CASUALTY             §        ORIGINAL
INSURANCE COMPANY, GHS HEALTH         §        PLEASE RETURN
MAINTENANCE ORGANIZATION, INC. d/b/a  §
BLUELINCS HMO,                        §
                                      §
        Defendants                    §

## SUMMONS

To the above-named Defendant: GHS PROPERTY AND CASUALTY INSURANCE COMPANY

        You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

        Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this  1st  day of  February , 2013.

                                    REJEANIA ZMEK , COURT CLERK

                            By _____
                                    Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff(s):

Benjamin L. Barnes, OBA #16173
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
Telephone: (405) 330-9860
Facsimile: (405) 231-4701

This summons was served on _____
(date of service)

_____
Signature of person serving summons

     YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

# BENJAMIN L. BARNES
### *Attorney & Counselor at Law*
**Centennial Plaza**
**2575 Kelley Pointe Parkway, Suite 100**
**Edmond, OK 73013**

Benjamin "Ben" L. Barnes

Telephone:     405-330-9860
Facsimile:      405-231-4701
Email:    bb@bbarneslaw.com

March 11, 2013

**VIA REGISTERED MAIL**

GHS Health Maintenance Organization d/b/a
BlueLincs HMO
R.A. Corporation Service Company
115 S.W. 89th Street
Oklahoma City, OK 73139

Re:     *CLINT JOHNSTON, JANEEN GOODIN and MARLA SHARP, as individuals and*
*as representatives of all of those similarly situated vs. BLUE CROSS AND BLUE*
*SHIELD OF OKLAHOMA, et al*
Case No. CJ-2013-17

*Service

Dear R.A. Corporation Service Company:

Please find enclosed all documents required for service upon the **Defendant GHS Health
Maintenance Organization d/b/a BlueLincs HMO**.

Thank you for your cooperation and attention herein. Should you have any questions do
not hesitate to contact me.

Sincerely,

Benjamin L. Barnes

BLB/atsk
enc.

IN THE DISTRICT COURT OF LOGAN COUNTY
STATE OF OKLAHOMA

CLINT JOHNSTON, JANEEN GOODIN and §
MARLA SHARP as individuals and as §
representatives of those similarly situated, §
                                          §
                    Plaintiffs, §
                                          §
vs. §        Case No.      CJ-2013-17
                                          §
BLUE CROSS AND BLUE SHIELD OF §
OKLAHOMA, HEALTH CARE SERVICE §
CORPORATION, BLUE CROSS §
BLUE SHIELD ASSOCIATION, HCSC §
INSURANCE SERVICES COMPANY, §
GHS PROPERTY AND CASUALTY §
INSURANCE COMPANY, GHS HEALTH §
MAINTENANCE ORGANIZATION, INC. d/b/a §
BLUELINCS HMO, §
                                          §
                  Defendants §

ORIGINAL
PLEASE RETURN

## SUMMONS

To the above-named Defendant:     GHS HEALTH MAINTENANCE ORGANIZATION, INC.
                                                d/b/a BLUELINCS HMO

      You have been sued by the above-named Plaintiff, and you are directed to file a written answer to the attached petition in the court at the above address within twenty (20) days after service of this summons upon you, exclusive of the day of service. Within the same time, a copy of your answer must be delivered or mailed to the attorney for the plaintiff.

      Unless you answer the petition within the time stated, judgment will be rendered against you with costs of the action.

Issued this ____ day of _____, 2013.

REJEANIA ZMEK
                                         , COURT CLERK

By _____
                          Deputy Court Clerk

(Seal)

Attorney(s) for Plaintiff(s):

Benjamin L. Barnes, OBA #16173
2575 Kelley Pointe Parkway, Suite 100
Edmond, OK 73013
Telephone: (405) 330-9860
Facsimile: (405) 231-4701

This summons was served on _____

(date of service)

_____

Signature of person serving summons

YOU MAY SEEK THE ADVICE OF AN ATTORNEY ON ANY MATTER CONNECTED WITH
THIS SUIT OR YOUR ANSWER. SUCH ATTORNEY SHOULD BE CONSULTED IMMEDIATELY SO
THAT AN ANSWER MAY BE FILED WITHIN THE TIME LIMIT STATED IN THE SUMMONS.

## OSCN
### THE OKLAHOMA STATE COURTS NETWORK
*www.oscn.net*

| Home | Courts | Court Dockets | Legal Research | Calendar | Help |

The information on this page is NOT an official record. Do not rely on the correctness or completeness of this information. Verify all information with the official record keeper. The information contained in this report is provided in compliance with the Oklahoma Open Records Act, 51 O.S. 24A.1. Use of this information is governed by this act, as well as other applicable state and federal laws.

