GZJ KDKV'5"

(SHx),DISCOVERY,MANADR

# UNITED STATES DISTRICT COURT for the CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
## CIVIL DOCKET FOR CASE #: 2:13-cv-03003-CAS-SH

| | |
|---|---|
| Judy Sheridan v. Blue Cross of California et al | Date Filed: 04/29/2013 |
| Assigned to: Judge Christina A. Snyder | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Stephen J. Hillman | Nature of Suit: 410 Anti-Trust |
| Case in other court: Superior Court of CA, Los Angeles County, BC504431 | Jurisdiction: Federal Question |
| Cause: 28:1441 Notice of Removal | |

**Plaintiff**

**Judy Sheridan**                    represented by    **James Patrick Carr**
Yuhl Carr LLP
4676 Admiralty Way Suite 550
Marina Del Rey, CA 90292
310-827-2800
Fax: 310-827-4200
Email: jcarr@ysclawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyler J Barnett**
Yuhl Carr LLP
4676 Admiralty Way Suite 550
Marina Del Rey, CA 90292
310-827-2800
Fax: 310-827-4200
Email: tbarnett@ysclawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blue Cross of California**

**Defendant**

**Blue Cross of Southern California, Inc.**

**Defendant**

**Blue Cross of Northern California**

**Defendant**

**Anthem Blue Cross Life and Health
Insurance Company**

<u>Defendant</u>

**Blue Cross of California Partnership
Plan Inc**

<u>Defendant</u>

**Blue Shield of California Life and
Health Insurance Company**

<u>Defendant</u>

**Anthem Life Insurance Company**

<u>Defendant</u>

| | |
|---|---|
| **Blue Cross and Blue Shield Association** | represented by **Mark Edward McKane** |
| | Kirkland and Ellis |
| | 555 California Street, Suite 2700 |
| | San Francisco, CA 94104 |
| | 415-439-1400 |
| | Fax: 415-439-1500 |
| | Email: mmckane@kirkland.com |
| | *LEAD ATTORNEY* |
| | *ATTORNEY TO BE NOTICED* |

<u>Defendant</u>

**WellPoint Inc**

<u>Defendant</u>

**The WellPoint Companies of
California Inc**

<u>Defendant</u>

**The WellPoint Companies Inc**

<u>Defendant</u>

**WellPoint California Services Inc**

<u>Defendant</u>

**WellPoint Behavioral Health Inc**

<u>Defendant</u>

**California Physicians' Service**

<u>Defendant</u>

**Blue Shield of California Life and
Health Insurance Company**

<u>Defendant</u>

**Does**
*1 through 100 inclusive*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/29/2013 | 1 | NOTICE OF REMOVAL from the Superior Court of CA, Los Angeles County, case number BC504431 with conformed copies of summons and complaint. Case assigned to Judge Christina A. Snyder, discovery to Magistrate Judge Stephen J. Hillman; (Filing fee $ 350 PAID ); filed by defendant Blue Cross and Blue Shield Association.(esa) (Entered: 05/02/2013) |
| 04/29/2013 | 2 | CERTIFICATION AND NOTICE OF INTERESTED PARTIES filed by defendant Blue Cross and Blue Shield Association. (esa) (Entered: 05/02/2013) |
| 04/29/2013 | 3 | CORPORATE DISCLOSURE STATEMENT filed by defendant Blue Cross and Blue Shield Association. (esa) (Entered: 05/02/2013) |
| 04/29/2013 | 4 | NOTICE OF PENDENCY OF OTHER ACTIONS filed by defendant Anthem Blue Cross Life and Health Insurance Company. See MDL 2406, 2:13-cv-2000, USDC Northern District of Alabama. (esa) (Entered: 05/02/2013) |
| 04/29/2013 | 5 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed.(esa) (Entered: 05/02/2013) |
| 05/02/2013 | 6 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to David J. Zott for Defendant Blue Cross and Blue Shield Association. Your Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U. S. Department of Justice are required to file a Pro Hac Vice application; no filing fee is required. (esa) (Entered: 05/02/2013) |
| 05/02/2013 | 7 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to David Laytin for Defendant Blue Cross and Blue Shield Association. Your Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U. S. Department of Justice are required to file a Pro Hac Vice application; no filing fee is required. (esa) (Entered: 05/02/2013) |
| 05/02/2013 | 8 | NOTICE OF FILING FEE DUE on Pro Hac Vice Application mailed to Ian R. Conner for Defendant Blue Cross and Blue Shield Association. Your Pro Hac Vice application has not been received by the court. Please return your completed Application of Non-Resident Attorney to Appear in a Specific Case, form G-64, or a copy of the Notice of Electronic Filing of your application and the $325.00 fee and this notice immediately. Out-of-state federal government attorneys who are not employed by the U. S. Department of Justice are required to file a Pro Hac Vice application; no filing fee is required. (esa) (Entered: |

|  |  | 05/02/2013) |
| --- | --- | --- |
| 05/02/2013 | 9 | STIPULATION Extending Time to Answer the complaint as to Blue Cross and Blue Shield Association answer now due 6/5/2013, filed by defendant Blue Cross and Blue Shield Association. (Attachments: # 1 Proposed Order) (McKane, Mark) (Entered: 05/02/2013) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 05/02/2013 13:52:37 | | |
| PACER Login: | ke0707 | Client Code: | 20098-0246 |
| Description: | Docket Report | Search Criteria: | 2:13-cv-03003-CAS-SH |
| Billable Pages: | 3 | Cost: | 0.30 |

# BY FAX

1

COPY

1   Mark E. McKane
2   (SBN 230552)
    Mark.McKane@kirkland.com
3   KIRKLAND & ELLIS LLP
4   555 California St.
    San Francisco, CA 94104
5   Telephone: (415) 439-1400
6   Facsimile: (415) 439-1500

FILED
CLERK, U.S. DISTRICT COURT

APR 29 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

7   Attorneys for Defendant Blue Cross and
8   Blue Shield Association.

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11

12  JUDY SHERIDAN,                          )  Case No.
                                            )
13            Plaintiff,                     )  CV13- 3003(CAS)(SHx)
                                            )
14       vs.                                 )
                                            )
15  Blue Cross of California; Blue Cross of  )  NOTICE OF REMOVAL OF
    Southern California; Blue Cross of Northern )  ACTION UNDER 1331, 1332, AND
16  California; Anthem Blue Cross Life and   )  1441
    Health Insurance Company; Blue Cross of  )
17  California Partnership Plan, Inc.; Blue Shield )  (CAFA DIVERSITY
    of California Life and Health Insurance  )  JURISDICTION AND FEDERAL
18  Company; Anthem Life Insurance Company;  )  QUESTION)
    Blue Cross and Blue Shield Association;   )
19  WellPoint, Inc.; the WellPoint Companies of )  [Los Angeles Superior Court Case
    California, Inc.; the WellPoint Companies, )  No. BC 504431]
20  Inc.; WellPoint California Services, Inc.; )
    WellPoint Behavioral Health Inc.; California )
21  Physicians' Service; Blue Shield of       )
    California Life and Health Insurance      )
22  Company; and DOES 1-100,                  )
                                            )
23            Defendants.                     )
                                            )
24

25

26

27

28

                    NOTICE OF REMOVAL

1     To this Honorable Court and the plaintiff and her counsel of record:

2         Please take note that the named defendants[1] remove this action under 28 U.S.C.

3     §§ 1441 and 1446, from the Superior Court of the State of California for the County of

4     Los Angeles, to the United States District Court for the Central District of California

5     on the following grounds:

6                               **Background**

7     1.     On March 29, 2013, the plaintiff Judy Sheridan filed this purported class action

8     in California state court. *Sheridan v. Blue Cross of California, et al.,* No. BC-504431

9     (Cal. Sup. Ct.). The complaint is attached as Exhibit 1.

10     2.     The defendant Blue Cross and Blue Shield Association was served on April 5,

11     2013. (Ex. 2.) No other defendant has been served.

12     3.     The state court action alleges that the defendants have violated the California

13     Cartwright Act (which is similar to the federal Sherman Act) by entering into

14     licensing agreements that provide for exclusive service areas and through other

15     allegedly anticompetitive conduct. (*See* Compl. ¶ 1.)

16     **Diversity Jurisdiction Under the Class Action Fairness Act**

17     4.     CAFA's "primary objective" is to ensure "[f]ederal court consideration of

18     interstate cases of national importance." *Standard Fire Ins. Co. v. Knowles*, No. 11-

19     1450, 2013 WL 1104735, at *5 (U.S. Mar. 19, 2013) (internal citation omitted).

20     Enacted to expand federal jurisdiction over purported class actions, CAFA provides

21     that a class action in state court may be removed to federal court if: (a) the purported

22     class includes at least 100 members; (b) any purported class member is a citizen of a

23     state that is different from any defendant; and (c) the aggregate amount in controversy

24     exceeds $5,000,000. *See* 28 U.S.C. §§ 1332(d) & 1453(b). This standard is easily met

25     here.

---

[1] Plaintiff improperly filed this action against Blue Cross of Southern California, Blue Cross of Northern California, the WellPoint Companies of California, Inc., the WellPoint Companies, Inc., WellPoint California Services, Inc., and WellPoint Behavior Health Inc. These are not the proper corporate names of WellPoint, Inc., or its California Blue Cross affiliates.

**NOTICE OF REMOVAL**

5.     The first requirement for removal under CAFA—that the proposed class includes at least 100 members—is satisfied. *See* 28 U.S.C. § 1332(d)(5)(B). The plaintiff brings her putative class action on behalf of all those who were domiciled in California on March 29, 2013 and paid health insurance premiums to the defendants for individual or group full-service commercial health insurance at any time since March 2009. (Compl. ¶ 28.) The plaintiff represents that she believes that there are "tens of thousands of Class members." (Compl. ¶ 30.) Where the plaintiff alleges a class of thousands of persons, then CAFA's numerosity requirement is satisfied. *See Kuxhausen v. BMW Financial Servs., NA LLC*, 707 F.3d 1136, 1140 (9th Cir. 2013).

6.     Indeed, the number of purported class members may be far greater. For instance, WellPoint is one of the nation's largest health insurers. (*See* Ex. 1, Compl. ¶ 113.) As of March 31, 2013, the WellPoint subsidiaries operating in California had more than 6,300,000 members in all categories of its commercial medical insurance business, including individual, small group, and large group. (Ex. 3, Declaration of Jay King ¶ 3.) The membership of WellPoint subsidiaries operating in California in the individual, small group, and large group commercial medical insurance plans was greater than 6,100,000 for every year from 2009 to 2013 with a high of more than 6,390,000 members in 2011. (*Id.* ¶ 4.) Likewise, as of March 31, 2013, Blue Shield had more than 1,300,000 members in individual, small group, and large group commercial insurance plans. (Ex. 4, Declaration of L. Crawford, at ¶ 4.) Even Blue Shield's subsidiary, Blue Shield Life, had more than 500,000 members in individual, small group, and large group commercial insurance plans as of March 31, 2013. (Ex. 5, Declaration of L. Crawford, at ¶ 4.)

7.     CAFA's second requirement—that one member of the purported class is a citizen of a different state than any one defendant—is also met here. *See* 28 U.S.C. § 1332(d)(2)(A). CAFA changes the traditional rule that only the citizenship of the named parties counts for purposes of determining diversity. *See Serrano v. 180*

3

1    *Connect, Inc.,* 478 F.3d 1018, 1021 n.4 (9th Cir. 2007). Although the named plaintiff

2    and several defendants are California citizens, BCBSA and WellPoint are not.

3    BCBSA is an Illinois citizen. (Compl. ¶ 18.) WellPoint is domiciled in Indiana.

4    (Compl. ¶ 19.)

5    8.      CAFA's third requirement—that the aggregate amount in controversy exceeds

6    $5,000,000, exclusive of interest and costs—also is easily satisfied. *See* 28 U.S.C.

7    § 1332(d)(2). The amount in controversy need only be a good faith estimate of the

8    amount likely to be at issue in the litigation. *See Lewis v. Verizon Commc'ns, Inc.,* 627

9    F.3d 395, 400 (9th Cir. 2010). Where the face of the complaint does not plead an

10   amount in controversy, the removing defendant must establish by a preponderance of

11   the evidence that the amount in controversy exceeds the jurisdictional amount. *See*

12   *Guglielmino v. McKee Foods Corp.,* 506 F.3d 696, 699 (9th Cir. 2007). Of course the

13   defendants disagree that they owe any damages at all, nevertheless, that the plaintiff

14   has placed more than $5,000,000 at issue is evident from the complaint itself.

15   9.      The defendants estimate that more than $5,000,000 of damages is at issue in

16   this case. Among other things, the plaintiff seeks treble damages for alleged violations

17   of California's Cartwright Act, attorneys' fees, and restitution of unjust enrichment of

18   a purported 4-year scheme involving a large proportion of the insurers in the state of

19   California and WellPoint. (Compl. ¶¶ 147, 172.) Currently, the WellPoint subsidiaries

20   operating in California have more than 6,300,000 members covered by plans sold in

21   the individual, small-group, and large-group commercial medical insurance market.

