# Exhibit 3

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:15-cv-03963-PBT

| | |
|---|---|
| CONWAY et al v.BLUE CROSS AND BLUE SHIELD OF ALABAMA et al | Date Filed: 07/17/2015 |
| | Jury Demand: None |
| Assigned to: CHIEF JUDGE PETRESE B. TUCKER | Nature of Suit: 410 Other Statutes: Anti-Trust |
| Cause: 15:15 Antitrust Litigation | Jurisdiction: Federal Question |

**Plaintiff**

**JERRY L. CONWAY**      represented by   **JOHN A. CORR**
*D.C.*                                    STARK & STARK PC
                                          777 TOWNSHIP LINE RD
                                          SUITE 120
                                          YARDLEY, PA 19067-5559
                                          267-759-9687
                                          Email: jcorr@stark-stark.com
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **STEPHEN A. CORR**
                                          STARK & STARK PC
                                          777 TOWNSHIP LINE ROAD
                                          SUITE 120
                                          YARDLEY, PA 19067
                                          267-759-9684
                                          Email: scorr@stark-stark.com
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**COREY MUSSELMAN**      represented by   **JOHN A. CORR**
*M.D.*                                    (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **STEPHEN A. CORR**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE SAN ANTONIO ORTHOPAEDIC GROUP, L.L.P.**

    represented by  **STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ORTHOPAEDIC SURGERY CENTER OF SAN ANTONIO, L.P.**

    represented by  **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES H. CLARK, III**
*M.D.*

    represented by  **STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CRENSHAW COMMUNITY HOSPITAL**

    represented by  **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BULLOCK COUNTY HOSPITAL**

    represented by  **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

    represented by  **JOHN A. CORR**
(See above for address)

**FAIRHOPE COSMETIC**
**DENTISTRY AND FRESH**
**BREATH CENTER, P.C.**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SPORTS AND ORTHO, P.C.**          represented by **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**KATHLEEN CAIN**          represented by **JOHN A. CORR**
*M.D.*                                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORTHWEST FLORIDA**          represented by **JOHN A. CORR**
**SURGERY CENTER, L.L.C.**                        (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WINI HAMILTON**          represented by **JOHN A. CORR**
*D.C.*                                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

STEPHEN A. CORR
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORTH JACKSON**          represented by   **JOHN A. CORR**
**PHARMACY, INC.**                          (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            STEPHEN A. CORR
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**NEUROMONITORING**        represented by   **JOHN A. CORR**
**SERVICE OF AMERICA, INC.**                (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            STEPHEN A. CORR
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CASON T. HUND**          represented by   **JOHN A. CORR**
*D.M.D.*                                    (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            STEPHEN A. CORR
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**PRO REHAB, P.C.**        represented by   **JOHN A. CORR**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **STEPHEN A. CORR**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEXAS PHYSICAL THERAPY, P.C.**                  represented by   **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BREAKTHROUGH PHYSICAL THERAPY, INC.**            represented by   **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DUNN PHYSICAL THERAPY, INC.**                    represented by   **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GASPAR PHYSICAL THERAPY, P.C.**                  represented by   **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TIMOTHY H. HENDLIN**          represented by **JOHN A. CORR**
*D.C.*                                           (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GREATER BRUNSWICK**          represented by **JOHN A. CORR**
**PHYSICAL THERAPY, P.A.**                       (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES BARNWELL**           represented by **JOHN A. CORR**
*D.C.*                                           (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BRAIN AND SPINE, L.L.C.**    represented by **JOHN A. CORR**
                                                (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

                                represented by

**HERITAGE MEDICAL
PARTNERS, L.L.C.**

JOHN A. CORR
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

STEPHEN A. CORR
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JUDITH KANZIC**
*D.C.*

represented by   JOHN A. CORR
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

STEPHEN A. CORR
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BRIAN ROADHOUSE**
*D.C.*

represented by   JOHN A. CORR
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

STEPHEN A. CORR
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JULIE MCCORMICK, M.D.,
L.L.C.**

represented by   JOHN A. CORR
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

STEPHEN A. CORR
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HARBIR MAKIN**
*M.D.*

represented by   JOHN A. CORR
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAKET K. AMBASHT**          represented by    **JOHN A. CORR**
*M.D.*                                          (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN M. NOLTE**            represented by    **JOHN A. CORR**
*M.D.*                                          (See above for address)
                                                *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**BAUMAN CHIROPRACTIC**      represented by    **JOHN A. CORR**
**CLINIC OF NORTHWEST**                         (See above for address)
**FLORIDA, P.A.**                               *LEAD ATTORNEY*
                                                *ATTORNEY TO BE NOTICED*

                                                **STEPHEN A. CORR**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOSEPH S. FEREZY**         represented by    **JOHN A. CORR**
*D.C.*                                          (See above for address)
*doing business as*                             *LEAD ATTORNEY*
FEREZY CLINIC OF                                *ATTORNEY TO BE NOTICED*

CHIROPRACTIC AND
NEUROLOGY

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SNOWDEN OLWAN**
**PSYCHOLOGICAL**
**SERVICES**

represented by **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EAR, NOSE & THROAT**
**CONSULTANTS AND**
**HEARING SERVICES, P.L.C.**

represented by **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**U.S. IMAGING NETWORK,**
**L.L.C.**
*ON BEHALF OF THEMSELVES*
*AND ALL OTHER SIMILARLY*
*SITUATED*
*doing business as*
IMAGING NETWORK
ADMINISTRATORS, L.L.C.

represented by **JOHN A. CORR**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN A. CORR**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BLUE CROSS AND BLUE**
**SHIELD OF ALABAMA**

**Defendant**

**ANTHEM, INC.**

**Defendant**

**HEALTH CARE SERVICE
CORPORATION**

**Defendant**

**CAMBIA HEALTH
SOLUTIONS, INC.**

**Defendant**

**CAREFIRST, INC.**

**Defendant**

**PREMERA BLUE CROSS**

**Defendant**

**PREMERA BLUE CROSS
AND BLUE SHIELD OF
ALASKA**

**Defendant**

**BLUE CROSS BLUE SHIELD
OF ARIZONA, INC.**

**Defendant**

**USABLE MUTUAL
INSURANCE COMPANY**
*doing business as*
ARKANSAS BLUE CROSS
AND BLUE SHIELD

**Defendant**

**BLUE CROSS OF
CALIFORNIA**
*doing business as*
ANTHEM BLUE CROSS

**Defendant**

**CALIFORNIA PHYSICIANS'
SERVICE, INC.**
*doing business as*

BLUE SHIELD OF
CALIFORNIA

**Defendant**

**ROCKY MOUNTAIN
HOSPITAL & MEDICAL
SERVICE, INC.**
*doing business as*
ANTHEM BLUE CORSS AND
BLUE SHIELD OF COLORADO

**Defendant**

**ANTHEM HEALTH PLANS,
INC.**
*doing business as*
ANTHEM BLUE CORSS AND
BLUE SHIELD OF
CONNECTICUT

**Defendant**

**HIGHMARK, INC.**

**Defendant**

**HIGHMARK BCBSD, INC.**
*doing business as*
HIGHMARK BLUE CROSS
AND BLUE SHIELD
DELAWARE

**Defendant**

**GROUP HOSPITALIZATION
AND MEDICAL SERVICES,
INC.**
*doing business as*
CAREFIRST BLUECROSS
BLUESHIELD

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF FLORIDA, INC.**

**Defendant**

**BLUE CROSS BLUE SHIELD
OF GEORGIA, INC.**

**Defendant**

**HAWAII MEDICAL SERVICE
ASSOCIATION**

**Defendant**

**BLUE CROSS OF IDAHO
HEALTH SERVICE, INC.**

**Defendant**

**REGENCE BLUESHIELD OF
IDAHO, INC.**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF ILLINOIS**

**Defendant**

**ANTHEM INSURANCE
COMPANIES, INC.**
*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF INDIANA

**Defendant**

**WELLMARK, INC.**
*doing business as*
WELLMARK BLUE CROSS
AND BLUE SHIELD OF IOWA

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF KANSAS, INC.**

**Defendant**

**ANTHEM HEALTH PLANS
OF KENTUCKY, INC.**
*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF KENTUCKY

**Defendant**

**LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY**
*doing business as*
BLUE CROSS AND BLUE SHIELD OF LOUISIANA

**Defendant**

**ANTHEM HEALTH PLANS OF MAINE, INC.**
*doing business as*
ANTHEM BLUE CROSS AND BLUE SHIELD OF MAINE

**Defendant**

**CAREFIRST OF MARYLAND, INC.**
*doing business as*
CAREFIRST BLUECROSS BLUESHIELD

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MICHIGAN**

**Defendant**

**BCBSM, INC.**
*doing business as*
BLUE CROSS AND BLUE SHIELD OF MINNESOTA

**Defendant**

**BLUE CROSS BLUE SHIELD OF MISSISSIPPI**

**Defendant**

**HMO MISSOURI, INC.**
*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF MISSOURI

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF KANSAS CITY**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF MONTANA**

**Defendant**

**CARING FOR MONTANANS,
INC.**
*formerly known as*
BLUE CROSS AND BLUE
SHIELD OF MONTANA, INC.

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF NEBRASKA**

**Defendant**

**ANTHEM BLUE CROSS AND
BLUE SHIELD OF NEVADA**

**Defendant**

**ANTHEM HEALTH PLANS
OF NEW HAMPSHIRE, INC.**
*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF NEW
HAMPSHIRE

**Defendant**

**HORIZON HEALTH CARE
SERVICES, INC.**
*doing business as*
HORIZON BLUE CROSS AND

BLUE SHIELD OF NEW
JERSEY

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF NEW MEXICO**

**Defendant**

**HEALTHNOW OF NEW
YORK, INC.**

**Defendant**

**BLUE SHIELD OF
NORTHEASTERN NEW
YORK**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF WESTERN NEW
YORK, INC.**

**Defendant**

**EMPIRE HEALTHCHOICE
ASSURANCE, INC.**
*doing business as*
EMPIRE BLUE CROSS BLUE
SHIELD

**Defendant**

**EXCELLUS HEALTH PLAN,
INC.**
*doing business as*
EXCELLUS BLUECROSS
BLUESHIELD

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF NORTH
CAROLINA, INC.**

**Defendant**

**NORIDIAN MUTUAL
INSURANCE COMPANY**
*doing business as*
BLUE CROSS BLUE SHIELD
OF NORTH DAKOTA

**Defendant**

**COMMUNITY INSURANCE
COMPANY, INC.**
*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF OHIO

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF OKLAHOMA**

**Defendant**

**REGENCE BLUECROSS
BLUESHIELD OF OREGON**

**Defendant**

**HOSPITAL SERVICE
ASSOCIATION OF
NORTHEASTERN
PENNSYLVANIA**
*doing business as*
BLUE CROSS OF
NORTHEASTERN
PENNSYLVANIA

**Defendant**

**CAPITAL BLUE CROSS**

**Defendant**

**HIGHMARK HEALTH
SERVICES, INC.**
*doing business as*
HIGHMARK BLUE CROSS
BLUE SHIELD
*doing business as*
HIGHMARK BLUE SHIELD

**Defendant**

**INDEPENDENCE BLUE
CROSS**

**Defendant**

**TRIPLE-S SALUD, INC.**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF RHODE ISLAND**

**Defendant**

**BLUECROSS BLUESHIELD
OF SOUTH CAROLINA, INC.**

**Defendant**

**WELLMARK OF SOUTH
DAKOTA, INC.**
*doing business as*
WELLMARK BLUE CROSS
AND BLUE SHIELD OF
SOUTH DAKOTA

**Defendant**

**BLUECROSS BLUESHIELD
OF TENNESSEE, INC.**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF TEXAS**

**Defendant**

**REGENCE BLUECROSS
BLUESHIELD OF UTAH**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD OF VERMONT**

**Defendant**

**ANTHEM HEALTH PLANS
OF VIRGINA, INC.**

*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF VIRGINIA,
INC.

**Defendant**

**REGENCE BLUESHIELD**

**Defendant**

**HIGHMARK WEST
VIRGINIA, INC.**
*doing business as*
HIGHMARK BLUE CROSS
BLUE SHIELD WEST
VIRGINIA

**Defendant**

**BLUE CROSS BLUE SHIELD
OF WISCONSIN**
*doing business as*
ANTHEM BLUE CROSS AND
BLUE SHIELD OF WISCONSIN

**Defendant**

**BLUE CROSS BLUE SHIELD
OF WYOMING**

**Defendant**

**CONSORTIUM HEALTH
PLANS, INC.**

**Defendant**

**NATIONAL ACCOUNT
SERVICE COMPANY, L.L.C.**

**Defendant**

**BLUE CROSS AND BLUE
SHIELD ASSOCIATION**

| Date Filed | # | Docket Text |
|---|---|---|
| 07/17/2015 | 1 | |

COMPLAINT *against All Defendants* against All Plaintiffs ( Filing fee $ 400 receipt number 0313-10737155.), filed by Joseph S. Ferezy, DC, Bauman Chiropractic Clinic of Northwest Florida, PA, Timothy H. Hendlin, Bullock County Hospital, Judith Kanzic, BreakThrough Physical Therapy, Inc., ProRehab, PC, Brian Roadhouse, DC, Gaspar Physical Therapy, PC, Kathleen Cain, John M. Nolte, MD, Ear, Nose, & Throat Consultants and Hearing Services, PLC, Northwest Florida Surgery Center, LLC, Harbir Makin, MD, Wini Hamilton, Cason T. Hund, Dunn Physical Therapy, Inc., Musselman Corey, Texas Physical Therapy Specialists, LLC, Conway L. Jerry, Saket K. Ambasht, MD, Heritage Medical Partners, LLC, Julie McCormick, MD, LLC, Neuromonitoring Services of America, Inc., Brain and Spine, LLC, Greater Brunswick Physical Therapy, PA, North Jackson Pharmacy, Inc., Charles Barnwell, Crenshaw Community Hospital, The San Antonio Orthopedic Group, LLP, U. S. Imaging Network, LLC, Sports and Ortho, PC, Fairhope Cosmetic Dentistry and Fresh Breath Center, PC, Orthopedic Surgery Center of San Antonio, LP, Snowden Olwan Psychological Services, Charles H. Clark, III. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit Complaint Attachment A)(CORR, STEPHEN) (Entered: 07/17/2015)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/20/2015 14:47:44 | | | |
| **PACER Login:** | wk1077:3963846:3961340 | **Client Code:** | 07495-0000 |
| **Description:** | Docket Report | **Search Criteria:** | 2:15-cv-03963-PBT |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA DIVISION**

| | |
|---|---|
| Jerry L. Conway, D.C., ) | **CLASS ACTION COMPLAINT** |
| Corey Musselman, M.D., ) | |
| The San Antonio Orthopaedic Group, L.L.P., ) | |
| Orthopaedic Surgery Center of San ) | |
|   Antonio, L.P., ) | |
| Charles H. Clark III, M.D., ) | |
| Crenshaw Community Hospital, ) | |
| Bullock County Hospital, ) | |
| Fairhope Cosmetic Dentistry and Fresh ) | |
|   Breath Center, P.C., ) | |
| Sports and Ortho, P.C., ) | |
| Kathleen Cain, M.D., ) | |
| Northwest Florida Surgery Center, L.L.C., ) | |
| Wini Hamilton, D.C., ) | |
| North Jackson Pharmacy, Inc., ) | |
| Neuromonitoring Services of America, Inc. ) | |
| Cason T. Hund, D.M.D., ) | |
| ProRehab, P.C., ) | |
| Texas Physical Therapy Specialists, L.L.C., ) | |
| BreakThrough Physical Therapy, Inc., ) | |
| Dunn Physical Therapy, Inc., ) | |
| Gaspar Physical Therapy, P.C., ) | |
| Timothy H. Hendlin, D.C., ) | |
| Greater Brunswick Physical Therapy, P.A., ) | |
| Charles Barnwell, D.C., ) | |
| Brain and Spine, L.L.C., ) | |
| Heritage Medical Partners, L.L.C., ) | |
| Judith Kanzic, D.C., ) | |
| Brian Roadhouse, D.C., ) | |
| Julie McCormick, M.D., L.L.C., ) | |
| Harbir Makin, M.D., ) | |
| Saket K. Ambasht, M.D., ) | |
| John M. Nolte, M.D., ) | |
| Bauman Chiropractic Clinic of Northwest ) | |
|   Florida, P.A., ) | |
| Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of ) | |
|   Chiropractic and Neurology, ) | |
| Snowden Olwan Psychological Services, ) | |
| Ear, Nose & Throat Consultants and Hearing ) | |
|   Services, P.L.C., ) | |
| and ) | |

U.S. Imaging Network, L.L.C. d/b/a      )
  Imaging Network Administrators, L.L.C. )
on behalf of themselves and all others similarly )
situated, )
         )
            **Plaintiffs,** )
         )
**v.** )
         )
Blue Cross and Blue Shield of Alabama, )
Anthem, Inc., )
Health Care Service Corporation, )
Cambia Health Solutions, Inc., )
CareFirst, Inc., )
Premera Blue Cross, )
Premera Blue Cross and Blue Shield of Alaska, )
Blue Cross Blue Shield of Arizona, Inc., )
USAble Mutual Insurance Company, d/b/a )
  Arkansas Blue Cross and Blue Shield, )
Blue Cross of California d/b/a Anthem Blue )
  Cross, )
California Physicians' Service, Inc. d/b/a Blue )
  Shield of California, )
Rocky Mountain Hospital and Medical )
  Service, Inc., d/b/a Anthem Blue Cross and )
  Blue Shield of Colorado, )
Anthem Health Plans, Inc. d/b/a Anthem Blue )
  Cross and Blue Shield of Connecticut, )
Highmark, Inc., )
Highmark BCBSD, Inc. d/b/a Highmark Blue )
  Cross and Blue Shield Delaware, )
Group Hospitalization and Medical )
  Services, Inc. d/b/a CareFirst BlueCross )
  BlueShield, )
Blue Cross and Blue Shield of Florida, Inc., )
Blue Cross and Blue Shield of Georgia, Inc., )
Hawaii Medical Service Association d/b/a )
  Blue Cross and Blue Shield of Hawaii, )
Blue Cross of Idaho Health Service, Inc., )
Regence BlueShield of Idaho, Inc., )
Blue Cross and Blue Shield of Illinois, )
Anthem Insurance Companies, Inc. d/b/a )
  Anthem Blue Cross and Blue Shield of Indiana, )
Wellmark, Inc. d/b/a/ Wellmark Blue Cross )
  and Blue Shield of Iowa, )
Blue Cross and Blue Shield of Kansas, Inc. )

Anthem Health Plans of Kentucky, Inc.                )
  d/b/a Anthem Blue Cross and Blue Shield       )
  of Kentucky,                                   )
Louisiana Health Service and Indemnity               )
  Company d/b/a/ Blue Cross and Blue Shield     )
  of Louisiana,                                  )
Anthem Health Plans of Maine, Inc.,                  )
  d/b/a Anthem Blue Cross and Blue Shield        )
  of Maine,                                      )
CareFirst of Maryland, Inc. d/b/a CareFirst          )
  BlueCross BlueShield,                          )
Blue Cross and Blue Shield of Massachusetts,         )
  Inc.,                                          )
Blue Cross and Blue Shield of Michigan,              )
BCBSM, Inc. d/b/a/ Blue Cross and Blue               )
  Shield of Minnesota,                           )
Blue Cross Blue Shield of Mississippi,               )
HMO Missouri, Inc. d/b/a Anthem Blue                 )
  Cross and Blue Shield of Missouri,             )
Blue Cross and Blue Shield of Kansas City, Inc.,     )
Blue Cross and Blue Shield of Montana,               )
Caring for Montanans, Inc. f/k/a                     )
  Blue Cross and Blue Shield of Montana, Inc.    )
Blue Cross and Blue Shield of Nebraska,              )
Anthem Blue Cross and Blue Shield of Nevada,         )
Anthem Health Plans of New Hampshire, Inc.           )
  d/b/a Anthem Blue Cross and Blue Shield of     )
  New Hampshire,                                 )
Horizon Health Care Services, Inc. d/b/a             )
  Horizon Blue Cross and Blue Shield of          )
  New Jersey,                                    )
Blue Cross and Blue Shield of New Mexico,            )
HealthNow New York, Inc.,                            )
Blue Shield of Northeastern New York,                )
Blue Cross and Blue Shield of Western                )
  New York, Inc.                                 )
Empire HealthChoice Assurance, Inc. d/b/a            )
  Empire Blue Cross Blue Shield,                 )
Excellus Health Plan, Inc. d/b/a Excellus            )
  BlueCross BlueShield,                          )
Blue Cross and Blue Shield of North Carolina,        )
  Inc.,                                          )
Noridian Mutual Insurance Company d/b/a              )
  Blue Cross Blue Shield of North Dakota,        )
Community Insurance Company d/b/a Anthem             )
  Blue Cross and Blue Shield of Ohio,            )

Blue Cross and Blue Shield of Oklahoma,                    )
Regence BlueCross BlueShield of Oregon,                    )
Hospital Service Association of Northeastern               )
  Pennsylvania d/b/a Blue Cross of Northeastern  )
  Pennsylvania,                                   )
Capital Blue Cross,                                        )
Highmark Health Services, Inc. d/b/a Highmark              )
  Blue Cross Blue Shield and d/b/a Highmark       )
  Blue Shield,                                    )
Independence Blue Cross,                                   )
Triple-S Salud, Inc.,                                      )
Blue Cross and Blue Shield of Rhode Island,                )
BlueCross BlueShield of South Carolina  Inc.,              )
Wellmark of South Dakota, Inc. d/b/a Wellmark              )
  Blue Cross and Blue Shield of South Dakota,     )
BlueCross BlueShield of Tennessee, Inc.,                   )
Blue Cross and Blue Shield of Texas,                       )
Regence BlueCross BlueShield of Utah,                      )
Blue Cross and Blue Shield of Vermont,                     )
Anthem Health Plans of Virginia, Inc. d/b/a                )
  Anthem Blue Cross and Blue Shield of           )
  Virginia, Inc.                                  )
Regence BlueShield,                                        )
Highmark West Virginia, Inc. d/b/a Highmark                )
  Blue Cross Blue Shield West Virginia,           )
Blue Cross Blue Shield of Wisconsin d/b/a                  )
  Anthem Blue Cross and Blue Shield of           )
  Wisconsin,                                      )
Blue Cross Blue Shield of Wyoming,                         )
Consortium Health Plans, Inc.,                             )
National Account Service Company, L.L.C. and               )
Blue Cross and Blue Shield Association,                    )
                                                           )
       Defendants.       )
_____

## CLASS ACTION COMPLAINT

Plaintiffs, Jerry L. Conway, D.C., Corey Musselman, M.D., The San Antonio

Orthopaedic Group, L.L.P., Orthopaedic Surgery Center of San Antonio, L.P., Charles H. Clark

III, M.D., Crenshaw Community Hospital, Bullock County Hospital, Fairhope Cosmetic

Dentistry and Fresh Breath Center, P.C., Sports and Ortho, P.C., Kathleen Cain, M.D.,

Northwest Florida Surgery Center, L.L.C., Wini Hamilton, D.C., North Jackson Pharmacy, Inc., Neuromonitoring Services of America, Inc., Cason T. Hund, D.M.D., ProRehab, P.C., Texas Physical Therapy Specialists, L.L.C., BreakThrough Physical Therapy, Inc., Dunn Physical Therapy, Inc., Gaspar Physical Therapy, P.C., Timothy H. Hendlin, D.C., Greater Brunswick Physical Therapy, P.A., Charles Barnwell, D.C., Brain and Spine, L.L.C., Heritage Medical Partners L.L.C., Judith Kanzic, D.C., Brian Roadhouse, D.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Saket K. Ambasht, M.D., John M. Nolte, M.D., Bauman Chiropractic Clinic of Northwest Florida, P.A., Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology, Snowden Olwan Psychological Services, Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and U.S. Imaging Network, L.L.C. d/b/a Imaging Network Administrators, L.L.C. (collectively "Plaintiffs" or "Provider Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Blue Cross and Blue Shield of Alabama, Anthem, Inc., Health Care Service Corporation, Cambia Health Solutions, Inc., CareFirst, Inc., Premera Blue Cross, Premera Blue Cross and Blue Shield of Alaska, Blue Cross Blue Shield of Arizona, Inc., USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield, Blue Cross of California d/b/a Anthem Blue Cross, California Physicians' Service, Inc. d/b/a Blue Shield of California, Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut, Highmark, Inc., Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, Group Hospitalization and Medical Services, Inc. d/b/a Carefirst BlueCross BlueShield, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Georgia, Inc., Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, Blue Cross of Idaho Health Service, Inc., Regence

BlueShield of Idaho, Inc., Blue Cross and Blue Shield of Illinois, Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Wellmark Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Inc., Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky, Louisiana Health Service and Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana, Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine, CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield, Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, BCBSM, Inc. d/b/a/ Blue Cross and Blue Shield of Minnesota, Blue Cross Blue Shield of Mississippi, HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City, Inc., Blue Cross and Blue Shield of Montana, Caring for Montanans, Inc. d/b/a Blue Cross and Blue Shield of Montana, Inc., Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and Blue Shield of Nevada, Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, Horizon Health Care Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, HealthNow New York Inc., Blue Shield of Northeastern New York, Blue Cross and Blue Shield of Western New York, Inc., Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield, Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, Blue Cross and Blue Shield of North Carolina, Inc., Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services, Inc. d/b/a/ Highmark Blue Cross

Blue Shield and d/b/a Highmark Blue Shield, Independence Blue Cross, Triple-S Salud, Inc., Blue Cross and Blue Shield of Rhode Island, BlueCross BlueShield of South Carolina, Inc., Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, BlueCross BlueShield of Tennessee, Inc., Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross and Blue Shield of Vermont, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., Regence BlueShield, Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin, Blue Cross Blue Shield of Wyoming (these independent Blue Cross Blue Shield licensees are referred to herein collectively, as "the Blues"), Consortium Health Plans, Inc., National Account Service Company, L.L.C., and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants" or "BCBS Defendants") allege violations of antitrust laws as follows:

## NATURE OF THE CASE

1.    Defendants, which are independent companies, have agreed with each other to carve the United States into "Service Areas" in which only one Blue can sell insurance, administer employee benefit plans or contract with healthcare providers (the "Market Allocation Conspiracy"). Defendants have engaged in a horizontal market allocation, which is illegal under a *per se*, quick look or rule of reason analysis. The *quid pro quo* for this illegal Market Allocation Conspiracy is a horizontal Price-Fixing and Boycott Conspiracy under which every other Blue gets the benefit of the artificially reduced prices that each Blue pays to healthcare providers. The Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs. The Market Allocation Conspiracy reduces the competition that each Blue faces and allows it to

7

reduce the prices that it pays to healthcare providers. The Price Fixing and Boycott Conspiracy fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices and further provides that the participating Blues will collectively boycott all Providers outside of their Service Areas.

