**EXHIBIT 1**

BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

IN RE: BLUE CROSS BLUE SHIELD           MDL No. 2406
ANTITRUST LITIGATION

This Filing Relates To The Following Case Only:

*Recovery Village at Umatilla, L.L.C. v. Blue Cross and Blue Shield of Florida, Inc., et al.*, S.D. Florida, Case No.: 0:15-cv-61414-JIC

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-18)

### INTRODUCTION

This state court action is a contract action. (Counts I–III and V). Defendants do not allege the contract and related declaratory relief claims bear relationship to the Blue Cross Blue Shield Antitrust MDL. Defendants seek transfer to the MDL based on alleged "common facts" with the remaining count (Count IV) alleging the state law tort of civil conspiracy. The conditional transfer order must be vacated. First, this action is not an antitrust challenge to the Blue Cross Blue Shield Association; it does not seek to dismantle its formation or operation, or its collective licensees. Second, this action does not challenge the legality of the Association, including its rules or regulations, the Blue Card Program, or the alleged conduct of these Defendants. Legality is not an issue. Finally, this action neither requires analysis nor discovery of market share or the competitive effects on any market to prove the requisite elements of its claims.

Recovery Village's claims involve inquiry into the existence of express or implied contracts between Recovery Village and each Defendant created during the utilization review process and the reasonable price for Recovery Village's substance use disorder treatment

1

services, including whether the price collectively paid by these Defendants fell below that reasonable value. At minimum, the separable, and admittedly wholly unrelated, contract claims must be remanded to the transferor court and the decision regarding the relatedness of Count IV should be stayed[1] pending the penultimate decision regarding whether the federal courts have subject matter jurisdiction of this action, a threshold question.

## BACKGROUND

This state court action is brought by a single provider alleging that Defendants failed to pay the agreed upon contract price for covered, pre-authorized services, or at minimum failed to pay the reasonable value of the services. Plaintiff must prove it made repeated offers to Defendants, who accepted and subsequently breached the contracts formed by such acceptances by failing to pay the contract price, or alternatively that Defendants failed at minimum to pay the reasonable value of the services.[2]

How this state law action found its way to the JPML for consideration is equally important as the lack of merit of its transfer. Ignoring binding Eleventh Circuit precedent

---

[1] Deferral conserves judicial resources. Transfer determinations should be delayed when there is a critical pending motion in the original court that could render transfer moot. *In re Res. Exploration, Inc., Sec. Litig.*, 483 F. Supp. 817, 822 (J.P.M.L. 1980); *In re L. E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.L. 1975); *In re Prof'l Hockey Antitrust Litig.*, 352 F. Supp. 1405, 1407 (J.P.M.L. 1973); *In re Kaehni Patent*, 311 F. Supp. 1342, 1344 (J.P.M.L. 1970); *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 496 (J.P.M.L. 1968) ("On principles of comity, where appropriate, the Panel has in the past timed its actions and constructed its orders in a manner which will permit the transferor courts . . . to reach timely decisions on particular issues without abrupt, disconcerting, untimely or inappropriate orders of transfer by the Panel. This policy of comity has been followed in the past and will be followed in the future by the Panel."). Where, as here, the pending motion is dispositive of the court's subject-matter jurisdiction, these considerations are amplified.

[2] Florida law sets forth the standard for determining the reasonable value of the services, which is not dependent on "antitrust" related questions such as whether Defendants' conduct was intentional or legal. *See Colomar v. Mercy Hosp., Inc.*, 461 F. Supp. 2d 1265, 1270–73 (S.D. Fla. 2006); *see also Colomar v. Mercy Hosp., Inc.*, No. 05-22409-CIV-SEITZ, 2007 WL 2083562, at *4–6 (S.D. Fla. July 20, 2007).

holding that Recovery Village's claims are free from ERISA's jurisdictional reach,[3] Defendants removed this action to the Southern District of Florida alleging ERISA preemption. Once pending in federal court, Defendants immediately sought to transfer the entire action to the Blue Cross Blue Shield Antitrust Multidistrict Litigation (the "Antitrust MDL") in an effort to defend, by delay rather than merits, the adjudication of Plaintiff's unrelated state law claims, which claims Defendants do not attempt to "relate" to the Antitrust MDL.[4] As demonstrated below, the single count on which Defendants seek transfer likewise bears no such resemblance.

