# EXHIBIT 3

CV

# U.S. District Court
## U.S. District of Minnesota (DMN)
## CIVIL DOCKET FOR CASE #: 0:16−cv−00725−MJD−FLN

Belzer et al v. Blue Cross Blue Shield of Alabama et al
Assigned to: Judge Michael J. Davis
Referred to: Magistrate Judge Franklin L. Noel
Cause: 28:1331 Fed. Question

Date Filed: 03/22/2016
Jury Demand: Plaintiff
Nature of Suit: 410 Anti−Trust
Jurisdiction: Federal Question

**Plaintiff**

**Betsy Jane Belzer**                       represented by   **Genevieve M Zimmerman**
Meshbesher & Spence
1616 Park Avenue
Mpls, MN 55404
612.339.9121
Fax: 612.339.9128
Email: gzimmerman@meshbesher.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Hanson Riebel**
Lockridge Grindal Nauen PLLP
100 Washington Ave S Ste 2200
Mpls, MN 55401−2179
612−339−6900
Fax: 612−339−0981
Email: riebekh@locklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca A. Peterson**
Lockridge Grindal Nauen PLLP
100 Washington Ave. S., Suite 2200
Minneapolis, MN 55401−2179
612−339−6900
Fax: 612−339−0981
Email: rapeterson@locklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Constance Dummer**                       represented by   **Genevieve M Zimmerman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Hanson Riebel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca A. Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Centerpointe Dental**                       represented by   **Genevieve M Zimmerman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Karen Hanson Riebel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rebecca A. Peterson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blue Cross Blue Shield of Alabama**

**Defendant**

**Premera Blue Cross**
*doing business as*
Premera Blue Cross Blue Shield of
Alaska

**Defendant**

**Blue Cross Blue Shield of Arizona**

**Defendant**

**USAble Mutual Insurance Company**
*doing business as*
Arkansas Blue Cross and Blue Shield

**Defendant**

**Anthem, Inc.**
*formerly known as*
Wellpoint, Inc.
*doing business as*
Anthem Blue Cross Life and Health
Insurance Company
*doing business as*
Blue Cross of California
*doing business as*
Blue Cross of Southern California
*doing business as*
Blue Cross of Northern California
*doing business as*
Rocky Mountain Hospital and Medical
Service Inc.
*doing business as*
Anthem Blue Cross Blue Shield of
Colorado
*doing business as*
Anthem Blue Cross Blue Shield of
Nevada
*doing business as*
Anthem Blue Cross Blue Shield of
Connecticut
*doing business as*
Blue Cross Blue Shield of Georgia
*doing business as*
Anthem Blue Cross Blue Shield of
Indiana
*doing business as*

Anthem Blue Cross Blue Shield of
Kentucky
*doing business as*
Anthem Blue Cross Blue Shield of Maine
*doing business as*
Anthem Blue Cross Blue Shield of
Missouri
*doing business as*
RightCHOICE Managed Care, Inc.
*doing business as*
HMO Missouri Inc.
*doing business as*
Anthem Health Plans of New Hampshire
as Anthem Blue Cross Blue Shield of
New Hampshire
*doing business as*
Empire HealthChoice Assurance, Inc. as
Empire Blue Cross Blue Shield
*doing business as*
Community Insurance Company as
Anthem Blue Cross Blue Shield of Ohio
*doing business as*
Anthem Blue Cross and Blue Shield of
Virgini
*doing business as*
Anthem Blue Cross Blue Shield of
Wisconsin

**<u>Defendant</u>**

**California Physicians' Service**
*doing business as*
Blue Shield of California

**<u>Defendant</u>**

**Highmark, Inc.**

**<u>Defendant</u>**

**Highmark Blue Cross Blue Shield
Delaware, Inc.**

**<u>Defendant</u>**

**Highmark West Virginia, Inc.**

**<u>Defendant</u>**

**CareFirst, Inc.**

**<u>Defendant</u>**

**Group Hospitalization and Medical
Services, Inc.**
*doing business as*
CareFirst BlueCross BlueShield

**<u>Defendant</u>**

**CareFirst of Maryland, Inc.**
*doing business as*
CareFirst BlueCross BlueShield

**<u>Defendant</u>**

**Blue Cross and Blue Shield of Florida,
Inc.**

**Defendant**

**Hawai'i Medical Service Association**
*doing business as*
Blue Cross and Blue Shield of Hawai'i

**Defendant**

**Blue Cross of Idaho Health Service, Inc.**

**Defendant**

**Cambia Health Solutions, Inc.**
*formerly doing business as*
Regence BlueShield of Idaho
*formerly doing business as*
Regence Blue Cross Blue Shield of Oregon
*formerly doing business as*
Regence Blue Cross Blue Shield of Utah
*formerly doing business as*
Regence Blue Shield (in Washington)

**Defendant**

**Health Care Service Corporation**
*doing business as*
Blue Cross and Blue Shield of Illinois
*doing business as*
Blue Cross and Blue Shield of New Mexico
*doing business as*
Blue Cross and Blue Shield of Oklahoma
*doing business as*
Blue Cross and Blue Shield of Montana
*doing business as*
Blue Cross Blue Shield of Texas

**Defendant**

**Caring For Montanans, Inc.**

**Defendant**

**Wellmark, Inc.**
*doing business as*
Wellmark Blue Cross and Blue Shield of Iowa

**Defendant**

**Wellmark of South Dakota, Inc.**
*doing business as*
Wellmark Blue Cross and Blue Shield of South Dakota

**Defendant**

**Blue Cross and Blue Shield of Kansas, Inc.**

**Defendant**

**Louisiana Health Service & Indemnity Company**
*doing business as*
Blue Cross and Blue Shield of Louisiana

**Defendant**

**Blue Cross and Blue Shield of Massachusetts, Inc.**

**Defendant**

**Blue Cross Blue Shield of Michigan**

**Defendant**

**BCBSM, Inc.**
*doing business as*
Blue Cross and Blue Shield of Minnesota

**Defendant**

**Blue Cross Blue Shield of Mississippi**

**Defendant**

**Blue Cross and Blue Shield of Kansas City**

**Defendant**

**Blue Cross and Blue Shield of Nebraska**

**Defendant**

**Horizon Healthcare Services, Inc.**
*doing business as*
Horizon Blue Cross and Blue Shield of New Jersey

**Defendant**

**Healthnow New York Inc.**
*doing business as*
BlueCross BlueShield of Western New York
*doing business as*
Blue Shield of Northeastern New York

**Defendant**

**Excellus Health Plan, Inc.**
*doing business as*
Excellus BlueCross BlueShield

**Defendant**

**Blue Cross and Blue Shield of North Carolina, Inc.**

**Defendant**

**Noridian Mutual Insurance Company**
*doing business as*
Blue Cross Blue Shield of North Dakota

**Defendant**

**Hospital Service Association of Northeastern Pennsylvania**
*doing business as*
Blue Cross of Northeastern Pennsylvania

**Defendant**

**Capital Bluecross**

**Defendant**

**Independence Hospital Indemnity
Plan, Inc.**
*formerly known as*
Independence Blue Cross

**Defendant**

**Triple–S Salud, Inc.**

**Defendant**

**Blue Cross & Blue Shield of Rhode
Island**

**Defendant**

**Blue Cross and Blue Shield of South
Carolina**

**Defendant**

**Blue Cross Blue Shield of Tennessee,
Inc.**

**Defendant**

**Blue Cross and Blue Shield of Vermont**

**Defendant**

**Blue Cross Blue Shield of Wyoming**

**Defendant**

**Blue Cross and Blue Shield Association**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/22/2016 | 1 | COMPLAINT against Anthem, Inc., BCBSM, Inc., Blue Cross & Blue Shield of Rhode Island, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Mississippi, Blue Cross Blue Shield of Tennessee, Inc., Blue Cross Blue Shield of Wyoming, Blue Cross and Blue Shield Association, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Kansas, Inc., Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Nebraska, Blue Cross and Blue Shield of North Carolina, Inc., Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Vermont, Blue Cross of Idaho Health Service, Inc., California Physicians' Service, Cambia Health Solutions, Inc., Capital Bluecross, CareFirst of Maryland, Inc., CareFirst, Inc., Caring For Montanans, Inc., Excellus Health Plan, Inc., Group Hospitalization and Medical Services, Inc., Hawai'i Medical Service Association, Health Care Service Corporation, Healthnow New York Inc., Highmark Blue Cross Blue Shield Delaware, Inc., Highmark West Virginia, Inc., Highmark, Inc., Horizon Healthcare Services, Inc., Hospital Service Association of Northeastern Pennsylvania, Independence Hospital Indemnity Plan, Inc., Louisiana Health Service & Indemnity Company, Noridian Mutual Insurance Company, Premera Blue Cross, Triple–S–Salud, Inc., USAble Mutual Insurance Company, Wellmark of South Dakota, Inc., Wellmark, Inc.. ( Filing fee $ 400 receipt number AMNDC–4836081.) Filed by Constance Dummer, Betsy Jane Belzer, Centerpointe Dental. Filer requests summons issued. (Attachments: # 1 Civil Cover Sheet) (Riebel, Karen) (Entered: 03/22/2016) |

| | | |
|---|---|---|
| 03/22/2016 | 2 | TEXT ONLY ENTRY: CLERK'S NOTICE OF INITIAL CASE ASSIGNMENT. Case assigned to Judge Richard H. Kyle per Civil (Antitrust) List and referred to Magistrate Judge Franklin L. Noel. Please use case number 16–cv–725 (RHK/FLN). (lmb) (Entered: 03/22/2016) |
| 03/22/2016 | 3 | Summons Issued as to Anthem, Inc., BCBSM, Inc., Blue Cross & Blue Shield of Rhode Island, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Arizona, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Mississippi, Blue Cross Blue Shield of Tennessee, Inc. (lmb) (Entered: 03/22/2016) |
| 03/22/2016 | 4 | Summons Issued as to Blue Cross Blue Shield of Wyoming, Blue Cross and Blue Shield Association, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Kansas, Inc., Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Nebraska, Blue Cross and Blue Shield of North Carolina, Inc. (lmb) (Entered: 03/22/2016) |
| 03/22/2016 | 5 | Summons Issued as to Blue Cross and Blue Shield of South Carolina, Blue Cross and Blue Shield of Vermont, Blue Cross of Idaho Health Service, Inc., California Physicians' Service, Cambia Health Solutions, Inc., Capital Bluecross, CareFirst of Maryland, Inc., CareFirst, Inc. (lmb) (Entered: 03/22/2016) |
| 03/22/2016 | 6 | Summons Issued as to Caring For Montanans, Inc., Centerpointe Dental, Excellus Health Plan, Inc., Group Hospitalization and Medical Services, Inc., Hawai'i Medical Service Association, Health Care Service Corporation, Healthnow New York Inc., Highmark Blue Cross Blue Shield Delaware, Inc. (lmb) (Entered: 03/22/2016) |
| 03/22/2016 | 7 | Summons Issued as to Highmark West Virginia, Inc., Highmark, Inc., Horizon Healthcare Services, Inc., Hospital Service Association of Northeastern Pennsylvania, Independence Hospital Indemnity Plan, Inc., Louisiana Health Service & Indemnity Company, Noridian Mutual Insurance Company, Premera Blue Cross. (lmb) (Entered: 03/22/2016) |
| 03/22/2016 | 8 | Summons Issued as to Triple–S Salud, Inc., USAble Mutual Insurance Company, Wellmark of South Dakota, Inc., Wellmark, Inc. (lmb) (Entered: 03/22/2016) |
| 03/23/2016 | 9 | ORDER for Disqualification and for Reassignment. Signed by Judge Richard H. Kyle on 3/23/16. (KLL) (Entered: 03/23/2016) |
| 03/23/2016 | 10 | TEXT ONLY ENTRY: CLERK'S NOTICE OF REASSIGNMENT. This case is reassigned to Judge Michael J. Davis. Judge Richard H. Kyle no longer assigned to the case. **NOTE:** the new case number is **16–cv–725 (MJD/FLN)**. Please use this case number for all subsequent pleadings. (las) (Entered: 03/23/2016) |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE  DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| BETSY JANE BELZER, CONSTANCE DUMMER, and CENTERPOINTE DENTAL | ) ) ) |
| **Plaintiffs,** | ) ) ) |
| vs. | ) **Case No. 16-CV-0725** ) |
| BLUE CROSS BLUE SHIELD OF ALABAMA; PREMERA BLUE CROSS, ALSO DBA PREMERA BLUE CROSS BLUE SHIELD OF ALASKA; BLUE CROSS BLUE SHIELD OF ARIZONA; USABLE MUTUAL INSURANCE COMPANY,d/b/a ARKANSAS BLUE CROSS AND BLUE SHIELD; ANTHEM, INC., F/K/A WELLPOINT, INC., d/b/a ANTHEM BLUE CROSS AND HEALTH INSURANCE COMPANY, BLUE CROSS OF CALIFORNIA, BLUE CROSS OF SOUTHERN CALIFORNIA, BLUE CROSS OF NORTHERN CALIFORNIA, ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF COLORADO AND ANTHEM BLUE CROSS BLUE SHIELD OF NEVADA, ANTHEM BLUE CROSS BLUE SHIELD OF     CONNECTICUT, BLUE CROSS BLUE SHIELD OF GEORGIA, ANTHEM BLUE CROSS BLUE SHIELD OF INDIANA, ANTHEM BLUE CROSS BLUE SHIELD OF KENTUCKY, ANTHEM BLUE CROSS BLUE SHIELD OF MAINE, ANTHEM BLUE CROSS BLUE SHIELD OF MISSOURI, RIGHTCHOICE MANAGED CARE, INC., HMO MISSOURI INC., ANTHEM HEALTH PLANS OF NEW HAMPSHIRE AS ANTHEM BLUE CROSS BLUE SHIELD OF NEW HAMPSHIRE, EMPIRE HEALTHCHOICE ASSURANCE, INC. AS EMPIRE BLUE CROSS BLUE SHIELD, COMMUNITY INSURANCE COMPANY AS ANTHEM BLUE CROSS BLUE | ) ) ) **CLASS ACTION COMPLAINT** ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

