**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**In re:  BLUE CROSS BLUE SHIELD**   )
**ANTITRUST LITIGATION**          )         **MDL. 2406**
_____)

<u>This filing relates to the following case only:</u>

*Chicoine et al. v. Wellmark, Inc. d/b/a Wellmark Blue Cross
and Blue Shield of Iowa, et al.,* S.D. Iowa, Case No. 4:17-cv-00210

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION TO VACATE CONDITIONAL TRANSFER ORDER (CTO-32)**

**<u>TABLE OF CONTENTS</u>**

I.     PRELIMINARY STATEMENT AND BACKGROUND ...........................................2

II.    PROCEDURAL HISTORY..................................................................................4

III.   THE FEDERAL COURTS LACK JURISDICTION ...................................................5

IV.   THIS ACTION IS NOT FACTUALLY SIMILAR TO MDL
2406 SUCH THAT TRANSFER WOULD PROMOTE
CONVENIENCE AND JUDICIAL ECONOMY ........................................................8

    A.  The Operative Facts at Issue in MDL 2406 ..................................................9

    B.  Factual Lack of Commonality Between This Case and MDL 2406 ...........................12

    C.  The Iowa Supreme Court Rejected Tying This Case to MDL 2406...........................17

V.    CONCLUSION...........................................................................................19

I.      **PRELIMINARY STATEMENT AND BACKGROUND**

Iowa-licensed Plaintiff chiropractors filed[1] this putative class action in Iowa state court

against the Wellmark[2] defendants, both Iowa corporations. Plaintiffs seek recovery for alleged

conspiracy in Iowa led by Wellmark defendants' price fixing against Iowa chiropractors in

violation of the Iowa Competition Act, Iowa Code § 553.4, claiming in the initial *Mueller I*

Petition filed May 20, 2008, for example:

> 45. The plaintiffs and the plaintiff class have been damaged in the past four years
> by receiving as much as 50% less than the Wellmark defendants paid other health
> care practitioners in Iowa for the same or similar services. This damage can be
> calculated through the examination of a schedule of fees prepared by the
> Wellmark defendants annually and comparing the compensation scheduled to be
> paid to plaintiffs and the plaintiff class to compensation scheduled to be paid to
> other Iowa health care practitioner for the same or similar services."

(Ex. 11). The *Chicoine* petition alleges Wellmark defendants entered a combination or

conspiracy with potential competitors—the other BCBS affiliates and self-funded employee

plans Wellmark administers—to restrain trade, commerce, and competition in contracts to

purchase of healthcare services in Iowa, causing discrimination and suppression of fee for

services of Iowa chiropractors. This *Chicoine* case, filed in Iowa District Court on October 5,

---

[1] The Iowa District Court case has two sets of plaintiffs, the Chicoine plaintiffs and the Mueller plaintiffs. The *Mueller* case alleging price fixing by the Wellmark defendants in violation of Iowa Code § 553.4 was initially filed on May 20, 2008. There have been four appeals to the Iowa Supreme Court: *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 267 (Iowa 2012) ("*Mueller I*") (reversing summary judgment in part); *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 575 (Iowa 2015) ("*Mueller II*") (affirming summary judgment dismissing the fourth amended petition); *Wellmark v. Iowa District Court*, 890 N.W.2d 636 (Iowa 2017) ("*Mueller III*") (sustaining writ of certiorari prohibiting further proceedings in district court); and *Chicoine v. Wellmark, Inc.*, 894 N.W.2d 454 (Iowa 2017) (stay of putative class action for anticompetitive conduct, in favor of federal multidistrict litigation, was immoderate and an abuse of discretion). The *Mueller* plaintiffs in this case are alleging continuation of *Mueller I* under Iowa Code § 614.10 (2017). This *Chicoine/Mueller* case against the Wellmark defendants was filed in Iowa District Court on October 5, 2015. (Ex. 1).

[2] Unless otherwise noted, Plaintiffs follow the shorthand designations set forth in their motion.

2

2015, against the Wellmark defendants only, was not removed to federal court until June 14, 2017, when notice of removal was filed by the Wellmark defendants in clear violation of 28 U.S.C. § 1446(b)(1). The federal courts do not have diversity jurisdiction over this case. The Iowa District Court for Polk County is the only court with jurisdiction to adjudicate Plaintiffs' claims.

