# Affidavit of
# Michelle A. Druker

## AFFIDAVIT OF MICHELE A. DRUKER

I, Michele A. Druker, state:

1.      I have been employed by Wellmark, Inc. since 1988, currently serving as Vice President, Associate General Counsel, and Assistant Board Secretary.  In those capacities, I have personal knowledge regarding Wellmark's history and business, administrative services agreements, provider agreements, the BlueCard® Program, and how these have worked in practice throughout the time of my employment.

2.      Wellmark, Inc. (doing business as Wellmark Blue Cross and Blue Shield of Iowa) and Wellmark Health Plan of Iowa, Inc. are Iowa corporations (hereinafter jointly referred to in the singular as "Wellmark") which, for all purposes relevant to this motion, provide health insurance or health maintenance organization plans to individuals or groups in Iowa, and also provide administrative services to others who provide health coverage, such as self-funded employer group health plans.

3.      Wellmark and other health insurers compete to provide insurance or administrative services primarily to employer groups and group health plans, with a much smaller market in the state for individual policies. Employer groups' employees (whether the group plans are fully insured or self funded), and the purchasers of individual policies, are commonly referred to by Wellmark as "members."  About half of Wellmark's members obtain their health insurance through self-funded employer group plans.

4.      Attached to this affidavit as Exhibit A is a true and correct copy of the standard Administrative Services Agreement between Wellmark and a self-funded employer group plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA").

5.      Attached to this affidavit as Exhibit B is a true and correct copy of the standard Administrative Services Agreement between Wellmark and an Iowa self-funded public body (non-ERISA) plan.

6.      Wellmark is a licensee of the Blue Cross and Blue Shield Association ("BCBSA"). Under its license agreement with the BCBSA, Wellmark is required to participate in national BCBSA programs, including the BlueCard® Program.

7.      Under the BlueCard® Program, Wellmark members (which include the members of the self-funded group health plans that Wellmark administers) have access to the provider networks of the other 37 BCBSA licensees ("Blues Plans"), and, in turn, other Blues Plans members have access to Wellmark's network. A description of the BlueCard® Program is provided at pages 19 through 23 of Exhibits A and B.

8.      A "provider network" is a group of physicians, clinics, other health care providers, facilities, and hospitals that provide services based on a discounted fee schedule or other pre-determined financial arrangements to participants or members of insured or self-funded group health plans.

9.      Pursuant to Iowa Code § 514.F.2 and 191 I.A.C. ch. 27, Wellmark enters into preferred provider arrangements in which providers agree to discounted fee arrangements for members of plans that Wellmark insures or administers and to any licensed subsidiary or affiliate of the Blue Cross and Blue Shield Association and Blues Plans. Attached to this affidavit as Exhibit C is a standard "Practitioner Services Agreement" filed with and approved by the Iowa Insurance Commissioner.

10.     In exchange for the network providers accepting discounted fees, Wellmark and the other Blues Plans provide incentives to their members to use those providers who are in

Wellmark's preferred provider network, including lower out-of-pocket costs and direct claims filing and handling.

11.    Wellmark's provider network is limited to Iowa, so without the BlueCard® Program, Wellmark would have significant difficulty competing for employer groups who have members located outside of Iowa.

I certify under penalty of perjury and pursuant and pursuant to the laws of the State of Iowa that the preceding is true and correct.

Date: _May 31, 2013_

_Michele A. Druker_
Michele A. Druker



**Wellmark Blue Cross Blue Shield of Iowa**
**Wellmark Health Plan of Iowa, Inc.**

Independent Licensees of the Blue Cross and
Blue Shield Association

# ADMINISTRATIVE SERVICES AGREEMENT

## WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA
## WELLMARK HEALTH PLAN OF IOWA, INC.

## and

## 2012 Sample – Self-Funded ERISA

Agreement Effective Date:  January 1, 2012

Form Number: IA WBCBSI & WHPI LG SF

Version: 11/11

## ADMINISTRATIVE SERVICES AGREEMENT

THIS ADMINISTRATIVE SERVICES AGREEMENT ("Agreement") is made and entered into effective the first day of January 2012, by and between Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa, an Iowa mutual insurance company, and Wellmark Health Plan of Iowa, Inc., an Iowa health maintenance organization, (collectively referred to herein as "Wellmark" unless either company is specifically referenced by name), and 2012 Sample – Self-Funded ERISA (herein "Account").

## RECITALS

1.  Account is the plan sponsor of a group health plan for its eligible individuals.

2.  The group health plan is sponsored and funded by Account. Account wishes to enter into a financial arrangement with Wellmark under which Account is solely responsible for the Claims Paid for covered health services provided to its Members. Wellmark does not assume any financial risk or obligation with respect to the Claims Paid for Covered Services provided to Members of the Plan.

3.  Account desires that Wellmark provide services for the group health plan and Wellmark is willing to provide such services subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT DEFINITIONS

1.1  "**Administrative Fee**" means an amount or amounts that Wellmark charges the Account for Administrative Services and which includes allocations for Wellmark's cost of administering the Plan and general operating costs. The monthly Administrative Fee is shown on Exhibit "A" attached to this Agreement and incorporated by this reference.

1.2  "**Administrative Services**" means those services to be performed by Wellmark for Account and the Plan under this Agreement, as described in Article 3 of this Agreement.

Administrative Services expressly exclude any services for the administration of continued health coverage pursuant to COBRA or any state or federal law relating to continuation coverage of the Plan, except as may be specified in a COBRA Administrative Services Agreement.

1.3  "**Affordable Care Act**" means the Patient Protection and Affordable Care Act, enacted March 23, 2010, and the Health Care and Education Reconciliation Act (collectively, "ACA"), including regulations promulgated thereunder.

1.4  "**Agreement**" means this Administrative Services Agreement, including all Exhibits, Benefits Document(s), amendments, Plan Member enrollment form(s), any applicable Health and Care Management Services Exhibit, and COBRA Administrative Services Agreement executed by the parties. This Agreement also incorporates by this reference the terms of the HIPAA Business Associate Agreement entered into between Wellmark and the Plan.

IA WBCBSI & WHPI LG SF                    1                    Version: 11/11

1.5     "**Amounts Not Covered**" means the amounts that are the liability of the Member under the Plan. These include services that are not covered, charges for services that are determined to be not medically necessary, reductions in benefits for failure to follow notification requirements, and charges for services that have reached a Plan maximum. Amounts Not Covered do not include amounts that are the responsibility of a provider under a provider's contract with Wellmark.

1.6     "**Benefits Document**" means the written document(s) that describe and define the terms and benefits of the Plan and may be titled Benefits Certificate, Coverage Manual, or something similar. If the Plan is subject to the terms of ERISA, Account may at its option incorporate the Benefits Document into its ERISA Summary Plan Description (SPD).

1.7     "**Capitation**" means a per Member fixed fee amount that may be paid by Wellmark on behalf of Account to health care providers each month for services provided to a Member. The capitation amount may change during the term of this Agreement in accordance with an agreement between Wellmark and the providers regarding payment and the scope of the capitated services.

1.8     "**Claims Paid**" means the amount of Wellmark's payment on behalf of the Account for Incurred Claims.

1.9     "**COBRA**" means the group coverage continuation provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including implementing regulations.

1.10    "**Covered Charges**" means the amount a health care provider bills a Member or Wellmark for Covered Services in accordance with the terms of the Benefits Document.

1.11    "**Covered Services**" means the health care services described in and covered by the applicable Benefits Document.

1.12    "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, including implementing regulations.

1.13    "**Grandfathered Health Plan or Non-Grandfathered Health Plan**" mean the same as such terms are used in ACA.

1.14    "**Health and Care Management Services**" means health management and wellness services Wellmark may provide to Members designed to encourage good health and help them make decisions about health care. These services may include but are not limited to telephonic health support services, disease management, pregnancy care, case management, or other programs.

1.15    "**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended, including the implementing regulations.

1.16    "**Host Blue**" means the local Blue Cross and/or Blue Shield licensee in a geographic area outside of the Wellmark service area.

1.17    "**Incurred Claims**" means claims for payment of the cost of health services that are provided to Members pursuant to the Plan.

1.18    "**Incurred Date**" means the date health services are provided to Members. With regard to inpatient hospital or facility services, the date of admission is the Incurred Date.

1.19    "**Maximum Allowable Fee**" means an amount Wellmark establishes using various methodologies for Covered Services and supplies.

For medical services, this amount is developed from various sources, such as charges billed for the same service or supply by most providers within Iowa, economic indicators, and relative value indices developed or approved by Wellmark, and is based on the simplicity or complexity of the service provided. For medical services received outside of Iowa or South Dakota, the Maximum Allowable Fee is either based on information from the local Blue Cross and/or Blue Shield Plan as further explained in the section entitled Out-of-Area Services or is the amount as described in the preceding sentence.

For all dental procedures covered under the Agreement, the fee schedule is developed based on Wellmark's contracts with dentists, input from its dental consultants, and the charges billed for the same procedure by dentists in Iowa.

1.20    "**Member**" means a person, including a Plan Member's eligible spouse or dependents, eligible and enrolled to receive health benefits under the Plan as determined by Account, the terms of the Plan, and as accepted by Wellmark.

1.21    "**Network Access Fee**" means the amount charged to Account to gain the collective advantages of the network of providers with which Wellmark, another Blue Cross or Blue Shield plan, or any subcontractor of either, has contracted for the provision of Covered Services. The fee is a monthly amount as shown on Exhibit "A", and may include funding for provider incentives. If the Network Access Fee is a percentage of Network Savings, the fee applies to Incurred Claims regardless of the date the claim is paid. A portion of the Network Access Fee may include an allocation for administrative expenses above the Administrative Fee.

1.22    "**Network Savings**" means the amount saved due to contracts between Wellmark or another Blue Cross or Blue Shield Plan and health care providers. It is generally calculated as the difference between the Covered Charge and the Maximum Allowable Fee. This result is then added to any other reductions in the liability to a provider pursuant to a contract between Wellmark and a provider, including, but not limited to, reductions for failure to satisfy any notification requirements and medical necessity determinations. If the amount paid to a provider on any claim exceeds the Covered Charges, the Network Savings may be reflected as a negative dollar amount on Account's bill.

1.23    "**Plan**" means the group health plan or plans sponsored by Account, the terms of which are described in the applicable Benefits Document.

1.24    "**Plan Member**" means an employee or other individual identified by Account as a person eligible and enrolled to receive health benefits under the Plan subject to the terms, conditions, and limitations described in the Plan documents and who is the

applicant on a completed enrollment form that has been provided to and accepted by Wellmark.

1.25    "**Plan Year**" means the year that is designated as the plan year in the plan document of the Plan or set forth on Exhibit "A".

1.26    "**Protected Health Information**" means the same as the term "protected health information" in 45 CFR §160.103.

1.27    "**Rating Period**" means the period of time set forth on Exhibit "A" or the most recent revision to Exhibit "A".

## ARTICLE 2
## RESPONSIBILITIES OF ACCOUNT

2.1     **Health Plan Compliance.** The Account is the plan administrator and plan sponsor of the Plan for purposes of this Agreement and ERISA, if applicable. Account has full responsibility for all of the following:

   a.    Maintaining and funding the Plan;

   b.    Determining eligibility criteria in accordance with Wellmark's established enrollment guidelines, applicable law, and Blue Cross and Blue Shield Association policies and guidelines and enrolling individuals in accordance with such criteria;

   c.    Compliance with all applicable laws, reporting and disclosure requirements;

   d.    Reviewing and approving promptly templates or drafts of Benefits Document(s) provided by Wellmark, and delivering Benefits Document(s) and provider directories, if applicable, to Plan Members. Based on the eligibility and benefit information Account provides, Wellmark will draft written Benefits Document(s) stating the benefits, terms and conditions of the Plan using Wellmark's standard contract language. Account is responsible for reviewing the draft Benefits Document(s) promptly, typically within thirty (30) days of receiving the draft document(s), and determining to Account's satisfaction that the document(s) meet all of Account's legal and business obligations and advising Wellmark of any necessary revisions or approval. In the absence of Account's approval, Wellmark will administer the benefits in accordance with the benefit information provided by Account and Wellmark's most similar standard Benefits Document(s) language;

   e.    Providing a Plan Member with a copy of this Agreement upon the Plan Member's request;

   f.    Making final determinations regarding claims, claims internal appeals, or claims exceptions, except to the extent expressly delegated to, and accepted by, Wellmark in Section 3.1 of this Agreement;

   g.    Payment of any state premium, or similar tax, or any similar benefit or Plan-related charge, tax, surcharge or assessment, however denominated, including

IA WBCBSI & WHPI LG SF                        4                        Version: 11/11

any penalties and interest payable with respect thereto, assessed against the Plan;

h.  If the Account terminates the coverage of any Plan Member or Member retroactively, Account represents that it has either not collected any premium contribution from the retroactively terminated Member, or has refunded any premium contribution to the retroactively terminated Member, for the period following the effective date of the termination;

i.  Delivering to Plan Members the notices required by ACA or ERISA, if applicable, in the time and manner required by law, including any summary of benefits and coverage explanation (sometimes referred to as an "SBC"), the uniform glossary of insurance-related terms, and the summary of material modification;

j.  Providing to Wellmark written notice of initial benefit selections, changes in the benefits at renewal, or material modifications at any time during the Rating Period. Account shall provide such notice in the time and manner required by Wellmark to fulfill the issuance of SBCs or other required notices within the time required by law;

k.  Performing non-discrimination testing, regarding highly compensated individuals, to comply with Internal Revenue Code Section 105 (h);

l.  If the Account has a Non-Grandfathered Health Plan or the Plan becomes a Non-Grandfathered Health Plan during the Rating Period, Account shall maintain a process for external review of final internal adverse benefit determinations as required by ACA, except to the extent expressly delegated to, and accepted by, Wellmark in this Agreement; and

m.  If the Account has a Grandfathered Health Plan, Account shall provide Wellmark at least sixty (60) days prior written notice of any change in the employer contribution information or any other information that may impact the Grandfathered Health Plan determination.

Account will exercise its administrative responsibilities in the time required by law.

Some of the Account's responsibilities with respect to compliance with COBRA may be delegated to Wellmark, but only to the extent expressly specified and agreed between the Account and Wellmark in a COBRA Administrative Services Agreement.

2.2  **Furnishing Information; Electronic Information.** Account agrees to furnish Wellmark with reports, data, and information, including but not limited to, eligibility and enrollment information for each Member, claims history, and information necessary for the proper administration of coordination of benefits and other limitations and exclusions contained in the Plan and any other Account services so that Wellmark may discharge its responsibilities under this Agreement. In the event Account establishes eligibility criteria, Account shall provide Wellmark thirty (30) days prior written notice of such criteria or any modification to such criteria. Account shall provide all such information in a time, form, electronic format if applicable, and manner required by Wellmark and is responsible for the timeliness, integrity, retention, and accuracy of information and records provided to Wellmark. Wellmark shall be entitled to rely upon such information in determining any

IA WBCBSI & WHPI LG SF                    5                    Version: 11/11

person's rights to benefits under the Plan and in discharging its responsibilities under this Agreement. Account recognizes the importance to the successful provision of the Administrative Services the timely, accurate, and complete reporting of the information set forth in this section and that should there be a delay in Account's delivery of such information, Wellmark shall not be responsible for the provision of the Administrative Services affected by such delay.

Eligibility or enrollment information provided to Wellmark on an electronic basis shall be provided in a standard medium and layout using Wellmark's proprietary format, the HIPAA ANSI 834 standard format, or an application such as BluesEnroll, unless the parties agree in writing to a non-standard format or application. Account acknowledges that it may be responsible for additional fees if it uses a non-standard format or if Wellmark is required to perform a comparison study of the full eligibility file.

2.3 **Notice of Persons Eligible for Coverage; Changes in Eligibility.** Account shall enroll persons eligible for coverage in the Plan in advance of each person's effective date of coverage and shall provide Wellmark with each person's name, Plan selection, and other required identifying information. Account shall provide all initial enrollment information in advance of the effective date of this Agreement. As new persons become eligible, or as eligibility changes occur, including any special enrollment events that require a person to be offered coverage, Account shall provide Wellmark with updated required information as the changes occur, in advance of the effective date of the change if possible, or at least once each week. A delay in providing eligibility changes more than three (3) months following the effective date of the change shall delay the requested effective date of coverage for the person and may cause Incurred Claims not to be paid.

2.4 **Notice of Persons No Longer Eligible for Coverage; Account's Liability for Claims for Ineligible Individuals.** Account shall notify Wellmark in advance if possible of each person's termination of coverage under the Plan. Account's failure to provide required information to Wellmark within three (3) months following the date of termination shall delay the requested termination date of coverage to a date no earlier than three (3) months prior to the date Wellmark receives the required information. Wellmark shall not be responsible for any Claims Paid for individuals who are not eligible individuals or Members at the time such services were provided. In the event Claims Paid for individuals who are not eligible are made related to pharmacy services or supplies, Account shall pay for the cost of the services for the individual. For all other services or supplies, Wellmark shall, at its election, (a) attempt to recoup such payments from the individual or the involved provider, unless Wellmark determines recoupment is not feasible under the circumstances; or (b) bill Account for such payments and associated Administrative Fee and upon the receipt of such billing, Account shall pay the amount due to Wellmark.

2.5 **Medicare Secondary Payer ("MSP").** Federal law mandates coordination of health care benefits in certain instances where a Member is covered under both a group health plan and Medicare. Proper coordination of benefits in this context depends on obtaining and maintaining accurate and timely information regarding such dual health coverage. Pursuant to contract and applicable law, Wellmark provides information to Centers for Medicare and Medicaid Services ("CMS") regarding such dual health coverage for Members and Account enrollment on a quarterly or more frequent basis.

IA WBCBSI & WHPI LG SF                                      6                                      Version: 11/11

Mueller et al v. Wellmark, Inc.  Deuker Affidavit - Exhibit A                    APPENDIX
Supreme Court Docket No. 13-1872   **Page 7 of 27**                            Page 11

Account is solely responsible for compliance with MSP laws and other requirements. Wellmark shall use all information provided by Account to properly coordinate benefits. In the event Account does not timely provide to Wellmark information requested by Wellmark regarding Account's size and status and Employer Identification Number(s), or does not gather and timely provide information to Wellmark concerning the Medicare enrollment of Members, Account enrollment, and related information (including, without limitation, Member Social Security Numbers), or such other information as requested by Wellmark for inclusion on the Confirmation of MSP form submissions and other disclosures, Account shall be solely responsible for non-compliance with MSP laws and other requirements, including, without limitation, any damages, losses, taxes, interest charges, and administrative penalties (including, without limitation, any civil money penalties) that may be assessed or otherwise result in connection therewith (including, without limitation, any claims by Members, providers or other claimants), and mistaken payments to CMS on behalf of Medicare enrolled Members.

2.6   **Customized Services**. From time to time, Account may request Wellmark to provide customized services. Such services shall be performed pursuant to further written agreement between Account and Wellmark. Account shall be charged according to the prevailing fees on the Wellmark price schedule or as agreed by the parties in advance.

2.7   **Grandfathered Health Plan Representation**. In the event Account is being issued a new Agreement by Wellmark and the Plan is to be treated by Wellmark as a Grandfathered Health Plan, Account represents and warrants to Wellmark that (a) its prior health plan coverage was, immediately prior to termination of such coverage, a Grandfathered Health Plan, and (b) the Plan will include no changes that will result in loss of treatment as a Grandfathered Health Plan as of the effective date of this Agreement.

2.8   **Stop Loss Insurance Coverage**. Account is solely responsible for the Claims Paid for Members of the Plan. Account may at its option purchase stop loss insurance coverage from Wellmark, which shall be reflected in a separate policy issued by Wellmark. If Account purchases stop loss insurance coverage from a carrier other than Wellmark, Account shall advise Wellmark of the terms of such coverage. Account shall be responsible for all reports, submission of claims, payment of premiums, and any other obligation required by its stop loss policy.

### ARTICLE 3
### WELLMARK'S RESPONSIBILITIES

3.1   **Determination of Claims; Administrative Services; and Health and Care Management Services**. During the term of this Agreement and subject to Account's payment to Wellmark, when due, of the charges for Claims Paid and other fees specified in this Agreement, Wellmark shall provide Administrative Services as specified in this section as follows:

a.   Wellmark shall provide Account with a written draft of Benefits Document(s), for Account's review and approval as required by Section 2.1(d), setting forth the benefits, terms and conditions of the Plan for delivery to Plan Members;

b.  Wellmark shall provide access to networks of providers and shall make information about the networks available to Members through print, the Internet, and/or telephone service;

c.  Wellmark shall prepare, print, and deliver identification cards to Plan Members;

d.  Wellmark shall retain records relating to the Account, Plan and Members in accordance with all applicable state and federal laws;

e.  Wellmark shall provide Account with forms of ACA or ERISA required notices, including the summary of benefits and coverage explanation ("SBC") and shall provide access to the uniform glossary of insurance-related terms;

f.  Wellmark shall determine benefits and process Incurred Claims for health services furnished Members in accordance with the terms, limitations and conditions set forth in the Plan, the Benefits Document(s), this Agreement, applicable laws and regulations, the terms of the applicable provider agreement, and the claims administration and medical policies of Wellmark, all of which may be revised from time to time. Processing of claims may include payment by Wellmark on behalf of Account and reporting of benefits to providers or Members, coordination of benefits, and the monitoring, detection, and investigation of potentially abusive or fraudulent claims submitted by providers or Members. Except for Paid Claims related to pharmacy services or supplies, Wellmark shall also make adjustments to processed claims, for a period of up to eighteen (18) months after the Incurred Claim was first processed, if Wellmark determines in its sole discretion that such adjustments are necessary and appropriate. Wellmark shall credit Account for adjustments to Claims Paid to the extent Wellmark actually recovers amounts paid;

g.  Wellmark shall maintain a single-level internal appeal procedure for adverse benefit determinations and a process for external review of final internal adverse benefit determinations, in accordance with the applicable requirements of the Plan, ACA, and ERISA, if applicable;

h.  Wellmark may, at its sole discretion, offer various Health and Care Management Services. Such services that may be offered are described in the Health and Care Management Services Exhibit, incorporated into this Agreement by this reference, and including those services, if any, specifically selected by Account as listed on Exhibit "A" attached to this Agreement; and

i.  To the extent that Account has delegated discretionary authority to Wellmark, Wellmark shall exercise its discretion to make determinations in connection with the administration of this Agreement and the Plan including, without limitation, determinations regarding whether services are medically necessary or whether charges are reasonable. Wellmark shall make determinations that are not arbitrary or capricious and such determinations shall be final and conclusive to the extent permitted by this Agreement and by law.

IA WBCBSI & WHPI LG SF                    8                    Version: 11/11

Mueller et al v. Wellmark, Inc. et al.    Druker Affidavit - Exhibit A    APPENDIX
Supreme Court Docket No. 13-1872          Page 9 of 27                    Page 13

3.2   **Certifications of Prior Creditable Coverage.** In accordance with the terms of HIPAA, Wellmark will provide written certifications of prior creditable coverage in the following specified situations limited to the period of time that such individuals were Members:

    a.   When Wellmark is notified that a Member becomes eligible for COBRA or applicable state continuation coverage due to loss of coverage under the Plan;

    b.   When Wellmark is notified that a Member loses coverage under the Plan and is not eligible for COBRA or applicable state continuation coverage;

    c.   When Wellmark is notified of cessation of COBRA or applicable state continuation coverage or, if applicable, upon expiration of any grace period for the payment of COBRA or applicable state continuation coverage premiums; and

    d.   Upon request by or on behalf of the Member at any time during the twenty-four (24) months after the Member loses eligibility under the Plan or exhausts COBRA or applicable state continuation coverage.

