**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| In re:  BLUE CROSS BLUE SHIELD  )<br>ANTITRUST LITIGATION            )<br>_____ ) | MDL No. 2406 |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO VACATE CONDITIONAL
TRANSFER ORDER (CTO-32)**

**Introduction**

Plaintiffs' copycat class-action lawsuit is one of more than 60 actions alleging that Blue Cross and Blue Shield Association ("BCBSA") and its 36 member Blue Cross Blue Shield Plans ("Blue Plans") conspired to fix prices in order to reduce prices paid to healthcare providers. Plaintiffs' complaint is not the first to attempt to avoid federal jurisdiction by naming only the local Blue Plan and bringing only state-law antitrust claims. In each of those cases, BCBSA intervened, the matter was removed, and then the case was tagged and transferred to MDL 2406. The significant and complex overlapping common factual issues raised in plaintiffs' complaint dictate transfer here as well.

Plaintiffs' contrary arguments have all been rejected by this very Panel. First, the slight differences between plaintiffs' complaint and the MDL do not preclude transfer. The standard for transfer under § 1407 is generous; it does not require a predominance or even a majority of common factual issues. Rather, a single overlapping question of fact can suffice. Transfer is particularly appropriate where, as here, cases present overlapping putative classes. Second, centralization will avoid the significant risk of conflicting rulings on overlapping issues, prevent duplicative discovery, and serve the convenience of the parties and the courts.

Finally, plaintiffs' pending motion to remand *supports* transfer. This Panel routinely transfers cases where jurisdictional issues are still pending, where they can be resolved consistently and efficiently by the transferee court. And federal jurisdiction over this case is clear. There can be little doubt that BCBSA has a right to intervene, as has been held in each case to address the issue. Given BCBSA's indispensable presence, this suit was removable, and the Class Action Fairness Act supplies subject-matter jurisdiction. For these reasons, the Panel should affirm the Conditional Transfer Order.

## BACKGROUND

BCBSA owns the rights to the famous Blue Cross and Blue Shield trademarks. *See Cent. Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1433 (S.D. Ohio 1989). BCBSA does not underwrite healthcare insurance itself, but rather licenses its trademarks to insurance companies, which then offer Blue-branded health-insurance products using the marks. For example, BCBSA licenses to Wellmark the right to use its trademarks in Iowa. Wellmark then contracts with hospitals, physicians, and other providers and offers Blue-branded health plans to subscribers in the state. BCBSA has operated its licensing system this way for decades.

Since February 2012, more than 60 suits have been filed across the country raising antitrust challenges to BCBSA's licensing agreements and BlueCard Program. Dozens of these suits were filed by healthcare providers, alleging that BCBSA and Blue Plans conspired to divide health-insurance markets and to fix prices paid to healthcare providers. In 2012, one of the plaintiffs petitioned this Panel for centralization, which was granted. (*In re Blue Cross Blue Shield Antitrust Litig.*, MDL 2406 (Dkt. No. 1.).) These suits are now consolidated for pretrial proceedings in front of Judge R. David Proctor.

Since creation of the MDL, a steady stream of individual and putative class action cases have been filed and transferred to the MDL. In addition, the provider plaintiffs have filed consolidated complaints against BCBSA, Wellmark, and the other Blue Plans. These complaints challenge, among other things, (1) the licensing agreements between BCBSA and the Blue Plans, and (2) the rules and procedures governing BCBSA's BlueCard Program. (*E.g.*, Ex. A, Dkt. 1083, ¶¶ 1–8[1].)

---

[1] Exhibit A was initially filed under seal, but has since been unsealed in its entirety.

