UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C., NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>and<br><br>STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C., MARK A. KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MILLER, D.C., and  LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>     Plaintiffs,<br><br>v.<br><br>WELLMARK INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>     Defendants. | No. 4:17-cv-00210<br><br><br><br><br><br><br><br>**NOTICE OF REMOVAL** |

COME NOW, Defendants Wellmark, Inc. d/b/a Wellmark Blue Cross and

Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc. ("Wellmark") and file

this Notice of Removal of this case from the Iowa District Court for Polk County, in

which it is now pending, to the United States District Court, Southern District of Iowa, Central Division.  In support of this Notice of Removal, Wellmark states:

1.     On October 5, 2015, plaintiffs, individually and on behalf of all others similarly situated, commenced this civil action in the Iowa District Court for Polk County, bearing Case Number CVCV050638.  Polk County is within the jurisdiction of the Southern District of Iowa.  Defendant Wellmark was served with a copy of the Class Action Petition for Damages on October 6, 2015.

2.     The action alleges that Wellmark conspired with the Blue Cross Blue Shield Association ("BCBSA"), thirty-five of BCBSA's Blue Cross Blue Shield member Plans ("Blue Plans") from all around the country, and an unspecified group of Wellmark's self-funded accounts in violation of the Iowa Competition Act, Iowa Code § 553.4 (2007), *et seq.*, through market allocation and price fixing agreements. However, in an attempt to avoid federal jurisdiction, plaintiffs chose only to name Wellmark—not BCBSA or its member Plans.

3.     On December 4, 2015, Wellmark filed a motion for stay, which was granted on January 28, 2016 by the Honorable Michael D. Huppert.  Plaintiffs appealed Judge Huppert's order, and the Supreme Court of Iowa vacated the order and remanded for further proceedings.  Judge Huppert lifted the stay on May 16, 2017.

4.     Pursuant to 28 U.S.C. § 1446(a), a copy of all pleadings, process, and orders that have been served on Defendants are attached hereto as Exhibits A through KK.

**DIVERSITY JURISDICTION**

5.    The Class Action Fairness Act ("CAFA") provides that a class action may be removed if: (a) membership in the class is not less than 100; (b) any member of the plaintiff class is a citizen of a foreign country or a state different from any defendant; and (c) the aggregate amount in controversy exceeds $5,000,000.  *See* 28 U.S.C. §§ 1453(b), 1332(d).  All three requirements are met here.

6.    CAFA's first requirement—that class membership be no less than 100—is easily satisfied here.   The putative class is alleged to consist of "approximately 1200 chiropractors."  (Exhibit B, Petition at Law, at ¶ 20.)

7.    CAFA's second requirement—that any one member of the purported class be a citizen of a state different from any defendant—is also satisfied here. Plaintiff alleges that Wellmark acted in conspiracy with BCBSA, an Illinois corporation located in Chicago, Illinois, but chose not to name BCBSA as a defendant.  However, BCBSA (not Wellmark) owns and licenses the Blue Cross® and Blue Shield® trademarks ("Blue Marks").  BCBSA (not Wellmark) administers the BlueCard Program.  BCBSA therefore has an interest relating to the subject of this action and its absence as a defendant herein, as a practical matter, impedes its ability to protect that interest.

8.    BCBSA is a primary defendant in this matter.

9.    Accordingly, BCBSA has been improperly omitted as a defendant from this lawsuit.  BCBSA has moved to intervene as a defendant.  (Exhibit KK, Motion to Intervene.)  If the motion is granted, minimal diversity will exist.

10.    CAFA's third and final requirement—that the aggregate amount in controversy exceed $5,000,000, exclusive of interest and costs—is also easily satisfied.

11.    In order to invoke federal jurisdiction, Wellmark merely must provide an estimate of the amount in controversy which is "plausible and adequately supported by the evidence." *Bloomberg v. Service Corp. Intl*, 639 F.3d 781, 763 (7th Cir. 2011).   The Eighth Circuit has made clear that this simply is a "pleading requirement, not a demand for proof," and that "[t]he removing party need not confess liability in order to show that the controversy exceeds the threshold." *Hartis v. Chi. Title Ins. Co.*, 694 F.3d 935, 945 (8th Cir. 2012) (internal quotations omitted).   "Once the proponent of federal jurisdiction has explained plausibly how the stakes exceed $5,000,000 . . . the case belongs in federal court unless it is legally impossible for the plaintiff to recover that much." *Bloomberg*, 639 F.3d at 764 (internal citations omitted).

12.    Wellmark estimates that plaintiffs seek to recover more than $5,000,000 in this case.  Among other things, plaintiffs seek damages on behalf of a putative class of 1,200 chiropractors over a thirteen-year period.   (Exhibit B, Petition at Law, at ¶¶ 20, 28 and 40.)    Plaintiffs further allege that Iowa chiropractors are paid "much less than 50% of what Wellmark defendants and their co-conspirators pay other health care practitioners in Iowa for the same or similar services." (*Id.* at ¶ 40.)  And $5 million is a small fraction of what Wellmark pays all Iowa chiropractors in just one year.

13.     During the three-year period preceding the filing of this matter, one or more other class actions asserting the same or similar claims on behalf of the same or other persons has been filed.  (*E.g.*, 9/30/14 Consol. 2d Am. Compl. ¶ 51 (Provider Track), *In re BCBS Antitrust Litigation*, No. 2:13-CV-20000-RDP (N.D. Ala.).)

**PROCEDURAL REQUIREMENTS UNDER REMOVAL STATUTE**

14.     This Notice of Removal is timely.  "A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(c)(1) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants."  28 U.S.C. § 1453(b).  In turn, § 1446(b) provides that "if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, or a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."  28 U.S.C. § 1446(b)(3).

15.     On June 14, 2017, BCBSA filed a motion to intervene in this litigation in the Iowa District Court for Polk County, under Iowa Rules of Civil Procedure 1.407(1) and 1.407(2).  (Exhibit KK, Motion to Intervene.)  BCBSA's motion, if granted, creates minimal diversity sufficient to confer federal jurisdiction.

16.     BCBSA's motion to intervene was delivered to Wellmark by BCBSA's counsel on or about June 14, 2017.  The date of this Notice of Removal is within

thirty days of receipt of the motion by Wellmark.   Accordingly, this Notice of Removal is timely under 28 U.S.C. § 1446(b) and § 1453(b).

17.     Pursuant to 28 U.S.C. § 1446(d), copies of this Notice of Removal are being served upon counsel for Plaintiff and filed with the Clerk of the Iowa District Court for Polk County.

18.     By filing this Notice of Removal, Wellmark does not waive any defense, argument, or principle of equity which may be available to it.

19.     Based upon the foregoing, Wellmark respectfully submits that: (i) this Court has diversity jurisdiction under 28 U.S.C. §§ 1332, 1441, 1446, and 1453; and (ii) the procedural requirements of 28 U.S.C. § 1446 are met.

WHEREFORE, the above-described action now pending against Wellmark in the Iowa District Court for Polk County is removed to the United States District Court for the Southern District of Iowa.


*/s/ Benjamin P. Roach*
Benjamin P. Roach
Hayward L. Draper
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA  50309
Telephone:  (515) 283-3100
Facsimile:  (515) 283-8045
E-mail:  bproach@nyemaster.com
E-mail:  hdraper@nyemaster.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2017, I presented the foregoing document to the Clerk of the Court for filing and uploading into the ECF system, which will send notification to the following ECF system participants.

Glenn L. Norris
HAWKINS & NORRIS, P.C.
2501 Grand Avenue, Suite C
Des Moines, IA  50312-5399
Telephone:  (515) 288-6532
Facsimile: (515) 281-1474
Email:         gnorris@2501grand.com
Email:         gnorrislaw@gmail.com

Steven P. Wandro
Kara M. Simons
Alison F. Kanne
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, IA  50312
Telephone:  (515) 281-1475
Facsimile: (515) 281-1474
Email:  swandro@2501grand.com
Email:  ksimons@2501grand.com
Email:  akanne@2501grand.com

Harley C. Erbe
ERBE LAW FIRM
2501 Grand Avenue
Des Moines, IA  50312-5399
Telephone:  (515) 281-1460
Facsimile: (515) 281-1474
Email:  herbelaw@aol.com

ATTORNEYS FOR PLAINTIFFS

Jeffrey A. Krausman
Joan M. Fletcher
DICKINSON, MACKAMAN, TYLER
  & HAGEN, P.C.
699 Walnut Street, Suite 1600
Des Moines, IA  50309
Telephone:  (515) 246-4525
Facsimile:  (515) 246-4550
Email:  jkrausman@dickinsonlaw.com
Email:  jfletcher@dickinsonlaw.com

ATTORNEYS FOR INTERVENOR

*/s/ Benjamin P. Roach*

### IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>     Plaintiffs,<br><br>and<br><br>STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C.; MARK A. KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>     Defendants. | Law No. |

## ORIGINAL NOTICE

TO THE ABOVE-NAMED DEFENDANTS:

     You are notified that a petition has been filed in the office of the clerk of this court naming you as the defendants in this action. A copy of the petition (and any documents filed with it) is attached to this notice. The attorney for the plaintiffs is Steven P. Wandro, whose address is 2501 Grand Avenue, Ste. B, Des Moines, IA 50312; telephone number 515-281-1474; facsimile number 515-181-1474; email swandro@2501grand.com.

     By stipulation between plaintiffs' counsel and your counsel, Hayward Draper, Mr. Draper will accept service by email for you and you will have 60 days from such service



of this original notice and petition to serve a motion or answer with the Clerk of Court for Polk County, at the county courthouse in Des Moines, Iowa. If you do not, judgment by default may be rendered against you for the relief demanded in the petition.

This case has been filed in a county that uses electronic filing. You must register to eFile through the Iowa Judicial Branch website at https://www.iowacourts.state.ia.us/Efile and obtain a log in and password for filing and viewing documents in your case and for receiving service and notices from the court.

 • For general rules and information on electronic filing, refer to the Iowa Court Rules Chapter 16 Pertaining to the Use of the Electronic Document Management System, available on the Iowa Judicial Branch website.

 • For court rules on the Protection of Personal Privacy in court filings, refer to Division VI of the Iowa Court Rules Chapter 16.

 • If you are unable to proceed electronically, you must receive permission from the court to file in paper. Contact the clerk of court in the county where the petition was filed for more information on being excused from electronic filing.
If you require the assistance of auxiliary aids or services to participate in court because of disability, immediately call you district ADA coordinator at   . (If you are hearing impaired, call Relay Iowa TTY at 1-800-735-2942).

Dated October 5, 2015.

_____
CLERK OF COURT
Polk County Courthouse, 500 Mulberry St.
Des Moines, Iowa 50309-4238

YOU ARE ADVISED TO SEEK LEGAL ADVICE AT ONCE TO PROTECT YOUR INTERESTS.

# STATE OF IOWA JUDICIARY

*Case No.* CVCV050638

*County* Polk

*Case Title* CHICOINE & MUELLER, ET AL. V. WELLMARK, ET AL.

**THIS CASE HAS BEEN FILED IN A COUNTY THAT USES ELECTRONIC FILING.**
Therefore, unless the attached Petition and Original Notice contains a hearing date for your appearance, or unless you obtain an exemption from the court, you must file your Appearance and Answer electronically.

You must register through the Iowa Judicial Branch website at http://www.iowacourts.state.ia.us/Efile and obtain a log in and password for the purposes of filing and viewing documents on your case and of receiving service and notices from the court.

**FOR GENERAL RULES AND INFORMATION ON ELECTRONIC FILING, REFER TO THE IOWA COURT RULES CHAPTER 16 PERTAINING TO THE USE OF THE ELECTRONIC DOCUMENT MANAGEMENT SYSTEM:**
http://www.iowacourts.state.ia.us/Efile

**FOR COURT RULES ON PROTECTION OF PERSONAL PRIVACY IN COURT FILINGS, REFER TO DIVISION VI OF IOWA COURT RULES CHAPTER 16:** http://www.iowacourts.state.ia.us/Efile

*Scheduled Hearing:*

If you require the assistance of auxiliary aids or services to participate in court because of a disability, immediately call your district ADA coordinator at **(515) 286-3394** .  (If you are hearing impaired, call Relay Iowa TTY at **1-800-735-2942**.)

*Date Issued* 10/06/2015 10:08:49 AM



*District Clerk of* Polk            *County*

/s/ Christy Wagner

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 11 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-28   Filed 06/14/17   Page 1 of 3
E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

ELECTRONICALLY FILED   MAY 15, 2017   CLERK OF SUPREME COURT

# IN THE SUPREME COURT OF IOWA

## No. 16-0364

## Polk County No. CVCV050638

## BILL OF COSTS

**BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C., NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C.,** on behalf of themselves and those like situated,
    **Plaintiffs-Appellants,**

**and**

**STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C.,** on behalf of themselves and those like situated,
    **Plaintiffs-Appellants,**

**vs.**

**WELLMARK, INC., d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa Corporation, and WELLMARK HEALTH PLAN OF IOWA, INC.,** an Iowa Corporation,
    **Defendants-Appellees.**

---

On April 21, 2017, the supreme court vacated the district court ruling and remanded with directions.

Clerk's fees incurred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   $   150.00
Amount of Clerk's fees already paid by the Appellant . . . . . . . . . . .   $   150.00
Amount of Clerk's fees already paid by the Appellee. . . . . . . . . . . .   $     0.00

Balance due the Clerk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   $     0.00

Printing costs of Appellant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   $     0.00



EXHIBIT
AA

1 of 3

E-FILED 2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

Printing costs of Appellee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    $       0.00

{Computed pursuant to Iowa Rule of Appellate Procedure
   6.903(1)(h) and 6.905(13(c) (2009)}                          _____

                                TOTAL TO BE PAID. . . . . . . . . . . . $     150.00

    The above costs of $150.00 are hereby taxed against the appellees, and judgment is entered accordingly.  The costs shall be paid to the Clerk of the District Court, who shall pay them to the persons entitled thereto.  *See* Iowa Code Section 625.19.  The District Court Clerk shall remit them to Glenn Leonard Norris.

Copies to:

Harley Christopher Erbe
2501 Grand Ave
Des Moines, IA 50312

Glenn Leonard Norris
2501 Grand Ave #c
Hawkins & Norris P C
Des Moines, IA 50301

Kara Marie Simons
Wandro & Associates Pc
2501 Grand Avenue
Des Moines, IA 50312

Steven Peter Wandro
2501 Grand Ave Suite B
Des Moines, IA 50312

Hayward Lloyd Draper
700 Walnut St. Suite 1600
Des Moines, IA 50309

Polk County District Court

E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**          **Case Title**
16-0364                  Chicoine v. Wellmark

So Ordered

Donna M. Humpal, Clerk

Electronically signed on 2017-05-15 11:30:53

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>    Plaintiffs,<br><br>and<br><br>STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C.; MARK A. KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>    Defendants. | Law No. |

## PETITION AT LAW
### (Jury Trial Demanded)

1



E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

# COUNT I

## PLAINTIFFS' CLASS ACTION AND CONDUCT ALLEGATIONS OF HORI-ZONTAL CONSPIRACY IN RESTRAINT OF TRADE OR COMMERCE

### NATURE OF THE CASE

1.    Plaintiffs bring this action on behalf of themselves and a class of Iowa licensed doctors of chiropractic who are citizens of the state of Iowa as of the date of filing.  They seek damages from Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc. ("Wellmark Defendants") for combination and conspiracy in restraint of trade or commerce in the purchase of health care delivery from Iowa chiropractors in setting the price paid for chiropractic services at a discriminatory low level and in restricting patient access to and coverage for treatment by Iowa-licensed doctors of chiropractic.

2.    This Petition is intended to conform to the Opinions of the Iowa Supreme Court in the case of *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244 (Iowa, July 27, 2012) and 861 N.W.2d 563 (Iowa, February 27, 2015), *rehearing denied*, 2015 Iowa Sup. LEXIS 54 (April 21, 2015).

3.    In its essence, this Petition alleges that Wellmark Defendants have, by contract, conspiracy and other unlawful means, conspired and combined to:

        (a)    enter into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa.

        (b)    enter into agreements with other independent entities to allocate territories and not to compete with each other in those allocated territories

2

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

(c)    impose maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(d)    prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(e)    prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(f)    historically enter into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors

(g)    Beginning in approximately 2007, Wellmark Defendants attempted to implement for itself and its co-conspirators a policy by which their subscriber-patients who elected to seek chiropractic treatment would be covered for only three treatment procedures per visit to a doctor of chiropractic regardless of the acuity, severity, or nature of the patient's condition or the number of her complaints;

(h)    Beginning in approximately 2007, Wellmark Defendants announced and attempted to implement for itself and its co-conspirators a policy by

E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

which subscriber-patients and those persons who were employees of self-funded en-
tities administered by Wellmark Defendants would be required to seek preapproval
of an agent of the Wellmark Defendants before any chiropractic services would be
paid, which policy solely related to chiropractic services and to no other services of
any other health care practitioner licensed by the state of Iowa;

      (i)     Wellmark Health Plan of Iowa, Inc. ("WHPI") and its co-con-
spirators have implemented a plan solely related to Iowa chiropractors and to no
other health care practitioner licensed in Iowa whereby Iowa chiropractors only are
subject to a capitated payment system whereby chiropractors are paid at rate less
than 50% of the rate payable for PPO services, while all other Iowa licensed practi-
tioners covered by WHPI are paid pursuant to a schedule derived from the PPO pay-
ment schedules with a 7-9% discount.

    4.     Such horizontal conspiracies are unreasonable restrictions and restraints
of competition, trade or commerce in Iowa and the anticompetitive consequences of
such conspiracy or conspiracies outweigh any procompetitive benefits.

## JURISDICTION AND VENUE

    5.     This Court has jurisdiction over the subject matter of this action pursuant
to Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendants in
that the Defendants are Iowa corporations with their corporate headquarters located in
Des Moines, Polk County, Iowa.

    6.     Venue is proper pursuant to Iowa Code Ch. 616.

## PARTIES

7.    The following individual plaintiff doctors of chiropractic bring this action for damages and injunction on behalf of all doctors of chiropractic in Iowa similarly situated (1) who are citizens of the state of Iowa as of the date of filing of this petition  or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after May 20, 2004, which is four years prior to the filing of the Plaintiffs' First Amendment to Petitioner for Damages, for Permanent Injunction and for Declaratory Judgment in *Mueller et al v. Wellmark, Inc., et* al, Law No. 107471, (Polk Co., Iowa, Dist. Ct., filed May 20, 2008). The doctor of chiropractic Plaintiffs are referred to as the "Provider Plaintiffs" or the "Providers." They are:

(a)    Plaintiff Bradley A. Chicoine, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Sioux City, Iowa. He is the owner of plaintiff Dr. Bradley A. Chicoine, D.C., P.C., an Iowa professional corporation, which has its principal place of business in Sioux City, Iowa.  During all times material to this action, Dr. Chicoine and/or his P.C. has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

(b)    Plaintiff Mark A. Niles, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Tipton, Iowa. He is the owner of plaintiff Niles Chiropractic, Inc., an Iowa corporation which has its principal place of business in Tipton, Iowa. During all times material to this action, Dr. Niles and/or Niles Chiropractic

5

has provided and billed for chiropractic services to patients who are enrolled in
plans offered or administered by Defendants.

(c)     Plaintiff Rod R. Rebarcak, D.C., a doctor of chiropractic li-
censed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resi-
dent of and practices chiropractic in Ames, Iowa. During all times material to this
action, Dr. Rebarcak has provided and billed for chiropractic services to patients
who are enrolled in plans offered or administered by Defendants.

(d)     Plaintiff Ben Winecoff, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and
practices chiropractic in Ames, Iowa. During all times material to this action, Dr.
Winecoff has provided and billed for chiropractic services to patients who are en-
rolled in plans offered or administered by Defendants.

8.     Additionally, the following individual plaintiff doctors of chiropractic
bring this action for damages and injunction, pursuant to the provisions of Iowa Code §
614.1o (2015), which states:

> If, after the commencement of an action, the plaintiff, for any causes ex-
> cept negligence in its prosecution, fails therein, and a new one is brought
> within six months thereafter, the second shall, for the purposes herein
> contemplated, be held a continuation of the first.

Procedendo came down in *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563 (Iowa, February
27, 2015), *rehearing denied*, 2015 Iowa Sup. LEXIS 54 (April 21, 2015), on April 22,
2015. The six months does not run until October 22, 2015. Thus, the net effect of §
614.10 in this case is that the five named plaintiffs can continue as class representatives,
because they, like the rest of the class still have a unruled upon claim for violation of

E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

Iowa Code § 553.4 under the rule of reason analysis. Accordingly, the following named plaintiffs also bring this action on behalf of all doctors of chiropractic in Iowa similarly situated (1) who are citizens of the state of Iowa as of the date of filing of this petition  or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after May 20, 2004, which is four years prior to the filing of the Plaintiffs' First Amendment to Petitioner for Damages, for Permanent Injunction and for Declaratory Judgment in *Mueller et al v. Wellmark, Inc., et* al, Law No. 107471, (Polk Co., Iowa, Dist. Ct., filed May 20, 2008). The doctor of chiropractic Plaintiffs are referred to as the "Provider Plaintiffs" or the "Providers." They are:

(a)    Plaintiff Steven A. Mueller, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Algona, Iowa. During all times material to this action, Dr. Mueller has provided and billed for chiropractic to patients who are enrolled in plans offered or administered by Defendants.

(b)    Plaintiff Bradley J. Brown, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Oelwein, Iowa. He is the owner of plaintiff Brown Chiropractic, P.C., an Iowa professional corporation, which has its principal place of business in Oelwein, Iowa. During all times material to this action, Dr. Brown and/or his P.C. has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

(c)    Plaintiff Mark A. Kruse, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 21 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-3    Filed 06/14/17    Page 8 of 26
E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

practices chiropractic in Sioux City, Iowa. He is the owner of plaintiff Dr. Mark A.

Kruse, D.C., P.C., an Iowa professional corporation, which has its principal place of

business in Sioux City, Iowa. During all times material to this action, Dr. Kruse

and/or his P.C. has provided and billed for chiropractic services to patients who are

enrolled in plans offered or administered by Defendants.

(d)    Plaintiff Kevin D. Miller, D.C., a doctor of chiropractic licensed

to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and

practices chiropractic in West Des Moines, Iowa. During all times material to this

action, Dr. Miller has provided and billed for chiropractic services to patients who

are enrolled in plans offered or administered by Defendants.

(e)    Plaintiff Larry E. Phipps, D.C., a doctor of chiropractic licensed

to practice in the State of Iowa, at time of the filing of the Plaintiffs' First Amend-

ment to Petitioner for Damages, for Permanent Injunction and for Declaratory

Judgment in *Mueller et al v. Wellmark, Inc., et* al, Law No. 107471, (Polk Co., Iowa,

Dist. Ct., filed May 20, 2008), was a citizen of the State of Iowa, and a resident of

and practitioner of chiropractic in Marshalltown, Iowa. During  times material to

this action, Dr. Phipps has provided and billed for chiropractic services to patients

who are enrolled in plans offered or administered by Defendants.

9.    Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are

Iowa corporations with their corporate headquarters located at 1331 Grand Avenue, Des

Moines, Iowa. Wellmark, Inc. does business as Wellmark Blue Cross and Blue Shield of

Iowa.  Wellmark and its subsidiaries and affiliated companies, including Wellmark Blue

Cross and Blue Shield of South Dakota and Wellmark Health Plan of Iowa, Inc., insure

E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

or pay health benefit claims for more than two million members in Iowa and South Da-kota.  Wellmark Blue Cross and Blue Shield of Iowa, Wellmark Blue Cross and Blue Shield of South Dakota, and Wellmark Health Plan of Iowa, Inc. are independent licen-sees of the Blue Cross and Blue Shield Association ("BCBSA").

10.     Defendant Wellmark, Inc., was originally incorporated on September 19, 1939, as a corporation not for pecuniary profit under what later became Chapter 504A of the Code of Iowa, to operate a nonprofit health service plan under [now] Chapter 514 of the Code of Iowa to provide payment for health care furnished to subscribers under con-tract with the corporation. (Second Restated Articles of Incorporation, filed September 1, 1989). On October 1, 1991, Wellmark adopted a plan of mutualization to become a cor-poration for pecuniary profit under Chapter 491 of the Code of Iowa and a mutual insur-ance company under Chapter 508 of the Code of Iowa. The company merged with South Dakota Medical Service, Inc., on July 25, 1996, and on May 15, 1997, it changed its name to Wellmark, Inc., an Iowa corporation and mutual insurance company. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

11.     Defendant Wellmark Health Plan of Iowa, Inc., was incorporated in Iowa on March 13, 1996, as an Iowa domestic profit corporation under Chapter 490 of the Code of Iowa. Its stated purpose in its articles of incorporation is to establish and oper-ate a health maintenance organization under Chapter 514B of the Code of Iowa. Its reg-istered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

12.     The Blue Cross and Blue Shield Association is a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.   Wellmark De-fendants are members of the Blue Cross and Blue Shield Association.   The Blue Cross

E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

and Blue Shield Association developed provider contracts and manuals which are being implemented in the State of Iowa by the Wellmark Defendants. The Blue Cross and Blue Shield Association is headquartered in Chicago, Illinois, with offices in Washington, D.C. The Blue Cross and Blue Shield Association (BCBSA) is a national federation of 39 Blue Cross and Blue Shield companies. Collectively, the 39 Blue Cross and Blue Shield System provides healthcare coverage for more than 99 million people or one-in-three Americans. The vast majority (65+%) of those persons covered by the Blue Cross and Blue Shield System are in PPO's, and an even greater percentage of Wellmark Defendants users are in PPO's. According to BCBSA, a Preferred Provider Organization (PPO) is an arrangement designed to supply health care services at a discounted cost by providing incentives for members to use designated health providers (who contract with the PPO at a discount), but which also provides coverage for services rendered by health care providers who are not part of the PPO network.

13.    Historically, Wellmark's predecessor under a former name was organized and controlled by the Iowa Medical Society and the majority of its Board of Directors were Iowa allopathic physicians. Under the control of allopathic physicians (and in later times in combination with osteopathic physicians), Wellmark's predecessor under a former name refused to seek authority to provide the services of chiropractors to its subscribers and members. In furtherance of that combination and conspiracy, in more recent times the Wellmark entities have established a scale of compensation for the same or similar diagnostic and treatment services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) receive as much as 100% higher

E-FILED  2015 OCT 03 2:59 PM POLK - CLERK OF DISTRICT COURT

payment than chiropractors receive for the same or similar diagnostic and treatment services.

14.    In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology purportedly based upon the Resource Based Relative Value System (RBRVS) and began issuing annual statewide fee schedules.  Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

15.    The 38 other members of BCBSA are non-party co-conspirators with the Wellmark defendants for purposes of the Iowa Competition Act. By agreement with Wellmark, BCBSA, and each other, such independent licensed affiliates of the Blue Cross and Blue Shield Association and licensed Blue Cross and Blue Shield Plans has agreed with Wellmark to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark under terms of the Practitioner Services Agreement and have further agreed to allocate territories and not to compete in Iowa and South Dakota with Wellmark.

16.    Additionally, providers for the employees of all of the self-funded plans Wellmark administers in Iowa use the same identical preferred provider panels as Wellmark's other coverages, i.e., they use providers contracted through Wellmark's Practitioner Service Agreement. By agreement with Wellmark, each of the self-funded

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

plans administered in Iowa by Wellmark has agreed with Wellmark to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark under terms of the Practitioner Services Agreement and Administrative Services Agreement of Wellmark Blue Cross and Blue Shield of Iowa. Accordingly, each of the self-funded plans administered by Wellmark is a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.

17.    Wellmark and various Iowa private and government self-funded employ-ers agree to jointly use the Wellmark PPO and HMO provider networks for the purchase of provider services. The network providers are not parties to these agreements. The self-funded employers agree to pay Wellmark a separate monthly fee which is a percent-age of the difference between what the provider usually bills for the service and the Max-imum Allowable Fee Wellmark established in its annual provider fee schedules. In other words, if the provider usually bills $500 for services and the Wellmark fee schedule sets $225 as the maximum it will pay a provider for such services, Wellmark receives a per-centage of the $275 difference from the self-funded employer as a Network Access Fee. This price setting fee is separate from the additional fee Wellmark charges Iowa private and government self-funded employees for claims administration services.

## CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action individually and as a class action pursuant to Iowa Rules of Civil Procedure 1.261 et seq on behalf of all chiropractors licensed in Iowa (1) who are citizens of Iowa as of the date of filing of this petition, or, (2) where citizens of Iowa on May 20, 2008, the date of the pleading in *Mueller et al v. Wellmark, Inc., et al*, Law No. 107471, (Polk Co., Iowa, Dist. Ct., pleading asserting class action filed May

20, 2008), which tolls the statute of limitations for the Provider Plaintiffs and proposed provider plaintiff class in this case for all times after May 20, 2004, which is four years prior to the filing of the Plaintiffs' First Amendment to Petitioner for Damages, for Permanent Injunction and for Declaratory Judgment in the *Mueller* case (Iowa R. Civ. P. 1.277), or, (3) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after May 20, 2008, each of whom have been damaged in their businesses by defendants' actions described below (the "Class").

19.    This action is properly maintainable as a class action.

20.    The Class are so numerous that joinder of all members is impracticable. There are approximately 1200 chiropractors licensed in Iowa who are citizens of the state of Iowa at the time of the filing of this petition. The names of the absent members of the class can be ascertained so that personal or mailed notice of the class action can be given them.

21.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)    whether Wellmark defendants have entered into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa.

(b)    Whether Wellmark defendants have entered into agreements with other independent entities to allocate territories and not to compete with each other in those allocated territories

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 27 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-3    Filed 06/14/17    Page 14 of 26
E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

(c)      whether Wellmark defendants have imposed maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(d)      whether Wellmark defendants have prescribed fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(e)      whether Wellmark defendants have prescribed limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code  of Iowa [Chapters 147 through 158];

(f)      whether Wellmark Defendants have engaged in a contract, combination or conspiracy between two or more persons to restrain (monopsonize) trade or commerce in Iowa as a whole and in major population centers of Iowa under Iowa Code § 553.4 (2007);

(g)      whether such horizontal conspiracies are unreasonable restrictions and restraints of competition, trade or commerce in Iowa and the anticompetitive consequences of such conspiracy or conspiracies outweigh any procompetitive benefits.

(h)      whether plaintiffs and the Class they represent have been injured by conduct prohibited by Section 553.4, Code of Iowa (2007); and,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 28 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-3   Filed 06/14/17   Page 15 of 26
E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

(i)     whether the case of *Mueller et al v. Wellmark, Inc., et* al, Law No. 107471, (Polk Co., Iowa, Dist. Ct., pleading asserting class action filed May 20, 2008) tolls the statute of limitations for the Provider Plaintiffs and proposed provider plaintiff class in this case for all times after May 20, 2004, which is four years prior to the filing of the Plaintiffs' First Amendment to Petitioner for Damages, for Permanent Injunction and for Declaratory Judgment in the *Mueller* case. Iowa R. Civ. P. 1.277.

(j)     whether the proposed class of chiropractic plaintiffs have been damaged in the four years previous to filing of the *Mueller* pleading asserting class action status and to the present by the invidious treatment by the Wellmark defendants and their co-conspirators, who have uniformly and discriminatorily paid chiropractors less for the same or similar services than has been paid for the same or similar services of other health care practitioners in Iowa.

(k)     whether the measure of damages to Provider Plaintiffs and to the proposed provider plaintiff class are subject to uniform and simple calculation applicable to all plaintiffs, and are not subject to individual situations among the provider plaintiff class which would require individualized trials for any of the proposed provider plaintiff class members;

(l)     whether plaintiffs and the class are entitled to injunctive relief from the horizontal conspiracies in restraint of competition, trade or commerce.

22.     Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

23.     Plaintiffs are adequate representatives of the Class, and have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.  The named plaintiffs and their attorneys have or can acquire adequate resources to ensure that the interests of the class will not be harmed.

24.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class under the standard of I.R.C.P. 1.262(3)(b).

25.     Adjudications with respect to individual members of the class as a practical matter would be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests under the standard of I.R.C.P. 1.262(3)(c).

26.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

27.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.


**TOLLING OF THE STATUTE OF LIMITATIONS**

28.     The statute of limitations for the Providers Plaintiffs and the proposed provider plaintiff class has been tolled is tolled for all class members upon the commencement of an action asserting a class action. The case of *Mueller et al v. Wellmark,*

E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

*Inc., et* al, Law No. 107471, (Polk Co., Iowa, Dist. Ct., pleading asserting class action filed May 20, 2008) tolls the statute of limitations for the Provider Plaintiffs and proposed provider plaintiff class in this case for all times after May 20, 2004, which is four years prior to the filing of the Plaintiffs' First Amendment to Petitioner for Damages, for Permanent Injunction and for Declaratory Judgment in the *Mueller* case. Iowa R. Civ. P. 1.277.

29.     The limitations statute resumes running under any one of four conditions stated in Iowa R. Civ. P. 1.277(1) – (4):

**1.277(1)** Upon filing an election of exclusion by that member.
**1.277(2)** Upon entry of an order of certification, or of an amendment thereof, eliminating that member from the class.
**1.277(3)** Except as to representative parties, upon entry of an order under rule 1.262 refusing to certify an action as a class action.
**1.277(4)** Upon dismissal of the action without an adjudication on the merits.

None of those conditions is applicable to Provider Plaintiffs or the proposed provider plaintiff class in this case.

30.     The doctrine of class action tolling was first established by the United States Supreme Court in the landmark case *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974). The Supreme Court in *American Pipe* limited its holding to instances in which the plaintiffs seek to *intervene* in a class action where class certification has been denied. The Court broadened this narrow holding, however, in *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983), making clear that the statute of limitations is tolled not only as to those class members seeking to intervene in the class action, but also as to *individual* actions filed by members of the putative class.

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

## FACTUAL CONDUCT ALLEGATIONS

31.     The Wellmark Defendants provide health services to the Iowa public on a statewide basis by offering and operating health care plans. Wellmark Defendants provide health care services including administration of self-funded health care plans to approximately 1.8 million Iowa enrollees in various health care plans statewide.

32.     Wellmark Defendants offer various health care coverage plans, including Indemnity Products: Comprehensive Major Medical (Protector), Blue Traditions (Full Service), Classic Blue (Alliance), Federal Employee Health Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card); Preferred Provider Organization Products: Alliance Select/Blue Select, Federal Employee Health Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card PPO); HMO Products: Blue Access, Blue Choice and Blue Advantage, and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card POS) to their subscribers.

33.     In addition to offering coverage agreements to subscribers, Wellmark Defendants enter into agreements with the providers of health care services, including those licensed under Iowa Code Ch. 148 (medical doctors -MD's), Ch.150A (doctors of osteopathic medicine –DO's), Ch. 148C (physician's assistants), Ch. 152 7 152E (nurse practitioners), Ch. 148A (physical therapists) and Ch. 151 (doctors of chiropractic -DC's).

34.     Under these provider agreements with the Wellmark Defendants, health care professionals, including the Provider Plaintiffs, render treatment services to patients who are enrolled in the Wellmark Defendants' various plans and the plans of Wellmark's co-conspirators.

18

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 32 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-3   Filed 06/14/17   Page 19 of 26
E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

35.     Services are provided under the fundamental premise that, if the services are covered and are medically necessary, the Wellmark Defendants' enrollees will be covered and the providers of the services, including the Provider Plaintiffs, will be compensated in a timely manner for those services.

36.     Wellmark Defendants have contracts with over 65 percent of the health care insurance and 95 percent of the provider services market in Iowa, primarily through PPO contracts.

37.     Wellmark Defendants, together with their co-conspirators, use their overwhelming economic power and market dominance to coerce the individual Provider Plaintiffs into acquiescing in practice restrictions and reimbursement schedules detrimental to Provider Plaintiffs and by limiting and restricting patient access to Provider Plaintiffs resulting in detriment to the physical care and choice of consumers.

38.     This action is based on the relationships between the Provider Plaintiffs and the Wellmark Defendants and their contractually bound co-conspirators, and also on the belief that the Wellmark Defendants' actions, as detailed below, detrimentally impact patient health and the general welfare of the public, inasmuch as those actions deprive and limit patient access to the Provider Plaintiffs' treatment, and restrict and otherwise interfere with and impede the relationships between the Provider Plaintiffs and their existing and prospective patients.

39.     Wellmark Defendants have agreed and conspired with their co-conspirators to engage in, and continue to engage in, a pattern of price fixing and other discrimination against the Iowa Provider Plaintiffs. This price fixing and other discrimination has occurred and is occurring in numerous ways, including:

   (a) Wellmark defendants have entered into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa;

   (b) Wellmark Defendants have entered into agreements with other independent entities to allocate territories and not to compete with each other in those allocated territories;

   (c) Wellmark defendants have imposed maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

   (d) Wellmark defendants have prescribed fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

   (e) Wellmark defendants have prescribed limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

   (f) As administered by Wellmark, most "Blue Advantage" plans caps the number of covered visits its subscribers may make to a doctor of chiropractic to 12, regardless of individual subscriber-patient circumstances. No such re-

E-FILED  2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

striction of 12 visits is imposed upon other health care providers-licensees.  In addition, in order to continue with additional treatment after the 12-visit cap has been reached, a subscriber-patient must obtain a referral from a "PCP" (Primary Care Physician) before any additional treatment from a doctor of chiropractic will be covered by Wellmark. Absent obtaining such an approved referral, the subscriber-patient must either forgo further chiropractic treatment or pay for the additional treatment personally, and then only after signing a waiver stating, in part, "I understand that I am requesting a service that may not be fully covered by my insurance company. I agree to be financially responsible for the full amount."

(g)    According to the Administrative Services Agreement of Wellmark Blue Cross and Blue Shield of Iowa, the co-conspirator self-funded entities pay a monthly Network Access Fee to Wellmark, which is the amount charged to the self-funded entity to gain the collective advantages of the network of providers with which Wellmark, any Host Blue, or any subcontractor has contracted for the providing for appropriate provision of covered services. Section 1.16. According to Section 3.1(b), one of Wellmark's obligations to the self-funded entity is to "provide access to networks of providers and . . . make information about the networks available to members through print, the Internet, and/or telephone service."  Section 3.1(e) says: "Wellmark shall determine benefits and process claims for health services furnished members in accordance with the terms, limitations and conditions set forth in the plan, the benefit documents, this agreement, applicable laws and regulations, the terms of the applicable provider agreement, and the claims administrations and medical policies of Wellmark, as amended from time to time." Part of

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

the Network Access Fee is a percentage of Network Savings, which is "the amount saved due to contract between Wellmark or another Blue Cross or Blue Shield Plan and health care providers." Wellmark processes claims for the self-funded entity through a plan called BlueCard, which is described in Article 9 of the Administrative Services Agreement.  The Host Blue, in accordance with applicable BlueCard policies, is responsible for providing such services as contracting with its participating providers and handling all interaction with its participating providers.  Section 9.2.

(h)    Beginning in approximately 2006, Wellmark Defendants attempted to implement for itself and its co-conspirators a policy by which their subscriber-patients who elected to seek chiropractic treatment would be covered for only three treatment procedures per visit to a doctor of chiropractic regardless of the acuity, severity, or nature of the patient's condition or the number of her complaints.

(i)    Beginning in approximately 2007, Wellmark Defendants announced and  attempted to implement for itself and its co-conspirators a policy by which subscriber-patients and those persons who were employees of self-funded entities administered by Wellmark Defendants would be required to seek preapproval of an agent of the Wellmark Defendants before any chiropractic services would be paid, which policy solely related to chiropractic services and to no other services of any other health care practitioner licensed by the state of Iowa.

(j)    Wellmark Health Plan of Iowa, Inc. ("WHPI") and its co-conspirators have implemented a plan solely related to Iowa chiropractors and to no other health care practitioner licensed in Iowa whereby Iowa chiropractors only are

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

subject to a capitated payment system whereby chiropractors are paid at  rate less

than 50% of the rate payable for PPO services, while all other Iowa licensed practi-

tioners covered by WHPI are paid pursuant to a schedule derived from the PPO pay-

ment schedules with a 7-9% discount.

40.    The plaintiffs and the plaintiff class have been damaged since at least May

20, 2004 and continue to be damaged presently by receiving less than 50% than

Wellmark pays for Iowa chiropractic physicians in its PPO and much less than 50% of

what Wellmark defendants and their co-conspirators pay other health care practitioners

in Iowa for the same or similar services.  This damage can be calculated through the ex-

amination of a schedule of fees prepared by the Wellmark defendants annually and com-

paring the compensation scheduled to be paid to plaintiffs and the plaintiff class to com-

pensation scheduled to be paid to other Iowa health care practitioner for the same or

similar services.

41.    Historically, Wellmark's predecessor under a former name was organized

and controlled by the Iowa Medical Society and the majority of its Board of Directors

were allopathic or osteopathic physicians.  Under the control of allopathic and osteo-

pathic physicians, Wellmark's predecessor under a former name refused to seek author-

ity to provide the services of chiropractors to its subscribers and members. In further-

ance of that combination and conspiracy, in more recent times the Wellmark entities

have established a scale of compensation for the same or similar diagnostic and treat-

ment services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of

Osteopathy (D.O.'s) receive as much as 100% higher payment than chiropractors receive

for the same or similar diagnostic and treatment services. Contrary to the authority

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

given by Chapter 514F of the Code of Iowa, however, and without filing with or obtaining the explicit approval of the Iowa Insurance Commissioner, the annual rate schedule for health care services which has been issued by Wellmark and which governs its payment of Iowa health care practitioners discriminates against those health care practitioners licensed under Chapter 151 of the Code of Iowa.

42.   In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology purportedly based upon the Resource Based Relative Value System (RBRVS) and began issuing annual RBRVS-based statewide fee schedules.  Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

## CLAIMS FOR RELIEF

## RESTRAINT OF TRADE

43.   Plaintiffs and the Class they represent have been injured by conduct prohibited by Section 553.4, Code of Iowa (2007), the anticompetitive consequences of such conspiracy or conspiracies outweigh any procompetitive benefits.

44.   Plaintiffs and the other members of the Class have been damaged in their businesses and property by and as a proximate cause of the conduct of the Wellmark defendants and their co-conspirators.

E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

45.    The actions of the Wellmark Defendants are willful or flagrant in light of the existing law of Iowa and the surrounding circumstances.

## **PRAYER**

**WHEREFORE**, Plaintiffs pray for the following relief:

1.    That the jury award plaintiffs and the plaintiff class damages in an amount determined by the evidence for conduct in violation of the Iowa Competition Act for the four years previous to the filing of this action and to the date of trial;

2.    That the jury award plaintiffs and the plaintiff class double their actual damages because of the egregious conduct of the Wellmark defendants;

3.    That, pursuant to I.R.C.P. 1.275(4), the Court award attorneys' fees to Plaintiffs, and that, pursuant to Iowa Code § 553.12(4), the Court award the necessary costs of bringing suit, including a reasonable attorney fee;

4.    That the Court award plaintiffs and the plaintiff class injunctive relief from the unreasonable horizontal restraints on competition, trade and commerce committed by Wellmark defendants, and

5.    That the Court award such other and further relief to which Plaintiffs are justly entitled.

## **JURY DEMAND**

The plaintiffs, by their attorneys of record, demand trial by jury of the claims raised in their Petition which may be tried at law.

Dated: October 5, 2015.

HAWKINS & NORRIS, P.C.
___/s/ Glenn L Norris_____
Glenn L. Norris  AT0005907

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 39 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-3   Filed 06/14/17   Page 26 of 26
E-FILED 2015 OCT 05 2:59 PM POLK - CLERK OF DISTRICT COURT

2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone: 515-288-6532
Facsimile: 515-281-1474
Email: gnorris@2501grand.com


WANDRO & ASSOCIATES, P.C.
_____/s/ Steven P. Wandro_____
Steven P. Wandro AT0008177
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
E-mail: swandro@2501grand.com

ERBE LAW FIRM
Harley C. Erbe AT0002430
2501 Grand Avenue
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1460
Facsimile: (515) 281-1474
E-mail: herbelaw@aol.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the ___5th__ day of __October____, 2015.

By:      ____ U.S.Mail      ____ Facsimile ____ Hand Delivery      ____ Overnight Courier

____ Fedex or UPS                __x__ E-mail      __x__ eFiling


_____/s/ Glenn L Norris_____

Copy to:
Hayward L. Draper, Esq.
Thomas H. Walton, Esq.
Ryan G. Koopmans, Esq.
NYEMASTER, GOODE, WEST, HANSELL
& O'BRIEN, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone: 515-283-3149, 283-3173
Facsimile: 515-283-8045
e-mail: hdraper@nyemaster.com;  twalton@nyemaster.com; rkoopmans@nyemaster.com

E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

# IN THE SUPREME COURT OF IOWA

## No. 16–0364

### Polk County No. CVCV050638

### PROCEDENDO

**BRADLEY A. CHICOINE, D.C., DR. BRADLEY
A. CHICOINE, D.C., P.C., MARK A. NILES,
D.C., NILES CHIROPRACTIC, INC., ROD R.
REBARCAK, D.C., and BEN WINECOFF, D.C.,
on behalf of themselves and those like
situated,**
     **Plaintiffs-Appellants,**

**and**

**STEVEN A. MUELLER, D.C.,
BRADLEY J. BROWN, D.C., MARK A.
KRUSE, D.C., KEVIN D. MILLER, D.C.,
and LARRY E. PHIPPS, D.C., on behalf
of themselves and those like situated,**
     **Plaintiffs-Appellants,**

**vs.**

**WELLMARK, INC., d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa Corporation, and
WELLMARK HEALTH PLAN OF IOWA, INC.,
an Iowa Corporation,**
     **Defendants-Appellees.**

_____

To the Iowa District Court for the County of Polk :

Whereas, there was an appeal from the district court in the above-captioned case to the supreme  court.  The appeal is now concluded.

Therefore, you are hereby directed to proceed in the manner required by law and consistent with the opinion of the court.

ELECTRONICALLY FILED   MAY 15, 2017    CLERK OF SUPREME COURT

1 of 3

EXHIBIT
BB

E-FILED 2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

In witness whereof, I have hereunto set my hand and affixed the seal of the supreme court.

Copies to:

Harley Christopher Erbe
2501 Grand Ave
Des Moines, IA 50312

Glenn Leonard Norris
2501 Grand Ave #c
Hawkins & Norris P C
Des Moines, IA 50301

Kara Marie Simons
Wandro & Associates Pc
2501 Grand Avenue
Des Moines, IA 50312

Steven Peter Wandro
2501 Grand Ave Suite B
Des Moines, IA 50312

Hayward Lloyd Draper
700 Walnut St. Suite 1600
Des Moines, IA 50309

Polk County District Court

E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**          **Case Title**
16-0364                  Chicoine v. Wellmark

So Ordered

Donna M. Humpal, Clerk

Electronically signed on 2017-05-15 11:31:37

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 43 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-4   Filed 06/14/17   Page 1 of 4
E-FILED 2015 OCT 07 1:19 PM POLK - CLERK OF DISTRICT COURT

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| and | Law No. CVCV050638 |
| STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C.; MARK A. KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| vs. | |
| WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation, | |
| Defendants. | |

## Return of Service

Glenn L. Norris, an attorney of record for plaintiffs, professionally states that service of the Original Notice and Petition was made by agreement of the parties upon Hayward L. Draper, attorney for the Defendants, by e-mail on October 6, 2015. This was confirmed by Mr. Draper on the same date, as disclosed by an e-mail exchange between the attorneys for the parties attached hereto.

Dated October 7, 2015.



EXHIBIT
C

E-FILED  2015 OCT 07 1:19 PM POLK - CLERK OF DISTRICT COURT

HAWKINS & NORRIS, P.C.

___/s/ Glenn L Norris_____
Glenn L. Norris  AT0005907
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-281-1474
Email:  gnorris@2501grand.com

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the ___7th__ day of _October_____, 2015.

By:       ____ U.S.Mail    ____  Facsimile ____ Hand Delivery       ____ Overnight Courier

____ Fedex or UPS               _x_ E-mail     _x_ eFiling

_____/s/ Glenn L Norris_____

Copy to:
Hayward L. Draper, Esq.
Thomas H. Walton, Esq.
Ryan G. Koopmans, Esq.
NYEMASTER, GOODE, WEST, HANSELL
& O'BRIEN, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone: 515-283-3149, 283-3173
Facsimile: 515-283-8045
e-mail: hdraper@nyemaster.com;  twalton@nyemaster.com; rkoopmans@nyemaster.com



**Glenn Norris <gnorrislaw@gmail.com>**

---

## Chicoine v. Wellmark

---

**Hayward L. Draper** <HDraper@nyemaster.com>                    Tue, Oct 6, 2015 at 10:38 AM
To: Patti Stober <PStober@2501grand.com>, Glenn Norris <gnorrislaw@gmail.com>
Cc: "John T. Clendenin" <jtclendenin@nyemaster.com>, Ryan Koopmans <RKoopmans@nyemaster.com>, Steve
Wandro <swandro@2501grand.com>


Service is hereby accepted as to both defendants.


### HAYWARD L. DRAPER

LITIGATION ATTORNEY, NYEMASTER GOODE, P.C.

**700 WALNUT STREET, SUITE 1600 | DES MOINES, IOWA 50309**

515.283.3149 (IOWA PHONE) | 231.256.7699 (MICHIGAN PHONE) |515.283.3108 (FAX)

HDRAPER@NYEMASTER.COM | WWW.NYEMASTER.COM


NOTICE: This E-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, is confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of this communication is strictly prohibited. Please reply to the sender that you have received the message in error, then delete it. Thank you.

---

**From:** Patti Stober [mailto:PStober@2501grand.com]
**Sent:** Tuesday, October 06, 2015 10:15 AM
**To:** Glenn Norris; Hayward L. Draper
**Cc:** John T. Clendenin; Ryan Koopmans; Steve Wandro
**Subject:** RE: Chicoine v. Wellmark


Please see the attached file-stamped Original Notice and Petition in the above matter.


**From:** Glenn Norris [mailto:gnorrislaw@gmail.com]
**Sent:** Monday, October 05, 2015 11:50 AM
**To:** Hayward L. Draper
**Cc:** John T. Clendenin; Ryan Koopmans; Steve Wandro; Patti Stober
**Subject:** Re: Chicoine v. Wellmark


Hayward,

10/7/2015                    Case 4:17-cv-00210-JAJ-SBJ   Gmail - Chisnte1 - Wellmark 06/14/17   Page 4 of 4
                             E-FILED  2015 OCT 07 1:19 PM POLK - CLERK OF DISTRICT COURT

When our paralegal, Patti Stober, got the Petition Friday to initiate the efiling, she had to remind me that I
needed all the plaintiffs SSNs or Tax ID numbers. Duh! So we are going on file this afternoon. I will transmit the
Petition to you all forthwith.


Glenn


On Mon, Oct 5, 2015 at 7:58 AM, Hayward L. Draper <HDraper@nyemaster.com> wrote:

Glenn,    When we last spoke, you had not yet filed your new lawsuit.  Have you done that yet?  If so,
please send me a file-stamped copy with an Original Notice so that I can accept service for Wellmark
Inc. and WHPI as agreed. E-mail would be sufficient.   -Hayward

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 47 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-30   Filed 06/14/17   Page 1 of 2
E-FILED   2017 MAY 16 10:16 AM POLK - CLERK OF DISTRICT COURT

5CV03                    IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br>Petitioner(s)<br><br>VS.<br><br>WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE<br>CROSS AND BLUE SHIELD OF IA<br><br>Respondent(s) | 05771  CVCV050638<br><br><br>ORDER<br>LIFTING STAY AND PROVIDING<br>NEW ANSWER DEADLINE |

Previously on January 28, 2017 the Court filed a ruling granting Defendant's motion to stay.
Petitioners then filed an application for interlocutory appeal, as a result of which the Supreme
Court of Iowa has reversed the stay order and remanded the matter to the district court for further
proceedings.

IT IS THEREFORE ORDERED that the stay in the District Court matter is hereby lifted and the case
may proceed.

IT IS FURTHER ORDERED that Defendants shall now have 14 days from the date of this order to file
an Answer.

EXHIBIT
CC

1 of 2

E-FILED 2017 MAY 16 10:16 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

| | |
|---|---|
| **Case Number** | **Case Title** |
| CVCV050638 | BRADLEY CHICOINE AND STEVEN MUELLER ET AL V WELLMARK ET AL |
| **Type:** | OTHER ORDER |

So Ordered

Michael D. Huppert, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2017-05-16 10:16:28

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 49 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-5   Filed 06/14/17   Page 1 of 2
E-FILED   2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | **Law No. CVCV050638** |
| Plaintiffs, | |
| and | |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | **Motion to Stay** |
| Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

Defendants Wellmark, Inc. and Wellmark Health Plan of Iowa, Inc.

(collectively, Wellmark) moved to stay this case pending the outcome of the multi-

district federal litigation involving the same claims. *In re: Blue Cross Blue Shield*

*Antitrust Litigation*, MDL No. 2406, N.D. Alabama, 2:13-cv-20000. The reasons why

a stay is required are set out, with case citations, in the attached brief.

1



E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Therefore, for the reasons stated in the attached brief, Wellmark respectfully requests that the Court stay this action pending the outcome the federal court multi-district litigation.

/s/ Ryan G. Koopmans
Hayward L. Draper AT0002075
John T. Clendenin AT0001529
Ryan G. Koopmans    AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:    (515) 283-3149
Facsimile:    (515) 283-8016
E-Mail:    hdraper@nyemaster.com
           jclendenin@nyemaster.com
           rkoopmans@nyemaster.com

ATTORNEYS FOR DEFENDANTS,
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN OF IOWA,
INC., and Iowa corporation

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 4th day of Dcember, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

/s/ Ryan G. Koopmans

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 51 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-31   Filed 06/14/17   Page 1 of 3
E-FILED  2017 MAY 17 4:45 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | Law No. CVCV050638 |
|     Plaintiffs, | |
| and | |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | **JOINT MOTION TO SPECIALLY ASSIGN JUDGE HUPPERT** |
|     Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
|     Defendants. | |

NOW COME all parties in this case and jointly move that Judge Huppert, to whom this class action antitrust action is presently assigned, be specially assigned to handle it to its conclusion. In support of this Motion, the parties state as follows:

1.    This is a class action antitrust case involving complicated issues of first impression.



EXHIBIT
DD

2.      This case may take many years to reach a final conclusion. Given the complicated issues that will be raised during class discovery and then appear again in a different form during merits discovery, it would be extremely deleterious to the efficient and fair resolution of this case to switch judges in the middle of the litigation.

3.      The parties previously agreed in a hearing before Chief Judge Gamble that they would have this case handled by the business court. However, there is some question as to the future of the business court, and the case has in fact already been assigned to business court Judge Michael Huppert.

4.      Given the uncertainty regarding the business court, the parties agree and believe that the most efficient mechanism for handling this case with the necessary consistency over time would be to specially assign it to Judge Huppert.

WHEREFORE, all parties in this matter respectfully request an Order specially assigning Judge Michael Huppert to this action.


*/s/Glenn L. Norris*
Glenn L. Norris
Hawkins & Norris, P.C.
2501 Grand Avenue, Suite C
Des Moines, IA 50312
Telephone: (515) 288-6532
Email: gnorris@2501grand.com

*/s/ Hayward L. Draper*
Hayward L. Draper, AT0002075
Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Telephone: (515) 283-3149
Email: hdraper@nyemaster.com

E-FILED 2017 MAY 17 4:45 PM POLK - CLERK OF DISTRICT COURT

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2017, I presented the foregoing document to the Clerk of the Court for filing and uploading into the EDMS system, which will send notification to the EDMS system participants.

*/s/ Hayward L. Draper*

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 54 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-6   Filed 06/14/17   Page 1 of 19
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | **Law No. CVCV050638** |
| Plaintiffs, | **Brief in Support of Defendants' Motion to Stay** |
| and | |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

## Introduction

This is a multi-million dollar class action antitrust case that involves every chiropractor in this State and every Blue Cross and Blue Shield insurance company in the country (there are 37 of them, including Wellmark).  As pleaded by Plaintiffs, this case will necessarily require massive amounts of discovery, numerous motions,

1



E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

and some of the most complicated antitrust (i.e., economics and market share) analysis that the Iowa court system has ever seen.

But here's the thing: These very same issues are already being litigated as a class action in federal court by an Iowa chiropractor named Joseph Ferezy. Ferezy's case is part of a multi-district litigation that involves the same antitrust claims that Plaintiffs are alleging here (that all the Blue Cross and Blue Shield insurance companies are "fixing" prices that they pay medical providers, to the detriment of chiropractors, and that they are dividing up the national market into particular territories). Ferezy's case, along with companion cases being brought by other chiropractors and medical professionals from around the country, has been on file for well over a year and is currently very active. That litigation is so complicated that the federal district court has retained a "special master" to give recommendations on how it should proceed, and he has set an "Economics Day" in which the parties' experts will come to court and present on antitrust and health care economics.

Thus, because these extremely complex issues are already being litigated as a class action in federal court, this case should be stayed pending the outcome of that multi-district federal case. The Iowa Supreme Court has ruled that, under the "doctrine of comity", a district court may stay a case where a similar case is pending in another jurisdiction. *First Midwest Corp. v. Corp. Fin. Assocs.*, 663 N.W.2d 888, 890 (Iowa 2003). The purpose of such a stay, the Court has explained, is to avoid having the same litigation in multiple forums (and thus to preserve resources); to

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

avoid "the possibility that a judgment entered in the foreign jurisdiction will give rise to collateral estoppel or will render the matter before the court res judicata"; and to show respect to the other court (who has already been working on the case). *Id.* at 891-92. Each of those reasons dictates staying this case.

But there's an additional—and independently dispositive—reason to stay this case: The Iowa Competition Law (which is Iowa's antitrust law), states expressly that it "shall be construed to complement and be harmonized with" the federal antitrust laws. Iowa Code § 553.2. In other words, Iowa courts are required to interpret and apply the Iowa Competition Law in the same manner that the federal courts interpret and apply the Sherman Act: If a certain practice violates the federal antitrust laws, then it violates the Iowa Competition Law. And the reverse is also true: If a certain practice *does not* violate the federal antitrust laws, then it *does not* violate the Iowa Competition Law.

So if the federal court decides that Wellmark's arrangements with the other Blues violate the federal antitrust laws, then Wellmark's arrangements also violate the Iowa Competition Law. But if the federal court rules in Wellmark's favor—if it decides that these types of arrangements are pro-competitive rather than anti-competitive, and thus do not violate the federal antitrust laws—then Wellmark is not violating the Iowa Competition Law, either. For that reason, alone, this Court should stay this case pending the outcome of the federal lawsuit.

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

## Factual and Procedural Background

A.   **Provider networks, the Blue Cross and Blue Shield BlueCard®
     Program, and *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563 (Iowa
     2015).**

This case is a spin-off of an earlier case that this Court and the Iowa
Supreme Court dismissed.  *See Mueller v. Wellmark, Inc.*, 861 N.W.2d 563 (Iowa
2015).  Both this case and the earlier one are about provider networks and Blue
Cross and Blue Shield's BlueCard® Program, and both cases involve antitrust
claims, albeit different ones.    Thus, an explanation of those terms—"provider
networks" and the "BlueCard® Program"—is in order.

A provider network is a network of medical providers (hospitals, clinics,
medical physicians, osteopathic physicians, chiropractors, physical therapists, etc.)
who contractually agree to treat a specific insurance company's insureds at
(typically) discounted rates.[1]    In exchange for that agreement, the insurance
company provides better coverage and/or co-pays to insureds who get their
treatment from these "in-network" providers, and thus in-network providers tend to
see a higher volume of patients insured by that carrier than do non-network
providers.

In order to create a provider network, insurance companies must (among
other things) survey each provider specialty (chiropractors, radiologists, oncologists,
orthopedists, psychologists, podiatrists, etc.) with regard to the tens of thousands of

---

[1] *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 603 F. Supp. 1077, 1081-82 (S.D. Ind.
1985) (discussing provider networks); *Coy Chiropractic Health Ctr. v. Travelers Cas. & Sur.
Co.*, No. 06 cv 678 DRH, 2007 WL 2122420, at *1 n.1 (S.D. Ill. July 20, 2007) (citing cases
explaining the basics of provider networks).

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

medical procedures that are recognized by the medical profession, "to determine what maximum prices would be high enough to attract sufficient numbers of individual doctors to sign up [with the network] but low enough to make the insurance plan competitive." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 353 n.28 (1982). Those determinations involve a great deal of complicated information gathering and analysis.

Wellmark does that work in Iowa and South Dakota because that's where Wellmark's customer base is.  Wellmark provides individual insurance to many Iowa and South Dakota residents.  It also provides group insurance to many Iowa and South Dakota employers (whose employees then become Wellmark insureds, a/k/a "members").  But Wellmark does not have a provider network outside of those two states, so if a Wellmark insured needs to visit a Michigan doctor—either because the insured is traveling or because his Iowa-based employer has stationed him there—then he would be unable to find a doctor that is in Wellmark's network.

That's where the BlueCard® Program comes in.  There are 37 insurance companies in the United States that are licensed by the Blue Cross and Blue Shield Association to carry the Blue Cross and Blue Shield name, including Wellmark. Those companies (who we refer to as the "Blues") allow each other's insureds to use their provider networks if those insureds are traveling or living out of state. So if a Wellmark insured goes to college in Michigan, she can visit a provider in the Blue Cross and Blue Shield of Michigan network and pay in-network fees.  The same is true for out-of-state insureds who visit Iowa: They can use Wellmark's network and

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

thus pay Wellmark's in-network fees.  In effect, the BlueCard® Program creates a national provider network that allows the Blues to compete with the national networks of very much larger, national insurance companies, such as United Healthcare and Aetna. *See Mueller*, 861 N.W.2d at 566-67 (explaining the BlueCard® Program).

In *Mueller*, the plaintiffs argued that this system—whereby Blue Cross and Blue Shield licensees allow each other's insureds to use their provider networks, and therefore provide their insureds the benefit of in-network fees—amounts to price fixing and is thus a *per se* violation of the antitrust laws.  This Court (Judge Hutchison presiding) ruled that that claim failed as a matter of law.  Sharing a provider network, he explained, is not the type of agreement that is *per se* (i.e., automatically) unlawful under the Iowa Competition Law (or its federal counterpart, the Sherman Act).  If anything, he concluded, the plaintiffs would have to bring their claims under the so-called "rule of reason" test.   The Iowa Supreme Court, in an opinion by Justice Mansfield, unanimously affirmed that ruling.

That distinction—between a *per se* claim and a rule-of-reason claim—goes to the heart of this motion to stay, and thus deserves some attention.

B.    **The *Per Se* Rule vs. the Rule of Reason**

The Iowa Competition Law, like the Sherman Act upon which it's modeled, proscribes all agreements that "restrain or monopolize trade." Iowa Code § 553.4.  If read literally, that language would make virtually every contract or business agreement unlawful, because every contract or business agreement restrains trade to some degree by setting a price for a particular product or business transaction. As

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

a result, Iowa's antitrust laws—following the U.S. Supreme Court's interpretation of the Sherman Act—condemn only those agreements that *unreasonably* restrain trade. *Leegin Creative Leather Prod. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007); Iowa Code § 553.2 (declaring that the Iowa Competition Law "shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose").[2]

To determine whether a particular agreement *unreasonably* restrains trade, courts "presumptively" apply the "rule of reason" test, under which a plaintiff must carry the burden of proving that the agreement results in the exercise of market power in a relevant market; that the exercise of that market power has anti-competitive consequences; and that those consequences outweigh the agreement's economic benefits. *Mueller*, 861 N.W.2d at 568 (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). That requires some very complicated economic analysis and extensive expert testimony.

There are, however, some arrangements that courts know are just so bad, so clearly anti-competitive, that they are deemed *per se* illegal. The plaintiff doesn't need to show market power; he doesn't need to show anticompetitive effect; and he doesn't need to rebut the defendant's pro-competitive justifications. Other than proving that there is indeed an agreement, the plaintiff doesn't have to show

---

[2] *See also Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 258 (Iowa 2012) (noting that the Iowa Competition Law is construed in conformity with the Sherman Act); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 452 (Iowa 2002) (Cady, J., dissenting) (stating that the legislature provided a "specific rule of construction" for interpreting the Iowa Competition Law).

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

anything: these agreements are simply "*per se* illegal," and thus expert economic opinions aren't necessary.  *Id.*

Thus, the difference between the two types of claims is in the amount of proof that a plaintiff is required to put forward to prove his case.  And that difference is vast.  As Justice Mansfield explained in *Mueller*:

> In applying the rule of reason, the factfinder weighs ***all of the circumstances*** of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. By contrast, when a practice falls under the *per se* rule, there is no need for case-by-case evaluation. The per se rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work.

*Mueller*, 861 N.W.2d at 568 (emphasis added).

As noted above, the plaintiffs in *Mueller* were only bringing *per se* claims, but this Court and the Iowa Supreme Court ruled that sharing a provider network was not the type of agreement on pricing that is subject to the *per se* rule.  So that case was thrown out.  *Id.*

C.    *Chicoine v. Wellmark* **(this case) and the rule of reason.**

The plaintiffs in this case are now doing what the plaintiffs in *Mueller* did not do: They're pleading rule of reason claims.   In their petition filed in October, Plaintiffs allege that by sharing their provider networks, Wellmark, the Blue Cross and Blue Shield Association, and the other 36 Blues "that sell Blue Cross insurance in other states" are fixing prices of chiropractic services through the BlueCard® Program in violation of the rule of reason.  Pet. ¶ 15.

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Plaintiffs are also raising a new claim: That Wellmark, the Blue Cross and Blue Shield Association, and the other 36 Blues have "agreed to allocate territories and not to compete with each other in those allocated territories." Pet. ¶ 3(b).  In *Mueller*, the plaintiffs hinted at bringing such a claim, but they never did pursue it, and thus the Supreme Court did "not consider it."  *Mueller*, 861 N.W.2d at 571 n.4.

To succeed on both these rule of reason claims, Plaintiffs will need to show that Wellmark and the Blues have market power in a distinct, defined *product* market and in a distinct, defined *geographic* market; that the sharing of a provider network creates anti-competitive effects in those markets; and that the anti-competitive effects outweigh the pro-competitive justifications.  *Mueller*, 861 N.W.2d at 568.  This Court will then have to "weigh[] all of the circumstances" of the case and decide whether these practices violate the Iowa Competition Law under the rule of reason.  *Mueller*, 861 N.W.2d at 568.  That task will involve significant economic analysis: Indeed, as Justice Mansfield explained in *Mueller*, the Iowa Competition Law takes "an economics-based approach to antitrust, since it condemns only those contracts, combinations, and conspiracies that restrain trade 'in a relevant market'—a distinctly economic concept." *Id*.  That will require several costly experts (or more), dozens of depositions (or more), the exchange of many thousands of pages of documents (or more), and numerous court filings. In addition, even before reaching the merits of a rule of reason analysis, plaintiffs also will need to pursue separate discovery and a separate evidentiary hearing on class certification, which will involve its own complicated factual and legal issues.

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

We know this complexity to be true based on general experience with class action antitrust cases.  But we know it to be even more true in this case, because the same claims are already being litigated in federal court.

### D.   The national, multi-district litigation involving the Blue Cross and Blue Shield Association and the 37 Blues.

In 2012, a group of individuals who are insured under Blue Cross and Blue Shield health plans filed a federal antitrust lawsuit against the Blue Cross and Blue Shield Association and all the 37 Blues (including Wellmark).  The plaintiffs alleged that, because the Blues can only use the trademarked "Blue Cross and Blue Shield" name in their own territories (Wellmark's territory is Iowa and South Dakota), the Blues have agreed to divvy up the market in violation of the antitrust laws.  *See In re: Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1375 (U.S. Jud. Pan. Mult. Lit. 2012). Soon thereafter, several more plaintiffs filed similar claims in other jurisdictions.  And soon after that, a group of medical providers filed a similar lawsuit.  And soon after that, additional providers filed additional lawsuits. *Id.*

All told, the number of lawsuits is now over 50, and as a result the United States Panel on Multidistrict Litigation entered an order that stayed each individual case and consolidated them all, for purposes of discovery and dispositive motions, in the Northern District of Alabama.  *Id.*  That case, which is now referred to as Multi-District Litigation No. 2406 (or "MDL 2406," for short) has two master complaints.  One complaint is comprised of insureds.  The other is comprised of medical providers.  The second one is the one that's important for this case.

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

The latest iteration of the MDL provider complaint (found at pages 1-162 of appendix that is being filed with this brief) was filed more than a year ago, on November 11, 2014.  It is a class action complaint that alleges that Wellmark and the other 36 Blues have engaged in a "market allocation conspiracy" by dividing the Country into "service areas," "allocating those geographic markets among the Blues," and then agreeing that they will not use the Blue Cross Blue Shield trademark in each other's service area.  Compl. ¶¶ 4-5, 170.  That, according to the plaintiffs, is a violation of section 1 of the Sherman Act (the one that section 553.4 of the Iowa Competition Law is modeled after).  Notably, that is the very same claim that Plaintiffs are making in this case.

The plaintiffs in MDL 2406 also allege that, by sharing each other's provider networks through the BlueCard® Program, Wellmark and the 36 other Blues are "entering into a Price Fixing and Boycott Conspiracy" that also violates section 1 of the Sherman Act.  Compl. ¶ 4-5.  Notably, that is also the very same claim that Plaintiffs are making in this case.

The MDL 2406 plaintiffs are making both claims under the rule of reason (Compl. at pp. 147-48) and they are including Iowa as one of their geographic markets. Compl. ¶¶ 254-256. Specifically, the plaintiffs allege that Wellmark "has market power at least in certain areas in the State of Iowa," and thus they request that the Court certify a "subclass" of plaintiffs for Iowa.  Compl. ¶¶ 274, 377.  That subclass is alleged to include all Iowa chiropractors, because Des Moines-area

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 65 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-6   Filed 06/14/17   Page 12 of 19
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

chiropractor Joseph Ferezy is one of the plaintiffs and he is bringing his claims on behalf of all chiropractors in the Iowa subclass.  Compl. ¶ 29.

So this case and MDL 2406 directly overlap.  They involve the same alleged class of plaintiffs  (i.e., all Iowa chiropractors) and the same rule of reason claims.

<div align="center">**Argument**</div>

This case should be stayed in deference to MDL 2406.  That class action covers the same claims (price fixing and geographic market division) and the same alleged class of plaintiffs (Iowa chiropractors).  It was filed well before this case; the parties have already conducted substantial discovery; and (most importantly), because Iowa courts have to follow federal courts' lead on the application of the antitrust laws, the outcome of MDL 2406 will likely dictate the outcome of this case.

I.   **Because the Iowa Competition Law must be applied consistently with the federal Sherman Act, this case should be stayed pending the outcome of the federal litigation.**

"The [Iowa] general assembly has directed that the Iowa Competition Law '*shall* be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose'" so as to "'achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.'"  *Mueller*, 861 N.W.2d at 567 (quoting Iowa Code § 553.2).  The purpose of that directive, as explained by the Iowa Supreme Court, is to ensure that "both state and federal antitrust law" apply "a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct." *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002).  In other words, if a business arrangement is illegal under the federal antitrust laws,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 66 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-6   Filed 06/14/17   Page 13 of 19
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

then it is illegal under the Iowa Competition Law.  And if a business arrangement is *not* illegal under the federal antitrust laws, then it is *not* illegal under the Iowa Competition Law.

That rule, which has been re-stated by the courts in many other states,[3] provides at least three benefits:

---

[3] Alabama (*Ex parte Rice*, 67 S.2d 825, 829 (Ala. 1953) ("The federal statutes ... prescribe the terms of unlawful ... restraints of trade as they should also be administered in Alabama.")); Alaska (*West v. Whitney-Fidalgo Seafoods*, 628 P.2d 10, 14 (Alaska 1981) ("The legislature intended that Alaska courts would look to Sherman Act cases in construing the [state] act.")); Connecticut (Conn. Gen. Stat. Ann. § 35-44b ("[T]he courts of this state shall be guided by interpretations given by the federal courts to federal antitrust law.")); Delaware (Del. Code Ann. tit. 6, § 2113 (indicating that state law "shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes"); Florida (Fla. Stat. Ann. § 542.32 ("It is the intent of the Legislature [that] due consideration and great weight be given to the interpretations of the federal courts ....")); Hawaii (Haw. Rev. Stat. Ann. § 480-3 ("This chapter shall be construed in accordance with judicial interpretations of similar federal antitrust statutes ....")); Idaho (Idaho Code Ann. § 48-102 (indicating that state law "shall be construed in harmony with federal judicial interpretation of federal antitrust statutes and consistent with [the state law's] purposes ....")); Massachusetts (Mass. Gen. Laws Ann. ch. 93 § 1 ("[S]hall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable.")); Michigan (Mich. Comp. Laws Ann. § 445.784(2) ("The courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason.")); Missouri (Mo. Rev. Stat. § 416.141 ("[S]hall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes.")); Nebraska (Neb. Rev. Stat. Ann. § 59-829 ("When any provision ... is the same as or similar to the language of a federal antitrust law, the courts of this state ... shall follow the construction given to the federal law by the federal courts.")); Nevada (Nev. Rev. Stat. Ann. § 598A.050 (West 2006) ("The provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes.")); New Jersey (N.J. Stat. Ann. § 56:9-18 ("This act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it.")); New Mexico (N.M. Stat. Ann. § 57-1-15 ("[T]he Antitrust Act shall be construed in harmony with judicial interpretations of the federal antitrust laws.")); Oklahoma (Okla. Stat. Ann. tit. 79, § 212 ("The provisions of this act shall be interpreted in a manner consistent with Federal Antitrust Law ... and the case law applicable thereto.")); Pennsylvania (Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014 (3d. Cir. 1994) (conceptualizing the Sherman Act as the statutory application of common law doctrine relating to the restraint of trade and indicating that courts look to federal precedent for guidance in defining unreasonable restraints of trade)); Rhode Island (R.I. Gen. Laws § 6-36-2(b) (LexisNexis 2006) ("[S]hall be construed in harmony with

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

*First,* and most obviously, it creates one, consistent body of antitrust law in Iowa, which means that national companies who do business here are not hampered with inconsistent antitrust regimes.  Almost all commerce is interstate commerce these days, so if one state's antitrust law is more burdensome than the federal law, then that state law becomes the standard that companies must meet.  It would be problematic (to say the least) if each state were to start regulating interstate commerce through their own, idiosyncratic antitrust laws.  Thus, almost every state has opted to follow federal law on the subject.

*Second*, since the language of antitrust statutes is vague and open-ended, antitrust law has been developed through court decisions.  But Iowa doesn't see many antitrust cases, so if Iowa courts *weren't* directed to follow federal law, then companies that do business in Iowa would be at a loss as to what the Iowa law is.  That's not efficient, and efficiency is what the antitrust laws are designed to create.  So by requiring Iowa state courts to interpret the Iowa Competition Law in

---

judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."); South Carolina (Drs. Steuer & Latham, P.A. v. Nat'l Med. Enters., 672 F. Supp. 1489, 1521 (D.S.C. 1987) ("South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement.")); Texas (Tex. Bus. & Com. Code Ann. § 15.04 (Vernon 2006) ("The provisions of this Act ... shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with th[e Act's] purpose.")); Virginia (Va. Code Ann. § 59.1-9.17 (West 2006) ("This chapter shall be applied and construed to effectuate its general purposes in harmony with judicial interpretation of comparable federal statutory provisions.")); West Virginia (W. Va. Code Ann. § 47-18-16 (West 2006) ("This article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.")); Wisconsin (Grams v. Boss, 294 N.W.2d 473, 480 (Wis. 1980) (stating that the state statute was a reenactment of the Sherman Act and, therefore, federal decisional law provides persuasive authority)).
22

E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

harmony with federal antitrust cases, the legislature has given Iowa businesses a deep body of federal case law to apply to their everyday decisions.  That's efficient.

   *Third,* and finally, antitrust law is incredibly complicated.  It requires judges to evaluate "economic and econometric analysis," a task that, as Former Federal Trade Commissioner Joshua Wright put it, is "increasingly complex."[4]  But the economics is just the beginning.  The *Manual for Complex Litigation* warns that antitrust lawsuits "involve voluminous documentary and testimonial evidence, extensive discovery, complicated legal, factual, and technical (particularly economic) questions, numerous parties and attorneys, and substantial sums of money." *Manual for Complex Litigation, Fourth*, § 30, p. 519, 2004 WL 258955, 1 (2004). That's why it's so important that state courts follow federal antitrust decisions. Federal judges have numerous resources at their disposal—including fewer cases and thus more time.  They also see more antitrust cases.  Thus, by relying on federal antitrust decisions, Iowa courts get the benefit of the federal resources and experience.

   Each of these three factors is at play in this case.  It is imperative that Iowa not be inconsistent with federal law on whether the Blue Cross and Blue Shield system is an issue of antitrust concern.  This lawsuit, because it claims that every Blue Cross and Blue Shield insurer is a co-conspirator, touches the lives of the

---

[4] *See* Joshua D. Wright & Michael R. Baye, *Is Antitrust Too Complicated for Generalist Judges? The Impact of Economic Complexity and Judicial Training on Appeals*, 54 J. of Law & Economics (2011), available at http://www.masonlec.org/site/rte_uploads/files/Baye_Wright_JLE-1.pdf.  (hereinafter, "Wright").

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 69 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-6   Filed 06/14/17   Page 16 of 19
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

many millions of individuals across the country who are insured by a Blue Cross and Blue Shield health plan. A case that has such a national significance—on an issue as important as healthcare—should be governed by one, national standard. A different result in Iowa as compared to other states could be devastating to Iowa businesses that operate in multiple states. Thus, this Court should wait to see what that standard is.

In addition, the federal court is already set to dig into the incredibly complex nature of these claims. There will be numerous economics experts in the federal lawsuit (some of whom will probably be the foremost experts in their field). That will give the federal court significant insight into the claims here. Indeed, we already know that the presiding judge is anxious to wade into the economics issues: He has already scheduled an "Economics Day" where parties must "make educational presentations regarding the economic issues in this case to the court." This Court will benefit from that experience. (The order is at page 207 of the attached Appendix.)

Most importantly, though—and this is worth repeating—Iowa law *directs* Iowa state courts to follow the federal courts' lead on antiturst. Iowa Code §553.2. As a result, this Court should stay this case pending the outcome of the federal action.

## II. Staying this case will also save significant resources and will guard against potential issues of res judicata and estoppel.

The federal courts stayed all the individual federal actions and consolidated them with one judge for the very purpose of conserving resources. "Centralization,"

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

the Multi-district Panel wrote, "will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary." *In re: Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at, 1376.

This case should be stayed for the same reasons.  As noted above, antitrust lawsuits require multiple, very expensive economics experts and result in voluminous discovery.  There is no reason to incur those costs when the ongoing federal class action includes the same plaintiffs (a class of all Iowa chiropractors) and the same claims.  Legal fees alone in this case can be expected to exceed well over a million dollars (as they did in the *Mueller* line of cases).  State courts frequently stay newly filed lawsuits when the same claims are pending in a federal class action.[5] As one court explained, doing otherwise—i.e., allowing the state action to continue—"would set up the potential for differing declarations by two separate judges, after duplicate hearings or trials, on identical issues of facts and law." *Van Emden Mgmt. Corp. v. Marsh & McLennan Cos.*, No. CIV.A. 05-0066-A, 2005 WL 2456737, at *4 (Mass. Super. Sept. 21, 2005) (internal quotation omitted).  That is

---

[5] *See, e.g., Williams v. Fedex Ground Package Sys., Inc. et al,* 23 Mas L. Rptr. 192, 2007 WL 3013266, at *3 (Mass. Super. Sept. 20, 2007) (state trial court granting motion to stay pending parallel federal MDL); *Polaris Pub. Income Funds v. Einhorn*, 625 So.2d 128, 129-30 (Fla. Dist. Ct. App. 1993) (adding that refusal to stay an action where purported class comprised a subset of a previously-filed nationwide class action pending in a New York court was an abuse of discretion because "[t]he Florida action is essentially subsumed within the New York action"); *Van Emden Mgmt. Corp. v. Marsh & McLennan Cos.*, No. CIV.A. 05-0066-A, 2005 WL 2456737, at *4 (Mass. Super. Sept. 21, 2005); *cf. Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 838 (7th Cir. 1999) ("Judges sometimes stay proceedings in the more recently filed case to allow the first to proceed; sometimes a stay permits the more comprehensive of the actions to go forward.")

17

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

not an efficient use of "the scarce judicial resources" of the state. *Id.* (ordering a stay pending the outcome of a federal, multi-district antitrust litigation).

Indeed, an Illinois state-court lawsuit similar to this one has already been stayed pending the outcome of MDL 2406.[6]   The Blue Cross and Blue Shield defendants in that case, like Wellmark here, filed a motion to stay.   The plaintiffs initially resisted that motion, but, after a hearing with the district court, they agreed that a stay would be most efficient. App. 204.   Thus, the parties stipulated that the case would be stayed "pending the outcome of the current MDL in federal district court." App. 204.

Wellmark respectfully requests that this Court do the same thing here as was done in Illinois.   The federal case has been on file longer, it's ahead of this newly filed case, and the federal MDL court already has a plan for dealing with the incredibly complex issues involved.   There is no need to attempt to duplicate those efforts in this Court—especially when the result in that case will ultimately dictate the result here.

## Conclusion

Because Iowa antitrust law follows federal antitrust law, the Court should stay this case pending the outcome of the federal MDL that will address the same issues, for the same plaintiffs (Iowa chiropractors). Moreover, staying this case will save significant resources—for both the parties and this Court.  And allowing the

---

[6] The plaintiff's petition in the Illinois case, along with the docket showing the order to stay that case, are included in the attached Appendix at pages 163 and 204, respectively.

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

case to continue will only risk the prospect of inconsistent rulings and wasted

resources.

*/s/ Ryan G. Koopmans*
Hayward L. Draper   AT0002075
John T. Clendenin   AT0001529
Ryan G. Koopmans     AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:     (515) 283-3149
Facsimile:     (515) 283-8016
E-Mail:     hdraper@nyemaster.com
              jclendenin@nyemaster.com
              rkoopmans@nyemaster.com


ATTORNEYS FOR DEFENDANTS,
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN OF IOWA,
INC., and Iowa corporation


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 4th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.


/s/ Ryan G. Koopmans

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 73 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-32   Filed 06/14/17   Page 1 of 3
E-FILED  2017 MAY 18 3:46 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>     Plaintiffs,<br><br>and<br><br>STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>     Plaintiffs,<br><br>v.<br><br>WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>     Defendants. | **Law No. CVCV050638**<br><br><br>**STIPULATED MOTION FOR EXTENSION OF TIME FOR RESPONSIVE PLEADING** |

NOW COME the Defendants, with the agreement and stipulation of counsel for the Plaintiffs, and respectfully request a fifteen day extension of time to file a responsive pleading in this matter, to June 14, 2017. In explanation and support of this motion, Defendants state as follows:

1



EXHIBIT
EE

E-FILED 2017 MAY 18 3:46 PM POLK - CLERK OF DISTRICT COURT

1.     This is a complicated class action antitrust case on remand from the Iowa Supreme Court.

2.     Upon issuance of the Procedendo, this Court ordered that Defendants' responsive pleading be filed in fourteen days, which was May 30, 2017.

3.     Although the undersigned counsel will continue as lead counsel in the defense of the case, his two partners on this file (John Clendenin and Ryan Koopmans) have both left the Nyemaster Goode Law Firm, one of them just a few days ago. This means that the attorneys working on this file will need some additional time to get up to speed on some of the complicated history and issues involved so that we can jointly formulate with Defendants our approach to responsive pleading in this matter. We also need time to get up to speed on what has been happening in the MDL that may affect our responsive pleading in this matter.

4.     The undersigned counsel has spoken with Glenn Norris, counsel for the Plaintiffs, and he stipulates and agrees to this extension of time.

WHEREFORE, Defendants respectfully request an extension of time to file our responsive pleading to and including June 14, 2017.

E-FILED 2017 MAY 18 3:46 PM POLK - CLERK OF DISTRICT COURT

/s/ Hayward L. Draper
Hayward L. Draper, AT0002075
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone:  515-283-3152
Facsimile:  515-283-8045
Email:        hld@nyemaster.com

ATTORNEYS FOR DEFENDANTS
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN
OF IOWA, INC., an Iowa corporation.


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 18th day of May, 2017 with the Clerk of Court using the EDMS system, which will send notification of such filing to the counsel of record.


/s/ Hayward L. Draper

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 76 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 1 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | **Law No. CVCV050638** |
| Plaintiffs, | |
| and | |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | **APPENDIX** |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

Corrected and Amended Complaint In Re: Blue Cross
Blue Shield Antitrust Litigation (United States District
Court for Northern District of Alabama, Southern
District Case No. 2:13-CV-250000) .................................................................. App. 001

Complaint – Class Action in Deborah Piercy and
Lisa Tomazolli v. Health care Service Corporation d/b/a
Blue Cross Blue Shield of Illinois (In the Circuit Court for
the First Judicial Circuit, Union County, Illinois, Case No. 2012-L-28)........ App. 163

1



E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Docket Report for Deborah Piercy and
Lisa Tomazolli v. Health care Service Corporation d/b/a
Blue Cross Blue Shield of Illinois (In the Circuit Court for
the First Judicial Circuit, Union County, Illinois, Case No. 2012-L-28)........ App. 204

Scheduling Order for In Re: Blue Cross Blue Shield,
(United States District Court for Northern District of
Alabama, Southern District Case No. 2:13-CV-250000) ................................ App. 206

*/s/ Ryan G. Koopmans*
Hayward L. Draper AT0002075
John T. Clendenin AT0001529
Ryan G. Koopmans   AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:   (515) 283-3149
Facsimile:    (515) 283-8016
E-Mail:     hdraper@nyemaster.com
              jclendenin@nyemaster.com
              rkoopmans@nyemaster.com

ATTORNEYS FOR DEFENDANTS,
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN OF IOWA,
INC., and Iowa corporation

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 4th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

/s/ Ryan G. Koopmans

2

FILED

2014 Nov-25  PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) Master File No. 2:13-CV-20000-RDP ) ) This document relates to: ) THE PROVIDER TRACK |
| _____ | ) |
| Jerry L. Conway, D.C., Corey Musselman, M.D., The San Antonio Orthopaedic Group, L.L.P., Orthopaedic Surgery Center of San Antonio, L.P., Charles H. Clark III, M.D., Crenshaw Community Hospital, Bullock County Hospital, Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C., Sports and Ortho, P.C., Kathleen Cain, M.D., Northwest Florida Surgery Center, L.L.C., Wini Hamilton, D.C., North Jackson Pharmacy, Inc., Neuromonitoring Services of America, Inc. Cason T. Hund, D.M.D., ProRehab, P.C., Texas Physical Therapy Specialists, L.L.C., BreakThrough Physical Therapy, Inc., Dunn Physical Therapy, Inc., Gaspar Physical Therapy, P.C., Timothy H. Hendlin, D.C., Greater Brunswick Physical Therapy, P.A., Charles Barnwell, D.C., Brain and Spine, L.L.C., Heritage Medical Partners, L.L.C., Judith Kanzic, D.C., Brian Roadhouse, D.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Saket K. Ambasht, M.D., John M. Nolte, M.D., Bauman Chiropractic Clinic of Northwest Florida, P.A., Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of | ) CORRECTED CONSOLIDATED ) SECOND AMENDED PROVIDER ) COMPLAINT ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 79 of 645

Case 4:17-cv-00210-RP-SBJ    Document 236-7    Filed 08/14/17    Page 2 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

|                                                                                    |    |
| ---------------------------------------------------------------------------------- | -- |
| Chiropractic and Neurology,                                                        | )  |
| Snowden Olwan Psychological Services,                                              | )  |
| Ear, Nose & Throat Consultants and Hearing                                         | )  |
|   Services, P.L.C.,                                                      | )  |
| and                                                                                | )  |
| U.S. Imaging Network, L.L.C. d/b/a                                                 | )  |
|   Imaging Network Administrators, L.L.C.                                 | )  |
| on behalf of themselves and all others similarly                                   | )  |
| situated,                                                                          | )  |
|                                                                                    | )  |
|                                           Plaintiffs,                              | )  |
|                                                                                    | )  |
| v.                                                                                 | )  |
|                                                                                    | )  |
| Blue Cross and Blue Shield of Alabama,                                             | )  |
| WellPoint, Inc.,                                                                   | )  |
| Health Care Service Corporation,                                                   | )  |
| Cambia Health Solutions, Inc.,                                                     | )  |
| CareFirst, Inc.,                                                                   | )  |
| Premera Blue Cross,                                                                | )  |
| Premera Blue Cross and Blue Shield of Alaska,                                      | )  |
| Blue Cross Blue Shield of Arizona, Inc.,                                           | )  |
| USAble Mutual Insurance Company, d/b/a                                             | )  |
|   Arkansas Blue Cross and Blue Shield,                                   | )  |
| Blue Cross of California d/b/a Anthem Blue                                          | )  |
|   Cross,                                                                 | )  |
| California Physicians' Service, Inc. d/b/a Blue                                    | )  |
|   Shield of California,                                                  | )  |
| Rocky Mountain Hospital and Medical                                                | )  |
|   Service, Inc., d/b/a Anthem Blue Cross and                             | )  |
|   Blue Shield of Colorado,                                               | )  |
| Anthem Health Plans, Inc. d/b/a Anthem Blue                                        | )  |
|   Cross and Blue Shield of Connecticut,                                  | )  |
| Highmark, Inc.,                                                                    | )  |
| Highmark BCBSD, Inc. d/b/a Highmark Blue                                           | )  |
|   Cross and Blue Shield Delaware,                                        | )  |
| Group Hospitalization and Medical                                                  | )  |
|   Services, Inc. d/b/a CareFirst BlueCross                               | )  |
|   BlueShield,                                                            | )  |
| Blue Cross and Blue Shield of Florida, Inc.,                                       | )  |
| Blue Cross and Blue Shield of Georgia, Inc.,                                       | )  |
| Hawaii Medical Service Association d/b/a                                           | )  |
|   Blue Cross and Blue Shield of Hawaii,                                  | )  |
| Blue Cross of Idaho Health Service, Inc.,                                          | )  |
| Regence BlueShield of Idaho, Inc.,                                                 | )  |
| Blue Cross and Blue Shield of Illinois,                                            | )  |

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 80 of 645

Case 4:17-cv-00210-RP-SBJ   Document 36-7   Filed 06/14/17   Page 5 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Anthem Insurance Companies, Inc. d/b/a     )
  Anthem Blue Cross and Blue Shield of Indiana, )
Wellmark, Inc. d/b/a/ Wellmark Blue Cross    )
  and Blue Shield of Iowa,     )
Blue Cross and Blue Shield of Kansas, Inc.   )
Anthem Health Plans of Kentucky, Inc.    )
  d/b/a Anthem Blue Cross and Blue Shield  )
  of Kentucky,    )
Louisiana Health Service and Indemnity   )
  Company d/b/a/ Blue Cross and Blue Shield )
  of Louisiana,    )
Anthem Health Plans of Maine, Inc.,    )
  d/b/a Anthem Blue Cross and Blue Shield  )
  of Maine,    )
CareFirst of Maryland, Inc. d/b/a CareFirst  )
  BlueCross BlueShield,    )
Blue Cross and Blue Shield of Massachusetts, )
  Inc.,    )
Blue Cross and Blue Shield of Michigan,   )
BCBSM, Inc. d/b/a/ Blue Cross and Blue   )
  Shield of Minnesota,    )
Blue Cross Blue Shield of Mississippi,    )
HMO Missouri, Inc. d/b/a Anthem Blue   )
  Cross and Blue Shield of Missouri,   )
Blue Cross and Blue Shield of Kansas City, Inc., )
Blue Cross and Blue Shield of Montana,   )
Caring for Montanans, Inc. f/k/a    )
  Blue Cross and Blue Shield of Montana, Inc. )
Blue Cross and Blue Shield of Nebraska,   )
Anthem Blue Cross and Blue Shield of Nevada, )
Anthem Health Plans of New Hampshire, Inc.  )
  d/b/a Anthem Blue Cross and Blue Shield of )
  New Hampshire,    )
Horizon Health Care Services, Inc. d/b/a   )
  Horizon Blue Cross and Blue Shield of   )
  New Jersey,    )
Blue Cross and Blue Shield of New Mexico,  )
HealthNow New York Inc.,    )
Blue Shield of Northeastern New York,   )
Blue Cross and Blue Shield of Western   )
  New York, Inc.    )
Empire HealthChoice Assurance, Inc. d/b/a  )
  Empire Blue Cross Blue Shield,   )
Excellus Health Plan, Inc. d/b/a Excellus   )
  BlueCross BlueShield,    )
Blue Cross and Blue Shield of North Carolina, )

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 81 of 645

Case 4:17-cv-00201-RDP   Document 236-7   Filed 06/14/17   Page 6 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

| | |
|---|---|
| Inc., | ) |
| **Noridian Mutual Insurance Company d/b/a** | ) |
| **Blue Cross Blue Shield of North Dakota,** | ) |
| **Community Insurance Company d/b/a Anthem** | ) |
| **Blue Cross and Blue Shield of Ohio,** | ) |
| **Blue Cross and Blue Shield of Oklahoma,** | ) |
| **Regence BlueCross BlueShield of Oregon,** | ) |
| **Hospital Service Association of Northeastern** | ) |
| **Pennsylvania d/b/a Blue Cross of Northeastern** | ) |
| **Pennsylvania,** | ) |
| **Capital Blue Cross,** | ) |
| **Highmark Health Services, Inc. d/b/a Highmark** | ) |
| **Blue Cross Blue Shield and d/b/a Highmark** | ) |
| **Blue Shield,** | ) |
| **Independence Blue Cross,** | ) |
| **Triple-S Salud, Inc.,** | ) |
| **Blue Cross and Blue Shield of Rhode Island,** | ) |
| **BlueCross BlueShield of South Carolina  Inc.,** | ) |
| **Wellmark of South Dakota, Inc. d/b/a Wellmark** | ) |
| **Blue Cross and Blue Shield of South Dakota,** | ) |
| **BlueCross BlueShield of Tennessee, Inc.,** | ) |
| **Blue Cross and Blue Shield of Texas,** | ) |
| **Regence BlueCross BlueShield of Utah,** | ) |
| **Blue Cross and Blue Shield of Vermont,** | ) |
| **Anthem Health Plans of Virginia, Inc. d/b/a** | ) |
| **Anthem Blue Cross and Blue Shield of** | ) |
| **Virginia, Inc.** | ) |
| **Regence BlueShield,** | ) |
| **Highmark West Virginia, Inc. d/b/a Highmark** | ) |
| **Blue Cross Blue Shield West Virginia,** | ) |
| **Blue Cross Blue Shield of Wisconsin d/b/a** | ) |
| **Anthem Blue Cross and Blue Shield of** | ) |
| **Wisconsin,** | ) |
| **Blue Cross Blue Shield of Wyoming,** | ) |
| **Consortium Health Plans, Inc.,** | ) |
| **National Account Service Company, L.L.C. and** | ) |
| **Blue Cross and Blue Shield Association,** | ) |
| | ) |
| **Defendants.** | ) |

_____

## **CORRECTED CONSOLIDATED  SECOND AMENDED PROVIDER COMPLAINT**

Plaintiffs, Jerry L. Conway, D.C., Corey Musselman, M.D., The San Antonio Orthopaedic Group, L.L.P., Orthopaedic Surgery Center of San Antonio, L.P., Charles H. Clark III, M.D., Crenshaw Community Hospital, Bullock County Hospital, Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C., Sports and Ortho, P.C., Kathleen Cain, M.D., Northwest Florida Surgery Center, L.L.C., Wini Hamilton, D.C., North Jackson Pharmacy, Inc., Neuromonitoring Services of America, Inc., Cason T. Hund, D.M.D., ProRehab, P.C., Texas Physical Therapy Specialists, L.L.C., BreakThrough Physical Therapy, Inc., Dunn Physical Therapy, Inc., Gaspar Physical Therapy, P.C., Timothy H. Hendlin, D.C., Greater Brunswick Physical Therapy, P.A., Charles Barnwell, D.C., Brain and Spine, L.L.C., Heritage Medical Partners L.L.C., Judith Kanzic, D.C., Brian Roadhouse, D.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Saket K. Ambasht, M.D., John M. Nolte, M.D., Bauman Chiropractic Clinic of Northwest Florida, P.A.,  Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology, Snowden Olwan Psychological Services, Ear, Nose & Throat Consultants and Hearing Services, P.L.C.,. and U.S. Imaging Network, L.L.C. d/b/a Imaging Network Administrators, L.L.C. (collectively "Plaintiffs" or "Provider Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Blue Cross and Blue Shield of Alabama, WellPoint, Inc., Health Care Service Corporation, Cambia Health Solutions, Inc., CareFirst, Inc., Premera Blue Cross, Premera Blue Cross and Blue Shield of Alaska, Blue Cross Blue Shield of Arizona, Inc., USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield, Blue Cross of California d/b/a Anthem Blue Cross, California Physicians' Service, Inc. d/b/a Blue Shield of California, Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut, Highmark, Inc., Highmark

1

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 83 of 645

Case 4:17-cv-00700-JAR-SBJ   Document 235-7   Filed 12/11/17   Page 8 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, Group Hospitalization and
Medical Services, Inc. d/b/a Carefirst BlueCross BlueShield, Blue Cross and Blue Shield of
Florida, Inc., Blue Cross and Blue Shield of Georgia, Inc., Hawaii Medical Service Association
d/b/a Blue Cross and Blue Shield of Hawaii, Blue Cross of Idaho Health Service, Inc., Regence
BlueShield of Idaho, Inc., Blue Cross and Blue Shield of Illinois, Anthem Insurance Companies,
Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Wellmark Blue
Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Inc., Anthem Health
Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky, Louisiana
Health Service and Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana, Anthem
Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine, CareFirst of
Maryland, Inc. d/b/a CareFirst BlueCross BlueShield, Blue Cross and Blue Shield of
Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, BCBSM, Inc. d/b/a/ Blue Cross
and Blue Shield of Minnesota, Blue Cross Blue Shield of Mississippi, HMO Missouri, Inc. d/b/a
Anthem Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City,
Inc., Blue Cross and Blue Shield of Montana, Caring for Montanans, Inc. d/b/a Blue Cross and
Blue Shield of Montana, Inc., Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and
Blue Shield of Nevada, Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross
and Blue Shield of New Hampshire, Horizon Health Care Services, Inc. d/b/a Horizon Blue
Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, HealthNow
New York Inc., Blue Shield of Northeastern New York, Blue Cross and Blue Shield of Western
New York, Inc., Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield,
Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, Blue Cross and Blue Shield of
North Carolina, Inc., Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of

App. p. 006

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 84 of 645

Case 4:17-cv-00701-RDP-SBJ   Document 236-7 Filed 10/14/17 Page 9 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

North Dakota, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services, Inc. d/b/a/ Highmark Blue Cross Blue Shield and d/b/a Highmark Blue Shield, Independence Blue Cross, Triple-S Salud, Inc., Blue Cross and Blue Shield of Rhode Island, BlueCross BlueShield of South Carolina, Inc., Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, BlueCross BlueShield of Tennessee, Inc., Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross and Blue Shield of Vermont, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., Regence BlueShield, Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin, Blue Cross Blue Shield of Wyoming (these independent Blue Cross Blue Shield licensees are referred to herein collectively, as "the Blues"), Consortium Health Plans, Inc., National Account Service Company, L.L.C., and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants" or "BCBS Defendants") allege violations of antitrust laws as follows:

## NATURE OF THE CASE

1.      Defendants, which are independent companies, have agreed with each other to carve the United States into "Service Areas" in which only one Blue can sell insurance, administer employee benefit plans or contract with healthcare providers (the "Market Allocation Conspiracy").  Defendants have engaged in a horizontal market allocation, which is illegal under a *per se*, quick look or rule of reason analysis.  The *quid pro quo* for this illegal Market Allocation Conspiracy is a horizontal Price-Fixing and Boycott Conspiracy under which every

App. p. 007

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 85 of 645

Case 2:12-cv-00200-ARS-JDD Document 367 Filed 06/14/17 Page 10 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

other Blue gets the benefit of the artificially reduced prices that each Blue pays to healthcare providers.  The Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs. The Market Allocation Conspiracy reduces the competition that each Blue faces and allows it to reduce the prices that it pays to healthcare providers.  The Price Fixing and Boycott Conspiracy fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices and further provides that the participating Blues will collectively boycott all Providers outside of their Service Areas.

2.      Plaintiffs are providers of healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients are insured by the Blues or are included in employee benefit plans administered by the Blues.

3.      Defendants are the Association and the Blues, their owners and affiliated companies, as well as companies through which they conduct their conspiracies.  The Blues provide health insurance coverage (To eliminate any possible ambiguity, Provider Plaintiffs have always intended to include dental insurance and vision insurance as well as administrative services for employee benefit plans within the meaning of health insurance coverage for purposes of this amended complaint) for approximately 100 million people in the United States and, according to the BCBSA's own estimates, more than 91% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues.  The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

4.      In the claims related to the Market Allocation Conspiracy, Plaintiff healthcare providers challenge the explicit agreement reached by Defendants to divide the United States

4

App. p. 008

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 86 of 645

Case 1:13-cv-00200-ARISBJ Document 367 Filed 06/14/17 Page 91 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

into what Defendants term "Service Areas" and then to allocate those geographic markets among the Blues, free of competition.  In the claims related to the Price Fixing and Boycott Conspiracy, Plaintiffs also challenge the agreement reached by Defendants to fix prices for goods, services and facilities rendered by healthcare providers such as Plaintiffs and to boycott the healthcare providers outside of their Service Areas.

5.      In furtherance of the Market Allocation Conspiracy, Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted.  Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

6.      The Blues, which are organized and operated independently, constitute potential competitors and, absent the Market Allocation Conspiracy, the Blues would, in fact, compete. The BCBSA readily admits on its own website that the Blues are "independent companies" that operate in "exclusive geographic areas." www.bcbsa/healthcare-news/press-center.com. Defendants' agreement to allocate markets is a horizontal restraint in violation of Section 1 of the Sherman Act.

7.      The Market Allocation Conspiracy has significantly decreased competition in the markets for healthcare financing including the markets for healthcare insurance and in the health services, all of which are discussed more fully below.  For example, Blue Cross and Blue Shield of Alabama controls access to more than 90% of privately insured or administered (in this amended complaint Plaintiffs will use insured to refer to administered as well as insured patients unless otherwise indicated) patients in the State of Alabama.  As a result of decreased competition, healthcare providers, including Plaintiffs, are paid much less than they would be

5

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 87 of 645

Case 4:13-cv-02100-RBP Document 336-7 Filed 06/14/17 Page 12 of 210
E-FILED 2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

absent the BCBS Market Allocation Conspiracy.  Healthcare providers who contract with the Blues are also subjected to less favorable terms than they would be absent the conspiracy.  The BCBS Market Allocation Conspiracy is a *per se* violation, as well as being a violation under the quick look and rule of reason analysis of Section 1 of the Sherman Act.

8.      Defendants have further exploited the market dominance they have secured through the Market Allocation Conspiracy by entering into a Price Fixing and Boycott Conspiracy.  In furtherance of the Price Fixing and Boycott Conspiracy, each Defendant has agreed to participate in each national program that the Blues adopt, including the Blue Card Program and the National Accounts Programs.  The Blue Card Program applies when a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant.  In the Blue Card Program the subscriber's Blue is the Home Plan and the Defendant Blue with the Service Area where the healthcare goods, services or facilities are provided is the Host Plan.  The National Accounts Programs function in a similar manner. National Accounts Programs generally apply to employee benefit plans with subscribers in multiple states.  The Defendant Blue that administers the employee benefit plan is the Control Plan, and the other Blues in whose Service Areas where the subscribers receive healthcare goods, services or facilities are Participating Plans.  These Programs and others have been established by a horizontal agreement between the Blues.  The Blue Card Program is managed by a Committee of Blues sitting on the Inter-Plan Programs Committee.  The National Accounts Programs are either established based on horizontal agreements between the Blues or managed through the Blue Card Program.  The excess profits from these Programs are then divided among the Blues. The national programs including the Blue Card Program and the National Accounts Programs lock in the fixed, discounted reimbursement rates that each Defendant achieves

6

through market dominance in its Service Area and makes those below-market rates available to all other Blues without the need for negotiation or contracting. The other national programs add to the Blues' market power and/or exclusive access to elements essential to competition. Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area. These fixed prices are then enforced through a horizontal agreement between the Blues. Under that horizontal agreement the Blues collectively enforce the fixed prices; the Host Plans and the Participating Plans recoup any payments that the Home or Control Plans make above the fixed prices. Part of the agreement for the participation in the National Accounts Program is that each Control Blue will not negotiate directly with providers outside its Service Area except in a contiguous area. As a result, a healthcare provider who renders services or supplies goods or facilities to a patient who is insured or administered by a Defendant in another Service Area receives significantly lower reimbursement than the healthcare provider would receive absent the Price Fixing and Boycott Conspiracy. The BCBS Price Fixing and Boycott Conspiracy is a violation of Section 1 of the Sherman Act under a *per se*, quick look and/or rule of reason analysis.

9.      One goal of the Blues' actions is to create or maintain monopsonies in the markets for health care services, and thus the Blues have conspired to monopsonize those markets. In many geographic areas, the Blues have successfully created or maintained a monopsony, or have created a dangerous probability of achieving a monopsony. This conduct violates Section 2 of the Sherman Act.

10.      Defendants' actions have significantly injured Plaintiffs and other healthcare providers. Defendants' agreements have also harmed competition by decreasing the options available to healthcare consumers. Fewer health insurance companies are competing in each

App. p. 011

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 89 of 645

Case 4:17-cv-00211-ALM-CAN   Document 335-7   Filed 06/14/17   Page 14 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Service Area.  Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than competitive prices that the Blues pay.  Their output has been diminished.  In addition, many hospitals and other healthcare facilities are closing or reducing services or are not expanding to provide additional services as a result of the Blues' low prices.  The only beneficiaries of Defendants' antitrust violations are Defendants themselves.  Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers.

### **JURISDICTION, VENUE AND PERSONAL JURISDICTION**

11.     Plaintiffs' federal antitrust claims are instituted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

12.     Several allegations in this complaint support this Court's personal jurisdiction over Defendants.  First, some of the Defendants including Blue Cross and Blue Shield of Alabama and Blue Cross Blue Shield of Mississippi have entered into contracts with healthcare providers in Alabama.  Second, all of Defendants have significant business in and contacts with Alabama through the national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of Defendants' subscribers who receive healthcare goods, services and facilities in Alabama, and in terms of subscribers from Blue Cross and Blue Shield of Alabama, who receive treatment in their Service Areas with all the Defendants dividing revenue resulting from those goods, services and facilities.  Third, all of the Defendants have conspired with Blue Cross and Blue Shield of Alabama.

App. p. 012

13.     Therefore, this Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the Defendants transact business in this District. This Court also has personal jurisdiction under the conspiracy theory of jurisdiction under Alabama law because Defendants participated in a conspiracy in which at least one conspirator committed overt acts in Alabama in furtherance of the conspiracy, *J&M Assocs. v. Callahan*, No. 07-0883-CG-C, 2011 U.S. Dist. LEXIS 131752, at *11 (S.D. Ala. Nov. 15, 2011), and under Alabama's long-arm statute, Ala. R. Civ. P. 4.2(b), because the Defendants' payments to Alabama health care providers to treat Alabama patients constitute minimum contacts with Alabama, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

14.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants transact business in this District, and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## **INTERSTATE COMMERCE**

15.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

16.     Many of the healthcare providers, including Plaintiffs, provide services, supplies, or equipment to persons who reside in other states.

17.     The national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program are involved in interstate commerce and transaction for healthcare services.

App. p. 013

18.    Plaintiffs and other healthcare providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

## PLAINTIFFS

19.    Plaintiff Jerry L. Conway, D.C. is a chiropractor and a citizen of Brent, Alabama. Dr. Conway practiced for thirty-eight years before his retirement in 2010.  During the relevant time period, Dr. Conway provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Conway was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Conway has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Conway has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

20.    Plaintiff Corey Musselman, M.D. is a family practice physician and a citizen of Cary, North Carolina.  During the relevant time period, Dr. Musselman provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to his in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Dr. Musselman was paid less for those services than he would have been but for

10

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 92 of 645

Case 4:13-cv-02701-ARB-JD   Document 236-7   Filed 06/14/17   Page 51 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Musselman has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Musselman has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

21.    Plaintiff The San Antonio Orthopaedic Group, L.L.P. ("TSAOG") is a physician office in San Antonio, Texas.  TSAOG brings these claims for itself and for its member and/or employed physicians.  During the relevant time period, TSAOG provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  TSAOG was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On September 18, 2008, TSAOG's contract with BCBS-TX was terminated; since that time, TSAOG has provided medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these services outside of any contractual relationship.  For these services, TSAOG has been paid less than it would have been but for Defendants' anticompetitive conduct.  On information and belief, TSAOG has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, TSAOG has been injured in its business or property as a result of Defendants' violations of the antitrust laws. TSAOG opted out of the *Love* Settlements in Florida.

11

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 93 of 645

Case 4:17-c-v-02070-ARSBJ Document 316-7 Filed 106/1/4/17 Page 18 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

22.    Plaintiff Orthopaedic Surgery Center of San Antonio, L.P. is an outpatient surgical center in San Antonio, Texas.  During the relevant time period, Orthopaedic Surgery Center of San Antonio provided facilities and medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by the Blues pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  Orthopaedic Surgery Center of San Antonio was paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On September 18, 2008, Orthopaedic Surgery Center of San Antonio's contract with BCBS-TX was terminated; since that time, Orthopaedic Surgery Center of San Antonio has provided facilities and medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these facilities and services outside of any contractual relationship.  For these facilities and services, Orthopaedic Surgery Center of San Antonio has been paid less than it would have been but for Defendants' anticompetitive conduct.  On information and belief, Orthopaedic Surgery Center of San Antonio has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Orthopaedic Surgery Center of San Antonio has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

23.    Plaintiff Charles H. Clark III, M.D. is a neurosurgeon and a citizen of Birmingham, Alabama.   During the relevant time period, Dr. Clark provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of

12

Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Clark was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Clark has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Clark has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

24.     Plaintiff Crenshaw Community Hospital is a non-profit, general medicine hospital in Luverne, Alabama.  During the relevant time period, Crenshaw Community Hospital provided facilities and medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Crenshaw Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Crenshaw Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Crenshaw Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

25.     Plaintiff Bullock County Hospital is a general medicine and surgical hospital in Union Springs, Alabama.  During the relevant time period, Bullock County Hospital provided facilities and medically necessary, covered services to members of Blue Cross and Blue Shield

13

of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Bullock County Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Bullock County Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Bullock County Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

26.     Plaintiff Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C. is a dental practice in Fairhope, Alabama. During the relevant time period, Fairhope Cosmetic Dentistry provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Fairhope Cosmetic Dentistry was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Fairhope Cosmetic Dentistry has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct As set forth herein, Fairhope Cosmetic Dentistry has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

27.     Plaintiff Sports and Ortho P.C. is a physical therapy provider in Chicago, Illinois. Sports and Ortho P.C. brings these claims for itself and for its member and/or employed physical

14

therapists.  During the relevant time period, Sports and Ortho provided medically necessary, covered services to members of Blue Cross and Blue Shield of Illinois pursuant to its in-network contract with BCBS-IL, and billed BCBS-IL for the same.  Sports and Ortho was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Sports and Ortho has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Sports and Ortho has been injured in its business or property as a result of Defendants' violations of the antitrust laws.  Sports and Ortho specifically reserves any and all claims it has or may have for denied requests for payments related to services provided to City of Chicago employees.

28.     Plaintiff Kathleen Cain, M.D. is a pediatrician and a citizen of Topeka, Kansas. During the relevant time period, Dr. Cain provided medically necessary, covered services to members of Blue Cross and Blue Shield of Kansas pursuant to her in-network contract with BCBS-KS, and billed BCBS-KS for the same.  Dr. Cain was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Cain has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Cain has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

15

29.     Plaintiff Northwest Florida Surgery Center, L.L.C. is a multispecialty outpatient ambulatory surgery center located in Panama City, Florida.  During the relevant time period, Northwest Florida Surgery Center provided facilities and medically necessary, covered services to members of Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same.  Northwest Florida Surgery Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Northwest Florida Surgery Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Northwest Florida Surgery Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

30.     Plaintiff Wini Hamilton, D.C. is a chiropractor and a citizen of Seattle, Washington.  During the relevant time period, Dr. Hamilton provided medically necessary, covered services to patients insured by Premera Blue Cross of Washington or who are included in employee benefit plans administered by Premera Blue Cross of Washington pursuant to her in-network contract with Premera, and billed Premera for the same.  Dr. Hamilton was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Hamilton has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.  As set

16

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 98 of 645

Case 4:17-cv-00210-RDP Document 335-7 Filed 06/14/17 Page 23 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

forth herein, Dr. Hamilton has been injured in her business or property as a result of Defendants'
violations of the antitrust laws.

31.     Plaintiff North Jackson Pharmacy, Inc. is a pharmacy in Stevenson, Alabama.
During the relevant time period, North Jackson Pharmacy provided medically necessary, covered
goods and services to patients insured by Blue Cross and Blue Shield of Alabama or who are
included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama
pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  North
Jackson Pharmacy was paid less for those goods and services than it would have been but for
Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result
thereof.  On information and belief, North Jackson Pharmacy has also provided medically
necessary, covered goods and services to other Blue Cross and Blue Shield Plan members
through national programs, has billed for same, and has been paid less for those goods and
services than it would have been but for Defendants' anticompetitive conduct.  As set forth
herein, North Jackson Pharmacy has been injured in its business or property as a result of
Defendants' violations of the antitrust laws.

32.     Plaintiff Neuromonitoring Services of America, Inc. ("NSOA") is a provider of
Intraoperative Neurophysiological Monitoring services based in Colorado Springs, Colorado.
During the relevant time period in Colorado, NSOA provided medically necessary, covered
services to members of Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue
Cross and Blue Shield of Colorado pursuant to its in-network contract with Anthem Blue Cross
and Blue Shield, and billed Anthem Blue Cross and Blue Shield for the same.  NSOA was paid
less for those services than it would have been but for Defendants' anticompetitive conduct and
has been injured by Defendants' conduct as a result thereof.  Also during the relevant time

17

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 99 of 645

Case 4:13-cv-20100-ARPSB-JD Document 335-7 Filed 06/14/17 Page 24 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

period, NSOA has provided medically necessary services to insured members of the Blues in Alabama, Arizona, Arkansas, California, Illinois, Indiana, Iowa, Mississippi, Montana, North Dakota, Ohio, South Dakota, Tennessee, and Wisconsin, and has billed those Defendants for these services outside of any contractual relationship. On information and belief, NSOA has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, NSOA has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

33.     Plaintiff Cason T. Hund, D.M.D. is a general practitioner of dentistry and a citizen of Mt. Pleasant, South Carolina. During the relevant time period, Dr. Hund provided medically necessary, covered dental services to patients insured by BlueCross BlueShield of South Carolina, Inc. or who are included in the employee benefit plans administered by BlueCross BlueShield of South Carolina, Inc. pursuant to his in-network contract with BCBS-SC, and billed BCBS-SC for the same. Dr. Hund was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hund has also provided medically necessary, covered dental services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Hund has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

34.     Plaintiff ProRehab, P.C. is a group of physical therapy clinics with a corporate office in Evansville, Indiana. ProRehab, P.C. operates physical therapy clinics in the cities of

18

Evansville, Haubstadt, Newburgh, Rockport and Vincennes in the State of Indiana. ProRehab also operates physical therapy clinics in the cities of Bowling Green, Henderson, and Madisonville in the Commonwealth of Kentucky. ProRehab, P.C. brings these claims for itself and for its member and/or employed physical therapists.   During the relevant time period, ProRehab provided medically necessary, covered services to patients insured by Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana and d/b/a Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant WellPoint, or who are included in employee benefit plans administered by Anthem Blue Cross and Blue Shield of Indiana or Anthem Blue Cross and Blue Shield of Kentucky pursuant to its in-network contracts with BCBS-IN and BCBS-KY, and billed BCBS-IN and BCBS-KY for the same.   ProRehab was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, ProRehab has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.   As set forth herein, ProRehab has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

35.     Plaintiff Texas Physical Therapy Specialists, L.L.C. is a group of physical therapy clinics with eighteen locations in the State of Texas.   Texas Physical Therapy Specialists operates physical therapy clinics in the cities of Austin, Dallas, Georgetown, Liberty Hill, New Braunfels, Round Rock, San Antonio, San Marcos, Schertz, Selma, and Spring Branch in the State of Texas.   Texas Physical Therapy Specialists, L.L.C. brings these claims for itself and for its member and/or employed physical therapists.   During the relevant time period, Texas

Physical Therapy Specialists provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  Texas Physical Therapy Specialists was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Texas Physical Therapy Specialists has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Texas Physical Therapy Specialists has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

36.     Plaintiff BreakThrough Physical Therapy, Inc. ("BreakThrough") is a group of physical therapy clinics with seven locations in the State of North Carolina. BreakThrough operates physical therapy clinics in the cities of Cameron, Fayetteville, Greensboro, Morehead City, and Winston-Salem in the State of North Carolina. BreakThrough brings these claims for itself and for its member and/or employed physical therapists.  During the relevant time period, Breakthrough provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Breakthrough was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Breakthrough has

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 102 of 645

Case 4:17-cv-00210-ALESBJ   Document 335-7   Filed 06/14/17   Page 27 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Breakthrough has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

37.    Plaintiff Dunn Physical Therapy, Inc. is a group of physical therapy clinics with four locations in the State of North Carolina. Dunn Physical Therapy operates physical therapy clinics in the cities of Cary, Raleigh, and Apex in the State of North Carolina. Dunn Physical Therapy, Inc. brings these claims for itself and for its member and/or employed physical therapists.  During the relevant time period, Dunn Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Dunn Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dunn Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dunn Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

38.    Plaintiff Gaspar Physical Therapy, P.C. is a physical therapy company with six physical therapy clinic locations in the State of California. Gaspar Physical Therapy operates physical therapy clinics in the cities of Carlsbad, Encinitas, Oceanside, and Solana Beach in the

21

State of California. Gaspar Physical Therapy brings these claims for itself and for its member and/or employed physical therapists.  During the relevant time period, Gaspar Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross of California d/b/a Anthem Blue Cross, a subsidiary of Defendant WellPoint, or who are included in employee benefit plans administered by Blue Cross of California pursuant to its in-network contract with BC-CA, and billed BC-CA for the same.  Gaspar Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Gaspar Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Gaspar Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

39.     Plaintiff Timothy H. Hendlin, D.C. is a chiropractor and a citizen of Kailua-Kona, Hawaii. During the relevant time period, Dr. Hendlin provided medically necessary, covered services to patients insured by Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Hawaii, and billed for those services.  Dr. Hendlin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Hendlin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for those services, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set

22

App. p. 026

forth herein, Dr. Hendlin has been injured in his business or property as a result of Defendants'
violations of the antitrust laws.

40.     Plaintiff Greater Brunswick Physical Therapy, P.A. ("GBPT") is a physical
therapy company with four physical therapy clinic locations in the State of Maine. GBPT
operates physical therapy clinic locations in the cities of Auburn, Bath, South Harpswell and
Topsham in the State of Maine. GBPT brings these claims for itself and for its member and/or
employed physical therapists.  During the relevant time period, GBPT provided medically
necessary, covered services to patients insured by Anthem Health Plans of Maine, Inc. d/b/a
Anthem Blue Cross and Blue Shield of Maine ("BCBS-ME"), a subsidiary of Defendant
WellPoint, or who are included in employee benefit plans administered by BCBS-ME pursuant
to its in-network contract with BCBS-ME, and billed BCBS-ME for the same.  GBPT was paid
less for those services than it would have been but for Defendants' anticompetitive conduct and
has been injured by Defendants' conduct as a result thereof.  On information and belief, GBPT
has also provided medically necessary, covered services to other Blue Cross and Blue Shield
Plan members through national programs, has billed for same, and has been paid less for those
services than it would have been but for Defendants' anticompetitive conduct.  As set forth
herein, GBPT has been injured in its business or property as a result of Defendants' violations of
the antitrust laws.

41.     Plaintiff Charles Barnwell, D.C. is a chiropractor providing services in Houston,
Texas.   During the relevant time period, Dr. Barnwell provided medically necessary, covered
services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant
HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue
Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the

23

same.  Dr. Barnwell was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Barnwell has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Barnwell has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

42.    Plaintiff Brain and Spine, L.L.C. is a physician group medical practice specializing neurosurgery in Panama City, Florida.  Brain and Spine, L.L.C. brings these claims for itself and for its member and/or employed physicians.  During the relevant time period, Brain and Spine provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Florida, Inc. or who are included in employee benefit plans administered by BCBS-FL pursuant to its in-network contract with BCBS-FL and billed it for the same.  Brain and Spine was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Brain and Spine has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Brain and Spine has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

43.    Plaintiff Heritage Medical Partners LLC ("Heritage") is a physician group medical practice specializing in internal medicine in Hilton Head, SC.  Heritage brings these claims for itself and for its member and/or employed physicians.  During the relevant time

period, Heritage provided medically necessary, covered services to patients insured by BCBS-SC, or who are included in employee benefit plans administered by BCBS-SC pursuant to its in-network contract with BCBS-SC and billed it for the same.  Heritage was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Heritage has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Heritage has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

44.     Plaintiff Judith Kanzic, D.C. is a chiropractor in Houston, TX.   During the relevant time period, Dr. Kanzic provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-TX and billed BCBS-TX for these services outside of any contractual relationship.  Dr. Kanzic was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. For these services, Dr. Kanzic has been paid less than she would have been but for Defendants' anticompetitive conduct.  On information and belief, Dr. Kanzic has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Kanzic has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

App. p. 029

45.    Plaintiff Brian Roadhouse, D.C. is a chiropractor in Tulsa, Oklahoma.    During the relevant time period, Dr. Roadhouse provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Oklahoma, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-OK pursuant to its in-network contract with BCBS-OK and billed it for the same.  Dr. Roadhouse was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Roadhouse has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Roadhouse has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

46.    Plaintiff Julie McCormick, M.D., L.L.C., is a doctor of internal medicine and a citizen of Anchorage, Alaska. During the relevant time period, Dr. McCormick provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to her in-network contract with Premera, and billed Premera for the same.  Dr. McCormick was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. McCormick has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than she would have been but for

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 108 of 645

Case 4:17-cv-02010-RBJ Document 335-7 Filed 06/14/17 Page 33 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Defendants' anticompetitive conduct.  As set forth herein, Dr. McCormick has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

47.     Plaintiff Harbir Makin, M.D. is a doctor of internal medicine and a citizen of Anchorage, Alaska.  During the relevant time period, Dr. Makin provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same.  Dr. Makin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Makin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Makin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

48.     Plaintiff Saket K. Ambasht, M.D. is a doctor of gastroenterology and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Ambasht has provided medically necessary services to Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") and has billed Premera for these services outside of any contractual relationship. For these services, Dr. Ambasht has been paid less that he would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Ambasht has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been

App. p. 031

but for Defendants' anticompetitive conduct. As set forth herein, Dr. Ambasht has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

      49.    John M. Nolte, M.D. is a family practice physician and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Nolte provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same.  Dr. Nolte was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Nolte has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Nolte has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

      50.    Plaintiff Bauman Chiropractic Clinic of Northwest Florida, P.A. ("Bauman Chiropractic") is a chiropractic office in Panama City, Florida. Bauman Chiropractic brings these claims for itself and for its member and/or employed chiropractors.  During the relevant time period, Bauman Chiropractic provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same.  Bauman Chiropractic was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Bauman

Chiropractic has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Bauman Chiropractic has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

51.     Plaintiff Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology ("FCCN") is a chiropractic office in Windsor Heights, Iowa. FCCN brings these claims for itself and for its member and/or employed chiropractors.  During the relevant time period, FCCN provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to his in-network contract with Wellmark, and billed Wellmark for the same.  FCCN was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, FCCN has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, FCCN has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

52.     Plaintiff Snowden Olwan Psychological Services ("Snowden Olwan") is a psychology clinic located in Sioux City, Iowa. Snowden Olwan brings these claims for itself and for its member and/or employed psychologists.  During the relevant time period, Snowden Olwan provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 111 of 645

Case 4:17-cv-02110-RDP    Document 335-7    Filed 06/14/17    Page 86 of 210
E-FILED  2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

employee benefit plans administered by Wellmark pursuant to its in-network contract with Wellmark, and billed Wellmark for the same.  Snowden Olwan was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Snowden Olwan has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Snowden Olwan has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

53.    Plaintiff Ear, Nose & Throat Consultants and Hearing Services, P.L.C. ("ENT Consultants") is a medical practice located in Dakota Dunes, South Dakota. ENT Consultants brings these claims for itself and for its member and/or employed physicians.  During the relevant time period, ENT Consultants provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark BCBS-IA"), Wellmark Blue Cross and Blue Shield of South Dakota ("Wellmark BCBS-SD"), and Blue Cross and Blue Shield of Nebraska ("BCBS-NE") or who are included in employee benefit plans administered by Wellmark BCBS-IA, Wellmark BCBS-SD, or BCBS-NE pursuant to its in-network contracts with those Defendants, and billed those Defendants for the same.  ENT Consultants was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ENT Consultants has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than it would have been but for

30

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 112 of 645

Case 4:17-cv-00210-RP-SBJ Document 35-7 Filed 06/14/17 Page 37 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Defendants' anticompetitive conduct.  As set forth herein, ENT Consultants has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

54.

55.    Plaintiff U.S. Imaging Network, L.L.C., d/b/a as Imaging Network Administrators, L.L.C. in the State of California and the State of Texas ("U.S. Imaging"), is a radiology network and scheduling service for outpatient advanced imaging. Through its direct contracts with imaging providers, U.S. Imaging arranges for outpatient advanced imaging exams for enrollees of various self insured group health plans and fully insured health plans in all states in the United States except for the states of West Virginia and North Dakota, adjudicates claims submitted by its providers, and then submits bills for payment of those services to various self insured health benefit plans and/or their administrators as well as health insurance companies which contract with U.S. Imaging directly. As a result of the Market Allocation Conspiracy and the Price Fixing and Boycott Conspiracy, the Blues, in their capacity as administrators of self insured groups, have collectively refused to pay U.S. Imaging's claims on behalf of (and instructed by) their self insured clients or perform other standard administrative services such as accepting accumulator data from U.S. Imaging, releasing historical client claims data to U.S. Imaging, or printing US Imaging's contact information on their client's medical identification cards, in order to frustrate and prevent the successful integration of U.S. Imaging's program with their self insured client's health plans. U.S. Imaging has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

56.    Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue.  Plaintiffs are

31

entitled to payment for their services, equipment, supplies or for use of their facilities either pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from patients who are covered by a plan that is insured and administered by a Blue.  All Plaintiffs have been paid less than they would have been paid absent Defendants' violation of the antitrust laws.  All Plaintiffs have a right to bring these claims.  But for Defendants' agreements not to compete, out-of-network providers would have been offered the ability to contract with the Blues at more competitive rates.  Accordingly, all Plaintiffs have standing and all have sustained antitrust injury.

57.    This Complaint is operative only with regard to the class action litigation and is not intended to supersede any additional claims brought by or intended to be litigated by "tag-along" Plaintiffs, such as the claims under Section 2 of the Sherman Act brought in the *Advanced Surgery Center* and the *Lifewatch* complaints.  Those claims are to be litigated separately from this class action litigation.

58.    Certain of the named Provider Plaintiffs in this action, Corey Musselman, M.D., Charles H. Clark III, M.D., Heritage Medical Partners, L.L.C., Brain and Spine, L.L.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Saket K. Ambasht, M.D, John M. Nolte, M.D., Ear, Nose & Throat Consultants and Hearing Services, P.L.C.,. and Kathleen Cain, M.D., ("the *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the BCBS Defendants consummated in the Southern District of Florida before Judge Moreno.  The San Antonio Orthopaedic Group opted-out of the *Love* Settlement but not the related *WellPoint*, *Highmark* and *Capital* settlements in the Southern District of Florida. The San Antonio Orthopaedic Group is pursuing claims against the Releasing Parties in the *Love* Settlement.  For purposes of this Complaint, those Providers who were members of the

32

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 114 of 645

Case 4:13-cv-02100-JAR-SBJ Document 335-7 Filed 06/14/17 Page 39 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Settlement Classes listed above do not bring claims against any of the released parties in those Settlements.  As this issue is currently being litigated in *Musselman v. Blue Cross Blue Shield of Alabama*, Case No. 1:13-cv-20050-FAM (S.D. Fla.); Case No. 13-14250-AA (11th Cir.), the *Love* Providers wish to allege here that:

      a.     they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those releases.  Accordingly, those claims would be included in this Complaint but for the BCBS Defendants' insistence that if the claims are alleged here, they will immediately seek to have the *Love* Providers held in contempt of the injunctions entered by Judge Moreno.  The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

      b.     they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor;

      c.     they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed below) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

59.     As is noted in the Plaintiffs' allegations, at least one of the named Physician Provider Plaintiffs opted out of the *Love* Settlement in Florida.  Those non-Settling physician

33

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 115 of 645

Case 4:13-cv-02719-RDP Document 35-7 Filed 06/4/17 Page 340 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Plaintiffs pursue claims on behalf of the class against all of the Defendants who were released in *Love* action.

60.     The Agreements between various Defendants and some of the named Provider Plaintiffs contain what Defendants will likely argue are binding arbitration provisions.  Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit.    Nevertheless, for purposes of this Complaint, those Plaintiffs with arbitration agreements arguably covering the claims or parties at issue in this litigation expressly only bring suit against those Defendants who are not parties to the arbitration provisions in their agreements.  For instance, a Provider with an arbitration provision in her contract with Blue Cross and Blue Shield of Kansas is not asserting claims against BCBS of Kansas, but rather is only pursuing her Sherman Act Section 1 claims against all Defendants other than BCBS of Kansas, none of whom are parties to her agreement.

## DEFENDANTS

61.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama.  Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than three million people.   The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450 Riverchase Parkway East, Birmingham, Alabama.  Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

62.     Defendant WellPoint, Inc. is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  WellPoint, Inc., its

subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "WellPoint" in this Complaint. WellPoint, the largest licensee within the BCBSA, is a publicly-traded, for-profit company.  By some measures WellPoint is the largest health benefits company in the nation with more than 37 million members in its affiliated health plans.   According to its website, one in nine Americans is a WellPoint member, and WellPoint is contracted with 92% of the physicians and 97% of hospitals nationwide through the Blue Card Program.  WellPoint, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

63.    Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099.  With more than 13 million members, Health Care Service Corporation is the largest customer-owned health insurer in the United States.  Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana.  In each of its five Blue service areas, Health Care Service Corporation exercises market dominance.  Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

64.    Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Formerly known

App. p. 039

as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011.  Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving more than 2 million members through its subsidiaries and affiliated health plans.  Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield,, Regence BlueCross BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in its states of operation or within areas of those states.  Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

65.    Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117.  With approximately 3.4 million members, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region.   Through its subsidiaries and affiliated companies, CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and Virginia, or within areas of those states.  CareFirst, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

66.    Defendant Premera Blue Cross is a Washington corporation with its corporate headquarters located at 7001 220th SW, Mountlake Terrace, WA 98043.  Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.7 million members in Alaska and Washington.   Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield

of Alaska.  Premera Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

67.     Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.  Premera Blue Cross Blue Shield of Alaska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

68.     Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ, 85021.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Arizona.  Blue Cross Blue Shield of Arizona, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

69.     Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 860,000 enrollees in various health care plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state.  Arkansas Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

70.     Defendant Blue Cross of California d/b/a/ Anthem Blue Cross is a California corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 119 of 645

Case 4:17-cv-00210-JAJ-RSBJ Document 336-7 Filed 06/14/17 Page 44 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

91367.  It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant WellPoint.  Blue Cross of California is the parent corporation of a number of subsidiaries that provide health care financing to approximately 8.3 million enrollees in various health care plans in California, more than any other carrier in the state.  Blue Cross of California, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of California" or "BC-CA" in this Complaint.

71.     Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, CA 94105-1808.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 3.5 million enrollees in various health care plans in California.  California Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

72.     Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant WellPoint and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Denver, CO 80273.  It is the parent corporation of a number of subsidiaries that provide health care financing to members through various health care plans in Colorado and Nevada.

73.     Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273.  Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant WellPoint.  Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and

App. p. 042

affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

74.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant WellPoint.  It is a Connecticut corporation with its corporate headquarters located at 370 Bassett Road, North Haven, Connecticut 06473 and is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Connecticut.  Anthem Blue Cross and Blue Shield of Connecticut, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

75.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222.  Highmark, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 5.3 million members in Pennsylvania, West Virginia and Delaware.  Highmark, Inc., its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint.

76.     Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is a subsidiary of Highmark, Inc.  It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801.  Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware.  It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield Delaware in July, 2012.  Highmark Blue Cross and Blue Shield Delaware provides health care financing to approximately 300,000 members in various health care plans in Delaware.  According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share in the state of Delaware.  Highmark Blue Cross and Blue Shield

39

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 121 of 645

Case 4:17-cv-02110-RDP Document 335-7 Filed 06/14/17 Page 46 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Delaware, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "BCBS-DE" in this Complaint.

77.    Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc. and provides health care financing in the District of Columbia, Maryland and areas of Virginia.  It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc.  Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117.  Group Hospitalization and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "GHMSI" in this Complaint.

78.    Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 7 million enrollees in various health care plans in Florida.  Blue Cross and Blue Shield of Florida, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint.  Under BCBSA's rules, BCBS-FL is allowed to contract with health care providers in Alabama counties adjacent to Florida.

79.    Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant WellPoint and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326. According to a 2009 Center for American Progress study on health competitiveness,   Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 122 of 645

Case 4:13-cv-02090-RDP   Document 336-7   Filed 06/14/17   Page 47 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

financing market.  Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 2.1 million enrollees in various health care plans in Georgia.  Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

80.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814.  It is the parent corporation of a number of subsidiaries that provide health care financing to 722,000 members in various health care plans in Hawaii. Hawaii Medical Service Association, its subsidiaries and affiliated companies are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

81.    Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho 83642.  It is the parent corporation of a number of subsidiaries that provide health care financing to 700,000 members in various health care plans in Idaho.  Blue Cross of Idaho Health Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Idaho" or "BC-ID" in this Complaint.

82.    Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, Idaho 83501.  Regence BlueShield of Idaho is the parent corporation of a number of subsidiaries that provide health care financing to more than 150,000 members in various health

App. p. 045

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 123 of 645

Case 4:13-cv-02010-RDP Document 235-7 Filed 06/14/17 Page 48 of 210
E-FILED  2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

care plans in Idaho.  Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

83.     Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601.  It is the parent of a number of subsidiaries that provide health care financing to approximately 6.5 million members in various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint.

84.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana is a subsidiary of Defendant WellPoint.  It is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Indiana.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint..

85.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.  It is the parent of a number of subsidiaries that provide health care financing to 1.8 million members in Iowa.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue Shield of Iowa" or "BCBS-IA" in this Complaint.

86.     Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 124 of 645

Case 4:13-cv-02219-RDP   Document 335-7   Filed 06/14/17   Page 49 of 210
E-FILED  2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide health care financing to 647,000 members in various health care plans in Kansas.  Blue Cross and Blue Shield of Kansas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

87.    Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is a subsidiary of Defendant WellPoint and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223.  It provides health care financing in Kentucky.  Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

88.    Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Louisiana.  Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

89.    Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant WellPoint.  It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016.  It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maine.  Anthem Health Plans of Maine, its subsidiaries and affiliated

43

companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

90.     Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117.  CareFirst of Maryland, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maryland.  CareFirst of Maryland, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

91.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts 02215.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in various health care plans in Massachusetts.  Blue Cross and Blue Shield of Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

92.     Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 4.8 million enrollees in various health care plans in Michigan.  Blue Cross and Blue Shield of Michigan, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.

93.     Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 126 of 645

Case 4:13-cv-02100-RDP   Document 235-7   Filed 06/14/17   Page 51 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Minnesota 55164.  BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 2.4 million enrollees in various health care plans in Minnesota.  Blue Cross and Blue Shield of Minnesota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint.

94.     Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company, is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1 million enrollees in various health care plans in Mississippi.  Blue Cross and Blue Shield of Mississippi, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this Complaint.   Blue Cross Blue Shield of Mississippi contracts with providers in counties in Alabama that are adjacent to Mississippi.

95.     Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is a subsidiary of Defendant WellPoint.  It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in a various health care plans in Missouri.  Defendant Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint.

96.     Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108.  It is the parent corporation of a number of subsidiaries that

App. p. 049

provide health care financing to 880,000 enrollees in various health care plans in Kansas City and its suburbs in Kansas and Missouri.  Blue Cross and Blue Shield of Kansas City, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint.

97.     Defendant Blue Cross and Blue Shield of Montana is a division of Defendant HCSC with its principal place of business at 560 North Park Avenue, Helena, Montana 59604.  It is the parent of a number of subsidiaries that provide health care financing to approximately 272,000 members in various health care plans in Montana.  Blue Cross and Blue Shield of Montana, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT" in this Complaint.  For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.

98.     Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 560 North Park Avenue, Helena, Montana 59604.  When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc.

99.     Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180.  It is the parent corporation of a number of subsidiaries that provide health care financing to over 700,000 enrollees in various health care plans in Nebraska.  Blue Cross and Blue Shield of Nebraska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 128 of 645

Case 4:13-cv-00210-JAJ-RAW    Document 315-7    Filed 06/14/17    Page 53 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

100.    Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273.  Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148.  Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant WellPoint that offer health care financing in Nevada.  Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

101.    Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is a subsidiary of Defendant WellPoint.  It is a New Hampshire corporation with its corporate headquarters located at 300 Goffs Falls Road, Manchester, New Hampshire 03111.  Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to over 600,000 members in various health care plans in New Hampshire.  Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint.

102.    Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105.  It is the parent corporation of a number of subsidiaries that provide health care financing to 3.6 million enrollees in various health care plans in New Jersey.  Horizon Healthcare Services, Inc., its subsidiaries and affiliated companies

47

are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

103.     Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.  Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care financing to 283,000 enrollees in various health care plans in New Mexico.  Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

104.     Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202.  HealthNow New York, Inc. does business as Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern New York.  HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York.  HealthNow New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "HealthNow" in this Complaint.

105.     Defendant Blue Shield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  Blue Shield of Northeastern New York is the parent of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York.  Blue Shield of Northeastern New York, its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 130 of 645

Case 4:13-cv-02210-RDP   Document 336-7   Filed 06/14/17   Page 55 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

106.    Blue Cross Blue Shield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  Blue Cross Blue Shield of Western New York is the parent of a number of subsidiaries that provide health care financing to more than 800,000 enrollees in various health care plans in New York.  Blue Cross Blue Shield of Western New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Western New York" or "BCBS-Western NY" in this Complaint.

107.    Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is a subsidiary of Defendant WellPoint.  It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006.  Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is the parent corporation of a number of subsidiaries that provide health care financing to nearly 6 million enrollees in various health care plans in New York.  Empire Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "Empire Blue Cross and Blue Shield" or "Empire-BCBS" in this Complaint.

108.    Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York 14647.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.7 million enrollees in various health care plans in the state of New York.  Excellus Health Plan, Inc., its subsidiaries and affiliated companies are collectively referred to as "Excellus BlueCross BlueShield" in this Complaint.

109.   Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina 27707.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 3.6 million members in various health care plans in North Carolina. Blue Cross and Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

110.   Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue, South Fargo, ND 58121.  Noridian Mutual Insurance Company is the parent company of a number of subsidiaries that provide health care financing to nearly 500,000 members in the midwestern and western United States.  Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care financing to approximately 390,000 members in various health care plans in North Dakota.  Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

111.   Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is a subsidiary of Defendant WellPoint.  It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040.  Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number of subsidiaries that provide health care financing to more than 3 million members in various health care plans in Ohio.  Community Insurance Co., its subsidiaries and affiliated

companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

112.    Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119.  Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health care financing to more than 700,000 enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

113.    Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant Cambia Health.  It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Regence BlueCross BlueShield of Oregon is the parent corporation of a number of subsidiaries that provide health care financing to more than 750,000 members in various health care plans in Oregon.  Regence BlueCross BlueShield of Oregon, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

114.    Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania is a Pennsylvania corporation with its corporate headquarters located at 19 North Main Street, Wilkes-Barre, Pennsylvania 18711.  It is the parent corporation of a number of subsidiaries that provide health care financing to nearly 550,000 enrollees in various health care plans in Pennsylvania.  Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, its subsidiaries and

affiliated companies are collectively referred to as "Blue Cross of Northeastern Pennsylvania" or "BCBS-NE PA" in this Complaint.

115.    Defendant Capital Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Pennsylvania.  Capital Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Capital Blue Cross" in this Complaint.

116.    Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011.  Highmark Health Services is the parent of a number of subsidiaries that provide health care financing to approximately 4.2 million members in various health care plans in Pennsylvania.   Highmark Health Services, its subsidiaries and affiliated companies are collectively referred to as "Highmark Health Services" in this Complaint.

117.    Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103.  It is the parent corporation of a number of subsidiaries that provide health care financing to 2.2 million enrollees in Pennsylvania and 3.1 million nationwide.  Independence Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

118.    Defendant Triple-S Salud, Inc. is a subsidiary of Triple-S Management Company and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt

Avenue, San Juan, Puerto Rico 00920.  It is the parent corporation of a number of subsidiaries that provide health care financing to 1.6 million enrollees in Puerto Rico.  Triple-S Salud, Inc., its subsidiaries and affiliated companies are collectively referred to as "Triple-S of Puerto Rico" in this Complaint.

119.    Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 15 LaSalle Square, Providence, Rhode Island 02903.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 600,000 enrollees in various health care plans in Rhode Island.  Blue Cross and Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

120.    Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29223.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately one million members in various health care plans in South Carolina. BlueCross BlueShield of South Carolina, its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint.

121.    Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104.  Wellmark of South Dakota, Inc. is a subsidiary of Defendant Wellmark, Inc.   Wellmark of South Dakota, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 325,000 enrollees in South Dakota.   Wellmark of South Dakota, its subsidiaries and affiliated companies are

App. p. 057

collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

122.    Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care financing to 3.2 million members in various health care plans in Tennessee.  BlueCross BlueShield of Tennessee, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Tennessee" or "BCBS-TN" in this Complaint.  BCBS-TN contracts with health care providers in Alabama counties adjacent to Tennessee.

123.    Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas.  Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

124.    Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121.  Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide health care financing to more than 320,000 members in various health care plans in Utah.  Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueCross BlueShield of Utah" or "BCBS-UT" in this Complaint.

125.    Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 200,000 enrollees in various health care plans within the state of Vermont.  Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

126.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. is a subsidiary of Defendant WellPoint.  It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230.  Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.2 million enrollees in various health care plans in Virginia.   Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

127.    Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101.  Regence BlueShield in Washington is the parent corporation of a number of subsidiaries that provide health care financing to 770,000 members in various health care plans in Washington.  Regence BlueShield in Washington, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

128.    Defendant Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia is a subsidiary of Defendant Highmark and is a West Virginia corporation with its corporate headquarters located at 614 Market Square, Parkersburg, West Virginia 26101.

App. p. 059

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 137 of 645

Case 4:17-cv-00210-ARJ-SBJ Document 335-7 Filed 06/14/17 Page 62 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care financing to nearly 300,000 enrollees in various health care plans in West Virginia and one county in Ohio.  Highmark Blue Cross Blue Shield West Virginia, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" in this Complaint.  BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

129.    Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant WellPoint and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Compcare Health Services Insurance Corporation, that provide health care financing to approximately 900,000 enrollees in various health care plans in Wisconsin.  Blue Cross Blue Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

130.    Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 100,000 enrollees in various health care plans in Wyoming.   Blue Cross Blue Shield of Wyoming, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint.

131.    Defendant Consortium Health Plans, Inc. ("CHP") is a Maryland corporation headquartered at 10490 Little Patuxent Parkway, Suite 550, Columbia, MD 21044-3517.

App. p. 060

Consortium Health Plans was formed in 1994 to help the Blues market their plans to national accounts. Today, CHP's members include BCBS-AL, BCBS-AR, BCBS-FL, BCBS-MA, BCBS-MI, BCBS-MN, BCBS-NE, BCBS-NC, BCBS-RI, BC-ID, BS-CA, Capital Blue Cross, CareFirst, HCSC, BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, Highmark, Highmark Health Services, BCBS-NJ, IBC, Premera Blue Cross, BCBS-AK, BS-ID, BCBS-OR, BCBS-UT, Regence BlueShield (WA), BCBS-IA, BCBS-SD, WellPoint, BCBS-CO, BCBS-CT, BCBS-IN, BCBS-KY, BCBS-ME, BCBS-MO, BCBS-NH, BCBS-NV, BCBS-OH, BCBS-VA, BCBS-WI, BC-CA, BCBS-GA and Empire BCBS. Working together through CHP, these Defendants share claims data reflecting provider reimbursements and use their market power to leverage that data to reduce reimbursement to providers who deliver health care services to patients insured through the Blues' National Accounts Program.

132. Defendant National Account Service Company L.L.C. ("NASCO") is a Delaware limited liability corporation headquartered at 1200 Abernathy Road NE, Suite 1000, Atlanta, GA 30328. NASCO was formed in 1987 through a partnership among major Blue Cross and Blue Shield plans. Since that time, NASCO has operated an integrated claims processing system for its partner plans' national accounts. NASCO also processes BlueCard claims for its partner plans. In 2013, NASCO processed approximately 250 million claims for these plans, including nearly 112 million BlueCard claims. Today, NASCO's partners include BCBS-AL, BCBS-MA, BCBS-MI, CareFirst, BCBS-NJ, Premera and WellPoint. NASCO is governed by an Executive Committee comprised of representatives of BCBS-MA, BCBS-MI, CareFirst, BCBS-MN, BCBS-NJ, Premera, WellPoint and the BCBSA.

133. Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled

57

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 139 of 645

Case 4:13-cv-02010-RDP   Document 215-7   Filed 06/14/17   Page 54 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

by 37 Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by the Blues and operates as the licensor.  Health insurance companies operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million - or one in three - Americans.  BCBSA itself does not provide health care financing and does not contract with health care providers, but it operates to create consistency and cooperation among its 37 members.  It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members.  The 37 Blues fund Defendant BCBSA.

134.    The list of Non-Released Blues (described above) includes: Blue Cross Blue Shield of Arizona, Arkansas Blue Cross Blue Shield, Blue Shield of California, Blue Cross and Blue Shield Delaware, Blue Cross of Idaho, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Nebraska, HealthNow, Noridian Mutual Insurance Co. d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Vermont, Blue Cross and Blue Shield of Wyoming, and Premier Health, Inc.  Additionally, while Excellus entered a settlement in New York state court, it did not obtain a release for any doctors other than those in New York, and that release does not affect the claims made in this amended complaint.  Excellus is therefore also treated as a Non-Released Blue for purposes of this Complaint.

## FACTUAL ALLEGATIONS

### The BCBS Defendants

135.    Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and cover 100

million Americans.   According to the BCBSA, more than 96% of hospitals and 91% of professional providers contract with one of the Defendants nationwide – "more than any other insurer."  Other Blues estimate even higher percentages.

136.   The Blues include many of the largest potentially competitive health insurance companies in the United States.  Indeed, WellPoint is the largest health insurance company in the country by total medical enrollment, with approximately 37 million enrollees.  Similarly, 15 of the 25 largest health insurance companies in the country are Blues.  Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the markets for health care financing and health services..

137.   For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 37 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare.  WellPoint also operates in a number of additional states through its Medicaid subsidiary, Amerigroup.  But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health care financing throughout the United States in competition with the other Blues.  Such competition would result in higher payment rates to Providers.

138.    Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, and BCBS-MT, is the largest mutual health insurance company in the country and the fourth largest health insurance company overall.  But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health care financing throughout the United States in competition with the other Blues.  Such competition would result in higher payment rates to Providers.

139.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan.  BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary.  But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

140.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees.  Its affiliated Blues include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania, BCBS-WV, and BCBS-DE.  It is in the process of acquiring Blue Cross of Northeastern Pennsylvania, and when the acquisition is completed, it will move further into the top ten.  But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

141.    Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million

enrollees.  But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Alabama would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

142.    CareFirst, which operates the Blues in Maryland, Washington, D.C., and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

143.    BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts.  But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

144.    BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida.  But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

145.   The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

146.   The BCBSA is a separate legal entity that purports to promote the common interests of the Blues. The BCBSA describes itself as "a national federation of 37 independent, community-based and locally operated Blue Cross and Blue Shield companies." The BCBSA refers to the 37 Blue Cross and Blue Shield companies as Member Plans.

147.   The BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete. As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 37] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [37] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

148.   Every Blue is a member of the BCBSA, every Blue CEO is on the Board of Directors of BCBSA and every Blue participates in numerous BCBSA Committees.

149.   The Blues govern BCBSA. BCBSA is entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

150.   As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the

App. p. 066

individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).  The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

151.    In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current chairman of the Board of Directors, John Forsyth, is also the Chairman and CEO of Wellmark Blue Cross and Blue Shield.  The CEO of each of the Individual Blues serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets at least annually.

152.    BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 37 members, including reimbursement rates for providers.  The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are in furtherance of Defendants' conspiracies.

153.    The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC").  The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.  This Committee has the power to enforce the requirements of the license agreements.

154.    The Blues control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA

63

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 145 of 645

Case 4:17-cv-02110-RDP-JHE Document 335-7 Filed 06/14/17 Page 67 of 210
E-FILED  2019 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

"seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved."

155.    The Blues control the rules and regulations that all members of BCBSA must obey.  According to the brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

156.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards."  In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 20, 2013.

157.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards

and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

158.    The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."  In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

159.    The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and "Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

160.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 147 of 645

Case 4:13-cv-02004-RDP Document 336-7 Filed 06/14/17 Page 72 of 210
E-FILED  2019 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

161.   A number of Blues also serve on the Inter-Plan Programs Committee ("IPPC") that control the national or Inter-Plan Programs of the Blues.   In each of their licensing agreements, the Blues agree to participate in the national programs and to comply with the terms established by the IPPC.   Therefore, the Blues are collectively agreeing to the terms of the national programs and their implementation.

162.   The Blues are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

163.   In addition, Blue Health Intelligence ("BHI"), a licensee of BCBSA, is managed by a Board of Managers entirely comprised of BCBS executives -- Highmark, BCBSNC, BCBSMI, BCBSAL, BCBSMA, BCBSMA, BCBSNE, HCSC, BCBSA, and IBC. www.bluehealthintelligence.com. BHI recently acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by BCBS companies.  Designed to lower health care reimbursement to providers, Intelimedix explicitly states that "we all share information."

App. p. 070

164.    Each BCBSA licensee is an independent legal organization.  The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues.  The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

165.    In its Sixth Circuit brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national coordination."  The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's parent Blue Plans - in the marketplace.  Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market.  New forms of competition were springing up at every turn, and market share was slipping year by year.  Survival was at stake.  The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

166.    On its website, BCBSA has admitted that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 37] Blue companies."

167.    BCBSA is simply a vehicle used by admittedly independent health insurance companies to conspire, coordinate, and enter into agreements that restrain competition.  Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

App. p. 071

168.    As detailed herein, the BCBSA not only enters into anticompetitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendants to suppress competition.   BCBSA is a convenient organization through which the Defendants enter into illegal territorial restraints between and among themselves.

### The BCBS Market Allocation Conspiracy

169.    Defendants allocate the geographic markets for health insurance by restricting each Defendant's activity outside of a designated geographic Service Area.  Accordingly, these restrictions insulate each Defendant from competition by other Blues in each of their respective geographic Service Areas.   These restrictions have no economic justification other than protecting Defendants from competition.

170.    Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws.  Defendants pay in-network providers directly pursuant to provider agreements.  Because of Defendants' market power and access to the more than one hundred million members of the Blues through the national programs, providers wishing to join the Blue network must accept lower reimbursement rates.  In many markets doctors and other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

171.    The vast majority of Blues refuse to honor consumer or patient assignment of benefits to providers, except when required by state law, such as in Tennessee and New Jersey. Defendants do this to discourage providers from remaining out-of-network.  Defendants coerce providers who attempt to be out-of-network into network at below market rates.  Defendants also retaliate against providers who attempt to operate out-of-network.  Various Blues, including Blue Cross and Blue Shield of Louisiana, have told providers that if they do not remain in network,

68

the Blue will pay the patient the reimbursement check for the provider services and the provider will then have to chase the patient while he or she rides off in a new car or fishing boat.  The refusal to honor assignments creates inefficiencies for consumers and providers.

172.    Defendants undertook a coordinated effort to allocate the market in which each Defendant would operate free of competition from other Blues.  They did this in various ways including through a licensing scheme, requiring geographic restrictions in the exclusive trademark licenses granted to each Defendant.

173.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs.  The Blue Cross plans were designed to provide a mechanism for covering the cost of hospital care.  The Blue Shield plans provided a mechanism for covering the cost of physicians.  The plans were all nonprofit entities with limited purposes, and they acknowledged obligations to treat healthcare providers fairly.

174.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans.  The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the American Medical Association responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

175.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue

Shield plan.  Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

176.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition because of its fear that a restraint-of-trade action might result from such cooperation.

177.    Despite the foregoing, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

178.    In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services ... to [the American Hospital Association]." (The "1954 Agreement".)  Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services."   The 1954 Agreement also noted limitations specifying that only "certain Individual Plans ... developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in particular areas served by such PLANS" and that the plan had the right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these presents."

179.    The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a condition of the grant of the license, including, among other things, that "[e]very qualified

general hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

180. Finally, the 1954 Agreement prevented the AHA from having control over the Blue Cross plans. In this regard, the agreement specified that the Blue Cross Plans needed only a majority vote to revoke the agreement, while the AHA could revoke it only prior to January 1, 1956, upon a three-fourths vote of the House of Delegates of the AHA.

181. The 1952 license agreement between the National Organization (the agreement's term for the AMCP) and its member medical care plans (the "1952 Agreement") was similarly limited in scope. That agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned, controlled or sponsored by county medical societies or state, district, territorial or provincial medical associations." The 1952 Agreement further specified that "[e]ach member plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization." In 1976, it again changed its name to the "Blue Shield Association." Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

182. Notably, this agreement did not contain any provision relating to Plans developing certain territorial rights. Instead, this agreement provided that "[t]he National Organization hereby grants to each of its member plans that are parties to this Agreement, subject to the terms of this agreement, permission to use said service mark in commerce among the several states or in foreign commerce."

71

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 153 of 645

Case 4:17-cv-02110-RDP-JLD Document 335-7 Filed 06/14/17 Page 78 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

183.    In 1972, a new license agreement was entered into between the Blue Cross Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement").  This agreement stated that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA Marks')."  The agreement then sought to expand the scope of the service marks by providing that the Blue Cross Plan "desires to use the BCA Marks and any revisions and variations hereafter developed (collectively called 'Licensed Marks')" and then grants such Plan the right to use the new Licensed Marks "as service marks, in the sale and advertising of programs for health care and related services operated on a non-profit basis."  This agreement also provides that the "rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement."

184.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a plan must treat providers fairly.  In this regard, the 1972 Agreement continued to specify that a plan must comply with certain requirements as a condition of the grant of the license including, among other things, that "[e]very qualified general hospital in the area served by the PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

185.    In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating.  By 1982, the process of the merger to form BCBSA had been completed.

186.    From 1981 to 1986, the Blues lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blues, and from non-Blue subsidiaries of Blues, increased substantially.

187.    In September 1982, the Board of Directors of the combined BCBSA adopted a Long Term Business Strategy under which Defendants agreed not to compete with each other. The Blues and the BCBSA was aware at the time that Defendants were violating the antitrust laws.

188.    To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities.  The Plans accordingly agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

189.    At that time, BCBSA became the sole owner of the Blue Cross Blue Shield trademarks and trade names that had previously been owned by the local plans.  BCBSA's Member Plans agreed to two propositions:  (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue Cross and Blue Shield plans within a state should further consolidate, ensuring that each state would have only one Blue.  As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 37 today.

190.    Starting in 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would not compete against each other.  During these meetings, Defendants agreed to maintain exclusive Service Areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues.  After the

1986 revocation of the Blues' tax-exempt status and throughout the 1990s, the number of non-Blue subsidiaries of Blues increased.  As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some."  These subsidiaries continued to compete with the other Blues.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

191.    Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

192.    Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey and guidelines proposed members must adhere to prior to joining the BCBSA.  These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). Those regulations provide for amendment with a vote of three fourths of the Member Plans.  These agreements, which were revised or amended as recently as 2013, are the agreements at issue in this case.

193.    These License Agreements depart from, and supersede, the historical licensing agreements.  For example, the "whereas" clauses of the Blue Cross License Agreements provide that the Plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the Plan "was desirous of assuring nationwide protection of

App. p. 078

the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

194.   Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system."  In order to accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined Service Areas.  The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below."  Paragraph 5 sets forth these new "Service Area[s]]" as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

195.   Despite the expanded scope of the license and the newly defined Service Areas, the License Agreements failed to include the provision, contained in both the 1954 and 1972 Agreements that required the Plan to treat providers fairly.  To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with health care providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

196.   Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic "Service Area," which is either the

75

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 157 of 645

Case 4:17-cv-02110-RDP Document 116-7 Filed 06/14/17 Page 82 of 210
E-FILED 2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

197.    Under the Guidelines and Membership Standards, each Member Plan agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business.  Both provisions directly limit the ability of each Blue to generate revenue from non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

198.    Therefore, Defendants have agreed that in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

199.    WellPoint, in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had

76

"no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

200.    The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition.

201.    The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard.  For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Defendant's territory.  However, many of the Blues have entered into what they call "gentlemen's agreements" not to compete in those counties.  For example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements.

### Historical Competition Among the Blues

202.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. For many years, Blue Cross plans competed with Blue Shield plans in several states. By 1947, Blue Cross and Blue Shield plans

coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. To this day, Blue Cross plans compete with Blue Shield plans in certain parts of the country, including all of California.

203.    Blue Cross plans have competed against Blue Cross plans as well: "Blue Cross plans were not supposed to overlap service territories, but there were exceptions—tolerated by the national Blue Cross agency for lack of power to insist on change. North Carolina was the outstanding example, with plans based at Chapel Hill and Durham, each headed by a capable executive well known in the state." Odin W. Anderson, Blue Cross Since 1929: Accountability and the Public Trust 78 (1975). Blue Cross plans also competed historically in parts of California and Illinois. Likewise, Blue Shield plans have competed with each other historically in North Carolina, Oregon, and large portions of California.

## Restricting Competition in Pennsylvania

204.    The Blues refuse to contract in an adjacent Blue's Service Area when the refusal benefits that Blue's market power, as demonstrated recently by Anthem Blue Cross and Blue Shield of Ohio's refusal to contract with a UPMC hospital in a county in Pennsylvania that borders on Ohio.

205.    UPMC has developed a number of areas of health care where it has an outstanding reputation for excellence.  For example, well-known people from Alabama have gone to UPMC for liver transplants when they could have gone anywhere in the world for the procedure.  The Defendants' illegal Conspiracies will mean that when the contract between UPMC and Highmark terminates, other Blues including Blue Cross and Blue Shield of Alabama

will not be permitted to enter into an in network relationship with UPMC, and the Blues'
subscribers will not have access to UPMC using in network coverage.  But for the illegal
Conspiracies, Blue Cross of Alabama and other Blues would be able to negotiate in network
relationships with UPMC.

206.    In addition, there have been other side agreements not to compete.  Highmark
BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue
Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties
of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for
the entire state of Pennsylvania.

207.    Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue
Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern
Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania
Blue Shield established in 1986 after Independence rejected its offer to form a joint venture
HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan
(also an HMO), which Independence BC acquired in response to Keystone Health Plan East's
entry into the market.  In 1991, Independence BC and Pennsylvania Blue Shield agreed to
combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East
name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO,
Personal Choice.  When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to
form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East
and Personal Choice to Independence BC.  As part of the purchase agreement, Pennsylvania
Blue Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement
not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern

App. p. 083

Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

208.   The conduct of Highmark and IBC demonstrates that the noncompetition agreement remains in place, though it putatively expired in 2007.  Instead of entering the Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and Independence BC intended to merge.  After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition. . . to the detriment of the insurance buying public."

209.   Capital Blue Cross presented an expert report from Monica Noether, Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark and IBC would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark-IBC will possess is likely to be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark and IBC would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark has competed in the past with IBC, could have been competing with IBC since 1997 but for a ten year non-compete agreement between them, and, in

my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with IBC in the future, especially given the absence of successful entry by other insurers."

- "Highmark has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to IBC and in cooperation with IBC through a joint operating agreement to offer indemnity insurance."

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania.  Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Health Care, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While health care services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, but **even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from**

> **Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region."**

(emphasis added).

210.    Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern Pennsylvania.  This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania.  After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing.  For example, IBC now pays Highmark to process its provider claims.  By processing those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers.  In addition, Highmark Blue Shield has been involved in similar non-competition arrangements with other Pennsylvania Blues and is now purchasing Blue Cross of Northeastern Pennsylvania.

211.    Capital Blue Cross has attempted to operate outside of its Service Area through its non-Blue branded for profit subsidiary, Avalon.  When Defendant Highmark developed a dispute with the largest provider in its Service Area, the University of Pittsburgh Medical Center (UPMC), Capital Blue Cross through Avalon attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-network basis.  Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this arrangement.  Defendant Highmark and

App. p. 086

Defendant BCBSA prevented competition from Defendant Capital in the Service Area of Highmark and Capital agreed to restrict its competition. The efforts by Capital Blue Cross through its non-Blue Avalon demonstrate that if it were not for the agreement not to expand outside of each Blue's Service Area, Capital would be operating in the Highmark Service Area.

### Restricting Competition in Ohio

212.   The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time.

213.   In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus. In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co., No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the State of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

214.   In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

215.    In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

216.    Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990.

217.    Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive service areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993, leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem

84

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 166 of 645

Case 4:17-cv-02110-RDP Document 336-7 Filed 06/4/17 Page 91 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Blue Cross and Blue Shield. The next year, Blue Cross and Blue Shield of Ohio proposed selling

its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number

of hospitals. BCBSA refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's

license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had

ended, as a result of the Blues' concerted conduct.

### Restricting Competition in Maryland

218.   As it did in Ohio, BCBSA capitulated when its horizontal territorial allocation

was challenged in Maryland, allowing two Blues to compete against each other statewide.

219.   As of 1984, BCBSA had divided Maryland between two Blues. Group

Hospitalization and Medical Services, Inc. ("GHMSI") operated in the Prince George's County

and Montgomery County suburbs of Washington, D.C., while Blue Cross and Blue Shield of

Maryland, Inc. ("BCBSM") operated in the remainder of the state.

220.   The State of Maryland filed suit in the U.S. District Court for the District of

Maryland against BCBSA, BCBSM, and GHI, alleging that their agreement to allocate territories

violates Section 1 of the Sherman Act, the same allegation that Plaintiffs have made in this case.

Maryland v. Blue Cross & Blue Shield Ass'n, 620 F. Supp. 907 (D. Md. 1985). The defendants

moved to dismiss Maryland's suit on the grounds that their agreement to allocate territory was

exempt from antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C. § 1012. Maryland

moved for summary judgment on the same issue. During discovery, BCBSM offered testimony

that its marketing department expressed interest from time to time in marketing across the

boundary separating it from GHMSI's territory, but its CEO determined not to do so in part

because it was prohibited by BCBSM's agreement with BCBSA.

221.    The court denied the motion to dismiss and the motion for summary judgment. Describing the defendants' agreement as "horizontal market allocation among insurance companies," the court held that material disputes precluded a finding on whether the agreement constituted the "business of insurance" for purposes of the McCarran Ferguson Act.

222.    Later in the case, shortly before the court was scheduled to rule on whether the case should be tried on a per se theory or under the rule of reason, the defendants settled the case. BCBSA allowed BCBSM and GHMSI to compete with each other throughout the state of Maryland until the later of January 1, 1991 or the completion of the Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

223.    As in Ohio, competition was not fatal. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHI's core business was profitable in 1992. (GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.) BCBSM reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well. GHMSI and BCBSM both continued to exist until they merged in 1998 to become CareFirst.

### Improper Use of Trademarks to Restrict Competition for Providers

224.    It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act.  The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws.  The agreed-to restrictions on the ability of the Blues to generate revenue

outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are per se violations of Section 1 of the Sherman Act.

225.    Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions.  The likelihood of increased competition is demonstrated in several ways.  First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition.  If there were no likelihood of competition, the restrictions would have been unnecessary.  In fact, as set forth above, the restrictions did not initially address competition by non-Blue businesses owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well.  Second, in certain portions of four states, limited competition among two Defendants has been permitted.  For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California.  Likewise, Highmark and Capital compete in Pennsylvania, with both operating effectively and successfully.  In fact, the combined market share of Highmark and Capital is comparable to the market share of many individual Blues.  The Blue Cross and the Blue Shield entities also compete in Washington and Idaho without any injury to their trademarks or trade names.  Obviously, these markets are far from competitive due to the agreements of the other Defendants not to compete in these Service Areas.  However, this competition demonstrates that competition among Blue Cross and Blue Shield licensees is not only possible but, in fact, does not undermine the Blue brand or trademark.  Third, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues.  For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states.  Prior to its merger with WellPoint, Anthem, which was

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 169 of 645

Case 4:13-cv-02010-RDP Document 316-7 Filed 06/14/17 Page 94 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states.  Undoubtedly, absent the current restrictions, WellPoint would readily compete in additional Service Areas and, in all likelihood, would compete nationally.  Other Defendants, including HCSC, have, in fact, recently expanded into other areas and, in all likelihood, would compete nationally but for the restrictions described in this complaint.  Fourth, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states.  For example, WellPoint has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup.  WellPoint also operates Caremore Centers in Arizona despite the fact that WellPoint is not the Blue Cross Blue Shield licensee in Arizona.  In addition, Defendant Blue Cross of Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services.  Other Blues have likewise expanded into other Service Areas in a similar manner.  Of course, these expansions are currently extremely limited by the restrictions on competition.  While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for provision of healthcare services.

226.    Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas.  The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for payment of healthcare providers.

227.    The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face

"[l]icense and membership termination."  If a Member's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

228.   In terms of their contracting and reimbursement practices with respect to healthcare providers, there is no danger of consumer confusion that would justify any territorial exclusions for the Blues.

### The BCBS Price Fixing and Boycott Conspiracy

229.   As a result of the Market Allocation Conspiracy, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area.  Defendants therefore have reached a horizontal agreement and implemented a Price Fixing and Boycott Conspiracy through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues.  The horizontal Conspiracy also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area.  Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members.  Those national programs include: A. Transfer Program; B. Inter-Plan Teleprocessing System (ITS); C. Blue Card Program; D. National Accounts Programs; E. National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and E. Inter-Plan Medicare Advantage Program.

230.   As part of their agreement to participate in the National Accounts Programs, the Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with

providers outside of their Service Areas.  In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

231.    Defendants achieved the Price Fixing and Boycott Conspiracy by agreeing that all Defendants would participate in the national programs including the Blue Card and National Accounts Programs,, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.  The Blue Card Program most commonly applies when employees reside in a different Service Area than the headquarters of their employer.  The Blue Card and National Accounts Programs are also used to process claims for medical services for Blue members while traveling.  Plaintiffs regularly treat patients who are insured by a Defendant or who are included in an employee benefit plan administered by a Defendant outside the Service Area where the medical treatment is rendered.

232.    The Defendant Blues implement the Conspiracy collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented.  The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

233.    Each of the Defendant Blues either has market power or exclusive access to an element essential to effective competition.  Through the national programs the Defendant Blues control more than one hundred million patients, something no other health insurance company has access to.  These more than one hundred million patients provide the Defendant Blues a substitute for market power when Defendant Blues are dealing with providers.  In fact, in many places providers treat more patients through the national programs than through the direct

90

subscribers of the local Defendant Blue.  One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of Blue Cross and Blue Shield of North Carolina.  When Blue Cross and Blue Shield of North Carolina demands below market rates from the subscribers in central North Carolina, it uses the many patients in the national programs to insist that the rates remain below competitive market rates.

234.    The national programs including the Blue Card and National Accounts Programs are implemented in a horizontal manner.  For example, when a hospital in east Alabama billed other Defendant Blues directly for their subscribers, those Blues, including Blue Cross of Minnesota paid for those services at the rates that it normally pays, which are higher than the rates paid by Blue Cross of Alabama.  When Blue Cross of Alabama learned of those payments, it then recouped the difference between those higher rates and the Blue Cross of Alabama rates from payments due for services for Blue Cross of Alabama subscribers.  Based on information and belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped under the procedures established by the Defendant Blues on the IPPC.  Also based on information and belief, Plaintiffs allege that in making the recoupments, Blue Cross of Alabama was following the procedures established by the Defendant Blues through the IPPC to enforce the price fixing conspiracy.

235.    When one Blue has a contract dispute or issue with a healthcare provider the other Blues, as independent horizontal conspirators and as horizontal conspirators through the Defendant Association, act to reinforce the market power of each of the Blues.  In the proceeding brought by Plaintiff Dr. Cain when Blue Cross and Blue Shield of Kansas retaliated against her for being a class representative and attempted to terminate her from being a participating

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 173 of 645

Case 4:13-cv-02102-RDP Document 335-7 Filed 06/14/17 Page 98 of 210
E-FILED  2019 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

physician after 16 years of service, Blue Cross and Blue Shield of Kansas City then refused to allow her into its Blue branded network.  When Highmark refused to pay the University of Pittsburgh Medical Center ("UPMC") reasonable rates and instead was going to allow its contract with UPMC to expire, UPMC, one of the leading medical centers in the world, wrote to Blues throughout the country, requesting that they separately contract with UPMC.  Some of the Blues, including Blue Cross of Alabama and Anthem Blue Cross of New Hampshire, responded directly and refused to negotiate.  At the same time, the Defendant Association coordinated responses for a number of other Blues, and the Association communicated the refusal to negotiate for those other Blues.  Other healthcare providers including one or more hospitals in North Carolina have attempted to negotiate contracts with Defendant Blues in other states but have received refusals from those Blues, while Blue Cross and Blue Shield of North Carolina continues to pay below market reimbursement rates.

236.    Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan."   The website of Defendant CareFirst describes Blue Card in the following manner:

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 174 of 645

Case 4:17-cv-00210-RDP-JCD Document 335-7 Filed 06/14/17 Page 99 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

### Key terms

Host Plan

Also called the local plan, where the actual medical service is provided; CareFirst is the Host Plan when a BCBS member from another Blue Plan service area obtains healthcare services from a CareFirst provider

Home Plan

The contracted BlueCross BlueShield Plan where the insured member is enrolled; The logo of the Home plan can be found on the member's BCBS insurance card.

Out-of-Area-Insured

An insured individual who is enrolled in a Blue Cross and Blue Shield other than CareFirst.

### Example

When you see an out-of-area insured patient like Julie Gilbert, submit your claims to CareFirst - the local or Host Plan. CareFirst then coordinates the claims process for you through the BlueCard program.



As the Host Plan, CareFirst receives your claim, codes and prices it according to contracted provider agreements, then sends an electronic submission to Julie's Seattle-based Home Plan.

When the Seattle-based Home Plan receives the information, the claim is processed by applying the Plan's medical policy, claim adjudication edits, and the member's benefit exclusions or limitations. The BCBS Plan then sends an electronic disposition back to the Host Plan, with instructions for paying the claim according to the Plan fee-schedule.

CareFirst then generates a voucher, pays you, and notifies the Home plan how the claim was paid.


237.    Under the National Accounts Program a Defendant Blue may administer a national or multi-state employee benefit plan.  In that instance, the Defendant Blue is the Control Plan while the other Defendant Blues are Participating Plans.  The Defendants divide the proceeds either through the Blue Card Program or through separate agreements they have entered into.

238.    To carry out the business of the Conspiracies, the Defendant Blues that are partners along with the BCBSA have established and own Defendant NASCO through which many of the Blues acting in concert process claims involved in National Accounts and other claims.  NASCO is a party to the Conspiracies and exists to implement them.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 175 of 645

Case 1:13-cv-20000-ABJ-SPJ   Document 367   Filed 06/54/17   Page 9800 of 6210
E-FILED  2015 DEC 04 3:39 PM POLK - CLERK OF DISTRICT COURT

239.    "In 1987 NASCO was formed through a partnership with major Blue Cross and Blue Shield Plans."  It has been engaged in activity "for some of the largest Blue Cross and Blue Shield Plans for over 20 years."   NASCO establishes "work groups composed of NASCO associates and customers."   NASCO also works with the Blues to "ensure their compliance with Blue     Cross     and     Blue     Shield     Association     (BCBSA)     mandates."   http://www.nasco.com/PDFs/2010_MarketingBrochure.pdf.

240.    NASCO not only provides a forum for the Conspiracies but also ensures that the agreements reached in the Conspiracies are implemented.

241.    In further support of the Conspiracies, numerous Blues and the BCBSA have also established CHP.  CHP, self-described as a "sales and marketing organization sponsored by 21 Blue Cross Blue Shield® Plans dedicated to positioning Blue Plans as the carrier of choice for national accounts," (http://www.consortiumhealthplans.com, last visited Sept. 30, 2014), is also a party to the Conspiracies and exists to implement them.   Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis.  The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

242.    For example, in a marketing brochure dated February 6, 2013 for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level.   In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics.

94

> ValueQuest has the ability to compare each carrier's per-member, per-month
> (PMPM) cost in markets where employees reside.

https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-

d4cb2f0a7b3f&groupId=10307, last visited Sept. 30, 2014.  The brochure further explains that

"[t]he ValueQuest data set contains claims and membership data for BCBS nationally.  The data

is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

243.    Against this backdrop, the brochure boasts that "Consultant feedback, client

results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of

care."  As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared
> BCBS PMPM historical results to a PMPM benchmark of national competitors.
> ***Results of the most recent study show an 11.3% cost of care advantage for
> BCBS at the national level.*** This study is the first of its kind to analyze total cost
> of care among competing health plans based on historical claims data.

(Emphasis added.)    Thus, according to CHP, the Blues pay healthcare providers less and

therefore enjoy an enormous cost of care advantage over their national competitors.  Indeed, as

CHP itself says, ***"[n]o other carrier even comes close.***"  (Emphasis added.)  And while the

brochure suggests that factors beyond discounts on provider reimbursements contribute to the

Blues' advantage in this regard, it also acknowledges that these discounts are far and away the

most significant factor.

244.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical

tool, the Blues have long recognized that the "size of provider networks" and the "depth of

discounts" imposed on the providers in those networks are the two most important factors in

lowering their costs.  http://www.questanalyticsgroup.com/pdf/ ClaimsQuest_Brochure.pdf, last

visited Sept. 14, 2014, at 6.

245.    That same brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP.  In this regard, the brochure makes the following claims, among others:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

http://www.questanalyticsgroup.com/pdf/ClaimsQuest_Brochure.pdf, last visited Sept. 30, 2014.

246.    Thus, CHP harnesses claims data for the Blues in every state, MSA and zip code in the country and, using that data, supports the Blues in imposing deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

247.    As a result of the Price Fixing and Boycott Conspiracy, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with that Defendant.  Instead, the Home Plan pays the healthcare provider the discounted rate the Host Plan has achieved as a result of the Market Allocation Conspiracy.  For example, many members of plans insured or administered by Defendants Empire, BCBS of Illinois and BCBS of Michigan spend time in Florida during the winter months.  Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in

Florida must accept the prices paid by Defendant Blue Cross of Florida.  Moreover, the Blues do not allow health care providers to have an escape clause to allow them to opt out of the national programs and contract separately with Blues.

248.    Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area.  Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices.  The Price Fixing Conspiracy is a per se violation of Section 1 of the Sherman Act.  It is also a violation under a quick look or rule of reason analysis.

249.    In addition to lowering payments for providers, the national programs including the Blue Card Program, the National Accounts Program also impose numerous inefficiencies and burdens on them.  While the rates paid for medical services are dictated by the Host or Participating Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home or Control Plan.  The Home or Control Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area.  Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members.  For example, Defendant BlueCross BlueShield of Tennessee administers the Nissan Employee Benefit Plan, which covers the many Nissan employees who reside in Mississippi and, accordingly, seek medical treatment there.  For these patients, Defendant Blue Cross of Tennessee is the Home or Control Plan, while Defendant Blue Cross Blue Shield of Mississippi is the Host or Participating Plan.  Blue Cross Blue Shield of Mississippi determines the price paid for services rendered by a healthcare provider in

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 179 of 645

Case 4:13-cv-02100-RDP Document 235-7 Filed 08/14/17 Page 104 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Mississippi.  However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BlueCross BlueShield of Tennessee.  While the Mississippi provider has access to the rules for preauthorization or pre-notification for Blue Cross Blue Shield of Mississippi because BlueCross BlueShield of Tennessee boycotts the Mississippi providers from participating in its network as a part of its horizontal agreement with all the Blues, and the provider does not have ready access to BlueCross BlueShield of Tennessee's rules.  In this example, the Mississippi healthcare provider can and does innocently fail to comply with the rules of BlueCross BlueShield of Tennessee and be paid nothing by BlueCross BlueShield of Tennessee, not even receiving the discounted amount that would result from the BCBS Price Fixing Conspiracy.  When this happens, the healthcare provider has no recourse.  Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan.  Moreover, the illustration includes only one Home or Control Plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area.

250.    Many Blues have different medical records requirements and timing for those requirements that apply to providers including hospitals.  Hospitals find their bills being reduced or denied because they comply with the Host or Participating Blue's requirements (those where the hospital is located and where the hospital is in network) but not with the Control or Home Blue's requirements.  Since the hospitals are not in network with the Control or Home Blue, those hospitals do not have ready access to those medical records requirements.  In an effort to address this highly inefficient process, hospitals in Florida, where there are many Blue Card and

App. p. 102

National Accounts subscribers, set up weekly telephone calls with Blues to try to learn the requirements of each of the plans for submitting medical records and other coverage requirements.  The employees of the hospitals spent hours week after week for an extended time to try to learn those requirements.  They would obtain inconsistent and incomplete answers to their inquiries.  Despite spending significant resources of the hospitals to comply with the Blues' multiple coverage requirements, the hospitals continued to have claims reduced and denied when they innocently failed to comply with one of those requirements.

251.    The national programs including the Blue Card and National Accounts Programs are so inefficient that the Defendants have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's Service Area. However, the Defendants use and abuse the adjacent county rule to reinforce each other's market power.  For example, when Highmark has been attempting to force UPMC to accept lower reimbursement rates, UPMC asked Anthem Blue Cross of Ohio to contract with Harmot Hospital, which is in a county adjacent to Ohio.  Anthem Blue Cross of Ohio refused to have discussions about a contract with Harmot Hospital.  Plaintiffs allege that the refusal was part of a horizontal agreement under which the Defendant Blues attempt to reinforce each other's market power.

252.    Plaintiff U.S. Imaging has established a network of outpatient imaging centers that are located in all the states (and Puerto Rico) in the country except West Virginia and North Dakota.  Through this network U.S. Imaging offers discounted prices and concierge scheduling for imaging services for enrollees of various health insurance companies and self insured benefit plans and has a proven track record of saving significant amounts of money on imaging services. U.S. Imaging has attempted to coordinate with the Blues in their capacity as self-insured group

administrators, but they have repeatedly refused to cooperate in any way with U.S. Imaging, in a concerted manner or a boycott. For example, on September 9, 2011, WellPoint stated in an email that it could not do business with U.S. Imaging and its national imaging network because: "The Blue Cross and Blue Shield Association has established requirements that are meant to protect the exclusive service areas of the 39 [now 37] Blue Cross and Blue Shield Plans.  The specific requirements that all Blue Cross and Blue Shield accounts must adhere to include: The local BCBS Plan must receive and price all local claims according to the applicable provider agreements and the local BCBS Plan must make all payments to its local providers (both in and out of network providers)."

253.    As a result of their Price Fixing and Boycott Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year.   These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

## **Allegations Related to the Rule of Reason Claims**

254.    The Defendant Blues have market power in many markets over prices or payment rates for healthcare providers.  Even in markets where Defendant Blues do not have high market concentrations, they have exclusive access to an essential element for competition, through the more than one hundred million subscribers of Blues involved in the Inter-Plan or national programs.  This access provides market power beyond what might be suggested by the local enrollment share.

255.    The market definitions both in terms of geographic and product descriptions will be determined by analysis of data that will be produced during discovery in this action.  Those market definitions will be included in the motion or motions for class certification to be filed

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 182 of 645

Case 4:17-cv-02100-RDB Document 236-7 Filed 08/14/17 Page 157 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

after sufficient discovery.  Provider Plaintiffs reserve the right to add any needed additional class representatives at the time motions for class certification are filed.

256.    There are several product markets that are relevant to this case.  The health care financing market includes the various means of paying or reimbursing for health care services, goods and facilities other than the direct payment by individuals who are not insured or indemnified.  The market includes health insurance as well as the administration of health care related employee benefit plans. The Plaintiffs will refer to the markets where prices or payment rates for health care providers are determined generally as health services markets.  In the motion for class certification Plaintiffs will describe those markets in a more detailed way so that the participants may be ascertained through SIC codes or otherwise, and some of the class members may be outside of SIC code definitions 80 or 8000.  The health services markets consist of relevant health care providers on the one hand and the purchasers or payors for the services, goods and facilities of the health care providers on the other hand.  The relevant health care providers sell their services, goods and facilities in those markets.  The vast majority of those services, goods and facilities are paid for by health insurance companies acting as insurers or administrators, with the Blues being the largest collection of those companies.  The vast majority of the services, goods and facilities that are paid for by managed care companies are provided through in network contracts. Publicly available data demonstrate there are many geographic markets where it is obvious that Defendant Blues have market power.  The publicly available data and reports using that data generally use market concentration information from the health care financing markets and sometimes from health insurance markets.  Because of the access that each Blue has to the hundred million subscribers covered by the Blues, the publicly available data and reports understate the market power that each of the Blues has in the markets where

101

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 183 of 645

Case 4:17-cv-02100-RDP-TMP   Document 236-7   Filed 08/14/17   Page 108 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

reimbursement rates or prices for health care providers are determined.  For most if not all health care providers in many markets a Blue dictates the price to be paid to the providers.  One of the publicly available reports is Competition in health insurance: A comprehensive study of U.S. markets, 2013 update (the "AMA Competition Study"), published by the American Medical Association.  These data and reports also include participants in the health care financing market that are not readily available to many health care providers.  For example, the AMA Competition Study includes Kaiser Permanente ("Kaiser").  In most markets where Kaiser is active in the health care financing market, it owns hospitals and ambulatory surgery centers and contracts for doctor services only with the Permanente Medical Group and does not purchase nonemergency medical services from other healthcare providers.  As a result, for most healthcare providers Kaiser is not a close or reasonable substitute for the Blues when those healthcare providers decide whether to contract with one of the Blues. Moreover, the publicly available data on concentration of healthcare financing markets does not account for the hundred million subscribers that each of the Blues has access to through the conspiracies alleged herein.  The Blues use the access to those hundred million subscribers to gain market power in the health services markets when their market share in the healthcare financing market would not otherwise give them that market power.  Plaintiffs allege that an analysis of the data will ultimately show that there are many markets where a Blue has market power in health services markets even though a superficial analysis of the publicly available data for health care financing markets would not so indicate on its face.

257.   Analysis of data to be produced during discovery is necessary to define geographic as well as product markets.  In economic research geographic market areas are sometimes defined as metropolitan areas and sometimes as other areas.  However, regardless of

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 184 of 645

Case 4:17-cv-00200-RDP Document 236-7 Filed 06/14/17 Page 109 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

how those markets are defined, the Blues have market power, and even where they do not have high market concentrations, they have exclusive access to elements essential to effective competition.

258.    In the following paragraphs Plaintiffs will use data from the latest AMA Competition Study.  Specifically, Plaintiffs will use market share data from the combined Health Maintenance Organization ("HMO"), Preferred Provider Organization ("PPO"), and Point of Service ("POS") product markets.  However, Plaintiffs allege that at least in many areas the Blues market shares will exceed the percentages used below when one accounts for the Blue Card and National Account Programs.  While the AMA Competition Study presents data at the metropolitan area level, Plaintiffs are not necessarily adopting the metropolitan areas as the appropriate antitrust markets for the Court to analyze, and Plaintiffs do not imply that non-metropolitan areas are outside the scope of their claims.  Instead, the markets will be specifically defined using data obtained during discovery and accepted economic methodology.  The data below is presented to show that there are markets throughout the country where the Defendants have high market concentration and market power.

259.    Defendant Blue Cross and Blue Shield of Alabama has market power throughout the State of Alabama in the health care financing market and in every market within Alabama.  It also has market power in the State of Alabama and in every health services market.  In Alabama, the Blue has an 86% market share in the entire state.  Its lowest market share is 82% in the Mobile area.  Its highest market share is 94% in the Gadsden area.  In addition, the Blue has market power and market share between 85% and 91% of the market in the Anniston-Oxford, Auburn-Opelika, Birmingham-Hoover, Decatur, Dothan, Florence, Huntsville, Montgomery and Tuscaloosa areas.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 185 of 645

Case 4:17-cv-02100-RBSBJ Document 236-7 Filed 04/24/17 Page 10 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

260.    Defendant Premera Blue Cross has market power throughout the State of Alaska in the health care financing market and in every market within Alaska.  It also has market power in the State of Alaska and in every health services market.  In Alaska, the Blue has a 60% market share in the entire state.  Its lowest market share is 55% in the Anchorage area.  Its highest market share is 67% in the Fairbanks area.

261.    Defendant Blue Cross Blue Shield of Arizona has market power at least in certain areas in Arizona in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Arizona in the health services markets and may have market power in the entire state.  For example, it has a 53% market share in the Flagstaff market and a 41% market share in the Prescott area.  Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Arizona.  The Blue uses those subscribers to increase its market power.

262.    Defendant Arkansas Blue Cross and Blue Shield has market power at least in certain areas in Arkansas in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Arkansas in the health services markets and may have market power in the entire state.  For example, it has a 56% market share in the Jonesboro market, a 52% market share in the Pine Bluff area, and a 40% market share in the Hot Springs area.

263.    Defendant Blue Cross of California d/b/a Anthem Blue Cross has market power at least in certain areas in California in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of California in the health services markets and may have market power in the entire state.  For example, it has a 50% market share in the Chico area, a 43% market share in the Bakersfield area,  a 58% market

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 186 of 645

Case 4:13-cv-02009-RDP Document 236-7 Filed 03/4/17 Page 191 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

share in the El Centro area, a 45% market share in the Fresno area, a 61% market share in the Hanfor-Corcoran area, a 49% market share in the Madera area, a 58% market share in the Merced area, a 42% market share in the Oxnard-Thousand Oaks-Ventura area, a 58% market share in the Redding area, a 65% market share in the Salinas area, a 59% market share in the San Luis Obispo-Paso Robles area, a 51% market share in the Santa Barbara-Santa Maria area, a 49% market share in the Santa Cruz-Santa Maria area, a 58% market share in the Visalia-Porterville area, and a 70% market share in the Yuba City-Maryville area. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Blue Cross of California would be the largest health insurer in California and would have a market share of more than 50% in many other areas in California. These percentages are presented only for Defendant Blue Cross of California. Defendant Blue Shield of California has somewhat lower market share percentages, but it and all of the other Blues are conspiring with Blue Cross of California. The analysis of market shares in this paragraph includes Kaiser. If Kaiser is excluded for reasons stated above, Blue Cross of California and Blue Shield of California will have much higher market share percentages in many areas in California. Discovery may also show that other Blues have market power in areas in California and reserve the right to present that evidence in the motion for class certification.

264.    Defendant Anthem Blue Cross and Blue Shield of Colorado, a subsidiary of Defendant WellPoint, has market power at least in certain areas in Colorado in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Colorado in the health services markets and may have market power in the entire state. In Colorado, Kaiser has a significant presence. If Kaiser is excluded from the economic analysis, the WellPoint market share will increase significantly.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 187 of 645

Case 4:17-cv-02100-RBSBJ Document 236-7 Filed 12/14/17 Page 112 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

265.    Defendant Anthem Blue Cross and Blue Shield of Connecticut, a subsidiary of Defendant WellPoint, has market power at least in certain areas in Connecticut in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Connecticut in the health services markets and may have market power in the entire state. For example, it has a 41% market share in the State of Connecticut generally, a 49% market share in the New Haven-Milford area, and a 49% market share in the Waterbury area. It also maintains market power in portions of the state of Rhode Island. WellPoint maintains a 50% market share in the Norwich-New London CT-RI area.

266.    Defendant Highmark Blue Cross and Blue Shield Delaware, a subsidiary of defendant Highmark, Inc., has market power throughout the State of Delaware in the health care financing market and in every market within Delaware.  It also has market power in the State of Delaware and in every health services market.  In Delaware the Blue has a 64% market share in the entire state.  Its lowest market share is 51% in the Wilmington area.  Its highest market share is 75% in the Dover area.

267.    Defendant CareFirst, through Defendant GHMSI, has market power in the District of Columbia in the health care financing market and in every health services market.  CareFirst has a 44% market share in the District of Columbia.

268.    Defendant Blue Cross and Blue Shield of Florida, Inc. has market power at least in certain areas in Florida in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Florida in the health services markets and may have market power in the entire state.  For example, it has a 56% market share in the Fort Walton Beach – Crestview – Destin area, a 40% market share in the Deltona-Daytona Beach-Ormond Beach area, a 61% market share in the Gainesville area, a 55%

market share in the Ocala market, a 43% market share in the Naples-Marco Island, FL area, a 67% market share in the Panama City/Lynn Haven area, a 46 % market share in the Pensacola-Ferry Pass- Brent area, a 43% market share in the Port St. Lucie-Fort Pierce area, an 84% market share in the Tallahassee area, and a 57% market share in the Vero Beach area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Florida.  The Blue uses those subscribers to increase its market power.

269.    Defendant Blue Cross and Blue Shield of Georgia, Inc., a subsidiary of Defendant WellPoint, has market power at least in certain areas in Georgia in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Georgia in the health services markets and may have market power in the entire state. For example, it has a 57% market share in the Warner-Robins area, a 46% market share in the Albany area, 42% market share in the Athens-Clarke County area, a 44% area share in the Columbus GA-AL area, a 47% market share in the Valdosta area, and a 56% market share in the Hinesville/Fort Stewart area. Kaiser has some presence in Georgia and exclusion of it will affect some of the market share percentages.

270.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii has market power throughout the State of Hawaii in the health care financing market and in every market within Hawaii.  It also has market power in the State of Hawaii and in every health services market.  In Hawaii, the Blue has a 65% market share in the entire state and has a 67% market share in the Honolulu area.  If Kaiser is excluded from the analysis, then its market share will be even greater.

271.    Defendant Blue Cross of Idaho Health Service, Inc., d/b/a Blue Cross of Idaho, has market power throughout the State of Idaho in the health care financing market and in every

market within Idaho. It also has market power in the State of Idaho and in every health services market. In Idaho, the Blue has a 54% market share. Its highest market share is 58% in the Pocatello area.  It also maintains a 55% market share in the Boise-Nampa area, a 45% share in the Coeur d'Alene area, 53% market share in the Idaho Falls area, and a 45% share in the Lewiston ID-WA area. Idaho is one of the states where Blue Cross and Blue Shield compete with each other, and in many of these areas the second largest market share holder is fellow conspirator Regence BlueShield of Idaho.

272.    Defendant Blue Cross and Blue Shield of Illinois, a division of Defendant HCSC, has market power at least in certain areas in Illinois in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Illinois in the health services markets and may have market power in the entire state. For example, it has a 51% market share in the entire state. It also has a 58% market share in the Chicago/Naperville/Joliet area, a 48% share in the Bloomington-Normal area, a 57% market share in the Decatur area, a 51% market share in the Kankakee/Bradley market, a 45% share in the Lake County-Kenosha County, IL-WI area, and a 51% market share in the Rockford area.

273.    Defendant Anthem Blue Cross and Blue Shield of Indiana, a subsidiary of Defendant WellPoint, has market power throughout the State of Indiana in the health care financing market and in every market within Indiana.  It also has market power in the State of Indiana and in every health services market.  It has a market share of 51% in the entire state. Its highest market share is 68% in the Anderson area.  It also maintains a 56% market share in the Bloomington area, a 57% share in the Columbus area, a 62% share in the Elkhart-Goshen area, a 43% share in the Evansville IN-KY area, a 56% share in the Fort Wayne area, a 44% share in the Gary area, a 49% share in the Indianapolis area, a 54% share in Kokomo, a 56% share in the

Michigan City-LaPorte area, a 63% share in the Muncie area, a 41% share in the South Bend-Mishawaka, IN-MI area, a 66% share in the Terre Haute area.

274.     Defendant Wellmark Blue Cross and Blue Shield of Iowa has market power at least in certain areas in Iowa in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Iowa in the health services markets and may have market power in the entire state. For example, it has a 52% market share in the entire state. It also has 76% market share in the Iowa City area, a 60% market share in the Cedar Rapids area, a 42 % share in the Des Moines area, a 53% market share in the Ames area, a 47% share in the Sioux City IA-NE area, and a 50% market share in the Dubuque area.

275.     Defendant Blue Cross and Blue Shield of Kansas has market power at least in certain areas in Kansas in the health care financing market and may have market power in the entire state.  Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of Kansas City have separate Service Areas within Kansas, the statewide market share percentages do not tell a complete story of market shares.  It has market power at least in certain areas in the State of Kansas in the health services markets and may have market power in the entire state. For example, it has a 69% market share in the Topeka area (the home of Dr. Cain), a 45% share in the Wichita, Kansas and a 56% market share in the Lawrence area.

276.     Defendant Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant WellPoint, has market power at least in certain areas in Kentucky in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the Commonwealth of Kentucky in the health services markets and may have

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 191 of 645

Case 4:17-cv-02100-RDSBJ  Document 236-7  Filed 06/14/17  Page 146 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

market power in the entire state. For example, it has a 66% market share in the Owensboro area, a 46% share in Elizabethtown area and a 63% market share in the Bowling Green area.

277.    Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana has market power throughout the State of Louisiana in the health care financing market and in every market within Louisiana.  It also has market power in the State of Louisiana and in every health services market.  For example, it has a 57% market share in the entire state. Also, it has a 64% market share in the Alexandria area, a 59% market share in the Houma/Bayou Cane/Thibodaux and Monroe areas, a 56% market share in the Shreveport/Bossier City area, a 55% market share in the Lafayette area, a 52% market share in the Baton Rouge area, a 51% market share in the New Orleans/Metairie/Kenner area, and a 50% market share in the Lake Charles area.

278.    Defendant Anthem Blue Cross and Blue Shield of Maine, a subsidiary of Defendant WellPoint, has market power throughout the State of Maine in the health care financing market and in every market within Maine.  It also has market power in the State of Maine and in every health services market.  For example, it has a 53% market share throughout the state. It also has a 57% market share in the Bangor area, a 56% market share in the Lewiston/Auburn area, and a 53% market share in the Portland/South Portland area.

279.    Defendant CareFirst, Inc., through Defendant CareFirst of Maryland has market power throughout the State of Maryland in the health care financing market and in every market within Maryland.  It also has market power in the State of Maryland and in every health services market.  For example, it has a market share of 48% of the entire state of Maryland. It also has a market share of 70% in the Salisbury area, a 43% market share in the Bethesda-Gaithersburg-

Frederick area, a 42% Cumberland MD-WV area and a market share of 54% in the Baltimore/Towson area.

280.    Defendant Blue Cross and Blue Shield of Massachusetts, Inc. has market power at least in certain areas in Massachusetts in the health care financing market and may have market power in the entire state.   It has market power at least in certain areas in the State of Massachusetts in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (46%) throughout the entire state. It also has a 57% market share in the Pittsfield area, a 50% market share in the Lynn/Peabody/Salem area, a 42% market share in the Barnstable Town area, a 43% share in the Boston-Cambridge-Quincy area, a 45% share in the Framingham area, a 45% share of the Brockton-Bridgewater-Easton area, a 42% share of the Lowell-Billerica-Chelmsford, MA-NH area, a 48% share of the New Bedford area, a 40% share of the Springfield area, and 48% market share of the Taunton-Norton-Raynham area.

281.    Defendant Blue Cross and Blue Shield of Michigan has market power at least in certain areas in Michigan in the health care financing market and may have market power in the entire state.   It has market power at least in certain areas in the State of Michigan in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state. It also has an 81% market share in the Lansing/East Lansing and Niles/Benton Harbor areas, a 77% market share in the Battle Creek area, a 73% market share in the Bay City area, a 72% market share in the Ann Arbor area, a 71% market share in the Saginaw/Saginaw Township North area, a 69% market share in the Monroe and Warren/Farmington Hills/Troy areas, a 67% market share in the Jackson area, a 66% market share in the Kalamazoo/Portage area, a 64% market share in the Flint area, a 58% market share

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 193 of 645

Case 4:17-cv-02700-RDP-JD Document 236-7 Filed 02/14/47 Page 168 of 620
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

in the Muskegon/Norton Shores area, and a 53% market share in the Detroit/Livonia/Dearborn area.

282.    Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota has market power at least in certain areas in Minnesota in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Minnesota in the health services markets and may have market power in the entire state where it has at least a 44% market share. For example, it has 56% market share in the Rochester area, a 46% share of the Duluth, MN-WI area and a 48% market share in the St. Cloud area.

283.    Defendant Blue Cross Blue Shield of Mississippi has market power at least in certain areas in Mississippi in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Mississippi in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (45%) throughout the entire state.  For example, it has a 52% market share in the Pascagoula area, a 44% market share of the Gulfport-Biloxi area, a 41% share of the Hattiesburg area,   and a 48% market share in the Jackson area.

284.    Defendant Blue Cross and Blue Shield of Kansas City has market power at least in certain parts of the states of Missouri and Kansas and the Kansas City area for the health care financing market and may have market power in the entire area.  It has market power at least in certain areas in the State of Kansas and Missouri in the health services markets and may have market power in the entire Kansas City area. For example, it has a 51% market share in the St. Joseph MO-KS area.

285.    Defendant Anthem Blue Cross and Blue Shield of Missouri, a subsidiary of Defendant WellPoint, has market power at least in certain areas in Missouri in the health care

112

financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Missouri in the health services markets and may have market power across the entire state. Discovery may also show that other Blues have market power in areas in Missouri and reserve the right to present that evidence in the motion for class certification

286.   Defendant Blue Cross and Blue Shield of Montana, a division of Defendant HCSC, has market power at least in certain areas in Montana in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Montana in the health services markets and may have market power in the entire state. For example, it has a market share of 41% in the Great Falls area.

287.   Defendant Blue Cross and Blue Shield of Nebraska has market power throughout the State of Nebraska in the health care financing market and in every market within Nebraska. It also has market power in the State of Nebraska and in every health services market.  For example, it has a 56% market share in the entire state. It also has 60% market share in the Lincoln area.

288.   Defendant Anthem Blue Cross and Blue Shield of Nevada, the trade name of Defendant Rocky Mountain Health and Medical Services, Inc., both subsidiaries of Defendant WellPoint, has market power at least in certain areas in Nevada in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Nevada in the health services markets and may have market power in the entire state.  For example, it maintains a market share of 44% in the Carson City area.

289.   Defendant Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, a subsidiary of Defendant WellPoint, has market power at least in certain areas in New Hampshire in the health care financing market and may

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 195 of 645

Case 4:17-cv-02100-RDSB-J   Document 236-7   Filed 08/14/17   Page 120 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

have market power in the entire state where it has a 44% market share.  It has market power at least in certain areas in the State of New Hampshire in the health services markets and may have market power in the entire state. For example, it has a market share of 53% in the Rochester/Dover area, and a 44% market share in the Portsmouth, NH-ME area

290.    Defendant Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross and Blue Shield of New Jersey has market power at least in certain areas in New Jersey in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of New Jersey in the health services markets and may have market power in the entire state. For example, it has a 60% market share in the Atlantic City area, a 57% market share in the Ocean City area, and a 42% share of the Vineland-Milville-Bridgeton area.

291.    Defendant Blue Cross and Blue Shield of New Mexico, a division of Defendant HCSC, has market power at least in certain areas in New Mexico in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of New Mexico in the health services markets and may have market power in the entire state. For example, it maintains a 41% market share in the Santa Fe area.

292.    Defendant Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, a subsidiary of Lifetime Healthcare, Inc., has market power at least in certain areas in New York in the health care financing market.  It has market power at least in certain areas in the State of New York in the health services markets. For example, it has a 56% market share in the Elmira area, 53% market share in the Syracuse area, a 43% market share in the Binghamton area, and a 41% market share in the Rochester area.  Discovery may also show that other Blues have market power in areas in New York and reserve the right to present that evidence in the motion for class certification.

293.     Defendant Blue Cross and Blue Shield of North Carolina has market power throughout the State of North Carolina in the health care financing market and in every market within North Carolina.  It also has market power in the State of North Carolina and in every health services market.  For example, it has a market share of almost half of the entire state. It also has a market share of 76% in the Goldsboro area, a market share of 75% in the Greenville area, a market share of 70% in the Rocky Mount area, a market share of 61% in the Hickory/Morganton/Lenoir area, a 47% market share in the Burlington area, a 44% market share in the Durham area, a 45% share in the Greensboro-High Point area, a 46% share in the Wilmington area, a 42% share of the Winston-Salem area, and a 51% market share in the Asheville area.

294.     Defendant Noridian Mutual Insurance Company, d/b/a Blue Cross Blue Shield of North Dakota has market power at least in certain areas in North Dakota in the health care financing market.  It has market power at least in certain areas in the State of North Dakota in the health services markets. For example, it has a 56% market share in the entire state.

295.     Defendant Community Health Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio, a subsidiary of Defendant WellPoint, has market power at least in certain areas in Ohio in the health care financing market.  It has market power at least in certain areas in the State of Ohio in the health services markets.   It has a market share of 38% in the Cincinnati/Middletown area, but since that area borders on Kentucky where Defendant WellPoint also has the Blue, it likely has market power through its combined operations.

296.     Defendant Blue Cross and Blue Shield of Oklahoma has market power at least in certain areas in Oklahoma in the health care financing market.  It has market power at least in certain areas in the State of Oklahoma in the health services markets. For example, it has a

115

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 197 of 645

Case 4:13-cv-02095-RBH   Document 235-7   Filed 08/14/17   Page 122 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

market share of nearly half of the entire state. It also has a market share of 49% of the Tulsa area and a 45% share of the Oklahoma City area.

297.    Defendant Regence BlueCross BlueShield of Oregon, a subsidiary of Defendant Cambia Health, has market power at least in certain areas in Oregon in the health care financing market.  It has market power at least in certain areas in the State of Oregon in the health services markets. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Regence BlueCross BlueShield of Oregon would be the largest health insurer in Oregon and would have a market share of more than 50% in many areas in Oregon.

298.    Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania has market power at least in certain areas in Pennsylvania in the health care financing market.   It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% markets share in each of the Scranton/Wilkes-Barre and Williamsport areas.   Defendant Highmark is in the process of purchasing Blue Cross of Northeastern Pennsylvania.

299.    Defendant Highmark, Inc., the parent of Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield, has market power at least in certain areas in Pennsylvania in the health care financing market.  It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 75% market share in the Johnstown area, a 73% market share in the Altoona area, a 69% market share in the Erie area, a 52% market share in the Pittsburgh area, a 45% share of the Harrisburg-Carlisle area, a 46% share of the Lebanon area, a 43% share of the Reading area, a 46% share of the State College area and a 42% of the York-Hanover area.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 198 of 645

Case 4:17-cv-02700-RBH   Document 236-7   Filed 08/14/17   Page 123 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

300.    Defendant Independence Blue Cross has market power at least in certain areas in Pennsylvania in the health care financing market.  It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 58% market share in the Philadelphia area.

301.    Defendant Triple-S of Puerto Rico has market power in the health care financing market or markets in Puerto Rico.  It also has market power in the health service markets in Puerto Rico.  While the AMA Study does not contain data on Puerto Rico, the data from the National Association of Insurance Commissioners shows a 90% market share for the top four health insurance companies, and Plaintiffs allege that Triple-S of Puerto Rico is a significant portion of that percentage.

302.    Defendant Blue Cross and Blue Shield of Rhode Island has market power at least in certain areas in Rhode Island in the health care financing market.  It has market power at least in certain areas in the State of Rhode Island in the health services markets.  For example, it has a market share of 50% across the entire state.

303.    Defendant BlueCross BlueShield of South Carolina, Inc. has market power throughout the State of South Carolina in the health care financing market and in every market within South Carolina.  It also has market power in the State of South Carolina and in every health services market. In South Carolina, the Blue has a 60% market share in the entire state. Its highest market share is 71% in the Sumter market. It also maintains a market share of 57% in the Greenville area, a 63% share in the Anderson area, a 62% share in the Charleston-North Charleston area, a 61% share of the Columbia area, a 63% share of the Florence area, a 64% share of the Myrtle Beach area, and a 64% share of the Spartanburg area.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 199 of 645

Case 4:17-cv-02100-RDP Document 236-7 Filed 08/14/17 Page 124 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

304.    Defendant Wellmark of South Dakota, Inc., d/b/a Wellmark Blue Cross and Blue Shield of South Dakota has market power at least in certain areas in South Dakota in the health care financing market.  It has market power at least in certain areas in the State of South Dakota in the health services markets.  For example, Wellmark has a 41% market share of the Rapid City area.

305.    Defendant BlueCross BlueShield of Tennessee, Inc. has market power at least in certain areas in Tennessee in the health care financing market.  It has market power at least in certain areas in the State of Tennessee in the health services markets. For example,  It has almost half of the market for the entire state of Tennessee. It also has a 51% market share of the Nashville-Davidson-Murfreesboro area, a 50% market share in the Jackson area, a 46% market share in the Chattanooga TN-GA area, a 44% share of the Cleveland area, a 46% share of the Johnson City area, and a 47% share of the Morristown area.

306.    Defendant Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, has market power at least in certain areas in Texas in the health care financing market.  It has market power at least in certain areas in the State of Texas in the health services markets. For example, it has a 78% market share in the Laredo area, a 75% market share in the Wichita Falls area, a 74% market share in the San Angelo area, a 66% market share in the Odessa area, a 65% market share in the McAllen/Edinburg-Mission area, a 62% market share in the Midland area, a 61% market share in each of the Brownsville/Harlingen and Tyler areas, a 59% market share in each of the Lubbock and Texarkana areas, a 56% market share in the Longview area, a 55% market share in the Waco area, a 53% market share in the College Station/Bryan and Corpus Christi areas, a 41% share of the Waco area, a 48% share of the Sherman-Denison area and a 51% market share in the Beaumont/Port Arthur area.

307.    Defendant BlueCross BlueShield of Utah, a subsidiary of Defendant Cambia Health, has the Blue Service Area for Utah. Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

308.    Defendant Blue Cross and Blue Shield of Vermont has market power at least in certain areas in Vermont in the health care financing market.  It has market power at least in certain areas in the State of Vermont in the health services markets. For example, it has a market share of 42% in the Burlington/South Burlington area.

309.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., a subsidiary of Defendant WellPoint, has market power at least in certain areas in Virginia in the health care financing market.  It has market power at least in certain areas in the State of Virginia in the health services markets. For example, it has an 85% market share in the Danville area, a 77% market share in the Blacksburg/Christianburg/Redford area, a 68% market share in the Harrisonburg area, a 67% market share in the Roanoke area, a 62% market share in the Lynchburg area, a 56% market share in the Winchester area, a 52% market share in the Virginia Beach/Norfolk/Newport News area, a 50% market share in the Richmond area, and a 47% share of the Charlottesville area.  CareFirst has the Blue Service Area in the northern part of the state near Washington, D.C.  Plaintiffs do not have data for the market share in that Service Area.  If discovery demonstrates that CareFirst has market power in that area, then Plaintiffs will address the issue in their motion for class certification.

310.    Defendant Premera Blue Cross has market power at least in certain areas in Washington in the health care financing market.  It has market power at least in certain areas in the State of Washington in the health services markets. For example, it has a 69% market share

119

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 201 of 645

Case 4:17-cv-02700-RBSBJ Document 236-7 Filed 08/14/17 Page 126 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

in the Wenatchee area.  Defendant Regence BlueShield also operates in Washington and has significant market shares in areas in Washington.  Kaiser also has a significant presence in Washington, and as stated above, may need to be excluded from the analysis of whether Premera or Regence has market power over providers in Washington or markets for health services in that state.  There may also be other managed care companies or health insurance companies operating in Washington that should be excluded from the market power analysis. Especially if Kaiser is excluded, Regence has market power in markets for health services in Washington.  These issues will be further addressed and developed in the Plaintiffs' motion for class certification.

311.    Defendant Highmark of West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, a subsidiary of Defendant Highmark, has market power at least in certain areas in West Virginia in the health care financing market.  It has market power at least in certain areas in the State of West Virginia in the health services markets. For example, it has a market share of 41% in the entire state of West Virginia, 42 % of the Charleston, WV area, and a 40% share of the Morgantown area.

312.    Defendant Blue Cross Blue Shield of Wisconsin, a subsidiary of Defendant WellPoint, has the Blue Service Area for the State of Wisconsin.  Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

313.    Defendant Blue Cross Blue Shield of Wyoming has the Blue Service Area for the State of Wyoming.  Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

314.    As described above, the Blues have more members than any health insurance or managed care company in the country.  Two of the four largest health insurance companies in the country, four of the largest ten, and 15 of the largest 25 are Blues.  Attachment A is a listing of the market share of the top four and top eight health insurance companies by state from 2004 through 2014 as reported by the National Association of Insurance Commissioners ("NAIC").  Evidence will be introduced that shows WellPoint is prevented from crossing the Georgia line to compete in Alabama, and other empirical evidence is consistent with all the other Blues agreeing not to compete in Alabama in health insurance markets as well.  If the Blues were allowed to compete, the market share for the largest four health insurance companies in Alabama would likely be much less.  It would also be expected that market power for any one company would diminish.  Evidence will show that HCSC is prevented from crossing the Illinois state line to compete in Indiana and prevents WellPoint from crossing the Indiana state line to compete in Illinois.  If the Blues were allowed to compete, the market share for the four largest health insurance companies in Illinois and Indiana would by definition fall below 80%.  The HHI Market Concentration Index calculated from the NAIC data places many states in the highly concentrated range based upon ratios used by the United States Department of Justice.  If the Blues Market Allocation Conspiracy is as alleged, the market shares of the top four health insurance companies, the market shares for the top eight insurance companies, and the HHI indices would likely be lower in every state.

315.    Having fewer competitors in any market generally gives the players in that market more access to market power, a greater ability to use market power, and a greater ability to use exclusive access to elements essential to effective competition, all else being equal.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 203 of 645

Case 4:17-cv-02100-RDSBJ Document 236-7 Filed 12/14/17 Page 128 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

316.    The Blues engage in a number of practices to increase their market power and to ensure that they alone have access to exclusive access to elements essential to effective competition.  Through the conspiracies alleged in this complaint, the Blues have exclusive access to more than one hundred million subscribers of all the conspiring Blues.  The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

317.    As demonstrated in the preliminary injunction proceeding for Dr. Cain, healthcare providers have essentially no choice but to be part of the networks of the Blues in order to remain in business.  The Blues have a general policy of refusing to honor assignments from subscribers to providers as a part of their overall effort to coerce providers to be in network.  The Blues also structure and implement out of network benefits for subscribers in a way that discourages them from using those benefits.  The Blues either eliminate or cap out of network benefits so that it costs subscribers significantly more to use their out of network benefits.  If Providers attempt to limit the out of pocket costs of subscribers who use their out of network benefits, the Blues retaliate against those Providers.  When Providers believe their patients are better served by using an out of network facility, the Blues retaliate by threatening to terminate the Providers from the Blue networks.

318.    As Dr. Noether described in the submission by Defendant Capital Blue Cross, there are significant barriers to entry for the health care financing market and therefore to be a payor for healthcare goods, services and facilities in the markets where prices are determined for healthcare providers.  One of the barriers is the development of a provider network.

319.    Some of the Blues have imposed most favored nation ("MFN") clauses to create additional barriers to entry.  An MFN is both an indicator of market power and a source of

market power because it excludes competitors.  Other Blues that do not have express MFNs in their contracts have the functional equivalent that operate in the same manner.

320.    The Blues' restraints have anticompetitive effects.    Service areas are anticompetitive on their face: they prevent the Blues from competing with each other.

321.    The Blues' agreement to limit the amount of non-Blue business they may conduct in another Blue's service area is anticompetitive on its face.

- The agreement puts an artificial limit on competition.

- The agreement reduces the incentive for the Blues to develop business out of their Service Areas because they know that the potential for that business is limited.

322.    The Blues would compete with each other but for the Market Allocation Conspiracy.

- Historically, Blue-on-Blue competition happened in certain places such as Ohio, North Carolina and Illinois.

- Blue Cross and Blue Shield organizations competed against each other for many years and still do in certain places, including California, Washington, Idaho, and Central Pennsylvania.

- The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*, resulted from one Blue's desire to compete outside of its service area; BCBSA ultimately agreed to allow all of Ohio's Blues to compete with each other, which they did.

- BCBSA settled the Maryland Blues litigation by allowing the D.C.-area Blues to compete against each other.

- Blues compete against each other in a limited way with respect to health care providers in areas covered by the one-county rule.

123

- Many of the Blues, especially the larger ones, such as WellPoint and HCSC, have expanded into other territories, but in a limited way because of the limits on their non-Blue business.

- The BCBSA prevents Blues from expanding into other Service Areas.

323.     The Price Fixing and Boycott Conspiracy and the national programs including the Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program are anticompetitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients (e.g., BCBS-FL providers treating Empire subscribers).

324.     Provider reimbursements are lower when the market for health care financing is highly concentrated.

325.     The Blues' agreements not to compete with each other, in addition to the other unlawful means of suppressing competition described in this complaint, constitute an agreement to monopsonize the market for health care services. In some area, the Blues have successfully monoposonized the market for health care services, while in others, the Blues have a dangerous probability of success.

326.     Output of health care services is reduced when the market for health care financing is highly concentrated.  For example, Alabama has the highest market concentration of any Blue in the country, and it also has the smallest number of primary care physicians per 100,000 patients of any state in the country.  This low ratio is especially damaging to public health and consumer welfare in Alabama because there is a national shortage of primary care physicians.  The national shortage of primary care physicians and the even greater shortage in Alabama have resulted from the low reimbursement rates paid by Defendants.  Since Blue Cross

124

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 206 of 645

Case 4:13-cv-02030-RDP Document 236-7 Filed 08/14/17 Page 131 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

and Blue Shield of Alabama has the largest market share of any health insurance company in the country, it is able to reduce provider reimbursement rates even more than other Blues.  Primary care physicians in Alabama have retired early and continue to retire early because the reimbursement rates paid by Blue Cross of Alabama are too low to make it worthwhile for them to continue practicing medicine.  These early retirements have made and are making the shortage of primary care physicians even worse.

327.    The Blues' outrageous levels of capital show that they have used their market power to earn supracompetitive returns.

328.    The Blues' agreements contain enforcement mechanisms.

- A Blue that disobeys the restriction on competition can have its license revoked.

- Non-Blue companies that might favor competition effectively cannot buy a Blue because the BCBSA board must approve an applicant for a license.

329.    The Blues' restraints offer no procompetitive benefits.

330.    The BCBSA agreement does not create a new product.

- The Blues cannot define the "new product" as a "Blue system that competes with nationally integrated insurers," as they did in their motion to dismiss; in *American Needle*, the Supreme Court stated, "Members of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products."

- Many other insurers have figured offer nationwide coverage to their subscribers without participating in territorial market allocation, price-fixing or boycott.

331.    The Blues do not need service areas to compete with national insurers.

- The Blues include several of the largest insurers in the country, which operate in several states and would operate more broadly including nationwide but for the Market Allocation Conspiracy.

- Other Blues, such as BCBS-AL, have more than held their own against national insurers.

332.   Service areas do not enhance efficiency by allowing the Blues to remain focused on their local areas.

- Without service areas, Blues could still focus on their local areas if they choose.

- BCBSA's actions undermine this argument; the Blues used to be more locally focused, but BCBSA required them to merge and operate statewide.

- The existence of large multi-state Blues like WellPoint and HCSC belies this argument as well.

333.   The Blues have argued that service areas prevent free riding, but there are less restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain standards and invest in the development of the brand.

334.   The Blues have argued that service areas prevent customer confusion, but Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when service areas were challenged there.  Moreover, the restrictions on competition with health care providers have no relevance to consumer confusion.

335.   Limiting the Blues' ability to compete outside of their service areas without using the Blue marks has no plausible procompetitive benefit.

336.   MFNs offer no procompetitive benefits.

126

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 208 of 645

Case 4:13-cv-02100-RDP Document 235-7 Filed 08/14/17 Page 133 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

337.    The national programs including the Blue Card Program and National Accounts Programs result in many inefficiencies that increase costs to health care providers and reduce consumer welfare.  The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating States to be in-network providers create many of those inefficiencies as described in more detail above.  Any alleged procompetitive effects of these Programs are far outweighed by the anticompetitive effects that they create.  Moreover, there is no justification for the price fixing aspects of these Programs.

338.    The Blues do not need to engage in the Price Fixing and Boycott Conspiracy to offer health insurance or health care financing on a regional or national basis.  Other health insurance companies or managed care companies offer health insurance or health care financing on a regional or national basis without engaging in such illegal conspiracies.

**Other Abuses That Preserve the Blues' Enhanced Market Power**

339.    In addition to the harms set forth above, healthcare providers are harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy.

340.    For example, a number of the Blues use MFNs with hospitals and other facilities. According to at least some defense counsel, Defendant BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."  Although the Michigan legislature recently made MFNs unlawful, the statement of BCBS-MI also applies to other Blues.  The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract.  Defendant Blue Cross of Alabama is one of the Defendants that uses such

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 209 of 645

Case 4:17-cv-02100-RDSBJ   Document 236-7   Filed 08/14/17   Page 334 of 610
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

terms in its contracts with hospitals.  As a result of the extremely high market share held by Blue Cross of Alabama, this prohibition of use provision is effectively the same as an MFN.

341.    All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996).  By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

342.    In addition, Defendants, including CareFirst, require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers.  Defendants thereby create asymmetric information in the market for the purchase of healthcare provider services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

343.    Finally, Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive "reserves" (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below market rates offered in a market free from competition from other Blues.  All of this is undertaken in an attempt to further drive down payment rates to providers and to raise barriers for competing firms to enter these markets.

### Antitrust Injury

344.    Defendants' illegal activities have resulted in antitrust injury and harm to competition.

128

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 210 of 645

Case 4:17-cv-02700-RFSBJ Document 235-7 Filed 08/14/17 Page 135 of 610
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

345.    Through their violations of the antitrust laws, Defendants have agreed that they will not compete with each other.  The effect is to prevent two of the largest four, four of the largest ten, and fifteen of the largest 25 health insurance or managed care companies from competing in other states, causing increased market concentration and reduced competition throughout the country.

346.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in the state of Alabama has been and continues to be harmed in that the other 36 Blues agree not to enter the Alabama market to compete with Blue Cross Blue Shield of Alabama no matter the circumstances.

347.    The Defendants have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets and have limited the ability of other health insurers to compete in other markets.  The Defendants suppressed prices for provider goods, services and facilities and have injured competition depriving patients of choices in the marketplace for healthcare providers.

348.    Additionally, because most of the Blues are monopolists in the health care financing and health insurance markets, in addition to being monopsonists in the health services markets, it does not stand to reason that lower payment rates necessarily lower consumers' premiums.  R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 211 of 645

Case 4:17-cv-00100-RDP Document 236-7 Filed 10/31/17 Page 136 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

349.    In the long run, the Blues' monopsony power gained by virtue of their unlawful agreements will harm consumers.  Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay.  A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians.  "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation        Survey        of        American        Physicians,"        available        at http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).  Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants.  According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation.  According to the 2013 Annual Report of the American Association of Medical Colleges, there will be a shortage of 90,000 physicians across all specialties by 2020.   Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.  Hospitals and other facilities are closing.  Other facilities are reducing services offered to consumers.  Still others that would otherwise expand are not doing so as a result of the Blues' low payments.

350.    In the end, economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 212 of 645

Case 4:17-cv-02100-RDB-JD Document 236-7 Filed 08/14/17 Page 137 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

351.    In addition, Plaintiffs suffer because agreements not to compete also restrict their choices in the market.  Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area.  This has the effect of depressing the payment rates in the market for in- and out-of-network services.

352.    During the class period including after 2010, the Blues implemented new fee schedules for providers, generally on an annual basis.  Those new fee schedules are lower than they would have been without the Defendants' anticompetitive conduct.  The new fee schedules have created new antitrust injuries and damages for the health care providers.

353.    Defendants' illegal activities have resulted in harm to competition.  Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between non-competitive rates or being put out of business through coercion.

354.    Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened future harm to Plaintiffs' business and property.

355.    If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

### Defendants, Even Those Organized As Not For Profit, Enjoy Supracompetitive Profit

356.    Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits.  Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer.  These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace.  As

Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

357.    Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues formed for-profit subsidiaries. A number of those then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

358.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

359.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

360.    Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks. These perks offer nice privileges to

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 214 of 645

Case 4:17-cv-02100-RDSBJ Document 236-7 Filed 02/14/17 Page 139 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

361.    Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services.  Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

362.    By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

363.    The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

364.    For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the

133

company or one of its affiliated entities.  Blue Cross of Michigan was recently found liable for

$5 million in damages for breach of its ERISA duties to one of its administered plans.

365.    In addition, despite claiming to be "not-for-profit," many of these Blues hold

massive "reserves" built off the net income spread between the high premiums they charge

customers and the below market rates they pay to Providers.  Those excessive reserves have

resulted in higher costs to consumers.

366.    Below is an illustration of the huge amounts of capital being held in excess of

requirements by a number of not-for-profit Blues.  As of Sept. 30, 2010, 33 "not-for-profit"

Blues held more than $27 billion in capital in excess of the minimum threshold reserves required

by the BCBSA. The chart below details those "reserves":

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 216 of 645

Case 4:17-cv-00100-RDB   Document 235-7   Filed 08/04/17   Page 341 of 610
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

of Tennessee

| | | | |
|---|---|---|---|
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

367.    Many of the Blues undersell their actual reserves substantially by citing only the surplus from the mainline company, but not the general reserves on the companies' combined reporting statements, which accounts for all lines of business.

368.    In South Carolina, for instance, BlueCross BlueShield of South Carolina's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

369.    Members of the Board of BlueCross BlueShield of South Carolina "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show."  They were required to do little but show up to the occasional meeting.

370.    This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies.  BlueCross BlueShield of South Carolina paid executives in the millions of dollars in 2010.

371.     HCSC, a conglomerate of several Blues, including Blue Cross and Blue Shield of Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012.  This net income does not even account for large blocks of plans it merely administers for the self-insured.  "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus.  The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011."  "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million in 2012."  See http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million.

372.     Likewise, large salary increases for executives with Blue Cross and Blue Shield of Alabama have recently been reported. Such salaries result in higher costs to consumers. These supracompetitive profits are built on the strength of Defendants' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force Providers to join their networks at below-market rates.  A spokeswoman for BlueCross BlueShield of South Carolina noted that the outrageous increases are priced "to reflect its superior networks."  Thus, the market power of the Blues allows them to pay below market rates to Providers.  This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

373.  If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

## Implementation of the Affordable Care Act

374.     When President Obama presented the Affordable Care Act to the Joint Session of Congress, he discussed the importance of competition among health insurers and cited BCBS-AL as a poster child for operating a concentrated market.  The ACA created insurance exchanges to encourage competition among health insurers. The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places.  The Blues have used their market power and their exclusive access to elements essential to competition to increase their market shares through the mechanisms created by the ACA.

375.     Of the 15 states where complete data on market share of the health insurance exchanges are available, Blues have obtained the greatest percentage of covered lives in 12 of those states.   The 12 states (including the District of Columbia) are California, Colorado, Connecticut, Indiana, Virginia, the District of Columbia, Florida, Maryland, Michigan, Rhode Island, Vermont, and Washington. Plaintiffs allege that even though the data is not available in many other states including Alabama and Tennessee, the Blues have increased their market shares through the exchanges.

## Class Action Allegations

376.     Plaintiffs bring this action on behalf of themselves and on behalf of a class of healthcare providers.  First, Plaintiffs bring this action seeking injunctive relief pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following Class (the "Nationwide Injunction Class"):

> All healthcare providers, not owned or employed by any of the Defendants, who currently provide healthcare services, equipment or supplies in the United States of America.

App. p. 141

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 219 of 645

Case 4:17-cv-02700-RDSBJ Document 236-7 Filed 02/14/17 Page 424 of 610
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

377.    Further, Plaintiffs bring this action seeking damages pursuant to the provisions of

Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following

class:

> All healthcare providers, not owned or employed by any of the
> Defendants, in the United States of America, who provided
> covered services, equipment or supplies to any patient who was
> insured by, or who was a member or beneficiary of any plan
> administered by, a Defendant within four years prior to the date of
> the filing of this action.

For Plaintiffs' claims relating to violations of Section 1 of the Sherman Act under the rule of

reason (Counts VI and VII), and claims relating to monopsonization and attempted

monopsonization under Section 2 of the Sherman Act, (Counts VIII and IX), this class will have

subclasses based on the geographic area in which each Plaintiff practices. In paragraphs 255 to

315, Plaintiffs have identified a number of geographic areas in which Defendants have market

power. For Counts VI, VII, and IX, there is a subclass for each geographic area in which a

Defendant has a market share of 40% or more, although Plaintiffs reserve the right to adjust this

percentage based upon discovery and expert analysis.  For Count VIII, there is a subclass for

each geographic area in which a Defendant has a market share of 70% or more although

Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis.

Prior to class certification, Plaintiffs reserve the right to amend the definition of the subclasses if

discovery into Defendants' market power warrants.

378.    Plaintiffs also reserve the right to request class certification under Rule 23(c)(4),

Federal Rules of Civil Procedure.

379.    Plaintiffs are all members of both Classes, their claims are typical of the claims of

the other Class members, and Plaintiffs will fairly and adequately protect the interests of the

Class.   Plaintiffs are represented by counsel who are competent and experienced in the

prosecution of class-action antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

380.   The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members.  The Class Members are so numerous that joinder of all members is impracticable.

381.   Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.

382.   Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

383.   There will be no extraordinary difficulty in the management of this Class Action.  Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.   Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

    a.    Whether Defendants violated Section 1 of the Sherman Act;

    b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

    c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 221 of 645

Case 4:17-cv-02100-RDSBJ  Document 236-7 Filed 06/14/17 Page 146 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

d.      Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e.      Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f.      Whether Defendants violated Section 2 of the Sherman Act;

g.      Whether the Blues collectively or any particular Blue has market power in a particular market;

h.      Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;

i.      Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

j.      Whether Defendants' conduct should be enjoined;

k.      The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

384.    These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

385.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

386.    This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 222 of 645

Case 4:17-cv-00190-RP-SBJ Document 236-7 Filed 08/14/17 Page 147 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## COUNT I

### Claim for Injunctive Relief, 15 U.S.C. § 26

387.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 387 as though set forth herein.

388.    This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

389.    As explained in Counts II through VII, Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a per se, quick look, or rule of reason analysis.

390.    As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

391.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their illegal conspiracies and to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

392.    Plaintiffs reserve the right to seek preliminary injunctions as necessary.

## COUNT II

### Claim for Threefold Damages and Interest,
### 15 U.S.C. § 15
### (The *Per Se* Market Allocation Conspiracy)

393.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 393 as though set forth herein.

141

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 223 of 645

Case 4:17-cv-02010-RBP-TSB Document 235-7 Filed 08/14/17 Page 148 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

394.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

395.     As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

396.     Defendants have agreed to divide and allocate the geographic markets for the finance of health care into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined.  By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing the rates paid to healthcare providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.  Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

397.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 224 of 645

Case 4:17-cv-00700-RDSBJ Document 236-7 Filed 08/4/17 Page 449 of 610
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

## COUNT III

### Claim for Threefold Damages and Interest,
### 15 U.S.C. § 15
### (The *Per Se* Price Fixing and Boycott Conspiracy)

398.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 398 as though set forth herein.

399.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

400.    The BCBS Price Fixing and Boycott Conspiracy operates in addition to and reinforces the Market Allocation Conspiracy.    The Conspiracy alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a per se violation of the Act.

401.    Through the Price Fixing and Boycott Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs.    By so doing, Defendants have agreed to suppress competition by fixing and maintaining the rates paid to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act.    Defendants' price fixing agreement through the national programs is per se illegal under Section 1 of the Sherman Act.

402.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.    Such injury flows directly from that which makes Defendants' conduct unlawful.    These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

143

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 225 of 645

Case 4:17-cv-02100-RDSBJ Document 236-7 Filed 08/4/17 Page 450 of 1210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

403.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT IV

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
Quick Look Claim for Market Allocation Conspiracy**

404.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 404 as though set forth herein.

405.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

406.    Under a quick look analysis Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act.

407.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).  The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

408.    The Market Allocation Conspiracy prevents many of the largest companies in the country offering health care financing including health insurance, from competing either throughout the country or in larger regions of the country.

409.    The Market Allocation Conspiracy has no pro-competitive effect.  The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

410.    The Defendants have not offered any new product.  Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

411.    Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

412.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

413.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT V

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
Quick Look Claim for Price Fixing and Boycott Conspiracy**

414.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 414 as though set forth herein.

415.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

416.    Under a quick look analysis Defendants' Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act.

417.   "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).  The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

418.   The Price Fixing and Boycott Conspiracy has the same effect and also results in price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from negotiating the price of health care providers' services. See Nat'l Soc. of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978).

419.   The Price Fixing and Boycott Conspiracy has no pro-competitive effect.  The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

420.   The Defendants have not offered any new product.  Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

421.   Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

422.   As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

423.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VI

**Claim for Threefold Damages and Interest,**
**15 U.S.C. § 15**
**Rule of Reason Claims for Market Allocation Conspiracy**

424.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 424 as though set forth herein.

425.     Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

426.     Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

427.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

428.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VII

**Claim for Threefold Damages and Interest,**
**15 U.S.C. § 15**
**Rule of Reason Claims for Price Fixing and Boycott Conspiracy**

429.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 429 as though set forth herein.

430.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

431.    Defendants Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

432.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

433.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VIII

**Claim for Threefold Damages and Interest,**
**15 U.S.C. § 15**
**(Monopsonization)**

434.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 434 as though set forth herein.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 230 of 645

Case 4:17-cv-02700-RDSBJ Document 236-7 Filed 08/14/17 Page 155 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

435.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

436.     As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained a monopsony in the market for health care services in certain geographic areas listed in paragraphs 255 to 315. For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants. These monopsonies have been durable, lasting for decades.

437.     These Defendants' creation of monopsonies was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsonies.

438.     By willfully creating or maintaining a monopsony, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

439.     As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for the Defendants' anticompetitive conduct.

440.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## COUNT IX

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
(Monopsonization)**

441.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 441 as though set forth herein.

442.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

443.     As alleged more specifically above, the Defendants have engaged in conduct by which they have attempted to create or maintain a monopsony in the market for health care services in certain geographic areas listed in paragraphs 255 to 315. For purposes of this Count, these Defendants are the ones identified as having a market share of 40% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants.

444.    These Defendants specifically intended to create monopsonies. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsonies.

445.    By attempting to create or maintain a monopsony, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when the Defendants have not yet created or maintained a monopsony, their conduct has created a dangerous risk of success.

446.     As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for the Defendants' anticompetitive conduct.

447.     As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

### COUNT X

**Claim for Threefold Damages and Interest,
15 U.S.C. § 15
(Conspiracy to Monopsonize)**

448.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 448 as though set forth herein.

449.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

450.     As alleged more specifically above, the Defendants have agreed to restrict competition among themselves in the market for health care services and thus to create monopsony power.  The Defendants specifically intended to create a monopsony. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsonies.  All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 233 of 645

Case 4:17-cv-02100-RDSBJ Document 236-7 Filed 06/14/17 Page 158 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

451.    By conspiring to create or maintain a monopsony, the Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

452.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have but for the Defendants' anticompetitive conduct.

453.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.    Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

d.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 234 of 645

Case 4:17-cv-02100-RDP   Document 236-7   Filed 08/14/17   Page 159 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

e.  Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.  Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

g.  Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

h.  Award Plaintiffs and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

i.  Award costs and attorneys' fees to Plaintiffs;

j.  Award prejudgment interest;

k.  For a trial by jury; and

l.  Award any such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  September 30, 2014                    Respectfully submitted,


*/s/ Edith M. Kallas*                         */s/ Joe R. Whatley, Jr.*
Edith M. Kallas – **Co-Lead Counsel**        Joe R. Whatley, Jr. – **Co-Lead Counsel**
WHATLEY KALLAS, LLP                          W. Tucker Brown
1180 Avenue of the Americas, 20th Floor      WHATLEY KALLAS, LLP
New York, NY 10036                           2001 Park Place North
Tel:  (212) 447-7060                         1000 Park Place Tower
Fax:  (800) 922-4851                         Birmingham, AL 35203
Email:  ekallas@whatleykallas.com            Tel:  (205) 488-1200
                                             Fax:  (800) 922-4851
                                             Email:  jwhatley@whatleykallas.com
                                                     tbrown@whatleykallas.com

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 235 of 645

Case 4:17-cv-02100-ARES-J Documen 236-7 Filed 06/14/17 Page 360 of 610
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel: (617) 573-5118
Fax: (617) 573-5090
Email: psheehan@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591
Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@rbfirm.net

Debra B. Hayes – *Plaintiffs' Steering Committee*
Charles Clinton Hunter
THE HAYES LAW FIRM
700 Rockmead, Suite 210
Kingwood, TX 77339
Tel: (281) 815-4963
Fax: (832) 575-4759
dhayes@dhayeslaw.com
chunter@dhayeslaw.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wcqp.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel: (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

E. Kirk Wood, Jr. – *Local Facilitating Counsel*
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel: (205) 612-0243
Fax: (205) 705-1223
Email: ekirkwood1@bellsouth.net

Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
       pprieto@podhurst.com

U.W. Clemon – *Plaintiffs' Steering Committee*
J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: uwclemon@whitearnolddowd.com
       adowd@whitearnolddowd.com
       mwhite@whitearnolddowd.com
       lflippo@whitearnolddowd.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
Email: vbunch@bffb.com

App. p. 158

bclark@wcqp.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
   & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email:  nroth@eysterkey.com
            jroth@eysterkey.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email:  david.balto@dcantitrustlaw.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email:  joey@bunchandjames.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email:  richard@frankowski.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email:  john@johndavislaw.net

Robert J. Axelrod – *Chair, Written Submissions
Committee*
AXELROD & DEAN LLP
830 Third Avenue, 5th Floor
New York, NY 10022
Tel:  (646) 448-5263
Fax:  (212) 840-8560
Email:  rjaxelrod@axelroddean.com

W. Daniel Miles, III – *Written Submissions
Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
   & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email:  dee.miles@beasleyallen.com

Peter H. Burke – *Class Certification Committee*
J. Allen Schreiber – *Litigation Committee*
BURKE HARVEY, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, AL 35205
Tel:  (205) 930-8144
Fax:  (205) 930-9054
Email:  pburke@burkeharvey.com
            aschreiber@burkeharvey.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email:  mdodge@gpm-law.com

155

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email:  mgray@grayandwhitelaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email:  steve@stephenmhansenlaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email:  hst@kttlaw.com
          jal@kttlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email:  wes@pittmanfirm.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email:  rroden@shelbyroden.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email:  Michael@gurleylaw.net

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email:  ljinks@jinkslaw.com
          ccrow@jinkslaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email:  myronpenn28@hotmail.com

Troy A. Doles – *Discovery Committee*
SCHLICHTER BOGARD & DENTON, LLP
100 S. 4th Street, Suite 900
St. Louis, MO 63102
Tel:  (314) 621-6115
Fax:  (314) 621-7151
Email:  tdoles@uselaws.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email:  petestrom@stromlaw.com

App. p. 160

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 238 of 645

Case 4:17-cv-00210-RP-SBJ   Document 36-7   Filed 06/14/17   Page 163 of 210
E-FILED  2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email:  gmason@wbmllp.com


Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email:  lance@searsandswanson.com


Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
2900 1st Avenue South
Birmingham, AL 352333
(205) 324-4644
(205) 324-4649 Fax
alamb@archielamb.com


Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
        Ray@dillonfindley.com
        Molly@dillonfindley.com


Thomas V. Bender
WALTERS BENDER STROHBEHN
  & VAUGHAN, P.C.
2500 City Center Square, 1100 Main
Kansas City, MO 64105
Tel:  (816) 421-6620
Fax:  (816) 421-4747
Email:  tbender@wbsvlaw.com


Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email:  brian@wojtalewiczlawfirm.com


Paul Lundberg
LUNDBERG LAW, PLC
600 4th Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com


James Redmond
Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Jim.Redmond@heidmanlaw.com
        Cynthia.Moser@heidmanlaw.com

157

App. p. 161

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 30th day of September 2014, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr.

App. p. 162

## IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL CIRCUIT
## UNION COUNTY, ILLINOIS

Deborah Piercy and Lisa Tomazolli, on )
Behalf of Themselves and All Others )
Similarly Situated, )
     )   Case No. 2012-L- 28
Plaintiffs, )
     )   **Class Action**
vs. )
     )
HEALTH CARE SERVICE )
CORPORATION D/B/A BLUE CROSS )
BLUE SHIELD OF ILLINOIS, )
Defendant. )

FILED

AUG 2 1 2012

Tomais Marland

CLERK OF THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
UNION COUNTY, ILLINOIS

### ORIGINAL COMPLAINT

The Plaintiffs Deborah Piercy and Lisa Tomazzoli, by and through their undersigned counsel of record, bring this action on behalf of themselves and all others similarly situated against Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois for damages and restitution. Plaintiffs hereby allege, on information and belief, except for information based on personal knowledge, which allegations are likely to have evidentiary support after further investigation and discovery, as follows:

### NATURE OF ACTION

1.    Plaintiffs Deborah Piercy and Lisa Tomazzoli (hereinafter "Plaintiffs") bring this action on behalf of themselves and other subscribers of Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois (hereinafter "BCBS-IL") for damages and restitution. Specifically, this action seeks to recover damages in the form of a refund of inflated premiums that BCBS-IL has charged Illinois subscribers as a result of an ongoing conspiracy in violation of the Illinois Antitrust Act 740 ILCS 10/1, et seq. between BCBS-IL and the thirty-seven (37) Blue Cross Blue Shield Association ("BCBSA") member health plans, and as a result of anti-

Case MDL No. 2406  Document 389-9  Filed 07/28/17  Page 241 of 645

Case 4:17-cv-00210-JAJ-SBJ  Document 1-7  Filed 06/14/17  Page 166 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

competitive conduct Defendant has engaged in to establish and maintain monopoly power throughout Illinois.

2.     BCBS-IL is by far the largest health insurance company operating in Illinois, and currently exercises market power in the commercial health insurance market throughout Illinois. According to the Illinois Department of Insurance, 55 percent of the Illinois residents who subscribe to full-service commercial health insurance (group plans and individual policies) are subscribers of BCBS-IL vastly more than the next largest full-service commercial insurer, United Healthcare Insurance Company, which carries just 12 percent of such subscribers.

3.     The dominant market share enjoyed by BCBS-IL is the direct result of an illegal conspiracy in which thirty-seven of the nation's largest health insurance companies have agreed that they will not compete with BCBS-IL, and that BCBS-IL will have the exclusive right to do business in the State of Illinois, so long as it limits its competition with any of its thirty-seven co-conspirators in each of their assigned geographic areas. These market allocation agreements are implemented through Blue Cross and Blue Shield license agreements executed between BCBSA, a licensing vehicle that is owned and controlled by all of the Blue Cross and Blue Shield plans, and each individual Blue Cross and Blue Shield licensee, including BCBS-IL. Through the terms of these per se illegal license agreements, the independent Blue Cross and Blue Shield entities throughout the country, including BCBS-IL, have explicitly agreed not to compete with one another, in direct violation of Illinois' Antitrust Act, specifically 740 ILCS 10/3, et seq. By so agreeing, they have attempted to entrench and perpetuate the dominant market position that each Blue Cross and Blue Shield entity has historically enjoyed in its specifically defined geographic market.

2

4.   Defendant's illegal conspiracy has perpetuated BCBS-IL monopoly power throughout Illinois, which has resulted in skyrocketing premiums for Illinois BCBS-IL enrollees for over a decade. BCBS-IL's anti-competitive behavior, and the lack of competition BCBS-IL faces because of its monopoly power and anti-competitive behavior, has led to higher costs, resulting in higher premiums charged to BCBS-IL customers. As a result of these inflated premiums, Health Care Service Corporation now has a surplus of more than $4 billion, which includes Illinois' proportionate share.

5.   These inflated premiums would not be possible if the market for health insurance in Illinois were truly competitive. Full and fair competition is the only answer to artificially-inflated prices, and competition is not possible so long as BCBS-IL is permitted to enter into agreements that have the actual and intended effect of restricting the ability of thirty-seven of the nation's largest health insurance companies from competing in Illinois.

## JURISDICTION AND VENUE

6.   This Court has jurisdiction over BCBS-IL pursuant to 735 ILCS 5/2-209(a)(1) and (b)(3) because Defendant transacts business within this state and is an Illinois corporation organized under the law of Illinois.

7.   Venue is proper in this Court pursuant to 735 ILCS 5/2-102 and 735 ILCS 5/2-103(e) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this county, Plaintiffs were harmed in this county, and BCBS-IL is an Illinois insurance company.

8.   All members of the Class are citizens of Illinois as of the date of filing this Complaint.

3

App. p. 165

9.      All claims, on behalf of the Plaintiffs and the Class, are brought exclusively under Illinois law.

## I.      PARTIES

### A.      Plaintiffs

10.      Plaintiff, Deborah Piercy is a citizen of the State of Illinois, and resides in Anna, Union County, Illinois. Plaintiff had an individual health insurance policy with, and paid premiums to BCBS-IL from at least 2005 through the present.

11.      Plaintiff Lisa Tomazzoli is a citizen of the State of Illinois, and resides in Cobden, Union County, Illinois. Plaintiff had an individual health insurance policy with, and paid premiums to BCBS-IL from 2003 through the present.

### B.      Defendant

12.      Defendant Health Care Service Corporation (also "HCSC") d/b/a Blue Cross and Blue Shield of Illinois ("BCBS-IL"), is an Illinois mutual legal reserve company, which may be served at 300 E. Randolph St. Chicago,  IL  60601 5099.  BCBS-IL is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Illinois.  Like other Blue Cross and Blue Shield plans nationwide, BCBS-IL is the largest health insurer in the State of Illinois, as measured by number of subscribers, within its service area, which is defined as the state of Illinois.  HCSC is the fourth largest health insurer in the country by total medical enrollment, with more than 13 million members in Illinois, Texas, Oklahoma, and New Mexico. Approximately 7.3 million of HCSC's members are served by BCBS-IL in all 102 Counties in Illinois.

## II.      TRADE AND COMMERCE

4

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 244 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 169 of 210
E-FILED 2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

13.   BCBSA is a corporation organized under the laws of the state of Illinois and headquartered in Chicago, Illinois.. It is owned and controlled by thirty-eight (38) health insurance plans, including BCBS-IL, that operate under the "Blue Cross and Blue Shield" trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million- or one in three- Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

14.   BCBS-IL and the 37 other health plans that own and control BCBSA are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with health insurance companies throughout the country that specify the geographic areas in which those companies can compete.

15.   The conduct of the Defendant BCBS-IL has substantial effects on trade and commerce in the State of Illinois.

### III.   CLASS ACTION ALLEGATIONS

16.   Pursuant to 735 ILCS 5/2-801, Plaintiffs bring this action on behalf of themselves and the members of the following proposed Class:

> All persons and entities who paid health insurance premiums to BCBS-IL for individual or small group full-service commercial health insurance at any time since four (4) years prior to commencement of this action and were citizens of Illinois on the date of the filing of this complaint. A small group full-service commercial health insurance plan is defined as any plan which provides health insurance benefits for a group consisting of 3-199 persons or employees.

> Excluded from the Class are: (i) Defendant any entity in which Defendant has   a

5

Case MDL No. 2406  Document 389-9  Filed 07/28/17  Page 245 of 645

Case 4:17-cv-00210-JAJ-SBJ  Document 1-7  Filed 06/14/17  Page 170 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

controlling interest, and Defendant's legal representatives, predecessors, successors, and assigns; (ii) governmental entities; (iii) Defendant's employees, officers, directors, agents and representatives and their family members; (iv) the Judge and staff to whom this case is assigned, and any member of the Judge's immediate family; (v) all persons and entities who paid health insurance premiums to BCBS-IL for any policies governed by The Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs reserve the right to amend the class definition as appropriate after class discovery is completed.

17.  The Class is so numerous and geographically dispersed in the State of Illinois that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Class, Plaintiffs believe that there are tens of thousands of Class members, the exact number and identities of which can be obtained from BCBS-IL.

18.  There are questions of law or fact common to the Class and such questions predominate over questions affecting individual members. The common legal and factual questions include, but are not limited to, the following:

       a)  Whether the restrictions set forth in the BCBSA license agreements are per se violations of 740 ILCS 10/3, et seq., or are otherwise prohibited under 740 ILCS 10/3, et seq.;

       b)  Whether, and the extent to which, premiums charged by BCBS-IL to class members have been artificially inflated as a result of the illegal restrictions in the BCBSA license agreements;

       c)  Whether the use of Most Favored Nation ("MFN") provisions in the BCBS-IL provider agreements is anti-competitive, by raising barriers of entry and by increasing the costs of care and insurance;

       d)  Whether, and the extent to which, premiums charged by BCBS-IL have been artificially inflated as a result of the anti-competitive practices adopted by BCBS-IL; and

       e)  Whether the restrictions set forth in the BCBSA license agreements are per se violations of 740 ILCS 10/3, et seq.;

20.  Plaintiffs will fairly and adequately protect the interests of the members of the

6

Class because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due them for the unfair and illegal conduct of which they complain. Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation. Plaintiffs are willing and prepared to serve the Court and the Class members in a representative capacity with all of the obligations and duties material thereto and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

21.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications, establishing incompatible standards of conduct for Defendant.

22.     A class action is an appropriate method for the fair and efficient adjudication of this controversy. The Class is readily definable and is one for which BCBS-IL has records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would produce. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## IV.     FACTUAL BACKGROUND

### A.     General Background and Summary of Allegations

7

23. BCBS-IL enjoys unrivaled market dominance within Illinois, enrolling approximately 55 percent of the market of non-elderly subscribers of full-service commercial health insurance plans. When considering full-service preferred provider organization ("PPO") subscribers alone, BCBS-IL's market dominance is nearly 54 percent of full-service PPO plan subscribers statewide are enrolled with BCBS-IL (PWP to check stats and correct sentence structure).

24. BCBS-IL's market dominance in Illinois is the result of a conspiracy between BCBS-IL and the thirty-seven other insurance companies that license the Blue Cross and/or Blue Shield brands to unlawfully divide and allocate the geographic markets for health insurance coverage in the United States. That conspiracy is implemented through the Blue Cross and Blue Shield license agreements that each licensee has entered into with BCBSA. As detailed herein, the member health insurance plans of BCBSA, including BCBS-IL, entered into a series of licensing arrangements that have insulated BCBS-IL and the other health insurance plans operating under the Blue Cross and/or Blue Shield trademarks from competition in each of their respective service areas.

25. This series of agreements has enabled BCBS-IL to acquire and maintain a grossly disproportionate market share for health insurance products in Illinois, where BCBS-IL enjoys market and monopoly power. The situation in Illinois is not unique, however, as other health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names reap similar benefits in their respective service areas across the United States.

26. BCBS-IL has used its market and monopoly power in Illinois to engage in a number of anti-competitive practices. For example, upon information and belief, BCBS-IL has

8

required key health care providers to agree to so-called "most favored nation" clauses ("MFNs") in their contracts with BCBS-IL. These clauses ensure that BCBS-IL receives the best pricing for health care services in the market. If a health care provider does not agree to the MFN, that provider will not remain in or become a part of BCBS-IL's network, which is generally an unacceptable result because BCBS-IL controls the vast majority of subscribers in Illinois. Faced with this prospect, providers capitulate to BCBS-IL's demands, including MFNs.

27.     The MFNs restrict competition by preventing competitors from negotiating for lower costs and thus raising the prices other health insurers must pay to providers.

28.     Because the BCBSA licensing agreements exclude rival health insurance plans from the market and BCBS-IL's MFNs ensures that its competitors may not negotiate lower health care provider costs, BCBS-IL faces little pressure to constrain its own costs. The MFN, by limiting the ability of an insurer to compete with BCBS-IL, thus also compounds the exclusion of BCBS-IL's rival health insurance plans from the market and the deprivation of consumers of choice in health insurance products. With few other health insurance plan options to compete with, BCBS-IL can raise premiums (and thereby recoup its costs) without any concern that its subscribers may switch to a rival insurance plan. The few consumers who subscribe to rival insurance plans face higher premiums as well, as these plans pass on to their subscribers the high costs set by BCBS-IL with health care providers.

29.     Upon information and belief, because BCBS-IL has implemented MFNs that ensure it receives the best rates in the market without the risk of low cost competition, health care providers have responded by increasing prices to cover the discounts that BCBS-IL receives through its MFNs. Thus, what was supposed to be a discount turns out to be a premium to

9

providers, thereby artificially raising prices for health care services. Again, consumers lose.

30.     Defendant's anti-competitive practices, by reducing the choices available to health insurance consumers and increasing the cost of health care in Illinois, have raised the premiums that Illinois citizens must pay to obtain health insurance. BCBS-IL's rival health insurance plans are excluded from the market, and the few rival plans that have broken into the Illinois market must pay significantly higher rates to health care providers.

31.     The skyrocketing cost of BCBS-IL health insurance coverage in Illinois tells the story of BCBS-IL's abuse of its market and monopoly power at the expense of health care consumers in Illinois.

**B.     Allegations Demonstrating Control of BCBSA By Member Plans**

32.     BCBSA calls itself "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies" and "the trade association for the Blue Cross Blue Shield companies."

33.     BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another. On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

34.     As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n, 711 F.

10

Supp. 1423, 1424-25 (S.D. Ohio 1989).

35. The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA. In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current chairman of the Board of Directors, Daniel J. Loepp, is also the current President and CEO of Blue Cross Blue Shield of Michigan. The Board of Directors of BCBSA meets at least annually.

## C. License Agreements and Restraints on Competition

36. The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"), a standing committee of the BCBSA Board of Directors that is composed of nine member-Plan CEOs and three independent members.

37. The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA. In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant ... must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

38. The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. According to a brief BCBSA filed during litigation in the United States Court of Appeals for the Sixth Circuit, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the

11

App. p. 173

Case MDL No. 2406  Document 389-9  Filed 07/28/17  Page 251 of 645

Case 4:17-cv-00210-JAJ-SBJ  Document 1-7  Filed 06/14/17  Page 176 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

"Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

39.     The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." In a brief it filed during litigation in the United States Court of Appeals for the Sixth Circuit, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on November 18, 2010.

40.     Under the terms of the License Agreements a plan "agrees ... to comply with the Membership Standards." The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised [G]uidelines shall not become effective... unless and until the Board of Directors approves them;" and that "[t]he PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

41.     The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the

12

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 252 of 645

Case 4:17-cv-00210-JAL-SBJ   Document 1-7   Filed 06/14/17   Page 177 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

42.     The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and "Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

43.     The independent Blue Cross and Blue Shield licensees control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In a brief filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the procedure for terminating a license agreement between

13

BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the
BCBSA: "In a double three-quarters vote, each plan votes twice- first with each Plan's vote
counting equally, and then with the votes weighted primarily according to the number of
subscribers."

## D.  Horizontal Agreements

44.     The independent Blue Cross and Blue Shield licensees are potential competitors
that use their control of BCBSA to coordinate their activities.  As a result, the rules and
regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member
plans on themselves.

45.     Each BCBSA licensee is an independent legal organization.  In a pleading
BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he
formation of BCBSA did not change each plan's fundamental independence."  In fact, the
License Agreements state that "[n]othing herein contained shall be construed to constitute the
parties hereto as partners or joint venturers, or either as the agent of the other."

46.     The independent Blue Cross and Blue Shield licensees include many of the largest
health insurance companies in the United States.  The largest health insurance company in the
nation by some measures is WellPoint, a BCBSA licensee.  Similarly, fifteen (15) of the twenty-
five (25) largest health insurance companies in the country are BCBSA licensees.  On its
website, BCBSA asserts that its members together provide "coverage for more than 99 million
individuals - one-in-three Americans" and "contract[s] with more hospitals and physicians than
any other insurer."  Absent the restrictions that the independent Blue Cross and Blue Shield
licensees have chosen to impose on themselves, discussed below, these companies would

14

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 254 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 179 of 210
E-FILED 2018 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

compete against each other in the market for commercial health insurance.

47.     In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination." The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other- and each other's parent Blue Plans - in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed ....

48.     On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that it "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 38] Blue companies." As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies ... works cooperatively in a number of ways that create significant market advantages ...."

49.     As the foregoing demonstrates, BCBSA is a vehicle used by independent health insurance companies to enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its

15

member plans constitutes a horizontal agreement between and among the member plans
themselves.

**E.  The Horizontal Agreements Not to Compete in the Licensing Arrangements
Between BCBSA and Member Plans, Including BCBS-IL, Are per Se
Violations of Illinois Antitrust Act, 740 ILCS 10/1, *et seq.***

50.   The rules and regulations of BCBSA, including, but not limited to, the License
Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements
between competitors, the independent Blue Cross and Blue Shield licensees, to divide the
geographic market for health insurance. As such, they are a per se violation of 740 ILCS 10/1, et
seq. --the Illinois Antitrust Act, and more specifically 740 ILCS 10/3(1)c.

51.   Through the License Agreements, which the independent Blue Cross and Blue
Shield licensees created, control, and enforce, each independent Blue Cross and Blue Shield
licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and
Blue Shield trademarks and trade names outside of a designated "Service Area." The License
Agreement defines each licensee's Service Area as "the geographical area(s) served by the Plan
on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

52.   Through the Guidelines and Membership Standards, which the independent Blue
Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must
agree to comply as part of the License Agreements, each independent Blue Cross and Blue
Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries
generate from within its designated Service Area (excluding Medicare and Medicaid) shall be
derived from services offered under the licensed Blue Cross and Blue Shield trademarks and
trade names. This provision directly limits the ability of each Blue plan to generate revenue

16

from non-Blue branded business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

53. Through the Guidelines and Membership Standards, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business. This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

54. The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its Service Area. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its Service Area (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever

17

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 257 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 182 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

making that investment.

55.    In sum, each independent Blue Cross and Blue Shield licensee has agreed with its

potential competitors that in exchange for having the exclusive right to use the Blue brand within

a designated geographic area, it will derive none of its revenue from services offered under the

Blue brand outside of that area, and will derive at most one-third of its revenue from outside of

its exclusive area, using services offered under a non-Blue brand. The latter amount will be

further reduced if the licensee derives any of its revenue within its designated geographic area

from services offered under a non-Blue brand.

56.    The foregoing restrictions on the ability of Blue plans to generate revenue outside

of their service areas constitute agreements between competitors to divide and allocate

geographic markets, and therefore are per se violations of 740 ILCS 10/1, et seq. --the Illinois

Antitrust Act, and more specifically 740 ILCS 10/3(1)c.

57.    More than one Blue Cross and Blue Shield licensee has publicly admitted the

existence of these territorial market divisions. For example, the former Blue Cross licensee in

Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in

1996 in an effort to block the sale of one member plan to a non-member that might present

increased competition to another member plan.

58.    The largest Blue licensee, WellPoint, is a publicly-traded company, and therefore

is required by the SEC rules to describe the restrictions on its ability to do business. Thus, in its

Form 10-K filed February 17, 2011, WellPoint stated that it had "no right to market products and

services using the BCBS names and marks outside of the states in which we are licensed to sell

BCBS products," and that "[t]he license agreements with the BCBSA contain certain

18

App. p. 180

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 258 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 183 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

requirements and restrictions regarding our operations and our use of the BCBS names and marks, including ... a requirement that at least 80% ... of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

59.    Likewise, in its Form 10-K filed March 9, 2011, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its Service Area], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield name and mark." Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield name and mark is already present."

60.    Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible. When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business .... The rules on

19

Case MDL No. 2406 Document 389-9 Filed 07/28/17 Page 259 of 645

Case 4:17-cv-00210-JAJ-SBJ Document 1-7 Filed 06/14/17 Page 184 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

what the plans do in this regard are contained in the license. However, the license terms
themselves are proprietary to BCBSA, and ... we would prefer not to share such trade secrets
with BCBSA's competitors."

61.    The member plans of BCBSA have agreed to impose harsh penalties on those that
violate the territorial restrictions.    According to the Guidelines, a licensee that violates one of
the territorial restrictions could face "[l]icense and membership termination." If a member plan's
license and membership are terminated, it loses the use of the Blue brands, which BCBSA
admits on its website are "the most recognized in the health care industry." In addition, in the
event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17,
2011 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee as of
December 31, 2010, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield
presence in the vacated service area."

62.    In sum, a terminated licensee would: (a) lose the brand through which it derived
the majority of its revenue; and (b) fund the establishment of a competing health insurer that
would replace it as the Blue licensee in its local area. These penalties essentially threaten to put
out of existence any Blue member plan that breaches the territorial restrictions.

63.    It is unsurprising, then, that most member plans do not operate outside of their
Service Areas. The territorial restrictions have therefore barred all competition by all of the Blue
plans (other than BCBS-IL) from the Illinois commercial health insurance market.

64.    The territorial restrictions agreed to by all BCBSA members operate to restrain
competition by preventing member plans from competing with each other and with non-- Blue
plans. These prohibitions on competition apply no matter how favorable the efficiencies and

20

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 260 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 185 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

**F.     The Anti-competitive Acquisition Restrictions in BCBSA Licensing Agreements**

65.     In addition to the per se illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which BCBS-IL and the other independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

66.     First, the Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA in order to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans could block its membership by majority vote.

67.     Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate automatically: (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power

21

Case MDL No. 2406 Document 389-9 Filed 07/28/17 Page 261 of 645

Case 4:17-cv-00210-JAJ-SBJ Document 1-7 Filed 06/14/17 Page 186 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

of the member plan; (3) if any person become beneficially entitled to 20 percent of more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

68.     These acquisition restraints reduce competition in violation of 740 ILCS 10/1, et seq., Illinois Antitrust Act, and more specifically 740 ILCS 10/3(2) and 740 ILCS 10/3(3), because they substantially reduce the ability of non-member insurance companies to expand their business. In order to expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. Blue provider networks may often be the most cost-effective due to historical tax breaks,

22

favorable legislation, and long-term presence in a region. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

69.  Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 38.

70.  By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is to tend to lessen or to lessen competition and higher premium costs for consumers, including enrollees of BCBS-IL.

**G.    The BCBSA Licensing Agreements Have Reduced Competition in Illinois.**

71.  BCBS-IL, as a licensee, member, and part of the governing body of BCBSA, has conspired with the other member plans of BCBSA to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the per se illegal territorial restrictions in the License Agreements and Guidelines. Many of the member plans with which BCBS-IL has conspired would otherwise be significant competitors of BCBS-IL in Illinois.

72.  For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 34 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue

23

App. p. 185

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 263 of 645

Case 4:17-cv-00210-1AJ-SBJ   Document 1-7   Filed 06/14/17   Page 188 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the
Kansas City area), Nevada, New Hampshire, New York, (as Blue Cross Blue Shield in 10 New
York City metropolitan and surrounding cities, and as Blue Cross or Blue Cross Blue Shield in
selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the
country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions
summarized above, WellPoint would be likely to offer its health insurance services and products
in Illinois in competition with BCBS-IL. Such competition would have resulted in lower health
care costs and premiums paid by BCBS-IL enrollees such as Plaintiff herein.

73.    Over 55 percent of Mississippi citizens who subscribe to full-service commercial
health insurance (whether through group plans or through individual policies) are subscribers of
Blue Cross Blue Shield of Mississippi - vastly more than the next largest full-service commercial
insurer. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield
of Mississippi would be likely to offer its health insurance services and products in Illinois in
competition with BCBS-IL. Such competition would result in lower health care costs and
premiums paid by BCBS-IL enrollees.

74.    Likewise, approximately 53 percent of Arkansas citizens who subscribe to full-
service commercial insurance (whether through group plans or through individual policies) are
subscribers of Blue Cross Blue Shield of Arkansas - vastly more than the next largest full-service
commercial insurer. But for the illegal territorial restrictions summarized above, Blue Cross
Blue Shield of Arkansas would be likely to offer its health insurance services and products in
Illinois in competition with BCBS-IL. Such competition would result in lower health care costs
and premiums paid by BCBS-IL enrollees.

24

75. Similarly, Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, with approximately 3.5 million enrollees. Blue Cross and Blue Shield of Alabama holds a stunning 93 percent share of the market for commercial HMO and PPO health insurance in its Service Area of Alabama. But for the illegal territorial restrictions summarized above, Blue Cross and Blue Shield of Alabama would be likely to offer its health insurance services and products in Illinois in competition with BCBS-IL. Such competition would result in lower health care costs and premiums paid by BCBS-IL enrollees.

76. In addition to the foregoing examples, there are dozens of other Blue plans that would and could compete in Illinois but for the illegal territorial restrictions. As alleged above, fifteen of the twenty-five largest health insurance companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete in Illinois, the result would have been lower costs and thus lower premiums paid by BCBS-IL enrollees, including Plaintiffs.

## H. The Widespread Use By BCBSA Licensees of Anti-competitive Most Favored Nation Clauses

77. Upon information and belief, over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

78. MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor

25

to be higher than the amount the provider charges the Blue entity are often known as "MFN plus" clauses, and typically require the amount to be higher by a specified percentage.

79. Upon information and belief, BCBS-IL's use of MFNs unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices charged, thus making the dominant provider indifferent to the actual price charged. The MFNs thus reduce competition by eliminating an incentive for BCBS-IL to reduce overhead prices.

80. Second, MFNs limit competition by preventing other health insurers in Illinois from achieving lower costs with providers and thereby becoming significant competitors to BCBS-IL. MFNs establish a price floor below which providers will not sell services to BCBS-IL's competitors; indeed, MFNs enable BCBS-IL to raise that price floor. This deters cost competition among health insurers in Illinois. By reducing the ability of BCBS-IL's competitors to compete against BCBS-IL, MFNs ensure that BCBS-IL can substantially raise premiums while maintaining, or even increasing, its market share.

81. Moreover, upon information and belief, if BCBS-IL is certain that no insurer will pay less to a provider than it will, BCBS-IL will be willing to pay more to that provider than it would otherwise. The more BCBS-IL agrees to pay that provider, the more BCBS-IL's competitors must pay that provider. And by raising the price floor, BCBS-IL keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums. As a result, and because of its market power, BCBS-IL can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from BCBS-IL.

26

Case MDL No. 2406  Document 389-9  Filed 07/28/17  Page 266 of 645

Case 4:17-cv-00210-JAJ-SBJ  Document 1-7  Filed 06/14/17  Page 191 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

82.    Third, MFNs raise barriers to entry in the market for commercial health insurance.
If a provider can reduce the price it charges an insurer with little to no market share only by
reducing the price it charges market-dominant BCBS-IL, the provider has a strong incentive not
to lower prices. Without the ability to compete on price, a new competitor will be unable to
price below BCBS-IL, and thus will be unable to survive.

83.    Upon information and belief, the independent Blue Cross and Blue Shield
licensees, including BCBS-IL, use MFNs to exploit the monopoly power they hold in their
respective Service Areas. The independent Blue Cross and Blue Shield licensees, including
BCBS-IL, have coordinated their use of MFNs with other Blue entities.

**I.     BCBS-IL Market Power in Relevant Illinois Markets**

84.    BCBS-IL has market power in the sale of full-service commercial health
insurance to individuals and small groups in relevant geographic markets throughout the State of
Illinois.

**V.     RELEVANT PRODUCT MARKET**

85.    The relevant product market is the sale of full-service commercial health
insurance products to individuals and small groups.

86.    To properly define a health insurance product market, it is useful to consider the
range of health insurance products for sale and the degree to which these products substitute for
one another, i.e., whether, in a competitive market, an increase in the price of one product would
increase demand for the second product. The characteristics of different products are important
factors in determining their substitutability.    For a health insurance product, important
characteristics include:

27

a) Commercial versus government health insurance: Unlike commercial health insurance products, government health insurance programs such as Medicare and Medicaid and privately operated government health insurance programs such as Medicare Advantage are available only to individuals who are disabled, elderly, or indigent. Therefore, commercial health insurance and government health insurance programs are not substitutes;

b) Full-service versus single-service health insurance: Full-service health insurance provides coverage for a wide range of medical and surgical services provided by hospitals, physicians, and other health care providers. In contrast, single-service health insurance provides narrow coverage restricted to a specific type of health care, e.g., dental care. Single-service health insurance is sold as a compliment to full-service health insurance when the latter excludes from coverage a specific type of health care, e.g., dental care. Thus, full-service health insurance and single-service health insurance are not substitutes;

c) Full-service commercial health insurance includes HMO products and PPO products, among others. Traditionally, HMO health insurance plans pay benefits only when enrollees use in-network providers; PPO health insurance plans pay a higher percentage of costs when enrollees use in-network providers and a lower percentage of costs when enrollees use out-of-network providers.   Both types of full-service commercial health insurers compete for consumers based on the price of the premiums they charge, the quality and breadth of their health care provider networks, the benefits they do or do not provide (including enrollees' out-of-pocket costs such as deductibles,

28

co-payment, and coinsurance), customer service, and reputation, among other factors. Economic research suggests that HMO and PPO health insurance products are substitutes;

d) Fully-insured health insurance versus ASO products:  When a consumer purchases a fully-insured health insurance product, the entity from which the consumer purchases that product provides a number of services: it pays its enrollees' medical costs, bears the risk that its enrollees' health care claims will exceed its anticipated losses, controls benefit structure and coverage decisions, and provides "administrative services" to its enrollees, e.g., processes medical bills and negotiates discounted prices with providers.  In contrast, when a consumer purchases an administrative services only ("ASO") product, sometimes known as "no risk," the entity from which the consumer purchases that product provides administrative services only.  Therefore, fully-insured health insurance products and ASO products are only substitutes for those consumers able to self-insure, i.e., able to pay their own medical costs and bear the risk that claims will exceed their anticipated losses; and,

e) Individual, small group, and large group consumers:  Consumers of health insurance products include both individuals and groups, such as employers who select a plan to offer to their employees and typically pay a portion of their employees' premiums. Group consumers are broken down into two categories, small group and large group, based on the number of persons in the group.  The Kaiser Family Foundation, which publishes an influential yearly survey of employer health benefits offered across the United States, defines small firms as those with 3-199 employees and large firms as those

29

with 200 or more employees.

87.   For the purposes of market division, it is appropriate to consider the individual and small group health insurance product market as distinct from the large group health insurance product market. In the former, consumers are largely unable to self-insure and competition is therefore restricted to plans that offer fully-insured health insurance products; in the latter, consumers are able to self-insure and the bulk of competition occurs between firms offering ASO products. For example, across the United States, 84 percent of small group consumers do not self-insure, while 83 percent of large group consumers do self-insure. Even apart from the prevalence of ASO products in each market, individual, small group, and large group product markets are distinct because health insurers can set different prices for these different consumers. Thus, pricing in the large group market would not impact competition in the small group market, and vice versa.

88.   Data on enrollment in full-service commercial health insurance: According to the American Medical Association, although Illinois licenses 15 companies to offer some type of health insurance in Illinois, Blue Cross had 55% of the commercial market share. In Chicago-Naperville-Joliet, Illinois, for example, BCBS-IL has 63 percent of the commercial market; while its nearest competitor, United Healthcare, has 10 percent.

## VI.   RELEVANT GEOGRAPHIC MARKETS

89.   In defining a geographic market, it is important to focus on an essential part of a full-service commercial health insurer's product - its provider network. An insurer's provider network is composed of the health care providers with which it contracts. Enrollees in both HMO and PPO full-service commercial health insurance products pay less for an "in-network"

30

provider's health care services than they would for the same services from an "out of network" provider. As a result, health insurance consumers pay special attention to an insurer's provider network when choosing a health insurance product, preferring insurers with networks that include local providers. This suggests that health insurers compete in distinct geographic markets.

90. There are a number of different ways to analyze the geographic markets for the sale of full-service commercial health insurance to individual and small group consumers in Illinois. The potentially relevant geographic markets could be defined alternatively as: (a) the entire state of Illinois; (b) the eleven regions, known as "Metropolitan Statistical Areas," or (c) twenty-three "Micropolitan Statistical Areas," into which the U.S. Office of Management and Budget divides Illinois. However the geographic market is defined, the result is the same- BCBS-IL has the dominant market position, and exercises market power.

91. BCBS-IL does business throughout the State of Illinois, is licensed to use the Blue Cross and Blue Shield trademarks and trade names throughout the State of Illinois, and has agreed with the other member plans of BCBSA that only BCBS-IL will do business in Illinois under the Blue brand. Therefore, the State of Illinois can be analyzed as a relevant geographic market within which to assess the effects of BCBS-IL's anti-competitive conduct.

92. The U.S. Office of Management and Budget divides the counties of the state of Illinois into Metropolitan Statistical Areas and Micropolitan Statistical Areas according to published standards applied to U.S. Census Bureau data. It states that "[t]he general concept of a metropolitan or micropolitan statistical area is that of a core area containing a substantial population nucleus, together with adjacent communities having a high degree of economic and

31

Case MDL No. 2406 Document 389-9 Filed 07/28/17 Page 271 of 645

Case 4:17-cv-00210-1A1-SBJ Document 1-7 Filed 06/14/17 Page 196 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

social integration with that core." Therefore, each of Illinois's eleven Metropolitan Statistical Areas, twenty-three Micropolitan Statistical Areas, and the remaining counties that are not part of Statistical Areas is a relevant geographic market within which to assess the effects of BCBS-IL's anti-competitive conduct.

93.     BCBS-IL's powerful market share is far from the only evidence of its market power. As alleged below, BCBS-IL's market power has significantly raised costs, resulting in skyrocketing premiums for BCBS-IL enrollees.

94.     Moreover, BCBS-IL's statewide share of the relevant product market has increased each year despite its substantial premium increases. BCBS-IL's ability to retain and increase enrollment while charging artificially inflated and supra-competitive prices is evidence of its market power.

## VII.  INFLATED PREMIUMS CHARGED BY BCBS-IL

95.     For at least the past ten years, BCBS-IL's illegal anti-competitive conduct, including its territorial market division agreements with the thirty-seven other members of BCBSA, has increased health care costs in Illinois, leading to artificially-inflated and supra-competitive premiums for individuals and small groups purchasing BCBS-IL's full-service commercial health insurance in the relevant geographic market(s). Upon information and belief, BCBS-IL's market power and its use of MFNs and other anti-competitive practices in Illinois have reduced the amount of competition in the market and ensured that BCBS-IL's few competitors face higher costs than BCBS-IL does. Without competition, and with the ability to increase premiums without losing customers, BCBS-IL faces little pressure to keep costs low.

96.     Over the past decade, BCBS-IL generally raised individual and small group

32

premiums by amounts greater than the national average. In 2008, for example, BCBS-IL raised individual premiums more than 20 percent in some instances.

97.     These rising premiums have enabled BCBS-IL to grow its surplus in excessive amounts, which is an unusual practice for a self-described nonprofit organization.

## VIII. CAUSES OF ACTION

### COUNT ONE

#### (Contract, Combination, or Conspiracy in Restraint of Trade in Violation of 740 ILCS 10/3 et seq.—Illinois Antitrust Law.)

98.     Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

99.     The License Agreements, Membership Standards, and Guidelines agreed to by BCBS-IL and BCBSA represent horizontal agreements entered into between BCBS-IL and the thirty-seven other member plans of BCBSA, all of whom are competitors or potential competitors in the market for commercial health insurance.

100.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and BCBS-IL represents a contract, combination, and conspiracy within the meaning of 740 ILCS 10/3(1).

101.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and BCBS-IL have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the thirty-eight BCBSA members. By so doing, BCBS-IL and BCBSA (and its members) have conspired to restrain trade in violation of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)c and 740 ILCS 10/3(2). These market allocation agreements are per se illegal under the aforesaid provisions.

102.    The market allocation agreements entered into between BCBS-IL and the thirty-

33

Case MDL No. 2406 Document 389-9 Filed 07/28/17 Page 273 of 645

Case 4:17-cv-00210-JAJ-SBJ Document 1-7 Filed 06/14/17 Page 198 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

seven other BCBSA member plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anti-competitive.

103.    BCBS-IL has market power in the sale of full-service commercial health insurance to individuals and small groups in each relevant geographic and product market alleged herein.

104.    Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

        a.      Reducing the number of health insurance companies competing with BCBS-IL throughout Illinois;

        b.      Unreasonably limiting the entry of competitor health insurance companies into Illinois;

        c.      Allowing BCBS-IL to maintain and enlarge its market power throughout Illinois;

        d.      Allowing BCBS-IL to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts; and,

        e.      Depriving consumers of health insurance of the benefits of free and open competition.

105.    The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

106.    The market allocation agreements in the License Agreements, Membership Standards, and Guidelines unreasonably restrain trade in violation of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)c and 740 ILCS 10/3(2).

34

107.    As a direct and proximate result of Defendant's continuing violations of 740 ILCS 10/3(1)a,740 ILCS 10/3(1)cc and 740 ILCS 10/3(2), Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-IL than they would have paid with increased competition but for the violations of 740 ILCS 10/3(1)a, 740 ILCS 10/3(1)(c) and 740 ILCS 10/3(2).

108.    Plaintiffs and the Class seek treble damages from Defendant for its violations of 740 ILCS 10/3 et seq.

## COUNT TWO

### (MFNs; 740 ILCS 10/3(2))

109.    Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

110.    BCBS-IL has market power in the sale of commercial health insurance to individuals and groups in each relevant geographic market alleged herein.

111.    The provider agreements BCBS-IL entered into between BCBS-IL and health care providers in Illinois that contain MFN provisions constitute contracts, combinations, and conspiracies within the meaning of 740 ILCS 10/3(2).

112.    Each of the BCBS-IL provider agreements containing an MFN has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

    a.    Raising the prices of health care services to commercial health insurers in competition with BCBS-IL;

    b.    Unreasonably restricting price and cost competition among commercial health insurers by limiting or preventing commercial        health        insurance        in

35

App. p. 197

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 275 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 200 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

competition with BCBS-IL from obtaining competitive pricing from health care providers;

c.     Unreasonably restricting the ability of health care providers to offer to BCBS-IL's competitors or potential competitors reduced prices for services that the health care providers and insurers consider to be in their mutual interest; and,

d.     Depriving consumers of health care services and health insurance of the benefits of free and open competition.

113.   The pro-competitive benefits, if any, of the BCBS-IL provider agreements containing MFN provisions do not outweigh the anti-competitive effects of the agreements.

114.   Each agreement between BCBS-IL and a health care provider that contains an MFN unreasonably restrains trade in violation of 740 ILCS 10/3(2), et seq.

115.   As a direct and proximate result of BCBS-IL's continuing violations of 740 ILCS 10/3(2) Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-IL than they would have paid but for the violations of 740 ILCS 10/3 et seq.

116.   Plaintiffs and the Class seek treble damages from BCBS-IL for its violations 740 ILCS 10/3 et seq.

## COUNT THREE

### (Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Private Health Insurance in Violation of 740 ILCS 10/3(3))

117.   Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

118.   BCBS-IL has monopoly power in the individual and small group full-service commercial health insurance market in Illinois. This monopoly power is evidenced by, among

36

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 276 of 645

Case 4:17-cv-00210-1AJ-SBJ   Document 1-7   Filed 06/14/17   Page 201 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

other things:

    a.    BCBS-IL's ability, upon information and belief, to enter into MFN agreements with providers, which evidences BCBS-IL's ability to control prices and exclude competitors; and/or,

    b.    BCBS-IL's high market share of the commercial health insurance market, including its increasing market share even as it has raised premiums.

119.    BCBS-IL has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the premiums it charges to consumers.

120.    BCBS-IL's conduct constitutes unlawful monopolization and unlawful anti-competitive conduct in the relevant markets in violation of 740 ILCS 10/3(3).

121.    As a direct and proximate result of BCBS-IL's continuing violations of 740 ILCS 10/3(3), Plaintiffs and other members of the Class have suffered injury and damages in an amount to be proven at trial. These damages consist of having paid higher health insurance premiums to BCBS-IL than they would have paid but for these violations.

122.    Plaintiffs and the Class seek treble damages from BCBS-IL for its violations of 740 ILCS 10/3 et seq.

## COUNT FOUR

### (Willful Attempted Monopolization in the Relevant Market for Private Health Insurance in Violation of 740 ILCS 10/3(3))

123.    Plaintiffs repeat and re-allege the allegations in the foregoing paragraphs.

124.    BCBS-IL has acted with the specific intent to monopolize the relevant markets.

125.    There was and is a dangerous possibility that BCBS-IL will succeed in its attempt

37

Case MDL No. 2406 Document 389-9 Filed 07/28/17 Page 277 of 645

Case 4:17-cv-00210-JAJ-SBJ Document 1-7 Filed 06/14/17 Page 202 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

to monopolize the relevant markets because BCBS-IL already controls a large percentage of those markets. Further success by BCBS-IL in excluding competitors from those markets will confer a monopoly on BCBS-IL in violation of 740 ILCS 10/3(3).

126.    BCBS-IL's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to Plaintiff and the Class. Premiums charged by BCBS-IL have been higher than they would have been in a competitive market.

127.    Plaintiff and the Class have been damaged as the result of BCBS-IL's attempted monopolization of the relevant markets and seek treble damages.

## COUNT FIVE

### UNJUST ENRICHMENT

128.    Plaintiffs incorporate and re-allege each of the allegations in the foregoing paragraphs.

129.    BCBS-IL has benefitted from its unlawful acts through the overpayments for health insurance premiums paid by Plaintiffs and the other Class members.

130.    It would be inequitable for BCBS-IL to be permitted to retain the benefit of these overpayments that were conferred by Plaintiffs and the Class and retained by BCBS-IL.

131.    By reason of its unlawful conduct, BCBS-IL must make restitution to Plaintiffs and the Class. Further, any actions which might have been taken by Plaintiffs to pursue administrative remedies would have been futile.

132.    In equity, BCBS-IL should not be allowed to retain the economic benefit derived from said improper conduct and should be ordered to pay restitution and pre-judgment interest to Plaintiffs and Class members.

38

App. p. 200

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 278 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-7   Filed 06/14/17   Page 203 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    The Court determine that this action may be maintained as a class action under 735 ILCS 5/2-801, et seq., appoint the Plaintiffs as representatives of the Class, and appoint the undersigned attorneys as Class counsel;

C.    The Court adjudge and decree that the Defendant has violated 740 ILCS 10/1 et seq. and award Plaintiffs and Class appropriate damages and relief;

D.    The Court award compensatory damages to Plaintiffs and Class resulting from the various acts of wrongdoing under the statutory laws of Illinois, in such amounts as represent the losses reasonably suffered by Plaintiffs and Class, as well as any treble damages available under Illinois law;

E.    The Court award Plaintiffs their reasonable costs and attorneys fees as applicable;

F.    The Court render judgment that Defendant has been unjustly enriched by its wrongful conduct, and award restitution to Plaintiffs and the Class;

G.    The Court award Plaintiffs and the Class all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and,

H.    The Court orders such other, further and general relief as is just and proper.

Respectfully submitted,

*Timothy Kelker*

Deborah Piercy and Lisa Tomazolli, on Behalf of
Themselves and All Others Similarly Situated,

39

Case MDL No. 2406  Document 389-9  Filed 07/28/17  Page 279 of 645

Case 4:17-cv-00210-1A1-SBJ  Document 1-7  Filed 06/14/17  Page 204 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

Plaintiffs.

Dale J. Aschemann (#6269347)
Timothy Keller (#6225309)
Aschemann Keller LLC
300 North Monroe
Marion, Illinois 62959
Telephone:   (618) 998-9988
Facsimile:   (618) 993-2565

Robert M. Foote, Esq. (#03124325)
Matthew J. Herman, Esq. (#06237297)
FOOTE, MEYERS, MIELKE &FLOWERS, LLC
28 N. First St., Suite 2
Geneva, Illinois 60134
Telephone:   (630) 232-6333
Facsimile:   (630) 845-8982

Kathleen C. Chavez (#6255735)
CHAVEZ LAW FIRM, P.C..
28 N. First St.
Suite 2
Geneva, Illinois 60134
Telephone:   (630) 232-4480
Facsimile:   (630) 845-8982

Gordon Ball (#1135)
Ball & Scott
555 W. Main Street
Knoxville, Tennessee 37902
Telephone:   (865) 525-7028
Facsimile:   (865) 525-4679

Patrick W. Pendley (# LSBA 10421)
Nicholas R. Rockfort (#LSBA 31305)
Pendley, Baudin & Coffin, L.L.P.
P.O. Box 71
Plaquemine, Louisiana 70765
Telephone:   (225) 687-6396
Facsimile:   (225) 687-6398

Patricia S. Murphy (#6217254)
Murphy Law Office
P.O. Box 220

40

App. p. 202

Energy, Illinois 62933
Telephone:   (618) 964-9640

41

EFILED 2013 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

# Union County, IL

**NOTICE:** By clicking the 'Search' button below, or otherwise using the Judici.com website

| 2012L28  PIERCY, DEBORAH | Last Search \| Information \| Dispositions \| **History** \| Payments \| Fines & Fees |
|---|---|

| Date | Entry | Judge |
|---|---|---|
| | Entered Under: PIERCY, DEBORAH | |
| 04/25/2013 | STIPULATION AND ORDER FILED. | UNASSIGNED |
| 03/08/2013 | TELEPHONE CONFERENCE HELD WITH COUNSEL. COUNSEL HAVE AGREED AND STIPULATED THAT THIS MATTER SHALL BE STAYED DURING PRE-TRIAL STAGE PENDING OUTCOME OF THE CURRENT MDL IN FEDERAL DISTRICT COURT. COUNSEL SHALL NOTIFY THE COURT WHEN ACTION ON THE MATTER IS REQUIRED. ORDER TO BE SUBMITTED. | MB |
| 03/01/2013 | PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO TRANSFER VENUE FILED. PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMIS FILED. | UNASSIGNED |
| 02/01/2013 | DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR STAY AND OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL FILED. | UNASSIGNED |
| 01/30/2013 | PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR STAY, OR IN THE ALTERNATIVE, A PROTECTIVE ORDER FILED. PLAINTIFF'S MOTION TO COMPEL FILED. | UNASSIGNED |
| 01/23/2013 | DEFENDANTS' MOTION FOR STAY OR, IN THE ALTERNATIVE, A PROTECTIVE ORDER FILED. | UNASSIGNED |
| 01/14/2013 | ORDER FILED. ORDER FILED. | UNASSIGNED |
| 01/10/2013 | PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO RESPOND TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO TRNASFER FOR FORUM NON CONVENIENS FILED. | UNASSIGNED |
| 01/08/2013 | PLAINTIFFS' MOTION FOR EXTENSION OF TIME TO RESPOND TO MOTIN TO DISMISS FILED. DEFENDANTS' MOTION TO TRANSFER FOR FORUM NON CONVENIENS FILED. DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO TRANSFER FOR FORUM NON CONVENIENS FILED. | UNASSIGNED |
| 12/21/2012 | MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FILED. | UNASSIGNED |
| 12/05/2012 | ORDER FILED. | UNASSIGNED |
| 11/29/2012 | NOTICE OF STATUS HEARING FILED. | UNASSIGNED |
| 11/28/2012 | Status hearing set for 12/04/2012 at 8:30 in courtroom 1. | |
| 11/27/2012 | JOINDER BY DEFENDANT HEALTH CARE SERVICE CORPORATION IN THE MOTION TO INTERVENE OF BLUE CROSS AND BLUE SHIELD ASSOCIATION FILED. | UNASSIGNED |
| 11/06/2012 | BCBSA'S MOTION FOR EXTENSION OF TIME TO RESOPND TO COMPLAINT FILED. REPLY BRIEF IN SUPPORT OF BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE FILED. | UNASSIGNED |
| 11/05/2012 | CERTIFICATE OF SERVICE FILED | UNASSIGNED |
| 10/22/2012 | PLAINTIFF'S OPPOSITION TO PROPOSED INTERVENOR BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE FILED. | UNASSIGNED |
| 10/19/2012 | PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT FILED. | UNASSIGNED |
| 10/11/2012 | NOTICE OF APPEARANCE FILED. | UNASSIGNED |
| 10/10/2012 | ORDER ON DEFENDANT HEALTH CARE SERVICE CORPORATIONS MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT FILED. ORDER FILED. | UNASSIGNED |
| 10/09/2012 | NOTICE OF FILING OF CORRECTED CERTIFICATE OF SERVICE FOR DEFENDANT HEALTH CARE SERVICE CORPORATION'S APPEARANCE AND MOTION FOR EXTENSION OF TIME FILED. | UNASSIGNED |
| 10/05/2012 | PLAINTIFF'S AMENDED MOTION FOR EXTENSION OF TIME TO RESPOND TO MOTION TO INTERVENE FILED. | UNASSIGNED |
| 10/04/2012 | PLAINTIFFS' AMENDED MOTION FOR EXTENSION OF TIME TO RESPOND TO MOTION TO INTERVENE FILED. APPEARANCE FILED. DEFENDANT HEALTH CARE SERVICE CORPORATION'S MOTION FOR EXTENSION OF TIME TO RESOPND TO COMPLAINT FILED. | UNASSIGNED |
| 10/03/2012 | MOTION TO WITHDRAW MOTION FOR SUBSTITUTION FILED. ORDER FILED. | UNASSIGNED |
| 10/01/2012 | SUMMONS RETURNED WITH PROOF OF SERVICE SHOWING SERVICE ON HEALTH CARE SERVICE CORPORATION FILED. MOTION FOR SUBSITUTION OF JUDGE AS OF RIGHT FILED. NOTICE OF FILING FILED. NOTICE OF FILING FILED. | UNASSIGNED |
| 09/27/2012 | MOTION TO INTERVENE FILED, BRIEF IN SUPPORT OF BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE FILED. | UNASSIGNED |
| 08/21/2012 | ORIGINAL COMPLAINT FILED. AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222 FILED. SUMMONS ISSUED TO HEALTH CARE SERVICE CORPORATION AND RETURNED TO ATTORNEY TO ARRANGE FOR SERVICE. | UNASSIGNED |

App. p. 204

E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

App. p. 205

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | Master File No.:  2:13-CV-20000-RDP |
| | } | |
| ANTITRUST LITIGATION | } | This document relates to all cases. |
| (MDL NO.: 2406) | } | |

### ORDER

Rule 1 of the Federal Rules of Civil Procedure provides that all of the rules "should be construed and, administered to secure *the just, speedy, and inexpensive* determination of every action and proceeding." Fed.R.Civ.P. 1.  With this goal in mind, the court will address recent developments.

## I.    Pending Motions to Dismiss Based On Personal Jurisdiction and Venue

Since the last time this court addressed these issues, even more cases have been filed against the Moving Defendants[1] in varying jurisdictions, and those cases have been transferred to this court by the Judicial Panel for Multidistrict Litigation.[2]  (Docs. # 393, 403, 404, 416).  The Moving Defendants (not all Defendants) have renewed their Motions to Dismiss based on personal jurisdiction and venue in these recently transferred cases.   As this court has noted

---

[1] "Moving Defendants" are Capital BlueCross, Triple-S Salud, Inc., Excellus Health Plan Inc., Blue Cross and Blue Shield of Arizona, Inc., Blue Cross of Idaho Health Service Inc., Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of Kansas, Inc., Blue Cross and Blue Shield of Nebraska, Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Western New York, Inc., Blue Shield of Northeastern New York, HealthNow New York Inc., Blue Cross Blue Shield of Wyoming, Blue Cross and Blue Shield of Mississippi, and California Physicians' Service Inc., d/b/a Blue Shield of California.

[2] Case Nos. 2:15-cv-01345-RDP, 2:15-cv-01346-RDP, 2:15-cv-01347-RDP, 2:15-cv-01348-RDP, 2:15-cv-01349-RDP, 2:15-cv-01475-RDP, and  2:15-cv-01550-RDP, all styled *Conway et al v Blue Cross Blue Shield of Alabama et al*; and Case No. 2:15-cv-01476-RDP, *Hospital Service District 1 of the Parish of East Baton Rouge, Louisiana v. Blue Cross and Blue Shield of Alabama et al*.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 284 of 645

Case 4:17-cv-00210-JHP   Document 169   Filed 03/30/17   Page 209 of 210
E-FILED 2015 DEC 04 3:59 PM POLK - CLERK OF DISTRICT COURT

court cannot try cases transferred to it from another district by the JPML.  523 U.S. 26, 40 (1998).  Because Defendants have made no alternative suggestions that would assist in streamlining the MDL, Defendants, themselves, leave the court with no option for streamlining or a potential bellwether *other* than the cases directly filed in this court, *i.e.*, the Alabama cases.

*American Electric Motor Services Inc. v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02169-RDP, a Subscriber case, and *Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP, a Provider case, are both cases which are a part of this MDL, but which were directly-filed in this court.   They are also the earliest-filed cases in the MDL.  Therefore, because (1) these cases were directly filed in this court, (2) they are the oldest cases in the MDL, and (3) the court has not been presented with (or itself identified) any other streamlining process, the court will issue an accelerated scheduling order applicable to discovery, class certification motions, *Daubert* motions, and dispositive motions in these two directly-filed cases.

## III.     Streamlining Scheduling Order

1.     **Application**.  These deadlines apply to *American Electric Motor Services Inc. v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02169-RDP, and *Conway v. Blue Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP.

2.     **Discovery:**

a.     All fact discovery is to be commenced in time to be completed by **January 13, 2017**.

b.     **Economics Day:** In **January 2017**, the parties should be prepared to make educational presentations regarding the economic issues in this case to the court.  The purpose of this presentation is educational in nature.  A court reporter will not be present

5

and no party may impeach any fact or expert witness based upon statements or submissions made as part of an Economics Day presentation.

      c.      **Reports from retained experts under Fed.R.Civ.P. 26(a)(2)**:

          i.      Due from Plaintiffs by **February 28, 2017**

          ii.      Due from Defendants by **March 28, 2017**

      d.      All expert discovery is to be commenced in time to be completed by **April 28, 2017**.

3.      **Daubert Motions:**  Motions to exclude any expert witness are due on or before **June 1, 2017**.

4.      **Class Certification Motions:** Motions for class certification are due on or before **June 1, 2017**.

5.      **Dispositive Motions:**  All potentially dispositive motions are due on or before **September 7, 2017**.

6.      **Pretrial Conference and Trial:** Should issues in the case remain to be tried the parties shall be ready to conduct a pretrial conference on or after **January 2018**.  A trial date will be set by separate order.

**IV.**      **Conclusion**

This is the plan; there is not an alternative plan.

**DONE** and **ORDERED** this October 30, 2015.

                                      **R. DAVID PROCTOR**
                                      UNITED STATES DISTRICT JUDGE

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 286 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-33   Filed 06/14/17   Page 1 of 2
E-FILED  2017 MAY 22 8:26 AM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>    Plaintiffs,<br><br>and<br><br>STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>    Plaintiffs,<br><br>v.<br><br>WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation,<br><br>    Defendants. | Law No. CVCV050638<br><br><br><br><br><br><br><br>**NOTICE OF APPEARANCE OF BENJAMIN P. ROACH** |

Benjamin P. Roach submits his appearance on behalf of Defendants, Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, and Wellmark Health Plan of Iowa, Inc., in the above-captioned matter.

/s/ Benjamin P. Roach
Benjamin P. Roach   AT0006588
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA  50309
Telephone:  (515) 283-3100
Facsimile:  (515) 283-8045
E-mail:  bproach@nyemaster.com


EXHIBIT
FF

E-FILED  2017 MAY 22 8:26 AM POLK - CLERK OF DISTRICT COURT

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2017, I presented the foregoing document to the Clerk of the Court for filing and uploading into the EDMS system, which will send notification to the EDMS system participants.

*/s/ Benjamin P. Roach*

E-FILED  2015 DEC 07 8:20 AM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br><br>   Plaintiff(s)<br><br>vs.<br><br>WELLMARK HEALTH PLAN OF IOWA<br>INC<br>WELLMARK INC DBA WELLMARK<br>BLUE CROSS AND BLUE SHIELD OF IA<br><br><br>   Defendant(s) | 05771  CVCV050638<br><br>**ORDER TO EXPEDITE DISPOSITION** |

   Upon examination of the above file, upon the Court's own motion, the Court finds that the Defendant(s) have been duly served with notice, no appearance or answer has been timely filed on behalf of Wellmark Health Plan of Iowa Inc, Wellmark Inc DBA Wellmark, Blue Cross and Blue Shield of IA, and no pleadings have been filed to conclude this matter.

   **IT IS THEREFORE ORDERED** that the Plaintiff shall within thirty (30) days of the Order take steps to pursue the relief requested by filing the appropriate pleadings including dispositive motions or a dismissal of the case.

   If no action is taken within THIRTY (30) days of this Order, sanctions may be imposed which may include dismissal of the Petition.

1 of 3

EXHIBIT
G

E-FILED 2015 DEC 07 8:20 AM POLK - CLERK OF DISTRICT COURT

**SO ORDERED** 12/07/2015.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 290 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-8    Filed 06/14/17    Page 3 of 3
E-FILED  2015 DEC 07 8:20 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**      **Case Title**
CVCV050638           CHICOINE AND MUELLER ET AL V WELLMARK ET AL
**Type:**            OTHER ORDER

So Ordered

David Porter, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2015-12-07 08:20:06

E-FILED 2017 MAY 30 3:13 PM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br><br><br>       Plaintiff(s),<br><br>VS.<br><br>WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE CROSS AND BLUE SHIELD OF IA<br><br><br>       Defendant(s) | 05771  CVCV050638<br><br>ORDER GRANTING MOTION |

   Defendant's motion comes before the Court for consideration.  The Court finds that the motion is not resisted, the motion is timely and should be granted.

**IT IS THE ORDER OF THE COURT** that the Defendant's Motion  for Extension of Time for Responsive Pleading (Stipulated) is GRANTED.

IT IS THEREFORE ORDERED that Defendants shall have through June 14, 2017 to file their responsive pleading.

**IT IS SO ORDERED** this 30th day of May, 2017.

1 of 2

EXHIBIT
**GG**

E-FILED 2017 MAY 30 3:13 PM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**          **Case Title**
CVCV050638               BRADLEY CHICOINE AND STEVEN MUELLER ET AL V
                         WELLMARK ET AL
**Type:**                OTHER ORDER

So Ordered

Michael D. Huppert, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2017-05-30 15:11:16

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 293 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-9   Filed 06/14/17   Page 1 of 2
E-FILED 2015 DEC 07 9:05 AM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | **Law No. CVCV050638** |
| Plaintiffs, | |
| and | **APPEARANCE** |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation, | |
| Defendants. | |

NOW COMES Hayward L. Draper and enters his Appearance as counsel for Defendants Wellmark, Inc. d/b/a Wellmark Blue Cross Blue Shield of Iowa, an Iowa corporation, and Wellmark Health Plan of Iowa, Inc., an Iowa corporation.



Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 294 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-9   Filed 06/14/17   Page 2 of 2
E-FILED  2015 DEC 07 9:05 AM POLK - CLERK OF DISTRICT COURT

/s/Hayward L. Draper
Hayward L. Draper, AT0002075
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone:  515-283-3152
Facsimile:  515-283-8045
Email: hld@nyemaster.com
ATTORNEYS FOR DEFENDANTS
WELLMARK, INC. d/b/a WELLMARK BLUE
CROSS AND BLUE SHIELD OF IOWA, an Iowa
corporation, and WELLMARK HEALTH PLAN
OF IOWA, INC., an Iowa corporation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 7th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

/s/ Hayward L. Draper

2

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 295 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-35   Filed 06/14/17   Page 1 of 2
E-FILED 2017 JUN 01 2:02 PM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br><br><br>                    Plaintiff(s),<br><br>VS.<br><br><br>WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE CROSS AND BLUE SHIELD OF IA<br><br><br>                    Defendant(s) | 05771  CVCV050638<br><br>ORDER GRANTING MOTION |

    The Parties Joint motion comes before the Court for consideration.  The Court finds that the motion is not resisted, the motion is timely and should be granted.

**IT IS THE ORDER OF THE COURT** that the Joint Motion  TO SPECIALLY ASSIGN JUDGE HUPPERT is GRANTED.


**IT IS SO ORDERED** this 1st day of June, 2017.


In addition to all persons entitled to a copy of this order, the Clerk shall provide a copy to the following:
Janis Haines- Ct Admin


EXHIBIT
HH

1 of 2

E-FILED 2017 JUN 01 2:02 PM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

| | |
|---|---|
| **Case Number** | **Case Title** |
| CVCV050638 | BRADLEY CHICOINE AND STEVEN MUELLER ET AL V |
| | WELLMARK ET AL |
| **Type:** | OTHER ORDER |

So Ordered

Arthur E. Gamble, Chief District Judge,
Fifth Judicial District of Iowa

Electronically signed on 2017-06-01 14:02:36

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 297 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-10    Filed 06/14/17    Page 1 of 2
E-FILED 2015 DEC 08 8:21 AM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | Law No. CVCV050638 |
| Plaintiffs, | |
| and | |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | **APPEARANCE** |
| Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

Ryan G. Koopmans of Nyemaster Goode, P.C. and enters his appearance on behalf of Defendants' Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, an Iowa corporation, and Wellmark Health Plan of Iowa, Inc..



EXHIBIT
I

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 298 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-10   Filed 06/14/17   Page 2 of 2
E-FILED  2015 DEC 08 8:21 AM POLK - CLERK OF DISTRICT COURT

/s/ Ryan G. Koopmans
Hayward L. Draper AT0002075
John T. Clendenin AT0001529
Ryan G. Koopmans    AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:    (515) 283-3149
Facsimile:    (515) 283-8016
E-Mail:    hdraper@nyemaster.com
            jclendenin@nyemaster.com
            rkoopmans@nyemaster.com

ATTORNEYS FOR DEFENDANTS,
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN OF IOWA,
INC., and Iowa corporation

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 8th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.


/s/ Ryan G. Koopmans

E-FILED 2017 JUN 01 3:24 PM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A CHICOINE, D.C., et al., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br>and<br><br>STEVEN A MUELLER, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br>vs.<br><br>WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, et al.,<br><br>        Defendants. | Case No. CVCV050638<br><br><br><br>**APPEARANCE** |

COMES NOW Alison F. Kanne of the firm Wandro & Associates, P.C. and hereby enters her appearance on behalf of Plaintiffs.

Respectfully submitted,

*/s/ Alison F.Kanne*

Steven P. Wandro        AT0008177
Kara M. Simons        AT0009876
Alison F. Kanne        AT0013262
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, Iowa 50312
Telephone:    515/281-1475
Facsimile:    515/281-1474
swandro@2501grand.com
ksimons@2501grand.com
akanne@2501grand.com

ATTORNEYS FOR PLAINTIFFS



E-FILED 2018 DEC 11 10:40 AM POLK - CLERK OF DISTRICT COURT

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| and | Law No. CVCV050638 |
| STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C.; MARK A. KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| vs. | |
| WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation, | |
| Defendants. | |

## Parties' Request for Extension of Time Regarding Resistance and Reply to Defendants' Motion to Stay and Stipulation of the Parties Regarding Same
### (Hearing Requested)

**COME NOW** Plaintiffs, by and through their undersigned counsel, and

Defendants, by and through their undersigned counsel, and respectfully request that the

1



E-FILED  2015 DEC 11 10:40 AM POLK - CLERK OF DISTRICT COURT

Court grant extension of time for and establish a time schedule for submission of Plaintiffs' Resistance to Defendants' Motion to Stay (filed December 4, 2015) for December 30, 2015, and for submission of Defendants' Reply to Plaintiffs' Resistance for January 11, 2016, and that the Court set a date for Hearing on the Motion to Stay at a time convenient to the Court's schedule after completion of the above-described submissions. The parties stipulate to this joint request and affirm that it is to accommodate existing scheduling conflicts and the intervening holidays and not for delay in these proceedings. Hayward L. Draper confirms that he authorizes his signature on this joint motion and stipulation.

Dated December 11, 2015.

___/s/ Glenn L Norris_____            ____/s/ Hayward L. Draper_____
Glenn L. Norris  AT0005907                   Hayward L. Draper AT0002075
HAWKINS & NORRIS, P.C.                        NYEMASTER GOODE, P.C.
2501 Grand Avenue, Suite C                    700 Walnut Street, Suite 1600
Des Moines, Iowa 50312-5399                   Des Moines, Iowa 50309-3899
Telephone:  515-288-6532                      Telephone: 515-283-3149
Facsimile:  515-281-1474                      Facsimile:  515-283-8016
Email:  gnorris@2501grand.com                 Email: hdraper@nyemaster.com
        gnorrislaw@gmail.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was filed on the 11th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

___/s/ Glenn L Norris_____

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 302 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-37   Filed 06/14/17   Page 1 of 1
E-FILED 2017 JUN 07 4:19 PM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

|  |  |
|---|---|
| BRADLEY A CHICOINE, D.C., et al., on behalf of themselves and those like situated,<br><br>          Plaintiffs,<br>and<br><br>STEVEN A MUELLER, D.C., on behalf of themselves and those like situated,<br><br>          Plaintiffs,<br>vs.<br><br>WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, et al.,<br><br>          Defendants. | Case No. CVCV050638<br><br><br><br>**APPEARANCE** |

COMES NOW Kara M. Simons of the firm Wandro & Associates, P.C. and hereby enters her appearance on behalf of Plaintiffs.

Respectfully submitted,

_/s/ Kara M. Simons_
Steven P. Wandro                    AT0008177
Kara M. Simons                      AT0009876
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, Iowa 50312
Telephone:     515/281-1475
Facsimile:      515/281-1474
swandro@2501grand.com
ksimons@2501grand.com

ATTORNEYS FOR PLAINTIFFS



EXHIBIT
JJ

E-FILED  2015 DEC 11 8:34 PM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

|  |  |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC | 05771  CVCV050638 |
| VS. | ORDER |
| WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE<br>CROSS AND BLUE SHIELD OF IA | |

On December 7, 2015 the Court entered an Order to Expedite.  After consulting with the parties, this Court finds the Order to Expedite should be and is hereby VACATED.

**IT IS SO ORDERED ON THIS DAY 12/11/15.**

Copies to:

WELLMARK HEALTH PLAN OF IOWA INC

WELLMARK INC DBA WELLMARK BLUE CROSS AND BLUE SHIELD OF IA



EXHIBIT

**K**

1 of 3

BRAD CHICOINE DC

BEN WINECOFF DC

LARRY EUGENE PHIPPS
105 WESTWOOD DR
MARSHALLTOWN IA 50158

STEVEN A MUELLER, DC

DR MARK A KRUSE DC PC

BROWN CHIROPRACTIC PC

BRADLEY J BROWN, DC

DR BRADLEY A CHICOINE DC PC

KEVIN MILLER DC

MARK A NILES

ROD R REBARCAK DC

NILES CHIROPRACTIC, INC

HARLEY CHRISTOPHER ERBE
2501 GRAND AVE
DES MOINES IA 50312

GLENN LEONARD NORRIS
HAWKINS & NORRIS, P C
2501 GRAND AVE , #C
DES MOINES IA 50301

STEVEN PETER WANDRO
2501 GRAND AVE, SUITE B
DES MOINES IA 50312
HAYWARD LLOYD DRAPER
700 WALNUT ST., SUITE 1600
DES MOINES IA 50309-3899

RYAN GENE KOOPMANS
700 WALNUT STREET SUITE 1600
DES MOINES IA 50309

Case 4:17-cv-00210-JAJ-SBJ   Document 1-12   Filed 06/14/17   Page 3 of 3

E-FILED  2015 DEC 11 6:34 PM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**     **Case Title**
CVCV050638          CHICOINE AND MUELLER ET AL V WELLMARK ET AL
**Type:**           OTHER ORDER

So Ordered

David Porter, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2015-12-11 18:34:12

### IN THE IOWA DISTRICT COURT FOR POLK COUNTY

|  |  |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C., NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>　　　　　Plaintiffs,<br>and<br><br>STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C., MARK A KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MUELLER, D.C., and LARRY D. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>　　　　　Defendants. | Law No. CVCV050638 |

### MOTION TO INTERVENE

**COMES NOW** Applicant Intervenor Blue Cross and Blue Shield Association ("BCBSA"), and pursuant to Iowa R. Civ. P. 1.407(1), moves the Court for permission to intervene as a matter of right in this case, for the following grounds and reasons:

1.　　　The name and address of the applicant intervenor defendant is:



EXHIBIT
KK

     a.    Blue Cross and Blue Shield Association, 225 Michigan Avenue, Chicago, IL 60601

2.    The applicant intervenor defendant is the owner of the famous Blue Cross® and Blue Shield® trademarks,[1] and licenses those trademarks to a national federation of thirty-six Blue Cross and Blue Shield companies ("Blue Plans"), including named defendant Wellmark, Inc., d/b/a Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc. ("Wellmark"). Collectively, the thirty-six Blue Plans provide healthcare coverage for more than 100 million Americans.

3.    According to Plaintiffs' complaint, Wellmark, Blue Cross and Blue Shield Association ("BCBSA"), BCBSA's other 35 Blue Plan licensees, and some of Wellmark's customers have conspired to suppress fees for chiropractors in violation of the Iowa Competition Act. Specifically, Plaintiffs challenge BCBSA's licensing structure and the rules and procedures governing its BlueCard Program.

4.    Under Iowa Rule of Civil Procedure 1.407(1), anyone shall be permitted to intervene in an action "[w]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Iowa R. Civ. P. 1.407(1)(b). "The court shall grant interventions of right unless the applicant's interest is adequately represented by existing parties." Iowa R. Civ. P. 1.407(4).

---

[1]    Use of these trademarks includes both the design marks and the trade name.

5.      BCBSA has a substantial legal interest in defending its trademarks, licensing structure, and BlueCard program.   BCBSA's ability to protect its interests will necessarily be impacted by disposition of this action.

6.      Wellmark may not adequately represent BCBSA's interests because BCBSA is the sole owner and licensor of the Blue Cross® and Blue Shield® trademarks.   BCBSA is also the exclusive administrator of the BlueCard Program.   The remedy for the alleged harm sought, if granted, necessarily would affect BCBSA's license agreements across the country, as well as the BlueCard Program.

7.      Allowing BCBSA to intervene will not unduly delay the adjudication of the rights of the original parties and will not prejudice any of the original parties.

8.      In the alternative, the Court should allow BCBSA to intervene under Iowa Rule of Civil Procedure 1.407(2).   An application for intervention is allowed "[w]hen an applicant's claim or defense and the main action have a question of law or fact in common."   Iowa R. Civ. P. 1.407(2)(b).   As in dozens of suits across the country that have been consolidated into a federal Multi-District Litigation, plaintiffs implicate BCBSA as an alleged co-conspirator with defendant Wellmark and the other Blue Plans.   Moreover, the fact that both Wellmark and BCBSA are already defending the validity of BCBSA's licensing system and BlueCard program in dozens of similar suits further demonstrates the connection between BCBSA's interests and the claims and defenses in the current litigation.   This justifies BCBSA's permissive intervention.

9.      This motion is supported by the accompanying brief in support.

Dated: June 14, 2017

**DICKINSON, MACKAMAN, TYLER & HAGEN, P.C.**

/s/ *Joan M. Fletcher*
Jeffrey A. Krausman
Joan M. Fletcher
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
Telephone: 515-246-4518
Fax: 515-246-4550
jkrausman@dickinsonlaw.com
jfletcher@dickinsonlaw.com

*Counsel for Blue Cross and Blue Shield Association*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the 14th day of June, 2017.

By:  ____ U.S. Mail          ____ Facsimile        ____ Hand Delivery

        ____ Overnight Courier        ____ Fedex or UPS        ____ E-mail        __X__ eFiling

/s/ *Joan M. Fletcher*
Joan M. Fletcher

Glenn L. Norris AT0005907
HAWKINS & NORRIS, P.C.
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone: 515-288-6532
Facsimile: 515-281-1474
Email: gnorris@2501grand.com

Steven P. Wandro
Kara M. Simons
Alison F. Kanne
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, IA 50312
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
Email: swandro@2501grand.com
Email: ksimons@2501grand.com
Email: akanne@2501grand.com

*Counsel for Plaintiffs*

Hayward L. Draper
Benjamin P. Roach
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Telephone: (515) 283-3100
Facsimile: (515) 283-8045
Email: hdraper@nyemaster.com
Email: bproach@nyemaster.com

*Counsel for Defendants, Wellmark, Inc.*
*d/b/a Wellmark Blue Cross and Blue Shield*
*of Iowa, and Wellmark Health Plan of Iowa,*
*Inc.*

**IN THE IOWA DISTRICT COURT FOR POLK COUNTY**

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C., NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br>and<br><br>STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C., MARK A KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MUELLER, D.C., and LARRY D. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>        Defendants. | Law No. CVCV050638 |

**BRIEF IN SUPPORT OF MOTION TO INTERVENE**

## INTRODUCTION

Plaintiffs challenge the way Blue Cross and Blue Shield Association ("BCBSA") licenses the famous Blue Cross® and Blue Shield® trademarks and implements its BlueCard Program. Specifically, plaintiffs claim that BCBSA conspired with Wellmark and thirty-five other Blue Cross Blue Shield Plans nationwide to allocate markets, fix prices, and engage in other anticompetitive conduct.  Despite leveling these challenges against BCBSA's core licensing practices and BlueCard Program, plaintiffs chose not to name BCBSA as a defendant. Accordingly, BCBSA seeks to intervene as a defendant.

BCBSA's intervention is a textbook application of Iowa Rule of Civil Procedure 1.407. BCBSA has a significant interest in protecting its decades-old licensing structure and its BlueCard Program.  Wellmark, one of dozens of downstream licensees of BCBSA's trademarks, may not adequately protect BCBSA's interests here.  Several courts have already permitted BCBSA to intervene is similar cases across the country.  The same result is appropriate here.

## BACKGROUND

BCBSA is a not-for-profit corporation that owns the nationally recognized Blue Cross and Blue Shield trademarks (the "Blue Marks").  Wellmark is one of thirty-six independent companies across the country to which BCBSA has licensed the Blue Marks.  (Compl. ¶¶ 12, 15.)  Plaintiffs, thirteen Iowa chiropractors, filed this putative class-action lawsuit against Wellmark.  Plaintiffs allege that Wellmark conspired with BCBSA and the other thirty-five Blue Plans to allocate markets, fix prices, and engage in other anticompetitive conduct with the purpose and effect of driving down chiropractor reimbursements to anti-competitive levels.  (*Id.* ¶¶ 1-4.)  Plaintiffs allege that this purported behavior violates the Iowa Competition Law.  *See* Iowa Code ch. 553 (2015).

More specifically, plaintiffs challenge the fact that BCBSA licensed Wellmark to use the Blue Cross Blue Shield name and trademark on an exclusive basis in Iowa — that is, other Blue Plans are not allowed to use the Blue Marks in Iowa.  Plaintiffs claim that this behavior amounts to market allocation, which, according to them, constitutes an unreasonable restraint on trade in violation of the Iowa Competition Act.  (*Id.* ¶¶ 15, 21, 37-39.)

In addition, Plaintiffs challenge BCBSA's BlueCard program, in which Wellmark (among dozens of others) participates.  (*Id.* ¶ 39(g).)  The program enables members of any Blue Plan to receive provider services and the benefits of their member contracts when living or traveling in an area served by another Blue Plan.  BlueCard enables the Blue Plans to operate on a national level.  However, plaintiffs challenge BlueCard as an unlawful conspiracy.  (*Id.*)

Not only does this action challenge BCBSA's licensing agreements and the BlueCard program, it also alleges that BCBSA is part of an on-going conspiracy with Wellmark, some of Wellmark's self-funded account customers, and the other thirty-five Blue Plans nationwide.  (*Id.* ¶¶ 12, 15, 39.)  Plaintiffs allege that these entities conspired "to engage in . . . a pattern of price fixing and other discrimination against the Iowa Provider Plaintiffs," including market allocation, discriminatory fees, and maximum fee schedules.  (*Id.* ¶ 39.)  The complaint is thus broader than an attack on Wellmark's behavior; it alleges that several of BCBSA's core practices and programs are anticompetitive and that BCBSA is a direct participant in the alleged anticompetitive behavior.  However, plaintiffs named only Wellmark as a party.

**ARGUMENT**

A straightforward application of Iowa Rule of Civil Procedure 1.407 justifies BCBSA's intervention.  Intervention is necessary to allow BCBSA to protect its significant interest in its licensing agreements and BlueCard Program across the country.  Plaintiffs' suit challenges the cornerstone of BCBSA's licensing structure—to license its trademarks to Plans in exclusive geographies, which allows Blue Plans to have a strong focus on local areas.  It also challenges the BlueCard Program, which, along with other inter-Plan programs, allows the otherwise-local Blue Plans to create joint products in order to compete against national competitors like Aetna, United Healthcare, and Cigna.  BCBSA has a right, therefore, to intervene in this litigation to defend its licensing system and BlueCard Program.

This is not the first case in which plaintiffs challenged BCBSA's licensing structure without naming BCBSA as a defendant.  Plaintiffs' is one of dozens of cases across the country challenging BCBSA's practice of licensing the Blue Marks in exclusive geographic areas.  Thus far, each of those cases to rule on BCBSA's motion to intervene has granted BCBSA's request. (Order Granting Motion to Intervene, *Morrissey v. Blue Cross & Blue Shield of Tenn., Inc.*, No. 2:12-cv-02359 (W.D. Tenn. Aug. 1, 2012) (attached as Exhibit 1); Order Granting Motion to Intervene, *Piercy v. Health Care Serv. Corp.*, No. 12-L-28 (Ill. Cir. Dec. 5, 2012) (attached as Exhibit 2); Order Granting Motion to Intervene, *Sosebee v. USAble Mutual Ins. Co.*, No. 2:13-cv-00014-RDP (N.D. Ala. Jan. 18, 2013) (attached as Exhibit 3)).  BCBSA respectfully requests that this Court do the same.

## I.   BCBSA is entitled to intervene as a matter of right under Rule 1.407(1).

Iowa Rule of Civil Procedure 1.407(1) provides that, upon a timely motion, a party shall be permitted to intervene as a matter of right "[w]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that

the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Iowa R. Civ. P. 1.407(1)(b).  This rule is nearly identical to Federal Rule of Civil Procedure 24, and federal case law interpreting that rule may be persuasive.  *See Lakes Gas Co. v. Terminal Props., Inc.,* 720 N.W.2d 192 (Iowa Ct. App. 2006).

This rule is remedial and should be "construed liberally, and [all] doubts resolved in favor of the proposed intervenor."  *Turn Key Gaming, Inc. v. Oglasla Sioux Tribe,* 164 F.3d 1080, 1081 (8th Cir. 1999) (interpreting Fed. R. Civ. P. 24); *see also Lakes Gas Co.*, 720 N.W.2d at *4.  In order to satisfy its burden, a proposed intervenor must show four things: (1) its application is timely; (2) the intervenor has an interest in the underlying litigation; (3) disposition of the action may practically impair that interest; and (4) the original parties may not adequately represent that interest.  *In re A.S.*, 883 N.W.2d 539 (Iowa Ct. App. 2016); *see also Kan. Pub. Emp. Ret. Sys. v. Reimer & Kroger Assoc., Inc.*, 60 F.3d 1304, 1307 (8th Cir. 1995) (interpreting Fed. R. Civ. P. 24 (a)).  As several courts have already held, each of those required elements is easily met here.

### A.   BCBSA's application is timely.

When determining if a motion to intervene is timely, Iowa courts have looked to language from the former rule regarding intervention, which suggests that an application would be "timely" at any time before trial begins.  *See, e.g., In Interest of B.B.M.*, 514 N.W.2d 425, 426 (Iowa 1994), *as amended on denial of reh'g* (Apr. 14, 1994); *In re Marriage of Mersman*, 871 N.W.2d 128 n. 3 (Iowa Ct. App. 2015).  Federal courts have stated that timeliness depends on the totality of circumstances, including how far the proceedings have progressed, whether there is any prejudice to the other parties, and the reason for the delay.  *See Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 999 (8th Cir. 1993).

Here, Wellmark has yet to file a responsive pleading and the parties have yet to engage in discovery. Any potential trial is at least months, if not years, away. Therefore, BCBSA's application to intervene is timely. *Id.* (concluding that intervention under Rule 24 was timely even though it was 18 months after the deadline for filing intervention motions because intervention still came before discovery).

    **B.**    **BCBSA has a sufficient legal interest in this litigation, and its ability to protect that interest will be affected by disposition of this action.**

A proposed intervenor must demonstrate that it has "a legal right which will be directly affected" by the outcome of the litigation or "a legal liability which will be directly enlarged or diminished by the judgment or decree therein." *In re J.R.,* 315 N.W.2d 750, 752 (Iowa 1982) (quoting 59 Am. Jur. 2d *Parties* § 138, at 567 (1971)). "The interest test should be construed broadly, so as to include as many parties as practicable and, although the intervenor cannot rely on an interest that is 'wholly remote and speculative,' the interest may be contingent on the outcome of litigation." *Animal Prot. Inst. v. Merriam,* 242 F.R.D. 524, 527 (D. Minn. 2006) (interpreting Fed. R. Civ. P. 24). The Iowa Supreme Court has granted intervention as a matter of right under Rule 1.407(1) when a party was able to show that the action would impact its proceeds earned. *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 289–90 (Iowa 2017), *reh'g denied* (Mar. 3, 2017).

Here, BCBSA has several direct interests in the underlying litigation. ***First***, the mere fact that BCBSA is a party to the licensing agreement at issue in this case confers on BCBSA a legally cognizable interest sufficient to invoke a right to intervene. *See, e.g.*, *Turn Key Gaming, Inc.*, 164 F.3d at 1081-82 (investment company, from which a gaming company borrowed money to construct a casino, could intervene in the gaming company's suit against the casino because various agreements gave the investment company an interest in payments); *SEC v. Flight Transp.*

*Corp.*, 699 F.2d 943, 948 (8th Cir. 1983) (lessor of planes had right to intervene in SEC action against company that owned planes where SEC's receiver took possession of planes).

***Second***, BCBSA has an interest in protecting the use of its trademarks and its licensing agreements with Wellmark in Iowa and Blue Plans nationwide.  Plaintiffs allege that BCBSA's long-standing structure of exclusive brand-use areas is an illegal market allocation.  (Compl. ¶ 15.)  This also confers on BCBSA a direct interest in this litigation.  *See DuTrac Cmty. Credit Union*, 893 N.W.2d at 289-90; *see also Nat'l Parks Conservation Ass'n v. U.S. E.P.A.*, 759 F.3d 969, 976 (8th Cir. 2014) (holding that proposed intervenors "financial stake in the litigation [is] sufficient to satisfy the recognized interest requirement of Rule 24(a)(2)").

***Third***, plaintiffs allege that BCBSA's BlueCard program is a form of anticompetitive discrimination in violation of antitrust laws.  (Compl. ¶ 39.)  The BlueCard program is a pillar of BCBSA's business model; without it, the Blue Plans couldn't operate on a national level.  BCBSA is the sole administrator of the BlueCard Program, and is therefore in a unique position to defend the validity and legality of the program.  This is another direct interest in this litigation.  *See, e.g.*, *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 295 F.3d 1111, 1115 (10th Cir. 2002) ("The threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest.").

***Finally***, BCBSA faces very similar allegations in dozens of class actions across the country that have been consolidated into an MDL pending in Alabama.  *See In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, No. 2:13–cv–20000 (N.D. Ala. 2012) ("MDL No. 2406").  One of these suits was brought by a putative class that includes Iowa providers, including all Iowa chiropractors.  Both lawsuits involve common issues and parties.  BCBSA has a legal interest in ensuring that its defense is consistent across all such matters.

Other courts have already recognized that BCBSA's interests in similar suits are more than sufficient to justify intervention.  (Ex. 1 at 2 (holding that BCBSA's interest in "defend[ing] the legality of contracts to which it is a party" was a sufficient interest to justify intervention); Ex. 2 at 3 (holding that "BCBSA has a sufficient legal interest in the underlying litigation" to intervene as of right); Ex. 3 (granting BCBSA's motion to intervene as of right for good cause shown)).

### C.      Wellmark does not adequately represent BCBSA's interests.

BCBSA's burden to demonstrate that its interests may not be adequately protected by Wellmark is "minimal."  *In re K.P.*, 814 N.W.2d 623 (Iowa Ct. App. 2012) (quoting *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n. 10 (1972)); *Kan. Pub. Emp. Ret. Sys.*, 60 F.3d at 1308 (stating that this requirement under Fed. R. Civ. P. 24(a) "is met by a minimal showing that representation 'may be' inadequate").  An interest of the litigant is adequately represented only when that interest is identical to, or not significantly different from, that of the proposed intervenor.  *Ingredients Unlimited, Inc., v. Scout Ave. Distrib., Inc., et al*, No. 3:09-CV-0034-CRW-RAW, 2009 WL 10666802 (S.D. Iowa June 10, 2009) ("When the interest of a proposed intervenor is the same as one of the existing parties, the existing party will often be seen as adequately representing the proposed intervener's interest.").  A "tactical similarity" between the legal positions of BCBSA and Wellmark is not enough to deny intervention.  *See, e.g. In re K.P.*, 814 N.W.2d 623 (holding that grandmother's interests were not adequately represented by mother in custody dispute even though positions were similar); *Kan. Pub. Emp. Ret. Sys.*, 60 F.3d at 1308 (stating "tactical similarity between [intervener] and the [defendant] does not assure adequate representation" (internal quotations omitted)).

For example, in *Sierra Club v. Robertson*, 960 F.2d 83 (8th Cir. 1992), a group of private persons and an environmental organization sued the Forest Service to bar certain forest management practices in order to protect forest products and tourism.  The State of Arkansas

moved to intervene, arguing that its interests were not adequately represented by the plaintiffs. The plaintiffs and the State had similar objectives: protect forest products and tourism. But the Eighth Circuit held that the State was not adequately represented by the plaintiffs, because the State represented the interests of all citizens, not just the members of the environmental organization. Further, the State had economic and property interests at stake, including its interest in protecting tax revenue. *Id.* at 86.

Intervention is similarly appropriate here. BCBSA is the sole owner and licensor of the famous Blue Marks. It is the only entity that is a party to each licensing agreement entered into with each of the thirty-six Blue Plans that are alleged to be part of the conspiracy. It is also the exclusive administrator of inter-Plan programs, including the BlueCard program. As one of BCBSA's thirty-six downstream licensees, Wellmark is not in a position to defend BCBSA's rights and interests as trademark owner, licensor, or administrator of BlueCard. Rather, BCBSA has a right to and is best positioned to defend a suit claiming that BCBSA's own actions are in violation of the Iowa Competition Act. Other courts have recognized as much. (Ex. 2 at 3 (holding that BCBSA's licensee in Illinois "does not or may not adequately represent BCBSA's interests"); *see also* Exs. 1, 3 (both granting BCBSA's motion to intervene.)

## II.     In the alternative, the Court should exercise its discretion to allow BCBSA to intervene under Rule 1.407(2).

In the alternative, the Court should permit BCBSA to intervene under Iowa Rule of Civil Procedure 1.407(2). Permissive intervention is allowed on timely motion by a proposed intervenor whose "claim or defense and the main action have a question of law or fact in common." Iowa R. Civ. P. 1.407(2)(b); *Countrywide Home Loans, Inc. v. All of the Unknown Claimants*, 730 N.W.2d 210 (Iowa Ct. App. 2007). Rule 1.407(2) does not require that all questions of fact or law raised by the dispute be common. *See* Iowa R. Civ. P. 1.407(2)(b) (allowing intervention when an

applicant's claim or defense and the main action "have *a* question of law or fact in common")
(emphasis added).

　　Here, BCBSA's defenses will involve common questions of law and fact to those raised
by Wellmark.  That BCBSA is a party to the Wellmark licensing agreement in dispute also weighs
in favor of permissive intervention.  *See Countrywide Home Loans, Inc.*, 730 N.W.2d 210
(permitting non-party who was a party to property sale to intervene).  In addition, not only have
Plaintiffs implicated BCBSA as an alleged co-conspirator with Wellmark in this case, both
Wellmark and BCBSA are defending against very similar allegations in MDL No. 2406.  That
these same entities are already defending the validity of BCBSA's licensing system and BlueCard
program in dozens of similar suits that have been consolidated in multi-district lawsuit further
demonstrates the connection between BCBSA's interests and the claims and defenses in the current
litigation.  This justifies BCBSA's permissive intervention.  (Ex. 2 at 4 (holding that BCBSA "has
also established and met the criteria for permissive intervention"); *see also* Exs. 1, 3.)

## CONCLUSION

For these reasons, BCBSA respectfully requests this Court grant its motion and allow it to intervene as a defendant in this matter.[1]


Dated: June 14, 2017

**DICKINSON, MACKAMAN, TYLER & HAGEN, P.C.**

*/s/ Joan M. Fletcher*
Jeffrey A. Krausman
Joan M. Fletcher
699 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3986
Telephone: 515-246-4518
Fax: 515-246-4550
jkrausman@dickinsonlaw.com
jfletcher@dickinsonlaw.com

*Counsel for Blue Cross and Blue Shield Association*

---

[1]   Rule 1.407(3) requires that a motion to intervene be accompanied by a pleading setting forth the claim or defense for which intervention is sought.  The purpose of Rule 24(c) is to inform the court of the right asserted by the would-be-intervenor.  *See United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009).  In accordance with Iowa Rule of Civil Procedure 1.407(3), BCBSA states that it is requesting permission to intervene to defend against all the allegations and claims in Plaintiffs' complaint.  Wellmark's motion to dismiss (or answer) has not yet been filed, so a dismissal brief from BCBSA with its intervention motion would be premature.  To the extent the Court desires a formal filing, BCBSA requests leave to file a motion to dismiss at a time this Court deems appropriate.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the 14th day of June, 2017.

By:  ____ U.S. Mail  ____ Facsimile  ____ Hand Delivery

  ____ Overnight Courier  ____ Fedex or UPS  ____ E-mail  __X__ eFiling

/s/ Joan M. Fletcher
Joan M. Fletcher

Glenn L. Norris AT0005907
HAWKINS & NORRIS, P.C.
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone: 515-288-6532
Facsimile: 515-281-1474
Email: gnorris@2501grand.com

Steven P. Wandro
Kara M. Simons
Alison F. Kanne
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, IA 50312
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
Email: swandro@2501grand.com
Email: ksimons@2501grand.com
Email: akanne@2501grand.com

*Counsel for Plaintiffs*

Hayward L. Draper
Benjamin P. Roach
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309
Telephone: (515) 283-3100
Facsimile: (515) 283-8045
Email: hdraper@nyemaster.com
Email: bproach@nyemaster.com

*Counsel for Defendants, Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, and Wellmark Health Plan of Iowa, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| MARY MORRISSEY, individually<br>and on behalf of all others<br>similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF<br>TENNESSEE, INC.,<br><br>    Defendant. | No. 12-2359 |

ORDER GRANTING MOTION TO INTERVENE

Before the Court is the Blue Cross and Blue Shield
Association's ("BCBSA") June 12, 2012 motion to intervene.
(Mot., ECF No. 7.)   Plaintiff Mary Morrissey ("Morrisey")
responded in opposition on June 29, 2012 (Resp., ECF No. 13),
and BCBSA replied on July 25, 2012.   (Reply, ECF No. 25.)   For
the following reasons, the Court GRANTS BCBSA's Motion.

The gravamen of Morrissey's complaint is that Blue Cross
and Blue Shield of Tennessee, Inc. ("BCBS-TN") has inflated
premiums as a result of a conspiracy in violation of the Sherman
Antitrust Act between BCBS-TN and other Blue Cross and Blue
Shield entities that are acting in concert through BCBSA.   (Am.
Compl. ¶ 1.)   Morrissey alleges that BCBSA was created to
coordinate the plans of Blue Cross and Blue Shield entities in

EXHIBIT

thirty-eight states.  (<u>Id.</u> ¶ 11.)  She alleges that the market share allocation agreements between BCBS-TN and BCBSA, reflecting this coordination, are illegal.  (<u>Id.</u> ¶¶ 2, 6.)

BCBSA moves to intervene to defend the legality of contracts to which it is a party.  For good cause shown, the motion to intervene is GRANTED.


So ordered this 30th day of July, 2012.


/s Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

## IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
## UNION COUNTY, ILLINOIS

Deborah Piercy and Lisa Tomazolli, on )
Behalf of Themselves and All Others )
Similarly Situated, )
         )
     Plaintiffs, )
         )
     vs. )     <u>NO.  12-L-28</u>
         )
HEALTH CARE SERVICE CORPORATION )
D/B/A BLUE CROSS BLUE SHIELD OF )
ILLINOIS, )
         )
     Defendant. )

REMINDER DATE _____
DUE DATE _____

DEC 0 7 2012

INITIALS _____

FILED
DEC 0 5 2012

*Lonnie Masland*
CLERK OF THE CIRCUIT COURT
FIRST JUDICIAL CIRCUIT
UNION COUNTY, ILLINOIS

### ORDER

THIS CAUSE coming on for consideration on the following pleadings:

    1)    Blue Cross and Blue Shield Association's MOTION TO INTERVENE and BRIEF IN SUPPORT thereof;

    2)    Plaintiffs, Deborah Piercy and Lisa Tomazolli, PLAINTIFFS' OPPOSITION TO PROPOSED INTERVENOR BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE;

    3)    Blue Cross and Blue Shield Association's REPLY BRIEF IN SUPPORT OF BLUE CROSS AND BLUE SHIELD ASSOCIATION'S MOTION TO INTERVENE; and

    4)    Defendant Health Care Service Corporation's JOINDER BY DEFENDANT HEALTH CARE SERVICE CORPORATION IN THE MOTION TO INTERVENE OF BLUE CROSS AND BLUE SHIELD ASSOCIATION.

    After considering the pleadings and the current statutory and case law, the Court does hereby FIND:

    1.    The Court must first address the procedural issues argued by the parties.  The Plaintiffs argue that the movant, Blue Cross and Blue Shield Association's ("BCBSA") MOTION TO INTERVENE should be denied for its failure to comply with the procedural requirements of 735 ILCS 5/2-408(e) which states:

**EXHIBIT**

A person desiring to intervene shall present a petition setting forth the grounds for the intervention, accompanied by the initial pleading or motion which he or she proposes to file. In cases in which the allowance of intervention is discretionary, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Both the Plaintiffs and BCBSA cite the case of <u>Soyland Power Co-op. v. Ill. Power Co.</u>, 213 Ill.App.3d 916, 572 N.E.2d 462 (Ill. App. 4th Dist. 1991), *appeal denied* 162 Ill.Dec. 509, 580 N.E.2d 135 (Ill. 1991), as well as several other Illinois and Federal cases in support of their respective positions on this issue. In <u>Soyland</u>, the 4th District Appellate Court held:

> The purpose of section 2-408(e) of the Code is to give both the trial court and any opposing party a clear indication of the relief the potential intervenor will be seeking if his petition to intervene is granted. This purpose is achieved by the requirement that the potential intervenor's initial pleading he proposes to file be attached to the petition to intervene. Only when the goals of the potential intervenor are revealed in this fashion can the trial court and any opposing party assess the appropriateness of the petition to intervene. Indeed, the very case before us, with the confusion we have already cited as to the goals of the potential intervenors, demonstrates the wisdom of the policy underlying the requirement of section 2-408(e) of the Code that the intervenor's proposed initial pleading be attached to the petition to intervene.

<u>Soyland</u>, 213 Ill.App.3d at 920, 572 N.E.2d at 465.

The Plaintiffs argue that a strict reading of §5/2-408(e) requires BCBSA to provide the Court and opposing counsel with a proposed pleading along with its motion to intervene. BCBSA contends that both the Illinois courts and the Federal courts in construing Federal Rule of Civil Procedure 24(c) have taken a more flexible approach in dealing with the issue. In rendering its decision, the Court considers BCBSA's entire MOTION TO INTERVENE and BRIEF IN SUPPORT thereof. Those pleadings give the Court and opposing counsel in-depth factual and legal reasoning as to why the Court should allow the intervention. It is the Court's opinion that the MOTION TO INTERVENE and BRIEF IN SUPPORT thereof are procedurally sufficient to indicate to the Court and opposing counsel BCBSA's reasons to request intervention and, accordingly, it denies the Plaintiffs' request to dismiss the MOTION TO INTERVENE pursuant to §5/2-408(e).

2

2.      Turning to the substantive arguments regarding the proposed intervention, BCBSA contends that it should be permitted to intervene in this action as a matter of right based upon 735 ILCS 5/2-408(a) which states in pertinent part:

> (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action.

Counsel for both the Plaintiffs and BCBSA cite the various elements the Court must consider in rendering its decision and numerous cases in support of their respective positions. As argued by BCBSA, the basic tenet of the intervention statute is that it is remedial and should be liberally construed; however, a movant (BCBSA) is required to allege specific facts that demonstrate that it has a right to intervene. Warbucks Investments Ltd. Partnership v. Rosewell, 241 Ill.App.3d 814, 609 N.E.2d 832 (Ill. App. 1st Dist. 1993). In order to allow intervention as a matter of right, the Court must determine: (1) the application is timely; (2) the movant must have a sufficient interest in the underlying litigation; and (3) that the original parties do or may not adequately represent the movant's interest. City of Chicago v. John Hancock Mut. Life Ins. Co., 127 Ill.App.3d 140, 468 N.E.2d 428 (Ill. App. 1st Dist. 1984), *appeal denied*. The Court must also note its consideration of the similar state court and predominantly federal court cases filed in numerous jurisdictions throughout the United States involving these same parties.

Based upon the Court's consideration of the pleadings and relevant statutory and case law, the Court's opinion is that BCBSA's MOTION TO INTERVENE was filed shortly after the original COMPLAINT was filed and is, therefore, timely. Based upon BCBSA's in-depth reasoning on the issue, the Court's opinion is that BCBSA has a sufficient legal interest in the underlying litigation. Further, based upon BCBSA's contentions and the JOINDER BY DEFENDANT HEALTH CARE SERVICE CORPORATION IN THE MOTION TO INTERVENE OF BLUE CROSS AND BLUE SHIELD ASSOCIATION, the Court's opinion is that the original defendant in this action does not or may not adequately represent BCBSA's interests. Therefore, the Court's opinion is that BCBSA has established and met the criteria for intervention pursuant to §5/2-408(a)(2).

3

3.      In the alternative, BCBSA contends that the Court should exercise its independent discretion and  permit it to intervene in this action pursuant to 735 ILCS 5/2-408(b) which states:

> Upon timely application anyone may in the discretion of the court be permitted to intervene in an action: . . . (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

Under §5/2-408(b), the Court may exercise its discretion upon timely application and grant permissive intervention when a statute confers the conditional right to intervene or when a movant's claim in the main action concerns a common question of law or fact. In re Estate of Mueller, 275 Ill.App.3d 128, 655 N.E.2d 1040 (Ill. App. 1st Dist. 1995), appeal denied 164 Ill.2d 564, 660 N.E.2d 1269.  When considering whether discretionary intervention should be authorized, the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.  University Square, Ltd. v. City of Chicago, 73 Ill.App.3d 872, 392 N.E.2d 136 (Ill. App. 1st Dist. 1979).

As stated above, the Court's opinion is that BCBSA's MOTION TO INTERVENE is timely.  Further, based upon the pleadings and relevant statutory and case law, the Court's opinion is that BCBSA has established that a common question of law or fact exists in this matter and that granting the MOTION TO INTERVENE will not unduly delay or prejudice the rights of the original parties.  Therefore, the Court's opinion is that BCBSA has also established and met the criteria for permissive intervention pursuant to §5/2-408(b)(2).

THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

1.      Blue Cross and Blue Shield Association's MOTION TO INTERVENE is granted.

2.      Blue Cross and Blue Shield Association is granted 28 days to file responsive pleadings.

DATED this _____5th_____ day of December, 2012.


PRESIDING CIRCUIT JUDGE

4

FILED

2013 Jan-18  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **WILLIAM LEE SOSEBEE,** | } | |
| **individually and on behalf of all others** | } | |
| **similarly situated,** | } | |
| | } | |
| **Plaintiffs,** | } | **Case No.:  2:13-CV-00014-RDP** |
| | } | |
| **v.** | } | |
| | } | |
| **USABLE MUTUAL INSURANCE** | } | |
| **COMPANY, d/b/a ARKANSAS BLUE** | } | |
| **CROSS AND BLUE SHIELD,** | } | |
| | } | |
| **Defendant.** | } | |

## ORDER

This case is before the court on Blue Cross and Blue Shield Association's Motion to Intervene

(Doc. # 3).  For good cause shown, and because the Motion is unopposed, Blue Cross and Blue

Shield Association's Motion to Intervene (Doc. # 3) is **GRANTED**.

**DONE** and **ORDERED** this _____18th_____ day of January, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

**EXHIBIT**

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br><br>        Plaintiff(s),<br><br>VS.<br><br>WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE CROSS AND BLUE SHIELD OF IA<br><br><br>        Defendant(s) | 05771  CVCV050638<br><br>ORDER GRANTING MOTION |

    The Parties' motion comes before the Court for consideration.  The Court finds that the motion is not resisted, the motion is timely and should be granted.

**IT IS THE ORDER OF THE COURT** that the parties' Motion  for Extension of Time Regarding Resistance and Reply to Defendants' Motion to Stay and Stipulation of the Parties Regarding Same is GRANTED.
Hearing is scheduled on 01/22/2016 at 8:30 AM at the Polk Co Courthouse, 500 Mulberry St, CtRm 308, DSM IA 50309.

The Court grants the extension of time as requested in the joint motion.  Specifically, Plaintiff shall file their written resistance no later than December 30, 2015.  Defendants shall file their reply to Plaintiffs' resistance no later than January 11, 2016

**IT IS SO ORDERED** this 14th day of December, 2015.

1 of 3

EXHIBIT

**L**

E-FILED  2015 DEC 14 9:32 AM POLK - CLERK OF DISTRICT COURT

E-FILED 2015 DEC 14 9:32 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| CVCV050638 | CHICOINE AND MUELLER ET AL V WELLMARK ET AL |
| **Type:** | OTHER ORDER |

So Ordered

David Porter, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2015-12-14 09:30:20

E-FILED  2018 DEC 28 11:46 AM POLK - CLERK OF DISTRICT COURT

**IN THE IOWA DISTRICT COURT FOR POLK COUNTY**

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | Law No. CVCV050638 |
| Plaintiffs, | |
| and | APPEARANCE |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

John T. Clendenin of Nyemaster Goode, P.C. and enters his appearance on behalf of Defendants' Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, an Iowa corporation, and Wellmark Health Plan of Iowa, Inc..



E-FILED  2015 DEC 28 11:46 AM POLK - CLERK OF DISTRICT COURT

*/s/ John T. Clendenin*
Hayward L. Draper  AT0002075
John T. Clendenin  AT0001529
Ryan G. Koopmans    AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:     (515) 283-3149
Facsimile:     (515) 283-8016
E-Mail:     hdraper@nyemaster.com
    jclendenin@nyemaster.com
    rkoopmans@nyemaster.com

ATTORNEYS FOR DEFENDANTS,
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN OF IOWA,
INC., and Iowa corporation

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 28th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

/s/ John T. Clendenin

E-FILED  2015 DEC 30 1:41 PM POLK - CLERK OF DISTRICT COURT

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br><br>and<br><br>STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., BROWN CHIROPRACTIC, P.C.; MARK A. KRUSE, D.C., DR. MARK A. KRUSE, D.C., P.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>        Defendants. | Law No. CVCV050638 |

# Plaintiffs' Brief in Resistance to Wellmark's Motion to Stay
# (Hearing Scheduled for January 22, 2016)

1



E-FILED 2015 DEC 30 11:41 PM POLK - CLERK OF DISTRICT COURT

**COME NOW** Plaintiffs, by and through their undersigned counsel, and hereby resist Wellmark's Motion to Stay and submit the following authorities in support of the resistance.

Wellmark's Motion to Stay fails for one very apparent reason. The leading Iowa case, *First Midwest Corp. v. Corporate Fin. Assocs.*, 663 N.W.2d 888, 891 (Iowa 2003), clearly states that a district court has discretion to stay a case pending before it "[w]here a prior foreign action involves the same parties and the same issues and is pending before a court capable of doing prompt and complete justice." In the first instance, none of the parties to the *Chicoine/Mueller* case before this Court are parties to the multidistrict litigation, *In re: Blue Cross Blue Shield Antitrust* Litigation, MDL No. 2406, pending before the Northern District of Alabama, except Wellmark, Inc., itself. None of the plaintiffs here are parties to any litigation in MDL 2406 and defendant Wellmark Health Plan of Iowa, Inc. is not a party to any litigation in MDL 2406.

Secondly, Judge R. David Proctor, of the Northern District of Alabama, who is the transferee judge in MDL 2406, does not have the power to give the plaintiffs in this *Chicoine/Mueller* case "prompt and complete justice." At its core, multidistrict litigation is only available for those civil cases that involve at least one common question of fact and that are pending in more than one federal district court. 28 U.S.C.A. § 1407(a) (2015). If these requirements are met the Judicial Panel on Multidistrict Litigation ("Panel") may transfer the actions "to any district court for coordinated and consolidated pretrial proceedings," provided that doing so is convenient for the parties and witnesses and will enhance the prospects for just and efficient proceedings.

Transfers may be initiated sua sponte by the Panel or by motion of any party to an action that wishes to have the proceedings consolidated. 28 U.S.C.A. § 1407(c)(i)-(ii) (2015)

The transferee court has broad power to preside and rule on the pretrial aspects of litigation. *See In re Patenaude*, 210 F.3d 135, 142-46 (3d Cir. 2000). But without consent from the parties that is where its power ends.[1] In fact, a transferee court does not have the ability to try a case that has been transferred to it by the Panel without first obtaining a waiver of any venue objections that the parties may have.[2] The Supreme Court unequivocally expressed this view in *Lexecon v. Milberg Weiss Bershad Hynes & Lerach*, by noting that the text of § 1407 "obligates the Panel to remand any pending case to its originating court when, at the latest, those pretrial proceedings have run their course."[3]

The Scheduling Order for MDL 2406 dated October 30, 2015, found at Wellmark's Appendix at pp. 206-08, makes this lack of power clear.

"As this court has noted court cannot try cases transferred to it from another district by the JPML. 523 U.S. 26, 40 (1998). Because Defendants

---

[1] *See* 28 U.S.C.A. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated . . . ."); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998); *see also* Fallon, et al., *supra* note 4, at 2328 (noting that the only real limit on a transferee court's authority is that it may not unilaterally transfer cases to itself for trial).

[2] *Lexecon*, 523 U.S. at 40.

[3] *Lexecon*, 523 U.S. at 34.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 338 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-15    Filed 06/14/17    Page 4 of 8
E-FILED  2015 DEC 30 11:41 PM POLK - CLERK OF DISTRICT COURT

> have made no alternative suggestions that would assist in streamlining the
> MDL, Defendants, themselves, leave the court with no option for
> streamlining or a potential bellwether other than the cases directly filed in
> this court, i.e., the Alabama cases."

Indeed, Wellmark, Inc. is not among the defendants in MDL 2406 who are "moving

defendants." Scheduling Order, App. p. 206 n. 1.

Judge Proctor is proceeding with discovery and trial of only two cases, which he

intends to be bellwether cases to perhaps induce a settlement of other cases in MDL

2406. "These deadlines apply to *American Electric Motor Services Inc. v. Blue Cross*

*and Blue Shield of Alabama et al*, Case No. 2:12-cv-02169-RDP, and *Conway v. Blue*

*Cross and Blue Shield of Alabama et al*, Case No. 2:12-cv-02532-RDP." Scheduling

Order, App. p. 207 ¶ 1. There are no Iowa citizen plaintiffs in either of those cases, and

certainly not these *Chicoine/Mueller* plaintiffs. All of the other MDL 2406 cases are

stayed *until on or after January 2018*. Scheduling Order, App. p. 208 ¶ 6 (emphasis

added).

Wellmark is not-so-subtly suggesting to this Court that some kind of favorable

ruling on antitrust issues in MDL 2406 will be binding on these plaintiffs.  There are

several reasons why this is not so. One of the factors stated in *First Midwest Corp.* is

"the possibility that a judgment entered in the foreign jurisdiction will give rise to

collateral estoppel or will render the matter before the court res judicata." For either

collateral estoppel or res judicata to apply, the party against whom issue or claim

preclusion can apply must be a party to the foreign (MDL 2406) litigation. Again, the

*Chicoine/Mueller* plaintiffs are not parties to MDL 24o6, nor will they ever be, under

E-FILED  2013 DEC 30 11:41 PM POLK - CLERK OF DISTRICT COURT

any circumstances. If a class of chiropractors might some day be declared in MDL 2406, these plaintiffs will opt out after being given notice under F.R.C.P. 23.

This whole concept of "virtual representation" through some other plaintiff somewhere losing some other lawsuit, has been given the heave-ho by the United States Supreme Court in *Taylor v. Sturgell*, 553 U.S. 880, 892-93, 128 S. Ct. 2161, 2171-72, 171 L. Ed. 2d 155 (2008):

> The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata." Under the doctrine of claim preclusion, a final judgment forecloses "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Issue preclusion, in contrast, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment," even if the issue recurs in the context of a different claim. *Id.*, at 748–749, 121 S.Ct. 1808. By "preclud[ing] parties from contesting matters that they have had a full and fair opportunity to litigate," these two doctrines protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

> A person who was not a party to a suit generally has not had a "full and fair opportunity to litigate" the claims and issues settled in that suit. The application of claim and issue preclusion to nonparties thus runs up against the "deep-rooted historic tradition that everyone should have his own day in court." *Richards*, 517 U.S., at 798, 116 S.Ct. 1761 (internal quotation marks omitted). Indicating the strength of that tradition, we have often repeated the general rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry*, 311 U.S., at 40, 61 S.Ct. 115. *See also*, e.g., *Richards*, 517 U.S., at 798, 116 S.Ct. 1761; *Martin v. Wilks*, 490 U.S. 755, 761, 109 S.Ct. 2180, 104 L.Ed.2d 835

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 340 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-15   Filed 06/14/17   Page 6 of 8
E-FILED   2015 DEC 30 11:41 PM POLK - CLERK OF DISTRICT COURT

(1989); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

Wellmark suggests that the *Chicoine/Mueller* plaintiffs are "parties" to the undetermined MDL 2406 class action brought by a single Iowa chiropractor because he joined the MDL 2406 provider class action litigation as a plaintiff in the Corrected Consolidated Second Amended Provider Complaint, filed November 25, 2014. Wellmark Appendix, p. 3. The purported class sought to be represented by the Iowa plaintiff and numerous other providers of health care services, equipment or supplies is defined in ¶ 376 as:

> All healthcare providers, not owned or employed by any of the Defendants, in the United States of America, who provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant within four years prior to the date of the filing of this action.

Even in the event that Judge Proctor, after hearing, refused to certify such an immense and diverse class, that action would not be binding on the plaintiffs here and the class sought here. *Smith v. Bayor Corp.*, 564 U.S. 299, 131 S. Ct. 2368, 2379-81, 180 L. Ed. 2d 341 (2011). In *Smith v. Bayor Corp.*, a federal district court enjoined a state district court from considering class action certification because the federal district court had denied a similar class-certification motion that had been filed against Bayer by a different plaintiff. The Supreme Court reversed:

> Bayer's first claim ill-comports with any proper understanding of what a "party" is. In general, "[a] 'party' to litigation is '[o]ne by or against whom a lawsuit is brought,' " *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, ––––, 129 S.Ct. 2230, 2234, 173 L.Ed.2d 1255 (2009), or one who "become[s] a party by intervention, substitution, or third-party practice," *Karcher v. May*, 484 U.S. 72, 77, 108 S.Ct. 388, 98 L.Ed.2d 327

6

(1987). And we have further held that an unnamed member of a certified class may be "considered a 'party' for the [particular] purpos[e] of appealing" an adverse judgment. *Devlin v. Scardelletti*, 536 U.S. 1, 7, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002). But as the dissent in Devlin noted, no one in that case was "willing to advance the novel and surely erroneous argument that a nonnamed class member is a party to the class-action litigation before the class is certified." *Id.*, at 16, n. 1, 122 S.Ct. 2005 (opinion of SCALIA, J.). Still less does that argument make sense once certification is denied. The definition of the term "party" can on no account be stretched so far as to cover a person like Smith, whom the plaintiff in a lawsuit was denied leave to represent.10 If the judgment in the McCollins litigation can indeed bind Smith, it must do so under principles of non party preclusion.

<center>*        *        *</center>

Bayer's strongest argument comes not from established principles of preclusion, but instead from policy concerns relating to use of the class action device. Bayer warns that under our approach class counsel can repeatedly try to certify the same class "by the simple expedient of changing the named plaintiff in the caption of the complaint." Brief for Respondent 47–48. And in this world of "serial relitigation of class certification," Bayer contends, defendants "would be forced in effect to buy litigation peace by settling." Id., at 2, 12; *see also In re Bridgestone/Firestone, Inc., Tires Prods. Liability Litigation*, 333 F.3d 763, 767 (C.A.7 2003) (objecting to an "an asymmetric system in which class counsel can win but never lose" because of their ability to relitigate the issue of certification).

But this form of argument flies in the face of the rule against nonparty preclusion. That rule perforce leads to relitigation of many issues, as plaintiff after plaintiff after plaintiff (none precluded by the last judgment because none a party to the last suit) tries his hand at establishing some legal principle or obtaining some grant of relief. We confronted a similar policy concern in Taylor, which involved litigation brought under the Freedom of Information Act (FOIA). The Government there cautioned that unless we bound nonparties a " 'potentially limitless' " number of plaintiffs, perhaps coordinating with each other, could "mount a series of repetitive lawsuits" demanding the selfsame documents. 553 U.S., at 903, 128 S.Ct. 2161. But we rejected this argument, even though the payoff in a single successful FOIA suit—disclosure of documents to the public—could

<center>7</center>

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 342 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-15   Filed 06/14/17   Page 8 of 8
E-FILED 2015 DEC 30 11:41 PM POLK - CLERK OF DISTRICT COURT

"trum[p]" or "subsum[e]" all prior losses, just as a single successful class certification motion could do. *In re Bridgestone/Firestone*, 333 F.3d, at 766, 767. As that response suggests, our legal system generally relies on principles of stare decisis and comity among courts to mitigate the sometimes substantial costs of similar litigation brought by different plaintiffs. We have not thought that the right approach (except in the discrete categories of cases we have recognized) lies in binding nonparties to a judgment.

131 S. Ct. at 2379-81.

Dated December 30, 2015.

Respectfully submitted,

_____/s/ Glenn L Norris_____

Glenn L. Norris  AT0005907

HAWKINS & NORRIS, P.C.

2501 Grand Avenue, Suite C

Des Moines, Iowa 50312-5399

Telephone:  515-288-6532

Facsimile:  515-281-1474

Email:  gnorris@2501grand.com

gnorrislaw@gmail.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was filed on the 30th day of December, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

_____/s/ Glenn L Norris_____

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 343 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 1 of 201
E-FILED   Chicoine/Mueller v. Wellmark, Law No. CVCV050638





# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

STEVEN A. MUELLER, D.C., BRADLEY J.
BROWN, D.C., MARK A. KRUSE, D.C., KEVIN
D. MILLER, D.C., and LARRY E. PHIPPS,
D.C., on behalf of themselves and those like
situated,

    Plaintiffs,

vs.

WELLMARK, INC d/b/a WELLMARK BLUE
CROSS AND BLUE SHIELD OF IOWA, an
Iowa corporation, and WELLMARK HEALTH
PLAN OF IOWA, INC., an Iowa corporation,

    Defendants

Law No. 107471



# PLAINTIFFS' FIRST AMENDMENT TO PETITION FOR DAMAGES, FOR PERMANENT INJUNCTION AND FOR DECLARATORY JUDGMENT
(Jury Trial Demanded)

## DIVISION I

### PLAINTIFFS' CLASS ACTION AND CONDUCT ALLEGATIONS

### COUNT I

### NATURE OF THE CASE

1.    Plaintiffs bring this action on behalf of themselves and a class of Iowa—

licensed doctors of chiropractic who are citizens of the state of Iowa as of the date of filing.

They seek damages, declaratory relief and permanent injunction halting the illegal actions

of Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc. ("Wellmark

1

Defendants") which are discriminatory to Plaintiffs and restrict patient access to and
coverage for treatment by Iowa-licensed doctors of chiropractic. Wellmark's procedures
and requirements discriminate against doctors of chiropractic, and are contrary to Iowa
statute and to the intent of the Iowa Legislature.

   2.   In particular, Iowa Code § 514F.2 (2007) provides:

   Nothing contained in the chapters of Title XIII, subtitle 1, of the Code
   [Chapters 505 through 523I] shall be construed to prohibit or discourage
   insurers, nonprofit service corporations, health maintenance organizations,
   or self-insurers for health care benefits to employees from providing
   payments of benefits or providing care and treatment under capitated
   payment systems, prospective reimbursement rate systems, utilization
   control systems, incentive systems for the use of least restrictive and least
   costly levels of care, preferred provider contracts limiting choice of specific
   provider, or other systems, methods or organizations designed to contain
   costs without sacrificing care or treatment outcome, provided these systems
   do not limit or make optional payment or reimbursement for health care
   services on a basis solely related to the license under or the practices
   authorized by chapter 151 or on a basis that is dependent upon a method of
   classification, categorization, or description based upon differences in
   terminology used by different licensees under the chapters of Title IV,
   subtitle 3, of the Code [Chapters 147 through 158] in describing human
   ailments or their diagnosis or treatment."

   3.   In its essence, this Petition alleges that Wellmark Defendants have, by
contract, conspiracy and other unlawful means, conspired and combined to:

        (a)   violate the various provisions of H.F. 2219 (1986 Acts (71 G.A.)

   ch. 1180)) in their contracts and dealings with chiropractors and chiropractic

                                        2

patients in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark Defendants;

(b)    impose definitions of "chiropractic" and "medical necessity" contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark Defendants;

(c)    usurp the authority of the Iowa General Assembly, to the detriment of Iowa chiropractors and the treatment and therapy offered to their patients, in requiring the use of and promulgating standards and rules of practice for "Chiropractic Assistants," a category of health care practitioner found nowhere in the present Code of Iowa in Chapters 147 through 158 or elsewhere, and in limiting the employment of certain modes of physiotherapy if not applied by chiropractors or "chiropractic assistants;"

(d)    impose maximum fee schedules to which chiropractors must agree with defendants and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(e)    prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(f)    prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment

3

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 346 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 4 of 201
*Chicoine/Mueller v. Wellmark, Law No. CVCV050638*

services of other practitioners of health care in Iowa licensed under the
chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

    (g)    agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and
Doctors of Osteopathy (D.O.'s) in active practice to numerous items of
preferential treatment, discriminatory to plaintiff, as found in Section 7 of a
Settlement Agreement dated April 27, 2007, to which the Wellmark defendants
and a class of plaintiffs consisting of all physicians (defined as an individual
duly licensed by a state licensing board as a Medical Doctor or as a Doctor of
Osteopathy including both those M.D.'s and D.O.'s participating by contract in
Wellmark plans as well as those non-participating) who provided covered
services to an plan member or services to any individual enrolled in or covered
by a plan offered or administered by Wellmark from May 22, 1999, to May 30,
2007, said agreement being effective and binding on the Wellmark defendants
for the next four years from April 27, 2007.

    (h)    Enter into agreements with various subdivisions of the State of
Iowa to limit or exclude chiropractic coverage from health plans offered to
employees of various subdivisions of the State of Iowa, based upon the
encouragement of and false information provided by the Wellmark
Defendants.

## JURISDICTION AND VENUE

    4.    This Court has jurisdiction over the subject matter of this action pursuant to
Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendants in that

4

the Defendants are Iowa corporations with their corporate headquarters located in Des
Moines, Polk County, Iowa.

5.     Venue is proper pursuant to Iowa Code Ch. 616.

## PARTIES

6.     The individual plaintiff doctors of chiropractic bring this action for damages,
declaratory relief and injunction on behalf of all doctors of chiropractic in Iowa similarly
situated who are citizens of the state of Iowa as of the date of filing of this petition. The
doctor of chiropractic Plaintiffs are referred to as the "Provider Plaintiffs" or the
"Providers." They are:

(a)     Plaintiff Steven A. Mueller, D.C., a doctor of chiropractic licensed
to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident
of and practices chiropractic in Algona, Iowa. During all times material to this
action, Dr. Mueller has provided and billed for chiropractic to patients who are
enrolled in plans offered by Defendants.

(b)     Plaintiff Bradley J. Brown, D.C., a doctor of chiropractic licensed
to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident
of and practices chiropractic in Oelwein, Iowa. During all times material to this
action, Dr. Brown has provided and billed for chiropractic services to patients
who are enrolled in plans offered by Defendants.

(c)     Plaintiff Mark A. Kruse, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of
and practices chiropractic in Sioux City, Iowa. During all times material to this

5

action, Dr. Kruse has provided and billed for chiropractic services to patients
who are enrolled in plans offered by Defendants.

(d)     Plaintiff Kevin D. Miller, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of
and practices chiropractic in West Des Moines, Iowa. During all times material
to this action, Dr. Miller has provided and billed for chiropractic services to
patients who are enrolled in plans offered by Defendants.

(e)     Plaintiff Larry E. Phipps, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of
and practices chiropractic in Marshalltown, Iowa. During all times material to
this action, Dr. Phipps has provided and billed for chiropractic services to
patients who are enrolled in plans offered by Defendants.

7.     Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are
Iowa corporations with their corporate headquarters located at 636 Grand Avenue, Des
Moines, Iowa. Wellmark, Inc. does business as Wellmark Blue Cross and Blue Shield of
Iowa. Wellmark and its subsidiaries and affiliated companies, including Wellmark Blue
Cross and Blue Shield of South Dakota and Wellmark Health Plan of Iowa, Inc., insure or
pay health benefit claims for more than two million members in Iowa and South Dakota.
Wellmark Blue Cross and Blue Shield of Iowa, Wellmark Blue Cross and Blue Shield of
South Dakota, and Wellmark Health Plan of Iowa, Inc. are independent licensees of the
Blue Cross and Blue Shield Association.

8.     Defendant Wellmark, Inc., was originally incorporated on September 19,
1939, as a corporation not for pecuniary profit under what later became Chapter 504A of

6

the Code of Iowa, to operate a nonprofit health service plan under [now] Chapter 514 of the Code of Iowa to provide payment for health care furnished to subscribers under contract with the corporation. (Second Restated Articles of Incorporation, filed September 1, 1989). On October 1, 1991, Wellmark adopted a plan of mutualization to become a corporation for pecuniary profit under Chapter 491 of the Code of Iowa and a mutual insurance company under Chapter 508 of the Code of Iowa. The company merged with South Dakota Medical Service, Inc., on July 25, 1996, and on May 15, 1997, it changed its name to Wellmark, Inc., an Iowa corporation and mutual insurance company. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

9.     Defendant Wellmark Health Plan of Iowa, Inc., was incorporated in Iowa on March 13, 1996, as an Iowa domestic profit corporation under Chapter 490 of the Code of Iowa. Its stated purpose in its articles of incorporation is to establish and operate a health maintenance organization under Chapter 514B of the Code of Iowa. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

10.     The Blue Cross and Blue Shield Association is a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act. Wellmark Defendants are members of the Blue Cross and Blue Shield Association. The Blue Cross and Blue Shield Association developed provider contracts and manuals which are being implemented in the State of Iowa by the Wellmark Defendants. The Blue Cross and Blue Shield Association is headquartered in Chicago, Illinois, with offices in Washington, D.C. The Blue Cross and Blue Shield Association (BCBSA) is a national federation of 39 Blue Cross and Blue Shield companies. Collectively, the 39 Blue Cross and Blue Shield System

7

provides healthcare coverage for more than 99 million people or one-in-three Americans.
The vast majority (65+%) of those persons covered by the Blue Cross and Blue Shield
System are in PPO's, and an even greater percentage of Wellmark Defendants users are in
PPO's. According to BCBSA, a Preferred Provider Organization (PPO) is an arrangement
designed to supply health care services at a discounted cost by providing incentives for
members to use designated health providers (who contract with the PPO at a discount),
but which also provides coverage for services rendered by health care providers who are
not part of the PPO network.  In Iowa, according to Iowa Code § 514F.3 (2007), the PPO
is subject to rules of the commissioner of insurance. Iowa Code § 514F.2 (2007) states that
such PPO shall not "limit or make optional payment or reimbursement for health care
services on a basis solely related to the license under or the practices authorized by
chapter 151 or on a basis that is dependent upon a method of classification, categorization,
or description based upon differences in terminology used by different licensees under the
chapters of Title IV, subtitle 3, of the Code [Chapters 147 through 158] in describing
human ailments or their diagnosis or treatment." The rule of the Iowa Commissioner of
Insurance with respect to Preferred Provider Arrangements, Chapter 27, 191-27.6(514F),
states: "A health care insurer subject to this chapter shall be subject to and is required to
comply with all other applicable laws and rules and regulations of this state."

11.     The class of plaintiffs consisting of all physicians (defined as an individual
duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy
including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well
as those non-participating) who provided covered services to an plan member or services
to any individual enrolled in or covered by a plan offered or administered by Wellmark

8

from May 22, 1999, to May 30, 2007, included in the Settlement Agreement of April 27, 2007, as alleged in Paragraph 3(e) above, are non-party co-conspirators with Wellmark for purposes of the Iowa Competition Act and for violations of H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)).

      12.    Wellmark has entered into agreement with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which Defendant Wellmark and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007.  These Iowa M.D.'s and D.O.'s, who are in direct competition with the Plaintiff Class.

      13.    In addition, the Iowa Medical Society has signed on to the Settlement Agreement dated April 27, 2007, and is also a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.

<div align="center">

**CLASS ACTION ALLEGATIONS**

</div>

      14.    Plaintiffs bring this action individually and as a class action pursuant to Iowa Rules of Civil Procedure 1.261 et seq on behalf of all chiropractors licensed in Iowa who are citizens of Iowa as of the date of filing of this petition, each of whom have been

<div align="center">

9

</div>

damaged in their businesses or property and is being or will be irreparably harmed by defendants' actions described below (the "Class").

15.    This action is properly maintainable as a class action.

16.    The Class are so numerous that joinder of all members is impracticable. There are approximately 1200 chiropractors licensed in Iowa who are citizens of the state of Iowa at the time of the filing of this petition. The names of the absent members of the class can be ascertained so that personal or mailed notice of the class action can be given them.

17.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)    whether the Wellmark Defendants have violated the various provisions of H.F. 2219 (1986 Acts (71 G.A.) Ch. 1180)) in their contracts and dealings with chiropractors and chiropractic patients;

(b)    whether the Wellmark Defendants have engaged or are about to engage in a contract, combination or conspiracy between two or more persons in restraint of trade or commerce in Iowa as a whole and in major population centers of Iowa under Iowa Code § 553.4 (2007);

(c)    whether under the proposed contracts, plans and policies of the Wellmark Defendants, Iowa chiropractors and the care and treatment of chiropractic patients in Iowa will be evaluated by standards contrary to Chapter 151, Code of Iowa (2007);

10

(d)     whether the Wellmark Defendants have attempted to usurp the
authority of the Iowa General Assembly, to the detriment of Iowa chiropractors
and the treatment and therapy offered to their patients, in requiring the use of
and promulgating standards and rules of practice for "Chiropractic Assistants,"
a category of health care practitioner found nowhere in the present Code of
Iowa in Chapters 147 through 158 or elsewhere, and in limiting the
employment of certain modes of physiotherapy if not applied by chiropractors
or "chiropractic assistants;"

(e)     whether any of the activities or arrangements of the Wellmark
Defendants have been expressly approved or regulated by any regulatory body
or officer acting under authority of this state;

(f)     whether the Wellmark Defendants, in bad faith and for improper
or pretextual motives, have discriminated against chiropractors on a basis
solely related to the license under or the practices authorized by chapter 151 or
on a basis that is dependent upon a method of classification, categorization, or
description based upon differences in terminology used by different licensees
under the chapters of Title IV, subtitle 3, of the Code [Chapters 147 through
158] in describing human ailments or their diagnosis or treatment;

(g)     whether plaintiffs and the Class they represent has been injured
or threatened with injury by conduct prohibited by Chapter 553, Code of Iowa
(2007);

(h)     whether to class of chiropractic plaintiffs have been damaged in
the past four years by the invidious treatment by the Wellmark defendants,

11

who have uniformly paid chiropractors less for the same or similar services
than has been paid for the services of other health care practitioners in Iowa;
and

     (i)    whether plaintiffs and the other members of the class will suffer
irreparable injury by the continuing discriminatory treatment and practices of
the Wellmark defendants.

18.    Plaintiffs' claims are typical of the claims of the other members of the Class
and plaintiffs do not have any interests adverse to the Class.

19.    Plaintiffs are adequate representatives of the Class, and have retained
competent counsel experienced in litigation of this nature and will fairly and adequately
protect the interests of the Class.  The named plaintiffs and their attorneys have or can
acquire adequate resources to ensure that the interests of the class will not be harmed.

20.    The prosecution of separate actions by individual members of the Class
would create a risk of inconsistent or varying adjudications with respect to individual
members of the Class which would establish incompatible standards of conduct for the
party opposing the Class under the standard of I.R.C.P. 1.262(3)(b).

21.    Adjudications with respect to individual members of the class as a practical
matter would be dispositive of the interests of other members not parties to the
adjudication or substantially impair or impede their ability to protect their interests under
the standard of I.R.C.P. 1.262(3)(c).

22.    Plaintiffs anticipate that there will be no difficulty in the management of this
litigation.  A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

12

23.     Defendants have acted on grounds generally applicable to the Class with
respect to the matters complained of herein, thereby making appropriate the relief sought
herein with respect to the Class as a whole.

### FACTUAL CONDUCT ALLEGATIONS

24.     The Wellmark Defendants provide health services to the Iowa public on a
statewide basis by offering and operating health care plans. Wellmark Defendants provide
health care services including administration of self-funded health care plans to
approximately 1.4 million Iowa enrollees in various health care plans statewide.

25.     Wellmark Defendants offer various health care coverage plans, including
their PPO plan, "Alliance Select," and their HMO plans, "Blue Advantage," "Blue Access,"
and "Blue Choice" to their subscribers.

26.     In addition to offering coverage agreements to subscribers, Wellmark
Defendants enter into agreements with the providers of health care services, including
those licensed under Iowa Code Ch. 148 (medical doctors -MD's), Ch.150A (doctors of
osteopathic medicine –DO's), and Ch. 151 (doctors of chiropractic -DC's).

27.     Under these provider agreements with the Wellmark Defendants, health
care professionals, including the Provider Plaintiffs, render treatment services to patients
who are enrolled in the Wellmark Defendants' various plans.

28.     Services are provided under the fundamental premise that, if the services
are covered and are medically necessary, the Wellmark Defendants' enrollees will be
covered and the providers of the services, including the Provider Plaintiffs, will be
compensated in a timely manner for those services.

13

29.     Wellmark Defendants control over 60 percent of the health care insurance and services market in Iowa, primarily through PPO contracts.

30.     Wellmark Defendants use their overwhelming economic power and market dominance to coerce the individual Provider Plaintiffs into acquiescing in practice restrictions and reimbursement schedules detrimental to Provider Plaintiffs and by limiting and restricting patient access to Provider Plaintiffs resulting in detriment to the physical care and choice of consumers.

31.     Wellmark Defendants further wield their economic power and market dominance by reserving the right to unilaterally amend, and by unilaterally amending, their contracts with the Provider Plaintiffs and the Provider class members, on a "take it or leave it" basis. It is instructive to compare the original Blue Shield of Iowa contract with chiropractic providers (attached hereto as Exhibit "A") formulated in 1986 after the general assembly passed H.F. 2219 and Blue Shield lost its declaratory ruling petition before the Insurance Commissioner, with the contract with providers (including chiropractors) which Wellmark is currently mandating to be effective November 1, 2007:

        (a)     The original provider agreement was under chapters 504A and 514 of the Iowa Code (1987) which explicitly authorized such contracts with providers. The November 1, 2007 agreement recites that Wellmark is authorized by the Iowa Division of Insurance to transact the business of health insurance and is licensed by the Blue Cross and Blue Shield Association. It cites no statutory authority for the provider contract, because there is none. The contract is not regulated nor approved by the Iowa Insurance Commissioner.

14

(b)     The original provider contract covered services "for which
Chiropractor has the necessary training, consistent with Chiropractor's
licensure under the laws of the State of Iowa." The standard for evaluating the
chiropractor's services was "necessity of care," which is defined, in part, as
"consistent with professionally recognized standards of health care." The
provider contract expressly acknowledges that the chiropractor is licensed
under Chapter 151, Code of Iowa (1987). The November 1, 2007 agreement
recites: "All Covered Services provided by Provider will be Medically
Necessary." Medically Necessary is defined as "in accordance with generally
accepted standards of medical practice." (A chiropractor in Iowa is expressly
forbidden to "prescribe any drug or medicine" (Iowa Code § 151.8 (2007)) and
does not practice medicine (Iowa Code § 148.2(2)).

(c)     The original provider contract stated: "Based upon the principles
of good faith, Blue Shield may seek from time to time to change the contracting
entity performing utilization review or to amend or modify the provisions of its
utilization review program under this Agreement." The standard for evaluating
the chiropractor's services was "necessity of care," which is defined, in part, as
"consistent with professionally recognized standards of health care." The
November 1, 2007 provider contract states: "At all times during the term of
this Agreement, Provider shall meet the Wellmark contracting and
credentialing standards set forth in the Provider Guide. Wellmark retains sole
discretion to determine whether Provider shall be accepted as a Participating

15

Provider pursuant to Wellmark's policies, rules, procedures and contracting and credentialing standards." The Provider Guide comes from Blue Cross and Blue Shield Association, and does not reference Iowa Code, Chapter 151.

32.    This action is based on the relationships between the Provider Plaintiffs and the Wellmark Defendants, and also on the belief that the Wellmark Defendants' actions, as detailed below, detrimentally impact patient health and the general welfare of the public, inasmuch as those actions deprive and limit patient access to the Provider Plaintiffs' treatment, and restrict and otherwise interfere with and impede the relationships between the Provider Plaintiffs and their existing and prospective patients.

33.    Wellmark Defendants have engaged in, and continue to engage in, a pattern and practice of treatment which discriminates against the Provider Plaintiffs as licensees under Iowa Code Ch. 151, all in violation of Iowa law. This discrimination has occurred and is occurring in numerous ways, including:

(a)    Wellmark Defendants have entered into agreement with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which Wellmark Defendants and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan

16

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 16 of 201**

member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007.

    (b)    As presently administered by Wellmark, most "Blue Advantage" plans caps the number of covered visits its subscribers may make to a doctor of chiropractic to 12, regardless of individual subscriber-patient circumstances. No such restriction of 12 visits is imposed upon other health care providers-licensees. In addition, in order to continue with additional treatment after the 12-visit cap has been reached, a subscriber-patient must obtain a referral from a "PCP" (Primary Care Physician) before any additional treatment from a doctor of chiropractic will be covered by Wellmark. Absent obtaining such an approved referral, the subscriber-patient must either forgo further chiropractic treatment or pay for the additional treatment personally, and then only after signing a waiver stating, in part, "I understand that I am requesting a service that may not be fully covered by my insurance company. I agree to be financially responsible for the full amount."

    (c)    Wellmark Defendants have arbitrarily imposed riders on the policies of patients excepting from coverage any medical benefits in connection with or on account of the spine and any related degenerative or congenital diseases, including treatment, operation or complications thereof, based solely upon the patient previously seeking the treatment of a neuromusculoskeletal condition by a doctor of chiropractic.

    (d)    Wellmark Defendants' "Blue Advantage" plan, as made available to employees of Iowa State University in late 2006, expressly provides for "no

17

co-pay for any service, including office visits, except for \$10 co-payment for chiropractic manipulation" ... and a \$100 co-payment for emergency room services;

(e)     Beginning in approximately 2006, Wellmark Defendants unilaterally determined that their subscriber-patients who elected to seek chiropractic treatment would be covered for only three treatment procedures per visit to a doctor of chiropractic regardless of the acuity, severity, or nature of the patient's condition or the number of her complaints.

(f)     Wellmark Defendants have implemented a pattern of payment practices whereby Iowa Doctors of Chiropractic are paid a substantially lesser amount (from 55% less to over 100% less) for the same services as Wellmark pays Medical Doctors, Doctors of Osteopathy, Physicians Assistants, and Nurse Practitioners. The stated rationale of the Wellmark Defendants for this discriminatory practice is that Medicare and Medicaid relative value formulations. The Medicare and Medicaid formulations, however, make no such distinctions with respect to the same codes, and do not employ different codes for the same diagnostic and treatment services. Further, Federal Medicare law contains a payment equity provision similar to those in HF 2219 in Iowa. The statute provides that: "A Medicare+Choice organization shall not discriminate with respect to participation, reimbursement, or indemnification as to any provider who is acting within the scope of the provider's license or certification under applicable State law, solely on the basis of such license or certification." 42 U.S.C. § 1395w-22 (b)(2). Medicare+Choice organizations are

18

private plans contracting to provide Medicare benefits in a managed care setting and are therefore more closely akin to the types of private entities which are the subject of H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)) in Iowa. In addition, the entire Medicare program is based on a relative value (RBRVS) system that establishes uniform payment for services and that does not take into consideration the license of the provider. Under Medicare, providers receive the same reimbursement for the same service provided without regard to licensure.

(g)     Wellmark Defendants have established a "Physical Medicine Guide", which purports to describe and cover office documentation for treatment by "physical medicine." The "Physical Medicine Guide" is in violation of various provisions of violations of H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)), which provide in pertinent part that coverage for a human ailment cannot be rejected "solely related to the license under or the practices authorized by chapter 151" and cannot be rejected on a basis that is "dependent upon a method of classification, categorization, or description based directly or indirectly upon differences in terminology used by different licensees in describing human ailments or their diagnosis or treatment."

## **LEGISLATIVE HISTORY AND INTENT**

34.     Doctors of chiropractic are licensed by the State of Iowa. Iowa Code section 151.1 defines "persons engaged in the practice of chiropractic" as persons "publicly professing to assume the duties incident to the practice of chiropractic" (§ 151.1(1)), or persons who treat "human ailments by the adjustment of the neuromusculoskeletal

19

structures, primarily, by hand or instrument, through spinal care," (§ 151.1(2)), or persons
utilizing differential diagnosis and related procedures, withdrawing or ordering
withdrawal of a patient's blood for diagnostic purposes, performing or utilizing routine
laboratory tests, performing physical examinations, rendering nutritional advice, and
utilizing chiropractic physiotherapy procedures, "all of which are subject to and
authorized by section 151.8." (§ 151.1(3))

    35.    Section 151.3 provides for licensing, and section 151.8 states that "[a]
chiropractor using the additional procedures and practices authorized by this Act shall be
held to the same standard of care applicable to any other health care practitioner in this
state." Pursuant to section 151.11, a board of chiropractic examiners is required to
promulgate rules governing chiropractic practice in this state.

    36.    In 1986, the Iowa Legislature amended Iowa Code section 509.3 to add a
new subsection (now section 509.3(6)), which requires that health insurance plans offer
coverage for chiropractic diagnosis and treatment of human ailments on a non-
discriminatory basis with respect to coverage of human ailments for which other health
care providers can provide diagnosis or treatment. The statute states:

    509.3(6)  A provision shall be made available to policyholders under
group policies covering diagnosis and treatment of human ailments for
payment or reimbursement for necessary diagnosis or treatment provided
by a chiropractor licensed under chapter 151, if the diagnosis or treatment is
provided within the scope of the chiropractor's license and if the policy
would pay or reimburse for the diagnosis or treatment by a person licensed
under chapter 148, 150, or 150A of the human ailment, irrespective of and
disregarding variances in terminology employed by the various licensed
professions in describing the human ailment or its diagnosis or its

20

treatment. The policy shall provide that the policyholder may reject the
coverage or provision if the coverage or provision for diagnosis or treatment
of a human ailment by a chiropractor is rejected for all providers of
diagnosis or treatment for similar human ailments licensed under chapter
148, 150, 150A, or 151. A policy of group health insurance may limit or make
optional the payment or reimbursement for lawful diagnostic or treatment
service by all licensees under chapters 148, 150, 150A, and 151 on any
rational basis which is not solely related to the license under or the practices
authorized by chapter 151 or is not dependent upon a method of
classification, categorization, or description based directly or indirectly upon
differences in terminology used by different licensees in describing human
ailments or their diagnosis or treatment. This subsection applies to group
policies delivered or issued for delivery after July 1, 1986, and to existing
group policies on their next anniversary or renewal date, or upon expiration
of the applicable collective bargaining contract, if any, whichever is later.
This subsection does not apply to blanket, short-term travel, accident-only,
limited or specified disease, or individual or group conversion policies, or
policies under Title XVIII of the Social Security Act, or any other similar
coverage under a state or federal government plan.

37.     The same legislation, H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)), modified the
provisions of Iowa Code, ch. 514, under which the defendant Wellmark (under a previous
name) was then operating. Among the changes to Chapter 514 were:

514.7 A provision shall be made available in approved contracts with
hospital and medical subscribers under group subscriber contracts or plans
covering diagnosis and treatment of human ailments, for payment or
reimbursement for necessary diagnosis or treatment provided by a
chiropractor licensed under chapter 151 if the diagnosis or treatment is
provided within the scope of the chiropractor's license and if the subscriber
contract would pay or reimburse for the diagnosis or treatment of the

21

Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay

human ailments, irrespective of and disregarding variances in terminology
employed by the various licensed professions in describing the human
ailments or their diagnosis or treatment, if it were provided by a person
licensed under chapter 148, 150, or 150A. The subscriber contract shall also
provide that the subscriber may reject the coverage or provision if the
coverage or provision for diagnosis or treatment of a human ailment by a
chiropractor is rejected for all providers of diagnosis or treatment for similar
human ailments licensed under chapter 148, 150, 150A, or 151. A group
subscriber contract may limit or make optional the payment or
reimbursement for lawful diagnostic or treatment service by all licensees
under chapters 148, 150, 150A, and 151 on any rational basis which is not
solely related to the license under or the practices authorized by chapter 151
or is not dependent upon a method of classification, categorization, or
description based upon differences in terminology used by different
licensees in describing human ailments or their diagnosis or treatment. This
paragraph applies to group subscriber contracts delivered after July 1, 1986,
and to group subscriber contracts on their anniversary or renewal date, or
upon the expiration of the applicable collective bargaining contract, if any,
whichever is the later. This paragraph does not apply to contracts designed
only for issuance to subscribers eligible for coverage under Title XVIII of the
Social Security Act, or any other similar coverage under a state or federal
government plan.

And,

514.23(2) A corporation organized and governed by this chapter
which becomes a mutual insurer under this section shall continue as a
mutual insurer to be governed by the provisions of section 514.7 and shall
also be governed by section 509.3, subsection 6.

38.    The same legislation, H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)), modified

Chapter 514B, governing health maintenance organizations:

22

514B.1(5)(c). The health care services available to enrollees under
prepaid group plans covering diagnosis and treatment of human ailments,
shall include a provision for payment of necessary diagnosis or treatment
provided by a chiropractor licensed under chapter 151 if the diagnosis or
treatment is provided within the scope of the chiropractor's license and if
the plan would pay or reimburse for the diagnosis or treatment of human
ailment, irrespective of and disregarding variances in terminology employed
by the various licensed professions in describing the human ailment or its
diagnosis or its treatment, if it were provided by a person licensed under
chapter 148, 150, or 150A. The plan shall also provide that the plan enrollees
may reject the coverage for diagnosis or treatment of a human ailment by a
chiropractor if the coverage is rejected for all providers of diagnosis or
treatment for similar human ailments licensed under chapter 148, 150,
150A, or 151. A prepaid group plan of health care services may limit or make
optional the payment or reimbursement for lawful diagnostic or treatment
service by all licensees under chapters 148, 150, 150A, and 151 on any
rational basis which is not solely related to the license under or the practices
authorized by chapter 151 or is not dependent upon a method of
classification, categorization, or description based upon differences in
terminology used by different licensees in describing human ailments or
their diagnosis or treatment. This paragraph applies to services provided
under plans made after July 1, 1986, and to existing group plans on their
next anniversary or renewal date, or upon the expiration of the applicable
collective bargaining contract, if any, whichever is the later. This paragraph
does not apply to enrollees eligible for coverage under Title XVIII of the
Social Security Act, or any other similar coverage under a state or federal
government plan.

39.     The same legislation, H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)), directed that
boards of examiners regulating health care licensees establish "utilization and cost control

23

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 366 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 24 of 201
**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

review committees," (Iowa Code § 514F.1)and also requires non-discriminatory treatment of chiropractic services. Iowa Code section 514F.2. It states, in pertinent part:

> "514F.2 Nothing contained in the chapters of Title XIII, subtitle 1, of
> the Code [Chapters 505 through 523I] shall be construed to prohibit or
> discourage insurers, nonprofit service corporations, health maintenance
> organizations, or self-insurers for health care benefits to employees from
> providing payments of benefits or providing care and treatment under
> capitated payment systems, prospective reimbursement rate systems,
> utilization control systems, incentive systems for the use of least restrictive
> and least costly levels of care, preferred provider contracts limiting choice of
> specific provider, or other systems, methods or organizations designed to
> contain costs without sacrificing care or treatment outcome, provided these
> systems do not limit or make optional payment or reimbursement for health
> care services on a basis solely related to the license under or the practices
> authorized by chapter 151 or on a basis that is dependent upon a method of
> classification, categorization, or description based upon differences in
> terminology used by different licensees under the chapters of Title IV,
> subtitle 3, of the Code [Chapters 147 through 158] in describing human
> ailments or their diagnosis or treatment."

40.    In short, since 1986, Iowa law has required that health insurers, health services providers, and HMO's, including the Wellmark Defendants, pay for or reimburse subscribers for diagnostic and treatment services provided by chiropractors for human ailments, if M.D. or D.O. services for the human ailment are covered.

41.    In response to a declaratory ruling petition filed by the Wellmark Defendants under a previously used name, then Iowa Insurance Commissioner William Hager explained the antidiscrimination aspects of the 1986 legislation as follows:

24

"[C]overage of chiropractic diagnosis or treatment authorized ... in §151.1
may be rejected only if coverage of the same type of diagnosis or treatment
by an M.D. or D.O., regardless of the label given the type of diagnosis or
treatment by the different professions, is also rejected. In this manner, there
is an equality of coverage between types of practitioners: an M.D. or D.O. is
not paid for a procedure which is not paid for when performed by a
chiropractor. Selective rejection of coverage or payment for a certain
method of diagnosis or treatment when performed by a chiropractor is not
permitted; that is, rejection is not allowed where coverage or payment is
made for the same essential method of diagnosis or treatment when
performed by an M.D. or D.O."

42.    Wellmark Defendants in the past have ignored this legislative mandate by
selectively imposing restrictions on doctors of chiropractic and their patients, including
Plaintiffs, with respect to chiropractic treatment, as specified above.

43.    Wellmark's new agreement with Iowa M.D.'s and D.O.'s gives numerous
preferences to those providers in direct competition with D.C.'s, including Plaintiff, and
therefore selectively target doctors of chiropractic and their patients, including Plaintiff,
with respect to chiropractic treatment, as specified above.

44.    Wellmark Defendants' discriminatory actions are a direct circumvention of
the non-discrimination requirements of Iowa Code sections 509.3(6), 514.7, 514.23(c),
514B.5 and 514F.2, are in direct violation of the announced public policy and laws of this
state, and are therefore void and unenforceable.

25

## PLAINTIFFS AND THE PLAINTIFF CLASS HAVE BEEN DAMAGED BY THE DISCRIMINATORY CONDUCT, RESTRAINT OF TRADE AND ABUSE OF MONOPOLY POWER OF THE WELLMARK DEFENDANTS

45.     The plaintiffs and the plaintiff class have been damaged in the past four years by receiving as much as 50% less than the Wellmark defendants paid other health care practitioners in Iowa for the same or similar services. This damage can be calculated through the examination of a schedule of fees prepared by the Wellmark defendants annually and comparing the compensation scheduled to be paid to plaintiffs and the plaintiff class to compensation scheduled to be paid to other Iowa health care practitioner for the same or similar services.

## PLAINTIFFS ARE IRREPARABLY HARMED BY DEFENDANTS' PAST AND ONGOING CONDUCT

46.     Wellmark Defendants' past and announced future restrictions place an unreasonable, illegal, and discriminatory burden on doctors of chiropractic, in terms of administrative requirements not applied to other health care providers and interfere with professional judgment, and limit the extent of care and treatment options available to patients.

47.     More importantly, the restrictions and discriminatory practices discourage chiropractic patients from receiving adequate treatment for their human ailments, depriving them of the benefits of chiropractic treatment secured for them under Iowa Code sections 509.3(6), 514.7, 514.23(c), 514B.5 and 514F.2 and under the Chiropractic Practice Act, Iowa Code, Chapter 151 (2007), and, accordingly, cause irreparable harm by causing patients to suffer from their human ailments rather than obtain effective and less costly relief for them.

26

**Plaintiffs' Appendix in Resistance          Page 26 of 201
to Wellmark Motion to Stay**

## HALTING DEFENDANTS' CONDUCT
## WILL FURTHER THE PUBLIC INTEREST

48.   Wellmark Defendants' past and announced future restrictions limit and deny access to one form of health care services, thus limiting the choices available to its subscribers. Its practices wrongfully restrict highly qualified health care providers from providing treatment services.

49.   Wellmark Defendants' practices will impermissibly direct patients to other health care providers, whose charges for comparable services are frequently higher.

## CLAIMS FOR RELIEF

## COUNT II

## REQUEST FOR DECLARATORY JUDGMENT

50.   Plaintiffs incorporate by reference the allegations set forth in the foregoing paragraphs 1 through 49 of this Petition as if fully set forth.

51.   Despite statutory authority barring discriminatory treatment of coverage for chiropractic treatment, Wellmark Defendants have insisted upon contractual provisions which selectively burden doctors of chiropractic and their patients, as set forth more fully above.

52.   Wellmark Defendants' actions are contrary to express Iowa statutory provisions, and are therefore void and unenforceable.

53.   Accordingly, Plaintiffs request that the Court enter its order declaring that the Wellmark Defendants' discriminatory actions, as detailed above, are unlawful, in violation of Iowa Code sections 509.3(6), 514.7, 514.23(c), 514B.5 and 514F.2, and are unenforceable as a matter of law.

27

## COUNT III

### RESTRAINT OF TRADE

54.    Plaintiffs, by this reference, hereby incorporate paragraphs 1 through 49, set out above in the Statement of Facts, as if set forth in this Count III.

55.    Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are engaged in the business of providing health care expense reimbursement or health care services in Des Moines, Polk County, Iowa, and in the State of Iowa generally. According to the provider contract of November 1, 2007, Wellmark is a licensee of the Blue Cross and Blue Shield Association (BCBSA). The Blue Cross and Blue Shield Association develops provider contracts and manuals for its member associations, including in particular the Wellmark.

56.    Wellmark has entered into agreement with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which Defendant Wellmark and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007. This agreement by its express terms runs until April 26, 2011.

28

57.    Doctors of Chiropractic are defined as physicians under Iowa law and are direct competitors of M.D.'s and D.O.'s in providing diagnostic and treatment of human ailments of Iowa residents.

58.    Wellmark and its co-conspirators have entered into a contract, combination and conspiracy between two or more persons in restraint of trade, and have conspired and combined to:

    (a)    violate the various provisions of H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)) in their contracts and dealings with chiropractors and chiropractic patients in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark;

    (b)    impose definitions of "chiropractic" and "medical necessity" contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the care for human ailments by chiropractors for which payment is and will be made by the Wellmark;

    (c)    impose maximum fee schedules to which chiropractors must agree with defendants and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

    (d)    prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

29

    (e)    Agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which the Wellmark Defendants and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007.

    (f)    Enter into agreements with various subdivisions of the State of Iowa to limit or exclude chiropractic coverage from health plans offered to employees of various subdivisions of the State of Iowa, based upon the encouragement of and false information provided by the Wellmark Defendants.

59.    As a direct and proximate result of Wellmark Defendants' conduct, competition in the relevant market described herein has been injured.

60.    Plaintiffs and the Class they represent have been injured or threatened with injury by conduct prohibited by Chapter 553, Code of Iowa (2007).

61.    Plaintiffs and the other members of the Class have been damaged in their businesses and property by and as a proximate cause of the conduct of the Wellmark defendants.

30

62.    Plaintiffs and the other members of the Class will suffer irreparable injury if the contracts announced by the Wellmark Defendants are implemented, in that patients will forego necessary chiropractic treatment because of the threat of or the actual imposition of refusals by the Wellmark Defendants to approve of or make payment for such necessary services. Such refusals affect the present and future health and welfare of the patients of chiropractors in Iowa, a matter for which there is no adequate remedy at law.

63.    The actions of the Wellmark Defendants are willful or flagrant in light of the existing law of Iowa and the surrounding circumstances.

## COUNT IV

## ABUSE OF MONOPOLY POWER

64.    Plaintiffs, by this reference, hereby incorporate paragraphs 1 through 49, set out above in the Statement of Facts, as if set forth in this Count IV.

65.    Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are engaged in the business of providing health care expense reimbursement or health care services in Des Moines, Polk County, Iowa, and in the State of Iowa generally. According to the provider contract of November 1, 2007, Wellmark is a licensee of the Blue Cross and Blue Shield Association (BCBSA). The Blue Cross and Blue Shield Association develops provider contracts and manuals for its member associations, including in particular the Wellmark.

66.    The Wellmark defendants have over 70% of the health insurance business in the state of Iowa and in most major metropolitan centers of Iowa.

31

67.   The Wellmark defendants have abused their monopoly power in the relevant geographic and product markets by the following conduct:

(a)   violate the various provisions of H.F. 2219 (1986 Acts (71 G.A.) ch. 1180)) in their contracts and dealings with chiropractors and chiropractic patients in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark;

(b)   impose definitions of "chiropractic" and "medical necessity" contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the care for human ailments by chiropractors for which payment is and will be made by the Wellmark;

(c)   impose maximum fee schedules to which chiropractors must agree with defendants and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(d)   prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(e)   Agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which the Wellmark Defendants and a class of plaintiffs consisting of all physicians (defined as an

32

individual duly licensed by a state licensing board as a Medical Doctor or as a
Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by
contract in Wellmark plans as well as those non-participating) who provided
covered services to an plan member or services to any individual enrolled in or
covered by a plan offered or administered by Wellmark from May 22, 1999, to
May 30, 2007.

68.    As a direct and proximate result of Wellmark Defendants' conduct,
competition in the relevant market described herein has been injured.

69.    Plaintiffs and the Class they represent have been injured or threatened with
injury by conduct prohibited by Chapter 553, Code of Iowa (2007).

70.    Plaintiffs and the other members of the Class have been damaged in their
businesses and property by and as a proximate cause of the conduct of the Wellmark
defendants.

71.    Plaintiffs and the other members of the Class will suffer irreparable injury if
the contracts announced by the Wellmark Defendants are implemented, in that patients
will forego necessary chiropractic treatment because of the threat of or the actual
imposition of refusals by the Wellmark Defendants to approve of or make payment for
such necessary services. Such refusals affect the present and future health and welfare of
the patients of chiropractors in Iowa, a matter for which there is no adequate remedy at
law.

72.    The actions of the Wellmark Defendants are willful or flagrant in light of the
existing law of Iowa and the surrounding circumstances.

33

## COUNT V

## APPLICATION FOR PERMANENT INJUNCTION

73.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs 1 through 49 of this Petition as if fully set forth.

74.    As set forth more fully above, there is a substantial likelihood that Plaintiffs will prevail on tile merits of their claim upon final hearing. Wellmark Defendants' past actions in selectively imposing restrictions in coverage on doctors of chiropractic and their patients, as well as their proposed new restrictions, which are also selectively targeted toward chiropractic, undermines the Iowa Legislature's intent in enacting the nondiscrimination provisions encompassed in Iowa Code sections 509.3(6), 514.7, 514.23(c), 514B.5 and 514F.2 and, in fact, renders the statutes' non-discrimination mandate meaningless. Because Wellmark Defendants' past and proposed actions violate express Iowa law, those actions are unenforceable in contract and void as contravening public policy and statute.

75.    As set forth more fully above, there is a substantial threat that the Provider Plaintiffs and the Health Care Consumer Plaintiffs will suffer irreparable injury absent entry of the requested temporary injunctive relief. In fact, as a direct consequence of Wellmark Defendants' conduct, the Provider Plaintiffs are and will increasingly be burdened with selectively imposed administrative and other costs, and through the targeted interference with patient care and chiropractor-patient relationships. Iowa health care consumers are suffering and increasingly will suffer injury in the form of selectively restricted access to chiropractic health care and through the targeted interference with patient care and chiropractor-patient relationships.

34

76.     This real and present injury outweighs any potential conceivable injury to
Wellmark Defendants should they be enjoined until an evidentiary hearing.

77.     As set forth more fully above, granting this temporary injunction will serve
the public interest by allowing greater access to treatment services on a non-
discriminatory basis.

78.     Plaintiffs' request for this temporary injunction seeks only to have this Court
maintain the status quo, in order to avoid any further irreparable harm.

79.     This application for temporary injunctive relief has not been presented to or
refused by any court or justice.

80.     Upon hearing on the merits after discovery has been taken, the plaintiffs
pray for the Court to issue a permanent injunction, enjoining the Wellmark Defendants
from continuing to violate Iowa Code sections 509.3(6), 514.7, 514.23(c), 514B.5 and
514F.2 (2007).

## PRAYER

**WHEREFORE**, Plaintiffs pray for the following relief:

1.      That the Court find and declare that this case and the Counts II through V of
the amended petition state a proper case for class wide relief in the form of damages,
declaratory relief and injunctive relief, and that notice be given to the class of this action
pursuant to Iowa Rule of Civil Procedure 1.261 et seq.;

2.      That the jury award plaintiffs and the plaintiff class damages in an amount
determined by the evidence;

3.      That the Court grant plaintiffs and the plaintiff class declaratory relief from
the discriminatory practices of the Wellmark defendants;

35

4.     That upon final hearing, the Court enter an order permanently enjoining Wellmark Defendants from continuing to enforce the discriminatory restrictions and procedures and from implementing the planned additional discriminatory restrictions and procedures;

(a)     That the jury award plaintiffs and the plaintiff class double their actual damages because of the egregious conduct of the Wellmark defendants;

5.     That, pursuant to I.R.C.P. 1.275(4), the Court award attorneys' fees to Plaintiffs, and that, pursuant to Iowa Code § 553.12(4), the Court award the necessary costs of bringing suit, including a reasonable attorney fee; and

6.     That the Court award such other and further relief to which Plaintiffs are justly entitled.

## DIVISION II

## PLAINTIFF MUELLER'S INDIVIDUAL ACTION

### NATURE OF THE CASE

7.     Plaintiff brings this action seeking damages for denial of claims.

### JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendant in that the Defendant is an Iowa corporation with its corporate headquarters located in Des Moines, Polk County, Iowa.

9.     Defendant Wellmark, through its counsel, has agreed with Plaintiff that the tolling date for bringing this action is December 9, 2007.

10.     Venue is proper pursuant to Iowa Code Ch. 616.

36

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 379 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 37 of 201
E-Filed Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Dated: May 20, 2008.

HAWKINS & NORRIS, P.C.

Glenn L. Norris   AT0005907
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-288-9733
Email:  gnorris@2501grand.com

WANDRO & BAER, P.C.

Steven P. Wandro   AT0008177
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
E-mail: swandro@2501grand.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the 20th day of May ,
2008.

By:    ___ U.S.Mail        ___ Facsimile    X Hand Delivery        ___ Overnight Courier    ___ Fedex or UPS

       X E-mail            ___ Other

Copy to:
Thomas H. Walton, Esq.
NYEMASTER, GOODE, WEST, HANSELL
& O'BRIEN, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone:  515-283-8003
Facsimile: 515-283-8045
e-mail: twalton@nyemaster.com

43

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>Defendants | Law No. 107471 |

# PLAINTIFFS' THIRD AMENDMENT TO PETITION FOR DAMAGES AND FOR PERMANENT INJUNCTION
# (To Conform to Court Ruling of Dec. 31, 2008)
(Jury Trial Demanded)

## DIVISION I

## COUNT I

## PLAINTIFFS' CLASS ACTION AND CONDUCT ALLEGATIONS

### NATURE OF THE CASE

1.    Plaintiffs bring this action on behalf of themselves and a class of Iowa-

licensed doctors of chiropractic who are citizens of the state of Iowa as of the date of filing.

They seek damages and permanent injunction halting the illegal actions of Defendants

Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc. ("Wellmark Defendants") which

1

restrain and monopolize trade or commerce in health care delivery and insurance and are discriminatory to Plaintiffs and restrict patient access to and coverage for treatment by Iowa-licensed doctors of chiropractic. Wellmark's procedures and requirements discriminate against doctors of chiropractic and the delivery of chiropractic services in Iowa and are contrary to Iowa statute and to the intent of the Iowa Legislature.

2.     In its essence, this Petition alleges that Wellmark Defendants have, by contract, conspiracy and other unlawful means, conspired and combined to:

(a)     impose maximum fee schedules to which chiropractors must agree with defendants and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(b)     prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(c)     prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(d)     have historically entered into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

2

(e)      agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and

Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential

treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement

Agreement dated April 27, 2007, to which the Wellmark defendants and a class of

plaintiffs consisting of all physicians (defined as an individual duly licensed by a state

licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those

M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-

participating) who provided covered services to an plan member or services to any

individual enrolled in or covered by a plan offered or administered by Wellmark from

May 22, 1999, to May 30, 2007, said agreement being effective and binding on the

Wellmark defendants for the next four years from April 27, 2007.

(f)      impose definitions of "chiropractic" and "medical necessity"

contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the

care for human ailments by chiropractors for which payment will be made by the

Wellmark Defendants;

(g)      usurp the authority of the Iowa General Assembly, to the

detriment of Iowa chiropractors and the treatment and therapy offered to their

patients, in requiring the use of and promulgating standards and rules of practice for

"Chiropractic Assistants," a category of health care practitioner found nowhere in the

present Code of Iowa in Chapters 147 through 158 or elsewhere, and in limiting the

employment of certain modes of physiotherapy if not applied by chiropractors or

"chiropractic assistants;"

3

  .    .

(h)    Enter into agreements with various subdivisions of the State of
Iowa to limit or exclude chiropractic coverage from health plans offered to employees
of various subdivisions of the State of Iowa, based upon the encouragement of and
false information provided by the Wellmark Defendants.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to
Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendants in that
the Defendants are Iowa corporations with their corporate headquarters located in Des
Moines, Polk County, Iowa.

4.    Venue is proper pursuant to Iowa Code Ch. 616.

## PARTIES

5.    The individual plaintiff doctors of chiropractic bring this action for damages,
declaratory relief and injunction on behalf of all doctors of chiropractic in Iowa similarly
situated who are citizens of the state of Iowa as of the date of filing of this petition. The
doctor of chiropractic Plaintiffs are referred to as the "Provider Plaintiffs" or the
"Providers." They are:

(a)    Plaintiff Steven A. Mueller, D.C., a doctor of chiropractic licensed
to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and
practices chiropractic in Algona, Iowa. During all times material to this action, Dr.
Mueller has provided and billed for chiropractic to patients who are enrolled in plans
offered by Defendants.

4

(b)     Plaintiff Bradley J. Brown, D.C., a doctor of chiropractic licensed
to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and
practices chiropractic in Oelwein, Iowa. During all times material to this action, Dr.
Brown has provided and billed for chiropractic services to patients who are enrolled
in plans offered by Defendants.

(c)     Plaintiff Mark A. Kruse, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and
practices chiropractic in Sioux City, Iowa. During all times material to this action, Dr.
Kruse has provided and billed for chiropractic services to patients who are enrolled in
plans offered by Defendants.

(d)     Plaintiff Kevin D. Miller, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and
practices chiropractic in West Des Moines, Iowa. During all times material to this
action, Dr. Miller has provided and billed for chiropractic services to patients who are
enrolled in plans offered by Defendants.

(e)     Plaintiff Larry E. Phipps, D.C., a doctor of chiropractic licensed to
practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and
practices chiropractic in Marshalltown, Iowa. During all times material to this action,
Dr. Phipps has provided and billed for chiropractic services to patients who are
enrolled in plans offered by Defendants.

6.     Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are
Iowa corporations with their corporate headquarters located at 636 Grand Avenue, Des
Moines, Iowa. Wellmark, Inc. does business as Wellmark Blue Cross and Blue Shield of

5

Iowa. Wellmark and its subsidiaries and affiliated companies, including Wellmark Blue
Cross and Blue Shield of South Dakota and Wellmark Health Plan of Iowa, Inc., insure or
pay health benefit claims for more than two million members in Iowa and South Dakota.
Wellmark Blue Cross and Blue Shield of Iowa, Wellmark Blue Cross and Blue Shield of
South Dakota, and Wellmark Health Plan of Iowa, Inc. are independent licensees of the
Blue Cross and Blue Shield Association.

7.      Defendant Wellmark, Inc., was originally incorporated on September 19,
1939, as a corporation not for pecuniary profit under what later became Chapter 504A of
the Code of Iowa, to operate a nonprofit health service plan under [now] Chapter 514 of
the Code of Iowa to provide payment for health care furnished to subscribers under
contract with the corporation. (Second Restated Articles of Incorporation, filed
September 1, 1989). On October 1, 1991, Wellmark adopted a plan of mutualization to
become a corporation for pecuniary profit under Chapter 491 of the Code of Iowa and a
mutual insurance company under Chapter 508 of the Code of Iowa. The company merged
with South Dakota Medical Service, Inc., on July 25, 1996, and on May 15, 1997, it
changed its name to Wellmark, Inc., an Iowa corporation and mutual insurance company.
Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa
50312.

8.      Defendant Wellmark Health Plan of Iowa, Inc., was incorporated in Iowa on
March 13, 1996, as an Iowa domestic profit corporation under Chapter 490 of the Code of
Iowa. Its stated purpose in its articles of incorporation is to establish and operate a health
maintenance organization under Chapter 514B of the Code of Iowa. Its registered agent is
CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

6

**Plaintiffs' Appendix in Resistance          Page 43 of 201
to Wellmark Motion to Stay**

9.    The Blue Cross and Blue Shield Association is a non-party co-conspirator
with the Wellmark defendants for purposes of the Iowa Competition Act.  Wellmark
Defendants are members of the Blue Cross and Blue Shield Association.  The Blue Cross
and Blue Shield Association developed provider contracts and manuals which are being
implemented in the State of Iowa by the Wellmark Defendants.  The Blue Cross and Blue
Shield Association is headquartered in Chicago, Illinois, with offices in Washington, D.C.
The Blue Cross and Blue Shield Association (BCBSA) is a national federation of 39 Blue
Cross and Blue Shield companies. Collectively, the 39 Blue Cross and Blue Shield System
provides healthcare coverage for more than 99 million people or one-in-three Americans.
The vast majority (65+%) of those persons covered by the Blue Cross and Blue Shield
System are in PPO's, and an even greater percentage of Wellmark Defendants users are in
PPO's.  According to BCBSA, a Preferred Provider Organization (PPO) is an arrangement
designed to supply health care services at a discounted cost by providing incentives for
members to use designated health providers (who contract with the PPO at a discount),
but which also provides coverage for services rendered by health care providers who are
not part of the PPO network.

10.    The class of plaintiffs consisting of all physicians (defined as an individual
duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy
including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well
as those non-participating) who provided covered services to an plan member or services
to any individual enrolled in or covered by a plan offered or administered by Wellmark
from May 22, 1999, to May 30, 2007, included in the Settlement Agreement of April 27,

7

2007, as alleged in Paragraph 3(e) above, are non-party co-conspirators with Wellmark for purposes of the Iowa Competition Act.

11.     Historically, Wellmark's predecessor under a former name was organized and controlled by the Iowa Medical Society and the majority of its Board of Directors were allopathic or osteopathic physicians. Under the control of allopathic and osteopathic physicians, Wellmark's predecessor under a former name refused to seek authority to provide the services of chiropractors to its subscribers and members. In furtherance of that combination and conspiracy, in more recent times the Wellmark entities have established a scale of compensation for the same or similar diagnostic and treatment services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) receive as much as 100% higher payment than chiropractors receive for the same or similar diagnostic and treatment services.

12.     In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology based upon the Resource Based Relative Value System (RBRVS) and began issuing annual RBRVS-based statewide fee schedules. Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

13.     Wellmark has entered into agreement with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a

8

Settlement Agreement dated April 27, 2007, to which Defendant Wellmark and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007. These Iowa M.D.'s and D.O.'s, who are in direct competition with the Plaintiff Class.

14. In addition, the Iowa Medical Society has signed on to the Settlement Agreement dated April 27, 2007, and is also a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.

## CLASS ACTION ALLEGATIONS

15. Plaintiffs bring this action individually and as a class action pursuant to Iowa Rules of Civil Procedure 1.261 et seq on behalf of all chiropractors licensed in Iowa who are citizens of Iowa as of the date of filing of this petition, each of whom have been damaged in their businesses or property and is being or will be irreparably harmed by defendants' actions described below (the "Class").

16. This action is properly maintainable as a class action.

17. The Class are so numerous that joinder of all members is impracticable. There are approximately 1200 chiropractors licensed in Iowa who are citizens of the state of Iowa at the time of the filing of this petition. The names of the absent members of the class can be ascertained so that personal or mailed notice of the class action can be given them.

9

18.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, *inter alia*, the following:

(a)     whether Wellmark defendants have imposed maximum fee schedules to which chiropractors must agree with defendants and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(b)     whether Wellmark defendants have prescribed fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(c)     whether Wellmark defendants have prescribed limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(d)     whether Wellmark defendants have historically entered into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

(e)     whether Wellmark defendants have agreed with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which the

10

Wellmark defendants and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007, said agreement being effective and binding on the Wellmark defendants for the next four years from April 27, 2007.

(f)     whether the Wellmark Defendants have engaged or are about to engage in a contract, combination or conspiracy between two or more persons in restraint of trade or commerce in Iowa as a whole and in major population centers of Iowa under Iowa Code § 553.4 (2007);

(g)     whether under the proposed contracts, plans and policies of the Wellmark Defendants, Iowa chiropractors and the care and treatment of chiropractic patients in Iowa will be evaluated by standards contrary to Chapter 151, Code of Iowa (2007);

(h)     whether the Wellmark Defendants have attempted to usurp the authority of the Iowa General Assembly, to the detriment of Iowa chiropractors and the treatment and therapy offered to their patients, in requiring the use of and promulgating standards and rules of practice for "Chiropractic Assistants," a category of health care practitioner found nowhere in the present Code of Iowa in Chapters 147 through 158 or elsewhere, and in limiting the employment of certain modes of physiotherapy if not applied by chiropractors or "chiropractic assistants;"

11

(i)     whether any of the activities or arrangements of the Wellmark
Defendants have been expressly approved or regulated by any regulatory body or
officer acting under authority of this state;

(j)     whether the Wellmark Defendants, acting under the purported
authority of Chapter 514F of the Code of Iowa and rules promulgated by the Iowa
Insurance Commissioner, have, in bad faith and for improper or pretextual motives,
discriminated against chiropractors;

(k)     whether plaintiffs and the Class they represent has been injured
or threatened with injury by conduct prohibited by Chapter 553, Code of Iowa (2007);

(l)     whether to class of chiropractic plaintiffs have been damaged in
the past four years by the invidious treatment by the Wellmark defendants, who have
uniformly paid chiropractors less for the same or similar services than has been paid
for the services of other health care practitioners in Iowa; and

(m)    whether plaintiffs and the other members of the class will suffer
irreparable injury by the continuing discriminatory treatment and practices of the
Wellmark defendants.

19.     Plaintiffs' claims are typical of the claims of the other members of the Class
and plaintiffs do not have any interests adverse to the Class.

20.     Plaintiffs are adequate representatives of the Class, and have retained
competent counsel experienced in litigation of this nature and will fairly and adequately
protect the interests of the Class. The named plaintiffs and their attorneys have or can
acquire adequate resources to ensure that the interests of the class will not be harmed.

12

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 49 of 201**

21.     The prosecution of separate actions by individual members of the Class
would create a risk of inconsistent or varying adjudications with respect to individual
members of the Class which would establish incompatible standards of conduct for the
party opposing the Class under the standard of I.R.C.P. 1.262(3)(b).

22.     Adjudications with respect to individual members of the class as a practical
matter would be dispositive of the interests of other members not parties to the
adjudication or substantially impair or impede their ability to protect their interests under
the standard of I.R.C.P. 1.262(3)(c).

23.     Plaintiffs anticipate that there will be no difficulty in the management of this
litigation. A class action is superior to other available methods for the fair and efficient
adjudication of this controversy.

24.     Defendants have acted on grounds generally applicable to the Class with
respect to the matters complained of herein, thereby making appropriate the relief sought
herein with respect to the Class as a whole.

## FACTUAL CONDUCT ALLEGATIONS

25.     The Wellmark Defendants provide health services to the Iowa public on a
statewide basis by offering and operating health care plans. Wellmark Defendants provide
health care services including administration of self-funded health care plans to
approximately 1.4 million Iowa enrollees in various health care plans statewide.

26.     Wellmark Defendants offer various health care coverage plans, including
their PPO plan, "Alliance Select," and their HMO plans, "Blue Advantage," "Blue Access,"
and "Blue Choice" to their subscribers.

13

27.    In addition to offering coverage agreements to subscribers, Wellmark
Defendants enter into agreements with the providers of health care services, including
those licensed under Iowa Code Ch. 148 (medical doctors -MD's), Ch.150A (doctors of
osteopathic medicine –DO's), and Ch. 151 (doctors of chiropractic -DC's).

28.    Under these provider agreements with the Wellmark Defendants, health
care professionals, including the Provider Plaintiffs, render treatment services to patients
who are enrolled in the Wellmark Defendants' various plans.

29.    Services are provided under the fundamental premise that, if the services
are covered and are medically necessary, the Wellmark Defendants' enrollees will be
covered and the providers of the services, including the Provider Plaintiffs, will be
compensated in a timely manner for those services.

30.    Wellmark Defendants control over 60 percent of the health care insurance
and services market in Iowa, primarily through PPO contracts.

31.    Wellmark Defendants use their overwhelming economic power and market
dominance to coerce the individual Provider Plaintiffs into acquiescing in practice
restrictions and reimbursement schedules detrimental to Provider Plaintiffs and by
limiting and restricting patient access to Provider Plaintiffs resulting in detriment to the
physical care and choice of consumers.

32.    This action is based on the relationships between the Provider Plaintiffs and
the Wellmark Defendants, and also on the belief that the Wellmark Defendants' actions,
as detailed below, detrimentally impact patient health and the general welfare of the
public, inasmuch as those actions deprive and limit patient access to the Provider

14

Plaintiffs' treatment, and restrict and otherwise interfere with and impede the
relationships between the Provider Plaintiffs and their existing and prospective patients.

33.    Wellmark Defendants have engaged in, and continue to engage in, a pattern
and practice of treatment which discriminates against the Provider Plaintiffs as licensees
under Iowa Code Ch. 151, all in violation of Iowa law. This discrimination has occurred
and is occurring in numerous ways, including:

(a)    Wellmark Defendants have entered into agreement with over
95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in
active practice to numerous items of preferential treatment, discriminatory to
plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to
which Wellmark Defendants and a class of plaintiffs consisting of all physicians
(defined as an individual duly licensed by a state licensing board as a Medical Doctor
or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by
contract in Wellmark plans as well as those non-participating) who provided covered
services to an plan member or services to any individual enrolled in or covered by a
plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007.

(b)    As presently administered by Wellmark, most "Blue Advantage"
plans caps the number of covered visits its subscribers may make to a doctor of
chiropractic to 12, regardless of individual subscriber-patient circumstances. No such
restriction of 12 visits is imposed upon other health care providers-licensees. In
addition, in order to continue with additional treatment after the 12-visit cap has been
reached, a subscriber-patient must obtain a referral from a "PCP" (Primary Care
Physician) before any additional treatment from a doctor of chiropractic will be

15

covered by Wellmark. Absent obtaining such an approved referral, the subscriber-
patient must either forgo further chiropractic treatment or pay for the additional
treatment personally, and then only after signing a waiver stating, in part, "I
understand that I am requesting a service that may not be fully covered by my
insurance company. I agree to be financially responsible for the full amount."

(c)     Wellmark Defendants have arbitrarily imposed riders on the
policies of patients excepting from coverage any medical benefits in connection with
or on account of the spine and any related degenerative or congenital diseases,
including treatment, operation or complications thereof, based solely upon the
patient previously seeking the treatment of a neuromusculoskeletal condition by a
doctor of chiropractic.

(d)     Wellmark Defendants' "Blue Advantage" plan, as made available
to employees of Iowa State University in late 2006, expressly provides for "no co-pay
for any service, including office visits, except for $10 co-payment for chiropractic
manipulation" ... and a $100 co-payment for emergency room services;

(e)     Beginning in approximately 2006, Wellmark Defendants
unilaterally determined that their subscriber-patients who elected to seek chiropractic
treatment would be covered for only three treatment procedures per visit to a doctor
of chiropractic regardless of the acuity, severity, or nature of the patient's condition or
the number of her complaints.

(f)     Wellmark Defendants have implemented a pattern of payment
practices whereby Iowa Doctors of Chiropractic are paid a substantially lesser amount
(from 55% less to over 100% less) for the same services as Wellmark pays Medical

16

Case MDL No. 2406  Document 389-9  Filed 07/28/17  Page 396 of 645

Case 4:17-cv-00210-JAJ-SBJ  Document 1-16  Filed 06/14/17  Page 54 of 201
E-Filed  Chicoine/Mueller v. Wellmark, Law No. CVCV050638  CRT

Doctors, Doctors of Osteopathy, Physicians Assistants, and Nurse Practitioners. The
stated rationale of the Wellmark Defendants for this discriminatory practice is that
Medicare and Medicaid relative value formulations. The Medicare and Medicaid
formulations, however, make no such distinctions with respect to the same codes, and
do not employ different codes for the same diagnostic and treatment services.
Further, Federal Medicare law contains a payment equity provision which provides
that: "A Medicare+Choice organization shall not discriminate with respect to
participation, reimbursement, or indemnification as to any provider who is acting
within the scope of the provider's license or certification under applicable State law,
solely on the basis of such license or certification." 42 U.S.C. § 1395w-22 (b)(2).
Medicare+Choice organizations are private plans contracting to provide Medicare
benefits in a managed care setting. In addition, the entire Medicare program is based
on a relative value (RBRVS) system that establishes uniform payment for services and
that does not take into consideration the license of the provider. Under Medicare,
providers receive the same reimbursement for the same service provided without
regard to licensure.

     (g)    Wellmark Defendants have established a "Physical Medicine
Guide", which purports to describe and cover office documentation for treatment by
"physical medicine." The "Physical Medicine Guide" discriminates against diagnostic
and treatment services provided by Iowa chiropractors and violates the authorization
for entering into preferred provider agreements found in Chapter 514F of the Iowa
Code.

## LEGISLATIVE HISTORY AND INTENT

17

.     .

34.     Doctors of chiropractic are licensed by the State of Iowa. Iowa Code section

151.1 defines "persons engaged in the practice of chiropractic" as persons "publicly

professing to assume the duties incident to the practice of chiropractic" (§ 151.1(1)), or

persons who treat "human ailments by the adjustment of the neuromusculoskeletal

structures, primarily, by hand or instrument, through spinal care," (§ 151.1(2)), or persons

utilizing differential diagnosis and related procedures, withdrawing or ordering

withdrawal of a patient's blood for diagnostic purposes, performing or utilizing routine

laboratory tests, performing physical examinations, rendering nutritional advice, and

utilizing chiropractic physiotherapy procedures, "all of which are subject to and

authorized by section 151.8." (§ 151.1(3))

35.     Section 151.3 provides for licensing, and section 151.8 states that "[a]

chiropractor using the additional procedures and practices authorized by this Act shall be

held to the same standard of care applicable to any other health care practitioner in this

state." Pursuant to section 151.11, a board of chiropractic examiners is required to

promulgate rules governing chiropractic practice in this state.

36.     Wellmark's agreements with Iowa M.D.'s and D.O.'s gives numerous

preferences to those providers in direct competition with D.C.'s, including Plaintiff, and

therefore selectively target doctors of chiropractic and their patients, including Plaintiff,

with respect to chiropractic treatment, as specified above.

## PLAINTIFFS AND THE PLAINTIFF CLASS HAVE BEEN DAMAGED BY THE DISCRIMINATORY CONDUCT, RESTRAINT OF TRADE AND ABUSE OF MONOPOLY POWER OF THE WELLMARK DEFENDANTS

37.     The plaintiffs and the plaintiff class have been damaged in the past four

years by receiving as much as 50% less than the Wellmark defendants paid other health

18

care practitioners in Iowa for the same or similar services. This damage can be calculated through the examination of a schedule of fees prepared by the Wellmark defendants annually and comparing the compensation scheduled to be paid to plaintiffs and the plaintiff class to compensation scheduled to be paid to other Iowa health care practitioner for the same or similar services.

## PLAINTIFFS ARE IRREPARABLY HARMED BY DEFENDANTS' PAST AND ONGOING CONDUCT

38.   Wellmark Defendants' past and announced future restrictions place an unreasonable, illegal, and discriminatory burden on doctors of chiropractic, in terms of administrative requirements not applied to other health care providers and interfere with professional judgment, and limit the extent of care and treatment options available to patients.

39.   More importantly, the restrictions and discriminatory practices discourage chiropractic patients from receiving adequate treatment for their human ailments, depriving them of the benefits of chiropractic treatment, and, accordingly, cause irreparable harm by causing patients to suffer from their human ailments rather than obtain effective and less costly relief for them.

## HALTING DEFENDANTS' CONDUCT WILL FURTHER THE PUBLIC INTEREST

40.   Wellmark Defendants' past and announced future restrictions limit and deny access to one form of health care services, thus limiting the choices available to its subscribers. Its practices wrongfully restrict highly qualified health care providers from providing treatment services.

19

41.     Wellmark Defendants' practices will impermissibly direct patients to other
health care providers, whose charges for comparable services are frequently higher.

## CLAIMS FOR RELIEF

## COUNT II

## RESTRAINT OF TRADE

42.     Plaintiffs, by this reference, hereby incorporate paragraphs 1 through 42, set
out above in the Statement of Facts, as if set forth in this Count II.

43.     Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are
engaged in the business of providing health care expense reimbursement or health care
services in Des Moines, Polk County, Iowa, and in the State of Iowa generally. According
to the provider contract of November 1, 2007, Wellmark is a licensee of the Blue Cross
and Blue Shield Association (BCBSA).  The Blue Cross and Blue Shield Association
develops provider contracts and manuals for its member associations, including in
particular the Wellmark.

44.     Historically, Wellmark's predecessor under a former name was organized
and controlled by the Iowa Medical Society and the majority of its Board of Directors were
allopathic or osteopathic physicians.  Under the control of allopathic and osteopathic
physicians, Wellmark's predecessor under a former name refused to seek authority to
provide the services of chiropractors to its subscribers and members. In furtherance of
that combination and conspiracy, in more recent times the Wellmark entities have
established a scale of compensation for the same or similar diagnostic and treatment
services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of
Osteopathy (D.O.'s) receive as much as 100% higher payment than chiropractors receive

20

for the same or similar diagnostic and treatment services. This is done now under purported authority of Iowa Code § 514F.3 and rules of the Iowa Insurance Commissioner which gives insurance companies such as Wellmark authority to enter into preferred provider agreements with various Iowa health care providers, including M.D.'s, D.O.'s, chiropractors, podiatrists, psychologists, physician's assistants, nurse practitioners, and others. Contrary to the authority given by Chapter 514F of the Code of Iowa, however, and without filing with or obtaining the explicit approval of the Iowa Insurance Commissioner, the annual rate schedule for health care services which has been issued by Wellmark and which governs its payment of Iowa health care practitioners discriminates against those health care practitioners licensed under Chapter 151 of the Code of Iowa.

45.    In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology based upon the Resource Based Relative Value System (RBRVS) and began issuing annual RBRVS-based statewide fee schedules. Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

46.    Wellmark has entered into agreement with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which Defendant Wellmark and a class of

21

plaintiffs consisting of all physicians (defined as an individual duly licensed by a state

licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those

M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-

participating) who provided covered services to an plan member or services to any

individual enrolled in or covered by a plan offered or administered by Wellmark from May

22, 1999, to May 30, 2007. This agreement by its express terms runs until April 26, 2011.

47.    Doctors of Chiropractic are defined as physicians under Iowa law and are

direct competitors of M.D.'s and D.O.'s in providing diagnostic and treatment of human

ailments of Iowa residents.

48.    Wellmark and its co-conspirators have entered into a contract, combination

and conspiracy between two or more persons in restraint of trade, and have conspired and

combined to:

(a)    impose maximum fee schedules to which chiropractors must

agree with defendants and with each other in order to provide diagnostic and

treatment services for their patients in Iowa;

(b)    prescribe fees for chiropractic services which are discriminatory

to doctors of chiropractic in relation to the fees for other health care practitioners for

the same or similar services;

(c)    have historically entered into a contract, combination and

conspiracy in restraint of trade or commerce in Iowa with health care providers other

than chiropractors to first boycott and then later discriminate against the diagnostic

and treatment services to members provided by Iowa chiropractors.

22

(d)     agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and
Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential
treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement
Agreement dated April 27, 2007, to which the Wellmark defendants and a class of
plaintiffs consisting of all physicians (defined as an individual duly licensed by a state
licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those
M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-
participating) who provided covered services to an plan member or services to any
individual enrolled in or covered by a plan offered or administered by Wellmark from
May 22, 1999, to May 30, 2007, said agreement being effective and binding on the
Wellmark defendants for the next four years from April 27, 2007.

(e)     impose definitions of "chiropractic" and "medical necessity"
contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the
care for human ailments by chiropractors for which payment will be made by the
Wellmark Defendants;

(f)     usurp the authority of the Iowa General Assembly, to the
detriment of Iowa chiropractors and the treatment and therapy offered to their
patients, in requiring the use of and promulgating standards and rules of practice for
"Chiropractic Assistants," a category of health care practitioner found nowhere in the
present Code of Iowa in Chapters 147 through 158 or elsewhere, and in limiting the
employment of certain modes of physiotherapy if not applied by chiropractors or
"chiropractic assistants;"

23

(g) Enter into agreements with various subdivisions of the State of Iowa to limit or exclude chiropractic coverage from health plans offered to employees of various subdivisions of the State of Iowa, based upon the encouragement of and false information provided by the Wellmark Defendants.

49. As a direct and proximate result of Wellmark Defendants' conduct, competition in the relevant market described herein has been injured.

50. Plaintiffs and the Class they represent have been injured or threatened with injury by conduct prohibited by Chapter 553, Code of Iowa (2007).

51. Plaintiffs and the other members of the Class have been damaged in their businesses and property by and as a proximate cause of the conduct of the Wellmark defendants.

52. Plaintiffs and the other members of the Class will suffer irreparable injury if the contracts announced by the Wellmark Defendants are implemented, in that patients will forego necessary chiropractic treatment because of the threat of or the actual imposition of refusals by the Wellmark Defendants to approve of or make payment for such necessary services. Such refusals affect the present and future health and welfare of the patients of chiropractors in Iowa, a matter for which there is no adequate remedy at law.

53. The actions of the Wellmark Defendants are willful or flagrant in light of the existing law of Iowa and the surrounding circumstances.

## COUNT III

### ABUSE OF MONOPOLY POWER

24

54.    Plaintiffs, by this reference, hereby incorporate paragraphs 1 through 42, set
out above in the Statement of Facts, as if set forth in this Count III.

55.    Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are
engaged in the business of providing health care expense reimbursement or health care
services in Des Moines, Polk County, Iowa, and in the State of Iowa generally. According
to the provider contract of November 1, 2007, Wellmark is a licensee of the Blue Cross
and Blue Shield Association (BCBSA). The Blue Cross and Blue Shield Association
develops provider contracts and manuals for its member associations, including in
particular the Wellmark.

56.    The Wellmark defendants have over 70% of the health insurance business in
the state of Iowa and in most major metropolitan centers of Iowa.

57.    The Wellmark defendants have attempted to establish and have established,
maintained and used a monopoly of trade or commerce in a relevant market for the
purpose of excluding competition or of controlling, fixing, or maintaining prices by the
following conduct:

(a)    impose maximum fee schedules to which chiropractors must
agree with defendants and with each other in order to provide diagnostic and
treatment services for their patients in Iowa;

(b)    prescribe fees for chiropractic services which are discriminatory
to doctors of chiropractic in relation to the fees for other health care practitioners for
the same or similar services;

(c)    prescribe limitations upon and make optional the coverage of
diagnostic and treatment services of chiropractors while not imposing the same

25

standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(d)     have historically entered into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

(e)     agree with over 95% of all Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) in active practice to numerous items of preferential treatment, discriminatory to plaintiff, as found in Section 7 of a Settlement Agreement dated April 27, 2007, to which the Wellmark defendants and a class of plaintiffs consisting of all physicians (defined as an individual duly licensed by a state licensing board as a Medical Doctor or as a Doctor of Osteopathy including both those M.D.'s and D.O.'s participating by contract in Wellmark plans as well as those non-participating) who provided covered services to an plan member or services to any individual enrolled in or covered by a plan offered or administered by Wellmark from May 22, 1999, to May 30, 2007, said agreement being effective and binding on the Wellmark defendants for the next four years from April 27, 2007.

(f)     impose definitions of "chiropractic" and "medical necessity" contrary to Chapter 151, Code of Iowa (2007) in order to diminish and restrict the care for human ailments by chiropractors for which payment will be made by the Wellmark Defendants;

26

58.    As a direct and proximate result of Wellmark Defendants' conduct, competition in the relevant market described herein has been injured.

59.    Plaintiffs and the Class they represent have been injured or threatened with injury by conduct prohibited by Chapter 553, Code of Iowa (2007).

60.    Plaintiffs and the other members of the Class have been damaged in their businesses and property by and as a proximate cause of the conduct of the Wellmark defendants.

61.    Plaintiffs and the other members of the Class will suffer irreparable injury if the contracts announced by the Wellmark Defendants are implemented, in that patients will forego necessary chiropractic treatment because of the threat of or the actual imposition of refusals by the Wellmark Defendants to approve of or make payment for such necessary services. Such refusals affect the present and future health and welfare of the patients of chiropractors in Iowa, a matter for which there is no adequate remedy at law.

62.    The actions of the Wellmark Defendants are willful or flagrant in light of the existing law of Iowa and the surrounding circumstances.

## COUNT IV

## APPLICATION FOR PERMANENT INJUNCTION

63.    Plaintiffs incorporate by reference the allegations in the foregoing paragraphs 1 through 42 of this Petition as if fully set forth.

64.    As set forth more fully above, there is a substantial threat that the Provider Plaintiffs and the health care consumer members of the Wellmark defendants will suffer irreparable injury absent entry of injunctive relief. In fact, as a direct consequence of

27

Wellmark Defendants' conduct, the Provider Plaintiffs are and will increasingly be

burdened with selectively imposed administrative and other costs, and through the

targeted interference with patient care and chiropractor-patient relationships. Iowa

health care consumers are suffering and increasingly will suffer injury in the form of

selectively restricted access to chiropractic health care and through the targeted

interference with patient care and chiropractor-patient relationships.

65.     This real and present injury outweighs any potential conceivable injury to

Wellmark Defendants.

66.     As set forth more fully above, granting this injunction will serve the public

interest by allowing greater access to treatment services on a nondiscriminatory basis.

67.     Upon hearing on the merits after discovery has been taken, the plaintiffs

pray for the Court to issue a permanent injunction, enjoining the Wellmark Defendants

from continuing to violate Iowa Code §§ 553.4 & .5.

## PRAYER

**WHEREFORE**, Plaintiffs pray for the following relief:

1.     That the Court find and declare that this case and the Counts II through IV

of the amended petition state a proper case for class wide relief in the form of damages

and for injunctive relief, and that notice be given to the class of this action pursuant to

Iowa Rule of Civil Procedure 1.261 et seq.;

2.     That the jury award plaintiffs and the plaintiff class damages in an amount

determined by the evidence;

3.     That upon final hearing, the Court enter an order permanently enjoining

Wellmark Defendants from continuing to enforce the discriminatory restrictions and

28

procedures and from implementing the planned additional discriminatory restrictions
and procedures;

(a)    That the jury award plaintiffs and the plaintiff class double their
actual damages because of the egregious conduct of the Wellmark defendants;

4.    That, pursuant to I.R.C.P. 1.275(4), the Court award attorneys' fees to
Plaintiffs, and that, pursuant to Iowa Code § 553.12(4), the Court award the necessary
costs of bringing suit, including a reasonable attorney fee; and

5.    That the Court award such other and further relief to which Plaintiffs are
justly entitled.

## DIVISION II

## PLAINTIFF MUELLER'S INDIVIDUAL ACTION

## U**NATURE OF THE CASE**

1.    Plaintiff brings this action seeking damages for denial of claims.

## **JURISDICTION AND VENUE**

2.    This Court has jurisdiction over the subject matter of this action pursuant to
Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendant in that the
Defendant is an Iowa corporation with its corporate headquarters located in Des Moines,
Polk County, Iowa.

3.    Defendant Wellmark, through its counsel, has agreed with Plaintiff that the
tolling date for bringing this action is December 9, 2007.

4.    Venue is proper pursuant to Iowa Code Ch. 616.

29

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 409 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 67 of 201
E-FILED 2017 JUN 12 4:30 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,<br><br>        Defendants | Law No. CL112671 |

## PLAINTIFFS' FOURTH AMENDED AND SUBSTITUTED PETITION FOR DAMAGES
### (To Conform to Opinion of Iowa Supreme Court)
### (Jury Trial Demanded)

### COUNT I

### PLAINTIFFS' CLASS ACTION AND CONDUCT ALLEGATIONS FOR CONSPIRACY TO RESTRAIN OR MONOPOLIZE COMMERCE

### NATURE OF THE CASE

1.      Plaintiffs bring this action on behalf of themselves and a class of Iowa-licensed doctors of chiropractic (1) who are citizens of the state of Iowa as of the date of filing or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after December 17, 2007, the date of initial filing of this suit. They seek damages from Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc. ("Wellmark Defendants") for combination and conspiracy to restrain or mo-

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 410 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 68 of 201
E-Filed    2013 JAN 14 4:45 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

nopolize (monopsonize) trade or commerce in the purchase of health care delivery from Iowa chiropractors in setting the price paid for chiropractic services at a discriminatory low level and in restricting patient access to and coverage for treatment by Iowa-licensed doctors of chiropractic in violation of the Iowa Competition Law, Iowa Code § 553.4 (2007).

2.    This Fourth Amended and Substituted Petition is intended to conform to the Opinion of the Iowa Supreme Court in this case issued on July 27, 2012.

3.    In its essence, this Petition alleges that Wellmark Defendants have, by contract, conspiracy and other unlawful means, conspired and combined to:

(a)    enter into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa;

(b)    impose maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(c)    prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(d)    prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 411 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 69 of 201
E-FILED 2016 MAR 14 1:49 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

(e)    historically enter into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

## JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject matter of this action pursuant to Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendants in that the Defendants are Iowa corporations with their corporate headquarters located in Des Moines, Polk County, Iowa.

5.    Venue is proper pursuant to Iowa Code Ch. 616.

## PARTIES

6.    The individual plaintiff doctors of chiropractic bring this action for damages, declaratory relief and injunction on behalf of all doctors of chiropractic in Iowa similarly situated (1) who are citizens of the state of Iowa as of the date of filing of this petition  or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after December 17, 2007, the date of initial filing of this suit.  The doctor of chiropractic Plaintiffs are referred to as the **"Provider Plaintiffs" or the "Providers."** They are:

(a)    Plaintiff Steven A. Mueller, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Algona, Iowa. During all times material to this action, Dr. Mueller has provided and billed for chiropractic to patients who are enrolled in plans offered by Defendants.

(b)    Plaintiff Bradley J. Brown, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resi-

3

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 412 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 70 of 201
E-Filed  2015 JUN 11 4:14PM MADISON - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

dent of and practices chiropractic in Oelwein, Iowa. During all times material to this action, Dr. Brown has provided and billed for chiropractic services to patients who are enrolled in plans offered by Defendants.

(c)     Plaintiff Mark A. Kruse, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Sioux City, Iowa. During all times material to this action, Dr. Kruse has provided and billed for chiropractic services to patients who are enrolled in plans offered by Defendants.

(d)     Plaintiff Kevin D. Miller, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in West Des Moines, Iowa. During all times material to this action, Dr. Miller has provided and billed for chiropractic services to patients who are enrolled in plans offered by Defendants.

(e)     Plaintiff Larry E. Phipps, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Marshalltown, Iowa. During all times material to this action, Dr. Phipps has provided and billed for chiropractic services to patients who are enrolled in plans offered by Defendants.

7.     Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are Iowa corporations with their corporate headquarters located at 1331 Grand Avenue, Des Moines, Iowa. Wellmark, Inc. does business as Wellmark Blue Cross and Blue Shield of Iowa.  Wellmark and its subsidiaries and affiliated companies, including Wellmark Blue Cross and Blue Shield of South Dakota and Wellmark Health Plan of Iowa, Inc., insure or pay health benefit claims for more than two million members in Iowa and South Dakota.  Wellmark Blue Cross and Blue Shield of Iowa, Wellmark Blue Cross and Blue

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 413 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 71 of 201
E-FILED 2016 MAR 11 4:48 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Shield of South Dakota, and Wellmark Health Plan of Iowa, Inc. are independent licensees of the Blue Cross and Blue Shield Association (**"BCBSA"**).

8.    Defendant Wellmark, Inc., was originally incorporated on September 19, 1939, as a corporation not for pecuniary profit under what later became Chapter 504A of the Code of Iowa, to operate a nonprofit health service plan under [now] Chapter 514 of the Code of Iowa to provide payment for health care furnished to subscribers under contract with the corporation. (Second Restated Articles of Incorporation, filed September 1, 1989). On October 1, 1991, Wellmark adopted a plan of mutualization to become a corporation for pecuniary profit under Chapter 491 of the Code of Iowa and a mutual insurance company under Chapter 508 of the Code of Iowa. The company merged with South Dakota Medical Service, Inc., on July 25, 1996, and on May 15, 1997, it changed its name to Wellmark, Inc., an Iowa corporation and mutual insurance company. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

9.    Defendant Wellmark Health Plan of Iowa, Inc., was incorporated in Iowa on March 13, 1996, as an Iowa domestic profit corporation under Chapter 490 of the Code of Iowa. Its stated purpose in its articles of incorporation is to establish and operate a health maintenance organization under Chapter 514B of the Code of Iowa. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

10.    The Blue Cross and Blue Shield Association and the 39 independent Blue Cross and Blue Shield companies are non-party co-conspirators with the Wellmark defendants for purposes of the Iowa Competition Act.   Wellmark Defendants are one of 39 members of the Blue Cross and Blue Shield Association.    The Blue Cross and Blue Shield Association developed provider contracts and manuals which are being implemented in the State of Iowa by the Wellmark Defendants.   The Blue Cross and Blue

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 414 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 72 of 201
E-FILED 2016 MAR 14 1:48 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Shield Association is headquartered in Chicago, Illinois, with offices in Washington, D.C. The Blue Cross and Blue Shield Association (BCBSA) is a national federation of 39 Blue Cross and Blue Shield independent companies. Collectively, the 39 Blue Cross and Blue Shield independent companies provide healthcare coverage for more than 99 million people or one-in-three Americans.  The vast majority (65+%) of those persons covered by the Blue Cross and Blue Shield System are in PPO's, and an even greater percentage of Wellmark Defendants users are in PPO's.  According to BCBSA, a Preferred Provider Organization (PPO) is an arrangement designed to supply health care services at a discounted cost by providing incentives for members to use designated health providers (who contract with the PPO at a discount), but which also provides coverage for services rendered by health care providers who are not part of the PPO network.

   11.  Historically, Wellmark's predecessor under a former name was organized and controlled by the Iowa Medical Society and the majority of its Board of Directors were Iowa allopathic physicians.  Under the control of allopathic physicians, Wellmark's predecessor under a former name refused to seek authority to provide the services of chiropractors to its subscribers and members. In furtherance of that combination and conspiracy, in more recent times the Wellmark entities have established a scale of compensation for the same or similar diagnostic and treatment services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) receive as much as 100% higher payment than chiropractors receive for the same or similar diagnostic and treatment services.

   12.  In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology purportedly based upon the Resource Based Relative Value System (RBRVS) and began issuing annual statewide fee schedules.  Contrary to the actual

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 415 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 73 of 201
E-FILED 2015 MAR 11 4:49 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates, not in substantial conformity with RVUs determined by the Center for Medicare and Medicaid Services, for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

13.      The 38 other independent members of BCBSA are non-party co-conspirators with the Wellmark defendants for purposes of the Iowa Competition Act. By agreement with Wellmark, BCBSA, and each other, any licensed subsidiary or affiliate of the Blue Cross and Blue Shield Association and licensed Blue Cross and Blue Shield Plans has agreed with Wellmark to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark under terms of the Practitioner Services Agreement.

14.      Additionally, providers for the employees of all or nearly all of the self-funded plans Wellmark administers in Iowa use the same identical preferred provider panels as Wellmark's other coverages, i.e., they use providers contracted through Wellmark's Practitioner Service Agreement. By contractual agreement with Wellmark, each of the self-funded plans administered in Iowa by Wellmark has agreed with Wellmark to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark under terms of the Practitioner Services Agreement and Administrative Services Agreement of Wellmark Blue Cross and Blue Shield of Iowa, attached as Exhibit 6 to Wellmark's motion for summary judgment. Accordingly, each of the self-funded plans administered by Wellmark is a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 416 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 74 of 201
E-FILED 2016 NR-CSB 1:49 WELLMARK CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs bring this action individually and as a class action pursuant to Iowa Rules of Civil Procedure 1.261 et seq on behalf of all chiropractors licensed in Iowa (1) who are citizens of Iowa as of the date of filing of this petition  or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after December 17, 2007, the date of initial filing of this suit, each of whom have been damaged in their businesses by defendants' actions described below (the "Class").

16.     This action is properly maintainable as a class action.

17.     The Class are so numerous that joinder of all members is impracticable. There are approximately 1200 chiropractors licensed in Iowa who are citizens of the state of Iowa at the time of the filing of this petition. The names of the absent members of the class can be ascertained so that personal or mailed notice of the class action can be given them.

18.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether Wellmark defendants have entered into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa.

(b)     whether Wellmark defendants have imposed maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

(c)    whether Wellmark defendants have prescribed fees for chiro-practic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(d)    whether Wellmark defendants have prescribed limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(e)    whether Wellmark defendants have historically entered into a contract, combination and conspiracy to restrain or monopolize (monopsonize) trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

(f)    whether the Wellmark Defendants have engaged in a contract, combination or conspiracy between two or more persons to restrain or monopolize (monopsonize) trade or commerce in Iowa as a whole and in major population centers of Iowa under Iowa Code § 553.4 (2007);

(g)    whether plaintiffs and the Class they represent have been injured by conduct prohibited by Section 553.4, Code of Iowa (2007); and,

(h)    whether the class of chiropractic plaintiffs have been damaged in the four years previous to filing and to the present by the invidious treatment by the Wellmark defendants and their co-conspirators, who have uniformly and discriminatorily paid chiropractors less for the same or similar services than has been paid for the services of other health care practitioners in Iowa.

9

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 418 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 76 of 201
E-FILED  2016 JUN 03 11:14 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

19.     Plaintiffs' claims are typical of the claims of the other members of the

Class and plaintiffs do not have any interests adverse to the Class.

20.     Plaintiffs are adequate representatives of the Class, and have retained

competent counsel experienced in litigation of this nature and will fairly and adequately

protect the interests of the Class.  The named plaintiffs and their attorneys have or can

acquire adequate resources to ensure that the interests of the class will not be harmed.

21.     The prosecution of separate actions by individual members of the Class

would create a risk of inconsistent or varying adjudications with respect to individual

members of the Class which would establish incompatible standards of conduct for the

party opposing the Class under the standard of I.R.C.P. 1.262(3)(b).

22.     Adjudications with respect to individual members of the class as a practi-

cal matter would be dispositive of the interests of other members not parties to the ad-

judication or substantially impair or impede their ability to protect their interests under

the standard of I.R.C.P. 1.262(3)(c).

23.     Plaintiffs anticipate that there will be no difficulty in the management of

this litigation.  A class action is superior to other available methods for the fair and effi-

cient adjudication of this controversy.

24.     Defendants have acted on grounds generally applicable to the Class with

respect to the matters complained of herein, thereby making appropriate the relief

sought herein with respect to the Class as a whole.

## FACTUAL CONDUCT ALLEGATIONS

25.     The Wellmark Defendants provide health services to the Iowa public on a

statewide basis by offering and operating health care plans, by administering Iowa activ-

ities for the other 38 independent Blue Cross and Blue Shield companies, and by admin-

istering self-insured plans in Iowa and elsewhere. Wellmark Defendants provide health

care services including administration of self-funded health care plans to over 2 million

Iowa enrollees in various health care plans statewide.

26.    Wellmark Defendants offer various health care coverage plans, including

Indemnity Products: Comprehensive Major Medical (Protector), Blue Traditions (Full

Service), Classic Blue (Alliance), Federal Employee Health Benefits Program (FEP), and

the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card); Preferred

Provider Organization Products: Alliance Select/Blue Select, Federal Employee Health

Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area

Program (Blue Card PPO); HMO Products: Blue Access, Blue Choice and Blue Ad-

vantage, and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue

Card POS) to their subscribers.

27.    In addition to offering coverage agreements to subscribers, Wellmark De-

fendants enter into agreements with the providers of health care services, including

those licensed under Iowa Code Ch. 148 (medical doctors -MD's), Ch.150A (doctors of

osteopathic medicine –DO's), Ch. 148C (physician's assistants), Ch. 152 7 152E (nurse

practitioners), Ch. 148A (physical therapists) and Ch. 151 (doctors of chiropractic -DC's).

28.    Under these provider agreements with the Wellmark Defendants, health

care professionals, including the Provider Plaintiffs, render treatment services to pa-

tients who are enrolled in the Wellmark Defendants' various plans and the plans of

Wellmark's co-conspirators.

29.    Services are provided under the fundamental premise that, if the services

are covered and are medically necessary, the Wellmark Defendants' enrollees will be

covered and the providers of the services, including the Provider Plaintiffs, will be com-

pensated in a timely manner for those services.

30.    Wellmark Defendants have contracts with over 65 percent of the health care insurance and 95 percent of the provider services market in Iowa through Provider Services Agreements, the terms of which Wellmark, together with its co-conspirators dictate.

31.    Wellmark Defendants, together with their co-conspirators, use their over-whelming economic power and market dominance to coerce the individual Provider Plaintiffs into acquiescing in practice restrictions and reimbursement schedules detri-mental to Provider Plaintiffs and by limiting and restricting patient access to Provider Plaintiffs resulting in detriment to the physical care and choice of consumers.

32.    This action is based on the relationships between the Provider Plaintiffs and the Wellmark Defendants and their contractually bound co-conspirators, and also **on the belief that the Wellmark Defendants' actions, as detailed below, detrimentally** impact competition in provider services in Iowa, and in patient health and the general welfare of the public, inasmuch as those actions deprive and limit patient access to the **Provider Plaintiffs' treatment, and restrict and otherwise interfere with and impede the** relationships between the Provider Plaintiffs and their existing and prospective patients.

33.    Wellmark Defendants have agreed and conspired with their co-conspirators to engage in, and continue to engage in, a pattern of price fixing, monopso-nization, and other discrimination against the Iowa Chiropractor Plaintiffs. This price fixing, monopsonization and other discrimination has occurred and is occurring in nu-merous ways, including:

(a)    Wellmark defendants have entered into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other po-tential competitors for chiropractic services in Iowa;

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 421 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 79 of 201
E-FILED 2014 MAR 11 4:49 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

(b)      Wellmark defendants have imposed maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(c)      Wellmark defendants have prescribed fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(d)      Wellmark defendants have prescribed limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(e)      Wellmark defendants have historically entered into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors;

(f)      As administered by Wellmark, most "Blue Advantage" plans caps the number of covered visits its subscribers may make to a doctor of chiropractic to 12, regardless of individual subscriber-patient circumstances. No such restriction of 12 visits is imposed upon other health care providers-licensees.  In addition, in order to continue with additional treatment after the 12-visit cap has been reached, a subscriber-patient must obtain a referral from a "PCP" (Primary Care Physician) before any additional treatment from a doctor of chiropractic will be covered by Wellmark. Absent obtaining such an approved referral, the subscriber-

13

E-FILED 2016 MAR 01 1:49 PM LINN - CLERK OF DISTRICT COURT
**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

patient must either forgo further chiropractic treatment or pay for the additional treatment personally, and then **only after signing a waiver stating, in part, "I under**stand that I am requesting a service that may not be fully covered by my insurance company. I agree to be financially responsible for the full amount;**"**

(g)     According to the Administrative Services Agreement of Wellmark Blue Cross and Blue Shield of Iowa, the co-conspirator self-funded entities pay a monthly Network Access Fee to Wellmark, which is the amount charged to the self-funded entity to gain the collective advantages of the network of providers with which Wellmark, any Host Blue, or any subcontractor has contracted for the providing for appropriate provision of covered services. Section 1.16. According to **Section 3.1(b), one of Wellmark's obligations to the self-funded entity is to "provide** access to networks of providers and . . . make information about the networks avail**able to members through print, the Internet, and/or telephone service."   Section** **3.1(e) says: "Wellmark shall determine benefits and process claims for health ser**vices furnished members in accordance with the terms, limitations and conditions set forth in the plan, the benefit documents, this agreement, applicable laws and regulations, the terms of the applicable provider agreement, and the claims adminis**trations and medical polic**ies of Wellmark, as amended from time to time." Part of the Network Access Fee is a percentage of Network Savings, which is "the amount saved due to contract between Wellmark or another Blue Cross or Blue Shield Plan **and health care providers." Wellmark pr**ocesses claims for the self-funded entity through a plan called BlueCard, which is described in Article 9 of the Administrative Services Agreement.  The Host Blue, in accordance with applicable BlueCard policies, is responsible for providing such services as contracting with its participating providers and handling all interaction with its participating providers.  Section 9.2;

**Plaintiffs' Appendix in Resistance                              Page 80 of 201
to Wellmark Motion to Stay**

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 423 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 81 of 201
E-FILED 2016 APR 01 14:49 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

(h)    Beginning in approximately 2006, Wellmark Defendants uni-laterally attempted to implement for itself and its co-conspirators a policy by which their subscriber-patients who elected to seek chiropractic treatment would be cov-ered for only three treatment procedures per visit to a doctor of chiropractic regard-**less of the acuity, severity, or nature of the patient's condition or the num**ber of her complaints and to require pre-approval of all chiropractic services, but not require pre-approval for most services of other health care providers.

34.    The plaintiffs and the plaintiff class have been damaged in the past four years and to date by receiving as much as 50% less than the Wellmark defendants paid other health care practitioners in Iowa for the same or similar services.  This damage can be calculated through the examination of a schedule of fees prepared by the Wellmark defendants annually and comparing the compensation scheduled to be paid to plaintiffs and the plaintiff class to compensation scheduled to be paid to other Iowa health care practitioner for the same or similar services.

35.    **Historically, Wellmark's predecessor under a former na**me was organized and controlled by the Iowa Medical Society and the majority of its Board of Directors were allopathic or osteopathic physicians.  Under the control of allopathic and osteo-**pathic physicians, Wellmark's predecessor under a former name refuse**d to seek authori-ty to provide the services of chiropractors to its subscribers and members. In further-ance of that combination and conspiracy, in more recent times the Wellmark entities have established a scale of compensation for the same or similar diagnostic and treat-ment services to its members wherein **Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s)** receive as much as 100% higher payment than chiropractors receive for the same or similar diagnostic and treatment services. Contrary to the authority giv-en by Chapter 514F of the Code of Iowa, however, and without filing with or obtaining

the explicit approval of the Iowa Insurance Commissioner, the annual rate schedule for health care services which has been issued by Wellmark and which governs its payment of Iowa health care practitioners discriminates against those health care practitioners licensed under Chapter 151 of the Code of Iowa.

36.    In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology purportedly based upon the Resource Based Relative Value System (RBRVS) and began issuing annual statewide fee schedules.  Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners, not in substantial conformity with RVUs determined by the Center for Medicare and Medicaid Services.

## CLAIMS FOR RELIEF

## CONSPIRACY TO RESTRAIN OR MONPOLIZE TRADE OR COMMERCE

37.    Wellmark and its co-conspirators have entered into a contract, combination and conspiracy between two or more persons to restrain or monopolize (monopsonize) trade or commerce in Iowa by fixing the price of chiropractic services.

38.    Plaintiffs and the Class they represent have been injured by conduct prohibited by Section 553.4, Code of Iowa (2007).

39.    Plaintiffs and the other members of the Class have been damaged in their businesses and property by and as a proximate cause of the conduct of the Wellmark defendants and their co-conspirators.

40.    The actions of the Wellmark Defendants are willful or flagrant in light of the existing law of Iowa and the surrounding circumstances.

<div align="center">

**PRAYER**

</div>

**WHEREFORE**, Plaintiffs pray for the following relief:

1.    That the jury award plaintiffs and the plaintiff class damages in an amount determined by the evidence for conduct in violation of the Iowa Competition Act for the four years previous to the filing of this action and to the date of trial;

2.    That the jury award plaintiffs and the plaintiff class double their actual damages because of the egregious conduct of the Wellmark defendants;

3.    **That, pursuant to I.R.C.P. 1.275(4), the Court award attorneys' fees to** Plaintiffs, and that, pursuant to Iowa Code § 553.12(4), the Court award the necessary costs of bringing suit, including a reasonable attorney fee; and

4.    That the Court award such other and further relief to which Plaintiffs are justly entitled.

<div align="center">

**JURY DEMAND**

</div>

The plaintiffs, by their attorneys of record, demand trial by jury of the claims raised in their Recast Third Amended Petition which may be tried at law.

Dated: October 6, 2012.

HAWKINS & NORRIS, P.C.

_____

Glenn L. Norris  AT0005907
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-288-9733
Email:  gnorris@2501grand.com

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 426 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 84 of 201
E-FILED 2012 NOV 13 1:49 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

WANDRO & ASSOCIATES, P.C.

_____

Steven P. Wandro AT0008177

_____

Michael R. Keller AT0009506
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
E-mail: swandro@2501grand.com
        mrkeller@2501grand.com

ERBE LAW FIRM

_____

Harley C. Erbe AT0002430
2501 Grand Avenue
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1460
Facsimile: (515) 281-1474
E-mail: herbelaw@aol.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the _____ day of _____, 2012.

By:      ___ U.S.Mail      ___ Facsimile      ___ Hand Delivery      ___ Overnight Courier      ___ Fedex or UPS

         ___ E-mail      ___ Other

                                         _____

Copy to:
Hayward L. Draper, Esq.
Thomas H. Walton, Esq.
NYEMASTER, GOODE, WEST, HANSELL
**& O'BRIEN, P.C.**
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone:  515-283-8003
Facsimile: 515-283-8045
e-mail: hdraper@nyemaster.com
        twalton@nyemaster.com

E-FILED 2012 DEC 04 1:49 PM POLK - CLERK OF DISTRICT COURT

FILED 12/04/2012 02:00 PM
CLERK OF DISTRICT COURT
POLK COUNTY IOWA

Chicoine/Mueller v. Wellmark, Law No. 112671

IN THE DISTRICT COURT OF IOWA IN AND FOR POLK COUNTY

|  |  |  |
|---|---|---|
| STEVEN A. MUELLER, D.C.,<br>BRADLEY J. BROWN, D.C., MARK A<br>KRUSE, D.C., KEVIN DE.MILLER, D.C.,<br>and LARRY PHIPPS, D.C., on behalf of<br>themselves and those like situated, | : <br> : <br> : <br> : <br> : | CASE NO. CL 112671 |
|  | : | SUBSTITUTED AND |
| Plaintiffs, | : | CORRECTED RULING ON |
|  | : | PLAINTIFFS' MOTION TO |
| v. | : | AMEND |
|  | : |  |
| WELLMARK, INC. d/b/a WELLMARK | : |  |
| BLUE CROSS AND BLUE SHIELD OF | : |  |
| IOWA, an Iowa corporation, and | : |  |
| WELLMARK HEALTH PLAN OF IOWA, | : |  |
| INC., an Iowa corporation, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

On November 20, 2012 plaintiffs' motion for leave to file its Fourth Amended and Substituted Petition for Damages came on for hearing before the Court. Plaintiffs appeared by their attorneys, Glenn Norris and Steve Wandro. Defendants appeared by their attorney, Hayward Draper. After hearing the statements and arguments of counsel, reviewing the court file and being fully advised in the premises, the Court now enters the following ruling.

Plaintiffs have stated in their motion to amend that the sole purpose of the proposed amendment is to conform the plaintiffs' claims to the ruling on the Supreme Court in this matter entered July 27, 2012. Defendant have stated that they have no objection to such a proposed amendment, but have concerns that paragraphs 33(e) and 35 of the proposed amendment state claims beyond those permitted by the Supreme Court. Plaintiffs respond that the two paragraphs in issue are included in the proposed

**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

amendment only by way of background, and are not intended to make an additional

claim.

      Plaintiffs' motion to file their Fourth Amended and Substituted Petition for

Damages is granted, and may stand as filed.  By this ruling, the Court intimates no

opinion as to whether the matters referred to in paragraphs 33(e) and 35 are admissible

into evidence or not.  That issue is reserved for trial.

      Dated this 4th day of December, 2012.


_____
      Robert A. Hutchison, Judge-
      Fifth Judicial District of Iowa

Copies to:

Glenn L. Norris
2501 Grand Ave., Suite C
Des Moines, IA  50312-5399
gnorris@2501grand.com

Steven Wandro
2501 Grand Ave., Suite B
Des Moines, IA  50312-5399
swandro@2501grand.com

Hayward Draper
700 Walnut St., Suite 1600
Des Moines, IA  50309-3899
hdraper@nyemaster.com

FILED

2012 Dec 06  PM 03:52

U.S. DISTRICT COURT
N.D. OF ALABAMA

FILED

2012 DEC 26  A 11: 01

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION          MDL No. 2406

TRANSFER ORDER

**Before the Panel:** Pursuant to 28 U.S.C. § 1407, plaintiffs in the Northern District of Alabama *GC Advertising* action move to centralize this litigation in the Northern District of Alabama. This antitrust litigation concerns the licensing agreements between and among the Blue Cross Blue Shield Association (BCBSA) and its 38 licensees (Blue Plans) and currently consists of seven actions pending in the Northern District of Alabama and an action each in the Western District of Tennessee and the Western District of North Carolina, as listed on Schedule A.[1]

According to defendants, BCBSA is a coordinated effort by health insurers to create a national brand with separate companies in local areas. In total, 38 separate Blue Plans operate under Blue Cross Blue Shield trademarks and trade names, providing health insurance to approximately 100 million subscribers. Plaintiffs contend that the 38 Blue Plans are independent health insurance companies that, but for any agreement to the contrary, could and would compete with one another. Instead, working together with and through the BCBSA, they have allegedly divided and allocated among themselves health insurance markets throughout the nation to eliminate competition. Plaintiffs variously contend that this conduct violates Sections 1 and 2 of the Sherman Antitrust Act, as well as various related state laws.

---

[*] All Panel members have interests that would normally disqualify them under 28 U.S.C. § 455 from participating in the decision of this matter; they have renounced any interest in the underlying litigation. Additionally, the Panel invoked the Rule of Necessity and all Panel members participated in the decision of this matter in order to provide the forum created by the governing statute, 28 U.S.C. § 1407. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,* 273 F. Supp. 2d 1353 (J.P.M.L. 2003) ; *In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.,* 170 F. Supp. 2d 1356 (J.P.M.L. 2001).

[1] The Panel has been notified of twelve additional related actions pending in twelve districts. These actions and any other related actions are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1 and 7.2. Further, various parties to the Eastern District of Pennsylvania *LifeWatch* action presented argument as to whether that action should be included in the centralized proceedings, as did plaintiff in the Western District of Pennsylvania *UPMC* action, which opposed inclusion of its action. Because those actions are not on this motion, and thus not squarely before us, such arguments are best presented as opposition to a conditional transfer order covering the respective actions, if issued.

Case 2:12-cv-02201-JHH-RDP   Document 1946   Filed 08/28/12   Page 88 of 201
Chicoine/Mueller v. Wellmark, Law No. CVCV050638
Case TNW/2:12-cv-02359   Document 28   Filed 12/12/12   Page 2 of 4

- 2 -

Plaintiffs in the Northern District of Alabama *Conway* action, the Western District of Tennessee *Morrissey* action and three potential tag-along actions support the plaintiffs' motion in its entirety, as do responding defendants.[2]  Plaintiffs in three Northern District of Alabama actions – *Carter*, *Richards* and *American Electric Motor* – oppose centralization.  Plaintiffs in the Northern District of Alabama *Bajalieh* and *One Stop Environmental* actions and the Western District of North Carolina *Cerven* action also oppose centralization and, alternatively, suggest centralization in the Northern District of Alabama or the Western District of North Carolina.

The primary arguments advanced against centralization are that there are too few pending actions, discovery will focus on each Blue Plan's activity in a specific market, and several potentially-dispositive state-specific issues will be prominent in each action.  We disagree that these considerations weigh against centralization here.  Though only nine actions pending in three districts were included on the motion for centralization, this litigation has since grown to encompass potentially 21 actions involving allegations of complex anticompetitive behavior pending in fourteen districts.  The Panel has, in the past, centralized antitrust cases involving allegations of concerted anticompetitive activity in the insurance market.  *See, e.g.*, MDL No. 767 – *In re: Commercial Gen. Liab. Ins. Antitrust Litig.*, Aug. 30, 1988, Transfer Order at 2 ("The complaints in all actions contain similar allegations of conspiracies, involving essentially the same groups of defendants, to manipulate the availability of commercial general liability insurance, in violation of federal antitrust laws.").  Transfer under Section 1407 does not require a complete identity of common factual issues as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant when the actions still arise from a common factual core.  Here, the actions involve substantial common questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions.  All of the Blue Plans are alleged to be co-conspirators, even

---

[2]  Anthem Blue Cross and Blue Shield of Connecticut; Anthem Blue Cross and Blue Shield of Indiana; Anthem Blue Cross and Blue Shield of New Hampshire; Anthem Blue Cross and Blue Shield of Virginia Inc.; Anthem Blue Cross and Shield of Missouri; Anthem Health Plans of Maine; Anthem Inc.; Arkansas Blue Cross and Blue Shield; Blue Cross and Blue Shield Association (BCBSA); Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida; Blue Cross and Blue Shield of Georgia; Blue Cross and Blue Shield of Kansas; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Louisiana; Blue Cross and Blue Shield of Massachusetts; Blue Cross and Blue Shield of Michigan; Blue Cross and Blue Shield of Minnesota; Blue Cross and Blue Shield of Mississippi; Blue Cross and Blue Shield of Nebraska; Blue Cross and Blue Shield of North Carolina; Blue Cross and Blue Shield of South Carolina; Blue Cross and Blue Shield of Tennessee; Blue Cross Blue Shield of Tennessee, Inc.; Blue Cross and Blue Shield of New Mexico; Blue Cross and Blue Shield of Oklahoma; Blue Cross and Blue Shield of Texas; CareFirst Blue Cross and Blue Shield of Maryland; Excellus BlueCross BlueShield of New York; Hawaii Medical Service Assoc.; Health Care Service Corp.; Horizon Blue Cross and Blue Shield of New Jersey; Independence Blue Cross;  Premera Blue Cross of Alaska; Triple S - Salud Inc.; Wellmark; Inc.; and Wellmark of South Dakota Inc.

Case 2:12-cv-02010-JHH-PSB   Document 1916   Filed 08/28/12   Page 89 of 201
Chicoine/Mueller v. Wellmark, Law No. CVCV050658
Case TNW/2:12-cv-02359   Document 28   Filed 12/12/12   Page 3 of 4

- 3 -

though some Blue Plans are named as defendants only in actions in their respective state. Centralizing these actions under Section 1407 will ensure streamlined resolution of this litigation to the overall benefit of the parties and the judiciary.

For all these reasons, on the basis of the papers filed and hearing session held, we find that these actions involve common questions of fact, and that centralization of all actions in the Northern District of Alabama will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification;[3] and conserve the resources of the parties, their counsel, and the judiciary.

Weighing all factors, we have selected the Northern District of Alabama as the transferee district for this litigation. Seven related actions are pending in this district, and these actions include claims on behalf of both Blue Plan subscribers and healthcare providers. Further, the Honorable R. David Proctor, to whom we assign this litigation, is an experienced transferee judge who is already familiar with the contours of the litigation and has taken preliminary steps to organize the litigation.

IT IS THEREFORE ORDERED that pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the Northern District of Alabama are transferred to the Northern District of Alabama and, with the consent of that court, assigned to the Honorable R. David Proctor for coordinated or consolidated pretrial proceedings with the action pending there.

PANEL ON MULTIDISTRICT LITIGATION

John G. Heyburn II
Chairman

Kathryn H. Vratil       W. Royal Furgeson, Jr.
Paul J. Barbadoro      Marjorie O. Rendell
Charles R. Breyer       Lewis A. Kaplan

---

[3] All actions are purported statewide and/or nationwide class actions brought against BCBSA and one or more Blue Plan defendants.

Case 2:12-cv-02010-JRB-SPB   Document 196   Filed 08/24/12   Page 90 of 201
Chicoine/Mueller v. Wellmark, Law No. CVCV050638
Case TNW/2:12-cv-02359   Document 28   Filed 12/12/12   Page 4 of 4

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION                                              MDL No. 2406

## SCHEDULE A

### Northern District of Alabama

Fred R. Richards, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
        C.A. No. 2:12-01133
One Stop Environmental, LLC, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
        C.A. No. 2:12-01910
American Electric Motor Services, Inc. v. Blue Cross and Blue Shield of Alabama, et al.,
        C.A. No. 2:12-02169
Chris Bajalieh, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
        C.A. No. 2:12-02185
GC Advertising, LLC, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
        C.A. No. 2:12-02525
Jerry L. Conway v. Blue Cross and Blue Shield of Alabama, et al., C.A. No. 2:12-02532
Thomas A. Carder, et al. v. Blue Cross and Blue Shield of Alabama, et al.,
        C.A. No. 2:12-02537

### Western District of North Carolina

Thomas A. Cerven, Jr., et al. v. Blue Cross and Blue Shield of North Carolina. et al.,
        C.A. No.  5:12-00017

### Western District of Tennessee

Mary Morrissey v. Blue Cross Blue Shield of Tennessee, Inc., C.A. No. 2:12-02359

E-Filed 2013 Jul 01 PM 10:25 POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

**FILED**

2013 Jul-01  PM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE:  BLUE CROSS BLUE SHIELD** | ) | **Master File No. 2:13-CV-20000-RDP** |
| **ANTITRUST LITIGATION** | ) | |
| **(MDL No. 2406)** | ) | **This document relates to:** |
| | ) | **THE PROVIDER TRACK** |

| | | |
|---|---|---|
| | ) | |
| **Jerry L. Conway, D.C.,** | ) | **CLASS ACTION COMPLAINT** |
| **Corey Musselman, M.D.,** | ) | |
| **The San Antonio Orthopaedic Group, LLP,** | ) | **JURY TRIAL DEMANDED** |
| **Orthopaedic Surgery Center of San** | ) | |
| **Antonio, L.P.,** | ) | |
| **Charles H. Clark III, M.D.,** | ) | |
| **Crenshaw Community Hospital,** | ) | |
| **Bullock County Hospital,** | ) | |
| **Fairhope Cosmetic Dentistry and Fresh** | ) | |
| **Breath Center, P.C.,** | ) | |
| **Sports and Ortho, P.C.,** | ) | |
| **Kathleen Cain, M.D.,** | ) | |
| **Northwest Florida Surgery Center, LLC,** | ) | |
| **Wini Hamilton, D.C.,** | ) | |
| **Bradley Moseng, D.C.,** | ) | |
| **Jay Korsen, D.C.,** | ) | |
| **North Jackson Pharmacy, Inc., and** | ) | |
| **IntraNerve, L.L.C. on behalf of** | ) | |
| **himself and all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Blue Cross and Blue Shield of Alabama,** | ) | |
| **WellPoint, Inc.,** | ) | |
| **Health Care Service Corporation,** | ) | |
| **Cambia Health Solutions, Inc.,** | ) | |
| **CareFirst, Inc.,** | ) | |
| **Premera Blue Cross,** | ) | |
| **Premera Blue Cross and Blue Shield** | ) | |
| **of Alaska,** | ) | |
| **Blue Cross Blue Shield of Arizona, Inc.,** | ) | |
| **Arkansas Blue Cross and Blue Shield,** | ) | |
| **Blue Cross of California d/b/a Anthem** | ) | |

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 434 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 92 of 201
E-FILED 2015 MAR 17 4:34 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Blue Cross of California,                                    )
California Physicians' Service Inc.                          )
  d/b/a Blue Shield of California,                 )
Rocky Mountain Hospital and Medical                         )
  Service, Inc.,                                    )
Anthem Blue Cross and Blue Shield                           )
of Colorado,                                                )
Anthem Health Plans, Inc.                                   )
d/b/a Anthem Blue Cross and Blue                            )
Shield of Connecticut,                                      )
Highmark, Inc.,                                             )
Highmark Blue Cross and Blue Shield                         )
of Delaware,                                                )
Group Hospitalization and Medical                           )
Services, Inc.,                                             )
Blue Cross and Blue Shield of                               )
Florida, Inc.,                                              )
Blue Cross and Blue Shield of                               )
Georgia, Inc.,                                              )
Hawaii Medical Service Association                          )
d/b/a Blue Cross and Blue Shield of Hawaii,                 )
Blue Cross of Idaho Health Service, Inc.,                   )
Regence BlueShield of Idaho, Inc.,                          )
Blue Cross and Blue Shield of Illinois,                     )
Anthem Insurance Companies, Inc.                            )
d/b/a Anthem Blue Cross and Blue Shield                     )
 of Indiana,                                            )
Wellmark, Inc. d/b/a/ Wellmark Blue                         )
Cross and Blue Shield of Iowa,                              )
Blue Cross and Blue Shield of Kansas,                       )
Anthem Health Plans of Kentucky, Inc.,                      )
Louisiana Health Service and Indemnity                      )
 Company d/b/a/ Blue Cross and Blue                     )
Shield of Louisiana,                                        )
Anthem Health Plans of Maine, Inc.,                         )
CareFirst of Maryland, Inc.                                 )
d/b/a CareFirst Blue Cross Blue Shield                      )
 of Maryland,                                           )
Blue Cross and Blue Shield of                               )
Massachusetts, Inc.,                                        )
Blue Cross and Blue Shield of Michigan,                     )
BCBSM, Inc. d/b/a/ Blue Cross and Blue                      )
 Shield of Minnesota,                                   )
Blue Cross and Blue Shield of Mississippi,                  )
Blue Cross and Blue Shield of Missouri,                     )
Blue Cross and Blue Shield of Kansas City, Inc.,            )

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 435 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 93 of 201
E-FILED 2015 MAR 11 4:54 PM POLK - CLERK OF DISTRICT COURT

**Chicoine/Mueller v. Wellmark, Law No: CVCV050638**

| | |
|---|---|
| Blue Cross and Blue Shield of Montana, Inc., | ) |
| Blue Cross and Blue Shield of Nebraska, | ) |
| Anthem Blue Cross and Blue Shield of Nevada,| ) |
| Anthem Health Plans of New Hampshire, Inc. | ) |
| d/b/a Blue Cross and Blue Shield | ) |
| of New Hampshire, | ) |
| Horizon Health Care Services, Inc. | ) |
| d/b/a Horizon Blue Cross and Blue | ) |
| Shield of New Jersey, | ) |
| Blue Cross and Blue Shield of New Mexico, | ) |
| HealthNow New York Inc., | ) |
| Blue Cross and Blue Shield of | ) |
| Northeastern New York, | ) |
| Blue Cross and Blue Shield of | ) |
| Western New York, | ) |
| Empire HealthChoice Assurance, Inc. | ) |
| d/b/a Empire Blue Cross Blue Shield, | ) |
| Excellus Health Plan, Inc. | ) |
| d/b/a Excellus Blue Cross Blue Shield, | ) |
| Blue Cross and Blue Shield of North Carolina, | ) |
| Noridian Mutual Insurance Company | ) |
| d/b/a Blue Cross Blue Shield of North Dakota, | ) |
| Community Insurance Company | ) |
| d/b/a Anthem Blue Cross and Blue Shield of Ohio, | ) |
| Blue Cross and Blue Shield of Oklahoma, | ) |
| Regence BlueCross BlueShield of Oregon, | ) |
| Hospital Service Association of | ) |
| Northeastern Pennsylvania | ) |
| d/b/a Blue Cross of Northeastern Pennsylvania, | ) |
| Capital Blue Cross, | ) |
| Highmark Health Services, Inc. | ) |
| d/b/a/ Highmark Blue Cross Blue Shield | ) |
| and d/b/a Highmark Blue Shield, | ) |
| Independence Blue Cross, Inc., | ) |
| Triple S – Salud, Inc., | ) |
| Blue Cross and Blue Shield of Rhode Island, Inc.,| ) |
| Blue Cross and Blue Shield of South | ) |
| Carolina, Inc., | ) |
| Wellmark of South Dakota, Inc. | ) |
| d/b/a Wellmark Blue Cross and Blue | ) |
| Shield of South Dakota, | ) |
| BlueCross BlueShield of Tennessee, Inc., | ) |
| Blue Cross and Blue Shield of Texas, | ) |
| Regence BlueCross BlueShield of Utah, | ) |
| Blue Cross Blue Shield of Vermont, | ) |
| Anthem Health Plans of Virginia, Inc. | ) |

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 436 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 94 of 201
E-FILED 2016 DEC 14 10:15 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | |
|---|---|
| d/b/a Anthem Blue Cross and Blue | ) |
| Shield of Virginia, | ) |
| Regence Blue Shield of Washington, | ) |
| Highmark West Virginia, Inc. | ) |
| d/b/a Highmark Blue Cross Blue Shield | ) |
| West Virginia, Inc., | ) |
| Blue Cross Blue Shield of Wisconsin | ) |
| d/b/a Anthem Blue Cross and Blue | ) |
| Shield of Wisconsin, | ) |
| Blue Cross Blue Shield of Wyoming and | ) |
| Blue Cross and Blue Shield | ) |
| Association, | ) |
| | ) |
| Defendants. | ) |

_____

## CONSOLIDATED AMENDED COMPLAINT

Plaintiffs, Jerry L. Conway, D.C., Corey Musselman, M.D., The San Antonio Orthopaedic Group, L.L.P., Orthopaedic Surgery Center of San Antonio, L.L.P., Charles H. Clark III, M.D., Crenshaw Community Hospital, Bullock County Hospital, Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C., Sports and Ortho, P.C., Kathleen Cain, M.D., Northwest Florida Surgery Center, L.L.C., Wini Hamilton, D.C., Bradley Moseng, D.C., Jay Korsen, D.C., North Jackson Pharmacy, Inc., and IntraNerve, L.L.C. (collectively "Plaintiffs" or "Provider Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Blue Cross and Blue Shield of Alabama, WellPoint, Inc., Health Care Service Corporation, Cambia Health Solutions, Inc., CareFirst, Inc., Premera Blue Cross, Premera Blue Cross and Blue Shield of Alaska, Blue Cross Blue Shield of Arizona, Inc., Arkansas Blue Cross and Blue Shield, Blue Cross of California d/b/a Anthem Blue Cross of California, California Physicians' Service Inc. d/b/a Blue Shield of California, Rocky Mountain Hospital and Medical Service, Inc., Anthem Blue Cross and Blue Shield of Colorado, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut, Highmark, Inc.,

1

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 437 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 95 of 201
E-FILED    2016 APR 11 1:14 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

Highmark Blue Cross and Blue Shield of Delaware, Group Hospitalization and Medical Services, Inc., Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Georgia, Inc., Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, Blue Cross of Idaho Health Service, Inc., Regence BlueShield of Idaho, Inc., Blue Cross and Blue Shield of Illinois, Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Wellmark Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Anthem Health Plans of Kentucky, Inc., Louisiana Health Service and Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana, Anthem Health Plans of Maine, Inc., CareFirst of Maryland, Inc. d/b/a CareFirst Blue Cross Blue Shield of Maryland, Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, BCBSM, Inc. d/b/a/ Blue Cross and Blue Shield of Minnesota, Blue Cross and Blue Shield of Mississippi, Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City, Inc., Blue Cross and Blue Shield of Montana, Inc., Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and Blue Shield of Nevada, Anthem Health Plans of New Hampshire, Inc. d/b/a Blue Cross and Blue Shield of New Hampshire, Horizon Health Care Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, HealthNow New York Inc., Blue Cross and Blue Shield of Northeastern New York, Blue Cross and Blue Shield of Western New York, Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield, Excellus Health Plan, Inc. d/b/a Excellus Blue Cross Blue Shield, Blue Cross and Blue Shield of North Carolina, Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Hospital Service Association of Northeastern Pennsylvania

**Plaintiffs' Appendix in Resistance**
**to Wellmark Motion to Stay**

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 438 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 96 of 201
E-FILED 2017 APR 11 2:11 PM POLK - CLERK OF DISTRICT COURT

**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

d/b/a Blue Cross of Northeastern Pennsylvania, Capital Blue Cross, Highmark Health Services, Inc. d/b/a/ Highmark Blue Cross Blue Shield and d/b/a Highmark Blue Shield, Independence Blue Cross, Inc., Triple S – Salud, Inc., Blue Cross and Blue Shield of Rhode Island, Inc., Blue Cross and Blue Shield of South Carolina, Inc., Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, BlueCross BlueShield of Tennessee, Inc., Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross Blue Shield of Vermont, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Regence Blue Shield of Washington, Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, Inc., Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin, Blue Cross Blue Shield of Wyoming (these independent Blue Cross Blue Shield licensees are referred to herein collectively, as "the Blues") and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants" or "BCBS Defendants") allege violations of antitrust laws as follows:

## NATURE OF THE CASE

1.      Plaintiffs are providers of healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients are insured by the Blues or are included in employee benefit plans administered by the Blues.

2.      Defendants are the Blue Cross Blue Shield Association and its thirty-eight Member Plans and their affiliated companies.  The Blues provide health insurance coverage for approximately 100 million people in the United States and, according to the BCBSA's own estimates, more than 91% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues.  The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 439 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 97 of 201
E-FILED 2017 MAY 11 1:46 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

3.      In this action, the Plaintiff healthcare providers challenge the explicit agreement reached by the Defendants to divide the United States into what the Defendants term "Service Areas" and then to allocate those geographic markets among the Blues, free of competition (the "BCBS Market Allocation Conspiracy").  Plaintiffs also challenge the agreement reached by the Defendants to fix prices for services rendered by healthcare providers such as Plaintiffs (the "BCBS Price Fixing Conspiracy").

4.      In furtherance of the BCBS Market Allocation Conspiracy, the Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted.  Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

5.      The Blues, which are organized and operated independently, constitute potential competitors and, absent the BCBS Market Allocation Conspiracy, the Blues would, in fact, compete.  The BCBSA readily admits on its own website that the Blues are "independent companies" that operate in "exclusive geographic areas."  Defendants' agreement to allocate markets is a horizontal restraint in violation of Section 1 of the Sherman Act.

6.      The BCBS Market Allocation Conspiracy has significantly decreased competition in the market for healthcare insurance and, accordingly, in the market for payment of healthcare provider services.  For example, Blue Cross Blue Shield of Alabama controls access to 93% of privately insured patients in the State of Alabama.  As a result of decreased competition, healthcare providers, including Plaintiffs, are paid much less than they would be absent the BCBS Market Allocation Conspiracy.  Healthcare providers who contract with the Blues are also

subjected to less favorable terms than they would be absent the conspiracy.  The BCBS Market Allocation Conspiracy is a *per se*[1] violation of Section 1 of the Sherman Act.

       7.      Defendants have further exploited the market dominance they have secured through the Market Allocation Conspiracy by entering into a Price Fixing Conspiracy.  In furtherance of the Price Fixing Conspiracy, each Defendant has agreed to participate in the Blue Card program.  According to the BCBSA, the Blue Card program "links participating healthcare providers and the independent Blue Cross and Blue Shield companies across the country through a single electronic network for claims processing and reimbursement."  The Blue Card program applies when a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant.  In effect, the Blue Card program locks in the discounted reimbursement rates that each Defendant achieves through market dominance in its Service Area and makes those below-market rates available to all other Blues without the need for negotiation or contracting.  Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area.  As a result, a healthcare provider who renders services to a patient who is insured or administered by a Defendant in another Service Area receives significantly lower reimbursement than the healthcare provider would receive absent the Price Fixing Conspiracy. The BCBS Price Fixing Conspiracy is a *per se* violation of Section 1 of the Sherman Act.

       8.      For example, Defendants' actions have significantly injured Plaintiffs and other healthcare providers.  Defendants' agreements have also harmed competition by decreasing the options available to healthcare consumers.  Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than competitive prices that the Blues pay.  In addition, many hospitals and other healthcare

---

[1]  Plaintiffs believe that the Defendants' actions are *per se* violations of Section 1 of the Sherman Act.  Plaintiffs hereby specifically reserve their rights to add market specific claims, including claims under Section 2 of the Sherman Act, should the Court not agree that the Defendants violations are subject to *per se* treatment.

facilities are closing or reducing services or are not expanding to provide additional services as a result of the Blues' low prices.  The only beneficiaries of Defendants' antitrust violations are Defendants themselves.  Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers.

## JURISDICTION AND VENUE

9.      Plaintiffs' federal antitrust claims are instituted under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

10.      Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

11.      The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

12.      Many of the healthcare providers, including Plaintiffs, provide services, supplies, or equipment to persons who reside in other states.

13.      The Blue Card Program is itself interstate commerce and transaction for healthcare services.

14.      Plaintiffs and other healthcare providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

## PLAINTIFFS

15.     Plaintiff Jerry L. Conway, D.C. is a chiropractor and a citizen of Brent, Alabama. Dr. Conway practiced for thirty-eight years before his retirement in 2010.  During the relevant time period, Dr. Conway provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Conway was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Conway has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market.  As set forth herein, Dr. Conway has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

16.     Plaintiff Corey Musselman, M.D. is a family practice physician and a citizen of Cary, North Carolina.  During the relevant time period, Dr. Musselman provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina pursuant to his in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Dr. Musselman was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Musselman has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market.  As set

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 443 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 101 of 201
E-FILED 2014 MAR 11 9:24 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

forth herein, Dr. Musselman has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

17.     Plaintiff The San Antonio Orthopaedic Group, L.L.P. is a physician office in San Antonio, Texas.  During the relevant time period, The San Antonio Orthopaedic Group provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  The San Antonio Orthopaedic Group was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On September 18, 2008, The San Antonio Orthopaedic Group's contract with BCBS-TX was terminated; since that time, The San Antonio Orthopaedic Group has provided medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these services outside of any contractual relationship.  For these services, The San Antonio Orthopaedic Group has been paid less than it would have been in a competitive market.  On information and belief, The San Antonio Orthopaedic Group has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market.  As set forth herein, The San Antonio Orthopaedic Group has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws. The San Antonio Orthopaedic Group opted out of the *Love* Settlements in Florida.

18.     Plaintiff Orthopaedic Surgery Center of San Antonio, L.P. is an outpatient surgical center in San Antonio, Texas.  During the relevant time period, Orthopaedic Surgery Center of San Antonio provided medically necessary, covered services to patients insured by

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 444 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 102 of 201
E-FILED 2016 MAY 10 10:23 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Blue Cross and Blue Shield of Texas or who are included in employee benefit plans administered by the Blues pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  Orthopaedic Surgery Center of San Antonio was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On September 18, 2008, Orthopaedic Surgery Center of San Antonio's contract with BCBS-TX was terminated; since that time, Orthopaedic Surgery Center of San Antonio has provided medically necessary services to BCBS-TX insureds, and has billed BCBS-TX for these services outside of any contractual relationship.  For these services, Orthopaedic Surgery Center of San Antonio has been paid less than it would have been in a competitive market.  On information and belief, Orthopaedic Surgery Center of San Antonio has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market.  As set forth herein, Orthopaedic Surgery Center of San Antonio has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

19.    Plaintiff Charles H. Clark III, M.D. is a neurosurgeon and a citizen of Birmingham, Alabama.  During the relevant time period, Dr. Clark provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Clark was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Clark has also provided medically necessary, covered services to other Blue Cross and Blue

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 445 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 103 of 201
E-FILED 2017 MAR 07 12:42 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market. As set forth herein, Dr. Clark has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

20. Plaintiff Crenshaw Community Hospital is a non-profit, general medicine hospital in Luverne, Alabama. During the relevant time period, Crenshaw Community Hospital provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Crenshaw Community Hospital was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Crenshaw Community Hospital has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Crenshaw Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

21. Plaintiff Bullock County Hospital is a general medicine and surgical hospital in Union Springs, Alabama. During the relevant time period, Bullock County Hospital provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Bullock County Hospital was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Bullock County Hospital has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 446 of 645

Case 4:17-cv-00210-1AJ-SBJ , Document 1-16   Filed 06/14/17   Page 104 of 201
E-Filed : Chicoine/Mueller v. Wellmark, Law No: CVCV050638

has been paid less for those services than it would have been in a competitive market.  As set forth herein, Bullock County Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

22.     Plaintiff Fairhope Cosmetic Dentistry and Fresh Breath Center, P.C. is a dental practice in Fairhope, Alabama.  During the relevant time period, Fairhope Cosmetic Dentistry provided medically necessary, covered services to members of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Fairhope Cosmetic Dentistry was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.   On information and belief, Fairhope Cosmetic Dentistry has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market.  As set forth herein, Fairhope Cosmetic Dentistry has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

23.     Plaintiff Sports and Ortho P.C. is a physical therapy provider in Chicago, Illinois. During the relevant time period, Sports and Ortho provided medically necessary, covered services to members of Blue Cross and Blue Shield of Illinois pursuant to its in-network contract with BCBS-IL, and billed BCBS-IL for the same.  Sports and Ortho was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.   On information and belief, Sports and Ortho has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market.  As set forth herein, Sports and Ortho has been

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 447 of 645

Case 4:17-cv-00210-1AJ-SBJ , Document 1-16   Filed 06/14/17   Page 105 of 201
E-Filed 2016 APR 13 2:21 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws. Sports and Ortho specifically reserves any and all claims it has or may have for denied requests for payments related to services provided to City of Chicago employees.

24.     Plaintiff Kathleen Cain, M.D. is a pediatrician and a citizen of Topeka, Kansas. During the relevant time period, Dr. Cain provided medically necessary, covered services to members of Blue Cross and Blue Shield of Kansas pursuant to her in-network contract with BCBS-KS, and billed BCBS-KS for the same. Dr. Cain was paid less for those services than she would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Cain has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than she would have been in a competitive market. As set forth herein, Dr. Cain has been injured in her business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

25.     Plaintiff Northwest Florida Surgery Center, L.L.C. is a multispecialty outpatient ambulatory surgery center located in Panama City, Florida. During the relevant time period, Northwest Florida Surgery Center provided medically necessary, covered services to members of Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same. Northwest Florida Surgery Center was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof. On information and belief, Northwest Florida Surgery Center has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, Northwest Florida Surgery

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 448 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 106 of 201
E-FILED 2015 MAR 11 3:40 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

Center has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

26.    Plaintiff Wini Hamilton, D.C. is a chiropractor and a citizen of Seattle, Washington.    During the relevant time period, Dr. Hamilton provided medically necessary, covered services to patients insured by Premera Blue Cross of Washington or who are included in employee benefit plans administered by Premera Blue Cross of Washington pursuant to her in-network contract with Premera, and billed Premera for the same.    Dr. Hamilton was paid less for those services than she would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.    On information and belief, Dr. Hamilton has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than she would have been in a competitive market.    As set forth herein, Dr. Hamilton has been injured in her business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

27.    Plaintiff Bradley Moseng, D.C. is a chiropractor and a citizen of Montevideo, Minnesota.    During the relevant time period, Dr. Moseng provided medically necessary, covered services to members of Blue Cross and Blue Shield of Minnesota pursuant to his in-network contract with BCBS-MN, and billed BCBS-MN for the same.    Dr. Moseng was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.    On information and belief, Dr. Moseng has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market.    As set forth herein, Dr. Moseng has

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 449 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 107 of 201
E-Filed 2016 NOV 14 1:33 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

28.     Plaintiff Jay S. Korsen, D.C. is a chiropractor and a citizen of Narragansett, Rhode Island.  During the relevant time period, Dr. Korsen provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Rhode Island or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Rhode Island pursuant to his in-network contract with BCBS-RI, and billed BCBS-RI for the same.  Dr. Korsen was paid less for those services than he would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.  In 2009, Dr. Korsen's contract with BCBS-RI was terminated; since that time, Dr. Korsen has provided medically necessary services to BCBS-RI insureds, and has billed BCBS-RI for these services, outside of any contractual relationship.  For these services, Dr. Korsen has been paid less than he would have been in a competitive market.  On information and belief, Dr. Korsen has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than he would have been in a competitive market.  As set forth herein, Dr. Korsen has been injured in his business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

29.     Plaintiff North Jackson Pharmacy, Inc. is a pharmacy in Stevenson, Alabama. During the relevant time period, North Jackson Pharmacy provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  North Jackson Pharmacy was paid less for those services than it would have been in a competitive market and

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 450 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 108 of 201
E-FILED 2016 MAR 11 3:49 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

has been injured by Defendants' conduct as a result thereof.  On information and belief, North Jackson Pharmacy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market.  As set forth herein, North Jackson Pharmacy has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

30.     Plaintiff IntraNerve, L.L.C. is a provider of Intraoperative Neurophysiological Monitoring services based in Colorado Springs, Colorado.  During the relevant time period, IntraNerve provided medically necessary, covered services to members of Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield pursuant to its in-network contract with Anthem Blue Cross and Blue Shield, and billed Anthem Blue Cross and Blue Shield for the same.  IntraNerve was paid less for those services than it would have been in a competitive market and has been injured by Defendants' conduct as a result thereof.   On information and belief, IntraNerve has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been in a competitive market. As set forth herein, IntraNerve has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

31.     Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue.  Plaintiffs are entitled to payment for their services, equipment, supplies or for use of their facilities either pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 451 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 109 of 201
E-FILED 2016 FEB 26 4:28 PM WELLMARK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

patients who are covered by a plan that is insured and administered by a Blue.  All Plaintiffs have been paid less than they would have been paid absent Defendants' violation of the antitrust laws.  All Plaintiffs have a right to bring these claims.  But for the Defendants' agreements not to compete, out-of-network providers would have been offered the ability to contract with the Blues at more competitive rates.   Accordingly, all Plaintiffs have standing and all have sustained antitrust injury.

32.      This Complaint is operative only with regard to the Class Action litigation and is not intended to supersede any additional claims brought by or intended to be litigated by "tag-along" Plaintiffs, such as the claims under Section 2 of the Sherman Act brought in the *Advanced Surgery Center* and the *Lifewatch* complaints.  Those claims are to be litigated separately from this Class Action litigation.

33.      Certain of the named Provider Plaintiffs in this action, Corey Musselman, M.D., Charles H. Clark III, M.D., and Kathleen Cain, M.D., ("the *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the BCBS Defendants consummated in the Southern District of Florida before Judge Moreno.  The San Antonio Orthopaedic Group opted-out of the *Love* Settlement but not the related *WellPoint*, *Highmark* and *Capital* settlements in the Southern District of Florida.   For purposes of this Complaint, those Providers do not bring claims against any of the released parties in those Settlements.  As this issue is currently being litigated in *Musselman v. Blue Cross of Alabama*, et al Case No. 1:13-cv-20050-FAM (S.D. Fl), the *Love* Providers wish to allege here that:

a.      they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 452 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 110 of 201
E-FILED 2017 MAR 01 11:47 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

releases.  Accordingly, those claims would be included in this Complaint but for the BCBS Defendants' insistence that if the claims are alleged here, they will immediately seek to have the *Love* Providers held in contempt of the injunctions entered by Judge Moreno.  The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b.      they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor or once Judge Moreno defers the release issues to this Court for review;

c.      they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed below) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

34.      As is noted in the Plaintiffs' allegations, at least one of the named Physician Provider Plaintiffs opted out of the *Love* Settlement in Florida.  Those non-Settling physician Plaintiffs pursue claims on behalf of the class against all of the Defendants who were released in *Love.*

35.      The Agreements between various Defendants and some of the named Provider Plaintiffs contain what Defendants will likely argue are binding arbitration provisions.  Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit.   Nevertheless, for purposes of this Complaint, those Plaintiffs with arbitration agreements arguably covering the claims or parties at issue in this litigation expressly only bring

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 453 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 111 of 201
E-Filed 2016 MAR 11 3:44 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

suit against those Defendants who are not parties to the arbitration provisions in their agreements.  For instance, a Provider with an arbitration provision in her contract with Blue Cross and Blue Shield of Kansas is not asserting claims against BCBS of Kansas, but rather is only pursuing her Sherman Act Section 1 claims against all Defendants other than BCBS of Kansas, none of whom are parties to her agreement.

## **DEFENDANTS**

36.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama.  Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare benefits in Alabama, providing coverage to more than three million people.  The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama.  Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

37.     Defendant WellPoint, Inc. is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  WellPoint, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care plans, are collectively referred to as "WellPoint" in this Complaint.  WellPoint, the largest licensee within the BCBSA, is a publicly-traded, for-profit company.  By some measures WellPoint is the largest health benefits company in the nation with more than 36 million members in its affiliated health plans.  WellPoint, by and through its subsidiaries and affiliated health plans, operates in fourteen states, including California, Colorado, Connecticut, Georgia,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 454 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 112 of 201
E-Filed 2016 NOV 01 1:47 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

38.     Defendant Health Care Service Corporation, a Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099.  With more than 13 million members, Health Care Service Corporation is the largest customer-owned health insurer in the United States.   Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Texas.  In September 2012, it was announced that Blue Cross and Blue Shield of Montana would join Health Care Service Corporation as its fifth member plan, contingent on approval from the Department of Insurance.  In each of its four service areas, Health Care Service Corporation exercises market dominance.  Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

39.     Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011.  Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving approximately 2.2 million members through its subsidiaries and affiliated health plans.  Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated health care plans, including Regence Blue Cross Blue Shield of Oregon, Regence Blue Shield of Washington, Regence Blue Cross Blue Shield of Utah, and Regence Blue Shield of Idaho, exercises market dominance in its states of operation or within areas of those states.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 455 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 113 of 201
E-FILED  2016 MAR 11 1:34 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

Cambia Health Solutions, Inc., its subsidiaries, and health care plans are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

40.     Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117.  With approximately 3.4 million members, CareFirst, Inc., through its subsidiaries CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region.  Through its subsidiaries and health plans, CareFirst, Inc. exercises market dominance in Maryland, the District of Columbia, and Virginia, or within areas of those states.  CareFirst, Inc., its subsidiaries and health care plans are collectively referred to as "CareFirst" in this Complaint.

41.     Defendant Premera Blue Cross is a Washington corporation with its corporate headquarters located at 7001 220th SW, Mountlake Terrace, WA 98043.  Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.7 million members in Alaska and Washington.  Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield of Alaska.  Premera Blue Cross, its subsidiaries and health care plans are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

42.     Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.  Premera Blue Cross Blue Shield of Alaska, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 456 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 114 of 201
E-Filed 2015 MAR 11 NNNNNNNNNN CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No: CVCV050638

43.    Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ, 85021.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million enrollees in various health care plans in Arizona.  Blue Cross Blue Shield of Arizona, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

44.    Defendant Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 860,000 enrollees in various health care plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state.  Arkansas Blue Cross and Blue Shield, its subsidiaries and health care plans are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

45.    Defendant Blue Cross of California d/b/a/ Anthem Blue Cross of California is a California corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA 91367.  It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant WellPoint.  Blue Cross of California is the parent corporation of a number of subsidiaries that provide health care services to approximately 8.3 million enrollees in various health care plans in California, more than any other carrier in the state.  Blue Cross of California, its subsidiaries and health care plans are collectively referred to as "Blue Cross of California" or "BC-CA" in this Complaint.

46.    Defendant California Physicians' Service Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 457 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 115 of 201
E-FILED 2017 JAN 11 1:48 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

CA 94105-1808.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.5 million enrollees in various health care plans in California. California Physicians' Service Inc., its subsidiaries and health care plans are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

47.     Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant WellPoint and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Denver, CO 80273.  It is the parent corporation of a number of subsidiaries that provide health care services to members through various health care plans in Colorado and Nevada.

48.     Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273.  Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant WellPoint.  Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and health plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

49.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant WellPoint.  It is a Connecticut corporation with its corporate headquarters located at 370 Bassett Road, North Haven, Connecticut 06473 and is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.4 million enrollees in various health care plans in Connecticut.  Anthem Blue Cross and Blue

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 458 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 116 of 201
E-FILED 2015 MAR 11 1:58 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

Shield of Connecticut, its subsidiaries and health plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

50.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222. Highmark, Inc. is the parent corporation of a number of subsidiaries that serve 5.3 million members in Pennsylvania, West Virginia and Delaware. Highmark, Inc., its subsidiaries and health care plans are collectively referred to as "Highmark" in this Complaint.

51.     Defendant Highmark Blue Cross and Blue Shield of Delaware is a subsidiary of Highmark, Inc. It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark Blue Cross and Blue Shield of Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield of Delaware in July, 2012. Highmark Blue Cross and Blue Shield of Delaware provides health care services to approximately 300,000 members in various health care plans in Delaware. According to a 2007 study, Highmark Blue Cross and Blue Shield held a 56% market share in the state of Delaware. Highmark Blue Cross and Blue Shield of Delaware, its subsidiaries and health care plans are collectively referred to as "Highmark Blue Cross and Blue Shield of Delaware" or "BCBS-DE" in this Complaint.

52.     Group Hospitalization and Medical Services, Inc. shares the business name CareFirst BlueCross and BlueShield with CareFirst of Maryland, Inc. and provides services in the District of Columbia, Maryland and areas of Virginia. It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc. Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117. Group Hospitalization and Medical Services, Inc.,

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 459 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 117 of 201
E-Filed 2016 MAR 04 8:11 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

its subsidiaries and health care plans are collectively referred to as "CareFirst BlueCross and BlueShield" in this Complaint.

53.    Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 7 million enrollees in various health care plans in Florida.  Blue Cross and Blue Shield of Florida, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint.

54.    Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant WellPoint and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326.  Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare market.  Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.1 million enrollees in various health care plans in Georgia.  Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

55.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 676,000 members in various health care plans in

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 460 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 118 of 201
E-FILED 2015 MAR 31 1:44 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Hawaii.  Hawaii Medical Service Association, its subsidiaries and health care plans are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

56.    Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho 83642.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 300,000 members in various health care plans in Idaho.  Blue Cross of Idaho Health Service, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross of Idaho" or "BC-ID" in this Complaint.

57.    Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, Idaho 83501.  Regence BlueShield of Idaho is the parent corporation of a number of subsidiaries that provide health care services to more than 150,000 members in various health care plans in Idaho.  Regence BlueShield of Idaho, Inc., its subsidiaries and health care plans are collectively referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

58.    Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601.  It is the parent of a number of subsidiaries that provide health care services to approximately 6.5 million members in various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint.

59.    Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana is a subsidiary of Defendant WellPoint.  It is an Indiana corporation with its

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 461 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 119 of 201
E-FILED CICHINE/MUELLER V WELLMARK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  It is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Indiana.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint..

60.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309. It is the parent of a number of subsidiaries that provide health care services to approximately 1.4 million members in Iowa.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its subsidiaries and health care plans in Iowa are collectively referred to as "Blue Cross and Blue Shield of Iowa" or "BCBS-IA" in this Complaint.

61.     Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629. Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide health care services to approximately 880,000 members in various health care plans in Kansas.  Blue Cross and Blue Shield of Kansas, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

62.     Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is a subsidiary of Defendant WellPoint and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223.  Anthem Health Plans of Kentucky, Inc., its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 462 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 120 of 201
E-Filed 2016 APR 11 VA*****CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

63.     Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million enrollees in various health care plans in Louisiana.  Louisiana Health Service & Indemnity Company, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

64.     Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant WellPoint.  It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 140,000 enrollees in various health care plans in Maine.  Anthem Health Plans of Maine, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

65.     Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield of Maryland is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117.  CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield of Maryland is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in Maryland.  CareFirst of Maryland, Inc., its subsidiaries and health care plans are collectively referred to as "CareFirst BlueCross BlueShield of Maryland" in this Complaint.

66.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 463 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 121 of 201
E-FILED 2017 MAY 11 1:44 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

02215.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in various health care plans in Massachusetts.  Blue Cross and Blue Shield of Massachusetts, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

67.    Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 4.8 million enrollees in various health care plans in Michigan.  Blue Cross and Blue Shield of Michigan, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.

68.    Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164.  BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is the parent corporation of a number of subsidiaries that provide health care services to approximately 2 million enrollees in various health care plans in Minnesota.  Blue Cross and Blue Shield of Minnesota, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint.

69.    Defendant Blue Cross and Blue Shield of Mississippi is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1 million enrollees in various health care plans in Mississippi.  Blue Cross and Blue Shield of Mississippi, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Mississippi" or "BCBS-MS" in this Complaint.

70.      Defendant Blue Cross and Blue Shield of Missouri d/b/a Anthem Blue Cross Blue Shield of Missouri is a subsidiary of Defendant WellPoint.  It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in a various health care plans in Missouri.  Defendant Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint.

71.      Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 805,000 enrollees in various health care plans in Kansas City and its suburbs in Kansas and Missouri.  Blue Cross and Blue Shield of Kansas City, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint.

72.      Defendant Blue Cross and Blue Shield of Montana, Inc. is a Montana corporation with its corporate headquarters located at 560 North Park Avenue, Helena, MT 59604.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 272,000 members in various health care plans in Montana.  In September 2012, it was announced that Blue Cross and Blue Shield of Montana would join Defendant HCSC as its fifth member plan contingent on approval from the Department of Insurance.  On June 27, 2013, this "merger" was approved by the Montana Attorney General with conditions.  Blue Cross Blue Shield of Montana, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT" in this Complaint.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 465 of 645

Case 4:17-cv-00210-1AJ-SBJ   Document 1-16   Filed 06/14/17   Page 123 of 201
E-Filed Chicoine/Mueller v. Wellmark, Law No. CVCV050638

73.     Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180.  It is the parent corporation of a number of subsidiaries that provide health care services to over 700,000 enrollees in various health care plans in Nebraska.  Blue Cross and Blue Shield of Nebraska, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

74.     Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273.  Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148.  Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant WellPoint. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and health plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

75.     Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is a subsidiary of Defendant WellPoint.  It is a New Hampshire corporation with its corporate headquarters located at 300 Goffs Falls Road, Manchester, New Hampshire 03111.  Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide health care services to over 600,000 members in various health care plans in New Hampshire.  Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH"  in this Complaint.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 466 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 124 of 201
E-FILED 2015 MAR 11 1:14 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

76.     Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross and Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 3.2 million enrollees in various health care plans in New Jersey.  Horizon Healthcare Services, Inc., its subsidiaries and health care plans are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

77.     Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.  Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care services to approximately 236,000 enrollees in various health care plans in New Mexico.  Blue Cross and Blue Shield of New Mexico, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

78.     Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202.  HealthNow New York, Inc. does business as Blue Cross Blue Shield of Western New York and Blue Shield of Northeastern New York.  HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care services to enrollees in various health care plans in New York.  HealthNow New York, Inc., its subsidiaries and health care plans are collectively referred to as "HealthNow" in this Complaint.

79.     Defendant Blue Shield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 467 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 125 of 201
E-Filed   2017 JUN 14 11:17 PM   CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

14202.  Blue Shield of Northeastern New York is the parent of a number of subsidiaries that provide health care services to enrollees in various health care plans in New York.  Blue Shield of Northeastern New York, its subsidiaries and health care plans are collectively referred to as "Blue Shield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

80.     Blue Cross Blue Shield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  Blue Cross Blue Shield of Western New York is the parent of a number of subsidiaries that provide health care services to more than 800,000 enrollees in various health care plans in New York.  Blue Cross Blue Shield of Western New York, Inc., its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Western New York" or "BCBS-Western NY" in this Complaint.

81.     Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is a subsidiary of Defendant WellPoint.  It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006.   Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross and Blue Shield is the parent corporation of a number of subsidiaries that provide health care services to nearly 6 million enrollees in various health care plans in New York.  Empire Blue Cross and Blue Shield, its subsidiaries and health care plans are collectively referred to as "Empire Blue Cross and Blue Shield" or "Empire-BCBS" in this Complaint.

82.     Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield of New York is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York 14647.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.8

Chicoine/Mueller v. Wellmark, Law No: CVCV050638

million enrollees in various health care plans in the state of New York.  Excellus, Inc., its subsidiaries and health care plans are collectively referred to as "Excellus BlueCross BlueShield" in this Complaint.

83.     Defendant Blue Cross and Blue Shield of North Carolina is a North Carolina corporation with its corporate headquarters located at 5901 Chapel Hill Road, Durham, North Carolina 27707.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 3.6 million members in various health care plans in North Carolina. Blue Cross and Blue Shield of North Carolina, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

84.     Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue, South Fargo, ND 58121.  Noridian Mutual Insurance Company is the parent company of a number of subsidiaries that provides health insurance products and related services to nearly 500,000 members in the midwestern and western United States.  Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care services to approximately 390,000 members in various health care plans in North Dakota.  Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

85.     Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is a subsidiary of Defendant WellPoint.  It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040.  Community Insurance

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 469 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 127 of 201
E-FILED 2016 FEB 11 4:22 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number of subsidiaries that provide health care services to more than 3 million members in various health care plans in Ohio.  Community Insurance Co., its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

86.    Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119.  Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health care services to approximately 2.8 million enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

87.    Defendant Regence Blue Cross Blue Shield of Oregon is a subsidiary of Defendant Cambia Health.  It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Regence Blue Cross Blue Shield of Oregon is the parent corporation of a number of subsidiaries that provide health care services to more than 750,000 members in various health care plans in Oregon.  Regence Blue Cross Blue Shield of Oregon, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

88.    Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania is a Pennsylvania corporation with its corporate headquarters located at 19 North Main Street, Wilkes-Barre, Pennsylvania 18711.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 470 of 645

Case 4:17-cv-00210-1AJ-SBJ   Document 1-16   Filed 06/14/17   Page 128 of 201
E-Filed  2016 JAN 11 4:19 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

570,000 enrollees in various health care plans in Pennsylvania.  Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania, its subsidiaries and health care plans are collectively referred to as "Blue Cross of Northeastern Pennsylvania" or "BCBS-NE PA" in this Complaint.

89.     Defendant Capital Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 1.3 million enrollees in various health care plans in Pennsylvania.  Capital Blue Cross, its subsidiaries and health care plans are collectively referred to as "Capital Blue Cross" in this Complaint.

90.     Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011.  Highmark Health Services is the parent of a number of subsidiaries that provide health care services to approximately 4.2 million members in various health care plans in Pennsylvania.  Highmark Health Services, its subsidiaries and health care plans are collectively referred to as "Highmark Health Services" in this Complaint.

91.     Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 3 million enrollees in Pennsylvania.  Independence Blue Cross, its subsidiaries and health care plans are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 471 of 645

Case 4:17-cv-00210-1AJ-SBJ   Document 1-16   Filed 06/14/17   Page 129 of 201
E-Filed   2016 APR 20 1:59 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

92.     Defendant Triple S – Salud, Inc. is a subsidiary of Triple-S Management Company and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.  It is the parent corporation of a number of subsidiaries that provide health care services to more than 600,000 enrollees in Puerto Rico. Triple S – Salud, Inc., its subsidiaries and health care plans are collectively referred to as "Triple-S of Puerto Rico" in this Complaint.

93.     Defendant Blue Cross and Blue Shield of Rhode Island, Inc. is a Rhode Island corporation with its corporate headquarters located at 15 LaSalle Square, Providence, Rhode Island 02903.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 600,000 enrollees in various health care plans in Rhode Island.  Blue Cross and Blue Shield of Rhode Island, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

94.     Defendant Blue Cross and Blue Shield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29223.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately one million members in various health care plans in South Carolina. Blue Cross and Blue Shield of South Carolina, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of South Carolina" or "BCBS-SC" in this Complaint.

95.     Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104.  Wellmark of South Dakota, Inc. is a subsidiary of Defendant Wellmark, Inc.   Wellmark of South Dakota, Inc. is the parent

corporation of a number of subsidiaries that provide health care services to approximately 250,000 enrollees in South Dakota. Wellmark of South Dakota, its subsidiaries and health care plans are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

96.    Defendant Blue Cross and Blue Shield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.3 million members in various health care plans in Tennessee. Blue Cross and Blue Shield of Tennessee, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Tennessee" or "BCBS-TN" in this Complaint.

97.    Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care services to approximately 2.9 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

98.    Regence Blue Cross Blue Shield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121. Regence Blue Cross Blue Shield of Utah is the parent corporation of a number of subsidiaries that provide health care services to more than 320,000 members in various health care plans in Utah. Regence Blue Cross Blue Shield of Utah, its subsidiaries and health care plans are collectively referred to as "Regence Blue Cross Blue Shield of Utah" or "BCBS-UT" in this Complaint.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 473 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 131 of 201
E-FILED  2015 JUL 07 2:04 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

99.     Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602.  It is the parent corporation of a number of subsidiaries that provide health care services to 160,000 enrollees in various health care plans within the state of Vermont.  Blue Cross and Blue Shield of Vermont, its subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

100.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia is a subsidiary of Defendant WellPoint.  It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230. Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care services to approximately 2.2 million enrollees in various health care plans in Virginia.   Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and health care plans are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

101.    Defendant Regence Blue Shield of Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101.  Regence Blue Shield of Washington is the parent corporation of a number of subsidiaries that provide health care services to more than 925,000 members in various health care plans in Washington.  Regence Blue Shield of Washington, its subsidiaries and health care plans are collectively referred to as "Regence Blue Shield of Washington" in this Complaint.

102.    Defendant Highmark of West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield of West Virginia is a subsidiary of Defendant Highmark and is a West Virginia

Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 474 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 132 of 201
E-Filed DIXON/MUELLER V WELLMARK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

corporation with its corporate headquarters located at 614 Market Square, Parkersburg, West Virginia 26101.   Highmark Blue Cross Blue Shield of West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care services to approximately 300,000 enrollees in various health care plans in West Virginia and one county in Ohio.   Highmark Blue Cross Blue Shield of West Virginia, its subsidiaries and health care plans are collectively referred to as "Highmark Blue Cross Blue Shield of West Virginia" or "BCBS-WV" in this Complaint.   BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

103.     Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant WellPoint and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Compcare Health Services Insurance Corporation, that provide health care services to approximately 900,000 enrollees in various health care plans in Wisconsin.   Blue Cross Blue Shield of Wisconsin, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

104.     Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001.  It is the parent corporation of a number of subsidiaries that provide health care services to approximately 100,000 enrollees in various health care plans in Wyoming.   Blue Cross Blue Shield of Wyoming, its subsidiaries and health care plans are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint.

105.    As a result of the Market Allocation Conspiracy, many of the Blues have market power in all, or large parts of, their defined service areas.

106.    Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601.  It is owned and controlled by 38 health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names.  BCBSA was created by these plans and operates as the licensor.  Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million - or one in three - Americans.  BCBSA itself does not provide health services and does not contract with physicians for the provisions of services, but it operates to create consistency and cooperation among its 38 members.  It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members.  The 38 plans fund Defendant BCBSA.

107.    BCBSA, and all other Defendants, have contacts with the State of Alabama by virtue of their conspiracy with BCBS-AL.

108.    The list of Non-Released Blues (described above) includes: Blue Cross Blue Shield of Arizona, Arkansas Blue Cross Blue Shield, Blue Shield of California, Blue Cross and Blue Shield Delaware, Blue Cross of Idaho, Blue Cross and Blue Shield of Kansas, Blue Cross and Blue Shield of Kansas City, Blue Cross Blue Shield of Nebraska, HealthNow, Noridian Mutual Insurance Co. d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross Blue Shield of Vermont, Blue Cross and Blue Shield of Wyoming, and Premier Health, Inc.  Additionally, while Excellus entered a settlement in New York state court, it did not obtain a release for any doctors other than those in New York, and that release does not affect the claims made in this

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 476 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 134 of 201
E-Filed 2016 MAR 01 3:17 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

amended complaint. Excellus is therefore also treated as a Non-Released Blue for purposes of this Complaint.

## FACTUAL ALLEGATIONS

### The BCBS Defendants

109.   Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and cover 100 million Americans.  According to the BCBSA, more than 96% of hospitals and 91% of professional providers contract with one of the Defendants nationwide – "more than any other insurer."

110.   The Blues include many of the largest potentially competitive health insurance companies in the United States.  Indeed, WellPoint is the largest health insurance company in the country by total medical enrollment, with approximately 34 million enrollees.  Similarly, 15 of the 25 largest health insurance companies in the country are Blues.  Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health insurance.

111.   For example, WellPoint is the largest health insurer in the country by total medical enrollment, with approximately 36 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country

through its non-Blue brand subsidiary, UniCare. WellPoint also operates in a number of additional states through its Medicaid subsidiary, Amerigroup. But for the illegal territorial restrictions summarized above, WellPoint would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

112.    Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, and BCBS-TX, is the largest mutual health insurance company in the country and the fourth largest health insurance company overall. But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health insurance services and products in many more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

113.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan. BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

114.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees. Its affiliated Blue plans include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 478 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 136 of 201
E-FILED 2016 MAR 01 3:41 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No: CVCV050638

BCBS-WV, and BCBS-DE.   But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

115.   Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees.  But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Alabama would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payment rates to Providers in those areas.

116.   CareFirst Blue Cross and Blue Shield, which operates the Blue Plans in Maryland, Washington, DC, and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

117.   BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts.  But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 479 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 137 of 201
E-FILED 2015 NOV 17 4:49 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

118.   BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida.  But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health insurance services and products in more regions across the United States in competition with the Blue in those regions.  Such competition would result in higher payment rates to Providers in those areas.

119.   The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

120.   The BCBSA is a separate legal entity that purports to promote the common interests of the Blues. The BCBSA describes itself as "a national federation of 38 independent, community-based and locally operated Blue Cross and Blue Shield companies."  The BCBSA refers to the 38 Blue Cross and Blue Shield companies as Member Plans.

121.   The BCBSA serves as the epicenter for the Defendants' communications and arrangements in furtherance of their agreements not to compete.  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 38] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [38] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

122.   Every Blue is a member of the BCBSA, every Blue CEO is on the Board of Directors of BCBSA and every Blue participates in numerous BCBSA Committees.

E-Filed 2017 MAY 04 3:54 PM POLK - CLERK OF DISTRICT COURT

**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

123.   The Blues govern BCBSA.  BCBSA is entirely controlled by its member plans, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

124.   As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).  The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

125.   In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current chairman of the Board of Directors, Alphonso O'Neil-White, is also the current President and CEO of BlueCross BlueShield of Western New York.  The CEO of each of the Individual Blue Plans serves on the Board of Directors of BCBSA.  The Board of Directors of BCBSA meets at least annually.

126.   BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 38 members.  The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend.  The BCBSA produces manuals, reports, list serves, and other correspondence to the Blues.  All of these activities are in furtherance of Defendants' conspiracy.

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

127.    The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC").  The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

128.    The Blues control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

129.    The Blues control the rules and regulations that all members of BCBSA must obey.  According to the brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

130.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards."  In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 21, 2012.

131.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 482 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 140 of 201
E-FILED 2015 DEC 11 8:12 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

132.    The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."   In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

133.    The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 483 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 141 of 201
E-Filed 2017 MAR 24 4:24 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

"Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

134.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

135.    The Blues are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

136.    Each BCBSA licensee is an independent legal organization.  The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues.  The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

137.    In its Sixth Circuit brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national coordination."  The authors of *The*

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 484 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 142 of 201
E-FILED 2015 JUN 24 7:45 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

*Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue

Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's
> parent Blue Plans - in the marketplace. Inter-Plan competition had
> been a fact of life from the earliest days, but a new set of
> conditions faced the Plans in the 1980s, now in a mature and
> saturated market. New forms of competition were springing up at
> every turn, and market share was slipping year by year. Survival
> was at stake. The stronger business pressure became, the stronger
> the temptation was to breach the service area boundaries for which
> the Plans were licensed . . . .

138.    On its website, BCBSA admits that "[w]hen the individual Blue companies'

priorities, business objectives and corporate culture conflict, it is our job to help them develop a

united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation

between [BCBSA] and the 39 [now 38] Blue companies."

139.    BCBSA is simply a vehicle used by admittedly independent health insurance

companies to conspire, coordinate, and enter into agreements that restrain competition. Because

BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one

of its member plans constitutes a horizontal agreement between and among the member plans

themselves.

140.    As detailed herein, the BCBSA not only enters into anticompetitive agreements

with the Blues to allocate markets, but also facilitates the cooperation and communications

between Defendants to suppress competition. BCBSA is a convenient organization through

which the Defendants enter into illegal territorial restraints between and among themselves.

## The BCBS Market Allocation Conspiracy

141.    Defendants allocate the geographic markets for health insurance by limiting each

Defendant's activity outside of a designated geographic Service Area. Accordingly, these

provisions insulate each Defendant from competition by other Blues in each of their respective

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 485 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 143 of 201
E-FILED 2016 APR 14 3:41 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

geographic Service Areas.  These provisions have no economic justification other than protecting Defendants from competition.

142.    Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws.  Defendants pay in-network providers directly pursuant to provider agreements.  Precisely because of Defendants' market power within each of their exclusive geographical markets, providers wishing to join the Blue network have virtually no bargaining power, and the terms of the provider agreements – including the offered payments for medical services – are given on a "take it or leave it" basis.  There is, as a general rule, no negotiation of payment terms.

143.    The vast majority of Blues pay out-of-network providers with assignments from patients directly when required by state law, such as in Tennessee and New Jersey, but refuse to honor assignments otherwise.  Defendants do this to discourage providers from remaining out-of-network, since out-of-network providers must look to their patients to collect any monies due to them for their services, or bill their patients at the time the services are rendered.  Defendants coerce providers who attempt to be out-of-network into network at below market rates.  Defendants also retaliate against providers who attempt to operate out-of-network.

144.    Defendants undertook a coordinated effort to allocate the market in which each Defendant would operate free of competition from other Blues.  They did this through a licensing scheme, requiring geographic restrictions in the exclusive trademark licenses granted to each Defendant.

145.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs.  The Blue Cross plans

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 486 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 144 of 201
E-Filed 2016 MAR 11 11:44:29 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

developed in conjunction with the American Hospital Association ("AHA") and were designed to provide a mechanism for covering the cost of hospital care.  The Blue Shield plans provided a mechanism for covering the cost of healthcare and were developed in conjunction with the American Medical Association ("AMA"), an organization that represents physicians.

146.    In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans.  When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."  In 1960, the AMCP changed its name to the "National Association of Blue Shield Plans" and, in 1976, changed its name to the "Blue Shield Association."

147.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.

148.    However, by the late 1940s, the Blues faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blues and were now entering the market.

149.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 487 of 645

Case 4:17-cv-00210-1AJ-SBJ   Document 1-16   Filed 06/14/17   Page 145 of 201
E-Filed   Chicoine/Mueller v. Wellmark, Law No. CVCV050638

150.    Instead, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

151.    Thus, in 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA.  In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.  Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which was renamed the Blue Shield Association in 1976.

152.    In the 1970's, the two Associations consolidated.  By 1982, the process of the merger to form BCBSA had been completed.

153.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.

154.    In September 1982, the Board of Directors of the combined BCBSA adopted a Long Term Business Strategy under which Defendants agreed not to compete with each other. The BCBSA was aware at the time that Defendants were violating the antitrust laws.

155.    To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities.  The Plans accordingly agreed to centralize the ownership of their trademarks and trade names.  In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 488 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 146 of 201
E-Filed    2017 JUN 14 7:54 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

156.    At that time, BCBSA became the sole owner of the Blue Cross Blue Shield trademarks and trade names that had previously been owned by the local plans.  BCBSA's Member Plans agreed to two propositions:  (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans should consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue Cross and Blue Shield plans within a state should further consolidate, ensuring that each state would have only one Blue.  As a result of these goals, the number of Member Plans went from 110 in 1984, to 75 in 1989, to 38 today.

157.    In 1987, the Member Plans of BCBSA held an "Assembly of Plans" – a series of meetings held for the purpose of determining how they would not compete against each other.  During these meetings, Defendants agreed to maintain exclusive Service Areas when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.  However, the Assembly of Plans left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues.  After the 1986 revocation of the Blues' tax-exempt status and throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased.  As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some."  These subsidiaries continued to compete with the other Blues.  As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

158.    Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 489 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 147 of 201
E-FILED 2017 APR 21 4:41 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

159.    Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey concerning members' Licensing Agreements and the guidelines proposed members must adhere to prior to joining the BCBSA. These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). Those regulations provide for amendment with a vote of three fourths of the Member Plans.  These agreements were revised or amended as recently as 2012.

160.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic "Service Area," which is either the geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

161.    Under the Guidelines and Membership Standards, each Member Plan agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 490 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 148 of 201
E-Filed   2017 JUN 14 2:16 PM WELLMARK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

enrollment from its Blue business.  Both provisions directly limit the ability of each Blue to generate revenue from non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.

162.    Therefore, Defendants have agreed that in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that area, and will derive at most one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

163.    WellPoint, in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the Blue Cross Blue Shield names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the Blue Cross Blue Shield  names and marks" and "a requirement that at least 66 and 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross Blue Shield  names and marks."

164.    The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition.

165.    The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard.  For example, under the licensing agreement, each Blue is allowed to contract one county into a contiguous Defendant's territory.  However, many of the Blues entered into what they call "gentlemen's agreements" not to compete in those counties.  In addition, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreement.

166.    In addition, there have been other side agreements not to compete.  Highmark BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

167.    Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into the market.  In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 492 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 150 of 201
E-Filed   2017 JUN 14 4:41 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

168.    On information and belief, this agreement remains in place, though it putatively expired in 2007. Instead of entering the Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and Independence BC intended to merge. After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition . . . to the detriment of the insurance buying public." Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield of West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield of Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 493 of 645

Case 4:17-cv-00210-1AJ-SBJ , Document 1-16 , Filed 06/14/17 , Page 151 of 201
E-Filed 2016 JAN 29 3:18 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Pennsylvania.  This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania, including in the Western Pennsylvania market.  In addition, Highmark has been involved in similar arrangements with other Pennsylvania Blues.

169.    It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act.  The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws.  The agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are *per se* violations of Section 1 of the Sherman Act.

170.    Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions.  The likelihood of increased competition is demonstrated in several ways.  First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition.  If there was no likelihood of competition, the restrictions would have been unnecessary.  In fact, as set forth above, the restrictions did not initially address competition by non-Blue plans owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well.  Second, in certain portions of four states, *limited* competition among two Defendants has been permitted.  For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California.  Likewise, Highmark and Capital compete in Pennsylvania, with both operating effectively and successfully.  In fact, the combined market share of Highmark and Capital is comparable to the market share of many individual Blues.  Obviously, these markets are far from competitive due to the agreements of the *other* Defendants not to compete in these Service Areas.  However, this competition demonstrates that competition

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 494 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 152 of 201
E-FILED 2015 MAR 31 2:54 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

among Blue Cross and Blue Shield Plans is not only possible but, in fact, does not undermine the Blue brand or trademark.  Third, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues.  For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states.  Prior to its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states.  Undoubtedly, absent the current restrictions, WellPoint would readily compete in additional Service Areas and, in all likelihood, would compete nationally.  Other Defendants, including HCSC, have, in fact, recently expanded into other areas.  Fourth, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states.  For example, WellPoint has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup.  WellPoint also operates Caremore Centers in Arizona despite the fact that WellPoint is not the Blue Cross Blue Shield licensee in Arizona.  In addition, Defendant Blue Cross of Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services.  Other Blues have likewise expanded into other Service Areas in a similar manner.  Of course, these expansions are currently extremely limited by the restrictions on competition.  While the Blues remain subject to the territorial restrictions of the Licensing Agreement, true competition cannot occur in the market for provision of healthcare services.

171.    Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas.  The territorial restrictions have therefore

barred competition from the respective commercial health insurance markets and the market for payment of healthcare providers.

172.    The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a Member Plan's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

### The BCBS Price Fixing Conspiracy

173.    As a result of the Market Allocation Conspiracy, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area.  Defendants therefore reached agreement and implemented a Price Fixing Conspiracy through the Blue Card Program in order to leverage the low provider pricing they had achieved in each Service Area to benefit all Blues.

174.    Defendants achieved this end by agreeing that all Defendants would participate in the Blue Card Program, which determines the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.  The Blue Card Program most commonly applies when employees reside in a different Service Area than the headquarters of their employer.  The Blue Card Program is also used to process claims for medical services for Blue members while traveling.  Plaintiffs regularly treat patients who are insured by a Defendant

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 496 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 154 of 201
E-FILED   2017 MAR 31 11:55 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

or who are included in an employee benefit plan administered by a Defendant outside the Service

Area where the medical treatment is rendered.

175.    Within the Blue Card Program, the Blue through which the subscriber is enrolled

is referred to as the "Home Plan," while the Blue located in the Service Area where the medical

service is provided is referred to as the "Host Plan."   The website of Defendant CareFirst

describes Blue Card in the following manner:

### Key terms
Host Plan
Also called the local plan, where the actual medical service is provided; CareFirst is the
Host Plan when a BCBS member from another Blue Plan service area obtains healthcare services
from a CareFirst provider
Home Plan
The contracted BlueCross BlueShield Plan where the insured member is enrolled; The
logo of the Home plan can be found on the member's BCBS insurance card.
Out-of-Area-Insured
An insured individual who is enrolled in a Blue Cross and Blue Shield other than
CareFirst.

### Example
When you see an out-of-area insured patient like Julie Gilbert, submit your claims to
CareFirst - the local or Host Plan. CareFirst then coordinates the claims process for you through
the BlueCard program.



As the Host Plan, CareFirst receives your claim, codes and
prices it according to contracted provider agreements, then sends an
electronic submission to Julie's Seattle-based Home Plan.
When the Seattle-based Home Plan receives the information,
the claim is processed by applying the Plan's medical policy, claim
adjudication edits, and the member's benefit exclusions or
limitations. The BCBS Plan then sends an electronic disposition
back to the Host Plan, with instructions for paying the claim according to the Plan fee-schedule.
CareFirst then generates a voucher, pays you, and notifies the Home plan how the claim
was paid.


176.    As a result of the BCBS Price Fixing Conspiracy, a healthcare provider treating a

patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate

agreement with that Defendant.   Instead, the Home Plan pays the healthcare provider the

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 497 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 155 of 201
E-Filed 2015 Mar 06 1:41 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

discounted rate the Host Plan has achieved as a result of the Market Allocation Conspiracy. For example, many members of plans insured or administered by Defendants Empire, BCBS of Illinois and BCBS of Michigan spend time in Florida during the winter months. Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida.

177. Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices. The Price Fixing Conspiracy is a *per se* violation of Section 1 of the Sherman Act.

178. In addition to lower payments for providers, the Blue Card Program also imposes numerous inefficiencies and burdens on them. While the rates paid for medical services are dictated by the Host Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home Plan. The Home Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area. Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. For example, Defendant Blue Cross of Tennessee administers the Nissan Employee Benefit Plan, which covers the many Nissan employees who reside in Mississippi and, accordingly, seek medical treatment there. For these patients, Defendant Blue Cross of Tennessee is the Home Plan, while Defendant Blue Cross of Mississippi is the Host Plan. Blue Cross of Mississippi determines the price paid for services rendered by a healthcare provider in

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 498 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 156 of 201
E-Filed 2016 DEC 21 2:14 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Mississippi.    However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by Blue Cross of Tennessee.  While the Mississippi provider has access to the rules for preauthorization or pre-notification for Blue Cross of Mississippi, the provider does not have ready access to Blue Cross of Tennessee's rules.  In this example, the Mississippi healthcare provider can innocently fail to comply with the rules of Blue Cross of Tennessee and be paid nothing by Blue Cross of Tennessee, not even receiving the discounted amount that would result from the BCBS Price Fixing Conspiracy.  When this happens, the healthcare provider has no recourse.  Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan. Moreover, the illustration includes only one Home Plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area.

179.    As a result of their Price Fixing Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year.  These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

## Other Abuses That Preserve the Blues' Enhanced Market Power

180.    In addition to the harms set forth above, healthcare providers are harmed in other numerous ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy.

181.    For example, a number of the Blues use most favored nations' clauses ("MFNs") with hospitals and other facilities.  According to at least some defense counsel, Defendant Blue Cross of Michigan says that its "medical cost advantage, delivered primarily through its facility

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 499 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 157 of 201
E-FILED 2015 MAR 11 3:11 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

discounts, is its largest source of competitive advantage."   The statement of Blue Cross of Michigan also applies to other Blues.   The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract.   Defendant Blue Cross of Alabama is one of the Defendants that uses such terms in its contracts with hospitals.   As a result of the extremely high market share held by Blue Cross of Alabama, this prohibition of use provision is effectively the same as an MFN.

182.   All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996).   By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

183.   In addition, Defendants, including CareFirst, require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers.   Defendants thereby create asymmetric information in the market for the purchase of healthcare provider services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

184.   Finally, Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive "reserves" (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below market rates offered in a market free from

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 500 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 158 of 201
E-FILED 2005 NAR 14 1:27 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

competition from other Blues.  All of this is undertaken in an attempt to further drive down payment rates to providers and to raise barriers for competing firms to enter these markets.

**Antitrust Injury**

185.    Defendants' illegal activities have resulted in antitrust injury and harm to competition.

186.    Through their violations of the antitrust laws, Defendants have suppressed prices and competition depriving patients of choices in the marketplace for healthcare providers.

187.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in the state of Alabama has been and continues to be harmed in that the other 37 Blues agree not to enter the Alabama market to compete with Blue Cross Blue Shield of Alabama no matter the circumstances.

188.    Additionally, because most of the Blues are monopolists in the insurance market, in addition to monopsonists, it does not stand to reason that lower payment rates necessarily lower consumers' premiums.  R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

189.    In the long run, the Blues monopsony power gained by virtue of their unlawful agreements will harm consumers.  Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**                    **Page 158 of 201**

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 501 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 159 of 201
E-FILED 2016 APR 28 4:47 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

competitive prices the Blues pay.  A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians.  "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation      Survey      of      American      Physicians,"      *available      at*      http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).  Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants.  According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation.

190.    Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.  Hospitals and other facilities are closing.  Other facilities are reducing services offered to consumers.  Still others that would otherwise expand are not doing so as a result of the Blues' low payments.

191.    In the end, economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

192.    In addition, Plaintiffs suffer because agreements not to compete also restrict their choices in the market.  Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area.  This has the effect of depressing the payment rates in the market for in- and out-of-network services, as there is virtually no competition to drive these costs of healthcare services up.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 502 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 160 of 201
E-Filed 2015 AUG 24 1:41 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

193.    Defendants' illegal activities have resulted in harm to competition.  Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between non-competitive rates or being put out of business through coercion.

194.    Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened future harm to Plaintiffs' business and property.

195.    If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

**Defendants, Even Those Organized As Not For Profit, Enjoy Supracompetitive Profit**

196.    Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits.  Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer.  This tremendous savings has resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace.  As Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."  Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

197.    Although the Blues were originally established as non-profits, they soon operated like for-profit corporations.  In 1986, after Congress revoked Defendants' tax-exempt status, the Blues formed for-profit subsidiaries.  The majority then converted to for-profit status and still operate as such today.  Those that have not officially converted are only nominally characterized

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 503 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 161 of 201
E-FILED 2015 MAR 01 4:13 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No: CVCV050638

as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

198.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

199.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates.   The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel.   Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

200.    Blues nationwide have many common threads which reach throughout their network.   Officers share with each other their otherwise well-kept expense schemes.   These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks.   These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

201.    Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services.   Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

202.    By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

•       Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executivess to cover the contributions and related income tax on the additional bonus.

203.  The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

204.  For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities.  Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

205.  In addition, despite claiming to be "not-for-profit," many of these Blues hold outrageous "reserves" built off the net income spread between the high premiums they charge customers and the below market rates they pay to Providers.

206.  Below is an example of the outrageous capital being held in excess of requirements by a number of not-for-profit Blues.  As of Sept. 30, 2010, 33 not-for-profit Blues held more than **$27 billion in capital in excess** of the minimum threshold reserves required by the BCBSA. The chart below details those "reserves":

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 505 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-16    Filed 06/14/17    Page 163 of 201
E-Filed  2011 JUN 14 1:14 PM  POLK - CLERK OF DISTRICT COURT

**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield of Tennessee | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

**Plaintiffs' Appendix in Resistance     Page 163 of 201
to Wellmark Motion to Stay**

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 506 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 164 of 201
E-FILED 2015 MAR 11 11:11 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

207.   Many of the Blues undersell their actual reserves substantially by citing only the surplus from the mainline company, but not the general reserves on the companies' combined reporting statements, which accounts for all lines of business.

208.   In South Carolina, for instance, "Blue Cross Blue Shield's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

209.   Members of the Board of South Carolina Blue Cross Blue Shield "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show."  They were required to do little but show up to the occasional meeting.

210.   This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies.  South Carolina Blue Cross paid executives in the millions of dollars in 2010.

211.   HCSC, a conglomerate of several Blues, including Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012.  This net income does not even account for large blocks of plans it merely administers for the self-insured.  "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus.  The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011."  "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 507 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 165 of 201
E-Filed 2016 APR 11 3:40 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No: CVCV050638

her total compensation to $8.7 million in 2012." *See*

http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million

212.    These supra-competitive profits are built on the strength of Defendants'
agreement not to compete, its price fixing Blue Card regime and its market power, in particular
its ability to force Providers to join their networks at below market rates.  A spokeswoman for
Blue Cross of South Carolina noted that the Plan's outrageous increases are priced "to reflect its
superior networks."  Thus, the market power of the Blues allows them to pay below market rates
to Providers.  This leads to huge surplus profits for companies supposedly organized as not for
profit or charitable companies.

213.    If Defendants' actions are not enjoined, harm to competition and injury to
Plaintiffs will continue.

### Class Action Allegations

214.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of
healthcare providers.  First, Plaintiffs bring this action seeking injunctive relief pursuant to the
provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on
behalf of the following Class (the "Nationwide Injunction Class"):

> All healthcare providers, not owned or employed by any of the
> Defendants,  who currently provide healthcare services, equipment
> or supplies in the United States of America.

215.    Further, Plaintiffs bring this action seeking damages pursuant to the provisions of
Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following
class:

> All healthcare providers, not  owned  or  employed  by  any  of  the
> Defendants,  in the United States of America provided covered services,

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 508 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 166 of 201
E-Filed                         2016 MAR 11 4:39 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant within four years prior to the date of the filing of this action.

Plaintiffs reserve the right to amend the class definitions including to present subclasses, and/or add additional class representatives prior to the time that the Court grants class certification.

216.    Plaintiffs are all members of both Classes, their claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.   Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation.   Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

217.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members.   The Class Members are so numerous that joinder of all members is impracticable.

218.    Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.   Common questions of law and fact will predominate over any individual questions of law and fact.

219.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

220.    There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.   Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 509 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 167 of 201
E-Filed   2017 JUN 14 1:31 PM POLK - CLERK OF DISTRICT COURT

**Chicoine/Mueller v. Wellmark, Law No: CVCV050638**

a.    Whether Defendants violated Section 1 of the Sherman Act;

b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d.    Whether Defendants' agreements, including its Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e.    Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f.    Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

g.    Whether Defendants' conduct should be enjoined;

h.    The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

221.    These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

222.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**Plaintiffs' Appendix in Resistance          Page 167 of 201
to Wellmark Motion to Stay**

Chicoine/Mueller v. Wellmark, Law No: CVCV050638

223.    This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## COUNT I

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (The BCBS Market Allocation Conspiracy)

224.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 223 as though set forth herein.

225.    The License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blues represent a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

226.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA, and the other Blue Cross entities have agreed to divide and allocate the geographic markets for the sale of commercial health insurance into a series of exclusive areas for each of the 38 BCBSA members.   By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing the rates paid to healthcare providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.  Defendants' market allocation agreements are *per se* illegal under Section 1 of the Sherman Act.

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 511 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 169 of 201
E-FILED 2017 APR 11 5:18 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No: CVCV050638

227.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

228.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

229.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs.  Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## COUNT II

### Contract, Combination, or Conspiracy in Restraint of Trade
### In Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (The BCBS Price Fixing Conspiracy)

230.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 229 as though set forth herein.

231.    The BCBS Price Fixing Conspiracy, in addition to the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Blues, represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act.

232.    Through the BCBS Price Fixing Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by agreeing to accept the "host plan" reimbursement rate through the Blue Card Program.  By so doing, Defendants have agreed to

E-FILED 2017 APR 11 1:41 PM POLK - CLERK OF DISTRICT COURT
**Chicoine/Mueller v. Wellmark, Law No: CVCV050638**

suppress competition by fixing and maintaining the rates paid to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act.  Defendants' price fixing agreement through the Blue Card Program is *per se* illegal under Section 1 of the Sherman Act.

233.   As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid lower rates, having been forced to accept far less favorable terms, and/or having access to far fewer patients than they would have with increased competition and but for Defendants' anticompetitive agreement.

234.   Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

235.   Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants from entering into, or from honoring or enforcing, any agreements that fix the prices paid by Defendants for services rendered by healthcare providers.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

a.   Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.   Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

E-FILED 2013 JUL 01 1:11 PM POLK - CLERK OF DISTRICT COURT
**Chicoine/Mueller v. Wellmark, Law No: CVCV050638**

      c.      Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

      d.      Permanently enjoin Defendants from utilizing the Blue Card Program to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

      e.      Award Plaintiffs and the Damages Class damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

      f.      Award costs and attorneys' fees to Plaintiffs;

      g.      Award prejudgment interest;

      h.      For a trial by jury; and

      i.      Award any such other and further relief as may be just and proper.

<u>**JURY DEMAND**</u>

      Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 1, 2013               Respectfully submitted,

*/s/ Edith M. Kallas*                  */s/ Joe R. Whatley, Jr.*

Edith M. Kallas – ***Co-Lead Counsel***      Joe R. Whatley, Jr. – ***Co-Lead Counsel***

WHATLEY KALLAS, LLP              W. Tucker Brown

380 Madison Avenue, 23rd Floor       WHATLEY KALLAS, LLP

New York, NY 10017                2001 Park Place North

Tel: (212) 447-7060                1000 Park Place Tower

Fax: (800) 922-4851               Birmingham, AL 35203

Email: ekallas@whatleykallas.com     Tel: (205) 488-1200

                                   Fax: (800) 922-4851

                                   Email: jwhatley@whatleykallas.com

                                         tbrown@whatleykallas.com

E-FILED 2017 JUN 07 1:26 PM POLK - CLERK OF DISTRICT COURT
**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel:  (617) 573-5118
Fax:  (617) 573-5090
Email: psheehan@whatleykallas.com

E. Kirk Wood, Jr. – *Local Facilitating Counsel*
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email: ekirkwood1@bellsouth.net

Debra B. Hayes – *Plaintiffs' Steering Committee*
Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email: dhayes@dhayeslaw.com
         dreich@rbfirm.net

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS QUINN &
PANTAZIS, LLC
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
         bclark@wcqp.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email: dwinegard@whatleykallas.com

Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
         pprieto@podhurst.com

U.W. Clemon – *Plaintiffs' Steering Committee*
J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: uwclemon@whitearnolddowd.com
         adowd@whitearnolddowd.com
         mwhite@whitearnolddowd.com
         lflippo@whitearnolddowd.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

79

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email:  nroth@eysterkey.com
          jroth@eysterkey.com


David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email:  david.balto@dcantitrustlaw.com


Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email:  joey@bunchandjames.com


John C. Davis – *Written Submissions
Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email:  john@johndavislaw.net

D. Brian Hufford – *Chair, Written Submissions
Committee*
Robert J. Axelrod – *Chair, Written Submissions
Committee*
POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS, LLP
600 Third Avenue, 20th Floor
New York, NY 10016
Tel:  (212) 661-1100
Fax:  (212) 661-8665
Email:  bhufford@pomlaw.com
          rjaxelrod@pomlaw.com


W. Daniel Miles, III – *Written Submissions
Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
  & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email:  dee.miles@beasleyallen.com


Peter H. Burke – *Class Certification Committee*
Richard S. Frankowski – *Discovery Committee*
J. Allen Schreiber – *Litigation Committee*
BURKE HARVEY & FRANKOWSKI, LLC
One Highland Place
2151 Highland Avenue, Suite 120
Birmingham, AL 35205
Tel:  (888) 880-9046
Fax:  (205) 588-8671
Email:  pburke@bhflegal.com
          rfrankowski@bhflegal.com
          aschreiber@bhflegal.com


Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email:  mdodge@gpm-law.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email:  mgray@grayandwhitelaw.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email:  Michael@gurleylaw.net

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email:  steve@stephenmhansenlaw.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email:  ljinks@jinkslaw.com
        ccrow@jinkslaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
   THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email:  hst@kttlaw.com
        jal@kttlaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email:  myronpenn28@hotmail.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email:  wes@pittmanfirm.com

Troy A. Doles – *Discovery Committee*
SCHLICHTER BOGARD & DENTON, LLP
100 S. 4th Street, Suite 900
St. Louis, MO 63102
Tel:  (314) 621-6115
Fax:  (314) 621-7151
Email:  tdoles@uselaws.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email:  rroden@shelbyroden.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email:  petestrom@stromlaw.com

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 517 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 175 of 201
E-FILED 2016 JAN 14 1:57 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DK 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email:  gmason@wbmllp.com

Thomas V. Bender
WALTERS BENDER STROHBEHN
 & VAUGHAN, P.C.
2500 City Center Square, 1100 Main
Kansas City, MO 64105
Tel:  (816) 421-6620
Fax:  (816) 421-4747
Email:  tbender@wbsvlaw.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email:  lance@searsandswanson.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email:  brian@wojtalewiczlawfirm.com

**Chicoine/Mueller v. Wellmark, Law No. CVCV050638**

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 1st day of July 2013, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr.

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

**FILED**
2013 Sep-03  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | } | |
| | } | |
| | } | |
| IN RE: BLUE CROSS BLUE SHIELD | } | |
| ANTITRUST LITIGATION | } | **Master File No.: 2:13-CV-20000-RDP** |
| (MDL No.: 2406) | } | |
| | } | **This document relates to all cases.** |
| | } | |
| | } | |

### ORDER SETTING BRIEFING SCHEDULE
### AND ESTABLISHING CERTAIN DISCOVERY PROCEDURES

Before the court is the Parties' July 19, 2013 Joint Status Report Regarding Motion to Dismiss Briefing Schedule (the "Joint Report"). This matter was heard at a status conference on August 21, 2013.

After carefully considering the Joint Report, the proposed briefing schedules of the Parties, and the arguments advanced by the Parties at the August 21, 2013 status conference, the court hereby **ORDERS** as follows regarding the briefing schedule and early discovery:

1.     Defendants **SHALL** file their Motions to Dismiss **on or before September 30, 2013**.

2.     Plaintiffs **SHALL** file their Oppositions to Defendants' Motions to Dismiss **on or before January 15, 2014**.

3.     Defendants **SHALL** file their Reply Briefs in support of their Motions to Dismiss **on or before March 6, 2014**.

4.     Initial briefs (for all Defendants and both Plaintiff tracks) are limited to 150 pages and replies are limited to 75 pages. As discussed at the August 21, 2013 hearing, Defendants intend to file two principal, non-duplicative briefs. The 37 individual Plans reserve the right to file non-

*Chicoine/Mueller v. Wellmark, Law No. CVCV050638*

duplicative briefs on any issues particular to them, with initial briefs (of a Plan and both Plaintiff tracks) limited to 20 pages and replies limited to 10 pages.

5.    **Within thirty days of this order**, the Parties **SHALL** meet and confer in person about potential evidence preservation, including the types of data and information sources that the Parties are preserving, time periods, types of custodians and the information referenced in the Parties' lists of categories, the scope of preservation going forward, e-discovery protocols, terms of a Protective Order (collectively "the foregoing topics"), and Rule 26(f) disclosures and conferences. Any party may present any dispute(s) that arise pursuant to this paragraph and relating to the foregoing topics or 26(f) disclosure and conference matters related to the foregoing topics, to the court at any time **after thirty (30) days of this Order**.

6.    **Within ninety days of this order,** for the time period covered by the applicable statute of limitations, the Association **SHALL**, without a request, produce the following documents:

a.    The License Agreements between each of the Individual Blue Plans and Blue Cross and Blue Shield Association ("BCBSA") (*i.e.*, both Blue Cross License Agreements and Blue Shield License Agreements).

b.    BCBSA Membership Standards Applicable to Regular Members.

c.    BCBSA Guidelines to Administer Membership Standards Applicable to Regular Members.

d.    List of members of BCBSA's Brand Enhancement and Protection Committee (the new name for the Plan Performance and Financial Standards Committee).

e.    Triennial membership compliance letters.

2

7.      The Parties **SHALL** hold a preliminary Rule 26(f) conference on any remaining Rule 26(f) issues after the completion of discussions on preservation, e-discovery protocol, and terms of a Protective Order; provided, however, the Rule 26(f) conference **SHALL** occur **no later than within sixty days of this order**.  The parties **SHALL** present to the court a Preliminary Rule 16 Order at the conclusion of that conference.  The Preliminary Rule 16 Order **SHALL** reflect the limited discovery that will be permitted at this stage of the case, and report on the Parties' discussions about how to best address the issue of sampling of documents which may be produced in this case, as well as suitable alternatives to sampling.[1]

8.      **On or before June 1, 2014** (eleven months from the date the Consolidated Amended Complaints were filed), the Parties **SHALL** file a status report with the court regarding a proposed discovery schedule for the remainder of discovery.  Except as provided for in this Order, discovery is otherwise **STAYED** until this date.

9.      While the discovery stay remains in place, the Parties may exchange RFPs related to three categories of documents: electronically stored information protocols; organizational charts; and data architecture.  Objections to the RFPs will be exchanged by the parties.  However, such objections **SHALL** be due **no earlier than forty-five (45) days after the date** on which Defendants file their Motions to Dismiss.  The Parties agree that a Party receiving the RFPs may need more than forty-five days to provide objections.  The RFP sponsoring Party may, as appropriate, raise issues regarding discovery in these categories with the court.

---

[1] The court understands this may be a lengthy process but asks the parties to provide an initial report on their discussions.

3

10.     Prior to raising any issue with the court, the Parties **SHALL** meet and confer as to

any challenged objections to the RFPs.

The court reserves the right to modify the terms of this Order.[2]

**DONE** and **ORDERED** this _____3rd_____ day of September, 2013.

_R. C. Proctor_ (signature)
_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[2] The court commends counsel for substantially narrowing their disputes in this matter prior to the hearing.  The court did not observe this same effort during the Parties' review of the draft order, and encourages the Parties to work in a collaborative manner in the future.

4

E-Filed 2016-09-21 14:44:06   Clerk of Court
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| United States Judicial Panel on Multidistrict Litigation | | Report Date: 12/15/2015 |
| --- | --- | --- |

### MDL Statistics Report - Docket Summary Listing

**MDL Filters:**

Status: **Transferred**

Limited to **Active Litigations**

Docket Summary Listing in Order by **Docket**

| DOCKET | TR'E DISTRICT/ JUDGE/ MDL STATUS | MASTER DOCKET | DATE FILED | DATE CLOSED |
| --- | --- | --- | --- | --- |
| 875 IN RE: Asbestos Products Liability Litigation (No. VI) | PAE/ Robreno, Eduardo C./ Transferred on 07/29/1991 | 2:91-md-875 | 01/17/1991 | |
| 1203 IN RE: Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation | PAE/ Bartle, Harvey/ Transferred on 12/10/1997 | 2:10-md-1203 | 09/23/1997 | |
| 1358 IN RE: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | NYS/ Scheindlin, Shira Ann/ Transferred on 10/10/2000 | 1:00-cv-1898 | 06/06/2000 | |
| 1409 IN RE: Currency Conversion Fee Antitrust Litigation | NYS/ Pauley, William H/ Transferred on 08/17/2001 | 1:01-md-1409 | 04/13/2001 | |
| 1419 IN RE: K-Dur Antitrust Litigation | NJ/ Chesler, Stanley R/ Transferred on 08/15/2001 | 2:01-cv-1652 | 05/31/2001 | |
| 1431 IN RE: Baycol Products Liability Litigation | MN/ Davis, Michael James/ Transferred on 12/18/2001 | 0:01-md-1431 | 08/21/2001 | |
| 1446 IN RE: Enron Corp. Securities, Derivative & "ERISA" Litigation | TXS/ Harmon, Melinda/ Transferred on 04/16/2002 | | 12/21/2001 | |
| 1507 IN RE: Prempro Products Liability Litigation | ARE/ Wilson, Billy Roy/ Transferred on 03/04/2003 | 4:03-cv-1507 | 10/18/2002 | |
| 1566 IN RE: Western States Wholesale Natural Gas Antitrust Litigation | NV/ Jones, Robert Clive/ Transferred on 11/06/2003 | 2:03-cv-1431 | 07/16/2003 | |
| 1570 IN RE: Terrorist Attacks on September 11, 2001 | NYS/ Daniels, George B/ Transferred on 12/09/2003 | 1:03-md-1570 | 08/21/2003 | |
| 1604 IN RE: Ocwen Federal Bank FSB Mortgage Servicing Litigation | ILN/ Norgle, Charles R./ Transferred on 04/13/2004 | 1:04-cv-2714 | 01/28/2004 | |
| 1616 IN RE: Urethane Antitrust Litigation | KS/ Lungstrum, John W/ Transferred on 08/23/2004 | 2:04-md-1616 | 04/13/2004 | |
| 1657 IN RE: Vioxx Marketing, Sales Practices and Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 02/16/2005 | 2:05-md-1657 | 10/08/2004 | |
| 1658 IN RE: Merck & Co., Inc., Securities, Derivative & "ERISA" Litigation | NJ/ Chesler, Stanley R/ Transferred on 02/23/2005 | 2:05-cv-1151 | 10/18/2004 | |
| 1663 IN RE: Insurance Brokerage Antitrust Litigation | NJ/ Cecchi, Claire C./ Transferred on 02/17/2005 | 2:04-cv-5184 | 11/19/2004 | |
| 1668 IN RE: Federal National Mortgage Association Securities, Derivative & "ERISA" Litigation | DC/ Leon, Richard J/ Transferred on 05/17/2005 | 1:05-mc-234 | 12/06/2004 | |
| 1674 IN RE: Community Bank of Northern Virginia Mortgage Lending Practices Litigation | PAW/ Schwab, Arthur J/ Transferred on 04/28/2005 | 2:03-cv-425 | 12/29/2004 | |
| 1700 IN RE: FedEx Ground Package System, Inc., Employment Practices Litigation (No. II) | INN/ Miller, Robert L./ Transferred on 08/10/2005 | 3:05-md-527 | 05/13/2005 | |
| 1715 IN RE: Ameriquest Mortgage Co. Mortgage Lending Practices Litigation | ILN/ Aspen, Marvin E/ Transferred on 12/13/2005 | 1:05-cv-7097 | 07/13/2005 | |
| 1720 IN RE: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | NYE/ Brodie, Margo K./ Transferred on 10/19/2005 | 1:05-md-1720 | 07/28/2005 | |
| 1738 IN RE: Vitamin C Antitrust Litigation | NYE/ Cogan, Brian M/ Transferred on 02/14/2006 | 1:06-md-1738 | 11/10/2005 | |
| 1775 IN RE: Air Cargo Shipping Services Antitrust Litigation | NYE/ Gleeson, John/ Transferred on 06/20/2006 | 1:06-md-1775 | 03/15/2006 | |
| 1782 IN RE: Pharmacy Benefit Managers Antitrust Litigation | PAE/ Jones, C. Darnell/ Transferred on 08/24/2006 | 2:06-md-1782 | 04/14/2006 | |
| 1789 IN RE: Fosamax Products Liability Litigation | NYS/ Keenan, John F/ Transferred on 08/16/2006 | 1:06-md-1789 | 05/24/2006 | |
| 1827 IN RE: TFT-LCD (Flat Panel) Antitrust Litigation | CAN/ Illston, Susan Yvonne/ Transferred on 04/17/2007 | 3:07-md-1827 | 12/22/2006 | |
| 1836 IN RE: Mirapex Products Liability Litigation | MN/ Davis, Michael James/ Transferred on 06/22/2007 | 0:07-md-1836 | 02/06/2007 | |
| 1840 IN RE: Motor Fuel Temperature Sales Practices Litigation | KS/ Vratil, Kathryn H/ Transferred on 06/18/2007 | 2:07-md-1840 | 02/22/2007 | |
| 1842 IN RE: Kugel Mesh Hernia Patch Products Liability Litigation | RI/ Lisi, Mary M/ Transferred on 06/22/2007 | 1:07-md-1842 | 02/28/2007 | |
| 1869 IN RE: Rail Freight Fuel Surcharge Antitrust Litigation | DC/ Friedman, Paul L/ Transferred on 11/06/2007 | 1:07-mc-489 | 06/06/2007 | |
| 1871 IN RE: Avandia Marketing, Sales Practices and Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 10/16/2007 | 2:07-md-1871 | 06/11/2007 | |
| 1877 IN RE: ClassicStar Mare Lease Litigation | KYE/ Hood, Joseph M/ Transferred on 10/19/2007 | 5:07-cv-353 | 07/02/2007 | |
| 1880 IN RE: Papst Licensing Digital Camera Patent Litigation | DC/ Collyer, Rosemary M./ Transferred on 11/05/2007 | 1:07-mc-493 | 07/13/2007 | |
| 1889 IN RE: Peregrine Systems, Inc., Securities Litigation | CAS/ Benitez, Roger T/ Transferred on 01/02/2008 | 3:02-cv-870 | 08/08/2007 | |
| 1913 IN RE: Transpacific Passenger Air Transportation Antitrust Litigation | CAN/ Breyer, Charles R./ Transferred on 02/19/2008 | 3:07-cv-5634 | 11/20/2007 | |
| 1916 IN RE: Chiquita Brands International, Inc., Alien Tort Statute and Shareholders Derivative Litigation | FLS/ Marra, Kenneth A/ Transferred on 02/20/2008 | 0:08-md-1916 | 11/28/2007 | |
| 1917 IN RE: Cathode Ray Tube (CRT) Antitrust Litigation | CAN/ Tigar, Jon S./ Transferred on 02/15/2008 | 3:07-cv-5944 | 11/29/2007 | |

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 182 of 201
E-Filed 2015 DEC 15 6:19 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 1932 IN RE: Family Dollar Stores, Inc., Wage and Hour Employment Practices Litigation | NCW/ Mullen, Graham C/ Transferred on 04/08/2008 | 3:08-md-1932 | 01/14/2008 |
| 1943 IN RE: Levaquin Products Liability Litigation | MN/ Tunheim, John R./ Transferred on 06/13/2008 | 0:08-md-1943 | 02/19/2008 |
| 1950 IN RE: Municipal Derivatives Antitrust Litigation | NYS/ Marrero, Victor/ Transferred on 06/16/2008 | 1:08-md-1950 | 03/19/2008 |
| 1952 IN RE: Packaged Ice Antitrust Litigation | MIE/ Borman, Paul D/ Transferred on 06/05/2008 | 2:08-md-1952 | 03/26/2008 |
| 1953 IN RE: Heparin Products Liability Litigation | OHN/ Carr, James G/ Transferred on 06/06/2008 | 1:08-hc-60000 | 04/04/2008 |
| 1963 IN RE: The Bear Stearns Companies Inc. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Sweet, Robert W/ Transferred on 08/18/2008 | 1:08-md-1963 | 05/05/2008 |
| 1964 IN RE: NuvaRing Products Liability Litigation | MOE/ Sippel, Rodney W/ Transferred on 08/22/2008 | 4:08-md-1964 | 05/09/2008 |
| 1995 IN RE: Time Warner Inc. Set-Top Cable Television Box Antitrust Litigation | NYS/ Castel, P. Kevin/ Transferred on 12/12/2008 | 1:08-md-1995 | 09/16/2008 |
| 2001 IN RE: Whirlpool Corp. Front-Loading Washer Products Liability Litigation | OHN/ Boyko, Christopher A/ Transferred on 12/02/2008 | 1:08-wp-65000 | 09/26/2008 |
| 2002 IN RE: Processed Egg Products Antitrust Litigation | PAE/ Pratter, Gene E.K./ Transferred on 12/02/2008 | 2:08-md-2002 | 10/09/2008 |
| 2004 IN RE: Mentor Corp. ObTape Transobturator Sling Products Liability Litigation | GAM/ Land, Clay D/ Transferred on 12/03/2008 | 4:08-md-2004 | 10/14/2008 |
| 2009 IN RE: Regions Morgan Keegan Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | TNW/ Mays, Samuel H./ Transferred on 02/12/2009 | 2:09-md-2009 | 10/31/2008 |
| 2011 IN RE: The Reserve Fund Securities and Derivative Litigation | NYS/ Gardephe, Paul G./ Transferred on 02/10/2009 | 1:09-md-2011 | 11/19/2008 |
| 2017 IN RE: Lehman Brothers Holdings, Inc., Securities & Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Kaplan, Lewis A./ Transferred on 02/09/2009 | 1:09-md-2017 | 01/04/2008 |
| 2020 IN RE: Aetna, Inc., Out-of-Network "UCR" Rates Litigation | NJ/ Hayden, Katharine S/ Transferred on 04/08/2009 | 2:07-cv-3541 | 12/11/2008 |
| 2034 IN RE: Comcast Corp. Set-Top Cable Television Box Antitrust Litigation | PAE/ Brody, Anita B/ Transferred on 06/17/2009 | 2:09-md-2034 | 02/25/2009 |
| 2036 IN RE: Checking Account Overdraft Litigation | FLS/ King, James Lawrence/ Transferred on 06/10/2009 | 1:09-md-2036 | 02/26/2009 |
| 2042 IN RE: Refrigerant Compressors Antitrust Litigation | MIE/ Cox, Sean F./ Transferred on 06/09/2009 | 2:09-md-2042 | 03/05/2009 |
| 2044 IN RE: Vertrue Inc. Marketing and Sales Practices Litigation | OHN/ Gaughan, Patricia A/ Transferred on 06/08/2009 | 1:09-vm-75000 | 03/06/2009 |
| 2047 IN RE: Chinese-Manufactured Drywall Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 06/15/2009 | 2:09-md-2047 | 03/13/2009 |
| 2048 IN RE: Cox Enterprises, Inc., Set-Top Cable Television Box Antitrust Litigation | OKW/ Cauthron, Robin J./ Transferred on 06/11/2009 | 5:12-ml-2048 | 03/18/2009 |
| 2050 IN RE: Bill of Lading Transmission and Processing System Patent Litigation | OHS/ Beckwith, Sandra S/ Transferred on 06/11/2009 | 1:09-md-2050 | 03/23/2009 |
| 2052 IN RE: Tremont Group Holdings, Inc., Securities Litigation | NYS/ Griesa, Thomas P/ Transferred on 06/11/2009 | 1:09-md-2052 | 03/25/2009 |
| 2058 IN RE: Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Castel, P. Kevin/ Transferred on 06/10/2009 | 1:09-md-2058 | 04/07/2009 |
| 2063 IN RE: Oppenheimer Rochester Funds Group Securities Litigation | CO/ Kane, John L/ Transferred on 06/17/2009 | 1:09-md-2063 | 04/14/2009 |
| 2067 IN RE: Celexa and Lexapro Marketing and Sales Practices Litigation | MA/ Gorton, Nathaniel M/ Transferred on 08/19/2009 | 1:09-md-2067 | 04/21/2009 |
| 2070 IN RE: Citigroup Inc. Securities Litigation | NYS/ Stein, Sidney H/ Transferred on 08/07/2009 | 1:09-md-2070 | 04/28/2009 |
| 2074 IN RE: WellPoint, Inc., Out-of-Network "UCR" Rates Litigation | CAC/ Gutierrez, Philip S/ Transferred on 08/19/2009 | 2:09-ml-2074 | 05/05/2009 |
| 2081 IN RE: Blood Reagents Antitrust Litigation | PAE/ DuBois, Jan E/ Transferred on 08/17/2009 | 2:09-md-2081 | 06/05/2009 |
| 2082 IN RE: Meridian Funds Group Securities & Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Griesa, Thomas P/ Transferred on 08/11/2009 | 1:09-md-2082 | 06/10/2009 |
| 2083 IN RE: KBR, Inc., Burn Pit Litigation | MD/ Titus, Roger W/ Transferred on 10/16/2009 | 8:09-md-2083 | 06/12/2009 |
| 2084 IN RE: AndroGel Antitrust Litigation (No. II) | GAN/ Thrash, Thomas W/ Transferred on 10/05/2009 | 1:09-md-2084 | 06/17/2009 |
| 2088 IN RE: Fairfield Greenwich Group Securities Litigation | NYS/ Marrero, Victor/ Transferred on 10/06/2009 | 1:09-md-2088 | 06/26/2009 |
| 2089 IN RE: Delta/AirTran Baggage Fee Antitrust Litigation | GAN/ Batten, Timothy C/ Transferred on 10/06/2009 | 1:09-md-2089 | 06/26/2009 |
| 2090 IN RE: Wholesale Grocery Products Antitrust Litigation | MN/ Montgomery, Ann D/ Transferred on 10/16/2009 | 0:09-md-2090 | 07/02/2009 |
| 2099 IN RE: Stanford Entities Securities Litigation | TXN/ Godbey, David C/ Transferred on 10/06/2009 | 3:09-md-2099 | 07/29/2009 |
| 2100 IN RE: Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation | ILS/ Herndon, David R./ Transferred on 10/01/2009 | 3:09-md-2100 | 07/30/2009 |
| 2104 IN RE: IKO Roofing Shingle Products Liability Litigation | ILC/ Baker, Harold A/ Transferred on 12/03/2009 | 2:09-md-2104 | 08/12/2009 |
| 2119 IN RE: Mortgage Electronic Registration Systems (MERS) Litigation | AZ/ Teilborg, James A/ Transferred on 12/07/2009 | 2:09-md-2119 | 10/01/2009 |
| 2121 IN RE: Musical Instruments and Equipment Antitrust Litigation | CAS/ Burns, Larry Alan/ Transferred on 12/09/2009 | 3:09-md-2121 | 10/07/2009 |
| 2143 IN RE: Optical Disk Drive Antitrust Litigation | CAN/ Seeborg, Richard/ Transferred on 04/02/2010 | 3:10-md-2143 | 12/29/2009 |
| 2151 IN RE: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation | CAC/ Selna, James V/ Transferred on 04/09/2010 | 8:10-ml-2151 | 02/04/2010 |
| 2153 IN RE: United Parcel Service "Air-in-Ground" Marketing and Sales Practices Litigation | CAC/ Wu, George H./ Transferred on 06/08/2010 | 2:10-ml-2153 | 02/23/2010 |
| 2158 IN RE: Zimmer Durom Hip Cup Products Liability Litigation | NJ/ Wigenton, Susan D/ Transferred on 06/09/2010 | 2:09-cv-4414 | 03/15/2010 |
| 2159 IN RE: AutoZone, Inc., Wage and Hour Employment Practices Litigation | CAN/ Breyer, Charles R./ Transferred on 06/15/2010 | 3:10-md-2159 | 03/17/2010 |

CM/ECF for JPML (LIVE)-MDL Report

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 525 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 183 of 201
E-Filed 2015 Dec 15 6:19 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2165 IN RE: Endangered Species Act Section 4 Deadline Litigation | DC/ Sullivan, Emmet G/ Transferred on 06/08/2010 | 1:10-mc-377 | 04/02/2010 |
| 2179 IN RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | LAE/ Barbier, Carl J/ Transferred on 08/10/2010 | 2:10-md-2179 | 05/06/2010 |
| 2181 IN RE: Method of Processing Ethanol Byproducts and Related Subsystems ('858) Patent Litigation | INS/ McKinney, Larry J/ Transferred on 08/06/2010 | 1:10-ml-2181 | 05/12/2010 |
| 2184 IN RE: Google Inc. Street View Electronic Communications Litigation | CAN/ Breyer, Charles R/ Transferred on 08/17/2010 | 3:10-md-2184 | 06/14/2010 |
| 2185 IN RE: BP p.l.c. Securities Litigation | TXS/ Ellison, Keith P/ Transferred on 08/10/2010 | 4:10-md-2185 | 06/15/2010 |
| 2186 IN RE: Fresh and Process Potatoes Antitrust Litigation | ID/ Winmill, B. Lynn/ Transferred on 10/13/2010 | 4:10-md-2186 | 07/13/2010 |
| 2187 IN RE: C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 10/12/2010 | 2:10-md-2187 | 07/15/2010 |
| 2193 IN RE: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation | MA/ Zobel, Rya W/ Transferred on 10/08/2010 | 1:10-md-2193 | 08/04/2010 |
| 2196 IN RE: Polyurethane Foam Antitrust Litigation | OHN/ Zouhary, Jack/ Transferred on 12/01/2010 | 1:10-md-2196 | 08/31/2010 |
| 2197 IN RE: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation | OHN/ Katz, David A/ Transferred on 12/03/2010 | 1:10-md-2197 | 09/03/2010 |
| 2199 IN RE: POM Wonderful LLC Marketing and Sales Practices Litigation | CAC/ Pregerson, Dean D/ Transferred on 11/30/2010 | 2:10-md-2199 | 10/05/2010 |
| 2215 IN RE: Glaceau Vitaminwater Marketing and Sales Practice Litigation (No. II) | NYE/ Irizarry, Dora Lizette/ Transferred on 02/08/2011 | 1:11-md-2215 | 11/16/2010 |
| 2218 IN RE: Camp Lejeune, North Carolina, Water Contamination Litigation | GAN/ Thrash, Thomas W/ Transferred on 02/04/2011 | 1:11-md-2218 | 11/24/2010 |
| 2221 IN RE: American Express Anti-Steering Rules Antitrust Litigation (No. II) | NYE/ Garaufis, Nicholas G/ Transferred on 02/07/2011 | 1:11-md-2221 | 12/07/2010 |
| 2226 IN RE: Darvocet, Darvon and Propoxyphene Products Liability Litigation | KYE/ Reeves, Danny C/ Transferred on 08/16/2011 | 2:11-md-2226 | 12/15/2010 |
| 2234 IN RE: Wal-Mart ATM Fee Notice Litigation | TNW/ McCalla, Jon P/ Transferred on 05/20/2011 | 2:11-md-2234 | 02/23/2011 |
| 2238 IN RE: Groupon, Inc., Marketing and Sales Practices Litigation | CAS/ Sabraw, Dana M / Transferred on 05/25/2011 | 3:11-md-2238 | 03/14/2011 |
| 2242 IN RE: Prograf Antitrust Litigation | MA/ Zobel, Rya W/ Transferred on 06/03/2011 | 1:11-md-2242 | 03/23/2011 |
| 2243 IN RE: Fosamax (Alendronate Sodium) Products Liability Litigation (No. II) | NJ/ Wolfson, Freda L/ Transferred on 05/23/2011 | 3:08-cv-8 | 03/24/2011 |
| 2244 IN RE: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation | TXN/ Kinkeade, James Edgar/ Transferred on 05/23/2011 | 3:11-md-2244 | 03/28/2011 |
| 2246 IN RE: Air Crash Near Rio Grande, Puerto Rico, on December 3, 2008 | FLS/ Marra, Kenneth A/ Transferred on 05/25/2011 | 9:11-md-2246 | 04/01/2011 |
| 2262 IN RE: Libor-Based Financial Instruments Antitrust Litigation | NYS/ Buchwald, Naomi Reice/ Transferred on 08/12/2011 | 1:11-md-2262 | 05/13/2011 |
| 2263 IN RE: Dial Complete Marketing and Sales Practices Litigation | NH/ McAuliffe, Steven J/ Transferred on 08/18/2011 | 1:11-md-2263 | 05/23/2011 |
| 2266 IN RE: Wells Fargo Wage and Hour Employment Practices Litigation (No. III) | TXS/ Miller, Gray H./ Transferred on 08/19/2011 | 4:11-md-2266 | 05/25/2011 |
| 2272 IN RE: Zimmer NexGen Knee Implant Products Liability Litigation | ILN/ Pallmeyer, Rebecca R/ Transferred on 08/08/2011 | 1:11-cv-5468 | 06/06/2011 |
| 2274 IN RE: CitiMortgage, Inc., Home Affordable Modification Program (HAMP) Contract Litigation | CAC/ Fischer, Dale S/ Transferred on 10/06/2011 | 2:11-md-2274 | 06/10/2011 |
| 2280 IN RE: Morgan Stanley Smith Barney LLC Wage and Hour Employment Practices Litigation | NJ/ Martini, William J/ Transferred on 10/12/2011 | 2:11-cv-3121 | 06/29/2011 |
| 2284 IN RE: Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation | PAE/ Pratter, Gene E.K./ Transferred on 10/20/2011 | 2:11-md-2284 | 07/22/2011 |
| 2286 IN RE: Midland Credit Management, Inc., Telephone Consumer Protection Act (TCPA) Litigation | CAS/ Anello, Michael M/ Transferred on 10/11/2011 | 3:11-md-2286 | 07/28/2011 |
| 2291 IN RE: Wesson Oil Marketing and Sales Practices Litigation | CAC/ Morrow, Margaret M/ Transferred on 10/13/2011 | 2:11-md-2291 | 08/04/2011 |
| 2293 IN RE: Electronic Books Antitrust Litigation | NYS/ Cote, Denise L/ Transferred on 12/09/2011 | 1:11-md-2293 | 08/16/2011 |
| 2294 IN RE: Webvention LLC ('294) Patent Litigation | MD/ Blake, Catherine C/ Transferred on 12/15/2011 | 1:11-md-2294 | 08/18/2011 |
| 2295 IN RE: Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act (TCPA) Litigation | CAS/ Houston, John A/ Transferred on 12/21/2011 | 3:11-md-2295 | 08/19/2011 |
| 2296 IN RE: Tribune Company Fraudulent Conveyance Litigation | NYS/ Sullivan, Richard J/ Transferred on 12/19/2011 | 1:11-md-2296 | 08/16/2011 |
| 2299 IN RE: Actos (Pioglitazone) Products Liability Litigation | LAW/ Doherty, Rebecca F/ Transferred on 12/29/2011 | 6:11-md-2299 | 08/31/2011 |
| 2303 IN RE: Innovatio IP Ventures, LLC, Patent Litigation | ILN/ Bucklo, Elaine E/ Transferred on 12/28/2011 | 1:11-cv-9308 | 09/14/2011 |
| 2308 IN RE: Skechers Toning Shoe Products Liability Litigation | KYW/ Russell, Thomas B/ Transferred on 12/19/2011 | 3:11-md-2308 | 09/30/2011 |
| 2309 IN RE: Transdata, Inc., Smart Meters Patent Litigation | OKW/ Cauthron, Robin J./ Transferred on 12/13/2011 | 5:12-ml-2309 | 10/05/2011 |
| 2311 IN RE: Automotive Parts Antitrust Litigation | MIE/ Battani, Marianne O/ Transferred on 02/07/2012 | 2:12-md-2311 | 10/11/2011 |
| 2314 IN RE: Facebook Internet Tracking Litigation | CAN/ Davila, Edward J / Transferred on 02/08/2012 | 5:12-md-2314 | 10/17/2011 |
| 2316 IN RE: Ford Motor Co. Spark Plug and 3-Valve Engine Products Liability Litigation | OHN/ Pearson, Benita Y./ Transferred on 02/08/2012 | 1:12-md-2316 | 10/21/2011 |
| 2320 IN RE: Colgate-Palmolive Softsoap Antibacterial Hand Soap Marketing and Sales Practices Litigation | NH/ Barbadoro, Paul J/ Transferred on 03/07/2012 | 1:12-md-2320 | 11/07/2011 |
| 2323 IN RE: National Football League Players' Concussion Injury Litigation | PAE/ Brody, Anita B/ Transferred on 01/31/2012 | 2:12-md-2323 | 11/15/2011 |
| 2324 IN RE: Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practices Litigation | FLS/ Lenard, Joan A/ Transferred on 02/09/2012 | 1:12-md-2324 | 11/28/2011 |
| 2325 IN RE: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2325 | 11/23/2011 |

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 526 of 645

CM/ECF for JPML (LIVE)-MDL Report

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 184 of 201
E-Filed 2015 DEC 15 4:48 PM JASPER - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2326 IN RE: Boston Scientific Corp. Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2326 | 11/28/2011 |
| 2327 IN RE: Ethicon, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2327 | 11/28/2011 |
| 2328 IN RE: Pool Products Distribution Market Antitrust Litigation | LAE/ Vance, Sarah S./ Transferred on 04/17/2012 | 2:12-md-2328 | 11/29/2011 |
| 2329 IN RE: Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation | GAN/ Duffey, William S/ Transferred on 02/08/2012 | 1:12-md-2329 | 11/29/2011 |
| 2330 IN RE: Carrier IQ, Inc., Consumer Privacy Litigation | CAN/ Chen, Edward M./ Transferred on 04/16/2012 | 3:12-md-2330 | 12/02/2011 |
| 2331 IN RE: Propecia (Finasteride) Products Liability Litigation | NYE/ Gleeson, John/ Transferred on 04/16/2012 | 1:12-md-2331 | 12/06/2011 |
| 2332 IN RE: Lipitor Antitrust Litigation | NJ/ Sheridan, Peter G./ Transferred on 04/20/2012 | 3:12-cv-2389 | 12/06/2011 |
| 2334 IN RE: Liberty Refund Anticipation Loan Litigation | ILN/ Gottschall, Joan B/ Transferred on 04/16/2012 | 1:12-cv-2949 | 12/09/2011 |
| 2335 IN RE: Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation | NYS/ Kaplan, Lewis A./ Transferred on 04/16/2012 | 1:12-md-2335 | 12/13/2011 |
| 2338 IN RE: MF Global Holdings Ltd. Investment Litigation | NYS/ Marrero, Victor/ Transferred on 04/23/2012 | 1:12-md-2338 | 01/06/2012 |
| 2342 IN RE: Zoloft (Sertraline Hydrochloride) Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 04/17/2012 | 2:12-md-2342 | 01/18/2012 |
| 2343 IN RE: Skelaxin (Metaxalone) Antitrust Litigation | TNE/ Collier, Curtis Lynn/ Transferred on 04/17/2012 | 1:12-md-2343 | 01/25/2012 |
| 2344 IN RE: Bear Creek Technologies, Inc., ('722) Patent Litigation | DE/ Sleet, Gregory M/ Transferred on 05/02/2012 | 1:12-md-2344 | 01/25/2012 |
| 2353 IN RE: Tropicana Orange Juice Marketing and Sales Practices Litigation | NJ/ Martini, William J/ Transferred on 06/11/2012 | 2:11-cv-7382 | 02/22/2012 |
| 2354 IN RE: Maxim Integrated Products, Inc., Patent Litigation | PAW/ Conti, Joy Flowers/ Transferred on 06/08/2012 | 2:12-mc-244 | 02/23/2012 |
| 2355 IN RE: Parallel Networks, LLC, ('111) Patent Litigation | TXE/ Schroeder, Robert W./ Transferred on 06/12/2012 | 6:10-cv-111 | 02/23/2012 |
| 2357 IN RE: Zappos.com, Inc., Customer Data Security Breach Litigation | NV/ Jones, Robert Clive/ Transferred on 06/13/2012 | 3:12-cv-325 | 02/28/2012 |
| 2359 IN RE: HardiePlank Fiber Cement Siding Litigation | MN/ Davis, Michael James/ Transferred on 06/11/2012 | 0:12-md-2359 | 03/06/2012 |
| 2361 IN RE: Simply Orange Orange Juice Marketing and Sales Practices Litigation | MOW/ Gaitan, Fernando J/ Transferred on 06/11/2012 | 4:12-md-2361 | 03/14/2012 |
| 2371 IN RE: Unified Messaging Solutions LLC Patent Litigation | ILN/ Lefkow, Joan Humphrey/ Transferred on 08/03/2012 | 1:12-cv-6286 | 04/14/2012 |
| 2375 IN RE: Body Science LLC Patent Litigation | MA/ Saylor, F. Dennis/ Transferred on 08/06/2012 | 1:12-md-2375 | 04/18/2012 |
| 2380 IN RE: Shop-Vac Marketing and Sales Practices Litigation | PAM/ Kane, Yvette/ Transferred on 08/15/2012 | 4:12-cv-2380 | 05/04/2012 |
| 2382 IN RE: Emerson Electric Co. Wet/Dry Vac Marketing and Sales Practices Litigation | MOE/ Autrey, Henry Edward/ Transferred on 08/15/2012 | 4:12-md-2382 | 05/09/2012 |
| 2384 IN RE: Swisher Hygiene, Inc., Securities and Derivative Litigation | NCW/ Mullen, Graham C/ Transferred on 08/13/2012 | 3:12-md-2384 | 05/30/2012 |
| 2385 IN RE: Pradaxa (Dabigatran Etexilate) Products Liability Litigation | ILS/ Herndon, David R./ Transferred on 08/08/2012 | 3:12-md-2385 | 05/30/2012 |
| 2387 IN RE: Coloplast Corp. Pelvic Support Systems Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 08/08/2012 | 2:12-md-2387 | 06/05/2012 |
| 2389 IN RE: Facebook, Inc., IPO Securities and Derivative Litigation | NYS/ Sweet, Robert W/ Transferred on 10/04/2012 | 1:12-md-2389 | 06/14/2012 |
| 2391 IN RE: Biomet M2a Magnum Hip Implant Products Liability Litigation | INN/ Miller, Robert L./ Transferred on 10/02/2012 | 3:12-md-2391 | 06/27/2012 |
| 2395 IN RE: Air Crash at Georgetown, Guyana, on July 30, 2011 | NYE/ Ross, Allyne R/ Transferred on 09/28/2012 | 1:12-md-2395 | 07/05/2012 |
| 2396 IN RE: TR Labs Patent Litigation | NJ/ Sheridan, Peter G./ Transferred on 10/01/2012 | 3:09-cv-3883 | 07/09/2012 |
| 2404 IN RE: Nexium (Esomeprazole) Products Liability Litigation | CAC/ Fischer, Dale S/ Transferred on 12/06/2012 | 2:12-md-2404 | 08/27/2012 |
| 2405 IN RE: On-Line Travel Company (OTC)/Hotel Booking Antitrust Litigation | TXN/ Boyle, Jane J/ Transferred on 12/11/2012 | 3:12-md-2405 | 08/29/2012 |
| 2406 IN RE: Blue Cross Blue Shield Antitrust Litigation | ALN/ Proctor, R. David/ Transferred on 12/12/2012 | 2:13-cv-20000 | 09/06/2012 |
| 2409 IN RE: Nexium (Esomeprazole) Antitrust Litigation | MA/ Young, William G./ Transferred on 12/06/2012 | 1:12-md-2409 | 09/12/2012 |
| 2413 IN RE: Frito-Lay North America, Inc., "All Natural" Litigation | NYE/ Mauskopf, Roslynn R./ Transferred on 12/12/2012 | 1:12-md-2413 | 09/21/2012 |
| 2415 IN RE: L'Oreal Wrinkle Cream Marketing and Sales Practices Litigation | NJ/ Martini, William J/ Transferred on 12/12/2012 | 2:12-cv-3571 | 09/28/2012 |
| 2416 IN RE: Capital One Telephone Consumer Protection Act (TCPA) Litigation | ILN/ Bucklo, Elaine E/ Transferred on 12/10/2012 | 1:12-cv-10064 | 10/03/2012 |
| 2418 IN RE: Plavix Marketing, Sales Practices and Products Liability Litigation (No. II) | NJ/ Wolfson, Freda L/ Transferred on 02/12/2013 | 3:13-cv-2418 | 10/15/2012 |
| 2419 IN RE: New England Compounding Pharmacy, Inc., Products Liability Litigation | MA/ Zobel, Rya W/ Transferred on 02/12/2013 | 1:13-md-2419 | 10/16/2012 |
| 2420 IN RE: Lithium Ion Batteries Antitrust Litigation | CAN/ Rogers, Yvonne Gonzalez/ Transferred on 02/06/2013 | 4:13-md-2420 | 10/16/2012 |
| 2426 IN RE: TRS Recovery Services, Inc., and TeleCheck Services, Inc., Fair Debt Collection Practices Act (FDCPA) Litigation | ME/ Hornby, D. Brock/ Transferred on 02/07/2013 | 2:13-md-2426 | 12/04/2012 |
| 2428 IN RE: Fresenius GranuFlo/NaturaLyte Dialysate Products Liability Litigation | MA/ Woodlock, Douglas P/ Transferred on 03/29/2013 | 1:13-md-2428 | 12/12/2012 |
| 2432 IN RE: Neurografix (360) Patent Litigation | MA/ Stearns, Richard G/ Transferred on 04/01/2013 | 1:13-md-2432 | 01/03/2013 |
| 2433 IN RE: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation | OHS/ Sargus, Edmund A./ Transferred on 04/08/2013 | 2:13-md-2433 | 01/11/2013 |
| 2434 IN RE: Mirena IUD Products Liability Litigation | NYS/ Seibel, Cathy/ Transferred on 04/08/2013 | 7:13-md-2434 | 01/16/2013 |

CM/ECF for JPML (LIVE)-MDL Report

| | | | |
|---|---|---|---|
| 2436 IN RE: Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation | PAE/ Stengel, Lawrence F/ Transferred on 04/01/2013 | 2:13-md-2436 | 01/17/2013 |
| 2437 IN RE: Domestic Drywall Antitrust Litigation | PAE/ Baylson, Michael M/ Transferred on 04/08/2013 | 2:13-md-2437 | 01/18/2013 |
| 2438 IN RE: 5-Hour Energy Marketing and Sales Practices Litigation | CAC/ Gutierrez, Philip S/ Transferred on 06/05/2013 | 2:13-md-2438 | 02/15/2013 |
| 2439 IN RE: Subway Footlong Sandwich Marketing and Sales Practices Litigation | WIE/ Adelman, Lynn S/ Transferred on 06/10/2013 | 2:13-md-2439 | 02/15/2013 |
| 2440 IN RE: Cook Medical, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 06/11/2013 | 2:13-md-2440 | 02/18/2013 |
| 2441 IN RE: Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation | MN/ Frank, Donovan W/ Transferred on 06/12/2013 | 0:13-md-2441 | 02/19/2013 |
| 2445 IN RE: Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation | PAE/ Goldberg, Mitchell S/ Transferred on 06/06/2013 | 2:13-md-2445 | 03/04/2013 |
| 2450 IN RE: Ford Fusion and C-Max Fuel Economy Litigation | NYS/ Karas, Kenneth M/ Transferred on 06/07/2013 | 7:13-md-2450 | 04/03/2013 |
| 2451 IN RE: HSBC Bank USA, N.A., Debit Card Overdraft Fee Litigation | NYE/ Spatt, Arthur D/ Transferred on 06/05/2013 | 2:13-md-2451 | 04/03/2013 |
| 2452 IN RE: Incretin-Based Therapies Products Liability Litigation | CAS/ Battaglia, Anthony J./ Transferred on 08/09/2013 | 3:13-md-2452 | 04/05/2013 |
| 2454 IN RE: Franck's Lab, Inc., Products Liability Litigation | LAE/ Engelhardt, Kurt D./ Transferred on 08/07/2013 | 2:13-md-2454 | 04/12/2013 |
| 2455 IN RE: Stericycle, Inc., Steri-Safe Contract Litigation | ILN/ Shadur, Milton I/ Transferred on 08/06/2013 | 1:13-cv-5795 | 04/15/2013 |
| 2460 IN RE: Niaspan Antitrust Litigation | PAE/ DuBois, Jan E/ Transferred on 09/17/2013 | 2:13-md-2460 | 04/26/2013 |
| 2461 IN RE: MyKey Technology Inc. Patent Litigation | CAC/ Guilford, Andrew J./ Transferred on 08/14/2013 | 2:13-ml-2461 | 05/07/2013 |
| 2471 IN RE: Vehicle Carrier Services Antitrust Litigation | NJ/ Salas, Esther/ Transferred on 10/18/2013 | 2:13-cv-3306 | 06/13/2013 |
| 2472 IN RE: Loestrin 24 Fe Antitrust Litigation | RI/ Smith, William F/ Transferred on 10/02/2013 | 1:13-md-2472 | 06/18/2013 |
| 2474 IN RE: H&R Block IRS Form 8863 Litigation | MOW/ Gaitan, Fernando J/ Transferred on 10/10/2013 | 4:13-md-2474 | 07/08/2013 |
| 2475 IN RE: North Sea Brent Crude Oil Futures Litigation | NYS/ Carter, Andrew L./ Transferred on 10/21/2013 | 1:13-md-2475 | 07/11/2013 |
| 2476 IN RE: Credit Default Swaps Antitrust Litigation | NYS/ Cote, Denise L/ Transferred on 10/16/2013 | 1:13-md-2476 | 07/16/2013 |
| 2478 IN RE: Convergent Telephone Consumer Protection Act (TCPA) Litigation | CT/ Thompson, Alvin W/ Transferred on 10/08/2013 | 3:13-md-2478 | 07/19/2013 |
| 2481 IN RE: Aluminum Warehousing Antitrust Litigation | NYS/ Forrest, Katherine B./ Transferred on 12/16/2013 | 1:13-md-2481 | 08/07/2013 |
| 2485 IN RE: New Cingular Wireless PCS, LLC, Data Services Sales Tax Refund Litigation | WAW/ Coughenour, John C/ Transferred on 12/19/2013 | 2:13-md-2485 | 08/14/2013 |
| 2491 IN RE: GNC Corp. TriFlex Products Marketing and Sales Practices Litigation (No. II) | MD/ Motz, J. Frederick/ Transferred on 12/17/2013 | 1:14-md-2491 | 08/30/2013 |
| 2492 IN RE: National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation | ILN/ Lee, John Z./ Transferred on 12/18/2013 | 1:13-cv-9116 | 09/04/2013 |
| 2493 IN RE: Monitronics International, Inc., Telephone Consumer Protection Act (TCPA) Litigation | WVN/ Keeley, Irene M/ Transferred on 12/16/2013 | 1:13-md-2493 | 09/06/2013 |
| 2494 IN RE: Columbia and Snake River Dams Clean Water Act Litigation | WAE/ Suko, Lonny R/ Transferred on 12/13/2013 | 2:13-md-2494 | 09/11/2013 |
| 2495 IN RE: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation | GAN/ Thrash, Thomas W/ Transferred on 12/19/2013 | 1:13-md-2495 | 09/17/2013 |
| 2497 IN RE: Air Crash at San Francisco, California, on July 6, 2013 | CAN/ Rogers, Yvonne Gonzalez/ Transferred on 12/13/2013 | 4:13-md-2497 | 09/24/2013 |
| 2498 IN RE: Nutramax Cosamin Marketing and Sales Practices Litigation | MD/ Motz, J. Frederick/ Transferred on 12/17/2013 | 1:14-md-2498 | 09/25/2013 |
| 2502 IN RE: Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No. II) | SC/ Gergel, Richard M/ Transferred on 02/18/2014 | 2:14-mn-2502 | 10/10/2013 |
| 2503 IN RE: Solodyn (Minocycline Hydrochloride) Antitrust Litigation | MA/ Casper, Denise J./ Transferred on 02/25/2014 | 1:14-md-2503 | 10/11/2013 |
| 2504 IN RE: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation | KYW/ Hale, David J./ Transferred on 02/19/2014 | 3:14-md-2504 | 10/12/2013 |
| 2506 IN RE: AZEK Building Products, Inc., Marketing and Sales Practices Litigation | NJ/ Arleo, Madeline C./ Transferred on 02/18/2014 | 2:12-cv-6627 | 10/29/2013 |
| 2508 IN RE: Cast Iron Soil Pipe and Fittings Antitrust Litigation | TNE/ Mattice, Harry S/ Transferred on 02/18/2014 | 1:14-md-2508 | 11/01/2013 |
| 2511 IN RE: Neomedic Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/18/2014 | 2:14-md-2511 | 11/08/2013 |
| 2513 IN RE: Collecto, Inc., Telephone Consumer Protection Act (TCPA) Litigation | MA/ Stearns, Richard G/ Transferred on 02/18/2014 | 1:14-cv-2513 | 11/19/2013 |
| 2514 IN RE: Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation | SC/ Norton, David C/ Transferred on 02/14/2014 | 2:14-mn-1 | 11/19/2013 |
| 2516 IN RE: Aggrenox Antitrust Litigation | CT/ Underhill, Stefan R/ Transferred on 04/03/2014 | 3:14-md-2516 | 12/13/2013 |
| 2521 IN RE: Lidoderm Antitrust Litigation | CAN/ Orrick, William H./ Transferred on 04/03/2014 | 3:14-md-2521 | 12/23/2013 |
| 2522 IN RE: Target Corporation Customer Data Security Breach Litigation | MN/ Magnuson, Paul A/ Transferred on 04/02/2014 | 0:14-md-2522 | 12/24/2013 |
| 2524 IN RE: Health Management Associates, Inc., Qui Tam Litigation (No. II) | DC/ Walton, Reggie B/ Transferred on 04/03/2014 | 1:14-mc-339 | 01/14/2014 |
| 2528 IN RE: Natrol, Inc., Glucosamine/Chondroitin Marketing and Sales Practices Litigation | MD/ Motz, J. Frederick/ Transferred on 06/10/2014 | 1:14-md-2528 | 02/11/2014 |
| 2531 IN RE: Michaels Stores, Inc., Wage and Hour Employment Practices Litigation | CAC/ Wu, George H./ Transferred on 06/04/2014 | 2:14-md-2531 | 02/20/2014 |
| 2532 IN RE: Yosemite National Park Hantavirus Litigation | CAN/ Chesney, Maxine M/ Transferred on 06/04/2014 | 3:14-md-2532 | 02/24/2014 |
| 2540 IN RE: Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation | NJ/ Simandle, Jerome B/ Transferred on 06/11/2014 | 1:14-cv-3722 | 03/18/2014 |

**Plaintiffs' Appendix in Resistance**                                         **Page 185 of 201**
**to Wellmark Motion to Stay**

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 528 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 186 of 201
E-Filed
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2541 IN RE: National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation | CAN/ Wilken, Claudia/ Transferred on 06/04/2014 | 4:14-md-2541 | 03/19/2014 |
| 2542 IN RE: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | NYS/ Broderick, Vernon S./ Transferred on 06/03/2014 | 1:14-md-2542 | 03/20/2014 |
| 2543 IN RE: General Motors LLC Ignition Switch Litigation | NYS/ Furman, Jesse M/ Transferred on 06/09/2014 | 1:14-md-2543 | 03/24/2014 |
| 2545 IN RE: Testosterone Replacement Therapy Products Liability Litigation | ILN/ Kennelly, Matthew F/ Transferred on 06/06/2014 | 1:14-cv-1748 | 03/28/2014 |
| 2548 IN RE: Commodity Exchange, Inc., Gold Futures and Options Trading Litigation | NYS/ Caproni, Valerie E./ Transferred on 08/13/2014 | 1:14-md-2548 | 04/14/2014 |
| 2551 IN RE: National Hockey League Players' Concussion Injury Litigation | MN/ Nelson, Susan Richard/ Transferred on 08/19/2014 | 0:14-md-2551 | 04/25/2014 |
| 2555 IN RE: Coca-Cola Products Marketing and Sales Practices Litigation (No. II) | CAN/ White, Jeffrey S/ Transferred on 08/07/2014 | 4:14-md-2555 | 05/21/2014 |
| 2557 IN RE: Auto Body Shop Antitrust Litigation | FLM/ Presnell, Gregory A/ Transferred on 08/08/2014 | 6:14-md-2557 | 05/21/2014 |
| 2562 IN RE: Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation | MOE/ Sippel, Rodney W/ Transferred on 10/17/2014 | 4:14-md-2562 | 06/16/2014 |
| 2564 IN RE: Life Time Fitness, Inc., Telephone Consumer Protection Act (TCPA) Litigation | MN/ Ericksen, Joan N./ Transferred on 10/15/2014 | 0:14-md-2564 | 06/18/2014 |
| 2566 IN RE: TelexFree Securities Litigation | MA/ Hillman, Timothy S/ Transferred on 10/21/2014 | 4:14-md-2566 | 07/01/2014 |
| 2567 IN RE: Pre-Filled Propane Tank Antitrust Litigation | MOW/ Fenner, Gary A/ Transferred on 10/16/2014 | 4:14-md-2567 | 07/02/2014 |
| 2570 IN RE: Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Products Liability Litigation | INS/ Young, Richard L./ Transferred on 10/15/2014 | 1:14-ml-2570 | 07/21/2014 |
| 2573 IN RE: London Silver Fixing, Ltd., Antitrust Litigation | NYS/ Caproni, Valerie E./ Transferred on 10/09/2014 | 1:14-md-2573 | 08/05/2014 |
| 2575 IN RE: Fluidmaster, Inc., Water Connector Components Products Liability Litigation | ILN/ Dow, Robert M/ Transferred on 12/11/2014 | 1:14-cv-5696 | 08/18/2014 |
| 2577 IN RE: GAF Elk Cross Timbers Decking Marketing, Sales Practices and Products Liability Litigation | NJ/ Linares, Jose L/ Transferred on 12/12/2014 | 2:15-cv-18 | 08/20/2014 |
| 2580 IN RE: Opana ER Antitrust Litigation | ILN/ Leinenweber, Harry D/ Transferred on 12/12/2014 | 1:14-cv-10150 | 08/26/2014 |
| 2581 IN RE: CTP Innovations, LLC, Patent Litigation | MD/ Garbis, Marvin J/ Transferred on 12/12/2014 | 1:14-md-2581 | 09/03/2014 |
| 2583 IN RE: The Home Depot, Inc., Customer Data Security Breach Litigation | GAN/ Thrash, Thomas W/ Transferred on 12/11/2014 | 1:14-md-2583 | 09/15/2014 |
| 2586 IN RE: Supervalu, Inc., Customer Data Security Breach Litigation | MN/ Montgomery, Ann D/ Transferred on 12/16/2014 | 0:14-md-2586 | 09/18/2014 |
| 2587 IN RE: IntraMTA Switched Access Charges Litigation | TXN/ Fitzwater, Sidney A./ Transferred on 12/16/2014 | 3:14-md-2587 | 09/19/2014 |
| 2588 IN RE: Whole Foods Market, Inc., Greek Yogurt Marketing and Sales Practices Litigation | TXW/ Sparks, Sam/ Transferred on 12/10/2014 | 1:14-mc-2588 | 09/30/2014 |
| 2590 IN RE: Navistar MaxxForce Engines Marketing, Sales Practices and Products Liability Litigation | ILN/ Gottschall, Joan B/ Transferred on 12/17/2014 | 1:14-cv-10318 | 10/03/2014 |
| 2591 IN RE: Syngenta AG MIR162 Corn Litigation | KS/ Lungstrum, John W/ Transferred on 12/11/2014 | 2:14-md-2591 | 10/07/2014 |
| 2592 IN RE: Xarelto (Rivaroxaban) Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 12/12/2014 | 2:14-md-2592 | 10/09/2014 |
| 2595 IN RE: Community Health Systems, Inc., Customer Data Security Breach Litigation | ALN/ Bowdre, Karon O./ Transferred on 02/04/2015 | 2:15-cv-222 | 10/17/2014 |
| 2599 IN RE: Takata Airbag Products Liability Litigation | FLS/ Moreno, Federico A/ Transferred on 02/05/2015 | 1:15-md-2599 | 11/03/2014 |
| 2600 IN RE: Protegrity Corporation and Protegrity USA, Inc., Patent Litigation | CAN/ Donato, James/ Transferred on 02/06/2015 | 3:15-md-2600 | 11/07/2014 |
| 2602 IN RE: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation | ILN/ St. Eve, Amy J/ Transferred on 02/06/2015 | 1:15-cv-1364 | 11/12/2014 |
| 2606 IN RE: Benicar (Olmesartan) Products Liability Litigation | NJ/ Kugler, Robert B./ Transferred on 04/03/2015 | 1:15-md-2606 | 12/18/2014 |
| 2613 IN RE: TD Bank, N.A., Debit Card Overdraft Fee Litigation | SC/ Hendricks, Bruce Howe/ Transferred on 04/02/2015 | 6:15-mn-2613 | 01/22/2015 |
| 2614 IN RE: Industrial Print Technologies, LLC, Patent Litigation | TXN/ Lynn, Barbara M.G./ Transferred on 04/07/2015 | 3:15-md-2614 | 01/22/2015 |
| 2615 IN RE: Michaels Stores, Inc., Fair Credit Reporting Act (FCRA) Litigation | NJ/ McNulty, Kevin/ Transferred on 04/02/2015 | 2:14-cv-7563 | 02/04/2015 |
| 2617 IN RE: Anthem, Inc., Customer Data Security Breach Litigation | CAN/ Koh, Lucy H./ Transferred on 06/08/2015 | 5:15-md-2617 | 02/10/2015 |
| 2619 IN RE: Herbal Supplements Marketing and Sales Practices Litigation | ILN/ Darrah, John W/ Transferred on 06/09/2015 | 1:15-cv-5070 | 02/12/2015 |
| 2624 IN RE: Lenovo Adware Litigation | CAN/ Whyte, Ronald M/ Transferred on 06/08/2015 | 5:15-md-2624 | 02/25/2015 |
| 2626 IN RE: Disposable Contact Lens Antitrust Litigation | FLM/ Schlesinger, Harvey E./ Transferred on 06/08/2015 | 3:15-md-2626 | 03/06/2015 |
| 2627 IN RE: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation | VAE/ Trenga, Anthony J/ Transferred on 06/12/2015 | 1:15-md-2627 | 03/09/2015 |
| 2631 IN RE: Alibaba Group Holding Limited Securities Litigation | NYS/ McMahon, Colleen/ Transferred on 06/09/2015 | 1:15-md-2631 | 03/23/2015 |
| 2633 IN RE: Premera Blue Cross Customer Data Security Breach Litigation | OR/ Simon, Michael H./ Transferred on 06/16/2015 | 3:15-md-2633 | 03/31/2015 |
| 2639 IN RE: Pacquiao-Mayweather Boxing Match Pay-Per-View Litigation | CAC/ Klausner, Robert Gary/ Transferred on 08/05/2015 | 2:15-ml-2639 | 05/08/2015 |
| 2641 IN RE: Bard IVC Filters Products Liability Litigation | AZ/ Campbell, David G./ Transferred on 08/17/2015 | 2:15-md-2641 | 05/18/2015 |
| 2642 IN RE: Fluoroquinolone Products Liability Litigation | MN/ Tunheim, John R./ Transferred on 08/17/2015 | 0:15-md-2642 | 05/19/2015 |
| 2645 IN RE: Kind LLC "All Natural" Litigation | NYS/ Pauley, William H/ Transferred on 08/07/2015 | 1:15-md-2645 | 06/01/2015 |
| 2652 IN RE: Ethicon, Inc., Power Morcellator Products Liability Litigation | KS/ Vratil, Kathryn H/ Transferred on 10/15/2015 | 2:15-md-2652 | 06/18/2015 |

CM/ECF for JPML (LIVE)-MDL Report

E-Filed   Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2654 IN RE: Amtrak Train Derailment in Philadelphia, Pennsylvania, on May 12, 2015 | PAE/ Davis, Legrome D/ Transferred on 10/13/2015 | 2:15-md-2654 | 06/22/2015 |
| 2656 IN RE: Domestic Airline Travel Antitrust Litigation | DC/ Kollar-Kotelly, Colleen/ Transferred on 10/13/2015 | 1:15-mc-1404 | 07/06/2015 |
| 2657 IN RE: Zofran (Ondansetron) Products Liability Litigation | MA/ Saylor, F. Dennis/ Transferred on 10/13/2015 | 1:15-md-2657 | 07/06/2015 |
| 2661 IN RE: American Honda Motor Co., Inc., CR-V Vibration Marketing and Sales Practices Litigation | OHS/ Watson, Michael H/ Transferred on 10/09/2015 | 2:15-md-2661 | 07/20/2015 |
| 2664 IN RE: U.S. Office of Personnel Management Data Security Breach Litigation | DC/ Jackson, Amy Berman/ Transferred on 10/09/2015 | 1:15-mc-1394 | 07/29/2015 |
| 2665 IN RE: McCormick & Company, Inc., Pepper Products Marketing and Sales Practices Litigation | DC/ Huvelle, Ellen Segal/ Transferred on 12/08/2015 | 1:15-mc-1825 | 08/10/2015 |
| 2666 IN RE: Bair Hugger Forced Air Warming Devices Products Liability Litigation | MN/ Ericksen, Joan N./ Transferred on 12/11/2015 | | 08/21/2015 |
| 2667 IN RE: Medical Informatics Engineering, Inc., Customer Data Security Breach Litigation | INN/ Miller, Robert L./ Transferred on 12/10/2015 | 3:15-md-2667 | 08/24/2015 |
| 2668 IN RE: National Football League's "Sunday Ticket" Antitrust Litigation | CAC/ O'Connell, Beverly Reid/ Transferred on 12/08/2015 | 2:15-ml-2668 | 08/27/2015 |
| 2669 IN RE: Ashley Madison Customer Data Security Breach Litigation | MOE/ Ross, John A./ Transferred on 12/09/2015 | | 08/27/2015 |
| 2670 IN RE: Packaged Seafood Products Antitrust Litigation | CAS/ Sammartino, Janis L./ Transferred on 12/09/2015 | | 08/28/2015 |
| 2672 IN RE: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation | CAN/ Breyer, Charles R./ Transferred on 12/08/2015 | | 09/23/2015 |
| 2673 IN RE: Treasury Securities Auction Antitrust Litigation | NYS/ Gardephe, Paul G./ Transferred on 12/08/2015 | | 09/24/2015 |

**MDLs Listed on this Report: 274**

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 187 of 201**

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 530 of 645

CM/ECF for JPML (LIVE)-MDL Report

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 188 of 201
E-Filed: 2016 NOV 01 4:44 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | United States Judicial Panel on Multidistrict Litigation | | Report Date: 12/15/2015 |
|---|---|---|---|

## MDL Statistics Report - Docket Type Summary

**MDL Filters:**

Status: **Transferred**

Limited to **Active Litigations**

**Docket Type Summary**

| DOCKET | TR'E DISTRICT/ JUDGE/ MDL STATUS | MASTER DOCKET | DATE FILED | DATE CLOSED |
|---|---|---|---|---|
| **Air Disaster** | | | | |
| 2246 IN RE: Air Crash Near Rio Grande, Puerto Rico, on December 3, 2008 | FLS/ Marra, Kenneth A/ Transferred on 05/25/2011 | 9:11-md-2246 | 04/01/2011 | |
| 2395 IN RE: Air Crash at Georgetown, Guyana, on July 30, 2011 | NYE/ Ross, Allyne R/ Transferred on 09/28/2012 | 1:12-md-2395 | 07/05/2012 | |
| 2497 IN RE: Air Crash at San Francisco, California, on July 6, 2013 | CAN/ Rogers, Yvonne Gonzalez/ Transferred on 12/13/2013 | 4:13-md-2497 | 09/24/2013 | |
| Number of **Air Disaster** Litigations Listed: **3** | | | | |
| **Antitrust** | | | | |
| 1409 IN RE: Currency Conversion Fee Antitrust Litigation | NYS/ Pauley, William H/ Transferred on 08/17/2001 | 1:01-md-1409 | 04/13/2001 | |
| 1419 IN RE: K-Dur Antitrust Litigation | NJ/ Chesler, Stanley R/ Transferred on 08/15/2001 | 2:01-cv-1652 | 05/31/2001 | |
| 1566 IN RE: Western States Wholesale Natural Gas Antitrust Litigation | NV/ Jones, Robert Clive/ Transferred on 11/06/2003 | 2:03-cv-1431 | 07/16/2003 | |
| 1616 IN RE: Urethane Antitrust Litigation | KS/ Lungstrum, John W/ Transferred on 08/23/2004 | 2:04-md-1616 | 04/13/2004 | |
| 1663 IN RE: Insurance Brokerage Antitrust Litigation | NJ/ Cecchi, Claire C./ Transferred on 02/17/2005 | 2:04-cv-5184 | 11/19/2004 | |
| 1720 IN RE: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | NYE/ Brodie, Margo K./ Transferred on 10/19/2005 | 1:05-md-1720 | 07/28/2005 | |
| 1738 IN RE: Vitamin C Antitrust Litigation | NYE/ Cogan, Brian M/ Transferred on 02/14/2006 | 1:06-md-1738 | 11/10/2005 | |
| 1775 IN RE: Air Cargo Shipping Services Antitrust Litigation | NYE/ Gleeson, John/ Transferred on 06/20/2006 | 1:06-md-1775 | 03/15/2006 | |
| 1782 IN RE: Pharmacy Benefit Managers Antitrust Litigation | PAE/ Jones, C. Darnell/ Transferred on 08/24/2006 | 2:06-md-1782 | 04/14/2006 | |
| 1827 IN RE: TFT-LCD (Flat Panel) Antitrust Litigation | CAN/ Illston, Susan Yvonne/ Transferred on 04/17/2007 | 3:07-md-1827 | 12/22/2006 | |
| 1869 IN RE: Rail Freight Fuel Surcharge Antitrust Litigation | DC/ Friedman, Paul L/ Transferred on 11/06/2007 | 1:07-mc-489 | 06/06/2007 | |
| 1913 IN RE: Transpacific Passenger Air Transportation Antitrust Litigation | CAN/ Breyer, Charles R./ Transferred on 02/19/2008 | 3:07-cv-5634 | 11/20/2007 | |
| 1917 IN RE: Cathode Ray Tube (CRT) Antitrust Litigation | CAN/ Tigar, Jon S./ Transferred on 02/15/2008 | 3:07-cv-5944 | 11/29/2007 | |
| 1950 IN RE: Municipal Derivatives Antitrust Litigation | NYS/ Marrero, Victor/ Transferred on 06/16/2008 | 1:08-md-1950 | 03/19/2008 | |
| 1952 IN RE: Packaged Ice Antitrust Litigation | MIE/ Borman, Paul D/ Transferred on 06/05/2008 | 2:08-md-1952 | 03/26/2008 | |
| 1995 IN RE: Time Warner Inc. Set-Top Cable Television Box Antitrust Litigation | NYS/ Castel, P. Kevin/ Transferred on 12/12/2008 | 1:08-md-1995 | 09/16/2008 | |
| 2002 IN RE: Processed Egg Products Antitrust Litigation | PAE/ Pratter, Gene E.K./ Transferred on 12/02/2008 | 2:08-md-2002 | 10/09/2008 | |
| 2034 IN RE: Comcast Corp. Set-Top Cable Television Box Antitrust Litigation | PAE/ Brody, Anita B/ Transferred on 06/17/2009 | 2:09-md-2034 | 02/25/2009 | |
| 2042 IN RE: Refrigerant Compressors Antitrust Litigation | MIE/ Cox, Sean F./ Transferred on 06/09/2009 | 2:09-md-2042 | 03/05/2009 | |
| 2048 IN RE: Cox Enterprises, Inc., Set-Top Cable Television Box Antitrust Litigation | OKW/ Cauthron, Robin J./ Transferred on 06/11/2009 | 5:12-ml-2048 | 03/18/2009 | |
| 2081 IN RE: Blood Reagents Antitrust Litigation | PAE/ DuBois, Jan E/ Transferred on 08/17/2009 | 2:09-md-2081 | 06/05/2009 | |
| 2084 IN RE: AndroGel Antitrust Litigation (No. II) | GAN/ Thrash, Thomas W/ Transferred on 10/05/2009 | 1:09-md-2084 | 06/17/2009 | |
| 2089 IN RE: Delta/AirTran Baggage Fee Antitrust Litigation | GAN/ Batten, Timothy C/ Transferred on 10/06/2009 | 1:09-md-2089 | 06/26/2009 | |
| 2090 IN RE: Wholesale Grocery Products Antitrust Litigation | MN/ Montgomery, Ann D/ Transferred on 10/16/2009 | 0:09-md-2090 | 07/02/2009 | |
| 2121 IN RE: Musical Instruments and Equipment Antitrust Litigation | CAS/ Burns, Larry Alan/ Transferred on 12/09/2009 | 3:09-md-2121 | 10/07/2009 | |
| 2143 IN RE: Optical Disk Drive Products Antitrust Litigation | CAN/ Seeborg, Richard/ Transferred on 04/02/2010 | 3:10-md-2143 | 12/29/2009 | |
| 2186 IN RE: Fresh and Process Potatoes Antitrust Litigation | ID/ Winmill, B. Lynn/ Transferred on 10/13/2010 | 4:10-md-2186 | 07/13/2010 | |
| 2196 IN RE: Polyurethane Foam Antitrust Litigation | OHN/ Zouhary, Jack/ Transferred on 12/01/2010 | 1:10-md-2196 | 08/31/2010 | |
| 2221 IN RE: American Express Anti-Steering Rules Antitrust Litigation (No. II) | NYE/ Garaufis, Nicholas G/ Transferred on 02/07/2011 | 1:11-md-2221 | 12/07/2010 | |
| 2242 IN RE: Prograf Antitrust Litigation | MA/ Zobel, Rya W/ Transferred on 06/03/2011 | 1:11-md-2242 | 03/23/2011 | |
| 2262 IN RE: Libor-Based Financial Instruments Antitrust Litigation | NYS/ Buchwald, Naomi Reice/ Transferred on 08/12/2011 | 1:11-md-2262 | 05/13/2011 | |
| 2293 IN RE: Electronic Books Antitrust Litigation | NYS/ Cote, Denise L/ Transferred on 12/09/2011 | 1:11-md-2293 | 08/16/2011 | |
| 2311 IN RE: Automotive Parts Antitrust Litigation | MIE/ Battani, Marianne O/ Transferred on 02/07/2012 | 2:12-md-2311 | 10/11/2011 | |
| 2328 IN RE: Pool Products Distribution Market Antitrust Litigation | LAE/ Vance, Sarah S / Transferred on 04/17/2012 | 2:12-md-2328 | 11/29/2011 | |
| 2332 IN RE: Lipitor Antitrust Litigation | NJ/ Sheridan, Peter G./ Transferred on 04/20/2012 | 3:12-cv-2389 | 12/06/2011 | |
| 2343 IN RE: Skelaxin (Metaxalone) Antitrust Litigation | TNE/ Collier, Curtis Lynn/ Transferred on 04/17/2012 | 1:12-md-2343 | 01/25/2012 | |
| 2405 IN RE: On-Line Travel Company (OTC)/Hotel Booking Antitrust Litigation | TXN/ Boyle, Jane J/ Transferred on 12/11/2012 | 3:12-md-2405 | 08/29/2012 | |
| 2406 IN RE: Blue Cross Blue Shield Antitrust Litigation | ALN/ Proctor, R. David/ Transferred on 12/12/2012 | 2:13-cv-20000 | 09/06/2012 | |

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 531 of 645

CM/ECF for JPML (LIVE)-MDL Report

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 189 of 201
E-Filed 2015 DEC 15 6:20 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| 2409 IN RE: Nexium (Esomeprazole) Antitrust Litigation | MA/ Young, William G./ Transferred on 12/06/2012 | 1:12-md-2409 | 09/12/2012 |
| 2420 IN RE: Lithium Ion Batteries Antitrust Litigation | CAN/ Rogers, Yvonne Gonzalez/ Transferred on 02/06/2013 | 4:13-md-2420 | 10/16/2012 |
| 2437 IN RE: Domestic Drywall Antitrust Litigation | PAE/ Baylson, Michael M/ Transferred on 04/08/2013 | 2:13-md-2437 | 01/18/2013 |
| 2445 IN RE: Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation | PAE/ Goldberg, Mitchell S/ Transferred on 06/06/2013 | 2:13-md-2445 | 03/04/2013 |
| 2460 IN RE: Niaspan Antitrust Litigation | PAE/ DuBois, Jan E/ Transferred on 09/17/2013 | 2:13-md-2460 | 04/26/2013 |
| 2471 IN RE: Vehicle Carrier Services Antitrust Litigation | NJ/ Salas, Esther/ Transferred on 10/18/2013 | 2:13-cv-3306 | 06/13/2013 |
| 2472 IN RE: Loestrin 24 Fe Antitrust Litigation | RI/ Smith, William E/ Transferred on 10/02/2013 | 1:13-md-2472 | 06/18/2013 |
| 2475 IN RE: North Sea Brent Crude Oil Futures Litigation | NYS/ Carter, Andrew L./ Transferred on 10/21/2013 | 1:13-md-2475 | 07/11/2013 |
| 2476 IN RE: Credit Default Swaps Antitrust Litigation | NYS/ Cote, Denise L/ Transferred on 10/16/2013 | 1:13-md-2476 | 07/16/2013 |
| 2481 IN RE: Aluminum Warehousing Antitrust Litigation | NYS/ Forrest, Katherine B/ Transferred on 12/16/2013 | 1:13-md-2481 | 08/07/2013 |
| 2503 IN RE: Solodyn (Minocycline Hydrochloride) Antitrust Litigation | MA/ Casper, Denise J./ Transferred on 02/25/2014 | 1:14-md-2503 | 10/11/2013 |
| 2508 IN RE: Cast Iron Soil Pipe and Fittings Antitrust Litigation | TNE/ Mattice, Harry S/ Transferred on 02/18/2014 | 1:14-md-2508 | 11/01/2013 |
| 2516 IN RE: Aggrenox Antitrust Litigation | CT/ Underhill, Stefan R/ Transferred on 04/03/2014 | 3:14-md-2516 | 12/13/2013 |
| 2521 IN RE: Lidoderm Antitrust Litigation | CAN/ Orrick, William H./ Transferred on 04/03/2014 | 3:14-md-2521 | 12/23/2013 |
| 2541 IN RE: National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation | CAN/ Wilken, Claudia/ Transferred on 06/04/2014 | 4:14-md-2541 | 03/19/2014 |
| 2542 IN RE: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | NYS/ Broderick, Vernon S./ Transferred on 06/03/2014 | 1:14-md-2542 | 03/20/2014 |
| 2548 IN RE: Commodity Exchange, Inc., Gold Futures and Options Trading Litigation | NYS/ Caproni, Valerie E/ Transferred on 08/13/2014 | 1:14-md-2548 | 04/14/2014 |
| 2557 IN RE: Auto Body Shop Antitrust Litigation | FLM/ Presnell, Gregory A/ Transferred on 08/08/2014 | 6:14-md-2557 | 05/21/2014 |
| 2567 IN RE: Pre-Filled Propane Tank Antitrust Litigation | MOW/ Fenner, Gary A/ Transferred on 10/16/2014 | 4:14-md-2567 | 07/02/2014 |
| 2573 IN RE: London Silver Fixing, Ltd., Antitrust Litigation | NYS/ Caproni, Valerie E/ Transferred on 10/09/2014 | 1:14-md-2573 | 08/05/2014 |
| 2580 IN RE: Opana ER Antitrust Litigation | ILN/ Leinenweber, Harry D/ Transferred on 12/12/2014 | 1:14-cv-10150 | 08/26/2014 |
| 2626 IN RE: Disposable Contact Lens Antitrust Litigation | FLM/ Schlesinger, Harvey E./ Transferred on 06/08/2015 | 3:15-md-2626 | 03/06/2015 |
| 2656 IN RE: Domestic Airline Travel Antitrust Litigation | DC/ Kollar-Kotelly, Colleen/ Transferred on 10/13/2015 | 1:15-mc-1404 | 07/06/2015 |
| 2668 IN RE: National Football League's "Sunday Ticket" Antitrust Litigation | CAC/ O'Connell, Beverly Reid/ Transferred on 12/08/2015 | 2:15-ml-2668 | 08/27/2015 |
| 2670 IN RE: Packaged Seafood Products Antitrust Litigation | CAS/ Sammartino, Janis L./ Transferred on 12/09/2015 | | 08/28/2015 |
| 2673 IN RE: Treasury Securities Auction Antitrust Litigation | NYS/ Gardephe, Paul G./ Transferred on 12/08/2015 | | 09/24/2015 |
| Number of **Antitrust** Litigations Listed: **64** | | | |

**Common Disaster**

| 1570 IN RE: Terrorist Attacks on September 11, 2001 | NYS/ Daniels, George B/ Transferred on 12/09/2003 | 1:03-md-1570 | 08/21/2003 |
| 2179 IN RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | LAE/ Barbier, Carl J/ Transferred on 08/10/2010 | 2:10-md-2179 | 05/06/2010 |
| 2654 IN RE: Amtrak Train Derailment in Philadelphia, Pennsylvania, on May 12, 2015 | PAE/ Davis, Legrome D/ Transferred on 10/13/2015 | 2:15-md-2654 | 06/22/2015 |
| Number of **Common Disaster** Litigations Listed: **3** | | | |

**Contract**

| 2020 IN RE: Aetna, Inc., Out-of-Network "UCR" Rates Litigation | NJ/ Hayden, Katharine S/ Transferred on 04/08/2009 | 2:07-cv-3541 | 12/11/2008 |
| 2036 IN RE: Checking Account Overdraft Litigation | FLS/ King, James Lawrence/ Transferred on 06/10/2009 | 1:09-md-2036 | 02/26/2009 |
| 3074 IN RE: WellPoint, Inc., Out-of-Network "UCR" Rates Litigation | CAC/ Gutierrez, Philip S/ Transferred on 08/19/2009 | 2:09-ml-2074 | 05/05/2009 |
| 2193 IN RE: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation | MA/ Zobel, Rya W/ Transferred on 10/08/2010 | 1:10-md-2193 | 08/04/2010 |
| 2274 IN RE: CitiMortgage, Inc., Home Affordable Modification Program (HAMP) Contract Litigation | CAC/ Fischer, Dale S/ Transferred on 10/06/2011 | 2:11-ml-2274 | 06/10/2011 |
| 2335 IN RE: Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation | NYS/ Kaplan, Lewis A./ Transferred on 04/16/2012 | 1:12-md-2335 | 12/13/2011 |
| 2451 IN RE: HSBC Bank USA, N.A., Debit Card Overdraft Fee Litigation | NYE/ Spatt, Arthur D/ Transferred on 06/05/2013 | 2:13-md-2451 | 04/03/2013 |
| 2455 IN RE: Stericycle, Inc., Steri-Safe Contract Litigation | ILN/ Shadur, Milton I/ Transferred on 06/23/2013 | 1:13-cv-5795 | 04/15/2013 |
| 2613 IN RE: TD Bank, N.A., Debit Card Overdraft Fee Litigation | SC/ Hendricks, Bruce Howe/ Transferred on 04/02/2015 | 6:15-mn-2613 | 01/22/2015 |
| Number of **Contract** Litigations Listed: **9** | | | |

**Employment Practices**

| 1700 IN RE: FedEx Ground Package System, Inc., Employment Practices Litigation (No. II) | INN/ Miller, Robert L./ Transferred on 08/10/2005 | 3:05-md-527 | 05/13/2005 |
| 1932 IN RE: Family Dollar Stores, Inc., Wage and Hour Employment Practices Litigation | NCW/ Mullen, Graham C/ Transferred on 04/08/2008 | 3:08-md-1932 | 01/14/2008 |
| 2159 IN RE: AutoZone, Inc., Wage and Hour Employment Practices Litigation | CAN/ Breyer, Charles R./ Transferred on 06/15/2010 | 3:10-md-2159 | 03/17/2010 |
| 2266 IN RE: Wells Fargo Wage and Hour Employment Practices Litigation (No. III) | TXS/ Miller, Gray H./ Transferred on 08/19/2011 | 4:11-md-2266 | 05/25/2011 |
| 2280 IN RE: Morgan Stanley Smith Barney LLC Wage and Hour Employment Practices Litigation | NJ/ Martini, William J/ Transferred on 10/12/2011 | 2:11-cv-3121 | 06/29/2011 |
| 2504 IN RE: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation | KYW/ Hale, David J./ Transferred on 02/19/2014 | 3:14-md-2504 | 10/12/2013 |
| 2531 IN RE: Michaels Stores, Inc., Wage and Hour Employment Practices Litigation | CAC/ Wu, George H./ Transferred on 06/04/2014 | 2:14-ml-2531 | 02/20/2014 |
| Number of **Employment Practices** Litigations Listed: **7** | | | |

**Intellectual Property**

CM/ECF for JPML (LIVE)-MDL Report

| | | | |
|---|---|---|---|
| 1880 IN RE: Papst Licensing Digital Camera Patent Litigation | DC/ Collyer, Rosemary M./ Transferred on 11/05/2007 | 1:07-mc-493 | 07/13/2007 |
| 2050 IN RE: Bill of Lading Transmission and Processing System Patent Litigation | OHS/ Beckwith, Sandra S/ Transferred on 01/11/2009 | 1:09-md-2050 | 03/23/2009 |
| 2181 IN RE: Method of Processing Ethanol Byproducts and Related Subsystems ('858) Patent Litigation | INS/ McKinney, Larry J/ Transferred on 08/06/2010 | 1:10-ml-2181 | 05/12/2010 |
| 2294 IN RE: Webvention LLC ('294) Patent Litigation | MD/ Blake, Catherine C/ Transferred on 12/15/2011 | 1:11-md-2294 | 08/18/2011 |
| 2303 IN RE: Innovatio IP Ventures, LLC, Patent Litigation | ILN/ Bucklo, Elaine E/ Transferred on 12/28/2011 | 1:11-cv-9308 | 09/14/2011 |
| 2309 IN RE: Translada, Inc., Smart Meters Patent Litigation | OKW/ Cauthron, Robin J./ Transferred on 12/13/2011 | 5:12-ml-2309 | 10/05/2011 |
| 2344 IN RE: Bear Creek Technologies, Inc., ('722) Patent Litigation | DE/ Sleet, Gregory M/ Transferred on 05/02/2012 | 1:12-md-2344 | 01/25/2012 |
| 2354 IN RE: Maxim Integrated Products, Inc., Patent Litigation | PAW/ Conti, Joy Flowers/ Transferred on 06/08/2012 | 2:12-mc-244 | 02/23/2012 |
| 2355 IN RE: Parallel Networks, LLC, ('111) Patent Litigation | TXE/ Schroeder, Robert W./ Transferred on 06/12/2012 | 6:10-cv-111 | 02/23/2012 |
| 2371 IN RE: Unified Messaging Solutions LLC Patent Litigation | ILN/ Lefkow, Joan Humphrey/ Transferred on 08/03/2012 | 1:12-cv-6286 | 04/14/2012 |
| 2375 IN RE: Body Science LLC Patent Litigation | MA/ Saylor, F. Dennis/ Transferred on 08/06/2012 | 1:12-md-2375 | 04/18/2012 |
| 2396 IN RE: TR Labs Patent Litigation | NJ/ Sheridan, Peter G./ Transferred on 10/01/2012 | 3:09-cv-3883 | 07/09/2012 |
| 2432 IN RE: Neurografix ('360) Patent Litigation | MA/ Stearns, Richard G/ Transferred on 04/01/2013 | 1:13-md-2432 | 01/03/2013 |
| 2461 IN RE: MyKey Technology Inc. Patent Litigation | CAC/ Guilford, Andrew J./ Transferred on 08/14/2013 | 2:13-ml-2461 | 05/07/2013 |
| 2581 IN RE: CTP Innovations, LLC, Patent Litigation | MD/ Garbis, Marvin J./ Transferred on 12/12/2014 | 1:14-md-2581 | 09/03/2014 |
| 2600 IN RE: Protegrity Corporation and Protegrity USA, Inc., Patent Litigation | CAN/ Donato, James/ Transferred on 02/06/2015 | 3:15-md-2600 | 11/07/2014 |
| 2614 IN RE: Industrial Print Technologies, LLC, Patent Litigation | TXN/ Lynn, Barbara M.G./ Transferred on 04/07/2015 | 3:15-md-2614 | 01/22/2015 |
| Number of **Intellectual Property** Litigations Listed: **17** | | | |

## Miscellaneous

| | | | |
|---|---|---|---|
| 1604 IN RE: Ocwen Federal Bank FSB Mortgage Servicing Litigation | ILN/ Norgle, Charles R./ Transferred on 04/13/2004 | 1:04-cv-2714 | 01/28/2004 |
| 1674 IN RE: Community Bank of Northern Virginia Mortgage Lending Practices Litigation | PAW/ Schwab, Arthur J/ Transferred on 04/28/2005 | 2:03-cv-425 | 12/29/2004 |
| 1715 IN RE: Ameriquest Mortgage Co. Mortgage Lending Practices Litigation | ILN/ Aspen, Marvin E/ Transferred on 12/13/2005 | 1:05-cv-7097 | 07/13/2005 |
| 1877 IN RE: ClassicStar Mare Lease Litigation | KYE/ Hood, Joseph M/ Transferred on 10/19/2007 | 5:07-cv-353 | 07/02/2007 |
| 1916 IN RE: Chiquita Brands International, Inc., Alien Tort Statute and Shareholders Derivative Litigation | FLS/ Marra, Kenneth A/ Transferred on 02/20/2008 | 0:08-md-1916 | 11/28/2007 |
| 2083 IN RE: KBR, Inc., Burn Pit Litigation | MD/ Titus, Roger W/ Transferred on 10/16/2009 | 8:09-md-2083 | 06/12/2009 |
| 2119 IN RE: Mortgage Electronic Registration Systems (MERS) Litigation | AZ/ Teilborg, James A/ Transferred on 12/07/2009 | 2:09-md-2119 | 10/01/2009 |
| 2165 IN RE: Endangered Species Act Section 4 Deadline Litigation | DC/ Sullivan, Emmet G/ Transferred on 06/08/2010 | 1:10-mc-377 | 04/02/2010 |
| 2184 IN RE: Google Inc. Street View Electronic Communications Litigation | CAN/ Breyer, Charles R./ Transferred on 08/17/2010 | 3:10-md-2184 | 06/14/2010 |
| 2218 IN RE: Camp Lejeune, North Carolina, Water Contamination Litigation | GAN/ Thrash, Thomas W/ Transferred on 11/04/2010 | 1:11-md-2218 | 11/24/2010 |
| 2234 IN RE: Wal-Mart ATM Fee Notice Litigation | TNW/ McCalla, Jon P./ Transferred on 05/20/2011 | 2:11-md-2234 | 02/23/2011 |
| 2286 IN RE: Midland Credit Management, Inc., Telephone Consumer Protection Act (TCPA) Litigation | CAS/ Anello, Michael M./ Transferred on 10/11/2011 | 3:11-md-2286 | 07/28/2011 |
| 2295 IN RE: Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act (TCPA) Litigation | CAS/ Houston, Larry A/ Transferred on 12/21/2011 | 3:11-md-2295 | 08/19/2011 |
| 2296 IN RE: Tribune Company Fraudulent Conveyance Litigation | NYS/ Sullivan, Richard J/ Transferred on 12/19/2011 | 1:11-md-2296 | 08/16/2011 |
| 2314 IN RE: Facebook Internet Tracking Litigation | CAN/ Davila, Edward J./ Transferred on 02/08/2012 | 5:12-md-2314 | 10/17/2011 |
| 2323 IN RE: National Football League Players' Concussion Injury Litigation | PAE/ Brody, Anita B/ Transferred on 01/31/2012 | 2:12-md-2323 | 11/15/2011 |
| 2330 IN RE: Carrier IQ, Inc., Consumer Privacy Litigation | CAN/ Chen, Edward M./ Transferred on 04/16/2012 | 3:12-md-2330 | 12/02/2011 |
| 2334 IN RE: Liberty Refund Anticipation Loan Litigation | ILN/ Gottschall, Joan B/ Transferred on 04/16/2012 | 1:12-cv-2949 | 12/09/2011 |
| 2357 IN RE: Zappos.com, Inc., Customer Data Security Breach Litigation | NV/ Jones, Robert Clive/ Transferred on 06/13/2012 | 3:12-cv-325 | 02/28/2012 |
| 2416 IN RE: Capital One Telephone Consumer Protection Act (TCPA) Litigation | ILN/ Bucklo, Elaine E/ Transferred on 12/10/2012 | 1:12-cv-10064 | 10/03/2012 |
| 2426 IN RE: TRS Recovery Services, Inc., and TeleCheck Services, Inc., Fair Debt Collection Practices Act (FDCPA) Litigation | ME/ Hornby, D. Brock/ Transferred on 02/07/2013 | 2:13-md-2426 | 12/04/2012 |
| 2433 IN RE: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation | OHS/ Sargus, Edmund A/ Transferred on 04/08/2013 | 2:13-md-2433 | 01/11/2013 |
| 2474 IN RE: H&R Block IRS Form 8863 Litigation | MOW/ Gaitan, Fernando J/ Transferred on 10/10/2013 | 4:13-md-2474 | 07/08/2013 |
| 2478 IN RE: Convergent Telephone Consumer Protection Act (TCPA) Litigation | CT/ Thompson, Alvin W/ Transferred on 10/08/2013 | 3:13-md-2478 | 07/19/2013 |
| 2485 IN RE: New Cingular Wireless PCS, LLC, Data Services Sales Tax Refund Litigation | WAW/ Coughenour, John C/ Transferred on 12/19/2013 | 2:13-md-2485 | 08/14/2013 |
| 2492 IN RE: National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation | ILN/ Lee, John Z./ Transferred on 12/18/2013 | 1:13-cv-9116 | 09/04/2013 |
| 2493 IN RE: Monitronics International, Inc., Telephone Consumer Protection Act (TCPA) Litigation | WVN/ Keeley, Irene M/ Transferred on 12/16/2013 | 1:13-md-2493 | 09/06/2013 |
| 2494 IN RE: Columbia and Snake River Dams Clean Water Act Litigation | WAE/ Suko, Lonny R/ Transferred on 12/13/2013 | 2:13-md-2494 | 09/11/2013 |
| 2513 IN RE: Collecto, Inc., Telephone Consumer Protection Act (TCPA) Litigation | MA/ Stearns, Richard G/ Transferred on 01/18/2014 | 1:14-cv-2513 | 11/19/2013 |
| 2522 IN RE: Target Corporation Customer Data Security Breach Litigation | MN/ Magnuson, Paul A/ Transferred on 04/02/2014 | 0:14-md-2522 | 12/24/2013 |
| 2524 IN RE: Health Management Associates, Inc., Qui Tam Litigation (No. II) | DC/ Walton, Reggie B/ Transferred on 04/03/2014 | 1:14-mc-339 | 01/14/2014 |
| 2532 IN RE: Yosemite National Park Hantavirus Litigation | CAN/ Chesney, Maxine M/ Transferred on 06/04/2014 | 3:14-md-2532 | 02/24/2014 |
| 2551 IN RE: National Hockey League Players' Concussion Injury Litigation | MN/ Nelson, Susan Richard/ Transferred on 08/19/2014 | 0:14-md-2551 | 04/25/2014 |
| 2564 IN RE: Life Time Fitness, Inc., Telephone Consumer Protection Act (TCPA) Litigation | MN/ Ericksen, Joan N./ Transferred on 10/15/2014 | 0:14-md-2564 | 06/18/2014 |
| 2583 IN RE: The Home Depot, Inc., Customer Data Security Breach Litigation | GAN/ Thrash, Thomas W/ Transferred on 12/11/2014 | 1:14-md-2583 | 09/15/2014 |
| 2586 IN RE: Supervalu, Inc., Customer Data Security Breach Litigation | MN/ Montgomery, Ann D/ Transferred on 12/16/2014 | 0:14-md-2586 | 09/18/2014 |
| 2587 IN RE: IntraMTA Switched Access Charges Litigation | TXN/ Fitzwater, Sidney A./ Transferred on 12/16/2014 | 3:14-md-2587 | 09/19/2014 |
| 2591 IN RE: Syngenta AG MIR162 Corn Litigation | KS/ Lungstrum, John W/ Transferred on 12/11/2014 | 2:14-md-2591 | 10/07/2014 |

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 190 of 201**

CM/ECF for JPML (LIVE)-MDL Report

E-Filed
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2595 IN RE: Community Health Systems, Inc., Customer Data Security Breach Litigation | ALN/ Bowdre, Karon O./ Transferred on 02/04/2015 | 2:15-cv-222 | 10/17/2014 |
| 2615 IN RE: Michaels Stores, Inc., Fair Credit Reporting Act (FCRA) Litigation | NJ/ McNulty, Kevin/ Transferred on 04/02/2015 | 2:14-cv-7563 | 02/04/2015 |
| 2617 IN RE: Anthem, Inc., Customer Data Security Breach Litigation | CAN/ Koh, Lucy H./ Transferred on 06/08/2015 | 5:15-md-2617 | 02/10/2015 |
| 2624 IN RE: Lenovo Adware Litigation | CAN/ Whyte, Ronald M/ Transferred on 06/08/2015 | 5:15-md-2624 | 02/25/2015 |
| 2633 IN RE: Premera Blue Cross Customer Data Security Breach Litigation | OR/ Simon, Michael H./ Transferred on 06/16/2015 | 3:15-md-2633 | 03/31/2015 |
| 2664 IN RE: U.S. Office of Personnel Management Data Security Breach Litigation | DC/ Jackson, Amy Berman/ Transferred on 10/09/2015 | 1:15-mc-1394 | 07/29/2015 |
| 2667 IN RE: Medical Informatics Engineering, Inc., Customer Data Security Breach Litigation | INN/ Miller, Robert L./ Transferred on 12/10/2015 | 3:15-md-2667 | 08/24/2015 |
| 2669 IN RE: Ashley Madison Customer Data Security Breach Litigation | MOE/ Ross, John A./ Transferred on 12/09/2015 | | 08/27/2015 |

Number of **Miscellaneous** Litigations Listed: **46**

### Products Liability

| | | | |
|---|---|---|---|
| 875 IN RE: Asbestos Products Liability Litigation (No. VI) | PAE/ Robreno, Eduardo C./ Transferred on 07/29/1991 | 2:91-md-875 | 01/17/1991 |
| 1203 IN RE: Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation | PAE/ Bartle, Harvey/ Transferred on 12/10/1997 | 2:10-md-1203 | 09/23/1997 |
| 1358 IN RE: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | NYS/ Scheindlin, Shira Ann/ Transferred on 10/10/2000 | 1:00-cv-1898 | 06/06/2000 |
| 1431 IN RE: Baycol Products Liability Litigation | MN/ Davis, Michael James/ Transferred on 12/18/2001 | 0:01-md-1431 | 08/21/2001 |
| 1507 IN RE: Prempro Products Liability Litigation | ARE/ Wilson, Billy Roy/ Transferred on 03/04/2003 | 4:03-cv-1507 | 10/18/2002 |
| 1657 IN RE: Vioxx Marketing, Sales Practices and Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 02/16/2005 | 2:05-md-1657 | 10/08/2004 |
| 1789 IN RE: Fosamax Products Liability Litigation | NYS/ Keenan, John F/ Transferred on 08/16/2006 | 1:06-md-1789 | 05/24/2006 |
| 1836 IN RE: Mirapex Products Liability Litigation | MN/ Davis, Michael James/ Transferred on 06/22/2007 | 0:07-md-1836 | 02/06/2007 |
| 1842 IN RE: Kugel Mesh Hernia Patch Products Liability Litigation | RI/ Lisi, Mary M/ Transferred on 06/22/2007 | 1:07-md-1842 | 02/28/2007 |
| 1871 IN RE: Avandia Marketing, Sales Practices and Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 10/16/2007 | 2:07-md-1871 | 06/11/2007 |
| 1943 IN RE: Levaquin Products Liability Litigation | MN/ Tunheim, John R./ Transferred on 06/13/2008 | 0:08-md-1943 | 02/19/2008 |
| 1953 IN RE: Heparin Products Liability Litigation | OHN/ Carr, James G/ Transferred on 06/06/2008 | 1:08-hc-60000 | 04/04/2008 |
| 1964 IN RE: NuvaRing Products Liability Litigation | MOE/ Sippel, Rodney W/ Transferred on 08/22/2008 | 4:08-md-1964 | 05/09/2008 |
| 2001 IN RE: Whirlpool Corp. Front-Loading Washer Products Liability Litigation | OHN/ Boyko, Christopher A/ Transferred on 12/02/2008 | 1:08-wp-65000 | 09/26/2008 |
| 2004 IN RE: Mentor Corp. ObTape Transobturator Sling Products Liability Litigation | GAM/ Land, Clay D/ Transferred on 12/03/2008 | 4:08-md-2004 | 10/14/2008 |
| 2047 IN RE: Chinese-Manufactured Drywall Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 06/15/2009 | 2:09-md-2047 | 03/13/2009 |
| 2100 IN RE: Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation | ILS/ Herndon, David R./ Transferred on 10/01/2009 | 3:09-md-2100 | 07/30/2009 |
| 2104 IN RE: IKO Roofing Shingle Products Liability Litigation | ILC/ Baker, Harold A/ Transferred on 12/03/2009 | 2:09-md-2104 | 08/12/2009 |
| 2151 IN RE: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation | CAC/ Selna, James V/ Transferred on 04/09/2010 | 8:10-ml-2151 | 02/04/2010 |
| 2158 IN RE: Zimmer Durom Hip Cup Products Liability Litigation | NJ/ Wigenton, Susan D/ Transferred on 06/09/2010 | 2:09-cv-4414 | 03/15/2010 |
| 2187 IN RE: C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 10/12/2010 | 2:10-md-2187 | 07/15/2010 |
| 2197 IN RE: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation | OHN/ Katz, David A/ Transferred on 12/03/2010 | 1:10-md-2197 | 09/03/2010 |
| 2226 IN RE: Darvocet, Darvon and Propoxyphene Products Liability Litigation | KYE/ Reeves, Danny C/ Transferred on 08/16/2011 | 2:11-md-2226 | 12/15/2010 |
| 2243 IN RE: Fosamax (Alendronate Sodium) Products Liability Litigation (No. II) | NJ/ Wolfson, Freda L/ Transferred on 05/23/2011 | 3:08-cv-8 | 03/24/2011 |
| 2244 IN RE: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation | TXN/ Kinkeade, James Edgar/ Transferred on 05/23/2011 | 3:11-md-2244 | 03/28/2011 |
| 2272 IN RE: Zimmer NexGen Knee Implant Products Liability Litigation | ILN/ Pallmeyer, Rebecca R/ Transferred on 08/08/2011 | 1:11-cv-5468 | 06/06/2011 |
| 2284 IN RE: Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation | PAE/ Pratter, Gene E.K./ Transferred on 10/20/2011 | 2:11-md-2284 | 07/22/2011 |
| 2299 IN RE: Actos (Pioglitazone) Products Liability Litigation | LAW/ Doherty, Rebecca F/ Transferred on 12/29/2011 | 6:11-md-2299 | 08/31/2011 |
| 2308 IN RE: Skechers Toning Shoe Products Liability Litigation | KYW/ Russell, Thomas B/ Transferred on 12/19/2011 | 3:11-md-2308 | 09/30/2011 |
| 2316 IN RE: Ford Motor Co. Spark Plug and 3-Valve Engine Products Liability Litigation | OHN/ Pearson, Benita Y./ Transferred on 02/08/2012 | 1:12-md-2316 | 10/21/2011 |
| 2325 IN RE: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2325 | 11/23/2011 |
| 2326 IN RE: Boston Scientific Corp. Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2326 | 11/28/2011 |
| 2327 IN RE: Ethicon, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2327 | 11/28/2011 |
| 2329 IN RE: Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation | GAN/ Duffey, William S/ Transferred on 02/08/2012 | 1:12-md-2329 | 11/29/2011 |
| 2331 IN RE: Propecia (Finasteride) Products Liability Litigation | NYE/ Gleeson, John/ Transferred on 04/16/2012 | 1:12-md-2331 | 12/06/2011 |
| 2342 IN RE: Zoloft (Sertraline Hydrochloride) Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 04/17/2012 | 2:12-md-2342 | 01/18/2012 |
| 2359 IN RE: HardiePlank Fiber Cement Siding Litigation | MN/ Davis, Michael James/ Transferred on 06/11/2012 | 0:12-md-2359 | 03/06/2012 |
| 2385 IN RE: Pradaxa (Dabigatran Etexilate) Products Liability Litigation | ILS/ Herndon, David R./ Transferred on 08/08/2012 | 3:12-md-2385 | 05/30/2012 |
| 2387 IN RE: Coloplast Corp. Pelvic Support Systems Products Liability Litigation | WVS/ Goodwin, Joseph R/ Transferred on 08/06/2012 | 2:12-md-2387 | 06/05/2012 |
| 2391 IN RE: Biomet M2a Magnum Hip Implant Products Liability Litigation | INN/ Miller, Robert L./ Transferred on 10/02/2012 | 3:12-md-2391 | 06/27/2012 |
| 2404 IN RE: Nexium (Esomeprazole) Products Liability Litigation | CAC/ Fischer, Dale S/ Transferred on 12/06/2012 | 2:12-ml-2404 | 08/27/2012 |
| 2418 IN RE: Plavix Marketing, Sales Practices and Products Liability Litigation (No. II) | NJ/ Wolfson, Freda L/ Transferred on 02/12/2013 | 3:13-cv-2418 | 10/15/2012 |
| 2419 IN RE: New England Compounding Pharmacy, Inc., Products Liability Litigation | MA/ Zobel, Rya W/ Transferred on 02/12/2013 | 1:13-md-2419 | 10/16/2012 |
| 2428 IN RE: Fresenius GranuFlo/NaturaLyte Dialysate Products Liability Litigation | MA/ Woodlock, Douglas P./ Transferred on 03/29/2013 | 1:13-md-2428 | 12/12/2012 |
| 2434 IN RE: Mirena IUD Products Liability Litigation | NYS/ Seibel, Cathy/ Transferred on 04/08/2013 | 7:13-md-2434 | 01/16/2013 |
| 2436 IN RE: Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation | PAE/ Stengel, Lawrence F/ Transferred on 04/01/2013 | 2:13-md-2436 | 01/17/2013 |
| 2440 IN RE: Cook Medical, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 06/11/2013 | 2:13-md-2440 | 02/18/2013 |

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 191 of 201**

12/15/2015 6:20 AM

| 2441 IN RE: Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation | MN/ Frank, Donovan W/ Transferred on 06/12/2013 | 0:13-md-2441 | 02/19/2013 |
| 2452 IN RE: Incretin-Based Therapies Products Liability Litigation | CAS/ Battaglia, Anthony J/ Transferred on 08/26/2013 | 3:13-md-2452 | 04/05/2013 |
| 2454 IN RE: Franck's Lab, Inc., Products Liability Litigation | LAE/ Engelhardt, Kurt D./ Transferred on 08/07/2013 | 2:13-md-2454 | 04/12/2013 |
| 2495 IN RE: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation | GAN/ Thrash, Thomas W/ Transferred on 12/19/2013 | 1:13-md-2495 | 09/17/2013 |
| 2502 IN RE: Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No. II) | SC/ Gergel, Richard M/ Transferred on 02/18/2014 | 2:14-mn-2502 | 10/10/2013 |
| 2511 IN RE: Neomedic Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/18/2014 | 2:14-md-2511 | 11/08/2013 |
| 2514 IN RE: Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation | SC/ Norton, David C/ Transferred on 02/14/2014 | 2:14-mn-1 | 11/19/2013 |
| 2540 IN RE: Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation | NJ/ Simandle, Jerome B/ Transferred on 06/11/2014 | 1:14-cv-3722 | 03/18/2014 |
| 2545 IN RE: Testosterone Replacement Therapy Products Liability Litigation | ILN/ Kennelly, Matthew F/ Transferred on 06/06/2014 | 1:14-cv-1748 | 03/28/2014 |
| 2570 IN RE: Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Products Liability Litigation | INS/ Young, Richard L./ Transferred on 10/15/2014 | 1:14-ml-2570 | 07/21/2014 |
| 2575 IN RE: Fluidmaster, Inc., Water Connector Components Products Liability Litigation | ILN/ Dow, Robert M/ Transferred on 12/11/2014 | 1:14-cv-5696 | 08/18/2014 |
| 2577 IN RE: GAF Elk Cross Timbers Decking Marketing, Sales Practices and Products Liability Litigation | NJ/ Linares, Jose L/ Transferred on 12/12/2014 | 2:15-cv-18 | 08/20/2014 |
| 2590 IN RE: Navistar MaxxForce Engines Marketing, Sales Practices and Products Liability Litigation | ILN/ Gottschall, Joan B/ Transferred on 12/17/2014 | 1:14-cv-10318 | 10/03/2014 |
| 2592 IN RE: Xarelto (Rivaroxaban) Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 12/12/2014 | 2:14-md-2592 | 10/09/2014 |
| 2599 IN RE: Takata Airbag Products Liability Litigation | FLS/ Moreno, Federico A/ Transferred on 02/05/2015 | 1:15-md-2599 | 11/03/2014 |
| 2602 IN RE: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation | ILN/ St. Eve, Amy J/ Transferred on 02/06/2015 | 1:15-cv-1364 | 11/12/2014 |
| 2606 IN RE: Benicar (Olmesartan) Products Liability Litigation | NJ/ Kugler, Robert B./ Transferred on 04/03/2015 | 1:15-md-2606 | 12/18/2014 |
| 2641 IN RE: Bard IVC Filters Products Liability Litigation | AZ/ Campbell, David G./ Transferred on 08/17/2015 | 2:15-md-2641 | 05/18/2015 |
| 2642 IN RE: Fluoroquinolone Products Liability Litigation | MN/ Tunheim, John R./ Transferred on 08/17/2015 | 0:15-md-2642 | 05/19/2015 |
| 2652 IN RE: Ethicon, Inc., Power Morcellator Products Liability Litigation | KS/ Vratil, Kathryn H/ Transferred on 10/15/2015 | 2:15-md-2652 | 06/18/2015 |
| 2657 IN RE: Zofran (Ondansetron) Products Liability Litigation | MA/ Saylor, F. Dennis/ Transferred on 10/13/2015 | 1:15-md-2657 | 07/06/2015 |
| 2666 IN RE: Bair Hugger Forced Air Warming Devices Products Liability Litigation | MN/ Ericksen, Joan N./ Transferred on 12/11/2015 | | 08/21/2015 |
| 2672 IN RE: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation | CAN/ Breyer, Charles R./ Transferred on 12/08/2015 | | 09/23/2015 |
| Number of **Products Liability** Litigations Listed: **70** | | | |

**Sales Practices**

| 1840 IN RE: Motor Fuel Temperature Sales Practices Litigation | KS/ Vratil, Kathryn H/ Transferred on 06/18/2007 | 2:07-md-1840 | 02/22/2007 |
| 2044 IN RE: Vertrue Inc. Marketing and Sales Practices Litigation | OHN/ Gaughan, Patricia A/ Transferred on 06/08/2009 | 1:09-vm-75000 | 03/06/2009 |
| 2067 IN RE: Celexa and Lexapro Marketing and Sales Practices Litigation | MA/ Gorton, Nathaniel M/ Transferred on 08/19/2009 | 1:09-md-2067 | 04/21/2009 |
| 2153 IN RE: United Parcel Service "Air-in-Ground" Marketing and Sales Practices Litigation | CAC/ Wu, George H./ Transferred on 06/08/2010 | 2:10-ml-2153 | 02/23/2010 |
| 2199 IN RE: POM Wonderful LLC Marketing and Sales Practices Litigation | CAC/ Pregerson, Dean D/ Transferred on 11/30/2010 | 2:10-md-2199 | 10/05/2010 |
| 2215 IN RE: Glaceau Vitaminwater Marketing and Sales Practice Litigation (No. II) | NYE/ Irizarry, Dora Lizette/ Transferred on 02/08/2011 | 1:11-md-2215 | 11/16/2010 |
| 2238 IN RE: Groupon, Inc., Marketing and Sales Practices Litigation | CAS/ Sabraw, Dana M./ Transferred on 05/25/2011 | 3:11-md-2238 | 03/14/2011 |
| 2263 IN RE: Dial Complete Marketing and Sales Practices Litigation | NH/ McAuliffe, Steven J/ Transferred on 08/18/2011 | 1:11-md-2263 | 05/23/2011 |
| 2291 IN RE: Wesson Oil Marketing and Sales Practices Litigation | CAC/ Morrow, Margaret M/ Transferred on 10/13/2011 | 2:11-ml-2291 | 08/04/2011 |
| 2320 IN RE: Colgate-Palmolive Softsoap Antibacterial Hand Soap Marketing and Sales Practices Litigation | NH/ Barbadoro, Paul J/ Transferred on 03/07/2012 | 1:12-md-2320 | 11/07/2011 |
| 2324 IN RE: Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practices Litigation | FLS/ Lenard, Joan A/ Transferred on 02/09/2012 | 1:12-md-2324 | 11/28/2011 |
| 2353 IN RE: Tropicana Orange Juice Marketing and Sales Practices Litigation | NJ/ Martini, William J/ Transferred on 06/11/2012 | 2:11-cv-7382 | 02/22/2012 |
| 2361 IN RE: Simply Orange Orange Juice Marketing and Sales Practices Litigation | MOW/ Gaitan, Fernando J/ Transferred on 06/11/2012 | 4:12-md-2361 | 03/14/2012 |
| 2380 IN RE: Shop-Vac Marketing and Sales Practices Litigation | PAM/ Kane, Yvette/ Transferred on 08/15/2012 | 4:12-cv-2380 | 05/04/2012 |
| 2382 IN RE: Emerson Electric Co. Wet-Dry Vac Marketing and Sales Practices Litigation | MOE/ Autrey, Henry Edward/ Transferred on 08/15/2012 | 4:12-md-2382 | 05/09/2012 |
| 2413 IN RE: Frito-Lay North America, Inc., "All Natural" Litigation | NYE/ Mauskopf, Roslynn R./ Transferred on 12/12/2012 | 1:12-md-2413 | 09/21/2012 |
| 2415 IN RE: L'Oreal Wrinkle Cream Marketing and Sales Practices Litigation | NJ/ Martini, William J/ Transferred on 12/12/2012 | 2:12-cv-3571 | 09/28/2012 |
| 2438 IN RE: 5-Hour Energy Marketing and Sales Practices Litigation | CAC/ Gutierrez, Philip S/ Transferred on 06/05/2013 | 2:13-md-2438 | 02/15/2013 |
| 2439 IN RE: Subway Footlong Sandwich Marketing and Sales Practices Litigation | WIE/ Adelman, Lynn S/ Transferred on 06/10/2013 | 2:13-md-2439 | 02/15/2013 |
| 2450 IN RE: Ford Fusion and C-Max Fuel Economy Litigation | NYS/ Karas, Kenneth M/ Transferred on 06/07/2013 | 7:13-md-2450 | 04/03/2013 |
| 2491 IN RE: GNC Corp. TriFlex Products Marketing and Sales Practices Litigation (No. II) | MD/ Motz, J. Frederick/ Transferred on 12/17/2013 | 1:14-md-2491 | 08/30/2013 |
| 2498 IN RE: Nutramax Cosamin Marketing and Sales Practices Litigation | MD/ Motz, J. Frederick/ Transferred on 12/17/2013 | 1:14-md-2498 | 09/25/2013 |
| 2506 IN RE: AZEK Building Products, Inc., Marketing and Sales Practices Litigation | NJ/ Arleo, Madeline C/ Transferred on 02/18/2014 | 2:12-cv-6627 | 10/29/2013 |
| 2528 IN RE: Natrol, Inc., Glucosamine/Chondroitin Marketing and Sales Practices Litigation | MD/ Motz, J. Frederick/ Transferred on 06/10/2014 | 1:14-md-2528 | 02/11/2014 |
| 2543 IN RE: General Motors LLC Ignition Switch Litigation | NYS/ Furman, Jesse M/ Transferred on 06/09/2014 | 1:14-md-2543 | 03/24/2014 |
| 2555 IN RE: Coca-Cola Products Marketing and Sales Practices Litigation (No. II) | CAN/ White, Jeffrey S/ Transferred on 08/07/2014 | 4:14-md-2555 | 05/21/2014 |
| 2562 IN RE: Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation | MOE/ Sippel, Rodney W/ Transferred on 10/17/2014 | 4:14-md-2562 | 06/16/2014 |
| 2588 IN RE: Whole Foods Market, Inc., Greek Yogurt Marketing and Sales Practices Litigation | TXW/ Sparks, Sam/ Transferred on 12/10/2014 | 1:14-mc-2588 | 09/30/2014 |
| 2619 IN RE: Herbal Supplements Marketing and Sales Practices Litigation | ILN/ Darrah, John W/ Transferred on 06/09/2015 | 1:15-cv-5070 | 02/12/2015 |
| 2627 IN RE: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation | VAE/ Trenga, Anthony J/ Transferred on 06/12/2015 | 1:15-md-2627 | 03/09/2015 |
| 2639 IN RE: Pacquiao-Mayweather Boxing Match Pay-Per-View Litigation | CAC/ Klausner, Robert Gary/ Transferred on 08/14/2015 | 2:15-md-2639 | 05/08/2015 |
| 2645 IN RE: Kind LLC "All Natural" Litigation | NYS/ Pauley, William H/ Transferred on 08/07/2015 | 1:15-md-2645 | 06/01/2015 |

CM/ECF for JPML (LIVE)-MDL Report

E-FILED 2015 DEC 15 7:17 AM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2661 IN RE: American Honda Motor Co., Inc., CR-V Vibration Marketing and Sales Practices Litigation | OHS/ Watson, Michael H/ Transferred on 10/09/2015 | 2:15-md-2661 | 07/20/2015 |
| 2665 IN RE: McCormick & Company, Inc., Pepper Products Marketing and Sales Practices Litigation | DC/ Huvelle, Ellen Segal/ Transferred on 12/08/2015 | 1:15-mc-1825 | 08/10/2015 |
| Number of **Sales Practices** Litigations Listed: **34** | | | |

**Securities**

| | | | |
|---|---|---|---|
| 1446 IN RE: Enron Corp. Securities, Derivative & "ERISA" Litigation | TXS/ Harmon, Melinda/ Transferred on 04/16/2002 | | 12/21/2001 |
| 1658 IN RE: Merck & Co., Inc., Securities, Derivative & "ERISA" Litigation | NJ/ Chesler, Stanley R/ Transferred on 02/23/2005 | 2:05-cv-1151 | 10/18/2004 |
| 1668 IN RE: Federal National Mortgage Association Securities, Derivative & "ERISA" Litigation | DC/ Leon, Richard J/ Transferred on 05/17/2005 | 1:05-mc-234 | 12/06/2004 |
| 1889 IN RE: Peregrine Systems, Inc., Securities Litigation | CAS/ Benitez, Roger T/ Transferred on 01/02/2008 | 3:02-cv-870 | 08/08/2007 |
| 1963 IN RE: The Bear Stearns Companies Inc. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Sweet, Robert W/ Transferred on 08/18/2008 | 1:08-md-1963 | 05/05/2008 |
| 2009 IN RE: Regions Morgan Keegan Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | TNW/ Mays, Samuel H./ Transferred on 02/12/2009 | 2:09-md-2009 | 10/31/2008 |
| 2011 IN RE: The Reserve Fund Securities and Derivative Litigation | NYS/ Gardephe, Paul G./ Transferred on 02/10/2009 | 1:09-md-2011 | 11/19/2008 |
| 2017 IN RE: Lehman Brothers Holdings, Inc., Securities & Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Kaplan, Lewis A./ Transferred on 02/09/2009 | 1:09-md-2017 | 01/04/2008 |
| 2052 IN RE: Tremont Group Holdings, Inc., Securities Litigation | NYS/ Griesa, Thomas P/ Transferred on 06/11/2009 | 1:09-md-2052 | 03/25/2009 |
| 2058 IN RE: Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Castel, P. Kevin/ Transferred on 06/10/2009 | 1:09-md-2058 | 04/07/2009 |
| 2063 IN RE: Oppenheimer Rochester Funds Group Securities Litigation | CO/ Kane, John L/ Transferred on 06/17/2009 | 1:09-md-2063 | 04/14/2009 |
| 2070 IN RE: Citigroup Inc. Securities Litigation | NYS/ Stein, Sidney H/ Transferred on 08/07/2009 | 1:09-md-2070 | 04/28/2009 |
| 2082 IN RE: Meridian Funds Group Securities & Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Griesa, Thomas P/ Transferred on 08/11/2009 | 1:09-md-2082 | 06/10/2009 |
| 2088 IN RE: Fairfield Greenwich Group Securities Litigation | NYS/ Marrero, Victor/ Transferred on 10/06/2009 | 1:09-md-2088 | 06/26/2009 |
| 2099 IN RE: Stanford Entities Securities Litigation | TXN/ Godbey, David C/ Transferred on 10/06/2009 | 3:09-md-2099 | 07/29/2009 |
| 2185 IN RE: BP p.l.c. Securities Litigation | TXS/ Ellison, Keith P/ Transferred on 08/10/2010 | 4:10-md-2185 | 06/15/2010 |
| 2338 IN RE: MF Global Holdings Ltd. Investment Litigation | NYS/ Marrero, Victor/ Transferred on 04/23/2012 | 1:12-md-2338 | 01/06/2012 |
| 2384 IN RE: Swisher Hygiene, Inc., Securities and Derivative Litigation | NCW/ Mullen, Graham C/ Transferred on 08/13/2012 | 3:12-md-2384 | 05/30/2012 |
| 2389 IN RE: Facebook, Inc., IPO Securities and Derivative Litigation | NYS/ Sweet, Robert W/ Transferred on 10/04/2012 | 1:12-md-2389 | 06/14/2012 |
| 2566 IN RE: TelexFree Securities Litigation | MA/ Hillman, Timothy S/ Transferred on 10/21/2014 | 4:14-md-2566 | 07/01/2014 |
| 2631 IN RE: Alibaba Group Holding Limited Securities Litigation | NYS/ McMahon, Colleen/ Transferred on 06/09/2015 | 1:15-md-2631 | 03/23/2015 |
| Number of **Securities** Litigations Listed: **21** | | | |

**MDLs Listed on this Report: 274**

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 193 of 201**

12/15/2015 6:20 AM

CM/ECF for JPML (LIVE)-MDL Report

| United States Judicial Panel on Multidistrict Litigation | | | | Report Date: 12/15/2015 |
|---|---|---|---|---|

## MDL Statistics Report - Docket Type Summary

**MDL Filters:**

Status: **Transferred**

Limited to **Active Litigations**

**Docket Type Summary**

| DOCKET | TR'E DISTRICT/ JUDGE/ MDL STATUS | MASTER DOCKET | DATE FILED | DATE CLOSED |
|---|---|---|---|---|
| **Air Disaster** | | | | |
| 2246 IN RE: Air Crash Near Rio Grande, Puerto Rico, on December 3, 2008 | FLS/ Marra, Kenneth A/ Transferred on 05/25/2011 | 9:11-md-2246 | 04/01/2011 | |
| 2395 IN RE: Air Crash at Georgetown, Guyana, on July 30, 2011 | NYE/ Ross, Allyne R/ Transferred on 09/28/2012 | 1:12-md-2395 | 07/05/2012 | |
| 2497 IN RE: Air Crash at San Francisco, California, on July 6, 2013 | CAN/ Rogers, Yvonne Gonzalez/ Transferred on 12/13/2013 | 4:13-md-2497 | 09/24/2013 | |
| Number of **Air Disaster** Litigations Listed: **3** | | | | |
| **Antitrust** | | | | |
| 1409 IN RE: Currency Conversion Fee Antitrust Litigation | NYS/ Pauley, William H/ Transferred on 08/17/2001 | 1:01-md-1409 | 04/13/2001 | |
| 1419 IN RE: K-Dur Antitrust Litigation | NJ/ Chesler, Stanley R/ Transferred on 08/15/2001 | 2:01-cv-1652 | 05/31/2001 | |
| 1566 IN RE: Western States Wholesale Natural Gas Antitrust Litigation | NV/ Jones, Robert Clive/ Transferred on 11/06/2003 | 2:03-cv-1431 | 07/16/2003 | |
| 1616 IN RE: Urethane Antitrust Litigation | KS/ Lungstrum, John W/ Transferred on 08/23/2004 | 2:04-md-1616 | 04/13/2004 | |
| 1663 IN RE: Insurance Brokerage Antitrust Litigation | NJ/ Cecchi, Claire C/ Transferred on 02/17/2005 | 2:04-cv-5184 | 11/19/2004 | |
| 1720 IN RE: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation | NYE/ Brodie, Margo K/ Transferred on 10/19/2005 | 1:05-md-1720 | 07/28/2005 | |
| 1738 IN RE: Vitamin C Antitrust Litigation | NYE/ Cogan, Brian M/ Transferred on 02/14/2006 | 1:06-md-1738 | 11/10/2005 | |
| 1775 IN RE: Air Cargo Shipping Services Antitrust Litigation | NYE/ Gleeson, John/ Transferred on 06/20/2006 | 1:06-md-1775 | 03/15/2006 | |
| 1782 IN RE: Pharmacy Benefit Managers Antitrust Litigation | PAE/ Jones, C. Darnell/ Transferred on 08/24/2006 | 2:06-md-1782 | 04/14/2006 | |
| 1827 IN RE: TFT-LCD (Flat Panel) Antitrust Litigation | CAN/ Illston, Susan Yvonne/ Transferred on 04/17/2007 | 3:07-md-1827 | 12/22/2006 | |
| 1869 IN RE: Rail Freight Fuel Surcharge Antitrust Litigation | DC/ Friedman, Paul L/ Transferred on 11/06/2007 | 1:07-mc-489 | 06/06/2007 | |
| 1913 IN RE: Transpacific Passenger Air Transportation Antitrust Litigation | CAN/ Breyer, Charles R./ Transferred on 02/19/2008 | 3:07-cv-5634 | 11/20/2007 | |
| 1917 IN RE: Cathode Ray Tube (CRT) Antitrust Litigation | CAN/ Tigar, Jon S./ Transferred on 02/15/2008 | 3:07-cv-5944 | 11/29/2007 | |
| 1950 IN RE: Municipal Derivatives Antitrust Litigation | NYS/ Marrero, Victor/ Transferred on 06/16/2008 | 1:08-md-1950 | 03/19/2008 | |
| 1952 IN RE: Packaged Ice Antitrust Litigation | MIE/ Borman, Paul D/ Transferred on 06/05/2008 | 2:08-md-1952 | 03/26/2008 | |
| 1995 IN RE: Time Warner Inc. Set-Top Cable Television Box Antitrust Litigation | NYS/ Castel, P. Kevin/ Transferred on 12/12/2008 | 1:08-md-1995 | 09/16/2008 | |
| 2002 IN RE: Processed Egg Products Antitrust Litigation | PAE/ Pratter, Gene E.K./ Transferred on 12/02/2008 | 2:08-md-2002 | 10/09/2008 | |
| 2034 IN RE: Comcast Corp. Set-Top Cable Television Box Antitrust Litigation | PAE/ Brody, Anita B/ Transferred on 06/17/2009 | 2:09-md-2034 | 02/25/2009 | |
| 2042 IN RE: Refrigerant Compressors Antitrust Litigation | MIE/ Cox, Sean F./ Transferred on 06/09/2009 | 2:09-md-2042 | 03/05/2009 | |
| 2048 IN RE: Cox Enterprises, Inc., Set-Top Cable Television Box Antitrust Litigation | OKW/ Cauthron, Robin J./ Transferred on 06/11/2009 | 5:12-ml-2048 | 03/18/2009 | |
| 2081 IN RE: Blood Reagents Antitrust Litigation | PAE/ DuBois, Jan E/ Transferred on 08/17/2009 | 2:09-md-2081 | 06/05/2009 | |
| 2084 IN RE: AndroGel Antitrust Litigation (No. II) | GAN/ Thrash, Thomas W/ Transferred on 10/05/2009 | 1:09-md-2084 | 06/17/2009 | |
| 2089 IN RE: Delta/AirTran Baggage Fee Antitrust Litigation | GAN/ Batten, Timothy C/ Transferred on 10/06/2009 | 1:09-md-2089 | 06/26/2009 | |
| 2090 IN RE: Wholesale Grocery Products Antitrust Litigation | MN/ Montgomery, Ann D/ Transferred on 10/16/2009 | 0:09-md-2090 | 07/02/2009 | |
| 2121 IN RE: Musical Instruments and Equipment Antitrust Litigation | CAS/ Burns, Larry Alan/ Transferred on 12/09/2009 | 3:09-md-2121 | 10/07/2009 | |
| 2143 IN RE: Optical Disk Drive Products Antitrust Litigation | CAN/ Seeborg, Richard/ Transferred on 04/02/2010 | 3:10-md-2143 | 12/29/2009 | |
| 2186 IN RE: Fresh and Process Potatoes Antitrust Litigation | ID/ Winmill, B. Lynn/ Transferred on 10/13/2010 | 4:10-md-2186 | 07/13/2010 | |
| 2196 IN RE: Polyurethane Foam Antitrust Litigation | OHN/ Zouhary, Jack/ Transferred on 12/01/2010 | 1:10-md-2196 | 08/31/2010 | |
| 2221 IN RE: American Express Anti-Steering Rules Antitrust Litigation (No. II) | NYE/ Garaufis, Nicholas G/ Transferred on 02/07/2011 | 1:11-md-2221 | 12/07/2010 | |
| 2242 IN RE: Prograf Antitrust Litigation | MA/ Zobel, Rya W/ Transferred on 06/03/2011 | 1:11-md-2242 | 03/23/2011 | |
| 2262 IN RE: Libor-Based Financial Instruments Antitrust Litigation | NYS/ Buchwald, Naomi Reice/ Transferred on 08/12/2011 | 1:11-md-2262 | 05/13/2011 | |
| 2293 IN RE: Electronic Books Antitrust Litigation | NYS/ Cote, Denise L/ Transferred on 12/09/2011 | 1:11-md-2293 | 08/16/2011 | |
| 2311 IN RE: Automotive Parts Antitrust Litigation | MIE/ Battani, Marianne O/ Transferred on 02/07/2012 | 2:12-md-2311 | 10/11/2011 | |
| 2328 IN RE: Pool Products Distribution Market Antitrust Litigation | LAE/ Vance, Sarah S./ Transferred on 04/17/2012 | 2:12-md-2328 | 11/29/2011 | |
| 2332 IN RE: Lipitor Antitrust Litigation | NJ/ Sheridan, Peter G./ Transferred on 04/20/2012 | 3:12-cv-2389 | 12/06/2011 | |
| 2343 IN RE: Skelaxin (Metaxalone) Antitrust Litigation | TNE/ Collier, Curtis Lynn/ Transferred on 04/17/2012 | 1:12-md-2343 | 01/25/2012 | |
| 2405 IN RE: On-Line Travel Company (OTC)/Hotel Booking Antitrust Litigation | TXN/ Boyle, Jane J/ Transferred on 12/11/2012 | 3:12-md-2405 | 08/29/2012 | |
| 2406 IN RE: Blue Cross Blue Shield Antitrust Litigation | ALN/ Proctor, R. David/ Transferred on 12/12/2012 | 2:13-cv-20000 | 09/06/2012 | |

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 537 of 645

CM/ECF for JPML (LIVE)-MDL Report

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 195 of 201
E-Filed
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2409 IN RE: Nexium (Esomeprazole) Antitrust Litigation | MA/ Young, William G./ Transferred on 12/06/2012 | 1:12-md-2409 | 09/12/2012 |
| 2420 IN RE: Lithium Ion Batteries Antitrust Litigation | CAN/ Rogers, Yvonne Gonzalez/ Transferred on 02/06/2013 | 4:13-md-2420 | 10/16/2012 |
| 2437 IN RE: Domestic Drywall Antitrust Litigation | PAE/ Baylson, Michael M/ Transferred on 04/08/2013 | 2:13-md-2437 | 01/18/2013 |
| 2445 IN RE: Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litigation | PAE/ Goldberg, Mitchell S/ Transferred on 06/06/2013 | 2:13-md-2445 | 03/04/2013 |
| 2460 IN RE: Niaspan Antitrust Litigation | PAE/ DuBois, Jan E/ Transferred on 09/17/2013 | 2:13-md-2460 | 04/26/2013 |
| 2471 IN RE: Vehicle Carrier Services Antitrust Litigation | NJ/ Salas, Esther/ Transferred on 10/18/2013 | 2:13-cv-3306 | 06/13/2013 |
| 2472 IN RE: Loestrin 24 Fe Antitrust Litigation | RI/ Smith, William E/ Transferred on 10/02/2013 | 1:13-md-2472 | 06/18/2013 |
| 2475 IN RE: North Sea Brent Crude Oil Futures Litigation | NYS/ Carter, Andrew L./ Transferred on 10/21/2013 | 1:13-md-2475 | 07/11/2013 |
| 2476 IN RE: Credit Default Swaps Antitrust Litigation | NYS/ Cote, Denise L/ Transferred on 10/16/2013 | 1:13-md-2476 | 07/16/2013 |
| 2481 IN RE: Aluminum Warehousing Antitrust Litigation | NYS/ Forrest, Katherine B/ Transferred on 12/16/2013 | 1:13-md-2481 | 08/07/2013 |
| 2503 IN RE: Solodyn (Minocycline Hydrochloride) Antitrust Litigation | MA/ Casper, Denise J./ Transferred on 02/25/2014 | 1:14-md-2503 | 10/11/2013 |
| 2508 IN RE: Cast Iron Soil Pipe and Fittings Antitrust Litigation | TNE/ Mattice, Harry S/ Transferred on 02/18/2014 | 1:14-md-2508 | 11/01/2013 |
| 2516 IN RE: Aggrenox Antitrust Litigation | CT/ Underhill, Stefan R/ Transferred on 04/03/2014 | 3:14-md-2516 | 12/13/2013 |
| 2521 IN RE: Lidoderm Antitrust Litigation | CAN/ Orrick, William H./ Transferred on 04/03/2014 | 3:14-md-2521 | 12/23/2013 |
| 2541 IN RE: National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation | CAN/ Wilken, Claudia/ Transferred on 06/04/2014 | 4:14-md-2541 | 03/19/2014 |
| 2542 IN RE: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | NYS/ Broderick, Vernon S./ Transferred on 06/03/2014 | 1:14-md-2542 | 03/20/2014 |
| 2548 IN RE: Commodity Exchange, Inc., Gold Futures and Options Trading Litigation | NYS/ Caproni, Valerie E/ Transferred on 08/13/2014 | 1:14-md-2548 | 04/14/2014 |
| 2557 IN RE: Auto Body Shop Antitrust Litigation | FLM/ Presnell, Gregory A/ Transferred on 08/08/2014 | 6:14-md-2557 | 05/21/2014 |
| 2567 IN RE: Pre-Filled Propane Tank Antitrust Litigation | MOW/ Fenner, Gary A/ Transferred on 10/16/2014 | 4:14-md-2567 | 07/02/2014 |
| 2573 IN RE: London Silver Fixing, Ltd., Antitrust Litigation | NYS/ Caproni, Valerie E./ Transferred on 10/09/2014 | 1:14-md-2573 | 08/05/2014 |
| 2580 IN RE: Opana ER Antitrust Litigation | ILN/ Leinenweber, Harry D/ Transferred on 12/12/2014 | 1:14-cv-10150 | 08/26/2014 |
| 2626 IN RE: Disposable Contact Lens Antitrust Litigation | FLM/ Schlesinger, Harvey E./ Transferred on 06/08/2015 | 3:15-md-2626 | 03/06/2015 |
| 2656 IN RE: Domestic Airline Travel Antitrust Litigation | DC/ Kollar-Kotelly, Colleen/ Transferred on 10/13/2015 | 1:15-mc-1404 | 07/06/2015 |
| 2668 IN RE: National Football League's "Sunday Ticket" Antitrust Litigation | CAC/ O'Connell, Beverly Reid/ Transferred on 12/08/2015 | 2:15-ml-2668 | 08/27/2015 |
| 2670 IN RE: Packaged Seafood Products Antitrust Litigation | CAS/ Sammartino, Janis L./ Transferred on 12/09/2015 | | 08/28/2015 |
| 2673 IN RE: Treasury Securities Auction Antitrust Litigation | NYS/ Gardephe, Paul G./ Transferred on 12/08/2015 | | 09/24/2015 |
| Number of **Antitrust** Litigations Listed: **64** | | | |

**Common Disaster**

| | | | |
|---|---|---|---|
| 1570 IN RE: Terrorist Attacks on September 11, 2001 | NYS/ Daniels, George B/ Transferred on 12/09/2003 | 1:03-md-1570 | 08/21/2003 |
| 2179 IN RE: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010 | LAE/ Barbier, Carl J/ Transferred on 08/10/2010 | 2:10-md-2179 | 05/06/2010 |
| 2654 IN RE: Amtrak Train Derailment in Philadelphia, Pennsylvania, on May 12, 2015 | PAE/ Davis, Legrome D/ Transferred on 10/13/2015 | 2:15-md-2654 | 06/22/2015 |
| Number of **Common Disaster** Litigations Listed: **3** | | | |

**Contract**

| | | | |
|---|---|---|---|
| 2020 IN RE: Aetna, Inc., Out-of-Network "UCR" Rates Litigation | NJ/ Hayden, Katharine S/ Transferred on 04/08/2009 | 2:07-cv-3541 | 12/11/2008 |
| 2036 IN RE: Checking Account Overdraft Litigation | FLS/ King, James Lawrence/ Transferred on 06/10/2009 | 1:09-md-2036 | 02/26/2009 |
| 2074 IN RE: WellPoint, Inc., Out-of-Network "UCR" Rates Litigation | CAC/ Gutierrez, Philip S/ Transferred on 08/19/2009 | 2:09-ml-2074 | 05/05/2009 |
| 2193 IN RE: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation | MA/ Zobel, Rya W/ Transferred on 10/08/2010 | 1:10-md-2193 | 08/04/2010 |
| 2274 IN RE: CitiMortgage, Inc., Home Affordable Modification Program (HAMP) Contract Litigation | CAC/ Fischer, Dale S/ Transferred on 10/06/2011 | 2:11-md-2274 | 06/10/2011 |
| 2335 IN RE: Bank of New York Mellon Corp. Foreign Exchange Transactions Litigation | NYS/ Kaplan, Lewis A./ Transferred on 04/16/2012 | 1:12-md-2335 | 12/13/2011 |
| 2451 IN RE: HSBC Bank USA, N.A., Debit Card Overdraft Fee Litigation | NYE/ Spatt, Arthur D/ Transferred on 06/05/2013 | 2:13-md-2451 | 04/03/2013 |
| 2455 IN RE: Stericycle, Inc., Steri-Safe Contract Litigation | ILN/ Shadur, Milton I/ Transferred on 06/05/2013 | 1:13-cv-5795 | 04/15/2013 |
| 2613 IN RE: TD Bank, N.A., Debit Card Overdraft Fee Litigation | SC/ Hendricks, Bruce Howe/ Transferred on 04/02/2015 | 6:15-mn-2613 | 01/22/2015 |
| Number of **Contract** Litigations Listed: **9** | | | |

**Employment Practices**

| | | | |
|---|---|---|---|
| 1700 IN RE: FedEx Ground Package System, Inc., Employment Practices Litigation (No. II) | INN/ Miller, Robert L./ Transferred on 08/10/2005 | 3:05-md-527 | 05/13/2005 |
| 1932 IN RE: Family Dollar Stores, Inc., Wage and Hour Employment Practices Litigation | NCW/ Mullen, Graham C/ Transferred on 04/08/2008 | 3:08-md-1932 | 01/14/2008 |
| 2159 IN RE: AutoZone, Inc., Wage and Hour Employment Practices Litigation | CAN/ Breyer, Charles R./ Transferred on 06/15/2010 | 3:10-md-2159 | 03/17/2010 |
| 2266 IN RE: Wells Fargo Wage and Hour Employment Practices Litigation (No. III) | TXS/ Miller, Gray H./ Transferred on 08/19/2011 | 4:11-md-2266 | 05/25/2011 |
| 2280 IN RE: Morgan Stanley Smith Barney LLC Wage and Hour Employment Practices Litigation | NJ/ Martini, William J/ Transferred on 10/12/2011 | 2:11-cv-3121 | 06/29/2011 |
| 2504 IN RE: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation | KYW/ Hale, David J./ Transferred on 02/19/2014 | 3:14-md-2504 | 10/12/2013 |
| 2531 IN RE: Michaels Stores, Inc., Wage and Hour Employment Practices Litigation | CAC/ Wu, George H./ Transferred on 06/04/2014 | 2:14-ml-2531 | 02/20/2014 |
| Number of **Employment Practices** Litigations Listed: **7** | | | |

**Intellectual Property**

CM/ECF for JPML (LIVE)-MDL Report

E-Filed 2015 DEC 15 1:34 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark , Law No. CVCV050638

| | | |
|---|---|---|
| 1880 IN RE: Papst Licensing Digital Camera Patent Litigation | DC/ Collyer, Rosemary M./ Transferred on 11/05/2007 | 1:07-mc-493 | 07/13/2007 |
| 2050 IN RE: Bill of Lading Transmission and Processing System Patent Litigation | OHS/ Beckwith, Sandra S/ Transferred on 01/14/2009 | 1:09-md-2050 | 03/23/2009 |
| 2181 IN RE: Method of Processing Ethanol Byproducts and Related Subsystems ('858) Patent Litigation | INS/ McKinney, Larry J/ Transferred on 08/06/2010 | 1:10-ml-2181 | 05/12/2010 |
| 2294 IN RE: Webvention LLC ('294) Patent Litigation | MD/ Blake, Catherine C/ Transferred on 12/15/2011 | 1:11-md-2294 | 08/18/2011 |
| 2303 IN RE: Innovatio IP Ventures, LLC, Patent Litigation | ILN/ Bucklo, Elaine E/ Transferred on 12/28/2011 | 1:11-cv-9308 | 09/14/2011 |
| 2309 IN RE: Translada, Inc., Smart Meters Patent Litigation | OKW/ Cauthron, Robin J./ Transferred on 12/13/2011 | 5:12-ml-2309 | 10/05/2011 |
| 2344 IN RE: Bear Creek Technologies, Inc., ('722) Patent Litigation | DE/ Sleet, Gregory M/ Transferred on 05/02/2012 | 1:12-md-2344 | 01/25/2012 |
| 2354 IN RE: Maxim Integrated Products, Inc., Patent Litigation | PAW/ Conti, Joy Flowers/ Transferred on 06/08/2012 | 2:12-mc-244 | 02/23/2012 |
| 2355 IN RE: Parallel Networks, LLC, ('111) Patent Litigation | TXE/ Schroeder, Robert W./ Transferred on 06/12/2012 | 6:10-cv-111 | 02/23/2012 |
| 2371 IN RE: Unified Messaging Solutions LLC Patent Litigation | ILN/ Lefkow, Joan Humphrey/ Transferred on 08/03/2012 | 1:12-cv-6286 | 04/14/2012 |
| 2375 IN RE: Body Science LLC Patent Litigation | MA/ Saylor, F. Dennis/ Transferred on 08/06/2012 | 1:12-md-2375 | 04/18/2012 |
| 2396 IN RE: TR Labs Patent Litigation | NJ/ Sheridan, Peter G./ Transferred on 10/01/2012 | 3:09-cv-3883 | 07/09/2012 |
| 2432 IN RE: Neurografix ('360) Patent Litigation | MA/ Stearns, Richard G/ Transferred on 04/01/2013 | 1:13-md-2432 | 01/03/2013 |
| 2461 IN RE: MyKey Technology Inc. Patent Litigation | CAC/ Guilford, Andrew J./ Transferred on 08/14/2013 | 2:13-ml-2461 | 05/07/2013 |
| 2581 IN RE: CTP Innovations, LLC, Patent Litigation | MD/ Garbis, Marvin J/ Transferred on 12/12/2014 | 1:14-md-2581 | 09/03/2014 |
| 2600 IN RE: Protegrity Corporation and Protegrity USA, Inc., Patent Litigation | CAN/ Donato, James/ Transferred on 02/06/2015 | 3:15-md-2600 | 11/07/2014 |
| 2614 IN RE: Industrial Print Technologies, LLC, Patent Litigation | TXN/ Lynn, Barbara M.G./ Transferred on 04/07/2015 | 3:15-md-2614 | 01/22/2015 |
| Number of **Intellectual Property** Litigations Listed: **17** | | |

### Miscellaneous

| | | |
|---|---|---|
| 1604 IN RE: Ocwen Federal Bank FSB Mortgage Servicing Litigation | ILN/ Norgle, Charles R./ Transferred on 04/13/2004 | 1:04-cv-2714 | 01/28/2004 |
| 1674 IN RE: Community Bank of Northern Virginia Mortgage Lending Practices Litigation | PAW/ Schwab, Arthur J/ Transferred on 04/28/2005 | 2:03-cv-425 | 12/29/2004 |
| 1715 IN RE: Ameriquest Mortgage Co. Mortgage Lending Practices Litigation | ILN/ Aspen, Marvin E/ Transferred on 12/13/2005 | 1:05-cv-7097 | 07/13/2005 |
| 1877 IN RE: ClassicStar Mare Lease Litigation | KYE/ Hood, Joseph M/ Transferred on 10/19/2007 | 5:07-cv-353 | 07/02/2007 |
| 1916 IN RE: Chiquita Brands International, Inc., Alien Tort Statute and Shareholders Derivative Litigation | FLS/ Marra, Kenneth A/ Transferred on 02/20/2008 | 0:08-md-1916 | 11/28/2007 |
| 2083 IN RE: KBR, Inc., Burn Pit Litigation | MD/ Titus, Roger W/ Transferred on 10/16/2009 | 8:09-md-2083 | 06/12/2009 |
| 2119 IN RE: Mortgage Electronic Registration Systems (MERS) Litigation | AZ/ Teilborg, James A/ Transferred on 12/07/2009 | 2:09-md-2119 | 10/01/2009 |
| 2165 IN RE: Endangered Species Act Section 4 Deadline Litigation | DC/ Sullivan, Emmet G/ Transferred on 06/08/2010 | 1:10-mc-377 | 04/02/2010 |
| 2184 IN RE: Google Inc. Street View Electronic Communications Litigation | CAN/ Breyer, Charles R./ Transferred on 08/17/2010 | 3:10-md-2184 | 06/14/2010 |
| 2218 IN RE: Camp Lejeune, North Carolina, Water Contamination Litigation | GAN/ Thrash, Thomas W/ Transferred on 11/24/2010 | 1:11-md-2218 | 11/24/2010 |
| 2234 IN RE: Wal-Mart ATM Fee Notice Litigation | TNW/ McCalla, Jon P./ Transferred on 05/20/2011 | 2:11-md-2234 | 02/23/2011 |
| 2286 IN RE: Midland Credit Management, Inc., Telephone Consumer Protection Act (TCPA) Litigation | CAS/ Anello, Michael M./ Transferred on 10/11/2011 | 3:11-md-2286 | 07/28/2011 |
| 2295 IN RE: Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act (TCPA) Litigation | CAS/ Houston, Alvin W/ Transferred on 12/21/2011 | 3:11-md-2295 | 08/19/2011 |
| 2296 IN RE: Tribune Company Fraudulent Conveyance Litigation | NYS/ Sullivan, Richard J/ Transferred on 12/19/2011 | 1:11-md-2296 | 08/16/2011 |
| 2314 IN RE: Facebook Internet Tracking Litigation | CAN/ Davila, Edward J./ Transferred on 02/08/2012 | 5:12-md-2314 | 10/17/2011 |
| 2323 IN RE: National Football League Players' Concussion Injury Litigation | PAE/ Brody, Anita B/ Transferred on 01/31/2012 | 2:12-md-2323 | 11/15/2011 |
| 2330 IN RE: Carrier IQ, Inc., Consumer Privacy Litigation | CAN/ Chen, Edward M./ Transferred on 04/16/2012 | 3:12-md-2330 | 12/02/2011 |
| 2334 IN RE: Liberty Refund Anticipation Loan Litigation | ILN/ Gottschall, Joan B/ Transferred on 04/16/2012 | 1:12-cv-2949 | 12/09/2011 |
| 2357 IN RE: Zappos.com, Inc., Customer Data Security Breach Litigation | NV/ Jones, Robert Clive/ Transferred on 06/13/2012 | 3:12-cv-325 | 02/28/2012 |
| 2416 IN RE: Capital One Telephone Consumer Protection Act (TCPA) Litigation | ILN/ Bucklo, Elaine E/ Transferred on 12/10/2012 | 1:12-cv-10064 | 10/03/2012 |
| 2426 IN RE: TRS Recovery Services, Inc., and TeleCheck Services, Inc., Fair Debt Collection Practices Act (FDCPA) Litigation | ME/ Hornby, D. Brock/ Transferred on 02/07/2013 | 2:13-md-2426 | 12/04/2012 |
| 2433 IN RE: E. I. du Pont de Nemours and Company C-8 Personal Injury Litigation | OHS/ Sargus, Edmund A./ Transferred on 04/08/2013 | 2:13-md-2433 | 01/11/2013 |
| 2474 IN RE: H&R Block IRS Form 8863 Litigation | MOW/ Gaitan, Fernando J/ Transferred on 10/10/2013 | 4:13-md-2474 | 07/08/2013 |
| 2478 IN RE: Convergent Telephone Consumer Protection Act (TCPA) Litigation | CT/ Thompson, Alvin W/ Transferred on 10/08/2013 | 3:13-md-2478 | 07/19/2013 |
| 2485 IN RE: New Cingular Wireless PCS, LLC, Data Services Sales Tax Refund Litigation | WAW/ Coughenour, John C/ Transferred on 12/19/2013 | 2:13-md-2485 | 08/14/2013 |
| 2492 IN RE: National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation | ILN/ Lee, John Z./ Transferred on 12/18/2013 | 1:13-cv-9116 | 09/04/2013 |
| 2493 IN RE: Monitronics International, Inc., Telephone Consumer Protection Act (TCPA) Litigation | WVN/ Keeley, Irene M/ Transferred on 12/16/2013 | 1:13-md-2493 | 09/06/2013 |
| 2494 IN RE: Columbia and Snake River Dams Clean Water Act Litigation | WAE/ Suko, Lonny R/ Transferred on 12/13/2013 | 2:13-md-2494 | 09/11/2013 |
| 2513 IN RE: Collecto, Inc., Telephone Consumer Protection Act (TCPA) Litigation | MA/ Stearns, Richard G/ Transferred on 02/18/2014 | 1:14-cv-2513 | 11/19/2013 |
| 2522 IN RE: Target Corporation Customer Data Security Breach Litigation | MN/ Magnuson, Paul A/ Transferred on 04/02/2014 | 0:14-md-2522 | 12/24/2013 |
| 2524 IN RE: Health Management Associates, Inc., Qui Tam Litigation (No. II) | DC/ Walton, Reggie B/ Transferred on 04/03/2014 | 1:14-mc-339 | 01/14/2014 |
| 2532 IN RE: Yosemite National Park Hantavirus Litigation | CAN/ Chesney, Maxine M/ Transferred on 06/04/2014 | 3:14-md-2532 | 02/24/2014 |
| 2551 IN RE: National Hockey League Players' Concussion Injury Litigation | MN/ Nelson, Susan Richard/ Transferred on 08/19/2014 | 0:14-md-2551 | 04/25/2014 |
| 2564 IN RE: Life Time Fitness, Inc., Telephone Consumer Protection Act (TCPA) Litigation | MN/ Ericksen, Joan N./ Transferred on 10/15/2014 | 0:14-md-2564 | 06/18/2014 |
| 2583 IN RE: The Home Depot, Inc., Customer Data Security Breach Litigation | GAN/ Thrash, Thomas W/ Transferred on 12/11/2014 | 1:14-md-2583 | 09/15/2014 |
| 2586 IN RE: Supervalu, Inc., Customer Data Security Breach Litigation | MN/ Montgomery, Ann D/ Transferred on 12/16/2014 | 0:14-md-2586 | 09/18/2014 |
| 2587 IN RE: IntraMTA Switched Access Charges Litigation | TXN/ Fitzwater, Sidney A./ Transferred on 12/16/2014 | 3:14-md-2587 | 09/19/2014 |
| 2591 IN RE: Syngenta AG MIR162 Corn Litigation | KS/ Lungstrum, John W/ Transferred on 12/11/2014 | 2:14-md-2591 | 10/07/2014 |

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 196 of 201**

CM/ECF for JPML (LIVE)-MDL Report

E-Filed 2016 FEB 09 8:00 AM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2595 IN RE: Community Health Systems, Inc., Customer Data Security Breach Litigation | ALN/ Bowdre, Karon O./ Transferred on 02/04/2015 | 2:15-cv-222 | 10/17/2014 |
| 2615 IN RE: Michaels Stores, Inc., Fair Credit Reporting Act (FCRA) Litigation | NJ/ McNulty, Kevin/ Transferred on 04/02/2015 | 2:14-cv-7563 | 02/04/2015 |
| 2617 IN RE: Anthem, Inc., Customer Data Security Breach Litigation | CAN/ Koh, Lucy H./ Transferred on 06/08/2015 | 5:15-md-2617 | 02/10/2015 |
| 2624 IN RE: Lenovo Adware Litigation | CAN/ Whyte, Ronald M/ Transferred on 06/08/2015 | 5:15-md-2624 | 02/25/2015 |
| 2633 IN RE: Premera Blue Cross Customer Data Security Breach Litigation | OR/ Simon, Michael H./ Transferred on 06/16/2015 | 3:15-md-2633 | 03/31/2015 |
| 2664 IN RE: U.S. Office of Personnel Management Data Security Breach Litigation | DC/ Jackson, Amy Berman/ Transferred on 10/09/2015 | 1:15-mc-1394 | 07/29/2015 |
| 2667 IN RE: Medical Informatics Engineering, Inc., Customer Data Security Breach Litigation | INN/ Miller, Robert L./ Transferred on 12/10/2015 | 3:15-md-2667 | 08/24/2015 |
| 2669 IN RE: Ashley Madison Customer Data Security Breach Litigation | MOE/ Ross, John A./ Transferred on 12/09/2015 | | 08/27/2015 |
| Number of **Miscellaneous** Litigations Listed: **46** | | | |

### Products Liability

| | | | |
|---|---|---|---|
| 875 IN RE: Asbestos Products Liability Litigation (No. VI) | PAE/ Robreno, Eduardo C./ Transferred on 07/29/1991 | 2:91-md-875 | 01/17/1991 |
| 1203 IN RE: Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation | PAE/ Bartle, Harvey/ Transferred on 12/10/1997 | 2:10-md-1203 | 09/23/1997 |
| 1358 IN RE: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | NYS/ Scheindlin, Shira Ann/ Transferred on 10/10/2000 | 1:00-cv-1898 | 06/06/2000 |
| 1431 IN RE: Baycol Products Liability Litigation | MN/ Davis, Michael James/ Transferred on 12/18/2001 | 0:01-md-1431 | 08/21/2001 |
| 1507 IN RE: Prempro Products Liability Litigation | ARE/ Wilson, Billy Roy/ Transferred on 03/04/2003 | 4:03-cv-1507 | 10/18/2002 |
| 1657 IN RE: Vioxx Marketing, Sales Practices and Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 02/16/2005 | 2:05-md-1657 | 10/08/2004 |
| 1789 IN RE: Fosamax Products Liability Litigation | NYS/ Keenan, John F/ Transferred on 08/16/2006 | 1:06-md-1789 | 05/24/2006 |
| 1836 IN RE: Mirapex Products Liability Litigation | MN/ Davis, Michael James/ Transferred on 06/22/2007 | 0:07-md-1836 | 02/06/2007 |
| 1842 IN RE: Kugel Mesh Hernia Patch Products Liability Litigation | RI/ Lisi, Mary M/ Transferred on 06/22/2007 | 1:07-md-1842 | 02/28/2007 |
| 1871 IN RE: Avandia Marketing, Sales Practices and Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 10/16/2007 | 2:07-md-1871 | 06/11/2007 |
| 1943 IN RE: Levaquin Products Liability Litigation | MN/ Tunheim, John R./ Transferred on 06/13/2008 | 0:08-md-1943 | 02/19/2008 |
| 1953 IN RE: Heparin Products Liability Litigation | OHN/ Carr, James G/ Transferred on 06/06/2008 | 1:08-hc-60000 | 04/04/2008 |
| 1964 IN RE: NuvaRing Products Liability Litigation | MOE/ Sippel, Rodney W/ Transferred on 08/22/2008 | 4:08-md-1964 | 05/09/2008 |
| 2001 IN RE: Whirlpool Corp. Front-Loading Washer Products Liability Litigation | OHN/ Boyko, Christopher A/ Transferred on 12/02/2008 | 1:08-wp-65000 | 09/26/2008 |
| 2004 IN RE: Mentor Corp. ObTape Transobturator Sling Products Liability Litigation | GAM/ Land, Clay D/ Transferred on 12/03/2008 | 4:08-md-2004 | 10/14/2008 |
| 2047 IN RE: Chinese-Manufactured Drywall Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 06/15/2009 | 2:09-md-2047 | 03/13/2009 |
| 2100 IN RE: Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation | ILS/ Herndon, David R./ Transferred on 10/01/2009 | 3:09-md-2100 | 07/30/2009 |
| 2104 IN RE: IKO Roofing Shingle Products Liability Litigation | ILC/ Baker, Harold A./ Transferred on 12/03/2009 | 2:09-md-2104 | 08/12/2009 |
| 2151 IN RE: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation | CAC/ Selna, James V/ Transferred on 04/09/2010 | 8:10-ml-2151 | 02/04/2010 |
| 2158 IN RE: Zimmer Durom Hip Cup Products Liability Litigation | NJ/ Wigenton, Susan D/ Transferred on 06/09/2010 | 2:09-cv-4414 | 03/15/2010 |
| 2187 IN RE: C.R. Bard, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 10/12/2010 | 2:10-md-2187 | 07/15/2010 |
| 2197 IN RE: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation | OHN/ Katz, David A/ Transferred on 12/03/2010 | 1:10-md-2197 | 09/03/2010 |
| 2226 IN RE: Darvocet, Darvon and Propoxyphene Products Liability Litigation | KYE/ Reeves, Danny C/ Transferred on 08/16/2011 | 2:11-md-2226 | 12/15/2010 |
| 2243 IN RE: Fosamax (Alendronate Sodium) Products Liability Litigation (No. II) | NJ/ Wolfson, Freda L/ Transferred on 05/23/2011 | 3:08-cv-8 | 03/24/2011 |
| 2244 IN RE: DePuy Orthopaedics, Inc., Pinnacle Hip Implant Products Liability Litigation | TXN/ Kinkeade, James Edgar/ Transferred on 05/23/2011 | 3:11-md-2244 | 03/28/2011 |
| 2272 IN RE: Zimmer NexGen Knee Implant Products Liability Litigation | ILN/ Pallmeyer, Rebecca R/ Transferred on 08/08/2011 | 1:11-cv-5468 | 06/06/2011 |
| 2284 IN RE: Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation | PAE/ Pratter, Gene E.K./ Transferred on 10/20/2011 | 2:11-md-2284 | 07/22/2011 |
| 2299 IN RE: Actos (Pioglitazone) Products Liability Litigation | LAW/ Doherty, Rebecca F/ Transferred on 12/29/2011 | 6:11-md-2299 | 08/31/2011 |
| 2308 IN RE: Skechers Toning Shoe Products Liability Litigation | KYW/ Russell, Thomas B/ Transferred on 12/19/2011 | 3:11-md-2308 | 09/30/2011 |
| 2316 IN RE: Ford Motor Co. Spark Plug and 3-Valve Engine Products Liability Litigation | OHN/ Pearson, Benita Y./ Transferred on 02/08/2012 | 1:12-md-2316 | 10/21/2011 |
| 2325 IN RE: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2325 | 11/23/2011 |
| 2326 IN RE: Boston Scientific Corp. Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2326 | 11/28/2011 |
| 2327 IN RE: Ethicon, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/07/2012 | 2:12-md-2327 | 11/28/2011 |
| 2329 IN RE: Wright Medical Technology, Inc., Conserve Hip Implant Products Liability Litigation | GAN/ Duffey, William S/ Transferred on 02/08/2012 | 1:12-md-2329 | 11/29/2011 |
| 2331 IN RE: Propecia (Finasteride) Products Liability Litigation | NYE/ Gleeson, John/ Transferred on 04/16/2012 | 1:12-md-2331 | 12/06/2011 |
| 2342 IN RE: Zoloft (Sertraline Hydrochloride) Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 04/17/2012 | 2:12-md-2342 | 01/18/2012 |
| 2359 IN RE: HardiePlank Fiber Cement Siding Litigation | MN/ Davis, Michael James/ Transferred on 06/11/2012 | 0:12-md-2359 | 03/06/2012 |
| 2385 IN RE: Pradaxa (Dabigatran Etexilate) Products Liability Litigation | ILS/ Herndon, David R/ Transferred on 08/08/2012 | 3:12-md-2385 | 05/30/2012 |
| 2387 IN RE: Coloplast Corp. Pelvic Support Systems Products Liability Litigation | WVS/ Goodwin, Joseph R/ Transferred on 08/06/2012 | 2:12-md-2387 | 06/05/2012 |
| 2391 IN RE: Biomet M2a Magnum Hip Implant Products Liability Litigation | INN/ Miller, Robert L./ Transferred on 10/02/2012 | 3:12-md-2391 | 06/27/2012 |
| 2404 IN RE: Nexium (Esomeprazole) Products Liability Litigation | CAC/ Fischer, Dale S/ Transferred on 12/06/2012 | 2:12-ml-2404 | 08/27/2012 |
| 2418 IN RE: Plavix Marketing, Sales Practices and Products Liability Litigation (No. II) | NJ/ Wolfson, Freda L/ Transferred on 02/12/2013 | 3:13-cv-2418 | 10/15/2012 |
| 2419 IN RE: New England Compounding Pharmacy, Inc., Products Liability Litigation | MA/ Zobel, Rya W/ Transferred on 02/12/2013 | 1:13-md-2419 | 10/16/2012 |
| 2428 IN RE: Fresenius GranuFlo/NaturaLyte Dialysate Products Liability Litigation | MA/ Woodlock, Douglas P/ Transferred on 03/29/2013 | 1:13-md-2428 | 12/12/2012 |
| 2434 IN RE: Mirena IUD Products Liability Litigation | NYS/ Seibel, Cathy/ Transferred on 04/08/2013 | 7:13-md-2434 | 01/16/2013 |
| 2436 IN RE: Tylenol (Acetaminophen) Marketing, Sales Practices and Products Liability Litigation | PAE/ Stengel, Lawrence F/ Transferred on 04/01/2013 | 2:13-md-2436 | 01/17/2013 |
| 2440 IN RE: Cook Medical, Inc., Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 06/11/2013 | 2:13-md-2440 | 02/18/2013 |

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 197 of 201**

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 540 of 645

CM/ECF for JPML (LIVE)-MDL Report

Case 4:17-cv-00210-JAJ-SBJ   Document 1-16   Filed 06/14/17   Page 198 of 201
E-Filed: 2015 DEC 15 4:40 PM POLK - CLERK OF DISTRICT COURT
Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2441 IN RE: Stryker Rejuvenate and ABG II Hip Implant Products Liability Litigation | MN/ Frank, Donovan W/ Transferred on 06/12/2013 | 0:13-md-2441 | 02/19/2013 |
| 2452 IN RE: Incretin-Based Therapies Products Liability Litigation | CAS/ Battaglia, Anthony J/ Transferred on 08/26/2013 | 3:13-md-2452 | 04/05/2013 |
| 2454 IN RE: Franck's Lab, Inc., Products Liability Litigation | LAE/ Engelhardt, Kurt D./ Transferred on 08/07/2013 | 2:13-md-2454 | 04/12/2013 |
| 2495 IN RE: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation | GAN/ Thrash, Thomas W/ Transferred on 12/19/2013 | 1:13-md-2495 | 09/17/2013 |
| 2502 IN RE: Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No. II) | SC/ Gergel, Richard M/ Transferred on 02/18/2014 | 2:14-mn-2502 | 10/10/2013 |
| 2511 IN RE: Neomedic Pelvic Repair System Products Liability Litigation | WVS/ Goodwin, Joseph R./ Transferred on 02/18/2014 | 2:14-md-2511 | 11/08/2013 |
| 2514 IN RE: Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation | SC/ Norton, David C/ Transferred on 02/14/2014 | 2:14-mn-1 | 11/19/2013 |
| 2540 IN RE: Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation | NJ/ Simandle, Jerome B/ Transferred on 06/11/2014 | 1:14-cv-3722 | 03/18/2014 |
| 2545 IN RE: Testosterone Replacement Therapy Products Liability Litigation | ILN/ Kennelly, Matthew F/ Transferred on 06/06/2014 | 1:14-cv-1748 | 03/28/2014 |
| 2570 IN RE: Cook Medical, Inc., IVC Filters Marketing, Sales Practices and Products Liability Litigation | INS/ Young, Richard L./ Transferred on 10/15/2014 | 1:14-ml-2570 | 07/21/2014 |
| 2575 IN RE: Fluidmaster, Inc., Water Connector Components Products Liability Litigation | ILN/ Dow, Robert M/ Transferred on 12/11/2014 | 1:14-cv-5696 | 08/18/2014 |
| 2577 IN RE: GAF Elk Cross Timbers Decking Marketing, Sales Practices and Products Liability Litigation | NJ/ Linares, Jose L/ Transferred on 12/12/2014 | 2:15-cv-18 | 08/20/2014 |
| 2590 IN RE: Navistar MaxxForce Engines Marketing, Sales Practices and Products Liability Litigation | ILN/ Gottschall, Joan B/ Transferred on 12/17/2014 | 1:14-cv-10318 | 10/03/2014 |
| 2592 IN RE: Xarelto (Rivaroxaban) Products Liability Litigation | LAE/ Fallon, Eldon E./ Transferred on 12/12/2014 | 2:14-md-2592 | 10/09/2014 |
| 2599 IN RE: Takata Airbag Products Liability Litigation | FLS/ Moreno, Federico A/ Transferred on 02/05/2015 | 1:15-md-2599 | 11/03/2014 |
| 2602 IN RE: Rust-Oleum Restore Marketing, Sales Practices and Products Liability Litigation | ILN/ St. Eve, Amy J/ Transferred on 02/06/2015 | 1:15-cv-1364 | 11/12/2014 |
| 2606 IN RE: Benicar (Olmesartan) Products Liability Litigation | NJ/ Kugler, Robert B./ Transferred on 04/03/2015 | 1:15-md-2606 | 12/18/2014 |
| 2641 IN RE: Bard IVC Filters Products Liability Litigation | AZ/ Campbell, David G./ Transferred on 08/17/2015 | 2:15-md-2641 | 05/18/2015 |
| 2642 IN RE: Fluoroquinolone Products Liability Litigation | MN/ Tunheim, John R./ Transferred on 08/17/2015 | 0:15-md-2642 | 05/19/2015 |
| 2652 IN RE: Ethicon, Inc., Power Morcellator Products Liability Litigation | KS/ Vratil, Kathryn H/ Transferred on 10/15/2015 | 2:15-md-2652 | 06/18/2015 |
| 2657 IN RE: Zofran (Ondansetron) Products Liability Litigation | MA/ Saylor, F. Dennis/ Transferred on 10/13/2015 | | 07/06/2015 |
| 2666 IN RE: Bair Hugger Forced Air Warming Devices Products Liability Litigation | MN/ Ericksen, Joan N./ Transferred on 12/11/2015 | | 08/21/2015 |
| 2672 IN RE: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation | CAN/ Breyer, Charles R./ Transferred on 12/08/2015 | | 09/23/2015 |
| Number of **Products Liability** Litigations Listed: **70** | | | |

**Sales Practices**

| | | | |
|---|---|---|---|
| 1840 IN RE: Motor Fuel Temperature Sales Practices Litigation | KS/ Vratil, Kathryn H/ Transferred on 06/18/2007 | 2:07-md-1840 | 02/22/2007 |
| 2044 IN RE: Vertrue Inc. Marketing and Sales Practices Litigation | OHN/ Gaughan, Patricia A./ Transferred on 06/08/2009 | 1:09-vm-75000 | 03/06/2009 |
| 2067 IN RE: Celexa and Lexapro Marketing and Sales Practices Litigation | MA/ Gorton, Nathaniel M/ Transferred on 08/19/2009 | 1:09-md-2067 | 04/21/2009 |
| 2153 IN RE: United Parcel Service "Air-in-Ground" Marketing and Sales Practices Litigation | CAC/ Wu, George H./ Transferred on 06/08/2010 | 2:10-md-2153 | 02/23/2010 |
| 2199 IN RE: POM Wonderful LLC Marketing and Sales Practices Litigation | CAC/ Pregerson, Dean D/ Transferred on 11/30/2010 | 2:10-md-2199 | 10/05/2010 |
| 2215 IN RE: Glaceau Vitaminwater Marketing and Sales Practice Litigation (No. II) | NYE/ Irizarry, Dora Lizette/ Transferred on 02/08/2011 | 1:11-md-2215 | 11/16/2010 |
| 2238 IN RE: Groupon, Inc., Marketing and Sales Practices Litigation | CAS/ Sabraw, Dana M./ Transferred on 05/25/2011 | 3:11-md-2238 | 03/14/2011 |
| 2263 IN RE: Dial Complete Marketing and Sales Practices Litigation | NH/ McAuliffe, Steven J/ Transferred on 08/18/2011 | 1:11-md-2263 | 05/23/2011 |
| 2291 IN RE: Wesson Oil Marketing and Sales Practices Litigation | CAC/ Morrow, Margaret M/ Transferred on 10/13/2011 | 2:11-ml-2291 | 08/04/2011 |
| 2320 IN RE: Colgate-Palmolive Softsoap Antibacterial Hand Soap Marketing and Sales Practices Litigation | NH/ Barbadoro, Paul J/ Transferred on 03/07/2012 | 1:12-md-2320 | 11/07/2011 |
| 2324 IN RE: Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practices Litigation | FLS/ Lenard, Joan A/ Transferred on 02/09/2012 | 1:12-md-2324 | 11/28/2011 |
| 2353 IN RE: Tropicana Orange Juice Marketing and Sales Practices Litigation | NJ/ Martini, William J/ Transferred on 06/11/2012 | 2:11-cv-7382 | 02/22/2012 |
| 2361 IN RE: Simply Orange Orange Juice Marketing and Sales Practices Litigation | MOW/ Gaitan, Fernando J/ Transferred on 06/11/2012 | 4:12-md-2361 | 03/14/2012 |
| 2380 IN RE: Shop-Vac Marketing and Sales Practices Litigation | PAM/ Kane, Yvette/ Transferred on 08/15/2012 | 4:12-cv-2380 | 05/04/2012 |
| 2382 IN RE: Emerson Electric Co. Wet-Dry Vac Marketing and Sales Practices Litigation | MOE/ Autrey, Henry Edward/ Transferred on 08/15/2012 | 4:12-md-2382 | 05/09/2012 |
| 2413 IN RE: Frito-Lay North America, Inc., "All Natural" Litigation | NYE/ Mauskopf, Roslynn R./ Transferred on 12/12/2012 | 1:12-md-2413 | 09/21/2012 |
| 2415 IN RE: L'Oreal Wrinkle Cream Marketing and Sales Practices Litigation | NJ/ Martini, William J/ Transferred on 12/12/2012 | 2:12-cv-3571 | 09/28/2012 |
| 2438 IN RE: 5-Hour Energy Marketing and Sales Practices Litigation | CAC/ Gutierrez, Philip S/ Transferred on 06/05/2013 | 2:13-md-2438 | 02/15/2013 |
| 2439 IN RE: Subway Footlong Sandwich Marketing and Sales Practices Litigation | WIE/ Adelman, Lynn S/ Transferred on 06/10/2013 | 2:13-md-2439 | 02/15/2013 |
| 2450 IN RE: Ford Fusion and C-Max Fuel Economy Litigation | NYS/ Karas, Kenneth M/ Transferred on 06/07/2013 | 7:13-md-2450 | 04/03/2013 |
| 2491 IN RE: GNC Corp. TriFlex Products Marketing and Sales Practices Litigation (No. II) | MD/ Motz, J. Frederick/ Transferred on 12/17/2013 | 1:14-md-2491 | 08/30/2013 |
| 2498 IN RE: Nutramax Cosamin Marketing and Sales Practices Litigation | MD/ Motz, J. Frederick/ Transferred on 12/17/2013 | 1:14-md-2498 | 09/25/2013 |
| 2506 IN RE: AZEK Building Products, Inc., Marketing and Sales Practices Litigation | NJ/ Arleo, Madeline C/ Transferred on 02/18/2014 | 2:12-cv-6627 | 10/29/2013 |
| 2528 IN RE: Natrol, Inc., Glucosamine/Chondroitin Marketing and Sales Practices Litigation | MD/ Motz, J. Frederick/ Transferred on 06/10/2014 | 1:14-md-2528 | 02/11/2014 |
| 2543 IN RE: General Motors LLC Ignition Switch Litigation | NYS/ Furman, Jesse M/ Transferred on 06/09/2014 | 1:14-md-2543 | 03/24/2014 |
| 2555 IN RE: Coca-Cola Products Marketing and Sales Practices Litigation (No. II) | CAN/ White, Jeffrey S/ Transferred on 08/07/2014 | 4:14-md-2555 | 05/21/2014 |
| 2562 IN RE: Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation | MOE/ Sippel, Rodney W/ Transferred on 10/17/2014 | 4:14-md-2562 | 06/16/2014 |
| 2588 IN RE: Whole Foods Market, Inc., Greek Yogurt Marketing and Sales Practices Litigation | TXW/ Sparks, Sam/ Transferred on 12/10/2014 | 1:14-mc-2588 | 09/30/2014 |
| 2619 IN RE: Herbal Supplements Marketing and Sales Practices Litigation | ILN/ Darrah, John W/ Transferred on 06/09/2015 | 1:15-cv-5070 | 02/12/2015 |
| 2627 IN RE: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation | VAE/ Trenga, Anthony J/ Transferred on 06/12/2015 | 1:15-md-2627 | 03/09/2015 |
| 2639 IN RE: Pacquiao-Mayweather Boxing Match Pay-Per-View Litigation | CAC/ Klausner, Robert Gary/ Transferred on 08/14/2015 | 2:15-md-2639 | 05/08/2015 |
| 2645 IN RE: Kind LLC "All Natural" Litigation | NYS/ Pauley, William H/ Transferred on 08/07/2015 | 1:15-md-2645 | 06/01/2015 |

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 198 of 201**

CM/ECF for JPML (LIVE)-MDL Report

E-FILED ... CLERK OF COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| | | | |
|---|---|---|---|
| 2661 IN RE: American Honda Motor Co., Inc., CR-V Vibration Marketing and Sales Practices Litigation | OHS/ Watson, Michael H/ Transferred on 10/09/2015 | 2:15-md-2661 | 07/20/2015 |
| 2665 IN RE: McCormick & Company, Inc., Pepper Products Marketing and Sales Practices Litigation | DC/ Huvelle, Ellen Segal/ Transferred on 12/08/2015 | 1:15-mc-1825 | 08/10/2015 |
| Number of **Sales Practices** Litigations Listed: **34** | | | |

**Securities**

| | | | |
|---|---|---|---|
| 1446 IN RE: Enron Corp. Securities, Derivative & "ERISA" Litigation | TXS/ Harmon, Melinda/ Transferred on 04/16/2002 | | 12/21/2001 |
| 1658 IN RE: Merck & Co., Inc., Securities, Derivative & "ERISA" Litigation | NJ/ Chesler, Stanley R/ Transferred on 02/23/2005 | 2:05-cv-1151 | 10/18/2004 |
| 1668 IN RE: Federal National Mortgage Association Securities, Derivative & "ERISA" Litigation | DC/ Leon, Richard J/ Transferred on 05/17/2005 | 1:05-mc-234 | 12/06/2004 |
| 1889 IN RE: Peregrine Systems, Inc., Securities Litigation | CAS/ Benitez, Roger T/ Transferred on 01/02/2008 | 3:02-cv-870 | 08/08/2007 |
| 1963 IN RE: The Bear Stearns Companies Inc. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Sweet, Robert W/ Transferred on 08/18/2008 | 1:08-md-1963 | 05/05/2008 |
| 2009 IN RE: Regions Morgan Keegan Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | TNW/ Mays, Samuel H./ Transferred on 02/12/2009 | 2:09-md-2009 | 10/31/2008 |
| 2011 IN RE: The Reserve Fund Securities and Derivative Litigation | NYS/ Gardephe, Paul G./ Transferred on 02/10/2009 | 1:09-md-2011 | 11/19/2008 |
| 2017 IN RE: Lehman Brothers Holdings, Inc., Securities & Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Kaplan, Lewis A./ Transferred on 02/09/2009 | 1:09-md-2017 | 01/04/2008 |
| 2052 IN RE: Tremont Group Holdings, Inc., Securities Litigation | NYS/ Griesa, Thomas P/ Transferred on 06/11/2009 | 1:09-md-2052 | 03/25/2009 |
| 2058 IN RE: Bank of America Corp. Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Castel, P. Kevin/ Transferred on 06/10/2009 | 1:09-md-2058 | 04/07/2009 |
| 2063 IN RE: Oppenheimer Rochester Funds Group Securities Litigation | CO/ Kane, John L/ Transferred on 06/17/2009 | 1:09-md-2063 | 04/14/2009 |
| 2070 IN RE: Citigroup Inc. Securities Litigation | NYS/ Stein, Sidney H/ Transferred on 08/07/2009 | 1:09-md-2070 | 04/28/2009 |
| 2082 IN RE: Meridian Funds Group Securities & Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Griesa, Thomas P/ Transferred on 08/11/2009 | 1:09-md-2082 | 06/10/2009 |
| 2088 IN RE: Fairfield Greenwich Group Securities Litigation | NYS/ Marrero, Victor/ Transferred on 10/06/2009 | 1:09-md-2088 | 06/26/2009 |
| 2099 IN RE: Stanford Entities Securities Litigation | TXN/ Godbey, David C/ Transferred on 10/06/2009 | 3:09-md-2099 | 07/29/2009 |
| 2185 IN RE: BP p.l.c. Securities Litigation | TXS/ Ellison, Keith P/ Transferred on 08/10/2010 | 4:10-md-2185 | 06/15/2010 |
| 2338 IN RE: MF Global Holdings Ltd. Investment Litigation | NYS/ Marrero, Victor/ Transferred on 04/23/2012 | 1:12-md-2338 | 01/06/2012 |
| 2384 IN RE: Swisher Hygiene, Inc., Securities and Derivative Litigation | NCW/ Mullen, Graham C/ Transferred on 08/13/2012 | 3:12-md-2384 | 05/30/2012 |
| 2389 IN RE: Facebook, Inc., IPO Securities and Derivative Litigation | NYS/ Sweet, Robert W/ Transferred on 10/04/2012 | 1:12-md-2389 | 06/14/2012 |
| 2566 IN RE: TelexFree Securities Litigation | MA/ Hillman, Timothy S/ Transferred on 10/21/2014 | 4:14-md-2566 | 07/01/2014 |
| 2631 IN RE: Alibaba Group Holding Limited Securities Litigation | NYS/ McMahon, Colleen/ Transferred on 06/09/2015 | 1:15-md-2631 | 03/23/2015 |
| Number of **Securities** Litigations Listed: **21** | | | |

MDLs Listed on this Report: **274**

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 199 of 201**

12/15/2015 6:20 AM

CM/ECF for JPML (LIVE)-MDL Report

E-Filed: Chicoine/Mueller v. Wellmark, Law No. CVCV050638 CLERK DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| United States Judicial Panel on Multidistrict Litigation | | | | Report Date: 12/15/2015 |
|---|---|---|---|---|

### MDL Statistics Report - Docket Summary Listing

**MDL Filters:**
Status: **Transferred**
Closed Between: **01/01/2015 - 12/15/2015**
Limited to **Closed Litigations**
Docket Summary Listing in Order by **Docket**

| DOCKET | TR'E DISTRICT/ JUDGE/ MDL STATUS | MASTER DOCKET | DATE FILED | DATE CLOSED |
|---|---|---|---|---|
| 1499 IN RE: South African Apartheid Litigation | NYS/ Scheindlin, Shira Ann/ Transferred on 12/16/2002 | 1:02-md-1499 | 08/19/2002 | 10/20/2015 |
| 1529 IN RE: Adelphia Communications Corp. Securities & Derivative Litigation (No. II) | NYS/ Furman, Jesse M/ Transferred on 07/23/2003 | 1:03-md-1529 | 03/04/2003 | 03/19/2015 |
| 1551 IN RE: Reciprocal of America (ROA) Sales Practices Litigation | TNW/ Breen, J. Daniel/ Transferred on 08/26/2003 | 3:04-md-1551 | 05/22/2003 | 07/07/2015 |
| 1603 IN RE: OxyContin Antitrust Litigation | NYS/ Stein, Sidney H/ Transferred on 04/22/2004 | 1:04-md-1603 | 01/23/2004 | 08/17/2015 |
| 1626 IN RE: Accutane (Isotretinoin) Products Liability Litigation | FLM/ Moody, James S/ Transferred on 11/01/2004 | 8:04-md-2523 | 06/07/2004 | 08/04/2015 |
| 1629 IN RE: Neurontin Marketing, Sales Practices and Products Liability Litigation | MA/ Saris, Patti B/ Transferred on 10/26/2004 | 1:04-cv-10981 | 06/09/2004 | 01/06/2015 |
| 1672 IN RE: Express Scripts, Inc., Pharmacy Benefits Management Litigation | MOE/ Autrey, Henry Edward/ Transferred on 04/29/2005 | 4:05-md-1672 | 12/22/2004 | 12/10/2015 |
| 1717 IN RE: Intel Corp. Microprocessor Antitrust Litigation | DE/ Stark, Leonard P/ Transferred on 11/08/2005 | 1:05-md-1717 | 07/14/2005 | 09/25/2015 |
| 1742 IN RE: Ortho Evra Products Liability Litigation | OHN/ Katz, David A/ Transferred on 03/01/2006 | 1:06-cv-40000 | 11/28/2005 | 01/07/2015 |
| 1811 IN RE: Genetically Modified Rice Litigation | MOE/ Perry, Catherine D/ Transferred on 12/19/2006 | 4:06-md-1811 | 09/29/2006 | 09/14/2015 |
| 1845 IN RE: ConAgra Peanut Butter Products Liability Litigation | GAN/ Thrash, Thomas W/ Transferred on 07/17/2007 | 1:07-md-1845 | 03/06/2007 | 04/02/2015 |
| 1846 IN RE: Trade Partners, Inc., Investors Litigation | MIW/ Bell, Robert Holmes/ Transferred on 06/26/2007 | 1:07-md-1846 | 03/07/2007 | 05/04/2015 |
| 1873 IN RE: FEMA Trailer Formaldehyde Products Liability Litigation | LAE/ Engelhardt, Kurt D./ Transferred on 10/24/2007 | 2:07-md-1873 | 06/12/2007 | 05/11/2015 |
| 1909 IN RE: Gadolinium Contrast Dyes Products Liability Litigation | OHN/ Polster, Dan A/ Transferred on 02/27/2008 | 1:08-gd-50000 | 10/26/2007 | 04/30/2015 |
| 1928 IN RE: Trasylol Products Liability Litigation | FLS/ Middlebrooks, Donald M/ Transferred on 04/07/2008 | 1:08-md-1928 | 01/03/2008 | 08/10/2015 |
| 1942 IN RE: Flat Glass Antitrust Litigation (No. II) | PAW/ Ambrose, Donetta W/ Transferred on 06/10/2008 | 2:08-mc-180 | 02/12/2008 | 08/12/2015 |
| 1961 IN RE: Municipal Mortgage & Equity, LLC, Securities and Derivative Litigation | MD/ Garbis, Marvin J/ Transferred on 08/13/2008 | 1:08-md-1961 | 04/29/2008 | 10/15/2015 |
| 1997 IN RE: Text Messaging Antitrust Litigation | ILN/ Kennelly, Matthew F/ Transferred on 12/03/2008 | 1:08-cv-7082 | 09/24/2008 | 08/25/2015 |
| 2013 IN RE: Fannie Mae Securities and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Crotty, Paul A/ Transferred on 02/11/2009 | 1:09-md-2013 | 11/24/2008 | 10/26/2015 |
| 2015 IN RE: Wachovia Corp. "Pick-A-Payment" Mortgage Marketing and Sales Practices Litigation | CAN/ Seeborg, Richard/ Transferred on 02/13/2009 | 5:09-md-2015 | 11/25/2008 | 12/07/2015 |
| 2031 IN RE: Dairy Farmers of America, Inc., Cheese Antitrust Litigation | ILN/ Dow, Robert M/ Transferred on 06/15/2009 | 1:09-cv-3690 | 02/23/2009 | 10/05/2015 |
| 2046 IN RE: Heartland Payment Systems, Inc., Customer Data Security Breach Litigation | TXS/ Rosenthal, Lee H/ Transferred on 06/10/2009 | 4:09-md-2046 | 03/12/2009 | 04/23/2015 |
| 2051 IN RE: Denture Cream Products Liability Litigation | FLS/ Altonaga, Cecilia M/ Transferred on 06/09/2009 | 1:09-md-2051 | 03/24/2009 | 11/16/2015 |
| 2072 IN RE: Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation | NYS/ Cedarbaum, Miriam Goldman/ Transferred on 08/11/2009 | 1:09-md-2072 | 04/30/2009 | 04/13/2015 |
| 2075 IN RE: Austin Capital Management, Ltd., Securities and Employee Retirement Income Security Act (ERISA) Litigation | NYS/ Griesa, Thomas P/ Transferred on 08/11/2009 | 1:09-md-2075 | 05/08/2009 | 05/12/2015 |
| 2087 IN RE: Hydroxycut Marketing and Sales Practices Litigation | CAS/ Moskowitz, Barry Ted/ Transferred on 10/06/2009 | 3:09-md-2087 | 06/26/2009 | 09/29/2015 |
| 2124 IN RE: Conseco Life Insurance Co. Lifetrend Insurance Marketing and Sales Practices Litigation | CAN/ Illston, Susan Yvonne/ Transferred on 02/03/2010 | 3:10-md-2124 | 10/21/2009 | 09/09/2015 |
| 2145 IN RE: Medical Capital Securities Litigation | CAC/ Carter, David O./ Transferred on 04/15/2010 | 8:10-ml-2145 | 01/06/2010 | 08/05/2015 |
| 2157 IN RE: JPMorgan Auction Rate Securities (ARS) Marketing Litigation | NYS/ Gardephe, Paul G./ Transferred on 06/09/2010 | 1:10-md-2157 | 03/09/2010 | 03/20/2015 |
| 2183 IN RE: Brican America LLC Equipment Lease Litigation | FLS/ Seitz, Patricia A/ Transferred on 08/12/2010 | 1:10-md-2183 | 06/14/2010 | 08/11/2015 |
| 2208 IN RE: Prudential Insurance Company of America SGLI/VGLI Contract Litigation | MA/ Ponsor, Michael A/ Transferred on 02/04/2011 | 3:11-md-2208 | 10/26/2010 | 02/19/2015 |
| 2213 IN RE: Commodity Exchange, Inc., Silver Futures and Options Trading Litigation | NYS/ Patterson, Robert P/ Transferred on 02/08/2011 | 1:11-md-2213 | 11/04/2010 | 03/19/2015 |
| 2220 IN RE: KABA Simplex Locks Marketing and Sales Practices Litigation | OHN/ Nugent, Donald C/ Transferred on 02/08/2011 | 1:11-md-2220 | 12/06/2010 | 06/01/2015 |
| 2235 IN RE: Foot Locker, Inc., Fair Labor Standards Act (FLSA) and Wage and Hour Litigation | PAE/ Joyner, J. Curtis/ Transferred on 05/26/2011 | 2:11-md-2235 | 03/01/2011 | 07/22/2015 |
| 2258 IN RE: Sony Gaming Networks and Customer Data Security Breach Litigation | CAS/ Battaglia, Anthony J./ Transferred on 08/08/2011 | 3:11-md-2258 | 05/09/2011 | 07/10/2015 |
| 2264 IN RE: Google Inc. Android Consumer Privacy Litigation | CAN/ White, Jeffrey S/ Transferred on 08/08/2011 | 3:11-md-2264 | 05/24/2011 | 02/13/2015 |

**Plaintiffs' Appendix in Resistance to Wellmark Motion to Stay**

**Page 200 of 201**

12/15/2015 6:21 AM

CM/ECF for JPML (LIVE)-MDL Report

E-Filed 2015 DEC 15 4:00 PM POLK - CLERK OF DISTRICT COURT

Chicoine/Mueller v. Wellmark, Law No. CVCV050638

| 2265 IN RE: Countrywide Financial Corp. Mortgage-Backed Securities Litigation | CAC/ Pfaelzer, Mariana R/ Transferred on 08/15/2011 | 2:11-ml-2265 | 05/23/2011 | 08/04/2015 |
| 2317 IN RE: Oreck Corporation Halo Vacuum and Air Purifiers Marketing and Sales Practices Litigation | CAC/ Snyder, Christina A/ Transferred on 02/03/2012 | 2:12-ml-2317 | 10/27/2011 | 07/22/2015 |
| 2333 IN RE: MI Windows and Doors, Inc., Products Liability Litigation | SC/ Norton, David C/ Transferred on 04/23/2012 | 2:12-mn-1 | 12/08/2011 | 08/04/2015 |
| 2352 IN RE: Century 21 Department Stores, LLC, Fair and Accurate Credit Transactions Act (FACTA) Litigation | NYS/ Sweet, Robert W/ Transferred on 06/11/2012 | 1:12-md-2352 | 02/15/2012 | 09/16/2015 |
| 2407 IN RE: Higher One OneAccount Marketing and Sales Practices Litigation | CT/ Bryant, Vanessa Lynee/ Transferred on 12/11/2012 | 3:12-md-2407 | 09/11/2012 | 07/27/2015 |
| 2424 IN RE: Hyundai and Kia Fuel Economy Litigation | CAC/ Wu, George H./ Transferred on 02/05/2013 | 2:13-ml-2424 | 11/19/2012 | 09/29/2015 |
| 2429 IN RE: Automated Transactions LLC Patent Litigation | DE/ Robinson, Sue L/ Transferred on 04/01/2013 | 1:13-md-2429 | 12/17/2012 | 07/21/2015 |
| 2443 IN RE: Nickelodeon Consumer Privacy Litigation | NJ/ Chesler, Stanley R/ Transferred on 06/11/2013 | 2:12-cv-7829 | 02/26/2013 | 02/03/2015 |
| 2458 IN RE: Effexor (Venlafaxine Hydrochloride) Products Liability Litigation | PAE/ Rufe, Cynthia M/ Transferred on 08/06/2013 | 2:13-md-2458 | 04/24/2013 | 09/22/2015 |
| 2470 IN RE: Schnuck Markets, Inc., Customer Data Security Breach Litigation | MOE/ Ross, John A./ Transferred on 10/18/2013 | 4:13-md-2470 | 06/10/2013 | 08/25/2015 |
| 2473 IN RE: Monsanto Company Genetically-Engineered Wheat Litigation | KS/ Vratil, Kathryn H/ Transferred on 10/16/2013 | 2:13-md-2473 | 06/20/2013 | 08/17/2015 |
| 2510 IN RE: BRCA1- and BRCA2-based Hereditary Cancer Test Patent Litigation | UT/ Shelby, Robert J./ Transferred on 02/19/2014 | 2:14-md-2510 | 11/08/2013 | 03/09/2015 |
| 2515 IN RE: Pilot Flying J Fuel Rebate Contract Litigation (No. II) | KYE/ Thapar, Amul R/ Transferred on 04/07/2014 | 2:14-md-2515 | 12/13/2013 | 09/28/2015 |
| 2519 IN RE: AIG Workers Compensation Insurance Policyholder Litigation | ILN/ Gettleman, Robert W/ Transferred on 04/07/2014 | 1:14-cv-2528 | 12/19/2013 | 07/20/2015 |
| 2527 IN RE: First National Collection Bureau, Inc., Telephone Consumer Protection Act (TCPA) Litigation | NV/ Dawson, Kent J/ Transferred on 08/04/2014 | 2:14-cv-557 | 02/03/2014 | 07/13/2015 |
| 2534 IN RE: TLI Communications LLC Patent Litigation | VAE/ Ellis, Thomas S/ Transferred on 06/12/2014 | 1:14-md-2534 | 02/26/2014 | 02/09/2015 |
| 2571 IN RE: Impulse Monitoring, Inc., Aetna Intraoperative Monitoring Services Claims and Employee Retirement Income Security Act (ERISA) Litigation | PAE/ Smith, Edward G/ Transferred on 10/14/2014 | 5:14-md-2571 | 07/25/2014 | 08/06/2015 |
| 2589 IN RE: Barclays Liquidity Cross and High Frequency Trading Litigation | NYS/ Furman, Jesse M/ Transferred on 12/12/2014 | 1:14-md-2589 | 10/02/2014 | 10/14/2015 |

**MDLs Listed on this Report: 54**

**Plaintiffs' Appendix in Resistance
to Wellmark Motion to Stay**

**Page 201 of 201**

12/15/2015 6:21 AM

E-FILED 2016 JAN 11 3:42 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br><br>and<br><br>STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,<br><br>        Plaintiffs,<br><br>v.<br><br>WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation,<br><br>        Defendants. | Law No. CVCV050638<br><br><br><br>**Reply Brief in Support of Defendants' Motion to Stay** |

Wellmark has moved to stay this action in deference to a pre-existing federal multi-district litigation (MDL 2406) that includes the same proposed class of all Iowa chiropractors and the same claims about Wellmark and all the other Blue Cross and Blue Shield plans in the United States (that they are allegedly fixing prices and dividing up the national healthcare market into territories). We

1



presented two primary reasons for such a stay. First, was the Iowa Supreme Court's "doctrine of comity," which the Court based on three different concerns: (1) to preserve resources when two matters involve substantially the same issues in discovery; (2) to avoid any risk of possible res judicata or collateral estoppel; and (3) to show respect to the other court. *Midwest Corp. v. Corp. Fin. Assocs.*, 663 N.W.2d 888, 890 (Iowa 2003). We also presented a second, "independently dispositive" reason for stay: namely, that the MDL will likely determine federal antitrust law on these issues (whether that law might be favorable to the Plaintiffs or favorable to the Defendants), and that Iowa courts are required by statute to follow the federal courts' lead when it comes to the application of the antitrust laws. *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563, 567 (Iowa 2015) (quoting Iowa Code § 553.2).

Plaintiffs' resistance to Wellmark's motion to stay is not so much a response to these arguments as it is a red herring. Either Plaintiffs miss the point, or they're hoping for a diversion. Either way, their resistance simply does not address Wellmark's basis for a stay in this case.

Plaintiffs' resistance is comprised of a series of reasons why Plaintiffs believe that the MDL proceedings (and the various cases that have been transferred to the MDL) will not have a res judicata effect on all named parties in this case, meaning that this lawsuit will not be completely barred by claim or issue preclusion. The problem, of course, is that we didn't move to stay the case based upon claim or issue preclusion. We mentioned that avoiding potential issues of estoppel and res judicata is *one* of the three reasons mentioned by the Iowa Supreme Court

E-FILED  2016 JAN 11 5:42 PM POLK - CLERK OF DISTRICT COURT

supporting the doctrine of comity.  But that was hardly the point of our motion. Indeed, *none* of the arguments in our motion depend upon the principles of claim or issue preclusion.

What we did say in our opening brief (at some length), is that Iowa courts are required to follow federal law when it comes to antitrust, and so this Court should wait to see what the federal law is.  *See* Wellmark Br. 12-16.  Indeed, we said that was the "most important[]" reason for staying this case. Yet Plaintiffs include *nothing* in their resistance about that issue.

To be sure, that wasn't our only argument.  But, by itself, it justifies a stay. The claims in this case are the very same claims of price fixing and geographic market division by all the Blue Cross and Blue Shield plans nationwide that are in the MDL (and the federal cases that have been transferred there).  Those claims are also some of the most complicated antitrust claims that are being litigated in the United States today.  To decide whether a health insurance company has violated the antitrust "rule of reason" by sharing a provider network, the federal courts involved in the MDL will have to hear from some of the most prominent economists in the world.  Those courts (who will have the benefit of these experts) may very well establish a new antitrust rule that applies to this situation, and they will then apply that rule to the case brought by the Iowa chiropractor (on behalf of all other Iowa chiropractors).  And most important, this Court will then have to apply the same substantive antitrust rulings to this case, because the Iowa Competition Law

directs as much. Thus, it makes no sense to waste resources litigating issues that will be decided by the federal court.

Plaintiffs seem to be confused, in that they think that the federal MDL will have no bearing on this case because the MDL court in Alabama, after handling the massive undertaking of all discovery and motions on these complicated antitrust issues, will refer all but two of the underlying cases (including the one by Dr. Ferezy on behalf of all Iowa chiropractors) back to their home venues for trial (assuming the case gets that far). But that has nothing to do either with the doctrine of comity (which would apply to both the MDL court in Alabama and also the home venue for the Iowa class claims) or with the more important argument about the controlling federal antitrust law involved.

Plaintiffs quote at great length the *Smith v Bayor Corp.*, 564 U.S. 299 (2011) case for the proposition that if Judge Proctor (the presiding judge in the MDL) rules that a federal class should *not* be certified, that this ruling will not be binding on the Plaintiffs' request to certify a class in this case. This, again, is a res judicata issue. It's also an irrelevant issue, since we agree with Plaintiffs that the federal court's class certification ruling will not be binding on this Court (though it may be instructive). It is the merits of the federal antitrust law involved that this Court will be required to look to.

Also off point is Plaintiffs' suggestion that the federal MDL will have no bearing on this case because the handful of named individual Plaintiffs (the ones that are listed in the caption) will (they say) opt out of the Iowa class in the federal

cases.  In other words, Plaintiffs seem to think that because they individually will never "be, under any circumstances," a party to the federal cases, those cases are irrelevant.  Plt. Br. 4-5.  That's wrong.  To be sure, if the named Plaintiffs in this case decide to opt out of a federal class, then claim or issue preclusion will not play a role in this case as to the individual named Plaintiffs (as opposed to the class of all Iowa chiropractors they seek to represent, which is the same class Dr. Ferezy is representing in the MDL). But this Court will still be required to follow the federal decisions on the application of the antitrust laws to the Blue Cross and Blue Shield agreements at issue.  *So it doesn't matter if the Plaintiffs opt out;* the result will be the same: The federal cases will, for all practical purposes, govern the outcome of this case.  And so we should wait.

Plaintiffs complain that waiting on the federal cases will take too long. That's not true.  As Plaintiffs note, the MDL "bellwether" cases will be tried in January 2018, just two years from now.  At that point, the case involving the Iowa chiropractor (which asks the court to certify an Iowa-specific subclass) will be transferred back to its home venue for trial (assuming the case gets that far).  That may seem like a long way off, but in antitrust years it's just around the corner. Indeed, this case, if it proceeded, would likely not go to trial until 2021 or 2022 *at the earliest*.  The parties will have to start with class-certification discovery (which has been going on in the federal case for some time) and also some important jurisdictional motions unique to some of these Plaintiffs' particular claims, and thus this Court probably won't be in a position to rule on class certification until

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 549 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-17    Filed 06/14/17    Page 6 of 8
E-FILED  2016 JAN 11 5:42 PM POLK - CLERK OF DISTRICT COURT

sometime in late 2017 or later.   If the Court certifies the class, Wellmark will almost certainly appeal (which is a matter of right under Iowa law[1]), and so this case probably wouldn't get back to this Court until sometime in late 2019. At that point, the parties will likely need to conduct additional merits and expert discovery. And later, possibly 2021, the court will be presented with dispositive motions.  It's possible that there could be an interlocutory appeal from those orders, pushing the case further into the future, in which case the trial on this matter (even if there were one) would not take place until 2024.

If that seems excessive, consider the Microsoft class action that was tried in this very Court.  It was filed in February 2000.  After thousands of hours, millions of dollars, and two Iowa Supreme Court decisions,[2] it settled during trial in August 2007.  So if Plaintiffs somehow believe that the MDL will take too long relative to litigation in this Court, they are mistaken.

Contrary to Plaintiffs' assertion, Wellmark isn't "suggesting to this Court that some kind of favorable ruling on antitrust issues in MDL 2406 will be binding on these plaintiffs" as if Wellmark seeks some one-sided result.  It's *stating*—as clearly as it can—that *whatever* the outcome of the MDL 2406 rulings (including rulings favorable to a Plaintiff class of all Iowa chiropractors), this Court will be required to apply many of the same legal rules and legal reasoning so as to "harmonize" the federal and state antitrust laws.  *See Mueller*, 861 N.W.2d at 567

---

[1] *See Martin v. Amana Refrigeration, Inc.*, 435 N.W.2d 364 (Iowa 1989) (holding "that a class certification order is appealable as a matter of right").

[2] *See Comes v. Microsoft Corp.*, 646 N.W.2d 440 (Iowa 2002); *Comes v. Microsoft Corp.*, 696 N.W.2d 318 (Iowa 2005).

E-FILED 2016 JAN 11 5:42 PM POLK - CLERK OF DISTRICT COURT

(quoting Iowa Code § 553.2). And if Plaintiffs win in the MDL, then this Court will have to look to that result for guidance as well.

That's the nub of it. And because Plaintiffs did not even address that issue (choosing instead to focus their brief exclusively on estoppel and res judiciata), there is no need to go on. For the reasons stated in our opening brief, Wellmark respectfully requests that the Court stay this case pending the outcome of the Iowa claims in MDL 2406.

<div style="margin-left:auto;">

*/s/ Ryan G. Koopmans*
Hayward L. Draper AT0002075
John T. Clendenin AT0001529
Ryan G. Koopmans    AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:    (515) 283-3149
Facsimile:    (515) 283-8016
E-Mail:    hdraper@nyemaster.com
           jclendenin@nyemaster.com
           rkoopmans@nyemaster.com

ATTORNEYS FOR DEFENDANTS,
WELLMARK, INC. d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa corporation, and
WELLMARK HEALTH PLAN OF IOWA,
INC., and Iowa corporation

</div>

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 551 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-17   Filed 06/14/17   Page 8 of 8
E-FILED 2016 JAN 11 5:42 PM POLK - CLERK OF DISTRICT COURT

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was filed on the 11th day of January, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the counsel of record.

*/s/ Ryan G. Koopmans*

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 552 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-18   Filed 06/14/17   Page 1 of 2
E-FILED 2016 JAN 26 9:02 AM POLK - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br>,<br><br>            Plaintiff(s)/Petitioner(s)<br><br>    vs.<br><br>WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE<br>CROSS AND BLUE SHIELD OF IA<br><br>,<br><br>            Defendant(s)/Respondent(s). | Case No. 05771  CVCV050638<br><br><br>COURT REPORTER<br>MEMORANDUM AND CERTIFICATE |

## COURT REPORTER MEMORANDUM

**Appearances:**
For Plaintiff/Petitioner:Glenn Norris/Steve Wandro
For Defendant/Respondent: Hayward Draper/Ryan Koopmans
Other:
**Information required by Iowa Rule of Civil Procedure 1.903(3):**
I, Rebecca Maxcy, am providing the following information as required by Iowa Rule of Civil Procedure
1.903(3):
   1. The type of proceeding that was reported: Motion to Stay
   2. The date(s) on which the proceeding occurred: 1-22-16
   3. The name of the court reporter who reported the proceeding:  Rebecca Maxcy
   4. The name of the judge who presided over the proceeding:  Michael D. Huppert
   5. The reporting fee for the proceeding:  $40.00
   6.  We, the undersigned judge before whom the above-entitled case was tried, and the official court
reporter who, by order of the Court, reported the same, do hereby certify that the above and foregoing
is the report of the whole proceedings upon the trial and/or hearing of the above-entitled cause made

EXHIBIT

Q

and taken pursuant to the order and direction of the Court, in accordance with Iowa Code Section 624.10.

**Dated January 26, 2016.**

/s/Rebecca Maxcy

_____

5th Judicial District  - Official Court Reporter
Phone:515.286.3231
Email:rebecca.maxcy@iowacourts.gov

/s/Michael D. Huppert
5th Judicial District Judge

E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| **BRADLEY A. CHICOINE, D.C., et al.,** on behalf of themselves and those like situated, | **CASE NO. CVCV050638** |
| **Plaintiffs,** | |
| **and** | **RULING ON DEFENDANTS' MOTION TO STAY** |
| **STEVEN A. MUELLER, D.C., et al.,** on behalf of themselves and those like situated, | |
| **Plaintiffs,** | |
| **vs.** | |
| **WELLMARK, INC., d/b/a Wellmark Blue Cross and Blue Shield of Iowa, an Iowa corporation, et al.,** | |
| **Defendants.** | |

A contested hearing on the defendants' motion to stay was held before the undersigned on January 22, 2016 as previously scheduled. Upon consideration of the arguments made at the hearing, and having reviewed the file and being otherwise duly advised in the premises, the court rules as follows:

## INTRODUCTION

This is a putative class action brought by plaintiffs on behalf of the following identified class:

> [A]ll doctors of chiropractic in Iowa similarly situated (1) who are citizens of the state of Iowa as of the date of the filing of this petition or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after May 20, 2004....



EXHIBIT
R

E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT

Petition at Law, p. 5, ¶7; see also pp. 12-13, ¶18.  The plaintiffs allege that the defendants

"have agreed and conspired with their co-conspirators to engage in, and continue to

engage in, a pattern of price fixing and other discrimination" against them.  Id. at p. 19,

¶39.  The petition alleges ten detailed specifications of wrongdoing on the part of the

defendants, all of which is claimed to have been undertaken in violation of the Iowa

Competition Law, specifically Iowa Code §553.4 ("A contract, combination, or

conspiracy between two or more persons shall not restrain or monopolize trade or

commerce in a relevant market").  Id. at pp. 20-23, ¶39(a)-(j), p. 24, ¶43; see also Iowa

Code §553.4 (2015).

The defendants seek to stay the present proceedings in favor of multi-district

litigation presently pending in the Northern District of Alabama, In re Blue Cross Blue

Shield Antitrust Litigation, MDL No. 2406 (N.D. Ala., Case No. 2:13-cv-20000)

(hereinafter "the MDL action").  The most recent version of the complaint filed in the

MDL litigation on November 25, 2014 lists thirty-six (36) individual plaintiffs and

seventy-one (71) defendants; included as a named plaintiff is Joseph S. Ferezy, D.C.,

d/b/a Ferezy Clinic of Chiropractic and Neurology ("FCCN") described as "a chiropractic

office in Windsor Heights, Iowa."  Corrected Consolidated Second Amended Provider

Complaint [hereinafter "Complaint"], Appendix to Motion to Stay, Caption, p. 29, ¶51,

App. 001-004, 033.  Included among the named defendants in the MDL action is one of

the defendants in the present litigation, Wellmark, Inc., d/b/a Wellmark Blue Cross and

Blue Shield of Iowa (hereinafter "Wellmark").  Id. at p. 42, ¶85, App. 046.[1]  The

---

[1] Of the 71 named defendants, 37 (including Wellmark) comprise the members of the Blue Cross Blue
Shield Association (BCBSA).  The members of the BCBSA other than Wellmark are identified as "non-
party conspirators with the…defendants for purposes of the Iowa Competition [Law.]"  Petition at Law, p.
11, ¶15.

interplay between FCCN, Wellmark and the other defendants is described in the MDL

complaint as follows:

> During the relevant time period, FCCN provided medically
> necessary, covered services to patients insured by
> Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield
> of Iowa ("Wellmark") or who are included in employee
> benefit plans administered by Wellmark pursuant to his in-
> network contract with Wellmark, and billed Wellmark for
> the same. FCCN was paid less for those services than he
> would have been but for Defendants' anticompetitive
> conduct and has been injured by Defendants' conduct as a
> result thereof. On information and belief, FCCN has also
> provided medically necessary, covered services to other
> Blue Cross and Blue Shield Plan members through national
> programs, has billed for same, and has been paid less for
> those services than he would have been but for Defendants'
> anticompetitive conduct.

Id. at p. 29, ¶51, App. 033.  The essence of the claims brought in the MDL action is

succinctly[2] summarized in the complaint as follows:

> Defendants, which are independent companies, have agreed
> with each other to carve the United States into "Service
> Areas" in which only one Blue can sell insurance,
> administer employee benefit plans or contract with
> healthcare providers (the "Market Allocation Conspiracy").
> Defendants have engaged in a horizontal market allocation,
> which is illegal under a per se, quick look or rule of reason
> analysis.  The quid pro quo for this illegal Market
> Allocation Conspiracy is a horizontal Price-Fixing and
> Boycott Conspiracy under which every other Blue gets the
> benefit of the artificially reduced prices that each Blue pays
> to healthcare providers. The Blues get those benefits
> through the national programs that the Blues have
> collectively established, including the Blue Card Program
> and the National Accounts Programs.  The Market
> Allocation Conspiracy reduces the competition that each
> Blue faces and allows it to reduce the prices that it pays to
> healthcare providers.  The Price Fixing and Boycott
> Conspiracy fixes those prices for all Blues, gives them the
> benefit of those reduced, fixed prices and further provides

---

[2] The current version of the MDL complaint encompasses approximately 153 pages, exclusive of the
caption, signature blocks and certificate of service.

> that the participating Blues will collectively boycott all
> Providers outside of their Service Areas.

Id. at pp. 3-4, ¶1, App. 007-008.  The purported wrongful conduct of the MDL

defendants is alleged to be in violation of both Section 1 and Section 2 of the Sherman

Act (15 U.S.C. §1 and §2).  Complaint, pp. 141-152, ¶¶387-453, App. 145-156.  Finally,

the MDL action is being brought on behalf of the named plaintiffs and on behalf of the

following-described class:

> All healthcare providers, not owned or employed by any of
> the Defendants, in the United States of America, who
> provided covered services, equipment or supplies to any
> patient who was insured by, or who was a member or
> beneficiary of any plan administered by, a Defendant
> within four years prior to the date of the filing of this
> action.

Id. at p. 138, ¶377, App. 142.  The MDL complaint also requests the establishment of

subclasses "based on the geographic area in which each Plaintiff practices" and those

"geographic areas in which Defendants have market power."  Id.  As currently pled,

Wellmark is alleged to have "market power at least in certain areas in the State of Iowa in

the health services markets and may have market power in the entire state" by virtue of

its 52% of the market share statewide and market share in specified geographic areas of

the state (ranging from 42% in the Des Moines area to 70% in the Iowa City area).  Id. at

p. 109, ¶274, App. 113.[3]

On October 30, 2015, the presiding judge in the MDL action entered a

streamlined scheduling order for the two cases directly filed in the Northern District of

---

[3] While not using the phrase "market power," the present plaintiffs have alleged that the Wellmark
defendants "have contracts with over 65 percent of the health care insurance and 95 percent of the provider
services market in Iowa" representing (along with their co-conspirators) "overwhelming economic power
and market dominance."  Petition at Law, p. 19, ¶¶36, 37.

4

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 558 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-19    Filed 06/14/17    Page 5 of 10
E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT

Alabama[4], in the absence of any authority allowing for the trial of any cases transferred

into that district by the Judicial Panel on Multi-District Litigation.  See Lexecon Inc. v.

Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 40, 118 S.Ct. 956, 964, 140

L.Ed.2d 62 (1998) ("Milberg may or may not be correct that permitting transferee courts

to make self-assignments would be more desirable than preserving a plaintiff's choice of

venue…, but the proper venue for resolving that issue remains the floor of Congress").

Discovery, including the use of an "Economics Day" in which educational presentations

on the applicable economic issues are made to the court, is to be completed by January

13, 2017; a schedule for expert reports and discovery was set, and deadlines for Daubert

motions, class certification motions and dispositive motions were established for June 1,

2017 for the first two classes of motions and September 7, 2017 for the third; a pretrial

conference shall be scheduled sometime on or after January of 2018, with a trial date to

be set by separate order.  Order, App. 206-208.

## ANALYSIS

The ability of a court to stay proceedings before it "is incidental to the power

inherent in every court to control the disposition of the causes on its docket with

economy of time and effort for itself, for counsel, and for litigants."  Landis v. North Am.

Co., 299 U.S. 248, 254, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936).  The most recent

pronouncement in this area by the Iowa Supreme Court provided the following guidance:

> Factors relevant to the grant or denial of a stay in this
> context include:  comity, the desirability of avoiding a
> multiplicity of forums, whether the foreign litigation is at
> an advanced or preliminary stage, the likelihood of
> obtaining complete relief in the foreign jurisdiction, and the
> possibility that a judgment entered in the foreign

---

[4] It appears undisputed that no Iowa plaintiffs (as identified in either the present litigation or the MDL litigation) are involved in these two cases.

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 559 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-19    Filed 06/14/17    Page 6 of 10
E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT

> jurisdiction will give rise to collateral estoppel or will
> render the matter before the court res judicata.  Where a
> prior foreign action involves the same parties and the same
> issues and is pending before a court capable of doing
> prompt and complete justice, the court's discretion may be
> freely exercised in favor of a stay.

First Midwest Corp. v. Corporate Finance Assocs., 663 N.W.2d 888, 890 (Iowa 2003).

Similar factors have been identified when a request for stay has been made in the federal

system:

> Among the relevant factors in determining whether to grant
> such a stay or dismissal include: the similarity of parties
> and issues involved in the foreign litigation; the promotion
> of judicial efficiency; adequacy of relief available in the
> alternative forum; issues of fairness to and convenience of
> the parties, counsel and witnesses; the possibility of
> prejudice to any of the parties; and the temporal sequence
> of the filing of the actions.

EFCO Corp. v. Aluma Systems USA, Inc., 983 F.Supp. 816, 824 (S.D. Iowa 1997)

(citations omitted) (quoted in RELCO Locomotives, Inc. v. AllRail, Inc., 4 F.Supp.3d

1073, 1080 (S.D. Iowa 2014); see also Akishev v. Kapustin, 23 F.Supp.3d 440, 445-46

(D.N.J. 2014).  The decision to grant or deny a stay is vested in the sound discretion of

the trial court, which may only be reversed in that decision if its discretion is exercised

capriciously or abused.  First Midwest, 663 N.W.2d at 890-91; see also Landis, 299 U.S.

at 254-55, 57 S.Ct. at 166 ("How this can best be done calls for the exercise of judgment,

which must weigh competing interests and maintain an even balance").  In this case, the

defendants as the movants bear the burden of demonstrating that a stay would be

appropriate:

> True, the suppliant for a stay must make out a clear case of
> hardship or inequity in being required to go forward, if
> there is even a fair possibility that the stay for which he
> prays will work damage to some one else.  Only in rare

6

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 560 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-19   Filed 06/14/17   Page 7 of 10
E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT

> circumstances will a litigant in one cause be compelled to
> stand aside while a litigant in another settles the rule of law
> that will define the rights of both.

Id. at 255, 57 S.Ct. at 166; see also Edizone, LLC v. Schering-Plough Healthcare

Products, Inc., 2011 WL 1559944 *1 (C.D. Utah, Case No. 2:10–CV–855 TS, filed April

25, 2011) (unpublished) ("The party seeking a Landis stay carries a heavy burden").

Taking all of the above into account, this court is satisfied that a stay of the

present proceedings in favor of the MDL action would be appropriate.  While there is not

a perfect symmetry between all of the parties in the two proceedings (most notably the

absence of Wellmark Health Plan of Iowa, Inc. in the MDL action), the prospective class

in the present litigation is subsumed within the putative class alleged in the MDL action

(all Iowa chiropractors in the former and all healthcare providers who was a member

provider with the defendants in the latter).  The interests of the putative class in the

present action can be effectively met through the requested establishment of geographic

subclasses in the MDL action.

In addition, the legal analysis necessary to resolve both proceedings is essentially

identical.  The construction of the Iowa Competition Law necessary to resolve the

allegations in the present action is mandated in Iowa Code §553.2:

> This chapter shall be construed to complement and be
> harmonized with the applied laws of the United States
> which have the same or similar purpose as this chapter.
> This construction shall not be made in such a way as to
> constitute a delegation of state authority to the federal
> government, but shall be made to achieve uniform
> application of the state and federal laws prohibiting
> restraints of economic activity and monopolistic practices.

Iowa Code §553.2 (2015).  The Iowa Supreme Court has accordingly held that "the Iowa

Competition Act is the progeny of the Sherman Act," State v. Cedar Rapids Bd. of

7

Realtors, 300 N.W.2d 127, 128 (Iowa 1981), and that Iowa Code §553.4 (the statute

relied upon by the present plaintiffs as the basis for liability) is "the counterpart to section

1 of the Federal Sherman Antitrust Act (the basis for the restraint of trade allegations in

the MDL action)." Mueller v. Wellmark, Inc., 861 N.W.2d 563, 565 (Iowa 2015). See

also Max 100 L.C. v. Iowa Realty Co., Inc., 621 N.W.2d 178, 181 (Iowa 2001) ("[O]ur

legislature intended the Iowa Competition Law to be construed uniformly with the

Sherman Act").

   Finally, the MDL action is at a far more advanced stage than the present litigation.

The lead cases in the MDL action are on track to be tried most likely in 2018, with a

remand of that part of the MDL action involving the Iowa chiropractor (Dr. Ferezy) and

his corresponding Iowa subclass to follow.  In the meantime, the court in the MDL action

is far better positioned to more timely address and resolve the many legal and evidentiary

issues that will be part of the overlapping claims raised in these two actions.   As the

defendants aptly point out, while the eventual trial of the Iowa portion of the MDL action

may not come for several years, a more glacial perspective is part and parcel of this type

of litigation, whether pursued in state of federal court.  While the MDL action does not

appear to provide the basis for application of collateral estoppel or res judicata in the

present action, this court is not convinced that the state litigation has a leg up on the MDL

action in terms of it being a more viable forum for a prompt resolution of the issues

presented.

   As a result, the court concludes that the MDL action involves a sufficient overlap

with the parties and issues in the present action, and is pending in a forum that is capable

E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT

of affording the present parties relatively prompt and complete justice.  Accordingly, the court will stay the present action in favor of the MDL action.

      **IT IS THEREFORE ORDERED** that the defendants' motion to stay is granted. The present action is stayed in favor of further proceedings in <u>In re Blue Cross Blue Shield Antitrust Litigation</u>, MDL No. 2406 (N.D. Ala., Case No. 2:13-cv-20000), until further order of this court.

E-FILED 2016 JAN 28 4:01 PM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**          OTHER ORDER

**Case Number**   **Case Title**
CVCV050638        CHICOINE AND MUELLER ET AL V WELLMARK ET AL


So Ordered

Michael D. Huppert, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2016-01-28 16:01:17     page 10 of 10

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 564 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 1 of 54
E-FILED 2016 FEB 08 8:21 PM POLK - CLERK OF DISTRICT COURT

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

BRADLEY A. CHICOINE, D.C., DR. BRADLEY
A. CHICOINE, D.C., P.C., MARK A. NILES,
D.C, NILES CHIROPRACTIC, INC., ROD R.
REBARCAK, D.C., and BEN WINECOFF, D.C.,
on behalf of themselves and those like
situated,

      Plaintiffs,

and

STEVEN A. MUELLER, D.C.,  BRADLEY J.
BROWN, D.C., BROWN CHIROPRACTIC,
P.C.; MARK A. KRUSE, D.C., DR. MARK A.
KRUSE, D.C., P.C., KEVIN D. MILLER, D.C.,
and LARRY E. PHIPPS, D.C., on behalf of
themselves and those like situated,

      Plaintiffs,

vs.

WELLMARK, INC d/b/a WELLMARK BLUE
CROSS AND BLUE SHIELD OF IOWA, an
Iowa corporation, and WELLMARK HEALTH
PLAN OF IOWA, INC., an Iowa corporation,

      Defendants.

Law No. CVCV050638

## Plaintiffs' Supplemental Appendix of Documents to Which Reference Was Made in the Hearing Held on January 22, 2016

**COME NOW** Plaintiffs, by and through their undersigned counsel, and hereby submit this Supplemental Appendix of documents to which reference was made in the Hearing held on January 22, 2016.

EXHIBIT

**S**

## <u>TABLE OF CONTENTS OF APPENDIX TO PLAINTIFFS' RESISTANCE TO MOTION TO STAY, FILED DECEMBER 30, 2015</u>

Plaintiffs' First Amended to Petition for Damages, for Permanent Injunction, and for Declaratory Judgment in *Mueller et al v. Wellmark, Inc. et al*, Law No. 107471 (now Law No. CL112671) (filed May 20, 2008) ........................................................................... App. 1

Plaintiffs' Third Amendment to Petition for Damages and for Permanent Injunction in *Mueller et al v. Wellmark, Inc. et al*, Law No. 107471 (now Law No. CL112671) (filed Jan. 3, 2009)...................................... App. 38

Plaintiffs' Fourth Amended and Substituted Petition for Damages in *Mueller et al v. Wellmark, Inc. et al*, Law No. CL112671 (filed Dec. 4, 2012) .........................................................................................App. 67

Substituted and Corrected Ruling on Plaintiffs' Motion to Amend in *Mueller et al v. Wellmark, Inc. et al*, Law No. CL112671 (filed Dec. 4, 2012) ......................................................................................... App. 85

Transfer Order of United States Judicial Panel on Multidistrict Litigation in *In Re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, dated Dec. 26, 2012.........................................................App. 87

Class Action Complaint, Master File No. 2-13-CV-20000-RDP (Provider Track) in *In Re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, filed July 1, 2013 ........................................ App. 91

Order Setting Briefing Schedule and Establishing Certain Discovery Procedures , Master File No. 2-13-CV-20000-RDP in *In Re: Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, filed Sept. 3, 2013 ........................................................................................... App. 177

MDL Statistics Report, Docket Summary Listing of United States Judicial Panel on Multidistrict Litigation, dated Dec. 15, 2015 ............................ App. 181

MDL Statistics Report, Docket Type Summary of United States Judicial Panel on Multidistrict Litigation, dated Dec. 15, 2015 ............................App. 188

MDL Statistics Report, Docket Summary Listing, Closed MDL Litigation in 2015 of United States Judicial Panel on Multidistrict Litigation, dated Dec. 15, 2015 ................................................. App. 200

E-FILED  2016 FEB 06 8:21 PM POLK - CLERK OF DISTRICT COURT

<u>TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX OF DOCUMENTS TO</u>
<u>WHICH REFERENCE WAS MADE IN THE HEARING HELD ON JANUARY 22, 2016</u>

Motion to Intervene (Intervenor Plaintiffs' Fifth Amended Petition
Attached) of Brad Chicoine, D.C., Mark A. Niles, D.C., Rod R.
Rebarcak, D.C., and Ben Winecoff, D.C., in *Mueller et al v.
Wellmark, Inc. et al*, Law No. CL112671 (filed Sept. 9, 2015) .........................Supp. App. 1

Ruling on Plaintiffs' Request for Pretrial Scheduling Conference in
*Mueller et al v. Wellmark, Inc. et al*, Law No. CL112671 (filed Nov.
6, 2015) ........................................................................................................Supp. App. 28

Wellmark Resistance to Motion to Intervene (of Brad Chicoine,
D.C., Mark A. Niles, D.C., Rod R. Rebarcak, D.C., and Ben Winecoff,
D.C., in *Mueller et al v. Wellmark, Inc. et al*, Law No. CL112671
(filed Dec. 7, 2015)............................................................................................Supp. App. 34

Order in *Mueller et al v. Wellmark, Inc. et al*, Law No. CL112671
(filed Dec. 8, 2015) ...........................................................................................Supp. App. 37

Plaintiffs' Motion for Leave to File Fifth Amended and Substituted
Petition for Damages in *Mueller et al v. Wellmark, Inc. et al*, Law
No. CL112671 (filed Dec. 9, 2015) ..................................................................Supp. App. 39

Order in *Wellmark, Inc. et al v. Iowa District Court*, No. 15-1922
(Iowa Supreme Court, filed Dec. 9, 2015) regarding Order filed Dec.
8, 2015 in *Mueller et al v. Wellmark, Inc. et al*, Law No. CL112671 .............Supp. App. 44

Notice from Joseph S. Ferezy, DC found at Ferezy Clinic of
Chiropractic and Neurology Home Page, admin@ferezyclinic.com.............. Supp. App. 47

"About Dr. Michael Davis" of Firm Foundation Chiropractic,
http://firmfoundationchiropractic.com/about-dr-michael-davis/ ..............Supp. App. 48

Dated February 5, 2016.

Respectfully submitted,

_____/s/ Glenn L Norris_____

Glenn L. Norris  AT0005907
HAWKINS & NORRIS, P.C.
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-281-1474
Email:  gnorris@2501grand.com
            gnorrislaw@gmail.com

_____/s/ Steven P. Wandro_____

Steven P. Wandro AT0008177
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
E-mail: swandro@2501grand.com

ATTORNEYS FOR PLANTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was filed on the 5th day of February, 2016 with
the Clerk of Court using the EDMS system, which will send notification of such filing to the counsel of
record.

_____/s/ Glenn L Norris_____

Copy to:
Hayward L. Draper AT0002075
John T. Clendenin AT0001529
Ryan G. Koopmans AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone: (515) 283-3149
Facsimile: (515) 283-8016
E-Mail: hdraper@nyemaster.com
            jclendenin@nyemaster.com
            rkoopmans@nyemaster.com
ATTORNEYS FOR WELLMARK DEFENDANTS

E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| | |
| Plaintiffs, | |
| | |
| and | |
| | |
| BRAD CHICOINE, D.C., MARK A. NILES, D.C, ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | Law No. CL112671 |
| | |
| Intervenor Plaintiffs, | |
| | |
| vs. | |
| | |
| WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation, | |
| | |
| Defendants. | |

## MOTION TO INTERVENE
### (Intervenor Plaintiffs' Fifth Amended Petition Attached)

**COME NOW** Applicant Intervenor Plaintiffs Brad Chicoine, D.C., Mark A. Niles,

D.C., Rod R. Rebarcak, D.C., and Ben Winecoff, D.C., and pursuant to Iowa R. Civ. P.

1

E-FILED 2016 SEB 08 8:21 AM POLK - CLERK OF DISTRICT COURT

1.407(1), move the Court for permission to intervene as a matter of right in this case, for the following grounds and reasons:

1.  Intervention is governed by Iowa Rule of Civil Procedure 1.407. One shall be permitted to intervene as a matter of right (1) if a statute confers an unconditional right to intervene or (2) if the individual claims an interest relating to the "property or transaction" which is the subject of the action. Iowa R. Civ. P. 1.407(1). One may permissively intervene if a statute confers a conditional right to intervene or if the individual's claim or defense has a common question of fact or law. Iowa R. Civ. P. 1.407(2).

2.  The names and addresses of the applicant intervenors plaintiffs are:

    a.  Brad Chicoine, D.C., 1501 Nebraska Street, Sioux City, IA 51105

    b.  Mark A. Niles, D.C., 200 E 5th St., Tipton, IA 52772

    c.  Rod R. Rebarcak, D.C., 205 Clark Avenue  Ames, IA 50010

    d.  Ben Winecoff, D.C., 205 Clark Avenue, Ames, IA 50010

3.  The applicant intervenor plaintiff doctors of chiropractic, who bring their actions for damages and injunction, are (1) citizens of the state of Iowa as of the date of filing of the original petition in this action or (2) have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after December 17, 2007, the date of initial filing of this suit.

4.  The applicant intervenor plaintiff doctors of chiropractic, during all times material to this action, have provided and billed for chiropractic provider services

2

E-FILED  2016 SEB 08 8:21 PM POLK - CLERK OF DISTRICT COURT

to patients who are enrolled in healthcare insurance or payment plans offered or administered by Defendants.

5.   The applicant intervenor plaintiffs have entered into Practitioner Agreements or Practitioner Services Agreements with Wellmark Licensees at present and/or in the past.

6.  Additionally, Applicant Intervenor Plaintiffs Rebarcak and Winecoff are members of Iowa Chiropractic Physicians Clinic, the only vehicle through which Wellmark defendants will compensate Iowa chiropractors for services rendered to HMO-covered patients.

7.  Within the meaning of Iowa R. Civ. P. 1.407(1)(a), applicant intervenor plaintiffs have an unconditional right under statute, i.e., the class action rules of the Iowa Rules of Civil Procedure, Iowa R. Civ. P. 1.261 *et seq*, to either intervene in the action, opt out of the action, or, upon duly being given notice, be bound by the result of a trial on the merits of the action if they do not either intervene or opt out. Iowa R. Civ. P. 1.266(2)(b),(d), (f).

8.  Within the meaning of Iowa R. Civ. P. 1.407(1)(b), applicant intervenor plaintiffs claim an interest relating to the property or transaction which is the subject of the action and the applicants are so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest. Presently, the applicants' interests are not adequately represented by existing parties. Iowa R. Civ. P. 1.407(4).

3

9.  This Motion to Intervene is not submitted for purposes of delay and will not delay

the proceedings which are the subject of the hearing to be held in this matter on

September 9, 2015.

10.  Accompanying this Motion to Intervene is a Fifth Amended Petition setting forth

the claim for which intervention is sought. Iowa R. Civ. P. 1.407(3).

Dated: September 9, 2015.

HAWKINS & NORRIS, P.C.
___/s/ Glenn L Norris_____
Glenn L. Norris  AT0005907
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-281-1474
Email:  gnorris@2501grand.com

WANDRO & ASSOCIATES, P.C.
Steven P. Wandro AT0008177
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
         E-mail: swandro@2501grand.com

ERBE LAW FIRM
Harley C. Erbe AT0002430
2501 Grand Avenue
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1460
Facsimile: (515) 281-1474
E-mail: herbelaw@aol.com

ATTORNEYS FOR PLAINTIFFS

4

E-FILED 2015 SEP 09 8:01 AM POLK - CLERK OF DISTRICT COURT

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the ____9th__ day of __September____, 2015.

By:      ____ U.S.Mail      ____ Facsimile  ____ Hand Delivery      ____ Overnight Courier

____ Fedex or UPS                  ____ E-mail    _x_ eFiling

_____/s/ Glenn L Norris_____

Copy to:
Hayward L. Draper, Esq.
Tomas H. Walton, Esq.
Ryan G. Koopmans, Esq.
NYEMASTER, GOODE, WEST, HANSELL
& O'BRIEN, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone:  515-283-3149, 283-3173
Facsimile: 515-283-8045
e-mail: hdraper@nyemaster.com
          twalton@nyemaster.com
          rkoopmans@nyemaster.com

5

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 573 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 10 of 54
E-FILED  2016 FEB 09 6:21 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | |
| Plaintiffs, | |
| and | |
| BRAD CHICOINE, D.C., MARK A. NILES, D.C, ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | Law No. CL112671 |
| Intervenor Plaintiffs, | |
| vs. | |
| WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation, | |
| Defendants. | |

## INTERVENOR PLAINTIFFS' FIFTH AMENDED PETITION
### (To Conform to Opinion of Iowa Supreme Court)
### (Jury Trial Demanded)

1

## COUNT I

## PLAINTIFFS' CLASS ACTION AND CONDUCT ALLEGATIONS OF HORI-

## ZONTAL CONSPIRACY IN RESTRAINT OF TRADE OR COMMERCE

## NATURE OF THE CASE

1.      Plaintiffs bring this action on behalf of themselves and a class of Iowa li-censed doctors of chiropractic who are citizens of the state of Iowa as of the date of fil-ing.  They seek damages from Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc. ("Wellmark Defendants") for combination and conspiracy in restraint of trade or commerce in the purchase of health care delivery from Iowa chiropractors in setting the price paid for chiropractic services at a discriminatory low level and in restricting patient access to and coverage for treatment by Iowa-licensed doctors of chiropractic.

2.      This Fifth Amended Petition is intended to conform to the Opinions of the Iowa Supreme Court in this case issued on July 27, 2012 and on February 27, 2015.

3.      In its essence, this Petition alleges that Wellmark Defendants have, by contract, conspiracy and other unlawful means, conspired and combined to:

(a)      enter into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiro-practic coverage from health plans offered by other potential competitors for chiro-practic services in Iowa.

(b)      enter into agreements with other independent entities to allo-cate territories and not to compete with each other in those allocated territories

2

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 575 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 12 of 54
E-FILED 2016 SEP 08 8:27 AM POLK - CLERK OF DISTRICT COURT

(c)    impose maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(d)    prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(e)    prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(f)    historically enter into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors;

4.    Such horizontal conspiracies are unreasonable restrictions and restraints of competition, trade or commerce in Iowa and the anticompetitive consequences of such conspiracy or conspiracies outweigh any procompetitive benefits.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to Iowa Code § 602.6101. This Court has personal jurisdiction over the Defendants in that the Defendants are Iowa corporations with their corporate headquarters located in Des Moines, Polk County, Iowa.

3

E-FILED 2018 SEB 08 8:87 AM POLK - CLERK OF DISTRICT COURT

6.    Venue is proper pursuant to Iowa Code Ch. 616.

## PARTIES

7.    The individual plaintiff doctors of chiropractic bring this action for damages and injunction on behalf of all doctors of chiropractic in Iowa similarly situated (1) who are citizens of the state of Iowa as of the date of filing of this petition  or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after December 17, 2007, the date of initial filing of this suit.  The doctor of chiropractic Plaintiffs are referred to as the "Provider Plaintiffs" or the "Providers." They are:

(a)    Plaintiff Steven A. Mueller, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Algona, Iowa. During all times material to this action, Dr. Mueller has provided and billed for chiropractic to patients who are enrolled in plans offered or administered by Defendants.

(b)    Plaintiff Bradley J. Brown, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Oelwein, Iowa. During all times material to this action, Dr. Brown has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

(c)    Plaintiff Mark A. Kruse, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Sioux City, Iowa. During all times material to this action,

4

Dr. Kruse has provided and billed for chiropractic services to patients who are en-rolled in plans offered or administered by Defendants.

(d)    Plaintiff Kevin D. Miller, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in West Des Moines, Iowa. During all times material to this action, Dr. Miller has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

(e)    Plaintiff Larry E. Phipps, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Marshalltown, Iowa. During  times material to this action, Dr. Phipps has provided and billed for chiropractic services to patients who are en-rolled in plans offered or administered by Defendants.

(f)    Plaintiff Brad Chicoine, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Sioux City, Iowa. During all times material to this action, Dr. Chicoine has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

(g)    Plaintiff Mark A. Niles, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Tipton, Iowa. During all times material to this action, Dr. Niles has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

5

E-FILED 2016 SEP 09 8:21 AM POLK - CLERK OF DISTRICT COURT

(h)    Plaintiff Rod R. Rebarcak, D.C., a doctor of chiropractic li-censed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resi-dent of and practices chiropractic in Ames, Iowa. During all times material to this action, Dr. Rebarcak has provided and billed for chiropractic services to patients who are enrolled in plans offered or administered by Defendants.

(i)    Plaintiff Ben Winecoff, D.C., a doctor of chiropractic licensed to practice in the State of Iowa, and a citizen of the State of Iowa, is a resident of and practices chiropractic in Ames, Iowa. During all times material to this action, Dr. Winecoff has provided and billed for chiropractic services to patients who are en-rolled in plans offered or administered by Defendants.

8.    Defendants Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc., are Iowa corporations with their corporate headquarters located at 1331 Grand Avenue, Des Moines, Iowa. Wellmark, Inc. does business as Wellmark Blue Cross and Blue Shield of Iowa.  Wellmark and its subsidiaries and affiliated companies, including Wellmark Blue Cross and Blue Shield of South Dakota and Wellmark Health Plan of Iowa, Inc., insure or pay health benefit claims for more than two million members in Iowa and South Da-kota.  Wellmark Blue Cross and Blue Shield of Iowa, Wellmark Blue Cross and Blue Shield of South Dakota, and Wellmark Health Plan of Iowa, Inc. are independent licen-sees of the Blue Cross and Blue Shield Association ("BCBSA").

9.    Defendant Wellmark, Inc., was originally incorporated on September 19, 1939, as a corporation not for pecuniary profit under what later became Chapter 504A of the Code of Iowa, to operate a nonprofit health service plan under [now] Chapter 514 of

6

the Code of Iowa to provide payment for health care furnished to subscribers under contract with the corporation. (Second Restated Articles of Incorporation, filed September 1, 1989). On October 1, 1991, Wellmark adopted a plan of mutualization to become a corporation for pecuniary profit under Chapter 491 of the Code of Iowa and a mutual insurance company under Chapter 508 of the Code of Iowa. The company merged with South Dakota Medical Service, Inc., on July 25, 1996, and on May 15, 1997, it changed its name to Wellmark, Inc., an Iowa corporation and mutual insurance company. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

10.    Defendant Wellmark Health Plan of Iowa, Inc., was incorporated in Iowa on March 13, 1996, as an Iowa domestic profit corporation under Chapter 490 of the Code of Iowa. Its stated purpose in its articles of incorporation is to establish and operate a health maintenance organization under Chapter 514B of the Code of Iowa. Its registered agent is CT Corporation System, 2222 Grand Avenue, Des Moines, Iowa 50312.

11.    The Blue Cross and Blue Shield Association is a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.   Wellmark Defendants are members of the Blue Cross and Blue Shield Association.    The Blue Cross and Blue Shield Association developed provider contracts and manuals which are being implemented in the State of Iowa by the Wellmark Defendants.  The Blue Cross and Blue Shield Association is headquartered in Chicago, Illinois, with offices in Washington, D.C. The Blue Cross and Blue Shield Association (BCBSA) is a national federation of 39 Blue Cross and Blue Shield companies. Collectively, the 39 Blue Cross and Blue Shield System provides healthcare coverage for more than 99 million people or one-in-three Americans.  The vast majority (65+%) of those persons covered by the Blue Cross

7

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 580 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 17 of 54
E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

and Blue Shield System are in PPO's, and an even greater percentage of Wellmark Defendants users are in PPO's.  According to BCBSA, a Preferred Provider Organization (PPO) is an arrangement designed to supply health care services at a discounted cost by providing incentives for members to use designated health providers (who contract with the PPO at a discount), but which also provides coverage for services rendered by health care providers who are not part of the PPO network.

12.    Historically, Wellmark's predecessor under a former name was organized and controlled by the Iowa Medical Society and the majority of its Board of Directors were Iowa allopathic physicians.  Under the control of allopathic physicians (and in later times in combination with osteopathic physicians), Wellmark's predecessor under a former name refused to seek authority to provide the services of chiropractors to its subscribers and members. In furtherance of that combination and conspiracy, in more recent times the Wellmark entities have established a scale of compensation for the same or similar diagnostic and treatment services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) receive as much as 100% higher payment than chiropractors receive for the same or similar diagnostic and treatment services.

13.    In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology purportedly based upon the Resource Based Relative Value System (RBRVS) and began issuing annual statewide fee schedules.  Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented

8

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 581 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 18 of 54
E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

the RBRVS system in a manner which discriminated against chiropractic services by es-tablishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

14.   The 38 other members of BCBSA are non-party co-conspirators with the Wellmark defendants for purposes of the Iowa Competition Act. By agreement with Wellmark, BCBSA, and each other, such independent licensed affiliates of the Blue Cross and Blue Shield Association and licensed Blue Cross and Blue Shield Plans has agreed with Wellmark to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark under terms of the Practitioner Services Agreement and have further agreed to allocate territories and not to compete in Iowa and South Dakota with Wellmark.

15.   Additionally, providers for the employees of all of the self-funded plans Wellmark administers in Iowa use the same identical preferred provider panels as Wellmark's other coverages, i.e., they use providers contracted through Wellmark's Practitioner Service Agreement. By agreement with Wellmark, each of the self-funded plans administered in Iowa by Wellmark has agreed with Wellmark to fix the price of Iowa chiropractic services in accordance with the prices set by Wellmark under terms of the Practitioner Services Agreement and Administrative Services Agreement of Wellmark Blue Cross and Blue Shield of Iowa. Accordingly, each of the self-funded plans administered by Wellmark is a non-party co-conspirator with the Wellmark defendants for purposes of the Iowa Competition Act.

9

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 582 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 19 of 54
E-FILED 2016 SEP 06 8:21 AM POLK - CLERK OF DISTRICT COURT

16.    Wellmark and various Iowa private and government self-funded employers agree to jointly use the Wellmark PPO and HMO provider networks for the purchase of provider services. The network providers are not parties to these agreements. The self-funded employers agree to pay Wellmark a separate monthly fee which is a percentage of the difference between what the provider usually bills for the service and the Maximum Allowable Fee Wellmark established in its annual provider fee schedules. In other words, if the provider usually bills $500 for services and the Wellmark fee schedule sets $225 as the maximum it will pay a provider for such services, Wellmark receives a percentage of the $275 difference from the self-funded employer as a Network Access Fee. This price setting fee is separate from the additional fee Wellmark charges Iowa private and government self-funded employees for claims administration services.

## CLASS ACTION ALLEGATIONS

17.    Plaintiffs bring this action individually and as a class action pursuant to Iowa Rules of Civil Procedure 1.261 et seq on behalf of all chiropractors licensed in Iowa (1) who are citizens of Iowa as of the date of filing of this petition  or (2) who have been citizens of Iowa at all times during their Iowa licensure as doctors of chiropractic after December 17, 2007, the date of initial filing of this suit, each of whom have been damaged in their businesses by defendants' actions described below (the "Class").

18.    This action is properly maintainable as a class action.

19.    The Class are so numerous that joinder of all members is impracticable. There are approximately 1200 chiropractors licensed in Iowa who are citizens of the state of Iowa at the time of the filing of this petition. The names of the absent members

E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

of the class can be ascertained so that personal or mailed notice of the class action can be given them.

20.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether Wellmark defendants have entered into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa.

(b)     Whether Wellmark defendants have entered into agreements with other independent entities to allocate territories and not to compete with each other in those allocated territories

(c)     whether Wellmark defendants have imposed maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(d)     whether Wellmark defendants have prescribed fees for chiro-practic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

(e)     whether Wellmark defendants have prescribed limitations upon and make optional the coverage of diagnostic and treatment services of chiroprac-tors while not imposing the same standards and practices to the coverage of diag-nostic and treatment services of other practitioners of health care in Iowa licensed

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 584 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 21 of 54
E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

      (f)     whether Wellmark defendants have historically entered into a contract, combination and conspiracy to restrain or monopolize (monopsonize) trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

      (g)     whether the Wellmark Defendants have engaged in a contract, combination or conspiracy between two or more persons to restrain or monopolize (monopsonize) trade or commerce in Iowa as a whole and in major population centers of Iowa under Iowa Code § 553.4 (2007);

      (h)     whether such horizontal conspiracies are unreasonable restrictions and restraints of competition, trade or commerce in Iowa and the anti-competitive consequences of such conspiracy or conspiracies outweigh any procompetitive benefits.

      (i)

      (j)     whether plaintiffs and the Class they represent have been injured by conduct prohibited by Section 553.4, Code of Iowa (2007); and,

      (k)     whether the class of chiropractic plaintiffs have been damaged in the four years previous to filing and to the present by the invidious treatment by the Wellmark defendants and their co-conspirators, who have uniformly and discriminatorily paid chiropractors less for the same or similar services than has been paid for the services of other health care practitioners in Iowa.

<center>12</center>

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 585 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 22 of 54
E-FILED 2016 SEB 09 8:21 AM POLK - CLERK OF DISTRICT COURT

whether plaintiffs and the class are entitled to injunctive relief from the horizontal conspiracies in restraint of competition, trade or commerce.

21.    Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

22.    Plaintiffs are adequate representatives of the Class, and have retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.  The named plaintiffs and their attorneys have or can acquire adequate resources to ensure that the interests of the class will not be harmed.

23.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class under the standard of I.R.C.P. 1.262(3)(b).

24.    Adjudications with respect to individual members of the class as a practical matter would be dispositive of the interests of other members not parties to the adjudication or substantially impair or impede their ability to protect their interests under the standard of I.R.C.P. 1.262(3)(c).

25.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

26.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

13

## FACTUAL CONDUCT ALLEGATIONS

27.    The Wellmark Defendants provide health services to the Iowa public on a statewide basis by offering and operating health care plans. Wellmark Defendants provide health care services including administration of self-funded health care plans to approximately 1.8 million Iowa enrollees in various health care plans statewide.

28.    Wellmark Defendants offer various health care coverage plans, including Indemnity Products: Comprehensive Major Medical (Protector), Blue Traditions (Full Service), Classic Blue (Alliance), Federal Employee Health Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card); Preferred Provider Organization Products: Alliance Select/Blue Select, Federal Employee Health Benefits Program (FEP), and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card PPO); HMO Products: Blue Access, Blue Choice and Blue Advantage, and the Blue Cross and Blue Shield Association Out-of-Area Program (Blue Card POS) to their subscribers.

29.    In addition to offering coverage agreements to subscribers, Wellmark Defendants enter into agreements with the providers of health care services, including those licensed under Iowa Code Ch. 148 (medical doctors -MD's), Ch.150A (doctors of osteopathic medicine –DO's), Ch. 148C (physician's assistants), Ch. 152 7 152E (nurse practitioners), Ch. 148A (physical therapists) and Ch. 151 (doctors of chiropractic -DC's).

30.    Under these provider agreements with the Wellmark Defendants, health care professionals, including the Provider Plaintiffs, render treatment services to patients who are enrolled in the Wellmark Defendants' various plans and the plans of Wellmark's co-conspirators.

E-FILED  2016 SEP 09 8:81 AM POLK - CLERK OF DISTRICT COURT

31.     Services are provided under the fundamental premise that, if the services are covered and are medically necessary, the Wellmark Defendants' enrollees will be covered and the providers of the services, including the Provider Plaintiffs, will be compensated in a timely manner for those services.

32.     Wellmark Defendants have contracts with over 65 percent of the health care insurance and 95 percent of the provider services market in Iowa, primarily through PPO contracts.

33.     Wellmark Defendants, together with their co-conspirators, use their overwhelming economic power and market dominance to coerce the individual Provider Plaintiffs into acquiescing in practice restrictions and reimbursement schedules detrimental to Provider Plaintiffs and by limiting and restricting patient access to Provider Plaintiffs resulting in detriment to the physical care and choice of consumers.

34.     This action is based on the relationships between the Provider Plaintiffs and the Wellmark Defendants and their contractually bound co-conspirators, and also on the belief that the Wellmark Defendants' actions, as detailed below, detrimentally impact patient health and the general welfare of the public, inasmuch as those actions deprive and limit patient access to the Provider Plaintiffs' treatment, and restrict and otherwise interfere with and impede the relationships between the Provider Plaintiffs and their existing and prospective patients.

35.     Wellmark Defendants have agreed and conspired with their co-conspirators to engage in, and continue to engage in, a pattern of price fixing, monopsonization,

15

E-FILED  2018 SEP 06 8:27 AM POLK - CLERK OF DISTRICT COURT

and other discrimination against the Iowa Provider Plaintiffs. This price fixing, monop-

sonization and other discrimination has occurred and is occurring in numerous ways,

including:

(a)     Wellmark defendants have entered into agreements with other

potential price competitors to artificially fix a lower price for chiropractic services

and to limit or exclude chiropractic coverage from health plans offered by other po-

tential competitors for chiropractic services in Iowa.

(b)     Wellmark defendantsw have entered into agreements with

other independent entities to allocate territories and not to compete with each other

in those allocated territories

(c)     Wellmark defendants have imposed maximum fee schedules to

which chiropractors must agree with defendants, their co-conspirators, and with

each other in order to provide diagnostic and treatment services for their patients in

Iowa;

(d)     Wellmark defendants have prescribed fees for chiropractic ser-

vices which are discriminatory to doctors of chiropractic in relation to the fees for

other health care practitioners for the same or similar services;

(e)     Wellmark defendants have prescribed limitations upon and

make optional the coverage of diagnostic and treatment services of chiropractors

while not imposing the same standards and practices to the coverage of diagnostic

and treatment services of other practitioners of health care in Iowa licensed under

the chapters of Title IV, subtitle 3, of the Code  of Iowa [Chapters 147 through 158];

16

(f)    Wellmark defendants have historically entered into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors.

(g)    As administered by Wellmark, most "Blue Advantage" plans caps the number of covered visits its subscribers may make to a doctor of chiropractic to 12, regardless of individual subscriber-patient circumstances. No such restriction of 12 visits is imposed upon other health care providers-licensees. In addition, in order to continue with additional treatment after the 12-visit cap has been reached, a subscriber-patient must obtain a referral from a "PCP" (Primary Care Physician) before any additional treatment from a doctor of chiropractic will be covered by Wellmark. Absent obtaining such an approved referral, the subscriber-patient must either forgo further chiropractic treatment or pay for the additional treatment personally, and then only after signing a waiver stating, in part, "I understand that I am requesting a service that may not be fully covered by my insurance company. I agree to be financially responsible for the full amount."

(h)    According to the Administrative Services Agreement of Wellmark Blue Cross and Blue Shield of Iowa, the co-conspirator self-funded entities pay a monthly Network Access Fee to Wellmark, which is the amount charged to the self-funded entity to gain the collective advantages of the network of providers with which Wellmark, any Host Blue, or any subcontractor has contracted for the providing for appropriate provision of covered services. Section 1.16. According to

17

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 590 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 27 of 54
E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

Section 3.1(b), one of Wellmark's obligations to the self-funded entity is to "provide access to networks of providers and . . . make information about the networks available to members through print, the Internet, and/or telephone service."  Section 3.1(e) says: "Wellmark shall determine benefits and process claims for health services furnished members in accordance with the terms, limitations and conditions set forth in the plan, the benefit documents, this agreement, applicable laws and regulations, the terms of the applicable provider agreement, and the claims administrations and medical policies of Wellmark, as amended from time to time." Part of the Network Access Fee is a percentage of Network Savings, which is "the amount saved due to contract between Wellmark or another Blue Cross or Blue Shield Plan and health care providers." Wellmark processes claims for the self-funded entity through a plan called BlueCard, which is described in Article 9 of the Administrative Services Agreement.  The Host Blue, in accordance with applicable BlueCard policies, is responsible for providing such services as contracting with its participating providers and handling all interaction with its participating providers.  Section 9.2.

(i)    Beginning in approximately 2006, Wellmark Defendants unilaterally attempted to implement for itself and its co-conspirators a policy by which their subscriber-patients who elected to seek chiropractic treatment would be covered for only three treatment procedures per visit to a doctor of chiropractic regardless of the acuity, severity, or nature of the patient's condition or the number of her complaints.

36.    The plaintiffs and the plaintiff class have been damaged since at least 2007 and continue to be damaged presently by receiving as much as 50% less than the

18

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 591 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 28 of 54
E-FILED 2016 SEP 08 8:21 AM POLK - CLERK OF DISTRICT COURT

Wellmark defendants paid other health care practitioners in Iowa for the same or similar services.  This damage can be calculated through the examination of a schedule of fees prepared by the Wellmark defendants annually and comparing the compensation scheduled to be paid to plaintiffs and the plaintiff class to compensation scheduled to be paid to other Iowa health care practitioner for the same or similar services.

37.     Historically, Wellmark's predecessor under a former name was organized and controlled by the Iowa Medical Society and the majority of its Board of Directors were allopathic or osteopathic physicians.  Under the control of allopathic and osteopathic physicians, Wellmark's predecessor under a former name refused to seek authority to provide the services of chiropractors to its subscribers and members. In furtherance of that combination and conspiracy, in more recent times the Wellmark entities have established a scale of compensation for the same or similar diagnostic and treatment services to its members wherein Iowa Doctors of Medicine (M.D.'s) and Doctors of Osteopathy (D.O.'s) receive as much as 100% higher payment than chiropractors receive for the same or similar diagnostic and treatment services. Contrary to the authority given by Chapter 514F of the Code of Iowa, however, and without filing with or obtaining the explicit approval of the Iowa Insurance Commissioner, the annual rate schedule for health care services which has been issued by Wellmark and which governs its payment of Iowa health care practitioners discriminates against those health care practitioners licensed under Chapter 151 of the Code of Iowa.

38.     In about September of 1998, Wellmark unilaterally offered one form of participating provider agreement for all health care providers and adopted a payment methodology purportedly based upon the Resource Based Relative Value System

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 592 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 29 of 54
E-FILED 2016 SEB 08 8:81 AM POLK - CLERK OF DISTRICT COURT

(RBRVS) and began issuing annual RBRVS-based statewide fee schedules.  Contrary to the actual RBRVS rates established by the Federal government, however, Wellmark implemented the RBRVS system in a manner which discriminated against chiropractic services by establishing lesser rates for chiropractic diagnostic and treatment services than for the same or similar services provided by M.D.'s, D.O.'s, physicians assistants, and nurse practitioners.

## CLAIMS FOR RELIEF

## RESTRAINT OF TRADE

39.    Plaintiffs and the Class they represent have been injured by conduct prohibited by Section 553.4, Code of Iowa (2007).

40.    Plaintiffs and the other members of the Class have been damaged in their businesses and property by and as a proximate cause of the conduct of the Wellmark defendants and their co-conspirators.

41.    The actions of the Wellmark Defendants are willful or flagrant in light of the existing law of Iowa and the surrounding circumstances.

## PRAYER

**WHEREFORE**, Plaintiffs pray for the following relief:

1.    That the jury award plaintiffs and the plaintiff class damages in an amount determined by the evidence for conduct in violation of the Iowa Competition Act for the four years previous to the filing of this action and to the date of trial;

2.    That the jury award plaintiffs and the plaintiff class double their actual damages because of the egregious conduct of the Wellmark defendants;

20

3.      That, pursuant to I.R.C.P. 1.275(4), the Court award attorneys' fees to Plaintiffs, and that, pursuant to Iowa Code § 553.12(4), the Court award the necessary costs of bringing suit, including a reasonable attorney fee;

4.      That the Court award plaintiffs and the plaintiff class injunctive relief from the unreasonable horizontal restraints on competition, trade and commerce committed by Wellmark defendants, and

5.      That the Court award such other and further relief to which Plaintiffs are justly entitled.

## **JURY DEMAND**

The plaintiffs, by their attorneys of record, demand trial by jury of the claims raised in their Fifth Amended Petition which may be tried at law.

Dated: September 9, 2015.

HAWKINS & NORRIS, P.C.
   /s/ Glenn L Norris
Glenn L. Norris  AT0005907
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-281-1474
Email:  gnorris@2501grand.com


WANDRO & ASSOCIATES, P.C.
Steven P. Wandro AT0008177
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
        E-mail: swandro@2501grand.com

ERBE LAW FIRM
Harley C. Erbe AT0002430
2501 Grand Avenue

E-FILED 2015 SEP 09 8:21 AM POLK - CLERK OF DISTRICT COURT

Des Moines, Iowa 50312-5399
Telephone: (515) 281-1460
Facsimile: (515) 281-1474
E-mail: herbelaw@aol.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or
to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the
____9th__ day of __September____, 2015.

By:      ____ U.S.Mail    ____ Facsimile ____ Hand Delivery     ____ Overnight Courier

____ Fedex or UPS               ____ E-mail    _x_ eFiling

_____/s/ Glenn L Norris_____

Copy to:
Hayward L. Draper, Esq.
Tomas H. Walton, Esq.
Ryan G. Koopmans, Esq.
NYEMASTER, GOODE, WEST, HANSELL
& O'BRIEN, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone:  515-283-3149, 283-3173
Facsimile: 515-283-8045
e-mail: hdraper@nyemaster.com
         twalton@nyemaster.com
         rkoopmans@nyemaster.com

IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STEVEN A. MUELLER, D.C.; BRADLEY J. BROWN, D.C.; MARK A. KRUSE, D.C.; KEVIN D. MILLER, D.C.; and LARRY E. PHIPPS, D.C.; on behalf of themselves and those like situated, | |
| Plaintiffs, | NO. LACL112671 |
| and | |
| BRAD CHICOINE, D.C.; MARK A. NILES, D.C.; ROD R. REBARCAK, D.C.; and BEN WINECOFF, D.C.; on behalf of themselves and those like situated, | **RULING ON PLAINTIFFS' REQUEST FOR PRETRIAL SCHEDULING CONFERENCE** |
| Intervenor Plaintiffs, | |
| vs. | |
| WELLMARK, INC. d/b/a/ WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation, | |
| Defendants. | |

On September 9, 2015, Plaintiffs' Request for Pretrial Scheduling Conference came on for hearing. Plaintiffs appeared through their attorneys, Glenn Norris and Steve Wandro. Defendants appeared through their attorney, Ryan Koopmans. After reviewing the file and hearing the arguments of counsel, the Court enters the following Ruling.

Plaintiffs filed this lawsuit as a class action under Iowa Rule of Civil Procedure 1.261 et seq. The District Court did not consider the issue of class certification under Rule 1.262. The District Court never held a pretrial scheduling hearing to determine the cause of proceeding including class certification. After the first appeal on this case, the defendants moved to dismiss or stay plaintiffs' remaining claim for price-fixing in violation of Iowa Code Section 553.4, the Iowa Competition Law. Defendants asserted this claim fell within the primary jurisdiction of the

1

Insurance Commissioner.  In a supplement to its motion, defendants stated it would withdraw its motion if plaintiffs would stipulate to a dismissal with prejudice of all of its claims except any price-fixing as a *per se* violation of the Iowa Competition Law.  Plaintiffs refused to enter into any stipulation for dismissal with prejudice of its rule-of-reason claim of price-fixing.  However, in order to avoid a stay of the entire lawsuit, plaintiffs stipulated that their Fourth Amended Petition only stated a *per se* price-fixing claim.  Defendants informed the Court that it did not need to rule on Defendants' Motion to Dismiss or Stay at that time.  In an order filed March 4, 2012, the Court stated, "The Court considers the motions withdrawn without prejudice to defendants to renew the motions if the need arises."

The case moved forward to hearing on defendants' motion for summary judgment on plaintiffs' *per se* claim.  At the hearing plaintiffs argued that they could amend their petition to raise a rule-of-reason claim.  The Court indicated plaintiffs could not do so in light of their stipulation.  Plaintiffs did not file the amendment at that time, but they did argue their rule of reason analysis.  On November 5, 2013, the district court granted  Defendants' Motion for Summary Judgment.  The Court's order did not dismiss plaintiffs' class-action petition.    In its Ruling on Motion for Summary Judgment, the Court stated:

> While the plaintiffs stipulated they are not asserting the rule of reason here, they argue Wellmark's price-fixing violates the Iowa Competition Law under a rule-of-reason analysis.  Because the plaintiffs stipulated Wellmark only committed a *per se* antitrust violation, this Court does not consider the rule of reason here.  This Court offers no opinion on any potential future claim that Wellmark's actions violate the Iowa Competition Law under a rule-of-reason analysis.

Plaintiffs filed notice of appeal form the district court's final order

In *Mueller v. Wellmark, Inc.*, 861 N.W.2d. 563, 574-75 (Iowa 2015), the Iowa Supreme Court affirmed the summary judgment on plaintiffs' *per se* claim.  Concerning the potential future rule-of-reason claim, the Court stated,

> We are not today foreclosing a rule-of-reason claim against Wellmark if it were shown that the anticompetitive consequences of its practices exceeded their procompetitive benefits.  We simply uphold the district court's ruling that Wellmark's arrangements with self-insured employers and out-of-state BCBS licenses are not subject to the *per se* rule.  Because the plaintiffs by stipulation limited themselves to a *per se* claim, we affirm the district court's grant of

2

summary judgment. . . For the foregoing reasons, the district court's judgment is affirmed.

On April 22, 2015, the Iowa Supreme Court issued a Procedendo directing the District Court to "proceed in the manner required by law and consistent with our opinion."

While this case was pending on appeal in 2014, the Insurance Commissioner issued a ruling on the contested case proceedings. According to the Plaintiffs, the Insurance Commissioner did not address any issue pertinent to this antitrust case. Plaintiffs contend the Insurance Commissioner's ruling clears the way for their rule-of-reason claim against Wellmark. They seek leave to file their rule-of-reason claim as a Fifth Amended Petition in this case.

At issue here is whether dismissal of this case is required by law in a manner consistent with the Supreme Court's opinion or whether plaintiffs can file a Fifth Amended Petition in this case to state their rule-of-reason claim. Both the district court's summary judgment and the Supreme Court's opinion preserved the plaintiffs' rule-of-reason claim. Neither court ordered that plaintiffs' rule-of-reason claim could not be filed as an amendment to their petition in this class action lawsuit. Neither court ordered that plaintiffs' rule-of-reason claim had to be filed in a new action with a new lookback period under the statute of limitations. The district court's summary judgment, which was affirmed by the Supreme Court, simply stated the Court offers no opinion on *any* potential future claim under the rule-of-reason analysis.

Defendant contends this case is over. Relying on *Franzen v. Deere & Co.*, 409 N.W.2d 672 (Iowa 1987), the defendant argues that the, "authority of the district court to decide substantive issues in a particular case terminates when a final judgment is entered," and "[i]n the absence of a remand or procedendo directing further proceedings in the trial court, the jurisdiction of the district court terminates both as to the parties and the subject matter when a district court judgment has been affirmed." Id. at 674-75." Defendant argues that plaintiffs appealed from the final judgment of the district court and by reason of their stipulation they cannot now "mend their hold" by amending their petition to assert their rule-of-reason claim in this class action. Defendant points out that the procedendo in this case does not direct further proceedings in the district court.

3

However, *Franzen* was not a class action.  The Court concludes *Franzen* is distinguishable and there are several procedural reasons why plaintiffs should be allowed to proceed with their rule-of-reason claim in this class action.  First, plaintiffs did not accede to defendant's demand that they dismiss their rule-of-reason claim with prejudice.  They deferred filing their rule-of-reason claim due to the pendency of a contested case proceeding before the Insurance Commissioner.  Plaintiffs merely stipulated that their Fourth Amended Petition only stated a *per se* claim so that the case could move forward.

Second, Defendant elected to pursue summary judgment on plaintiffs' *per se* claim before the District Court considered class certification.  As a result, the Court's summary judgment is binding only on the named plaintiffs and is not binding on the class. See Iowa Rule of Civil Procedure 1.272; *Wright v. Schock*, 742 F2d 541, 544 (9th Cir. 1984)(Where defendant obtains summary judgment before class certification, defendant has prevailed only against the named plaintiffs and the judgment is not res judicata as to other individual plaintiffs or members of any class that may be certified.); but see *Jibson v. Michigan Educ. Ass'n-NEA*, 30 F.3d 723, 734 (6th.Cir 1994)(Where grant of summary judgment in defendant's favor resolved sole issue in the case, class certification is moot.).  The Iowa Supreme Court has not decided this issue under our class action rules.  This Court comes down in favor of reaching the merits of this controversy in this case now that the Insurance Commissioner has ruled.

Third, while the district court adjudicated the merits of the named plaintiffs' per se claim, the district court did not follow the procedure set forth in Rule 1.271 concerning dismissal of the class action.  The Court did not refuse to certify this action as a class action under Rule 1.262.  The Court had not yet ruled on class certification.  The Court did not consider giving notice of hearing on a proposed dismissal to potential class members as allowed by Rule 1.271(2).   The Court did not conduct a hearing regarding dismissal of the class action under Rule 1.271(1) and 1.271(4).  Under the terms of Rule 1.271(1)(b), the class action could not be dismissed involuntarily without an adjudication on the merits.  There was no adjudication on the merits of the class action because the class had not yet been certified and the summary judgment was not binding on the class.

4

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 599 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 36 of 54
E-FILED 2015 OCT 06 2:32 PM POLK - CLERK OF DISTRICT COURT

Fourth, the district court did not dismiss the class action. The district court in its summary judgment order offered no opinion on any potential future claim under the rule-of-reason claim. The Court's ruling granted summary judgment on plaintiffs' *per se* claim and did not dismiss plaintiffs' petition.

Finally, where the district court's summary judgment was a final order on plaintiffs' *per se* violation claim, it was not a final judgment on plaintiffs' rule-of-reason claim. Under the unique procedural posture of this particular case, this was a final order that was applicable under Iowa Rule of Appellate Procedure 6.101(1)(c) because it dismissed some (the *per se* claim) but not all of the plaintiffs' claims and some (the named plaintiffs) but not all of the potential parties since it was not binding on other individual plaintiffs and the class.

Therefore, under the procedural posture of this particular case, this case is not over. Plaintiffs' class action petition was not dismissed. The procedendo directing the district court to "proceed in the manner required by law and consistent with our opinion" does not preclude further action in this case. The Court will consider whether to allow Plaintiffs to amend their to state their rule-of-reason claim. This matter should come on for a pretrial scheduling conference as requested by the plaintiffs.

Plaintiffs' Request for Pretrial Scheduling Conference is sustained. This matter shall come on before the undersigned judge for a pretrial scheduling conference and a hearing on all pending motions on the 19th day of November, 2015, at 8:15 a.m. in Room 314.

SO ORDERED.

5

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 600 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 37 of 54
E-FILED 2015 NOV 06 10:32 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Type:**          OTHER ORDER

**Case Number**    **Case Title**
LACL112671         STEVEN A MUELLER DC ETAL VS WELLMARK INC DBA
                   ETAL

So Ordered

Arthur E. Gamble, Chief District Judge,
Fifth Judicial District of Iowa

Electronically signed on 2015-11-06 10:32:06   page 6 of 6

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | Law No. CL112671 |
| Plaintiffs, | RESISTANCE TO MOTION TO INTERVENE |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

Wellmark, Inc. and Wellmark Health Plan of Iowa, Inc. (collectively, Wellmark) resist the Motion to Intervene filed on September 9, 2015, for the following reasons:

1. Final judgment was entered in this case on November 5, 2013, as affirmed by the Iowa Supreme Court in *Mueller v. Wellmark, Inc.*, 861 N.W.2d 563 (Iowa 2015).

2. The proposed interveners have already brought an identical action against the same defendants, so there is no need or justification for them to re-file the same claims in this case. *Chicoine* et al *v. Wellmark* et al, Law No. CVCV050638.

3. The issue of statute of limitations for the proposed new claims (what this Court has referred to as the "look back") is the same in the *Chicoine* case as it would

1

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 602 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 39 of 54
E-FILED  2016 DEC 07 3:21 PM POLK - CLERK OF DISTRICT COURT

be if the same pleadings were added to this case, and therefore presents no reason to allow Plaintiffs to bring two actions simultaneously.

4. Adding wholly new claims seven years after filing this case is inappropriate after entry of judgment on all the claims previously pled.

5. There is a Petition for Writ of Certiorari pending before the Iowa Supreme Court, Case No. 15-1922 that raises the same issues as are being presented in this Resistance to Motion to Intervene. As a matter of discretion, this Court ought to defer ruling on Plaintiffs' Motion to Intervene until the Supreme Court has determined these issues. This is particularly true given that some of these issues are jurisdictional.

WHEREFORE, Defendants respectfully request that the Motion to Intervene be denied.

/s/ Ryan G. Koopmans
Hayward L. Draper  AT0002075
John T. Clendenin   AT0001529
Ryan G. Koopmans    AT0009366
NYEMASTER GOODE, P.C.
700 Walnut Street, Suite 1600
Des Moines, Iowa 50309-3899
Telephone:    (515) 283-3149
Facsimile:     (515) 283-8016
E-Mail:  hdraper@nyemaster.com
          jtc@nyemaster.com
          rkoopmans@nyemaster.com

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 603 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 40 of 54
E-FILED 2015 DEC 07 3:21 PM POLK - CLERK OF DISTRICT COURT

CERTIFICATE OF SERVICE

    The undersigned certifies that the foregoing instrument was filed on December 7, 2015 with the Clerk of Court using the ECF system, which will send notification of such filing to the below counsel of record:

| | |
|---|---|
| Glenn L. Norris | Harley C. Erbe |
| Hawkins & Norris, P.C. | Erbe Law Firm |
| 2501 Grand Avenue, Ste. C | 2501 Grand Avenue |
| Des Moines, IA  50312-5399 | Des Moines, IA  50312-5399 |

Steven P. Wandro
Michael R. Keller
Wandro & Baer, P.C.
2501 Grand Avenue, Ste. B
Des Moines, IA  50312-5399

/s/ Ryan G. Koopmans

3

E-FILED  2018 DEC 06 3:26 AM POLK - CLERK OF DISTRICT COURT

5CV03          IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| KEVIN D MILLER DC<br>MARK A KRUSE DC<br>LARRY E PHIPPS DC<br>STEVEN A MUELLER D.C.<br>BRADLEY J BROWN DC<br><br>Plaintiff(s)<br><br>VS.<br><br>WELLMARK INC DBA WELLMARK BLUE<br>CROSS AND BLUE SHIELD OF IA<br>WELLMARK HEALTH PLAN OF IOWA INC<br><br>Defendant(s) | 05771  LACL112671<br><br><br>ORDER |
|---|---|

Plaintiff's Request for Pretrial Scheduling Conference came on for hearing. The parties appeared through counsel. Upon hearing it is ordered:

Plaintiffs will immediately file their Motion for Leave to File a Fifth Amended and Substituted Petition for Damages. Defendants will resist. If the motion for leave to amend is granted, Defendants will move or plead in response.

The Court will defer the Motion to Intervene of the Chicoine plaintiffs at this time as intervention may be unnecessary depending on the ruling of the Supreme Court on Defendants' Petition for Writ of Certiorari.

The Court understands that the parties will stipulate to the assignment of this case and the Chicoine case to the Business Court so that both cases can be scheduled and handled by the same judge.

**IT IS SO ORDERED ON THIS DAY 12/08/15.**

E-FILED 2015 DEC 08 9:26 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| LACL112671 | STEVEN A MUELLER DC ETAL VS WELLMARK INC DBA ETAL |
| **Type:** | OTHER ORDER |

So Ordered

Arthur E. Gamble, Chief District Judge,
Fifth Judicial District of Iowa

Electronically signed on 2015-12-08 09:15:06

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 606 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 43 of 54
E-FILED  2015 OCT 08  8:20 AM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

STEVEN A. MUELLER, D.C.,  BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated,

      Plaintiffs,

vs.

WELLMARK, INC d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., an Iowa corporation,

      Defendants

Law No. CL112671

## PLAINTIFFS' MOTION FOR LEAVE TO FILE FIFTH AMENDED AND SUBSTITUTED PETITION FOR DAMAGES

**COME NOW** the Plaintiffs, and, pursuant to I.R.C.P. 1.402(4), hereby move for leave to amend and file a **Plaintiffs' Fourth Amended and Substituted Petition for Damages** against Defendants, as stated in Attachment A hereto, for the following reasons:

1. This Fifth Amended and Substituted Petition is intended to conform to the Opinions of the Iowa Supreme Court in this case issued on July 27, 2012 and February 27, 2015.

2. In its essence, the Fifth Amended and Substituted Petition alleges that Wellmark Defendants have, by contract, conspiracy and other unlawful means, conspired and combined to:

1

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 607 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-20   Filed 06/14/17   Page 44 of 54
E-FILED 2015 OCT 08 02:07 AM POLK - CLERK OF DISTRICT COURT

      (a)    enter into agreements with other potential price competitors to artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa.

      (b)    enter into agreements with other independent entities to allocate territories and not to compete with each other in those allocated territories

      (c)    impose maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

      (d)    prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the fees for other health care practitioners for the same or similar services;

      (e)    prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

      (f)    historically enter into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors

<div align="center">2</div>

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 608 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 45 of 54
E-FILED 2017 OCT 03 10:16 AM POLK - CLERK OF DISTRICT COURT

(g)    Beginning in approximately 2007, Wellmark Defendants attempted to implement for itself and its co-conspirators a policy by which their subscriber-patients who elected to seek chiropractic treatment would be covered for only three treatment procedures per visit to a doctor of **chiropractic regardless of the acuity, severity, or nature of the patient's** condition or the number of her complaints:

(h)    Beginning in approximately 2007, Wellmark Defendants announced and  attempted to implement for itself and its co-conspirators a policy by which subscriber-patients and those persons who were employees of self-funded entities administered by Wellmark Defendants would be required to seek preapproval of an agent of the Wellmark Defendants before any chiropractic services would be paid, which policy solely related to chiropractic services and to no other services of any other health care practitioner licensed by the state of Iowa;

(i)    **Wellmark Health Plan of Iowa, Inc. ("WHPI") and its co-** conspirators have implemented a plan solely related to Iowa chiropractors and to no other health care practitioner licensed in Iowa whereby Iowa chiropractors only are subject to a capitated payment system whereby chiropractors are paid at  rate less than 50% of the rate payable for PPO services, while all other Iowa licensed practitioners covered by WHPI are paid pursuant to a schedule derived from the PPO payment schedules with a 7-9% discount.

3.    Plaintiffs allege that such horizontal conspiracies are unreasonable restrictions and restraints of competition, trade or commerce in Iowa and the

<div align="center">3</div>

Case MDL No. 2406    Document 389-9    Filed 07/28/17    Page 609 of 645

Case 4:17-cv-00210-JAJ-SBJ    Document 1-20    Filed 06/14/17    Page 46 of 54
E-FILED 2015 DEC 09 2:16 PM POLK - CLERK OF DISTRICT COURT

anticompetitive consequences of such conspiracy or conspiracies outweigh any procompetitive benefits.

    4.    There is no scheduling order in place.

    5.    Pleadings have not closed in this case.

    6.    This motion is not made for purposes of delay, and it is in the interests of justice to allow the proposed Fifth Amended Petition.

    **WHEREFORE** the Plaintiffs, pursuant to I.R.C.P. 1.402(4), hereby pray for leave to amend and file a **Plaintiffs' F**ifth Amended and Substituted Petition for Damages against Defendants, as stated in Attachment A hereto.

Dated: December 9, 2015.

HAWKINS & NORRIS, P.C.
   /s/ Glenn L Norris
Glenn L. Norris  AT0005907
2501 Grand Avenue, Suite C
Des Moines, Iowa 50312-5399
Telephone:  515-288-6532
Facsimile:  515-281-1474
Email:  gnorris@2501grand.com


WANDRO & ASSOCIATES, P.C.
   /s/ Steven P. Wandro
Steven P. Wandro AT0008177
2501 Grand Avenue, Suite B
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1475
Facsimile: (515) 281-1474
E-mail: swandro@2501grand.com

ERBE LAW FIRM
Harley C. Erbe AT0002430
2501 Grand Avenue
Des Moines, Iowa 50312-5399
Telephone: (515) 281-1460
Facsimile: (515) 281-1474
E-mail: herbelaw@aol.com

<div align="center">4</div>

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause or to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on the ___9th___ day of ___December___, 2015.

By:  ____ U.S.Mail  ____ Facsimile  ____ Hand Delivery  ____ Overnight Courier

____ Fedex or UPS  __x__ E-mail  __x__ eFiling

_____/s/ Glenn L Norris_____

Copy to:
Hayward L. Draper, Esq.
John T. Clendenin, Esq.
Ryan G. Koopmans, Esq.
NYEMASTER, GOODE, WEST, HANSELL
**& O'BRIEN, P.C.**
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
Telephone: 515-283-3149, 283-3173
Facsimile: 515-283-8045
e-mail: hdraper@nyemaster.com;  jtc@nyemaster.com;  rkoopmans@nyemaster.com

E-FILED 2016 FEB 06 8:27 PM POLK - CLERK OF DISTRICT COURT

# IN THE SUPREME COURT OF IOWA

## No. 15–1922

### Polk County No. LACL112671

### ORDER

**WELLMARK, INC. d/b/a**
**WELLMARK BLUE CROSS AND**
**BLUE SHIELD OF IOWA, an**
**Iowa corporation, and**
**WELLMARK HEALTH PLAN OF**
**IOWA, INC., an Iowa corporation,**
        **Plaintiffs,**

**v.**

**IOWA DISTRICT COURT FOR**
**POLK COUNTY,**
        **Defendant.**

---

This matter comes before the court on a petition for writ of certiorari filed by Wellmark, Inc., and Wellmark Health Plan of Iowa, Inc. (Wellmark), the defendants in the district court proceedings.  The plaintiffs in the district court proceedings have filed a resistance.  Wellmark has filed a reply.

Upon consideration of the papers filed, the court grants the petition for writ of certiorari.   District court proceedings are stayed.   *See* Iowa R. App. P. 6.107(2).  Wellmark shall pay the additional $50 filing fee within 7 days, and file and serve the combined certificate within 14 days, of the filing of this order.  Further proceedings shall be had pursuant to the rules of appellate procedure.

Copies to:

CLERK OF SUPREME COURT

DEC 09, 2015

ELECTRONICALLY FILED

E-FILED 2018 FEB 06 8:21 PM POLK - CLERK OF DISTRICT COURT

John Clendenin
700 Walnut  Suite 1600
Des Moines, IA 50309

Hayward Lloyd Draper
700 Walnut St.  Suite 1600
Des Moines, IA 50309

Ryan Gene Koopmans
700 Walnut Street Suite 1600
Des Moines, IA 50301

Harley Christopher Erbe
2501 Grand Ave
Des Moines, IA 50312

Michael Ray Keller
2501 Grand Ave Suite B
Des Moines, IA 50312-5342

Glenn Leonard Norris
2501 Grand Ave   #c
Hawkins & Norris  P C
Des Moines, IA 50301

Steven Peter Wandro
2501 Grand Ave   Suite B
Des Moines, IA 50312

Polk County Iowa District Court
E-Served

2 of 3
Plaintiffs' Supplemental Appendix in Resistance          Page 45 of 50
to Wellmark Motion to Stay

E-FILED 2016 FEB 06 8:21 PM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**
15-1922

**Case Title**
Wellmark Inc. v. District Court

So Ordered

Thomas D. Waterman, Justice

Electronically signed on 2015-12-08 17:21:49

Home Page



Home Page

## Home Page

### NOTICE FROM JOSEPH S. FEREZY, DC:

My Dear Patients,

As you are probably already aware, I am no longer seeing patients at FerezyClinic in Windsor Heights.  I am now pursuing my personal development and educational commitment at a full time level. My existing patients are to please contact Dr. Michael Davis, who has taken over my practice, and has all of your medical records and knowledge of your condition and treatment.

After almost 30 years of continuous chiropractic practice this was not an easy decision.  While insurance companies, medical record requirements and governmental regulations have made the practice of chiropractic more challenging, my patients have always made it one of the most rewarding aspects of my life.  I will miss seeing and interacting with each of you as my patients, and as my friends.

Warmest Personal Regards,

JS Ferezy, DC

### CLICK HERE For Dr. Davis Clinic Website

Dr. Ferezy is a world renowned expert and lecturer in chiropractic neurology. Below are video clips where he discusses topics of interest in complementary and alternative medicine (CAM). Shows will be available to view after their original air date. Patients may want to view these videos to hear from Dr. Ferezy on a variety of subjects.

CLICK HERE to view "CAM & Dangers of NSAID's"
CLICK HERE to view "Acupuncture".
CLICK HERE to view "Introduction To Chiropractic Part 1"
CLICK HERE to view "Introduction To Chiropractic Part 2"
CLICK HERE to view "Spinal Decompression".
CLICK HERE to view "Headache Part 1: Warning Signs"
CLICK HERE to view "Headache Part 2: Migraines"
CLICK HERE to view "Headache: Part 3: "Subluxation-Tension".
CLICK HERE to view "Headache: Part 4: Rebound Headache".
CLICK HERE to view "Calldoctorjoe: Part 1:"Why go to a chiropractor?"
CLICK HERE to view "Calldoctorjoe: Part 2:"How do I find a chiropractor and will I have to keep going?"
CLICK HERE to view "Calldoctorjoe: Part 3:"Are chiropractors pseudo-orthopedists?"
CLICK HERE to view "Calldoctorjoe: Part 4: "Is it OK to crack my own back?"
CLICK HERE to view "Patients of Dr. Joe: Part 1"
CLICK HERE to view "Cold Laser Therapy"
CLICK HERE to view "Vertigone for Vertigo"

FerezyClinic
admin@ferezyclinic.com

http://www.ferezyclinic.com/[2/4/2016 11:19:05 PM]

About Dr. Michael Davis | Firm Foundation Chiropractic



**FIRM FOUNDATION**
C H I R O P R A C T I C

*Call us at (515) 440-2005!*

# ABOUT DR. MICHAEL DAVIS

Home » About Dr. Michael Davis



Dr. Michael Davis was born in the United Kingdom to military parents. After moving back to the US, he swam competitively for 11 years for the Old Dominion Aquatic Club under Olympic coach Bill Peak in Virginia. It was during his experience as a competitive athlete that he was first exposed to the healing and performance enhancing benefits of chiropractic. Under chiropractic care, he recovered from a minor accident and experienced an unexpected increase in his athletic performance. Dr. Davis also watched his mother recover from severe back problems once she, too, started seeing a chiropractor on a regular basis.

Dr. Davis completed his undergraduate degree at James Madison University, Harrisonburg, Virginia, and received a B.S. in Health Promotion

http://firmfoundationchiropractic.com/about-dr-michael-davis/[1/21/2016 9:44:50 PM]

E-FILED  2016 FEB 08 8:21 PM POLK - CLERK OF DISTRICT COURT

and Assessment. When completion of his degree required a practicum, he chose to work with a group of chiropractors in the Tidewater, Virginia. It was during this experience that his desire to pursue a career in chiropractic was born.

Shortly after he married his wife Christina, the Davis family moved to Marietta, Georgia where Dr. Davis attended chiropractic school at Life University. After graduation in 2004, Dr. Davis, also known to his patients as "Dr. Mike," ran a successful chiropractic office in the Atlanta area. Dr. Davis moved to Urbandale, Iowa in 2007 to support his wife's career as a business executive. Shortly after moving to Iowa, Dr. Davis opened Firm Foundation Chiropractic. His practice has been based upon the philosophy that everyone needs an optimally functioning nervous system which leads to optimum health. A healthy nervous system can only be maintained with regular chiropractic adjustments. Without this "Firm Foundation" a person cannot realize his or her full health potential.

In addition to his chiropractic practice, Dr. Davis also teaches anatomy, physiology, and health classes at Grand View University and Des Moines Area Community College. He is well known for bringing humor and clinical practice experiences into the classroom to incorporate a dose of reality and levity into the educational environment. In addition to his roles as chiropractor, husband, and instructor, he is also Daddy to two wonderful daughters. Outside of the clinic, the Davis family lives a holistic lifestyle that is consistent with the message taught to both patients and students alike. From home births, proper nutrition, and exercise, to preventive maintenance, the Davis family firmly believes good health does not happen by accident. It is a matter of building a Firm Foundation and making deliberate choices to support good health.

In May of 2014, Dr. Davis was offered a unique opportunity to enter into practice with Dr. Joseph Ferezy at the Ferezy Clinic of Chiropractic and Neurology. Dr. Davis enjoyed the opportunity to deepen his understanding of neurology by working alongside Dr. Joseph Ferezy, a Board Certified Chiropractic Neurologist. "Dr. Joe" is a widely known and respected chiropractor who has practiced for 30 years. Over the course of one year,

About Dr. Michael Davis | Firm Foundation Chiropractic

E-FILED 2016 FEB 06 3:21 PM POLK - CLERK OF DISTRICT COURT

Dr. Davis enjoyed the exceptional facilities and equipment available at the Ferezy Clinic, which allowed him to provide comprehensive patient assessment and care. Dr. Davis built a good rapport with the patients of the Ferezy Clinic and so enjoyed the practice, he purchased the clinic in April of 2015. Dr. Davis continues to use state of the art digital x-ray, spinal decompression therapy (SDT), ultrasound therapy, computerized foot/gait analysis and manual chiropractic adjusting techniques, to provide his patients the best quality chiropractic health care.

## DON'T MISS OUT!

Love us? Keep up with what's happening - events, specials, and the latest health information!

First Name

Email Address

## CONNECT

☐  Facebook

☐  Google+

☐  LinkedIn

☐  Twitter

## RECENT POSTS

☐  New Beginnings

☐  Massage Therapy Now Available

☐  The Holiday Rat Race: The Keys to Painle

## SEARCH

http://firmfoundationchiropractic.com/about-dr-michael-davis/[1/21/2016 9:44:50 PM]

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 618 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-21   Filed 06/14/17   Page 1 of 3
E-FILED  2016 APR 11 4:27 PM POLK - CLERK OF DISTRICT COURT

CLERK OF SUPREME COURT

APR 11, 2016

ELECTRONICALLY FILED

# IN THE SUPREME COURT OF IOWA

## No. 16–0364

## Polk County No. CVCV050638

## ORDER

**BRADLEY A. CHICOINE, D.C., DR. BRADLEY
A. CHICOINE, D.C., P.C., MARK A. NILES,
D.C., NILES CHIROPRACTIC, INC., ROD R.
REBARCAK, D.C., and BEN WINECOFF, D.C.,
on behalf of themselves and those like
situated,**
    **Plaintiffs-Appellants,**

**and**

**STEVEN A. MUELLER, D.C.,
BRADLEY J. BROWN, D.C., MARK A.
KRUSE, D.C., KEVIN D. MILLER, D.C.,
and LARRY E. PHIPPS, D.C., on behalf
of themselves and those like situated,**
    **Plaintiffs-Appellants,**

**vs.**

**WELLMARK, INC., d/b/a WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, an Iowa Corporation, and
WELLMARK HEALTH PLAN OF IOWA, INC.,
and Iowa Corporation,**
    **Defendants-Appellees.**

---

This matter comes before the court upon the plaintiffs' application for interlocutory appeal.  Iowa R. App. P. 6.104.  The defendants have filed a resistance. The plaintiffs seek interlocutory review of the district court's Ruling on Defendants' Motion to Stay filed January 28, 2016.



EXHIBIT
T

1 of 3

E-FILED 2016 APR 11 4:27 PM POLK - CLERK OF DISTRICT COURT

The application for interlocutory review is granted.  Within seven days of the date of this order, the plaintiffs shall pay the additional $50 filing fee required when an application for interlocutory appeal is granted.  *See* Iowa R. App. P. 6.702(1)(*b*).  The plaintiffs shall file the combined certificate within 14 days of the date of this order and further proceedings shall be had pursuant to the rules of appellate procedure.  Iowa R. App. P. 6.104(3).

Copies to:

Harley C. Erbe

Glenn L. Norris

Kara M. Simons

Steven P. Wandro

John T. Clendenin

Hayward L. Draper

Ryan G. Koopmans

E-FILED  2016 APR 11 4:27 PM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

| Case Number | Case Title |
| --- | --- |
| 16-0364 | Chicoine v. Wellmark |

So Ordered

David S. Wiggins
Justice

Electronically signed on 2016-04-11 16:05:55

E-FILED  2016 MAY 02 11:49 AM POLK - CLERK OF DISTRICT COURT

# IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., ET AL., <br> Plaintiffs, <br>          and | Case No.:  CVCV 050638 |
| STEVEN A. MUELLER, D.C., ET AL,. <br> Plaintiffs, | NOTICE OF TRANSCRIPT REDACTIONS |
| vs. <br> WELLMARK, INC., ET AL., <br> Defendants. | |

_ X _ An Original Transcript has been e-Filed in this case.

ORDERED BY:  Steve Wandro

BEFORE JUDGE:   Michael D. Huppert

DATE OF PROCEEDINGS:  1-22-16

BECAUSE YOUR CASE IS, OR AT SOME POINT WILL BECOME, OPEN TO THE PUBLIC, YOU ARE REQUIRED TO REVIEW THIS DOCUMENT FOR PROTECTED INFORMATION. Refer to *Division VI* of *Chapter 16 Rules Pertaining to the Use of the Electronic Document Management System* for a definition of personal information that is now considered protected by the court.

**Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter.**

Under Rule 16.601(2), it is your responsibility to review this transcript and ensure that the appropriate information is designated as protected material.

⊠ COPY OF TRANSCRIPT WITH REDACTIONS DESIGNATED: **NO REDACTIONS NECESSARY**

⊠ COURT REPORTER TRANSCRIPT : CHICOINE

YOU HAVE 21 CALENDAR DAYS AFTER THE FILING OF THIS NOTICE TO REVIEW AND RESPOND. If you find that protected information, either as defined in rule 16.602 or as ordered by the court, has been included in the document, you must file a Stipulation Regarding Redaction of Transcript identifying the information that must be redacted from the transcript. If you find additional information that you wish to have designated as protected under rule 16.604, you may file a Stipulation Regarding Redaction of Transcript identifying the additional information you wish to redact. Any disagreement about whether additional information should be designated as protected will be decided by the court.

Your failure to respond within twenty-one (21) days of the filing of this notice will be deemed an agreement that the transcript has been properly redacted per rule 16.601(2), and the transcript will become public unless otherwise designated by law or court order.

Date: 5-2-16                       /s/ Rebecca S. Maxcy
                                   Rebecca S. Maxcy, CSR, RMR
                                   500 Mulberry Street, Room 304A
                                   Des Moines, IA 50309
                                   515.286.3231/rebecca.maxcy@iowacourts.gov



E-FILED  2016 OCT 20 12:32 PM POLK - CLERK OF DISTRICT COURT

LAW OFFICES OF

## HAWKINS & NORRIS, P.C.
2501 GRAND AVENUE, SUITE C
DES MOINES, IOWA 50312

LEX HAWKINS (retired)
GLENN L. NORRIS

gnorris@2501grand.com
gnorrislaw@gmail.com

TELEPHONE
(515) 288-6532
FACSIMILE
(515) 281-1474

October 20, 2016

Polk County Clerk of Court
Attn: Civil Division
500 Mulberry Street
Des Moines, IA 503 09

Clerk of Court
Iowa Supreme Court
Judicial Branch Building
1111 E. Court A venue
Des Moines, Iowa 50319

      Re:    *Chicoine et al v. Wellmark, Inc. et al*
              Polk County District Court, Law No. CVCV050638
              Iowa Supreme Court, No. 16-0364

Dear Clerk of Court:

      Pursuant to Iowa Rule of Appellate Procedure 6.802(2), please transmit the remaining record in the above case to the Iowa Supreme Court.

                  Sincerely,

                  /s/ Glenn L Norris
                  Glenn L. Norris



EXHIBIT
V

E-FILED  2016 OCT 20 3:23 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

BRADLEY CHICOINE AND STEVEN
MUELLER ET AL V WELLMARK ET AL

Case No. 05771  CVCV050638

### Clerk's Certificate of Transmission of Record for Appeal

I, the undersigned Clerk of District Court or designee, do hereby certify as follows:

**Case Security:**
The ICIS case level security of this matter is: 0

☑ All of the case record in this matter is public record

☐ All or part of the case record in this matter is confidential under Iowa law:

☐ Juvenile Record, including children and families in need of assistance, termination of parental rights and certain confidential delinquency actions

☐ Involuntary Hospitalization of Persons with Mental Illness Record

☐ Involuntary Commitment or Treatment of Chronic Substance Abuse Record

☐ Pending Dissolution of Marriage Record

☐ While this case type is public record, certain documents are confidential or sealed

☐ Probate

☐ Other:

**Document Security:**

☑ The security level for the documents in this binder is 0.  The event/document security table is shown at the end of this certificate.

**Transmission of Record:**
The record is being transmitted to the Clerk of Supreme Court in the following format(s):

☑ Fully electronic format (attached)

☐ Part electronic/part non-electronic

☐ Partially electronic format (attached in binder)

☐ Partially non-electronic.  Non-electronic records will be delivered to the  and will consist of the following records:

☐ The following non-electronic records or exhibits are of unusual bulk, weight or substance and will be delivered to the only upon specific request:

☐ Other:

EXHIBIT
W

Dated: October 20, 2016

/s/ CHRISTY WAGNER
_____

Clerk of Court/Designee
POLK County

EDMS/ICIS event and document security levels:

0   Public

1   Confidential - accessible by case parties

2   Confidential - accessible by self-represented litigants

3   Confidential - accessible by attorneys on the case

4   Confidential - accessible by county attorney

5   Confidential - accessible by authorized court personnel (paper copy may be publicly available at Clerk of District Court office)

6   (Not designated)

7   (Not designated)

8   Expunged - accessible by judges, magistrates and clerks of court

9   Sealed - accessible by judges and clerks of court

E-FILED  2017 MAY 05 2:14 PM POLK - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT FOR POLK COUNTY

| | |
|---|---|
| BRADLEY A. CHICOINE, D.C., DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, D.C, NILES CHIROPRACTIC, INC., ROD R. REBARCAK, D.C., and BEN WINECOFF, D.C., on behalf of themselves and those like situated, | Law No. CVCV050638 |
| Plaintiffs, | |
| and | |
| STEVEN A. MUELLER, D.C., BRADLEY J. BROWN, D.C., MARK A. KRUSE, D.C., KEVIN D. MILLER, D.C., and LARRY E. PHIPPS, D.C., on behalf of themselves and those like situated, | **NOTICE OF WITHDRAWAL OF RYAN G. KOOPMANS** |
| Plaintiffs, | |
| v. | |
| WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, an Iowa corporation, and WELLMARK HEALTH PLAN OF IOWA, INC., and Iowa corporation, | |
| Defendants. | |

Ryan G. Koopmans, of the law firm Nyemaster Goode, P.C., hereby gives notice of his withdrawal as counsel for Defendants in this matter.

Hayward L. Draper, of the law firm Nyemaster Goode, P.C., remains as counsel for Defendants in this matter.



EXHIBIT

X

E-FILED 2017 MAY 05 2:14 PM POLK - CLERK OF DISTRICT COURT

> */s/ Ryan G. Koopmans*
> Ryan G. Koopmans    AT0009366
> NYEMASTER GOODE, P.C.
> 700 Walnut Street, Suite 1600
> Des Moines, Iowa 50309-3899
> Telephone:  (515) 283-3138
> Facsimile:  (515) 283-8016
> E-Mail:  rkoopmans@nyemaster.com

## CERTIFICATE OF SERVICE

I hereby certify that on <u>May 5, 2017</u>, I presented the foregoing document to the Clerk of the Court for filing and uploading into the EDMS system, which will send notification to the EDMS system participants.

> */s/ Ryan G. Koopmans*

E-FILED  2017 MAY 15 8:42 AM POLK - CLERK OF DISTRICT COURT

IN THE DISTRICT COURT OF IOWA IN AND FOR POLK COUNTY

| | |
|---|---|
| BRAD CHICOINE DC<br>BEN WINECOFF DC<br>LARRY EUGENE PHIPPS<br>STEVEN A MUELLER, DC<br>DR MARK A KRUSE DC PC<br>BROWN CHIROPRACTIC PC<br>BRADLEY J BROWN, DC<br>DR BRADLEY A CHICOINE DC PC<br>KEVIN MILLER DC<br>MARK A NILES<br>ROD R REBARCAK DC<br>NILES CHIROPRACTIC, INC<br><br>        Plaintiffs<br><br>VS.<br><br>WELLMARK HEALTH PLAN OF IOWA INC<br>WELLMARK INC DBA WELLMARK BLUE<br>CROSS AND BLUE SHIELD OF IA<br><br>        Defendants | 05771  CVCV050638<br><br>**ORDER GRANTING MOTION TO WITHDRAW** |

This matter is before the Court upon a Motion to Withdraw Appearance as Counsel for Defendants filed by Ryan Koopmans.  Upon review of the file and the Motion, the Court FINDS that the Motion should be granted.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that Ryan Koopmans is  allowed to withdraw his Appearance as Counsel for Defendants.

**Dated this 15th day of May, 2017.**

1 of 2

EXHIBIT
**Y**

E-FILED 2017 MAY 15 8:42 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

**Case Number**       **Case Title**
CVCV050638            BRADLEY CHICOINE AND STEVEN MUELLER ET AL V
                      WELLMARK ET AL
**Type:**             OTHER ORDER

So Ordered

Michael D. Huppert, District Court Judge,
Fifth Judicial District of Iowa

Electronically signed on 2017-05-15 08:42:10

E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

# IN THE SUPREME COURT OF IOWA

No. 16–0364

Filed April 21, 2017

**BRADLEY A. CHICOINE, DR. BRADLEY A. CHICOINE, D.C., P.C., MARK A. NILES, NILES CHIROPRACTIC, INC., ROD R. REBARCAK,** and **BEN WINECOFF,** on Behalf of Themselves and Those Like Situated**,**

      Appellants,

and

**STEVEN A. MUELLER, BRADLEY J. BROWN, MARK A. KRUSE, KEVIN D. MILLER,** and **LARRY E. PHIPPS,** on Behalf of Themselves and Those Like Situated**,**

      Appellants,

vs.

**WELLMARK, INC.** d/b/a **WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA,** an Iowa Corporation, and **WELLMARK HEALTH PLAN OF IOWA, INC.,** an Iowa Corporation,

      Appellees.

---

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

A district court indefinitely stayed state antitrust proceedings in favor of further proceedings in federal multidistrict antitrust litigation. **RULING ON MOTION VACATED; REMANDED WITH DIRECTIONS.**

Glenn L. Norris of Hawkins & Norris, P.C., Des Moines, and Steven P. Wandro and Kara M. Simons of Wandro & Associates, P.C., Des Moines, for appellants.

EXHIBIT
**Z**

1 of 17

E-FILED 2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

2

Hayward L. Draper, Ryan G. Koopmans, and John T. Clendenin (until withdrawal) of Nyemaster Goode, P.C., Des Moines, for appellees.

E-FILED 2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

3

**HECHT, Justice.**

Thirteen Iowa chiropractors filed this class-action lawsuit against Iowa's largest health insurer alleging it conspired with nonparty competitors to fix prices, allocate markets, and engage in other anticompetitive conduct in Iowa in violation of the Iowa Competition Law. *See* Iowa Code ch. 553 (2015). The Iowa chiropractors allege that this anticompetitive conduct has had the purpose and effect of driving down chiropractor reimbursements to discriminatorily low levels.

On the defendants' motion, and over the plaintiffs' objection, the district court stayed the case in its entirety pending further proceedings in federal multidistrict litigation (MDL) in Alabama brought under the federal antitrust laws. *See* 15 U.S.C. §§ 1, 4 (2012). The Alabama MDL includes physicians, hospitals, and other healthcare providers from around the country as plaintiffs. As in the present case, the plaintiffs allege conspiracies by the insurers to fix prices and allocate markets. However, the MDL complaint alleges that the conspiracies have had the effect of driving down *all* healthcare provider reimbursements to artificially low levels. One of the plaintiffs in the Alabama MDL is an Iowa chiropractor and one of the defendants is Iowa's largest health insurer.

On interlocutory review, we conclude the district court abused its discretion in staying the Iowa litigation pending further proceedings in the Alabama MDL. Resolution of the Alabama MDL, which is still in bellwether pretrial proceedings, could take years, and although there is some overlap between the two cases, there are also considerable differences in the issues they present. Accordingly, we vacate the order staying this action and remand for further proceedings.

Case 4:17-cv-00210-JAJ-SBJ    Document 1-27    Filed 06/14/17    Page 4 of 17
E-FILED 2017 MAY 15 1:32 AM POLK - CLERK OF DISTRICT COURT

4

## I.  Background Facts and Proceedings.

The plaintiffs are Iowa chiropractors who treat patients enrolled in health insurance plans offered or administered by the defendants, Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc. (collectively, Wellmark). Wellmark is an Iowa health insurance corporation and a member of the national Blue Cross and Blue Shield Association (BCBSA), a federation of over thirty-five independent Blue Cross and Blue Shield (BCBS) affiliates known as the Blues.

Wellmark contracts with the plaintiffs and other healthcare providers who agree to provide services to BCBS subscribers at or under a discounted fee in exchange for being added to Wellmark's network of preferred providers.  Wellmark shares this fee schedule and provider network with the self-funded employee plans it administers in exchange for a fee and with the other BCBS affiliates in exchange for their promises to not use the BCBS trademark in Iowa and to share their own fee schedules and provider networks with Wellmark's subscribers (the BlueCard® Program) seeking medical services in other states.  *See Mueller v. Wellmark* (*Mueller II*), 861 N.W.2d 563, 566–67 (Iowa 2015).

**A.  Prior Iowa Chiropractic Litigation.**  Wellmark's involvement in the BlueCard® Program and its arrangements with self-funded employee plans have been challenged by Iowa chiropractors in related chiropractic litigation that has come before our court four times.  *See Abbas v. Iowa Ins. Div.*, ___ N.W.2d ___ (Iowa 2017); *Wellmark, Inc. v. Iowa Dist. Ct.*, 890 N.W.2d 636 (Iowa 2017); *Mueller II*, 861 N.W.2d 563; *Mueller v. Wellmark, Inc.* (*Mueller I*), 818 N.W.2d 244 (Iowa 2012).  For a brief summary of those cases, see *Wellmark, Inc.*, 890 N.W.2d at 638–42.

E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

5

**B.  *Chicoine* Petition.**  On October 5, 2015, the plaintiffs filed a class-action petition alleging Wellmark violated section 553.4 of the Iowa Competition Law under the rule of reason.  *See* Iowa Code § 553.4 ("A contract, combination, or conspiracy between two or more persons shall not restrain or monopolize trade or commerce in a relevant market.").[1] The petition alleges Wellmark entered a combination or conspiracy with potential competitors—the other BCBS affiliates and self-funded employee plans Wellmark administers—to restrain trade, commerce, and competition in the sale and purchase of healthcare services in Iowa.  The plaintiffs argue this alleged conduct violates the Iowa Competition Law under the rule of reason because "the anticompetitive consequences of such conspiracy or conspiracies outweigh any procompetitive benefits."

The alleged restraints include agreements to

(a) . . . artificially fix a lower price for chiropractic services and to limit or exclude chiropractic coverage from health plans offered by other potential competitors for chiropractic services in Iowa[;]

(b) . . . allocate territories and not to compete with each other in those allocated territories[;]

(c) impose maximum fee schedules to which chiropractors must agree with defendants, their co-conspirators, and with each other in order to provide diagnostic and treatment services for their patients in Iowa;

(d) prescribe fees for chiropractic services which are discriminatory to doctors of chiropractic in relation to the

---

[1]Five of the named plaintiffs in this case, led by Steven A. Mueller, D.C., previously challenged Wellmark's preferred-provider arrangements as constituting a per se violation of section 553.4 of the Iowa Competition Law.  *See Mueller II*, 861 N.W.2d at 574–75 (affirming summary judgment in favor of Wellmark on the plaintiffs' per se liability claim); *Mueller I*, 818 N.W.2d at 264.  The *Mueller* plaintiffs contend this lawsuit asserting a rule-of-reason claim is a continuation of *Mueller I*, commenced in May 2008.  *See* Iowa Code § 614.10 ("If, after the commencement of an action, the plaintiff, for any cause except negligence in its prosecution, fails therein, and a new one is brought within six months thereafter, the second shall, for the purposes herein contemplated, be held a continuation of the first.").

Case MDL No. 2406   Document 389-9   Filed 07/28/17   Page 634 of 645

Case 4:17-cv-00210-JAJ-SBJ   Document 1-27   Filed 06/14/17   Page 6 of 17
E-FILED 2017 MAY 15 1:32 AM POLK - CLERK OF DISTRICT COURT

6

fees for other health care practitioners for the same or similar services;

(e) prescribe limitations upon and make optional the coverage of diagnostic and treatment services of chiropractors while not imposing the same standards and practices to the coverage of diagnostic and treatment services of other practitioners of health care in Iowa licensed under the chapters of Title IV, subtitle 3, of the Code of Iowa [Chapters 147 through 158];

(f) historically enter into a contract, combination and conspiracy in restraint of trade or commerce in Iowa with health care providers other than chiropractors to first boycott and then later discriminate against the diagnostic and treatment services to members provided by Iowa chiropractors[.]

The petition also challenges Wellmark's attempt to implement plans and policies for itself and its alleged coconspirators under which

(g) . . . subscriber-patients who elected to seek chiropractic treatment would be covered for only three treatment procedures per visit to a doctor of chiropractic regardless of the acuity, severity, or nature of the patient's condition or the number of her complaints;

(h) . . . subscriber-patients and those persons who were employees of self-funded entities administered by Wellmark . . . would be required to seek preapproval . . . before any chiropractic services would be paid, which policy solely related to chiropractic services and to no other services of any other health care practitioner licensed by the state of Iowa;

(i) . . . Iowa chiropractors only are subject to a capitated payment system whereby chiropractors are paid at [a] rate less than 50% of the rate payable for PPO services, while all other Iowa licensed practitioners covered by WHPI are paid pursuant to a schedule derived from the PPO payment schedules with a 7-9% discount.

The plaintiffs seek certification of a class comprised of all similarly situated chiropractors who were either Iowa citizens (1) on the date the petition was filed or (2) "at all times during their Iowa licensure as doctors of chiropractic after May 20, 2004, which is four years prior to

the filing of the Plaintiffs' First [Amended Petition] in [*Mueller I*, 818 N.W.2d 244]."

    **C.  Motion to Stay.**  In December 2015, Wellmark filed a motion to stay proceedings in favor of multidistrict litigation pending in the United States District Court for the Northern District of Alabama.  *See In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, No. 2:13–cv–20000 (N.D. Ala. 2012) [hereinafter MDL No. 2406].  MDL No. 2406 consolidated for pretrial purposes a significant number of federal antitrust cases brought by various healthcare providers and health insurance subscribers against the BCBSA and at least one affiliate. Wellmark asserted a stay was appropriate because MDL No. 2406 was filed first, had advanced farther, concerned the same putative class, and involved common issues and parties.  Wellmark also argued a stay would be consistent with principles of comity, give the Iowa court the benefit of federal judicial expertise, save significant resources by eliminating duplicative efforts, and help avoid inconsistent interpretations of the Iowa Competition Law and the Federal Sherman Act.

    MDL No. 2406 has two master class-action complaints, a provider complaint and a subscriber complaint.  Only the provider complaint is relevant to this case.  The most recent version of the provider complaint available in the record on appeal was filed in MDL No. 2406 on November 25, 2014, by medical suppliers and healthcare providers, including Iowa chiropractor Joseph Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology (FCCN).  The provider complaint alleges Wellmark, the other BCBS affiliates, and the BCBSA conspired to allocate markets, fix prices, and boycott providers outside each affiliate's allocated market in violation of Section 1 of the Sherman Act under per se, quick-look, or rule-of-reason analyses.  The plaintiffs ask the

E-FILED 2017 MAY 15 1:32 AM POLK - CLERK OF DISTRICT COURT

8

federal court to certify a class of healthcare providers and a subclass of plaintiffs for Iowa that includes all Iowa chiropractors who provided insured services within four years of the filing of the action, with Joseph Ferezy as representative for the subclass of Iowa chiropractors.

With respect to Iowa chiropractor Joseph Ferezy's claims, the complaint states,

> During the relevant time period, FCCN provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to his in-network contract with Wellmark, and billed Wellmark for the same. FCCN was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, FCCN has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan members through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.

*Corrected Consolidated Second Amended Provider Complaint*, MDL No. 2406, No. 2:13–cv–20000, EFC No. 236, at *29, ¶51 (N.D. Ala. filed Nov. 25, 2014).

On October 30, 2015, the court in MDL No. 2406 issued a scheduling order adopting a bellwether approach to streamlining MDL No. 2406. *See Order*, MDL No. 2406, No. 2:13–cv–20000, EFC No. 469 (N.D. Ala. filed Oct. 30, 2015). The court stayed all but the two cases filed in its district until January 2018—*American Electric Motor Services, Inc. v. Blue Cross & Blue Shield of Alabama*, Case No. 2:12-cv-02169, a subscriber case, and *Conway v. Blue Cross & Blue Shield of Alabama*, Case No. 2:12-cv-02532, a provider case (collectively, the bellwether cases). *Id.* at 5. The court then set an accelerated schedule for pretrial

9

proceedings in the two bellwether cases to occur throughout 2017.[2]  *Id.* at 5–6.  A pretrial conference would occur no sooner than January 2018, with a trial date for the two bellwether cases to be set by separate order. *Id.* at 6.

**D.  Subsequent Proceedings.**  The plaintiffs resisted Wellmark's motion to stay this action in December 2015, asking the court to conclude under standards established in *First Midwest Corp. v. Corporate Finance Associates* that a stay is unwarranted.  *See* 663 N.W.2d 888, 891 (Iowa 2003).  Wellmark replied, and the district court held a hearing in January 2016.  On January 28, 2016, the district court stayed the case "in favor of further proceedings in [MDL No. 2406], until further order of this court."  We granted the plaintiffs' application for interlocutory appeal.

**II.  Standard of Review.**

We review the decision to grant or deny a stay for abuse of discretion.  *Id.* at 890–91.  Reversal is warranted when discretion "is capriciously exercised or abused."  *Id.* (quoting *Chrysler Credit Corp. v. Rosenberger*, 512 N.W.2d 303, 305 (Iowa 1994)).  Discretion is abused unless the evidence clearly and convincingly shows that the need for a stay outweighs the potential for harm or prejudice to the other litigants. *See Landis v. N. Am. Co.*, 299 U.S. 248, 255, 57 S. Ct. 163, 166 (1936) ("[T]he suppliant for a stay must make out a clear case of hardship or

---

[2]The court required factual discovery to be completed by January 13, 2017; expert reports to be submitted by February, 28, 2017 and March 28, 2017, for the plaintiffs and defendants, respectively; expert discovery to be completed by April 28, 2017; class certification and *Daubert* motions to be submitted by June 1, 2017; and potentially dispositive motions to be submitted by September 7, 2017.  *Order*, MDL No. 2406, No. 2:13-cv-20000, EFC No. 469, at 5–6.  The court also set a nonrecord economics day in January 2017 so the parties could educate the court about relevant economic issues.  *Id.*

E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

10

inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else."); *see also Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) ("The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative.").

### III. Analysis.

The issue on appeal is whether the district court abused its discretion by staying the plaintiffs' lawsuit in its entirety pending further proceedings in MDL No. 2406.  We begin by reviewing the law governing stays.

A "stay" is the temporary postponement of all or part of a judgment or judicial proceeding by court order.  *Stay, Black's Law Dictionary* (10th ed. 2014).[3]  The power to grant a stay "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254, 57 S. Ct. at 166; *see also Brenton Bros. v. Dorr*, 213 Iowa 725, 728, 239 N.W. 808, 809 (1931).  District courts have broad discretion in deciding whether to grant or deny a stay.  *See First Midwest Corp.*, 663 N.W.2d at 890.  That discretion, however, is not unbridled.  *Id.*

A district court must act reasonably when deciding whether to stay a case in favor of a proceeding in another jurisdiction, taking into

---

[3]We recognize three classes of stays: those issued under a court's common law authority to control the disposition of causes on its docket, those granted pursuant to statute, and those associated with appellate proceedings and certain postjudgment motions.  *Brenton Bros. v. Dorr*, 213 Iowa 725, 728, 239 N.W. 808, 809–10 (1931); *see also* Iowa R. Civ. P. 1.1006 (permitting a stay pending the resolution of motions for judgment notwithstanding the verdict, for a new trial, or to vacate or modify a judgment).  The first class of stay is at issue in this case.

Case 4:17-cv-00210-JAJ-SBJ    Document 1-27    Filed 06/14/17    Page 11 of 17
E-FILED  2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

11

account the parties' competing interests, the consequences of a stay to the parties, and other relevant considerations. *See Landis*, 299 U.S. at 254–58, 57 S. Ct. at 166–67. The other relevant considerations include

> comity,[4] the desirability of avoiding a multiplicity of forums, whether the foreign litigation is at an advanced or preliminary stage, the likelihood of obtaining complete relief in the foreign jurisdiction, and the possibility that a judgment entered in the foreign jurisdiction will give rise to collateral estoppel or will render the matter before the court res judicata.

*First Midwest Corp.*, 663 N.W.2d at 891 (quoting 1 Am. Jur. 2d *Actions* § 78, at 773 (1994)). Other considerations include the relative convenience of the forums; which action was filed first; the forums' subject-matter knowledge and expertise; whether the actions were brought in good faith; and the similarity of "the parties, causes of action, and issues in the two actions." E.H. Schopler, Annotation, *Stay of Civil Proceedings Pending Determination of Action in Federal Court in Same State*, 56 A.L.R.2d 335, § 2, Westlaw (database updated April 2017) (footnotes omitted).

"Where a prior foreign action involves the same parties and the same issues and is pending before a court capable of doing prompt and complete justice, the court's discretion may be freely exercised in favor of a stay." *First Midwest Corp.*, 663 N.W.2d at 891 (quoting 1 Am. Jur. 2d *Actions* § 78, at 773). Conversely, where the parties or issues are different, a stay will only be justified in rare circumstances. *See Landis*, 299 U.S. at 255, 57 S. Ct. at 166. A stay may be justified in favor of another case involving different parties if both cases require "the minute

---

[4]"Comity is . . . a principle in accordance with which the courts of one state will give effect to the laws and judicial decisions of another, not as a matter of right but out of deference and respect." *Jacobsen v. Saner*, 247 Iowa 191, 193, 72 N.W.2d 900, 901 (1955).

E-FILED  2017 MAY 15 11:52 AM POLK - CLERK OF DISTRICT COURT

12

investigation of intercorporate relations, linked in a web of baffling intricacy" or present "novel problems of far-reaching importance to the parties or public." *Id.* at 256, 57 S. Ct. at 166.  Likewise, a stay may be justified in favor of another case involving different issues of fact and law if "in all likelihood it will settle many [issues] and simplify them all." *Id.*

The seminal case concerning a trial court's common law authority to stay a case *pendent lite* is *Landis*.  In *Landis*, the Supreme Court held that the terms of a stay must be moderate in extent and unoppressive in effect.  *Id.* at 256, 57 S. Ct. at 166.  "[A] stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description."  *Id.* at 257, 57 S. Ct. at 167.  The Court concluded the trial court abused its discretion by granting a stay pending the final appellate decision in another case that was still in pretrial proceedings because the stay would be in effect for years and might ultimately be of little to no benefit to the stayed case, depending on how the other case was decided.  *Id.* at 256–57, 57 S. Ct. at 167.  The stay did not become moderate merely "because conceivably the court that made it may be persuaded at a later time to undo what it has done."  *Id.* at 257, 57 S. Ct. at 167.

In this case, the only limit the district court placed on the duration of the stay was that it would remain in effect "until further order of this court."   Absent the district court's decision to end the stay, it will continue in effect through a decision by the district court in the bellwether cases and any appeal to the United States Court of Appeals for the Fifth Circuit and United States Supreme Court.  Once the bellwether cases are resolved, the stay could continue while the nonbellwether cases proceed through the pretrial phase of MDL

No. 2406.  The stay order concluded a stay was warranted even though "the eventual trial of the Iowa portion of the MDL action may not come for several years," indicating the district court might even consider letting the stay remain in effect through the remand and trial of the Iowa portion of the MDL action.

As in *Landis*, the stay in this case serves to prolong the decision-making process for years without adequately protecting or advancing the plaintiffs' interest in receiving a prompt decision.  At a minimum, the stay will last until 2018—the earliest date the bellwether cases could precede to trial under the current scheduling order in MDL No. 2406.  In all likelihood, the stay could last several years or even a decade or more as the bellwether cases and the consolidated federal case involving the Iowa plaintiff move through their trial and appellate stages.  Such a lengthy and indefinite stay violates the plaintiffs' interest in prompt and complete justice.  *Cf. First Midwest Corp.*, 663 N.W.2d at 891.  The stay does not become moderate simply because the plaintiffs could petition the court to enter an order ending the stay or because the court could end the stay sooner of its own accord.  *See Landis*, 299 U.S. at 257, 57 S. Ct. at 167.

Furthermore, any benefit of a decision in MDL No. 2406 advancing the resolution of this case is uncertain for several reasons.  First, if MDL No. 2406 is resolved under a per se or quick-look theory, it will provide little or no benefit to the economic and econometric analyses in the Iowa plaintiffs' rule-of-reason claim.  Second, the federal court in MDL No. 2406 has adopted a bellwether approach, making it more likely that the Iowa portion of MDL No. 2406 will settle before trial or even pretrial proceedings, thus removing many of the potential benefits of a stay in this case.  *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir.

14

1997) ("The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar.").   The bellwether cases involve Alabama plaintiffs, and it is possible that competitive conditions in Alabama may have no connection to those in Iowa.[5]

Finally, as the district court found, the plaintiffs raised approximately "ten detailed specifications of wrongdoing" concerning Wellmark's treatment of *Iowa chiropractors* while MDL No. 2406 focused on two allegations concerning the BCBSA's treatment of *all healthcare providers*.  Although there appears to be an allegation common to both cases that the BCBSA entities have generally conspired to stay out of each other's territories (i.e., Iowa and South Dakota in the case of Wellmark), the present case alleges discriminatory treatment of chiropractors instead of artificially low reimbursements for all healthcare providers.  In addition, the present case alleges other anticompetitive agreements, including between Wellmark and self-insurers.  It is unclear in our view whether any resolution of claims in MDL No. 2406 would result in the resolution of claims in this action.  *See Landis*, 299 U.S. at 256, 57 S. Ct. at 166 (noting a stay may be justified in favor of a case with nonidentical issues if "in all likelihood it will settle many and simplify them all").

An indefinite delay for uncertain benefits is patently immoderate. *Cf. Univ. of Utah Hosp. & Med. Ctr. v. Twin Falls County*, 842 P.2d 689, 692 (Idaho 1992) (finding the stay of an application for medical indigency

---

[5]A federal MDL is for pretrial purposes only, and cases are returned to their home district for trial.  *See* 28 U.S.C. § 1407(a).

pending a final appellate decision in a disability application to be patently unreasonable), *superseded by statute*, 1996 Idaho Sess. Laws 1360, *as recognized in St. Luke's Magic Valley Reg'l Med. Ctr., Ltd. v. Bd. of Cty. Comm'rs*, 237 P.3d 1210, 1215 (Idaho 2010). "Relief so drastic and unusual overpasses the limits of any reasonable need, at least upon the showing made when the motion was submitted." *Landis*, 299 U.S. at 257, 57 S. Ct. at 167. Under the circumstances, we conclude it was an abuse of discretion for the district court to stay this litigation.

We disagree with Wellmark's contention that Iowa Code section 553.2 supports a stay here.[6]  Although section 553.2 provides that the Iowa Competition Law "shall be construed to complement and be harmonized with" federal antitrust laws, it also directs that it shall not be construed "in such a way as to constitute a delegation of state authority to the federal government." Iowa Code § 553.2. The purpose of section 553.2 is to achieve "a uniform standard of conduct so that businesses will know what is acceptable conduct and what is not acceptable conduct." *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2003). But attainment of that purpose does not necessarily require an Iowa state trial court to wait for and then defer to the legal rulings of an Alabama federal trial court in a specific case. Our courts are capable of applying antitrust precedent.

---

[6]Iowa Code section 553.2 provides,

This chapter shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction shall not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.

E-FILED 2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT

16

**IV. Disposition.**

The order of the district court is vacated, and the case is remanded.

**RULING ON MOTION VACATED; REMANDED WITH DIRECTIONS.**

All justices concur except Appel, J., who takes no part.

E-FILED 2017 MAY 15 11:32 AM POLK - CLERK OF DISTRICT COURT



State of Iowa Courts

| Case Number | Case Title |
|---|---|
| 16-0364 | Chicoine v. Wellmark |

Electronically signed on 2017-04-21 11:12:18