**U.S. Bankruptcy Court**
**California Northern Bankruptcy Court (Oakland)**
**Adversary Proceeding #: 21-04034**

*Assigned to:*                                                                          *Date Filed:* 09/22/21
*Demand:*

*Nature[s] of Suit:*  01 Determination of removed claim or cause

---

### Plaintiff

**VHS LIQUIDATING** represented **Michael P. Esser**
**TRUST**                    by Kirkland & Ellis LLP
One Embarcadero        555 California St, 27th Fl
Center                        San Francisco, CA 94104
Suite 800                    (415)439-1400
San Francisco, CA      Email: michael.esser@kirkland.com
94111

---

### Plaintiff

**PRIME**              represented **Michael P. Esser**
**HEALTHCARE**                  by (See above for address)
**SERVICES, INC.**
One Embarcadero
Center
Suite 800
San Francisco, CA
94111

---

### Plaintiff

**PRIME**              represented **Michael P. Esser**
**HEALTHCARE**                  by (See above for address)
**FOUNDATION, INC.**
One Embarcadero
Center
Suite 800
San Francisco, CA
94111

---

### Plaintiff

**PRIME**              represented **Michael P. Esser**
**HEALTHCARE**                  by (See above for address)
**MANAGEMENT,**
**INC.**
One Embarcadero
Center
Suite 800
San Francisco, CA
94111

V.

---

### Defendant

**ANTHEM BLUE**       represented **ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY**
**CROSS LIFE AND**              by PRO SE
**HEALTH**
**INSURANCE**
**COMPANY**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

### Defendant

**CALIFORNIA**        represented **CALIFORNIA PHYSICIANS SERVICE d/b/a BLUE SHIELD OF CALIFORNIA**
**PHYSICIANS**                  by PRO SE
**SERVICE d/b/a**
**BLUE SHIELD OF**
**CALIFORNIA**
825 Eighth Avenue
New York, NY 10019

*Defendant*
-----------------------
**BLUE CROSS AND**        represented **BLUE CROSS AND BLUE SHIELD OF ALABAMA**
**BLUE SHIELD OF**              by PRO SE
**ALABAMA**
825 Eighth Avenue
New York, NY 10019


*Defendant*
-----------------------
**BLUE CROSS OF**        represented **BLUE CROSS OF CALIFORNIA**
**CALIFORNIA**                  by PRO SE
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025


*Defendant*
-----------------------
**PREMERA**        represented **PREMERA**
1420 Fifth Avenue              by PRO SE
Suite 3700
Seattle, WA 98101


*Defendant*
-----------------------
**PREMERA BLUE**        represented **PREMERA BLUE CROSS**
**CROSS**                          by PRO SE
1420 Fifth Avenue
Suite 3700
Seattle, WA 98101


*Defendant*
-----------------------
**PREMERA BLUE**        represented **PREMERA BLUE CROSS BLUE SHIELD OF ALASKA**
**CROSS BLUE**                  by PRO SE
**SHIELD OF**
**ALASKA**
1420 Fifth Avenue
Suite 3700
Seattle, WA 98101


*Defendant*
-----------------------
**BLUE CROSS BLUE**    represented **BLUE CROSS BLUE SHIELD OF ARIZONA, INC.**
**SHIELD OF**                      by PRO SE
**ARIZONA, INC.**
590 Madison Ave.
20th Floor
New York, NY 10022


*Defendant*
-----------------------
**USABLE MUTUAL**    represented **USABLE MUTUAL INSURANCE COMPANY d/b/a ARKANSAS BLUE CROSS AND BLUE SHIELD**
**INSURANCE**                  by PRO SE
**COMPANY d/b/a**
**ARKANSAS BLUE**
**CROSS AND BLUE**
**SHIELD**
555 California Street
Suite 1700
San Francisco, CA
94104


*Defendant*
-----------------------
**ANTHEM, INC. f/k/a**  represented **ANTHEM, INC. f/k/a WELLPOINT, INC. d/b/a ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY**
**WELLPOINT, INC.**              by PRO SE
**d/b/a ANTHEM**
**BLUE CROSS LIFE**
**AND HEALTH**
**INSURANCE**
**COMPANY**
4085 Campbell
Avenue
Suite 100

Menlo Park, CA 94025

---

*Defendant*
-----------------------

**ANTHEM HEALTH PLANS, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE **ANTHEM HEALTH PLANS, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT**

---

*Defendant*
-----------------------

**BLUE CROSS AND BLUE SHIELD OF GEORGIA**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE **BLUE CROSS AND BLUE SHIELD OF GEORGIA**

---

*Defendant*
-----------------------

**ROCKY MOUNTAIN HOSPITAL & MEDICAL SERVICE INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE **ROCKY MOUNTAIN HOSPITAL & MEDICAL SERVICE INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO**

---

*Defendant*
-----------------------

**ANTHEM BLUE CROSS AND BLUE SHIELD OF NEVADA**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE **ANTHEM BLUE CROSS AND BLUE SHIELD OF NEVADA**

---

*Defendant*
-----------------------

**ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF INDIANA**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE **ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF INDIANA**

---

*Defendant*
-----------------------

**ANTHEM HEALTH PLANS OF KENTUCKY, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF KENTUCKY**
4085 Campbell
Avenue
Suite 100

represented by PRO SE **ANTHEM HEALTH PLANS OF KENTUCKY, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF KENTUCKY**

---

Menlo Park, CA 94025

---

*Defendant*

---------------------

**ANTHEM HEALTH** represented **ANTHEM HEALTH PLANS OF MAINE, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF MAINE**
**PLANS OF MAINE,** by PRO SE
**INC. d/b/a ANTHEM**
**BLUE CROSS AND**
**BLUE SHIELD OF**
**MAINE**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

*Defendant*

---------------------

**HMO MISSOURI** represented **HMO MISSOURI INC., d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF MISSOURI**
**INC., d/b/a** by PRO SE
**ANTHEM BLUE**
**CROSS BLUE**
**SHIELD OF**
**MISSOURI**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

*Defendant*

---------------------

**RIGHTCHOICE** represented **RIGHTCHOICE MANAGED CARE, INC.**
**MANAGED CARE,** by PRO SE
**INC.**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

*Defendant*

---------------------

**HEALTHY** represented **HEALTHY ALLIANCE LIFE INSURANCE COMPANY**
**ALLIANCE LIFE** by PRO SE
**INSURANCE**
**COMPANY**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

*Defendant*

---------------------

**ANTHEM HEALTH** represented **ANTHEM HEALTH PLANS OF NEW HAMPSHIRE, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW HAMPSHII**
**PLANS OF NEW** by PRO SE
**HAMPSHIRE, INC.**
**d/b/a ANTHEM**
**BLUE CROSS AND**
**BLUE SHIELD OF**
**NEW HAMPSHIRE**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

*Defendant*

---------------------

**EMPIRE** represented **EMPIRE HEALTHCHOICE ASSURANCE, INC. d/b/a EMPIRE BLUE CROSS BLUE SHIELD**
**HEALTHCHOICE** by PRO SE
**ASSURANCE, INC.**
**d/b/a EMPIRE**
**BLUE CROSS BLUE**
**SHIELD**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

---

*Defendant*

**COMMUNITY
INSURANCE
COMPANY d/b/a
ANTHEM BLUE
CROSS AND BLUE
SHIELD OF OHIO**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **COMMUNITY INSURANCE COMPANY d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF OHIO**
by PRO SE

*Defendant*
-----------------------

**ANTHEM HEALTH
PLANS OF
VIRGINIA, INC.,
d/b/a ANTHEM
BLUE CROSS AND
BLUE SHIELD OF
VIRGINIA, INC.**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **ANTHEM HEALTH PLANS OF VIRGINIA, INC., d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF VIRGINIA, INC.**
by PRO SE

*Defendant*
-----------------------

**BLUE CROSS BLUE
SHIELD OF
WISCONSIN, d/b/a
ANTHEM BLUE
CROSS AND BLUE
SHIELD OF
WISCONSIN**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **BLUE CROSS BLUE SHIELD OF WISCONSIN, d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF WISCONSIN**
by PRO SE

*Defendant*
-----------------------

**COMPCARE
HEALTH
SERVICES
INSURANCE
CORPORATION**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **COMPCARE HEALTH SERVICES INSURANCE CORPORATION**
by PRO SE

*Defendant*
-----------------------

**HIGHMARK
HEALTH
SERVICES**
555 California Street
27th Floor
San Francisco, CA
94104

represented **HIGHMARK HEALTH SERVICES**
by PRO SE

*Defendant*
-----------------------

**HIGHMARK INC.
d/b/a HIGHMARK
BLUE SHIELD**
555 California Street
27th Floor
San Francisco, CA
94104

represented **HIGHMARK INC. d/b/a HIGHMARK BLUE SHIELD**
by PRO SE

*Defendant*
-----------------------

**HIGHMARK BLUE
CROSS BLUE
SHIELD**
555 California Street

represented **HIGHMARK BLUE CROSS BLUE SHIELD**
by PRO SE

27th Floor
San Francisco, CA
94104

**Defendant**

**-----------------------**
**HOSPITAL**          represented  **HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA f/d/b/a BLUE CROSS OF NORTHEASTERN PENNS**
**SERVICE**                 by  PRO SE
**ASSOCIATION OF**
**NORTHEASTERN**
**PENNSYLVANIA**
**f/d/b/a BLUE CROSS**
**OF**
**NORTHEASTERN**
**PENNSYLVANIA**
555 California Street
27th Floor
San Francisco, CA
94104

**Defendant**

**-----------------------**
**HIGHMARK BLUE**      represented  **HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE**
**CROSS BLUE**              by  PRO SE
**SHIELD**
**DELAWARE INC.**
**d/b/a HIGHMARK**
**BLUE CROSS BLUE**
**SHIELD**
**DELAWARE**
555 California Street
27th Floor
San Francisco, CA
94104

**Defendant**

**-----------------------**
**BLUE CROSS AND**     represented  **BLUE CROSS AND BLUE SHIELD ASSOCIATION**
**BLUE SHIELD**             by  PRO SE
**ASSOCIATION**
555 California Street
27th Floor
San Francisco, CA
94104

**Defendant**

**-----------------------**
**HIGHMARK WEST**      represented  **HIGHMARK WEST VIRGINIA INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD WEST VIRGINIA**
**VIRGINIA INC.**           by  PRO SE
**d/b/a HIGHMARK**
**BLUE CROSS BLUE**
**SHIELD WEST**
**VIRGINIA**
555 California Street
27th Floor
San Francisco, CA
94104

**Defendant**

**-----------------------**
**CAREFIRST, INC.**    represented  **CAREFIRST, INC.**
825 Eighth Avenue          by  PRO SE
New York, NY 10019

**Defendant**

**-----------------------**
**GROUP**              represented  **GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC.**
**HOSPITALIZATION**         by  PRO SE
**AND MEDICAL**
**SERVICES, INC.**
825 Eighth Avenue
New York, NY 10019

**Defendant**

**-----------------------**
**CAREFIRST OF**                    **CAREFIRST OF MARYLAND, INC.**

**MARYLAND, INC.**
825 Eighth Avenue
New York, NY 10019

represented PRO SE
by

**Defendant**
----------------------
**CAREFIRST
BLUECHOICE, INC.**
825 Eighth Avenue
New York, NY 10019

represented **CAREFIRST BLUECHOICE, INC.**
by PRO SE

**Defendant**
----------------------
**AREFIRST
BLUECROSS
BLUESHIELD**
825 Eighth Avenue
New York, NY 10019

represented **AREFIRST BLUECROSS BLUESHIELD**
by PRO SE

**Defendant**
----------------------
**GUIDEWELL
MUTUAL
HOLDING
CORPORATION**
825 Eighth Avenue
New York, NY 10019

represented **GUIDEWELL MUTUAL HOLDING CORPORATION**
by PRO SE

**Defendant**
----------------------
**BLUE CROSS AND
BLUE SHIELD OF
FLORIDA, INC.**
825 Eighth Avenue
New York, NY 10019

represented **BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC.**
by PRO SE

**Defendant**
----------------------
**HAWAII MEDICAL
SERVICE
ASSOCIATION d/b/a
BLUE CROSS AND
BLUE SHIELD OF
HAWAII**
555 California Street
27th Floor
San Francisco, CA
94104

represented **HAWAII MEDICAL SERVICE ASSOCIATION d/b/a BLUE CROSS AND BLUE SHIELD OF HAWAII**
by PRO SE

**Defendant**
----------------------
**REGENCE
BLUESHIELD OF
IDAHO, INC.**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **REGENCE BLUESHIELD OF IDAHO, INC.**
by PRO SE

**Defendant**
----------------------
**BLUE CROSS OF
IDAHO HEALTH
SERVICE, INC.
d/b/a BLUE CROSS
OF IDAHO**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

represented **BLUE CROSS OF IDAHO HEALTH SERVICE, INC. d/b/a BLUE CROSS OF IDAHO**
by PRO SE

**Defendant**
----------------------
**CAMBIA HEALTH
SOLUTIONS, INC.**
4085 Campbell

represented **CAMBIA HEALTH SOLUTIONS, INC.**
by PRO SE

Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*
-----------------------
**REGENCE BLUE CROSS BLUE SHIELD OF OREGON**    represented **REGENCE BLUE CROSS BLUE SHIELD OF OREGON**
by PRO SE

4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025


*Defendant*
-----------------------
**REGENCE BLUE CROSS BLUE SHIELD OF UTAH**    represented **REGENCE BLUE CROSS BLUE SHIELD OF UTAH**
by PRO SE

4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025


*Defendant*
-----------------------
**REGENCE BLUE SHIELD (WASHINGTON)**    represented **REGENCE BLUE SHIELD (WASHINGTON)**
by PRO SE

4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025


*Defendant*
-----------------------
**HEALTH CARE SERVICE CORPORATION**    represented **HEALTH CARE SERVICE CORPORATION**
by PRO SE

555 California Street
27th Floor
San Francisco, CA
94104


*Defendant*
-----------------------
**BLUE CROSS AND BLUE SHIELD OF ILLINOIS**    represented **BLUE CROSS AND BLUE SHIELD OF ILLINOIS**
by PRO SE

555 California Street
27th Floor
San Francisco, CA
94104


*Defendant*
-----------------------
**BLUE CROSS AND BLUE SHIELD OF MONTANA**    represented **BLUE CROSS AND BLUE SHIELD OF MONTANA**
by PRO SE

555 California Street
27th Floor
San Francisco, CA
94104


*Defendant*
-----------------------
**CARING OR MONTANANS, INC.**    represented **CARING OR MONTANANS, INC.**
by PRO SE

555 California Street
27th Floor
San Francisco, CA
94104


*Defendant*
-----------------------

**BLUE CROSS AND BLUE SHIELD OF NEW MEXICO**
555 California Street
27th Floor
San Francisco, CA
94104

represented **BLUE CROSS AND BLUE SHIELD OF NEW MEXICO**
by PRO SE

*Defendant*
----------------------

**BLUE CROSS AND BLUE SHIELD OF OKLAHOMA**
555 California Street
27th Floor
San Francisco, CA
94104

represented **BLUE CROSS AND BLUE SHIELD OF OKLAHOMA**
by PRO SE

*Defendant*
----------------------

**BLUE CROSS AND BLUE SHIELD OF TEXAS, INC.**
555 California Street
27th Floor
San Francisco, CA
94104

represented **BLUE CROSS AND BLUE SHIELD OF TEXAS, INC.**
by PRO SE

*Defendant*
----------------------

**WELLMARK, INC.**
555 California Street
27th Floor
San Francisco, CA
94104

represented **WELLMARK, INC.**
by PRO SE

*Defendant*
----------------------

**WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA**
555 California Street
27th Floor
San Francisco, CA
94104

represented **WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA**
by PRO SE

*Defendant*
----------------------

**WELLMARK OF SOUTH DAKOTA, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA**
555 California Street
27th Floor
San Francisco, CA
94104

represented **WELLMARK OF SOUTH DAKOTA, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA**
by PRO SE

*Defendant*
----------------------

**BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

represented **BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.**
by PRO SE

*Defendant*
----------------------

**LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND**

represented **LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA**
by PRO SE

**BLUE SHIELD OF LOUISIANA**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*
----------------------

**BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.**
825 Eighth Avenue
New York, NY 10019

represented by PRO SE   **BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC.**

*Defendant*
----------------------

**BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY**
535 Mission Street
25th Floor
San Francisco, CA 94105

represented by PRO SE   **BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY**

*Defendant*
----------------------

**AWARE INTEGRATED, INC.**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE   **AWARE INTEGRATED, INC.**

*Defendant*
----------------------

**BCBSM, INC. d/b/a BLUE CROSS AND BLUE SHIELD OF MINNESOTA**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented by PRO SE   **BCBSM, INC. d/b/a BLUE CROSS AND BLUE SHIELD OF MINNESOTA**

*Defendant*
----------------------

**BLUE CROSS & BLUE SHIELD OF MISSISSIPPI**
555 California Street
Suite 1700
San Francisco, CA 94104

represented by PRO SE   **BLUE CROSS & BLUE SHIELD OF MISSISSIPPI**

*Defendant*
----------------------

**BLUE CROSS AND BLUE SHIELD OF KANSAS CITY**
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

represented by PRO SE   **BLUE CROSS AND BLUE SHIELD OF KANSAS CITY**

*Defendant*
----------------------

**GOODLIFE PARTNERS, INC.**
3 Embarcadero Center
26th Floor
San Francisco, CA

represented by PRO SE   **GOODLIFE PARTNERS, INC.**

*Defendant*

---------------------
**BLUE CROSS AND**      represented   **BLUE CROSS AND BLUE SHIELD OF NEBRASKA**
**BLUE SHIELD OF**             by PRO SE
**NEBRASKA**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

*Defendant*

---------------------
**HORIZON**           represented   **HORIZON HEALTHCARE SERVICES, INC. d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY**
**HEALTHCARE**             by PRO SE
**SERVICES, INC.**
**d/b/a HORIZON**
**BLUE CROSS BLUE**
**SHIELD OF NEW**
**JERSEY**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*

---------------------
**HEALTHNOW**         represented   **HEALTHNOW SYSTEMS, INC.**
**SYSTEMS, INC.**          by PRO SE
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

*Defendant*

---------------------
**HEALTHNOW NEW**  represented   **HEALTHNOW NEW YORK, INC. d/b/a BLUECROSS BLUESHIELD OF WESTERN NEW YORK**
**YORK, INC. d/b/a**          by PRO SE
**BLUECROSS**
**BLUESHIELD OF**
**WESTERN NEW**
**YORK**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

*Defendant*

---------------------
**BLUESHIELD OF**      represented   **BLUESHIELD OF NORTHEASTERN NEW YORK**
**NORTHEASTERN**           by PRO SE
**NEW YORK**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

*Defendant*

---------------------
**LIFETIME**           represented   **LIFETIME HEALTHCARE, INC.**
**HEALTHCARE,**            by PRO SE
**INC.**
22 Battery Street
Suite 401
San Francisco, CA
94111

*Defendant*

---------------------
**EXCELLUS**          represented   **EXCELLUS HEALTH PLAN, INC. d/b/a EXCELLUS BLUECROSS BLUESHIELD**
**HEALTH PLAN,**          by PRO SE
**INC. d/b/a**
**EXCELLUS**
**BLUECROSS**
**BLUESHIELD**
22 Battery Street

Suite 401
San Francisco, CA
94111

*Defendant*
----------------------
**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, INC.**
825 Eighth Avenue
New York, NY 10019

represented by   **BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, INC.**
PRO SE

*Defendant*
----------------------
**NORIDIAN MUTUAL INSURANCE COMPANY**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

represented by   **NORIDIAN MUTUAL INSURANCE COMPANY**
PRO SE

*Defendant*
----------------------
**HEALTHYDAKOTA MUTUAL HOLDINGS**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

represented by   **HEALTHYDAKOTA MUTUAL HOLDINGS**
PRO SE

*Defendant*
----------------------
**BLUE CROSS BLUE SHIELD OF NORTH DAKOTA**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

represented by   **BLUE CROSS BLUE SHIELD OF NORTH DAKOTA**
PRO SE

*Defendant*
----------------------
**CAPITAL BLUE CROSS**
5901 W. Century Blvd.
Suite 1100
Los Angeles, CA
90045

represented by   **CAPITAL BLUE CROSS**
PRO SE

*Defendant*
----------------------
**INDEPENDENCE HEALTH GROUP, INC.**
560 Mission Street
San Francisco, CA
94105

represented by   **INDEPENDENCE HEALTH GROUP, INC.**
PRO SE

*Defendant*
----------------------
**INDEPENDENCE HOSPITAL INDEMNITY PLAN, INC. f/k/a INDEPENDENCE BLUE CROSS**
560 Mission Street
San Francisco, CA
94105

represented by   **INDEPENDENCE HOSPITAL INDEMNITY PLAN, INC. f/k/a INDEPENDENCE BLUE CROSS**
PRO SE

*Defendant*
----------------------

**TRIPLE-S MANAGEMENT CORPORATION**
555 California Street
27th Floor
San Francisco, CA
94104

represented **TRIPLE-S MANAGEMENT CORPORATION**
by PRO SE

*Defendant*
------------------------
**TRIPLE-S SALUD, INC.**
555 California Street
27th Floor
San Francisco, CA
94104

represented **TRIPLE-S SALUD, INC.**
by PRO SE

*Defendant*
------------------------
**BLUE CROSS & BLUE SHIELD OF RHODE ISLAND**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **BLUE CROSS & BLUE SHIELD OF RHODE ISLAND**
by PRO SE

*Defendant*
------------------------
**BLUE CROSS BLUE SHIELD OF SOUTH CAROLINA**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **BLUE CROSS BLUE SHIELD OF SOUTH CAROLINA**
by PRO SE

*Defendant*
------------------------
**BLUECROSS BLUESHIELD OF TENNESSEE, INC.**
825 Eighth Avenue
New York, NY 10019

represented **BLUECROSS BLUESHIELD OF TENNESSEE, INC.**
by PRO SE

*Defendant*
------------------------
**BLUE CROSS AND BLUE SHIELD OF VERMONT**
4085 Campbell
Avenue
Suite 100
Menlo Park, CA 94025

represented **BLUE CROSS AND BLUE SHIELD OF VERMONT**
by PRO SE

*Defendant*
------------------------
**BLUE CROSS BLUE SHIELD OF WYOMING**
3 Embarcadero Center
26th Floor
San Francisco, CA
94111

represented **BLUE CROSS BLUE SHIELD OF WYOMING**
by PRO SE

| Filing Date | # | Docket Text |
|---|---|---|
| 09/22/2021 | 1 (498 pgs; 5 docs) | 01 (Determination of removed claim or cause) Complaint by VHS LIQUIDATING TRUST, PRIME HEALTHCARE SERVICES, INC., PRIME HEALTHCARE FOUNDATION, INC., PRIME HEALTHCARE MANAGEMENT, INC. against ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, CALIFORNIA PHYSICIANS SERVICE d/b/a BLUE SHIELD OF CALIFORNIA, BLUE CROSS AND BLUE SHIELD OF ALABAMA, BLUE CROSS OF CALIFORNIA, PREMERA, PREMERA BLUE CROSS, PREMERA BLUE CROSS BLUE SHIELD OF ALASKA, BLUE CROSS BLUE SHIELD OF ARIZONA, INC., USABLE MUTUAL INSURANCE COMPANY d/b/a ARKANSAS BLUE CROSS AND BLUE SHIELD, ANTHEM, INC. f/k/a WELLPOINT, INC. d/b/a ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, ANTHEM HEALTH PLANS, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT, BLUE CROSS AND BLUE SHIELD OF GEORGIA, ROCKY MOUNTAIN HOSPITAL & MEDICAL SERVICE INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO, ANTHEM BLUE CROSS AND |

BLUE SHIELD OF NEVADA, ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF INDIANA, ANTHEM HEALTH PLANS OF KENTUCKY, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF KENTUCKY, ANTHEM HEALTH PLANS OF MAINE, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF MAINE, HMO MISSOURI INC., d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF MISSOURI, RIGHTCHOICE MANAGED CARE, INC., HEALTHY ALLIANCE LIFE INSURANCE COMPANY, ANTHEM HEALTH PLANS OF NEW HAMPSHIRE, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW HAMPSHIRE, EMPIRE HEALTHCHOICE ASSURANCE, INC. d/b/a EMPIRE BLUE CROSS BLUE SHIELD, COMMUNITY INSURANCE COMPANY d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF OHIO, ANTHEM HEALTH PLANS OF VIRGINIA, INC., d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF VIRGINIA, INC., BLUE CROSS BLUE SHIELD OF WISCONSIN, d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF WISCONSIN, COMPCARE HEALTH SERVICES INSURANCE CORPORATION, HIGHMARK HEALTH SERVICES, HIGHMARK INC. d/b/a HIGHMARK BLUE SHIELD, HIGHMARK BLUE CROSS BLUE SHIELD, HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA f/d/b/a BLUE CROSS OF NORTHEASTERN PENNSYLVANIA, HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE, BLUE CROSS AND BLUE SHIELD ASSOCIATION, HIGHMARK WEST VIRGINIA INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD WEST VIRGINIA, CAREFIRST, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., CAREFIRST OF MARYLAND, INC., CAREFIRST BLUECHOICE, INC., AREFIRST BLUECROSS BLUESHIELD, GUIDEWELL MUTUAL HOLDING CORPORATION, BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., HAWAII MEDICAL SERVICE ASSOCIATION d/b/a BLUE CROSS AND BLUE SHIELD OF HAWAII, REGENCE BLUESHIELD OF IDAHO, INC., BLUE CROSS OF IDAHO HEALTH SERVICE, INC. d/b/a BLUE CROSS OF IDAHO, CAMBIA HEALTH SOLUTIONS, INC., REGENCE BLUE CROSS BLUE SHIELD OF OREGON, REGENCE BLUE CROSS BLUE SHIELD OF UTAH, REGENCE BLUE SHIELD (WASHINGTON), HEALTH CARE SERVICE CORPORATION, BLUE CROSS AND BLUE SHIELD OF ILLINOIS, BLUE CROSS AND BLUE SHIELD OF MONTANA, CARING OR MONTANANS, INC., BLUE CROSS AND BLUE SHIELD OF NEW MEXICO, BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, BLUE CROSS AND BLUE SHIELD OF TEXAS, INC., WELLMARK, INC., WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, WELLMARK OF SOUTH DAKOTA, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA, BLUE CROSS AND BLUE SHIELD OF KANSAS, INC., LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC., BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY, AWARE INTEGRATED, INC., BCBSM, INC. d/b/a BLUE CROSS AND BLUE SHIELD OF MINNESOTA, BLUE CROSS & BLUE SHIELD OF MISSISSIPPI, BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, GOODLIFE PARTNERS, INC., BLUE CROSS AND BLUE SHIELD OF NEBRASKA, HORIZON HEALTHCARE SERVICES, INC. d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, BLUE CROSS BLUE SHIELD OF WESTERN NEW YORK, BLUESHIELD OF NORTHEASTERN NEW YORK, LIFETIME HEALTHCARE, INC., EXCELLUS HEALTH PLAN, INC. d/b/a EXCELLUS BLUECROSS BLUESHIELD, BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, INC., NORIDIAN MUTUAL INSURANCE COMPANY, HEALTHYDAKOTA MUTUAL HOLDINGS, BLUE CROSS BLUE SHIELD OF NORTH DAKOTA, CAPITAL BLUE CROSS, INDEPENDENCE HEALTH GROUP, INC., INDEPENDENCE HOSPITAL INDEMNITY PLAN, INC. f/k/a INDEPENDENCE BLUE CROSS, TRIPLE-S MANAGEMENT CORPORATION, TRIPLE-S SALUD, INC., BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, BLUE CROSS BLUE SHIELD OF SOUTH CAROLINA, BLUECROSS BLUESHIELD OF TENNESSEE, INC., BLUE CROSS AND BLUE SHIELD OF VERMONT, BLUE CROSS BLUE SHIELD OF WYOMING. Fee Amount $350. (Attachments: # 1 Exhibit Exhibit A # 2 Exhibit Exhibit B # 3 Exhibit Exhibit C # 4 AP Cover Sheet) (Esser, Michael) (Entered: 09/22/2021)

| 09/22/2021 | | Receipt of filing fee for Complaint( 21-04034) [cmp,cmp] ( 350.00). Receipt number A31538478, amount $ 350.00 (re: Doc# 1 Complaint) (U.S. Treasury) (Entered: 09/22/2021) |

---

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 09/22/2021 14:06:55 | | |
| **PACER Login:** | kirklandpacer | **Client Code:** | 20098-0230/41999 |
| **Description:** | Docket Report | **Search Criteria:** | 21-04034 Fil or Ent: filed From: 7/23/2021 To: 9/22/2021 Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

1  PATRICK M. RYAN (SBN 203215)
     *pryan@bzbm.com*
2  PATRICK E. O'SHAUGHNESSY (SBN 218051)
     *poshaughnessy@bzbm.com*
3  JOHN F. MCLEAN (SBN 55914)
     *jmclean@bzbm.com*
4  OLIVER Q. DUNLAP (SBN 225566)
     *odunlap@bzbm.com*
5  SEAN R. MCTIGUE (SBN 286839)
     *smctigue@bzbm.com*
6  BARTKO ZANKEL BUNZEL & MILLER
   A Professional Law Corporation
7  One Embarcadero Center, Suite 800
   San Francisco, California 94111
8  Telephone: (415) 956-1900
   Facsimile:  (415) 956-1152
9

10 Attorneys for Plaintiffs
   VHS LIQUIDATING TRUST, PRIME
11 HEALTHCARE SERVICES, INC., PRIME
   HEALTHCARE FOUNDATION, INC., and
12 PRIME HEALTHCARE MANAGEMENT, INC.

