# EXHIBIT 1

# U.S. Bankruptcy Court
## California Northern Bankruptcy Court (Oakland)
## Adversary Proceeding #: 21-04034

*Assigned to:* Judge Charles Novack                         *Date Filed:* 09/22/21
*Demand:*

*Nature[s] of Suit:* 01 Determination of removed claim or cause

### *Plaintiff*
----------------------
**VHS Liquidating Trust,** *liquidating*        represented by **C. Griffith Towle**
*trust for Verity Health System of*                             Bartko, Zankel, Tarrant and Miller
*California, Inc., a California*                                 1 Embarcadero Center # 800
*corporation*                                                   San Francisco, CA 94111
One Embarcadero Center                                          (415) 956-1900
Suite 800                                                       Email: gtowle@bzbm.com
San Francisco, CA 94111

### *Plaintiff*
----------------------
**Prime Healthcare Services, Inc., *a***        represented by **C. Griffith Towle**
***Delaware corporation***                                      (See above for address)
One Embarcadero Center
Suite 800
San Francisco, CA 94111

### *Plaintiff*
----------------------
**Prime Healthcare Foundation, Inc., *a***      represented by **C. Griffith Towle**
***Delaware corporation***                                      (See above for address)
One Embarcadero Center
Suite 800
San Francisco, CA 94111

### *Plaintiff*
----------------------
**Prime Healthcare Management Inc.,**           represented by **C. Griffith Towle**
***a California corporation***                                  (See above for address)
One Embarcadero Center
Suite 800
San Francisco, CA 94111

V.

*Defendant*
-----------------------
**California Physcians Service,** *all*        represented by **Michael P. Esser**
*California corporations*                      Kirkland & Ellis LLP
825 Eighth Avenue                             555 California St, 27th Fl
New York, NY 10019                            San Francisco, CA 94104
*dba* **Blue Shield of California**           (415)439-1400
                                              Email: michael.esser@kirkland.com


*Defendant*
-----------------------
**Blue Cross of California**                   represented by **Christopher J. Cox**
4085 Campbell Avenue                           Hogan Lovells US LLP
Suite 100                                      4085 Campbell Avenue
Menlo Park, CA 94025                           Suite 100
                                               Menlo Park, CA 94025
                                               650-463-4000
                                               Fax : 650-463-4199
                                               Email: chris.cox@hoganlovells.com


*Defendant*
-----------------------
**Blue Cross and Blue Shield of**             represented by **Michael P. Esser**
**Alabama,** *an Alabama corporation*         (See above for address)
825 Eighth Avenue
New York, NY 10019


*Defendant*
-----------------------
**Premera,** *both Washington*                represented by **Premera**
*corporations*                                PRO SE
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Premera Blue Cross Blue Shield**
**of Alaska**


*Defendant*
-----------------------
**Premera Blue Cross,** *both*                represented by **Premera Blue Cross**
*Washington corporations*                     PRO SE
1420 Fifth Avenue
Suite 3700
Seattle, WA 98101
*dba* **Premera Blue Cross Blue Shield**

**of Alaska**


*Defendant*
-----------------------

**Blue Cross Blue Shield of Arizona,**     represented by **Honor Costello**
**Inc.,** *an Arizona corporation*                     Crowell & Moring LLP
590 Madison Ave.                                     590 Madison Avenue
20th Floor                                         New York, NY 10022
New York, NY 10022                           212-803-4064
  Fax : 212-223-4134
  Email: hcostello@crowell.com

                                               **Sarah Gilbert**
  Crowell & Moring LLP
  590 Madison Avenue
  New York, NY 10022
  212-895-4226
  Fax : 212-223-4134
  Email: sgilbert@crowell.com

  **Tracy Ann Roman**
  Crowell & Moring LLP
  1001 Pennsylvania Avenue NW
  Washington, DC 20004
  202-624-2500
  Email: troman@crowell.com

  **Kathleen Taylor Sooy**
  Crowell & Moring LLP
  1001 Pennsylvania Ave. NW
  Washington, DC 20004
  202-624-2500
  Email: ksooy@crowell.com

  **Rebecca Suarez**
  Crowell & Moring, LLP
  3 Embarcadero Center, 26th Fl.
  San Francisco, CA 94111
  (415) 365-7278
  Email: rsuarez@crowell.com


*Defendant*
-----------------------

**Usable Mutual Insurance Company,**    represented by **Shane J. Moses**
*an Arkansas corporation*                               Foley & Lardner LLP
555 California Street, Suite 1700                 555 California Street, Suite 1700
San Francisco, CA 94104                          San Francisco, CA 94104
*dba* **Arkansas Blue Cross and Blue**             (415) 434-4484
**Shield**                                               Email: smoses@foley.com

**Defendant**
----------------------
**Anthem, Inc.,** *an Indiana*                    represented by **Christopher J. Cox**
*corporation, and its subsidiaries or*                (See above for address)
*divisions, including,*
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross Life and**
**Health Insurance Company**
*fka* **Wellpoint, Inc.**


**Defendant**
----------------------
**Anthem Health Plans, Inc.,** *a*                represented by **Christopher J. Cox**
*Connecticut corporation*                            (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross and Blue**
**Shield of Connecticut**


**Defendant**
----------------------
**Rocky Mountain Hospital & Medical**            represented by **Christopher J. Cox**
**Service Inc.,** *a Colorado corporation*           (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross and Blue**
**Shield of Colorado**


**Defendant**
----------------------
**Anthem Blue Cross and Blue Shield**            represented by **Christopher J. Cox**
**of Nevada,** *a Nevada corporation*                (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025


**Defendant**
----------------------
**Anthem Insurance Companies, Inc.,**            represented by **Christopher J. Cox**
*an Indiana corporation*                             (See above for address)

4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross Blue Shield**
**of Indiana**

*Defendant*
----------------------
**Anthem Health Plans of Kentucky,**         represented by **Christopher J. Cox**
**Inc.,** *a Kentucky corporation*                        (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross Blue Shield**
**of Kentucky**

*Defendant*
----------------------
**Anthem Health Plans of Maine, Inc.,**      represented by **Christopher J. Cox**
*a Maine corporation*                                     (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross and Blue**
**Shield of Maine**

*Defendant*
----------------------
**HMO Missouri Inc.,** *a Missouri*          represented by **Christopher J. Cox**
*corporation*                                             (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross Blue Shield**
**of Missouri**

*Defendant*
----------------------
**Healthy Alliance Life Insurance**          represented by **Christopher J. Cox**
**Company,** *a Missouri corporation*                     (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*
-----------------------
**Anthem Health Plans of New**          represented by **Christopher J. Cox**
**Hampshire, Inc.,** *a New Hampshire*            (See above for address)
*corporation*
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross and Blue**
**Shield of New Hampshire**


*Defendant*
-----------------------
**Empire Healthchoice Assurance,**      represented by **Christopher J. Cox**
**Inc.,** *a New York corporation*                (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Empire Blue Cross Blue Shield**


*Defendant*
-----------------------
**Community Insurance Company,** *an*   represented by **Christopher J. Cox**
*Ohio corporation*                                (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross and Blue**
**Shield of Ohio**


*Defendant*
-----------------------
**Anthem Health Plans of Virginia,**    represented by **Christopher J. Cox**
**Inc.,** *a Virginia corporation*               (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Anthem Blue Cross and Blue**
**Shield of Virginia, Inc.**


*Defendant*
-----------------------
**Blue Cross Blue Shield of Wisconsin** represented by **Christopher J. Cox**
4085 Campbell Avenue                              (See above for address)
Suite 100

Menlo Park, CA 94025
***dba* Anthem Blue Cross and Blue
Shield of Wisconsin**

*Defendant*
----------------------
**Compare Health Services Insurance**          represented by **Christopher J. Cox**
**Corporation,** ***both Wisconsin***                    (See above for address)
***corporations***
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*
----------------------
**Highmark Health Services**          represented by **Helen Witt**
555 California Street                  Kirkland & Ellis LLP
27th Floor                             300 North LaSalle Street
San Francisco, CA 94104                Chicago, IL 60654
                                       312-861-2148
                                       Email: hwitt@kirkland.com

                                       **Jeffrey J. Zeiger**
                                       Kirkland & Ellis LLP
                                       300 North LaSalle
                                       Chicago, IL 60654
                                       312-862-3237
                                       Email: jzeiger@kirkland.com

*Defendant*
----------------------
**Highmark Inc. predecessor Hospital**          represented by **Michael P. Esser**
**Service Association of Northeastern**                    (See above for address)
**Pennsylvania,** ***all Pennsylvania***
***corporation***
555 California Street
27th Floor
San Francisco, CA 94104
***fdba* Blue Cross of Northeastern**
**Pennsylvania**

*Defendant*
----------------------
**Highmark Blue Cross Blue Shield**          represented by **Michael P. Esser**
**Delaware Inc.,** ***a Delaware***                    (See above for address)
***corporation***

555 California Street
27th Floor
San Francisco, CA 94104
**dba Highmark Blue Cross Blue Shield Delaware**


**Defendant**
----------------------
**Highmark West Virginia Inc., *a West Virginia corporation***
555 California Street
27th Floor
San Francisco, CA 94104
**dba Highmark Blue Cross Blue Shield West Virginia**

represented by **Michael P. Esser**
(See above for address)

**Helen Witt**
(See above for address)

**Jeffrey J. Zeiger**
(See above for address)


**Defendant**
----------------------
**Carefirst, Inc., *a Maryland corporation, and its subsidaries or affiliates including***
825 Eighth Avenue
New York, NY 10019

represented by **Carefirst, Inc.**
PRO SE


**Defendant**
----------------------
**Group Hospitalization and Medical Services, Inc.**
825 Eighth Avenue
New York, NY 10019

represented by **Group Hospitalization and Medical Services, Inc.**
PRO SE


**Defendant**
----------------------
**Carefirst, Inc.**
825 Eighth Avenue
New York, NY 10019

represented by **Carefirst, Inc.**
PRO SE


**Defendant**
----------------------
**Carefirst Bluechoice, Inc., *all Maryland corporations***
825 Eighth Avenue
New York, NY 10019

represented by **Carefirst Bluechoice, Inc.**
PRO SE

*dba* **Carefirst Bluecross Blueshield**


### *Defendant*
-----------------------
**Guidewell Mutual Holding**                 represented by **Guidewell Mutual Holding Corporation**
**Corporation,** *a Florida corporation*                    PRO SE
825 Eighth Avenue
New York, NY 10019


### *Defendant*
-----------------------
**Blue Cross and Blue Shield of**            represented by **Blue Cross and Blue Shield of Florida, Inc.**
**Florida, Inc.,** *a Florida corporation*                  PRO SE
825 Eighth Avenue
New York, NY 10019


### *Defendant*
-----------------------
**Hawaii Medical Service Association,**      represented by **Michael P. Esser**
*a Hawaii corporation*                                      (See above for address)
555 California Street
27th Floor
San Francisco, CA 94104
*aka* **Blue Cross and Blue Shield of**
**Hawaii**


### *Defendant*
-----------------------
**Regence Blueshield of Idaho, Inc.**        represented by **Christopher J. Cox**
4085 Campbell Avenue                                        (See above for address)
Suite 100
Menlo Park, CA 94025


### *Defendant*
-----------------------
**Blue Cross of Idaho Health Service,**      represented by **Honor Costello**
**Inc.,** *both Idaho corporations*                         (See above for address)
3 Embarcadero Center
26th Floor
San Francisco, CA 94111                                     **Sarah Gilbert**
*dba* **Blue Cross of Idaho**                               (See above for address)

                                                            **Tracy Ann Roman**
                                                            (See above for address)

                                                            **Kathleen Taylor Sooy**

(See above for address)

**Rebecca Suarez**
(See above for address)

**Defendant**
----------------------
**Cambia Health Solutions, Inc.,** *an*          represented by **Christopher J. Cox**
*Oregon corporation*                                          (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Regence Blueshield of Idaho, Inc.**

**Defendant**
----------------------
**Regence Blue Cross Blue Shield of**          represented by **Christopher J. Cox**
**Oregon**                                                    (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

**Defendant**
----------------------
**Regence Blue Cross Blue Shield of**          represented by **Christopher J. Cox**
**Utah**                                                       (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

**Defendant**
----------------------
**Regence Blue Shield (Washington)**          represented by **Christopher J. Cox**
                                                              (See above for address)

**Defendant**
----------------------
**Blue Cross and Blue Shield of**          represented by **Michael P. Esser**
**Montana**                                                (See above for address)
555 California Street
27th Floor                                                 **Helen Witt**
San Francisco, CA 94104                          (See above for address)

                                                              **Jeffrey J. Zeiger**
                                                              (See above for address)

*Defendant*
-----------------------
**Caring for Montanans, Inc.**          represented by **Michael P. Esser**
555 California Street                                    (See above for address)
27th Floor
San Francisco, CA 94104                                 **Helen Witt**
                                                         (See above for address)

                                                         **Jeffrey J. Zeiger**
                                                         (See above for address)


*Defendant*
-----------------------
**Blue Cross and Blue Shield of New**   represented by **Michael P. Esser**
**Mexico**                                               (See above for address)
555 California Street
27th Floor                                               **Helen Witt**
San Francisco, CA 94104                                  (See above for address)

                                                         **Jeffrey J. Zeiger**
                                                         (See above for address)


*Defendant*
-----------------------
**Blue Cross and Blue Shield of**       represented by **Michael P. Esser**
**Oklahoma**                                             (See above for address)
555 California Street
27th Floor                                               **Helen Witt**
San Francisco, CA 94104                                  (See above for address)

                                                         **Jeffrey J. Zeiger**
                                                         (See above for address)


*Defendant*
-----------------------
**Blue Cross and Blue Shield of Texas,**  represented by **Michael P. Esser**
**Inc.**                                                 (See above for address)
555 California Street
27th Floor                                               **Helen Witt**
San Francisco, CA 94104                                  (See above for address)

                                                         **Jeffrey J. Zeiger**
                                                         (See above for address)

*Defendant*
----------------------
**Wellmark, Inc., *including its***      represented by **Michael P. Esser**
**subsidiaries and/or divisions**            (See above for address)
555 California Street
27th Floor
San Francisco, CA 94104


*Defendant*
----------------------
**Wellmark Blue Cross and Blue**      represented by **Michael P. Esser**
**Shield of Iowa, *both Iowa***            (See above for address)
**corporations**
555 California Street
27th Floor
San Francisco, CA 94104


*Defendant*
----------------------
**Wellmark of South Dakota, Inc., *a***      represented by **Michael P. Esser**
**South Dakota corporation**            (See above for address)
555 California Street
27th Floor
San Francisco, CA 94104
*dba* **Wellmark Blue Cross and Blue**
**Shield of South Dakota**


*Defendant*
----------------------
**Blue Cross and Blue Shield of**      represented by **Honor Costello**
**Kansas, Inc., *a Kansas corporation***         (See above for address)
3 Embarcadero Center
26th Floor
San Francisco, CA 94111                **Sarah Gilbert**
                                          (See above for address)

                                          **Tracy Ann Roman**
                                          (See above for address)

                                          **Kathleen Taylor Sooy**
                                          (See above for address)

                                          **Rebecca Suarez**
                                          (See above for address)

***Defendant***
----------------------
**Louisiana Health Service &**          represented by **Christopher J. Cox**
**Indemnity Company, *a Louisiana***                    (See above for address)
***corporation***
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
***dba* Blue Cross and Blue Shield of**
**Louisiana**


***Defendant***
----------------------
**Blue Cross and Blue Shield of**       represented by **Blue Cross and Blue Shield of Massachusetts, Inc.**
**Massachusetts, Inc., *a Massachusetts***               PRO SE
***corporation***
825 Eighth Avenue
New York, NY 10019


***Defendant***
----------------------
**Blue Cross Blue Shield of Michigan**   represented by **John Cove, Jr**
**Mutual Insurance Company, *a***                        Shearman & Sterling LLP
***Michigan corporation***                               535 Mission Street
825 Eighth Avenue                                        25th Floor
New York, NY 10019                                       San Francisco, CA 94105
                                                         415-616-1100
                                                         Fax : 415-616-1339
                                                         Email: john.cove@shearman.com


***Defendant***
----------------------
**Aware Integrated, Inc.**               represented by **Christopher J. Cox**
4085 Campbell Avenue                                     (See above for address)
Suite 100
Menlo Park, CA 94025


***Defendant***
----------------------
**BCBSM, Inc., *both Minnesota***        represented by **Christopher J. Cox**
***corporations***                                       (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
***dba* Blue Cross and Blue Shield of**

## Minnesota

### *Defendant*
-----------------------
**Blue Cross & Blue Shield of**                represented by **Shane J. Moses**
**Mississippi,** *a mutual insurance*                         McNutt Law Group LLP
*company*                                                      219 9th St.
555 California Street                                          San Francisco, CA 94103
27th Floor                                                    (415)995-8475
San Francisco, CA 94104                                       Email: smoses@foley.com

### *Defendant*
-----------------------
**Blue Cross and Blue Shield of**              represented by **Honor Costello**
**Kansas City,** *a Missouri corporation*                     (See above for address)
3 Embarcadero Center
26th Floor                                                    **Sarah Gilbert**
San Francisco, CA 94111                                       (See above for address)

                                                              **Tracy Ann Roman**
                                                              (See above for address)

                                                              **Kathleen Taylor Sooy**
                                                              (See above for address)

                                                              **Rebecca Suarez**
                                                              (See above for address)

### *Defendant*
-----------------------
**Goodlife Partners, Inc.**                    represented by **Honor Costello**
3 Embarcadero Center                                          (See above for address)
26th Floor
San Francisco, CA 94111                                       **Sarah Gilbert**
                                                              (See above for address)

                                                              **Tracy Ann Roman**
                                                              (See above for address)

                                                              **Kathleen Taylor Sooy**
                                                              (See above for address)

                                                              **Rebecca Suarez**
                                                              (See above for address)

*Defendant*
----------------------

**Blue Cross and Blue Shield of
Nebraska,** *both Nebraska
corporations*
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

represented by **Honor Costello**
(See above for address)

**Sarah Gilbert**
(See above for address)

**Tracy Ann Roman**
(See above for address)

**Kathleen Taylor Sooy**
(See above for address)

**Rebecca Suarez**
(See above for address)

*Defendant*
----------------------

**Horizon Healthcare Services Inc.,** *a
New Jersey corporation*
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025
*dba* **Horizon Blue Cross Blue Shield
of New Jersey**

represented by **Christopher J. Cox**
(See above for address)

*Defendant*
----------------------

**Healthnow Systems, Inc.**
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

represented by **Honor Costello**
(See above for address)

**Sarah Gilbert**
(See above for address)

**Tracy Ann Roman**
(See above for address)

**Kathleen Taylor Sooy**
(See above for address)

**Rebecca Suarez**
(See above for address)

*Defendant*
----------------------

**Healthnow New York, Inc.**
3 Embarcadero Center
26th Floor
San Francisco, CA 94111
*dba* **Bluecross Blueshield of Western
New York and Blueshield of
Northeastern New York**

represented by **Rebecca Suarez**
(See above for address)

**Defendant**
-----------------------
**Lifetime Healthcare, Inc.**
22 Battery St. #810
San Francisco, CA 94111

represented by **Edward Bloomberg**
Phillips Lytle LLP
One Canalside
125 Main St.
Buffalo, NY 14203
716-847-8400
Email: ebloomberglaw@phillipslytle.com

**Danisha Brar**
Keller Benvenutti Kim LLP
650 California St. Suite 1900
San Francisco, CA 94108
415-496-6723
Email: dbrar@kbkllp.com

**Anna Mercado Clark**
Phillips Lytle LLP
340 Madison Avenue
Ste 17th Floor
New York, NY 10173-1922
212-508-0466
Email: aclark@phillipslytle.com

**Lawrence Ng**
Chan Punzalan, LLP
22 Battery Street, Ste 401
San Francisco, CA 94111
(650) 362-4150
Email: lawrence@chanpunzalan.com

**Mark Punzalan**
Chan Punzalan, LLP
22 Bettery Street, Ste 401
San Francisco, CA 94111
(650) 362-4150
Email: mark@chanpunzalan.com

**John G. Schmidt, Jr**
Phillips Lytle LLP
One Canalside

125 Main Street
Buffalo, NY 14203
716-847-7095
Email: jschmidt@phillipslytle.com


**Defendant**
-----------------------
**Excellus Health Plan, Inc.,** *all New*
*York corporations*
22 Battery St. #810
San Francisco, CA 94111
*dba* **Excellus Bluecross Blueshield**

represented by **Edward Bloomberg**
(See above for address)

**Danisha Brar**
(See above for address)

**Anna Mercado Clark**
(See above for address)

**Lawrence Ng**
(See above for address)

**Mark Punzalan**
(See above for address)

**John G. Schmidt, Jr**
(See above for address)


**Defendant**
-----------------------
**Blue Cross and Blue Shield of North**
**Carolina Inc.,** *a North Carolina*
*corporation*
825 Eighth Avenue
New York, NY 10019

represented by **Blue Cross and Blue Shield of North Carolina Inc.**
PRO SE


**Defendant**
-----------------------
**Noridian Mutual Insurance**
**Company**
3 Embarcadero Center
26th Floor
San Francisco, CA 94111

represented by **Noridian Mutual Insurance Company**
PRO SE


**Defendant**
-----------------------
**Healthydakota Mutual Holdings,**
*both North Dakota corporations*
3 Embarcadero Center

represented by **Honor Costello**
(See above for address)

26th Floor
San Francisco, CA 94111
***dba* Blue Cross Blue Shield of North
Dakota**

**Sarah Gilbert**
(See above for address)

**Tracy Ann Roman**
(See above for address)

**Kathleen Taylor Sooy**
(See above for address)

**Rebecca Suarez**
(See above for address)

*Defendant*
----------------------
**Capital Blue Cross**                    represented by **Capital Blue Cross**
5901 W. Century Blvd.                                   PRO SE
Suite 1100
Los Angeles, CA 90045

*Defendant*
----------------------
**Independence Health Group, Inc.**       represented by **Daniel Bitton**
560 Mission Street                                      Axinn Veltrop & Harkrider, LLP
San Francisco, CA 94105                                 560 Mission Street
                                                        San Francisco, CA 94105
                                                        (415) 490-2000
                                                        Email: dbitton@axinn.com

                                                        **John Briggs**
                                                        Axinn, Veltrop and Harkrider
                                                        1901 L Street NW
                                                        Washington, DC 20036
                                                        202-912-4700
                                                        Email: jbriggs@axinn.com
                                                        *LEAD ATTORNEY*

                                                        **Jeny Maier**
                                                        Axinn Veltrop & Harkrider, LLP
                                                        1901 L Street NW
                                                        5th Floor
                                                        Washington, DC 20036
                                                        202-469-3523
                                                        Email: jmaier@axinn.com

*Defendant*
----------------------
**Independence Hospital Indemnity**       represented by **Daniel Bitton**

**Plan, Inc.,** *all Pennsylvania*                         (See above for address)
*corporations*
560 Mission Street                                         **John Briggs**
San Francisco, CA 94105                                    (See above for address)
*fka* **Independence Blue Cross**                          *LEAD ATTORNEY*

                                                           **Jeny Maier**
                                                           (See above for address)


**Defendant**
----------------------
**Triple-S Management Corporation**      represented by **Michael P. Esser**
555 California Street                                    (See above for address)
27th Floor
San Francisco, CA 94104


**Defendant**
----------------------
**Triple-S Salud, Inc.,** *both Puerto Rico*    represented by **Michael P. Esser**
*corporations*                                          (See above for address)
555 California Street
27th Floor
San Francisco, CA 94104


**Defendant**
----------------------
**Blue Cross & Blue Shield of Rhode**    represented by **Christopher J. Cox**
**Island,** *a Rhode Island corporation*                (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025


**Defendant**
----------------------
**Blue Cross Blue Shield of South**      represented by **Christopher J. Cox**
**Carolina,** *a South Carolina*                        (See above for address)
*corporation*
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025


**Defendant**
----------------------
**Bluecross Blueshield of Tennessee,**   represented by **Bluecross Blueshield of Tennessee, Inc.**
**Inc.,** *a Tennessee corporation*                      PRO SE

825 Eighth Avenue
New York, NY 10019

*Defendant*
----------------------

**Blue Cross and Blue Shield of**          represented by **Christopher J. Cox**
**Vermont,** *a Vermont corporation*                   (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*
----------------------

**Blue Cross Blue Shield of Wyoming,**     represented by **Honor Costello**
*a Wyoming corporation*                                (See above for address)
3 Embarcadero Center
26th Floor                                             **Sarah Gilbert**
San Francisco, CA 94111                                (See above for address)

                                                       **Tracy Ann Roman**
                                                       (See above for address)

                                                       **Kathleen Taylor Sooy**
                                                       (See above for address)

                                                       **Rebecca Suarez**
                                                       (See above for address)

*Defendant*
----------------------

**Blue Cross and Blue Shield of**          represented by **Christopher J. Cox**
**Georgia,** *a Georgia corporation*                   (See above for address)
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

*Defendant*
----------------------

**Carefirst of Maryland, Inc.**            represented by **Carefirst of Maryland, Inc.**
825 Eighth Avenue                                      PRO SE
New York, NY 10019

*Defendant*
----------------------

**Health Care Service Corporation,** *an Illinois mutual legal reserve company, an Illinois corporation*
555 California St, 27th Fl
San Francisco, CA 94104
*dba* **Blue Cross and Blue Shield of Illinois**

represented by **Michael P. Esser**
(See above for address)

**Helen Witt**
(See above for address)

**Jeffrey J. Zeiger**
(See above for address)

**Defendant**
----------------------
**Rightchoice Managed Care, Inc.,** *a Missouri corporation*
4085 Campbell Avenue
Suite 100
Menlo Park, CA 94025

represented by **Christopher J. Cox**
(See above for address)

**Defendant**
----------------------
**Anthem Blue Cross Life and Health Insurance Company**
555 California Street
27th Floor
San Francisco, CA 94104

represented by **Christopher J. Cox**
(See above for address)

**Defendant**
----------------------
**California Physicians Service,** *all California corporation*
825 Eighth Avenue
New York, NY 10019
*dba* **Blue Shield of California**

represented by **California Physicians Service**
PRO SE

**Defendant**
----------------------
**The Blue Cross and Blue Shield Association,** *an Illinois corporation*
555 California Street
27th Floor
San Francisco, CA 94104

represented by **Michael P. Esser**
(See above for address)

**Zachary Holmstead**
Kirkland & Ellis LLP
300 North Lasalle
Chicago, IL 60654
312-862-2392
Email: zachary.holmstead@kirkland.com

**Tobias S. Keller**

Keller Benvenutti Kim LLP
650 California St. #1900
San Francisco, CA 94108
(415) 796-0709
Email: tkeller@kellerbenvenutti.com

**Daniel Edward Laytin**
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
312-862-2198
Fax : 312-862-2200
Email: daniel.laytin@kirkland.com

**Thomas B. Rupp**
Keller Benvenutti Kim LLP
650 California Street, Suite 1900
San Francisco, CA 94108
415-636-9015
Email: trupp@kbkllp.com

**David Zott**
Kirkland & Ellis LLP
300 North Lasalle
Chicago, IL 60654
312-862-2428
Email: dzott@kirkland.com


*Defendant*
-----------------------
**Highmark Inc.**                     represented by **Jeffrey J. Zeiger**
555 California Street                               (See above for address)
27th Floor
San Francisco, CA 94104
*dba* **Highmark Blue Shield**


*Defendant*
-----------------------
**Highmark Blue Cross Blue Shield**   represented by **Highmark Blue Cross Blue Shield**
555 California Street                               PRO SE
27th Floor
San Francisco, CA 94104


*Defendant*
-----------------------
**Blue Cross and Blue Shield of Illinois**   represented by **Jeffrey J. Zeiger**
555 California Street                                     (See above for address)

27th Floor
San Francisco, CA 94104


*Defendant*
-----------------------
**Highmark BCBSD, Inc.**      represented by **Jeffrey J. Zeiger**
555 California St. 27th Fl        (See above for address)
San Francisco, CA 94101

| Filing Date | # | Docket Text |
|---|---|---|
| 09/22/2021 | **1** (498 pgs; 5 docs) | 01 (Determination of removed claim or cause) Complaint by Plaintiffs against Defendants . Fee Amount $350. (Attachments: # **1** Exhibit Exhibit A # **2** Exhibit Exhibit B # **3** Exhibit Exhibit C # **4** AP Cover Sheet) (Esser, Michael). CORRECTIVE ENTRY: Clerk modified plaintiff and defendant names, party text, and DBA's to reflect the state court summons. Modified on 9/24/2021 (klr). (Entered: 09/22/2021) |
| 09/22/2021 | | Receipt of filing fee for Complaint( 21-04034) [cmp,cmp] ( 350.00). Receipt number A31538478, amount $ 350.00 (re: Doc# **1** Complaint) (U.S. Treasury) (Entered: 09/22/2021) |
| 09/22/2021 | **2** (7 pgs; 2 docs) | Statement of Corporate Ownership of Defendants Lifetime Healthcare, Inc. and Excellus Healthcare, Inc., d/b/a Excellus BlueCross BlueShield . Filed by Defendants EXCELLUS HEALTH PLAN, INC. d/b/a EXCELLUS BLUECROSS BLUESHIELD, LIFETIME HEALTHCARE, INC. (Attachments: # **1** Exhibit A Certificate of Service) (Brar, Danisha) DEFECTIVE ENTRY: Incorrect event code selected. Modified on 9/23/2021 (ka). (Entered: 09/22/2021) |
| 09/22/2021 | **3** (6 pgs) | Corporate Disclosure Statement. Filed by Defendant USABLE MUTUAL INSURANCE COMPANY d/b/a ARKANSAS BLUE CROSS AND BLUE SHIELD (Moses, Shane) (Entered: 09/22/2021) |
| 09/22/2021 | **4** (6 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS & BLUE SHIELD OF MISSISSIPPI (Moses, Shane) (Entered: 09/22/2021) |
| 09/22/2021 | **5** (6 pgs) | Document: *Defendant Blue Cross Blue Shield Association's Corporate Ownership Statement.*. Filed by Defendant BLUE CROSS AND BLUE SHIELD ASSOCIATION (Esser, Michael) DEFECTIVE ENTRY: Incorrect event code selected. Modified on 9/23/2021 (ka). (Entered: |

| | | |
|---|---|---|
| | | 09/22/2021) |
| 09/22/2021 | **6**<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendant CARING OR MONTANANS, INC. (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **7**<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant HAWAII MEDICAL SERVICE ASSOCIATION d/b/a BLUE CROSS AND BLUE SHIELD OF HAWAII (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **8**<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant TRIPLE-S MANAGEMENT CORPORATION (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **9**<br>(6 pgs) | Corporate Disclosure Statement. Corporate Parent, Triple-S Management Corporation has been added. Filed by Defendant TRIPLE-S SALUD, INC. (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **10**<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendants WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA, WELLMARK, INC. (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **11**<br>(6 pgs) | Corporate Disclosure Statement. Corporate Parent, Wellmark, Inc. has been added. Filed by Defendant WELLMARK OF SOUTH DAKOTA, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF SOUTH DAKOTA (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **12**<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendants BLUE CROSS AND BLUE SHIELD OF ILLINOIS, BLUE CROSS AND BLUE SHIELD OF MONTANA, BLUE CROSS AND BLUE SHIELD OF NEW MEXICO, BLUE CROSS AND BLUE SHIELD OF OKLAHOMA, BLUE CROSS AND BLUE SHIELD OF TEXAS, INC., HEALTH CARE SERVICE CORPORATION (Esser, Michael) (Entered: 09/22/2021) |
| 09/22/2021 | **13**<br>(7 pgs) | Corporate Disclosure Statement. Corporate Parent, Highmark Health has been added. Filed by Defendants HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE, HIGHMARK INC. d/b/a HIGHMARK BLUE SHIELD, HIGHMARK WEST VIRGINIA INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD WEST VIRGINIA (Esser, Michael) (Entered: 09/22/2021) |

| | | | |
|---|---|---|---|
| | | [14](#)<br>(8 pgs) | Corporate Disclosure Statement. Filed by Defendants ANTHEM BLUE CROSS AND BLUE SHIELD OF NEVADA, ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, ANTHEM HEALTH PLANS OF KENTUCKY, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF KENTUCKY, ANTHEM HEALTH PLANS OF MAINE, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF MAINE, ANTHEM HEALTH PLANS OF NEW HAMPSHIRE, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF NEW HAMPSHIRE, ANTHEM HEALTH PLANS OF VIRGINIA, INC., d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF VIRGINIA, INC., ANTHEM HEALTH PLANS, INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF CONNECTICUT, ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF INDIANA, ANTHEM, INC. f/k/a WELLPOINT, INC. d/b/a ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, AWARE INTEGRATED, INC., BCBSM, INC. d/b/a BLUE CROSS AND BLUE SHIELD OF MINNESOTA, BLUE CROSS & BLUE SHIELD OF RHODE ISLAND, BLUE CROSS AND BLUE SHIELD OF GEORGIA, BLUE CROSS AND BLUE SHIELD OF VERMONT, BLUE CROSS BLUE SHIELD OF SOUTH CAROLINA, BLUE CROSS BLUE SHIELD OF WISCONSIN, d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF WISCONSIN, BLUE CROSS OF CALIFORNIA, CAMBIA HEALTH SOLUTIONS, INC., COMMUNITY INSURANCE COMPANY d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF OHIO, COMPCARE HEALTH SERVICES INSURANCE CORPORATION, EMPIRE HEALTHCHOICE ASSURANCE, INC. d/b/a EMPIRE BLUE CROSS BLUE SHIELD, HEALTHY ALLIANCE LIFE INSURANCE COMPANY, HMO MISSOURI INC., d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF MISSOURI, HORIZON HEALTHCARE SERVICES, INC. d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY d/b/a BLUE CROSS AND BLUE SHIELD OF LOUISIANA, REGENCE BLUE CROSS BLUE SHIELD OF OREGON, REGENCE BLUE CROSS BLUE SHIELD OF UTAH, REGENCE BLUE SHIELD (WASHINGTON), REGENCE BLUESHIELD OF IDAHO, INC., RIGHTCHOICE MANAGED CARE, INC., ROCKY MOUNTAIN HOSPITAL & MEDICAL SERVICE INC. d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF COLORADO (Cox, Christopher) (Entered: 09/22/2021) |
| | 09/22/2021 | | |

| | | |
|---|---|---|
| 09/22/2021 | [15](#)<br>(3 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS BLUE SHIELD OF ARIZONA, INC. (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [16](#)<br>(3 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS AND BLUE SHIELD OF KANSAS CITY (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [17](#)<br>(3 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS AND BLUE SHIELD OF KANSAS, INC. (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [18](#)<br>(3 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS BLUE SHIELD OF WYOMING (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [19](#)<br>(3 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS OF IDAHO HEALTH SERVICE, INC. d/b/a BLUE CROSS OF IDAHO (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [20](#)<br>(3 pgs) | Corporate Disclosure Statement. Corporate Parent, GoodLife Solutions, Inc. has been added. Filed by Defendants BLUE CROSS AND BLUE SHIELD OF NEBRASKA, GOODLIFE PARTNERS, INC. (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [21](#)<br>(3 pgs) | Corporate Disclosure Statement. Filed by Defendant HEALTHNOW SYSTEMS, INC. (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [22](#)<br>(3 pgs) | Corporate Disclosure Statement. Corporate Parent, Healthy Dakota Mutual Holdings has been added. Filed by Defendants BLUE CROSS BLUE SHIELD OF NORTH DAKOTA, HEALTHYDAKOTA MUTUAL HOLDINGS (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [23](#)<br>(3 pgs) | Corporate Disclosure Statement. Corporate Parent, Highmark Health, Highmark Inc. has been added. Filed by Defendant HEALTHNOW NEW YORK, INC. d/b/a BLUECROSS BLUESHIELD OF WESTERN NEW YORK (Suarez, Rebecca) (Entered: 09/22/2021) |
| 09/22/2021 | [24](#)<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS AND BLUE SHIELD OF ALABAMA (dmf) (Entered: 09/23/2021) |

| | | |
|---|---|---|
| 09/22/2021 | 25<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC. (dmf) (Entered: 09/23/2021) |
| 09/22/2021 | 26<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, INC. (dmf) (Entered: 09/23/2021) |
| 09/22/2021 | 27<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUECROSS BLUESHIELD OF TENNESSEE, INC. (dmf) (Entered: 09/23/2021) |
| 09/22/2021 | 28<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant CALIFORNIA PHYSICIANS SERVICE d/b/a BLUE SHIELD OF CALIFORNIA (dmf) (Entered: 09/23/2021) |
| 09/22/2021 | 29<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendants CAREFIRST BLUECHOICE, INC. , CAREFIRST OF MARYLAND, INC. , CAREFIRST, INC. , GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC. (dmf) (Entered: 09/23/2021) |
| 09/22/2021 | 30<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendants BLUE CROSS AND BLUE SHIELD OF FLORIDA, INC. , GUIDEWELL MUTUAL HOLDING CORPORATION (dmf) (Entered: 09/23/2021) |
| 09/22/2021 | 31<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendant CAPITAL BLUE CROSS (dmf) (Entered: 09/23/2021) |
| 09/23/2021 | 32<br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of Good Standing) (Holmstead, Zachary) (Entered: 09/23/2021) |
| 09/23/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31540638, amount $ 317.00 (re: Doc# 32 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/23/2021) |
| 09/23/2021 | 33<br>(7 pgs) | Corporate Disclosure Statement. Filed by Defendants PREMERA BLUE CROSS, PREMERA BLUE CROSS BLUE SHIELD OF ALASKA (Smith, James) (Entered: 09/23/2021) |

| | | |
|---|---|---|
| 09/23/2021 | 34<br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of Good Standing) (Laytin, Daniel) (Entered: 09/23/2021) |
| 09/23/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31540794, amount $ 317.00 (re: Doc# 34 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/23/2021) |
| 09/23/2021 | 35<br>(4 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of Good Standing) (Zeiger, Jeffrey) (Entered: 09/23/2021) |
| 09/23/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31540853, amount $ 317.00 (re: Doc# 35 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/23/2021) |
| 09/23/2021 | 36<br>(4 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of Good Standing) (Witt, Helen) (Entered: 09/23/2021) |
| 09/23/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31541322, amount $ 317.00 (re: Doc# 36 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/23/2021) |
| 09/23/2021 | 37<br>(6 pgs) | Corporate Disclosure Statement. Filed by Defendant BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY (Cove, John) (Entered: 09/23/2021) |
| 09/23/2021 | 38<br>(6 pgs) | Notice of Appearance and Request for Notice *of Lawrence Ng and Mark Punzalan, Chan Punzalan LLP,* by Jane Kim. Filed by Defendants EXCELLUS HEALTH PLAN, INC. d/b/a EXCELLUS BLUECROSS BLUESHIELD, LIFETIME HEALTHCARE, INC. (Kim, Jane) (Entered: 09/23/2021) |
| 09/24/2021 | 39<br>(2 pgs; 2 docs) | Order to File Required Documents and Notice of Automatic Dismissal. Incomplete Filings due by 10/8/2021. (klr) (Entered: 09/24/2021) |

| | | |
|---|---|---|
| 09/24/2021 | 40 | Notice of **Status Conference scheduled for 12/3/2021 at 11:00 AM via Tele/Videoconference - www.canb.uscourts.gov/calendars.** NOTE: Please disregard and refer to document #41. (klr) (Entered: 09/24/2021) |
| 09/24/2021 | 41 (1 pg) | Notice of **Status Conference scheduled for 12/3/2021 at 11:00 AM via Tele/Videoconference - www.canb.uscourts.gov/calendars.** . (klr) (Entered: 09/24/2021) |
| 09/24/2021 | 42 (38 pgs; 4 docs) | Notice Regarding *Errata* (RE: related document(s)1 Complaint filed by Defendant California Physcians Service, Defendant Blue Cross of California, Defendant Blue Cross and Blue Shield of Alabama, Defendant Premera, Defendant Premera Blue Cross, Defendant Blue Cross Blue Shield of Arizona, Inc., Defendant Usable Mutual Insurance Company, Defendant Anthem, Inc., Defendant Anthem Health Plans, Inc., Defendant Rocky Mountain Hospital & Medical Service Inc., Defendant Anthem Blue Cross and Blue Shield of Nevada, Defendant Anthem Insurance Companies, Inc., Defendant Anthem Health Plans of Kentucky, Inc., Defendant Anthem Health Plans of Maine, Inc., Defendant HMO Missouri Inc., Defendant Healthy Alliance Life Insurance Company, Defendant Anthem Health Plans of New Hampshire, Inc., Defendant Empire Healthchoice Assurance, Inc., Defendant Community Insurance Company, Defendant Anthem Health Plans of Virginia, Inc., Defendant Blue Cross Blue Shield of Wisconsin, Defendant Compare Health Services Insurance Corporation, Defendant Highmark Health Services, Defendant Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania, Defendant Highmark Blue Cross Blue Shield Delaware Inc., Defendant Highmark West Virginia Inc., Defendant Carefirst, Inc., Defendant Group Hospitalization and Medical Services, Inc., Defendant Carefirst, Inc., Defendant Carefirst Bluechoice, Inc., Defendant Guidewell Mutual Holding Corporation, Defendant Blue Cross and Blue Shield of Florida, Inc., Defendant Hawaii Medical Service Association, Defendant Regence Blueshield of Idaho, Inc., Defendant Blue Cross of Idaho Health Service, Inc., Defendant Cambia Health Solutions, Inc., Defendant Regence Blue Cross Blue Shield of Oregon, Defendant Regence Blue Cross Blue Shield of Utah, Defendant Regence Blue Shield (Washington), Defendant Blue Cross and Blue Shield of Montana, Defendant Caring for Montanans, Inc., Defendant Blue Cross and Blue Shield of New Mexico, Defendant Blue Cross and Blue Shield of Oklahoma, Defendant Blue Cross |

| | | |
|---|---|---|
| | | and Blue Shield of Texas, Inc., Defendant Wellmark, Inc., Defendant Wellmark Blue Cross and Blue Shield of Iowa, Defendant Wellmark of South Dakota, Inc., Defendant Blue Cross and Blue Shield of Kansas, Inc., Defendant Louisiana Health Service & Indemnity Company, Defendant Blue Cross and Blue Shield of Massachusetts, Inc., Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company, Defendant Aware Integrated, Inc., Defendant BCBSM, Inc., Defendant Blue Cross & Blue Shield of Mississippi, Defendant Blue Cross and Blue Shield of Kansas City, Defendant Goodlife Partners, Inc., Defendant Blue Cross and Blue Shield of Nebraska, Defendant Horizon Healthcare Services Inc., Defendant Healthnow Systems, Inc., Defendant Healthnow New York, Inc., Defendant Lifetime Healthcare, Inc., Defendant Excellus Health Plan, Inc., Defendant Blue Cross and Blue Shield of North Carolina Inc., Defendant Noridian Mutual Insurance Company, Defendant Healthydakota Mutual Holdings, Defendant Capital Blue Cross, Defendant Independence Health Group, Inc., Defendant Independence Hospital Indemnity Plan, Inc., Defendant Triple-S Management Corporation, Defendant Triple-S Salud, Inc., Defendant Blue Cross & Blue Shield of Rhode Island, Defendant Blue Cross Blue Shield of South Carolina, Defendant Bluecross Blueshield of Tennessee, Inc., Defendant Blue Cross and Blue Shield of Vermont, Defendant Blue Cross Blue Shield of Wyoming, Defendant Blue Cross and Blue Shield Association, Defendant Anthem Blue Cross Life and Health Insurance Company, Defendant Blue Cross and Blue Shield of Georgia, Defendant Carefirst of Maryland, Inc., Defendant Health Care Service Corporation, Defendant Rightchoice Managed Care, Inc.). Filed by Defendant Blue Cross and Blue Shield Association. (Attachments: # 1 Exhibit A # 2 Index B # 3 Exhibit C) (Esser, Michael) (Entered: 09/24/2021) |
| 09/24/2021 | 43<br>(609 pgs; 2 docs) | Notice Regarding *Notice of Potential Tag-Along* Filed by Defendant Blue Cross and Blue Shield Association. (Attachments: # 1 Exhibit A) (Esser, Michael) (Entered: 09/24/2021) |
| 09/26/2021 | 44<br>(3 pgs) | BNC Certificate of Mailing (RE: related document(s) 39 Order to File Missing Documents). Notice Date 09/26/2021. (Admin.) (Entered: 09/26/2021) |
| 09/27/2021 | 45<br>(2 pgs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Zott, David) (Entered: 09/27/2021) |

| | | |
|---|---|---|
| 09/27/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31545984, amount $ 317.00 (re: Doc# 45 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/27/2021) |
| 09/27/2021 | 46 (6 pgs) | Notice of Appearance and Request for Notice by John Cove Jr. Filed by Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company (Cove, John) (Entered: 09/27/2021) |
| 09/27/2021 | 47 (3 pgs) | Corporate Disclosure Statement. Filed by Defendants Independence Health Group, Inc., Independence Hospital Indemnity Plan, Inc. (Bitton, Daniel) (Entered: 09/27/2021) |
| 09/28/2021 | 48 (6 pgs) | Notice of Change of Address Filed by Defendant Usable Mutual Insurance Company (Moses, Shane) (Entered: 09/28/2021) |
| 09/28/2021 | 49 (8 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing) (Clark, Anna) (Entered: 09/28/2021) |
| 09/28/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31547661, amount $ 317.00 (re: Doc# 49 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/28/2021) |
| 09/28/2021 | 50 (8 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing) (Schmidt, John) (Entered: 09/28/2021) |
| 09/28/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number C31547703, amount $ 317.00 (re: Doc# 50 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/28/2021) |
| 09/28/2021 | 51 (8 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing) (Bloomberg, Edward) (Entered: 09/28/2021) |
| 09/28/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31547723, amount $ 317.00 (re: |

| | | |
|---|---|---|
| | | Doc# <u>51</u> Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/28/2021) |
| 09/28/2021 | <u>52</u><br>(4 pgs; 2 docs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # <u>45</u> Application for Admission of Attorney Pro Hac Vice (Zott, David) ). (ds) (Entered: 09/28/2021) |
| 09/28/2021 | <u>53</u><br>(4 pgs; 2 docs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # <u>36</u> Application for Admission of Attorney Pro Hac Vice (Witt, Helen) ). (ds) (Entered: 09/28/2021) |
| 09/28/2021 | <u>54</u><br>(4 pgs; 2 docs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # <u>35</u> Application for Admission of Attorney Pro Hac Vice (Zeiger, Jeffrey)). (ds) (Entered: 09/28/2021) |
| 09/28/2021 | <u>55</u><br>(4 pgs; 2 docs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # <u>34</u> Application for Admission of Attorney Pro Hac Vice (Laytin, Daniel) ). (ds) (Entered: 09/28/2021) |
| 09/29/2021 | <u>56</u><br>(8 pgs) | Joint Stipulation to Extend Time *to Answer or Otherwise Respond to the Complaint and to Accept Electronic Service* Filed by Defendant The Blue Cross and Blue Shield Association. (Esser, Michael) (Entered: 09/29/2021) |
| 09/29/2021 | <u>57</u><br>(4 pgs) | Declaration of Zachary D. Holmstead in Support of *Joint Stipulation to Enlarge Time to Answer or Otherwise Respond to the Complaint and Accept Electronic Service* (RE: related document(s)<u>56</u> Stipulation to Extend Time). Filed by Defendant The Blue Cross and Blue Shield Association (Esser, Michael) (Entered: 09/29/2021) |
| 09/29/2021 | <u>58</u><br>(4 pgs; 2 docs) | United States Judicial Panel on Multidistrict Litigation - Conditional Transfer Order (CTO-36) (trw) (Entered: 09/29/2021) |
| 09/29/2021 | <u>59</u><br>(4 pgs; 2 docs) | Order Granting Joint Stipulation to Enlarge Time to Answer or Otherwise Respond to the Complaint and to Accept Electronic Service (RE: related document(s)<u>56</u> Stipulation to Extend Time filed by Defendant The Blue Cross and Blue Shield Association). (ds) (Entered: 09/29/2021) |
| 09/29/2021 | <u>60</u><br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # <u>1</u> Certificate of Good Standing) (Sooy, Kathleen) Modified on 9/30/2021 NOTE: |

| | | |
|---|---|---|
| | | Incorrect PDF attached on pages 1-2 (dc). (Entered: 09/29/2021) |
| 09/29/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31551441, amount $ 317.00 (re: Doc# 60 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/29/2021) |
| 09/30/2021 | 61<br>(3 pgs; 2 docs) | Application for Pro Hac Vice (RE: related document(s)60 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317). (Attachments: # 1 Certificate of Good Standing) (Sooy, Kathleen) NOTE: Clerk modified docket text to remove the word amended. (Entered: 09/30/2021) |
| 09/30/2021 | 62<br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing) (Roman, Tracy) (Entered: 09/30/2021) |
| 09/30/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31552310, amount $ 317.00 (re: Doc# 62 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/30/2021) |
| 09/30/2021 | 63<br>(4 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing) (Costello, Honor) (Entered: 09/30/2021) |
| 09/30/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31552693, amount $ 317.00 (re: Doc# 63 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/30/2021) |
| 09/30/2021 | 64<br>(4 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing) (Gilbert, Sarah) (Entered: 09/30/2021) |
| 09/30/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31552855, amount $ 317.00 (re: Doc# 64 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/30/2021) |

| | | |
|---|---|---|
| 09/30/2021 | 65<br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of Good Standing) (Maier, Jeny) (Entered: 09/30/2021) |
| 09/30/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31552890, amount $ 317.00 (re: Doc# 65 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 09/30/2021) |
| 09/30/2021 | 66<br>(4 pgs; 2 docs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # 32 Application for Admission of Attorney Pro Hac Vice (Holmstead, Zachary)). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | 67<br>(5 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice for Anna Mercado Clark (Related Doc # 49 Application for Admission of Attorney Pro Hac Vice ). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | 68<br>(5 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice for John G. Schmidt, Jr. (Related Doc # 50 Application for Admission of Attorney Pro Hac Vice). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | 69<br>(5 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice for Edward Bloomberg (Related Doc # 51 Application for Admission of Attorney Pro Hac Vice). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | 70<br>(3 pgs) | Order Granting Application for Attorney Pro Hac Vice (Related Doc # 61 Application for Pro Hac Vice (RE: related document(s)60 Application for Admission of Attorney Pro Hac Vice (Sooy, Kathleen)) (ds) (Entered: 09/30/2021) |
| 09/30/2021 | 71<br>(3 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # 62 Application for Admission of Attorney Pro Hac Vice (Roman, Tracy)). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | 72<br>(3 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # 63 Application for Admission of Attorney Pro Hac Vice (Costello, Honor) ). (ds) (Entered: 09/30/2021) |

| | | |
|---|---|---|
| 09/30/2021 | [73](#)<br>(3 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # 64 Application for Admission of Attorney Pro Hac Vice (Gilbert, Sarah) ). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | [74](#)<br>(2 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # 65 Application for Admission of Attorney Pro Hac Vice (Maier, Jeny) ). (ds) (Entered: 09/30/2021) |
| 09/30/2021 | [75](#)<br>(413 pgs; 5 docs) | Motion to Stay *Proceedings Pending Final Ruling by the Judicial Panel on Multidistrict Litigation* Filed by Defendant The Blue Cross and Blue Shield Association. (Attachments: # 1 Memorandum In Support # 2 Exhibit A # 3 Exhibit B # 4 Exhibit C) (Esser, Michael) (Entered: 09/30/2021) |
| 09/30/2021 | [76](#)<br>(4 pgs) | Notice Regarding *Opportunity for Hearing on Motion to Stay Proceedings Pending Final Ruling by the Judicial Panel on Multidistrict Litigation* (RE: related document(s)75 Motion to Stay filed by Defendant The Blue Cross and Blue Shield Association). Filed by Defendant The Blue Cross and Blue Shield Association. (Esser, Michael) DEFECTIVE ENTRY: Incorrect event code selected. Modified on 10/4/2021 (dmf). (Entered: 09/30/2021) |
| 09/30/2021 | [77](#)<br>(5 pgs) | BNC Certificate of Mailing - Electronic Order (RE: related document(s) 52 Order on Application for Admission of Attorney Pro Hac Vice). Notice Date 09/30/2021. (Admin.) (Entered: 09/30/2021) |
| 09/30/2021 | [78](#)<br>(5 pgs) | BNC Certificate of Mailing - Electronic Order (RE: related document(s) 53 Order on Application for Admission of Attorney Pro Hac Vice). Notice Date 09/30/2021. (Admin.) (Entered: 09/30/2021) |
| 09/30/2021 | [79](#)<br>(5 pgs) | BNC Certificate of Mailing - Electronic Order (RE: related document(s) 54 Order on Application for Admission of Attorney Pro Hac Vice). Notice Date 09/30/2021. (Admin.) (Entered: 09/30/2021) |
| 09/30/2021 | [80](#)<br>(5 pgs) | BNC Certificate of Mailing - Electronic Order (RE: related document(s) 55 Order on Application for Admission of Attorney Pro Hac Vice). Notice Date 09/30/2021. (Admin.) (Entered: 09/30/2021) |
| 10/01/2021 | [81](#)<br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of |

| | | |
|---|---|---|
| | | Good Standing) (Briggs, John) (Entered: 10/01/2021) |
| 10/01/2021 | 82<br>(3 pgs; 2 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Exhibit Certificate of Good Standing) (Briggs, John) Note: This is a duplicate entry to docket #81. Fee will be voided. Modified on 10/1/2021 (jf). (Entered: 10/01/2021) |
| 10/01/2021 | | **COURT ENTRY**PAYMENT DUE STATUS VOIDED-. (Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( $317.00)) NO FEE DUE. Reason: Duplicate Document Filed In Error (dts) (Entered: 10/01/2021) |
| 10/01/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number A31555526, amount $ 317.00 (re: Doc# 81 Application for Admission of Attorney Pro Hac Vice . Fee Amount $317) (U.S. Treasury) (Entered: 10/01/2021) |
| 10/01/2021 | 83<br>(108 pgs; 5 docs) | Notice of Hearing *on Plaintiff's Motion to Remand* (RE: related document(s)1 Complaint filed by Defendant California Physcians Service, Defendant Blue Cross of California, Defendant Blue Cross and Blue Shield of Alabama, Defendant Premera, Defendant Premera Blue Cross, Defendant Blue Cross Blue Shield of Arizona, Inc., Defendant Usable Mutual Insurance Company, Defendant Anthem, Inc., Defendant Anthem Health Plans, Inc., Defendant Rocky Mountain Hospital & Medical Service Inc., Defendant Anthem Blue Cross and Blue Shield of Nevada, Defendant Anthem Insurance Companies, Inc., Defendant Anthem Health Plans of Kentucky, Inc., Defendant Anthem Health Plans of Maine, Inc., Defendant HMO Missouri Inc., Defendant Healthy Alliance Life Insurance Company, Defendant Anthem Health Plans of New Hampshire, Inc., Defendant Empire Healthchoice Assurance, Inc., Defendant Community Insurance Company, Defendant Anthem Health Plans of Virginia, Inc., Defendant Blue Cross Blue Shield of Wisconsin, Defendant Compare Health Services Insurance Corporation, Defendant Highmark Health Services, Defendant Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania, Defendant Highmark Blue Cross Blue Shield Delaware Inc., Defendant Highmark West Virginia Inc., Defendant Carefirst, Inc., Defendant Group Hospitalization and Medical Services, Inc., Defendant Carefirst, Inc., Defendant Carefirst Bluechoice, Inc., Defendant Guidewell Mutual Holding Corporation, Defendant Blue Cross and |

Blue Shield of Florida, Inc., Defendant Hawaii Medical Service Association, Defendant Regence Blueshield of Idaho, Inc., Defendant Blue Cross of Idaho Health Service, Inc., Defendant Cambia Health Solutions, Inc., Defendant Regence Blue Cross Blue Shield of Oregon, Defendant Regence Blue Cross Blue Shield of Utah, Defendant Regence Blue Shield (Washington), Defendant Blue Cross and Blue Shield of Montana, Defendant Caring for Montanans, Inc., Defendant Blue Cross and Blue Shield of New Mexico, Defendant Blue Cross and Blue Shield of Oklahoma, Defendant Blue Cross and Blue Shield of Texas, Inc., Defendant Wellmark, Inc., Defendant Wellmark Blue Cross and Blue Shield of Iowa, Defendant Wellmark of South Dakota, Inc., Defendant Blue Cross and Blue Shield of Kansas, Inc., Defendant Louisiana Health Service & Indemnity Company, Defendant Blue Cross and Blue Shield of Massachusetts, Inc., Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company, Defendant Aware Integrated, Inc., Defendant BCBSM, Inc., Defendant Blue Cross & Blue Shield of Mississippi, Defendant Blue Cross and Blue Shield of Kansas City, Defendant Goodlife Partners, Inc., Defendant Blue Cross and Blue Shield of Nebraska, Defendant Horizon Healthcare Services Inc., Defendant Healthnow Systems, Inc., Defendant Healthnow New York, Inc., Defendant Lifetime Healthcare, Inc., Defendant Excellus Health Plan, Inc., Defendant Blue Cross and Blue Shield of North Carolina Inc., Defendant Noridian Mutual Insurance Company, Defendant Healthydakota Mutual Holdings, Defendant Capital Blue Cross, Defendant Independence Health Group, Inc., Defendant Independence Hospital Indemnity Plan, Inc., Defendant Triple-S Management Corporation, Defendant Triple-S Salud, Inc., Defendant Blue Cross & Blue Shield of Rhode Island, Defendant Blue Cross Blue Shield of South Carolina, Defendant Bluecross Blueshield of Tennessee, Inc., Defendant Blue Cross and Blue Shield of Vermont, Defendant Blue Cross Blue Shield of Wyoming, Defendant Blue Cross and Blue Shield of Georgia, Defendant Carefirst of Maryland, Inc., Defendant Health Care Service Corporation, Defendant Rightchoice Managed Care, Inc.). **Hearing to be held on 10/29/2021 at 11:00 AM** (check with court for location). Filed by *Plaintiffs Prime Healthcare Foundation, Inc., Prime Healthcare Management Inc., Prime Healthcare Services, Inc., VHS Liquidating Trust.* (Attachments: # 1 MOTION TO REMAND # 2 Declaration of Patrick Ryan ISO Plaintiffs' Moton for Remand # 3 Exhibit 1 to Ryan Declaration # 4 Exhibit 2 to Ryan Declaration) (Towle, C.) DEFECTIVE ENTRY: Hearing location on the PDF page #2. does not correspond to information entered on the docket. Modified on 10/4/2021 (jmb). (Entered:

| | | |
|---|---|---|
| | | 10/01/2021) |
| 10/01/2021 | 84<br>(2 pgs) | Corporate Disclosure Statement. Filed by Plaintiffs Prime Healthcare Foundation, Inc., Prime Healthcare Management Inc., Prime Healthcare Services, Inc. (Towle, C.) (Entered: 10/01/2021) |
| 10/01/2021 | 85<br>(2 pgs) | Order Granting Application for Admission of Attorney Pro Hac Vice (Related Doc # 81 Application for Admission of Attorney Pro Hac Vice (Briggs, John)). (ds) (Entered: 10/01/2021) |
| 10/01/2021 | 86<br>(5 pgs) | BNC Certificate of Mailing - Electronic Order (RE: related document(s) 58 Order). Notice Date 10/01/2021. (Admin.) (Entered: 10/01/2021) |
| 10/01/2021 | 87<br>(5 pgs) | BNC Certificate of Mailing (RE: related document(s) 59 Order on Stipulation). Notice Date 10/01/2021. (Admin.) (Entered: 10/01/2021) |
| 10/02/2021 | 88<br>(5 pgs) | BNC Certificate of Mailing - Electronic Order (RE: related document(s) 66 Order on Application for Admission of Attorney Pro Hac Vice). Notice Date 10/02/2021. (Admin.) (Entered: 10/02/2021) |
| 10/04/2021 | 89<br>(4 pgs; 2 docs) | Certificate of Service *Regarding Notice of Status Conference in a Case Removed to Bankruptcy Court* (RE: related document(s)41 Notice of Status Conference). Filed by Defendant The Blue Cross and Blue Shield Association (Attachments: # 1 Exhibit 1) (Esser, Michael) (Entered: 10/04/2021) |
| 10/04/2021 | 90<br>(4 pgs) | Notice of Hearing *on Motion to Stay Proceedings Pending Final Ruling by the Judicial Panel on Multidistrict Litigation* (RE: related document(s)75 Motion to Stay filed by Defendant The Blue Cross and Blue Shield Association). **Hearing scheduled for 10/29/2021 at 11:00 AM via Tele/Videoconference - www.canb.uscourts.gov/calendars.** Filed by Defendant The Blue Cross and Blue Shield Association. (Esser, Michael) (Entered: 10/04/2021) |
| 10/07/2021 | 91<br>(3 pgs; 3 docs) | Application for Admission of Attorney Pro Hac Vice . Fee Amount $317 (Attachments: # 1 Certificate of Good Standing # 2 Order Granting Application for Admission of Attorney Pro Hac Vice) (Stenerson, Todd) (Entered: 10/07/2021) |
| 10/07/2021 | | Receipt of filing fee for Application for Admission of Attorney Pro Hac Vice( 21-04034) [motion,mprohac] ( 317.00). Receipt number B31564773, amount $ 317.00 (re: Doc# 91 Application for Admission of Attorney Pro Hac Vice |

| | | |
|---|---|---|
| | | . Fee Amount $317) (U.S. Treasury) (Entered: 10/07/2021) |
| 10/11/2021 | | Returned Mail: Mail originally sent on 10/01/2021 returned as undeliverable. Returned Mail: The following order sent to Blue Cross and Blue Shield of Montana 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Blue Cross and Blue Shield of New Mexico 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Blue Cross and Blue Shield of Oklahoma 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Blue Cross and Blue Shield of Texas, Inc. 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Wellmark Blue Cross and Blue Shield of Iowa 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); (Entered: 10/11/2021) |
| 10/12/2021 | 92 (3 pgs) | Notice Regarding *Notice of Appearance and Request for Notice* Filed by Defendant The Blue Cross and Blue Shield Association. (Rupp, Thomas). NOTE:Incorrect docket event selected. Modified on 10/13/2021 (klr). (Entered: 10/12/2021) |
| 10/12/2021 | 93 (3 pgs) | Notice Regarding *Notice of Appearance and Request for Notice* Filed by Defendant The Blue Cross and Blue Shield Association. (Keller, Tobias). NOTE:Incorrect docket event selected. Modified on 10/13/2021 (klr). (Entered: 10/12/2021) |
| 10/14/2021 | 94 (3 pgs) | Joint Stipulation to Continue Hearing *and Set Briefing Schedule re Dkt. Nos. 75 and 83* Filed by Plaintiffs Prime Healthcare Foundation, Inc., Prime Healthcare Management Inc., Prime Healthcare Services, Inc., VHS Liquidating Trust. (Towle, C.). Related document(s) 75 Motion to Stay *Proceedings Pending Final Ruling by the Judicial Panel on Multidistrict Litigation* filed by Defendant The Blue Cross and Blue Shield Association. CORRECTIVE ENTRY: Clerk added/removed linkage to document(s) #75_. Modified on 10/15/2021 (lj). (Entered: 10/14/2021) |
| 10/15/2021 | | Returned Mail: Mail originally sent on 10/01/2021 returned as undeliverable. Returned Mail: The following order sent to |

| | | |
|---|---|---|
| | | Excellus Health Plan, Inc. 22 Battery St. #810 San Francisco, CA 94111-5522 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Independence Health Group, Inc. 560 Mission Street San Francisco, CA 94105-2907 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Independence Hospital Indemnity Plan, Inc. 560 Mission Street San Francisco, CA 94105-2907 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Lifetime Healthcare, Inc. 22 Battery St. #810 San Francisco, CA 94111-5522 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); (Entered: 10/15/2021) |
| 10/18/2021 | 95 (3 pgs) | Order Setting Briefing Schedule and Continuing Hearing on Motion to Remand And Motion to Stay (RE: related document(s)75 Motion to Stay filed by Defendant The Blue Cross and Blue Shield Association, 83 Notice of Hearing filed by Plaintiff VHS Liquidating Trust, Plaintiff Prime Healthcare Services, Inc., Plaintiff Prime Healthcare Foundation, Inc., Plaintiff Prime Healthcare Management Inc., 94 Stipulation to Continue Hearing filed by Plaintiff VHS Liquidating Trust, Plaintiff Prime Healthcare Services, Inc., Plaintiff Prime Healthcare Foundation, Inc., Plaintiff Prime Healthcare Management Inc.). **Hearing scheduled for 11/12/2021 at 11:00 AM Tele/Videoconference - www.canb.uscourts.gov/calendars for 75,** . (rba) (Entered: 10/18/2021) |
| 10/18/2021 | | Returned Mail: Mail originally sent on 10/01/2021 returned as undeliverable. Returned Mail: The following order sent to Anthem Blue Cross Life and Health Insurance Compa 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Blue Cross & Blue Shield of Mississippi 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Highmark Blue Cross Blue Shield 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Highmark Blue Cross Blue Shield Delaware Inc. 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to Highmark West Virginia Inc. 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 |

| | | was returned as undeliverable: Order (ADI Administrator court); Returned Mail: The following order sent to The Blue Cross and Blue Shield Association 555 California Street 27th Floor San Francisco, CA 94104-1503 on 10/01/2021 was returned as undeliverable: Order (ADI Administrator court); (Entered: 10/18/2021) |
|---|---|---|

## PACER Service Center

### Transaction Receipt

| 10/21/2021 16:15:29 | | | |
|---|---|---|---|
| **PACER Login:** | nightsky500 | **Client Code:** | 0999-0000-TLI |
| **Description:** | Docket Report | **Search Criteria:** | 21-04034 Fil or Ent: filed From: 8/20/2021 To: 10/21/2021 Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 25 | **Cost:** | 2.50 |

1  PATRICK M. RYAN (SBN 203215)
      *pryan@bzbm.com*
2  PATRICK E. O'SHAUGHNESSY (SBN 218051)
      *poshaughnessy@bzbm.com*
3  JOHN F. MCLEAN (SBN 55914)
      *jmclean@bzbm.com*
4  OLIVER Q. DUNLAP (SBN 225566)
      *odunlap@bzbm.com*
5  SEAN R. MCTIGUE (SBN 286839)
      *smctigue@bzbm.com*
6  BARTKO ZANKEL BUNZEL & MILLER
   A Professional Law Corporation
7  One Embarcadero Center, Suite 800
   San Francisco, California 94111
8  Telephone: (415) 956-1900
   Facsimile:  (415) 956-1152
9

10  Attorneys for Plaintiffs
    VHS LIQUIDATING TRUST, PRIME
11  HEALTHCARE SERVICES, INC., PRIME
    HEALTHCARE FOUNDATION, INC., and
12  PRIME HEALTHCARE MANAGEMENT, INC.

13              SUPERIOR COURT OF THE STATE OF CALIFORNIA

14                         COUNTY OF ALAMEDA

15

16  VHS LIQUIDATING TRUST, liquidating      Case No. RG21106600
    trust for Verity Health System of California,
17  Inc., a California corporation;          **FIRST AMENDED COMPLAINT FOR
                                             VIOLATIONS OF THE CARTWRIGHT
18  PRIME HEALTHCARE SERVICES, INC., a       ACT (BUS. & PROF. CODE §§ 16720, *et
    Delaware corporation;                    seq.*), UNFAIR COMPETITION (BUS. &
19                                           PROF. CODE §§ 17200, *et seq.*), AND
    PRIME HEALTHCARE FOUNDATION,             OTHER STATE ANTITRUST LAWS**
20  INC., a Delaware corporation; and

21  PRIME HEALTHCARE MANAGEMENT,
    INC., a California corporation,
22
                 Plaintiffs,
23
            v.
24

25  BLUE CROSS OF CALIFORNIA,

26  ANTHEM BLUE CROSS LIFE AND
    HEALTH INSURANCE COMPANY, and
27
    CALIFORNIA PHYSICIANS' SERVICE
28  d/b/a BLUE SHIELD OF CALIFORNIA, all

---

2854.003/1645949.2

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

ENDORSED
FILED
ALAMEDA COUNTY

JUL 2 8 2021

CLERK OF THE SUPERIOR COURT
By _____
          Molly   Kautz
                    Deputy

1  California corporations;

2  BLUE CROSS AND BLUE SHIELD OF
   ALABAMA; an Alabama corporation;
3
   PREMERA and PREMERA BLUE CROSS,
4  also d/b/a PREMERA BLUE CROSS BLUE
   SHIELD OF ALASKA, both Washington
5  corporations;

6  BLUE CROSS BLUE SHIELD OF
   ARIZONA, INC., an Arizona corporation;
7
   USABLE MUTUAL INSURANCE
8  COMPANY d/b/a ARKANSAS BLUE
   CROSS AND BLUE SHIELD, an Arkansas
9  corporation;

10 ANTHEM, INC. f/k/a WELLPOINT, INC.
   d/b/a ANTHEM BLUE CROSS LIFE AND
11 HEALTH INSURANCE COMPANY, an
   Indiana corporation, and its subsidiaries or
12 divisions, including,

13 ANTHEM HEALTH PLANS, INC. d/b/a
   ANTHEM BLUE CROSS AND BLUE
14 SHIELD OF CONNECTICUT, a Connecticut
   corporation;
15
   BLUE CROSS AND BLUE SHIELD OF
16 GEORGIA, a Georgia corporation;

17 ROCKY MOUNTAIN HOSPITAL &
   MEDICAL SERVICE INC. d/b/a ANTHEM
18 BLUE CROSS AND BLUE SHIELD OF
   COLORADO, a Colorado corporation, and
19
   ANTHEM BLUE CROSS AND BLUE
20 SHIELD OF NEVADA, a Nevada
   corporation;
21
   ANTHEM INSURANCE COMPANIES, INC.
22 d/b/a ANTHEM BLUE CROSS BLUE
   SHIELD OF INDIANA, an Indiana
23 corporation;

24 ANTHEM HEALTH PLANS OF
   KENTUCKY, INC. d/b/a ANTHEM BLUE
25 CROSS BLUE SHIELD OF KENTUCKY, a
   Kentucky corporation;
26
   ANTHEM HEALTH PLANS OF MAINE,
27 INC. d/b/a ANTHEM BLUE CROSS AND
   BLUE SHIELD OF MAINE, a Maine
28 corporation;

1  HMO MISSOURI INC., d/b/a ANTHEM
   BLUE CROSS BLUE SHIELD OF
2  MISSOURI, a Missouri corporation;

3  RIGHTCHOICE MANAGED CARE, INC., a
   Missouri corporation;
4
   HEALTHY ALLIANCE LIFE INSURANCE
5  COMPANY, a Missouri corporation;

6  ANTHEM HEALTH PLANS OF NEW
   HAMPSHIRE, INC. d/b/a ANTHEM BLUE
7  CROSS AND BLUE SHIELD OF NEW
   HAMPSHIRE, a New Hampshire corporation;
8
   EMPIRE HEALTHCHOICE ASSURANCE,
9  INC. d/b/a EMPIRE BLUE CROSS BLUE
   SHIELD, a New York corporation;
10
   COMMUNITY INSURANCE COMPANY
11 d/b/a ANTHEM BLUE CROSS AND BLUE
   SHIELD OF OHIO, an Ohio corporation;
12
   ANTHEM HEALTH PLANS OF VIRGINIA,
13 INC., d/b/a ANTHEM BLUE CROSS AND
   BLUE SHIELD OF VIRGINIA, INC., a
14 Virginia corporation;

15 BLUE CROSS BLUE SHIELD OF
   WISCONSIN, d/b/a ANTHEM BLUE CROSS
16 AND BLUE SHIELD OF WISCONSIN, and

17 COMPCARE HEALTH SERVICES
   INSURANCE CORPORATION, both
18 Wisconsin corporations;

19 HIGHMARK HEALTH SERVICES and

20 HIGHMARK INC. d/b/a HIGHMARK BLUE
   SHIELD and
21
   HIGHMARK BLUE CROSS BLUE SHIELD
22 and including

23 HIGHMARK INC. predecessor HOSPITAL
   SERVICE ASSOCIATION OF
24 NORTHEASTERN PENNSYLVANIA f/d/b/a
   BLUE CROSS OF NORTHEASTERN
25 PENNSYLVANIA, all Pennsylvania
   corporations;
26
   HIGHMARK BLUE CROSS BLUE SHIELD
27 DELAWARE INC. d/b/a HIGHMARK BLUE
   CROSS BLUE SHIELD DELAWARE, a
28 Delaware corporation;

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

HIGHMARK WEST VIRGINIA INC. d/b/a
HIGHMARK BLUE CROSS BLUE SHIELD
WEST VIRGINIA, a West Virginia
corporation;

CAREFIRST, INC., a Maryland corporation,
and its subsidiaries or affiliates including

GROUP HOSPITALIZATION AND
MEDICAL SERVICES, INC.,

CAREFIRST OF MARYLAND, INC., and

CAREFIRST BLUECHOICE, INC., which
collectively d/b/a CAREFIRST BLUECROSS
BLUESHIELD, all Maryland corporations;

GUIDEWELL MUTUAL HOLDING
CORPORATION, a Florida corporation;

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC., a Florida corporation;

HAWAII MEDICAL SERVICE
ASSOCIATION d/b/a BLUE CROSS AND
BLUE SHIELD OF HAWAII, a Hawaii
corporation;

REGENCE BLUESHIELD OF IDAHO, INC.,
and;

BLUE CROSS OF IDAHO HEALTH
SERVICE, INC. d/b/a BLUE CROSS OF
IDAHO, both Idaho corporations;

CAMBIA HEALTH SOLUTIONS, INC., an
Oregon corporation, d/b/a REGENCE
BLUESHIELD OF IDAHO, INC.,

REGENCE BLUE CROSS BLUE SHIELD
OF OREGON,

REGENCE BLUE CROSS BLUE SHIELD
OF UTAH, and

REGENCE BLUE SHIELD
(WASHINGTON);

HEALTH CARE SERVICE
CORPORATION, an Illinois mutual legal
reserve company, an Illinois corporation d/b/a
BLUE CROSS AND BLUE SHIELD OF
ILLINOIS,

4

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

BLUE CROSS AND BLUE SHIELD OF
MONTANA, including its predecessor,
CARING FOR MONTANANS, INC.,

BLUE CROSS AND BLUE SHIELD OF
NEW MEXICO,

BLUE CROSS AND BLUE SHIELD OF
OKLAHOMA, and

BLUE CROSS AND BLUE SHIELD OF
TEXAS, INC.;

WELLMARK, INC., including its subsidiaries
and/or divisions, and

WELLMARK BLUE CROSS AND BLUE
SHIELD OF IOWA, both Iowa corporations,

WELLMARK OF SOUTH DAKOTA, INC.
d/b/a WELLMARK BLUE CROSS AND
BLUE SHIELD OF SOUTH DAKOTA, a
South Dakota corporation;

BLUE CROSS AND BLUE SHIELD OF
KANSAS, INC., a Kansas corporation;

LOUISIANA HEALTH SERVICE &
INDEMNITY COMPANY d/b/a BLUE
CROSS AND BLUE SHIELD OF
LOUISIANA, a Louisiana corporation;

BLUE CROSS AND BLUE SHIELD OF
MASSACHUSETTS, INC., a Massachusetts
corporation;

BLUE CROSS BLUE SHIELD OF
MICHIGAN MUTUAL INSURANCE
COMPANY, a Michigan corporation;

AWARE INTEGRATED, INC. and

BCBSM, INC. collectively d/b/a BLUE
CROSS AND BLUE SHIELD OF
MINNESOTA, both Minnesota corporations;

BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, a mutual insurance company;

BLUE CROSS AND BLUE SHIELD OF
KANSAS CITY, a Missouri corporation;

GOODLIFE PARTNERS, INC., and

BLUE CROSS AND BLUE SHIELD OF
NEBRASKA, both Nebraska corporations;
HORIZON HEALTHCARE SERVICES, INC.
d/b/a HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY, a New Jersey
corporation;

HEALTHNOW SYSTEMS, INC., and

HEALTHNOW NEW YORK, INC. d/b/a
BLUECROSS BLUESHIELD OF WESTERN
NEW YORK and BLUESHIELD OF
NORTHEASTERN NEW YORK, and

LIFETIME HEALTHCARE, INC. and

EXCELLUS HEALTH PLAN, INC.
collectively d/b/a EXCELLUS BLUECROSS
BLUESHIELD, all New York corporations;

BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA, INC., a North Carolina
corporation;

NORIDIAN MUTUAL INSURANCE
COMPANY and

HEALTHYDAKOTA MUTUAL HOLDINGS
collectively d/b/a BLUE CROSS BLUE
SHIELD OF NORTH DAKOTA, both North
Dakota corporations;

CAPITAL BLUE CROSS, and

INDEPENDENCE HEALTH GROUP, INC.
and

INDEPENDENCE HOSPITAL INDEMNITY
PLAN, INC. f/k/a INDEPENDENCE BLUE
CROSS, all Pennsylvania corporations;

TRIPLE-S MANAGEMENT
CORPORATION and

TRIPLE-S SALUD, INC., both Puerto Rico
corporations;

BLUE CROSS & BLUE SHIELD OF
RHODE ISLAND, a Rhode Island
corporation;

BLUE CROSS BLUE SHIELD OF SOUTH
CAROLINA, a South Carolina corporation;

1  BLUECROSS BLUESHIELD OF
   TENNESSEE, INC., a Tennessee corporation;
2
   BLUE CROSS AND BLUE SHIELD OF
3  VERMONT, a Vermont corporation;

4  BLUE CROSS BLUE SHIELD OF
   WYOMING, a Wyoming corporation;
5
   the BLUE CROSS AND BLUE SHIELD
6  ASSOCIATION, an Illinois corporation; and

7  DOES 1 through 50, inclusive,

8                    Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................. 10

A.    Statement of the Case .............................................................. 10

B.    Defendants' Violations of Law Are Extensive and Intentional ............................. 13

C.    Defendant Blues Have Been and Are Actual and Potential Competitors .............. 17

D.    Defendant Blues Have Refused to Compete With Each Other ............................. 18

E.    Defendants' Unlawful Conduct Injured Plaintiffs ................................. 22

II.   JURISDICTION AND VENUE ................................................................. 23

III.  THE PARTIES ........................................................................... 24

A.    Plaintiffs ....................................................................... 24

B.    Defendants ....................................................................... 30

C.    The Unlawful-Agreement-Stabilizing, Supporting, and Facilitating Roles of Defendant BCBSA and BHI ....................................................................... 48

IV.   FACTS ................................................................................. 54

A.    The History of the Blues: Before and After the Unlawful Agreements .................. 54

      1.    Before the Long-Term Business Strategy ....................................... 54

      2.    The Long-Term Business Strategy and Assembly of Plans ........................ 59

      3.    Defendant Blues Entered Into Unlawful Agreements .............................. 64

      4.    The Blue Card and National Accounts Programs ................................. 71

      5.    Protecting and Increasing "Differentials" ................................... 78

      6.    Differences Between the Modern Blues and Other Insurers ...................... 79

B.    Specific Examples of Defendants' Unlawful Conduct .......................... 80

      1.    The Leading Example: Alabama ................................................. 80

      2.    Restricting Competition in Pennsylvania and Ohio ............................. 90

      3.    The Market Allocation Agreement .............................................. 96

      4.    The Price-Fixing and Boycott Agreements ..................................... 100

      5.    Other Abuses ................................................................. 104

      6.    Defendants Enjoyed Unlawfully Gained and Supracompetitive Profits ........................................................................... 108

C.     Implementation of the Affordable Care Act (ACA) ............................................ 112

D.     Defendants' Unlawful Agreements Reduce Health Care Quality and Increase Health Care Costs ................................................................. 114

E.     Antitrust Injury .......................................................................................... 116

F.     Market Power and Related Considerations ............................................... 120

     1.     The Sale of Health Insurance and Related Products and Services ........... 121

     2.     The Purchase of Products and Services from Healthcare providers ........ 125

     3.     State-Specific Market Share Information ................................................. 133

V.     VIOLATIONS OF LAW ...................................................................................... 138

    FIRST COUNT: CALIFORNIA HORIZONTAL MARKET ALLOCATION ............... 138

    SECOND COUNT: CALIFORNIA HORIZONTAL PRICE FIXING AND BOYCOTT ............................................................................................... 140

    THIRD COUNT: CALIFORNIA HORIZONTAL UNLAWFUL EXCHANGE OF COMPETITIVELY SENSITIVE BUSINESS INFORMATION ........................ 141

    FOURTH COUNT: CALIFORNIA UNFAIR COMPETTIION ................................... 141

    FIFTH COUNT: ALABAMA DECEPTIVE TRADE PRACTICES ACT ..................... 143

    SIXTH COUNT: .................................................................................................... 143

    FLORIDA ANTITRUST ACT AND FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ................................................................ 143

    SEVENTH COUNT: INDIANA ANTITRUST ACT ................................................. 145

    EIGHTH COUNT: KANSAS RESTRAINT OF TRADE ACT .................................... 145

    NINTH COUNT: MICHIGAN ANTITRUST REFORM ACT ................................... 146

    TENTH COUNT: NEVADA UNFAIR TRADE PRACTICES ACT ........................... 146

    ELEVENTH COUNT: NEW JERSEY ANTITRUST ACT ......................................... 146

    TWELFTH COUNT: OHIO REV. CODE § 1331.01, *et seq.* ..................................... 147

    THIRTEENTH COUNT: RHODE ISLAND ANTITRUST ACT ................................. 147

VI.     PRAYER FOR RELIEF ........................................................................................ 147

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1

<center>**COMPLAINT**</center>

2       Plaintiffs VHS LIQUIDATING TRUST, liquidating trust for Verity Health System of

3  California, Inc. ("Verity"), and PRIME HEALTHCARE SERICES, INC. PRIME HEALTHCARE

4  FOUNDATION, INC., and PRIME HEALTHCARE MANAGEMENT, INC. (collectively,

5  "Prime") (and all four together "Plaintiffs"), on behalf of themselves, for their Complaint against

6  the above-captioned Defendants, which include the independent U.S. Blue Cross Blue Shield

7  licensees ("Defendant Blues"), and the Blue Cross and Blue Shield Association ("BCBSA" or the

8  "Association") (collectively, "Defendants," defined further below in Section III.B) allege the

9  following.

10

<center>**I.   INTRODUCTION**</center>

11  **A.   Statement of the Case**

12       1.   Powerful and wealthy commercial health insurers—Defendant Blues—entered into

13  unlawful agreements to both reduce the reimbursements they paid to U.S. healthcare providers,

14  including Plaintiffs, and simultaneously force Plaintiffs and others to pay them more to provide

15  health insurance to their employees. Non-profit plaintiff Verity, along with Prime and other

16  providers, badly needed that money to deliver high-quality health care to patients and to obtain

17  competitively priced health insurance for employees. By underpaying for reimbursements and

18  overcharging for healthcare insurance and related services, Defendant Blues caused substantial

19  harm to healthcare providers including Plaintiffs.  Verity, along with Prime, bring this action to

20  vindicate their rights and recoup the funds that wrongfully lined Defendants' already full pockets.

21       2.   Defendant Blues are all independent companies engaged in the business of

22  providing effectively the same products and services to their customers and suppliers, including

23  Plaintiffs.

24       3.   They attempted to deny these conspicuous realities approximately four years ago,

25  but an Alabama Federal Court held otherwise after careful analysis and rejected their motion for

26  summary judgment on these issues.

27       4.   Defendant Blues agreed with each other to allocate the United States into separate

28  geographic "Service Areas" in which only one Blue, or an agreed and limited number of Blues,

<center>10</center>

1  could sell health insurance, administer employee benefit plans, or contract with healthcare

2  providers (the "Market Allocation Agreement").

3      5.    In instances—like in California—where Defendant Blues agreed to limit

4  "competition" between the Blues to specific Blues (here, Anthem Blue Cross and Blue Shield of

5  California), Defendants further agreed to restrain competition. In these states, Defendants limited

6  the permitted Blues activities through the agreements outlined in this Complaint, specifically

7  including their horizontal agreements "best efforts rules" and to unlawfully exchange

8  competitively sensitive business information, which coordinated and stabilized their "competitive"

9  activities.

10      6.    Defendant Association intentionally joined and facilitated Defendant Blues'

11  unlawful horizontal agreements and other unlawful agreements with and among Defendant Blues

12  and committed numerous overt acts in substantial furtherance of Defendants' collective unlawful

13  objectives and actions.

14      7.    Anthem Blue Cross and Blue Shield of California should compete against other

15  Blues in California, but they and the other Blues unlawfully agreed with each other to prohibit this

16  competition.

17      8.    Further, Anthem Blue Cross and Blue Shield of California should compete against

18  each other in California without unlawful restraints, but they and the other Blues agreed with each

19  other to unlawfully restrain this competition as well.

20      9.    Defendants engaged, starting at least as early as 2008 and continuing into 2020, in

21  an unlawful horizontal market allocation—a *per se* violation of California's Cartwright Act—and

22  numerous other California Cartwright Act and Unfair Competition Law violations, in addition to

23  violations of other states' antitrust laws at issue in this lawsuit.

24      10.    Defendants further entered into multiple agreements among themselves to support

25  and facilitate the Market Allocation Agreement and to divide the proceeds of their unlawful

26  conduct.

27      11.    They attempted to deny the conspicuous reality that their horizontal agreements

28  were *per se* unlawful, but the same Alabama Federal Court held otherwise after careful analysis,

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

and wrote on summary judgment: "Provider and Subscriber Plaintiffs argue that the geographic market allocations constitute *per se* anticompetitive conduct…. [And] Plaintiffs have presented evidence of an aggregation of competitive restraints … which, considered together, constitute a *per se* violation of the Sherman Act."

12.     The Alabama Federal Court held "the Rule 56 evidence in the record supports the proposition that the allocation of areas was the result of" the alleged unlawful conduct.

13.     Indeed, the Alabama Federal Court noted, "an attorney representing [Blue] Anthem's predecessors expressed 'significant doubt whether, under the antitrust laws, an association like BCBSA could lawfully bar members from engaging in unbranded business outside their exclusive territories.' (Doc. # 1555–1 at 7). In light of [the governing Sherman Act precedent], that attorney's doubts were well founded."

14.     "[T]here is little question," the Alabama Federal Court held, "that, properly analyzed, [Defendants' conduct] is an output restriction. Output restrictions have been called one of the 'most important per se categories.'"  "The undisputed evidence before the court establishes that, in 2005, Defendants adopted … an output restriction on a Plan's non–Blue business." This "constitutes a *per se* violation of the Sherman Act, particularly when layered on top of other restrictions Defendants have placed on competition."

15.     ***The exact same conduct that the Alabama Federal Court held "constitutes a per se violation of the Sherman Act" is at issue in this lawsuit.***

16.     ***And the governing California Supreme Court rule is not just that "State antitrust law ordinarily is fully compatible with federal law," but also that California's "'Cartwright Act is broader in range and deeper in reach than the Sherman Act.'"***

17.     ***In other words, if it violates the Sherman Act in Alabama federal court, it violates the Cartwright Act in California state court.***

18.     The consequences of Defendants' unlawful conduct have been severe for California's healthcare providers and its purchasers of health insurance and related services, including Plaintiffs, who each sold access to their products and services to health insurers and each

1  bought products and services from health insurers at effective prices that were substantially worse
2  than they otherwise would have been but for Defendants' conduct.

3      19.    In no small part because of the unlawful conduct at issue in this Complaint,
4  Defendants' revenues and profits skyrocketed off the backs of struggling hospitals and other
5  providers.

6      20.    Defendants' unlawful conduct dramatically diminished the capacity of hospitals
7  and other providers to, among other things: (a) improve their facilities; (b) comply with legally
8  required seismic and building safety standards; (c) upgrade their equipment and technology to
9  keep pace with medical standards of care; and (d) provide the same level of health care to their
10 patients that they would have but for Defendants' unlawful conduct.

11     21.    Plaintiff Verity, a non-profit health care services provider, went bankrupt;
12 Defendants' conduct was a substantial factor in causing that bankruptcy.

13     22.    As Verity, and other health providers, went bankrupt and closed due to the conduct
14 at issue, the Blues became even larger and more wealthy—and they were already among the
15 largest and most wealthy businesses in the country.

16     23.    For example, Anthem alone is the second largest health insurance company in the
17 country by enrollment and had more than $120 billion in 2020 revenues, which is an increase of
18 17% from 2019. And, at one point during the time period at issue in this complaint, 15 of the 25
19 largest health insurance companies in the country were Blues. Defendants collectively wield
20 massive economic power, and they have intentionally engaged in persistent, pernicious, and
21 unlawful collective actions to injure Plaintiffs and others.

22     24.    By filing this Complaint, Verity, standing alongside Prime, seeks to redress
23 Defendants' unlawful and outrageous conduct and prays to recover antitrust damages and lost
24 profits.

25 **B.    Defendants' Violations of Law Are Extensive and Intentional**

26     25.    Defendants went to great lengths to capture and protect the fruits of their unlawful
27 conduct.

28

26.     Specific components of Defendants' Market Allocation Agreement include horizontal-coordinating and market-stabilizing information exchanges of granular, current, and competitively sensitive claims data through Blue Health Intelligence ("BHI"), a licensee of BCBSA that is managed entirely by BCBS executives.

27.     These exchanges are independent violations of the Cartwright Act and other antitrust laws.

28.     Other components, and *quid pro quos*, of Defendants' unlawful Market Allocation Agreement are horizontal price-fixing and boycott agreements under which every Blue gets the benefit of the artificially reduced prices each Blue pays to healthcare providers and agrees to collectively boycott all Providers outside of their Service Areas ("Price-Fixing and Boycott Agreements").

29.     The Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs (both of which are described in detail below).

30.     The Market Allocation Agreement reduces the competition that each Blue faces to allow it to reduce the prices that it pays to healthcare providers, including in California.

31.     The Price Fixing and Boycott Agreements fix those prices for all Blues, give them the benefit of those reduced, fixed prices, and further provide that the participating Blues will collectively boycott all Providers outside of their Service Areas, including in California.

32.     Defendant Blues provide health insurance coverage for nearly 105 million people in the United States. (Plaintiffs include administrative services for employee benefit plans within the meaning of health insurance coverage for purposes of this Complaint.)

33.     Defendants developed and operate the most extensive Provider Networks in the United States. According to the BCBSA's own estimates, more than 96% of hospitals and 93% of professional providers in the United States contract directly with the Blues.

34.     The Defendants agreed that they will not compete with each other in terms of their Provider Networks. Even where Defendants have significant enrollees in another Blue's service area, including California, Defendants agreed they will not contract with providers outside of their

Service Areas except in limited circumstances. The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

35.     In furtherance of the Market Allocation Agreement, Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted. Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

36.     In furtherance of the Price Fixing and Boycott Agreement, each Defendant has agreed to participate in each national program that the Blues adopt, including the Blue Card Program and the National Accounts Programs.

37.     The "Blue Card Program" applies when a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant. In the Blue Card Program, the subscriber's Blue is the "Home Plan" and the Defendant Blue—within the Service Area where the healthcare goods, services, or facilities are provided—is the "Host Plan."

38.     The "National Accounts Programs" function in a similar manner. National Accounts Programs generally apply to employee benefit plans with subscribers in multiple states.

39.     The Defendant Blue that administers the employee benefit plan is the "Control Plan," and the other Blues in whose Service Areas where the subscribers receive healthcare goods, services, or facilities are "Participating Plans."

40.     These programs and others have been established by a horizontal agreement between the Blues.

41.     The Blue Card Program is managed by a committee of Blues called the "Inter-Plan Programs Committee." The National Accounts Programs are either established based on horizontal agreements between the Blues or managed through the Blue Card Program.

42.     The excess profits from these programs are then divided among the Blues. The national programs, including the Blue Card Program and the National Accounts Programs, lock in the fixed, discounted reimbursement rates that each Defendant achieves in its Service Area,

1  including in California, through market dominance and makes those sub-competitive rates

2  available to all other Blues without the need for negotiation or contracting.

3      43.    The other national programs add to the Blues' market power and/or are

4  anticompetitive. Rather than forming competing networks of providers in other Service Areas, the

5  Blues operating as a Home Plan or Control Plan receive a payment called an "Access Fee."  This

6  arrangement allows Blues to maintain their market power while sharing the excess profits they

7  achieve through the sub-competitive prices that the Defendants pay to providers.

8      44.    Accordingly, Defendants have fixed the prices for healthcare reimbursement in

9  each Service Area. These fixed prices are then enforced through a horizontal agreement between

10  the Blues.

11      45.    Under that horizontal agreement, the Blues collectively enforce the fixed prices; the

12  Host Plans and the Participating Plans recoup any payments that the Home or Control Plans make

13  above the fixed prices.

14      46.    Part of the agreement for the participation in the National Accounts Programs is

15  that each Blue will not negotiate directly with providers outside its Service Area except in a

16  contiguous area. As a result, a healthcare provider who renders services or supplies goods or

17  facilities to a patient who is insured or administered by a Defendant in another Service Area

18  receives a significantly lower reimbursement than the healthcare provider would receive absent the

19  Price Fixing and Boycott Agreement.

20      47.    Many of the Defendants have large numbers of enrollees or members outside of

21  their Service Areas. Rather than forming competing networks of providers in other Service Areas,

22  the Defendants pay the Home Plan a kickback, also called an "Access Fee," and thereby share the

23  excess profits they achieve through the sub-competitive prices that the Defendants pay to

24  providers.

25      48.    The non-Blue revenue restriction agreements, which the Blues call "Best Efforts

26  Rules" to hide the obvious anticompetitive effects of the agreements, also reinforce the other

27  agreements and prevent the Defendants from engaging in meaningful competition in any manner,

28  including in California.

49.     The non-Blue revenue restrictions were adopted by the Blues to prevent Anthem and others from competing with other Blues even outside of the Blue branded area. Those restrictions prevent any Blue license holder from receiving more than 20% of its revenue from a non-Blue business in a service area or more than one-third of its revenue company-wide from a non-Blue business.

50.     The anticompetitive effects of the non-Blue revenue restriction agreement became apparent during a federal trial in Washington, DC, challenging the proposed merger of Anthem and Cigna. If Anthem had been successful in carrying out the anticompetitive merger, the non-Blue revenue restriction agreement, at the state-wide and company-wide level, would have forced Anthem to convert innovative, collaborative Cigna-administered health plans into less innovative and efficient Blue plans. This anticompetitive agreement resulted in less efficient and more costly health insurance and administrative services, it resulted in less innovation, and it resulted in lower reimbursement rates for healthcare providers.

51.     Defendants' agreements separately have anticompetitive effects, and they reinforce the anticompetitive effects of the other agreements.

52.     The Defendants entered into each of the agreements for anticompetitive reasons.

53.     Each of the agreements has injured consumers, subscribers, and healthcare providers, including Plaintiffs.

**C.     Defendant Blues Have Been and Are Actual and Potential Competitors**

54.     Defendant Blues, which are organized and operated independently, constitute actual and potential competitors and, absent their unlawful conduct, would compete against each other, including in California.

55.     The BCBSA readily admits on its own website that Defendant Blues are "independent companies" that operate in "exclusive geographic areas." *See* www.bcbsa/healthcare-news/press-center.com.

56.     In a recent trial brief filed with the United States District Court for the District of Columbia, Anthem, which is the largest Blue, stated that "***the various Blues are not a single firm***; notwithstanding their participation in the BCBSA, ***they are separate firms that at times compete***

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

*with one another and that at all times separately seek to maximize their own profits*." *United States v. Anthem, Inc.*, No. 16-cv-1493, Doc. No. 324 at 10 (filed Nov. 10, 2016) ("Anthem Brief"). (Emphasis added.)

57.     Many Defendant Blues have developed substantial non-Blue brands that could compete with other Defendant Blues.

58.     Defendant Blues potentially are a major source of competition in health insurance and financing in the United States. Two of the largest four health insurance companies in the country are Blues, as are 4 of the largest 10, and 15 of the largest 25.

59.     Defendants' territorial limitations among actual or potential competitors (*i.e.*, horizontal parties) severely limit the ability of Defendant Blues to compete outside of their geographic areas, even under their non-Blue brands.

60.     But for the unlawful agreements not to compete with one another at issue in this Complaint, these entities could and would use their Blue brands and non-Blue brands to compete with each other throughout their Service Areas.

61.     This would result in greater competition and competitive pricing for providers and subscribers.

**D.     Defendant Blues Have Refused to Compete With Each Other**

62.     Defendant Blues have a basic premise to their various agreements: We will not compete with each other.

63.     Defendant Blues will not compete in the establishment of healthcare provider networks, where they could develop meaningful innovation through collaboration with providers to improve our healthcare system and diminish overall costs.

64.     Defendant Blues will not compete in the administration of healthcare plans including regional and national accounts.

65.     Defendant Blues will not compete in the sale of health insurance.

66.     Defendant Blues openly acknowledged their desire to collaborate and not compete. In March of 2007, *a participant in a "Blue Caucus" held in San Francisco, California, stated*

1  that *"[w]e intend to continue to strive to keep the interest of all Blue plans…aligned so the*

2  *System can remain in a mutually supportive state."* (Emphasis added.)

3      67.      It was noted that *"[t]he historic success of the System has been driven by the*

4  *cooperation … of member Plans. The future success of the System is dependent on this*

5  *continued cooperation.* The ability of the member Plans to focus on the collective good of the

6  System is critical to our success."  (Emphasis added.)

7      68.      Defendants will not compete with each other with respect to healthcare provider

8  networks and, with limited exceptions, Defendant Blues have agreed not to contract with providers

9  in other Defendants' Service Areas, including California.

10      69.      Many Blues have large numbers of members outside their designated Service

11  Areas, but because of Defendant Blues' anticompetitive agreement, they cannot develop

12  innovative, collaborative arrangements with providers outside those areas that would improve

13  quality and decrease overall costs of healthcare.

14      70.      Instead, Defendant Blues operate through the Blue Card Program that creates

15  numerous inherent inefficiencies such as forcing providers to learn and navigate other Blues'

16  coverage and payment rules. Moreover, innovative collaborative arrangements require

17  coordination involving patients and providers such as those described by Cigna in the Anthem

18  merger trial. The Blue System therefore stifles innovation by creating additional barriers and

19  inefficiencies.

20      71.      Defendant Blues have also created other barriers to innovation, including through

21  their discount payment system. In their effort to increase their "differentials" as compared to other

22  health insurers, Defendant Blues pay providers less than other insurers. The evidence in the

23  Anthem merger trial demonstrates that Defendant Blues are generally the lowest paying health

24  insurer.

25      72.      For many reasons, including the costs of IT systems, innovation is expensive while

26  in the long run it reduces overall costs in healthcare. As Cigna executives testified in the Anthem

27  merger trial, reducing reimbursement rates to providers makes it more difficult to have

28  collaborative, innovative arrangements. The overall Blues' system reduces competition in

1  healthcare networks, adds to inefficiencies, reduces the quality of healthcare outcomes, and

2  ultimately increases costs in healthcare.

3      73.    The Blues will not compete in the administration of healthcare benefit plans that

4  are self-insured. Many Blues conduct more business in the administration of healthcare benefit

5  plans or administrative services than they do in the underwritten health insurance business.

6      74.    Defendant Blues have agreed that they will not bid for the contract to provide

7  administrative services for health care benefit plans located or headquartered outside of their

8  Service Areas unless the Blue with that service area cedes the right to make the bid to another

9  Blue.

10      75.    When there is a cede, only the Blue receiving the cede, ***and no other Blue***, may bid

11  for a contract to provide administrative services for the health care benefit plan. In other words, for

12  a health care benefit plan located in Los Angeles, unless Anthem Blue Cross or Blue Shield of

13  California (together, the "California Blues") cede the right to bid to another Blue, only the

14  California Blues can bid to provide administrative services, even if the plan has members

15  throughout the country.

16      76.    Other Blues cannot bid. Health Care Service Corporation and its subsidiaries and

17  health care plans ("HCSC"), the fourth largest company in the business, cannot bid. When the

18  health care benefit plan has employees in Texas, Illinois, or another HCSC services area, the

19  health care benefit plan must pay the Blue Card access and administration fees in addition to the

20  payments made to providers and the administrative service fees charged by the California Blues.

21      77.    When the health care benefit plan has employees in Georgia, New York City, or

22  another service area, the health care benefit plan must pay the Blue Card access and administration

23  fees in addition to the payments to providers and the administrative service fees charged by the

24  California Blues.

25      78.    The Blues use this anticompetitive agreement to extract higher administrative

26  service fees from health care benefit plans, including in California. This anticompetitive

27  agreement results in reduced competition, reduced choices for the administration of health care

28  benefit plans, increased costs, and less innovation and efficiency, including in California. The

anticompetitive agreement also results in lower reimbursement rates to healthcare providers, including in California.

79.     Defendant Blues will not compete in the sale of health insurance. ***California has three different Blues selling health insurance immediately across the state borders. Defendant Blues have agreed that none of those Blues will cross the state line to sell health insurance in California.***

80.     The same agreement also prohibits HCSC, the fourth largest health insurer in the country, Highmark, the eighth largest health insurer in the country, and Blue Cross & Blue Shield of Michigan, the ninth largest health insurer in the country, and all other Blues from competing with the California Blues in the sale of health insurance in California.

81.     The Defendants are able to maintain this anticompetitive agreement because they have the Blue Card Program. While the sale of health insurance is a minority of the business of Blues, this refusal to compete injures consumers for obvious reasons. This anticompetitive agreement also results in lower reimbursement rates to healthcare providers.

82.     The Blue Card agreement is a part of the other agreements and reinforces them by allowing them not to compete and providing a quid pro quo to the tune of billions of dollars each year that the Blues pay to each other and charge to their customers.

83.     In numerous ways, the Blue Card Program is highly inefficient. It places significant administrative burdens and expenses on healthcare providers by having at least 36 different sets of coverage and payment rules that the providers must learn and comply with, often without access to the rules of the 35 Blues for which they are not in-network. By having different companies responsible for patients than for providers, the Blues make it highly inefficient and often impossible to have innovative, efficient arrangements for the delivery and administration of healthcare services.

84.     The Blue Card Program allows the Blues to charge higher administrative service fees to health care benefit plans, including in California. Those fees are separate and apart from the Blue Card administrative and access fees, which are also paid by health care benefit plans under the administrative services agreements that the Blues have with those benefit plans.

85.     A Blue plan that violates the restrictions detailed in this complaint faces license and membership termination from BCBSA, which would mean both the loss of the brand through which the Blue derives the majority of its revenue and the required payment of a large fee to BCBSA that would help to fund the establishment of a competing health insurer.

**E.      Defendants' Unlawful Conduct Injured Plaintiffs**

86.     Defendants' actions have significantly injured Plaintiffs and other healthcare providers. When there is more competition among insurers to create provider networks, including competition among the Blues, providers will be paid more. Defendants' agreements have also harmed competition by decreasing the options available to health insurance consumers.

87.     Fewer health insurance companies are competing in each Service Area. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices that the Blues pay. Their output has been diminished.

88.     In addition, many hospitals and other healthcare facilities have closed or reduced services, or are not expanding to provide additional services, as a result of Defendants' conduct.

89.     The harm has been particularly acute in California and for Plaintiffs.

90.     At least dozens of California hospitals, including Plaintiffs', have closed since 1998. Many of these are small, independent or rural facilities.

91.     Still other facilities, including Plaintiffs', have entered bankruptcy or are reducing services offered to consumers.

92.     Still others, including Plaintiffs', that would have otherwise expanded are not doing so as a result of Defendant Blues' low payments.

93.     Defendant Blues' low reimbursements, particularly in California, make it almost impossible for these hospitals to continue providing all the services they would offer in a competitive market, leaving consumers to travel much further for care, with no places for the most critically injured patients, or those without transportation, to receive care.

94.     Defendants' actions also have injured Plaintiffs in the form of supracompetitive premiums and administrative fees for self-funded accounts ("ASO Fees"). Defendant Blues'

1   anticompetitive agreement, implementing conduct and foreclosure of competition have prevented

2   subscribers and enrollees from being offered competitive premium prices and self-funded accounts

3   from being offered competitive ASO Fees. Plaintiffs have paid Defendant Blues inflated

4   premiums and ASO Fees as a result of their unlawful agreements.

5       95.     The only beneficiaries of Defendants' antitrust violations are Defendants

6   themselves. Defendant Blue Shield of California, for example, alone held surpluses in excess of

7   $2.2 billion as early as 2010.

8                          **II.    JURISDICTION AND VENUE**

9       96.     Plaintiffs bring their claims under the California Cartwright Act and Unfair

10  Competition Law, Cal. Bus. & Prof. Code §§ 16720, *et seq.* and 17200, *et seq.*, and other laws for

11  monetary damages and other relief caused by Defendants' unlawful conduct.

12      97.     This Court has subject matter jurisdiction over this action pursuant to Article VI,

13  Section 10 of California's Constitution.

14      98.     This Court has personal jurisdiction over Defendants because they and their

15  affiliates do business in California, and the claims asserted herein arise from conduct occurring in

16  California.

17      99.     In addition, the California Blues are California corporations with their principal

18  places of business in California.

19      100.    Further, additional Defendants have entered into contracts with healthcare

20  providers in California.

21      101.    Defendants have significant business in and contacts with California through the

22  national programs including the Blue Card Program, the National Accounts Programs, and the

23  Inter-Plan Medicare Advantage Program.

24      102.    All of the Defendants have entered into unlawful agreements with the California

25  Blues.

26      103.    And through their violation of California Business & Professions Code §§ 16720,

27  *et seq.*, each Defendant purposefully directed its anticompetitive conduct at California, and caused

28  injuries in California, including to Plaintiffs.

104.    This Court also has personal jurisdiction under California's long-arm statute, California Code Civil Procedure § 410.10, because the Defendants' payments to California healthcare providers to treat patients constitute minimum contacts with California, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

105.    Venue is proper in Alameda County under California Code of Civil Procedure § 395(a) because Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California resides in the county.

106.    In addition, venue is proper in Alameda County because Defendants' liability arose, at least in part, in Alameda County.

### III.    THE PARTIES

**A.    Plaintiffs**

107.    Plaintiffs were and are providers of health care services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients were and are insured by Defendant Blues or included in employee benefit plans administered by Defendant Blues.

108.    Plaintiffs were and are also subscribers and self-funded accounts of Defendant Blues. Plaintiffs purchased or were covered by commercial health benefit products offered by Defendant Blues.

109.    These products include traditional insurance products in which a plan pays for or reimburses health care expenses of its members in exchange for premiums, and administrative-services-only ("ASO") products in which a plan provides services such as claims administration or access to a network of medical providers at negotiated rates in exchange for ASO Fees charged to a self-funded account. With an ASO product, the self-funded account, rather than the plan, pays for or reimburses the cost of medical care.

110.    Plaintiff VHS Liquidating Trust ("Verity") is the bankruptcy liquidator for Verity Health System of California, Inc.

24

111.    Verity Health System of California, Inc. was a not-for-profit healthcare services organization based in California. It was the sole owner of six medical centers serving the San Francisco, Los Angeles, and San Jose metropolitan areas: Seton Medical Center in Daly City, Seton Coastside in Moss Beach, St. Vincent Medical Center in Los Angeles, O'Connor Hospital in San Jose, St. Louise Regional Hospital in Gilroy and St. Francis Medical Center in Lynwood. These hospitals had 1,650 patient beds, 6 active emergency rooms, a trauma center, and a host of medical specialties including tertiary and quaternary care.

112.    Verity Health System of California, Inc. filed for bankruptcy on August 31, 2018.

113.    The Bankruptcy Court on August 14, 2020 ordered the creation Verity (VHS Liquidating Trust) and subsequently vested in it and transferred to it the Verity Health System of California, Inc. claims asserted in this lawsuit.

114.    Thus, Verity controls the claims of St. Louise, St. Francis (up until the date of its sale to Prime), St. Vincent, Seton, Seton Coastside, and O'Connor hospitals, their affiliated medical foundations and affiliates, and Verity Health System of California, Inc.

115.    During the relevant time period, Verity provided medically necessary, covered services to patients insured by the California Blues, or who were included in employee benefit plans administered by the California Blues, pursuant to its in-network contracts with the California Blues, and billed the California Blues for the same.

116.    Verity was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  Verity has not entirely released the claims at issue in this Complaint and, to the extent it may have, it does not assert those claims in this lawsuit.

117.    Verity also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.

118.    Verity has purchased health insurance and administrative services for employee benefit plans from both of the California Blues.

119.    Verity has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

120.    Plaintiff Prime Healthcare Services, Inc. is a Delaware corporation and Plaintiff Prime Healthcare Foundation, Inc. is a nonprofit public charity.  Both have their principal place of business in Ontario, California.  They own and operate hospitals and other healthcare providers throughout the country, including:

a.    Alvarado Hospital Medical Center in San Diego, California

b.    Bio-Med Services in Ontario, California

c.    Carondelet Home Care Services in Blue Springs, Missouri

d.    Centinela Hospital Medical Center in Inglewood, California

e.    Chino Valley Medical Center in Chino, California

f.    Coshocton Regional Medical Center in Coshocton, Ohio

g.    Dallas Medical Center in Dallas, Texas

h.    Dallas Medical Physician Group in Dallas, Texas

i.    Dallas Regional Medical Center in Mesquite, Texas

j.    Desert Valley Hospital in Victorville, California

k.    East Liverpool City Hospital in East Liverpool, Ohio

l.    East Liverpool Medical Group / River Valley Physicians in Liverpool, Ohio

m.    Encino Hospital Medical Center in Encino, California

n.    Gadsden Physicians Management in Gadsden, Alabama

o.    Garden City Hospital in Garden City, Michigan

p.    Garden City Medical Group in Garden City, Michigan

q.    Garden Grove Hospital Medical Center in Garden Grove, California

r.    Glendora Community Hospital in Glendora, California

s.    Harlingen Medical Center in Harlingen, Texas

t.    Huntington Beach Hospital in Huntington Beach, California

| | | |
|---|---|---|
| u. | Knapp Medical Center in Weslaco, Texas |
| v. | Knapp Medical Group in Weslaco, Texas |
| w. | Knapp Surgery Center in Weslaco, Texas |
| x. | La Palma Intercommunity Hospital in La Palma, California |
| y. | Lake Huron Urgent Care Center in Fort Gratiot, Michigan |
| z. | Lake Huron Medical Center in Port Huron, Michigan |
| aa. | Landmark Medical Center in Woonsocket, Rhode Island |
| bb. | Lehigh Regional Medical Center in Lehigh Acres, Florida |
| cc. | Lehigh Medical Group in Lehigh Acres, Florida |
| dd. | Lower Bucks Hospital in Bristol, Pennsylvania |
| ee. | Mission Regional Medical Center in Mission, Texas |
| ff. | Monroe Hospital in Bloomington, Indiana |
| gg. | Montclair Hospital Medical Center in Montclair, California |
| hh. | North Vista Physicians in North Las Vegas, Nevada |
| ii. | North Vista Hospital in North Las Vegas, Nevada |
| jj. | Ohio Valley Home Health Services in Liverpool, Ohio |
| kk. | Pampa Regional Medical Center in Pampa, Texas |
| ll. | Paradise Valley Hospital in National City, California |
| mm. | Providence Medical Center in Kansas City, Kansas |
| nn. | Providence Medical Group in Kansas City, Kansas |
| oo. | Providence Place Rehabilitation Center in Kansas City, Kansas |
| pp. | Rehabilitation Hospital of Rhode Island in North Smithfield, Rhode Island |
| qq. | Reno Tahoe Anesthesia in Reno, Nevada |
| rr. | Riverview Regional Medical Center in Gadsden, Alabama |
| ss. | Roxborough Memorial Hospital in Philadelphia, Pennsylvania |
| tt. | Saint Clare's Behavioral Health in Boonton Township, New Jersey |

| | | |
|---|---|---|
| uu. | Saint Clare's Denville Hospital in Denville, New Jersey |
| vv. | Saint Clare's Dover Hospital in Dover, New Jersey |
| ww. | Saint Clare's Sussex Hospital in Sussex, NJ |
| xx. | Saint John Hospital in Leavenworth, Kansas |
| yy. | Saint Mary's Medical Group in Reno, Nevada |
| zz. | Saint Mary's Regional Medical Center in Reno, Nevada |
| aaa. | Saint Michael's Medical Center in Newark, New Jersey |
| bbb. | San Dimas Community Hospital in San Dimas, California |
| ccc. | Shasta Regional Medical Center in Redding, California |
| ddd. | Sherman Oaks Hospital in Sherman Oaks, California |
| eee. | South Kansas SurgiCenter in Kansas City, Missouri |
| fff. | Southern Regional Medical Center in Riverdale, Georgia |
| ggg. | St. Francis Medical Center in Lynwood, California (from the date of its sale to Prime onward) |
| hhh. | St. Joseph Medical Center in Kansas City, Missouri |
| iii. | St. Joseph Medical Group and St. Mary's Medical Group in Kansas City, Missouri |
| jjj. | St. Mary's General Hospital in Passaic, New Jersey |
| kkk. | St. Mary's Medical Center in Blue Springs, Missouri |
| lll. | St Mary's Surgical Center in Blue Springs, Missouri |
| mmm. | Suburban Community Hospital in Norriton, Pennsylvania |
| nnn. | Suburban Medical Group in Norriton, Pennsylvania |
| ooo. | Summit Surgery Center at St. Mary's Galena in Reno, Nevada |
| ppp. | United Home Health Services in Garden City, Michigan |
| qqq. | West Anaheim Medical Center in Anaheim, California |

121. Prime Healthcare Management, Inc. is a California corporation with a primary place of business in Ontario, California. Prime Healthcare Management, Inc. employs staff to

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  support the operations of other Prime entities, and also has subsidiaries such as Hospital Business

2  Services, LLC.

3       122.    Collectively, Prime Healthcare Services, Inc., Prime Healthcare Foundation, Inc.,

4  Prime Healthcare Management, Inc., their hospitals and their affiliates are described herein as

5  "Prime."

6       123.    During the relevant time period, Prime provided medically necessary, covered

7  services to patients insured by Defendants, or who are included in employee benefit plans

8  administered by Defendants.

9       124.    Prime provided such services pursuant to its in-network contracts with those

10 Defendants and billed those Defendants for the same.

11      125.    Prime was paid less for those services than it would have been but for Defendants'

12 anticompetitive conduct, and Prime has been injured by Defendants' conduct as a result.

13      126.    Prime has also provided medically necessary, covered services to other Blue Cross

14 and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid

15 less for those services than it would have been but for Defendants' anticompetitive conduct.

16      127.    Prime has purchased health insurance and administrative services for employee

17 benefit plans from Defendants.

18      128.    Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as

19 facilities where medical or surgical procedures are performed, to patients who are insured by a

20 Blue or who are included in an employee benefit plan administered by a Blue. Plaintiffs are

21 entitled to payment for their services, equipment, supplies or for use of their facilities either

22 pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from

23 patients who are covered by a plan that is insured and administered by a Blue. Plaintiffs have been

24 paid less than they would have been paid absent Defendants' violation of the antitrust laws. But

25 for Defendants' agreements not to compete, providers would have been offered the ability to

26 contract with the Blues at more competitive rates.

27

28

29

1       129.    Plaintiffs purchased or were covered by commercial health benefit products offered

2  by Defendant Blues. Plaintiffs have paid more for premiums and ASO Fees than they would have

3  paid absent Defendants' violation of the antitrust laws.

4       130.    Accordingly, Plaintiffs have standing and have sustained antitrust injury.

5  **B.**    **Defendants**

6       131.    Defendants Blue Cross of California and Anthem Blue Cross Life and Health

7  Insurance Company are California corporations with their corporate headquarters located at

8  21215 Burbank Boulevard, Woodland Hills, CA 91367. Defendant Blue Cross of California is a

9  subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant Anthem. Blue

10  Cross of California is the parent corporation of a number of subsidiaries that provide health care

11  financing to approximately 8.3 million enrollees in various health care plans in California, more

12  than any other carrier in the state. Blue Cross of California, Anthem Blue Cross Life and Health

13  Insurance Company, and their subsidiaries and affiliated companies, are collectively referred to as

14  "Blue Cross of California" or "BC-CA" in this Complaint.

15       132.    Defendant California Physicians' Service d/b/a Blue Shield of California is a

16  California corporation with its corporate headquarters located at 601 12th Street, 20th Floor,

17  Oakland, CA 94607. It is the parent corporation of a number of subsidiaries that provide health

18  care financing to over 4 million enrollees in various health care plans in California. California

19  Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as

20  "Blue Shield of California" or "BS-CA" in this Complaint.

21       133.    Defendant Blue Cross and Blue Shield of Alabama is the health insurance company

22  operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue

23  Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and

24  administrative services for health plans in Alabama, providing coverage to more than three million

25  people. The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450

26  Riverchase Parkway East, Birmingham, AL 35244. Blue Cross and Blue Shield of Alabama is

27  referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

28

134.    Defendant Anthem, Inc. (formerly Wellpoint, Inc.) d/b/a Anthem Blue Cross Life and Health Insurance Company is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, IN 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. By some measures Anthem is the largest health benefits company in the nation with more than 37 million enrollees in its affiliated health plans. According to its website, one in nine Americans is an Anthem member, and Anthem is contracted with 93% of the physicians and 96% of hospitals nationwide through the Blue Card Program. Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

135.    Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099. With more than 15 million enrollees, Health Care Service Corporation is the largest customer-owned health insurer in the United States. Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana. In each of its five Blue Service Areas, HCSC exercises market dominance.

136.    Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving more than 2 million enrollees through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield, Regence BlueCross

1    BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in

2    its states of operation or within areas of those states. Cambia Health Solutions, Inc., its

3    subsidiaries, and affiliated companies are collectively referred to as "Cambia Health" or "Cambia"

4    in this Complaint.

5           137.    Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters

6    located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117. With approximately 3.2

7    million enrollees, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc.,

8    Carefirst Bluechoice, Inc. and Group Hospitalization and Medical Services, Inc., is the largest

9    health care insurer in the Mid-Atlantic Region. Through its subsidiaries and affiliated companies,

10   CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and

11   Virginia, or within areas of those states. CareFirst, Inc., its subsidiaries and affiliated companies

12   are collectively referred to as "CareFirst" in this Complaint.

13          138.    Defendants Premera and Premera Blue Cross are both Washington corporations

14   with their corporate headquarters located at 7001 220th SW, Building 1, Mountlake Terrace, WA

15   98043. Premera Blue Cross is the parent corporation of a number of subsidiaries that provide

16   health care financing to approximately 2 million enrollees in Alaska and Washington. Premera

17   Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue

18   Cross Blue Shield of Alaska. Premera, Premera Blue Cross, and their subsidiaries and affiliated

19   companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

20          139.    Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant

21   Premera Blue Cross with its principal place of business located at 3800 Centerpoint Drive, Suite

22   940, Anchorage, AK 99503. Premera Blue Cross Blue Shield of Alaska, its subsidiaries and

23   affiliated companies are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-

24   AK" in this Complaint.

25          140.    Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its

26   corporate headquarters located at 2444 W. Las Palmaritas Drive, Phoenix, AZ 85021. It is the

27   parent corporation of a number of subsidiaries that provide health care financing to approximately

28   1.5 million enrollees in various health care plans in Arizona. Blue Cross Blue Shield of Arizona,

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

141.    Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, AR 72201. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 860,000 enrollees in various health care plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state. Arkansas Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

142.    Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant Anthem and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Suite 600, Denver, CO 80273. It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees through various health care plans in Colorado and Nevada.

143.    Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Hospital and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant Anthem. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and affiliated companies, which provide health care financing to more than 1.3 million enrollees, are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

144.    Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant Anthem. It is a Connecticut corporation with its corporate headquarters located at 108 Leigus Road, Wallingford, CT 06492 and is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Connecticut. Anthem Blue Cross and Blue Shield

1   of Connecticut, its subsidiaries and affiliated companies are collectively referred to as "Anthem

2   Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

3       145.    Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate

4   headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222. Highmark,

5   Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 5.2

6   million enrollees in Pennsylvania, West Virginia and Delaware. Highmark, Inc., its subsidiaries

7   and affiliated companies, including predecessor Hospital Service Association of Northeastern

8   Pennsylvania, are collectively referred to as "Highmark" in this Complaint.

9       146.    Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield

10  Delaware is a subsidiary of Highmark, Inc. It is a Delaware corporation with its corporate

11  headquarters located at 800 Delaware Avenue, Wilmington, DE 19801. Highmark Blue Cross and

12  Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became

13  affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue

14  Cross and Blue Shield Delaware in July, 2012. Highmark Blue Cross and Blue Shield Delaware

15  provides health care financing to approximately 397,000 enrollees in various health care plans in

16  Delaware. According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share

17  in the state of Delaware. Highmark Blue Cross and Blue Shield Delaware, its subsidiaries and

18  affiliated companies are collectively referred to as "Highmark Blue Cross and Blue Shield

19  Delaware" or "BCBS-DE" in this Complaint.

20      147.    Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the

21  business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc.

22  and provides health care financing in the District of Columbia, Maryland and areas of Virginia. It

23  is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc. Its principal place

24  of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117. Group Hospitalization

25  and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as

26  "GHMSI" in this Complaint.

27      148.    Defendants Blue Cross and Blue Shield of Florida, Inc. and Guidewell Mutual

28  Holding Corporation are Florida corporations with their corporate headquarters located at 4800

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  Deerwood Campus Parkway, Jacksonville, FL 32246. Defendant Blue Cross and Blue Shield of
2  Florida is the parent corporation of a number of subsidiaries that provide health care financing to
3  approximately 7 million enrollees in various health care plans in Florida. Blue Cross and Blue
4  Shield of Florida, Guidewell Mutual Holding Corporation, and their subsidiaries and affiliated
5  companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL"
6  in this Complaint. Under BCBSA's rules, BCBS-FL is allowed to contract with healthcare
7  providers in Alabama counties adjacent to Florida.

8        149.    Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company,
9  Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization,
10 are subsidiaries of Defendant Anthem and are Georgia corporations with corporate headquarters
11 located at 3350 Peachtree Road, N.E., Atlanta, GA 30326. According to a 2009 Center for
12 American Progress study on health competitiveness, Blue Cross and Blue Shield of Georgia, by
13 and through its subsidiaries, controls approximately 61% of the state's healthcare financing
14 market. Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of
15 subsidiaries that provide health care financing to 3.2 million enrollees in various health care plans
16 in Georgia. Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield
17 Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as
18 "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

19       150.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield
20 of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku
21 Street, Honolulu, HI 96814. It is the parent corporation of a number of subsidiaries that provide
22 health care financing to 722,000 enrollees in various health care plans in Hawaii. Hawaii Medical
23 Service Association, its subsidiaries and affiliated companies are collectively referred to as
24 "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

25       151.    Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho
26 corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, ID 83642.
27 It is the parent corporation of a number of subsidiaries that provide health care financing to
28 550,000 enrollees in various health care plans in Idaho. Blue Cross of Idaho Health Service, Inc.,

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1    its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Idaho" or

2    "BC-ID" in this Complaint.

3    152.    Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and

4    is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, ID

5    83501. Regence BlueShield of Idaho, Inc. is the parent corporation of a number of subsidiaries

6    that provide health care financing to more than 150,000 enrollees in various health care plans in

7    Idaho. Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies are collectively

8    referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

9    153.    Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC

10   with its principal place of business located at 300 East Randolph Street, Chicago, IL 60601. It is

11   the parent of a number of subsidiaries that provide health care financing to over 7 million enrollees

12   in various health care plans in Illinois. Blue Cross and Blue Shield of Illinois, its subsidiaries and

13   affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Illinois" or

14   "BCBS-IL" in this Complaint.

15   154.    Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue

16   Shield of Indiana is a subsidiary of Defendant Anthem. It is an Indiana corporation with its

17   corporate headquarters located at 120 Monument Circle, Indianapolis, IN 46204. It is the parent

18   corporation of a number of subsidiaries that provide health care financing to enrollees in various

19   health care plans in Indiana. Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield

20   of Indiana, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue

21   Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint.

22   155.    Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is

23   an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.

24   It is the parent of a number of subsidiaries that provide health care financing to 1.8 million

25   enrollees in Iowa. Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its

26   subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue

27   Shield of Iowa" or "BCBS-IA" in this Complaint.

28

156.    Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, KS 66629. Blue Cross and Blue Shield of Kansas, Inc. is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide health care financing to approximately 950,000 enrollees in various health care plans in Kansas. Blue Cross and Blue Shield of Kansas, Inc. its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

157.    Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky is a subsidiary of Defendant Anthem and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223. It provides health care financing in Kentucky. Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

158.    Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, LA 70809. It is the parent corporation of a number of subsidiaries that provide health care financing to more than 1.1 million enrollees in various health care plans in Louisiana. Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

159.    Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant Anthem. It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, ME 04016. It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maine. Anthem Health Plans of Maine, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

160.    Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters

1    located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117. CareFirst of Maryland,

2    Inc. is the parent corporation of a number of subsidiaries that provide health care financing to

3    enrollees in various health care plans in Maryland. CareFirst of Maryland, Inc., its subsidiaries and

4    affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

5         161.   Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts

6    corporation with its corporate headquarters located at 401 Park Drive, Boston, MA 02215. It is the

7    parent corporation of a number of subsidiaries that provide health care financing to approximately

8    2.8 million enrollees in various health care plans in Massachusetts. Blue Cross and Blue Shield of

9    Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross

10   and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

11        162.   Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company is a

12   Michigan corporation with its corporate headquarters located at 600 E. Lafayette Boulevard,

13   Detroit, MI 48226. It is the parent corporation of a number of subsidiaries that provide health care

14   financing to approximately 4.5 million enrollees in various health care plans in Michigan. Blue

15   Cross and Blue Shield of Michigan Mutual Insurance Company, its subsidiaries and affiliated

16   companies are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-

17   MI" in this Complaint.

18        163.   Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a

19   Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul,

20   MN 55164. BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is

21   the parent corporation of a number of subsidiaries that provide health care financing to 2.6 million

22   enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its

23   subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of

24   Minnesota" or "BCBS-MN" in this Complaint.

25        164.   Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company, is

26   a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive,

27   Flowood, MS 39232. It is the parent corporation of a number of subsidiaries that provide health

28   care financing to approximately 1 million enrollees in various health care plans in Mississippi.

1   Blue Cross and Blue Shield of Mississippi, its subsidiaries and affiliated companies are

2   collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this

3   Complaint. Blue Cross Blue Shield of Mississippi contracts with providers in counties in Alabama

4   that are adjacent to Mississippi.

5       165.    Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of

6   Missouri is a subsidiary of Defendant Anthem. It is the parent corporation of a number of

7   subsidiaries that provide health care financing to approximately 2.8 million enrollees in various

8   health care plans in Missouri. Defendants HMO Missouri, Inc., Healthy Life Insurance Company

9   and Rightchoice Managed Care, Inc. are all Missouri corporations with their corporate

10  headquarters located at 1831 Chestnut Street, St. Louis, MO 63103. Defendants HMO Missouri,

11  Inc., Health Alliance Life Insurance Company, Rightchoice Managed Care, Inc., and Anthem Blue

12  Cross and Blue Shield of Missouri, and their subsidiaries and affiliated companies, are collectively

13  referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this

14  Complaint.

15      166.    Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri

16  corporation with its corporate headquarters located at One Pershing Square, 2301 Main Street,

17  Kansas City, MO 64108. It is the parent corporation of a number of subsidiaries that provide

18  health care financing to approximately 900,000 enrollees in various health care plans in Kansas

19  City and its suburbs in Kansas and Missouri. Blue Cross and Blue Shield of Kansas City, its

20  subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of

21  Kansas City or "BCBS – Kansas City" in this Complaint.

22      167.    Defendant Blue Cross and Blue Shield of Montana is a division of Defendant

23  HCSC with its principal place of business at 3645 Alice Street, Helena, MT 59604-4309. It is the

24  parent of a number of subsidiaries that provide health care financing to approximately 240,000

25  enrollees in various health care plans in Montana. Blue Cross and Blue Shield of Montana, its

26  subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of

27  Montana" or "BCBS-MT" in this Complaint. For purposes of this Complaint, references to Blue

28

1   Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue

2   Cross and Blue Shield of Montana, Inc.

3         168.    Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana

4   Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena,

5   MT 59604-4309. When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant

6   HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the

7   corporation now known as Caring for Montanans, Inc.

8         169.    Defendant Blue Cross and Blue Shield of Nebraska and GoodLife Partners, Inc. are

9   Nebraska corporations with their corporate headquarters located at 1919 Aksarben Drive, Omaha,

10  NE 68180. Defendant Blue Cross and Blue Shield of Nebraska is the parent corporation of a

11  number of subsidiaries that provide health care financing to over 700,000 enrollees in various

12  health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska, Defendant GoodLife

13  Partners, Inc., and their subsidiaries and affiliated companies are collectively referred to as "Blue

14  Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

15        170.    Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of

16  Defendant Rocky Mountain Hospital and Medical Service, Inc., a Colorado corporation with its

17  headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of

18  Nevada has a principal place of business in Nevada located at 9133 West Russell Road, Suite 200,

19  Las Vegas, NV 89148. Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky

20  Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant Anthem that offer

21  health care financing in Nevada. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries

22  and affiliated companies, which provide health care financing to more than 300,000 enrollees, are

23  collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

24        171.    Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross

25  and Blue Shield of New Hampshire is a subsidiary of Defendant Anthem. It is a New Hampshire

26  corporation with its corporate headquarters located at 3000 Goff Falls Road, Manchester, NH

27  03111. Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of

28  subsidiaries that provide health care financing to over 600,000 enrollees in various health care

plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint.

172.    Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, NJ 07105. It is the parent corporation of a number of subsidiaries that provide health care financing to 3.6 million enrollees in various health care plans in New Jersey. Horizon Healthcare Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

173.    Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113. Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

174.    Defendants HealthNow New York, Inc. and HealthNow Systems, Inc. are New York corporations with their corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202. Defendants HealthNow New York, Inc. and HealthNow Systems, Inc. do business as Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern New York. HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York. HealthNow New York, Inc., HealthNow Systems, Inc., and their subsidiaries and affiliated companies are collectively referred to as "HealthNow" in this Complaint.

175.    Defendant BlueShield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 40 Century Hill Drive, Latham, NY 12110. BlueShield of Northeastern New York is the parent of a number of subsidiaries that

provide health care financing to enrollees in various health care plans in New York. BlueShield of Northeastern New York, its subsidiaries and affiliated companies are collectively referred to as "BlueShield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

176.    BlueCross BlueShield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202. BlueCross BlueShield of Western New York is the parent of a number of subsidiaries that provide health care financing to more than 800,000 enrollees in various health care plans in New York. BlueCross BlueShield of Western New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Western New York" or "BCBS-Western NY" in this Complaint.

177.    Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield is a subsidiary of Defendant Anthem. It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006. Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield is the parent corporation of a number of subsidiaries that provide health care financing to nearly 6 million enrollees in various health care plans in New York. Empire BlueCross BlueShield, its subsidiaries and affiliated companies are collectively referred to as "Empire BlueCross BlueShield" or "Empire-BCBS" in this Complaint.

178.    Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, NY 14647. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in the state of New York. Excellus Health Plan, Inc., its subsidiaries and affiliated companies are collectively referred to as "Excellus BlueCross BlueShield" in this Complaint.

179.    Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina corporation with its corporate headquarters located at 4615 University Drive, Durham, NC 27707. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 3.9 million enrollees in various health care plans in North Carolina. Blue Cross and

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1  Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are collectively

2  referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

3      180.    Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of

4  North Dakota and HealthyDakota Mutual Holdings are North Dakota corporations with their

5  corporate headquarters located at 4510 13th Avenue South, Fargo, ND 58121. Noridian Mutual

6  Insurance Company is the parent company of a number of subsidiaries that provide health care

7  financing to nearly 500,000 enrollees in the midwestern and western United States. Blue Cross

8  Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care

9  financing to approximately 390,000 enrollees in various health care plans in North Dakota.

10  Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota,

11  HealthyDakota Mutual Holdings, and their subsidiaries and affiliated companies are collectively

12  referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

13      181.    Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue

14  Shield of Ohio is a subsidiary of Defendant Anthem. It is an Ohio corporation with its

15  headquarters located at 4361 Irwin Simpson Road, Mason, OH 45040. Community Insurance

16  Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number

17  of subsidiaries that provide health care financing to more than 3 million enrollees in various health

18  care plans in Ohio. Community Insurance Co., its subsidiaries and affiliated companies are

19  collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

20      182.    Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant

21  HCSC with its principal place of business located at 1400 South Boston, Tulsa, OK 74119. Blue

22  Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health

23  care financing to more than 835,000 enrollees in various health care plans in Oklahoma. Blue

24  Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively

25  referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

26      183.    Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant

27  Cambia Health. It is an Oregon corporation with its corporate headquarters located at 100 SW

28  Market Street, Portland, OR 97201. Regence BlueCross BlueShield of Oregon is the parent

1  corporation of a number of subsidiaries that provide health care financing to more than 750,000

2  enrollees in various health care plans in Oregon. Regence BlueCross BlueShield of Oregon, its

3  subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of

4  Oregon" or "BCBS-OR" in this Complaint.

5         184.    Defendant Capital BlueCross is a Pennsylvania corporation with its corporate

6  headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It

7  is the parent corporation of a number of subsidiaries that provide health care financing to

8  approximately 1.3 million enrollees in various health care plans in Pennsylvania. Capital

9  BlueCross, its subsidiaries and affiliated companies are collectively referred to as "Capital

10  BlueCross" in this Complaint.

11         185.    Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and

12  also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania

13  corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, PA 17011.

14  Highmark Health Services is the parent of a number of subsidiaries that provide health care

15  financing to approximately 4.2 million enrollees in various health care plans in Pennsylvania.

16  Highmark Health Services, its subsidiaries and affiliated companies are collectively referred to as

17  "Highmark Health Services" in this Complaint.

18         186.    Defendants Independence Blue Cross, Independence Hospital Indemnity Plan, Inc.,

19  and Independence Health Group, Inc. are Pennsylvania corporations with their corporate

20  headquarters located at 1901 Market Street, Philadelphia, PA 19103. It is the parent corporation of

21  a number of subsidiaries that provide health care financing to 2.5 million enrollees in

22  Pennsylvania and 6 million nationwide. Independence Blue Cross, Independence Health Group,

23  Inc., Independence Hospital Indemnity Plan, Inc., and their subsidiaries and affiliated companies

24  are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

25         187.    Defendant Triple-S Salud, Inc. is a subsidiary of Triple-S Management Corporation

26  and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt

27  Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that

28  provide health care financing to 1.6 million enrollees in Puerto Rico. Triple-S Salud, Inc., its

1  subsidiaries and affiliated companies are collectively referred to as "Triple-S of Puerto Rico" in

2  this Complaint.

3       188.    Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island

4  corporation with its corporate headquarters located at 500 Exchange Street, Providence, RI 02903.

5  It is the parent corporation of a number of subsidiaries that provide health care financing to

6  approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and

7  Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to

8  as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

9       189.    Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina

10  corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, SC 29219.

11  It is the parent corporation of a number of subsidiaries that provide health care financing to

12  approximately one million enrollees in various health care plans in South Carolina. BlueCross

13  BlueShield of South Carolina, its subsidiaries and affiliated companies are collectively referred to

14  as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint.

15       190.    Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue

16  Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at

17  1601 W. Madison, Sioux Falls, SD 57104. Wellmark of South Dakota, Inc. is a subsidiary of

18  Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. is the parent corporation of a number

19  of subsidiaries that provide health care financing to 325,000 enrollees in South Dakota. Wellmark

20  of South Dakota, its subsidiaries and affiliated companies are collectively referred to as

21  "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

22       191.    Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation

23  with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, TN 37402. It is the

24  parent corporation of a number of subsidiaries that provide health care financing to nearly 3

25  million enrollees in various health care plans in Tennessee. BlueCross BlueShield of Tennessee,

26  Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield

27  of Tennessee" or "BCBS-TN" in this Complaint. BCBS-TN contracts with healthcare providers in

28  Alabama counties adjacent to Tennessee.

192.    Defendant Blue Cross and Blue Shield of Texas, Inc. is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, TX 75082. Blue Cross and Blue Shield of Texas, Inc. is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

193.    Defendant Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121. Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide health care financing to more than 320,000 enrollees in various health care plans in Utah. Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueCross BlueShield of Utah" or "BCBS-UT" in this Complaint.

194.    Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, VT 05602. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 200,000 enrollees in various health care plans within the state of Vermont. Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

195.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. is a subsidiary of Defendant Anthem. It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, VA 23230. Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.2 million enrollees in various health care plans in Virginia. Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

196.     Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101. Regence BlueShield in Washington is the parent corporation of a number of subsidiaries that provide health care financing to 770,000 enrollees in various health care plans in Washington. Regence BlueShield in Washington, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

197.     Defendant Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia is a subsidiary of Defendant Highmark and is a West Virginia corporation with its corporate headquarters located at 614 Market Square, Parkersburg, WV 26101. Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care financing to nearly 493,000 enrollees in various health care plans in West Virginia and one county in Ohio. Highmark Blue Cross Blue Shield West Virginia, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" in this Complaint. BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

198.     Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant Anthem and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Defendant Compcare Health Services Insurance Corporation, that provide health care financing to approximately 900,000 enrollees in various health care plans in Wisconsin. Blue Cross Blue Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

199.     Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001. It is the parent corporation of a number of subsidiaries that provide health care financing to over 100,000 enrollees in various health care plans in Wyoming. Blue Cross Blue Shield of Wyoming, its

1    subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of

2    Wyoming" or "BCBS-WY" in this Complaint.

3         200.    Defendant BCBSA is a corporation organized in the State of Illinois and

4    headquartered at 225 N. Michigan Avenue, Chicago, IL 60601. It is owned and controlled by 36

5    Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was

6    created by the Blues and operates as the licensor. Health insurance companies operating under the

7    Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for

8    nearly 105 million, or one in three, Americans. BCBSA itself does not provide health care

9    financing and does not contract with healthcare providers, but it operates to create consistency and

10   cooperation among its 36 members. It is owned and controlled by its members and is governed by

11   a board of directors, two-thirds of which must be composed of either plan chief executive officers

12   or plan board members. The 36 Blues fund Defendant BCBSA.

13        201.    Defendants, in all instances, includes the companies through which Defendants'

14   conduct their agreements.

15        202.    The true names and capacities, whether individual, corporate, associate or

16   otherwise of Defendant Does 1 through 50, inclusive, are unknown to Plaintiffs who therefore sue

17   said Defendants by such fictitious names pursuant to Code of Civil Procedure § 474. Plaintiffs

18   further allege that each of said fictitious Doe Defendants is in some manner responsible for the

19   acts and occurrences hereinafter set forth. Plaintiffs will amend this Complaint to show their true

20   names and capacities when the same are ascertained, as well as the manner in which each fictitious

21   Doe Defendant is responsible for the damages sustained by Plaintiffs.

22   C.   **The Unlawful-Agreement-Stabilizing, Supporting, and Facilitating Roles of**

23        **Defendant BCBSA and BHI**

24        203.    The BCBSA is a separate legal entity that purports to promote the common

25   interests of the Blues. The BCBSA describes itself as "a national federation of 36 independent,

26   community-based and locally operated Blue Cross and Blue Shield companies." The BCBSA

27   refers to the 36 Blue Cross and Blue Shield companies as Member Plans.

28

204.    The BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete.

205.    As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."

206.    ***One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages."***

207.    Every Defendant Blue is a member of the BCBSA; every Defendant Blue CEO is on the Board of Directors of BCBSA; and every Defendant Blue participates in numerous BCBSA committees.

208.    Defendant Blues govern BCBSA. BCBSA is entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

209.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Cent. Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).

210.    In a pleading it filed during the *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n* litigation in the Northern District of Illinois, Civil Action No. 09-c-5619, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current Chairman of the Board of Directors, David Holmberg, is also the President and CEO of Highmark Health. The CEO of each of the Individual Blues serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets at least annually.

211.    BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 36 members, including reimbursement rates for providers. The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are in furtherance of Defendants' agreements.

212.    Defendant Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine Member Plan CEOs and three independent members. This committee has the power to enforce the requirements of the license agreements.

213.    Defendant Blues control the entry of new members into BCBSA. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross and Blue Shield Ass'n*, Brief of Appellee, 1997 WL 34609472, at *7, *21 (filed Jan. 9, 1997) (the "Sixth Circuit Brief").

214.    Defendant Blues control the rules and regulations that all members of BCBSA must obey. According to the Sixth Circuit Brief, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). *Id*. at n. 4.

215.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards." In the Sixth Circuit Brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and

1  "revised." The License Agreements explicitly state that the member plans most recently met to

2  adopt amendments, if any, to the licenses on June 20, 2013.

3     216.   The Guidelines state that the Membership Standards and the Guidelines "were

4  developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially

5  became effective as of December 31, 1994"; that the Membership Standards "remain in effect

6  until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may

7  only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote";

8  that "new or revised guidelines shall not become effective . . . unless and until the Board of

9  Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and

10  Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate,

11  adequate and enforceable."

12     217.   Defendant Blues themselves police the compliance of all members of BCBSA with

13  the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for

14  making the initial determination about a Plan's compliance with the license agreements and

15  membership standards. Based on that determination, PPFSC makes a recommendation to the

16  BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In

17  addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to

18  each [member] Plan's CEO," which includes, among other things, "a copy of the Membership

19  Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and

20  PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements

21  and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to

22  the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board

23  Members."

24     218.   Defendant Blues control and administer the disciplinary process for members of

25  BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three

26  responses to a member plan's failure to comply—"Immediate Termination," "Mediation and

27  Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in

28  the termination of a member plan's license.

219.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In its Sixth Circuit Brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

220.    A number of Defendant Blues also serve on the IPPC, which controls the national or Inter-Plan Programs of the Blues. In each of their licensing agreements, Defendant Blues agree to participate in the national programs and to comply with the terms established by the IPPC. Therefore, Defendant Blues are collectively agreeing to the terms of the national programs and their implementation.

221.    Defendant Blues are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

222.    In addition, Defendant Blues have agreed to exchange competitively sensitive in-network provider information for the purpose and effect of stabilizing prices through Blue Health Intelligence ("BHI") (www.bluehealthintelligence.com). BHI is a licensee of BCBSA and is managed by a Board of Managers entirely comprised of BCBS executives—Highmark, BCBS-NC, BCBS-MI, BCBS-AL, BCBS-MA, BCBS-NE, HCSC, BCBSA, and IBC. BHI recently acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by BCBS companies. Designed to lower health care reimbursement to providers, Intelimedix explicitly states that "we all share information."

223.    BHI receives pricing data from each of the Blues via BCBSA. BHI uses the BCBSA claims data, called the BCBSA National Data Warehouse Core, to perform analytic reports on in-network pricing for the benefit of the Blues. The BHI reports provide the Blues with information about in-network pricing which is at the heart of their negotiations with providers. Typically, insurance companies and providers consider these data proprietary and highly confidential. Yet, BHI provides a mechanism for the sharing of such pricing data among all the Blues, including those few situations where Blues entities are presently competitors in a state, and California is such an example. These data are used for the purpose and with the effect of lowering reimbursements to providers, stabilizing the Blues pricing for health care services provided by hospitals in various markets, and managing the various anticompetitive national BCBSA programs.

224.    Each BCBSA licensee is an independent legal organization. The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues. The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

225.    In the Sixth Circuit Brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national cooperation." 1997 WL 34609472, at *3. The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

226.    BCBSA is a vehicle used by admittedly independent health insurance companies to enter into unlawful agreements, coordinate, and enter into agreements that restrain competition.

Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

227.    As detailed herein, the BCBSA not only enters into anticompetitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendants to suppress competition. BCBSA is a convenient organization through which the Defendants enter into unlawful territorial restraints between and among themselves.

## IV.    FACTS

### A.    The History of the Blues: Before and After the Unlawful Agreements

228.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently. Later, the plans jointly conceived of using the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand with each plan operating within its local area. While originally structured as non-profit organizations, since the 1980s, these local Blue plans have increasingly operated as for-profit entities either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

229.    BCBSA was created by Blue plans to support this endeavor and it is entirely controlled by those plans. The history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would be unimpeded by other Blue plans within its local Service Area.

### 1.    Before the Long-Term Business Strategy

230.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs. The Blue Cross plans were designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans provided a mechanism for covering the cost of physicians. The plans were all nonprofit entities with limited purposes, and they acknowledged obligations to treat all healthcare providers fairly.

231.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans. The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the American Medical Association ("AMA") responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

232.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

233.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. The authors of The Blues: A History of the Blue Cross and Blue Shield System, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

234.    By 1947, Blue Cross and Blue Shield plans coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. Competition in the same geographic areas under the Blue Cross name, as well as the

55

1   Blue Shield name, has been a feature of the system since the 1930s, and it continues to this day in

2   some places.

3        235.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to

4   develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health

5   Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition

6   and fear that a restraint-of-trade action might result from such cooperation.

7        236.    According to an affidavit of C. Rufus Rorem, who was the Director of the Blue

8   Cross Commission, a goal of the Commission was to "prohibit[] the operation of multiple Plans in

9   a single service area to reduce health care costs." The manner of reducing health care costs was to

10  eliminate competition among the Blue Cross plans to induce hospitals to participate with the plans

11  at reimbursement rates favorable to the plans: "One of several Plans operating in the same area

12  with an enrollment of only a small fraction of the area's eligible subscribers had substantially less

13  influence with and therefore success in convincing the area's hospitals to participate in the

14  Plan. … The operation of only one Plan *per se*rvice area helped the Plan obtain the participation of

15  hospitals on terms which were favorable to the Plan and its subscribers, thereby enhancing the

16  Plan's attractiveness in the marketplace."

17       237.    In the 1950's, to address competition from commercial insurers, including other

18  Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to

19  centralize the ownership of their trademarks and trade names.

20       238.    In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS

21  and the design of a blue cross, as service marks, for a prepayment plan for hospital care and

22  related services . . . to [the American Hospital Association]." (The "1954 Agreement.") Notably,

23  the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating

24  that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the

25  United States and in foreign countries as designating plans for prepayment of hospital care and

26  related services." The 1954 Agreement also noted limitations specifying that only "certain

27  Individual Plans . . . developed certain territorial rights with respect to the words BLUE CROSS

28  and the design of a blue cross in particular areas served by such PLANS" and that the plan had the

1  right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these

2  presents."

3      239.    The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In

4  this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a

5  condition of the grant of the license, including, among other things, that "[e]very qualified general

6  hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to

7  become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-

8  contracting hospitals."

9      240.    Finally, the 1954 Agreement prevented the American Hospital Association

10 ("AHA") from having control over the Blue Cross plans. In this regard, the agreement specified

11 that the Blue Cross plans needed only a majority vote to revoke the agreement, while the AHA

12 could revoke it only prior to January 1, 1956, upon a three-fourths vote of the House of Delegates

13 of the AHA.

14     241.    With respect to the Blue Shield entities, a 1952 license agreement between the

15 National Organization (the agreement's term for the AMCP) and its member medical care plans

16 (the "1952 Agreement") was similarly limited in scope. That agreement stated that the words

17 "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and

18 elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned,

19 controlled or sponsored by county medical societies or state, district, territorial or provincial

20 medical associations."

21     242.    The 1952 Agreement further stated that "[e]ach member plan that is a party hereto

22 is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the

23 public its nonprofit medical care plan and its membership in the National Organization."

24     243.    In 1976, the organization changed its name to the "Blue Shield Association."

25 Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

26     244.    Notably, this agreement did not contain any provision relating to the Blues

27 developing territorial rights. Instead, this agreement provided that "[t]he National Organization

28 hereby grants to each of its member plans that are parties to this Agreement, subject to the terms

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  of this agreement, permission to use said service mark in commerce among the several states or in

2  foreign commerce."

3       245.    In 1972, a new license agreement was entered into between the Blue Cross

4  Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement"). This agreement stated

5  that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of

6  a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA

7  Marks')." The agreement sought to expand the scope of the marks covered by providing that the

8  Blue Cross plan "desires to use the BCA Marks and any revisions and variations hereafter

9  developed (collectively called 'Licensed Marks')" and grants such plan the right to use the new

10  Licensed Marks "as service marks, in the sale and advertising of programs for health care and

11  related services operated on a non-profit basis."

12      246.    The 1972 Agreement included territorial restrictions in the license: the "rights

13  hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the

14  effective date of this License Agreement."

15      247.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a

16  plan must treat providers fairly. In this regard, the 1972 Agreement continued to specify that a

17  plan must comply with certain requirements as a condition of the grant of the license, including,

18  among other things, that "[e]very qualified general hospital in the area served by the PLAN shall

19  have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for

20  benefits in qualified non-contracting hospitals."

21      248.    In prior litigation, BCBSA has stated that the local plans transferred their rights in

22  the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local

23  plans, which were otherwise actual or potential competitors, "recognized the necessity of national

24  cooperation."

25      249.    In the 1970s, the Blue Cross Association and the Blue Shield Association began

26  consolidating. In his annual report to the associations given in 1979, President Walter J.

27  McNerney said that his focus would be on the "need for the Plans, within the framework of the

28

58

1  Associations, to work together in today's challenging environment and to do so with a renewed

2  sense of common mission."

3       250.    He noted that "problems" existed, "particularly where cooperative action among 2

4  or more Plans is required." He called for "mutual respect" among plans, decrying the "hazards" of

5  competition across service areas—called "Blue sharking"—and the submission by an out-of-area

6  plan of "highly competitive" prices.

7       251.    With respect to one Blue plan encroaching on the territory of another Blue plan, he

8  said "[t]he home Plan may resent the intrusion openly or covertly and add more fuel to antagonism

9  within the system with the potentially perverted result of weakening mutual support and

10  heightening the type of anxiety that leads to destructive competition."

11      252.    He added that "national accounts can only be served by coordinated action, and

12  because national accounts are growing in importance, so is coordinated action." He concluded

13  with a call for "coordinated action."

14      253.    This "coordinated action" raised antitrust concerns. In 1980, when the two

15  associations were considering a joint National Government Market Strategy, it was noted that

16  "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust

17  aspects of what is being proposed, as well as the manner in which it is being considered."

18      254.    By 1982, the process of the merger to form BCBSA had been completed. At that

19  time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks, trade

20  names, and service marks that had previously been owned by the local plans.

21           **2.    The Long-Term Business Strategy and Assembly of Plans**

22      255.    In the early 1980s, the Blues fundamentally changed the way they conducted

23  business. The Blues contracted with each other unlawfully through a work group organized by the

24  BCBSA, to set mandates that became known as the "Long-Term Business Strategy." Edwin R.

25  Werner, the President of Blue Cross and Blue Shield of Greater New York (now Defendant

26  Empire Blue Cross, which is a part of Defendant Anthem), led the effort.

27      256.    Prior to the Long-Term Business Strategy, each Blue Cross and Blue Shield Plan

28  was an autonomous company with a local presence, but often with strategic plans to compete in

other service areas—whether within a state or across state lines. Some plans saw the importance of national accounts and wished to compete for all of these accounts (notwithstanding their territorial basis).

257.    Competition across service areas was so common among the Blues that it had a name: "Blue Sharking." Some plans saw themselves as competing with other commercial health insurers who had national presence and national provider networks. These plans in particular were not interested in other Blue plans and the BCBSA was telling them what they could and could not do with their capital, that they must coordinate with anyone, and that they must cede any authority to an association. Yet this was the direct and lasting outcome of the Long-Term Business Strategy.

258.    Werner presented the Long-Term Business Strategy to the Blues at the Blue Cross and Blue Shield Annual Meeting on November 11, 1982. In his presentation, Werner described the Long-Term Business Strategy as a "fundamental change" that would result in "a concentration of power." The Blues approved the Long-Term Business Strategy the next day.

259.    According to the Long-Term Business Strategy itself, two of the three "measures of success" for the Blue Cross and Blue Shield organization were market share and profit. The mandates of the Long-Term Business Strategy were designed to further these goals in part by reducing competition among the Blues.

260.    Two of the mandates contained in the Long-Term Business Strategy reduced competition among the Blues by reducing the number of Blues who could compete with each other. Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint Blue Cross Blue Shield plans by the end of 1984, "except where the Association Board of Directors agrees that business needs dictate otherwise." Proposition 1.2 required further consolidation so that there would be only one Blue per state by the end of 1985, "except where the Association Board of Directors agrees that business needs dictate otherwise."

261.    When he presented these propositions, Werner described a "significant reduction in the number of corporations which make up our collective effort" as "wise," questioning why "it makes good business sense for four corporations in one state to chase a total market potential of

1  677,000 employed people." He asked, "Can we really justify 12 member corporations in one state

2  – even though it is a large one?"

3       262.    Although the Blues approved these propositions, some Blue plans disagreed with

4  this strategy as antithetical to competition and plan autonomy. William Flaherty, the President of

5  Blue Cross Blue Shield of Florida, sent a letter to Werner in 1982 expressing reservations about

6  portions of the Long-Term Business Strategy. With respect to the consolidation of plans, he said

7  that "[t]he large market share of the system of plans would have precipitated anti-trust actions

8  were it not for the insurance industry exemptions and the community-service orientation."

9       263.    Blue Cross of Central New York stated in a position paper, "Blue Cross of Central

10  New York is opposed to statewide merger or consolidation. Such a move would destroy virtually

11  everything our community leaders have built in our 10-county service area in the 47 years we have

12  functioned as a community organization. . . . Home rule and local autonomy were the key reasons

13  for the Plan's creation."

14       264.    Similarly, in 1983 the Presidents of Blue Cross of Western New York and Blue

15  Shield of New York sent a letter to each of the Chief Executive Officers of the Blue plans voicing

16  their dissent. They argued that the Long-Term Business Strategy was a threat to the autonomy of

17  individual plans "and [to] transform Plans into branch offices," a disguised program to strengthen

18  the BCBSA, and "a concerted effort to establish a corporate entity."

19       265.    The Blues carried out Propositions 1.1 and 1.2, dramatically reducing the number

20  of Blues in the years after they adopted the Long-Term Business Strategy. In 1980 there were 114

21  Blues. By 1989 there were 75, and now there are 36. Competition between Blue Cross plans and

22  Blue Shield plans ended in all but a few states.

23       266.    Another important mandate of the Long-Term Business Strategy was Proposition

24  3.4: "Launch an intensified program to retain, acquire and expand provider and professional

25  payment differentials." "Differentials" referred to the difference between healthcare providers'

26  billed charges and what the Blues paid, which was an advantage for the Blues because its

27  competitors generally paid the providers' billed charges. (More recently, the Blues have

28  sometimes used "differentials" to mean the difference between what the Blues pay a healthcare

provider and what their competitors pay.) In other words, the Blues unlawfully agreed to reduce the payments they were making to providers. Among the steps for implementing Proposition 3.4 was for the "Association to survey all Plans by March 1, 1983, to determine status to their efforts to protect/secure payment differentials."

267.     Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. Commenting on the Long-Term Business Strategy, Flaherty wrote to Werner, "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty also wrote, "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Thus, the Blues were aware that by using their market power to secure large differentials, they could "close out" other insurers. Blue Cross and Blue Shield of Alabama is one of the Blues that secured a large differential by imposing cost-based reimbursement on hospitals.

268.     Another mandate of the Long-Term Business Strategy was Proposition 1.4: "Continue study of Blue Cross and Blue Shield organization and make further recommendations for change." A Proposition 1.4 Work Group was established, and it wrote in 1985:

> One deterrent to Plan support for common cohesive effort was quickly identified and is the subject of the balance of this report. A common effort requires a common bonding. The bond in our case is the use of the Blue Cross and Blue Shield names and marks. Yet as we analyzed the current provisions of the basic agreements with plans, that bond seems unduly weak for the current environment. As will be developed, a strengthened license agreement is deemed essential.

The Proposition 1.4 Work Group identified as a problem the possibility that a plan could hold a license to use the Blue marks but not be a member of BCBSA, imperiling cooperation and coordination among plans. The solution was to tie the terms of the license agreement to membership in BCBSA.

269.     The Proposition 1.4 Work Group also recommended a series of meetings among the Blues, known as the "Assembly of Plans." The Board of Directors of BCBSA approved this proposal in 1986.

270.    On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues plans, including actions that plans should do collectively.

271.    In June 1986, John Larkin Thompson, the CEO of Blue Cross and Blue Shield of Massachusetts, agreed to Chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine plan CEOs. The Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the plan CEOs. This became known as the "White Paper."

272.    The focus of the White Paper was "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements." The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue service marks within the plans' Service Areas.

273.    It acknowledged, however, that exclusive Service Areas were not essential to the Blue marks, and that they were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing *Sealy* and *Topco*]. . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future Thus, an issue for the Assembly is whether to consider – at this time – alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

The White Paper recognized that "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned." As the author of a paper summarizing a meeting discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas in the future—shouldn't we be looking instead for other alternatives."

274.    During this process, it was clear that the reason for preserving exclusive Service Areas was to prevent competition that would otherwise arise among the Blues. According to an internal report about the Assembly of Plans, "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare."

275.   And the result of reduced competition was lower payments to providers; according to same report, "By enjoying exclusive territories, Plans can bargain aggressively. In turn, national accounts enjoy local discounts." According to the internal Assembly of Plans report, exclusive service areas create "Larger market share because other Blues stay out and do not fragment the market. … Stronger provider agreements for the same reason."

276.   Despite the significant legal problems with exclusive areas, the Assembly of Plans considered and rejected proposals to create non-exclusive "primary service areas" or to eliminate territorial allocation entirely.

277.   Ultimately, through nine meetings of the Assembly of Plans from 1987 through 1989, and despite open acknowledgement that a number of Plans were happily competing with each other outside their exclusive Service Areas, the Assembly of Plans issued its Final Report on February 8, 1990. It recommended to the BCBSA approval of new license agreements that would tie together licensing of the Blue marks and membership in BCBSA (and satisfaction of its membership standards; prior to this a plan was not required to be a member of BCBSA to obtain a license to use the BCBS name and marks).

278.   When these license agreements were executed, the BCBSA acquired the ability to enforce exclusive Service Areas by membership restrictions in BCBSA, limitations on use of the BCBS name and marks, and monetary sanctions. This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where plans wish to compete with each other across assigned territories.

### 3.   Defendant Blues Entered Into Unlawful Agreements

279.   Until 1986, the Blues were tax-exempt. The Tax Reform Act of 1986 revoked this exemption and added Section 833 of the Internal Revenue Code, which treats the Blues as taxable stock insurance companies.

280.   Since 1986, some Blues have converted to for-profit organizations. The largest, Anthem, reported a net income of $2.56 billion in 2015. As described in more detail below, many of the Blues that have remained nominally nonprofit behave like for-profit companies by building up unnecessarily high levels of surplus and paying outsized compensation to executives.

281.     Although the Assembly of Plans eliminated the potential for BCBSA-sanctioned "Blue on Blue" competition in most states, it left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues. After the 1986 revocation of the Blues' tax-exempt status and throughout the early1990s, the number of non-Blue subsidiaries of Blues increased.

282.     As quoted in The Blues: A History of the Blue Cross and Blue Shield System, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with the other Blues. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

283.     Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

284.     Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey, and guidelines that proposed members must adhere to prior to joining the BCBSA. These rules and regulations include the License Agreements, the Membership Standards, and the Guidelines. These agreements, which were revised or amended at least as of 2013, are the agreements at issue in this case.

285.     These License Agreements depart from, and supersede, the previous licensing agreements. For example, the "whereas" clauses of the Blue Cross License Agreements provided that the plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the plan "was desirous of assuring nationwide protection of the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

286.     Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system." In order to

accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined Service Areas. The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below." Paragraph 5 sets forth these new "Service Area[s]]" as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

287.    Despite the expanded scope of the license and the newly defined Service Areas, the License Agreements failed to include the provision—contained in both the 1954 and 1972 Agreements—that required the plan to treat providers fairly. To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with healthcare providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

288.    In 1990, Defendants developed an amended license agreement that continued to require that all Blue license holders be non-profit entities. At that point, Associated Insurance Companies of Indianapolis, which became Anthem, wished to be a for-profit company and refused to sign the amended license agreement, and it "bought the giant Dallas-based American General Insurance Company in 1990 . . . it was a 'Sputnik event' for the rest of the [Blue] Plans, according to M. Edward Sellers, a former BCBSA vice president who became president and CEO of Blue Cross and Blue Shield of South Carolina in 1987. Soon the Indiana Plan was competing under another brand name in many other Plans' home markets." The Blues: A History of the Blue Cross and Blue Shield System at 241. During the 1990s, in order to end the developing competition, the Defendants agreed to restrict non-Blue competition and to develop the Blue Card Program in a highly anticompetitive manner described previously in this Complaint.

289.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic Service Area, which is either the geographical area(s)

1 served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent

2 license.

3      290.    Under the Guidelines and Membership Standards that were developed in the early

4 to mid-1990s, each member plan agrees that at least 80% of the annual revenue that it or its

5 subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid)

6 shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks

7 and trade names.

8      291.    Each Defendant also agrees that at least two-thirds of the annual revenue generated

9 by it or its subsidiaries from either inside or outside of its designated Service Area (excluding

10 Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue

11 Shield trademarks and trade names.

12      292.    The Guidelines provide that national enrollment can be substituted for annual

13 revenue, making the alternative restriction that a plan will derive no less than 66.66% of its

14 national enrollment from its Blue business.

15      293.    Both provisions directly limit the ability of each Blue to generate revenue from a

16 non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands

17 that could and would compete with other Blues.

18      294.    The Defendants also agree that they will participate in inter-plan programs,

19 including Blue Card, with the billions of dollars of access fees providing the quid pro quo for the

20 agreements not to compete.

21      295.    Therefore, Defendants have agreed that in exchange for having the exclusive right

22 to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each

23 Blue will derive none of its revenue from services offered under the Blue brand outside of that

24 area, and will derive at most one-third of its revenue from outside of its exclusive area using

25 services offered under a non-Blue brand. The latter amount will be further reduced if the licensee

26 derives any of its revenue within its designated geographic area from services offered under a non-

27 Blue brand.

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

296.     Anthem (then known as WellPoint), in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

297.     These agreements drastically limited the Blues' ability to compete.

298.     The rules and regulations also prohibit acquisition of a Plan by a non-Blue entity without the approval of BCBSA. The Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services."

299.     Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans accordingly may block its membership by majority vote.

300.     The License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (i.e., to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate automatically: (1) if any institutional investor becomes beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor becomes beneficially entitled to 5 percent or more of the voting power of the member plan; (3) if

any person becomes beneficially entitled to 20 percent or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent or more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

301.    These acquisition restraints reduce competition in violation of antitrust laws because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Blues. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area.

302.    Through the acquisition restrictions, the Blue plans have agreed unlawfully to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

303.    The Defendants have long been aware that their limits on non-Blue business could constitute an unlawful restraint of trade. A "Blue Cross and Blue Shield Issue Summary" dated February 4, 1993, which "was assembled by asking several Blue Cross and Blue Shield Plan CEOs to identify issues that they believed were divisive to the Plans and BCBSA," cited

unbranded competition as a divisive issue, and stated as one position that "[a]ny attempt to restrict competition between licensees using trademarks other than the Blue marks is a violation of federal and state antitrust laws and subject to criminal and civil penalties. Competition is good for the consumer and that is who we are obligated to serve. It makes the Plans more effective. No harm has ever been demonstrated. It would be impractical to regulate much less unlawful."

304.    One plan wrote in an "Executive Overview" that "[a]ny new restrictions on 'unbranded' activities will be reviewed under the antitrust laws . . . and could be viewed as an agreement among competing Plans and therefore an unlawful horizontal restraint . . . ."

305.    Despite this concern, the Blues eventually imposed restrictions on non-Blue businesses with the stated purpose of restraining competition. In an April 30, 2001 memorandum to the Blues, BCBSA expressed concern about Blues competing under non-Blue brand names. According to BCBSA, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local Blue Plan." For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

306.    The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition, in addition to the explicit agreements described above.

307.    The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard. For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Defendant's territory.

308.    However, many of the Blues have entered into what they call "gentlemen's agreements" not to compete in those counties. For example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements.

70

309. Other Blues have engaged in similar conduct to the detriment of providers, including Anthem's refusal to contract with hospitals in counties adjacent to Ohio which is described below.

### 4. The Blue Card and National Accounts Programs

310. In the 1940s and 1950s, the Blues used the development of employment-based health benefits to advance their bargaining power. As the demand grew over the next few decades for insurance and servicing of benefit plans that covered the employees of a single employer across many states, the Blues found a way to use, maintain and enhance that bargaining power and market share by accessing each other's provider networks, and sharing the benefit of any differentials they had obtained.

311. During the early to mid-1990s as part of their overall agreement to restrict competition, the Defendants agreed to develop the Blue Card Program as part of their Inter-Plan and National Accounts Programs. Under the Blue Card/National Accounts Programs, one, and only one, Defendant Blue may administer a national or multi-state employee benefit plan. The Blue where the national account is headquartered is the Control Plan (or "Control Blue") while the other Blues are Participating Plans.

312. The Control Blue is the only Blue that may bid for the business of that national account unless that Control Blue cedes the right to another Blue, which is then the only Blue that may bid for the business of that national account. In other words, in this area and many others, the Defendants agree that they will not compete. The Defendants divide the proceeds derived from this anticompetitive scheme either through the Blue Card Program or through separate agreements.

313. All of the Blues are required to participate in the Blue Card Program, which applies when a subscriber obtains healthcare services outside of the Service Area of the subscriber's Blue plan. With the Blue Card Program, claims are processed by a provider in one Service Area on behalf of the patient whose Blue plan is based in another Service Area.

314. Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan."

315.     Generally, when a provider treats a patient who is a member of a Blue plan outside the provider's service area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays. The provider is paid based on the reimbursement rates or prices in the provider's contract with the Host Plan, but in order to be paid, the provider must comply with the medical policy and other requirements of the Home Plan, to which the provider often does not have access.

316.     As a result of the Blue Card Program, providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for providers and the health care system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the providers.

317.     All healthcare providers are required to participate in the Blue Card Program as a condition of their participation in the Blue plan in their Service Area. As a result, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with the Blue in that Service Area. Instead, the Home Plan pays the healthcare provider the discounted rate that the Host Plan has imposed on the provider. For example, many members of plans insured or administered by Defendants Empire (New York), BCBS of Illinois, and BCBS of Michigan spend time in Florida during the winter months.

318.     Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida. Moreover, the Blues do not allow healthcare providers to have an escape clause to allow them to opt-out of the national programs and contract separately with the Blues.

319.     The Blue Card and National Accounts Programs are thus agreements to fix prices. Healthcare providers, such as Plaintiffs, providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area receive significantly lower reimbursements than they would receive absent Defendants' agreement to fix prices. In 2002, BCBSA reported that in 2001, the Blue Card Program saved $9 billion. This figure represents the reduction in payments to healthcare providers that the Blues were able to obtain by fixing prices.

320.     The Blues share the discounts they are able to impose through the Blue Card and National Accounts programs. In addition to an administrative fee that purports to cover the cost of processing claims through Blue Card, a standard Blue Card fee is the Access Fee, which is a percentage of the Host Plan's discount that the Host Plan shares with the Home Plan. Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for fixing their prices. For its self-funded accounts, Defendants such as BCBS-AL bill access fees to the account as a cost of the medical claim, even though the access fee is not paid to the provider.

321.     The Blue Card Program encourages the Blues to fix prices rather than compete, even in the limited contexts in which BCBSA rules allow them to compete outside their Service Areas. Because of the discounts that the Blues receive through the Blue Card Program, they can lower their payments to providers in counties contiguous to their Service Areas by relying on Blue Card rather than negotiating and contracting with those providers directly.

322.     By way of example, since the 1980s, Blue Cross and Blue Shield of Alabama maintained agreements with healthcare providers, including hospitals, in contiguous counties of adjacent states such as Florida and Mississippi. These out-of-state hospitals were not subject to the same rules as the in-state Alabama hospitals, and were not required to submit the "Blue Cross Cost Study" that in-state Alabama hospitals are required to submit as part of their agreement with Blue Cross and Blue Shield of Alabama. Therefore, Blue Cross and Blue Shield of Alabama could not force these out-of-state hospitals to accept the lower outpatient payment methodology that it imposed on Alabama hospitals.

323.     In 2013, Blue Cross and Blue Shield of Alabama terminated its contracts with all hospitals in contiguous out-of-state counties. It ultimately terminated the contracts of twenty-nine hospitals in four states: Florida (nine hospitals), Georgia (five hospitals), Mississippi (nine hospitals), and Tennessee (six hospitals). Each of these hospitals remained in-network with its in-state Blue. Therefore, Blue Cross and Blue Shield of Alabama could leverage the Blue Card Program to maintain access to these hospitals for its enrollees.

73

324. Blue Cross and Blue Shield of Alabama identified the "impetus" of the terminations as the significant reduction in payments it could make to these hospitals by taking advantage of the Blue Card Program, rather than directly contracting with these hospitals. This was true, even net of the Access Fees it would be required to pay to utilize the Blue Card Program.

325. In addition to lowering payments for providers, the national programs, including the Blue Card Program and the National Accounts Programs, also impose numerous inefficiencies and burdens on the providers. While the amounts paid for medical services are dictated by the Host or Participating Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home or Control Plan. The Home or Control Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area.

326. Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. For example, BlueCross BlueShield of South Carolina administers the benefit plan for employees of Winn Dixie Stores, many of whom live in Alabama and, accordingly, seek medical treatment there.

327. For these patients, BlueCross BlueShield of South Carolina is the Home or Control Plan, while BCBS-AL is the Host or Participating Plan. BCBS-AL determines the price paid for services rendered by a healthcare provider in Alabama. However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BlueCross BlueShield of South Carolina.

328. While the Alabama provider has access to the rules for preauthorization or pre-notification for BCBS-AL, because BlueCross BlueShield of South Carolina boycotts the Alabama providers from participating in its network as a part of its horizontal agreement with all the Blues, the provider does not have ready access to BlueCross BlueShield of South Carolina's rules. In this example, the Alabama healthcare provider can and does innocently fail to comply with the rules of BlueCross BlueShield of South Carolina and be paid nothing by BlueCross

1   BlueShield of South Carolina, not even receiving the discounted amount that would result from

2   the Price Fixing Agreement.

3   329.   When this happens, the healthcare provider has no recourse. Healthcare providers

4   spend innumerable hours attempting to locate and understand Home Plan medical policies, claims

5   edits, and coverage rules, frequently to no avail despite the fact that the providers have made no

6   agreement with the Home Plan. Moreover, the illustration includes only one Home or Control

7   Plan, whereas, in reality, a healthcare provider's patients may include patients enrolled in various

8   plans that are insured or administered by multiple Blues other than the Blue in the provider's

9   Service Area.

10   330.   Furthermore, Blues will even offer commercial health insurance across state lines

11   to healthcare providers, through national accounts or other programs, even where they will not

12   contract in their capacity as a healthcare provider. For example, at various times Illinois-based

13   Defendant HCSC has provided Blue-branded commercial health insurance for Tenet Healthcare, a

14   large healthcare company with facilities in many states including Brookwood Hospital in

15   Alabama.

16   331.   Despite this, because of Association rules, HCSC is barred from contracting

17   directly with Brookwood Hospital for its healthcare services. This is, of course, because the

18   arrangement allows BCBS-AL to use its combined market share to extract the maximum discount

19   possible from Brookwood and other hospitals. This sort of approach is common.

20   332.   Many Blues have different medical records requirements and timing for those

21   requirements that apply to providers, including hospitals. Hospitals find their bills being reduced

22   or denied because they comply with the Host or Participating Plan's requirements (those where the

23   hospital is located and where the hospital is in-network) but not with the Control or Home Plan's

24   requirements.

25   333.   Since the hospitals are not in-network with the Control or Home Plan, those

26   hospitals do not have ready access to those medical records requirements. In an effort to address

27   this highly inefficient process, hospitals in Florida, where there are many Blue Card and National

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  Accounts subscribers, set up weekly telephone calls with Blues to try to learn the requirements of

2  each of the plans for submitting medical records and other coverage requirements.

3      334.    The employees of the hospitals spend hours, week after week, for an extended time

4  in trying to learn those requirements. They would obtain inconsistent and incomplete answers to

5  their inquiries. Despite spending significant resources of the hospitals to comply with the Blues'

6  multiple coverage requirements, the hospitals continued to have claims reduced and denied when

7  they innocently failed to comply with one of those requirements.

8      335.    The national programs, including the Blue Card and National Accounts Programs,

9  are so inefficient that the Defendants have established an adjacent county rule that allows them to

10  contract with healthcare providers in one county into the adjacent Blue's Service Area. However,

11  the Defendants use and abuse the adjacent county rule to reinforce each other's market power. For

12  example, when Highmark was attempting to force University of Pittsburgh Medical Center

13  ("UPMC") to accept lower reimbursement rates, UPMC asked Anthem Blue Cross of Ohio to

14  contract with Harmot Hospital, which is in a county adjacent to Ohio. Anthem Blue Cross of Ohio

15  refused to have discussions about a contract with Harmot Hospital. Plaintiffs allege that the refusal

16  was part of a horizontal agreement under which the Defendant Blues attempt to reinforce each

17  other's market power.

18      336.    To facilitate the agreements, the Defendant Blues that are partners along with the

19  BCBSA have established and own National Account Service Company L.L.C. ("NASCO"), which

20  assists the Blues in processing claims involved in national accounts and other claims.

21      337.    "In 1987 NASCO was formed through a partnership with major Blue Cross and

22  Blue Shield Plans." It has been engaged in activity "for some of the largest Blue Cross and Blue

23  Shield Plans for over 20 years." NASCO establishes "work groups composed of NASCO

24  associates and customers." NASCO also works with the Blues to "ensure their compliance with

25  Blue Cross and Blue Shield Association (BCBSA) mandates." *See* Exhibit A.

26      338.    To facilitate the agreements, numerous Blues and the BCBSA have also established

27  Consortium Health Plans, Inc. ("CHP"). CHP describes itself as a "national coalition of 20 leading

28  BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination,

for the Blue System among national accounts . . ." whose "mission is to position Blue Cross Blue Shield as the preferred choice for national accounts." *See* Exhibit B. Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis. The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

339.    For example, in a marketing brochure dated February 6, 2013 for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level. In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-d4cb2f0a7b3f&groupId=10307, last visited Sept. 30, 2014. The brochure further explains that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally. The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

340.    Another brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP. In this regard, the brochure makes the following claims, among others:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

77

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

341.    Thus, CHP harnesses claims data for the Blues in every state, metropolitan statistical area ("MSA") and zip code in the country and, using that data, allows the Blues to impose deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

### 5.    Protecting and Increasing "Differentials"

342.    The Defendants have aggressively protected and increased their differentials. In August 1983, the Defendants had established two projects aimed at increasing the differentials or reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of BCBSA to the CEOs of the Blues, "Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact in each Plan."

343.    The second project was "Project State Watch," which included states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the overall Blue System differential would be reduced by a reduction in the differential in those states. In other words, all the Blues benefited by acting together to decrease provider payments in each state.

344.    The Blues' efforts to establish, maintain, and increase their differentials continue to this day. The CHP brochure described above boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care." As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

(Emphasis added.) Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors. Indeed, as CHP itself

78

says, "[n]o other carrier even comes close." (Emphasis added.) And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor. According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

345.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs. *See* Exhibit C.

346.    Despite its claims that it is simply a marketing agent, CHP acts with the Association and the plans not just to measure and market discounts, but to unlawfully agree to actively suppress the amounts paid to providers in the name of "differentials." CHP regularly meets with the Association and with network contracting executives from plans to identify and develop "action plans" for "critical markets" to help with the Association's "corporate obj[ective]" of reducing provider reimbursement and increasing "discounts." CHP facilitates the Blues' agreements by allowing them to collaborate to reduce provider reimbursements.

347.    Despite enjoying an advantage over its competitors in provider reimbursements, the Blues have higher administrative fees for self-funded plans than its competitors, even before accounting for the access fees the Blues charge as medical costs.

### 6.    Differences Between the Modern Blues and Other Insurers

348.    The Blues' anticompetitive agreements make them very different from other insurers. If an insurer like UnitedHealthcare wants to establish a provider network, its value proposition to a provider includes its ability to steer its enrollees to that provider. And a provider who is thinking about leaving the network knows that the consequence is the inability to treat UnitedHealthcare's enrollees on an in-network basis.

349.    Each Blue, on the other hand, brings not only its own enrollees, but also the enrollees of every other Blue into negotiations with providers. ("Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-leave it basis.) And a provider who is

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1   thinking about leaving the local Blue's network knows that the consequence is not just the

2   inability to treat the local Blue's enrollees on an in-network basis, but the inability to treat all of

3   the Blues' enrollees on an in-network basis. Thus, the Blues are able to use leverage against

4   providers that is unavailable to their competitors.

5       350.    In addition, the Blues operate less efficiently than their competitors. For example,

6   the rules associated with the Blue Card program, requiring compliance with each Home Plan's

7   rules, create confusion for providers in a way that does not exist for other major insurers.

8   **B.    Specific Examples of Defendants' Unlawful Conduct**

9          **1.    The Leading Example: Alabama**

10      351.    The history of Blue Cross and Blue Shield of Alabama shows how competition

11  could have developed in Alabama but for the Blues' anticompetitive agreements.

12      352.    The National Labor Relations Act, which was enacted in 1935, and as ultimately

13  interpreted provided the basis for the growth of employer-based health benefit plans. Health

14  benefits for employees expanded enormously during World War II as a method of increasing

15  competition without increasing wages or salaries because of wage freezes. This expansion

16  continued in the post-war years.

17      353.    During the period after World War II, Alabama was the most unionized state in the

18  Southeast. Some of the largest employers in the State were in the steel industry, and the workers in

19  that industry were represented by the United Steelworkers of America. After the United States

20  Supreme Court and the National Labor Relations Board recognized fringe benefits, including

21  pensions and health care benefits as mandatory subjects of bargaining, in 1949 the United

22  Steelworkers of America demanded that health care benefits be included in the new collective

23  bargaining agreement.

24      354.    After a strike, the steel industry agreed to include health care benefits in the

25  collective bargaining agreement, and designated Blue Cross of Western Pennsylvania, now

26  Highmark, as the entity to coordinate those benefits. Because of the territorial restrictions that the

27  Defendants had agreed to, Blue Cross of Western Pennsylvania would not provide those

28  healthcare benefits to the many thousands of steelworkers in Alabama.

355.    If it had been able to do so, Blue Cross of Western Pennsylvania could have become a major health insurer in Alabama, developed a provider network, and even sold health insurance in the State to compete with Blue Cross and Blue Shield of Alabama. Instead, Blue Cross and Blue Shield of Alabama used this event to become the dominant health insurer in the State of Alabama.

356.    In The History of Blue Cross and Blue Shield of Alabama, written by Clarence Joseph Vance and copyrighted in 1978 by Blue Cross and Blue Shield of Alabama, the following statement appears: "The enrollment in Alabama in 1950 of the U.S. Steelworkers was a progressive milestone; in terms of increasing enrollment. It was a major breakthrough. Heretofore, Blue Cross Plans had become conditioned to limit their markets to the white-collar workers . . ." *Id*. at 88–89. "The first step toward national accounts business was taken when Abraham Oseroff convinced the U.S. Steel Corporation and the Congress of Industrial Organizations in Pittsburgh that his Pittsburgh Plan could serve as a syndicate head. Working with the Blue Cross Commission and with Mr. Thompson, the New York Plan's actuary, Mr. Oseroff put together the first syndicate, covering over 1 million steel workers, with an estimated 75,000 in Alabama." *Id*. at 98. As the book notes, this syndicate was still intact at the time of publication in 1978. "The Steel contract has been the most stable piece of business, both locally and nationally." *Id*.

357.    These "national accounts" were critical to Blue Cross of Alabama's growth. "Early in 1950, competing in the national market place with large commercial carriers became a crisis issue." *Id*. at 98. However, the individual plans were ill equipped to do this on their own. "The locally autonomous Plans could not reply [sic] upon their loose confederation… ."

358.    Blue Cross and Blue Shield of Alabama experienced a similar increase in enrollment from other unionized industries. For example, the auto workers at the Ford plant in Sheffield became enrolled with Blue Cross and Blue Shield of Alabama shortly before the Steelworkers, and they would have been covered by Defendant Blue Cross and Blue Shield of Michigan if it were not for the territorial restrictions agreed to by the Defendants.

359.    Thus, Blue Cross and Blue Shield of Michigan also would have become a meaningful competitor in Alabama if it were not for those restrictions. The addition of the

1    Steelworkers and other unionized workers to Blue Cross and Blue Shield of Alabama's rolls

2    resulted in its fastest growth in history. "The Corporation's enrollment at the end of the first

3    decade (1946) had reached 160,000 members; however, at the end of the second decade (1947-56)

4    enrollment has reached 668,000, or a 416 percent increase." *Id*. at 194–95. As employee benefit

5    plans expanded, BCBS-AL and the other Defendants used those plans and their anticompetitive

6    system to expand their market shares and market power.

7         360.    Blue Cross and Blue Shield of Alabama also acted as a control plan for South

8    Central Bell Telephone Company and International Paper's Southern Kraft Division, and aided

9    other Defendants in developing their market shares and market power.

10        361.    Blue Cross and Blue Shield of Alabama's rapid growth in enrollment gave it

11   increased market power when dealing with healthcare providers. As the copyrighted history states,

12   "while the U.S. Steel breakthrough was an enrollment boon, it also brought with it reimbursement

13   problems." *Id*. at 89. Blue Cross and Blue Shield of Alabama addressed those reimbursement

14   problems by forcing hospitals in Alabama to accept a cost-based reimbursement system.

15        362.    That system is unique and has resulted in hospitals in Alabama receiving among the

16   lowest reimbursement rates in the country. That system remains in place for hospitals in Alabama,

17   and BCBS-AL requires cost-based reimbursement for hospitals in Alabama each year, including

18   during years since 2008.

19        363.    Today, hundreds of thousands of enrollees of non-Alabama Blues live and work in

20   Alabama. As of 2012, Defendant Anthem had approximately 121,000 enrollees in Alabama (and

21   127,000 as of 2015), Defendant Highmark had approximately 40,000, Defendant HCSC had

22   approximately 94,000, Defendant Blue Cross and Blue Shield of Michigan had approximately

23   30,000, and Defendant BlueCross BlueShield of Tennessee had approximately 31,000 (and 35,000

24   as of 2015).

25        364.    Yet the Blues' rules prevent Alabama providers who treat these patients from

26   negotiating with those Blues; instead, they must accept the low reimbursement rates imposed by

27   BCBS-AL. Moreover, BCBS-AL is free to set its low rates with the knowledge that Anthem,

28   HCSC, and others are prohibited from competing for the business of BCBS-AL's enrollees or

1  negotiating with Alabama providers. BCBS-AL has taken advantage of its market power in a

2  number of ways.

3          a.      **BCBS-AL Stifled Competition Promoted by the Alabama Health**

4                  **Care Council**

5          365.    In 1985, the CEOs of several major corporations, including Alabama Power,

6  Drummond Company, and SouthTrust Bank, formed the Alabama Health Care Council as a non-

7  profit entity to help Alabama corporations improve the quality and cost of health care.

8          366.    In September 1995, in response to rising health care costs in Alabama, the council

9  solicited health insurance proposals. It received bids from over twenty companies, and ultimately

10  narrowed the bids to United Healthcare of Alabama and HealthPartners of Alabama, the former

11  insurance arm of then-Baptist Health System. BCBS-AL did not initially submit a bid in response

12  to the council's solicitation.

13         367.    BCBS-AL stood to lose the business of approximately 60,000 employees if the

14  members of the council contracted with another insurer.

15         368.    In an effort to maintain its market share and delay and block healthcare reforms in

16  Alabama, BCBS-AL offered the council a 20 percent discount for the next three years, which the

17  council accepted. Pursuant to its agreement with the council, BCBS-AL was further obligated to

18  reduce the costs of health care for the council's members once the three-year guarantee expired by

19  better managing the delivery of health care services and the administration of health benefit plans

20  in Alabama.

21         369.    Effectuating a 20 percent savings for the council's members would have required

22  BCBS-AL to significantly change its methods of managing the delivery of health care services and

23  administering health benefit plans in Alabama. Instead of making these changes, BCBS-AL

24  financed these discounts by relying on its hundreds of millions of dollars in surplus and increased

25  charges to other consumers.

26         370.    As the three-year savings guarantee came to an end, the council's members learned

27  that if they continued their relationship with BCBS-AL, their health care costs in the next year

28  would increase by approximately 35–45 percent.

371.    In September 1999, Drummond Company terminated its contract with BCBS-AL. Drummond subsequently obtained health coverage for its employees through Select Care.

372.    As a result of BCBS-AL's use of most-favored-nation clauses ("MFNs"), Drummond encountered significant problems in negotiating favorable rates with hospitals and physicians and establishing satisfactory hospital and physician networks. The best rates that hospitals generally were able to offer Drummond was 15 percent greater than the rates received by BCBS-AL. This example illustrates how BCBS-AL used MFN's to preserve its market power and insulate itself from competition.

373.    In May 2000, Drummond filed suit against BCBS-AL in the Northern District of Alabama, in part challenging its use of MFNs. *See Drummond Co. v. Blue Cross & Blue Shield of Alabama*, Civil Action No. CV-00-AR-1354-S.

374.    In August 2001, the parties settled the action. As part of the settlement agreement, BCBS-AL agreed to cease the use of MFNs. Since 2001, BCBS-AL has, however, engaged in similar conduct that allows it to obtain larger discounts from its providers than its competitors can obtain.

b.    **BCBS-AL Uses Its Market Power to Extract Money From Providers Through "Tiering"**

375.    BCBS-AL abuses its market power and the lack of competition in Alabama in other ways as well.

376.    In a further effort to depress prices paid to hospitals and gain greater "differentials," BCBS-AL began its "Hospital Tiered Network Program" in 2006. Their stated goal was to "recognize hospitals that have taken action to improve healthcare quality and work with Blue Cross and Blue Shield of Alabama to reduce healthcare costs for our customers."

377.    In its Hospital Tiered Network Program, BCBS-AL ranks hospitals in various categories. BCBS-AL enrollees face higher out-of-pocket responsibility for treatment at hospitals that are ranked in lower tiers.

378.    Initially, the three primary categories of the tiered hospital criteria were fiscal, quality, and patient safety. BCBS-AL states in its program description that the program criteria is

1  evaluated and enhanced each year in an effort to continually pursue high quality healthcare in the

2  State of Alabama. In 2010, BCBS-AL added a fourth category of patient experience.

3      379.    The Hospital Tiered Network Program has been based on a scoring system that

4  allowed for a maximum of 100 points divided between the categories. To be a Tier 1 hospital you

5  had to score between 80 and 100. For Tier 2 from 60-79 points and Tier 3, when there was a Tier 3

6  category, 59 or below

7      380.    Despite any claims concerning quality or safety, since inception, the Fiscal

8  category has always been the primary driver of the tier a particular hospital was placed in, and

9  that, that fiscal component is always based upon the hospital's acceptance of terms that reduced

10  the amounts or rates that BCBS-AL paid to the hospital.

11      381.    Through 2011, the sole criteria that had to be met to receive any points in the fiscal

12  category was to continue an annual POF/ASC contract whose only purpose was to reduce

13  reimbursement for the hospitals' ambulatory surgery center and other ambulatory services. BCBS-

14  AL has made clear that "[h]ospitals scoring high in this category have entered into financial

15  arrangements with Blue Cross and Blue Shield of Alabama to provide the most favorable

16  discounts for their services."

17      382.    In particular, the Fiscal category through at least 2010, required each hospital to

18  accept a reduction in their reimbursement to receive 25 points if it accepted the lower contract

19  reimbursement and zero points for that category if it did not. Therefore, without "accepting"

20  BCBS-AL's even lower fee schedule, a hospital could not qualify to be in Tier 1 in Alabama. A

21  hospital could achieve every other point available under the Hospital Tiered Network Program and

22  would still end up in Tier 2 if it refused to accept the lower reduced reimbursement from BCBS-

23  AL.

24      383.    The Quality, Patient Safety, and Patient Experience categories are all measured by

25  standard measures which are largely achieved by all the hospitals in the state. As shown above,

26  quality, patient safety, and patient experience are not what ultimately drive a hospital's tier.

27      384.    In the current iteration of the Hospital Tiered Network Program, a facility's rank is

28  determined based on its "costs." A hospital's "costs" are compared to a particular percentage of

Medicare and scored for tiering purposes. As with the earlier iterations, it impossible to achieve a Tier 1 ranking without meeting BCBS-AL's lower "cost" thresholds. BCBS-AL itself notes that the new method puts even "greater emphasis on cost."

385.    The new methodology placed 50% weight on "cost" with the thresholds of $ for "costs" under 130 percent of Medicare, $$ for "costs" between 130 and 140 percent of Medicare and $$$ for "costs" above 140 percent of Medicare. Hospitals in the state have sought information from BCBS-AL on how "costs" are determined but have been unable to match BCBS-AL's purported cost calculations or tie them off to the same Medicare percentages. BCBS-AL has refused to provide its internal calculations, essentially treating them as a black box during the initial process.

386.    Further, BCBS-AL personnel have stated that the particular percentages of Medicare used for the "cost" thresholds are supported by a study or other work done for BCBS-AL. BCBS-AL refused to provide the basis for these particular percentages of Medicare as appropriate "cost" thresholds to the hospitals. Defendants have stated that no such studies exist. Based on this, Plaintiffs must conclude that there is no study that demonstrates that these percentages of Medicare are appropriate measures of costs. Therefore, these percentages of Medicare seem to be arbitrary thresholds designed to lower reimbursements paid by BCBS-AL or to extract payments from the hospitals as part of the Tiering process.

387.    Under the new method, 17 hospitals were pushed from Tier 1 to Tier 2.

388.    For instance, in 2016, UAB Hospital was placed in Tier 2. Since UAB Hospital is one of the premier and most advanced hospitals in the state, this relegation to a higher cost tier demonstrates that the quality of the facility is not the driving force behind BCBS-AL's Tier rankings

389.    Plaintiffs Jackson Medical Center, LLC, Evergreen Medical Center, LLC, and Crenshaw Community Hospital all were placed in Tier 2.

390.    In 2016, Mobile Infirmary was also placed in Tier 2 originally. After negotiations with BCBS-AL, and after significant money was paid to BCBS-AL, in October 2016 Mobile Infirmary was placed in Tier 1.

391.    In 2016, before the tiering decisions were made public, BCBS-AL told Decatur Morgan Hospital in Decatur that it would be a Tier 2 when the rankings were released. The parties attempted to reach an agreement on payments to Blue Cross that would allow Decatur Morgan to regain Tier 1 status. Decatur Morgan and BCBS-AL were unable to reach an agreement. BCBS-AL took the tiering rankings public and pushed to the local media in Decatur that Decatur Morgan would be Tier 2 and patients would be subjected to higher patient responsibility at Decatur Morgan in the hopes of driving Decatur Morgan to make a deal.

392.    After the rankings were public, but before the tiering went into effect, Decatur Morgan and BCBS-AL reached an agreement whereby Decatur Morgan would pay BCBS-AL approximately 1.7 million dollars, and BCBS-AL would move Decatur Morgan back to Tier 1 status. Decatur Morgan was therefore moved back into Tier 1 before the new rankings went into effect.

393.    In addition to the general ability to force providers to continually lower costs, it is not clear to hospitals how BCBS-AL actually determines the "costs" it uses for tiering purposes or how it calculates the corresponding percentage of Medicare payment rates for purposes of the tiering exercise. Hospitals have asked for information on the calculations that drive these cost measures but are not allowed to see or confirm how these costs measures are actually derived. Essentially, the tiering process is driven by a black-box calculation that determines which hospitals will be favored for steerage by BCBS-AL.

394.    Further, under the tiering regime, BCBS-AL's initial cost determinations and tier assignment are used to hold the Tier 2 hospital hostage. In order to regain Tier 1 status, a "negotiation" unfolds where BCBS-AL extracts certain concessions either with respect to the costs a hospital reported in earlier years, or by reductions in forward-looking reimbursement rates. In some cases, hospitals have been asked to cut checks of over a million dollars to BCBS-AL for cost adjustments from earlier years in order to regain their Tier 1 status.

395.    Being placed below Tier 1 is designed to cause extraordinary harm to a hospital. BCBS-AL acts to affirmatively steer patients away from these hospitals by imposing higher costs on enrollees and actively pushing its enrollees to Tier 1 Hospitals. Thus, when faced with the

prospect of losing large portions of their patient base, or paying the ransom, hospitals have no choice but to accept lower rates and pay BCBS-AL so that they can continue to treat the high percentage of BCBS-AL enrollees in this state.

c.   **BCBS-AL Lowers Hospital Reimbursements Through Onerous and Arbitrary "Cost Reporting" Requirements**

396.   Along the same lines, BCBS-AL has required all participating hospitals to submit to cost reporting since 1957. This information has historically provided BCBS-AL an informational competitive advantage over all other commercial insurers. In addition, this reporting requirement introduced a barrier to entry in the sense that every hospital would refrain from negotiating a contract with another insurer since the related costs and revenues would be revealed to BCBS-AL. Consequently, this cost reporting requirement acts, essentially, as a barrier to entry as well as a guarantee that BCBS-AL gets the best rates from hospitals in the State of Alabama.

397.   Regarding hospital outpatient services, BCBS-AL pays each hospital a fixed percentage of its charges. At the end of the year, the hospitals report their costs and BCBS-AL will either true up or true down the payments they made over the course of the year based not on the contracted rates but on the actual costs of the hospitals plus a fixed percentage (11%).

398.   Blue Cross then either takes money back from the hospital if it feels it got charged too much, or pays late amounts due to a hospital that should have been paid previously.

399.   The process is time consuming, administratively inefficient, and difficult for the hospitals, often requiring them to submit to several rounds of auditing. From the hospitals' perspective, the process is costly and arbitrary, and BCBS-AL often relies on classifications of expenses that make no sense to the hospitals. In the end, it often simply becomes another way for BCBS-AL to utilize its market power and drive provider reimbursements lower.

400.   With regard to hospital inpatient services, BCBS-AL pays each hospital a fixed per diem, regardless of the type of procedure performed (i.e., diagnosis related group). BCBS-AL does not true up or true down its payments for inpatient hospital stays. It does, however, change the per diem rates that it pays each hospital throughout the year. Plaintiffs are not aware of any other commercial health insurer in the country that requires hospitals to submit to this kind of cost

88

reporting. This cost reporting requirement is a remarkable showing of the market dominance BCBS-AL has when compared to other commercial health insurers and relative to providers, even hospitals with whom the Blues purport to have difficulty negotiating.

401.    In addition to these practices, BCBS-AL prohibits hospitals from using the rates that BCBS-AL pays in any other of the hospitals' contracts.

### d.    **BCBS-AL Interfered With Competitive Bidding in Birmingham**

402.    BCBS-AL's interference with competitive bidding for health coverage for the City of Birmingham's employees is another illustration of BCBS-AL's use of its market dominance and political influence to obtain business which it would otherwise not have earned through fair competition and to exclude potential competition.

403.    In 2013, United Healthcare brought suit against the City of Birmingham, Alabama, alleging that the city wrongfully directed business away from United Healthcare to BCBS-AL. The lawsuit, *United Healthcare Services, Inc. v. City of Birmingham, Alabama*, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.), alleged that, following a bid process, United Healthcare emerged as the lowest responsible bidder for a contract managing the City's employee health coverage. However, in an effort to avoid losing subscribers and allowing United Healthcare to increase its market share in Alabama, BCBS-AL approached the City and offered to provide additional services. The City awarded the contract to BCBS-AL.

404.    A Jefferson County, Alabama court sided with United Healthcare and determined that the City's actions violated Alabama's Competitive Bid Law. The court ordered the City to restart the bid process and award the contract to the lowest responsible company.

### e.    **BCBS-AL Spends Heavily on Executive Compensation and Lobbying**

405.    BCBS-AL's executives have profited handsomely from the lack of competition in Alabama. Prior to 2015, the compensation of BCBS-AL executives was publicly available through the Alabama Department of Insurance. In 2013, the last year for which information is available, the total compensation of top BCBS-AL executives was as follows: CEO and President Terry Kellogg, $4.84 million; Executive VP Timothy Kirkpatrick, $2.69 million; Chief Administrative

1  Officer Timothy Vines, $1.9 million; Senior VP and Chief Marketing Officer Timothy Sexton,

2  $1.7 million; Senior VP and CFO Cynthia Vice, $1.47 million; Senior VP and CIO Brian S.

3  McGlaun, $1.45 million; Senior VP of Business Operations Dick Briggs III, $1.44 million; Senior

4  VP of Health Care Networks Jeffrey Ingrum, $1.42 million; Senior VP of Enterprise Resources

5  Vickie Saxon, $1.26 million; and Senior VP and Chief Legal Officer Michael Patterson, $1.03

6  million.

7        406.    These amounts are inconsistent with BCBS-AL's status as a non-profit entity and

8  suggest that its executives' decisions are motivated by potential personal gain rather than the

9  benefit to BCBS-AL's customers. By point of comparison, BCBS-NC, also a nonprofit, has

10  roughly 3.8 million customers compared to BCBS-AL's 3 million, and its 2013 annual revenue

11  was $6.4 billion, compared to BCBS-AL's $4.1 billion 2013 annual revenue. In 2013, BCBS-

12  NC's CEO, Brad Wilson, earned $2.9 million in total compensation.

13        407.    In recognition of this inconsistency, BCBS-AL lobbied in support of legislation

14  aimed at keeping its executives' compensation out of the public record. In 2015, the Alabama

15  legislature amended Alabama Code 1975 § 27-2-24, designating the compensation of officers and

16  employees of insurance companies confidential and privileged.

17        408.    The amendment was sponsored by Sen. Slade Blackwell. In 2013 and 2014,

18  Blackwell received $53,250 in contributions from political action committees that in turn received

19  $336,000 in contributions from BCBS-AL. BCBS-AL also makes payments to family members of

20  legislators.

21            **2.    Restricting Competition in Pennsylvania and Ohio**

22        409.    Despite the Blues' portrayal of Service Areas as essential to the functioning of the

23  "Blue System," historical experience has shown that the BCBSA has allowed competition between

24  Blues, especially when doing so would avoid a court decision about whether Service Areas violate

25  the antitrust laws.

26                a.    **Pennsylvania**

27        410.    The Blues refuse to contract in an adjacent Blue's Service Area when the refusal

28  benefits that Blue's market power, as demonstrated recently by Anthem Blue Cross and Blue

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1   Shield of Ohio's refusal to contract with a UPMC hospital in a county in Pennsylvania that

2   borders on Ohio.

3       411.   UPMC has developed a number of areas of health care where it has an outstanding

4   reputation for excellence. For example, people from elsewhere in the country have gone to UPMC

5   for liver transplants when they could have gone anywhere in the world for the procedure. The

6   Defendants' unlawful agreements will mean that when the contract between UPMC and Highmark

7   terminates, other Blues will not be permitted to enter into an in-network relationship with UPMC,

8   and the Blues' subscribers will not have access to UPMC using in-network coverage. But for the

9   unlawful agreements, other Blues would be able to negotiate in-network relationships with

10   UPMC.

11       412.   In addition, there have been other side agreements not to compete. Highmark

12   BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross

13   of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of

14   Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the

15   entire state of Pennsylvania.

16       413.   Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue

17   Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern

18   Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania

19   Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO

20   plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an

21   HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into

22   the market. In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these

23   HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and

24   Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal

25   Choice.

26       414.   When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form

27   Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and

28   Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

415.    The conduct of Highmark and IBC demonstrates that the noncompetition agreement remains in place, though it putatively expired in 2007. Instead of entering the Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and Independence BC intended to merge. After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition. . . to the detriment of the insurance buying public."

416.    Capital Blue Cross presented an expert report from economist Monica Noether, Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark and IBC would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark-IBC will possess is likely to be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark and IBC would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark has competed in the past with IBC, could have been competing with IBC since 1997 but for a ten year non-compete agreement between them, and, in my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with IBC in the future, especially given the absence of successful entry by other insurers."

- "Highmark has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to IBC and in cooperation with IBC through a joint operating agreement to offer indemnity insurance."

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania. Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Health Care, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While health care services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, **but even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region**."

(Emphasis added.)

417.    Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield

Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern Pennsylvania.

418.     This unlawful, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania. After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing. For example, IBC now pays Highmark to process its provider claims. By processing those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers. In addition, Highmark Blue Shield has been involved in similar non-competition arrangements with other Pennsylvania Blues and has purchased Blue Cross of Northeastern Pennsylvania.

419.     In a large part of central Pennsylvania, Capital Blue Cross and Highmark Blue Shield compete. In that area and in others where Blues compete, including with separate Provider Networks, reimbursement rates or prices are higher. The same would be true in Alabama if other Defendants competed with BCBS-AL, including with Provider Networks. Capital Blue Cross has attempted to operate outside of its Service Area through its non-Blue branded for profit subsidiary, Avalon.

420.     When Defendant Highmark developed a dispute with the largest provider in its Service Area, the University of Pittsburgh Medical Center (UPMC), Capital Blue Cross through Avalon attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-network basis. Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this arrangement. Defendant Highmark and Defendant BCBSA prevented competition from Defendant Capital in the Service Area of Highmark and Capital agreed to restrict its competition. The efforts by Capital Blue Cross through its non-Blue Avalon demonstrate that if it were not for the agreement not to expand outside of each Blue's Service Area, Capital would be operating in the Highmark Service Area.

b.     **Ohio**

421.     The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

422.     In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus.

423.     In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. *Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the state of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

424.     In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

425.     In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1.

426.     In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

427.     Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990.

428.     Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive Service Areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993 leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem Blue Cross and Blue Shield.

429.     The next year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. BCBSA refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended as a result of the Blues' concerted conduct.

### 3.     The Market Allocation Agreement

430.     As described above, Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area. Accordingly, these restrictions insulate each Defendant from competition from other Blues in each of their respective geographic Service Areas, and prevent providers from contracting with Blues in other Service Areas. These restrictions have no economic justification other than protecting Defendants from competition.

431.     Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws. Defendants pay in-network providers directly pursuant to provider agreements. Because of Defendants' market power and access to the more than one hundred million enrollees of the Blues through the national programs, providers wishing

1  to join the Blue network must accept lower reimbursement rates. In many markets, doctors and

2  other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

3        432.   Numerous Blues and non-Blue businesses owned by Defendants could and would

4  compete more effectively in other Service Areas but for the territorial restrictions. The likelihood

5  of increased competition is demonstrated in several ways. First, as set forth above, the restrictions

6  were specifically put in place to eliminate "Blue on Blue" competition. If there were no likelihood

7  of competition, the restrictions would have been unnecessary. In fact, as set forth above, the

8  restrictions did not initially address competition by non-Blue businesses owned by Defendants;

9  however, when it became evident that such competition was an "increasing problem," the

10 restrictions were revised to address this as well.

11       433.   Second, certain Blues have, in fact, expanded beyond their initial Service Areas by

12 merging with other Blues. For example, WellPoint, which was initially the Blue Cross licensee for

13 California, is currently the BCBSA licensee for fourteen states (under the name Anthem). Prior to

14 its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had

15 expanded to become the BCBSA licensee for eight states. Undoubtedly, absent the current

16 restrictions, Anthem would compete to an extent in additional Service Areas and, in all likelihood,

17 would compete nationally. Other Defendants, including HCSC, have, in fact, recently expanded

18 into other areas and, in all likelihood, would compete to an extent nationally but for the

19 restrictions described in this Complaint.

20       434.   Third, various Defendants have demonstrated that, absent the restrictions that each

21 of the Blues agreed to put into the licensing agreement, they would expand into other geographic

22 areas and states. For example, Anthem has expanded into many states where it is not licensed to

23 operate as a Blue entity: first through Unicare and, more recently, through its purchase of

24 Amerigroup. Anthem also operates Caremore Centers in Arizona despite the fact that Anthem is

25 not the Blue Cross Blue Shield licensee in Arizona. In addition, Defendant Blue Cross of

26 Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid

27 managed care services. Other Blues have likewise expanded into other Service Areas in a similar

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

manner. Of course, these expansions are currently extremely limited by the restrictions on competition.

435.     Fourth, the Blues' practice of "ceding" accounts, as well as their history of informally competing for national accounts and accounts located in border areas, which the Association has attempted to eliminate by pressuring the Blues to work together through joint ventures and similar arrangements rather than compete, shows that they are ready and willing to do business to an extent outside their Service Areas when they are permitted to do so. While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for health care services.

436.     Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for health care services.

437.     In a letter written in February of 2016, AHA summarized the market dominance of the Blue plans (footnotes omitted):

a.     Blue plans have the largest membership of any insurer. The Blues cover more than 105 million Americans. That is "nearly one in three Americans." Collectively, the Blues are three times bigger than any other health plan.

b.     Blue plans command the largest share of the commercial fully insured (FI) segment in at least 45 states and the District of Columbia (D.C.); in 35 states, a Blue plan holds 50 percent or more FI market share; in some states, 85 percent of all FI members belong to a Blue plan.

c.     Blue plans rank first in total membership in at least 43 states and D.C., with a high market share of 97 percent.

d.     In the Federal Employees Health Benefits Program, the Blue plans command 66 percent of total membership, and control 50 to 90 percent of the membership in 48 states and D.C.

e.    In the public exchanges, Blue plans dominate. In at least one state, the Blue plan enrolled 100 percent of the exchange membership in 2015, and other Blue plans acquired membership shares in the forties through nineties in many states.

f.    Blue plans collectively are significantly larger than any of their rivals on a consolidated basis. Indeed, collectively Blue plans had $244 billion in revenue in 2013, making them larger than all companies on the Fortune 500 except for Walmart and Exxon Mobil.

g.    The Blue plans of Alabama, Florida, Illinois, Kansas, Minnesota, Montana, Nebraska, New Mexico, North Dakota, North Carolina, Oklahoma, Texas and Wyoming through their jointly owned pharmacy benefit manager acknowledge their "market dominance."

h.    Blue plans dominate provider networks. In 32 states and D.C., Blue plans have the largest provider networks and, in seven more states, Blue plans have the second-largest provider networks.

i.    Blue plans contract with 96 percent (more than 5,100) of U.S. hospitals and 92 percent of professional providers, which is more than any other insurer.[1]

438.    The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a Member's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

---

[1] American Hospital Association Letter to Hon. William Baer, Antitrust Division, U.S. Department of Justice (Feb. 29, 2016) ("AHA Letter"), at 7-9.

439.    Defendants' agreements to limit competition and not contract with providers based on geographic Service Areas are referred to in this Complaint as the "Market Allocation Agreement."

440.    The Market Allocation Agreement continues to this day.

441.    In an effort to enhance its market power and the market power of the Blues in general, Anthem attempted to purchase Cigna, one of the largest health insurance companies in the country and one of only four companies that competes in the administration of national accounts. After Anthem entered into the agreement with Cigna, the CEO of Anthem met with CEOs of various other Defendants in a private room in the luxurious Peninsula Hotel in Chicago, Illinois. In those private meetings, various Defendants agreed unlawfully with each other, and developed a "Blue Bias Strategy" for the implementation of the agreed merger of Anthem and Cigna. The merger, as planned by Anthem and the Blue Plans that had agreed unlawfully with it, was enjoined because it would have been anticompetitive.

### 4.    The Price-Fixing and Boycott Agreements

442.    As a result of the Market Allocation Agreement, Defendants achieved market dominance, low pricing for healthcare provider services, and higher premiums and ASO Fees in each Service Area. As described above, Defendants have reached a horizontal agreement and implemented a Price Fixing and Boycott Agreement through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues.

443.    The horizontal Agreement also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members. Those national programs include: a) Transfer Program; b) Inter-Plan Teleprocessing System (ITS); c) Blue Card Program; d) National Accounts Programs; e) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and f) the "Inter-Plan Medicare Advantage Program," which is similar to the Blue Card and National Accounts Programs, but for members enrolled in Medicare Advantage plans

444.     The Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with providers outside of their Service Areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

445.     Defendants achieved the Price Fixing and Boycott Agreement by agreeing that all Defendants would participate in the national programs, including the Blue Card and National Accounts programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.

446.     The Defendant Blues implement the Agreement collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

447.     Each of the Defendant Blues either has market power or has otherwise taken anticompetitive action in furtherance of gaining market power. Through the national programs the Defendant Blues control more than 100 million patients, something no other health insurance company has access to. These more than 100 million patients provide the Defendant Blues a substitute for market power when Defendant Blues are dealing with providers. In fact, in many places providers treat more patients through the national programs than through the direct subscribers of the local Defendant Blue. One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of Blue Cross and Blue Shield of North Carolina. When Blue Cross and Blue Shield of North Carolina negotiates with providers in central North Carolina, it uses the many patients in the national programs (which expand its bargaining power and effective market share) to obtain rates that are below competitive rates, and remain low.

448.     The national programs, including the Blue Card and National Accounts Programs, are implemented in a horizontal manner. For example, when a hospital in east Alabama billed other Defendant Blues directly for services provided to their subscribers, those Blues, including

1   Blue Cross of Minnesota, paid for those services at the rates that it normally pays, which are

2   higher than the rates paid by Blue Cross of Alabama. When Blue Cross of Alabama learned of

3   those payments, it then recouped the difference between those two rates. Based on information and

4   belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped

5   under the procedures established by the Defendant Blues on the IPPC. Also based on information

6   and belief, Plaintiffs allege that in making the recoupments, Blue Cross of Alabama was following

7   the procedures established by the Defendant Blues through the IPPC to enforce the price fixing

8   agreement.

9       449.    When one Blue has a contract dispute or issue with a healthcare provider the other

10  Blues, as independent horizontal businesses, and the Defendant Association act collectively to

11  reinforce the market power of each of the Blues. In a proceeding brought by Dr. Kathleen Cain

12  when Blue Cross and Blue Shield of Kansas retaliated against her for being a class representative

13  and attempted to terminate her from being a participating physician after 16 years of service, Blue

14  Cross and Blue Shield of Kansas City then refused to allow her into its Blue branded network.

15  When Highmark refused to pay the UPMC reasonable rates and instead was going to allow its

16  contract with UPMC to expire, UPMC, one of the leading medical centers in the world, wrote to

17  Blues throughout the country, requesting that they separately contract with UPMC. Some of the

18  Blues, including Blue Cross of Alabama and Anthem Blue Cross of New Hampshire, responded

19  directly and refused to negotiate. At the same time, the Defendant Association coordinated

20  responses for a number of other Blues, and the Association communicated the refusal to negotiate

21  for those other Blues. Other healthcare providers, including one or more hospitals in North

22  Carolina, have attempted to negotiate contracts with Defendant Blues in other states but have

23  received refusals from those Blues, while Blue Cross and Blue Shield of North Carolina continues

24  to reimburse at sub-competitive rates.

25      450.    Accordingly, Defendants have agreed to fix the prices for healthcare

26  reimbursement within each Service Area. Healthcare providers providing services to patients

27  insured by or included in employee benefit plans administered by a Blue from another Service

28  Area, including Plaintiffs, receive significantly lower reimbursement than they would receive

1    absent Defendants' agreement to fix prices. The Price Fixing Agreement is a *per se* violation of

2    the Cartwright Act and other laws.

3         451.    As a result of their Price Fixing and Boycott Agreement, Defendants reduce their

4    payments to healthcare providers by in excess of ten billion dollars every year. These reductions,

5    of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

6         452.    The Price Fixing and Boycott Agreement facilitates the Blues' monopolization and

7    exercise of market power by increasing the volume of patients each Blue brings to its negotiations

8    with providers. A provider who does not accept the local Blue's terms loses the ability to treat on

9    an in-network basis not only that Blue's enrollees, but all Blues' enrollees.

10        453.    The Blues' Price Fixing and Boycott Agreement does not constitute a joint

11   purchasing agreement. The Defendants have already denied that they are engaged in joint

12   purchasing. Moreover, the Blues' model, in which the Home Plan pays only the rate agreed to by

13   the provider and the Home Plan, is naked price-fixing, not joint purchasing. As the Department of

14   Justice and Federal Trade Commission explained in their 1996 publication Statements of Antitrust

15   Enforcement Policy in Health Care, "[a]n agreement among purchasers that simply fixes the price

16   that each purchaser will pay or offer to pay for a product or service is not a legitimate joint

17   purchasing arrangement and is a *per se* antitrust violation."

18        454.    Even if the Blues were engaged in joint purchasing, which they are not, their

19   activity would not fall within the "safety zone" that the DOJ and FTC have established in the

20   context of joint purchasing arrangements among healthcare providers.

21        455.    The Blues' model also has none of the safeguards that the DOJ and FTC have

22   identified as mitigating concerns associated with joint purchasing. "First, antitrust concern is

23   lessened if members are not required to use the arrangement for all their purchases of a particular

24   product or service." The Blues are required to use the Blue Card Program for all purchases of

25   health care services from providers with whom they do not have a contract.

26        456.    "Second, where negotiations are conducted on behalf of the joint purchasing

27   arrangement by an independent employee or agent who is not also an employee of a participant,

28   antitrust risk is lowered." The Blues do not do this. "Third, the likelihood of anticompetitive

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

communications is lessened where communications between the purchasing group and each individual participant are kept confidential, and not discussed with, or disseminated to, other participants." Because the Blues do not use a purchasing group, but instead extend the Host Plan's pricing to all Home Plans, this safeguard does not apply.

### 5.    Other Abuses

457.    In addition to the harms set forth above, Plaintiffs were harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their agreement.

458.    For example, a number of the Blues use MFNs with hospitals and other facilities. According to at least some defense counsel, Defendant BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."

459.    Although the Michigan legislature recently made MFNs unlawful, the statement of BCBS-MI also applies to other Blues. The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract. In its contracts with hospitals, BCBS-AL imposes the functional equivalent of an MFN when it, as the dominant health insurer, prohibits the hospitals from using the reimbursement rates of BCBS-AL in a contract with any other payor.

460.    All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996). By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

461.    In addition, Defendants require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers. Defendants thereby create asymmetric information in the market for

1  health care services, preventing the market from functioning competitively and giving Defendants

2  an advantage in any bargaining that occurs between Defendants and providers.

3      462.    Defendants, specifically Defendant Highmark, have threatened to utilize their

4  extraordinary and excessive surplus (almost $5 billion in the case of Highmark) to enter (and have

5  already done so in some cases) the market as providers of health care services if providers do not

6  acquiesce to the far below competitive rates offered in a market free from competition from other

7  Blues. All of this is undertaken in an attempt to further drive down payments to providers and to

8  raise barriers for competing firms to enter these markets.

9      463.    Defendants also use their trademarks to circumvent antitrust laws.

10     464.    The Trademark Act itself penalizes use of a trademark in violation of the antitrust

11 laws. The agreed-to restrictions on the ability of the Blues to generate revenue outside of their

12 specified Service Areas constitute agreements to divide and allocate geographic markets, and,

13 therefore, are *per se* violations of the Cartwright Act.

14     465.    Competition among the Blues does not threaten their marks by creating confusion.

15 In Washington, Idaho, Pennsylvania, and New York, the Blues currently compete using the Blue

16 marks, without consumer confusion. A 1987 BCBSA internal memorandum noted that "Blue

17 Cross of Washington and Alaska is actively competing against every other plan in the state. Not

18 only has Blue Cross written a strategic plan which targets the Blue Shield Plans, but it has

19 developed a full range of products to sell statewide. Yet, despite open competition, consumer

20 confusion has remained minimal."

21     466.    Moreover, the Blues' enrollees carry membership cards that clearly identify the

22 Blue that underwrites or administers that enrollee's plan. The Blues already allow hundreds of

23 thousands of their  enrollees to carry cards with the names of out-of-state Blues, indicating that the

24 Blues do not believe that the presence of a Blue outside its Service Area will create confusion.

25     467.    The Blues' well-established and widely utilized practice of "ceding" the right to be

26 the Control Plan for National Accounts when doing so will ensure that an account is gained or

27 retained by the Blue system belies their position that their exclusive Service Areas are necessary to

28 protect their local trademarks. For example, Blue Cross Blue Shield of Arkansas, which is the

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

1   Control Plan for Wal-Mart, ceded substantial portions of the Wal-Mart business to both Blue

2   Cross Blue Shield of Alabama and Blue Cross Blue Shield of Illinois to ensure that Wal-Mart

3   remained a Blue account. Similarly, Anthem ceded its General Electric business to Blue Cross

4   Blue Shield of Alabama. The Blues' practice of ceding national accounts demonstrates that

5   consumer confusion does not result when a Blue plan other than the local Blue administers their

6   health insurance plan.

7          468.   The possibility of confusion among the Blues is non-existent for providers, who

8   already deal with multiple Blues on a regular basis. If anything, allowing Blues to contract with

9   providers outside their Service Areas would reduce confusion. As described above, providers must

10  comply with the claim processing rules of Blues located outside their Service Area, often without

11  easy access to those rules. If a provider could contract with these Blues, they would be given those

12  rules from the beginning of the contract and would likely have fewer claims denied for failure to

13  follow the rules.

14         469.   The experience of BCBS-AL and North Mississippi Medical Center ("NMCC")

15  further illustrates how the Blues' territorial allocation restrains competition for the services of

16  healthcare providers and belies the Blues' arguments that their trademarks allow them to agree not

17  to compete with each other.

18         470.   Beginning in the mid-1990s, BCBS-AL maintained a network agreement with

19  NMCC. This agreement was in place for almost a decade. BCBS-AL maintained the agreement for

20  many years "because of the [hospital's] proximity to many of our customers."

21         471.   NMCC is located in Tupelo which is located in Lee County, Mississippi. Lee

22  County is not contiguous with any other state and is located two counties in from Alabama.

23  BCBS-AL maintained this contract for several years even though it was not a "contiguous county"

24  contract as allowed by the Blue Cross rules. BCBS-AL marketed this agreement to its North and

25  West Alabama insureds who wanted to be able to seek treatment and the more convenient facility

26  in Tupelo.

27

28

472.     In late 2003, BCBS-MS and NMCC were engaged in heated discussions over NMCC's network agreement. On November 20, 2003, NMCC did not renew its agreement with BCBS-MS in response to BCBS-MS's request for reimbursement rates which amounted to "excessive discounts." The non-renewal of this agreement did not affect NMCC's stand-alone contract with BCBS-AL in and of itself.

473.     On the same day, BCBS-MS's CEO Richard J. Hale wrote to Roger G. Wilson, the General Counsel and Corporate Secretary of the BCBSA, and informed him that BCBS-AL's contract with NMCC was not in compliance with BCBSA Brand Regulations on "Contiguous Area" contracting. BCBS-MS indicated that it had been aware of the contract for some time, but had not objected until now.

474.     In Mr. Hale's letter, he noted that the contract violated BCBSA Brand Regulation 4.7 and 4.8 because NMCC was not located in a contiguous area to BCBS-AL's Service Area.

475.     In internal correspondence, BCBS-MS made clear to BCBS-AL that its contract with BCBS-MS was "hurting" BCBS-MS's "bargaining position" with NMCC and was likely to result in a less favorable contract for BCBS-MS. Thus, BCBS-MS had to enforce the BCBSA Brand Regulations not because it was concerned about the marks or the brand, but because competition from BCBS-AL was empowering NMCC and hurting BCBS-MS.

476.     In September 2004, and at the behest of the BCBSA and BCBS-MS, BCBS-AL was forced to terminate its agreement with NMCC and any other affiliated Lee County, MS providers. In correspondence with the hospital, BCBS-AL indicated that the BCBSA rules and not any unhappiness or disagreement with NMCC was the reason for the contract termination.

477.     The loss of this contract and competition from BCBS-AL not only hurt NMCC, but it hurt BCBS-AL's own customers who were now subject to higher rates and patient responsibility amounts due to NMCC's out-of-network status with BCBS-AL.

478.     Not surprisingly, after BCBS-AL was forced to terminate its agreement, BCBS-MS and NMCC reached a new network agreement.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

479.     In summary, the Blues observe each other's trademark rights only when it is beneficial to them. When the Blues find it convenient or profitable, they do not enforce their trademark rights.

**6.     Defendants Enjoyed Unlawfully Gained and Supracompetitive Profits**

480.     Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits. Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace. As Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

481.     Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues began to form for-profit subsidiaries. A number of the non-profit Blues then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

482.     The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

483.     Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

484.     Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even

excess medical claim benefit perks. These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

485.    Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services. Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

486.    By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;
- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;
- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;
- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;
- Cost Allocations not arms-length or fair and reasonable;
- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;
- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

487.    The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

488.    For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities. Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

489.    In addition, despite claiming to be "not-for-profit," many of these Blues hold massive excess surplus levels built off the net income spread between the high premiums they charge customers and the sub-competitive payments to providers. Those excessive surplus levels have come at the expense of higher premiums to consumers.

490.    Below is an illustration of the huge amounts of capital being held in excess of requirements by a number of not-for-profit Blues. As of Sept. 30, 2010, 33 "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by the BCBSA. The chart below details those excessive levels of surplus:

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield of Tennessee | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

491.    Many of the Blues understate their actual surplus substantially by citing only the surplus from the mainline company, but not the general surplus on the companies' combined reporting statements, which accounts for all lines of business.

492.    In South Carolina, for instance, BlueCross BlueShield of South Carolina's "net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

493.    Members of the Board of BlueCross BlueShield of South Carolina "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show." They were required to do little but show up to the occasional meeting.

494.    This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies. BlueCross BlueShield of South Carolina paid executives in the millions of dollars in 2010.

495.    HCSC, a conglomerate of several Blues, including Blue Cross and Blue Shield of Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011, and 2012. This net income does not even account for large blocks of plans it merely administers for the self-insured. "CEO Patricia Hemingway Hall's 2012

base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus. The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011." "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million in 2012." *See* Exhibit D.

496.    Other Blues also pay excessive executive compensation. For example, when Anthem's CEO led the company through the ill-fated merger effort with Cigna that will cost the company a break fee of $1.85 billion and perhaps more, Anthem's Board awarded him with a salary increase of 3 million dollars. *See* Exhibit E.

497.    Blue Shield of California holds an extraordinary and unnecessary surplus created by its sub-competitive reimbursements to providers. Blue Shield of California's surplus is far in excess of any requirements under the law or BCBSA rules.

498.    While Defendants often claim these surpluses are designed as insurance reserves for future payments, they are more often used as strategic monies allowing acquisitions of competitors, market share, or provider practices.

499.    Likewise, large salary increases for executives with the Blues have recently been reported. Such salaries result in higher costs to consumers. The supracompetitive profits that feed the salary increases are built on the strength of Defendants' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force providers to join their networks at sub-competitive rates. A spokeswoman for BlueCross BlueShield of South Carolina noted that the outrageous increases are priced "to reflect its superior networks." Thus, the market power of the Blues allows them to pay sub-competitive rates to providers. This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

C.    **Implementation of the Affordable Care Act (ACA)**

500.    When President Obama presented the Affordable Care Act to the Joint Session of Congress, he discussed the importance of competition among health insurers and cited BCBS-AL as a poster child for operating a concentrated market. The ACA created insurance exchanges to

112

encourage competition among health insurers. The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places. The Blues, including BCBS-AL, have used their market power and their anticompetitive activities to increase their market shares through the mechanisms created by the ACA.

501.    In the first year of the ACA exchange in Alabama, BCBS-AL claimed a loss of approximately $135 million based almost entirely on losses in the individual market and ACA exchange. It is not clear how much of this "loss" is being subsidized through monies available to BCBS-AL under the ACA.

502.    In considering how to approach the ACA market, BCBS-AL internally expressed concern over increased consumer choice in Alabama as a result of entry into the individual market through the exchange. Their response to these concerns became clear in the aftermath of the loss. According to publicly available documents and media reports, "Blue Cross spends more on the health care costs of individual marketplace customers than it collects through copayments and premiums." Stated differently, BCBS-AL priced premiums below its actual health care costs for consumers in the individual exchange market.

503.    Shortly after, all other insurers (United and Humana) exited the Alabama exchange market, leaving only BCBS-AL offering products in the exchange market.

504.    BCBS-AL's response to being the only remaining competitor in the market should not be surprising. With its potential competition now out of the market, rather than continuing to price premiums below actual costs, BCBS-AL raised premiums in the market by approximately 40 percent

505.    Of the 15 states where complete data on market share of the health insurance exchanges are available, Blues have obtained the greatest percentage of covered lives in 12 of those states. The 12 states (including the District of Columbia) are California, Colorado, Connecticut, Indiana, Virginia, the District of Columbia, Florida, Maryland, Michigan, Rhode Island, Vermont, and Washington. In short, the Blues have increased their market shares through the exchanges.

**D.     Defendants' Unlawful Agreements Reduce Health Care Quality and Increase Health Care Costs**

506.     Economist John Hicks recognized in 1935 that: "The best of all monopoly profits is a quiet life." J.R. Hicks, The Theory of Monopoly, Econometrica, Vol 3, No. 1 (Jan. 1935), pp. 1-20. Part of the quiet life that a monopolist enjoys is that it does not have to innovate. The Defendants' conduct, exemplified by their conduct in Alabama, demonstrates the truth of Professor Hicks' observation.

507.     BCBS-AL is a monopolist in the sale of commercial health insurance and in the sale of administrative serves for health care plans in Alabama and in every market that one could possibly define in Alabama. The other Defendants have agreed that they will not compete with BCBS-AL in the sale of commercial health insurance or in the sale of administrative services in Alabama. BCBS-AL is a monopsonist in the purchase of health care services by commercial insurers in Alabama and within every market one could possibly define in Alabama. By recent measure, it has over 83-86 percent of this market statewide. The other Defendants collectively represent the second largest purchaser of health care services by commercial insurers in Alabama, and they have reached an agreement with BCBS-AL to use its prices in those purchases and to allow BCBS-AL to use their market shares in setting its prices to pay Providers in Alabama.

508.     Innovation in healthcare is essential to preserve and improve quality and to limit and reduce costs. Collaboration between health insurers and providers is one way to encourage innovation in healthcare. When health insurers pay low reimbursement rates to providers, they discourage collaboration and innovation. The recent evidence and findings in the Anthem merger trial demonstrate the truth of the allegations in this paragraph. Representatives of Cigna, including its CEO, testified that the Blues such as Anthem pay providers lower reimbursement rates than Cigna, but that by encouraging collaboration and innovation Cigna was able to lower the cost of healthcare for employers and consumers while paying providers higher reimbursement rates. Those witnesses also testified that if Cigna reduced its reimbursement rates to the rates paid by Anthem and other Blues, its ability to collaborate and innovate with providers would be diminished.

509.    The conduct of the Defendants has discouraged innovation in healthcare. One need go no further than a recent edition of Health Affairs to understand how this is happening. "Organizations seeking to create innovative environments need to address a number of factors. These include making available sufficient resources – especially money and space . . .." D. Bates, A. Sheikh, D. Asch, "Innovative Environments in Health Care: Where and How New Approaches to Care Are Succeeding," Health Affairs, March 2017, 400, 401.

510.    The Defendants pay hospitals among the lowest reimbursement rates in the country. The hospitals, including in California, are therefore deprived of the resources they need to innovate. One example of the cost of innovation is that tracking patients to make sure they are receiving the best healthcare possible requires expensive IT systems.

511.    The authors in this article further recognized that: "part of the slow pace of innovation stems from the health care payment system." In Alabama, because the Defendants have enjoyed the quiet life of a monopolist they have refused to develop innovative payment systems.

512.    In the early 1980s, the Medicare Program changed from per-diem reimbursement rates for hospitals to DRG rates in order to encourage efficiency. In Alabama, BCBS-AL for itself and the other Blues with members being treated in hospitals in Alabama continued to use the archaic per-diem rates until recently, and only began implementing partial changes in the per-diem rates approximately 35 years after Medicare. BCBS-AL has retained consultants who found that the result was longer stays in hospitals. In other words, the refusal of BCBS-AL as a monopolist/monopsonist to innovate has reduced the quality of healthcare in Alabama and added to its expense.

513.    In order to achieve the best possible outcomes in health care at the most reasonable price, one must track the patients as well as the Providers, something that is highly inefficient in the Blues' system. Cigna has tracked both its health plan members and their providers in its networks. In Alabama, Anthem has more than 120,000 members for whom Anthem maintains patient healthcare information, and HCSC has more than 100,000 members for whom HCSC maintains patient healthcare information. Those members and thousands of others who are members of other Blues are treated in Alabama by Providers in the BCBS-AL network, for whom

1   BCBS-AL maintains the provider healthcare information. This characteristic of the Blue system

2   makes innovative healthcare inefficient and often impossible.

3       514.    If the Blues allowed Anthem to contract with Alabama hospitals directly, it could

4   combine healthcare information for its patients and providers to more efficiently provide

5   healthcare.

6   **E.    Antitrust Injury**

7       515.    Defendants' unlawful activities have resulted in antitrust injury and harm to

8   competition.

9       516.    Defendants violated the antitrust laws by agreeing that they will not compete with

10  each other. The effect has been to prevent two of the largest four, four of the largest ten, and

11  fifteen of the largest 25 health insurance or managed care companies from competing in other

12  states, reducing competition throughout the country in various ways, including by increasing

13  market concentration and health insurer power over healthcare providers, health insurance and

14  related services buyers, and Plaintiffs.

15      517.    By definition, Defendants have harmed competition by virtue of their agreements

16  in that they have agreed not to compete with one another in each of the Blues' Services Areas. For

17  instance, competition in California has been and continues to be harmed in that the other Blues

18  agree not to enter the California market to compete no matter the circumstances.

19      518.    The Defendants have created and increased barriers to entry for other health

20  insurers, have kept other health insurers out of markets and have limited the ability of other health

21  insurers to compete in other markets. The Defendants suppressed prices for provider goods,

22  services and facilities; increased health-care costs; inflated premiums and ASO Fees; and have

23  injured competition, depriving patients of choices in the marketplace for healthcare providers, and

24  depriving individuals and businesses the opportunity to purchase health insurance or

25  administrative services at a lower premium or contractual rate, or at a price set by a market free

26  from the non-price restraints imposed by Defendants' anticompetitive agreements.

27      519.    Additionally, because most of the Blues are monopolists and monopsonists, it does

28  not stand to reason that lower reimbursement rates necessarily lower consumers' premiums. The

monetary, and other, losses Plaintiffs suffered from Defendants' conduct substantially enhanced Defendants' wealth and reflect a healthcare provider to insurer transfer.

520.    The Blues' monopsony power gained by virtue of their unlawful agreements has harmed consumers.

521.    Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay. A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians. "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," *see* Exhibit F (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).

522.    Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants. According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation. According to the 2013 Annual Report of the American Association of Medical Colleges, there will be a shortage of 90,000 physicians across all specialties by 2020.

523.    Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.

524.    Hospitals and other facilities are closing.

525.    Plaintiff Verity went bankrupt.

526.    In California the harm has been particularly acute. The Blues' low reimbursements in California make it almost impossible for hospitals to continue providing all the services they would offer in a competitive market, leaving consumers to travel much further for care and no place for the most critically injured patients to receive care nearby or for those without transportation.

527.    Even where care is available, Defendants' conduct has reduced the quality of health care services provided to Californians.

528.     Further, Defendants' conduct has significantly limited the ability of healthcare providers to improve their patient care through investments in better quality and services for their patients.

529.     The loss of these hospitals and other healthcare providers also diminishes the ability of communities to keep jobs and to attract new business and residents.

530.     Defendants have the power to control prices and exclude competition, and their agreements not to compete, along with the other actions described in this Complaint, prevent or exclude competition. Defendants have harmed the competitive process, and by contributing to the lack of providers, have harmed consumers, subscribers and providers.

531.     Consumer welfare is best protected by a competitive marketplace for purchasing provider services.

532.     The agreements among the Blues have the effect of stifling innovation in the marketplace.

533.     For example, providers have requested that the California Blues switch its payment to a value-based or risk-based approach in which Blues pay providers commensurate with the value they provide to the plan, and share in the risk if they cannot effectively manage the patient population. This type of payment model can benefit and reward efficient, low-cost providers with higher quality care.

534.     The California Blues rebuffed requests by healthcare providers to provide value-based or risk-based contracting. The California Blues have demonstrated that not only are they not interested in undertaking potential efficiency-creating methods of contracting, but that they are unwilling to innovate in this way. Because they face no threat of competition from the Blues, they have no interest or incentive to innovate.

535.     Competition stimulates innovation; the lack of competition stifles innovation and California provides a laboratory example of that axiom. There is no opportunity for providers to engage in more efficient health care management techniques such as population management unless the California Blues chose to embrace such efficiency-enhancing innovations.

118

536.     The Blues have failed to innovate in other ways which would benefit the market and consumers. Their extraordinary market power and lack of a significant threat of competition in many markets has stifled their innovation and the development of new payments models that would benefit providers, consumers, and the market in general strictly to the benefit of their bottom line.

537.     Plaintiffs suffer because agreements not to compete also restrict their choices in the market. Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area. The exclusion of these potential participants in the health services financing market has the effect of depressing payments in the market for health care services, whether or not the provider is in-network with the local Blue.

538.     The Blues implemented new fee schedules for providers, generally on an annual basis. Those new fee schedules are lower than they would have been without the Defendants' anticompetitive conduct. The new fee schedules have created incrementally larger antitrust injuries and damages for the health-care providers.

539.     When the Blues face innovative competitors, they engage in anticompetitive activity designed to take those competitors out of the market. For example, when Cigna developed innovative programs that paid providers higher reimbursement rates than Anthem and other Blues by collaborating with providers to reduce the overall cost of healthcare, Anthem attempted to purchase Cigna and then after secret meetings with the CEOs of other Blues in a private room in the luxurious Peninsula Hotel in Chicago, Anthem and the other Blues developed the Blue Bias strategy to prevent Cigna from implementing those programs. Instead, Anthem and the other Blues continue to pay low reimbursement rates to hospitals and other providers to maintain their differentials between the Blues reimbursement rates and those paid by companies like Cigna. Those low reimbursement rates undermine and prevent efforts at innovation and collaboration with providers.

119

540.    Defendants' unlawful activities have resulted in harm to competition. Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between sub-competitive rates or being put out of business through coercion.

541.    Defendants' unlawful activities have resulted in antitrust injury to Plaintiffs, including: (a) lost revenue resulting from anticompetitively low prices for goods, services and facilities that Plaintiffs provided to patients insured by the Blues; (b) lost revenue resulting from decreased use of Plaintiffs' services and facilities; (c) inflated premiums and ASO Fees; and (d) threatened future harm to Plaintiffs' business and property, all as a result of Defendants' unlawful conduct.

**F.     Market Power and Related Considerations**

542.    The Defendant Blues have market power in many markets over prices or payment rates for healthcare providers. The 36 Blues serve 106 million people—roughly one out of every three Americans. The various plans service 88 of the Fortune 100 companies, including major firms like Wal-Mart, Microsoft, General Motors, and UPS. They also service over seven million people who work for small employers.

543.    They are the number one choice for organized labor, serving 17 million organized workers, retirees, and their families. They offer coverage through Affordable Care Act insurance exchanges and service millions of Americans through government-supported healthcare programs.

544.    The BCBS provider network includes more than 90% of doctors and hospitals nationwide. More than 62 million BCBS members across all 50 states have access to care from more than 342,000 providers. The market shares of individual Blue plans in various states are indicative of market power.

545.    Even in markets where Defendant Blues do not enjoy high market concentrations, they have market power or have otherwise exploited anticompetitive actions, through the more than 100 million subscribers of Blues involved in the inter-plan or National Accounts programs. This access provides market power beyond what might be suggested by the local enrollment share.

120

1. **The Sale of Health Insurance and Related Products and Services**

546.    This case involves a number of product markets in which the Defendants participate. One is the market for the sale of commercial healthcare financing services (excluding Medicare Advantage and managed Medicaid), which includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified. The market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, including access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market. This relevant product market can be described as the market for the sale of commercial health insurance and includes both fully insured plans and ASO plans.

547.    The purchasers of commercial health insurance do not have reasonable alternatives. Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees. Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance. For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price, or SSNIP. The number of employers or other groups substituting away from commercial health insurance is likely to be insufficient to make the SSNIP unprofitable.

548.    Within the market for the sale of commercial health insurance, the Defendants participate in a number of submarkets. These submarkets are alleged in the alternative to be relevant product markets for purposes of Plaintiffs' claims.

549.    The first submarket is the sale of commercial health insurance to national accounts with 5,000 employees or more, who are spread over more than one state. The relevant submarket can be described as the sale of commercial health insurance to these national accounts and includes both fully-insured plans and ASO plans. There is no reasonable substitute for this

product. Large multistate employers have unique needs when seeking commercial health insurance for their employees. They desire a national network, a high degree of plan customization, and sophisticated claims administration, customer service, and data reporting. If faced with a SSNIP, a national account would have only two alternatives: self-supply by handling all aspects of the insurance product themselves, or forgo the purchase of commercial health insurance altogether. Neither is a reasonable substitute. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP.

550.     Because other insurance products, such as those without national networks, do not meet the unique needs of national accounts, the substitution between commercial health insurance for national accounts and other health insurance products is low, as reflected in measures such as a low cross elasticity of demand. Moreover, "national account" is a well-understood term in the health insurance industry. Insurance brokers and benefits consultants generally consider national accounts to constitute a separate line of business. Many of the largest insurers in the country, including Defendant Anthem, manage national accounts separately from their other business. Cigna and Defendant Anthem both use 5,000 employees as the threshold for defining national accounts, and that figure is considered to be reasonable by insurance brokers and benefits consultants.

551.     The second submarket is the sale of commercial health insurance to large group employers. The relevant submarket can be described as the sale of commercial health insurance to large group employers and includes both fully insured plans and ASO plans. "Large group" is defined as an employer with more than 50 employees. This is the threshold established by the Affordable Care Act for "large employers." 42 U.S.C. § 18024(b)(1). There is some overlap between this submarket and the submarket for the sale of commercial health insurance to national accounts. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. Large group insurance is subject to less stringent regulation, and it permits more customization and differentiation. Insurers can profitably target large groups—in other words, engage in price discrimination—because they

can easily identify large groups; prices for large-group products are negotiated individually; and arbitrage is impossible. There are no reasonable substitutes for commercial health insurance sold to large groups. A large group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) somehow morph into small groups.

552. Forgoing health insurance is not a reasonable substitute because virtually all large employers offer health coverage to their employees. Handling all aspects of the insurance product is impractical. And large groups are not in a position to reduce their numbers of benefits-eligible employees below state-law thresholds. In other words, the substitution between large-group insurance and other healthcare financing options is low, as reflected in measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market would likely raise prices above competitive levels by imposing at least a SSNIP.

553. The third submarket is the sale of commercial health insurance to small group employers. The relevant submarket can be described as the sale of commercial health insurance to small-group employers and includes both fully insured plans and ASO plans. "Small group" is defined as an employer with 50 employees or fewer. This is the threshold established by the Affordable Care Act for "small employers." 42 U.S.C. § 18024(b)(2). The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. There are no reasonable substitutes for small group insurance. A small group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) hire enough new employees to become a large group.

554. Forgoing health coverage is not a reasonable substitute because health coverage is considered to be an important benefit. Handling all aspects of the insurance product is impractical. And hiring more employees for the sole purpose of being able to purchase different insurance is impractical. In other words, the substitution between small group insurance and other healthcare financing options is low, as reflected in measures such as a low cross-elasticity of demand.

1    Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices

2    above competitive levels by imposing at least a SSNIP.

3        555.    For the relevant product markets described above, California is a relevant

4    geographic market. Sellers of commercial health insurance compete for the business of employers,

5    in part, by offering attractive provider networks in the geographic areas where employers'

6    employees live and work. Individuals tend to get their healthcare services near their home and

7    work. If the hypothetical monopolist of commercial health insurance in California were to

8    implement a SSNIP, employers in California would not substitute commercial health insurance in

9    other states because their employees in California value access to providers in California. For

10   employers in California, there are no reasonable substitutes to commercial health insurance in

11   California. Further, in response to a SSNIP, employers will not move their employees to other

12   states. In other words, the substitution between commercial health insurance in California and

13   commercial health insurance outside California is low, as reflected in measures such as a low

14   cross-elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these

15   product markets in California would likely increase prices above competitive levels by imposing

16   at least a SSNIP.

17       556.    In the alternative, for the relevant product markets described above, California

18   Core-Based Statistical Areas, and counties or combinations of counties not part of one of these

19   areas, are relevant geographic markets. "Core-Based Statistical Areas" is a term used by the

20   United States Office of Management and Budget to encompass Metropolitan Statistical Areas and

21   Micropolitan Statistical Areas. Metropolitan Statistical Areas especially are used in the ordinary

22   course of business in the insurance industry when examining local markets. Defining markets for

23   commercial health insurance as local is consistent with the desire of employers to provide health

24   plans with networks of local providers, specifically providers located near their employees' home

25   and work. In other words, the substitution between commercial health insurance in an employer's

26   local area and commercial health insurance outside the employer's local area is low, as reflected in

27   measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing hypothetical

28   monopolist in these product markets in California Core-Based Statistical Areas, and counties or

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1  combinations of counties not part of one of these areas, likely would increase prices above

2  competitive levels by imposing at least a SSNIP.

3            **2.      The Purchase of Products and Services from Healthcare providers**

4            557.    In addition to the market for commercial health insurance, the Defendants

5  participate in the market for the purchase of goods and services from healthcare providers. Outside

6  of payments by the government, the vast majority of those goods and services are paid through or

7  by health insurance companies, with the 36 independent Blues being the largest collection of those

8  companies. The vast majority of the goods and services that health insurance companies purchase

9  from healthcare providers are provided through in-network contracts.

10           558.    The purchase of goods and services from healthcare providers by commercial

11  buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and

12  managed Medicaid) is a relevant product market. Prescription drugs are excluded from this

13  relevant market because they are largely purchased indirectly, through pharmacy benefit

14  managers. These commercial buyers are the companies in the business of selling commercial

15  health insurance or administering commercial health plans for private employers or other groups.

16           559.    These companies have separate business units dedicated to contracting for the

17  purchase of goods and services from healthcare providers. For healthcare providers, there is no

18  reasonable alternative to contracting with these commercial buyers in order to be in-network

19  providers for the health plans sold to private employers or groups. Sellers of healthcare goods and

20  services are not in a position to forgo sales to commercial buyers, in favor of patients who pay out

21  of pocket, a group that essentially does not exist.

22           560.    Nor can they obtain enough Medicare or Medicaid patients, insured either under the

23  government's traditional programs or managed care programs, to replace the volume they would

24  lose from dropping commercial insurance. Further, the prices paid to healthcare providers by the

25  government programs, including Medicare Advantage and managed Medicaid, are lower than the

26  prices paid for the commercial health plans of private employers or groups. In other words, for

27  providers, the substitution between commercial buyers and other payors is low, as reflected in

28  measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing hypothetical

1   monopsonist in this market likely would lower prices paid to providers below competitive levels

2   by imposing at least a small but significant and non-transitory reduction in price (SSNRP).

3        561.    The prices paid to healthcare providers by the government programs, including

4   Medicare Advantage and managed Medicaid, are different than the prices paid for the commercial

5   health plans of private employers or groups. Also some healthcare providers have separate

6   contracts for Medicare Advantage and managed Medicaid, and some insurers have separate

7   contracting teams for these products.

8        562.    This market need not be segmented by the type of provider at issue. Healthcare

9   providers participate in what is known as two-stage competition; first they compete for inclusion

10  in the provider networks of insurers' plans, and then they compete for patients within a plan. This

11  market relates to the first stage of that competition. For a healthcare provider in California, the

12  fundamental question in defining this product market is not, "Who will my patients be?" but "Who

13  are the payors with whom I can contract?" In California, the answer is the same, regardless of who

14  the provider is—the Blues, the non-Blue commercial insurers in the state, and government

15  programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid.

16  All providers, regardless of their type, face these options. Moreover, multiple types of providers

17  can form a "cluster market," a concept widely accepted in healthcare antitrust cases and scholarly

18  economic analyses.

19       563.    In the alternative, three submarkets within this market are relevant product markets.

20  These are the purchase of goods and services from healthcare professionals, the purchase of goods

21  and services from healthcare facilities, and the purchase of durable medical equipment ("DME"),

22  all by commercial buyers of healthcare goods and services who are the companies in the business

23  of selling commercial health insurance or administering commercial health plans (excluding the

24  purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid).

25       564.    The submarket for DME is limited to DME provided to California residents.

26  Practical indicia support the segmentation into three submarkets. For example, the industry

27  recognizes distinctions among healthcare professional services, healthcare facility services, and

28  DME, and insurers often differ in the reimbursement methodologies they employ for each of these

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1   groups. For example, many commercial buyers reimburse healthcare facilities for inpatient

2   services based on diagnosis-related group codes instead of paying for each good or service

3   individually.

4           565.    Commercial buyers' contracting teams and processes also differ among these

5   submarkets. Nonetheless, providers of healthcare professional services and providers of healthcare

6   facility services face the same options for the purchase of their goods and services described

7   above. As a result, in each of these submarkets, the substitution between commercial insurance

8   and other payors is low, as reflected in measures such as a low cross-elasticity of demand.

9   Therefore, a profit-maximizing hypothetical monopsonist in these submarkets would likely lower

10  prices paid to providers below competitive levels by imposing at least a SSNRP.

11          566.    For the relevant product markets described above, other than DME, California's

12  Metropolitan Areas are relevant geographic markets.

13          567.    In the alternative, for the relevant product markets described above , other than

14  DME, California is a relevant geographic market. Healthcare providers, who have built their

15  patient base and have invested in physical assets located in California, are unlikely to respond to a

16  SSNRP by moving their practice out of the state. Therefore, a profit-maximizing hypothetical

17  monopsonist in these product markets in California would likely reduce prices below competitive

18  levels by imposing at least a SSNRP.

19          568.    In the alternative, for the relevant product markets described above, other than

20  DME, California Core-Based Statistical Areas, and counties or combinations of counties not part

21  of one of these areas, are relevant geographic markets. Healthcare professionals and healthcare

22  facilities usually provide services to patients living or working in relatively close proximity to

23  their offices or other facilities. Healthcare professionals and healthcare facilities have invested in

24  physical capital in their local geographic areas and invested in their human capital (reputation and

25  referral patterns) that is specific to their local geographic areas. Therefore, they are unlikely to

26  respond to a SSNRP by moving their practice out of their local area.

27          569.    The disincentive to moving is even more compelling in the real world than in the

28  world of the hypothetical monopsonist because California providers cannot contract with out-of-

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the provider's local area makes little difference unless the provider is willing to leave the state entirely. In other words, in the product markets for the purchase of healthcare services, the substitution between commercial buyers in the local geographic markets identified above and commercial buyers outside the local geographic markets identified above is low, as reflected in measures such as a low cross-elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the geographic markets identified above would likely reduce prices below competitive levels by imposing at least a SSNRP.

570.    Because DME can be shipped across state lines, the geographic market for DME is national.

571.    Plaintiffs reserve the right to further refine their definitions of the relevant product markets and relevant geographic markets as more information becomes available, if needed.

572.    Defendant Blue Cross of California d/b/a Anthem Blue Cross has market power at least in certain areas in California in the health care financing market and may have market power in the entire state. For example, it has a 50% market share in the Chico area, a 43% market share in the Bakersfield area, a 58% market share in the El Centro area, a 45% market share in the Fresno area, a 61% market share in the Hanfor-Corcoran area, a 49% market share in the Madera area, a 58% market share in the Merced area, a 42% market share in the Oxnard-Thousand Oaks-Ventura area, a 58% market share in the Redding area, a 65% market share in the Salinas area, a 59% market share in the San Luis Obispo-Paso Robles area, a 51% market share in the Santa Barbara-Santa Maria area, a 49% market share in the Santa Cruz-Santa Maria area, a 58% market share in the Visalia-Porterville area, and a 70% market share in the Yuba City-Maryville area, according to the 2013 AMA Competition Study. If Kaiser is removed from the markets where the prices for non-Kaiser healthcare providers are determined, then Blue Cross of California would be the largest health insurer in California and would have a market share of more than 50% in many other areas in California.

573.     These percentages are presented only for Defendant Blue Cross of California. Defendant Blue Shield of California has somewhat lower market share percentages, but it and all of the other Blues are unlawfully agreeing and working with Blue Cross of California.

574.     In addition to the submarkets alleged above, the California Blues also have a large share of the number of Californians with individual insurance policies, which further increases their market power over providers.

575.     As described above, the Blues have more enrollees than any health insurance or managed-care company in the country. Two of the four largest health insurance companies in the country, four of the largest ten, and 15 of the largest 25 are Blues. Exhibit G is a listing of the market share of the top four and top eight health insurance companies by state from 2004 through 2014 as reported by the National Association of Insurance Commissioners ("NAIC").

576.     Evidence will be introduced that shows that the other Blues agreed not to compete in California in health insurance markets. If individual Blue plans were allowed to enter and compete, the market share for the largest health insurance companies in California would likely become much less. It would also be expected that market power for any one company would diminish.

577.     But for the Blues' Market Allocation Agreement, the market shares of the top health insurance companies and the Herfindahl-Hirschman indices, which measure market concentration, would likely be lower in every state.

578.     Having fewer competitors in any market generally gives the players in that market more access to market power, and a greater ability to use market power, all else being equal.

579.     The Blues engage in a number of anticompetitive practices to increase their market power and to ensure that any competitors that do exist are marginalized or are unable to effectively compete. Through the agreements alleged in this Complaint, the Blues have exclusive access to more than 100 million subscribers of all the Blues. The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

580.     An expert economist for Defendant Capital Blue Cross in a merger proceeding before the Pennsylvania Insurance Department explained that there are significant barriers to entry

1 for the health care financing market and, therefore, to be a payor for healthcare goods, services

2 and facilities in the markets where prices are determined for healthcare providers. One of the

3 barriers is the development of a provider network.

4   581. Some of the Blues have imposed most MFNs to create additional barriers to entry.

5 An MFN is both an indicator and a source of market power because it excludes competitors. Other

6 Blues that do not have express MFNs in their contracts have the functional equivalents that

7 operate in the same manner.

8   582. The Blues' restraints have anticompetitive effects. Service areas are anticompetitive

9 on their face: they prevent the Blues from competing with each other.

10   583. The Blues' agreement to limit the amount of non-Blue business they may conduct

11 in another Blue's Service Area is anticompetitive on its face.

12    • The agreement puts an artificial limit on competition.

13    • The agreement reduces the incentive for the Blues to develop business out

14     of their Service Areas because they know that the potential for that business

15     is limited.

16   584. The Blues would compete to an extent with each other but for their unlawful

17 conduct.

18    • Historically, Blue-on-Blue competition has happened at times in certain

19     places such as Ohio, North Carolina and Illinois.

20    • Blue Cross and Blue Shield organizations competed against each other for

21     many years and still do to a limited extent in certain places, including

22     Washington, Idaho, and Central Pennsylvania.

23    • The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*,

24     resulted from one Blue's desire to compete outside of its service area;

25     BCBSA ultimately agreed to allow all of Ohio's Blues to compete with

26     each other, which they did.

27    • BCBSA settled the Maryland Blues litigation by allowing the D.C.-area

28     Blues to compete against each other.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

- Blues compete against each other in a limited way with respect to healthcare providers in areas covered by the one-county rule.

- Anthem, HCSC, and other Blues have large numbers of enrollees in Alabama through their National Accounts.

- Many of the Blues, especially the larger ones, such as Anthem and HCSC, have expanded into other territories through their non-Blue business, but in a limited way because of the limits on that business.

- Anthem is attempting to acquire CIGNA, which would give Anthem non-Blue branded business in Alabama.

- The BCBSA prevents Blues from expanding into other Service Areas.

- The Blues administer national accounts of companies headquartered outside their Service Areas through "ceding" arrangements.

585.    The Price Fixing and Boycott Agreement and the national programs including the Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program are anticompetitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients.

586.    Provider reimbursements are lower when the market for health care financing is highly concentrated.

587.    Output of quality health care services is reduced when the market for health care financing is highly concentrated. For example, Alabama has the highest market concentration of any Blue in the country, and it also has the sixth smallest number of primary care physicians per 100,000 patients of any state in the country. This low ratio damages public health and consumer welfare in Alabama.

588.    The national shortage of primary care physicians resulted from the low reimbursements paid by Defendants. Since Blue Cross and Blue Shield of, for example, Alabama has the largest market share of any health insurance company in the country, it is able to reduce provider reimbursement rates even more than other Blues. Primary care physicians in Alabama have retired early and continue to retire early because the reimbursements paid by Blue Cross of

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1    Alabama are too low to make it worthwhile for them to continue practicing medicine. These early

2    retirements have made and are making the shortage of primary care physicians even worse.

3        589.    The Blues' outrageous levels of capital show that they have used their market

4    power to earn supracompetitive returns.

5        590.    The Blues' agreements contain enforcement mechanisms.

6            •    A Blue that disobeys the restriction on competition can have its license

7                revoked.

8            •    Non-Blue companies that might favor competition effectively cannot buy a

9                Blue because the BCBSA board must approve an applicant for a license.

10        591.    The Blues' restraints offer no procompetitive benefits.

11        592.    The BCBSA agreement does not create a new product.

12        593.    The Blues do not need exclusive Service Areas to compete with national insurers.

13            •    The Blues include several of the largest insurers in the country, which

14                operate in several states and would operate more broadly including

15                nationwide but for the Market Allocation Agreement.

16            •    Other Blues have more than held their own against national insurers.

17        594.    Exclusive Service Areas do not enhance efficiency by allowing the Blues to remain

18    focused on their local areas.

19            •    Without exclusive Service Areas, Blues could still focus on their local areas

20                if they choose.

21            •    BCBSA's actions undermine this argument; the Blues used to be more

22                locally focused, but BCBSA required them to merge and operate statewide.

23            •    The existence of large multi-state Blues like Anthem and HCSC belies this

24                argument as well.

25        595.    The Blues have argued that Service Areas prevent free riding, but there are less

26    restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain

27    standards and invest in the development of the brand.

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

596.    The Blues have argued that Service Areas prevent customer confusion, but Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when Service Areas were challenged there. Moreover, the restrictions on competition with healthcare providers have no relevance to consumer confusion.

597.    Limiting the Blues' ability to compete outside of their Service Areas without using the Blue marks has no plausible procompetitive benefit.

598.    MFNs offer no procompetitive benefits.

599.    The national programs including the Blue Card Program and National Accounts Programs result in many inefficiencies that increase costs to healthcare providers and reduce consumer welfare. The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating Plans to be in-network providers create many of those inefficiencies as described in more detail above. Any alleged procompetitive effects of these programs are far outweighed by the anticompetitive effects that they create. Moreover, there is no justification for the price fixing aspects of these programs.

600.    The Blues do not need to engage in the Price Fixing and Boycott Agreement to offer health insurance or health care financing on a regional or national basis. Other health insurance companies or managed care companies offer health insurance or health care financing on a regional or <u>national</u> basis without engaging in such unlawful agreements.

### 3.    State-Specific Market Share Information

601.    Additional detail on the Defendants' market power within their Service Area is available in the 2013 AMA Competition Study, which includes Kaiser Permanente ("Kaiser"). If Kaiser is excluded from the calculation, the applicable Blues' market share is even higher.

602.    Defendants Blue Cross and Blue Shield of Alabama have market power throughout the State of Alabama in the market for the sale of commercial health insurance and in every geographic area within Alabama. In addition to the submarkets alleged above, BBS-AL also has an overwhelming share of the number of Alabamians with individual insurance policies, which further increases its market power over providers. It also has market power in the State of Alabama and the markets in which it is a purchaser. In Alabama, BCBS-AL's market share in the

1   entire state was 86% in the 2013 study and 83% in the 2016 study. Its lowest market share is in the

2   Mobile Metropolitan Statistical Area ("MSA"): 82% in the 2013 study and 78% in the 2016 study.

3   Its highest market share is in the Gadsden MSA: 94% in the 2013 study and 90% in the 2016

4   study. In addition, BCBS-AL has market power and market share between 85% and 91% (2013

5   study) and 81% and 88% (2016 study) of the market in the Anniston-Oxford, Auburn-Opelika,

6   Birmingham-Hoover, Decatur, Dothan, Florence, Huntsville, Montgomery and Tuscaloosa MSAs.

7   According to a 2011 report for BCBS-AL by the consulting firm Milliman, BCBS-AL's statewide

8   market share was 89.8% for individual policies, 97.2% for small groups, and 91.6% for large

9   groups. Because the market in Alabama is so concentrated, the Herfindahl–Hirschman Index for

10  Alabama is 7,531 (2013 study) or 6,914 (2016 study). By comparison, the United States

11  Department of Justice considers a market to be highly concentrated when its Herfindahl–

12  Hirschman Index exceeds 1,800.

13        603.    Defendant Blue Cross and Blue Shield of Florida, Inc. has market power at least in

14  certain areas in Florida in the health care financing market and may have market power in the

15  entire state. It has market power at least in certain areas in the State of Florida in the health

16  services markets and may have market power in the entire state. For example, it has a 56% market

17  share in the Fort Walton Beach – Crestview – Destin area, a 40% market share in the Deltona-

18  Daytona Beach-Ormond Beach area, a 61% market share in the Gainesville area, a 55% market

19  share in the Ocala market, a 43% market share in the Naples-Marco Island, FL area, a 67% market

20  share in the Panama City/Lynn Haven area, a 46 % market share in the Pensacola-Ferry Pass-

21  Brent area, a 43% market share in the Port St. Lucie-Fort Pierce area, an 84% market share in the

22  Tallahassee area, and a 57% market share in the Vero Beach area. Also, during the colder months

23  of the year, many people who are subscribers of Blues in Northern states spend time in Florida.

24  The Blue uses those subscribers to increase its market power.

25        604.    Defendant Blue Cross and Blue Shield of Georgia, Inc., a subsidiary of Defendant

26  Anthem, has market power at least in certain areas in Georgia in the health care financing market

27  and may have market power in the entire state. It has market power at least in certain areas in the

28  State of Georgia in the health services markets and may have market power in the entire state. For

example, it has a 57% market share in the Warner-Robins area, a 46% market share in the Albany area, 42% market share in the Athens-Clarke County area, a 44% area share in the Columbus GA-AL area, a 47% market share in the Valdosta area, and a 56% market share in the Hinesville/Fort Stewart area. Kaiser has some presence in Georgia and exclusion of it will affect some of the market share percentages.

605.    Defendant Anthem Blue Cross and Blue Shield of Indiana, a subsidiary of Defendant Anthem, has market power throughout the State of Indiana in the health care financing market and in every market within Indiana. It also has market power in the State of Indiana and in every health services market. It has a market share of 51% in the entire state. Its highest market share is 68% in the Anderson area. It also maintains a 56% market share in the Bloomington area, a 57% share in the Columbus area, a 62% share in the Elkhart-Goshen area, a 43% share in the Evansville IN-KY area, a 56% share in the Fort Wayne area, a 44% share in the Gary area, a 49% share in the Indianapolis area, a 54% share in Kokomo, a 56% share in the Michigan City-LaPorte area, a 63% share in the Muncie area, a 41% share in the South Bend-Mishawaka, IN-MI area, a 66% share in the Terre Haute area.

606.    Defendant Blue Cross and Blue Shield of Kansas has market power at least in certain areas in Kansas in the health care financing market and may have market power in the entire state. Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of Kansas City have separate Service Areas within Kansas, the statewide market share percentages do not tell a complete story of market shares. It has market power at least in certain areas in the State of Kansas in the health services markets and may have market power in the entire state. For example, it has a 69% market share in the Topeka area (the home of Dr. Cain), a 45% share in the Wichita, Kansas and a 56% market share in the Lawrence area.

607.    Defendant Blue Cross and Blue Shield of Michigan has market power at least in certain areas in Michigan in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Michigan in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state. It also has an 81% market share in the Lansing/East Lansing and

Niles/Benton Harbor areas, a 77% market share in the Battle Creek area, a 73% market share in the Bay City area, a 72% market share in the Ann Arbor area, a 71% market share in the Saginaw/Saginaw Township North area, a 69% market share in the Monroe and Warren/Farmington Hills/Troy areas, a 67% market share in the Jackson area, a 66% market share in the Kalamazoo/Portage area, a 64% market share in the Flint area, a 58% market share in the Muskegon/Norton Shores area, and a 53% market share in the Detroit/Livonia/Dearborn area.

608.     Defendant Blue Cross and Blue Shield of Kansas City has market power at least in certain parts of the states of Missouri and Kansas and the Kansas City area for the health care financing market and may have market power in the entire area. It has market power at least in certain areas in the State of Kansas and Missouri in the health services markets and may have market power in the entire Kansas City area. For example, it has a 51% market share in the St. Joseph MO-KS area.

609.     Defendant Anthem Blue Cross and Blue Shield of Missouri, a subsidiary of Defendant Anthem, has market power at least in certain areas in Missouri in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Missouri in the health services markets and may have market power across the entire state. Discovery may also show that other Blues have market power in areas in Missouri.

610.     Defendant Anthem Blue Cross and Blue Shield of Nevada, the trade name of Defendant Rocky Mountain Hospital and Medical Services, Inc., both subsidiaries of Defendant Anthem, has market power at least in certain areas in Nevada in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Nevada in the health services markets and may have market power in the entire state. For example, it maintains a market share of 44% in the Carson City area.

611.     Defendant Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross and Blue Shield of New Jersey has market power at least in certain areas in New Jersey in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of New Jersey in the health services markets and may have market power

1    in the entire state. For example, it has a 60% market share in the Atlantic City area, a 57% market

2    share in the Ocean City area, and a 42% share of the Vineland-Milville-Bridgeton area.

3       612.    Defendant Community Health Insurance Company, d/b/a Anthem Blue Cross and

4    Blue Shield of Ohio, a subsidiary of Defendant Anthem, has market power at least in certain areas

5    in Ohio in the health care financing market. It has market power at least in certain areas in the

6    State of Ohio in the health services markets. It has a market share of 38% in the

7    Cincinnati/Middletown area, but since that area borders on Kentucky where Defendant Anthem

8    also has the Blue, it likely has market power through its combined operations.

9       613.    Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue

10    Cross of Northeastern Pennsylvania has market power at least in certain areas in Pennsylvania in

11    the health care financing market. It has market power at least in certain areas in the

12    Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% markets

13    share in each of the Scranton/Wilkes-Barre and Williamsport areas. Defendant Highmark is in the

14    process of purchasing Blue Cross of Northeastern Pennsylvania.

15       614.    Defendant Highmark, Inc., the parent of Defendant Highmark Health Services d/b/a

16    Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield, has market power at least

17    in certain areas in Pennsylvania in the health care financing market. It has market power at least in

18    certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it

19    has a 75% market share in the Johnstown area, a 73% market share in the Altoona area, a 69%

20    market share in the Erie area, a 52% market share in the Pittsburgh area, a 45% share of the

21    Harrisburg-Carlisle area, a 46% share of the Lebanon area, a 43% share of the Reading area, a

22    46% share of the State College area and a 42% of the York-Hanover area.

23       615.    Defendant Independence Blue Cross has market power at least in certain areas in

24    Pennsylvania in the health care financing market. It has market power at least in certain areas in

25    the Commonwealth of Pennsylvania in the health services markets. For example, it has a 58%

26    market share in the Philadelphia area.

27       616.    Defendant Blue Cross and Blue Shield of Rhode Island has market power at least in

28    certain areas in Rhode Island in the health care financing market. It has market power at least in

certain areas in the State of Rhode Island in the health services markets. For example, it has a market share of 50% across the entire state.

617.     Defendant Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, has market power at least in certain areas in Texas in the health care financing market. It has market power at least in certain areas in the State of Texas in the health services markets. For example, it has a 78% market share in the Laredo area, a 75% market share in the Wichita Falls area, a 74% market share in the San Angelo area, a 66% market share in the Odessa area, a 65% market share in the McAllen/Edinburg-Mission area, a 62% market share in the Midland area, a 61% market share in each of the Brownsville/Harlingen and Tyler areas, a 59% market share in each of the Lubbock and Texarkana areas, a 56% market share in the Longview area, a 55% market share in the Waco area, a 53% market share in the College Station/Bryan and Corpus Christi areas, a 41% share of the Waco area, a 48% share of the Sherman-Denison area and a 51% market share in the Beaumont/Port Arthur area.

## V.     VIOLATIONS OF LAW

### <u>FIRST COUNT</u>: CALIFORNIA HORIZONTAL MARKET ALLOCATION

### (All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 16720, *et seq.*)

618.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

619.     Plaintiffs bring this claim under Cal. Bus. & Prof. Code § 16720, *et seq.*, for Defendants' violations of California's Cartwright Act through their Market Allocation Agreement.

620.     Defendants have agreed to divide and allocate the geographic markets for the financing of health care and the sale of commercial health benefit products into a series of exclusive areas for BCBSA members.

621.     Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined.

622.     By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare providers in violation of the Cartwright Act.

623.   Due to the lack of competition which results from Defendants' unlawful conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.

624.   Defendants' market allocation agreements are *per se* unlawful under the Cartwright Act.

625.   Defendants' continuing violations of the Cartwright Act have denied Plaintiffs the opportunity to purchase health benefit products from a lower cost competitor and/or at a price set by a market free from the anticompetitive agreements, and of a wider choice of healthcare products and services as well as of increased innovation.

626.   The challenged agreements have had substantial and unreasonable anticompetitive effects, including but not limited to:

a.   Reducing the number of Blue-branded licensee health benefit product companies competing with the Blues throughout their respective Service Areas;

b.   Unreasonably limiting the entry of competitor health benefit product companies into California;

c.   Allowing the Blues to maintain and enlarge their market power in their respective Service Areas;

d.   Allowing the Blues to supra-competitively raise the premiums and ASO Fees charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

e.   Depriving Plaintiffs the full benefits of free and open competition.

627.   As a direct and proximate result of Defendants' continuing violations of the Cartwright Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that California's antitrust laws were designed to prevent.

628.   Such injury flows directly from that which makes Defendants' conduct unlawful.

629.   These damages include: having been paid less for healthcare services, equipment and/or supplies than they would have but for Defendants' anticompetitive agreement; having been

1  forced to accept far less favorable rates and other contract terms; having access to far fewer

2  patients; and having paid artificially inflated, unreasonable or supra-competitive premiums and

3  ASO Fees.

4        630.    These damages further consist of being deprived of the opportunity to purchase

5  health benefit products from one or more of the other Blues and/or their non-Blue affiliates at a

6  lower premium or contractual rate and/or at a price set by a market free from the non-price

7  restraints imposed by Defendants' anticompetitive agreements.

8        631.    Plaintiffs seek money damages and lost profits from Defendants for their violations

9  of the Cartwright Act.

10  **SECOND COUNT: CALIFORNIA HORIZONTAL PRICE FIXING AND BOYCOTT**

11  **(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 16720, *et seq.*)**

12        632.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though

13  set forth herein.

14        633.    Plaintiffs bring this claim under Cal. Bus. & Prof. Code § 16720, *et seq.*, for

15  Defendants' violations of California's Cartwright Act through their Price Fixing and Boycott

16  Agreements.

17        634.    The Price Fixing and Boycott Agreements operate in addition to and reinforces the

18  Market Allocation Agreement. The Agreements alleged in this Count also violate the Cartwright

19  Act and are *per se* violations of the Act.

20        635.    Through the Price Fixing and Boycott Agreements, the Blues have agreed to fix

21  reimbursement rates for providers among themselves by reimbursing providers according to the

22  "Host Plan" or "Participating Plan" reimbursement rate through the national programs.

23        636.    By so doing, Defendants have agreed to suppress competition by fixing and

24  maintaining payments to healthcare providers at less than competitive levels in violation of the

25  Cartwright Act.

26        637.    As a direct and proximate result of Defendants' continuing violations of the

27  Cartwright Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that

28  California's antitrust laws were designed to prevent.

638.   Such injury flows directly from that which makes Defendants' conduct unlawful.

639.   These damages include: having been paid less for healthcare services, equipment and/or supplies; having been forced to accept far less favorable rates and other contract terms; and having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

640.   Plaintiffs seek money damages and lost profits from Defendants for their violations of the Cartwright Act.

### THIRD COUNT: CALIFORNIA HORIZONTAL UNLAWFUL EXCHANGE OF COMPETITIVELY SENSITIVE BUSINESS INFORMATION

**(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 16720, *et seq.*)**

641.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

642.   Plaintiffs bring this claim under California Business & Professions Code § 16720, *et seq.*, for Defendants' violations of California's Cartwright Act through their Price Fixing and Boycott Agreements.

643.   As alleged more specifically above, Defendants have engaged in an agreement to exchange sensitive in-network, provider price information to BCBSA, BHI, and CHP which are owned and controlled by the Blues.

644.   Through various programs, these entities provide pricing reports to the Blues for the purpose and with the effect of lowering reimbursements to providers, stabilizing the Blues pricing for health care services provided by hospitals in various markets, and managing the various anticompetitive national BCBSA programs to protect the individual Blues from competition in violation of the Cartwright Act, California Business & Professions Code § 16720.

645.   Plaintiffs seek money damages from Defendants for their violations of the Cartwright Act.

### FOURTH COUNT: CALIFORNIA UNFAIR COMPETTIION

**(All Plaintiffs Against All Defendants Under Cal. Bus. & Prof. Code § 17200, *et seq.*)**

646.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in the preceding paragraphs of this Complaint.

647.    California Business & Professions Code § 17203 prohibits the commission of any "unlawful, unfair, or fraudulent" business act or practice.

648.    Defendants' business acts and practices, as alleged herein, constituted and constitute a continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California's Unfair Competition Law, Business & Professions Code § 17200, *et seq*.

649.    Through their actions as alleged herein, Defendants have engaged in unlawful, unfair and/or fraudulent business acts or practices within the meaning of California Business & Professions Code § 17200, *et seq.* because Defendants' conduct, business affairs and practices as alleged herein violate the antitrust laws, the Cartwright Act, and California Business & Professions Code § 16720, *et seq*., each of which constitutes an independent and separate violation of California Business & Professions Code § 17200, *et seq*.

650.    Defendants' conduct, business affairs and practices described herein further constitute unlawful, unfair and/or fraudulent business acts or practices within the meaning of California Business & Professions Code § 17200, *et seq.* because such conduct threatens an incipient violation of California's consumer protection and antitrust laws, including but not limited to the Unfair Competition Law and Cartwright Act, and/or violates the policy or spirit of such laws because it significantly harms and threatens competition.

651.    Plaintiffs have standing to bring this action under the UCL because they have suffered injury as a proximate result of Defendants' unlawful, unfair and/or fraudulent business practices.

652.    As a proximate result of Defendants' unlawful, unfair, and/or fraudulent business practices, Plaintiffs have been denied fair and reasonable payments for health care services, equipment and/or supplies, and have paid artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

653.     Plaintiffs are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefit, such other monetary relief as the court deems just in light of the ill-gotten gains obtained by Defendants as a result of such business acts or practices.

### FIFTH COUNT: ALABAMA DECEPTIVE TRADE PRACTICES ACT

### (All Plaintiffs Against All Defendants Under Ala. Code § 8-19-5(27))

654.     Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

655.     The acts and practices by Defendants constitute unconscionable acts in violation of the Alabama Deceptive Trade Practices Act, Code of Alabama, 1975, §§ 8-19-10, 8-19-5(27) for which Plaintiffs are entitled to relief.

656.     The acts and practices by Defendants further constitute an unlawful trust, combine or monopoly in violation of Code of Alabama, 975, § 6-5-60.

### SIXTH COUNT:

### FLORIDA ANTITRUST ACT AND FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### (All Plaintiffs Against All Defendants Under Fla. Stat. § 542.18)

### (All Plaintiffs Against All Defendants Under Fla. Stat. § 501.201, *et seq.*)

657.     Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

658.     This is an action that alleges a violation of the Florida Antitrust Act, Section 542.18, and the Florida Deceptive and Unfair Trade Practices Act, Section 501.201, *et seq.* Plaintiffs are entitled to relief, including, but not limited to, damages, disgorgement, civil penalties, equitable relief, attorneys' fees and costs resulting from the Defendants' conduct as stated above, for all for all unfair and unreasonable payments for health care services, equipment and/or supplies, and for all artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

659.   Defendants knowingly—that is, voluntarily and intentionally—entered into an agreement to divide and allocate the geographic markets for the financing of health care and the sale of commercial health benefit products into a series of exclusive areas for BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined. By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare . Due to the lack of competition which results from Defendants' unlawful conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.

660.   Defendants knowingly—that is, voluntarily and intentionally—agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs. By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels.

661.   Defendants knowingly—that is, voluntarily and intentionally—Defendants agreed to exchange sensitive in-network, provider price information to BHI which provides pricing reports to all the Blues for the purpose and effect of lowering reimbursements to providers, stabilizing the Blues pricing for health care services provided by hospitals in various markets, and managing the various anticompetitive national BCBSA programs.

662.   As a direct and proximate result of the Defendants' conduct, Plaintiffs have been injured and will continue to be injured by being denied fair and reasonable payments for health care services, equipment and/or supplies, and paying artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

663.   The sale of health insurance, the sale of administrative services for employee benefit plans, and the purchase of health-care services, facilities and equipment all involve trade or commerce within the meaning of the Florida Antitrust Act and the Florida Deceptive and Unfair Trade Practices Act.

664.    The combination, acts, agreements and practices alleged herein constitute unfair methods of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, 501. 201, *et seq.*, Florida Statutes.

665.    Further, Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to Florida businesses and consumers in violation of Section 501.204, Florida Statutes.

## SEVENTH COUNT: INDIANA ANTITRUST ACT

**(All Plaintiffs Against All Defendants Under Ind. Code §§ 24-1-2-1, *et seq.*)**

666.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

667.    The aforementioned practices are a violation of Chapter Two of the Indiana Antitrust Act, Indiana Code Section 24-1-2-1, and Plaintiffs seek recovery pursuant to Indiana Code Section 24-1-2-7.

668.    As a direct and proximate result of Defendants' contracts, combinations and agreements to restrain trade, as more fully described above, Plaintiffs have been injured and will continue to be injured by being denied fair and reasonable payments for health care services, equipment and/or supplies, and paying artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

669.    Accordingly, Plaintiffs are entitled to and seeks relief, including but not limited to trebled damages, attorney's fees and costs.

## EIGHTH COUNT: KANSAS RESTRAINT OF TRADE ACT

**(All Plaintiffs Against All Defendants Under Kan. Stat. Ann. §§ 50-101, *et seq.*)**

670.    Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

671.    The aforementioned practices by Defendants were and are in violation of the Kansas Restraint of Trade Act, Kan. Stat. Ann. §§ 50-101, *et seq*.

672.    Plaintiffs are entitled to treble damages, reasonable attorney fees and costs, and any other appropriate relief that the Court so orders, pursuant to Kan. Stat. Ann. § 50-161.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

**NINTH COUNT: MICHIGAN ANTITRUST REFORM ACT**

**(All Plaintiffs Against All Defendants Under Mich. Comp. Laws §§ 445.771, *et seq.*)**

673.　Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

674.　The aforementioned practices by Defendants were and are in violation of the Michigan Antitrust Reform Act, Mich. Comp. Laws §§ 445.771, *et seq.*

675.　As a direct and proximate result of Defendants' contracts, combinations and agreements to restrain trade, as more fully described above, Plaintiffs have been injured and will continue to be injured by being denied fair and reasonable payments for health care services, equipment and/or supplies, and paying artificially inflated, unreasonable and supra-competitive premiums and ASO Fees.

676.　Accordingly, Plaintiffs are entitled to relief including but not limited to disgorgement, damages, interest, costs and attorney's fees.

**TENTH COUNT: NEVADA UNFAIR TRADE PRACTICES ACT**

**(All Plaintiffs Against All Defendants Under Nev. Rev. Stat. §§ 598A.010, *et seq.*)**

677.　Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

678.　As alleged herein, Defendants' anticompetitive conduct harmed, and continues to harm, Plaintiffs. Accordingly, the aforementioned acts and practices by Defendants were, and are, in violation of the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010, et seq., and specifically Nev. Rev. Stat. §§ 598A.060(a), (b) and (c).

679.　Accordingly, Plaintiffs seek all relief available under the Nevada Unfair Trade Practices Act. Plaintiffs are entitled to relief including but not limited to treble damages, attorneys' fees and costs.

**ELEVENTH COUNT: NEW JERSEY ANTITRUST ACT**

**(All Plaintiffs Against All Defendants Under N.J.S.A. 56:9-1, *et seq.*)**

680.　Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION, AND OTHER STATE ANTITRUST LAWS

681.     Defendants' actions as alleged herein violate the New Jersey Antitrust Act, N.J.S.A. 56:9-1, *et seq.*, in that they have the purpose and effect of unreasonably restraining trade and commerce within the State of New Jersey and elsewhere. N.J.S.A. 56:9-3. Plaintiffs seek relief including, but not limited to, treble damages, attorney's fees and costs. N.J.S.A. 56:9-12.

## TWELFTH COUNT: OHIO REV. CODE § 1331.01, *et seq.*

### (All Plaintiffs Against All Defendants Under Ohio Rev. Code § 1331.01, *et seq.*)

682.     Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

683.     The aforementioned practices by Defendants were, and are, a per se violation of Ohio Revised Code Section 1331.01, *et seq.*, the common law of Ohio, and voice pursuant to Ohio Revised Code Section 1331.06. Plaintiffs, the general economy of Ohio, Ohio entities and individuals in Ohio were harmed as a direct result of Defendants' per se illegal conduct. Defendants received ill-gotten gains or proceeds as a direct result of their per se illegal conduct.

684.     Plaintiffs seek and are entitled to treble damages and costs of suit. Ohio Rev. Code § 1331.08.

## THIRTEENTH COUNT: RHODE ISLAND ANTITRUST ACT

### (All Plaintiffs Against All Defendants Under R.I. General Laws § 6-36-1, *et seq.*)

685.     Plaintiffs repeat and re-allege each and every preceding allegation as if fully set forth herein.

686.     Defendants' actions as alleged herein violate the Rhode Island Antitrust Act, R.I. Gen. Laws § 6-36-1, *et seq.*

687.     Plaintiffs bring this action pursuant to Rhode Island General Law Section 6-36-11, and seeks relief, including but not limited to treble damages, fees, costs and such other relief as this court deems just and equitable.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court enter judgment on its behalf against defendants, jointly and severally, adjudging and decreeing that:

a.      Defendants have engaged in trusts, contracts, combinations, or agreements in violation of Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and Plaintiffs have been damaged and injured as a result and are entitled to relief under Cal. Bus. & Prof. Code § 16750(a).

b.      The unlawful conduct, contracts or combinations alleged in this Complaint be adjudged and decreed to be:

        i.     A *per se* unlawful horizontal market allocation violation of the Cartwright Act;

       ii.     A *per se* horizontal price-fixing violation of the Cartwright Act;

      iii.     A *per se* horizontal boycott violation of the Cartwright Act;

      iv.     Unlawful efforts to maintain, control, reduce, or tamper with reimbursement prices in violation of the Cartwright Act;

       v.     Unreasonable restraints of trade in violation of the Cartwright Act;

      vi.     Unlawful, unfair, and/or fraudulent business practices within the meaning of California's Unfair Competition Act, Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and

     vii.     Corresponding violations of other states' laws.

c.      Judgment shall be entered against Defendants and in favor of Plaintiffs for damages arising from Defendants' unlawful conduct as determined to have been sustained by them, in an amount to be trebled to the extent permitted by law, together with the costs of suit, including reasonable attorneys' fees;

d.      Judgment shall be entered against Defendants and in favor of Plaintiffs for restitution and disgorgement of ill-gotten monetary gains determined to have been obtained by them, as allowed by law and equity, together with the costs of suit, including reasonable attorneys' fees;

e.      Judgement shall be entered against Defendants and in favor of Plaintiffs, as applicable, for damages and lost profits arising from Defendants wrongful conduct diminishing the value of Plaintiff's enterprise and driving it into bankruptcy;

f.      Plaintiffs be awarded monetary damages (trebled as appropriate), restitution, and disgorgement of the monetary gains obtained by Defendants as a result of their acts of unfair competition;

g.      Plaintiffs be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

h.      Plaintiffs shall recover its costs of suit, including reasonable attorneys' fees, as provided by law; and

i.      Plaintiffs have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.


DATED: July 28, 2021                              BARTKO ZANKEL BUNZEL & MILLER
                                                                 A Professional Law Corporation

                                                                 PATRICK M. RYAN
                                                                 PATRICK E. O'SHAUGHNESSY
                                                                 JOHN F. MCLEAN
                                                                 OLIVER Q. DUNLAP
                                                                 SEAN R. MCTIGUE


                              By: _____
                                                                 Patrick E. O'Shaughnessy
                                                                 Attorneys for Plaintiffs
                                                                 VHS LIQUIDATING TRUST, PRIME
                                                                 HEALTHCARE SERVICES, INC., PRIME
                                                                 ALTHCARE FOUNDATION, INC., and PRIME
                                                                 HEALTHCARE MANAGEMENT, INC.

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

1

## JURY DEMAND

2       Plaintiffs demand a trial by jury on all issues so triable.

3

4  DATED: July 28, 2021

BARTKO ZANKEL BUNZEL & MILLER
A Professional Law Corporation

5

6                               PATRICK M. RYAN
                            PATRICK E. O'SHAUGHNESSY

7                                 JOHN F. MCLEAN
                               OLIVER Q. DUNLAP

8                                 SEAN R. MCTIGUE

9

10                By:

11                         Patrick E. O'Shaughnessy
                         Attorneys for Plaintiffs

12           VHS LIQUIDATING TRUST, PRIME
HEALTHCARE SERVICES, INC., PRIME

13           ALTHCARE FOUNDATION, INC., and PRIME
HEALTHCARE MANAGEMENT, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE CARTWRIGHT ACT, UNFAIR COMPETITION,
AND OTHER STATE ANTITRUST LAWS

# EXHIBIT A







1200 Abernathy Road, Suite 1000
Atlanta, Georgia 30328
678.441.0061 • www.nasco.com



Copyright © 2010 NASCO
Blue Cross® and Blue Shield®, BlueCard®, Blue℠ and BlueExchange® are registered service marks of the
Blue Cross Blue Shield Association, an association of Independent Blue Cross and Blue Shield Plans.
DART™ is a registered trademark of Health Data Management Solutions.
MetaVance® is a registered trademark of Hewlett-Packard Development Company, LP.



In 1987, NASCO was formed through a partnership among major Blue Cross® and Blue Shield® Plans. It was then that NASCO introduced an integrated claims processing system for the Plans' national accounts, which quickly earned the reputation for bridging the payer gap with quality support and personal service.

Today, NASCO provides the most efficient single-system claims processing solution for national, state, large group, small group, individual and government programs. NASCO's core strength comes from our claims processing system, which is unsurpassed in the market for reliability, flexibility, scalability and operational performance. We also offer a highly configurable membership and billing solution that can be suited for any Plan's total book of business, as well as a multitude of performance-based services designed to help our Plan customers improve their operational efficiencies and reduce costs.

NASCO's administrative solutions are designed to integrate and maximize the value of third-party systems, including care management and network management platforms. This comprehensive enterprise solution automates Plan business processes and greatly increases Plan efficiencies.

Our mission: NO GAPS. Our vision: to be at the heart of the fastest, most effective and efficient Blue payer system.

The creation, implementation and evolution of our total payer approach allows us to close the payer gap – at every relationship level – by making our Plan customers' complex challenges easier to solve. Of course, there are many types of gaps and many ways to challenge them, but we know exactly how to do just that because we've been doing it successfully for some of the largest Blue Cross and Blue Shield Plans in the United States for over 20 years.

Bridge them. Fill them. Close them. Challenge them.

NASCO is dedicated to challenging all gaps to meet the needs of our customers.



# Claims

NASCO's foundation is its claims processing system. Providing consistent benefit reimbursement to members no matter where they live, work or travel, NASCO's claims processing system is unparalleled in performance.

" **NASCO** does a great job quickly."

## Claims

NASCO's claims processing system is otherwise known as the NASCO Processing System (NPS). The NPS easily processes national and local business, including small group, large group and individual accounts, on one system platform. We are dedicated to supporting our Plan customers' efforts to grow their business. NASCO provides the products and services our Plan customers need to sell diverse healthcare products, service those segments through high-performing delivery and provide a great customer experience to their accounts, members and providers.

Our single system allows Plans to eliminate redundancy and share the costs of development and maintenance. The NPS is built to handle large volumes and complex business; having processed over 1 billion claims, it is unsurpassed in the market for reliability, flexibility, scalability and operational performance.

NASCO is committed to maximizing our customers' performance and lowering their costs through our unique shared-system environment. The NPS offers economies of scale and reduces Plans' operating costs for their entire book of business. NASCO invests in new products and services, including mandates, while Plans fund their own customizations. Throughout the development of new products or services, NASCO ensures that our Plan customers' needs are addressed via work groups composed of NASCO associates and customers.

In addition to lowering costs through the shared platform, NASCO is able to reduce costs for our Plan customers through high performance. With the ability to automatically adjudicate over 90 percent of all claims processed, NASCO allows our Plan customers to achieve greater overall efficiency and maximize their operational performance.

7

NASCO specializes in delivering creative solutions to complex benefit configurations. Our claims offering includes the following capabilities:

## Inter-Plan Programs

As one of the largest processors of BlueCard® claims for Blue Cross and Blue Shield Plans across the country, NASCO provides enhanced BlueCard capabilities by leveraging existing national, local, labor, dental, vision and major medical account functionality in our single processing system.

NASCO offers Blue²® to our Plan customers to ensure their compliance with Blue Cross and Blue Shield Association (BCBSA) mandates. This Web application enables Plans to manage claims inventory, request claim status, view claim formats, request medical attachments and send electronic attachments in a real-time environment.

NASCO also offers BlueExchange® to ensure our Plan customers' compliance with BCBSA BlueExchange mandates. Plan customers can elect to have NASCO respond on their behalf to claim status or eligibility inquiries and generate out-of-area Medicare crossover claim remittance information. Plans can also choose to receive their BlueExchange responses directly from the BCBSA and forward that information to NASCO, allowing the Plans more control over the transactions and the ability to repurpose the information for third-party vendors. Both of these options decrease or eliminate local development costs for the Plan and improve response performance to its BlueExchange inquiries.

## Consumer-Directed Healthcare

NASCO's consumer-directed healthcare (CDH) product, *Consumer's Choice*℠, is a state-of-the-art consumer savings/spending account management platform that offers our Plan customers the flexibility they require to enable competitive FSA, HSA and HRA product offerings without the limitations of choice often imposed by other technology platforms or administrators.

But that's not all. Consumer's Choice is much more than just a healthcare savings/ spending account management platform for Plans or employers. Because Consumer's Choice is seamlessly integrated into NASCO's *Health Care Benefits Online*® member Website, it provides real-time access to healthcare spending account data and offers tools designed to empower and support members as they make decisions about managing their healthcare.

9



# Consumer Products and Services

## Service Facilitators

NASCO's Health Care Benefits Online (HCBO) Website is a robust, competitive tool that Plans can use to their advantage. Designed as a convenient resource for members, employers and Plan customer service representatives, this self-service Website is customizable with Plan-specific branding. HCBO provides members real-time access to their healthcare information while giving employers the ability to quickly update member information. Plan customer service representatives can access member information to perform activities such as requesting ID cards or updating coordination of benefits information.

NASCO's Customer Service Workstation (CSW) is a graphical, user-friendly interface for the NPS. Designed to improve the efficiency of customer service representatives, CSW provides a simplified and more intuitive method for call handling, research and worksheet workflows. This greatly reduces training time on the system and allows Plans to focus on customer account specific requirements.

## Interoperability

**InterAct** NASCO's XML messaging service, enables Plan applications to interact directly with the NPS. Using InterAct, Plans have real-time access to the most up-to-date NPS information and can use this data for applications such as Plan Websites, customer service applications or Interactive Voice Response systems.

NASCO understands how important it is for information among third-party vendors to be transmitted on a regular basis, versus overnight batch. NASCO's Enhanced Ancillary Vendor Integration product provides standardized vendor integration processes, which allow Plans to benefit from speed to market through simplified implementations. The product enables real-time updates to both the NPS and vendor systems, such as pharmacy benefits managers, in order to remain synchronized.

## Account Reporting

NASCO, in partnership with Health Data Management Solutions, provides a comprehensive and highly flexible Data Analysis and Reporting Tool (DART™) to our Plan customers. This Web-based tool gives Plans extensive reporting capabilities and allows them to provide their customers with detailed cost and usage reports, regardless of the account size. With DART, NASCO is simplifying the matrices associated with understanding healthcare costs and how they may affect our Plans' accounts.

## Jointly Administered Accounts

*FlexLink*, NASCO's product that supports jointly administered labor accounts, provides a collaborative claim processing arrangement between the NASCO Plan customer and the labor Fund or its third-party administrator. With FlexLink, Plans are able to offer their national provider networks while allowing the labor Funds to administer their members' benefits.

## Government Programs

NASCO processes Federal Employee Program (FEP) claims and enables our Plan customers to interface with the FEP Operations Center in Washington, D.C., to adjudicate claims for federal employees. NASCO also processes claims for state health benefit programs and has been instrumental in assisting our Plan customers with retaining these accounts.

## Print-and-Mail Fulfillment

NASCO's print-and-mail fulfillment provides Plan customers with customizable Explanation of Benefits (EOB) that can be distributed electronically or printed and mailed to members and providers. With the option for next business-day print distribution, Plan customers are ensured a quick turnaround. In addition, Plan customers can take advantage of the NASCO document retrieval system for viewing copies of EOB documents that have been sent to members and providers. NASCO also provides special handling for these documents upon request.

We maneuver through complex payer environments on behalf of our customers – so they can realize value faster and with greater confidence.

**NASCO** DELIVERS CREATIVE SOLUTIONS TO COMPLEX PROBLEMS.



# Membership

With NASCO's membership solution, *MembersEdge*℠, you have the benefit of working with a trusted leader in the claims processing industry and knowing that you are getting a highly configurable system that can be suited for any Plan's total book of business.

" **NASCO** listens and responds to meet my needs."

## MembersEdge

Suited for any Plan's total book of business, MembersEdge will drive down your operational costs with greater overall efficiency by eliminating redundant systems, maintenance and enhancement costs.

A combination of NPS functionality, the MetaVance® solution and the NASCO membership Web client, MembersEdge is a fully integrated membership solution that makes the servicing of complex accounts simple through process automation.

MembersEdge supports all enrollment, billing, payment reconciliation, financial reporting and claims eligibility functions, as well as a variety of Plan business options – ASO, direct pay and premium billed accounts. It also supports several HIPAA-compliant transactions and gives our Plan customers added flexibility to meet changing market demands with enhanced billing functions that allow for single invoicing to reflect both risk and non-risk business.

A highly configurable platform that is able to meet the needs of the individual Plan, MembersEdge features:

- The ability to integrate with other membership and claims systems

- Migration support with faster and less expensive group implementation

- Real-time access to billing and enrollment all the way to the member level via our membership Web client or Web services components

- The ability to support multiple vendors in the Electronic Bill Presentment and Payment arena

- Member-level benefits and billing, which allow you to focus on an individual member's health and select benefits accordingly

17





We focus on creating end-to-end solutions that actually drive operational costs down by achieving greater overall efficiency.

NASCO LOWERS COSTS THROUGH INTEGRATED, LEVERAGED, STREAMLINED SOLUTIONS.



# Performance Services

NASCO firmly believes that the value of a solution can only be measured by the results it achieves, and that is why we are committed to ensuring that our Plan customers are experiencing the highest performance levels at the lowest possible cost. NASCO is much more than a claims processing system. We offer a multitude of performance-based services designed to help our Plan customers improve their operational efficiencies and reduce costs.

" **NASCO** is truly one of the best business partners I've ever worked with. "

## Performance Services

The strength of NASCO's performance services is our people. Recognized for their ability to solve problems quickly and accurately, NASCO associates have a wealth of healthcare and NPS knowledge and experience that our Plan customers can leverage to help challenge any gaps they may face.

### Account Implementations

Dedicated to making complex challenges easier to solve, NASCO offers our Plan customers tools and services to help close the gaps of account implementations. In addition to maintaining NASCO benefit tables and offering our Plan customers unparalleled NPS benefit coding expertise, NASCO has developed a suite of tools, *BeneFACT℠*, to automate and increase the ease of benefit coding in the NPS.

NASCO's BeneFACT suite increases the speed of implementation, drives efficiency, reduces rework, ensures accuracy and improves Plan operational effectiveness. Tools within the suite enable efficient research, analysis and troubleshooting of benefit code; gather benefit data into a single data repository that can be shared among various applications to reduce multiple interpretations; and enable Plan customers to configure their own benefits and promote automated implementations.

Our benefit coding services, delivered using BeneFACT, have resulted in faster and more consistent benefit coding in the NPS. We also offer, on an as-needed basis, an Online Benefit Narrative (OBN) content load service to help Plan customers meet account implementation targets.

These services and tools significantly reduce account implementation time frames for our Plan customers and improve the quality of the claims' processing cycle.

### Consulting

NASCO consults with our Plan customers on a one-on-one basis to determine methods they can adopt to increase efficiency. Combining industry accepted methodologies for performance improvement, like Rummler-Brache process mapping and Six Sigma, with an extraordinary ability to understand our customer Plans' business practices, our consultants are uniquely positioned to guide our Plan customers to higher levels of operational performance.

23



## Education

The NASCO Learning Center (NLC) provides learning solutions with real benefits that address the complexities and rate of change of the NPS. Offering online courses that build both knowledge and skills, the NLC is available 24x7, has no class size limitation and provides the opportunity for Plan customers to take the courses that meet their needs, whenever and wherever it is convenient. The NLC is transforming the training experience by reducing classroom time and decreasing the costs associated with developing and maintaining courseware.

In addition to the online courses and on-demand Webcasts available via the NLC, NASCO continues to offer instructor-facilitated Webcasts, train-the-trainer sessions and role-based classroom training, delivered at NASCO's learning facility in Atlanta or at our Plan customers' facilities. Training consultants work with our Plan customers to identify their unique needs and customize courses accordingly.

## Performance Support

NASCO maintains the central libraries of Online Desk Levels (ODLs) and Automated Letter Generating System (ALGS) letters. For Plan customers who prefer to create their own Plan-specific libraries, we provide one-on-one assistance and support.

NASCO provides and maintains extensive user documentation on our extranet, where reference manuals, implementation guides and job aids can be accessed and printed. NASCO is in the process of transitioning to online help so users will be able to find answers to their questions without leaving the application in which they are working.

In addition, NASCO's Customer Service Center (NCSC) is available to assist our Plan customers in resolving issues associated with the NPS or MembersEdge. Customers can contact the NCSC at 888.320.NCSC (6272) or via email at NCSC@nasco.com.

## Projects

NASCO can support our Plan customers in a variety of ways with project and implementation management, testing or staff augmentation. Regardless of the size of the project, NASCO can provide our Plan customers with resources to meet their individual needs. Broadly skilled within the industry with extensive knowledge of processing systems, NASCO's associates can provide extensive project and implementation services, including project and program management, business analyst support, testing support, new business and product implementation, process redesign, or they can provide staff augmentation to fulfill our customers' dynamic resource requirements.

25



With our hands-on perspective and experience, our customers turn to NASCO first for advice to help meet any payer challenge they may face.

NASCO IS THE SOURCE FOR INDISPENSABLE ADVICE.





" **NASCO** meets my
every need. "

# EXHIBIT B

**Linked**in

Join now    Sign in

Consortium Health Plans in Worldwide



···

## Consortium Health Plans

Management Consulting

Columbia, Maryland · 2,694 followers

Consortium Health Plans strives to position Blue Cross Blue Shield Plans as the preferred carrier of national accounts.

**See jobs**      Follow

 **View all 92 employees**

---

**Overview**    Jobs    Life

# About us

Consortium Health Plans was formed in 1994 to help its founding Blue Cross Blue Shield Plans position themselves as the preferred choice for national accounts.

Now a national coalition of 20 leading BCBS Plans, Consortium provides a clear and unified voice, as well as effective central coordination, for the Blue System among national accounts and the consultants and brokers who serve them.

Mission:

Consortium Health Plans' mission is to position Blue Cross Blue Shield as the preferred choice for national accounts.

Vision:

Consortium Health Plans will be a key enabler of BCBS Plans' strategies to meet the healthcare needs of National Account employers.

| | |
|---|---|
| **Website** | http://www.consortiumhealthplans.com/ ↗ |
| **Industries** | Management Consulting |
| **Company size** | 51-200 employees |
| **Headquarters** | Columbia, Maryland |
| **Type** | Privately Held |
| **Founded** | 1994 |
| **Specialties** | Data Analytics, Consultant Relations Support, Sales, Marketing, National Accounts, Insurance, Healthcare, and Actuarial |

## Locations

**Primary**

10480 Little Patuxent Parkway, Suite 400
Columbia, Maryland 21044, US

Get directions ↗

## Employees at Consortium Health Plans

 **Robert Lewis - PAHM, FAHM, PHIAS, FHIAS, ITILv3, CSM**



### Leonid Beryozkin

Director Information Security at Consortium Health Plans



### Deirdre Martin

Executive Assistant at Consortium Health Plans



### Joseph Brennan

Associate at Consortium Health Plans

See all employees

## Affiliated pages



**Consortium Affinity Groups**

## Similar pages



**Blue Cross Blue Shield Association**

Insurance

Chicago, IL



**Consortium Education**

Consumer Goods

Abingdon, Oxfordshire



**Hinge Health**

Health, Wellness and Fitness

San Francisco, California

**Anthem, Inc.**

Hospital & Health Care

Indianapolis, Indiana

Show more similar pages ⌄

# Browse jobs

### Healthcare Manager jobs
51,107 open jobs

### Healthcare Assistant jobs
129,373 open jobs

### Healthcare Consultant jobs
17,253 open jobs

### Marketing Communications Manager jobs
36,104 open jobs

### Revenue Manager jobs
24,496 open jobs

### Project Manager jobs
209,469 open jobs

### Reviewer jobs
14,437 open jobs

### Policy Analyst jobs
5,423 open jobs

### Scheduler jobs
22,480 open jobs

### Junior Consultant jobs
12,932 open jobs

Show more jobs like this ⌄

**Linked**in  © 2021

Accessibility

Privacy Policy

Copyright Policy

Guest Controls

Language ⌄

About

User Agreement

Cookie Policy

Brand Policy

Community Guidelines

# EXHIBIT C



CLAIMS COST MODEL CLEARINGHOUSE FOR THE BLUE SYSTEM



CONSORTIUM

NORTH

SOUTH

HEALTH PLANS

ACCURATE

**Increasingly,** *health care consultants—and the employers they serve—have been raising the bar for information about provider network financial performance, asking carriers for data that meet a higher standard for accuracy and dependability. A sample fee schedule bears little relationship to what happens when actual claims are processed; self-reported data in a repricing exercise cannot present a reliable picture of health plan discounts. To address these issues, along with the need to provide consistent claims discount information across the Blue System, Consortium Health Plans took the initiative to find a solution.*



### Meeting the market demand for reliable information on provider network financial performance

With sales, marketing, claims, operations, and underwriting representatives from Blue Plans across the nation, a task force under the direction of Consortium Health Plans recommended a new approach to gathering, calculating, and reporting claims data, and developed the foundation and structure for a new cost model. Consortium Health Plans then engaged the services of Milliman USA, a leading actuarial firm with more than a decade of cost modeling experience.

Together, they created ClaimsQuest®, a revolutionary data warehouse and cost modeling system that quickly and accurately delivers provider network financial performance information based on actual claims paid—without projections, trend increases, actuarial manipulations, or other adjustments. Using a time-tested cost modeling methodology for this unprecedented system, Milliman collects and evaluates raw claims data and calculates experience-based charges and discounts.

### Setting a new pricing standard with ClaimsQuest

Now one of the world's largest commercial claims data warehouses—with 1.5 billion claims records representing more than $270 billion in claims expense—ClaimsQuest enables participating Blue Cross Blue Shield (BCBS) Plans to provide consistent information on provider network financial performance. As a third-party actuarial firm, Milliman not only brings methodology and data processing expertise but also delivers an important level of objectivity to the resulting cost model reports. Through ClaimsQuest, the BCBS System achieves a new level of responsive service to the national account marketplace and sets a new industry standard. The result is a methodology with more rigor, and information with greater validity.

# Supporting better decision-making with better claims

**Before ClaimsQuest,** multi-state employers frequently had to settle for self-reported data of inconsistent quality. To support critical decision-making, pricing data must provide the basis for a true carrier-to-carrier comparison. To be reliable, it must be based not on a health plan's sample fee schedule but on actual claims paid. ClaimsQuest meets those criteria and enables employers to compare the economic value of health plan networks.

Historical methods—discounts by major service category, per diem, diagnosis related grouping (DRG) case rate, and hospital contract review—do not lead to consistent pricing or numbers that can be relied on to make assumptions about future costs. ClaimsQuest uses historical book-of-business claims data to create a unit-cost database. Raw claims detail can be compiled into various formats: cost model, inpatient major diagnostic category (MDC), inpatient DRG, and CPT-4 code listing.

## Bringing actuarial expertise to network reimbursement evaluation and claims repricing

The ClaimsQuest cost model approach comes from a proven actuarial methodology. Similar cost modeling tools have long been used internally by carriers and by the actuarial firms themselves to understand and monitor health care costs. Milliman pioneered the concept of cost modeling to help health care providers better understand overall epidsode of care expenditures. Consortium Health Plans now takes this proven industry tool and applies it to claims cost analysis for the benefit of the large purchasers of health benefits.

## Reflecting patterns of service to gauge actual utilization

All decisions surrounding the ClaimsQuest Cost Model methodology have been made to build a cost model that gets as close as possible to historical medical service utilization. ClaimsQuest:

- Only uses actual claims paid.
- Captures health care costs by member residence.
- Uses the average of what was paid across a geographic area.
- Defines service type uniformly and consistently applies the unit of service—whether it is a day, a visit, or a procedure.
- Reprices claims line by line

ClaimsQuest does not reprice a claim to a particular provider; it's based on a weighted average in a geographic area, which leads to better, more representative data. The repricing is very specific on the procedure and the geographic location, but not specific to a given hospital or physician.

# information.

By using the employee's residential zip instead of the provider zip in the claims cost model, ClaimsQuest more effectively measures the costs associated with employees in specific geographic areas, no matter where they travel to receive care. The employee zip more accurately reflects true patterns of care and offers employers the most relevant information for their decision-making needs. This ability to closely capture the employee health care cost experience becomes particularly important considering the movement toward consumer-directed health care.



### Following a disciplined approach.

Twice a year, all participating BCBS Plans submit their book-of-business claims data according to detailed specifications that ensure uniformity. An extensive integrity review takes place when the data arrive for processing. Once validated, the claims coding is reviewed for various types of claims, including reversals and adjustments. Any data issues and claims coding questions are addressed with the local Plans. The raw claims data are converted to standard cost categories and compiled into ClaimsQuest formats for PPO and POS networks, with the initial cost model results and zip code rollups reviewed by local BCBS Plan staff. The results are then finalized and made available for use by the BCBS Plans.

Claims are mapped to cost model categories using defined and consistent criteria, relying primarily on HCFA revenue codes for facility claims and CPT-4 codes for professional claims. When ClaimsQuest certified data go to the marketplace, consultants and employers alike know that it carries a stamp of consistency and credibility based on a rigorous third-party methodology and eight-step data collection and validation process.

*ClaimsQuest incorporates a strict data collection and validation process, resulting in reliable information, certified by an objective third party.* ▶

---

**8 Step Collection & Validation Process**



Uniform Data
Requirements
**SPECIFIED**
to Plans



Book-of-Business
Claims Data
**SUBMITTED**

Data Integrity
**VALIDATED**



Claims Data
**REVIEWED**



Data Questions
**ADDRESSED**
with Plans



Data
**COMPILED**
into ClaimsQuest
Formats



Preliminary Cost
Model
& ZIP Code Rollups
**EXAMINED**
by Plans



Results
**FINALIZED
& UPLOADED**
for BCBS Plan Use



# Providing a Powerful New Tool for Consultants

**ClaimsQuest enables** efficient responses to consultants' discount RFIs and individual employer RFPs. Consultants can call upon a Blue Plan representative at any time during the RFP process—before, during, or after—whether it is for client reporting, information to advise a client on relative carrier performance, or repricing a claims tape. While ClaimsQuest was developed to bring unprecedented speed and reliability to the proposal process, the Blue Plans can also use it to respond to complex ad hoc questions quickly and effectively. In addition, BCBS Plans can use ClaimsQuest data internally to evaluate their provider network financial performance and discounts on an ongoing basis and, in doing so, continue to provide the marketplace with the best network value.

## Delivering pricing insight through a variety of reports

BCBS Plan representatives have access to four different types of reports that demonstrate the economic value of the BCBS provider networks. They pull from this information to populate consultant templates and answer specific questions. The Cost Model Report is the foundation report, with three additional reports: CPT-4 Code Listing, DRG Module, and MDC Module. Customized claims repricing services are also available, along with responses to ad hoc queries.

Inpatient MDC summaries for each metropolitan statistical area (MSA) map inpatient claims to one of 25 unique categories based on primary diagnosis code on the claim record. These summaries show utilization, average length of stay, case rates, and per diems (both billed and allowed) for each MDC. The DRG module is derived from the MDC values. For all DRGs included in an MDC category, amounts are calculated based on Milliman's utilization assumptions and HCFA DRG cost weights. Cost detail information can be examined at increasing degrees of granularity from the national, state, MSA, and three-digit zip level. With every report comes an evaluation of data credibility—high, moderate, minimal—based on the total number of claims.

As a result, the compiled data reflect actual distribution of utilization among BCBS contracted providers. The information is experience-based and reflects what happens to claims in the real world, reflecting provider stop loss provisions, manual claim adjustments, prompt pay discounts, and other provider arrangements. Repricing exercises are therefore reliable surrogates of what really would have happened if BCBS had been the carrier during the time period.



NATIONAL

STATE

MSA

ZIP

◄ *Four levels of data: Reports generally present state-by-state information, but data can be rolled up to provide national totals or drilled down to the MSA and 3-digit zip levels.*

## ClaimsQuest Delivers Accurate Repricing Comparisons

| Category | Billed | Incumbent Carrier Allowed | BCBS Allowed | Savings* | Incumbent Carrier Discount | BCBS Discount |
|---|---|---|---|---|---|---|
| Inpatient Hospital | $ 7,831,689 | $ 5,515,761 | $ 4,030,317 | $ 1,485,444 | 29.6% | 48.5% |
| Outpatient Hospital | 7,254,783 | 5,688,195 | 4,320,267 | 1,367,928 | 21.6% | 40.4% |
| Physician | 8,972,422 | 7,148,774 | 5,473,598 | 1,675,176 | 20.3% | 39.0% |
| Ancillary | 629,067 | 587,789 | 460,623 | 127,167 | 6.6% | 26.8% |
| Total | $ 24,687,961 | $ 18,940,519 | $ 14,284,804 | $ 4,655,715 | 23.3% | 42.1% |

*Before any benefits are applied.

*This comprehensive report shows charges and discounts for PPO/POS networks across 47 service categories. With this valuable decision-support tool, consultants and employers can get an accurate view of Blue Cross Blue Shield pricing and instantly compare discounts between a BCBS Plan and an incumbent carrier.*



**HIGHLY CREDIBLE**
More than 5,000

**MODERATELY CREDIBLE**
2,000 - 5,000

**MINIMALLY CREDIBLE**
Under 2,000

*ClaimsQuest Data Credibility Based on Inpatient Days*

*Data thresholds also exist to assign credibility levels based on the number of cases and procedures, the other two units of service.*

## ClaimsQuest®
### Cost Model Format
### Blue Cross and Blue Shield of XXX
### PPO

| Benefit Category | Utilization | Units | Average Billed Charge | Average Allowed Charge | % Discount Off Billed |
|---|---|---|---|---|---|
| **Hospital** | | | | | |
| Hospital Inpatient | | | | | |
| Medical/Surgical | 88,109 | Days | $ 2,882.07 | $ | 64.1% |
| Psychiatric and Alcohol & Drug Abuse | 6,720 | Days | 1,109.03 | 1,035.49 | 61.9% |
| Skilled Nursing Facility | 13,301 | Days | 416.86 | 422.84 | 31.0% |
| Maternity | 108,130 | Days | 2,713.70 | 287.69 | 47.2% |
| | | Days | $ 2,751.17 | $ 1,432.37 | 62.0% |
| | | | | 1,046.23 | |
| Hospital Outpatient | | | | | |
| Emergency Room | 41,896 | Cases | $ 510.15 | $ | 48.3% |
| Surgery | 23,255 | Cases | 2,506.19 | 263.87 | 65.0% |
| Radiology | 83,945 | Services | 389.59 | 876.72 | 37.8% |
| Pathology | 266,068 | Services | 53.28 | 242.20 | 44.3% |
| Cardiovascular | 16,684 | Services | 365.42 | 29.65 | 55.0% |
| PT/OT/ST | 59,730 | Services | 80.22 | 164.52 | 42.6% |
| Other | 23,257 | Services | 340.20 | 46.06 | 42.8% |
| Cardiac Rehab | 2,276 | Services | 125.50 | 194.44 | 36.6% |
| Dialysis | 1,366 | Services | 3,711.70 | 79.60 | 66.2% |
| Psych Facility | 4,749 | Services | 201.64 | 1,253.15 | 52.8% |
| Med/Pharmacy | 21,370 | Services | 458.47 | 95.13 | 46.1% |
| Maternity Non-Deliveries | 435 | Services | 260.19 | 247.02 | 26.6% |
| | 545,031 | Services | $ 296.42 | $ 191.09 | 52.1% |
| | | | | 141.99 | |
| Surgery - Non-Maternity | | | | | |
| Primary Surgeon | 23,199 | Procedures | $ 2,778.77 | $ | 66.6% |
| Assistant Surgeon | 1,756 | Procedures | 1,533.96 | 928.09 | |
| Anesthesia | 12,903 | Procedures | 1,241.71 | 437.17 | |
| | 37,858 | Procedures | $ 2,197.10 | | |
| **Normal Deliveries** | | | | | |
| Cesarean Deliveries | | | | | |
| Non-Deliveries | | | | | |

5

# Benefiting from Total Value Purchasing

**In the absence** of reliable network charge and discount information, employers have relied heavily on the fixed monthly administration costs when comparing the prices of various health carriers. Administrative fees, however, only represent a small fraction of the employer's financial exposure, accounting for less than ten percent of the total cost. In an organization with annual health care expenditures of $100 million, the cost of claims paid can account for as much as $91 million, as compared to administrative costs of $9 million.

Two closely related factors have significantly more impact on the employer's actual costs: the size of the provider network and the depth of the negotiated provider discounts. The larger the carrier's provider network, the better the employees' access to care and the easier it is for them to remain in network. In turn, the size of the network and the strength of local relationships leads to a better position for negotiating favorable discounts. With a higher selection of in-network physicians, the employer benefits from subscriber utilization at deeply discounted reimbursement rates.

ClaimsQuest brings into clear focus the two factors with significantly more impact on the employer's actual costs. A sample fee schedule cannot reliably predict the actual cost of claims paid, because it cannot take into consideration the value and the performance of the provider network. ClaimsQuest brings visibility to the concept of Total Value Purchasing and makes it possible for employers to have a more accurate picture of health benefit costs.

**Total Value Purchasing Formula**



Size of Provider Network + Depth of Discounts + Administrative Savings = Total Value Purchasing℠

6

# *TAKING THE GUESSWORK OUT OF CLAIMS COST ANALYSIS*

With ClaimsQuest, Consortium Health Plans addresses a major marketplace need for dependable information about provider network financial performance. ClaimsQuest creates a picture of what the Blue networks can deliver based on past performance. ClaimsQuest delivers on every attribute for data.

**COMPLETE**     ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs.

**ACCURATE**     ClaimsQuest calculates discounts based on historic claims data. Working with claims actually paid results in real-world information that allows employers to project claims costs with confidence. Because the figures used for provider network charges and discounts serve as the basis for other calculations in an RFP, ClaimsQuest provides a reliable foundation for the entire proposal.

**ROBUST**     The sheer size of the ClaimsQuest data warehouse means that it generates information with a high degree of statistical accuracy.

**CONSISTENT**     The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code.

**CLEAR**     ClaimsQuest user-friendly reporting makes it quick and easy to provide consultants and employers with the straightforward information they need in any format they prefer, knowing that the data hold true from market to market.

**FLEXIBLE**     The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an "apples-to-apples" comparison.

**FAST**     The ClaimsQuest system is fully automated and capable of turning around consolidated responses to standard RFP requests quickly.

**OBJECTIVE**     The ClaimsQuest cost model approach uses time-honored and tested actuarial principles. Milliman provides third-party verification of every report generated.

**CONFIRMED**

*Just how good is the ClaimsQuest cost model approach? In empirical testing of results for several large national organizations totaling more than $500 million in claims, ClaimsQuest repricing proved itself to be an excellent predictor of actual performance. In three separate tests, actual claims costs were within a range of .1 to 1 percent of the repricing exercise.*

# Setting a new standard for the Blue network…and the



**ClaimsQuest brings** an unparalleled consistency and reliability to measuring the performance of the Blue Cross Blue Shield provider networks throughout the country. As an industry standard, ClaimsQuest can also provide an objective experience-based means for comparing discounts among carriers. Furthermore, ClaimsQuest offers an important backend delivery benefit by assisting BCBS clients in understanding health care costs associated with their workforce. Through the development and management of ClaimsQuest, Consortium Health Plans brings a new rigor to the process of claims cost analysis.

Milliman brings discipline and third-party objectivity to the process, through its involvement at every stage of ClaimsQuest development and implementation—from the creation of the cost model itself to the specification of data requirements, from the management of data collection and validation to the ultimate delivery of the BCBS Plan data in consistent ClaimsQuest formats.

ClaimsQuest has been market-tested for two years, revealing itself to be reliable and credible. Moreover, ClaimsQuest makes it possible for BCBS Plans to demonstrate the superior value of the Blue System through the real-world performance of its provider networks and the savings they represent for employers.

With ClaimsQuest, multi-state employers and the consultants and brokers who represent their interests, have the ability for the first time to evaluate network financial performance and compare carrier costs. ClaimsQuest represents a new starting point for understanding the cost of health care and a reliable framework for decision-making.

health care industry.



# CLAIMS QUEST®

CLAIMS COST MODEL CLEARINGHOUSE FOR THE BLUE SYSTEM



CONSORTIUM

HEALTH PLANS

Consortium Health Plans

10490 Little Patuxent Parkway

Suite 550

Columbia, MD 21044-3517

Phone: 410-772-2900

Fax:     410-884-9445

© 2003 Consortium Health Plans, Inc. Consortium
Health Plans and ClaimsQuest are registered trade-
marks of Consortium Health Plans, Inc. Blue Cross and
Blue Shield are registered service marks of the Blue
Cross and Blue Shield Association, an association of
independent Blue Cross and Blue Shield Plans.

# EXHIBIT D



Home › Health Care

April 11, 2013 07:00 AM

## Blue Cross parent CEO's compensation rockets past $16 million

ANDREW L. WANG

 TWEET    SHARE    SHARE    EMAIL

REPRINTS



Patricia
Hemingway
Hall

The CEO of the parent of Blue Cross & Blue Shield of Illinois received a 24 percent pay increase in 2012, to $16 million, even as the company's net income declined, according to a filing with state insurance regulators.

Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus. The CEO of Chicago-based Health Care Service Corp. received **$12.9 million in 2011.**

Her 2012 compensation is about 70 percent of the $23 million that the company has agreed to pay to acquire Blue Cross & Blue Shield of Montana.

The big bump in Ms. Hall's pay came even though the company, which also operates Blues plans in Texas, Oklahoma and New Mexico, booked lower net profits on its core insurance business in 2012.

Health Care Service posted $1.01 billion in net income and **$20.65 billion in revenue** last year, a drop in profit of about 16 percent from 2011, when it earned $1.20 billion on revenue of $19.91 billion, according to annual financial filings. The numbers reflect Health Care Service's fully insured business, not its administrative services-only segment for self-insured plans.

Despite the decline, Health Care Service has crossed the $1 billion mark three years in a row.

A company spokesman downplayed the significance of the any individual salary figure.

"One cannot draw conclusions from the analysis of specific individuals' compensation year over year because many factors could impact amounts from year to year including, but not limited to, company performance and individuals' tenure and deferral elections," he said in an email.

Other Health Care Service executives also received significantly higher pay in 2012. Each of the company's 10 highest-paid executives got at least $1.2 million more than in the previous year. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million, from $3.9 million in 2011.

**A BUMPY ROAD IN MONTANA**

Health Care Service's executive compensation has become an issue in Montana, where the company is trying to secure regulatory approval for its **purchase of the nonprofit Blue Cross plan there.**

In a public hearing last month, the state's commissioner of insurance and securities, Monica Lindeen, asked the company to make public compensation information for its executives, but Health Care Service has declined, citing privacy concerns, **the Great Falls (Mont.) Tribune reported.**

Health Care Service is a mutual company owned by policyholders. The company has provided the information to Montana officials under a confidentiality agreement, the paper said.

Other aspects of the deal have not gone smoothly. Health Care Service originally proposed to pay $17.6 million for the Montana company, but upped its offer to $23 million and agreed to build a call center in Great Falls if regulators approved the plan by the end of March.

The company scuttled the call center plan on March 31 because the state hadn't given assurances that the acquisition would get the thumbs up, the paper said.

The deal must be approved by Ms. Lindeen and Montana Attorney General Tim Fox.

(Editor's note: This story has been changed to make clear that the compensation information was provided to Montana officials under a confidentiality agreement.)

RECOMMENDED FOR YOU

You're vaccinated. What's your COVID risk now?

Here's how the vaccine rollout is going in Chicago

Abbott beats revenue expectations despite decline in virus testing

Sponsored Content: Luxury Home of the Week





SPONSORED CONTENT

**Learn about the impact of proposed tax legislation changes.**





Business owners, changes to tax legislation may be coming. Get a jump start on the tax strategy for your business and personal wealth. Read what our

Case MDL No. 2406 Document 507-3 Filed 10/21/21 Page 233 of 373

and personal wealth. Read what our
expert has to say about the proposed

## GET OUR NEWSLETTERS

Staying current is easy with Crain's news delivered straight to your inbox, free of charge.

Email Address

SIGN UP NOW

## SUBSCRIBE TODAY

Get the best business coverage in Chicago, from breaking news to razor-sharp analysis, in print and online.

SUBSCRIBE NOW

## CONNECT WITH US

CRAIN'S CHICAGO BUSINESS

**CONTACT US**

150 N. Michigan Ave.
Chicago, IL 60601
E-mail our editor
(312) 649-5200

More contacts

FAQs/Customer service

**RESOURCES**

About Us

Media Kit

Crain's Chicago jobs

Classified Advertising

Advertise with Us

Staff



Reprints                                                                 Sitemap

Ad Choices ▷

**AWARDS**

Special reports

**LEGAL**

Terms and Conditions

Privacy Policy

Privacy Request

# CRAIN

Copyright © 1996-2021. Crain Communications, Inc. All Rights Reserved.

# EXHIBIT E



**Get notifications from The New York Post**

Click 'Sign Up' then 'Allow'

Dismiss    Sign Up

BUSINESS

# Anthem CEO's $3M s        om Wall Street

By Josh Kosman                                                    March 20, 2017  |  10:07pm  |  Updated



Reuters

Anthem Chairman and Chief Executive Joseph Swedish's 21 percent hike in total 2016 compensation drew criticism from Wall Street on Monday.

The health insurer's stock was a laggard in the sector last year and the robust pay increase — to $16.5 million, up from $13.6 million — is rich for a company that underperformed its rivals, one analyst told The Post.

"As far as stock performance, in 2016, Anthem was up 11 percent while the average Big 5 HMO was up 20 percent," said the analyst, speaking on the condition of anonymity, referring to UnitedHealthcare, Aetna, Cigna, Humana and Anthem.

"Anthem was not the best performer," the analyst said.

Anthem's 2016 was highlighted by its battle against federal regulators intent on blocking its $54 billion merger with rival Cigna. In February, a judge blocked the deal on antitrust grounds.

Anthem is appealing that decision and could be forced to pay Cigna a $1.85 billion breakup fee and further damages. A hearing on the appeal is scheduled for this week.

Anthem in 2016 recorded $2.5 billion in n

The company is hoping the Trump admini                                    e blocking the merger.

The 65-year-old Swedish last week spoke                                    health care plan. It is not known whether
the subject of the merger was brought up

Cigna is suing Anthem in a separate court case for $13 billion, plus the breakup fee. The next hearing in that Delaware case is in mid-April.

Anthem in its proxy filing said it gave Swedish a raise to recognize his performance and place his target pay closer to that of his peers.

Anthem's shares in the last two years have risen 6 percent while, over the same time frame, UnitedHealth is up 41 percent, Aetna 19 percent and Cigna and Humana 18 percent each.

"Approximately 90 percent of Mr. Swedish's total compensation is incentive-based, as compared with 80 percent for executive officers," an Anthem spokesperson told The Post.

FILED UNDER   ANTHEM, HEALTH CARE, HEALTH INSURANCE, STOCKS, WALL STREET, 3/20/17

**Get notifications from The New York Post**

Click 'Sign Up' then 'Allow'

Dismiss     Sign Up



RECOMMENDED   1/5

Frito-Lay workers choose to end strike after nearly a month

Read More

# EXHIBIT F



THE
PHYSICIANS
FOUNDATION
Empowering Physicians
Improving Healthcare

A SURVEY OF AMERICA'S PHYSICIANS:
# PRACTICE PATTERNS AND PERSPECTIVES

An Examination of the Professional Morale, Practice Patterns, Career Plans, and Healthcare Perspectives of Today's Physicians, Aggregated by Age, Gender, Primary Care/Specialists, and Practice Owners/Employees

Survey conducted on behalf of The Physicians Foundation by Merritt Hawkins  |  Completed September, 2012. Copyright 2012, The Physicians Foundation





THE PHYSICIANS FOUNDATION
A SURVEY OF AMERICA'S PHYSICIANS

## WHAT IS INCLUDED IN THIS REPORT?

This report summarizes the results of one of the largest and most comprehensive physician surveys ever undertaken in the United States. The survey was sent by email to over 630,000 physicians (approximately 84 percent of all physicians in active patient care), or to virtually every physician with an email address on file with the nation's largest physician database.

### IT INCLUDES

Responses from 13,575 physicians revealing:

• current morale levels of today's doctors

• their perspective on healthcare reform and its effects on their practices

• physician practice patterns and metrics

• the career plans of today's doctors

• what they believe is detracting from effective healthcare delivery

• how delivery can be enhanced

and many other issues impacting patient care and the quality of the medical practice environment.

• Over one million data points derived from responses to 48 questions, many of them featuring multi-response answers.

• Selections from some 8,000 written comments on the current state of the healthcare system by physicians reflecting a wide range opinions and recommendations.

• A detailed analysis underscoring survey implications for policy makers and patients

• Responses aggregated by physician age, gender, practice type (primary care vs. specialists) and practice status (employed physicians vs. practice owners) for cross-referencing between different physician groups.

### KEY QUESTIONS ADDRESSED

What do physicians think about the current state of the medical profession?

How satisfied are they in their careers?

What changes will they make in their practices?

Will they continue to see Medicare and Medicaid patients?

What do they think of ACOs and other emerging delivery models?

How many patients do they see?

How many hours do they work?

What do they think about health reform?

A Survey of America's Physicians provides answers to these and other questions directly impacting quality and access to patient care in the United States.

# TABLE OF CONTENTS

INTRODUCTION: A QUESTION OF CONTEXT ............................................ PAGE 4

ABOUT THE PHYSICIANS FOUNDATION AND
MERRITT HAWKINS ........................................................................ PAGES 5-6

SURVEY METHODOLOGY ........................................................................ PAGE 6

SURVEY ACCURACY STATEMENT ........................................................ PAGE 7

KEY FINDINGS AND ANALYSIS ........................................................ PAGES 7-9

PART I: DESCRIPTION OF SURVEY RESPONDENTS ........................ PAGES 10-17

PART II: PROFESSIONAL SATISFACTION AND MORALE ............ PAGES 18-29

PART III: HEALTH SYSTEM TRENDS ................................................ PAGES 30-38

PART IV: PRACTICE PATTERNS AND METRICS ............................ PAGES 39-49

PART V: PHYSICIAN COMMENTS ...................................................... PAGES 50-62

PART VI: ADDENDUM: SURVEY RESPONSES BY: ............................ PAGE 63

      AGE ........................................................................................ PAGES 63-78

      PRACTICE OWNER/EMPLOYEE ...................................... PAGES 79-94

      GENDER ............................................................................ PAGES 95-110

      PRIMARY CARE/SPECIALISTS ...................................... PAGES 111-126

ADDITIONAL STUDIES AND GRANTS SPONSORED
BY THE PHYSICIANS FOUNDATION ................................................ PAGE 127

# INTRODUCTION

## A QUESTION OF CONTEXT

Each year, physicians in America conduct over 1.2 billion patient visits, treating illnesses ranging from the minor to the life-threatening.*

Though they are ably aided in their efforts by nurses, therapists, and a host of other qualified healthcare professionals, physicians remain at the center of the healthcare system. It is primarily physicians who diagnose patients, admit them to the hospital, order tests, perform procedures, and supervise treatments. Physicians typically are the first people we see coming into the world and among the last we see leaving it.

How physicians practice – and what they think about their profession – is therefore of profound importance to both the quality of care patients receive and the access to care they are able to obtain.

With *A Survey of America's Physicians*, The Physicians Foundation has endeavored to provide a "state of the union" of the medical profession. Our goal was to reveal a snapshot of what physicians are thinking in the year 2012: about the practice of medicine, about their career plans, and about the current state of the healthcare system. The survey was sent to over 630,000 physicians – or over 80 percent of physicians in active patient care -- and represents The Physicians Foundation's effort to provide as many physicians as possible with a voice.

The survey was conducted in the context of one of the most transformative eras in the history of modern healthcare. Health reform – considered as both the Patient Protection and Affordable Care Act (PPACA) and ongoing market forces – is changing how healthcare is paid for and how it is delivered. An epic experiment is in progress to determine if access to healthcare can be expanded while quality of care is simultaneously improved and costs curtailed.

Physicians are at the vortex of these changes. How physicians are organized, how they are evaluated, how they are reimbursed, and how they interact with patients are all subject to partial or complete modification. It is a challenging and uncertain time to be a doctor.

The results of the survey reflect this uncertainty and should be taken in the context of current events. As the course of healthcare reform becomes clearer, attitudes and perspectives may change. However, we believe the survey reveals what doctors are thinking today and is relevant to healthcare professionals, policy makers, media members, and to anyone who has been seen by a physician or who will be.

LOUIS GOODMAN, PH.D.
PRESIDENT

TIM NORBECK
CHIEF EXECUTIVE
OFFICER

WALKER RAY, M.D.
RESEARCH COMMITTEE
CHAIR

KARL M. ALTENBURGER, M.D.
RESEARCH SUBCOMMITTEE
CHAIR

*Source: Ambulatory Medical Care Utilization Estimates, Center for Disease Control.  www.cdc.gov/nchs/data/series/sr_13/sr13_16*

4

## ABOUT THE PHYSICIANS FOUNDATION

The Physicians Foundation is a nonprofit 501(c)(3) organization that seeks to advance the work of practicing physicians and help facilitate the delivery of healthcare to their patients. As the U.S. healthcare system continues to evolve, The Physicians Foundation is steadfast in its determination to strengthen the physician-patient relationship and assist physicians in sustaining their medical practices in a difficult practice environment.

The Foundation participates in the national healthcare discussion by providing the perspective of practicing physicians on the many issues facing them today. This includes identifying how The Patient Protection and Affordable Care Act and other aspects of health system reform impact physicians, and what should be re-assessed or changed in order to achieve the following goals:

- Provide physicians with the leadership skills necessary to drive healthcare excellence
- Offer physicians resources to succeed in today's challenging healthcare environment
- Understand evolving practice trends to help physicians continue to deliver quality care to their patients
- Meet the current and future needs of all patients by assessing the supply of physicians

The Physicians Foundation pursues its mission through a variety of activities including grantmaking, research, white papers and policy studies. The Foundation provides grants to nonprofit organizations, universities, healthcare systems and medical society foundations that support its objectives and, since 2005, has awarded numerous multi-year grants totaling more than $28 million.

The Physicians Foundation also examines critical issues affecting the current and future healthcare system by periodically surveying physicians and patients, and studying the impact on them of government healthcare policies. The Foundation believes that as America evaluates significant changes in healthcare, the perspectives of practicing physicians and their patients must be well-understood and addressed.

For more information, please visit www.PhysiciansFoundation.org

SIGNATORY MEDICAL SOCIETIES OF THE PHYSICIANS FOUNDATION INCLUDE:

Alaska State Medical Association

California Medical Association

Connecticut State Medical Society

Denton County Medical Society (Texas)

El Paso County Medical Society (Colorado)

Florida Medical Association

Hawaii Medical Association

Louisiana State Medical Society

Medical Association of Georgia

Medical Society of New Jersey

Medical Society of Northern Virginia

Medical Society of the State of New York

Nebraska Medical Association

New Hampshire Medical Society

North Carolina Medical Society

South Carolina Medical Association

Tennessee Medical Association

Texas Medical Association

Vermont Medical Society

Washington State Medical Association

## ABOUT MERRITT HAWKINS

Merritt Hawkins is the largest physician search and consulting firm in the United States and is a company of AMN Healthcare (NYSE: AHS), the leader in innovative healthcare workforce solutions. Founded in 1987, Merritt Hawkins has consulted with thousands of healthcare organizations nationwide on physician staffing and related issues.

Merritt Hawkins conducts both internal research and research for third parties and has completed three previous projects on behalf of The Physicians Foundation, including The Physicians' Perspective, A Survey of Medical Practice in 2008; In Their Own Words, 12,000 Physicians Reveal Their Thoughts on Medical Practice in America; and Health Reform and the Decline of Physicians Private Practice, a white paper featuring the 2010 survey Physicians and Health Reform.

Additional information about Merritt Hawkins and AMN Healthcare can be accessed at: www.merritthawkins.com and at www.amnhealthcare.com.

## METHODOLOGY

The Survey of America's Physicians was emailed to virtually every physician in the United States with an email address on record with the American Medical Association's Physician Master File, the largest physician database in the nation. Additional emails were sent to physicians on Merritt Hawkins' database and on the databases of various state medical societies. The emails were sent in increments of several thousand to over 100,000 from late March, 2012 to early June, 2012, with survey links closed as of June 8, 2012.

Emails were sent to approximately 630,000 individual physician email addresses, or to some 84 percent of the approximately 750,000 physicians in active patient care in the U.S. Approximately 600,000 emails were successfully delivered. The survey was configured so that it could not be taken twice from any one computer.

Total number of responses received was 13,575. Experts at the University of Tennessee, who specialize in survey research methodology and statistical inference, assessed non-response bias and margin of error for all questions. A summary of their findings is included below. A complete copy of their findings is available upon request.

The survey included 48 separate questions with multiple responses possible on some questions. A fully completed survey could include over 100 data points, with total aggregate survey responses accounting for well over one million data points. This does not include additional data points that may be gleaned by disaggregating survey responses in various fields, including age, gender, specialty, and state.

In terms of total outreach, number of physician responses, and number of individual data points, the Survey of America's Physicians represents one of the largest and most comprehensive physician surveys ever undertaken in the United States.

*Over half of physicians surveyed have reached a tipping point and plan to make changes to their practices. Many intend to take one or more steps likely to reduce patient access to their services, limiting physician availability at a time when doctors already are in short supply.*

## MARGIN OF ERROR ASSESSMENT

"The overall margin of error (MOE) for the entire survey is (u +/- 0.998%), with an unweighted mean error of (u +/- 0.969%), a standard deviation of 0.04%, and item-level errors ranging from 0.796% to 1.022%. We take the overall MOE as evidence of a "low to very low" sampling error for a survey such as this, which is seeing to draw opinions and beliefs (i.e., tapping psychometric constructs) from a large population. This MOE was calculated using the strictest of the conventionally employed confidence intervals for surveys of this type: 99%. Generally, an overall MOE at 99% confidence can be considered highly trustworthy at +/- 2% or less, and all questions within the current survey meet this criterion."

*Source: University of Tennessee, Knoxville. Full report available upon request.*

## KEY FINDINGS

Responses to the survey combined with some 8,000 written comments submitted by physicians reflect a high level of disillusionment among doctors regarding the medical practice environment and the current state of the healthcare system. How physicians will respond to ongoing changes now transforming healthcare delivery varies. Many physicians plan to continue practicing the way they are, but over half of physicians surveyed have reached a tipping point and plan to make changes to their practices. Many intend to take one or more steps likely to reduce patient access to their services, limiting physician availability at a time when doctors already are in short supply.

Key findings of the survey include:

Over three quarters of physicians – 77.4 percent – are somewhat pessimistic or very pessimistic about the future of the medical profession.

......................................................................................................................

**Over 84 percent of physicians agree that the medical profession is in decline.**

......................................................................................................................

The majority of physicians – 57.9 percent -- would not recommend medicine as a career to their children or other young people.

......................................................................................................................

Over one third of physicians would not choose medicine if they had their careers to do over.

......................................................................................................................

Physicians are working 5.9% fewer hours than they did in 2008, **resulting in a loss of 44,250 full-time-equivalents (FTEs) from the physician workforce.**

7



Physicians are seeing 16.6% fewer patients per day than they did in 2008, **a decline that could lead to tens of millions of fewer patients seen per year.**

Physicians spend over 22 percent of their time on non-clinical paperwork, resulting in a loss of some 165,000 FTEs.

**Over 60 percent of physicians would retire today if they had the means.**

Physicians are not uniform in their opinions – younger physicians, female physicians, employed physicians and primary care physicians are generally more positive about their profession than older physicians, male physicians, practice owners and specialists.

**Over 52 percent of physicians have limited the access Medicare patients have to their practices or are planning to do so.**

Over 26 percent of physicians have closed their practices to Medicaid patients.

In the next one to three years, over 50 percent of physicians plan to cut back on patients, work part-time, switch to concierge medicine, retire or take other steps that would reduce patient access to their services.

Over 59 percent of physicians indicate passage of the Patient Protection and Affordable Care Act (i.e., "health reform") has made them less positive about the future of healthcare in America.

Over 82 percent of physicians believe doctors have little ability to change the healthcare system.

Close to 92 percent of physicians are unsure where the health system will be or how they will fit into it three to five years from now.

Over 62 percent of physicians said Accountable Care Organizations (ACOs) are either unlikely to increase healthcare quality and decrease costs or that that any quality/cost gains will not be worth the effort.

Physicians are divided on the efficacy of medical homes, and many (37.9 percent) remain uncertain about their structure and purpose.

Over 47 percent have significant concerns that EMR poses a risk to patient privacy

Over 62 percent of physicians estimate they provide $25,000 or more each year in uncompensated care.

Following is a breakdown of questions asked by the survey, responses received, and analyses and observations regarding survey results.

## 2012 SURVEY OF AMERICA'S PHYSICIANS

## QUESTIONS ASKED AND RESPONSES RECEIVED

Responses to the Survey of America's Physicians are organized in six sections, including:

I. Description of Physician Respondents

II. Professional Satisfaction and Morale

III. Health System Trends

IV. Practice Patterns and Metrics

V. Physician Comments

VI. Responses by Categorical Groups

An analysis of responses is included in each section where appropriate. In 2008, The Physicians Foundation conducted a national survey of physicians that included a number of questions similar to those asked in 2012 (*see Medical Practice in 2008: The Physicians Perspective* www.physiciansfoundation.org). Reponses from the 2008 survey are included for comparison where possible.



| PART ONE | DESCRIPTION OF PHYSICIAN RESPONDENTS |
|----------|--------------------------------------|

Part I of the survey tracks physician respondents by age, gender, region and related factors. Comparisons are made where possible between those who responded to the survey and all physicians currently active in patient care in the United States.

## 1  IN WHAT STATE DO YOU PRACTICE?

| | Survey respondents | All Physicians/U.S. (active patient care only)* | | Survey respondents | All Physicians/U.S. (active patient care only)* |
|---|---|---|---|---|---|
| New York | 9.1% | 8.3% | Minnesota | 1.0% | 1.8% |
| Texas | 8.7% | 6.6% | Connecticut | 1.0% | 1.5% |
| Florida | 8.1% | 5.8% | Louisiana | 0.9% | 1.4% |
| Massachusetts | 6.4% | 3.3% | Alabama | 0.8% | 1.2% |
| Pennsylvania | 6.2% | 4.9% | Montana | 0.8% | 0.3% |
| North Carolina | 5.3% | 2.8% | Oklahoma | 0.7% | 0.9% |
| California | 5.1% | 11.3% | Kentucky | 0.7% | 1.2% |
| Illinois | 4.4% | 4.3% | Oregon | 0.7% | 1.3% |
| New Jersey | 3.4% | 3.3% | Nebraska | 0.6% | 0.5% |
| South Carolina | 2.7% | 1.3% | Iowa | 0.6% | 0.8% |
| Arkansas | 2.6% | .7% | Hawaii | 0.5% | 0.5% |
| Ohio | 2.6% | 4.0% | New Mexico | 0.5% | 0.6% |
| Washington | 2.4% | 2.0% | New Hampshire | 0.5% | 0.4% |
| Virginia | 2.4% | 2.5% | Kansas | 0.5% | 0.8% |
| Missouri | 2.2% | 1.9% | Maine | 0.4% | 0.5% |
| Michigan | 1.7% | 3.4% | Mississippi | 0.4% | 0.7% |
| Georgia | 1.7% | 2.5% | Nevada | 0.4% | 0.6% |
| Tennessee | 1.7% | 2.0% | Utah | 0.4% | 0.7% |
| Alaska | 1.5% | .2% | Rhode Island | 0.3% | 0.5% |
| South Dakota | 1.4% | .2% | Vermont | 0.2% | 0.2% |
| Maryland | 1.4% | 2.5% | Washington, D.C | 0.2% | 0.5% |
| Arizona | 1.3% | 1.8% | Idaho | 0.2% | 0.3% |
| Indiana | 1.3% | 1.7% | West Virginia | 0.2% | 0.6% |
| Wisconsin | 1.2% | 1.7% | North Dakota | 0.2% | 0.2% |
| Delaware | 1.1% | .3% | Puerto Rico | 0.2% | 1.0% |
| Colorado | 1.0% | 1.6% | Wyoming | 0.2% | 0.1% |

*Source: AMA Physician Master File, 2012*

## 2 WHAT IS YOUR MEDICAL SPECIALTY?

| Primary Care | Survey Respondents | All Physicians* |
|---|---|---|
| Family Physician | 14.2% | 11.6% |
| General Internal Medicine | 11.3% | 13.6% |
| Pediatrics | 9.3% | 7% |
| Total | 34.8% | 32.2% |

| Surgical/Medical/Other | Survey Respondents | All Physicians* |
|---|---|---|
| Surgical Specialty | 13.6% | 18.8% |
| Medical Specialty | 12.2% | 35.0% |
| Ob/Gyn | 6.2% | 5.0% |
| General Surgery | 4.4% | 4.0% |
| Other | 28.8% | 5.0% |
| Total | 65.2% | 67.8% |

*Source: AMA Physician Master File, 2012*

*Physicians are working fewer hours on average and seeing fewer patients than four years ago. If these patterns continue, over 44,250 full-time-equivalent (FTE) physicians could be lost from the workforce in the next four years.*

## 3 WHAT IS YOUR CURRENT PROFESSIONAL STATUS?

| | Survey Respondents | All Physicians* |
|---|---|---|
| Employed by hospital, group or other entity | 43.7% | 57.0% |
| Practice owner/partner/associate | 48.5% | 43.0% |
| Other | 7.8% | N/A |

*Source: Accenture*

4 | WHAT IS YOUR AGE?

| | Survey Respondents | All Physicians* |
|---|---|---|
| 20–29 | 0.9% | 5.8% |
| 30–39 | 12.9% | 22% |
| 40–49 | 21% | 24.8% |
| 50–59 | 34.4% | 25.1% |
| 60–69 | 24% | 16.9% |
| 70–79 | 5.8% | 4.7% |
| 80–89 | 0.9% | 0.7% |
| 90+ | 0.1% | 0.0% |

*Source: AMA Physician Master File, 2012*

5 | WHAT IS YOUR GENDER?

| | Survey Respondents | All Physicians* |
|---|---|---|
| Male | 73.6% | 67% |
| Female | 26.4% | 33% |

*Source: AMA Physician Master File, 2012*

6 | IN WHAT SIZE COMMUNITY DO YOU PRACTICE?

| | Survey Respondents |
|---|---|
| 50,000 or less | 18.3% |
| 50,001 to 100,000 | 15.5% |
| 100,001 to 250,000 | 16.4% |
| 250,001 to 500,000 | 15.8% |
| 500,001 to 1 million | 11.5% |
| 1 million or more | 22.5% |

| | All Physicians* |
|---|---|
| 99,000 or less | 9.6% |
| 100,000 – 249,000 | 6.9% |
| 250,000 – 1 million | 15.7% |
| 1 million or more | 67.8% |

*Source: AMA Physician Master File, 2012*

12



## 7  WHAT IS THE SIZE OF YOUR PRACTICE?

|  | Survey Respondents | All Physicians* |
|---|---|---|
| Solo | 24.9% | 13.0% |
| 2 – 5 physicians | 26.2% | N/A |
| 6 – 10 physicians | 14.5% | N/A |
| 11-30 physicians | 14.5% | N/A |
| 31 – 100 physicians | 7.8% | N/A |
| 100+ physicians | 12.1% | N/A |

*Source: AMA Physician Master File, 2012*

## 8  ARE YOU A MEMBER OF YOUR:

|  | Survey Respondents | All Physicians |
|---|---|---|
| County medical society | 50.1% | N/A |
| State medical society | 63.6% | N/A |
| National specialty society | 70.4% | N/A |
| American Medical Association | 24.5% | 15.0%* |
| American Osteopathic Association | 5.2% | 4.2%** |

*Source: Associated Press, June 20, 2011. (Number does not include medical students or residents)*
**American Osteopathic Association*

13

9 | WHAT IS YOUR ETHNICITY?

| | Survey Respondents | All Physicians* |
|---|---|---|
| African–American | 1.9% | 3.5% |
| Pacific Islander | 7.5% | 12.2% |
| Caucasian | 84.7% | 54.4% |
| Hispanic | 4.1% | 4.9% |
| Native American | 0.1% | 0.2% |
| Other | 1.7% | 1.3% |
| Unknown | 0.0% | 23.4% |

*Source: Physician Characteristics and Distribution in the US, 2010 Edition, American Medical Association*

## PART I: DESCRIPTION OF PHYSICIAN RESPONDENTS: SAMPLE ANALYSIS AND OBSERVATIONS

The Survey of America's Physicians was sent by email to over 80 percent of physicians in the United States, in order to allow as many physicians as possible to express their viewpoints to policy makers and the public.

Survey respondents were therefore necessarily self-selected. Those who elected to complete the survey reflect to some extent the characteristics of all practicing physicians in the United States, though in other respects they are different.

Survey respondents are located in all 50 states and Puerto Rico, representative of a broad geographic sample. However, the ten states from which the most responses were received accounted for 59.5 percent of all responses. These same states account for 52 percent of all practicing physicians, based on the AMA Master File, indicating a slight overrepresentation of these states within the sample.

In particular, Texas, Florida, Massachusetts, Pennsylvania, North Carolina, South Carolina, Delaware, Alaska, and Arkansas were overrepresented in the survey relative to total physicians in these states. This may be accounted for in part by the fact that state medical societies in several of these states elected to email the survey to their physician members, supplementing the email surveys sent by The Physicians Foundation.

Other states, including California, Ohio, Michigan, Georgia, Maryland, Colorado, Minnesota, Connecticut, Louisiana, and Oregon were underrepresented in the survey relative to total number of practicing physicians in these states. Most of the remaining states, including Illinois, New Jersey, Virginia, Missouri,

14

Tennessee, Alabama, Oklahoma, Nebraska, Iowa, Hawaii, New Mexico, New Hampshire, Maine, Nevada, Rhode Island, Vermont, Idaho and North Dakota were proportionately represented in the sample relative to the physician population in these states.

Physicians are generally separated into two professional categories, including those who are engaged in primary care, treating the whole patient on a largely cognitive basis, and those who are engaged in specialties and subspecialties, treating specific organs or body systems on a largely consultative and procedural basis. Primary care physicians in this survey are designated as those practicing family medicine, general internal medicine, or pediatrics. All other physicians are designated in this report as specialists.

Primary care respondents represented 34.8 percent of all respondents to the survey, consistent with their representation in the overall physician population -- 32.2 percent of which is composed of primary care physicians. Specialists represented the remaining 65.2 percent of respondents, a number proportionate to specialists in the overall physician population.

Historically, physicians in the United States have operated as independent owners or partners of their practices, typically running them as small businesses. In recent years, the independent practice model has been increasingly supplanted by the employment model, in which physicians are employed by hospitals or multi-physician medical groups. The chart below depicts this trend as tracked by the consulting firm Accenture:

INDEPENDENT PHYSICIANS AS A PERCENT OF TOTAL PHYSICIANS



*Source: Adapting to a new model of physician employment. Accenture. August, 2011*

Physicians are embracing employment for a variety of reasons, including the economic security employment offers and the relative absence of administrative and business ownership responsibilities it entails.

Over 48 percent of survey respondents identified themselves as practice owners, partners or associates. The practice status of physicians is fluid, and it is difficult to know how this number corresponds exactly to the overall physician population. However, available data suggests practice owners and partners

15

responded to the survey in slightly higher numbers than is reflected in the general physician population. It may be inferred that practice owners have relatively strong feelings about issues such as the benefits of practice autonomy and other aspects of the medical practice environment referenced in the survey and may have chosen to complete the survey for that reason. Indeed, a number of survey responses included in this report suggest that some practice owners do feel differently about the medical profession than other types of physicians.

Over 72 percent of all practicing physicians in the United States are 40 years old or older. By contrast, over 86 percent of physicians responding to this survey are 40 or older. The average age of all survey respondents is 54, whereas the average age of all AMA-listed physicians is 49.22. Therefore, survey respondents are on average about five years older than all physicians known to be currently in active practice.

Because of these discrepancies, aggregate survey responses may represent the viewpoints of older, more established physicians disproportionately. These physicians have seen the medical practice environment change dramatically during the course of their careers in ways some may not consider favorable (see Part II for an expanded discussion of this issue). By contrast, younger physicians who have grown up in the era of managed medicine may be less disaffected with the current healthcare system, or simply may not have practiced long enough to become disaffected. To assess this issue, this survey report includes comparisons of responses from older and younger physicians; in certain instances, variances of opinion between the two groups are observed.

Medicine was once a predominantly male profession, but the demographic make-up of physicians is rapidly changing. Between 1980 and 2009, the number of female physicians in the United States increased by 430 percent (see Physician Characteristics and Distribution, American Medical Association, 2011). Today, one-third of all practicing physicians are female, up from 10 percent in the 1970s. In 1965, seven percent of medical school graduates were women. Today, over 50 percent of new medical students are female, suggesting that females will represent the majority of all physicians within a generation. The ranks of primary care physicians and obstetrician/gynecologists, in particular, should consist more predominantly of female physicians in the near future, as the chart below indicates.



PERCENT OF FINAL-YEAR RESIDENTS WHO ARE FEMALE

Pediatrics 73%
Family Practice 55%
Internal-Medicine 45%
Ob/Gyn 83%

*Source: AMA Physician Master File, 2012*

16

Female physicians make up 26.4 percent of survey respondents, a number disproportionately lower than in the overall physician population by approximately seven percent. The relatively low number of female respondents is likely connected to the disproportionately high number of older respondents, as the great majority of older doctors are male. As responses to a variety of questions summarized in this report suggest, female physicians at times may differ from male physicians in their outlook toward the medical profession and other topics.

Only 16.5 percent of all physicians practice in communities of 250,000 or less, according to the American Medical Association's Physician Master File. By contrast, 50.2 percent of survey respondents indicated they live in communities of 250,000 or less. This disparity may in part be caused by how physicians classified their community size relative to the AMA classification. A physician respondent living in a suburban community may not have classified herself as living in the larger metropolitan area, whereas the AMA may place her within the larger metropolitan statistical area (MSA). Nevertheless, it is possible that physicians practicing in smaller communities are disproportionately represented in the survey.

Solo physicians, once common throughout the country, are now a vanishing breed. Of the 2,711 physician search assignments Merritt Hawkins represented in 2011/12, less than one percent offered a solo practice, down from 22 percent in 2004. The most recent data available from the AMA Physician Master File indicates 13 percent of all physicians are in solo practice today. By contrast, 24.9 percent of survey respondents indicated they are currently in solo practice. As referenced above in regard to independent practice owners, some solo physicians may have relatively stronger feelings regarding practice autonomy and other issues referenced in this survey versus others and may have chosen to complete the survey at least partially for that reason.

Physicians also are changing in regard to the professional associations of which they are members. In the early 1950s, about 75 percent of physicians were members of the American Medical Association (see American Medical Association Membership Woes Continue, Canadian Medical Association Journal, August 9, 2011.) Today, approximately 15 percent of practicing physicians are AMA members (see Associated Press, June 20, 2011). However, over 24 percent of survey respondents indicated they are AMA members, a higher number than in the overall physician population. Over five percent of survey respondents indicated they are members of the American Osteopathic Association (AOA), while just four percent of all physicians are members of the AOA.

The majority of survey respondents (84.7 percent) indicated they are Caucasian. As question nine above indicates, the AMA classifies 54.5 percent of physicians as Caucasian and classifies the ethnicity of 23.4 percent of physicians as unknown. Assuming all of the "unknown" physicians are Caucasian, at most some 77 percent of physicians can be classified as Caucasian. Caucasians are therefore disproportionately represented in the survey.

PART I - CONCLUSION

Survey respondents share some of the characteristics of the population of all practicing physicians but are different in several ways. The physicians sample is disproportionately older than the national population, with the sampled physicians plausibly experiencing profound changes in the medical practice environment during the course of their careers. The sample is also significantly more male and rural than the physician population, and is more likely than the population to operate a solo practice or be an AMA member. The aggregate survey responses therefore are most representative of those physicians in a position to compare medical practice dynamics today to those of ten, twenty or thirty years ago. However, the Addendum to the survey includes responses partitioned by physician age, gender, specialty (primary care vs. specialties), and work status (independent vs. employed), allowing for comparisons across groups.

17

| PART TWO | PROFESSIONAL SATISFACTION/MORALE |
|---|---|

Part II of the survey focuses on the professional career satisfaction and morale of today's physicians, their thoughts about the current state of the medical profession, and their career plans. As referenced above, comparisons are made where possible to responses to the physician survey The Physicians Foundation conducted in 2008.

**1  WHICH BEST DESCRIBES YOUR FEELINGS ABOUT THE CURRENT STATE OF THE MEDICAL PROFESSION?**

| | |
|---|---|
| Very positive | 3.9% |
| Somewhat positive | 27.9% |
| Somewhat negative | 44.8% |
| Very negative | 23.4% |

**2  WHICH BEST DESCRIBES HOW YOU FEEL ABOUT THE FUTURE OF THE MEDICAL PROFESSION?**

| | |
|---|---|
| Very positive/optimistic | 3.1% |
| Somewhat positive/optimistic | 19.5% |
| Somewhat negative/pessimistic | 45.9% |
| Very negative/pessimistic | 31.5% |

**3  HOW WOULD YOU RATE THE PROFESSIONAL MORALE OF PHYSICIANS YOU KNOW?**

| | |
|---|---|
| Very positive | 1.8% |
| Somewhat positive | 17.7% |
| Somewhat negative | 55.8% |
| Very negative | 24.6% |

18



## 4  HOW WOULD YOU RATE YOUR OWN PROFESSIONAL MORALE?

| | |
|---|---|
| Very positive | 11% |
| Somewhat positive | 30.7% |
| Somewhat negative | 41% |
| Very negative | 17.3% |

## 5  SOME PHYSICIANS BELIEVE THAT THE MEDICAL PROFESSION IS IN DECLINE. DO YOU:

| | |
|---|---|
| Mostly agree | 41.6% |
| Somewhat agree | 42.6% |
| Somewhat disagree | 8.6% |
| Mostly disagree | 7.2% |

## 6  IF YOU MOSTLY OR SOMEWHAT AGREE, WHY IS THE PROFESSION IN DECLINE?

| | Very Important | Somewhat Important | Unimportant |
|---|---|---|---|
| Too much regulation/paperwork | 79.2% | 19.3% | 1.5% |
| Loss of clinical autonomy | 64.5% | 31.0% | 4.5% |
| Erosion of physician/patient relationship | 54.4% | 37.8% | 7.8% |
| Scope of practice encroachment | 43.7% | 40.6% | 15.7% |
| Too many part-time doctors | 6.9% | 22.6% | 70.5% |
| Money trumps patient care | 45.9% | 40.1% | 14.0% |
| Physicians not compensated for quality | 58.6% | 33.7% | 7.7% |

19

7 │ TWO YEARS AGO, WHICH BEST DESCRIBED YOUR ATTITUDE TOWARD MEDICAL PRACTICE?

| | |
|---|---|
| Very positive/satisfying | 14.1% |
| Somewhat positive/satisfying | 52.1% |
| Somewhat negative/unsatisfying | 30.1% |
| Very negative/unsatisfying | 3.7% |

8 │ WHICH BEST DESCRIBES YOUR ATTITUDE TOWARD MEDICAL PRACTICE TODAY?

| | |
|---|---|
| Very positive/satisfying | 7.3% |
| Somewhat positive/satisfying | 31.7% |
| Somewhat negative/unsatisfying | 41.2% |
| Very negative/unsatisfying | 19.8% |

9 │ IF YOU HAD YOUR CAREER TO DO OVER, WOULD YOU CHOOSE TO BE A PHYSICIAN?

| 2012 | | | 2008 | |
|---|---|---|---|---|
| Yes | 66.5% | | Yes | 73% |
| No | 33.5% | | No | 27% |

10 │ WOULD YOU RECOMMEND MEDICINE AS A CAREER TO YOUR CHILDREN OR OTHER YOUNG PEOPLE?

| 2012 | | | 2008 | |
|---|---|---|---|---|
| Yes | 42.1% | | Yes | 40.2% |
| No | 57.9% | | No | 59.8% |

20

## 11 | IF YOU HAD THE ABILITY, WOULD YOU RETIRE TODAY?

| 2012 | |
|---|---|
| Yes | 60.6% |
| No | 39.4% |

| 2008 | |
|---|---|
| Yes | 45% |
| No | 55% |

## 12 | WHAT TWO FACTORS DO YOU FIND MOST SATISFYING ABOUT MEDICAL PRACTICE?

| 2012 | |
|---|---|
| Patient relationships | 80.2% |
| Prestige of medicine | 10% |
| Intellectual stimulation | 69.7% |
| Interaction with colleagues | 19.2% |
| Financial rewards | 11.7% |

| 2008* | |
|---|---|
| Patient relationships | 78.2% |
| Prestige of medicine | 34.9% |
| Intellectual stimulation | 81.7% |
| Interaction with colleagues | 56.2% |
| Financial rewards | 22.6% |

*Question asked as:
"What do you find
most satisfying about
medical practice?"*

## 13 | WHAT TWO FACTORS DO YOU FIND LEAST SATISFYING ABOUT MEDICAL PRACTICE?

| 2012 | |
|---|---|
| Long hours/lack of personal time | 24.9% |
| Liability/defensive medicine pressures | 40.3% |
| Reimbursement issues | 27.3% |
| Lack of clinical autonomy | 9.2% |
| Dealing with Medicare/Medicaid/government regulations | 27.4% |
| Pressure of running a practice | 5.6% |
| Non–clinical paperwork | 18.1% |
| Uncertainty/changes of health reform | 21.5% |
| Managed care | 7.6% |
| EMR implementation | 9.2% |
| Other | 5.1% |

21

14 | IN THE NEXT ONE TO THREE YEARS, DO YOU PLAN TO (CHECK ALL THAT APPLY):

|  | 2012 | 2008 |
|---|---|---|
| Continue as I am | 49.8% | 51.48% |
| Cut back on hours | 22.0% | 20.3% |
| Retire | 13.4% | 11.0% |
| Switch to a cash/concierge practice | 6.8% | 7.0% |
| Relocate to another practice/community | 10.9% | N/A |
| Cut back on patients seen | 9.6% | N/A |
| Seek a non–clinical job within healthcare | 9.9% | 13.4% |
| Seek employment with a hospital | 5.6% | N/A |
| Work part–time | 6.5% | 10.2% |
| Work locum tenens | 6.4% | 7.5% |
| Seek a non–healthcare job/business | 6.4% | 10.1% |
| Close my practice to new patients | 4.0% | 7.4% |
| Other | 5.5% | N/A |

## PART II: PROFESSIONAL SATISFACTION AND MORALE: ANALYSIS AND OBSERVATIONS

For better or for worse, medical practice today is not what it used to be.

In some respects, the glass for physicians and patients is more than half full. Treatment options for patients, and the skills and resources physicians can bring to bear, are far superior to what was available 100, 50 or even ten years ago. In 1933, only four specialty examining boards existed. Today, physicians can be board certified in over 145 specialties and subspecialties (American Board of Medical Specialties, www.abms.org/About-ABMS/ABMS-History) and doctors now are capable of performing procedures once envisioned only in the annals of science fiction. For all its perceived and real faults, the healthcare system U.S. physicians operate in today is the most advanced in the world.

More problematic for physicians, as revealed in this survey, is the environment in which they must practice. Many of the doctors who responded to the survey are disillusioned with medical practice and pessimistic about the future of their profession. This may be in part because the survey was conducted at a time when a number of longstanding trends in medicine are coming to a head.

PRACTICE EROSION

Over the last half century or more, medicine has evolved from the province of solo and small group practitioners who contracted directly with patients, to an increasingly centralized profession in which treatment is paid for by third parties. Several decades ago, both Medicare and private insurance companies paid physicians retroactively for "usual, customary and reasonable charges," meaning doctors typically received what they invoiced. This system has been repeatedly modified since, in an effort to reduce costs and manage care, often creating a disconnect between the services physicians provide or believe is appropriate and the services for which they are compensated. This trend may reach a culmination on January 1, 2013, when physicians are due for a 30 percent reduction of their Medicare reimbursement under Medicare's Sustainable Growth Rate (SGR) formula.

These developments have coincided with a rapidly escalating level of regulatory compliance imposed on all employers, including physicians, through OSHA, EEOC and related government agencies. In addition, many government compliance requirements are imposed specifically on physicians by HIPAA, Medicare's quality assurance program, and related laws and regulations. Medical malpractice lawsuits, a rarity prior to the era of medical specialization, now are common, adding an additional layer of paper work, expense and stress to virtually every physician's day.

Nevertheless, the bar to professional entry for physicians keeps rising, with four years of college education, four years of medical school, and as many as seven years of residency training necessary for those who wish to sub-specialize. Medical education and training come at a high cost, as medical school graduates now carry an average of $156,456 in educational debt, according to the Association of American Medical Colleges (AAMC).

THE ADVENT OF HEALTH REFORM

Health reform arrived on the heels of both a slow erosion of physician autonomy and reimbursement and on a steady increase in physician regulatory responsibility and liability. Reform, considered as both the Patient Protection and Affordable Care Act (PPACA) and market forces, is predicated largely on a change in physician behaviors. Physicians are being asked or compelled to transition from a fee-for-service system in which volume of consults, treatments or procedures is rewarded, to one in which value -- as measured by quality and cost outcomes -- is the metric used to determine compensation.

That some such reform is needed to reduce costs and enhance quality of care has been widely acknowledged by health professionals, policy makers, and the public. Putting these reforms into effect, however, will require an upheaval in the way many physicians practice. New delivery models promoted by reform, such as Accountable Care Organizations (ACOs), may require physicians to join larger groups, more closely align with hospitals, and take on financial risk for managing patient care.

The medical home model, which is encouraged by reform, also may require fundamental practice restructuring, obliging physicians to sustain greater information technology and staffing costs while following difficult to implement treatment protocols. Some of the standards by which physicians will be evaluated and compensated, such as quality of care measures, are likely to be subjective and out of the physician's control.

Further, PPACA seeks to reduce Medicare fraud and overpayments as a cost savings measure. The new law requires physicians to follow more stringent deadlines for identifying Medicare overpayments, exposes



physicians to penalties for even unintentional violations of the law, and imposes a number of other compliance measures (for a further discussion on the impact of PPACA on physicians see the white paper Health Reform and the Decline of Physician Private Practice, The Physicians Foundation, 2010.)

## A SNAPSHOT IN TIME

How physicians may ultimately adjust to these reforms – and how they will affect quality, cost and access to patient care -- remains to be seen. In time, many or at least some of these emerging delivery models and requirements may be embraced as beneficial by both patients and physicians.

For the present, however, the medical profession is in the midst of a tsunami of change, and change is frequently difficult. Part II of the survey reflects the physicians' perspective on the medical profession in this transformative and challenging era.

## FLAGGING MORALE, PERVASIVE PESSIMISM

When asked which best describes their feelings about the current state of the medical profession, only 3.9 percent of physicians used the words "very positive," while 23.4 percent of physicians indicated their feelings are "very negative." The majority of physicians – 68.2 percent -- described their feelings as either "somewhat negative" or "very negative," while only 31.8 percent of physicians described their feelings as "somewhat positive" or "very positive."

Physicians were similarly downbeat about the future of the medical profession. Only 3.1 percent of physicians said they were "very positive/optimistic" about the future of the medical profession, while 31.5 percent indicated they were "very negative/pessimistic" about the future of the medical profession. Over three quarters of physicians (77.4 percent) described themselves as "somewhat negative/ pessimistic" or "very negative/pessimistic" about the future of the medical profession, while only 22.6 percent indicated they are "somewhat positive/optimistic" or "very positive/optimistic" about the future of the medical profession.

When asked about the morale of physicians they know, the great majority of physicians (80.6 percent) described it as either "somewhat negative" or "very negative." Physicians were somewhat more favorable about their own morale, though the majority (58.3 percent) also characterized it as "somewhat negative" or "very negative."

However, it should be noted that physicians 39 or younger are conspicuously less pessimistic about the medical profession and express higher levels of morale than physicians 40 or older, as the charts below indicate. In addition, female physicians express a lower level of pessimism and a higher level of morale than do male physicians, employed physicians express lower levels of pessimism and higher morale than do practice owners, and primary care physicians express lower levels of pessimism and higher levels of morale than do specialists.

24

| | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| **State of the Medical Profession** | | | | | | | | |
| Very/somewhat positive | 40.6% | 30.2% | 31% | 35.5% | 37.6% | 26.1% | 36.5% | 29.7% |
| Somewhat/very negative | 59.4% | 69.8% | 69% | 64.5% | 62.4% | 72.9% | 63.5% | 70.3% |
| **Future of Medical Profession** | | | | | | | | |
| Very/somewhat positive | 26.6% | 21.9% | 21.5% | 26.2% | 27.7% | 16.5% | 28.8% | 19.8% |
| Somewhat/very negative | 73.4% | 78.1% | 78.5% | 73.8% | 72.3% | 83.5% | 71.2% | 80.2% |
| **Morale of Physicians You Know** | | | | | | | | |
| Very/somewhat positive | 28% | 17.8% | 18.7% | 22% | 24% | 14% | 23.5% | 17.5% |
| Somewhat/very negative | 72% | 82.2% | 81.3% | 78% | 76% | 86% | 76.5% | 82.5% |
| **Your Morale** | | | | | | | | |
| Very/somewhat positive | 53.9% | 39.4% | 40.5% | 45.8% | 47.7% | 35.6% | 47.1% | 39.3% |
| Somewhat/very negative | 46.1% | 60.6% | 59.5% | 54.2% | 52.3% | 64.4% | 52.9% | 60.7% |

Only 30.2 percent of physicians 40 or older indicated they feel "very or somewhat positive" about the state of the medical profession. By contrast, over 40 percent of physicians 39 or younger expressed positive feelings about the state of the medical profession. Only 31 percent of male physicians indicated they are "very or somewhat positive" about the state of the medical profession, compared to 35.5 percent of female physicians who expressed positive feelings.

Despite being relatively more positive than their older peers, the majority of younger physicians are nevertheless downbeat regarding the state of the medical profession, its future and the morale of physicians they know. However, the majority (53.9 percent) describe their own morale as positive, a stark contrast to older physicians, only 39.4 percent of whom describe their own morale as positive. The majority of female physicians, employed physicians, and primary care physicians, though less pessimistic than their male, practice owner and specialist peers, are nevertheless pessimistic about the medical profession and express low levels of morale.

Physician feelings about medical practice have trended downward compared to two years ago, the survey indicates. When asked to describe their attitude toward medical practice two years ago, 66.2 percent of physicians said it was "somewhat positive/satisfying" or "very positive/satisfying." When asked to describe their attitude toward medical practice today, only 39 percent indicated it is either "somewhat positive/satisfying" or "very positive/satisfying."

The great majority of physicians (84.2 percent) agree with that the medical profession is in decline. Only 7.2 percent "mostly disagree" with this statement. Younger and older physicians generally agree on this point, as the chart below indicates, as do male and female physicians. However, practice owners are more inclined to believe the medical profession is in decline than are employed physicians and specialists are more inclined to believe the medical profession is in decline than are primary care physicians.

| | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| **The Medical Profession is in Decline** | | | | | | | | |
| Very/somewhat agree | 83.8% | 84.3% | 84.4% | 83.5% | 81.5% | 87.4% | 81.5% | 85.5% |
| Very/somewhat disagree | 16.2% | 15.7% | 15.6% | 16.5% | 18.5% | 12.6% | 18.5% | 14.5% |

Of total respondents who agree the medical profession is in decline, the majority identify "too much regulation/paperwork" as the most important factor in the profession's decline, followed by "loss of clinical autonomy," "physicians not compensated for quality," and "erosion of the physician/patient relationship."

Though paperwork and bureaucracy are present in many working environments, there is no disputing that medicine is one of the most highly regulated of all professions, and that physicians must adhere to a vast array of laws and requirements imposed by the government and third party payers. While the U.S. tax code runs to some 75,000 pages, the Medicare regulatory code stipulating provisions by which physicians must abide is over 130,000 pages long (politicalcalculations.blogspot.com/20/0/03/growing-complexity-of-us-federal-tax.html). As the survey indicates, the majority of physicians also associate the decline of the medical profession with the growing burden of regulation imposed upon them.

In addition, physicians today often must obtain "pre-authorization" from third party payers before they can order tests or treatments for patients. Sometimes, payers will decline to reimburse for services physicians believe are necessary, further eroding the physician's autonomy over clinical decision making. The survey underscores that many physicians believe their powerlessness to use their training and judgment on their patients' behalf is a key contributor to the decline of their profession.

These conditions play into another factor physicians identified as an important contributor to the decline of the medical profession: the erosion of the physician/patient relationship. Many doctors view the intrusion of third parties into clinical decision making as corrosive to the bond between physician and patient.

As a result of the profession's decline, the majority of physicians (57.9 percent, down slightly from 59.8 percent in 2008) would not recommend medicine as a career to their children or to other young people, while over one-third (34.5 percent) would choose not to be physicians if they had their careers to do over, up from 27 percent in 2008. Employed physicians and primary care physicians are more likely to recommend medicine as a career than are other types of physicians, and would be more likely to choose medicine if they had their careers to do over. Medical practice owners are the least likely to recommend medicine as a career or to choose medicine if they had their careers to do over (see below).

**Would You Recommend Medicine as a Career to Your Children?**

| | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Yes | 41.4% | 42.2% | 41.9% | 42.8% | 45.9% | 37% | 47.3% | 39.6% |
| No | 58.6% | 57.8% | 58.1% | 57.2% | 54.1% | 63% | 52.7% | 60.3% |

26

**Would You Become a Physician Again?**

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| **Yes** | 65.1% | 66.7% | 65.9% | 67.8% | 69.3% | 63.1% | 70.1% | 64.7% |
| **No** | 34.9% | 33.3% | 34.1% | 32.2% | 30.7% | 36.9% | 29.9% | 35.3% |

Many physicians surveyed are ready to retire. Over 60 percent said they would retire today if they had the ability to do so, up from 44.9 percent in 2008. As might be expected, younger physicians would be the least likely to retire today if they had the ability to do so, while medical practice owners would be the most likely (see chart below). Fewer female physicians said they would retire today if they could than did male physicians, and fewer primary care physicians said they would retire today than did specialists.

**Would You Retire Today?**

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| **Yes** | 46.9% | 63% | 61.6% | 58% | 56.8% | 64.2% | 57% | 62.2% |
| **No** | 53.1% | 37% | 38.4% | 42% | 43.2% | 35.8% | 43% | 37.8% |

## A CLEAR PATTERN

The survey clearly shows a pattern of older physicians, practice owners, specialists and male physicians being more pessimistic about the medical profession and in general more negative about the current state the healthcare system than are younger physicians, employed physicians, female physicians and primary care physicians.

As referenced above, it is generally perceived that medical practice owners face the highest levels of administrative paperwork and reimbursement challenges in medicine, which may be one reason for their relative disaffection compared to employed physicians. Also as referenced above, older physicians have experienced significant changes in the medical practice environment over the years, which they may not view favorably, whereas younger physicians have "grown up" in today's evolving system and have no basis for comparison.

Historically, primary care physicians have not been perceived as being preeminent in the medical hierarchy, since their incomes are generally lower than specialist physicians and the constraints on their personal time are often higher (see Merritt Hawkins Survey of Primary Care Physicians, 2008).

However, emerging practice models such as Accountable Care Organizations (ACOs) and patient centered medical homes provide primary care physicians with a more central role in the delivery system as the coordinators of care and the "quarterbacks" of the clinical team. The Patient Protection and Affordable Care Act (PPACA) included a temporary ten percent increase in Medicare reimbursement to qualified primary care physicians, offering many primary care physicians a boost in income.

Primary care physicians may be feeling relatively more positive about the medical profession due to changes that appear to favor them. Female physicians are more likely to practice primary care than are

27

male physicians, which may explain to some extent their relatively more positive feelings about the medical profession. Female physicians also work fewer hours on average than male physicians, which also may contribute to their relatively positive attitude.

By contrast, Medicare has recently reduced reimbursement for a variety of services provided by cardiologists, oncologists and other medical specialists, many of whom may believe that cost cutting efforts are taking place at their expense and that ACOs, medical homes and other emerging delivery models may further dilute their clinical autonomy.

## LIKES AND DISLIKES

The survey suggests that physicians are fairly unanimous regarding the factors that provide them with professional satisfaction. When asked to identify the two most satisfying aspects of medical practice, 80.2 percent of physicians indicated "patient relationships" as a factor, followed by 69.7 percent who cited "intellectual stimulation." Only 11.7 percent of physicians identified "financial rewards" as one of the two most satisfying aspects of medical practice.

Physicians identified "liability/defensive medicine" as the least satisfying aspect of medical practice, followed by "Medicare/Medicaid/government regulations," "reimbursement issues," and "uncertainty/ changes of health reform." These factors and others cited in the survey tend to interfere with or distract doctors from patient relationships and therefore diminish their professional satisfaction.

## SEEKING ALTERNATIVES

The survey asked physicians what they plan to do in the next one to three years. Close to half (49.8 percent) said they will continue practicing as they are. The remaining 50.2 percent, however, indicated they plan to take one or more steps that would be likely to reduce patient access to their practices, up from 48.5 percent in 2008.

Over 22 percent said they will cut back on their hours. This would continue a trend of physicians reducing their hours observed in a study published in the Journal of the American Medical Association (see chart below).

| Average Physician Hours Worked Per Week | |
| --- | --- |
| 1977 – 1996 | 55 |
| 1997 – 2008 | 51 |
| Total FTEs lost | 36,000 |

*Source: Journal of the American Medical Association, 2010;303(8):747-753*

The study referenced above tied the decrease in physician hours more closely to reductions in physician reimbursement taking place from 1996 onwards than to other factors, including physician gender and age. The implication is that as the long hours traditionally characteristic of medical practice become less rewarding, physicians are responding by adopting the relatively more regular hours of other professions. As a result, tens of thousands of physician full-time equivalents (FTEs) are being lost to the work force, contributing to the physician shortage. This trend also is observed in this report and is discussed in more detail in Part IV.

28

**Over 13 percent of physicians indicated they plan to retire over the next one to three years,** which will remove them from the medical workforce altogether. Close to ten percent of physicians plan to seek a non-clinical job within healthcare, which also would remove them from direct patient care. Over nine percent plan to cut back on patients seen, 6.5 percent plan to work part-time, and four percent plan to close their practices to new patients. All of these steps would limit patient access to physician services.

Close to seven percent plan to switch to concierge or cash only practices in which third party payers are eliminated. Physicians who switch to this model typically greatly reduce the number of patients they see in order to increase time available per patient. Over five percent plan to seek employment with a hospital. Physicians who transition from private practice (where their incomes often are directly tied to the number of patients they see) to hospital employment (where they receive a salary) may become less productive (See Part IV of the survey comparing patients seen per day by employed physicians versus practice owners). Four percent of physicians plan to close their practices to new patients.

As the graph below indicates, certain types of physicians are more likely to make particular changes to their practices than are others. A greater percent of female physicians plan to work part-time, while a higher percent of practice owners plan to open concierge practices.

**What Do You Plan To Do in the Next One to Three Years?**

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Continue as I am | 56.6% | 49.1% | 50.3% | 51.1% | 53.3% | 50.1% | 51% | 49.3% |
| Work part-time | 4.6% | 6.9% | 5.9% | 8.4% | 6.5% | 5.8% | 7% | 6.2% |
| Concierge | 7.5% | 6.8% | 7.1% | 6.4% | 4.5% | 9.6% | 7.7% | 6.4% |

A MATTER OF ACCESS

Should physicians embrace these steps in even a limited way, the effect on patient access to care will be dramatic. The nation currently is in the midst of a growing physician shortage and can ill afford to lose doctors to retirement, voluntary cut-backs, or other practice modifications that are likely to reduce patient access to their services. The Association of American Medical Colleges (AAMC) estimates the U.S. already is in the midst of a physician shortage. By 2025, the shortage is projected to grow by between 140,000 and 214,000 physicians – a deficit of between 15 to 25 percent (see Shortage of Physicians, APNs, and PAs could double by 2025, American Medical News, July 27, 2012) Health reform is projected to add 32 million people to the ranks of the insured, greatly increasing demand for physicians.

PART II – CONCLUSION

How physicians feel about the practice of medicine has significant real world implications for America's patient population, particularly as it pertains to access to medical care. That doctors are dispirited is more than a matter of "professional grumbling," as a robust, engaged physician workforce is critical to meeting patient needs. Part II of the survey suggests that physicians are at a tipping point at which they will seek ways to further disengage from today's medical practice environment, reducing their hours, decreasing the number of patients they see, and accepting the status of salaried employees – trends that should be of urgent concern to both policy makers and the public.

29

| PART THREE | HEALTH SYSTEM TRENDS |
|---|---|

Part III of the survey examines how physicians feel about the current direction of the healthcare system, including the implications of healthcare reform.

**1** HOW HAS PASSAGE OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT (PPACA/HEALTH REFORM) AFFECTED YOUR FEELINGS ABOUT THE DIRECTION AND FUTURE OF HEALTHCARE IN AMERICA?

| | |
|---|---|
| I am more positive | 18.5% |
| I am less positive | 59.3% |
| My feelings have not changed | 22.2% |

**2** MOST PHYSICIANS TODAY ARE FOCUSED ON THEIR DAILY RESPONSIBILITIES AND ARE UNSURE WHERE THE HEALTH SYSTEM WILL BE OR HOW THEY WILL FIT INTO IT THREE TO FIVE YEARS FROM NOW.

| | |
|---|---|
| Mostly agree | 55.2% |
| Somewhat agree | 36.5% |
| Somewhat disagree | 5.6% |
| Mostly disagree | 2.7% |

**3** PHYSICIANS HAVE LITTLE INFLUENCE ON THE DIRECTION OF HEALTHCARE AND HAVE LITTLE ABILITY TO AFFECT CHANGE.

| | |
|---|---|
| Mostly agree | 50.4% |
| Somewhat agree | 31.7% |
| Somewhat disagree | 12.7% |
| Mostly disagree | 5.2% |

**4** HOSPITAL EMPLOYMENT OF PHYSICIANS IS A POSITIVE TREND LIKELY TO ENHANCE QUALITY OF CARE AND DECREASE COSTS

| | |
|---|---|
| Mostly agree | 4.6% |
| Somewhat agree | 19.9% |
| Somewhat disagree | 32.8% |
| Mostly disagree | 42.7% |

30

5 HOSPITAL EMPLOYMENT WILL ERODE THE PHYSICIAN/PATIENT RELATIONSHIP AND QUALITY OF CARE.

| | |
|---|---|
| Mostly agree | 38.5% |
| Somewhat agree | 33.1% |
| Somewhat disagree | 20.2% |
| Mostly disagree | 8.2% |

6 IN YOUR OPINION, TO WHAT DEGREE DO THE FOLLOWING FACTORS CONTRIBUTE TO RISING HEALTH COSTS?

| | Major Cost Driver | Moderate Cost Driver | Minor Cost Driver |
|---|---|---|---|
| State and federal insurance Mandates | 41.6% | 37.6% | 20.8% |
| Defensive medicine | 69.1% | 26.2% | 4.7% |
| Fraud | 18.8% | 35.3% | 45.9% |
| Advances in technology/Treatment | 51.2% | 40.1% | 8.7% |
| Limited patient financial Obligations | 39.0% | 44.2% | 16.8% |
| Absence of free markets | 37.2% | 35.6% | 27.2% |
| Cost of pharmaceuticals | 59.1% | 34.9% | 6% |
| Lack of pricing transparency | 40.5% | 40.5% | 19% |
| Physician fees | 3.8% | 27.9% | 68.3% |
| Price controls on fees and products | 17.9% | 41.6% | 40.5% |
| Aging population | 64.9% | 29.4% | 5.7% |
| Fee-for-service reimbursement | 12.5% | 35.7% | 51.8% |
| Social conditions (poverty, drugs,Violence, illegal immigration, etc.) | 43.5% | 40.0% | 16.5% |
| Relative Value Update Committee/RUC | 17.3% | 47.8% | 34.9% |

31

7   IS YOUR PRACTICE OR EMPLOYER ACTIVELY SEEKING DESIGNATION AS AN ACCOUNTABLE
    CARE ORGANIZATION (ACO)?

| Yes | 21.9% |
| No | 44.0% |
| Unsure | 34.1% |

*Over 82 percent of physicians agreed with the statement, "Physicians have little influence on the direction of healthcare and have little ability to affect change." Only 5.2 percent "mostly disagreed" with the statement.*

8   WHICH BEST DESCRIBES YOUR FEELINGS ABOUT ACOS?

| They are likely to enhance quality/decrease cost | 9.0% |
| Quality/cost gains will not justify organizational cost/effort | 21.8% |
| Unlikely to increase quality/decrease cost | 40.6% |
| Unsure about structure or purpose of ACOs | 28.6% |

9   WHICH BEST DESCRIBES YOUR FEELINGS ABOUT MEDICAL HOMES?

| They are likely to increase quality/reduce costs | 24.4% |
| They are unlikely to improve quality/reduce costs | 37.7% |
| Unsure about structure/purpose of medical homes | 37.9% |

32

## 10 HOW WOULD YOU RATE THE FOLLOWING AS SOLUTIONS TO THE HEALTH SYSTEM'S COST AND ACCESS CHALLENGES?

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| Single payer/Canadian style system | 19.3% | 17% | 15.4% | 14.9% | 33.4% |
| Wide spread adoption of ACOs | 2.2% | 8.2% | 38.6% | 26.4% | 24.6% |
| Widespread adoption of medical homes | 8.0% | 15.6% | 42.0% | 19.4% | 15.0% |
| Medicare voucher system | 5.6% | 18.5% | 42.7% | 17.1% | 16.1% |
| Widespread adoption of health savings accounts | 22.3% | 33.4% | 27.2% | 9.8% | 7.3% |
| Evidence based medicine | 33.8% | 36.2% | 20.2% | 6.6% | 3.2% |
| Reduce the supply of physicians | 2.2% | 3.7% | 20.4% | 23.9% | 49.8% |
| Increase the supply of physicians | 21.9% | 32.1% | 34.6% | 6.7% | 4.7% |
| Electronic medical records | 15.9% | 25.6% | 25.6% | 18.0% | 14.9% |
| More government regulation | 2.0% | 5.4% | 12.9% | 15.4% | 64.3% |
| Less government regulation | 49.8% | 24.0% | 17.0% | 5.8% | 3.4% |

## PART III: HEALTH SYSTEM TRENDS ANALYSIS AND OBSERVATIONS

Though physicians are at the heart of healthcare delivery, Part III of the survey suggests that the majority of physicians believe they have little ability to affect changes to the system or its overall direction.

Over 82 percent of physicians agreed with the statement, "Physicians have little influence on the direction of healthcare and have little ability to affect change." Only 5.2 percent "mostly disagreed" with the statement. In general, older physicians feel more powerless to affect change than do younger physicians, males feel more powerless than females, practice owners more powerless than employed physicians and specialists more powerless than primary care physicians, repeating the pattern referenced above (see chart below).

### PHYSICIANS HAVE LITTLE INFLUENCE TODAY

| | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Agree | 78.3% | 82.7% | 82.8% | 79.3% | 80.3% | 85.4% | 79.3% | 83.6% |
| Disagree | 21.7% | 17.3% | 17.2% | 20.7% | 19.7% | 14.6% | 20.7% | 16.4% |

33

Close to 92 percent of physicians agreed with the statement, "Most physicians today are focused on their daily responsibilities and are unsure where the health system will be or how they will fit into it three to five years from now." Only 2.7 percent of physicians strongly disagreed with the statement.

As referenced above, fewer physicians today are part of a national, multi-specialty medical society, such as the AMA. Instead, physicians are increasingly Balkanized by region or by specialty, and there is no one organization representing the majority of doctors. This may contribute to their feelings of powerlessness when it comes to affecting change on a national level.

The majority of physicians also expressed pessimism about how the Patient Protection and Affordable Care Act (PPACA) will affect the future of healthcare in America. Over 59 percent said PPACA has made them less positive about the future of healthcare, compared to 18.5 percent who said PPACA has made them more positive. Though essentially the same percent of older and younger physicians indicated PPACA has made them more positive about the future of healthcare, female physicians, employed physicians and primary care physicians generally are more positive about PPACA than are male physicians, practice owners and medical specialists, repeating the pattern noted above.

### Effect of PPACA on Healthcare

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| More positive | 18.7% | 18.4% | 16.2% | 24.7% | 23.6% | 12.2% | 25.1% | 15.3% |
| Less positive | 53.7% | 60.4% | 63.3% | 48.4% | 52% | 67.8% | 50.4% | 63.5% |
| No change | 27.6% | 21.2% | 20.5% | 26.9% | 24.4% | 20% | 24.5% | 21.2% |

### ACOs AND MEDICAL HOMES

Both PPACA and market trends encourage the formation of Accountable Care Organizations (ACOs) and patient centered medical homes (for additional information on ACOs and medical homes, including case studies, see the white paper Health Reform and the Decline of Physician Private Practice, The Physicians Foundation, 2010). Many physicians were dubious or uncertain about both of these delivery models.

Close to 22 percent of physicians said their practice or employer is activity seeking designation as an ACO. The remaining 78 percent said their practice or employer is either not seeking active designation as an ACO or they are not sure if they are doing so.

ACOs are intended to enhance quality of care and reduce costs through better physician/hospital alignment, aggressive use of information technology, and reimbursement that rewards providers for quality and managing risk. However, only nine percent of physicians said ACOs are likely to enhance quality and decrease costs. Over 62 percent said ACOs are either unlikely to increase quality and reduce costs or that any quality and cost gains achieved will not be worth the organizational expense and effort. A substantial minority of physicians surveyed (28.6 percent) are still unsure of the structure and purpose of ACOs.

34

Primary care physicians and employed physicians are the most likely to have positive feelings about the potential of ACOs to improve quality and reduce costs (see chart below). These types of physicians also are the most likely to have had exposure to ACOs, which often are based on the employed physician model and which depend on primary care physicians as the coordinators of care. Specialists are the least likely to be positive about ACOs, as some may believe ACOs will be used as a vehicle for reducing utilization of specialty services or of further managing specialty care.

### Opinion of ACOs

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Likely to enhance quality/decrease costs | 10% | 8.9% | 8.6% | 10.4% | 12.9% | 5% | 13.2% | 7.1% |

Medical homes are intended to provide patients with one point of contact for all their care, usually a primary care physician who coordinates care with specialists and who is responsible for ensuring patients receive timely and appropriate treatment as stipulated by treatment protocols. About one quarter of physicians (24.4 percent) said medical homes are likely to increase quality and reduce costs. However, a greater number (37.7 percent) said they are unlikely to improve quality or reduce costs. A plurality of physicians (37.9 percent) still are unsure about the structure and purpose of medical homes. Primary care physicians are significantly more positive about the potential of medical homes to improve quality and reduce costs than are physicians in other categories (see chart below).

### Opinion of Medical Homes

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Like to increase quality/decrease costs | 29% | 23.7% | 21.2% | 34.6% | 29.9% | 18.4% | 41.8% | 16.2% |

The medical home model is primary care driven, and primary care physicians are much more likely to have direct experience with medical homes than are specialists. Primary care physicians may believe medical homes will enhance their position in the medical hierarchy while specialist may feel they will have the opposite effect, reducing their clinical autonomy and adding layers of infrastructure and paperwork to their practices.

### HOSPITAL EMPLOYMENT

By requiring greater physician/hospital alignment, ACOs are among a number of factors driving the increased employment of physicians by hospitals. Hospital employment may provide physicians with a stable income in the form of a salary and may relieve them of some of the administrative and liability burdens of private practice. Some physicians are embracing hospital employment for these reasons, though the survey suggests doctors see a downside to hospital employment.

Fewer than five percent of physicians "mostly agreed" with the statement, "hospital employment of physicians is a positive trend likely to enhance quality of care and decrease costs," while 42.7 percent of physicians "mostly disagreed" with the statement. Close to 72 percent of physicians agreed with the statement, "hospital employment will erode the physician/patient relationship and quality of care," while only some 28 percent disagreed with this statement. Traditionally, physicians have viewed themselves as the primary advocates for patients and may fear that as employees of a hospital, they will have less autonomy over clinical decision making.

Physicians who have directly experienced employment are more positive about hospital employment than are practice owners. However, even the majority of employed physicians (62.3 percent) do not rate hospital employment as a positive trend (see chart below). It should be noted that some of these employed physicians may be employed by medical groups and not by hospitals.

### Employed Physicians vs. Practice Owners

| | Employed | Owner |
|---|---|---|
| Somewhat/mostly agree hospital employment is a positive trend | 37.7% | 11.1% |
| Somewhat/mostly disagree hospital employment is a positive trend | 62.3% | 88.9% |

## COSTS DRIVERS AND SOLUTIONS

The U.S. now spends over three trillion dollars per year on healthcare, or 17 percent of gross domestic product (GDP), up from only 5.9 percent in 1965 and 10.2 percent in 1982 (see Kaiser Family Foundation, www.kff.org/insurance/snapwhot/oecd042111.cfm), with costs continuing to rise. Physicians were asked to what degree certain factors contribute to rising health costs.

"Defensive medicine" was the number one ranked factor, cited by 69.1 percent of physicians as a major cost driver. Defensive medicine generally is understood as the practice of ordering tests, prescribing drugs, or conducting procedures, partly or solely as a defense against potential malpractice lawsuits. The cost of defensive medicine is difficult to calculate, but a 2010 study estimates the cost at $45.6 billion a year (see Health Affairs, Sept. 2010, vol. 29, #9).

The survey suggests physicians believe defensive medicine is a far more important cost driver than is fee-for-service reimbursement, which many policy makers, academics and others indentify as a key driver of healthcare costs. Only 12.5 percent of physicians indicated that fee-for-service medicine, which rewards physicians based on volume of services provided, is a major healthcare cost driver. Only 3.8 percent of those surveyed rated "physician fees" as a major driver of healthcare costs.

The physicians' perspective on this issue may be colored by the fact that Medicare and private insurers have been putting downward pressure on physician reimbursement for years. It has been projected that physicians receive or control 87 percent of all spending on personal health in the United States (see Health Costs Absorb One Quarter of Economic Growth, Boston University School of Public Health, Feb. 9, 2005). As noted above, it is physicians who admit patients to the hospital, order tests, perform procedures and drive many of the healthcare decisions that result in direct and indirect healthcare spending. However, direct payments to physicians comprise only about 13 percent of all Medicare

spending (see Physician Services Payment System, MedPac, 2009, www.medpac.gov) and some 22 percent of all healthcare spending (www.cms.gov/statistics-data-and-systems/statistics-trends-and-reports/ NationalHealthExpendData). These factors may contribute to the perception among physicians that doctor fees are not a key cause of accelerated healthcare spending.

Physicians identified an "aging population" as the second most important cost driver in healthcare. On average, older patients visit the physician three times as often per year as younger patients, as the chart below illustrates. Starting in 2011, some 75 million Baby Boomers began turning 65, becoming eligible for Medicare at a rate of one every eight seconds. Physicians will soon be expected to treat millions of additional Medicare patients, many of whom will require comparatively more physician time than younger patients.

| Average Annual Physician Visits by Age | |
|---|---|
| 66 and older | 6.0 |
| 46–65 | 5.4 |
| 36–45 | 3.5 |
| 25–35 | 2.2 |
| 16–24 | 1.5 |
| 0–15 | 2.0 |
| Per population | 3.0 |

*Source: National Ambulatory Medical Care Survey/Center for Disease Control*

"Cost of pharmaceuticals," "advances in technology/treatment," and "social conditions" also were ranked by physicians as major drivers of healthcare costs.

Physicians were asked how they rate various factors as solutions to the health system's cost and access challenges. "Less government regulation" was rated as the most positive solution to cost and access challenges, followed by "evidence-based medicine" and "widespread adoption of health savings accounts." The high ranking given evidence-based medicine suggests many physicians would be in favor of more uniform treatment protocols if they are based on clinical evidence. Physicians have historically objected to treatment protocols imposed by third party payers for what they perceive as cost-related reasons.

"Increase the supply of physicians" was rated as the fourth most positive solution to health system cost and access challenges. This finding suggests that many physicians recognize that there is a shortage of doctors and, rather than opposing an increase in the number of physicians as a potential competitive threat, would welcome an increase.

Over one-third of physicians (36.3 percent) rated a "single payer/Canadian style system" as a "somewhat positive" or "very positive" solution to cost and access challenges, indicating physicians are not uniformly opposed to the single-payer model. However, a greater number (48.2 percent) rated a Canadian style system as a "somewhat negative" or "very negative" solution.



Employed physicians are more likely to be positive about a single payer system than are practice owners, while primary care physicians are more likely to be positive about a single payer system than are specialists (see chart below). Somewhat surprisingly, the survey suggests that many older physicians, who it may be inferred are generally not in favor of change, are slightly more inclined to feel positively about a single payer system than are younger doctors, while female physicians are considerably more likely to feel positively about a single payer system than are male physicians.

**Canadian/Single Payer System**

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Somewhat/very positive | 35.6% | 36.5% | 33.8% | 42.6% | 42.4% | 29.5% | 44% | 32.8% |

Only 10.4 percent of physicians rated "widespread adoption of ACOs" as a positive solution to cost and access challenges, the lowest ranking besides "more government regulation." This finding further underlines the lack of confidence many physicians have in the ACO model, which many policy makers and health professionals project as a key to cost reduction.

PART III – CONCLUSION

Health reform is driving changes to the healthcare system that are designed to reduce costs and enhance quality. Part III of the survey indicates that physicians generally are not optimistic about the emerging delivery models promoted by reform, such as ACOs and medical homes, yet feel powerless to affect change themselves. The success of ACOs and medical homes will largely depend on active physician acceptance and cooperation. Physicians participating in these models will be expected to significantly restructure how they practice and to accept new methods of performance evaluation and reimbursement. That the majority of physicians do not view ACOs and medical homes favorably, or do not understand their structure or purpose, underscores the as yet uncertain future of these models.

38

| PART FOUR | PRACTICE PATTERNS AND METRICS |
|---|---|

Part IV of the survey provides national benchmark data concerning various physician practice patterns and metrics, including hours worked per week, number of patients seen, payer mix, income trends and related factors. Comparisons are made to the physician survey The Physicians Foundation conducted in 2008 where appropriate.

## 1 ON AVERAGE, HOW MANY HOURS DO YOU WORK PER WEEK?

| | 2012 | 2008 |
|---|---|---|
| 0–20 | 4% | 3.3% |
| 21–30 | 4.5% | 4% |
| 31–40 | 12.2% | 11% |
| 41–50 | 21.9% | 18.13% |
| 51–60 | 26.1% | 25.3% |
| 61–70 | 15.3% | 15.7% |
| 71–80 | 9.9% | 12.7% |
| 81–90 | 3.9% | 5.1% |
| 91 – 100 | 1.6% | 2.4% |
| 101 or more | 0.6% | 2.1% |

## 2 OF THESE, HOW MANY HOURS DO YOU WORK EACH WEEK ON NON–CLINICAL (PAPERWORK) DUTIES ONLY?

| | 2012 | 2008 |
|---|---|---|
| 0–10 | 58.0% | 39.8% |
| 11–20 | 26.1% | 34.8% |
| 21–30 | 9.3% | 14.9% |
| 31–40 | 3.7% | 6.7% |
| 41–50 | 1.5% | 2.6% |
| 51–60 | 0.9% | 0.8% |
| 61 or more | 0.5% | 0.4% |

39

3 | ON AVERAGE, HOW MANY PATIENTS DO YOU SEE PER DAY?

|       | 2012  | 2008  |
|-------|-------|-------|
| 0–10  | 19.5% | 7.4%  |
| 11–20 | 39.8% | 31.7% |
| 21–30 | 26.8% | 41.3% |
| 31–40 | 8.1%  | 13.7% |
| 41–50 | 2.6%  | 3.7%  |
| 51–60 | 0.8%  | 1.0%  |
| 61    | 2.4%  | 1.2%  |

4 | WHICH OF THE FOLLOWING BEST DESCRIBES YOUR CURRENT PRACTICE?

|                                                    | 2012  | 2008   |
|----------------------------------------------------|-------|--------|
| I am overextended and overworked                   | 22.6% | 31.37% |
| I am at full capacity                              | 52.8% | 44.92% |
| I have time to see more patients and assume more duties | 24.6% | 23.71% |

5 | HAVE TIME OR COST CONSTRAINTS COMPELLED YOU TO CLOSE YOUR PRACTICE TO MEDICARE OR MEDICAID PATIENTS?

|                             | 2012  | 2008  |
|-----------------------------|-------|-------|
| Yes, Medicare               | 8.6%  | 6.2 % |
| Yes, Medicaid               | 26.7% | 17.8% |
| No, I have not closed to either | 64.7% | 76.0% |

40

6   ESTIMATE THE AMOUNT OF UNCOMPENSATED CARE YOU PERSONALLY (NOT YOUR ENTIRE GROUP) PROVIDE IN THE COURSE OF A YEAR:

|                     | 2012  | 2008  |
|---------------------|-------|-------|
| $0–$5000            | 14.6% | 6.3%  |
| $5001 – $15,000     | 10.6% | 13.2% |
| $15,001 – $25,000   | 12.6% | 15.7% |
| $25,001 – $35,000   | 6.5%  | 11.2% |
| $35,001 – $50,000   | 16.4% | 14.0% |
| $50,001 o r more    | 39.3% | 39.6% |

7   WHAT PERCENT OF YOUR PATIENTS ARE:

| Medicare    | 31.0% |
|-------------|-------|
| Medicaid    | 17.9% |
| Private pay | 29.7% |
| Indigent    | 8.0%  |
| TriCare     | 4.0%  |
| Other       | 9.4%  |

8   DESCRIBE YOUR INCOME FROM THE PRACTICE OF MEDICINE OVER THE LAST THREE YEARS:

|            | 2012  | 2008  |
|------------|-------|-------|
| Flat       | 39.7% | 44.1% |
| Declining  | 46.7% | 40.1% |
| Increasing | 13.6% | 15.8% |

41

**9** AS A RESULT OF THE ONGOING PROBLEMS WITH MEDICARE FEE SCHEDULE UPDATES, WHAT ACTION HAVE YOU TAKEN OR ARE YOU PLANNING TO TAKE? (CHECK ALL THAT APPLY)

| | |
|---|---|
| Place new or additional limits on Medicare acceptance | 22.9% |
| Accept no new Medicare patients | 12.6% |
| Terminate existing Medicare patients | 2.8% |
| Change status to non-participating | 6.8% |
| Formally opt out of Medicare | 6.9% |
| Place new or additional limits on Medicaid acceptance | 22.2% |
| Reduce the amount of charity care I deliver | 22.0% |
| Increase standard fees charged to other patients | 15.5% |
| Delay information technology implementation | 15.9% |
| Renegotiate or terminate some commercial health plan contracts | 17.7% |
| Reduce staff compensation or benefits | 27.0% |

**10** IF MEDICARE FEES DECREASE BY 10 PERCENT OR MORE, WHAT ACTIONS WILL YOU TAKE? (CHECK ALL THAT APPLY)

| | 2012 | 2008 |
|---|---|---|
| Place new or additional limits on Medicare acceptance | 28.3% | N/A |
| Accept no new Medicare patients | 25.9% | 13.7% |
| Terminate existing Medicare patients | 9.5% | N/A |
| Change status to non-participating | 11.6% | N/A |
| Formally opt out of Medicare | 14.0% | N/A |
| Place new or additional limits on Medicaid acceptance | 21.3% | N/A |
| Reduce the amount of charity care I deliver | 22.3% | 15.0% |
| Increase standard fees charged to other patients | 17.8% | N/A |
| Delay information technology implementation | 15.1% | N/A |
| Renegotiate or terminate some commercial health plan contracts | 16.5% | N/A |
| Reduce staff compensation or benefits | 26.5% | N/A |

**11** HAS YOUR PRACTICE IMPLEMENTED ELECTRONIC MEDICAL RECORDS?

| Yes | 69.5% |
|-----|-------|
| No  | 30.5% |

**12** IF YES, WHAT EFFECT HAS EMR HAD ON THE QUALITY OF PATIENT CARE IN YOUR PRACTICE?

| | |
|---|---|
| No effect | 12.9% |
| Has improved quality of care | 32.9% |
| Not yet improved quality, but I anticipate it will | 13.4% |
| Has not improved quality, and I do not anticipate it will | 18.5% |
| May improve quality, but not worth the investment | 7.9% |
| Decreased quality, but I anticipate it eventually will improve quality | 4.0% |
| Decreased quality and I do not anticipate it will improve quality | 10.4% |

**13** IF YOU HAVE NOT IMPLEMENTED EMR, WHY NOT?

| | 2012 | 2008* |
|---|------|-------|
| No time to install EMR | 19.3% | 61.0% |
| Do not have the money to install EMR | 33.6% | 77.0% |
| Do not have the personnel to install EMR | 20.2% | 68.0% |
| Do not have the resources/expertise to install EMR | 26.9% | 69.0% |

*Question posed differently in 2008*

**14** DO YOU HAVE SIGNIFICANT CONCERNS THAT EMR POSES A RISK TO PATIENT PRIVACY?

| Yes | 47.4% |
|-----|-------|
| No  | 52.6% |

43

## PART IV: PRACTICE PATTERNS AND METRICS: ANALYSIS AND OBSERVATIONS

How physicians practice – the number of patients they see, the hours they work, the type of insurance they accept -- has a direct impact on patient access to medical services. Part IV of the survey indicates that the majority of physicians have reached the point where they are unable or unwilling to see more patients and may be obliged to reduce access to certain types of patients, a sobering development in light of the growing physician shortage.

### HOURS AND PATIENTS SEEN

The majority of physicians surveyed (79.3 percent) work full-time schedules of 41 hours a week or more, while the remaining 20.7 percent work 40 hours a week or less. This represents an increase in the number of physicians working less than full schedules relative to 2008, when 18.4 percent of physicians surveyed worked 40 hours or fewer.

It is widely perceived that female physicians work fewer hours per week than male physicians, that employed physicians work fewer hours than independent physicians who own their practices, that younger physicians work fewer hours than older physicians, and that specialists work fewer hours per week than primary care physicians. The survey appears to confirm some of these perceptions, but contradicts others (see chart below).

**Less Than 40 Hours Per Week**

| < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|
| 14.9% | 21.8% | 17.9% | 27.4% | 20.1% | 18.4% | 22.6% | 19.9% |

Over 27 percent of female physicians work 40 hours a week or less, compared to 17.9 percent of male physicians, confirming the perception that more female physicians work less than full time schedules than do male physicians. Over 20 percent of employed physicians work 40 hours a week or less, compared to 18.4 percent of practice owners, numbers that also confirm the general perception that employed physicians are more likely to work part-time schedules than are practice owners.

However, less than 15 percent of physicians age 40 or younger said they work 40 hours or fewer a week, compared to 21.8 percent of physicians 41 or older. This contradicts a commonly held perception that younger physicians are more likely to work part-time schedules than are older physicians. Close to 23 percent of primary care physicians work 40 hours a week or fewer, compared to 19.9 percent of specialists. This contradicts the perception that specialists, who often have relatively controllable schedules, are more likely to work less than 40 hour weeks than are primary care physicians. However, these numbers may be affected by the fact that female physicians, who worker fewer hours than male physicians, are concentrated in primary care

The chart below indicates the average number of hours worked per week by various physician groups.

**Average Hours Per Week**

| < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|
| 56.3 | 52.2 | 53.7 | 50.7 | 53.1 | 54.1 | 51.1 | 53.9 |

44

As these numbers indicate, specialists work 5 percent more hours than do primary care physicians, male physicians work 6 percent more hours than do female physicians, younger doctors work 7.8 percent more hours than older physicians and practice owners work 2 percent more hours than do employed physicians.

The survey suggests fewer physicians today are working the extremely long hours often associated with private practice than did in 2008. In the 2012 survey, only 16 percent of physicians reported working 71 hours a week or more, while in 2008 over 22 percent of physicians said they worked 71 one hours or more a week.

On average, physicians surveyed in 2012 work an average of 52.93 hours per week, down from an average of 56.93 hours in 2008, a decline of 5.9 percent (see chart below).

|  | 2012 | 2008 | Decline |
|---|---|---|---|
| Average Hours Per Week | 52.93 | 56.93 | 5.9 |

However, the survey also indicates the number of hours physicians spend on non-clinical (i.e., paperwork) duties have decreased relative to 2008. In 2008, some 40 percent of physicians said they spent 10 hours a week or less on non-clinical paperwork, while 60 percent said they spent 11 hours or more a week on non-clinical duties. In 2012, by contrast, 58 percent of physicians said they spent 10 hours or fewer on non-clinical paperwork, while 42 percent said they spent 11 hours or more.

On average, physicians in 2012 reported they spent 12.01 hours a week on non-clinical duties, or 22.6 percent of their total working hours. In 2008, by contrast physicians said they spent 15.19 hours a week on non-clinical paperwork, or 26 percent of their total working hours. Comparatively less administrative paperwork is one of the presumed characteristics of employed medical practice and is a reason many physicians are embracing the employed model. It could be inferred that a general decrease in the average non-clinical hours worked per week by physicians may be attributable to the increased number of doctors working as employees. However, the survey does not bear this out, as the chart below indicates.

|  | Employed Physicians | Practice Owners |
|---|---|---|
| Hours on Non-Clinical Paperwork Per Week | 12.66 | 11.01 |

The survey indicates that employed physicians spend an average of 14.96 percent more hours per week on non-clinical paperwork than do practice owners. The reason for this is not clear, though it may be conjectured that the comparatively large, bureaucratic organizations that typically employ physicians generate even more paperwork for doctors than do the smaller practices in which practice owners typically work.

## PATIENTS PER DAY

Physicians in the 2012 survey reported seeing fewer patients per day on average than those surveyed by The Physicians Foundation in 2008. Over 59 percent of physicians in 2012 said they see 20 patients or fewer per day in 2012, up from 39.11 percent in 2008. The average number of patients seen per day by physicians in 2012 was 20.01, down from 23.43 in 2008, a decline of 16.6%.

| | 2012 | 2008 | Decline |
|---|---|---|---|
| Average Patients Seen Per day | 20.10 | 23.43 | 16.6% |

It is widely presumed that employed physicians, who are on fixed salaries, are not as motivated to see numerous patients as are independent physicians, whose incomes may be more directly tied to their patient volumes. Most employed physicians are provided with production bonuses that allow them to increase their incomes by meeting metrics that often are tied to patient volume (see Merritt Hawkins 2012 Review of Physician Recruiting Incentives). Nevertheless, the survey confirms that practice owners see significantly more patients per day than do employed physicians (see chart below).

**Average Patients Seen Per Day**

| < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|
| 19 | 19.8 | 20.4 | 17.6 | 18.1 | 21.9 | 19.2 | 19.8 |

As these numbers indicate, employed physicians see 17.35 percent fewer patients per day than do practice owners. Female physicians see 13.7 percent fewer patients than do male physicians, primary care physicians see 3.0 percent fewer patients than do specialists, and physicians 40 or younger see 4.04 percent fewer patients per day than do patients 41 or older. Interestingly, while the survey suggests that younger physicians work relatively more hours per week than older physicians, older physicians see relatively more patients per day.

## ACCESS AND INCOMES

Though they are working fewer hours and are seeing fewer patients per day relative to 2008 , the majority of physicians (75.4 percent) surveyed in 2012 said they are either "overextended and overworked" or are "at full capacity." Only 24.6 percent said they "have time to see more patients and assume more duties."

Physicians were asked to describe income in their practices over the last three years. Over 86 percent described their income as "flat or declining," while only 13.6 percent described their income as "increasing." Through Medicare reimbursement increases referenced above, and because of their enhanced role in medical homes and ACOs for which they are supposed to be rewarded, it may be inferred that incomes for primary care physicians are increasing. By contrast, due to continuing cuts to their reimbursement, it may be inferred that incomes for specialist physicians are decreasing.

The numbers in the chart below confirm that more primary care physicians indicated they have seen income increases over the last three years than have specialists, though the majority of both groups said their incomes were flat or declined. If incomes for primary care physicians are increasing, the survey suggests most primary care physicians have not yet noticed. As referenced above, many physicians are seeking employment in the expectation of a secure salary. The numbers below suggest that considerably more practice owners experienced income declines in the last three years than did employed physicians, confirming to some degree the perception that employment offers physicians a measure of economic security. Nevertheless, even the great majority of employed physicians indicated their incomes were flat or declined over the last three years.

46



Income Flat or Declining

|  | < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|---|---|---|---|---|---|---|---|---|
| Increasing | 22.6% | 11.9% | 12.7% | 16.3% | 17.6% | 10.5% | 19.0% | 11% |
| Flat | 46.7% | 38.5% | 38.5% | 43.8% | 48.5% | 31.2% | 44.3% | 37.6% |
| Declining | 30.7% | 49.6% | 48.8% | 39.9% | 33.9% | 58.3% | 36.7% | 51.4% |

As a result of time and cost constraints, some physicians have had to close their practices to Medicare or Medicaid patients. Over one-third of physicians (35.3 percent) surveyed in 2012 have closed their practices to either Medicare or Medicaid patients, up from 24 percent in 2008, a 47% increase (see chart below).

|  | 2012 | 2008 | Increase |
|---|---|---|---|
| Closed Practice to Medicare/Medicaid | 35.3% | 24% | 47% |

Of the 35.3 percent of physicians above, 8.6 percent have closed their practices to Medicare patients, up from 6.2 percent in 2008, while 26.7 percent of physicians have closed their practices to Medicaid patients, up from 17.8 percent in 2008. Many physicians feel compelled to close their practices to Medicare and Medicaid patients because these payers often reimburse at rates less than the physician's cost of providing care.

Physicians were asked what actions they have taken or plan to take in response to problems with Medicare fee schedule updates. Fifty-two percent of physicians said they have or will take one or more steps that would limit the access Medicare patients have to their practices. These steps include "placing new or additional limits on Medicare acceptance," (22.9 percent), "accepting no new Medicare patients," (12.6 percent), "terminating existing Medicare patients," (2.8 percent), "changing their Medicare status to non-participating," (6.8 percent) or "formally opting out of Medicare" (6.9 percent).

Should Medicare fees decrease by ten percent or more, 89.3 percent of physicians said they will take one or more of the steps listed above.

47

Physicians surveyed indicated a reduction in Medicare fees also would affect the non-Medicare patients they see in their practices. Charity care and Medicaid patients would be particularly affected. Over 22 percent of physicians said they would "reduce the amount of charity care" they can deliver and 21 percent said they would "place new or additional limits on Medicaid patients." The ripple effect would extend to non-patients, as 26.5 percent of physicians said Medicare cuts would cause them to "reduce staff compensation or benefits."

Most physicians provide care for which they are not compensated, either because physicians elect not to submit an invoice for charitable reasons, because the patient could not or would not pay, or because reimbursement was denied by third party payers. Over 62 percent of physicians surveyed in 2012 estimated they provide $25,000 or more in uncompensated care in the course of a year, a number similar to that reported by physicians surveyed in 2008. In 2012, physicians reported they provided an average of $36,445 in uncompensated care per year, down from $37,698 in 2008, a decline of 3.3 percent. The survey suggests that as physician income remains flat or declines, physicians already may be reducing the amount of charity care they provide.

## THE EFFECT ON THE PHYSICIAN WORKFORCE

That physicians are working relatively fewer hours, seeing relatively fewer patients, and are limiting access to their practices supports the inference of the JAMA study referenced in Part II above that physicians are recalibrating how they approach medical practice in response to changes to the practice environment.

These changes in physician practice patterns have profound implications for the future of the physician workforce. Should the average number of hours physicians work per week drop by 5.9 percent over the next four years, as they did over the last four years, **44,250 physician FTEs would be lost from the workforce** (assuming a total workforce of 750,000 physicians). Should 100,000 physicians transition from practice owner to employed status over the next four years, the survey indicates they will see over **91 million fewer patients per year.** As the medical profession becomes majority female, tens of thousands of additional FTEs will be lost. This will occur at a time when the population is both growing and aging, and when access to healthcare insurance is likely to be expanded, further fueling demand for physician services.

## ELECTRONIC MEDICAL RECORDS

Emerging delivery models that are encouraged by health reform, such as ACOs and medical homes, are predicated to a large degree on the adoption by physicians of electronic medical records (EMR). EMR implementation is necessary in order to achieve greater alignment, coordination, and communication between primary care physicians, specialists, hospitals and others involved in patient care. Through the economic stimulus, money was allocated for physicians and hospitals to implement EMR provided they are "meaningful users" of these information technology systems.

Over 69 percent of physicians surveyed indicated they have implemented EMR into their practices. However, those who have done so are divided over the potential effects of EMR on the quality of patient care they can provide.

Over 46 percent of those who have implemented EMR indicated their system has either already improved quality of care in their practices or they anticipate that it will. An additional four percent indicated that EMR has decreased quality in their practices, but they anticipate it eventually will improve quality. However, over 31 percent said EMR has either had no effect on quality or has not improved quality of care in their practices and they do not anticipate that it will. Over ten percent said EMR has decreased quality

48

in their practices and they do not anticipate it will increase quality, while 7.9 percent said EMR may improve quality but will not be worth the investment.

The survey suggests there is a significant gap between older and younger physician attitudes toward EMR. Close to 63 percent of physicians 39 or younger expressed optimism about the ability of EMR to improve quality of care, compared to 47.5 percent of physicians 40 or older. Primary care physicians expressed more optimism about EMR than did specialists, employed physicians expressed more optimism than did practice owners, and female physicians expressed more optimism than did male physicians (see chart below).

**EMR Has/Will Improve Quality (Physicians Who Have Implemented EMR Only)**

| < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|------|------|------|--------|----------|-------|-----|-------------|
| 62.8% | 47.5% | 47.4% | 58.8% | 57.3% | 40.9% | 59.2% | 45.9% |

In addition to concerns about quality, many physicians have reservations about EMR and patient privacy. Electronic medical records are envisioned as secure systems which will not reveal sensitive patient health information to hackers, commercial interests, or others with no right to it. Nevertheless, over 47 percent of physicians surveyed said they have "significant concerns" that EMR poses a risk to patient privacy.

In the same pattern observed above, younger physicians are less likely to be concerned about EMR and patient privacy than are older physicians, primary care physicians are less likely to be concerned than specialists, employed physicians less likely to be concerned than practice owners and female physicians are less likely to be concerned than male physicians.

**Concerned EMR is a Significant Risk To Privacy**

| < 40 | 40 > | Male | Female | Employed | Owner | PC | Specialists |
|------|------|------|--------|----------|-------|-----|-------------|
| 25% | 51.5% | 48.9% | 41.9% | 39.4% | 55% | 42.9% | 49.6% |

Of those physicians who have not implemented EMR, the majority (58 percent) cited lack of money as the principal reason, though time constraints, lack of expertise and lack of personnel also were cited as factors.

PART IV – CONCLUSION

The majority of physicians surveyed in 2012 reported that they are either at capacity or are overworked and overextended, suggesting there is little potential extra capacity in today's physician workforce. Practice style changes that physicians are adopting in response to today's medical practice environment could further strain the physician workforce, as physicians cut back on hours worked and patients seen while restricting access to their practices to certain types of patients, Medicaid and Medicare patients in particular. While the majority of physicians have implemented electronic medical records, close to half of those who have done so question the effect EMR will have on quality of care in their practices and close to half of all respondents have significant concerns about the effect EMR may have on patient privacy.

49

| PART FIVE | IN THEIR OWN WORDS |
| --- | --- |

Part V of the survey includes written comments by physicians conveying their thoughts about the current state of the medical profession. Close to 8,000 of the 13,600 physicians who responded to the survey elected to include written comments after providing answers to 47 previous questions, underscoring the passion many physicians feel about the direction of their profession.

Some selected comments are provided below reflecting the general tone and content of many of the comments received.

## PHYSICIAN SURVEY 2012: PHYSICIAN COMMENTS

Physicians were asked to respond to the question: "What would you say to policy makers and the public regarding the current state of the medical profession?" Following is a small sample of the 8,000 written comments received, including statements reflecting physician concerns, physician recommendations for change, and physician opinions regarding EMR.

## PHYSICIANS: IN THEIR OWN WORDS

*1. The state of the medical profession today is a disaster. With all of the regulation and documentation required of physicians and nurses, less and less time is spent with the patients. The patients are literally dying to have their questions and concerns answered by their doctor. I believe that there is a need for a universal system to cover only the basics. This would include immunizations, catastrophic disease (cancer, trauma, etc.). Everything else should be privatized.*

*2. There is a shortage of primary care physicians currently. This will be even more acutely be felt if too much is asked for them to do as far as regulation is concerned. A majority of them are close to retirement and will just leave if more is expected of them that has little to do with actual patient care. The current trend to increase the regulations will push more of them into retirement.*

*3. Leave us alone. There was a time when I gave 20% of my time to indigent patients. Now I can't afford to see anybody without being paid. There was a time when drug companies happily supplied me with free samples for my patients who could not afford their products. That too is gone. Politicians do not and cannot understand medical practice. They need to keep their noses out.*

*4. It is still a very honorable profession that takes a lot of smarts, skills, and patience to be truly good at, and it needs to be respected as such.*

*5. I recently quit my job at a local mental health center where I served as the main geriatric psychiatrist. I was sick of dealing with Medicare part D plan formularies and prior authorizations, sick of being told how to practice, sick of being told I had only 15 minutes to see patients, and sick of being lumped in with "mental health" or "behavioral health" organizations" where I was treated like a counselor. I am now full time in my private practice. I see anyone and everyone. Some of my patients can't pay at all. I make A LOT less money. I am quickly burning out on private insurance formularies, being reimbursed the exact same*

50

*amount as someone who graduated last week, being told by insurance companies how much I will get paid and that my patients aren't allowed to make up the difference and having to fill out pages and pages of useless paperwork to BEG for visits with my patients or to use a medication that I have carefully thought out and think will help my patients. If it were not for the intellectual stimulation of psychiatry and the reward of seeing patients lives completely change when someone finally puts them on the right medication, I would walk out.*

*6. I was told once by a healthcare administrator, and have heard this "mantra" from several more: "Healthcare would be a great business if it weren't for patients and doctors...who keep interfering with the business." With the influx of non-health-care-MBA administrators into the role of managing and lording over the actual Healthcare providers who are providing the quality of care; and physicians, for the most part, being shut out, ignored or silenced regarding decision on healthcare policy and other associated issues and the fact that physicians do not get the importance of advocating for themselves, their patients and profession, the focus of healthcare has sadly and dramatically changed: It no longer is patient care or the quality of care that is important. It is all about the money. Alarmingly individuals who actually take care of patients have taken a "second seat" to MBAs whom are more concerned about their individual salaries.*

*7. I'm getting out ASAP.*

*8. Individual physicians need more autonomy less regulation. We could reduce costs if not obligated by and threatened by malpractice suits; various legislations and insurance limitations.*

*9. It has turned from a noble profession into a business where physicians are traded.*

*10. Medicine died. As long as we are not physicians but "healthcare providers" and there are no patients but "healthcare consumers," the situation will not get any better. As long as people with no medical training are dictating how we should practice medicine, none of us will get proper care. As long as people do not understand that you cannot put a price on a person's life and you cannot expect to make money out of sick people, the system will continue to deteriorate.*

*11. Our medical system has continued to erode in many ways over the past 20 years. Physicians are no longer doctors but "providers" Patients are no longer patients but "customers". If I had to do it all over again I would have gone to business school and be running some insurance scam-er, company and get my 6 figure salary with a BIG bonus. You can't tell me that anyone of those CEO's ever lost sleep at night because they had a patient in the ICU incubated with septic shock, cardiogenic shock after coding 3 times and still alive. What's that worth?*

*12. The profession has turned from a noble career into a business where entities use the brains of physicians to get rich quick!*

*13. Number one; over-involvement of government in medical practice: I no longer can order tests, establish a plan or prescribe medications without some approval or authorization from an unaccountable referral person or insurance/Medicare/Medicaid rep.*

*14. We are not training our replacements adequately. Clinical contact time with patients (by residents) has shrunk to nearly nothing. The residents don't know how to do a physical exam, they are not learning to think clinically, and are spending 80% plus of their "clinical" dealing with slow clunky computers, in the role of "Data Entry" clerks.*

*15. We are in the process of ruining the profession. Medicine is not a shift work job - it is a profession (even a calling, for some) of great importance to all of society. It is very discouraging that the best are being kept from learning and/or doing their best because of ill-conceived outside intervention (of many different sorts); the current situation is very, very sad.*

51

*16. I wish policy makers could spend a month in my office before they make the major mistakes they continue to make concerning healthcare initiatives. It would be a real eye opener. Unfortunately, no one seems to be interested in what the doctors are going thru, just what it costs.*

*17. We have basically developed a system that spends more money and time on the third party, rather than the physician and the patient.*

*18. Chronic diseases contribute to 70% of the healthcare costs in this country, and the obesity epidemic will continue to fuel this escalating problem. It is the elephant in the room that everyone is trying to ignore. Why???*

*19. Physicians train into their 30s, exit school and residency in hundreds of thousands of dollars in debt, and manage our most precious commodity...our health. They deserve to be reimbursed as the professionals that they truly are. It is truly demeaning to read a newspaper article about a football player who has received a multi-million dollar contract for 2-3 years of play, but a physician is considered overpaid if they generate an income of $200,000.*

*20. In the past 5 years, the best clinicians I know have sought non-clinical positions. I am worried for the profession.*

*21. Medical care should be between doctor and patient. Any time a third party gets involved, be it the government or private insurance, it compromises patient care.*

*22. Everybody can't have everything for nothing.*

*23. Have the government get out of our business, allow us to practice the skills we have learned because we really know what's best for the patients, not a non-healthcare provider at the end of the telephone.*

*24. In the end it is one doctor and one nurse caring for one patient so to the extent possible third parties should be kept out of patient care decisions.*

*25. Primary-care providers work hardest, have the most unrealistic expectations placed on them, are paid a fraction of what specialists earn... and diminishing numbers of graduates are choosing primary care. Look into which of these components could be changed, because Medical Home and ACO depend upon enough PCPs.*

*26. As long as profit is a major factor motivator of any group involved in the process of healthcare, the patient will always be second. We need to do better, by removing as much as possible the effect of profit on healthcare.*

*27. As long as trial attorneys continue to rampantly impinge on our ability to care for patients, we have no reason for optimism.*

*28. Physicians continue to enjoy treating patients, however, we still run a small business and find it increasingly difficult to make ends meet, which decreases our employees' salaries and benefits and decreases physicians' willingness to provide indigent care.*

*29. Doctors and patient should make the decisions - not the government, not the hospital, not the insurance company, not the medical societies or state board regulators.*

*30. Why are insurance companies allowed to make medical decisions? They recommend to patients changes in medication / treatments. They discern whether or not patients should receive certain therapies (ex: physical therapy). They are not trained, licensed, nor insured to provide these services.*

52

*So why are they allowed to continue to make medical decisions and foster medical care? This is what I do for a living. This is my training. This is why patients seeme and not the insurance representative.*

*31. The system is broken because we failed. We turned against each other instead of uniting together.*

*32. As government and insurance company interference became more dominant the patient/physician relationship deteriorated. Care is not better, it is much worse. As further intrusion into the patient/physician relationship occurs it will become much worse. Almost all physicians I know abhor the present system. It pits physicians against patient all because of money.*

*33. Thirty years from now it will be hard to recruit bright young people to the medical profession.*

*34. A big problem, ignored by our federal leaders, is the cost of medical education. Students finish with a high burden of debt. These students cannot be expected to pay back their loans comfortably if Congress continues to influence decreased reimbursements to physicians for the admirable job they do every day. If a student leaves med school with six figures of debt they expect a six figure salary. If physicians are expected to earn less than their education is going to have to be subsidized; there is no other way. Such a change will have to be gradual and supported by all state governments. Interestingly, no one in congress gripes about how much bankers and lawyers make each year; whose lives are they saving?*

*35. A healthcare system can be sustainable or comprehensive, but not both. It is time to try for sustainable.*

*36. A house of cards-very wobbly! I will say goodbye ASAP.*

*37. A major problem is the replacement of Internal Medicine physicians by mid-level staff (PA's and ARNP's). I believe this will be the final downfall of our profession.*

*38. A mechanic makes $80-$100 an hour. A physician makes less money but has lots of student loan debts, has to pay so many licenses, etc.*

*39. A mess and getting worse with too much regulations.*

*40. A once honorable, hard working profession is being assassinated by insurance inefficiency, federal mandates and a lack of voice.*

*41. A once personally rewarding profession, now with too many frustrating bureaucratic and legal entities placing roadblocks to cost effective care and enjoyment in a difficult job. The continued expansion of medical care options and requirements (choices in management) placed against time and economic constraints often adds to complexity but with less emotional and monetary reimbursement. Personal and family sacrifices are no longer worth the fading positive things once appreciated by both the MD and community.*

*42. Too many professionals have taken advantage of healthcare and use the pain, disease and suffering of others to make a profit (i.e. pharmaceutical companies, insurance companies, hospital administrators, lawyers). I think the best single thing that could help the state of medicine and health is to remove the money from medicine. I cannot, and will not come to, understanding how a health insurance executive can make millions of dollars, when a compassionate and competent Family Medicine doctor and his staff cannot keep their clinic open to take of care patients. Medicine has been hijacked by greed and profits. It was never intended to be a business, and cannot be looked at as one.*

*43. Access to healthcare is a major issue in our country. We need to find a way to incentivize providers of primary care. Without enough quality primary care providers, healthcare in this country will continue to suffer.*

53

*44. I see the future of Primary Care is in the hands of the NPs and PAs with a few general internists.*

*45. Quality is going to suffer because administrators run medicine, not the physicians. The administrators tell us how many patients we should see, what tests we can order, how much we will get paid. No one is looking out for the patients.*

*46. Actually, within one year I will probably close my practice. The local, state, and federal mandates and regulations have overwhelmed my ability to continue as a small businessman. I love being a doctor and I really don't know what I'll do next.*

*47. I look forward to a day when providing healthcare is more about patients being served by their doctors and other providers and less about bureaucracy and large corporations making money for their shareholders.*

*48. Administrative overhead & regulation is ruining the practice.*

*49. The multi-billion cost of insurance company overhead and the cost to physicians of billing and finding ways to game the insurance-based system is crushing.*

*50. I would like to be able to practice medicine and provide the best care for my patients without even knowing who the payer is or how payment would be made. In today's environment, that is impossible. What is best for the patient is always dependent on who the payer is.*

*51. After 12 years of training, it is ridiculous to be following protocols, which increase cost and do not change my care. I have lost much autonomy and feel like I'm just documenting what has occurred while I was on shift.*

*52. I worry every day about taking more (yes, I said more) personal loans out just to keep my practice going. Then why am I still doing this you ask? There really is no reward for continuing to practice other than knowing in my heart that I am doing a good job and patients are benefitting.*

*53. The government and insurance industry is pushing the medical profession further and further away from the committed solo practitioner. I understand the economics behind this but it is not good for the future of medicine. The "art" of being a physician will be lost and all we will have left is a few Norman Rockwell paintings.*

*54. My life has been destroyed, and as a consequence my happiness, patriotism, and professionalism have all been permanently damaged.*

*55. All aspects of American medical care are in decline and Americans will suffer for it. No matter the spin, there is no free meal-- you get what you pay for. Less qualified people are entering and practicing medicine and care will be provided by second tier providers and imported medical providers.*

*56. All doctors want to do is to practice medicine in peace.*

*57. Medicine is a noble profession but we are treated like slaves.*

*58. All laws and regulations are well intended; but, they serve to limit access to healthcare.*

*59. "Doctors are rich" is the false perception. No one jumps up and down to pay my $300,000 student loan. How about all the sacrifice I made? I wasn't blessed with a brilliant mind or a silver spoon. I had to work very hard, foregone many many sleepless nights, seen my children 3-4 times per year while away in med school and residency. Isn't all the sacrifice worth something? Shouldn't I be compensated somewhat? Yes, I am bitter.*

54

60. *All predictions of restrictions of patient care will come to fruition if the government takes over healthcare. This was predicted when Medicare came into being. The future is written. There is no hope.*

61. *The day will come when the practice of medicine will have no more appeal than digging ditches with an overseer standing over with a whip.*

62. *All the smart kids are not choosing medicine as a career.*

63. *We have a two tier medical care system--one for the rich and another for the poor. It is very sad.*

64. *Although I am fortunate enough to have the best possible profession, I would not recommend going into medicine to become a physician to anyone considering it. Why should we continue to place ourselves in great financial and personal risk in the absence of any foreseeable tort reform, the prospect of working more hours for less reward and giving up our personal lives as well? It is a tough sell to any but the most passionate.*

65. *Although I continue to enjoy the personal relationships that make medicine a rewarding profession for me, I am very concerned about the future of medicine. I am discouraged by the amount of documentation, paperwork, and data entry now required of physicians. The amount of time left for my patients is shrinking daily!*

66. *Although I still love clinical practice of medicine and relating with patients, I hate what medicine is becoming and the distain the government has for the profession that I do not know how long I can continue. I see it only getting worst.*

67. *Am not sure why any intelligent student would decide at the present time to pursue a career in Medicine. I am truly concerned about the quality of physician I will have as I age.*

68. *American medicine is being destroyed as we know it and will continue to decline.*

69. *American medicine is in decline despite significant advances in technology and expertise. We will not be able to afford the quality of care we are capable of producing.*

70. *American medicine lacks vigorous leadership in protecting medical care from a continuing assault by the federal and state government. As a result, we will see a decline in care, fewer physicians in practice, and the expanded use of non-physicians to deliver medical services. I never dreamed that this is where we would be in 2012.*

71. *American physicians of the future are going to be very different from those now in practice. Future doctors will consider medicine to be a job, not a profession. They will be employed by large organizations, keep regular hours, and leave at quitting time, whether or not a patient is in need of care. Because it is so expensive to get a medical education, compared with limited potential lifetime earnings, very few highly talented people will choose medicine, and instead will opt for business or law. These changes are partially in effect at this time, and will steadily worsen as baby boomers retire. As a result, the average intelligence of practicing doctors will decline, care will not be excellent, and research and innovation will slow to a crawl.*

72. *An increasing proportion of young doctors feel constrained by their occupation choice simply due to the level of debt they accrue for their training.*

73. *Care is a word that is used a lot, but actually there's little caring provided anymore with the evolving structure of what medicine is becoming. The Doctor- patient relationship is one of the most sacred relationships there is. From all sides, this is being eroded- under siege from external forces and mandates. What are we doing to medicine?*

55

*74. Approximately 50% of the costs of delivering medical care to people in America result from conditions that people knowingly cause to themselves. So why should we doctors (and hospitals, and insurance companies, and Medicare/Social Security) be blamed for these increasing costs...and why don't we even hear the barest/faintest hint of a whisper about accountable patients? When will personal responsibility, and appropriate rationing of care, both of which are very reasonable cost-controlling-influences, (possibly reducing expenditures by 50%), be introduced into the national debate? I believe we all must confront greedy patient-behaviors and demands, and introduce patient responsibility into the public and policy- making debates about the state of our national medical care system.*

*75. Are you kidding? It is abysmal and getting worse by the minute.*

*76. I see my future pay reducing substantially with what is going on in Washington today. If that occurs, I will leave medicine. I do not see, for the years of training required, liability, hours per week, etc that, given the future loss of physician compensation, there will be enough young, bright individuals interested in medicine.*

*77. As a heart surgeon who trains surgeons, I am very worried about the quality of trainees today because of reducing payments, reducing prestige, taking care of sicker patients and expecting better results, time commitment to training. In the past only the most talented and brightest became heart surgeons, now almost anyone can be. Quality will erode, malpractice will increase and there will be less access to even average quality of care.*

*78. As a minority physician from a poor family, I have worked very hard to be where I am. I was an excellent student and chief resident. I am considered an excellent physician. However, I regret choosing medicine. Today, I am heavily in debt (student loans), and don't own a house. Every day is constant struggle in my solo practice. I no longer believe in the American Dream. My friends that did not peruse higher education are very happy, without debt, and are doing better than I am.*

*79. I'm very discouraged about the state of the medical profession. Our educational costs are increasing each year meaning most of us start out with a significant amount of debt and our compensation keeps decreasing.*

*80. As a physician, I feel that society has broken the social contract expected for the training and service that I have received. While willing to perform the work, physicians have been continually devalued from every angle: Reimbursement declines, midlevel provider encroachment, insurance intrusion, and consumerism and government oversight have all led to a negative impact on clinical practice. The result has been a demoralizing experience. Sadly, no matter what actually occurs in the discussion of healthcare, is that physicians in clinical practice are left powerless to effectively work together and create a group impact that should shape and mold healthcare.*

*81. As a psychiatrist, I am subjected to all sorts of inspection and regulation by state and federal inspection teams in my practice in county community mental health(as an employee), and in my small private practice for one locked skilled nursing facility and one nursing home. The system has become dysfunctional and berserk. I am told what to do by inspectors, and I have no power whatsoever, to provide any feedback. The people inspecting me have no education or understanding at my level. All they have is political and authoritative and fiscal power. I consider them thugs. They have recently put me in a position where I have to fraudulently sign informed consent documents on each patient for psychotropic and med changes. I consider this and other issues a very deep and longstanding corruption of our government. There seems nothing I can do about this. I feel victimized and without any ability to retort, or change anything.*

*82. As a result of the increased demands placed on doctors today coupled with decreased compensation, the healthcare system in America is being eroded. America once had the best healthcare system, but it is now over regulated to the point that physicians make very little decisions.*

56

83. *As a young new doctor, I have only begun to earn a living at age 33. I have school loans equivalent to a first home mortgage and unless I work myself to death seeing volumes of (Medicare) patients (i.e. 25 per day due to pathetic reimbursement for my mental energy), I cannot even send my 4 year old to summer camp and I tell my wife to skip the fresh fruit this week.*

84. *As Americans we deserve better. We spend a lot of money on healthcare but do not get our money's worth; despite paying the most for healthcare of any country in the world we do not have the best outcomes in many areas. We have structured a system that focuses on doing as much as possible but not the best possible. We pay for tests and procedures but not physicians that help patients get healthy and stay healthy.*

85. *No other professional in the USA is mandated to provide services without being paid for it.*

86. *As doctor's incomes fall, fewer bright people will go in to the profession and quality will decline.*

87. *As government gets more involved in medicine and threatens cuts, especially Medicare, more and more physicians are saying goodbye to medicine. The result will be poorer healthcare, by far, a few years from now. Thankfully, I will be out of it, but will have to suffer as a consumer with the consequences of this short-sided reaction.*

88. *While we prioritize profit over the patient, we cannot make improvements in this country's healthcare. While we allow insurance companies to deny claims and reject the sickest patients so that they can pay more to their shareholders, we cannot say that we are serving our community. We need radical change.*

89. *As Physicians, we all are on your side. It is now and has always been our goal to improve the quality of medical care we deliver when you need it but also to guide you in a healthier lifestyle so that you and your families need fewer and fewer of our services. We want to you to be healthy, happy, successful, active people and will do what we can to help lead you to a healthier life. We are not the enemy.*

90. *Ask the practitioners where the problems are. The people making the rules do not understand the issues. We can tell you where the waste is. We can tell you the problems. Just ask. It feels like no one cares what the physicians think.*

91. *Should a "time machine" cast me back to 1957 (graduation from college) I have no idea what I would do to make a living. But, it would not be medicine.*

92. *During the week, I have to start around 6am and I don't finish until well after 7pm. I feel like all I do is work. I would never do this again. It's too much work and sacrifices from the get go with medical school and residency, plus a tremendous financial investment. I gave up the best years of my life and now I'm on an endless treadmill. This is depressing.*

93. *As a Medicaid provider, I yearly have to send back several thousand dollars to Medicaid Administrators because they "did a survey" and decided they had "overpaid" me. Either I pay them back between ten and twenty thousand dollars a year, or "they will do a full audit" instead of a "remote audit". Since they can arbitrarily decide how much they "overpaid", can you imagine what a "full audit" would produce? I have never been told how they arrived at the "overpaid" figure.*

94. *Restore the patient-physician relationship by removing the government as middleman. Reduce mandates to insurance companies so that policies tailored to the individual are possible. Insurance should not be through an employer, but rather between the insurance company and the insured, as in the case of home and auto insurance. "Routine maintenance" should not be part of health insurance; no more than oil changes or tire rotation is for auto insurance; that would make health insurance more affordable.*

95. *Free market or single payer, not in between.*

*96. PUSH FOR MEDICAL SAVINGS ACCOUNTS FOR MOST AND A SAFETY NET FOR THE NEEDY!*

*97. The younger generation feels that medical care is an entitlement. They should be made to pay for their care. There are so many who waste the resources of the ER's by going there for a headache that normal people would just take an aspirin for and go on but, because, of defensive medicine, the ER docs are forced to do an unnecessary expensive work-up because of all the lawyers out there and no tort reform.*

*98. "Reforming" medicine by having physicians employed by large hospital systems is NOT THE ANSWER. "Reforming" payment by paying large hospital systems rather than directly paying physicians for health services provided will be a huge error.*

*99. Make people responsible for much of the cost of their own health and illness. Increase the use of Osteopathic concepts of nutrition, exercise, hands on OMT, and self-directed healthcare.*

*100. Fix the Medicare system by flushing out corrupt practitioners and corrupt insurance companies. Stop the bureaucrats at the insurance companies and HMO from interfering with patient care.*

*101. Socialized medicine with a fair salary for physicians and mid-levels as in Great Britain. Optional supplementary insurance for those who can afford it to allow private hospitals to provide an upgrade in amenities, not better care. If meaningful use of the EMR was an expectation, why wasn't one basic platform decided upon that all EMR vendors had to use so that each program could interface with all others? What you have now is government spending (in the form of reimbursements) for multiple systems that in many cases don't even communicate with the local lab, radiology facility or hospital. Prior data just repopulates itself over and over and is often incorrect. Important data doesn't necessarily push forward. But the taxpayers are funding this with the mantra that the EMR is going to save millions of dollars. Not in my lifetime.*

*102. Federally fund EMTALA (with monies received from violations) If federal law mandates all-comers be seen in the ER, provide the remuneration to see those who are not legal and do not pay. Implement tort reform. Lawyers bringing frivolous lawsuits must suffer consequences for wasting our time that should be spent with patients, not in court. Allow insurance companies free market competition across state lines. Require those writing healthcare policy to have taken the Hippocratic oath!*

*103. Increase the patient's control of their own care - and their responsibility for their choices! Put cap on malpractice awards. Decrease liability costs for healthcare providers, employers and faith based/ charitable organizations that donate 10% or more to charity. Eliminate "retroactive" regulations. Eliminate government regulation of insurance coverage at the federal level. Reduce the cost of medical education or offer more scholarship/grant support/ loan forgiveness for physicians working in lower income areas and poorly represented subspecialties. Eliminate quotas in medical student selection based on gender, ethnicity.*

*104. Run medical liability and work comp in all states like work comp is run in Indiana and you will save 90% of your current expenditures: end the welfare system for lawyers.*

*105. The main drivers of healthcare costs are the fragmented, self-interested, commercial insurers; the technology & pharmaceutical industries; and the costs of defensive medicine. I recommend UNIVERSAL, SINGLE-PAYER, and NATIONAL HEALTHCARE. It presents the ethical solution, including all of us under the same big umbrella.*

*106. Make obesity, alcohol and cigarette use additional costs to insure - so patients would be more likely to take responsibility for their own health.*

*107. Any healthcare reform MUST include tort reform. Period.*

*108. Tort Reform. Tort Reform. Tort Reform!! (Tort Reform).*

58

*109. Put all doctors on salary. This would instantly solve the overutilization problem.*

.....................................................................................................................................

*110. Applying free-market principles to health insurance (e.g., allowing insurance companies to compete for policy holders across state boundaries) will reduce costs and improve quality - this invariably occurs in every industry that is required to compete.*

.....................................................................................................................................

*111. Create a Basic Health System for ALL (including alien immigrants which are absorbed into citizenship and pay appropriate taxes):*
*a. which is self-sustaining to maintain a healthy educational and work force; probably governed by the CDC.*
*b. paid for with appropriate taxation (such as basic education, basic police and fire departments).*
*c. uses generic drugs and devices*

.....................................................................................................................................

*112. Fix liability issues. Best would be a European type system of loser pays. This should NOT be the patient; they do not have the resources.*

.....................................................................................................................................

*113. All insurance companies and HMOs should be abolished. National healthcare, as in England, France, Germany, Australia, etc should be implemented. Two levels of care, a basic coverage, and a higher level based on family income, should be available, as in Australia (where both patients and doctors are quite happy with the system).*

.....................................................................................................................................

*114. Health insurance should be modeled after car insurance: not for routine maintenance health insurance companies should be treated as utilities: private companies with strict oversight and regulation.*

.....................................................................................................................................

*115. 30% of medical costs go to insurance companies; almost any not-for-profit entity could parse healthcare cheaper and perhaps more fairly. I think a government, or other one-payer, system could make healthcare more rational and fair.*

.....................................................................................................................................

*116. A single payer government system will be a catastrophe. Just look at the efficiency and productivity of the US Postal service compared to UPS or Fed-Ex. Also, the brightest minds will no longer seek medicine as a profession if this type of system is mandated. Most physicians want autonomy, not complete government control.*

.....................................................................................................................................

*117. A single payer system is the only answer to the problem of the uninsured and the rising cost of care. Eliminating the middle man (insurers) eliminates approximately 30% of the cost of US medical care. Allowing the government to negotiate drug prices for the whole country should also lower drug prices and the eventual total cost of care for the country.*

.....................................................................................................................................

*118. A single payer system or Nationalized/mandatory insurance programs will hurt the medical care provided in the United States.*

.....................................................................................................................................

*119. The medical profession has become a business. The doctor-patient professional relationship is faltering and respect for physicians has declined. No one respects the fact that physicians spend the best years of their lives in school and training only to arrive at the doctor's degree in debt for more money than the cost of a home and car. Patients think that searching Web MD is as good as going to medical school. Doctor's want to make up for their debt by getting high paying jobs, plus the cost of malpractice insurance is more than the yearly salary for the average American worker. The cost of medications and technology is phenomenal. Patients want convenience and feel everything is an emergency and it is their right to free care thus crowding the hospital emergency rooms. It is a difficult job to have right now and it is going to take a tremendous effort to correct all the problems existing in the system as it is*

.....................................................................................................................................

*120. A single payer system would help alleviate many of the burdens our patients face when trying to obtain healthcare. As a collective society, how can we fail to see how the health of our nation and its citizens is important to economics and our overall wellbeing? More education needs to be geared to the*

59

*public about health, its economic effects and when to actually seek out health professionals. Many patients fail to take responsibility for their health, or the costs of their care.*

*121. A single payer health system is the worst possible solution to our current healthcare crisis.*

*122. Abolish Obamacare as soon as possible. Stop all the mandates from Washington i.e. EHR requirements and allow the physician to practice good medicine. Need tort reform for improvement of liability issues.*

*123. We need to have some system where the patient knows the cost of their care up front. No hidden fees and threats of bankruptcy after they have been treated. Hospitals are running up costs because no one knows what anything costs, not the doctors, patients, nurses or lab people. I think that we should get paid for each thing that we do, but just reduce the amount for each item. For instance, why should physicians do the work and then have Medicare tell us after the fact that they don't think we should get paid for that? You can't get away with that at the supermarket.*

*124. Adopt the Canadian or British systems. Simply tax citizens a nominal fee for the anticipated premiums LESS the grossly exaggerated mark-up in price the current Healthcare administrators are obviously charging, implement the current Medicare system for everyone WITHOUT donut holes/ restrictions/pre-existing illness exclusions/and pre-authorizations for medications the physician recommends, and implement real tort reform. Let the trial lawyers and current healthcare executives and pharmaceutical giants understand that they have financially ruined the small businesses simply for their own selfish profiteering and let Congress know they are in dereliction of duty by accepting campaign financing from these groups.*

*125. Affordable Health Act [ OmabaCare ] will prove to be a great plus to lower and middle class families. Just as Social security and Medicare / MediAid have greatly improved the lives of most Americans.*

*126. Al government employees without exception should participate in the same quality medical plan. This includes the President of the United States, his family, and everyone down the chain including all politicians from Congress, representatives, delegates, the Supreme Court, the armed services in all its variety and disciplines, the Veterans Administration, and all branches of government without exception; etc. There should be no differentiation. Now that would be fair .. and boy would 'they' fix the system fast. Unfortunately Congress makes its own rules...like insider trading was illegal for everybody - except Congress - until it became public knowledge.*

*127. All physicians should be on salary. No physician should earn more than twice what any other physician earns. There should be loan forgiveness for those practicing primary care. These simple changes would solve many of the problems we face today.*

*128. Allow the patient and physician relationship to evolve in an environment of trust. Implement TORT reform and remove the government from the examination room.*

*129. America has the best medicine in the world. Leave it to doctors and the patients. You will see wonderful results.*

*130. Everyone needs to take a hard look at pricing. Why do things cost what they do? Can negotiating better pricing (like prescription drugs) lower costs overall? Why do hospitals charge what they do? There should be a set price for all at any given facility and there should be transparency of those costs. Having different discounts available to differing health plans is cumbersome and unfair to patients. Also, why should medicine be for profit? A shareholder should not profit from a cancer patient's premiums.*

*131. Medical care & medical decisions should be made by physicians & other medical persons, not lawyers, not insurance companies, not prescription plans, and not politicians. It may not be as "cost-efficient" but it allows innovation when appropriate, and patients & providers were much happier.*

60

132. *Adequate basic medical care should be available to all not just to those fortunate enough to have insurance. The US needs to look at systems of healthcare which work in other countries and stop fooling ourselves that we have the best medical system in the world which is not true for the majority though it may be for a few. Physicians also need to educate themselves on what works in other countries and stop scaremongering and complaining. We are a profession who are highly regarded in the community and in general have interesting, worthwhile jobs. We change people's lives every day and are able to contribute positively in ways that others never can. I deal with many indigent and underprivileged patients - I learn from them and do my best to help them. Every day is a new challenge and I feel privileged go be able to work in this great profession*

133. *Admit that healthcare is expensive. Admit that everyone needs healthcare. Admit that healthcare is failing because the first two statements have not been accepted and dealt with appropriately. Admit that 50% of healthcare expenses occur in the last 6 months of life and deal with that appropriately too. Admit that private insurance companies have become a significant barrier to good healthcare and that not everyone can afford healthcare. Deal with all these realities and maybe the system will evolve in a meaningful, comprehensive, positive fashion.*

134. *All people need access to healthcare and we need to get a handle on poverty, obesity, and violence.*

135. *At a time of wonderful strides in knowledge, we are spending less time in listening to patients and in addressing their concerns. The best thing about private practice used to be having a doctor in your corner against the world. Increasing costs coupled with electronic medical records have tripled the amount of time it takes to help a patient, granted that we have a better looking record of it. Current medical record software is designed for billing rather than efficient patient care, and is starting to make it impossible to figure out what is happening because of the sheer bulk of megabytes. Quality improvement efforts are confined to that which can be measured, and often consists of checking off boxes in patient charts. Organized medicine, even the subspecialty groups, has been afraid to protest the banality of these efforts. I have loved my life in medicine, but finishing my chart notes at ten PM every night before supper is making it a lot easier to consider retirement.*

136. *"I'm from the Government and I'm here to help you." Despite the hopes of many that this could be true, it is not. The idea that physicians can see more patients in less time and not decrease the quality of healthcare is not true. The idea that changing paperwork performed by medical office staff into computer work performed by physicians will improve the quality of healthcare is not true unless fewer patients are seen by each physician in a day.*

137. *EMR is biggest waste of time and money. Until all doctors are on the SAME electronic network it's a complete waste of time and money. There are so many different EMRs that are NOT compatible with one another. This is how government gets it all wrong. Make EMRS compatible with one another. Doctors' fees are NOT the problem. Insurance companies are printing money. They are monstrous in how they deal with patients and doctors. Do not let insurance companies dictate what is usual and customary. Respect the Fairhealth settlement. Government is naive and refuses to wade into the problems and simply cherry picks the easy issues like doctor fees as a problem when it's not remotely close. We are losing the best and the brightest and this will continue. The sacrifice to be a doctor is too long and hard to compromise a doctor's ability to own a home, put his kids through college and maybe go on a vacation or two.*

138. *1) The value of the clinicians' experience and intuition is being grossly underestimated.*
*2) The value of EMR is being grossly overestimated.*
*3) The billions of dollars being allocated to developing EMR will not improve quality of medical care, and it will not increase access to medical care.*
*4) The overhead costs of insurance industry and government interventions are enormous and grossly underestimated. These costs will eventually "break the back" of American taxpayers, and will result in reduction of quality and/or availability of medical care, for the majority of Americans.*

61

*139. Have a company like Apple to make a Standardized User friendly EMR.*

..............................................................................................................................................

*140. Electronic charts are a scam. Computers are good for collecting black & white information (e.g. billing & data). There still are no studies demonstrating quality or costs improvements simply by using a computer(evidence based rating D).*

..............................................................................................................................................

*141. Stop the mandatory institution of electronic medical records. They simply do not work for certain specialties (such as my own, dermatology.) In addition, this is going to hasten the retirement of many excellent clinicians who simply do not want to deal with this nonsense.*

..............................................................................................................................................

*142. EMRs are a scam and need a serious study to determine if they can meet the goals that are highly touted. The cost is formidable for a small office and cannot be recouped. EMRs will increase errors, increase utilization, decrease communication, lower the quality of patient care and ultimately be a moderate disaster.*

..............................................................................................................................................

*143. EMR is time consuming and is less effective than just jotting important notes into a paper chart. I spend less time listening to, and examining the patient as opposed to charting in the EMR. In the emergency room all of the physicians spend their time in a dark room charting on the EMR than they do with the patients. Most of their time is spent documenting the time needed to submit a level 5 consult as opposed to actually earning it.*

..............................................................................................................................................

*144. Benefits of an EMR are overstated. There is much potential, but no system I have seen approaches this. This is a sad commentary considering the powerful programs used in other businesses. Support for EMRs is poor and the systems do not seem to have been designed with any significant physician input.*

..............................................................................................................................................

*145. I am a sole practitioner with one full time nurse and one part-time employee. It would be a significant financial hardship (actually, financial impossibility) for me to begin using electronic prescriptions and /or EMR. Not only the equipment and software costs, I simply do not have the revenue to hire someone nor the time to enter patient data, demographics, etc into a system of that kind nor the revenues to hire an IT person to manage and maintain it.*

..............................................................................................................................................

*146. A national EMR (inclusive of all specialties) should have been developed before implementation of multiple disparate systems.*

..............................................................................................................................................

*147. EMR is useful for research and patient info access but a pain for docs to input data at the expense of patient care time.*

..............................................................................................................................................

*148. EMR will NOT SAVE MONEY because it is an efficiency killer in clinic, and because the systems do not talk to each other.*

..............................................................................................................................................

*149. We are inundated with so many rules, seeing a patient is a chore rather than a pleasure. My patient numbers have been cut by 20% due to paper regulations and EMR has made it worse. I have been on EMR for 8 years and it is not new to me. We focus more on the paperwork than the patient. This is due to regulation and not due to a true desire to establish good relationships.*

..............................................................................................................................................

*150. In order to do more with less resources, please simplify. I cannot afford a 15 minute phone call to pre-approve a commonly used medicine or extensive paperwork to obtain a wheelchair for a crippled Medicare patient. Please seek medical input from folks that actually see patients daily before adding to the administrative load*

| PART SIX | ADDENDUM: SURVEY RESPONSES BY AGE, GENDER, EMPLOYED/PRACTICE OWNER AND PRIMARY CARE/SPECIALTIES |
|---|---|

The Addendum includes responses to the survey aggregated by age, gender, employed status vs. private practice owner, and primary care physicians vs. all other physicians. Comparisons are made within these groups and to all survey respondents.

## PART I: RESPONSES BY AGE – PHYSICIANS YOUNGER THAN 40 COMPARED TO 40 AND OLDER AND TO ALL RESPONDENTS

### 1  WHAT IS YOUR MEDICAL SPECIALTY?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Family Physician | 13.8% | 14.2% | 14.2% |
| General Internal Medicine | 10.5% | 10.9% | 11.3% |
| Pediatrics | 13.7% | 8.9% | 9.3% |
| Total | 38.0% | 34.0% | 34.8% |
| Surgical/Medical/Other | | | |
| Surgical Specialty | 11.9% | 14.3% | 13.6% |
| Medical Specialty | 13.2% | 12.0% | 12.2% |
| Ob/Gyn | 4.3% | 6.6% | 6.2% |
| General Surgery | 2.9% | 4.6% | 4 .4% |
| Other | 29.6% | 28.5% | 28.8% |
| Total | 61.9% | 66.0% | 65.2% |

### 2  WHAT IS YOUR CURRENT PROFESSIONAL STATUS?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Employed by hospital, group or other entity | 62% | 40.2% | 43.7% |
| Practice owner/partner/associate | 28.8% | 52.3% | 48.5% |
| Other | 9.2% | 7.5% | 7.8% |

63

## 3  WHAT IS YOUR GENDER?

|        | < 40  | 40 >  | All Respondents |
|--------|-------|-------|-----------------|
| Male   | 60.1% | 76.2% | 73.6%           |
| Female | 39.9% | 23.8% | 26.4%           |

## 4  IN WHAT SIZE COMMUNITY DO YOU PRACTICE?

|                      | < 40  | 40 >  | All Respondents |
|----------------------|-------|-------|-----------------|
| 50,000 or less       | 13.1% | 19.3% | 18.3%           |
| 50,001 to 100,000    | 13.6% | 16.0% | 15.5%           |
| 100,001 to 250,000   | 17.6% | 16.2% | 16.4%           |
| 250,001 to 500,000   | 17.1% | 15.6% | 15.8%           |
| 500,001 to 1 million | 13.6% | 11.1% | 11.5%           |
| 1 million or more    | 25.1% | 21.9% | 22.5%           |

## 5  ARE YOU A MEMBER OF YOUR:

|                                 | < 40  | 40 >  | All Respondents |
|---------------------------------|-------|-------|-----------------|
| County medical society          | 32.9% | 53.9% | 50.1%           |
| State medical society           | 58.6% | 65.2% | 63.6%           |
| National special society        | 71.8% | 70.8% | 70.4%           |
| American Medical Association     | 25.5% | 24.6% | 24.5%           |
| American Osteopathic Association | 4.1%  | 5.3%  | 5.2%            |

## 6  WHAT IS YOUR ETHNICITY?

|                        | < 40  | 40 >  | All Respondents |
|------------------------|-------|-------|-----------------|
| African-American       | 3.5%  | 1.5%  | 1.9%            |
| Asian/Pacific Islander | 14.5% | 6.3%  | 7.5%            |
| Caucasian              | 73.1% | 86.8% | 84.7%           |
| Hispanic               | 5.9%  | 3.8%  | 4.1%            |
| Native American        | 0.1%  | 0.1%  | 0 .1%           |
| Other                  | 2.9%  | 1.5%  | 1.7%            |

7 WHICH BEST DESCRIBES YOUR FEELINGS ABOUT THE CURRENT STATE OF THE MEDICAL PROFESSION?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Very positive | 3.5%% | 4% | 3.9% |
| Somewhat positive | 37.1% | 26.1% | 27.9% |
| Somewhat negative | 43.5% | 45.1% | 44.8% |
| Very negative | 15.9% | 24.8% | 23.4% |

8 WHICH BEST DESCRIBES HOW YOU FEEL ABOUT THE FUTURE OF THE MEDICAL PROFESSION?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Very positive/optimistic | 2.4% | 3.2% | 3.1% |
| Somewhat positive/optimistic | 24.2% | 18.8% | 19.5% |
| Somewhat negative/pessimistic | 47.3% | 45.5% | 45.9% |
| Very negative/pessimistic | 26.1% | 32.5% | 31.5% |

9 HOW WOULD YOU RATE THE PROFESSIONAL MORALE OF PHYSICIANS YOU KNOW?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Very positive | 2.6% | 1.6% | 1.8% |
| Somewhat positive | 25.4% | 16.2% | 17.7% |
| Somewhat negative | 55.5% | 56.0% | 55.9% |
| Very negative | 16.6% | 26.3% | 24.7% |

10 HOW WOULD YOU RATE YOUR OWN PROFESSIONAL MORALE?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Very positive | 11.9% | 10.8% | 11% |
| Somewhat positive | 42% | 28.6% | 30.7% |
| Somewhat negative | 35.2% | 42.1% | 41% |
| Very negative | 10.9% | 18.5% | 17.3% |

65

**11** | SOME PHYSICIANS BELIEVE THAT THE MEDICAL PROFESSION IS IN DECLINE. DO YOU:

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Mostly agree | 35.3% | 42.9% | 41.6% |
| Somewhat agree | 48.5% | 41.4% | 42.6% |
| Somewhat disagree | 11.6% | 8.0% | 8.6% |
| Mostly disagree | 4.6% | 7.7% | 7.2% |

**12** | IF YOU MOSTLY OR SOMEWHAT AGREE, WHY IS THE PROFESSION IN DECLINE?

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | < 40 | All | 40 > | All | 40 < | All |
| Too much regulation/paperwork | 77.6% | 79.2% | 20.6% | 19.3% | 1.8% | 1.5% |
| Loss of clinical autonomy | 56.6% | 64.6% | 37.2% | 31% | 6.1% | 4.5% |
| Erosion of physician/patient relationship | 46.4% | 54.4% | 42.2% | 37.8% | 11.4% | 7.8% |
| Scope of practice encroachment | 37.8% | 43.7% | 45% | 40.6% | 17.2% | 15.7% |
| Too many part-time doctors | 4.5% | 6.8 % | 17% | 22.6% | 78.6% | 70.5% |
| Money trumps patient care | 41.7% | 45.9% | 41.5% | 40.1% | 16.8% | 14% |
| Physicians not compensated for quality | 59.3% | 58.6% | 32.8% | 33.7% | 7.9% | 7.7% |

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | 40 > | All | 40 > | All | 40 > | All |
| Too much regulation/paperwork | 79.5% | 79.2% | 19.1% | 19.4% | 1.4% | 1.5% |
| Loss of clinical autonomy | 66.0% | 64.5% | 29.8% | 31% | 4.2% | 4.5% |
| Erosion of physician/patient relationship | 55.9% | 54.4% | 36.9% | 37.7% | 7.2% | 7.8% |
| Scope of practice encroachment | 44.6% | 43.7% | 39.7% | 40.6% | 15.5% | 15.7% |
| Too many part-time doctors | 7.4% | 6.9% | 23.6% | 22.6% | 69% | 70.5% |
| Money trumps patient care | 46.7% | 45.9% | 39.8% | 40.1% | 13.5% | 14% |
| Physicians not compensated for quality | 58.4% | 58.6% | 34% | 33.7% | 7.6% | 7.7% |

66

## 13  TWO YEARS AGO, WHICH BEST DESCRIBED YOUR ATTITUDE TOWARD MEDICAL PRACTICE?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 19.8% | 13.1% | 14.1% |
| Somewhat positive/satisfying | 59.4% | 50.6% | 52.1% |
| Somewhat negative/unsatisfying | 19% | 32.2% | 30.1% |
| Very negative/unsatisfying | 1.8% | 4.1% | 3.7% |

## 14  WHICH BEST DESCRIBES YOUR ATTITUDE TOWARD MEDICAL PRACTICE TODAY?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 7.2% | 7.4% | 7.3% |
| Somewhat positive/satisfying | 41.8% | 29.6% | 31.7% |
| Somewhat negative/unsatisfying | 38.1% | 41.9% | 41.2% |
| Very negative/unsatisfying | 12.9% | 21.1% | 19.8% |

## 15  IF YOU HAD YOUR CAREER TO DO OVER, WOULD YOU CHOOSE TO BE A PHYSICIAN?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Yes | 65.1% | 66.7% | 66.5% |
| No | 34.9% | 33.3% | 33.5% |

## 16  WOULD YOU RECOMMEND MEDICINE AS A CAREER TO YOUR CHILDREN OR OTHER YOUNG PEOPLE?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Yes | 41.4% | 42.2% | 42.1% |
| No | 58.6% | 57.8% | 57.9% |

## 17  IF YOU HAD THE ABILITY, WOULD YOU RETIRE TODAY?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Yes | 46.9% | 63% | 60.6% |
| No | 53.1% | 37% | 39.4% |

67



**18** WHAT TWO FACTORS DO YOU FIND MOST SATISFYING ABOUT MEDICAL PRACTICE?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Patient relationships | 75.2% | 81.9% | 80.2% |
| Prestige of medicine | 12.3% | 9.5% | 10.0% |
| Intellectual stimulation | 69.7% | 70.4% | 69.7% |
| Interaction with colleagues | 21.4% | 18.9% | 19.2% |
| Financial rewards | 14.8% | 11.3% | 11.7% |

**19** WHAT TWO FACTORS DO YOU FIND LEAST SATISFYING ABOUT MEDICAL PRACTICE?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Long hours/lack of personal time | 31.6% | 23.9% | 24.9% |
| Liability/defensive medicine pressures | 52.0% | 38.5% | 40.3% |
| Reimbursement issues | 27.6% | 27.5% | 27.3% |
| Lack of clinical autonomy | 6.0% | 9.8% | 9.2% |
| Dealing with Medicare/Medicaid/government regulations | 22.9% | 28.6% | 27.4% |
| Pressure of running a practice | 2.8% | 6.2% | 5.6% |
| Non-clinical paperwork | 20.8% | 17.8% | 18.1% |
| Uncertainty/changes of health reform | 21.5% | 21.6% | 21.5% |
| Managed care | 5.2% | 8.0% | 7.6% |
| EMR implementation | 3.8% | 10.4% | 9.2% |
| Other | 4.4% | 5.3% | 5.1% |

20  IN THE NEXT ONE TO THREE YEARS, DO YOU PLAN TO (CHECK ALL THAT APPLY):

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Continue as I am | 56.6% | 49.1% | 49.8% |
| Cut back on hours | 14.7% | 25.5% | 22.0% |
| Retire | 0.6% | 15.7% | 13.4% |
| Switch to a cash/concierge practice | 7.5% | 6.8% | 6.8% |
| Relocate to another practice/community | 22.5% | 8.9% | 10.9% |
| Cut back on patients seen | 6.5% | 10.2% | 9.6% |
| Seek a non-clinical job within healthcare | 11.0% | 9.8% | 9.9% |
| Seek employment with a hospital | 7.8% | 5.2% | 5.6% |
| Work part-time | 4.6% | 6.9% | 6.5% |
| Close my practice to new patients | 2.6% | 4.3% | 4.0% |
| Seek job/business unrelated to healthcare | 8.2% | 6.3% | 6.4% |
| Work locum tenens | 5.8% | 6.7% | 6.4% |
| Other | 4.8% | 5.7% | 5.5% |

21  HOW HAS PASSAGE OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT (PPACA/HEALTH REFORM) AFFECTED YOUR FEELINGS ABOUT THE DIRECTION AND FUTURE OF HEALTHCARE IN AMERICA?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| I am more positive | 18.7% | 18.4% | 18.5% |
| I am less positive | 53.7% | 60.4% | 59.3% |
| My feelings have not changed | 27.6% | 21.2% | 22.2% |

22  MOST PHYSICIANS TODAY ARE FOCUSED ON THEIR DAILY RESPONSIBILITIES AND UNSURE WHERE THE HEALTH SYSTEM WILL BE OR HOW THEY WILL FIT INTO IT THREE TO FIVE YEARS FROM NOW.

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Mostly agree | 50.3% | 56.3% | 55.2% |
| Somewhat agree | 41.6% | 35.4% | 36.5% |
| Somewhat disagree | 6.2% | 5.5% | 5.6% |
| Mostly disagree | 1.9% | 2.8% | 2.7% |

69

23 | PHYSICIANS HAVE LITTLE INFLUENCE ON THE DIRECTION OF HEALTHCARE AND HAVE LITTLE ABILITY TO EFFECT CHANGE.

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Mostly agree | 42.6% | 51.9% | 50.4% |
| Somewhat agree | 35.6% | 30.9% | 31.7% |
| Somewhat disagree | 16.5% | 12% | 12.7% |
| Mostly disagree | 5.3% | 5.2% | 5.2% |

*less than 15 percent of physicians age 40 or younger said they work 40 hours or fewer a week, compared to 21.8 percent of physicians 41 or older. This contradicts a commonly held perception that younger physicians are more likely to work part-time schedules than are older physicians.*

24 | HOSPITAL EMPLOYMENT OF PHYSICIANS IS A POSITIVE TREND LIKELY TO ENHANCE QUALITY OF CARE AND DECREASE COSTS

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Mostly agree | 5.8% | 4.3% | 4.6% |
| Somewhat agree | 27.3% | 18.5% | 19.9% |
| Somewhat disagree | 35.1% | 32.4% | 32.8% |
| Mostly disagree | 31.8% | 44.8% | 42.7% |

25 | HOSPITAL EMPLOYMENT WILL ERODE THE PHYSICIAN/PATIENT RELATIONSHIP AND QUALITY OF CARE.

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Mostly agree | 28.5% | 40.4% | 38.5% |
| Somewhat agree | 35.2% | 32.7% | 33.1% |
| Somewhat disagree | 28.0% | 18.8% | 20.2% |
| Mostly disagree | 8.3% | 8.1% | 8.2% |

70

**26** | IN YOUR OPINION, TO WHAT DEGREE DO THE FOLLOWING FACTORS CONTRIBUTE TO RISING HEALTH COSTS

| | Major Cost Driver | | Moderate Cost Driver | | Minor Cost Driver | |
|---|---|---|---|---|---|---|
| | < 40 | All | < 40 | All | < 40 | All |
| State and federal insurance mandates | 35.7% | 41.6% | 41.2% | 37.6% | 23.1% | 20.8% |
| Defensive medicine | 77.1% | 69.1% | 20.2% | 26.2% | 2.7% | 4.8% |
| Fraud | 20.1% | 18.8% | 36.3% | 35.3% | 43.6% | 45.9% |
| Advances in technology/treatment | 41.1% | 51.2% | 45.7% | 40.1% | 13.2% | 8.7% |
| Limited patient financial obligations | 42.9% | 39% | 41.2% | 44.2% | 15.9% | 16.8% |
| Absence of free markets | 37.1% | 37.2% | 37.4% | 35.6% | 25.5% | 27.2% |
| Cost of pharmaceuticals | 53.7% | 59.1% | 39% | 34.9% | 7.3% | 6% |
| Lack of pricing transparency | 43.4% | 40.5% | 39.7% | 40.5% | 16.9% | 19% |
| Physician fees | 2.7% | 3.8% | 25.6% | 27.9% | 71.7% | 68.3% |
| Price controls on fees and products | 15.4% | 17.9% | 48% | 41.6% | 36.6% | 40.5% |
| Aging population | 61.6% | 64.9% | 31.8% | 29.4% | 6.6% | 5.7% |
| Fee-for-service reimbursement | 13.5% | 12.5% | 39.1% | 35.7% | 47.4% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 42.4% | 43.5% | 39.4% | 40% | 18.2% | 16.5% |
| Relative Value Update Committee/RUC | 14.4% | 17.3% | 52.8% | 47.8% | 32.8% | 34.9% |
| | 40 > | All | 40 > | All | 40 > | All |
| State and federal insurance mandates | 42.6% | 41.6% | 36.9% | 37.6% | 20.5% | 20.9% |
| Defensive medicine | 67.6% | 69.1% | 27.3% | 26.2% | 5.1% | 4.8% |
| Fraud | 18.5% | 18.8% | 35.1% | 35.3% | 46.4% | 45.9% |
| Advances in technology/treatment | 53.3% | 51.2% | 38.9% | 40.1% | 7.8% | 8.7% |
| Limited patient financial obligations | 38.3% | 39% | 44.7% | 44.2% | 17% | 16.8% |
| Absence of free markets | 37.3% | 37.2% | 35.2% | 35.5% | 27.5% | 27.2% |
| Cost of pharmaceuticals | 60.1% | 59.1% | 34.1% | 34.9% | 5.8% | 6% |
| Lack of pricing transparency | 39.9% | 40.5% | 40.7% | 40.6% | 19.4% | 19% |
| Physician fees | 4.0% | 3.8% | 28.2% | 27.9% | 67.8% | 68.3% |
| Price controls on fees and products | 18.3% | 17.9% | 40.4% | 41.6% | 41.3% | 40.5% |
| Aging population | 65.6% | 64.9% | 28.8% | 29.4% | 5.6% | 5.7% |
| Fee-for-service reimbursement | 12.3% | 12.5% | 35.1% | 35.7% | 52.6% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 43.7% | 43.5% | 40.1% | 40% | 16.2% | 16.5% |
| Relative Value Update Committee/RUC | 17.8% | 17.3% | 46.8% | 47.8% | 35.4% | 34.9% |

27  IS YOUR PRACTICE OR EMPLOYER ACTIVELY SEEKING DESIGNATION AS AN ACCOUNTABLE
CARE ORGANIZATION (ACO)?

|       | < 40  | 40 >  | All Respondents |
|-------|-------|-------|-----------------|
| Yes   | 21.8% | 22%   | 21.9%           |
| No    | 26.5% | 47.4% | 44%             |
| Unsure| 51.7% | 30.6% | 34.1%           |



28  WHICH BEST DESCRIBES YOUR FEELINGS ABOUT ACOS?

|                                                      | < 40  | 40 >  | All Respondents |
|------------------------------------------------------|-------|-------|-----------------|
| They are likely to enhance quality/decrease cost     | 10%   | 8.9%  | 9%              |
| Quality/cost gains will not justify organizational cost/effort | 16.7% | 22.8% | 21.8% |
| Unlikely to increase quality/decrease cost           | 31.3% | 42.3% | 40.6%           |
| Unsure about structure or purpose of ACOs            | 42%   | 26%   | 28.6%           |

29  WHICH BEST DESCRIBES YOUR FEELINGS ABOUT MEDICAL HOMES?

|                                                    | < 40  | 40 >  | All Respondents |
|----------------------------------------------------|-------|-------|-----------------|
| They are likely to increase quality/reduce costs   | 29%   | 23.7% | 24.4%           |
| They are unlikely to improve quality/reduce costs  | 30.4% | 38.9% | 37.7%           |
| Unsure about structure/purpose of medical homes    | 40.6% | 37.4% | 37.9%           |

30 HOW WOULD YOU RATE THE FOLLOWING AS SOLUTIONS TO THE HEALTH SYSTEM'S COST AND ACCESS CHALLENGES?

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| | Younger than 40 only | | | | |
| Singlepayer/Canadian style system | 16.6% | 19% | 19.5% | 15.6% | 29.3% |
| Wide spread adoption of ACOs | 2.6% | 8.9% | 50.1% | 21.9% | 16.5% |
| Widespread adoption of medical homes | 9.4% | 19.3% | 46.1% | 15.4% | 9.8% |
| Medicare voucher system | 3.8% | 16.0% | 49.8% | 17.5% | 12.9% |
| Widespread adoption of health savings accounts | 17.6% | 33.0% | 33.7% | 9.7% | 6% |
| Evidence based medicine | 45.2% | 36.8% | 13.7% | 3.0% | 1.3% |
| Reduce the supply of physicians | 2.5% | 4.4% | 19.5% | 25.2% | 48.4% |
| Increase the supply of physicians | 24.2% | 30.3% | 34.0% | 7.4% | 4.1% |
| Electronic medical records | 27.2% | 34.3% | 22.7% | 9.4% | 6.4% |
| More government regulation | 2.7% | 7.7% | 18.3% | 18.6% | 52.7% |
| Less government regulation | 41.4% | 24.8% | 22.9% | 7.5% | 3.4% |

31 ON AVERAGE, HOW MANY HOURS DO YOU WORK PER WEEK?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| 0–20 | 0.8% | 4.6% | 4% |
| 21–30 | 2.3% | 4.9% | 4.5% |
| 31–40 | 11.8% | 12.3% | 12.2% |
| 41–50 | 24.2% | 21.5% | 21.9% |
| 51–60 | 24.0% | 26.4% | 26.1% |
| 61–70 | 15.8% | 15.0% | 15.3% |
| 71–80 | 13.7% | 9.2% | 9.9% |
| 81–90 | 5.1% | 3.8% | 3.9% |
| 91 – 100 | 1.8% | 1.6% | 1.6% |
| 101 or more | 0.5% | 0.7% | 0.6% |

73

32  OF THESE, HOW MANY HOURS DO YOU WORK EACH WEEK ON NON–CLINICAL (PAPERWORK) DUTIES ONLY?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| 0–10 | 56.8% | 58.2% | 58% |
| 11–20 | 25.6% | 26.1% | 26.1% |
| 21–30 | 10.6% | 9.0% | 9.3% |
| 31–40 | 4.4% | 3.5% | 3.7% |
| 41–50 | 1.5% | 1.6% | 1.5% |
| 51–60 | 0.8% | 1.0% | 0.9% |
| 61 or more | 0.3% | 0.6% | 0.5% |

33  ON AVERAGE, HOW MANY PATIENTS DO YOU SEE PER DAY?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| 0–10 | 19.3% | 19.7% | 19.5% |
| 11–20 | 44.3% | 38.8% | 39.8% |
| 21–30 | 23.2% | 27.4% | 26.8% |
| 31–40 | 8.3% | 8.1% | 8.1% |
| 41–50 | 2.3% | 2.7% | 2.6% |
| 51–60 | 0.8% | 0.8% | 0.8% |
| 61 or more | 1.8% | 2.5% | 2.4% |

34  WHICH OF THE FOLLOWING BEST DESCRIBES YOUR CURRENT PRACTICE?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| I am overextended and overworked | 24.5% | 22.3% | 22.7% |
| I am at full capacity | 53.6% | 52.6% | 52.7% |
| I have time to see more patients and assume more duties | 21.9% | 25.1% | 24.6% |

74

35 HAVE TIME OR COST CONSTRAINTS COMPELLED YOU TO CLOSE YOUR PRACTICE TO MEDICARE OR MEDICAID PATIENTS?

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Yes, Medicare | 6% | 9.1% | 8.6% |
| Yes, Medicaid | 17.8% | 28.3% | 26.7% |
| No, I have not closed to either | 76.2% | 62.6% | 64.7% |

36 ESTIMATE THE AMOUNT OF UNCOMPENSATED CARE YOU PERSONALLY (NOT YOUR ENTIRE GROUP) PROVIDE IN THE COURSE OF A YEAR:

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| $0-$5000 | 12.6% | 14.9% | 14.6% |
| $5001 – $15,000 | 9.8% | 10.7% | 10.6% |
| $15,001 – $25,000 | 10.7% | 12.9% | 12.6% |
| $25,001 – $35,000 | 4.5% | 6.8% | 6.5% |
| $35,001 – $50,000 | 17.9% | 16.2% | 16.4% |
| $50,001 o r more | 44.5% | 38.5% | 39.3% |

37 WHAT PERCENT OF YOUR PATIENTS ARE:

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Medicare | 27.7% | 31% | 31% |
| Medicaid | 23.9% | 16.9% | 17.9% |
| Private pay | 27.7% | 29.9% | 29.7% |
| Indigent | 9.7% | 7.7% | 8% |
| TriCare | 5.2% | 3.9% | 4% |
| Other | 5.8% | 10.6% | 9.4% |

75

**38** DESCRIBE YOUR INCOME FROM THE PRACTICE OF MEDICINE OVER THE LAST THREE YEARS

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Flat | 46.7% | 38.5% | 39.7% |
| Declining | 30.7% | 49.6% | 46.7% |
| Increasing | 22.6% | 11.9% | 13.6% |

*it should be noted that physicians 39 or younger are conspicuously less pessimistic about the medical profession and express higher levels of morale than physicians 40 or older.*

**39** AS A RESULT OF THE ONGOING PROBLEMS WITH MEDICARE FEE SCHEDULE UPDATES, WHAT ACTION HAVE YOU TAKEN OR ARE YOU PLANNING TO TAKE? (CHECK ALL THAT APPLY)

|  | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 22.4% | 23.2% | 22.9% |
| Accept no new Medicare patients | 11.4% | 12.9% | 12.6% |
| Terminate existing Medicare patients | 3.1% | 2.8% | 2.8% |
| Change status to non-participating | 5.9% | 7% | 6.8% |
| Formally opt out of Medicare | 5.8% | 7.2% | 6.9% |
| Place new or additional limits on Medicaid acceptance | 20.7% | 22.6% | 22.2% |
| Reduce the amount of charity care I deliver | 22.6% | 22.2% | 22% |
| Increase standard fees charged to other patients | 12.6% | 16.3% | 15.5% |
| Delay information technology implementation | 8.2% | 17.5% | 15.9% |
| Renegotiate or terminate some commercial health plan contracts | 13.8% | 18.7% | 17.7% |
| Reduce staff compensation or benefits | 22.4% | 28.3% | 27% |

76

**40** | IF MEDICARE FEES DECREASE BY 10 PERCENT OR MORE, WHAT ACTIONS WILL YOU TAKE?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 27.4% | 28.8% | 28.3% |
| Accept no new Medicare patients | 24.6% | 26.4% | 25.9% |
| Terminate existing Medicare patients | 10.8% | 9.4% | 9.5% |
| Change status to non–participating | 10.5% | 11.9% | 11.6% |
| Formally opt out of Medicare | 13.8% | 14.2% | 14% |
| Place new or additional limits on Medicaid acceptance | 20.3% | 21.7% | 21.3% |
| Reduce the amount of charity care I deliver | 20.8% | 22.8% | 22.3% |
| Increase standard fees charged to other patients | 15.5% | 18.5% | 17.8% |
| Delay information technology implementation | 9.4% | 16.3% | 15.1% |
| Renegotiate or terminate some commercial health plan contracts | 14.8% | 17.0% | 16.5% |
| Reduce staff compensation or benefits | 22.6% | 27.5% | 26.5% |

**41** | HAS YOUR PRACTICE IMPLEMENTED ELECTRONIC MEDICAL RECORDS?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Yes | 82.5% | 67.2% | 69.5% |
| No | 17.5% | 32.8% | 30.5% |

**42** | IF YES, WHAT EFFECT HAS EMR HAD ON THE QUALITY OF PATIENT CARE IN YOUR PRACTICE?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| No effect | 10.4% | 13.5% | 12.9% |
| Has improved quality of care | 43.8% | 30.5% | 32.9% |
| Not yet improved quality, but I anticipate it will | 15.4% | 13% | 13.4% |
| Has not improved quality, and I do not anticipate it will | 13.4% | 19.6% | 18.5% |
| May improve quality, but not worth the investment | 6.6% | 8.2% | 7.9% |
| Decreased quality, but I anticipate it eventually will improve quality | 3.6% | 4.0% | 4% |
| Decreased quality and I do not anticipate it will improve quality | 6.8% | 11.2% | 10.4% |

77



**43** IF YOU HAVE NOT IMPLEMENTED EMR, WHY NOT? (CHECK ALL THAT APPLY)

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| No time to install EMR | 22.4% | 19.1% | 19.3% |
| Do not have the money to install EMR | 36.4% | 33.3% | 33.6% |
| Do not have the personnel to install EMR | 16.4% | 20.5% | 20.2% |
| Do not have the resources/expertise to install EMR | 24.8% | 27.1% | 26.9% |

**44** DO YOU HAVE SIGNIFICANT CONCERNS THAT EMR POSES A RISK TO PATIENT PRIVACY?

| | < 40 | 40 > | All Respondents |
|---|---|---|---|
| Yes | 25% | 51.5% | 47.4% |
| No | 75% | 48.5% | 52.6% |

78

## PART II: RESPONSES BY EMPLOYED PHYSICIANS VS. PRACTICE OWNERS AND ALL RESPONDENTS

**1** WHAT IS YOUR MEDICAL SPECIALTY?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Family Physician | 16% | 11.3% | 14.2% |
| General Internal Medicine | 11.8% | 9.3% | 11.3% |
| Pediatrics | 10.7% | 7.6% | 9.3% |
| Total | 38.5% | 28.2% | 34.8% |
| Surgical/Medical/Other | | | |
| Surgical Specialty | 10.1% | 16.1% | 13.6% |
| Medical Specialty | 13.0% | 11.6% | 12.2% |
| Ob/Gyn | 5.7% | 6.4% | 6.2% |
| General Surgery | 4.5% | 4.0% | 4 .4% |
| Other | 28.2% | 33.7% | 28.8% |
| Total | 61.5% | 71.9% | 65.2% |

**2** WHAT IS YOUR CURRENT PROFESSIONAL STATUS?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Employed by hospital, group or other entity | 100% | 0% | 43.7% |
| Practice owner/partner/associate | 0% | 100% | 48.5% |
| Other | 0% | 0% | 7.8% |

**3** WHAT IS YOUR GENDER?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Male | 67.5% | 79.7% | 73.6% |
| Female | 32.5% | 20.3% | 26.4% |

4   IN WHAT SIZE COMMUNITY DO YOU PRACTICE?

| | Employed | Owner | All Respondents |
|---|---|---|---|
| 50,000 or less | 18.8% | 17.4% | 18.3% |
| 50,001 to 100,000 | 14.3% | 17% | 15.5% |
| 100,001 to 250,000 | 15.7% | 17.3% | 16.4% |
| 250,001 to 500,000 | 15.0% | 16.7% | 15.8% |
| 500,001 to 1 million | 12.3% | 10.7% | 11.5% |
| 1 million or more | 23.9% | 20.9% | 22.5% |

5   ARE YOU A MEMBER OF YOUR:

| | Employed | Owner | All Respondents |
|---|---|---|---|
| County medical society | 38.2% | 63.3% | 50.1% |
| State medical society | 56.2% | 73.2% | 63.6% |
| National special society | 67.7% | 73.2% | 70.4% |
| American Medical Association | 23.4% | 25.6% | 24.5% |
| American Osteopathic Association | 6% | 4.5% | 5.2% |

*Should 100,000 physicians transition from practice owner to employed status over the next four years, the survey indicates they will see over 91 million fewer patients per year.*

6   WHAT IS YOUR ETHNICITY?

| | Employed | Owner | All Respondents |
|---|---|---|---|
| African–American | 2.2% | 1.3% | 1.9% |
| Asian/Pacific Islander | 8.9% | 6.6% | 7.5% |
| Caucasian | 83.0% | 86.6% | 84.7% |
| Hispanic | 4.3% | 3.8% | 4.1% |
| Native American | 0.0% | 0.1% | 0 .1% |
| Other | 1.6% | 1.6% | 1.7% |

7  WHICH BEST DESCRIBES YOUR FEELINGS ABOUT THE CURRENT STATE OF THE MEDICAL PROFESSION?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Very positive | 4% | 3.3% | 3.9% |
| Somewhat positive | 33.6% | 22.8% | 27.9% |
| Somewhat negative | 44% | 46% | 44.8% |
| Very negative | 18.4% | 27.9% | 23.4% |

8  WHICH BEST DESCRIBES HOW YOU FEEL ABOUT THE FUTURE OF THE MEDICAL PROFESSION?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Very positive/optimistic | 3.6% | 2.3% | 3.1% |
| Somewhat positive/optimistic | 24.1% | 14.2% | 19.5% |
| Somewhat negative/pessimistic | 46.5% | 45.6% | 45.9% |
| Very negative/pessimistic | 25.8% | 37.9% | 31.5% |

9  HOW WOULD YOU RATE THE PROFESSIONAL MORALE OF PHYSICIANS YOU KNOW?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Very positive | 2.1% | 1.2% | 1.8% |
| Somewhat positive | 21.9% | 12.8% | 17.7% |
| Somewhat negative | 57.3% | 54.8% | 55.9% |
| Very negative | 18.7% | 31.2% | 24.7% |

10  HOW WOULD YOU RATE YOUR OWN PROFESSIONAL MORALE?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Very positive | 12% | 9% | 11% |
| Somewhat positive | 35.7% | 26.6% | 30.8% |
| Somewhat negative | 38.6% | 44.1% | 41% |
| Very negative | 13.7% | 20.3% | 17.3% |

81

## 11 · SOME PHYSICIANS BELIEVE THAT THE MEDICAL PROFESSION IS IN DECLINE. DO YOU:

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Mostly agree | 35.4% | 47.8% | 41.6% |
| Somewhat agree | 46.1% | 39.5% | 42.6% |
| Somewhat disagree | 10.7% | 6.5% | 8.6% |
| Mostly disagree | 7.8% | 6.2% | 7.2% |

## 12 · IF YOU MOSTLY OR SOMEWHAT AGREE, WHY IS THE PROFESSION IN DECLINE?

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | Employed | All | Employed | All | Employed | All |
| Too much regulation/paperwork | 77.4% | 79.2% | 20.9% | 19.3% | 1.7% | 1.5% |
| Loss of clinical autonomy | 59.6% | 64.5% | 34.7% | 31% | 5.7% | 4.5% |
| Erosion of physician/patient relationship | 52.5% | 54.4% | 39% | 37.8% | 8.7% | 7.8% |
| Scope of practice encroachment | 38.8% | 43.7% | 43.8% | 40.6% | 17.4% | 15.7% |
| Too many part-time doctors | 5.8% | 6.9% | 20.5% | 22.6% | 73.7% | 70.5% |
| Money trumps patient care | 47.4% | 45.9% | 39.2% | 40.1% | 13.4% | 14% |
| Physicians not compensated for quality | 56.6% | 58.6% | 35.7% | 33.7% | 7.7% | 7.7% |

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | Owner | All | Owner | All | Owner | All |
| Too much regulation/paperwork | 82.2% | 79.2% | 16.9% | 19.4% | 0.9% | 1.5% |
| Loss of clinical autonomy | 68.8% | 64.5% | 28% | 31% | 3.2% | 4.5% |
| Erosion of physician/patient relationship | 55.5% | 54.4% | 37.1% | 37.7% | 7.4% | 7.8% |
| Scope of practice encroachment | 47.6% | 43.7% | 38.3% | 40.6% | 14% | 15.7% |
| Too many part-time doctors | 7.8% | 6.9% | 24.9% | 22.6% | 67.3% | 70.5% |
| Money trumps patient care | 43.7% | 45.9% | 41.1% | 40.1% | 15.2% | 14% |
| Physicians not compensated for quality | 60.5% | 58.6% | 31.9% | 33.7% | 7.5% | 7.7% |

13  TWO YEARS AGO, WHICH BEST DESCRIBED YOUR ATTITUDE TOWARD MEDICAL PRACTICE?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 14.7% | 13.2% | 14.1% |
| Somewhat positive/satisfying | 54.6% | 51.2% | 52.1% |
| Somewhat negative/unsatisfying | 27.6% | 31.8% | 30.1% |
| Very negative/unsatisfying | 3.1% | 3.8% | 3.7% |

14  WHICH BEST DESCRIBES YOUR ATTITUDE TOWARD MEDICAL PRACTICE TODAY?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 8.2% | 6.2% | 7.3% |
| Somewhat positive/satisfying | 35.8% | 27.7% | 31.7% |
| Somewhat negative/unsatisfying | 40.4% | 42.4% | 41.2% |
| Very negative/unsatisfying | 15.6% | 23.7% | 19.8% |

15  IF YOU HAD YOUR CAREER TO DO OVER, WOULD YOU CHOOSE TO BE A PHYSICIAN?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Yes | 69.3% | 63.1% | 66.5% |
| No | 30.7% | 36.9% | 34.5% |

16  WOULD YOU RECOMMEND MEDICINE AS A CAREER TO YOUR CHILDREN OR OTHER YOUNG PEOPLE?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Yes | 45.9% | 37% | 42.1% |
| No | 54.1% | 63% | 57.9% |

17  IF YOU HAD THE ABILITY, WOULD YOU RETIRE TODAY?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Yes | 56.8% | 64.2% | 60.6% |
| No | 43.2% | 35.8% | 39.4% |

83



18 : WHAT TWO FACTORS DO YOU FIND MOST SATISFYING ABOUT MEDICAL PRACTICE?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Patient relationships | 78.2% | 84.3% | 80.2% |
| Prestige of medicine | 9.6% | 10.5% | 10% |
| Intellectual stimulation | 71.1% | 69.6% | 69.7% |
| Interaction with colleagues | 21.5% | 16.9% | 19.2% |
| Financial rewards | 12.4% | 11.4% | 11.7% |

19 : WHAT TWO FACTORS DO YOU FIND LEAST SATISFYING ABOUT MEDICAL PRACTICE?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Long hours/lack of personal time | 31.8% | 18.9% | 24.9% |
| Liability/defensive medicine pressures | 44.5% | 37% | 40.3% |
| Reimbursement issues | 19.9% | 35.5% | 27.3% |
| Lack of clinical autonomy | 10.2% | 7.9% | 9.2% |
| Dealing with Medicare/Medicaid/government regulations | 25.3% | 30.6% | 27.4% |
| Pressure of running a practice | 1.8% | 9.4% | 5.6% |
| Non-clinical paperwork | 22.5% | 14% | 18.1% |
| Uncertainty/changes of health reform | 19.4% | 24.1% | 21.5% |
| Managed care | 6.6% | 8.2% | 7.6% |
| EMR implementation | 9.5% | 9.5% | 9.2% |

**20** IN THE NEXT ONE TO THREE YEARS, DO YOU PLAN TO (CHECK ALL THAT APPLY):

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Continue as I am | 53.3% | 50.1% | 49.8% |
| Cut back on hours | 20.9% | 25% | 22% |
| Retire | 10.6% | 13.7% | 13.4% |
| Switch to a cash/concierge practice | 4.5% | 9.6% | 6.8% |
| Relocate to another practice/community | 15.2% | 6.9% | 10.9% |
| Cut back on patients seen | 7.5% | 12.5% | 9.6% |
| Seek a non–clinical job within healthcare | 11.6% | 8.5% | 9.9% |
| Seek employment with a hospital | 3.9% | 6.9% | 5.6% |
| Work part–time | 6.5% | 5.8% | 6.5% |
| Close my practice to new patients | 3.1% | 5.4% | 4% |
| Seek job/business unrelated to healthcare | 5.8% | 7.0% | 6.9% |
| Work locum tenens | 6.8% | 5.2% | 6.4% |

**21** HOW HAS PASSAGE OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT (PPACA/HEALTH REFORM) AFFECTED YOUR FEELINGS ABOUT THE DIRECTION AND FUTURE OF HEALTHCARE IN AMERICA?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| I am more positive | 23.6% | 12.2% | 18.5% |
| I am less positive | 52% | 67.8% | 59.3% |
| My feelings have not changed | 24.4% | 20% | 22.2% |

**22** MOST PHYSICIANS TODAY ARE FOCUSED ON THEIR DAILY RESPONSIBILITIES AND UNSURE WHERE THE HEALTH SYSTEM WILL BE OR HOW THEY WILL FIT INTO IT THREE TO FIVE YEARS FROM NOW.

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Mostly agree | 50.3% | 60.5% | 55.2% |
| Somewhat agree | 40.8% | 31.7% | 36.5% |
| Somewhat disagree | 6.5% | 4.7% | 5.6% |
| Mostly disagree | 2.4% | 3.1% | 2.7% |

85

## 23 PHYSICIANS HAVE LITTLE INFLUENCE ON THE DIRECTION OF HEALTHCARE AND HAVE LITTLE ABILITY TO EFFECT CHANGE.

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Mostly agree | 45.5% | 55.8% | 50.4% |
| Somewhat agree | 34.3% | 29.6% | 31.7% |
| Somewhat disagree | 14.7% | 10.2% | 12.7% |
| Mostly disagree | 5.5% | 4.4% | 5.2% |



## 24 HOSPITAL EMPLOYMENT OF PHYSICIANS IS A POSITIVE TREND LIKELY TO ENHANCE QUALITY OF CARE AND DECREASE COSTS

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Mostly agree | 7.2% | 1.9% | 4.6% |
| Somewhat agree | 30.5% | 9.2% | 19.9% |
| Somewhat disagree | 36.8% | 29.2% | 32.8% |
| Mostly disagree | 25.5% | 59.7% | 42.7% |

## 25 HOSPITAL EMPLOYMENT WILL ERODE THE PHYSICIAN/PATIENT RELATIONSHIP AND QUALITY OF CARE.

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Mostly agree | 24.1% | 52.9% | 38.5% |
| Somewhat agree | 33.6% | 32% | 33.1% |
| Somewhat disagree | 30.3% | 10.7% | 20.2% |
| Mostly disagree | 12% | 4.4% | 8.2% |

**26** IN YOUR OPINION, TO WHAT DEGREE DO THE FOLLOWING FACTORS CONTRIBUTE TO RISING HEALTH COSTS

| | Major Cost Driver | | Moderate Cost Driver | | Minor Cost Driver | |
|---|---|---|---|---|---|---|
| | Employed | All | Employed | All | Employed | All |
| State and federal insurance mandates | 38.4% | 41.6% | 37.7% | 37.6% | 23.9% | 20.8% |
| Defensive medicine | 70.6% | 69.1% | 24.8% | 26.2% | 4.6% | 4.7% |
| Fraud | 19.3% | 18.8% | 36.7% | 35.3% | 44% | 45.9% |
| Advances in technology/treatment | 50.7% | 51.2% | 40.8% | 40.1% | 8.5% | 8.7% |
| Limited patient financial obligations | 38.2% | 39% | 44.5% | 44.2% | 17.3% | 16.8% |
| Absence of free markets | 32.3% | 37.2% | 36.4% | 35.6% | 31.2% | 27.2% |
| Cost of pharmaceuticals | 58.3% | 59.1% | 35.7% | 34.9% | 6% | 6% |
| Lack of pricing transparency | 42.9% | 40.5% | 40.4% | 40.5% | 16.7% | 19% |
| Physician fees | 4% | 3.8% | 30.8% | 27.9% | 65.2% | 68.3% |
| Price controls on fees and products | 15.9% | 17.9% | 41.7% | 41.6% | 42.4% | 40.5% |
| Aging population | 64.6% | 64.9% | 29.8% | 29.4% | 5.6% | 5.7% |
| Fee-for-service reimbursement | 15.3% | 12.5% | 40% | 35.7% | 44.7% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 46.1% | 43.5% | 38.8% | 40% | 15.1% | 16.5% |
| Relative Value Update Committee/RUC | 15.9% | 17.3% | 48.6% | 47.8% | 35.5% | 34.9% |
| | Owner | All | Owner | All | Owner | All |
| State and federal insurance mandates | 45% | 41.6% | 37.8% | 37.6% | 17.2% | 20.9% |
| Defensive medicine | 68.3% | 69.1% | 27.2% | 26.2% | 4.5% | 4.8% |
| Fraud | 17.7% | 18.8% | 34.2% | 35.3% | 48.1% | 45.9% |
| Advances in technology/treatment | 51.7% | 51.2% | 39.4% | 40.1% | 8.9% | 8.7% |
| Limited patient financial obligations | 40.8% | 39% | 43.8% | 44.2% | 15.4% | 16.8% |
| Absence of free markets | 42.5% | 37.2% | 34.8% | 35.5% | 22.7% | 27.2% |
| Cost of pharmaceuticals | 59.2% | 59.1% | 34.6% | 34.9% | 6.2% | 6% |
| Lack of pricing transparency | 37.5% | 40.5% | 41.3% | 40.6% | 21.2% | 19% |
| Physician fees | 2.8% | 3.8% | 23.9% | 27.9% | 73.3% | 68.3% |
| Price controls on fees and products | 20.1% | 17.9% | 41.6% | 41.6% | 38.3% | 40.5% |
| Aging population | 66.0% | 64.9% | 28.4% | 29.4% | 5.6% | 5.7% |
| Fee-for-service reimbursement | 8.7% | 12.5% | 32% | 35.7% | 59.3% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 40.8% | 43.5% | 41.4% | 40% | 17.8% | 16.5% |
| Relative Value Update Committee/RUC | 18.4% | 17.3% | 47.6% | 47.8% | 34% | 34.9% |

27 | IS YOUR PRACTICE OR EMPLOYER ACTIVELY SEEKING DESIGNATION AS AN ACCOUNTABLE
CARE ORGANIZATION (ACO)?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Yes | 33% | 13.4% | 21.9% |
| No | 19.5% | 67.4% | 44% |
| Unsure | 47.5% | 19.2% | 34.1% |

28 | WHICH BEST DESCRIBES YOUR FEELINGS ABOUT ACOS?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| They are likely to enhance quality/decrease cost | 12.9% | 5% | 9% |
| Quality/cost gains will not justify organizational cost/effort | 21.8% | 22.7% | 21.8% |
| Unlikely to increase quality/decrease cost | 32.5% | 49.5% | 40.6% |
| Unsure about structure or purpose of ACOs | 32.8% | 22.8% | 28.6% |

29 | WHICH BEST DESCRIBES YOUR FEELINGS ABOUT MEDICAL HOMES?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| They are likely to increase quality/reduce costs | 29.9% | 18.4% | 24.4% |
| They are unlikely to improve quality/reduce costs | 34.6% | 42.3% | 37.7% |
| Unsure about structure/purpose of medical homes | 35.5% | 39.3% | 37.9% |

*Physicians who have directly experienced employment are more positive about hospital employment than are practice owners. However, even the majority of employed physicians do not rate hospital employment as a positive trend.*

30  HOW WOULD YOU RATE THE FOLLOWING AS SOLUTIONS TO THE HEALTH SYSTEM'S COST AND ACCESS CHALLENGES?

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| **Employed Only** | | | | | |
| Singlepayer/Canadian style system | 23.1% | 19.3% | 16.5% | 14.3% | 26.8% |
| Wide spread adoption of ACOs | 3.3% | 11.3% | 45.8% | 23.6% | 16% |
| Widespread adoption of medical homes | 10.1% | 19.4% | 43.4% | 17.2% | 9.9% |
| Medicare voucher system | 4.8% | 17.8% | 44.9% | 16.9% | 15.6% |
| Widespread adoption of health savings accounts | 18.5% | 31.8% | 30.4% | 10.9% | 8.4% |
| Evidence based medicine | 38.3% | 36.8% | 17.2% | 5.6% | 2.1% |
| Reduce the supply of physicians | 2% | 3.3% | 18.4% | 24.4% | 51.9% |
| Increase the supply of physicians | 24.1% | 33.7% | 31.9% | 6.4% | 3.9% |
| Electronic medical records | 20.3% | 30.2% | 24.7% | 15.0% | 9.8% |
| More government regulation | 2.3% | 7.3% | 16.3% | 18.0% | 56.1% |
| Less government regulation | 43.3% | 24.1% | 20.7% | 7.6% | 4.3% |

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| **Owner only** | | | | | |
| Singlepayer/Canadian style system | 14.7% | 14.8% | 14.4% | 15.4% | 40.7% |
| Wide spread adoption of ACOs | 1% | 4.9% | 30.5% | 29.7% | 33.9% |
| Widespread adoption of medical homes | 5.4% | 11.7% | 40.3% | 22.0% | 20.6% |
| Medicare voucher system | 6.3% | 19.4% | 41.4% | 16.6% | 16.3% |
| Widespread adoption of health savings accounts | 26.4% | 35.2% | 24.2% | 8.3% | 5.9% |
| Evidence based medicine | 29.8% | 35.4% | 23.1% | 7.5% | 4.2% |
| Reduce the supply of physicians | 2.3% | 3.9% | 22.9% | 23.5% | 47.4% |
| Increase the supply of physicians | 19% | 30.5% | 38% | 6.9% | 5.5% |
| Electronic medical records | 11.1% | 20.6% | 26.5% | 21.6% | 20.2% |
| More government regulation | 1.4% | 3.3% | 8.8% | 13% | 73.5% |
| Less government regulation | 56.9% | 24.2% | 13.0% | 3.6% | 2.3% |

89



31 | ON AVERAGE, HOW MANY HOURS DO YOU WORK PER WEEK?

| | Employed | Owner | All Respondents |
|---|---|---|---|
| 0–20 | 2.5% | 4.6% | 4% |
| 21–30 | 4.7% | 4.9% | 4.5% |
| 31–40 | 12.9% | 12.3% | 12.2% |
| 41–50 | 23.0% | 21.5% | 21.9% |
| 51–60 | 26.5% | 26.4% | 26.1% |
| 61–70 | 14.6% | 15% | 15.3% |
| 71–80 | 9.9% | 9.3% | 9.9% |
| 81–90 | 3.9% | 3.7% | 3.9% |
| 91 – 100 | 1.5% | 1.6% | 1.6% |
| 101 or more | 0.5% | 0.7% | 0.6% |

32 | OF THESE, HOW MANY HOURS DO YOU WORK EACH WEEK ON NON–CLINICAL (PAPERWORK) DUTIES ONLY?

| | Employed | Owner | All Respondents |
|---|---|---|---|
| 0–10 | 55.3% | 60.5% | 58% |
| 11–20 | 26.3% | 26.7% | 26.1% |
| 21–30 | 10.5% | 8.3% | 9.3% |
| 31–40 | 4.4% | 2.7% | 3.7% |
| 41–50 | 1.9% | 0.8% | 1.5% |
| 51–60 | 1.1% | 0.5% | 0.9% |
| 61 or more | 0.5 % | 0.5% | 0.5% |

## 33 ON AVERAGE, HOW MANY PATIENTS DO YOU SEE PER DAY?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| 0–10 | 20.8% | 14.4% | 19.5% |
| 11–20 | 45.1% | 36.1% | 39.8% |
| 21–30 | 24.7% | 30.5% | 26.8% |
| 31–40 | 5.5% | 11.1% | 8.1% |
| 41–50 | 1.7% | 3.8% | 2.6% |
| 51–60 | 0.4% | 1.1% | 0.8% |
| 61 or more | 1.8% | 3.0% | 2.4% |

*Traditionally, physicians have viewed themselves as the primary advocates for patients and may fear that as employees of a hospital, they will have less autonomy over clinical decision making.*

## 34 WHICH OF THE FOLLOWING BEST DESCRIBES YOUR CURRENT PRACTICE?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| I am overextended and overworked | 25.1% | 20.8% | 22.7% |
| I am at full capacity | 54.3% | 52 % | 52.7% |
| I have time to see more patients and assume more duties | 20.6% | 27.2% | 24.6% |

## 35 HAVE TIME OR COST CONSTRAINTS COMPELLED YOU TO CLOSE YOUR PRACTICE TO MEDICARE OR MEDICAID PATIENTS?

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Yes, Medicare | 4.9% | 11.7% | 8.6% |
| Yes, Medicaid | 13.9% | 38.8% | 26.7% |
| No, I have not closed to either | 81.2% | 49.5% | 64.7% |

91

36  ESTIMATE THE AMOUNT OF UNCOMPENSATED CARE YOU PERSONALLY
(NOT YOUR ENTIRE GROUP) PROVIDE IN THE COURSE OF A YEAR:

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| $0–$5000 | 17.1% | 10.6% | 14.6% |
| $5001 – $15,000 | 9.2% | 11.6% | 10.6% |
| $15,001 – $25,000 | 11.3% | 14.5% | 12.6% |
| $25,001 – $35,000 | 5.9% | 7.1% | 6.5% |
| $35,001 – $50,000 | 16.2% | 17.1% | 16.4% |
| $50,001 o r more | 40.3% | 39.1% | 39.3% |

37  WHAT PERCENT OF YOUR PATIENTS ARE:

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Medicare | 29.3% | 31.3% | 31% |
| Medicaid | 24.6% | 12.4% | 17.9% |
| Private pay | 25.3% | 33.6% | 29.7% |
| Indigent | 10% | 5.7% | 8% |
| TriCare | 4.1% | 3.6% | 4% |
| Other | 6.7% | 13.4% | 9.4% |

38  DESCRIBE YOUR INCOME FROM THE PRACTICE OF MEDICINE OVER THE LAST THREE YEARS:

|  | Employed | Owner | All Respondents |
|---|---|---|---|
| Flat | 48.6% | 31.2% | 39.7% |
| Declining | 33.8% | 58.3% | 46.7% |
| Increasing | 17.6% | 10.5% | 13.6% |

39 AS A RESULT OF THE ONGOING PROBLEMS WITH MEDICARE FEE SCHEDULE UPDATES, WHAT ACTION HAVE YOU TAKEN OR ARE YOU PLANNING TO TAKE? (CHECK ALL THAT APPLY)

| | Employed | Owner | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 16.7% | 30.4% | 22.9% |
| Accept no new Medicare patients | 9.5% | 15.8% | 12.6% |
| Terminate existing Medicare patients | 2.1% | 3.5% | 2.8% |
| Change status to non–participating | 4.3% | 9.1% | 6.8% |
| Formally opt out of Medicare | 4.1% | 9.5% | 6.9% |
| Place new or additional limits on Medicaid acceptance | 16.6% | 28.9% | 22.2% |
| Reduce the amount of charity care I deliver | 18.2% | 27.4% | 22% |
| Increase standard fees charged to other patients | 12.1% | 20% | 15.5% |
| Delay information technology implementation | 8.7% | 23.6% | 15.9% |
| Renegotiate or terminate some commercial health plan contracts | 12.2% | 24.1% | 17.7% |
| Reduce staff compensation or benefits | 19.9% | 36.5% | 27% |

40 IF MEDICARE FEES DECREASE BY 10 PERCENT OR MORE, WHAT ACTIONS WILL YOU TAKE? (CHECK ALL THAT APPLY)

| | Employed | Owner | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 22.8% | 35.7% | 28.3% |
| Accept no new Medicare patients | 19.7% | 33.2% | 25.9% |
| Terminate existing Medicare patients | 7.0% | 12.3% | 9.5% |
| Change status to non–participating | 8.3% | 15.1% | 11.6% |
| Formally opt out of Medicare | 10.1% | 17.9% | 14% |
| Place new or additional limits on Medicaid acceptance | 17.5% | 26.6% | 21.3% |
| Reduce the amount of charity care I deliver | 18.7% | 27.4% | 22.3% |
| Increase standard fees charged to other patients | 14.3% | 22.6% | 17.8% |
| Delay information technology implementation | 8.8% | 22.0% | 15.1% |
| Renegotiate or terminate some commercial health plan contracts | 12.3% | 21.9% | 16.5% |
| Reduce staff compensation or benefits | 20.3% | 35.1% | 26.5% |

93

41 | HAS YOUR PRACTICE IMPLEMENTED ELECTRONIC MEDICAL RECORDS?

|     | Employed | Owner | All Respondents |
|-----|----------|-------|-----------------|
| Yes | 81.8%    | 59.1% | 69.5%           |
| No  | 18.2%    | 40.9% | 30.5%           |

42 | IF YES, WHAT EFFECT HAS EMR HAD ON THE QUALITY OF PATIENT CARE IN YOUR PRACTICE?

|                                                                      | Employed | Owner | All Respondents |
|----------------------------------------------------------------------|----------|-------|-----------------|
| No effect                                                            | 9.5%     | 16.7% | 12.9%           |
| Has improved quality of care                                         | 37.4%    | 27.1% | 32.9%           |
| Not yet improved quality, but I anticipate it will                   | 15.2%    | 10.7% | 13.4%           |
| Has not improved quality, and I do not anticipate it will            | 16.4%    | 21.9% | 18.5%           |
| May improve quality, but not worth the investment                    | 7.3%     | 8.7%  | 7.9%            |
| Decreased quality, but I anticipate it eventually will improve quality | 4.7%   | 3.1%  | 4%              |
| Decreased quality and I do not anticipate it will improve quality    | 9.5%     | 11.8% | 10.4%           |

43 | IF YOU HAVE NOT IMPLEMENTED EMR, WHY NOT? (CHECK ALL THAT APPLY)

|                                            | Employed | Owner | All Respondents |
|--------------------------------------------|----------|-------|-----------------|
| No time to install EMR                     | 18.8%    | 19.7% | 19.3%           |
| Do not have the money to install EMR       | 34.9%    | 33.1% | 33.6%           |
| Do not have the personnel to install EMR   | 18.1%    | 21%   | 20.2%           |
| Do not have the resources/expertise to install EMR | 28.2% | 26.1% | 26.9%       |

44 | DO YOU HAVE SIGNIFICANT CONCERNS THAT EMR POSES A RISK TO PATIENT PRIVACY?

|     | Employed | Owner | All Respondents |
|-----|----------|-------|-----------------|
| Yes | 39.4%    | 55%   | 47.4%           |
| No  | 60.6%    | 45%   | 52.6%           |

94

## PART III: RESPONSES BY MALE PHYSICIANS VS. FEMALE PHYSICIANS AND ALL RESPONDENTS

1 WHAT IS YOUR MEDICAL SPECIALTY?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Family Physician | 13.4% | 16.3% | 14.2% |
| General Internal Medicine | 10.3% | 12.1% | 11.3% |
| Pediatrics | 6.5% | 17.6% | 9.3% |
| Total | 30.2% | 46.0% | 34.8% |
| Surgical/Medical/Other | | | |
| Surgical Specialty | 16.6% | 5.5% | 13.6% |
| Medical Specialty | 13.2% | 9.5% | 12.2% |
| Ob/Gyn | 5.2% | 9.1% | 6.2% |
| General Surgery | 5.1% | 2.1% | 4 .4% |
| Other | 29.8% | 27.8% | 28.8% |
| Total | 69.8% | 54.0% | 65.2% |

2 WHAT IS YOUR CURRENT PROFESSIONAL STATUS?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Employed by hospital, group or other entity | 40% | 53.5% | 43.7% |
| Practice owner/partner/associate | 52.5% | 37.2% | 48.5% |
| Other | 7.5% | 9.3% | 7.8% |

3 WHAT IS YOUR GENDER?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Male | 100% | 0% | 73.6% |
| Female | 0% | 100% | 26.4% |



4 | IN WHAT SIZE COMMUNITY DO YOU PRACTICE?

| | Male | Female | All Respondents |
|---|---|---|---|
| 50,000 or less | 18.6% | 17.7% | 18.3% |
| 50,001 to 100,000 | 15.6% | 15.2% | 15.5% |
| 100,001 to 250,000 | 17% | 14.8% | 16.4% |
| 250,001 to 500,000 | 15.3% | 17.4% | 15.8% |
| 500,001 to 1 million | 11.1% | 12.6% | 11.5% |
| 1 million or more | 22.4% | 22.3% | 22.5% |

5 | ARE YOU A MEMBER OF YOUR:

| | Male | Female | All Respondents |
|---|---|---|---|
| County medical society | 54% | 40.7% | 50.1% |
| State medical society | 65.9% | 60.4% | 63.6% |
| National special society | 71.9% | 68.8% | 70.4% |
| American Medical Association | 25.1% | 23.6% | 24.5% |
| American Osteopathic Association | 5.2% | 5.6% | 5.2% |

6 | WHAT IS YOUR ETHNICITY?

| | Male | Female | All Respondents |
|---|---|---|---|
| African–American | 1.1% | 4.3% | 1.9% |
| Asian/Pacific Islander | 7.2% | 9% | 7.5% |
| Caucasian | 86% | 80.1% | 84.7% |
| Hispanic | 3.9% | 4.9% | 4.1% |
| Native American | 0.1% | 0.2% | 0 .1% |
| Other | 1.7% | 1.5% | 1.7% |

7 | WHICH BEST DESCRIBES YOUR FEELINGS ABOUT THE CURRENT STATE OF THE MEDICAL PROFESSION?

|                    | Male  | Female | All Respondents |
|--------------------|-------|--------|-----------------|
| Very positive      | 4.2%  | 3.1%   | 3.9%            |
| Somewhat positive  | 26.7% | 32%    | 27.9%           |
| Somewhat negative  | 44.7% | 45.6%  | 44.8%           |
| Very negative      | 24.4% | 19.3%  | 23.4%           |

8 | WHICH BEST DESCRIBES HOW YOU FEEL ABOUT THE FUTURE OF THE MEDICAL PROFESSION?

|                               | Male  | Female | All Respondents |
|-------------------------------|-------|--------|-----------------|
| Very positive/optimistic      | 3.3%  | 2.6%   | 3.1%            |
| Somewhat positive/optimistic  | 18.2% | 23.6%  | 19.5%           |
| Somewhat negative/pessimistic | 44.7% | 49.1%  | 45.9%           |
| Very negative/pessimistic     | 33.8% | 24.7   | 31.5%           |

9 | HOW WOULD YOU RATE THE PROFESSIONAL MORALE OF PHYSICIANS YOU KNOW?

|                    | Male  | Female | All Respondents |
|--------------------|-------|--------|-----------------|
| Very positive      | 1.6%  | 2.1%   | 1.8%            |
| Somewhat positive  | 17%   | 19.9%  | 17.7%           |
| Somewhat negative  | 55.2% | 57.8%  | 55.9%           |
| Very negative      | 26.2% | 20.2%  | 24.7%           |

10 | HOW WOULD YOU RATE YOUR OWN PROFESSIONAL MORALE?

|                    | Male  | Female | All Respondents |
|--------------------|-------|--------|-----------------|
| Very positive      | 10.8% | 11.1%  | 11%             |
| Somewhat positive  | 29.7% | 34.7%  | 30.8%           |
| Somewhat negative  | 41.1% | 40.6%  | 41%             |
| Very negative      | 18.4% | 13.6%  | 17.3%           |

97

**11** SOME PHYSICIANS BELIEVE THAT THE MEDICAL PROFESSION IS IN DECLINE. DO YOU:

|  | Male | Female | All Respondents |
|---|---|---|---|
| Mostly agree | 43.3% | 35.2% | 41.6% |
| Somewhat agree | 41.2% | 48.2% | 42.6% |
| Somewhat disagree | 8.3% | 10.1% | 8.6% |
| Mostly disagree | 7.2% | 6.5% | 7.2% |

**12** IF YOU MOSTLY OR SOMEWHAT AGREE, WHY IS THE PROFESSION IN DECLINE?

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | Male | All | Male | All | Male | All |
| Too much regulation/paperwork | 80.2% | 79.2% | 18.4% | 19.3% | 1.4% | 1.5% |
| Loss of clinical autonomy | 64.8% | 64.5% | 30.8% | 31% | 4.4% | 4.5% |
| Erosion of physician/patient relationship | 53.9% | 54.4% | 38.5% | 37.8% | 7.6% | 7.8% |
| Scope of practice encroachment | 44.3% | 43.7% | 40.4% | 40.6% | 15.3% | 15.7% |
| Too many part-time doctors | 7.7% | 6.9% | 24.5% | 22.6% | 67.8% | 70.5% |
| Money trumps patient care | 44.4% | 45.9% | 40.8% | 40.1% | 14.8% | 14% |
| Physicians not compensated for quality | 56.8% | 58.6% | 35.1% | 33.7% | 8.2% | 7.7% |

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | Female | All | Female | All | Female | All |
| Too much regulation/paperwork | 76.1% | 79.2% | 22.2% | 19.4% | 1.7% | 1.5% |
| Loss of clinical autonomy | 63.1% | 64.5% | 32.6% | 31% | 4.3% | 4.5% |
| Erosion of physician/patient relationship | 54.8% | 54.4% | 36.6% | 37.7% | 8.6% | 7.8% |
| Scope of practice encroachment | 41.6% | 43.7% | 41.9% | 40.6% | 16.5% | 15.7% |
| Too many part-time doctors | 4.6% | 6.9% | 17% | 22.6% | 78.3% | 70.5% |
| Money trumps patient care | 49.2% | 45.9% | 38.7% | 40.1% | 12% | 14% |
| Physicians not compensated for quality | 63.2% | 58.6% | 30.5% | 33.7% | 6.3% | 7.7% |

98

## 13 TWO YEARS AGO, WHICH BEST DESCRIBED YOUR ATTITUDE TOWARD MEDICAL PRACTICE?

| | Male | Female | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 13.2% | 17% | 14.1% |
| Somewhat positive/satisfying | 51.7% | 52.9% | 52.1% |
| Somewhat negative/unsatisfying | 31.5% | 26.5% | 30.1% |
| Very negative/unsatisfying | 3.6% | 3.6% | 3.7% |

## 14 WHICH BEST DESCRIBES YOUR ATTITUDE TOWARD MEDICAL PRACTICE TODAY?

| | Male | Female | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 7.3% | 7.2% | 7.3% |
| Somewhat positive/satisfying | 30% | 36.4% | 31.7% |
| Somewhat negative/unsatisfying | 41.5% | 41% | 41.2% |
| Very negative/unsatisfying | 21.2% | 15.4% | 19.8% |

## 15 IF YOU HAD YOUR CAREER TO DO OVER, WOULD YOU CHOOSE TO BE A PHYSICIAN?

| | Male | Female | All Respondents |
|---|---|---|---|
| Yes | 65.9% | 67.8% | 66.5% |
| No | 34.1% | 32.2% | 33.5% |

## 16 WOULD YOU RECOMMEND MEDICINE AS A CAREER TO YOUR CHILDREN OR OTHER YOUNG PEOPLE?

| | Male | Female | All Respondents |
|---|---|---|---|
| Yes | 41.9% | 42.8% | 42.1% |
| No | 58.1% | 57.2% | 57.9% |

## 17 IF YOU HAD THE ABILITY, WOULD YOU RETIRE TODAY?

| | Male | Female | All Respondents |
|---|---|---|---|
| Yes | 61.6% | 58% | 60.6% |
| No | 38.4% | 42% | 39.4% |

18   WHAT TWO FACTORS DO YOU FIND MOST SATISFYING ABOUT MEDICAL PRACTICE?

| | Male | Female | All Respondents |
|---|---|---|---|
| Patient relationships | 79.9% | 83.6% | 80.2% |
| Prestige of medicine | 11.2% | 6.9% | 10% |
| Intellectual stimulation | 69.3% | 73.2% | 69.7% |
| Interaction with colleagues | 19% | 19.5% | 19.2% |
| Financial rewards | 12.9% | 9.1% | 11.7% |

*Over 27 percent of female physicians work 40 hours a week or less, compared to 17.9 percent of male physicians, confirming the perception that more female physicians work less than full time schedules than do male physicians.*

19   WHAT TWO FACTORS DO YOU FIND LEAST SATISFYING ABOUT MEDICAL PRACTICE?

| | Male | Female | All Respondents |
|---|---|---|---|
| Long hours/lack of personal time | 22.9% | 32.3% | 24.9% |
| Liability/defensive medicine pressures | 40.2% | 42.1% | 40.3% |
| Reimbursement issues | 28.3% | 25.5% | 27.3% |
| Lack of clinical autonomy | 9% | 9.6% | 9.2% |
| Dealing with Medicare/Medicaid/government regulations | 29.8% | 21.7% | 27.4% |
| Pressure of running a practice | 5.7% | 5.8% | 5.6% |
| Non-clinical paperwork | 17.2% | 20.7% | 18.1% |
| Uncertainty/changes of health reform | 23.3% | 17.4% | 21.5% |
| Managed care | 7.9% | 6.4% | 7.6% |
| EMR implementation | 9.3% | 8.9% | 9.2% |
| Other | 4.5% | 6.9% | 5.1% |

20 | IN THE NEXT ONE TO THREE YEARS, DO YOU PLAN TO (CHECK ALL THAT APPLY):

|  | Male | Female | All Respondents |
|---|---|---|---|
| Continue as I am | 48% | 51.1% | 49.8% |
| Cut back on hours | 22.4% | 21.1% | 22% |
| Retire | 15.2% | 7.% | 13.4% |
| Switch to a cash/concierge practice | 7.1% | 6.4% | 6.8% |
| Relocate to another practice/community | 10.5% | 13.1% | 10.9% |
| Cut back on patients seen | 10.2% | 7.9% | 9.6% |
| Seek a non-clinical job within healthcare | 9.5% | 11.9% | 9.9% |
| Seek employment with a hospital | 5.5% | 6.2% | 5.6% |
| Work part-time | 5.9% | 8.4% | 6.5% |
| Close my practice to new patients | 6.8% | 4.4% | 4% |
| Seek job/business unrelated to healthcare | 6.8% | 6.2% | 6.9% |
| Work locum tenens | 6.5% | 7.1% | 6.4% |
| Other | 5.2% | 6.9% | 5.5% |

21 | HOW HAS PASSAGE OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT (PPACA/HEALTH REFORM) AFFECTED YOUR FEELINGS ABOUT THE DIRECTION AND FUTURE OF HEALTHCARE IN AMERICA?

|  | Male | Female | All Respondents |
|---|---|---|---|
| I am more positive | 16.2% | 24.7% | 18.5% |
| I am less positive | 63.3% | 48.4% | 59.3% |
| My feelings have not changed | 20.5% | 26.9% | 22.2% |

22 | MOST PHYSICIANS TODAY ARE FOCUSED ON THEIR DAILY RESPONSIBILITIES AND UNSURE WHERE THE HEALTH SYSTEM WILL BE OR HOW THEY WILL FIT INTO IT THREE TO FIVE YEARS FROM NOW.

|  | Male | Female | All Respondents |
|---|---|---|---|
| Mostly agree | 56.3% | 51.5% | 55.2% |
| Somewhat agree | 35.3% | 40.7% | 36.5% |
| Somewhat disagree | 5.6% | 5.7% | 5.6% |
| Mostly disagree | 2.8% | 2.1% | 2.7% |



**23** PHYSICIANS HAVE LITTLE INFLUENCE ON THE DIRECTION OF HEALTHCARE AND HAVE LITTLE ABILITY TO EFFECT CHANGE.

|  | Male | Female | All Respondents |
|---|---|---|---|
| Mostly agree | 52.2% | 43.6% | 50.4% |
| Somewhat agree | 30.6% | 35.7% | 31.7% |
| Somewhat disagree | 12% | 15.5% | 12.7% |
| Mostly disagree | 5.2% | 5.2% | 5.2% |

**24** HOSPITAL EMPLOYMENT OF PHYSICIANS IS A POSITIVE TREND LIKELY TO ENHANCE QUALITY OF CARE AND DECREASE COSTS

|  | Male | Female | All Respondents |
|---|---|---|---|
| Mostly agree | 4.2% | 5.7% | 4.6% |
| Somewhat agree | 18% | 25.1% | 19.9% |
| Somewhat disagree | 31.8% | 36.5% | 32.8% |
| Mostly disagree | 46% | 32.7% | 42.7% |

**25** HOSPITAL EMPLOYMENT WILL ERODE THE PHYSICIAN/PATIENT RELATIONSHIP AND QUALITY OF CARE.

|  | Male | Female | All Respondents |
|---|---|---|---|
| Mostly agree | 41.6% | 29.1% | 38.5% |
| Somewhat agree | 32.3% | 35.6% | 33.1% |
| Somewhat disagree | 18.2% | 26.2% | 20.2% |
| Mostly disagree | 7.9% | 9.1% | 8.2% |

## 26 | IN YOUR OPINION, TO WHAT DEGREE DO THE FOLLOWING FACTORS CONTRIBUTE TO RISING HEALTH COSTS

| | Major Cost Driver | | Moderate Cost Driver | | Minor Cost Driver | |
|---|---|---|---|---|---|---|
| | Male | All | Male | All | Male | All |
| State and federal insurance mandates | 42.4% | 41.6% | 37.2% | 37.6% | 20.4% | 20.8% |
| Defensive medicine | 67.8% | 69.1% | 26.7% | 26.2% | 5.5% | 4.7% |
| Fraud | 18.1% | 18.8% | 34.2% | 35.3% | 47.7% | 45.9% |
| Advances in technology/treatment | 52.1% | 51.2% | 39.5% | 40.1% | 8.4% | 8.7% |
| Limited patient financial obligations | 40% | 39% | 44.1% | 44.2% | 15.9% | 16.8% |
| Absence of free markets | 38.9% | 37.2% | 35.2% | 35.6% | 25.9% | 27.2% |
| Cost of pharmaceuticals | 57.3% | 59.1% | 36.1% | 34.9% | 6.6% | 6% |
| Lack of pricing transparency | 38.9% | 40.5% | 41.4% | 40.5% | 19.7% | 19% |
| Physician fees | 3.8% | 3.8% | 26.6% | 27.9% | 69.6% | 68.3% |
| Price controls on fees and products | 18.2% | 17.9% | 40.7% | 41.6% | 41.1% | 40.5% |
| Aging population | 65.4% | 64.9% | 28.9% | 29.4% | 5.7% | 5.7% |
| Fee-for-service reimbursement | 11.8% | 12.5% | 34.3% | 35.7% | 53.9% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 41.4% | 43.5% | 40.7% | 40% | 17.9% | 16.5% |
| Relative Value Update Committee/RUC | 17.4% | 17.3% | 46.7% | 47.8% | 35.9% | 34.9% |
| | Female | All | Female | All | Female | All |
| State and federal insurance mandates | 38.8% | 41.6% | 38.6% | 37.6% | 22.6% | 20.9% |
| Defensive medicine | 72.8% | 69.1% | 24.2% | 26.2% | 3% | 4.8% |
| Fraud | 20.5% | 18.8% | 38.5% | 35.3% | 41% | 45.9% |
| Advances in technology/treatment | 48.5% | 51.2% | 41.6% | 40.1% | 9.9% | 8.7% |
| Limited patient financial obligations | 36.7% | 39% | 44.2% | 44.2% | 19.1% | 16.8% |
| Absence of free markets | 32.8% | 37.2% | 36.7% | 35.5% | 30.5% | 27.2% |
| Cost of pharmaceuticals | 63.8% | 59.1% | 31.7% | 34.9% | 4.5% | 6% |
| Lack of pricing transparency | 44.6% | 40.5% | 38.5% | 40.6% | 16.9% | 19% |
| Physician fees | 3.6% | 3.8% | 30.5% | 27.9% | 65.9% | 68.3% |
| Price controls on fees and products | 16.8% | 17.9% | 44.3% | 41.6% | 38.9% | 40.5% |
| Aging population | 63% | 64.9% | 31.2% | 29.4% | 5.8% | 5.7% |
| Fee-for-service reimbursement | 14% | 12.5% | 39.6% | 35.7% | 46.4% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 48.2% | 43.5% | 39% | 40% | 12.8% | 16.5% |
| Relative Value Update Committee/RUC | 17.2% | 17.3% | 50.8% | 47.8% | 32% | 34.9% |

27 : IS YOUR PRACTICE OR EMPLOYER ACTIVELY SEEKING DESIGNATION AS AN ACCOUNTABLE
     CARE ORGANIZATION (ACO)?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Yes | 21.6% | 23.2% | 21.9% |
| No | 47.4% | 34.1% | 44% |
| Unsure | 31% | 42.7% | 34.1% |

28 : WHICH BEST DESCRIBES YOUR FEELINGS ABOUT ACOS?

|  | Male | Female | All Respondents |
|---|---|---|---|
| They are likely to enhance quality/decrease cost | 8.6% | 10.4% | 9% |
| Quality/cost gains will not justify organizational cost/effort | 21.9% | 21.6% | 21.8% |
| Unlikely to increase quality/decrease cost | 44.4% | 30% | 40.6% |
| Unsure about structure or purpose of ACOs | 25.1% | 38% | 28.6% |

*Medicine was once a predominantly male profession, but the demographic make-up of physicians is rapidly changing. Between 1980 and 2009, the number of female physicians in the United States increased by 430 percent*

29 : WHICH BEST DESCRIBES YOUR FEELINGS ABOUT MEDICAL HOMES?

|  | Male | Female | All Respondents |
|---|---|---|---|
| They are likely to increase quality/reduce costs | 21.2% | 34.6% | 24.4% |
| They are unlikely to improve quality/reduce costs | 40% | 30.9% | 37.7% |
| Unsure about structure/purpose of medical homes | 38.8% | 34.5% | 37.9% |

## 30 HOW WOULD YOU RATE THE FOLLOWING AS SOLUTIONS TO THE HEALTH SYSTEM'S COST AND ACCESS CHALLENGES?

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| **Male Only** | | | | | |
| Singlepayer/Canadian style system | 17.8% | 16% | 14.2% | 14.9% | 37.1% |
| Wide spread adoption of ACOs | 2.1% | 7.6% | 35.1% | 27.7% | 27.5% |
| Widespread adoption of medical homes | 6.5% | 13.9% | 41.4% | 21.2% | 17% |
| Medicare voucher system | 6.2% | 19.6% | 40.8% | 17.1% | 16.3% |
| Widespread adoption of health savings accounts | 23.8% | 33.5% | 26.3% | 9.4% | 7% |
| Evidence based medicine | 32.7% | 36.1% | 21% | 6.8% | 3.4% |
| Reduce the supply of physicians | 2.7% | 4.1% | 21.5% | 24.2% | 47.5% |
| Increase the supply of physicians | 20.5% | 31.3% | 35.5% | 7.2% | 5.5% |
| Electronic medical records | 13.9% | 24.7% | 25.9% | 19.3% | 16.2% |
| More government regulation | 1.8% | 4.2% | 10.8% | 14.4% | 68.8% |
| Less government regulation | 53.7% | 23.8% | 14.5% | 4.9% | 3.1% |

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| **Female only** | | | | | |
| Singlepayer/Canadian style system | 22.6% | 20% | 18.8% | 15.2% | 23.4% |
| Wide spread adoption of ACOs | 2.5% | 10.3% | 48% | 23% | 16.2% |
| Widespread adoption of medical homes | 12.6% | 20.6% | 43.1% | 14.5% | 9.2% |
| Medicare voucher system | 3.6% | 14.6% | 49% | 17.6% | 15.2% |
| Widespread adoption of health savings accounts | 18.2% | 32.7% | 30.1% | 11% | 8% |
| Evidence based medicine | 38% | 36.9% | 17.5% | 5.3% | 2.3% |
| Reduce the supply of physicians | 0.8% | 2.4% | 16.4% | 23.4% | 57% |
| Increase the supply of physicians | 26.1% | 34.8% | 31.7% | 5% | 2.4% |
| Electronic medical records | 22% | 28.3% | 24.8% | 14.7% | 10.2% |
| More government regulation | 2.2% | 8.8% | 18.5% | 18.5% | 52% |
| Less government regulation | 38.9% | 24.6% | 24% | 8.3% | 4.2% |

## 31 ON AVERAGE, HOW MANY HOURS DO YOU WORK PER WEEK?

|            | Male   | Female | All Respondents |
|------------|--------|--------|-----------------|
| 0–20       | 3.8%   | 3.8%   | 4%              |
| 21–30      | 3.4%   | 7.1%   | 4.5%            |
| 31–40      | 10.7%  | 16.6%  | 12.2%           |
| 41–50      | 21.8%  | 22.5%  | 21.9%           |
| 51–60      | 27.4%  | 22.3%  | 26.1%           |
| 61–70      | 16.2%  | 12.8%  | 15.3%           |
| 71–80      | 10.4%  | 8.8%   | 9.9%            |
| 81–90      | 4.1%   | 3.6%   | 3.9%            |
| 91 – 100   | 1.5%   | 1.8%   | 1.6%            |
| 101 or more| 0.7%   | 0.7%   | 0.6%            |



## 32 OF THESE, HOW MANY HOURS DO YOU WORK EACH WEEK ON NON-CLINICAL (PAPERWORK) DUTIES ONLY?

|            | Male   | Female | All Respondents |
|------------|--------|--------|-----------------|
| 0–10       | 58.8%  | 55.1%  | 58%             |
| 11–20      | 26%    | 26.2%  | 26.1%           |
| 21–30      | 8.9%   | 10.4%  | 9.3%            |
| 31–40      | 3.4%   | 4.8%   | 3.7%            |
| 41–50      | 1.4%   | 1.9%   | 1.5%            |
| 51–60      | 0.9%   | 1.2%   | 0.9%            |
| 61 or more | 0.6 %  | 0.4%   | 0.5%            |

33 | ON AVERAGE, HOW MANY PATIENTS DO YOU SEE PER DAY?

|  | Male | Female | All Respondents |
|---|---|---|---|
| 0–10 | 18.4% | 22.4% | 19.5% |
| 11–20 | 38.1% | 44.5% | 39.8% |
| 21–30 | 27.9% | 24.3% | 26.8% |
| 31–40 | 8.9% | 5.6% | 8.1% |
| 41–50 | 3.1% | 1.5% | 2.6% |
| 51–60 | 0.9% | 0.5% | 0.8% |
| 61 or more | 2.7% | 1.2% | 2.4% |

*In 1965, seven percent of medical school graduates were women. Today, over 50 percent of new medical students are female, suggesting that females will represent the majority of all physicians within a generation.*

34 | WHICH OF THE FOLLOWING BEST DESCRIBES YOUR CURRENT PRACTICE?

|  | Male | Female | All Respondents |
|---|---|---|---|
| I am overextended and overworked | 21.4% | 27% | 22.7% |
| I am at full capacity | 53.5% | 51.1 % | 52.7% |
| I have time to see more patients and assume more duties | 25.1% | 21.9% | 24.6% |

35 | HAVE TIME OR COST CONSTRAINTS COMPELLED YOU TO CLOSE YOUR PRACTICE TO MEDICARE OR MEDICAID PATIENTS?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Yes, Medicare | 8.3% | 9.4% | 8.6% |
| Yes, Medicaid | 27.3% | 24.6% | 26.7% |
| No, I have not closed to either | 64.4% | 66% | 64.7% |

36  ESTIMATE THE AMOUNT OF UNCOMPENSATED CARE YOU PERSONALLY
    (NOT YOUR ENTIRE GROUP) PROVIDE IN THE COURSE OF A YEAR:

|  | Male | Female | All Respondents |
|---|---|---|---|
| $0–$5000 | 12.6% | 20.6% | 14.6% |
| $5001 – $15,000 | 9.6% | 13.8% | 10.6% |
| $15,001 – $25,000 | 12.2% | 13.7% | 12.6% |
| $25,001 – $35,000 | 6.8% | 5.8% | 6.5% |
| $35,001 – $50,000 | 16.6% | 15.6% | 16.4% |
| $50,001 o r more | 42.3% | 30.6% | 39.3% |

37  WHAT PERCENT OF YOUR PATIENTS ARE:

|  | Male | Female | All Respondents |
|---|---|---|---|
| Medicare | 32.3% | 24.5% | 31% |
| Medicaid | 16.1% | 23.3% | 17.9% |
| Private pay | 28.7% | 31.7% | 29.7% |
| Indigent | 7.6% | 8.5% | 8% |
| TriCare | 4.1% | 4% | 4% |
| Other | 11.2% | 8% | 9.4% |

38  DESCRIBE YOUR INCOME FROM THE PRACTICE OF MEDICINE OVER THE LAST THREE YEARS:

|  | Male | Female | All Respondents |
|---|---|---|---|
| Flat | 38.5% | 43.8% | 39.7% |
| Declining | 48.8% | 39.9% | 46.7% |
| Increasing | 12.7% | 16.3% | 13.6% |

108

39  AS A RESULT OF THE ONGOING PROBLEMS WITH MEDICARE FEE SCHEDULE UPDATES, WHAT ACTION HAVE YOU TAKEN OR ARE YOU PLANNING TO TAKE? (CHECK ALL THAT APPLY)

|  | Male | Female | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 25.1% | 17.7% | 22.9% |
| Accept no new Medicare patients | 13.2% | 11.3% | 12.6% |
| Terminate existing Medicare patients | 3.3% | 1.9% | 2.8% |
| Change status to non–participating | 7.4% | 5.5% | 6.8% |
| Formally opt out of Medicare | 7.3% | 5.9% | 6.9% |
| Place new or additional limits on Medicaid acceptance | 24.2% | 17.8% | 22.2% |
| Reduce the amount of charity care I deliver | 24.4% | 16.5% | 22% |
| Increase standard fees charged to other patients | 17.4% | 10.9% | 15.5% |
| Delay information technology implementation | 17.3% | 11.8% | 15.9% |
| Renegotiate or terminate some commercial health plan contracts | 19% | 15.1% | 17.7% |
| Reduce staff compensation or benefits | 29.1% | 23% | 27% |

40  IF MEDICARE FEES DECREASE BY 10 PERCENT OR MORE, WHAT ACTIONS WILL YOU TAKE? (CHECK ALL THAT APPLY)

|  | Male | Female | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 28.3% | 22% | 28.3% |
| Accept no new Medicare patients | 28% | 21.4% | 25.9% |
| Terminate existing Medicare patients | 11% | 6.9% | 9.5% |
| Change status to non–participating | 12.6% | 9.4% | 11.6% |
| Formally opt out of Medicare | 15.6% | 10.5% | 14% |
| Place new or additional limits on Medicaid acceptance | 23.3% | 16.9% | 21.3% |
| Reduce the amount of charity care I deliver | 25% | 15.8% | 22.3% |
| Increase standard fees charged to other patients | 20.3% | 11.9% | 17.8% |
| Delay information technology implementation | 16.7% | 10.8% | 15.1% |
| Renegotiate or terminate some commercial health plan contracts | 17.8% | 13.6% | 16.5% |
| Reduce staff compensation or benefits | 29.2% | 20.9% | 26.5% |

109

## 41 | HAS YOUR PRACTICE IMPLEMENTED ELECTRONIC MEDICAL RECORDS?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Yes | 68.5% | 73.3% | 69.5% |
| No | 31.5% | 26.7% | 30.5% |

## 42 | IF YES, WHAT EFFECT HAS EMR HAD ON THE QUALITY OF PATIENT CARE IN YOUR PRACTICE?

|  | Male | Female | All Respondents |
|---|---|---|---|
| No effect | 13.7% | 10.2% | 12.9% |
| Has improved quality of care | 30.4% | 40.2% | 32.9% |
| Not yet improved quality, but I anticipate it will | 13.2% | 14.2% | 13.4% |
| Has not improved quality, and I do not anticipate it will | 19.3% | 16.1% | 18.5% |
| May improve quality, but not worth the investment | 8.3% | 7.1% | 7.9% |
| Decreased quality, but I anticipate it eventually will improve quality | 3.8% | 4.4% | 4% |
| Decreased quality and I do not anticipate it will improve quality | 11.3% | 7.8% | 10.4% |

## 43 | IF YOU HAVE NOT IMPLEMENTED EMR, WHY NOT? (CHECK ALL THAT APPLY)

|  | Male | Female | All Respondents |
|---|---|---|---|
| No time to install EMR | 19.6% | 18.8% | 19.3% |
| Do not have the money to install EMR | 32.9% | 36.2% | 33.6% |
| Do not have the personnel to install EMR | 20.3% | 19.9% | 20.2% |
| Do not have the resources/expertise to install EMR | 27.2% | 25% | 26.9% |

## 44 | DO YOU HAVE SIGNIFICANT CONCERNS THAT EMR POSES A RISK TO PATIENT PRIVACY?

|  | Male | Female | All Respondents |
|---|---|---|---|
| Yes | 48.9% | 41.9% | 47.4% |
| No | 51.1% | 58.1% | 52.6% |

110

## PART IV: RESPONSES BY PRIMARY CARE PHYSICIANS VS. SPECIALISTS AND ALL RESPONDENTS

1 | WHAT IS YOUR MEDICAL SPECIALTY?

| Primary Care | | All Respondents |
|---|---|---|
| Family Physician | 41.2% | 14.2% |
| General Internal Medicine | 31.6% | 11.3% |
| Pediatrics | 27.2% | 9.3% |
| Total | 100% | 34.8% |

| Surgical/Medical/Other | | |
|---|---|---|
| Surgical Specialty | 20.8% | 13.6% |
| Medical Specialty | 18.7% | 12.2% |
| Ob/Gyn | 9.5% | 6.2% |
| General Surgery | 6.6% | 4 .4% |
| Other | 44.4% | 28.8% |
| Total | 100% | 65.2% |

2 | WHAT IS YOUR CURRENT PROFESSIONAL STATUS?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Employed by hospital, group or other entity | 49.1% | 40.8% | 43.7% |
| Practice owner/partner/associate | 43% | 51.1% | 48.5% |
| Other | 7.9% | 8.1% | 7.8% |

3 | WHAT IS YOUR GENDER?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Male | 64.6% | 77.8% | 73.6% |
| Female | 35.4% | 22.2% | 26.4% |

111

4   IN WHAT SIZE COMMUNITY DO YOU PRACTICE?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| 50,000 or less | 27.1% | 14.2% | 18.3% |
| 50,001 to 100,000 | 16.9% | 14.9% | 15.5% |
| 100,001 to 250,000 | 15.4% | 16.8% | 16.4% |
| 250,001 to 500,000 | 14.2% | 16.6% | 15.8% |
| 500,001 to 1 million | 9% | 12.7% | 11.5% |
| 1 million or more | 17.4% | 24.8% | 22.5% |

*Physicians were asked to describe income in their practices over the last three years. Over 86 percent described their income as "flat or declining," while only 13.6 percent described their income as "increasing."*

5   ARE YOU A MEMBER OF YOUR:

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| County medical society | 46.7% | 51.7% | 50.1% |
| State medical society | 62.2% | 64.3% | 63.6% |
| National special society | 60.3% | 75% | 70.4% |
| American Medical Association | 23.1% | 25.2% | 24.5% |
| American Osteopathic Association | 7.5% | 4.2% | 5.2% |

6   WHAT IS YOUR ETHNICITY?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| African–American | 2.7% | 1.5% | 1.9% |
| Asian/Pacific Islander | 7.9% | 7.4% | 7.5% |
| Caucasian | 82.4% | 85.8% | 84.7% |
| Hispanic | 4.9% | 3.7% | 4.1% |
| Native American | 0.1% | 0.1% | 0 .1% |
| Other | 2% | 1.5% | 1.7% |

7   WHICH BEST DESCRIBES YOUR FEELINGS ABOUT THE CURRENT STATE OF THE MEDICAL PROFESSION?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Very positive | 4.5% | 3.6% | 3.9% |
| Somewhat positive | 32% | 26.1% | 27.9% |
| Somewhat negative | 43.4% | 45.5% | 44.8% |
| Very negative | 20.1% | 24.8% | 23.4% |

8   WHICH BEST DESCRIBES HOW YOU FEEL ABOUT THE FUTURE OF THE MEDICAL PROFESSION?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Very positive/optimistic | 4.1% | 2.7% | 3.1% |
| Somewhat positive/optimistic | 24.7% | 17.1% | 19.5% |
| Somewhat negative/pessimistic | 46.5% | 45.5% | 45.9% |
| Very negative/pessimistic | 24.7% | 34.7% | 31.5% |

9   HOW WOULD YOU RATE THE PROFESSIONAL MORALE OF PHYSICIANS YOU KNOW?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Very positive | 2% | 1.7% | 1.8% |
| Somewhat positive | 21.5% | 15.8% | 17.7% |
| Somewhat negative | 56.3% | 55.7% | 55.9% |
| Very negative | 20.2% | 26.8% | 24.7% |

10   HOW WOULD YOU RATE YOUR OWN PROFESSIONAL MORALE?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Very positive | 12.5% | 10.3% | 11% |
| Somewhat positive | 34.6% | 29% | 30.8% |
| Somewhat negative | 38% | 42.4% | 41% |
| Very negative | 14.9% | 18.3% | 17.3% |

113

**11** SOME PHYSICIANS BELIEVE THAT THE MEDICAL PROFESSION IS IN DECLINE. DO YOU:

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Mostly agree | 43.3% | 35.2% | 41.6% |
| Somewhat agree | 41.2% | 48.2% | 42.6% |
| Somewhat disagree | 8.3% | 10.1% | 8.6% |
| Mostly disagree | 7.2% | 6.5% | 7.2% |

**12** IF YOU MOSTLY OR SOMEWHAT AGREE, WHY IS THE PROFESSION IN DECLINE?

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | PC | All | PC | All | PC | All |
| Too much regulation/paperwork | 80.2% | 79.2% | 18.5% | 19.3% | 1.3% | 1.5% |
| Loss of clinical autonomy | 63.1% | 64.5% | 31.5% | 31% | 5.4% | 4.5% |
| Erosion of physician/patient relationship | 54.7% | 54.4% | 36.6% | 37.8% | 8.7% | 7.8% |
| Scope of practice encroachment | 41.8% | 43.7% | 41.5% | 40.6% | 16.7% | 15.7% |
| Too many part-time doctors | 6.9% | 6.9% | 22.6% | 22.6% | 70.5% | 70.5% |
| Money trumps patient care | 49.6% | 45.9% | 38.2% | 40.1% | 12.2% | 14% |
| Physicians not compensated for quality | 61.5% | 58.6% | 31.3% | 33.7% | 7.2% | 7.7% |

|  | Very Important | | Somewhat Important | | Unimportant | |
|---|---|---|---|---|---|---|
|  | Other | All | Other | All | Other | All |
| Too much regulation/paperwork | 78.7% | 79.2% | 19.8% | 19.4% | 1.5% | 1.5% |
| Loss of clinical autonomy | 65.2% | 64.5% | 30.8% | 31% | 4% | 4.5% |
| Erosion of physician/patient relationship | 54.3% | 54.4% | 38.3% | 37.7% | 7.4% | 7.8% |
| Scope of practice encroachment | 44.5% | 43.7% | 40.2% | 40.6% | 15.3% | 15.7% |
| Too many part-time doctors | 6.9% | 6.9% | 22.6% | 22.6% | 70.5% | 70.5% |
| Money trumps patient care | 44.3% | 45.9% | 40.9% | 40.1% | 14.8% | 14% |
| Physicians not compensated for quality | 57.3% | 58.6% | 34.8% | 33.7% | 7.9% | 7.7% |

114

**13** TWO YEARS AGO, WHICH BEST DESCRIBED YOUR ATTITUDE TOWARD MEDICAL PRACTICE?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 16% | 13.3% | 14.1% |
| Somewhat positive/satisfying | 52.6% | 51.8% | 52.1% |
| Somewhat negative/unsatisfying | 27.3% | 31.4% | 30.1% |
| Very negative/unsatisfying | 4.1% | 3.5% | 3.7% |

**14** WHICH BEST DESCRIBES YOUR ATTITUDE TOWARD MEDICAL PRACTICE TODAY?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Very positive/satisfying | 8.7% | 6.7% | 7.3% |
| Somewhat positive/satisfying | 35.7% | 29.7% | 31.7% |
| Somewhat negative/unsatisfying | 38.5% | 42.5% | 41.2% |
| Very negative/unsatisfying | 17.1% | 21.1% | 19.8% |

**15** IF YOU HAD YOUR CAREER TO DO OVER, WOULD YOU CHOOSE TO BE A PHYSICIAN?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes | 70.1% | 64.8% | 66.5% |
| No | 29.9% | 35.2% | 33.5% |

**16** WOULD YOU RECOMMEND MEDICINE AS A CAREER TO YOUR CHILDREN OR OTHER YOUNG PEOPLE?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes | 47.3% | 39.6% | 42.1% |
| No | 52.7% | 60.4% | 57.9% |

**17** IF YOU HAD THE ABILITY, WOULD YOU RETIRE TODAY?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes | 57% | 62.2% | 60.6% |
| No | 43% | 37.8% | 39.4% |

18 : WHAT TWO FACTORS DO YOU FIND MOST SATISFYING ABOUT MEDICAL PRACTICE?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Patient relationships | 88.9% | 76.2% | 80.2% |
| Prestige of medicine | 10.5% | 9.7% | 10% |
| Intellectual stimulation | 69.5% | 69.8% | 69.7% |
| Interaction with colleagues | 15.3% | 20.9% | 19.2% |
| Financial rewards | 9% | 13% | 11.7% |



19 : WHAT TWO FACTORS DO YOU FIND LEAST SATISFYING ABOUT MEDICAL PRACTICE?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Long hours/lack of personal time | 29.2% | 22.9% | 24.9% |
| Liability/defensive medicine pressures | 36.1% | 42.3% | 40.3% |
| Reimbursement issues | 24.5% | 28.6% | 27.3% |
| Lack of clinical autonomy | 9.8% | 8.9% | 9.2% |
| Dealing with Medicare/Medicaid/government regulations | 25.1% | 28.5% | 27.4% |
| Pressure of running a practice | 6.4% | 5.3% | 5.6% |
| Non-clinical paperwork | 26.2% | 14.3% | 18.1% |
| Uncertainty/changes of health reform | 16.1% | 24% | 21.5% |
| Managed care | 7.6% | 7.5% | 7.6% |
| EMR implementation | 11.6% | 8.1% | 9.2% |
| Other | 4.8% | 5.2% | 5.1% |

20  IN THE NEXT ONE TO THREE YEARS, DO YOU PLAN TO (CHECK ALL THAT APPLY):

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Continue as I am | 49.3% | 51% | 49.8% |
| Cut back on hours | 22.5% | 20.8% | 22% |
| Retire | 14% | 12.1% | 13.4% |
| Switch to a cash/concierge practice | 6.4% | 7.7% | 6.8% |
| Relocate to another practice/community | 10.7% | 11.3% | 10.9% |
| Cut back on patients seen | 9.5% | 9.8% | 9.6% |
| Seek a non-clinical job within healthcare | 9.6% | 10.5% | 9.9% |
| Seek employment with a hospital | 6.2% | 4.4% | 5.6% |
| Work part-time | 6.2% | 7% | 6.5% |
| Close my practice to new patients | 2.3% | 7.5% | 4.0% |
| Seek job/business unrelated to healthcare | 6.7% | 6.1% | 6.9% |
| Work locum tenens | 6.9% | 5.7% | 6.4% |
| Other | 5.3% | 5.9% | 5.5% |

21  HOW HAS PASSAGE OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT (PPACA/HEALTH REFORM) AFFECTED YOUR FEELINGS ABOUT THE DIRECTION AND FUTURE OF HEALTHCARE IN AMERICA?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| I am more positive | 25.1% | 15.3% | 18.5% |
| I am less positive | 50.4% | 63.5% | 59.3% |
| My feelings have not changed | 24.5% | 21.2% | 22.2% |

22  MOST PHYSICIANS TODAY ARE FOCUSED ON THEIR DAILY RESPONSIBILITIES AND UNSURE WHERE THE HEALTH SYSTEM WILL BE OR HOW THEY WILL FIT INTO IT THREE TO FIVE YEARS FROM NOW.

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Mostly agree | 51.9% | 56.7% | 55.2% |
| Somewhat agree | 39.2% | 35.2% | 36.5% |
| Somewhat disagree | 6.1% | 5.4% | 5.6% |
| Mostly disagree | 2.8% | 2.7% | 2.7% |

117



**23** PHYSICIANS HAVE LITTLE INFLUENCE ON THE DIRECTION OF HEALTHCARE AND HAVE LITTLE ABILITY TO EFFECT CHANGE.

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Mostly agree | 46.5% | 52.2% | 50.4% |
| Somewhat agree | 32.8% | 31.3% | 31.7% |
| Somewhat disagree | 14.2% | 12% | 12.7% |
| Mostly disagree | 6.5% | 4.5% | 5.2% |

**24** HOSPITAL EMPLOYMENT OF PHYSICIANS IS A POSITIVE TREND LIKELY TO ENHANCE QUALITY OF CARE AND DECREASE COSTS:

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Mostly agree | 5.5% | 4.1% | 4.6% |
| Somewhat agree | 22.1% | 18.9% | 19.9% |
| Somewhat disagree | 34.6% | 32.1% | 32.8% |
| Mostly disagree | 37.8% | 44.9% | 42.7% |

**25** HOSPITAL EMPLOYMENT WILL ERODE THE PHYSICIAN/PATIENT RELATIONSHIP AND QUALITY OF CARE.

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Mostly agree | 34.6% | 40.3% | 38.5% |
| Somewhat agree | 33.4% | 33% | 33.1% |
| Somewhat disagree | 22.9% | 19% | 20.2% |
| Mostly disagree | 9.1% | 7.7% | 8.2% |

118

## 26 | IN YOUR OPINION, TO WHAT DEGREE DO THE FOLLOWING FACTORS CONTRIBUTE TO RISING HEALTH COSTS

| | Major Cost Driver | | Moderate Cost Driver | | Minor Cost Driver | |
|---|---|---|---|---|---|---|
| | PC | All | PC | All | PC | All |
| State and federal insurance mandates | 38.7% | 41.6% | 37.6% | 37.6% | 23.7% | 20.8% |
| Defensive medicine | 67.6% | 69.1% | 27.5% | 26.2% | 4.9% | 4.7% |
| Fraud | 18.7% | 18.8% | 36.6% | 35.3% | 44.7% | 45.9% |
| Advances in technology/treatment | 51.6% | 51.2% | 39.8% | 40.1% | 8.6% | 8.7% |
| Limited patient financial obligations | 38.1% | 39% | 44% | 44.2% | 17.9% | 16.8% |
| Absence of free markets | 34% | 37.2% | 35.1% | 35.6% | 30.9% | 27.2% |
| Cost of pharmaceuticals | 60.5% | 59.1% | 33.1% | 34.9% | 6.4% | 6% |
| Lack of pricing transparency | 42.3% | 40.5% | 39.5% | 40.5% | 18.2% | 19% |
| Physician fees | 5% | 3.8% | 32.8% | 27.9% | 62.2% | 68.3% |
| Price controls on fees and products | 17.4% | 17.9% | 41.1% | 41.6% | 41.5% | 40.5% |
| Aging population | 65.2% | 64.9% | 29% | 29.4% | 5.8% | 5.7% |
| Fee-for-service reimbursement | 16.3% | 12.5% | 37.4% | 35.7% | 46.3% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 42.9% | 43.5% | 40.4% | 40% | 16.7% | 16.5% |
| Relative Value Update Committee/RUC | 18.6% | 17.3% | 47.9% | 47.8% | 33.5% | 34.9% |
| | Other | All | Other | All | Other | All |
| State and federal insurance mandates | 42.9% | 41.6% | 37.5% | 37.6% | 19.6% | 20.8% |
| Defensive medicine | 69.8% | 69.1% | 25.5% | 26.2% | 4.7% | 4.7% |
| Fraud | 18.8% | 18.8% | 34.8% | 35.3% | 46.4% | 45.9% |
| Advances in technology/treatment | 51% | 51.2% | 40.2% | 40.1% | 8.8% | 8.7% |
| Limited patient financial obligations | 39.4% | 39% | 44.2% | 44.2% | 16.4% | 16.8% |
| Absence of free markets | 38.8% | 37.2% | 35.8% | 35.5% | 25.4% | 27.2% |
| Cost of pharmaceuticals | 58.4% | 59.1% | 35.7% | 34.9% | 5.9% | 6% |
| Lack of pricing transparency | 39.6% | 40.5% | 41.1% | 40.6% | 19.3% | 19% |
| Physician fees | 3.3% | 3.8% | 25.6% | 27.9% | 71.1% | 68.3% |
| Price controls on fees and products | 18.2% | 17.9% | 41.8% | 41.6% | 40% | 40.5% |
| Aging population | 64.7% | 64.9% | 29.5% | 29.4% | 5.7% | 5.7% |
| Fee-for-service reimbursement | 10.7% | 12.5% | 35% | 35.7% | 54.3% | 51.8% |
| Social conditions (poverty, drugs, Violence, illegal immigration, etc.) | 43.8% | 43.5% | 39.8% | 40% | 16.4% | 16.5% |
| Relative Value Update Committee/RUC | 16.7% | 17.3% | 47.7% | 47.8% | 35.6% | 34.9% |

**27** IS YOUR PRACTICE OR EMPLOYER ACTIVELY SEEKING DESIGNATION AS AN ACCOUNTABLE CARE ORGANIZATION (ACO)?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes | 26.3% | 19.8% | 21.9% |
| No | 40.9% | 45.4% | 44% |
| Unsure | 32.8% | 34.8% | 34.1% |



**28** WHICH BEST DESCRIBES YOUR FEELINGS ABOUT ACOS?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| They are likely to enhance quality/decrease cost | 13.2% | 7.1% | 9% |
| Quality/cost gains will not justify organizational cost/effort | 22.4% | 21.4% | 21.8% |
| Unlikely to increase quality/decrease cost | 35% | 43.3% | 40.6% |
| Unsure about structure or purpose of ACOs | 29.4% | 28.2% | 28.6% |

**29** WHICH BEST DESCRIBES YOUR FEELINGS ABOUT MEDICAL HOMES?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| They are likely to increase quality/reduce costs | 41.8% | 16.2% | 24.4% |
| They are unlikely to improve quality/reduce costs | 37.8% | 37.6% | 37.7% |
| Unsure about structure/purpose of medical homes | 20.4% | 46.2% | 37.9% |

30 | HOW WOULD YOU RATE THE FOLLOWING AS SOLUTIONS TO THE HEALTH SYSTEM'S COST AND ACCESS CHALLENGES?

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| **PC Only** | | | | | |
| Singlepayer/Canadian style system | 25.3% | 18.7% | 16.1% | 13.3% | 26.6% |
| Wide spread adoption of ACOs | 3.6% | 11.6% | 40.5% | 24.2% | 20.1% |
| Widespread adoption of medical homes | 17.4% | 24.4% | 32.5% | 15.5% | 10.2% |
| Medicare voucher system | 4.8% | 16.1% | 46% | 16.6% | 16.5% |
| Widespread adoption of health savings accounts | 18.1% | 30.2% | 30.5% | 12.3% | 8.9% |
| Evidence based medicine | 37.1% | 35.2% | 19.2% | 5.7% | 2.8% |
| Reduce the supply of physicians | 1.3% | 2.7% | 18.5% | 23.5% | 54% |
| Increase the supply of physicians | 27.1% | 34.3% | 29.9% | 5.2% | 3.5% |
| Electronic medical records | 18% | 27.9% | 24.8% | 16.9% | 12.4% |
| More government regulation | 2.8% | 7.3% | 16% | 17.3% | 56.6% |
| Less government regulation | 43.9% | 23.8% | 20.7% | 7.1% | 4.5% |

| | Very Positive | Somewhat Positive | Neither Positive or Negative | Somewhat Negative | Very Negative |
|---|---|---|---|---|---|
| **Specialists Only** | | | | | |
| Singlepayer/Canadian style system | 16.5% | 16.3% | 15.1% | 15.5% | 36.6% |
| Wide spread adoption of ACOs | 1.6% | 6.6% | 37.7% | 27.3% | 26.8% |
| Widespread adoption of medical homes | 3.5% | 11.4% | 46.5% | 21.3% | 17.3% |
| Medicare voucher system | 6% | 19.6% | 41.2% | 17.3% | 15.9% |
| Widespread adoption of health savings accounts | 24.2% | 34.9% | 25.6% | 8.7% | 6.6% |
| Evidence based medicine | 32.3% | 36.7% | 20.7% | 7% | 3.3% |
| Reduce the supply of physicians | 2.7% | 4.2% | 21.3% | 24% | 47.8% |
| Increase the supply of physicians | 19.4% | 31.1% | 36.9% | 7.3% | 5.3% |
| Electronic medical records | 15% | 24.5% | 26% | 18.5% | 16% |
| More government regulation | 1.6% | 4.6% | 11.4% | 14.5% | 67.9% |
| Less government regulation | 52.5% | 24.1% | 15.3% | 5.2% | 2.9% |

31 ON AVERAGE, HOW MANY HOURS DO YOU WORK PER WEEK?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| 0–20 | 4% | 4% | 4% |
| 21–30 | 5.2% | 4.2% | 4.5% |
| 31–40 | 13.4% | 11.7% | 12.2% |
| 41–50 | 24.7% | 20.5% | 21.9% |
| 51–60 | 26.2% | 26% | 26.1% |
| 61–70 | 13.7% | 15.9% | 15.3% |
| 71–80 | 8.2% | 10.7% | 9.9% |
| 81–90 | 3% | 4.4% | 3.9% |
| 91 – 100 | 1.2% | 1.7% | 1.6% |
| 101 or more | 0.4% | 0.9% | 0.6% |



32 OF THESE, HOW MANY HOURS DO YOU WORK EACH WEEK ON NON–CLINICAL (PAPERWORK) DUTIES ONLY?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| 0–10 | 54.8% | 59.4% | 58% |
| 11–20 | 27.2% | 25.5% | 26.1% |
| 21–30 | 10.4% | 8.7% | 9.3% |
| 31–40 | 4.3% | 3.4% | 3.7% |
| 41–50 | 1.8% | 1.4% | 1.5% |
| 51–60 | 0.9% | 1% | 0.9% |
| 61 or more | 0.6 % | 0.6% | 0.5% |

33 | ON AVERAGE, HOW MANY PATIENTS DO YOU SEE PER DAY?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| 0–10 | 13% | 22.6% | 19.5% |
| 11–20 | 44.3% | 37.6% | 39.8% |
| 21–30 | 33.2% | 23.7% | 26.8% |
| 31–40 | 7.2% | 8.5% | 8.1% |
| 41–50 | 1.5% | 3.1% | 2.6% |
| 51–60 | 0.2% | 1% | 0.8% |
| 61 or more | 0.6% | 3.5% | 2.4% |

*Over 13 percent of physicians indicated they plan to retire over the next one to three years, which will remove them from the medical workforce altogether.*

34 | WHICH OF THE FOLLOWING BEST DESCRIBES YOUR CURRENT PRACTICE?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| I am overextended and overworked | 24.7% | 21.8% | 22.7% |
| I am at full capacity | 52.7% | 52.8 % | 52.7% |
| I have time to see more patients and assume more duties | 22.6% | 25.4% | 24.6% |

35 | HAVE TIME OR COST CONSTRAINTS COMPELLED YOU TO CLOSE YOUR PRACTICE TO MEDICARE OR MEDICAID PATIENTS?

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes, Medicare | 11% | 7.5% | 8.6% |
| Yes, Medicaid | 31.2% | 24.5% | 26.7% |
| No, I have not closed to either | 57.8% | 68% | 64.7% |

123

36  ESTIMATE THE AMOUNT OF UNCOMPENSATED CARE YOU PERSONALLY
    (NOT YOUR ENTIRE GROUP) PROVIDE IN THE COURSE OF A YEAR:

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| $0–$5000 | 19.5% | 12.4% | 14.6% |
| $5001 – $15,000 | 14.5% | 8.9% | 10.6% |
| $15,001 – $25,000 | 16.3% | 10.8% | 12.6% |
| $25,001 – $35,000 | 8.1% | 5.8% | 6.5% |
| $35,001 – $50,000 | 16.3% | 16.5% | 16.4% |
| $50,001 o r more | 25.3% | 45.6% | 39.3% |

37  WHAT PERCENT OF YOUR PATIENTS ARE:

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Medicare | 25.9% | 32.4% | 31% |
| Medicaid | 21.8% | 15.9% | 17.9% |
| Private pay | 31.2% | 28.4% | 29.7% |
| Indigent | 7.8% | 8.2% | 8% |
| TriCare | 3.8% | 4.1% | 4% |
| Other | 9.5% | 11% | 9.4% |

38  DESCRIBE YOUR INCOME FROM THE PRACTICE OF MEDICINE OVER THE LAST THREE YEARS:

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Flat | 44.3% | 37.6% | 39.7% |
| Declining | 36.7% | 51.4% | 46.7% |
| Increasing | 19% | 11% | 13.6% |

124

**39** AS A RESULT OF THE ONGOING PROBLEMS WITH MEDICARE FEE SCHEDULE UPDATES, WHAT ACTION HAVE YOU TAKEN OR ARE YOU PLANNING TO TAKE? (CHECK ALL THAT APPLY)

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 21.9% | 23.3% | 22.9% |
| Accept no new Medicare patients | 16.9% | 10.6% | 12.6% |
| Terminate existing Medicare patients | 2.8% | 2.8% | 2.8% |
| Change status to non-participating | 5.5% | 7.4% | 6.8% |
| Formally opt out of Medicare | 5.7% | 7.5% | 6.9% |
| Place new or additional limits on Medicaid acceptance | 22.4% | 22% | 22.2% |
| Reduce the amount of charity care I deliver | 18.7% | 23.6% | 22% |
| Increase standard fees charged to other patients | 14% | 16.3% | 15.5% |
| Delay information technology implementation | 13.3% | 17.1% | 15.9% |
| Renegotiate or terminate some commercial health plan contracts | 14.2% | 19.3% | 17.7% |
| Reduce staff compensation or benefits | 20% | 30.3% | 27% |

**40** IF MEDICARE FEES DECREASE BY 10 PERCENT OR MORE, WHAT ACTIONS WILL YOU TAKE? (CHECK ALL THAT APPLY)

| | PC | Specialists | All Respondents |
|---|---|---|---|
| Place new or additional limits on Medicare acceptance | 24.9% | 29.8% | 28.3% |
| Accept no new Medicare patients | 29.6% | 24.2% | 25.9% |
| Terminate existing Medicare patients | 9.4% | 9.6% | 9.5% |
| Change status to non-participating | 9.7% | 12.5% | 11.6% |
| Formally opt out of Medicare | 11.9% | 15% | 14% |
| Place new or additional limits on Medicaid acceptance | 21.1% | 21.4% | 21.3% |
| Reduce the amount of charity care I deliver | 18.1% | 24.2% | 22.3% |
| Increase standard fees charged to other patients | 15.7% | 18.8% | 17.8% |
| Delay information technology implementation | 12.5% | 16.2% | 15.1% |
| Renegotiate or terminate some commercial health plan contracts | 13.5% | 17.9% | 16.5% |
| Reduce staff compensation or benefits | 20.4% | 29.3% | 26.5% |

125

## 41 | HAS YOUR PRACTICE IMPLEMENTED ELECTRONIC MEDICAL RECORDS?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes | 72.9% | 67.9% | 69.5% |
| No | 27.1% | 32.1% | 30.5% |

## 42 | IF YES, WHAT EFFECT HAS EMR HAD ON THE QUALITY OF PATIENT CARE IN YOUR PRACTICE?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| No effect | 9.8% | 14.5% | 12.9% |
| Has improved quality of care | 39.5% | 29.6% | 32.9% |
| Not yet improved quality, but I anticipate it will | 15.3% | 12.5% | 13.4% |
| Has not improved quality, and I do not anticipate it will | 14.5% | 20.5% | 18.5% |
| May improve quality, but not worth the investment | 8% | 7.8% | 7.9% |
| Decreased quality, but I anticipate it eventually will improve quality | 4.4% | 3.8% | 4% |
| Decreased quality and I do not anticipate it will improve quality | 8.5% | 11.3% | 10.4% |

## 43 | IF YOU HAVE NOT IMPLEMENTED EMR, WHY NOT? (CHECK ALL THAT APPLY)

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| No time to install EMR | 20.1% | 19% | 19.3% |
| Do not have the money to install EMR | 35% | 33% | 33.6% |
| Do not have the personnel to install EMR | 20.1% | 20.2% | 20.2% |
| Do not have the resources/expertise to install EMR | 24.8% | 27.8% | 26.9% |

## 44 | DO YOU HAVE SIGNIFICANT CONCERNS THAT EMR POSES A RISK TO PATIENT PRIVACY?

|  | PC | Specialists | All Respondents |
|---|---|---|---|
| Yes | 42.9% | 49.6% | 47.4% |
| No | 57.1% | 50.4% | 52.6% |

## ADDITIONAL STUDIES PUBLISHED BY THE PHYSICIANS FOUNDATION

THE FUTURE OF MEDICAL PRACTICE: CREATING OPTIONS FOR PRACTICING PHYSICIANS TO CONTROL THEIR PROFESSIONAL DESTINY (2012)

SURVIVAL OF THE FITTEST: A REVIEW OF PROMISING MODELS FOR THE MAINTENANCE OF INDEPENDENT PRIVATE MEDICAL PRACTICE (2012)

PRACTICE ARRANGEMENTS AMONG YOUNG PHYSICIANS, AND THEIR VIEWS REGARDING THE FUTURE OF THE U.S.HEALTHCARE SYSTEM (2012)

A ROADMAP FOR PHYSICIANS TO HEALTH REFORM (2011)

SURVEY: PHYSICIANS AND HEALTH REFORM (2010)

THE PHYSICIANS' PERSPECTIVE: MEDICAL PRACTICE IN 2008

IN THEIR OWN WORDS, 12,000 PHYSICIANS REVEAL THEIR THOUGHTS ON MEDICAL PRACTICE IN AMERICA

FOR FURTHER INFORMATION ABOUT THIS SURVEY, CONTACT:

THE PHYSICIANS FOUNDATION

Tim Norbeck, CEO
tnorbeck@comcast.net

MERRITT HAWKINS

Phillip Miller
800-876-0500
phil.miller@amnhealthcare.com



# EXHIBIT G

**Market Share of Top Four Health Insurance Companies, By Region, 2004-2014**
**Based on Enrollments in All Plans***

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 99% | 98% | 98% | 94% | 96% | 95% | 94% | 94% | 100% |
| Alabama | 91% | 97% | 95% | 95% | 95% | 94% | 95% | 92% | 90% | 90% | 100% |
| Arkansas | 97% | 96% | 93% | 90% | 87% | 85% | 88% | 86% | 81% | 81% | 95% |
| American Samoa | | | | | | | | 100% | 100% | | |
| Arizona | 64% | 64% | 63% | 62% | 65% | 66% | 68% | 70% | 70% | 70% | 73% |
| California | 100% | 99% | 81% | 80% | 67% | 88% | 88% | 82% | 81% | 86% | 99% |
| Colorado | 64% | 66% | 73% | 76% | 77% | 76% | 79% | 79% | 76% | 76% | 84% |
| Connecticut | 86% | 85% | 82% | 80% | 81% | 72% | 67% | 74% | 79% | 79% | 98% |
| Delware | 73% | 70% | 90% | 74% | 71% | 68% | 68% | 75% | 75% | 74% | 99% |
| District of Columbia | 83% | 81% | 74% | 76% | 75% | 77% | 83% | 80% | 78% | 76% | 100% |
| Florida | 45% | 47% | 48% | 61% | 59% | 56% | 52% | 51% | 48% | 46% | 50% |
| Georgia | 84% | 77% | 59% | 56% | 55% | 47% | 50% | 52% | 48% | 49% | 65% |
| Guatemala | | 12% | 12% | 12% | 13% | 13% | 14% | 13% | 13% | 14% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Hawaii | 97% | 97% | 90% | 93% | 90% | 88% | 89% | 88% | 90% | 88% | 96% |
| Iowa | 89% | 94% | 93% | 92% | 94% | 94% | 93% | 92% | 91% | 88% | 98% |
| Idaho | 99% | 97% | 96% | 95% | 94% | 93% | 94% | 93% | 92% | 90% | 100% |
| Illinois | 76% | 76% | 76% | 75% | 80% | 81% | 83% | 82% | 81% | 80% | 81% |
| Indiana | 60% | 57% | 64% | 79% | 80% | 79% | 81% | 79% | 82% | 81% | 83% |
| Kansas | 64% | 63% | 64% | 64% | 63% | 61% | 64% | 62% | 67% | 56% | 98% |
| Kentucky | 66% | 64% | 65% | 68% | 65% | 63% | 66% | 55% | 55% | 59% | 83% |
| Louisiana | 85% | 85% | 76% | 79% | 78% | 70% | 72% | 67% | 55% | 59% | 75% |
| Massachusetts | 90% | 84% | 80% | 78% | 72% | 72% | 71% | 59% | 57% | 57% | 59% |
| Maryland | 44% | 43% | 44% | 52% | 50% | 49% | 49% | 52% | 52% | 51% | 70% |
| Maine | 96% | 98% | 90% | 90% | 86% | 84% | 85% | 85% | 82% | 81% | 100% |
| Michigan | 61% | 59% | 59% | 63% | 59% | 56% | 55% | 54% | 56% | 58% | 59% |
| Minnesota | 66% | 61% | 70% | 71% | 72% | 70% | 68% | 59% | 57% | 56% | 66% |
| Missouri | 46% | 47% | 47% | 51% | 51% | 52% | 63% | 67% | 67% | 68% | 79% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 72% | 91% | 89% | 82% | 85% | 78% | 80% | 80% | 100% |
| Montana | 100% | 99% | 97% | 94% | 92% | 88% | 88% | 88% | 82% | 81% | 100% |
| North Carolina | 87% | 88% | 86% | 87% | 85% | 81% | 85% | 84% | 82% | 84% | 98% |
| North Dakota | 98% | 98% | 97% | 97% | 97% | 96% | 95% | 95% | 92% | 88% | 100% |
| Nebraska | 92% | 92% | 88% | 89% | 89% | 91% | 92% | 90% | 86% | 83% | 95% |
| New Hampshire | 96% | 95% | 88% | 88% | 85% | 79% | 76% | 81% | 79% | 64% | 89% |
| New Jersey | 56% | 45% | 48% | 48% | 51% | 55% | 55% | 52% | 54% | 51% | 84% |
| New Mexico | 90% | 70% | 68% | 71% | 68% | 67% | 65% | 63% | 61% | 63% | 87% |
| Nevada | 74% | 73% | 79% | 75% | 75% | 68% | 73% | 71% | 71% | 65% | 77% |
| New York | 49% | 49% | 49% | 48% | 49% | 49% | 47% | 49% | 50% | 50% | 51% |
| Ohio | 66% | 66% | 62% | 62% | 63% | 61% | 62% | 62% | 64% | 64% | 65% |
| Oklahoma | 89% | 89% | 85% | 82% | 83% | 82% | 84% | 84% | 83% | 86% | 90% |
| Oregon | 72% | 71% | 71% | 70% | 66% | 67% | 63% | 63% | 61% | 61% | 68% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 44% | 44% | 44% | 40% | 39% | 39% | 38% | 37% | 37% | 36% | 41% |
| Puerto Rico | 85% | 86% | 84% | 78% | 79% | 81% | 81% | 87% | 87% | 90% | 90% |
| Rhode Island | 84% | 94% | 94% | 94% | 93% | 91% | 91% | 91% | 89% | 88% | 91% |
| South Carolina | 93% | 89% | 85% | 81% | 74% | 70% | 72% | 74% | 73% | 77% | 96% |
| South Dakota | 92% | 88% | 86% | 88% | 84% | 85% | 83% | 83% | 81% | 74% | 92% |
| Tennessee | 86% | 87% | 78% | 84% | 85% | 85% | 80% | 79% | 75% | 75% | 91% |
| Texas | 48% | 55% | 52% | 52% | 55% | 56% | 55% | 53% | 52% | 53% | 45% |
| Utah | 88% | 83% | 83% | 86% | 86% | 79% | 79% | 77% | 73% | 65% | 78% |
| Virginia | 44% | 57% | 57% | 57% | 58% | 57% | 59% | 66% | 66% | 66% | 80% |
| Virgin Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | |
| Vermont | 100% | 99% | 96% | 94% | 92% | 89% | 91% | 94% | 85% | 86% | 100% |
| Washington | 64% | 64% | 64% | 64% | 61% | 59% | 57% | 57% | 54% | 55% | 61% |
| Wisconsin | 44% | 45% | 39% | 36% | 35% | 35% | 36% | 37% | 33% | 33% | 79% |
| West Virigina | 79% | 76% | 66% | 63% | 60% | 60% | 59% | 59% | 61% | 62% | 82% |
| Wyoming | 100% | 100% | 98% | 98% | 98% | 97% | 97% | 95% | 92% | 96% | 100% |

Note:   *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
and other.
**Blank indicates data are not available.

Source:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

**Market Share of Top Eight Health Insurance Companies, By Region, 2004-2014**
**Based on Enrollments in All Plans***

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 100% |
| Alabama | 100% | 100% | 99% | 99% | 99% | 98% | 99% | 97% | 97% | 97% | 100% |
| Arkansas | 100% | 100% | 98% | 95% | 94% | 93% | 93% | 92% | 91% | 93% | 100% |
| American Samoa | | | | | | | | 100% | 100% | | |
| Arizona | 85% | 84% | 82% | 81% | 81% | 82% | 82% | 82% | 81% | 81% | 87% |
| California | 100% | 100% | 100% | 99% | 97% | 98% | 98% | 96% | 95% | 96% | 100% |
| Colorado | 91% | 91% | 91% | 91% | 91% | 92% | 93% | 94% | 90% | 91% | 98% |
| Connecticut | 97% | 97% | 95% | 93% | 93% | 89% | 87% | 90% | 92% | 93% | 100% |
| Delware | 91% | 89% | 96% | 92% | 92% | 92% | 92% | 92% | 91% | 89% | 100% |
| District of Columbia | 95% | 93% | 89% | 91% | 91% | 92% | 96% | 96% | 94% | 94% | 100% |
| Florida | 68% | 67% | 65% | 74% | 74% | 72% | 67% | 66% | 67% | 67% | 70% |
| Georgia | 96% | 95% | 85% | 84% | 82% | 74% | 77% | 77% | 75% | 77% | 95% |
| Guatemala | | 18% | 17% | 18% | 19% | 19% | 19% | 18% | 18% | 19% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Hawaii | 100% | 100% | 99% | 99% | 99% | 98% | 99% | 99% | 99% | 99% | 100% |
| Iowa | 99% | 99% | 98% | 98% | 99% | 99% | 98% | 98% | 97% | 96% | 100% |
| Idaho | 100% | 100% | 99% | 98% | 98% | 98% | 98% | 98% | 96% | 96% | 100% |
| Illinois | 89% | 88% | 86% | 87% | 89% | 90% | 92% | 91% | 90% | 90% | 90% |
| Indiana | 81% | 80% | 84% | 93% | 95% | 94% | 94% | 93% | 94% | 94% | 98% |
| Kansas | 92% | 90% | 88% | 85% | 86% | 86% | 93% | 90% | 93% | 91% | 100% |
| Kentucky | 88% | 88% | 84% | 88% | 87% | 87% | 87% | 78% | 79% | 84% | 99% |
| Louisiana | 97% | 96% | 89% | 91% | 91% | 87% | 89% | 88% | 78% | 81% | 96% |
| Massachusetts | 98% | 97% | 95% | 95% | 91% | 90% | 90% | 83% | 81% | 81% | 84% |
| Maryland | 65% | 64% | 64% | 70% | 69% | 71% | 70% | 73% | 74% | 75% | 86% |
| Maine | 100% | 100% | 99% | 98% | 98% | 97% | 98% | 97% | 94% | 96% | 100% |
| Michigan | 76% | 73% | 74% | 79% | 76% | 73% | 75% | 73% | 74% | 74% | 78% |
| Minnesota | 98% | 94% | 97% | 97% | 97% | 96% | 95% | 88% | 88% | 87% | 93% |
| Missouri | 69% | 65% | 64% | 68% | 68% | 70% | 78% | 80% | 81% | 82% | 93% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 99% | 98% | 97% | 95% | 96% | 92% | 93% | 94% | |
| Montana | 100% | 100% | 100% | 99% | 99% | 98% | 98% | 97% | 96% | 97% | 100% |
| North Carolina | 96% | 98% | 93% | 93% | 93% | 90% | 93% | 92% | 91% | 94% | 100% |
| North Dakota | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 99% | 98% | 99% | 100% |
| Nebraska | 100% | 100% | 98% | 99% | 99% | 99% | 99% | 98% | 97% | 96% | 100% |
| New Hampshire | 100% | 100% | 97% | 98% | 97% | 96% | 96% | 96% | 94% | 87% | 100% |
| New Jersey | 75% | 67% | 71% | 72% | 73% | 75% | 76% | 75% | 76% | 74% | 100% |
| New Mexico | 100% | 95% | 94% | 96% | 94% | 91% | 89% | 88% | 86% | 87% | 100% |
| Nevada | 93% | 90% | 95% | 89% | 87% | 86% | 87% | 85% | 87% | 86% | 94% |
| New York | 70% | 69% | 70% | 71% | 72% | 72% | 71% | 72% | 72% | 72% | 74% |
| Ohio | 81% | 81% | 76% | 76% | 77% | 76% | 77% | 78% | 79% | 80% | 84% |
| Oklahoma | 100% | 98% | 95% | 93% | 93% | 92% | 93% | 92% | 92% | 95% | 99% |
| Oregon | 92% | 91% | 90% | 89% | 88% | 88% | 87% | 87% | 84% | 83% | 88% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 61% | 60% | 60% | 57% | 57% | 57% | 55% | 54% | 54% | 53% | 57% |
| Puerto Rico | 100% | 100% | 100% | 97% | 96% | 98% | 98% | 99% | 99% | 99% | 99% |
| Rhode Island | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 100% |
| South Carolina | 100% | 99% | 95% | 93% | 87% | 83% | 89% | 90% | 88% | 90% | 100% |
| South Dakota | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 98% | 96% | 94% | 100% |
| Tennessee | 98% | 97% | 89% | 93% | 94% | 93% | 93% | 91% | 89% | 90% | 99% |
| Texas | 65% | 69% | 66% | 64% | 66% | 67% | 68% | 66% | 66% | 66% | 61% |
| Utah | 98% | 96% | 95% | 95% | 95% | 94% | 93% | 92% | 90% | 86% | 98% |
| Virginia | 64% | 72% | 73% | 74% | 75% | 75% | 80% | 84% | 84% | 84% | 95% |
| Virgin Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Vermont | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 99% | 100% |
| Washington | 87% | 87% | 86% | 86% | 84% | 84% | 83% | 83% | 80% | 80% | 87% |
| Wisconsin | 65% | 67% | 63% | 61% | 60% | 58% | 60% | 59% | 55% | 56% | 86% |
| West Viriginia | 99% | 97% | 89% | 90% | 88% | 88% | 87% | 85% | 86% | 88% | 100% |
| Wyoming | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 99% | 97% | 99% | 100% |

Note:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
and other.

**Blank indicates data are not available.

Source:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

**HHI Market Concentration, By Region, 2004-2014**
**Based on Enrollments in All Plans***

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 6,469 | 5,897 | 5,307 | 5,122 | 4,958 | 4,212 | 4,401 | 5,148 | 5,053 | 5,037 | 10,000 |
| Alabama | 2,909 | 7,459 | 7,218 | 7,029 | 6,920 | 6,116 | 6,176 | 5,569 | 5,142 | 4,983 | 8,364 |
| Arkansas | 4,515 | 4,719 | 4,423 | 3,929 | 3,461 | 3,176 | 3,312 | 3,223 | 2,780 | 2,741 | 2,980 |
| American Samoa | | | | | | | | 10,000 | 10,000 | | |
| Arizona | 1,745 | 1,845 | 1,901 | 1,916 | 2,085 | 2,046 | 2,153 | 2,052 | 2,017 | 2,004 | 1,681 |
| California | 4,834 | 6,042 | 1,954 | 1,910 | 1,435 | 5,732 | 5,680 | 4,738 | 4,495 | 4,739 | 6,868 |
| Colorado | 1,647 | 1,769 | 2,135 | 2,210 | 2,341 | 2,264 | 2,385 | 2,312 | 1,530 | 1,562 | 2,102 |
| Connecticut | 2,321 | 2,383 | 2,728 | 2,520 | 2,512 | 2,014 | 1,817 | 2,561 | 2,993 | 2,719 | 8,073 |
| Delware | 1,994 | 1,699 | 5,861 | 1,953 | 1,636 | 1,488 | 1,486 | 1,724 | 1,639 | 1,543 | 6,944 |
| District of Columbia | 1,997 | 1,919 | 1,645 | 1,861 | 1,912 | 2,014 | 2,654 | 2,460 | 2,382 | 2,019 | 4,239 |
| Florida | 732 | 892 | 995 | 1,445 | 1,311 | 1,148 | 975 | 947 | 855 | 767 | 867 |
| Georgia | 2,408 | 2,049 | 1,182 | 1,127 | 1,062 | 846 | 920 | 956 | 853 | 879 | 1,377 |
| Guatemala | | 88 | 86 | 94 | 97 | 98 | 98 | 95 | 94 | 98 | |
| Guam | | 10,000 | 10,000 | 9,999 | 9,998 | 10,000 | 10,000 | 9,994 | 9,980 | 10,000 | 10,000 |
| Hawaii | 5,019 | 4,984 | 4,310 | 4,069 | 3,825 | 3,650 | 3,633 | 3,568 | 4,044 | 3,953 | 4,672 |
| Iowa | 2,290 | 5,744 | 5,813 | 5,791 | 6,035 | 6,158 | 5,775 | 5,791 | 5,523 | 5,199 | 7,600 |
| Idaho | 4,331 | 5,845 | 3,113 | 3,356 | 3,730 | 3,880 | 4,191 | 4,395 | 4,150 | 3,804 | 4,828 |
| Illinois | 2,894 | 2,588 | 2,496 | 2,434 | 3,183 | 3,213 | 3,456 | 3,277 | 3,169 | 3,129 | 3,805 |
| Indiana | 1,198 | 1,070 | 1,655 | 2,520 | 2,699 | 3,003 | 3,083 | 3,008 | 3,575 | 3,349 | 3,828 |
| Kansas | 1,366 | 1,269 | 1,335 | 1,247 | 1,229 | 1,199 | 1,378 | 1,258 | 1,340 | 1,162 | 2,775 |
| Kentucky | 1,742 | 1,777 | 1,606 | 1,645 | 1,593 | 1,492 | 1,462 | 1,082 | 1,168 | 1,288 | 2,004 |
| Louisiana | 3,198 | 3,284 | 2,862 | 3,028 | 2,852 | 2,236 | 2,300 | 1,946 | 1,147 | 1,330 | 2,256 |
| Massachusetts | 2,980 | 2,231 | 2,249 | 2,200 | 2,005 | 1,807 | 1,765 | 1,165 | 1,115 | 1,138 | 1,210 |
| Maryland | 844 | 818 | 759 | 908 | 810 | 814 | 776 | 872 | 871 | 874 | 1,506 |
| Maine | 3,720 | 6,618 | 5,551 | 5,434 | 4,955 | 4,430 | 4,777 | 4,748 | 2,979 | 2,759 | 4,878 |
| Michigan | 1,542 | 1,435 | 1,450 | 1,571 | 1,209 | 1,115 | 1,082 | 1,010 | 1,063 | 1,092 | 1,265 |
| Minnesota | 1,469 | 1,321 | 1,576 | 1,569 | 1,548 | 1,470 | 1,423 | 1,174 | 1,147 | 1,128 | 1,360 |
| Missouri | 774 | 758 | 782 | 885 | 903 | 955 | 1,328 | 1,504 | 1,496 | 1,544 | 1,899 |
| Northern Mariana Islands | | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| Mississippi | 4,496 | 4,705 | 1,617 | 6,353 | 5,719 | 3,857 | 3,677 | 2,967 | 3,277 | 3,179 | 6,618 |
| Montana | 5,765 | 5,737 | 5,976 | 6,355 | 5,890 | 4,338 | 4,655 | 4,471 | 4,465 | 4,198 | 5,087 |
| North Carolina | 3,323 | 3,457 | 3,615 | 3,693 | 3,435 | 3,361 | 3,956 | 3,831 | 3,674 | 3,827 | 7,067 |
| North Dakota | 5,611 | 5,652 | 5,647 | 5,693 | 5,524 | 5,520 | 4,427 | 4,286 | 3,955 | 4,806 | 6,902 |
| Nebraska | 3,818 | 4,030 | 4,074 | 4,094 | 4,079 | 4,210 | 3,798 | 3,701 | 3,112 | 2,335 | 3,189 |
| New Hampshire | 2,967 | 2,807 | 2,385 | 2,432 | 2,322 | 1,989 | 1,761 | 1,940 | 1,917 | 1,323 | 2,369 |
| New Jersey | 1,068 | 767 | 809 | 879 | 938 | 948 | 979 | 920 | 954 | 865 | 2,582 |
| New Mexico | 2,494 | 1,531 | 1,485 | 1,540 | 1,406 | 1,414 | 1,330 | 1,288 | 1,227 | 1,288 | 2,369 |
| Nevada | 1,722 | 1,651 | 2,007 | 1,781 | 1,842 | 1,621 | 1,690 | 1,737 | 1,715 | 1,502 | 2,193 |
| New York | 798 | 793 | 799 | 791 | 813 | 816 | 762 | 785 | 812 | 822 | 864 |
| Ohio | 1,311 | 1,302 | 1,228 | 1,203 | 1,197 | 1,133 | 1,129 | 1,133 | 1,189 | 1,208 | 1,253 |
| Oklahoma | 2,654 | 2,821 | 2,549 | 2,063 | 2,288 | 2,191 | 2,338 | 2,319 | 2,300 | 2,393 | 3,114 |
| Oregon | 1,763 | 1,728 | 1,794 | 1,858 | 1,524 | 1,533 | 1,357 | 1,299 | 1,216 | 1,214 | 1,501 |
| Other | 8,023 | 5,759 | 10,000 | 10,000 | | 10,000 | 9,904 | 9,884 | 9,894 | 9,959 | |
| Pennsylvannia | 820 | 754 | 736 | 609 | 594 | 594 | 561 | 535 | 527 | 498 | 624 |
| Puerto Rico | 2,519 | 2,572 | 2,176 | 1,993 | 2,229 | 2,454 | 1,891 | 3,234 | 3,236 | 4,802 | 4,812 |
| Rhode Island | 2,302 | 2,787 | 2,866 | 3,043 | 2,951 | 2,557 | 2,454 | 2,463 | 2,367 | 2,304 | 2,636 |
| South Carolina | 6,508 | 5,317 | 4,814 | 3,287 | 2,978 | 2,508 | 2,777 | 2,862 | 2,777 | 2,930 | 4,836 |
| South Dakota | 4,126 | 3,026 | 2,909 | 2,353 | 2,629 | 2,686 | 2,562 | 2,504 | 2,261 | 2,021 | 3,629 |
| Tennessee | 3,921 | 4,385 | 3,479 | 3,434 | 3,061 | 2,817 | 2,082 | 2,041 | 1,888 | 2,000 | 3,817 |
| Texas | 953 | 1,066 | 994 | 992 | 1,199 | 1,121 | 1,154 | 1,028 | 844 | 863 | 749 |
| Utah | 2,731 | 2,371 | 2,419 | 2,565 | 2,534 | 1,973 | 2,172 | 2,059 | 1,880 | 1,566 | 2,160 |
| Virginia | 693 | 1,251 | 1,243 | 1,240 | 1,201 | 1,108 | 1,140 | 1,453 | 1,418 | 1,418 | 1,992 |
| Virgin Islands | | | 10,000 | 9,841 | 9,604 | 8,498 | 5,874 | 8,153 | 3,698 | 7,246 | |
| Vermont | 5,000 | 4,901 | 4,796 | 4,329 | 3,767 | 3,242 | 3,019 | 3,041 | 2,460 | 2,638 | 4,626 |
| Washington | 1,254 | 1,244 | 1,241 | 1,223 | 1,155 | 1,081 | 1,036 | 1,030 | 971 | 981 | 1,163 |
| Wisconsin | 719 | 751 | 632 | 571 | 553 | 536 | 555 | 561 | 501 | 518 | 3,133 |
| West Virigina | 2,364 | 1,933 | 1,553 | 1,428 | 1,393 | 1,309 | 1,284 | 1,246 | 1,314 | 1,331 | 2,200 |
| Wyoming | 7,717 | 7,337 | 6,881 | 6,328 | 6,491 | 6,610 | 6,392 | 6,606 | 6,108 | 4,202 | 4,856 |

Note:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
and other.

**Blank indicates data are not available.

***HHI < 1,500 is unconcentrated (white); 1,500 ≤ HHI ≤ 2,500 is moderately concentrated (yellow); HHI > 2,500 is highly concentrated
(orange).

Source:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

**Market Share of Top Four Health Insurance Companies, By Region, 2004-2014**
Based on Enrollments in Comprehensive (Hospital & Medical) Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Alabama | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Arkansas | 100% | 99% | 99% | 97% | 98% | 98% | 97% | 96% | 97% | 97% | 99% |
| American Samoa | | | | | | | | | | | |
| Arizona | 85% | 83% | 81% | 78% | 78% | 82% | 87% | 89% | 90% | 90% | 100% |
| California | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Colorado | 75% | 78% | 79% | 75% | 79% | 80% | 83% | 85% | 84% | 83% | 90% |
| Connecticut | 91% | 91% | 88% | 88% | 89% | 87% | 83% | 87% | 85% | 88% | 96% |
| Delware | 83% | 91% | 90% | 92% | 93% | 96% | 97% | 96% | 96% | 96% | 100% |
| District of Columbia | 80% | 81% | 73% | 70% | 71% | 72% | 85% | 87% | 92% | 96% | 100% |
| Florida | 62% | 63% | 65% | 65% | 66% | 66% | 63% | 64% | 64% | 64% | 63% |
| Georgia | 90% | 87% | 85% | 83% | 80% | 79% | 78% | 71% | 68% | 67% | 71% |
| Guatemala | | 13% | 13% | 13% | 14% | 15% | 15% | 15% | 15% | 15% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Hawaii | 100% | 100% | 97% | 97% | 95% | 95% | 98% | 99% | 99% | 99% | 100% |
| Iowa | 97% | 95% | 96% | 94% | 96% | 96% | 95% | 95% | 95% | 95% | 100% |
| Idaho | 100% | 100% | 99% | 99% | 98% | 99% | 99% | 99% | 99% | 98% | 100% |
| Illinois | 79% | 88% | 90% | 89% | 90% | 91% | 94% | 95% | 95% | 95% | 97% |
| Indiana | 71% | 80% | 88% | 89% | 96% | 96% | 97% | 94% | 95% | 97% | 99% |
| Kansas | 82% | 72% | 69% | 68% | 73% | 74% | 92% | 93% | 94% | 90% | 100% |
| Kentucky | 95% | 96% | 96% | 97% | 99% | 99% | 98% | 94% | 94% | 95% | 97% |
| Louisiana | 93% | 94% | 93% | 92% | 93% | 95% | 96% | 97% | 97% | 95% | 95% |
| Massachusetts | 93% | 88% | 88% | 87% | 82% | 79% | 77% | 75% | 72% | 70% | 67% |
| Maryland | 69% | 69% | 68% | 73% | 77% | 82% | 83% | 85% | 85% | 80% | 94% |
| Maine | 99% | 100% | 99% | 98% | 99% | 100% | 100% | 100% | 100% | 100% | 100% |
| Michigan | 79% | 83% | 84% | 94% | 94% | 94% | 94% | 88% | 87% | 85% | 85% |
| Minnesota | 89% | 89% | 92% | 92% | 93% | 92% | 92% | 93% | 94% | 93% | 94% |
| Missouri | 63% | 61% | 55% | 60% | 65% | 69% | 78% | 88% | 90% | 90% | 92% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Montana | 100% | 100% | 100% | 100% | 99% | 99% | 98% | 99% | 99% | 100% | 100% |
| North Carolina | 94% | 98% | 98% | 97% | 96% | 97% | 97% | 97% | 97% | 97% | 100% |
| North Dakota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nebraska | 100% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New Hampshire | 100% | 99% | 97% | 96% | 93% | 90% | 89% | 93% | 94% | 96% | 100% |
| New Jersey | 76% | 69% | 77% | 72% | 74% | 74% | 75% | 76% | 77% | 74% | 97% |
| New Mexico | 100% | 93% | 90% | 100% | 96% | 98% | 93% | 90% | 91% | 92% | 100% |
| Nevada | 81% | 82% | 88% | 80% | 82% | 86% | 88% | 86% | 87% | 83% | 91% |
| New York | 55% | 56% | 57% | 58% | 61% | 63% | 61% | 63% | 62% | 62% | 60% |
| Ohio | 75% | 75% | 79% | 80% | 80% | 81% | 80% | 82% | 82% | 83% | 90% |
| Oklahoma | 96% | 95% | 94% | 87% | 84% | 83% | 84% | 86% | 88% | 91% | 95% |
| Oregon | 75% | 75% | 77% | 78% | 77% | 79% | 79% | 80% | 81% | 82% | 82% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 55% | 60% | 62% | 62% | 61% | 62% | 56% | 52% | 51% | 50% | 51% |
| Puerto Rico | 97% | 98% | 97% | 92% | 92% | 99% | 100% | 100% | 99% | 99% | 99% |
| Rhode Island | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| South Carolina | 98% | 97% | 99% | 98% | 96% | 97% | 100% | 100% | 100% | 99% | 100% |
| South Dakota | 100% | 100% | 97% | 97% | 97% | 98% | 99% | 99% | 97% | 97% | 100% |
| Tennessee | 94% | 95% | 92% | 92% | 91% | 93% | 95% | 94% | 94% | 96% | 100% |
| Texas | 60% | 74% | 75% | 71% | 71% | 71% | 73% | 70% | 73% | 77% | 51% |
| Utah | 97% | 98% | 98% | 98% | 99% | 98% | 99% | 99% | 99% | 98% | 100% |
| Virginia | 47% | 62% | 64% | 65% | 66% | 67% | 73% | 75% | 75% | 73% | 95% |
| Virgin Islands | | | | | | | 100% | 100% | 100% | 100% | |
| Vermont | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% | 100% | 100% | 100% |
| Washington | 78% | 79% | 78% | 78% | 77% | 79% | 78% | 78% | 75% | 77% | 84% |
| Wisconsin | 46% | 44% | 43% | 42% | 45% | 46% | 46% | 46% | 46% | 48% | 64% |
| West Virigina | 97% | 86% | 93% | 96% | 96% | 96% | 97% | 98% | 97% | 97% | 100% |
| Wyoming | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Note:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
   **Blank indicates data are not available.

Source:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

**Market Share of Top Eight Health Insurance Companies, By Region, 2004-2014**
Based on Enrollments in Comprehensive (Hospital & Medical) Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Alabama | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Arkansas | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| American Samoa | | | | | | | | | | | |
| Arizona | 100% | 98% | 98% | 96% | 96% | 98% | 100% | 100% | 100% | 100% | 100% |
| California | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Colorado | 94% | 95% | 95% | 90% | 92% | 94% | 96% | 96% | 96% | 96% | 99% |
| Connecticut | 100% | 100% | 100% | 100% | 100% | 99% | 99% | 100% | 100% | 100% | |
| Delware | 99% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| District of Columbia | 99% | 99% | 97% | 96% | 91% | 91% | 98% | 99% | 99% | 100% | 100% |
| Florida | 84% | 83% | 84% | 83% | 83% | 83% | 83% | 83% | 82% | 82% | 81% |
| Georgia | 98% | 96% | 95% | 95% | 96% | 97% | 96% | 95% | 95% | 92% | 97% |
| Guatemala | | 20% | 21% | 21% | 22% | 23% | 23% | 23% | 23% | 23% | |
| Guam | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Hawaii | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Iowa | 99% | 99% | 99% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Idaho | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Illinois | 96% | 97% | 97% | 97% | 97% | 97% | 99% | 99% | 99% | 99% | 100% |
| Indiana | 94% | 96% | 98% | 98% | 99% | 99% | 100% | 99% | 99% | 100% | 100% |
| Kansas | 99% | 96% | 96% | 97% | 96% | 98% | 100% | 100% | 100% | 100% | 100% |
| Kentucky | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% |
| Louisiana | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Massachusetts | 99% | 98% | 98% | 98% | 97% | 95% | 94% | 91% | 90% | 90% | 87% |
| Maryland | 95% | 96% | 97% | 96% | 96% | 96% | 96% | 96% | 96% | 94% | 100% |
| Maine | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Michigan | 96% | 98% | 98% | 99% | 99% | 99% | 99% | 95% | 95% | 93% | 93% |
| Minnesota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 99% | 100% | 100% | 100% |
| Missouri | 89% | 89% | 85% | 89% | 90% | 93% | 96% | 98% | 99% | 99% | 99% |
| Northern Mariana Islands | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Mississippi | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Montana | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| North Carolina | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| North Dakota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nebraska | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New Hampshire | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| New Jersey | 95% | 91% | 94% | 94% | 95% | 94% | 96% | 97% | 97% | 94% | 100% |
| New Mexico | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Nevada | 96% | 95% | 98% | 91% | 94% | 96% | 97% | 98% | 97% | 94% | 100% |
| New York | 79% | 80% | 81% | 83% | 84% | 84% | 85% | 87% | 88% | 88% | 88% |
| Ohio | 90% | 90% | 92% | 92% | 92% | 93% | 91% | 94% | 94% | 94% | 100% |
| Oklahoma | 100% | 100% | 100% | 99% | 98% | 98% | 100% | 100% | 100% | 100% | 100% |
| Oregon | 98% | 99% | 98% | 98% | 98% | 98% | 99% | 99% | 99% | 99% | 99% |
| Other | 100% | 100% | 100% | 100% | | 100% | 100% | 100% | 100% | 100% | |
| Pennsylvannia | 78% | 79% | 82% | 82% | 82% | 83% | 80% | 79% | 79% | 78% | 79% |
| Puerto Rico | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Rhode Island | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| South Carolina | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| South Dakota | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Tennessee | 100% | 100% | 99% | 99% | 99% | 99% | 99% | 99% | 99% | 99% | 100% |
| Texas | 78% | 86% | 86% | 82% | 82% | 84% | 85% | 83% | 85% | 87% | 74% |
| Utah | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Virginia | 75% | 82% | 83% | 84% | 84% | 85% | 90% | 92% | 93% | 93% | 100% |
| Virgin Islands | | | | | | | 100% | 100% | 100% | 100% | |
| Vermont | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Washington | 92% | 93% | 93% | 93% | 93% | 94% | 95% | 96% | 92% | 93% | 98% |
| Wisconsin | 72% | 72% | 71% | 71% | 72% | 73% | 74% | 75% | 74% | 75% | 81% |
| West Viriginia | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Wyoming | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Note:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
   **Blank indicates data are not available.

Source:  NAIC Exhibit of Premiums, Enrollment, and Utilization.

## HHI Market Concentration, By Region, 2004-2014
### Based on Enrollments in Comprehensive (Hospital & Medical) Plans*

| State/Region | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alaska | 10,000 | 9,942 | 9,949 | 9,543 | 9,153 | 8,586 | 8,388 | 8,542 | 8,635 | 8,462 | |
| Alabama | 2,942 | 9,122 | 9,264 | 9,311 | 9,356 | 9,355 | 9,298 | 9,255 | 9,262 | 9,274 | 9,274 |
| Arkansas | 5,041 | 5,411 | 5,734 | 5,298 | 4,733 | 4,406 | 4,360 | 4,333 | 4,340 | 4,305 | 4,781 |
| American Samoa | | | | | | | | | | | |
| Arizona | 2,444 | 2,426 | 2,816 | 2,720 | 3,051 | 3,806 | 4,724 | 4,875 | 5,000 | 5,103 | 6,240 |
| California | | 5,870 | 7,927 | 8,373 | 10,000 | 9,765 | 9,601 | 9,240 | 9,178 | 8,865 | 8,449 |
| Colorado | 1,950 | 2,253 | 2,405 | 2,294 | 2,462 | 2,631 | 3,103 | 3,167 | 3,012 | 2,988 | 3,332 |
| Connecticut | 2,467 | 3,119 | 3,127 | 3,317 | 3,415 | 3,235 | 2,522 | 2,642 | 2,735 | 2,830 | 3,416 |
| Delware | 2,670 | 3,464 | 3,747 | 3,899 | 4,222 | 4,766 | 4,812 | 4,602 | 4,681 | 4,669 | 6,049 |
| District of Columbia | 1,853 | 1,851 | 1,618 | 1,613 | 1,630 | 1,612 | 2,217 | 2,321 | 2,621 | 2,759 | 5,379 |
| Florida | 1,233 | 1,304 | 1,657 | 1,854 | 1,914 | 1,865 | 1,698 | 1,801 | 1,933 | 1,876 | 1,804 |
| Georgia | 2,892 | 2,504 | 2,433 | 2,266 | 2,079 | 2,000 | 1,929 | 1,604 | 1,544 | 1,471 | 1,634 |
| Guatemala | | 108 | 115 | 118 | 127 | 137 | 139 | 137 | 143 | 153 | |
| Guam | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Hawaii | 5,228 | 5,162 | 4,960 | 4,219 | 4,207 | 4,236 | 4,189 | 4,144 | 4,725 | 4,638 | 4,738 |
| Iowa | 3,795 | 4,355 | 4,450 | 4,461 | 4,610 | 4,989 | 4,781 | 4,593 | 4,756 | 4,683 | 5,926 |
| Idaho | 5,261 | 8,688 | 5,035 | 4,692 | 4,556 | 4,511 | 4,439 | 4,265 | 4,188 | 4,338 | 5,639 |
| Illinois | 2,005 | 5,318 | 5,601 | 5,318 | 5,606 | 5,901 | 6,427 | 6,530 | 6,430 | 6,341 | 7,549 |
| Indiana | 1,937 | 2,285 | 3,773 | 4,097 | 5,626 | 5,385 | 5,577 | 5,526 | 5,779 | 6,029 | 6,373 |
| Kansas | 1,925 | 1,595 | 1,487 | 1,493 | 1,698 | 1,819 | 2,603 | 2,676 | 2,644 | 2,457 | 6,687 |
| Kentucky | 3,004 | 3,218 | 4,304 | 4,634 | 4,932 | 4,957 | 4,979 | 3,892 | 4,515 | 4,437 | 4,090 |
| Louisiana | 3,388 | 3,619 | 4,427 | 4,511 | 4,364 | 4,283 | 4,468 | 4,654 | 4,743 | 4,453 | 4,464 |
| Massachusetts | 3,203 | 2,626 | 2,727 | 2,623 | 2,327 | 2,180 | 1,982 | 1,835 | 1,729 | 1,765 | 1,618 |
| Maryland | 1,496 | 1,565 | 1,560 | 1,781 | 1,945 | 2,170 | 2,186 | 2,320 | 2,390 | 2,257 | 3,821 |
| Maine | 4,924 | 6,087 | 6,063 | 5,999 | 5,544 | 5,682 | 6,088 | 5,896 | 5,555 | 4,803 | 8,483 |
| Michigan | 2,342 | 2,528 | 2,577 | 2,941 | 3,079 | 3,052 | 2,898 | 2,511 | 2,517 | 2,486 | 2,477 |
| Minnesota | 2,239 | 2,440 | 2,721 | 2,715 | 2,722 | 2,676 | 2,633 | 2,367 | 2,432 | 2,419 | 2,458 |
| Missouri | 1,286 | 1,236 | 1,083 | 1,190 | 1,313 | 1,476 | 2,429 | 2,713 | 2,837 | 2,948 | 2,791 |
| Northern Mariana Islands | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | | |
| Mississippi | 8,417 | 9,735 | 10,000 | 9,875 | 9,791 | 8,311 | 9,629 | 9,487 | 9,453 | 9,072 | 9,231 |
| Montana | 6,645 | 7,421 | 7,608 | 6,939 | 6,339 | 5,694 | 5,520 | 5,430 | 6,103 | 5,891 | 10,000 |
| North Carolina | 4,550 | 5,318 | 6,046 | 6,597 | 7,208 | 7,531 | 7,749 | 7,523 | 7,613 | 7,573 | 7,672 |
| North Dakota | 9,170 | 8,961 | 8,882 | 8,858 | 8,541 | 8,514 | 8,661 | 8,842 | 8,688 | 8,655 | 9,955 |
| Nebraska | 6,063 | 6,118 | 6,318 | 6,412 | 6,747 | 7,101 | 7,026 | 7,072 | 7,363 | 7,414 | 8,464 |
| New Hampshire | 3,514 | 3,129 | 2,862 | 2,771 | 2,573 | 2,397 | 2,372 | 2,692 | 3,005 | 2,926 | 5,129 |
| New Jersey | 1,938 | 1,537 | 2,011 | 1,831 | 1,951 | 1,956 | 1,919 | 1,877 | 2,010 | 2,591 | 2,707 |
| New Mexico | 3,333 | 2,387 | 2,298 | 3,222 | 3,191 | 3,507 | 2,885 | 2,507 | 2,436 | 2,879 | 3,854 |
| Nevada | 3,281 | 3,255 | 3,631 | 3,146 | 3,536 | 3,838 | 3,885 | 3,752 | 3,777 | 2,897 | 4,408 |
| New York | 1,008 | 1,041 | 1,088 | 1,117 | 1,214 | 1,259 | 1,135 | 1,197 | 1,189 | 1,191 | 1,188 |
| Ohio | 2,090 | 2,208 | 2,697 | 2,733 | 2,775 | 2,767 | 2,751 | 2,899 | 2,940 | 2,997 | 3,480 |
| Oklahoma | 3,427 | 3,888 | 4,121 | 3,161 | 3,098 | 3,344 | 3,645 | 3,864 | 4,119 | 4,451 | 3,763 |
| Oregon | 1,866 | 1,940 | 2,015 | 2,112 | 1,924 | 1,969 | 1,910 | 1,946 | 1,959 | 2,052 | 2,063 |
| Other | 9,778 | 5,705 | 10,000 | 10,000 | | 10,000 | 9,904 | 9,884 | 9,894 | 9,959 | |
| Pennsylvania | 1,025 | 1,132 | 1,299 | 1,312 | 1,270 | 1,273 | 1,084 | 976 | 991 | 958 | 944 |
| Puerto Rico | 3,776 | 3,627 | 3,307 | 3,109 | 3,061 | 5,099 | 5,255 | 5,315 | 5,195 | 5,026 | 5,041 |
| Rhode Island | 5,435 | 7,153 | 7,543 | 7,978 | 7,865 | 8,667 | 8,467 | 9,128 | 8,880 | 8,907 | 9,801 |
| South Carolina | 4,362 | 4,496 | 4,750 | 4,984 | 4,848 | 5,088 | 5,496 | 5,553 | 5,532 | 5,628 | 6,505 |
| South Dakota | 3,956 | 4,852 | 4,443 | 3,266 | 4,476 | 4,479 | 4,102 | 4,095 | 4,069 | 3,981 | 4,011 |
| Tennessee | 5,276 | 6,082 | 5,695 | 6,075 | 6,606 | 7,112 | 6,147 | 6,226 | 6,310 | 6,576 | 7,990 |
| Texas | 1,351 | 2,627 | 2,836 | 2,701 | 2,856 | 3,130 | 3,472 | 3,240 | 3,517 | 3,939 | 989 |
| Utah | 3,516 | 3,714 | 3,678 | 3,682 | 3,734 | 3,889 | 4,469 | 4,409 | 4,239 | 4,086 | 4,167 |
| Virginia | 870 | 1,908 | 1,999 | 2,014 | 1,986 | 1,955 | 2,161 | 2,182 | 2,200 | 2,156 | 3,839 |
| Virgin Islands | | | | | | | 10,000 | 10,000 | 10,000 | 7,209 | |
| Vermont | 4,094 | 4,018 | 4,244 | 3,675 | 3,297 | 2,938 | 3,057 | 3,373 | 3,739 | 3,870 | 5,461 |
| Washington | 1,945 | 1,961 | 1,995 | 1,965 | 1,859 | 1,805 | 1,733 | 1,719 | 1,617 | 1,709 | 1,999 |
| Wisconsin | 837 | 812 | 802 | 788 | 815 | 828 | 838 | 855 | 846 | 877 | 1,968 |
| West Virigina | 3,525 | 3,018 | 3,463 | 3,774 | 4,090 | 4,244 | 4,403 | 4,541 | 5,537 | 5,192 | 5,137 |
| Wyoming | 6,920 | 6,491 | 6,333 | 5,554 | 5,825 | 6,008 | 5,920 | 6,408 | 6,597 | 6,884 | 7,740 |

Note:  *Includes enrollments for comprehensive (hospital and medical); Medicare supplement; vision; dental; federal; Title 18 & 19 Medicare;
   **Blank indicates data are not available.
   ***HHI < 1,500 is unconcentrated (white); 1,500 ≤ HHI ≤ 2,500 is moderately concentrated (yellow); HHI > 2,500 is highly concentrated (orange).

Source:  NAIC Exhibit of Premiums, Enrollment, and Utilization.