BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

In re: BLUE CROSS BLUE SHIELD     )
ANTITRUST LITIGATION              )     MDL No. 2406
                                  )

NOTICE OF POTENTIAL TAG-ALONG ACTION

To:  Clerk of the Panel
     Judicial Panel on Multidistrict Litigation
     Thurgood Marshall Federal Judiciary Building
     One Columbus Circle, N.E.
     Room G-255, North Lobby
     Washington, D.C. 20002-8004

Pursuant to Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, Defendants in the following related action[1] hereby give notice of such action filed in the United States District Court for the Southern District of Florida: *Hoover v. Blue Cross and Blue Shield Ass'n*, No. 1:21-cv-23448 (the "*Hoover* Action"). A copy of the docket sheet is attached as Exhibit 1A. A copy of the Complaint For Sherman Act Violations and Demand For Jury Trial (the "Complaint") is attached as Exhibit 1B.

I. **THE *HOOVER* ACTION AND ITS ALLEGATIONS ARE NEARLY IDENTICAL TO CASES CENTRALIZED IN THE BCBS ANTITRUST MDL**

The *Hoover* Action is a copycat subscriber action that involves common questions of fact—and **numerous identical** fact allegations—with dozens of actions the Panel previously centralized in *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 13-cv-20000 (N.D. Ala.) (the

---

[1] Plaintiffs have named the following entities in this lawsuit: Blue Cross and Blue Shield Association; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Alabama; Louisiana Health Service & Indemnity Co. d/b/a Blue Cross Blue Shield of Louisiana; Blue Cross and Blue Shield of Massachusetts, Inc.; Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield; HMO Missouri, Inc. d/b/a Anthem Blue Cross Blue Shield of Missouri, Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey; Blue Cross and Blue Shield of North Carolina; Health Care Service Corp. d/b/a Blue Cross and Blue Shield of Illinois; and, Highmark, Inc. d/b/a BlueShield of Northeastern New York.

"BCBS Antitrust MDL" or "MDL"). As the Panel will recall, the BCBS Antitrust MDL contains dozens of lawsuits brought on behalf of subscribers of local Blue Cross Blue Shield Plans ("Blue Plans"), alleging those Blue Plans and the Blue Cross Blue Shield Association ("BCBSA") violated the antitrust laws by, among other things, allocating exclusive territories and establishing revenue restrictions. *See In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012).

In centralizing the numerous actions, the Panel found (1) that they "involve substantial common questions of fact relating to the state [Blue Plans'] relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas," and (2) that the Blue Plans "are alleged to be co-conspirators." *Id*. More specifically, the Panel previously held that the Northern District of Alabama was an appropriate Section 1407 forum for actions sharing factual questions regarding "the licensing agreements between and among the Blue Cross Blue Shield Association (BCBSA) and its 38 licensees (Blue Plans)." *Id.* at 1374.

The *Hoover* Plaintiffs do not merely plead common questions of fact with those in the BCBS Antitrust MDL—they copy, **nearly verbatim**, significant portions of their Complaint from the MDL Consolidated Subscriber Complaint ("MDL Subscriber Complaint," attached as Exhibit 1C), and proceed under similar legal theories.

All of the Plaintiffs in the *Hoover* Action[2] purport to be members of the putative subscriber class in the BCBS Antitrust MDL. Plaintiffs are various individuals residing in Alabama,

---

[2] Plaintiffs are: John Hoover; Sharon Zelbley; Erick Gibbs; Darin Griffin; Edward Inglesby; Matt Motta; Frank Melchiore; Donald Cosgrove; Bob Farohideh; Tiana Kelley; Iman Jones; Terra Scott Dannison; Alvin McCray; Michael Leach; Douglas Howie; Sandra Styles Horvath; Valery Rivera; Catalina Dinovo; Kevan Watkins; Winford House; Peter Zitoli; Dave Barth; Danny Beltran; Sue-ling Rosario; Eva Clark; Barbara Dicks; Mary Floyd; David Sexton; Jeannine Noll; Tiffany Duke; Justin Duke; Brendan Price; James Moore; and, Sara Corcoran.

