# Appendix A

## Appendix A:  Table of Selected Copycat Allegations

| The Verity Action<br>(Dkt. 433-3) | Consolidated Prov. Compl. in the BCBS MDL (Dkt. 434-2) |
|---|---|
| The History of the Blues: "Before the Long-Term Business Strategy" (§ IV.A.1) | "The History of the Blues:  Before the Long-Term Business Strategy" (at 59) |
| "Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete. . . . Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist." (¶¶ 232-33) | *Identical.*  (¶¶ 152-53) |
| "In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating."  (¶ 249) | *Identical.*  (¶ 164) |
| "The Long-Term Business Strategy and Assembly of Plans" (§ IV.A.2) | "The Long-Term Business Strategy and Assembly of Plans" (at 64) |
| "In the early 1980s, the Blues fundamentally changed the way they conducted business. The Blues contracted with each other unlawfully through a work group organized by the BCBSA, to set mandates that became known as the 'Long-Term Business Strategy.'"  (¶ 255) | "In the early 1980s, the Blues fundamentally changed the way they conducted business.  The Blues conspired through a work group organized by the BCBSA, created a set of mandates that became known as the 'Long-Term Business Strategy.'"  (¶ 165) |
| "When these license agreements were executed, the BCBSA acquired the ability to enforce exclusive Service Areas by membership restrictions in BCBSA, limitations on use of the BCBS name and marks, and monetary sanctions." (¶ 278) | "When these license agreements were executed the result was BCBSA's ability to enforce exclusive service areas by membership restrictions in BCBSA, use of the BCBS name and marks, and monetary sanctions." (¶ 180) |

| "Defendant Blues Entered Into Unlawful Agreements" (§ IV.A.3) | "The Blues' Reached an Anticompetitive Agreement . . ." (at 70) |
|---|---|
| "Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic Service Area . . . ." (¶ 289) | "Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic 'Service Area' . . . ." (¶ 189) |
| "The Defendants also agree that they will participate in inter-plan programs, including Blue Card, with the billions of dollars of access fees providing the quid pro quo for the agreements not compete." (¶ 294) | "The Defendants also agree that they will participate in Inter-Plan programs, including Blue Card, with the billions of dollars of access fees providing the *quid pro quo* for the agreements not to compete." (¶ 190) |
| "The Blue Card and National Account Programs" (§ IV.A.4) | "The Blue Card and National Accounts Programs" (at 76) |
| "As a result of the Blue Card Program, providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for providers and the health care system, and resulting in many claim denials . . . ." (¶ 316) | "As a result of the Blue Card system, Providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for Providers and the health care system, and resulting in many claim denials . . . ." (¶ 201) |
| "The Blue Card and National Accounts Programs are thus agreements to fix prices." (¶ 319) | *Identical.* (¶ 203) |
| "Protecting and Increasing 'Differentials'" (§ IV.A.5) | "Protecting and Increasing 'Differentials'" (at 84) |
| "Despite enjoying an advantage over its competitors in provider reimbursements, the Blues have higher administrative fees for self-funded plans than its competitors, even before accounting for the access fees the Blues charge as medical costs." (¶ 347) | *Identical.* (¶ 223) |

2

| "Differences Between the Modern Blues and Other Insurers" (§ IV.A.6) | "Differences Between the Modern Blues and Other Insurers" (at 86) |
|---|---|
| "Thus, the Blues are able to use leverage against providers that is unavailable to their competitors." (¶ 349) | *Identical.* (¶ 224) |
| "In addition, the Blues operate less efficiently than their competitors." (¶ 350) | *Identical.* (¶ 225) |
| "Restricting Competition in Pennsylvania and Ohio" (§ IV.B.2) | "Allowing and Restricting Competition in Pennsylvania" and "Allowing and Restricting Competition in Ohio" (at 101, 106) |
| "This unlawful, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania.  After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing. . . . In a large part of central Pennsylvania, Capital Blue Cross and Highmark Blue Shield compete.  In that area and in others where Blues compete, including with separate Provider Networks, reimbursement rates or prices are higher." (¶¶ 418-19) | "This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania.  After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing. . . . In a large part of central Pennsylvania, Capital Blue Cross and Highmark Blue Shield compete.  In that area and in others where Blues compete, including with separate Provider Networks, reimbursement rates or prices are higher." (¶¶ 287-88) |
| "The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time." (¶ 421) | *Identical.* (¶ 289) |

3


| "The Market Allocation Agreement" (§ IV.B.3) | "The BCBS Market Allocation Conspiracy" (at 114) |
|---|---|
| "Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area. Accordingly, these restrictions insulate each Defendant from competition from other Blues in each of their respective geographic Service Area, and prevent providers from contracting with Blues in other Service Areas." (¶ 430) | "Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area. Accordingly, these restrictions insulate each Defendant from competition by other Blues in each of their respective geographic Service Area, and prevent providers from contracting with Blues in other Service Areas." (¶ 317) |
| "Because of Defendants' market power . . . providers wishing to join the Blue network must accept lower reimbursement rates." (¶ 431) | *Identical.* (¶ 318) |
| **"The Price-Fixing and Boycott Agreements" (§ IV.B.4)** | **"The BCBS Price Fixing and Boycott Conspiracy" (at 118)** |
| "Defendants achieved the Price Fixing and Boycott Agreement by agreeing that all Defendants would participate in the national programs, including the Blue Card and National Accounts programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue." (¶ 445) | "Defendants achieved the Price Fixing and Boycott Conspiracy by agreeing that all Defendants would participate in the national programs, including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue." (¶ 328) |
| "As a result of their Price Fixing and Boycott Agreement, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs." (¶ 451) | "As a result of their Price Fixing and Boycott Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs." (¶ 334) |

| | |
|---|---|
| "Other Abuses" (§ IV.B.5) | "Other Abuses That Preserve the Blues' Enhanced Market Power" (at 140) |
| "In addition to the harms set forth above, Plaintiffs were harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their agreement. For example, a number of the Blues use MFNs with hospitals and other facilities." (¶¶ 457-58) | "In addition to the harms set forth above, healthcare providers are harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy. For example, a number of the Blues use MFNs with hospitals and other facilities." (¶¶ 383-84) |
| "Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive surplus . . . to enter (and have already done so in some cases) the market as providers of health care services if providers do not acquiesce to the far below competitive rates offered in a market free from competition from other Blues." (¶ 462) | *Identical.* (¶ 387) |
| "Implementation of the Affordable Care Act (ACA)" (§ IV.C) | "Implementation of the Affordable Care Act" (at 156) |
| "The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places. The Blues, including BCBS-AL, have used their market power and their anticompetitive activities to increase their market shares through the mechanisms created by the ACA." (¶ 500) | *Identical.* (¶ 434) |