**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re:  **BLUE CROSS BLUE SHIELD**    )
**ANTITRUST LITIGATION**              )                    **MDL No. 2406**
                                      )

**NOTICE OF POTENTIAL TAG-ALONG ACTION**

To:    Clerk of the Panel
       Judicial Panel on Multidistrict Litigation
       Thurgood Marshall Federal Judiciary Building
       One Columbus Circle, N.E.
       Room G-255, North Lobby
       Washington, D.C. 20002-8004

       Pursuant to Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on

Multidistrict Litigation, Defendants in the following related action[1] hereby give notice of such

---

[1] Plaintiffs have named the following entities in this lawsuit:  Blue Cross and Blue Shield of Alabama; Premera and Premera Blue Cross, also *d/b/a* Premera Blue Cross Blue Shield of Alaska; Blue Cross Blue Shield of Arizona, Inc.; USAble Mutual Insurance Company *d/b/a* Arkansas Blue Cross and Blue Shield; Anthem, Inc. *f/k/a* Wellpoint, Inc. *d/b/a* Anthem Blue Cross Life and Health Insurance Company; Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California, and Blue Cross Blue Shield of Georgia, and also doing business through its subsidiaries or divisions, including, Anthem Health Plans, Inc. *d/b/a* Anthem Blue Cross Blue Shield of Connecticut; Rocky Mountain Hospital & Medical Service Inc. *d/b/a* Anthem Blue Cross Blue Shield of Colorado and Anthem Blue Cross Blue Shield of Nevada, Anthem Insurance Companies, Inc. *d/b/a* Anthem Blue Cross Blue Shield of Indiana, Anthem Health Plans of Kentucky, Inc. *d/b/a* Anthem Blue Cross Blue Shield of Kentucky, Anthem Health Plans of Maine, Inc. *d/b/a* Anthem Blue Cross Blue Shield of Maine, Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company, HMO Missouri Inc., Anthem Health Plans of New Hampshire, Inc. *d/b/a* Anthem Blue Cross Blue Shield of New Hampshire, Empire HealthChoice Assurance, Inc. *d/b/a* Empire Blue Cross Blue Shield, Community Insurance Company *d/b/a* Anthem Blue Cross Blue Shield of Ohio, Anthem Health Plans of Virginia, Inc., *d/b/a* Anthem Blue Cross and Blue Shield of Virginia, Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation; California Physicians' Service *d/b/a* Blue Shield of California; Highmark Health and Highmark Inc. *d/b/a* Highmark Blue Shield and Highmark Blue Cross Blue Shield including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania *f/d/b/a* Blue Cross of Northeastern Pennsylvania ("BC-Northeastern PA") (together, "Highmark BCBS"); Highmark Blue Cross Blue Shield Delaware Inc. *d/b/a* Highmark Blue Cross Blue Shield Delaware; Highmark West Virginia Inc. *d/b/a* Highmark Blue Cross Blue Shield West Virginia; CareFirst, Inc. and its subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and

1

action filed in the United States District Court for the Southern District of New York: *Metropolitan Transportation Authority vs. Blue Cross & Blue Shield of Alabama*, No. 1:21-cv-09101 (the "*MTA* Action"). A copy of the docket sheet is attached as Exhibit 1A. A copy of the Complaint is attached as Exhibit 1B.

## I.   THE *MTA* ACTION AND ITS ALLEGATIONS ARE NEARLY IDENTICAL TO CASES CENTRALIZED IN THE BCBS ANTITRUST MDL

The *MTA* Action is a copycat subscriber action that involves common questions of fact—and **numerous identical** fact allegations—with dozens of actions the Panel previously centralized in *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 13-cv-20000 (N.D. Ala.) (the "BCBS Antitrust MDL" or "MDL"). As the Panel will recall, the BCBS Antitrust MDL contains

