# Exhibit 1C

FILED

2020 Nov-02  PM 01:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **GALACTIC FUNK TOURING, INC.; AMERICAN ELECTRIC MOTOR SERVICES, INC.; CB ROOFING, LLC; PEARCE, BEVILL, LEESBURG, MOORE, P.C.; PETTUS PLUMBING & PIPING, INC.; CONSUMER FINANCIAL EDUCATION FOUNDATION OF AMERICA, INC.; FORT MCCLELLAN CREDIT UNION; ROLISON TRUCKING CO., LLC; CONRAD WATSON AIR CONDITIONING, INC.; LINDA MILLS; FRANK CURTIS; JENNIFER RAY DAVIDSON; PETE MOORE CHEVROLET, INC.; JEWELERS TRADE SHOP; SACCOCCIO & LOPEZ; ANGEL FOSTER; MONIKA BHUTA; MICHAEL E. STARK; G&S TRAILER REPAIR INCORPORATED; CHELSEA L. HORNER; MONTIS, INC.; RENEE E. ALLIE; JOHN G. THOMPSON; AVANTGARDE AVIATION, INC.; HESS, HESS & DANIEL, P.C.; BETSY JANE BELZER; BARTLETT, INC. D/B/A ENERGY SAVERS; MATTHEW ALLAN BOYD; GASTON CPA FIRM; ROCHELLE MCGILL; BRIAN MCGILL; SADLER ELECTRIC; JEFFREY S. GARNER; AMY MACRAE; VAUGHAN POOLS, INC.; CASA BLANCA, LLC; JENNIFER D. CHILDRESS; CLINT JOHNSTON; JANEEN GOODIN; MARLA S. SHARP; ERIK BARSTOW; GC/AAA FENCES, INC.; KEITH O. CERVEN; TERESA M. CERVEN; SHGI CORP.; KATHRYN SCHELLER; IRON GATE TECHNOLOGY, INC.; NANCY THOMAS; PIONEER FARM EQUIPMENT, INC.; SCOTT A. MORRIS; DEBORA FORSYTHE; TONY FORSYTHE; JOEL JAMESON; ROSS HILL; ANGIE HILL; KEVIN BRADBERRY; CHRISTY BRADBERRY; TOM ASCHENBRENNER;** | **CLASS ACTION COMPLAINT**<br><br>**MDL No. 2406**<br><br>**JURY TRIAL DEMANDED**<br><br>**Master File No. 2:13-CV-20000-RDP**<br><br>**This document relates to:**<br>**Subscriber Track cases** |

**JUANITA ASCHENBRENNER; FREE STATE GROWERS, INC.; TOM A. GOODMAN; JASON GOODMAN; COMET CAPITAL, LLC; BARR, STERNBERG, MOSS, LAWRENCE, SILVER & MUNSON, P .C.; MARK KRIEGER, A. DUIE PYLE, INC., DEBORAH PIERCY, LISA TOMAZZOLI and HIBBETT SPORTS, INC.,**

**Plaintiffs,**

**v.**

**BLUE CROSS AND BLUE SHIELD OF ALABAMA; PREMERA and PREMERA BLUE CROSS, also d/b/a PREMERA BLUE CROSS BLUE SHIELD OF ALASKA; BLUE CROSS AND BLUE SHIELD OF ARIZONA, INC.; USABLE MUTUAL INSURANCE COMPANY d/b/a ARKANSAS BLUE CROSS AND BLUE SHIELD; ANTHEM, INC. f/k/a WELLPOINT, INC. d/b/a ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE COMPANY, BLUE CROSS OF CALIFORNIA, BLUE CROSS OF SOUTHERN CALIFORNIA, BLUE CROSS OF NORTHERN CALIFORNIA, and BLUE CROSS BLUE SHIELD OF GEORGIA, and also doing business through its subsidiaries or divisions, including, ANTHEM HEALTH PLANS, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF CONNECTICUT, ROCKY MOUNTAIN HOSPITAL & MEDICAL SERVICE INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF COLORADO and ANTHEM BLUE CROSS BLUE SHIELD OF NEVADA, ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF INDIANA, ANTHEM HEALTH PLANS OF KENTUCKY, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF KENTUCKY, ANTHEM HEALTH PLANS OF MAINE, INC. d/b/a ANTHEM BLUE CROSS BLUE**

**SHIELD OF MAINE, ANTHEM BLUE CROSS BLUE SHIELD OF MISSOURI, RIGHTCHOICE MANAGED CARE, INC., HEALTHY ALLIANCE LIFE INSURANCE COMPANY, HMO MISSOURI INC., ANTHEM HEALTH PLANS OF NEW HAMPSHIRE, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF NEW HAMPSHIRE, EMPIRE HEALTHCHOICE ASSURANCE, INC. d/b/a EMPIRE BLUE CROSS BLUE SHIELD, COMMUNITY INSURANCE COMPANY d/b/a ANTHEM BLUE CROSS BLUE SHIELD OF OHIO, ANTHEM HEALTH PLANS OF VIRGINIA, INC., d/b/a ANTHEM BLUE CROSS AND BLUE SHIELD OF VIRGINIA, ANTHEM BLUE CROSS BLUE SHIELD OF WISCONSIN, and COMPCARE HEALTH SERVICES INSURANCE CORPORATION; CALIFORNIA PHYSICIANS' SERVICE d/b/a BLUE SHIELD OF CALIFORNIA; HIGHMARK HEALTH, and HIGHMARK INC. d/b/a HIGHMARK BLUE SHIELD and HIGHMARK BLUE CROSS BLUE SHIELD and including <u>HIGHMARK INC.</u> predecessor HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA f/d/b/a BLUE CROSS OF NORTHEASTERN PENNSYLVANIA ("BC-NORTHEASTERN PA") (together, "HIGHMARK BCBS"); HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE; HIGHMARK WEST VIRGINIA INC. d/b/a HIGHMARK BLUE CROSS BLUE SHIELD WEST VIRGINIA; CAREFIRST, INC. and its subsidiaries or affiliates GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., CAREFIRST OF MARYLAND, INC., and CAREFIRST BLUECHOICE, INC., which collectively d/b/a CAREFIRST BLUECROSS BLUESHIELD; GUIDEWELL MUTUAL HOLDING**

CORPORATION; BLUE CROSS AND
BLUE SHIELD OF FLORIDA, INC.;
HAWAII MEDICAL SERVICE
ASSOCIATION d/b/a BLUE CROSS AND
BLUE SHIELD OF HAWAII; REGENCE
BLUESHIELD OF IDAHO and BLUE
CROSS OF IDAHO HEALTH SERVICE,
INC. d/b/a BLUE CROSS OF IDAHO;
CAMBIA HEALTH SOLUTIONS, INC.
d/b/a REGENCE BLUESHIELD OF
IDAHO, REGENCE BLUE CROSS BLUE
SHIELD OF OREGON, REGENCE BLUE
CROSS BLUE SHIELD OF UTAH, and
REGENCE BLUE SHIELD
(WASHINGTON); HEALTH CARE
SERVICE CORPORATION, A MUTUAL
LEGAL RESERVE COMPANY, d/b/a
BLUE CROSS AND BLUE SHIELD OF
ILLINOIS, BLUE CROSS AND BLUE
SHIELD OF MONTANA, including its
predecessor, CARING FOR MONTANANS,
INC., BLUE CROSS AND BLUE SHIELD
OF NEW MEXICO, BLUE CROSS AND
BLUE SHIELD OF OKLAHOMA, and
BLUE CROSS AND BLUE SHIELD OF
TEXAS; WELLMARK, INC., including its
subsidiaries and/or divisions, WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA, WELLMARK OF SOUTH
DAKOTA, INC. d/b/a WELLMARK BLUE
CROSS AND BLUE SHIELD OF SOUTH
DAKOTA; BLUE CROSS AND BLUE
SHIELD OF KANSAS, INC.; LOUISIANA
HEALTH SERVICE & INDEMNITY
COMPANY d/b/a BLUE CROSS AND
BLUE SHIELD OF LOUISIANA; BLUE
CROSS AND BLUE SHIELD OF
MASSACHUSETTS, INC.; BLUE CROSS
BLUE SHIELD OF MICHIGAN MUTUAL
INSURANCE COMPANY; AWARE
INTEGRATED, INC. and BCBSM, INC.
d/b/a BLUE CROSS AND BLUE SHIELD
OF MINNESOTA; BLUE CROSS & BLUE
SHIELD OF MISSISSIPPI, A MUTUAL
INSURANCE COMPANY; BLUE CROSS
AND BLUE SHIELD OF KANSAS CITY;

**GOODLIFE PARTNERS, INC.; BLUE CROSS AND BLUE SHIELD OF NEBRASKA; HORIZON HEALTHCARE SERVICES, INC. d/b/a HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY; HEALTHNOW SYSTEMS, INC.; HEALTHNOW NEW YORK, INC. d/b/a BLUECROSS BLUESHIELD OF WESTERN NEW YORK and BLUESHIELD OF NORTHEASTERN NEW YORK; LIFETIME HEALTHCARE, INC. and EXCELLUS HEALTH PLAN, INC. d/b/a EXCELLUS BLUECROSS BLUESHIELD; BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA; NORIDIAN MUTUAL INSURANCE COMPANY and HEALTHYDAKOTA MUTUAL HOLDINGS d/b/a BLUE CROSS BLUE SHIELD OF NORTH DAKOTA; CAPITAL BLUE CROSS; INDEPENDENCE HEALTH GROUP, INC. and INDEPENDENCE HOSPITAL INDEMNITY PLAN, INC. f/k/a INDEPENDENCE BLUE CROSS; TRIPLE-S MANAGEMENT CORPORATION and TRIPLE S-SALUD, INC.; BLUE CROSS & BLUE SHIELD OF RHODE ISLAND; BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA; BLUECROSS BLUESHIELD OF TENNESSEE, INC.; BLUE CROSS AND BLUE SHIELD OF VERMONT; and BLUE CROSS AND BLUE SHIELD OF WYOMING; and the BLUE CROSS AND BLUE SHIELD ASSOCIATION,**

**Defendants.**

**SUBSCRIBER TRACK FOURTH AMENDED
CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

NATURE OF THE CASE ..................................................................................................................6

JURISDICTION AND VENUE ......................................................................................................10

PARTIES ........................................................................................................................................13

  Plaintiffs ....................................................................................................................................13

  Defendants ................................................................................................................................21

CLASS ACTION ALLEGATIONS ...............................................................................................65

FACTUAL BACKGROUND .........................................................................................................69

  History of the Blue Cross and Blue Shield Plans and of BCBSA ...........................................70

    Development of the Blue Cross Plans .................................................................................70

    Development of the Blue Shield Plans ................................................................................72

    Creation of the Blue Cross and Blue Shield Association ...................................................73

  Allegations Demonstrating Control of BCBSA By Member Plans ..........................................82

  License Agreements and Restraints on Competition ...............................................................84

  Horizontal Agreements .............................................................................................................88

  The Horizontal Agreements Not To Compete .........................................................................92

  The Anticompetitive Acquisition Restrictions........................................................................100

  The BCBSA Licensing Agreements Have Reduced Competition Across The United States ...................102

  Supra-Competitive Premiums and ASO Fees Charged by BCBS Plans And Deprivation of Consumer Choice And Access To More Innovative Products ........................................................109

  The Widespread Use By BCBSA Licensees Of Anticompetitive Most Favored Nation Clauses.............113

  Blue Plans' Collective Market Power.....................................................................................119

VIOLATIONS ALLEGED............................................................................................................121

RELIEF REQUESTED..................................................................................................................125

APPENDIX—GLOSSARY OF TERMS ......................................................................................133

This amended complaint includes two named plaintiffs that contracted for Administrative Services Only ("ASO").

Plaintiffs Galactic Funk Touring, Inc.; American Electric Motor Services, Inc.; CB Roofing, LLC; Pearce, Bevill, Leesburg, Moore, P.C.; Pettus Plumbing & Piping, Inc.; Consumer Financial Education Foundation of America, Inc.; Fort McClellan Credit Union; Rolison Trucking Co., LLC; Conrad Watson Air Conditioning, Inc.; Linda Mills; Frank Curtis; Jennifer Ray Davidson; Pete Moore Chevrolet, Inc.; Jewelers Trade Shop; Saccoccio & Lopez; Angel Foster (*fka* Angel Vardas); Monika Bhuta; Michael E. Stark; G&S Trailer Repair Incorporated; Chelsea L. Horner; Montis, Inc.; Renee E. Allie; John G. Thompson; Avantgarde Aviation, Inc.; Hess, Hess & Daniel, P.C.; Betsy Jane Belzer; Bartlett, Inc. d/b/a Energy Savers; Matthew Allan Boyd; Gaston CPA Firm; Rochelle and Brian McGill; Sadler Electric; Jeffrey S. Garner; Amy MacRae; Vaughan Pools, Inc.; Casa Blanca, LLC; Jennifer D. Childress; Clint Johnston; Janeen Goodin; Marla S. Sharp; Erik Barstow; GC/AAA Fences, Inc.; Keith O. Cerven; Teresa M. Cerven; SHGI Corp.; Kathryn Scheller; Iron Gate Technology, Inc.; Nancy Thomas; Pioneer Farm Equipment, Inc.; Scott A. Morris; Debora Forsythe; Tony Forsythe; Joel Jameson; Ross Hill; Angie Hill; Kevin Bradberry; Christy Bradberry; Tom Aschenbrenner; Juanita Aschenbrenner; Free State Growers, Inc.; Tom A. Goodman; Jason Goodman; Comet Capital, LLC; Barr, Sternberg, Moss, Lawrence, Silver & Munson, P .C.; Mark Krieger, A. Duie Pyle, Inc., Deborah Piercy and Lisa Tomazzoli and Hibbett Sports, Inc., on behalf of themselves and all others similarly situated (collectively referred to herein as "Plaintiffs"), for their Complaint against Defendants Blue Cross and Blue Shield of Alabama ("BCBS-AL"); PREMERA and Premera Blue Cross ("BC-WA"), which also does business as Premera Blue Cross Blue Shield of Alaska ("BCBS-AK"); Blue Cross and Blue Shield of Arizona, Inc. ("BCBS-AZ"); USAble Mutual Insurance Company d/b/a Arkansas Blue

Cross and Blue Shield ("BCBS-AR"); Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California (Blue Cross of California, Blue Cross of Southern California and Blue Cross of Northern California are referred to herein, together, as "BC-CA"), and Blue Cross Blue Shield of Georgia ("BCBS-GA"), and also does business through its subsidiaries or divisions, including, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut ("BCBS-CT"), Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado ("BCBS-CO") and Anthem Blue Cross Blue Shield of Nevada ("BCBS-NV"), Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross Blue Shield of Indiana ("BCBS-IN"), Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky ("BCBS-KY"), Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine ("BCBS-ME"), Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company; HMO Missouri Inc. (together, "BCBS-MO"), Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire ("BCBS-NH"), Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield ("Empire BCBS"), Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio ("BCBS-OH"), Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, ("BCBS-VA"), Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation (together, "BCBS-WI"); California Physicians' Service, d/b/a Blue Shield of California ("BS-CA"); Highmark Health, and Highmark Inc. d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania ("BC-Northeastern PA") (together, "Highmark BCBS");

3

Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("BCBS-DE"), Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia ("BCBS-WV"); CareFirst, Inc. and its subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and CareFirst BlueChoice, Inc., which collectively d/b/a CareFirst BlueCross BlueShield (CareFirst, Inc., CareFirst of Maryland, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "BCBS-MD", and CareFirst, Inc., Group Hospitalization and Medical Services, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "BCBS-DC"); GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue ("BCBS-FL"); Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("BCBS-HI"); Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("BC-ID"); Cambia Health Solutions, Inc., f/d/b/a Regence BlueShield of Idaho ("BS-ID"), Regence Blue Cross Blue Shield of Oregon ("BCBS-OR"), Regence Blue Cross Blue Shield of Utah ("BCBS-UT"), and Regence Blue Shield (in Washington) ("BS-WA"); Health Care Service Corporation, a Mutual Legal Reserve Company,  d/b/a Blue Cross and Blue Shield of Illinois ("BCBS-IL"), Blue Cross and Blue Shield of Montana, ("BCBS-MT", including its predecessor Caring for Montanans, Inc.), Blue Cross and Blue Shield of New Mexico ("BCBS-NM"), Blue Cross and Blue Shield of Oklahoma ("BCBS-OK"), and Blue Cross and Blue Shield of Texas ("BCBS-TX"); Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of Iowa, Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota (together, "Wellmark"); Blue Cross and Blue Shield of Kansas, Inc., also d/b/a BlueCross Blue Shield of Kansas ("BCBS-KS"); Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("BCBS-LA"); Blue Cross and Blue Shield of Massachusetts, Inc. ("BCBS-MA"); Blue Cross Blue Shield

of Michigan Mutual Insurance Company (together, "BCBS-MI"); Aware Integrated, Inc. and BCBSM, Inc., d/b/a Blue Cross and Blue Shield of Minnesota ("BCBS-MN"); Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company ("BCBS-MS"); Blue Cross and Blue Shield of Kansas City ("BCBS-KC"); GoodLife Partners, Inc. and Blue Cross and Blue Shield of Nebraska (together, "BCBS-NE"); Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("BCBS-NJ"); HealthNow Systems, Inc. and HealthNow New York, Inc., together d/b/a BlueCross BlueShield of Western New York ("BCBS-Western NY") and BlueShield of Northeastern New York ("BS-Northeastern NY"); Lifetime Healthcare, Inc. and Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (together, "Excellus BCBS"); Blue Cross and Blue Shield of North Carolina ("BCBS-NC"); HealthyDakota Mutual Holdings and Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota (together, "BCBS-ND"); Capital Blue Cross ("Capital BC"); Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc., and its subsidiary or division Independence Blue Cross (together, "Independence BC"); Triple-S Management Corporation and Triple S-Salud, Inc. (together, "BCBS-Puerto Rico"); Blue Cross & Blue Shield of Rhode Island ("BCBS-RI"); Blue Cross and Blue Shield of South Carolina ("BCBS-SC"); BlueCross BlueShield of Tennessee, Inc. ("BCBS-TN"); Blue Cross and Blue Shield of Vermont ("BCBS-VT"); and Blue Cross Blue Shield of Wyoming ("BCBS-WY") (collectively, the "Individual Blue Plans"); and the Blue Cross and Blue Shield Association ("BCBSA"), allege as follows:

## NATURE OF THE CASE

1.      The Supreme Court has repeatedly stated: "Collusion is the supreme evil of antitrust." *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 151 (2013) (quoting *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004)). The Supreme Court has also explained the types of collusion long condemned by the antitrust laws: "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984). These prohibitions on *per se* illegal conduct are at the core of antitrust law's protection of our free enterprise system. As Robert Bork has explained about "the doctrine of *per se* illegality . . . (*e.g.*, price fixing and market division)": "Its contributions to consumer welfare over the decades have been enormous." Robert H. Bork, *The Antitrust Paradox* 263 (rev. ed. 1993). Here, the BCBSA and Individual Blue Plans, who are potential competitors with each other on both a Blue-branded or non-Blue branded basis, agreed to impose: a system of, *inter alia*, Exclusive Service Areas ("Service Areas" or "ESAs") that created geographic regions where other Blue Plans could not compete with them and thereby severely limited competition within the respective Service Areas, including competition for National Accounts or multistate accounts headquartered within a specific Service Area; National Best Efforts requirements which extremely limited the Individual Blue Plans' ability to engage in non-Blue-branded business; and other restraints.

2.      This is a class action brought on behalf of subscribers of, enrollees in, or self-funded accounts of the Individual Blue Plans. Members of the Classes purchased or were covered by commercial health benefit products offered by the Individual Blue Plans. These products include traditional insurance products, in which a plan pays for or reimburses health care expenses of its

members in exchange for premiums, and ASO products, in which a plan provides services such as claims administration or access to a network of medical providers at negotiated rates in exchange for various fees charged to a self-funded account ("ASO fees"). With an ASO product, the self-funded account, rather than the plan, pays for or reimburses the cost of medical care.

3.     Members of the Classes seek to enjoin an ongoing conspiracy between and among the Individual Blue Plans and BCBSA to allocate markets in violation of the prohibitions of the Sherman Act. In addition, this action seeks to recover damages for a class of subscribers, enrollees (but not dependents and beneficiaries) and self-funded accounts in the form of both (a) supra-competitive premiums and ASO fees that the Individual Blue Plans have charged; and/or (b) the difference between what subscribers and self-funded accounts have paid their Individual Blue Plan and the lower competitive premiums and ASO fees that non-competing Blue plans would have charged, all as a result of this illegal conspiracy. This action also seeks these damages as a result of anticompetitive conduct the Individual Blue Plans have committed in their illegal efforts to establish and maintain market power throughout the regions in which they operate.

4.     The Antitrust Division of the United States Department of Justice defines *per se* illegal market division as follows: "Market division or allocation schemes are agreements in which competitors divide markets among themselves. In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves. For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers. In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors. In other schemes, competitors agree to sell only to customers in certain

geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."[1]

5.      This Court ruled in connection with summary judgment motions directed to the applicable standard of review for the aforementioned practices that "Defendants' aggregation of a market allocation scheme together with certain other output restrictions is due to be analyzed under the per se standard of review." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F.Supp.3d 1241, 1279 (N.D. Ala. 2018), *petition to appeal denied,* No. 18-90020-E, 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

6.      Defendants have engaged and are still engaging in *per se* illegal market division. These market allocation agreements are reached and implemented in part through the Blue Cross and Blue Shield license agreements between each of the Individual Blue Plans and BCBSA, an association owned and controlled by all of the Individual Blue Plans, as well as through the BCBSA Membership Standards and Guidelines. In part through the artifice of the Plan-owned-and-controlled BCBSA, an entity that the Individual Blue Plans created and wholly control, Defendants have engaged in prohibited market allocation by entering into *per se* illegal agreements under the federal antitrust laws that:

   a.   Prohibit the Individual Blue Plans from competing against each other when using the Blue name by allocating territories among the individual Blues;

   b.   Limit the Individual Blue Plans from competing against each other, even when they are not using the Blue name, by mandating the percentage of their business

---

[1] *Price Fixing, Bid Rigging, and Market Allocaiton Schemes: What They Are and What to Look For* U.S. Dep't of Justice, https://www.justice.gov/sites/default/files/atr/legacy/2007/10/24/211578.pdf (last visited October 13, 2020).

that they must do under the Blue name, both inside and outside each Plan's territory; and/or

c. Restrict the right of any Individual Blue Plan to be sold to a company that is not a member of BCBSA, thereby preventing new entrants into the individual Blues' markets.

7.      An Individual Blue Plan that violates one or more of these restrictions faces license and membership termination from BCBSA, which would mean both the loss of the brand through which the Plan derives the majority of its revenue and the required payment of a large fee to BCBSA that would help to fund the establishment of a competing health insurer.

8.      These territorial limitations among actual or potential competitors (*i.e.* horizontal parties) severely limit the ability of the Individual Blue Plans to compete outside of their geographic areas, even under their non-Blue brands.

9.      Many of the Individual Blue Plans have developed substantial non-Blue brands that could compete with other Individual Blue Plans. But for the illegal agreements not to compete with one another, these entities could and would use their Blue brands and non-Blue brands to compete with each other throughout their Service Areas. This would result in greater competition and competitively priced premiums and ASO fees for subscribers and self-funded accounts as well as in greater consumer choice.

