# Exhibit 1C

FILED

2017 Apr-18  AM 10:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | )  Master File No. 2:13-CV-20000-RDP )   )  This document relates to: )  2:12-cv-2532 |

## CONSOLIDATED FOURTH AMENDED PROVIDER COMPLAINT

# FILED UNDER SEAL
### Pursuant to the Qualified Protective Order (Doc. 550)
### and the Order Regarding Revised Sealing Procedures (Doc. 758)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:  BLUE CROSS BLUE SHIELD** | ) **Master File No. 2:13-CV-20000-RDP** |
| **ANTITRUST LITIGATION** | ) |
| **(MDL No. 2406)** | ) **This document relates to:** |
| | ) **2:12-cv-2532** |
| _____ | ) |
| | ) |
| **Jerry L. Conway, D.C.,** | ) **CONSOLIDATED FOURTH** |
| **Corey Musselman, M.D.,** | ) **AMENDED PROVIDER** |
| **Charles H. Clark III, M.D.,** | ) **COMPLAINT** |
| **Crenshaw Community Hospital,** | ) |
| **Bullock County Hospital,** | ) |
| **North Jackson Pharmacy, Inc.,** | ) |
| **Evergreen Medical Center, L.L.C.,** | ) |
| **Jackson Medical Center, L.L.C.,** | ) |
| **Ivy Creek of Elmore, L.L.C. d/b/a** | ) |
| **  Elmore Community Hospital,** | ) |
| **Ivy Creek of Butler, L.L.C. d/b/a** | ) |
| **  Georgiana Medical Center,** | ) |
| **Ivy Creek of Tallapoosa, L.L.C. d/b/a** | ) |
| **  Lake Martin Community Hospital,** | ) |
| **Luis R. Pernia, M.D.,** | ) |
| **Joseph D. Ackerson, PhD,** | ) |
| **Janine Nesin, P.T., D.P.T., O.C.S.,** | ) |
| **Robert W. Nesbitt, M.D.,** | ) |
| **Kathleen Cain, M.D.,** | ) |
| **John Clifton Crosby, M.D.,** | ) |
| **Michael Dole, M.D.,** | ) |
| **Michael Dole, M.D., A.P.M.C.,** | ) |
| **Michael Dole, M.D., L.L.C.,** | ) |
| **Spine Diagnostic Center of Baton Rouge, Inc.,** | ) |
| **Northwest Florida Surgery Center, L.L.C.,** | ) |
| **Roman Nation, M.D.** | ) |
| **Neuromonitoring Services of America, Inc.** | ) |
| **Cason T. Hund, D.M.D.,** | ) |
| **ProRehab, P.C.,** | ) |
| **Texas Physical Therapy Specialists, L.L.C.,** | ) |
| **BreakThrough Physical Therapy, Inc.,** | ) |
| **Dunn Physical Therapy, Inc.,** | ) |
| **Gaspar Physical Therapy, P.C.,** | ) |
| **Timothy H. Hendlin, D.C.,** | ) |
| **Greater Brunswick Physical Therapy, P.A.,** | ) |
| **Charles Barnwell, D.C.,** | ) |

Brain and Spine, L.L.C.,                                    )
Heritage Medical Partners, L.L.C.,                          )
Judith Kanzic, D.C.,                                        )
Brian Roadhouse, D.C.,                                      )
Julie McCormick, M.D., L.L.C.,                              )
Harbir Makin, M.D.,                                         )
Saket K. Ambasht, M.D.,                                     )
Hillside Family Medicine, LLC                               )
Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of              )
  Chiropractic and Neurology,                               )
Snowden Olwan Psychological Services,                       )
and                                                         )
Ear, Nose & Throat Consultants and Hearing                 )
  Services, P.L.C.,                                         )
on behalf of themselves and all others similarly           )
situated,                                                   )
                                                            )
                    Plaintiffs,                             )
                                                            )
v.                                                          )
                                                            )
Blue Cross and Blue Shield of Alabama,                      )
Anthem, Inc.,                                               )
Health Care Service Corporation,                            )
Cambia Health Solutions, Inc.,                              )
CareFirst, Inc.,                                            )
Premera Blue Cross,                                         )
Premera Blue Cross Blue Shield of Alaska,                   )
Blue Cross Blue Shield of Arizona, Inc.,                    )
USAble Mutual Insurance Company, d/b/a                      )
  Arkansas Blue Cross and Blue Shield,                      )
Blue Cross of California d/b/a Anthem Blue                  )
  Cross,                                                    )
California Physicians' Service, Inc. d/b/a Blue             )
  Shield of California,                                     )
Rocky Mountain Hospital and Medical                        )
  Service, Inc., d/b/a Anthem Blue Cross and               )
  Blue Shield of Colorado,                                  )
Anthem Health Plans, Inc. d/b/a Anthem Blue                )
  Cross and Blue Shield of Connecticut,                    )
Highmark, Inc.,                                             )
Highmark BCBSD, Inc. d/b/a Highmark Blue                   )
  Cross Blue Shield Delaware,                               )
Group Hospitalization and Medical                          )
  Services, Inc. d/b/a CareFirst BlueCross                 )
  BlueShield,                                               )

Blue Cross and Blue Shield of Florida, Inc.,                          )
Blue Cross Blue Shield of Georgia, Inc.,                              )
Hawaii Medical Service Association d/b/a                              )
  Blue Cross and Blue Shield of Hawaii,                    )
Blue Cross of Idaho Health Service, Inc.,                            )
Regence BlueShield of Idaho, Inc.,                                   )
Blue Cross and Blue Shield of Illinois,                              )
Anthem Insurance Companies, Inc. d/b/a                               )
  Anthem Blue Cross and Blue Shield of Indiana, )
Wellmark, Inc. d/b/a/ Wellmark Blue Cross                            )
  and Blue Shield of Iowa,                                )
Blue Cross and Blue Shield of Kansas, Inc.                           )
Anthem Health Plans of Kentucky, Inc.                                )
  d/b/a Anthem Blue Cross and Blue Shield                 )
  of Kentucky,                                            )
Louisiana Health Service and Indemnity                               )
  Company d/b/a/ Blue Cross and Blue Shield               )
  of Louisiana,                                           )
Anthem Health Plans of Maine, Inc.,                                  )
  d/b/a Anthem Blue Cross and Blue Shield                 )
  of Maine,                                               )
CareFirst of Maryland, Inc. d/b/a CareFirst                          )
  BlueCross BlueShield,                                   )
Blue Cross Blue Shield of Massachusetts,                             )
  Inc.,                                                   )
Blue Cross Blue Shield of Michigan,                                  )
BCBSM, Inc. d/b/a/ Blue Cross and Blue                               )
  Shield of Minnesota,                                    )
BlueCross BlueShield of Mississippi,                                 )
HMO Missouri, Inc. d/b/a Anthem Blue                                 )
  Cross and Blue Shield of Missouri,                      )
Blue Cross Blue Shield of Kansas City, Inc.,                         )
BlueCross BlueShield of Montana,                                     )
Caring for Montanans, Inc. f/k/a                                     )
  Blue Cross Blue Shield of Montana, Inc.                 )
Blue Cross Blue Shield of Nebraska,                                  )
Anthem Blue Cross and Blue Shield of Nevada,                         )
Anthem Health Plans of New Hampshire, Inc.                           )
  d/b/a Anthem Blue Cross and Blue Shield of              )
  New Hampshire,                                          )
Horizon Health Care Services, Inc. d/b/a                             )
  Horizon Blue Cross Blue Shield of                       )
  New Jersey,                                             )
Blue Cross and Blue Shield of New Mexico,                            )
HealthNow New York Inc.,                                             )
BlueShield of Northeastern New York,                                 )

BlueCross BlueShield of Western                        )
  New York, Inc.                                          )
Empire HealthChoice Assurance, Inc. d/b/a             )
  Empire BlueCross BlueShield,                       )
Excellus Health Plan, Inc. d/b/a Excellus            )
  BlueCross BlueShield,                              )
Blue Cross and Blue Shield of North Carolina,        )
  Inc.,                                              )
Noridian Mutual Insurance Company d/b/a              )
  Blue Cross Blue Shield of North Dakota,            )
Community Insurance Company d/b/a Anthem             )
  Blue Cross and Blue Shield of Ohio,                )
Blue Cross and Blue Shield of Oklahoma,              )
Regence BlueCross BlueShield of Oregon,              )
Capital Blue Cross,                                  )
Highmark Health Services, Inc. d/b/a Highmark        )
  Blue Cross Blue Shield and d/b/a Highmark          )
  Blue Shield,                                       )
Independence Blue Cross,                             )
Triple-S Salud, Inc.,                                )
Blue Cross & Blue Shield of Rhode Island,            )
BlueCross BlueShield of South Carolina  Inc.,        )
Wellmark of South Dakota, Inc. d/b/a Wellmark        )
  Blue Cross and Blue Shield of South Dakota,        )
BlueCross BlueShield of Tennessee, Inc.,             )
Blue Cross and Blue Shield of Texas,                 )
Regence BlueCross BlueShield of Utah,                )
Blue Cross and Blue Shield of Vermont,               )
Anthem Health Plans of Virginia, Inc. d/b/a          )
  Anthem Blue Cross and Blue Shield of               )
  Virginia, Inc.                                     )
Regence BlueShield,                                  )
Highmark West Virginia, Inc. d/b/a Highmark          )
  Blue Cross Blue Shield West Virginia,              )
Blue Cross Blue Shield of Wisconsin d/b/a            )
  Anthem Blue Cross and Blue Shield of               )
  Wisconsin,                                         )
Blue Cross Blue Shield of Wyoming, and               )
Blue Cross and Blue Shield Association,              )
                                                     )
          **Defendants.**                         )

_____

## CONSOLIDATED FOURTH AMENDED PROVIDER COMPLAINT

Plaintiffs, Jerry L. Conway, D.C., Charles H. Clark III, M.D., Crenshaw Community Hospital, Bullock County Hospital, North Jackson Pharmacy, Inc., Joseph D. Ackerson, PhD, Luis R. Pernia, M.D., Evergreen Medical Center, LLC, Jackson Medical Center, LLC, Ivy Creek of Elmore, L.L.C. d/b/a Elmore Community Hospital, Ivy Creek of Butler, L.L.C. d/b/a Georgiana Medical Center, Ivy Creek of Tallapoosa, L.L.C. d/b/a Lake Martin Community Hospital, Janine Nesin, P.T., D.P.T., O.C.S.,  Robert W. Nesbitt, M.D., Corey Musselman, M.D., Kathleen Cain, M.D., John Clifton Crosby, M.D., Michael Dole, M.D., Michael Dole, M.D., A.P.M.C., Michael Dole, M.D., L.L.C., Spine Diagnostic Center of Baton Rouge, Inc., Northwest Florida Surgery Center, L.L.C., Roman Nation, N.D., Neuromonitoring Services of America, Inc., Cason T. Hund, D.M.D., ProRehab, P.C., Texas Physical Therapy Specialists, L.L.C., BreakThrough Physical Therapy, Inc., Dunn Physical Therapy, Inc., Gaspar Physical Therapy, P.C., Timothy H. Hendlin, D.C., Greater Brunswick Physical Therapy, P.A., Charles Barnwell, D.C., Brain and Spine, L.L.C., Heritage Medical Partners L.L.C., Judith Kanzic, D.C., Brian Roadhouse, D.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Saket K. Ambasht, M.D., Hillside Family Medicine, LLC, Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology, Snowden Olwan Psychological Services, and Ear, Nose & Throat Consultants and Hearing Services, P.L.C. (collectively "Plaintiffs" or "Provider Plaintiffs"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants, Blue Cross and Blue Shield of Alabama, Anthem, Inc., Health Care Service Corporation, Cambia Health Solutions, Inc., CareFirst, Inc., Premera Blue Cross, Premera Blue Cross and Blue Shield of Alaska, Blue Cross Blue Shield of Arizona, Inc., USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield, Blue Cross of California d/b/a Anthem Blue Cross,

California Physicians' Service, Inc. d/b/a Blue Shield of California, Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut, Highmark, Inc., Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, Group Hospitalization and Medical Services, Inc. d/b/a Carefirst BlueCross BlueShield, Blue Cross and Blue Shield of Florida, Inc., Blue Cross and Blue Shield of Georgia, Inc., Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, Blue Cross of Idaho Health Service, Inc., Regence BlueShield of Idaho, Inc., Blue Cross and Blue Shield of Illinois, Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana, Wellmark, Inc. d/b/a/ Wellmark Blue Cross and Blue Shield of Iowa, Blue Cross and Blue Shield of Kansas, Inc., Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky, Louisiana Health Service and Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana, Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine, CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield, Blue Cross and Blue Shield of Massachusetts, Inc., Blue Cross and Blue Shield of Michigan, BCBSM, Inc. d/b/a/ Blue Cross and Blue Shield of Minnesota, Blue Cross Blue Shield of Mississippi, HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri, Blue Cross and Blue Shield of Kansas City, Inc., Blue Cross and Blue Shield of Montana, Caring for Montanans, Inc. d/b/a Blue Cross and Blue Shield of Montana, Inc., Blue Cross and Blue Shield of Nebraska, Anthem Blue Cross and Blue Shield of Nevada, Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, Horizon Health Care Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey, Blue Cross and Blue Shield of New Mexico, HealthNow New York Inc., Blue Shield of Northeastern New York, Blue Cross and Blue Shield of Western New

York, Inc., Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield, Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, Blue Cross and Blue Shield of North Carolina, Inc., Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, Blue Cross and Blue Shield of Oklahoma, Regence BlueCross BlueShield of Oregon, Capital Blue Cross, Highmark Health Services, Inc. d/b/a/ Highmark Blue Cross Blue Shield and d/b/a Highmark Blue Shield, Independence Blue Cross, Triple-S Salud, Inc., Blue Cross and Blue Shield of Rhode Island, BlueCross BlueShield of South Carolina, Inc., Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, BlueCross BlueShield of Tennessee, Inc., Blue Cross and Blue Shield of Texas, Regence BlueCross BlueShield of Utah, Blue Cross and Blue Shield of Vermont, Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., Regence BlueShield, Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin, Blue Cross Blue Shield of Wyoming (these independent Blue Cross Blue Shield licensees are referred to herein collectively, as "the Blues"), and the Blue Cross and Blue Shield Association ("BCBSA" or the "Association") (collectively "Defendants")[1] allege violations of antitrust laws as follows:

## NATURE OF THE CASE

1.      Defendants, which are independent companies, have agreed with each other to carve the United States into "Service Areas" in which only one Blue can sell insurance, administer employee benefit plans or contract with healthcare providers (the "Market Allocation Conspiracy").  Defendants have engaged in a horizontal market allocation, which is illegal under

---

[1] In addition to the Defendants listed here, the Provider Plaintiffs asserted claims against Consortium Health Plans, Inc. ("CHP") and National Account Service Company, L.L.C. ("NASCO"). The Court granted summary judgment to NASCO and CHP. The Provider Plaintiffs reserve the right to appeal that decision.

a *per se*, quick look or rule of reason analysis.   The *quid pro quo* for this illegal Market

Allocation Conspiracy is a horizontal Price-Fixing and Boycott Conspiracy under which every

other Blue gets the benefit of the artificially reduced prices that each Blue pays to healthcare

providers.   The Blues get those benefits through the national programs that the Blues have

collectively established, including the Blue Card Program and the National Accounts Programs.

The Market Allocation Conspiracy reduces the competition that each Blue faces and allows it to

reduce the prices that it pays to healthcare providers.   The Price Fixing and Boycott Conspiracy

fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices and further

provides that the participating Blues will collectively boycott all Providers outside of their

Service Areas.

2.      Plaintiffs are providers of healthcare services and/or equipment and/or supplies,

as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs'

patients are insured by the Blues or are included in employee benefit plans administered by the

Blues.

3.      Defendants are the Association and the Blues, their owners and affiliated

companies, as well as companies through which they conduct their conspiracies.   The Blues

provide health insurance coverage for nearly 105 million people in the United States. (To

eliminate any possible ambiguity, Provider Plaintiffs have always intended to include

administrative services for employee benefit plans within the meaning of health insurance

coverage for purposes of this amended complaint.) The Defendants also have developed and

operate the most extensive Provider Networks in the United States. According to the BCBSA's

own estimates, more than 93% of professional providers and more than 96% of hospitals in the

United States contract directly with the Blues.   The Defendants have agreed that they will not

compete with each other in terms of their Provider Networks. Even when Defendants have significant enrollees in another Blue's service area, including Alabama, the Defendants have agreed that they will not contract with Providers outside of their service areas except in limited circumstances. The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

4.      In the claims related to the Market Allocation Conspiracy, Plaintiff healthcare providers challenge the explicit agreement reached by Defendants to divide the United States into what Defendants term "Service Areas" and then to allocate those geographic areas among the Blues, free of competition.  In the claims related to the Price Fixing and Boycott Conspiracy, Plaintiffs also challenge the agreement reached by Defendants to fix prices for goods, services and facilities rendered by healthcare providers such as Plaintiffs and to boycott the healthcare providers outside of their Service Areas.

5.      In furtherance of the Market Allocation Conspiracy, Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted.  Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets.

6.      The Blues, which are organized and operated independently, constitute potential competitors and, absent the Market Allocation Conspiracy, the Blues would, in fact, compete, including in Alabama.  The BCBSA readily admits on its own website that the Blues are "independent companies" that operate in "exclusive geographic areas." www.bcbsa/healthcare-news/press-center.com.  In a recent trial brief filed with the United States District Court for the District of Columbia, Anthem, which is the largest Blue, stated that "the various Blues are not a

single firm; notwithstanding their participation in the BCBSA, they are separate firms that at times compete with one another and that at all times separately seek to maximize their own profits." United States v. Anthem, Inc., No. 16-cv-1493, Doc. No. 324 at 10 (filed Nov. 10, 2016) ("Anthem Brief").  Defendants' agreement to allocate markets is a horizontal restraint in violation of Section 1 of the Sherman Act.

7.     The Market Allocation Conspiracy has significantly decreased competition in the markets for healthcare financing, including the markets for healthcare insurance and healthcare services, all of which are discussed more fully below.  For example, Blue Cross and Blue Shield of Alabama controls access to more than 90% of privately insured or administered (in this amended complaint Plaintiffs will use insured to refer to administered as well as insured patients unless otherwise indicated) patients in the State of Alabama, and providers cannot contract with other Blue plans except in very limited circumstances.  As a result, healthcare providers, including Plaintiffs, are paid much less than they would be absent the BCBS Market Allocation Conspiracy.  Healthcare providers who contract with the Blues are also subjected to less favorable terms than they would be absent the conspiracy.  The BCBS Market Allocation Conspiracy is a *per se* violation, as well as being a violation under the quick look and rule of reason analysis of Section 1 of the Sherman Act.

8.     Defendants have further exploited the market dominance they have secured through the Market Allocation Conspiracy by entering into a Price Fixing and Boycott Conspiracy, under which the Defendants divide the excess profits that they achieve through their illegal anticompetitive conduct.  In furtherance of the Price Fixing and Boycott Conspiracy, each Defendant has agreed to participate in each national program that the Blues adopt, including the Blue Card Program and the National Accounts Programs.  The Blue Card Program applies when

a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant.  In the Blue Card Program the subscriber's Blue is the Home Plan and the Defendant Blue with the Service Area where the healthcare goods, services or facilities are provided is the Host Plan.  The National Accounts Programs function in a similar manner. National Accounts Programs generally apply to employee benefit plans with subscribers in multiple states.  The Defendant Blue that administers the employee benefit plan is the Control Plan, and the other Blues in whose Service Areas where the subscribers receive healthcare goods, services or facilities are Participating Plans.  These Programs and others have been established by a horizontal agreement between the Blues.  The Blue Card Program is managed by a Committee of Blues sitting on the Inter-Plan Programs Committee.  The National Accounts Programs are either established based on horizontal agreements between the Blues or managed through the Blue Card Program.  The excess profits from these Programs are then divided among the Blues. The national programs including the Blue Card Program and the National Accounts Programs lock in the fixed, discounted reimbursement rates that each Defendant achieves through market dominance in its Service Area and makes those subcompetitive rates available to all other Blues without the need for negotiation or contracting.  The other national programs add to the Blues' market power and/or are anticompetitive.  Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area.  These fixed prices are then enforced through a horizontal agreement between the Blues.  Under that horizontal agreement the Blues collectively enforce the fixed prices; the Host Plans and the Participating Plans recoup any payments that the Home or Control Plans make above the fixed prices.  Part of the agreement for the participation in the National Accounts Program is that each Control Blue will not negotiate directly with providers outside its Service Area except in a contiguous area. As a result, a

healthcare provider who renders services or supplies goods or facilities to a patient who is insured or administered by a Defendant in another Service Area receives significantly lower reimbursement than the healthcare provider would receive absent the Price Fixing and Boycott Conspiracy.  Many of the Defendants have large numbers of enrollees or members outside of their service areas. Rather than forming competing networks of providers in other service areas, the Defendants pay the Home Plan a kickback, called an Access Fee, and thereby share the excess profits they achieve through the sub-competitive prices that the Defendants pay to Providers. The BCBS Price Fixing and Boycott Conspiracy is a violation of Section 1 of the Sherman Act under a *per se*, quick look and/or rule of reason analysis.

9.      The Blues are the major source of potential competition in health insurance and financing in the United States.  Two of the largest four health insurance companies in the country are Blues, as are four of the largest 10 and 15 of the largest 25.  The Blues have a basic rule in their various agreements, repeated over and over in the Anthem merger trial: We will not compete.  The Blues will not compete in the establishment of healthcare provider networks, where they could develop meaningful innovation through collaboration with providers to improve our healthcare system and diminish overall costs.  The Blues will not compete in the administration of healthcare plans including regional and national accounts.  The Blues will not compete in the sale of health insurance.  The result of the Blues agreements not to compete are what President Trump described in the Republican Primary Debates:

> TRUMP: What I'd like to see is a private system without the artificial lines around every state. I have a big company with thousands and thousands of employees. And if I'm negotiating in New York or in New Jersey or in California, I have like one bidder. Nobody can bid.  You know why? Because the insurance companies are making a fortune because . . . they have total control of the politicians. They're making a fortune.  Get rid of the artificial lines and you will have...yourself great plans.

10.     The "economic certainty" that the Blues' system results in higher prices to consumers was described concisely by Press Secretary Spicer speaking on behalf of the President of the United States and of the Secretary of Health and Human Services on March 14, 2017:

> Who could be against allowing insurance to be sold over state lines?  It's something that you can do your car insurance -- so many -- there is no other product that I can think of -- I'm sure someone will fact-check me on this -- but for the most part, the American consumer, when you want a product, you can go online, you can go to a store.  You have choice.  You could go to a store across state lines.  If you live in Virginia, you can drive to Maryland or the District and shop around.  With our [health] insurance, we don't have that ability.  There's no question that increased competition drives down cost.  It is just an economic certainty.  And allowing greater choice will do the same.

Only the Defendants and their paid experts could argue against this simple economic certainty.

11.     The first anticompetitive agreement is that the Defendants will not compete with each other with respect to healthcare provider networks.  With limited exceptions, the Blues have agreed not to contract with providers in other Defendants' service areas.  Many Blues have large numbers of members in other service areas, such as Anthem having more than 120,000 members residing in Alabama, but because of the Blues anticompetitive agreement, Anthem cannot develop innovative, collaborative arrangements with Providers in Alabama that would improve quality and decrease overall costs of healthcare.  Instead, the Blues operate through the Blue Card System that creates numerous inherent inefficiencies such as the fact that Providers in Alabama have to become aware of and deal with the coverage and payment rules of 35 other Blues in addition to BCBS-AL.  Moreover, innovative collaborative arrangements require coordination involving patients and providers such as those described by Cigna in the Anthem merger trial.  In the Blue Card System, Anthem has the information on the more than 120,000 members in Alabama while BCBS-AL has the information on the patients.  The Blue System therefore stifles innovation by creating additional barriers and inefficiencies.  The Blues have

also created other barriers to innovation including through their discount payment system.   In their effort to increase their "differentials" as compared to other health insurers, the Blues including BCBS-AL pay Providers less than other insurers.   The evidence in the Anthem merger trial demonstrates that the Blues are generally the lowest paying health insurer.   For many reasons including the costs of IT systems, innovation is expensive while in the long run it reduces overall costs in healthcare.   As Cigna executives testified in the Anthem merger trial, reducing reimbursement rates to Providers makes it more difficult to have collaborative, innovative arrangements.   The overall Blues' system and the efforts that the Blues have made since the long-term business strategy reduce competition in healthcare networks, add to inefficiencies, reduce the quality of healthcare outcomes, and ultimately increase costs in healthcare.

12.   The second anticompetitive agreement is that the Blues will not compete in the administration of health care benefit plans that are self-insured.   BCBS-AL and many other Blues including Anthem and HCSC conduct more business in the administration of health care benefit plans or administrative services than they do in the underwritten health insurance business.   The Blues have agreed that they will not bid for the contract to provide administrative services for health care benefit plans located or headquartered outside of their service areas unless the Blue with that service area cedes the right to make the bid to another Blue.   When there is a cede, only the Blue receiving the cede, and no other Blue, may bid for a contract to provide administrative services for the health care benefit plan.   In other words, for a health care benefit plan located in Birmingham, Alabama, unless BCBS-AL cedes the unilateral Blue right to bid to another Blue, only BCBS-AL can bid to provide administrative services, even if the plan has members throughout the country.   Anthem, the first or second largest company in the

business, cannot bid.  HCSC, the fourth largest company in the business, cannot bid.  When the health care benefit plan has employees in Texas, Illinois or another HCSC services area, the health care benefit plan must pay the Blue Card access and administration fees in addition to the payments made to Providers and the administrative service fees charged by BCBS-AL.  When the health care benefit plan has employees in Georgia, New York City, or another Anthem service area, the health care benefit plan must pay the Blue Card access and administration fees in addition to the payments to Providers and the administrative service fees charged by BCBS-AL.  It was this anticompetitive agreement of the Blues that then candidate Trump was complaining about before the election.  The Blues use this anticompetitive agreement to extract higher administrative service fees from health care benefit plans.  This anticompetitive agreement results in reduced competition, reduced choices for the administrative of health care benefit plans, increased costs, and less innovation and efficiency.  The anticompetitive agreement also results in lower reimbursement rates to health care Providers.

13.    The third anticompetitive agreement is that the Blues will not compete in the sale of health insurance.  Alabama has four different Blues selling health insurance immediately across the state borders.  One of them is Anthem, which owns Blue Cross & Blue Shield of Georgia, and it is the first or second largest health insurer in the country depending upon the measure.  The Blues have agreed that none of those Blues will cross the state line to sell health insurance in Alabama.  The same agreement also prohibits HCSC, the fourth largest health insurer in the country, Highmark, the 8th largest health insurer in the country, and Blue Cross & Blue Shield of Michigan, the 9th largest health insurer in the country, and all other Blues from competing with BCBS-AL in the sale of health insurance.  The Defendants are able to maintain this anticompetitive agreement because they have the Blue Card Program.  While the sale of

health insurance is a minority of the business of Blues such as BCBS-AL, this refusal to compete injures consumers for obvious reasons including those described by Press Secretary Spicer.  This anticompetitive agreement also results in lower reimbursement rates to health care Providers.

14.     The Blue Card agreement is a part of the other agreements and reinforces them by allowing them not to compete and providing the *quid pro quo* to the tune of billions of dollars each year that the Blues pay to each other and charge to their customers.  In numerous ways, the Blue Card Program is highly inefficient.   It places significant administrative burdens and expenses on health care Providers by having at least 36 different sets of coverage and payment rules that the Providers must learn and comply with, often without access to the rules of the 35 Blues for which they are not in network.  By having different companies responsible for patients than for Providers, the Blues make it highly inefficient and often impossible to have innovative, efficient arrangements for the delivery and administration of health care services.  The Blue Card Program allows the Blue Card Program allows the Blues to charge higher administrative service fees to health care benefit plans, separate and apart from the Blue Card administrative and access fees, which are also paid by health care benefit plans under the administrative services agreements that the Blues have with those benefit plans.

15.     The non-Blue revenue restriction agreement, which the Blues call "best efforts rules" to hide the obvious anti-competitive effects of this agreement also reinforces the other agreements and prevents the Defendants from engaging in meaningful competition in any manner.  The non-Blue revenue restrictions were adopted by the Blues to prevent Anthem and others from competing with other Blues even outside of the Blue branded area.   Those restrictions prevent any Blue license holder from receiving more than 20% of its revenue from non-Blue business in a service area or more than one third of its revenue company-wide from

non-Blue business. The evidence from the Anthem merger trial demonstrates some of the anticompetitive effects of the non-Blue revenue restriction agreement. If Anthem had been successful in carrying out the anti-competitive merger of Cigna into it, the non-Blue revenue restriction agreement, at the state-wide and company-wide level would have forced Anthem to convert innovative, collaborative Cigna administered health plans into less innovative and efficient Blue plans. This anticompetitive agreement results in less efficient and more costly health insurance and administrative services, it results in less innovation, and it results in lower reimbursement rates for health care Providers.

16. These five agreements separately have anti-competitive effects, and they reinforce the anti-competitive effects of the other agreements. The Defendants entered into each of the agreements for anti-competitive reasons. Each of the agreements has injured consumers, and they have injured health care Providers.

17. One goal of the Blues' actions is to create or maintain monopsony power in the markets for health care services, facilities, and goods, and thus the Blues have conspired to monopsonize those markets. In many geographic areas, the Blues have successfully created or maintained monopsony power, or have created a dangerous probability of achieving monopsony power. This conduct violates Section 2 of the Sherman Act.

