**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**In re: BLUE CROSS BLUE SHIELD**       **MDL No. 2406**
**ANTITRUST LITIGATION**

---

### NOTICE OF POTENTIAL TAG-ALONG ACTION

To:    Clerk of the Panel
       Judicial Panel on Multidistrict Litigation
       Thurgood Marshall Federal Judiciary Building
       One Columbus Circle, N.E.
       Room G-255, North Lobby
       Washington, D.C. 20002-8004

Pursuant to Rule 7.1(a) of the Rules of Procedure for the United States Judicial Panel on Multidistrict Litigation, Defendant in the following related action, Blue Cross Blue Shield of Michigan ("BCBSM"), hereby gives notice of such action filed in the United States District Court for the Eastern District of Michigan: *Anesthesia Associates of Ann Arbor, PLLC v. Blue Cross Blue Shield of Michigan*, No. 2:20-cv-12916-TGB-APP (the "A4 Action"). A copy of the docket sheet is attached as Exhibit 1A. An annotated copy of the Amended Complaint (the "A4 Complaint") is attached as Exhibit 1B (A4 Action ECF No. 53).

### I.    Background

On October 29, 2020, Anesthesia Associates of Ann Arbor ("A4") filed a lawsuit against BCBSM in the Eastern District of Michigan alleging that BCBSM violated federal antitrust laws and various state laws. *See generally*, A4 Action, ECF No. 1. A4 asserted that BCBSM, the alleged dominant purchaser of anesthesiology services in Michigan, offered A4 an unacceptably low price for a network contract and when A4 refused, BCBSM pressured hospitals to stop working with A4 and tried to persuade hospitals to hire A4's anesthesiologists. *Id.* A4 alleged that BCBSM built its dominance using horizontal agreements with other Blue Cross Blue Shield Plans ("Blue Plans")

that precluded them from competing in Michigan. *Id.* at ¶ 35-39. At the time, BCBSM noted the relationship to the *In re Blue Cross Blue Shield Antitrust Litigation*, 2:13-CV-20000-RDP (N.D. Ala.) (the "MDL Litigation") but did not tag the case then, as the claims did not entirely overlap with the claims in the MDL Litigation and A4's allegations at the time were primarily focused on BCBSM supposedly pressuring the local Michigan hospitals to not work with A4 or hire its anesthesiologists. BCBSM also believed the case would be dismissed and transfer would become moot.

On September 14, 2021, the Eastern District of Michigan granted BCBSM's motion to dismiss all of A4's claims without prejudice. A4 Action, ECF No. 41.  A4 subsequently moved to amend its complaint.  A4 Action, ECF No. 43.  On September 28, 2022, the Court granted in part and denied in part A4's motion, holding that the only federal antitrust claims that can proceed in A4's suit are allegations related to BCBSM's alleged agreements with the other Blue Plans (the "Blue System Claims").  A4 Action, ECF No. 52. This ruling was based in large part on Judge David Proctor's rulings on various Motions to Dismiss filed in the MDL, in light of the Eastern District of Michigan's finding that the "provider-plaintiffs' allegations closely track A4's allegations against BCBS-MI" and that there is an "**uncanny similarity** between A4's [Blue System] allegations and the In re Blue Cross healthcare providers' claims . . . ." *Id.* at Page 32, 30 (emphasis added). The Eastern District of Michigan further cited the opinions of the MDL court in reaching the outcome of the Order Regarding Amendment and noted areas where the MDL court will need to further opine on issues such as the standard of review. *Id.* at 29, 31 (citing *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1180, 1187 (N.D. Ala. 2014)).