### IN THE DISTRICT COURT IN AND FOR LOGAN COUNTY, OKLAHOMA

| | |
|---|---|
| Clint Johnston, Janeen Goodin and Marla Sharp, as individual & representative of those similarly situated, Plaintiffs<br><br>vs.<br><br>Blue Cross and Blue Shield of Oklahoma, Health Care Service Corporation, and Blue Cross Blue Shield Association, Defendants<br><br>AMENDED 2/4/2013 TO READ AS FOLLOWS:<br><br>Clint Johnston, Janeen Goodin and Marla Sharp, as individual & representative of those similarly situated, Plaintiffs<br><br>vs.<br><br>Blue Cross and Blue Shield of Oklahoma, Health Care Service Corporation, and Blue Cross Blue Shield Association, HCSC Insurance Services Company, GHS Property and Casualty Insurance Company, GHS Health Maintenance Organization, Inc. d/b/a Bluelincs HMO, Defendants | **No. CJ-2013-17**<br>**(Civil relief more than $10,000:**<br>**BREACH OF AGREEMENT - CONTRACT)**<br><br>Filed: 01/18/2013<br><br><br>Judge: Corley, Phillip C. |

## Parties

Blue Cross and Blue Shield of Oklahoma , Defendant
Blue Cross Blue Shield Association , Defendant
GHS Health Maintenance Organization, Inc. , Defendant
GHS Property and Casualty Insurance Company , Defendant
Goodin, Janeen , Plaintiff
HCSC Insurance Services Company , Defendant
Health Care Service Corporation , Defendant
Johnston, Clint , Plaintiff
Sharp, Marla , Plaintiff

## Attorneys

| Attorney | Represented Parties |
|---|---|
| Barnes, Benjamin L.(Bar # 16173)<br>Centennial Plaza<br>2575 Kelley Pointe Parkway, Suite 100<br>Edmond, OK 73013 | Johnston, Clint<br>Goodin, Janeen<br>Sharp, Marla |

**EXHIBIT 6**

## Events

| Event | Party | Docket | Reporter |
|---|---|---|---|

## Issues

For cases filed before 1/1/2000, ancillary issues may not appear except in the docket.

**Issue # 1.**

Issue: BREACH OF AGREEMENT - CONTRACT (CONTRACT)
Filed by: Johnston, Clint
Filed Date: 01/18/2013

**Party Name:**

**Disposition Information:**

**Defendant:** Blue Cross and Blue Shield of Oklahoma Pending.

**Defendant:** Health Care Service Corporation        Pending.

**Defendant:** Blue Cross Blue Shield Association      Pending.

**Defendant:** HCSC Insurance Services Company         Pending.

**Defendant:** GHS Property and Casualty Insurance Company    Pending.

**Defendant:** GHS Health Maintenance Organization, Inc.    Pending.

**Issue # 2.**

Issue: BREACH OF AGREEMENT - CONTRACT (CONTRACT)
Filed by: Goodin, Janeen
Filed Date: 01/18/2013

**Party Name:**

**Disposition Information:**

**Defendant:** Blue Cross and Blue Shield of Oklahoma Pending.

**Defendant:** Health Care Service Corporation        Pending.

**Defendant:** Blue Cross Blue Shield Association      Pending.

**Defendant:** HCSC Insurance Services Company         Pending.

**Defendant:** GHS Property and Casualty Insurance Company    Pending.

**Defendant:** GHS Health Maintenance Organization, Inc.    Pending.

**Issue # 3.**

Issue: BREACH OF AGREEMENT - CONTRACT (CONTRACT)
Filed by: Sharp, Marla
Filed Date: 01/18/2013

**Party Name:**

**Disposition Information:**

**Defendant:** Blue Cross and Blue Shield of Oklahoma Pending.

**Defendant:** Health Care Service Corporation        Pending.

**Defendant:** Blue Cross Blue Shield Association      Pending.

**Defendant:** HCSC Insurance Services Company         Pending.

http://www.oscn.net/applications/oscn/GetCaseInformation.asp?number=cj-13-17&db=Logan&su... 3/27/2013

Case MDL No. 2406 Document 187-3 Filed 08/28/13 Page 193 of 197
Case 5:13-cv-00294-D Document 1-6 Filed 03/27/13 Page 3 of 5