22   (Ex. 3, Declaration of Jay King ¶ 3). Therefore, if the plaintiff were to prevail and a

23   class received damages of $0.20 in premium overpayments per class member just

24   related to the Blue Cross plan in California, per year, the damages in this case, before

25   trebling, would exceed the $5,000,000 threshold. And when taking into account the

26   trebling sought by the plaintiff under the antitrust laws, the purported class would

27   need to establish only $0.07 in premium overpayments just to Blue Cross per year.

28   These purported premium overpayment damages could be even lower and yet

4

**NOTICE OF REMOVAL**

1   establish the $5,000,000 threshold considering the 1.3 million Blue Shield members in

2   California during the alleged class period. (Ex. 4, Declaration of L. Crawford, at ¶ 4.)

3   **Federal Question Jurisdiction**

4   10.    In addition to having jurisdiction under CAFA, this Court also has jurisdiction

5   under 28 U.S.C. § 1331, because the complaint asserts a substantial federal question

6   under the Sherman Antitrust Act and because the plaintiff's claims are preempted

7   under the Employee Retirement Income Security Act of 1974. The district courts of

8   the United States have original jurisdiction over claims brought under ERISA and the

9   Sherman Act. *See* 15 U.S.C. §§ 1-7; 28 U.S.C. §§ 1331, 1337; and 29 U.S.C.

10  § 1132(e).

11  11.    Despite alleging that BCBSA's license agreements are the product of a

12  conspiracy among WellPoint, Blue Shield of California, BCBSA, and 36 other health

13  plans around the country to restrain trade, the plaintiff attempts to artfully plead

14  around the Sherman Act by alleging only state-law causes of action under the

15  California Cartwright Act. The plaintiff has done so in order to avoid having her

16  case—which simply mimics cases filed in federal courts around the country—

17  removed to federal court where it may be centralized into the Multidistrict Litigation

18  pending in the U.S. District Court for the Northern District of Alabama. *See In re Blue*

19  *Cross and Blue Shield Antitrust Litig.*, MDL No. 2406 (N.D. Ala.). In her complaint,

20  the plaintiff omits the reality that the remedy for the alleged harm sought, if granted,

21  necessarily would upset the license agreements of every Blue Cross Blue Shield Plan

22  across the country. Thus, the plaintiffs' state-law claim has a significant impact on

23  interstate commerce as a result of its interstate nature and the unquestionably national

24  effect of the relief requested.

25  12.    Moreover, the plaintiff's complaint includes in the purported class all persons

26  and entitles who paid health insurance premiums to defendants (other than BCBSA)

27  for individual or group full-service commercial health insurance at any time since

28  2009. (Compl. ¶ 28.) These group plans are predominately employee welfare benefits

5

1  plans within the meaning of ERISA Section 3(1). *See* 29 U.S.C. § 1001, 1002(1).

2  Here, the plaintiff's claims fall within Section 502(a)(2) as relating to the fiduciary

3  duty of plan administrators to avoid anticompetitive conduct that would harm plan

4  members. Accordingly, the plaintiff's claims are removable to federal court because

5  federal ERISA law completely preempts the plaintiff's claims. *See, e.g., Aetna Health*

6  *Inc. v. Davila*, 542 U.S. 200, 210 (2004); *see also Pilot Life Ins. Co. v. Dedeaux*, 481

7  U.S. 41 (1987); *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987).

8  **Procedural Requirements Under the Removal Statute**

9  13.    Additionally, the procedural requirements for removal in 28 U.S.C. § 1446 are

10  satisfied here. Section (a) of that statute requires the removing party to file a notice of

11  removal, signed in accordance with Federal Rule of Civil Procedure 11, "in the district

12  court of the United States for the district and division within which such action is

13  pending," which the defendants have done with this filing. Section (a) also requires a

14  moving party to provide to the District Court a copy of all process, pleadings, and

15  orders served on the defendants in the state action. The defendants have attached a

16  copy of the complaint, which was served on BCBSA. (*See* Ex. 1 and 2.)

17  14.    This notice of removal is timely under 28 U.S.C. § 1446(b). "The notice of

18  removal of a civil action or proceeding shall be filed within 30 days after the receipt

19  by the defendant, through service or otherwise, of a copy of the initial pleading setting

20  forth the claim for relief upon which such action or proceeding is based." 28 U.S.C.

21  § 1446(b). The Notice of removal is due 30 days after service. *See Murphy Brothers,*

22  *Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354, 119 S. Ct. 1322, 143 L.E.2d

23  448 (1999) ("[I]f the complaint is filed in court prior to any service, the removal

24  period runs from the service of the summons."). BCBSA was served on April 5, 2013.

25  The other defendants have not been served. Thus, this notice of removal has been filed

26  within 30 days of service of the initial pleading by the defendants.

27  15.    In accordance with 28 U.S.C. § 1446(d), copies of this notice are being served

28  upon plaintiff's counsel and filed with the Clerk of the Central District of California.

16.     By filing this notice, the defendants do not waive any defense, argument, or principle of equity that may be available to them.

DATED: April 29, 2013                                    Respectfully submitted,

By: _____            By: _____
   Mark E. McKane                              Craig A. Hoover
   (SBN 230552)                                (SBN 113965)
   Mark.McKane@kirkland.com                    craig.hoover@hoganlovells.com
   KIRKLAND & ELLIS LLP                        E. Desmond Hogan
   555 California St.                          desmond.hogan@hoganlovells.com
   San Francisco, CA 94104                     Hogan Lovells US LLP
   Telephone: (415) 439-1400                   Columbia Square
   Facsimile: (415) 439-1500                   555 Thirteenth Street, NW
                                               Washington, D.C. 20004
                                               Tel: (202) 637-5600
   David J. Zott, P.C.                         Fax: (202) 637-5910
   David.Zott@kirkland.com
   Daniel Laytin, P.C.                         Attorneys for Defendants
   Daniel.Laytin@kirkland.com                  WellPoint, Inc., Blue Cross of
   Ian R. Conner                               California d/b/a Anthem Blue
   Ian.Conner@kirkland.com                     Cross, Anthem Blue Cross Life and
   Kirkland & Ellis LLP                        Health Insurance Company, and
   300 N. LaSalle                              Anthem Life Insurance Company
   Chicago, Illinois 60614
   Telephone: (312) 862-2000
   Facsimile: (312) 862-2200            By: _____
                                               Charles Sweeris
   Attorneys for Defendant Blue                (SBN 151083)
   Cross and Blue Shield Association.          Charles.Sweeris@blueshieldca.com
                                               Mary C. St. John
                                               (SBN 126271)
                                               marcy.st.john@blueshieldca.com
                                               Blue Shield of California
                                               50 Beale St.
                                               San Francisco, CA 94109
                                               Telephone: (415) 229-5107
                                               Fax: (415) 229-5343

                                               Attorneys for Blue Shield of
                                               California and Blue Shield of
                                               California Life & Health Insurance
                                               Company

7

**NOTICE OF REMOVAL**

## CERTIFICATE OF SERVICE

I, Janaya Guerrero, am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is 555 California Street, San Francisco, California 94104.

On April 29, 2013, I served a copy of the following document(s) described as:

**NOTICE OF REMOVAL OF ACTION UNDER 1331, 1332, AND 1441**

on the interested parties in this action as follows:

☑

**By Overnight Mail**
By causing the document(s) listed above to be delivered to the addressee(s) set forth below on the following business morning by Federal Express Corporation or Express Mail.

James Carr
Tyler J. Barnett
YUHL | CARR LLP
4676 Admiralty Way, Suite 550
Marina del Rey, California 90292
Telephone: (310) 827-2800

*Attorneys for Plaintiff*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 29. 2013, at San Francisco, California.

Janaya Guerrero

Certificate of Service                    1          LA Superior Court Case No. BC 504431

# EXHIBIT 1

AL003

1  YUHL | CARR LLP
   James Carr, SBN 75357
2  Tyler J. Barnett, SBN 223478
   4676 Admiralty Way, Suite 550
3  Marina del Rey , California 90292
   Telephone:  (310) 827-2800
4  Facsimile:   (310) 827-4200

5  Attorneys for Plaintiffs

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                    FOR THE COUNTY OF LOS ANGELES

9  JUDY SHERIDAN,                    )   CASE NO. BC504431
                  Plaintiff,         )
10                                    )
              vs.                     )
11                                    )
   BLUE CROSS OF CALIFORNIA; BLUE     )   D308 Jane Johnson
12 CROSS OF SOUTHERN CALIFORNIA;      )
   BLUE CROSS OF NORTHERN             )
13 CALIFORNIA; ANTHEM BLUE CROSS      )
   LIFE AND HEALTH INSURANCE          )
14 COMPANY; BLUE CROSS OF             )
   CALIFORNIA PARTNERSHIP PLAN, INC.; )
15 BLUE SHIELD OF CALIFORNIA LIFE &   )   COMPLAINT FOR VIOLATION OF
   HEALTH INSURANCE COMPANY;          )   CARTWRIGHT ACT (Bus. & Prof.
16 ANTHEM LIFE INSURANCE COMPANY;     )   Code §16720 et seq.) – CLASS
   BLUE CROSS BLUE SHIELD             )   ACTION
17 ASSOCIATION; WELLPOINT, INC.; THE  )
   WELLPOINT COMPANIES OF             )
18 CALIFORNIA, INC.; THE WELLPOINT    )
   COMPANIES, INC.; WELLPOINT         )
19 CALIFORNIA SERVICES, INC.;         )
   WELLPOINT BEHAVIORAL HEALTH,       )
20 INC.; CALIFORNIA PHYSICIANS'       )
   SERVICE; BLUE SHIELD OF            )
21 CALIFORNIA LIFE & HEALTH           )
   INSURANCE COMPANY; and DOES 1      )
22 through 100, inclusive,            )
                                      )
23           Defendants              )
   _____)

24

25      NOW COMES Plaintiff, Judy Sheridan, and bring this action on behalf of herself and

26 all others similarly situated against Defendants, Blue Cross of California; Blue Cross of

27 Southern California; Blue Cross of Northern California; Anthem Blue Cross Life and Health

28 Insurance Company; Blue Cross of California Partnership Plan, Inc.; Blue Shield of

                                      1
         COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

ORIGINAL

California Life & Health Insurance Company; Anthem Life Insurance Company; Blue Cross Blue Shield Association; WellPoint, Inc.; The WellPoint Companies of California, Inc.; The WellPoint Companies, Inc.; WellPoint California Services, Inc.; WellPoint Behavioral Health, Inc.; California Physicians' Service; Blue Shield of California Life & Health Insurance Company; and Does 1 through 100, inclusive, for damages and restitution.

## FACTS

1.  Plaintiff, Judy Sheridan, brings this action on behalf of herself and other subscribers of Defendants, Blue Cross of California; Blue Cross of Southern California; Blue Cross of Northern California; Anthem Blue Cross Life and Health Insurance Company; Blue Cross of California Partnership Plan, Inc.; Blue Shield of California Life & Health Insurance Company; Anthem Life Insurance Company; Blue Cross Blue Shield Association; WellPoint, Inc.; The WellPoint Companies of California, Inc.; The WellPoint Companies, Inc.; WellPoint California Services, Inc.; WellPoint Behavioral Health, Inc.; California Physicians' Service; Blue Shield of California Life & Health Insurance Company (collectively "Defendants") for damages and restitution.  Specifically, this action seeks to recover damages in the form of a refund of inflated premiums that Defendants have charged California subscribers as a result of an ongoing a conspiracy and attempt to monopolize the California health insurance market in violation of the Cartwright Act, Sections 16720, et seq., of the California Business and Professions Code which bars, in part, any agreement that would serve to fix prices or allocate customers or markets.

2.  The Defendants control the largest health insurance operation in California, and currently exercises market power in the commercial health insurance market throughout California.

3.  The dominant market share enjoyed by Defendants is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed through their membership in the Blue Cross Blue Shield Association ("BCBSA") that they will not compete with Defendants and that Defendants will have

2

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE010

the exclusive right to do business in the State of California so long as they limit competition among themselves and with the thirty-seven BCBSA co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including Defendants.  Through the terms of these per se illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including those in California, have explicitly agreed not to compete with one another, in direct violation of the Cartwright Act.  By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each entity has historically enjoyed in its specifically defined geographic market.

4.    Defendants' illegal conspiracy has perpetuated Defendants' monopoly power throughout California, which has resulted in skyrocketing premiums for California subscribers for over a decade.  Defendants' anti-competitive behavior, and the lack of competition each face because of their monopoly power, has led to higher costs, resulting in higher premiums charged to Defendants' customer subscribers.  As a result of these inflated premiums, Defendants have a surplus of premiums collected from Plaintiff and the class she represents in the hundreds of millions of dollars.

5.    These inflated premiums would not be possible if the market for health insurance in California was truly competitive.  Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as Defendants and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in California.

//

//

//

3

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE011

## JURISDICTION AND VENUE

6.    This Court has original jurisdiction over this matter pursuant to the California Constitution, article VI, section 10, and Business & Professions Code sections 16750, 16754, and 16754.5.