2. Plaintiffs are providers of healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients are insured by the Blues or are included in employee benefit plans administered by the Blues.

3. Defendants are the Association and the Blues, their owners and affiliated companies, as well as companies through which they conduct their conspiracies. The Blues provide health insurance coverage (To eliminate any possible ambiguity, Provider Plaintiffs have always intended to include dental insurance and vision insurance as well as administrative services for employee benefit plans within the meaning of health insurance coverage for purposes of this amended complaint) for approximately 100 million people in the United States and, according to the BCBSA's own estimates, more than 91% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues. The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

4. In the claims related to the Market Allocation Conspiracy, Plaintiff healthcare providers challenge the explicit agreement reached by Defendants to divide the United States into what Defendants term "Service Areas" and then to allocate those geographic markets among the Blues, free of competition. In the claims related to the Price Fixing and Boycott Conspiracy, Plaintiffs also challenge the agreement reached by Defendants to fix prices for goods, services

and facilities rendered by healthcare providers such as Plaintiffs and to boycott the healthcare providers outside of their Service Areas.

5.     In furtherance of the Market Allocation Conspiracy, Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted.  Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

6.     The Blues, which are organized and operated independently, constitute potential competitors and, absent the Market Allocation Conspiracy, the Blues would, in fact, compete. The BCBSA readily admits on its own website that the Blues are "independent companies" that operate in "exclusive geographic areas." www.bcbsa/healthcare-news/press-center.com. Defendants' agreement to allocate markets is a horizontal restraint in violation of Section 1 of the Sherman Act.

7.     The Market Allocation Conspiracy has significantly decreased competition in the markets for healthcare financing including the markets for healthcare insurance and in the health services, all of which are discussed more fully below.  For example, Blue Cross and Blue Shield of Alabama controls access to more than 90% of privately insured or administered (in this amended complaint Plaintiffs will use insured to refer to administered as well as insured patients unless otherwise indicated) patients in the State of Alabama.   As a result of decreased competition, healthcare providers, including Plaintiffs, are paid much less than they would be absent the BCBS Market Allocation Conspiracy.  Healthcare providers who contract with the Blues are also subjected to less favorable terms than they would be absent the conspiracy.  The

BCBS Market Allocation Conspiracy is a *per se* violation, as well as being a violation under the quick look and rule of reason analysis of Section 1 of the Sherman Act.

8.      Defendants have further exploited the market dominance they have secured through the Market Allocation Conspiracy by entering into a Price Fixing and Boycott Conspiracy.  In furtherance of the Price Fixing and Boycott Conspiracy, each Defendant has agreed to participate in each national program that the Blues adopt, including the Blue Card Program and the National Accounts Programs.  The Blue Card Program applies when a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant.  In the Blue Card Program the subscriber's Blue is the Home Plan and the Defendant Blue with the Service Area where the healthcare goods, services or facilities are provided is the Host Plan.  The National Accounts Programs function in a similar manner. National Accounts Programs generally apply to employee benefit plans with subscribers in multiple states.  The Defendant Blue that administers the employee benefit plan is the Control Plan, and the other Blues in whose Service Areas where the subscribers receive healthcare goods, services or facilities are Participating Plans.  These Programs and others have been established by a horizontal agreement between the Blues.  The Blue Card Program is managed by a Committee of Blues sitting on the Inter-Plan Programs Committee.  The National Accounts Programs are either established based on horizontal agreements between the Blues or managed through the Blue Card Program.  The excess profits from these Programs are then divided among the Blues. The national programs including the Blue Card Program and the National Accounts Programs lock in the fixed, discounted reimbursement rates that each Defendant achieves through market dominance in its Service Area and makes those below-market rates available to all other Blues without the need for negotiation or contracting.  The other national programs add

to the Blues' market power and/or exclusive access to elements essential to competition. Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area. These fixed prices are then enforced through a horizontal agreement between the Blues. Under that horizontal agreement the Blues collectively enforce the fixed prices; the Host Plans and the Participating Plans recoup any payments that the Home or Control Plans make above the fixed prices. Part of the agreement for the participation in the National Accounts Program is that each Control Blue will not negotiate directly with providers outside its Service Area except in a contiguous area. As a result, a healthcare provider who renders services or supplies goods or facilities to a patient who is insured or administered by a Defendant in another Service Area receives significantly lower reimbursement than the healthcare provider would receive absent the Price Fixing and Boycott Conspiracy. The BCBS Price Fixing and Boycott Conspiracy is a violation of Section 1 of the Sherman Act under a *per se*, quick look and/or rule of reason analysis.

9.     One goal of the Blues' actions is to create or maintain monopsonies in the markets for health care services, and thus the Blues have conspired to monopsonize those markets. In many geographic areas, the Blues have successfully created or maintained a monopsony, or have created a dangerous probability of achieving a monopsony. This conduct violates Section 2 of the Sherman Act.

10.     Defendants' actions have significantly injured Plaintiffs and other healthcare providers. Defendants' agreements have also harmed competition by decreasing the options available to healthcare consumers. Fewer health insurance companies are competing in each Service Area. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than competitive prices that the

11

Blues pay. Their output has been diminished. In addition, many hospitals and other healthcare facilities are closing or reducing services or are not expanding to provide additional services as a result of the Blues' low prices. The only beneficiaries of Defendants' antitrust violations are Defendants themselves. Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers.

## JURISDICTION, VENUE AND PERSONAL JURISDICTION

11.     Plaintiffs' federal antitrust claims are instituted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

12.     Several allegations in this complaint support this Court's personal jurisdiction over Defendants. First, some of the Defendants including Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, and Independence Blue Cross are headquartered and have contracted with providers in Pennsylvania. Second, all Defendants have significant business in and contacts with Pennsylvania through the national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of Defendants' subscribers who receive healthcare goods, services and facilities in Pennsylvania, in particular the Eastern District of Pennsylvania, and in terms of subscribers of Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, and Independence Blue Cross, who receive

treatment in Defendants' Service Areas with all the Defendants dividing revenue resulting from those goods, services and facilities. With respect to Defendants' subscribers who reside in Pennsylvania, Defendants intended to pay claims on behalf of these subscribers when they agreed to offer insurance or administrative services to employers with employees who reside in Puerto Rico. Third, all of the Defendants have conspired with Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, and Independence Blue Cross as described below, and Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, and Independence Blue Cross have taken overt acts in furtherance of those conspiracies in Pennsylvania, including paying providers at rates below competitive levels for services provided to subscribers of plans offered by Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, Independence Blue Cross, and other Defendants. By definition, Defendants have harmed competition by virtue of their conspiracy in that they have agreed not to compete with one another in each of the Blues' Service Areas. For instance, competition in Pennsylvania has been and continues to be harmed in that the other Blues agree not to compete with Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, and Independence Blue Cross.

13

13.     Therefore, this Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the Defendants transact business in this District. This Court also has personal jurisdiction under Pennsylvania's long-arm statute, 42 Pa. Cons. Stat. § 5322(a)(1)(i), (a)(2), and (a)(6)(i), because the Defendants' payments to Pennsylvania health care providers to treat Pennsylvania patients constitute a transaction of business, the Defendants contract to supply services and things in the Commonwealth of Pennsylvania, and the Defendants contract to insure risk in the Commonwealth.

14.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants, in particular Highmark, Inc., Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services d/b/a Highmark Blue Shield and also d/b/a Highmark Blue Cross Blue Shield, and Independence Blue Cross transact significant business in this District, and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

15.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

16.     Many of the healthcare providers, including Plaintiffs, provide services, supplies, or equipment to persons who reside in other states.

17.     The national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program are involved in interstate commerce and transaction for healthcare services.

18.     Plaintiffs and other healthcare providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

## PLAINTIFFS

19.     Plaintiff Jerry L. Conway, D.C. is a chiropractor and a citizen of Brent, Alabama. Dr. Conway practiced for thirty-eight years before his retirement in 2010.  During the relevant time period, Dr. Conway provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Conway was paid less for those *services than he would* have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Conway has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Conway has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

20.     Plaintiff Corey Musselman, M.D. is a family practice physician and a citizen of Cary, North Carolina.  During the relevant time period, Dr. Musselman provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to his in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Dr. Musselman was paid less for those services than he would have been but for

Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Musselman has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Musselman has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

21.     Plaintiff The San Antonio Orthopaedic Group, L.L.P. ("TSAOG") is a physician office in San Antonio, Texas. TSAOG brings these claims for itself and for its member and/or employed physicians. During the relevant time period, TSAOG provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same. TSAOG was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On September 18, 2008, TSAOG's contract with BCBS-TX was terminated; since that time, TSAOG has provided medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these services outside of any contractual relationship. For these services, TSAOG has been paid less than it would have been but for Defendants' anticompetitive conduct. On information and belief, TSAOG has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, TSAOG has been injured in its business or property as a result of Defendants' violations of the antitrust laws. TSAOG opted out of the *Love* Settlements in Florida.

16

22. Plaintiff Orthopaedic Surgery Center of San Antonio, L.P. is an outpatient surgical center in San Antonio, Texas. During the relevant time period, Orthopaedic Surgery Center of San Antonio provided facilities and medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by the Blues pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same. Orthopaedic Surgery Center of San Antonio was paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On September 18, 2008, Orthopaedic Surgery Center of San Antonio's contract with BCBS-TX was terminated; since that time, Orthopaedic Surgery Center of San Antonio has provided facilities and medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these facilities and services outside of any contractual relationship. For these facilities and services, Orthopaedic Surgery Center of San Antonio has been paid less than it would have been but for Defendants' anticompetitive conduct. On information and belief, Orthopaedic Surgery Center of San Antonio has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Orthopaedic Surgery Center of San Antonio has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

23. Plaintiff Charles H. Clark III, M.D. is a neurosurgeon and a citizen of Birmingham, Alabama. During the relevant time period, Dr. Clark provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of

Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Clark was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Clark has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Clark has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

24.     Plaintiff Crenshaw Community Hospital is a non-profit, general medicine hospital in Luverne, Alabama. During the relevant time period, Crenshaw Community Hospital provided facilities and medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Crenshaw Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Crenshaw Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Crenshaw Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

25.     Plaintiff Bullock County Hospital is a general medicine and surgical hospital in Union Springs, Alabama. During the relevant time period, Bullock County Hospital provided facilities and medically necessary, covered services to members of Blue Cross and Blue Shield

of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Bullock County Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Bullock County Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Bullock County Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

26.     Plaintiff Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C. is a dental practice in Fairhope, Alabama. During the relevant time period, Fairhope Cosmetic Dentistry provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Fairhope Cosmetic Dentistry was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Fairhope Cosmetic Dentistry has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct As set forth herein, Fairhope Cosmetic Dentistry has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

27.     Plaintiff Sports and Ortho P.C. is a physical therapy provider in Chicago, Illinois. Sports and Ortho P.C. brings these claims for itself and for its member and/or employed physical

therapists. During the relevant time period, Sports and Ortho provided medically necessary, covered services to members of Blue Cross and Blue Shield of Illinois pursuant to its in-network contract with BCBS-IL, and billed BCBS-IL for the same. Sports and Ortho was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Sports and Ortho has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Sports and Ortho has been injured in its business or property as a result of Defendants' violations of the antitrust laws. Sports and Ortho specifically reserves any and all claims it has or may have for denied requests for payments related to services provided to City of Chicago employees.

28. Plaintiff Kathleen Cain, M.D. is a pediatrician and a citizen of Topeka, Kansas. During the relevant time period, Dr. Cain provided medically necessary, covered services to members of Blue Cross and Blue Shield of Kansas pursuant to her in-network contract with BCBS-KS, and billed BCBS-KS for the same. Dr. Cain was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Cain has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Cain has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

29.     Plaintiff Northwest Florida Surgery Center, L.L.C. is a multispecialty outpatient ambulatory surgery center located in Panama City, Florida.  During the relevant time period, Northwest Florida Surgery Center provided facilities and medically necessary, covered services to members of Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same.  Northwest Florida Surgery Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Northwest Florida Surgery Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Northwest Florida Surgery Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

30.     Plaintiff Wini Hamilton, D.C. is a chiropractor and a citizen of Seattle, Washington.  During the relevant time period, Dr. Hamilton provided medically necessary, covered services to patients insured by Premera Blue Cross of Washington or who are included in employee benefit plans administered by Premera Blue Cross of Washington pursuant to her in-network contract with Premera, and billed Premera for the same.  Dr. Hamilton was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Hamilton has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.  As set

forth herein, Dr. Hamilton has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

31.     Plaintiff North Jackson Pharmacy, Inc. is a pharmacy in Stevenson, Alabama. During the relevant time period, North Jackson Pharmacy provided medically necessary, covered goods and services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. North Jackson Pharmacy was paid less for those goods and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, North Jackson Pharmacy has also provided medically necessary, covered goods and services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those goods and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, North Jackson Pharmacy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

32.     Plaintiff Neuromonitoring Services of America, Inc. ("NSOA") is a provider of Intraoperative Neurophysiological Monitoring services based in Colorado Springs, Colorado. During the relevant time period in Colorado, NSOA provided medically necessary, covered services to members of Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado pursuant to its in-network contract with Anthem Blue Cross and Blue Shield, and billed Anthem Blue Cross and Blue Shield for the same. NSOA was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. Also during the relevant time

period, NSOA has provided medically necessary services to insured members of the Blues in Alabama, Arizona, Arkansas, California, Illinois, Indiana, Iowa, Mississippi, Montana, North Dakota, Ohio, South Dakota, Tennessee, and Wisconsin, and has billed those Defendants for these services outside of any contractual relationship. On information and belief, NSOA has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, NSOA has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

33. Plaintiff Cason T. Hund, D.M.D. is a general practitioner of dentistry and a citizen of Mt. Pleasant, South Carolina. During the relevant time period, Dr. Hund provided medically necessary, covered dental services to patients insured by BlueCross BlueShield of South Carolina, Inc. or who are included in the employee benefit plans administered by BlueCross BlueShield of South Carolina, Inc. pursuant to his in-network contract with BCBS-SC, and billed BCBS-SC for the same. Dr. Hund was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hund has also provided medically necessary, covered dental services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Hund has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

34. Plaintiff ProRehab, P.C. is a group of physical therapy clinics with a corporate office in Evansville, Indiana. ProRehab, P.C. operates physical therapy clinics in the cities of

Evansville, Haubstadt, Newburgh, Rockport and Vincennes in the State of Indiana. ProRehab also operates physical therapy clinics in the cities of Bowling Green, Henderson, and Madisonville in the Commonwealth of Kentucky. ProRehab, P.C. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, ProRehab provided medically necessary, covered services to patients insured by Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana and d/b/a Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant Anthem, Inc., or who are included in employee benefit plans administered by Anthem Blue Cross and Blue Shield of Indiana or Anthem Blue Cross and Blue Shield of Kentucky pursuant to its in-network contracts with BCBS-IN and BCBS-KY, and billed BCBS-IN and BCBS-KY for the same. ProRehab was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ProRehab has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, ProRehab has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

35. Plaintiff Texas Physical Therapy Specialists, L.L.C. is a group of physical therapy clinics with eighteen locations in the State of Texas. Texas Physical Therapy Specialists operates physical therapy clinics in the cities of Austin, Dallas, Georgetown, Liberty Hill, New Braunfels, Round Rock, San Antonio, San Marcos, Schertz, Selma, and Spring Branch in the State of Texas. Texas Physical Therapy Specialists, L.L.C. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Texas

Physical Therapy Specialists provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same. Texas Physical Therapy Specialists was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Texas Physical Therapy Specialists has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Texas Physical Therapy Specialists has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

36.     Plaintiff BreakThrough Physical Therapy, Inc. ("BreakThrough") is a group of physical therapy clinics with seven locations in the State of North Carolina. BreakThrough operates physical therapy clinics in the cities of Cameron, Fayetteville, Greensboro, Morehead City, and Winston-Salem in the State of North Carolina. BreakThrough brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Breakthrough provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same. Breakthrough was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Breakthrough has

also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Breakthrough has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

37.     Plaintiff Dunn Physical Therapy, Inc. is a group of physical therapy clinics with four locations in the State of North Carolina. Dunn Physical Therapy operates physical therapy clinics in the cities of Cary, Raleigh, and Apex in the State of North Carolina. Dunn Physical Therapy, Inc. brings these claims for itself and for its member and/or employed physical therapists.  During the relevant time period, Dunn Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Dunn Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dunn Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dunn Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

38.     Plaintiff Gaspar Physical Therapy, P.C. is a physical therapy company with six physical therapy clinic locations in the State of California. Gaspar Physical Therapy operates physical therapy clinics in the cities of Carlsbad, Encinitas, Oceanside, and Solana Beach in the

State of California. Gaspar Physical Therapy brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Gaspar Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross of California d/b/a Anthem Blue Cross, a subsidiary of Defendant Anthem, Inc., or who are included in employee benefit plans administered by Blue Cross of California pursuant to its in-network contract with BC-CA, and billed BC-CA for the same. Gaspar Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Gaspar Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Gaspar Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

39.     Plaintiff Timothy H. Hendlin, D.C. is a chiropractor and a citizen of Kailua-Kona, Hawaii. During the relevant time period, Dr. Hendlin provided medically necessary, covered services to patients insured by Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Hawaii, and billed for those services. Dr. Hendlin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hendlin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for those services, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set

forth herein, Dr. Hendlin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

40.     Plaintiff Greater Brunswick Physical Therapy, P.A. ("GBPT") is a physical therapy company with four physical therapy clinic locations in the State of Maine. GBPT operates physical therapy clinic locations in the cities of Auburn, Bath, South Harpswell and Topsham in the State of Maine. GBPT brings these claims for itself and for its member and/or employed physical therapists.  During the relevant time period, GBPT provided medically necessary, covered services to patients insured by Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine ("BCBS-ME"), a subsidiary of Defendant Anthem, Inc., or who are included in employee benefit plans administered by BCBS-ME pursuant to its in-network contract with BCBS-ME, and billed BCBS-ME for the same.  GBPT was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, GBPT has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, GBPT has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

41.     Plaintiff Charles Barnwell, D.C. is a chiropractor providing services in Houston, Texas.    During the relevant time period, Dr. Barnwell provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the

same.  Dr. Barnwell was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Barnwell has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Barnwell has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

42.     Plaintiff Brain and Spine, L.L.C. is a physician group medical practice specializing neurosurgery in Panama City, Florida.  Brain and Spine, L.L.C. brings these claims for itself and for its member and/or employed physicians.  During the relevant time period, Brain and Spine provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Florida, Inc. or who are included in employee benefit plans administered by BCBS-FL pursuant to its in-network contract with BCBS-FL and billed it for the same.  Brain and Spine was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Brain and Spine has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Brain and Spine has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

43.     Plaintiff Heritage Medical Partners LLC ("Heritage") is a physician group medical practice specializing in internal medicine in Hilton Head, SC.  Heritage brings these claims for itself and for its member and/or employed physicians.  During the relevant time

period, Heritage provided medically necessary, covered services to patients insured by BCBS-SC, or who are included in employee benefit plans administered by BCBS-SC pursuant to its in-network contract with BCBS-SC and billed it for the same. Heritage was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Heritage has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Heritage has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

44. Plaintiff Judith Kanzic, D.C. is a chiropractor in Houston, TX. During the relevant time period, Dr. Kanzic provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-TX and billed BCBS-TX for these services outside of any contractual relationship. Dr. Kanzic was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. For these services, Dr. Kanzic has been paid less than she would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Kanzic has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Kanzic has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

45.     Plaintiff Brian Roadhouse, D.C. is a chiropractor in Tulsa, Oklahoma.   During the relevant time period, Dr. Roadhouse provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Oklahoma, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-OK pursuant to its in-network contract with BCBS-OK and billed it for the same.  Dr. Roadhouse was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Roadhouse has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Roadhouse has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

46.     Plaintiff Julie McCormick, M.D., L.L.C., is a doctor of internal medicine and a citizen of Anchorage, Alaska. During the relevant time period, Dr. McCormick provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to her in-network contract with Premera, and billed Premera for the same.  Dr. McCormick was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. McCormick has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for

Defendants' anticompetitive conduct.  As set forth herein, Dr. McCormick has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

47.     Plaintiff Harbir Makin, M.D. is a doctor of internal medicine and a citizen of Anchorage, Alaska.  During the relevant time period, Dr. Makin provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same.  Dr. Makin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Makin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Makin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

48.     Plaintiff Saket K. Ambasht, M.D. is a doctor of gastroenterology and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Ambasht has provided medically necessary services to Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") and has billed Premera for these services outside of any contractual relationship. For these services, Dr. Ambasht has been paid less that he would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Ambasht has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been

but for Defendants' anticompetitive conduct. As set forth herein, Dr. Ambasht has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

49.     John M. Nolte, M.D. is a family practice physician and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Nolte provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same.  Dr. Nolte was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Nolte has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Nolte has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

50.     Plaintiff Bauman Chiropractic Clinic of Northwest Florida, P.A. ("Bauman Chiropractic") is a chiropractic office in Panama City, Florida. Bauman Chiropractic brings these claims for itself and for its member and/or employed chiropractors.  During the relevant time period, Bauman Chiropractic provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same.  Bauman Chiropractic was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Bauman

Chiropractic has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Bauman Chiropractic has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

51.     Plaintiff Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology ("FCCN") is a chiropractic office in Windsor Heights, Iowa. FCCN brings these claims for itself and for its member and/or employed chiropractors. During the relevant time period, FCCN provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to his in-network contract with Wellmark, and billed Wellmark for the same. FCCN was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, FCCN has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, FCCN has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

52.     Plaintiff Snowden Olwan Psychological Services ("Snowden Olwan") is a psychology clinic located in Sioux City, Iowa. Snowden Olwan brings these claims for itself and for its member and/or employed psychologists. During the relevant time period, Snowden Olwan provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in

employee benefit plans administered by Wellmark pursuant to its in-network contract with Wellmark, and billed Wellmark for the same. Snowden Olwan was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Snowden Olwan has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Snowden Olwan has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

53.     Plaintiff Ear, Nose & Throat Consultants and Hearing Services, P.L.C. ("ENT Consultants") is a medical practice located in Dakota Dunes, South Dakota. ENT Consultants brings these claims for itself and for its member and/or employed physicians. During the relevant time period, ENT Consultants provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark BCBS-IA"), Wellmark Blue Cross and Blue Shield of South Dakota ("Wellmark BCBS-SD"), and Blue Cross and Blue Shield of Nebraska ("BCBS-NE") or who are included in employee benefit plans administered by Wellmark BCBS-IA, Wellmark BCBS-SD, or BCBS-NE pursuant to its in-network contracts with those Defendants, and billed those Defendants for the same. ENT Consultants was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ENT Consultants has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for

Defendants' anticompetitive conduct. As set forth herein, ENT Consultants has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

54.     Plaintiff U.S. Imaging Network, L.L.C., d/b/a as Imaging Network Administrators, L.L.C. in the State of California and the State of Texas ("U.S. Imaging"), is a radiology network and scheduling service for outpatient advanced imaging. Through its direct contracts with imaging providers, U.S. Imaging arranges for outpatient advanced imaging exams for enrollees of various self insured group health plans and fully insured health plans in all states in the United States except for the states of West Virginia and North Dakota, adjudicates claims submitted by its providers, and then submits bills for payment of those services to various self insured health benefit plans and/or their administrators as well as health insurance companies which contract with U.S. Imaging directly. As a result of the Market Allocation Conspiracy and the Price Fixing and Boycott Conspiracy, the Blues, in their capacity as administrators of self insured groups, have collectively refused to pay U.S. Imaging's claims on behalf of (and instructed by) their self insured clients or perform other standard administrative services such as accepting accumulator data from U.S. Imaging, releasing historical client claims data to U.S. Imaging, or printing US Imaging's contact information on their client's medical identification cards, in order to frustrate and prevent the successful integration of U.S. Imaging's program with their self insured client's health plans. U.S. Imaging has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

55.     Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue. Plaintiffs are entitled to payment for their services, equipment, supplies or for use of their facilities either

pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from patients who are covered by a plan that is insured and administered by a Blue. All Plaintiffs have been paid less than they would have been paid absent Defendants' violation of the antitrust laws. All Plaintiffs have a right to bring these claims. But for Defendants' agreements not to compete, out-of-network providers would have been offered the ability to contract with the Blues at more competitive rates. Accordingly, all Plaintiffs have standing and all have sustained antitrust injury.