Looking beyond labels, Plaintiff's civil conspiracy claim is bottomed on a unique and independent state law tort theory that neither implicates nor mimics the elements of the MDL's antitrust claims. The relevant facts and proofs required in this action are entirely inapposite to those in the MDL.[5] The mere existence of some common facts pled as background in Recovery Village's state law claim without actual "common questions of fact" corresponding to issues in the MDL does not justify transfer, particularly where, as here, there is no risk of inconsistent rulings because of the dissimilarity of the causes of action. Recovery Village's civil conspiracy

---

[3] As discussed in Plaintiff's remand motion, none of Recovery Village's claims are subject to federal subject-matter jurisdiction. This case concerns only the appropriate *"rate of payment"* for pre-authorized, covered services provided by Recovery Village with the express knowledge and approval of Defendants. Eleventh Circuit precedent makes clear such claims do not implicate ERISA. *See Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591 F.3d 1337, 1350–51 (11th Cir. 2009). Recovery Village's remand motion can be found at D.E. 19, in Case No. 0:15-cv-61414-JIC in the Southern District of Florida.

[4] While transfer is an apparent common defense tactic, *DeLaventura v. Columbia Acorn Trust*, 417 F. Supp. 2d 147, 155–56 (D. Mass. 2006), here the impropriety of Defendants' strategy is compounded because transfer is based on the single claim admittedly not subject to original federal subject matter jurisdiction.

[5] By example, Recovery Village is an "out of network" provider with the Blue Plans. Unlike the allegedly "related" MDL antitrust claims, Recovery Village does not allege that the Defendant Blue Plans are "required" or mandated by the Association to "share" pricing for out-of-network claims, because they are not, nor does Recovery Village sue all Blue Plans whose members have received its services.

3

claim does not share any relevant or dispositive factual issues with the Antirust MDL claims nor does it pose any danger of inconsistent rulings or duplicative proceedings with those in the Antitrust MDL. The Panel should vacate the CTO.

At minimum, the Panel should vacate transfer of the admittedly separable claims and defer its consideration of the transfer of the civil conspiracy claim until the district court determines the threshold jurisdictional issue of ERISA complete preemption.[6] Defendants' inevitable rejoinder that the transferee court can decide the threshold jurisdictional issues fall flat in these circumstances. "The only reason to permit the transferee court to decide the jurisdictional issue would be to further judicial economy and consistency. H.R.Rep. No. 90-1190. If the jurisdictional issue in the particular case is different from those in the other cases subject or potentially subject to MDL jurisdiction, these values do not come into play." *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044, 1049 (E.D. Wis. 2001). Here, judicial economy will not be served, as the jurisdictional issue in Plaintiff's case is not at issue in the Antitrust MDL.

## LEGAL STANDARD

A conditional transfer order "is an administrative device used to expeditiously transfer apparently related cases where there is no opposition to such a transfer. It should not be considered by counsel as a decision or judgment by the Panel which must be reversed before such an order can be vacated. It is simply an administrative act of the Clerk which can be and will be vacated upon the showing of good cause by any party." *In re Grain Shipments*, 319 F.

---

[6] Indeed, The Manual for Complex Litigation suggests that "matters such as motions to dismiss or to remand, raising issues unique to the particular case, may be particularly appropriate for resolution before the Panel acts on the motion to transfer." Manual for Complex Litigation (Fourth) § 20.132 (2004). ERISA preemption is not an issue in the Antitrust MDL, and thus judicial economy favors the currently-presiding district court resolving that issue. Refiling the motion in the transferee court would result is needless delay and use of resources for both the parties and the judiciary.

4

Supp. 533, 534 (J.P.M.L. 1970) (footnote omitted). Transfer is appropriate only where (1) "common questions of fact" exist between the actions, (2) transfer will be "for the convenience of the parties and witnesses," and (3) transfer will "promote the just and efficient conduct" of the actions. 28 U.S.C. § 1407(a).

In other words, the existence of common questions of fact is a necessary, but not sufficient, condition for transfer to be appropriate. *See In re Deering Milliken Patent*, 328 F. Supp. 504, 505 (J.P.M.L. 1970) ("This jurisdictional requirement having been met, the Panel proceeds to consider those matters significant in determining whether transfer under Section 1407 would serve the convenience of parties and witnesses and the interests of justice."). Thus, the Panel has held transfer to be inappropriate where the common questions of fact were not "sufficiently complex,"[7] would not "predominate over individual questions of fact present in each action,"[8] or otherwise would "not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of the litigation."[9]

## ARGUMENT

**A.  Recovery Village's Suit Does Not Share "Common Questions of Fact" with the Antirust MDL.**

---

[7] *In re Air Crash near Canandaigua, N.Y., on Sept. 16, 2002*, 427 F. Supp. 2d 1365, 1366 (J.P.M.L. 2006) ("[M]ovants have failed to persuade us that any common questions of fact are sufficiently complex to warrant Section 1407 centralization.")