SHIELD OF OHIO, ANTHEM BLUE CROSS )
AND BLUE SHIELD OF VIRGINIA, AND )
ANTHEM BLUE CROSS BLUE SHIELD OF )
WISCONSIN; CALIFORNIA PHYSICIANS' )
SERVICE, D/B/A BLUE SHIELD OF )
CALIFORNIA; HIGHMARK, INC.; )
HIGHMARK BLUE        CROSS BLUE SHIELD )
DELAWARE, INC.; HIGHMARK WEST )
VIRGINIA, INC.; CAREFIRST, INC.; GROUP )
HOSPITALIZATION AND MEDICAL )
SERVICES, INC. D/B/A CAREFIRST )
BLUECROSS BLUESHIELD; CAREFIRST OF )
MARYLAND, INC. D/B/A CAREFIRST )
BLUECROSS BLUESHIELD; BLUE CROSS )
AND BLUE SHIELD OF FLORIDA, INC.; )
HAWAI'I MEDICAL SERVICE )
ASSOCIATION D/B/A BLUE CROSS AND )
BLUE SHIELD OF HAWAI'I; BLUE CROSS )
OF IDAHO HEALTH SERVICE, INC.; )
CAMBIA HEALTH SOLUTIONS, INC., f/d/b/a )
REGENCE BLUESHIELD OF IDAHO, )
REGENCE BLUE CROSS BLUE SHIELD OF )
OREGON, REGENCE BLUE CROSS BLUE )
SHIELD OF UTAH, AND REGENCE BLUE )
SHIELD (IN WASHINGTON); HEALTH CARE )
SERVICE CORPORATION, D/B/A BLUE )
CROSS AND BLUE SHIELD OF ILLINOIS, )
BLUECROSS AND BLUE SHIELD OF NEW )
MEXICO, BLUE CROSS AND BLUE SHIELD )
OF OKLAHOMA, BLUE CROSS AND BLUE )
SHIELD OF MONTANA, AND BLUE CROSS )
BLUESHIELD OF TEXAS; CARING FOR )
MONTANANS, INC.; WELLMARK, )
INC., d/b/a WELLMARK BLUE CROSS AND )
BLUE SHIELD OF IOWA; WELLMARK OF )
SOUTH DAKOTA, INC., D/B/A WELLMARK )
BLUE CROSS AND BLUE SHIELD OF )
SOUTH DAKOTA; BLUE CROSS AND BLUE )
SHIELD OF KANSAS, INC.; LOUISIANA )
HEALTH SERVICE & INDEMNITY )
COMPANY d/b/a BLUE CROSS AND BLUE )
SHIELD OF LOUISIANA; BLUE CROSS AND )
BLUE SHIELD OF MASSACHUSETTS, INC.; )

BLUE CROSS BLUE SHIELD OF MICHIGAN;          )
BCBSM, INC., D/B/A BLUE CROSS AND             )
BLUE SHIELD OF MINNESOTA; BLUE               )
CROSS BLUE SHIELD OF MISSISSIPPI;            )
BLUE CROSS AND BLUE SHIELD OF                )
KANSAS CITY; BLUE CROSS AND BLUE             )
SHIELD OF NEBRASKA; HORIZON                  )
HEALTHCARE SERVICES, INC., D/B/A             )
HORIZON BLUE CROSS AND BLUE SHIELD           )
OF NEW JERSEY; HEALTHNOW NEW                 )
YORK INC., d/b/a BLUECROSS                   )
BLUESHIELD OF WESTERN NEW YORK               )
AND BLUE SHIELD OF NORTHEASTERN              )
NEW YORK; EXCELLUS HEALTH PLAN,              )
INC., D/B/A EXCELLUS BLUECROSS               )
BLUESHIELD; BLUE CROSS AND BLUE              )
SHIELD OF NORTH CAROLINA, INC.;              )
NORIDIAN MUTUAL INSURANCE                    )
COMPANY d/b/a BLUE CROSS        BLUE         )
SHIELD OF NORTH DAKOTA; HOSPITAL            )
SERVICE ASSOCIATION OF                       )
NORTHEASTERN PENNSYLVANIA d/b/a             )
BLUE CROSS OF NORTHEASTERN                   )
PENNSYLVANIA; CAPITAL BLUECROSS;            )
INDEPENDENCE HOSPITALINDEMNITY              )
PLAN, INC., F/K/A INDEPENDENCE BLUE          )
CROSS; TRIPLE-S        SALUD, INC.; BLUE     )
CROSS & BLUE SHIELD OF RHODE                 )
ISLAND; BLUE CROSS AND BLUE SHIELD           )
OF SOUTH CAROLINA; BLUE CROSS BLUE           )
SHIELD OF TENNESSEE, INC.; BLUE             )
CROSS AND BLUE SHIELD OF VERMONT;            )
BLUE CROSS BLUE SHIELD OF WYOMING;           )
and BLUE CROSS AND BLUE SHIELD               )
ASSOCIATION,                                 )
                                             )
_____Defendants._____    )

# TABLE OF CONTENTS

NATURE OF THE CASE ........................................................................................................ 3

JURISDICTION AND VENUE ............................................................................................ 7

PARTIES .................................................................................................................................. 10
  Plaintiffs ............................................................................................................................. 10
  Defendants .......................................................................................................................... 10

TRADE AND COMMERCE ................................................................................................. 59

CLASS ACTION ALLEGATIONS ..................................................................................... 59

FACTUAL BACKGROUND ................................................................................................. 61
  History of the Blue Cross and Blue Shield Plans and of BCBSA ................................. 61
      Development of the Blue Cross Plans ........................................................................ 62
      Development of the Blue Shield Plans ...................................................................... 64
      Creation of the Blue Cross and Blue Shield Association ....................................... 65

  Allegations Demonstrating Control of BCBSA By Member Plans ............................... 69

  License Agreements and Restraints on Competition ..................................................... 70

  Horizontal Agreements ..................................................................................................... 73

  The Horizontal Agreements Not To Compete .............................................................. 76

  The Anticompetitive Acquisition Restrictions .............................................................. 83

  The BCBSA Licensing Agreements Have Reduced Competition In Regions Across The United States
  .............................................................................................................................................. 86

  Supra-Competitive Premiums Charged by BCBS Plans ............................................... 90

  The Widespread Use By BCBSA Licensees Of Anticompetitive Most Favored Nation Clauses .. 91

  BCBS-MN's Market Power In Minnesota ...................................................................... 97
      Relevant Product Market: .......................................................................................... 97
      Relevant Geographic Markets: ................................................................................ 100
      MINNESOTA ALLEGATIONS .............................................................................. 101

  State Insurance Laws Do Not Protect Subscribers from the Market Allocation Scheme ............. 104

Case MDL No. 2406 Document 336-5 Filed 03/25/16 Page 13 of 129

VIOLATIONS ALLEGED ........................................................................................................... 105

RELIEF REQUESTED ................................................................................................................ 115

Plaintiffs Betsy Jane Belzer, Constance Dummer and Centerpointe Dental (collectively herein, "Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants Blue Cross Blue Shield of Alabama ("BCBS-AL"); Premera Blue Cross ("BC-WA"), which also does business as Premera Blue Cross Blue Shield of Alaska ("BCBS-AK"); Blue Cross Blue Shield of Arizona ("BCBS-AZ"); USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield ("BCBS-AR"); Anthem, Inc., f/k/a WellPoint, Inc., d/b/a Anthem Blue Cross Life and Health Insurance Company and Blue Cross of California as well as Blue Cross of Southern California and Blue Cross of Northern California (together, "BC-CA"), Rocky Mountain Hospital & Medical Service Inc., doing business as Anthem Blue Cross Blue Shield of Colorado ("BCBS-CO") and Anthem Blue Cross Blue Shield of Nevada ("BCBS-NV"), Anthem Blue Cross Blue Shield of Connecticut ("BCBS-CT"), Blue Cross Blue Shield of Georgia ("BCBS-GA"), Anthem Blue Cross Blue Shield of Indiana ("BCBS-IN"), Anthem Blue Cross Blue Shield of Kentucky ("BCBS-KY"), Anthem Blue Cross Blue Shield of Maine ("BCBS-ME"), Anthem Blue Cross Blue Shield of Missouri as well as RightCHOICE Managed Care, Inc. and HMO Missouri Inc. ("BCBS-MO"), Anthem Health Plans of New Hampshire as Anthem Blue Cross Blue Shield of New Hampshire ("BCBS-NH"), Empire HealthChoice Assurance, Inc. as Empire Blue Cross Blue Shield ("Empire BCBS"), Community Insurance Company as Anthem Blue Cross Blue Shield of Ohio ("BCBS-OH"), Anthem Blue Cross and Blue Shield of Virginia ("BCBS-VA"), and Anthem Blue Cross Blue Shield of Wisconsin ("BCBS-WI"); California Physicians' Service, d/b/a Blue Shield of California ("BS-CA");

1

Highmark, Inc. ("Highmark BCBS"); Highmark West Virginia, Inc. ("BCBS-WV"); Highmark Blue Cross Blue Shield Delaware, Inc. ("BCBS-DE"); CareFirst, Inc. (a/k/a CareFirst BlueCross BlueShield); Group Hospitalization and Medical Services, Inc., d/b/a CareFirst BlueCross BlueShield ("BCBS-DC"); CareFirst of Maryland, Inc., d/b/a Carefirst BlueCross BlueShield ("BCBS-MD"); Blue Cross Blue and Shield of Florida, Inc. ("BCBS-FL"); Hawai'i Medical Service Association d/b/a Blue Cross and Blue Shield of Hawai'i ("BCBS-HI"); Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("BC-ID"); Cambia Health Solutions, Inc., f/d/b/a Regence BlueShield of Idaho ("BS-ID"), Regence Blue Cross Blue Shield of Oregon ("BCBS-OR"), Regence Blue Cross Blue Shield of Utah ("BCBS-UT"), and Regence Blue Shield (in Washington) ("BS-WA"); Health Care Service Corporation, d/b/a Blue Cross and Blue Shield of Illinois ("BCBS-IL"), Blue Cross and Blue Shield of Montana, (BCBS-MT"), Blue Cross and Blue Shield of New Mexico ("BCBS-NM"), Blue Cross and Blue Shield of Oklahoma as well as GHS Property and Casualty Insurance Company and GHS Health Maintenance Organization ("BCBS-OK"), and Blue Cross and Blue Shield of Texas ("BCBS-TX"); Caring for Montanans, Inc.; Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("BCBS-IA"); Wellmark of South Dakota, Inc., d/b/a Blue Cross and Blue Shield of South Dakota ("BCBS-SD"); Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS"); Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBS-LA"); Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA"); Blue Cross Blue Shield of Michigan ("BCBS-MI"); BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota ("BCBS-MN"); Blue

Cross Blue Shield of Mississippi ("BCBS-MS"); Blue Cross and Blue Shield of Kansas City ("BCBS-KC"); Blue Cross and Blue Shield of Nebraska ("BCBS-NE"); Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("BCBS-NJ"); HealthNow New York, Inc., d/b/a BlueCross BlueShield of Western New York ("BCBS-Western NY") and BlueShield of Northeastern New York ("BS-Northeastern NY"); Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield ("Excellus BCBS"); Blue Cross and Blue Shield of North Carolina, Inc. ("BCBS-NC"); Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota ("BCBS-ND"); Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania ("BC-Northeastern PA"); Capital BlueCross ("Capital BC"); Independence Hospital Indemnity Plan, Inc., f/k/a Independence Blue Cross ("Independence BC"); Triple S-Salud, Inc. ("BCBS-Puerto Rico"); Blue Cross and Blue Shield of Rhode Island ("BCBS-RI"); Blue Cross and Blue Shield of South Carolina ("BCBS-SC"); Blue Cross Blue Shield of Tennessee, Inc. ("BCBS-TN"); Blue Cross and Blue Shield of Vermont ("BCBS-VT"); and Blue Cross Blue Shield of Wyoming ("BCBS-WY") (collectively, the "Individual Blue Plans"); and the Blue Cross and Blue Shield Association ("BCBSA"), allege as follows:

## NATURE OF THE CASE

1.     The Supreme Court has repeatedly stated: "Collusion is the supreme evil of antitrust." *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2233 (2013). The Supreme Court has also explained the types of collusion long condemned by the antitrust laws: "Certain agreements, such as horizontal price fixing and market allocation, are thought so

inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). These prohibitions on *per se* illegal conduct are at the core of antitrust law's protection of our free enterprise system. As Robert Bork has explained about "the doctrine of *per se* illegality . . . (*e.g.*, price fixing and market division)": "Its contributions to consumer welfare over the decades have been enormous."  Robert H. Bork, *The Antitrust Paradox* 263 (rev. ed. 1993).

2.    This is a class action brought on behalf of subscribers of BCBS-MN health insurance to enjoin an ongoing conspiracy between and among BCBS-MN, the Individual Blue Plans and BCBSA to allocate markets in violation of the prohibitions of the Sherman Act. In addition, this action seeks to recover damages for a class of subscribers in the form of both (a) supra-competitive premiums that BCBS-MN has charged, and (b) the difference between what subscribers have paid BCBS-MN and the lower competitive premiums that non-competing Blue plans would have charged, all as a result of this illegal conspiracy. This action also seeks these damages as a result of anticompetitive conduct BCBS-MN has taken in its illegal efforts to establish and maintain monopoly power throughout this state. This action also asserts related claims under the law of Minnesota.

3.    The Antitrust Division of the Department of Justice defines *per se* illegal market division as follows: "Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among

themselves. For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers. In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

4.       Defendants are engaging in and have engaged in *per se* illegal market division. These market allocation agreements are reached and implemented in part through the Blue Cross and Blue Shield license agreements between each of the Individual Blue Plans and BCBSA, an association owned and controlled by all of the Individual Blue Plans, as well as the BCBSA Membership Standards and Guidelines. In part through the artifice of the Plan-owned and controlled BCBSA, an entity that the Individual Blue Plans created and wholly control, Defendants have engaged in prohibited market allocation by entering into *per se* illegal agreements under the federal antitrust laws that:

> a. Prohibit the Individual Blue Plans from competing against each other using the Blue name by allocating territories among the individual Blues;
>
> b. Limit the Individual Blue Plans from competing against each other, even when they are not using the Blue name, by mandating the percentage of their business that they must do under the Blue name, both inside and outside each Plan's territory; and/or

Case: MDL No 2406 Document 336-5 Filed 03/25/16 Page 19 of 129

     c. Restrict the right of any Individual Blue Plan to be sold to a company that is not a member of BCBSA, thereby preventing new entrants into the individual Blues' markets.

5.     An Individual Blue Plan that violates one or more of these restrictions faces license and membership termination from BCBSA, which would mean both the loss of the brand through which it derives the majority of its revenue and the required payment of a large fee to BCBSA that would help to fund the establishment of a competing health insurer.

6.     These territorial limitations among actual or potential competitors (*i.e.* horizontal parties) severely limit the ability of the Individual Blue Plans to compete outside of their geographic areas, even under their non-Blue brands.

7.     Many of the Individual Blue Plans have developed substantial non-Blue brands that could compete with other of the Individual Blue Plans. But for the illegal agreements not to compete with one another, these entities could and would use their Blue brands and non-Blue brands to compete with each other throughout their Service Areas, which would result in greater competition and competitively priced premiums for subscribers.

8.     The Individual Blue Plans enjoy remarkable market dominance in regions throughout the United States, and in particular, within Minnesota. The Blue Plans agreed to entrench and perpetuate the dominant market position that each of them has historically enjoyed in its specifically defined geographic market ("Service Area"), insulating the Individual Blue Plans from competition in each of their respective service

areas. Their dominant market shares are the direct result of the illegal conspiracy to unlawfully divide and allocate the geographic markets for health insurance in the United States. This series of agreements has enabled many Individual Blue Plans, including Defendants in this case, to acquire and maintain grossly disproportionate market shares for health insurance products in their respective regions, where these Plans enjoy market and monopoly power.

9.    The Individual Blue Plans' anticompetitive conduct has also resulted in higher premiums for their enrollees for over a decade. This anticompetitive behavior, and the lack of competition the Individual Blue Plans face because of their market allocation scheme and monopoly power and anticompetitive behavior, have prevented subscribers from being offered competitive prices and have caused supra-competitive premiums charged to Plan customers.

10.    These inflated premiums would not be possible if the market for health insurance in these Individual Blue Plans' Service Areas were truly competitive. Competition is not possible so long as the Individual Blue Plans and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-six of the nation's largest health insurance companies from competing with each other.