Ever since Plaintiffs filed *Chicoine* in state court, the Wellmark defendants have sought to delay Plaintiffs' pursuit of their claims by trying to tie them to MDL 2406. First, the Wellmark defendants tried to stay the Iowa District Court action pending further proceedings in MDL 2406. But the Iowa Supreme Court found "considerable differences" between the cases and said no. *Chicoine v. Wellmark, Inc.*, 894 N.W.2d 454, 456 (Iowa 2017) (reversing stay for abuse of discretion). Plaintiffs' case is about Wellmark's price fixing combination in Iowa that discriminates against Iowa chiropractors; by contrast, MDL No. 2406 centers on allegations that BCBSA provides artificially low reimbursements to all healthcare providers nationwide in violation of federal antitrust laws[3]. *See id.* at 462. Staying the Iowa District Court action indefinitely pending further proceedings in the MDL would injure Plaintiffs' interest in prompt adjudication of their rights, the Iowa Supreme Court said. *Id.* at 461.

Heedless of these strictures, the Wellmark defendants joined forces with applicant putative intervenor BCBSA (which, Wellmark, together with 36 other BCBSA licensees owns and controls[4]) to circumvent the Iowa Supreme Court's decision and tie this case into the MDL

---

[3] More specifically, the master provider complaint in MDL No. 2406 "alleges Wellmark, the other BCBS affiliates and the BCBSA conspired to allocate markets, fix prices, and boycott providers outside each affiliate's allocated market in violation of Section 1 of the Sherman Act under per se quick-look, or rule of reason analysis." *Chicoine,* 894 N.W. at 458.

[4] [*See, e.g.,* Doc. 1083 ¶¶ 115, 146-149].

anyway, through an onslaught of actions: BCBSA's intervention request in Iowa District Court, Wellmark's immediate removal to federal court and Wellmark's subsequent notice of potential tag-along action that triggered CTO-32. Plaintiffs have a pending motion to remand in the S.D. Iowa case and have resisted BCBSA's motion to intervene. Plaintiffs have agreed to stay proceedings in the S.D. Iowa case pending the Panel's determination on transfer. They continue to maintain in that court and before the Panel that the federal courts do not have subject matter jurisdiction.

Plaintiffs' factual claims do not fit into the Consolidated Fourth Amended Provider Complaint [Doc. 1083] filed with the Northern District of Alabama on April 18, 2017. Transferring this case to the Northern District of Alabama for inclusion in Section 1407 pretrial proceedings will not serve the convenience of the parties and witnesses and will not promote the just and efficient conduct of this litigation. Plaintiffs respectfully request that the Panel vacate the conditional transfer order of this matter to the Northern District of Alabama.

## II.   PROCEDURAL HISTORY

On October 5, 2015, the *Chicoine* plaintiffs, on behalf of themselves and those like situated, and the *Mueller* plaintiffs, on behalf of themselves and those like situated[5], filed their Petition at Law in Iowa District Court (Ex. 1). On April 21, 2017, the Iowa Supreme Court reversed for abuse of discretion the trial court's stay pending further proceedings in MDL 2406. *Chicoine et al. v. Wellmark et al.*, 894 N.W.2d 454 (Iowa 2017) (Ex. 2). On June 14, 2017, Plaintiffs filed their First Amendment to Petition (Ex. 3). Plaintiffs' Petition together with the First Amendment contain Plaintiffs' operative allegations under Iowa R. Civ. P. 1.402(4).

---

[5] The history of the *Mueller* case is described in footnote 1 above and in the various *Mueller* decisions of the Iowa Supreme Court referenced.

4

On June 14, 2017, BCBSA moved to intervene in the Iowa state case (Ex. 4), and the Wellmark defendants filed their Notice of Removal to the Southern District of Iowa (Ex. 5[6]). On June 19, 2017, Wellmark notified this Panel of a "potential tag-along action," thereby triggering a conditional transfer order [Doc. 364 and 365]. It should be noted that the Notice of Potential Tag-along Action shows Kirkland & Ellis, LLP of Chicago, Illinois as counsel for both BCBSA and Wellmark, tending to belie any idea that Wellmark is not adequately representing BCBSA in the *Chicoine/Mueller* Iowa case. On June 20, 2017, Plaintiffs filed their motion to remand in the S.D. Iowa case (Ex. 6). On June 23, 2017, Wellmark requested a stay of the S.D. Iowa case pending this Panel's determination on transfer (Ex. 7). On June 28, 2017, Plaintiffs agreed to the stay (Ex. 8) and filed their resistance to BCBSA's motion to intervene (Ex. 9).