In light of the time required in which Wellmark must provide the certifications of prior creditable coverage to such Members, Account hereby agrees to provide Wellmark timely and promptly with all information required by Wellmark to fulfill the issuance of such certifications to Members.

3.3   **HIPAA Notices.**

    a.   Except as otherwise provided in Section 3.3(b), Wellmark agrees to provide applicable HIPAA notices relating to health coverage portability, including, but not limited to, the General Notice of Pre-Existing Condition Exclusion, the Notice of Special Enrollee Rights, and the Individual Notice of Period of Preexisting Condition Exclusion to Members and other individuals entitled under HIPAA to such notices.

    b.   In the event Account provides Wellmark with eligibility or enrollment information on an electronic basis and/or Account prepares its own enrollment materials, Account agrees to provide applicable HIPAA notices relating to health coverage portability, including, but not limited to, the General Notice of Pre-Existing Condition Exclusion and the Notice of Special Enrollee Rights. Account shall be solely responsible for providing such notices in compliance with HIPAA to Members and other individuals entitled under HIPAA to such notices.

3.4   **Subrogation.** Wellmark shall provide subrogation recovery service for Claims Paid while this Agreement is in force, but shall have no obligation to initiate subrogation recovery services after this Agreement is terminated and shall have no obligation to continue subrogation recovery services initiated prior to termination more than twelve (12) months following termination of the Agreement. Following the twelve (12) month run-out period, Wellmark will forward any open subrogation files information to Account. The nature and extent of efforts to pursue subrogation recovery are within the sole discretion of Wellmark. Such subrogation recovery service may include all steps necessary to recover Claims Paid that may be found to be the liability of a third party or other insurance carrier. The Account shall be responsible for all fees or costs, including attorney's fees and the fees and costs of any third party utilized by Wellmark to perform subrogation

IA WBCBSI & WHPI LG SF        9        Version: 11/11

Mueller et al v. Wellmark, Inc. **Dreher Affidavit - Exhibit A**    **APPENDIX**
Supreme Court Docket No. 13-1872   **Page 10 of 27**    Page 14

recovery services, incurred in the recovery process, with those costs and fees first paid from any funds recovered and the net amount only credited to Account's Claims Paid amounts. Account acknowledges that its stop loss carrier has priority of any recovery in the event the Claims Paid exceed the stop loss attachment level and there is insufficient recovery to reimburse stop loss carrier and Account in full. The Account shall accept any such recoveries as negotiated by Wellmark as payment in full and the determination of the recovery amount is within the sole discretion of Wellmark.

Wellmark has sole discretion with regard to the choice of counsel to pursue subrogation recovery. Wellmark may choose to allow a Member's counsel to represent the Account's subrogation interest. However, if the fee charged for collection of the subrogation interest by legal counsel retained by the Member exceeds the prevalent fees for such services, Wellmark shall not authorize pursuit or settlement of the subrogation claim by said Member's attorney or payment of that attorney's fee without Account's written authorization. Further, if in the opinion of Wellmark, recovery of funds shall not offset the costs associated with such recovery, or recovery of the funds is not otherwise practicable, Wellmark shall inform the Account in writing of its opinion. Thereafter, unless the Account directs otherwise, Wellmark shall not further pursue the claim. In the event Account directs Wellmark to pursue Account's subrogation interest notwithstanding Wellmark's notice to Account of its opinion that the recovery shall not offset the involved costs, Account shall be responsible for all attorney's fees and costs incurred by Wellmark to pursue recovery, including the reasonable cost of Wellmark's staff time as determined by Wellmark.

Wellmark does not guarantee the recovery of funds and nothing in this section or Agreement obligates Wellmark to participate in or initiate any subrogation efforts or litigation to recover Claims Paid.

## ARTICLE 4
## BILLING AND PAYMENT

4.1    **Account's Payment to Wellmark**. Account authorizes Wellmark and Wellmark agrees to process Incurred Claims as received, subject to the limitations, conditions, and exclusions stated in the Benefits Document.

Wellmark shall bill Account for Claims Paid, Capitation, Network Access Fee, Administrative Fee, and other fees, based on the billing and payment method set forth on Exhibit "A" attached to this Agreement. Any adjustments due to membership or eligibility changes shall be reflected on the billing for the month in which the membership or eligibility change is made. Adjustments to Network Access Fee, Administrative Fee, and other fees, billed on a per Plan Member or per Member basis, shall be limited to a period of three (3) months prior to the date Wellmark processes the Member eligibility change. Wellmark shall provide a bill to Account that shows the amounts due and, if applicable, the amounts of any weekly payments received by Wellmark and other credits during the preceding month. Account shall promptly pay Wellmark at Wellmark's office, the total amount due, no later than the due date on the bill. Such payment may be made by wire transfer, check, automatic funds withdrawal or electronic means. If Account elects automated funds withdrawal, it shall execute the necessary authorization. If a credit amount exceeds the amount due, Wellmark shall refund such amount to Account.

IA WBCBSI & WHPI LG SF                        10                        Version: 11/11

Mueller et al v. Wellmark, Inc. et al.   **Drilker Affidavit - Exhibit A**        APPENDIX
Supreme Court Docket No. 13-1872   **Page 11 of 27**                        Page 15

If Account elects to authorize automatic funds withdrawal from a deposit account, the automatic withdrawal will change to correspond with the applicable billing. Account's authorization for automatic funds withdrawal shall include authorization for automatic withdrawal of any changed amount unless Account calls or provides its bank with written notice not less than three (3) business days before a scheduled withdrawal to stop the payment. If Account calls its bank to stop payment, Account may be required to provide a written request within fourteen (14) days after the call. Account will be responsible for any fee assessed by its bank for stop-payment orders made by Account.

4.2    **Late Payments**. All payments from Account to Wellmark must be paid on time and when due in accordance with Section 4.1. If the Account fails to make payments in full when due, Wellmark may in its discretion do any or all of the following: stop the payment of all claims for Members, regardless of the Incurred Date; require an alternative billing and payment method; or require an alternative financial arrangement. Payments not made when due shall include an interest charge on the outstanding amount from the due date until payment is made in full at the then current prime rate as published in the Midwest edition of The Wall Street Journal plus two percent (2%). The acceptance by Wellmark of any late payments or partial payments shall not constitute a waiver of any rights under this Agreement. If Account fails to make payments when due for two or more consecutive months, Wellmark may impose additional late fees of up to eighteen percent (18%) per annum.

## ARTICLE 5
## CONFIDENTIAL INFORMATION; REPORTING; EXAMINATION OF RECORDS

5.1    **Protected Health Information**. Account and Wellmark shall not reveal any Protected Health Information except in accordance with applicable federal and state law including, when required, receipt of proper authorization from the individual involved.

5.2    **Non-Disclosure of Information**. All information and data collected or developed by Wellmark related to claims, cost, utilization, outcomes, quality, and financial performance of the Plan during the term of this Agreement and any extensions thereof shall be referred to as "Data". Without limiting the foregoing, the term "Data" includes any claims, payment, and pricing information relating to, but not limited to, Health and Care Management Services, and pharmacy benefits provided by Wellmark, its vendors, or its pharmacy benefits manager(s) to Account. Wellmark shall provide Account with reports derived from the Data. In recognition of the fact the Data may contain confidential, proprietary, or personally identifiable financial or health information, including Protected Health Information, the following additional provisions apply to Data that is not de-identified:

a.      The Data shall be used solely for payment and health care operations regarding the Plan and shall not be disclosed or otherwise made available to any entity or person except those employees or agents who have a legitimate need to have knowledge of the Data or as otherwise permitted by law;

b.      Safeguards shall be adopted by the parties as necessary to ensure that such Data remains confidential;

IA WBCBSI & WHPI LG SF                         11                         Version: 11/11

Mueller et al v. Wellmark, Inc. **Druker Affidavit - Exhibit A**                         APPENDIX
Supreme Court Docket No. 13-1872    **Page 12 of 27**                         Page 16

c.   Employees and agents of the parties shall be instructed regarding the penalties for unauthorized disclosures of the Data, not to use the Data except to the extent allowed by law, and to destroy the Data when it is no longer necessary; and

d.   Account shall file a statement with the Iowa Division of Insurance, as required pursuant to Iowa Code Section 228.7, if access to mental health information is desired.

5.3   **Wellmark's Right to Use Data**. Wellmark shall have the right to de-identify the Data so that such Data no longer constitutes Protected Health Information, and so that such Data is no longer identifiable with respect to Account, and to aggregate such de-identified Data for any purpose whatsoever; provided that such use is in accordance with all applicable laws, including but not limited to HIPAA. Such Data shall be Wellmark's property.

5.4   **Right to Examine Records**. Wellmark may at its own expense examine the financial, enrollment, and claims records of Account reasonably related to the administration of this Agreement, as often as Wellmark deems appropriate, to reconcile enrollment information and records, to determine whether Account can make the payments required by this Agreement, or to determine payment of benefits under the Plan. Such examination shall be conducted during regular business hours, upon reasonable advance written notice. The examination period may cover the most recent twenty-four (24) months only, if applicable. Upon completion of the examination, Wellmark shall share its examination findings with Account and conduct an exit conference with Account.

Account or its authorized representative may at its own expense examine Wellmark's records reasonably related to Wellmark's discharge of its responsibilities under this Agreement. Such examination shall be conducted during regular business hours, upon reasonable advance written notice. Records subject to examination shall include case listings, third-party explanations of health care benefits, eligibility records, claims history, and coordination of benefits procedures. Account shall complete an authorization for Wellmark to disclose information to any third party conducting such examination. The examination period may cover the most recent twenty-four (24) months only, notwithstanding the period for claim adjustments as may be specified in Section 3.1. Upon completion of the examination, Account shall share its examination findings with Wellmark and conduct an exit conference with Wellmark.

5.5   **Website Access**. Wellmark may provide Account with access to Wellmark's web site or other electronic data bases with respect to the Plan and Members. Account agrees that its access to such web sites and data bases is subject to all of the terms and conditions as are established by Wellmark from time to time with respect to such access, all of which terms and conditions are hereby agreed to by Account.

5.6   **Survival**. Any obligations of either party to the other under this Article of the Agreement shall not be extinguished by termination of this Agreement.

IA WBCBSI & WHPI LG SF                          12                          Version: 11/11

Mueller et al v. Wellmark, Inc.   **Druker Affidavit - Exhibit A**              APPENDIX
Supreme Court Docket No. 13-1872   **Page 13 of 27**              Page 17

## ARTICLE 6
## WELLMARK'S PAYMENT ARRANGEMENTS; CLAIMS RECOVERIES; REBATE ARRANGEMENTS

6.1 **Provider Payment Arrangements**. Wellmark will be responsible for negotiating and entering into separate payment arrangements with health care providers. Such provider payment arrangements and agreements shall apply to services by such providers for all Members entitled to benefits under plans insured or administered by Wellmark, including Members under this Plan.

Wellmark shall determine, in its sole discretion, the payment arrangements with health care providers including, without limitation, the Maximum Allowable Fees for Incurred Claims. Without limiting the foregoing, Wellmark may compensate providers pursuant to a variety of payment arrangements, including the following:

a. Fee for service arrangements, including, without limitation, per diem and percent of charge arrangements;

b. Capitation arrangements under which payment is based on a monthly per Member per month fixed fee or other methodology that is based on pre-determined criteria; or

c. Episode of care arrangements under which payment is based on a pre-established rate for a health care encounter, including, without limitation, a hospital stay or outpatient visit.

6.2 **Network Savings Allocations**. Any Network Savings amounts allocated to the Account shall be reflected in the amount of Claims Paid. Based on Wellmark's payment arrangements with health care providers, and in accordance with Section 6.1, the amount paid on an individual claim may be more or less than the Covered Charge minus any applicable Amounts Not Covered, deductible, copayment, and coinsurance amounts. If the amount paid to a provider on any claim exceeds the Covered Charge, the Network Savings is reflected as a negative dollar amount. Any Network Savings amounts allocated to Plan Members shall be reflected in the calculation of coinsurance, where applicable. The calculation of coinsurance depends on the type and location of the services provided and the contracting status of the health care provider. The calculation of coinsurance is further described in the applicable Benefits Document.

6.3 **Non-Contracting Providers**. If the applicable Benefits Document provides benefits for Covered Services rendered by health care providers that have not contracted with Wellmark or another Blue Cross and Blue Shield Plan ("Non-Contracting Providers"), Members may be liable to Non-Contracting Providers for any difference between the Covered Charges and the Maximum Allowable Fee and Members are responsible for paying the provider in full.

6.4 **Claims Recoveries**. From time to time, Wellmark, Account, or Plan may receive notice of a pending or potential lawsuit (including, without limitation, a class action lawsuit) that seeks recovery of health care claims expenses on behalf of one or more group health plans or payors and that may include Wellmark, Account, and/or the Plan as a party (a "Lawsuit"). Notwithstanding any language to the contrary in this Agreement, Wellmark shall not participate in a Lawsuit on behalf of Account or Plan or pursue recovery on

IA WBCBSI & WHPI LG SF                    13                    Version: 11/11

Mueller et al v. Wellmark, Inc. **Duffer Affidavit - Exhibit A**          APPENDIX
Supreme Court Docket No. 13-1872   **Page 14 of 27**                Page 18

behalf of Account or Plan unless Wellmark and Account enter into a separate written agreement relating to participation, recovery, and expenses in such Lawsuit. Wellmark has no duty to notify Account or Plan of Wellmark's receipt of any notices in connection with any Lawsuit and each party is free to make its own determination whether to initiate or participate in any Lawsuit on its own behalf.

6.5    **Disclosure and Payment of Drug Rebates**. Wellmark contracts with pharmacy benefits manager(s) to provide pharmacy benefits management services. Account pays a monthly fee for such services as shown on Exhibit "A". Wellmark receives from its pharmacy benefits manager(s) prescription drug rebates paid by drug manufacturers. Approximately three calendar quarters following the payment of claims for such drugs, Wellmark's pharmacy benefits manager(s) shall, in conjunction with manufacturers, calculate the proportionate share of manufacturer rebates that are attributable to the use of drugs for which rebates have been paid to the pharmacy benefits manager(s) and forward such amount to Wellmark. Wellmark shall credit or pay to Account quarterly the amount of the rebate remitted to Wellmark by the pharmacy benefits manager(s), or, in the event this Agreement has terminated, Wellmark shall either credit or pay any rebate amount directly to Account. The amount of the rebate payment may vary and additional rebate amounts may become available. Additional amounts, if any, Wellmark receives from the pharmacy benefits manager(s) in subsequent quarters will be credited to Account. Wellmark shall periodically provide Account with the total number of rebated claims and average rebate per prescription. Wellmark does not independently determine the amount of the rebate but rather relies on the pharmacy benefits manager(s) to perform that calculation and forward the results to Wellmark. Prior to the actual credit or payment of rebates, Wellmark's pharmacy benefits manager(s) or Wellmark may provide to Account the amount of rebates billed by the pharmacy benefits manager(s) to manufacturers or other estimates. Such billed amounts or other estimates may be higher or lower than the actual rebates credited or paid to Account and are not binding on Wellmark or its pharmacy benefits manager(s). The rebates shall not be allocated or distributed by Wellmark in any manner to Members nor shall the rebates be taken into account in determining any applicable deductibles, coinsurance, copayment, or out-of-pocket maximum amounts for which the Member is responsible.

6.6    **Disclosure of Compensation**. Wellmark shall comply with Department of Labor requirements regarding the disclosure of compensation received from all sources in connection with this Agreement.

### ARTICLE 7
### LIABILITY OF THE PARTIES

7.1    **Responsibility for Claims**. Account is solely responsible for all Capitation and Claims Paid for its Members, including, without limitation, an individual added or deleted as a result of a retroactive eligibility change. Wellmark provides Administrative Services and network access only and does not assume any financial risk or obligation with respect to claims, including, without limitation, any Claims Paid. For Wellmark Health Plan of Iowa, Inc. coverage, network access is only available within Wellmark's service area or within the service area of another licensee of the Blue Cross and Blue Shield Association when services are provided under Inter-Plan Programs. Wellmark has no obligation to pay Capitation and Incurred Claims if Account fails to pay or reimburse Wellmark in accordance with this Agreement.

IA WBCBSI & WHPI LG SF                    14                    Version: 11/11

Mueller et al v. Wellmark, Inc.    **Druker Affidavit - Exhibit A**            APPENDIX
Supreme Court Docket No. 13-1872    **Page 15 of 27**            Page 19

7.2   **No Duty to Defend**. Wellmark shall have no duty or obligation to defend against any action or proceeding brought against Account or Plan to recover a claim for benefits. Wellmark shall, however, make available to Account and its counsel, such evidence relevant to such action or proceeding as Wellmark may have as a result of its administration of the contested benefit determination.

7.3   **Account's Liability**. Except as otherwise explicitly provided in this Agreement, Account shall accept the tender of defense and have the liability for all Plan benefit claims and all expenses incident to the Plan, and agrees to release, hold harmless, and indemnify Wellmark and its employees, officers, and directors against any and all amounts, expenses, losses, liability, claims, lawsuits, injuries, damages, taxes, interest charges, administrative penalties, and other costs or obligations, including reasonable attorney fees and court costs, for which Wellmark may become liable:

a.   for any state premium, or similar tax, or any similar benefit or plan-related charge, surcharge or assessment, however denominated, including any penalties and interest payable with respect thereto, assessed against Wellmark on the basis of and/or measured by the amount of Plan benefits administered by Wellmark pursuant to this Agreement;

b.   arising from any action or proceeding brought by a third party to recover benefits under the Plan;

c.   arising from any allegation of a breach of confidentiality arising out of release of confidential information to Account, the Plan, or a third party at Account's direction or arising out of any improper use of such information by Account or such third party;

d.   due to Account's failure to timely provide requested information to Wellmark for inclusion on the Confirmation of MSP form submissions and other disclosures that relate to Account's size and status, Employer Identification Number(s), the Medicare enrollment of Members, Account enrollment, and related information (including, without limitation, Member Social Security Numbers), or such other information requested by Wellmark resulting in processing of claims not in compliance with MSP laws and other requirements in accordance with Section 2.5;

e.   due to Account's failure to timely provide information to Wellmark that results in Wellmark's inability to timely provide the certifications of prior creditable coverage in accordance with Section 3.2;

f.   due to Account's failure to comply with HIPAA relating to issuing or failing to issue the required notices in accordance with Section 3.3(b);

g.   due to Account's failure to timely provide reports, data, and information, including but not limited to, eligibility and enrollment information for each Member, claims history, and information necessary for the proper administration of coordination of benefits and other limitations and exclusions contained in the Plan affecting Wellmark's ability to discharge its responsibilities under this Agreement;

IA WBCBSI & WHPI LG SF                    15                    Version: 11/11

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit A**          APPENDIX
Supreme Court Docket No. 13-1872   **Page 16 of 27**          Page 20

h.     due to any excise taxes or any other liability with respect to Health Savings Accounts (HSA), if any;

i.     due to or arising out of or relating to the Account's or its employees' or agents' negligence or material breach of their obligations under this Agreement, except to the extent that any such losses are caused by the negligence or willful misconduct of Wellmark;

j.     arising from any other acts or omissions of Account that constitute a material breach of an obligation hereunder or which, in the aggregate, constitute a failure on the part of Account to perform its obligations under this Agreement in accordance with the provisions of this Agreement; or

k.     due to or arising out of Wellmark's compliance with any direction from Account with regard to the Administrative Services provided under this Agreement.

7.4    **Selection of Counsel**. In the event litigation is instituted by a third party against the Account and/or Wellmark concerning any matter under the Plan, including a suit for Plan benefits, each party to this Agreement shall, to the extent possible, advise the other of the legal action, and shall have sole authority to select legal counsel of its choice.

7.5    **Wellmark's Liability**. In performing its obligations under this Agreement, Wellmark shall use reasonable diligence and that degree of skill and judgment possessed by one experienced in furnishing claim administration services to group health plans of similar size and characteristics as the Plan. Wellmark agrees to release, hold harmless, and indemnify Account and its employees, officers, and directors against any and all amounts, expenses, losses, liability, claims, lawsuits, injuries, damages, taxes, interest charges, administrative penalties, and other costs or obligations, including reasonable attorney fees and court costs, for which Account may become liable:

a.     arising from any acts or omission of Wellmark which constitute a material breach of an obligation hereunder or which, in the aggregate, constitute a failure on the part of Wellmark to perform its obligations under this Agreement in accordance with the provisions of this Agreement; and

b.     arising from any allegation of a breach of confidentiality arising out of release of confidential information to Wellmark or a third party at Wellmark's direction or arising out of any improper use of such information by Wellmark or such third party.

7.6    **Disclaimer of Warranties; Limitation of Liability**. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, WELLMARK DOES NOT MAKE AND HEREBY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, REGARDING ANY OF THE SERVICES WELLMARK PROVIDES OR ARRANGES TO PROVIDE UNDER THIS AGREEMENT. IN NO EVENT SHALL ANY PARTY BE LIABLE FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, LOSS OF DATA OR LOST PROFITS, EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY REPRESENTS THE ALLOCATION OF RISK BETWEEN THE PARTIES AS REFLECTED IN THE PRICING

HEREUNDER AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES. ADDITIONAL DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITIES REGARDING HEALTH AND CARE MANAGEMENT SERVICES ARE SET FORTH IN THE HEALTH AND CARE MANAGEMENT SERVICES EXHIBIT.

7.7 **Grandfathered Health Plan Disclaimer.** Applicable provisions under ACA shall be implemented for the Plan at the first Plan Year on or after September 23, 2010. Account has the sole obligation to determine the status of its Plan as either a Grandfathered Health Plan or a Non-Grandfathered Health Plan.

Wellmark does not make any representation or warranty and Wellmark expressly disclaims any and all representations or warranties, oral or written, regarding the past, present, or future Grandfathered Health Plan status of the Plan.

No federal or state official has determined that this Plan qualifies as a Grandfathered Health Plan, and to the extent that this Plan is determined to be eligible as a Grandfathered Health Plan, Wellmark makes no representation or warranty that this status will be retained during the current Rating Period or any future renewal.

Wellmark is not responsible and shall not be liable for any claims, costs, liabilities, losses, penalties, damages or other expenses of any kind whatsoever that, directly or indirectly, arise from or relate to this Plan's past, present and future Grandfathered Health Plan status, lack thereof, or any changes regarding the Plan's past, present and future Grandfathered Health Plan status, including, but not limited to, any representation made by any employee, broker, agent, or independent contractor of Wellmark regarding this Plan's past, present and future Grandfathered Health Plan status.

7.8 **No Testing for Health Plans.** Wellmark will not determine whether coverage is discriminatory or otherwise in violation of Internal Revenue Code Section 105(h). Wellmark also will not provide any testing for compliance with Internal Revenue Code Section 105(h). Wellmark will not be held liable for any penalties or other losses resulting from Account offering coverage in violation of Section 105(h).

7.9 **Survival.** The indemnities set forth in this Article shall survive the termination of this Agreement.

**ARTICLE 8**
**TERM AND TERMINATION**

8.1 **Term.** This Agreement shall become effective on the effective date and shall continue in force for the Rating Period.