As to the BlueCard Program, the MDL plaintiffs challenge rules, including those that require a member of one Blue Plan receiving healthcare services in another Blue Plan's service area (*e.g.*, when traveling) to receive the same negotiated provider discounts as members of the second Blue Plan. (Ex. A ¶ 8.) According to plaintiffs, this arrangement constitutes price-fixing by all the Blue Plans nationwide, including Wellmark. (*Id.*) However, the BlueCard Program delivers significant benefits to both providers and subscribers. Providers benefit from high patient volume, ease of claims submissions, and prompt payment, while subscribers are protected from price-discrimination by providers and benefit from a single point of contact. Critically, the program allows the otherwise-regional Blue Plans to create joint products in order to meet the needs of multi-state employers and subscribers who travel. This increases interbrand competition against national competitors like Aetna, United Healthcare, and Cigna. Notwithstanding these procompetitive benefits, the MDL plaintiffs assert that the alleged conspiracy between BCBSA and all Blue Plans, including Wellmark, has resulted in inflated premiums for subscribers and decreased reimbursements for providers, including the Plaintiffs here. (*Id.*)

Several actions now transferred into the MDL were artfully pled to avoid federal court by naming only the local Blue Plan as a defendant and asserting only state-law claims. In such cases, BCBSA moved to intervene, the matter was removed, and the case was tagged and transferred to the MDL. (*E.g.*, Ex. B, 7/30/12 Order Granting Motion to Intervene, *Morrissey v. Blue Cross & Blue Shield of Tenn.*, No. 12-cv-02359-JTF (W.D. Tenn.) (Dkt. No. 28); Ex. C, 1/18/13 Order Granting Motion to Intervene, *Sosebee v. Usable Mut. Ins. Co.*, 13-cv-00014-RDP (N.D. Ala.) (Dkt. No. 12); Ex. D, MDL 2406 (Dkt. No. 128) (J.P.M.L.); Ex. E, MDL 2406 (Dkt. No. 146) (J.P.M.L.).) There is no reason to treat the present class-action lawsuit any differently.

Plaintiff's complaint was filed in October 2015.  Plaintiffs allege that Wellmark, as a licensee and member of BCBSA, conspired with all of BCBSA's other member Blue Plans to fix prices for chiropractic services in Iowa through the BlueCard Program.  (Ex. F, Petition ¶¶ 3(a), 12, 15, 21(a), 37, 38; Ex. G, 6/14/17 1st Am. to Petition.)  Plaintiffs assert that this arrangement constitutes price-fixing by all Blue Plans, including Wellmark.

These allegations substantially overlap with and run parallel to those brought in the 60-plus cases already centralized in the MDL.  For example:

| *Chicoine* Allegation | MDL Allegation |
| --- | --- |
| By agreements between Wellmark defendants and each of the other 38 (now 36) BCBSA licensees, Wellmark processes and pays Iowa providers for out-of-state licensees member claims for provider services for each of the other BCBSA licensees. *Wellmark defendants have agreed with each of the other licensees to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark defendants under terms of the Practitioner Services Agreements* and the agreement with Iowa Chiropractic Physicians Clinic.  (Ex. G ¶ 1(c) (emphasis added).) | Through the Price Fixing and Boycott Conspiracy, *the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate* through the national programs.  (Ex. A ¶ 474 (emphasis added).) |
| Wellmark Defendants, together with their co-conspirators, use their *overwhelming economic power and market dominance to coerce the individual Provider Plaintiffs into acquiescing in practice restrictions and reimbursement schedules detrimental to Provider Plaintiffs* and by limiting and restricting patient access to Provider Plaintiffs resulting in detriment to the physical care and choice of consumers.  (Ex. F ¶ 37 (emphasis added).) | As a result of the Market Allocation Conspiracy, *Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area.* As described above, Defendants have reached a horizontal agreement and implemented a *Price Fixing and Boycott Conspiracy through the national programs in order to leverage the low provider pricing they have achieved in each Service Area* to benefit all Blues.  (Ex. A ¶ 326 (emphasis added).) |

| *Chicoine* Allegation | MDL Allegation |
|---|---|
| Wellmark defendants have entered into *agreements with other potential price competitors to artificially fix a lower price* for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa. (Ex. F ¶ 39(a) (emphasis added).) | Accordingly, *Defendants have fixed the prices for healthcare reimbursement in each Service Area.* These fixed prices are then enforced through a horizontal agreement between the Blues. (Ex. A ¶ 8 (emphasis added).) |

Moreover, the putative class asserted here *completely overlaps* with the putative classes asserted in the MDL. (*Compare* Ex. F ¶ 7 *with* Ex. A ¶¶ 530–34, 617–18.) In fact, one of the MDL class representatives is an Iowa chiropractor who provided covered services to patients insured by Wellmark. (Ex. A ¶ 556.)