ENDORSED
FILED
ALAMEDA COUNTY

JUL 2 8 2021

CLERK OF THE SUPERIOR COURT
By _____ Molly   Kautz _____
                              Deputy

13         SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                  COUNTY OF ALAMEDA

15

16 VHS LIQUIDATING TRUST, liquidating
   trust for Verity Health System of California,
17 Inc., a California corporation;

18 PRIME HEALTHCARE SERVICES, INC., a
   Delaware corporation;
19
   PRIME HEALTHCARE FOUNDATION,
20 INC., a Delaware corporation; and

21 PRIME HEALTHCARE MANAGEMENT,
   INC., a California corporation,
22
             Plaintiffs,
23
         v.
24

25 BLUE CROSS OF CALIFORNIA,

26 ANTHEM BLUE CROSS LIFE AND
   HEALTH INSURANCE COMPANY, and
27
   CALIFORNIA PHYSICIANS' SERVICE
28 d/b/a BLUE SHIELD OF CALIFORNIA, all

Case No. RG21106600

**FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE CARTWRIGHT
ACT (BUS. & PROF. CODE §§ 16720, *et
seq.*), UNFAIR COMPETITION (BUS. &
PROF. CODE §§ 17200, *et seq.*), AND
OTHER STATE ANTITRUST LAWS**

2854.003/1645949.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1 | California corporations;

2 | BLUE CROSS AND BLUE SHIELD OF
ALABAMA; an Alabama corporation;

3 |

4 | PREMERA and PREMERA BLUE CROSS,
also d/b/a PREMERA BLUE CROSS BLUE
SHIELD OF ALASKA, both Washington

5 | corporations;

6 | BLUE CROSS BLUE SHIELD OF
ARIZONA, INC., an Arizona corporation;

7 |

8 | USABLE MUTUAL INSURANCE
COMPANY d/b/a ARKANSAS BLUE
CROSS AND BLUE SHIELD, an Arkansas

9 | corporation;

10 | ANTHEM, INC. f/k/a WELLPOINT, INC.
d/b/a ANTHEM BLUE CROSS LIFE AND

11 | HEALTH INSURANCE COMPANY, an
Indiana corporation, and its subsidiaries or

12 | divisions, including,

13 | ANTHEM HEALTH PLANS, INC. d/b/a
ANTHEM BLUE CROSS AND BLUE

14 | SHIELD OF CONNECTICUT, a Connecticut
corporation;

15 |

16 | BLUE CROSS AND BLUE SHIELD OF
GEORGIA, a Georgia corporation;

17 | ROCKY MOUNTAIN HOSPITAL &
MEDICAL SERVICE INC. d/b/a ANTHEM

18 | BLUE CROSS AND BLUE SHIELD OF
COLORADO, a Colorado corporation, and

19 |

20 | ANTHEM BLUE CROSS AND BLUE
SHIELD OF NEVADA, a Nevada
corporation;

21 |

22 | ANTHEM INSURANCE COMPANIES, INC.
d/b/a ANTHEM BLUE CROSS BLUE
SHIELD OF INDIANA, an Indiana

23 | corporation;

24 | ANTHEM HEALTH PLANS OF
KENTUCKY, INC. d/b/a ANTHEM BLUE

25 | CROSS BLUE SHIELD OF KENTUCKY, a
Kentucky corporation;

26 |

27 | ANTHEM HEALTH PLANS OF MAINE,
INC. d/b/a ANTHEM BLUE CROSS AND
BLUE SHIELD OF MAINE, a Maine

28 | corporation;

2

1   HMO MISSOURI INC., d/b/a ANTHEM
    BLUE CROSS BLUE SHIELD OF
2   MISSOURI, a Missouri corporation;

3   RIGHTCHOICE MANAGED CARE, INC., a
    Missouri corporation;
4
    HEALTHY ALLIANCE LIFE INSURANCE
5   COMPANY, a Missouri corporation;

6   ANTHEM HEALTH PLANS OF NEW
    HAMPSHIRE, INC. d/b/a ANTHEM BLUE
7   CROSS AND BLUE SHIELD OF NEW
    HAMPSHIRE, a New Hampshire corporation;
8
    EMPIRE HEALTHCHOICE ASSURANCE,
9   INC. d/b/a EMPIRE BLUE CROSS BLUE
    SHIELD, a New York corporation;
10
    COMMUNITY INSURANCE COMPANY
11  d/b/a ANTHEM BLUE CROSS AND BLUE
    SHIELD OF OHIO, an Ohio corporation;
12
    ANTHEM HEALTH PLANS OF VIRGINIA,
13  INC., d/b/a ANTHEM BLUE CROSS AND
    BLUE SHIELD OF VIRGINIA, INC., a
14  Virginia corporation;

15  BLUE CROSS BLUE SHIELD OF
    WISCONSIN, d/b/a ANTHEM BLUE CROSS
16  AND BLUE SHIELD OF WISCONSIN, and

17  COMPCARE HEALTH SERVICES
    INSURANCE CORPORATION, both
18  Wisconsin corporations;

19  HIGHMARK HEALTH SERVICES and

20  HIGHMARK INC. d/b/a HIGHMARK BLUE
    SHIELD and
21
    HIGHMARK BLUE CROSS BLUE SHIELD
22  and including

23  HIGHMARK INC. predecessor HOSPITAL
    SERVICE ASSOCIATION OF
24  NORTHEASTERN PENNSYLVANIA f/d/b/a
    BLUE CROSS OF NORTHEASTERN
25  PENNSYLVANIA, all Pennsylvania
    corporations;
26
    HIGHMARK BLUE CROSS BLUE SHIELD
27  DELAWARE INC. d/b/a HIGHMARK BLUE
    CROSS BLUE SHIELD DELAWARE, a
28  Delaware corporation;

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1 | HIGHMARK WEST VIRGINIA INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD
2 | WEST VIRGINIA, a West Virginia corporation;

3 | CAREFIRST, INC., a Maryland corporation,
4 | and its subsidiaries or affiliates including

5 | GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC.,

6 | CAREFIRST OF MARYLAND, INC., and
7 |

8 | CAREFIRST BLUECHOICE, INC., which collectively d/b/a CAREFIRST BLUECROSS
   | BLUESHIELD, all Maryland corporations;
9 |

10 | GUIDEWELL MUTUAL HOLDING CORPORATION, a Florida corporation;

11 | BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC., a Florida corporation;
12 |

13 | HAWAII MEDICAL SERVICE ASSOCIATION d/b/a BLUE CROSS AND
    | BLUE SHIELD OF HAWAII, a Hawaii
14 | corporation;

15 | REGENCE BLUESHIELD OF IDAHO, INC., and;
16 |

17 | BLUE CROSS OF IDAHO HEALTH SERVICE, INC. d/b/a BLUE CROSS OF
    | IDAHO, both Idaho corporations;
18 |

19 | CAMBIA HEALTH SOLUTIONS, INC., an Oregon corporation, d/b/a REGENCE
    | BLUESHIELD OF IDAHO, INC.,
20 |

21 | REGENCE BLUE CROSS BLUE SHIELD OF OREGON,

22 | REGENCE BLUE CROSS BLUE SHIELD OF UTAH, and
23 |

24 | REGENCE BLUE SHIELD (WASHINGTON);

25 | HEALTH CARE SERVICE CORPORATION, an Illinois mutual legal
26 | reserve company, an Illinois corporation d/b/a
    | BLUE CROSS AND BLUE SHIELD OF
27 | ILLINOIS,

28 |

1  BLUE CROSS AND BLUE SHIELD OF
   MONTANA, including its predecessor,
2  CARING FOR MONTANANS, INC.,

3  BLUE CROSS AND BLUE SHIELD OF
   NEW MEXICO,
4
   BLUE CROSS AND BLUE SHIELD OF
5  OKLAHOMA, and

6
   BLUE CROSS AND BLUE SHIELD OF
7  TEXAS, INC.;

8  WELLMARK, INC., including its subsidiaries
   and/or divisions, and
9
   WELLMARK BLUE CROSS AND BLUE
10 SHIELD OF IOWA, both Iowa corporations,

11 WELLMARK OF SOUTH DAKOTA, INC.
   d/b/a WELLMARK BLUE CROSS AND
12 BLUE SHIELD OF SOUTH DAKOTA, a
   South Dakota corporation;
13
   BLUE CROSS AND BLUE SHIELD OF
14 KANSAS, INC., a Kansas corporation;

15 LOUISIANA HEALTH SERVICE &
   INDEMNITY COMPANY d/b/a BLUE
16 CROSS AND BLUE SHIELD OF
   LOUISIANA, a Louisiana corporation;
17
   BLUE CROSS AND BLUE SHIELD OF
18 MASSACHUSETTS, INC., a Massachusetts
   corporation;
19
   BLUE CROSS BLUE SHIELD OF
20 MICHIGAN MUTUAL INSURANCE
   COMPANY, a Michigan corporation;
21
   AWARE INTEGRATED, INC. and
22
   BCBSM, INC. collectively d/b/a BLUE
23 CROSS AND BLUE SHIELD OF
   MINNESOTA, both Minnesota corporations;
24
   BLUE CROSS & BLUE SHIELD OF
25 MISSISSIPPI, a mutual insurance company;

26 BLUE CROSS AND BLUE SHIELD OF
   KANSAS CITY, a Missouri corporation;
27
   GOODLIFE PARTNERS, INC., and
28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  BLUE CROSS AND BLUE SHIELD OF
   NEBRASKA, both Nebraska corporations;
2  HORIZON HEALTHCARE SERVICES, INC.
   d/b/a HORIZON BLUE CROSS BLUE
3  SHIELD OF NEW JERSEY, a New Jersey
   corporation;
4
   HEALTHNOW SYSTEMS, INC., and
5
   HEALTHNOW NEW YORK, INC. d/b/a
6  BLUECROSS BLUESHIELD OF WESTERN
   NEW YORK and BLUESHIELD OF
7  NORTHEASTERN NEW YORK, and
8  LIFETIME HEALTHCARE, INC. and
9  EXCELLUS HEALTH PLAN, INC.
   collectively d/b/a EXCELLUS BLUECROSS
10 BLUESHIELD, all New York corporations;
11 BLUE CROSS AND BLUE SHIELD OF
   NORTH CAROLINA, INC., a North Carolina
12 corporation;
13 NORIDIAN MUTUAL INSURANCE
   COMPANY and
14
   HEALTHYDAKOTA MUTUAL HOLDINGS
15 collectively d/b/a BLUE CROSS BLUE
   SHIELD OF NORTH DAKOTA, both North
16 Dakota corporations;
17 CAPITAL BLUE CROSS, and
18 INDEPENDENCE HEALTH GROUP, INC.
   and
19
   INDEPENDENCE HOSPITAL INDEMNITY
20 PLAN, INC. f/k/a INDEPENDENCE BLUE
   CROSS, all Pennsylvania corporations;
21
   TRIPLE-S MANAGEMENT
22 CORPORATION and
23 TRIPLE-S SALUD, INC., both Puerto Rico
   corporations;
24
   BLUE CROSS & BLUE SHIELD OF
25 RHODE ISLAND, a Rhode Island
   corporation;
26
   BLUE CROSS BLUE SHIELD OF SOUTH
27 CAROLINA, a South Carolina corporation;
28

2854.003/1645949.2

6

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

1  BLUECROSS BLUESHIELD OF
   TENNESSEE, INC., a Tennessee corporation;
2
   BLUE CROSS AND BLUE SHIELD OF
3  VERMONT, a Vermont corporation;

4  BLUE CROSS BLUE SHIELD OF
   WYOMING, a Wyoming corporation;
5
   the BLUE CROSS AND BLUE SHIELD
6  ASSOCIATION, an Illinois corporation; and

7  DOES 1 through 50, inclusive,

8              Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2854.003/1645949.2                           7
FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
                    AND OTHER STATE ANTITRUST LAWS

# TABLE OF CONTENTS

Page No.

I.      INTRODUCTION ....................................................................................................... 10

        A.      Statement of the Case ................................................................................... 10

        B.      Defendants' Violations of Law Are Extensive and Intentional ................... 13

        C.      Defendant Blues Have Been and Are Actual and Potential Competitors .............. 17

        D.      Defendant Blues Have Refused to Compete With Each Other ................................ 18

        E.      Defendants' Unlawful Conduct Injured Plaintiffs ................................................... 22

II.     JURISDICTION AND VENUE ................................................................................ 23

III.    THE PARTIES ......................................................................................................... 24

        A.      Plaintiffs ....................................................................................................... 24

        B.      Defendants .................................................................................................... 30

        C.      The Unlawful-Agreement-Stabilizing, Supporting, and Facilitating Roles of
                Defendant BCBSA and BHI ......................................................................... 48

IV.     FACTS ...................................................................................................................... 54

        A.      The History of the Blues: Before and After the Unlawful Agreements ................ 54

                1.      Before the Long-Term Business Strategy ......................................... 54

                2.      The Long-Term Business Strategy and Assembly of Plans ........................ 59

                3.      Defendant Blues Entered Into Unlawful Agreements ................................... 64

                4.      The Blue Card and National Accounts Programs ........................................ 71

                5.      Protecting and Increasing "Differentials" ..................................... 78

                6.      Differences Between the Modern Blues and Other Insurers ....................... 79

        B.      Specific Examples of Defendants' Unlawful Conduct ............................................ 80

                1.      The Leading Example: Alabama ................................................................ 80

                2.      Restricting Competition in Pennsylvania and Ohio ..................................... 90

                3.      The Market Allocation Agreement ............................................................. 96

                4.      The Price-Fixing and Boycott Agreements ................................................ 100

                5.      Other Abuses ........................................................................................... 104

                6.      Defendants Enjoyed Unlawfully Gained and Supracompetitive
                        Profits ...................................................................................................... 108

|   | C. | Implementation of the Affordable Care Act (ACA) | 112 |
|   | D. | Defendants' Unlawful Agreements Reduce Health Care Quality and Increase Health Care Costs | 114 |
|   | E. | Antitrust Injury | 116 |
|   | F. | Market Power and Related Considerations | 120 |
|   |    | 1. The Sale of Health Insurance and Related Products and Services | 121 |
|   |    | 2. The Purchase of Products and Services from Healthcare providers | 125 |
|   |    | 3. State-Specific Market Share Information | 133 |

V. VIOLATIONS OF LAW ............................................................................. 138

FIRST COUNT: CALIFORNIA HORIZONTAL MARKET ALLOCATION .............. 138

SECOND COUNT: CALIFORNIA HORIZONTAL PRICE FIXING AND BOYCOTT ................................................................................................ 140

THIRD COUNT: CALIFORNIA HORIZONTAL UNLAWFUL EXCHANGE OF COMPETITIVELY SENSITIVE BUSINESS INFORMATION ......................... 141

FOURTH COUNT: CALIFORNIA UNFAIR COMPETTIION ..................................... 141

FIFTH COUNT: ALABAMA DECEPTIVE TRADE PRACTICES ACT ..................... 143

SIXTH COUNT: ...................................................................................................... 143

FLORIDA ANTITRUST ACT AND FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT .................................................................... 143

SEVENTH COUNT: INDIANA ANTITRUST ACT .................................................. 145

EIGHTH COUNT: KANSAS RESTRAINT OF TRADE ACT .................................... 145

NINTH COUNT: MICHIGAN ANTITRUST REFORM ACT ..................................... 146

TENTH COUNT: NEVADA UNFAIR TRADE PRACTICES ACT ............................. 146

ELEVENTH COUNT: NEW JERSEY ANTITRUST ACT .......................................... 146

TWELFTH COUNT: OHIO REV. CODE § 1331.01, *et seq.* .................................... 147

THIRTEENTH COUNT: RHODE ISLAND ANTITRUST ACT ................................. 147

VI. PRAYER FOR RELIEF ............................................................................. 147

9

1

**COMPLAINT**

2      Plaintiffs VHS LIQUIDATING TRUST, liquidating trust for Verity Health System of

3   California, Inc. ("Verity"), and PRIME HEALTHCARE SERICES, INC. PRIME HEALTHCARE

4   FOUNDATION, INC., and PRIME HEALTHCARE MANAGEMENT, INC. (collectively,

5   "Prime") (and all four together "Plaintiffs"), on behalf of themselves, for their Complaint against

6   the above-captioned Defendants, which include the independent U.S. Blue Cross Blue Shield

7   licensees ("Defendant Blues"), and the Blue Cross and Blue Shield Association ("BCBSA" or the

8   "Association") (collectively, "Defendants," defined further below in Section III.B) allege the

9   following.

10                          **I.      INTRODUCTION**

11   **A.      Statement of the Case**

12      1.      Powerful and wealthy commercial health insurers—Defendant Blues—entered into

13   unlawful agreements to both reduce the reimbursements they paid to U.S. healthcare providers,

14   including Plaintiffs, and simultaneously force Plaintiffs and others to pay them more to provide

15   health insurance to their employees. Non-profit plaintiff Verity, along with Prime and other

16   providers, badly needed that money to deliver high-quality health care to patients and to obtain

17   competitively priced health insurance for employees. By underpaying for reimbursements and

18   overcharging for healthcare insurance and related services, Defendant Blues caused substantial

19   harm to healthcare providers including Plaintiffs.  Verity, along with Prime, bring this action to

20   vindicate their rights and recoup the funds that wrongfully lined Defendants' already full pockets.

21      2.      Defendant Blues are all independent companies engaged in the business of

22   providing effectively the same products and services to their customers and suppliers, including

23   Plaintiffs.

24      3.      They attempted to deny these conspicuous realities approximately four years ago,

25   but an Alabama Federal Court held otherwise after careful analysis and rejected their motion for

26   summary judgment on these issues.

27      4.      Defendant Blues agreed with each other to allocate the United States into separate

28   geographic "Service Areas" in which only one Blue, or an agreed and limited number of Blues,

2854.003/1645949.2                                    10

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

1 could sell health insurance, administer employee benefit plans, or contract with healthcare

2 providers (the "Market Allocation Agreement").

3    5.    In instances—like in California—where Defendant Blues agreed to limit

4 "competition" between the Blues to specific Blues (here, Anthem Blue Cross and Blue Shield of

5 California), Defendants further agreed to restrain competition. In these states, Defendants limited

6 the permitted Blues activities through the agreements outlined in this Complaint, specifically

7 including their horizontal agreements "best efforts rules" and to unlawfully exchange

8 competitively sensitive business information, which coordinated and stabilized their "competitive"

9 activities.

10    6.    Defendant Association intentionally joined and facilitated Defendant Blues'

11 unlawful horizontal agreements and other unlawful agreements with and among Defendant Blues

12 and committed numerous overt acts in substantial furtherance of Defendants' collective unlawful

13 objectives and actions.

14    7.    Anthem Blue Cross and Blue Shield of California should compete against other

15 Blues in California, but they and the other Blues unlawfully agreed with each other to prohibit this

16 competition.

17    8.    Further, Anthem Blue Cross and Blue Shield of California should compete against

18 each other in California without unlawful restraints, but they and the other Blues agreed with each

19 other to unlawfully restrain this competition as well.

20    9.    Defendants engaged, starting at least as early as 2008 and continuing into 2020, in

21 an unlawful horizontal market allocation—a *per se* violation of California's Cartwright Act—and

22 numerous other California Cartwright Act and Unfair Competition Law violations, in addition to

23 violations of other states' antitrust laws at issue in this lawsuit.

24    10.    Defendants further entered into multiple agreements among themselves to support

25 and facilitate the Market Allocation Agreement and to divide the proceeds of their unlawful

26 conduct.

27    11.    They attempted to deny the conspicuous reality that their horizontal agreements

28 were *per se* unlawful, but the same Alabama Federal Court held otherwise after careful analysis,

2854.003/1645949.2

11

Case 21-04034    Doc# 1-2    Filed: 09/22/21    Entered: 09/22/21 13:19:45    Page 12 of
151

1   and wrote on summary judgment: "Provider and Subscriber Plaintiffs argue that the geographic

2   market allocations constitute *per se* anticompetitive conduct.... [And] Plaintiffs have presented

3   evidence of an aggregation of competitive restraints ... which, considered together, constitute a

4   *per se* violation of the Sherman Act."

5       12.     The Alabama Federal Court held "the Rule 56 evidence in the record supports the

6   proposition that the allocation of areas was the result of" the alleged unlawful conduct.

7       13.     Indeed, the Alabama Federal Court noted, "an attorney representing [Blue]

8   Anthem's predecessors expressed 'significant doubt whether, under the antitrust laws, an

9   association like BCBSA could lawfully bar members from engaging in unbranded business

10  outside their exclusive territories.' (Doc. # 1555–1 at 7). In light of [the governing Sherman Act

11  precedent], that attorney's doubts were well founded."

12      14.     "[T]here is little question," the Alabama Federal Court held, "that, properly

13  analyzed, [Defendants' conduct] is an output restriction. Output restrictions have been called one

14  of the 'most important per se categories.'" "The undisputed evidence before the court establishes

15  that, in 2005, Defendants adopted ... an output restriction on a Plan's non–Blue business." This

16  "constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other

17  restrictions Defendants have placed on competition."

18      15.     ***The exact same conduct that the Alabama Federal Court held "constitutes a per***

19  ***se violation of the Sherman Act" is at issue in this lawsuit.***

20      16.     ***And the governing California Supreme Court rule is not just that "State antitrust***

21  ***law ordinarily is fully compatible with federal law," but also that California's "'Cartwright Act***

22  ***is broader in range and deeper in reach than the Sherman Act.'"***

23      17.     ***In other words, if it violates the Sherman Act in Alabama federal court, it violates***

24  ***the Cartwright Act in California state court.***

25      18.     The consequences of Defendants' unlawful conduct have been severe for

26  California's healthcare providers and its purchasers of health insurance and related services,

27  including Plaintiffs, who each sold access to their products and services to health insurers and each

28

2854.003/1645949.2                                          12

bought products and services from health insurers at effective prices that were substantially worse than they otherwise would have been but for Defendants' conduct.

19.    In no small part because of the unlawful conduct at issue in this Complaint, Defendants' revenues and profits skyrocketed off the backs of struggling hospitals and other providers.

20.    Defendants' unlawful conduct dramatically diminished the capacity of hospitals and other providers to, among other things: (a) improve their facilities; (b) comply with legally required seismic and building safety standards; (c) upgrade their equipment and technology to keep pace with medical standards of care; and (d) provide the same level of health care to their patients that they would have but for Defendants' unlawful conduct.

21.    Plaintiff Verity, a non-profit health care services provider, went bankrupt; Defendants' conduct was a substantial factor in causing that bankruptcy.

22.    As Verity, and other health providers, went bankrupt and closed due to the conduct at issue, the Blues became even larger and more wealthy—and they were already among the largest and most wealthy businesses in the country.

23.    For example, Anthem alone is the second largest health insurance company in the country by enrollment and had more than $120 billion in 2020 revenues, which is an increase of 17% from 2019. And, at one point during the time period at issue in this complaint, 15 of the 25 largest health insurance companies in the country were Blues. Defendants collectively wield massive economic power, and they have intentionally engaged in persistent, pernicious, and unlawful collective actions to injure Plaintiffs and others.

24.    By filing this Complaint, Verity, standing alongside Prime, seeks to redress Defendants' unlawful and outrageous conduct and prays to recover antitrust damages and lost profits.

**B.    Defendants' Violations of Law Are Extensive and Intentional**

25.    Defendants went to great lengths to capture and protect the fruits of their unlawful conduct.

13

26.     Specific components of Defendants' Market Allocation Agreement include horizontal-coordinating and market-stabilizing information exchanges of granular, current, and competitively sensitive claims data through Blue Health Intelligence ("BHI"), a licensee of BCBSA that is managed entirely by BCBS executives.

27.     These exchanges are independent violations of the Cartwright Act and other antitrust laws.

28.     Other components, and *quid pro quos*, of Defendants' unlawful Market Allocation Agreement are horizontal price-fixing and boycott agreements under which every Blue gets the benefit of the artificially reduced prices each Blue pays to healthcare providers and agrees to collectively boycott all Providers outside of their Service Areas ("Price-Fixing and Boycott Agreements").

29.     The Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs (both of which are described in detail below).

30.     The Market Allocation Agreement reduces the competition that each Blue faces to allow it to reduce the prices that it pays to healthcare providers, including in California.

31.     The Price Fixing and Boycott Agreements fix those prices for all Blues, give them the benefit of those reduced, fixed prices, and further provide that the participating Blues will collectively boycott all Providers outside of their Service Areas, including in California.

32.     Defendant Blues provide health insurance coverage for nearly 105 million people in the United States. (Plaintiffs include administrative services for employee benefit plans within the meaning of health insurance coverage for purposes of this Complaint.)

33.     Defendants developed and operate the most extensive Provider Networks in the United States. According to the BCBSA's own estimates, more than 96% of hospitals and 93% of professional providers in the United States contract directly with the Blues.

34.     The Defendants agreed that they will not compete with each other in terms of their Provider Networks. Even where Defendants have significant enrollees in another Blue's service area, including California, Defendants agreed they will not contract with providers outside of their

2854.003/1645949.2

14

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1 Service Areas except in limited circumstances. The BCBSA exists solely for the benefit of the

2 Blues and to facilitate their concerted activities.

3     35.     In furtherance of the Market Allocation Agreement, Defendants agreed that each

4 Defendant would be allocated a defined Service Area and further agreed that each Defendant's

5 ability to operate and to generate revenue outside its geographic Service Area would be severely

6 restricted. Accordingly, Defendants have agreed to an allocation of markets and have agreed not to

7 compete with each other within those markets.

8     36.     In furtherance of the Price Fixing and Boycott Agreement, each Defendant has

9 agreed to participate in each national program that the Blues adopt, including the Blue Card

10 Program and the National Accounts Programs.

11     37.     The "Blue Card Program" applies when a subscriber of one of the Defendants

12 receives healthcare services within the Service Area of another Defendant. In the Blue Card

13 Program, the subscriber's Blue is the "Home Plan" and the Defendant Blue—within the Service

14 Area where the healthcare goods, services, or facilities are provided—is the "Host Plan."

15     38.     The "National Accounts Programs" function in a similar manner. National

16 Accounts Programs generally apply to employee benefit plans with subscribers in multiple states.

17     39.     The Defendant Blue that administers the employee benefit plan is the "Control

18 Plan," and the other Blues in whose Service Areas where the subscribers receive healthcare goods,

19 services, or facilities are "Participating Plans."

20     40.     These programs and others have been established by a horizontal agreement

21 between the Blues.

22     41.     The Blue Card Program is managed by a committee of Blues called the "Inter-Plan

23 Programs Committee." The National Accounts Programs are either established based on

24 horizontal agreements between the Blues or managed through the Blue Card Program.

25     42.     The excess profits from these programs are then divided among the Blues. The

26 national programs, including the Blue Card Program and the National Accounts Programs, lock in

27 the fixed, discounted reimbursement rates that each Defendant achieves in its Service Area,

28

2854.003/1645949.2     15

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

Case: 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 16 of 151

1  including in California, through market dominance and makes those sub-competitive rates

2  available to all other Blues without the need for negotiation or contracting.

3      43.    The other national programs add to the Blues' market power and/or are

4  anticompetitive. Rather than forming competing networks of providers in other Service Areas, the

5  Blues operating as a Home Plan or Control Plan receive a payment called an "Access Fee." This

6  arrangement allows Blues to maintain their market power while sharing the excess profits they

7  achieve through the sub-competitive prices that the Defendants pay to providers.

8      44.    Accordingly, Defendants have fixed the prices for healthcare reimbursement in

9  each Service Area. These fixed prices are then enforced through a horizontal agreement between

10  the Blues.

11      45.    Under that horizontal agreement, the Blues collectively enforce the fixed prices; the

12  Host Plans and the Participating Plans recoup any payments that the Home or Control Plans make

13  above the fixed prices.

14      46.    Part of the agreement for the participation in the National Accounts Programs is

15  that each Blue will not negotiate directly with providers outside its Service Area except in a

16  contiguous area. As a result, a healthcare provider who renders services or supplies goods or

17  facilities to a patient who is insured or administered by a Defendant in another Service Area

18  receives a significantly lower reimbursement than the healthcare provider would receive absent the

19  Price Fixing and Boycott Agreement.

20      47.    Many of the Defendants have large numbers of enrollees or members outside of

21  their Service Areas. Rather than forming competing networks of providers in other Service Areas,

22  the Defendants pay the Home Plan a kickback, also called an "Access Fee," and thereby share the

23  excess profits they achieve through the sub-competitive prices that the Defendants pay to

24  providers.

25      48.    The non-Blue revenue restriction agreements, which the Blues call "Best Efforts

26  Rules" to hide the obvious anticompetitive effects of the agreements, also reinforce the other

27  agreements and prevent the Defendants from engaging in meaningful competition in any manner,

28  including in California.

49.     The non-Blue revenue restrictions were adopted by the Blues to prevent Anthem and others from competing with other Blues even outside of the Blue branded area. Those restrictions prevent any Blue license holder from receiving more than 20% of its revenue from a non-Blue business in a service area or more than one-third of its revenue company-wide from a non-Blue business.

50.     The anticompetitive effects of the non-Blue revenue restriction agreement became apparent during a federal trial in Washington, DC, challenging the proposed merger of Anthem and Cigna. If Anthem had been successful in carrying out the anticompetitive merger, the non-Blue revenue restriction agreement, at the state-wide and company-wide level, would have forced Anthem to convert innovative, collaborative Cigna-administered health plans into less innovative and efficient Blue plans. This anticompetitive agreement resulted in less efficient and more costly health insurance and administrative services, it resulted in less innovation, and it resulted in lower reimbursement rates for healthcare providers.

51.     Defendants' agreements separately have anticompetitive effects, and they reinforce the anticompetitive effects of the other agreements.

52.     The Defendants entered into each of the agreements for anticompetitive reasons.

53.     Each of the agreements has injured consumers, subscribers, and healthcare providers, including Plaintiffs.

**C.     Defendant Blues Have Been and Are Actual and Potential Competitors**

54.     Defendant Blues, which are organized and operated independently, constitute actual and potential competitors and, absent their unlawful conduct, would compete against each other, including in California.

55.     The BCBSA readily admits on its own website that Defendant Blues are "independent companies" that operate in "exclusive geographic areas." *See* www.bcbsa/healthcare-news/press-center.com.

56.     In a recent trial brief filed with the United States District Court for the District of Columbia, Anthem, which is the largest Blue, stated that "***the various Blues are not a single firm***; notwithstanding their participation in the BCBSA, ***they are separate firms that at times compete***

2854.003/1645949.2                                    17

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1    *with one another and that at all times separately seek to maximize their own profits*." *United*

2    *States v. Anthem, Inc.*, No. 16-cv-1493, Doc. No. 324 at 10 (filed Nov. 10, 2016) ("Anthem

3    Brief"). (Emphasis added.)

4        57.    Many Defendant Blues have developed substantial non-Blue brands that could

5    compete with other Defendant Blues.

6        58.    Defendant Blues potentially are a major source of competition in health insurance

7    and financing in the United States. Two of the largest four health insurance companies in the

8    country are Blues, as are 4 of the largest 10, and 15 of the largest 25.

9        59.    Defendants' territorial limitations among actual or potential competitors (*i.e.*,

10   horizontal parties) severely limit the ability of Defendant Blues to compete outside of their

11   geographic areas, even under their non-Blue brands.

12       60.    But for the unlawful agreements not to compete with one another at issue in this

13   Complaint, these entities could and would use their Blue brands and non-Blue brands to compete

14   with each other throughout their Service Areas.

15       61.    This would result in greater competition and competitive pricing for providers and

16   subscribers.

17   **D.    Defendant Blues Have Refused to Compete With Each Other**

18       62.    Defendant Blues have a basic premise to their various agreements: We will not

19   compete with each other.

20       63.    Defendant Blues will not compete in the establishment of healthcare provider

21   networks, where they could develop meaningful innovation through collaboration with providers

22   to improve our healthcare system and diminish overall costs.

23       64.    Defendant Blues will not compete in the administration of healthcare plans

24   including regional and national accounts.

25       65.    Defendant Blues will not compete in the sale of health insurance.

26       66.    Defendant Blues openly acknowledged their desire to collaborate and not compete.

27   In March of 2007, *a participant in a "Blue Caucus" held in San Francisco, California, stated*

28

2854.003/1645949.2                                           18

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST CLAIMS

1   *that "[w]e intend to continue to strive to keep the interest of all Blue plans…aligned so the*

2   *System can remain in a mutually supportive state."* (Emphasis added.)

3        67.     It was noted that *"[t]he historic success of the System has been driven by the*

4   *cooperation … of member Plans. The future success of the System is dependent on this*

5   *continued cooperation.* The ability of the member Plans to focus on the collective good of the

6   System is critical to our success." (Emphasis added.)

7        68.     Defendants will not compete with each other with respect to healthcare provider

8   networks and, with limited exceptions, Defendant Blues have agreed not to contract with providers

9   in other Defendants' Service Areas, including California.

10        69.     Many Blues have large numbers of members outside their designated Service

11   Areas, but because of Defendant Blues' anticompetitive agreement, they cannot develop

12   innovative, collaborative arrangements with providers outside those areas that would improve

13   quality and decrease overall costs of healthcare.

14        70.     Instead, Defendant Blues operate through the Blue Card Program that creates

15   numerous inherent inefficiencies such as forcing providers to learn and navigate other Blues'

16   coverage and payment rules. Moreover, innovative collaborative arrangements require

17   coordination involving patients and providers such as those described by Cigna in the Anthem

18   merger trial. The Blue System therefore stifles innovation by creating additional barriers and

19   inefficiencies.

20        71.     Defendant Blues have also created other barriers to innovation, including through

21   their discount payment system. In their effort to increase their "differentials" as compared to other

22   health insurers, Defendant Blues pay providers less than other insurers. The evidence in the

23   Anthem merger trial demonstrates that Defendant Blues are generally the lowest paying health

24   insurer.

25        72.     For many reasons, including the costs of IT systems, innovation is expensive while

26   in the long run it reduces overall costs in healthcare. As Cigna executives testified in the Anthem

27   merger trial, reducing reimbursement rates to providers makes it more difficult to have

28   collaborative, innovative arrangements. The overall Blues' system reduces competition in

2854.003/1645949.2               19

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1   healthcare networks, adds to inefficiencies, reduces the quality of healthcare outcomes, and
2   ultimately increases costs in healthcare.

3        73.    The Blues will not compete in the administration of healthcare benefit plans that
4   are self-insured. Many Blues conduct more business in the administration of healthcare benefit
5   plans or administrative services than they do in the underwritten health insurance business.

6        74.    Defendant Blues have agreed that they will not bid for the contract to provide
7   administrative services for health care benefit plans located or headquartered outside of their
8   Service Areas unless the Blue with that service area cedes the right to make the bid to another
9   Blue.

10       75.    When there is a cede, only the Blue receiving the cede, *and no other Blue*, may bid
11  for a contract to provide administrative services for the health care benefit plan. In other words, for
12  a health care benefit plan located in Los Angeles, unless Anthem Blue Cross or Blue Shield of
13  California (together, the "California Blues") cede the right to bid to another Blue, only the
14  California Blues can bid to provide administrative services, even if the plan has members
15  throughout the country.

16       76.    Other Blues cannot bid. Health Care Service Corporation and its subsidiaries and
17  health care plans ("HCSC"), the fourth largest company in the business, cannot bid. When the
18  health care benefit plan has employees in Texas, Illinois, or another HCSC services area, the
19  health care benefit plan must pay the Blue Card access and administration fees in addition to the
20  payments made to providers and the administrative service fees charged by the California Blues.