Washington D.C., Florida, Louisiana, Massachusetts, and Missouri who allege they have been enrolled in policies issued by, or included in employee benefit plans administered by, Defendants between at least 2008 and the present. *See* Ex. 1B, Compl. ¶¶ 19–51. The Complaint alleges that Plaintiffs "ha[ve] been enrolled in [Defendants'] health insurance polic[ies]." *Id.* As such, Plaintiffs would be members of the putative class in the MDL. *See* Ex. 1C, MDL Sub. Compl. ¶ 317 (alleging a Nationwide Injunctive Class consisting of "[a]ll Individual Members . . . that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by [a Defendant Blue Plan]").[3]

With minor word changes, Plaintiffs structured their allegations in this case to ***directly track*** the MDL Subscriber Complaint. Numerous subsections (and the express allegations contained therein) are ***identical or nearly identical***, including, but not limited to, the following examples:

| *Hoover* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "Historically the Blue Plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of Blue Plans to compete with or offer coverage in an area already covered by another Blue Plan." (¶ 62) | "Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield Plan." (¶¶ 345–46) |
| "Eventually, to address the increasing competition among the Blue Plans, they sought to ensure 'national cooperation' among their different entities. . . . [T]he Blue Plans agreed to centralize their individual ownership of the Blue Brand." (¶ 63) | "To address the increasing competition, the Blues sought to ensure 'national cooperation' among the different Blue entities. The Plans accordingly agreed to centralize the ownership of their trademarks and trade names." (¶ 350) |

---

[3] Plaintiffs have opted out of the Rule 23(b)(3) damages class proposed as part of a settlement with subscribers in the BCBS Antitrust MDL but remain part of the Rule 23(b)(2) injunctive relief class. *See* Ex. 1B, Compl. ¶ 3 ("This is an action for damages and injunctive relief for antitrust violations brought by individuals who timely opted out of the settlement reached in the pending class action against the Defendants . . . .").

3

| *Hoover* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "The BCBSA is entirely controlled by the Blue Plans, all of whom are independent health insurance companies that license the use of the Blue Brand from the BCBSA, and that, but for any agreements to the contrary, could and would compete with one another." (¶ 66) | "BCBSA is entirely controlled by its member plans, all of whom are independent commercial health benefit product companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another." (¶ 397) |
| "The Blue Plans control the rules and regulations that all members of the BCBSA must obey.  These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the 'License Agreements'), the Membership Standards Applicable to Regular Members (the 'Membership Standards'), and the Guidelines to Administer Membership Standards Applicable to Regular Members (the 'Guidelines')." (¶ 70) | "The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. . . . [T]hese rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the 'License Agreements'), the Membership Standards Applicable to Regular Members (the 'Membership Standards'), and the Guidelines to Administer Membership Standards Applicable to Regular Members (the 'Guidelines')." (¶¶ 414–15) |
| "The motivating factor for the creation of the BCBSA was to reduce or eliminate competition among the Blue Plans ('Blue on Blue Competition') . . . by restricting the use of the Blue Brand to exclusive service areas ('ESAs'), which are assigned to each Blue Plan." (¶ 76) | "[T]hese independent health insurers and competitors agreed to maintain exclusive service areas ['ESAs'] when operating under the Blue brand, thereby eliminated 'Blue on Blue' competition." (¶ 369) |
| "[T]he Blue Plans have agreed that they may not use the Blue Brand outside of their ESA . . . ." (¶ 78) | "[E]ach independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated ESA." (¶ 448) |
| "As one Blue Plan CEO noted, '[Blue] Plans benefit from the [ESAs] because it eliminates competition from other Blue Plans' and that without ESAs, 'there would be open warfare.'" (¶ 80) | "As one internal memorandum by Harris Feldick, President and CEO of Blue Cross for Western Iowa and South Dakota, noted, '[p]lans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare . . . .'" (¶ 370) |

4

| *Hoover* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "Eventually, the Blue Plans sought to rein in competition between them and the non-Blue Brand entities owned by the Blue Plans . . . . First . . . each Blue Plan agrees that at least 80% of the annual revenue that it *or* its subsidiaries generate from within its ESA shall be derived from services offered under the Blue Brand.  Second . . . each Blue Plan further agrees that at least two-third of the annual revenue generated by it *or* its subsidiaries from either inside *or* outside its ESA shall be attributable to services offered under the Blue Brand." (¶¶ 84–89) | "Defendants have allocated U.S. markets for commercial health benefit products among themselves by agreeing to limit their competition against one another when not using the Blue names. . . . First, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated ESA . . . shall be derived from services offered under the commercial Blue Cross and Blue Shield trademarks and trade names. . . . Second, each independent Blue Cross and Blue Shield licensee further agrees that at least two-third of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated ESA . . . shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names." (¶¶ 452–55) |
| "For example, the one-third cap on non-Blue Brand revenue provides a Blue Plan with minimal, if any incentive to compete outside its ESA." (¶ 93) | "The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its ESA." (¶ 457) |
| "In addition to the *per se* illegal market allocation scheme and output restrictions summarized above, the rules and regulations of the BCBSA, which the Blue Plans created, control, and agree to obey, also include provisions adopted in 1996 that restrict the ability of non-members of the BCBSA to acquire or obtain control over any Blue Plan." (¶ 96) | "In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which the independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan." (¶ 479) |
| "Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Plans have been acquisitions by other Blue Plans.  In fact, there has been a wave of consolidation among the Blue Plans since 1996 from 62 to only 35." (¶ 101) | "Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans:  in 1996, there were 62 Blue licensees; at present, there are only 36." (¶ 483) |