---

CareFirst BlueChoice, Inc., which collectively *d/b/a* CareFirst BlueCross BlueShield; Guidewell Mutual Holding Corporation; Blue Cross and Blue Shield of Florida Inc.; Hawaii Medical Service Association *d/b/a* Blue Cross and Blue Shield of Hawaii; Regence BlueShield of Idaho and Blue Cross of Idaho Health Service, Inc. *d/b/a* Blue Cross of Idaho; Cambia Health Solutions, Inc. *d/b/a* Regence BlueShield of Idaho, Regence Blue Cross Blue Shield of Oregon, Regence Blue Cross Blue Shield of Utah, and Regence Blue Shield (Washington); Health Care Service Corporation, a Mutual Legal Reserve company, *d/b/a* Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Montana, including its predecessor, Caring for Montanans, Inc., Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Texas; Wellmark, Inc. including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of Iowa, Wellmark of South Dakota, Inc. *d/b/a* Wellmark Blue Cross and Blue Shield of South Dakota; Blue Cross and Blue Shield of Kansas, Inc.; Louisiana Health Service & Indemnity Company *d/b/a* Blue Cross and Blue Shield of Louisiana; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross Blue Shield of Michigan Mutual Insurance Company; Aware Integrated, Inc., and BCBSM, Inc. *d/b/a* Blue Cross and Blue Shield of Minnesota; Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company; Blue Cross and Blue Shield of Kansas City; GoodLife Partners, Inc.; Blue Cross and Blue Shield of Nebraska; Horizon Healthcare Services, Inc. *d/b/a* Horizon Blue Cross Blue Shield of New Jersey; HealthNow Systems, Inc., HealthNow New York, Inc. *d/b/a* BlueCross BlueShield of Western New York and BlueShield of Northeastern New York; Lifetime Healthcare, Inc. and Excellus Health Plan, Inc. *d/b/a* Excellus BlueCross BlueShield; Blue Cross and Blue Shield of North Carolina; Noridian Mutual Insurance Company and HealthyDakota Mutual Holdings *d/b/a* Blue Cross Blue Shield of North Dakota; Capital Blue Cross; Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc. *f/k/a* Independence Blue Cross; Triple-S Management Corporation and Triple-S Salud, Inc.; Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of South Carolina; BlueCross BlueShield of Tennessee, Inc.; Blue Cross and Blue Shield of Vermont; Blue Cross and Blue Shield of Wyoming; and the Blue Cross and Blue Shield Association.

dozens of lawsuits brought on behalf of subscribers of local Blue Cross Blue Shield Plans ("Blue Plans"), alleging those Blue Plans and the Blue Cross Blue Shield Association ("BCBSA") violated the antitrust laws by, among other things, allocating exclusive territories and establishing revenue restrictions. *See In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012).

In centralizing the numerous actions, the Panel found (1) that they "involve substantial common questions of fact relating to the state [Blue Plans'] relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas," and (2) that the "Blue Plans are alleged to be coconspirators." *Id*. More specifically, the Panel previously held that the Northern District of Alabama was an appropriate Section 1407 forum for actions sharing factual questions regarding "the licensing agreements between and among the Blue Cross Blue Shield Association (BCBSA) and its 38 licensees (Blue Plans)." *Id.* at 1374, 1376.

The *MTA* Plaintiffs do not merely plead common questions of fact with those in the BCBS Antitrust MDL—they copy, ***nearly verbatim***, significant portions of their Complaint from the MDL Subscriber Track Fourth Amended Consolidated Class Action Complaint ("MDL Subscriber Complaint," attached as Exhibit 1C), and proceed under similar legal theories.

All of the Plaintiffs in the *MTA* Action[2] purport to be members of the putative subscriber class in the BCBS Antitrust MDL.  Plaintiffs are transportation entities operating in New York

---

[2] Plaintiffs are:  Metropolitan Transportation Authority, New York City Transit Authority, Manhattan and Bronx Surface Transit Operating Authority, Triborough Bridge and Tunnel Authority, The Long Island Rail Road Company, Metro-North Commuter Railroad Company, MTA Bus Company, MTA Construction and Development Company, and Staten Island Rapid Transit Operating Authority.

with self-funded accounts that paid premiums, including ASO fees, for employee healthcare administered by Anthem, Inc., formerly known as WellPoint, Inc. and doing business as Empire Blue Cross Blue Shield.  Compl. ¶¶ 5, 17–25.  Plaintiffs allege they first procured commercial health insurance services from Defendant Empire Blue Cross Blue Shield in 1994.  Compl. ¶¶ 26–29.  Based on these allegations, Plaintiffs would be members of the putative class in the MDL.  *See* MDL Sub. Compl. ¶ 317 (alleging a Nationwide Injunctive Class consisting of "[a]ll . . . Self-Funded Accounts . . . that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by [a Defendant Blue Plan]").[3]