10.      The Individual Blue Plans often have substantial market power within their respective Service Areas throughout the United States. The restraints summarized above enabled the Plans to entrench and perpetuate those respective market positions, thereby insulating them from competition by other Blue licensees. This was the direct result of the illegal conspiracy to

unlawfully divide and allocate the geographic markets and limit competition for commercial health benefit products in the United States.

11.     The Individual Blue Plans' anticompetitive agreement and implementing conduct and foreclosure of competition have prevented subscribers and enrollees from being offered competitive premium prices and self-funded accounts from being offered competitive ASO fees.

12.     These inflated premiums and ASO fees would not be possible if the market for commercial health benefit products in these Individual Blue Plans' Service Areas were competitively unrestrained. Competition is not possible so long as the Individual Blue Plans and BCBSA are permitted to enter into agreements that have the actual and intended effect of restricting their ability to compete with each other, either as a Blue or a non-Blue Plan.

## JURISDICTION AND VENUE

13.     This Court, and the federal district courts in which the subscriber track cases were originally filed, have federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and recover treble damages and costs of suit, including reasonable attorneys' fees, against the Individual Blue Plans and BCBSA for the injuries sustained by Plaintiffs and the Classes by reason of the violations, as hereinafter alleged, of §§1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

14.     This Court, and the federal district courts in which these subscriber track cases were originally filed also can assert personal jurisdiction over each defendant pursuant to Section 12 of the Clayton Act and/or pursuant to the relevant states' long-arm statutes under one or more of the theories below:

a. Each defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each defendant participated in a conspiracy which injured or threatened injury to subscribers and enrollees in the United States and overt acts in furtherance of the conspiracy were committed within the United States (defined in this Complaint to include the District of Columbia and the Territory of Puerto Rico); and/or

b. Each defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each defendant committed intentional acts that were intended to cause and did cause injury within the United States; and/or

c. Each defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each defendant committed intentional acts that defendants knew were likely to cause injury within the United States; and/or

d. Each defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each defendant is a party to an anticompetitive agreement with a resident of the United States, which agreement is performed in whole or in part within the United States; and/or

e. Each defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum

contacts therein because each defendant has committed a tort within the relevant state, which has caused injury within the state; and/or

f.   Each defendant has purposefully availed itself of the privilege of conducting business activities within the United States and has the requisite minimum contacts therein because each defendant either has members within the United States or transacts business within the relevant state, either via the BlueCard program or otherwise.

15.   This action is also instituted to secure injunctive relief against BCBSA and the Individual Blue Plans to prevent them from further violations of Sections 1 and 3 of the Sherman Act as hereinafter alleged.

16.   Venue is proper in this district and the districts in which these subscriber track cases were originally filed, pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.

## PARTIES

**Plaintiffs**

17.     **Plaintiff American Electric Motor Services, Inc. ("American Electric Motor Services")** is an Alabama corporation with its principal office located at 2012 1st Avenue North, Irondale, AL 35210. Plaintiff American Electric Motor Services has purchased BCBS-AL health insurance to cover its 4 employees during the relevant class period.

18.     **Plaintiff CB Roofing, LLC ("CB Roofing")** is an Alabama corporation with its principal office located in Chelsea, AL. Plaintiff CB Roofing has purchased BCBS-AL health insurance to cover its employees during the relevant class period.

19.     **Plaintiff Pettus Plumbing & Piping, Inc. ("Pettus")** is an Alabama corporation with its principal office located in Colbert County, Alabama. Plaintiff Pettus has purchased BCBS-AL health insurance during the relevant class period. During all but one year of the relevant class period, Plaintiff has had more than 50, but fewer than 200, employees enrolled on its BCBS-AL health insurance policy. Plaintiff Pettus today has approximately 185 total employees.

20.     **Plaintiff Pearce, Bevill, Leesburg, Moore, P.C. ("Pearce Bevill")** is an Alabama corporation with its principal office located in Jefferson County, Alabama. Plaintiff Pearce Bevill has purchased BCBS-AL small group health insurance during the relevant class period. During the relevant class period, Plaintiff Pearce Bevill has had more than 50, but fewer than 200, employees enrolled on its BCBS-AL small group health insurance policy.

21.     **Plaintiff Consumer Financial Education Foundation of America, Inc. ("CFEFA")** is an Alabama corporation with its principal office located in Jefferson County, Alabama. Plaintiff CFEFA has purchased BCBS-AL small group health insurance during the relevant class period. During the relevant class period, Plaintiff CFEFA has had between 2 and 50 employees enrolled on its BCBS-AL small group health insurance policy.

13

22.      **Plaintiff Fort McClellan Credit Union ("Fort McClellan CU")** is an Alabama company with its principal office located in Anniston, Alabama. Plaintiff Fort McClellan Credit Union has purchased BCBS-AL health insurance to cover its employees during the relevant class period.

23.      **Plaintiff Rolison Trucking Co., LLC ("Rolison Trucking")** is an Alabama company with its principal office located in Butler, Alabama. Plaintiff Rolison Trucking has purchased BCBS-AL health insurance to cover its employees during the relevant class period.

24.      **Plaintiff Conrad Watson Air Conditioning, Inc. ("Conrad Watson Air")** is an Alabama corporation with its principal office located in Monroeville, Alabama. Plaintiff Conrad Watson Air has purchased BCBS-AL health insurance to cover its employees during the relevant class period.

25.      **Plaintiff Linda Mills** is a resident citizen of Judsonia, White County, Arkansas. She has been enrolled in an individual BCBS-AR health insurance policy since approximately 1997.

26.      **Plaintiff Frank Curtis** is a resident citizen of Arkansas. He has purchased BCBS-AR health insurance to cover himself and his family members during the relevant class period.

27.      **Plaintiff Jennifer Ray Davidson** is a resident citizen of Lynn Haven, Bay County, Florida. She has been enrolled in an individual BCBS-FL health insurance policy during the relevant class period.

28.      **Plaintiff Pete Moore Chevrolet, Inc.** is a Florida corporation with its principal place of business in Escambia County, Florida, and has been a subscriber of a BCBS-FL small group health insurance policy during the relevant class period.

29.     **Plaintiff Jewelers Trade Shop** is a resident citizen of Escambia County, FL and has been a subscriber of a BCBS-FL small group health insurance policy during the relevant class period.

30.     **Plaintiff Saccoccio & Lopez** is a Hawaii business with its principal office located at 66-037 Kamehameha Highway, Suite 3, Haleiwa, HI 96712. Plaintiff Saccoccio & Lopez has purchased BCBS-HI health insurance to cover its 3 employees since around 2000.

31.     **Plaintiff Angel Foster (*fka* Angel Vardas)** is a resident citizen of Honolulu, Hawaii who has purchased BCBS-HI health insurance during the relevant class period.

32.     **Plaintiff Monika Bhuta** is a resident citizen of Chicago, IL. She has been enrolled in an individual BCBS-IL health insurance policy during the relevant class period.

33.     **Plaintiff Michael E. Stark** is a resident citizen of Illinois. He has been enrolled in an individual BCBS-IL health insurance policy since April 1, 2005.

34.     **Plaintiff G&S Trailer Repair Incorporated** is an Illinois corporation with its principal office located at 3359 S. Lawndale Avenue, Chicago, IL. Plaintiff G&S Trailer Repair Incorporated has purchased BCBS-IL health insurance to cover its employees during the relevant class period.

35.     **Plaintiff  Deborah Piercy** is a citizen of the State of Illinois. Piercy  purchased an individual health insurance policy from and paid premiums to BCBS-IL during the class period.

36.     **Plaintiff Lisa Tomazzoli** is a citizen of the State of Illinois.  Tomazzoli purchased an individual health insurance policy from, and paid premiums to BCBS-IL during the class period.

37.     **Plaintiff Mark Krieger** is an Indiana resident residing in Clinton, Indiana. During the relevant class period, Mr. Krieger has purchased health insurance from the Defendant BCBS-IN.

38.     **Plaintiffs Juanita and Tom Aschenbrenner** are Kansas residents living in Brewster, Kansas. Plaintiffs have purchased BCBS-KS health insurance during the relevant class period.

39.     **Plaintiff Free State Growers, Inc.** is a Kansas company with its principal office in Linwood, Kansas. Plaintiff has purchased BCBS-KS health insurance during the relevant class period.

40.     **Plaintiff Chelsea L. Horner** is a Missouri resident living at 516 Gladstone Place, Kansas City, Missouri. Plaintiff Horner has purchased BCBS-KC health insurance during the relevant class period.

41.     **Plaintiff Montis, Inc**. is a Kansas company with its principal office located at 15553 EBY, Overland Park, KS 66221. Plaintiff Montis, Inc. has purchased BCBS-KC health insurance during the relevant class period.

42.     **Plaintiff Renee E. Allie** is a resident citizen of New Orleans, Louisiana. She has been enrolled in an individual BCBS-LA health insurance policy since October 15, 2008.

43.     **Plaintiff Galactic Funk Touring, Inc.** is a Louisiana corporation with its principal office located at 1020 Franklin Avenue, New Orleans, LA 70117. Plaintiff Galactic Funk Touring, Inc. has purchased BCBS-LA health insurance to cover its employees since November 15, 2008.

44.     **Plaintiff John G. Thompson** is a resident citizen of Clark Township, Mackinac County, Michigan. He was enrolled in an individual BCBS-MI health insurance policy for 35 years, including during the relevant class period.

45.     **Plaintiff Avantgarde Aviation, Inc.** is a Michigan business corporation and resident citizen Michigan. Avantgarde Aviation, Inc. has purchased BCBS-MI small group health insurance policy during the relevant class period.

46.    **Plaintiff Hess, Hess & Daniel, P.C.** is a Michigan law firm that has purchased BCBS-MI small group health insurance policy during the relevant class period.

47.    **Plaintiff Betsy Jane Belzer** resides in Minneapolis, Minnesota. Plaintiff Belzer has purchased BCBS-MN health insurance during the relevant class period.

48.    **Plaintiff Bartlett, Inc., d/b/a Energy Savers ("Energy Savers")** is a Minnesota company with its principal office located in Oakdale, Minnesota. Plaintiff Energy Savers has purchased BCBS-MN health insurance during the relevant class period.

49.    **Plaintiff Matthew Allan Boyd** is a resident citizen of Ridgeland, Madison County, Mississippi. He has been enrolled in an individual BCBS-MS health insurance policy since 1999.

50.    **Plaintiff Gaston CPA Firm** is a Mississippi corporation with its principal office located in Coahoma County, MS. Plaintiff Gaston CPA Firm has purchased BCBS-MS health insurance to cover its employees during the relevant class period.

51.    **Plaintiff Jeffrey S. Garner** is a resident citizen of St. Charles County, Missouri. He has been enrolled in BCBS-MO health plans almost continuously since 2001, including in an individual BCBS-MO health insurance policy since 2011.

52.    **Plaintiff Amy MacRae** is a resident citizen of St. Louis, Missouri who has purchased BCBS-MO health insurance during the relevant class period.

53.    **Plaintiff Vaughan Pools, Inc.** is a Missouri corporation with its principal place of business in Jefferson City, Missouri. Vaughan Pools, Inc. has purchased BCBS-MO health insurance during the relevant class period.

54.    **Plaintiff Tom A. Goodman** is a Montana resident living in Cascade County, Montana. Plaintiff Tom Goodman has purchased BCBS-MT health insurance both as part of a

group and subsequently as an individual to cover hospital and physician expenses during the relevant class period.

55.    **Plaintiff Jason Goodman** is a Montana resident living in Cascade County, Montana. Plaintiff Jason Goodman has purchased BCBS-MT health insurance to cover hospital and physician expenses during the relevant class period.

56.    **Plaintiffs Rochelle and Brian McGill ("the McGills")** are residents of Douglas County, Nebraska. The McGills purchased BCBS-NE health insurance during the relevant class period.

57.    **Plaintiff Sadler Electric** is a Nebraska company with its principal office located at 5855 South 77th St. Omaha, Nebraska 68127. Plaintiff Sadler Electric has purchased BCBS-NE health insurance to cover hospital and physician expenses during the relevant class period.

58.    **Plaintiff Erik Barstow** is a resident citizen of Portsmouth, Rockingham County, New Hampshire. He has been enrolled in an individual BCBS-NH health insurance policy since January 2012.

59.    **Plaintiff GC/AAA Fences, Inc.** is a New Hampshire corporation with its principal office located at 292 Durham Road, Dover, NH 03820. Plaintiff GC/AAA Fences, Inc. has purchased BCBS-NH health insurance to cover its employees since 2009.

60.    **Plaintiff Keith O. Cerven** is a resident citizen of Mooresville, NC. He has been enrolled in an individual BCBS-NC health insurance policy since 2007.

61.    **Plaintiff Teresa M. Cerven** is a resident citizen of Mooresville, NC. She has purchased BCBS-NC health insurance to cover herself and her children since 2007.

62.     **Plaintiff SHGI Corp.** is a North Carolina corporation with its principal office located at 122 Lyman Street, Building #1, Asheville, NC 28801. Plaintiff SHGI Corp. has purchased BCBS-NC health insurance to cover its employees since January 1, 2006.

63.     **Plaintiff Joel Jameson** is a North Dakota resident. Plaintiff Jameson has purchased a BCBS-ND health insurance policy during the relevant class period.

64.     **Plaintiff Casa Blanca, LLC ("Casa Blanca")** is an Oklahoma company with its principal place of business in Norman, Oklahoma. Plaintiff Casa Blanca has purchased BCBS-OK health insurance to cover its employees during the relevant class period.

65.     **Plaintiff Jennifer D. Childress ("Childress")** is a resident of Noble, Oklahoma. Plaintiff Childress has purchased BCBS-OK health insurance during the relevant class period.

66.     **Plaintiff Clint Johnston ("Johnston")** is a resident of Edmond Oklahoma. Plaintiff Johnston has purchased BCBS-OK health insurance during the relevant class period.

67.     **Plaintiff Janeen Goodin ("Goodin")** is a resident of Oklahoma City, Oklahoma. Plaintiff Goodin has purchased BCBS-OK health insurance during the relevant class period.

68.     **Plaintiff Marla S. Sharp ("Sharp")** is a resident of Oklahoma City, Oklahoma. Plaintiff Goodin has purchased BCBS-OK health insurance during the relevant class period.

69.     **Plaintiff Kathryn Scheller** is a resident citizen of Valencia, Pennsylvania. She has been enrolled in an individual Highmark BCBS health insurance policy since 1996.

70.     **Plaintiff Iron Gate Technology, Inc.** is a Western Pennsylvania corporation with its principal office located at The Cardello Building, 1501 Reedsdale Street, Suite 107, Pittsburgh, PA 15233. Plaintiff Iron Gate Technology, Inc. has purchased Highmark BCBS health insurance to cover its 3 employees since January 2012.

71.     **Plaintiff Nancy Thomas** is a resident citizen of Cranston, Rhode Island. She has been enrolled in an individual BCBS-RI health insurance policy since October 2011.

72.     **Plaintiff Pioneer Farm Equipment, Inc.** is a South Carolina corporation with its principal office located at847 Big Buck Boulevard, Orangeburg, SC. Plaintiff Pioneer has purchased BCBS-SC health insurance during the relevant class period.

73.     **Plaintiff Scott A. Morris** is a resident citizen of Charleston County, South Carolina. Plaintiff Scott Morris has purchased BCBS-SC health insurance during the relevant class period.

74.     **Plaintiffs Ross and Angie Hill ("the Hills")** are South Dakota residents. The Hills purchased BCBS-SD health insurance during the relevant class period.

75.     **Plaintiffs Kevin and Christy Bradberry ("the Bradberrys")** are South Dakota residents. The Bradberrys purchased BCBS-SD health insurance during the relevant class period.

76.     **Plaintiffs Debora and Tony Forsythe ("the Forsythes")** are Tennessee residents. The Forsythes purchased BCBS-TN health insurance during the relevant class period.

77.     **Plaintiff Barr, Sternberg, Moss, Lawrence, Silver & Munson, P.C. ("Barr Sternberg")** is a Vermont company doing business in Bennington, VT. Plaintiff Barr Sternberg has purchased BCBS-VT health insurance during the relevant class period.

78.     **Plaintiff Comet Capital LLC ("Comet Capital")** is a Virginia company with its principal place of business in Troy, Virginia. Plaintiff Comet Capital has purchased BCBS-VA health insurance during the relevant class period.

79.     **Plaintiff Hibbett Sports, Inc. ("Hibbett")** is a publicly traded company incorporated in Delaware with its principal place of business in Birmingham, Alabama.  Hibbett

maintains a self-funded health insurance plan and contracted with BCBS-AL for ASO services during the relevant self-funded account class period.

80.    **Plaintiff A. Duie Pyle, Inc. ("ADPI")** is a Pennsylvania corporation with a principal place of business located in West Chester Pennsylvania. ADPI maintains a self-funded health insurance plan for more than 3,000 employees and contracted for ASO services provided by Independence BC during the relevant self-funded account class period.

81.    All Plaintiffs are unaware of any arbitration provision in their contracts or agreements with the Individual Blue Plans.

**Defendants**

82.    **Defendant BCBSA** is a corporation organized under the state of Illinois and headquartered in Chicago, Illinois. It is owned and controlled by thirty-six (36) health insurance plans that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by these plans and operates as a licensor for these plans. Health insurance plans operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for approximately 100 million – or one in three – Americans. A BCBS licensee is the largest health insurer, as measured by number of subscribers, in forty-four (44) states.

83.    The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

84.    BCBSA has contacts with all 50 States, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the Individual Blue Plans. In particular, BCBSA has entered into a series of license agreements with the Individual Blue Plans that control the geographic areas in which the Individual Blue Plans can operate on either a Blue-branded or non-Blue-branded basis. These agreements are a subject of this Complaint.

85.     **Defendant BCBS-AL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in the state of Alabama. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AL is the largest health insurer, as measured by number of subscribers and enrollees, within its Service Area, which is defined as the state of Alabama. BCBS-AL likewise provides ASO services to self-funded accounts throughout Alabama.

86.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, AL 35244. BCBS-AL does business in each county in the state of Alabama.

87.     BCBS-AL is by far the largest health insurance company operating in Alabama and currently exercises market power in the commercial health insurance market throughout Alabama. As of 2008, at least 93 percent of the Alabama residents who subscribe to, or are enrolled in, full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-AL. As of 2011, BCBS-AL maintained 86 percent market share in the individual market, and 96 percent market share in the small group market. Two recent studies concluded that Alabama has the *least* competitive health insurance market in the country. Alabama's Department of Insurance Commissioner has recognized that "the state's health insurance market has been in a non-competitive posture for many years."

88.     BCBS-AL has led the way in increasing premiums each year. From 2006 to 2010, BCBS-AL small group policy premiums rose 28 percent from 2006 to 2010 per member per month. In 2010, BCBS-AL raised some premiums by as much as 17 percent and others by as much as 21 percent. The National Association of Insurance Commissioners reports that BCBS-AL's premiums increased almost 42 percent over the past several years. As a result of these and other inflated premiums, between 2001 and 2009, BCBS-AL increased its surplus from $433.7 million to $649 million. In 2011, BCBS-AL reported net income of $256.92 million, 58 percent higher than the

previous year, resulting in a profit of almost $94 million for FY 2011. From 2000 to 2009, the average employer-sponsored health insurance premium for families in Alabama increased by approximately 88.7 percent, whereas median earnings rose only 22.4 percent during that same period.

89.    **Defendant BCBS-AK** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Alaska. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AK is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Alaska. BCBS-AK likewise provides ASO services to self-funded accounts throughout Alaska.

90.    The principal headquarters for BCBS-AK is located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503. BCBS-AK does business in each county in Alaska.

91.    BCBS-AK currently exercises market power in the commercial health insurance market throughout Alaska. As of 2010, approximately 60 percent of the Alaska residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or are enrolled in of BCBS-AK – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Alaska, Aetna, which carries approximately 30 percent of such subscribers or enrollees. As of 2011, BCBS-AK held at least a 58 percent share of the individual full-service commercial health insurance market and at least a 72 percent share of the small group full-service commercial health insurance market.

92.    BCBS-AK has led the way in increasing premiums in Alaska. From 2000 to 2007, median insurance premiums in Alaska increased nearly 74 percent while median income increased only 13 percent. Thus, health insurance premiums increased nearly six times faster than income in Alaska during that period. In 2011 alone, BCBS-AK reported reserves of more than $1 billion.

93. **Defendant BCBS-AR** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arkansas. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AR is the largest health insurer, as measured by number of subscribersor enrollees within its Service Area, which is defined as the state of Arkansas. BCBS-AR likewise provides ASO services to self-funded accounts throughout Arkansas.

94. The principal headquarters for BCBS-AR is located at 601 S. Gaines Street, Little Rock, Arkansas, 72201. BCBS-AR does business in each county in Arkansas.

95. BCBS-AR currently exercises market power in the commercial health insurance market throughout Arkansas. As of 2010, at least 78 percent of the Arkansas residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 55 percent of the Arkansas residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-AR – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Arkansas, which carries only 7 percent of individual subscribers and 19 percent of small group subscribers.

96. BCBS-AR has led the way in increasing premiums each year in Arkansas. As a result, from 2007 to 2011, BCBS-AR's net income increased by 64 percent, while its membership remained relatively flat, growing by only 5 percent; as of 2011, it increased its surplus to a stunning $581.7 million.

97. **Defendant BCBS-AZ** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Arizona. Like many other Blue Cross and Blue Shield plans nationwide, BCBS-AZ is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Arizona. BCBS-AZ likewise provides ASO services to self-funded accounts throughout Arizona.

98.    The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021. BCBS-AZ does business in each county in Arizona.

99.    BCBS-AZ currently exercises market power in the commercial health insurance market throughout Arizona. As of 2011, at least 49 percent of the Arizona residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 26 percent of the Arizona residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-AZ.

100.    BCBS-AZ has led the way in increasing premiums in Arizona. As a result, by 2010, BCBS-AZ held surpluses in excess of $570 million.

101.    **Defendant BC-CA** is the health insurance plan operating under the Blue Cross trademark and tradename in California. Like many other Blue Cross and Blue Shield plans nationwide, BC-CA is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of California. BC-CA likewise provides ASO services to self-funded accounts throughout California.

102.    The principal headquarters for BC-CA is located at One Wellpoint Way, Thousand Oaks, CA 91362. BC-CA does business in each county in California.

103.    **Defendant BS-CA** is the health insurance plan operating under the Blue Shield trademark and tradename in California. Like many other Blue Cross and Blue Shield plans nationwide, BS-CA is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of California. BS-CA likewise provides ASO services to self-funded accounts throughout California.

104.    The principal headquarters for BS-CA is located at 50 Beale Street, San Francisco, CA 94105-1808. BS-CA does business in each county in California.

25

105.    BC-CA, together with BS-CA, currently exercises market power in the relevant commercial health insurance markets throughout California. As of 2010, at least 29 percent of the California residents who subscribe to or are enrolled in full-service commercial health insurance are BC-CA subscribers alone; as of 2011, at least 37 percent of the California residents who subscribe to or are enrolled in individual full-service commercial health insurance and at least 15 percent of the California residents who subscribe to or are enrolled in small group full-service commercial health insurance are BC-CA subscribers alone.