18. Defendants' actions have significantly injured Plaintiffs and other healthcare providers. It is textbook economics that when there is more competition among insurers to create provider networks, including competition among the Blues, providers will be paid more. Defendants' agreements have also harmed competition by decreasing the options available to healthcare consumers. Fewer health insurance companies are competing in each Service Area. Fewer healthcare professionals are practicing, especially in primary care, than would be

practicing in a competitive market because of the lower than competitive prices that the Blues pay. Their output has been diminished. In addition, many hospitals and other healthcare facilities are closing or reducing services or are not expanding to provide additional services as a result of the Blues' low prices. The only beneficiaries of Defendants' antitrust violations are Defendants themselves. Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers.

## **JURISDICTION, VENUE AND PERSONAL JURISDICTION**

19.     Plaintiffs' federal antitrust claims are instituted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

20.     Several allegations in this complaint support this Court's personal jurisdiction over Defendants. First, some of the Defendants including Blue Cross and Blue Shield of Alabama and Blue Cross Blue Shield of Mississippi have entered into contracts with healthcare providers in Alabama. Second, all of Defendants have significant business in and contacts with Alabama through the national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of Defendants' subscribers who receive healthcare goods, services and facilities in Alabama, and in terms of subscribers from Blue Cross and Blue Shield of Alabama, who receive treatment in their Service Areas with all the Defendants dividing revenue resulting from those goods, services and facilities. Third, all of the Defendants have conspired with Blue Cross and Blue Shield of Alabama.

21.     Therefore, this Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the Defendants transact business in this District. This Court also has personal jurisdiction under the conspiracy theory of jurisdiction under Alabama law because Defendants participated in a conspiracy in which at least one conspirator committed overt acts in Alabama in furtherance of the conspiracy, *J&M Assocs. v. Callahan*, No. 07-0883-CG-C, 2011 U.S. Dist. LEXIS 131752, at *11 (S.D. Ala. Nov. 15, 2011), and under Alabama's long-arm statute, Ala. R. Civ. P. 4.2(b), because the Defendants' payments to Alabama health care providers to treat Alabama patients constitute minimum contacts with Alabama, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

22.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants transact business in this District, and 28 U.S.C. § 1391, because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## INTERSTATE COMMERCE

23.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

24.     Many of the healthcare providers, including Plaintiffs, provide services, supplies, or equipment to persons who reside in other states.

25.     The national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program are involved in interstate commerce and transaction for healthcare services.

26.     Plaintiffs and other healthcare providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

**PLAINTIFFS**

27.     Plaintiff Jerry L. Conway, D.C. is a chiropractor and a citizen of Brent, Alabama. Dr. Conway practiced for thirty-eight years before his retirement in 2010.  During the relevant time period, Dr. Conway provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Conway was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Conway has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.   As set forth herein, Dr. Conway has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

28.     Plaintiff Charles H. Clark III, M.D. is a neurosurgeon and a citizen of Birmingham, Alabama.  Dr. Clark has provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Clark is not seeking damages for the period before June 24, 2013.  Dr. Clark was paid less for those services than he would

have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Clark has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Clark has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

29.     Plaintiff Bullock County Hospital is a general medicine and surgical hospital in Union Springs, Alabama.  During the relevant time period, Bullock County Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Bullock County Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Bullock County Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Bullock County Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

30.     Plaintiff Crenshaw Community Hospital is a general medicine and surgical hospital in Luverne, Alabama.  During the relevant time period, Crenshaw Community Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Crenshaw Community Hospital was paid less for those services than it would have

been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Crenshaw Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Crenshaw Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

31.     Plaintiff North Jackson Pharmacy, Inc. is a pharmacy in Stevenson, Alabama. During the relevant time period, North Jackson Pharmacy provided medically necessary, covered goods and services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  North Jackson Pharmacy was paid less for those goods and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, North Jackson Pharmacy has also provided medically necessary, covered goods and services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those goods and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, North Jackson Pharmacy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

32.     Plaintiff Jackson Medical Center, LLC is a general medicine and acute care hospital in Jackson, Alabama.  During the relevant time period, Jackson Medical Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of

Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Jackson Medical Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Jackson Medical Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Jackson Medical Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

33.     Plaintiff Evergreen Medical Center, LLC is a general medicine and acute care hospital in Evergreen, Alabama. During the relevant time period, Evergreen Medical Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Evergreen Medical Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Evergreen Medical Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Evergreen Medical Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

34.     Plaintiff Ivy Creek of Elmore, LLC d/b/a Elmore Community Hospital is a general medicine and acute care hospital in Wetumpka, Alabama. During the relevant time

period, Elmore Community Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Elmore Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Elmore Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Elmore Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

35.     Plaintiff Ivy Creek of Butler, LLC d/b/a Georgiana Medical Center is a general medicine and acute care hospital in Georgiana, Alabama.  During the relevant time period, Georgiana Medical Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Georgiana Medical Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Georgiana Medical Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Georgiana Medical Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

36.     Plaintiff Ivy Creek of Tallapoosa, LLC d/b/a Lake Martin Community Hospital is a general medicine and acute care hospital in Dadeville, Alabama.  During the relevant time period, Lake Martin Community Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Lake Martin Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Lake Martin Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Lake Martin Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

37.     Plaintiff Robert W. Nesbitt, M.D. is an interventional pain medicine specialist and a citizen of Birmingham, Alabama.  During the relevant time period, Dr. Nesbitt provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Nesbitt was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Nesbitt has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants'

anticompetitive conduct.  As set forth herein, Dr. Nesbitt has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

38.     Plaintiff Janine Nesin, P.T., D.P.T., O.C.S. is a physical therapist and a resident of Huntsville, Alabama. During the relevant time period, Dr. Nesin provided medically necessary, covered services to patients insured by BCBS-AL, or who are included in employee benefit plans administered by BCBS-AL pursuant to her in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Nesin was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Nesin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Nesin has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

39.     Plaintiff Joseph D. Ackerson, PhD is a neuropsychologist located in Vestavia Hills, Alabama.  During the relevant time period, Dr. Ackerson provided medically necessary, covered services to patients insured by BCBS-AL or who are included in employee benefit plans administered by BCBS-AL pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Ackerson was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Ackerson has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for

22

Defendants' anticompetitive conduct.  As set forth herein, Dr. Ackerson has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

40.    Plaintiff Luis R. Pernia, M.D. is a plastic surgeon and a citizen of Tuscaloosa, Alabama.  During the relevant time period, Dr. Pernia provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same.  Dr. Pernia was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Pernia has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Pernia has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

41.    Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue.  Plaintiffs are entitled to payment for their services, equipment, supplies or for use of their facilities either pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from patients who are covered by a plan that is insured and administered by a Blue.  All Plaintiffs have been paid less than they would have been paid absent Defendants' violation of the antitrust laws.  All Plaintiffs have a right to bring these claims.  But for Defendants' agreements not to compete, out-of-network providers would have been offered the ability to contract with the Blues

at more competitive rates.  Accordingly, all Plaintiffs have standing and all have sustained antitrust injury.

42.     Certain of the named Provider Plaintiffs in this action, Charles H. Clark III, M.D., Robert W. Nesbitt, M.D., and Luis R. Pernia, M.D. ("the Alabama *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements withsome of the Defendants consummated in the Southern District of Florida before Judge Moreno.     For purposes of this Complaint, those Providers who were members of the Settlement Classes listed above do not bring claims against any of the released parties in those Settlements.  As this issue is currently being litigated in *Musselman v. Blue Cross Blue Shield of Alabama*, Case No. 1:13-cv-20050-FAM (S.D. Fla.); Case No. 13-14250-AA (11th Cir.), the Alabama *Love* Providers wish to allege here that:

a.     they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those releases.  Accordingly, those claims would be included in this Complaint but for the Defendants' insistence that if the claims are alleged here, they will immediately seek to have the Alabama *Love* Providers held in contempt of the injunctions entered by Judge Moreno.  The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b.     they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor;

c.      they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed below) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

43.      The list of Non-Released Blues (described above) includes: Blue Cross Blue Shield of Arizona, Arkansas Blue Cross and Blue Shield, Blue Shield of California, Highmark Blue Cross Blue Shield Delaware, Blue Cross of Idaho, Blue Cross and Blue Shield of Kansas, Blue Cross Blue Shield of Kansas City, Blue Cross Blue Shield of Nebraska, HealthNow, Noridian Mutual Insurance Co. d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Vermont, Blue Cross Blue Shield of Wyoming, and Premier Health, Inc. Additionally, while Excellus entered a settlement in New York state court, it did not obtain a release for any doctors other than those in New York, and that release does not affect the claims made in this amended complaint. Excellus is therefore also treated as a Non-Released Blue for purposes of this Complaint.

44.      As is noted in the Plaintiffs' allegations, at least one of the named Physician Provider Plaintiffs was not a member of the *Love* (and related) Settlement in Florida. Those non-Settling physician Plaintiffs pursue claims on behalf of the class against all of the Defendants who were released in *Love* action.

45.      The Agreements between various Defendants and some of the named Provider Plaintiffs contain what Defendants, including Blue Cross and Blue Shield of Alabama, will likely argue are binding arbitration provisions. Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of

25

this Complaint, those Plaintiffs with arbitration agreements covering the claims or parties at issue in this litigation expressly only bring suit against those Defendants who are not parties to the arbitration provisions in their agreements.  For instance, a Provider with an arbitration provision in her contract with Blue Cross and Blue Shield of Alabama is not asserting claims against Blue Cross and Blue Shield of Alabama, but rather is only pursuing her Sherman Act Section 1 claims against all Defendants other than Blue Cross and Blue Shield of Alabama, none of whom are parties to her agreement.

## **DEFENDANTS**

46.     Defendant Blue Cross and Blue Shield of Alabama is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama.  Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than three million people.  The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450 Riverchase Parkway East, Birmingham, Alabama.  Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

47.     Defendant Anthem, Inc. (formerly Wellpoint, Inc.) is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "Anthem" in this Complaint.  Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company.  By some measures Anthem is the largest health benefits company in the nation with

26

more than 37 million enrollees in its affiliated health plans.   According to its website, one in nine Americans is an Anthem member, and Anthem is contracted with 93% of the physicians and 96% of hospitals nationwide through the Blue Card Program.   Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

48.     Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099.   With more than 15 million enrollees, Health Care Service Corporation is the largest customer-owned health insurer in the United States.   Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana.   In each of its five Blue service areas, Health Care Service Corporation exercises market dominance.   Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

49.     Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.   Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving more than 2 million enrollees through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield,,

Regence BlueCross BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in its states of operation or within areas of those states.  Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

50.     Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117.  With approximately 3.2 million enrollees, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region.   Through its subsidiaries and affiliated companies, CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and Virginia, or within areas of those states.  CareFirst, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

51.     Defendant Premera Blue Cross is a Washington corporation with its corporate headquarters located at 7001 220th SW, Building 1, Mountlake Terrace, WA 98043.  Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2 million enrollees in Alaska and Washington.  Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield of Alaska.  Premera Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

52.     Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 3800 Centerpoint Drive, Suite 940, Anchorage, AK 99503.  Premera Blue Cross Blue Shield of Alaska, its subsidiaries and

affiliated companies are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

53.   Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ, 85021. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Arizona. Blue Cross Blue Shield of Arizona, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

54.   Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines Street, Little Rock, Arkansas 72201. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 860,000 enrollees in various health care plans in Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the state. Arkansas Blue Cross and Blue Shield, its subsidiaries and affiliated companies are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this Complaint.

55.   Defendant Blue Cross of California d/b/a/ Anthem Blue Cross is a California corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA 91367. It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant Anthem. Blue Cross of California is the parent corporation of a number of subsidiaries that provide health care financing to approximately 8.3 million enrollees in various health care plans in California, more than any other carrier in the state. Blue Cross of California, its subsidiaries

and affiliated companies are collectively referred to as "Blue Cross of California" or "BC-CA" in this Complaint.

56. Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, CA 94105-1808. It is the parent corporation of a number of subsidiaries that provide health care financing to over 4 million enrollees in various health care plans in California. California Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

57. Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant Anthem and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Suite 600, Denver, CO 80273. It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees through various health care plans in Colorado and Nevada.

58. Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant Anthem. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and affiliated companies, which provide health care financing to more than 1.3 million enrollees, are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

59.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant Anthem.  It is a Connecticut corporation with its corporate headquarters located at 108 Leigus Road, Wallingford, Connecticut 06492  and is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Connecticut.  Anthem Blue Cross and Blue Shield of Connecticut, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

60.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222.  Highmark, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 5.2 million enrollees in Pennsylvania, West Virginia and Delaware.  Highmark, Inc., its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint.

61.     Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is a subsidiary of Highmark, Inc.  It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801.  Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware.  It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield Delaware in July, 2012.  Highmark Blue Cross and Blue Shield Delaware provides health care financing to approximately 397,000 enrollees in various health care plans in Delaware.  According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share in the state of Delaware.  Highmark Blue Cross and Blue Shield Delaware, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "BCBS-DE" in this Complaint.

62.     Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc. and provides health care financing in the District of Columbia, Maryland and areas of Virginia.  It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc.  Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117.   Group Hospitalization and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "GHMSI" in this Complaint.

63.     Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 7 million enrollees in various health care plans in Florida.  Blue Cross and Blue Shield of Florida, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint.  Under BCBSA's rules, BCBS-FL is allowed to contract with health care providers in Alabama counties adjacent to Florida.

64.     Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant Anthem and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326. According to a 2009 Center for American Progress study on health competitiveness,   Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare financing market.  Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 3.2 million enrollees in various health care

plans in Georgia.  Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross

Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively

referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

65.     Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield

of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku

Street, Honolulu, Hawaii 96814.  It is the parent corporation of a number of subsidiaries that

provide health care financing to 722,000 enrollees in various health care plans in Hawaii.

Hawaii Medical Service Association, its subsidiaries and affiliated companies are collectively

referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

66.     Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho

corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho

83642.  It is the parent corporation of a number of subsidiaries that provide health care financing

to 550,000 enrollees in various health care plans in Idaho.  Blue Cross of Idaho Health Service,

Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of

Idaho" or "BC-ID" in this Complaint.

67.     Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health

and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue,

Lewiston, Idaho 83501.  Regence BlueShield of Idaho is the parent corporation of a number of

subsidiaries that provide health care financing to more than 150,000 enrollees in various health

care plans in Idaho.  Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies

are collectively referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

68.     Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant

HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois

60601.  It is the parent of a number of subsidiaries that provide health care financing to over 7

million enrollees in various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois,

its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue

Shield of Illinois" or "BCBS-IL" in this Complaint.

69.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue

Shield of Indiana is a subsidiary of Defendant Anthem.  It is an Indiana corporation with its

corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204.  It is the

parent corporation of a number of subsidiaries that provide health care financing to enrollees in

various health care plans in Indiana.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and

Blue Shield of Indiana, its subsidiaries and affiliated companies are collectively referred to as

"Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint.

70.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is

an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.

It is the parent of a number of subsidiaries that provide health care financing to 1.8 million

enrollees in Iowa.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its

subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue

Shield of Iowa" or "BCBS-IA" in this Complaint.

71.     Defendant Blue Cross and Blue Shield of Kansas is a Kansas corporation with its

corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.  Blue

Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including

Premier Health, Inc., that provide health care financing to approximately 950,000 enrollees in

various health care plans in Kansas.  Blue Cross and Blue Shield of Kansas, its subsidiaries and

affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

72.     Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is a subsidiary of Defendant Anthem and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223.   It provides health care financing in Kentucky.  Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

73.     Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.  It is the parent corporation of a number of subsidiaries that provide health care financing to more than 1.1 million enrollees in various health care plans in Louisiana.  Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

74.     Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant Anthem.  It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016.  It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maine.  Anthem Health Plans of Maine, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

75.     Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117.   CareFirst of Maryland, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maryland.  CareFirst of Maryland, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

76.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts 02215.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in various health care plans in Massachusetts.  Blue Cross and Blue Shield of Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

77.     Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 4.5 million enrollees in various health care plans in Michigan.  Blue Cross and Blue Shield of Michigan, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.

78.     Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164.  BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is the parent corporation of a number of subsidiaries that provide health care

financing to 2.6 million enrollees in various health care plans in Minnesota.  Blue Cross and Blue Shield of Minnesota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint.

79.      Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company, is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1 million enrollees in various health care plans in Mississippi.  Blue Cross and Blue Shield of Mississippi, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this Complaint.    Blue Cross Blue Shield of Mississippi contracts with providers in counties in Alabama that are adjacent to Mississippi.

80.      Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is a subsidiary of Defendant Anthem.  It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in a various health care plans in Missouri.  Defendant Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint.

81.      Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at One Pershing Square, 2301 Main Street, Kansas City, Missouri 64108.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 900,000 enrollees in various health care plans in Kansas City and its suburbs in Kansas and Missouri.  Blue Cross and Blue Shield of Kansas

City, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint.

82.    Defendant Blue Cross and Blue Shield of Montana is a division of Defendant HCSC with its principal place of business at 3645 Alice Street, Helena, Montana 59604-4309.  It is the parent of a number of subsidiaries that provide health care financing to approximately 240,000 enrollees in various health care plans in Montana.  Blue Cross and Blue Shield of Montana, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT" in this Complaint.  For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.

83.    Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena, Montana 59604-4309.  When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc.

84.    Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180.  It is the parent corporation of a number of subsidiaries that provide health care financing to over 700,000 enrollees in various health care plans in Nebraska.  Blue Cross and Blue Shield of Nebraska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

85.    Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its

38

headquarters located at 700 Broadway, Denver, CO 80273.  Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148.  Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant Anthem that offer health care financing in Nevada.  Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and affiliated companies, which provide health care financing to more than 300,000 enrollees, are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

86.     Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is a subsidiary of Defendant Anthem.  It is a New Hampshire corporation with its corporate headquarters located at 3000 Goff Falls Road, Manchester, New Hampshire 03111.  Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to over 600,000 enrollees in various health care plans in New Hampshire.  Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint.

87.     Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105.  It is the parent corporation of a number of subsidiaries that provide health care financing to 3.6 million enrollees in various health care plans in New Jersey.  Horizon Healthcare Services, Inc., its subsidiaries and affiliated companies

are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

88.     Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.  Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in New Mexico.  Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

89.     Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202.  HealthNow New York, Inc. does business as Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern New York.  HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York.  HealthNow New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "HealthNow" in this Complaint.

90.     Defendant BlueShield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 40 Century Hill Drive, Latham, NY 12110.  BlueShield of Northeastern New York is the parent of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York.  BlueShield of Northeastern New York, its subsidiaries and affiliated companies are collectively referred to as "BlueShield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

91.     BlueCross BlueShield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202.  BlueCross BlueShield of Western New York is the parent of a number of subsidiaries that provide health care financing to more than 800,000 enrollees in various health care plans in New York.  BlueCross BlueShield of Western New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Western New York" or "BCBS-Western NY" in this Complaint.

92.     Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield is a subsidiary of Defendant Anthem.  It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006.  Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield is the parent corporation of a number of subsidiaries that provide health care financing to nearly 6 million enrollees in various health care plans in New York.  Empire BlueCross BlueShield, its subsidiaries and affiliated companies are collectively referred to as "Empire BlueCross BlueShield" or "Empire-BCBS" in this Complaint.

93.     Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate headquarters located at 165 Court Street, Rochester, New York 14647.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in the state of New York.  Excellus Health Plan, Inc., its subsidiaries and affiliated companies are collectively referred to as "Excellus BlueCross BlueShield" in this Complaint.

94.     Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina corporation with its corporate headquarters located at 4615 University Drive, Durham, North

Carolina 27707.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 3.9 million enrollees in various health care plans in North Carolina. Blue Cross and Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.

95.    Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue South, Fargo, ND 58121.  Noridian Mutual Insurance Company is the parent company of a number of subsidiaries that provide health care financing to nearly 500,000 enrollees in the midwestern and western United States.  Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care financing to approximately 390,000 enrollees in various health care plans in North Dakota.  Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

96.    Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is a subsidiary of Defendant Anthem.  It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040.  Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number of subsidiaries that provide health care financing to more than 3 million enrollees in various health care plans in Ohio.  Community Insurance Co., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

97.     Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119.  Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health care financing to more than 835,000 enrollees in various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

98.     Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant Cambia Health.  It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201.  Regence BlueCross BlueShield of Oregon is the parent corporation of a number of subsidiaries that provide health care financing to more than 750,000 enrollees in various health care plans in Oregon.  Regence BlueCross BlueShield of Oregon, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

99.     Defendant Capital BlueCross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Pennsylvania.  Capital BlueCross, its subsidiaries and affiliated companies are collectively referred to as "Capital BlueCross" in this Complaint.

100.     Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill,

Pennsylvania 17011. Highmark Health Services is the parent of a number of subsidiaries that provide health care financing to approximately 4.2 million enrollees in various health care plans in Pennsylvania. Highmark Health Services, its subsidiaries and affiliated companies are collectively referred to as "Highmark Health Services" in this Complaint.

101.    Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103. It is the parent corporation of a number of subsidiaries that provide health care financing to 2.5 million enrollees in Pennsylvania and 6 million nationwide. Independence Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

102.    Defendant Triple-S Salud, Inc. is a subsidiary of Triple-S Management Company and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that provide health care financing to 1.6 million enrollees in Puerto Rico. Triple-S Salud, Inc., its subsidiaries and affiliated companies are collectively referred to as "Triple-S of Puerto Rico" in this Complaint.

103.    Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 500 Exchange Street, Providence, Rhode Island 02903. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

104.    Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29219.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately one million enrollees in various health care plans in South Carolina. BlueCross BlueShield of South Carolina, its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint.

105.    Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104.  Wellmark of South Dakota, Inc. is a subsidiary of Defendant Wellmark, Inc.   Wellmark of South Dakota, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 325,000 enrollees in South Dakota.   Wellmark of South Dakota, its subsidiaries and affiliated companies are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

106.    Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care financing to nearly 3 million enrollees in various health care plans in Tennessee.  BlueCross BlueShield of Tennessee, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Tennessee" or "BCBS-TN" in this Complaint.  BCBS-TN contracts with health care providers in Alabama counties adjacent to Tennessee.

107.    Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas.  Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

108.    Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121.  Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide health care financing to more than 320,000 enrollees in various health care plans in Utah.  Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueCross BlueShield of Utah" or "BCBS-UT" in this Complaint.

109.    Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602.  It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 200,000 enrollees in various health care plans within the state of Vermont.  Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

110.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. is a subsidiary of Defendant Anthem.  It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230. Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of

subsidiaries that provide health care financing to approximately 2.2 million enrollees in various health care plans in Virginia. Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

111.    Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101. Regence BlueShield in Washington is the parent corporation of a number of subsidiaries that provide health care financing to 770,000 enrollees in various health care plans in Washington. Regence BlueShield in Washington, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

112.    Defendant Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia is a subsidiary of Defendant Highmark and is a West Virginia corporation with its corporate headquarters located at 614 Market Square, Parkersburg, West Virginia 26101. Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care financing to nearly 493,000 enrollees in various health care plans in West Virginia and one county in Ohio. Highmark Blue Cross Blue Shield West Virginia, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" in this Complaint. BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

113.    Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant Anthem and is a Wisconsin corporation with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203.

Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Compcare Health Services Insurance Corporation, that provide health care financing to approximately 900,000 enrollees in various health care plans in Wisconsin.  Blue Cross Blue Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

114.    Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001.  It is the parent corporation of a number of subsidiaries that provide health care financing to over 100,000 enrollees in various health care plans in Wyoming.  Blue Cross Blue Shield of Wyoming, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint.

115.    Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601.  It is owned and controlled by 36 Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by the Blues and operates as the licensor.  Health insurance companies operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for nearly 105 million - or one in three - Americans.  BCBSA itself does not provide health care financing and does not contract with health care providers, but it operates to create consistency and cooperation among its 36 members.  It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of either plan chief executive officers or plan board members.  The 36 Blues fund Defendant BCBSA.

## FACTUAL ALLEGATIONS

### The Defendants

116.    Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and cover nearly 105 million Americans.  Defendants also operate the most extensive Provider Networks in the United States. According to the BCBSA, more than 96% of hospitals and 93% of professional providers contract with one of the Defendants nationwide – "more than any other insurer."  Other Blues estimate even higher percentages.

117.    The Blues include many of the largest potentially competitive health insurance companies in the United States.  Indeed, Anthem is the largest health insurance company in the country by total medical enrollment, with approximately 37 million enrollees. Health Care Service Corporation ("HCSC") is the largest mutual health insurance company in the country and the fourth largest health insurance company overall, with approximately 13 million enrollees. Similarly, 15 of the 25 largest health insurance companies in the country are Blues. Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the markets for health care financing and health services.

118.    Anthem is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary,

UniCare.  Anthem also operates in a number of additional states through its Medicaid subsidiary, Amerigroup.  But for the illegal territorial restrictions summarized above, Anthem would be likely to offer its health care financing throughout the United States in competition with the other Blues, including in Alabama. In fact, in 2015 Anthem had approximately 127,000 enrollees in Alabama. Anthem has further demonstrated its desire to operate in Alabama through its offer to purchase CIGNA, by market share the seventh largest health insurance company in the country, which operates in Alabama. If Anthem did develop and operate a Provider Network in Alabama, it would provide increased competition, and such competition would result in higher payments to Providers. Anthem recently admitted its desire to compete nationwide, including in Alabama, in its trial brief supporting its attempt to merge with Cigna: "a prime reason for the proposed merger is to provide Anthem with Cigna's nationwide network so that Anthem may for the first time become a true nationwide competitor." Anthem Brief at 10. Anthem also stated that its membership in the Association "will not diminish Anthem's incentives to compete through the Cigna brand in the 36 states where Anthem does not hold a Blue license. Anthem will have powerful incentives to win business through Cigna in those states because the margins on such business far exceed any BlueCard fees to be earned if another Blue happens to win the business." *Id.* at 12.

119.    HCSC, which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, and BCBS-MT, is the largest mutual health insurance company in the country and the fourth largest health insurance company overall.  But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health care financing throughout the United States in competition with the other Blues, including in Alabama. In 2015 HCSC had approximately 92,000 enrollees in Alabama.  Such competition would result in higher payments to Providers.

120.    BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan.  BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary.  But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 BCBS-MI had approximately 30,000 enrollees in Alabama.  Such competition would result in higher payments to Providers in those areas.

121.    Highmark, Inc. is the eighth largest health insurer in the country by market share, with approximately 5.2 million enrollees.  Its affiliated Blues include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania, BCBS-WV, and BCBS-DE.  It has acquired Blue Cross of Northeastern Pennsylvania, causing it to move further into the top ten.  But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 Highmark had approximately 40,000 enrollees in Alabama.  Such competition would result in higher payments to Providers in those areas.

122.    Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees.  But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Alabama would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to Providers in those areas.

51

123.    CareFirst, which operates the Blues in Maryland, Washington, D.C., and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 CareFirst had approximately 5,000 enrollees in Alabama.  Such competition would result in higher payments to Providers in those areas.

124.    BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts.  But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 BCBS-MA had approximately 5,000 enrollees in Alabama.  Such competition would result in higher payments to Providers in those areas.

125.    BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida.  But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama.  In 2012 BCBS-FL had approximately 4,000 enrollees in Alabama.  Such competition would result in higher payments to Providers in those areas.

126.    The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

127.    The BCBSA is a separate legal entity that purports to promote the common interests of the Blues. The BCBSA describes itself as "a national federation of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies."  The BCBSA refers to the 36 Blue Cross and Blue Shield companies as Member Plans.

128.    The BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete.  As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies."  One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

129.    Every Blue is a member of the BCBSA, every Blue CEO is on the Board of Directors of BCBSA and every Blue participates in numerous BCBSA Committees.

130.    The Blues govern BCBSA.  BCBSA is entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

131.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the individual plans."  *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989).  The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

132.    In a pleading it filed during the *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n* litigation in the Northern District of Illinois, Civil Action No. 09-c-5619, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer."  The current Chairman of the Board of Directors, Daniel J. Hilferty, is also the President and CEO of Independence Blue Cross.  The CEO of each of the Individual Blues serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets at least annually.

133.    BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 36 members, including reimbursement rates for providers.  The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are in furtherance of Defendants' conspiracies.

134.    The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC").  The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members.  This Committee has the power to enforce the requirements of the license agreements.

135.    The Blues control the entry of new members into BCBSA.  In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved." *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue*

*Shield Association*, Brief of Appellee, 1997 WL 34609472, at *7, 21 (filed Jan. 9, 1997) (the "Sixth Circuit Brief").

136.   The Blues control the rules and regulations that all members of BCBSA must obey.  According to the Sixth Circuit Brief, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). *Id.* at n.4.

137.   The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards."  In the Sixth Circuit Brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised."  The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 20, 2013.

138.   The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards

and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

139.    The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA.  The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards.  Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."   In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

140.    The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations.  The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and "Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

141.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation."

However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote."  In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

142.     A number of Blues also serve on the Inter-Plan Programs Committee ("IPPC"), which controls the national or Inter-Plan Programs of the Blues.  BCBS-AL CEO and President Terry Kellogg has been the Chairman of this Committee, and BCBS-AL Chief Administrative Officer Timothy Vines is currently a member.  In each of their licensing agreements, the Blues agree to participate in the national programs and to comply with the terms established by the IPPC.  Therefore, the Blues are collectively agreeing to the terms of the national programs and their implementation.

143.     The Blues are potential competitors that use their control of BCBSA to coordinate their activities.  As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

144.     In addition, Blue Health Intelligence ("BHI"), a licensee of BCBSA, is managed by a Board of Managers entirely comprised of BCBS executives -- Highmark, BCBS-NC, BCBS-MI,     BCBS-AL,     BCBS-MA,     BCBS-NE,     HCSC,     BCBSA,     and     IBC. www.bluehealthintelligence.com. BHI recently acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by BCBS

companies.  Designed to lower health care reimbursement to providers, Intelimedix explicitly states that "we all share information."