A4 filed its Amended Complaint on October 7, 2022, s*ee* Exhibit 1B. However, A4's Amended Complaint continued to assert state law claims that did not relate to or implicate the Blue

System Claims. *See id*. BCBSM therefore filed a Motion to Dismiss and to Strike on October 21, 2022, asking the Eastern District of Michigan to dismiss A4's state law claims and strike factual allegations that related only to the dismissed claims. A4 Action, ECF No. 57. The Eastern District of Michigan granted that Motion in full on December 29, 2022, finding that the state law claims were unrelated to the Blue System Claims and the exercise of supplemental jurisdiction was inappropriate. A4 Action, ECF No. 63.[1] This ruling has the result that only the Blues System Claims remain operative. Thereafter, BCBSM promptly filed this notice.

## II.   The Newly Narrowed Claims in the A4 Action Are Nearly Identical to Claims in Cases Centralized in the BCBS Antitrust MDL

The Eastern District of Michigan's September 28, 2022 and December 29, 2022 Orders narrowed the A4 Action, and the only remaining claims are identical to the allegations raised in the actions centralized as *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, 13-cv-20000 (N.D. Ala.) (the "BCBS Antitrust MDL" or "MDL").  As the Panel will recall, the BCBS Antitrust MDL contains dozens of lawsuits brought on behalf of healthcare providers, alleging those Blue Plans and the Blue Cross Blue Shield Association ("BCBSA") violated the antitrust laws by, amongst other things, allocating exclusive territories and establishing revenue restrictions. *See In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d 1373, 1376 (J.P.M.L. 2012). In centralizing the numerous actions, the Panel found that (1) they "involve substantial common questions of fact relating to the state [Blue Plans'] relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas," and (2) the "Blue Plans are alleged to be coconspirators." *Id*. Further, the Panel previously

---

[1] Exhibit 1B shows A4's October 7, 2022 complaint with annotations showing the portions that the Court's December 29, 2022 order dismissed and struck.

determined that the Northern District of Alabama was an appropriate Section 1407 forum for actions sharing factual questions regarding "the licensing agreements between and among the Blue Cross Blue Shield Association (BCBSA) and its 38 licensees (Blue Plans)." *Id*. at 1374, 1376.

A4 is an anesthesiology practice group operating primarily in Southeast Michigan. A4 Amended Complaint, ¶ 40. As a healthcare provider offering healthcare services in the United States of America, including to BCBSM-covered members, A4 is a putative member of the provider class in the MDL. *See* MDL Provider Compl. ¶ 617–18 (alleging a "Nationwide Injunction Class" and "Nationwide Damages Class" consisting of "All healthcare providers, not owned or employed by any of the Defendants, who currently provide healthcare services, equipment or supplies in the United States of America" and such providers to the extent they "provided covered services . . . to any patient who was insured by, or who was a member or beneficiary of any plan administered by" an MDL defendant).

A4 does not merely plead common questions of fact with those in the BCBS Antitrust MDL—it copies, nearly verbatim, significant portions of its Amended Complaint from the MDL Consolidated Fourth Amended Provider Complaint ("MDL Provider Complaint," attached as Exhibit 2), and proceeds under similar legal theories.[2] Indeed, A4 is represented by lead counsel

---

[2] The position taken by A4 as to the anticompetitive nature of the Blues system, given that David Boies, in his role as lead counsel for the Subscriber class, made a number of statements on the record as to its *pro-competitive* nature:

> In this particular context, I think there can be no doubt that the new system, the post-settlement system, is substantially more procompetitive than the old system. . . .

> I think the Court can find that it would not have made its per se decision in the face of the procompetitive injunctive relief that has been proposed or, put differently, that if the world that the Court had been confronted with at the time of its decision was the post-settlement world, the Court would not have found that to have been per se unlawful. I think the Court can also easily find that the procompetitive

for the class of subscriber plaintiffs, and therefore has counsel that is intimately familiar with the