**Defendant:** GHS Property and Casualty Insurance     Pending.
Company

**Defendant:** GHS Health Maintenance Organization,   Pending.
Inc.

## Docket

| Date | Code | Count | Party | Serial # | Entry Date | | |
|------|------|-------|-------|----------|------------|--|--|
| 01-18-2013 | TEXT | - | Johnston, Clint | 1834643 | Jan 22 2013 11:01:01:460AM | - | $ 0.00 |
| | PETITION - CLASS ACTION | | | | | | |
| | 📄 *Document Available (#1020415884)* | | | | | | |
| 01-18-2013 | CONTRACT | - | | 1834645 | Jan 18 2013 1:50:22:580PM | Realized | $ 0.00 |
| | BREACH OF AGREEMENT - CONTRACT | | | | | | |
| 01-18-2013 | DMFE | - | | 1834646 | Jan 18 2013 1:50:22:590PM | Realized | $ 2.00 |
| | DISPUTE MEDIATION FEE($ 2.00) | | | | | | |
| 01-18-2013 | PFE1 | - | | 1834647 | Jan 18 2013 1:50:22:590PM | Realized | $ 163.00 |
| | PETITION($ 163.00) | | | | | | |
| 01-18-2013 | PFE7 | - | | 1834648 | Jan 18 2013 1:50:22:590PM | Realized | $ 6.00 |
| | LAW LIBRARY FEE($ 6.00) | | | | | | |
| 01-18-2013 | OCISR | - | | 1834649 | Jan 18 2013 1:50:22:590PM | Realized | $ 25.00 |
| | OKLAHOMA COURT INFORMATION SYSTEM REVOLVING FUND($ 25.00) | | | | | | |
| 01-18-2013 | CCADMIN02 | - | | 1834650 | Jan 18 2013 1:50:22:590PM | Realized | $ 0.20 |
| | COURT CLERK ADMINISTRATIVE FEE ON $2 COLLECTIONS($ 0.20) | | | | | | |
| 01-18-2013 | OCJC | - | | 1834651 | Jan 18 2013 1:50:22:590PM | Realized | $ 2.00 |
| | OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND($ 2.00) | | | | | | |
| 01-18-2013 | OCASA | - | | 1834652 | Jan 18 2013 1:50:22:590PM | Realized | $ 5.00 |
| | OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES($ 5.00) | | | | | | |
| 01-18-2013 | CCADMIN04 | - | | 1834653 | Jan 18 2013 1:50:22:590PM | Realized | $ 0.50 |
| | COURT CLERK ADMINISTRATIVE FEE ON COLLECTIONS($ 0.50) | | | | | | |
| 01-18-2013 | LTF | - | | 1834654 | Jan 18 2013 1:50:22:710PM | Realized | $ 10.00 |
| | LENGTHY TRIAL FUND($ 10.00) | | | | | | |
| 01-18-2013 | SMF | - | | 1834655 | Jan 18 2013 1:50:40:970PM | Realized | $ 15.00 |
| | SUMMONS FEE (CLERKS FEE)($ 15.00) | | | | | | |
| 01-18-2013 | TEXT | - | Blue Cross and Blue Shield of Oklahoma | 1835093 | Jan 22 2013 11:02:06:590AM | - | $ 0.00 |
| | SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON BLUE CROSS AND BLUE SHIELD OF OKLAHOMA. | | | | | | |
| | 📄 *Document Available (#1020415885)* | | | | | | |
| 01-18-2013 | TEXT | - | Blue Cross Blue Shield Association | 1835094 | Jan 22 2013 11:02:25:810AM | - | $ 0.00 |

http://www.oscn.net/applications/oscn/GetCaseInformation.asp?number=cj-13-17&db=Logan&su...    3/27/2013

Case MD. No. 24062 Document 187-1 -6 Filed 08/28/13 Page 194 of 197
Case 5:13-cv-00294-D   Document 1-6   Filed 03/27/13   Page 4 of 5

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON BLUE CROSS BLUE SHIELD
ASSOCIATION.

*Document Available (#1020415886)*

---

| 01-18-2013 TEXT | - | Health Care Service Corporation | 1835096 | Jan 22 2013 11:02:45:090AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON HEALTH CARE SERVICE
CORPORATION.

*Document Available (#1020415887)*

---

| 01-18-2013 TEXT | - | | 1834644 | Jan 18 2013 1:50:22:560PM | - | $ 0.00 |

OCIS HAS AUTOMATICALLY ASSIGNED JUDGE CORLEY, PHILLIP C. TO THIS CASE.

---

| 01-18-2013 ACCOUNT | - | | 1834685 | Jan 18 2013 1:58:21:050PM | - | $ 0.00 |

RECEIPT # 2013-149949 ON 01/18/2013.
PAYOR:BLB GROUP LLC TOTAL AMOUNT PAID: $228.70.
LINE ITEMS:
CJ-2013-17: $178.00 ON AC01 CLERK FEES.
CJ-2013-17: $6.00 ON AC23 LAW LIBRARY FEE.
CJ-2013-17: $0.70 ON AC31 COURT CLERK REVOLVING FUND.
CJ-2013-17: $5.00 ON AC58 OKLAHOMA COURT APPOINTED SPECIAL ADVOCATES.
CJ-2013-17: $2.00 ON AC59 OKLAHOMA COUNCIL ON JUDICIAL COMPLAINTS REVOLVING FUND.
CJ-2013-17: $2.00 ON AC64 DISPUTE MEDIATION FEES.
CJ-2013-17: $25.00 ON AC79 OCIS REVOLVING FUND.
CJ-2013-17: $10.00 ON AC81 LENGTHY TRIAL FUND.