7.    This Court has personal jurisdiction over Defendants because many of them[1] are domiciled within this State; these Defendants have made and currently have many dozens of business contracts with individuals and health care providers physically based and/or located in this State, which contracts are the bases for the allegations in this lawsuit; and these Defendants regularly insure health claims within this State.

8.    Venue is proper in this County under Business & Professions Code section 16754 because some of the offenses complained of were committed in this County; Defendants do business in this County and the violations of law alleged in this Complaint occurred in Los Angeles County and in other counties in California, or occurred outside California but were intended by Defendants to influence and affect subscribers in Los Angeles County and in other counties in California, and consumers in Los Angeles County and elsewhere in the State of California purchased Defendant's health insurance coverage sold by the Defendants.

9.    All members of the Class are residents of only California.

## PARTIES

10.   Plaintiff, Judy Sheridan, is domiciled in Los Angeles County, California. Plaintiff has an individual health insurance policy with Anthem Blue Cross number XDL 396A62419, and paid premiums to Defendants.

11.   Blue Cross of California is a California corporation, but with its physical address in Indianapolis, Indiana.  It may be served through its registered agent for service of

[1]Blue Cross of California; Blue Cross of Southern California; Blue Cross of Northern California; Anthem Blue Cross Life and Health Insurance Company; Blue Cross of California Partnership Plan, Inc.; Blue Shield of California Life & Health Insurance Company;; The WellPoint Companies of California, Inc.; California Physicians' Service; Blue Shield of California Life & Health Insurance Company

4

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

1    process CT Corporation System, 818 W Seventh St., Los Angeles, CA 90017.

2  12.  Blue Cross of Southern California is a California corporation, but with its physical

3    address in Indianapolis, Indiana.  It may be served through its registered agent for

4    service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA

5    90017.

6  13.  Blue Cross of Northern California is a California corporation, but with its physical

7    address in Indianapolis, Indiana.  It may be served through its registered agent for

8    service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA

9    90017.

10  14.  Anthem Blue Cross Life and Health Insurance Company is a California corporation,

11    but with its physical address in Indianapolis, Indiana.  It may be served through its

12    registered agent for service of process CT Corporation System, 818 W Seventh St.,

13    Los Angeles, CA 90017.

14  15.  Blue Cross of California Partnership Plan, Inc. is a California corporation, but with

15    its physical address in Indianapolis, Indiana.  It may be served through its registered

16    agent for service of process CT Corporation System, 818 W Seventh St., Los

17    Angeles, CA 90017.

18  16.  Blue Shield of California Life & Health Insurance Company is a California

19    corporation, with its physical address in San Francisco, California.  It may be served

20    through its registered agent for service of process National Corporate Research,

21    Ltd., 523 W 6th St., Ste. 544, Los Angeles, CA 90014.

22  17.  Anthem Life Insurance Company is a California corporation, but with its physical

23    address in Indianapolis, Indiana.  It may be served through its registered agent for

24    service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA

25    90017.

26  18.  Blue Cross Blue Shield Association ("BCBSA") is a corporation organized under the

27    state of Illinois and headquartered in Chicago, Illinois.  BCBSA may be served

28    through its registered agent for service of process, Roger G. Wilson, 225 N.

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

Michigan Ave., Chicago, IL 60601.

19.  WellPoint, Inc. is an Indiana corporation, with its physical address in Indianapolis, Indiana.  It may be served through its registered agent for service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA 90017.

20.  The WellPoint Companies of California, Inc. is a California corporation, but with its physical address in Indianapolis, Indiana.  It may be served through its registered agent for service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA 90017.

21.  The WellPoint Companies, Inc. is an Indiana corporation, with its physical address in Indianapolis, Indiana.  It may be served through its registered agent for service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA 90017.

22.  WellPoint California Services, Inc. is a Delaware corporation, with its physical address in Indianapolis, Indiana.  It may be served through its registered agent for service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA 90017.

23.  WellPoint Behavioral Health, Inc. is a Delaware corporation, with its physical address in Indianapolis, Indiana.  It may be served through its registered agent for service of process CT Corporation System, 818 W Seventh St., Los Angeles, CA 90017.

24.  California Physicians' Service is a California corporation, with its physical address in San Francisco, California.  It may be served through its registered agent for service of process National Corporate Research, Ltd., 523 W 6th St., Ste. 544, Los Angeles, CA 90014.

25.  Blue Shield of California Life & Health Insurance Company is a California corporation, with its physical address in San Francisco, California.  It may be served through its registered agent for service of process National Corporate Research, Ltd., 523 W 6th St., Ste. 544, Los Angeles, CA 90014.

//

6

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

## TRADE AND COMMERCE

26. Defendants and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially effects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.

27. The conduct of the Defendants has substantial effects on trade and commerce in the State of California.

## CLASS ACTION ALLEGATIONS

28. Plaintiff, pursuant to California Code of Civil Procedure §382, that specifies when a question is one of common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all, accordingly, brings this action on behalf of herself and the members of the following proposed Class:

> All persons and entities who paid health insurance premiums to Blue Cross of California; Blue Cross of Southern California; Blue Cross of Northern California; Anthem Blue Cross Life and Health Insurance Company; Blue Cross of California Partnership Plan, Inc.; Blue Shield of California Life & Health Insurance Company; Anthem Life Insurance Company; WellPoint, Inc.; The WellPoint Companies of California, Inc.; The WellPoint Companies, Inc.; WellPoint California Services, Inc.; WellPoint Behavioral Health, Inc.; California Physicians' Service; or Blue Shield of California Life & Health Insurance Company for individual or group full-service commercial health insurance at any time since four (4) years prior to commencement of this action and were domiciled in California and solely residents of California on March 28, 2013.

29. Excluded from the Class are: (I) Defendants, any entity in which Defendants have a controlling interest, and Defendants' legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendants' employees, officers, directors, agents and representatives and their family members; and (iv) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family.  Plaintiff reserves the right to amend the class definition as

7

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE015

appropriate after class discovery is completed.

30. The Class is so numerous and geographically dispersed in the State of California that joinder of all members is impracticable. While Plaintiff does not know the number and identity of all members of the Class, Plaintiff believes that there are tens of thousands of Class members, the exact number and identities of which can be obtained from Defendants.

31. There are questions of law or fact common to the Class and such questions predominate over questions affecting individual members. The common legal and factual questions include, but are not limited to, the following:

   a. Whether the restrictions set forth in the BCBSA license agreements are per se violations of the Cartwright Act, Sections 16720, et seq., of the Business and Professions Code, or are otherwise prohibited thereunder;

   b. Whether, and the extent to which, premiums charged by Defendants to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

   c. Whether the use of Most Favored Nation ("MFN") provisions in the Defendants' provider agreements are anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance;

   d. Whether, and the extent to which, premiums charged by Defendants have been artificially inflated as a result of the anti-competitive practices adopted by Defendants; and

   e. Whether the restrictions set forth in the BCBSA license agreements are per se violations of the Cartwright Act, Sections 16720, et seq., of the Business and Professions Code.

32. Plaintiff's claims are typical of the claims of the members of the Class, because Plaintiff purchased full-service commercial health insurance products from Defendants in the same manner as members of the Class, and her interests coincide with and are not antagonistic to other members of the Class.

33. Plaintiff will fairly and adequately protect the interests of the members of the Class because it is in her best interest to prosecute the claims alleged herein to obtain full compensation due her for the unfair and illegal conduct of which she complains.

34. Plaintiff has retained and is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation. Plaintiff is

8

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE016

1    willing and prepared to serve the Court and the Class members in a representative

2    capacity with all of the obligations and duties material thereto and is determined to

3    diligently discharge those duties by vigorously seeking the maximum possible

4    recovery for Class members.

5    35.   The prosecution of separate actions by individual members of the Class would

6    create a risk of inconsistent and varying adjudications, establishing incompatible

7    standards of conduct for Defendants.

8    36.   A class action is superior to other available methods for the fair and efficient

9    adjudication of this controversy. The Class is readily definable and is one for which

10   Defendants have records. Prosecution as a class action will eliminate the possibility

11   of repetitious litigation. Treatment of this case as a class action will permit a large

12   number of similarly situated persons to adjudicate their common claims in a single

13   forum simultaneously, efficiently, and without the duplication of effort and expense

14   that numerous individual actions would produce. Class treatment will also permit

15   the adjudication of relatively small claims by many Class members who otherwise

16   could not afford to litigate an antitrust claim such as is asserted in this Complaint.

17   This class action does not present any difficulties of management that would

18   preclude its maintenance as a class action.

19                          **FACTUAL BACKGROUND**

20   37.   The Defendants enjoy unrivaled market dominance within California, collectively

21   enrolling vast percentages of the health insurance plan subscribers.   The

22   Defendants' market dominance in California is the result of a conspiracy between

23   Defendants among themselves as well as the thirty-seven other insurance

24   companies that license the Blue Cross and/or Blue Shield brands to unlawfully

25   divide and allocate the geographic markets for health insurance coverage in

26   California and the United States. That conspiracy is implemented through the Blue

27   Cross and Blue Shield license agreements that each licensee has entered into with

28   BCBSA. As detailed herein, the members' health insurance plans of BCBSA,

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE017

1    including Defendants, entered into a series of licensing arrangements that have

2    insulated Defendants and the other health insurance plans operating under the Blue

3    Cross and/or Blue Shield trademarks from competition in each of their respective

4    service areas.

5    38.    This series of agreements has enabled Defendants to acquire and maintain a

6    grossly disproportionate market share for health insurance products in California,

7    where Defendants enjoy an unlawful allocation of customers and markets that come

8    with their market and monopoly power.  The situation in California is not unique,

9    however, as other health insurance plans operating under the Blue Cross and Blue

10    Shield trademarks and trade names reap similar benefits in their respective service

11    areas across the State and within the United States.

12    39.    Defendants have used their market and monopoly power in California to engage in

13    a number of anti-competitive practices.  For example, upon information and belief,

14    Defendants have required key health care providers to agree to so-called "most

15    favored nation" clauses ("MFNs") in their contracts with the Defendants.  These

16    clauses ensure that Defendants receive the best pricing for health care services in

17    the market.  If a health care provider does not agree to the MFN, that provider will

18    not remain in or become a part of Defendants' vast network, which is generally an

19    unacceptable result because Defendants control the vast majority of subscribers in

20    California. Faced with this prospect, providers capitulate to Defendants' demands,

21    including MFNs.  The MFNs restrict competition by preventing competitors from

22    negotiating for lower costs and thus raising the prices other health insurers must

23    pay to providers.

24    40.    Because the BCBSA licensing agreements exclude rival health insurance plans

25    from the market and Defendants' MFNs clauses ensure that their competitors may

26    not negotiate lower health care provider costs, Defendants face little pressure to

27    constrain their own costs.  The MFN, by limiting the ability of an insurer to compete

28    with Defendants thus also compounds the exclusion of Defendants' rival health

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE018

1    insurance plans from the market and the deprivation of consumers of choice in

2    health insurance products.  With few other health insurance plan options to

3    compete with, Defendants can raise premiums (and thereby recoup its costs)

4    without any concern that its subscribers may switch to a rival insurance plan.  The

5    few consumers who subscribe to rival insurance plans face higher premiums as

6    well, as these plans pass on to their subscribers the high costs set by Defendants

7    with health care providers.

8    41.   Upon information and belief, because Defendants have implemented MFNs that

9    ensure they receive the best rates in the market without the risk of low-cost

10   competition, health care providers have responded by increasing prices to cover the

11   discounts that Defendants receive through its MFNs.  Thus, what was supposed to

12   be a discount turns out to be a premium to providers, thereby artificially raising

13   prices for health care services.  Again, consumers lose.

14   42.   Defendants' anti-competitive practices, by reducing the choices available to health

15   insurance consumers and increasing the cost of health care in California, have

16   raised the premiums that California residents must pay to obtain health insurance.

17   Defendants' rival health insurance plans are excluded from the market, and the few

18   rival plans that have broken into the California market must pay significantly higher

19   rates to health care providers.

20   43.   The skyrocketing cost of Defendants' health insurance coverage in California tells

21   the story of Defendants' abuse of its market and monopoly power at the expense

22   of health care consumers in California.

23   HISTORY OF THE BLUE CROSS AND BLUE SHIELD PLANS AND OF **BCBSA**

24   44.   The history of the Blue Cross and Blue Shield plans demonstrates that the plans

25   arose independently, that they jointly conceived of the Blue Cross and Blue Shield

26   marks in a coordinated effort to create a national brand that each would operate

27   within its local area, and that they quickly developed into local monopolies in the

28   growing market for health care coverage.  While originally structured as nonprofit

EXHIBIT ONE
PAGE019

organizations since the 1980s, these local "Blue" plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses.