56. This Complaint is operative only with regard to the class action litigation and is not intended to supersede any additional claims brought by or intended to be litigated by "tag-along" Plaintiffs, such as the claims under Section 2 of the Sherman Act brought in the *Advanced Surgery Center* and the *Lifewatch* complaints. Those claims are to be litigated separately from this class action litigation.

57. Certain of the named Provider Plaintiffs in this action, Corey Musselman, M.D., Charles H. Clark III, M.D., Heritage Medical Partners, L.L.C., Brain and Spine, L.L.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., John M. Nolte, M.D., Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D., ("the *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the BCBS Defendants consummated in the Southern District of Florida before Judge Moreno. The San Antonio Orthopaedic Group opted-out of the *Love* Settlement but not the related *WellPoint*, *Highmark* and *Capital* settlements in the Southern District of Florida. The San Antonio Orthopaedic Group is pursuing claims against the Releasing Parties in the *Love* Settlement. For purposes of this Complaint, those Providers who were members of the Settlement Classes listed above do not bring claims against any of the released parties in those Settlements. As this issue

37

is currently being litigated in *Musselman v. Blue Cross Blue Shield of Alabama*, Case No. 1:13-cv-20050-FAM (S.D. Fla.); Case No. 13-14250-AA (11th Cir.), the *Love* Providers wish to allege here that:

a.     they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those releases. Accordingly, those claims would be included in this Complaint but for the BCBS Defendants' insistence that if the claims are alleged here, they will immediately seek to have the *Love* Providers held in contempt of the injunctions entered by Judge Moreno. The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b.     they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor;

c.     they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed below) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

58.     As is noted in the Plaintiffs' allegations, at least one of the named Physician Provider Plaintiffs opted out of the *Love* Settlement in Florida. Those non-Settling physician Plaintiffs pursue claims on behalf of the class against all of the Defendants who were released in *Love* action.

38

59.     The Agreements between various Defendants and some of the named Provider Plaintiffs contain what Defendants will likely argue are binding arbitration provisions. Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of this Complaint, those Plaintiffs with arbitration agreements arguably covering the claims or parties at issue in this litigation expressly only bring suit against those Defendants who are not parties to the arbitration provisions in their agreements. For instance, a Provider with an arbitration provision in her contract with Blue Cross and Blue Shield of Kansas is not asserting claims against BCBS of Kansas, but rather is only pursuing her Sherman Act Section 1 claims against all Defendants other than BCBS of Kansas, none of whom are parties to her agreement.

## **DEFENDANTS**

60.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than three million people. The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450 Riverchase Parkway East, Birmingham, Alabama. Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

61.     Defendant Anthem, Inc. is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care

insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. By some measures Anthem is the largest health benefits company in the nation with more than 38.5 million members in its affiliated health plans. According to its website, one in nine Americans is an Anthem member, and Anthem is contracted with 92% of the physicians and 97% of hospitals nationwide through the Blue Card Program. Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

62.     Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099. With more than 13 million members, Health Care Service Corporation is the largest customer-owned health insurer in the United States. Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana. In each of its five Blue service areas, Health Care Service Corporation exercises market dominance. Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

63.     Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or

Intermountain Region, serving more than 2 million members through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield,, Regence BlueCross BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in its states of operation or within areas of those states. Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

64.     Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117. With approximately 3.4 million members, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region. Through its subsidiaries and affiliated companies, CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and Virginia, or within areas of those states. CareFirst, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

65.     Defendant Premera Blue Cross is a Washington corporation with its corporate headquarters located at 7001 220th SW, Mountlake Terrace, WA 98043. Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.7 million members in Alaska and Washington. Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield of Alaska. Premera Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

66.     Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.  Premera Blue Cross Blue Shield of Alaska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

67.     Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ, 85021.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Arizona.  Blue Cross Blue Shield of Arizona, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

68.     Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 860,000 enrollees in various health care plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state.  Arkansas Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

69.     Defendant Blue Cross of California d/b/a/ Anthem Blue Cross is a California corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA 91367.  It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant Anthem.  Blue Cross of California is the parent corporation of a number of subsidiaries that

provide health care financing to approximately 8.3 million enrollees in various health care plans in California, more than any other carrier in the state. Blue Cross of California, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of California" or "BC-CA" in this Complaint.

70. Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, CA 94105-1808. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 3.5 million enrollees in various health care plans in California. California Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

71. Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant Anthem and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Denver, CO 80273. It is the parent corporation of a number of subsidiaries that provide health care financing to members through various health care plans in Colorado and Nevada.

72. Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant Anthem. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

73.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant Anthem.  It is a Connecticut corporation with its corporate headquarters located at 370 Bassett Road, North Haven, Connecticut 06473 and is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Connecticut.  Anthem Blue Cross and Blue Shield of Connecticut, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

74.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222.  Highmark, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 5.3 million members in Pennsylvania, West Virginia and Delaware.  On June 1, 2015, the State of Pennsylvania approved the merger of Blue Cross of Northeastern Pennsylvania with Defendant Highmark, Inc.  Highmark, Inc., its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint.

75.     Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is a subsidiary of Highmark, Inc.  It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801.  Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware.  It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield Delaware in July, 2012.  Highmark Blue Cross and Blue Shield Delaware provides health care financing to approximately 300,000 members in various health care plans in Delaware.  According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share in the state of Delaware.  Highmark Blue Cross and Blue Shield

Delaware, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "BCBS-DE" in this Complaint.

76.     Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc. and provides health care financing in the District of Columbia, Maryland and areas of Virginia.  It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc.  Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117.   Group Hospitalization and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "GHMSI" in this Complaint.

77.     Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 7 million enrollees in various health care plans in Florida.  Blue Cross and Blue Shield of Florida, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint.  Under BCBSA's rules, BCBS-FL is allowed to contract with health care providers in Alabama counties adjacent to Florida.

78.     Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant Anthem and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326. According to a 2009 Center for American Progress study on health competitiveness,   Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare financing

market.  Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 2.1 million enrollees in various health care plans in Georgia.  Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

79.  Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814.  It is the parent corporation of a number of subsidiaries that provide health care financing to 722,000 members in various health care plans in Hawaii. Hawaii Medical Service Association, its subsidiaries and affiliated companies are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

80.  Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho 83642.  It is the parent corporation of a number of subsidiaries that provide health care financing to 700,000 members in various health care plans in Idaho.  Blue Cross of Idaho Health Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Idaho" or "BC-ID" in this Complaint.

81.  Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, Idaho 83501.  Regence BlueShield of Idaho is the parent corporation of a number of subsidiaries that provide health care financing to more than 150,000 members in various health care plans in Idaho.  Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

82.     Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601.  It is the parent of a number of subsidiaries that provide health care financing to approximately 6.5 million members in various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint.

83.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana is a subsidiary of Defendant Anthem.  It is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Indiana.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint..

84.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.  It is the parent of a number of subsidiaries that provide health care financing to 1.8 million members in Iowa.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue Shield of Iowa" or "BCBS-IA" in this Complaint.

85.     Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.  Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide health care financing to 647,000 members in various

health care plans in Kansas.  Blue Cross and Blue Shield of Kansas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

86.    Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is a subsidiary of Defendant Anthem and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Park Boulevard, Louisville, KY 40223.   It provides health care financing in Kentucky.   Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

87.    Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Louisiana.  Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

88.    Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant Anthem.  It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016.  It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maine.  Anthem Health Plans of Maine, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

89.     Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117. CareFirst of Maryland, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maryland. CareFirst of Maryland, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

90.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts 02215. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in various health care plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

91.     Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 4.8 million enrollees in various health care plans in Michigan. Blue Cross and Blue Shield of Michigan, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.

92.     Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, Eagan, Minnesota 55122. BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is the parent corporation of a number of subsidiaries that provide health care

financing to 2.4 million enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint.

93. Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company, is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1 million enrollees in various health care plans in Mississippi. Blue Cross and Blue Shield of Mississippi, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this Complaint. Blue Cross Blue Shield of Mississippi contracts with providers in counties in Alabama that are adjacent to Mississippi.

94. Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is a subsidiary of Defendant Anthem. It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in a various health care plans in Missouri. Defendant Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint.

95. Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108. It is the parent corporation of a number of subsidiaries that provide health care financing to 880,000 enrollees in various health care plans in Kansas City and its suburbs in Kansas and Missouri. Blue Cross and Blue Shield of Kansas City, its

subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint.

96.     Defendant Blue Cross and Blue Shield of Montana is a division of Defendant HCSC with its principal place of business at 560 North Park Avenue, Helena, Montana 59601.  It is the parent of a number of subsidiaries that provide health care financing to approximately 272,000 members in various health care plans in Montana.  Blue Cross and Blue Shield of Montana, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT" in this Complaint.  For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.

97.     Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 560 North Park Avenue, Helena, Montana 59601.  When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc.

98.     Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180.  It is the parent corporation of a number of subsidiaries that provide health care financing to over 700,000 enrollees in various health care plans in Nebraska.  Blue Cross and Blue Shield of Nebraska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

99.     Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its

51

headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148. Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant Anthem that offer health care financing in Nevada. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

100.   Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is a subsidiary of Defendant Anthem. It is a New Hampshire corporation with its corporate headquarters located at 1155 Elm Street, Suite 200, Manchester, New Hampshire 03101. Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to over 600,000 members in various health care plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint.

101.   Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105. It is the parent corporation of a number of subsidiaries that provide health care financing to 3.6 million enrollees in various health care plans in New Jersey. Horizon Healthcare Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

102.    Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.  Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care financing to 283,000 enrollees in various health care plans in New Mexico.  Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

103.    Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202.  HealthNow New York, Inc. does business as Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern New York.  HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York.  HealthNow New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "HealthNow" in this Complaint.

104.    Defendant Blue Shield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  Blue Shield of Northeastern New York is the parent of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York.  Blue Shield of Northeastern New York, its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

105.    Blue Cross Blue Shield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  Blue Cross Blue Shield of Western New York is the parent of a number of subsidiaries

that provide health care financing to more than 800,000 enrollees in various health care plans in New York. Blue Cross Blue Shield of Western New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Western New York" or "BCBS-Western NY" in this Complaint.

106. Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is a subsidiary of Defendant Anthem. It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006. Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is the parent corporation of a number of subsidiaries that provide health care financing to nearly 6 million enrollees in various health care plans in New York. Empire Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "Empire Blue Cross and Blue Shield" or "Empire-BCBS" in this Complaint.

107. Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York 14647. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.7 million enrollees in various health care plans in the state of New York. Excellus Health Plan, Inc., its subsidiaries and affiliated companies are collectively referred to as "Excellus BlueCross BlueShield" in this Complaint.

108. Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina 27707. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 3.6 million members in various health care plans in North Carolina.

Blue Cross and Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

109.    Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue, South Fargo, ND 58121.  Noridian Mutual Insurance Company is the parent company of a number of subsidiaries that provide health care financing to nearly 500,000 members in the midwestern and western United States.  Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care financing to approximately 390,000 members in various health care plans in North Dakota.  Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

110.    Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is a subsidiary of Defendant Anthem.  It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040.  Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number of subsidiaries that provide health care financing to more than 3 million members in various health care plans in Ohio.  Community Insurance Co., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

111.    Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119.  Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that

provide health care financing to more than 700,000 enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

112.     Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant Cambia Health.   It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Regence BlueCross BlueShield of Oregon is the parent corporation of a number of subsidiaries that provide health care financing to more than 750,000 members in various health care plans in Oregon.  Regence BlueCross BlueShield of Oregon, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

113.     Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania is a Pennsylvania corporation with its corporate headquarters located at 19 North Main Street, Wilkes-Barre, Pennsylvania 18711.  On June 1, 2015, the State of Pennsylvania approved the merger of Blue Cross of Northeastern Pennsylvania with Defendant Highmark, Inc. Hospital Service Association d/b/a Blue Cross of Northeastern Pennsylvania is the parent corporation of a number of subsidiaries that provide health care financing to nearly 550,000 enrollees in various health care plans in Pennsylvania.  Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Northeastern Pennsylvania" or "BC-NEPA" in this Complaint.

114.     Defendant Capital Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177.

It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Pennsylvania. Capital Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Capital Blue Cross" in this Complaint.

115. Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011. Highmark Health Services is the parent of a number of subsidiaries that provide health care financing to approximately 4.2 million members in various health care plans in Pennsylvania. On June 1, 2015, the State of Pennsylvania approved Highmark Health Services d/b/a Highmark Blue Cross Blue Shield's merger with Defendant Hospital Service Association d/b/a Blue Cross of Northeastern Pennsylvania. Highmark Health Services, its subsidiaries and affiliated companies are collectively referred to as "Highmark Health Services" in this Complaint.

116. Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103. It is the parent corporation of a number of subsidiaries that provide health care financing to 2.2 million enrollees in Pennsylvania and 3.1 million nationwide. Independence Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

117. Defendant Triple-S Salud, Inc. is a subsidiary of Triple-S Management Company and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries

that provide health care financing to 1.6 million enrollees in Puerto Rico. Triple-S Salud, Inc., its subsidiaries and affiliated companies are collectively referred to as "Triple-S of Puerto Rico" in this Complaint.

118. Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 500 Exchange Street, Providence, Rhode Island 02903. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

119. Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29223. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately one million members in various health care plans in South Carolina. BlueCross BlueShield of South Carolina, its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint.

120. Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104. Wellmark of South Dakota, Inc. is a subsidiary of Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 325,000 enrollees in South Dakota. Wellmark of South Dakota, its subsidiaries and affiliated companies are

collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

121.    Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care financing to 3.2 million members in various health care plans in Tennessee.  BlueCross BlueShield of Tennessee, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Tennessee" or "BCBS-TN" in this Complaint.  BCBS-TN contracts with health care providers in Alabama counties adjacent to Tennessee.

122.    Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas.  Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

123.    Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121.  Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide health care financing to more than 320,000 members in various health care plans in Utah.  Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueCross BlueShield of Utah" or "BCBS-UT" in this Complaint.

124.    Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 200,000 enrollees in various health care plans within the state of Vermont.  Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

125.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. is a subsidiary of Defendant Anthem.  It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230.  Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.2 million enrollees in various health care plans in Virginia.   Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

126.    Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101.  Regence BlueShield in Washington is the parent corporation of a number of subsidiaries that provide health care financing to 770,000 members in various health care plans in Washington.  Regence BlueShield in Washington, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

127.    Defendant Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia is a subsidiary of Defendant Highmark and is a West Virginia corporation with its corporate headquarters located at 614 Market Street, Parkersburg, West Virginia 26101.

Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care financing to nearly 300,000 enrollees in various health care plans in West Virginia and one county in Ohio.  Highmark Blue Cross Blue Shield West Virginia, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" in this Complaint.  BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

128.    Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant Anthem and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203.  Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Compcare Health Services Insurance Corporation, that provide health care financing to approximately 900,000 enrollees in various health care plans in Wisconsin.  Blue Cross Blue Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

129.    Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 100,000 enrollees in various health care plans in Wyoming.  Blue Cross Blue Shield of Wyoming, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint.

130.    Defendant Consortium Health Plans, Inc. ("CHP") is a Maryland corporation headquartered at 10490 Little Patuxent Parkway, Suite 550, Columbia, MD 21044-3517.

61

Consortium Health Plans was formed in 1994 to help the Blues market their plans to national accounts. Today, CHP's members include BCBS-AL, BCBS-AR, BCBS-FL, BCBS-MA, BCBS-MI, BCBS-MN, BCBS-NE, BCBS-NC, BCBS-RI, BC-ID, BS-CA, Capital Blue Cross, CareFirst, HCSC, BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, Highmark, Highmark Health Services, BCBS-NJ, IBC, Premera Blue Cross, BCBS-AK, BS-ID, BCBS-OR, BCBS-UT, Regence BlueShield (WA), BCBS-IA, BCBS-SD, Anthem, BCBS-CO, BCBS-CT, BCBS-IN, BCBS-KY, BCBS-ME, BCBS-MO, BCBS-NH, BCBS-NV, BCBS-OH, BCBS-VA, BCBS-WI, BC-CA, BCBS-GA and Empire BCBS. Working together through CHP, these Defendants share claims data reflecting provider reimbursements and use their market power to leverage that data to reduce reimbursement to providers who deliver health care services to patients insured through the Blues' National Accounts Program.

131. Defendant National Account Service Company L.L.C. ("NASCO") is a Delaware limited liability corporation headquartered at 1200 Abernathy Road NE, Suite 1000, Atlanta, GA 30328. NASCO was formed in 1987 through a partnership among major Blue Cross and Blue Shield plans. Since that time, NASCO has operated an integrated claims processing system for its partner plans' national accounts. NASCO also processes BlueCard claims for its partner plans. In 2013, NASCO processed approximately 250 million claims for these plans, including nearly 112 million BlueCard claims. Today, NASCO's partners include BCBS-AL, BCBS-MA, BCBS-MI, CareFirst, BCBS-NJ, Premera and Anthem. NASCO is governed by an Executive Committee comprised of representatives of BCBS-MA, BCBS-MI, CareFirst, BCBS-MN, BCBS-NJ, Premera, Anthem and the BCBSA.

132. Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled

by 36 Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by the Blues and operates as the licensor. Health insurance companies operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million - or one in three - Americans. BCBSA itself does not provide health care financing and does not contract with health care providers, but it operates to create consistency and cooperation among its 36 members. It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members. The 36 Blues fund Defendant BCBSA.

133. The list of Non-Released Blues (described above) includes: Blue Cross Blue Shield of Arizona, Arkansas Blue Cross Blue Shield, Blue Shield of California, Blue Cross and Blue Shield Delaware, Blue Cross of Idaho, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Nebraska, HealthNow, Noridian Mutual Insurance Co. d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Vermont, Blue Cross and Blue Shield of Wyoming, and Premier Health, Inc. Additionally, while Excellus entered a settlement in New York state court, it did not obtain a release for any doctors other than those in New York, and that release does not affect the claims made in this amended complaint. Excellus is therefore also treated as a Non-Released Blue for purposes of this Complaint.

## FACTUAL ALLEGATIONS

### The BCBS Defendants

134. Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and cover 100

million Americans. According to the BCBSA, more than 96% of hospitals and 91% of professional providers contract with one of the Defendants nationwide – "more than any other insurer." Other Blues estimate even higher percentages.

135. The Blues include many of the largest potentially competitive health insurance companies in the United States. Indeed, Anthem is the largest health insurance company in the country by total medical enrollment, with approximately 38.5 million enrollees. Similarly, 15 of the 25 largest health insurance companies in the country are Blues. Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the markets for health care financing and health services..

136. For example, Anthem is the largest health insurer in the country by total medical enrollment, with approximately 38.5 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. Anthem also operates in a number of additional states through its Medicaid subsidiary, Amerigroup. But for the illegal territorial restrictions summarized above, Anthem would be likely to offer its health care financing throughout the United States in competition with the other Blues. Such competition would result in higher payment rates to Providers.

137.    Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, and BCBS-MT, is the largest mutual health insurance company in the country and the fourth largest health insurance company overall.  But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health care financing throughout the United States in competition with the other Blues.  Such competition would result in higher payment rates to Providers.

138.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan.  BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary.  But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

139.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees.  Its affiliated Blues include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania, BCBS-WV, and BCBS-DE.  It is in the process of acquiring Blue Cross of Northeastern Pennsylvania, and when the acquisition is completed, it will move further into the top ten.  But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

140.    Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million

enrollees. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Alabama would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

141. CareFirst, which operates the Blues in Maryland, Washington, D.C., and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

142. BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

143. BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida. But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

144.    The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

145.    The BCBSA is a separate legal entity that purports to promote the common interests of the Blues. The BCBSA describes itself as "a national federation of 37 [now 36] independent, community-based and locally operated Blue Cross and Blue Shield companies." The BCBSA refers to the 36 Blue Cross and Blue Shield companies as Member Plans.

146.    The BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete.  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

147.    Every Blue is a member of the BCBSA, every Blue CEO is on the Board of Directors of BCBSA and every Blue participates in numerous BCBSA Committees.

148.    The Blues govern BCBSA.  BCBSA is entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

149.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the

individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989). The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

150.　In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current chairman of the Board of Directors, John Forsyth, is also the Chairman and CEO of Wellmark Blue Cross and Blue Shield. The CEO of each of the Individual Blues serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets at least annually.

151.　BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 36 members, including reimbursement rates for providers. The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are in furtherance of Defendants' conspiracies.

152.　The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members. This Committee has the power to enforce the requirements of the license agreements.

153.　The Blues control the entry of new members into BCBSA. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA

"seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved."

154. The Blues control the rules and regulations that all members of BCBSA must obey. According to the brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

155. The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards." In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 20, 2013.

156. The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards

and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

157.    The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

158.    The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and "Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

159.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."

However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

160.    A number of Blues also serve on the Inter-Plan Programs Committee ("IPPC") that control the national or Inter-Plan Programs of the Blues. In each of their licensing agreements, the Blues agree to participate in the national programs and to comply with the terms established by the IPPC. Therefore, the Blues are collectively agreeing to the terms of the national programs and their implementation.

161.    The Blues are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

162.    In addition, Blue Health Intelligence ("BHI"), a licensee of BCBSA, is managed by a Board of Managers entirely comprised of BCBS executives -- Highmark, BCBSNC, BCBSMI, BCBSAL, BCBSMA, BCBSMA, BCBSNE, HCSC, BCBSA, and IBC. www.bluehealthintelligence.com. BHI recently acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by BCBS companies. Designed to lower health care reimbursement to providers, Intelimedix explicitly states that "we all share information."

163.    Each BCBSA licensee is an independent legal organization.  The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues.  The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

164.    In its Sixth Circuit brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national coordination."  The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's parent Blue Plans - in the marketplace.  Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market.  New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake.  The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

165.    On its website, BCBSA has admitted that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 36] Blue companies."

166.    BCBSA is simply a vehicle used by admittedly independent health insurance companies to conspire, coordinate, and enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

167.    As detailed herein, the BCBSA not only enters into anticompetitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendants to suppress competition.  BCBSA is a convenient organization through which the Defendants enter into illegal territorial restraints between and among themselves.