[8] *In re Asbestos Sch. Prods. Liab. Litig.*, 606 F. Supp. 713, 714 (J.P.M.L. 1985) ("[W]e find that Section 1407 transfer would neither serve the convenience of the parties and witnesses nor further the just and efficient conduct of the litigation. Although we recognize that the actions in this litigation involve some common questions of fact, we are not persuaded that these common questions of fact will predominate over individual questions of fact present in each action.")

[9] *In re Asbestos & Asbestos Insulation Material Prods. Liab. Litig.*, 431 F. Supp. 906, 910 (J.P.M.L. 1977) ("Although we recognize the existence of some common questions of fact among these actions, we find that transfer under Section 1407 would not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of the litigation. Accordingly, the order to show cause is vacated.")

### 1. Florida Independent Civil Conspiracy Claims Are Distinct from Antitrust Claims.

In analyzing the "relatedness" of Count IV, its substance, not label, must control. While most jurisdictions require a plaintiff to prove an underlying, independently actionable wrong to state a claim for civil conspiracy (in other words, unlawful conduct), the Florida Supreme Court has fashioned a unique, "independent tort" of civil conspiracy. *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977). This cause of action arises where the plaintiff "can show some peculiar power of coercion possessed by the conspirators by virtue of their combination, which power an individual would not possess." *Id.* As set forth in *Churruca*, the elements of an independent tortious conspiracy claim are "a malicious motive and coercion through numbers or economic influence." *Id.*

A Florida independent civil conspiracy claim is unique.[10] In most states, a civil conspiracy claim requires an underlying unlawful act, without regard to any malicious motive. 15A C.J.S. *Conspiracy* § 17 (2015) ("[P]ersons who combine to achieve goals that they have a legal right to seek, *even if they are maliciously motivated*, do not conspire. A civil action for conspiracy does not lie if the object of the alleged conspiracy or the means used to attain it is lawful *even if a defendant acts with a malicious motive*.") (emphases added) (footnotes omitted).

---

[10] Only four states recognize an independent civil conspiracy tort, each one with their own distinctions. *See* P. Benjamin Cox, *Combination to Achieve an Immoral Purpose: The Oppressively Vague Tort of Civil Conspiracy in Arkansas*, 62 Ark. L. Rev. 57, 67–69 (2009) (discussing how Florida, Massachusetts, Colorado, and South Carolina recognize independent civil conspiracy torts while the rest of the states have not recognized this novel claim). Florida's right to fashion or recognize a claim as here is fundamental to our system of federalism. As Justice Brandeis, and eventually the Supreme Court, observed: "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J. dissenting) (quoted again with approval most recently in *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, No. 13-1314, 2015 WL 2473452, at *17 (U.S. June 29, 2015)).

Florida's unique independent civil conspiracy claim is just the opposite. It requires a "malicious motive," but no illegal or wrongful underlying conduct.[11] *Churruca*, 353 So. 2d at 550; *Walters v. Blankenship*, 931 So. 2d 137, 140–41 (Fla. Dist. Ct. App. 2006).

In *Churruca*, for example, a group of jai-alai players sued various frontons for the frontons' alleged conspiracy to refuse to employ any of the plaintiffs as retaliation for a prior players strike. 353 So. 2d at 548–49. The court held that while the frontons were individually entitled to employ whomever they wished and even could decide in combination to refuse employment to unsatisfactory persons, the frontons would be liable for tortious conspiracy "if the concerted effort of the fronton owners is designed maliciously for the purpose of beggaring petitioners by depriving them of their livelihood." *Id.* at 549.

Similarly in the *Walters* decision the court found otherwise lawful conduct sufficient to state a claim for an independent tortious conspiracy under Florida law. The *Walters* court held that the plaintiffs sufficiently stated a civil conspiracy claim by alleging that multiple condominium owners simultaneously placed "for sale by owner" signs in front of their units, though not actually for sale, on the same day the plaintiffs were selling their units. 931 So. 2d at 140–41. Had a single defendant put up a sign, the court determined it would have had little effect, but the concerted effort of multiple neighbors had sufficient effect to lower the market value of each unit by "suggest[ing] something may have been wrong with the condominiums or, at the very least, dramatically increase[ing] the supply of units for sale." *Id.* at 141.