**JURISDICTION AND VENUE**

11.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton

Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against the Individual Blue Plans and BCBSA for the injuries sustained by Plaintiffs and the Class by reason of the violations, as hereinafter alleged, of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

12.     This Court also has supplemental jurisdiction over the state claims asserted herein pursuant to 28 U.S.C. § 1367(a)].

13.     This Court can assert personal jurisdiction over each defendant pursuant to Section 12 of the Clayton Act and/or pursuant to this state's long-arm statute under one or more of the theories below:

    a.  Each defendant has purposefully availed itself of the privilege of conducting business activities within this state and has the requisite minimum contacts with it because each defendant participated in a conspiracy which injured subscribers in this state and overt acts in furtherance of the conspiracy were committed within this state; and/or

    b.  Each defendant has purposefully availed itself of the privilege of conducting business activities within this state and has the requisite minimum contacts with it because each defendant committed intentional acts that were intended to cause and did cause injury within this state; and/or

    c.  Each defendant has purposefully availed itself of the privilege of conducting business activities within this state and has the requisite minimum contacts with it because each defendant committed intentional

acts that defendants knew were likely to cause injury within this state; and/or

d. Each defendant has purposefully availed itself of the privilege of conducting business activities within this state and has the requisite minimum contacts with it because each defendant is a party to an anticompetitive agreement with a resident of this state, which agreement is performed in whole or in part within this state; and/or

e. Each defendant has purposefully availed itself of the privilege of conducting business activities within this state and has the requisite minimum contacts with it because each defendant has committed a tort within this state, which has caused injury within this state; and/or

f. Each defendant has purposefully availed itself of the privilege of conducting business activities within this state and has the requisite minimum contacts with it because each defendant either has members within this state or transacts business within this state, either via the BlueCard program or otherwise.

14. Venue is proper in this district pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

15. Plaintiffs note that they do not waive their rights under *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

## PARTIES

**Plaintiffs**

16.     **Plaintiff Betsy Jane Belzer ("Belzer")** resides in Minneapolis, Minnesota. Plaintiff Belzer has purchased BCBS-MN health insurance during the relevant class period.

17.     **Plaintiff Constance Dummer ("Dummer")** resides in Chaska, Minnesota. Plaintiff Dummer has purchased BCBS-MN health insurance during the relevant class period.

18.     **Plaintiff Centerpointe Dental ("Centerpointe Dental")** is a Minnesota company with its principal office located in Burnsville, Minnesota. Plaintiff Centerpointe Dental has purchased BCBS-MN health insurance during the relevant class period.

19.     Plaintiffs Belzer, Dummer and Centerpointe Dental are unaware of any arbitration agreements that would govern the claims they assert herein.

**Defendants**

20.     **Defendant BCBSA** is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-six (36) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

10

21.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

22.     BCBSA has contacts with all 50 States, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the Individual Blue Plans. In particular, BCBSA has entered into a series of license agreements with the Individual Blue Plans that control the geographic areas in which the Individual Blue Plans can operate. These agreements are a subject of this Complaint.

23.     **Defendant BCBS-AL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in the state of Alabama. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Alabama.

24.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, AL 35244. BCBS-AL does business in each county in the state of Alabama.

25.     BCBS-AL is by far the largest health insurance company operating in Alabama and currently exercises market power in the commercial health insurance market throughout Alabama. As of 2008, at least 93 percent of the Alabama residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-AL. As of 2011, BCBS-AL maintained 86 percent market share in the individual market, and 96 percent market share in the small group market. Two recent studies concluded that Alabama has the *least*

competitive health insurance market in the country. Alabama's Department of Insurance Commissioner has recognized that "the state's health insurance market has been in a non-competitive posture for many years."

26.    As the dominant player in Alabama, BCBS-AL has led the way in causing premiums to be increased each year. From 2006 to 2010, BCBS-AL small group policy premiums rose 28 percent from 2006 to 2010 per member per month. In 2010, BCBS-AL raised some premiums by as much as 17 percent and others by as much as 21 percent. The National Association of Insurance Commissioners reports that BCBS-AL's premiums increased almost 42 percent over the past several years. As a result of these and other inflated premiums, between 2001 and 2009, BCBS-AL increased its surplus from $433.7 million to $649 million. In 2011, BCBS-AL reported net income of $256.92 million, 58 percent higher than the previous year, resulting in a profit of almost $94 million for FY 2011. From 2000 to 2009, the average employer-sponsored health insurance premium for families in Alabama increased by approximately 88.7 percent, whereas median earnings rose only 22.4 percent during that same period.

27.    **Defendant BCBS-AK** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and tradenames in Alaska. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AK is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Alaska.

28.    The principal headquarters for BCBS-AK is located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503. BCBS-AK does business in each county in Alaska.

29.     BCBS-AK currently exercises market power in the commercial health insurance market throughout Alaska. As of 2010, approximately 60 percent of the Alaska residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-AK – vastly more than are subscribers of the next largest commercial insurer operating in Alaska, Aetna, which carries approximately 30 percent of such subscribers. As of 2011, BCBS-AK held at least a 58 percent share of the individual full-service commercial health insurance market and at least a 72 percent share of the small group full-service commercial health insurance market.

30.     As the dominant insurer in Alaska, BCBS-AK has led the way in causing supra-competitive prices. From 2000 to 2007, median insurance premiums in Alaska increased nearly 74 percent while median income increased only 13 percent. Thus, health insurance premiums increased nearly six times faster than income in Alaska during that period. In 2011 alone, BCBS-AK reported reserves of more than $1 billion.

31.     **Defendant BCBS-AR** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arkansas. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AR is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Arkansas.

32.     The principal headquarters for BCBS-AR is located at 601 S. Gaines Street, Little Rock, Arkansas, 72201. BCBS-AR does business in each county in Arkansas.

13

33.     BCBS-AR currently exercises market power in the commercial health insurance market throughout Arkansas. As of 2010, at least 78 percent of the Arkansas residents who subscribe to full-service individual commercial health insurance and at least 55 percent of the Arkansas residents who subscribe to small group policies are subscribers of BCBS-AR – vastly more than are subscribers of the next largest commercial insurer operating in Arkansas, which carries only 7 percent of individual subscribers and 19 percent of small group subscribers.

34.     As the dominant insurer in Arkansas, BCBS-AR has led the way in causing premiums to be increased each year. As a result, from 2007 to 2011, BCBS-AR's net income increased by 64 percent, while its membership remained relatively flat, growing by only 5 percent; as of 2011, it increased its surplus to a stunning $581.7 million.

35.     **Defendant BCBS-AZ** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arizona. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AZ is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Arizona.

36.     The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021. BCBS-AZ does business in each county in Arizona.

37.     BCBS-AZ currently exercises market power in the commercial health insurance market throughout Arizona. As of 2011, at least 49 percent of the Arizona residents who subscribe to full-service individual commercial health insurance and at

14

least 26 percent of the Arizona residents who subscribe to small group policies are subscribers of BCBS-AZ.

38. As the dominant insurer in Arizona, BCBS-AZ has led the way in causing supra-competitive prices. As a result, by 2010, BCBS-AZ held surpluses in excess of $570 million.

39. **Defendant BC-CA** is the health insurance plan operating under the Blue Cross trademark and tradename in California. Like many other Blue Cross and Blue Shield plans nationwide, BC-CA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of California.

40. The principal headquarters for BC-CA is located at One WellPoint Way, Thousand Oaks, CA 91362. BC-CA does business in each county in California.

41. **Defendant BS-CA** is the health insurance plan operating under the Blue Shield trademark and tradename in California. Like many other Blue Cross and Blue Shield plans nationwide, BS-CA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of California.

42. The principal headquarters for BS-CA is located at 50 Beale Street, San Francisco, CA 94105-1808. BS-CA does business in each county in California.

43. BC-CA, together with BS-CA, currently exercises market power in the relevant commercial health insurance markets throughout California. As of 2010, at least 29 percent of the California residents who subscribe to full-service commercial health insurance are BC-CA subscribers alone; as of 2011, at least 37 percent of the California residents who subscribe to individual full-service commercial health insurance and at

least 15 percent of the California residents who subscribe to small group full-service commercial health insurance are BC-CA subscribers alone.

44.     As the dominant insurers in California, BC-CA and BS-CA have led the way in causing supra-competitive prices. As one result, by 2010, BS-CA alone held surpluses in excess of $2.2 billion.

45.     **Defendant BCBS-CO** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Colorado. Like other Blue Cross and Blue Shield plans nationwide, BCBS-CO is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Colorado.

46.     The principal headquarters for BCBS-CO is located at 120 Monument Circle, Indianapolis, IN 46204. BCBS-CO does business in each county in Colorado.

47.     BCBS-CO currently exercises market power in the commercial health insurance market throughout Colorado. As of 2010, at least 22 percent of the Colorado residents who subscribe to full-service commercial health insurance are subscribers of BCBS-CO.

48.     As the dominant insurer in Colorado, BCBS-CO has led the way in causing supra-competitive prices.

49.     **Defendant BCBS-CT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Connecticut. Like other Blue Cross and Blue Shield plans nationwide, BCBS-CT is the largest health insurer, as measured by

number of subscribers, within its service area, which is defined as the state of Connecticut.

50.     The principal headquarters for BCBS-CT is located at 370 Bassett Road, North Haven, CT 06473. BCBS-CT does business in each county in Connecticut.

51.     BCBS-CT currently exercises market power in the commercial health insurance market throughout Connecticut. As of 2011, at least 48 percent of the Connecticut residents who subscribe to full-service individual commercial health insurance and at least 31 percent of the Connecticut residents who subscribe to small group policies are subscribers of BCBS-CT.

52.     As the dominant insurer in Connecticut, BCBS-CT has led the way in causing supra-competitive prices.

53.     **Defendant BCBS-DE** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Delaware. Like other Blue Cross and Blue Shield plans nationwide, BCBS-DE is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Delaware.

54.     The principal headquarters for BCBS-DE is located at 800 Delaware Avenue, Wilmington, DE 19801. BCBS-DE does business in each county in Delaware.

55.     BCBS-DE currently exercises market power in the commercial health insurance market throughout Delaware. As of 2011, at least 51 percent of the Delaware residents who subscribe to full-service individual commercial health insurance and at least 61 percent of the Delaware residents who subscribe to small group policies are subscribers of BCBS-DE.

56.     As the dominant insurer in Delaware, BCBS-DE has led the way in causing supra-competitive prices. As a result, by mid-2011, it had built a surplus of over $180 million, an increase of 48 percent since the end of 2008.

57.     **Defendant BCBS-FL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Florida. Like other Blue Cross and Blue Shield plans nationwide, BCBS-FL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Florida.

58.     The principal headquarters for BCBS-FL is located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246. BCBS-FL does business in each county in Florida.

59.     BCBS-FL currently exercises market power in the commercial health insurance market throughout Florida. As of 2010, at least 31 percent of the Florida residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies), and as much as 83 percent of those residents in certain regions of the state, are subscribers of BCBS-FL. As of 2011, at least 48 percent of the Florida residents who subscribe to individual full-service commercial health insurance and at least 28 percent of the Florida residents who subscribe to small group full-service commercial health insurance are BCBS-FL subscribers.

60.     As the dominant insurer in Florida, BCBS-FL has led the way in causing supra-competitive prices.

61.     **Defendant BCBS-GA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Georgia. Like other Blue Cross and

18

Blue Shield plans nationwide, BCBS-GA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Georgia.

62.     The principal headquarters for BCBS-GA is located at 3350 Peachtree Road NE, Atlanta, GA 30326. BCBS-GA does business in each county in Georgia.

63.     BCBS-GA currently exercises market power in the commercial health insurance market throughout Arizona. As of 2011, at least 48 percent of the Georgia residents who subscribe to full-service individual commercial health insurance and at least 41 percent of the Georgia residents who subscribe to small group policies are subscribers of BCBS-GA.

64.     As the dominant insurer in Georgia, BCBS-GA has led the way in causing supra-competitive prices.

65.     **Defendant BCBS-HI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Hawai'i. Like other Blue Cross and Blue Shield plans nationwide, BCBS-HI is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Hawai'i.

66.     The principal headquarters for BCBS-HI is located at 818 Keeaumoku Street, Honolulu, HI 96814. BCBS-HI does business in each county in Hawai'i.

67.     BCBS-HI currently exercises market power in the commercial health insurance market throughout Hawai'i. As of 2010, at least 69 percent of the Hawai'i residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-HI – vastly more than are subscribers of the next largest commercial insurer operating in Hawai'i, Kaiser

Permanente, which carries only 20 percent of such subscribers. A 2012 study by the American Medical Association found that BCBS-HI had the second-least competitive commercial health-insurance market in the country.

68.     As the dominant insurer in Hawai'i, BCBS-HI has led the way in causing supra-competitive prices. In 2008, for example, BCBS-HI raised its premiums for its Preferred Provider and HPH Plus plans 9.9% and 11.5%, respectively; from 2003 to 2011 individual and family insurance premiums in Hawai'i increased, on average, 61% and 74%, respectively, while median household income in Hawai'i has failed to keep pace with those increases, rising only 16% for individuals and *falling* 1% for families during the same period. As a result of these and other inflated premiums, BCBS-HI has increased its profits to the point where it holds reserves in the amount of approximately $400 million.

69.     **Defendant BC-ID** is the health insurance plan operating under the Blue Cross trademark and trade name in Idaho. Like other Blue Cross and Blue Shield plans nationwide, BC-ID is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Idaho.

70.     The principal headquarters for BC-ID is located at 3000 East Pine Avenue, Meridian, ID 83642. BC-ID does business in each county in Idaho.

71.     BC-ID, together with BS-ID, currently exercises market power in the commercial health insurance market throughout Idaho. As of 2010, at least 47 percent of the Idaho residents who subscribe to full-service commercial health insurance, including

(as of 2011), 44 percent of those who subscribe to individual products and at least 48 percent of those who subscribe to small group products, are subscribers of BC-ID.

72.   **Defendant BS-ID** is the health insurance plan operating under the Blue Shield trademark and trade name in Idaho. Like other Blue Cross and Blue Shield plans nationwide, BS-ID is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Idaho.

73.   The principal headquarters for BS-ID is located at 1602 21st Ave, Lewiston, ID 83501. BS-ID does business in each county in Idaho.

74.   As the dominant insurers in Idaho, BC-ID and BS-ID have led the way in causing supra-competitive prices. As a result of these inflated premiums, as of 2010, BC-ID had more than $415.5 million in capital and surplus.

75.   **Defendant BCBS-IA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Iowa. Like other Blue Cross and Blue Shield plans nationwide, BCBS-IA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Iowa.

76.   The principal headquarters for BCBS-IA is located at 1331 Grand Avenue, Des Moines, IA 50306. BCBS-IA does business in each county in Iowa.

77.   BCBS-IA currently exercises market power in the commercial health insurance market throughout Iowa. As of 2011, at least 83 percent of the Iowa residents who subscribe to full-service individual commercial health insurance and at least 61 percent of the Iowa residents who subscribe to small group policies are subscribers of BCBS-IA.

21

78.     As the dominant insurer in Iowa, BCBS-IA has led the way in causing supra-competitive prices. Each year from 2002 to 2012, Iowans' premiums have increased an average rate of 10 percent annually, leaving BCBS-IA's parent company, Wellmark, with a surplus of over $1 billion.

79.     **Defendant BCBS-IL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Illinois. Like other Blue Cross and Blue Shield plans nationwide, BCBS-IL is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Illinois.