## III.   THE FEDERAL COURTS LACK JURISDICTION

As a preliminary issue, the federal courts do not have subject matter jurisdiction of this matter under 28 U.S.C. § 1332(a) or (d). This action involves only Iowa parties and violations of Iowa law. BCBSA has never been named as a defendant, and should not be granted intervention under Iowa R. Civ. P. 1.407(1) or (2). (*See* Ex. 9). Plaintiff's First Amendment to Petition (Ex. 3), filed before notice of removal, takes all allegations of BCBSA horizontal territorial allocation out of the case. The extant Iowa pleadings do not support BCBSA's intervention request. Plaintiffs in this case are not attacking the validity of BCBSA's trademarks, underlying licensing system or the BlueCard Program. There is no need for BCBSA to intervene in this action to protect its interest in the same because its owner, Wellmark, Inc., has adequate motivation and knowledge and because the First Amended Petition eliminates any separate interest of BCBSA. Rather, Plaintiffs' allegations center on discriminatory treatment of Iowa chiropractors through

---

[6] Exhibit 5 includes only the notice itself; the attachments are voluminous.

price fixing and coverage limitations in Iowa by Iowa actors—the Wellmark Iowa defendants. The Wellmark Iowa defendants are the parties who maintain the price fix by administering payments to Iowa chiropractors for contractually bound co-conspirators.

BCBSA's intervention request is motivated by a desire to create diversity jurisdiction where none exists in order to pigeonhole this case into MDL 2406 in the Northern District of Alabama, where it will languish for years because it does not fit factually into the mainstream master complaints on file. Plaintiffs respectfully request that the Panel refuse to sanction BCBSA and Wellmark defendants' gamesmanship of the legal system through baseless removal to federal court for the sole purpose of immediately filing a notice of potential tag-along action[7]. This is particularly an issue when the Iowa Supreme Court has already refused to stay Plaintiffs' state case while the MDL plays out because the actions have "considerable differences" and because doing so would prejudice Plaintiffs. The S.D. of Iowa should decide Plaintiffs' remand motion.

While recognizing their agreement to stay the S.D. Iowa case, Plaintiffs submit that the lack of federal jurisdiction supports vacating the conditional transfer order. It would not serve the objectives of Section 1407 to have the Northern District of Alabama decide Plaintiffs' remand motion because the jurisdictional issue is neither difficult nor similar to the other transferred cases. *See Meyers v. Bayer AG,* 143 F. Supp. 2d 1044, 1049 (ED. Wis. 2001).

> The only reason to permit the transferee court to decide the jurisdictional issue would be to further judicial economy and consistency. H.R.Rep. No. 90-1 190. If

---

[7] *See, e.g., Sundby v. Bank of N.Y. Mellon,* No. 11CV627 DMS RBB, 2011 WL 1670914, at *2 (S.D. Cal. May 3, 2011) (granting remand motion where removal was baseless, citing Fed. R. Civ. P. 11(b) and stating "[i]f in fact the removal of this action was done for the purpose of delay, the Court strongly disapproves of such gamesmanship of the legal system and waste of judicial resources").

> the jurisdictional issue in the particular case is different from those in the other cases subject or potentially subject to MDL jurisdiction, these values do not come into play.

*Id.* The only possible factual connection in the MDL to Iowa chiropractors is the allegation in the Combined Fourth Amended Provider Complaint that one of the plaintiffs in the Allegations Relevant to the Non-Prioritized Proceedings (the ones on stay pending bellwether trial of Alabama cases) is Joseph S. Ferezy,D.C., who is claimed to have a chiropractic office in Windsor Heights, Iowa.[8] [Doc. 1083, ¶ 556]. His claim does not allege discriminatory price-fixing treatment of Iowa chiropractors as Plaintiffs allege here. As far as Plaintiffs know, no action before the MDL presents a similar issue of whether BCBSA should be allowed tof intervene under like circumstances and where the validity of its trademarks, underlying licensing system or the BlueCard Program are not under attack.

The Panel has expressed its "reluctan[ce] to transfer any action that has an important motion under submission with a court." *In re L.E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.D.L. 1975). Transferring the case before determination of the jurisdictional issue would not promote judicial economy and would not further expeditious resolution of the MDL litigation as a whole; moreover, it would require the MDL court to decide issues that are not similar to the other MDL cases. The conditional transfer order should be vacated.

---

[8] Plaintiffs in *Chicoine/Mueller* have established in the Iowa District Court record that Dr. Ferezy retired from active practice and sold his practice in Windsor Heights, Iowa to another chiropractor in May 2014. [Plaintiffs' Supplemental Appendix of Documents, filed Feb. 6, 2016 (Ex. S to Wellmark Notice of Removal, which is Doc. 2 in the S.D. Iowa Case), pp. 47-50]

**IV.    THIS ACTION IS NOT FACTUALLY SIMILAR TO MDL 2406 SUCH THAT TRANSFER WOULD PROMOTE CONVENIENCE AND JUDICIAL ECONOMY.**

A conditional transfer order is not a Panel judgment requiring reversal in order to vacate it, but rather such an order is "an administrative device used to expeditiously transfer apparently related cases where there is no opposition to such a transfer." *In re Grain Shipments*, 319 F. Supp. 533, 534 (J.P.M.L. 1970) (citing *A Survey of Federal Multidistrict Litigation*, 15 Vill.L.Rev. 916, 940-942 (1970)). "It is simply an administrative act of the Clerk which can be and will be vacated upon the showing of good cause by any party." *Id.* (citing *In re IBM Antitrust Litigation*, 316 F. Supp. 976 (J.P.M.L. August 13, 1970)).