8.2 **Renewal Terms.** Unless terminated or superseded, this Agreement shall continue in force from year to year. Wellmark shall have the right to change any of the Administrative Fees or other fees for any renewal term upon thirty (30) days advance written notice. Any such changes shall be reflected on a revised or new Exhibit "A".

8.3 **Termination Notice.** Either party may terminate this Agreement at any time by giving written notice of termination delivered to the other party at least thirty (30) days in advance of the effective date of termination.

IA WBCBSI & WHPI LG SF                                17                                Version: 11/11

8.4     **Termination for Nonpayment**. Wellmark may terminate this Agreement at any time, upon ten (10) days written notice delivered or mailed to Account, if Account fails to make complete payments, including late fees, when due in accordance with this Agreement or Wellmark determines that the Account has inadequate funds to make payments required by this Agreement. Account is solely responsible for notifying its Plan Members of the termination of this Agreement for nonpayment or for any other reason.

8.5     **Effects of Termination**. If Wellmark terminates this Agreement for nonpayment, Wellmark shall not be required to pay on behalf of Account any Incurred Claims beyond the effective date of the termination regardless of when services were received.

8.6     **Termination and Claims Administration**. If, following termination of this Agreement for reasons other than Account's nonpayment, Incurred Claims with Incurred Dates prior to the date of termination are submitted to Wellmark in the period specified in the Benefits Document for timely filing of claims, Wellmark shall pay these claims on behalf of Account in accordance with this Agreement and submit bills to the Account for the payment of Claims Paid for a period of twelve (12) months following termination. The bills shall also include a Network Access Fee amount when the Network Access Fee, shown on Exhibit "A", is reflected as a percentage of Network Savings or when Account makes retroactive changes to add or delete a Plan Member from coverage during the Rating Period. The Account shall pay all bills in accordance with the procedures set forth in Section 4.1. Wellmark shall not, on behalf of Account, pay Incurred Claims with dates of service following the date of termination.

8.7     **Availability of Records**. Upon written request by the Account, Wellmark will make available to any successor benefit services administrator, designated by the Account, standard reports and materials in its possession at the time of termination that are reasonably necessary to continue the administration of the Plan. Wellmark shall provide such materials in its standard format and Account shall pay a reasonable fee for such services.

8.8     **Survival**. Any liability of either party to the other for amounts owed or owing or for indemnification under this Agreement shall not be extinguished by the termination of this Agreement.

**ARTICLE 9**
**BLUE CROSS AND BLUE SHIELD DISCLOSURES**

9.1     **Blue Cross and Blue Shield Disclosure Statement**. Account on behalf of itself and its Members, hereby expressly acknowledges its understanding this Agreement constitutes a contract solely between Account and Wellmark, which is an independent corporation operating under licenses from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (BCBSA), permitting Wellmark to use the Blue Cross and Blue Shield Service Marks in the state of Iowa, and that Wellmark is not contracting as the agent of BCBSA. Account on behalf of itself and its Members, further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Wellmark and that no person, entity, or organization other than Wellmark shall be accountable or liable to Account for any of Wellmark's obligations to Account created under this Agreement. This

section shall not create any additional obligations whatsoever on the part of Wellmark other than those obligations created under other provisions of this Agreement.

9.2 **Account Locations Outside of Iowa**. Account understands and agrees that Wellmark defines a National Account as any company headquartered in Iowa that also has employees in other states whose claims are processed through Inter-Plan Programs. Only persons associated with a National Account or with Account locations in Iowa are eligible for coverage. If the entity is not headquartered in Iowa, coverage will be void for any persons associated with Account locations outside of Iowa. Eligibility of persons located outside Iowa, or associated with Account locations outside Iowa is subject to Blue Cross and Blue Shield Association guidelines.

9.3 **Out-of-Area Services**. Wellmark has a variety of relationships with other Blue Cross and/or Blue Shield Licensees referred to generally as "Inter-Plan Programs." Whenever Members access health care services outside the geographic area Wellmark serves, the claim for those services may be processed through one of these Inter-Plan Programs and presented to Wellmark for payment in accordance with the rules of the Inter-Plan Programs policies then in effect. The Inter-Plan Programs available to Members under this Agreement are described generally below.

Typically, Members, when accessing care outside the geographic area Wellmark serves, obtain care from health care providers that have a contractual agreement (i.e., are "participating providers") with the local Blue Cross and/or Blue Shield Licensee in that other geographic area ("Host Blue"). In some instances, Members may obtain care from nonparticipating health care providers. Wellmark's payment practices in both instances are described below.

For Wellmark Health Plan of Iowa, Inc. coverage, Wellmark may cover only limited health care services received outside of the Wellmark Health Plan Network as described in the applicable Benefits Document. Any other services will not be covered when processed through any Inter-Plan Programs arrangements. These "other services" must be provided or authorized by Member's primary care physician ("PCP").

a. **BlueCard® Program**. Under the BlueCard® Program, when Members access Covered Services within the geographic area served by a Host Blue, Wellmark will remain responsible to Account for fulfilling Wellmark's contract obligations. However, in accordance with applicable Inter-Plan Programs policies then in effect, the Host Blue will be responsible for providing such services as contracting and handling substantially all interactions with its participating health care providers, and providing some managed care services. The financial terms of the BlueCard Program are described generally below. Individual circumstances may arise that are not directly covered by this description; however, in those instances, our action will be consistent with the spirit of this description.

i. **Liability Calculation Method Per Claim**. The calculation of the Member liability on claims for Covered Services processed through the BlueCard Program, if not a flat dollar copayment amount, will be based on the lower of the participating health care provider's Covered Charges or the negotiated price made available to Wellmark by the Host Blue.

The calculation of Account's liability on claims for Covered Services processed through the BlueCard Program will be based on the negotiated price made available to Wellmark by the Host Blue. Sometimes, this negotiated price may be greater than billed charges if the Host Blue has negotiated with its participating health care provider(s) an inclusive allowance (e.g., per case or per day amount) for specific health care services.

Host Blues may use various methods to determine a negotiated price, depending on the terms of each Host Blue's health care provider contracts. The negotiated price made available to Wellmark by the Host Blue may represent a payment negotiated by a Host Blue with a health care provider that is one of the following:

a)   an actual price. An actual price is a negotiated payment without any other increases or decreases; or

b)   an estimated price. An estimated price is a negotiated payment reduced or increased by a percentage to take into account certain payments negotiated with the provider and other claim- and non-claim-related transactions. Such transactions may include, but are not limited to, anti-fraud and abuse recoveries, provider refunds not applied on a claim-specific basis, retrospective settlements, and performance-related bonuses or incentives; or

c)   an average price. An average price is a percentage of Covered Charges representing the aggregate payments negotiated by the Host Blue with all of its health care providers or a similar classification of its providers and other claim- and non-claim-related transactions. Such transactions may include the same ones as noted above for an estimated price.

Host Blues using either an estimated price or an average price may, in accordance with Inter-Plan Programs policies, prospectively increase or reduce such prices to correct for over- or underestimation of past prices (i.e., prospective adjustments may mean that a current price reflects additional amounts or credits for claims already paid to providers or anticipated to be paid to or received from providers). However, the amount paid by the Member and Account is a final price; no future price adjustment will result in increases or decreases to the pricing of past claims. The BlueCard Program requires that the price submitted by a Host Blue to Wellmark is a final price irrespective of any future adjustments based on the use of estimated or average pricing.

If a Host Blue uses either an estimated price or an average price on a claim, it may also hold some portion of the amount that Account pays in a variance account, pending settlement with its participating health care providers. Because all amounts paid are final, neither variance account funds held to be paid, nor funds expected to be received, are due to or from Account. Such payable or receivable would be eventually exhausted by health care provider settlements and/or through prospective

adjustment to the negotiated prices. Some Host Blues may retain interest earned, if any, on funds held in variance accounts.

A small number of states require a Host Blue either (i) to use a basis for determining Member liability for Covered Services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (ii) to add a surcharge. Should the state in which health care services are accessed mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, Wellmark would then calculate Member liability and Account's liability in accordance with applicable law.

ii.   **Return of Overpayments**. Under the BlueCard Program, recoveries from a Host Blue or its participating health care providers can arise in several ways including, but not limited to, anti-fraud and abuse recoveries, health care provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Blue will engage a third party to assist in identification or collection of recovery amounts. The fees of such a third party may be netted against the recovery. Recovery amounts, determined this way will be applied in accordance with applicable Inter-Plan Programs policies, which generally require correction on a claim-by-claim or prospective basis.

iii.  **BlueCard Program Fees and Compensation**. Account understands and agrees to reimburse Wellmark for certain fees and compensation which Wellmark is obligated under the BlueCard Program to pay to the Host Blues, to the Blue Cross and Blue Shield Association (BCBSA), and/or to BlueCard Program vendors, as described below. Fees and compensation under the BlueCard Program may be revised in accordance with the Program's standard procedures for revising such fees and compensation, which do not provide for prior approval by any Accounts. Such revisions typically are made annually as a result of Program policy changes and/or vendor negotiations. These revisions may occur at any time during the course of a given calendar year, and they do not necessarily coincide with Account benefit period under this Agreement.

All BlueCard Program-related fees, including any access fees paid to Host Blues, are included in Wellmark's Network Access Fee and its Administrative Fee. Per claim BlueCard Program access fees will be limited to the Program's then allowable percentage of Network Savings received from the Host Blue and will not exceed $2,000 per claim. Account will consider any increases to the Network Access Fee and Administrative Fee amounts due to increases in BlueCard fees and compensation at the next renewal.

Wellmark's Network Access Fee, shown on Exhibit "A", may include the following fees associated with claims processing:

a)   Access fees
b)   Administrative Expense Allowance (AEA) fees
c)   Per Contract Per Month (PCPM) fees

     d)     Non-Standard AEA fees

Wellmark's Administrative Fee, shown on Exhibit "A", may include the following fees associated with claims processing:

     a)     Central Financial Agency (CFA) fees
     b)     ITS transaction fees

iv.     **Determinations of Covered Health Care Services.** If Wellmark, or if applicable Account, determines that health care services are covered, or the Plan covers the health care services, coverage of those health care services cannot be denied based on the Host Blue's network protocols. Furthermore, under the BlueCard Program, the Member cannot be denied coverage of health care services received outside of the geographic area Wellmark serves if the health care services (i) are covered by the network protocols of the Host Blue; and (ii) are not specifically limited or excluded by the Plan.

b.     **Nonparticipating Health Care Providers Outside Wellmark's Service Area.**

i.     **Member Liability Calculation.** When Covered Services are provided outside of Wellmark's service area by nonparticipating health care providers, the amount(s) a Member pays for such services will generally be based on either the Host Blue's nonparticipating health care provider local payment or the pricing arrangements required by applicable state law. In these situations, the Member may be responsible for the difference between the amount that the nonparticipating health care provider bills and the payment Wellmark will make for the Covered Services as set forth in this paragraph.

ii.     **Exceptions.** In some exception cases, Wellmark may pay claims from nonparticipating health care providers outside of Wellmark's service area based on the provider's billed charge, such as in situations where a Member did not have reasonable access to a participating provider, as determined by Wellmark in Wellmark's sole and absolute discretion or by applicable state law. In other exception cases, Wellmark may pay such claims based on the payment Wellmark would make if Wellmark were paying a nonparticipating provider for the same Covered Services inside of Wellmark's service area, as described elsewhere in this Agreement where the Host Blue's corresponding payment would be more than Wellmark's in-service area nonparticipating provider payment, or in our sole and absolute discretion, Wellmark may negotiate a payment with such a provider on an exception basis. In any of these exception situations, the Member may be responsible for the difference between the amount that the nonparticipating health care provider bills and the payment Wellmark will make for the Covered Services as set forth in this paragraph.

iii.     **Fees and Compensation.** Account understands and agrees to reimburse Wellmark for certain fees and compensation which Wellmark is obligated under applicable Inter-Plan Programs requirements to pay to the Host

IA WBCBSI & WHPI LG SF          22          Version: 11/11

Mueller et al v. Wellmark, Inc. **Deuker Affidavit - Exhibit A**     **APPENDIX**
Supreme Court Docket No. 13-1872   **Page 23 of 27**     **Page 27**

Blues, to the Blue Cross and Blue Shield Association, and/or to Inter-Plan Programs vendors. Fees and compensation under applicable Inter-Plan Programs may be revised in accordance with the specific Program's standard procedures for revising such fees and compensation, which do not provide for prior approval by any Accounts. Such revisions typically are made annually as a result of Inter-Plan Programs policy changes and/or vendor negotiations. These revisions may occur at any time during the course of a given calendar year, and they do not necessarily coincide with Account benefit period under this Agreement.

All Inter-Plan Program-related fees are included in Wellmark's Administrative Fee. Account will consider any increases to the Administrative Fee amount due to increases in Inter-Plan Program fees and compensation at the next renewal.

Wellmark's Administrative Fee, shown on Exhibit "A", may include the following fees associated with claims processing:

a)   Central Financial Agency (CFA) fees
b)   ITS transaction fees

### ARTICLE 10
### MISCELLANEOUS

10.1   **Change of Agreement.** If Account makes changes in the Plan, Account shall give Wellmark sufficient advance notice of such changes. If Account makes any material changes in the Plan, or if material changes are required by law, including the addition or deletion of benefits, makes a material change in group composition or to membership or eligibility requirements, such as a change in the number of eligible individuals of more than ten percent (10%), percentage of individuals enrolled, types of coverage offered, business entities covered, or offerings of other health insurers' coverage to eligible individuals, Wellmark shall have the right at its option to amend this Agreement, including an adjustment to the financial terms shown on Exhibit "A", or to terminate this Agreement in accordance with Section 8.3.

10.2   **No Actuarial Certification.** Nothing contained in this Agreement or on Exhibit "A" shall be construed or considered to be an actuarial opinion or certification by Wellmark regarding the adequacy of reserves, rates, or financial condition of Account or the Plan. If applicable, Account is responsible for reporting any paid losses for the Account's self-funded operation of the Plan, as required by Iowa Code Section 513C.10, and for paying any assessment related to those paid losses.

10.3   **Use of Trademarks and Names.** Wellmark and Account reserve the right to control the use of their respective corporate names and any other respective symbols, assumed names, trademarks, and service marks, presently existing or subsequently established. Wellmark and Account agree not to use the corporate name, symbol, assumed names, trademarks, or service marks of the other in advertising, promotional materials, or otherwise without the prior written consent of the other. Any previously approved usage shall cease immediately upon the termination of this Agreement and any materials using such names or marks are the property of the appropriate namesake and shall be

IA WBCBSI & WHPI LG SF                           23                           Version: 11/11

returned to the appropriate property owner upon request or at the termination of this Agreement.

10.4 **Complete Agreement; Amendments**. The parties agree that this Agreement, including, without limitation, any Exhibits or amendments hereto, the Health and Care Management Services Exhibit, and COBRA Administrative Services Agreement, if any, constitutes the complete and exclusive agreement and statement of the relationship between the parties with regard to the subject matter of this Agreement and supersedes all related discussions, understandings, proposals, exhibits, amendments, prior and concurrent agreements, representations and warranties, whether oral or written, and any other communications between the parties in regard to the subject matter hereof. This Agreement, including, without limitation, any Exhibits hereto, may be amended from time to time by Wellmark. Amendments to this Agreement shall be effective only when the written amendment has been signed by an authorized representative of Wellmark and delivered in accordance with Section 10.11. Any other change, modification, or waiver of any of the terms or provisions of this Agreement shall be effective only when made in writing and signed by each party. This Agreement shall take precedence over any other documents that may be in conflict with it.

Notwithstanding the foregoing, if this Agreement supersedes a prior Agreement, health services with an Incurred Date prior to the effective date of this Agreement shall be processed pursuant to the terms of the applicable superseded Agreement.

10.5 **Force Majeure**. The parties to this Agreement shall be excused from any performance under this Agreement, other than payment of amounts due, for any period and to the extent they are delayed, restricted, or prevented from performing under this Agreement as a result of an act of God, war, civil disturbance, court order, labor dispute, act of terrorism, or other cause beyond their reasonable control.

10.6 **Limitation of Action**. Notwithstanding Sections 5.6, 7.9, and 8.8, no legal or equitable action or claim, may be brought against Wellmark for an action or claim arising under or relating to this Agreement more than two (2) years after the cause of action arose.

10.7 **Assignment**. The Agreement shall be binding on the parties and their respective successors and permitted assigns. Neither party may assign this Agreement to any third party, in whole or in part, without the prior written consent of the other; provided, however, Wellmark may assign this Agreement, in whole or in part, to any entity that controls, is controlled by, or is under common control with Wellmark. Further, Wellmark may, in its sole and unfettered discretion, contract with a third party to perform some Administrative Services or other of Wellmark's duties under this Agreement, including, without limitation, the subrogation recovery services for Claims Paid. To the extent Wellmark contracts with a third party to perform any such services or duties, the term "Wellmark" as used in this Agreement shall be deemed to include the contracted third party, as the context so requires.

10.8 **Waiver**. The failure of any party to enforce any terms or provisions of the Agreement shall not be deemed or construed to be a waiver of the enforceability of such provision. Similarly, the failure to enforce any remedy arising from a default under the terms of the Agreement shall not be deemed or construed to be a waiver of such default.

10.9   **Nature of Relationship; Authority of Parties**. Nothing contained in this Agreement and no action taken or omitted to be taken by Account or Wellmark pursuant hereto shall be deemed to constitute Account and Wellmark a partnership, an association, a joint venture or other entity whatsoever. Wellmark shall at all times be acting as an independent contractor under this Agreement. No party has the authority to bind the other in any respect whatsoever.

10.10   **No Third-Party Beneficiaries**. This Agreement is for the benefit of Account and Wellmark and not for any other person. It shall not create any legal relationship between Wellmark and any employee, Member, or any other party claiming any right, whether legal or equitable, under the terms of this Agreement or of the Plan.

10.11   **Notices and Communication**. The parties shall be entitled to rely upon any communication or notice from the other in connection with this Agreement to be genuine, truthful, and accurate, and to have been authorized, signed, or issued by an officer or agent of such entity empowered to make such representation on behalf of the entity.

Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered personally, placed in the U.S. mail (postage prepaid), delivered to a recognized courier service for delivery (delivery charges prepaid), or sent by electronic means and addressed to the last address furnished in writing. Until another address is furnished in writing, notice to Account may be addressed to the address shown on Exhibit "A" attached to this Agreement.

Notice to Wellmark may be addressed:

> Wellmark Blue Cross and Blue Shield of Iowa
> Wellmark Health Plan of Iowa, Inc.
> Attention: Procurement and Contracts
> 1331 Grand Avenue
> Des Moines, Iowa  50309-2901

10.12   **Applicable Law and Venue**. This Agreement is issued and delivered in the state of Iowa. To the extent not superseded by the laws of the United States and without regard to any conflict of law rule, this Agreement shall be construed in accordance with and governed by the laws of the state of Iowa. Any action in regard to this Agreement or arising out of the terms of this Agreement shall be instituted and litigated in the state or federal courts located in the state of Iowa and no other.

IA WBCBSI & WHPI LG SF                     25                     Version: 11/11

Mueller et al v. Wellmark, Inc.   **Decker Affidavit - Exhibit A**            APPENDIX
Supreme Court Docket No. 13-1872   **Page 26 of 27**            Page 30

## ARTICLE 11
## EFFECTIVENESS OF AGREEMENT AND WAIVER OF JURY TRIAL

THIS AGREEMENT shall be deemed to be effective and in full force as of the effective date indicated at the beginning of the Agreement upon the affixation of Wellmark's authorized signature below and the Account's payment to Wellmark of the Claims Paid, Network Access Fee, Administrative Fee, or other fees as billed by Wellmark. **ACCOUNT AND WELLMARK WAIVE ANY RIGHT TO A JURY TRIAL WITH RESPECT TO AND IN ANY ACTION, PROCEEDING, CLAIM, COUNTERCLAIM, DEMAND OR OTHER MATTER WHATSOEVER ARISING OUT OF THIS AGREEMENT.**

Wellmark, Inc.
Wellmark Health Plan of Iowa, Inc.


By:
David S. Brown
Executive Vice President, Chief Financial Officer and Treasurer

Date:



**Wellmark.**

Wellmark Blue Cross Blue Shield of Iowa
Wellmark Health Plan of Iowa, Inc.

Independent Licensees of the Blue Cross and
Blue Shield Association

# ADMINISTRATIVE SERVICES AGREEMENT

## WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA
## WELLMARK HEALTH PLAN OF IOWA, INC.

### and

### 2012 Sample – Self-Funded Public Body

Agreement Effective Date:  January 1, 2012

Form Number: IA WBCBSI & WHPI LG SF

Version: 11/11

Mueller et al v. Wellmark, Inc., et al.
Supreme Court Docket No. 13-1872  **Page 1 of 27**

**Dauker Affidavit - Exhibit B**

APPENDIX
Page 32

## ADMINISTRATIVE SERVICES AGREEMENT

THIS ADMINISTRATIVE SERVICES AGREEMENT ("Agreement") is made and entered into effective the first day of January 2012, by and between Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa, an Iowa mutual insurance company, and Wellmark Health Plan of Iowa, Inc., an Iowa health maintenance organization, (collectively referred to herein as "Wellmark" unless either company is specifically referenced by name), and 2012 Sample – Self-Funded Public Body (herein "Account").

## RECITALS

1.      Account is the plan sponsor of a group health plan for its eligible individuals.

2.      The group health plan is sponsored and funded by Account. Account wishes to enter into a financial arrangement with Wellmark under which Account is solely responsible for the Claims Paid for covered health services provided to its Members. Wellmark does not assume any financial risk or obligation with respect to the Claims Paid for Covered Services provided to Members of the Plan.

3.      Account desires that Wellmark provide services for the group health plan and Wellmark is willing to provide such services subject to the terms and conditions set forth herein.

**NOW, THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT DEFINITIONS

1.1     "**Administrative Fee**" means an amount or amounts that Wellmark charges the Account for Administrative Services and which includes allocations for Wellmark's cost of administering the Plan and general operating costs. The monthly Administrative Fee is shown on Exhibit "A" attached to this Agreement and incorporated by this reference.

1.2     "**Administrative Services**" means those services to be performed by Wellmark for Account and the Plan under this Agreement, as described in Article 3 of this Agreement.

        Administrative Services expressly exclude any services for the administration of continued health coverage pursuant to COBRA or any state or federal law relating to continuation coverage of the Plan, except as may be specified in a COBRA Administrative Services Agreement.

1.3     "**Affordable Care Act**" means the Patient Protection and Affordable Care Act, enacted March 23, 2010, and the Health Care and Education Reconciliation Act (collectively, "ACA"), including regulations promulgated thereunder.

1.4     "**Agreement**" means this Administrative Services Agreement, including all Exhibits, Benefits Document(s), amendments, Plan Member enrollment form(s), any applicable Health and Care Management Services Exhibit, and COBRA Administrative Services Agreement executed by the parties. This Agreement also incorporates by this reference the terms of the HIPAA Business Associate Agreement entered into between Wellmark and the Plan.

IA WBCBSI & WHPI LG SF                                    1                                    Version: 11/11

1.5   "**Amounts Not Covered**" means the amounts that are the liability of the Member under the Plan. These include services that are not covered, charges for services that are determined to be not medically necessary, reductions in benefits for failure to follow notification requirements, and charges for services that have reached a Plan maximum. Amounts Not Covered do not include amounts that are the responsibility of a provider under a provider's contract with Wellmark.

1.6   "**Benefits Document**" means the written document(s) that describe and define the terms and benefits of the Plan and may be titled Benefits Certificate, Coverage Manual, or something similar. If the Plan is subject to the terms of ERISA, Account may at its option incorporate the Benefits Document into its ERISA Summary Plan Description (SPD).