Despite directly challenging BCBSA's BlueCard Program and business practices, the artfully pled complaint names *only* Wellmark as a defendant and intentionally omits BCBSA to avoid federal jurisdiction. Upon becoming aware of this Complaint, BCBSA moved to intervene. (Ex. H, 6/14/17 Motion to Intervene, *Chicoine, et. al. v. Wellmark, et al.*, No. CVCV 050638 (Iowa Dist.).) Wellmark then filed a timely notice of removal. (Ex. I, 6/14/17 Notice of Removal, No. 4:17-cv-00210 (S.D. Iowa) (Dkt. No. 1).)

Wellmark also filed a notice of potential tag-along action. (Ex. J, Dkt. No. 364.) A Conditional Transfer Order issued the next day. The Order recognized that this case appears to "involve questions of fact that are common to the actions previously transferred to the Northern District of Alabama and assigned to Judge Proctor." (Ex. K, Dkt. No. 366.) Proceedings in the transferor court have been stayed while the CTO is pending before this Panel. (Ex. L, 7/19/2017 Order, No. 4:17-cv-00210 (S.D. Iowa) (Dkt. No. 13).)

## ARGUMENT

Transfer under § 1407 is appropriate if (1) the actions involve one or more common questions of fact; (2) transfer promotes just and efficient conduct; and (3) transfer will be convenient for the parties and witnesses. 28 U.S.C. § 1407(a). The standard for resolving transfer of a tag-along action is the same. *See, e.g.*, *In re Stirling Homex Corp. Sec. Litig*, 442 F. Supp. 547, 549 (J.P.M.L. 1977); David F. Herr, *Multidistrict Litig. Manual* § 8:1 (2012).

This case presents a textbook case for transfer. Plaintiffs do not dispute that this action and the MDL share at least one common question of fact. And, as has been the case for the 60-plus cases already centralized before Judge Proctor, transfer will promote just and efficient conduct, and serve the convenience of the parties and witnesses. Moreover, plaintiffs' argument regarding federal jurisdiction is unavailing; pending jurisdictional disputes are routinely transferred to MDL courts for resolution. *See, e.g.*, *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 170 F. Supp. 2d 1346, 1347 (J.P.M.L. 2001). In fact, the Panel transferred several cases where remand was pending in this very MDL. (Exs. D, E.) In any event, there is indeed federal subject matter jurisdiction here under the Class Action Fairness Act.

## I.     THIS ACTION SATISFIES ALL REQUIREMENTS OF § 1407.

Plaintiffs' suit, like dozens of actions already transferred, alleges that BCBSA's pro-competitive BlueCard Program and longstanding practices constitute price-fixing in violation of the antitrust laws. This significant question should only be decided once, not countless times in various jurisdictions across the country. As long recognized by the Panel, overlapping and related antitrust class actions are particularly well suited for consolidation under § 1407. *See, e.g.*, *In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d 1341 (J.P.M.L. 2017); *In re Hydrogen Peroxide Antitrust Litig.*, 374 F. Supp. 2d 1345, 1346 (J.P.M.L. 2005).

### A. MDL 2406 and this case involve numerous common questions of fact.

Section 1407 does not require a complete identity or even a majority of common factual and legal issues. *In re Travel Agent Comm'n Antitrust Litig.,* 290 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003). Rather, a suit should be transferred if there are common questions of fact "of sufficient magnitude and complexity." *In re Western Liquid Asphalt*, 309 F. Supp. 157, 159 (J.P.M.L. 1970). "Where multidistrict litigation involves two or more categories of cases with some overlapping questions of fact and some unique questions of fact it has generally been thought desirable to transfer them to a single district and to assign them to a single judge." *In re Grain Shipments*, 319 F. Supp. 533, 535 (J.P.M.L. 1970).