21       77.    When the health care benefit plan has employees in Georgia, New York City, or
22  another service area, the health care benefit plan must pay the Blue Card access and administration
23  fees in addition to the payments to providers and the administrative service fees charged by the
24  California Blues.

25       78.    The Blues use this anticompetitive agreement to extract higher administrative
26  service fees from health care benefit plans, including in California. This anticompetitive
27  agreement results in reduced competition, reduced choices for the administration of health care
28  benefit plans, increased costs, and less innovation and efficiency, including in California. The

2854.003/1645949.2                              20

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE AND FEDERAL LAWS

anticompetitive agreement also results in lower reimbursement rates to healthcare providers, including in California.

79. Defendant Blues will not compete in the sale of health insurance. *California has three different Blues selling health insurance immediately across the state borders. Defendant Blues have agreed that none of those Blues will cross the state line to sell health insurance in California.*

80. The same agreement also prohibits HCSC, the fourth largest health insurer in the country, Highmark, the eighth largest health insurer in the country, and Blue Cross & Blue Shield of Michigan, the ninth largest health insurer in the country, and all other Blues from competing with the California Blues in the sale of health insurance in California.

81. The Defendants are able to maintain this anticompetitive agreement because they have the Blue Card Program. While the sale of health insurance is a minority of the business of Blues, this refusal to compete injures consumers for obvious reasons. This anticompetitive agreement also results in lower reimbursement rates to healthcare providers.

82. The Blue Card agreement is a part of the other agreements and reinforces them by allowing them not to compete and providing a quid pro quo to the tune of billions of dollars each year that the Blues pay to each other and charge to their customers.

83. In numerous ways, the Blue Card Program is highly inefficient. It places significant administrative burdens and expenses on healthcare providers by having at least 36 different sets of coverage and payment rules that the providers must learn and comply with, often without access to the rules of the 35 Blues for which they are not in-network. By having different companies responsible for patients than for providers, the Blues make it highly inefficient and often impossible to have innovative, efficient arrangements for the delivery and administration of healthcare services.

84. The Blue Card Program allows the Blues to charge higher administrative service fees to health care benefit plans, including in California. Those fees are separate and apart from the Blue Card administrative and access fees, which are also paid by health care benefit plans under the administrative services agreements that the Blues have with those benefit plans.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

85.     A Blue plan that violates the restrictions detailed in this complaint faces license and membership termination from BCBSA, which would mean both the loss of the brand through which the Blue derives the majority of its revenue and the required payment of a large fee to BCBSA that would help to fund the establishment of a competing health insurer.

**E.     Defendants' Unlawful Conduct Injured Plaintiffs**

86.     Defendants' actions have significantly injured Plaintiffs and other healthcare providers. When there is more competition among insurers to create provider networks, including competition among the Blues, providers will be paid more. Defendants' agreements have also harmed competition by decreasing the options available to health insurance consumers.

87.     Fewer health insurance companies are competing in each Service Area. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices that the Blues pay. Their output has been diminished.

88.     In addition, many hospitals and other healthcare facilities have closed or reduced services, or are not expanding to provide additional services, as a result of Defendants' conduct.

89.     The harm has been particularly acute in California and for Plaintiffs.

90.     At least dozens of California hospitals, including Plaintiffs', have closed since 1998. Many of these are small, independent or rural facilities.

91.     Still other facilities, including Plaintiffs', have entered bankruptcy or are reducing services offered to consumers.

92.     Still others, including Plaintiffs', that would have otherwise expanded are not doing so as a result of Defendant Blues' low payments.

93.     Defendant Blues' low reimbursements, particularly in California, make it almost impossible for these hospitals to continue providing all the services they would offer in a competitive market, leaving consumers to travel much further for care, with no places for the most critically injured patients, or those without transportation, to receive care.

94.     Defendants' actions also have injured Plaintiffs in the form of supracompetitive premiums and administrative fees for self-funded accounts ("ASO Fees"). Defendant Blues'

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

1    anticompetitive agreement, implementing conduct and foreclosure of competition have prevented

2    subscribers and enrollees from being offered competitive premium prices and self-funded accounts

3    from being offered competitive ASO Fees. Plaintiffs have paid Defendant Blues inflated

4    premiums and ASO Fees as a result of their unlawful agreements.

5        95.    The only beneficiaries of Defendants' antitrust violations are Defendants

6    themselves. Defendant Blue Shield of California, for example, alone held surpluses in excess of

7    $2.2 billion as early as 2010.

8                    **II.    JURISDICTION AND VENUE**

9        96.    Plaintiffs bring their claims under the California Cartwright Act and Unfair

10   Competition Law, Cal. Bus. & Prof. Code §§ 16720, *et seq.* and 17200, *et seq.*, and other laws for

11   monetary damages and other relief caused by Defendants' unlawful conduct.

12       97.    This Court has subject matter jurisdiction over this action pursuant to Article VI,

13   Section 10 of California's Constitution.

14       98.    This Court has personal jurisdiction over Defendants because they and their

15   affiliates do business in California, and the claims asserted herein arise from conduct occurring in

16   California.

17       99.    In addition, the California Blues are California corporations with their principal

18   places of business in California.

19       100.   Further, additional Defendants have entered into contracts with healthcare

20   providers in California.

21       101.   Defendants have significant business in and contacts with California through the

22   national programs including the Blue Card Program, the National Accounts Programs, and the

23   Inter-Plan Medicare Advantage Program.

24       102.   All of the Defendants have entered into unlawful agreements with the California

25   Blues.

26       103.   And through their violation of California Business & Professions Code §§ 16720,

27   *et seq.*, each Defendant purposefully directed its anticompetitive conduct at California, and caused

28   injuries in California, including to Plaintiffs.

2854.003/1645949.2                                                  23

104.     This Court also has personal jurisdiction under California's long-arm statute, California Code Civil Procedure § 410.10, because the Defendants' payments to California healthcare providers to treat patients constitute minimum contacts with California, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

105.     Venue is proper in Alameda County under California Code of Civil Procedure § 395(a) because Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California resides in the county.

106.     In addition, venue is proper in Alameda County because Defendants' liability arose, at least in part, in Alameda County.

### III.     THE PARTIES

#### A.     Plaintiffs

107.     Plaintiffs were and are providers of health care services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients were and are insured by Defendant Blues or included in employee benefit plans administered by Defendant Blues.

108.     Plaintiffs were and are also subscribers and self-funded accounts of Defendant Blues. Plaintiffs purchased or were covered by commercial health benefit products offered by Defendant Blues.

109.     These products include traditional insurance products in which a plan pays for or reimburses health care expenses of its members in exchange for premiums, and administrative-services-only ("ASO") products in which a plan provides services such as claims administration or access to a network of medical providers at negotiated rates in exchange for ASO Fees charged to a self-funded account. With an ASO product, the self-funded account, rather than the plan, pays for or reimburses the cost of medical care.

110.     Plaintiff VHS Liquidating Trust ("Verity") is the bankruptcy liquidator for Verity Health System of California, Inc.

2854.003/1645949.2                                                24

Case 21-04034   Doc# 1-2   Filed 09/22/21   Entered 09/22/21 13:19:45   Page 25 of 151

111.    Verity Health System of California, Inc. was a not-for-profit healthcare services organization based in California. It was the sole owner of six medical centers serving the San Francisco, Los Angeles, and San Jose metropolitan areas: Seton Medical Center in Daly City, Seton Coastside in Moss Beach, St. Vincent Medical Center in Los Angeles, O'Connor Hospital in San Jose, St. Louise Regional Hospital in Gilroy and St. Francis Medical Center in Lynwood. These hospitals had 1,650 patient beds, 6 active emergency rooms, a trauma center, and a host of medical specialties including tertiary and quaternary care.

112.    Verity Health System of California, Inc. filed for bankruptcy on August 31, 2018.

113.    The Bankruptcy Court on August 14, 2020 ordered the creation Verity (VHS Liquidating Trust) and subsequently vested in it and transferred to it the Verity Health System of California, Inc. claims asserted in this lawsuit.

114.    Thus, Verity controls the claims of St. Louise, St. Francis (up until the date of its sale to Prime), St. Vincent, Seton, Seton Coastside, and O'Connor hospitals, their affiliated medical foundations and affiliates, and Verity Health System of California, Inc.

115.    During the relevant time period, Verity provided medically necessary, covered services to patients insured by the California Blues, or who were included in employee benefit plans administered by the California Blues, pursuant to its in-network contracts with the California Blues, and billed the California Blues for the same.

116.    Verity was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  Verity has not entirely released the claims at issue in this Complaint and, to the extent it may have, it does not assert those claims in this lawsuit.

117.    Verity also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.

118.    Verity has purchased health insurance and administrative services for employee benefit plans from both of the California Blues.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1    119.    Verity has been injured in its business or property as a result of Defendants'

2    violations of the antitrust laws.

3    120.    Plaintiff Prime Healthcare Services, Inc. is a Delaware corporation and Plaintiff

4    Prime Healthcare Foundation, Inc. is a nonprofit public charity. Both have their principal place of

5    business in Ontario, California. They own and operate hospitals and other healthcare providers

6    throughout the country, including:

7    a.    Alvarado Hospital Medical Center in San Diego, California

8    b.    Bio-Med Services in Ontario, California

9    c.    Carondelet Home Care Services in Blue Springs, Missouri

10    d.    Centinela Hospital Medical Center in Inglewood, California

11    e.    Chino Valley Medical Center in Chino, California

12    f.    Coshocton Regional Medical Center in Coshocton, Ohio

13    g.    Dallas Medical Center in Dallas, Texas

14    h.    Dallas Medical Physician Group in Dallas, Texas

15    i.    Dallas Regional Medical Center in Mesquite, Texas

16    j.    Desert Valley Hospital in Victorville, California

17    k.    East Liverpool City Hospital in East Liverpool, Ohio

18    l.    East Liverpool Medical Group / River Valley Physicians in Liverpool, Ohio

19    m.    Encino Hospital Medical Center in Encino, California

20    n.    Gadsden Physicians Management in Gadsden, Alabama

21    o.    Garden City Hospital in Garden City, Michigan

22    p.    Garden City Medical Group in Garden City, Michigan

23    q.    Garden Grove Hospital Medical Center in Garden Grove, California

24    r.    Glendora Community Hospital in Glendora, California

25    s.    Harlingen Medical Center in Harlingen, Texas

26    t.    Huntington Beach Hospital in Huntington Beach, California

27

28

2854.003/1645949.2

26

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

| | | |
|---|---|---|
| u. | Knapp Medical Center in Weslaco, Texas | |
| v. | Knapp Medical Group in Weslaco, Texas | |
| w. | Knapp Surgery Center in Weslaco, Texas | |
| x. | La Palma Intercommunity Hospital in La Palma, California | |
| y. | Lake Huron Urgent Care Center in Fort Gratiot, Michigan | |
| z. | Lake Huron Medical Center in Port Huron, Michigan | |
| aa. | Landmark Medical Center in Woonsocket, Rhode Island | |
| bb. | Lehigh Regional Medical Center in Lehigh Acres, Florida | |
| cc. | Lehigh Medical Group in Lehigh Acres, Florida | |
| dd. | Lower Bucks Hospital in Bristol, Pennsylvania | |
| ee. | Mission Regional Medical Center in Mission, Texas | |
| ff. | Monroe Hospital in Bloomington, Indiana | |
| gg. | Montclair Hospital Medical Center in Montclair, California | |
| hh. | North Vista Physicians in North Las Vegas, Nevada | |
| ii. | North Vista Hospital in North Las Vegas, Nevada | |
| jj. | Ohio Valley Home Health Services in Liverpool, Ohio | |
| kk. | Pampa Regional Medical Center in Pampa, Texas | |
| ll. | Paradise Valley Hospital in National City, California | |
| mm. | Providence Medical Center in Kansas City, Kansas | |
| nn. | Providence Medical Group in Kansas City, Kansas | |
| oo. | Providence Place Rehabilitation Center in Kansas City, Kansas | |
| pp. | Rehabilitation Hospital of Rhode Island in North Smithfield, Rhode Island | |
| qq. | Reno Tahoe Anesthesia in Reno, Nevada | |
| rr. | Riverview Regional Medical Center in Gadsden, Alabama | |
| ss. | Roxborough Memorial Hospital in Philadelphia, Pennsylvania | |
| tt. | Saint Clare's Behavioral Health in Boonton Township, New Jersey | |

uu.     Saint Clare's Denville Hospital in Denville, New Jersey

vv.     Saint Clare's Dover Hospital in Dover, New Jersey

ww.     Saint Clare's  Sussex Hospital in Sussex, NJ

xx.     Saint John Hospital in Leavenworth, Kansas

yy.     Saint Mary's Medical Group in Reno, Nevada

zz.     Saint Mary's Regional Medical Center in Reno, Nevada

aaa.    Saint Michael's Medical Center in Newark, New Jersey

bbb.    San Dimas Community Hospital in San Dimas, California

ccc.    Shasta Regional Medical Center in Redding, California

ddd.    Sherman Oaks Hospital in Sherman Oaks, California

eee.    South Kansas SurgiCenter in Kansas City, Missouri

fff.    Southern Regional Medical Center in Riverdale, Georgia

ggg.    St. Francis Medical Center in Lynwood, California (from the date of its sale to Prime onward)

hhh.    St. Joseph Medical Center in Kansas City, Missouri

iii.    St. Joseph Medical Group and St. Mary's Medical Group in Kansas City, Missouri

jjj.    St. Mary's General Hospital in Passaic, New Jersey

kkk.    St. Mary's Medical Center in Blue Springs, Missouri

lll.    St Mary's Surgical Center in Blue Springs, Missouri

mmm.    Suburban Community Hospital in Norriton, Pennsylvania

nnn.    Suburban Medical Group in Norriton, Pennsylvania

ooo.    Summit Surgery Center at St. Mary's Galena in Reno, Nevada

ppp.    United Home Health Services in Garden City, Michigan

qqq.    West Anaheim Medical Center in Anaheim, California

121.    Prime Healthcare Management, Inc. is a California corporation with a primary place of business in Ontario, California. Prime Healthcare Management, Inc. employs staff to

2854.003/1645949.2

28



1   support the operations of other Prime entities, and also has subsidiaries such as Hospital Business

2   Services, LLC.

3        122.    Collectively, Prime Healthcare Services, Inc., Prime Healthcare Foundation, Inc.,

4   Prime Healthcare Management, Inc., their hospitals and their affiliates are described herein as

5   "Prime."

6        123.    During the relevant time period, Prime provided medically necessary, covered

7   services to patients insured by Defendants, or who are included in employee benefit plans

8   administered by Defendants.

9        124.    Prime provided such services pursuant to its in-network contracts with those

10  Defendants and billed those Defendants for the same.

11       125.    Prime was paid less for those services than it would have been but for Defendants'

12  anticompetitive conduct, and Prime has been injured by Defendants' conduct as a result.

13       126.    Prime has also provided medically necessary, covered services to other Blue Cross

14  and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid

15  less for those services than it would have been but for Defendants' anticompetitive conduct.

16       127.    Prime has purchased health insurance and administrative services for employee

17  benefit plans from Defendants.

18       128.    Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as

19  facilities where medical or surgical procedures are performed, to patients who are insured by a

20  Blue or who are included in an employee benefit plan administered by a Blue. Plaintiffs are

21  entitled to payment for their services, equipment, supplies or for use of their facilities either

22  pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from

23  patients who are covered by a plan that is insured and administered by a Blue. Plaintiffs have been

24  paid less than they would have been paid absent Defendants' violation of the antitrust laws. But

25  for Defendants' agreements not to compete, providers would have been offered the ability to

26  contract with the Blues at more competitive rates.

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

Case: 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 30 of
151

129.    Plaintiffs purchased or were covered by commercial health benefit products offered by Defendant Blues. Plaintiffs have paid more for premiums and ASO Fees than they would have paid absent Defendants' violation of the antitrust laws.

130.    Accordingly, Plaintiffs have standing and have sustained antitrust injury.

**B.    Defendants**

131.    Defendants Blue Cross of California and Anthem Blue Cross Life and Health Insurance Company are California corporations with their corporate headquarters located at 21215 Burbank Boulevard, Woodland Hills, CA 91367. Defendant Blue Cross of California is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant Anthem. Blue Cross of California is the parent corporation of a number of subsidiaries that provide health care financing to approximately 8.3 million enrollees in various health care plans in California, more than any other carrier in the state. Blue Cross of California, Anthem Blue Cross Life and Health Insurance Company, and their subsidiaries and affiliated companies, are collectively referred to as "Blue Cross of California" or "BC-CA" in this Complaint.

132.    Defendant California Physicians' Service d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 601 12th Street, 20th Floor, Oakland, CA 94607. It is the parent corporation of a number of subsidiaries that provide health care financing to over 4 million enrollees in various health care plans in California. California Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

133.    Defendant Blue Cross and Blue Shield of Alabama is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than three million people. The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450 Riverchase Parkway East, Birmingham, AL 35244. Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

134.    Defendant Anthem, Inc. (formerly Wellpoint, Inc.) d/b/a Anthem Blue Cross Life and Health Insurance Company is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, IN 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. By some measures Anthem is the largest health benefits company in the nation with more than 37 million enrollees in its affiliated health plans. According to its website, one in nine Americans is an Anthem member, and Anthem is contracted with 93% of the physicians and 96% of hospitals nationwide through the Blue Card Program. Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

135.    Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099. With more than 15 million enrollees, Health Care Service Corporation is the largest customer-owned health insurer in the United States. Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana. In each of its five Blue Service Areas, HCSC exercises market dominance.

136.    Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving more than 2 million enrollees through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield, Regence BlueCross

BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in its states of operation or within areas of those states. Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

137.    Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117. With approximately 3.2 million enrollees, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc., Carefirst Bluechoice, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region. Through its subsidiaries and affiliated companies, CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and Virginia, or within areas of those states. CareFirst, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

138.    Defendants Premera and Premera Blue Cross are both Washington corporations with their corporate headquarters located at 7001 220th SW, Building 1, Mountlake Terrace, WA 98043. Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2 million enrollees in Alaska and Washington. Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield of Alaska. Premera, Premera Blue Cross, and their subsidiaries and affiliated companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

139.    Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 3800 Centerpoint Drive, Suite 940, Anchorage, AK 99503. Premera Blue Cross Blue Shield of Alaska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

140.    Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Drive, Phoenix, AZ 85021. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Arizona. Blue Cross Blue Shield of Arizona,

32

1  Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue

2  Shield of Arizona" or "BCBS-AZ" in this Complaint.

3      141.    Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and

4  Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines

5  Street, Little Rock, AR 72201. It is the parent corporation of a number of subsidiaries that provide

6  health care financing to approximately 860,000 enrollees in various health care plans in Arkansas,

7  or approximately one-third of Arkansans, making it the largest health insurer in the state. Arkansas

8  Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as

9  "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

10      142.    Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue

11  Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of

12  Nevada in Nevada is a subsidiary of Defendant Anthem and is a Colorado corporation with its

13  corporate headquarters located at 700 Broadway, Suite 600, Denver, CO 80273. It is the parent

14  corporation of a number of subsidiaries that provide health care financing to enrollees through

15  various health care plans in Colorado and Nevada.

16      143.    Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of

17  Defendant Rocky Mountain Hospital and Medical Service, Inc., a Colorado corporation with its

18  headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of

19  Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of

20  Defendant Anthem. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and

21  affiliated companies, which provide health care financing to more than 1.3 million enrollees, are

22  collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in

23  this Complaint.

24      144.    Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of

25  Connecticut is a subsidiary of Defendant Anthem. It is a Connecticut corporation with its

26  corporate headquarters located at 108 Leigus Road, Wallingford, CT 06492 and is the parent

27  corporation of a number of subsidiaries that provide health care financing to approximately 1.5

28  million enrollees in various health care plans in Connecticut. Anthem Blue Cross and Blue Shield

2854.003/1645949.2                                           33

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

of Connecticut, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

145.    Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222. Highmark, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 5.2 million enrollees in Pennsylvania, West Virginia and Delaware. Highmark, Inc., its subsidiaries and affiliated companies, including predecessor Hospital Service Association of Northeastern Pennsylvania, are collectively referred to as "Highmark" in this Complaint.

146.    Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is a subsidiary of Highmark, Inc. It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, DE 19801. Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield Delaware in July, 2012. Highmark Blue Cross and Blue Shield Delaware provides health care financing to approximately 397,000 enrollees in various health care plans in Delaware. According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share in the state of Delaware. Highmark Blue Cross and Blue Shield Delaware, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "BCBS-DE" in this Complaint.

147.    Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc. and provides health care financing in the District of Columbia, Maryland and areas of Virginia. It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc. Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117. Group Hospitalization and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "GHMSI" in this Complaint.

148.    Defendants Blue Cross and Blue Shield of Florida, Inc. and Guidewell Mutual Holding Corporation are Florida corporations with their corporate headquarters located at 4800

Deerwood Campus Parkway, Jacksonville, FL 32246. Defendant Blue Cross and Blue Shield of Florida is the parent corporation of a number of subsidiaries that provide health care financing to approximately 7 million enrollees in various health care plans in Florida. Blue Cross and Blue Shield of Florida, Guidewell Mutual Holding Corporation, and their subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint. Under BCBSA's rules, BCBS-FL is allowed to contract with healthcare providers in Alabama counties adjacent to Florida.

149.    Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant Anthem and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, GA 30326. According to a 2009 Center for American Progress study on health competitiveness, Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare financing market. Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 3.2 million enrollees in various health care plans in Georgia. Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

150.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, HI 96814. It is the parent corporation of a number of subsidiaries that provide health care financing to 722,000 enrollees in various health care plans in Hawaii. Hawaii Medical Service Association, its subsidiaries and affiliated companies are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

151.    Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, ID 83642. It is the parent corporation of a number of subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in Idaho. Blue Cross of Idaho Health Service, Inc.,

1  its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Idaho" or

2  "BC-ID" in this Complaint.

3    152.    Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and

4  is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, ID

5  83501. Regence BlueShield of Idaho, Inc. is the parent corporation of a number of subsidiaries

6  that provide health care financing to more than 150,000 enrollees in various health care plans in

7  Idaho. Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies are collectively

8  referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

9    153.    Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC

10  with its principal place of business located at 300 East Randolph Street, Chicago, IL 60601. It is

11  the parent of a number of subsidiaries that provide health care financing to over 7 million enrollees

12  in various health care plans in Illinois. Blue Cross and Blue Shield of Illinois, its subsidiaries and

13  affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Illinois" or

14  "BCBS-IL" in this Complaint.

15    154.    Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue

16  Shield of Indiana is a subsidiary of Defendant Anthem. It is an Indiana corporation with its

17  corporate headquarters located at 120 Monument Circle, Indianapolis, IN 46204. It is the parent

18  corporation of a number of subsidiaries that provide health care financing to enrollees in various

19  health care plans in Indiana. Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield

20  of Indiana, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue

21  Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint.

22    155.    Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is

23  an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.

24  It is the parent of a number of subsidiaries that provide health care financing to 1.8 million

25  enrollees in Iowa. Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its

26  subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue

27  Shield of Iowa" or "BCBS-IA" in this Complaint.

28

1   156.    Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with

2   its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, KS 66629. Blue Cross

3   and Blue Shield of Kansas, Inc. is the parent corporation of a number of subsidiaries, including

4   Premier Health, Inc., that provide health care financing to approximately 950,000 enrollees in

5   various health care plans in Kansas. Blue Cross and Blue Shield of Kansas, Inc. its subsidiaries

6   and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or

7   "BCBS-KS."

8   157.    Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of

9   Kentucky is a subsidiary of Defendant Anthem and is a Kentucky corporation with its corporate

10  headquarters located at 13550 Triton Boulevard, Louisville, KY 40223. It provides health care

11  financing in Kentucky. Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated

12  companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or

13  "BCBS-KY" in this Complaint.

14  158.    Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and

15  Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525

16  Reitz Avenue, Baton Rouge, LA 70809. It is the parent corporation of a number of subsidiaries

17  that provide health care financing to more than 1.1 million enrollees in various health care plans in

18  Louisiana. Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated

19  companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-

20  LA" in this Complaint.

21  159.    Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue

22  Shield of Maine is a subsidiary of Defendant Anthem. It is a Maine corporation with its corporate

23  headquarters located at 2 Gannett Drive, South Portland, ME 04016. It is the parent corporation of

24  a number of subsidiaries that provide health care financing to enrollees in various health care plans

25  in Maine. Anthem Health Plans of Maine, its subsidiaries and affiliated companies are collectively

26  referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

27  160.    Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a

28  subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters

2854.003/1645949.2                                37

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS
Case: 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 38 of
151

1  located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117. CareFirst of Maryland,
2  Inc. is the parent corporation of a number of subsidiaries that provide health care financing to
3  enrollees in various health care plans in Maryland. CareFirst of Maryland, Inc., its subsidiaries and
4  affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

5      161.    Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts
6  corporation with its corporate headquarters located at 401 Park Drive, Boston, MA 02215. It is the
7  parent corporation of a number of subsidiaries that provide health care financing to approximately
8  2.8 million enrollees in various health care plans in Massachusetts. Blue Cross and Blue Shield of
9  Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross
10  and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

11      162.    Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company is a
12  Michigan corporation with its corporate headquarters located at 600 E. Lafayette Boulevard,
13  Detroit, MI 48226. It is the parent corporation of a number of subsidiaries that provide health care
14  financing to approximately 4.5 million enrollees in various health care plans in Michigan. Blue
15  Cross and Blue Shield of Michigan Mutual Insurance Company, its subsidiaries and affiliated
16  companies are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-
17  MI" in this Complaint.

18      163.    Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a
19  Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul,
20  MN 55164. BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is
21  the parent corporation of a number of subsidiaries that provide health care financing to 2.6 million
22  enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its
23  subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of
24  Minnesota" or "BCBS-MN" in this Complaint.

25      164.    Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company, is
26  a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive,
27  Flowood, MS 39232. It is the parent corporation of a number of subsidiaries that provide health
28  care financing to approximately 1 million enrollees in various health care plans in Mississippi.

2854.003/1645949.2                                    38

1  Blue Cross and Blue Shield of Mississippi, its subsidiaries and affiliated companies are

2  collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this

3  Complaint. Blue Cross Blue Shield of Mississippi contracts with providers in counties in Alabama

4  that are adjacent to Mississippi.

5      165.   Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of

6  Missouri is a subsidiary of Defendant Anthem. It is the parent corporation of a number of

7  subsidiaries that provide health care financing to approximately 2.8 million enrollees in various

8  health care plans in Missouri. Defendants HMO Missouri, Inc., Healthy Life Insurance Company

9  and Rightchoice Managed Care, Inc. are all Missouri corporations with their corporate

10 headquarters located at 1831 Chestnut Street, St. Louis, MO 63103. Defendants HMO Missouri,

11 Inc., Health Alliance Life Insurance Company, Rightchoice Managed Care, Inc., and Anthem Blue

12 Cross and Blue Shield of Missouri, and their subsidiaries and affiliated companies, are collectively

13 referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this

14 Complaint.

15     166.   Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri

16 corporation with its corporate headquarters located at One Pershing Square, 2301 Main Street,

17 Kansas City, MO 64108. It is the parent corporation of a number of subsidiaries that provide

18 health care financing to approximately 900,000 enrollees in various health care plans in Kansas

19 City and its suburbs in Kansas and Missouri. Blue Cross and Blue Shield of Kansas City, its

20 subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of

21 Kansas City or "BCBS – Kansas City" in this Complaint.

22     167.   Defendant Blue Cross and Blue Shield of Montana is a division of Defendant

23 HCSC with its principal place of business at 3645 Alice Street, Helena, MT 59604-4309. It is the

24 parent of a number of subsidiaries that provide health care financing to approximately 240,000

25 enrollees in various health care plans in Montana. Blue Cross and Blue Shield of Montana, its

26 subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of

27 Montana" or "BCBS-MT" in this Complaint. For purposes of this Complaint, references to Blue

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue

2  Cross and Blue Shield of Montana, Inc.

3      168.    Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana

4  Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena,

5  MT 59604-4309. When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant

6  HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the

7  corporation now known as Caring for Montanans, Inc.

8      169.    Defendant Blue Cross and Blue Shield of Nebraska and GoodLife Partners, Inc. are

9  Nebraska corporations with their corporate headquarters located at 1919 Aksarben Drive, Omaha,

10  NE 68180. Defendant Blue Cross and Blue Shield of Nebraska is the parent corporation of a

11  number of subsidiaries that provide health care financing to over 700,000 enrollees in various

12  health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska, Defendant GoodLife

13  Partners, Inc., and their subsidiaries and affiliated companies are collectively referred to as "Blue

14  Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

15      170.    Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of

16  Defendant Rocky Mountain Hospital and Medical Service, Inc., a Colorado corporation with its

17  headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of

18  Nevada has a principal place of business in Nevada located at 9133 West Russell Road, Suite 200,

19  Las Vegas, NV 89148. Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky

20  Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant Anthem that offer

21  health care financing in Nevada. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries

22  and affiliated companies, which provide health care financing to more than 300,000 enrollees, are

23  collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

24      171.    Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross

25  and Blue Shield of New Hampshire is a subsidiary of Defendant Anthem. It is a New Hampshire

26  corporation with its corporate headquarters located at 3000 Goff Falls Road, Manchester, NH

27  03111. Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of

28  subsidiaries that provide health care financing to over 600,000 enrollees in various health care

2854.003/1645949.2

40

1   plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross

2   and Blue Shield of New Hampshire, its subsidiaries and affiliated companies are collectively

3   referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this

4   Complaint.

5        172.    Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield

6   of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn

7   Plaza East, Newark, NJ 07105. It is the parent corporation of a number of subsidiaries that provide

8   health care financing to 3.6 million enrollees in various health care plans in New Jersey. Horizon

9   Healthcare Services, Inc., its subsidiaries and affiliated companies are collectively referred to as

10  "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

11       173.    Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant

12  HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast,

13  Albuquerque, NM 87113. Blue Cross and Blue Shield of New Mexico is the parent of a number of

14  subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in

15  New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated

16  companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-

17  NM" in this Complaint.

18       174.    Defendants HealthNow New York, Inc. and HealthNow Systems, Inc. are New

19  York corporations with their corporate headquarters located at 257 West Genesee Street, Buffalo,

20  NY 14202. Defendants HealthNow New York, Inc. and HealthNow Systems, Inc. do business as

21  Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern New York.

22  HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide

23  health care financing to enrollees in various health care plans in New York. HealthNow New

24  York, Inc., HealthNow Systems, Inc., and their subsidiaries and affiliated companies are

25  collectively referred to as "HealthNow" in this Complaint.

26       175.    Defendant BlueShield of Northeastern New York is a division of Defendant

27  HealthNow with its principal place of business located at 40 Century Hill Drive, Latham, NY

28  12110. BlueShield of Northeastern New York is the parent of a number of subsidiaries that

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  provide health care financing to enrollees in various health care plans in New York. BlueShield of

2  Northeastern New York, its subsidiaries and affiliated companies are collectively referred to as

3  "BlueShield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

4      176.   BlueCross BlueShield of Western New York, Inc. is a division of Defendant

5  HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY

6  14202. BlueCross BlueShield of Western New York is the parent of a number of subsidiaries that

7  provide health care financing to more than 800,000 enrollees in various health care plans in New

8  York. BlueCross BlueShield of Western New York, Inc., its subsidiaries and affiliated companies

9  are collectively referred to as "BlueCross BlueShield of Western New York" or "BCBS-Western

10  NY" in this Complaint.

11      177.   Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross

12  BlueShield is a subsidiary of Defendant Anthem. It is a New York corporation with its corporate

13  headquarters located at One Liberty Plaza, New York, NY 10006. Empire HealthChoice

14  Assurance, Inc. d/b/a Empire BlueCross BlueShield is the parent corporation of a number of

15  subsidiaries that provide health care financing to nearly 6 million enrollees in various health care

16  plans in New York. Empire BlueCross BlueShield, its subsidiaries and affiliated companies are

17  collectively referred to as "Empire BlueCross BlueShield" or "Empire-BCBS" in this Complaint.

18      178.   Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a

19  subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate

20  headquarters located at 165 Court Street, Rochester, NY 14647. It is the parent corporation of a

21  number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in

22  various health care plans in the state of New York. Excellus Health Plan, Inc., its subsidiaries and

23  affiliated companies are collectively referred to as "Excellus BlueCross BlueShield" in this

24  Complaint.

25      179.   Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina

26  corporation with its corporate headquarters located at 4615 University Drive, Durham, NC 27707.