| *Hoover* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "These acquisition restraints reduce competition because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Blue Plans." (¶ 102) | "These acquisition restraints reduce competition . . . because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Individual Blue Plans." (¶ 482) |
| "By agreeing to restrict the pool of potential purchasers of a Blue Plan to other Blue Plans, the member plans of the BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves from competition." (¶ 105) | "By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect each other from competition." (¶ 484) |
| "BCBSA is simply a vehicle used by the Blue Plans – independent health insurance companies – to enter into agreements that restrain trade and competition and to facilitate their ongoing concerted activities to maintain those agreements." (¶ 110) | "BCBSA is a vehicle used by independent commercial health benefit product companies to enter into agreements that restrain competition." (¶ 434) |
| "[T]he members of the BCBSA – the Blue Plans – have agreed to impose harsh penalties on those that violate the restrictions. According to the Guidelines, a Blue Plan in violation of one of the anticompetitive restrictions could face '[l]icense and membership termination.'" (¶ 118) | "The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face '[l]icense and membership termination.'" (¶¶ 466–67) |
| "The challenged restraints also limited consumer choice and adversely affected innovation in health care products and services." (¶ 126) | "The challenged restraints also limited consumer choice and adversely affected innovation in health care products and services." (¶ 507) |
| "The Blue Plans have substantial market power within their respective ESAs throughout the U.S. The restraints summarized above enabled the Blue Plans to entrench and perpetuate those respective market positions, thereby insulating them from competition not only from other Blue Plans . . . ." (¶ 128) | "The Individual Blue Plans often have substantial market power within their respective Service Areas throughout the United States. The restraints summarized above enabled the Plans to entrench and perpetuate those respective market positions, thereby insulating them from competition by other Blue licensees." (¶ 10) |

| ***Hoover* Complaint** (Ex. 1B) | **MDL Subscriber Complaint** (Ex. 1C) |
|---|---|
| "The Defendants' anticompetitive agreements, implementing conduct, and foreclosure of competition have prevented consumers from being offered competitive premium prices." (¶ 129) | "The Individual Blue Plans' anticompetitive agreement and implementing conduct and foreclosure of competition have prevented subscribers and enrollees from being offered competitive premium prices and self-funded accounts from being offered competitive ASO fees." (¶ 11) |

Furthermore, Plaintiffs proceed under the same legal theories and same statutory violations that make up the core of the BCBS Antitrust MDL:

| ***Hoover* Complaint** (Ex. 1B) | **MDL Subscriber Complaint** (Ex. 1C) |
|---|---|
| **Count I – Contract, Combination, or Conspiracy in Restraint of Trade in Violation of 15 U.S.C. §§ 1 and 3 (As To All Defendants)** | **Count Two (Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sections 1 and 3 of the Sherman Act- Damages) (Asserted Against All Defendants)** |
| "The challenged agreements have had substantial and unreasonable anticompetitive effects, including but not limited to:<br><br>(a) reducing or eliminating Blue on Blue Competition and Blue on Non-Blue Competition;<br><br>(b) allowing the Blue Plans to maintain and enlarge their market power in their respective ESAs;<br><br>(c) unreasonably limiting the entry of competitor health insurance companies into the U.S.;<br><br>(d) allowing the Blue Plans to supra-competitively raise the premiums charged consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and<br><br>(e) depriving consumers of the full benefits of free and open competition." (¶ 144) | "Each of the challenged agreements has had substantial and unreasonable anticompetitive effects, including but not limited to:<br><br>(a) Reducing the number of Blue-branded licensee health benefit product companies competing with the Individual Blue Plans throughout their respective Service Areas;<br><br>(b) Unreasonably limiting the entry of competitor health benefit product companies into Alabama;<br><br>(c) Allowing the Individual Blue Plans to maintain and enlarge their market power in their respective Service Areas;<br><br>(d) Allowing the Individual Blue Plans to supra-competitively raise the premiums . . . charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and, |