With minor wordsmithing changes, Plaintiffs structured their allegations in this case to ***directly track*** the MDL Subscriber Complaint.  Numerous subsections (and the express allegations contained therein) are ***identical or nearly identical***, including, but not limited to, the following examples:

| *MTA* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
| --- | --- |
| "Historically and generally . . . the Blue Plans did compete for business within one another's geographic territories, both in the form of Blue Cross plan versus Blue Shield plan competition, as well as so-called Blue Cross-on-Blue Cross competition and Blue Shield-on-Blue Shield competition within singular geographic markets."  (¶¶ 163–164) | "Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield Plan.  Cross-on-Cross and Shield-on-Shield competition also flourished."  (¶¶ 345–46) |

---

[3] Plaintiffs have opted out of the Rule 23(b)(3) damages class proposed as part of a settlement with subscribers in the BCBS Antitrust MDL but remain part of the Rule 23(b)(2) injunctive relief class.  *See* Compl. ¶ 30 ("Plaintiffs timely submitted an exclusion request and became opt-outs from the Rule 23(b)(3) Damages Class . . . .").  Plaintiffs seek the same injunction sought by subscribers in the MDL.  *See id.* ¶ 248(b) ("Plaintiffs pray that . . . [e]ach Defendant be permanently enjoined from engaging in, enforcing, carrying out, renewing . . . the agreements in which it is alleged to have engaged . . . .").

| *MTA* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "In an effort to coordinate national cooperation among the Blue Plans, the Plans agreed to centralize ownership of their trademarks and brand names in precursor organizations to BCBSA."  (¶ 165) | "To address the increasing competition, the Blues sought to ensure 'national cooperation' among the different Blue entities.  The Plans accordingly agreed to centralize the ownership of their trademarks and trade names."  (¶ 350) |
| "The individual Blue Plans are members of, and govern, BCBSA.  BCBSA is entirely controlled by the Blue Plans – individual commercial health insurance product companies that are licensees of the Blue trademarks and brand names who, but for any agreement otherwise, could and would compete with one another."  (¶¶ 179–180) | "The Plans are the members of, and govern, BCBSA.  BCBSA is entirely controlled by its member plans, all of whom are independent commercial health benefit product companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another."  (¶¶ 396–397) |
| "[T]he individual Blue Plans control the rules and regulations that all Blue Plan members of BCBSA must abide by. . . . [P]ertinent rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the 'License Agreements'), the Membership Standards Applicable to Regular Members (the 'Membership Standards'), and the Guidelines to Administer Membership Standards (the 'Guidelines')."  (¶ 190) | "The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey. . . . [T]hese rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the 'License Agreements'), the Membership Standards Applicable to Regular Members (the 'Membership Standards'), and the Guidelines to Administer Membership Standards (the 'Guidelines')."  (¶¶ 414–15) |
| "[T]he Blue Plans agreed to the establishment of ESAs, resulting in the elimination of competition between Blue Plans within designated geographic territories."  (¶ 173) | "[T]hese independent health insurers and competitors agreed to maintain exclusive service areas ['ESAs'] when operating under the Blue brand, thereby eliminating 'Blue on Blue' competition."  (¶ 369) |
| "[E]ach Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross or Blue Shield trademarks or brand names outside of a designated ESA."  (¶ 210) | "[E]ach independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated ESA."  (¶ 448) |