106.    BC-CA and BS-CA have led the way in c increasing premiums in California. As one result, by 2010, BS-CA alone held surpluses in excess of $2.2 billion.

107.    **Defendant BCBS-CO** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Colorado. Like other Blue Cross and Blue Shield plans nationwide, BCBS-CO is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Colorado. BCBS-CO likewise provides ASO services to self-funded accounts throughout Colorado.

108.    The principal headquarters for BCBS-CO is located at 120 Monument Circle, Indianapolis, IN 46204. BCBS-CO does business in each county in Colorado.

109.    BCBS-CO currently exercises market power in the commercial health insurance market throughout Colorado. As of 2010, at least 22 percent of the Colorado residents who subscribe to full-service commercial health insurance are subscribers of BCBS-CO.

110.    BCBS-CO has led the way in increasing premiums in Colorado.

111.    **Defendant BCBS-CT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Connecticut. Like other Blue Cross and Blue Shield plans nationwide, BCBS-CT is the largest health insurer, as measured by number of subscribers

or enrollees within its Service Area, which is defined as the state of Connecticut. BCBS-CT likewise provides ASO services to self-funded accounts throughout Connecticut.

112.  The principal headquarters for BCBS-CT is located at 370 Bassett Road, North Haven, CT 06473. BCBS-CT does business in each county in Connecticut.

113.  BCBS-CT currently exercises market power in the commercial health insurance market throughout Connecticut. As of 2011, at least 48 percent of the Connecticut residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 31 percent of the Connecticut residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-CT.

114.  BCBS-CT has led the way in increasing premiums in Connecticut.

115.  **Defendant BCBS-DE** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Delaware. Like other Blue Cross and Blue Shield plans nationwide, BCBS-DE is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Delaware. BCBS-DE likewise provides ASO services to self-funded accounts throughout Delaware.

116.  The principal headquarters for BCBS-DE is located at 800 Delaware Avenue, Wilmington, DE 19801. BCBS-DE does business in each county in Delaware.

117.  BCBS-DE currently exercises market power in the commercial health insurance market throughout Delaware. As of 2011, at least 51 percent of the Delaware residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 61 percent of the Delaware residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-DE.

118.    BCBS-DE has led the way in increasing premiums in Delaware. As a result, by mid-2011, it had built a surplus of over $180 million, an increase of 48 percent since the end of 2008.

119.    **Defendant BCBS-FL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Florida. Like other Blue Cross and Blue Shield plans nationwide, BCBS-FL is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Florida. BCBS-FL likewise provides ASO services to self-funded accounts throughout Florida.

120.    The principal headquarters for BCBS-FL is located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246. BCBS-FL does business in each county in Florida.

121.    BCBS-FL currently exercises market power in the commercial health insurance market throughout Florida. As of 2010, at least 31 percent of the Florida residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies), and as much as 83 percent of those residents in certain regions of the state, are subscribers of BCBS-FL. As of 2011, at least 48 percent of the Florida residents who subscribe to or are enrolled in individual full-service commercial health insurance and at least 28 percent of the Florida residents who subscribe to or are enrolled in small group full-service commercial health insurance are BCBS-FL subscribers.

122.    BCBS-FL has led the way in increasing premiums in Florida.

123.    **Defendant BCBS-GA** is the health insurance plan operating causing supra-competitive priceunder the Blue Cross and Blue Shield trademarks and trade names in Georgia. Like other Blue Cross and Blue Shield plans nationwide, BCBS-GA is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the

state of Georgia. BCBS-GA likewise provides ASO services to self-funded accounts throughout Georgia.

124.    The principal headquarters for BCBS-GA is located at 3350 Peachtree Road NE, Atlanta, GA 30326. BCBS-GA does business in each county in Georgia.

125.    BCBS-GA currently exercises market power in the commercial health insurance market throughout Arizona. As of 2011, at least 48 percent of the Georgia residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 41 percent of the Georgia residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-GA.

126.    BCBS-GA has led the way in increasing premiums in Georgia.

127.    **Defendant BCBS-HI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Hawaii. Like other Blue Cross and Blue Shield plans nationwide, BCBS-HI is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Hawaii. BCBS-HI likewise provides ASO services to self-funded accounts throughout Hawaii.

128.    The principal headquarters for BCBS-HI is located at 818 Keeaumoku Street, Honolulu, HI 96814. BCBS-HI does business in each county in Hawaii.

129.    BCBS-HI currently exercises market power in the commercial health insurance market throughout Hawaii. As of 2010, at least 69 percent of the Hawaii residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-HI – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Hawaii, Kaiser Permanente, which carries only 20 percent of such subscribers or enrollees. A 2012 study by the American Medical

29

Association found that Hawaii had the second-least competitive commercial health-insurance market in the country.

130.    BCBS-HI has led the way in increasing premiums in Hawaii. In 2008, for example, BCBS-HI raised its premiums for its Preferred Provider and HPH Plus plans 9.9% and 11.5%, respectively; from 2003 to 2011 individual and family insurance premiums in Hawaii increased, on average, 61% and 74%, respectively, while median household income in Hawaii has failed to keep pace with those increases, rising only 16% for individuals and *falling* 1% for families during the same period. As a result, BCBS-Hawaii has increased its profits to the point where it holds reserves in the amount of approximately $400 million.

131.    **Defendant BC-ID** is the health insurance plan operating under the Blue Cross trademark and trade name in Idaho. Like other Blue Cross and Blue Shield plans nationwide, BC-ID is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Idaho. BC-ID likewise provides ASO services to self-funded accounts throughout Idaho.

132.    The principal headquarters for BC-ID is located at 3000 East Pine Avenue, Meridian, ID 83642. BC-ID does business in each county in Idaho.

133.    BC-ID, together with BS-ID, currently exercises market power in the commercial health insurance market throughout Idaho. As of 2010, at least 47 percent of the Idaho residents who subscribe to or are enrolled in full-service commercial health insurance, including (as of 2011), 44 percent of those who subscribe to or are enrolled in individual products and at least 48 percent of those who subscribe to or are enrolled in small group products, are subscribers of BC-ID.

134.    **Defendant BS-ID** is the health insurance plan operating under the Blue Shield trademark and trade name in Idaho. Like other Blue Cross and Blue Shield plans nationwide, BS-ID is one of the largest health insurers, as measured by number of subscribersor enrollees within its Service Area, which is defined as the state of Idaho. BS-ID likewise provides ASO services to self-funded accounts throughout Idaho.

135.    The principal headquarters for BS-ID is located at 1602 21st Ave, Lewiston, ID 83501. BS-ID does business in each county in Idaho.

136.    BC-ID and BS-ID have led the way in increasing premiums in Idaho. As a result of these inflated premiums, as of 2010, BC-ID had more than $415.5 million in capital and surplus.

137.    **Defendant BCBS-IA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Iowa. Like other Blue Cross and Blue Shield plans nationwide, BCBS-IA is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Iowa. BCBS-IA likewise provides ASO services to self-funded accounts throughout Iowa.

138.    The principal headquarters for BCBS-IA is located at 1331 Grand Avenue, Des Moines, IA 50306. BCBS-IA does business in each county in Iowa.

139.    BCBS-IA currently exercises market power in the commercial health insurance market throughout Iowa. As of 2011, at least 83 percent of the Iowa residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 61 percent of the Iowa residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-IA.

140. BCBS-IA has led the way in increasing premiums in Iowa. Each year from 2002 to 2012, Iowans' premiums have increased an average rate of 10 percent annually, leaving BCBS-IA's parent company, Wellmark, with a surplus of over $1 billion.

141. **Defendant BCBS-IL** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Illinois. Like other Blue Cross and Blue Shield plans nationwide, BCBS-IL is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Illinois. BCBS-IL likewise provides ASO services to self-funded accounts throughout Illinois.

142. The principal headquarters for BCBS-IL is located at 300 E. Randolph Street, Chicago, IL 60601. BCBS-IL does business in each county in Illinois.

143. BCBS-IL currently exercises market power in the commercial health insurance market throughout Illinois. As of 2010, at least 55 percent of the Illinois residents who subscribe to full-service commercial health insurance for small groups and at least 65 percent of the Illinois residents who subscribe to or are enrolled in full-service commercial health insurance for individuals are subscribers of BCBS-IL – vastly more than are subscribers of or are enrolled in the next largest commercial insurer operating in Illinois, United Healthcare, which carries only 12 percent of Illinois residents who subscribe to full-service commercial health insurance.

144. BCBS-IL has led the way in increasing premiums in Illinois. BCBS-IL raised premiums 10.2 percent in 2007, 18 percent in 2008, and 8.4 percent in 2009, for some customers. As a result of these and other inflated premiums, HCSC, which owns BCBS-IL, grew its surplus from $6.1 billion in 2007 to $6.7 billion in 2009, up from $4.3 billion just four years earlier in 2005. The company's surplus is five times the minimum required for solvency protection.

145.  **Defendant BCBS-IN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Indiana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-IN is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Indiana. BCBS-IN likewise provides ASO services to self-funded accounts throughout Indiana.

146.  The principal headquarters for BCBS-IN is located at 120 Monument Circle, Indianapolis, IN 46204. BCBS-IN does business in each county in Indiana.

147.  BCBS-IN currently exercises market power in the commercial health insurance market throughout Indiana. As of 2012, at least 56 percent of the Indiana residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of or are enrolled in BCBS-IN – vastly more than are subscribers of the next largest commercial insurer operating in Indiana, United Healthcare, which carries only 14 percent of such subscribers or enrollees. As of 2013, at least 59 percent of the Indiana residents who subscribe to or are enrolled in full-service commercial health insurance for individuals and 56 percent of small group insureds are subscribers of or are enrolled in BCBS-IN. Its parent company, Anthem, is the largest publicly traded commercial health benefits company in terms of membership in the United States.

148.  BCBS-IN has led the way in increasing premiums in Indiana. As a result of these and other inflated premiums, BCBS-IN's parent company, Anthem, has a surplus in excess of $300 million.

149.  **Defendant BCBS-KS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kansas. Like other Blue Cross and Blue Shield plans nationwide, BCBS-KS is the largest health insurer, as measured by number of subscribers

33

or enrollees within its Service Area, which is defined as the state of Kansas. BCBS-KS likewise provides ASO services to self-funded accounts throughout Kansas.

150.    The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, KS 66629. BCBS-KS does business in each county in Kansas.

151.    BCBS-KS currently exercises market power in the commercial health insurance market throughout Kansas. As of 2011, at least 47 percent of the Kansas residents who subscribe to or are enrolled in full-service individual commercial health insurance and as of 2013, at least 64 percent of the Kansas residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-KS.

152.    BCBS-KS has led the way in increasing premiums in Kansasd.

153.    **Defendant BCBS-KY** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Kentucky. Like other Blue Cross and Blue Shield plans nationwide, BCBS-KY is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Kentucky. BCBS-KY likewise provides ASO services to self-funded accounts throughout Kentucky.

154.    The principal headquarters for BCBS-KY is located at 13550 Triton Park Blvd., Louisville, KY 40223. BCBS-KY does business in each county in Kentucky.

155.    BCBS-KY currently exercises market power in the commercial health insurance market throughout Kentucky. BCBS-KY commands at least 85 percent of the market for individual health insurance plans, with nearly 127,000 customers. The next largest carrier in Kentucky, Humana, has less than 12 percent of the market, demonstrating the complete lack of meaningful competition within this market. A 2007 study published by the American Medical Association shows BCBS-KY's statewide market share for PPO plans was 66 percent. However, in Owensboro

34

it was at least 73 percent and in Bowling Green the market share was at least 79 percent. A 2012 report published by the University of Kentucky indicates that BCBS-KY has at least 53 percent market share in HMO enrollment in Kentucky. These figures represent a steep increase from earlier years. For example, data submitted to the U.S. Securities and Exchange Commission shows BCBS-KY's overall market share in Kentucky in 1993 was just 38 percent.

156.    BCBS-KY (another Anthem Blue) has led the way inc increasing premiums in Kentucky. As a result of its inflated premiums, BCBS-KY collects $326 million in premiums annually. The state's next largest insurer, Humana, collects just $27 million, or less than 10 percent as much as BCBS-KY.

157.    **Defendant BCBS-LA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Louisiana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-LA is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Louisiana. BCBS-LA likewise provides ASO services to self-funded accounts throughout Louisiana.

158.    The principal headquarters for BCBS-LA is located at 5525 Reitz Avenue, Baton Rouge, LA 70809. BCBS-LA does business in each parish in Louisiana.

159.    BCBS-LA currently exercises market power in the commercial health insurance market throughout Louisiana. As of 2010, at least 73 percent of the Louisiana residents who subscribe to or are enrolled in full-service commercial health insurance in the individual market and at least 80 percent of the Louisiana residents who subscribe to or are enrolled in full-service commercial health insurance in the small group market are subscribers or enrollees of BCBS-LA – vastly more than are subscribers enrollees of the next largest commercial insurer operating in Louisiana, United Healthcare.

160.    BCBS-LA has led the way in increasing premiums Louisiana. In fact, from 2000 to 2007, Louisiana health insurance premiums increased by 75.3 percent, 3.3 times faster than Louisiana wages, which only increased by 22.9 percent. Additionally, a 2009 forecast predicted that an average Louisiana worker would spend nearly 60 percent of her or his income on health insurance by 2016, one of the highest predicted nationwide ratios. As a result, BCBS-LA has amassed a massive surplus; between 2004 and 2008, its surplus rose from $352.7 million to $621.1 million. As of the end of 2010, BCBS-LA's surplus exceeded $706.6 million.

161.    **Defendant BCBS-ME** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Maine. Like other Blue Cross and Blue Shield plans nationwide, BCBS-ME is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Maine. BCBS-ME likewise provides ASO services to self-funded accounts throughout Maine.

162.    The principal headquarters for BCBS-ME is located at 2 Gannett Drive, South Portland, ME 04016. BCBS-ME does business in each county in Maine.

163.    BCBS-ME currently exercises market power in the commercial health insurance market throughout Maine. As of 2011, at least 45 percent of the Maine residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 50 percent of the Maine residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-ME.

164.    BCBS-ME has led the way in increasing premiums prices in Maine.

165.    **Defendant BCBS-MD** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Maryland. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MD is the largest health insurer, as measured by number of subscribers

36

or enrollees within its Service Area, which is defined as the state of Maryland. BCBS-MD likewise provides ASO services to self-funded accounts throughout Maryland.

166.    The principal headquarters for BCBS-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117. BCBS-MD does business in each county in Maryland.

167.    BCBS-MD currently exercises market power in the commercial health insurance market throughout Maryland. As of 2011, at least 70 percent of the Maryland residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 72 percent of the Maryland residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-MD.

168.    BCBS-MD has led the way in increasing premiums in Maryland. As a result, BCBS-MD's parent company, CareFirst, accumulated nearly $1 billion in surplus by the end of 2011.

169.    **Defendant BCBS-MA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Massachusetts. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MA is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Massachusetts. BCBS-MA likewise provides ASO services to self-funded accounts throughout Massachusetts.

170.    The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, MA 02215. BCBS-MA does business in each county in Massachusetts.

171.    BCBS-MA currently exercises market power in the commercial health insurance market throughout Massachusetts. As of 2011, at least 63 percent of the Massachusetts residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least

40 percent of the Massachusetts residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-MA.

172.    BCBS-MA has led the way in increasing premiums in Massachusetts. As a result, by mid-2010, BCBS-MA had amassed a surplus of $1.4 billion. In 2011, BCBS-MA paid one of its departing executives a severance of over $11 million.

173.    **Defendant BCBS-MI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Michigan. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MI is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Michigan. BCBS-MI likewise provides ASO services to self-funded accounts throughout Michigan.

174.    The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, MI 48226. BCBS-MI does business in each county in Michigan.

175.    BCBS-MI currently exercises market power in the commercial health insurance market throughout Michigan. As of 2010, at least 69 percent of the Michigan residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-MI – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Michigan, Priority Health, which carries only 9 percent of such subscribers or enrollees. The American Medical Association ranks Michigan as the third least competitive state for commercial coverage, as of 2010.

176.    BCBS-MI has led the way in increasing premiums in Michigan. Premiums in the small group market grew by 9% and 13% in 2010 and 2011. BCBS-MI raised rates on individuals 22% in 2009 alone. As a result of these and other inflated premiums, BCBS-MI earned profits of

$222 million and $40 million in 2010 and 2011, respectively, and currently maintains a reserve of approximately $3 billion. This "non-profit" pays its CEO compensation of $3.8 million annually. Additionally, facing increasing political pressure to reform its practices, BCBS-MI has used its "profits" to increase its political influence. In the 1990 election cycle, BCBS-MI spent about $155,000 through its political action committee on campaign contributions. That number now has soared to $1.2 million in the 2011-2012 campaign cycle.

177.     **Defendant BCBS-MN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Minnesota. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MN is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Minnesota. BCBS-MN likewise provides ASO services to self-funded accounts throughout Minnesota.

178.     The principal headquarters for BCBS-MN is located at 3535 Blue Cross Road, St. Paul, MN 55164. BCBS-MN does business in each county in Minnesota.

179.     BCBS-MN currently exercises market power in the commercial health insurance market throughout Minnesota. As of 2013, at least 57 percent of the Minnesota residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 38 percent of the Minnesota residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-MN.

180.     BCBS-MN has led the way in increasing premiums in Minnesota. As a result, by 2011, BCBS-MN had accumulated more than $250 million in surplus. In 2010, BCBS-MN paid its then-current CEO, Peter Geraghty, $1.5 million in compensation, the highest salary for any Minnesota non-profit leader.

181.   **Defendant BCBS-MS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Mississippi. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MS is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Mississippi. BCBS-MS likewise provides ASO services to self-funded accounts throughout Mississippi.

182.   The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, MS 39232. BCBS-MS does business in each county in Mississippi.

183.   BCBS-MS currently exercises market power in the commercial health insurance market throughout Mississippi. As of 2011, at least 57 percent of the Mississippi residents who subscribe to or are enrolled in full-service commercial health insurance through individual policies and at least 73 percent of the Mississippi residents who subscribe to or are enrolled in full-service commercial health insurance through small group plans are subscribers or enrollees of BCBS-MS – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Mississippi, United Healthcare.

184.   BCBS-MS has led the way in increasing premiums in Mississippi. As a result of these and other inflated premiums, BCBS-MS now has a surplus of approximately $561 million.

185.   **Defendant BCBS-MO** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and NW Missouri. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MO is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Missouri, except the 32 counties in greater Kansas City and NW Missouri. BCBS-MO likewise provides ASO services to self-funded accounts throughout the same geographic region.

40

186.    The principal headquarters for BCBS-MO is located at 1831 Chestnut Street, St. Louis, MO 63103. BCBS-MO does business in all but 32 counties in the state of Missouri.

187.    **Defendant BCBS-KC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas. Like other Blue Cross and Blue Shield plans nationwide, BCBS-Kansas City is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas. BCBS-KC likewise provides ASO services to self-funded accounts throughout the counties in which it operates.

188.    The principal headquarters for BCBS-Kansas City is located at 2301 Main Street, One Pershing Square, Kansas City, MO 64108. BCBS-Kansas City does business in each county in the 32 counties of greater Kansas City and NW Missouri, plus Johnson and Wyandotte counties in Kansas.

189.    BCBS-MO, with BCBS-KC, currently exercises market power in the commercial health insurance market throughout Missouri (with the exception of certain counties which are not part of its service area). As of 2010, at least 26 percent of the Missouri residents who subscribe or are enrolled in to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-MO, including at least 32 percent of those with individual insurance products and at least 48 percent of those with small group insurance products. In parts of its service area in Missouri, BCBS-KC has as much as 62 percent market share, or more.

41

190.    BCBS-MO and BCBS-KC have led the way in increasing premiums in Missouri. In fact, health insurance premiums for Missouri working families increased 76 percent from 2000 to 2007. For family health coverage in Missouri from 2000 to 2007, the average employer's portion of annual premiums rose 72 percent, while the average worker's share grew by 91 percent.

191.    **Defendant BCBS-MT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Montana. Like other Blue Cross and Blue Shield plans nationwide, BCBS-MT is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Montana. Defendant Health Care Service Corporation acquired Blue Cross and Blue Shield of Montana in 2012. Following the asset sale, the original Montana entity, which is now known as Caring for Montanans, Inc., no longer operated as a health insurer. However, Health Care Service Corporation has assumed liability for claims involving Blue Cross and Blue Shield of Montana in this MDL. BCBS-MT likewise provides ASO services to self-funded accounts throughout Montana.

192.    The principal headquarters for BCBS-MT is located at 560 N. Park Avenue, Helena, MT 59604-4309. BCBS-MT does business in each county in Montana.

193.    BCBS-MT currently exercises market power in the commercial health insurance market throughout Montana. As of 2011, at least 56 percent of the Montana residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 72 percent of the Montana residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-MT. The American Medical Association has identified Montana as one of 10 states experiencing the largest drop in competition levels for commercial health insurance between 2010 and 2013.

194.     BCBS-MT has led the way in increasing premiums in Montana. In 2010, for example, BCBS-MT raised some insurance premiums by as much as 40 percent.

195.     **Defendant BCBS-NE** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Nebraska. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NE is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Nebraska. BCBS-NE likewise provides ASO services to self-funded accounts throughout Nebraska.

196.     The principal headquarters for BCBS-NE is located at 1919 Aksarban Drive, Omaha, NE 68180. BCBS-NE does business in each county in Nebraska.

197.     BCBS-NE currently exercises market power in the commercial health insurance market throughout Nebraska. As of 2011, at least 65 percent of the Nebraska residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 42 percent of the Nebraska residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-NE.

198.     BCBS-NE has led the way in increasing premiums in Nebraska. In 2012, BCBS-NE raised premiums an average of 10 percent, some by as much as 17 percent.

199.     **Defendant BCBS-NV** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Nevada. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NV is one of the largest health insurers, as measured by number of subscribersor enrollees within its Service Area, which is defined as the state of Nevada. BCBS-NV likewise provides ASO services to self-funded accounts throughout Nevada.

200.     The principal headquarters for BCBS-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, NV 89148. BCBS-NV does business in each county in Nevada.

201.    BCBS-NV currently exercises market power in the commercial health insurance market throughout Nevada. As of 2010, BCBS-NV had as much as 31 percent market share of full-service commercial health insurance in regions of its service area.

202.    BCBS-NV has led the way in increasing premiums in Nevada.

203.    **Defendant BCBS-NH** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Hampshire. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NH is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of New Hampshire. BCBS-NH likewise provides ASO services to self-funded accounts throughout New Hampshire.

204.    The principal headquarters for BCBS-NH is located at 3000 Goffs Falls Rd, Manchester, NH 03103. BCBS-NH does business in each county in New Hampshire.

205.    BCBS-NH currently exercises market power in the commercial health insurance market throughout New Hampshire. As of 2010 and 2011, at least 51 percent of the New Hampshire residents who subscribe to or are enrolled in full-service commercial health insurance—including at least 76 percent of those who subscribe to or are enrolled in individual plans and at least 67 percent of those who subscribe to or are enrolled in small group plans—are subscribers of BCBS-NH – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in New Hampshire, Harvard Pilgrim, which carries only 20 percent of such subscribers.