145.    BHI receives its claims data from, among other sources, BCBSA, which in turn receives these data from each of its Blues Plan members. BHI uses the BCBSA claims data, called the BCBSA National Data Warehouse Core, to perform analytic reports for the benefit of Blues Plans. Prior to the time period in which Plans submitted claims data directly to BCBSA, Plans submitted data to BHI. Among those entities that BHI transmitted claims data to was Consortium. Thus, BHI operates as a mechanism for the sharing of claims data among all the Blues, which they use to lower reimbursements to Providers.

146.    Each BCBSA licensee is an independent legal organization.  The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues.  The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

147.    In the Sixth Circuit Brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national cooperation." 1997 WL 34609472, at *3.  The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's
> parent Blue Plans - in the marketplace.  Inter-Plan competition had
> been a fact of life from the earliest days, but a new set of
> conditions faced the Plans in the 1980s, now in a mature and
> saturated market.  New forms of competition were springing up at
> every turn, and market share was slipping year by year. Survival
> was at stake.  The stronger business pressure became, the stronger

the temptation was to breach the service area boundaries for which
the Plans were licensed . . . .

148.    BCBSA is simply a vehicle used by admittedly independent health insurance
companies to conspire, coordinate, and enter into agreements that restrain competition.  Because
BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one
of its member plans constitutes a horizontal agreement between and among the member plans
themselves.

149.    As detailed herein, the BCBSA not only enters into anticompetitive agreements
with the Blues to allocate markets, but also facilitates the cooperation and communications
between Defendants to suppress competition.  BCBSA is a convenient organization through
which the Defendants enter into illegal territorial restraints between and among themselves.

### The History of the Blues

#### *Before the Long-Term Business Strategy*

150.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were
separate and distinct and were developed to meet differing needs.  The Blue Cross plans were
designed to provide a mechanism for covering the cost of hospital care.  The Blue Shield plans
provided a mechanism for covering the cost of physicians.  The plans were all nonprofit entities
with limited purposes, and they acknowledged obligations to treat all healthcare providers fairly.

151.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a
national body intended to coordinate and "approve" the independent Blue Shield plans.  The
AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield
symbol be used to signify that a Blue Shield plan was "approved," the American Medical
Association responded, "[i]t is inconceivable to us that any group of state medical society Plans

should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

152.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors.  During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan.  Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

153.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. By 1947, Blue Cross and Blue Shield plans coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. Competition in the same geographic areas under the Blue Cross name, as well as the Blue Shield name, has been a feature of the system since the 1930s, and it continues to this day. For example, the Durham and Chapel Hill plans competed with each other under the Blue Cross name from 1938 until 1968, and these plans continued to compete under the Blue Shield name for six years after that. Plans that are now part of Excellus and Anthem have been competing under the Blue Cross and Blue Shield names since 1947, and plans that are now part of  HealthNow and Excellus have been competing under the Blue Cross and Blue Shield names since 1952. Cross-on-Cross competition, Shield-on-Shield competition, or both, exist or have existed in California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, Washington, and Wisconsin. Moreover, not all of this competition is based on historical practices; Premera and Regence Blue Shield of Idaho

began competing under the Blue Shield name in Washington in 1995, and they continue to compete there.

154. From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition because of its fear that a restraint-of-trade action might result from such cooperation.

155. According to an affidavit of C. Rufus Rorem, who was the Director of the Blue Cross Commission, a goal of the Commission was to "prohibit[] the operation of multiple Plans in a single service area to reduce health care costs." The manner of reducing health care costs was to eliminate competition among the Blue Cross plans to induce hospitals to participate with the plans at reimbursement rates favorable to the plans: "One of several Plans operating in the same area with an enrollment of only a small fraction of the area's eligible subscribers had substantially less influence with and therefore success in convincing the area's hospitals to participate in the Plan. … The operation of only one Plan per service area helped the Plan obtain the participation of hospitals on terms which were favorable to the Plan and its subscribers, thereby enhancing the Plan's attractiveness in the marketplace."

156. Despite the foregoing, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

157. In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services ... to [the American Hospital Association]." (The "1954 Agreement".)  Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating

that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." The 1954 Agreement also noted limitations specifying that only "certain Individual Plans ... developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in particular areas served by such PLANS" and that the plan had the right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these presents."

158. The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a condition of the grant of the license, including, among other things, that "[e]very qualified general hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

159. Finally, the 1954 Agreement prevented the AHA from having control over the Blue Cross plans. In this regard, the agreement specified that the Blue Cross Plans needed only a majority vote to revoke the agreement, while the AHA could revoke it only prior to January 1, 1956, upon a three-fourths vote of the House of Delegates of the AHA.

160. With respect to the Blue Shield entities, the 1952 license agreement between the National Organization (the agreement's term for the AMCP) and its member medical care plans (the "1952 Agreement") was similarly limited in scope. That agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned, controlled or sponsored by county medical societies or state, district, territorial or

provincial medical associations."  The 1952 Agreement further specified that "[e]ach member plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization."  In 1976, it again changed its name to the "Blue Shield Association." Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

161.    Notably, this agreement did not contain any provision relating to Plans developing certain territorial rights.  Instead, this agreement provided that "[t]he National Organization hereby grants to each of its member plans that are parties to this Agreement, subject to the terms of this agreement, permission to use said service mark in commerce among the several states or in foreign commerce."

162.    In 1972, a new license agreement was entered into between the Blue Cross Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement").  This agreement stated that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA Marks')."  The agreement then sought to expand the scope of the service marks by providing that the Blue Cross Plan "desires to use the BCA Marks and any revisions and variations hereafter developed (collectively called 'Licensed Marks')" and then grants such Plan the right to use the new Licensed Marks "as service marks, in the sale and advertising of programs for health care and related services operated on a non-profit basis."  This agreement also provides that the "rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement."

163.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a plan must treat providers fairly.  In this regard, the 1972 Agreement continued to specify that a

plan must comply with certain requirements as a condition of the grant of the license including, among other things, that "[e]very qualified general hospital in the area served by the PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

164.    In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating.  By 1982, the process of the merger to form BCBSA had been completed.

### The Long-Term Business Strategy and Assembly of Plans

165.    In the early 1980s, the Blues fundamentally changed the way they conducted business.  The Blues conspired through a work group organized by the BCBSA, created a set of mandates that became known as the "Long-Term Business Strategy." Edwin R. Werner, the President of Blue Cross and Blue Shield of Greater New York (now Defendant Empire Blue Cross, which is a part of Defendant Anthem), led the effort.

166.    Prior to the Long-Term Business Strategy, each Blue Cross and Blue Shield Plan was an autonomous company with a local presence, but often with strategic plans to compete in other service areas—whether within a state or across state lines. Some plans saw the importance of national accounts and wished to compete for all of these accounts (notwithstanding their territorial basis). Competition across service areas was so common among the Blues that it had a name: "Blue Sharking." Some plans saw themselves as competing with other commercial health insurers who had as national presence and national provider networks. These plans in particular were not interested in other Blue plans and the BCBSA telling them what they could and could not do with their capital, that they must coordinate with anyone, and that they must cede any authority to an association. Yet this was the direct and lasting outcome of the Long-Term Business Strategy.

167.    Werner presented the Long-Term Business Strategy to the Blues at the Blue Cross and Blue Shield Annual Meeting on November 11, 1982. In his presentation, Werner described the Long-Term Business Strategy as a "fundamental change" that would result in "a concentration of power." The Blues approved the Long-Term Business Strategy the next day.

168.    According to the Long-Term Business Strategy itself, two of the three "measures of success" for the Blue Cross and Blue Shield organization were market share and profit. The mandates of the Long-Term Business Strategy were designed to further these goals in part by reducing competition among the Blues.

169.    Two of the mandates contained in the Long-Term Business Strategy reduced competition among the Blues by reducing the number of Blues who could compete with each other. So-called Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint Blue Cross Blue Shield plans by the end of 1984, "except where the Association Board of Directors agrees that business needs dictate otherwise." Proposition 1.2 required further consolidation so that there would be only one Blue per state by the end of 1985, "except where the Association Board of Directors agrees that business needs dictate otherwise."

170.    When he presented these propositions, Werner described a "significant reduction in the number of corporations which make up our collective effort" as "wise," questioning why "it makes good business sense for four corporations in one state to chase a total market potential of 677,000 employed people." He asked, "Can we really justify 12 member corporations in one state – even though it is a large one?"

171.    Although the Blues approved these propositions, some Blue plans disagreed with this strategy as antithetical to competition and plan autonomy. William Flaherty, the President of Blue Cross Blue Shield of Florida sent a letter to Werner in 1982 expressing reservations about

portions of the Long-Term Business Strategy. With respect to the consolidation of plans, he said that "[t]he large market share of the system of plans would have precipitated anti-trust actions were it not for the insurance industry exemptions and the community-service orientation." Blue Cross of Central New York stated in a position paper, "Blue Cross of Central New York is opposed to statewide merger or consolidation. Such a move would destroy virtually everything our community leaders have built in our 10-county service area in the 47 years we have functioned as a community organization. . . . Home rule and local autonomy were the key reasons for the Plan's creation." Similarly, in 1983 the Presidents of Blue Cross of Western New York and Blue Shield of New York sent a letter to each of the Chief Executive Officers of the Blue plans voicing their dissent. They argued that the Long-Term Business Strategy was a threat to the autonomy of individual plans "and [to] transform Plans into branch offices," a disguised program to strengthen the BCBSA, and a concerted effort to establish a corporate entity."

172.    The Blues carried out Propositions 1.1 and 1.2, dramatically reducing the number of Blues in the years after they adopted the Long-Term Business Strategy. In 1980 there were 114 Blues. By 1989 there were 75, and now there are 36. Competition between Blue Cross plans and Blue Shield plans ended in all but a few states.

173.    Another important mandate of the Long-Term Business Strategy was Proposition 3.4: "Launch an intensified program to retain, acquire and expand provider and professional payment differentials." "Differentials" referred to the difference between healthcare providers' billed charges and what the Blues paid, which was an advantage for the Blues because its competitors generally paid the providers' billed charges. (More recently, the Blues have sometimes used "differentials" to mean the difference between what the Blues pay a healthcare provider and what their competitors pay.)  In other words, the Blues conspired to reduce the

payments they were making to providers. Among the steps for implementing Proposition 3.4 was, "Association to survey all Plans by March 1, 1983, to determine status to their efforts to protect/secure payment differentials."

174.    Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. Commenting on the Long-Term Business Strategy, Flaherty wrote to Werner, "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty also wrote, "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Thus, the Blues were aware that by using their market power to secure large differentials, they could "close out" other insurers. Blue Cross and Blue Shield of Alabama is one of the Blues that secured a large differential by imposing cost-based reimbursement on hospitals.

175.    Another mandate of the Long-Term Business Strategy was Proposition 1.4, "Continue study of Blue Cross and Blue Shield organization and make further recommendations for change." A Proposition 1.4 Work Group was established, and it wrote in 1985,

> One deterrent to Plan support for common cohesive effort was quickly identified and is the subject of the balance of this report. A common effort requires a common bonding. The bond in our case is the use of the Blue Cross and Blue Shield names and marks. Yet as we analyzed the current provisions of the basic agreements with plans, that bond seems unduly weak for the current environment. As will be developed, a strengthened license agreement is deemed essential.

The Proposition 1.4 Work Group identified as a problem the possibility that a plan could hold a license to use the Blue marks but not be a member of BCBSA, imperiling cooperation and coordination among plans. The solution was to tie the terms of the license agreement to membership in BCBSA.

176.    The Proposition 1.4 Work Group also recommended a series of meetings among the Blues, known as the "Assembly of Plans." The Board of Directors of BCBSA approved this proposal in 1986. On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues plans, including actions that plans should do collectively. In June 1986, John Larkin Thompson, the CEO of Blue Cross and Blue Shield of Massachusetts, agreed to Chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine plan CEOs. The Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the plan CEOs. This became known as the White Paper.

177.    The focus of the White Paper was "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements." The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue service marks within the plans' service areas. It acknowledged, however, that exclusive service areas were not essential to the Blue marks, and that they were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing *Sealy* and *Topco*]. . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future. . . . Thus, an issue for the Assembly is whether to consider – at this time – alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

The White Paper recognized that "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned." As the author of a paper summarizing a meeting discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas in the future—shouldn't we be looking instead for other alternatives."

68

178.    During this process, it was clear that the reason for preserving exclusive service areas was to prevent competition that would otherwise arise among the Blues. According to an internal report about the Assembly of Plans, "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare." And the result of reduced competition was lower payments to providers; according to same report, "By enjoying exclusive territories, Plans can bargain aggressively. In turn, national accounts enjoy local discounts." According to the internal Assembly of Plans report, exclusive service areas create "Larger market share because other Blues stay out and do not fragment the market. … Stronger provider agreements for the same reason."

179.    Despite the significant legal problems with exclusive areas, the Assembly of Plans considered and rejected proposals to create non-exclusive "primary service areas" or to eliminate territorial allocation entirely.

180.    Ultimately, through nine meetings of the Assembly of Plans from 1987 through 1989, and despite open acknowledgement that a number of Plans were happily competing with each other outside their exclusive service areas, the Assembly of Plans issued its Final Report on February 8, 1990. It recommended to the BCBSA approval of new license agreements that would tie together licensure of the BCBS name and marks and membership in BCBSA (and its membership standards; prior to this a plan was not required to be a member of BCBSA to obtain a license to use the BCBS name and marks).  When these license agreements were executed the result was BCBSA's ability to enforce exclusive service areas by membership restrictions in BCBSA, use of the BCBS name and marks, and monetary sanctions. This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where plans wish to compete with each other across assigned territories.

**The Blues' Reached an Anticompetitive Agreement to Allow
to a For-Profit Business Model, to Restrict Competition
Even on a non-Blue Branded Basis, and as a Quid Pro Quo to
Develop the Blue Card Program in an Inefficient Manner.**

181.    Until 1986, the Blues were tax-exempt. The Tax Reform Act of 1986 revoked this

exemption and added Section 833 of the Internal Revenue Code, which treats the Blues as

taxable stock insurance companies. Since 1986, several of the Blues have converted to for-profit

organizations. The largest, Anthem, reported a net income of $2.56 billion in 2015. As described

in more detail below, many of the Blues that have remained nominally nonprofit behave like for-

profit companies by building up unnecessarily high levels of surplus and paying outsized

compensation to executives.

182.    Although the Assembly of Plans eliminated the potential for BCBSA-sanctioned

"Blue on Blue" competition in most states, it left open the possibility of competition from non-

Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many

Blues.  After the 1986 revocation of the Blues' tax-exempt status and throughout the early1990s,

the number of non-Blue subsidiaries of Blues increased.  As quoted in The Blues: A History of

the Blue Cross and Blue Shield System, former BCBSA counsel Marv Reiter explained in 1991,

"Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles.

. . . We went from 50 or 60 nationally to where there's now 400 and some."  These subsidiaries

continued to compete with the other Blues.  As a result, the member plans of BCBSA discussed

ways to rein in such non-Blue branded competition.

183.    Subsequently, Defendants agreed to restrict the territories in which Defendants

would operate under any brand, Blue or non-Blue, as well as the ability of non-members of

BCBSA to control or acquire the Member Plans.

184.    Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey and guidelines proposed members must adhere to prior to joining the BCBSA.   These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). Those regulations provide for amendment with a vote of three fourths of the Member Plans.   These agreements, which were revised or amended at least as of 2013, are the agreements at issue in this case.

185.    These License Agreements depart from, and supersede, the historical licensing agreements.  For example, the "whereas" clauses of the Blue Cross License Agreements provide that the Plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the Plan "was desirous of assuring nationwide protection of the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

186.    Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system."   In order to accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined Service Areas.  The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below."  Paragraph

5 sets forth these new "Service Area[s]]" as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

187.    Despite the expanded scope of the license and the newly defined Service Areas, the License Agreements failed to include the provision, contained in both the 1954 and 1972 Agreements that required the Plan to treat providers fairly.  To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with health care providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

188.    In 1990, Defendants developed an amended license agreement that continued to require that all Blue license holders be non-profit entities.  At that point, Associated Insurance Companies of Indianapolis, which became Anthem, wished to be a for-profit company and refused to sign the amended license agreement, and it "bought the giant Dallas-based American General Insurance Company in 1990 . . . it was a 'Sputnik event' for the rest of the [Blue] Plans, according to M. Edward Sellers, a former BCBSA vice president who became president and CEO of Blue Cross and Blue Shield of South Carolina in 1987.  Soon the Indiana Plan was competing under another brand name in many other Plans' home markets."  The Blues: A History of the Blue Cross and Blue Shield System at 241.  During the 1990s, in order to end the developing competition, the Defendants agreed to restrict non-Blue competition and to develop the Blue Card Program in a highly inefficient manner described elsewhere in this Amended Complaint.

189.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic "Service Area," which is either the geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

190.    Under the Guidelines and Membership Standards that were developed in the early to mid-1990s, each Member Plan agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names.  The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business.  Both provisions directly limit the ability of each Blue to generate revenue from non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.  The Defendants also agree that they will participate in Inter-plan Programs including Blue Card with the billions of dollars of access fees providing the *quid pro quo* for the agreements not to compete.

191.    Therefore, Defendants have agreed that in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that

area, and will derive at most one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand.  The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

192.    Anthem (then known as WellPoint), in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

193.    The Defendants have long been aware that their limits on non-Blue business could constitute an unlawful restraint of trade. A "Blue Cross and Blue Shield Issue Summary" dated February 4, 1993, which "was assembled by asking several Blue Cross and Blue Shield Plan CEOs to identify issues that they believed were divisive to the Plans and BCBSA," cited unbranded competition as a divisive issue, and stated as one position that "[a]ny attempt to restrict competition between licensees using trademarks other than the Blue marks is a violation of federal and state antitrust laws and subject to criminal and civil penalties. Competition is good

for the consumer and that is who we are obligated to serve. It makes the Plans more effective. No harm has ever been demonstrated. It would be impractical to regulate much less illegal."

194.    Despite this concern, the Blues eventually imposed restrictions on non-Blue business with the stated purpose of restraining competition. In an April 30, 2001 memorandum to the Blue Plans, BCBSA expressed concern about Blues competing under non-Blue brand names. According to BCBSA, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local Blue Plan." For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

195.    In addition to being an agreement to allocate geographic markets, the restrictions on non-Blue competition facilitate the Blues' monopsonization and exercise of market power by making sure that each Blue brings more members, on a branded basis, to negotiations with providers.

196.    The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition, in addition to the explicit agreements described above.

197.    The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership Standard.  For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Defendant's territory.  However, many of the Blues have entered into what they call "gentlemen's agreements" not to compete in those counties.  For

example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements.

198.    Other Blues have engaged in similar conduct to the detriment of providers, including Anthem's refusal to contract with hospitals in counties adjacent to Ohio, which is described below.

### The Blue Card and National Accounts Programs

199.    In the 1940s and 1950s, the Blues used the development of employment-based health benefits to advance their bargaining power. As the demand grew over the next few decades for insurance and servicing of benefit plans that covered the employees of a single employer across many states, the Blues found a way to use maintain and enhance that bargaining power and market share by accessing each other's provider networks, and sharing the benefit of any differentials they had obtained.

200.    During the early to mid-1990s as part of their overall agreement to restrict competition, the Defendants agreed to develop the Blue Card Program as part of their Inter-Plan and National Accounts Program.  Under the Blue Card/National Accounts Program, one, and only one, Defendant Blue may administer a national or multi-state employee benefit plan.  In that instance, the Defendant Blue is the Control Plan while the other Defendant Blues are Participating Plans.  The Defendant Blue where the national account is headquartered is the only Blue that may bid for the business of that national account unless that Defendant cedes the right to another Defendant, which is then the only Defendant that may bid for the business of the national account.  In other words, in this area and many others, the Defendants agree that they

will not compete.  The Defendants divide the proceeds derived from this anticompetitive scheme either through the Blue Card Program or through separate agreements they have entered into.

201.    All of the Blues are required to participate in the Blue Card program, through which they process claims by a provider in one Service Area on behalf of a patient whose Blue plan is based in another Service Area. Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan." Generally, when a provider treats a patient who is a member of a plan outside the provider's service area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays. The provider is paid based on the reimbursement rates or prices in his or her contract with the Host Plan, but in order to be paid, he or she must comply with the medical policy and other requirements of the Home Plan, to which he or she often does not have access.  As a result of the Blue Card system, Providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for Providers and the health care system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the Providers.

202.    All healthcare providers are required to participate in the Blue Card program as a condition of their participation with the Blue plan in their Service Area. As a result, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with the Blue in that Service Area.  Instead, the Home Plan pays the healthcare provider the discounted rate the Host Plan has imposed on the provider.  For example, many members of plans insured or administered by Defendants Empire, BCBS of Illinois and BCBS of Michigan spend time in Florida during the winter months.  Rather than

being permitted to negotiate prices with these Defendants, however, healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida. Moreover, the Blues do not allow health care providers to have an escape clause to allow them to opt-out of the national programs and contract separately with Blues.

203.    The Blue Card and National Accounts programs are thus agreements to fix prices. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including the Provider Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices. In 2002, BCBSA reported that in 2001, the Blue Card program saved $9 billion. This figure represents the reduction in payments to healthcare providers that the Blues were able to obtain by fixing prices.

204.    The Blues share the discounts they are able to impose through the Blue Card and National Accounts programs. In addition to an administrative fee that purports to cover the cost of processing claims through Blue Card, a standard Blue Card fee is the "access fee," which is a percentage of the Host Plan's discount that the Home Plan kicks back to the Host Plan. Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for fixing their prices. For its self-funded accounts, BCBS-AL bills access fees to the account as a cost of the medical claim, even though the access fee is not paid to the provider.

205.    The Blue Card program encourages the Blues to fix prices rather than compete, even in the limited contexts in which BCBSA Rules allow them to compete outside their Service Areas. Because of the discounts that the Blues receive through the Blue Card program, they can

lower their payments to providers in counties contiguous to their Service Areas by relying on Blue Card rather than negotiating and contracting with those providers directly.

206.    By way of example, since the 1980s, Blue Cross and Blue Shield of Alabama maintained agreements with healthcare providers, including hospitals, in contiguous counties of adjacent states such as Florida and Mississippi. These out-of-state hospitals were not subject to the same rules as the in-state Alabama hospitals, and were not required to submit the "Blue Cross Cost Study" that in-state Alabama hospitals are required to submit as part of their agreement with Blue Cross and Blue Shield of Alabama.  Therefore, Blue Cross and Blue Shield of Alabama could not force these out-of-state hospitals to accept the lower outpatient payment methodology that it imposed on Alabama hospitals.

207.    In 2013, Blue Cross and Blue Shield of Alabama terminated its contracts with all hospitals in contiguous counties. It ultimately terminated the contracts of twenty-nine hospitals in four states: Florida (nine hospitals), Georgia (five hospitals), Mississippi (nine hospitals), and Tennessee (six hospitals).  Each of these hospitals remained in network with its in-state Blue. But Blue Cross and Blue Shield of Alabama could still leverage the Blue Card program to maintain access to these hospitals for its enrollees.

208.    Blue Cross and Blue Shield of Alabama identified the "impetus" of the terminations as the significant reduction in payments it could make to these hospitals by taking advantage of the Blue Card program, rather than directly contracting with these hospitals.  This was true, even net of the "access fees" it would be required to pay to utilize the Blue Card program.

209.    In addition to lowering payments for providers, the national programs, including the Blue Card Program and the National Accounts Program, also impose numerous inefficiencies

and burdens on them.  While the amounts paid for medical services are dictated by the Host or Participating Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home or Control Plan.  The Home or Control Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area.  Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members.  For example, BlueCross BlueShield of South Carolina administers the benefit plan for employees of Winn Dixie Stores, many of whom live in Alabama and, accordingly, seek medical treatment here.  For these patients, BlueCross BlueShield of South Carolina is the Home or Control Plan, while BCBS-AL is the Host or Participating Plan.  BCBS-AL determines the price paid for services rendered by a healthcare provider in Alabama.  However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BlueCross BlueShield of South Carolina.  While the Alabama provider has access to the rules for preauthorization or pre-notification for BCBS-AL, because BlueCross BlueShield of South Carolina boycotts the Alabama providers from participating in its network as a part of its horizontal agreement with all the Blues, the provider does not have ready access to BlueCross BlueShield of South Carolina's rules.  In this example, the Alabama healthcare provider can and does innocently fail to comply with the rules of BlueCross BlueShield of South Carolina and be paid nothing by BlueCross BlueShield of South Carolina, not even receiving the discounted amount that would result from the BCBS Price Fixing Conspiracy.  When this happens, the healthcare provider has no recourse.  Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have

made no agreement with the Home Plan.  Moreover, the illustration includes only one Home or

Control Plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in

various plans that are insured or administered by multiple Blues other than the Blue in the

provider's Service Area. This is a longstanding problem in Alabama, where workers at U.S. Steel

were covered by Highmark, workers at Southern Company have been covered by Anthem, Wal-

Mart employees may be covered by Anthem, and Publix employees are covered by BlueCross

BlueShield of South Carolina.

210.    Further, Blues will even offer commercial health insurance across state lines to

healthcare providers, through national accounts or other programs, even where they will not

contract in their capacity as a healthcare provider    For example, at various times Defendant

HCSC has provided Blue Branded commercial health insurance for Tenet Healthcare, the parent

company of Brookwood Hospital. Despite this, because of Association rules, it is barred from

contracting directly with Brookwood Hospital for its healthcare services.  This is, of course,

because the arrangement allows BCBS-AL to use its combined market share to extract the

maximum discount possible from Brookwood and other hospitals.  This sort of approach is

common.

211.    Many Blues have different medical records requirements and timing for those

requirements that apply to providers including hospitals.  Hospitals find their bills being reduced

or denied because they comply with the Host or Participating Blue's requirements (those where

the hospital is located and where the hospital is in network) but not with the Control or Home

Blue's requirements.  Since the hospitals are not in network with the Control or Home Blue,

those hospitals do not have ready access to those medical records requirements.  In an effort to

address this highly inefficient process, hospitals in Florida, where there are many Blue Card and

National Accounts subscribers, set up weekly telephone calls with Blues to try to learn the requirements of each of the plans for submitting medical records and other coverage requirements.  The employees of the hospitals spent hours week after week for an extended time to try to learn those requirements.  They would obtain inconsistent and incomplete answers to their inquiries.  Despite spending significant resources of the hospitals to comply with the Blues' multiple coverage requirements, the hospitals continued to have claims reduced and denied when they innocently failed to comply with one of those requirements.

212.    The national programs including the Blue Card and National Accounts Programs are so inefficient that the Defendants have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's Service Area.  However, the Defendants use and abuse the adjacent county rule to reinforce each other's market power.  For example, when Highmark was attempting to force UPMC to accept lower reimbursement rates, UPMC asked Anthem Blue Cross of Ohio to contract with Harmot Hospital, which is in a county adjacent to Ohio.  Anthem Blue Cross of Ohio refused to have discussions about a contract with Harmot Hospital.  Plaintiffs allege that the refusal was part of a horizontal agreement under which the Defendant Blues attempt to reinforce each other's market power.

213.    To facilitate the Conspiracies, the Defendant Blues that are partners along with the BCBSA have established and own National Account Service Company L.L.C. ("NASCO"), which assists the Blues in processing claims involved in National Accounts and other claims.

214.    "In 1987 NASCO was formed through a partnership with major Blue Cross and Blue Shield Plans."  It has been engaged in activity "for some of the largest Blue Cross and Blue Shield Plans for over 20 years."  NASCO establishes "work groups composed of NASCO

associates and customers."  NASCO also works with the Blues to "ensure their compliance with Blue Cross and Blue Shield Association (BCBSA) mandates." http://www.nasco.com/PDFs/2010_MarketingBrochure.pdf.

215.   To facilitate the Conspiracies, numerous Blues and the BCBSA have also established Consortium Health Plans, Inc. ("CHP").  CHP describes itself as a "national coalition of 21 leading BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination, for the Blue System among national accounts..." and "help[s] its founding Blue Cross Blue Shield Plans position themselves as the preferred choice for national accounts," (http://www.consortiumhealthplans.com, last visited Nov. 8, 2016).  Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis.  The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

216.   For example, in a marketing brochure dated February 6, 2013 for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level.   In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-d4cb2f0a7b3f&groupId=10307, last visited Sept. 30, 2014.  The brochure further explains that

"[t]he ValueQuest data set contains claims and membership data for BCBS nationally.  The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

217.    Another brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP.  In this regard, the brochure makes the following claims, among others:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

http://www.questanalyticsgroup.com/pdf/ClaimsQuest_Brochure.pdf, last visited Sept. 30, 2014.

218.    Thus, CHP harnesses claims data for the Blues in every state, MSA and zip code in the country and, using that data, allows the Blues to impose deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

### *Protecting and Increasing "Differentials"*

219.    The Defendants have aggressively protected and increased their differentials. In August 1983, the Defendants had established two projects aimed at increasing the differentials or reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of BCBSA to the CEOs of the Blues, "Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact

in each Plan." The second project was "Project State Watch," which included Alabama and other states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the overall Blue System differential would be reduced by a reduction in the differential in those states, including Alabama. In other words, all the Blues benefited by acting together to decrease provider payments in each state.

220.    The Blues' efforts to establish, maintain, and increase their differentials continue to this day. The CHP brochure described above boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care." As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

(Emphasis added.)   Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors.  Indeed, as CHP itself says, ***"[n]o other carrier even comes close.***"   (Emphasis added.)   And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor.   According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

221.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in

lowering their costs.   http://www.questanalyticsgroup.com/pdf/ ClaimsQuest_Brochure.pdf, last
visited Sept. 14, 2014, at 6.