MDL. The following examples are a non-exhaustive list of the numerous sections, and the express

allegations contained therein, from A4's complaint that are identical or nearly identical to those in

the MDL Provider Complaint:

| MDL Provider Complaint (Ex. 2) | A4 Amended Complaint (Ex. 1B) |
|---|---|
| All of the Blues are required to participate in the Blue Card program, through which they process claims by a provider in one Service Area on behalf of a patient whose Blue plan is based in another Service Area. Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan." Generally, when a provider treats a patient who is a member of a plan outside the provider's service area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays. The provider is paid based on the reimbursement rates or prices in his or her contract with the Host Plan . . . The Blue Card and | "The BlueCard program is a method through which BCBSM can process claims by a provider in its service area on behalf of a patient covered by another Blue plan, and vice versa. Under the BlueCard program, the patient's Blue insurer is referred to as the "Home Plan," while the Blue located where the medical service is provided is the "Host Plan." If a healthcare provider treats someone covered by a Blue plan in another state, the healthcare provider must submit their claim to the Host Plan, after which the claim is transmitted to the Home Plan for processing. The provider is paid based on the reimbursement rates in his or her contract with the Host Plan—thereby fixing prices between the Host Plan and the Home Plan." ¶ 95. |

---

benefits of the settlement substantially outweigh any remaining anticompetitive
elements of the system.

*Hearing on Preliminary Approval of Subscriber Track Settlement*, ECF 2626, 45:21–23, 52:11–
20. Mr. Boies' co-counsel, Michael Hausfeld, also concurred with the statement that "the only
reason BlueCard exists is because service areas exist. And without service areas and the kind of
cooperation that they facilitate, there would be no BlueCard and there would be no benefits like
BlueCard gives to the subscribers." *Id*. at 161:17-20; 162:12.

By contrast, in the A4 Amended Complaint, Mr. Boies' colleagues at Boies Shiller Flexner LLP
specifically state that "[t]here is no pro-competitive justification for BCBSM's horizontal
conspiracy with the other Blues." A4 Amended Complaint, ¶ 99. In fact, BlueCard is a key
remaining element of the Blue System, which A4 directly attacks. *Id*. at ¶ 26 (stating that the
BlueCard program is a "method by which the Blues fix prices and boycott healthcare providers").

| | |
|---|---|
| National Accounts programs are thus agreements to fix prices." ¶¶ 201–203. | |
| "[I[n order to be paid, [a provider] must comply with the medical policy and other requirements of the Home Plan, to which he or she often does not have access. As a result of the Blue Card system, Providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for Providers and the health care system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the Providers." ¶ 201. | "Adding to the administrative difficulties, the provider must comply with the medical policy and other requirements of the Home Plan, to which he or she often does not have access. As a result of the BlueCard system, A4 is expected to comply with myriad different variations of medical policies, creating inefficiencies, adding to administrative costs and resulting in claim denials, in whole or part based upon the lack of information available about the various other Blue plans." ¶ 96. |
| "The Blues provide health insurance coverage for nearly 105 million people in the United States. . . . According to the BCBSA's own estimates, more than 93% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues." ¶ 3. | "Together, the Blues insure around 105 million Americans and have provider networks including around 96% of hospitals and around 93% of professional providers." ¶ 89. |
| Even when Defendants have significant enrollees in another Blue's service area, including Alabama, the Defendants have agreed that they will not contract with Providers outside of their service areas except in limited circumstances. . . . Defendants agreed that each Defendant would be allocated a defined Service Area and further agreed that each Defendant's ability to operate and to generate revenue outside its geographic Service Area would be severely restricted. Accordingly, Defendants have agreed to an allocation of markets and have agreed not to compete with each other within those markets." ¶¶ 3, 5. | "For example, the "amended license agreement" includes an agreement to allocate geographic markets, referred to as "services areas," among the Blues, pursuant to which Blues will refrain, with limited exceptions, from competing in each other's service areas and will curtail competition involving their non-Blue affiliates." ¶ 90. |
| The non-Blue revenue restriction agreement, which the Blues call "best efforts rules" to hide the obvious anti-competitive effects of this agreement also reinforces the other agreements and prevents the Defendants from engaging in meaningful competition in any manner. . . . Those restrictions prevent any Blue license holder from receiving more than 20% of its revenue from non-Blue business in a service area or more than one third of its revenue company-wide from non-Blue business." ¶ 15. | "Under these so-called "Best Efforts" rules, a Blue license holder cannot receive more than 20% of its revenue from non-Blue business in its designated service area and cannot receive more than 33% of its company-wide revenue from non-Blue business. These limits, which are output restrictions on non-Blue revenues, ensure that Blues will not circumvent the service area allocations by competing with each other using non-Blue subsidiaries." ¶ 91. |