---

| 02-01-2013 SMF | - | Johnston, Clint | 1841730 | Feb 1 2013 9:43:52:800AM | Realized | $ 30.00 |

SUMMONS FEE (CLERKS FEE)($ 30.00)

---

| 02-01-2013 AMP | - | Johnston, Clint | 1843012 | Feb 4 2013 10:26:25:150AM | - | $ 0.00 |

FIRST AMENDED PETITION - CLASS ACTION

*Document Available (#1020420333)*

---

| 02-01-2013 TEXT | - | Blue Cross and Blue Shield of Oklahoma | 1843017 | Feb 4 2013 10:26:58:390AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON BLUE CROSS AND BLUE SHIELD OF
OKLAHOMA.

*Document Available (#1020420334)*

---

| 02-01-2013 TEXT | - | Health Care Service Corporation | 1843018 | Feb 4 2013 10:27:14:830AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON HEALTH CARE SERVICE
CORPORATION.

*Document Available (#1020420335)*

---

| 02-01-2013 TEXT | - | Blue Cross Blue Shield Association | 1843019 | Feb 4 2013 10:28:08:410AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON BLUE CROSS BLUE SHIELD
ASSOCIATION.

*Document Available (#1020420336)*

---

| 02-01-2013 TEXT | - | HCSC Insurance Services Company | 1843020 | Feb 4 2013 10:28:37:660AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON HCSC INSURANCE SERVICES
COMPANY.

*Document Available (#1020420337)*

---

| 02-01-2013 TEXT | - | GHS Property and Casualty Insurance Company | 1843021 | Feb 4 2013 10:29:43:150AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON GHS PROPERTY AND CASUALTY

INSURANCE COMPANY.

📄 *Document Available (#1020420338)*

---

| 02-01-2013 | TEXT | - | GHS Health Maintenance Organization, Inc. | 1843022 | Feb 4 2013 10:30:05:780AM | - | $ 0.00 |

SUMMONS ISSUED BACK TO ATTORNEY FOR SERVICE ON GHS HEALTH MAINTENANCE ORGANIZATION, INC. D/B/A BLUELINCS HMO.

📄 *Document Available (#1020420339)*

---

| 02-01-2013 | ACCOUNT | - | Johnston, Clint | 1841731 | Feb 1 2013 9:44:28:530AM | - | $ 0.00 |

RECEIPT # 2013-150464 ON 02/01/2013.
PAYOR:BLB GROUP LLC TOTAL AMOUNT PAID: $30.00.
LINE ITEMS:
CJ-2013-17: $30.00 ON AC01 CLERK FEES FOR JOHNSTON, CLINT.

---

Report Generated by The Oklahoma Court Information System at March 27, 2013 10:01 AM

---

End of Transmission.

JS 44 (Rev. 12/12)

Case MDL No. 2406 Document 187-3 Filed 06/28/13 Page 196 of 197
Case 5:13-cv-00294-W Document 1-1 Filed 03/27/13 Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Clint Johnston, Janeen Goodin, and Marla Sharp, as individuals and as representatives of those similarly situated

**DEFENDANTS**
Blue Cross and Blue Shield of Oklahoma, et al.

**(b)** County of Residence of First Listed Plaintiff   Logan County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Benjamin L. Barnes, OBA #16173; BENJAMIN L. BARNES, Attorney & Counselor at Law; Centennial Plaza; 2575 Kelley Pointe Parkway, Suite 100; Edmond, Oklahoma 73013; (405) 330-9860

Attorneys *(If Known)*
D. Kent Meyers, OBA #6168; Elizabeth Barnett LaBauve, OBA #21102; CROWE & DUNLEVY, P.C.; 20 N. Broadway Ave., Suite 1800; Oklahoma City, Oklahoma 73102; (405) 235-7700

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☐ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 2  U.S. Government
      Defendant

☒ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☒ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original
     Proceeding

☒ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     Another District
     *(specify)*

☐ 6 Multidistrict
     Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(d)

Brief description of cause:
Alleged violation of Oklahoma Antitrust Reform Act, 79 O.S. Sec. 203, et seq.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
> 5,000,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   R. David Proctor

DOCKET NUMBER   MDL-2406 (N.D. Ala.)

DATE
03/27/2013

SIGNATURE OF ATTORNEY OF RECORD
s/D.Kent Meyers

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**   **Nature of Suit.**  Place an "X" in the appropriate box.  If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit.  If the cause fits more than one nature of suit, select the most definitive.

**V.**   **Origin.**  Place an "X" in one of the six boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

**VI.**   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.