45. The history of BCBSA demonstrates that it was created by the local Blue plans and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

46. In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

47. In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

48. In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

49. In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Contrary to the

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

EXHIBIT ONE
PAGE020

1    principles that plans would not compete and that plans would not operate in each

2    others' service areas, the independently formed prepaid hospital plans, now

3    operating under the Blue Cross name, engaged in fierce competition with each

4    other and often entered each other's territories. The authors of *The Blues: A History*

5    *of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers

6    reviewed prior to publication, describe the heated competition between the various

7    Blue Cross plans at that time:

8         The most bitter fights were between intrastate rivals . . . .
          Bickering over nonexistent boundaries was perpetual between
9         Pittsburgh and Philadelphia, for example . . . John Morgan,
          who directed a Plan in Youngstown, Ohio, for nearly
10        twenty-five years before going on to lead the Blue Cross Plan
          in Cincinnati, recalled: "In Ohio, New York, and West Virginia,
11        we were knee deep in Plans." At one time or another, there
          were Plans in Akron, Canton, Columbus, Cincinnati,
12        Lima, Portsmouth, Toledo, and Youngstown . . . By then there
          were also eight Plans in New York and four in West Virginia. .
13        . . Various reciprocity agreements between the Plans were
          proposed, but they generally broke down because the
14        Commission did not have the power to enforce them.

15   50.  For many years, Cross-on-Cross competition continued, as described in Odin

16        Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was

17        funded by the Blue Cross Association, a predecessor to BCBSA.  Anderson points

18        to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and

19        a Durham plan] was fierce," as particular examples, and explains that though "Blue

20        Cross plans were not supposed to overlap service territories," such competition was

21        "tolerated by the national Blue Cross agency for lack of power to insist on change."

22   51.  By 1975, the Blue Cross plans had a total enrollment of 84 million.

23   52.  The development of what became the Blue Shield plans followed, and imitated, the

24        development of the Blue Cross plans. These plans were designed to provide a

25        mechanism for covering the cost of physician care, just as the Blue Cross plans had

26        provided a mechanism for covering the cost of hospital care. Similarly, the Blue

27        Cross hospital plans were developed in conjunction with the AHA (which represents

28        hospitals), while the Blue Shield medical society plans were developed in

---

13

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

1   conjunction with the American Medical Association ("AMA") (which represents

2   physicians).

3   53.   Like the Blue Cross symbol, the Blue Shield symbol was developed by a local

4   medical society plan, and then proliferated as other plans adopted it.

5   54.   In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national

6   body intended to coordinate and "approve" the independent Blue Shield plans.

7   When the AMCP proposed that the Blue Shield symbol be used to signify that a

8   Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that

9   any group of state medical society Plans should band together to exclude other

10   state medical society programs by patenting a term, name, symbol, or product." In

11   1960, the AMCP changed its name to the National Association of Blue Shield Plans,

12   which in 1976 changed its name to the Blue Shield Association.

13   55.   By 1975, the Blue Shield plans had a total enrollment of 73 million.

14   56.   Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.

15   During the early decades of their existence, there were no restrictions on the ability

16   of a Blue Cross plan to compete with or offer coverage in an area already covered

17   by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also

18   flourished.

19   57.   However, by the late 1940s, the Blue plans faced growing competition not just from

20   each other, but also from commercial insurance companies that had recognized the

21   success of the Blue plans and were now entering the market. Between 1940 and

22   1946, the number of hospitalization policies held by commercial insurance

23   companies rose from 3.7 million to 14.3 million policies. While the Blues remained

24   dominant in most markets, this growth of competition was a threat. In particular,

25   unlike the Blue plans, these commercial insurance companies were able to offer

26   uniform nationwide contracts, which were attractive to large employers or unions

27   with members located in different cities and states.

28   58.   From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to

14

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

59.  Even when the Plans were putatively cooperating, as they appeared to be in the 1950s while competing with commercial insurers for the opportunity to provide insurance to federal government employees, they were at war.  As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

60.  To address competition from commercial insurers and competition from other Blue plans, and to ensure "national cooperation" among the different Blue entities, the plans agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has asserted that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

61.  Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

62.  Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

63.  During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging.  By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year.  In 1978,

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE023

1      the Blue Cross Association and the National Association of Blue Shield Plans (now

2      called the Blue Shield Association) consolidated their staffs, although they retained

3      separate boards of directors.

4    64.    In 1982, the Blue Cross Association and the Blue Shield Association merged to

5      form BCBSA.  At that time, BCBSA became the sole owner of the various Blue

6      Cross and Blue Shield trademarks and trade names that had previously been

7      owned by the local plans.

8    65.    In November 1982, after heated debate, BCBSA's member plans agreed to two

9      propositions: that by the end of 1984, all existing Blue Cross plans and Blue Shield

10      plans should consolidate at a local level to form Blue Cross and Blue Shield plans;

11      and that by the end of 1985, all Blue plans within a state should further consolidate,

12      ensuring that each state would have only one Blue plan.  As a result of these goals,

13      the number of member plans went from 110 in 1984, to 75 in 1989, to 38 today.

14      However, the goals did not end competition between Blue plans.  In the early 1980s,

15      for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern

16      New York competed head-to-head.

17    66.    During the 1980s and afterwards, the plans began to operate less like charitable

18      entities and more like for-profit corporations, accumulating substantial surpluses.

19      In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form

20      for-profit subsidiaries.

21    67.    In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-

22      for-profit entities.  As a result, many member plans converted to for-profit status.

23      One such plan, now called WellPoint, has grown to become the largest health

24      insurance company in the country, at least by some measures.  While nominally still

25      characterized as not-for-profit, Defendants and other nonprofit Blue plans generate

26      substantial earnings and surpluses, and pay their senior administrators and officials

27      substantial salaries and bonuses – often in the multimillion dollar range.

28    68.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately one

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

EXHIBIT ONE
PAGE024

percent per year.  At the same time, the amount of competition among Blue plans,

and from non-Blue subsidiaries of Blue plans, increased substantially.  As a result

of this increased competition, in April of 1987, the member plans of BCBSA held an

"Assembly of Plans" – a series of meetings held for the purpose of determining how

they would and would not compete against each other.  During these meetings,

these independent health insurers and competitors agreed to maintain exclusive

service areas when operating under the Blue brand, thereby eliminating "Blue on

Blue" competition.  However, the Assembly of Plans left open the possibility of

competition from non-Blue subsidiaries of Blue plans – an increasing "problem" that

had caused complaints from many Blue plans.

69.   Throughout the 1990s, the number of non-Blue subsidiaries of Blue plans

increased, and they continued to compete with Blue plans.  As a result, the member

plans of BCBSA discussed ways to rein in such non-Blue branded competition.

70.   At some later date, the Blue Cross and Blue Shield plans together agreed to restrict

the territories in which they would operate under any brand, Blue or non-Blue, as

well as the ability of nonmembers of BCBSA to control or acquire the member plans.

These illegal restraints are discussed below.

71.   BCBSA calls itself "a national federation of 38 independent, community-based and

locally operated Blue Cross and Blue Shield companies" and "the trade association

for the Blue Cross Blue Shield companies."

72.   BCBSA is entirely controlled by its member plans, all of whom are independent

health insurance companies that license the Blue Cross and/or Blue Shield

trademarks and trade names, and that, but for any agreements to the contrary,

could and would compete with one another.  On its website, BCBSA admits that in

its "unique structure," "the Blue Cross and Blue Shield companies are [its]

customers, [its] Member Licensees and [its] governing Board."

73.   As at least one federal court has recognized, BCBSA "is owned and controlled by

the member plans" to such an extent that "by majority vote, the plans could dissolve

17

EXHIBIT ONE
PAGE025

1    the Association and return ownership of the Blue Cross and Blue Shield names and

2    marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue*

3    *Shield Ass'n,* 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

4    74.    The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

5    In a pleading it filed during litigation in the Northern District of Texas, BCBSA

6    admitted that its Board of Directors consists of "the chief executive officer from each

7    of its Member Plans and BCBSA's own chief executive officer."   The current

8    chairman of the Board of Directors, Daniel J. Loepp, is also the current President

9    and CEO of Blue Cross Blue Shield of Michigan. The Board of Directors of BCBSA

10   meets at least annually.

11   75.    The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan

12   Performance and Financial Standards Committee (the "PPFSC"), a standing

13   committee of the BCBSA Board of Directors that is composed of nine member-Plan

14   CEOs and three independent members.

15   76.    The independent Blue Cross and Blue Shield licensees control the entry of new

16   members into BCBSA. In a brief it filed during litigation in the United States Court

17   of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure,

18   [an] applicant  . . .  must receive a majority vote of [BCBSA's] Board" and that

19   BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the

20   hands of a stranger the Association has not approved."

21   77.    The independent Blue Cross and Blue Shield licensees control the rules and

22   regulations that all members of BCBSA must obey. According to a brief BCBSA

23   filed during litigation in the United States Court of Appeals for the Sixth Circuit,

24   these rules and regulations include the Blue Cross License Agreement and the Blue

25   Shield License Agreement (collectively, the "License Agreements"), the Membership

26   Standards Applicable to Regular Members (the "Membership Standards"), and the

27   Guidelines to Administer Membership Standards (the "Guidelines").

28   78.    The License Agreements state that they "may be amended only by the affirmative

18

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE026

1  vote of three-fourths of the Plans and three-fourths of the total then current
2  weighted vote of all the Plans." In a brief it filed during litigation in the United States
3  Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the
4  License Agreements as something the member plans "deliberately chose," "agreed
5  to," and "revised." The License Agreements explicitly state that the member plans
6  most recently met to adopt amendments, if any, to the licenses on November 18,
7  2010.

8  79.  Under the terms of the License Agreements a plan "agrees . . . to comply with the
9  Membership Standards." The Guidelines state that the Membership Standards and
10  the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans
11  in November 1994 and initially became effective as of December 31, 1994;" that the
12  Membership Standards "remain in effect until otherwise amended by the Member
13  Plans;" that revisions to the Membership Standards "may only be made if approved
14  by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or
15  revised [G]uidelines shall not become effective . . . unless and until the Board of
16  Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership
17  Standards and Guidelines "to ensure that . . . all requirements (standards and
18  guidelines) are appropriate, adequate and enforceable."

19  80.  The independent Blue Cross and Blue Shield licensees police the compliance of all
20  members of BCBSA with the rules and regulations of BCBSA. The Guidelines state
21  that the PPFSC "is responsible for making the initial determination about a Plan's
22  compliance with the license agreements and membership standards. Based on that
23  determination, PPFSC makes a recommendation to the BCBSA Board of Directors,
24  which may accept, reject, or modify the recommendation." In addition, the
25  Guidelines state that "BCBSA shall send a triennial membership compliance letter
26  to each [member] Plan's CEO," which includes, among other things, "a copy of the
27  Membership Standards and Guidelines, a report of the Plan's licensure and
28  membership status by Standard, and PPFSC comments or concerns, if any, about

19

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

81.  The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," and "Sanctions" – each of which is administered by the PPFSC and could result in the termination of a member plan's license.

82.  The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA.  The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

83.  The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

84.  Each BCBSA licensee is an independent legal organization.  In a pleading BCBSA

20

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1   filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he

2   formation of BCBSA did not change each plan's fundamental independence."  In

3   fact, the License Agreements state that "[n]othing herein contained shall be

4   construed to constitute the parties hereto as partners or joint venturers, or either as

5   the agent of the other."

6   85.   The independent Blue Cross and Blue Shield licensees include many of the largest

7   health insurance companies in the United States.  The largest health insurance

8   company in the nation by some measures is WellPoint, a BCBSA licensee.

9   Similarly, fifteen (15) of the twenty-five (25) largest health insurance companies in

10  the country are BCBSA licensees. On its website, BCBSA asserts that its members

11  together provide "coverage for more than 99 million individuals – one-in-three

12  Americans" and "contract[] with more hospitals and physicians than any other

13  insurer." Absent the restrictions that the independent Blue Cross and Blue Shield

14  licensees have chosen to impose on themselves, discussed below, these

15  companies would compete against each other in the market for commercial health

16  insurance.

17  86.   In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA

18  admitted that the Member Plans formed the precursor to BCBSA when they

19  "recognized the necessity of national coordination." The authors of *The Blues: A*

20  *History of the Blue Cross and Blue Shield System* describe the desperation of the

21  Blue Cross and Blue Shield licensees before they agreed to impose restrictions on

22  themselves:

23          The subsidiaries kept running into each other – and each
            other's parent Blue Plans – in the marketplace.  Inter-Plan
24          competition had been a fact of life from the earliest days, but
            a new set of conditions faced the Plans in the 1980s, now in a
25          mature and saturated market.  New forms of competition were
            springing up at every turn, and market share was slipping year
26          by year.  Survival was at stake.  The stronger business
            pressure became, the stronger the temptation was to breach
27          the service area boundaries for which the Plans were licensed.
            . . .

28  //

---

21

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

87.    On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages. . . ."

88.    As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

### THE HORIZONTAL AGREEMENTS NOT TO COMPETE IN THE LICENSING ARRANGEMENTS BETWEEN BCBSA AND MEMBER PLANS, INCLUDING THE DEFENDANTS, ARE PER SE VIOLATIONS OF THE CARTWRIGHT ACT, §§16720, ET SEQ., OF THE BUSINESS AND PROFESSIONS CODE

89.    The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a per se violation of the Cartwright Act, §§16720, et seq., of the Business and Professions Code.