## The BCBS Market Allocation Conspiracy

168.    Defendants allocate the geographic markets for health insurance by restricting each Defendant's activity outside of a designated geographic Service Area.  Accordingly, these restrictions insulate each Defendant from competition by other Blues in each of their respective geographic Service Areas.  These restrictions have no economic justification other than protecting Defendants from competition.

169.    Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws.  Defendants pay in-network providers directly pursuant to provider agreements.  Because of Defendants' market power and access to the more than one hundred million members of the Blues through the national programs, providers wishing to join the Blue network must accept lower reimbursement rates.  In many markets doctors and other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

170.    The vast majority of Blues refuse to honor consumer or patient assignment of benefits to providers, except when required by state law, such as in Tennessee and New Jersey. Defendants do this to discourage providers from remaining out-of-network.  Defendants coerce providers who attempt to be out-of-network into network at below market rates.  Defendants also retaliate against providers who attempt to operate out-of-network.  Various Blues, including Blue Cross and Blue Shield of Louisiana, have told providers that if they do not remain in network,

the Blue will pay the patient the reimbursement check for the provider services and the provider will then have to chase the patient while he or she rides off in a new car or fishing boat. The refusal to honor assignments creates inefficiencies for consumers and providers.

171.    Defendants undertook a coordinated effort to allocate the market in which each Defendant would operate free of competition from other Blues. They did this in various ways including through a licensing scheme, requiring geographic restrictions in the exclusive trademark licenses granted to each Defendant.

172.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs. The Blue Cross plans were designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans provided a mechanism for covering the cost of physicians. The plans were all nonprofit entities with limited purposes, and they acknowledged obligations to treat healthcare providers fairly.

173.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans. The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the American Medical Association responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

174.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue

Shield plan. Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

175. From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition because of its fear that a restraint-of-trade action might result from such cooperation.

176. Despite the foregoing, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

177. In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services ... to [the American Hospital Association]." (The "1954 Agreement".) Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." The 1954 Agreement also noted limitations specifying that only "certain Individual Plans ... developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in particular areas served by such PLANS" and that the plan had the right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these presents."

178. The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a condition of the grant of the license, including, among other things, that "[e]very qualified

general hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

179.    Finally, the 1954 Agreement prevented the AHA from having control over the Blue Cross plans.  In this regard, the agreement specified that the Blue Cross Plans needed only a majority vote to revoke the agreement, while the AHA could revoke it only prior to January 1, 1956, upon a three-fourths vote of the House of Delegates of the AHA.

180.    The 1952 license agreement between the National Organization (the agreement's term for the AMCP) and its member medical care plans (the "1952 Agreement") was similarly limited in scope.   That agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned, controlled or sponsored by county medical societies or state, district, territorial or provincial medical associations."  The 1952 Agreement further specified that "[e]ach member plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization." In 1976, it again changed its name to the "Blue Shield Association."  Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

181.    Notably, this agreement did not contain any provision relating to Plans developing certain territorial rights.   Instead, this agreement provided that "[t]he National Organization hereby grants to each of its member plans that are parties to this Agreement, subject to the terms of this agreement, permission to use said service mark in commerce among the several states or in foreign commerce."

182.    In 1972, a new license agreement was entered into between the Blue Cross Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement"). This agreement stated that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA Marks')." The agreement then sought to expand the scope of the service marks by providing that the Blue Cross Plan "desires to use the BCA Marks and any revisions and variations hereafter developed (collectively called 'Licensed Marks')" and then grants such Plan the right to use the new Licensed Marks "as service marks, in the sale and advertising of programs for health care and related services operated on a non-profit basis." This agreement also provides that the "rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement."

183.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a plan must treat providers fairly. In this regard, the 1972 Agreement continued to specify that a plan must comply with certain requirements as a condition of the grant of the license including, among other things, that "[e]very qualified general hospital in the area served by the PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

184.    In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating. By 1982, the process of the merger to form BCBSA had been completed.

185.    From 1981 to 1986, the Blues lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blues, and from non-Blue subsidiaries of Blues, increased substantially.

186.    In September 1982, the Board of Directors of the combined BCBSA adopted a Long Term Business Strategy under which Defendants agreed not to compete with each other. The Blues and the BCBSA was aware at the time that Defendants were violating the antitrust laws.

187.    To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities. The Plans accordingly agreed to centralize the ownership of their trademarks and trade names. In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

188.    At that time, BCBSA became the sole owner of the Blue Cross Blue Shield trademarks and trade names that had previously been owned by the local plans. BCBSA's Member Plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue Cross and Blue Shield plans within a state should further consolidate, ensuring that each state would have only one Blue. As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 36 today.

189.    Starting in 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would not compete against each other. During these meetings, Defendants agreed to maintain exclusive Service Areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues. After the

1986 revocation of the Blues' tax-exempt status and throughout the 1990s, the number of non-Blue subsidiaries of Blues increased. As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with the other Blues. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

190. Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

191. Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey and guidelines proposed members must adhere to prior to joining the BCBSA. These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). Those regulations provide for amendment with a vote of three fourths of the Member Plans. These agreements, which were revised or amended as recently as 2013, are the agreements at issue in this case.

192. These License Agreements depart from, and supersede, the historical licensing agreements. For example, the "whereas" clauses of the Blue Cross License Agreements provide that the Plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the Plan "was desirous of assuring nationwide protection of

the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

193.    Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system."   In order to accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined Service Areas.  The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below."  Paragraph 5 sets forth these new "Service Area[s]]" as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

194.    Despite the expanded scope of the license and the newly defined Service Areas, the License Agreements failed to include the provision, contained in both the 1954 and 1972 Agreements that required the Plan to treat providers fairly.  To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with health care providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

195.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic "Service Area," which is either the

80

geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

196.    Under the Guidelines and Membership Standards, each Member Plan agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business.  Both provisions directly limit the ability of each Blue to generate revenue from non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

197.    Therefore, Defendants have agreed that in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

198.    Anthem, in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had

"no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

199.    The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition.

200.    The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard.  For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Defendant's territory.  However, many of the Blues have entered into what they call "gentlemen's agreements" not to compete in those counties.  For example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and Anthem had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements.

**Historical Competition Among the Blues**

201.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. For many years, Blue Cross plans competed with Blue Shield plans in several states. By 1947, Blue Cross and Blue Shield plans

coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. To this day, Blue Cross plans compete with Blue Shield plans in certain parts of the country, including all of California.

202.    Blue Cross plans have competed against Blue Cross plans as well: "Blue Cross plans were not supposed to overlap service territories, but there were exceptions—tolerated by the national Blue Cross agency for lack of power to insist on change. North Carolina was the outstanding example, with plans based at Chapel Hill and Durham, each headed by a capable executive well known in the state." Odin W. Anderson, Blue Cross Since 1929: Accountability and the Public Trust 78 (1975). Blue Cross plans also competed historically in parts of California and Illinois. Likewise, Blue Shield plans have competed with each other historically in North Carolina, Oregon, and large portions of California.

## Restricting Competition in Pennsylvania

203.    The Blues refuse to contract in an adjacent Blue's Service Area when the refusal benefits that Blue's market power, as demonstrated recently by Anthem Blue Cross and Blue Shield of Ohio's refusal to contract with a UPMC hospital in a county in Pennsylvania that borders on Ohio.

204.    UPMC has developed a number of areas of health care where it has an outstanding reputation for excellence.  For example, well-known people from Alabama have gone to UPMC for liver transplants when they could have gone anywhere in the world for the procedure.  The Defendants' illegal Conspiracies will mean that when the contract between UPMC and Highmark terminates, other Blues including Blue Cross and Blue Shield of Alabama

will not be permitted to enter into an in network relationship with UPMC, and the Blues' subscribers will not have access to UPMC using in network coverage. But for the illegal Conspiracies, Blue Cross of Alabama and other Blues would be able to negotiate in network relationships with UPMC.

205. In addition, there have been other side agreements not to compete. Highmark BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

206. Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into the market. In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern

84

Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

207.    The conduct of Highmark and IBC demonstrates that the noncompetition agreement remains in place, though it putatively expired in 2007. Instead of entering the Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and Independence BC intended to merge. After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition. . . to the detriment of the insurance buying public."

208.    Capital Blue Cross presented an expert report from Monica Noether, Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark and IBC would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark-IBC will possess is likely to be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark and IBC would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark has competed in the past with IBC, could have been competing with IBC since 1997 but for a ten year non-compete agreement between them, and, in

my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with IBC in the future, especially given the absence of successful entry by other insurers."

- "Highmark has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to IBC and in cooperation with IBC through a joint operating agreement to offer indemnity insurance."

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania. Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Health Care, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While health care services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, but **even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from**

**Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region."**

(emphasis added).

209.     Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern Pennsylvania.  This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania.  After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing.  For example, IBC now pays Highmark to process its provider claims.  By processing those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers.  In addition, Highmark Blue Shield has been involved in similar non-competition arrangements with other Pennsylvania Blues and has now purchased Blue Cross of Northeastern Pennsylvania.

210.     Capital Blue Cross has attempted to operate outside of its Service Area through its non-Blue branded for profit subsidiary, Avalon.  When Defendant Highmark developed a dispute with the largest provider in its Service Area, the University of Pittsburgh Medical Center (UPMC), Capital Blue Cross through Avalon attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-network basis.  Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this arrangement.  Defendant Highmark and

87

Defendant BCBSA prevented competition from Defendant Capital in the Service Area of Highmark and Capital agreed to restrict its competition. The efforts by Capital Blue Cross through its non-Blue Avalon demonstrate that if it were not for the agreement not to expand outside of each Blue's Service Area, Capital would be operating in the Highmark Service Area.

## Restricting Competition in Ohio

211. The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time.

212. In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus. In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co., No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the State of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

213. In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

214.    In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

215.    Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990.

216.    Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive service areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993, leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem

Blue Cross and Blue Shield. The next year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. BCBSA refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended, as a result of the Blues' concerted conduct.

### Restricting Competition in Maryland

217.    As it did in Ohio, BCBSA capitulated when its horizontal territorial allocation was challenged in Maryland, allowing two Blues to compete against each other statewide.

218.    As of 1984, BCBSA had divided Maryland between two Blues. Group Hospitalization and Medical Services, Inc. ("GHMSI") operated in the Prince George's County and Montgomery County suburbs of Washington, D.C., while Blue Cross and Blue Shield of Maryland, Inc. ("BCBSM") operated in the remainder of the state.

219.    The State of Maryland filed suit in the U.S. District Court for the District of Maryland against BCBSA, BCBSM, and GHI, alleging that their agreement to allocate territories violates Section 1 of the Sherman Act, the same allegation that Plaintiffs have made in this case. Maryland v. Blue Cross & Blue Shield Ass'n, 620 F. Supp. 907 (D. Md. 1985). The defendants moved to dismiss Maryland's suit on the grounds that their agreement to allocate territory was exempt from antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C. § 1012. Maryland moved for summary judgment on the same issue. During discovery, BCBSM offered testimony that its marketing department expressed interest from time to time in marketing across the boundary separating it from GHMSI's territory, but its CEO determined not to do so in part because it was prohibited by BCBSM's agreement with BCBSA.

220.     The court denied the motion to dismiss and the motion for summary judgment. Describing the defendants' agreement as "horizontal market allocation among insurance companies," the court held that material disputes precluded a finding on whether the agreement constituted the "business of insurance" for purposes of the McCarran Ferguson Act.

221.     Later in the case, shortly before the court was scheduled to rule on whether the case should be tried on a per se theory or under the rule of reason, the defendants settled the case. BCBSA allowed BCBSM and GHMSI to compete with each other throughout the state of Maryland until the later of January 1, 1991 or the completion of the Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

222.     As in Ohio, competition was not fatal. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHI's core business was profitable in 1992. (GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.) BCBSM reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well. GHMSI and BCBSM both continued to exist until they merged in 1998 to become CareFirst.

### **Improper Use of Trademarks to Restrict Competition for Providers**

223.     It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act. The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws. The agreed-to restrictions on the ability of the Blues to generate revenue

outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are per se violations of Section 1 of the Sherman Act.

224. Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions. The likelihood of increased competition is demonstrated in several ways. First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition. If there were no likelihood of competition, the restrictions would have been unnecessary. In fact, as set forth above, the restrictions did not initially address competition by non-Blue businesses owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well. Second, in certain portions of four states, limited competition among two Defendants has been permitted. For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California. Likewise, Highmark and Capital compete in Pennsylvania, with both operating effectively and successfully. In fact, the combined market share of Highmark and Capital is comparable to the market share of many individual Blues. The Blue Cross and the Blue Shield entities also compete in Washington and Idaho without any injury to their trademarks or trade names. Obviously, these markets are far from competitive due to the agreements of the other Defendants not to compete in these Service Areas. However, this competition demonstrates that competition among Blue Cross and Blue Shield licensees is not only possible but, in fact, does not undermine the Blue brand or trademark. Third, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues. For example, Anthem (formerly WellPoint), which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states. Prior to its merger with

WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states. Undoubtedly, absent the current restrictions, Anthem would readily compete in additional Service Areas and, in all likelihood, would compete nationally. Other Defendants, including HCSC, have, in fact, recently expanded into other areas and, in all likelihood, would compete nationally but for the restrictions described in this complaint. Fourth, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states. For example, Anthem has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup. Anthem also operates Caremore Centers in Arizona despite the fact that Anthem is not the Blue Cross Blue Shield licensee in Arizona. In addition, Defendant Blue Cross of Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services. Other Blues have likewise expanded into other Service Areas in a similar manner. Of course, these expansions are currently extremely limited by the restrictions on competition. While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for provision of healthcare services.

225. Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for payment of healthcare providers.

226. The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face

"[l]icense and membership termination." If a Member's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to Anthem's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

227.    In terms of their contracting and reimbursement practices with respect to healthcare providers, there is no danger of consumer confusion that would justify any territorial exclusions for the Blues.

### The BCBS Price Fixing and Boycott Conspiracy

228.    As a result of the Market Allocation Conspiracy, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area. Defendants therefore have reached a horizontal agreement and implemented a Price Fixing and Boycott Conspiracy through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues. The horizontal Conspiracy also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members. Those national programs include: A. Transfer Program; B. Inter-Plan Teleprocessing System (ITS); C. Blue Card Program; D. National Accounts Programs; E. National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and E. Inter-Plan Medicare Advantage Program.

229.    As part of their agreement to participate in the National Accounts Programs, the Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with

providers outside of their Service Areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

230.    Defendants achieved the Price Fixing and Boycott Conspiracy by agreeing that all Defendants would participate in the national programs including the Blue Card and National Accounts Programs,, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue. The Blue Card Program most commonly applies when employees reside in a different Service Area than the headquarters of their employer. The Blue Card and National Accounts Programs are also used to process claims for medical services for Blue members while traveling. Plaintiffs regularly treat patients who are insured by a Defendant or who are included in an employee benefit plan administered by a Defendant outside the Service Area where the medical treatment is rendered.

231.    The Defendant Blues implement the Conspiracy collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

232.    Each of the Defendant Blues either has market power or exclusive access to an element essential to effective competition. Through the national programs the Defendant Blues control more than one hundred million patients, something no other health insurance company has access to. These more than one hundred million patients provide the Defendant Blues a substitute for market power when Defendant Blues are dealing with providers. In fact, in many places providers treat more patients through the national programs than through the direct

subscribers of the local Defendant Blue. One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of Blue Cross and Blue Shield of North Carolina. When Blue Cross and Blue Shield of North Carolina demands below market rates from the subscribers in central North Carolina, it uses the many patients in the national programs to insist that the rates remain below competitive market rates.

233.    The national programs including the Blue Card and National Accounts Programs are implemented in a horizontal manner. For example, when a hospital in east Alabama billed other Defendant Blues directly for their subscribers, those Blues, including Blue Cross of Minnesota paid for those services at the rates that it normally pays, which are higher than the rates paid by Blue Cross of Alabama. When Blue Cross of Alabama learned of those payments, it then recouped the difference between those higher rates and the Blue Cross of Alabama rates from payments due for services for Blue Cross of Alabama subscribers. Based on information and belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped under the procedures established by the Defendant Blues on the IPPC. Also based on information and belief, Plaintiffs allege that in making the recoupments, Blue Cross of Alabama was following the procedures established by the Defendant Blues through the IPPC to enforce the price fixing conspiracy.

234.    When one Blue has a contract dispute or issue with a healthcare provider the other Blues, as independent horizontal conspirators and as horizontal conspirators through the Defendant Association, act to reinforce the market power of each of the Blues. In the proceeding brought by Plaintiff Dr. Cain when Blue Cross and Blue Shield of Kansas retaliated against her for being a class representative and attempted to terminate her from being a participating

physician after 16 years of service, Blue Cross and Blue Shield of Kansas City then refused to allow her into its Blue branded network. When Highmark refused to pay the University of Pittsburgh Medical Center ("UPMC") reasonable rates and instead was going to allow its contract with UPMC to expire, UPMC, one of the leading medical centers in the world, wrote to Blues throughout the country, requesting that they separately contract with UPMC. Some of the Blues, including Blue Cross of Alabama and Anthem Blue Cross of New Hampshire, responded directly and refused to negotiate. At the same time, the Defendant Association coordinated responses for a number of other Blues, and the Association communicated the refusal to negotiate for those other Blues. Other healthcare providers including one or more hospitals in North Carolina have attempted to negotiate contracts with Defendant Blues in other states but have received refusals from those Blues, while Blue Cross and Blue Shield of North Carolina continues to pay below market reimbursement rates.

235. Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan." The website of Defendant CareFirst describes Blue Card in the following manner:

### Key terms

Host Plan

Also called the local plan, where the actual medical service is provided; CareFirst is the Host Plan when a BCBS member from another Blue Plan service area obtains healthcare services from a CareFirst provider

Home Plan

The contracted BlueCross BlueShield Plan where the insured member is enrolled; The logo of the Home plan can be found on the member's BCBS insurance card.

Out-of-Area-Insured

An insured individual who is enrolled in a Blue Cross and Blue Shield other than CareFirst.

### Example

When you see an out-of-area insured patient like Julie Gilbert, submit your claims to CareFirst - the local or Host Plan. CareFirst then coordinates the claims process for you through the BlueCard program.



As the Host Plan, CareFirst receives your claim, codes and prices it according to contracted provider agreements, then sends an electronic submission to Julie's Seattle-based Home Plan.

When the Seattle-based Home Plan receives the information, the claim is processed by applying the Plan's medical policy, claim adjudication edits, and the member's benefit exclusions or limitations. The BCBS Plan then sends an electronic disposition back to the Host Plan, with instructions for paying the claim according to the Plan fee-schedule.

CareFirst then generates a voucher, pays you, and notifies the Home plan how the claim was paid.

236.    Under the National Accounts Program a Defendant Blue may administer a national or multi-state employee benefit plan.  In that instance, the Defendant Blue is the Control Plan while the other Defendant Blues are Participating Plans.  The Defendants divide the proceeds either through the Blue Card Program or through separate agreements they have entered into.

237.    To carry out the business of the Conspiracies, the Defendant Blues that are partners along with the BCBSA have established and own Defendant NASCO through which many of the Blues acting in concert process claims involved in National Accounts and other claims.  NASCO is a party to the Conspiracies and exists to implement them.

238.    "In 1987 NASCO was formed through a partnership with major Blue Cross and Blue Shield Plans."  It has been engaged in activity "for some of the largest Blue Cross and Blue Shield Plans for over 20 years."  NASCO establishes "work groups composed of NASCO associates and customers."  NASCO also works with the Blues to "ensure their compliance with Blue        Cross        and        Blue        Shield        Association        (BCBSA)        mandates." http://www.nasco.com/PDFs/2010_MarketingBrochure.pdf.

239.    NASCO not only provides a forum for the Conspiracies but also ensures that the agreements reached in the Conspiracies are implemented.

240.    In further support of the Conspiracies, numerous Blues and the BCBSA have also established CHP.  CHP, self-described as a "sales and marketing organization sponsored by 21 Blue Cross Blue Shield® Plans dedicated to positioning Blue Plans as the carrier of choice for national accounts," (http://www.consortiumhealthplans.com, last visited Sept. 30, 2014), is also a party to the Conspiracies and exists to implement them.   Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis.  The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

241.    For example, in a marketing brochure dated February 6, 2013 for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level.   In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics.

> ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-d4cb2f0a7b3f&groupId=10307, last visited Sept. 30, 2014.  The brochure further explains that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally.  The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

242.    Against this backdrop, the brochure boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care."  As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

(Emphasis added.)   Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors.  Indeed, as CHP itself says, ***"[n]o other carrier even comes close.***"   (Emphasis added.)   And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor.

243.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs.  http://www.questanalyticsgroup.com/pdf/ ClaimsQuest_Brochure.pdf, last visited Sept. 14, 2014, at 6.

244.     That same brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP.  In this regard, the brochure makes the following claims, among others:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

http://www.questanalyticsgroup.com/pdf/ClaimsQuest_Brochure.pdf, last visited Sept. 30, 2014.

245.     Thus, CHP harnesses claims data for the Blues in every state, MSA and zip code in the country and, using that data, supports the Blues in imposing deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

246.     As a result of the Price Fixing and Boycott Conspiracy, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with that Defendant.  Instead, the Home Plan pays the healthcare provider the discounted rate the Host Plan has achieved as a result of the Market Allocation Conspiracy.  For example, many members of plans insured or administered by Defendants Empire, BCBS of Illinois and BCBS of Michigan spend time in Florida during the winter months.  Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in

Florida must accept the prices paid by Defendant Blue Cross of Florida. Moreover, the Blues do not allow health care providers to have an escape clause to allow them to opt out of the national programs and contract separately with Blues.

247. Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices. The Price Fixing Conspiracy is a per se violation of Section 1 of the Sherman Act. It is also a violation under a quick look or rule of reason analysis.

248. In addition to lowering payments for providers, the national programs including the Blue Card Program, the National Accounts Program also impose numerous inefficiencies and burdens on them. While the rates paid for medical services are dictated by the Host or Participating Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home or Control Plan. The Home or Control Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area. Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. For example, Defendant BlueCross BlueShield of Tennessee administers the Nissan Employee Benefit Plan, which covers the many Nissan employees who reside in Mississippi and, accordingly, seek medical treatment there. For these patients, Defendant Blue Cross of Tennessee is the Home or Control Plan, while Defendant Blue Cross Blue Shield of Mississippi is the Host or Participating Plan. Blue Cross Blue Shield of Mississippi determines the price paid for services rendered by a healthcare provider in

Mississippi. However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BlueCross BlueShield of Tennessee. While the Mississippi provider has access to the rules for preauthorization or pre-notification for Blue Cross Blue Shield of Mississippi because BlueCross BlueShield of Tennessee boycotts the Mississippi providers from participating in its network as a part of its horizontal agreement with all the Blues, and the provider does not have ready access to BlueCross BlueShield of Tennessee's rules. In this example, the Mississippi healthcare provider can and does innocently fail to comply with the rules of BlueCross BlueShield of Tennessee and be paid nothing by BlueCross BlueShield of Tennessee, not even receiving the discounted amount that would result from the BCBS Price Fixing Conspiracy. When this happens, the healthcare provider has no recourse. Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan. Moreover, the illustration includes only one Home or Control Plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area.

249. Many Blues have different medical records requirements and timing for those requirements that apply to providers including hospitals. Hospitals find their bills being reduced or denied because they comply with the Host or Participating Blue's requirements (those where the hospital is located and where the hospital is in network) but not with the Control or Home Blue's requirements. Since the hospitals are not in network with the Control or Home Blue, those hospitals do not have ready access to those medical records requirements. In an effort to address this highly inefficient process, hospitals in Florida, where there are many Blue Card and

National Accounts subscribers, set up weekly telephone calls with Blues to try to learn the requirements of each of the plans for submitting medical records and other coverage requirements.  The employees of the hospitals spent hours week after week for an extended time to try to learn those requirements.  They would obtain inconsistent and incomplete answers to their inquiries.  Despite spending significant resources of the hospitals to comply with the Blues' multiple coverage requirements, the hospitals continued to have claims reduced and denied when they innocently failed to comply with one of those requirements.