It is axiomatic that an antitrust conspiracy to restrain trade requires proof that the conspirators' scheme was "designed to achieve an *unlawful* objective." *DeLong Equip. Co. v. Wash. Mills Abrasive Co.*, 887 F.2d 1499, 1508 (11th Cir. 1989) (emphasis added) (citation and

---

[11] Thus, an unlawful objective (required for an antitrust violation) and a malicious motive (required for a Florida independent civil conspiracy claim) are distinct.

quotation marks omitted). In contrast, Recovery Village's independent civil conspiracy claim depends only on whether the combined effect of the Defendants' actions harmed Recovery Village, regardless of the legality of the conduct or whether it harmed a broader market.

Moreover, the purpose of a tort claim, such as Recovery Village's civil conspiracy claim, is compensation of the injured party for damages caused *to that plaintiff* by the defendants' tortious conduct. *Fla. Physician's Ins. Reciprocal v. Stanley*, 452 So. 2d 514, 516 (Fla. 1984); *see also Porter v. White*, 483 F.3d 1294, 1307 (11th Cir. 2007). Unlike tort law, antitrust law does not exist to compensate an injured plaintiff.[12] *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (explaining that antitrust law is directed "against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest."); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'") (citation omitted); *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389 (11th Cir. 1990) ("[I]n order to receive damages under the antitrust laws, a plaintiff must prove more than the fact that he was injured through conduct of the defendant.").[13]

---

[12] *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.* 4 F. Supp. 3d 1123, 1139 (D. Ariz. 2014) (granting summary judgment to the defendant on an antitrust claim because the plaintiff's evidence did "not show an anticompetitive effect. Rather, it suggests that [Defendant's] conduct, *even though possibly injurious to [Plaintiff]*, has a pro-competitive effect on the market as a whole.") (emphasis added); *see also id.* at 1140 ("The evidence presented by Aerotec is limited to the effects felt by Aerotec. . . . [T]hus, the court cannot conclude that effects felt by Aerotec will have a meaningful impact on the market as a whole.").

[13] *Callahan v. Scott Paper Co.*, 541 F. Supp. 550, 560 (E.D. Pa. 1982) ("In addition, to the extent that plaintiffs' injuries may go uncompensated, I simply note that the antitrust laws were never

As the Panel is aware, antitrust laws "were enacted specifically to protect competition in the marketplace. The fundamental premise is that the public benefits from a competitive economy that provides for efficient allocation of resources and increased production at lower prices." *Int'l Wood Processors v. Power Dry, Inc.*, 792 F.2d 416, 427 (4th Cir. 1986). "[T]he promotion of the public benefit through a competitive economy" is "a central goal" of antitrust law. *Id.* Accordingly, liability for a private antitrust action requires proving *both* a violation of the antitrust laws (i.e., an anticompetitive effect on the market) and an impact on the plaintiff from the violation. *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, No. MDL 232, 2014 WL 7338958, at *8 (E.D. La. Dec. 22, 2014); *see also Aquatherm Indus., Inc. v. Fla. Power & Light Co.*, 145 F.3d 1258, 1262 (11th Cir. 1998) ("A plaintiff who alleges unfair competition must prove injury to *competition* in order to sustain a federal antitrust claim."). Because of their focus on markets rather than plaintiffs, basic antitrust analysis requires a number of critical factual inquiries apart from harm to the plaintiff.[14] None of these inquiries are necessary to Recovery Village's state law civil conspiracy claim.[15]

---

intended to be a panacea. The court of appeals has denied standing in the past where the victim has been left remediless.").

[14] *In re Pool Prods.*, 2014 WL 7338958, at *8 (listing the following inquiries relevant to an antitrust claim: "What is the relevant product market for purposes of assessing market power? What is the relevant geographic market for purposes of assessing market power? What was [Defendant's] share of the relevant market? . . . Did [Defendant] engage in exclusionary conduct? Did the alleged . . . agreements have an anticompetitive impact on the relevant market?"); *Total Ben. Servs., Inc. v. Grp. Ins. Admin., Inc.*, 875 F. Supp. 1228, 1232 (E.D. La. 1995) ("The Court agrees with defendants that plaintiff's antitrust claims under both Section 1 and Section 2 of the Sherman Act for the most part rise or fall with the issue of the relevant market and defendants' power in that market."). In *Total Benefit*, the court listed the following necessary inquiries: "definition of the relevant market in both its product and geographic dimensions," "the effect of the challenged conduct on competitive conditions in the market," whether the restraint had "a substantial anticompetitive impact," and the "number of firms in the relevant market and their market shares." *Id.* at 1233.