80.     The principal headquarters for BCBS-IL is located at 300 E. Randolph Street, Chicago, IL 60601. BCBS-IL does business in each county in Illinois.

81.     BCBS-IL currently exercises market power in the commercial health insurance market throughout Illinois. As of 2010, at least 55 percent of the Illinois residents who subscribe to full-service commercial health insurance for small groups and at least 65 percent of the Illinois residents who subscribe to full-service commercial health insurance for individuals are subscribers of BCBS-IL – vastly more than are subscribers of the next largest commercial insurer operating in Illinois, United Healthcare, which carries only 12 percent of Illinois residents who subscribe to full-service commercial health insurance.

82.     As the dominant insurer in Illinois, BCBS-IL has led the way in causing supra-competitive prices. BCBS-IL raised premiums 10.2 percent in 2007, 18 percent in 2008, and 8.4 percent in 2009, for some customers. As a result of these and other inflated premiums, HCSC, which owns BCBS-IL, grew its surplus from $6.1 billion in 2007 to

$6.7 billion in 2009, up from $4.3 billion just four years earlier in 2005. The company's surplus is five times the minimum required for solvency protection.

83. **Defendant BCBS-IN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Indiana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-IN is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Indiana.

84. The principal headquarters for BCBS-IN is located at 120 Monument Circle, Indianapolis, IN 46204. BCBS-IN does business in each county in Indiana.

85. BCBS-IN currently exercises market power in the commercial health insurance market throughout Indiana. As of 2010, at least 56 percent of the Indiana residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-IN – vastly more than are subscribers of the next largest commercial insurer operating in Indiana, United Healthcare, which carries only 15 percent of such subscribers. Its parent company, Anthem, formerly doing business as WellPoint, is the largest publicly traded commercial health benefits company in terms of membership in the United States.

86. As the dominant insurer in Indiana, BCBS-IN has led the way in causing supra-competitive prices. As a result of these and other inflated premiums, BCBS-IN's parent company, Anthem, has a surplus in excess of $300 million.

87. **Defendant BCBS-KS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kansas. Like other Blue Cross and

Blue Shield plans nationwide, BCBS-KS is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Kansas.

88.     The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, KS 66629. BCBS-KS does business in each county in Kansas.

89.     BCBS-KS currently exercises market power in the commercial health insurance market throughout Kansas. As of 2011, at least 47 percent of the Kansas residents who subscribe to full-service individual commercial health insurance and at least 58 percent of the Kansas residents who subscribe to small group policies are subscribers of BCBS-KS.

90.     As the dominant insurer in Kansas, BCBS-KS has led the way in causing supra-competitive prices.

91.     **Defendant BCBS-KY** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kentucky. Like other Blue Cross and Blue Shield plans nationwide, BCBS-KY is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Kentucky.

92.     The principal headquarters for BCBS-KY is located at 13550 Triton Park Blvd., Louisville, KY 40223. BCBS-KY does business in each county in Kentucky.

93.     BCBS-KY currently exercises market power in the commercial health insurance market throughout Kentucky. BCBS-KY commands at least 85 percent of the market for individual health insurance plans, with nearly 127,000 customers. The next largest carrier in Kentucky, Humana, has less than 12 percent of the market, demonstrating the complete lack of meaningful competition within this market. A 2007

study published by the American Medical Association shows BCBS-KY's statewide market share for PPO plans was 66 percent. However, in Owensboro it was at least 73 percent and in Bowling Green the market share was at least 79 percent. A 2012 report published by the University of Kentucky indicates that BCBS-KY has at least 53 percent market share in HMO enrollment in Kentucky. These figures represent a steep increase from earlier years. For example, data submitted to the U.S. Securities and Exchange Commission shows BCBS-KY's overall market share in Kentucky in 1993 was just 38 percent.

94.     As the dominant insurer in Kentucky, BCBS-KY (another Anthem Blue) has led the way in causing supra-competitive prices. As a result of its inflated premiums, BCBS-KY collects $326 million in premiums annually. The state's next largest insurer, Humana, collects just $27 million, or less than 10 percent as much as BCBS-KY.

95.     **Defendant BCBS-LA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Louisiana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-LA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Louisiana.

96.     The principal headquarters for BCBS-LA is located at 5525 Reitz Avenue, Baton Rouge, LA 70809. BCBS-LA does business in each parish in Louisiana.

97.     BCBS-LA currently exercises market power in the commercial health insurance market throughout Louisiana. As of 2010, at least 73 percent of the Louisiana residents who subscribe to full-service commercial health insurance in the individual market and at least 80 percent of the Louisiana residents who subscribe to full-service

commercial health insurance in the small group market are subscribers of BCBS-LA –
vastly more than are subscribers of the next largest commercial insurer operating in
Louisiana, United Healthcare.

98.    As the dominant insurer in Louisiana, BCBS-LA has led the way in causing
supra-competitive prices. In fact, from 2000 to 2007, Louisiana health insurance
premiums increased by 75.3 percent, 3.3 times faster than Louisiana wages, which only
increased by 22.9 percent. Additionally, a 2009 forecast predicted that an average
Louisiana worker would spend nearly 60 percent of her or his income on health insurance
by 2016, one of the highest predicted nationwide ratios. As a result of its inflated
premiums, BCBS-LA has amassed a massive surplus; between 2004 and 2008, its surplus
rose from $352.7 million to $621.1 million. As of the end of 2010, BCBS-LA's surplus
exceeded $706.6 million.

99.    **Defendant BCBS-ME** is the health insurance plan operating under the
Blue Cross and Blue Shield trademarks and trade names in Maine. Like other Blue Cross
and Blue Shield plans nationwide, BCBS-ME is the largest health insurer, as measured
by number of subscribers, within its service area, which is defined as the state of Maine.

100.    The principal headquarters for BCBS-ME is located at 2 Gannett Drive,
South Portland, ME 04016. BCBS-ME does business in each county in Maine.

101.    BCBS-ME currently exercises market power in the commercial health
insurance market throughout Maine. As of 2011, at least 45 percent of the Maine
residents who subscribe to full-service individual commercial health insurance and at

least 50 percent of the Maine residents who subscribe to small group policies are subscribers of BCBS-ME.

102.    As the dominant insurer in Maine, BCBS-ME has led the way in causing supra-competitive prices.

103.    **Defendant BCBS-MD**, operated by Carefirst, Inc., is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Maryland. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MD is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Maryland.

104.    The principal headquarters for BCBS-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117. BCBS-MD does business in each county in Maryland.

105.    BCBS-MD currently exercises market power in the commercial health insurance market throughout Maryland. As of 2011, at least 70 percent of the Maryland residents who subscribe to full-service individual commercial health insurance and at least 72 percent of the Maryland residents who subscribe to small group policies are subscribers of BCBS-MD.

106.    As the dominant insurer in Maryland, BCBS-MD has led the way in causing supra-competitive prices. As a result, BCBS-MD's parent company, CareFirst, Inc., accumulated nearly $1 billion in surplus by the end of 2011.

107.    **Defendant BCBS-MA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Massachusetts. Like other

Blue Cross and Blue Shield plans nationwide, BCBS-MA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Massachusetts.

108.    The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, MA 02215. BCBS-MA does business in each county in Massachusetts.

109.    BCBS-MA currently exercises market power in the commercial health insurance market throughout Massachusetts. As of 2011, at least 63 percent of the Massachusetts residents who subscribe to full-service individual commercial health insurance and at least 40 percent of the Massachusetts residents who subscribe to small group policies are subscribers of BCBS-MA.

110.    As the dominant insurer in Massachusetts, BCBS-MA has led the way in causing supra-competitive prices. As a result, by mid-2010, BCBS-MA had amassed a surplus of $1.4 billion. In 2011, BCBS-MA paid one of its departing executives a severance of over $11 million.

111.    **Defendant BCBS-MI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Michigan. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MI is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Michigan.

112.    The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, MI 48226. BCBS-MI does business in each county in Michigan.

113.    BCBS-MI currently exercises market power in the commercial health insurance market throughout Michigan. As of 2010, at least 69 percent of the Michigan

residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-MI – vastly more than are subscribers of the next largest commercial insurer operating in Michigan, Priority Health, which carries only 9 percent of such subscribers. The American Medical Association ranks Michigan as the third least competitive state for commercial coverage, as of 2010.

114.    As the dominant insurer in Michigan, BCBS-MI has led the way in causing supra-competitive prices. Premiums in the small group market grew by 9% and 13% in 2010 and 2011. BCBS-MI raised rates on individuals 22% in 2009 alone. As a result of these and other inflated premiums, BCBS-MI earned profits of $222 million and $40 million in 2010 and 2011, respectively, and currently maintains a reserve of approximately $3 billion. This "non-profit" pays its CEO compensation of $3.8 million annually. Additionally, facing increasing political pressure to reform its practices, BCBS-MI has used its "profits" to increase its political influence. In the 1990 election cycle, BCBS-MI spent about $155,000 through its political action committee on campaign contributions. That number now has soared to $1.2 million in the 2011-2012 campaign cycle.

115.    **Defendant BCBS-MN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Minnesota. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MN is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Minnesota.

116.    The principal headquarters for BCBS-MN is located at 3535 Blue Cross Road, St. Paul, MN 55164. BCBS-MN does business in each county in Minnesota.

117.    BCBS-MN currently exercises market power in the commercial health insurance market throughout Minnesota. As of 2013, at least 57 percent of the Minnesota residents who subscribe to full-service individual commercial health insurance and at least 38 percent of the Minnesota residents who subscribe to small group policies are subscribers of BCBS-MN.

118.    As the dominant insurer in Minnesota, BCBS-MN has led the way in causing supra-competitive prices. As a result, by 2011, BCBS-MN had accumulated more than $250 million in surplus. In 2010, BCBS-MN paid its then-current CEO, Peter Geraghty, $1.5 million in compensation, the highest salary for any Minnesota non-profit leader.

119.    **Defendant BCBS-MS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Mississippi. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MS is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Mississippi.

120.    The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, MS 39232. BCBS-MS does business in each county in Mississippi.

121.    BCBS-MS currently exercises market power in the commercial health insurance market throughout Mississippi. As of 2011, at least 57 percent of the Mississippi residents who subscribe to full-service commercial health insurance through

individual policies and at least 73 percent of the Mississippi residents who subscribe to full-service commercial health insurance through small group plans are subscribers of BCBS-MS – vastly more than are subscribers of the next largest commercial insurer operating in Mississippi, United Healthcare.

122.    As the dominant insurer in Mississippi, BCBS-MS has led the way in causing supra-competitive prices. As a result of these and other inflated premiums, BCBS-MS now has a surplus of approximately $561 million.

123.    **Defendant BCBS-MO** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and NW Missouri. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MO is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Missouri, except the 32 counties in greater Kansas City and NW Missouri.

124.    The principal headquarters for BCBS-MO is located at 1831 Chestnut Street, St. Louis, MO 63103. BCBS-MO does business in all but 32 counties in the state of Missouri.

125.    **Defendant BCBS-KC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas. Like other Blue Cross and Blue Shield plans nationwide, BCBS-Kansas City is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined

Case MDL No. 2406 Document 336-5 Filed 03/25/16 Page 45 of 129

as the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.

126.    The principal headquarters for BCBS-Kansas City is located at 2301 Main Street, One Pershing Square, Kansas City, MO 64108. BCBS-Kansas City does business in each county in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.

127.    BCBS-MO, with BCBS-KC, currently exercises market power in the commercial health insurance market throughout Missouri (with the exception of certain counties which are not part of its service area). As of 2010, at least 26 percent of the Missouri residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-MO, including at least 32 percent of those with individual insurance products and at least 48 percent of those with small group insurance products. In parts of its service area in Missouri, BCBS-KC has as much as 62 percent market share, or more.

128.    As the dominant insurers in Missouri, BCBS-MO and BCBS-KC have led the way in causing supra-competitive prices. In fact, health insurance premiums for Missouri working families increased 76 percent from 2000 to 2007. For family health coverage in Missouri from 2000 to 2007, the average employer's portion of annual premiums rose 72 percent, while the average worker's share grew by 91 percent.

129.    **<u>Defendant BCBS-MT</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Montana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MT is one of the largest health insurers,

as measured by number of subscribers, within its service area, which is defined as the state of Montana. Defendant Health Care Service Corporation acquired Blue Cross and Blue Shield of Montana in 2012. Following the asset sale, the original Montana entity, which is now known as Caring for Montanans, Inc., no longer operated as a health insurer. However, Health Care Service Corporation assumed liability for claims involving Blue Cross and Blue Shield of Montana in MDL 2406. This complaint is asserted against Health Care Service Corporation for, among other things, liabilities attributable to Blue Cross and Blue Shield of Montana.

130. The principal headquarters for BCBS-MT is located at 560 N. Park Avenue, Helena, MT 59604-4309. BCBS-MT does business in each county in Montana.

131. BCBS-MT currently exercises market power in the commercial health insurance market throughout Montana. As of 2011, at least 56 percent of the Montana residents who subscribe to full-service individual commercial health insurance and at least 72 percent of the Montana residents who subscribe to small group policies are subscribers of BCBS-MT.

132. As the dominant insurer in Montana, BCBS-MT has led the way in causing supra-competitive prices. In 2010, for example, BCBS-MT raised some insurance premiums by as much as 40 percent.

133. **Defendant BCBS-NE** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Nebraska. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NE is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Nebraska.

134.    The principal headquarters for BCBS-NE is located at 1919 Aksarban Drive, Omaha, NE 68180. BCBS-NE does business in each county in Nebraska.

135.    BCBS-NE currently exercises market power in the commercial health insurance market throughout Nebraska. As of 2011, at least 65 percent of the Nebraska residents who subscribe to full-service individual commercial health insurance and at least 42 percent of the Nebraska residents who subscribe to small group policies are subscribers of BCBS-NE.

136.    As the dominant insurer in Nebraska, BCBS-NE has led the way in causing supra-competitive prices. In 2012, BCBS-NE raised premiums an average of 10 percent, some by as much as 17 percent.

137.    **<u>Defendant BCBS-NV</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Nevada. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NV is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Nevada.

138.    The principal headquarters for BCBS-NV is located at 9133 West Russell Rd.
Suite 200, Las Vegas, NV 89148. BCBS-NV does business in each county in Nevada.

139.    BCBS-NV currently exercises market power in the commercial health insurance market throughout Nevada. As of 2010, BCBS-NV had as much as 31 percent market share of full-service commercial health insurance in regions of its service area.

140. As one of the dominant insurers in Nevada, BCBS-NV has led the way in causing supra-competitive prices.

141. **Defendant BCBS-NH** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Hampshire. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NH is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of New Hampshire.

142. The principal headquarters for BCBS-NH is located at 3000 Goffs Falls Rd, Manchester, NH 03103. BCBS-NH does business in each county in New Hampshire.

143. BCBS-NH currently exercises market power in the commercial health insurance market throughout New Hampshire. As of 2010 and 2011, at least 51 percent of the New Hampshire residents who subscribe to full-service commercial health insurance—including at least 76 percent of those who subscribe to individual plans and at least 67 percent of those who subscribe to small group plans—are subscribers of BCBS-NH – vastly more than are subscribers of the next largest commercial insurer operating in New Hampshire, Harvard Pilgrim, which carries only 20 percent of such subscribers.