Section 1407 transfers are conditioned on "one or more common questions of fact" between the actions and a determination by the Panel "that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Even if there are some shared fact questions, a conditional transfer order should be vacated where transfer would not satisfy the objectives of Section 1407. *See In re Petroleum Prod. Antitrust Litig.*, 476 F. Supp. 455, 457 (J.P.M.L. 1979) (granting motion to vacate). The Panel has rejected transfer where the consolidated action raised "no question" about the "apparent crux" of the action at issue. *In re IBM*, 316 F. Supp. 976, 977 (J.P.M.L. 1970) ("in spite of a few common fact questions resulting from the common defendant, the just and efficient conduct of the actions will not be promoted by transfer") (citing *In re Multidistrict Civil Antitrust Litigation Involving Photocopy Paper*, 305 F.Supp. 60 (JPML 1969)); *see also In re Western Liquid Asphalt*, 309 F. Supp. 157, 159 (JPML 1970) (transferring only actions presenting "common questions of fact [that] are of sufficient magnitude and complexity"  while refusing transfer of an action involving an "unrelated" product). If the action

at issue would "likely require unique discovery and other pretrial proceedings," transfer is not warranted. *In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 542 F. Supp. 2d 1357, 1358 (U.S. Jud. Pan. Mult. Lit. 2008) (vacating conditional transfer order where the MDL related to "allegedly predatory lending practices," while the actions at issue presented "individual claims based on the specific loan transactions").

The Section 1407 requirements have not been satisfied and good cause exists to vacate the conditional transfer order. Plaintiffs object to the underlying basis stated in CTO-32:

> It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Northern District of Alabama and assigned to Judge Proctor.

[Doc. 366]. Below Plaintiffs set forth A) the operative facts at issue in MDL 2406; B) the lack of factual commonality between their case and MDL 2406; and C) instructive guidance from the Iowa Supreme Court's review of the same.

### A.  The Operative Facts at Issue in MDL 2406

Plaintiffs recognize that transferee judge in MDL 2406, Hon. R. David Proctor, is one of seven current Panel members. The Consolidated Fourth Amended Complaint [Doc. 1083] already has been the subject of Judge Proctor's ruling on a motion to dismiss of June 28, 2017. *See In re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 2017 WL 2797267 (N.D. Ala.). The current Consolidated Fourth Amended Complaint appears to be essentially identical in terms of operative facts to the previous version, the Consolidated Third Amended Provider Complaint [Doc. 236], which Judge Proctor summarized in a prior ruling on motions to dismiss dated December 21, 2016. *See In re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 2016 WL 7384839 (N.D. Ala.). Of course, the paragraph numbering of the fourth iteration is different, because the Fourth Amended Provider Complaint is 239 pages with 695 paragraphs

9

stating the factual allegations in greater detail [Doc. 1083]. It primarily focuses on matters in or directly concerning Alabama.[9] [*See* ¶¶ 1-596 of Doc. 1083]. Judge Proctor summarized the consolidated cases before him as follows:

> In their consolidated complaint, Provider Plaintiffs allege that Defendants have violated various federal and state competition laws, including the Sherman Act, by agreeing to allocate geographic service areas between Blue Cross and Blue Shield entities (or plans) ("Blue Plans"), fix prices for certain products and services available from health care providers, and boycott all health care providers who reside outside of a Blue Plan's allocated geographic service area. (*See, e.g.*, *id.* at ¶¶ 4, 169, 229). Specifically, they allege that in September 1982 the Board of Directors for the Blue Cross Blue Shield Association ("BCBSA" or "Association") adopted a Long Term Business Strategy, through which "Defendants agreed not to compete with each other." (*Id.* at ¶ 187). The Blue Plans agreed to "centralize the ownership of their trademarks and trade names" and to ensure that by the end of 1985 "each state would only have one Blue [Plan]." (*Id.* at ¶¶ 188–89).
>
> According to Provider Plaintiffs, all of the Blue Plan Defendants (including Moving Defendants) held a series of meetings in 1987, during which they agreed to sell insurance under the Blue Cross and Blue Shield trademarks in exclusive geographic service areas. (*Id.* at ¶ 190). Thereafter, each Blue Plan entered into

---

[9] The Scheduling Order for MDL 2406 dated October 30, 2015, states:

> As this court has noted [the] court cannot try cases transferred to it from another district by the JPML. 523 U.S. 26, 40 (1998). Because Defendants have made no alternative suggestions that would assist in streamlining the MDL, Defendants, themselves, leave the court with no option for streamlining or a potential bellwether other than the cases directly filed in this court, i.e., the Alabama cases.