1.7   "**Capitation**" means a per Member fixed fee amount that may be paid by Wellmark on behalf of Account to health care providers each month for services provided to a Member. The capitation amount may change during the term of this Agreement in accordance with an agreement between Wellmark and the providers regarding payment and the scope of the capitated services.

1.8   "**Claims Paid**" means the amount of Wellmark's payment on behalf of the Account for Incurred Claims.

1.9   "**COBRA**" means the group coverage continuation provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including implementing regulations.

1.10   "**Covered Charges**" means the amount a health care provider bills a Member or Wellmark for Covered Services in accordance with the terms of the Benefits Document.

1.11   "**Covered Services**" means the health care services described in and covered by the applicable Benefits Document.

1.12   "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, including implementing regulations.

1.13   "**Grandfathered Health Plan or Non-Grandfathered Health Plan**" mean the same as such terms are used in ACA.

1.14   "**Health and Care Management Services**" means health management and wellness services Wellmark may provide to Members designed to encourage good health and help them make decisions about health care. These services may include but are not limited to telephonic health support services, disease management, pregnancy care, case management, or other programs.

1.15   "**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended, including the implementing regulations.

1.16   "**Host Blue**" means the local Blue Cross and/or Blue Shield licensee in a geographic area outside of the Wellmark service area.

1.17    "**Incurred Claims**" means claims for payment of the cost of health services that are provided to Members pursuant to the Plan.

1.18    "**Incurred Date**" means the date health services are provided to Members. With regard to inpatient hospital or facility services, the date of admission is the Incurred Date.

1.19    "**Maximum Allowable Fee**" means an amount Wellmark establishes using various methodologies for Covered Services and supplies.

For medical services, this amount is developed from various sources, such as charges billed for the same service or supply by most providers within Iowa, economic indicators, and relative value indices developed or approved by Wellmark, and is based on the simplicity or complexity of the service provided. For medical services received outside of Iowa or South Dakota, the Maximum Allowable Fee is either based on information from the local Blue Cross and/or Blue Shield Plan as further explained in the section entitled Out-of-Area Services or is the amount as described in the preceding sentence.

For all dental procedures covered under the Agreement, the fee schedule is developed based on Wellmark's contracts with dentists, input from its dental consultants, and the charges billed for the same procedure by dentists in Iowa.

1.20    "**Member**" means a person, including a Plan Member's eligible spouse or dependents, eligible and enrolled to receive health benefits under the Plan as determined by Account, the terms of the Plan, and as accepted by Wellmark.

1.21    "**Network Access Fee**" means the amount charged to Account to gain the collective advantages of the network of providers with which Wellmark, another Blue Cross or Blue Shield plan, or any subcontractor of either, has contracted for the provision of Covered Services. The fee is a monthly amount as shown on Exhibit "A", and may include funding for provider incentives. If the Network Access Fee is a percentage of Network Savings, the fee applies to Incurred Claims regardless of the date the claim is paid. A portion of the Network Access Fee may include an allocation for administrative expenses above the Administrative Fee.

1.22    "**Network Savings**" means the amount saved due to contracts between Wellmark or another Blue Cross or Blue Shield Plan and health care providers. It is generally calculated as the difference between the Covered Charge and the Maximum Allowable Fee. This result is then added to any other reductions in the liability to a provider pursuant to a contract between Wellmark and a provider, including, but not limited to, reductions for failure to satisfy any notification requirements and medical necessity determinations. If the amount paid to a provider on any claim exceeds the Covered Charges, the Network Savings may be reflected as a negative dollar amount on Account's bill.

1.23    "**Plan**" means the group health plan or plans sponsored by Account, the terms of which are described in the applicable Benefits Document.

1.24    "**Plan Member**" means an employee or other individual identified by Account as a person eligible and enrolled to receive health benefits under the Plan subject to the terms, conditions, and limitations described in the Plan documents and who is the

IA WBCBSI & WHPI LG SF                    3                    Version: 11/11

applicant on a completed enrollment form that has been provided to and accepted by Wellmark.

1.25   **"Plan Year"** means the year that is designated as the plan year in the plan document of the Plan or set forth on Exhibit "A".

1.26   **"Protected Health Information"** means the same as the term "protected health information" in 45 CFR §160.103.

1.27   **"Rating Period"** means the period of time set forth on Exhibit "A" or the most recent revision to Exhibit "A".

## ARTICLE 2
## RESPONSIBILITIES OF ACCOUNT

2.1   **Health Plan Compliance.** The Account is the plan administrator and plan sponsor of the Plan for purposes of this Agreement and ERISA, if applicable. Account has full responsibility for all of the following:

    a.    Maintaining and funding the Plan;

    b.    Determining eligibility criteria in accordance with Wellmark's established enrollment guidelines, applicable law, and Blue Cross and Blue Shield Association policies and guidelines and enrolling individuals in accordance with such criteria;

    c.    Compliance with all applicable laws, reporting and disclosure requirements;

    d.    Reviewing and approving promptly templates or drafts of Benefits Document(s) provided by Wellmark, and delivering Benefits Document(s) and provider directories, if applicable, to Plan Members. Based on the eligibility and benefit information Account provides, Wellmark will draft written Benefits Document(s) stating the benefits, terms and conditions of the Plan using Wellmark's standard contract language. Account is responsible for reviewing the draft Benefits Document(s) promptly, typically within thirty (30) days of receiving the draft document(s), and determining to Account's satisfaction that the document(s) meet all of Account's legal and business obligations and advising Wellmark of any necessary revisions or approval. In the absence of Account's approval, Wellmark will administer the benefits in accordance with the benefit information provided by Account and Wellmark's most similar standard Benefits Document(s) language;

    e.    Providing a Plan Member with a copy of this Agreement upon the Plan Member's request;

    f.    Making final determinations regarding claims, claims internal appeals, or claims exceptions, except to the extent expressly delegated to, and accepted by, Wellmark in Section 3.1 of this Agreement;

    g.    Payment of any state premium, or similar tax, or any similar benefit or Plan-related charge, tax, surcharge or assessment, however denominated, including

any penalties and interest payable with respect thereto, assessed against the Plan;

h.    If the Account terminates the coverage of any Plan Member or Member retroactively, Account represents that it has either not collected any premium contribution from the retroactively terminated Member, or has refunded any premium contribution to the retroactively terminated Member, for the period following the effective date of the termination;

i.    Delivering to Plan Members the notices required by ACA or ERISA, if applicable, in the time and manner required by law, including any summary of benefits and coverage explanation (sometimes referred to as an "SBC"), the uniform glossary of insurance-related terms, and the summary of material modification;

j.    Providing to Wellmark written notice of initial benefit selections, changes in the benefits at renewal, or material modifications at any time during the Rating Period. Account shall provide such notice in the time and manner required by Wellmark to fulfill the issuance of SBCs or other required notices within the time required by law;

k.    Performing non-discrimination testing, regarding highly compensated individuals, to comply with Internal Revenue Code Section 105 (h);

l.    If the Account has a Non-Grandfathered Health Plan or the Plan becomes a Non-Grandfathered Health Plan during the Rating Period, Account shall maintain a process for external review of final internal adverse benefit determinations as required by ACA, except to the extent expressly delegated to, and accepted by, Wellmark in this Agreement; and

m.    If the Account has a Grandfathered Health Plan, Account shall provide Wellmark at least sixty (60) days prior written notice of any change in the employer contribution information or any other information that may impact the Grandfathered Health Plan determination.

Account will exercise its administrative responsibilities in the time required by law.

Some of the Account's responsibilities with respect to compliance with COBRA may be delegated to Wellmark, but only to the extent expressly specified and agreed between the Account and Wellmark in a COBRA Administrative Services Agreement.

2.2    **Furnishing Information; Electronic Information.** Account agrees to furnish Wellmark with reports, data, and information, including but not limited to, eligibility and enrollment information for each Member, claims history, and information necessary for the proper administration of coordination of benefits and other limitations and exclusions contained in the Plan and any other Account services so that Wellmark may discharge its responsibilities under this Agreement. In the event Account establishes eligibility criteria, Account shall provide Wellmark thirty (30) days prior written notice of such criteria or any modification to such criteria. Account shall provide all such information in a time, form, electronic format if applicable, and manner required by Wellmark and is responsible for the timeliness, integrity, retention, and accuracy of information and records provided to Wellmark. Wellmark shall be entitled to rely upon such information in determining any

IA WBCBSI & WHPI LG SF         5         Version: 11/11

Mueller et al v. Wellmark, Inc. et al.    Decker Affidavit - Exhibit B    APPENDIX
Supreme Court Docket No. 13-1872    Page 6 of 27    Page 37

person's rights to benefits under the Plan and in discharging its responsibilities under this Agreement. Account recognizes the importance to the successful provision of the Administrative Services the timely, accurate, and complete reporting of the information set forth in this section and that should there be a delay in Account's delivery of such information, Wellmark shall not be responsible for the provision of the Administrative Services affected by such delay.

Eligibility or enrollment information provided to Wellmark on an electronic basis shall be provided in a standard medium and layout using Wellmark's proprietary format, the HIPAA ANSI 834 standard format, or an application such as BluesEnroll, unless the parties agree in writing to a non-standard format or application. Account acknowledges that it may be responsible for additional fees if it uses a non-standard format or if Wellmark is required to perform a comparison study of the full eligibility file.

2.3 **Notice of Persons Eligible for Coverage; Changes in Eligibility**. Account shall enroll persons eligible for coverage in the Plan in advance of each person's effective date of coverage and shall provide Wellmark with each person's name, Plan selection, and other required identifying information. Account shall provide all initial enrollment information in advance of the effective date of this Agreement. As new persons become eligible, or as eligibility changes occur, including any special enrollment events that require a person to be offered coverage, Account shall provide Wellmark with updated required information as the changes occur, in advance of the effective date of the change if possible, or at least once each week. A delay in providing eligibility changes more than three (3) months following the effective date of the change shall delay the requested effective date of coverage for the person and may cause Incurred Claims not to be paid.

2.4 **Notice of Persons No Longer Eligible for Coverage; Account's Liability for Claims for Ineligible Individuals**. Account shall notify Wellmark in advance if possible of each person's termination of coverage under the Plan. Account's failure to provide required information to Wellmark within three (3) months following the date of termination shall delay the requested termination date of coverage to a date no earlier than three (3) months prior to the date Wellmark receives the required information. Wellmark shall not be responsible for any Claims Paid for individuals who are not eligible individuals or Members at the time such services were provided. In the event Claims Paid for individuals who are not eligible are made related to pharmacy services or supplies, Account shall pay for the cost of the services for the individual. For all other services or supplies, Wellmark shall, at its election, (a) attempt to recoup such payments from the individual or the involved provider, unless Wellmark determines recoupment is not feasible under the circumstances; or (b) bill Account for such payments and associated Administrative Fee and upon the receipt of such billing, Account shall pay the amount due to Wellmark.

2.5 **Medicare Secondary Payer ("MSP")**. Federal law mandates coordination of health care benefits in certain instances where a Member is covered under both a group health plan and Medicare. Proper coordination of benefits in this context depends on obtaining and maintaining accurate and timely information regarding such dual health coverage. Pursuant to contract and applicable law, Wellmark provides information to Centers for Medicare and Medicaid Services ("CMS") regarding such dual health coverage for Members and Account enrollment on a quarterly or more frequent basis.

Account is solely responsible for compliance with MSP laws and other requirements. Wellmark shall use all information provided by Account to properly coordinate benefits. In the event Account does not timely provide to Wellmark information requested by Wellmark regarding Account's size and status and Employer Identification Number(s), or does not gather and timely provide information to Wellmark concerning the Medicare enrollment of Members, Account enrollment, and related information (including, without limitation, Member Social Security Numbers), or such other information as requested by Wellmark for inclusion on the Confirmation of MSP form submissions and other disclosures, Account shall be solely responsible for non-compliance with MSP laws and other requirements, including, without limitation, any damages, losses, taxes, interest charges, and administrative penalties (including, without limitation, any civil money penalties) that may be assessed or otherwise result in connection therewith (including, without limitation, any claims by Members, providers or other claimants), and mistaken payments to CMS on behalf of Medicare enrolled Members.

2.6    **Customized Services**. From time to time, Account may request Wellmark to provide customized services. Such services shall be performed pursuant to further written agreement between Account and Wellmark. Account shall be charged according to the prevailing fees on the Wellmark price schedule or as agreed by the parties in advance.

2.7    **Grandfathered Health Plan Representation**. In the event Account is being issued a new Agreement by Wellmark and the Plan is to be treated by Wellmark as a Grandfathered Health Plan, Account represents and warrants to Wellmark that (a) its prior health plan coverage was, immediately prior to termination of such coverage, a Grandfathered Health Plan, and (b) the Plan will include no changes that will result in loss of treatment as a Grandfathered Health Plan as of the effective date of this Agreement.

2.8    **Stop Loss Insurance Coverage**. Account is solely responsible for the Claims Paid for Members of the Plan. Account may at its option purchase stop loss insurance coverage from Wellmark, which shall be reflected in a separate policy issued by Wellmark. If Account purchases stop loss insurance coverage from a carrier other than Wellmark, Account shall advise Wellmark of the terms of such coverage. Account shall be responsible for all reports, submission of claims, payment of premiums, and any other obligation required by its stop loss policy.

## ARTICLE 3
## WELLMARK'S RESPONSIBILITIES

3.1    **Determination of Claims; Administrative Services; and Health and Care Management Services**. During the term of this Agreement and subject to Account's payment to Wellmark, when due, of the charges for Claims Paid and other fees specified in this Agreement, Wellmark shall provide Administrative Services as specified in this section as follows:

    a.    Wellmark shall provide Account with a written draft of Benefits Document(s), for Account's review and approval as required by Section 2.1(d), setting forth the benefits, terms and conditions of the Plan for delivery to Plan Members;

IA WBCBSI & WHPI LG SF          7          Version: 11/11

Mueller et al v. Wellmark, Inc.   **Druker Affidavit - Exhibit B**   APPENDIX
Supreme Court Docket No. 13-1872   **Page 8 of 27**   Page 39

b.    Wellmark shall provide access to networks of providers and shall make information about the networks available to Members through print, the Internet, and/or telephone service;

c.    Wellmark shall prepare, print, and deliver identification cards to Plan Members;

d.    Wellmark shall retain records relating to the Account, Plan and Members in accordance with all applicable state and federal laws;

e.    Wellmark shall provide Account with forms of ACA or ERISA required notices, including the summary of benefits and coverage explanation ("SBC") and shall provide access to the uniform glossary of insurance-related terms;

f.    Wellmark shall determine benefits and process Incurred Claims for health services furnished Members in accordance with the terms, limitations and conditions set forth in the Plan, the Benefits Document(s), this Agreement, applicable laws and regulations, the terms of the applicable provider agreement, and the claims administration and medical policies of Wellmark, all of which may be revised from time to time. Processing of claims may include payment by Wellmark on behalf of Account and reporting of benefits to providers or Members, coordination of benefits, and the monitoring, detection, and investigation of potentially abusive or fraudulent claims submitted by providers or Members. Except for Paid Claims related to pharmacy services or supplies, Wellmark shall also make adjustments to processed claims, for a period of up to eighteen (18) months after the Incurred Claim was first processed, if Wellmark determines in its sole discretion that such adjustments are necessary and appropriate. Wellmark shall credit Account for adjustments to Claims Paid to the extent Wellmark actually recovers amounts paid;

g.    Wellmark shall maintain a single-level internal appeal procedure for adverse benefit determinations and a process for external review of final internal adverse benefit determinations, in accordance with the applicable requirements of the Plan, ACA, and ERISA, if applicable;

h.    Wellmark may, at its sole discretion, offer various Health and Care Management Services. Such services that may be offered are described in the Health and Care Management Services Exhibit, incorporated into this Agreement by this reference, and including those services, if any, specifically selected by Account as listed on Exhibit "A" attached to this Agreement; and

i.    To the extent that Account has delegated discretionary authority to Wellmark, Wellmark shall exercise its discretion to make determinations in connection with the administration of this Agreement and the Plan including, without limitation, determinations regarding whether services are medically necessary or whether charges are reasonable. Wellmark shall make determinations that are not arbitrary or capricious and such determinations shall be final and conclusive to the extent permitted by this Agreement and by law.

IA WBCBSI & WHPI LG SF                          8                          Version: 11/11

Mueller et al v. Wellmark, Inc., et al   Druker Affidavit - Exhibit B              APPENDIX
Supreme Court Docket No. 13-1872   Page 9 of 27                                   Page 40

3.2     **Certifications of Prior Creditable Coverage**. In accordance with the terms of HIPAA, Wellmark will provide written certifications of prior creditable coverage in the following specified situations limited to the period of time that such individuals were Members:

a.      When Wellmark is notified that a Member becomes eligible for COBRA or applicable state continuation coverage due to loss of coverage under the Plan;

b.      When Wellmark is notified that a Member loses coverage under the Plan and is not eligible for COBRA or applicable state continuation coverage;

c.      When Wellmark is notified of cessation of COBRA or applicable state continuation coverage or, if applicable, upon expiration of any grace period for the payment of COBRA or applicable state continuation coverage premiums; and

d.      Upon request by or on behalf of the Member at any time during the twenty-four (24) months after the Member loses eligibility under the Plan or exhausts COBRA or applicable state continuation coverage.

In light of the time required in which Wellmark must provide the certifications of prior creditable coverage to such Members, Account hereby agrees to provide Wellmark timely and promptly with all information required by Wellmark to fulfill the issuance of such certifications to Members.

3.3     **HIPAA Notices.**

a.      Except as otherwise provided in Section 3.2(b), Wellmark agrees to provide applicable HIPAA notices relating to health coverage portability, including, but not limited to, the General Notice of Pre-Existing Condition Exclusion, the Notice of Special Enrollee Rights, and the Individual Notice of Period of Preexisting Condition Exclusion to Members and other individuals entitled under HIPAA to such notices.

b.      In the event Account provides Wellmark with eligibility or enrollment information on an electronic basis and/or Account prepares its own enrollment materials, Account agrees to provide applicable HIPAA notices relating to health coverage portability, including, but not limited to, the General Notice of Pre-Existing Condition Exclusion and the Notice of Special Enrollee Rights. Account shall be solely responsible for providing such notices in compliance with HIPAA to Members and other individuals entitled under HIPAA to such notices.

3.4     **Subrogation**. Wellmark shall provide subrogation recovery service for Claims Paid while this Agreement is in force, but shall have no obligation to initiate subrogation recovery services after this Agreement is terminated and shall have no obligation to continue subrogation recovery services initiated prior to termination more than twelve (12) months following termination of the Agreement. Following the twelve (12) month run-out period, Wellmark will forward any open subrogation files information to Account. The nature and extent of efforts to pursue subrogation recovery are within the sole discretion of Wellmark. Such subrogation recovery service may include all steps necessary to recover Claims Paid that may be found to be the liability of a third party or other insurance carrier. The Account shall be responsible for all fees or costs, including attorney's fees and the fees and costs of any third party utilized by Wellmark to perform subrogation

IA WBCBSI & WHPI LG SF                          9                          Version: 11/11

Mueller et al v. Wellmark, Inc.   Drucker Affidavit - Exhibit B                          APPENDIX
Supreme Court Docket No. 13-1872  **Page 10 of 27**                          Page 41

recovery services, incurred in the recovery process, with those costs and fees first paid from any funds recovered and the net amount only credited to Account's Claims Paid amounts. Account acknowledges that its stop loss carrier has priority of any recovery in the event the Claims Paid exceed the stop loss attachment level and there is insufficient recovery to reimburse stop loss carrier and Account in full. The Account shall accept any such recoveries as negotiated by Wellmark as payment in full and the determination of the recovery amount is within the sole discretion of Wellmark.

Wellmark has sole discretion with regard to the choice of counsel to pursue subrogation recovery. Wellmark may choose to allow a Member's counsel to represent the Account's subrogation interest. However, if the fee charged for collection of the subrogation interest by legal counsel retained by the Member exceeds the prevalent fees for such services, Wellmark shall not authorize pursuit or settlement of the subrogation claim by said Member's attorney or payment of that attorney's fee without Account's written authorization. Further, if in the opinion of Wellmark, recovery of funds shall not offset the costs associated with such recovery, or recovery of the funds is not otherwise practicable, Wellmark shall inform the Account in writing of its opinion. Thereafter, unless the Account directs otherwise, Wellmark shall not further pursue the claim. In the event Account directs Wellmark to pursue Account's subrogation interest notwithstanding Wellmark's notice to Account of its opinion that the recovery shall not offset the involved costs, Account shall be responsible for all attorney's fees and costs incurred by Wellmark to pursue recovery, including the reasonable cost of Wellmark's staff time as determined by Wellmark.

Wellmark does not guarantee the recovery of funds and nothing in this section or Agreement obligates Wellmark to participate in or initiate any subrogation efforts or litigation to recover Claims Paid.

## ARTICLE 4
## BILLING AND PAYMENT

4.1 **Account's Payment to Wellmark**. Account authorizes Wellmark and Wellmark agrees to process Incurred Claims as received, subject to the limitations, conditions, and exclusions stated in the Benefits Document.

Wellmark shall bill Account for Claims Paid, Capitation, Network Access Fee, Administrative Fee, and other fees, based on the billing and payment method set forth on Exhibit "A" attached to this Agreement. Any adjustments due to membership or eligibility changes shall be reflected on the billing for the month in which the membership or eligibility change is made. Adjustments to Network Access Fee, Administrative Fee, and other fees, billed on a per Plan Member or per Member basis, shall be limited to a period of three (3) months prior to the date Wellmark processes the Member eligibility change. Wellmark shall provide a bill to Account that shows the amounts due and, if applicable, the amounts of any weekly payments received by Wellmark and other credits during the preceding month. Account shall promptly pay Wellmark at Wellmark's office, the total amount due, no later than the due date on the bill. Such payment may be made by wire transfer, check, automatic funds withdrawal or electronic means. If Account elects automated funds withdrawal, it shall execute the necessary authorization. If a credit amount exceeds the amount due, Wellmark shall refund such amount to Account.

If Account elects to authorize automatic funds withdrawal from a deposit account, the automatic withdrawal will change to correspond with the applicable billing. Account's authorization for automatic funds withdrawal shall include authorization for automatic withdrawal of any changed amount unless Account calls or provides its bank with written notice not less than three (3) business days before a scheduled withdrawal to stop the payment. If Account calls its bank to stop payment, Account may be required to provide a written request within fourteen (14) days after the call. Account will be responsible for any fee assessed by its bank for stop-payment orders made by Account.

4.2 **Late Payments.** All payments from Account to Wellmark must be paid on time and when due in accordance with Section 4.1. If the Account fails to make payments in full when due, Wellmark may in its discretion do any or all of the following: stop the payment of all claims for Members, regardless of the Incurred Date; require an alternative billing and payment method; or require an alternative financial arrangement. Payments not made when due shall include an interest charge on the outstanding amount from the due date until payment is made in full at the then current prime rate as published in the Midwest edition of The Wall Street Journal plus two percent (2%). The acceptance by Wellmark of any late payments or partial payments shall not constitute a waiver of any rights under this Agreement. If Account fails to make payments when due for two or more consecutive months, Wellmark may impose additional late fees of up to eighteen percent (18%) per annum.