This suit fits comfortably within the long line of precedent centralizing antitrust actions alleging injuries sustained as a result of the same alleged conspiracy.[2] As discussed above, the overlapping factual and legal issues presented in plaintiffs' complaint and the MDL are obvious, substantial, and complex. Like the other plaintiffs in the MDL, plaintiffs here allege that Wellmark conspired with the 36 other Blue Plans to drive down reimbursements for providers by fixing prices. (*Compare* Ex. A ¶¶ 8, 474 *with* Ex. F ¶ 39(a), Ex. G ¶ 1(c).) In addition, plaintiffs in both the MDL and this case allege that this "conspiracy" enabled Wellmark and other Blue Plans to acquire market power, which they used to coerce providers into unfavorable contracts and depressed reimbursement rates. (*Compare* Ex. A ¶ 326 *with* Ex. F ¶¶ 21(a), 37.)

---

[2] *See, e.g.*, *In re Lipitor Antitrust Litig.*, MDL No. 2332, 2012 WL 4069565, at *1 (J.P.M.L. Aug. 3, 2012) (affirming CTO where individual action shared questions of fact with other antitrust class actions); *In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008) (affirming CTO where suit did not involve exact same factual issues but alleged same conspiracy to monopolize pain-medication market); *In re "Fine Paper" Antitrust Litig.*, 453 F. Supp. 118, 121 (J.P.M.L. 1978) (affirming CTO where, even though actions involved "some different defendants and some dissimilar factual issues," centralization was appropriate because all concerned "whether there has been a conspiracy to engage in restrictive trade practices").

8

Despite these obvious overlaps, plaintiffs argue that § 1407's first requirement is not met. (Pl. Br. 8–16.) Plaintiffs are wrong. ***First,*** plaintiffs wrongly suggest that § 1407 requires that the "primary issues" in their action and the MDL be common. (*Id.* at 12.) But § 1407 contains no such primacy or predominance requirement. *See, e.g.*, Herr, *Multidistrict Litig. Manual* § 5:44 (2012). The Panel has consistently held that § 1407 does not require "a complete identity of common factual issues," and "the presence of additional or differing legal theories" will not preclude transfer. *In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d at 1360. Rather, § 1407 requires only that the actions share at least one common factual question.[3]

Further, this case and the MDL share several "primary issues." Both cases allege a massive price-fixing conspiracy between BCBSA, Wellmark, and the other 35 Blue Plans nationwide. Both cases also seek certification of overlapping classes of healthcare providers. The Panel has held that the "potential for conflicting or overlapping class actions presents one of the strongest reasons for transferring such related actions to a single district." *In re Plumbing Fixtures,* 308 F. Supp. 242, 243–44 (J.P.M.L. 1970); *see also In re Ditropan XL Antitrust Litig*., 429 F. Supp. 2d 1364, 1366 (J.P.M.L. 2006); *In re Sulfuric Acid Antitrust Litig*., 270 F. Supp. 2d 1379, 1380 (J.P.M.L. 2003).

***Second,*** plaintiffs assert that their case "solely centers on conspiratorial and discriminatory price fixing treatment of Iowa chiropractors in Iowa by Iowa actors in violation of Iowa law." (Pl. Mot. 2; *see also* Pl. Br. at 12–13, 16.) This directly contradicts the complaint, which alleges a

---

[3] Plaintiffs repeatedly reference the Iowa Supreme Court's decision regarding a stay in this matter. The Iowa Court held that the case should proceed forward, but did not have before it the question of in what forum it should proceed since BCBSA had not yet intervened. And that decision did not apply or even mention § 1407. In fact, the court emphasized that "[i]t is unclear in our view whether any resolution of claims in MDL No. 2406 would result in the resolution of claims in this action," and the stay would last until 2018 at a minimum. *Chicoine v. Wellmark, Inc.* 894 N.W.2d 454, 461–62 (Iowa 2017). This standard is different than what is required by § 1407. Accordingly, the stay decision is no impediment to transfer.