27  It is the parent corporation of a number of subsidiaries that provide health care financing to

28  approximately 3.9 million enrollees in various health care plans in North Carolina. Blue Cross and

1   Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are collectively

2   referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

3          180.    Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of

4   North Dakota and HealthyDakota Mutual Holdings are North Dakota corporations with their

5   corporate headquarters located at 4510 13th Avenue South, Fargo, ND 58121. Noridian Mutual

6   Insurance Company is the parent company of a number of subsidiaries that provide health care

7   financing to nearly 500,000 enrollees in the midwestern and western United States. Blue Cross

8   Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care

9   financing to approximately 390,000 enrollees in various health care plans in North Dakota.

10  Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota,

11  HealthyDakota Mutual Holdings, and their subsidiaries and affiliated companies are collectively

12  referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

13         181.    Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue

14  Shield of Ohio is a subsidiary of Defendant Anthem. It is an Ohio corporation with its

15  headquarters located at 4361 Irwin Simpson Road, Mason, OH 45040. Community Insurance

16  Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number

17  of subsidiaries that provide health care financing to more than 3 million enrollees in various health

18  care plans in Ohio. Community Insurance Co., its subsidiaries and affiliated companies are

19  collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

20         182.    Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant

21  HCSC with its principal place of business located at 1400 South Boston, Tulsa, OK 74119. Blue

22  Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health

23  care financing to more than 835,000 enrollees in various health care plans in Oklahoma. Blue

24  Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively

25  referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

26         183.    Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant

27  Cambia Health. It is an Oregon corporation with its corporate headquarters located at 100 SW

28  Market Street, Portland, OR 97201. Regence BlueCross BlueShield of Oregon is the parent

2854.003/1645949.2

43

corporation of a number of subsidiaries that provide health care financing to more than 750,000 enrollees in various health care plans in Oregon. Regence BlueCross BlueShield of Oregon, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

184.   Defendant Capital BlueCross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Pennsylvania. Capital BlueCross, its subsidiaries and affiliated companies are collectively referred to as "Capital BlueCross" in this Complaint.

185.   Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, PA 17011. Highmark Health Services is the parent of a number of subsidiaries that provide health care financing to approximately 4.2 million enrollees in various health care plans in Pennsylvania. Highmark Health Services, its subsidiaries and affiliated companies are collectively referred to as "Highmark Health Services" in this Complaint.

186.   Defendants Independence Blue Cross, Independence Hospital Indemnity Plan, Inc., and Independence Health Group, Inc. are Pennsylvania corporations with their corporate headquarters located at 1901 Market Street, Philadelphia, PA 19103. It is the parent corporation of a number of subsidiaries that provide health care financing to 2.5 million enrollees in Pennsylvania and 6 million nationwide. Independence Blue Cross, Independence Health Group, Inc., Independence Hospital Indemnity Plan, Inc., and their subsidiaries and affiliated companies are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

187.   Defendant Triple-S Salud, Inc. is a subsidiary of Triple-S Management Corporation and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that provide health care financing to 1.6 million enrollees in Puerto Rico. Triple-S Salud, Inc., its

1  subsidiaries and affiliated companies are collectively referred to as "Triple-S of Puerto Rico" in

2  this Complaint.

3      188.    Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island

4  corporation with its corporate headquarters located at 500 Exchange Street, Providence, RI 02903.

5  It is the parent corporation of a number of subsidiaries that provide health care financing to

6  approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and

7  Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to

8  as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

9      189.    Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina

10  corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, SC 29219.

11  It is the parent corporation of a number of subsidiaries that provide health care financing to

12  approximately one million enrollees in various health care plans in South Carolina. BlueCross

13  BlueShield of South Carolina, its subsidiaries and affiliated companies are collectively referred to

14  as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint.

15      190.    Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue

16  Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at

17  1601 W. Madison, Sioux Falls, SD 57104. Wellmark of South Dakota, Inc. is a subsidiary of

18  Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. is the parent corporation of a number

19  of subsidiaries that provide health care financing to 325,000 enrollees in South Dakota. Wellmark

20  of South Dakota, its subsidiaries and affiliated companies are collectively referred to as

21  "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

22      191.    Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation

23  with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, TN 37402. It is the

24  parent corporation of a number of subsidiaries that provide health care financing to nearly 3

25  million enrollees in various health care plans in Tennessee. BlueCross BlueShield of Tennessee,

26  Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield

27  of Tennessee" or "BCBS-TN" in this Complaint. BCBS-TN contracts with healthcare providers in

28  Alabama counties adjacent to Tennessee.

2854.003/1645949.2                                45

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS
Case: 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 46 of
151

192.    Defendant Blue Cross and Blue Shield of Texas, Inc. is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, TX 75082. Blue Cross and Blue Shield of Texas, Inc. is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

193.    Defendant Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121. Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide health care financing to more than 320,000 enrollees in various health care plans in Utah. Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueCross BlueShield of Utah" or "BCBS-UT" in this Complaint.

194.    Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, VT 05602. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 200,000 enrollees in various health care plans within the state of Vermont. Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

195.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. is a subsidiary of Defendant Anthem. It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, VA 23230. Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.2 million enrollees in various health care plans in Virginia. Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

46

1    196.    Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia

2  Health and is a Washington corporation with its corporate headquarters located at 1800 9th

3  Avenue, Seattle, WA 98101. Regence BlueShield in Washington is the parent corporation of a

4  number of subsidiaries that provide health care financing to 770,000 enrollees in various health

5  care plans in Washington. Regence BlueShield in Washington, its subsidiaries and affiliated

6  companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

7    197.    Defendant Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield

8  West Virginia is a subsidiary of Defendant Highmark and is a West Virginia corporation with its

9  corporate headquarters located at 614 Market Square, Parkersburg, WV 26101. Highmark Blue

10  Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is

11  the parent corporation of a number of subsidiaries that provide health care financing to nearly

12  493,000 enrollees in various health care plans in West Virginia and one county in Ohio. Highmark

13  Blue Cross Blue Shield West Virginia, its subsidiaries and affiliated companies are collectively

14  referred to as "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" in this

15  Complaint. BCBS-WV exercises market dominance in the states of West Virginia and Ohio or

16  within areas of those states.

17    198.    Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue

18  Shield of Wisconsin is a subsidiary of Defendant Anthem and is a Wisconsin corporation with its

19  corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross

20  Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including

21  Defendant Compcare Health Services Insurance Corporation, that provide health care financing to

22  approximately 900,000 enrollees in various health care plans in Wisconsin. Blue Cross Blue

23  Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "Blue

24  Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

25    199.    Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its

26  company headquarters located at 4000 House Avenue, Cheyenne, WY 82001. It is the parent

27  corporation of a number of subsidiaries that provide health care financing to over 100,000

28  enrollees in various health care plans in Wyoming. Blue Cross Blue Shield of Wyoming, its

1   subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of

2   Wyoming" or "BCBS-WY" in this Complaint.

3        200.   Defendant BCBSA is a corporation organized in the State of Illinois and

4   headquartered at 225 N. Michigan Avenue, Chicago, IL 60601. It is owned and controlled by 36

5   Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was

6   created by the Blues and operates as the licensor. Health insurance companies operating under the

7   Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for

8   nearly 105 million, or one in three, Americans. BCBSA itself does not provide health care

9   financing and does not contract with healthcare providers, but it operates to create consistency and

10  cooperation among its 36 members. It is owned and controlled by its members and is governed by

11  a board of directors, two-thirds of which must be composed of either plan chief executive officers

12  or plan board members. The 36 Blues fund Defendant BCBSA.

13       201.   Defendants, in all instances, includes the companies through which Defendants'

14  conduct their agreements.

15       202.   The true names and capacities, whether individual, corporate, associate or

16  otherwise of Defendant Does 1 through 50, inclusive, are unknown to Plaintiffs who therefore sue

17  said Defendants by such fictitious names pursuant to Code of Civil Procedure § 474. Plaintiffs

18  further allege that each of said fictitious Doe Defendants is in some manner responsible for the

19  acts and occurrences hereinafter set forth. Plaintiffs will amend this Complaint to show their true

20  names and capacities when the same are ascertained, as well as the manner in which each fictitious

21  Doe Defendant is responsible for the damages sustained by Plaintiffs.

22  **C.**    **The Unlawful-Agreement-Stabilizing, Supporting, and Facilitating Roles of**

23         **Defendant BCBSA and BHI**

24       203.   The BCBSA is a separate legal entity that purports to promote the common

25  interests of the Blues. The BCBSA describes itself as "a national federation of 36 independent,

26  community-based and locally operated Blue Cross and Blue Shield companies." The BCBSA

27  refers to the 36 Blue Cross and Blue Shield companies as Member Plans.

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST CLAIMS

204.    The BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete.

205.    As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."

206.    ***One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages."***

207.    Every Defendant Blue is a member of the BCBSA; every Defendant Blue CEO is on the Board of Directors of BCBSA; and every Defendant Blue participates in numerous BCBSA committees.

208.    Defendant Blues govern BCBSA. BCBSA is entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

209.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Cent. Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

210.    In a pleading it filed during the *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n* litigation in the Northern District of Illinois, Civil Action No. 09-c-5619, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current Chairman of the Board of Directors, David Holmberg, is also the President and CEO of Highmark Health. The CEO of each of the Individual Blues serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets at least annually.

1    211.   BCBSA meetings provide a forum for representatives of Defendants to share

2  information on management of Defendants and specific health insurance issues common to

3  Defendants, and this information is disseminated to all 36 members, including reimbursement

4  rates for providers. The BCBSA includes numerous committees governed by the Defendants and

5  sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are

6  in furtherance of Defendants' agreements.

7    212.   Defendant Blues also control BCBSA's Plan Performance and Financial Standards

8  Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors

9  that is composed of nine Member Plan CEOs and three independent members. This committee has

10  the power to enforce the requirements of the license agreements.

11    213.   Defendant Blues control the entry of new members into BCBSA. In a brief it filed

12  during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for

13  licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA

14  "seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the

15  Association has not approved." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue*

16  *Shield Ass'n*, Brief of Appellee, 1997 WL 34609472, at *7, *21 (filed Jan. 9, 1997) (the "Sixth

17  Circuit Brief").

18    214.   Defendant Blues control the rules and regulations that all members of BCBSA must

19  obey. According to the Sixth Circuit Brief, these rules and regulations include the Blue Cross

20  License Agreement and the Blue Shield License Agreement (collectively, the "License

21  Agreements"), the Membership Standards Applicable to Regular Members (the "Membership

22  Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). *Id.* at

23  n. 4.

24    215.   The License Agreements state that they "may be amended only by the affirmative

25  vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all

26  the Plans." Under the terms of the License Agreements, a plan "agrees . . . to comply with the

27  Membership Standards." In the Sixth Circuit Brief, BCBSA described the provisions of the

28  License Agreements as something the member plans "deliberately chose," "agreed to," and

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST CLAIMS

1  "revised." The License Agreements explicitly state that the member plans most recently met to

2  adopt amendments, if any, to the licenses on June 20, 2013.

3      216.    The Guidelines state that the Membership Standards and the Guidelines "were

4  developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially

5  became effective as of December 31, 1994"; that the Membership Standards "remain in effect

6  until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may

7  only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote";

8  that "new or revised guidelines shall not become effective . . . unless and until the Board of

9  Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and

10  Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate,

11  adequate and enforceable."

12      217.    Defendant Blues themselves police the compliance of all members of BCBSA with

13  the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for

14  making the initial determination about a Plan's compliance with the license agreements and

15  membership standards. Based on that determination, PPFSC makes a recommendation to the

16  BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In

17  addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to

18  each [member] Plan's CEO," which includes, among other things, "a copy of the Membership

19  Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and

20  PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements

21  and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to

22  the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board

23  Members."

24      218.    Defendant Blues control and administer the disciplinary process for members of

25  BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three

26  responses to a member plan's failure to comply—"Immediate Termination," "Mediation and

27  Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in

28  the termination of a member plan's license.

2854.003/1645949.2

51

Case 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 52 of 151

219.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In its Sixth Circuit Brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

220.    A number of Defendant Blues also serve on the IPPC, which controls the national or Inter-Plan Programs of the Blues. In each of their licensing agreements, Defendant Blues agree to participate in the national programs and to comply with the terms established by the IPPC. Therefore, Defendant Blues are collectively agreeing to the terms of the national programs and their implementation.

221.    Defendant Blues are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

222.    In addition, Defendant Blues have agreed to exchange competitively sensitive in-network provider information for the purpose and effect of stabilizing prices through Blue Health Intelligence ("BHI") (www.bluehealthintelligence.com). BHI is a licensee of BCBSA and is managed by a Board of Managers entirely comprised of BCBS executives—Highmark, BCBS-NC, BCBS-MI, BCBS-AL, BCBS-MA, BCBS-NE, HCSC, BCBSA, and IBC. BHI recently acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by BCBS companies. Designed to lower health care reimbursement to providers, Intelimedix explicitly states that "we all share information."

2854.003/1645949.2
52
FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE AND FEDERAL CLAIMS

Case: 21-04034   Doc# 1-2   Filed: 07/12/21   Entered: 07/12/21 13:19:45   Page 53 of 151

223.    BHI receives pricing data from each of the Blues via BCBSA. BHI uses the

BCBSA claims data, called the BCBSA National Data Warehouse Core, to perform analytic

reports on in-network pricing for the benefit of the Blues. The BHI reports provide the Blues with

information about in-network pricing which is at the heart of their negotiations with providers.

Typically, insurance companies and providers consider these data proprietary and highly

confidential. Yet, BHI provides a mechanism for the sharing of such pricing data among all the

Blues, including those few situations where Blues entities are presently competitors in a state, and

California is such an example. These data are used for the purpose and with the effect of lowering

reimbursements to providers, stabilizing the Blues pricing for health care services provided by

hospitals in various markets, and managing the various anticompetitive national BCBSA

programs.

224.    Each BCBSA licensee is an independent legal organization. The BCBSA has never

taken the position that the formation of BCBSA changed the fundamental independence of the

individual Blues. The License Agreements state that "[n]othing herein contained shall be

construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the

other."

225.    In the Sixth Circuit Brief, BCBSA admitted that the Blues formed the precursor to

BCBSA when they "recognized the necessity of national cooperation." 1997 WL 34609472, at *3.

The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the

desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions

on themselves:

> The subsidiaries kept running into each other—and each other's
> parent Blue Plans—in the marketplace. Inter-Plan competition had
> been a fact of life from the earliest days, but a new set of conditions
> faced the Plans in the 1980s, now in a mature and saturated market.
> New forms of competition were springing up at every turn, and
> market share was slipping year by year. Survival was at stake. The
> stronger business pressure became, the stronger the temptation was
> to breach the service area boundaries for which the Plans were
> licensed . . . .

226.    BCBSA is a vehicle used by admittedly independent health insurance companies to

enter into unlawful agreements, coordinate, and enter into agreements that restrain competition.

53

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1 | Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA

2 | and one of its member plans constitutes a horizontal agreement between and among the member

3 | plans themselves.

4 | 227.    As detailed herein, the BCBSA not only enters into anticompetitive agreements

5 | with the Blues to allocate markets, but also facilitates the cooperation and communications

6 | between Defendants to suppress competition. BCBSA is a convenient organization through which

7 | the Defendants enter into unlawful territorial restraints between and among themselves.

8 | IV.    FACTS

9 | **A.    The History of the Blues: Before and After the Unlawful Agreements**

10 | 228.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans

11 | arose independently. Later, the plans jointly conceived of using the Blue Cross and Blue Shield

12 | marks in a coordinated effort to create a national brand with each plan operating within its local

13 | area. While originally structured as non-profit organizations, since the 1980s, these local Blue

14 | plans have increasingly operated as for-profit entities either by formally converting to for-profit

15 | status, or by generating substantial surpluses that have been used to fund multi-million dollar

16 | salaries and bonuses for their administrators.

17 | 229.    BCBSA was created by Blue plans to support this endeavor and it is entirely

18 | controlled by those plans. The history of BCBSA demonstrates that the origin of the geographic

19 | restrictions in its trademark licenses was an effort to avoid competition between the various Blue

20 | plans, and to ensure that each Blue plan would be unimpeded by other Blue plans within its local

21 | Service Area.

22 | **1.    Before the Long-Term Business Strategy**

23 | 230.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were

24 | separate and distinct and were developed to meet differing needs. The Blue Cross plans were

25 | designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans

26 | provided a mechanism for covering the cost of physicians. The plans were all nonprofit entities

27 | with limited purposes, and they acknowledged obligations to treat all healthcare providers fairly.

28 |

54

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND UNJUST ENRICHMENT

231.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans. The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the American Medical Association ("AMA") responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

232.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

233.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. The authors of The Blues: A History of the Blue Cross and Blue Shield System, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

234.    By 1947, Blue Cross and Blue Shield plans coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. Competition in the same geographic areas under the Blue Cross name, as well as the

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

Blue Shield name, has been a feature of the system since the 1930s, and it continues to this day in some places.

235.   From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition and fear that a restraint-of-trade action might result from such cooperation.

236.   According to an affidavit of C. Rufus Rorem, who was the Director of the Blue Cross Commission, a goal of the Commission was to "prohibit[] the operation of multiple Plans in a single service area to reduce health care costs." The manner of reducing health care costs was to eliminate competition among the Blue Cross plans to induce hospitals to participate with the plans at reimbursement rates favorable to the plans: "One of several Plans operating in the same area with an enrollment of only a small fraction of the area's eligible subscribers had substantially less influence with and therefore success in convincing the area's hospitals to participate in the Plan. ... The operation of only one Plan *per service* area helped the Plan obtain the participation of hospitals on terms which were favorable to the Plan and its subscribers, thereby enhancing the Plan's attractiveness in the marketplace."

237.   In the 1950's, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

238.   In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services . . . to [the American Hospital Association]." (The "1954 Agreement.") Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." The 1954 Agreement also noted limitations specifying that only "certain Individual Plans . . . developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in particular areas served by such PLANS" and that the plan had the

56

1  right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these

2  presents."

3       239.    The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In

4  this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a

5  condition of the grant of the license, including, among other things, that "[e]very qualified general

6  hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to

7  become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-

8  contracting hospitals."

9       240.    Finally, the 1954 Agreement prevented the American Hospital Association

10 ("AHA") from having control over the Blue Cross plans. In this regard, the agreement specified

11 that the Blue Cross plans needed only a majority vote to revoke the agreement, while the AHA

12 could revoke it only prior to January 1, 1956, upon a three-fourths vote of the House of Delegates

13 of the AHA.

14      241.    With respect to the Blue Shield entities, a 1952 license agreement between the

15 National Organization (the agreement's term for the AMCP) and its member medical care plans

16 (the "1952 Agreement") was similarly limited in scope. That agreement stated that the words

17 "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and

18 elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned,

19 controlled or sponsored by county medical societies or state, district, territorial or provincial

20 medical associations."

21      242.    The 1952 Agreement further stated that "[e]ach member plan that is a party hereto

22 is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the

23 public its nonprofit medical care plan and its membership in the National Organization."

24      243.    In 1976, the organization changed its name to the "Blue Shield Association."

25 Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

26      244.    Notably, this agreement did not contain any provision relating to the Blues

27 developing territorial rights. Instead, this agreement provided that "[t]he National Organization

28 hereby grants to each of its member plans that are parties to this Agreement, subject to the terms

2854.003/1645949.2                                          57

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  of this agreement, permission to use said service mark in commerce among the several states or in

2  foreign commerce."

3      245.    In 1972, a new license agreement was entered into between the Blue Cross

4  Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement"). This agreement stated

5  that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of

6  a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA

7  Marks')." The agreement sought to expand the scope of the marks covered by providing that the

8  Blue Cross plan "desires to use the BCA Marks and any revisions and variations hereafter

9  developed (collectively called 'Licensed Marks')" and grants such plan the right to use the new

10  Licensed Marks "as service marks, in the sale and advertising of programs for health care and

11  related services operated on a non-profit basis."

12      246.    The 1972 Agreement included territorial restrictions in the license: the "rights

13  hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the

14  effective date of this License Agreement."

15      247.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a

16  plan must treat providers fairly. In this regard, the 1972 Agreement continued to specify that a

17  plan must comply with certain requirements as a condition of the grant of the license, including,

18  among other things, that "[e]very qualified general hospital in the area served by the PLAN shall

19  have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for

20  benefits in qualified non-contracting hospitals."

21      248.    In prior litigation, BCBSA has stated that the local plans transferred their rights in

22  the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local

23  plans, which were otherwise actual or potential competitors, "recognized the necessity of national

24  cooperation."

25      249.    In the 1970s, the Blue Cross Association and the Blue Shield Association began

26  consolidating. In his annual report to the associations given in 1979, President Walter J.

27  McNerney said that his focus would be on the "need for the Plans, within the framework of the

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE LAW CLAIMS

1   Associations, to work together in today's challenging environment and to do so with a renewed

2   sense of common mission."

3       250.    He noted that "problems" existed, "particularly where cooperative action among 2

4   or more Plans is required." He called for "mutual respect" among plans, decrying the "hazards" of

5   competition across service areas—called "Blue sharking"—and the submission by an out-of-area

6   plan of "highly competitive" prices.

7       251.    With respect to one Blue plan encroaching on the territory of another Blue plan, he

8   said "[t]he home Plan may resent the intrusion openly or covertly and add more fuel to antagonism

9   within the system with the potentially perverted result of weakening mutual support and

10  heightening the type of anxiety that leads to destructive competition."

11      252.    He added that "national accounts can only be served by coordinated action, and

12  because national accounts are growing in importance, so is coordinated action." He concluded

13  with a call for "coordinated action."

14      253.    This "coordinated action" raised antitrust concerns. In 1980, when the two

15  associations were considering a joint National Government Market Strategy, it was noted that

16  "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust

17  aspects of what is being proposed, as well as the manner in which it is being considered."

18      254.    By 1982, the process of the merger to form BCBSA had been completed. At that

19  time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks, trade

20  names, and service marks that had previously been owned by the local plans.

21          **2.    The Long-Term Business Strategy and Assembly of Plans**

22      255.    In the early 1980s, the Blues fundamentally changed the way they conducted

23  business. The Blues contracted with each other unlawfully through a work group organized by the

24  BCBSA, to set mandates that became known as the "Long-Term Business Strategy." Edwin R.

25  Werner, the President of Blue Cross and Blue Shield of Greater New York (now Defendant

26  Empire Blue Cross, which is a part of Defendant Anthem), led the effort.

27      256.    Prior to the Long-Term Business Strategy, each Blue Cross and Blue Shield Plan

28  was an autonomous company with a local presence, but often with strategic plans to compete in

2854.003/1645949.2                                   59

1  other service areas—whether within a state or across state lines. Some plans saw the importance of

2  national accounts and wished to compete for all of these accounts (notwithstanding their territorial

3  basis).

4      257.    Competition across service areas was so common among the Blues that it had a

5  name: "Blue Sharking." Some plans saw themselves as competing with other commercial health

6  insurers who had national presence and national provider networks. These plans in particular were

7  not interested in other Blue plans and the BCBSA was telling them what they could and could not

8  do with their capital, that they must coordinate with anyone, and that they must cede any authority

9  to an association. Yet this was the direct and lasting outcome of the Long-Term Business Strategy.

10     258.    Werner presented the Long-Term Business Strategy to the Blues at the Blue Cross

11  and Blue Shield Annual Meeting on November 11, 1982. In his presentation, Werner described the

12  Long-Term Business Strategy as a "fundamental change" that would result in "a concentration of

13  power." The Blues approved the Long-Term Business Strategy the next day.

14     259.    According to the Long-Term Business Strategy itself, two of the three "measures of

15  success" for the Blue Cross and Blue Shield organization were market share and profit. The

16  mandates of the Long-Term Business Strategy were designed to further these goals in part by

17  reducing competition among the Blues.

18     260.    Two of the mandates contained in the Long-Term Business Strategy reduced

19  competition among the Blues by reducing the number of Blues who could compete with each

20  other. Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint Blue

21  Cross Blue Shield plans by the end of 1984, "except where the Association Board of Directors

22  agrees that business needs dictate otherwise." Proposition 1.2 required further consolidation so

23  that there would be only one Blue per state by the end of 1985, "except where the Association

24  Board of Directors agrees that business needs dictate otherwise."

25     261.    When he presented these propositions, Werner described a "significant reduction in

26  the number of corporations which make up our collective effort" as "wise," questioning why "it

27  makes good business sense for four corporations in one state to chase a total market potential of

28

1  677,000 employed people." He asked, "Can we really justify 12 member corporations in one state

2  – even though it is a large one?"

3      262.    Although the Blues approved these propositions, some Blue plans disagreed with

4  this strategy as antithetical to competition and plan autonomy. William Flaherty, the President of

5  Blue Cross Blue Shield of Florida, sent a letter to Werner in 1982 expressing reservations about

6  portions of the Long-Term Business Strategy. With respect to the consolidation of plans, he said

7  that "[t]he large market share of the system of plans would have precipitated anti-trust actions

8  were it not for the insurance industry exemptions and the community-service orientation."

9      263.    Blue Cross of Central New York stated in a position paper, "Blue Cross of Central

10  New York is opposed to statewide merger or consolidation. Such a move would destroy virtually

11  everything our community leaders have built in our 10-county service area in the 47 years we have

12  functioned as a community organization. . . . Home rule and local autonomy were the key reasons

13  for the Plan's creation."

14      264.    Similarly, in 1983 the Presidents of Blue Cross of Western New York and Blue

15  Shield of New York sent a letter to each of the Chief Executive Officers of the Blue plans voicing

16  their dissent. They argued that the Long-Term Business Strategy was a threat to the autonomy of

17  individual plans "and [to] transform Plans into branch offices," a disguised program to strengthen

18  the BCBSA, and "a concerted effort to establish a corporate entity."

19      265.    The Blues carried out Propositions 1.1 and 1.2, dramatically reducing the number

20  of Blues in the years after they adopted the Long-Term Business Strategy. In 1980 there were 114

21  Blues. By 1989 there were 75, and now there are 36. Competition between Blue Cross plans and

22  Blue Shield plans ended in all but a few states.

23      266.    Another important mandate of the Long-Term Business Strategy was Proposition

24  3.4: "Launch an intensified program to retain, acquire and expand provider and professional

25  payment differentials." "Differentials" referred to the difference between healthcare providers'

26  billed charges and what the Blues paid, which was an advantage for the Blues because its

27  competitors generally paid the providers' billed charges. (More recently, the Blues have

28  sometimes used "differentials" to mean the difference between what the Blues pay a healthcare

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

provider and what their competitors pay.) In other words, the Blues unlawfully agreed to reduce the payments they were making to providers. Among the steps for implementing Proposition 3.4 was for the "Association to survey all Plans by March 1, 1983, to determine status to their efforts to protect/secure payment differentials."

267.    Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. Commenting on the Long-Term Business Strategy, Flaherty wrote to Werner, "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty also wrote, "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Thus, the Blues were aware that by using their market power to secure large differentials, they could "close out" other insurers. Blue Cross and Blue Shield of Alabama is one of the Blues that secured a large differential by imposing cost-based reimbursement on hospitals.

268.    Another mandate of the Long-Term Business Strategy was Proposition 1.4: "Continue study of Blue Cross and Blue Shield organization and make further recommendations for change." A Proposition 1.4 Work Group was established, and it wrote in 1985:

> One deterrent to Plan support for common cohesive effort was quickly identified and is the subject of the balance of this report. A common effort requires a common bonding. The bond in our case is the use of the Blue Cross and Blue Shield names and marks. Yet as we analyzed the current provisions of the basic agreements with plans, that bond seems unduly weak for the current environment. As will be developed, a strengthened license agreement is deemed essential.

The Proposition 1.4 Work Group identified as a problem the possibility that a plan could hold a license to use the Blue marks but not be a member of BCBSA, imperiling cooperation and coordination among plans. The solution was to tie the terms of the license agreement to membership in BCBSA.

269.    The Proposition 1.4 Work Group also recommended a series of meetings among the Blues, known as the "Assembly of Plans." The Board of Directors of BCBSA approved this proposal in 1986.

2854.003/1645949.2

62

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

270.    On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues plans, including actions that plans should do collectively.

271.    In June 1986, John Larkin Thompson, the CEO of Blue Cross and Blue Shield of Massachusetts, agreed to Chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine plan CEOs. The Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the plan CEOs. This became known as the "White Paper."

272.    The focus of the White Paper was "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements." The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue service marks within the plans' Service Areas.

273.    It acknowledged, however, that exclusive Service Areas were not essential to the Blue marks, and that they were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing *Sealy* and *Topco*]. . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future Thus, an issue for the Assembly is whether to consider – at this time – alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

The White Paper recognized that "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned." As the author of a paper summarizing a meeting discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas in the future—shouldn't we be looking instead for other alternatives."

274.    During this process, it was clear that the reason for preserving exclusive Service Areas was to prevent competition that would otherwise arise among the Blues. According to an internal report about the Assembly of Plans, "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare."

275.    And the result of reduced competition was lower payments to providers; according to same report, "By enjoying exclusive territories, Plans can bargain aggressively. In turn, national accounts enjoy local discounts." According to the internal Assembly of Plans report, exclusive service areas create "Larger market share because other Blues stay out and do not fragment the market. … Stronger provider agreements for the same reason."

276.    Despite the significant legal problems with exclusive areas, the Assembly of Plans considered and rejected proposals to create non-exclusive "primary service areas" or to eliminate territorial allocation entirely.

277.    Ultimately, through nine meetings of the Assembly of Plans from 1987 through 1989, and despite open acknowledgement that a number of Plans were happily competing with each other outside their exclusive Service Areas, the Assembly of Plans issued its Final Report on February 8, 1990. It recommended to the BCBSA approval of new license agreements that would tie together licensing of the Blue marks and membership in BCBSA (and satisfaction of its membership standards; prior to this a plan was not required to be a member of BCBSA to obtain a license to use the BCBS name and marks).

278.    When these license agreements were executed, the BCBSA acquired the ability to enforce exclusive Service Areas by membership restrictions in BCBSA, limitations on use of the BCBS name and marks, and monetary sanctions. This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where plans wish to compete with each other across assigned territories.

### 3.    Defendant Blues Entered Into Unlawful Agreements

279.    Until 1986, the Blues were tax-exempt. The Tax Reform Act of 1986 revoked this exemption and added Section 833 of the Internal Revenue Code, which treats the Blues as taxable stock insurance companies.

280.    Since 1986, some Blues have converted to for-profit organizations. The largest, Anthem, reported a net income of $2.56 billion in 2015. As described in more detail below, many of the Blues that have remained nominally nonprofit behave like for-profit companies by building up unnecessarily high levels of surplus and paying outsized compensation to executives.

281.    Although the Assembly of Plans eliminated the potential for BCBSA-sanctioned "Blue on Blue" competition in most states, it left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues. After the 1986 revocation of the Blues' tax-exempt status and throughout the early1990s, the number of non-Blue subsidiaries of Blues increased.

282.    As quoted in The Blues: A History of the Blue Cross and Blue Shield System, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with the other Blues. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

283.    Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

284.    Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey, and guidelines that proposed members must adhere to prior to joining the BCBSA. These rules and regulations include the License Agreements, the Membership Standards, and the Guidelines. These agreements, which were revised or amended at least as of 2013, are the agreements at issue in this case.

285.    These License Agreements depart from, and supersede, the previous licensing agreements. For example, the "whereas" clauses of the Blue Cross License Agreements provided that the plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the plan "was desirous of assuring nationwide protection of the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

286.    Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system." In order to

1    accomplish these objectives, these new License Agreements dramatically expand the scope of the

2    license and newly defined Service Areas. The scope of the license is expanded to include the

3    "right to use the Licensed Marks, in the sale, marketing and administration of health care plans

4    and related services in the Service Area set forth and defined in paragraph 5 below." Paragraph 5

5    sets forth these new "Service Area[s]]" as "the geographical area(s) served by the Plan on June 30,

6    1972, and/or as to which the Plan has been granted a subsequent license."

7        287.    Despite the expanded scope of the license and the newly defined Service Areas, the

8    License Agreements failed to include the provision—contained in both the 1954 and 1972

9    Agreements—that required the plan to treat providers fairly. To make matters worse, an exhibit to

10    the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in

11    contracting with healthcare providers or soliciting such contracts in areas contiguous to a Plan's

12    Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing

13    or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a

14    tag line or otherwise, to negotiate directly with providers outside its Service Area."