| *Hoover* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| | (e) Depriving Plaintiffs and class members of the full benefits of free and open competition." (¶ 545) |
| **Count II – Monopolization, Attempted Monopolization, or Conspiracy to Monopolize in Violation of 15 U.S.C. § 2 (As To All Defendants)** | **Count Three (Violation of Section 2 of the Sherman Act-Damages) (Asserted Against All Defendants)** |
| "The License Agreements, Membership Standards, and the Guidelines agreed to by each of the Blue Plans and the BCBSA and the attempts by the Defendants to enforce the policies challenged herein, represent overt acts in furtherance of the Defendants' efforts to monopolize." (¶ 163) | "The License Agreements, Membership Standards, and Guidelines agreed to by each of the Individual Blue Plans and BCBSA, as well as meetings between the Individual Blue Plans and attempts by the Individual Blue Plans to enforce the policies challenged in this Complaint, represent overt acts in furtherance of the Individual Blue Plans' efforts to monopolize." (¶ 548) |
| **Count III – Injunctive Relief for Violations of 15 U.S.C. §§ 1, 2, and 3 (As To All Defendants)** | **Count One (Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief)** |
| "The License Agreements, Membership Standards, and the Guidelines agreed to by the Blue Plans represent horizontal agreements entered into between and among the Defendants, who are actual or potential competitors in the market for commercial health insurance in the U.S." (¶ 170 incorporating ¶ 134) | "The License Agreements, Membership Standards, and Guidelines agreed to by the Individual Blue Plans and BCBSA represent horizontal agreements entered into between the Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health benefit products." (¶ 535) |
| "Each of the License Agreements, Membership Standards, and the Guidelines entered into between the BCBSA and the Blue Plans represents a contract, combination, and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act." (¶ 170 incorporating ¶ 135) | "Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Individual Blue Plans represents a contract, combination, and/or conspiracy within the meaning of Sections 1 and 3 of the Sherman Act." (¶ 536) |

| *Hoover* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "Through the License Agreements, Membership Standards, and the Guidelines, the Defendants have agreed to divide and allocate the geographic territories for the sale of commercial health insurance into a series of ESAs for each of the thirty-five (35) Blue Plans."  (¶ 170 incorporating ¶ 136) | "Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Individual Blue Plans have agreed to divide and allocate the geographic territories for the sale of commercial health benefit products into a series of exclusive areas for each of the thirty-six BCBSA members."  (¶ 537) |

The Complaint avers:  "[b]*ut for these illegal agreements*, **the Blue Plans could and would compete with each other** through the Blue Brand and their non-Blue Brand affiliates."   Ex. 1B, Compl. ¶ 95 (emphasis added).  Plaintiffs' allegations are thus identical to those in the BCBS Antitrust MDL, as summarized by the Panel's prior order centralizing the actions:  "Plaintiffs contend that the . . . Blue Plans are independent health insurance companies that, **but for any agreement to the contrary, could and would compete with one another**."  *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1375 (emphasis added).

The common allegations and legal theories provide the precise connection that the Panel has found sufficient to justify transfer of tag-along cases to the MDL.  Indeed, in the Panel's prior order, and in subsequent orders transferring additional related actions to the MDL, the Panel has been clear:  "Transfer under Section 1407 does not require a complete identity of common factual issues as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant when the actions still arise from a common factual core."  *Id.* at 1376; *see also* Final Transfer Order, *Zimmerman v. Blue Cross Blue Shield of Ala. et al.*, MDL No. 2406 [Dkt. 358] at 1 (J.P.M.L. June 17, 2016) ("[A]ction(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Northern District of Alabama and assigned to Judge Proctor."); Final Transfer Order, *Aschenbrenner et al. v. Blue Cross Blue Shield of Ala. et al.*, MDL No. 2406 [Dkt. 362] at 1 (J.P.M.L. July 22, 2016) (same).  The *Hoover*

9

Action easily meets and surpasses that bar. Not only does the instant Complaint share certain allegations with the MDL Subscriber Complaint, they possess near "complete identity of common factual issues." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376.