| *MTA* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| "Defendants have also agreed to limit their competition when they or their subsidiaries are not using the Blue trademarks or brand names. . . . (1) each Blue Plan agrees that at least 80 percent of the annual revenue that is derived from products within its designated ESA . . . must be derived from those products offered under their licensed Blue trademarks and brand names, and (2) each Blue Plan agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries – whether inside *or* outside its ESA . . . shall be derived from products offered under the Blue trademarks and brand names." (¶ 214) | "Defendants have allocated U.S. markets for commercial health benefit products among themselves by agreeing to limit their competition against one another when not using the Blue names. . . . First, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated ESA . . . shall be derived from services offered under the Blue Cross and Blue Shield trademarks and trade names. . . . Second, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated ESA . . . shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names." (¶¶ 452–55) |
| "The one-third cap on non-Blue branded revenue further detracts from a Blue Plan's incentive, if there is any whatsoever, to compete outside of its ESA." (¶ 216) | "The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its ESA." (¶ 457) |
| "In addition to the per se illegal geographic restrictions discussed above, BCBSA rules and regulations (which the individual Blue Plans created, control, and agree to abide by) also illegally restrict the ability of non-members of BCBSA to acquire or otherwise obtain control of a Blue Plan . . . ." (¶ 226) | "In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which the independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan." (¶ 479) |
| "Since the acquisition restrictions were approved by BCBSA in 1996, the only acquisitions of Blue Plans have been made by other Blue Plans.  During this time, there has also been a consolidation of Blue Plans nationwide – down from 62 Blue licensees in 1996 to around 36 today." (¶ 228) | "Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans.  During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans:  in 1996, there were 62 Blue licensees; at present, there are only 36." (¶ 483) |

| *MTA* Complaint<br>(Ex. 1B) | MDL Subscriber Complaint<br>(Ex. 1C) |
|---|---|
| "The acquisition restrictions are an agreement by the Blue Plans to force high costs upon competitors for the ability to expand their networks, reduce market efficiencies and in all, to insulate themselves from further competition." (¶ 229) | "By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition." (¶ 484) |
| "BCBSA is a nationwide organization used by the individual Blue Plans to enter into agreements that result in Competitive Restraints." (¶ 201) | "BCBSA is a vehicle used by independent commercial health benefit product companies to enter into agreements that restrain competition." (¶ 434) |
| "The Blue Plans have agreed to impose the aforementioned sharp penalties on Blue Plans that violate the territorial restrictions of the ESAs, in the form of *inter alia* license termination penalties and the imposition of exit fees." (¶ 220) | "The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.  According to the Guidelines, a licensee that violates one of the territorial restrictions could face '[l]icense and membership termination.'" (¶¶ 466–67) |
| "The Competitive Restraints imposed by Defendants' anticompetitive conduct also has the effect of reducing consumer choice and detracting from any or all innovation in the healthcare products and services purchased by Plaintiffs." (¶ 235) | "The challenged restraints also limited consumer choice and adversely affected innovation in health care products and services."  (¶ 507) |
| "Across the nation, each of the Blue Plans often has a high degree of market power within its ESAs.  The Competitive Restraints articulated above serve to illegally enhance this market power within each ESA by curtailing competition from other Blue Plans in each individual market." (¶ 11) | "The Individual Blue Plans often have substantial market power within their respective Service Areas throughout the United States.  The restraints summarized above enabled the Plans to entrench and perpetuate those respective market positions, thereby insulating them from competition by other Blue licensees." (¶ 10) |
| "The Blue Plan Defendants' illegal agreement and requisite anticompetitive activity, which stifled or outright removed competition from the marketplace for commercial health insurance products has prevented self-funded accounts from being offered competitive ASO fees." (¶ 12) | "The Individual Blue Plans' anticompetitive agreement and implementing conduct and foreclosure of competition have prevented subscribers and enrollees from being offered competitive premium prices and self-funded accounts from being offered competitive ASO fees." (¶ 11) |

Furthermore, Plaintiffs proceed under the same legal theories and same alleged statutory violations that make up the core of the BCBS Antitrust MDL:

| *MTA* Complaint (Ex. 1B) | MDL Subscriber Complaint (Ex. 1C) |
|---|---|
| **Count I – Violations of Sections 1 and 3 of the Sherman Act (Against All Defendants)** | **Count Two (Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sections 1 and 3 of the Sherman Act– Damages) (Asserted Against All Defendants)** |
| "The *per se* illegal agreements have yielded substantial and unreasonable anticompetitive effects, including but not limited to the following:<br><br>(1) a reduction in the number of Blue-Branded licensed commercial health insurance product companies competitive with the Blue Plan Defendants within their individual ESAs;<br><br>(2) the unreasonable limitation upon the entry of competitor commercial health insurance product companies into New York;<br><br>(3) the permitting of the Blue Plan Defendants to not only maintain, but also substantially enlarge their already strong market power in their individual ESAs, including in this District;<br><br>(4) the permitting of the Blue Plan Defendants to supra-competitively raise the ASO fees paid by Plaintiffs by artificially inflated, unreasonable and/or supra-competitive amounts; and,<br><br>(5) a deprivation of Plaintiffs' full benefits of free and open competition." (¶ 242) | "Each of the challenged agreements has had substantial and unreasonable anticompetitive effects, including but not limited to:<br><br>(a) Reducing the number of Blue-branded licensee health benefit product companies competing with the Individual Blue Plans throughout their respective Service Areas;<br><br>(b) Unreasonably limiting the entry of competitor health benefit product companies into Alabama;<br><br>(c) Allowing the Individual Blue Plans to maintain and enlarge their market power in their respective Service Areas;<br><br>(d) Allowing the Individual Blue Plans to supra-competitively raise the premiums . . . charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and,<br><br>(e) Depriving Plaintiffs and class members of the full benefits of free and open competition." (¶ 545) |
| **Count II – Violation of Section 2 of the Sherman Act (Against All Defendants)** | **Count Three (Violation of Section 2 of the Sherman Act–Damages) (Asserted Against All Defendants)** |
| "The License Agreements, Membership Standards, and Guidelines agreed to by the Blue Plan Defendants and BCBSA, as well as | "The License Agreements, Membership Standards, and the Guidelines agreed to by each of the Individual Blue Plans and the BCBSA, as |

| *MTA* Complaint<br>(Ex. 1B) | MDL Subscriber Complaint<br>(Ex. 1C) |
|---|---|
| meetings between the Blue Plan Defendants and attempts by the Blue Plan Defendants to enforce policies challenged in this Complaint, represent overt acts in furtherance of the Blue Plan Defendants' efforts to monopolize the national market for commercial health insurance products, including the market in this District." (¶ 246) | well as meetings between the Individual Blue Plans and attempts by the Individual Blue Plans to enforce the policies challenged in this Complaint, represent overt acts in furtherance of the Individual Blue Plans' efforts to monopolize." (¶ 548) |

The Complaint avers:  "the Blue Plans [are] individual commercial health insurance product companies . . . who, ***but for any agreement otherwise, could and would compete with one another***."   Compl. ¶ 180 (emphasis added).  Plaintiffs' allegations are thus identical to those in the BCBS Antitrust MDL, as summarized by the Panel's prior order centralizing the actions:  "Plaintiffs contend that the . . . Blue Plans are independent health insurance companies that, ***but for any agreement to the contrary, could and would compete with one another***."  *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1375 (emphasis added).

The common allegations and legal theories provide the precise connection that the Panel has found sufficient to justify transfer of tag-along cases to the MDL.  Indeed, in the Panel's prior order, and in subsequent orders transferring additional related actions to the MDL, the Panel has been clear:  "Transfer under Section 1407 does not require a complete identity of common factual issues as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant when the actions still arise from a common factual core."  *Id.* at 1376; *see also* Final Transfer Order, *Zimmerman v. Blue Cross Blue Shield of Ala. et al.*, MDL No. 2406 [Dkt. 358] at 1 (J.P.M.L. June 17, 2016) ("[A]ction(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Northern District of Alabama and assigned to Judge Proctor."); Final Transfer Order, *Aschenbrenner et al. v. Blue Cross Blue*

*Shield of Ala. et al.*, MDL No. 2406 [Dkt. 362] at 1 (J.P.M.L. July 22, 2016) (same).  The *MTA*

Action easily meets and surpasses that bar.  Not only does the Complaint share allegations with

the MDL Subscriber Complaint, they possess near "complete identity of common factual issues."

*In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376.

## II.   TRANSFERRING THE *MTA* ACTION TO THE BCBS ANTITRUST MDL PROMOTES EFFICIENT RESOLUTION OF COMMON ALLEGATIONS AND PREVENTS INCONSISTENT RULINGS

Because of the similarities between Plaintiffs' Complaint and the MDL Subscriber

Complaint, transferring the *MTA* Action to the MDL will allow a single court to address the

underlying claims and the legality of the BCBSA License Agreements.  The Northern District of

Alabama has unique expertise as "an experienced transferee judge who is already familiar with the

contours of the litigation."  *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376.