206.    BCBS-NH has led the way in increasing premiums in New Hampshire. For example, from 2009 to 2010 the cost of insurance coverage for small groups and individuals rose 15% and 39%, respectively. As a result of these and other inflated premiums, between 2006 and

2011, BCBS-NH reported annual income between $26 million and $112 million and a cumulative profit of approximately $360 million.

207.   **Defendant BCBS-NJ** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Jersey. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NJ is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of New Jersey. BCBS-NJ likewise provides ASO services to self-funded accounts throughout New Jersey.

208.   The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, NJ 07105. BCBS-NJ does business in each county in New Jersey.

209.   BCBS-NJ currently exercises market power in the commercial health insurance market throughout New Jersey. As of 2011, at least 63 percent of the New Jersey residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 59 percent of the New Jersey residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-NJ.

210.   BCBS-NJ has led the way in increasing premiums in New Jersey. In 2010, CEO and President William Marino received $8.7 million in compensation, three other executives made more than $2 million in total compensation, and six others made more than $1 million.

211.   **Defendant BCBS-NM** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in New Mexico. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NM is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of New Mexico. BCBS-NM likewise provides ASO services to self-funded accounts throughout New Mexico.

212.    The principal headquarters for BCBS-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113. BCBS-NM does business in each county in New Mexico.

213.    BCBS-NM currently exercises market power in the commercial health insurance market throughout New Mexico. As of 2011, at least 52 percent of the New Mexico residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 31 percent of the New Mexico residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-NM.

214.    BCBS-NM has led the way in increasing premiums in New Mexico. As a result, BCBS-NM's parent company, Health Care Service Corp., was able to amass an estimated $6.1 billion in surplus by 2007. For at least three years following, some BCBS-NM subscribers faced annual rate hikes of up to 20 percent.

215.    **Defendant Empire BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York. Like other Blue Cross and Blue Shield plans nationwide, Empire BCBS is the largest health insurer, as measured by number of subscribersor enrollees within its Service Area, which is defined as the 28 counties of Eastern and Southeastern New York state. Empire BCBS likewise provides ASO services to self-funded accounts throughout its Service Area.

216.    The principal headquarters for Empire BCBS is located at One Liberty Plaza, New York, NY 10006. Empire BCBS does business in each county in New York.

217.    **Defendant BCBS-Western New York** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western New York. Like other Blue Cross and Blue Shield plans nationwide, BCBS-Western New York is one of the largest

46

health insurers, as measured by number of subscribersor enrollees within its Service Area, which is defined as Western New York state. BCBS-Western New York likewise provides ASO services to self-funded accounts throughout its Service Area.

218.    The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, NY 14202. BCBS-Western New York does business in a number of counties in Western New York.

219.    **Defendant BS-Northeastern New York** is the health insurance plan operating under the Blue Shield trademark and trade name in Northeastern New York. Like other Blue Cross and Blue Shield plans nationwide, BS-Northeastern New York is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as 13 counties in Northeastern New York. BS-Northeastern New York likewise provides ASO services to self-funded accounts throughout its Service Area.

220.    The principal headquarters for BS-Northeastern New York is located at 257 West Genesee Street, Buffalo, NY 14202. BS-Northeastern New York does business in 13 counties in Northeastern New York.

221.    **Defendant Excellus BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in central New York. Like other Blue Cross and Blue Shield plans nationwide, Excellus BCBS is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as 31 counties in central New York. Excellus BCBS likewise provides ASO services to self-funded accounts throughout its Service Area.

222.    The principal headquarters for Excellus BCBS is located at 165 Court Street, Rochester, NY 14647. Excellus BCBS does business in each county in the 31 counties of central New York.

223.    Empire BCBS, BCBS-Western New York, BS-Northeastern New York, and Excellus BCBS currently exercise market power in the commercial health insurance market throughout their respective service areas of New York. As of 2010, at least 67 percent of the New York residents who subscribe to or are enrolled in full-service commercial health insurance are subscribers or enrollees of these New York Individual Blue Plans.

224.    Empire BCBS, BCBS-Western New York, BS-Northeastern New York, and Excellus BCBS have led the way in increasing premiums in their respective Service Areas.

225.    **Defendant BCBS-NC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Carolina. Like other Blue Cross and Blue Shield plans nationwide, BCBS-NC is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of North Carolina. BCBS-NC likewise provides ASO services to self-funded accounts throughout North Carolina.

226.    The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, NC 27707. BCBS-NC does business in each county in North Carolina.

227.    BCBS-NC currently exercises market power in the commercial health insurance market throughout North Carolina. According to the North Carolina Department of Insurance ("NCDOI"), over 73 percent of the North Carolina residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-NC – vastly more than the next largest full-service commercial insurer, Coventry Health Care, which carries only 7 percent of all subscribers or

enrollees . BCBS-NC currently has a greater than 50 percent share of full-service commercial health insurance subscribers or enrollees in all fifteen of the major metropolitan health insurance markets in the State, and a greater than 75 percent share in ten of those fifteen markets. As of 2011, BCBS-NC had at least an 83 percent share of the individual market and at least a 63 percent share of the small group market.

228.   BCBS-NC has led the way in increasing premiums in North Carolina. As a result of these inflated premiums, BCBS-NC now has a surplus of over $1.4 billion and has paid salaries and bonuses to its executives in the millions of dollars each year.

229.   **Defendant BCBS-ND** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in North Dakota. Like other Blue Cross and Blue Shield plans nationwide, BCBS-ND is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of North Dakota. BCBS-ND likewise provides ASO services to self-funded accounts throughout North Dakota.

230.   The principal headquarters for BCBS-ND is located at 4510 13th Avenue South, Fargo, ND 58121. BCBS-ND does business in each county in North Dakota.

231.   BCBS-ND currently exercises market power in the commercial health insurance market throughout North Dakota. As of 2013, at least 80 percent of the North Dakota residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 85 percent of the North Dakota residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-ND.

232.   BCBS-ND has led the way in increasing premiums in North Dakota. In 2011, BCBS-ND raised premiums for some subscribers by as much as 17 percent; in 2009, an audit

revealed that the insurer had spent nearly $35,000 for a farewell party for an unnamed executive the year before.

233.    **Defendant BCBS-OH** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Ohio. Like other Blue Cross and Blue Shield plans nationwide, BCBS-OH is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Ohio. BCBS-OH likewise provides ASO services to self-funded accounts throughout Ohio.

234.    The principal headquarters for BCBS-OH is located at 120 Monument Circle, Indianapolis, IN 46203. BCBS-OH does business in each county in Ohio.

235.    BCBS-OH currently exercises market power in the commercial health insurance market throughout Ohio. As of 2011, at least 36 percent of the Ohio residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 41 percent of the Ohio residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-OH.

236.    BCBS-OH has led the way in increasing premiums in Ohio. In 2013, the insurer raised rates for small group subscribers by an average of 12 percent.

237.    **Defendant BCBS-OK** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oklahoma. Like other Blue Cross and Blue Shield plans nationwide, BCBS-OK is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Oklahoma. BCBS-OK likewise provides ASO services to self-funded accounts throughout Oklahoma.

238.    The principal headquarters for BCBS-OK is located at 1400 South Boston, Tulsa, OK 74119. BCBS-OK does business in each county in Oklahoma.

239.    BCBS-OK currently exercises market power in the commercial health insurance market throughout Oklahoma. As of 2012, at least 67 percent of the Oklahoma residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-OK – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Oklahoma, Aetna, which carries only 19 percent of such subscribers or enrollees. As of 2013, BCBS-OK maintained at least 64 percent market share in the individual market, and at least 60 percent market share in the small group market. The 2012 Oklahoma Insurance Department Annual Report placed BCBS-OK's individual plan market share at 70 percent and group plan market share at 56 percent.

240.    BCBS-OK has led the way in increasing premiums in Oklahoma. From 2005 (when Health Care Service Corp. purchased BCBS-OK) to 2011, BCBS-OK nearly doubled its premium revenue, from $956 million to $1.8 billion. Health Care Service Corp. now has a surplus of over $620 million.

241.    **Defendant BCBS-OR** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Oregon. Like other Blue Cross and Blue Shield plans nationwide, BCBS-OR is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Oregon. BCBS-OR likewise provides ASO services to self-funded accounts throughout Oregon.

242.    The principal headquarters for BCBS-OR is located at 100 SW Market Street, Portland, OR 97207. BCBS-OR does business in each county in Oregon.

243.    BCBS-OR currently exercises market power in the commercial health insurance market throughout Oregon. As of 2011, at least 35 percent of the Oregon residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 21 percent of

51

the Oregon residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-OR.

244.    BCBS-OR has led the way in increasing premiums in Oregon. From 2009 to 2010, while building a surplus of $565 million (3.6 times the regulatory minimum), BCBS-OR raised rates on some individual plans by an average of 25 percent.

245.    **Defendant Highmark BCBS** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and the Blue Shield trademarks and trade names throughout the entire state of Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Highmark BCBS is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the 29 counties of Western Pennsylvania: Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties. Highmark BCBS likewise provides ASO services to self-funded accounts throughout its Service Area. (As described below, Highmark BCBS has entered into illegal and anticompetitive agreements with at least two of the other Individual Blue Plans in Pennsylvania, which prevent Highmark BCBS from competing under its Blue Shield trademark in Northeastern and Southeastern Pennsylvania.)

246.    The principal headquarters for Highmark BCBS is located at 120 Fifth Avenue Place, Pittsburgh, PA 15222. Highmark BCBS does business in each county in Western Pennsylvania.

247.    **Defendant BC-Northeastern PA** is the health insurance plan operating under the Blue Cross trademark and trade name in Northeastern Pennsylvania. During the pendency of this

litigation, BC-Northeastern PA has been acquired by Highmark, Inc. BC-Northeastern PA is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the 13 counties that make up Northeastern Pennsylvania: Bradford, Carbon, Clinton, Lackawanna, Luzerne, Lycoming, Monroe, Pike, Sullivan, Susquehanna, Tioga, Wayne, and Wyoming Counties. BC-Northeastern PA likewise provides ASO services to self-funded accounts throughout its Service Area.

248.    The principal headquarters for BC-Northeastern PA is located at 19 North Main Street, Wilkes-Barre, PA. 18711. BC-Northeastern PA does business in each county in Northeastern Pennsylvania.

249.    **Defendant Capital BC** is the health insurance plan operating under the Blue Cross trademark and trade name in central Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Capital BC is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the 21 counties that make up central Pennsylvania: Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties. Capital BC likewise provides ASO services to self-funded accounts throughout its Service Area.

250.    The principal headquarters for Capital BC is located at 2500 Elmerton Avenue, Harrisburg, PA 17177. Capital BC does business in 21 counties in central Pennsylvania.

251.    **Defendant Independence BC** is the health insurance plan operating under the Blue Cross trademark and trade name in Southeastern Pennsylvania. Like other Blue Cross and Blue Shield plans nationwide, Independence BC is the largest health insurer, as measured by number of subscribersor enrollees within its Service Area, which is defined as the 5 counties that make up

Southeastern Pennsylvania: Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties. Independence-BC likewise provides ASO services to self-funded accounts throughout its Service Area.

252.    The principal headquarters for Independence BC is located at 1901 Market Street, Philadelphia, PA 19103. Independence BC does business in each county in Southeastern Pennsylvania.

253.    Highmark BCBS, BC-Northeastern PA, Capital BC, and Independence BC currently exercise market power in the commercial health insurance market in their respective services areas of Pennsylvania, including Highmark BCBS throughout Western Pennsylvania. Since 2000, between 60% and 80% of the Western Pennsylvania residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Highmark. Highmark Executive Vice President John Paul has stated publicly that Highmark is "an insurer that clearly dominates the commercial market" and "it's pretty obvious [Highmark] control[s] finance of health care in western Pennsylvania." As of 2006, at least 60 percent of the Northeastern Pennsylvania residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BC-Northeastern PA, at least and at least 62 percent of the Southeastern Pennsylvania residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of Independence BC.

254.    Highmark BCBS, BC-Northeastern PA, Capital BC, and Independence BC have led the way in increasing premiums in their respective Service Areas. From 2002-2006, health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and

health insurance premiums for Pittsburgh families rose approximately 51%. In 2008, Highmark raised its rates for its CompleteCare program by 15%. In 2012, Highmark filed for premium rate increases of 9.8% for its small group plans. As a result of these and other inflated premiums, net income increased from less than $50 million in 2001 to approximately $444.7 million in 2011. By the end of 2005, Highmark's surplus (*i.e.*, assets in excess of legally required reserves to pay claims) exceeded $2.8 billion; by 2011, it exceeded $4.1 billion. In 2012, Highmark paid its CEOs more than $6 million and paid its Board of Directors $1.9 million.

255.    **Defendant BCBS-Puerto Rico** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Puerto Rico. Like other Blue Cross and Blue Shield plans nationwide, BCBC-Puerto Rico is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the territory of Puerto Rico. BCBS-Puerto Rico likewise provides ASO services to self-funded accounts throughout Puerto Rico.

256.    The principal headquarters for BCBS-Puerto Rico is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. BCBS-Puerto Rico does business throughout Puerto Rico.

257.    BCBS-Puerto Rico currently exercises market power in the commercial health insurance market throughout Puerto Rico.BCBS-Puerto Rico has led the way in increasing premiums in Puerto Rico.

258.    **Defendant BCBS-RI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Rhode Island. Like other Blue Cross and Blue Shield plans nationwide, BCBS-RI is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Rhode Island. BCBS-RI likewise provides ASO services to self-funded accounts throughout Rhode Island.

259.    The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, RI 02903. BCBS-RI does business in each county in Rhode Island.

260.    BCBS-RI currently exercises market power in the commercial health insurance market throughout Rhode Island. As of 2012, at least 71 percent of the Rhode Island residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-RI – vastly more than are subscribers of the next largest commercial insurer operating in Rhode Island, United Healthcare, which carries only 15 percent of such subscribers or enrollees. As of 2011, BCBS-RI maintained a stunning 95 percent market share in the individual market, and at least 74 percent market share in the small group market.

261.    BCBS-RI has led the way in increasing premiums in Rhode Island. From 2003 to 2011, individual and family insurance premiums rose 59 percent and 61 percent, respectively. From 2000 to 2009, the average employer-sponsored health insurance premiums for families in Rhode Island increased by approximately 105.8 percent, whereas median earnings rose only 22.4 percent during that same period. In 2011, BCBS-RI raised premiums by about 10%. As a result of these and other inflated premiums, by 2011, BCBS-RI had amassed an approximately $320 million surplus.

262.    **Defendant BCBS-SC** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Carolina. Like other Blue Cross and Blue Shield plans nationwide, BCBS-SC is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of South Carolina. BCBS-SC likewise provides ASO services to self-funded accounts throughout South Carolina.

263.    The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, SC 29212. BCBS-SC does business in each county in South Carolina.

264.    BCBS-SC currently exercises market power in the commercial health insurance market throughout South Carolina. As of 2010, at least 60 percent of the South Carolina residents who subscribe to full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-SC – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in South Carolina, Cigna, which carries only 15 percent of such subscribers. As of 2011, BCBS-SC maintained 55 percent market share in the individual market, and 70 percent market share in the small group market.

265.    BCBS-SC has led the way in increasing premiums in South Carolina. As a result of these inflated premiums, BCBS-SC now has a surplus of reserves over $1.7 billion.

266.    **Defendant BCBS-SD** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in South Dakota. Like other Blue Cross and Blue Shield plans nationwide, BCBS-SD is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of South Dakota. BCBS-SD likewise provides ASO services to self-funded accounts throughout South Dakota.

267.    The principal headquarters for BCBS-SD is located at 1601 W. Madison, Sioux Falls, SD 57104. BCBS-SD does business in each county in South Dakota.

268.    BCBS-SD currently exercises market power in the commercial health insurance market throughout South Dakota. As of 2011, at least 74 percent of the South Dakota residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 62 percent of the South Dakota residents who subscribe to small group policies are subscribers or enrollees of BCBS-SD.

269.     BCBS-SD has led the way in increasing premiums in South Dakota. As a result, as of 2012, its parent company, Wellmark, held a surplus of over $1 billion.

270.     **Defendant BCBS-TN** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Tennessee. Like other Blue Cross and Blue Shield plans nationwide, BCBS-TN is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Tennessee. BCBS-TN likewise provides ASO services to self-funded accounts throughout Tennessee.

271.     The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, TN 37402. BCBS-TN does business in each county in Tennessee.

272.     BCBS-TN currently exercises market power in the commercial health insurance market throughout Tennessee. As of 2010, at least 46 percent of the Tennessee residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers or enrollees of BCBS-TN – vastly more than are subscribers of the next largest commercial insurer operating in Tennessee, Cigna, which carries only 24 percent of such subscribers. As of 2013, BCBS-TN maintained at least 42 percent market share in the individual market and at least 67 percent market share in the small group market.

273.     BCBS-TN has led the way in increasing premiums in Texas. As a result of these inflated premiums, BCBS-TN now has a surplus of almost $1.6 billion.

274.     **Defendant BCBS-TX** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Texas. Like other Blue Cross and Blue Shield plans nationwide, BCBS-TX is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Texas. BCBS-TX likewise provides ASO services to self-funded accounts throughout Texas.

275.    The principal headquarters for BCBS-TX is located at 1001 E. Lookout Drive, Richardson, TX 75082. BCBS-TX does business in each county in Texas.

276.    BCBS-TX currently exercises market power in the commercial health insurance market throughout Texas. As of 2010, at least 35 percent of the Texas residents who subscribe to or are enrolled in full-service commercial health insurance (whether through group plans or through individual policies) are subscribers of BCBS-TX – vastly more than are subscribers or enrollees of the next largest commercial insurer operating in Texas, Aetna, which carries only 22 percent of such subscribers or enrollees. As of 2011, BCBS-TX maintained 57 percent market share in the individual market and 46 percent market share in the small group market.

277.    BCBS-TX has led the way in increasing premiums in Texas. As a result of these inflated premiums, BCBS-TX's parent company, Health Care Service Corp., now has a surplus of more than $620 million.

278.    **Defendant BCBS-UT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Utah. Like other Blue Cross and Blue Shield plans nationwide, BCBS-UT is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Utah. BCBS-UT likewise provides ASO services to self-funded accounts throughout Utah.

279.    The principal headquarters for BCBS-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, UT 84121. BCBS-UT does business in each county in Utah.

280.    BCBS-UT currently exercises market power in the commercial health insurance market throughout Utah. As of 2011, at least 17 percent of the Utah residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 23 percent of the

Utah residents who subscribe to or are enrolled in small group policies are subscribers or enrollees of BCBS-UT.

281.    BCBS-UT has led the way in increasing premiums in Utah.

282.    **Defendant BCBS-VT** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Vermont. Like other Blue Cross and Blue Shield plans nationwide, BCBS-VT is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Vermont. BCBS-VT likewise provides ASO services to self-funded accounts throughout Vermont.

283.    The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, VT 05602. BCBS-VT does business in each county in Vermont.

284.    BCBS-VT currently exercises market power in the commercial health insurance market throughout Vermont. As of 2013, at least 89 percent of the Vermont residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 74 percent of the Vermont residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-VT.

285.    BCBS-VT has led the way in increasing premiums in Vermont. In 2010, Vermont's Banking, Insurance, Securities, and Health Care Administration Department found that BCBS-VT had overpaid its former President and CEO William Milnes Jr. by roughly $3 million, having paid him $7.2 million in 2008 upon his retirement, in violation of state law.

286.    **Defendant BCBS-VA** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small portion of Northern Virginia in the Washington, DC suburbs. Like other Blue Cross and Blue Shield plans nationwide, BCBS-VA is the largest health insurer, as measured by number of

subscribers or enrollees within its Service Area, which is defined as the state of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs. BCBS-VA likewise provides ASO services to self-funded accounts throughout its Service Area.

287.   The principal headquarters for BCBS-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, VA 23230. BCBS-VA does business in each county in Virginia.

288.   BCBS-VA currently exercises market power in the commercial health insurance market throughout Virginia. As of 2013, at least 74 percent of the Virginia residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 45 percent (50 percent as of 2011) of the Virginia residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-VA.

289.   BCBS-VA has led the way in increasing premiums in its Service Area. In 2009, BCBS-VA's parent company, Anthem, raised its CEO Angela Braly's total compensation by 51 percent, to $13 million.

290.   **Defendant BC-WA** is the health insurance plan operating under the Blue Cross trademarks and trade names in Washington. Like other Blue Cross and Blue Shield plans nationwide, BC-WA is one of the largest health insurers, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of Washington. BC-WA likewise provides ASO services to self-funded accounts throughout Washington.

291.   The principal headquarters for BC-WA is located at 7001 220th Street SW, Mountlake Terrace, WA 98043-4000. BC-WA does business in each county in Washington.

292.   **Defendant BS-WA** is the health insurance plan operating under the Blue Shield trademarks and trade names in Washington. Like other Blue Cross and Blue Shield plans nationwide, BS-WA is one of the largest health insurers, as measured by number of subscribers or

enrollees within its Service Area, which is defined as the state of Washington. BS-WA likewise provides ASO services to self-funded accounts throughout Washington.

293.    The principal headquarters for BS-WA is located at 1800 Ninth Avenue, Seattle, WA 98111. BS-WA does business in each county in Washington.

294.    BC-WA and BS-WA currently exercise market power in the commercial health insurance market throughout Washington. As of 2011, at least 36 percent of the Washington residents who subscribe to or are enrolled in full-service individual commercial health insurance are subscribers of BC-WA, while at least 37 percent of those residents are subscribers or enrollees of BS-WA (for a total of 73 percent). At least 32 percent of the Washington residents who subscribe to or are enrolled in small group policies are subscribers of BC-WA, while at least 33 percent of those residents are subscribers or enrollees of BS-WA (for a total of 65 percent).

295.    BC-WA and BS-WA have led the way in increasing premiums in Washington. In 2012, BC-WA's CEO threatened to increase premium rates for individual plans by as much as 50 to 70 percent.

296.    **<u>Defendant BCBS-DC</u>** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs. Like other Blue Cross and Blue Shield plans nationwide, BCBS-DC is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as Washington, DC and a small portion of Northern Virginia in the Washington, DC suburbs. BCBS-DC likewise provides ASO services to self-funded accounts throughout its Service Area.

297.    The principal headquarters for BCBS-DC is located at 10455 Mill Run Circle, Owings Mill, MD 21117. BCBS-DC does business throughout Washington, DC.

298.    BCBS-DC currently exercises market power in the commercial health insurance market throughout the Washington, DC region. As of 2011, at least 69 percent of the Washington, DC region residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 76 percent of the Washington, DC region residents who subscribe to or are enrolled in small group policies are subscribers or enrollees of BCBS-DC.

299.    BCBS-DC has led the way in increasing premiums in its Service Area. In 2010, BCBS-DC raised rated by as much as 35 percent, so high that the insurance regulator for the District of Columbia rescinded the rate.

300.    **Defendant BCBS-WV** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in West Virginia. Like other Blue Cross and Blue Shield plans nationwide, BCBS-WV is the largest health insurer, as measured by number of subscribers or enrollees within its Service Area, which is defined as the state of West Virginia. BCBS-WV likewise provides ASO services to self-funded accounts throughout West Virginia.