222.    Despite its claims that it is simply a marketing agent, CHP acts, with the
Association and the plans not just to measure and market discounts, but to conspire to actively
suppress the amounts paid to Providers in the name of "differentials."  CHP regularly meets with
the Association and with network contracting executives from plans to identify and develop
"action plans" for  "critical markets" to help with the Association's "corporate obj[ective]" of
reducing Provider reimbursement and increasing "discounts."   CHP's role is that of active
participant in facilitating the Blues conspiracies, by actively allowing them to collaborate to
reduce Provider reimbursements.

223.    Despite enjoying an advantage over its competitors in provider reimbursements,
the Blues have higher administrative fees for self-funded plans than its competitors, even before
accounting for the access fees the Blues charge as medical costs.

### Differences Between the Modern Blues and Other Insurers

224.    The Blues' anticompetitive agreements make them very different from other
insurers. If an insurer like UnitedHealthcare wants to establish a provider network, its value
proposition to a provider includes its ability to steer its enrollees to that provider. And a provider
who is thinking about leaving the network knows that the consequence is the inability to treat
UnitedHealthcare's enrollees on an in-network basis. Each Blue, on the other hand, brings not
only its own enrollees, but also the enrollees of every other Blue into negotiations with
providers. ("Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-
leave it basis.) And a provider who is thinking about leaving the local Blue's network knows that
the consequence is not just the inability to treat the local Blue's enrollees on an in-network basis,

but the inability to treat all of the Blues' enrollees on an in-network basis. Thus, the Blues are able to use leverage against providers that is unavailable to their competitors.

225.    In addition, the Blues operate less efficiently than their competitors. BCBS-AL, for example, uses a 25-year-old claims system, and the rules associated with Blue Card create confusion for providers in a way that does not exist for other major insurers.

### The Blues Agreement that Prohibits Defendants from Contracting with Providers in Other Blues' Service Areas Should be Enjoined, the BlueCard Program Should be Reformed to Create Competitive Market Conditions, and Blues Should be Allowed to Use Non-Blue Rental Networks to Supplement Their Provider Networks.

226.    The Defendants' agreement that they will not contract with providers in other Blues' service areas is obviously anticompetitive.  That agreement prevents the development of provider networks and competition among provider networks.  The agreement also prevents Blues from developing innovative and collaborative agreements with Providers that would be efficient, improve quality and lower health care costs.  The agreement also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts.  For example, Anthem, the first or second largest health insurer in the country, and HCSC, the fourth largest health insurer in the country, must each have national provider networks in order to compete for national accounts.

227.    The Blue Card Program reinforces the agreements that the Defendants have made not to compete and it provides the *quid pro quo* in terms of billions of dollars in payments that are made to the Blues.  The Blue Card Program is used largely in the administration of health care benefit plans including for national and regional employers.  Those employers pay the Blue Card access and administrative fees, and the Blues pocket those payments.  Currently, BCBS-AL is able to use its market power as the largest health insurer and administrator in Alabama to coerce healthcare providers in Alabama into participating in the Blue Card System.  In order to

remedy that coercion and abuse of market power, Providers should be allowed to opt-out of the Blue Card System with no threat of retaliation.  In the long run, that opt-out right will restore market condition and encourage the positive development of the Blue Card System so that it functions in as efficient a manner as possible.  To the extent that Providers wish to remain in the Blue Card Program, they can do so.  In order to correct the adverse effects that the Defendants have had on the market, the Court should impose an affirmative obligation on all Defendants to bargain in good faith with Providers who wish to negotiate with them, and maintain that obligation until the adverse effects of the Defendants' conduct have been fully remedied.

228.    In addition, the Blues' current prohibition against the use of non-Blue rental networks should be enjoined.  Other health insurers, including United, Aetna and Cigna used such rental networks to supplement their networks when necessary.  Consumers and Providers should have the ability to access such non-Blue rental networks for Blues in Alabama just as they do for other health insurers.

### Examples of Defendants' Restrictions on Competition

#### *Restricting Competition in Alabama*

229.    The history of Blue Cross and Blue Shield of Alabama shows how competition could have developed in Alabama but for the Blues' anticompetitive agreements.

230.    The National Labor Relations Act, which was enacted in 1935, and as ultimately interpreted provided the basis for the growth of employer-based health benefit plans. Health benefits for employees expanded enormously during World War II, as a method of increasing competition without increasing wages or salaries because of wage freezes. This expansion continued in the post-war years.

231.    During the period after World War II, Alabama was the most unionized state in the Southeast.  Some of the largest employers in the State were in the steel industry, and the workers in that industry were represented by the United Steelworkers of America.  After the United States Supreme Court and the National Labor Relations Board recognized fringe benefits including pensions and health care benefits as mandatory subjects of bargaining, in 1949 the United Steelworkers of America demanded that health care benefits be included in the new collective bargaining agreement.  After a strike, the steel industry agreed to include health care benefits in the collective bargaining agreement, and designated Blue Cross of Western Pennsylvania, now Highmark, as the entity to coordinate those benefits.  Because of the territorial restrictions that the Defendants had agreed to, Blue Cross of Western Pennsylvania would not provide those healthcare benefits to the many thousands of steelworkers in Alabama.  If it had been able to do so, Blue Cross of Western Pennsylvania could have become a major health insurer in Alabama, developed a provider network and even sold health insurance in the State to compete with Blue Cross and Blue Shield of Alabama.  Instead, Blue Cross and Blue Shield of Alabama used this event to become the dominant health insurer in the State of Alabama.

232.    In The History of Blue Cross and Blue Shield of Alabama, written by Clarence Joseph Vance and copyrighted in 1978 by Blue Cross and Blue Shield of Alabama, the following statement appears: "The enrollment in Alabama in 1950 of the U.S. Steelworkers was a progressive milestone; in terms of increasing enrollment. It was a major breakthrough. Heretofore, Blue Cross Plans had become conditioned to limit their markets to the white-collar workers . . ." Id. at 88–89.  "The first step toward national accounts business was taken when Abraham Oseroff convinced the U.S. Steel Corporation and the Congress of Industrial

Organizations in Pittsburgh that his Pittsburgh Plan could serve as a syndicate head.  Working with the Blue Cross Commission and with Mr. Thompson, the New York Plan's actuary, Mr. Oseroff put together the first syndicate, covering over 1 million steel workers, with an estimated 75,000 in Alabama" Id. at 98. As the book notes, this syndicate was still intact at the time of publication in 1978. "The Steel contract has been the most stable piece of business, both locally and nationally." Id.

233.    These "national accounts" were critical to Blue Cross of Alabama's growth. "Early in 1950, competing in the national market place with large commercial carriers became a crisis issue." Id. at 98.    However, the individual plans were ill equipped to do this on their own. "The locally autonomous Plans could not reply [sic] upon their loose confederation… ."

234.    Blue Cross and Blue Shield of Alabama experienced a similar increase in enrollment from other unionized industries.  For example, the auto workers at the Ford plant in Sheffield became enrolled with Blue Cross and Blue Shield of Alabama shortly before the Steelworkers, and they would have been covered by Defendant Blue Cross and Blue Shield of Michigan if it were not for the territorial restrictions agreed to by the Defendants. Thus, Blue Cross and Blue Shield of Michigan also would have become a meaningful competitor in Alabama if it were not for those restrictions.   The addition of the Steelworkers and other unionized workers to Blue Cross and Blue Shield of Alabama's rolls resulted in its fastest growth in history.   "The Corporation's enrollment at the end of the first decade (1946) had reached 160,000 members; however, at the end of the second decade (1947-56) enrollment has reached 668,000, or a 416 percent increase." Id. at 194–95.  As employee benefit plans expanded, BCBS-AL and the other Defendants used those plans and their anticompetitive system to expand their market shares and market power.

235.    Blue Cross and Blue Shield of Alabama also acted as a control plan for South Central Bell Telephone Company and International Paper's Southern Kraft Division, and aided other Defendants in developing their market shares and market power.

236.    Blue Cross and Blue Shield of Alabama's rapid growth in enrollment gave it increased market power when dealing with healthcare providers.   As the copyrighted history states, "while the U.S. Steel breakthrough was an enrollment boon, it also brought with it reimbursement problems." Id. at 89.   Blue Cross and Blue Shield of Alabama addressed those reimbursement problems by forcing hospitals in Alabama to accept a cost-based reimbursement system.   That system is unique and has resulted in hospitals in Alabama receiving among the lowest reimbursement rates in the country.   That system remains in place for hospitals in Alabama, and BCBSAL requires cost-based reimbursement for hospitals in Alabama each year including during years since 2008.

237.    Today, hundreds of thousands of enrollees of non-Alabama Blues live and work in Alabama. As of 2012, Defendant Anthem had approximately 121,000 enrollees in Alabama (and 127,000 as of 2015), Defendant Highmark had approximately 40,000, Defendant HCSC had approximately 94,000, Defendant Blue Cross and Blue Shield of Michigan had approximately 30,000, and Defendant BlueCross BlueShield of Tennessee had approximately 31,000 (and 35,000 as of 2015). Yet the Blues' rules prevent Alabama providers who treat these patients from negotiating with those Blues; instead, they must accept the low reimbursement rates imposed by BCBS-AL. Moreover, BCBS-AL is free to set its low rates with the knowledge that Anthem, HCSC, and other are prohibited from competing for the business of BCBS-AL's enrollees or negotiating with Alabama providers. BCBS-AL has taken advantage of its market power in a number of ways.

### *BCBS-AL Stifled Competition Promoted by the*
### *Alabama Health Care Council*

238.    In 1985, the CEOs of several major corporations, including Alabama Power, Drummond Company, and SouthTrust Bank, formed the Alabama Health Care Council as a non-profit entity to help Alabama corporations improve the quality and cost of health care.

239.    In September 1995, in response to rising health care costs in Alabama, the council solicited health insurance proposals. It received bids from over twenty companies, and ultimately narrowed the bids to United Healthcare of Alabama and HealthPartners of Alabama, the former insurance arm of then-Baptist Health System. BCBS-AL did not initially submit a bid in response to the council's solicitation.

240.    BCBS-AL stood to lose the business of approximately 60,000 employees if the members of the council contracted with another insurer.

241.    In an effort to maintain its market share and delay and block healthcare reforms in Alabama, BCBS-AL offered the council a twenty percent discount for the next three years, which the council accepted. Pursuant to its agreement with the council, BCBS-AL was further obligated to reduce the costs of health care for the council's members once the three-year guarantee expired by better managing the delivery of health care services and the administration of health benefit plans in Alabama.

242.    Effectuating a twenty percent savings for the council's members would have required BCBS-AL to significantly change its methods of managing the delivery of health care services and administering health benefit plans in Alabama. Instead of making these changes, BCBS-AL financed these discounts by relying on its hundreds of millions of dollars in surplus and increased charges to other consumers.

243.    As the three-year savings guarantee came to an end, the council's members learned that if they continued their relationship with BCBS-AL, their health care costs in the next year would increase by approximately thirty-five to forty-five percent.

244.    In September 1999, Drummond Company terminated its contract with BCBS-AL. Drummond subsequently obtained health coverage for its employees through Select Care.

245.    As a result of BCBS-AL's use of most-favored-nation clauses ("MFNs"), Drummond encountered significant problems in negotiating favorable rates with hospitals and physicians and establishing satisfactory hospital and physician networks. The best rates that hospitals generally were able to offer Drummond was 15 percent greater than the rates received by BCBS-AL. This example illustrates how BCBS-AL used MFN's to preserve its market power and insulate itself from competition.

246.    In May 2000, Drummond filed suit against BCBS-AL in the Northern District of Alabama, in part challenging its use of MFNs. See Drummond Co. v. Blue Cross & Blue Shield of Alabama, Civil Action No. CV-00-AR-1354-S.

247.    In August 2001, the parties settled the action. As part of the settlement agreement, BCBS-AL agreed to cease the use of MFNs. Since 2001, BCBS-AL has, however, engaged in similar conduct that allows it to obtain larger discounts from its providers than its competitors can obtain.

### BCBS-AL Uses Its Market Power to Extract Money from Providers Through "Tiering"

248.    BCBS-AL abuses its market power and the lack of competition in Alabama in other ways as well.

249.    In a further effort to depress prices paid to hospitals and gain greater "differentials" BCBS-AL began its Hospital Tiered Network Program in 2006. Their stated goal

was to "recognize hospitals that have taken action to improve healthcare quality and work with Blue Cross and Blue Shield of Alabama to reduce healthcare costs for our customers."

250.    In its Tiered Hospital Program, BCBS-AL ranks hospitals in various categories. BCBS-AL enrollees face higher out-of-pocket responsibility for treatment at hospitals that are ranked in lower tiers.

251.    Initially, the three primary categories of the Tiered Hospital criteria were fiscal, quality, and patient safety. BCBS-AL states in its program description that the program criteria is evaluated and enhanced each year in an effort to continually pursue high quality healthcare in the State of Alabama.  In 2010, BCBSAL added a fourth category of patient experience.

252.    The Tiered Hospital Program has been based on a scoring system that allowed for a maximum of 100 points divided between the categories. To be a Tier 1 hospital you had to score between 80 and 100.  For Tier 2 from 60 - 79 points and Tier 3, when there was a Tier 3 category, 59 or below

253.    Despite any claims about concerns about quality or safety, since inception, the Fiscal category has always been the primary driver of the tier a particular hospital was placed in, and that that fiscal component is always based upon the hospital's acceptance of terms that reduced the amounts or rates that BCBS-AL paid to the hospital. Through 2011, the sole criteria that had to be met to receive any points in the fiscal category was to continue an annual POF/ASC contract whose only purpose was to reduce reimbursement for the hospitals ambulatory surgery center and other ambulatory services. BCBS-AL has made clear that "[h]ospitals scoring high in this category have entered into financial arrangements with Blue Cross and Blue Shield of Alabama to provide the most favorable discounts for their services."

254.    In particular, the Fiscal category through at least 2010, required each hospital to accept a reduction in their reimbursement to receive 25 points if it accepted the lower contract reimbursement and zero points for that category if it did not.    Therefore, without "accepting" BCBS-AL's even lower fee schedule, a hospital could not qualify to be in Tier 1 in Alabama. A hospital could achieve every other point available under the Tiered Hospital Program and would still end up in Tier 2 if it refused to accept the lower reduced reimbursement from BCBS-AL.

255.    The Quality, Patient Safety and Patient Experience categories are all measured by standard measures which are largely achieved by all the hospitals in the state.  As shown above, quality, patient safety and patient experience are not what ultimately drive a hospital's tier.

256.    In the current iteration of the Hospital Tiered Network, a facility's rank is determined based on its "Costs."  A hospital's "costs" are compared to a particular percentage of Medicare and scored for tiering purposes. As with the earlier iterations, it impossible to achieve a Tier 1 ranking without meeting BCBS-AL's lower "cost" thresholds. BCBS-AL itself notes that the new method puts even "greater emphasis on cost."

257.    The new methodology placed 50% weight on "cost" with the thresholds of $ for "costs" under 130 percent of Medicare, $$ for "costs" between 130 and 140 percent of Medicare and $$$ for "costs" above 140 percent of Medicare. Hospitals in the state have sought information from BCBS-AL on how "costs" are determined but have been unable to match BCBS-AL's purported cost calculations or tie them off to the same Medicare percentages. BCBS-AL has refused to provide its internal calculations essentially treating them as a black box during the initial process.

258.    Further, BCBS-AL personnel have stated that the particular percentages of Medicare used for the "cost" thresholds are supported by a study or other work done for BCBS-

AL.  BCBS-AL refused to provide the basis for these particular percentages of Medicare as appropriate "cost" thresholds to the hospitals.  Plaintiffs requested these documents in discovery and were told no such studies exist.  Based on this, Provider Plaintiffs must conclude that there is no study that demonstrates that these percentages of Medicare are appropriate measures of costs. Therefore, these percentages of Medicare seem to be arbitrary thresholds designed to lower reimbursements paid by BCBS-AL or to extract payments from the hospitals as part of the Tiering process.

259.    Under the new method, 17 hospitals were pushed from Tier 1 to Tier 2.

260.    For instance, in 2016, UAB Hospital was placed in Tier 2. Since UAB Hospital is one of the premier and most advanced hospitals in the state, this relegation to a higher cost tier demonstrates that the quality of the facility is not the driving force behind BCBS-AL's Tier rankings

261.    Plaintiffs Jackson Medical Center, LLC; Evergreen Medical Center, LLC; and Crenshaw Community Hospital all were placed in Tier 2.

262.    In 2016, Mobile Infirmary was also placed in Tier 2 originally.  After negotiations with BCBS-AL, and after significant money was paid to BCBS-AL, in October 2016 was placed in Tier 1.

263.    In 2016, before the tiering decisions were made public, BCBS-AL told Decatur Morgan Hospital in Decatur that it would be Tier 2 when the rankings were released.  The parties attempted to reach an agreement on payments to Blue Cross that would allow Decatur Morgan to regain Tier 1 status.  Decatur Morgan and BCBS-AL were unable to reach an agreement. BCBS-AL took the tiering rankings public and pushed to the local media in Decatur that Decatur Morgan would be Tier 2 and patients would be subjected to higher patient responsibility at

Decatur Morgan in hope of driving Decatur Morgan to make a deal.  After the rankings were public, but before the tiering went into effect, Decatur Morgan and BCBS-AL reached an agreement whereby Decatur Morgan would pay BCBS-AL approximately 1.7 million dollars, and BCBS-AL would move Decatur Morgan back to Tier 1 status. Decatur Morgan was therefore moved back into Tier 1 before the new rankings went into effect.

264.    In addition to the general ability to force providers to continually lower costs, it is not clear to hospitals how BCBS-AL actually determines the "costs" its uses for tiering purposes or how it calculates the corresponding percentage of Medicare payment rates for purposes of the tiering exercise.  Hospitals have asked for information on the calculations that drive these cost measures but are not allowed to see or confirm how these costs measures are actually derived.  Essentially, the Tiering process is driven by a black box calculation that determines which hospitals will be favored for steerage by BCBS-AL.

265.    Further, under the tiering regime, BCBS-AL's initial cost determinations and Tier assignment are used to hold the Tier 2 hospital hostage.  In order to regain Tier 1 status, a "negotiation" unfolds where BCBS-AL extracts certain concessions either with respect to the costs a hospital reported in earlier years, or by reductions in forward-looking reimbursement rates.  In some cases, hospitals have been asked to cut checks of over a million dollars to BCBS-AL for cost adjustments from earlier years in order to regain their Tier 1 status.

266.    Being placed below Tier 1 is designed to cause extraordinary harm to a hospital. BCBS-AL acts to affirmatively steer patients away from these hospitals by imposing higher costs on enrollees and actively pushing its enrollees to Tier 1 Hospitals.  Thus, when faced with the prospect of losing large portions of their patient base, or paying the ransom, hospitals have no

choice but to accept lower rates and pay BCBS-AL so that they can continue to treat the high percentage of BCBS-AL enrollees in this state.

### BCBS-AL Lowers Hospital Reimbursements Through
### Onerous and Arbitrary "Cost Reporting" Requirements

267.     Along the same lines, BCBS-AL has required all participating hospitals to submit to cost reporting since 1957. This information has historically provided BCBSAL an informational competitive advantage over all other commercial insurers.   In addition, this reporting requirement introduced a barrier to entry in the sense that every hospital would refrain from negotiating a contract with another insurer since the related costs and revenues would be revealed to BCBSAL. Consequently, this cost reporting requirement acts, essentially, as a barrier to entry as well as a guarantee that BCBS-AL gets the best rates from hospitals in the State of Alabama.

268.     Regarding hospital outpatient services, BCBSAL pays each hospital a fixed percentage of its charges.  At the end of the year, the hospitals report their costs and BCBS-AL will either true up or true down the payments they made over the course of the year based not on the contracted rates but on the actual costs of the hospitals plus a fixed percentage (11%).

269.     Blue Cross then either takes money back from the hospital if it feels it got charged too much or pays, late, amounts due to a hospital that should have been paid previously.

270.     The process is time consuming, administratively inefficient, and difficult for the hospitals, often requiring them to submit to several rounds of auditing. From the hospitals' perspective, the process is costly and arbitrary, and BCBS-AL often relies on classifications of expenses that make no sense to the hospitals.  In the end, it often simply becomes another way for BCBS-AL to utilize its market power and drive provider reimbursements lower.

271.    With regard to hospital inpatient services, BCBSAL pays each hospital a fixed per diem, regardless of the type of procedure performed (i.e., diagnosis related group).  BCBSAL does not true up or down its payments for inpatient hospital stays. It does, however, change the per diem rates that it pays each hospital throughout the year. Plaintiffs are not aware of any other commercial health insurer in the country that requires hospitals to submit to this kind of cost reporting.  This cost reporting requirement is a remarkable showing of the market dominance BCBS-AL has when compared to other commercial health insurers and relative to providers, even hospitals with whom the Blue purport to have difficulty negotiating.

272.    In addition to these practices, BCBS-AL prohibits hospitals from using the rates that BCBS-AL pays in any other of the hospitals' contracts.

### *BCBS-AL Interfered with Competitive Bidding in Birmingham*

273.    BCBS-AL's interference with competitive bidding for health coverage for the City of Birmingham's employees is another illustration of BCBS-AL's use of its market dominance and political influence to obtain business which it would otherwise not have earned through fair competition and to exclude potential competition.

274.    In 2013, United Healthcare brought suit against the City of Birmingham, Alabama, alleging that the city wrongfully directed business away from United Healthcare to BCBS-AL. The lawsuit, *United Healthcare Services, Inc. v. City of Birmingham, Alabama*, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.), alleged that, following a bid process, United Healthcare emerged as the lowest responsible bidder for a contract managing the city's employee health coverage. However, in an effort to avoid losing subscribers and allowing United Healthcare to increase its market share in Alabama, BCBS-AL approached the city and offered to provide additional services. The city awarded the contract to BCBS-AL.

275.    A Jefferson County, Alabama Court sided with United Healthcare and determined that the city's actions violated Alabama's Competitive Bid Law. The Court ordered the city to restart the bid process and award the contract to the lowest responsible company.

### BCBS-AL Spends Heavily on Executive Compensation and Lobbying

276.    BCBS-AL's executives have profited handsomely from the lack of competition in Alabama. Prior to 2015, the compensation of BCBS-AL executives was publicly available through the Alabama Department of Insurance. In 2013, the last year for which information is available, the total compensation of top BCBS-AL executives was as follows: CEO and President Terry Kellogg, $4.84 million; Executive VP Timothy Kirkpatrick, $2.69 million; Chief Administrative Officer Timothy Vines, $1.9 million; Senior VP and Chief Marketing Officer Timothy Sexton, $1.7 million; Senior VP and CFO Cynthia Vice, $1.47 million; Senior VP and CIO Brian S. McGlaun, $1.45 million; Senior VP of Business Operations Dick Briggs III, $1.44 million; Senior VP of Health Care Networks Jeffrey Ingrum, $1.42 million; Senior VP of Enterprise Resources Vickie Saxon, $1.26 million; Senior VP and Chief Legal Officer Michael Patterson, $1.03 million.

277.    These amounts are inconsistent with BCBS-AL's status as a non-profit entity and suggest that its executives' decisions are motivated by potential personal gain rather than the benefit to BCBS-AL's customers. By point of comparison, BCBS-NC, also a nonprofit, has roughly 3.8 million customers compared to BCBS-AL's 3 million, and its 2013 annual revenue was $6.4 billion, compared to BCBS-AL's $4.1 billion 2013 annual revenue. In 2013, BCBS-NC's CEO, Brad Wilson, earned $2.9 million in total compensation.

278.    In recognition of this inconsistency, BCBS-AL lobbied in support of legislation aimed at keeping its executives' compensation out of the public record. In 2015, the Alabama

legislature amended Alabama Code 1975 § 27-2-24, designating the compensation of officers and employees of insurance companies confidential and privileged.

279.    The amendment was sponsored by Sen. Slade Blackwell. In 2013 and 2014, Blackwell received $53,250 in contributions from political action committees that in turn received $336,000 in contributions from BCBS-AL. BCBS-AL also makes payments to family members of legislators.

### Allowing and Restricting Competition Among the Blues

280.    Despite the Blues' portrayal of Service Areas as essential to the functioning of the "Blue System," historical experience has shown that the BCBSA has allowed competition between Blues, especially when doing so would avoid a court decision about whether Service Areas violate the antitrust laws. As in Pennsylvania, Ohio, and Maryland, BCBSA could allow competition, but it chooses not to.

#### *Allowing and Restricting Competition in Pennsylvania*

281.    The Blues refuse to contract in an adjacent Blue's Service Area when the refusal benefits that Blue's market power, as demonstrated recently by Anthem Blue Cross and Blue Shield of Ohio's refusal to contract with a UPMC hospital in a county in Pennsylvania that borders on Ohio.

282.    UPMC has developed a number of areas of health care where it has an outstanding reputation for excellence.  For example, well-known people from Alabama have gone to UPMC for liver transplants when they could have gone anywhere in the world for the procedure.  The Defendants' illegal Conspiracies will mean that when the contract between UPMC and Highmark terminates, other Blues including Blue Cross and Blue Shield of Alabama will not be permitted to enter into an in network relationship with UPMC, and the Blues'

subscribers will not have access to UPMC using in network coverage. But for the illegal Conspiracies, Blue Cross of Alabama and other Blues would be able to negotiate in network relationships with UPMC.

283.    In addition, there have been other side agreements not to compete. Highmark BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

284.    Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania Blue Shield established in 1986 after Independence rejected its offer to form a joint venture HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan (also an HMO), which Independence BC acquired in response to Keystone Health Plan East's entry into the market. In 1991, Independence BC and Pennsylvania Blue Shield agreed to combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO, Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East and Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern

Pennsylvania, despite being licensed to compete under the Blue Shield name and mark throughout Pennsylvania.

285.    The conduct of Highmark and IBC demonstrates that the noncompetition agreement remains in place, though it putatively expired in 2007.   Instead of entering the Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and Independence BC intended to merge.  After an exhaustive review by the Pennsylvania Insurance Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application. In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated that he was "prepared to disapprove this transaction because it would have lessened competition. . . to the detriment of the insurance buying public."

286.    Capital Blue Cross presented an expert report from Monica Noether, Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark and IBC would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark-IBC will possess is likely to be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark and IBC would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark has competed in the past with IBC, could have been competing with IBC since 1997 but for a ten year non-compete agreement between them, and, in my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with IBC in the future, especially given the absence of successful entry by other insurers."

- "Highmark has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to IBC and in cooperation with IBC through a joint operating agreement to offer indemnity insurance."

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania.  Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Health Care, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While health care services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do

business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, but **even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region."**

(emphasis added).

287.    Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern Pennsylvania.  This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania.  After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing.  For example, IBC now pays Highmark to process its provider claims.  By processing those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers.  In addition, Highmark Blue Shield has been involved in similar non-competition arrangements with other Pennsylvania Blues and has purchased Blue Cross of Northeastern Pennsylvania.

288.    In a large part of central Pennsylvania, Capital Blue Cross and Highmark Blue Shield compete.  In that area and in others where Blues compete including with separate Provider Networks, reimbursement rates or prices are higher.  The same would be true in Alabama if other

105

Defendants competed with BCBS-AL including with Provider Networks.  Capital Blue Cross has attempted to operate outside of its Service Area through its non-Blue branded for profit subsidiary, Avalon.  When Defendant Highmark developed a dispute with the largest provider in its Service Area, the University of Pittsburgh Medical Center (UPMC), Capital Blue Cross through Avalon attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-network basis.  Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this arrangement.  Defendant Highmark and Defendant BCBSA prevented competition from Defendant Capital in the Service Area of Highmark and Capital agreed to restrict its competition.  The efforts by Capital Blue Cross through its non-Blue Avalon demonstrate that if it were not for the agreement not to expand outside of each Blue's Service Area, Capital would be operating in the Highmark Service Area.

### *Allowing and Restricting Competition in Ohio*

289.    The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time.

290.    In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus. In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. *Blue Cross & Blue Shield Ass'n v.*

*Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the State of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

291.    In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

292.    In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

293.    Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by

1990. Likewise, healthy competition among the Blues could exist in Alabama but for the Blues' conspiracies.

294.    Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive service areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993, leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem Blue Cross and Blue Shield. The next year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. BCBSA refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended, as a result of the Blues' concerted conduct.

### Allowing and Restricting Competition in Maryland

295.    As it did in Ohio, BCBSA capitulated when its horizontal territorial allocation was challenged in Maryland, allowing two Blues to compete against each other statewide.

296.    As of 1984, BCBSA had divided Maryland between two Blues. Group Hospitalization and Medical Services, Inc. ("GHMSI") operated in the Prince George's County and Montgomery County suburbs of Washington, D.C., while Blue Cross and Blue Shield of Maryland, Inc. ("BCBSM") operated in the remainder of the state.

297.    The State of Maryland filed suit in the U.S. District Court for the District of Maryland against BCBSA, BCBSM, and GHI, alleging that their agreement to allocate territories

violates Section 1 of the Sherman Act, the same allegation that Plaintiffs have made in this case. *Maryland v. Blue Cross & Blue Shield Ass'n*, 620 F. Supp. 907 (D. Md. 1985). The defendants moved to dismiss Maryland's suit on the grounds that their agreement to allocate territory was exempt from antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C. § 1012. Maryland moved for summary judgment on the same issue. During discovery, BCBSM offered testimony that its marketing department expressed interest from time to time in marketing across the boundary separating it from GHMSI's territory, but its CEO determined not to do so in part because it was prohibited by BCBSM's agreement with BCBSA.