| | |
|---|---|
| "One goal of the Blues' actions is to create or maintain monopsony power in the markets for health care services, facilities, and goods, and thus the Blues have conspired to monopsonize those markets. In many geographic areas, the Blues have successfully created or maintained monopsony power, or have created a dangerous probability of achieving monopsony power. This conduct violates Section 2 of the Sherman Act." ¶ 17. | "BCBSM entered into a horizontal conspiracy with other insurers nationwide to suppress competition and monopsonize the markets for buying healthcare provider services, including hospital services and anesthesiology services. BCBSM entered into this horizontal conspiracy with other Blues— commercial health insurance companies licensing the Blue Cross Blue Shield brand." ¶ 88. |
| "The Market Allocation Conspiracy reduces the competition that each Blue faces and allows it to reduce the prices that it pays to healthcare providers. The Price Fixing and Boycott Conspiracy fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices and further provides that the participating Blues will collectively boycott all Providers outside of their Service Areas. . . . The overall Blues' system and the efforts that the Blues have made since the long-term business strategy reduce competition in healthcare networks, add to inefficiencies, reduce the quality of healthcare outcomes, and ultimately increase costs in healthcare." ¶¶ 1, 11. | This horizontal conspiracy results in BCBSM enjoying less competition in Michigan both for selling commercial health insurance and for signing providers up to its network. In exchange, BCBSM restricts its competition with the other Blues in their service areas. By restraining competition with the other Blues and their affiliates, BCBSM is able to pay providers less than it otherwise would have: lowering its costs and increasing its control of the Michigan commercial health insurance market. These restrictions have no pro-competitive justification, and instead serve to protect BCBSM and the other Blues from the normal market forces that drive competition and innovation, while harming competing health insurers, healthcare providers, and consumers." ¶ 92. |
| "But for the horizontal conspiracy among Blues insurers, BCBS-WISC, BCBS-OH, or both would likely offer health care products in neighboring Michigan, thereby exerting competitive pressures against both BCBSM's monopsony and monopoly power. However, the geographic and output restrictions in the "amended license agreement" allow BCBSM to insulate itself from the normal forces of competition, thereby allowing BCBSM to keep premiums up and provider reimbursements down." ¶ 327. | "In addition, the 'amended license agreement' also requires Blues to fix prices and boycott healthcare providers outside their service area (the 'Price Fixing and Boycott' conspiracy)." ¶ 94. |
| "Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the markets for health care financing and health services." ¶ 117. | Other Blues would compete with BCBSM, and vice-versa, under normal market conditions . . . . But for the horizontal conspiracy among Blues insurers, BCBS-WISC, BCBS-OH, or both would likely offer health care products in neighboring Michigan, thereby exerting competitive pressures against both BCBSM's monopsony and monopoly |