90.    Through the License Agreements, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area." The License Agreement defines each licensee's Service

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1    Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as

2    to which the Plan has been granted a subsequent license."

3    91.    Through the Guidelines and Membership Standards, which the independent Blue

4    Cross and Blue Shield licensees created, control, and enforce, and with which each

5    licensee must agree to comply as part of the License Agreements, each

6    independent Blue Cross and Blue Shield licensee agrees that at least 80 percent

7    of the annual revenue that it or its subsidiaries generate from within its designated

8    Service Area (excluding Medicare and Medicaid) shall be derived from services

9    offered under the licensed Blue Cross and Blue Shield trademarks and trade

10   names.  This provision directly limits the ability of each Blue plan to generate

11   revenue from non-Blue branded business.  This provision also thereby limits the

12   ability of each plan to develop non-Blue brands that could and would compete with

13   Blue plans. It further discourages and disincentivizes each plan from developing

14   any non-Blue branded businesses.

15   92.    Through the Guidelines and Membership Standards, each independent Blue Cross

16   and Blue Shield licensee further agrees that at least two-thirds of the annual

17   revenue generated by it or its subsidiaries from either inside or outside of its

18   designated Service Area (excluding Medicare and Medicaid) shall be attributable to

19   services offered under the Blue Cross and Blue Shield trademarks and trade

20   names.  The Guidelines provide that national enrollment can be substituted for

21   annual revenue, making the alternative restriction that a plan will derive no less than

22   66 ⅔ percent of its national enrollment from its Blue-brand business.  This provision

23   directly limits the ability of each Blue plan to generate revenue from non-Blue

24   branded business, and thereby limits the ability of each plan to develop non-Blue

25   brands that could and would compete with Blue plans.  It further discourages and

26   disincentivizes each plan from developing any non-Blue branded businesses.

27   93.    The one-third cap on non-Blue revenue provides a licensee with minimal, if any,

28   incentive to compete outside its Service Area.  To do so, the licensee would have

23

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1    to buy, rent, or build a provider network under a non-Blue brand, while ensuring that

2    revenue derived from that brand did not exceed the one-third cap.  Should the

3    licensee offer services and products under the non-Blue brand within its Service

4    Area (which is likely, since that is its base of operations), that would further reduce

5    the amount of non-Blue revenue it is permitted to earn from outside its designated

6    area.  Thus, the potential upside of making an investment in developing business

7    outside of a designated area is severely limited, which obviously creates a

8    disincentive from ever making that investment.

9  94.    In sum, each independent Blue Cross and Blue Shield licensee has agreed with its

10    potential competitors that in exchange for having the exclusive right to use the Blue

11    brand within a designated geographic area, it will derive none of its revenue from

12    services offered under the Blue brand outside of that area, and will derive at most

13    one-third of its revenue from outside of its exclusive area, using services offered

14    under a non-Blue brand. The latter amount will be further reduced if the licensee

15    derives any of its revenue within its designated geographic area from services

16    offered under a non-Blue brand.

17  95.    The foregoing restrictions on the ability of Blue plans to generate revenue outside

18    of their service areas constitute agreements between competitors to divide and

19    allocate geographic markets, and therefore are per se violations of the Cartwright

20    Act, §§16720, et seq., of the Business and Professions Code.

21  96.    More than one Blue Cross and Blue Shield licensee has publicly admitted the

22    existence of these territorial market divisions. For example, the former Blue Cross

23    licensee in Ohio alleged that BCBSA member plans agreed to include these

24    restrictions in the Guidelines in 1996 in an effort to block the sale of one member

25    plan to a nonmember that might present increased competition to another member

26    plan.

27  97.    The largest Blue licensee, co-Defendant, WellPoint, is a publicly-traded company,

28    and therefore is required by the SEC rules to describe the restrictions on its ability

24

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

1    to do business.  Thus, in its Form 10-K filed February 17, 2011, WellPoint stated

2    that it had "no right to market products and services using the BCBS names and

3    marks outside of the states in which we are licensed to sell BCBS products," and

4    that "[t]he license agreements with the BCBSA contain certain requirements and

5    restrictions regarding our operations and our use of the BCBS names and marks,

6    including . . . a requirement that at least 80% . . . of a licensee's annual combined

7    net revenue attributable to health benefit plans within its service area must be sold,

8    marketed, administered or underwritten under the BCBS names and marks" and "a

9    requirement that at least 66 ⅔% of a licensee's annual combined national revenue

10   attributable to health benefit plans must be sold, marketed, administered or

11   underwritten under the BCBS names and marks."

12  98.    Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for

13   Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at

14   least 80% of the revenue that we earn from health care plans and related services

15   in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least

16   66.7% of the enrollment for) health care plans and related services both in [and

17   outside its Service Area], must be sold, marketed, administered, or underwritten

18   through use of the Blue Cross Blue Shield name and mark."  Further, the Triple-S

19   licensee stated that the territorial restrictions "may limit the extent to which we will

20   be able to expand our health care operations, whether through acquisitions of

21   existing managed care providers or otherwise, in areas where a holder of an

22   exclusive right to the Blue Cross Blue Shield name and mark is already present."

23  99.    Despite these public admissions, both BCBSA and its member plans have

24   attempted to keep the territorial restrictions as secret as possible.  When asked by

25   the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or

26   informal limitations that BSBSA [sic] places on competition among holders of the

27   [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's

28   general counsel responded that "BCBSA licensed companies may compete

---

25

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE033



1    anywhere with non-Blue branded business . . . The rules on what the plans do in

2    this regard are contained in the license.  However, the license terms themselves are

3    proprietary to BCBSA, and  . . .  we would prefer not to share such trade secrets

4    with BCBSA's competitors."

5    100.   The member plans of BCBSA have agreed to impose harsh penalties on those that

6         violate the territorial restrictions.  According to the Guidelines, a licensee that

7         violates one of the territorial restrictions could face "[l]icense and membership

8         termination."  If a member plan's license and membership are terminated, it loses

9         the use of the Blue brands, which BCBSA admits on its website are "the most

10        recognized in the health care industry."  In addition, in the event of termination, a

11        plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form

12        10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of

13        December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or

14        Blue Shield presence in the vacated service area."

15   101.   In sum, a terminated licensee would: (a) lose the brand through which it derived the

16        majority of its revenue; and (b) fund the establishment of a competing health insurer

17        that would replace it as the Blue licensee in its local area.  These penalties

18        essentially threaten to put out of existence any Blue member plan that breaches the

19        territorial restrictions.

20   102.   It is unsurprising, then, that most member plans do not operate outside of their

21        Service Areas.  The territorial restrictions have therefore barred all competition by

22        all of the Blue plans (other than Defendants) from the California commercial health

23        insurance market.

24   103.   Even in the relatively rare instance, in other states, in which Blue plans conduct

25        operations outside of their Service Areas, they have been required to keep those

26        operations tightly under control by preventing growth – exactly the opposite of how

27        they would normally operate.  The relationship between WellPoint and its non-Blue

28        subsidiary, UniCare, is an illustrative example.  WellPoint reported in its Form 10-K

26

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1    for the year ending December 31, 1999 that approximately 70 percent of its total

2    medical membership was sold by its Blue-licensed subsidiary, co-Defendant, Blue

3    Cross of California.  In its Form 10-K for the year ending December 31,2000, this

4    percentage decreased to approximately 67 percent.  In its Form 10-K for the year

5    ending December 31, 2001, after WellPoint had acquired the BCBSA member plans

6    operating in Georgia and part of Missouri, it reported that approximately 78 percent

7    of its total medical membership was in its Blue-licensed subsidiaries.  By the time

8    WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the

9    Blue licensees in fourteen states.  For the first time, it admitted the existence of the

10   territorial restrictions in the BCBSA licenses and stated that it was in compliance

11   with them.  This may explain why, from 1999 to 2002, while other Texas health

12   insurers experienced average revenue growth of 17 percent, UniCare experienced

13   growth of only 1.4 percent in Texas.   During those same years, UniCare

14   experienced virtually no growth in the state of Washington, while overall health

15   insurance revenue in the state grew by 17 percent.  Similarly, in New Jersey from

16   2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (now part

17   of WellPoint and known as Empire Blue Cross Blue Shield) did not increase, despite

18   an overall 25 percent growth rate for health insurers in the state during the same

19   period.  In Mississippi, between 2001 and 2002, premium revenue earned by most

20   health insurance companies increased by more than 10 percent, but revenue for the

21   non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare)

22   or negative (in the case of Anthem, now part of WellPoint).

23   104.   In another example, one Pennsylvania Blue plan, Independence Blue Cross, has

24   2.4 million Blue-brand commercial health insurance enrollees in its service area of

25   Southeastern Pennsylvania, and has close to one million non-Blue brand Medicare

26   and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana,

27   Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial

28   health insurance subsidiary, AmeriHealth, which operates in New Jersey and

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE035

1    Delaware, has an enrollment of only approximately 130,000, or 4 percent of

2    independence Blue Cross's total commercial health insurance enrollment.

3    105.   Thus, the territorial restrictions agreed to by all BCBSA members operate to restrain

4    competition by preventing member plans from competing with each other and with

5    non-Blue plans.  These prohibitions on competition apply no matter how favorable

6    the efficiencies and economies of scale that might result from expansion of a Blue

7    into a new area, and no matter how much premiums and other costs might be

8    reduced if competition were permitted.

9    106.   In addition to the per se illegal territorial restrictions summarized above, the rules

10   and regulations of BCBSA, which Defendants and the other independent Blue

11   Cross and Blue Shield licensees created, control, and agree to obey, also include

12   provisions that restrict the ability of nonmembers of BCBSA to acquire or obtain

13   control over any member plan.

14   107.   First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled

15   Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed

16   Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger

17   Controlled Affiliate or to acquire a substantial portion of its assets related to

18   licensable services." Should a nonmember wish to obtain such control or assets, it

19   "is invited to apply to become a licensee." However, as alleged above, the member

20   plans control the entry of new members into BCBSA. Should a nonmember attempt

21   to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the

22   assets of a member plan, the other member plans could block its membership by

23   majority vote.

24   108.   Second, the License Agreements contain a number of acquisition restrictions

25   applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees

26   who would otherwise be capable of having their shares acquired). These include

27   four situations in which a member plan's license will terminate automatically: (1) if

28   any institutional investor becomes beneficially entitled to 10 percent or more of the

28

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE036

1    voting power of the member plan; (2) if any non-institutional investor becomes

2    beneficially entitled to 5 percent or more of the voting power of the member plan;

3    (3) if any person becomes beneficially entitled to 20 percent of more of the member

4    plan's then-outstanding common stock or equity securities; or (4) if the member plan

5    conveys, assigns, transfers, or sells substantially all of its assets to any person, or

6    consolidates or merges with or into any person, other than a merger in which the

7    member plan is the surviving entity and in which, immediately after the merger, no

8    institutional investor is beneficially entitled to 10 percent or more of the voting

9    power, no non-institutional investor is beneficially entitled to 5 percent or more of the

10    voting power, and no person is beneficially entitled to 20 percent of more of the

11    then-outstanding common stock or equity securities.   These restrictions apply

12    unless modified or waived in particular circumstances upon the affirmative vote both

13    of a majority of the disinterested member plans and also of a majority-weighted vote

14    of the disinterested member plans.   These restraints effectively preclude the sale

15    of a BCBSA member to a nonmember entity, absent special approval.

16  109.   These acquisition restraints reduce competition in violation of the Cartwright Act,

17    §§16720, et seq., of the Business and Professions Code, because they

18    substantially reduce the ability of nonmember insurance companies to expand their

19    business.  In order to expand into a new geographic area, a nonmember insurance

20    company faces the choice of whether to build its own network in that area, or to

21    acquire a network by buying some or all of an existing plan doing business in that

22    area. Through the acquisition restrictions, the Blue plans have conspired to force

23    competitors to build their own networks, and have effectively prohibited those

24    competitors from ever choosing what may often be the more efficient solution of

25    acquiring new networks by purchasing some or all of an existing Blue plan.  Blue

26    provider networks may often be the most cost-effective due to historical tax breaks,

27    favorable legislation, and long-term presence in a region.  By preventing non-Blue

28    entities from acquiring Blue entities and their networks, the acquisition restrictions

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

EXHIBIT ONE
PAGE037

1    in the BCBSA licenses effectively force competitors to adopt less efficient methods

2    of expanding their networks, thereby reducing and in some instances eliminating

3    competition.

4  110.    Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue

5    Cross or Blue Shield licensees have been acquisitions by other member plans.

6    During the period from 1996 to the present, there has been a wave of consolidation

7    among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are

8    only 38.

9  111.    By agreeing to restrict the pool of potential purchasers of a Blue licensee to other

10    Blue licensees, the member plans of BCBSA raise the costs their rivals must incur

11    to expand their networks and areas of practice, reduce efficiency, and protect

12    themselves and each other from competition.  The net effect is to tend to lessen or

13    to lessen competition and higher premium costs for consumers, including

14    Defendants' enrollees.

15  112.    Defendants, as licensees, members, and part of the governing body of BCBSA,

16    have conspired with the other member plans of BCBSA to create, approve, abide

17    by, and enforce the rules and regulations of BCBSA, including the per se illegal

18    territorial restrictions in the License Agreements and Guidelines.   Many of the

19    member plans with which Defendants have conspired would otherwise be significant

20    competitors of Defendants in California.