250.    The national programs including the Blue Card and National Accounts Programs are so inefficient that the Defendants have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's Service Area.  However, the Defendants use and abuse the adjacent county rule to reinforce each other's market power.  For example, when Highmark has been attempting to force UPMC to accept lower reimbursement rates, UPMC asked Anthem Blue Cross of Ohio to contract with Harmot Hospital, which is in a county adjacent to Ohio.  Anthem Blue Cross of Ohio refused to have discussions about a contract with Harmot Hospital.  Plaintiffs allege that the refusal was part of a horizontal agreement under which the Defendant Blues attempt to reinforce each other's market power.

251.    Plaintiff U.S. Imaging has established a network of outpatient imaging centers that are located in all the states (and Puerto Rico) in the country except West Virginia and North Dakota.  Through this network U.S. Imaging offers discounted prices and concierge scheduling for imaging services for enrollees of various health insurance companies and self insured benefit plans and has a proven track record of saving significant amounts of money on imaging services.  U.S. Imaging has attempted to coordinate with the Blues in their capacity as self-insured group

administrators, but they have repeatedly refused to cooperate in any way with U.S. Imaging, in a concerted manner or a boycott. For example, on September 9, 2011, Anthem stated in an email that it could not do business with U.S. Imaging and its national imaging network because: "The Blue Cross and Blue Shield Association has established requirements that are meant to protect the exclusive service areas of the 39 [now 36] Blue Cross and Blue Shield Plans. The specific requirements that all Blue Cross and Blue Shield accounts must adhere to include: The local BCBS Plan must receive and price all local claims according to the applicable provider agreements and the local BCBS Plan must make all payments to its local providers (both in and out of network providers)."

252. As a result of their Price Fixing and Boycott Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

## Allegations Related to the Rule of Reason Claims

253. The Defendant Blues have market power in many markets over prices or payment rates for healthcare providers. Even in markets where Defendant Blues do not have high market concentrations, they have exclusive access to an essential element for competition, through the more than one hundred million subscribers of Blues involved in the Inter-Plan or national programs. This access provides market power beyond what might be suggested by the local enrollment share.

254. The market definitions both in terms of geographic and product descriptions will be determined by analysis of data that will be produced during discovery in this action. Those market definitions will be included in the motion or motions for class certification to be filed

after sufficient discovery.  Provider Plaintiffs reserve the right to add any needed additional class representatives at the time motions for class certification are filed.

255.    There are several product markets that are relevant to this case.  The health care financing market includes the various means of paying or reimbursing for health care services, goods and facilities other than the direct payment by individuals who are not insured or indemnified.  The market includes health insurance as well as the administration of health care related employee benefit plans. The Plaintiffs will refer to the markets where prices or payment rates for health care providers are determined generally as health services markets.  In the motion for class certification Plaintiffs will describe those markets in a more detailed way so that the participants may be ascertained through SIC codes or otherwise, and some of the class members may be outside of SIC code definitions 80 or 8000.  The health services markets consist of relevant health care providers on the one hand and the purchasers or payors for the services, goods and facilities of the health care providers on the other hand.  The relevant health care providers sell their services, goods and facilities in those markets.  The vast majority of those services, goods and facilities are paid for by health insurance companies acting as insurers or administrators, with the Blues being the largest collection of those companies.  The vast majority of the services, goods and facilities that are paid for by managed care companies are provided through in network contracts. Publicly available data demonstrate there are many geographic markets where it is obvious that Defendant Blues have market power.  The publicly available data and reports using that data generally use market concentration information from the health care financing markets and sometimes from health insurance markets.  Because of the access that each Blue has to the hundred million subscribers covered by the Blues, the publicly available data and reports understate the market power that each of the Blues has in the markets where

reimbursement rates or prices for health care providers are determined. For most if not all health care providers in many markets a Blue dictates the price to be paid to the providers. One of the publicly available reports is Competition in health insurance: A comprehensive study of U.S. markets, 2013 update (the "AMA Competition Study"), published by the American Medical Association. These data and reports also include participants in the health care financing market that are not readily available to many health care providers. For example, the AMA Competition Study includes Kaiser Permanente ("Kaiser"). In most markets where Kaiser is active in the health care financing market, it owns hospitals and ambulatory surgery centers and contracts for doctor services only with the Permanente Medical Group and does not purchase nonemergency medical services from other healthcare providers. As a result, for most healthcare providers Kaiser is not a close or reasonable substitute for the Blues when those healthcare providers decide whether to contract with one of the Blues. Moreover, the publicly available data on concentration of healthcare financing markets does not account for the hundred million subscribers that each of the Blues has access to through the conspiracies alleged herein. The Blues use the access to those hundred million subscribers to gain market power in the health services markets when their market share in the healthcare financing market would not otherwise give them that market power. Plaintiffs allege that an analysis of the data will ultimately show that there are many markets where a Blue has market power in health services markets even though a superficial analysis of the publicly available data for health care financing markets would not so indicate on its face.

256. Analysis of data to be produced during discovery is necessary to define geographic as well as product markets. In economic research geographic market areas are sometimes defined as metropolitan areas and sometimes as other areas. However, regardless of

how those markets are defined, the Blues have market power, and even where they do not have high market concentrations, they have exclusive access to elements essential to effective competition.

257.    In the following paragraphs Plaintiffs will use data from the latest AMA Competition Study.  Specifically, Plaintiffs will use market share data from the combined Health Maintenance Organization ("HMO"), Preferred Provider Organization ("PPO"), and Point of Service ("POS") product markets.  However, Plaintiffs allege that at least in many areas the Blues market shares will exceed the percentages used below when one accounts for the Blue Card and National Account Programs.  While the AMA Competition Study presents data at the metropolitan area level, Plaintiffs are not necessarily adopting the metropolitan areas as the appropriate antitrust markets for the Court to analyze, and Plaintiffs do not imply that non-metropolitan areas are outside the scope of their claims.  Instead, the markets will be specifically defined using data obtained during discovery and accepted economic methodology.  The data below is presented to show that there are markets throughout the country where the Defendants have high market concentration and market power.

258.    Defendant Blue Cross and Blue Shield of Alabama has market power throughout the State of Alabama in the health care financing market and in every market within Alabama.  It also has market power in the State of Alabama and in every health services market.  In Alabama, the Blue has an 86% market share in the entire state.  Its lowest market share is 82% in the Mobile area.  Its highest market share is 94% in the Gadsden area.  In addition, the Blue has market power and market share between 85% and 91% of the market in the Anniston-Oxford, Auburn-Opelika, Birmingham-Hoover, Decatur, Dothan, Florence, Huntsville, Montgomery and Tuscaloosa areas.

259.    Defendant Premera Blue Cross has market power throughout the State of Alaska in the health care financing market and in every market within Alaska.  It also has market power in the State of Alaska and in every health services market.  In Alaska, the Blue has a 60% market share in the entire state.  Its lowest market share is 55% in the Anchorage area.  Its highest market share is 67% in the Fairbanks area.

260.    Defendant Blue Cross Blue Shield of Arizona has market power at least in certain areas in Arizona in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Arizona in the health services markets and may have market power in the entire state.  For example, it has a 53% market share in the Flagstaff market and a 41% market share in the Prescott area.  Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Arizona.  The Blue uses those subscribers to increase its market power.

261.    Defendant Arkansas Blue Cross and Blue Shield has market power at least in certain areas in Arkansas in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Arkansas in the health services markets and may have market power in the entire state.  For example, it has a 56% market share in the Jonesboro market, a 52% market share in the Pine Bluff area, and a 40% market share in the Hot Springs area.

262.    Defendant Blue Cross of California d/b/a Anthem Blue Cross has market power at least in certain areas in California in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of California in the health services markets and may have market power in the entire state.  For example, it has a 50% market share in the Chico area, a 43% market share in the Bakersfield area,  a 58% market

share in the El Centro area, a 45% market share in the Fresno area, a 61% market share in the Hanfor-Corcoran area, a 49% market share in the Madera area, a 58% market share in the Merced area, a 42% market share in the Oxnard-Thousand Oaks-Ventura area, a 58% market share in the Redding area, a 65% market share in the Salinas area, a 59% market share in the San Luis Obispo-Paso Robles area, a 51% market share in the Santa Barbara-Santa Maria area, a 49% market share in the Santa Cruz-Santa Maria area, a 58% market share in the Visalia-Porterville area, and a 70% market share in the Yuba City-Maryville area. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Blue Cross of California would be the largest health insurer in California and would have a market share of more than 50% in many other areas in California. These percentages are presented only for Defendant Blue Cross of California. Defendant Blue Shield of California has somewhat lower market share percentages, but it and all of the other Blues are conspiring with Blue Cross of California. The analysis of market shares in this paragraph includes Kaiser. If Kaiser is excluded for reasons stated above, Blue Cross of California and Blue Shield of California will have much higher market share percentages in many areas in California. Discovery may also show that other Blues have market power in areas in California and reserve the right to present that evidence in the motion for class certification.

263.    Defendant Anthem Blue Cross and Blue Shield of Colorado, a subsidiary of Defendant Anthem, has market power at least in certain areas in Colorado in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Colorado in the health services markets and may have market power in the entire state. In Colorado, Kaiser has a significant presence. If Kaiser is excluded from the economic analysis, the Anthem market share will increase significantly.

264.    Defendant Anthem Blue Cross and Blue Shield of Connecticut, a subsidiary of Defendant Anthem, has market power at least in certain areas in Connecticut in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Connecticut in the health services markets and may have market power in the entire state. For example, it has a 41% market share in the State of Connecticut generally, a 49% market share in the New Haven-Milford area, and a 49% market share in the Waterbury area. It also maintains market power in portions of the state of Rhode Island. Anthem maintains a 50% market share in the Norwich-New London CT-RI area.

265.    Defendant Highmark Blue Cross and Blue Shield Delaware, a subsidiary of defendant Highmark, Inc., has market power throughout the State of Delaware in the health care financing market and in every market within Delaware.  It also has market power in the State of Delaware and in every health services market.  In Delaware the Blue has a 64% market share in the entire state.  Its lowest market share is 51% in the Wilmington area.  Its highest market share is 75% in the Dover area.

266.    Defendant CareFirst, through Defendant GHMSI, has market power in the District of Columbia in the health care financing market and in every health services market.  CareFirst has a 44% market share in the District of Columbia.

267.    Defendant Blue Cross and Blue Shield of Florida, Inc. has market power at least in certain areas in Florida in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Florida in the health services markets and may have market power in the entire state.  For example, it has a 56% market share in the Fort Walton Beach – Crestview – Destin area, a 40% market share in the Deltona-Daytona Beach-Ormond Beach area, a 61% market share in the Gainesville area, a 55%

market share in the Ocala market, a 43% market share in the Naples-Marco Island, FL area, a 67% market share in the Panama City/Lynn Haven area, a 46 % market share in the Pensacola-Ferry Pass- Brent area, a 43% market share in the Port St. Lucie-Fort Pierce area, an 84% market share in the Tallahassee area, and a 57% market share in the Vero Beach area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Florida. The Blue uses those subscribers to increase its market power.

268. Defendant Blue Cross and Blue Shield of Georgia, Inc., a subsidiary of Defendant Anthem, has market power at least in certain areas in Georgia in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Georgia in the health services markets and may have market power in the entire state. For example, it has a 57% market share in the Warner-Robins area, a 46% market share in the Albany area, 42% market share in the Athens-Clarke County area, a 44% area share in the Columbus GA-AL area, a 47% market share in the Valdosta area, and a 56% market share in the Hinesville/Fort Stewart area. Kaiser has some presence in Georgia and exclusion of it will affect some of the market share percentages.

269. Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii has market power throughout the State of Hawaii in the health care financing market and in every market within Hawaii. It also has market power in the State of Hawaii and in every health services market. In Hawaii, the Blue has a 65% market share in the entire state and has a 67% market share in the Honolulu area. If Kaiser is excluded from the analysis, then its market share will be even greater.

270. Defendant Blue Cross of Idaho Health Service, Inc., d/b/a Blue Cross of Idaho, has market power throughout the State of Idaho in the health care financing market and in every

market within Idaho. It also has market power in the State of Idaho and in every health services market. In Idaho, the Blue has a 54% market share. Its highest market share is 58% in the Pocatello area. It also maintains a 55% market share in the Boise-Nampa area, a 45% share in the Coeur d'Alene area, 53% market share in the Idaho Falls area, and a 45% share in the Lewiston ID-WA area. Idaho is one of the states where Blue Cross and Blue Shield compete with each other, and in many of these areas the second largest market share holder is fellow conspirator Regence BlueShield of Idaho.

271.    Defendant Blue Cross and Blue Shield of Illinois, a division of Defendant HCSC, has market power at least in certain areas in Illinois in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Illinois in the health services markets and may have market power in the entire state. For example, it has a 51% market share in the entire state. It also has a 58% market share in the Chicago/Naperville/Joliet area, a 48% share in the Bloomington-Normal area, a 57% market share in the Decatur area, a 51% market share in the Kankakee/Bradley market, a 45% share in the Lake County-Kenosha County, IL-WI area, and a 51% market share in the Rockford area.

272.    Defendant Anthem Blue Cross and Blue Shield of Indiana, a subsidiary of Defendant Anthem, has market power throughout the State of Indiana in the health care financing market and in every market within Indiana. It also has market power in the State of Indiana and in every health services market. It has a market share of 51% in the entire state. Its highest market share is 68% in the Anderson area. It also maintains a 56% market share in the Bloomington area, a 57% share in the Columbus area, a 62% share in the Elkhart-Goshen area, a 43% share in the Evansville IN-KY area, a 56% share in the Fort Wayne area, a 44% share in the Gary area, a 49% share in the Indianapolis area, a 54% share in Kokomo, a 56% share in the

Michigan City-LaPorte area, a 63% share in the Muncie area, a 41% share in the South Bend-Mishawaka, IN-MI area, a 66% share in the Terre Haute area.

273.    Defendant Wellmark Blue Cross and Blue Shield of Iowa has market power at least in certain areas in Iowa in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Iowa in the health services markets and may have market power in the entire state. For example, it has a 52% market share in the entire state. It also has 76% market share in the Iowa City area, a 60% market share in the Cedar Rapids area, a 42 % share in the Des Moines area, a 53% market share in the Ames area, a 47% share in the Sioux City IA-NE area, and a 50% market share in the Dubuque area.

274.    Defendant Blue Cross and Blue Shield of Kansas has market power at least in certain areas in Kansas in the health care financing market and may have market power in the entire state.  Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of Kansas City have separate Service Areas within Kansas, the statewide market share percentages do not tell a complete story of market shares.  It has market power at least in certain areas in the State of Kansas in the health services markets and may have market power in the entire state. For example, it has a 69% market share in the Topeka area (the home of Dr. Cain), a 45% share in the Wichita, Kansas and a 56% market share in the Lawrence area.

275.    Defendant Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant Anthem, has market power at least in certain areas in Kentucky in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the Commonwealth of Kentucky in the health services markets and may have

market power in the entire state. For example, it has a 66% market share in the Owensboro area, a 46% share in Elizabethtown area and a 63% market share in the Bowling Green area.

276.   Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana has market power throughout the State of Louisiana in the health care financing market and in every market within Louisiana.  It also has market power in the State of Louisiana and in every health services market.  For example, it has a 57% market share in the entire state. Also, it has a 64% market share in the Alexandria area, a 59% market share in the Houma/Bayou Cane/Thibodaux and Monroe areas, a 56% market share in the Shreveport/Bossier City area, a 55% market share in the Lafayette area, a 52% market share in the Baton Rouge area, a 51% market share in the New Orleans/Metairie/Kenner area, and a 50% market share in the Lake Charles area.

277.   Defendant Anthem Blue Cross and Blue Shield of Maine, a subsidiary of Defendant Anthem, has market power throughout the State of Maine in the health care financing market and in every market within Maine.  It also has market power in the State of Maine and in every health services market.  For example, it has a 53% market share throughout the state. It also has a 57% market share in the Bangor area, a 56% market share in the Lewiston/Auburn area, and a 53% market share in the Portland/South Portland area.

278.   Defendant CareFirst, Inc., through Defendant CareFirst of Maryland has market power throughout the State of Maryland in the health care financing market and in every market within Maryland.  It also has market power in the State of Maryland and in every health services market.  For example, it has a market share of 48% of the entire state of Maryland. It also has a market share of 70% in the Salisbury area, a 43% market share in the Bethesda-Gaithersburg-

Frederick area, a 42% Cumberland MD-WV area and a market share of 54% in the Baltimore/Towson area.

279.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. has market power at least in certain areas in Massachusetts in the health care financing market and may have market power in the entire state.   It has market power at least in certain areas in the State of Massachusetts in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (46%) throughout the entire state. It also has a 57% market share in the Pittsfield area, a 50% market share in the Lynn/Peabody/Salem area, a 42% market share in the Barnstable Town area, a 43% share in the Boston-Cambridge-Quincy area, a 45% share in the Framingham area, a 45% share of the Brockton-Bridgewater-Easton area, a 42% share of the Lowell-Billerica-Chelmsford, MA-NH area, a 48% share of the New Bedford area, a 40% share of the Springfield area, and 48% market share of the Taunton-Norton-Raynham area.

280.     Defendant Blue Cross and Blue Shield of Michigan has market power at least in certain areas in Michigan in the health care financing market and may have market power in the entire state.   It has market power at least in certain areas in the State of Michigan in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state. It also has an 81% market share in the Lansing/East Lansing and Niles/Benton Harbor areas, a 77% market share in the Battle Creek area, a 73% market share in the Bay City area, a 72% market share in the Ann Arbor area, a 71% market share in the Saginaw/Saginaw Township North area, a 69% market share in the Monroe and Warren/Farmington Hills/Troy areas, a 67% market share in the Jackson area, a 66% market share in the Kalamazoo/Portage area, a 64% market share in the Flint area, a 58% market share

in the Muskegon/Norton Shores area, and a 53% market share in the Detroit/Livonia/Dearborn area.

281.    Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota has market power at least in certain areas in Minnesota in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Minnesota in the health services markets and may have market power in the entire state where it has at least a 44% market share. For example, it has 56% market share in the Rochester area, a 46% share of the Duluth, MN-WI area and a 48% market share in the St. Cloud area.

282.    Defendant Blue Cross Blue Shield of Mississippi has market power at least in certain areas in Mississippi in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Mississippi in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (45%) throughout the entire state.  For example, it has a 52% market share in the Pascagoula area, a 44% market share of the Gulfport-Biloxi area, a 41% share of the Hattiesburg area,   and a 48% market share in the Jackson area.

283.    Defendant Blue Cross and Blue Shield of Kansas City has market power at least in certain parts of the states of Missouri and Kansas and the Kansas City area for the health care financing market and may have market power in the entire area.  It has market power at least in certain areas in the State of Kansas and Missouri in the health services markets and may have market power in the entire Kansas City area. For example, it has a 51% market share in the St. Joseph MO-KS area.

284.    Defendant Anthem Blue Cross and Blue Shield of Missouri, a subsidiary of Defendant Anthem, has market power at least in certain areas in Missouri in the health care

financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Missouri in the health services markets and may have market power across the entire state. Discovery may also show that other Blues have market power in areas in Missouri and reserve the right to present that evidence in the motion for class certification

285. Defendant Blue Cross and Blue Shield of Montana, a division of Defendant HCSC, has market power at least in certain areas in Montana in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Montana in the health services markets and may have market power in the entire state. For example, it has a market share of 41% in the Great Falls area.

286. Defendant Blue Cross and Blue Shield of Nebraska has market power throughout the State of Nebraska in the health care financing market and in every market within Nebraska. It also has market power in the State of Nebraska and in every health services market. For example, it has a 56% market share in the entire state. It also has 60% market share in the Lincoln area.

287. Defendant Anthem Blue Cross and Blue Shield of Nevada, the trade name of Defendant Rocky Mountain Health and Medical Services, Inc., both subsidiaries of Defendant Anthem, has market power at least in certain areas in Nevada in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Nevada in the health services markets and may have market power in the entire state. For example, it maintains a market share of 44% in the Carson City area.

288. Defendant Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, a subsidiary of Defendant Anthem, has market power at least in certain areas in New Hampshire in the health care financing market and may have

market power in the entire state where it has a 44% market share.  It has market power at least in certain areas in the State of New Hampshire in the health services markets and may have market power in the entire state. For example, it has a market share of 53% in the Rochester/Dover area, and a 44% market share in the Portsmouth, NH-ME area

289.    Defendant Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross and Blue Shield of New Jersey has market power at least in certain areas in New Jersey in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of New Jersey in the health services markets and may have market power in the entire state. For example, it has a 60% market share in the Atlantic City area, a 57% market share in the Ocean City area, and a 42% share of the Vineland-Milville-Bridgeton area.

290.    Defendant Blue Cross and Blue Shield of New Mexico, a division of Defendant HCSC, has market power at least in certain areas in New Mexico in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of New Mexico in the health services markets and may have market power in the entire state. For example, it maintains a 41% market share in the Santa Fe area.

291.    Defendant Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, a subsidiary of Lifetime Healthcare, Inc., has market power at least in certain areas in New York in the health care financing market.  It has market power at least in certain areas in the State of New York in the health services markets. For example, it has a 56% market share in the Elmira area, 53% market share in the Syracuse area, a 43% market share in the Binghamton area, and a 41% market share in the Rochester area.  Discovery may also show that other Blues have market power in areas in New York and reserve the right to present that evidence in the motion for class certification.

292.    Defendant Blue Cross and Blue Shield of North Carolina has market power throughout the State of North Carolina in the health care financing market and in every market within North Carolina.  It also has market power in the State of North Carolina and in every health services market.  For example, it has a market share of almost half of the entire state. It also has a market share of 76% in the Goldsboro area, a market share of 75% in the Greenville area, a market share of 70% in the Rocky Mount area, a market share of 61% in the Hickory/Morganton/Lenoir area, a 47% market share in the Burlington area, a 44% market share in the Durham area, a 45% share in the Greensboro-High Point area, a 46% share in the Wilmington area, a 42% share of the Winston-Salem area, and a 51% market share in the Asheville area.

293.    Defendant Noridian Mutual Insurance Company, d/b/a Blue Cross Blue Shield of North Dakota has market power at least in certain areas in North Dakota in the health care financing market.  It has market power at least in certain areas in the State of North Dakota in the health services markets. For example, it has a 56% market share in the entire state.

294.    Defendant Community Health Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio, a subsidiary of Defendant Anthem, has market power at least in certain areas in Ohio in the health care financing market.  It has market power at least in certain areas in the State of Ohio in the health services markets.  It has a market share of 38% in the Cincinnati/Middletown area, but since that area borders on Kentucky where Defendant Anthem also has the Blue, it likely has market power through its combined operations.

295.    Defendant Blue Cross and Blue Shield of Oklahoma has market power at least in certain areas in Oklahoma in the health care financing market.  It has market power at least in certain areas in the State of Oklahoma in the health services markets. For example, it has a

market share of nearly half of the entire state. It also has a market share of 49% of the Tulsa area and a 45% share of the Oklahoma City area.

296.    Defendant Regence BlueCross BlueShield of Oregon, a subsidiary of Defendant Cambia Health, has market power at least in certain areas in Oregon in the health care financing market.  It has market power at least in certain areas in the State of Oregon in the health services markets. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Regence BlueCross BlueShield of Oregon would be the largest health insurer in Oregon and would have a market share of more than 50% in many areas in Oregon.

297.    Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania has market power at least in certain areas in Pennsylvania in the health care financing market.   It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% market share in each of the Scranton/Wilkes-Barre and Williamsport areas.   Defendant Highmark Blue Cross Blue Shield, a subsidiary of Defendant Highmark, finalized its merger with Blue Cross of Northeastern Pennsylvania on June 1, 2015.

298.    Defendant Highmark, Inc., the parent of Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield, has market power at least in certain areas in Pennsylvania in the health care financing market.  It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 75% market share in the Johnstown area, a 73% market share in the Altoona area, a 69% market share in the Erie area, a 52% market share in the Pittsburgh area, a

45% share of the Harrisburg-Carlisle area, a 46% share of the Lebanon area, a 43% share of the Reading area, a 46% share of the State College area and a 42% of the York-Hanover area.

299. Defendant Independence Blue Cross has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 58% market share in the Philadelphia area.