[15] A *per se* claim requires a finding that the Defendants' conduct is "manifestly anticompetitive" and thus *per se* illegal, while a "rule of reason" analysis requires balancing procompetitive and

## 2. The Questions of Fact Raised by Recovery Village's Complaint are Distinct from Those Raised by the Antitrust Complaint.

The plaintiffs in the Blue Cross Blue Shield Antitrust Litigation ("Antitrust Plaintiffs")[16] allege facts in support of ten (10) claims: injunctive relief under Section 16 of the Clayton Act (Count I); threefold damages and interest under Section 4 of the Clayton Act for the *per se* market allocation conspiracy (Count II); *per se* price fixing and boycott conspiracy (Count III); a "quick look" claim for market allocation conspiracy (Count IV); a "quick look" claim for price fixing and boycott conspiracy (Count V); "rule of reason" claims for market allocation conspiracy (Count VI); "rule of reason" claims for price fixing and boycott conspiracy (Count VII); monopsonization (Counts VIII and IX); and conspiracy to monopsonize (Count X). *See* Corrected Second Am. Provider Compl. at 145–56,[17] *In re: Blue Cross Blue Shield Antitrust Litig.* (MDL No. 2406), No. 2:13-CV-200000-RDP (S.D. Ala. Nov. 25, 2014) (D.E. 236) (hereinafter, "Antitrust Complaint"). Recovery Village's complaint does not share any *relevant or dispositive factual* issues with those advanced by the Antitrust Plaintiffs. While the Antirust Plaintiffs cast a wide net—detailing hundreds of distinct factual allegations—these allegations support claims wholly distinct from those raised by Recovery Village.

---

anticompetitive effects on the market and defining a relevant market. *DeLong*, 887 F.2d at 1506–07; *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) ("In the rule of reason analysis, 'the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market.' . . . [The analysis] requires 'examination of market circumstances,' including market power and share.") (citations omitted); *Military Servs. Realty, Inc. v. Realty Consultants of Va., Ltd.*, 823 F.2d 829, 832 (4th Cir. 1987) ("In proving a Section 1 violation, the plaintiff must show the market shares of the competitors in the relevant market. . . . Evidence concerning the effect of the defendants' conduct on the relevant market is essential in analyzing a Section 1 claim under a rule of reason analysis.").

[16] The Antitrust MDL also includes a separate class of "subscriber plaintiffs." Defendants here only allege similarity to the provider plaintiffs' claims. *See* D.E. 264.

[17] Page citations refer to the CM/ECF header pagination.

10

The thrust of the Antitrust Plaintiffs' allegations is Defendants' alleged price-fixing and market-allocation schemes in violation of Sections 1 and 2 of the Sherman Act. *Id.* Unlike Recovery Village's complaint, the Antirust Complaint is a class action complaint that conveniently lists the questions of law and fact common to all class members:

> a. Whether Defendants violated Section 1 of the Sherman Act;
>
> b. Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;
>
> c. Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;
>
> d. Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;
>
> e. Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;
>
> f. Whether Defendants violated Section 2 of the Sherman Act;
>
> g. Whether the Blues collectively or any particular Blue has market power in a particular market;
>
> h. Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;
>
> i. Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;
>
> j. Whether Defendants' conduct should be enjoined;
>
> k. The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

*Id.* at ¶ 383. Recovery Village's state law claims, including its civil conspiracy claim, depend on the outcome of <u>none</u> of these questions.