144. As the dominant insurer in New Hampshire, BCBS-NH has led the way in causing supra-competitive prices. For example, from 2009 to 2010 the cost of insurance coverage for small groups and individuals rose 15% and 39%, respectively. As a result of these and other inflated premiums, between 2006 and 2011, BCBS-NH reported annual income between $26 million and $112 million and a cumulative profit of approximately $360 million.

145. **Defendant BCBS-NJ** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Jersey. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NJ is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of New Jersey.

146. The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, NJ 07105. BCBS-NJ does business in each county in New Jersey.

147. BCBS-NJ currently exercises market power in the commercial health insurance market throughout New Jersey. As of 2011, at least 63 percent of the New Jersey residents who subscribe to full-service individual commercial health insurance and at least 59 percent of the New Jersey residents who subscribe to small group policies are subscribers of BCBS-NJ.

148. As the dominant insurer in New Jersey, BCBS-NJ has led the way in causing supra-competitive prices. In 2010, CEO and President William Marino received $8.7 million in compensation, three other executives made more than $2 million in total compensation, and six others made more than $1 million.

149. **Defendant BCBS-NM** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Mexico. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NM is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of New Mexico.

150.     The principal headquarters for BCBS-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113. BCBS-NM does business in each county in New Mexico.

151.     BCBS-NM currently exercises market power in the commercial health insurance market throughout New Mexico. As of 2011, at least 52 percent of the New Mexico residents who subscribe to full-service individual commercial health insurance and at least 31 percent of the New Mexico residents who subscribe to small group policies are subscribers of BCBS-NM.

152.     As the dominant insurer in New Mexico, BCBS-NM has led the way in causing supra-competitive prices. As a result, BCBS-NM's parent company, Health Care Service Corp., was able to amass an estimated $6.1 billion in surplus by 2007. For at least three years following, some BCBS-NM subscribers faced annual rate hikes of up to 20 percent.

153.     **Defendant Empire BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York. Like other Blue Cross and Blue Shield plans nationwide, Empire BCBS is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the 28 counties of Eastern and Southeastern New York state.

154.     The principal headquarters for Empire BCBS is located at One Liberty Plaza, New York, NY 10006. Empire BCBS does business in each county in New York.

155.     **Defendant BCBS-Western New York** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western

New York. Like other Blue Cross and Blue Shield plans nationwide, BCBS-Western New York is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as Western New York state.

156.     The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, NY 14202. BCBS-Western New York does business in a number of counties in Western New York.

157.     **Defendant BS-Northeastern New York** is the health insurance plan operating under the Blue Shield trademark and trade name in Northeastern New York. Like other Blue Cross and Blue Shield plans nationwide, BS-Northeastern New York is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as 13 counties in Northeastern New York.

158.     The principal headquarters for BS-Northeastern New York is located at 257 West Genesee Street, Buffalo, NY 14202. BS-Northeastern New York does business in 13 counties in Northeastern New York.

159.     **Defendant Excellus BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in central New York. Like other Blue Cross and Blue Shield plans nationwide, Excellus BCBS is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as 31 counties in central New York.

160.     The principal headquarters for Excellus BCBS is located at 165 Court Street, Rochester, NY 14647. Excellus BCBS does business in each county in the 31 counties of central New York.

38

161.   Empire BCBS, BCBS-Western New York, BS-Northeastern New York, and Excellus BCBS currently exercise market power in the commercial health insurance market throughout their respective service areas of New York. As of 2010, at least 67 percent of the New York residents who subscribe to full-service commercial health insurance are subscribers of these New York Individual Blue Plans.

162.   As the dominant insurers in New Mexico, Empire BCBS, BCBS-Western New York, BS-Northeastern New York, and Excellus BCBS have led the way in causing supra-competitive prices.

163.   **Defendant BCBS-NC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Carolina. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of North Carolina.

164.   The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, NC 27707. BCBS-NC does business in each county in North Carolina.

165.   BCBS-NC currently exercises market power in the commercial health insurance market throughout North Carolina. According to the North Carolina Department of Insurance ("NCDOI"), over 73 percent of the North Carolina residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-NC – vastly more than the next largest full-service commercial insurer, Coventry Health Care, which carries only 7 percent of all subscribers. BCBS-NC currently has a greater than 50 percent share of full-

service commercial health insurance enrollees in all fifteen of the major metropolitan health insurance markets in the State, and a greater than 75 percent share in ten of those fifteen markets. As of 2011, BCBS-NC had at least an 83 percent share of the individual market and at least a 63 percent share of the small group market.

166.    As the dominant insurer in North Carolina, BCBS-NC has led the way in causing supra-competitive prices. As a result of these inflated premiums, BCBS-NC now has a surplus of over $1.4 billion and has paid its executives salaries and bonuses in the millions of dollars each year.

167.    **<u>Defendant BCBS-ND</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Dakota. Like other Blue Cross and Blue Shield plans nationwide, BCBS-ND is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of North Dakota.

168.    The principal headquarters for BCBS-ND is located at 4510 13th Avenue South, Fargo, ND 58121. BCBS-ND does business in each county in North Dakota.

169.    BCBS-ND currently exercises market power in the commercial health insurance market throughout North Dakota. As of 2011, at least 75 percent of the North Dakota residents who subscribe to full-service individual commercial health insurance and at least 85 percent of the North Dakota residents who subscribe to small group policies are subscribers of BCBS-ND.

170.    As the dominant insurer in North Dakota, BCBS-ND has led the way in causing supra-competitive prices. In 2011, BCBS-ND raised premiums for some

subscribers by as much as 17 percent; in 2009, an audit revealed that the insurer had spent nearly $35,000 for a farewell party for an unnamed executive the year before.

171.     **Defendant BCBS-OH** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Ohio. Like other Blue Cross and Blue Shield plans nationwide, BCBS-OH is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Ohio.

172.     The principal headquarters for BCBS-OH is located at 120 Monument Circle, Indianapolis, IN 46203. BCBS-OH does business in each county in Ohio.

173.     BCBS-OH currently exercises market power in the commercial health insurance market throughout Ohio. As of 2011, at least 36 percent of the Ohio residents who subscribe to full-service individual commercial health insurance and at least 41 percent of the Ohio residents who subscribe to small group policies are subscribers of BCBS-OH.

174.     As the dominant insurer in Ohio, BCBS-OH has led the way in causing supra-competitive prices. In 2013, the insurer raised rates for small group subscribers by an average of 12 percent.

175.     **Defendant BCBS-OK** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oklahoma. Like other Blue Cross and Blue Shield plans nationwide, BCBS-OK is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Oklahoma.

176.    The principal headquarters for BCBS-OK is located at 1400 South Boston, Tulsa, OK 74119. BCBS-OK does business in each county in Oklahoma.

177.    BCBS-OK currently exercises market power in the commercial health insurance market throughout Oklahoma. As of 2010, at least 45 percent of the Oklahoma residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-OK – vastly more than are subscribers of the next largest commercial insurer operating in Oklahoma, Aetna, which carries only 19 percent of such subscribers. As of 2011, BCBS-OK maintained at least 58 percent market share in the individual market, and at least 48 percent market share in the small group market. The 2012 Oklahoma Insurance Department Annual Report placed BCBS-OK's individual plan market share at 70 percent and group plan market share at 56 percent.

178.    As the dominant insurer in Oklahoma, BCBS-OK has led the way in causing supra-competitive prices. From 2005 (when Health Care Service Corp. purchased BCBS-OK) to 2011, BCBS-OK nearly doubled its premium revenue, from $956 million to $1.8 billion. Health Care Service Corp. now has a surplus of over $620 million.

179.    **Defendant BCBS-OR** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oregon. Like other Blue Cross and Blue Shield plans nationwide, BCBS-OR is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Oregon.

180.    The principal headquarters for BCBS-OR is located at 100 SW Market Street, Portland, OR 97207. BCBS-OR does business in each county in Oregon.

181. BCBS-OR currently exercises market power in the commercial health insurance market throughout Oregon. As of 2011, at least 35 percent of the Oregon residents who subscribe to full-service individual commercial health insurance and at least 21 percent of the Oregon residents who subscribe to small group policies are subscribers of BCBS-OR.

182. As the dominant insurer in Oregon, BCBS-OR has led the way in causing supra-competitive prices. From 2009 to 2010, while building a surplus of $565 million (3.6 times the regulatory minimum), BCBS-OR raised rates on some individual plans by an average of 25 percent.

183. **Defendant Highmark BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and the Blue Shield trademarks and trade names throughout the entire state of Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Highmark BCBS is the largest health insurer, as measured by number of subscribers, within its Blue Cross and Blue Shield service area, which is defined as the 29 counties of Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Greene, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties. (As described below, Highmark BCBS has entered into illegal and anticompetitive agreements with at least two of the other Individual Blue Plans in Pennsylvania, which prevent Highmark BCBS from

competing under its Blue Shield trademark in Northeastern and Southeastern Pennsylvania.)

184. The principal headquarters for Highmark BCBS is located at 120 Fifth Avenue Place, Pittsburgh, PA 15222. Highmark BCBS does business in each county in Western Pennsylvania.

185. **Defendant BC-Northeastern PA** is the health insurance plan operating under the Blue Cross trademark and trade name in Northeastern Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, BC-Northeastern PA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the 13 counties that make up Northeastern Pennsylvania: Bradford, Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga, Wayne, and Wyoming Counties.

186. The principal headquarters for BC-Northeastern PA is located at 19 North Main Street, Wilkes-Barre, PA. 18711. BC-Northeastern PA does business in each county in Northeastern Pennsylvania.

187. **Defendant Capital BC** is the health insurance plan operating under the Blue Cross trademark and trade name in central Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Capital BC is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the 21 counties that make up central Pennsylvania: Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh,

Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties.

188. The principal headquarters for Capital BC is located at 2500 Elmerton Avenue, Harrisburg, PA 17177. Capital BC does business in 21 counties in central Pennsylvania.

189. **Defendant Independent BC** is the health insurance plan operating under the Blue Cross trademark and trade name in Southeastern Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Independence BC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the 5 counties that make up Southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

190. The principal headquarters for Independence BC is located at 1901 Market Street, Philadelphia, PA 19103. Independence BC does business in each county in Southeastern Pennsylvania.

191. Highmark BCBS, BC-Northeastern PA, Capital BC, and Independence BC currently exercise market power in the commercial health insurance market in their respective services areas of Pennsylvania, including Highmark BCBS throughout Western Pennsylvania. Since 2000, between 60% and 80% of the Western Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Highmark. Highmark Executive Vice President John Paul has stated publicly that Highmark is "an insurer that clearly dominates the commercial market" and "it's pretty obvious [Highmark] control[s]

finance of health care in western Pennsylvania." As of 2006, at least 60 percent of the Northeastern Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BC-Northeastern PA, and at least 62 percent of the Southeastern Pennsylvania residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Independence BC.

192.    As the dominant insurers in Pennsylvania, Highmark BCBS, BC-Northeastern PA, Capital BC, and Independence BC have led the way in causing supra-competitive prices. From 2002-2006, health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%. In 2008, Highmark raised its rates for its CompleteCare program by 15%. In 2012, Highmark filed for premium rate increases of 9.8% for its small group plans. As a result of these and other inflated premiums, net income increased from less than $50 million in 2001 to approximately $444.7 million in 2011. By the end of 2005, Highmark's surplus (*i.e.*, assets in excess of legally required reserves to pay claims) exceeded $2.8 billion; by 2011, it exceeded $4.1 billion. In 2012, Highmark paid its CEOs more than $6 million and paid its Board of Directors $1.9 million.

193.    **Defendant BCBS-Puerto Rico** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Puerto Rico. Like other Blue Cross and Blue Shield plans nationwide, BCBC-Puerto Rico is one of the largest

health insurers, as measured by number of subscribers, within its service area, which is defined as the territory of Puerto Rico.

194.    The principal headquarters for BCBS-Puerto Rico is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. BCBS-Puerto Rico does business throughout Puerto Rico.

195.    BCBS-Puerto Rico currently exercises market power in the commercial health insurance market throughout Puerto Rico. As a dominant insurer in Puerto Rico, BCBS-Puerto Rico has led the way in causing supra-competitive prices.

196.    **Defendant BCBS-RI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Rhode Island. Like other Blue Cross and Blue Shield plans nationwide, BCBS-RI is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Rhode Island.

197.    The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, RI 02903. BCBS-RI does business in each county in Rhode Island.

198.    BCBS-RI currently exercises market power in the commercial health insurance market throughout Rhode Island. As of 2012, at least 71 percent of the Rhode Island residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-RI – vastly more than are subscribers of the next largest commercial insurer operating in Rhode Island, United Healthcare, which carries only 15 percent of such subscribers. As of 2011,

BCBS-RI maintained a stunning 95 percent market share in the individual market, and at least 74 percent market share in the small group market.

199.    As the dominant insurer in Rhode Island, BCBS-RI has led the way in causing supra-competitive prices. From 2003 to 2011, individual and family insurance premiums rose 59 percent and 61 percent, respectively. From 2000 to 2009, the average employer-sponsored health insurance premiums for families in Rhode Island increased by approximately 105.8 percent, whereas median earnings rose only 22.4 percent during that same period. In 2011, BCBS-RI raised premiums by about 10%. As a result of these and other inflated premiums, by 2011, BCBS-RI had amassed an approximately $320 million surplus.

200.    **<u>Defendant BCBS-SC</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Carolina. Like other Blue Cross and Blue Shield plans nationwide, BCBS-SC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of South Carolina.

201.    The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, SC 29212. BCBS-SC does business in each county in South Carolina.

202.    BCBS-SC currently exercises market power in the commercial health insurance market throughout South Carolina. As of 2010, at least 60 percent of the South Carolina residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-SC – vastly more than are subscribers of the next largest commercial insurer operating in South

Carolina, Cigna, which carries only 15 percent of such subscribers. As of 2011, BCBS-SC maintained 55 percent market share in the individual market, and 70 percent market share in the small group market.

203. As the dominant insurer in South Carolina, BCBS-SC has led the way in causing supra-competitive prices. As a result of these inflated premiums, BCBS-SC now has a surplus of reserves over $1.7 billion.

204. **Defendant BCBS-SD** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Dakota. Like other Blue Cross and Blue Shield plans nationwide, BCBS-SD is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of South Dakota.

205. The principal headquarters for BCBS-SD is located at 1601 W. Madison, Sioux Falls, SD 57104. BCBS-SD does business in each county in South Dakota.

206. BCBS-SD currently exercises market power in the commercial health insurance market throughout South Dakota. As of 2011, at least 74 percent of the South Dakota residents who subscribe to full-service individual commercial health insurance and at least 62 percent of the South Dakota residents who subscribe to small group policies are subscribers of BCBS-SD.

207. As the dominant insurer in South Dakota, BCBS-SD has led the way in causing supra-competitive prices. As a result, as of 2012, its parent company, Wellmark, held a surplus of over $1 billion.

Case MDL No 2406 Document 336-5 Filed 03/25/16 Page 63 of 129

208. **Defendant BCBS-TN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Tennessee. Like other Blue Cross and Blue Shield plans nationwide, BCBS-TN is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Tennessee.

209. The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, TN 37402. BCBS-TN does business in each county in Tennessee.

210. BCBS-TN currently exercises market power in the commercial health insurance market throughout Tennessee. As of 2010, at least 46 percent of the Tennessee residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-TN – vastly more than are subscribers of the next largest commercial insurer operating in Tennessee, Cigna, which carries only 24 percent of such subscribers. As of 2011, BCBS-TN maintained at least 36 percent market share in the individual market and at least 70 percent market share in the small group market.