[Doc. 469]; *see also* 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated . . . ."); and *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34, 40 (1998). Judge Proctor is proceeding with discovery and trial of only two cases, which he intends to be bellwether cases to perhaps induce a settlement of other cases in MDL 2406. "These deadlines apply to *American Electric Motor Services Inc. v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02169-RDP, and *Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP." [Doc. 469 section III ¶ 1]. All of the other MDL 2406 cases are stayed until on or after January 2018. [*see* Doc. 469, section III ¶ 6].

Blue Cross License Agreements and Blue Shield License Agreements (collectively referred to as "License Agreements") with the Association. (*Id.* at ¶ 192). These License Agreements prevent a Blue Plan or its subsidiaries from competing under the Blue Cross and Blue Shield trademarks outside of a designated geographic service area. (*Id.* at ¶ 196). Moreover, the License Agreements dictate that the entity owning a Blue Plan for a certain geographic service area must obtain at least 80 percent of its annual revenue generated within that designated service area from services offered under the Blue Cross and Blue Shield trademarks. (*Id.* at ¶ 197).

Additionally, the License Agreements mandate that Blue Plans participate in various BCBSA national programs, including the BlueCard Program and the National Accounts Program. (*Id.* at ¶ 229). Pursuant to the National Accounts Program, Blue Plans agree, with limited exceptions, not to solicit services from or contract with health care providers outside of their designated geographic service areas. (*Id.* at ¶ 230). If a Blue Plan's member requires health care services while he or she is outside of the Blue Plan's geographic service area, the BlueCard Program allows that member to receive health care services from a provider who has a contract with the Blue Plan that controls that geographic service area. (*See id.* at ¶ 231). When a health care provider serves a member of a Blue Plan from another geographic service area, the provider submits a claim to the Blue Plan within that geographic service area (called the Host Plan). (*Id.* at ¶ 236). The Host Plan "prices [the claim] according to contracted provider agreements, then sends an electronic submission" to the member's out-of-area Blue Plan (called the Home Plan). (*Id.*). The Home Plan reviews the submitted claim from the Host Plan and sends a disposition to the Host Plan, which is responsible for reimbursing the health care provider. (*Id.*).

Provider Plaintiffs allege that BCBS–AL is the thirteenth largest health insurer in the nation and that it would likely offer health care financing in regions other than the state of Alabama but for the territorial restrictions in the License Agreements. (*Id.* at ¶ 141). According to Provider Plaintiffs, BCBS–AL has market power throughout Alabama in the health care financing market, with an 86 percent market share in the entire state. (*Id.* at ¶ 259). They claim that BCBS–AL's reimbursement rates for primary care physicians are so low that many primary care physicians retire because it is not worthwhile for them to continue practicing medicine. (*Id.* at ¶ 326). Moreover, BCBS–AL prohibits providers from offering similar price terms to other health care insurers. (*Id.* at ¶ 340). Accordingly, "competition in the state of Alabama has been and continues to be harmed in that the other 36 Blue [ ] [Plans] agree not to enter the Alabama market to complete

11

with Blue Cross Blue Shield of Alabama[,] no matter the circumstances." (*Id.* at ¶ 346).

*In re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 2016 WL 7384839, at *2 (N.D. Ala., Dec. 21, 2016) (internal footnotes omitted). With this summary in mind, Plaintiffs next highlight the factual differences between MDL 2406 and their action.

### B. Factual Lack of Commonality Between This Case and MDL 2406

The operative facts of this case are not in common with the facts asserted in the Consolidated Fourth Amended Complaint for several compelling reasons:

First, primary issues in MDL 2406 are not included in Plaintiffs' claims. There is nothing in Plaintiffs' First Amended Petition about agreement by Wellmark defendants to sell insurance under the Blue Cross and Blue Shield trademarks in exclusive geographic service areas. Nor do Plaintiffs make allegations about Wellmark defendants agreeing to License Agreements that mandate Blue Plans participate in various BCBSA national programs, including the BlueCard Program and the National Accounts Program. (*See* Exs. 1, 3).