### ARTICLE 5
### CONFIDENTIAL INFORMATION; REPORTING; EXAMINATION OF RECORDS

5.1 **Protected Health Information.** Account and Wellmark shall not reveal any Protected Health Information except in accordance with applicable federal and state law including, when required, receipt of proper authorization from the individual involved.

5.2 **Non-Disclosure of Information.** All information and data collected or developed by Wellmark related to claims, cost, utilization, outcomes, quality, and financial performance of the Plan during the term of this Agreement and any extensions thereof shall be referred to as "Data". Without limiting the foregoing, the term "Data" includes any claims, payment, and pricing information relating to, but not limited to, Health and Care Management Services, and pharmacy benefits provided by Wellmark, its vendors, or its pharmacy benefits manager(s) to Account. Wellmark shall provide Account with reports derived from the Data. In recognition of the fact the Data may contain confidential, proprietary, or personally identifiable financial or health information, including Protected Health Information, the following additional provisions apply to Data that is not de-identified:

   a. The Data shall be used solely for payment and health care operations regarding the Plan and shall not be disclosed or otherwise made available to any entity or person except those employees or agents who have a legitimate need to have knowledge of the Data or as otherwise permitted by law;

   b. Safeguards shall be adopted by the parties as necessary to ensure that such Data remains confidential;

IA WBCBSI & WHPI LG SF                    11                    Version: 11/11

Mueller et al v. Wellmark, Inc. — **Deuker Affidavit - Exhibit B**                    APPENDIX
Supreme Court Docket No. 13-1872 **Page 12 of 27**                    Page 43

c. Employees and agents of the parties shall be instructed regarding the penalties for unauthorized disclosures of the Data, not to use the Data except to the extent allowed by law, and to destroy the Data when it is no longer necessary; and

d. Account shall file a statement with the Iowa Division of Insurance, as required pursuant to Iowa Code Section 228.7, if access to mental health information is desired.

5.3 **Wellmark's Right to Use Data.** Wellmark shall have the right to de-identify the Data so that such Data no longer constitutes Protected Health Information, and so that such Data is no longer identifiable with respect to Account, and to aggregate such de-identified Data for any purpose whatsoever; provided that such use is in accordance with all applicable laws, including but not limited to HIPAA. Such Data shall be Wellmark's property.

5.4 **Right to Examine Records.** Wellmark may at its own expense examine the financial, enrollment, and claims records of Account reasonably related to the administration of this Agreement, as often as Wellmark deems appropriate, to reconcile enrollment information and records, to determine whether Account can make the payments required by this Agreement, or to determine payment of benefits under the Plan. Such examination shall be conducted during regular business hours, upon reasonable advance written notice. The examination period may cover the most recent twenty-four (24) months only, if applicable. Upon completion of the examination, Wellmark shall share its examination findings with Account and conduct an exit conference with Account.

Account or its authorized representative may at its own expense examine Wellmark's records reasonably related to Wellmark's discharge of its responsibilities under this Agreement. Such examination shall be conducted during regular business hours, upon reasonable advance written notice. Records subject to examination shall include case listings, third-party explanations of health care benefits, eligibility records, claims history, and coordination of benefits procedures. Account shall complete an authorization for Wellmark to disclose information to any third party conducting such examination. The examination period may cover the most recent twenty-four (24) months only, notwithstanding the period for claim adjustments as may be specified in Section 3.1. Upon completion of the examination, Account shall share its examination findings with Wellmark and conduct an exit conference with Wellmark.

5.5 **Website Access.** Wellmark may provide Account with access to Wellmark's web site or other electronic data bases with respect to the Plan and Members. Account agrees that its access to such web sites and data bases is subject to all of the terms and conditions as are established by Wellmark from time to time with respect to such access, all of which terms and conditions are hereby agreed to by Account.

5.6 **Survival.** Any obligations of either party to the other under this Article of the Agreement shall not be extinguished by termination of this Agreement.

## ARTICLE 6
## WELLMARK'S PAYMENT ARRANGEMENTS; CLAIMS RECOVERIES; REBATE ARRANGEMENTS

6.1 **Provider Payment Arrangements**. Wellmark will be responsible for negotiating and entering into separate payment arrangements with health care providers. Such provider payment arrangements and agreements shall apply to services by such providers for all Members entitled to benefits under plans insured or administered by Wellmark, including Members under this Plan.

Wellmark shall determine, in its sole discretion, the payment arrangements with health care providers including, without limitation, the Maximum Allowable Fees for Incurred Claims. Without limiting the foregoing, Wellmark may compensate providers pursuant to a variety of payment arrangements, including the following:

a. Fee for service arrangements, including, without limitation, per diem and percent of charge arrangements;

b. Capitation arrangements under which payment is based on a monthly per Member per month fixed fee or other methodology that is based on pre-determined criteria; or

c. Episode of care arrangements under which payment is based on a pre-established rate for a health care encounter, including, without limitation, a hospital stay or outpatient visit.

6.2 **Network Savings Allocations**. Any Network Savings amounts allocated to the Account shall be reflected in the amount of Claims Paid. Based on Wellmark's payment arrangements with health care providers, and in accordance with Section 6.1, the amount paid on an individual claim may be more or less than the Covered Charge minus any applicable Amounts Not Covered, deductible, copayment, and coinsurance amounts. If the amount paid to a provider on any claim exceeds the Covered Charge, the Network Savings is reflected as a negative dollar amount. Any Network Savings amounts allocated to Plan Members shall be reflected in the calculation of coinsurance, where applicable. The calculation of coinsurance depends on the type and location of the services provided and the contracting status of the health care provider. The calculation of coinsurance is further described in the applicable Benefits Document.

6.3 **Non-Contracting Providers**. If the applicable Benefits Document provides benefits for Covered Services rendered by health care providers that have not contracted with Wellmark or another Blue Cross and Blue Shield Plan ("Non-Contracting Providers"), Members may be liable to Non-Contracting Providers for any difference between the Covered Charges and the Maximum Allowable Fee and Members are responsible for paying the provider in full.

6.4 **Claims Recoveries**. From time to time, Wellmark, Account, or Plan may receive notice of a pending or potential lawsuit (including, without limitation, a class action lawsuit) that seeks recovery of health care claims expenses on behalf of one or more group health plans or payors and that may include Wellmark, Account, and/or the Plan as a party (a "Lawsuit"). Notwithstanding any language to the contrary in this Agreement, Wellmark shall not participate in a Lawsuit on behalf of Account or Plan or pursue recovery on

IA WBCBSI & WHPI LG SF                    13                    Version: 11/11

behalf of Account or Plan unless Wellmark and Account enter into a separate written agreement relating to participation, recovery, and expenses in such Lawsuit. Wellmark has no duty to notify Account or Plan of Wellmark's receipt of any notices in connection with any Lawsuit and each party is free to make its own determination whether to initiate or participate in any Lawsuit on its own behalf.

6.5    **Disclosure and Payment of Drug Rebates.** Wellmark contracts with pharmacy benefits manager(s) to provide pharmacy benefits management services. Account pays a monthly fee for such services as shown on Exhibit "A". Wellmark receives from its pharmacy benefits manager(s) prescription drug rebates paid by drug manufacturers. Approximately three calendar quarters following the payment of claims for such drugs, Wellmark's pharmacy benefits manager(s) shall, in conjunction with manufacturers, calculate the proportionate share of manufacturer rebates that are attributable to the use of drugs for which rebates have been paid to the pharmacy benefits manager(s) and forward such amount to Wellmark. Wellmark shall credit or pay to Account quarterly the amount of the rebate remitted to Wellmark by the pharmacy benefits manager(s), or, in the event this Agreement has terminated, Wellmark shall either credit or pay any rebate amount directly to Account. The amount of the rebate payment may vary and additional rebate amounts may become available. Additional amounts, if any, Wellmark receives from the pharmacy benefits manager(s) in subsequent quarters will be credited to Account. Wellmark shall periodically provide Account with the total number of rebated claims and average rebate per prescription. Wellmark does not independently determine the amount of the rebate but rather relies on the pharmacy benefits manager(s) to perform that calculation and forward the results to Wellmark. Prior to the actual credit or payment of rebates, Wellmark's pharmacy benefits manager(s) or Wellmark may provide to Account the amount of rebates billed by the pharmacy benefits manager(s) to manufacturers or other estimates. Such billed amounts or other estimates may be higher or lower than the actual rebates credited or paid to Account and are not binding on Wellmark or its pharmacy benefits manager(s). The rebates shall not be allocated or distributed by Wellmark in any manner to Members nor shall the rebates be taken into account in determining any applicable deductibles, coinsurance, copayment, or out-of-pocket maximum amounts for which the Member is responsible.

6.6    **Disclosure of Compensation.** Wellmark shall comply with Department of Labor requirements regarding the disclosure of compensation received from all sources in connection with this Agreement.

## ARTICLE 7
## LIABILITY OF THE PARTIES

7.1    **Responsibility for Claims.** Account is solely responsible for all Capitation and Claims Paid for its Members, including, without limitation, an individual added or deleted as a result of a retroactive eligibility change. Wellmark provides Administrative Services and network access only and does not assume any financial risk or obligation with respect to claims, including, without limitation, any Claims Paid. For Wellmark Health Plan of Iowa, Inc. coverage, network access is only available within Wellmark's service area or within the service area of another licensee of the Blue Cross and Blue Shield Association when services are provided under Inter-Plan Programs. Wellmark has no obligation to pay Capitation and Incurred Claims if Account fails to pay or reimburse Wellmark in accordance with this Agreement.

IA WBCBSI & WHPI LG SF                          14                          Version: 11/11

7.2     **No Duty to Defend.** Wellmark shall have no duty or obligation to defend against any action or proceeding brought against Account or Plan to recover a claim for benefits. Wellmark shall, however, make available to Account and its counsel, such evidence relevant to such action or proceeding as Wellmark may have as a result of its administration of the contested benefit determination.

7.3     **Account's Liability.** Except as otherwise explicitly provided in this Agreement, Account shall accept the tender of defense and have the liability for all Plan benefit claims and all expenses incident to the Plan, and agrees to release, hold harmless, and indemnify Wellmark and its employees, officers, and directors against any and all amounts, expenses, losses, liability, claims, lawsuits, injuries, damages, taxes, interest charges, administrative penalties, and other costs or obligations, including reasonable attorney fees and court costs, for which Wellmark may become liable:

   a.     for any state premium, or similar tax, or any similar benefit or plan-related charge, surcharge or assessment, however denominated, including any penalties and interest payable with respect thereto, assessed against Wellmark on the basis of and/or measured by the amount of Plan benefits administered by Wellmark pursuant to this Agreement;

   b.     arising from any action or proceeding brought by a third party to recover benefits under the Plan;

   c.     arising from any allegation of a breach of confidentiality arising out of release of confidential information to Account, the Plan, or a third party at Account's direction or arising out of any improper use of such information by Account or such third party;

   d.     due to Account's failure to timely provide requested information to Wellmark for inclusion on the Confirmation of MSP form submissions and other disclosures that relate to Account's size and status, Employer Identification Number(s), the Medicare enrollment of Members, Account enrollment, and related information (including, without limitation, Member Social Security Numbers), or such other information requested by Wellmark resulting in processing of claims not in compliance with MSP laws and other requirements in accordance with Section 2.5;

   e.     due to Account's failure to timely provide information to Wellmark that results in Wellmark's inability to timely provide the certifications of prior creditable coverage in accordance with Section 3.2;

   f.     due to Account's failure to comply with HIPAA relating to issuing or failing to issue the required notices in accordance with Section 3.3(b);

   g.     due to Account's failure to timely provide reports, data, and information, including but not limited to, eligibility and enrollment information for each Member, claims history, and information necessary for the proper administration of coordination of benefits and other limitations and exclusions contained in the Plan affecting Wellmark's ability to discharge its responsibilities under this Agreement;

IA WBCBSI & WHPI LG SF                    15                    Version: 11/11

Mueller et al v. Wellmark, Inc. **Druker Affidavit - Exhibit B**                    **APPENDIX**
Supreme Court Docket No. 13-1872  **Page 16 of 27**                    **Page 47**

h.    due to any excise taxes or any other liability with respect to Health Savings Accounts (HSA), if any;

i.    due to or arising out of or relating to the Account's or its employees' or agents' negligence or material breach of their obligations under this Agreement, except to the extent that any such losses are caused by the negligence or willful misconduct of Wellmark;

j.    arising from any other acts or omissions of Account that constitute a material breach of an obligation hereunder or which, in the aggregate, constitute a failure on the part of Account to perform its obligations under this Agreement in accordance with the provisions of this Agreement; or

k.    due to or arising out of Wellmark's compliance with any direction from Account with regard to the Administrative Services provided under this Agreement.

7.4    **Selection of Counsel**. In the event litigation is instituted by a third party against the Account and/or Wellmark concerning any matter under the Plan, including a suit for Plan benefits, each party to this Agreement shall, to the extent possible, advise the other of the legal action, and shall have sole authority to select legal counsel of its choice.

7.5    **Wellmark's Liability**. In performing its obligations under this Agreement, Wellmark shall use reasonable diligence and that degree of skill and judgment possessed by one experienced in furnishing claim administration services to group health plans of similar size and characteristics as the Plan. Wellmark agrees to release, hold harmless, and indemnify Account and its employees, officers, and directors against any and all amounts, expenses, losses, liability, claims, lawsuits, injuries, damages, taxes, interest charges, administrative penalties, and other costs or obligations, including reasonable attorney fees and court costs, for which Account may become liable:

a.    arising from any acts or omission of Wellmark which constitute a material breach of an obligation hereunder or which, in the aggregate, constitute a failure on the part of Wellmark to perform its obligations under this Agreement in accordance with the provisions of this Agreement; and

b.    arising from any allegation of a breach of confidentiality arising out of release of confidential information to Wellmark or a third party at Wellmark's direction or arising out of any improper use of such information by Wellmark or such third party.

7.6    **Disclaimer of Warranties; Limitation of Liability**. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, WELLMARK DOES NOT MAKE AND HEREBY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, REGARDING ANY OF THE SERVICES WELLMARK PROVIDES OR ARRANGES TO PROVIDE UNDER THIS AGREEMENT. IN NO EVENT SHALL ANY PARTY BE LIABLE FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, LOSS OF DATA OR LOST PROFITS, EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY REPRESENTS THE ALLOCATION OF RISK BETWEEN THE PARTIES AS REFLECTED IN THE PRICING

HEREUNDER AND IS AN ESSENTIAL ELEMENT OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES. ADDITIONAL DISCLAIMER OF WARRANTIES AND LIMITATION OF LIABILITIES REGARDING HEALTH AND CARE MANAGEMENT SERVICES ARE SET FORTH IN THE HEALTH AND CARE MANAGEMENT SERVICES EXHIBIT.

7.7 **Grandfathered Health Plan Disclaimer**. Applicable provisions under ACA shall be implemented for the Plan at the first Plan Year on or after September 23, 2010. Account has the sole obligation to determine the status of its Plan as either a Grandfathered Health Plan or a Non-Grandfathered Health Plan.

Wellmark does not make any representation or warranty and Wellmark expressly disclaims any and all representations or warranties, oral or written, regarding the past, present, or future Grandfathered Health Plan status of the Plan.

No federal or state official has determined that this Plan qualifies as a Grandfathered Health Plan, and to the extent that this Plan is determined to be eligible as a Grandfathered Health Plan, Wellmark makes no representation or warranty that this status will be retained during the current Rating Period or any future renewal.

Wellmark is not responsible and shall not be liable for any claims, costs, liabilities, losses, penalties, damages or other expenses of any kind whatsoever that, directly or indirectly, arise from or relate to this Plan's past, present and future Grandfathered Health Plan status, lack thereof, or any changes regarding the Plan's past, present and future Grandfathered Health Plan status, including, but not limited to, any representation made by any employee, broker, agent, or independent contractor of Wellmark regarding this Plan's past, present and future Grandfathered Health Plan status.

7.8 **No Testing for Health Plans**. Wellmark will not determine whether coverage is discriminatory or otherwise in violation of Internal Revenue Code Section 105(h). Wellmark also will not provide any testing for compliance with Internal Revenue Code Section 105(h). Wellmark will not be held liable for any penalties or other losses resulting from Account offering coverage in violation of Section 105(h).

7.9 **Survival**. The indemnities set forth in this Article shall survive the termination of this Agreement.

### ARTICLE 8
### TERM AND TERMINATION

8.1 **Term**. This Agreement shall become effective on the effective date and shall continue in force for the Rating Period.

8.2 **Renewal Terms**. Unless terminated or superseded, this Agreement shall continue in force from year to year. Wellmark shall have the right to change any of the Administrative Fees or other fees for any renewal term upon thirty (30) days advance written notice. Any such changes shall be reflected on a revised or new Exhibit "A".

8.3 **Termination Notice**. Either party may terminate this Agreement at any time by giving written notice of termination delivered to the other party at least thirty (30) days in advance of the effective date of termination.

IA WBCBSI & WHPI LG SF                     17                     Version: 11/11

Mueller et al v. Wellmark, Inc.   **Deuker Affidavit - Exhibit B**        APPENDIX
Supreme Court Docket No. 13-1872  **Page 18 of 27**                      Page 49

8.4 **Termination for Nonpayment**. Wellmark may terminate this Agreement at any time, upon ten (10) days written notice delivered or mailed to Account, if Account fails to make complete payments, including late fees, when due in accordance with this Agreement or Wellmark determines that the Account has inadequate funds to make payments required by this Agreement. Account is solely responsible for notifying its Plan Members of the termination of this Agreement for nonpayment or for any other reason.

8.5 **Effects of Termination**. If Wellmark terminates this Agreement for nonpayment, Wellmark shall not be required to pay on behalf of Account any Incurred Claims beyond the effective date of the termination regardless of when services were received.

8.6 **Termination and Claims Administration**. If, following termination of this Agreement for reasons other than Account's nonpayment, Incurred Claims with Incurred Dates prior to the date of termination are submitted to Wellmark in the period specified in the Benefits Document for timely filing of claims, Wellmark shall pay these claims on behalf of Account in accordance with this Agreement and submit bills to the Account for the payment of Claims Paid for a period of twelve (12) months following termination. The bills shall also include a Network Access Fee amount when the Network Access Fee, shown on Exhibit "A", is reflected as a percentage of Network Savings or when Account makes retroactive changes to add or delete a Plan Member from coverage during the Rating Period. The Account shall pay all bills in accordance with the procedures set forth in Section 4.1. Wellmark shall not, on behalf of Account, pay Incurred Claims with dates of service following the date of termination.

8.7 **Availability of Records**. Upon written request by the Account, Wellmark will make available to any successor benefit services administrator, designated by the Account, standard reports and materials in its possession at the time of termination that are reasonably necessary to continue the administration of the Plan. Wellmark shall provide such materials in its standard format and Account shall pay a reasonable fee for such services.

8.8 **Survival**. Any liability of either party to the other for amounts owed or owing or for indemnification under this Agreement shall not be extinguished by the termination of this Agreement.

**ARTICLE 9**
**BLUE CROSS AND BLUE SHIELD DISCLOSURES**

9.1 **Blue Cross and Blue Shield Disclosure Statement**. Account on behalf of itself and its Members, hereby expressly acknowledges its understanding this Agreement constitutes a contract solely between Account and Wellmark, which is an independent corporation operating under licenses from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (BCBSA), permitting Wellmark to use the Blue Cross and Blue Shield Service Marks in the state of Iowa, and that Wellmark is not contracting as the agent of BCBSA. Account on behalf of itself and its Members, further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Wellmark and that no person, entity, or organization other than Wellmark shall be accountable or liable to Account for any of Wellmark's obligations to Account created under this Agreement. This

IA WBCBSI & WHPI LG SF                18                Version: 11/11

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit B**        APPENDIX
Supreme Court Docket No. 13-1872 **Page 19 of 27**        Page 50

section shall not create any additional obligations whatsoever on the part of Wellmark other than those obligations created under other provisions of this Agreement.

9.2 **Account Locations Outside of Iowa**. Account understands and agrees that Wellmark defines a National Account as any company headquartered in Iowa that also has employees in other states whose claims are processed through Inter-Plan Programs. Only persons associated with a National Account or with Account locations in Iowa are eligible for coverage. If the entity is not headquartered in Iowa, coverage will be void for any persons associated with Account locations outside of Iowa. Eligibility of persons located outside Iowa, or associated with Account locations outside Iowa is subject to Blue Cross and Blue Shield Association guidelines.

9.3 **Out-of-Area Services**. Wellmark has a variety of relationships with other Blue Cross and/or Blue Shield Licensees referred to generally as "Inter-Plan Programs." Whenever Members access health care services outside the geographic area Wellmark serves, the claim for those services may be processed through one of these Inter-Plan Programs and presented to Wellmark for payment in accordance with the rules of the Inter-Plan Programs policies then in effect. The Inter-Plan Programs available to Members under this Agreement are described generally below.

Typically, Members, when accessing care outside the geographic area Wellmark serves, obtain care from health care providers that have a contractual agreement (i.e., are "participating providers") with the local Blue Cross and/or Blue Shield Licensee in that other geographic area ("Host Blue"). In some instances, Members may obtain care from nonparticipating health care providers. Wellmark's payment practices in both instances are described below.

For Wellmark Health Plan of Iowa, Inc. coverage, Wellmark may cover only limited health care services received outside of the Wellmark Health Plan Network as described in the applicable Benefits Document. Any other services will not be covered when processed through any Inter-Plan Programs arrangements. These "other services" must be provided or authorized by Member's primary care physician ("PCP").

a. **BlueCard® Program**. Under the BlueCard® Program, when Members access Covered Services within the geographic area served by a Host Blue, Wellmark will remain responsible to Account for fulfilling Wellmark's contract obligations. However, in accordance with applicable Inter-Plan Programs policies then in effect, the Host Blue will be responsible for providing such services as contracting and handling substantially all interactions with its participating health care providers, and providing some managed care services. The financial terms of the BlueCard Program are described generally below. Individual circumstances may arise that are not directly covered by this description; however, in those instances, our action will be consistent with the spirit of this description.

i. **Liability Calculation Method Per Claim**. The calculation of the Member liability on claims for Covered Services processed through the BlueCard Program, if not a flat dollar copayment amount, will be based on the lower of the participating health care provider's Covered Charges or the negotiated price made available to Wellmark by the Host Blue.

IA WBCBSI & WHPI LG SF                    19                    Version: 11/11

Mueller et al v. Wellmark, Inc. **Deuker Affidavit - Exhibit B**                    APPENDIX
Supreme Court Docket No. 13-1872 **Page 20 of 27**                    Page 51

The calculation of Account's liability on claims for Covered Services processed through the BlueCard Program will be based on the negotiated price made available to Wellmark by the Host Blue. Sometimes, this negotiated price may be greater than billed charges if the Host Blue has negotiated with its participating health care provider(s) an inclusive allowance (e.g., per case or per day amount) for specific health care services.

Host Blues may use various methods to determine a negotiated price, depending on the terms of each Host Blue's health care provider contracts. The negotiated price made available to Wellmark by the Host Blue may represent a payment negotiated by a Host Blue with a health care provider that is one of the following:

a)   an actual price. An actual price is a negotiated payment without any other increases or decreases; or

b)   an estimated price. An estimated price is a negotiated payment reduced or increased by a percentage to take into account certain payments negotiated with the provider and other claim- and non-claim-related transactions. Such transactions may include, but are not limited to, anti-fraud and abuse recoveries, provider refunds not applied on a claim-specific basis, retrospective settlements, and performance-related bonuses or incentives; or

c)   an average price. An average price is a percentage of Covered Charges representing the aggregate payments negotiated by the Host Blue with all of its health care providers or a similar classification of its providers and other claim- and non-claim-related transactions. Such transactions may include the same ones as noted above for an estimated price.