conspiracy among all 36 Blue Plans nationwide: "Wellmark defendants have agreed *with each of the other licensees to fix the price of Iowa chiropractic services* in accordance with the prices set by Wellmark defendants under terms of the Practitioner Services Agreements and the agreement with Iowa Chiropractic Physicians Clinic." (Ex. G ¶ 1(c) (emphasis added); *see also* Pl. Br. 6 (characterizing out-of-state Blue Plans as "contractually bound co-conspirators").)

Moreover, alleging a narrower subset of the global conspiracy at issue in the MDL puts plaintiffs' case *within* the conspiracy alleged by the other plaintiffs, not outside of it. *In re Cuisinart Food Processor Antitrust Litig.*, 506 F. Supp. 651 (J.P.M.L. 1981), is instructive. In that case, the defendant sought to centralize eight actions that alleged a conspiracy to fix the prices for food processors. One plaintiff asked to be excluded because he alleged a more limited conspiracy—one limited to particular purchasers and focused on distinctly local factors. The Panel rejected this argument, holding that the broader conspiracy "necessarily encompasses many aspects of the somewhat more limited" conspiracy and that transfer was necessary to prevent duplicative discovery. *Id.* at 655; *see also In re Cement & Concrete Antitrust Litig.*, 465 F. Supp. 1299, 1300 (J.P.M.L. 1979) (centralizing statewide antitrust conspiracy suits with other antitrust actions because "national conspiracy alleged in some of the actions in the transferee district naturally encompasses the statewide conspiracy").

*Finally,* plaintiffs argue that their complaint alleges "a considerably greater market share" and a different damages theory than the operative complaint in the MDL. (Pl. Br. 13–16.) But the Panel's case law is clear that inconsistencies in market allegations do not warrant denial of transfer. *In re Petrol. Prods. Antitrust Litig.*, 407 F. Supp. 249, 251 (J.P.M.L. 1976); *In re Midwest Milk Monopolization Litig.*, 379 F. Supp. 989, 991-92 (J.P.M.L. 1974). In fact, in those cases the Panel ordered transfer even though the plaintiffs alleged entirely different *markets*, not just differences

in the level of market share. Similarly, differences in damages theories are no obstacle to transfer. *See, e.g.*, *In re McDonald's French Fries Litig.*, 560 F. Supp. 2d 1355, 1356 (J.P.M.L. 2008) (denying motion to vacate even though action sought damages for personal injury and while cases consolidated in MDL brought solely economic damage claims).[4]

Plaintiffs' case presents overlapping antitrust conspiracy allegations and an overlapping class with the cases already centralized in the MDL. Plaintiffs' attempt to shift focus away from these significant and complex overlapping issues cannot preclude transfer. *See, e.g.*, *In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d at 1342 (granting consolidation even though actions named separate defendants and involved separate products).

**B.   Transfer will promote just and efficient conduct.**

Transfer will promote just and efficient conduct by eliminating duplicative discovery as well as the risk of inconsistent rulings. Discovery in all 60-plus actions, as well as other prospective tag-along actions, will be substantially overlapping and duplicative. Indeed, plaintiffs do not even seriously dispute this fact in their Motion to Vacate.

Plaintiffs have already attempted to amend their petition to avoid transfer. (Ex. G.) Tellingly, they refused to drop their allegations that (1) Wellmark conspired with the other Blue Plans to drive down reimbursements for providers by fixing prices (Ex. F ¶ 37, 38; Ex. G ¶ 1(c)); and (2) the BlueCard Program is anticompetitive and illegal (Ex. F. 39(g)).