15        288.    In 1990, Defendants developed an amended license agreement that continued to

16    require that all Blue license holders be non-profit entities. At that point, Associated Insurance

17    Companies of Indianapolis, which became Anthem, wished to be a for-profit company and refused

18    to sign the amended license agreement, and it "bought the giant Dallas-based American General

19    Insurance Company in 1990 . . . it was a 'Sputnik event' for the rest of the [Blue] Plans, according

20    to M. Edward Sellers, a former BCBSA vice president who became president and CEO of Blue

21    Cross and Blue Shield of South Carolina in 1987. Soon the Indiana Plan was competing under

22    another brand name in many other Plans' home markets." The Blues: A History of the Blue Cross

23    and Blue Shield System at 241. During the 1990s, in order to end the developing competition, the

24    Defendants agreed to restrict non-Blue competition and to develop the Blue Card Program in a

25    highly anticompetitive manner described previously in this Complaint.

26        289.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries

27    will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside

28    of a specifically designated geographic Service Area, which is either the geographical area(s)

2854.003/1645949.2

66

1   served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent

2   license.

3       290.    Under the Guidelines and Membership Standards that were developed in the early

4   to mid-1990s, each member plan agrees that at least 80% of the annual revenue that it or its

5   subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid)

6   shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks

7   and trade names.

8       291.    Each Defendant also agrees that at least two-thirds of the annual revenue generated

9   by it or its subsidiaries from either inside or outside of its designated Service Area (excluding

10  Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue

11  Shield trademarks and trade names.

12      292.    The Guidelines provide that national enrollment can be substituted for annual

13  revenue, making the alternative restriction that a plan will derive no less than 66.66% of its

14  national enrollment from its Blue business.

15      293.    Both provisions directly limit the ability of each Blue to generate revenue from a

16  non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands

17  that could and would compete with other Blues.

18      294.    The Defendants also agree that they will participate in inter-plan programs,

19  including Blue Card, with the billions of dollars of access fees providing the quid pro quo for the

20  agreements not to compete.

21      295.    Therefore, Defendants have agreed that in exchange for having the exclusive right

22  to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each

23  Blue will derive none of its revenue from services offered under the Blue brand outside of that

24  area, and will derive at most one-third of its revenue from outside of its exclusive area using

25  services offered under a non-Blue brand. The latter amount will be further reduced if the licensee

26  derives any of its revenue within its designated geographic area from services offered under a non-

27  Blue brand.

28

2854.003/1645949.2           67

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS
Case: 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 68 of
151

296.     Anthem (then known as WellPoint), in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

297.     These agreements drastically limited the Blues' ability to compete.

298.     The rules and regulations also prohibit acquisition of a Plan by a non-Blue entity without the approval of BCBSA. The Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."

299.     Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans accordingly may block its membership by majority vote.

300.     The License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate automatically: (1) if any institutional investor becomes beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor becomes beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if

2854.003/1645949.2

68

any person becomes beneficially entitled to 20 percent or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent or more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

301.    These acquisition restraints reduce competition in violation of antitrust laws because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Blues. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.

302.    Through the acquisition restrictions, the Blue plans have agreed unlawfully to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

303.    The Defendants have long been aware that their limits on non-Blue business could constitute an unlawful restraint of trade. A "Blue Cross and Blue Shield Issue Summary" dated February 4, 1993, which "was assembled by asking several Blue Cross and Blue Shield Plan CEOs to identify issues that they believed were divisive to the Plans and BCBSA," cited

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

unbranded competition as a divisive issue, and stated as one position that "[a]ny attempt to restrict competition between licensees using trademarks other than the Blue marks is a violation of federal and state antitrust laws and subject to criminal and civil penalties. Competition is good for the consumer and that is who we are obligated to serve. It makes the Plans more effective. No harm has ever been demonstrated. It would be impractical to regulate much less unlawful."

304. One plan wrote in an "Executive Overview" that "[a]ny new restrictions on 'unbranded' activities will be reviewed under the antitrust laws . . . and could be viewed as an agreement among competing Plans and therefore an unlawful horizontal restraint . . . ."

305. Despite this concern, the Blues eventually imposed restrictions on non-Blue businesses with the stated purpose of restraining competition. In an April 30, 2001 memorandum to the Blues, BCBSA expressed concern about Blues competing under non-Blue brand names. According to BCBSA, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local Blue Plan." For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

306. The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition, in addition to the explicit agreements described above.

307. The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard. For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Defendant's territory.

308. However, many of the Blues have entered into what they call "gentlemen's agreements" not to compete in those counties. For example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements.

309.    Other Blues have engaged in similar conduct to the detriment of providers, including Anthem's refusal to contract with hospitals in counties adjacent to Ohio which is described below.

### 4.    The Blue Card and National Accounts Programs

310.    In the 1940s and 1950s, the Blues used the development of employment-based health benefits to advance their bargaining power. As the demand grew over the next few decades for insurance and servicing of benefit plans that covered the employees of a single employer across many states, the Blues found a way to use, maintain and enhance that bargaining power and market share by accessing each other's provider networks, and sharing the benefit of any differentials they had obtained.

311.    During the early to mid-1990s as part of their overall agreement to restrict competition, the Defendants agreed to develop the Blue Card Program as part of their Inter-Plan and National Accounts Programs. Under the Blue Card/National Accounts Programs, one, and only one, Defendant Blue may administer a national or multi-state employee benefit plan. The Blue where the national account is headquartered is the Control Plan (or "Control Blue") while the other Blues are Participating Plans.

312.    The Control Blue is the only Blue that may bid for the business of that national account unless that Control Blue cedes the right to another Blue, which is then the only Blue that may bid for the business of that national account. In other words, in this area and many others, the Defendants agree that they will not compete. The Defendants divide the proceeds derived from this anticompetitive scheme either through the Blue Card Program or through separate agreements.

313.    All of the Blues are required to participate in the Blue Card Program, which applies when a subscriber obtains healthcare services outside of the Service Area of the subscriber's Blue plan. With the Blue Card Program, claims are processed by a provider in one Service Area on behalf of the patient whose Blue plan is based in another Service Area.

314.    Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan."

71

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

315.     Generally, when a provider treats a patient who is a member of a Blue plan outside the provider's service area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays. The provider is paid based on the reimbursement rates or prices in the provider's contract with the Host Plan, but in order to be paid, the provider must comply with the medical policy and other requirements of the Home Plan, to which the provider often does not have access.

316.     As a result of the Blue Card Program, providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for providers and the health care system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the providers.

317.     All healthcare providers are required to participate in the Blue Card Program as a condition of their participation in the Blue plan in their Service Area. As a result, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with the Blue in that Service Area. Instead, the Home Plan pays the healthcare provider the discounted rate that the Host Plan has imposed on the provider. For example, many members of plans insured or administered by Defendants Empire (New York), BCBS of Illinois, and BCBS of Michigan spend time in Florida during the winter months.

318.     Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida. Moreover, the Blues do not allow healthcare providers to have an escape clause to allow them to opt-out of the national programs and contract separately with the Blues.

319.     The Blue Card and National Accounts Programs are thus agreements to fix prices. Healthcare providers, such as Plaintiffs, providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area receive significantly lower reimbursements than they would receive absent Defendants' agreement to fix prices. In 2002, BCBSA reported that in 2001, the Blue Card Program saved $9 billion. This figure represents the reduction in payments to healthcare providers that the Blues were able to obtain by fixing prices.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

320.    The Blues share the discounts they are able to impose through the Blue Card and National Accounts programs. In addition to an administrative fee that purports to cover the cost of processing claims through Blue Card, a standard Blue Card fee is the Access Fee, which is a percentage of the Host Plan's discount that the Host Plan shares with the Home Plan. Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for fixing their prices. For its self-funded accounts, Defendants such as BCBS-AL bill access fees to the account as a cost of the medical claim, even though the access fee is not paid to the provider.

321.    The Blue Card Program encourages the Blues to fix prices rather than compete, even in the limited contexts in which BCBSA rules allow them to compete outside their Service Areas. Because of the discounts that the Blues receive through the Blue Card Program, they can lower their payments to providers in counties contiguous to their Service Areas by relying on Blue Card rather than negotiating and contracting with those providers directly.

322.    By way of example, since the 1980s, Blue Cross and Blue Shield of Alabama maintained agreements with healthcare providers, including hospitals, in contiguous counties of adjacent states such as Florida and Mississippi. These out-of-state hospitals were not subject to the same rules as the in-state Alabama hospitals, and were not required to submit the "Blue Cross Cost Study" that in-state Alabama hospitals are required to submit as part of their agreement with Blue Cross and Blue Shield of Alabama. Therefore, Blue Cross and Blue Shield of Alabama could not force these out-of-state hospitals to accept the lower outpatient payment methodology that it imposed on Alabama hospitals.

323.    In 2013, Blue Cross and Blue Shield of Alabama terminated its contracts with all hospitals in contiguous out-of-state counties. It ultimately terminated the contracts of twenty-nine hospitals in four states: Florida (nine hospitals), Georgia (five hospitals), Mississippi (nine hospitals), and Tennessee (six hospitals). Each of these hospitals remained in-network with its in-state Blue. Therefore, Blue Cross and Blue Shield of Alabama could leverage the Blue Card Program to maintain access to these hospitals for its enrollees.

Case: 21-04034    Doc# 1-2    Filed: 09/22/21    Entered: 09/22/21 13:19:45    Page 74 of 151

324.    Blue Cross and Blue Shield of Alabama identified the "impetus" of the terminations as the significant reduction in payments it could make to these hospitals by taking advantage of the Blue Card Program, rather than directly contracting with these hospitals. This was true, even net of the Access Fees it would be required to pay to utilize the Blue Card Program.

325.    In addition to lowering payments for providers, the national programs, including the Blue Card Program and the National Accounts Programs, also impose numerous inefficiencies and burdens on the providers. While the amounts paid for medical services are dictated by the Host or Participating Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home or Control Plan. The Home or Control Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area.

326.    Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. For example, BlueCross BlueShield of South Carolina administers the benefit plan for employees of Winn Dixie Stores, many of whom live in Alabama and, accordingly, seek medical treatment there.

327.    For these patients, BlueCross BlueShield of South Carolina is the Home or Control Plan, while BCBS-AL is the Host or Participating Plan. BCBS-AL determines the price paid for services rendered by a healthcare provider in Alabama. However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BlueCross BlueShield of South Carolina.

328.    While the Alabama provider has access to the rules for preauthorization or pre-notification for BCBS-AL, because BlueCross BlueShield of South Carolina boycotts the Alabama providers from participating in its network as a part of its horizontal agreement with all the Blues, the provider does not have ready access to BlueCross BlueShield of South Carolina's rules. In this example, the Alabama healthcare provider can and does innocently fail to comply with the rules of BlueCross BlueShield of South Carolina and be paid nothing by BlueCross

74

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

BlueShield of South Carolina, not even receiving the discounted amount that would result from the Price Fixing Agreement.

329.    When this happens, the healthcare provider has no recourse. Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits, and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan. Moreover, the illustration includes only one Home or Control Plan, whereas, in reality, a healthcare provider's patients may include patients enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area.

330.    Furthermore, Blues will even offer commercial health insurance across state lines to healthcare providers, through national accounts or other programs, even where they will not contract in their capacity as a healthcare provider. For example, at various times Illinois-based Defendant HCSC has provided Blue-branded commercial health insurance for Tenet Healthcare, a large healthcare company with facilities in many states including Brookwood Hospital in Alabama.

331.    Despite this, because of Association rules, HCSC is barred from contracting directly with Brookwood Hospital for its healthcare services. This is, of course, because the arrangement allows BCBS-AL to use its combined market share to extract the maximum discount possible from Brookwood and other hospitals. This sort of approach is common.

332.    Many Blues have different medical records requirements and timing for those requirements that apply to providers, including hospitals. Hospitals find their bills being reduced or denied because they comply with the Host or Participating Plan's requirements (those where the hospital is located and where the hospital is in-network) but not with the Control or Home Plan's requirements.

333.    Since the hospitals are not in-network with the Control or Home Plan, those hospitals do not have ready access to those medical records requirements. In an effort to address this highly inefficient process, hospitals in Florida, where there are many Blue Card and National

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  Accounts subscribers, set up weekly telephone calls with Blues to try to learn the requirements of

2  each of the plans for submitting medical records and other coverage requirements.

3      334.   The employees of the hospitals spend hours, week after week, for an extended time

4  in trying to learn those requirements. They would obtain inconsistent and incomplete answers to

5  their inquiries. Despite spending significant resources of the hospitals to comply with the Blues'

6  multiple coverage requirements, the hospitals continued to have claims reduced and denied when

7  they innocently failed to comply with one of those requirements.

8      335.   The national programs, including the Blue Card and National Accounts Programs,

9  are so inefficient that the Defendants have established an adjacent county rule that allows them to

10  contract with healthcare providers in one county into the adjacent Blue's Service Area. However,

11  the Defendants use and abuse the adjacent county rule to reinforce each other's market power. For

12  example, when Highmark was attempting to force University of Pittsburgh Medical Center

13  ("UPMC") to accept lower reimbursement rates, UPMC asked Anthem Blue Cross of Ohio to

14  contract with Harmot Hospital, which is in a county adjacent to Ohio. Anthem Blue Cross of Ohio

15  refused to have discussions about a contract with Harmot Hospital. Plaintiffs allege that the refusal

16  was part of a horizontal agreement under which the Defendant Blues attempt to reinforce each

17  other's market power.

18      336.   To facilitate the agreements, the Defendant Blues that are partners along with the

19  BCBSA have established and own National Account Service Company L.L.C. ("NASCO"), which

20  assists the Blues in processing claims involved in national accounts and other claims.

21      337.   "In 1987 NASCO was formed through a partnership with major Blue Cross and

22  Blue Shield Plans." It has been engaged in activity "for some of the largest Blue Cross and Blue

23  Shield Plans for over 20 years." NASCO establishes "work groups composed of NASCO

24  associates and customers." NASCO also works with the Blues to "ensure their compliance with

25  Blue Cross and Blue Shield Association (BCBSA) mandates." *See* Exhibit A.

26      338.   To facilitate the agreements, numerous Blues and the BCBSA have also established

27  Consortium Health Plans, Inc. ("CHP"). CHP describes itself as a "national coalition of 20 leading

28  BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination,

2854.003/1645949.2

76

1   for the Blue System among national accounts . . ." whose "mission is to position Blue Cross Blue

2   Shield as the preferred choice for national accounts." *See* Exhibit B.  Through CHP, the Blues

3   share claims data reflecting provider reimbursements on a nationwide basis. The Blues leverage

4   that data and their collective market power to impose deep discounts on reimbursements to

5   providers, which they then market to employer groups and other purchasers of health insurance.

6       339.    For example, in a marketing brochure dated February 6, 2013 for CHP's

7   "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared

8   claims data and collective market power to reduce reimbursement to providers to levels far below

9   their competitors on the national level. In this regard, the brochure describes the ValueQuest tool

10  as follows:

11          ValueQuest is Blue Cross Blue Shield's leading-edge analytical
            platform for measuring total health plan value. ValueQuest
12          incorporates sophisticated data analytics with relevant industry
            benchmarks, new advances in measurement around cost, access to
13          care, and lifestyle and behavioral characteristics. ValueQuest has the
            ability to compare each carrier's per-member, per-month (PMPM)
14          cost in markets where employees reside.

15  https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-

16  d4cb2f0a7b3f&groupId=10307, last visited Sept. 30, 2014. The brochure further explains that

17  "[t]he ValueQuest data set contains claims and membership data for BCBS nationally. The data is

18  pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

19      340.    Another brochure sheds light on the extraordinary breadth of the claims data shared

20  by the Blues through CHP. In this regard, the brochure makes the following claims, among others:

21      • "ClaimsQuest provides in-network and out-of-network data for all 50 states in

22          three-digit zips and MSAs."

23      • "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield

24          Plan, and the same data criteria are applied across every state, every MSA,

25          every zip code."

26      • "The ClaimsQuest model not only works effectively for every Plan in the Blue

27          System, it also applies to other carriers. Applying the ClaimsQuest cost model

28          to all carriers permits an 'apples-to-apples' comparison."

2854.003/1645949.2                          77

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

341.    Thus, CHP harnesses claims data for the Blues in every state, metropolitan statistical area ("MSA") and zip code in the country and, using that data, allows the Blues to impose deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

### 5.    Protecting and Increasing "Differentials"

342.    The Defendants have aggressively protected and increased their differentials. In August 1983, the Defendants had established two projects aimed at increasing the differentials or reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of BCBSA to the CEOs of the Blues, "Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact in each Plan."

343.    The second project was "Project State Watch," which included states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the overall Blue System differential would be reduced by a reduction in the differential in those states. In other words, all the Blues benefited by acting together to decrease provider payments in each state.

344.    The Blues' efforts to establish, maintain, and increase their differentials continue to this day. The CHP brochure described above boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care." As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

(Emphasis added.) Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors. Indeed, as CHP itself

2854.003/1645949.2

78

says, "[n]o other carrier even comes close." (Emphasis added.) And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor. According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

345.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs. *See* Exhibit C.

346.    Despite its claims that it is simply a marketing agent, CHP acts with the Association and the plans not just to measure and market discounts, but to unlawfully agree to actively suppress the amounts paid to providers in the name of "differentials." CHP regularly meets with the Association and with network contracting executives from plans to identify and develop "action plans" for "critical markets" to help with the Association's "corporate obj[ective]" of reducing provider reimbursement and increasing "discounts." CHP facilitates the Blues' agreements by allowing them to collaborate to reduce provider reimbursements.

347.    Despite enjoying an advantage over its competitors in provider reimbursements, the Blues have higher administrative fees for self-funded plans than its competitors, even before accounting for the access fees the Blues charge as medical costs.

### 6.    Differences Between the Modern Blues and Other Insurers

348.    The Blues' anticompetitive agreements make them very different from other insurers. If an insurer like UnitedHealthcare wants to establish a provider network, its value proposition to a provider includes its ability to steer its enrollees to that provider. And a provider who is thinking about leaving the network knows that the consequence is the inability to treat UnitedHealthcare's enrollees on an in-network basis.

349.    Each Blue, on the other hand, brings not only its own enrollees, but also the enrollees of every other Blue into negotiations with providers. ("Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-leave it basis.) And a provider who is

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  thinking about leaving the local Blue's network knows that the consequence is not just the

2  inability to treat the local Blue's enrollees on an in-network basis, but the inability to treat all of

3  the Blues' enrollees on an in-network basis. Thus, the Blues are able to use leverage against

4  providers that is unavailable to their competitors.

5  350.    In addition, the Blues operate less efficiently than their competitors. For example,

6  the rules associated with the Blue Card program, requiring compliance with each Home Plan's

7  rules, create confusion for providers in a way that does not exist for other major insurers.

8  **B.    Specific Examples of Defendants' Unlawful Conduct**

9  **1.    The Leading Example: Alabama**

10  351.    The history of Blue Cross and Blue Shield of Alabama shows how competition

11  could have developed in Alabama but for the Blues' anticompetitive agreements.

12  352.    The National Labor Relations Act, which was enacted in 1935, and as ultimately

13  interpreted provided the basis for the growth of employer-based health benefit plans. Health

14  benefits for employees expanded enormously during World War II as a method of increasing

15  competition without increasing wages or salaries because of wage freezes. This expansion

16  continued in the post-war years.

17  353.    During the period after World War II, Alabama was the most unionized state in the

18  Southeast. Some of the largest employers in the State were in the steel industry, and the workers in

19  that industry were represented by the United Steelworkers of America. After the United States

20  Supreme Court and the National Labor Relations Board recognized fringe benefits, including

21  pensions and health care benefits as mandatory subjects of bargaining, in 1949 the United

22  Steelworkers of America demanded that health care benefits be included in the new collective

23  bargaining agreement.

24  354.    After a strike, the steel industry agreed to include health care benefits in the

25  collective bargaining agreement, and designated Blue Cross of Western Pennsylvania, now

26  Highmark, as the entity to coordinate those benefits. Because of the territorial restrictions that the

27  Defendants had agreed to, Blue Cross of Western Pennsylvania would not provide those

28  healthcare benefits to the many thousands of steelworkers in Alabama.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

355.    If it had been able to do so, Blue Cross of Western Pennsylvania could have become a major health insurer in Alabama, developed a provider network, and even sold health insurance in the State to compete with Blue Cross and Blue Shield of Alabama. Instead, Blue Cross and Blue Shield of Alabama used this event to become the dominant health insurer in the State of Alabama.

356.    In The History of Blue Cross and Blue Shield of Alabama, written by Clarence Joseph Vance and copyrighted in 1978 by Blue Cross and Blue Shield of Alabama, the following statement appears: "The enrollment in Alabama in 1950 of the U.S. Steelworkers was a progressive milestone; in terms of increasing enrollment. It was a major breakthrough. Heretofore, Blue Cross Plans had become conditioned to limit their markets to the white-collar workers . . ." *Id.* at 88–89. "The first step toward national accounts business was taken when Abraham Oseroff convinced the U.S. Steel Corporation and the Congress of Industrial Organizations in Pittsburgh that his Pittsburgh Plan could serve as a syndicate head. Working with the Blue Cross Commission and with Mr. Thompson, the New York Plan's actuary, Mr. Oseroff put together the first syndicate, covering over 1 million steel workers, with an estimated 75,000 in Alabama." *Id.* at 98. As the book notes, this syndicate was still intact at the time of publication in 1978. "The Steel contract has been the most stable piece of business, both locally and nationally." *Id.*

357.    These "national accounts" were critical to Blue Cross of Alabama's growth. "Early in 1950, competing in the national market place with large commercial carriers became a crisis issue." *Id.* at 98. However, the individual plans were ill equipped to do this on their own. "The locally autonomous Plans could not reply [sic] upon their loose confederation… ."

358.    Blue Cross and Blue Shield of Alabama experienced a similar increase in enrollment from other unionized industries. For example, the auto workers at the Ford plant in Sheffield became enrolled with Blue Cross and Blue Shield of Alabama shortly before the Steelworkers, and they would have been covered by Defendant Blue Cross and Blue Shield of Michigan if it were not for the territorial restrictions agreed to by the Defendants.

359.    Thus, Blue Cross and Blue Shield of Michigan also would have become a meaningful competitor in Alabama if it were not for those restrictions. The addition of the

2854.003/1645949.2

81

Case: 21-04034   Doc# 1-2   Filed: 09/22/21   Entered: 09/22/21 13:19:45   Page 82 of 151

1    Steelworkers and other unionized workers to Blue Cross and Blue Shield of Alabama's rolls

2    resulted in its fastest growth in history. "The Corporation's enrollment at the end of the first

3    decade (1946) had reached 160,000 members; however, at the end of the second decade (1947-56)

4    enrollment has reached 668,000, or a 416 percent increase." *Id.* at 194–95. As employee benefit

5    plans expanded, BCBS-AL and the other Defendants used those plans and their anticompetitive

6    system to expand their market shares and market power.

7        360.    Blue Cross and Blue Shield of Alabama also acted as a control plan for South

8    Central Bell Telephone Company and International Paper's Southern Kraft Division, and aided

9    other Defendants in developing their market shares and market power.

10       361.    Blue Cross and Blue Shield of Alabama's rapid growth in enrollment gave it

11   increased market power when dealing with healthcare providers. As the copyrighted history states,

12   "while the U.S. Steel breakthrough was an enrollment boon, it also brought with it reimbursement

13   problems." *Id.* at 89. Blue Cross and Blue Shield of Alabama addressed those reimbursement

14   problems by forcing hospitals in Alabama to accept a cost-based reimbursement system.

15       362.    That system is unique and has resulted in hospitals in Alabama receiving among the

16   lowest reimbursement rates in the country. That system remains in place for hospitals in Alabama,

17   and BCBS-AL requires cost-based reimbursement for hospitals in Alabama each year, including

18   during years since 2008.

19       363.    Today, hundreds of thousands of enrollees of non-Alabama Blues live and work in

20   Alabama. As of 2012, Defendant Anthem had approximately 121,000 enrollees in Alabama (and

21   127,000 as of 2015), Defendant Highmark had approximately 40,000, Defendant HCSC had

22   approximately 94,000, Defendant Blue Cross and Blue Shield of Michigan had approximately

23   30,000, and Defendant BlueCross BlueShield of Tennessee had approximately 31,000 (and 35,000

24   as of 2015).

25       364.    Yet the Blues' rules prevent Alabama providers who treat these patients from

26   negotiating with those Blues; instead, they must accept the low reimbursement rates imposed by

27   BCBS-AL. Moreover, BCBS-AL is free to set its low rates with the knowledge that Anthem,

28   HCSC, and others are prohibited from competing for the business of BCBS-AL's enrollees or

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

1  negotiating with Alabama providers. BCBS-AL has taken advantage of its market power in a

2  number of ways.

3                              a.    **BCBS-AL Stifled Competition Promoted by the Alabama Health**

4                                    **Care Council**

5          365.    In 1985, the CEOs of several major corporations, including Alabama Power,

6  Drummond Company, and SouthTrust Bank, formed the Alabama Health Care Council as a non-

7  profit entity to help Alabama corporations improve the quality and cost of health care.

8          366.    In September 1995, in response to rising health care costs in Alabama, the council

9  solicited health insurance proposals. It received bids from over twenty companies, and ultimately

10  narrowed the bids to United Healthcare of Alabama and HealthPartners of Alabama, the former

11  insurance arm of then-Baptist Health System. BCBS-AL did not initially submit a bid in response

12  to the council's solicitation.

13          367.    BCBS-AL stood to lose the business of approximately 60,000 employees if the

14  members of the council contracted with another insurer.

15          368.    In an effort to maintain its market share and delay and block healthcare reforms in

16  Alabama, BCBS-AL offered the council a 20 percent discount for the next three years, which the

17  council accepted. Pursuant to its agreement with the council, BCBS-AL was further obligated to

18  reduce the costs of health care for the council's members once the three-year guarantee expired by

19  better managing the delivery of health care services and the administration of health benefit plans

20  in Alabama.

21          369.    Effectuating a 20 percent savings for the council's members would have required

22  BCBS-AL to significantly change its methods of managing the delivery of health care services and

23  administering health benefit plans in Alabama. Instead of making these changes, BCBS-AL

24  financed these discounts by relying on its hundreds of millions of dollars in surplus and increased

25  charges to other consumers.

26          370.    As the three-year savings guarantee came to an end, the council's members learned

27  that if they continued their relationship with BCBS-AL, their health care costs in the next year

28  would increase by approximately 35–45 percent.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

Case: 21-04034    Doc# 1-2    Filed: 09/22/21    Entered: 09/22/21 13:19:45    Page 84 of
151

371.   In September 1999, Drummond Company terminated its contract with BCBS-AL. Drummond subsequently obtained health coverage for its employees through Select Care.

372.   As a result of BCBS-AL's use of most-favored-nation clauses ("MFNs"), Drummond encountered significant problems in negotiating favorable rates with hospitals and physicians and establishing satisfactory hospital and physician networks. The best rates that hospitals generally were able to offer Drummond was 15 percent greater than the rates received by BCBS-AL. This example illustrates how BCBS-AL used MFN's to preserve its market power and insulate itself from competition.

373.   In May 2000, Drummond filed suit against BCBS-AL in the Northern District of Alabama, in part challenging its use of MFNs. *See Drummond Co. v. Blue Cross & Blue Shield of Alabama*, Civil Action No. CV-00-AR-1354-S.

374.   In August 2001, the parties settled the action. As part of the settlement agreement, BCBS-AL agreed to cease the use of MFNs. Since 2001, BCBS-AL has, however, engaged in similar conduct that allows it to obtain larger discounts from its providers than its competitors can obtain.

        b.   **BCBS-AL Uses Its Market Power to Extract Money From Providers Through "Tiering"**

375.   BCBS-AL abuses its market power and the lack of competition in Alabama in other ways as well.

376.   In a further effort to depress prices paid to hospitals and gain greater "differentials," BCBS-AL began its "Hospital Tiered Network Program" in 2006. Their stated goal was to "recognize hospitals that have taken action to improve healthcare quality and work with Blue Cross and Blue Shield of Alabama to reduce healthcare costs for our customers."

377.   In its Hospital Tiered Network Program, BCBS-AL ranks hospitals in various categories. BCBS-AL enrollees face higher out-of-pocket responsibility for treatment at hospitals that are ranked in lower tiers.

378.   Initially, the three primary categories of the tiered hospital criteria were fiscal, quality, and patient safety. BCBS-AL states in its program description that the program criteria is

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

evaluated and enhanced each year in an effort to continually pursue high quality healthcare in the State of Alabama. In 2010, BCBS-AL added a fourth category of patient experience.

379.   The Hospital Tiered Network Program has been based on a scoring system that allowed for a maximum of 100 points divided between the categories. To be a Tier 1 hospital you had to score between 80 and 100. For Tier 2 from 60-79 points and Tier 3, when there was a Tier 3 category, 59 or below

380.   Despite any claims concerning quality or safety, since inception, the Fiscal category has always been the primary driver of the tier a particular hospital was placed in, and that, that fiscal component is always based upon the hospital's acceptance of terms that reduced the amounts or rates that BCBS-AL paid to the hospital.

381.   Through 2011, the sole criteria that had to be met to receive any points in the fiscal category was to continue an annual POF/ASC contract whose only purpose was to reduce reimbursement for the hospitals' ambulatory surgery center and other ambulatory services. BCBS-AL has made clear that "[h]ospitals scoring high in this category have entered into financial arrangements with Blue Cross and Blue Shield of Alabama to provide the most favorable discounts for their services."

382.   In particular, the Fiscal category through at least 2010, required each hospital to accept a reduction in their reimbursement to receive 25 points if it accepted the lower contract reimbursement and zero points for that category if it did not. Therefore, without "accepting" BCBS-AL's even lower fee schedule, a hospital could not qualify to be in Tier 1 in Alabama. A hospital could achieve every other point available under the Hospital Tiered Network Program and would still end up in Tier 2 if it refused to accept the lower reduced reimbursement from BCBS-AL.

383.   The Quality, Patient Safety, and Patient Experience categories are all measured by standard measures which are largely achieved by all the hospitals in the state. As shown above, quality, patient safety, and patient experience are not what ultimately drive a hospital's tier.

384.   In the current iteration of the Hospital Tiered Network Program, a facility's rank is determined based on its "costs." A hospital's "costs" are compared to a particular percentage of

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  Medicare and scored for tiering purposes. As with the earlier iterations, it impossible to achieve a

2  Tier 1 ranking without meeting BCBS-AL's lower "cost" thresholds. BCBS-AL itself notes that

3  the new method puts even "greater emphasis on cost."

4       385.    The new methodology placed 50% weight on "cost" with the thresholds of $ for

5  "costs" under 130 percent of Medicare, $$ for "costs" between 130 and 140 percent of Medicare

6  and $$$ for "costs" above 140 percent of Medicare. Hospitals in the state have sought information

7  from BCBS-AL on how "costs" are determined but have been unable to match BCBS-AL's

8  purported cost calculations or tie them off to the same Medicare percentages. BCBS-AL has

9  refused to provide its internal calculations, essentially treating them as a black box during the

10 initial process.

11      386.    Further, BCBS-AL personnel have stated that the particular percentages of

12 Medicare used for the "cost" thresholds are supported by a study or other work done for BCBS-

13 AL. BCBS-AL refused to provide the basis for these particular percentages of Medicare as

14 appropriate "cost" thresholds to the hospitals. Defendants have stated that no such studies exist.

15 Based on this, Plaintiffs must conclude that there is no study that demonstrates that these

16 percentages of Medicare are appropriate measures of costs. Therefore, these percentages of

17 Medicare seem to be arbitrary thresholds designed to lower reimbursements paid by BCBS-AL or

18 to extract payments from the hospitals as part of the Tiering process.

19      387.    Under the new method, 17 hospitals were pushed from Tier 1 to Tier 2.

20      388.    For instance, in 2016, UAB Hospital was placed in Tier 2. Since UAB Hospital is

21 one of the premier and most advanced hospitals in the state, this relegation to a higher cost tier

22 demonstrates that the quality of the facility is not the driving force behind BCBS-AL's Tier

23 rankings

24      389.    Plaintiffs Jackson Medical Center, LLC, Evergreen Medical Center, LLC, and

25 Crenshaw Community Hospital all were placed in Tier 2.

26      390.    In 2016, Mobile Infirmary was also placed in Tier 2 originally. After negotiations

27 with BCBS-AL, and after significant money was paid to BCBS-AL, in October 2016 Mobile

28 Infirmary was placed in Tier 1.

2854.003/1645949.2
FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

391.    In 2016, before the tiering decisions were made public, BCBS-AL told Decatur Morgan Hospital in Decatur that it would be a Tier 2 when the rankings were released. The parties attempted to reach an agreement on payments to Blue Cross that would allow Decatur Morgan to regain Tier 1 status. Decatur Morgan and BCBS-AL were unable to reach an agreement. BCBS-AL took the tiering rankings public and pushed to the local media in Decatur that Decatur Morgan would be Tier 2 and patients would be subjected to higher patient responsibility at Decatur Morgan in the hopes of driving Decatur Morgan to make a deal.