## II. TRANSFERRING THE *HOOVER* ACTION TO THE BCBS ANTITRUST MDL PROMOTES EFFICIENT RESOLUTION OF COMMON ALLEGATIONS AND PREVENTS INCONSISTENT RULINGS

Because of the similarities between Plaintiffs' Complaint and the MDL Subscriber Complaint, transferring the *Hoover* Action to the MDL will allow a single court to address the underlying claims and the legality of the BCBSA License Agreements. The Northern District of Alabama has unique expertise as "an experienced transferee judge who is already familiar with the contours of the litigation." *Id.* at 1376. And transferring the *Hoover* Action to the MDL will "prevent inconsistent pretrial rulings" on the "common questions of fact" presented by these cases. *Id.*

The Defendants in the *Hoover* Action are also already defendants in the cases centralized in the MDL and dispute the common claims of collaboration or conspiracy. In other words, if the *Hoover* Action is not transferred to the MDL, there is a significant risk of conflicting rulings from different courts on the purported existence of the nationwide collaboration or conspiracy and the effects of the BCBSA License Agreements on subscriber premiums. The Panel has consistently held that the potential for inconsistent rulings is a significant factor warranting transfer of related actions. *See In re BP Sec., Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d 1380, 1382 (J.P.M.L. 2010) (transferring cases to existing MDL to "prevent inconsistent pretrial rulings on discovery disputes and other pretrial issues"); *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 474 F. Supp. 2d 1355, 1356 (J.P.M.L. 2007) (affirming transfer of actions to previously centralized action to "prevent inconsistent pretrial rulings"). The potential for inconsistent rulings by itself heavily weighs in favor of transferring the *Hoover* Action to the MDL.

### III. TRANSFERRING THE *HOOVER* ACTION TO THE BCBS ANTITRUST MDL ELIMINATES DUPLICATIVE DISCOVERY AND CONSERVES THE COURTS' AND PARTIES' RESOURCES

Transferring the *Hoover* Action to the BCBS Antitrust MDL to be managed with other cases involving similar, overlapping allegations will avoid duplicative or inconsistent discovery obligations being imposed on Defendants. The Panel centralized the initial actions in the MDL in large part to "eliminate duplicative discovery" and "conserve the resources of the parties, their counsel, and the judiciary." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376. Transferring the *Hoover* Action will help achieve these same goals.

The Panel has repeatedly held that a potential for parties to be subject to duplicative discovery is a substantial factor that warrants transfer. *See In re BP Sec., Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d at 1382 (transferring cases to existing MDL to "eliminate duplicative discovery"); *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 474 F. Supp. 2d at 1356 (affirming transfer of actions to previously centralized action to "eliminate duplicative discovery"). If the *Hoover* Action is not transferred to the MDL, Defendants (whose respective principal places of business are located across the country) will likely have to prepare written discovery responses, produce documents, and provide deposition testimony about factual issues that overlap with those relevant to the MDL. Duplicating those efforts in a separate litigation would be a waste of judicial and party resources, and would risk exposing Defendants to duplicative or inconsistent discovery obligations.

For all of these reasons, this *Hoover* Action should be transferred to the BCBS Antitrust MDL.

Date: November 4, 2021                                    Very truly yours,

                                                          /s/ Daniel E. Laytin, P.C.
                                                          Daniel E. Laytin, P.C.
                                                          Zachary D. Holmstead

KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
dlaytin@kirkland.com
zachary.holmstead@kirkland.com

*Counsel for Blue Cross Blue Shield Association*

Craig A. Hoover
E. Desmond Hogan
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, D.C. 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com

*Counsel for HMO Missouri, Inc. d/b/a Anthem Blue Cross Blue Shield of Missouri, Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey)*

Jonathan M. Redgrave
REDGRAVE, LLP
14555 Avion Parkway, Suite 275
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants*

Kathleen Taylor Sooy
ksooy@crowell.com
Tracy A. Roman
troman@crowell.com
CROWELL & MORING LLP

Christopher J. Kelly
MAYER BROWN LLP
Two Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 331-2025
Fax:  (650) 331-2060
cjkelly@mayerbrown.com

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina, Inc.; Group Hospitalization and Medical Services, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its*

1001 Pennsylvania Ave. NW
Washington, D.C. 20004
Tel: (202) 624-2500
Fax: (202) 628-5116

Sarah M. Gilbert
sgilbert@crowell.com
Honor R. Costello
hcostello@crowell.com
CROWELL & MORING LLP
590 Madison Ave., 20th Floor
New York, NY 10022
Tel: (212) 223-4000
Fax: (212) 223-4134

*Counsel for Defendants Highmark Western and Northeastern New York Inc.*

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com

*Counsel for Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its division Blue Cross and Blue Shield of Illinois*

*division Blue Cross and Blue Shield of Illinois*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Nicholas J. Boos
MAYNARD, COOPER & GALE PC
2 Embarcadero Center, Suite 1450
San Francisco, CA 94111
Tel: (415) 646-4674
Fax: (205) 714-6709
nboos@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE & BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP, counsel for Defendant Blue Cross Blue Shield of Alabama*