And transferring the *MTA* Action to the MDL will "prevent inconsistent pretrial rulings" on the

"common questions of fact" presented by these cases.  *Id*.

The Defendants in the *MTA* Action are also already defendants in the cases centralized in

the MDL and dispute the common claims of conspiracy.  In other words, if the *MTA* Action is not

transferred to the MDL, there is a significant risk of conflicting rulings from different courts on

the purported existence of the nationwide conspiracy and the effects of the BCBSA License

Agreements on subscriber premiums.  The Panel has consistently held that the potential for

inconsistent rulings is a significant factor warranting transfer of related actions.  *See In re BP Sec.,*

*Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d 1380, 1382 (J.P.M.L.

2010) (transferring cases to existing MDL to "prevent inconsistent pretrial rulings on discovery

disputes and other pretrial issues"); *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 474 F. Supp.

2d 1355, 1356 (J.P.M.L. 2007) (affirming transfer of actions to previously centralized action to

"prevent inconsistent pretrial rulings"). The potential for inconsistent rulings by itself heavily weighs in favor of transferring the *MTA* Action to the MDL.

## III.   TRANSFERRING THE *MTA* ACTION TO THE BCBS ANTITRUST MDL ELIMINATES DUPLICATIVE DISCOVERY AND CONSERVES THE COURTS' AND PARTIES' RESOURCES

Transferring the *MTA* Action to the BCBS Antitrust MDL to be managed with other cases involving similar, overlapping allegations will avoid duplicative or inconsistent discovery obligations being imposed on Defendants. The Panel centralized the initial actions in the MDL in large part to "eliminate duplicative discovery" and "conserve the resources of the parties, their counsel, and the judiciary." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376. Transferring the *MTA* Action will help achieve these same goals.

The Panel has repeatedly held that a potential for parties to be subject to duplicative discovery is a substantial factor that warrants transfer. *See In re BP Sec., Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d at 1382 (transferring cases to existing MDL to "eliminate duplicative discovery"); *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 474 F. Supp. 2d at 1356 (affirming transfer of actions to previously centralized action to "eliminate duplicative discovery"). If the *MTA* Action is not transferred to the MDL, Defendants (whose respective principal places of business are located across the country) will likely have to prepare written discovery responses, produce documents, and provide deposition testimony about factual issues that overlap with those relevant to the MDL. Duplicating those efforts in a separate litigation would be a waste of judicial and party resources, and would risk exposing Defendants to duplicative or inconsistent discovery obligations.

For all of these reasons, the *MTA* Action should be transferred to the MDL.

Date:  December 1, 2021

Respectfully submitted,

*/s/ Karin A. DeMasi*

Karin A. DeMasi
Evan R. Chesler
Christine A. Varney
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
kdemasi@cravath.com
echesler@cravath.com
cvarney@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Counsel for Blue Cross Blue Shield Association*

Craig A. Hoover
E. Desmond Hogan
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc. and all of its named subsidiaries in this action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Aware Integrated, Inc.; Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue*

Evan R. Chesler
Christine A. Varney
Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
cvarney@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com

*Counsel for Defendants Blue Cross and Blue Shield of Alabama; Blue Cross Blue Shield of Arizona; Blue Cross and Blue Shield of Florida, Inc.; Guidewell Mutual Holding Corp.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Blue Cross and Blue Shield of Massachusetts, Inc.; Blue*

*Cross Blue Shield of Utah; Regence Blue
Shield (of Washington); Regence Blue Cross
Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON
LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera and
Premera Blue Cross, d/b/a Premera Blue
Cross Blue Shield of Alaska*

R. David Kaufman
M. Patrick McDowell
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
dkaufman@brunini.com
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue
Shield of Mississippi, a Mutual Insurance
Company*