301.    The principal headquarters for BCBS-WV is located at 700 Market Square, Parkersburg, West Virginia 26101. BCBS-WV does business in each county in West Virginia.

302.    BCBS-WV currently exercises market power in the commercial health insurance market throughout West Virginia. As of 2011, at least 44 percent of the West Virginia residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 57 percent of the West Virginia residents who subscribe to or are enrolled in small group policies are subscribers of BCBS-WV.

303.    BCBS-WV has led the way in increasing premiums in West Virginia. In 2012, BCBS-WV's parent company, Highmark, paid eight current or former executives more than $1 million in compensation.

304.  **Defendant BCBS-WI** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Wisconsin. Like other Blue Cross and Blue Shield plans nationwide, BCBS-WI is one of the largest health insurers, as measured by number of subscribersor enrollees within its Service Area, which is defined as the state of Wisconsin. BCBS-WI likewise provides ASO services to self-funded accounts throughout Wisconsin.

305.

306.  The principal headquarters for BCBS-WI is located at 120 Monument Circle, Indianapolis, IN 46204. BCBS-WI does business in each county in Wisconsin.

307.  BCBS-WI currently exercises market power in the commercial health insurance market throughout Wisconsin. As of 2011, at least 19 percent of the Wisconsin residents who subscribe to or are enrolled in full-service individual commercial health insurance and at least 12 percent of the Wisconsin residents who subscribe or are enrolled in to small group policies are subscribers of BCBS-WI.

308.  BCBS-WI has led the way in increasing premiums in Wisconsin.

309.  **Defendant BCBS-WY** is the health insurance plan operating under the Blue Cross and Blue Shield trademarks and trade names in Wyoming. Like other Blue Cross and Blue Shield plans nationwide, BCBS-WY is one of the largest health insurers, as measured by number of subscribersor enrollees within its Service Area, which is defined as the state of Wyoming. BCBS-WY likewise provides ASO services to self-funded accounts throughout Wyoming.

310.  The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, WY 82003. BCBS-WY does business in each county in Wyoming.

311.  BCBS-WY currently exercises market power in the commercial health insurance market throughout Wyoming. As of 2011, at least 38 percent of the Wyoming residents who

subscribe to or are enrolled in full-service individual commercial health insurance and at least 61 percent of the Wyoming residents who subscribe to small group policies are subscribers or enrollees of BCBS-WY.

312.    BCBS-WY has led the way in increasing premiums in Wyoming.

## INTERSTATE COMMERCE

313.    The Individual Blue Plans, which own and control BCBSA, are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. BCBSA enters into agreements with commercial health benefit product companies throughout the country that specify the geographic areas in which those companies can compete. The Individual Blue Plans provide commercial health insurance and ASO services that cover residents of their respective regions (which together include all 50 states) when they travel across state lines, purchase health care in interstate commerce when these residents require health care out of state, and receive payments from employers outside of their regions on behalf of their regions' residents.

## CLASS ACTION ALLEGATIONS

314.    Plaintiffs collectively bring this action on behalf of themselves individually and on behalf of a class seeking nationwide injunctive relief and on behalf of a nationwide class seeking treble damages.

315.    The meaning of the capitalized terms in the definition of these classes and subclass are set forth in the Appendix to this Complaint.

### Nationwide Injunctive Relief Class

316.    The class period is February 7, 2008 through October 16, 2020, except for Self-Funded Accounts for whom the class period is September 1, 2015 through October 16, 2020 (together, the "Class Period").

317.    Plaintiffs bring this action seeking injunctive relief on behalf of a nationwide class of subscribers or enrollees, pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, with such class (the "Nationwide Injunctive Class") defined as:

> All Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Class Period.

**Nationwide Damages Class**

318.    Plaintiffs bring this action seeking damages on behalf of themselves individually and on behalf of a class (the "Nationwide Damages Class") and subclass pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure. The Nationwide Damages Class is defined as:

> All Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Individual Blue Plan during the Class Period of February 7, 2008 through October 16, 2020 (in the case of all Damages Class members other than the Self-Funded Sub-Class, for whom the Class Period is September 1, 2015 through October 16, 2020).

319.    The Nationwide Damages Class contains a subclass (the "Self-Funded Subclass"), represented by Hibbett, consisting of the following:

All Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product (unless the person or entity's only Blue-Branded Commercial Health Benefit Product during the Settlement Class Period was a stand-alone vision or dental product) sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan from September 1, 2015 through October 16, 2020.

320. Excluded from both the Nationwide Damages Class and the Self-Funded Subclass are Government Accounts, Medicare Accounts of any kind, Settling Defendants themselves, and any parent or subsidiary of any Settling Defendant (and their covered or enrolled employees), along with Opt-Outs, the judge presiding over this matter, and any members of his judicial staff, to the extent such staff were covered by a Commercial Health Benefit Product not purchased by a Government Account during the Class Period.

321. For both the Nationwide Damages Class and the Self-Funded Subclass, the term "employee" means any current or former employee, officer, director, partner, or proprietor of an entity.

322. The Nationwide Injunctive Class, Nationwide Damages Class, and the Self-Funded Subclass defined above are referred to collectively herein as the "Classes."

323. The Classes are so numerous and geographically dispersed that joinder of all members is impracticable. While Plaintiffs do not know the number and identity of all members of the Classes, Plaintiffs believe that there are millions of Class members, the exact number and identities of which can be obtained from BCBSA and the Individual Blue Plans.

324. There are questions of law or fact common to the Classes, including but not limited to:

a.  Whether the restrictions set forth in the BCBSA license agreements are *per se* violations of Sections 1 and 3 of the Sherman Act or are otherwise prohibited under Sections 1 and 3 of the Sherman Act;

b.  Whether, and the extent to which, premiums and ASO fees charged by the Individual Blue Plans to Class members have been supracompetitvely impacted as a result of the illegal restrictions in the BCBSA license agreements;

c.  Whether the use of Most Favored Nation ("MFN") provisions in certain Individual Blue Plans' provider agreements is anti-competitive because the provisions raise barriers to entry and increase the costs of applicable health care and insurance;

d.  Whether the challenged conduct should be the subject of injunctive relief because it violates Sections 1 and 3 of the Sherman Act, reduces innovation in health care products and services, and limits consumer choice for such products and services;

e.  Whether, and the extent to which, premiums and ASO fees charged by the Individual Blue Plans have been supracompetitively impacted as a result of the anticompetitive practices adopted by them.

325.  The questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members of the Classes, including legal and factual issues relating to liability and damages.

326.  All Plaintiffs are members of the Nationwide Injunctive and Damages Classes; their claims are typical of the claims of the members of the Classes; and Plaintiffs will fairly and adequately protect the interests of the members of the Classes.

327.     Plaintiffs and the Classes are direct purchasers of, covered by, or enrolled in Blue-Branded Commercial Health Benefit Products from Individual Blue Plans and their interests are coincident with and not antagonistic to other members of the Classes. In addition, Plaintiffs have retained and are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation. In this regard, Self-Funded Account Plaintiffs are represented by separate, similarly qualified counsel.

328.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and varying adjudications that would establish incompatible standards of conduct for BCBSA and the Individual Blue Plans.

329.     BCBSA and the Individual Blue Plans have acted on grounds generally applicable to the Nationwide Class, thereby making appropriate final injunctive relief with respect to the Nationwide Classes as a whole.

330.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Classes are readily definable and are ones for which the Individual Blue Plans have records. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment of this case as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint. This class action does not present any difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

## History of the Blue Cross and Blue Shield Plans and of BCBSA

331.    The history of the Blue Cross and Blue Shield plans demonstrates that the plans arose independently, that they jointly conceived of the Blue Cross and Blue Shield marks in a coordinated effort to create a national brand that each would operate within its local area, and that they quickly developed in the growing market for health care coverage. While originally structured as non-profit organizations, since the 1980s, these local Blue plans have increasingly operated as for-profit entities: either by formally converting to for-profit status, or by generating substantial surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.

332.    BCBSA was created by Blue plans and is entirely controlled by those plans.

333.    Moreover, the history of BCBSA demonstrates that the origin of the geographic restrictions in its trademark licenses was an effort to avoid competition between the various Blue plans, and to ensure that each Blue plan would be unimpeded by other Blue Plans within its local service area.

## Development of the Blue Cross Plans

334.    In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota. In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross, and used the symbol and the name "Blue Cross" to identify the plan. This is believed to be the first use of the Blue Cross symbol and name as a brand symbol for a health care plan. Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.

335.    In 1937, Blue Cross plan executives met in Chicago. At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA. In 1938, the Committee

on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans. One such principle was that the plans would not compete with each other. When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

336.    In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

337.    In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard: that approval would be denied to any plan operating in another plan's service area. Despite this, the independently formed prepaid hospital plans, now operating under the Blue Cross name, engaged in fierce competition with each other and often entered each other's territories.

338.    The authors of *The Blues: A History of the Blue Cross and Blue Shield System*, which BCBSA sponsored and its officers reviewed prior to publication, describe the heated competition at that time:

> The most bitter fights were between intrastate rivals . . . . Bickering over nonexistent boundaries was perpetual between Pittsburgh and Philadelphia, for example. . . . John Morgan, who directed a Plan in Youngstown, Ohio, for nearly twenty-five years before going on to lead the Blue Cross Plan in Cincinnati, recalled: "In Ohio, New York, and West Virginia, we were knee deep in Plans." At one time or another, there were Plans in Akron, Canton, Columbus, Cleveland, Cincinnati, Lima, Portsmouth, Toledo, and Youngstown . . . . By then there were also eight Plans in New York and four in West Virginia. . . . Various reciprocity agreements between the Plans were proposed, but they generally broke down because the Commission did not have the power to enforce them.

339.    For many years, Cross-on-Cross competition continued, as described in Odin Anderson's *Blue Cross Since 1929: Accountability and the Public Trust*, which was funded by the Blue Cross Association, one predecessor to BCBSA. Anderson points to Illinois and North Carolina, where "[t]he rivalry [between a Chapel Hill plan and a Durham plan] was fierce," as

particular examples, and explains that though "Blue Cross plans were not supposed to overlap service territories," such competition was "tolerated by the national Blue Cross agency for lack of power to insist on change."

340.   By 1975, the Blue Cross plans had a total enrollment of 84 million subscribers.

## Development of the Blue Shield Plans

341.   The development of what became the Blue Shield plans followed, and largely imitated, the development of the Blue Cross plans. Blue Shield plans were designed to provide a mechanism for covering the cost of physician care, just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care. Similarly, the Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

342.   Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

343.   In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the AMA responded, "It is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product." In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

344.   By 1975, the Blue Shield plans had a total enrollment of 73 million.

**Creation of the Blue Cross and Blue Shield Association**

345.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.

346.    During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Cross-on-Cross and Shield-on-Shield competition also flourished.

347.    By the late 1940s, the Blue plans faced growing competition not just from each other, but also from commercial insurance companies that had recognized the success of the Blue plans and were now entering the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million policies. While the Blues remained dominant in most markets, this growth of competition was a threat.

348.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blue plans, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's fear that a restraint of trade action might result from such cooperation.

349.    During the 1950s, while competing with commercial insurers for the opportunity to provide insurance to federal government employees, the Plans were at war with one another. As the former marketing chief of the National Association of Blue Shield Plans admitted, "Blue Cross was separate; Blue Shield was separate. Two boards; two sets of managements. Rivalries, animosities, some days . . . pure, unadulterated hatred of each other."

350.    To address the increasing competition, the Blues sought to ensure "national cooperation" among the different Blue entities. The Plans accordingly agreed to centralize the ownership of their trademarks and trade names.

73

351.    In prior litigation, BCBSA has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of BCBSA because the local plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation."

352.    In 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

353.    Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the National Association of Blue Shield Plans, which in 1976 was renamed the Blue Shield Association.

354.    During the 1970s, local Blue Cross and Blue Shield plans all over the U.S. began merging. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (now called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

355.    In his annual report to the associations given in 1979, President Walter J. McNerney said that his focus would be on the "need for the Plans, within the framework of the Associations, to work together in today's challenging environment and to do so with a renewed sense of common mission." He noted that "problems" existed, "particularly where cooperative action among 2 or more Plans is required." He called for "mutual respect" among plans, decrying the "hazards" of "Blue sharking", the submission by an out-of-area plan of "highly competitive" prices. With respect to one Blue plan encroaching on the territory of another Blue plan, he said "[t]he home Plan may resent the intrusion openly or covertly and add more fuel to antagonism within the system

74

with the potentially perverted result of weakening mutual support and heightening the type of anxiety that leads to destructive competition." He added that "national accounts can only be served by coordinated action, and because national accounts are growing in importance, so is coordinated action." He concluded with a call for "coordinated action."[2]

356.    This "coordinated action" raised antitrust concerns. In 1980, when the two associations were considering a joint National Government Market Strategy, it was noted that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."[3]

357.    In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross and Blue Shield trademarks and trade names that had previously been owned by the local plans.

358.    In November 1982, after heated debate, BCBSA's member plans agreed to two "propositions" (Proposition Nos. 1.1 and 1.2): (1) by the end of 1984, all existing Blue Cross plans and Blue Shield plans would consolidate at a local level to form Blue Cross and Blue Shield plans; and (2) by the end of 1985, all Blue plans within a state would further consolidate, ensuring that each state would have only one Blue plan. Proposition 1.2 was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively", including "decision-making" and "policy determination".[4] As a result of these propositions, the number of member plans declined sharply from 110 in 1984, to 75 in 1989, to 38 and now 36.

---

[2] BCBSA00032683-703.

[3] BCBS-NE_MDL000363005.

[4] BCBSAL_0000022540-55.

359.    Even consolidation did not end competition between Blue plans, however.

360.    In the early 1980s, for example, Blue Cross of Northeastern New York and Blue Shield of Northeastern New York competed head-to-head.

361.    During the 1980s and afterwards, the plans began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses. In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

362.    In 1992, BCBSA ceased requiring Blue Cross and Blue Shield licensees to be not-for-profit entities. As a result, many member plans converted to for-profit status.

363.    One such plan, now called Anthem, has grown to become, by some measures, the largest health insurance company in the country.

364.    While nominally still characterized as not-for-profit, a number of the Individual Blue Plans generate substantial earnings and surpluses, and pay their senior administrators and officials substantial salaries and bonuses – often in the multi-million dollar range.

365.    From 1981 to 1986, the Blue plans lost market share at a rate of approximately one percent per year. At the same time, the amount of competition among Blue plans, and from non-Blue subsidiaries of Blue plans, increased substantially.

366.    For example, a 1984 position paper prepared by BCBS-GA advocated that it and another in-state Blue plan join forces, saying "[c]onsolidation of the Georgia Plans is the only way to protect the interest of the board and management and the subscribers they represent from external control by Plans in other states."[5]

367.    One internal memorandum prepared in 1986 discussed actions by Blue members that "weaken the Plans", such as "blue sharking, lack of understanding of each other's problems,

---

[5] BCBSA00125018-48.

open competition and cannibalization." It was noted that "if the entire system were to become a publicly-held corporation, coordination among the Plans and the appropriate checks and balances could come automatically."[6]

368.    After the merger of Blue Cross and Blue Shield, a taskforce was created to examine "how to improve the ability and willingness of the Plans to work together." One suggestion was creation of a common, "strengthened" licensing agreement applicable to both the Blue Cross and Blue Shield marks. It was noted that this task was "complicated" by "antitrust matters."[7] The United States Department of Justice ("DOJ") had commenced an investigation into how the then-operative license agreements worked.

369.    In order to provide "checks and balances" against "open competition", in April of 1987, the member plans of BCBSA held an "Assembly of Plans" -- a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain exclusive service areas ("ESAs") when operating under the Blue brand, thereby eliminating "Blue on Blue" competition.

370.    As one internal memorandum by Harris Feldick, President and CEO of Blue Cross for Western Iowa and South Dakota, noted, "[p]lans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare…."[8]

---

[6] BCBSA00115411-20.

[7] BCBSA00139979-81.

[8] BCBSA00083738-39.

371.     There was internal recognition that such a market allocation strategy had significant legal risks. A 1987 report on interviews of Plan CEOs that was sent to John Thompson, Chairman of the Ad Hoc Committee of the Assembly of Plans, observed that "[m]ost regard the maintenance of exclusive service areas as a must in order to avoid chaos within the system. There was concern that this issue be handled cautiously in view of antitrust implications and various court cases pending in Ohio and elsewhere, There was a view that the right to control name and market may not extend to the ability/right to enforce exclusivity."[9]

372.     Similarly, one internal memorandum from the CEO of BCBS-MD frankly recognized the illegal and horizontal nature of any Blues' market allocation agreement, stating the 'feeling that the current licensing arrangements are 'illegal.'" The memorandum further explained that "we are in the position of approving our own licenses as members of the association. Therefore, we are in the position of determining whether or not our licenses to the individual plans continue."[10] As this memorandum recognized, the Blues' use of the Association as the licensor is illusory; the arrangements are, in truth, horizontal, and accordingly, constitute *per se* violations of Section 1 of the Sherman Act.

373.     However, the 1987 Assembly of Plans did not restrain competition by non-Blue subsidiaries of Blue plans – an increasing "problem" that had caused complaints from many Blue plans.

374.     In 1989, for example, William Flaherty, President of BCBS-FL, asked that an agenda item be added to the next Assembly of Plans on inter-Plan "unbranded competition." While

---

[9] BCBSA00083662-69.

[10] BCBSA00083755-59.

acknowledging potential antitrust constraints, he said that "[s]uch endeavors threaten Plans in their own markets and create mistrust which subsequently damages our ability to work together on other issues using the name and mark."[11]

375.    After the 1986 revocation of the Blues' tax-exempt status and throughout the 1990s, the number of non-Blue subsidiaries of Blue plans increased.

376.    As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "[w]here you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some."

377.    These subsidiaries continued to compete with Blue plans.

378.    As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

379.    In 1996, after recommendations by a Special Committee of the BCBSA, the Blues voted to modify the standards to which the BCBSA's members were subject by imposing in the service mark Licensing agreement a local "best efforts" requirement. It reads as follows: "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to health care plans and related services … offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names."

380.    The Blues also accepted a rule that required any Plan that departed from BCBSA to pay an exit fee.

381.    They also limited transfer rights by requiring prior BCBSA review and facilitation of the establishment of a successor Blue Licensee.

---

[11] BCBSAL_0000037559.

382.    There was left to be resolved the issue of a national "best efforts" requirement. A May 2001 BCBSA document noted that:

> Plan CEO's [sic] are united in their desire to strengthen Brand performance, but divided on questions of how to do so. One particularly divisive question has been the adoption of a 'national best efforts' requirement. Supporters argue that such a requirement will assure the commitment from all Plans that is necessary to grow the Blue Brand. Opponents argue that such a requirement only limits healthy competition and does nothing to assure strong Blue brand performance.[12]

383.    A 51% national best efforts proposal was voted down in 2001. A stricter proposal was presented in 2004 and later accepted. It is embodied in the following guideline: "[a]t least 66-2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to health care plans and related services … must be sold, marketed, administered or underwritten under the Licensed Marks and Names. The percentage set forth in this paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph."

384.    The Blue Plans also enacted rules regarding allocation of customers of national accounts amongst Blue Plans, or ceding. "Ceding occurs when a Licensee designates another Licensee to contact, sell too [sic], and service the members of a National Account headquartered in its Service Area, in compliance with current Inter-Plan Program Policies and Procedures."[13]

385.    A national account is an entity with employee and/or retiree locations in more than one state.

386.    The effect of all of these various additions to the BCBSA rules was to drastically limit the ability of Blue Plans to compete.

---

[12] BCBSA00199973-83.

[13] BCBSA02762054.

387.    In March of 2007, there was a "Blue Caucus" held in San Francisco, California that acknowledged this emphasis on collaboration rather than competition, stating that "[w]e intend to continue to strive to keep the interest of all Blue plans…aligned so the System can remain in a mutually supportive state." It was noted that "[t]he historic success of the System has been driven by the cooperation…of member Plans. The future success of the System is dependent on this continued cooperation. The ability of the member Plans to focus on the collective good of the System is critical to our success."[14]

388.    One plan wrote in an "Executive Overview" that "[a]ny new restrictions on "unbranded" activities will be reviewed under the antitrust laws . . . and could be viewed as an agreement among competing Plans and therefore an unlawful horizontal restraint . . . ."[15]

389.    In 2012, a BCBS-Idaho employee asked "[c]ould you help me understand the anti-trust implications of working together with BCBSA and the other Plans to develop products?" A BCBS-Idaho Vice President responded, conceding that BCBS competitors not only cannot cooperate on pricing, but also "[c]annot cooperate to freeze other competitors out of the market" or cooperate on what they are not going to offer.[16]

390.    Thus, the ESAs were agreed upon and have been maintained by all Defendants despite all of these antitrust concerns.

391.    There was extensive inter-Plan recognition of the mandatory aspect of exclusive territories as well.

---

[14] Ark BCBSe – 0171747.

[15] IBC-00765238-40.

[16] BC-Idaho_MDL000302382.

392.    BCBS-AL told the Alabama Department of Insurance in 2010 that "[c]urrently the BCBS Association would not allow us to market out of state absent some agreement by the affected plans and approval from the Association."[17]

393.    Another Blue plan noted in one document that it "had been approached by brokers in the tri-state area… about quoting Blue business and we have been very clear that we can only do so within the IBC service area."[18]

394.    Similarly, in another internal document, in response to a question concerning the extent to which "Plans individuals and collectively benefit from the exclusive service areas," another executive replied that they could maintain "[l]arger market shares because other Blues stay out and do not fragment the market."[19]

**Allegations Demonstrating Control of BCBSA By Member Plans**

395.    On its website, BCBSA calls itself "a national association of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies." It "grants licenses to independent companies to use the trademarks and names in exclusive geographic areas."

396.    The Plans are the members of, and govern, BCBSA.

397.    BCBSA is entirely controlled by its member plans, all of whom are independent commercial health benefit product companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

---

[17] BCBSAL_0000291100.

[18] IBC-00011181-82.

[19] BCBSA00083761-66.

398.    On its website, BCBSA admits that in its "unique structure," "the Blue Cross and Blue Shield companies are [its] customers, [its] Member Licensees and [its] governing Board."

399.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424–25 (S.D. Ohio 1989).

400.    In 1994, the Government Accounting Office ("GAO") issued a detailed report on the operations of BCBSA, which was prepared with the cooperation of the association.[20] The GAO's report described the governance structure of BCBSA as follows:

> As members of the Association, Blues plans collectively govern the Association's affairs pursuant to written bylaws. Under these bylaws, the Association is governed by a board of directors. The board of directors consists of the CEOS of most plans and the Association president. Plan representatives to the membership meetings may or may not be the plan CEO. For practical purposes, meetings of the Association's board of directors and its membership comprise largely the same individuals.[21]

401.    Thus, the Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

402.    In a pleading it filed during litigation in the Northern District of Illinois, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."

---

[20] Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 24, *available at* http://archive.gao.gov/t2pbat3/151562.pdf.

[21] *Id.* at 24-25.

403.    The current chairman of the Board of Directors, Alphonso O'Neil-White, is also the current President and CEO of BlueCross BlueShield of Western New York.