298.    The court denied the motion to dismiss and the motion for summary judgment. Describing the defendants' agreement as "horizontal market allocation among insurance companies," the court held that material disputes precluded a finding on whether the agreement constituted the "business of insurance" for purposes of the McCarran Ferguson Act.

299.    Later in the case, shortly before the court was scheduled to rule on whether the case should be tried on a per se theory or under the rule of reason, the defendants settled the case. BCBSA allowed BCBSM and GHMSI to compete with each other throughout the state of Maryland until the later of January 1, 1991 or the completion of the Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

300.    As in Ohio, competition was not fatal. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHI's core business was profitable in 1992. (GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such

as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.) BCBSM reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well. GHMSI and BCBSM both continued to exist until they merged in 1998 to become CareFirst. The Blues' experience in Maryland again demonstrates that healthy competition among the Blues could exist in Alabama but for the Blues' conspiracies.

### *Improper Use of Trademarks to Restrict Competition for Providers*

301.    It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act.  The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws.  The agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are per se violations of Section 1 of the Sherman Act.

302.    Competition among the Blues does not threaten their marks by creating confusion. In California, Washington, Idaho, Pennsylvania, and New York, the Blues currently compete using the Blue marks, without consumer confusion. A 1987 BCBSA internal memorandum noted that "Blue Cross of Washington and Alaska is actively competing against every other plan in the state. Not only has Blue Cross written a strategic plan which targets the Blue Shield Plans, but it has developed a full range of products to sell statewide. Yet, despite open competition, consumer confusion has remained minimal."

303.    Moreover, the Blues' enrollees carry membership cards that clearly identify the Blue that underwrites or administers that enrollee's plan. The Blues already allow hundreds of thousands of their Alabama enrollees to carry cards with the names of Anthem and other out-of-

state Blues, indicating that the Blues do not believe that the presence of a Blue outside its Service Area will create confusion.

304.    The Blues' well-established and widely utilized practice of "ceding" the right to be the Control Plan for National Accounts when doing so will ensure that an account is gained or retained by the Blue system belies their position that their exclusive Service Areas are necessary to protect their local trademarks.  For example, Blue Cross Blue Shield of Arkansas, which is the Control Plan for Wal-Mart, ceded substantial portions of the Wal-Mart business to both Blue Cross Blue Shield of Alabama and Blue Cross Blue Shield of Illinois to ensure that Wal-Mart remained a Blue account.  Similarly, Anthem ceded its General Electric business to Blue Cross Blue Shield of Alabama.  The Blues' practice of ceding national accounts demonstrates that consumer confusion does not result when a Blue plan other than the local Blue administers their health insurance plan.

305.    The possibility of confusion among the Blues is non-existent for Providers, who already deal with multiple Blues on a regular basis. If anything, allowing Blues to contract with Providers outside their Service Areas would reduce confusion. As described above, Providers must comply with the claim processing rules of Blues located outside their Service Area, often without easy access to those rules. If a Provider could contract with these Blues, they would be given those rules from the beginning of the contract and would likely have fewer claims denied for failure to follow the rules.

306.    The experience of BCBS-AL and North Mississippi Medical Center ("NMCC") further illustrates how the Blues' territorial allocation restrains competition for the services of healthcare providers and belies the Blues' arguments that their trademarks allow them to agree not to compete with each other.

307.    Beginning in the mid-1990s, BCBS-AL maintained a network agreement with NMCC.  This agreement was in place for almost a decade. BCBS-AL maintained the agreement for many years "because of the [hospital's] proximity to many of our customers."

308.    NMCC is located in Tupelo which is located in Lee County, Mississippi. Lee County is not contiguous with any other state and is located two counties in from Alabama. BCBS-AL maintained this contract for several years even though it was not a "contiguous county" contract as allowed by the Blue Cross rules.  BCBS-AL marketed this agreement to its North and West Alabama insureds who wanted to be able to seek treatment and the more convenient facility in Tupelo.



309.    In late 2003, BCBS-MS and NMCC were engaged in heated discussions over NMCC's network agreement.  On November 20, 2003, did not renew its agreement with BCBS-MS in response to BCBS-MS's request for reimbursement rates which amounted to "excessive

discounts." The non-renewal of this agreement did not affect NMCC's stand-alone contract with BCBS-AL in and of itself.

310.    On the same day, BCBS-MS's CEO Richard J. Hale wrote to Roger G. Wilson, the General Counsel and Corporate Secretary of the BCBSA, and informed him that BCBS-AL's contract with NMCC was not in compliance with BCBSA Brand Regulations on "Contiguous Area" contracting.  BCBS-MS indicated that it had been aware of the contract for some time, but had not objected until now.

311.    In Mr. Hale's letter, he noted that the contract violated BCBSA Brand Regulation 4.7 and 4.8 because NMCC was not located in a contiguous area to BCBS-AL's service area.

312.    In internal correspondence, BCBS-MS made clear to BCBS-AL that its contract with BCBS-MS was "hurting" BCBS-MS's "bargaining position" with NMCC and was likely to result in less favorable contract for BCBS-MS.  Thus, BCBS-MS had to enforce the BCBSA Brand Regulations not because it was concerned about the marks or the brand, but because competition from BCBS-AL was empowering NMCC and hurting BCBS-MS.

313.    In September 2004, and at the behest of the BCBSA and BCBS-MS, BCBS-AL was forced to terminate its agreement with NMCC and any other affiliated Lee County, MS providers.  In correspondence with the hospital, BCBS-AL indicated that the BCBSA rules and not any unhappiness or disagreement with NMCC was the reason for the contract termination.

314.    The loss of this contract and competition from BCBS-AL not only hurt NMCC, but its hurt BCBS-AL's own customers who were now subject to higher rates and patient responsibility amounts due to NMCC's out-of-network status with BCBS-AL.

315.    Not surprisingly, after BCBS-AL was forced to terminate its agreement, BCBS-MS and NMCC reached a new network agreement.

316.    In summary, the Blues observe each other's trademark rights only when it is beneficial to them. When the Blues find it convenient or profitable, they do not enforce their trademark rights.

### The BCBS Market Allocation Conspiracy

317.    As described above, Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area.  Accordingly, these restrictions insulate each Defendant from competition by other Blues in each of their respective geographic Service Areas, and prevent providers from contracting with Blues in other Service Areas.  These restrictions have no economic justification other than protecting Defendants from competition.

318.    Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws.  Defendants pay in-network providers directly pursuant to provider agreements.  Because of Defendants' market power and access to the more than one hundred million enrollees of the Blues through the national programs, providers wishing to join the Blue network must accept lower reimbursement rates.  In many markets doctors and other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

319.    Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions.  The likelihood of increased competition is demonstrated in several ways.  First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition.  If there were no likelihood of competition, the restrictions would have been unnecessary.  In fact, as set forth

above, the restrictions did not initially address competition by non-Blue businesses owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well.  Second, in certain portions of five states, limited competition among two Defendants has been permitted.  For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California.  Likewise, Highmark and Capital compete in Pennsylvania, with both operating effectively and successfully.  In fact, the combined market share of Highmark and Capital is comparable to the market share of many individual Blues.  The Blue Cross and the Blue Shield entities also compete in Washington and Idaho without any injury to their trademarks or trade names.  Obviously, these markets are far from competitive due to the agreements of the other Defendants not to compete in these Service Areas.  However, this competition demonstrates that competition among Blue Cross and Blue Shield licensees is not only possible but, in fact, does not undermine the Blue brand or trademark.  Third, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues.  For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states (under the name Anthem).  Prior to its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states.  Undoubtedly, absent the current restrictions, Anthem would readily compete in additional Service Areas and, in all likelihood, would compete nationally.  Other Defendants, including HCSC, have, in fact, recently expanded into other areas and, in all likelihood, would compete nationally but for the restrictions described in this complaint.  Fourth, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic

areas and states.  For example, Anthem has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup.  Anthem also operates Caremore Centers in Arizona despite the fact that Anthem is not the Blue Cross Blue Shield licensee in Arizona.  In addition, Defendant Blue Cross of Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services.  Other Blues have likewise expanded into other Service Areas in a similar manner.  Of course, these expansions are currently extremely limited by the restrictions on competition.  Fifth, the Blues' practice of "ceding" accounts, as well as their history of informally competing for National Accounts and accounts located in border areas, which the Association has attempted to eliminate by pressuring the Blues to work together through joint ventures and similar arrangements rather than compete, shows that they are ready and willing to do business outside their service areas when they are permitted to do so.  While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for health care services.

320.    Internally, the Blues have noted that Blue on Blue Competition has exactly the market effect that the Providers have noted. In particular, at least one Blue noted that in areas where more than one Blue competes "it is very difficult to obtain or maintain market share with "premium" pricing levels" and that such competition creates "enormous downward pressure on premium price levels, and upward pressure on provider contracting."

321.    Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas.  The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for health care services.

322.     The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination."  If a Member's license and membership are terminated, it loses the use of the Blue brands, which BCBSA admits on its website are "the most recognized in the health care industry."  In addition, in the event of termination, a plan must pay a fee to BCBSA.  According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

323.     Defendants' agreements to limit competition and not contract with providers based on geographic Service Areas are referred to in this complaint as the "BCBS Market Allocation Conspiracy."

324.     The BCBS Market Allocation Conspiracy continues to this day and will continue into the future if the Court does not issue injunctive relief enjoining the conspiracy.

325.     In an effort to enhance its market power and the market power of the Blues in general, Anthem attempted to purchase Cigna, one of the largest health insurance companies in the country and one of only four companies that competes in the administration of national accounts.  After Anthem entered into the agreement with Cigna, the CEO of Anthem met with CEOs of various other Defendants in a private room in the luxurious Peninsula Hotel in Chicago, Illinois.  In those private meetings, various Defendants conspired and developed a "Blue Bias Strategy" for the implementation of the agreed merger of Anthem and Cigna.  The merger as planned by Anthem and its conspiring Blue Plans was enjoined because it would have been anti-competitive.

### The BCBS Price Fixing and Boycott Conspiracy

326.    As a result of the Market Allocation Conspiracy, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area.  As described above, Defendants have reached a horizontal agreement and implemented a Price Fixing and Boycott Conspiracy through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues.  The horizontal Conspiracy also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area.  Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members.  Those national programs include: a) Transfer Program; b) Inter-Plan Teleprocessing System (ITS); c) Blue Card Program; d) National Accounts Programs; e) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and f) Inter-Plan Medicare Advantage Program.

327.    The Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with providers outside of their Service Areas.  In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

328.    Defendants achieved the Price Fixing and Boycott Conspiracy by agreeing that all Defendants would participate in the national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.

329.    The Defendant Blues implement the Conspiracy collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented.  The

118

National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

330.    Each of the Defendant Blues either has market power or has otherwise taken anticompetitive action in furtherance of gaining market power.  Through the national programs the Defendant Blues control more than one hundred million patients, something no other health insurance company has access to.  These more than one hundred million patients provide the Defendant Blues a substitute for market power when Defendant Blues are dealing with providers.  In fact, in many places providers treat more patients through the national programs than through the direct subscribers of the local Defendant Blue.  One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of Blue Cross and Blue Shield of North Carolina.  When Blue Cross and Blue Shield of North Carolina negotiates with providers in central North Carolina, it uses the many patients in the national programs (which expand its bargaining power and effective market share) to obtain rates that are below competitive rates, and remain low.

331.    The national programs including the Blue Card and National Accounts Programs are implemented in a horizontal manner.  For example, when a hospital in east Alabama billed other Defendant Blues directly for services provided to their subscribers, those Blues, including Blue Cross of Minnesota paid for those services at the rates that it normally pays, which are higher than the rates paid by Blue Cross of Alabama.  When Blue Cross of Alabama learned of those payments, it then recouped the difference between those two rates.  Based on information and belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped under the procedures established by the Defendant Blues on the IPPC.  Also based on information and belief, Plaintiffs allege that in making the recoupments, Blue Cross of Alabama

119

was following the procedures established by the Defendant Blues through the IPPC to enforce the price fixing conspiracy.

332.    When one Blue has a contract dispute or issue with a healthcare provider the other Blues, as independent horizontal conspirators and as horizontal conspirators through the Defendant Association, act to reinforce the market power of each of the Blues.  In the proceeding brought by Plaintiff Dr. Cain when Blue Cross and Blue Shield of Kansas retaliated against her for being a class representative and attempted to terminate her from being a participating physician after 16 years of service, Blue Cross and Blue Shield of Kansas City then refused to allow her into its Blue branded network.  When Highmark refused to pay the University of Pittsburgh Medical Center ("UPMC") reasonable rates and instead was going to allow its contract with UPMC to expire, UPMC, one of the leading medical centers in the world, wrote to Blues throughout the country, requesting that they separately contract with UPMC.  Some of the Blues, including Blue Cross of Alabama and Anthem Blue Cross of New Hampshire, responded directly and refused to negotiate.  At the same time, the Defendant Association coordinated responses for a number of other Blues, and the Association communicated the refusal to negotiate for those other Blues.  Other healthcare providers including one or more hospitals in North Carolina have attempted to negotiate contracts with Defendant Blues in other states but have received refusals from those Blues, while Blue Cross and Blue Shield of North Carolina continues to reimburse at subcompetitive rates.

333.    Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area.  Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive

absent Defendants' agreement to fix prices.  The Price Fixing Conspiracy is a per se violation of Section 1 of the Sherman Act.  It is also a violation under a quick look or rule of reason analysis.

334.    As a result of their Price Fixing and Boycott Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year.  These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

335.    The Price Fixing and Boycott Conspiracy facilitates the Blues' monopsonization and exercise of market power by increasing the volume of patients each Blue brings to its negotiations with providers. A provider who does not accept the local Blue's terms loses the ability to treat on an in-network basis not only that Blue's enrollees, but all Blues' enrollees.

336.    The Blues' Price Fixing and Boycott Conspiracy does not constitute a joint purchasing agreement. The Defendants have already denied that they are engaged in joint purchasing. (Doc. No. 120 at 42–43.) Moreover, the Blues' model, in which the Home Plan pays only the rate agreed to by the provider and the Home Plan, is naked price-fixing, not joint purchasing. As the Department of Justice and Federal Trade Commission explained in their 1996 publication Statements of Antitrust Enforcement Policy in Health Care, "[a]n agreement among purchasers that simply fixes the price that each purchaser will pay or offer to pay for a product or service is not a legitimate joint purchasing arrangement and is a per se antitrust violation."

337.    Even if the Blues were engaged in joint purchasing, which they are not, their activity would not fall within the "safety zone" that the DOJ and FTC have established in the context of joint purchasing arrangements among health care providers. The DOJ and the FTC have stated that they "will not challenge, absent extraordinary circumstances, any joint purchasing arrangement among health care providers where two conditions are present: (1) the

purchases account for less than 35 percent of the total sales of the purchased product or service in the relevant market; and (2) the cost of the products and services purchased jointly accounts for less than 20 percent of the total revenues from all products or services sold by each competing participant in the joint purchasing arrangement." The following section of this Complaint lists dozens of markets in which the purchases among the Blues account for more than 35 percent of the market. And the cost of services purchased jointly would account for far more than 20 percent of each Host Plan's revenues, and possibly for some Home Plans as well.

338.    The Blues' model also has none of the safeguards that the DOJ and FTC have identified as mitigating concerns associated with joint purchasing. "First, antitrust concern is lessened if members are not required to use the arrangement for all their purchases of a particular product or service." The Blues are required to use the Blue Card program for all purchases of health care services from providers with who their do not have a contract. "Second, where negotiations are conducted on behalf of the joint purchasing arrangement by an independent employee or agent who is not also an employee of a participant, antitrust risk is lowered." The Blues do not do this. "Third, the likelihood of anticompetitive communications is lessened where communications between the purchasing group and each individual participant are kept confidential, and not discussed with, or disseminated to, other participants." Because the Blues do not use a purchasing group, but instead extend the Host Plan's pricing to all Home Plans, this safeguard does not apply.

### Allegations Related to the Rule of Reason Claims

339.    The Defendant Blues have market power in many markets over prices or payment rates for healthcare providers.  Even in markets where Defendant Blues do not have high market concentrations, they have market power or have otherwise exploited anticompetitive actions,

through the more than one hundred million subscribers of Blues involved in the Inter-Plan or national programs. This access provides market power beyond what might be suggested by the local enrollment share.

340. This case involves a number of product markets in which the Defendants participate. One is the market for the sale of commercial healthcare financing services (excluding Medicare Advantage and managed Medicaid), which includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified. The market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, including access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market. This relevant product market can be described as the market for the sale of commercial health insurance and includes both fully insured plans and Administrative Service Only (ASO) plans. The purchasers of commercial health insurance do not have reasonable alternatives, as described in more detail in Paragraphs 341–346. Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees. Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance. For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price, or SSNIP.

The number of employers or other groups substituting away from commercial health insurance is likely to be insufficient to make the SSNIP unprofitable.

341.    Within the market for the sale of commercial health insurance, the Defendants participate in a number of submarkets. These submarkets are alleged in the alternative to be relevant product markets for purposes of Provider Plaintiffs' claims.

342.    The first submarket is the sale of commercial health insurance to national accounts with 5,000 employees or more, who are spread over more than one state. The relevant submarket can be described as the sale of commercial health insurance to these national accounts and includes both fully-insured plans and ASO plans. There is no reasonable substitute for this product. Large multistate employers have unique needs when seeking commercial health insurance for their employees. They desire a national network, a high degree of plan customization, and sophisticated claims administration, customer service, and data reporting. If faced with a SSNIP, a national account would have only two alternatives: self-supply by handling all aspects of the insurance product themselves, or forgo the purchase of commercial health insurance altogether. Neither is a reasonable substitute. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP. Because other insurance products, such as those without national networks, do not meet the unique needs of national accounts, the substitution between commercial health insurance for national accounts and other health insurance products is low, as reflected in measures such as a low cross elasticity of demand. Moreover, "national account" is a well-understood term in the health insurance industry. Insurance brokers and benefits consultants generally consider national accounts to constitute a separate line of business. Many of the largest insurers in the country, including Defendant Anthem, manage national accounts separately from

their other business. Cigna and Defendant Anthem both use 5,000 employees as the threshold for defining national accounts, and that figure is considered to be reasonable by insurance brokers and benefits consultants.

343.    The second submarket is the sale of commercial health insurance to large group employers. The relevant submarket can be described as the sale of commercial health insurance to large group employers and includes both fully insured plans and ASO plans. "Large group" is defined as an employer with more than 50 employees. This is the threshold established by the Affordable Care Act for "large employers." 42 U.S.C. § 18024(b)(1). Although the Affordable Care Act gives states the option to change this threshold to 100 employees, Alabama has not done so. There is some overlap between this submarket and the submarket for the sale of commercial health insurance to national accounts. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. Large group insurance is subject to less stringent regulation, and it permits more customization and differentiation. Insurers can profitably target large groups—in other words, engage in price discrimination—because they can easily identify large groups; prices for large-group products are negotiated individually; and arbitrage is impossible. There are no reasonable substitutes for commercial health insurance sold to large groups. A large group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) somehow morph into small groups. Forgoing health insurance is not a reasonable substitute because virtually all large employers offer health coverage to their employees. Handling all aspects of the insurance product is impractical. And large groups are not in a

position to reduce their numbers of benefits-eligible employees below state-law thresholds. In other words, the substitution between large group insurance and other healthcare financing options is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market would likely raise prices above competitive levels by imposing at least a SSNIP.

344.    The third submarket is the sale of commercial health insurance to small group employers. The relevant submarket can be described as the sale of commercial health insurance to small group employers and includes both fully insured plans and ASO plans. "Small group" is defined as an employer with 50 employees or fewer. This is the threshold established by the Affordable Care Act for "small employers." 42 U.S.C. § 18024(b)(2). Although the Affordable Care Act gives states the option to change this threshold to 100 employees, Alabama has not done so. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. There are no reasonable substitutes for small group insurance. A small group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) hire enough new employees to become a large group. Forgoing health coverage is not a reasonable substitute because health coverage is considered to be an important benefit. Handling all aspects of the insurance product is impractical. And hiring more employees for the sole purpose of being able to purchase different insurance is impractical. In other words, the substitution between small group insurance and other healthcare financing options is low, as reflected in measures such as a

low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP.

345.    For the relevant product markets described above, the State of Alabama is a relevant geographic market.  Sellers of commercial health insurance compete for the business of employers, in part, by offering attractive provider networks in the geographic areas where employers' employees live and work.  Individuals tend to get their healthcare services in locations near to where they live and work.  If the hypothetical monopolist of commercial health insurance in Alabama were to implement a SSNIP, employers in Alabama would not substitute commercial health insurance in other states because their employees in Alabama value access to providers in Alabama.  For employers in Alabama, there are no reasonable substitutes to commercial health insurance in Alabama.  Further, in response to a SSNIP, employers will not move their employees to other states.  In other words, the substitution between commercial health insurance in Alabama and commercial health insurance outside Alabama is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in the State of Alabama would likely increase prices above competitive levels by imposing at least a SSNIP.

346.    In the alternative, for the relevant product markets described above, Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. "Core-Based Statistical Areas" is a term used by the United States Office of Management and Budget to encompass Metropolitan Statistical Areas and Micropolitan Statistical Areas. Metropolitan Statistical Areas especially are used in the ordinary course of business in the insurance industry when examining local markets. Defining markets for commercial health insurance as local is consistent with the desire of employers to

provide health plans with networks of local providers, specifically providers located near where their employees live and work. In other words, the substitution between commercial health insurance in an employer's local area and commercial health insurance outside the employer's local area is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, likely would increase prices above competitive levels by imposing at least a SSNIP.

347.    In addition to the market for commercial health insurance, the Defendants participate in the market for the purchase of goods and services from healthcare providers. Outside of payments by the government, the vast majority of those goods and services are paid through or by health insurance companies, with the 36 independent Blues being the largest collection of those companies. Of the goods and services of healthcare providers that are paid for by health insurance companies, the vast majority are provided through in-network contracts.

348.    The purchase of goods and services from healthcare providers by commercial buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid) is a relevant product market. Prescription drugs are excluded from this relevant market because they are largely purchased indirectly, through pharmacy benefit managers. These commercial buyers are the companies in the business of selling commercial health insurance or administering commercial health plans for private employers or other groups. These companies have separate business units dedicated to contracting for the purchase of goods and services from healthcare providers. For healthcare providers, there is no reasonable alternative to contracting with these commercial buyers in order to be in-network providers for the health plans sold to private employers or groups. Sellers of healthcare goods and services are

not in a position to forgo sales to commercial buyers, in favor of patients who pay out of pocket, a group that essentially does not exist. Nor can they obtain enough Medicare or Medicaid patients, insured either under the government's traditional programs or managed care programs, to replace the volume they would lose from dropping commercial insurance. Further, the prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are lower than the prices paid for the commercial health plans of private employers or groups. In other words, for providers, the substitution between commercial buyers and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in this market likely would lower prices paid to providers below competitive levels by imposing at least a small but significant and non-transitory reduction in price (SSNRP). The prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are different than the prices paid for the commercial health plans of private employers or groups. Also some healthcare providers have separate contracts for Medicare Advantage and managed Medicaid, and some insurers have separate contracting teams for these products.

349.    This market need not be segmented by the type of provider at issue. Healthcare providers participate in what is known as two-stage competition; first they compete for inclusion in the provider networks of insurers' plans, and then they compete for patients within a plan. This market relates to the first stage of that competition. For a healthcare provider in Alabama, the fundamental question in defining this product market is not, "Who will my patients be?" but "Who are the payors with whom I can contract?" In Alabama, where the Blues combine to make the vast majority of commercial insurance payments, the answer is the same, regardless of who the provider is—the Blues, the few non-Blue commercial insurers with a small presence in the

state, and government programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid. All providers, regardless of their type, face these options. Moreover, multiple types of providers can form a "cluster market," a concept widely accepted in healthcare antitrust cases and scholarly economic analyses.

350.    In the alternative, three submarkets within this market are relevant product markets. These are the purchase of goods and services from healthcare professionals, the purchase of goods and services from healthcare facilities, and the purchase of durable medical equipment (DME), all by commercial buyers of healthcare goods and services who are the companies in the business of selling commercial health insurance or administering commercial health plans (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid). The submarket for DME is limited to DME provided to Alabama residents. Practical indicia support the segmentation into three submarkets. For example, the industry recognizes distinctions among healthcare professional services, healthcare facility services, and DME, and insurers often differ in the reimbursement methodologies they employ for each of these groups. For example, many commercial buyers reimburse healthcare facilities for inpatient services based on diagnosis-related group codes instead of paying for each good or service individually. Commercial buyers' contracting teams and processes also differ among these submarkets. Nonetheless, providers of healthcare professional services and providers of healthcare facility services face the same options for the purchase of their goods and services described above in Paragraph 347-349. As a result, in each of these submarkets, the substitution between commercial insurance and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical

monopsonist in these submarkets would likely lower prices paid to providers below competitive levels by imposing at least a SSNRP.

351.    For the relevant product markets described in Paragraphs 342 to 350, other than DME, the State of Alabama is a relevant geographic market.  Healthcare providers, who have built their patient base and have invested in physical assets located in Alabama, are unlikely to respond to a SSNRP by moving their practice out of the state. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the State of Alabama would likely reduce prices below competitive levels by imposing at least a SSNRP.

352.    In the alternative, for the relevant product markets described in Paragraphs 342 to 350 (other than the market for DME), Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. Healthcare professionals and healthcare facilities usually provide services to patients living or working in relatively close proximity to their offices or other facilities.  Healthcare professionals and healthcare facilities have invested in physical capital in their local geographic areas and invested in their human capital (reputation and referral patterns) that is specific to their local geographic areas. Therefore, they are unlikely to respond to a SSNRP by moving their practice out of their local area. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because BCBS-AL has market power throughout Alabama, and Alabama providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the provider's local area makes little difference unless the provider is willing to leave the state entirely. In other words, in the product markets for the purchase of healthcare services, the substitution between commercial buyers in the local geographic markets identified above and commercial buyers

outside the local geographic markets identified above is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the geographic markets identified above would likely reduce prices below competitive levels by imposing at least a SSNRP.

353.   In the alternative, for the product market defined as the purchase of goods and services from healthcare facilities by commercial buyers (excluding prescription drugs their purchases for Medicare Advantage and managed Medicaid), Dartmouth Atlas Hospital Referral Regions and Dartmouth Atlas Hospital Service Areas are relevant geographic markets. The Dartmouth Atlas of Health Care is produced by the Dartmouth Institute for Health Policy and Clinical Practice. Hospital Referral Regions represent regional health care markets for tertiary medical care that generally requires the services of a major referral center. Hospital Service Areas are local health care markets for hospital care. Healthcare facilities, including hospitals, treat patients from these areas and have invested in physical capital and built goodwill in these areas. Therefore, they are unlikely to respond to a SSNRP by moving their facilities. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because BCBS-AL has market power throughout Alabama, and Alabama providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the facility's Hospital Referral Region or Hospital Service Area makes little difference unless the facility is willing to leave the state entirely. In other words, the substitution in the relevant product markets between commercial buyers in these geographic markets and commercial buyers outside these geographic markets is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a

profit-maximizing hypothetical monopsonist in this product markets in these geographic markets would likely reduce prices below competitive levels by imposing at least a SSNRP.

354. Because DME can be shipped across state lines, the geographic market for DME is national.

355. BCBS-AL's market power with respect to DME shipped to Alabama residents, however, is high because of the Blues' geographic market allocation and BCBS-AL's practice of offering contracts to DME providers that cover only shipments made from Alabama (or possibly from a contiguous county).

356. The Provider Plaintiffs reserve the right to further refine their definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

357. Defendant Blue Cross and Blue Shield of Alabama has market power throughout the State of Alabama in the market for the sale of commercial health insurance and in every geographic area within Alabama. In addition to the submarkets alleged above, BBS-AL also has an overwhelming share of the number of Alabamians with individual insurance policies, which further increases its market power over providers. It also has market power in the State of Alabama and the markets in which it is a purchaser, which are described above. In Alabama, BCBS-AL's market share in the entire state was 86% in the 2013 study and 83% in the 2016 study. Its lowest market share is in the Mobile Metropolitan Statistical Area ("MSA"): 82% in the 2013 study and 78% in the 2016 study. Its highest market share is in the Gadsden MSA: 94% in the 2013 study and 90% in the 2016 study. In addition, BCBS-AL has market power and market share between 85% and 91% (2013 study) and 81% and 88% (2016 study) of the market in the Anniston-Oxford, Auburn-Opelika, Birmingham-Hoover, Decatur, Dothan, Florence,

Huntsville, Montgomery and Tuscaloosa MSAs. According to a 2011 report for BCBS-AL by the consulting firm Milliman, BCBS-AL's statewide market share was 89.8% for individual policies, 97.2% for small groups, and 91.6% for large groups. Because the market in Alabama is so concentrated, the Herfindahl–Hirschman Index for Alabama is 7,531 (2013 study) or 6,914 (2016 study). By comparison, the United States Department of Justice considers a market to be highly concentrated when its Herfindahl–Hirschman Index exceeds 1,800.