| | |
|---|---|
| "The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another." ¶ 126. | power. However, the geographic and output restrictions in the "amended license agreement" allow BCBSM to insulate itself from the normal forces of competition, thereby allowing BCBSM to keep premiums up and provider reimbursements down." ¶ 93. |
| "The national programs including the Blue Card and National Accounts Programs are implemented in a horizontal manner. For example, when a hospital in east Alabama billed other Defendant Blues directly for services provided to their subscribers, those Blues, including Blue Cross of Minnesota paid for those services at the rates that it normally pays, which are higher than the rates paid by Blue Cross of Alabama. When Blue Cross of Alabama learned of those payments, it then recouped the difference between those two rates." ¶ 331.<br><br>"Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices." ¶ 333. | "As part of the Price Fixing and Boycott conspiracy, BCBSM and the other Blues have also agreed not to contract with providers outside of their respective service areas. This boycott means that A4's only option for providing services in Michigan to patients insured under other Blues is to do so through BCBSM, using the BlueCard program. A4 is therefore forced to accept BCBSM's anesthesiology rate when it covers patients insured by any of the Blues, regardless of what those insurers' rates are. This price fixing in turn keeps the anesthesiology rates in Michigan artificially suppressed. . . . For example, Blue Cross Blue Shield of Florida uses conversion rates of around $70 - $80, significantly higher than BCBSM's $63.76 conversion rate in 2020. However, when A4 treats patients insured by Blue Cross Blue Shield of Florida, it must accept BCBSM's lower rate." ¶¶ 97-98. |

Given that the factual basis for the A4 Blue System Claims occur in a bare sixteen paragraphs, the degree of overlap shown in the above establishes exactly how similar the A4 Blue System Claims are to the claims asserted in the MDL litigation. In addition, much of the product market allegations in the A4 Amended Complaint appear to have been copied directly out of the MDL Provider Complaint. *Compare* A4 Amended Complaint, ¶ 198–200, 202 to MDL Provider Complaint, ¶ 339–40, 348. Further, following the Eastern District of Michigan Court's December 29, 2022 Order, the only claims remaining are those "based on the allegedly anticompetitive effects of BCBS-MI's agreements with other Blues across the country." A4 Action, ECF No. 63, PageID.2430.

The common allegations and legal theories provide a sufficient justification for this Panel to transfer the A4 Action to the MDL, as noted by prior orders of this Panel in transferring other related actions. As this Panel has held: "Transfer under Section 1407 does not require a complete identity of common factual issues as a prerequisite to transfer, and the presence of additional facts or differing legal theories is not significant when the actions still arise from a common factual core." *In re: Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. at 1376; *see also*, Transfer Order, MDL No. 2406 [Dkt. 1600] at 1 (although Plaintiffs' action "focuses on anticompetitive conduct that occurred in Iowa against Iowa chiropractors by Iowa-based defendants . . . plaintiffs still allege sufficient factual overlap . . . to justify transfer.")

The A4 Action easily surpasses the bar set in these Orders—the A4 Amended Complaint does not merely share allegations with the MDL Provider Complaint, they possess near "complete identity of common factual issues." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376.

## III. Transferring the A4 Action to the BCBS Antitrust MDL Promotes Efficient Resolution of Common Allegations and Prevents Inconsistent Rulings.

Because of the similarities between the A4 Amended Complaint and the MDL Provider Complaint, transferring the A4 Action to the MDL will allow a single court to address underlying claims and the legality of the BCBSA License Agreements. The Northern District of Alabama has unique expertise as "an experienced transferee judge who is already familiar with the contours of the litigation." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376. And transferring the A4 Action to the MDL will "prevent inconsistent pretrial rulings" on the "common questions of fact" presented by these cases. *Id*. This is particularly true because a local court and local judge have already had the opportunity to evaluate and rule on those issues related to local

issues, and all that is left to determine are claims that stem from the same general claims about the Blue System as are asserted in the MDL.

As the Eastern District of Michigan Court intimated, failing to transfer the A4 Action to the MDL creates a significant risk of conflicting rulings from different courts on the purported existence of the nationwide conspiracy and the effects of the BCBSA License Agreements on providers. The Panel has consistently held that the potential for inconsistent rulings is a significant factor warranting transfer of related actions. *See In re BP Sec., Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d 1380, 1382 (J.P.M.L. 2010) (transferring cases to existing MDL to "prevent inconsistent pretrial rulings on discovery disputes and other pretrial issues"); *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 474 F. Supp. 2d 1355, 1356 (J.P.M.L. 2007) (affirming transfer of actions to previously centralized action to "prevent inconsistent pretrial rulings"). The potential for inconsistent rulings by itself heavily weighs in favor of transferring the A4 Action to the MDL.