21  113.    For example, co-Defendant WellPoint is the largest health insurer in the country by

22    total medical enrollment, with approximately 34 million enrollees.  It is the Blue

23    Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as

24    well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine,

25    Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire,

26    New York, (as Blue Cross Blue Shield in 10 New York City metropolitan and

27    surrounding cities, and as Blue Cross or Blue Cross Blue Shield in selected upstate

28    counties only), Ohio, and Wisconsin, and also serves customers throughout the

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

EXHIBIT ONE
PAGE038

1    country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial

2    restrictions summarized above, WellPoint would be likely to offer its health

3    insurance services and products in other markets where it is restrained, and such

4    competition would result in lower health care costs and premiums.

5    114.   More than 55 percent of Mississippi residents who subscribe to full-service

6    commercial health insurance (whether through group plans or through individual

7    policies) are subscribers of Blue Cross Blue Shield of Mississippi – vastly more than

8    the next largest full-service commercial insurer.   But for the illegal territorial

9    restrictions summarized above, Blue Cross and Blue Shield of Mississippi would be

10    likely to offer its health insurance services and products in California in competition

11    with Defendants.   Such competition would result in lower health care costs and

12    premiums paid by Defendants' enrollees.

13    115.   Likewise, approximately 53 percent of Arkansas residents who subscribe to

14    full-service commercial insurance (whether through group plans or through

15    individual policies) are subscribers of Blue Cross Blue Shield of Arkansas – vastly

16    more than the next largest full-service commercial insurer.   But for the illegal

17    territorial restrictions summarized above, Blue Cross Blue Shield of Arkansas would

18    be likely to offer its health insurance services and products in California in

19    competition with Defendants.   Such competition would result in lower health care

20    costs and premiums paid by Defendants' enrollees.

21    116.   Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health

22    insurer in the country by total medical enrollment, with approximately 3.5 million

23    enrollees.   Blue Cross and Blue Shield of Alabama holds a stunning 93 percent

24    share of the market for commercial HMO and PPO health insurance in its Service

25    Area of Alabama. But for the illegal territorial restrictions summarized above, Blue

26    Cross and Blue Shield of Alabama would be likely to offer its health insurance

27    services and products in California in competition with Defendants.   Such

28    competition would result in lower health care costs and premiums paid by

31

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1    Defendants' enrollees.

2    117.   In addition to the foregoing examples, there are dozens of other Blue plans that

3           would and could compete in California but for the illegal territorial restrictions.  As

4           alleged above, fifteen of the twenty-five largest health insurance companies in the

5           country are Blue plans: if all of these plans, together with all other BCBSA

6           members, were able to compete in California, the result would have been lower

7           costs and thus lower premiums paid by Defendants' enrollees, including Plaintiff.

8    118.   Upon information and belief, over the past two decades (if not longer), numerous

9           Blue plans have adopted what is described in the industry as "Most Favored Nation"

10          ("MFN") clauses in their reimbursement agreements.

11   119.   MFNs (also known as "most favored customer," "most favored pricing," "most

12          favored discount," or "parity" clauses) require a service provider to charge a Blue

13          entity's competitors either more than, or no less than, what the provider charges the

14          Blue entity for the same services.  MFNs that require the amount the provider

15          charges the Blue entity's competitor to be higher than the amount the provider

16          charges the Blue entity are often known as "MFN plus" clauses, and typically require

17          the amount to be higher by a specified percentage.

18   120.   Upon information and belief, Defendants use of MFNs unreasonably reduces

19          competition for a number of reasons. First, MFNs establish that the dominant

20          market provider will be charged the lowest prices charged, thus making the

21          dominant provider indifferent to the actual price charged.  The MFNs thus reduce

22          competition by eliminating an incentive for Defendants to reduce overhead prices.

23   121.   Second, MFNs limit competition by preventing other health insurers in California

24          from achieving lower costs with providers and thereby becoming significant

25          competitors to Defendants.  MFNs establish a price floor below which providers will

26          not sell services to Defendants' competitors; indeed, MFNs enable Defendants to

27          raise that price floor.  This deters cost competition among health insurers in

28          California.  By reducing the ability of Defendants' competitors to compete, MFNs

32

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1    ensure that Defendants can substantially raise premiums while maintaining, or even

2    increasing, its market share.

3    122.   Moreover, upon information and belief, if Defendants are certain that no insurer will

4    pay less to a provider than it will, Defendants will be willing to pay more to that

5    provider than it would otherwise.  The more Defendants agree to pay that provider,

6    the more Defendants' competitors must pay that provider.  And by raising the price

7    floor, Defendants keep other insurers' costs artificially high, forcing those insurers

8    to offset the higher costs by raising premiums.  As a result, and because of its

9    market power, Defendants can pass their own higher costs onto consumers through

10   higher premiums without fearing that their competitors will be able to reduce

11   premiums and draw consumers from Defendants.

12   123.   Third, MFNs raise barriers to entry in the market for commercial health insurance.

13   If a provider can reduce the price it charges an insurer with little to no market share

14   only by reducing the price it charges the market-dominant Defendants, the provider

15   has a strong incentive not to lower prices.  Without the ability to compete on price,

16   a new competitor will be unable to price below the Defendants and thus will be

17   unable to survive.

18   124.   Upon information and belief, the independent Blue Cross and Blue Shield licensees,

19   including Defendants, use MFNs to exploit the monopoly power they hold in their

20   respective Service Areas.  The independent Blue Cross and Blue Shield licensees

21   have coordinated their use of MFNs with other Blue entities.

22   125.   Defendants have market power in the sale of full-service commercial health

23   insurance to individuals and small groups in relevant geographic markets throughout

24   the State of California.

25               RELEVANT PRODUCT MARKET

26   126.   The relevant product market is the sale of full-service commercial health insurance

27   products to individuals and small groups.

28   127.   To properly define a health insurance product market, it is useful to consider the

33

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION



range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product.   The characteristics of different products are important factors in determining their substitutability.  For a health insurance product, important characteristics include:

a.   Commercial versus government health insurance: Unlike commercial health insurance products, government health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent.  Therefore, commercial health insurance and government health insurance programs are not substitutes.

b.   Full-service versus single-service health insurance: Full-service health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers. In contrast, single-service health insurance provides narrow coverage restricted to a specific type of health care, *e.g.*, dental care.  Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, e.g., dental care.  Thus, full-service health insurance and single-service health insurance are not substitutes.  Full-service commercial health insurance includes HMO products and PPO products, among others.  Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers.  Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors.  Economic research suggests that HMO and PPO health insurance products are substitutes.

c.   Fully-insured health insurance versus ASO products:  When a consumer purchases a fully-insured health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers.  In contrast, when a consumer purchases an administrative services only ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

d.   Individual, small group, and large group consumers:  Consumers of health insurance products include both individuals and groups, such as employers who select a plan to offer to their employees and typically pay a portion of

EXHIBIT ONE
PAGE042

their employees' premium. Group consumers are broken down into two categories, small group and large group, based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those with 200 or more employees. For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products. For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure. Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

e.  Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although California licenses companies to offer some type of health insurance in California, co-Defendant WellPoint alone had 29% of the commercial market share statewide, when combined with co-Defendants such as Blue Shield of California, it is much higher. In certain markets, the Blues command in excess of half the market. In Chico, co-Defendants WellPoint control 50% and Blue Shield of California controls 41, for a total Blues domination of 91%; in El Centro the Blues control 68%; Hartford-Corcoran 83%; Madera 67%; Redding 91%; Salinas 81%; San Luis Obispo 79%; Santa Barbara 67%; Santa Cruz 63%; and Visalia 80%.

### RELEVANT GEOGRAPHIC MARKETS

128. In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network. An insurer's provider network is composed of the health care providers with which it contracts. Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider. As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers. This suggests that health insurers compete in distinct geographic markets.

129. There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers

35

1   in California. The potentially relevant geographic markets could be defined

2   alternatively as (a) the entire state of California; (b) the 26 metropolitan statistical

3   areas, nine micropolitan statistical areas, and four combined statistical areas (into

4   two Metropolitan Statistical Areas) into which the U.S. Office of Management and

5   Budget divides the State of California. However the geographic market is defined,

6   the result is the same: Defendants have the dominant market position, and

7   exercises that market power.  In the 28 regional markets studied by the American

8   Medical Association, Defendants dominated ten regions as mentioned above, led

9   in market share in 18,  and was a close second in market share in twenty of the

10  regions.  There was not one region where a Defendant was not the first or second

11  holder of the largest market share.

12  130.  Defendants do business throughout the State of California, are licensed to use the

13  Blue Cross and Blue Shield trademarks and trade names throughout the State of

14  California and has agreed with the other member plans of BCBSA that only they will

15  do business in California under the Blue brand or association.  Therefore, the State

16  of California can be analyzed as a relevant geographic market within which to

17  assess the effects of Defendants' anti-competitive conduct.

18  131.  The U.S. Office of Management and Budget divides the counties of the state of

19  California into Metropolitan Statistical Areas and Micropolitan Statistical Areas

20  according to published standards applied to U.S. Census Bureau data. It states that

21  "[t]he general concept of a metropolitan or micropolitan statistical area is that of a

22  core area containing a substantial population nucleus, together with adjacent

23  communities having a high degree of economic and social integration with that

24  core." Therefore, each of California's 26 metropolitan statistical areas, nine

25  micropolitan statistical areas, four combined statistical areas, and the remaining

26  counties that are not part of Statistical Areas is a relevant geographic market within

27  which to assess the effects of Defendants' anti-competitive conduct.

28  132.  Defendants' powerful market share is far from the only evidence of its market

36

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

1      power.  As alleged below, Defendants' market power has significantly raised costs,

2      resulting in skyrocketing premiums for Defendants' enrollees.

3  133.  Moreover, Defendants' statewide share of the relevant product market has

4      increased each year despite its substantial premium increases.  Defendants' ability

5      to retain and increase enrollment while charging artificially inflated and

6      supra-competitive prices are evidence of its market power.

7                  INFLATED PREMIUMS CHARGED BY DEFENDANTS

8  134.  For at least the past ten years, Defendants' illegal anti-competitive conduct,

9      including its territorial market division agreements with the thirty-seven other

10      members of BCBSA, has increased health care costs in California, leading to

11      artificially-inflated and supra-competitive premiums for individuals and small groups

12      purchasing Defendants' full-service commercial health insurance in the relevant

13      geographic market(s).  Upon information and belief, Defendants' market power and

14      its use of MFNs and other anti-competitive practices in California have reduced the

15      amount of competition in the market and ensured that Defendants' few competitors

16      face higher costs than Defendants do. Without competition, and with the ability to

17      increase premiums without losing customers, Defendants face little pressure to

18      keep costs low.

19  135.  Over the past decade, Defendants generally raised individual and small group

20      premiums by amounts greater than the national average.  Most states regulate what

21      companies charge their residents for health insurance.  But in California, the

22      California Insurance Commissioner has no authority to stop the rate increases.

23  136.  These rising premiums have enabled Defendants to grow its surplus in excessive

24      amounts, which is an unusual practice for a self-described nonprofit organization.

25                          **CAUSES OF ACTION**

26  137.  **COUNT ONE.** (Horizontal Restraints – Allocation of Trade or Commerce in violation

27      of the Cartwright Act, §§16720, et seq., of the California Business and Professions

28      Code).  Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

37

138. The License Agreements, Membership Standards, and Guidelines agreed to by Defendants and BCBSA represent horizontal agreements entered into between Defendants amongst themselves and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

139. Each of the License Agreements, Membership Standards, and Guidelines entered into between Defendants amongst themselves and BCBSA represents an agreement, trust, combination of capital, skill or acts by two or more persons, within the meaning of the Cartwright Act.

140. Through the License Agreements, Membership Standards, and Guidelines, BCBSA and Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the Defendants within California as well as the thirty-eight BCBSA members. By so doing, Defendants and BCBSA (and its members) have conspired to restrain trade in violation of the Cartwright Act. These market allocation agreements are per se illegal under the aforesaid provisions.

141. The market allocation agreements entered into between Defendants amongst themselves and the thirty-seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anti-competitive.

142. Defendants have market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

143. Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

a. Reducing the number of health insurance companies competing with Defendants throughout California;

b. Unreasonably limiting the entry of competitor health insurance companies into California;

38

EXHIBIT ONE
PAGE046

c.   Allowing Defendants to maintain and enlarge its market power throughout California;

d.   Allowing Defendants to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

e.   Depriving consumers of health insurance of the benefits of free and open competition.

144.   The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

145.   The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of the Cartwright Act.

146.   As a direct and proximate result of Defendants continuing violations of the Cartwright Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to Defendants than they would have paid with increased competition and but for the violations of the Cartwright Act.