300. Defendant Triple-S of Puerto Rico has market power in the health care financing market or markets in Puerto Rico. It also has market power in the health service markets in Puerto Rico. While the AMA Study does not contain data on Puerto Rico, the data from the National Association of Insurance Commissioners shows a 90% market share for the top four health insurance companies, and Plaintiffs allege that Triple-S of Puerto Rico is a significant portion of that percentage.

301. Defendant Blue Cross and Blue Shield of Rhode Island has market power at least in certain areas in Rhode Island in the health care financing market. It has market power at least in certain areas in the State of Rhode Island in the health services markets. For example, it has a market share of 50% across the entire state.

302. Defendant BlueCross BlueShield of South Carolina, Inc. has market power throughout the State of South Carolina in the health care financing market and in every market within South Carolina. It also has market power in the State of South Carolina and in every health services market. In South Carolina, the Blue has a 60% market share in the entire state. Its highest market share is 71% in the Sumter market. It also maintains a market share of 57% in the Greenville area, a 63% share in the Anderson area, a 62% share in the Charleston-North

Charleston area, a 61% share of the Columbia area, a 63% share of the Florence area, a 64% share of the Myrtle Beach area, and a 64% share of the Spartanburg area.

303.    Defendant Wellmark of South Dakota, Inc., d/b/a Wellmark Blue Cross and Blue Shield of South Dakota has market power at least in certain areas in South Dakota in the health care financing market.  It has market power at least in certain areas in the State of South Dakota in the health services markets.  For example, Wellmark has a 41% market share of the Rapid City area.

304.    Defendant BlueCross BlueShield of Tennessee, Inc. has market power at least in certain areas in Tennessee in the health care financing market.  It has market power at least in certain areas in the State of Tennessee in the health services markets. For example,  It has almost half of the market for the entire state of Tennessee. It also has a 51% market share of the Nashville-Davidson-Murfreesboro area, a 50% market share in the Jackson area, a 46% market share in the Chattanooga TN-GA area, a 44% share of the Cleveland area, a 46% share of the Johnson City area, and a 47% share of the Morristown area.

305.    Defendant Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, has market power at least in certain areas in Texas in the health care financing market.  It has market power at least in certain areas in the State of Texas in the health services markets. For example, it has a 78% market share in the Laredo area, a 75% market share in the Wichita Falls area, a 74% market share in the San Angelo area, a 66% market share in the Odessa area, a 65% market share in the McAllen/Edinburg-Mission area, a 62% market share in the Midland area, a 61% market share in each of the Brownsville/Harlingen and Tyler areas, a 59% market share in each of the Lubbock and Texarkana areas, a 56% market share in the Longview area, a 55% market share in the Waco area, a 53% market share in the College Station/Bryan and Corpus

Christi areas, a 41% share of the Waco area, a 48% share of the Sherman-Denison area and a 51% market share in the Beaumont/Port Arthur area.

306.    Defendant BlueCross BlueShield of Utah, a subsidiary of Defendant Cambia Health, has the Blue Service Area for Utah. Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

307.    Defendant Blue Cross and Blue Shield of Vermont has market power at least in certain areas in Vermont in the health care financing market.  It has market power at least in certain areas in the State of Vermont in the health services markets. For example, it has a market share of 42% in the Burlington/South Burlington area.

308.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., a subsidiary of Defendant Anthem, has market power at least in certain areas in Virginia in the health care financing market.  It has market power at least in certain areas in the State of Virginia in the health services markets. For example, it has an 85% market share in the Danville area, a 77% market share in the Blacksburg/Christianburg/Redford area, a 68% market share in the Harrisonburg area, a 67% market share in the Roanoke area, a 62% market share in the Lynchburg area, a 56% market share in the Winchester area, a 52% market share in the Virginia Beach/Norfolk/Newport News area, a 50% market share in the Richmond area, and a 47% share of the Charlottesville area.  CareFirst has the Blue Service Area in the northern part of the state near Washington, D.C.  Plaintiffs do not have data for the market share in that Service Area.  If discovery demonstrates that CareFirst has market power in that area, then Plaintiffs will address the issue in their motion for class certification.

309.     Defendant Premera Blue Cross has market power at least in certain areas in Washington in the health care financing market.  It has market power at least in certain areas in the State of Washington in the health services markets. For example, it has a 69% market share in the Wenatchee area.  Defendant Regence BlueShield also operates in Washington and has significant market shares in areas in Washington.  Kaiser also has a significant presence in Washington, and as stated above, may need to be excluded from the analysis of whether Premera or Regence has market power over providers in Washington or markets for health services in that state.  There may also be other managed care companies or health insurance companies operating in Washington that should be excluded from the market power analysis. Especially if Kaiser is excluded, Regence has market power in markets for health services in Washington.  These issues will be further addressed and developed in the Plaintiffs' motion for class certification.

310.     Defendant Highmark of West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, a subsidiary of Defendant Highmark, has market power at least in certain areas in West Virginia in the health care financing market.  It has market power at least in certain areas in the State of West Virginia in the health services markets. For example, it has a market share of 41% in the entire state of West Virginia, 42 % of the Charleston, WV area, and a 40% share of the Morgantown area.

311.     Defendant Blue Cross Blue Shield of Wisconsin, a subsidiary of Defendant Anthem, has the Blue Service Area for the State of Wisconsin.  Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

312.     Defendant Blue Cross Blue Shield of Wyoming has the Blue Service Area for the State of Wyoming.  Plaintiffs will conduct discovery to determine whether it has market power

in any health services markets and, if so, will include those markets in the motion for class certification.

313. As described above, the Blues have more members than any health insurance or managed care company in the country. Two of the four largest health insurance companies in the country, four of the largest ten, and 15 of the largest 25 are Blues. Attachment A is a listing of the market share of the top four and top eight health insurance companies by state from 2004 through 2014 as reported by the National Association of Insurance Commissioners ("NAIC"). Evidence will be introduced that shows Anthem is prevented from crossing the Georgia line to compete in Alabama, and other empirical evidence is consistent with all the other Blues agreeing not to compete in Alabama in health insurance markets as well. If the Blues were allowed to compete, the market share for the largest four health insurance companies in Alabama would likely be much less. It would also be expected that market power for any one company would diminish. Evidence will show that HCSC is prevented from crossing the Illinois state line to compete in Indiana and prevents Anthem from crossing the Indiana state line to compete in Illinois. If the Blues were allowed to compete, the market share for the four largest health insurance companies in Illinois and Indiana would by definition fall below 80%. The HHI Market Concentration Index calculated from the NAIC data places many states in the highly concentrated range based upon ratios used by the United States Department of Justice. If the Blues Market Allocation Conspiracy is as alleged, the market shares of the top four health insurance companies, the market shares for the top eight insurance companies, and the HHI indices would likely be lower in every state.

314.     Having fewer competitors in any market generally gives the players in that market more access to market power, a greater ability to use market power, and a greater ability to use exclusive access to elements essential to effective competition, all else being equal.

315.     The Blues engage in a number of practices to increase their market power and to ensure that they alone have access to exclusive access to elements essential to effective competition.  Through the conspiracies alleged in this complaint, the Blues have exclusive access to more than one hundred million subscribers of all the conspiring Blues.  The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

316.     As demonstrated in the preliminary injunction proceeding for Dr. Cain, healthcare providers have essentially no choice but to be part of the networks of the Blues in order to remain in business.  The Blues have a general policy of refusing to honor assignments from subscribers to providers as a part of their overall effort to coerce providers to be in network.  The Blues also structure and implement out of network benefits for subscribers in a way that discourages them from using those benefits.  The Blues either eliminate or cap out of network benefits so that it costs subscribers significantly more to use their out of network benefits.  If Providers attempt to limit the out of pocket costs of subscribers who use their out of network benefits, the Blues retaliate against those Providers.  When Providers believe their patients are better served by using an out of network facility, the Blues retaliate by threatening to terminate the Providers from the Blue networks.

317.     As Dr. Noether described in the submission by Defendant Capital Blue Cross, there are significant barriers to entry for the health care financing market and therefore to be a payor for healthcare goods, services and facilities in the markets where prices are determined for healthcare providers.  One of the barriers is the development of a provider network.

318. Some of the Blues have imposed most favored nation ("MFN") clauses to create additional barriers to entry. An MFN is both an indicator of market power and a source of market power because it excludes competitors. Other Blues that do not have express MFNs in their contracts have the functional equivalent that operate in the same manner.

319. The Blues' restraints have anticompetitive effects. Service areas are anticompetitive on their face: they prevent the Blues from competing with each other.

320. The Blues' agreement to limit the amount of non-Blue business they may conduct in another Blue's service area is anticompetitive on its face.

- The agreement puts an artificial limit on competition.

- The agreement reduces the incentive for the Blues to develop business out of their Service Areas because they know that the potential for that business is limited.

321. The Blues would compete with each other but for the Market Allocation Conspiracy.

- Historically, Blue-on-Blue competition happened in certain places such as Ohio, North Carolina and Illinois.

- Blue Cross and Blue Shield organizations competed against each other for many years and still do in certain places, including California, Washington, Idaho, and Central Pennsylvania.

- The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*, resulted from one Blue's desire to compete outside of its service area; BCBSA ultimately agreed to allow all of Ohio's Blues to compete with each other, which they did.

- BCBSA settled the Maryland Blues litigation by allowing the D.C.-area Blues to compete against each other.

- Blues compete against each other in a limited way with respect to health care providers in areas covered by the one-county rule.

- Many of the Blues, especially the larger ones, such as Anthem and HCSC, have expanded into other territories, but in a limited way because of the limits on their non-Blue business.

- The BCBSA prevents Blues from expanding into other Service Areas.

322.   The Price Fixing and Boycott Conspiracy and the national programs including the Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program are anticompetitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients (e.g., BCBS-FL providers treating Empire subscribers).

323.   Provider reimbursements are lower when the market for health care financing is highly concentrated.

324.   The Blues' agreements not to compete with each other, in addition to the other unlawful means of suppressing competition described in this complaint, constitute an agreement to monopsonize the market for health care services. In some area, the Blues have successfully monoposonized the market for health care services, while in others, the Blues have a dangerous probability of success.

325.   Output of health care services is reduced when the market for health care financing is highly concentrated.  For example, Alabama has the highest market concentration of any Blue in the country, and it also has the smallest number of primary care physicians per 100,000 patients of any state in the country.  This low ratio is especially damaging to public health and consumer welfare in Alabama because there is a national shortage of primary care

physicians.  The national shortage of primary care physicians and the even greater shortage in Alabama have resulted from the low reimbursement rates paid by Defendants.  Since Blue Cross and Blue Shield of Alabama has the largest market share of any health insurance company in the country, it is able to reduce provider reimbursement rates even more than other Blues.  Primary care physicians in Alabama have retired early and continue to retire early because the reimbursement rates paid by Blue Cross of Alabama are too low to make it worthwhile for them to continue practicing medicine.  These early retirements have made and are making the shortage of primary care physicians even worse.

326.  The Blues' outrageous levels of capital show that they have used their market power to earn supracompetitive returns.

327.  The Blues' agreements contain enforcement mechanisms.

- A Blue that disobeys the restriction on competition can have its license revoked.

- Non-Blue companies that might favor competition effectively cannot buy a Blue because the BCBSA board must approve an applicant for a license.

328.  The Blues' restraints offer no procompetitive benefits.

329.  The BCBSA agreement does not create a new product.

- The Blues cannot define the "new product" as a "Blue system that competes with nationally integrated insurers," as they did in their motion to dismiss; in *American Needle*, the Supreme Court stated, "Members of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products."

- Many other insurers have figured offer nationwide coverage to their subscribers without participating in territorial market allocation, price-fixing or boycott.

330.    The Blues do not need service areas to compete with national insurers.

•       The Blues include several of the largest insurers in the country, which operate in several states and would operate more broadly including nationwide but for the Market Allocation Conspiracy.

•       Other Blues, such as BCBS-AL, have more than held their own against national insurers.

331.    Service areas do not enhance efficiency by allowing the Blues to remain focused on their local areas.

•       Without service areas, Blues could still focus on their local areas if they choose.

•       BCBSA's actions undermine this argument; the Blues used to be more locally focused, but BCBSA required them to merge and operate statewide.

•       The existence of large multi-state Blues like Anthem and HCSC belies this argument as well.

332.    The Blues have argued that service areas prevent free riding, but there are less restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain standards and invest in the development of the brand.

333.    The Blues have argued that service areas prevent customer confusion, but Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when service areas were challenged there.  Moreover, the restrictions on competition with health care providers have no relevance to consumer confusion.

334.    Limiting the Blues' ability to compete outside of their service areas without using the Blue marks has no plausible procompetitive benefit.

335.    MFNs offer no procompetitive benefits.

336.    The national programs including the Blue Card Program and National Accounts Programs result in many inefficiencies that increase costs to health care providers and reduce consumer welfare.  The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating States to be in-network providers create many of those inefficiencies as described in more detail above.  Any alleged procompetitive effects of these Programs are far outweighed by the anticompetitive effects that they create.  Moreover, there is no justification for the price fixing aspects of these Programs.

337.    The Blues do not need to engage in the Price Fixing and Boycott Conspiracy to offer health insurance or health care financing on a regional or national basis.  Other health insurance companies or managed care companies offer health insurance or health care financing on a regional or national basis without engaging in such illegal conspiracies.

## Other Abuses That Preserve the Blues' Enhanced Market Power

338.    In addition to the harms set forth above, healthcare providers are harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy.

339.    For example, a number of the Blues use MFNs with hospitals and other facilities.  According to at least some defense counsel, Defendant BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."  Although the Michigan legislature recently made MFNs unlawful, the statement of BCBS-MI also applies to other Blues.  The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract.  Defendant Blue Cross of Alabama is one of the Defendants that uses such

terms in its contracts with hospitals. As a result of the extremely high market share held by Blue Cross of Alabama, this prohibition of use provision is effectively the same as an MFN.

340. All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996). By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

341. In addition, Defendants, including CareFirst, require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers. Defendants thereby create asymmetric information in the market for the purchase of healthcare provider services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

342. Finally, Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive "reserves" (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below market rates offered in a market free from competition from other Blues. All of this is undertaken in an attempt to further drive down payment rates to providers and to raise barriers for competing firms to enter these markets.

## Antitrust Injury

343. Defendants' illegal activities have resulted in antitrust injury and harm to competition.

344.    Through their violations of the antitrust laws, Defendants have agreed that they will not compete with each other.  The effect is to prevent two of the largest four, four of the largest ten, and fifteen of the largest 25 health insurance or managed care companies from competing in other states, causing increased market concentration and reduced competition throughout the country.

345.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in the state of Pennsylvania has been and continues to be harmed in that the other Blues agree not to enter Highmark's, BC-NEPA's, and/or IBC's Service Areas to compete with Highmark, BC-NE PA, and/or IBC no matter the circumstances.

346.    The Defendants have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets and have limited the ability of other health insurers to compete in other markets.  The Defendants suppressed prices for provider goods, services and facilities and have injured competition depriving patients of choices in the marketplace for healthcare providers.

347.    Additionally, because most of the Blues are monopolists in the health care financing and health insurance markets, in addition to being monopsonists in the health services markets, it does not stand to reason that lower payment rates necessarily lower consumers' premiums.  R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-

reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

348.    In the long run, the Blues' monopsony power gained by virtue of their unlawful agreements will harm consumers.  Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay.  A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians.  "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," available at http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).  Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants.  According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation.  According to the 2013 Annual Report of the American Association of Medical Colleges, there will be a shortage of 90,000 physicians across all specialties by 2020.   Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.  Hospitals and other facilities are closing.  Other facilities are reducing services offered to consumers.  Still others that would otherwise expand are not doing so as a result of the Blues' low payments.

349.    In the end, economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

350. In addition, Plaintiffs suffer because agreements not to compete also restrict their choices in the market. Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area. This has the effect of depressing the payment rates in the market for in- and out-of-network services.

351. During the class period including after 2010, the Blues implemented new fee schedules for providers, generally on an annual basis. Those new fee schedules are lower than they would have been without the Defendants' anticompetitive conduct. The new fee schedules have created new antitrust injuries and damages for the health care providers.

352. Defendants' illegal activities have resulted in harm to competition. Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between non-competitive rates or being put out of business through coercion.

353. Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened future harm to Plaintiffs' business and property.

354. If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

## Defendants, Even Those Organized As Not For Profit, Enjoy Supracompetitive Profit

355. Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits. Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace. As

Case 2:13-cv-03565-PBT Document 5 Filed 07/10/15 Page 157 of 190

Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

356.    Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues formed for-profit subsidiaries. A number of those then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

357.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

358.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

359.    Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks. These perks offer nice privileges to

management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

360.     Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services.  Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

361.     By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

362.     The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

363.     For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the

company or one of its affiliated entities. Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

364. In addition, despite claiming to be "not-for-profit," many of these Blues hold massive "reserves" built off the net income spread between the high premiums they charge customers and the below market rates they pay to Providers. Those excessive reserves have resulted in higher costs to consumers.

365. Below is an illustration of the huge amounts of capital being held in excess of requirements by a number of not-for-profit Blues. As of Sept. 30, 2010, 33 "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by the BCBSA. The chart below details those "reserves":

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |

of Tennessee

| | | | |
|---|---|---|---|
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

366.    Many of the Blues undersell their actual reserves substantially by citing only the surplus from the mainline company, but not the general reserves on the companies' combined reporting statements, which accounts for all lines of business.

367.    In South Carolina, for instance, BlueCross BlueShield of South Carolina's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

368.    Members of the Board of BlueCross BlueShield of South Carolina "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show." They were required to do little but show up to the occasional meeting.

369.    This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies.  BlueCross BlueShield of South Carolina paid executives in the millions of dollars in 2010.

370.    HCSC, a conglomerate of several Blues, including Blue Cross and Blue Shield of Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012.  This net income does not even account for large blocks of plans it merely administers for the self-insured.  "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus.  The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011."  "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million in 2012."  See http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million.

371.    Likewise, large salary increases for executives with Blue Cross and Blue Shield of Alabama have recently been reported. Such salaries result in higher costs to consumers. These supracompetitive profits are built on the strength of Defendants' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force Providers to join their networks at below-market rates.  A spokeswoman for BlueCross BlueShield of South Carolina noted that the outrageous increases are priced "to reflect its superior networks."  Thus, the market power of the Blues allows them to pay below market rates to Providers.  This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

372.    If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

## Implementation of the Affordable Care Act

373.    When President Obama presented the Affordable Care Act to the Joint Session of Congress, he discussed the importance of competition among health insurers and cited BCBS-AL as a poster child for operating a concentrated market.  The ACA created insurance exchanges to encourage competition among health insurers. The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places.  The Blues have used their market power and their exclusive access to elements essential to competition to increase their market shares through the mechanisms created by the ACA.

374.    Of the 15 states where complete data on market share of the health insurance exchanges are available, Blues have obtained the greatest percentage of covered lives in 12 of those states.  The 12 states (including the District of Columbia) are California, Colorado, Connecticut, Indiana, Virginia, the District of Columbia, Florida, Maryland, Michigan, Rhode Island, Vermont, and Washington. Plaintiffs allege that even though the data is not available in many other states including Alabama and Tennessee, the Blues have increased their market shares through the exchanges.

## Class Action Allegations

375.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of healthcare providers.  First, Plaintiffs bring this action seeking injunctive relief pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following Class (the "Nationwide Injunction Class"):

> All healthcare providers, not owned or employed by any of the Defendants, who currently provide healthcare services, equipment or supplies in the United States of America.

376. Further, Plaintiffs bring this action seeking damages pursuant to the provisions of Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

> All healthcare providers, not owned or employed by any of the Defendants, in the United States of America, who provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant within four years prior to the date of the filing of this action.

For Plaintiffs' claims relating to violations of Section 1 of the Sherman Act under the rule of reason (Counts VI and VII), and claims relating to monopsonization and attempted monopsonization under Section 2 of the Sherman Act, (Counts VIII and IX), this class will have subclasses based on the geographic area in which each Plaintiff practices. In paragraphs 255 to 315, Plaintiffs have identified a number of geographic areas in which Defendants have market power. For Counts VI, VII, and IX, there is a subclass for each geographic area in which a Defendant has a market share of 40% or more, although Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis. For Count VIII, there is a subclass for each geographic area in which a Defendant has a market share of 70% or more although Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis. Prior to class certification, Plaintiffs reserve the right to amend the definition of the subclasses if discovery into Defendants' market power warrants.

377. Plaintiffs also reserve the right to request class certification under Rule 23(c)(4), Federal Rules of Civil Procedure.

378. Plaintiffs are all members of both Classes, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are represented by counsel who are competent and experienced in the

prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

379. The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members. The Class Members are so numerous that joinder of all members is impracticable.

380. Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact.

381. Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

382. There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

    a.    Whether Defendants violated Section 1 of the Sherman Act;

    b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

    c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d.   Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e.   Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f.   Whether Defendants violated Section 2 of the Sherman Act;

g.   Whether the Blues collectively or any particular Blue has market power in a particular market;

h.   Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;

i.   Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

j.   Whether Defendants' conduct should be enjoined;

k.   The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

383.   These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

384.   The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

385.   This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class Members are small in relation to the expense

and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

**COUNT I**

**Claim for Injunctive Relief, 15 U.S.C. § 26**

386.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 385 as though set forth herein.

387.     This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

388.     As explained in Counts II through VII, Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S. C. § 1 under a per se, quick look, or rule of reason analysis.

389.     As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

390.     Defendants' unlawful conduct threatens to continue to injure Plaintiffs.  Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their illegal conspiracies and to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

391.     Plaintiffs reserve the right to seek preliminary injunctions as necessary.

**COUNT II**

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
(The *Per Se* Market Allocation Conspiracy)**

392.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 391 as though set forth herein.

146

393.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

394.    As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

395.    Defendants have agreed to divide and allocate the geographic markets for the finance of health care into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined.  By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing the rates paid to healthcare providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.  Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

396.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## COUNT III

### Claim for Threefold Damages and Interest,
### 15 U.S.C. § 15
### (The *Per Se* Price Fixing and Boycott Conspiracy)

397.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 396 as though set forth herein.

398.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

399.    The BCBS Price Fixing and Boycott Conspiracy operates in addition to and reinforces the Market Allocation Conspiracy.   The Conspiracy alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a per se violation of the Act.

400.    Through the Price Fixing and Boycott Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs.  By so doing, Defendants have agreed to suppress competition by fixing and maintaining the rates paid to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act.  Defendants' price fixing agreement through the national programs is per se illegal under Section 1 of the Sherman Act.

401.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

402.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT IV

### Claim for Threefold Damages and Interest,
### 15 U.S.C. § 15
### Quick Look Claim for Market Allocation Conspiracy

403.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 402 as though set forth herein.

404.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

405.    Under a quick look analysis Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act.

406.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).  The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

407.    The Market Allocation Conspiracy prevents many of the largest companies in the country offering health care financing including health insurance, from competing either throughout the country or in larger regions of the country.

408.    The Market Allocation Conspiracy has no pro-competitive effect.  The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

409.   The Defendants have not offered any new product.   Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

410.   Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

411.   As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.   Such injury flows directly from that which makes Defendants' conduct unlawful.   These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

412.   Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT V

**Claim for Threefold Damages and Interest,**
**15 U.S.C. § 15**
**Quick Look Claim for Price Fixing and Boycott Conspiracy**

413.   Plaintiffs incorporate the allegations set forth in paragraphs 1 through 412 as though set forth herein.

414.   Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

415.   Under a quick look analysis Defendants' Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act.

416.  "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).  The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

417.  The Price Fixing and Boycott Conspiracy has the same effect and also results in price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from negotiating the price of health care providers' services. See Nat'l Soc. of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978).

418.  The Price Fixing and Boycott Conspiracy has no pro-competitive effect.  The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

419.  The Defendants have not offered any new product.  Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

420.  Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

421.  As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

422.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VI

**Claim for Threefold Damages and Interest,**
**15 U.S.C. § 15**
**Rule of Reason Claims for Market Allocation Conspiracy**

423.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 422 as though set forth herein.

424.     Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

425.     Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

426.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

427.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VII

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
Rule of Reason Claims for Price Fixing and Boycott Conspiracy**

428.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 427 as though set forth herein.

429.     Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

430.     Defendants Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

431.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

432.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VIII

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
(Monopsonization)**

433.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 432 as though set forth herein.

434.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

435.    As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained a monopsony in the market for health care services in certain geographic areas listed in paragraphs 255 to 315. For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants. These monopsonies have been durable, lasting for decades.