11

As the Panel and the District Court presiding over the Antitrust MDL have stated, "'the core controversy'" of this MDL is "'the propriety of BCBSA's license agreements and the anticompetitive effects of certain provisions in those agreements, most notably the geographical service area restrictions.'" D.E. 260 (District Court's Suggestion of Remand) at 2 (quoting the JPML). When the Panel first consolidated the Blue Cross Blue Shield Antitrust Litigation, it said that the common questions of fact among the consolidated proceedings were "the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions." *In re: Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012). The purpose of centralization was to "eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary." *Id.* (footnote omitted).[18]

Recovery Village's claims are far less ambitious than those of the Antitrust Plaintiffs. In contrast, Recovery Village brought a five-count complaint based purely on state-law grounds against several Blue Cross Blue Shield health insurers who have underpaid it for substance use disorder treatment services Recovery Village rendered to their members. *See* D.E. 264-3 (hereinafter "Recovery Village's Complaint"). Unlike the Antitrust Plaintiffs, Recovery Village does not seek to dismantle or enjoin the Defendants' trademark or licensing agreements nor their multiple national programs (which include, but as alleged in the Antitrust Plaintiffs' complaint are not limited to, the Blue Card Program). Instead, Recovery Village merely seeks to be paid the contracted or otherwise reasonable price for its services. *Compare id.* at 30, *with* Antitrust Complaint at 156–57 (requesting, *inter alia*, that the court permanently enjoin defendants from

---

[18] The Panel also noted that all the actions were statewide or nationwide class actions. *Id.* at 1376 n.3. Recovery Village does not assert a class action.

honoring or enforcing their license agreements and from using their national programs, including but not limited to the Blue Card Program).

Critically, unlike the Antitrust Plaintiffs, Recovery Village alleges that it contracted with *each* Defendant, rather than only the Blue Plan in its service area. Recovery Village alleges that it contracted with Blue Plans located outside Florida (Blue Cross Blue Shield of Florida's "service area"), while the Antitrust Plaintiffs assert an inability to contract independently with Blue Plans located outside their service areas due to their implementation of national programs such as the Blue Card Program. *Compare* Recovery Village Compl. ¶¶ 2, 30–43 (alleging contracts formed with each Defendant), *with* Antitrust Compl. ¶¶ 19–53, 60, 229 (alleging contracts only with a defendant located in the "service area" of the plaintiff and further alleging a "Price Fixing and Boycott Conspiracy" that "involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area"). The allegations in the Recovery Village Complaint and the Antitrust Complaint are irreconcilable.

While Recovery Village's complaint alleges some facts in common with the Antitrust Complaint, the complaints do not raise any "common questions of fact." Instead, the only common facts are those that are undisputed as they are based on publicly available information from the Defendants' themselves. *See In re Air Crash Disaster at Pago Pago, Am. Samoa, on Jan. 30, 1974*, 394 F. Supp. 799, 800 (J.P.M.L. 1975) (granting motion to vacate CTO because, though the actions shared common facts, there were no common questions of fact due to defendant's admissions); *see also In re Swine Flu Immunization Prods. Liab. Litig.*, 464 F. Supp. 949, 951 (J.P.M.L. 1979) (same). For example, Recovery Village's complaint provides as

13

background how the Blue Card Program[19] operates and how the Blue Plans' defined service areas are part of that program.

That is where the similarities end. The Antitrust Plaintiffs assert that the Blue Card Program is part of a conspiracy to destroy competition. They question the legality and enforceability of the Blue Card Program and the Blue Plans' license agreements. Recovery Village merely asserts that Defendants combine to substantially underpay it for services rendered. *See* Recovery Village Compl. ¶ 59, 62. What matters is that Defendants combine to systematically underpay Recovery Village. That they use the Blue Card Program to do so is only secondary. And, that the Blue Card Program may be anticompetitive is irrelevant. Contrary to Defendants' assertion, Recovery Village's state law civil conspiracy claim does not depend on any finding regarding the legality or enforceability of the Blue Card Program or Defendants' license agreements.[20]

Defendants mistakenly, and misleadingly, contend that Recovery Village's civil conspiracy claim implicates the same common facts as antitrust violations before the MDL court. Any factual allegations that appear similar are background facts based on Defendants' own

---

[19] Unlike Recovery Village's complaint, the Antitrust Complaint contains detailed allegations concerning multiple national programs established by the Blue Plans. Recovery Village's complaint does not even mention the National Accounts Program, CHP, or other Blue programs aside from the Blue Card Program.