211. As the dominant insurer in Tennessee, BCBS-TN has led the way in causing supra-competitive prices. As a result of these inflated premiums, BCBS-TN now has a surplus of almost $1.6 billion.

212. **Defendant BCBS-TX** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Texas. Like other Blue Cross and Blue Shield plans nationwide, BCBS-TX is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Texas.

213.    The principal headquarters for BCBS-TX is located at 1001 E. Lookout Drive, Richardson, TX 75082. BCBS-TX does business in each county in Texas.

214.    BCBS-TX currently exercises market power in the commercial health insurance market throughout Texas. As of 2010, at least 35 percent of the Texas residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-TX – vastly more than are subscribers of the next largest commercial insurer operating in Texas, Aetna, which carries only 22 percent of such subscribers. As of 2011, BCBS-TX maintained 57 percent market share in the individual market and 46 percent market share in the small group market.

215.    As the dominant insurer in Texas, BCBS-TX has led the way in causing supra-competitive prices. As a result of these inflated premiums, BCBS-TX's parent company, Health Care Service Corp., now has a surplus of more than $620 million.

216.    **<u>Defendant BCBS-UT</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Utah. Like other Blue Cross and Blue Shield plans nationwide, BCBS-UT is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Utah.

217.    The principal headquarters for BCBS-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, UT 84121. BCBS-UT does business in each county in Utah.

218.    BCBS-UT currently exercises market power in the commercial health insurance market throughout Utah. As of 2011, at least 17 percent of the Utah residents who subscribe to full-service individual commercial health insurance and at least 23 percent of the Utah residents who subscribe to small group policies are subscribers of BCBS-UT.

219.    As one of the dominant insurers in Utah, BCBS-UT has led the way in causing supra-competitive prices.

220.    **Defendant BCBS-VT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Vermont. Like other Blue Cross and Blue Shield plans nationwide, BCBS-VT is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Vermont.

221.    The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, VT 05602. BCBS-VT does business in each county in Vermont.

222.    BCBS-VT currently exercises market power in the commercial health insurance market throughout Vermont. As of 2011, at least 77 percent of the Vermont residents who subscribe to full-service individual commercial health insurance and at least 43 percent of the Vermont residents who subscribe to small group policies are subscribers of BCBS-VT.

223.    As the dominant insurer in Vermont, BCBS-VT has led the way in causing supra-competitive prices. In 2010, Vermont's Banking, Insurance, Securities, and Health Care Administration Department found that BCBS-VT had overpaid its former President

and CEO William Milnes Jr. by roughly $3 million, having paid him $7.2 million in 2008 upon his retirement, in violation of state law.

224.    **Defendant BCBS-VA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small portion of Northern Virginia in the Washington, DC suburbs. Like other Blue Cross and Blue Shield plans nationwide, BCBS-VA is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs.

225.    The principal headquarters for BCBS-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, VA 23230. BCBS-VA does business in each county in Virginia.

226.    BCBS-VA currently exercises market power in the commercial health insurance market throughout Virginia. As of 2011, at least 74 percent of the Virginia residents who subscribe to full-service individual commercial health insurance and at least 50 percent of the Virginia residents who subscribe to small group policies are subscribers of BCBS-VA.

227.    As the dominant insurer in Virginia, BCBS-VA has led the way in causing supra-competitive prices. In 2009, BCBS-VA's parent company, Anthem, raised its CEO Angela Braly's total compensation by 51 percent, to $13 million.

228.    **Defendant BC-WA** is the health insurance plan operating under the Blue Cross trademarks and trade names in Washington. Like other Blue Cross and Blue Shield

plans nationwide, BC-WA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as eastern Washington.

229.    The principal headquarters for BC-WA is located at 7001 220th Street SW, Mountlake Terrace, WA 98043-4000. BC-WA does business in each county in Washington.

230.    **Defendant BS-WA** is the health insurance plan operating under the Blue Shield trademarks and trade names in Washington. Like other Blue Cross and Blue Shield plans nationwide, BS-WA is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as western Washington.

231.    The principal headquarters for BS-WA is located at 1800 Ninth Avenue, Seattle, WA 98111. BS-WA does business in each county in Washington.

232.    BC-WA and BS-WA currently exercise market power in the commercial health insurance market throughout Washington. As of 2011, at least 36 percent of the Washington residents who subscribe to full-service individual commercial health insurance are subscribers of BC-WA, while at least 37 percent of those residents are subscribers of BS-WA (for a total of 73 percent). At least 32 percent of the Washington residents who subscribe to small group policies are subscribers of BC-WA, while at least 33 percent of those residents are subscribers of BS-WA (for a total of 65 percent).

233.    As the dominant insurers in Washington, BC-WA and BS-WA have led the way in causing supra-competitive prices. In 2012, BC-WA's CEO threatened to increase premium rates for individual plans by as much as 50 to 70 percent.

234. **Defendant BCBS-DC**, operated by CareFirst, Inc., is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs. Like other Blue Cross and Blue Shield plans nationwide, BCBS-DC is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as Washington, DC and a small portion of Northern Virginia in the Washington, DC suburbs.

235. The principal headquarters for BCBS-DC is located at 10455 Mill Run Circle, Owings Mill, MD 21117. BCBS-DC does business throughout Washington, DC.

236. BCBS-DC currently exercises market power in the commercial health insurance market throughout the Washington, DC region. As of 2011, at least 69 percent of the Washington, DC region residents who subscribe to full-service individual commercial health insurance and at least 76 percent of the Washington, DC region residents who subscribe to small group policies are subscribers of BCBS-DC.

237. As the dominant insurer in the Washington, DC region, BCBS-DC has led the way in causing supra-competitive prices. In 2010, BCBS-DC raised rated by as much as 35 percent, so high that the insurance regulator for the District of Columbia rescinded the rate.

238. **Defendant BCBS-WV** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in West Virginia. Like other Blue Cross and Blue Shield plans nationwide, BCBS-WV is the largest health insurer, as measured by number of subscribers, within its service area, which is defined as the state of West Virginia.

239. The principal headquarters for BCBS-WV is located at 700 Market Square, Parkersburg, West Virginia 26101. BCBS-WV does business in each county in West Virginia.

240. BCBS-WV currently exercises market power in the commercial health insurance market throughout West Virginia. As of 2011, at least 44 percent of the West Virginia residents who subscribe to full-service individual commercial health insurance and at least 57 percent of the West Virginia residents who subscribe to small group policies are subscribers of BCBS-WV.

241. As the dominant insurer in West Virginia, BCBS-WV has led the way in causing supra-competitive prices. In 2012, BCBS-WV's parent company, Highmark, paid eight current or former executives more than $1 million in compensation.

242. **Defendant BCBS-WI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Wisconsin. Like other Blue Cross and Blue Shield plans nationwide, BCBS-WI is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Wisconsin.

243. The principal headquarters for BCBS-WI is located at 120 Monument Circle, Indianapolis, IN 46204. BCBS-WI does business in each county in Wisconsin.

244. BCBS-WI currently exercises market power in the commercial health insurance market throughout Wisconsin. As of 2011, at least 19 percent of the Wisconsin residents who subscribe to full-service individual commercial health insurance and at

least 12 percent of the Wisconsin residents who subscribe to small group policies are subscribers of BCBS-WI.

245.    As one of the dominant insurers in Wisconsin, BCBS-WI has led the way in causing supra-competitive prices.

246.    **Defendant BCBS-WY** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Wyoming. Like other Blue Cross and Blue Shield plans nationwide, BCBS-WY is one of the largest health insurers, as measured by number of subscribers, within its service area, which is defined as the state of Wyoming.

247.    The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, WY 82003. BCBS-WY does business in each county in Wyoming.

248.    BCBS-WY currently exercises market power in the commercial health insurance market throughout Wyoming. As of 2011, at least 38 percent of the Wyoming residents who subscribe to full-service individual commercial health insurance and at least 61 percent of the Wyoming residents who subscribe to small group policies are subscribers of BCBS-WY.

249.    As the dominant insurer in Wyoming, BCBS-WY has led the way in causing supra-competitive prices.

250.    **Defendant Cambia Health Solutions, Inc**. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health

insurer in the Northwest or Intermountain Region, serving more than 2 million members through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including defendants BCBS-OR, BCBS-UT, and BCBS-ID, exercises market dominance as a Blue in its states of operation or within areas of those states. Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia" in this Complaint.

## TRADE AND COMMERCE

251.    The Individual Blue Plans, which own and control BCBSA, are engaged in

interstate commerce and in activities substantially affecting interstate commerce, and the

conduct alleged herein substantially affects interstate commerce. BCBSA enters into

agreements with health insurance companies throughout the country that specify the

geographic areas in which those companies can compete. The Individual Blue Plans

provide commercial health insurance that covers residents of their respective regions

(which together include all 50 states) when they travel across state lines, purchase health

care in interstate commerce when these residents require health care out of state, and

receive payments from employers outside of their regions on behalf of their regions'

residents.

## CLASS ACTION ALLEGATIONS

252.    Plaintiffs bring this action seeking damages on behalf of themselves and on

behalf of a class pursuant to the provisions of Rule 23(a) and Rule 23(b)(3) of the Federal

Rules of Civil Procedure, with such class (the "Class" or "Minnesota Class") defined as:

> All persons or entities who, during the period from April 17, 2008 to
> the present (the "Class Period"), have paid health insurance
> premiums to BCBS-MN for individual or small group full-service
> commercial health insurance.

253.    The Class is so numerous and geographically dispersed that joinder of all

members is impracticable. While Plaintiffs do not know the number and identity of all

members of the Class, Plaintiffs believe that there are thousands of Class members, the

exact number and identities of which can be obtained from BCBSA and the Individual

Blue Plans.

254.    There are questions of law or fact common to the Class, including but not

limited to:

> a.  Whether the restrictions set forth in the BCBSA license agreements are
>     *per se* violations of Section 1 of the Sherman Act, or are otherwise
>     prohibited under Section 1 of the Sherman Act;
>
> b.  Whether, and the extent to which, premiums charged by BCBS-MN
>     have been artificially inflated as a result of the illegal restrictions in the
>     BCBSA license agreements; and
>
> c.  Whether, and the extent to which, premiums charged by BCBS-MN to
>     Class member have been artificially inflated as a result of the
>     anticompetitive practices adopted by them.

255.    Plaintiffs are members of the Class; their claims are typical of the claims of

the members of the Class; and Plaintiffs will fairly and adequately protect the interests of

the members of the Class.

256.    The questions of law or fact common to the members of the Class

predominate over any questions affecting only individual members, including legal and

factual issues relating to liability and damages.

257.    Plaintiffs and the Class members are direct purchasers of individual or

small group full-service commercial health insurance from BCBS-MN, which dominates

the market in Minnesota, and their interests are coincident with and not antagonistic to

other members of the Class. In addition, Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

258.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for BCBSA and the Individual Blue Plans.

259.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable and the Class members will be identifiable from the defendants' records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

### History of the Blue Cross and Blue Shield Plans and of BCBSA

260.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield

marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed into local monopolies in the growing market for health care coverage. While originally structured as non-profit organizations, since the 1980s, these local Blue plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

261. BCBSA was created by the local Blue plans and is entirely controlled by those plans. Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would retain a dominant position within its local service area.

**Development of the Blue Cross Plans**

262. In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

263. In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans

meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

264.    In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

265.    In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Despite this, the independently formed prepaid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each other's territories. The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans."  At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

266. For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the Blue Cross Association, one predecessor to BCBSA. Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

267. By 1975, the Blue Cross plans had a total enrollment of 84 million subscribers.

## Development of the Blue Shield Plans

268. The development of what became the Blue Shield plans followed, and largely imitated, the development of the Blue Cross plans. Blue Shield plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

269. Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

270. In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

271. By 1975, the Blue Shield plans had a total enrollment of 73 million.

## Creation of the Blue Cross and Blue Shield Association

272. Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

273. By the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies. While the Blues remained dominant in most markets, this growth of competition was a threat.

274.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

275.    During the 1950s, while competing with commercial insurers for the opportunity to provide insurance to federal government employees, the Plans were at war with one another. As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

276.    To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities. The Plans accordingly agreed to centralize the ownership of their trademarks and trade names. In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

277.    In 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

278.    Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National

Association of Blue Shield Plans, which in 1976 was renamed the Blue Shield Association.

279.     During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

280.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

281.     In November 1982, after heated debate, BCBSA's member plans agreed to two propositions: (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans would consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state would further consolidate, ensuring that each state would have only one Blue plan. As a result of these goals, the number of member plans declined sharply from 110 in 1984, to 75 in 1989, to 38 and to 36 today.

282.     Even consolidation did not end competition between Blue plans. In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

283. During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses. In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

284. In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities. As a result, many member plans converted to for-profit status. One such plan, now called Anthem, has grown to become, by some measures, the largest health insurance company in the country. While nominally still characterized as not-for-profit, a number of the Individual Blue Plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

285. From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially. As a result of this increased competition, in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -- a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition. However, the Assembly of Plans did not restrain competition by non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

286.     After the 1986 revocation of the Blues' tax-exempt status and throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased. As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with Blue plans. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

287.     At some later date, the Blue Cross and Blue Shield plans together agreed to restrict the territories in which they would operate under *any* brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the member plans. These illegal restraints are discussed below.

### **Allegations Demonstrating Control of BCBSA By Member Plans**

288.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

289.     The Plans are the members of, and govern, BCBSA. BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. On its

website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

290. As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

291. The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The chairman of the Board of Directors through November 2014, John Forsyth, was also the Chairman and CEO of Wellmark. The CEO of each of the Individual Blue Plans serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets quarterly.

## License Agreements and Restraints on Competition

292. The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

293. The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the Sixth Circuit Court

of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

294.    The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to the brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

295.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards."  In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 21, 2012.

296.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards

71

"remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

297.    The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."   In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."   In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

298.    The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member

plan's failure to comply—"Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

299.    The independent Blue Cross and Blue Shield licensees likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."   However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."   In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

**Horizontal Agreements**

300.    The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

301.     Each BCBSA licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other." As BCBS-AL's group health insurance policy contract explains, "Blue Cross and Blue Shield of Alabama is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans. The Blue Cross and Blue Shield Association permits us to use the Blue Cross and Blue Shield service marks in the state of Alabama. Blue Cross and Blue Shield is not acting as an agent of the Blue Cross and Blue Shield Association."

302.     The independent Blue Cross and Blue Shield licensees include many of the largest health insurance companies in the United States. By some measures, Anthem is the largest health insurance company in the nation. Similarly, fifteen of the twenty-five largest health insurance companies in the country are BCBSA licensees. On its website, BCBSA states that its members together provide "coverage for nearly 100 million people – one-third of all Americans" and that, nationwide, "more than 96% of hospitals and 91% of professional providers contract with Blue Cross and Blue Shield companies – more than any other insurers." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

303.    In its Sixth Circuit brief, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

304.    On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 36] Blue companies."   As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."   One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

305.    As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because

BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

## **The Horizontal Agreements Not To Compete**

306.   The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for health insurance. As such, they are a *per se* violation of Section 1 of the Sherman Act.