Second, primary issues in Plaintiffs' action are wholly separate from MDL 2406. Unlike Plaintiffs' claims, the Consolidated Fourth Amended Complaint nowhere alleges Wellmark defendants entered a combination or conspiracy with potential competitors—the other BCBS affiliates and self-funded employee plans Wellmark administers—to restrain trade, commerce, and competition in contracts to purchase of healthcare services in Iowa, causing discrimination and suppression of fee for services of Iowa chiropractors. There is no allegation in MDL 2406 that the national BCBSA conspiracy was aimed at chiropractors in any manner other than in common with all other health care institutions, professional and other services providers and goods providers.

Third, the only specific mention of Iowa-based Wellmark, Inc. in the Consolidated Fourth Amended Complaint is in the "Non-Prioritized Proceedings" respecting its market power in Iowa. [Doc. 1083 ((section ¶¶ 527-625 at ¶ 576)] The market power figures are from the 2013 AMA Competition Study. (*Id.*) By contrast, the Plaintiffs in this action allege a considerably greater market share. (Ex. 1 ¶ 36). Better market power statistics have been available in Iowa for many years pertinent to Plaintiffs' allegations because of a 2010 requirement in Iowa Code § 505.18 that the Iowa Insurance Division to publish an annual report of health insurance market competitive conditions. For example, the Annual Report for November 2012 shows Wellmark, Inc.'s share of small group in 2011 to be 55% for all of Iowa and 65% for large group insurance. (Ex. 10, pp. 6, 8). Wellmark Health Plan of Iowa, Inc. has an additional 16% share of small group insurance and 13% of large group insurance in Iowa in 2011. (*Id.*) That is a considerably greater market share than is alleged in ¶ 576 of the Consolidated Fourth Amended Complaint of 52% statewide [Doc. 1083].

Fourth, the MDL does not distinguish between payments to chiropractors as compared to other health care providers. Judge Proctor's recent opinion on the adequacy of the geographic and market share allegations of the Consolidated Fourth Amended Complaint [Doc.1083 ¶¶ 339-356] found proof of damages presently are based on an expert econometric study; that study posits a small but significant and non-transitory increase in price, or "SSNIP," as a minimal damages amount applicable to all potential class members, including "all healthcare providers, not owned or employed by any of the Defendants, in the United States of America, who provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant within four years prior to the

date of the filing of this action." *See In re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 2017 WL 2797267 (N.D. Ala. June 28, 2017); [*see also* Doc. 1083 at ¶ 618].

However, there is no damage differential for chiropractors. By contrast, Plaintiffs' allegations center on discriminatory low prices for chiropractic services and limitations or exclusions on chiropractic coverage, particularly in comparison to treatment of other health care practitioners. (*See, e.g.,* Ex. 1 ¶ 3). Accordingly, the asserted basis for proving damages in MDL 2406 would not be instructive for Plaintiffs' recovery.

By contrast, Plaintiffs allege a specific and easily provable measure of damages to Iowa chiropractors as the result of the Wellmark defendants' price fixing conspiracy in Iowa. Wellmark purports to employ the Resource Based Relative Value System ("RBRVS") developed for the Center for Medicare and Medicaid Services ("CMS") for payments to health care providers for Medicare and Medicaid services. *See Mueller I*, 818 N.W.2d at 251. The CMS publishes an annual National Physician Fee Schedule Relative Value File, which shows the Relative Value Units ("RVU") for physician services and how they are computed. CMS multiplies the RVU for a particular service by an annually established *single* conversion factor, which determines payment to physicians for Medicare and Medicaid services provided. CMS uses a Relative Value Update Committee ("Committee") to determine the actual comparative values of the RVUs. The website https://www.ama-assn.org/about-us/ruc explains how this works.

The Committee is composed of 31 members, most of whom are representatives of specialist provider interests, including a chiropractic representative. In rotating fashion, the Committee re-evaluates the RVU codes every 5 years. Chiropractic manipulative therapy code values are approximately 90% of the code values for osteopathic manipulative therapy.

Wellmark defendants (for themselves and for their Iowa self-funded private and governmental heath plan contractees and their out-of-state Blues contractees) pay chiropractic physicians substantially less than this 90% value for the same services. This is the essential contract in restraint of trade Plaintiffs complain of. Accordingly, the easily provable damage to Iowa chiropractors is the difference between what Wellmark pays Iowa chiropractors for fee for service and the 90% value established by the RUC expert panel. Unlike the astonishingly expensive econometric models needed to establish the SSNIP damages in MDL 2406, the Iowa chiropractic plaintiffs have a readily available damage model done by the CMS upon recommendation of its expert RUC panel.