Host Blues using either an estimated price or an average price may, in accordance with Inter-Plan Programs policies, prospectively increase or reduce such prices to correct for over- or underestimation of past prices (i.e., prospective adjustments may mean that a current price reflects additional amounts or credits for claims already paid to providers or anticipated to be paid to or received from providers). However, the amount paid by the Member and Account is a final price; no future price adjustment will result in increases or decreases to the pricing of past claims. The BlueCard Program requires that the price submitted by a Host Blue to Wellmark is a final price irrespective of any future adjustments based on the use of estimated or average pricing.

If a Host Blue uses either an estimated price or an average price on a claim, it may also hold some portion of the amount that Account pays in a variance account, pending settlement with its participating health care providers. Because all amounts paid are final, neither variance account funds held to be paid, nor funds expected to be received, are due to or from Account. Such payable or receivable would be eventually exhausted by health care provider settlements and/or through prospective

IA WBCBSI & WHPI LG SF                    20                    Version: 11/11

Mueller et al v. Wellmark, Inc.   Deuker Affidavit - Exhibit B            APPENDIX
Supreme Court Docket No. 13-1872   Page 21 of 27                          Page 52

adjustment to the negotiated prices. Some Host Blues may retain interest earned, if any, on funds held in variance accounts.

A small number of states require a Host Blue either (i) to use a basis for determining Member liability for Covered Services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (ii) to add a surcharge. Should the state in which health care services are accessed mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, Wellmark would then calculate Member liability and Account's liability in accordance with applicable law.

ii.     **Return of Overpayments**. Under the BlueCard Program, recoveries from a Host Blue or its participating health care providers can arise in several ways including, but not limited to, anti-fraud and abuse recoveries, health care provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Blue will engage a third party to assist in identification or collection of recovery amounts. The fees of such a third party may be netted against the recovery. Recovery amounts, determined this way will be applied in accordance with applicable Inter-Plan Programs policies, which generally require correction on a claim-by-claim or prospective basis.

iii.    **BlueCard Program Fees and Compensation**. Account understands and agrees to reimburse Wellmark for certain fees and compensation which Wellmark is obligated under the BlueCard Program to pay to the Host Blues, to the Blue Cross and Blue Shield Association (BCBSA), and/or to BlueCard Program vendors, as described below. Fees and compensation under the BlueCard Program may be revised in accordance with the Program's standard procedures for revising such fees and compensation, which do not provide for prior approval by any Accounts. Such revisions typically are made annually as a result of Program policy changes and/or vendor negotiations. These revisions may occur at any time during the course of a given calendar year, and they do not necessarily coincide with Account benefit period under this Agreement.

All BlueCard Program-related fees, including any access fees paid to Host Blues, are included in Wellmark's Network Access Fee and its Administrative Fee. Per claim BlueCard Program access fees will be limited to the Program's then allowable percentage of Network Savings received from the Host Blue and will not exceed $2,000 per claim. Account will consider any increases to the Network Access Fee and Administrative Fee amounts due to increases in BlueCard fees and compensation at the next renewal.

Wellmark's Network Access Fee, shown on Exhibit "A", may include the following fees associated with claims processing:

a)      Access fees
b)      Administrative Expense Allowance (AEA) fees
c)      Per Contract Per Month (PCPM) fees

d)   Non-Standard AEA fees

Wellmark's Administrative Fee, shown on Exhibit "A", may include the following fees associated with claims processing:

a)   Central Financial Agency (CFA) fees
b)   ITS transaction fees

iv.   **Determinations of Covered Health Care Services.** If Wellmark, or if applicable Account, determines that health care services are covered, or the Plan covers the health care services, coverage of those health care services cannot be denied based on the Host Blue's network protocols. Furthermore, under the BlueCard Program, the Member cannot be denied coverage of health care services received outside of the geographic area Wellmark serves if the health care services (i) are covered by the network protocols of the Host Blue; and (ii) are not specifically limited or excluded by the Plan.

b.   **Nonparticipating Health Care Providers Outside Wellmark's Service Area.**

i.   **Member Liability Calculation.** When Covered Services are provided outside of Wellmark's service area by nonparticipating health care providers, the amount(s) a Member pays for such services will generally be based on either the Host Blue's nonparticipating health care provider local payment or the pricing arrangements required by applicable state law. In these situations, the Member may be responsible for the difference between the amount that the nonparticipating health care provider bills and the payment Wellmark will make for the Covered Services as set forth in this paragraph.

ii.   **Exceptions.** In some exception cases, Wellmark may pay claims from nonparticipating health care providers outside of Wellmark's service area based on the provider's billed charge, such as in situations where a Member did not have reasonable access to a participating provider, as determined by Wellmark in Wellmark's sole and absolute discretion or by applicable state law. In other exception cases, Wellmark may pay such claims based on the payment Wellmark would make if Wellmark were paying a nonparticipating provider for the same Covered Services inside of Wellmark's service area, as described elsewhere in this Agreement where the Host Blue's corresponding payment would be more than Wellmark's in-service area nonparticipating provider payment, or in our sole and absolute discretion, Wellmark may negotiate a payment with such a provider on an exception basis. In any of these exception situations, the Member may be responsible for the difference between the amount that the nonparticipating health care provider bills and the payment Wellmark will make for the Covered Services as set forth in this paragraph.

iii.   **Fees and Compensation.** Account understands and agrees to reimburse Wellmark for certain fees and compensation which Wellmark is obligated under applicable Inter-Plan Programs requirements to pay to the Host

Blues, to the Blue Cross and Blue Shield Association, and/or to Inter-Plan Programs vendors. Fees and compensation under applicable Inter-Plan Programs may be revised in accordance with the specific Program's standard procedures for revising such fees and compensation, which do not provide for prior approval by any Accounts. Such revisions typically are made annually as a result of Inter-Plan Programs policy changes and/or vendor negotiations. These revisions may occur at any time during the course of a given calendar year, and they do not necessarily coincide with Account benefit period under this Agreement.

All Inter-Plan Program-related fees are included in Wellmark's Administrative Fee. Account will consider any increases to the Administrative Fee amount due to increases in Inter-Plan Program fees and compensation at the next renewal.

Wellmark's Administrative Fee, shown on Exhibit "A", may include the following fees associated with claims processing:

a)      Central Financial Agency (CFA) fees
b)      ITS transaction fees

## ARTICLE 10
## MISCELLANEOUS

10.1    **Change of Agreement**. If Account makes changes in the Plan, Account shall give Wellmark sufficient advance notice of such changes. If Account makes any material changes in the Plan, or if material changes are required by law, including the addition or deletion of benefits, makes a material change in group composition or to membership or eligibility requirements, such as a change in the number of eligible individuals of more than ten percent (10%), percentage of individuals enrolled, types of coverage offered, business entities covered, or offerings of other health insurers' coverage to eligible individuals, Wellmark shall have the right at its option to amend this Agreement, including an adjustment to the financial terms shown on Exhibit "A", or to terminate this Agreement in accordance with Section 8.3.

10.2    **Iowa Code Chapter 509A Compliance; No Actuarial Certification**. Nothing contained in this Agreement or on Exhibit "A" shall be construed or considered to be an actuarial opinion or certification by Wellmark in connection with Iowa Code Chapter 509A regarding the adequacy of reserves, rates, or financial condition of Account or the Plan. Account is solely responsible for compliance with all provisions of Iowa Code Chapter 509A and implementing regulations and, if applicable, is responsible for reporting any paid losses for the Account's self-funded operation of the Plan, as required by Iowa Code Section 513C.10, and for paying any assessment related to those paid losses.

10.3    **Use of Trademarks and Names**. Wellmark and Account reserve the right to control the use of their respective corporate names and any other respective symbols, assumed names, trademarks, and service marks, presently existing or subsequently established. Wellmark and Account agree not to use the corporate name, symbol, assumed names, trademarks, or service marks of the other in advertising, promotional materials, or otherwise without the prior written consent of the other. Any previously approved usage shall cease immediately upon the termination of this Agreement and any materials using

such names or marks are the property of the appropriate namesake and shall be returned to the appropriate property owner upon request or at the termination of this Agreement.

10.4    **Complete Agreement; Amendments**. The parties agree that this Agreement, including, without limitation, any Exhibits or amendments hereto, the Health and Care Management Services Exhibit, and COBRA Administrative Services Agreement, if any, constitutes the complete and exclusive agreement and statement of the relationship between the parties with regard to the subject matter of this Agreement and supersedes all related discussions, understandings, proposals, exhibits, amendments, prior and concurrent agreements, representations and warranties, whether oral or written, and any other communications between the parties in regard to the subject matter hereof. This Agreement, including, without limitation, any Exhibits hereto, may be amended from time to time by Wellmark. Amendments to this Agreement shall be effective only when the written amendment has been signed by an authorized representative of Wellmark and delivered in accordance with Section 10.11. Any other change, modification, or waiver of any of the terms or provisions of this Agreement shall be effective only when made in writing and signed by each party. This Agreement shall take precedence over any other documents that may be in conflict with it.

Notwithstanding the foregoing, if this Agreement supersedes a prior Agreement, health services with an Incurred Date prior to the effective date of this Agreement shall be processed pursuant to the terms of the applicable superseded Agreement.

10.5    **Force Majeure**. The parties to this Agreement shall be excused from any performance under this Agreement, other than payment of amounts due, for any period and to the extent they are delayed, restricted, or prevented from performing under this Agreement as a result of an act of God, war, civil disturbance, court order, labor dispute, act of terrorism, or other cause beyond their reasonable control.

10.6    **Limitation of Action**. Notwithstanding Sections 5.6, 7.9, and 8.8, no legal or equitable action or claim, may be brought against Wellmark for an action or claim arising under or relating to this Agreement more than two (2) years after the cause of action arose.

10.7    **Assignment**. The Agreement shall be binding on the parties and their respective successors and permitted assigns. Neither party may assign this Agreement to any third party, in whole or in part, without the prior written consent of the other; provided, however, Wellmark may assign this Agreement, in whole or in part, to any entity that controls, is controlled by, or is under common control with Wellmark. Further, Wellmark may, in its sole and unfettered discretion, contract with a third party to perform some Administrative Services or other of Wellmark's duties under this Agreement, including, without limitation, the subrogation recovery services for Claims Paid. To the extent Wellmark contracts with a third party to perform any such services or duties, the term "Wellmark" as used in this Agreement shall be deemed to include the contracted third party, as the context so requires.

10.8    **Waiver**. The failure of any party to enforce any terms or provisions of the Agreement shall not be deemed or construed to be a waiver of the enforceability of such provision. Similarly, the failure to enforce any remedy arising from a default under the terms of the Agreement shall not be deemed or construed to be a waiver of such default.

IA WBCBSI & WHPI LG SF                                24                                Version: 11/11

Mueller et al v. Wellmark, Inc.  **Decker Affidavit - Exhibit B**                APPENDIX
Supreme Court Docket No. 13-1872  **Page 25 of 27**                          Page 56

10.9 **Nature of Relationship; Authority of Parties**. Nothing contained in this Agreement and no action taken or omitted to be taken by Account or Wellmark pursuant hereto shall be deemed to constitute Account and Wellmark a partnership, an association, a joint venture or other entity whatsoever. Wellmark shall at all times be acting as an independent contractor under this Agreement. No party has the authority to bind the other in any respect whatsoever.

10.10 **No Third-Party Beneficiaries**. This Agreement is for the benefit of Account and Wellmark and not for any other person. It shall not create any legal relationship between Wellmark and any employee, Member, or any other party claiming any right, whether legal or equitable, under the terms of this Agreement or of the Plan.

10.11 **Notices and Communication**. The parties shall be entitled to rely upon any communication or notice from the other in connection with this Agreement to be genuine, truthful, and accurate, and to have been authorized, signed, or issued by an officer or agent of such entity empowered to make such representation on behalf of the entity.

Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered personally, placed in the U.S. mail (postage prepaid), delivered to a recognized courier service for delivery (delivery charges prepaid), or sent by electronic means and addressed to the last address furnished in writing. Until another address is furnished in writing, notice to Account may be addressed to the address shown on Exhibit "A" attached to this Agreement.

Notice to Wellmark may be addressed:

> Wellmark Blue Cross and Blue Shield of Iowa
> Wellmark Health Plan of Iowa, Inc.
> Attention: Procurement and Contracts
> 1331 Grand Avenue
> Des Moines, Iowa 50309-2901

10.12 **Applicable Law and Venue**. This Agreement is issued and delivered in the state of Iowa. To the extent not superseded by the laws of the United States and without regard to any conflict of law rule, this Agreement shall be construed in accordance with and governed by the laws of the state of Iowa. Any action in regard to this Agreement or arising out of the terms of this Agreement shall be instituted and litigated in the state or federal courts located in the state of Iowa and no other.

IA WBCBSI & WHPI LG SF     25     Version: 11/11

Mueller et al v. Wellmark, Inc. **Deuker Affidavit - Exhibit B**
Supreme Court Docket No. 13-1872 **Page 26 of 27**     **APPENDIX Page 57**

## ARTICLE 11
### EFFECTIVENESS OF AGREEMENT AND WAIVER OF JURY TRIAL

THIS AGREEMENT shall be deemed to be effective and in full force as of the effective date indicated at the beginning of the Agreement upon the affixation of Wellmark's authorized signature below and the Account's payment to Wellmark of the Claims Paid, Network Access Fee, Administrative Fee, or other fees as billed by Wellmark. **ACCOUNT AND WELLMARK WAIVE ANY RIGHT TO A JURY TRIAL WITH RESPECT TO AND IN ANY ACTION, PROCEEDING, CLAIM, COUNTERCLAIM, DEMAND OR OTHER MATTER WHATSOEVER ARISING OUT OF THIS AGREEMENT.**

Wellmark, Inc.
Wellmark Health Plan of Iowa, Inc.


By:
David S. Brown
Executive Vice President, Chief Financial Officer
and Treasurer

Date:

IA WBCBSI & WHPI LG SF                    26                    Version: 11/11

Mueller et al v. Wellmark, Inc. **Drnew Affidavit - Exhibit B**          APPENDIX
Supreme Court Docket No. 13-1872 **Page 27 of 27**                       Page 58

## WELLMARK, INC.
## PRACTITIONER SERVICES AGREEMENT

This Practitioner Services Agreement ("Agreement") is made by and between Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and Affiliates (hereinafter, collectively, "Wellmark"), and the Provider identified on the signature page (hereinafter "Provider").

### RECITALS

1.  Wellmark is authorized by the Iowa Division of Insurance to transact the business of health insurance and is licensed by the Blue Cross and Blue Shield Association.

2.  Wellmark, on behalf of itself and: (i) state and federal programs administered by Wellmark, (ii) any licensed subsidiary or affiliate of the Blue Cross and Blue Shield Association and licensed Blue Cross and Blue Shield Plans, and (iii) Wellmark's subsidiaries and Affiliates, wishes to secure the health care services of providers for Wellmark's Covered Persons and for the covered persons and products of the other programs and entities set forth above.

3.  Provider desires to make health care services available to Wellmark's Covered Persons and the covered persons and products of the other programs and entities set forth in Recital 2 for the purposes specified in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

1.1 **"Affiliate"** of a party to this Agreement means any entity that now or hereafter: (i) is owned or controlled (directly or indirectly) by such party to this Agreement, (ii) owns or controls (directly or indirectly) any such party to this Agreement, or (iii) is under common control with such party to this Agreement. "Affiliate" also includes an Affiliate of an Affiliate.

1.2 **"Agreement"** means this Agreement and the Exhibits attached hereto presently in effect and hereafter added by amendment to this Agreement. The Exhibits attached to this Agreement at the time of initial execution are as follows:

Exhibit A: Payment
Exhibit B: Products

1.3 **"Client"** means an employer or group sponsor for whom Select First benefits are processed.

1.4 **"Contract"** means the benefit certificate, policy or other written documents setting forth the health care benefits the Covered Person is eligible to receive.

1.5 **"Covered Person"** means any eligible employee, individual or group member, and any eligible sponsored dependent, entitled to receive Covered Services according to the terms and conditions of this Agreement and pursuant to an applicable Contract.

1.6 **"Covered Services"** means those health care services or supplies to which a Covered Person is entitled pursuant to a Contract.

1.7 **"Emergency Medical Condition"** means a medical condition manifesting itself by acute symptoms of sufficient severity, including severe pain, that a prudent layperson, possessing an average knowledge of health and medicine, could reasonably expect absence of immediate medical attention to result in one of the following:

IA/WBCBSI/PRAC-061507
1008.41

1

wm

      (a)     Placing the health of the individual or, with respect to a pregnant woman, the health of the woman and her unborn child, in serious jeopardy;

      (b)     Serious impairment to bodily function; or

      (c)     Serious dysfunction of any bodily organ or part.

**1.8**     **"Medically Necessary" or "Medical Necessity"** means Covered Services that a physician, exercising prudent clinical judgment, would provide to a Covered Person for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the Covered Person's illness, injury or disease; and (c) not primarily for the convenience of the Covered Person, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that Covered Person's illness, injury or disease.

**1.9**     **"Participating Provider"** means a provider who has entered into a provider agreement with Wellmark whereby such provider has agreed to provide health care services to Wellmark's Covered Persons and the covered persons of the programs and entities set forth in Recital 2.

**1.10**    **"Product"** means a health benefit plan offered or administered by Wellmark.

**1.11**    **"Provider"** means the provider who is identified as such on the signature page of this Agreement. If Provider is a professional corporation ("PC"), professional limited liability company ("PLLC") or other legal entity, "Provider" means: (i) the PC, the PLLC or the other legal entity, as the case may be, and (ii) the person who is licensed, certified or otherwise authorized by a governmental entity to carry on the profession on behalf of the PC, the PLLC or the other legal entity.

**1.12**    **"Provider Guide"** means the Wellmark documents (guides and/or manuals), and all attachments thereto, incorporated herein by this reference, and as amended from time to time, made available to Provider that set forth applicable Wellmark administrative/operational policies, rules and procedures.

**1.13**    **"Quality Improvement"** means measuring, evaluating and improving the quality of Covered Services provided to Covered Persons by Provider.

**1.14**    **"Utilization Management"** means the review and determination on prospective, concurrent and retrospective bases of the Medical Necessity of Covered Services provided to Covered Persons pursuant to the terms and conditions of this Agreement.

**1.15**    **"Wellmark"** means Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and Affiliates, including Wellmark Health Plan of Iowa, Inc.

**ARTICLE II**
**SCOPE OF AGREEMENT**

**2.1**     **Applicability.** This Agreement applies to those Products that are issued or administered by Wellmark set forth on Exhibit B. This Agreement also applies to those Products that are added from time to time by amendment to this Agreement as provided in Section 14.9.

Wellmark and the Provider agree that Provider will also provide health care services, as set forth in this Agreement, for the benefit of covered persons and products of the following programs and entities: (i) state and federal programs administered by Wellmark; (ii) any licensed subsidiary or

IA/WBCBSI/PRAC-061507               2                               wm
1008.41

affiliate of the Blue Cross and Blue Shield Association and licensed Blue Cross and Blue Shield Plans; and (iii) Wellmark's Affiliates.

Upon request, Wellmark shall furnish to Provider a specimen Contract or benefit summary for each Product subject to this Agreement.

**2.2** **Construction.** This Agreement shall be construed together with the terms and conditions of Contracts and Products subject to this Agreement; provided, however, that in the event of conflict, the terms of this Agreement shall govern.

## ARTICLE III
## RELATIONSHIP BETWEEN WELLMARK AND PROVIDER

**3.1** **Independent Contractors.** Wellmark and Provider are independent contractors under this Agreement with respect to each other. Nothing in this Agreement shall be construed or deemed to create a relationship of employer and employee, principal and agent, joint venturers, or any relationship other than that of independent entities contracting with each other solely for the purpose of carrying out the terms and conditions of this Agreement. Neither party shall have any express or implied right or authority to assume or create any obligation or responsibility on behalf of, or in the name of, the other party, except as set forth herein.

**3.2** **Blue Cross and Blue Shield Disclosure.** Provider hereby expressly acknowledges Provider's understanding that this Agreement constitutes a contract between Provider and Wellmark, that Wellmark is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (the "Association"), permitting Wellmark to use the Blue Cross and Blue Shield Service Marks in the State of Iowa, and that Wellmark is not contracting as an agent of the Association. Provider further acknowledges and agrees that Provider has not entered into this Agreement based upon representations by any person other than Wellmark and that no person, entity or organization other than Wellmark shall be held accountable or liable to Provider for any of Wellmark's obligations to Provider created under this Agreement. This paragraph shall not create any obligations whatsoever on the part of Wellmark other than those obligations created under other provisions of this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

**4.1** **By Wellmark.** Wellmark represents and warrants to Provider that: (a) Wellmark possesses and agrees to maintain during the term of this Agreement all licenses, permits, registrations, governmental and other approvals required to carry out its obligations pursuant to the terms of this Agreement; (b) this Agreement is authorized by all necessary corporate action on behalf of Wellmark, is duly executed and delivered by Wellmark, constituting a legal and binding obligation upon Wellmark; and (c) Wellmark shall comply with relevant federal, state and local laws, statutes, ordinances, orders and regulations which are applicable to the terms and conditions of this Agreement.

**4.2** **By Provider.** Provider represents and warrants to Wellmark that: (a) the information furnished by Provider on and in connection with Provider's application and all updates thereto is and shall remain true, correct and complete with no material omissions at all times during the term of this Agreement; (b) Provider now possesses, and during the term of this Agreement shall maintain, all professional licenses, accreditations, certifications, permits, registrations, governmental and other approvals required in order to provide the Covered Services; (c) Provider shall comply with relevant federal, state and local laws, statutes, ordinances, orders and regulations which are applicable to the terms and conditions of this Agreement; (d) if Provider is an entity, then Provider is duly organized and validly existing under the laws of the state of its organization, as applicable, with full power and authority to engage in practice as currently conducted; and (e) this Agreement

IA/WBCBSI/PRAC-061507                                          3                                                     wm
1008.41

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit C**                                         APPENDIX
Supreme Court Docket No. 13-1872 **Page 3 of 25**                                                       Page 61

has been authorized by all necessary action on behalf of Provider, is duly executed and delivered, and constitutes a legal and binding obligation of Provider.

## ARTICLE V
## WELLMARK

5.1 **Medical Necessity; Experimental or Investigational.** A physician designated by Wellmark will make the determination on behalf of Wellmark whether health care services are Medically Necessary, or experimental or investigational in nature.

5.2 **Acceptance and Credentialing of Provider.** At all times during the term of this Agreement, Provider shall meet the Wellmark contracting and credentialing standards set forth in the Provider Guide. Wellmark retains sole discretion to determine whether Provider shall be accepted as a Participating Provider pursuant to Wellmark's policies, rules, procedures and contracting and credentialing standards.