It's clear that, along with all the other plaintiffs in the MDL, plaintiffs here will seek discovery on the alleged "rules" or "guidelines" that are supposedly implemented by BCBSA

---

[4] Plaintiffs' various other cited cases are inapposite. *See In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, 542 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008) (denying transfer of *individual* claims, not class-action claims); *In re Petroleum Prod. Antitrust Litig.*, 476 F. Supp. 455, 458 (J.P.M.L. 1979) (denying transfer of a case that "would disrupt and substantially delay the orderly progress of pretrial proceedings in the transferee district"); *In re IBM*, 316 F. Supp. 976, 977 (J.P.M.L. 1970) (denying transfer where MDL claims were "irrelevant" to the claim at issue).

licenses and imposed upon the various Blue Plans. Absent centralization, BCBSA and the other defendants might be forced to produce the same documents (and possibly raise the same objections) many times. The dozens of other Blue Plans named as co-conspirators in the alleged national conspiracy would likely face overlapping, third-party discovery. In addition, the same employees would be subjected to multiple depositions in multiple forums on the same issues. Where parties must depose the same witnesses, examine the same documents, and make the same (or similar) pretrial motions, the benefits of a single judge supervising these proceedings are "obvious." *In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978). Any unique factual issue can be dealt with under the transferee judge's discretion to manage the case. *See In re Bristol Bay, Alaska Salmon Fishery Antitrust Litig.*, 424 F. Supp. 504, 506 (J.P.M.L. 1976) (transferring action that might involve "substantial amount of discovery" on unique issue given transferee judge's discretion "to allow discovery on issues unique to any action to proceed concurrently with the common discovery").

It is also clear that, absent transfer, there is a real potential for conflicting rulings on the existence of the alleged nationwide conspiracy, the validity of BCBSA's BlueCard Program, and the viability of proposed overlapping classes. Avoiding this result is one of the primary aims of § 1407; accordingly, the Panel has consistently transferred sweeping conspiracy claims with national implications. *See, e.g.*, *In re Lipitor Antitrust Litig.*, 856 F. Supp. 2d 1355, 1356 (J.P.M.L. 2012); *In re Automotive Wire Harness Sys. Antitrust Litig.*, 867 F. Supp. 2d 1349, 1350–51 (J.P.M.L. 2012); *In re Cement & Concrete Antitrust Litig.,* 465 F. Supp. at 1300–01; *In re Sugar Indus. Antitrust Litig*., 427 F. Supp. 1018, 1025–26 (J.P.M.L. 1977).

### C. The benefits to centralization far outweigh any alleged inconvenience.

Plaintiffs cannot show that any alleged inconveniences outweigh the obvious benefits of centralization. Plaintiffs assert that "the Iowa District Court is more convenient." (Pl. Br. 16.)

But this "worm's eye view" to inconvenience was rejected by the Panel long ago: "Of course it is to the interest of each plaintiff to have all of the proceedings in his suit handled in his district. But the Panel must weigh the interests of all the plaintiffs and all the defendants, and must consider multiple litigation as a whole in the light of the purposes of the law." *In re Library Editions of Children's Books*, 297 F. Supp. 385, 386 (J.P.M.L. 1968); *accord In re Fed. Election Campaign Act Litig.*, 511 F. Supp. 821, 823 (J.P.M.L. 1979). Centralization may be "less than convenient for some parties," but where the benefits outweigh this inconvenience for one party, centralization is appropriate. *See In re Wells Fargo Wage & Hour Emp. Prac. Litig.* (No. III), 804 F. Supp. 2d 1382, 1384 (J.P.M.L. 2011).

Here, there is no great inconvenience to plaintiffs. Centralized proceedings do not require parties to attend all the proceedings in the transferee court, and discovery of the parties can take place in the district where the parties reside. *See, e.g., In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424 F. Supp. at 506–07. In contrast, BCBSA (located in Chicago) and Wellmark—not to mention the 35 non-Iowa licensees—would be forced to litigate the same issues multiple times, in multiple districts. Plaintiffs' mere preference cannot trump the benefits of centralization.