392.    After the rankings were public, but before the tiering went into effect, Decatur Morgan and BCBS-AL reached an agreement whereby Decatur Morgan would pay BCBS-AL approximately 1.7 million dollars, and BCBS-AL would move Decatur Morgan back to Tier 1 status. Decatur Morgan was therefore moved back into Tier 1 before the new rankings went into effect.

393.    In addition to the general ability to force providers to continually lower costs, it is not clear to hospitals how BCBS-AL actually determines the "costs" it uses for tiering purposes or how it calculates the corresponding percentage of Medicare payment rates for purposes of the tiering exercise. Hospitals have asked for information on the calculations that drive these cost measures but are not allowed to see or confirm how these costs measures are actually derived. Essentially, the tiering process is driven by a black-box calculation that determines which hospitals will be favored for steerage by BCBS-AL.

394.    Further, under the tiering regime, BCBS-AL's initial cost determinations and tier assignment are used to hold the Tier 2 hospital hostage. In order to regain Tier 1 status, a "negotiation" unfolds where BCBS-AL extracts certain concessions either with respect to the costs a hospital reported in earlier years, or by reductions in forward-looking reimbursement rates. In some cases, hospitals have been asked to cut checks of over a million dollars to BCBS-AL for cost adjustments from earlier years in order to regain their Tier 1 status.

395.    Being placed below Tier 1 is designed to cause extraordinary harm to a hospital. BCBS-AL acts to affirmatively steer patients away from these hospitals by imposing higher costs on enrollees and actively pushing its enrollees to Tier 1 Hospitals. Thus, when faced with the

1   prospect of losing large portions of their patient base, or paying the ransom, hospitals have no

2   choice but to accept lower rates and pay BCBS-AL so that they can continue to treat the high

3   percentage of BCBS-AL enrollees in this state.

c.   **BCBS-AL Lowers Hospital Reimbursements Through**

**Onerous and Arbitrary "Cost Reporting" Requirements**

6   396.   Along the same lines, BCBS-AL has required all participating hospitals to submit

7   to cost reporting since 1957. This information has historically provided BCBS-AL an

8   informational competitive advantage over all other commercial insurers. In addition, this reporting

9   requirement introduced a barrier to entry in the sense that every hospital would refrain from

10  negotiating a contract with another insurer since the related costs and revenues would be revealed

11  to BCBS-AL. Consequently, this cost reporting requirement acts, essentially, as a barrier to entry

12  as well as a guarantee that BCBS-AL gets the best rates from hospitals in the State of Alabama.

13  397.   Regarding hospital outpatient services, BCBS-AL pays each hospital a fixed

14  percentage of its charges. At the end of the year, the hospitals report their costs and BCBS-AL will

15  either true up or true down the payments they made over the course of the year based not on the

16  contracted rates but on the actual costs of the hospitals plus a fixed percentage (11%).

17  398.   Blue Cross then either takes money back from the hospital if it feels it got charged

18  too much, or pays late amounts due to a hospital that should have been paid previously.

19  399.   The process is time consuming, administratively inefficient, and difficult for the

20  hospitals, often requiring them to submit to several rounds of auditing. From the hospitals'

21  perspective, the process is costly and arbitrary, and BCBS-AL often relies on classifications of

22  expenses that make no sense to the hospitals. In the end, it often simply becomes another way for

23  BCBS-AL to utilize its market power and drive provider reimbursements lower.

24  400.   With regard to hospital inpatient services, BCBS-AL pays each hospital a fixed per

25  diem, regardless of the type of procedure performed (i.e., diagnosis related group). BCBS-AL does

26  not true up or true down its payments for inpatient hospital stays. It does, however, change the per

27  diem rates that it pays each hospital throughout the year. Plaintiffs are not aware of any other

28  commercial health insurer in the country that requires hospitals to submit to this kind of cost

2854.003/1645949.2                              88

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

reporting. This cost reporting requirement is a remarkable showing of the market dominance BCBS-AL has when compared to other commercial health insurers and relative to providers, even hospitals with whom the Blues purport to have difficulty negotiating.

401.    In addition to these practices, BCBS-AL prohibits hospitals from using the rates that BCBS-AL pays in any other of the hospitals' contracts.

                    d.    **BCBS-AL Interfered With Competitive Bidding in Birmingham**

402.    BCBS-AL's interference with competitive bidding for health coverage for the City of Birmingham's employees is another illustration of BCBS-AL's use of its market dominance and political influence to obtain business which it would otherwise not have earned through fair competition and to exclude potential competition.

403.    In 2013, United Healthcare brought suit against the City of Birmingham, Alabama, alleging that the city wrongfully directed business away from United Healthcare to BCBS-AL. The lawsuit, *United Healthcare Services, Inc. v. City of Birmingham, Alabama*, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.), alleged that, following a bid process, United Healthcare emerged as the lowest responsible bidder for a contract managing the City's employee health coverage. However, in an effort to avoid losing subscribers and allowing United Healthcare to increase its market share in Alabama, BCBS-AL approached the City and offered to provide additional services. The City awarded the contract to BCBS-AL.

404.    A Jefferson County, Alabama court sided with United Healthcare and determined that the City's actions violated Alabama's Competitive Bid Law. The court ordered the City to restart the bid process and award the contract to the lowest responsible company.

                    e.    **BCBS-AL Spends Heavily on Executive Compensation and Lobbying**

405.    BCBS-AL's executives have profited handsomely from the lack of competition in Alabama. Prior to 2015, the compensation of BCBS-AL executives was publicly available through the Alabama Department of Insurance. In 2013, the last year for which information is available, the total compensation of top BCBS-AL executives was as follows: CEO and President Terry Kellogg, $4.84 million; Executive VP Timothy Kirkpatrick, $2.69 million; Chief Administrative

89

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

Officer Timothy Vines, $1.9 million; Senior VP and Chief Marketing Officer Timothy Sexton, $1.7 million; Senior VP and CFO Cynthia Vice, $1.47 million; Senior VP and CIO Brian S. McGlaun, $1.45 million; Senior VP of Business Operations Dick Briggs III, $1.44 million; Senior VP of Health Care Networks Jeffrey Ingrum, $1.42 million; Senior VP of Enterprise Resources Vickie Saxon, $1.26 million; and Senior VP and Chief Legal Officer Michael Patterson, $1.03 million.

406.    These amounts are inconsistent with BCBS-AL's status as a non-profit entity and suggest that its executives' decisions are motivated by potential personal gain rather than the benefit to BCBS-AL's customers. By point of comparison, BCBS-NC, also a nonprofit, has roughly 3.8 million customers compared to BCBS-AL's 3 million, and its 2013 annual revenue was $6.4 billion, compared to BCBS-AL's $4.1 billion 2013 annual revenue. In 2013, BCBS-NC's CEO, Brad Wilson, earned $2.9 million in total compensation.

407.    In recognition of this inconsistency, BCBS-AL lobbied in support of legislation aimed at keeping its executives' compensation out of the public record. In 2015, the Alabama legislature amended Alabama Code 1975 § 27-2-24, designating the compensation of officers and employees of insurance companies confidential and privileged.

408.    The amendment was sponsored by Sen. Slade Blackwell. In 2013 and 2014, Blackwell received $53,250 in contributions from political action committees that in turn received $336,000 in contributions from BCBS-AL. BCBS-AL also makes payments to family members of legislators.

### 2.    Restricting Competition in Pennsylvania and Ohio

409.    Despite the Blues' portrayal of Service Areas as essential to the functioning of the "Blue System," historical experience has shown that the BCBSA has allowed competition between Blues, especially when doing so would avoid a court decision about whether Service Areas violate the antitrust laws.

### a.    Pennsylvania

410.    The Blues refuse to contract in an adjacent Blue's Service Area when the refusal benefits that Blue's market power, as demonstrated recently by Anthem Blue Cross and Blue

2854.003/1645949.2                                                           90

1   Shield of Ohio's refusal to contract with a UPMC hospital in a county in Pennsylvania that

2   borders on Ohio.

3       411.   UPMC has developed a number of areas of health care where it has an outstanding

4   reputation for excellence. For example, people from elsewhere in the country have gone to UPMC

5   for liver transplants when they could have gone anywhere in the world for the procedure. The

6   Defendants' unlawful agreements will mean that when the contract between UPMC and Highmark

7   terminates, other Blues will not be permitted to enter into an in-network relationship with UPMC,

8   and the Blues' subscribers will not have access to UPMC using in-network coverage. But for the

9   unlawful agreements, other Blues would be able to negotiate in-network relationships with

10   UPMC.

11       412.   . In addition, there have been other side agreements not to compete. Highmark

12   BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross

13   of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of

14   Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the

15   entire state of Pennsylvania.

16       413.   Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue

17   Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern

18   Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania

19   Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO

20   plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an

21   HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into

22   the market. In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these

23   HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and

24   Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal

25   Choice.

26       414.   When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form

27   Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and

28   Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue

1  Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not to

2  compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania,

3  despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

4      415.  The conduct of Highmark and IBC demonstrates that the noncompetition

5  agreement remains in place, though it putatively expired in 2007. Instead of entering the

6  Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and

7  Independence BC intended to merge. After an exhaustive review by the Pennsylvania Insurance

8  Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application.

9  In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated

10 that he was "prepared to disapprove this transaction because it would have lessened competition. .

11 . to the detriment of the insurance buying public."

12     416.  Capital Blue Cross presented an expert report from economist Monica Noether,

13 Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether

14 offered the following opinions:

15     •  "Based on my review of historical data on attempted entry, it is my opinion that the
   Pennsylvania health insurance market has been difficult to enter successfully even
16        by otherwise successful national firms. Moreover, there has been little or no
   expansion by the existing competitors of the Blues plans in the Commonwealth."
17

18     •  "Highmark and IBC would have a post-merger market share in excess of 70
   percent. As noted above, in a scenario where entry and expansion are difficult, a
   firm with as large a share as the combined Highmark-IBC will possess is likely to
19        be able to exert market power. Indeed, it appears to be the case that the health
   insurance market in Pennsylvania is characterized by difficulties in entry and
20        expansion."

21     •  "The combination of Highmark and IBC would result in a combined entity with
   more than 70 percent of the fully- and self-insured commercial health business in
22        the Commonwealth. This is significantly more than the 53 percent share cited by
   others, which itself is material and well above the safe harbor guideline of 35
23        percent established by the DOJ and FTC in the Merger Guidelines."

24     •  "Highmark has competed in the past with IBC, could have been competing with
   IBC since 1997 but for a ten year non-compete agreement between them, and, in
25        my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete
   with IBC in the future, especially given the absence of successful entry by other
26        insurers."

27     •  "Highmark has competed successfully for business in Southeastern Pennsylvania
   previously, both as a competitor to IBC and in cooperation with IBC through a joint
28        operating agreement to offer indemnity insurance."

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE AND FEDERAL LAWS

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania. Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Health Care, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While health care services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, **but even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region.**"

(Emphasis added.)

417.    Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1   Delaware), and despite the supposed "expiration" of the non-compete agreement with

2   Independence BC, Highmark BCBS has still not attempted to enter Southeastern Pennsylvania.

3       418.   This unlawful, anticompetitive agreement not to compete has reduced competition

4   throughout the state of Pennsylvania. After the Pennsylvania regulator refused to approve the

5   merger of IBC into Highmark, the two entities began engaging in more joint activity instead of

6   competing. For example, IBC now pays Highmark to process its provider claims. By processing

7   those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers. In

8   addition, Highmark Blue Shield has been involved in similar non-competition arrangements with

9   other Pennsylvania Blues and has purchased Blue Cross of Northeastern Pennsylvania.

10      419.   In a large part of central Pennsylvania, Capital Blue Cross and Highmark Blue

11  Shield compete. In that area and in others where Blues compete, including with separate Provider

12  Networks, reimbursement rates or prices are higher. The same would be true in Alabama if other

13  Defendants competed with BCBS-AL, including with Provider Networks. Capital Blue Cross has

14  attempted to operate outside of its Service Area through its non-Blue branded for profit subsidiary,

15  Avalon.

16      420.   When Defendant Highmark developed a dispute with the largest provider in its

17  Service Area, the University of Pittsburgh Medical Center (UPMC), Capital Blue Cross through

18  Avalon attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-

19  network basis. Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this

20  arrangement. Defendant Highmark and Defendant BCBSA prevented competition from Defendant

21  Capital in the Service Area of Highmark and Capital agreed to restrict its competition. The efforts

22  by Capital Blue Cross through its non-Blue Avalon demonstrate that if it were not for the

23  agreement not to expand outside of each Blue's Service Area, Capital would be operating in the

24  Highmark Service Area.

25           b.    **Ohio**

26      421.   The history of Blue Cross and Blue Shield in Ohio shows that not only is

27  competition possible among the Blues, but also that it occurred with BCBSA's agreement and was

28  seen as beneficial to consumers at the time.

2854.003/1645949.2                         94

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

422.    In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus.

423.    In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. *Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the state of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

424.    In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

425.    In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1.

426.    In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

427. Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990.

428. Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive Service Areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993 leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem Blue Cross and Blue Shield.

429. The next year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. BCBSA refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended as a result of the Blues' concerted conduct.

### 3.    The Market Allocation Agreement

430. As described above, Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area. Accordingly, these restrictions insulate each Defendant from competition from other Blues in each of their respective geographic Service Areas, and prevent providers from contracting with Blues in other Service Areas. These restrictions have no economic justification other than protecting Defendants from competition.

431. Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws. Defendants pay in-network providers directly pursuant to provider agreements. Because of Defendants' market power and access to the more than one hundred million enrollees of the Blues through the national programs, providers wishing

1  to join the Blue network must accept lower reimbursement rates. In many markets, doctors and

2  other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

3      432.    Numerous Blues and non-Blue businesses owned by Defendants could and would

4  compete more effectively in other Service Areas but for the territorial restrictions. The likelihood

5  of increased competition is demonstrated in several ways. First, as set forth above, the restrictions

6  were specifically put in place to eliminate "Blue on Blue" competition. If there were no likelihood

7  of competition, the restrictions would have been unnecessary. In fact, as set forth above, the

8  restrictions did not initially address competition by non-Blue businesses owned by Defendants;

9  however, when it became evident that such competition was an "increasing problem," the

10 restrictions were revised to address this as well.

11     433.    Second, certain Blues have, in fact, expanded beyond their initial Service Areas by

12 merging with other Blues. For example, WellPoint, which was initially the Blue Cross licensee for

13 California, is currently the BCBSA licensee for fourteen states (under the name Anthem). Prior to

14 its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had

15 expanded to become the BCBSA licensee for eight states. Undoubtedly, absent the current

16 restrictions, Anthem would compete to an extent in additional Service Areas and, in all likelihood,

17 would compete nationally. Other Defendants, including HCSC, have, in fact, recently expanded

18 into other areas and, in all likelihood, would compete to an extent nationally but for the

19 restrictions described in this Complaint.

20     434.    Third, various Defendants have demonstrated that, absent the restrictions that each

21 of the Blues agreed to put into the licensing agreement, they would expand into other geographic

22 areas and states. For example, Anthem has expanded into many states where it is not licensed to

23 operate as a Blue entity: first through Unicare and, more recently, through its purchase of

24 Amerigroup. Anthem also operates Caremore Centers in Arizona despite the fact that Anthem is

25 not the Blue Cross Blue Shield licensee in Arizona. In addition, Defendant Blue Cross of

26 Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid

27 managed care services. Other Blues have likewise expanded into other Service Areas in a similar

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  manner. Of course, these expansions are currently extremely limited by the restrictions on

2  competition.

3     435.    Fourth, the Blues' practice of "ceding" accounts, as well as their history of

4  informally competing for national accounts and accounts located in border areas, which the

5  Association has attempted to eliminate by pressuring the Blues to work together through joint

6  ventures and similar arrangements rather than compete, shows that they are ready and willing to

7  do business to an extent outside their Service Areas when they are permitted to do so. While the

8  Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition

9  cannot occur in the market for health care services.

10     436.    Absent competition, the Blues have achieved significant market power and

11  domination in the markets in their Service Areas. The territorial restrictions have therefore barred

12  competition from the respective commercial health insurance markets and the market for health

13  care services.

14     437.    In a letter written in February of 2016, AHA summarized the market dominance of

15  the Blue plans (footnotes omitted):

16         a.    Blue plans have the largest membership of any insurer. The Blues cover

17              more than 105 million Americans. That is "nearly one in three Americans."

18              Collectively, the Blues are three times bigger than any other health plan.

19         b.    Blue plans command the largest share of the commercial fully insured (FI)

20              segment in at least 45 states and the District of Columbia (D.C.); in 35

21              states, a Blue plan holds 50 percent or more FI market share; in some states,

22              85 percent of all FI members belong to a Blue plan.

23         c.    Blue plans rank first in total membership in at least 43 states and D.C., with

24              a high market share of 97 percent.

25         d.    In the Federal Employees Health Benefits Program, the Blue plans

26              command 66 percent of total membership, and control 50 to 90 percent of

27              the membership in 48 states and D.C.

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST CLAIMS

e.   In the public exchanges, Blue plans dominate. In at least one state, the Blue plan enrolled 100 percent of the exchange membership in 2015, and other Blue plans acquired membership shares in the forties through nineties in many states.

f.   Blue plans collectively are significantly larger than any of their rivals on a consolidated basis. Indeed, collectively Blue plans had $244 billion in revenue in 2013, making them larger than all companies on the Fortune 500 except for Walmart and Exxon Mobil.

g.   The Blue plans of Alabama, Florida, Illinois, Kansas, Minnesota, Montana, Nebraska, New Mexico, North Dakota, North Carolina, Oklahoma, Texas and Wyoming through their jointly owned pharmacy benefit manager acknowledge their "market dominance."

h.   Blue plans dominate provider networks. In 32 states and D.C., Blue plans have the largest provider networks and, in seven more states, Blue plans have the second-largest provider networks.

i.   Blue plans contract with 96 percent (more than 5,100) of U.S. hospitals and 92 percent of professional providers, which is more than any other insurer.[1]

438.   The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a Member's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

---

[1] American Hospital Association Letter to Hon. William Baer, Antitrust Division, U.S. Department of Justice (Feb. 29, 2016) ("AHA Letter"), at 7-9.

2854.003/1645949.2                                          99

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

439.  Defendants' agreements to limit competition and not contract with providers based on geographic Service Areas are referred to in this Complaint as the "Market Allocation Agreement."

440.  The Market Allocation Agreement continues to this day.

441.  In an effort to enhance its market power and the market power of the Blues in general, Anthem attempted to purchase Cigna, one of the largest health insurance companies in the country and one of only four companies that competes in the administration of national accounts. After Anthem entered into the agreement with Cigna, the CEO of Anthem met with CEOs of various other Defendants in a private room in the luxurious Peninsula Hotel in Chicago, Illinois. In those private meetings, various Defendants agreed unlawfully with each other, and developed a "Blue Bias Strategy" for the implementation of the agreed merger of Anthem and Cigna. The merger, as planned by Anthem and the Blue Plans that had agreed unlawfully with it, was enjoined because it would have been anticompetitive.

### 4.   The Price-Fixing and Boycott Agreements

442.  As a result of the Market Allocation Agreement, Defendants achieved market dominance, low pricing for healthcare provider services, and higher premiums and ASO Fees in each Service Area. As described above, Defendants have reached a horizontal agreement and implemented a Price Fixing and Boycott Agreement through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues.

443.  The horizontal Agreement also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members. Those national programs include: a) Transfer Program; b) Inter-Plan Teleprocessing System (ITS); c) Blue Card Program; d) National Accounts Programs; e) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and f) the "Inter-Plan Medicare Advantage Program," which is similar to the Blue Card and National Accounts Programs, but for members enrolled in Medicare Advantage plans

444.    The Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with providers outside of their Service Areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

445.    Defendants achieved the Price Fixing and Boycott Agreement by agreeing that all Defendants would participate in the national programs, including the Blue Card and National Accounts programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.

446.    The Defendant Blues implement the Agreement collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

447.    Each of the Defendant Blues either has market power or has otherwise taken anticompetitive action in furtherance of gaining market power. Through the national programs the Defendant Blues control more than 100 million patients, something no other health insurance company has access to. These more than 100 million patients provide the Defendant Blues a substitute for market power when Defendant Blues are dealing with providers. In fact, in many places providers treat more patients through the national programs than through the direct subscribers of the local Defendant Blue. One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of Blue Cross and Blue Shield of North Carolina. When Blue Cross and Blue Shield of North Carolina negotiates with providers in central North Carolina, it uses the many patients in the national programs (which expand its bargaining power and effective market share) to obtain rates that are below competitive rates, and remain low.

448.    The national programs, including the Blue Card and National Accounts Programs, are implemented in a horizontal manner. For example, when a hospital in east Alabama billed other Defendant Blues directly for services provided to their subscribers, those Blues, including

1   Blue Cross of Minnesota, paid for those services at the rates that it normally pays, which are

2   higher than the rates paid by Blue Cross of Alabama. When Blue Cross of Alabama learned of

3   those payments, it then recouped the difference between those two rates. Based on information and

4   belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped

5   under the procedures established by the Defendant Blues on the IPPC. Also based on information

6   and belief, Plaintiffs allege that in making the recoupments, Blue Cross of Alabama was following

7   the procedures established by the Defendant Blues through the IPPC to enforce the price fixing

8   agreement.

9        449.    When one Blue has a contract dispute or issue with a healthcare provider the other

10  Blues, as independent horizontal businesses, and the Defendant Association act collectively to

11  reinforce the market power of each of the Blues. In a proceeding brought by Dr. Kathleen Cain

12  when Blue Cross and Blue Shield of Kansas retaliated against her for being a class representative

13  and attempted to terminate her from being a participating physician after 16 years of service, Blue

14  Cross and Blue Shield of Kansas City then refused to allow her into its Blue branded network.

15  When Highmark refused to pay the UPMC reasonable rates and instead was going to allow its

16  contract with UPMC to expire, UPMC, one of the leading medical centers in the world, wrote to

17  Blues throughout the country, requesting that they separately contract with UPMC. Some of the

18  Blues, including Blue Cross of Alabama and Anthem Blue Cross of New Hampshire, responded

19  directly and refused to negotiate. At the same time, the Defendant Association coordinated

20  responses for a number of other Blues, and the Association communicated the refusal to negotiate

21  for those other Blues. Other healthcare providers, including one or more hospitals in North

22  Carolina, have attempted to negotiate contracts with Defendant Blues in other states but have

23  received refusals from those Blues, while Blue Cross and Blue Shield of North Carolina continues

24  to reimburse at sub-competitive rates.

25       450.    Accordingly, Defendants have agreed to fix the prices for healthcare

26  reimbursement within each Service Area. Healthcare providers providing services to patients

27  insured by or included in employee benefit plans administered by a Blue from another Service

28  Area, including Plaintiffs, receive significantly lower reimbursement than they would receive

2854.003/1645949.2                                            102

absent Defendants' agreement to fix prices. The Price Fixing Agreement is a *per se* violation of the Cartwright Act and other laws.

451.    As a result of their Price Fixing and Boycott Agreement, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

452.    The Price Fixing and Boycott Agreement facilitates the Blues' monopolization and exercise of market power by increasing the volume of patients each Blue brings to its negotiations with providers. A provider who does not accept the local Blue's terms loses the ability to treat on an in-network basis not only that Blue's enrollees, but all Blues' enrollees.

453.    The Blues' Price Fixing and Boycott Agreement does not constitute a joint purchasing agreement. The Defendants have already denied that they are engaged in joint purchasing. Moreover, the Blues' model, in which the Home Plan pays only the rate agreed to by the provider and the Home Plan, is naked price-fixing, not joint purchasing. As the Department of Justice and Federal Trade Commission explained in their 1996 publication Statements of Antitrust Enforcement Policy in Health Care, "[a]n agreement among purchasers that simply fixes the price that each purchaser will pay or offer to pay for a product or service is not a legitimate joint purchasing arrangement and is a *per se* antitrust violation."

454.    Even if the Blues were engaged in joint purchasing, which they are not, their activity would not fall within the "safety zone" that the DOJ and FTC have established in the context of joint purchasing arrangements among healthcare providers.

455.    The Blues' model also has none of the safeguards that the DOJ and FTC have identified as mitigating concerns associated with joint purchasing. "First, antitrust concern is lessened if members are not required to use the arrangement for all their purchases of a particular product or service." The Blues are required to use the Blue Card Program for all purchases of health care services from providers with whom they do not have a contract.

456.    "Second, where negotiations are conducted on behalf of the joint purchasing arrangement by an independent employee or agent who is not also an employee of a participant, antitrust risk is lowered." The Blues do not do this. "Third, the likelihood of anticompetitive

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1    communications is lessened where communications between the purchasing group and each

2    individual participant are kept confidential, and not discussed with, or disseminated to, other

3    participants." Because the Blues do not use a purchasing group, but instead extend the Host Plan's

4    pricing to all Home Plans, this safeguard does not apply.

5        **5.    Other Abuses**

6        457.    In addition to the harms set forth above, Plaintiffs were harmed in numerous other

7    ways as a result of Defendants' abuse of the significant market power that has resulted from their

8    agreement.

9        458.    For example, a number of the Blues use MFNs with hospitals and other facilities.

10   According to at least some defense counsel, Defendant BCBS-MI says that its "medical cost

11   advantage, delivered primarily through its facility discounts, is its largest source of competitive

12   advantage."

13       459.    Although the Michigan legislature recently made MFNs unlawful, the statement of

14   BCBS-MI also applies to other Blues. The Blues that use MFNs, as well as those that do not use

15   explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in

16   any other contract. In its contracts with hospitals, BCBS-AL imposes the functional equivalent of

17   an MFN when it, as the dominant health insurer, prohibits the hospitals from using the

18   reimbursement rates of BCBS-AL in a contract with any other payor.

19       460.    All or practically all of the Blues also include confidentiality clauses in their

20   contracts with healthcare providers that prohibit the disclosure of price terms among providers,

21   even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust

22   Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade

23   Commission (August 1996). By preventing the full disclosure of price terms of the contracts,

24   Defendants undermine competition.

25       461.    In addition, Defendants require Plaintiffs to disclose the rates (prices) that other

26   health insurance companies are paying to them, while Defendants refuse to disclose the rates that

27   they pay to other providers. Defendants thereby create asymmetric information in the market for

28

2854.003/1645949.2                                                104

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1   health care services, preventing the market from functioning competitively and giving Defendants

2   an advantage in any bargaining that occurs between Defendants and providers.

3       462.    Defendants, specifically Defendant Highmark, have threatened to utilize their

4   extraordinary and excessive surplus (almost $5 billion in the case of Highmark) to enter (and have

5   already done so in some cases) the market as providers of health care services if providers do not

6   acquiesce to the far below competitive rates offered in a market free from competition from other

7   Blues. All of this is undertaken in an attempt to further drive down payments to providers and to

8   raise barriers for competing firms to enter these markets.

9       463.    Defendants also use their trademarks to circumvent antitrust laws.

10       464.    The Trademark Act itself penalizes use of a trademark in violation of the antitrust

11   laws. The agreed-to restrictions on the ability of the Blues to generate revenue outside of their

12   specified Service Areas constitute agreements to divide and allocate geographic markets, and,

13   therefore, are *per se* violations of the Cartwright Act.

14       465.    Competition among the Blues does not threaten their marks by creating confusion.

15   In Washington, Idaho, Pennsylvania, and New York, the Blues currently compete using the Blue

16   marks, without consumer confusion. A 1987 BCBSA internal memorandum noted that "Blue

17   Cross of Washington and Alaska is actively competing against every other plan in the state. Not

18   only has Blue Cross written a strategic plan which targets the Blue Shield Plans, but it has

19   developed a full range of products to sell statewide. Yet, despite open competition, consumer

20   confusion has remained minimal."

21       466.    Moreover, the Blues' enrollees carry membership cards that clearly identify the

22   Blue that underwrites or administers that enrollee's plan. The Blues already allow hundreds of

23   thousands of their enrollees to carry cards with the names of out-of-state Blues, indicating that the

24   Blues do not believe that the presence of a Blue outside its Service Area will create confusion.

25       467.    The Blues' well-established and widely utilized practice of "ceding" the right to be

26   the Control Plan for National Accounts when doing so will ensure that an account is gained or

27   retained by the Blue system belies their position that their exclusive Service Areas are necessary to

28   protect their local trademarks. For example, Blue Cross Blue Shield of Arkansas, which is the

105

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1   Control Plan for Wal-Mart, ceded substantial portions of the Wal-Mart business to both Blue

2   Cross Blue Shield of Alabama and Blue Cross Blue Shield of Illinois to ensure that Wal-Mart

3   remained a Blue account. Similarly, Anthem ceded its General Electric business to Blue Cross

4   Blue Shield of Alabama. The Blues' practice of ceding national accounts demonstrates that

5   consumer confusion does not result when a Blue plan other than the local Blue administers their

6   health insurance plan.

7       468.    The possibility of confusion among the Blues is non-existent for providers, who

8   already deal with multiple Blues on a regular basis. If anything, allowing Blues to contract with

9   providers outside their Service Areas would reduce confusion. As described above, providers must

10   comply with the claim processing rules of Blues located outside their Service Area, often without

11   easy access to those rules. If a provider could contract with these Blues, they would be given those

12   rules from the beginning of the contract and would likely have fewer claims denied for failure to

13   follow the rules.

14       469.    The experience of BCBS-AL and North Mississippi Medical Center ("NMCC")

15   further illustrates how the Blues' territorial allocation restrains competition for the services of

16   healthcare providers and belies the Blues' arguments that their trademarks allow them to agree not

17   to compete with each other.

18       470.    Beginning in the mid-1990s, BCBS-AL maintained a network agreement with

19   NMCC. This agreement was in place for almost a decade. BCBS-AL maintained the agreement for

20   many years "because of the [hospital's] proximity to many of our customers."

21       471.    NMCC is located in Tupelo which is located in Lee County, Mississippi. Lee

22   County is not contiguous with any other state and is located two counties in from Alabama.

23   BCBS-AL maintained this contract for several years even though it was not a "contiguous county"

24   contract as allowed by the Blue Cross rules. BCBS-AL marketed this agreement to its North and

25   West Alabama insureds who wanted to be able to seek treatment and the more convenient facility

26   in Tupelo.

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

472.    In late 2003, BCBS-MS and NMCC were engaged in heated discussions over NMCC's network agreement. On November 20, 2003, NMCC did not renew its agreement with BCBS-MS in response to BCBS-MS's request for reimbursement rates which amounted to "excessive discounts." The non-renewal of this agreement did not affect NMCC's stand-alone contract with BCBS-AL in and of itself.

473.    On the same day, BCBS-MS's CEO Richard J. Hale wrote to Roger G. Wilson, the General Counsel and Corporate Secretary of the BCBSA, and informed him that BCBS-AL's contract with NMCC was not in compliance with BCBSA Brand Regulations on "Contiguous Area" contracting. BCBS-MS indicated that it had been aware of the contract for some time, but had not objected until now.

474.    In Mr. Hale's letter, he noted that the contract violated BCBSA Brand Regulation 4.7 and 4.8 because NMCC was not located in a contiguous area to BCBS-AL's Service Area.

475.    In internal correspondence, BCBS-MS made clear to BCBS-AL that its contract with BCBS-MS was "hurting" BCBS-MS's "bargaining position" with NMCC and was likely to result in a less favorable contract for BCBS-MS. Thus, BCBS-MS had to enforce the BCBSA Brand Regulations not because it was concerned about the marks or the brand, but because competition from BCBS-AL was empowering NMCC and hurting BCBS-MS.

476.    In September 2004, and at the behest of the BCBSA and BCBS-MS, BCBS-AL was forced to terminate its agreement with NMCC and any other affiliated Lee County, MS providers. In correspondence with the hospital, BCBS-AL indicated that the BCBSA rules and not any unhappiness or disagreement with NMCC was the reason for the contract termination.

477.    The loss of this contract and competition from BCBS-AL not only hurt NMCC, but it hurt BCBS-AL's own customers who were now subject to higher rates and patient responsibility amounts due to NMCC's out-of-network status with BCBS-AL.

478.    Not surprisingly, after BCBS-AL was forced to terminate its agreement, BCBS-MS and NMCC reached a new network agreement.

479.    In summary, the Blues observe each other's trademark rights only when it is beneficial to them. When the Blues find it convenient or profitable, they do not enforce their trademark rights.