Michael A. Naranjo
FOLEY & LARDNER LLP
555 California Street, Suite 1700

*Cross and Blue Shield of North
Carolina, Inc.; BlueCross BlueShield
of Tennessee, Inc.; California
Physicians' Service d/b/a Blue Shield of
California; CareFirst, Inc.; CareFirst of
Maryland, Inc.; Group Hospitalization
and Medical Services, Inc.; CareFirst
BlueChoice, Inc.; Health Care Service
Corporation, an Illinois Mutual Legal
Reserve Company, including its
divisions Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue Shield of
Texas, Blue Cross and Blue Shield of
New Mexico, Blue Cross and Blue
Shield of Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and
Blue Shield of Montana, Inc.*

James L. Priester
Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
jpriester@maynardcooper.com
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP,
counsel for Defendant Blue Cross Blue
Shield of Alabama*

San Francisco, CA  94104
Tel: (415) 434-4484
Fax: (415) 434-4507
mnaranjo@foley.com

*Counsel for Defendant USAble Mutual*
*Insurance Company, doing business as*
*Arkansas Blue Cross and Blue Shield*

Robert K. Spotswood
Joshua K. Payne
Jess R. Nix
SPOTSWOOD SANSOM & SANSBURY
LLC
505 20th Street North, Suite 700
Birmingham, Alabama 35203
Telephone: (205) 986-3620
Facsimile: (205) 986-3639
rks@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com

*Counsel for Defendant Capital BlueCross*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY  14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

*Counsel for Defendant, Excellus Health Plan,*
*Inc., d/b/a Excellus BlueCross BlueShield;*
*and Lifetime Healthcare, Inc.*

Daniel E. Laytin
Zachary Holmstead
KIRKLAND & ELLIS LLP

Helen E. Witt, P.C.
Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
hwitt@kirkland.com
jzeiger@kirkland.com

*Counsel for Defendants Health Care*
*Service Corporation, an Illinois Mutual*
*Legal Reserve Company, including its*
*divisions Blue Cross and Blue Shield of*
*Illinois, Blue Cross and Blue Shield of*
*Texas, Blue Cross and Blue Shield of*
*New Mexico, Blue Cross and Blue*
*Shield of Oklahoma, and Blue Cross and*
*Blue Shield of Montana; Caring for*
*Montanans, Inc., f/k/a Blue Cross and*
*Blue Shield of Montana, Inc.; Highmark*
*Inc., f/k/a Highmark Health Services;*
*Highmark West Virginia Inc.; Highmark*
*Blue Cross Blue Shield Delaware Inc.*

Todd M. Stenerson
Brian C. Hauser
Edmund Y. Saw
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com
edmund.saw@shearman.com

*Counsel for Defendant Blue Cross and*
*Blue Shield of Michigan*

John DeQ. Briggs
Rachel J. Adcox
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP

14

300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
zachary.holmstead@kirkland.com
daniel.laytin@kirkland.com

*Counsel for Defendants Wellmark of South
Dakota, Inc. (Wellmark Blue Cross and Blue
Shield of South Dakota); Wellmark, Inc.
(Wellmark Blue Cross and Blue Shield of
Iowa); Triple-S Salud, Inc.; and Triple-S
Management Corp.*

1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
radcox@axinn.com
jmaier@axinn.com

*Counsel for Defendant Independence
Blue Cross; Independence Health Group,
Inc.*

Kathleen Taylor Sooy
ksooy@crowell.com
Tracy A. Roman
troman@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

Sarah M. Gilbert
sgilbert@crowell.com
Honor R. Costello
hcostello@crowell.com
CROWELL & MORING LLP
590 Madison Ave., 20th Floor
New York, NY 10022
Telephone: (212) 223-4000
Facsimile: (212) 223-4134

*Counsel for Defendants Blue Cross of
Idaho Health Service, Inc.; Blue Cross
and Blue Shield of Kansas, Inc.; Blue
Cross and Blue Shield of Kansas City;
GoodLife Partners, Inc.; Blue Cross and
Blue Shield of Nebraska;
HealthyDakota Mutual Holdings; Blue
Cross Blue Shield of North Dakota
(incorrectly sued as "Noridian Mutual
Insurance Company d/b/a Blue Cross
Blue Shield of North Dakota"); Blue
Cross Blue Shield of Wyoming;
HealthNow Systems, Inc.; Highmark
Western and Northeastern New York*

*Inc. (incorrectly sued as "HealthNow New York, Inc.")*