404.    The CEO of each of the Individual Blue Plans serves on the Board of Directors of BCBSA.

405.    The Board of Directors of BCBSA meets at least quarterly.

406.    The GAO Report also described the voting process used by the BCBSA:

Decisions on significant issues relevant to all plans are generally decided by a vote of the Association membership. Examples of significant issues include the termination of a plan's membership license or the amendment of the Association's bylaws. The membership voting process combines a straight vote-one member, one vote-and a weighted vote. Under weighted voting, each member plan is entitled to one vote for each $1,000 of annual dues it pays to the Association. Because dues are based on plan premium volume, the larger plans receive a greater number of weighted votes than smaller plans.

For a membership vote to pass, the bylaws generally require a majority of both the straight and weighted votes of the members. However, this rule has exceptions. For example, the termination of a plan's trademark license requires at least three-fourths of the straight vote and three-fourths of the weighted vote rather than a simple majority. An amendment to the Association bylaws, on the other hand, requires one-half of the straight vote and two-thirds of the weighted vote.[22]

**License Agreements and Restraints on Competition**

407.    As noted above, BCBSA implements a license agreement with respect to its members' use of its service marks.

408.    The GAO Report says that:

To use the Blue Cross and Blue Shield names and trademarks, each Blues plan must sign a license agreement with the Association. The agreement does not constitute a partnership or joint venture, and the Association has no obligations for the debts of member plans.

---

[22] *Id.* at 25-26.

> The license agreement restricts plans from using the trademark outside their prescribed service area to prevent competition among plans using the Blue Cross and Blue Shield names and trademarks.[23]

The "prescribed service area" is the "ESA" described above.

409.    As a BCBSA handbook noted, "[t]he ESAs encourage Plans to work together" in dealing with other health insurers.

410.    The independent Blue Cross and Blue Shield licensees also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.

411.    The GAO Report notes that the BCBSA has various "standing committees" that "oversee" its activities in various areas: "[f]or example, the Association's Licensure and Financial Services Division monitors Blues plans' compliance with the membership standards and reports directly to the board's Plan Performance and Financial Standards Committee, which makes recommendations to the board on plan licensure decisions."[24]

412.    The independent Blue Cross and Blue Shield licensees control the entry of new members into BCBSA.

413.    In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue Marks will not fall into the hands of a stranger the Association has not approved."

---

[23] *Id.* at 28.

[24] *Id.* at 25.

414.    The independent Blue Cross and Blue Shield licensees control the rules and regulations that all members of BCBSA must obey.

415.    According to the brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines").

416.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards." In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 21, 2012.

417.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994;" that the Membership Standards "remain in effect until otherwise amended by the Member Plans;" that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote;" that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them;" and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

418.    The independent Blue Cross and Blue Shield licensees police the compliance of all members of BCBSA with the rules and regulations of BCBSA.

419.    The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

420.    The independent Blue Cross and Blue Shield licensees control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply—"Immediate Termination," "Mediation and Arbitration," and "Sanctions"—each of which is administered by the PPFSC and could result in the termination of a member plan's license.

421.    The independent Blue Cross and Blue Shield licensees likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's

licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."

422.    In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

<u>**Horizontal Agreements**</u>

423.    The independent Blue Cross and Blue Shield licensees are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

424.    Each BCBSA licensee is an independent legal organization.

425.    In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that "[t]he formation of BCBSA did not change each plan's fundamental independence." The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

426.    As BCBS-AL's group health insurance policy contract explains, "Blue Cross and Blue Shield of Alabama is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans. The Blue Cross and Blue Shield Association permits us to use the Blue Cross and Blue Shield service marks in the state of Alabama. Blue Cross and Blue Shield is not acting as an agent of the Blue Cross and Blue Shield Association."

427.    The independent Blue Cross and Blue Shield licensees include many of the largest commercial health benefit product companies in the United States.

428.    By some measures, Anthem is the largest commercial health benefit product companies in the nation. Similarly, fifteen of the twenty-five largest commercial health benefit product companies in the country are BCBSA licensees. On its website, BCBSA states that its members together provide "coverage for nearly 100 million people – one-third of all Americans" and that, nationwide, "more than 96% of hospitals and 91% of professional providers contract with Blue Cross and Blue Shield companies – more than any other insurers." Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the market for commercial health benefit products.

429.    In its Sixth Circuit brief, BCBSA admitted that the Member Plans formed the precursor to BCBSA when they "recognized the necessity of national coordination."

430.    The authors of *The Blues: A History of the Blue Cross and Blue Shield System* set forth:

> The subsidiaries kept running into each other—and each other's parent Blue Plans—in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

431.    On its website, BCBSA admits that "[w]hen the individual Blue companies' priorities, business objectives and corporate culture conflict, it is our job to help them develop a united vision and strategy" and that BCBSA "[e]stablishes a common direction and cooperation between [BCBSA] and the 39 [now 36] Blue companies."

432.    As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."

433.    One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

434.    As the foregoing demonstrates, BCBSA is a vehicle used by independent commercial health benefit product companies to enter into agreements that restrain competition.

435.    Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves. As two economists told the FTC back in 1978, "[t]he Blues collude almost perfectly. Blue Cross and Blue Shield plans agree upon geographical market areas with the assistance of their national associations."[25] This collusion later became perfect, with the advent of ESAs and the "best efforts" requirements outlined above. As one legal scholar (Mark Hal of Wake Forest Law School) noted recently, "[i]t's sort of antitrust law 101 that direct competitors can't agree to divvy up their territory."[26]

436.    All of this occurred even though various BCBS plans have antitrust policies that squarely prohibit what the Association and Plans are doing.

---

[25] Federal Trade Commission, "Competition in the Health Care Sector: Past, Present, and Future," Mar. 1978, at 212, *at* https://www.ftc.gov/sites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf (last accessed April 16, 2017).

[26] American Bar Association, "Blue Cross Blue Shield Antitrust Litigation: Update on the Issues," May 4, 2016, *at* http://www.americanbar.org/content/dam/aba/publications/antitrust_law/20160504_at160504_materials.authcheckdam.pdf (last accessed April 16, 2017).

437.     For example, BCBS-MN's policy states that "[t]hese [antitrust] laws prohibit such things as price fixing, market allocation…and monopolization. ….Antitrust laws are designed, in part, to prevent one business from gaining advantage over another and forcing other businesses out of the marketplace."[27] That is exactly what BCBSA's tactics achieve.

438.     Another example is found in BCBS-AL's Code of Business Conduct:

> You are responsible for guarding and keeping confidential the Company's trade secrets and proprietary and confidential information. This is information that is not usually made public and would be useful to competitors. . . . Outside the Company, you can only disclose proprietary or confidential information if confidentiality agreements have been arranged through the Legal Department with the individual or organization to whom you are making the disclosure. Examples of misuse of proprietary information, trade secrets, and confidential information include … [d]iscussing . . . corporate strategy with competitors.[28]

439.     Upon information and belief, Defendants have shared sensitive information with each other repeatedly throughout the class period that was (in some instances) less than three months old.

440.     For example, Defendants had monthly calls among chief actuaries from multiple Defendants. Agendas for the actuary calls were circulated, and included topics like "competitive issues,"[29] "complying with MLR targets and what is being done if a loss ratio is below the MLR target,"[30] and "competitive landscapes."[31]

---

[27] BCBS-MN, "Code of Blue: Living our Values," *at* https://www.bluecrossmn.com/healthy/public/portalcomponents/PublicContentServlet?contentId=P11GA_11976942 (last accessed April 16, 2017).

[28] BCBS-AL, "Code of Ethics and Business," *at* https://www.bcbsal.org/web/documents/1511503/9929532/Code+of+Business+Conduct.pdf/61a9f1e6-7200-4a14-93e1-70b99a08b49c (last accessed April 16, 2017).

[29] BCBSA02985906-07.

[30] BCBSA02010686-87.

[31] BCBSA01507798-99.

441.    BCBSA also established other "Workgroups" for "Information Sharing" among Defendants, which provided repeated opportunities to exchange sensitive information. Those included Workgroups entitled: "Chief Financial Officer Forum," "Blue Card Executives," "National Account Executives," and "Strategy Collaborative" (which "discusses major strategic issues facing Plans").[32]

442.    BCBS-AL had multiple employees that served on these BCBSA Workgroups.[33]

### The Horizontal Agreements Not To Compete

443.    Each Defendant listed herein is an independent legal entity.

444.    No Defendant has or had any franchise agreement with another Blue Plan during the class period.

445.    No Defendant has or had any franchise agreement with BCBSA during the class period.

446.    The rules and regulations of BCBSA, including, but not limited to, the License Agreements, the Membership Standards, and the Guidelines, constitute horizontal agreements between competitors, the independent Blue Cross and Blue Shield licensees, to divide the geographic market for commercial health benefit products. As such, they are a *per se* violation of Sections 1 and 3 of the Sherman Act.

447.    Defendants have divided United States markets for commercial health benefit products into ESAs allocated to distinct Blue Plans.

448.    Through the License Agreements, Guidelines, and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, each

---

[32] BCBSA03039808-22.

[33] BCBSAL_0001257494-503.

independent Blue Cross and Blue Shield licensee agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a designated ESA.

449.    The License Agreement defines each licensee's ESA as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

450.    Each Defendant entered into a License Agreement with BCBSA.

451.    All Defendants enforced the ESA provided by the License Agreement from at least 2008 to the present.

452.    Further, Defendants have allocated U.S. markets for commercial health benefit products among themselves by agreeing to limit their competition against one another when not using the Blue names. The Guidelines and Membership Standards, which the independent Blue Cross and Blue Shield licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, establish two key restrictions on non-Blue competition, which have been quoted above.

453.    First, each independent Blue Cross and Blue Shield licensee agrees that at least 80 percent of the annual revenue that it or its subsidiaries generate from within its designated ESA (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names.

454.    This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business. This provision also thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

455.    Second, each independent Blue Cross and Blue Shield licensee further agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside *or outside* of its designated ESA (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66-2/3 percent of its national enrollment from its Blue-brand business.

456.    This provision directly limits the ability of each Blue plan to generate revenue from non-Blue branded business, and thereby limits the ability of each plan to develop non-Blue brands that could and would compete with Blue plans. It further discourages and disincentivizes each plan from developing any non-Blue branded businesses.

457.    The one-third cap on non-Blue revenue provides a licensee with minimal, if any, incentive to compete outside its ESA. To do so, the licensee would have to buy, rent, or build a provider network under a non-Blue brand, while ensuring that revenue derived from that brand did not exceed the one-third cap. Should the licensee offer services and products under the non-Blue brand within its ESA (which is likely, since that is its base of operations), that would further reduce the amount of non-Blue revenue it is permitted to earn from outside its designated area. Thus, the potential upside of making an investment in developing business outside of a designated area is severely limited, which obviously creates a disincentive from ever making that investment.

458.    In sum, each independent Blue Cross and Blue Shield licensee has agreed with its potential competitors that each will exercise the exclusive right to use the Blue brand within a designated geographic area, derive *none* of its revenue from services offered under the Blue brand outside of that area, and derive *at most* one-third of its revenue from outside of its exclusive area,

using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

459.    The foregoing restrictions on the ability of Blue plans to generate revenue outside of their ESAs constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Sections 1 and 3 of the Sherman Act.

460.    Each Defendant abided by the foregoing restrictions on the ability of Blue plans to generate revenue outside of their ESA from 2008 to the present.

461.    More than one Blue Cross and Blue Shield licensee has publicly admitted the existence of these territorial market divisions. For example, the former Blue Cross licensee in Ohio alleged that BCBSA member plans agreed to include these restrictions in the Guidelines in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.

462.    The largest Blue licensee, WellPoint, now doing business as Anthem, Inc., is a publicly-traded company, and therefore is required by the SEC rules to describe the restrictions on its ability to do business. Thus, in its Form 10-K filed February 22, 2013, WellPoint stated that it had "no right to market products and services using the Blue Cross and Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross and Blue Shield products." WellPoint has further stated that the "license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the Blue Cross and Blue Shield names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the BCBSA, attributable to health benefit plans within its ESA must be sold, marketed, administered or underwritten under the Blue Cross and Blue

Shield names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national net revenue, as defined by the BCBSA, attributable to health benefit plans must be sold, marketed, administered or underwritten under the Blue Cross and Blue Shield names and marks."

463.    Likewise, in its Form 10-K filed March 14, 2013, Triple-S Salud, the Blue licensee for Puerto Rico, explained that "[p]ursuant to our license agreements with BCBSA, at least 80% of the revenue that we earn from health care plans and related services in [its ESA] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) health care plans and related services both in [and outside its ESA], must be sold, marketed, administered, or underwritten through use of the Blue Cross Blue Shield" name and mark. Further, the Triple-S licensee stated that the territorial restrictions "may limit the extent to which we will be able to expand our health care operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the Blue Cross Blue Shield Names and Marks is already present."

464.    Despite these public admissions, both BCBSA and its member plans have attempted to keep the territorial restrictions as secret as possible.

465.    When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," BCBSA's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license. However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."

466.    The member plans of BCBSA have agreed to impose harsh penalties on those that violate the territorial restrictions.

467.    According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a member plan's license and membership are terminated, it loses the use of the Blue brands. In addition, in the event of termination, a plan must pay a fee to BCBSA.

468.    According to WellPoint's February 22, 2013 Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee through December 31, 2012, "would allow the BCBSA to 're-establish' a Blue Cross and/or Blue Shield license in the vacated ESA."

469.    In sum, a terminated licensee would: (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Blue licensee in its local area. These penalties essentially threaten to put out of existence any Blue member plan that breaches the territorial restrictions.

470.    During the class period, no Defendant competed under the licensed Blue Cross and Blue Shield trademarks and/or trade names outside of its designated ESA.

471.    Since entering the License Agreement, no Defendant competed under the licensed Blue Cross and Blue Shield trademarks and/or trade names outside of its designated ESA.

472.    Thus, while there are numerous Blue plans, and non-Blue businesses owned by such plans, that could and would compete effectively in each other's ESAs but for the territorial restrictions, almost none compete outside their ESAs under non-Blue names and brands, despite their ability to do so.

473.    Even in the relatively rare instance in which Blue plans conduct operations outside of their ESAs, they have been required to keep those operations tightly under control by preventing

growth – exactly the opposite of how they would normally operate. The relationship between WellPoint and its non-Blue subsidiary, UniCare, is an illustrative example. WellPoint reported in its Form 10-K for the year ending December 31, 1999 that approximately 70 percent of its total medical membership was sold by its Blue-licensed subsidiary, Blue Cross of California. In its Form 10-K for the year ending December 31, 2000, this percentage decreased to approximately 67 percent. In its Form 10-K for the year ending December 31, 2001, after WellPoint had acquired the BCBSA member plans operating in Georgia and part of Missouri, it reported that approximately 78 percent of its total medical membership was in its Blue-licensed subsidiaries.

474.    By the time WellPoint filed its 10-K for the year ending December 31, 2005, it had acquired the Blue licensees in fourteen states. For the first time, it admitted the existence of the territorial restrictions in the BCBSA licenses and stated that it was in compliance with them. As a result of these restrictions, from 1999 to 2002, while other Texas health insurers experienced average revenue growth of 17 percent, UniCare experienced growth of only 1.4 percent in Texas. During those same years, UniCare experienced virtually no growth in the state of Washington, while overall health insurance revenue in the state grew by 17 percent. Similarly, in New Jersey from 2000 to 2002, the number of out-of-Service-Area enrollees of WellChoice (which became a part of WellPoint and is known as Empire BlueCross BlueShield) did not increase, despite an overall 25 percent growth rate for health insurers in the state during the same period. In Mississippi, between 2001 and 2002, premium revenue earned by most health insurance companies increased by more than 10 percent, but revenue for the non-Blue business of out-of-state Blue plans was either flat (in the case of UniCare) or negative (in the case of the former Anthem, which is now part of WellPoint).

475.    In a 2010 earnings call, Wellpoint's President said:

Marketplace dynamics made it increasingly difficult for UniCare to provide affordable, high-quality products to Commercial customers in [Illinois and Texas]. We know from our . . . 14 Blue states that a plan must have sufficient scale to obtain optimal provider arrangements and deliver maximum value to Commercial and individual customers. . . . the fundamental drivers that are important to this business . . . . [n]amely scale; we need to have scale; we need to have the best discounts in the market. And those are characteristics that we as Blue plans can share together. That, as well as the UniCare transaction for us was a strategic one. We transitioned the membership in Texas and Illinois to another Blue plan. So we really think we are working really well with our Blue plan partners ….. But it was a strategic decision to transfer that membership. We don't have the scale. We don't have the depth of the provider discounts that we have in other geographies. And that was really critical.[34]

476.    "Scale" as used here was a code word for the benefits conferred by the horizontal agreements created under the BCBSA banner that Wellpoint's non-Blue branded business could never achieve.

477.    In another example, as of 2010, one Pennsylvania Blue plan, Independence Blue Cross, had 2.4 million Blue-brand commercial health insurance enrollees in its ESA of Southeastern Pennsylvania, and had close to 1 million non-Blue brand Medicare and Medicaid enrollees (to which the territorial restrictions do not apply) in Indiana, Kentucky, Pennsylvania, and South Carolina, but its non-Blue brand commercial health insurance subsidiary, AmeriHealth, which operates in New Jersey and Delaware, had an enrollment of only approximately 130,000, or 4 percent of Independence Blue Cross's total commercial health insurance enrollment.

478.    The territorial restrictions agreed to by all BCBSA members operate to restrain competition by preventing member plans from competing with each other and with non-Blue plans. These prohibitions on competition apply no matter how favorable the efficiencies and

---

[34] "Q4 2009 WELLPOINT, INC. EARNINGS CONFERENCE CALL 16" (Jan. 27, 2010), available at http://seekingalpha.com/article/184862-wellpoint-inc-q4-2009-earnings-call-transcript.

economies of scale that might result from expansion of a Blue into a new area, and no matter how much premiums and other costs might be reduced if competition were permitted.

## The Anticompetitive Acquisition Restrictions

479.    In addition to the *per se* illegal territorial restrictions summarized above, the rules and regulations of BCBSA, which the independent Blue Cross and Blue Shield licensees created, control, and agree to obey, also include provisions that restrict the ability of non-members of BCBSA to acquire or obtain control over any member plan.

480.    First, the rules and regulations prohibit acquisition of a Plan by a non-Blue entity without the approval of BCBSA. The Guidelines state that "[n]either a [Member] Plan nor any Larger Controlled Affiliate shall cause or permit an entity other than a [Member] Plan or a Licensed Controlled Affiliate thereof to obtain control of the [Member] Plan or Larger Controlled Affiliate or to acquire a substantial portion of its assets related to licensable services." Should a non-member wish to obtain such control or assets, it "is invited to apply to become a licensee." However, as alleged above, the member plans control the entry of new members into BCBSA. Should a non-member attempt to join BCBSA to obtain control of, or to acquire a substantial portion of, the assets of a member plan, the other member plans accordingly may block its membership by majority vote.

481.    Second, the License Agreements contain a number of acquisition restrictions applicable to for-profit Blue Cross and Blue Shield licensees (*i.e.*, to those licensees who would otherwise be capable of having their shares acquired). These include four situations in which a member plan's license will terminate *automatically*: (1) if any institutional investor become beneficially entitled to 10 percent or more of the voting power of the member plan; (2) if any non-institutional investor become beneficially entitled to 5 percent or more of the voting power of the

member plan; (3) if any person become beneficially entitled to 20 percent or more of the member plan's then-outstanding common stock or equity securities; or (4) if the member plan conveys, assigns, transfers, or sells substantially all of its assets to any person, or consolidates or merges with or into any person, other than a merger in which the member plan is the surviving entity and in which, immediately after the merger, no institutional investor is beneficially entitled to 10 percent or more of the voting power, no non-institutional investor is beneficially entitled to 5 percent or more of the voting power, and no person is beneficially entitled to 20 percent of more of the then-outstanding common stock or equity securities. These restrictions apply unless modified or waived in particular circumstances upon the affirmative vote both of a majority of the disinterested member plans and also of a majority weighted vote of the disinterested member plans. These restraints effectively preclude the sale of a BCBSA member to a non-member entity, absent special approval.

482.    These acquisition restraints reduce competition in violation of the Sherman Act because they substantially reduce the ability of non-member insurance companies to expand their business and compete against the Individual Blue Plans. To expand into a new geographic area, a non-member insurance company faces the choice of whether to build its own network in that area, or to acquire a network by buying some or all of an existing plan doing business in that area. Through the acquisition restrictions, the Blue plans have conspired to force competitors to build their own networks, and have effectively prohibited those competitors from ever choosing what may often be the more efficient solution of acquiring new networks by purchasing some or all of an existing Blue plan. By preventing non-Blue entities from acquiring Blue entities and their networks, the acquisition restrictions in the BCBSA licenses effectively force competitors to adopt

less efficient methods of expanding their networks, thereby reducing and in some instances eliminating competition.

483.     Since the 1996 adoption of the acquisition restrictions, the only acquisitions of Blue Cross or Blue Shield licensees have been acquisitions by other member plans. During the period from 1996 to the present, there has been a wave of consolidation among the Blue plans: in 1996, there were 62 Blue licensees; at present, there are only 36.

484.     By agreeing to restrict the pool of potential purchasers of a Blue licensee to other Blue licensees, the member plans of BCBSA raise the costs their rivals must incur to expand their networks and areas of practice, reduce efficiency, and protect themselves and each other from competition. The net effect is less competition and higher premium costs for consumers.

### The BCBSA Licensing Agreements Have Reduced Competition Across The United States

485.     The Individual Blue Plans, as licensees, members, and parts of the governing body of BCBSA, have conspired with each other (the member plans of BCBSA) to create, approve, abide by, and enforce the rules and regulations of BCBSA, including the *per se* illegal territorial restrictions in the License Agreements and Guidelines nationwide.

486.     But for the *per se* illegal territorial restrictions, many of the Individual Blue Plans would otherwise be significant competitors of each other in their respective ESAs. As alleged above, fifteen of the twenty-five largest commercial health benefit product companies in the country are Blue plans: if all of these plans, together with all other BCBSA members, were able to compete with each other, the result would be lower costs and thus lower premiums and ASO fees paid by their enrollees.

487.     In a letter written in February of 2016, the American Hospital Association ("AHA") summarized the market dominance of the Blue plans (footnotes omitted):

• Blue plans have the largest membership of any insurer. The Blues cover more than 105 million Americans. That is "nearly one in three Americans." Collectively, the Blues are three times bigger than any other health plan.

• Blue plans command the largest share of the commercial fully insured (FI) segment in at least 45 states and the District of Columbia (D.C.); in 35 states, a Blue plan holds 50 percent or more FI market share; in some states, 85 percent of all FI members belong to a Blue plan.

• Blue plans rank first in total membership in at least 43 states and D.C., with a high market share of 97 percent.

• In the Federal Employees Health Benefits Program, the Blue plans command 66 percent of total membership, and control 50 to 90 percent of the membership in 48 states and D.C.

• In the public exchanges, Blue plans dominate. In at least one state, the Blue plan enrolled 100 percent of the exchange membership in 2015, and other Blue plans acquired membership shares in the forties through nineties in many states.