358.    As described above, the Blues have more enrollees than any health insurance or managed-care company in the country.  Two of the four largest health insurance companies in the country, four of the largest ten, and 15 of the largest 25 are Blues.  Attachment A is a listing of the market share of the top four and top eight health insurance companies by state from 2004 through 2014 as reported by the National Association of Insurance Commissioners ("NAIC").   Evidence will be introduced that shows Anthem is prevented from crossing the Georgia line to compete in Alabama, and other empirical evidence is consistent with all the other Blues agreeing not to compete in Alabama in health insurance markets as well.  If individual Blue plans were allowed to enter and compete, the market share for the largest four health insurance companies in Alabama would likely become much less. Anthem and HCSC are already the third and fourth largest insurers in Alabama by covered lives (primarily because of their National Accounts), and they would be able to market their products directly to Alabama employers, and negotiate with Alabama providers, but for the Blues' conspiracies.  It would also be expected that market power for any one company would diminish.  Evidence will show that HCSC is prevented from crossing the Illinois state line to compete in Indiana and prevents Anthem from crossing the Indiana state line to compete in Illinois.  Anthem also follows the same policy in other States including in Alabama, while it gets the benefit of the subcompetitive

rates that BCBS-AL pays to Providers.  If individual Blue plans were allowed to enter and compete, the market share for the four largest health insurance companies in Illinois and Indiana would by definition fall below 80%.  The HHI Market Concentration Index calculated from the NAIC data places many states in the highly concentrated range based upon ratios used by the United States Department of Justice.  But for the Blues' Market Allocation Conspiracy, the market shares of the top four health insurance companies, the market shares for the top eight insurance companies, and the HHI indices would likely be lower in every state.

359.    Having fewer competitors in any market generally gives the players in that market more access to market power, and a greater ability to use market power, all else being equal.

360.    The Blues engage in a number of anticompetitive practices to increase their market power and to ensure that any competitors that do exist are marginalized or is unable to effectively compete.  Through the conspiracies alleged in this complaint, the Blues have exclusive access to more than one hundred million subscribers of all the conspiring Blues.  The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

361.    As demonstrated in the preliminary injunction proceeding for Dr. Cain, healthcare providers have essentially no choice but to be part of the networks of the Blues in order to remain in business.  The Blues have a general policy of refusing to honor assignments from subscribers to providers as a part of their overall effort to coerce providers to be in network.  The Blues also structure and implement out of network benefits for subscribers in a way that discourages them from using those benefits.  The Blues either eliminate or cap out of network benefits so that it costs subscribers significantly more to use their out of network benefits.  If

Providers attempt to limit the out of pocket costs of subscribers who use their out of network benefits, the Blues retaliate against those Providers.  When Providers believe their patients are better served by using an out of network facility, the Blues retaliate by threatening to terminate the Providers from the Blue networks.

362.    As Dr. Noether described in the submission by Defendant Capital Blue Cross, there are significant barriers to entry for the health care financing market and therefore to be a payor for healthcare goods, services and facilities in the markets where prices are determined for healthcare providers.  One of the barriers is the development of a provider network.

363.    Some of the Blues have imposed most favored nation clauses ("MFN") to create additional barriers to entry.  An MFN is both an indicator of market power and a source of market power because it excludes competitors.  Other Blues that do not have express MFNs in their contracts have the functional equivalents that operate in the same manner.

364.    The Blues' restraints have anticompetitive effects.    Service areas are anticompetitive on their face: they prevent the Blues from competing with each other.

365.    The Blues' agreement to limit the amount of non-Blue business they may conduct in another Blue's service area is anticompetitive on its face.

- The agreement puts an artificial limit on competition.

- The agreement reduces the incentive for the Blues to develop business out of their Service Areas because they know that the potential for that business is limited.

366.    The Blues would compete with each other but for the Market Allocation Conspiracy.

- Historically, Blue-on-Blue competition happened in certain places such as Ohio, North Carolina and Illinois.

- Blue Cross and Blue Shield organizations competed against each other for many years and still do in certain places, including California, Washington, Idaho, and Central Pennsylvania.

136

- The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*, resulted from one Blue's desire to compete outside of its service area; BCBSA ultimately agreed to allow all of Ohio's Blues to compete with each other, which they did.

- BCBSA settled the Maryland Blues litigation by allowing the D.C.-area Blues to compete against each other.

- Blues compete against each other in a limited way with respect to health care providers in areas covered by the one-county rule.

- Anthem, HCSC, and other Blues have large numbers of enrollees in Alabama through their National Accounts.

- Many of the Blues, especially the larger ones, such as Anthem and HCSC, have expanded into other territories through their non-Blue business, but in a limited way because of the limits on that business.

- Anthem is attempting to acquire CIGNA, which would give Anthem non-Blue branded business in Alabama.

- The BCBSA prevents Blues from expanding into other Service Areas.

- The Blues administer National Accounts of companies headquartered outside their Service Areas through "ceding" arrangements.

367.    The Price Fixing and Boycott Conspiracy and the national programs including the Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program are anticompetitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients (e.g., BCBS-FL providers treating Empire subscribers).

368.    Provider reimbursements are lower when the market for health care financing is highly concentrated.

369.    The Blues' agreements not to compete with each other, in addition to the other unlawful means of suppressing competition described in this complaint, constitute an agreement to monopsonize the market for health care services. In some areas, the Blues have successfully

monoposonized the market for health care services, while in others, the Blues have a dangerous probability of success.

370.    Output of quality health care services is reduced when the market for health care financing is highly concentrated.  For example, Alabama has the highest market concentration of any Blue in the country, and it also has the sixth smallest number of primary care physicians per 100,000 patients of any state in the country.  This low ratio damages public health and consumer welfare in Alabama.  The national shortage of primary care physicians and the even greater shortage in Alabama have resulted from the low reimbursements paid by Defendants.  Since Blue Cross and Blue Shield of Alabama has the largest market share of any health insurance company in the country, it is able to reduce provider reimbursement rates even more than other Blues.  Primary care physicians in Alabama have retired early and continue to retire early because the reimbursements paid by Blue Cross of Alabama are too low to make it worthwhile for them to continue practicing medicine.  These early retirements have made and are making the shortage of primary care physicians even worse.

371.    The Blues' outrageous levels of capital show that they have used their market power to earn supracompetitive returns.

372.    The Blues' agreements contain enforcement mechanisms.

- A Blue that disobeys the restriction on competition can have its license revoked.

- Non-Blue companies that might favor competition effectively cannot buy a Blue because the BCBSA board must approve an applicant for a license.

373.    The Blues' restraints offer no procompetitive benefits.

374.    The BCBSA agreement does not create a new product.

- The Blues cannot define the "new product" as a "Blue system that competes with nationally integrated insurers," as they did in their motion to dismiss; in American Needle, the Supreme Court stated, "Members of any cartel could insist that their

138

cooperation is necessary to produce the 'cartel product' and compete with other products."

- Many other insurers have figured out how to offer nationwide coverage to their subscribers without participating in territorial market allocation, price-fixing or boycott.

375.   The Blues do not need exclusive service areas to compete with national insurers.

- The Blues include several of the largest insurers in the country, which operate in several states and would operate more broadly including nationwide but for the Market Allocation Conspiracy.

- Other Blues, such as BCBS-AL, have more than held their own against national insurers.

376.   Exclusive service areas do not enhance efficiency by allowing the Blues to remain focused on their local areas.

- Without exclusive service areas, Blues could still focus on their local areas if they choose.

- BCBSA's actions undermine this argument; the Blues used to be more locally focused, but BCBSA required them to merge and operate statewide.

- The existence of large multi-state Blues like Anthem and HCSC belies this argument as well.

377.   The Blues have argued that service areas prevent free riding, but there are less restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain standards and invest in the development of the brand.

378.   The Blues have argued that service areas prevent customer confusion, but Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when service areas were challenged there.   Moreover, the restrictions on competition with health care providers have no relevance to consumer confusion.

379.   Limiting the Blues' ability to compete outside of their service areas without using the Blue marks has no plausible procompetitive benefit.

380.    MFNs offer no procompetitive benefits.

381.    The national programs including the Blue Card Program and National Accounts Programs result in many inefficiencies that increase costs to health care providers and reduce consumer welfare.  The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating States to be in-network providers create many of those inefficiencies as described in more detail above.  Any alleged procompetitive effects of these Programs are far outweighed by the anticompetitive effects that they create.  Moreover, there is no justification for the price fixing aspects of these Programs.

382.    The Blues do not need to engage in the Price Fixing and Boycott Conspiracy to offer health insurance or health care financing on a regional or national basis.  Other health insurance companies or managed care companies offer health insurance or health care financing on a regional or national basis without engaging in such illegal conspiracies.

### Other Abuses That Preserve the Blues' Enhanced Market Power

383.    In addition to the harms set forth above, healthcare providers are harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy.

384.    For example, a number of the Blues use MFNs with hospitals and other facilities. According to at least some defense counsel, Defendant BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."  Although the Michigan legislature recently made MFNs unlawful, the statement of BCBS-MI also applies to other Blues.  The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract.  In its contracts with hospitals, BCBS-AL imposes the functional equivalent

of an MFN when it, as the dominant health insurer, prohibits the hospitals from using the reimbursement rates of BCBS-AL in a contract with any other payor.

385.    All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996).   By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

386.    In addition, Defendants, including CareFirst, require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers.   Defendants thereby create asymmetric information in the market for health care services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

387.    Finally, Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive surplus (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below competitive rates offered in a market free from competition from other Blues.   All of this is undertaken in an attempt to further drive down payments to providers and to raise barriers for competing firms to enter these markets. BCBS-AL has attempted to use its excess surplus to buy provider practices.

388.    The vast majority of Blues, including BCBS-AL, refuse to honor consumer or patient assignments of benefits to providers, except when required by state law, such as in

Tennessee and New Jersey.  BCBSA encourages this policy.  For example, BCBSA's Electronic Claims Routing Process ("ECRP") system, which processes provider claims for reimbursement which are exempt from the Blue Card Program, defaults to paying the subscriber rather than the provider when the provider is out-of-network.  Defendants refuse to honor assignments of benefits for the express purpose of making collection problematic and increasing accounts receivable for out-of-network providers, thereby discouraging providers from remaining out-of-network or going out-of-network.  Defendants further leverage their refusal to honor assignments of benefits as a contracting tactic designed to coerce providers who attempt to be out-of-network into network at subcompetitive rates.  Defendants also retaliate against providers who attempt to operate out-of-network.  Various Blues, including Blue Cross and Blue Shield of Louisiana, have told providers that if they do not remain in network, the Blue will pay the patient the reimbursement check for the provider services and the provider will then have to chase the patient while he or she rides off in a new car or fishing boat.  The refusal to honor assignments creates inefficiencies for consumers and providers.

**Antitrust Injury**

389.   Defendants' illegal activities have resulted in antitrust injury and harm to competition.

390.   Through their violations of the antitrust laws, Defendants have agreed that they will not compete with each other.  The effect is to prevent two of the largest four, four of the largest ten, and fifteen of the largest 25 health insurance or managed care companies from competing in other states, causing increased market concentration and reduced competition throughout the country.

391.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in the state of Alabama has been and continues to be harmed in that the other 35 Blues agree not to enter the Alabama market to compete with Blue Cross Blue Shield of Alabama no matter the circumstances.

392.    The Defendants have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets and have limited the ability of other health insurers to compete in other markets.  The Defendants suppressed prices for provider goods, services and facilities and have injured competition depriving patients of choices in the marketplace for healthcare providers.

393.    Additionally, because most of the Blues are monopolists in the health care financing and health insurance markets, in addition to being monopsonists in the health services markets, it does not stand to reason that lower reimbursement rates necessarily lower consumers' premiums.  R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price the merged firm pays for its inputs, consumers will necessarily benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

394.    In the long run, the Blues' monopsony power gained by virtue of their unlawful agreements will harm consumers.  Fewer healthcare professionals are practicing, especially in

primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay.  A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians.  "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," available at http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years).  Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants.  According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation.  According to the 2013 Annual Report of the American Association of Medical Colleges, there will be a shortage of 90,000 physicians across all specialties by 2020.   Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments.  Hospitals and other facilities are closing.  In Alabama the harm has been particularly acute, seventeen hospitals have closed since the year 2000. Ten Alabama hospitals have closed in 2011, many of these in rural areas (such as Elba, Roanoke, and Hartselle). Eight rural hospitals in Alabama have closed. Still other facilities are reducing services offered to consumers.  Still others that would otherwise expand are not doing so as a result of the Blues' low payments. The Blues' low reimbursements, particularly in Alabama, make it almost for these hospitals to continue providing all the services they would offer in a competitive market, leaving consumers to travel much further for care and no place for the most critically injured patients to receive care nearby or for those without transportation. The loss of these hospitals and other

healthcare providers also affects these communities' ability to keep jobs and  to attract new business and residents.

395.    This lack of providers affects Alabama especially heavily, which is no surprise given that by some measures, Alabama has the most concentrated market. According to the American Association of Medical Colleges' 2015 State Physician Workforce Data Book, Alabama has the sixth lowest number of active primary care physicians per capita.

396.    Defendants, and especially BCBS-AL, have the power to control prices and exclude competition, and their agreements not to compete, along with the other actions described in this complaint, prevent or exclude competition. Defendants have harmed the competitive process, and by contributing to the lack of providers, have harmed consumers as well as providers.

397.    Economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

398.    The agreements among the Blues have the effect of stifling innovation in the marketplace. For example, because of the agreements and the significant market share of BCBS-AL in the relevant markets, BCBS-AL has acted to stamp out innovation in the marketplace and affirmatively failed to innovate in ways that would have benefited providers and consumers.

399.    Providers have requested that BCBS-AL switch its payment model for providers, in particular hospitals, to a value-based or risk-based approach in which the Providers are paid commensurate with the value they provide to the plan and share in the risk if they cannot effectively manage the patient population.  This type of payment model can benefit efficient low-cost providers and can reward them for their efficiencies and higher quality care. Further, it can reward patients by rewarding more efficient and effective healthcare.

400.    BCBS-AL has rebuffed requests by healthcare providers to provide for value-based or risk-based contracting.  BCBS-AL has demonstrated that not only is it not interested in undertaking potential efficiency-creating methods of contracting, but that it is unwilling to innovate in this way.  Because BCBS-AL faces no threat of competition from the Blues or others, it has no interest or incentive to innovate. Innovation does require some investment so there would be capital costs, however, the because of existing dominate market share there would not be additional members to help defray the costs.   Consequently, BCBSAL has historically failed to failure to invest in its own data systems; it is using a primary claims data system that dates back over 25 years.   Moreover, it chooses to maintain its current payment technologies and methodologies because it is the least costly option.   Competition stimulates innovation; the lack of competition stifles innovation and Alabama provides a laboratory example of that axiom.  There is no opportunity for providers to engage in more efficient health care management techniques such as population management unless BCBSAL choses to embrace such efficiency enhancing innovations.

401.    BCBS-AL and the other Blues have failed to innovate in other ways which would benefit the market and consumers. Their extraordinary market power and lack of a significant threat of competition in many markets has stifled their innovation and the development of new payments models that would benefit providers, consumers, and the market in general strictly to the benefit of their bottom line.

402.    Plaintiffs suffer because agreements not to compete also restrict their choices in the market.  Because the other Blues agree not to compete in other Service Areas, providers are not offered the opportunity to contract directly with any Blue other than the Blue in the providers' Service Area.  The exclusion of these potential participants in the health services

financing market has the effect of depressing payments in the market for health care services, whether or not the provider is in-network with the local Blue.

403.   During the class period including after 2010, the Blues implemented new fee schedules for providers, generally on an annual basis.  Those new fee schedules are lower than they would have been without the Defendants' anticompetitive conduct.  The new fee schedules have created incrementally larger antitrust injuries and damages for the health care providers.

404.   When the Blues face innovative competitors, they engage in anti-competitive activity designed to take those competitors out of the market.  For example, when Cigna developed innovative programs with Providers that involved paying Providers higher reimbursement rates than Anthem and other Blues pay but collaborating with Providers to reduce the overall cost of healthcare, Anthem attempted to purchase Cigna and then after secret meetings with the CEOs of other Blues in a private room in the luxurious Peninsula Hotel in Chicago, Anthem and the other Blues developed the Blue Bias strategy to prevent the on-going implementation of the innovative programs that Cigna had developed with Providers.  Instead, Anthem and the other Blues including BCBS-AL continue to follow their strategy of paying low reimbursement rates to hospitals and other Providers to maintain their differentials between the Blues reimbursement rates and those paid by companies like Cigna, and those low reimbursement rates undermine and prevent efforts at innovation and collaboration with Providers.

405.   Defendants' illegal activities have resulted in harm to competition.  Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between subcompetitive rates or being put out of business through coercion.

406.   Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened future harm to Plaintiffs' business and property.

407.   If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

### Defendants, Even Those Organized As Not For Profit, Enjoy Supracompetitive Profit

408.   Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits.   Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer.   These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace.   As Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage."   Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

409.   Although the Blues were originally established as non-profits, they soon operated like for-profit corporations.   In 1986, after Congress revoked Defendants' tax-exempt status, the Blues began to form for-profit subsidiaries.   A number of the non-profit Blues then converted to for-profit status and still operate as such today.   Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

410.    The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

411.    Often these holding company systems include both "not-for-profit" and "for-profit" affiliates.   The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel.   Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

412.    Blues nationwide have many common threads that reach throughout their network.   Officers share with each other their otherwise well-kept expense schemes.   These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks.   These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

413.    Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services.   Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

414.    By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

415.   The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

416.   For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities.  Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

417.   In addition, despite claiming to be "not-for-profit," many of these Blues hold massive excess surplus levels built off the net income spread between the high premiums they charge customers and the subcompetitive payments to Providers.  Those excessive surplus levels have come at the expense of higher premiums to consumers.

418.   Below is an illustration of the huge amounts of capital being held in excess of requirements by a number of not-for-profit Blues.  As of Sept. 30, 2010, 33 "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by the BCBSA. The chart below details those excessive levels of surplus:

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross BlueShield of Tennessee | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,770 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

419.    Many of the Blues understate their actual surplus substantially by citing only the surplus from the mainline company, but not the general surplus on the companies' combined reporting statements, which accounts for all lines of business.

420.    In South Carolina, for instance, BlueCross BlueShield of South Carolina's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

421.    Members of the Board of BlueCross BlueShield of South Carolina "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show."  They were required to do little but show up to the occasional meeting.

422.    This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies.  BlueCross BlueShield of South Carolina paid executives in the millions of dollars in 2010.

423.    HCSC, a conglomerate of several Blues, including Blue Cross and Blue Shield of Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012.  This net income does not even account for large blocks of plans it merely administers for the self-insured.  "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus.  The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011."  "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled her total compensation to $8.7 million in 2012."    See

http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million.

424.    Other Blues also pay excessive executive compensation.  For example, when Anthem's CEO led the company through the ill-fated merger effort with Cigna that will cost the company a break fee of $1.85 Billion and perhaps more, Anthem's Board awarded him with a salary increase of 3 million dollars. http://nypost.com/2017/03/20/anthem-ceos-3m-salary-hike-draws-criticism-from-wall-street/ (accessed 4/8/2017).

425.    BCBS-AL holds an extraordinary and unnecessary surplus created by its sub-competitive reimbursements to Providers.  BCBS-AL's surplus is far in excess of any requirements under the law or BCBSA rules.

426.    In addition to being larger than any required reserve, BCBS-AL's surplus has skyrocketed in recent years.

427.    In the year 2000, BCBS-AL held a surplus of $432,450,713.  In 2008, as the class period began, BCBS-AL held a "surplus" of $656,360,820.  Since the beginning of the class period, BCBS-AL has increased its "surplus" by $504,714,541, more than the entire surplus it held in the year 2000.

428.    As Figures 1-3 demonstrate, the BCBS-AL's surplus has risen dramatically since the turn of the century.  Despite what BCBS-AL may say, its liabilities have not risen in lock step with its growing surplus.  In fact, the increase in surplus far outpaces the percentage increase in total liabilities. The only recent reduction in BCBS-AL's surplus also demonstrates that these dollars are not meant to be a reflection of BCBS-AL's expected liabilities for claims. The substantial reduction in BCBS-AL surplus in 2014 was caused not by an unexpected increase in

claims liabilities, but by a one-time charge related to BCBS-AL's own employee benefits, including funding pension obligations for its highly paid executives.

Figure 1



Figure 2

**Blue Cross & Blue Shield of AL**
**Growth of Unassigned Surplus**

| YEAR | Unassigned Surplus |
|------|------|
| 2000 | $ 432,450,713 |
| 2001 | $ 433,655,157 |
| 2002 | $ 452,263,593 |
| 2003 | $ 514,617,342 |
| 2004 | $ 554,350,269 |
| 2005 | $ 587,153,526 |
| 2006 | $ 694,586,920 |
| 2007 | $ 744,453,976 |
| 2008 | $ 656,360,820 |
| 2009 | $ 649,034,983 |
| 2010 | $ 855,801,660 |
| 2011 | $ 991,060,251 |
| 2012 | $ 1,118,864,635 |
| 2013 | $ 1,243,929,650 |
| 2014 | $ 997,070,082 |

|  |  |
|---|---|
| 2015 | $ 1,059,868,980 |
| Q2 '16 | $ 1,161,075,361 |

[Source: Sworn Annual Statements as Filed w/NAIC]

**Figure 3**

| YEAR | Total Liabilities | % Up | Unassigned Surplus | % Up |
|---|---|---|---|---|
| **2000** | $ 1,008,824,717 | | $ 432,450,713 | |
| **Q2 '16** | $ 1,751,898,227 | **73.7%** | $ 1,161,075,361 | **168.5%** |

429. If BCBS-AL's surplus was simply designed to cover its liabilities, like claim costs, that "surplus" would not be expected grow between 2 and 3 times faster than BCBS-AL's liabilities have over a 15 year period.

430. Of course, BCBS-AL's surplus is not a reflection of its liabilities but of the supra-competitive profits it has accrued during the class period and before.

431. While Defendants often claim these surpluses are designed as insurance reserves for future payments, they are more often used as strategic monies allowing acquisitions of competitors, market share or Provider practices.

432. Likewise, large salary increases for executives with Blue Cross and Blue Shield of Alabama have recently been reported. Such salaries result in higher costs to consumers. The supracompetitive profits that feed the salary increases are built on the strength of Defendants' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force Providers to join their networks at subcompetitive rates. A spokeswoman for BlueCross BlueShield of South Carolina noted that the outrageous increases are priced "to reflect its superior networks." Thus, the market power of the Blues allows them to pay subcompetitive rates to Providers. This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

433.    If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

### Implementation of the Affordable Care Act

434.    When President Obama presented the Affordable Care Act to the Joint Session of Congress, he discussed the importance of competition among health insurers and cited BCBS-AL as a poster child for operating a concentrated market.  The ACA created insurance exchanges to encourage competition among health insurers. The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places.  The Blues, including BCBS-AL, have used their market power and their anticompetitive activities to increase their market shares through the mechanisms created by the ACA.

435.    In the first year of the ACA exchange in Alabama, BCBS-AL claimed a loss of approximately $135 million based almost entirely on losses in the individual market and ACA exchange. It is not clear how much of this "loss" is being subsidized through monies available to BCBS-AL under the ACA.

436.    In considering how to approach the ACA market, BCBS-AL internally expressed concern over increased consumer choice in Alabama as a result of entry into the individual market through the exchange.   Their response to these concerns became clear in the aftermath of the loss.  According to publicly available documents and media reports, "Blue Cross spends more on the health care costs of individual marketplace customers than it collects through copayments and premiums." Stated differently, BCBS-AL priced premiums below its actual health care costs for consumers in the individual exchange market.

437.    Shortly after, all other insurers (United and Humana) exited the Alabama exchange market, leaving only BCBS-AL offering products in the exchange market.

438.    BCBS-AL's response to being the only remaining competitor in the market should be not surprising.   With its potential competition now out of the market, rather than continuing to price premiums below actual costs, BCBS-AL raised premiums in the market by approximately 40 percent.

### The Blues Agreement that Prohibits Defendants from Contracting with Providers in Other Blues' Service Areas Should be Enjoined, the BlueCard Program Should be Reformed to Create Competitive Market Conditions, and Blues Should be Allowed to Use Non-Blue Rental Networks to Supplement Their Provider Networks

439.    The Defendants' agreement that they will not contract with providers in other Blues' service areas is obviously anticompetitive.   That agreement prevents the development of provider networks and competition among provider networks.   The agreement also prevents Blues from developing innovative and collaborative agreements with Providers that would be efficient, improve quality and lower health care costs.   The agreement also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts.   For example, Anthem, the first or second largest health insurer in the country, and HCSC, the fourth largest health insurer in the country, must each have national provider networks in order to compete for national accounts.

440.    The Blue Card Program reinforces the agreements that the Defendants have made not to compete and it provides the *quid pro quo* in terms of billions of dollars in payments that are made to the Blues.   Stated another way, the Blue Card Program is the glue that holds the Blues' anticompetitive system together.   The Blue Card Program is used largely in the administration of health care benefit plans including for national and regional employers.   Those employers pay the Blue Card access and administrative fees, and the Blues pocket those

payments.  Currently, BCBS-AL is able to use its market power as the largest health insurer and administrator in Alabama to coerce healthcare providers in Alabama into participating in the Blue Card System.  In order to remedy that coercion and abuse of market power, Providers should be allowed to opt-out of the Blue Card System with no threat of retaliation.  In the long run, that opt-out right will restore market condition and encourage the positive development of the Blue Card System so that it functions in as efficient a manner as possible.  To the extent that Providers wish to remain in the Blue Card Program, they can do so.  In order to correct the adverse effects that the Defendants have had on the market, the Court should impose an affirmative obligation on all Defendants to bargain in good faith with Providers who wish to negotiate with them, and maintain that obligation until the adverse effects of the Defendants' conduct have been fully remedied.

441.    In addition, the Blues' current prohibition against the use of non-Blue rental networks should be enjoined.  Other health insurers, including United, Aetna and Cigna used such rental networks to supplement their networks when necessary.  Consumers and Providers should have the ability to access such non-Blue rental networks for Blues in Alabama just as they do for other health insurers.

**The Blues System Prevents Innovation, Especially in Markets
Like Those in Alabama Where the Blues Enjoy a Monopoly/Monopsony,
and the Lack of Innovation Reduces the Quality of Healthcare and Increases Its Costs.**

442.    In 1935, the respected economist J.R. Hicks recognized that: "The best of all monopoly profits is a quiet life."  J.R. Hicks, The Theory of Monopoly, Econometrica, Vol 3, No. 1 (Jan. 1935), pp. 1-20.  Part of the quiet life that a monopolist enjoys is that it does not have to innovate.  The Defendants' conduct in Alabama demonstrates the truth of Professor Hicks writing more than 80 years ago.

443.    BCBS-AL is a monopolist in the sale of commercial health insurance and in the sale of administrative serves for health care plans in Alabama and in every market that one could possibly define in Alabama. This is described in detail in Provider Plaintiffs' market allegations Paragraphs 339-382.   The other Defendants have agreed that they will not compete with BCBS-AL in the sale of commercial health insurance or in the sale of administrative services in Alabama.  BCBS-AL is a monopsonist in the purchase of health care services by commercial insurers in Alabama and within every market one could possibly define in Alabama.  By recent measure, it has over 83-86 percent of this market statewide.  The other Defendants collectively represent the second largest purchaser of health care services by commercial insurers in Alabama, and they have reached an agreed with BCBS-AL to use its prices in those purchases and to allow BCBS-AL to use their market shares in setting its prices to pay Providers in Alabama.   Under the law, the Defendants are unquestionably both a monopolist and a monopsonist.

444.    Innovation in healthcare is essential to preserve and improve quality and to limit and reduce costs.  Collaboration between health insurers and providers is one way to encourage innovation in healthcare.  When health insurers pay low reimbursement rates to Providers, they discourage collaboration and innovation.   The recent evidence and findings in the Anthem merger trial demonstrate the truth of the allegations in this paragraph.  Representatives of Cigna, including its CEO, and others testified that the Blues such as Anthem pay providers lower reimbursement rates than Cigna, but that by encouraging collaboration and innovation Cigna was able to lower the cost of healthcare for employers and consumers while paying Providers higher reimbursement rates.  Those witnesses also testified that if Cigna reduced its reimbursement rates

to the rates paid by Anthem and other Blues, its ability to collaborate and innovate with Providers would be diminished.

445.     The conduct of the Defendants has discouraged innovation in healthcare in Alabama.   One need go no further than one of the most recent edition of Health Affairs to understand how this is happening.   "Organizations seeking to create innovative environments need to address a number of factors.   These include making available sufficient resources – especially money and space . . .."  D. Bates, A. Sheikh, D. Asch, "Innovative Environments in Health Care: Where and How New Approaches to Care Are Succeeding," Health Affairs, March 2017, 400, 401.   The Defendants pay hospitals among the lowest reimbursement rates in the country.   The hospitals in Alabama are therefore deprived of the resources to be able to innovate. One example of the cost of innovation is that tracking patients to make sure they are receiving the best healthcare possible requires expensive IT systems.

446.     The authors in this article further recognized that: "part of the slow pace of innovation stems from the health care payment system."   In Alabama, because the Defendants have enjoyed the quiet life of a monopolist they have refused to develop innovative payment systems.   In the early 1980s, the Medicare Program changed from per diem reimbursement rates for hospitals to DRG rates in order to encourage efficiency.   In Alabama, BCBS-AL for itself and the other Blues with members being treated in hospitals in Alabama continued to use the archaic per diem rates until several years after this lawsuit was filed and only began implementing partial changes in the per diem rates approximately 35 years after Medicare. BCBS-AL has retained consultants who found that the result was longer stays in hospitals.   In other words, the refusal of BCBS-AL as a monopolist/monopsonist to innovate has reduced the quality of healthcare in Alabama and to add to its expense.