## IV.   Transferring the A4 Action to the BCBS Antitrust MDL Eliminates the Risk of Duplicative Discovery and Conserves Resources of Both the Courts and the Parties.

Transferring the A4 Action to the BCBS Antitrust MDL will allow consistent management of cases with similar, overlapping allegations and thereby avoid imposing duplicative or inconsistent discovery obligations on BCBSM. The Panel centralized the initial actions in the MDL in large part to "eliminate duplicative discovery" and "conserve the resources of the parties, their counsel, and the judiciary." *In re Blue Cross Blue Shield Antitrust Litig.*, 908 F. Supp. 2d at 1376. Transferring the A4 Action will help achieve these same goals.

The Panel has repeatedly held that transfer is warranted where there is potential for reducing duplicative discovery obligations. *See In re BP Sec., Derivative and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 734 F. Supp. 2d at 1382 (transferring cases to existing MDL to "eliminate

duplicative discovery"); *In re Nat'l Sec. Agency Telecomm. Recs. Litig.*, 474 F. Supp. 2d at 1356 (affirming transfer to "eliminate duplicative discovery"). While the A4 Action involves only one of the MDL Defendants, the allegations are much broader, and A4 seeks discovery into the history of the Blue System, including national contracting practices and System rules.

Indeed, A4 has requested extensive re-production of the factual record from the MDL, and has sought new discovery on a number of issues directly related to the MDL, such as the practices of neighboring Blues, Blues service areas, nationwide rates and provider compensation, best efforts rules, BCBSA licensing agreements, and Blue Card operations. *See* Ex. 3 (December 6, 2022 A4's Second Requests for Production of Documents to BCBSM). Much of this discovery has already been accomplished in the MDL. Additionally, other MDL Defendants may be dragged into Michigan court for third-party discovery that is, again, duplicative of the efforts already undertaken in the MDL. A4 has already requested discovery concerning Blue Cross Blue Shield of Wisconsin, Ohio and Indiana. *Id.* at Requests 51-53. Proceeding with such discovery in Michigan would be a waste of judicial and party resources, and would risk exposing BCBSM and the MDL Defendants at large to duplicative or inconsistent discovery obligations.

Moreover, until the September 28, 2022 ruling, BCBSM objected to discovery related to the Blue System Claims. Ex. 4 at p.2 (June 9, 2021 BCBSM Initial Disclosures). After the September 28, 2022 ruling, BCBSM has engaged in only very preliminary discovery on the Blues System Claims, limited to providing supplemental initial disclosures on October 21, 2022 and serving responses and objections to A4's requests for production related to such claims on January 5, 2023. Transferring the action now will allow for coordination with existing MDL discovery, avoid duplication, and conserve the resources of the Courts and the parties.

For all of these reasons, the A4 Action should be transferred to the MDL.

Dated: January 6, 2023                             Respectfully submitted,

SHEARMAN & STERLING LLP
By: */s/ Todd M. Stenerson*
Todd M. Stenerson
Brian Hauser
401 9th Street, Suite 800
Washington, DC 20004
(202) 508-8000
todd.stenerson@shearman.com

Rachel Mossman Zieminski
2601 Olive Street, Suite 1700
Dallas, TX 75201
(214) 271-5777

BODMAN PLC
By:*/s/ Thomas J. Rheaume, Jr.*
Thomas J. Rheaume, Jr.
Sarah L. Cylkowski
Alexandra C. Markel
1901 Saint Antoine Street, 6th FL
Detroit, Michigan 48226
(313) 392-1074
trheaume@bodmanlaw.com
*Attorneys for Defendant BCBSM*