147.   Under Business and Professions Code §16750(a), Plaintiff and the Class seek treble damages and attorneys' fees.

148.   **COUNT TWO**.   (MFNs; Unreasonable Restraint of Trade in violation of the Cartwright Act, §§16720, et seq., of the California Business and Professions Code).

149.   Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

150.   Defendants have market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

151.   The provider agreements Defendants entered into with health care providers in California that contain MFN provisions are unreasonable restraints of trade, the purpose or effect of which is to restrain competition.  MFN provisions prohibit less favorable terms with Defendants' competitors, substantially lessening the competition and tending to create a monopoly.  Each of the Defendants' provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

39

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

a.  Raising the prices of health care services to commercial health insurers in competition with Defendants;

b.  Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial health insurance in competition with Defendants from obtaining competitive pricing from health care providers;

c.  Unreasonably restricting the ability of health care providers to offer to Defendants' competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest;

d.  Depriving consumers of health care services and health insurance of the benefits of free and open competition.

152.  Defendants' MFN agreements are a trust, combination of capital, skill or acts by two or more persons, within the meaning of the Cartwright Act, with an anticompetitive effect of the restraint outweighing any beneficial effect on competition as stated above.  Such restraint harmed Plaintiff and Defendants' conduct was a substantial factor in causing Plaintiff's harm and harm to the class she represents.

153.  The pro-competitive benefits, if any, of the Defendants' provider agreements containing MFN provisions do not outweigh the anti-competitive effects of the agreements.

154.  Each agreement between Defendants and a health care provider that contain an MFN unreasonably restrains trade in violation of Cartwright Act, §§16720, et seq., of the California Business and Professions Code.

155.  As a direct and proximate result of Defendants continuing violations of the Cartwright Act, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial.  These damages consist of having paid higher health insurance premiums to Defendants than they would have paid with increased competition and but for the violations of the Cartwright Act.

156.  Under Business and Professions Code §16750(a), Plaintiff and the Class seek treble damages and attorneys' fees.

157.  **COUNT THREE.**  (Willful Acquisition and Maintenance of a Monopoly in the

40

EXHIBIT ONE
PAGE048



1  Relevant Market for Private Health Insurance in violation of the Cartwright Act,

2  §16727 of the California Business and Professions Code).

3  158.  Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

4  159.  Defendants have monopoly power in the individual and small group full-service

5  commercial health insurance market in California.   This monopoly power is

6  evidenced by, among other things:

7  a.    Defendants' ability, upon information and belief, to enter into MFN
   agreements with providers, which evidences Defendants' ability to control
8        prices and exclude competitors;

9  b.    Defendants' high market share of the commercial health insurance market,
        including its increasing market share even as it has raised premiums.

10
   c.    Defendants have abused and continue to abuse its monopoly power in order
11       to maintain and enhance its market dominance by unreasonably restraining
        trade, thus artificially inflating the premiums it charges to consumers.

12
13  160.  Defendants' conduct constitutes unlawful monopolization and is unlawful

14  anti-competitive conduct in the relevant markets in violation of the §16727 of the

    Cartwright Act.
15
16  161.  As a direct and proximate result of Defendants continuing violations of the

17  Cartwright Act, Plaintiffs and other members of the Class have suffered injury and

    damages in an amount to be proven at trial.  These damages consist of having paid
18
19  higher health insurance premiums to Defendants than they would have paid with

    increased competition and but for the violations of the Cartwright Act.
20
21  162.  Under Business and Professions Code §16750(a), Plaintiff and the Class seek

    treble damages and attorneys' fees.
22
23  163.  **COUNT FOUR.**  (Willful Attempted Monopolization in the Relevant Market for

    Private Health Insurance in Violation of the Cartwright Act, §16727 of the California
24
25  Business and Professions Code).

26  164.  Plaintiff repeats and re-alleges the allegations in the foregoing paragraphs.

27  165.  Defendants have acted with the specific intent to monopolize the relevant markets.

28  166.  There was and is a dangerous possibility that Defendants will succeed in their

    attempt to monopolize the relevant markets because Defendants already control a

---
41

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

1    large percentage of those markets.  Further success by Defendants in excluding

2    competitors from those markets is an attempt to monopolize, or attempt to combine

3    or conspire to monopolize, will confer a monopoly for Defendants in violation of

4    §16727 of the Cartwright Act.

5    167.    Defendants' attempted monopolization of the relevant markets has harmed

6    competition in those markets and has caused injury to Plaintiffs and the Class.

7    Premiums charged by Defendants have been higher than they would have been in

8    a competitive market.

9    168.    Plaintiff and the Class have been damaged as the result of Defendants' attempted

10    monopolization of the relevant markets and seek treble damages.

11    169.    **COUNT FIVE.** (Unjust Enrichment).  Plaintiffs incorporate and re-allege each of the

12    foregoing paragraphs.

13    170.    Defendants have benefitted from their unlawful acts through the overpayments for

14    health insurance premiums by Plaintiff and the Class members.

15    171.    It would be inequitable for Defendants to retain the benefit of these overpayments

16    that were conferred by Plaintiff and the Class and retained by Defendants.

17    172.    By reason of its unlawful conduct, Defendants must make restitution to Plaintiff and

18    the Class.

19    173.    Further, any action which might have been taken by Plaintiff to pursue

20    administrative remedies would have been futile.  In equity, Defendants cannot retain

21    the economic benefits derived from their improper conduct and should be ordered

22    to pay restitution and prejudgement interest to Plaintiff and Class members.

23                          **PRAYER FOR RELIEF**

24    174.    WHEREFORE, Plaintiff prays:

25        a.    That the summons be issued and that Defendants be duly served with a
           copy of this Complaint and required to answer same, and that this Court
26           decree and enter judgment;

27        b.    That the Court determine that this action may be maintained as a class
           action under California Code of Civil Procedure §382 and appoint the Plaintiff
28           as representative of the Class;

//

42

**COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION**

EXHIBIT ONE
PAGE050

c.   That the Court adjudge and decree that Defendants have violated Cartwright Act, §§16720, et seq., of the California Business and Professions Code and award Plaintiffs and the Class appropriate damages and relief;

d.   That the Court award compensatory damages to Plaintiff and the Class resulting from the various acts of wrongdoing under the Cartwright Act in such amounts representing the losses reasonably suffered by Plaintiff and the Class, as well as any treble damages available under Business and Professions Code §16750(a);

e.   That the Court award Plaintiff her reasonable costs;

f.   That the Court render judgment that Defendants were unjustly enriched by their wrongful conduct, and award restitution to Plaintiff and the Class;

g.   That the Court award Plaintiff and the Class all available prejudgement and postjudgment interest, to the fullest extent available under law or equity;

h.   That the Court order such other, further and general relief as is just and proper.

Respectfully submitted,

YUHL | CARR LLP

James Carr, SBN 75357
jcarr@yuhlcarr.com
Tyler J. Barnett, SBN 223478
tbarnett@yuhlcarr.com
4676 Admiralty Way, Suite 550
Marina del Rey , California 90292
Telephone:  (310) 827-2800
Facsimile:   (310) 827-4200

---

43

COMPLAINT FOR VIOLATION OF CARTWRIGHT ACT – CLASS ACTION

CM-010

| **ATTORNEY OR PARTY WITHOUT ATTORNEY** (Name, State Bar number, and address): | **FOR COURT USE ONLY** |
|---|---|
| James P. Carr, Esq., SBN 75357; Tyler J. Barnett, Esq., SBN 223478 Yuhl Carr LLP 4676 Admiralty Way, Suite 550 Marina Del Rey, California 90292 | |

TELEPHONE NO.: (310) 827-2800    FAX NO.: (310) 827-4200
ATTORNEY FOR (Name): Plaintiff Judy Sheridan

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Central District

**FILED**
LOS ANGELES SUPERIOR COURT

MAR 29 2013

JOHN A. CLARKE, CLERK
BY AMBER HAYES, DEPUTY

CASE NAME:
Sheridan v. Blue Cross of California, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **BC504431** |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [✓] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint (not specified above) (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition (not specified above) (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [✓] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary   b. [✓] nonmonetary; declaratory or injunctive relief   c. [✓] punitive
4. Number of causes of action (specify): One - Violation of Cartwright Act (Bus. & Prof. Code Section 16720 et seq.
5. This case [✓] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 29, 2013

Tyler J. Barnett
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

EXHIBIT ONE
PAGE052



CM-010

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

EXHIBIT ONE
PAGE053

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | CASE NUMBER BC504431 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.**

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES   CLASS ACTION? ☑ YES   LIMITED CASE? ☐ YES   TIME ESTIMATED FOR TRIAL 30 ☐ HOURS/ ☑ DAYS

**Item II. Indicate** the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

| Applicable Reasons for Choosing Courthouse Location (see Column C below) |
|---|

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C**<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

ORIGINAL

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| Non-Personal Injury/ Property Damage/ Wrongful Death Tort | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| Employment | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| Contract | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| Real Property | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation        Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| Unlawful Detainer | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | CASE NUMBER |
|---|---|

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|
| Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus<br>☐ A6152  Writ - Mandamus on Limited Court Case Matter<br>☐ A6153  Writ - Other Limited Court Case Review | 2., 8.<br>2.<br>2. |
| Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| Antitrust/Trade Regulation (03) | ☑ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment<br>☐ A6160  Abstract of Judgment<br>☐ A6107  Confession of Judgment (non-domestic relations)<br>☐ A6140  Administrative Agency Award (not unpaid taxes)<br>☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax<br>☐ A6112  Other Enforcement of Judgment Case | 2., 9.<br>2., 6.<br>2., 9.<br>2., 8.<br>2., 8.<br>2., 8., 9. |
| RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only<br>☐ A6040  Injunctive Relief Only (not domestic/harassment)<br>☐ A6011  Other Commercial Complaint Case (non-tort/non-complex)<br>☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8.<br>2., 8.<br>1., 2., 8.<br>1., 2., 8. |
| Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment<br>☐ A6123  Workplace Harassment<br>☐ A6124  Elder/Dependent Adult Abuse Case<br>☐ A6190  Election Contest<br>☐ A6110  Petition for Change of Name<br>☐ A6170  Petition for Relief from Late Claim Law<br>☐ A6100  Other Civil Petition | 2., 3., 9.<br>2., 3., 9.<br>2., 3., 9.<br>2.<br>2., 7.<br>2., 3., 4., 8.<br>2., 9. |

Judicial Review — Provisionally Complex Litigation — Enforcement of Judgment — Miscellaneous Civil Complaints — Miscellaneous Civil Petitions

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | CASE NUMBER |
|---|---|
| | |

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON:  Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☑1. ☐2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>All Class Actions must be filed in Central District - Stanley Mosk Courthouse |
|---|---|
| CITY:                          STATE:             ZIP CODE: | |

**Item IV.** *Declaration of Assignment*: I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the <u>Stanley Mosk</u> courthouse in the <u>Central</u> District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: <u>March 29, 2013</u>

<u>(SIGNATURE OF ATTORNEY/FILING PARTY)</u>

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 4 of 4
EXHIBIT ONE
PAGE057

EXHIBIT 2



SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)
**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

MAR 29 2013

John A. Clarke, Executive Officer/Clerk
By Amber Hayes, Deputy

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

BLUE CROSS OF CALIFORNIA; BLUE CROSS OF SOUTHERN
CALIFORNIA; BLUE CROSS OF NORTHERN CALIFORNIA;

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

JUDY SHERIDAN,

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 o más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Los Angeles Superior Court<br><br>111 North Hill Street<br>Los Angeles, California 90012 | CASE NUMBER:<br>*(Número del Caso):* **B C 5 0 4 4 3 1** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James P. Carr, Esq. and Tyler J. Barnett, Esq., Yuhl Carr LLP, 4676 Admiralty
Way, Suite 550, Marina Del Rey, California 90292; (310) 827-2800

| DATE:<br>*(Fecha)* John A. Clarke | Clerk, by<br>*(Secretario)* Amber Hayes | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

MAR 29 2013

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify):

    under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Sheridan v. Blue Cross of California, et al. | |

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

☐ Plaintiff   ☑ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY; BLUE CROSS OF CALIFORNIA PARTNERSHIP PLAN, INC.; BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY; ANTHEM LIFE INSURANCE COMPANY; BLUE CROSS BLUE SHIELD ASSOCIATION; WELLPOINT, INC.; THE WELLPOINT COMPANIES OF CALIFORNIA, INC.; THE WELLPOINT COMPANIES, INC.; WELLPOINT CALIFORNIA SERVICES, INC.; WELLPOINT BEHAVIORAL HEALTH, INC.; CALIFORNIA PHYSICIANS' SERVICE; BLUE SHIELD OF CALIFORNIA LIFE & HEALTH INSURANCE COMPANY; and DOES 1 through 100, inclusive.

Page 1 of 1

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

EXHIBIT TWO
PAGE059

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
James P. Carr, Esq., SBN 75357, Tyler J. Barnett, Esq., SBN 223478
Yuki Carr LLP
4676 Admiralty Way, Suite 550
Marina Del Rey, California 90292
TELEPHONE NO. (310) 827-2800     FAX NO. (310) 827-4200
ATTORNEY FOR (Name): Plaintiff Judy Sheridan

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: Central District

CASE NAME:
Sheridan v. Blue Cross of California, et al.