436.    These Defendants' creation of monopsonies was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsonies.

437.    By willfully creating or maintaining a monopsony, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

438.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for the Defendants' anticompetitive conduct.

439. As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## COUNT IX

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
(Monopsonization)**

440. Plaintiffs incorporate the allegations set forth in paragraphs 1 through 439 as though set forth herein.

441. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

442. As alleged more specifically above, the Defendants have engaged in conduct by which they have attempted to create or maintain a monopsony in the market for health care services in certain geographic areas listed in paragraphs 255 to 315. For purposes of this Count, these Defendants are the ones identified as having a market share of 40% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants.

443. These Defendants specifically intended to create monopsonies. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsonies.

444. By attempting to create or maintain a monopsony, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when the Defendants have not yet created or maintained a monopsony, their conduct has created a dangerous risk of success.

445.     As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for the Defendants' anticompetitive conduct.

446.     As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## COUNT X

### Claim for Threefold Damages and Interest,
### 15 U.S.C. § 15
### (Conspiracy to Monopsonize)

447.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 446 as though set forth herein.

448.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

449.     As alleged more specifically above, the Defendants have agreed to restrict competition among themselves in the market for health care services and thus to create monopsony power.  The Defendants specifically intended to create a monopsony. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsonies.  All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

450.     By conspiring to create or maintain a monopsony, the Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

451.     As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for the Defendants' anticompetitive conduct.

452.     As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.     Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.     Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.     Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

d.     Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

e.       Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.       Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

g.       Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

h.       Award Plaintiffs and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

i.       Award costs and attorneys' fees to Plaintiffs;

j.       Award prejudgment interest;

k.       For a trial by jury; and

l.       Award any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 17, 2015                    Respectfully submitted,

/s/ John A. Corr
John A. Corr
PA Attorney No. 52820
Stephen A. Corr
PA Attorney No. 65266
STARK & STARK, P.C.
777 Township Line Road
Yardley, PA  19067-5559
Tel: (267) 759-9684
Fax: (267) 907-9659
Email:  jcorr@stark-stark.com
            scorr@stark-stark-com

Edith M. Kallas
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Tel:  (212) 447-7060
Fax:  (800) 922-4851
Email:  ekallas@whatleykallas.com

Joe R. Whatley, Jr.
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1200
Fax:  (800) 922-4851
Email:  jwhatley@whatleykallas.com
         tbrown@whatleykallas.com

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel:  (617) 573-5118
Fax:  (617) 371-2950
Email:  psheehan@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email:  dwinegard@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel:  (603) 294-1591
Fax:  (800) 922-4851
Email:  hquillen@whatleykallas.com

E. Kirk Wood, Jr.
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email:  ekirkwood1@bellsouth.net

Debra B. Hayes
Charles Clinton Hunter
THE HAYES LAW FIRM
700 Rockmead, Suite 210
Kingwood, TX  77339
Tel:  (281) 815-4963
Fax: (832) 575-4759
dhayes@dhayeslaw.com
chunter@dhayeslaw.com

Aaron S. Podhurst
Peter Prieto
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email:  apodhurst@podhurst.com
         pprieto@podhurst.com

Dennis Pantazis
Brian Clark
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
         bclark@wcqp.com

U.W. Clemon
J. Mark White
Augusta S. Dowd
Linda G. Flippo
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: uwclemon@whitearnolddowd.com
         adowd@whitearnolddowd.com
         mwhite@whitearnolddowd.com
         lflippo@whitearnolddowd.com

Dennis C. Reich
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

Van Bunch
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

Nicholas B. Roth
Julia Smeds Roth
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nroth@eysterkey.com
         jroth@eysterkey.com

Robert J. Axelrod
AXELROD & DEAN LLP
830 Third Avenue, 5th Floor
New York, NY 10022
Tel:  (646) 448-5263
Fax:  (212) 840-8560
Email: rjaxelrod@axelroddean.com

David A. Balto
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

W. Daniel Miles, III
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

160

Joey K. James
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel: (256) 764-0095
Fax: (256) 767-5705
Email: joey@bunchandjames.com

Richard S. Frankowski
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

John C. Davis
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Mark K. Gray
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147
Email: steve@stephenmhansenlaw.com

Peter H. Burke
J. Allen Schreiber
BURKE HARVEY, LLC
3535 Grandview Parkway
Suite 100
Birmingham, AL 35243
Tel: (205) 930-9091
Fax: (205) 930-9054
Email: pburke@burkeharvey.com
       aschreiber@burkeharvey.com

Michael C. Dodge
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

Michael E. Gurley, Jr.
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: Michael@gurleylaw.net

Lynn W. Jinks, III
Christina D. Crow
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229
Email: ljinks@jinkslaw.com
       ccrow@jinkslaw.com

Harley S. Tropin
Javier A. Lopez
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
       jal@kttlaw.com

Myron C. Penn
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

C. Wes Pittman
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Troy A. Doles
SCHLICHTER BOGARD & DENTON, LLP
100 S. 4th Street, Suite 900
St. Louis, MO 63102
Tel:  (314) 621-6115
Fax:  (314) 621-7151
Email: tdoles@uselaws.com

Robert B. Roden
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

J. Preston Strom, Jr.
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

Gary E. Mason
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Thomas V. Bender
WALTERS BENDER STROHBEHN
  & VAUGHAN, P.C.
2500 City Center Square, 1100 Main
Kansas City, MO 64105
Tel:  (816) 421-6620
Fax:  (816) 421-4747
Email: tbender@wbsvlaw.com

Michael L. Murphy
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
mmurphy@baileyglasser.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsandswanson.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
         Ray@dillonfindley.com
         Molly@dillonfindley.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
2900 1st Avenue South
Birmingham, AL 352333
(205) 324-4644
(205) 324-4649 Fax
alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4th Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

James Redmond
Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: Jim.Redmond@heidmanlaw.com
         Cynthia.Moser@heidmanlaw.com

# ATTACHMENT A

**Market Share of Top Four Health Insurance Companies, By Region, 2004-2014**
**Based on Enrollments in All Plans\***

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 99% | 98% | 98% | 94% | 96% | 95% | 94% | 94% | 100% |
| Alabama | 91% | 97% | 95% | 95% | 95% | 94% | 95% | 92% | 90% | 90% | 100% |
| Arkansas | 97% | 96% | 93% | 90% | 87% | 85% | 88% | 86% | 81% | 81% | 95% |
| American Samoa | | | | | | | | 100% | 100% | | |
| Arizona | 64% | 64% | 63% | 62% | 65% | 66% | 68% | 70% | 70% | 70% | 73% |
| California | 100% | 99% | 81% | 80% | 67% | 88% | 88% | 82% | 81% | 86% | 99% |
| Colorado | 64% | 66% | 73% | 76% | 77% | 76% | 79% | 79% | 76% | 76% | 84% |
| Connecticut | 86% | 85% | 82% | 80% | 81% | 72% | 67% | 74% | 79% | 79% | 98% |
| Delware | 73% | 70% | 90% | 74% | 71% | 68% | 68% | 75% | 75% | 74% | 99% |
| District of Columbia | 83% | 81% | 74% | 76% | 75% | 77% | 83% | 80% | 78% | 76% | 100% |
| Florida | 45% | 47% | 48% | 61% | 59% | 56% | 52% | 51% | 48% | 46% | 50% |
| Georgia | 84% | 77% | 59% | 56% | 55% | 47% | 50% | 52% | 48% | 49% | 65% |
| Guatemala | | 12% | 12% | 12% | 13% | 13% | 14% | 13% | 13% | 14% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Hawaii | 97% | 97% | 90% | 93% | 90% | 88% | 89% | 88% | 90% | 88% | 96% |
| Iowa | 89% | 94% | 93% | 92% | 94% | 94% | 93% | 92% | 91% | 88% | 98% |
| Idaho | 99% | 97% | 96% | 95% | 94% | 93% | 94% | 93% | 92% | 90% | 100% |
| Illinois | 76% | 76% | 76% | 75% | 80% | 81% | 83% | 82% | 81% | 80% | 81% |
| Indiana | 60% | 57% | 64% | 79% | 80% | 79% | 81% | 79% | 82% | 81% | 83% |
| Kansas | 64% | 63% | 64% | 64% | 63% | 61% | 64% | 62% | 67% | 56% | 98% |
| Kentucky | 66% | 64% | 65% | 68% | 65% | 63% | 66% | 55% | 55% | 59% | 83% |
| Louisiana | 85% | 85% | 76% | 79% | 78% | 70% | 72% | 67% | 55% | 59% | 75% |
| Massachusetts | 90% | 84% | 80% | 78% | 72% | 72% | 71% | 59% | 57% | 57% | 59% |
| Maryland | 44% | 43% | 44% | 52% | 50% | 49% | 49% | 52% | 52% | 51% | 70% |
| Maine | 96% | 98% | 90% | 90% | 86% | 84% | 85% | 85% | 82% | 81% | 100% |
| Michigan | 61% | 59% | 59% | 63% | 59% | 56% | 55% | 54% | 56% | 58% | 59% |
| Minnesota | 66% | 61% | 70% | 71% | 72% | 70% | 68% | 59% | 57% | 56% | 66% |
| Missouri | 46% | 47% | 47% | 51% | 51% | 52% | 63% | 67% | 67% | 68% | 79% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 72% | 91% | 89% | 82% | 85% | 78% | 80% | 80% | 100% |
| Montana | 100% | 99% | 97% | 94% | 92% | 88% | 88% | 88% | 82% | 81% | 100% |
| North Carolina | 87% | 88% | 86% | 87% | 85% | 81% | 85% | 84% | 82% | 84% | 98% |
| North Dakota | 98% | 98% | 97% | 97% | 97% | 96% | 95% | 95% | 92% | 88% | 100% |
| Nebraska | 92% | 92% | 88% | 89% | 89% | 91% | 92% | 90% | 86% | 83% | 95% |
| New Hampshire | 96% | 95% | 88% | 88% | 85% | 79% | 76% | 81% | 79% | 64% | 89% |
| New Jersey | 56% | 45% | 48% | 48% | 51% | 55% | 55% | 52% | 54% | 51% | 84% |
| New Mexico | 90% | 70% | 68% | 71% | 68% | 67% | 65% | 63% | 61% | 63% | 87% |
| Nevada | 74% | 73% | 79% | 75% | 75% | 68% | 73% | 71% | 71% | 65% | 77% |
| New York | 49% | 49% | 49% | 48% | 49% | 49% | 47% | 49% | 50% | 50% | 51% |
| Ohio | 66% | 66% | 62% | 62% | 63% | 61% | 62% | 64% | 64% | 64% | 65% |
| Oklahoma | 89% | 89% | 85% | 82% | 83% | 82% | 84% | 84% | 83% | 86% | 90% |
| Oregon | 72% | 71% | 71% | 70% | 66% | 67% | 63% | 63% | 61% | 61% | 68% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 44% | 44% | 44% | 40% | 39% | 39% | 38% | 37% | 37% | 36% | 41% |
| Puerto Rico | 85% | 86% | 84% | 78% | 79% | 81% | 81% | 87% | 87% | 90% | 90% |
| Rhode Island | 84% | 94% | 94% | 94% | 93% | 91% | 91% | 91% | 89% | 88% | 91% |
| South Carolina | 93% | 89% | 85% | 81% | 74% | 70% | 72% | 74% | 73% | 77% | 96% |
| South Dakota | 92% | 88% | 86% | 88% | 84% | 85% | 83% | 83% | 81% | 74% | 92% |
| Tennessee | 86% | 87% | 78% | 84% | 85% | 85% | 80% | 79% | 75% | 75% | 91% |
| Texas | 48% | 55% | 52% | 52% | 55% | 56% | 55% | 53% | 52% | 53% | 45% |
| Utah | 88% | 83% | 83% | 86% | 86% | 79% | 79% | 77% | 73% | 65% | 78% |
| Virginia | 44% | 57% | 57% | 57% | 58% | 57% | 59% | 66% | 66% | 66% | 80% |
| Virgin Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | |
| Vermont | 100% | 99% | 96% | 94% | 92% | 89% | 91% | 94% | 85% | 86% | 100% |
| Washington | 64% | 64% | 64% | 64% | 61% | 59% | 57% | 57% | 54% | 55% | 61% |
| Wisconsin | 44% | 45% | 39% | 36% | 35% | 35% | 36% | 37% | 33% | 33% | 79% |
| West Virigina | 79% | 76% | 66% | 63% | 60% | 60% | 59% | 59% | 61% | 62% | 82% |
| Wyoming | 100% | 100% | 98% | 98% | 98% | 97% | 97% | 95% | 92% | 96% | 100% |

<u>Note</u>:  \*Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
and other.
\*\*Blank indicates data are not available.

<u>Source</u>:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

**Market Share of Top Eight Health Insurance Companies, By Region, 2004-2014**
**Based on Enrollments in All Plans\***

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 100% |
| Alabama | 100% | 100% | 99% | 99% | 99% | 98% | 99% | 97% | 97% | 97% | 100% |
| Arkansas | 100% | 100% | 98% | 95% | 94% | 93% | 93% | 92% | 91% | 93% | 100% |
| American Samoa | | | | | | | | 100% | 100% | | |
| Arizona | 85% | 84% | 82% | 81% | 81% | 82% | 82% | 82% | 81% | 81% | 87% |
| California | 100% | 100% | 100% | 99% | 97% | 98% | 98% | 96% | 95% | 96% | 100% |
| Colorado | 91% | 91% | 91% | 91% | 91% | 92% | 93% | 94% | 90% | 91% | 98% |
| Connecticut | 97% | 97% | 95% | 93% | 93% | 89% | 87% | 90% | 92% | 93% | 100% |
| Delware | 91% | 89% | 96% | 92% | 92% | 92% | 92% | 92% | 91% | 89% | 100% |
| District of Columbia | 95% | 93% | 89% | 91% | 91% | 92% | 96% | 96% | 94% | 94% | 100% |
| Florida | 68% | 67% | 65% | 74% | 74% | 72% | 67% | 66% | 67% | 67% | 70% |
| Georgia | 96% | 95% | 85% | 84% | 82% | 74% | 77% | 77% | 75% | 77% | 95% |
| Guatemala | | 18% | 17% | 18% | 19% | 19% | 19% | 18% | 18% | 19% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Hawaii | 100% | 100% | 99% | 99% | 99% | 98% | 99% | 99% | 99% | 99% | 100% |
| Iowa | 99% | 99% | 98% | 98% | 99% | 99% | 98% | 98% | 97% | 96% | 100% |
| Idaho | 100% | 100% | 99% | 98% | 98% | 98% | 98% | 98% | 96% | 96% | 100% |
| Illinois | 89% | 88% | 86% | 87% | 89% | 90% | 92% | 91% | 90% | 90% | 90% |
| Indiana | 81% | 80% | 84% | 93% | 95% | 94% | 94% | 93% | 94% | 94% | 98% |
| Kansas | 92% | 90% | 88% | 85% | 86% | 86% | 93% | 90% | 93% | 91% | 100% |
| Kentucky | 88% | 88% | 84% | 88% | 87% | 87% | 87% | 78% | 79% | 84% | 99% |
| Louisiana | 97% | 96% | 89% | 91% | 91% | 87% | 89% | 88% | 78% | 81% | 96% |
| Massachusetts | 98% | 97% | 95% | 95% | 91% | 90% | 90% | 83% | 81% | 81% | 84% |
| Maryland | 65% | 64% | 64% | 70% | 69% | 71% | 70% | 73% | 74% | 75% | 86% |
| Maine | 100% | 100% | 99% | 98% | 98% | 97% | 98% | 97% | 94% | 96% | 100% |
| Michigan | 76% | 73% | 74% | 79% | 76% | 73% | 75% | 73% | 74% | 74% | 78% |
| Minnesota | 98% | 94% | 97% | 97% | 97% | 96% | 95% | 88% | 88% | 87% | 93% |
| Missouri | 69% | 65% | 64% | 68% | 68% | 70% | 78% | 80% | 81% | 82% | 93% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 99% | 98% | 97% | 95% | 96% | 92% | 93% | 94% | 100% |
| Montana | 100% | 100% | 100% | 99% | 99% | 98% | 98% | 97% | 96% | 97% | 100% |
| North Carolina | 96% | 98% | 93% | 93% | 93% | 90% | 93% | 92% | 91% | 94% | 100% |
| North Dakota | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 99% | 98% | 99% | 100% |
| Nebraska | 100% | 100% | 98% | 99% | 99% | 99% | 99% | 98% | 97% | 96% | 100% |
| New Hampshire | 100% | 100% | 97% | 98% | 97% | 96% | 96% | 96% | 94% | 87% | 100% |
| New Jersey | 75% | 67% | 71% | 72% | 73% | 75% | 76% | 75% | 76% | 74% | 100% |
| New Mexico | 100% | 95% | 94% | 96% | 94% | 91% | 89% | 88% | 86% | 87% | 100% |
| Nevada | 93% | 90% | 95% | 89% | 87% | 86% | 87% | 85% | 87% | 86% | 94% |
| New York | 70% | 69% | 70% | 71% | 72% | 72% | 71% | 72% | 72% | 72% | 74% |
| Ohio | 81% | 81% | 76% | 76% | 77% | 76% | 77% | 78% | 79% | 80% | 84% |
| Oklahoma | 100% | 98% | 95% | 93% | 93% | 92% | 93% | 92% | 92% | 95% | 99% |
| Oregon | 92% | 91% | 90% | 89% | 88% | 88% | 87% | 87% | 84% | 83% | 88% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 61% | 60% | 60% | 57% | 57% | 57% | 55% | 54% | 54% | 53% | 57% |
| Puerto Rico | 100% | 100% | 100% | 97% | 96% | 98% | 98% | 99% | 99% | 99% | 99% |
| Rhode Island | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 100% |
| South Carolina | 100% | 99% | 95% | 93% | 87% | 83% | 89% | 90% | 88% | 90% | 100% |
| South Dakota | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 98% | 96% | 94% | 100% |
| Tennessee | 98% | 97% | 89% | 93% | 94% | 93% | 93% | 91% | 89% | 90% | 99% |
| Texas | 65% | 69% | 66% | 64% | 66% | 67% | 68% | 66% | 66% | 66% | 61% |
| Utah | 98% | 96% | 95% | 95% | 95% | 94% | 93% | 92% | 90% | 86% | 98% |
| Virginia | 64% | 72% | 73% | 74% | 75% | 75% | 80% | 84% | 84% | 84% | 95% |
| Virgin Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Vermont | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 99% | 100% |
| Washington | 87% | 87% | 86% | 86% | 84% | 84% | 83% | 83% | 80% | 80% | 87% |
| Wisconsin | 65% | 67% | 63% | 61% | 60% | 58% | 60% | 59% | 55% | 56% | 86% |
| West Virigina | 99% | 97% | 89% | 90% | 88% | 88% | 87% | 85% | 86% | 88% | 100% |
| Wyoming | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 97% | 99% | 100% |

<u>Note</u>:  \*Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
and other.

\*\*Blank indicates data are not available.

<u>Source</u>:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

## HHI Market Concentration, By Region, 2004-2014
### Based on Enrollments in All Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 6,469 | 5,897 | 5,307 | 5,122 | 4,958 | 4,212 | 4,401 | 5,148 | 5,053 | 5,037 | 10,000 |
| Alabama | 2,909 | 7,459 | 7,218 | 7,029 | 6,920 | 6,116 | 6,176 | 5,569 | 5,142 | 4,983 | 8,364 |
| Arkansas | 4,515 | 4,719 | 4,423 | 3,929 | 3,461 | 3,176 | 3,312 | 3,223 | 2,780 | 2,741 | 2,980 |
| American Samoa | | | | | | | | 10,000 | 10,000 | | |
| Arizona | 1,745 | 1,845 | 1,901 | 1,916 | 2,085 | 2,046 | 2,153 | 2,052 | 2,017 | 2,004 | 1,681 |
| California | 4,834 | 6,042 | 1,954 | 1,435 | | 5,732 | 5,680 | 4,738 | 4,495 | 4,739 | 6,868 |
| Colorado | 1,647 | 1,769 | 2,135 | 2,210 | 2,341 | 2,264 | 2,385 | 2,312 | 1,530 | 1,562 | 2,102 |
| Connecticut | 2,321 | 2,383 | 2,728 | 2,520 | 2,512 | 2,014 | 1,817 | 2,561 | 2,993 | 2,719 | 8,073 |
| Delware | 1,994 | 1,699 | 5,861 | 1,953 | 1,636 | 1,488 | 1,486 | 1,724 | 1,639 | 1,543 | 6,944 |
| District of Columbia | 1,997 | 1,919 | 1,645 | 1,861 | 1,912 | 2,014 | 2,654 | 2,460 | 2,382 | 2,019 | 4,239 |
| Florida | 732 | 892 | 995 | 1,445 | 1,311 | 1,148 | 975 | 947 | 855 | 767 | 867 |
| Georgia | 2,408 | 2,049 | 1,182 | 1,127 | 1,062 | 846 | 920 | 956 | 853 | 879 | 1,377 |
| Guatemala | | 88 | 86 | 94 | 97 | 98 | 98 | 95 | 94 | 98 | |
| Guam | | 10,000 | 10,000 | 9,999 | 9,998 | 10,000 | 10,000 | 9,994 | 9,980 | 10,000 | 10,000 |
| Hawaii | 5,019 | 4,984 | 4,310 | 4,069 | 3,825 | 3,650 | 3,633 | 3,568 | 4,044 | 3,953 | 4,672 |
| Iowa | 2,290 | 5,744 | 5,813 | 5,791 | 6,035 | 6,158 | 5,775 | 5,791 | 5,523 | 5,199 | 7,600 |
| Idaho | 4,331 | 5,845 | 3,113 | 3,356 | 3,730 | 3,880 | 4,191 | 4,395 | 4,150 | 3,804 | 4,828 |
| Illinois | 2,894 | 2,588 | 2,496 | 2,434 | 3,183 | 3,213 | 3,456 | 3,277 | 3,169 | 3,129 | 3,805 |
| Indiana | 1,198 | 1,070 | 1,655 | 2,520 | 2,699 | 3,003 | 3,083 | 3,008 | 3,575 | 3,349 | 3,828 |
| Kansas | 1,366 | 1,269 | 1,335 | 1,247 | 1,229 | 1,199 | 1,378 | 1,258 | 1,340 | 1,162 | 2,775 |
| Kentucky | 1,742 | 1,777 | 1,606 | 1,645 | 1,593 | 1,492 | 1,462 | 1,082 | 1,168 | 1,288 | 2,004 |
| Louisiana | 3,198 | 3,284 | 2,862 | 3,028 | 2,852 | 2,236 | 2,300 | 1,946 | 1,147 | 1,330 | 2,256 |
| Massachusetts | 2,980 | 2,231 | 2,249 | 2,200 | 2,005 | 1,807 | 1,765 | 1,165 | 1,115 | 1,138 | 1,210 |
| Maryland | 844 | 818 | 759 | 908 | 810 | 814 | 776 | 872 | 871 | 874 | 1,506 |
| Maine | 3,720 | 6,618 | 5,551 | 5,434 | 4,955 | 4,430 | 4,777 | 4,748 | 2,979 | 2,759 | 4,878 |
| Michigan | 1,542 | 1,435 | 1,450 | 1,571 | 1,209 | 1,115 | 1,082 | 1,010 | 1,063 | 1,092 | 1,265 |
| Minnesota | 1,469 | 1,321 | 1,576 | 1,569 | 1,548 | 1,470 | 1,423 | 1,174 | 1,147 | 1,128 | 1,360 |
| Missouri | 774 | 758 | 782 | 885 | 903 | 955 | 1,328 | 1,504 | 1,496 | 1,544 | 1,899 |
| Northern Mariana Islands | | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Mississippi | 4,496 | 4,705 | 1,617 | 6,353 | 5,719 | 3,857 | 3,677 | 2,967 | 3,277 | 3,179 | 6,618 |
| Montana | 5,765 | 5,737 | 5,976 | 6,355 | 5,890 | 4,338 | 4,655 | 4,471 | 4,465 | 4,198 | 5,087 |
| North Carolina | 3,323 | 3,457 | 3,615 | 3,693 | 3,435 | 3,361 | 3,956 | 3,831 | 3,674 | 3,827 | 7,067 |
| North Dakota | 5,611 | 5,652 | 5,647 | 5,693 | 5,524 | 5,520 | 4,427 | 4,286 | 3,955 | 4,806 | 6,902 |
| Nebraska | 3,818 | 4,030 | 4,074 | 4,094 | 4,079 | 4,210 | 3,798 | 3,701 | 3,112 | 2,335 | 3,189 |
| New Hampshire | 2,967 | 2,807 | 2,385 | 2,432 | 2,322 | 1,989 | 1,761 | 1,940 | 1,917 | 1,323 | 2,369 |
| New Jersey | 1,068 | 767 | 809 | 879 | 938 | 948 | 979 | 920 | 954 | 865 | 2,582 |
| New Mexico | 2,494 | 1,531 | 1,485 | 1,540 | 1,406 | 1,414 | 1,330 | 1,288 | 1,227 | 1,288 | 2,369 |
| Nevada | 1,722 | 1,651 | 2,007 | 1,781 | 1,842 | 1,621 | 1,690 | 1,737 | 1,715 | 1,502 | 2,193 |
| New York | 798 | 793 | 799 | 791 | 813 | 816 | 762 | 785 | 812 | 822 | 864 |
| Ohio | 1,311 | 1,302 | 1,228 | 1,203 | 1,197 | 1,133 | 1,129 | 1,133 | 1,189 | 1,208 | 1,253 |
| Oklahoma | 2,654 | 2,821 | 2,549 | 2,063 | 2,288 | 2,191 | 2,338 | 2,319 | 2,300 | 2,393 | 3,114 |
| Oregon | 1,763 | 1,728 | 1,794 | 1,858 | 1,524 | 1,533 | 1,357 | 1,299 | 1,216 | 1,214 | 1,501 |
| Other | 8,023 | 5,759 | 10,000 | 10,000 | | 10,000 | 9,904 | 9,884 | 9,894 | 9,959 | |
| Pennsylvannia | 820 | 754 | 736 | 609 | 594 | 594 | 561 | 535 | 527 | 498 | 624 |
| Puerto Rico | 2,519 | 2,572 | 2,176 | 1,993 | 2,229 | 2,454 | 1,891 | 3,234 | 3,236 | 4,802 | 4,672 |
| Rhode Island | 2,302 | 2,787 | 2,866 | 3,043 | 2,951 | 2,557 | 2,454 | 2,463 | 2,367 | 2,304 | 2,636 |
| South Carolina | 6,508 | 5,317 | 4,814 | 3,287 | 2,978 | 2,508 | 2,777 | 2,862 | 2,777 | 2,930 | 4,836 |
| South Dakota | 4,126 | 3,026 | 2,909 | 2,353 | 2,629 | 2,686 | 2,562 | 2,504 | 2,261 | 2,021 | 3,629 |
| Tennessee | 3,921 | 4,385 | 3,479 | 3,434 | 3,061 | 2,817 | 2,082 | 2,041 | 1,888 | 2,000 | 3,817 |
| Texas | 953 | 1,066 | 994 | 992 | 1,199 | 1,121 | 1,154 | 1,028 | 844 | 863 | 749 |
| Utah | 2,731 | 2,371 | 2,419 | 2,565 | 2,534 | 1,973 | 2,172 | 2,059 | 1,880 | 1,566 | 2,160 |
| Virginia | 693 | 1,251 | 1,243 | 1,240 | 1,201 | 1,108 | 1,140 | 1,453 | 1,418 | 1,418 | 1,992 |
| Virgin Islands | | | 10,000 | 9,841 | 9,604 | 8,498 | 5,874 | 8,153 | 3,698 | 7,246 | |
| Vermont | 5,000 | 4,901 | 4,796 | 4,329 | 3,767 | 3,242 | 3,019 | 3,041 | 2,460 | 2,638 | 4,626 |
| Washington | 1,254 | 1,244 | 1,241 | 1,223 | 1,155 | 1,081 | 1,036 | 1,030 | 971 | 981 | 1,163 |
| Wisconsin | 719 | 751 | 632 | 571 | 553 | 536 | 555 | 561 | 501 | 518 | 3,133 |
| West Virigina | 2,364 | 1,933 | 1,553 | 1,428 | 1,393 | 1,309 | 1,284 | 1,246 | 1,314 | 1,331 | 2,200 |
| Wyoming | 7,717 | 7,337 | 6,881 | 6,328 | 6,491 | 6,610 | 6,392 | 6,606 | 6,108 | 4,202 | 4,856 |