[20] Recovery Village notes that the overwhelming majority of the Antitrust Plaintiffs are in-network providers. They assert a price-fixing conspiracy in which each Blue Plan Defendant has agreed to certain rules under which a Home Plan must follow the Host Plan's pricing. *See, e.g.,* Antitrust Compl. ¶ 247. Recovery Village has sued only certain Defendants that have followed Host Plan pricing, which Recovery Village alleges to be below the contract price or the reasonable price for the services. Other Blue Plans have not. Thus, the "price-fixing" conspiracy claim is irrelevant to Recovery Village's claims. Moreover, even the Antitrust Plaintiffs' allegations regarding the Blue Card Program's effect on out-of-network providers differ completely from Recovery Village's claims. *See, e.g.,* Antitrust Compl. ¶ 250 (alleging only inefficiencies caused by the Blue Plan's national programs).

descriptions of their companies and operations. Merely having a small number of non-dispositive common facts between the two litigations in any event does not warrant transfer:

> *Although Computer Graphics has cast its complaint in terms of antitrust violations in the electronic data processing industry, the capacity of the MT/ST and MT/SC as computer input devices is irrelevant to Computer Graphics' action and is relied on only as an explanation for IBM's alleged acts.* Computer Graphics has used its machines only for the typesetting and typewriting functions for which they were intended and any antitrust questions raised by it concern IBM's monopolization of this aspect of the office machine market. No question is raised concerning IBM's alleged tie-in of computer software with computer hardware sales, the apparent crux of the Minnesota actions. We conclude that, in spite of a few common fact questions resulting from the common defendant, the just and efficient conduct of the actions will not be promoted by transfer of Computer Graphics action.

*In re IBM*, 316 F. Supp. 976, 977 (J.P.M.L. 1970) (emphasis added). Defendants' attempt to convert this simple state law claim into a complex antitrust suit is meritless.

### 3. Defendants Admit That Recovery Village's Contract Claims Are Separable Claims.

Should the Panel determine that transfer is appropriate based on the civil conspiracy claim, Recovery Village's contract claims and related declaratory relief claim remain separable.[21] *See* R.P.J.P.M.L 9.1(b) (noting that a transfer order may "provide[]for the separation and simultaneous remand of any claim, cross-claim, counterclaim, or third-party claim");

---

[21] Another reason to defer ruling on transfer until the district court determines the jurisdictional issues is that, if the claims are separated upon transfer (as they must be because even Defendants do not assert that the contract and declaratory relief claims merit transfer), the transferee court in the Northern District of Alabama would have to sort out the jurisdictional puzzle of presiding over a claim for which only supplemental federal subject-matter jurisdiction exists without any claim to actually provide original subject-matter jurisdiction. The question becomes even more difficult if the transferor court remands the contract and declaratory relief claims while the civil conspiracy claim remains with the transferee court. Such questions can be easily avoided, and not deplete judicial resources, by simply allowing the district court in the Southern District of Florida to complete its determination of the jurisdictional issues before any consideration of transfer.

15

10.1(b)(ii) (noting that the Panel may, on its own initiative, remand any separable claim). Defendants effectively admit as much.

Defendants' "tag-along" notice conspicuously fails to inform the Panel that Recovery Village primarily asserts elementary claims for breach of express and implied contracts requiring no proof of any conspiracy or combination. Defendants allege only the "similarity" between Count IV and the Antitrust MDL.

Briefly, Recovery Village's contract claims arise out of independent contracts between Recovery Village and each Defendant formed when the respective Defendant authorizes or otherwise approves treatment services provided to the Defendant's member. The claims concern only whether the three elements of contract formation are present in the independent agreements. *Pezold Air Charters v. Phoenix Corp.*, 192 F.R.D. 721, 725 (M.D. Fla. 2000) ("A contract is made under Florida law when the three elements of contract formation are present: offer, acceptance, and consideration.").[22] The implied-in-law contract claim requires that the Plaintiff confer a benefit on the Defendant and "the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 385 (Fla. 4th DCA 1997) (en banc). None of these claims depend on *any* conspiracy or combination between Defendants. Nor do they even bear a superficial similarity with the Antitrust MDL claims. These case-specific claims would not benefit from any coordinated pre-trial proceedings. Transfer would unnecessarily burden and waste the time and resources of the parties, the MDL district court, and the other parties to the Antitrust MDL.

---

[22] The only distinction is that the implied-in-fact contract claims require proof of acceptance by words or conduct. *Commerce P'ship 8098 Ltd. P'ship v. Equity Contracting Co.*, 695 So. 2d 383, 385 (Fla. 4th DCA 1997) (en banc).

### B. Transfer Will Not Serve the Convenience of the Parties and Witnesses Nor Promote the Just and Efficient Conduct of This Litigation.