307.   Defendants have divided U.S. health care markets for insurance among themselves by dividing the nation into exclusive service areas allocated to individual Blues. Through the License Agreements, Guidelines, and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated "Service Area."  The License Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

308.   Further, Defendants have allocated U.S. health care markets for insurance among themselves by agreeing to limit their competition against one another when not using the Blue names. The Guidelines and Membership Standards, which the independent

Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, establish two key restrictions on non-Blue competition. First, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

309.    Second, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

310.     The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

311.     In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that each will exercise the exclusive right to use the Blue brand within a designated geographic area, derive *none* of its revenue from services offered under the Blue brand outside of that area, and derive *at most* one-third of its revenue from outside of its exclusive area, using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

312.     The foregoing restrictions on the ability of Blue plans to generate revenue outside of their service areas constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act.

313.    More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions. For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

314.    The largest Blue licensee, WellPoint, now doing business as Anthem, Inc., is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business. Thus, in its Form 10-K filed February 22, 2013, WellPoint stated that it had "no right to market products and services using the Blue Cross and Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross and Blue Shield products."  WellPoint has further stated that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the Blue Cross and Blue Shield names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the BCBSA, attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national net revenue, as defined by the BCBSA, attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks."

315.    Likewise, in its Form 10-K filed March 14, 2013, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with

BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield" name and mark. Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield Names and Marks is already present."

316.    Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible. When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license. However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

317.    The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a member plan's license and membership are terminated, it loses the use

of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 22, 2013 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee through December 31, 2012, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield license in the vacated service area."

318. In sum, a terminated licensee would (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

319. It is unsurprising, then, that most member plans do not operate outside of their Service Areas. Thus, while there are numerous Blue plans, and non-Blue businesses owned by such plans, that could and would compete effectively in each other's Service Areas but for the territorial restrictions, almost none compete outside their Service Areas under non-Blue names and brands, despite their ability to do so.

320. Even in the relatively rare instance in which Blue plans conduct operations outside of their Service Areas, they have been required to keep those operations tightly under control by preventing growth – exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its

Blue-licensed subsidiary, Blue Cross of California. In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent. In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, WellPoint reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries.

321.    By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states. For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them. As a result of these restrictions, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas. During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (which became a part of WellPoint/Anthem and is known as Empire BlueCross BlueShield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period. In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of the former Anthem which is now part of WellPoint).

322.    In another example, as of 2010, one Pennsylvania Blue plan, Independence Blue Cross, had 2.4 million Blue-brand commercial health insurance enrollees in its service area of Southeastern Pennsylvania, and had close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, had an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

323.    The territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

## The Anticompetitive Acquisition Restrictions

324.    In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which the independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

325.    First, the rules and regulations prohibit acquisition of a Plan by a non-Blue entity without the approval of BCBSA. The Guidelines state that "[n]either a [Member]

Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans accordingly may block its membership by majority vote.

326. Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate *automatically*: (1) if any institutional investor becomes beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor becomes beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if any person becomes beneficially entitled to 20 percent or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person (other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional

investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities). These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

327.     These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Individual Blue Plans. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

328.     Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.

During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 36.

329. By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is less competition and higher premium costs for consumers.

### The BCBSA Licensing Agreements Have Reduced Competition In Regions Across The United States

330. The Individual Blue Plans, as licensees, members, and parts of the governing body of BCBSA, have conspired with each other (the member plans of BCBSA) to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines.

331. But for the *per se* illegal territorial restrictions, many of the Individual Blue Plans would otherwise be significant competitors of each other in their respective Service Areas. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete with each other, the result would be lower costs and thus lower premiums paid by their enrollees.

332.   For example, Anthem is the largest health insurer in the country by total medical enrollment, with approximately 36 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, Anthem would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

333.   Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, and BCBS-TX, is the largest mutual health insurance company in the country and the fourth largest overall. But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

334.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

335.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees. Its affiliated Blue plans include Highmark BCBS, BCBS-WV, and BCBS-DE. But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

336.    BCBS-AL is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees. But for the illegal territorial restrictions summarized above, BCBS-AL would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

337.    CareFirst, Inc., which operates the Blue Plans in Maryland, Washington, DC, and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

338.    BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

339.    BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida. But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health insurance services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees.

**Supra-Competitive Premiums Charged by BCBS Plans**

340.     From February 7, 2008 to the present, the Individual Blue Plans' illegal anticompetitive conduct has restrained competition, prevented entry by Individual Blue Plans and their non-Blue affiliates into other markets, increased health care costs, inflated premiums, and deprived individuals and small groups of the opportunity to purchase health insurance in the relevant markets from one or more additional Individual Blue Plans and/or their non-Blue affiliates, at a lower premium rate and/or at a price set by a market free from the non-price restraints imposed by Defendants' anti-competitive agreements.

341.     Plaintiffs and the Class were damaged by paying supra-competitive premiums, which are to be calculated by estimating the premiums that would have been actually charged to consumers but for the Individual Blue Plans' antitrust violations, not the base rates or rate "schedules" filed with a state agency.

342.     Plaintiffs have also suffered damages as a result of not being offered lower health insurance premium rates by competitors or potential competitors that have not entered the relevant market.

## The Widespread Use By BCBSA Licensees Of
## Anticompetitive Most Favored Nation Clauses

343.     Over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

344.     MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN-plus" clauses, and typically require the amount to be higher by a specified percentage.

345.     Use of MFNs by the Blues unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices. The Blues have the ability to pass through costs, thus making them indifferent to the actual price charged in markets in which they are dominant, as long as they are not competitively disadvantaged. The MFNs thus reduce competition by eliminating an incentive for the Plans to reduce overhead prices.

346.     Second, MFNs limit competition by preventing other health insurers in the region from achieving lower costs with providers and thereby becoming significant competitors to the MFN user. Because of the Blues' market power in their respective Service Areas, the MFN user can pass its own higher costs onto consumers through

higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from it.

347. MFNs also effectively establish a price floor below which providers will not sell services to the MFN user's competitors. MFNs enable the MFN user to raise that price floor. The price floors deter competition among health insurers in the relevant region. By reducing the ability of the MFN user's competitors to compete against the MFN user, MFNs ensure that the Plans can substantially raise premiums while maintaining, or even increasing, its market share.

348. Moreover, if the MFN user is certain that no insurer will pay less to a provider than it will, it will be willing to pay more to that provider than it would otherwise. The more the MFN user agrees to pay that provider, the more its competitors must pay that provider. And by raising the price floor, the MFN user keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums.

349. Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges a market-dominant MFN user, the provider has a strong incentive not to lower prices. Without the ability to compete on price, a new competitor will be unable to price below the market-dominant MFN user, and thus will be unable to survive.

350. A number of the independent Blue Cross and Blue Shield licensees, including BCBS-MI, BCBS-NC, Highmark BCBS, and BCBS-SC, have used and/or

continue to use MFNs to exploit the monopoly power they hold in their respective Service Areas. These independent Blue Cross and Blue Shield licensees, including BCBS-MI, BCBS-NC, Highmark BCBS, and BCBS-SC, have coordinated their use of MFNs with other Blue entities.

351.    Use of MFNs and related techniques is widespread and pervasive among Blue plans. The member plans of BCBSA have discussed the legality and usefulness of MFNs at BCBSA gatherings, such as the BCBSA 41st Annual Lawyers Conference, held May 3, 2007 in Miami, Florida. There, a presenter informed representatives of the member plans that "DOJ and FTC have focused on potential anticompetitive character of MFN clauses, particularly on exclusionary impact" and that "[w]here [an] MFN has overall exclusionary effect on competition and entrenches market power, it could be actionable."

352.    On October 18, 2010, the U.S. Department of Justice and the Attorney General of Michigan filed a joint complaint in the United States District Court for the Eastern District of Michigan, accusing BCBS-MI of engaging in a widespread anticompetitive use of MFNs. In the complaint, the Department of Justice alleges that BCBS-MI "currently has agreements containing MFNs or similar clauses with at least 70 of Michigan's 131 general acute care hospitals" and that these MFNs were sought and obtained "in exchange for increases in prices [the insurer] pays for the hospitals' services," "likely raising prices for health insurance in Michigan."  On March 25, 2011, the *Wall Street Journal* reported that the U.S. Department of Justice expanded its probe into the use of MFNs by the member plans operating in the North Carolina, the District of

Columbia, Kansas, Missouri, Ohio, South Carolina, and West Virginia. The Department of Justice voluntarily dismissed its suit against BCBS-MI after the state of Michigan passed legislation prohibiting BCBS-MI from continuing to exploit its market power through MFN use.

353.    There is direct evidence that, like BCBS-MI and its fellow member plans of BCBSA, BCBS-NC uses MFNs in its contracts with providers. On July 13, 2006, BCBS-NC admitted that "BCBSNC's favorable pricing [MFN] clause has been in use for years." BCBS-NC's use of MFNs has raised the costs of its competitors, has protected it from competition (and thereby protected its ever-growing market share), and has contributed to the artificial inflation of its health insurance premiums in North Carolina.

354.    From 2006 to 2009, BCBS-NC used at least four form provider agreements that included MFNs. These form provider agreements (May 15, 2006, December 19, 2007, May 21, 2008, and May 8, 2009) all included an MFN stating that:

> Provider acknowledges and warrants that, as of [date], Provider [has notified BCBSNC of] [does not have [and will not enter into]] any contract, agreement, or other arrangement under which it provides services, treatments, or supplies at a rate of payment and/or through any payment mechanism, which results [or will result in] lower [or equal] aggregate payments to the Provider by any such similar payor than BCBSNC's payments would produce under this Agreement.

355.    There is direct evidence that, like its fellow member plans of BCBSA, Highmark BCBS uses MFNs in its contracts with providers. Highmark BCBS's use of MFNs has raised the costs of its competitors, has protected it from competition (and thereby protected its ever-growing market share), and has contributed to the artificial inflation of its health insurance premiums in Western Pennsylvania.

356.     Multiple Highmark BCBS provider contracts, publicly available on PID's website, evidence Highmark BCBS's recent and current use of MFNs. Highmark BCBS's MFNs in provider contracts come in at least two forms. In one type of provider contract, Highmark BCBS defines "Usual Charges" as "the amount that the Provider bills other payors and/or patients for the same services" and then states that "Highmark agrees to pay the Provider for Provider Services provided to eligible Members and determined to be Covered Services *the lesser of*: (A) the payment due in accordance with Highmark's payment rates as currently in effect at the time the Provider Services are rendered; or (b) *one hundred percent (100%) of the Provider's Usual Charges*" (emphasis added). This type of MFN appeared in a Highmark BCBS freestanding renal dialysis ancillary provider agreement filed June 3, 2008; a Highmark BCBS ground ambulance transport ancillary provider agreement filed June 3, 2008; a Highmark BCBS durable medical equipment and/or respiratory therapy equipment ancillary provider agreement filed June 3, 2008; a Highmark BCBS oncology ancillary provider agreement filed February 13, 2009; a Highmark BCBS home infusion therapy ancillary provider agreement filed August 25, 2009; a Highmark BCBS laboratory services ancillary provider agreement filed January 12, 2011; and potentially others.

357.     In the second type of MFN, Highmark BCBS states that it will pay the contracting provider a rate established by agreement "*or one hundred percent (100%) of the [contracting provider's] total covered charges for such services, whichever is less*" (emphasis added). This type of MFN appeared in a Highmark BCBS acute care facility agreement filed September 2, 2008; a Highmark BCBS freestanding ambulatory surgery

facility agreement filed September 10, 2008; a Highmark BCBS managed care products hospital facility agreement filed September 15, 2008; a Highmark BCBS traditional products only hospital facility agreement filed September 15, 2008; a Highmark BCBS home health agency provider agreement filed September 26, 2008; a Highmark BCBS long term acute care facility agreement filed October 9, 2008; a Highmark BCBS home health agency provider agreement filed October 24, 2008; a Highmark BCBS managed care products hospital facility agreement filed March 28, 2008; a Highmark BCBS traditional products only hospital facility agreement filed March 28, 2008; a Highmark BCBS traditional products only hospital facility agreement filed May 29, 2009; a Highmark BCBS managed care products hospital facility agreement filed June 5, 2009; a Highmark BCBS traditional products only hospital facility agreement filed June 5, 2009; a Highmark BCBS acute care facility agreement filed June 16, 2009; and potentially others.

358.  There is direct evidence that, like its fellow member plans of BCBSA, BCBS-SC uses MFNs in its contracts with providers. In a recent *Post and Courier* article, a BCBS-SC spokesman admitted that BCBS-SC used MFNs, claiming that they are intended "to ensure that our customers get the best possible pricing for their health care services" and "reflect our intention to obtain the best value for our customers as we possibly can."  Instead, BCBS-SC's use of MFNs has raised the costs of its competitors, protected it from competition (and thereby protected its ever-growing market share), and contributed to the artificial inflation of its health insurance premiums in South Carolina.

359.     In 2006, the South Carolina Legislature repealed a decades-old insurance code, stripping the State's authority to regulate provider contracts between insurers and health care providers. This deletion allows BCBS-SC to negotiate and execute provider contracts that include MFNs, with no review or approval required from the South Carolina Department of Insurance.

## BCBS-MN's Market Power In Minnesota

### Relevant Product Market:

360.     The relevant product market is the sale of full-service commercial health insurance products to individuals and small groups (up to 199 people).

361.     To properly define a health insurance product market, it is useful to consider the range of health insurance products for sale and the degree to which these products substitute for one another, *i.e.*, whether, in a competitive market, an increase in the price of one product would increase demand for the second product. The characteristics of different products are important factors in determining their substitutability. For a health insurance product, important characteristics include:

362.     <u>Commercial versus government health insurance</u>:   Unlike *commercial* health insurance products, *government* health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent. Therefore, commercial health insurance and government health insurance programs are not substitutes.

363.  <u>Full-service versus single-service health insurance</u>:  *Full-service* health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers. In contrast, *single-service* health insurance provides narrow coverage restricted to a specific type of health care, *e.g.*, dental care. Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, *e.g.*, dental care. Thus, full-service health insurance and single-service health insurance are not substitutes.

364.  Full-service commercial health insurance includes *HMO* products and *PPO* products, among others. Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers. Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles, co-payment, and coinsurance), customer service, and reputation, among other factors. Economic research suggests that HMO and PPO health insurance products *are* substitutes.

365.  <u>Fully-insured health insurance versus ASO products</u>:  When a consumer purchases a *fully-insured* health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses,

controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, *e.g.*, processes medical bills and negotiates discounted prices with providers. In contrast, when a consumer purchases an *administrative services only* ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only. Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, *i.e.*, able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses.

366.    Individual, small group, and large group consumers:  Consumers of health insurance products include both *individuals* and *groups*, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, *small group* and *large group*, based on the number of persons in the group. The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small groups as those with up to 199 employees and large firms as those with 200 or more employees.

367.    For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products. Across the United States, 84

percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure. Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

**Relevant Geographic Markets:**

368.    In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product: its provider network. An insurer's provider network is composed of the health care providers with which it contracts. Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network" provider's health care services than they would for the same services from an "out of network" provider. As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers. This suggests that health insurers compete in distinct geographic markets.

369.    There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers of a particular Individual Blue Plan. The potentially relevant geographic markets could be defined alternatively as (a) that Blue Plan's service area; and (b) each of the regions, known as "Metropolitan Statistical Areas," "Micropolitan Statistical Areas,"

and counties, into which the U.S. Office of Management and Budget divides the counties that make up that service area.