Moreover, the market conditions respecting hospital and M.D./D.O. healthcare services in Iowa strongly suggest that hospitals and M.D./D.O. physicians are not damaged by the Iowa price fixing conspiracy Plaintiffs allege. Two health care hospital and physician networks predominate in Iowa.

According to its website at  www.unitypoint.org, UnityPoint Health is the 13th largest non-profit health system in the nation and most of its business is in Iowa. It has $2.7 billion annual revenue in Iowa, which comparatively is nearly half of the annual provider expenditures of Wellmark. Its hospitals and clinics employ 30,000 people. It has 19 hospitals, 18 community network hospitals, and 280 clinics and directly employs 900 physicians (no chiropractors) and large numbers of physician assistants, nurse practitioners and physical therapists. It has 3,500 physicians on its staffs (Iowa has approximately 8,000 M.D./D.O.'s in active practice).

According to its website, www.mercyhealthnetwork.com, Mercy Health Networks is nearly as large, with 42 Iowa hospitals, 207 medical clinics, 1000 formally integrated M.D./D.O.'s and 2000 staff physicians (no chiropractors). With 17,000 Iowa employees, it has

$2.5 billion annual Iowa revenue, again comparatively nearly half as much as Wellmark's total yearly provider expenditures.

These numbers suggest that Iowa healthcare is controlled by a bilateral monopoly of Wellmark against UnityPoint and Mercy Health. This is not similar in any respect to the Alabama situation described in the Consolidated Fourth Amended Complaint.

Finally, but not least pertinent, to the degree there is any overlap between the actions, the conspiracy alleged in MDL 2406 amounts to a very small part of the Iowa chiropractors' damages. The Wellmark price fixing conspiracy relating to claim processing by Iowa hospitals and health care providers for services to members of the out-of-state Blues is a very small percentage of the hospital's and providers' Wellmark claims. It is believed to be about 3% of all claims processed annually. The remainder of the claims are about one-half for Wellmark defendant-insured members and one-half for members of private and government self-insured plans administered by Wellmark. (Ex. 12, p. 2-4, Affidavit of Michelle A. Druker).

All of these factual differences show transferring this action to MDL 2406 will not serve the objectives of Section 1407. The lack of commonality would make it impossible for consolidation to create efficiency through the typical channels. For example, consolidation would not avoid duplicative discovery, prevent inconsistent pretrial rulings or conserve the parties' and witnesses' time and efforts. Moreover, the Iowa District Court is more convenient since all of the parties are located in Iowa, with the exception of BCBSA, which should not be granted intervention for reasons previously stated. The only objective served by transfer would be to delay Plaintiffs' adjudication of their claims indefinitely and unnecessarily, which is what the Wellmark defendants and BCBSA want. The conditional transfer order should be vacated.

### C.  The Iowa Supreme Court Rejected Tying This Case to MDL 2406

The fact that the Iowa Supreme Court recently rejected the Wellmark defendants' goal of tying this case to MDL 2406 reveals their underlying purpose in removing to federal court and notifying the Panel of a potential tag-along: to circumvent the unfavorable ruling. The Iowa Supreme Court's review and rejection of the Wellmark defendants' claim of alleged commonality of facts and issues with MDL 2406 is instructive because of similar considerations at issue regarding lack of efficiency and prejudice to Plaintiffs. It wrote:

> On the defendants' motion, and over the plaintiffs' objection, the district court stayed the case in its entirety pending further proceedings in federal multidistrict litigation (MDL) in Alabama brought under the federal antitrust laws. *See* 15 U.S.C. §§ 1, 4 (2012). The Alabama MDL includes physicians, hospitals, and other healthcare providers from around the country as plaintiffs. As in the present case, the plaintiffs allege conspiracies by the insurers to fix prices and allocate markets. However, the MDL complaint alleges that the conspiracies have had the effect of driving down all healthcare provider reimbursements to artificially low levels. One of the plaintiffs in the Alabama MDL is an Iowa chiropractor and one of the defendants is Iowa's largest health insurer.

> On interlocutory review, we conclude the district court abused its discretion in staying the Iowa litigation pending further proceedings in the Alabama MDL. Resolution of the Alabama MDL, which is still in bellwether pretrial proceedings, could take years, and although there is some overlap between the two cases, there are also considerable differences in the issues they present. Accordingly, we vacate the order staying this action and remand for further proceedings.

*Chicoine*, 894 N.W.2d at 456.