5.3 **Rights Reserved to Wellmark.** Wellmark reserves the right to communicate directly with Provider on any subject matter. Wellmark may decline, limit, or suspend the participation of Provider under this Agreement, or terminate this Agreement, under circumstances including, but not limited to, the following: (a) termination, suspension, limitation, voluntary surrender or restriction of Provider's or Provider's Affiliate's professional license, accreditation, certification, permit, or other governmental authorization; (b) if applicable to Provider or Provider's Affiliate, any hospital disciplinary action or termination, suspension, limitation or restriction of professional staff appointments or clinical privileges; (c) failure to maintain any insurance as required herein; (d) Provider's or Provider's Affiliate's conviction of a felony or any other criminal charge; (e) any disciplinary action taken by a state licensing board, the Drug Enforcement Agency ("DEA"), if applicable, or other governmental agency; (f) Provider's or Provider's Affiliate's suspension or exclusion from participation in the Medicare or Medicaid programs; (g) any other legal, governmental or other action or event which may materially impair the Provider's ability to perform any duties or obligations under this Agreement; or (h) Wellmark believes Provider does not meet or no longer meets Wellmark's contracting or credentialing standards set forth in the Provider Guide.

Consistent with the "Provider Denial, Termination, Appeal and Reporting Procedure" ("Procedure") set forth in the Provider Guide, should Wellmark believe termination of this Agreement is warranted at any time after Provider has been accepted as a Participating Provider hereunder, it shall so notify Provider and advise Provider of Provider's right to appeal the proposed adverse action; provided, however, that the Procedure is only applicable to certain individual health care practitioners (not to legal entities), and is only applicable if termination is based on competence or professional conduct. Wellmark may immediately suspend or limit Provider's participation in any or all Contracts where the failure to take such immediate action could, in Wellmark's judgment, result in imminent danger to the health of any Covered Person. In the event this Agreement is terminated because Provider fails to maintain professional licensure, accreditation, certification, a permit, or other governmental authorization required to provide Covered Services, Provider shall have no right to a hearing or an appeal under the Procedure concerning such termination.

In the event Provider's participation is declined, limited, or suspended, or this Agreement is terminated, as provided above, Provider will immediately notify Provider's patients of such decline, limitation, suspension or termination.

## ARTICLE VI
## PROVIDER RESPONSIBILITIES

In addition to the other duties of Provider under this Agreement, Provider agrees as follows:

**6.1 Provider's Notices.** Provider shall notify Wellmark, in writing, within fifteen (15) business days of: (a) any termination, suspension, limitation, voluntary surrender or restriction of Provider's professional license, accreditation, certification, permit, or other governmental authorization; (b) if applicable to Provider, any hospital disciplinary action or termination, suspension, limitation or restriction of professional staff appointments or clinical privileges; (c) failure to maintain any insurance as required herein; (d) Provider's conviction of a felony or any other criminal charge relating to Provider; (e) any disciplinary action taken by a state licensing board, the DEA, if applicable, or other governmental agency; (f) Provider's suspension or exclusion from participation in the Medicare or Medicaid programs; or (g) any other legal, governmental or other action or event which may materially impair the Provider's ability to perform any duties and obligations under this Agreement.

**6.2 Provide Covered Services.** Upon presentation by a Covered Person of a Wellmark-issued or administered identification card stating the Covered Person's identification number or pursuant to Wellmark's telephonic or electronic verification (or other means of verification hereafter established by Wellmark from time to time) of a Covered Person's eligibility, Provider will provide Covered Services in accordance with the terms of this Agreement with the same quality and accessibility in terms of timeliness, duration and scope as is provided to Provider's other patients. All Covered Services provided by Provider will be Medically Necessary. Further, Provider shall not discriminate against Covered Persons based upon their status as Covered Persons, their age, sex, race, religion, national origin, creed, color, physical or mental disability, political belief or health status. Provider shall, unless medically contraindicated or in a situation requiring emergency services to evaluate or stabilize an Emergency Medical Condition, refer Covered Persons to another provider designated as a Participating Provider by Wellmark in the event that Provider cannot provide the type of Covered Services required by the Covered Person.

**6.3 Blue Cross and Blue Shield Out-of-Area Program.** Provider shall provide covered services to any person covered by another licensed Blue Cross and Blue Shield Plan ("Plan") under the Blue Cross and Blue Shield Association's out-of-area or reciprocal programs and to submit claims for payment to Wellmark for Wellmark's coordination with the appropriate Plan in adjudicating the claim according to the person's benefit contract. The provisions of this Agreement shall apply to charges for covered services under the Blue Cross and Blue Shield out-of-area and reciprocal programs. Provider shall accept reimbursement by Wellmark as payment in full for covered services provided to such persons except to the extent of deductibles, coinsurance and/or copayments.

**6.4 Participate in Complaint Resolution.** Provider shall participate in such complaint procedures as Wellmark may put into effect to address the complaints of Covered Persons provided, however, that compliance with this Section shall not include the provision of information protected by Iowa Code sections 135.40-42 and 147.135 or responding to allegations of medical malpractice or other claims that could result in damage awards against Provider.

**6.5 Health Management.** Wellmark has established a Utilization Management program which includes the review and determination on prospective and retrospective bases of the Medical Necessity of Covered Services provided to Covered Persons, and a Quality Improvement program which includes measurement, evaluation and improvement of the quality of Covered Services provided to Covered Persons by Provider. The Utilization Management and Quality Improvement programs are set forth in the Provider Guide. Provider shall cooperate in carrying out all duties specified in the Utilization Management and Quality Improvement programs consistent with applicable Contracts.

Wellmark may, at its discretion, request Provider's participation in the development and/or ongoing review and oversight of the Utilization Management and Quality Improvement programs through Provider representation on various health management committees which may be

IA/WBCBSI/PRAC-061507                                5                                                    wm
1008.41

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit C**                              **APPENDIX**
Supreme Court Docket No. 13-1872 **Page 5 of 25**                                              **Page 63**

established from time to time by Wellmark. The mechanism for appointment to and responsibilities of the health management committees are also set forth in the Provider Guide.

**6.6** **Information Requests.** Provider shall furnish information as requested, in accordance with relevant state and federal laws, including, but not limited to, the medical records of Covered Persons and Health Plan Employer Data and Information Set reporting, to support Wellmark quality initiatives and performance. Ownership of all such information (except for the medical records) shall vest exclusively in Wellmark. Provider shall be paid reasonable costs, not to exceed a maximum of $15.00 per patient, for the duplication of information contained in such patient records related to Provider's compliance with Wellmark quality initiatives as contemplated by this Section. Provider shall obtain from the Covered Persons any consents and authorizations necessary in order to provide such records and information to Wellmark.

**6.7** **Compliance with Administrative/Operational Policies.** Provider shall comply with the administrative/operational policies, rules, procedures and protocols set forth in the Provider Guide, as adopted and amended from time to time by Wellmark, and as made available to Provider. Non-material changes to the Provider Guide may be made from time to time by Wellmark without amendment of this Agreement. Material changes, adverse to Provider, to the Provider Guide may be made from time to time by Wellmark by amendment of this Agreement as provided in Section 14.9 of this Agreement.

**6.8** **Periodic Evaluation.** Provider shall cooperate with Wellmark's periodic evaluation of Provider's professional qualifications, which shall include, but not be limited to, Provider giving consent to the release of information from any hospital at which Provider has medical staff privileges.

**6.9** **Hospital Privileges.** Provider shall maintain staff privileges at a hospital designated by Wellmark as a "participating" hospital. Wellmark may waive this requirement if Provider's practice does not require the maintenance of hospital staff privileges.

## ARTICLE VII
## WELLMARK RESPONSIBILITIES

In addition to the other duties of Wellmark under this Agreement, Wellmark agrees as follows:

**7.1** **Provider Guide.** In conjunction with the initial delivery of this Agreement to Provider, Wellmark will make available a Provider Guide to Provider. The Provider Guide will be updated on a regular basis and supplemented with communications as needed to reflect changes in benefits and any other administrative/operational policies, including Quality Improvement and Utilization Management policies, with which Provider must comply as a condition of participation.

**7.2** **Benefit Differentials, Limited Networks and Incentive Programs.** Benefits under Contracts may vary. Wellmark may establish incentives in the Contracts for Covered Persons to receive Covered Services from Participating Providers. Wellmark may establish networks limited to eligible providers and financial and other incentive programs that may cause Covered Persons to use the services of providers contracting with Wellmark other than Provider. Provider may not be eligible for such networks and programs, and such networks and programs may not be offered to all providers. Such networks and programs may include, but are not limited to: networks limited to eligible providers; programs for specialty Covered Services; variances among copayments, deductibles and/or coinsurance; varying payment arrangements among providers; provider training/coaching programs; and programs that attempt to support the improvement of the quality of Covered Services (participation in which programs may be publicly disclosed, as well as the levels achieved in such programs).

## ARTICLE VIII
## PAYMENT FOR COVERED SERVICES

IA/WBCBSI/PRAC-061507
1008.41

6

wm

Mueller et al v. Wellmark, Inc.**Decker Affidavit - Exhibit C**
Supreme Court Docket No. 13-1872 **Page 6 of 25**

APPENDIX
Page 64

**8.1**   **Payment.**  Subject to the terms and conditions of this Agreement, Wellmark will make payment to Provider in accordance with the terms and conditions of the applicable provisions of Exhibit A.

**8.2**   **Source of Payment.**  Except as expressly provided herein, Provider agrees to: (a) accept payment by Wellmark as full payment for Covered Services furnished to Covered Persons except to the extent of deductibles, coinsurance and/or copayments; (b) not bill Covered Persons for any balance attributable to Covered Services other than deductibles, coinsurance and copayments; and (c) seek payment from Covered Persons for any such deductibles, coinsurance and/or copayments. Provider  may seek payment from Covered Persons for other services not covered under the applicable Contract, except that Provider may only seek payment in accordance with Section 8.5 of this Agreement for services determined not to be Medically Necessary.

In the event of Client insolvency or refusal to provide adequate funds to Wellmark for the payment of Select First claims, Provider may seek payment for such Select First claims directly from Client or the Covered Person.  Provider agrees that should Client become insolvent or fail to remit adequate funds for payment of such Select First claims, Wellmark shall have no obligation to make payment to Provider for such claims and that Provider's sole recourse shall be against the Client or the Covered Person.

**8.3**   **Utilization Management Procedures.**  Provider will follow Wellmark's Utilization Management procedures set forth in the Provider Guide with respect to the specified services identified in such Provider Guide.  Provider will not attempt to collect from Covered Persons any payment reduction resulting from Provider's failure to follow such procedures.

**8.4**   **Claims Filing and Claims Adjustments.**  Provider shall submit claims on behalf of Covered Persons in a manner and format acceptable to Wellmark and as prescribed from time to time by Wellmark.

In order for Provider to be paid for Covered Services furnished to a Covered Person, the claim for such Covered Services must be received by Wellmark within three hundred sixty-five (365) days immediately following: (i) the date the Covered Service was furnished to the Covered Person when Wellmark is the primary payor, or (ii) if Wellmark is the secondary payor, the date of the primary payor's explanation of benefits (or if the primary payor does not issue an explanation of benefits, then the date of the primary payor's remittance advice).  Wellmark shall extend the three hundred sixty-five (365) day time period for a reasonable period, on a case-by-case basis, if Provider provides written notice to Wellmark, along with appropriate evidence (as determined by Wellmark), of circumstances reasonably beyond Provider's control (as determined by Wellmark) that resulted in the delayed submission.  Provider shall not bill Covered Persons for Covered Services associated with any claim Provider fails to submit within such three hundred sixty-five (365) day period.

If, under this Agreement or any of its Exhibits, it is determined that Wellmark has made payment to Provider in error, Wellmark may deduct from future payments due to Provider amounts equal to the amount of payment or payments made in error or may recover payments directly from Provider for such payment or payments made in error; provided, however, that Wellmark may not initiate deductions from future payments due to Provider or initiate efforts to recover payments directly from Provider with respect to a claim more than eighteen (18) months after the date of Wellmark's remittance advice with respect to such claim, except that no such time limit will apply to Wellmark's recovery efforts: (i) based on Wellmark's reasonable belief of fraud or other intentional misconduct, (ii) required by a self-insured employer or group sponsor, or (iii) required by a state or federal government program.  If Provider asserts a claim for an underpayment, Wellmark may defend or set off such claim based on payments made in error to Provider, and may go back in time as far as the claimed underpayment.  If it is determined by Wellmark that an underpayment has been made to Provider, Wellmark will make a payment adjustment in that amount to Provider; provided, however, that Wellmark shall not make a payment adjustment with

respect to a claim unless Wellmark becomes aware of such underpayment within eighteen (18) months from the date of Wellmark's remittance advice with respect to such claim.

**8.5 Payment by Covered Persons.** Provider shall have the right to seek payment from a Covered Person for services rendered to the Covered Person which have been determined not to be Medically Necessary or which have been determined to be investigational or experimental, provided that, prior to rendering such services, the Provider provides the Covered Person with advance written notice that: (i) identifies the proposed services, (ii) informs the Covered Person that such services may be deemed by Wellmark (or have been deemed by Wellmark, as the case may be) to be not Medically Necessary or to be experimental or investigational, and (iii) provides an estimate of the cost to that Covered Person for such services and the Covered Person agrees in writing in advance of receiving such services to assume financial responsibility for such services.

**8.6 Coordination of Benefits.** Provider shall cooperate, to the extent permitted by law, with Wellmark's coordination of benefits efforts, providing to Wellmark such information as Provider may obtain regarding other payors, primary or other than primary, with respect to a particular Covered Person. Payments made to Provider by Wellmark and/or a Covered Person pursuant to this Agreement shall be based upon payment methodologies described in this Agreement regardless of whether Wellmark is the primary payor for the Covered Person.

**8.7 Subrogation.** Provider shall cooperate, to the extent permitted by law, with Wellmark's efforts regarding subrogation by providing to Wellmark such information as the Provider may obtain regarding other payors.

**8.8 Liens.** In the event Provider is entitled to assert a lien upon any recovery or sum collected or to be collected by a Covered Person or the Covered Person's heirs or personal representatives in the case of Covered Person's death, Provider shall furnish Wellmark with a copy of any lien filed within thirty (30) days of the filing thereof.

**8.9 Time for Payment.** Wellmark shall promptly pay Provider's "clean claims" (as defined by applicable statute) for Covered Services within thirty (30) days of receipt by Wellmark. A description of the information necessary for claims processing is set forth in the Provider Guide.

## ARTICLE IX
## MARKETING, ADVERTISING AND PUBLICITY

**9.1 Use of Provider's Name and Other Identifying Data.** Wellmark shall have the right to use Provider's name and other identifying data concerning Provider for the purposes of publishing Participating Provider directories, marketing, informing Covered Persons of the identity of the Products and Participating Providers, and as necessary to carry out the terms of this Agreement. Provider shall have the right to review marketing materials prepared by Wellmark which specifically reference Provider and may request revision to the extent Provider believes such marketing materials are inaccurate, incomplete or carry a material risk of liability for Provider. Nothing herein shall permit Wellmark to use any symbols, service marks, trademarks or trade names of Provider without the written approval of Provider.

**9.2 Use of Wellmark Name.** Provider shall have the right to use the name of Wellmark as necessary to carry out the terms of this Agreement. Nothing herein shall permit Provider to use any symbols, service marks, trademarks or trade names of Wellmark without the prior written approval of Wellmark. Provider shall cease any such permitted usage immediately: (i) upon notice from Wellmark, and (ii) upon termination of this Agreement. Wellmark shall have the right to prior review and approval of any use of the name "Wellmark, Inc.," "Wellmark Blue Cross and Blue Shield of Iowa," or any derivative thereof.

IA/WBCBSI/PRAC-061507
1008.41

8

wm

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit C**
Supreme Court Docket No. 13-1872 **Page 8 of 25**

APPENDIX
Page 66

## ARTICLE X
## RECORDS, CONFIDENTIALITY AND AUDIT

**10.1** **Product Data.** All information and data collected or developed by Wellmark related to claims, cost, utilization, outcomes, quality and financial performance under the health benefit plans offered or administered by Wellmark during the term of this Agreement shall be referred to as "Product Data." Any Product Data that relates to services of a specific provider to a specific Covered Person shall be referred to as "Provider Specific Product Data." Wellmark shall be the owner of all Product Data and all Provider Specific Product Data. Product Data provided to Provider by Wellmark shall be kept confidential by Provider and used only for the purpose of carrying out Provider's obligations under this Agreement. Upon termination of this Agreement, Provider shall return to Wellmark any Product Data that is not Provider Specific Product Data.

To the extent permitted by law, Wellmark reserves the right to disclose (during the term and after termination of this Agreement) to a current or prospective Covered Person, to a current or prospective employer or sponsor of a group health benefit plan or to an auditor or health care consultant of a current or prospective employer or sponsor, insofar as the information concerns Covered Services that are or would be provided under Contracts, information derived from the Provider Specific Product Data. Such information may explicitly or implicitly identify Provider and include, but not be limited to, actual or projected payment levels made to Provider.

**10.2** **Records.** Provider shall prepare and maintain, in accordance with prudent record-keeping procedures, and as required by applicable federal and state law, legible medical, financial and other records and data with respect to Covered Services rendered by Provider under this Agreement. Ownership of and access to medical records of Covered Persons are governed by applicable state and federal laws and this Agreement. Provider shall obtain from the Covered Persons any consents and authorizations necessary in order to provide such records and information to Wellmark. Subject to privacy and confidentiality requirements, the records of a Covered Person (and the information contained therein) shall be available to Wellmark (during the term and after termination of this Agreement) upon reasonable request by Wellmark.

**10.3** **Mental Health Records.** Pursuant to Iowa Code chapter 228, Wellmark will file and maintain a confidentiality statement with the Iowa Commissioner of Insurance.

**10.4** **Release of Information.** Provider agrees that: (i) all information provided to Wellmark by Provider, or (ii) otherwise obtained by Wellmark in connection with Provider's application for participation or pursuant to Quality Improvement review, peer review, Utilization Management review, provider profiling or other review or audit of Provider's practice conducted by or on behalf of Wellmark, may be released or disclosed to: (a) Wellmark's Affiliates; and (b) the Provider to whom the information relates. Provider shall, if requested by Wellmark, complete Wellmark's standard confidentiality/hold harmless agreement preceding the release to Provider of the information contemplated by this Section.

**10.5** **Office and Record Audit.** Provider shall provide access to Wellmark representatives to perform office audits and medical record reviews during normal business hours. Provider shall give access to Wellmark to all records and documents reasonably related to the obligations of Provider under this Agreement. Wellmark will attempt to notify Provider, in writing, thirty (30) days in advance of routine office audits and medical record reviews, but reserves the right, when necessary in the judgment of Wellmark, to conduct audits and reviews pursuant to advance notice of less than thirty (30) days.

Mueller et al v. Wellmark, Inc. et al. **Decker Affidavit - Exhibit C**
Supreme Court Docket No. 13-1872 **Page 9 of 25**

APPENDIX
Page 67

**ARTICLE XI**
**INSURANCE AND LIABILITY**

**11.1    Insurance.**

(a)    Coverage.  Each party agrees to carry professional liability insurance (claims-made with appropriate tail coverage or occurrence-based), at its own expense, in an amount of not less than $1,000,000 per occurrence and $1,000,000 aggregate, covering any claims with respect to Covered Services which may arise out of an incident occurring during the term of this Agreement.  Such insurance shall include coverage for claims in connection with the performance of each party's respective responsibilities under this Agreement. Provider shall furnish to Wellmark at the time Provider signs this Agreement, and from time to time thereafter as requested by Wellmark, proof of such insurance, which proof will include the name of the carrier, effective dates of coverage and coverage amounts.

(b)    Notice of Claims.  Provider shall promptly notify Wellmark whenever Provider learns that a Covered Person has filed a claim or notice of intent to commence a claim against Provider in connection with Covered Services.  Upon request, Provider shall provide full details to Wellmark, to the extent of Provider's knowledge, regarding the nature, circumstances and disposition of such claims.

**11.2    Liability.**

(a)    Liability of Wellmark.  Wellmark shall not be liable for any claims, damages, losses or expenses resulting from any injury or death of persons, damage to property or other form of injury arising from the alleged malpractice, negligence, breach of contract or other act of Provider or any of Provider's employees, representatives or agents relating in any way to the performance or omission of any act or responsibility of Provider under this Agreement.

(b)    Liability of Provider.  Provider shall not be liable for any claims, damages, losses or expenses resulting from any injury or death of persons, damage to property or other form of injury arising from the alleged malpractice, negligence, breach of contract or other act of Wellmark or any of Wellmark's employees, representatives or agents relating in any way to the performance or omission of any act or responsibility of Wellmark under this Agreement.

**ARTICLE XII**
**CONTRACT TERM AND TERMINATION**

**12.1    Term.**  The term of this Agreement commences upon the date of acceptance of this Agreement by Wellmark and shall continue until terminated in accordance with Section 12.2.

**12.2    Termination.**  This Agreement:

(a)    shall terminate in the event Wellmark dissolves or Provider dies (if Provider is an individual) or dissolves (if Provider is an entity); or

(b)    shall be terminated upon sixty (60) days written notice in the event of a material breach in the performance of the terms and conditions of this Agreement, which breach, upon written notice by the non-breaching party to the party in breach, remains uncured by the party in breach at the end of the sixty (60) day notice period; or

(c)    may be terminated by either party upon one hundred twenty (120) days advance written notice to the other party; or

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit C**                    APPENDIX
Supreme Court Docket No. 13-1872 **Page 10 of 25**                                Page 68

(d)     may be terminated by Wellmark immediately upon written notice to Provider in the event of termination under Section 5.3; or

(e)     may be terminated by Provider as provided in Section 14.9.

Notice of termination shall be given in accordance with Section 14.4 of this Agreement.

**12.3    Obligations During Termination Period.**  In the event this Agreement is terminated pursuant to (b), (c) or (e) in Section 12.2 above, Provider shall continue providing Covered Services to Covered Persons throughout the Termination Period in accordance with all prevailing standards of care and applicable professional ethical canons.  For purposes of this Agreement, "Termination Period" is defined to mean that period of time beginning with the date of written notice of termination pursuant to Sections 12.2 or 14.9, and concluding with the effective date of termination.  Covered Services provided during the Termination Period shall be reimbursed in accordance with the terms and conditions of Exhibit A.

**12.4    Post Termination.**  Upon termination of this Agreement, Provider shall no longer be entitled to designation as a Participating Provider.  Provider shall return all Wellmark promotional materials to Wellmark and take those steps that may be reasonably required by Wellmark for Provider to be disassociated from Wellmark including, but not limited to, notifying Provider's patients that Provider is no longer a Participating Provider.

### ARTICLE XIII
### NON-EXCLUSIVITY

**13.1    Provider.**  Nothing herein shall preclude Provider from contracting with other health insurance companies, health maintenance organizations or other entities licensed to assume health insurance risk.

**13.2    Wellmark.**  Nothing herein shall preclude Wellmark from contracting with other providers to provide Covered Services to Covered Persons.

### ARTICLE XIV
### MISCELLANEOUS

**14.1    Assignment.**  No assignment of the rights, duties or obligations of this Agreement shall be made by Wellmark or Provider without the consent of Provider or Wellmark, respectively.

**14.2    Waiver.**  Waiver of a breach of any provision of this Agreement shall not be deemed a waiver of any other breach of the same or different provision.

**14.3    Entire Agreement.**  This Agreement, all Exhibits hereto and the Provider Guide constitute the entire Agreement between the parties with respect to the subject matter hereof, and all prior and concurrent agreements, understandings, representations and warranties, whether written or oral, in regard to the subject matter hereof including, without limitation, any provider agreement previously entered into with Wellmark concerning the Contracts subject to this Agreement by or on behalf of Provider, are hereby superceded; provided, however, this Agreement does not supercede any: (i)  Medicare Advantage provider agreement, (ii) provider agreement concerning TriCare beneficiaries, (iii) any provider agreement concerning workers' compensation, between the parties; or (iv) HMO provider agreement.