## II.   SUBJECT-MATTER JURISDICTION IS BEST RESOLVED BY THE TRANSFEREE COURT.

Plaintiffs' last argument is that the Panel should vacate the conditional transfer order because there is no federal jurisdiction over their case. Plaintiffs are wrong for two reasons. First, a pending jurisdictional dispute counsels in *favor* of transfer. Second, there is no doubt that federal jurisdiction exists over plaintiffs' class action lawsuit.

*First,* plaintiffs' assertion that "[t]ransferring the case before determination of the jurisdictional issue would not promote judicial economy" (Pl. Br. 7) contravenes established precedent. The Panel routinely transfers cases with pending jurisdictional disputes. *See, e.g.*, *In*

13

*re C.R. Bard, Inc.*, MDL No. 2187, 2015 WL 1641343 at *1 (J.P.M.L. April 7, 2015) ("The Panel often has held that jurisdictional issues do not present an impediment to transfer, as plaintiffs can present these arguments to the transferee judge."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 170 F. Supp. 2d at 1347-48; *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 368 F. Supp. 812, 813 (J.P.M.L. 1973); *see also In re Ivy*, 901 F.2d 7, 10 (2d Cir. 1990) (denying mandamus to direct JPML to vacate CTO on the ground that there was no subject-matter jurisdiction).[5]  Indeed, judicial efficiency and consistency are served by permitting the MDL court to decide issues of remand and federal jurisdiction.

Plaintiffs also argue that "no action before the MDL presents a similar issue of whether BCBSA should be allowed to intervene under like circumstances." (Pl. Br. 7.)  Not so.  Multiple other cases were brought only against the local Blue Plan and asserted only state-law claims.  In every case to address the issue, BCBSA's motion to intervene was granted.  (Exs. B, C.)  And all of those cases that were pending in federal court were transferred to MDL No. 2406.  (Exs. D, E.)  In addition, just weeks ago the Panel issued CTO-33.  (6/28/17 CTO-33, MDL No. 2406 at Dkt. No. 371.)  That case involves almost identical jurisdictional questions to those raised here, including BCBSA's intervention and the propriety of removal and jurisdiction under the Class Action Fairness Act.  Future copycat cases could raise similar issues.  Denying transfer would create a significant risk of inconsistent pretrial rulings.  It is clear that Judge Proctor should decide these key jurisdictional issues in order to ensure consistent treatment.

*Second,* plaintiffs' arguments against federal jurisdiction have no merit.  BCBSA properly intervened as a matter of right in this action. (*See generally* Ex. H.)  The heart of plaintiffs' suit is

---

[5] Plaintiffs' citation to *In re L.E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) is misplaced, as the "important motion" at issue in that case was a request for a preliminary injunction.  Similarly, *Myers v. Bayer AG*, 143 F. Supp. 2d 1044, 1049 (E.D. Wis. 2001), was decided on a motion to stay and did not apply or interpret § 1407.

that BCBSA's licensing agreements and nationwide BlueCard Program constitute an illegal price-fixing conspiracy. The BlueCard Program is a collaboration that has enabled the creation of nationwide healthcare products for all Blue subscribers and providers that would otherwise be unavailable. It is a pillar of BCBSA's business model; without it, BCBSA and Blue Plans couldn't operate on a national level. Disposing of the action without BCBSA's participation would impair BCBSA's ability to protect its interests nationwide.

BCBSA's presence as a party-defendant creates the minimal diversity required by the Class Action Fairness Act, which reflects Congress' judgment that class actions with national character belong in federal court. *See* 28 U.S.C. § 1332(d). The Act's other prima facie requirements—that the proposed class consists of more than 100 members, and that the amount in controversy exceeds $5 million—are also easily met. *Id*. Finally, neither of CAFA's narrow exceptions for local controversies apply. Numerous similar suits were filed in the three years prior to plaintiffs' complaint, and BCBSA unquestionably is a primary defendant. Therefore, like its sister suits before it, this case was properly removed to federal court and should be transferred to the MDL.