**6.    Defendants Enjoyed Unlawfully Gained and Supracompetitive Profits**

480.    Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits. Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace. As Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

481.    Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues began to form for-profit subsidiaries. A number of the non-profit Blues then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

482.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

483.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

484.    Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even

2854.003/1645949.2                                                 108

excess medical claim benefit perks. These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

485.   Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services. Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

486.   By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;
- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;
- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;
- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;
- Cost Allocations not arms-length or fair and reasonable;
- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;
- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

487.   The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

488.   For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities. Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

2854.003/1645949.2                                     109

1      489.    In addition, despite claiming to be "not-for-profit," many of these Blues hold

2  massive excess surplus levels built off the net income spread between the high premiums they

3  charge customers and the sub-competitive payments to providers. Those excessive surplus levels

4  have come at the expense of higher premiums to consumers.

5      490.    Below is an illustration of the huge amounts of capital being held in excess of

6  requirements by a number of not-for-profit Blues. As of Sept. 30, 2010, 33 "not-for-profit" Blues

7  held more than $27 billion in capital in excess of the minimum threshold reserves required by the

8  BCBSA. The chart below details those excessive levels of surplus:

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield of Tennessee | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

491.   Many of the Blues understate their actual surplus substantially by citing only the surplus from the mainline company, but not the general surplus on the companies' combined reporting statements, which accounts for all lines of business.

492.   In South Carolina, for instance, BlueCross BlueShield of South Carolina's "net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

493.   Members of the Board of BlueCross BlueShield of South Carolina "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show." They were required to do little but show up to the occasional meeting.

494.   This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies. BlueCross BlueShield of South Carolina paid executives in the millions of dollars in 2010.

495.   HCSC, a conglomerate of several Blues, including Blue Cross and Blue Shield of Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011, and 2012. This net income does not even account for large blocks of plans it merely administers for the self-insured. "CEO Patricia Hemingway Hall's 2012

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1   base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus.

2   The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011." "Each of

3   HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011.

4   Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled

5   her total compensation to $8.7 million in 2012." *See* Exhibit D.

6     496. Other Blues also pay excessive executive compensation. For example, when

7   Anthem's CEO led the company through the ill-fated merger effort with Cigna that will cost the

8   company a break fee of $1.85 billion and perhaps more, Anthem's Board awarded him with a

9   salary increase of 3 million dollars. *See* Exhibit E.

10     497. Blue Shield of California holds an extraordinary and unnecessary surplus created

11   by its sub-competitive reimbursements to providers. Blue Shield of California's surplus is far in

12   excess of any requirements under the law or BCBSA rules.

13     498. While Defendants often claim these surpluses are designed as insurance reserves

14   for future payments, they are more often used as strategic monies allowing acquisitions of

15   competitors, market share, or provider practices.

16     499. Likewise, large salary increases for executives with the Blues have recently been

17   reported. Such salaries result in higher costs to consumers. The supracompetitive profits that feed

18   the salary increases are built on the strength of Defendants' agreement not to compete, their

19   price-fixing Blue Card regime and their market power, in particular their ability to force providers

20   to join their networks at sub-competitive rates. A spokeswoman for BlueCross BlueShield of

21   South Carolina noted that the outrageous increases are priced "to reflect its superior networks."

22   Thus, the market power of the Blues allows them to pay sub-competitive rates to providers. This

23   leads to huge surplus profits for companies supposedly organized as not for profit or charitable

24   companies.

25   **C. Implementation of the Affordable Care Act (ACA)**

26     500. When President Obama presented the Affordable Care Act to the Joint Session of

27   Congress, he discussed the importance of competition among health insurers and cited BCBS-AL

28   as a poster child for operating a concentrated market. The ACA created insurance exchanges to

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE AND FEDERAL LAWS

encourage competition among health insurers. The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places. The Blues, including BCBS-AL, have used their market power and their anticompetitive activities to increase their market shares through the mechanisms created by the ACA.

501.    In the first year of the ACA exchange in Alabama, BCBS-AL claimed a loss of approximately $135 million based almost entirely on losses in the individual market and ACA exchange. It is not clear how much of this "loss" is being subsidized through monies available to BCBS-AL under the ACA.

502.    In considering how to approach the ACA market, BCBS-AL internally expressed concern over increased consumer choice in Alabama as a result of entry into the individual market through the exchange. Their response to these concerns became clear in the aftermath of the loss. According to publicly available documents and media reports, "Blue Cross spends more on the health care costs of individual marketplace customers than it collects through copayments and premiums." Stated differently, BCBS-AL priced premiums below its actual health care costs for consumers in the individual exchange market.

503.    Shortly after, all other insurers (United and Humana) exited the Alabama exchange market, leaving only BCBS-AL offering products in the exchange market.

504.    BCBS-AL's response to being the only remaining competitor in the market should not be surprising. With its potential competition now out of the market, rather than continuing to price premiums below actual costs, BCBS-AL raised premiums in the market by approximately 40 percent

505.    Of the 15 states where complete data on market share of the health insurance exchanges are available, Blues have obtained the greatest percentage of covered lives in 12 of those states. The 12 states (including the District of Columbia) are California, Colorado, Connecticut, Indiana, Virginia, the District of Columbia, Florida, Maryland, Michigan, Rhode Island, Vermont, and Washington. In short, the Blues have increased their market shares through the exchanges.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

**D.      Defendants' Unlawful Agreements Reduce Health Care Quality and Increase Health Care Costs**

506.    Economist John Hicks recognized in 1935 that: "The best of all monopoly profits is a quiet life." J.R. Hicks, The Theory of Monopoly, Econometrica, Vol 3, No. 1 (Jan. 1935), pp. 1-20. Part of the quiet life that a monopolist enjoys is that it does not have to innovate. The Defendants' conduct, exemplified by their conduct in Alabama, demonstrates the truth of Professor Hicks' observation.

507.    BCBS-AL is a monopolist in the sale of commercial health insurance and in the sale of administrative serves for health care plans in Alabama and in every market that one could possibly define in Alabama. The other Defendants have agreed that they will not compete with BCBS-AL in the sale of commercial health insurance or in the sale of administrative services in Alabama. BCBS-AL is a monopsonist in the purchase of health care services by commercial insurers in Alabama and within every market one could possibly define in Alabama. By recent measure, it has over 83-86 percent of this market statewide. The other Defendants collectively represent the second largest purchaser of health care services by commercial insurers in Alabama, and they have reached an agreement with BCBS-AL to use its prices in those purchases and to allow BCBS-AL to use their market shares in setting its prices to pay Providers in Alabama.

508.    Innovation in healthcare is essential to preserve and improve quality and to limit and reduce costs. Collaboration between health insurers and providers is one way to encourage innovation in healthcare. When health insurers pay low reimbursement rates to providers, they discourage collaboration and innovation. The recent evidence and findings in the Anthem merger trial demonstrate the truth of the allegations in this paragraph. Representatives of Cigna, including its CEO, testified that the Blues such as Anthem pay providers lower reimbursement rates than Cigna, but that by encouraging collaboration and innovation Cigna was able to lower the cost of healthcare for employers and consumers while paying providers higher reimbursement rates. Those witnesses also testified that if Cigna reduced its reimbursement rates to the rates paid by Anthem and other Blues, its ability to collaborate and innovate with providers would be diminished.

114

509.    The conduct of the Defendants has discouraged innovation in healthcare. One need go no further than a recent edition of Health Affairs to understand how this is happening. "Organizations seeking to create innovative environments need to address a number of factors. These include making available sufficient resources – especially money and space . . . ." D. Bates, A. Sheikh, D. Asch, "Innovative Environments in Health Care: Where and How New Approaches to Care Are Succeeding," Health Affairs, March 2017, 400, 401.

510.    The Defendants pay hospitals among the lowest reimbursement rates in the country. The hospitals, including in California, are therefore deprived of the resources they need to innovate. One example of the cost of innovation is that tracking patients to make sure they are receiving the best healthcare possible requires expensive IT systems.

511.    The authors in this article further recognized that: "part of the slow pace of innovation stems from the health care payment system." In Alabama, because the Defendants have enjoyed the quiet life of a monopolist they have refused to develop innovative payment systems.

512.    In the early 1980s, the Medicare Program changed from per-diem reimbursement rates for hospitals to DRG rates in order to encourage efficiency. In Alabama, BCBS-AL for itself and the other Blues with members being treated in hospitals in Alabama continued to use the archaic per-diem rates until recently, and only began implementing partial changes in the per-diem rates approximately 35 years after Medicare. BCBS-AL has retained consultants who found that the result was longer stays in hospitals. In other words, the refusal of BCBS-AL as a monopolist/monopsonist to innovate has reduced the quality of healthcare in Alabama and added to its expense.

513.    In order to achieve the best possible outcomes in health care at the most reasonable price, one must track the patients as well as the Providers, something that is highly inefficient in the Blues' system. Cigna has tracked both its health plan members and their providers in its networks. In Alabama, Anthem has more than 120,000 members for whom Anthem maintains patient healthcare information, and HCSC has more than 100,000 members for whom HCSC maintains patient healthcare information. Those members and thousands of others who are members of other Blues are treated in Alabama by Providers in the BCBS-AL network, for whom

2854.003/1645949.2

115

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

BCBS-AL maintains the provider healthcare information. This characteristic of the Blue system makes innovative healthcare inefficient and often impossible.

514.    If the Blues allowed Anthem to contract with Alabama hospitals directly, it could combine healthcare information for its patients and providers to more efficiently provide healthcare.

**E.     Antitrust Injury**

515.    Defendants' unlawful activities have resulted in antitrust injury and harm to competition.

516.    Defendants violated the antitrust laws by agreeing that they will not compete with each other. The effect has been to prevent two of the largest four, four of the largest ten, and fifteen of the largest 25 health insurance or managed care companies from competing in other states, reducing competition throughout the country in various ways, including by increasing market concentration and health insurer power over healthcare providers, health insurance and related services buyers, and Plaintiffs.

517.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in California has been and continues to be harmed in that the other Blues agree not to enter the California market to compete no matter the circumstances.

518.    The Defendants have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets and have limited the ability of other health insurers to compete in other markets. The Defendants suppressed prices for provider goods, services and facilities; increased health-care costs; inflated premiums and ASO Fees; and have injured competition, depriving patients of choices in the marketplace for healthcare providers, and depriving individuals and businesses the opportunity to purchase health insurance or administrative services at a lower premium or contractual rate, or at a price set by a market free from the non-price restraints imposed by Defendants' anticompetitive agreements.

519.    Additionally, because most of the Blues are monopolists and monopsonists, it does not stand to reason that lower reimbursement rates necessarily lower consumers' premiums. The

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

monetary, and other, losses Plaintiffs suffered from Defendants' conduct substantially enhanced Defendants' wealth and reflect a healthcare provider to insurer transfer.

520. The Blues' monopsony power gained by virtue of their unlawful agreements has harmed consumers.

521. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay. A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians. "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," *see* Exhibit F (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).

522. Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants. According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation. According to the 2013 Annual Report of the American Association of Medical Colleges, there will be a shortage of 90,000 physicians across all specialties by 2020.

523. Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.

524. Hospitals and other facilities are closing.

525. Plaintiff Verity went bankrupt.

526. In California the harm has been particularly acute. The Blues' low reimbursements in California make it almost impossible for hospitals to continue providing all the services they would offer in a competitive market, leaving consumers to travel much further for care and no place for the most critically injured patients to receive care nearby or for those without transportation.

527. Even where care is available, Defendants' conduct has reduced the quality of health care services provided to Californians.

117
FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

528. Further, Defendants' conduct has significantly limited the ability of healthcare providers to improve their patient care through investments in better quality and services for their patients.

529. The loss of these hospitals and other healthcare providers also diminishes the ability of communities to keep jobs and to attract new business and residents.

530. Defendants have the power to control prices and exclude competition, and their agreements not to compete, along with the other actions described in this Complaint, prevent or exclude competition. Defendants have harmed the competitive process, and by contributing to the lack of providers, have harmed consumers, subscribers and providers.

531. Consumer welfare is best protected by a competitive marketplace for purchasing provider services.

532. The agreements among the Blues have the effect of stifling innovation in the marketplace.

533. For example, providers have requested that the California Blues switch its payment to a value-based or risk-based approach in which Blues pay providers commensurate with the value they provide to the plan, and share in the risk if they cannot effectively manage the patient population. This type of payment model can benefit and reward efficient, low-cost providers with higher quality care.

534. The California Blues rebuffed requests by healthcare providers to provide value-based or risk-based contracting. The California Blues have demonstrated that not only are they not interested in undertaking potential efficiency-creating methods of contracting, but that they are unwilling to innovate in this way. Because they face no threat of competition from the Blues, they have no interest or incentive to innovate.

535. Competition stimulates innovation; the lack of competition stifles innovation and California provides a laboratory example of that axiom. There is no opportunity for providers to engage in more efficient health care management techniques such as population management unless the California Blues chose to embrace such efficiency-enhancing innovations.

536.    The Blues have failed to innovate in other ways which would benefit the market and consumers. Their extraordinary market power and lack of a significant threat of competition in many markets has stifled their innovation and the development of new payments models that would benefit providers, consumers, and the market in general strictly to the benefit of their bottom line.

537.    Plaintiffs suffer because agreements not to compete also restrict their choices in the market. Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area. The exclusion of these potential participants in the health services financing market has the effect of depressing payments in the market for health care services, whether or not the provider is in-network with the local Blue.

538.    The Blues implemented new fee schedules for providers, generally on an annual basis. Those new fee schedules are lower than they would have been without the Defendants' anticompetitive conduct. The new fee schedules have created incrementally larger antitrust injuries and damages for the health-care providers.

539.    When the Blues face innovative competitors, they engage in anticompetitive activity designed to take those competitors out of the market. For example, when Cigna developed innovative programs that paid providers higher reimbursement rates than Anthem and other Blues by collaborating with providers to reduce the overall cost of healthcare, Anthem attempted to purchase Cigna and then after secret meetings with the CEOs of other Blues in a private room in the luxurious Peninsula Hotel in Chicago, Anthem and the other Blues developed the Blue Bias strategy to prevent Cigna from implementing those programs. Instead, Anthem and the other Blues continue to pay low reimbursement rates to hospitals and other providers to maintain their differentials between the Blues reimbursement rates and those paid by companies like Cigna. Those low reimbursement rates undermine and prevent efforts at innovation and collaboration with providers.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

540. Defendants' unlawful activities have resulted in harm to competition. Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between sub-competitive rates or being put out of business through coercion.

541. Defendants' unlawful activities have resulted in antitrust injury to Plaintiffs, including: (a) lost revenue resulting from anticompetitively low prices for goods, services and facilities that Plaintiffs provided to patients insured by the Blues; (b) lost revenue resulting from decreased use of Plaintiffs' services and facilities; (c) inflated premiums and ASO Fees; and (d) threatened future harm to Plaintiffs' business and property, all as a result of Defendants' unlawful conduct.

## F.    Market Power and Related Considerations

542. The Defendant Blues have market power in many markets over prices or payment rates for healthcare providers. The 36 Blues serve 106 million people—roughly one out of every three Americans. The various plans service 88 of the Fortune 100 companies, including major firms like Wal-Mart, Microsoft, General Motors, and UPS. They also service over seven million people who work for small employers.

543. They are the number one choice for organized labor, serving 17 million organized workers, retirees, and their families. They offer coverage through Affordable Care Act insurance exchanges and service millions of Americans through government-supported healthcare programs.

544. The BCBS provider network includes more than 90% of doctors and hospitals nationwide. More than 62 million BCBS members across all 50 states have access to care from more than 342,000 providers. The market shares of individual Blue plans in various states are indicative of market power.

545. Even in markets where Defendant Blues do not enjoy high market concentrations, they have market power or have otherwise exploited anticompetitive actions, through the more than 100 million subscribers of Blues involved in the inter-plan or National Accounts programs. This access provides market power beyond what might be suggested by the local enrollment share.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE AND FEDERAL LAWS

1. **The Sale of Health Insurance and Related Products and Services**

546. This case involves a number of product markets in which the Defendants participate. One is the market for the sale of commercial healthcare financing services (excluding Medicare Advantage and managed Medicaid), which includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified. The market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, including access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market. This relevant product market can be described as the market for the sale of commercial health insurance and includes both fully insured plans and ASO plans.

547. The purchasers of commercial health insurance do not have reasonable alternatives. Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees. Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance. For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price, or SSNIP. The number of employers or other groups substituting away from commercial health insurance is likely to be insufficient to make the SSNIP unprofitable.

548. Within the market for the sale of commercial health insurance, the Defendants participate in a number of submarkets. These submarkets are alleged in the alternative to be relevant product markets for purposes of Plaintiffs' claims.

549. The first submarket is the sale of commercial health insurance to national accounts with 5,000 employees or more, who are spread over more than one state. The relevant submarket can be described as the sale of commercial health insurance to these national accounts and includes both fully-insured plans and ASO plans. There is no reasonable substitute for this

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  product. Large multistate employers have unique needs when seeking commercial health insurance

2  for their employees. They desire a national network, a high degree of plan customization, and

3  sophisticated claims administration, customer service, and data reporting. If faced with a SSNIP, a

4  national account would have only two alternatives: self-supply by handling all aspects of the

5  insurance product themselves, or forgo the purchase of commercial health insurance altogether.

6  Neither is a reasonable substitute. Therefore, a profit-maximizing hypothetical monopolist in this

7  market likely would raise prices above competitive levels by imposing at least a SSNIP.

8      550.    Because other insurance products, such as those without national networks, do not

9  meet the unique needs of national accounts, the substitution between commercial health insurance

10  for national accounts and other health insurance products is low, as reflected in measures such as a

11  low cross elasticity of demand. Moreover, "national account" is a well-understood term in the

12  health insurance industry. Insurance brokers and benefits consultants generally consider national

13  accounts to constitute a separate line of business. Many of the largest insurers in the country,

14  including Defendant Anthem, manage national accounts separately from their other business.

15  Cigna and Defendant Anthem both use 5,000 employees as the threshold for defining national

16  accounts, and that figure is considered to be reasonable by insurance brokers and benefits

17  consultants.

18      551.    The second submarket is the sale of commercial health insurance to large group

19  employers. The relevant submarket can be described as the sale of commercial health insurance to

20  large group employers and includes both fully insured plans and ASO plans. "Large group" is

21  defined as an employer with more than 50 employees. This is the threshold established by the

22  Affordable Care Act for "large employers." 42 U.S.C. § 18024(b)(1). There is some overlap

23  between this submarket and the submarket for the sale of commercial health insurance to national

24  accounts. The insurance industry recognizes a clear distinction between insurance for small groups

25  (employers with 50 or fewer employees) and large groups because small group insurance is

26  defined by state regulation and subject to state and federal statutes. Large group insurance is

27  subject to less stringent regulation, and it permits more customization and differentiation. Insurers

28  can profitably target large groups—in other words, engage in price discrimination—because they

1    can easily identify large groups; prices for large-group products are negotiated individually; and

2    arbitrage is impossible. There are no reasonable substitutes for commercial health insurance sold

3    to large groups. A large group employer can respond to a SSNIP in one of three ways: (1) forgo

4    the purchase of group health insurance for their employees; or (2) self-supply by handling all

5    aspects of the insurance product themselves; or (3) somehow morph into small groups.

6        552.     Forgoing health insurance is not a reasonable substitute because virtually all large

7    employers offer health coverage to their employees. Handling all aspects of the insurance product

8    is impractical. And large groups are not in a position to reduce their numbers of benefits-eligible

9    employees below state-law thresholds. In other words, the substitution between large-group

10    insurance and other healthcare financing options is low, as reflected in measures such as a low

11    cross-elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market

12    would likely raise prices above competitive levels by imposing at least a SSNIP.

13        553.     The third submarket is the sale of commercial health insurance to small group

14    employers. The relevant submarket can be described as the sale of commercial health insurance to

15    small-group employers and includes both fully insured plans and ASO plans. "Small group" is

16    defined as an employer with 50 employees or fewer. This is the threshold established by the

17    Affordable Care Act for "small employers." 42 U.S.C. § 18024(b)(2). The insurance industry

18    recognizes a clear distinction between insurance for small groups (employers with 50 or fewer

19    employees) and large groups because small group insurance is defined by state regulation and

20    subject to state and federal statutes. There are no reasonable substitutes for small group insurance.

21    A small group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of

22    group health insurance for their employees; or (2) self-supply by handling all aspects of the

23    insurance product themselves; or (3) hire enough new employees to become a large group.

24        554.     Forgoing health coverage is not a reasonable substitute because health coverage is

25    considered to be an important benefit. Handling all aspects of the insurance product is impractical.

26    And hiring more employees for the sole purpose of being able to purchase different insurance is

27    impractical. In other words, the substitution between small group insurance and other healthcare

28    financing options is low, as reflected in measures such as a low cross-elasticity of demand.

2854.003/1645949.2

123

1  Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices

2  above competitive levels by imposing at least a SSNIP.

3      555.   For the relevant product markets described above, California is a relevant

4  geographic market. Sellers of commercial health insurance compete for the business of employers,

5  in part, by offering attractive provider networks in the geographic areas where employers'

6  employees live and work. Individuals tend to get their healthcare services near their home and

7  work. If the hypothetical monopolist of commercial health insurance in California were to

8  implement a SSNIP, employers in California would not substitute commercial health insurance in

9  other states because their employees in California value access to providers in California. For

10  employers in California, there are no reasonable substitutes to commercial health insurance in

11  California. Further, in response to a SSNIP, employers will not move their employees to other

12  states. In other words, the substitution between commercial health insurance in California and

13  commercial health insurance outside California is low, as reflected in measures such as a low

14  cross-elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these

15  product markets in California would likely increase prices above competitive levels by imposing

16  at least a SSNIP.

17      556.   In the alternative, for the relevant product markets described above, California

18  Core-Based Statistical Areas, and counties or combinations of counties not part of one of these

19  areas, are relevant geographic markets. "Core-Based Statistical Areas" is a term used by the

20  United States Office of Management and Budget to encompass Metropolitan Statistical Areas and

21  Micropolitan Statistical Areas. Metropolitan Statistical Areas especially are used in the ordinary

22  course of business in the insurance industry when examining local markets. Defining markets for

23  commercial health insurance as local is consistent with the desire of employers to provide health

24  plans with networks of local providers, specifically providers located near their employees' home

25  and work. In other words, the substitution between commercial health insurance in an employer's

26  local area and commercial health insurance outside the employer's local area is low, as reflected in

27  measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing hypothetical

28  monopolist in these product markets in California Core-Based Statistical Areas, and counties or

1  combinations of counties not part of one of these areas, likely would increase prices above

2  competitive levels by imposing at least a SSNIP.

3  **2.    The Purchase of Products and Services from Healthcare providers**

4      557.    In addition to the market for commercial health insurance, the Defendants

5  participate in the market for the purchase of goods and services from healthcare providers. Outside

6  of payments by the government, the vast majority of those goods and services are paid through or

7  by health insurance companies, with the 36 independent Blues being the largest collection of those

8  companies. The vast majority of the goods and services that health insurance companies purchase

9  from healthcare providers are provided through in-network contracts.

10      558.    The purchase of goods and services from healthcare providers by commercial

11  buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and

12  managed Medicaid) is a relevant product market. Prescription drugs are excluded from this

13  relevant market because they are largely purchased indirectly, through pharmacy benefit

14  managers. These commercial buyers are the companies in the business of selling commercial

15  health insurance or administering commercial health plans for private employers or other groups.

16      559.    These companies have separate business units dedicated to contracting for the

17  purchase of goods and services from healthcare providers. For healthcare providers, there is no

18  reasonable alternative to contracting with these commercial buyers in order to be in-network

19  providers for the health plans sold to private employers or groups. Sellers of healthcare goods and

20  services are not in a position to forgo sales to commercial buyers, in favor of patients who pay out

21  of pocket, a group that essentially does not exist.

22      560.    Nor can they obtain enough Medicare or Medicaid patients, insured either under the

23  government's traditional programs or managed care programs, to replace the volume they would

24  lose from dropping commercial insurance. Further, the prices paid to healthcare providers by the

25  government programs, including Medicare Advantage and managed Medicaid, are lower than the

26  prices paid for the commercial health plans of private employers or groups. In other words, for

27  providers, the substitution between commercial buyers and other payors is low, as reflected in

28  measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing hypothetical

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  monopsonist in this market likely would lower prices paid to providers below competitive levels

2  by imposing at least a small but significant and non-transitory reduction in price (SSNRP).

3      561.    The prices paid to healthcare providers by the government programs, including

4  Medicare Advantage and managed Medicaid, are different than the prices paid for the commercial

5  health plans of private employers or groups. Also some healthcare providers have separate

6  contracts for Medicare Advantage and managed Medicaid, and some insurers have separate

7  contracting teams for these products.

8      562.    This market need not be segmented by the type of provider at issue. Healthcare

9  providers participate in what is known as two-stage competition; first they compete for inclusion

10  in the provider networks of insurers' plans, and then they compete for patients within a plan. This

11  market relates to the first stage of that competition. For a healthcare provider in California, the

12  fundamental question in defining this product market is not, "Who will my patients be?" but "Who

13  are the payors with whom I can contract?" In California, the answer is the same, regardless of who

14  the provider is—the Blues, the non-Blue commercial insurers in the state, and government

15  programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid.

16  All providers, regardless of their type, face these options. Moreover, multiple types of providers

17  can form a "cluster market," a concept widely accepted in healthcare antitrust cases and scholarly

18  economic analyses.

19      563.    In the alternative, three submarkets within this market are relevant product markets.

20  These are the purchase of goods and services from healthcare professionals, the purchase of goods

21  and services from healthcare facilities, and the purchase of durable medical equipment ("DME"),

22  all by commercial buyers of healthcare goods and services who are the companies in the business

23  of selling commercial health insurance or administering commercial health plans (excluding the

24  purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid).

25      564.    The submarket for DME is limited to DME provided to California residents.

26  Practical indicia support the segmentation into three submarkets. For example, the industry

27  recognizes distinctions among healthcare professional services, healthcare facility services, and

28  DME, and insurers often differ in the reimbursement methodologies they employ for each of these

2854.003/1645949.2

126

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE AND FEDERAL ANTITRUST LAWS

1 groups. For example, many commercial buyers reimburse healthcare facilities for inpatient

2 services based on diagnosis-related group codes instead of paying for each good or service

3 individually.

4     565.    Commercial buyers' contracting teams and processes also differ among these

5 submarkets. Nonetheless, providers of healthcare professional services and providers of healthcare

6 facility services face the same options for the purchase of their goods and services described

7 above. As a result, in each of these submarkets, the substitution between commercial insurance

8 and other payors is low, as reflected in measures such as a low cross-elasticity of demand.

9 Therefore, a profit-maximizing hypothetical monopsonist in these submarkets would likely lower

10 prices paid to providers below competitive levels by imposing at least a SSNRP.

11     566.    For the relevant product markets described above, other than DME, California's

12 Metropolitan Areas are relevant geographic markets.

13     567.    In the alternative, for the relevant product markets described above , other than

14 DME, California is a relevant geographic market. Healthcare providers, who have built their

15 patient base and have invested in physical assets located in California, are unlikely to respond to a

16 SSNRP by moving their practice out of the state. Therefore, a profit-maximizing hypothetical

17 monopsonist in these product markets in California would likely reduce prices below competitive

18 levels by imposing at least a SSNRP.

19     568.    In the alternative, for the relevant product markets described above, other than

20 DME, California Core-Based Statistical Areas, and counties or combinations of counties not part

21 of one of these areas, are relevant geographic markets. Healthcare professionals and healthcare

22 facilities usually provide services to patients living or working in relatively close proximity to

23 their offices or other facilities. Healthcare professionals and healthcare facilities have invested in

24 physical capital in their local geographic areas and invested in their human capital (reputation and

25 referral patterns) that is specific to their local geographic areas. Therefore, they are unlikely to

26 respond to a SSNRP by moving their practice out of their local area.

27     569.    The disincentive to moving is even more compelling in the real world than in the

28 world of the hypothetical monopsonist because California providers cannot contract with out-of-

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  state Blues except in limited circumstances due to the Blues' horizontal market allocation.

2  Therefore, leaving the provider's local area makes little difference unless the provider is willing to

3  leave the state entirely. In other words, in the product markets for the purchase of healthcare

4  services, the substitution between commercial buyers in the local geographic markets identified

5  above and commercial buyers outside the local geographic markets identified above is low, as

6  reflected in measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing

7  hypothetical monopsonist in these product markets in the geographic markets identified above

8  would likely reduce prices below competitive levels by imposing at least a SSNRP.

9      570.    Because DME can be shipped across state lines, the geographic market for DME is

10  national.

11      571.    Plaintiffs reserve the right to further refine their definitions of the relevant product

12  markets and relevant geographic markets as more information becomes available, if needed.

13      572.    Defendant Blue Cross of California d/b/a Anthem Blue Cross has market power at

14  least in certain areas in California in the health care financing market and may have market power

15  in the entire state. For example, it has a 50% market share in the Chico area, a 43% market share

16  in the Bakersfield area, a 58% market share in the El Centro area, a 45% market share in the

17  Fresno area, a 61% market share in the Hanfor-Corcoran area, a 49% market share in the Madera

18  area, a 58% market share in the Merced area, a 42% market share in the Oxnard-Thousand Oaks-

19  Ventura area, a 58% market share in the Redding area, a 65% market share in the Salinas area, a

20  59% market share in the San Luis Obispo-Paso Robles area, a 51% market share in the Santa

21  Barbara-Santa Maria area, a 49% market share in the Santa Cruz-Santa Maria area, a 58% market

22  share in the Visalia-Porterville area, and a 70% market share in the Yuba City-Maryville area,

23  according to the 2013 AMA Competition Study. If Kaiser is removed from the markets where the

24  prices for non-Kaiser healthcare providers are determined, then Blue Cross of California would be

25  the largest health insurer in California and would have a market share of more than 50% in many

26  other areas in California.

27

28

2854.003/1645949.2

128

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

573. These percentages are presented only for Defendant Blue Cross of California. Defendant Blue Shield of California has somewhat lower market share percentages, but it and all of the other Blues are unlawfully agreeing and working with Blue Cross of California.

574. In addition to the submarkets alleged above, the California Blues also have a large share of the number of Californians with individual insurance policies, which further increases their market power over providers.

575. As described above, the Blues have more enrollees than any health insurance or managed-care company in the country. Two of the four largest health insurance companies in the country, four of the largest ten, and 15 of the largest 25 are Blues. Exhibit G is a listing of the market share of the top four and top eight health insurance companies by state from 2004 through 2014 as reported by the National Association of Insurance Commissioners ("NAIC").

576. Evidence will be introduced that shows that the other Blues agreed not to compete in California in health insurance markets. If individual Blue plans were allowed to enter and compete, the market share for the largest health insurance companies in California would likely become much less. It would also be expected that market power for any one company would diminish.

577. But for the Blues' Market Allocation Agreement, the market shares of the top health insurance companies and the Herfindahl-Hirschman indices, which measure market concentration, would likely be lower in every state.

578. Having fewer competitors in any market generally gives the players in that market more access to market power, and a greater ability to use market power, all else being equal.

579. The Blues engage in a number of anticompetitive practices to increase their market power and to ensure that any competitors that do exist are marginalized or are unable to effectively compete. Through the agreements alleged in this Complaint, the Blues have exclusive access to more than 100 million subscribers of all the Blues. The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

580. An expert economist for Defendant Capital Blue Cross in a merger proceeding before the Pennsylvania Insurance Department explained that there are significant barriers to entry

129

1   for the health care financing market and, therefore, to be a payor for healthcare goods, services

2   and facilities in the markets where prices are determined for healthcare providers. One of the

3   barriers is the development of a provider network.

4       581.   Some of the Blues have imposed most MFNs to create additional barriers to entry.

5   An MFN is both an indicator and a source of market power because it excludes competitors. Other

6   Blues that do not have express MFNs in their contracts have the functional equivalents that

7   operate in the same manner.

8       582.   The Blues' restraints have anticompetitive effects. Service areas are anticompetitive

9   on their face: they prevent the Blues from competing with each other.

10       583.   The Blues' agreement to limit the amount of non-Blue business they may conduct

11   in another Blue's Service Area is anticompetitive on its face.

12          •   The agreement puts an artificial limit on competition.

13          •   The agreement reduces the incentive for the Blues to develop business out

14             of their Service Areas because they know that the potential for that business

15             is limited.

16       584.   The Blues would compete to an extent with each other but for their unlawful

17   conduct.

18          •   Historically, Blue-on-Blue competition has happened at times in certain

19             places such as Ohio, North Carolina and Illinois.