• Blue plans collectively are significantly larger than any of their rivals on a consolidated basis. Indeed, collectively Blue plans had $244 billion in revenue in 2013, making them larger than all companies on the Fortune 500 except for Walmart and Exxon Mobil.

• The Blue plans of Alabama, Florida, Illinois, Kansas, Minnesota, Montana, Nebraska, New Mexico, North Dakota, North Carolina, Oklahoma, Texas and Wyoming through their jointly owned pharmacy benefit manager acknowledge their "market dominance."

• Blue plans dominate provider networks. In 32 states and D.C., Blue plans have the largest provider networks and, in seven more states, Blue plans have the second-largest provider networks.



● Blue plans contract with 96 percent (more than 5,100) of U.S. hospitals and 92 percent of professional providers, which is more than any other insurer.[35]

488.    A 2015 snapshot of the Blues' state-by-state market penetration is reflected in the following chart:

---

[35] American Hospital Association Letter to Hon. William Baer, Antitrust Division, U.S. Department of Justice (Feb. 29, 2016) ("AHA Letter"), at 7-9.



Source: Comprehensive medical membership data, Health Coverage Portal™, Mark Farrah Associates

489.    The market allocation agreement "eliminates competition from other Blue Plans" and evades "open warfare" between the Blues.[36]

490.    For example, one Plan noted that "If BCBSKC's right to its exclusive service territory were lost or materially changed, we could experience increased competition from other, much larger Blue Plans in our 32-county territory."[37]

491.    BCBS-AL stated that for itself, "[c]ompetitive advantage, rather than simply being competitive, is the key to long-term success."[38]

---

[36] BCBSA00083738-39.

[37] BCBS-KC_MDL00091966.

[38] BCBSAL_0000042594-650.

492.     Consideration of a few of the Blue Plans illustrates this point. For example, WellPoint/Anthem is the largest health insurer in the country by total medical enrollment, with approximately 36 million enrollees. It is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, and portions of Virginia, as well as for California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. But for the illegal territorial restrictions summarized above, Anthem would be likely to offer its commercial health benefit services and products in many more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

493.     Similarly, with more than 13 million members, Health Care Service Corporation ("HCSC"), which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-MT and BCBS-TX, is the largest mutual health insurance company in the country and the fourth largest overall. But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its commercial health benefit services and products in many more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs, premiums, and ASO paid by the other Individual Blue Plans' enrollees as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

494.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its ESA of Michigan. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its commercial health benefit services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

495.    Highmark, Inc. is the tenth largest health insurer in the country by total medical enrollment, with approximately 4.1 million enrollees. Its affiliated Blue plans include Highmark BCBS, BCBS-WV, and BCBS-DE. But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its commercial health benefit services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees, as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

496.    BCBS-AL is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees. But for the illegal territorial restrictions summarized above, BCBS-AL would be likely to offer its commercial health benefit services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees as well as lower ASO fees,

thereby increasing consumer choice and stimulating innovation in healthcare products and services.

497.    CareFirst, Inc., which operates the Blue Plans Maryland, Washington, DC, and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its commercial health benefit services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

498.    BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its ESA of Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its commercial health benefit services and products in more regions across the United States in competition with the Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

499.    BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its ESA of Florida. But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its commercial health benefit services and products in more regions across the United States in competition with the

Individual Blue Plans in those regions. Such competition would result in lower health care costs and premiums paid by the other Individual Blue Plans' enrollees as well as lower ASO fees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

<u>**Supra-Competitive Premiums and ASO Fees Charged by BCBS Plans And Deprivation of Consumer Choice And Access To More Innovative Products**</u>

500.    **Supracompetitive premiums and ASO Fees.** The Individual Blue Plans' illegal anticompetitive conduct has restrained competition, prevented entry by Individual Blue Plans and their non-Blue affiliates into other markets, among other matters increased health care costs, inflated premiums and ASO fees, and deprived individuals, small groups, and other businesses of the opportunity to purchase health insurance or ASO services in the respective Service Areas from one or more additional Individual Blue Plans and/or their non-Blue affiliates, at a lower premium or contractual rate and/or at a price set by a market free from the non-price restraints imposed by Defendants' anti-competitive agreements.

501.    Highmark Health Services noted in 2003 that Pennsylvania was one of the very few states with two competing Blue Plans and the result was "enormous downward pressure on premium price levels . . . ."[39]

502.    The ESAs eliminated competition among Blue Plans and, therefore, eliminated the downward pressure on premium and ASO contract price levels.

503.    As the AHA explained in the aforementioned 2016 AHA Letter (footnotes omitted):

A recent study looking at pricing changes on 34 state exchanges found that the "largest insurance company in each state on average increased their rates 75 percent more than smaller insurers in the same state," and increases did not appear to be related to higher medical costs. "In most states insurers with large market share

---

[39] HMK00205245-64.

[overwhelmingly Blue plans] have proposed rate increases in excess of 20 percent for next year." These studies seem to suggest that Blue premiums are higher in states where they are dominant and any network efficiencies they enjoy as a result do not translate into lower premiums for consumers.

• New Mexico — the Blue plan requested a 52 percent increase.

• North Carolina — the Blue plan sought an average increase of 26 percent and the Blue plan's individual rates are increasing by 32.5 percent for 2016.

• Illinois — the Blue asked for an average increase of 29 percent for its HMO plan and 38 percent for its PPO plans.

• Pennsylvania and Maryland — the Blue plan asked for 30 percent increases.

• Alaska — the Blue plan requested 39 percent average increases.

• Arizona — the Blue plan requested a 21 percent increase.

• Idaho — the Blue plan requested a 24 percent increase.

• Kansas — the Blue plan asked for average increases of 38 percent.

• Montana — the Blue plan requested a 23 percent increase.

• Oklahoma — the Blue plan requested increases from 23 to 44 percent.

• Tennessee — the Blue plan was approved for a 36.3 percent average increase.

• Anthem requested exchange premium increases of more than 10 percent in California, Connecticut, Georgia, Kentucky, New York, and Virginia. Despite its higher premiums in the individual market and despite losing some share to lower-priced competitors, Anthem declared that "we will not chase price to buy membership.[40]

504.    Small groups and individuals are especially injured by the Blue' anticompetitive

practices, as explained in the AHA letter (footnotes omitted):

While all sized groups are sensitive to price increases, small groups are particularly sensitive to them:

---

[40] AHA Letter at 18-19.

[S]mall employers are less able to provide health coverage . . . because of the greater risk associated with small groups. Furthermore, such firms generally do not have the necessary administrative capacity to negotiate with multiple provider groups and handle all the day-to-day operational functions.

To "help keep premiums affordable, small firms tend to offer coverage with higher deductibles."

Similar observations may be made about individual health insurance: "Because individual health insurance is not subsidized by employers, each consumer pays the entire cost, deciding whether the coverage justifies the premiums. As a result, consumers in this market tend to be very price sensitive." Yet, "individual insurance is expensive for what one gets . . . ."

The Blue plans' dominance in these insurance markets appears to be corroborated by their success in the health insurance marketplaces, or exchanges. In the exchanges' first year of operation, Blue plans "account[ed] for almost half [48 percent] of all exchange products." That initial lead will undoubtedly widen in the wake of the failure of a number of co-op competitors. To date, 12 of the 23 co-ops subsidized by the federal government have failed and two capped enrollment for 2016.80 The only money-making co-op last year is now losing millions.81 This is especially concerning because the exchanges were expected to provide a platform for new entry and greater competition.[41]

505.    There is also evidence obtained through discovery in this case from BCBS-AL Chief Actuary Noel Carden that BCBS-AL has for years charged supracompetitive insurance rates that were never filed with state regulators.

506.    Plaintiffs were damaged by paying non-competitive premiums or ASO fees, which are to be calculated by estimating the premiums or ASO fees that would have been competitively available to consumers but for the Individual Blue Plans' antitrust violations.

507.    **Deleterious Effects On Consumer Choice And Innovation.** The challenged restraints also limited consumer choice and adversely affected innovation in health care products and services.

---

[41] *Id.* at 14-15.

508.    This point was made by Professor Daniel Rubinfeld, a highly respected economist retained by Plaintiffs in this litigation:

The challenged restraints, by virtue of eliminating most Blue-on-Blue competition and reducing Blue-on-Green competition, reduce incentives to innovate. As part of its strategy, the Blue System has depended on its broad-based networks to growth its customer base while making it difficult for competitors (including Blues and Greens) to entice customers. To compete with the Blues, competitors like Cigna have developed different innovative strategies to reduce costs, such as through the use of accountable care organizations that provide financial incentives for higher-quality care. These kinds of innovate strategies can reduce costs to consumers while improving quality. However, Blues like BCBS-AL, which enjoys substantial market power in Alabama, have no incentive to deviate from a broad-based network approach. I find it noteworthy that in an internal survey pointed out that "it is becoming increasingly difficult to innovate in broad networks" and further "that competitors are more appealing for accounts seeking innovative solutions." A survey of subscribers rating the Blues and other national carriers gave the Blues the lowest marks for innovation. The same survey pointed out that a "[t]heme" for BCBS was "[l]ack of innovation."

 Indeed, the threat to innovation was one of the reasons that the court rejected the Anthem/Cigna proposed merger. The district court in the case brought by the government against the Anthem-Cigna merger found that Anthem and Cigna, as competitors, offered two different approaches to cost savings:

"Anthem's defense is that its greater ability to command discounts from providers will save customers money at the end of the day. At the same time, Cigna says that its collaboration with providers will save customers money at the end of the day. Plaintiffs take the position that customers should continue to have a choice between these options, and the Court agrees."

"While Anthem has also moved to incorporate quality and cost savings incentives into its provider contracts, Cigna has sought to differentiate itself with its approach towards reducing costs by increasing health. Its message is that better information and clinical management on the provider side, along with encouraging behaviors that support health on the patient side, can reduce a patient's need to be hospitalized or undergo expensive medical procedures at all, and that this decrease in utilization will reduce the total medical cost per employee over time. For this reason, some customers prefer Cigna notwithstanding its discount disadvantage, and there was costs, such as through the use of accountable care organizations that provide financial incentives for higher-quality care. These kinds of innovate strategies can reduce costs to consumers while improving quality. However, Blues like BCBS-AL, which enjoys substantial market power in Alabama, have no incentive to deviate from a broad-based network approach. I find it noteworthy that in an internal survey pointed out that 'it is becoming increasingly difficult to innovate in

broad networks' and further 'that competitors are more appealing for accounts seeking innovative solutions.'" A survey of subscribers rating the Blues and other national carriers gave the Blues the lowest marks for innovation. The same survey pointed out that a '[t]heme' for BCBS was '[l]ack of innovation.'"

The court further found that Cigna's innovation "spurred even those carriers with strong provider discounts to improve their products." It is reasonable to conclude that competition among the Blues, or between Greens and Blues, would likewise spur innovation in the delivery of health care; indeed, documentary evidence shows that the Blues do tend to be pushed towards innovation when their competitors force them. Conversely, lack of such competition has had the effect of depriving subscribers of these benefits of competition.[42]

## The Widespread Use By BCBSA Licensees Of Anticompetitive Most Favored Nation Clauses

509.    Over the past two decades (if not longer), numerous Blue plans have adopted what are described in the industry as "Most Favored Nation" ("MFN") clauses in their reimbursement agreements.

510.    MFNs (also known as "most favored customer," "most favored pricing," "most favored discount," or "parity" clauses) require a service provider to charge a Blue entity's competitors either more than, or no less than, what the provider charges the Blue entity for the same services. MFNs that require the amount the provider charges the Blue entity's competitor to be higher than the amount the provider charges the Blue entity are often known as "MFN-plus" clauses, and typically require the amount to be higher by a specified percentage.

511.    In 2010, the DOJ filed a civil action against BCBS-MI, alleging that it entered into MFNs with 70 of Michigan's 131 acute care hospitals. The district court denied a motion to dismiss. *United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665 (E.D. Mich. 2011). The district court ruled that "[b]ased on the allegations in the Complaint, it is plausible that the

---

[42] Class Certification Expert Report of Professor Daniel Rubinfeld 53–55, *In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406 (N.D. Ala. filed May 8, 2020), ECF No. 2568-1 (footnotes omitted) (quoting *Anthem*, 236 F. Supp. 3d at 183–84).

MFNs entered into by Blue Cross with various hospitals in Michigan establish anticompetitive effects as to other health insurers and the cost of health services in those areas."

512.   The government later dismissed the case after the Michigan Department of Insurance issued rules that forbade the use of such MFNs. In a follow-on class action (*Shane Group Inv. v. Blue Cross Blue Shield of Mich.*, No. 2:10-cv-14360-DPH-MKM (E.D. Mich.), documents were unsealed that showed explicit written agreements between BCBS-MI and Michigan hospitals that were intended to deter competition. Dr. Jeffrey Leitzinger, the expert for the plaintiff class in that case, issued a report that said:

> The antitrust injury sustained by Class members in this case is reflected in increased rates of hospital reimbursement—both those paid by BCBSM as consideration for hospitals' agreement to MFNs and those imposed upon other insurers by hospitals in compliance with their MFN agreements with BCBSM. For each "Affected combination" shown in Table 1 economic evidence shows that MFN agreements led to higher payments for hospital services. This evidence involves analysis of rates of reimbursement for eligible claims over time at the Affected combinations, as well as statistical comparisons of reimbursement rates at the Affected combinations compared with other hospitals involving the same insurers and networks where there were no MFN agreements.
>
> • The reimbursement mechanisms set forth in the Affected Provider Agreements operated such that inflated rates of overall reimbursement would accompany inflated payments for all or virtually all of the claims paid pursuant to those agreements. Inflated claim payments mean that Class members paid overcharges. In particular, Class members that are health insurance companies paid increased amounts to cover their reimbursement obligations under fully-insured plans. Employer Class members paid increased amounts to cover their obligations under self-insured plans implemented on behalf of their employees. Class members who were participants in these plans (the patients receiving hospital services) paid increased amounts for the service through deductibles and co-insurance payments. As a result, all (or virtually all) Class members were impacted by higher hospital reimbursement rates stemming from the MFNs.
>
> • I have concluded that the aggregate overcharges incurred by the Class is susceptible to formulaic calculation in a class-wide manner. Individualized analysis on the part of Class members will not be necessary. In particular, using claims data provided by BCBSM and other insurers in this case, statistical analysis of reimbursement rates across hospitals in the State of Michigan with and without MFN agreements can be used to measure the impact of those agreements on

114

reimbursement for hospital healthcare services. That impact can be used in turn to quantify the amount by which total reimbursements paid by the Class members as a whole were inflated by virtue of the MFN agreements.[43]

513.    Use of MFNs by the Blues unreasonably reduces competition for a number of reasons. First, MFNs establish that the dominant market provider will be charged the lowest prices. The Blues have the ability to pass through costs, thus making them indifferent to the actual price charged in markets in which they are dominant, as long as they are not competitively disadvantaged. The MFNs thus reduce competition by eliminating an incentive for the Plans to reduce overhead prices.

514.    Second, MFNs limit competition by preventing other health insurers in the region from achieving lower costs with providers and thereby becoming significant competitors to the MFN user. Because of the Blues' market power in their respective ESAs, the MFN user can pass its own higher costs onto consumers through higher premiums without fearing that its competitors will be able to reduce premiums and draw consumers from it.

515.    MFNs also effectively establish a price floor below which providers will not sell services to the MFN user's competitors. MFNs enable the MFN user to raise that price floor. The price floors deter competition among health insurers in the relevant region. By reducing the ability of the MFN user's competitors to compete against the MFN user, MFNs ensure that the Plans can substantially raise premiums while maintaining, or even increasing, their respective market shares.

516.    Moreover, if the MFN user is certain that no insurer will pay less to a provider than it will, it will be willing to pay more to that provider than it would otherwise. The more the MFN user agrees to pay that provider, the more its competitors must pay that provider. And by raising

---

[43] *See id.* Doc. No. 290-2 at 4-5.

the price floor, the MFN user keeps other insurers' costs artificially high, forcing those insurers to offset the higher costs by raising premiums.

517.    Third, MFNs raise barriers to entry in the market for commercial health insurance. If a provider can reduce the price it charges an insurer with little to no market share only by reducing the price it charges a market-dominant MFN user, the provider has a strong incentive not to lower prices. Without the ability to compete on price, a new competitor will be unable to price below the market-dominant MFN user, and thus will be unable to survive.

518.    A number of the independent Blue Cross and Blue Shield licensees, including BCBS-MI, BCBS-NC, Highmark BCBS, and BCBS-SC, have used and/or continue to use MFNs to exploit the monopoly power they hold in their respective ESAs. These independent Blue Cross and Blue Shield licensees, including BCBS-MI, BCBS-NC, Highmark BCBS, and BCBS-SC, have coordinated their use of MFNs with other Blue entities.

519.    Use of MFNs and related techniques is widespread and pervasive among Blue plans. The member plans of BCBSA have discussed the legality and usefulness of MFNs at BCBSA gatherings, such as the BCBSA 41st Annual Lawyers Conference, held May 3, 2007 in Miami, Florida. There, a presenter informed representatives of the member plans that "DOJ and FTC have focused on potential anticompetitive character of MFN clauses, particularly on exclusionary impact" and that "[w]here [an] MFN has overall exclusionary effect on competition and entrenches market power, it could be actionable."

520.    There is direct evidence that, like BCBS-MI and its fellow member plans of BCBSA, BCBS-NC uses MFNs in its contracts with providers. On July 13, 2006, BCBS-NC admitted that "BCBSNC's favorable pricing [MFN] clause has been in use for years." BCBS-NC's use of MFNs has raised the costs of its competitors, has protected it from competition (and thereby

protected its ever-growing market share), and has contributed to the artificial inflation of its health insurance premiums in North Carolina.

521.    From 2006 to 2009, BCBS-NC used at least four form provider agreements that included MFNs. These form provider agreements (May 15, 2006, December 19, 2007, May 21, 2008, and May 8, 2009) all included an MFN stating that:

> Provider acknowledges and warrants that, as of [date], Provider [has notified BCBSNC of] [does not have [and will not enter into]] any contract, agreement, or other arrangement under which it provides services, treatments, or supplies at a rate of payment and/or through any payment mechanism, which results [or will result in] lower [or equal] aggregate payments to the Provider by any such similar payor than BCBSNC's payments would produce under this Agreement.

522.    There is direct evidence that, like its fellow member plans of BCBSA, Highmark BCBS uses MFNs in its contracts with providers. Highmark BCBS's use of MFNs has raised the costs of its competitors, has protected it from competition (and thereby protected its ever-growing market share), and has contributed to the artificial inflation of its health insurance premiums in Western Pennsylvania.

523.    Multiple Highmark BCBS provider contracts, publicly available on PID's website, evidence Highmark BCBS's recent and current use of MFNs. Highmark BCBS's MFNs in provider contracts come in at least two forms. In one type of provider contract, Highmark BCBS defines "Usual Charges" as "the amount that the Provider bills other payors and/or patients for the same services" and then states that "Highmark agrees to pay the Provider for Provider Services provided to eligible Members and determined to be Covered Services *the lesser of*: (A) the payment due in accordance with Highmark's payment rates as currently in effect at the time the Provider Services are rendered; or (b) *one hundred percent (100%) of the Provider's Usual Charges*" (emphasis added). This type of MFN appeared in a Highmark BCBS freestanding renal dialysis ancillary provider agreement filed June 3, 2008; a Highmark BCBS ground ambulance

transport ancillary provider agreement filed June 3, 2008; a Highmark BCBS durable medical equipment and/or respiratory therapy equipment ancillary provider agreement filed June 3, 2008; a Highmark BCBS oncology ancillary provider agreement filed February 13, 2009; a Highmark BCBS home infusion therapy ancillary provider agreement filed August 25, 2009; a Highmark BCBS laboratory services ancillary provider agreement filed January 12, 2011; and potentially others.

524.    In the second type of MFN, Highmark BCBS states that it will pay the contracting provider a rate established by agreement "*or one hundred percent (100%) of the [contracting provider's] total covered charges for such services, whichever is less*" (emphasis added). This type of MFN appeared in a Highmark BCBS acute care facility agreement filed September 2, 2008; a Highmark BCBS freestanding ambulatory surgery facility agreement filed September 10, 2008; a Highmark BCBS managed care products hospital facility agreement filed September 15, 2008; a Highmark BCBS traditional products only hospital facility agreement filed September 15, 2008; a Highmark BCBS home health agency provider agreement filed September 26, 2008; a Highmark BCBS long term acute care facility agreement filed October 9, 2008; a Highmark BCBS home health agency provider agreement filed October 24, 2008; a Highmark BCBS managed care products hospital facility agreement filed March 28, 2008; a Highmark BCBS traditional products only hospital facility agreement filed March 28, 2008; a Highmark BCBS traditional products only hospital facility agreement filed May 29, 2009; a Highmark BCBS managed care products hospital facility agreement filed June 5, 2009; a Highmark BCBS traditional products only hospital facility agreement filed June 5, 2009; a Highmark BCBS acute care facility agreement filed June 16, 2009; and potentially others.

525.    There is direct evidence that, like its fellow member plans of BCBSA, BCBS-SC uses MFNs in its contracts with providers. In a recent *Post and Courier* article, a BCBS-SC spokesman admitted that BCBS-SC used MFNs, claiming that they are intended "to ensure that our customers get the best possible pricing for their health care services" and "reflect our intention to obtain the best value for our customers as we possibly can." Instead, BCBS-SC's use of MFNs has raised the costs of its competitors, protected it from competition (and thereby protected its ever-growing market share), and contributed to the artificial inflation of its health insurance premiums in South Carolina.

526.    In 2006, the South Carolina Legislature repealed a decades-old insurance code, stripping the State's authority to regulate provider contracts between insurers and health care providers. This deletion allows BCBS-SC to negotiate and execute provider contracts that include MFNs, with no review or approval required from the South Carolina Department of Insurance.

### Blue Plans' Collective Market Power

527.    The Blue Plans wield collective nationwide economic power. BCBSA's own factsheet admits this.[44]

528.    The 36 Individual Blue Plans serve 106 million people—one out of every three Americans. The various Plans service 88 of the Fortune 100 companies, including major firms like Wal-Mart, Microsoft, General Motors, and UPS. They also service over seven million people who work for small employers. They are the number one choice for organized labor, serving 17 million organized workers, retirees, and their families. They offer coverage through Affordable Care Act insurance exchanges and service millions of Americans through government-supported healthcare programs. The BCBS provider network includes more than 90% of doctors and hospitals

---

[44] https://www.bcbs.com/sites/default/files/file-attachments/page/BCBS.Facts__0.pdf

nationwide. More than 62 million BCBS members across all 50 states have access to care from more than 342,000 providers. As described above, the market shares of Individual Blue Plans in various states are indicative of market power.

529.    The state insurance authorities in any of the Defendant Individual Blue Plans' states do not regulate the division of markets and allocation of customers that are the subject of this Complaint.

530.    No state insurance authority in any of the Defendant Individual Blue Plans' states clearly articulates and affirmatively expresses as state policy the challenged restraints on trade that are the subject of this Complaint, *i.e.*, division of markets and allocation of customers. Nor does any state insurance authority in any of the Individual Blue Plans' states actively supervise the challenged restraints on trade that are the subject of this Complaint.