447. In order to achieve the best possible outcomes in health care at the most reasonable price, one must track the patients and well as the Providers, something that is highly inefficient in the Blues' system at least for members being treated under the Blue Card Program. One of the things that Cigna has been doing to improve healthcare at a lower price is to track both the patients who are its health plan members and their providers in its networks. In Alabama, Anthem has more than 120,000 members for whom Anthem maintains their patient healthcare information, and HCSC has more than 100,000 members for whom HCSC maintains their patient healthcare information. Those members and thousands of others who are members of other Blues are treated in Alabama by Providers in the BCBS-AL network, for whom BCBS-AL maintains the provider healthcare information. This characteristic of the Blue System makes innovative healthcare inefficient and often impossible. By contrast, if Anthem would contract with Alabama hospitals directly, it could combine healthcare information for its patients and providers so that innovative healthcare could be provided efficiently. Of course, this inefficiency adds current inefficiency in the Blues system where Providers must know and comply with the coverage and payment rules of 36 different Blue license holders while being in network with only one and generally only having ready access to that one Blue's rules.

### The Defendants Have Created Anticompetitive Conditions That Will Require Injunctive Relief, Reporting, and Judicial Oversight for a Significant Period of Time to Remedy

448. The anticompetitive conduct of the Defendants over a significant period to time will require meaningful injunctive relief. Even with that relief, the conduct and market conditions created by the Defendants will not be remedied over-night. The Court will require reporting and judicial oversight for a significant period of time to insure that the remedies are adequate and effective. The Court should use the resources of the Special Master who has

developed expertise in this case and rapport with the parties to it to make sure that the remedies are proceeding in an effective and efficient manner.

## Class Action Allegations

449.   For purposes of the streamlined action, the Alabama Plaintiffs bring this action on behalf of themselves and on behalf of a class of Alabama healthcare providers.  First, Alabama Plaintiffs bring this action seeking injunctive relief pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following Class (the "Alabama Injunction Class"):

> All healthcare providers in the State of Alabama, not owned or employed by any of the Defendants, who currently provide healthcare services, equipment or supplies within the State of Alabama.

450.   Further, Alabama Plaintiffs bring this action seeking damages pursuant to the provisions of Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Alabama Damages Class"):

> All healthcare providers, not owned or employed by any of the Defendants, in the State of Alabama, who provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant, and who have had a participation agreement with Blue Cross and Blue Shield of Alabama, within four years prior to the date of the filing of this action.

451.   Plaintiffs also reserve the right to request class certification under Rule 23(c)(4), Federal Rules of Civil Procedure.

452.   Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust

litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

453.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members.  The Class Members are so numerous that joinder of all members is impracticable.

454.   Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.

455.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

456.    There will be no extraordinary difficulty in the management of this Class Action.  Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.   Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a.    Whether Defendants violated Section 1 of the Sherman Act;

b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d.     Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e.     Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f.     Whether Defendants violated Section 2 of the Sherman Act;

g.     Whether the Blues collectively or any particular Blue has market power in a particular market;

h.     Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;

i.     Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

j.     Whether Defendants' conduct should be enjoined;

k.     The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

457.     These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

458.     The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

459.     This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class Members are small in relation to the expense

and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## COUNT I

### Claim for Injunctive Relief, 15 U.S.C. § 26

460.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

461.    This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

462.    As explained in Counts II through VII, Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a per se, quick look, or rule of reason analysis.

463.    As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

464.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs.  Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their illegal conspiracies and to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

465.    Plaintiffs reserve the right to seek preliminary injunctions as necessary.

## COUNT II

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (The *Per Se* Market Allocation Conspiracy)

466.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

467.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

468.    As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

469.    Defendants have agreed to divide and allocate the geographic markets for the financing of health care into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined.  By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.  Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

470.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## COUNT III

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (The *Per Se* Price Fixing and Boycott Conspiracy)

471.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

472.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

473.    The BCBS Price Fixing and Boycott Conspiracy operates in addition to and reinforces the Market Allocation Conspiracy.  The Conspiracy alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a per se violation of the Act.

474.    Through the Price Fixing and Boycott Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs.  By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' price fixing agreement through the national programs is per se illegal under Section 1 of the Sherman Act.

475.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

476.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT IV

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Quick Look Claim for Market Allocation Conspiracy)**

477.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

478.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

479.     Under a quick look analysis Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act.

480.     "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).  The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

481.     The Market Allocation Conspiracy prevents the Blues, including many of the largest participants in the relevant product markets defined above, from competing nationally, regionally, or in the relevant geographic markets defined above.

482.     The Market Allocation Conspiracy has no pro-competitive effect.  The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

483.    The Defendants have not offered any new product.  Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

484.    Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

485.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

486.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

### COUNT V

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Quick Look Claim for Price Fixing and Boycott Conspiracy)**

487.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

488.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

489.    Under a quick look analysis Defendants' Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act.

490.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers

and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).  The arrangements also have

an anticompetitive effect on health care providers and reduce output by health care providers.

491.    The Price Fixing and Boycott Conspiracy has the same effect and also results in

price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from

negotiating the price the goods and services in the relevant markets described above.  *See Nat'l*

*Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

492.    The Price Fixing and Boycott Conspiracy has no pro-competitive effect.  The

restrictions that the Defendants have imposed on their relationships with health care providers

are not related to the trademark rationales offered by the Defendants and have nothing to do with

any issue related to consumer confusion.

493.    The Defendants have not offered any new product.  Moreover, they would

increase competition if they provided health care financing without the anticompetitive

conspiracies that they are engaging in.

494.    Because a "quick look" shows that the Blues' arrangements are anticompetitive,

no inquiry into market power is required.

495.    As a direct and proximate result of Defendants' continuing violations of Section 1

of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the

type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that

which makes Defendants' conduct unlawful.  These damages consist of having been paid less,

having been forced to accept far less favorable rates and other contract terms, and/or having

access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

496.    Plaintiffs seek money damages from Defendants for their violations of Section 1

of the Sherman Act.

## COUNT VI

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Rule of Reason Claims for Market Allocation Conspiracy)

497.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

498.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

499.    Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

500.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

501.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Rule of Reason Claims for Price Fixing and Boycott Conspiracy)

502.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

503.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

504.    Defendants Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

505.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

506.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VIII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Monopsonization)

507.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

508.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

509.    As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets described above.  For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although

Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants. This monopsony power has been durable, lasting for decades.

510.    These Defendants' creation of monopsony power was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsony power.

511.    By willfully creating or maintaining monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

512.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

513.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## COUNT IX

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Attempted Monopsonization)

514.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

173

515.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

516.    As alleged more specifically above, the Defendants have engaged in conduct by which they have attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.

517.    These Defendants specifically intended to create monopsony power. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.

518.    By attempting to create or maintain monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when the Defendants have not yet created or maintained monopsony power, their conduct has created a dangerous risk of success.

519.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

520.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## COUNT X

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Conspiracy to Monopsonize)

521.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

522.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

523.    As alleged more specifically above, the Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power.  The Defendants specifically intended to create monopsony power. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.  All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

524.    By conspiring to create or maintain monopsony power, the Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

525.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms,

175

and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

526.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.    Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

d.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

e.    Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.    Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

g.    In particular with respect to the Blue Card Program request the following permanent injunctive relief be ordered by Court:

1)    The Defendants are enjoined from refusing to contract with Providers in Alabama even though those Providers are outside of

the Defendants' service areas or adjacent counties thereto. Providers in Alabama may request contract negotiations with any Blue Plan with members residing in Alabama, and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

2)   The Defendants are enjoined from refusing to contract with national and regional hospital chains with hospitals in Alabama to provide services to their members throughout the country, in the same manner that the Blue Plans are allowed to negotiate with national and regional pharmacy chains. The national and regional provider chains may request contract negotiations with any Blue Plan and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

3)   Defendants may continue to operate the BlueCard Program. However, each Provider in Alabama shall have the right to opt-out of the Blue Card Program for any Blue that is either a Home Plan or Control Plan for any subscribers in Alabama, while remaining in the networks of BCBS-AL, and those Home Plans and Control Plans will have a good faith obligation to negotiate with the Providers who opt-out of the BlueCard Program. The opt-out right will be on a Blue by Blue basis so that a Provider will have the right to opt-out with respect to one Blue Plan but remain in the BlueCard Program for another Blue Plan. The opt-out right shall be exercised on a year by year basis.

4)   Providers who are out of network for BCBS-AL but who treat subscribers of any other Blue Plan may request contract negotiations with any such Blue Plan and any such Blue Plan shall have a good faith obligation to negotiate with the Provider.

5)   The failure of a Provider to negotiate in good faith with a Defendant will be a defense to any compliance dispute brought by a Provider under the terms of this injunction.

6)   Defendants' may use non-Blue rental networks to supplement their networks, and any prohibition against the use of such a rental network is enjoined.

h.   Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

i.   Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

177

j.      Require on-going periodic reporting on compliance by the Defendants, monitoring by the Special Master and the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

k.      Award Plaintiffs and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

l.      Award costs and attorneys' fees to Plaintiffs;

m.      Award prejudgment interest;

n.      For a trial by jury; and

o.      Award any such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

## ALLEGATIONS RELEVANT TO THE NON-PRIORITIZED PROCEEDINGS

527.    The Provider Plaintiffs reallege the foregoing allegations.

### Plaintiffs

528.    Plaintiff Corey Musselman, M.D. is a family practice physician and a citizen of Cary, North Carolina.   During the relevant time period, Dr. Musselman provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to his in-network contract with BCBS-NC, and billed BCBS-NC for the same.   Dr. Musselman was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Musselman has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.   As set forth herein, Dr. Musselman has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

529.    Plaintiff Kathleen Cain, M.D. is a pediatrician and a citizen of Topeka, Kansas. During the relevant time period, Dr. Cain provided medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Kansas pursuant to her in-network contract with BCBS-KS, and billed BCBS-KS for the same.   Dr. Cain was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Cain has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she

would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Cain has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

530.   Plaintiff John Clifton Crosby, M.D. is an anesthesiologist and a citizen of Baton Rouge, Louisiana. During the relevant time period, Dr. Crosby provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to his in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same.  Dr. Crosby was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Crosby has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Crosby has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

531.   Plaintiff Michael Dole, M.D. is a physician specializing in physical medicine and rehabilitation and pain management and a citizen of Alexandria, Louisiana.  Dr. Dole has provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to his in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same.  Dr. Dole was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Dole has also provided medically necessary, covered services to Defendants'

enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Dole has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

532.    Plaintiff Michael Dole, M.D., A.P.M.C. is a physical medicine and rehabilitation and pain management facility and physician's office located in Alexandria, Louisiana.  During the relevant time period Michael Dole, M.D., A.P.M.C. provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to its in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same, until September 1, 2015.  Michael Dole, M.D., A.P.M.C. was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief Michael Dole, M.D., A.P.M.C. has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Michael Dole, M.D., A.P.M.C. has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

533.    Plaintiff Michael Dole, M.D., L.L.C. is a physical medicine and rehabilitation and pain management facility and physician's office located in Alexandria, Louisiana.  During the relevant time period Michael Dole, M.D., L.L.C. provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to its in-network

contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same, until September 1, 2015. Michael Dole, M.D., L.L.C. was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief Michael Dole, M.D., L.L.C. has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Michael Dole, M.D., L.L.C. has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

534.    Plaintiff Spine Diagnostic Center of Baton Rouge, Inc. is an interventional pain management facility located in Baton Rouge, Louisiana. During the relevant time period, Spine Diagnostic Center of Baton Rouge provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to its in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same. Spine Diagnostic Center of Baton Rouge was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Spine Diagnostic Center of Baton Rouge has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Spine Diagnostic Center of Baton Rouge has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

535.     Plaintiff Northwest Florida Surgery Center, L.L.C. is a multispecialty outpatient ambulatory surgery center located in Panama City, Florida.  During the relevant time period, Northwest Florida Surgery Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same.  Northwest Florida Surgery Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Northwest Florida Surgery Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Northwest Florida Surgery Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

536.     Plaintiff Roman Nation, M.D. is a family practice physician and a citizen of Lynn Haven, Florida. During the relevant time period, Dr. Nation has provided medically necessary services to Blue Cross Blue Shield of Florida and has billed BCBS-FL for these services outside of any contractual relationship. For these services, Dr. Nation has been paid less that he would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Nation has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Nation has been injured in his business or property as a result of Defendants' violations of the antitrust laws. On information and belief, Dr.Nation was not a member of the *Love* Settlement classes.

537.   Plaintiff Wini Hamilton, D.C. is a chiropractor and a citizen of Seattle, Washington.   During the relevant time period, Dr. Hamilton provided medically necessary, covered services to patients insured by Premera Blue Cross of Washington or who are included in employee benefit plans administered by Premera Blue Cross of Washington pursuant to her in-network contract with Premera, and billed Premera for the same.   Dr. Hamilton was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Hamilton has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.   As set forth herein, Dr. Hamilton has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

538.   Plaintiff Neuromonitoring Services of America, Inc. ("NSOA") is a provider of Intraoperative Neurophysiological Monitoring services based in Colorado Springs, Colorado. During the relevant time period in Colorado, NSOA provided medically necessary, covered services to enrollees of Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado pursuant to its in-network contract with Anthem Blue Cross and Blue Shield, and billed Anthem Blue Cross and Blue Shield for the same.   NSOA was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   Also during the relevant time period, NSOA has provided medically necessary services to insured enrollees of the Blues in Alabama, Arizona, Arkansas, California, Illinois, Indiana, Iowa, Mississippi, Montana, North

Dakota, Ohio, South Dakota, Tennessee, and Wisconsin, and has billed those Defendants for these services outside of any contractual relationship. On information and belief, NSOA has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, NSOA has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

539.    Plaintiff Cason T. Hund, D.M.D. is a general practitioner of dentistry and a citizen of Mt. Pleasant, South Carolina. During the relevant time period, Dr. Hund provided medically necessary, covered dental services to patients insured by BlueCross BlueShield of South Carolina, Inc. or who are included in the employee benefit plans administered by BlueCross BlueShield of South Carolina, Inc. pursuant to his in-network contract with BCBS-SC, and billed BCBS-SC for the same. Dr. Hund was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hund has also provided medically necessary, covered dental services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Hund has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

540.    Plaintiff ProRehab, P.C. is a group of physical therapy clinics with a corporate office in Evansville, Indiana. ProRehab, P.C. operates physical therapy clinics in the cities of Evansville, Haubstadt, Newburgh, Rockport and Vincennes in the State of Indiana. ProRehab also operates physical therapy clinics in the cities of Bowling Green, Henderson, and

Madisonville in the Commonwealth of Kentucky. ProRehab, P.C. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, ProRehab provided medically necessary, covered services to patients insured by Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana and d/b/a Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant Anthem, or who are included in employee benefit plans administered by Anthem Blue Cross and Blue Shield of Indiana or Anthem Blue Cross and Blue Shield of Kentucky pursuant to its in-network contracts with BCBS-IN and BCBS-KY, and billed BCBS-IN and BCBS-KY for the same. ProRehab was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ProRehab has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, ProRehab has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

541. Plaintiff Texas Physical Therapy Specialists, L.L.C. is a group of physical therapy clinics with eighteen locations in the State of Texas. Texas Physical Therapy Specialists operates physical therapy clinics in the cities of Austin, Dallas, Georgetown, Liberty Hill, New Braunfels, Round Rock, San Antonio, San Marcos, Schertz, Selma, and Spring Branch in the State of Texas. Texas Physical Therapy Specialists, L.L.C. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Texas Physical Therapy Specialists provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in

employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.  Texas Physical Therapy Specialists was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Texas Physical Therapy Specialists has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Texas Physical Therapy Specialists has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

542.   Plaintiff BreakThrough Physical Therapy, Inc. ("BreakThrough") is a group of physical therapy clinics with seven locations in the State of North Carolina. BreakThrough operates physical therapy clinics in the cities of Cameron, Fayetteville, Greensboro, Morehead City, and Winston-Salem in the State of North Carolina. BreakThrough brings these claims for itself and for its member and/or employed physical therapists.  During the relevant time period, Breakthrough provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same.  Breakthrough was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Breakthrough has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those

services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Breakthrough has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

543. Plaintiff Dunn Physical Therapy, Inc. is a group of physical therapy clinics with four locations in the State of North Carolina. Dunn Physical Therapy operates physical therapy clinics in the cities of Cary, Raleigh, and Apex in the State of North Carolina. Dunn Physical Therapy, Inc. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Dunn Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same. Dunn Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dunn Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Dunn Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

544. Plaintiff Gaspar Physical Therapy, P.C. is a physical therapy company with six physical therapy clinic locations in the State of California. Gaspar Physical Therapy operates physical therapy clinics in the cities of Carlsbad, Encinitas, Oceanside, and Solana Beach in the State of California. Gaspar Physical Therapy brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Gaspar Physical Therapy

provided medically necessary, covered services to patients insured by Blue Cross of California d/b/a Anthem Blue Cross, a subsidiary of Defendant Anthem, or who are included in employee benefit plans administered by Blue Cross of California pursuant to its in-network contract with BC-CA, and billed BC-CA for the same.   Gaspar Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Gaspar Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.   As set forth herein, Gaspar Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

545.    Plaintiff Timothy H. Hendlin, D.C. is a chiropractor and a citizen of Kailua-Kona, Hawaii. During the relevant time period, Dr. Hendlin provided medically necessary, covered services to patients insured by Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Hawaii, and billed for those services.   Dr. Hendlin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, Dr. Hendlin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for those services, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.   As set forth herein, Dr. Hendlin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

546.   Plaintiff Greater Brunswick Physical Therapy, P.A. ("GBPT") is a physical therapy company with four physical therapy clinic locations in the State of Maine. GBPT operates physical therapy clinic locations in the cities of Auburn, Bath, South Harpswell and Topsham in the State of Maine. GBPT brings these claims for itself and for its member and/or employed physical therapists.   During the relevant time period, GBPT provided medically necessary, covered services to patients insured by Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine ("BCBS-ME"), a subsidiary of Defendant Anthem, or who are included in employee benefit plans administered by BCBS-ME pursuant to its in-network contract with BCBS-ME, and billed BCBS-ME for the same.   GBPT was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.   On information and belief, GBPT has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.   As set forth herein, GBPT has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

547.   Plaintiff Charles Barnwell, D.C. is a chiropractor providing services in Houston, Texas.    During the relevant time period, Dr. Barnwell provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same.   Dr. Barnwell was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result

thereof.  On information and belief, Dr. Barnwell has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Barnwell has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

548.  Plaintiff Brain and Spine, L.L.C. is a physician group medical practice specializing neurosurgery in Panama City, Florida.  Brain and Spine, L.L.C. brings these claims for itself and for its member and/or employed physicians.  During the relevant time period, Brain and Spine provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Florida, Inc. or who are included in employee benefit plans administered by BCBS-FL pursuant to its in-network contract with BCBS-FL and billed it for the same.  Brain and Spine was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Brain and Spine has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Brain and Spine has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

549.  Plaintiff Heritage Medical Partners LLC ("Heritage") is a physician group medical practice specializing in internal medicine in Hilton Head, SC.  Heritage brings these claims for itself and for its member and/or employed physicians.  During the relevant time period, Heritage provided medically necessary, covered services to patients insured by BCBS-SC, or who are included in employee benefit plans administered by BCBS-SC pursuant to its in-

network contract with BCBS-SC and billed it for the same.  Heritage was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Heritage has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct.  As set forth herein, Heritage has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

550.    Plaintiff Judith Kanzic, D.C. is a chiropractor in Houston, TX.  During the relevant time period, Dr. Kanzic provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-TX and billed BCBS-TX for these services outside of any contractual relationship.  Dr. Kanzic was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. For these services, Dr. Kanzic has been paid less than she would have been but for Defendants' anticompetitive conduct.  On information and belief, Dr. Kanzic has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Kanzic has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

551.    Plaintiff Brian Roadhouse, D.C. is a chiropractor in Tulsa, Oklahoma.  During the relevant time period, Dr. Roadhouse provided medically necessary, covered services to

patients insured by Blue Cross and Blue Shield of Oklahoma, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-OK pursuant to its in-network contract with BCBS-OK and billed it for the same. Dr. Roadhouse was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Roadhouse has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Roadhouse has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

552.    Plaintiff Julie McCormick, M.D., L.L.C., is a doctor of internal medicine and a citizen of Anchorage, Alaska. During the relevant time period, Dr. McCormick provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to her in-network contract with Premera, and billed Premera for the same. Dr. McCormick was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. McCormick has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. McCormick has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

553.    Plaintiff Harbir Makin, M.D. is a doctor of internal medicine and a citizen of Anchorage, Alaska.  During the relevant time period, Dr. Makin provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same.  Dr. Makin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Dr. Makin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Dr. Makin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

554.    Plaintiff Saket K. Ambasht, M.D. is a doctor of gastroenterology and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Ambasht has provided medically necessary services to Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") and has billed Premera for these services outside of any contractual relationship. For these services, Dr. Ambasht has been paid less that he would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Ambasht has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Ambasht has been injured in his business or property as a result of Defendants' violations of the antitrust laws. Dr. Ambasht was not a member of the *Love* Settlement classes.

555.   Hillside Family Medicine, LLC is a family medicine practice in Anchorage, Alaska. During the relevant time period, Hillside Family Medicine, LLC provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same. Hillside was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof.  On information and belief, Hillside has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct.  As set forth herein, Hillside has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

556.   Plaintiff Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology ("FCCN") is a chiropractic office in Windsor Heights, Iowa. FCCN brings these claims for itself and for its member and/or employed chiropractors.  During the relevant time period, FCCN provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to his in-network contract with Wellmark, and billed Wellmark for the same.  FCCN was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, FCCN has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he

would have been but for Defendants' anticompetitive conduct. As set forth herein, FCCN has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

557.    Plaintiff Snowden Olwan Psychological Services ("Snowden Olwan") is a psychology clinic located in Sioux City, Iowa. Snowden Olwan brings these claims for itself and for its member and/or employed psychologists. During the relevant time period, Snowden Olwan provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to its in-network contract with Wellmark, and billed Wellmark for the same. Snowden Olwan was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Snowden Olwan has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Snowden Olwan has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

558.    Plaintiff Ear, Nose & Throat Consultants and Hearing Services, P.L.C. ("ENT Consultants") is a medical practice located in Dakota Dunes, South Dakota. ENT Consultants brings these claims for itself and for its member and/or employed physicians. During the relevant time period, ENT Consultants provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark BCBS-IA"), Wellmark Blue Cross and Blue Shield of South Dakota ("Wellmark BCBS-SD"), and Blue Cross and Blue Shield of Nebraska ("BCBS-NE") or who are included in

employee benefit plans administered by Wellmark BCBS-IA, Wellmark BCBS-SD, or BCBS-NE pursuant to its in-network contracts with those Defendants, and billed those Defendants for the same. ENT Consultants was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ENT Consultants has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, ENT Consultants has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

559.     Certain of the named Provider Plaintiffs in this action, Corey Musselman, M.D., Heritage Medical Partners, L.L.C., Brain and Spine, L.L.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Hillside Family Medicine, LLC,  John Clifton Crosby, M.D., Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D., ("the non-Alabama Love Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the Defendants consummated in the Southern District of Florida before Judge Moreno.  For purposes of this Complaint, those Providers who were members of the Settlement Classes listed above do not bring claims against any of the released parties in those Settlements.  As this issue is currently being litigated in *Musselman v. Blue Cross Blue Shield of Alabama*, Case No. 1:13-cv-20050-FAM (S.D. Fla.); Case No. 13-14250-AA (11th Cir.), the non-Alabama *Love* Providers wish to allege here that:

a.      they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those

releases.  Accordingly, those claims would be included in this Complaint but for the Defendants' insistence that if the claims are alleged here, they will immediately seek to have the non-Alabama *Love* Providers held in contempt of the injunctions entered by Judge Moreno.  The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b.   they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor;

c.   they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed above) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

**Allegations Relating to the Rule of Reason Claims**

560.   For the non-prioritized proceedings, the relevant product markets are the same as those alleged in Paragraphs 342 - 350.  The relevant geographic markets are defined in the same way as the relevant geographic markets alleged in Paragraphs 351 - 352, except that the outer boundary of each Defendant's relevant geographic markets is the same as the boundary of that Defendant's service area.  Additional detail on the Defendants' market power within their service area is given below.

561.   The figures in the paragraphs below are taken from the 2013 AMA Competition Study, which includes Kaiser Permanente ("Kaiser").  In most markets where Kaiser is active in the health care financing market, it owns hospitals and ambulatory surgery centers and contracts

for doctor services only with the Permanente Medical Group and does not purchase nonemergency medical services from other healthcare providers. As a result, for most healthcare providers Kaiser is not a close or reasonable substitute for the Blues when those healthcare providers decide whether to contract with one of the Blues. This can cause the Blue's market share to be understated.

562.    Defendant Premera Blue Cross has market power throughout the State of Alaska in the health care financing market and in every market within Alaska. It also has market power in the State of Alaska and in every health services market. In Alaska, the Blue has a 60% market share in the entire state. Its lowest market share is 55% in the Anchorage area. Its highest market share is 67% in the Fairbanks area.

563.    Defendant Blue Cross Blue Shield of Arizona has market power at least in certain areas in Arizona in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Arizona in the health services markets and may have market power in the entire state. For example, it has a 53% market share in the Flagstaff market and a 41% market share in the Prescott area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Arizona. The Blue uses those subscribers to increase its market power.

564.    Defendant Arkansas Blue Cross and Blue Shield has market power at least in certain areas in Arkansas in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Arkansas in the health services markets and may have market power in the entire state. For example, it has a 56% market share in the Jonesboro market, a 52% market share in the Pine Bluff area, and a 40% market share in the Hot Springs area.

565.   Defendant Blue Cross of California d/b/a Anthem Blue Cross has market power at least in certain areas in California in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of California in the health services markets and may have market power in the entire state.  For example, it has a 50% market share in the Chico area, a 43% market share in the Bakersfield area,  a 58% market share in the El Centro area, a 45% market share in the Fresno area, a 61% market share in the Hanfor-Corcoran area, a 49% market share in the Madera area, a 58% market share in the Merced area, a 42% market share in the Oxnard-Thousand Oaks-Ventura area, a 58% market share in the Redding area, a 65% market share in the Salinas area, a 59% market share in the San Luis Obispo-Paso Robles area, a 51% market share in the Santa Barbara-Santa Maria area, a 49% market share in the Santa Cruz-Santa Maria area, a 58% market share in the Visalia-Porterville area, and a 70% market share in the Yuba City-Maryville area.  If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Blue Cross of California would be the largest health insurer in California and would have a market share of more than 50% in many other areas in California. These percentages are presented only for Defendant Blue Cross of California.  Defendant Blue Shield of California has somewhat lower market share percentages, but it and all of the other Blues are conspiring with Blue Cross of California.  The analysis of market shares in this paragraph includes Kaiser.  If Kaiser is excluded for reasons stated above, Blue Cross of California and Blue Shield of California will have much higher market share percentages in many areas in California.  Discovery may also show that other Blues have market power in areas in California and reserve the right to present that evidence in the motion for class certification.

566.    Defendant Anthem Blue Cross and Blue Shield of Colorado, a subsidiary of Defendant Anthem, has market power at least in certain areas in Colorado in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Colorado in the health services markets and may have market power in the entire state.  In Colorado, Kaiser has a significant presence.  If Kaiser is excluded from the economic analysis, the Anthem market share will increase significantly.

567.    Defendant Anthem Blue Cross and Blue Shield of Connecticut, a subsidiary of Defendant Anthem, has market power at least in certain areas in Connecticut in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Connecticut in the health services markets and may have market power in the entire state. For example, it has a 41% market share in the State of Connecticut generally, a 49% market share in the New Haven-Milford area, and a 49% market share in the Waterbury area. It also maintains market power in portions of the state of Rhode Island. Anthem maintains a 50% market share in the Norwich-New London CT-RI area.

568.    Defendant Highmark Blue Cross and Blue Shield Delaware, a subsidiary of defendant Highmark, Inc., has market power throughout the State of Delaware in the health care financing market and in every market within Delaware.  It also has market power in the State of Delaware and in every health services market.  In Delaware the Blue has a 64% market share in the entire state.  Its lowest market share is 51% in the Wilmington area.  Its highest market share is 75% in the Dover area.

569.    Defendant CareFirst, through Defendant GHMSI, has market power in the District of Columbia in the health care financing market and in every health services market.  CareFirst has a 44% market share in the District of Columbia.

570.    Defendant Blue Cross and Blue Shield of Florida, Inc. has market power at least in certain areas in Florida in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Florida in the health services markets and may have market power in the entire state.  For example, it has a 56% market share in the Fort Walton Beach – Crestview – Destin area, a 40% market share in the Deltona-Daytona Beach-Ormond Beach area, a 61% market share in the Gainesville area, a 55% market share in the Ocala market, a 43% market share in the Naples-Marco Island, FL area, a 67% market share in the Panama City/Lynn Haven area, a 46 % market share in the Pensacola-Ferry Pass- Brent area, a 43% market share in the Port St. Lucie-Fort Pierce area, an 84% market share in the Tallahassee area, and a 57% market share in the Vero Beach area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Florida.  The Blue uses those subscribers to increase its market power.

571.    Defendant Blue Cross and Blue Shield of Georgia, Inc., a subsidiary of Defendant Anthem, has market power at least in certain areas in Georgia in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Georgia in the health services markets and may have market power in the entire state. For example, it has a 57% market share in the Warner-Robins area, a 46% market share in the Albany area, 42% market share in the Athens-Clarke County area, a 44% area share in the Columbus GA-AL area, a 47% market share in the Valdosta area, and a 56% market share in the Hinesville/Fort Stewart area. Kaiser has some presence in Georgia and exclusion of it will affect some of the market share percentages.

572.    Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii has market power throughout the State of Hawaii in the health care financing market

and in every market within Hawaii.  It also has market power in the State of Hawaii and in every health services market.  In Hawaii, the Blue has a 65% market share in the entire state and has a 67% market share in the Honolulu area.  If Kaiser is excluded from the analysis, then its market share will be even greater.