FOR COURT USE ONLY

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

MAR 29 2013

John A. Clarke, Executive Officer/Clerk
By Amber Hayes, Deputy

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: BC504431 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT: |

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [✓] Large number of separately represented parties
b. [✓] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [✓] Substantial amount of documentary evidence
d. [✓] Large number of witnesses
e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [✓] monetary b. [✓] nonmonetary; declaratory or injunctive relief c. [✓] punitive
4. Number of causes of action (specify): One - Violation of Cartwright Act (Bus. & Prof. Code Section 16720 et seq.
5. This case [✓] is [ ] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: March 29, 2013
Tyler J. Barnett
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

EXHIBIT TWO
PAGE060

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)—Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) (if the
case involves an uninsured
motorist claim subject to
arbitration, check this item
instead of Auto)

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability (not asbestos or
toxic/environmental) (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip
and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination,
false arrest) (not civil
harassment) (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
(not medical or legal)
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract (not unlawful detainer
or wrongful eviction)
Contract/Warranty Breach–Seller
Plaintiff (not fraud or negligence)
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open
book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage (not provisionally
complex) (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property (not eminent
domain, landlord/tenant, or
foreclosure)

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) (if the case involves illegal
drugs, check this item; otherwise,
report as Commercial or Residential)

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
(arising from provisionally complex
case type listed above) (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment (non-
domestic relations)
Sister State Judgment
Administrative Agency Award
(not unpaid taxes)
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint (not specified
above) (42)
Declaratory Relief Only
Injunctive Relief Only (non-
harassment)
Mechanics Lien
Other Commercial Complaint
Case (non-tort/non-complex)
Other Civil Complaint
(non-tort/non-complex)

**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition (not specified
above) (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Page 2 of 3

EXHIBIT TWO
PAGE061

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | CASE NUMBER B C 5 0 4 4 3 1 |
|---|---|

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☑ YES    CLASS ACTION? ☑ YES  LIMITED CASE? ☐ YES  TIME ESTIMATED FOR TRIAL 30 ☐ HOURS/ ☑ DAYS

**Item II.** Indicate the correct district and courthouse location (4 steps – if you checked "Limited Case", skip to item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check <u>one</u> Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

> ### Applicable Reasons for Choosing Courthouse Location (see Column C below)
>
> 1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
> 2. May be filed in central (other county, or no bodily injury/property damage).
> 3. Location where cause of action arose.
> 4. Location where bodily injury, death or damage occurred.
> 5. Location where performance required or defendant resides.
> 6. Location of property or permanently garaged vehicle.
> 7. Location where petitioner resides.
> 8. Location wherein defendant/respondent functions wholly.
> 9. Location where one or more of the parties reside.
> 10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV. Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>(See Step 3 Above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other<br>Personal Injury<br>Property Damage<br>Wrongful Death<br>(23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

### CIVIL CASE COVER SHEET ADDENDUM
### AND STATEMENT OF LOCATION

Local Rule 2.0
Page 1 of 4

EXHIBIT TWO
PAGE062

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | | CASE NUMBER |
|---|---|---|

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1., 2., 3. |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2., 3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1., 2., 3. |
| | | ☐ A6109  Labor Commissioner Appeals | 10. |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2., 5. |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2., 5. |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1., 2., 5. |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 2., 5., 6. |
| | | ☐ A6012  Other Promissory Note/Collections Case | 2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1., 2., 3., 5. |
| | | ☐ A6031  Tortious Interference | 1., 2., 3., 5. |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation      Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2., 6. |
| | | ☐ A6032  Quiet Title | 2., 6. |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

EXHIBIT TWO
PAGE063

| SHORT TITLE: | CASE NUMBER |
|---|---|
| Sheridan v. Blue Cross of California, et al. | |

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons<br>-See Step 3 Above- |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☑ A6003  Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2., 9. |
| | | ☐ A6160  Abstract of Judgment | 2., 6. |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2., 3., 9. |
| | | ☐ A6123  Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190  Election Contest | 2. |
| | | ☐ A6110  Petition for Change of Name | 2., 7. |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100  Other Civil Petition | 2., 9. |

LACIV 109 (Rev. 03/11)    **CIVIL CASE COVER SHEET ADDENDUM**    Local Rule 2.0
LASC Approved 03-04    **AND STATEMENT OF LOCATION**    Page 3 of 4

EXHIBIT TWO
PAGE064

| SHORT TITLE: Sheridan v. Blue Cross of California, et al. | CASE NUMBER |
|---|---|

**Item III.** Statement of Location: Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., **Step 3** on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☑1. ☐2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>All Class Actions must be filed in Central District - Stanley Mosk Courthouse |
|---|---|
| CITY: | STATE: | ZIP CODE: |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the ___Stanley Mosk___ courthouse in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: March 29, 2013

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

EXHIBIT TWO
PAGE065

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT – CLASS ACTION CASES

B C 5 0 4 4 3 1

Case Number _____

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT
Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 3.3(e)).

| ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|
| Judge Elihu M. Berle | 323 | 1707 |
| Judge Lee Smalley Edmon | 322 | 1702 |
| Judge John Shepard Wiley, Jr. | 311 | 1408 |
| Judge Kenneth Freeman | 310 | 1412 |
| Judge Jane Johnson | 308 | 1415 |
| Judge Anthony J. Mohr | 309 | 1409 |
| Judge William F. Highberger | 307 | 1402 |

## Instructions for handling Class Action Civil Cases

The following critical provisions of the Chapter Three Rules, as applicable in the Central District, are summarized for your assistance.

**APPLICATION**
The Chapter Three Rules were effective January 1, 1994. They apply to all general civil cases.

**PRIORITY OVER OTHER RULES**
The Chapter Three Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

**CHALLENGE TO ASSIGNED JUDGE**
A challenge under Code of Civil Procedure section 170.6 must be made 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

**TIME STANDARDS**
Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS**: All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS**: Without leave of court first being obtained, no cross complaint may be filed by any party after their answer is filed. Cross complaints shall be served within 30 days of the filing date and proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

**FINAL STATUS CONFERENCE**
The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

**SANCTIONS**
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

This is not a complete delineation of the Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under the Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.

Given to Plaintiff/Cross-Complainant/Attorney of Record on _____.          JOHN A. CLARKE, Executive Officer/Clerk

By _____ , Deputy Clerk

# EXHIBIT 3

1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JUDY SHERIDAN, | ) | Case No. |
| Plaintiff, | ) | |
| vs. | ) | |
| Blue Cross of California; Blue Cross of Southern California; Blue Cross of Northern California; Anthem Blue Cross Life and Health Insurance Company; Blue Cross of California Partnership Plan, Inc.; Blue Shield of California Life & Health Insurance Company; Anthem Life Insurance Company; Blue Cross and Blue Shield Association; WellPoint, Inc.; the WellPoint Companies of California, Inc.; the WellPoint Companies, Inc.; WellPoint California Services, Inc.; WellPoint Behavioral Health Inc.; California Physicians' Service; Blue Shield of California Life & Health Insurance Company; and DOES 1-100, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DECLARATION OF JAY KING** |
| Defendants. | ) | |

Jay King, being duly sworn, states the following:

1.     I have been employed by WellPoint Inc. for 13 years. Currently, I am Regional Vice President, Financial Planning & Analysis for California Local Business.

2.     As part of my regular duties, I work with information related to WellPoint

1   subsidiaries' membership and other business records. The information provided in this

2   declaration is based on knowledge I obtained from these sources during the course of

3   my employment.

4   3.      As of March 31, 2013, the WellPoint subsidiaries operating in California had

5   more than 6,308,000 members in all categories of its commercial medical insurance

6   business, including individual, small group, and large group.

7   4.      The membership of WellPoint subsidiaries operating in California in the

8   individual, small group, and large group commercial medical insurance plans was

9   greater than 6,124,000 for every year from 2009 to 2013, with a high of more than

10   6,391,000 members in 2011.

11   5.      In addition, WellPoint, Inc. is the parent company of Blue Plans operating in

12   fourteen states across the country.  As of March 31, 2013, these Blue Plans are

13   comprised of over 22,357,000 members.

14

15          I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that

16   the foregoing is true and correct to the best of my knowledge and belief.

17   DATED: April 26, 2013                    By:_____

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT THREE
PAGE068

# EXHIBIT 4

1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11   JUDY SHERIDAN,                        )   Case No.
                                           )
12                   Plaintiff,            )
                                           )
13        vs.                              )
                                           )
14   Blue Cross of California; Blue Cross of )   **DECLARATION OF LESLIE**
     Southern California; Blue Cross of Northern )   **CRAWFORD**
15   California; Anthem Blue Cross Life and )
     Health Insurance Company; Blue Cross of )
16   California Partnership Plan, Inc.; Blue Shield )
     of California Life & Health Insurance )
17   Company; Anthem Life Insurance Company; )
     Blue Cross and Blue Shield Association; )
18   WellPoint, Inc.; the WellPoint Companies of )
     California, Inc.; the WellPoint Companies, )
19   Inc.; WellPoint California Services, Inc.; )
     WellPoint Behavioral Health Inc.; California )
20   Physicians' Service; Blue Shield of )
     California Life & Health Insurance )
21   Company; and DOES 1-100, )
                                           )
22                   Defendants.           )

23

24        I, Leslie Crawford, being duly sworn, state the following:

25   1.        I have been employed by California Physicians' Service d/b/a Blue Shield of

26   California ("Blue Shield") for 42 years. Currently, I am a litigation specialist in the

27   Law Department of Blue Shield, a defendant in this action.

28   2.        As part of my regular duties, I work with information related to Blue Shield's

---

1    membership and other business records. The information provided in this declaration

2    is based on knowledge I obtained from these sources during the course of my

3    employment.

4    3.      As of March 31, 2013, Blue Shield had more than 2,200,000 members in all

5    categories of its business, including individual, small group, and large group.

6    4.      As of March 31, 2013, Blue Shield had more than 1,800,000 members in

7    individual, small group (2-50 eligible employees), and large group commercial health

8    plans, including ASO plans.

9    5.      Blue Shield's membership in the individual and small group commercial health

10   plans was greater than 200,000 for every year from 2009 to 2013, with a high of more

11   than 450,000 members in January 2009.

12          I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that

13   the foregoing is true and correct to the best of my knowledge and belief.

14

15   DATED: April 29, 2013                      By: _Leslie Crawford_____

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5

1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

10

CENTRAL DISTRICT OF CALIFORNIA

11
JUDY SHERIDAN,                                  ) Case No.
                                                )
12                  Plaintiff,                   )
                                                )
13      vs.                                      )
                                                )
14 Blue Cross of California; Blue Cross of       ) **DECLARATION OF LESLIE**
   Southern California; Blue Cross of Northern   ) **CRAWFORD**
15 California; Anthem Blue Cross Life and        )
   Health Insurance Company; Blue Cross of       )
16 California Partnership Plan, Inc.; Blue Shield)
   of California Life & Health Insurance         )
17 Company; Anthem Life Insurance Company;       )
   Blue Cross and Blue Shield Association;       )
18 WellPoint, Inc.; the WellPoint Companies of   )
   California, Inc.; the WellPoint Companies,    )
19 Inc.; WellPoint California Services, Inc.;    )
   WellPoint Behavioral Health Inc.; California  )
20 Physicians' Service; Blue Shield of           )
   California Life & Health Insurance            )
21 Company; and DOES 1-100,                      )
                                                )
22                  Defendants.                  )
   _____)
23

24

        I, Leslie Crawford, being duly sworn, state the following:
25
   1.      I have been employed by California Physicians' Service d/b/a Blue Shield of
26
   California ("Blue Shield") for 42 years. Currently, I am a litigation specialist for Blue
27
   Shield and for its wholly owned subsidiary, Blue Shield of California Life & Health
28

---

DECLARATION OF LESLIE CRAWFORD                          EXHIBIT FIVE
                                                        PAGE071

1   Insurance Company ("Blue Shield Life"), a defendant in this action.

2   2.      As part of my regular duties, I work with information related to Blue Shield

3   Life's membership and other business records. The information provided in this

4   declaration is based on knowledge I obtained from these sources during the course of

5   my employment.

6   3.      As of March 31, 2013, Blue Shield Life had more than 716,000 members in all

7   categories of its business, including individual, small group (2-50 eligible employees),

8   and large group.

9   4.      As of March 31, 2013, Blue Shield Life had more than 597,000 members in

10  individual, small group (2-50 eligible employees), and large group commercial

11  insurance plans.

12  5.      Blue Shield Life's membership in the individual and small group (2-50 eligible

13  employees) commercial insurance plans was greater than 250,000 for every year from

14  2009 to 2013, with a high of more than 598,000 members in December 2012.

15          I hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that

16  the foregoing is true and correct to the best of my knowledge and belief.

17
18  DATED: April 29, 2013                  By:___*Leslie Crawford*_____

19

20

21

22

23

24

25

26

27

28

2