Note: *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare; and other.

**Blank indicates data are not available.

***HHI < 1,500 is unconcentrated (white); 1,500 ≤ HHI ≤ 2,500 is moderately concentrated (yellow); HHI > 2,500 is highly concentrated (orange).

Source: NAIC Exhibit of Premiums, Enrollment, and Utilization.

**Market Share of Top Four Health Insurance Companies, By Region, 2004-2014**
Based on Enrollments in Comprehensive (Hospital & Medical) Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Alabama | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Arkansas | 100% | 99% | 99% | 97% | 98% | 98% | 97% | 96% | 97% | 97% | 99% |
| American Samoa | | | | | | | | | | | |
| Arizona | 85% | 83% | 81% | 78% | 78% | 82% | 87% | 89% | 90% | 90% | 100% |
| California | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Colorado | 75% | 78% | 79% | 75% | 79% | 80% | 83% | 85% | 84% | 83% | 90% |
| Connecticut | 91% | 91% | 88% | 88% | 89% | 87% | 83% | 87% | 85% | 88% | 96% |
| Delware | 83% | 91% | 90% | 92% | 93% | 96% | 97% | 96% | 96% | 96% | 100% |
| District of Columbia | 80% | 81% | 73% | 70% | 71% | 72% | 85% | 87% | 92% | 96% | 100% |
| Florida | 62% | 63% | 65% | 65% | 66% | 66% | 63% | 64% | 64% | 64% | 63% |
| Georgia | 90% | 87% | 85% | 83% | 80% | 79% | 78% | 71% | 68% | 67% | 71% |
| Guatemala | | 13% | 13% | 13% | 14% | 15% | 15% | 15% | 15% | 15% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Hawaii | 100% | 100% | 97% | 97% | 95% | 95% | 98% | 99% | 99% | 99% | 100% |
| Iowa | 97% | 95% | 96% | 94% | 96% | 96% | 95% | 95% | 95% | 95% | 100% |
| Idaho | 100% | 100% | 99% | 99% | 98% | 99% | 99% | 99% | 99% | 98% | 100% |
| Illinois | 79% | 88% | 90% | 89% | 90% | 91% | 94% | 95% | 95% | 95% | 97% |
| Indiana | 71% | 80% | 88% | 89% | 96% | 96% | 97% | 94% | 95% | 97% | 99% |
| Kansas | 82% | 72% | 69% | 68% | 73% | 74% | 92% | 93% | 94% | 90% | 100% |
| Kentucky | 95% | 96% | 96% | 97% | 99% | 99% | 98% | 94% | 94% | 95% | 97% |
| Louisiana | 93% | 94% | 93% | 92% | 93% | 95% | 96% | 97% | 97% | 95% | 95% |
| Massachusetts | 93% | 88% | 88% | 87% | 82% | 79% | 77% | 75% | 72% | 70% | 67% |
| Maryland | 69% | 69% | 68% | 73% | 77% | 82% | 83% | 85% | 85% | 80% | 94% |
| Maine | 99% | 100% | 99% | 98% | 99% | 100% | 100% | 100% | 100% | 100% | 100% |
| Michigan | 79% | 83% | 84% | 94% | 94% | 94% | 94% | 88% | 87% | 85% | 85% |
| Minnesota | 89% | 89% | 92% | 92% | 93% | 92% | 92% | 93% | 94% | 93% | 94% |
| Missouri | 63% | 61% | 55% | 60% | 65% | 69% | 78% | 88% | 90% | 90% | 92% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Montana | 100% | 100% | 100% | 100% | 99% | 99% | 98% | 99% | 99% | 100% | 100% |
| North Carolina | 94% | 98% | 98% | 97% | 96% | 97% | 97% | 97% | 97% | 97% | 100% |
| North Dakota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nebraska | 100% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New Hampshire | 100% | 99% | 97% | 96% | 93% | 90% | 89% | 93% | 94% | 96% | 100% |
| New Jersey | 76% | 69% | 77% | 72% | 74% | 74% | 75% | 76% | 77% | 74% | 97% |
| New Mexico | 100% | 93% | 90% | 100% | 96% | 98% | 93% | 90% | 91% | 92% | 100% |
| Nevada | 81% | 82% | 88% | 80% | 82% | 86% | 88% | 86% | 87% | 83% | 91% |
| New York | 55% | 56% | 57% | 58% | 61% | 63% | 61% | 63% | 62% | 62% | 60% |
| Ohio | 75% | 75% | 79% | 80% | 80% | 81% | 80% | 82% | 83% | 83% | 90% |
| Oklahoma | 96% | 95% | 94% | 87% | 84% | 83% | 84% | 86% | 88% | 91% | 95% |
| Oregon | 75% | 75% | 77% | 78% | 77% | 79% | 79% | 80% | 81% | 82% | 82% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 55% | 60% | 62% | 62% | 61% | 62% | 56% | 52% | 51% | 50% | 51% |
| Puerto Rico | 97% | 98% | 97% | 92% | 92% | 99% | 100% | 100% | 99% | 99% | 99% |
| Rhode Island | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| South Carolina | 98% | 97% | 99% | 98% | 96% | 97% | 100% | 100% | 100% | 99% | 100% |
| South Dakota | 100% | 100% | 97% | 97% | 97% | 98% | 99% | 99% | 97% | 97% | 100% |
| Tennessee | 94% | 95% | 92% | 92% | 91% | 93% | 95% | 94% | 94% | 96% | 100% |
| Texas | 60% | 74% | 75% | 71% | 71% | 71% | 73% | 70% | 73% | 77% | 51% |
| Utah | 97% | 98% | 98% | 98% | 99% | 98% | 99% | 99% | 99% | 98% | 100% |
| Virginia | 47% | 62% | 64% | 65% | 66% | 67% | 73% | 75% | 75% | 73% | 95% |
| Virgin Islands | | | | | | | 100% | 100% | 100% | 100% | |
| Vermont | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% | 100% | 100% | 100% |
| Washington | 78% | 79% | 78% | 78% | 77% | 79% | 78% | 78% | 75% | 77% | 84% |
| Wisconsin | 46% | 44% | 43% | 42% | 45% | 46% | 46% | 46% | 46% | 48% | 64% |
| West Virigina | 97% | 86% | 93% | 96% | 96% | 96% | 97% | 98% | 97% | 97% | 100% |
| Wyoming | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

<u>Note</u>:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
       **Blank indicates data are not available.

<u>Source</u>:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

**Market Share of Top Eight Health Insurance Companies, By Region, 2004-2014**
Based on Enrollments in Comprehensive (Hospital & Medical) Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Alabama | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Arkansas | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| American Samoa | | | | | | | | | | | |
| Arizona | 100% | 98% | 98% | 96% | 96% | 98% | 100% | 100% | 100% | 100% | |
| California | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Colorado | 94% | 95% | 95% | 90% | 92% | 94% | 96% | 96% | 96% | 96% | 99% |
| Connecticut | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 100% | 100% | 100% | 100% |
| Delware | 99% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| District of Columbia | 99% | 99% | 97% | 96% | 91% | 91% | 98% | 99% | 99% | 100% | 100% |
| Florida | 84% | 83% | 84% | 83% | 83% | 83% | 83% | 83% | 82% | 82% | 81% |
| Georgia | 98% | 96% | 95% | 95% | 96% | 97% | 96% | 95% | 95% | 92% | 97% |
| Guatemala | | 20% | 21% | 21% | 22% | 23% | 23% | 23% | 23% | 23% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Hawaii | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Iowa | 99% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Idaho | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Illinois | 96% | 97% | 97% | 97% | 97% | 97% | 99% | 99% | 99% | 99% | 100% |
| Indiana | 94% | 96% | 98% | 98% | 99% | 99% | 100% | 99% | 99% | 100% | 100% |
| Kansas | 99% | 96% | 96% | 97% | 96% | 98% | 100% | 100% | 100% | 100% | 100% |
| Kentucky | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% |
| Louisiana | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Massachusetts | 99% | 98% | 98% | 98% | 97% | 95% | 94% | 91% | 90% | 90% | 87% |
| Maryland | 95% | 96% | 97% | 96% | 96% | 96% | 96% | 96% | 96% | 94% | 100% |
| Maine | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Michigan | 96% | 98% | 98% | 99% | 99% | 99% | 99% | 95% | 95% | 93% | 93% |
| Minnesota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% |
| Missouri | 89% | 89% | 85% | 89% | 90% | 93% | 96% | 98% | 99% | 99% | 99% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Montana | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| North Carolina | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| North Dakota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nebraska | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New Hampshire | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New Jersey | 95% | 91% | 94% | 94% | 95% | 94% | 96% | 97% | 97% | 94% | 100% |
| New Mexico | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nevada | 96% | 95% | 98% | 91% | 94% | 96% | 97% | 98% | 97% | 94% | 100% |
| New York | 79% | 80% | 81% | 83% | 84% | 84% | 85% | 87% | 88% | 88% | 88% |
| Ohio | 90% | 90% | 92% | 92% | 92% | 93% | 91% | 94% | 94% | 94% | 100% |
| Oklahoma | 100% | 100% | 100% | 99% | 98% | 98% | 100% | 100% | 100% | 100% | 100% |
| Oregon | 98% | 98% | 98% | 98% | 98% | 98% | 99% | 99% | 99% | 99% | 99% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 78% | 79% | 82% | 82% | 82% | 83% | 80% | 79% | 79% | 78% | 79% |
| Puerto Rico | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Rhode Island | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| South Carolina | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| South Dakota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Tennessee | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 99% | 99% | 99% | 100% |
| Texas | 78% | 86% | 86% | 82% | 82% | 84% | 85% | 83% | 85% | 87% | 74% |
| Utah | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Virginia | 75% | 82% | 83% | 84% | 84% | 85% | 90% | 92% | 93% | 93% | 100% |
| Virgin Islands | | | | | | 100% | 100% | 100% | 100% | | |
| Vermont | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Washington | 92% | 93% | 93% | 93% | 93% | 94% | 95% | 96% | 92% | 93% | 98% |
| Wisconsin | 72% | 72% | 71% | 71% | 72% | 73% | 74% | 75% | 74% | 75% | 81% |
| West Virigina | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Wyoming | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |

Note: *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
  **Blank indicates data are not available.

Source: NAIC Exhibit of Premiums, Enrollment, and Utilization.

## HHI Market Concentration, By Region, 2004-2014
### Based on Enrollments in Comprehensive (Hospital & Medical) Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 10,000 | 9,942 | 9,949 | 9,543 | 9,153 | 8,586 | 8,388 | 8,542 | 8,635 | 8,462 | |
| Alabama | 2,942 | 9,122 | 9,264 | 9,311 | 9,356 | 9,355 | 9,298 | 9,255 | 9,262 | 9,274 | 9,274 |
| Arkansas | 5,041 | 5,411 | 5,734 | 5,298 | 4,733 | 4,406 | 4,360 | 4,333 | 4,340 | 4,305 | 4,781 |
| American Samoa | | | | | | | | | | | |
| Arizona | 2,444 | 2,426 | 2,816 | 2,720 | 3,051 | 3,806 | 4,724 | 4,875 | 5,000 | 5,103 | 6,240 |
| California | | 5,870 | 7,927 | 8,373 | 10,000 | 9,765 | 9,601 | 9,240 | 9,178 | 8,865 | 8,449 |
| Colorado | 1,950 | 2,253 | 2,405 | 2,294 | 2,462 | 2,631 | 3,103 | 3,167 | 3,012 | 2,988 | 3,332 |
| Connecticut | 2,467 | 3,119 | 3,127 | 3,317 | 3,415 | 3,235 | 2,522 | 2,642 | 2,735 | 2,830 | 3,416 |
| Delware | 2,670 | 3,464 | 3,747 | 3,899 | 4,222 | 4,766 | 4,812 | 4,602 | 4,681 | 4,669 | 6,049 |
| District of Columbia | 1,853 | 1,851 | 1,618 | 1,613 | 1,630 | 1,612 | 2,217 | 2,321 | 2,621 | 2,759 | 5,379 |
| Florida | 1,233 | 1,304 | 1,657 | 1,854 | 1,914 | 1,865 | 1,698 | 1,801 | 1,933 | 1,876 | 1,804 |
| Georgia | 2,892 | 2,504 | 2,433 | 2,266 | 2,079 | 2,000 | 1,929 | 1,604 | 1,544 | 1,471 | 1,634 |
| Guatemala | | 108 | 115 | 118 | 127 | 137 | 139 | 137 | 143 | 153 | |
| Guam | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Hawaii | 5,228 | 5,162 | 4,960 | 4,219 | 4,207 | 4,236 | 4,189 | 4,144 | 4,725 | 4,638 | 4,738 |
| Iowa | 3,795 | 4,355 | 4,450 | 4,461 | 4,610 | 4,989 | 4,781 | 4,593 | 4,756 | 4,683 | 5,926 |
| Idaho | 5,261 | 8,688 | 5,035 | 4,692 | 4,556 | 4,511 | 4,439 | 4,265 | 4,188 | 4,338 | 5,639 |
| Illinois | 2,005 | 5,318 | 5,601 | 5,318 | 5,606 | 5,901 | 6,427 | 6,530 | 6,430 | 6,341 | 7,549 |
| Indiana | 1,937 | 2,285 | 3,773 | 4,097 | 5,626 | 5,385 | 5,577 | 5,526 | 5,779 | 6,029 | 6,373 |
| Kansas | 1,925 | 1,595 | 1,487 | 1,493 | 1,698 | 1,819 | 2,603 | 2,676 | 2,644 | 2,457 | 6,687 |
| Kentucky | 3,004 | 3,218 | 4,304 | 4,634 | 4,932 | 4,957 | 4,979 | 3,892 | 4,515 | 4,437 | 4,090 |
| Louisiana | 3,388 | 3,619 | 4,427 | 4,511 | 4,364 | 4,283 | 4,468 | 4,654 | 4,743 | 4,453 | 4,464 |
| Massachusetts | 3,203 | 2,626 | 2,727 | 2,623 | 2,327 | 2,180 | 1,982 | 1,835 | 1,729 | 1,765 | 1,618 |
| Maryland | 1,496 | 1,565 | 1,560 | 1,781 | 1,945 | 2,170 | 2,186 | 2,320 | 2,390 | 2,257 | 3,821 |
| Maine | 4,924 | 6,087 | 6,063 | 5,999 | 5,544 | 5,682 | 6,088 | 5,896 | 5,555 | 4,803 | 8,483 |
| Michigan | 2,342 | 2,528 | 2,577 | 2,941 | 3,079 | 3,052 | 2,898 | 2,511 | 2,517 | 2,486 | 2,477 |
| Minnesota | 2,239 | 2,440 | 2,721 | 2,715 | 2,722 | 2,676 | 2,633 | 2,367 | 2,432 | 2,419 | 2,458 |
| Missouri | 1,286 | 1,236 | 1,083 | 1,190 | 1,313 | 1,476 | 2,429 | 2,713 | 2,837 | 2,948 | 2,791 |
| Northern Mariana Islands | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Mississippi | 8,417 | 9,735 | 10,000 | 9,875 | 9,791 | 8,311 | 9,629 | 9,487 | 9,453 | 9,072 | 9,231 |
| Montana | 6,645 | 7,421 | 7,608 | 6,939 | 6,339 | 5,646 | 5,520 | 5,430 | 6,103 | 5,891 | 10,000 |
| North Carolina | 4,550 | 5,318 | 6,046 | 6,597 | 7,208 | 7,531 | 7,749 | 7,523 | 7,613 | 7,573 | 7,672 |
| North Dakota | 9,170 | 8,961 | 8,882 | 8,858 | 8,541 | 8,514 | 8,661 | 8,842 | 8,688 | 8,655 | 9,955 |
| Nebraska | 6,063 | 6,118 | 6,318 | 6,412 | 6,747 | 7,101 | 7,026 | 7,072 | 7,363 | 7,414 | 8,464 |
| New Hampshire | 3,514 | 3,129 | 2,862 | 2,771 | 2,573 | 2,397 | 2,372 | 2,692 | 3,005 | 2,926 | 5,129 |
| New Jersey | 1,938 | 1,537 | 2,011 | 1,831 | 1,951 | 1,956 | 1,919 | 1,877 | 2,010 | 2,591 | 2,707 |
| New Mexico | 3,333 | 2,387 | 2,298 | 3,222 | 3,191 | 3,507 | 2,885 | 2,507 | 2,436 | 2,879 | 3,854 |
| Nevada | 3,281 | 3,255 | 3,631 | 3,146 | 3,536 | 3,838 | 3,885 | 3,752 | 3,777 | 2,897 | 4,408 |
| New York | 1,008 | 1,041 | 1,088 | 1,117 | 1,214 | 1,259 | 1,135 | 1,197 | 1,189 | 1,191 | 1,188 |
| Ohio | 2,090 | 2,208 | 2,697 | 2,733 | 2,775 | 2,767 | 2,751 | 2,899 | 2,940 | 2,997 | 3,480 |
| Oklahoma | 3,427 | 3,888 | 4,121 | 3,161 | 3,098 | 3,344 | 3,645 | 3,864 | 4,119 | 4,451 | 3,763 |
| Oregon | 1,866 | 1,940 | 2,015 | 2,112 | 1,924 | 1,969 | 1,910 | 1,946 | 1,959 | 2,052 | 2,063 |
| Other | 9,778 | 5,705 | 10,000 | 10,000 | | 10,000 | 9,904 | 9,884 | 9,894 | 9,959 | |
| Pennsylvannia | 1,025 | 1,132 | 1,299 | 1,312 | 1,270 | 1,273 | 1,084 | 976 | 991 | 958 | 944 |
| Puerto Rico | 3,776 | 3,627 | 3,307 | 3,109 | 3,061 | 5,099 | 5,255 | 5,315 | 5,195 | 5,026 | 5,041 |
| Rhode Island | 5,435 | 7,153 | 7,543 | 7,978 | 7,365 | 8,067 | 8,467 | 9,128 | 8,880 | 8,907 | 9,801 |
| South Carolina | 4,362 | 4,496 | 4,750 | 4,984 | 4,848 | 5,088 | 5,496 | 5,553 | 5,532 | 5,628 | 6,505 |
| South Dakota | 3,956 | 4,852 | 4,443 | 3,266 | 4,476 | 4,479 | 4,102 | 4,095 | 4,069 | 3,981 | 4,011 |
| Tennessee | 5,276 | 6,082 | 5,695 | 6,075 | 6,606 | 7,112 | 6,147 | 6,226 | 6,310 | 6,576 | 7,990 |
| Texas | 1,351 | 2,627 | 2,836 | 2,701 | 2,856 | 3,130 | 3,472 | 3,240 | 3,517 | 3,939 | 989 |
| Utah | 3,516 | 3,714 | 3,678 | 3,682 | 3,734 | 3,889 | 4,469 | 4,409 | 4,239 | 4,086 | 4,167 |
| Virginia | 870 | 1,908 | 1,999 | 2,014 | 1,986 | 1,955 | 2,161 | 2,182 | 2,200 | 2,156 | 3,839 |
| Virgin Islands | | | | | | | 10,000 | 10,000 | 10,000 | 7,209 | |
| Vermont | 4,094 | 4,018 | 4,244 | 3,675 | 3,297 | 2,938 | 3,057 | 3,373 | 3,739 | 3,870 | 5,461 |
| Washington | 1,945 | 1,961 | 1,995 | 1,965 | 1,859 | 1,805 | 1,733 | 1,719 | 1,617 | 1,709 | 1,999 |
| Wisconsin | 837 | 812 | 802 | 788 | 815 | 828 | 838 | 855 | 846 | 877 | 1,968 |
| West Virigina | 3,525 | 3,018 | 3,463 | 3,774 | 4,090 | 4,244 | 4,403 | 4,541 | 5,537 | 5,192 | 5,137 |
| Wyoming | 6,920 | 6,491 | 6,333 | 5,554 | 5,825 | 6,008 | 5,920 | 6,408 | 6,597 | 6,884 | 7,740 |

<u>Note</u>:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
   **Blank indicates data are not available.
   ***HHI < 1,500 is unconcentrated (white); 1,500 ≤ HHI ≤ 2,500 is moderately concentrated (yellow); HHI > 2,500 is highly concentrated (orange).

<u>Source</u>:  NAIC Exhibit of Premiums, Enrollment, and Utilization.