Transfer of this matter will not serve the convenience of Recovery Village, which is located in Florida. Nor will it convenience any Defendant aside from Blue Cross Blue Shield of Alabama, as Defendants are dispersed throughout the country and one, Blue Cross Blue Shield of Florida, is also located in Florida. Transfer will also inconvenience Recovery Village's witnesses, who live in Florida. Contrary to convenience considerations, transfer to the MDL will necessarily (and needlessly) increase the cost of Recovery Village's litigation of its state law contract claims should it be haled into an out-of-state jurisdiction and forced to coordinate with more than forty other plaintiffs or stand in line behind them.

The impact of transferring Recovery Village's state law claims would be that those claims would spend significant time being litigated in a very full MDL docket when the federal judiciary, but for Defendants' improper actions, would have lacked jurisdiction from the start. Thus, a transfer of this action would greatly prejudice Plaintiff by depriving it of the opportunity to resolve its litigation in a timely, cost-effective, and efficient manner in a Florida state court—where it was originally brought and where it plainly belongs. Recovery Village continues to be harmed by Defendants' actions and will be yet further harmed if its litigation is derailed into the potentially lengthy and protracted MDL litigation.

As explained *supra*, while some "common facts" may be asserted as background to Recovery Village's state law claim, this in no way suggests that Plaintiff's claim shares actual "common questions of fact" with those cases in the Antitrust MDL. Even if some very minimal discovery overlap potentially exists between Recovery Village's state law civil conspiracy claim

17

and the Antitrust MDL, there are a multitude of methods to avoid duplication of efforts other than the unnecessary wholesale transfer of Plaintiff's entire state litigation into a federal MDL.[23]

In considering the "just and efficient" conduct of this litigation, the Panel should also not reward Defendants' gamesmanship. Defendants chose to ignore controlling law governing complete ERISA preemption and improperly removed Recovery Village's state law claims. The law and the resources of the judiciary were of no concern. Aware that justice delayed is justice denied, Defendants knew that if they removed and then immediately filed a "tag along" notice with this Panel, a transfer to MDL might take place before the Southern District of Florida could rule on Recovery Village's pending remand motion.

Defendants' actions do not serve the interests of justice, fairness, or judicial economy—rather they are entirely self-serving and meant achieve an unfair strategic advantage at Recovery Village's expense by manipulating the court system and delaying Recovery Village's litigation:

> If in fact the removal of this action was done for the purpose of delay, the Court strongly disapproves of such gamesmanship of the legal system and waste of judicial resources. Rule 11 states, "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b). Counsel should be mindful of this and cautious in pursuing such tactics in the future.

*Sundby v. Bank of New York Mellon*, 11CV627 DMS RBB, 2011 WL 1670914, at *2 (S.D. Cal. May 3, 2011). What Defendants have done is little more than forum shopping in reverse; a

---

[23] *See In re Eli 1 Lilly & Co. (Cephalexin Monohydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978) ("We observe that suitable alternatives to Section 1407 transfer are available in order to minimize the possibility of duplicative discovery. For example, notices for a particular deposition could be filed in all actions, thereby making the deposition applicable in each action; the parties could seek to agree upon a stipulation that any discovery relevant to more than one action may be used in all those actions; and any party could seek orders from the three courts directing the parties to coordinate their pretrial efforts.").

deliberate and calculated effort to manipulate the court system in order to achieve a tactical advantage. *See, e.g., BBC Intern. Ltd. v. Lumino Designs, Inc.*, 441 F. Supp. 2d 438, 444 (E.D.N.Y. 2006). Defendants have abused the MDL process and, respectfully, this Panel should consider if such actions are proper and can be tolerated in our legal system.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that the Panel vacate the conditional transfer order (CTO-18) with respect to this action, or alternatively vacate the conditional transfer order (CTO-18) with respect to separable claims or defer a ruling on this motion until the district court has ruled on Recovery Village's pending motion to remand, together with such additional relief the Panel deems just and proper.

Dated this 31st day of July, 2015.

Respectfully submitted,

/s/ Eileen L. Parsons
Eileen L. Parsons
Jeremy L. Kahn
Dale S. Dobuler
Kristen A. Corpion
VER PLOEG & LUMPKIN, P.A.
100 S.E. Second Street, Suite 3000
Miami, FL 33131
Telephone: (305) 577-3996
Fax: (305) 577-3559
eparsons@vpl-law.com
iromero@vpl-law.com
jkahn@vpl-law.com
ddobuler@vpl-law.com
kcorpion@vpl-law.com

*Counsel for Plaintiff, Recovery Village at Umatilla, L.L.C.*

19