## MINNESOTA ALLEGATIONS

370.  However the geographic market is defined, BCBS-MN has the dominant market position, and exercises market power, in the sale of full-service commercial health insurance to individuals and small groups in relevant geographic markets throughout the state of Minnesota.

371.  BCBS-MN does business throughout the state of Minnesota, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the state of Minnesota, and has agreed with the other member plans of BCBSA that only BCBS-MN will do business in Minnesota under the Blue brand. Therefore, the state of Minnesota can be analyzed as a relevant geographic market within which to assess the effects of BCBS-MN's anticompetitive conduct.  BCBS-MN has dominated the health insurance market in Minnesota for years.  In the small group market, its market share increased from 36 percent in 1997 to 47 percent in 2002.  In 2010, BCBS-MN held a 43% market share in the small group market, based on health insurance premiums.  BCBS-MN accounted for 63% of the individual market in 2010.  In 2011, it maintained a 63% share of the individual market.  And in 2013, BCBS-MN held at least a 57% market share in the relevant individual market and at least a 38% market share in the relevant small group market.

372.    The U.S. Office of Management and Budget divides the 87 counties of Minnesota into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and social integration with that core."   Therefore, each of Minnesota's eight Metropolitan Statistical Areas, 15 Micropolitan Statistical Areas, and 41 counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-MN's anticompetitive conduct. As of 2012, held at least the following shares of the relevant product market in these Metropolitan Statistical Areas: the Duluth Metropolitan Statistical Area: 44 percent; the Minneapolis-St. Paul-Bloomington Metropolitan Statistical Area: 36 percent; the Rochester Metropolitan Statistical Area:55 percent; and the St. Cloud Metropolitan Statistical Area: 47 percent.

373.    BCBS-MN's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-MN's market power has significantly raised costs, resulting in higher premiums for BCBS-MN enrollees, and costing Minnesota subscribers the opportunity for lower, competitively-priced premiums.

*Supra-Competitive Premiums Charged By BCBS-MN*

374.    From March 1, 2007 to the present, BCBS-MN's illegal anticompetitive conduct, including its territorial market division agreements with the  other members of the BCBSA, has increased health care costs in Minnesota, leading to inflated and/or supra-competitive premiums for individuals and small groups purchasing BCBS-MN's

full-service commercial health insurance in the relevant geographic markets, and further, depriving subscribers of the opportunity to purchase health insurance from one or more of the other Individual Blue Plans and/or their non-Blue affiliates, at a lower premium rate and/or at a price set by a market free from the non-price restraints imposed by Defendants' anti-competitive agreements. BCBS-MN's market power and its use of anticompetitive practices in Minnesota have reduced the amount of competition in the market and ensured that BCBS-MN's few competitors face higher costs than BCBS-MN does. Without competition, and with the ability to increase premiums without losing customers, BCBS-MN faces little pressure to keep prices low.

375. Over the past decade, BCBS-MN generally raised individual and small group premiums by amounts greater than the national average.

376. Plaintiffs were damaged, both by paying supra-competitive premiums, which are to be calculated by estimating the premiums that would have been actually charged to consumers but for the Individual Blue Plans' antitrust violations, not the base rates or rate "schedules" filed with a state agency, and by being denied access to lower and/or competitively-priced health insurance products that could and would have been offered in Minnesota by other Individual Blue Plans, or their non-Blue affiliates, but for Defendants' unreasonable geographic market allocations.

377. These rising premiums have enabled BCBS-MN to lavishly compensate its executives and grow its surplus in excessive amounts, unusual practices for a self-described non-profit organization. In 2011, BCBS-MN had accumulated more than $250

million in reserves. By 2013, BCBS-MN held $448.9 million dollars in reserves, or 1,162% of the regulatory minimum level.

### State Insurance Laws Do Not Protect Subscribers from the Market Allocation Scheme

378. Defendants that have conspired to allocate markets and thereby not enter a market of another Blue Plan do not file rates in the markets that they have not entered. Those Defendants are also not subject to state insurance regulatory authorities for the markets they have not entered. Thus, neither the BCBSA, nor any of the Individual Blue Plan defendants other than BCBS-MN filed any rate within Minnesota.

379. Further, BCBSA is not regulated by state insurance regulatory authorities, including in Minnesota.

380. The state insurance authorities in Minnesota do not regulate the division of markets and allocation of customers that is the subject of this Complaint.

381. The Insurance Department at the Minnesota Department of Commerce does not clearly articulate and affirmatively permit as state policy the challenged restraints on trade that are the subject of this Complaint, *i.e.*, division of markets and allocation of customers. Nor does the Insurance Department at the Minnesota Department of Commerce actively supervise the challenged restraints on trade that are the subject of this Complaint.

382. No Defendant Individual Blue Plan, including the BCBS-MN, filed its insurance rate(s) with a federal regulatory agency.

383.    No Defendant Individual Blue Plan disclosed the challenged restraints on trade that are the subject of this Complaint to any insurance authority.

384.    The conspiracy alleged in this Complaint hindered the development of the Minnesota health care markets defined herein, because the Defendant Individual Blue Plans acted to inhibit lower cost competitors from entering such markets.

385.    The Defendant Individual Blue Plans breached their duties of good faith and fair dealing with subscribers.

## **VIOLATIONS ALLEGED**

### **Count One**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sherman Act, Section 1)
(Asserted Against All Defendants)

386.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

387.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MN, the other Individual Blue Plans, and BCBSA represent horizontal agreements entered into between BCBS-MN and the other Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health insurance.

388.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Individual Blue Plan Defendants represents a contract, combination and/or conspiracy within the meaning of Section 1 of the Sherman Act.

389.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA, BCBS-MN, and the other Individual Blue Plan Defendants have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the Individual Blue Plans. By so doing, the Individual Blue Plans (including BCBS-MN) and the BCBSA have conspired to restrain trade in violation of Section 1 of the Sherman Act. These market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

390.    The market allocation agreements entered into among BCBS-MN, BCBSA, and the other Individual Blue Plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

391.    BCBS-MN has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

392.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.  Reducing the number of health insurance companies competing with BCBS-MN throughout Minnesota;

    b.  Unreasonably limiting the entry of competitor health insurance companies into Minnesota;

    c.  Allowing BCBS-MN to maintain and enlarge its market power throughout Minnesota;

d. Allowing BCBS-MN to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

e. Depriving the Plaintiffs and Class members and other consumers of health insurance of the benefits of free and open competition.

393. The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

394. The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Section 1 of the Sherman Act. The conspiracy to allocate markets and restrain trade adversely affects consumers in this State and around the nation by depriving such consumers, among other things, of the opportunity to purchase insurance from a lower cost competitor and/or at a price set by a market free from the non-price restraints imposed by the alleged anti-competitive agreements. As a result of the Defendants' market allocation agreement and related restraints, the other Individual Blue Plans have not marketed individual and/or small group commercial health insurance products in BCBS-MN's service area and have been precluded by such agreements and restraints from doing so.

395. As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MN than they would

107

have paid with increased competition and but for the Sherman Act violations, and further, of being deprived of the opportunity to purchase health insurance from one or more of the other Individual Blue Plans and/or their non-Blue affiliates, at a lower premium rate and/or at a price set by a market free from the non-price restraints imposed by Defendants' anti-competitive agreements.

396.     Plaintiffs and the Class seek money damages from all Defendants for their violations of Section 1 of the Sherman Act.

## Count Two
(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)
(Asserted Against BCBS-MN)

397.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

398.     BCBS-MN has monopoly power in the individual and small group full-service commercial health insurance market in Minnesota. This monopoly power is evidenced by, among other things, BCBS-MN's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

399.     BCBS-MN has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

400.     BCBS-MN's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Section 2 of the Sherman

Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

401.     As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Minnesota Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MN than they would have paid but for the Sherman Act violations.

402.     Plaintiffs and the Minnesota Class seek money damages from BCBS-MN for its violations of Section 2 of the Sherman Act.

**Count Three**
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Sherman Act, Section 2)
(Asserted Against BCBS-MN)

403.     Plaintiffs repeat and reallege the allegations in all Paragraphs above.

404.     BCBS-MN has acted with the specific intent to monopolize the relevant markets.

405.     There was and is a dangerous possibility that BCBS-MN will succeed in its attempt to monopolize the relevant markets because BCBS-MN controls a large percentage of those markets already, and further success by BCBS-MN in excluding competitors from those markets will confer a monopoly on BCBS-MN in violation of Section 2 of the Sherman Act.

406.    BCBS-MN's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Minnesota Class. Premiums charged by BCBS-MN have been higher than they would have been in a competitive market.

407.    Plaintiffs and the Minnesota Class have been damaged as the result of BCBS-MN's attempted monopolization of the relevant markets.

### Count Four
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Minn. Stat. § 325D.53)
(Asserted Against All Defendants)

408.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

409.    The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-MN, the Individual Blue Plans and BCBSA represent horizontal agreements entered into between BCBS-MN and the Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health insurance.

410.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBS-MN, BCBSA and the Individual Blue Plans represents a contract, combination and/or conspiracy within the meaning of Minn. Stat. § 325D.51 and an unreasonable restraint of trade or commerce within the meaning of Minn. Stat. § 325D53.

411.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA, BCBS-MN, and the other Individual Blue Plans have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series

of exclusive areas for each of the thirty-six BCBSA members. By so doing, the BCBSA members (including BCBS-MN) have conspired to restrain trade in violation of Minn. Stat. § 325D.51 and Minn. Stat. § 325D53. These market allocation agreements are *per se* illegal under Minn. Stat. § 325D.51 and Minn. Stat. § 325D.53.

412. The market allocation agreements entered into between BCBS-MN and the other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive.

413. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a. Reducing the number of health insurance companies competing with BCBS-MN throughout Minnesota;

b. Unreasonably limiting the entry of competitor health insurance companies into Minnesota;

c. Allowing BCBS-MN to maintain and enlarge its market power throughout Minnesota;

d. Allowing BCBS-MN to supra-competitively raise the premiums charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

e. Depriving Class members and other consumers of health insurance of the benefits of free and open competition.

414. The procompetitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anticompetitive effects of those agreements.

415.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of Minn. Stat. § 325D.51 and Minn. Stat. § 325D.53. The conspiracy to allocate markets and restrain trade adversely affects consumers in Minnesota and around the nation by depriving such consumers, among other things, of the opportunity to purchase insurance from a lower cost competitor and/or at a price set by a market free from the non-price restraints imposed by the alleged anti-competitive agreements. As a result of the Defendants' market allocation agreement and related restraints, the other Individual Blue Plans have not marketed individual and/or small group commercial health insurance products in BCBS-MN's service area and have been precluded by such agreements and restraints from doing so.

416.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Minn. Stat. § 325D.51 and Minn. Stat. § 325D.53 described in this Complaint, Plaintiffs and other members of the Minnesota Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MN than they would have paid with increased competition and but for the violations of Minn. Stat. § 325D.51 and Minn. Stat. § 325D.53 and further, of being deprived of the opportunity to purchase health insurance from one or more of the other Individual Blue Plans and/or their non-Blue affiliates, at a lower premium rate and/or at a price set by a market free from the non-price restraints imposed by Defendants' anti-competitive agreements.

417. Plaintiffs and the Minnesota Class seek money damages under Minn. Stat. § 325D.57 from BCBS-MN, the other Individual Blue Plans and BCBSA for their violations of Minn. Stat. § 325D.51 and Minn. Stat. § 325D.53

**Count Five**

(Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of Minn. Stat. § 325D.52)
(Asserted Against BCBS-MN)

418. Plaintiffs repeat and reallege the allegations in all Paragraphs above.

419. BCBS-MN has monopoly power in the individual and small group full-service commercial health insurance market in Minnesota. This monopoly power is evidenced by, among other things, BCBS-MN's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

420. BCBS-MN has abused and continues to abuse its monopoly power to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

421. BCBS-MN's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of Minn. Stat. § 325D.52, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

422. As a direct and proximate result of the Individual Blue Plans' continuing violations of Minn. Stat. § 325D.52 described in this Complaint, Plaintiffs and other members of the Minnesota Class have suffered injury and damages in an amount to be

proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive and higher health insurance premiums to BCBS-MN than they would have paid but for the violations of Minn. Stat. § 325D.52.

423.    Plaintiffs and the Minnesota Class seek money damages from BCBS-MN for its violations of Minn. Stat. § 325D.52.

### Count Six
(Willful Attempted Monopolization in the Relevant Market
for Private Health Insurance in Violation of Minn. Stat. § 325D.52)
(Asserted Against BCBS-MN)

424.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

425.    BCBS-MN has acted with the specific intent to monopolize the relevant markets.

426.    There was and is a dangerous possibility that BCBS-MN will succeed in its attempt to monopolize the relevant markets because BCBS-MN controls a large percentage of those markets already, and further success by BCBS-MN in excluding competitors from those markets will confer a monopoly on BCBS-MN in violation of Minn. Stat. § 325D.52.

427.    BCBS-MN's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiffs and the Minnesota Class. Premiums charged by BCBS-MN have been higher than they would have been in a competitive market.

428.    Plaintiffs and the Minnesota Class have been damaged as the result of BCBS-MN's attempted monopolization of the relevant markets.

## Count Seven
(Unjust Enrichment)
(Asserted Against BCBS-MN)

429.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

430.    BCBS-MN has benefitted from its unlawful acts through Plaintiffs' and the Minnesota Class's overpayments for health insurance premiums to BCBS-MN.

431.    It would be inequitable for BCBS-MN to be permitted to retain the benefit of these supra-competitive premiums that were conferred by Plaintiffs and the Minnesota Class and retained by BCBS-MN.

432.    In equity, BCBS-MN should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and the Minnesota Class.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Fed. R. Civ. P. 23;

b.     Adjudge and decree that BCBS-MN and all other Defendants have violated both Section 1 and Section 2 of the Sherman Act;

c.    Adjudge and decree that BCBS-MN and all other Defendants have violated of Minn. Stat. §§ 325D.51-.53 and award Plaintiff and the Minnesota class appropriate damages and relief;

d.    Enjoin Defendants from entering into, or from honoring or enforcing, any

agreements that restrict them from competing within the state of Minnesota;

e.    Award Plaintiffs and the Class treble damages;

f.    Award costs and attorneys' fees to Plaintiffs;

g.    Conduct a trial by jury; and

h.    Award any such other and further relief as may be just and proper.

Respectfully submitted,

Dated:  March 22, 2016

**s/Karen Hanson Riebel**
Karen Hanson Riebel (MN #219770)
Rebecca Peterson (MN #392663)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave. South, Suite 2200
Minneapolis, MN  55401
khriebel@locklaw.com
rapeterson@locklaw.com

Andrew A. Lemmon
**LEMON LAW FIRM**
650 Poydras St., Suite 2335
New Orleans, LA 70130
andrew@lemmonlawfirm.com

Robert Christopher Cowan
**THE COWAN LAW FIRM**
One Meadows Building
5005 Greenville Avenue, Suite 200
Dallas, Texas 75206
chris@cowanlaw.net

Genevieve M. Zimmerman (MN #330292)
**MESHBESHER & SPENCE, LTD.**
1616 Park Avenue South
Minneapolis, MN 55404
Email: gzimmerman@meshbesher.com

**COUNSEL FOR PLAINTIFFS**