For the same reasons that the Iowa Supreme Court held that the granting of an indefinite stay was an abuse of discretion, the overruling of this motion to vacate would create the same delays after removal to the Northern District of Alabama, because this case does not fit into the Consolidated Fourth Amended Complaints filed in MDL 2406:

> As in *Landis*, the stay in this case serves to prolong the decision-making process for years without adequately protecting or advancing the plaintiffs' interest in receiving a prompt decision. At a minimum, the stay will last until 2018—the earliest date the bellwether cases could precede to trial under the current

scheduling order in MDL No. 2406. In all likelihood, the stay could last several years or even a decade or more as the bellwether cases and the consolidated federal case involving the Iowa plaintiff move through their trial and appellate stages. Such a lengthy and indefinite stay violates the plaintiffs' interest in prompt and complete justice. Cf. *First Midwest Corp.*, 663 N.W.2d at 891. The stay does not become moderate simply because the plaintiffs could petition the court to enter an order ending the stay or because the court could end the stay sooner of its own accord. See *Landis*, 299 U.S. at 257, 57 S. Ct. at 167.

Furthermore, any benefit of a decision in MDL No. 2406 advancing the resolution of this case is uncertain for several reasons. First, if MDL No. 2406 is resolved under a per se or quick-look theory, it will provide little or no benefit to the economic and econometric analyses in the Iowa plaintiffs' rule-of-reason claim. Second, the federal court in MDL No. 2406 has adopted a bellwether approach, making it more likely that the Iowa portion of MDL No. 2406 will settle before trial or even pretrial proceedings, thus removing many of the potential benefits of a stay in this case. See *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar."). The bellwether cases involve Alabama plaintiffs, and it is possible that competitive conditions in Alabama may have no connection to those in Iowa.

Finally, as the district court found, the plaintiffs raised approximately "ten detailed specifications of wrongdoing" concerning Wellmark's treatment of Iowa chiropractors while MDL No. 2406 focused on two allegations concerning the BCBSA's treatment of all healthcare providers. Although there appears to be an allegation common to both cases that the BCBSA entities have generally conspired to stay out of each other's territories (i.e., Iowa and South Dakota in the case of Wellmark), the present case alleges discriminatory treatment of chiropractors instead of artificially low reimbursements for all healthcare providers. In addition, the present case alleges other anticompetitive agreements, including between Wellmark and self-insurers. It is unclear in our view whether any resolution of claims in MDL No. 2406 would result in the resolution of claims in this action. See *Landis*, 299 U.S. at 256, 57 S. Ct. at 166 (noting a stay may be justified in favor of a case with nonidentical issues if "in all likelihood it will settle many and simplify them all")."

*Chicoine*, 894 N.W.2d at 461-62. Plaintiffs respectfully request that this Panel reject the Wellmark defendants' attempts to circumvent the Iowa Supreme Court's ruling and vacate the conditional transfer order.

**V.     CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Panel vacate the conditional transfer order (CTO-32) and grant Plaintiffs such additional relief to which they may be entitled and which the Panel deems just and proper.

Date: July 7, 2017

> /s/ *Steven P. Wandro*
> Steven P. Wandro  AT0008177
> Kara M. Simons  AT0009876
> WANDRO & ASSOCIATES, P.C.
> 2501 Grand Avenue, Suite B
> Des Moines, Iowa 50312
> Telephone:  515-281-1475
> Facsimile:   515-281-1474
> Email: swandro@2501grand.com
>              ksimons@2501grand.com
>
> Glenn L. Norris  AT0005907
> HAWKINS & NORRIS, P.C.
> 2501 Grand Avenue, Suite C
> Des Moines, Iowa 50312-5399
> Telephone:  515-288-6532
> Facsimile:  515-281-1474
> Email: gnorris@2501grand.com
>              gnorrislaw@gmail.com
>
> ATTORNEYS FOR PLAINTIFFS CHICOINE ET AL. IN CASE NO. 4:17-cv-00210 BEFORE THE U.S. DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2017, a copy of the foregoing was electronically filed with the Judicial Panel on Multidistrict Litigation by using the CM/ECF system on behalf of Plaintiffs Bradley A. Chicoine, D.C., Mark A. Niles, D.C., Rod R. Rebarcak, D.C., and Ben Winecoff, D.C., on behalf of themselves and those like situated, and Steven A. Mueller, D.C., Bradley J. Brown, D.C., Mark A. Kruse, D.C., Kevin D. Miller, D.C., and Larry E. Phipps, D.C., on behalf of themselves and those like situated, which will send notice of electronic filing to counsel for all parties of record: Defendants Wellmark, Inc. d/b/a Wellmark Blue Cross and BlueShield of Iowa and Wellmark Health Plan of Iowa, Inc., and Applicant Intervenor Blue Cross Blue Shield Association.

Date: July 7, 2017

/s/ Steven P. Wandro
Steven P. Wandro