**14.4    Notices.**  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed given when delivered personally, placed in the U.S. mail (postage prepaid), or delivered to a recognized overnight courier service for next day delivery (delivery charges prepaid), and addressed to the address set forth below if to Wellmark or if to Provider to the address set forth on the signature page of this Agreement.

Attn: Network Engagement – 5W392
Wellmark, Inc.
1331 Grand Avenue
Des Moines, IA  50309-2901

Either party may change said address pursuant to notice of such change in accordance herewith.

**14.5** **Professional Judgment.** Provider shall exercise Provider's independent professional judgment in providing health care services.  Nothing in this Agreement shall be construed to prohibit or otherwise restrict Provider, acting within the lawful scope of Provider's profession, from discussing with a Covered Person the Covered Person's health status and medical care or treatment options regardless of whether such medical care or treatment options are Covered Services.

**14.6** **Severability.**  In the event any provision of this Agreement is prohibited by or invalid under applicable law or determined invalid or unenforceable by a court of competent jurisdiction or any other governmental authority with jurisdiction over the parties hereto, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability without invalidating the remainder of the provision or the remaining provisions of this Agreement.

**14.7** **Headings; Recitals.**  The headings of Articles and Sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The Recitals are a part of this Agreement.

**14.8** **Governing Law.**  This Agreement has been entered into, and is performable in part, in Des Moines, Iowa.  This Agreement shall be construed and enforced in accordance with the laws of the State of Iowa, but without regard to provisions thereof relating to conflicts of law.

**14.9** **Amendment.**  This Agreement, including any Exhibits hereto, may be amended from time to time. Except as expressly stated hereinafter in this Section 14.9, no amendment will be effective unless duly executed in writing by Wellmark and Provider.

Wellmark shall provide written notice to Provider regarding any proposed amendment one hundred twenty (120) days in advance of the stated effective date of the proposed amendment (the "Amendment Notice").  If Provider objects to the amendment, Provider must, within sixty (60) days from the date the Amendment Notice was given to Provider, give written notice of termination of this Agreement to Wellmark.  In such event, this Agreement shall terminate at the end of the one hundred twenty (120) day Amendment Notice period, unless Wellmark gives written notice to the objecting Provider within sixty-five (65) days of the date of the Amendment Notice that Wellmark will not implement, as to Provider, the amendment to which Provider objected.  If Provider does not give written notice of termination of this Agreement to Wellmark within such sixty (60) day period, such amendment to this Agreement will become effective at the end of the one hundred twenty (120) day Amendment Notice period.

**14.10** **Third-Party Beneficiary.**  This Agreement is not a third-party beneficiary contract and shall not in any respect whatsoever increase the rights of Covered Persons or any other third party with respect to Provider or Wellmark or the duties of each of those parties or create any rights or remedies on behalf of Covered Persons against Provider or Wellmark.

**14.11** **Consideration; Construction.**    Provider and Wellmark agree that the mutual obligations contained herein constitute consideration for their respective obligations and that there shall not be any separate monetary compensation therefor.  This Agreement shall not be construed more strongly against any party regardless of who was more responsible for its preparation.

**14.12** **Limitation of Action; Waiver of Jury Trial.** No legal or equitable action may be brought on any claim arising under this Agreement more than two (2) years after the cause of action arose. **Wellmark and Provider each irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Agreement.**

**IN WITNESS WHEREOF,** Wellmark and Provider have entered into this Agreement.

_____
Print Legal Name of Provider

_____
Social Security or Tax Identification Number

_____
Street Address

_____
City, State and Zip Code

_____          _____
Date of Execution by Provider               Signature

Wellmark, Inc. (dba
Wellmark Blue Cross and Blue Shield of Iowa)
1331 Grand Avenue
Des Moines, Iowa 50309-2901

By:_____
David Brown
Executive Vice President, Chief Financial Officer and
Treasurer

_____
Date of Acceptance by
Wellmark, Inc.

IA/WBCBSI/PRAC-061507          13          wm
1008.41

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit C**          **APPENDIX**
Supreme Court Docket No. 13-1872 **Page 13 of 25**          **Page 71**

**EXHIBIT A**
**to the**
**Wellmark, Inc.**
**Practitioner Services Agreement**

**PAYMENT**

The purpose of this Exhibit is to identify the terms and conditions by which Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and Affiliates, ("Wellmark"), shall make payment to Provider for Covered Services furnished to Covered Persons by Provider under a Contract. This Exhibit is an integral part of and subject to all of the terms and conditions of the Practitioner Services Agreement ("Agreement") to which this is attached. Except as provided herein, each of the terms defined in the Agreement shall have the same meaning when used in this Exhibit.

**1. Definitions**

1.1 "Maximum Allowable Fee" (MAF) for medical services and supplies means the fees established annually by Wellmark based upon any one or more of the following three (3) elements (as determined by Wellmark): (i) the Resource Based Relative Value System ("RBRVS") that includes Relative Value Units ("RVUs") times Wellmark-determined multipliers; (ii) statistically derived customary charge, based upon the same service when performed by a majority of providers with comparable skills and training within the State of Iowa or, as applicable, another state; and (iii) commercially available fee schedules, payment values and methods developed by Wellmark. Such annual revisions to the MAF will be provided at least ninety (90) days prior to the effective date, and are not material changes to this Agreement (and do not require an amendment to this Agreement).

1.2 "Maximum Allowable Fee for Drugs" (MAFD) means the fees for therapeutic drugs established quarterly by Wellmark as follows: (i) for all CPT/HCPCS codes with a published CMS Average Sale Price, Average Sale Price times Wellmark-determined multipliers; (ii) for all CPT/HCPCS codes with no published CMS Average Sale Price, including unlisted CPT/HCPCS codes, median average wholesale price (the data source for which is determined by Wellmark) times Wellmark-determined multipliers; and (iii) for all remaining CPT/HCPCS codes, fees determined by Wellmark. The MAFD does not apply to drugs used in diagnostic procedures. Such quarterly revisions to the MAFD are not material changes to this Agreement (and do not require an amendment to this Agreement).

**2. Payment**

For claims incurred, Provider will be paid for Covered Services, less applicable deductibles, coinsurance and copayments, as follows: for medical services and supplies, the lesser of the Provider's billed charge or the MAF; for therapeutic drugs, the lesser of the Provider's billed charge or the MAFD.

IA/WBCBSI/PRAC/EXA-061507
1008.41

A-1

wm

Mueller et al v. Wellmark, Inc. **Decker Affidavit - Exhibit C**
Supreme Court Docket No. 13-1872 **Page 14 of 25**

APPENDIX
Page 72

**EXHIBIT B**
**to the**
**Wellmark, Inc.**
**Practitioner Services Agreement**

**PRODUCTS**

The purpose of this Exhibit is to identify the Products to which the Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and Affiliates, (hereinafter, collectively, "Wellmark") Practitioner Services Agreement ("Agreement") to which this is attached applies. This Exhibit is an integral part of and subject to all of the terms and conditions of the Agreement. Except as provided herein, each of the terms defined in the Agreement shall have the same meaning when used in this Exhibit.

The Products included in this Agreement are as follows for services provided at practice/service locations in Iowa:

Indemnity Products
Comprehensive Major Medical (*Protector*), Blue Traditions (*Full Service*) Classic Blue (*Alliance*), Federal Employee Health Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area Program (BlueCard).

Preferred Provider Organization Products
Alliance Select/Blue Select, Select First, Federal Employee Health Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area Program (BlueCard PPO).

The Products included in this Agreement are as follows for services provided at practice/service locations not located in Iowa:

Preferred Provider Organization Products
Select First.

Effective March 1, 2007

## Life, Accident & Health, Annuity, Credit Transmittal Document

APPROVED

| 1. | Prepared for the State of | Iowa | | | | | |
|---|---|---|---|---|---|---|---|
| 2. | State Tracking ID | Department Use Only | | | | JUN 0 7 2007 | |

IOWA INSURANCE DIVISION

| 3. | Insurer Name & Address | Domicile | Insurer License Type | NAIC Group # | NAIC # | FEIN # | State # |
|---|---|---|---|---|---|---|---|
| | Wellmark Blue Cross and Blue Shield of Iowa 636 Grand Avenue Des Moines, Iowa 50309 | Iowa | Accident & Health | 770 | 88848 | 42-0318333 | 0186 |

| 4. | Contact Name & Address | Telephone # | Fax # | E-mail Address |
|---|---|---|---|---|
| | Ms. Michele A. Druker Same as Above | 515-245-4718 | 515-245-4925 | mdruker@wellmark.com |

| 5. | Requested Filing Mode | ☒ Review & Approval  ☐ File & Use  ☐ Informational<br>☐ Combination (please explain): _____<br>☐ Other (please explain): _____ |
|---|---|---|

| 6. | Company Tracking Number | IA/UNIV/PRAC-061507 |
|---|---|---|

| 7. | ☒ New Submission | ☐ Resubmission | Previous file # _____ |
|---|---|---|---|

| 8. | Market | ☐ Individual  ☐ Franchise |
|---|---|---|
| | | Group | ☐ Small  ☐ Large  ☐ Small and Large<br>☐ Employer  ☐ Association  ☐ Blanket<br>☐ Discretionary  ☐ Trust<br>☐ Other: _____ |

| 9. | Type of Insurance | Group Health - Major Medical  Individual Health - Major Medical |
|---|---|---|

| 10. | Product Coding Matrix Filing Code | H16G    H16I |
|---|---|---|

| 11. | Submitted Documents | ☐ **FORMS**<br>☐ Policy  ☐ Outline of Coverage  ☐ Certificate<br>☐ Application/Enrollment  ☐ Rider/Endorsement  ☐ Advertising<br>☐ Schedule of Benefits  ☐ Other<br><br>**Rates**<br>☐ New Rate  ☐ Revised Rate<br><br>☒ **FILING OTHER THAN FORM OR RATE:**<br>Please explain:  Provider Agreements<br><br>SUPPORTING DOCUMENTATION<br>☐ Articles of Incorporation  ☐ Third Party Authorization<br>☐ Association Bylaws  ☐ Trust Agreements<br>☐ Statement of Variability  ☐ Certifications<br>☐ Actuarial Memorandum<br>☐ Other _____ |
|---|---|---|

LHTD-1, Page 1 of 2

© 2007 National Association of Insurance Commissioners                 1

| 12. | Filing Submission Date | May 15, 2007 | |
|---|---|---|---|
| 13 | Filing Fee (If required) | Amount      N/A | Check Date |
| | | Retaliatory   ☐ Yes   ☒ No | Check Number |
| 14. | Date of Domiciliary Approval | N/A | |
| 15. | Filing Description: | | |

Wellmark, Inc., doing business as Wellmark Blue Cross and Blue Shield of Iowa requests Insurance Division approval of the practitioner services universal agreement form, IA/UNIV/PRAC-061507, with attached Exhibits A (IA/UNIV/PRAC/EXA-061507) and B (IA/UNIV/PRAC/EXB-061507). Approval is also requested for the hospital services universal agreement form, IA/UNIV/HOSP-061507, with the attached Exhibits A (IA/UNIV/HOSP/EXA-061507), and B (IA/UNIV/HOSP/EXB-061507). Redlined versions of each form marked to show changes from the prior approved form are attached for reference. These forms replace the previously filed provider agreement forms and also substantially replace the other provider agreement forms listed on the next page. The practitioner services universal agreement is used to contract with about 89% of the physicians in Iowa and the hospital services universal agreement is used to contract with about 98% of the Iowa hospitals. The other provider agreement forms use substantially the same language with changes made as necessary to contract with provider groups, physician hospital organizations (PHOs), provider organizations, facilities, and entities. Providers may be offered a choice of agreement depending upon the range of product participation the provider desires.

Substantive changes are being made to the definition of medical necessity, limited networks, the period of time permitted for claims adjustments for over or under-payments, the advance notice required for termination of the agreement without cause, and the process for amending the agreement. Changes are also being made to the payment exhibit with regard to payment for therapeutic drugs.

| 16. | Certification (If required) | |
|---|---|---|

I HEREBY CERTIFY that I have reviewed the applicable filing requirements for this filing, and the filing complies with all applicable statutory and regulatory provisions for the state of _____ Iowa _____.

Print Name   Michele A. Druker
                                                                    Title   Vice President and Associate General Counsel

Signature _____                              Date:   May 15, 2007

LHTD-1, Page 2 of 2

Effective March 1, 2007               

| 17. | | Form Filing Attachment | | | |
|---|---|---|---|---|---|
| This filing transmittal is part of company tracking number | | | IA/UNIV/PRAC-061507 | | |
| This filing corresponds to rate filing company tracking number | | | N/A | | |
| | Document Name | Form Number | | | Replaced Form Number |
| | Description | | | | Previous State Filing Number |
| 01 | Practitioner Services Universal Agreement | IA/UNIV/PRAC-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PRAC-062504 |
| 02 | Hospital Services Universal Agreement | IA/UNIV/HOSP-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/HOSP-060804 |
| 03 | Provider Group Services Universal Agreement | IA/UNIV/PGRP-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PGRP-062504 |
| 04 | Physician Hospital Organization Services Universal Agreement | IA/UNIV/PHO-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PHO-060804 |
| 05 | Physician Organization Services Universal Agreement | IA/UNIV/PO-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PO-062504 |
| 06 | Practitioner Services Universal Agreement - Exhibit A | IA/UNIV/PRAC/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PRAC/EXA-062504 |
| 07 | Hospital Services Universal Agreement - Exhibit A | IA/UNIV/HOSP/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/HOSP/EXA-120106 |
| 08 | Provider Group Services Universal Agreement - Exhibit A | IA/UNIV/PGRP/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PGRP/EXA-062504 |
| 09 | Physician Hospital Organization Services Universal Agreement - Exhibit A | IA/UNIV/PHO/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PHO/EXA-120106 |
| 10 | Physician Organization Services Universal Agreement - Exhibit A | IA/UNIV/PO/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PO/EXA-062504 |
| 11 | Practitioner Services Universal Agreement - Exhibit B | IA/UNIV/PRAC/EXB-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/PRAC/EXB-062504 |
| 12 | Hospital Services Universal Agreement - Exhibit B | IA/UNIV/HOSP/EXB-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | | IA/UNIV/HOSP/EXB-060804 |

LH FFA-I

© 2007 National Association of Insurance Commissioners          3

Effective March 1, 2007

 

| | Document Name<br>Description | Form Number | | Replaced Form Number<br>Previous State Filing Number |
|---|---|---|---|---|
| 13 | Provider Group Services Universal Agreement - Exhibit B | IA/UNIV/PGRP/EX B-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/UNIV/PGRP/EXB-062504 |
| 14 | Physician Hospital Organization Services Universal Agreement - Exhibit B | IA/UNIV/PHO/EXB -061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/UNIV/PHO/EXB-060804 |
| 15 | Physician Organization Services Universal Agreement - Exhibit B | IA/UNIV/PO/EXB-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/UNIV/PO/EXB-062504 |
| 16 | Practitioner Agreement | IA/WBCBSI/PRAC-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/WBCBSI/PRAC-1001 |
| 17 | Hospital Agreement | IA/WBCBSI/HOSP-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/WBCBSI/HOSPITAL-090904 |
| 18 | Provider Group Agreement | IA/WBCBSI/PGRP-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/WBCBSI/PGRP-101201 |
| 19 | Facility Agreement | IA/UNIV/FAC-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/WBCBSI/FACILITY-121504 |
| 20 | Entity Agreement | IA/UNIV/ENT-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/WBCBSI/ENTITY-020703-Ex A rev 042006 |
| 21 | Practitioner Agreement - Exhibit A | IA/WBCBSI/PRAC/EXA-061507 | ☒ Initial<br>☐ Revised<br>☐ Other _____ | |
| 22 | Hospital Agreement - Exhibit A | IA/WBCBSI/HOSP/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other _____ | IA/WBCBSI/HOSPITAL/EXA-120106 |
| 23 | Provider Group Agreement - Exhibit A | IA/WBCBSI/PGRP/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other | IA/WBCBSI/PGRP/ExA-0801 |
| 24 | Facility Agreement - Exhibit A | IA/UNIV/FAC/EXA-061507 | ☐ Initial<br>☒ Revised<br>☐ Other | IA/WBCBSI/FACILITY/EXA-121504 |

© 2007 National Association of Insurance Commissioners                4

Effective March 1, 2007

 

| | Document Name | Form Number | | Replaced Form Number |
|---|---|---|---|---|
| | Description | | | Previous State Filing Number |
| 25 | Entity Agreement - Exhibit A | IA/UNIV/ENT/EXA-061507 | ☐ Initial ☒ Revised ☐ Other _____ | IA/WBCBSI/ENTITY-020703-Ex A rev 042006 |
| 26 | Practitioner Agreement - Exhibit B | IA/WBCBSI/PRAC/EXB-061507 | ☒ Initial ☐ Revised ☐ Other _____ | |
| 27 | Hospital Agreement - Exhibit B | IA/WBCBSI/HOSP/EXB-061507 | ☒ Initial ☐ Revised ☐ Other _____ | |
| 28 | Provider Group Agreement - Exhibit B | IA/WBCBSI/PGRP/EXB-061507 | ☒ Initial ☐ Revised ☐ Other _____ | |
| 29 | Facility Agreement - Exhibit B | IA/UNIV/FAC/EXB-061507 | ☒ Initial ☐ Revised ☐ Other _____ | |
| 30 | Entity Agreement - Exhibit B | IAUNIV/ENT/EXB-061507 | ☒ Initial ☐ Revised ☐ Other _____ | |
| 31 | | | ☐ Initial ☐ Revised ☐ Other _____ | |
| 32 | | | ☐ Initial ☐ Revised ☐ Other _____ | |
| 33 | | | ☐ Initial ☐ Revised ☐ Other _____ | |
| 34 | | | ☐ Initial ☐ Revised ☐ Other _____ | |
| 35 | | | ☐ Initial ☐ Revised ☐ Other _____ | |
| 36 | | | ☐ Initial ☐ Revised ☐ Other _____ | |

© 2007 National Association of Insurance Commissioners          5


Created by SERFF on 06-18-2007 05:41 PM

## Filing at a Glance

Companies: Wellmark Blue Cross and Blue Shield of Iowa, Wellmark Health Plan of Iowa, Inc.

| | | |
|---|---|---|
| Product Name: Provider Agreements | SERFF Tr Num: WMIA-125196069 | State: Iowa |
| TOI: H21 Health - Other | SERFF Status: Closed | State Tr Num: |
| Sub-TOI: H21.000 Health - Other | Co Tr Num: PRAC & HOSP AGREEMENTS | State Status: |
| Filing Type: Form | Co Status: | Reviewer(s): Tom O'Meara |
| | Authors: Michele Druker, Becky Latuska | Disposition Date: 06-18-2007 |
| | Date Submitted: 06-01-2007 | Disposition Status: Approved |
| Implementation Date Requested: On Approval | | Implementation Date: |

## General Information

| | |
|---|---|
| Project Name: Iowa Provider Agreements | Status of Filing in Domicile: Authorized |
| Project Number: | Date Approved in Domicile: |
| Requested Filing Mode: Review & Approval | Domicile Status Comments: |
| Explanation for Combination/Other: | Market Type: Individual |
| Submission Type: New Submission | Group Market Size: |
| Overall Rate Impact: | Group Market Type: |
| Filing Status Changed: 06-18-2007 | Company Status Changed: |
| State Status Changed: | Deemer Date: |
| Corresponding Filing Tracking Number: | |

Filing Description:

On May 15, 2007, Wellmark, Inc. filed practitioner and hospital service agreements and exhibits A and B on paper for approval. As we completed our final review of the these agreements, we identified changes that needed to be made to Sections 7.2 and 8.2 of each agreement. Therefore, we are filing revised practitioner and hospital service agreements that replace the agreements filed on May 15. No changes were made to exhibits A and B that were previously filed. Sample paragraphs that reflect these changes are also attached for your reference.

On May 18, 2007, Wellmark Health Plan of Iowa, Inc. (WHPI) filed provider and practitioner agreements for approval and received requested approval on May 23, 2007. Changes were also identified for Section 7.2 of the agreements and are submitted now for your review and approval. No changes were made to exhibits A and B that were previously filed for WHPI. A sample paragraph that reflects these changes is also attached for your review.

Please contact me if you have any questions. I appreciate your assistance with this review.

 eated by SERFF on 06-18-2007 0 PM

## Company and Contact

**Filing Contact Information**
Michele Druker, Vice President and Associate  mdruker@wellmark.com
General Counsel
636 Grand Avenue - Sta 32                          (515) 245-4718 [Phone]
Des Moines, IA 50309                               (515) 245-4925[FAX]
**Filing Company Information**
Wellmark Blue Cross and Blue Shield of Iowa  CoCode: 88848             State of Domicile: Iowa
636 Grand Avenue                             Group Code: 770           Company Type: Health
Des Moines, IA 50309                         Group Name:               State ID Number: 0186
(515) 245-4670 ext. [Phone]                  FEIN Number: 42-0318333

---------

Wellmark Health Plan of Iowa, Inc.           CoCode: 95531             State of Domicile: Iowa
636 Grand Avenue                             Group Code: 770           Company Type: HMO
Des Moines, IA 50309                         Group Name:               State ID Number: 2763
(515) 245-4670 ext. [Phone]                  FEIN Number: 42-1455449

---------

## Filing Fees

| Fee Required? | No |
| --- | --- |
| Retaliatory? | No |
| Fee Explanation: | |
| Per Company: | Yes |

Created by SERFF on 06-18-2007 09:01 PM

## Disposition

Disposition Date: 06-18-2007
Implementation Date:
Status: Approved
Comment:

Rate data does NOT apply to filing.

 Created by SERFF on 06-18-2007 05:01 PM

| Item Type | Item Name | Item Status | Public Access |
|---|---|---|---|
| Supporting Document | Actuarial Certification - Life & A&H | Approved | Yes |
| Supporting Document | Actuarial Memorandum - Life & A&H | Approved | Yes |
| Supporting Document | Premium Rate Sheets - Life & A&H | Approved | Yes |
| Supporting Document | Filing Fee Form (if applicable) | Approved | Yes |
| Supporting Document | Sample Paragraphs | Approved | Yes |
| Supporting Document | Certificate of Compliance | Approved | Yes |
| Form | Practitioner Services Universal Agreement | Approved | Yes |
| Form | Hospital Services Universal Agreement | Approved | Yes |
| Form | Practitioner Services HMO Agreement | Approved | Yes |

Mueller et al v. Wellmark, Inc., et al. **Decker Affidavit - Exhibit C**
Supreme Court Docket No. 13-1872 **Page 24 of 25**

APPENDIX
Page 82



Created by SERFF on 06-18-2007 05:01 PM

## Supporting Document Schedules

| | | Review Status: | |
|---|---|---|---|
| **Satisfied -Name:** | Sample Paragraphs | Approved | 06-18-2007 |

**Comments:**

Attached are the sample paragraphs tracking the changes made to the Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc. provider agreements.

**Attachments:**

IA PRAC Sample Paragraph.pdf

WHPI Sample Paragraph.pdf

| | | Review Status: | |
|---|---|---|---|
| **Satisfied -Name:** | Certificate of Compliance | Approved | 06-18-2007 |

**Comments:**

Attached are the required Certificates of Compliance for this filing.

**Attachments:**

MAD -Cert of Compliance - Prac Agr Wellmark - 06-01-07.pdf

MAD -Cert of Compliance - Prac Agr WHPI - 06-01-07.pdf