## CONCLUSION

The Panel has already centralized actions alleging that the BlueCard Program is a "conspiracy" to fix prices and drive down reimbursements to health care providers. Plaintiffs here allege the same conspiracy and assert an overlapping putative class. Therefore, transfer of its case will promote just and efficient conduct, and any claimed inconvenience is outweighed by the benefits achieved by centralization. Rather than force Wellmark and BCBSA to duplicate pretrial efforts and risk inconsistent rulings, this Panel should transfer of this case to MDL No. 2406.

Date:  July 28, 2017 /s/ Daniel E. Laytin, P.C.
Daniel E. Laytin, P.C.
Zachary D. Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
zachary.holmstead@kirkland.com

*Counsel for Blue Cross and Blue Shield Association*

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re: BLUE CROSS BLUE SHIELD )
ANTITRUST LITIGATION ) MDL No. 2406
_____ )

**CERTIFICATE OF SERVICE**

    I, Daniel E. Laytin, as Counsel for Defendant Blue Cross and Blue Shield Association, hereby certify that on the 28th day of July, 2017, a copy of the foregoing Notice of Potential Tag-Along Action was electronically filed with the Judicial Panel on Multidistrict Litigation by using the CM/ECF system on behalf of Defendant Blue Cross and Blue Shield Association, which will send notice of electronic filing to all parties of record:

| | |
|---|---|
| Glenn L. Norris<br>HAWKINS & NORRIS PC<br>2501 Grand Ave.<br>Des Moines, IA 50312-1791<br>Tel: (515) 288 6532<br>Fax: (515) 288-9733<br>gnorris@2501grand.com | Benjamin Patrick Roach<br>NYEMASTER GOODE PC<br>700 Walnut Street<br>Suite 1600<br>Des Moines, IA 50309-3899<br>Tel: (515) 283-8158<br>Fax: (515) 283-3108<br>bproach@nyemaster.com |
| Harley C. Erbe<br>ERBE LAW FIRM<br>2501 Grand Ave.<br>Des Moines, IA 50312-1791<br>Tel: (515) 281-1460<br>Fax: (515) 281-1474<br>erbelawfirm@aol.com | Hayward L. Draper<br>NYEMASTER GOODE PC<br>700 Walnut Street<br>Suite 1600<br>Des Moines, IA 50309-3899<br>Tel: (515) 283-8158<br>Fax: (515) 283-3108<br>hdraper@nyemaster.com |
| Kara Marie Simons<br>Steven P. Wandro<br>WANDRO & ASSOCIATES, P.C.<br>2501 Grand Ave.<br>Suite B<br>Des Moines, IA 50312-1791<br>Tel: (515) 281-1475<br>Fax: (515) 281-1474<br>ksimons@2501grand.com<br>swandro@2501grand.com | *Counsel for the Defendants Wellmark, Inc.* d/b/a *Wellmark Blue Cross and Blue Shield of Iowa*, an Iowa corporation, and *Wellmark Health Plan of Iowa, Inc.*, an Iowa corporation |

*Counsel for Plaintiffs*

                                                                Joan M. Fletcher
                                                                Jeffrey A. Krausman
                                                                DICKINSON MACKAMAN TYLER 7 HAGEN PC
                                                                699 Walnut St.
                                                                1600 Hub Tower
                                                                Des Moines, IA 50309-3986
                                                                Tel: (515) 244-2600
                                                                Fax: (515) 246-4550
                                                                jfletcher@dickinsonlaw.com
                                                                jkrausman@dickinsonlaw.com

                                                                *Counsel for Blue Cross and Blue Shield Association*

Date:  July 28, 2017                              /s/ Daniel E. Laytin, P.C.
                                                                Daniel E. Laytin, P.C.
                                                                Zachary D. Holmstead
                                                                KIRKLAND & ELLIS LLP
                                                                300 North LaSalle Street
                                                                Chicago, IL 60654
                                                                Tel: (312) 862-2000
                                                                Fax: (312) 862-2200
                                                                dlaytin@kirkland.com
                                                                zachary.holmstead@kirkland.com

                                                                *Counsel for Blue Cross and Blue Shield Association*