20          •   Blue Cross and Blue Shield organizations competed against each other for

21             many years and still do to a limited extent in certain places, including

22             Washington, Idaho, and Central Pennsylvania.

23          •   The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*,

24             resulted from one Blue's desire to compete outside of its service area;

25             BCBSA ultimately agreed to allow all of Ohio's Blues to compete with

26             each other, which they did.

27          •   BCBSA settled the Maryland Blues litigation by allowing the D.C.-area

28             Blues to compete against each other.

130

- Blues compete against each other in a limited way with respect to healthcare providers in areas covered by the one-county rule.

- Anthem, HCSC, and other Blues have large numbers of enrollees in Alabama through their National Accounts.

- Many of the Blues, especially the larger ones, such as Anthem and HCSC, have expanded into other territories through their non-Blue business, but in a limited way because of the limits on that business.

- Anthem is attempting to acquire CIGNA, which would give Anthem non-Blue branded business in Alabama.

- The BCBSA prevents Blues from expanding into other Service Areas.

- The Blues administer national accounts of companies headquartered outside their Service Areas through "ceding" arrangements.

585.    The Price Fixing and Boycott Agreement and the national programs including the Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program are anticompetitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients.

586.    Provider reimbursements are lower when the market for health care financing is highly concentrated.

587.    Output of quality health care services is reduced when the market for health care financing is highly concentrated. For example, Alabama has the highest market concentration of any Blue in the country, and it also has the sixth smallest number of primary care physicians per 100,000 patients of any state in the country. This low ratio damages public health and consumer welfare in Alabama.

588.    The national shortage of primary care physicians resulted from the low reimbursements paid by Defendants. Since Blue Cross and Blue Shield of, for example, Alabama has the largest market share of any health insurance company in the country, it is able to reduce provider reimbursement rates even more than other Blues. Primary care physicians in Alabama have retired early and continue to retire early because the reimbursements paid by Blue Cross of

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1 │ Alabama are too low to make it worthwhile for them to continue practicing medicine. These early

2 │ retirements have made and are making the shortage of primary care physicians even worse.

3 │     589.   The Blues' outrageous levels of capital show that they have used their market

4 │ power to earn supracompetitive returns.

5 │     590.   The Blues' agreements contain enforcement mechanisms.

6 │        •   A Blue that disobeys the restriction on competition can have its license

7 │           revoked.

8 │        •   Non-Blue companies that might favor competition effectively cannot buy a

9 │           Blue because the BCBSA board must approve an applicant for a license.

10 │     591.   The Blues' restraints offer no procompetitive benefits.

11 │     592.   The BCBSA agreement does not create a new product.

12 │     593.   The Blues do not need exclusive Service Areas to compete with national insurers.

13 │        •   The Blues include several of the largest insurers in the country, which

14 │           operate in several states and would operate more broadly including

15 │           nationwide but for the Market Allocation Agreement.

16 │        •   Other Blues have more than held their own against national insurers.

17 │     594.   Exclusive Service Areas do not enhance efficiency by allowing the Blues to remain

18 │ focused on their local areas.

19 │        •   Without exclusive Service Areas, Blues could still focus on their local areas

20 │           if they choose.

21 │        •   BCBSA's actions undermine this argument; the Blues used to be more

22 │           locally focused, but BCBSA required them to merge and operate statewide.

23 │        •   The existence of large multi-state Blues like Anthem and HCSC belies this

24 │           argument as well.

25 │     595.   The Blues have argued that Service Areas prevent free riding, but there are less

26 │ restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain

27 │ standards and invest in the development of the brand.

28 │

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE AND FEDERAL LAWS

596.    The Blues have argued that Service Areas prevent customer confusion, but Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when Service Areas were challenged there. Moreover, the restrictions on competition with healthcare providers have no relevance to consumer confusion.

597.    Limiting the Blues' ability to compete outside of their Service Areas without using the Blue marks has no plausible procompetitive benefit.

598.    MFNs offer no procompetitive benefits.

599.    The national programs including the Blue Card Program and National Accounts Programs result in many inefficiencies that increase costs to healthcare providers and reduce consumer welfare. The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating Plans to be in-network providers create many of those inefficiencies as described in more detail above. Any alleged procompetitive effects of these programs are far outweighed by the anticompetitive effects that they create. Moreover, there is no justification for the price fixing aspects of these programs.

600.    The Blues do not need to engage in the Price Fixing and Boycott Agreement to offer health insurance or health care financing on a regional or national basis. Other health insurance companies or managed care companies offer health insurance or health care financing on a regional or <u>national</u> basis without engaging in such unlawful agreements.

### 3.    State-Specific Market Share Information

601.    Additional detail on the Defendants' market power within their Service Area is available in the 2013 AMA Competition Study, which includes Kaiser Permanente ("Kaiser"). If Kaiser is excluded from the calculation, the applicable Blues' market share is even higher.

602.    Defendants Blue Cross and Blue Shield of Alabama have market power throughout the State of Alabama in the market for the sale of commercial health insurance and in every geographic area within Alabama. In addition to the submarkets alleged above, BBS-AL also haves an overwhelming share of the number of Alabamians with individual insurance policies, which further increases its market power over providers. It also has market power in the State of Alabama and the markets in which it is a purchaser. In Alabama, BCBS-AL's market share in the

2854.003/1645949.2

133

1    entire state was 86% in the 2013 study and 83% in the 2016 study. Its lowest market share is in the

2    Mobile Metropolitan Statistical Area ("MSA"): 82% in the 2013 study and 78% in the 2016 study.

3    Its highest market share is in the Gadsden MSA: 94% in the 2013 study and 90% in the 2016

4    study. In addition, BCBS-AL has market power and market share between 85% and 91% (2013

5    study) and 81% and 88% (2016 study) of the market in the Anniston-Oxford, Auburn-Opelika,

6    Birmingham-Hoover, Decatur, Dothan, Florence, Huntsville, Montgomery and Tuscaloosa MSAs.

7    According to a 2011 report for BCBS-AL by the consulting firm Milliman, BCBS-AL's statewide

8    market share was 89.8% for individual policies, 97.2% for small groups, and 91.6% for large

9    groups. Because the market in Alabama is so concentrated, the Herfindahl–Hirschman Index for

10   Alabama is 7,531 (2013 study) or 6,914 (2016 study). By comparison, the United States

11   Department of Justice considers a market to be highly concentrated when its Herfindahl–

12   Hirschman Index exceeds 1,800.

13       603.    Defendant Blue Cross and Blue Shield of Florida, Inc. has market power at least in

14   certain areas in Florida in the health care financing market and may have market power in the

15   entire state. It has market power at least in certain areas in the State of Florida in the health

16   services markets and may have market power in the entire state. For example, it has a 56% market

17   share in the Fort Walton Beach – Crestview – Destin area, a 40% market share in the Deltona-

18   Daytona Beach-Ormond Beach area, a 61% market share in the Gainesville area, a 55% market

19   share in the Ocala market, a 43% market share in the Naples-Marco Island, FL area, a 67% market

20   share in the Panama City/Lynn Haven area, a 46 % market share in the Pensacola-Ferry Pass-

21   Brent area, a 43% market share in the Port St. Lucie-Fort Pierce area, an 84% market share in the

22   Tallahassee area, and a 57% market share in the Vero Beach area. Also, during the colder months

23   of the year, many people who are subscribers of Blues in Northern states spend time in Florida.

24   The Blue uses those subscribers to increase its market power.

25       604.    Defendant Blue Cross and Blue Shield of Georgia, Inc., a subsidiary of Defendant

26   Anthem, has market power at least in certain areas in Georgia in the health care financing market

27   and may have market power in the entire state. It has market power at least in certain areas in the

28   State of Georgia in the health services markets and may have market power in the entire state. For

1  example, it has a 57% market share in the Warner-Robins area, a 46% market share in the Albany

2  area, 42% market share in the Athens-Clarke County area, a 44% area share in the Columbus GA-

3  AL area, a 47% market share in the Valdosta area, and a 56% market share in the Hinesville/Fort

4  Stewart area. Kaiser has some presence in Georgia and exclusion of it will affect some of the

5  market share percentages.

6      605.  Defendant Anthem Blue Cross and Blue Shield of Indiana, a subsidiary of

7  Defendant Anthem, has market power throughout the State of Indiana in the health care financing

8  market and in every market within Indiana. It also has market power in the State of Indiana and in

9  every health services market. It has a market share of 51% in the entire state. Its highest market

10  share is 68% in the Anderson area. It also maintains a 56% market share in the Bloomington area,

11  a 57% share in the Columbus area, a 62% share in the Elkhart-Goshen area, a 43% share in the

12  Evansville IN-KY area, a 56% share in the Fort Wayne area, a 44% share in the Gary area, a 49%

13  share in the Indianapolis area, a 54% share in Kokomo, a 56% share in the Michigan City-LaPorte

14  area, a 63% share in the Muncie area, a 41% share in the South Bend-Mishawaka, IN-MI area, a

15  66% share in the Terre Haute area.

16      606.  Defendant Blue Cross and Blue Shield of Kansas has market power at least in

17  certain areas in Kansas in the health care financing market and may have market power in the

18  entire state. Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of

19  Kansas City have separate Service Areas within Kansas, the statewide market share percentages

20  do not tell a complete story of market shares. It has market power at least in certain areas in the

21  State of Kansas in the health services markets and may have market power in the entire state. For

22  example, it has a 69% market share in the Topeka area (the home of Dr. Cain), a 45% share in the

23  Wichita, Kansas and a 56% market share in the Lawrence area.

24      607.  Defendant Blue Cross and Blue Shield of Michigan has market power at least in

25  certain areas in Michigan in the health care financing market and may have market power in the

26  entire state. It has market power at least in certain areas in the State of Michigan in the health

27  services markets and may have market power in the entire state. For example, it has a 67% market

28  share in the entire state. It also has an 81% market share in the Lansing/East Lansing and

135

1  Niles/Benton Harbor areas, a 77% market share in the Battle Creek area, a 73% market share in

2  the Bay City area, a 72% market share in the Ann Arbor area, a 71% market share in the

3  Saginaw/Saginaw Township North area, a 69% market share in the Monroe and

4  Warren/Farmington Hills/Troy areas, a 67% market share in the Jackson area, a 66% market share

5  in the Kalamazoo/Portage area, a 64% market share in the Flint area, a 58% market share in the

6  Muskegon/Norton Shores area, and a 53% market share in the Detroit/Livonia/Dearborn area.

7        608.    Defendant Blue Cross and Blue Shield of Kansas City has market power at least in

8  certain parts of the states of Missouri and Kansas and the Kansas City area for the health care

9  financing market and may have market power in the entire area. It has market power at least in

10  certain areas in the State of Kansas and Missouri in the health services markets and may have

11  market power in the entire Kansas City area. For example, it has a 51% market share in the St.

12  Joseph MO-KS area.

13        609.    Defendant Anthem Blue Cross and Blue Shield of Missouri, a subsidiary of

14  Defendant Anthem, has market power at least in certain areas in Missouri in the health care

15  financing market and may have market power in the entire state. It has market power at least in

16  certain areas in the State of Missouri in the health services markets and may have market power

17  across the entire state. Discovery may also show that other Blues have market power in areas in

18  Missouri.

19        610.    Defendant Anthem Blue Cross and Blue Shield of Nevada, the trade name of

20  Defendant Rocky Mountain Hospital and Medical Services, Inc., both subsidiaries of Defendant

21  Anthem, has market power at least in certain areas in Nevada in the health care financing market

22  and may have market power in the entire state. It has market power at least in certain areas in the

23  State of Nevada in the health services markets and may have market power in the entire state. For

24  example, it maintains a market share of 44% in the Carson City area.

25        611.    Defendant Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross and Blue

26  Shield of New Jersey has market power at least in certain areas in New Jersey in the health care

27  financing market and may have market power in the entire state. It has market power at least in

28  certain areas in the State of New Jersey in the health services markets and may have market power

2854.003/1645949.2

136

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  in the entire state. For example, it has a 60% market share in the Atlantic City area, a 57% market

2  share in the Ocean City area, and a 42% share of the Vineland-Milville-Bridgeton area.

3      612.   Defendant Community Health Insurance Company, d/b/a Anthem Blue Cross and

4  Blue Shield of Ohio, a subsidiary of Defendant Anthem, has market power at least in certain areas

5  in Ohio in the health care financing market. It has market power at least in certain areas in the

6  State of Ohio in the health services markets. It has a market share of 38% in the

7  Cincinnati/Middletown area, but since that area borders on Kentucky where Defendant Anthem

8  also has the Blue, it likely has market power through its combined operations.

9      613.   Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue

10  Cross of Northeastern Pennsylvania has market power at least in certain areas in Pennsylvania in

11  the health care financing market. It has market power at least in certain areas in the

12  Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% markets

13  share in each of the Scranton/Wilkes-Barre and Williamsport areas. Defendant Highmark is in the

14  process of purchasing Blue Cross of Northeastern Pennsylvania.

15      614.   Defendant Highmark, Inc., the parent of Defendant Highmark Health Services d/b/a

16  Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield, has market power at least

17  in certain areas in Pennsylvania in the health care financing market. It has market power at least in

18  certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it

19  has a 75% market share in the Johnstown area, a 73% market share in the Altoona area, a 69%

20  market share in the Erie area, a 52% market share in the Pittsburgh area, a 45% share of the

21  Harrisburg-Carlisle area, a 46% share of the Lebanon area, a 43% share of the Reading area, a

22  46% share of the State College area and a 42% of the York-Hanover area.

23      615.   Defendant Independence Blue Cross has market power at least in certain areas in

24  Pennsylvania in the health care financing market. It has market power at least in certain areas in

25  the Commonwealth of Pennsylvania in the health services markets. For example, it has a 58%

26  market share in the Philadelphia area.

27      616.   Defendant Blue Cross and Blue Shield of Rhode Island has market power at least in

28  certain areas in Rhode Island in the health care financing market. It has market power at least in

2854.003/1645949.2                        137

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1    certain areas in the State of Rhode Island in the health services markets. For example, it has a

2    market share of 50% across the entire state.

3         617.    Defendant Blue Cross and Blue Shield of Texas, a division of Defendant HCSC,

4    has market power at least in certain areas in Texas in the health care financing market. It has

5    market power at least in certain areas in the State of Texas in the health services markets. For

6    example, it has a 78% market share in the Laredo area, a 75% market share in the Wichita Falls

7    area, a 74% market share in the San Angelo area, a 66% market share in the Odessa area, a 65%

8    market share in the McAllen/Edinburg-Mission area, a 62% market share in the Midland area, a

9    61% market share in each of the Brownsville/Harlingen and Tyler areas, a 59% market share in

10   each of the Lubbock and Texarkana areas, a 56% market share in the Longview area, a 55%

11   market share in the Waco area, a 53% market share in the College Station/Bryan and Corpus

12   Christi areas, a 41% share of the Waco area, a 48% share of the Sherman-Denison area and a 51%

13   market share in the Beaumont/Port Arthur area.

14                      **V.    VIOLATIONS OF LAW**

15        **FIRST COUNT: CALIFORNIA HORIZONTAL MARKET ALLOCATION**

16        **(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 16720, *et seq.*)**

17        618.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

18   set forth herein.

19        619.    Plaintiffs bring this claim under Cal. Bus. & Prof. Code § 16720, *et seq.*, for

20   Defendants' violations of California's Cartwright Act through their Market Allocation Agreement.

21        620.    Defendants have agreed to divide and allocate the geographic markets for the

22   financing of health care and the sale of commercial health benefit products into a series of

23   exclusive areas for BCBSA members.

24        621.    Defendants have at the same time agreed to divide and allocate the geographic

25   markets where provider reimbursement rates are determined.

26        622.    By so doing, the BCBSA members have agreed to suppress competition and to

27   increase their profits by decreasing payments to healthcare providers in violation of the Cartwright

28   Act.

2854.003/1645949.2                                 138

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

623. Due to the lack of competition which results from Defendants' unlawful conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.

624. Defendants' market allocation agreements are *per se* unlawful under the Cartwright Act.

625. Defendants' continuing violations of the Cartwright Act have denied Plaintiffs the opportunity to purchase health benefit products from a lower cost competitor and/or at a price set by a market free from the anticompetitive agreements, and of a wider choice of healthcare products and services as well as of increased innovation.

626. The challenged agreements have had substantial and unreasonable anticompetitive effects, including but not limited to:

    a.    Reducing the number of Blue-branded licensee health benefit product companies competing with the Blues throughout their respective Service Areas;

    b.    Unreasonably limiting the entry of competitor health benefit product companies into California;

    c.    Allowing the Blues to maintain and enlarge their market power in their respective Service Areas;

    d.    Allowing the Blues to supra-competitively raise the premiums and ASO Fees charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

    e.    Depriving Plaintiffs the full benefits of free and open competition.

627. As a direct and proximate result of Defendants' continuing violations of the Cartwright Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that California's antitrust laws were designed to prevent.

628. Such injury flows directly from that which makes Defendants' conduct unlawful.

629. These damages include: having been paid less for healthcare services, equipment and/or supplies than they would have but for Defendants' anticompetitive agreement; having been

1   forced to accept far less favorable rates and other contract terms; having access to far fewer

2   patients; and having paid artificially inflated, unreasonable or supra-competitive premiums and

3   ASO Fees.

4       630.   These damages further consist of being deprived of the opportunity to purchase

5   health benefit products from one or more of the other Blues and/or their non-Blue affiliates at a

6   lower premium or contractual rate and/or at a price set by a market free from the non-price

7   restraints imposed by Defendants' anticompetitive agreements.

8       631.   Plaintiffs seek money damages and lost profits from Defendants for their violations

9   of the Cartwright Act.

10   **SECOND COUNT: CALIFORNIA HORIZONTAL PRICE FIXING AND BOYCOTT**

11   **(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 16720, *et seq.*)**

12       632.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

13   set forth herein.

14       633.   Plaintiffs bring this claim under Cal. Bus. & Prof. Code § 16720, *et seq.*, for

15   Defendants' violations of California's Cartwright Act through their Price Fixing and Boycott

16   Agreements.

17       634.   The Price Fixing and Boycott Agreements operate in addition to and reinforces the

18   Market Allocation Agreement. The Agreements alleged in this Count also violate the Cartwright

19   Act and are *per se* violations of the Act.

20       635.   Through the Price Fixing and Boycott Agreements, the Blues have agreed to fix

21   reimbursement rates for providers among themselves by reimbursing providers according to the

22   "Host Plan" or "Participating Plan" reimbursement rate through the national programs.

23       636.   By so doing, Defendants have agreed to suppress competition by fixing and

24   maintaining payments to healthcare providers at less than competitive levels in violation of the

25   Cartwright Act.

26       637.   As a direct and proximate result of Defendants' continuing violations of the

27   Cartwright Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that

28   California's antitrust laws were designed to prevent.

2854.003/1645949.2

140

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,

1    638.    Such injury flows directly from that which makes Defendants' conduct unlawful.

2    639.    These damages include: having been paid less for healthcare services, equipment

3  and/or supplies; having been forced to accept far less favorable rates and other contract terms; and

4  having access to far fewer patients than they would have but for Defendants' anticompetitive

5  agreement.

6    640.    Plaintiffs seek money damages and lost profits from Defendants for their violations

7  of the Cartwright Act.

8    **THIRD COUNT**: **CALIFORNIA HORIZONTAL UNLAWFUL EXCHANGE OF**

9    **COMPETITIVELY SENSITIVE BUSINESS INFORMATION**

10    **(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 16720, *et seq.*)**

11    641.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

12  set forth herein.

13    642.    Plaintiffs bring this claim under California Business & Professions Code § 16720,

14  *et seq.*, for Defendants' violations of California's Cartwright Act through their Price Fixing and

15  Boycott Agreements.

16    643.    As alleged more specifically above, Defendants have engaged in an agreement to

17  exchange sensitive in-network, provider price information to BCBSA, BHI, and CHP which are

18  owned and controlled by the Blues.

19    644.    Through various programs, these entities provide pricing reports to the Blues for

20  the purpose and with the effect of lowering reimbursements to providers, stabilizing the Blues

21  pricing for health care services provided by hospitals in various markets, and managing the

22  various anticompetitive national BCBSA programs to protect the individual Blues from

23  competition in violation of the Cartwright Act, California Business & Professions Code § 16720.

24    645.    Plaintiffs seek money damages from Defendants for their violations of the

25  Cartwright Act.

26    **FOURTH COUNT**: **CALIFORNIA UNFAIR COMPETTIION**

27    **(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 17200, *et seq.*)**

28

2854.003/1645949.2                             141

1     646.   Plaintiffs incorporate by reference and reallege each and every allegation set forth

2 in the preceding paragraphs of this Complaint.

3     647.   California Business & Professions Code § 17203 prohibits the commission of any

4 "unlawful, unfair, or fraudulent" business act or practice.

5     648.   Defendants' business acts and practices, as alleged herein, constituted and

6 constitute a continuous and continuing course of conduct of unfair competition by means of unfair,

7 unlawful and/or fraudulent business acts or practices within the meaning of California's Unfair

8 Competition Law, Business & Professions Code § 17200, *et seq.*

9     649.   Through their actions as alleged herein, Defendants have engaged in unlawful,

10 unfair and/or fraudulent business acts or practices within the meaning of California Business &

11 Professions Code § 17200, *et seq.* because Defendants' conduct, business affairs and practices as

12 alleged herein violate the antitrust laws, the Cartwright Act, and California Business &

13 Professions Code § 16720, *et seq.*, each of which constitutes an independent and separate violation

14 of California Business & Professions Code § 17200, *et seq.*

15     650.   Defendants' conduct, business affairs and practices described herein further

16 constitute unlawful, unfair and/or fraudulent business acts or practices within the meaning of

17 California Business & Professions Code § 17200, *et seq.* because such conduct threatens an

18 incipient violation of California's consumer protection and antitrust laws, including but not limited

19 to the Unfair Competition Law and Cartwright Act, and/or violates the policy or spirit of such

20 laws because it significantly harms and threatens competition.

21     651.   Plaintiffs have standing to bring this action under the UCL because they have

22 suffered injury as a proximate result of Defendants' unlawful, unfair and/or fraudulent business

23 practices.

24     652.   As a proximate result of Defendants' unlawful, unfair, and/or fraudulent business

25 practices, Plaintiffs have been denied fair and reasonable payments for health care services,

26 equipment and/or supplies, and have paid artificially inflated, unreasonable and supra-competitive

27 premiums and ASO Fees.

28

2854.003/1645949.2

142

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE AND FEDERAL ANTITRUST LAWS

653.    Plaintiffs are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefit, such other monetary relief as the court deems just in light of the ill-gotten gains obtained by Defendants as a result of such business acts or practices.

### FIFTH COUNT: ALABAMA DECEPTIVE TRADE PRACTICES ACT

**(All Plaintiffs Against All Defendants Under Ala. Code § 8-19-5(27))**

654.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

655.    The acts and practices by Defendants constitute unconscionable acts in violation of the Alabama Deceptive Trade Practices Act, Code of Alabama, 1975, §§ 8-19-10, 8-19-5(27) for which Plaintiffs are entitled to relief.

656.    The acts and practices by Defendants further constitute an unlawful trust, combine or monopoly in violation of Code of Alabama, 975, § 6-5-60.

### SIXTH COUNT:

### FLORIDA ANTITRUST ACT AND FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

**(All Plaintiffs Against All Defendants Under Fla. Stat. § 542.18)**

**(All Plaintiffs Against All Defendants Under Fla. Stat. § 501.201, _et seq._)**

657.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

658.    This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, and the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, _et seq._ Plaintiffs are entitled to relief, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, attorneys' fees and costs resulting from the Defendants' conduct as stated above, for all for all unfair and unreasonable payments for health care services, equipment and/or supplies, and for all artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

659.   Defendants knowingly—that is, voluntarily and intentionally—entered into an agreement to divide and allocate the geographic markets for the financing of health care and the sale of commercial health benefit products into a series of exclusive areas for BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined. By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare . Due to the lack of competition which results from Defendants' unlawful conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.

660.   Defendants knowingly—that is, voluntarily and intentionally—agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs. By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels.

661.   Defendants knowingly—that is, voluntarily and intentionally—Defendants agreed to exchange sensitive in-network provider price information to BHI which provides pricing reports to all the Blues for the purpose and effect of lowering reimbursements to providers, stabilizing the Blues pricing for health care services provided by hospitals in various markets, and managing the various anticompetitive national BCBSA programs.

662.   As a direct and proximate result of the Defendants' conduct, Plaintiffs have been injured and will continue to be injured by being denied fair and reasonable payments for health care services, equipment and/or supplies, and paying artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

663.   The sale of health insurance, the sale of administrative services for employee benefit plans, and the purchase of health-care services, facilities and equipment all involve trade or commerce within the meaning of the Florida Antitrust Act and the Florida Deceptive and Unfair Trade Practices Act.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE AND FEDERAL ANTITRUST LAWS

664.     The combination, acts, agreements and practices alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, 501. 201, *et seq.*, Florida Statutes.

665.     Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida businesses and consumers in violation of Section 501.204, Florida Statutes.

### SEVENTH COUNT: INDIANA ANTITRUST ACT

**(All Plaintiffs Against All Defendants Under Ind. Code §§ 24-1-2-1, *et seq.*)**

666.     Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

667.     The aforementioned practices are a violation of Chapter Two of the Indiana Antitrust Act, Indiana Code Section 24-1-2-1, and Plaintiffs seek recovery pursuant to Indiana Code Section 24-1-2-7.

668.     As a direct and proximate result of Defendants' contracts, combinations and agreements to restrain trade, as more fully described above, Plaintiffs have been injured and will continue to be injured by being denied fair and reasonable payments for health care services, equipment and/or supplies, and paying artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

669.     Accordingly, Plaintiffs are entitled to and seeks relief, including but not limited to trebled damages, attorney's fees and costs.

### EIGHTH COUNT: KANSAS RESTRAINT OF TRADE ACT

**(All Plaintiffs Against All Defendants Under Kan. Stat. Ann. §§ 50-101, *et seq.*)**

670.     Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

671.     The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq.*

672.     Plaintiffs are entitled to treble damages, reasonable attorney fees and costs, and any other appropriate relief that the Court so orders, pursuant to Kan. Stat. Ann. § 50-161.

**NINTH COUNT: MICHIGAN ANTITRUST REFORM ACT**

**(All Plaintiffs Against All Defendants Under Mich. Comp. Laws §§ 445.771, *et seq.*)**

673.   Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

674.   The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq.*

675.   As a direct and proximate result of Defendants' contracts, combinations and agreements to restrain trade, as more fully described above, Plaintiffs have been injured and will continue to be injured by being denied fair and reasonable payments for health care services, equipment and/or supplies, and paying artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

676.   Accordingly, Plaintiffs are entitled to relief including but not limited to disgorgement, damages, interest, costs and attorney's fees.

**TENTH COUNT: NEVADA UNFAIR TRADE PRACTICES ACT**

**(All Plaintiffs Against All Defendants Under Nev. Rev. Stat. §§ 598A.010, *et seq.*)**

677.   Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

678.   As alleged herein, Defendants' anticompetitive conduct harmed, and continues to harm, Plaintiffs. Accordingly, the aforementioned acts and practices by Defendants were, and are, in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, et seq., and specifically Nev. Rev. Stat. §§ 598A.060(a), (b) and (c).

679.   Accordingly, Plaintiffs seek all relief available under the Nevada Unfair Trade Practices Act. Plaintiffs are entitled to relief including but not limited to treble damages, attorneys' fees and costs.

**ELEVENTH COUNT: NEW JERSEY ANTITRUST ACT**

**(All Plaintiffs Against All Defendants Under N.J.S.A. 56:9-1, *et seq.*)**

680.   Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

681.    Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1, *et seq.*, in that they have the purpose and effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere. N.J.S.A. 56:9-3. Plaintiffs seek relief including, but not limited to, treble damages, attorney's fees and costs. N.J.S.A. 56:9-12.

### TWELFTH COUNT: OHIO REV. CODE § 1331.01, *et seq.*

**(All Plaintiffs Against All Defendants Under Ohio Rev. Code § 1331.01, *et seq.*)**

682.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

683.    The aforementioned practices by Defendants were, and are, a per se violation of Ohio Revised Code Section 1331.01, *et seq.*, the common law of Ohio, and voice pursuant to Ohio Revised Code Section 1331.06. Plaintiffs, the general economy of Ohio, Ohio entities and individuals in Ohio were harmed as a direct result of Defendants' per se illegal conduct. Defendants received ill-gotten gains or proceeds as a direct result of their per se illegal conduct.

684.    Plaintiffs seek and are entitled to treble damages and costs of suit. Ohio Rev. Code § 1331.08.

### THIRTEENTH COUNT: RHODE ISLAND ANTITRUST ACT

**(All Plaintiffs Against All Defendants Under R.I. General Laws § 6-36-1, *et seq.*)**

685.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

686.    Defendants' actions as alleged herein violate the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*

687.    Plaintiffs bring this action pursuant to Rhode Island General Law Section 6-36-11, and seeks relief, including but not limited to treble damages, fees, costs and such other relief as this court deems just and equitable.

### VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter judgment on its behalf against defendants, jointly and severally, adjudging and decreeing that:

1      a.     Defendants have engaged in trusts, contracts, combinations, or agreements in

2 violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and Plaintiffs have been damaged and

3 injured as a result and are entitled to relief under Cal. Bus. & Prof. Code § 16750(a).

4      b.     The unlawful conduct, contracts or combinations alleged in this Complaint be

5 adjudged and decreed to be:

6            i.    A *per se* unlawful horizontal market allocation violation of the Cartwright

7                Act;

8           ii.    A *per se* horizontal price-fixing violation of the Cartwright Act;

9          iii.    A *per se* horizontal boycott violation of the Cartwright Act;

10         iv.    Unlawful efforts to maintain, control, reduce, or tamper with reimbursement

11                prices in violation of the Cartwright Act;

12          v.    Unreasonable restraints of trade in violation of the Cartwright Act;

13         vi.    Unlawful, unfair, and/or fraudulent business practices within the meaning of

14                California's Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et*

15                *seq.*; and

16         vii.    Corresponding violations of other states' laws.

17      c.     Judgment shall be entered against Defendants and in favor of Plaintiffs for damages

18 arising from Defendants' unlawful conduct as determined to have been sustained by them, in an

19 amount to be trebled to the extent permitted by law, together with the costs of suit, including

20 reasonable attorneys' fees;

21      d.     Judgment shall be entered against Defendants and in favor of Plaintiffs for

22 restitution and disgorgement of ill-gotten monetary gains determined to have been obtained by

23 them, as allowed by law and equity, together with the costs of suit, including reasonable attorneys'

24 fees;

25      e.     Judgement shall be entered against Defendants and in favor of Plaintiffs, as

26 applicable, for damages and lost profits arising from Defendants wrongful conduct diminishing the

27 value of Plaintiff's enterprise and driving it into bankruptcy;

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1    f.      Plaintiffs be awarded monetary damages (trebled as appropriate), restitution, and

2  disgorgement of the monetary gains obtained by Defendants as a result of their acts of unfair

3  competition;

4    g.      Plaintiffs be awarded pre- and post-judgment interest as provided by law, and that

5  such interest be awarded at the highest legal rate from and after the date of service of the initial

6  Complaint in this action;

7    h.      Plaintiffs shall recover its costs of suit, including reasonable attorneys' fees, as

8  provided by law; and

9    i.      Plaintiffs have such other, further, and different relief as the case may require and

10  the Court may deem just and proper under the circumstances.

11

12  DATED: July 28, 2021                          BARTKO ZANKEL BUNZEL & MILLER
                                                   A Professional Law Corporation
13
                                                   PATRICK M. RYAN
14                                                 PATRICK E. O'SHAUGHNESSY
                                                   JOHN F. MCLEAN
15                                                 OLIVER Q. DUNLAP
                                                   SEAN R. MCTIGUE
16

17

18                                      By: _____
19                                             Patrick E. O'Shaughnessy
                                               Attorneys for Plaintiffs
20                                        VHS LIQUIDATING TRUST, PRIME
                                          HEALTHCARE SERVICES, INC., PRIME
21                                        ALTHCARE FOUNDATION, INC., and PRIME
                                          HEALTHCARE MANAGEMENT, INC.
22

23

24

25

26

27

28

2854.003/1645949.2                                   149
FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: July 28, 2021

BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation

PATRICK M. RYAN
PATRICK E. O'SHAUGHNESSY
JOHN F. MCLEAN
OLIVER Q. DUNLAP
SEAN R. MCTIGUE

By: _____
Patrick E. O'Shaughnessy
Attorneys for Plaintiffs
VHS LIQUIDATING TRUST, PRIME
HEALTHCARE SERVICES, INC., PRIME
HEALTHCARE FOUNDATION, INC., and PRIME
HEALTHCARE MANAGEMENT, INC.