531.    Prior to the Affordable Care Act, no Defendant Individual Blue Plan filed its insurance rate(s) with a federal regulatory agency.

532.    Even since the Affordable Care Act has been implemented, no federal regulatory agency has had the authority to prevent the Defendant Individual Blue Plans from increasing premiums.

533.    No Defendant Individual Blue Plan has detailed the challenged restraints on trade that are the subject of this Complaint to any insurance authority.

534.    The conspiracy alleged in this Complaint hindered the development of the health care markets across the nation because the Defendant Individual Blue Plans acted to inhibit lower cost Blue competitors from entry and stifled innovation and consumer choice.

## **VIOLATIONS ALLEGED**

### **Count One**
(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief)

535.    The License Agreements, Membership Standards, and Guidelines agreed to by the Individual Blue Plans and BCBSA represent horizontal agreements entered into between the Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health benefit products.

536.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Individual Blue Plans represents a contract, combination, and/or conspiracy within the meaning of Sections 1 and 3 of the Sherman Act.

537.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Individual Blue Plans have agreed to divide and allocate the geographic territories for the sale of commercial health benefit products into a series of exclusive areas for each of the thirty-six BCBSA members. By so doing, the BCBSA members (the Individual Blue Plans) have conspired to restrain trade in violation of Sections 1 and 3 of the Sherman Act. These territorial allocation agreements are *per se* illegal under Sections 1 and 3 of the Sherman Act.

538.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Nationwide Injunctive Class have suffered actual or threatened injury.

539.    Plaintiffs and the Nationwide Injunctive Class seek an injunction prohibiting the Individual Blue Plans and BCBSA from entering into, honoring, or enforcing any agreements that restrict the territories or geographic areas in which any BCBSA member may compete.

## Count Two

(Contract, Combination, or Conspiracy in Restraint of Trade
in Violation of Sections 1 and 3 of the Sherman Act–Damages)
(Asserted Against All Defendants)

540.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

541.    The License Agreements, Membership Standards, and Guidelines agreed to by the Individual Blue Plans represent horizontal agreements entered into between and among the Individual Blue Plans, all of whom are competitors or potential competitors in the market for commercial health benefit products in the United States.

542.    Each of the License Agreements, Membership Standards, and Guidelines entered into between BCBSA and the Individual Blue Plans represents a contract, combination and/or conspiracy within the meaning of Sections 1 and 3 of the Sherman Act.

543.    Through the License Agreements, Membership Standards, and Guidelines, BCBSA and the Individual Blue Plans have agreed to divide and allocate the geographic territories for the sale of commercial health benefit products into a series of exclusive areas for each of the thirty-six Individual Blue Plans. By so doing, the Individual Blue Plans and the BCBSA have conspired to restrain trade in violation of Sections 1 and 3 of the Sherman Act. These market allocation agreements are *per se* illegal under Sections 1 and 3 of the Sherman Act.

544.    The market allocation agreements entered into between the Individual Blue Plans (executed through the BCBSA License Agreements and related Membership Standards and Guidelines) are anticompetitive. The conspiracy to allocate markets and restrain trade adversely affected Blue subscribers, enrollees, and self-funded accounts around the nation by depriving such consumers of, among other things, the opportunity to purchase health benefit products from a lower cost competitor and/or at a price set by a market free from the non-price restraints imposed by the alleged anti-competitive agreements and of a wider choice of healthcare products and

services as well as of increased innovation. As a result of Defendants' market allocation agreement and related restraints, the 36 Individual Blue Plans have not marketed individual and/or commercial health benefit products in other Individual Blue Plans' respective Service Areas and have been precluded by the agreement and restraints from doing so.

545.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects, including but not limited to:

      a.   Reducing the number of Blue-branded licensee health benefit product companies competing with the Individual Blue Plans throughout their respective Service Areas;

      b.   Unreasonably limiting the entry of competitor health benefit product companies into Alabama;

      c.   Allowing the Individual Blue Plans to maintain and enlarge their market power in their respective Service Areas;

      d.   Allowing the Individual Blue Plans to supra-competitively raise the premiums and ASO fees charged to consumers by artificially inflated, unreasonable, and/or supra-competitive amounts; and

      e.   Depriving Plaintiffs and class members of the full benefits of free and open competition.

546.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Sections 1 and 3 of the Sherman Act described in this Complaint, Plaintiffs and Members of the Nationwide Damages Class and the Self-Funded Subclass have suffered and continued to be threatened with suffering injury and damages in an amount to be proven at trial. These damages consist of having paid artificially inflated, unreasonable, and/or supra-competitive premiums and

ASO fees to the Individual Blue Plans; these premiums and ASO fees were higher than Plaintiffs and Members of the Nationwide Damages Class and the Self-Funded Subclass would have paid but for the Sherman Act violations. These damages further consist of being deprived of the opportunity to purchase health benefit products from one or more of the other Individual Blue Plans and/or their non-Blue affiliates at a lower premium or contractual rate and/or at a price set by a market free from the non-price restraints imposed by Defendants' anti-competitive agreements. As described above, Plaintiffs and other Members of the Nationwide Damages Class and the Self-Funded Subclass have also been deprived of consumer choice and increased innovation.

**Count Three**
(Violation of Section 2  of the Sherman Act–Damages)
(Asserted Against All Defendants)

547.    In addition to being a violation of Section 1 of the Sherman Act, Plaintiffs allege that Defendants' restrictions on competition violate Section 2 of the Sherman Act in each of the jurisdictions in which Defendants operate.

548.    The License Agreements, Membership Standards, and Guidelines agreed to by each of the Individual Blue Plans and BCBSA, as well as meetings between the Individual Blue Plans and attempts by the Individual Blue Plans to enforce the policies challenged in this Complaint, represent overt acts in furtherance of the Individual Blue Plans' efforts to monopolize.

549.    As a direct and proximate result of the Individual Blue Plans' continuing violations of Section 2 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Damages Class have suffered injury and seek damages.  Plaintiffs and the Injunctive Class also seek injunctive relief from BCBSA and the Individual Blue Plans for their violations of Section 2 of the Sherman Act.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Enjoin BCBSA and each of the Individual Blue Plans from entering into, honoring, or enforcing any agreements that restrict the territories or geographic areas in which any BCBSA member plan may compete;

c.    Adjudge and decree that BCBSA and each of the Individual Blue Plans have violated Sections 1, 2, and 3 of the Sherman Act;

d.    Award Plaintiffs treble damages;

e.    Award costs and attorneys' fees to Plaintiffs;

f.    Award any such other and further relief as may be just and proper.

This the 2nd day of November, 2020

Respectfully submitted,

| | |
|---|---|
|   /s/ David Boies |   /s/ Michael D. Hausfeld |
| David Boies – ***Co-Lead Counsel*** | Michael D. Hausfeld – ***Co-Lead*** |
| BOIES, SCHILLER & FLEXNER LLP | ***Counsel*** |
| 333 Main Street | Swathi Bojedla – ***Discovery Committee*** |
| Armonk, NY 10504 | HAUSFELD LLP |
| Tel: (914) 749-8200 | 1700 K Street NW, Suite 650 |
| Fax: (914) 749-8200 | Washington, DC 20006 |
| dboies@bsfllp.com | Tel: (202) 540-7200 |
| | Fax: (202) 540-7201 |
| | mhausfeld@hausfeld.com |
| | sbojedla@hausfeld.com |

| | |
|---|---|
| Charles J. Cooper – ***Co-Chair, Written Submissions Committee*** | Megan Jones – ***Settlement Committee & PSC Member*** |
| COOPER & KIRK, PLLC | Arthur Bailey – ***Discovery Committee*** |
| 1523 New Hampshire Avenue NW | HAUSFELD LLP |
| Washington, DC 20036 | 600 Montgomery Street, Suite 3200 |
| Tel: (202) 220-9600 | San Francisco, CA 94111 |
| Fax: (202) 220-9601 | Tel: (415) 633-1908 |
| ccooper@cooperkirk.com | Fax: (415) 358-4980 |
| | mjones@hausfeld.com |
| | abailey@hausfeld.com |

| | |
|---|---|
| Chris T. Hellums – ***Local Facilitating Counsel*** | William A. Isaacson – ***Settlement Committee & PSC Member*** |
| PITTMAN, DUTTON & HELLUMS, P.C. | PAUL WEISS |
| 2001 Park Place N, 1100 Park Place Tower | 2001 K Street, NW |
| Birmingham, AL 35203 | Washington, DC 20006-1047 |
| Tel: (205) 322-8880 | Tel: (202) 223-7313 |
| Fax: (205) 328-2711 | Fax: (202) 379-4937 |
| chrish@pittmandutton.com | wisaacson@bsfllp.com |

Gregory Davis – *Settlement Committee & PSC Member*
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tel: (334) 832-9080
Fax: (334) 409-7001
gldavis@knology.net

Kathleen Chavez – *Settlement Committee & PSC Member*
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
kcc@fmcolaw.com

Carl S. Kravitz – *Expert Committee*
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036-5807
Tel: (202) 778-1800
Fax: (202) 822-8106
ckravitz@zuckerman.com

Cyril V. Smith – *Settlement Committee & PSC Member*
ZUCKERMAN SPAEDER, LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
Tel: (410) 949-1145
Fax: (410) 659-0436
csmith@zuckerman.com

David Guin – *Co-Chair, Written Submissions Committee*
Tammy Stokes – *Damages Committee*
GUIN, STOKES & EVANS, LLC
300 Richard Arrington Jr. Blvd. North
Suite 600/Title Building
Birmingham, AL 35203
Tel: (205) 226-2282
Fax: (205) 226-2357
davidg@gseattorneys.com
tammys@gseattorneys.com

Richard Feinstein – *Expert Committee*
Karen Dyer – *Expert Committee*
Hamish P.M. Hume – *Discovery Committee*
BOIES, SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
rfeinstein@bsfllp.com
kdyer@bsfllp.com
hhume@bsfllp.com

Mindee Reuben
Lite DePalma Greenberg
1835 Market Street, Suite 2700
Philadelphia, PA 19103
Tel:  (267) 314-7980
Fax: (973) 623-0858
mreubin@litedepalma.com

Nate Cihlar
Joshua Callister
Srauss & Boies
4041 University Drive, 5th Floor
Fairfax, VA 22030
Tel:  (703) 764-8700
Fax:  (703) 764-8704
ncihlar@straus-boies.com
jcallister@straus-boies.com

Patrick Cafferty – ***Discovery Committee***
CAFFERTY CLOBES
MERIWETHER & SPRENGEL LLP
150 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: (312) 782-4880
pcafferty@caffertyclobes.com

Bryan Clobes – ***Litigation Committee***
Ellen Meriwether – ***Written Submissions Committee***
CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP
2005 North Monroe Street
Media, PA 19063
Tel: (215) 864-2800
Fax: (215) 864-2810
bclobes@caffertyclobes.com
emeriwether@caffertyclobes.com

Andrew Lemmon – Chair, Discovery Committee
LEMMON LAW FIRM
15058 River Road
PO Box 904
Hahnville, LA 70057
Tel: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Virginia Buchanan – Chair, Class Certification Committee
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR, P.A.
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel: (850) 435-7000
Fax: (850) 435-7020
vbuchanan@levinlaw.com

Douglas Dellaccio – ***Litigation Committee***
CORY WATSON CROWDER & DEGARIS, P.C.
2131 Magnolia Avenue, Suite 200
Birmingham, AL 32505
Tel: (205) 328-2200
Fax: (205) 324-7896
ddellaccio@cwcd.com

Edwin J. Kilpela, Jr.
Benjamin Sweet – ***Litigation Committee***
DEL SOLE CAVANAUGH STROYD LLC
200 First Avenue, Suite 300
Pittsburgh, PA 15222
Tel: (412) 261-2393
Fax: (412) 261-2110
ekilpela@dsclaw.com
bsweet@dsclaw.com

Charles T. Caliendo – ***Class Certification Committee***
GRANT & EISENHOFER
485 Lexington Avenue
New York, NY 10017
Tel: (646) 722-8500
Fax: (646) 722-8501
ccaliendo@gelaw.com

Larry McDevitt – ***Chair, Class Certification Committee***
David Wilkerson – ***Discovery Committee***
VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Robert M. Foote – ***Damages Committee***
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, IL 60134
Tel: (630) 797-3339
Fax: (630) 232-7452
rmf@fmcolaw.com

Robert Eisler – ***Discovery Committee***
GRANT & EISENHOFER
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
reisler@gelaw.com

Daniel Gustafson – ***Litigation Committee***
Daniel C. Hedlund – ***Damages Committee***
GUSTAFSON GLUEK PLLC
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com

Brent Hazzard – ***Litigation Committee***
HAZZARD LAW, LLC
447 Northpark Drive
Ridgeland, MS 39157
Tel: (601) 977-5253
Fax: (601) 977-5236
brenthazzard@yahoo.com

John Saxon – ***Litigation Committee***
JOHN D. SAXON, P.C.
2119 3rd Avenue North
Birmingham, AL 35203-3314
Tel: (205) 324-0223
Fax: (205) 323-1583
jsaxon@saxonattorneys.com

Lawrence Jones – ***Damages Committee***
JONES WARD PLC
The Pointe
1205 East Washington Street, Suite 111
Louisville, Kentucky 40206
Tel:  (502) 882-6000
Fax: (502) 587-2007
larry@jonesward.com

Robert Methvin – ***Chair, Settlement Committee***
James M. Terrell – ***Class Certification Committee***
MCCALLUM, METHVIN & TERRELL, P.C.
The Highland Building
2201 Arlington Avenue South
Birmingham, AL 35205
Tel: (205) 939-0199
Fax: (205) 939-0399
rgm@mmlaw.net
jterrell@mmlaw.net

Michael McGartland – ***Class Certification Committee***
MCGARTLAND & BORCHARDT LLP
1300 South University Drive, Suite 500
Fort Worth, TX 76107
Tel: (817) 332-9300
Fax: (817) 332-9301
mike@attorneysmb.com

H. Lewis Gillis – ***Co-Head Chair, Litigation Committee***
MEANS GILLIS LAW, LLC
3121 Zelda Court
Montgomery, AL 36106
Tel: 1-800-626-9684
hlgillis@tmgslaw.com

Dianne M. Nast – ***Class Certification Committee***
NASTLAW LLC
1101 Market Street, Suite 2801
Philadelphia, PA 19107
Tel: (215) 923-9300
Fax: (215) 923-9302
dnast@nastlaw.com

Edgar D. Gankendorff – ***Co-Head Chair, Litigation Committee***
Eric R.G. Belin – ***Damages Committee***
PROVOSTY & GANKENDORFF, LLC
650 Poydras Street, Suite 2700
New Orleans, LA 70130
Tel: (504) 410-2795
Fax: (504) 410-2796
egankendorff@provostylaw.com
ebelin@provostylaw.com

David J. Hodge – ***Chair, Settlement Committee***
MORRIS, KING & HODGE
200 Pratt Avenue NE
Huntsville, AL 35801
Tel: (256) 536-0588
Fax: (256) 533-1504
lstewart@alinjurylaw.com

Patrick W. Pendley – ***Chair, Damages Committee***
Christopher Coffin – ***State Liaison Committee***
PENDLEY, BAUDIN & COFFIN, LLP
Post Office Drawer 71
Plaquemine, LA 70765
Tel: (225) 687-6369
pwpendley@pbclawfirm.com
ccoffin@pbclawfirm.com

Richard Rouco – ***Written Submissions Committee***
QUINN, CONNOR, WEAVER, DAVIES & ROUCO LLP
2 – 20th Street North, Suite 930
Birmingham, AL 35203
Tel: (205) 870-9989
Fax: (205) 870-9989
rrouco@qcwdr.com

131

Garrett Blanchfield – *Written Submissions Committee*
REINHARDT, WENDORF & BLANCHFIELD
E-1250 First National Bank Building
332 Minnesota Street
St. Paul, MN 55101
Tel: (651) 287-2100
Fax: (651) 287-2103
g.blanchfield@rwblawfirm.com

Jason Thompson – *Damages Committee*
SOMMERS SCHWARTZ
One Towne Square, 17th Floor
Southfield, MI 48076
Tel: (248) 355-0300
jthompson@sommerspc.com

*Subscriber Plaintiff Co-Lead Counsel and Committee Chairs and Members*

Steven P. Gregory (ASB-0737-R73S)
GREGORY LAW FIRM, P.C.
505 20th Street North
Suite 1215
Birmingham, AL. 35203
Telephone 205-208-0312
email: steve@gregorylawfirm.us
*Local Counsel for Subclass Plaintiffs Hibbett Sports, Inc. and A. Duie Pyle, Inc.*

Warren Burns
BURNS CHAREST LP
900 Jackson St., Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
Email: wburns@burnscharest.com
*Counsel for Subclass Plaintiff Hibbett Sports, Inc.*

David S. Stone
STONE & MAGNANINI LAW FIRM
100 Connell Drive
Suite 2200
Berkeley Heights, NJ 07922
Telephone: (973) 218-1111
Facsimile: (973)218-1106
Email: dstone@stonemagnalaw.com
*Counsel for Sublcass Plaintiff A. Duie Pyle, Inc.*

*Counsel for Sublcass Plaintiffs*

## APPENDIX—GLOSSARY OF TERMS

"Blue-Branded" means a product a service marketed, offered, or sold under any of the Blue Marks.

"Blue Marks" means the Blue Cross and/or Blue Shield service marks, trademarks, names, and/or symbols.

"Commercial Health Benefit Product" means any product or plan providing for the payment or administration of health care services (including but not limited to medical, pharmacy, dental, and vision products and services) or expenses through insurance, reimbursement, or other similar healthcare financing mechanism, for Members in the U.S. (however funded, including insured or self-funded) other than a product or plan offered under the Children with Special Health Care Needs Program (CSHCN); Children's Health Insurance Program (CHIP); Civilian Health and Medical Program of the Department of Veteran's Affairs (CHAMPVA); Civilian Health and Medical Program of the Uniformed Services (CHAMPUS); Indian Health Service, Tribal, and Urban Indian Health Plan; Medicaid; Medicare; Medicare Advantage (including but not limited to Medicare Advantage Prescription Drug Plans and Special Needs Plans, including but not limited to Medicare-Medicaid or Dual-Eligible Plans); Medicare Stand-Alone Prescription Drug Plans; Refugee Medical Assistance Program; State Maternal and Child Health Program (MCH); or TriCare. For purposes of clarity, it excludes any product or plan purchased or offered by a Government Account.

"Commercial Health Insurance" means any Commercial Health Benefit Product which (1) an insurer, carrier, or health plan underwrites, issues, insures, or reinsures (*e.g.*, through a stop-loss policy) to cover healthcare costs and/or utilization risk, or (2) is filed with the applicable state regulator as, or is considered by the applicable state regulator to be, an insured product.

"Controlled Affiliate Licensee" means a company operating under the control of a Primary Licensee that is licensed to use the Blue Marks pursuant to a Controlled Affiliate License Agreement (Larger or Smaller) granted by BCBSA.

"Government Account" means only a state, a county, a municipality, an unincorporated association performing municipal functions, a Native American tribe, or the federal government (including the Federal Employee Program). A Government Account includes all Members of the Government Account. No other entity that is not a state, county, municipality, unincorporated association performing municipal functions, Native American tribe or the federal government is a Government Account, unless it is required by law to provide any health care coverage it makes available to Members only under, or as a participant in, a Commercial Health Benefit Product approved, selected, procured, sponsored or purchased by a Government Account. Entities that are not Government Accounts (e.g., utility companies, school districts, government-funded hospitals, public retiree benefit plans, public libraries, port authorities, transportation authorities, waste disposal districts, police departments, fire departments) will receive notice and an opportunity to submit a claim form to the extent they are otherwise within the definition of the Damages Class.

"Individual Member" means a person (including dependents and beneficiaries under the policy) covered by an individual Commercial Health Insurance policy (*i.e.*, a non-group Commercial Health Insurance policy).

"Insured Group" means a health benefit plan, group account, or employer, including all Members, sponsors, administrators, and fiduciaries thereof, that purchases, subscribes to, or is covered by Commercial Health Insurance. For associational entities (e.g., trade associations, unions, etc.), this includes any member entity which is covered by, enrolled in, or included in the

associational entity's Blue-Branded Commercial Health Benefit Product. For clarity, this definition excludes all Government Accounts.

"Member" means any individual enrolled in or covered by a Commercial Health Benefit Product regardless what term or title is used to refer to the individual in documents that pertain to the Commercial Health Benefit Product, including employees, their spouses and dependents, beneficiaries, and ERISA participants.

"Primary Licensee" means the following entities:

> Anthem, Inc.
> Aware Integrated, Inc.
> Blue Cross and Blue Shield of Alabama
> Blue Cross and Blue Shield of Arizona, Inc.
> Blue Cross and Blue Shield of Florida, Inc.
> Blue Cross and Blue Shield of Kansas City
> Blue Cross and Blue Shield of Kansas, Inc.
> Blue Cross and Blue Shield of Massachusetts, Inc.
> Blue Cross Blue Shield of Michigan Mutual Insurance Company
> Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company
> Blue Cross and Blue Shield of North Carolina
> Blue Cross & Blue Shield of Rhode Island
> Blue Cross and Blue Shield of South Carolina
> BlueCross BlueShield of Tennessee, Inc.
> Blue Cross and Blue Shield of Vermont
> Blue Cross and Blue Shield of Wyoming
> Blue Cross of Idaho Health Service, Inc.
> California Physicians' Service
> Cambia Health Solutions, Inc.
> Capital Blue Cross
> CareFirst, Inc.
> GoodLife Partners, Inc.
> GuideWell Mutual Holding Corporation
> Hawaii Medical Service Association
> Health Care Service Corporation, a Mutual Legal Reserve Company
> HealthNow Systems, Inc.
> HealthyDakota Mutual Holdings
> Highmark Health
> Horizon Healthcare Services, Inc.
> Independence Health Group, Inc.
> Lifetime Healthcare, Inc.
> Louisiana Health Service & Indemnity Company

PREMERA
Regence BlueShield of Idaho
Triple-S Management Corporation
USAble Mutual Insurance Company
Wellmark, Inc.

"Self-Funded Account" means any account, employer, health benefit plan, ERISA plan, non-ERISA plan, or group, including all sponsors, administrators, fiduciaries, and Members thereof, that purchases, is covered by, participates in, or is enrolled in a Self-Funded Health Benefit Plan. For associational entities (*e.g.*, trade associations, unions, etc.), this includes any member entity which is covered by, enrolled in, or included in the associational entity's Blue-Branded Commercial Health Benefit Product. A Self-Funded Account that purchases a Blue-Branded Self-Funded Health Benefit Plan and Blue-Branded stop-loss coverage remains a Self-Funded Account. For clarity, Self-Funded Account also excludes all Government Accounts.

"Self-Funded Health Benefit Plan" means any Commercial Health Benefit Product other than Commercial Health Insurance, including administrative services only ("ASO") contracts or accounts, administrative services contracts or accounts ("ASC"), and jointly administered administrative services contracts or accounts ("JAA").

"Settling Defendants" means Blue Cross Blue Shield Association and any Primary Licensee and its Controlled Affiliate Licensees.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served using the CM/ECF system, which will send notification of such filing to counsel of record.

Dated:  November 2, 2020

/s/ *David J. Guin*
David J. Guin