573.    Defendant Blue Cross of Idaho Health Service, Inc., d/b/a Blue Cross of Idaho, has market power throughout the State of Idaho in the health care financing market and in every market within Idaho. It also has market power in the State of Idaho and in every health services market. In Idaho, the Blue has a 54% market share. Its highest market share is 58% in the Pocatello area.  It also maintains a 55% market share in the Boise-Nampa area, a 45% share in the Coeur d'Alene area, 53% market share in the Idaho Falls area, and a 45% share in the Lewiston ID-WA area. Idaho is one of the states where Blue Cross and Blue Shield compete with each other, and in many of these areas the second largest market share holder is fellow conspirator Regence BlueShield of Idaho.

574.    Defendant Blue Cross and Blue Shield of Illinois, a division of Defendant HCSC, has market power at least in certain areas in Illinois in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Illinois in the health services markets and may have market power in the entire state. For example, it has a 51% market share in the entire state. It also has a 58% market share in the Chicago/Naperville/Joliet area, a 48% share in the Bloomington-Normal area, a 57% market share in the Decatur area, a 51% market share in the Kankakee/Bradley market, a 45% share in the Lake County-Kenosha County, IL-WI area, and a 51% market share in the Rockford area.

575.    Defendant Anthem Blue Cross and Blue Shield of Indiana, a subsidiary of Defendant Anthem, has market power throughout the State of Indiana in the health care

financing market and in every market within Indiana.  It also has market power in the State of Indiana and in every health services market.  It has a market share of 51% in the entire state. Its highest market share is 68% in the Anderson area.  It also maintains a 56% market share in the Bloomington area, a 57% share in the Columbus area, a 62% share in the Elkhart-Goshen area, a 43% share in the Evansville IN-KY area, a 56% share in the Fort Wayne area, a 44% share in the Gary area, a 49% share in the Indianapolis area, a 54% share in Kokomo, a 56% share in the Michigan City-LaPorte area, a 63% share in the Muncie area, a 41% share in the South Bend-Mishawaka, IN-MI area, a 66% share in the Terre Haute area.

576.    Defendant Wellmark Blue Cross and Blue Shield of Iowa has market power at least in certain areas in Iowa in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Iowa in the health services markets and may have market power in the entire state. For example, it has a 52% market share in the entire state. It also has 76% market share in the Iowa City area, a 60% market share in the Cedar Rapids area, a 42 % share in the Des Moines area, a 53% market share in the Ames area, a 47% share in the Sioux City IA-NE area, and a 50% market share in the Dubuque area.

577.    Defendant Blue Cross and Blue Shield of Kansas has market power at least in certain areas in Kansas in the health care financing market and may have market power in the entire state.  Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of Kansas City have separate Service Areas within Kansas, the statewide market share percentages do not tell a complete story of market shares.  It has market power at least in certain areas in the State of Kansas in the health services markets and may have market power in the entire state. For

example, it has a 69% market share in the Topeka area (the home of Dr. Cain), a 45% share in the Wichita, Kansas and a 56% market share in the Lawrence area.

578.   Defendant Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant Anthem, has market power at least in certain areas in Kentucky in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the Commonwealth of Kentucky in the health services markets and may have market power in the entire state. For example, it has a 66% market share in the Owensboro area, a 46% share in Elizabethtown area and a 63% market share in the Bowling Green area.

579.   Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana has market power throughout the State of Louisiana in the health care financing market and in every market within Louisiana.  It also has market power in the State of Louisiana and in every health services market.  For example, it has a 57% market share in the entire state. Also, it has a 64% market share in the Alexandria area, a 59% market share in the Houma/Bayou Cane/Thibodaux and Monroe areas, a 56% market share in the Shreveport/Bossier City area, a 55% market share in the Lafayette area, a 52% market share in the Baton Rouge area, a 51% market share in the New Orleans/Metairie/Kenner area, and a 50% market share in the Lake Charles area.

580.   Defendant Anthem Blue Cross and Blue Shield of Maine, a subsidiary of Defendant Anthem, has market power throughout the State of Maine in the health care financing market and in every market within Maine.  It also has market power in the State of Maine and in every health services market.  For example, it has a 53% market share throughout the state. It also has a 57% market share in the Bangor area, a 56% market share in the Lewiston/Auburn area, and a 53% market share in the Portland/South Portland area.

581.    Defendant CareFirst, Inc., through Defendant CareFirst of Maryland has market power throughout the State of Maryland in the health care financing market and in every market within Maryland.  It also has market power in the State of Maryland and in every health services market.  For example, it has a market share of 48% of the entire state of Maryland. It also has a market share of 70% in the Salisbury area, a 43% market share in the Bethesda-Gaithersburg-Frederick area, a 42% Cumberland MD-WV area and a market share of 54% in the Baltimore/Towson area.

582.    Defendant Blue Cross and Blue Shield of Massachusetts, Inc. has market power at least in certain areas in Massachusetts in the health care financing market and may have market power in the entire state.   It has market power at least in certain areas in the State of Massachusetts in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (46%) throughout the entire state. It also has a 57% market share in the Pittsfield area, a 50% market share in the Lynn/Peabody/Salem area, a 42% market share in the Barnstable Town area, a 43% share in the Boston-Cambridge-Quincy area, a 45% share in the Framingham area, a 45% share of the Brockton-Bridgewater-Easton area, a 42% share of the Lowell-Billerica-Chelmsford, MA-NH area, a 48% share of the New Bedford area, a 40% share of the Springfield area, and 48% market share of the Taunton-Norton-Raynham area.

583.    Defendant Blue Cross and Blue Shield of Michigan has market power at least in certain areas in Michigan in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Michigan in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state. It also has an 81% market share in the Lansing/East Lansing and

Niles/Benton Harbor areas, a 77% market share in the Battle Creek area, a 73% market share in the Bay City area, a 72% market share in the Ann Arbor area, a 71% market share in the Saginaw/Saginaw Township North area, a 69% market share in the Monroe and Warren/Farmington Hills/Troy areas, a 67% market share in the Jackson area, a 66% market share in the Kalamazoo/Portage area, a 64% market share in the Flint area, a 58% market share in the Muskegon/Norton Shores area, and a 53% market share in the Detroit/Livonia/Dearborn area.

584. Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota has market power at least in certain areas in Minnesota in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Minnesota in the health services markets and may have market power in the entire state where it has at least a 44% market share. For example, it has 56% market share in the Rochester area, a 46% share of the Duluth, MN-WI area and a 48% market share in the St. Cloud area.

585. Defendant Blue Cross Blue Shield of Mississippi has market power at least in certain areas in Mississippi in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Mississippi in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (45%) throughout the entire state. For example, it has a 52% market share in the Pascagoula area, a 44% market share of the Gulfport-Biloxi area, a 41% share of the Hattiesburg area,   and a 48% market share in the Jackson area.

586. Defendant Blue Cross and Blue Shield of Kansas City has market power at least in certain parts of the states of Missouri and Kansas and the Kansas City area for the health care financing market and may have market power in the entire area. It has market power at least in

certain areas in the State of Kansas and Missouri in the health services markets and may have market power in the entire Kansas City area. For example, it has a 51% market share in the St. Joseph MO-KS area.

587.    Defendant Anthem Blue Cross and Blue Shield of Missouri, a subsidiary of Defendant Anthem, has market power at least in certain areas in Missouri in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Missouri in the health services markets and may have market power across the entire state. Discovery may also show that other Blues have market power in areas in Missouri and reserve the right to present that evidence in the motion for class certification

588.    Defendant Blue Cross and Blue Shield of Montana, a division of Defendant HCSC, has market power at least in certain areas in Montana in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of Montana in the health services markets and may have market power in the entire state. For example, it has a market share of 41% in the Great Falls area.

589.    Defendant Blue Cross and Blue Shield of Nebraska has market power throughout the State of Nebraska in the health care financing market and in every market within Nebraska. It also has market power in the State of Nebraska and in every health services market.  For example, it has a 56% market share in the entire state. It also has 60% market share in the Lincoln area.

590.    Defendant Anthem Blue Cross and Blue Shield of Nevada, the trade name of Defendant Rocky Mountain Health and Medical Services, Inc., both subsidiaries of Defendant Anthem, has market power at least in certain areas in Nevada in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in

the State of Nevada in the health services markets and may have market power in the entire state. For example, it maintains a market share of 44% in the Carson City area.

591.    Defendant Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, a subsidiary of Defendant Anthem, has market power at least in certain areas in New Hampshire in the health care financing market and may have market power in the entire state where it has a 44% market share.  It has market power at least in certain areas in the State of New Hampshire in the health services markets and may have market power in the entire state. For example, it has a market share of 53% in the Rochester/Dover area, and a 44% market share in the Portsmouth, NH-ME area

592.    Defendant Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross and Blue Shield of New Jersey has market power at least in certain areas in New Jersey in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of New Jersey in the health services markets and may have market power in the entire state. For example, it has a 60% market share in the Atlantic City area, a 57% market share in the Ocean City area, and a 42% share of the Vineland-Milville-Bridgeton area.

593.    Defendant Blue Cross and Blue Shield of New Mexico, a division of Defendant HCSC, has market power at least in certain areas in New Mexico in the health care financing market and may have market power in the entire state.  It has market power at least in certain areas in the State of New Mexico in the health services markets and may have market power in the entire state. For example, it maintains a 41% market share in the Santa Fe area.

594.    Defendant Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, a subsidiary of Lifetime Healthcare, Inc., has market power at least in certain areas in New York in the health care financing market.  It has market power at least in certain areas in the State of New

York in the health services markets. For example, it has a 56% market share in the Elmira area, 53% market share in the Syracuse area, a 43% market share in the Binghamton area, and a 41% market share in the Rochester area.  Discovery may also show that other Blues have market power in areas in New York and reserve the right to present that evidence in the motion for class certification.

595.    Defendant Blue Cross and Blue Shield of North Carolina has market power throughout the State of North Carolina in the health care financing market and in every market within North Carolina.  It also has market power in the State of North Carolina and in every health services market.  For example, it has a market share of almost half of the entire state. It also has a market share of 76% in the Goldsboro area, a market share of 75% in the Greenville area, a market share of 70% in the Rocky Mount area, a market share of 61% in the Hickory/Morganton/Lenoir area, a 47% market share in the Burlington area, a 44% market share in the Durham area, a 45% share in the Greensboro-High Point area, a 46% share in the Wilmington area, a 42% share of the Winston-Salem area, and a 51% market share in the Asheville area.

596.    Defendant Noridian Mutual Insurance Company, d/b/a Blue Cross Blue Shield of North Dakota has market power at least in certain areas in North Dakota in the health care financing market.  It has market power at least in certain areas in the State of North Dakota in the health services markets. For example, it has a 56% market share in the entire state.

597.    Defendant Community Health Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio, a subsidiary of Defendant Anthem, has market power at least in certain areas in Ohio in the health care financing market.  It has market power at least in certain areas in the State of Ohio in the health services markets.  It has a market share of 38% in the

Cincinnati/Middletown area, but since that area borders on Kentucky where Defendant Anthem also has the Blue, it likely has market power through its combined operations.

598.    Defendant Blue Cross and Blue Shield of Oklahoma has market power at least in certain areas in Oklahoma in the health care financing market.  It has market power at least in certain areas in the State of Oklahoma in the health services markets. For example, it has a market share of nearly half of the entire state. It also has a market share of 49% of the Tulsa area and a 45% share of the Oklahoma City area.

599.    Defendant Regence BlueCross BlueShield of Oregon, a subsidiary of Defendant Cambia Health, has market power at least in certain areas in Oregon in the health care financing market.  It has market power at least in certain areas in the State of Oregon in the health services markets. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Regence BlueCross BlueShield of Oregon would be the largest health insurer in Oregon and would have a market share of more than 50% in many areas in Oregon.

600.    Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania has market power at least in certain areas in Pennsylvania in the health care financing market.  It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% markets share in each of the Scranton/Wilkes-Barre and Williamsport areas.   Defendant Highmark is in the process of purchasing Blue Cross of Northeastern Pennsylvania.

601.    Defendant Highmark, Inc., the parent of Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield, has market power at least in certain areas in Pennsylvania in the health care financing market.  It has market power

at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 75% market share in the Johnstown area, a 73% market share in the Altoona area, a 69% market share in the Erie area, a 52% market share in the Pittsburgh area, a 45% share of the Harrisburg-Carlisle area, a 46% share of the Lebanon area, a 43% share of the Reading area, a 46% share of the State College area and a 42% of the York-Hanover area.

602.    Defendant Independence Blue Cross has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 58% market share in the Philadelphia area.

603.    Defendant Triple-S of Puerto Rico has market power in the health care financing market or markets in Puerto Rico. It also has market power in the health service markets in Puerto Rico. While the AMA Study does not contain data on Puerto Rico, the data from the National Association of Insurance Commissioners shows a 90% market share for the top four health insurance companies, and Plaintiffs allege that Triple-S of Puerto Rico is a significant portion of that percentage.

604.    Defendant Blue Cross and Blue Shield of Rhode Island has market power at least in certain areas in Rhode Island in the health care financing market. It has market power at least in certain areas in the State of Rhode Island in the health services markets. For example, it has a market share of 50% across the entire state.

605.    Defendant BlueCross BlueShield of South Carolina, Inc. has market power throughout the State of South Carolina in the health care financing market and in every market within South Carolina. It also has market power in the State of South Carolina and in every health services market. In South Carolina, the Blue has a 60% market share in the entire state. Its

highest market share is 71% in the Sumter market. It also maintains a market share of 57% in the Greenville area, a 63% share in the Anderson area, a 62% share in the Charleston-North Charleston area, a 61% share of the Columbia area, a 63% share of the Florence area, a 64% share of the Myrtle Beach area, and a 64% share of the Spartanburg area.

606.    Defendant Wellmark of South Dakota, Inc., d/b/a Wellmark Blue Cross and Blue Shield of South Dakota has market power at least in certain areas in South Dakota in the health care financing market.  It has market power at least in certain areas in the State of South Dakota in the health services markets.  For example, Wellmark has a 41% market share of the Rapid City area.

607.    Defendant BlueCross BlueShield of Tennessee, Inc. has market power at least in certain areas in Tennessee in the health care financing market.  It has market power at least in certain areas in the State of Tennessee in the health services markets. For example,  It has almost half of the market for the entire state of Tennessee. It also has a 51% market share of the Nashville-Davidson-Murfreesboro area, a 50% market share in the Jackson area, a 46% market share in the Chattanooga TN-GA area, a 44% share of the Cleveland area, a 46% share of the Johnson City area, and a 47% share of the Morristown area.

608.    Defendant Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, has market power at least in certain areas in Texas in the health care financing market.  It has market power at least in certain areas in the State of Texas in the health services markets. For example, it has a 78% market share in the Laredo area, a 75% market share in the Wichita Falls area, a 74% market share in the San Angelo area, a 66% market share in the Odessa area, a 65% market share in the McAllen/Edinburg-Mission area, a 62% market share in the Midland area, a 61% market share in each of the Brownsville/Harlingen and Tyler areas, a 59% market share in

each of the Lubbock and Texarkana areas, a 56% market share in the Longview area, a 55% market share in the Waco area, a 53% market share in the College Station/Bryan and Corpus Christi areas, a 41% share of the Waco area, a 48% share of the Sherman-Denison area and a 51% market share in the Beaumont/Port Arthur area.

609.    Defendant BlueCross BlueShield of Utah, a subsidiary of Defendant Cambia Health, has the Blue Service Area for Utah. Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

610.    Defendant Blue Cross and Blue Shield of Vermont has market power at least in certain areas in Vermont in the health care financing market.  It has market power at least in certain areas in the State of Vermont in the health services markets. For example, it has a market share of 42% in the Burlington/South Burlington area.

611.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., a subsidiary of Defendant Anthem, has market power at least in certain areas in Virginia in the health care financing market.  It has market power at least in certain areas in the State of Virginia in the health services markets. For example, it has an 85% market share in the Danville area, a 77% market share in the Blacksburg/Christianburg/Redford area, a 68% market share in the Harrisonburg area, a 67% market share in the Roanoke area, a 62% market share in the Lynchburg area, a 56% market share in the Winchester area, a 52% market share in the Virginia Beach/Norfolk/Newport News area, a 50% market share in the Richmond area, and a 47% share of the Charlottesville area.  CareFirst has the Blue Service Area in the northern part of the state near Washington, D.C.  Plaintiffs do not have data for the market

share in that Service Area.  If discovery demonstrates that CareFirst has market power in that area, then Plaintiffs will address the issue in their motion for class certification.

612.   Defendant Premera Blue Cross has market power at least in certain areas in Washington in the health care financing market.  It has market power at least in certain areas in the State of Washington in the health services markets. For example, it has a 69% market share in the Wenatchee area.  Defendant Regence BlueShield also operates in Washington and has significant market shares in areas in Washington.  Kaiser also has a significant presence in Washington, and as stated above, may need to be excluded from the analysis of whether Premera or Regence has market power over providers in Washington or markets for health care services in that state.  There may also be other managed care companies or health insurance companies operating in Washington that should be excluded from the market power analysis. Especially if Kaiser is excluded, Regence has market power in markets for health care services in Washington. These issues will be further addressed and developed in the Plaintiffs' motion for class certification.

613.   Defendant Highmark of West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, a subsidiary of Defendant Highmark, has market power at least in certain areas in West Virginia in the health care financing market.  It has market power at least in certain areas in the State of West Virginia in the health services markets. For example, it has a market share of 41% in the entire state of West Virginia, 42 % of the Charleston, WV area, and a 40% share of the Morgantown area.

614.   Defendant Blue Cross Blue Shield of Wisconsin, a subsidiary of Defendant Anthem, has the Blue Service Area for the State of Wisconsin.  Plaintiffs will conduct discovery

to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

615.    Defendant Blue Cross Blue Shield of Wyoming has the Blue Service Area for the State of Wyoming.  Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

## Implementation of the Affordable Care Act

616.    Of the 15 states where complete data on market share of the health insurance exchanges are available, Blues have obtained the greatest percentage of covered lives in 12 of those states.   The 12 states (including the District of Columbia) are California, Colorado, Connecticut, Indiana, Virginia, the District of Columbia, Florida, Maryland, Michigan, Rhode Island, Vermont, and Washington. Plaintiffs allege that even though the data is not available in many other states including Alabama and Tennessee, the Blues have increased their market shares through the exchanges.

## Class Action Allegations

617.    Plaintiffs bring this action on behalf of themselves and on behalf of a class of healthcare providers.  First, Plaintiffs bring this action seeking injunctive relief pursuant to the provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following Class (the "Nationwide Injunction Class"):

> All healthcare providers, not owned or employed by any of the Defendants, who currently provide healthcare services, equipment or supplies in the United States of America.

618.    Further, Plaintiffs bring this action seeking damages pursuant to the provisions of Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Nationwide Damages Class"):

> All healthcare providers, not owned or employed by any of the Defendants, in the United States of America, who provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant within four years prior to the date of the filing of this action.

619.   For Plaintiffs' claims relating to violations of Section 1 of the Sherman Act under the rule of reason (Counts VI and VII), and claims relating to monopsonization and attempted monopsonization under Section 2 of the Sherman Act, (Counts VIII and IX), this class will have subclasses based on the geographic area in which each Plaintiff practices. In paragraphs 345-346; 351-354; 561-615, Plaintiffs have identified a number of geographic areas in which Defendants have market power. For Counts VI, VII, and IX, there is a subclass for each geographic area in which a Defendant has a market share of 40% or more, although Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis.  For Count VIII, there is a subclass for each geographic area in which a Defendant has a market share of 70% or more although Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis. Prior to class certification, Plaintiffs reserve the right to amend the definition of the subclasses if discovery into Defendants' market power warrants.

620.   Plaintiffs also reserve the right to request class certification under Rule 23(c)(4), Federal Rules of Civil Procedure.

621.   Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

622.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members.  The Class Members are so numerous that joinder of all members is impracticable.

623.    Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform.  Common questions of law and fact will predominate over any individual questions of law and fact.

624.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

625.    There will be no extraordinary difficulty in the management of this Class Action.  Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members.   Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a.    Whether Defendants violated Section 1 of the Sherman Act;

b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d.    Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute per se illegal restraint of trade in violation of Section 1 of the Sherman Act;

e.      Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f.      Whether Defendants violated Section 2 of the Sherman Act;

g.      Whether the Blues collectively or any particular Blue has market power in a particular market;

h.      Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;

i.      Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

j.      Whether Defendants' conduct should be enjoined;

k.      The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

626.    These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

627.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

628.    This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible.  The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## COUNT I

### Claim for Injunctive Relief, 15 U.S.C. § 26

629.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

630.   This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

631.   As explained in Counts II through VII, Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 under a per se, quick look, or rule of reason analysis.

632.   As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

633.   Defendants' unlawful conduct threatens to continue to injure Plaintiffs.  Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their illegal conspiracies and to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

634.   Plaintiffs reserve the right to seek preliminary injunctions as necessary.

## COUNT II

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (The *Per Se* Market Allocation Conspiracy)

635.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

636.   Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

637.    As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

638.    Defendants have agreed to divide and allocate the geographic markets for the finance of health care into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined.  By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare providers in violation of Section 1 of the Sherman Act.  Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide.  Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

639.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

## COUNT III

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(The *Per Se* Price Fixing and Boycott Conspiracy)**

640.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

641.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

642.     The BCBS Price Fixing and Boycott Conspiracy operates in addition to and reinforces the Market Allocation Conspiracy.   The Conspiracy alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a per se violation of the Act.

643.     Through the Price Fixing and Boycott Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs.   By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' price fixing agreement through the national programs is per se illegal under Section 1 of the Sherman Act.

644.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.   Such injury flows directly from that which makes Defendants' conduct unlawful.   These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

645.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT IV

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**Quick Look Claim for Market Allocation Conspiracy**

646.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

647.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

648.    Under a quick look analysis Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act.

649.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999). The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

650.    The Market Allocation Conspiracy prevents the Blues, including many of the largest participants in the relevant product markets defined above, from competing nationally, regionally, or in the relevant geographic markets defined above.

651.    The Market Allocation Conspiracy has no pro-competitive effect. The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

652.    The Defendants have not offered any new product. Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

653.    Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

654.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

655.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT V

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Quick Look Claim for Price Fixing and Boycott Conspiracy)

656.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

657.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

658.    Under a quick look analysis Defendants' Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act.

659.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).  The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

660.    The Price Fixing and Boycott Conspiracy has the same effect and also results in price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from negotiating the price of the goods and services in the relevant markets described above.  *See Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

661.    The Price Fixing and Boycott Conspiracy has no pro-competitive effect.  The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

662.    The Defendants have not offered any new product.  Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

663.    Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

664.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

665.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

<u>COUNT VI</u>

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Rule of Reason Claims for Market Allocation Conspiracy)**

666.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

667.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

668.    Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

669.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

670.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

<u>COUNT VII</u>

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Rule of Reason Claims for Price Fixing and Boycott Conspiracy)**

671.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

672.     Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

673.     Defendants Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

674.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

675.     Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

## COUNT VIII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Monopsonization)

676.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

677.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

678.     As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets described above.  For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although

Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants. This monopsony power has been durable, lasting for decades.

679.     These Defendants' creation of monopsony power was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsony power.

680.     By willfully creating or maintaining monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

681.     As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

682.     As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

### COUNT IX

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Attempted Monopsonization)**

683.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

684.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

685.    As alleged more specifically above, the Defendants have engaged in conduct by which they have attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.  For purposes of this Count, these Defendants are the ones identified as having a market share of 40% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants.

686.    These Defendants specifically intended to create monopsony power. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.

687.    By attempting to create or maintain monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when the Defendants have not yet created or maintained monopsony power, their conduct has created a dangerous risk of success.

688.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly from that which makes the Defendants' conduct unlawful.  These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

689.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

## COUNT X

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Conspiracy to Monopsonize)**

690.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

691.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

692.    As alleged more specifically above, the Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power.  The Defendants specifically intended to create monopsony power. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.  All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

693.    By conspiring to create or maintain monopsony power, the Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

694.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent.  Such injury flows directly

from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

695.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.    Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

d.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

e.    Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.    Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

g.   In particular with respect to the Blue Card Program request the following

permanent injunctive relief be ordered by Court:

1)   The Defendants are enjoined from refusing to contract with Providers in Alabama even though those Providers are outside of the Defendants' service areas or adjacent counties thereto.  Providers in Alabama may request contract negotiations with any Blue Plan with members residing in Alabama, and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

2)   The Defendants are enjoined from refusing to contract with national and regional hospital chains with hospitals in Alabama to provide services to their members throughout the country, in the same manner that the Blue Plans are allowed to negotiate with national and regional pharmacy chains. The national and regional provider chains may request contract negotiations with any Blue Plan and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

3)   Defendants may continue to operate the BlueCard Program.  However, each Provider in Alabama shall have the right to opt-out of the Blue Card Program for any Blue that is either a Home Plan or Control Plan for any subscribers in Alabama, while remaining in the networks of BCBS-AL, and those Home Plans and Control Plans will have a good faith obligation to negotiate with the Providers who opt-out of the BlueCard Program. The opt-out right will be on a Blue by Blue basis so that a Provider will have the right to opt-out with respect to one Blue Plan but remain in the BlueCard Program for another Blue Plan.  The opt-out right shall be exercised on a year by year basis.

4)   Providers who are out of network for BCBS-AL but who treat subscribers of any other Blue Plan may request contract negotiations with any such Blue Plan and any such Blue Plan shall have a good faith obligation to negotiate with the Provider.

5)   The failure of a Provider to negotiate in good faith with a Defendant will be a defense to any compliance dispute brought by a Provider under the terms of this injunction.

6)   Defendants' may use non-Blue rental networks to supplement their networks, and any prohibition against the use of such a rental network is enjoined.

h.   Permanently enjoin Defendants from continuing with the Price Fixing and

Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

232

i.      Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

j.      Require on-going periodic reporting on compliance by the Defendants, monitoring by the Special Master and the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

k.      Award Plaintiffs and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

l.      Award costs and attorneys' fees to Plaintiffs;

m.      Award prejudgment interest;

n.      For a trial by jury; and

o.      Award any such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

233

Date:  April 17, 2017

Respectfully submitted,

*/s/ Edith M. Kallas*

Edith M. Kallas – ***Co-Lead Counsel***
Michael S. Lyons
WHATLEY KALLAS, LLP
1180 Avenue of the Americas, 20th Floor
New York, NY 10036
Tel:  (212) 447-7060
Fax:  (800) 922-4851
Email:  ekallas@whatleykallas.com
            mlyons@whatleykallas.com

Patrick J. Sheehan
WHATLEY KALLAS, LLP
60 State Street, 7th Floor
Boston, MA 02109
Tel:  (617) 573-5118
Fax:  (617) 371-2950
Email:  psheehan@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel:  (603) 294-1591
Fax:  (800) 922-4851
Email:  hquillen@whatleykallas.com

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (281) 768-4731
Fax: (713) 583-7047
chunter@hayeshunterlaw.com

*/s/ Joe R. Whatley, Jr.*

Joe R. Whatley, Jr. – ***Co-Lead Counsel***
W. Tucker Brown
Helen L. Eckinger
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1200
Fax:  (800) 922-4851
Email:  jwhatley@whatleykallas.com
            tbrown@whatleykallas.com
            heckinger@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email:  dwinegard@whatleykallas.com

E. Kirk Wood, Jr. – ***Local Facilitating Counsel***
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email:  ekirkwood1@bellsouth.net

Aaron S. Podhurst – ***Plaintiffs' Steering Committee***
Peter Prieto – ***Chair, Expert Committee***
PODHURST ORSECK, P.A.
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email:  apodhurst@podhurst.com
            pprieto@podhurst.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email:  dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email:  mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
  & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email:  nbroth@eysterkey.com
        jroth@eysterkey.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
  BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email:  vbunch@bffb.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email:  david.balto@dcantitrustlaw.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD & DEAN LLP
830 Third Avenue, 5th Floor
New York, NY 10022
Tel:  (646) 448-5263
Fax:  (212) 840-8560
Email:  rjaxelrod@axelroddean.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
   & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

Peter H. Burke – *Class Certification Committee*
J. Allen Schreiber – *Litigation Committee*
BURKE HARVEY, LLC
3535 Grandview Parkway
Suite 100
Birmingham, AL  35243
Tel:  (205) 930-9091
Fax:  (205) 930-9054
Email:  pburke@burkeharvey.com
           aschreiber@burkeharvey.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
           ccrow@jinkslaw.com

Harley S. Tropin – **Damages Committee**
Javier A. Lopez – **Discovery Committee**
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
          jal@kttlaw.com

Myron C. Penn – **Discovery Committee**
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

C. Wes Pittman – **Settlement Committee**
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

J. Preston Strom, Jr. – **Litigation Committee**
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

Robert B. Roden – **Litigation Committee**
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Thomas V. Bender – **Discovery Committee**
WALTERS BENDER STROHBEHN
  & VAUGHAN, P.C.
2500 City Center Square, 1100 Main
Kansas City, MO 64105
Tel:  (816) 421-6620
Fax:  (816) 421-4747
Email: tbender@wbsvlaw.com

Gary E. Mason – **Class Certification Committee**
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Gregory S. Cusimano – **Litigation Committee**
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Michael L. Murphy – **Discovery Committee**
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email: lance@searsassociates.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
         Ray@dillonfindley.com
         Molly@dillonfindley.com

James Redmond
Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Jim.Redmond@heidmanlaw.com
         Cynthia.Moser@heidmanlaw.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

238

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 17th day of April 2017, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.


*/s/ Joe R. Whatley, Jr.*
Joe R. Whatley, Jr.