# EXHIBIT B

FILED

2017 Jul-12 PM 06:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | ) Master File No. 2:13-CV-20000-RDP <br> ) <br> ) This document relates to: <br> ) 2:12cv2532 <br> ) <br> ) Jury Trial Demanded |

## DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S ANSWER TO CONSOLIDATED FOURTH AMENDED PROVIDER COMPLAINT

The Blue System originated almost 80 years ago under the auspices of professional associations, such as the American Hospital Association and local medical societies, to meet the health-financing needs of local communities. Blue Plan service areas are the bedrock of the Blue System. They allow Blue Plans to compete like a nationally integrated health insurer, while still preserving each Plan's historically local focus. They have been scrutinized by Congress, the Courts, the Federal Trade Commission, and the Department of Justice, without any finding of anti-competitive effects.

Plaintiffs' Amended Complaints allege that, through its use of service areas and programs such as BlueCard, the Blue System is anti-competitive. Plaintiffs are wrong. The Blue System is decidedly pro-competitive. It is based on legitimate and independent business justifications, including but not limited to creating a national healthcare services network, facilitating the provision of healthcare services to healthcare subscribers, reducing costs and prices, protecting the value of lawfully-acquired intellectual property rights, increasing efficiency and quality of healthcare services, and increasing competition. It has benefited both healthcare providers and subscribers for nearly a century. It continues to evolve to meet the demands of a highly competitive, complex, and ever-changing marketplace. The success of the Blue System today is a testament to its pro-competitive nature and the benefits to both providers and subscribers of its

community-focused structure and national network. The 36 Blue Plans in the United States and Puerto Rico collectively provide healthcare coverage to approximately 106 million (or nearly one in three) Americans in all 50 states, the District of Columbia, and Puerto Rico. The Blue Cross and Blue Shield Association and the Blue Plans also are a single entity with respect to the licensing and related governance of the Blue Marks, in competing against national insurance companies, and in offering an integrated product to customers across the United States and around the world.

Defendant Blue Cross Blue Shield of Michigan ("BCBS-MI") answers and sets forth its affirmative defenses to the Provider Track Fourth Amended Consolidated Class Action Complaint ("Fourth Amended Provider Complaint") as follows. It denies each and every allegation in Plaintiffs' Fourth Amended Provider Complaint except as expressly admitted below:

## <u>NATURE OF THE CASE</u>[1]

1. Defendants, which are independent companies, have agreed with each other to carve the United States into "Service Areas" in which only one Blue can sell insurance, administer employee benefit plans or contract with healthcare providers (the "Market Allocation Conspiracy"). Defendants have engaged in a horizontal market allocation, which is illegal under a *per se*, quick look or rule of reason analysis. The *quid pro quo* for this illegal Market Allocation Conspiracy is a horizontal Price-Fixing and Boycott Conspiracy under which every other Blue gets the benefit of the artificially reduced prices that each Blue pays to healthcare providers. The Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs. The Market Allocation Conspiracy reduces the competition that each Blue faces and allows it to reduce the prices that it pays to healthcare providers. The Price Fixing and Boycott Conspiracy fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices and further provides that the participating Blues will collectively boycott all Providers outside of their Service Areas.

---

[1] The headings and titles in Plaintiffs' complaint are not factual allegations to which a response is required. To the extent a response is deemed required, BCBSA denies any allegations in Plaintiffs' headings and titles.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 1.

2.      Plaintiffs are providers of healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed. Many of Plaintiffs' patients are insured by the Blues or are included in employee benefit plans administered by the Blues.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 2 and therefore denies those allegations.

3.      Defendants are the Association and the Blues, their owners and affiliated companies, as well as companies through which they conduct their conspiracies. The Blues provide health insurance coverage for nearly 105 million people in the United States. (To eliminate any possible ambiguity, Provider Plaintiffs have always intended to include administrative services for employee benefit plans within the meaning of health insurance coverage for purposes of this amended complaint.) The Defendants also have developed and operate the most extensive Provider Networks in the United States. According to the BCBSA's own estimates, more than 93% of professional providers and more than 96% of hospitals in the United States contract directly with the Blues. The Defendants have agreed that they will not compete with each other in terms of their Provider Networks. Even when Defendants have significant enrollees in another Blue's service area, including Alabama, the Defendants have agreed that they will not contract with Providers outside of their service areas except in limited circumstances. The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims against BCBSA and 36 Blue

Plans.  BCBS-MI admits that Plaintiffs purport to include administrative services for employee

benefit plans within the meaning of health insurance coverage for purposes of their amended

complaint.  BCBS-MI further admits that, as of July 2017, there are 36 independent, community-

based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto

Rico that collectively provide healthcare coverage to approximately 106 million (or nearly

one in three) Americans in all 50 states, the District of Columbia, and Puerto Rico. BCBS-

MI admits that BCBSA's website states that 93% of professional providers in the United States

and more than 96% of hospitals in the United States contract with Blue Cross and Blue Shield

plans. BCBS-MI is without knowledge or information to form a belief as to the truth of the

allegations in the fourth sentence of Paragraph 3. BCBS-MI denies the remaining allegations in

Paragraph 3.

4.     In the claims related to the Market Allocation Conspiracy, Plaintiff healthcare
providers challenge the explicit agreement reached by Defendants to divide the United States
into what Defendants term "Service Areas" and then to allocate those geographic areas among
the Blues, free of competition. In the claims related to the Price Fixing and Boycott Conspiracy,
Plaintiffs also challenge the agreement reached by Defendants to fix prices for goods, services
and facilities rendered by healthcare providers such as Plaintiffs and to boycott the healthcare
providers outside of their Service Areas.

**ANSWER:**

BCBS-MI admits that Plaintiffs' "Market Allocation Conspiracy" purports to challenge

Blue Plans' use of "Service Areas." BCBS-MI further admits that Plaintiffs' "Price Fixing and

Boycott Conspiracy" purports to challenge actions by Blue Plans that Plaintiffs allege involve

agreements to fix prices and boycott healthcare providers. BCBS-MI denies the remaining

allegations in Paragraph 4.

5.     In furtherance of the Market Allocation Conspiracy, Defendants agreed that each
Defendant would be allocated a defined Service Area and further agreed that each Defendant's
ability to operate and to generate revenue outside its geographic Service Area would be severely
restricted. Accordingly, Defendants have agreed to an allocation of markets and have agreed not
to compete with each other within those markets.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 5.

6.     The Blues, which are organized and operated independently, constitute potential
competitors and, absent the Market Allocation Conspiracy, the Blues would, in fact, compete,
including in Alabama. The BCBSA readily admits on its own website that the Blues are
"independent companies" that operate in "exclusive geographic areas." www.bcbsa/healthcare-
news/press-center.com. In a recent trial brief filed with the United States District Court for the
District of Columbia, Anthem, which is the largest Blue, stated that "the various Blues are not a
single firm; notwithstanding their participation in the BCBSA, they are separate firms that at
times compete with one another and that at all times separately seek to maximize their own
profits." United States v. Anthem, Inc., No. 16-cv-1493, Doc. No. 324 at 10 (filed Nov. 10,

2016) ("Anthem Brief"). Defendants' agreement to allocate markets is a horizontal restraint in violation of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from BCBSA's website and a brief filed by Anthem in *United States v. Anthem, Inc.,* No. 16-cv-1493 (D.D.C. 2016). BCBS-MI refers to those sources for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 6.

7. The Market Allocation Conspiracy has significantly decreased competition in the markets for healthcare financing, including the markets for healthcare insurance and healthcare services, all of which are discussed more fully below. For example, Blue Cross and Blue Shield of Alabama controls access to more than 90% of privately insured or administered (in this amended complaint Plaintiffs will use insured to refer to administered as well as insured patients unless otherwise indicated) patients in the State of Alabama, and providers cannot contract with other Blue plans except in very limited circumstances. As a result, healthcare providers, including Plaintiffs, are paid much less than they would be absent the BCBS Market Allocation Conspiracy. Healthcare providers who contract with the Blues are also subjected to less favorable terms than they would be absent the conspiracy. The BCBS Market Allocation Conspiracy is a *per se* violation, as well as being a violation under the quick look and rule of reason analysis of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 7.

8. Defendants have further exploited the market dominance they have secured through the Market Allocation Conspiracy by entering into a Price Fixing and Boycott Conspiracy, under which the Defendants divide the excess profits that they achieve through their illegal anticompetitive conduct. In furtherance of the Price Fixing and Boycott Conspiracy, each Defendant has agreed to participate in each national program that the Blues adopt, including the Blue Card Program and the National Accounts Programs. The Blue Card Program applies when a subscriber of one of the Defendants receives healthcare services within the Service Area of another Defendant. In the Blue Card Program the subscriber's Blue is the Home Plan and the Defendant Blue with the Service Area where the healthcare goods, services or facilities are provided is the Host Plan. The National Accounts Programs function in a similar manner. National Accounts Programs generally apply to employee benefit plans with subscribers in multiple states. The Defendant Blue that administers the employee benefit plan is the Control Plan, and the other Blues in whose Service Areas where the subscribers receive healthcare goods, services or facilities are Participating Plans. These Programs and others have been established by a horizontal agreement between the Blues. The Blue Card Program is managed by a Committee of Blues sitting on the Inter-Plan Programs Committee. The National Accounts Programs are either established based on horizontal agreements between the Blues or managed through the

Blue Card Program. The excess profits from these Programs are then divided among the Blues. The national programs including the Blue Card Program and the National Accounts Programs lock in the fixed, discounted reimbursement rates that each Defendant achieves through market dominance in its Service Area and makes those subcompetitive rates available to all other Blues without the need for negotiation or contracting. The other national programs add to the Blues' market power and/or are anticompetitive. Accordingly, Defendants have fixed the prices for healthcare reimbursement in each Service Area. These fixed prices are then enforced through a horizontal agreement between the Blues. Under that horizontal agreement the Blues collectively enforce the fixed prices; the Host Plans and the Participating Plans recoup any payments that the Home or Control Plans make above the fixed prices. Part of the agreement for the participation in the National Accounts Program is that each Control Blue will not negotiate directly with providers outside its Service Area except in a contiguous area. As a result, a healthcare provider who renders services or supplies goods or facilities to a patient who is insured or administered by a Defendant in another Service Area receives significantly lower reimbursement than the healthcare provider would receive absent the Price Fixing and Boycott Conspiracy. Many of the Defendants have large numbers of enrollees or members outside of their service areas. Rather than forming competing networks of providers in other service areas, the Defendants pay the Home Plan a kickback, called an Access Fee, and thereby share the excess profits they achieve through the sub-competitive prices that the Defendants pay to Providers. The BCBS Price Fixing and Boycott Conspiracy is a violation of Section 1 of the Sherman Act under a *per se*, quick look and/or rule of reason analysis.

**ANSWER:**

BCBS-MI admits the BlueCard program may apply when a subscriber of one Blue Plan receives healthcare services within the service area of another Blue Plan. BCBS-MI further admits the allegations in the fourth, fifth, sixth, and seventh sentences of Paragraph 8. BCBS-MI admits that one responsibility of the Inter-Plan Programs Committee is making rules and regulations for administering the Inter-Plan Programs, including BlueCard. The allegations in the first, second, eighth, tenth, twelfth, thirteenth, fifteenth, sixteenth, eighteenth, twentieth, and twenty-first sentences of Paragraph 8 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies these allegations. BCBS-MI denies the remaining allegations in Paragraph 8.

9. The Blues are the major source of potential competition in health insurance and financing in the United States. Two of the largest four health insurance companies in the country are Blues, as are four of the largest 10 and 15 of the largest 25. The Blues have a basic rule in their various agreements, repeated over and over in the Anthem merger trial: We will not compete. The Blues will not compete in the establishment of healthcare provider networks,

where they could develop meaningful innovation through collaboration with providers to improve our healthcare system and diminish overall costs. The Blues will not compete in the administration of healthcare plans including regional and national accounts. The Blues will not compete in the sale of health insurance. The result of the Blues agreements not to compete are what President Trump described in the Republican Primary Debates:

> TRUMP: What I'd like to see is a private system without the artificial lines around every state. I have a big company with thousands and thousands of employees. And if I'm negotiating in New York or in New Jersey or in California, I have like one bidder. Nobody can bid. You know why? Because the insurance companies are making a fortune because . . . they have total control of the politicians. They're making a fortune. Get rid of the artificial lines and you will have...yourself great plans.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in the second sentence of Paragraph 9 and therefore denies those allegations.

BCBS-MI denies the remaining allegations in Paragraph 9.


10.     The "economic certainty" that the Blues' system results in higher prices to consumers was described concisely by Press Secretary Spicer speaking on behalf of the President of the United States and of the Secretary of Health and Human Services on March 14, 2017:

> Who could be against allowing insurance to be sold over state lines? It's something that you can do your car insurance  -- so many -- there is no other product that I can think of -- I'm sure someone will fact-check me on this -- but for the most part, the American consumer, when you want a product, you can go online, you can go to a store. You have choice. You could go to a store across state lines. If you live in Virginia, you can drive to Maryland or the District and shop around. With our [health] insurance, we don't have that ability. There's no question that increased competition drives down cost. It is just an economic certainty.  And allowing greater choice will do the same.

Only the Defendants and their paid experts could argue against this simple economic certainty.

**ANSWER:**

The last sentence in Paragraph 10 does not contain factual allegations to which a response is required. To the extent a response is required, BCBS-MI denies the allegations in the last sentence of Paragraph 10. BCBS-MI denies the remaining allegations in Paragraph 10.

11.     The first anticompetitive agreement is that the Defendants will not compete with each other with respect to healthcare provider networks. With limited exceptions, the Blues have agreed not to contract with providers in other Defendants' service areas. Many Blues have large numbers of members in other service areas, such as Anthem having more than 120,000 members residing in Alabama, but because of the Blues anticompetitive agreement, Anthem cannot develop innovative, collaborative arrangements with Providers in Alabama that would improve quality and decrease overall costs of healthcare. Instead, the Blues operate through the Blue Card System that creates numerous inherent inefficiencies such as the fact that Providers in Alabama have to become aware of and deal with the coverage and payment rules of 35 other Blues in addition to BCBS-AL. Moreover, innovative collaborative arrangements require coordination involving patients and providers such as those described by Cigna in the Anthem merger trial. In the Blue Card System, Anthem has the information on the more than 120,000 members in Alabama while BCBS-AL has the information on the patients. The Blue System therefore stifles innovation by creating additional barriers and inefficiencies. The Blues have also created other barriers to innovation including through their discount payment system. In their effort to increase their "differentials" as compared to other health insurers, the Blues including BCBS-AL pay Providers less than other insurers. The evidence in the Anthem merger trial demonstrates that the Blues are generally the lowest paying health insurer. For many reasons including the costs of IT systems, innovation is expensive while in the long run it reduces overall costs in healthcare. As Cigna executives testified in the Anthem merger trial, reducing reimbursement rates to Providers makes it more difficult to have collaborative, innovative arrangements. The overall Blues' system and the efforts that the Blues have made since the long-term business strategy reduce competition in healthcare networks, add to inefficiencies, reduce the quality of healthcare outcomes, and ultimately increase costs in healthcare.

**ANSWER:**

The first and third sentences of Paragraph 11 contain legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in the first and third sentences of Paragraph 11. BCBS-MI admits that Plaintiffs purport to summarize information from *United States v. Anthem, Inc.*, No. CV 16-1493 (ABJ) (D.D.C. Feb. 21, 2017). BCBS-MI refers to the record in that case for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 11.

12.     The second anticompetitive agreement is that the Blues will not compete in the administration of health care benefit plans that are self-insured.  BCBS-AL and many other Blues including Anthem and HCSC conduct more business in the administration of health care benefit plans or administrative services than they do in the underwritten health insurance business. The Blues have agreed that they will not bid for the contract to provide administrative services for health care benefit plans located or headquartered outside of their service areas unless the Blue with that service area cedes the right to make the bid to another Blue. When there is a cede, only the Blue receiving the cede, and no other Blue, may bid for a contract to provide administrative services for the health care benefit plan. In other words, for a health care benefit plan located in Birmingham, Alabama, unless BCBS-AL cedes the unilateral Blue right  to bid to another Blue, only BCBS-AL can bid to provide administrative services, even if the  plan has members throughout the country.  Anthem, the first or second largest company in the business, cannot bid. HCSC, the fourth largest company in the business, cannot bid. When the health care benefit plan has employees in Texas, Illinois or another HCSC services area, the health care benefit plan must pay the Blue Card access and administration fees in addition to the payments made to Providers and the administrative service fees charged by BCBS-AL. When the health care benefit plan has employees in Georgia, New York City, or another Anthem service area, the health care benefit plan must pay the Blue Card access and administration fees in addition to the payments to Providers and the administrative service fees charged by BCBS- AL. It was this anticompetitive agreement of the Blues that then candidate Trump was complaining about before the election. The Blues use this anticompetitive agreement to extract higher administrative service fees from health care benefit plans. This anticompetitive agreement results in reduced competition, reduced choices for the administrative of health care benefit plans, increased costs, and less innovation and efficiency. The anticompetitive agreement also results in lower reimbursement rates to health care Providers.

**<u>ANSWER:</u>**

The first, tenth, eleventh, and twelfth sentences of Paragraph 12 contain legal conclusions to which no response is required.  To the extent a response is required, BCBS-MI denies the allegations in the first, tenth, eleventh, and twelfth sentences of Paragraph 12.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 12, and therefore denies those allegations.  BCBS-MI admits that its Inter-Plan Program contains a policy regarding "Alternative Control Plan Licensees." BCBS-MI refers to the policy for its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 12.

13.     The third anticompetitive agreement is that the Blues will not compete in the sale of health insurance. Alabama has four different Blues selling health insurance immediately across the state borders. One of them is Anthem, which owns Blue Cross & Blue Shield of

Georgia, and it is the first or second largest health insurer in the country depending upon the measure. The Blues have agreed that none of those Blues will cross the state line to sell health insurance in Alabama. The same agreement also prohibits HCSC, the fourth largest health insurer in the country, Highmark, the 8th largest health insurer in the country, and Blue Cross & Blue Shield of Michigan, the 9th largest health insurer in the country, and all other Blues from competing with BCBS-AL in the sale of health insurance. The Defendants are able to maintain this anticompetitive agreement because they have the Blue Card Program. While the sale of health insurance is a minority of the business of Blues such as BCBS-AL, this refusal to compete injures consumers for obvious reasons including those described by Press Secretary Spicer. This anticompetitive agreement also results in lower reimbursement rates to health care Providers.

**ANSWER:**

The first, sixth, and eighth sentences of Paragraph 13 contain legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in the first, sixth, and ninth sentences of Paragraph 13. BCBS-MI denies the remaining allegations in Paragraph 13.

14. The Blue Card agreement is a part of the other agreements and reinforces them by allowing them not to compete and providing the quid pro quo to the tune of billions of dollars each year that the Blues pay to each other and charge to their customers. In numerous ways, the Blue Card Program is highly inefficient. It places significant administrative burdens and expenses on health care Providers by having at least 36 different sets of coverage and payment rules that the Providers must learn and comply with, often without access to the rules of the 35 Blues for which they are not in network. By having different companies responsible for patients than for Providers, the Blues make it highly inefficient and often impossible to have innovative, efficient arrangements for the delivery and administration of health care services. The Blue Card Program allows the Blue Card Program allows the Blues to charge higher administrative service fees to health care benefit plans, separate and apart from the Blue Card administrative and access fees, which are also paid by health care benefit plans under the administrative services agreements that the Blues have with those benefit plans.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 14.

15. The non-Blue revenue restriction agreement, which the Blues call "best efforts rules" to hide the obvious anti-competitive effects of this agreement also reinforces the other agreements and prevents the Defendants from engaging in meaningful competition in any manner. The non-Blue revenue restrictions were adopted by the Blues to prevent Anthem and others from competing with other Blues even outside of the Blue branded area. Those restrictions prevent any Blue license holder from receiving more than 20% of its revenue from non-Blue business in a service area or more than one third of its revenue company-wide from non-Blue business. The evidence from the Anthem merger trial demonstrates some of the anticompetitive

effects of the non-Blue revenue restriction agreement. If Anthem had been successful in carrying out the anti-competitive merger of Cigna into it, the non-Blue revenue restriction agreement, at the state-wide and company-wide level would have forced Anthem to convert innovative, collaborative Cigna administered health plans into less innovative and efficient Blue plans. This anticompetitive agreement results in less efficient and more costly health insurance and administrative services, it results in less innovation, and it results in lower reimbursement rates for health care Providers.

**ANSWER:**

The first, fourth, fifth, and sixth sentences of Paragraph 15 contain legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in the first, fourth, fifth, and sixth sentences of Paragraph 15. BCBS-MI denies the remaining allegations in Paragraph 15.

16. These five agreements separately have anti-competitive effects, and they reinforce the anti-competitive effects of the other agreements. The Defendants entered into each of the agreements for anti-competitive reasons. Each of the agreements has injured consumers, and they have injured health care Providers.

**ANSWER:**

The first and third sentences of Paragraph 16 contain legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in the first and third sentences of Paragraph 16. BCBS-MI denies the remaining allegations in Paragraph 16.

17. One goal of the Blues' actions is to create or maintain monopsony power in the markets for health care services, facilities, and goods, and thus the Blues have conspired to monopsonize those markets. In many geographic areas, the Blues have successfully created or maintained monopsony power, or have created a dangerous probability of achieving monopsony power. This conduct violates Section 2 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in the first sentence in Paragraph 17. The remaining allegations in Paragraph 17 contain legal conclusions to which no response is required. To the

extent a response is deemed required, BCBS-MI denies the remaining allegations in Paragraph 17.

18.     Defendants' actions have significantly injured Plaintiffs and other healthcare providers. It is textbook economics that when there is more competition among insurers to create provider networks, including competition among the Blues, providers will be paid more. Defendants' agreements have also harmed competition by decreasing the options available to healthcare consumers. Fewer health insurance companies are competing in each Service Area. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower than competitive prices that the Blues pay. Their output has been diminished. In addition, many hospitals and other healthcare facilities are closing or reducing services or are not expanding to provide additional services as a result of the Blues' low prices. The only beneficiaries of Defendants' antitrust violations are Defendants themselves. Absent injunctive relief, Defendants' antitrust violations will continue unabated to the detriment of competition and to the harm of healthcare providers.

**ANSWER:**

The second sentence of Paragraph 18 does not contain factual allegations to which a response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the second sentence of Paragraph 18.  BCBS-MI denies the remaining allegations in Paragraph 18.

## JURISDICTION, VENUE AND PERSONAL JURISDICTION

19.     Plaintiffs' federal antitrust claims are instituted under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, but denies that Plaintiffs can state any claim.  Whether the Court has subject matter jurisdiction over this action is a legal conclusion to which no response is required.  To the extent a response is deemed required, BCBS-MI admits that the Court has subject matter jurisdiction over this action.  BCBS-MI denies any remaining allegations in Paragraph 19.

20. Several allegations in this complaint support this Court's personal jurisdiction over Defendants. First, some of the Defendants including Blue Cross and Blue Shield of Alabama and Blue Cross Blue Shield of Mississippi have entered into contracts with healthcare providers in Alabama. Second, all of Defendants have significant business in and contacts with Alabama through the national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of Defendants' subscribers who receive healthcare goods, services and facilities in Alabama, and in terms of subscribers from Blue Cross and Blue Shield of Alabama, who receive treatment in their Service Areas with all the Defendants dividing revenue resulting from those goods, services and facilities. Third, all of the Defendants have conspired with Blue Cross and Blue Shield of Alabama.

**ANSWER:**

On information and belief, BCBS-MI admits the allegations in the second sentence of Paragraph 20. Whether the Court has personal jurisdiction over BCBS-MI is a legal conclusion to which no response is required. To the extent a response is deemed required, BCBS-MI admits that the Court has personal jurisdiction over BCBS-MI. BCBS-MI denies the remaining allegations in Paragraph 20.

21. Therefore, this Court has personal jurisdiction over Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because the Defendants transact business in this District. This Court also has personal jurisdiction under the conspiracy theory of jurisdiction under Alabama law because Defendants participated in a conspiracy in which at least one conspirator committed overt acts in Alabama in furtherance of the conspiracy, *J&M Assocs. v. Callahan*, No. 07-0883-CG-C, 2011 U.S. Dist. LEXIS 131752, at *11 (S.D. Ala. Nov. 15, 2011), and under Alabama's long-arm statute, Ala. R. Civ. P. 4.2(b), because the Defendants' payments to Alabama health care providers to treat Alabama patients constitute minimum contacts with Alabama, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

**ANSWER:**

Whether the Court has personal jurisdiction over BCBS-MI is a legal conclusion to which no response is required. To the extent a response is deemed required, BCBS-MI admits that the Court has personal jurisdiction over BCBS-MI. BCBS-MI denies any remaining allegations in Paragraph 21.

22. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22 because Defendants transact business in this District, and 28 U.S.C. § 1391, because a

significant part of the events, acts and omissions giving rise to this action occurred in the District.

**ANSWER:**

Whether venue properly lies in this District is a legal conclusion to which no response is required. To the extent a response is deemed required, BCBS-MI admits that venue properly lies in this District for pretrial proceedings pursuant to the Transfer Order of the Judicial Panel on Multidistrict Litigation. BCBS-MI denies any remaining allegations in Paragraph 22.

## INTERSTATE COMMERCE

23.     The activities of Defendants that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

**ANSWER:**

The allegations in Paragraph 23 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI admits that the activities Plaintiffs purport to challenge in their amended complaint affect interstate trade and commerce.

24.     Many of the healthcare providers, including Plaintiffs, provide services, supplies, or equipment to persons who reside in other states.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and therefore denies those allegations.

25.     The national programs including the Blue Card Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program are involved in interstate commerce and transaction for healthcare services.

**ANSWER:**

The allegations in Paragraph 25 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI admits that the BlueCard

Program, the National Accounts Program, and the Medicare Advantage Program affect interstate trade and commerce.

26.     Plaintiffs and other healthcare providers have used interstate banking facilities and have purchased substantial quantities of goods and services across state lines for use in providing healthcare services to individuals.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and therefore denies those allegations.

## PLAINTIFFS

27.     Plaintiff Jerry L. Conway, D.C. is a chiropractor and a citizen of Brent, Alabama. Dr. Conway practiced for thirty-eight years before his retirement in 2010. During the relevant time period, Dr. Conway provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Conway was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Conway has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Conway has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The fourth, fifth, and sixth sentences in Paragraph 27 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the fourth, fifth, and sixth sentences in Paragraph 27.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27 and therefore denies those allegations.

28.     Plaintiff Charles H. Clark III, M.D. is a neurosurgeon and a citizen of Birmingham, Alabama. Dr. Clark has provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Clark is not seeking damages

for the period before June 24, 2013. Dr. Clark was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Clark has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Clark has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 28 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 28. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 28 and therefore denies those allegations.

29. Plaintiff Bullock County Hospital is a general medicine and surgical hospital in Union Springs, Alabama. During the relevant time period, Bullock County Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Bullock County Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Bullock County Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Bullock County Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 29 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 29. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 29 and therefore denies those allegations.

30. Plaintiff Crenshaw Community Hospital is a non-profit, general medicine and surgical hospital in Luverne, Alabama. During the relevant time period, Crenshaw Community

Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Crenshaw Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Crenshaw Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Crenshaw Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 30 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 30. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 30 and therefore denies those allegations.

31. Plaintiff North Jackson Pharmacy, Inc. is a pharmacy in Stevenson, Alabama. During the relevant time period, North Jackson Pharmacy provided medically necessary, covered goods and services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. North Jackson Pharmacy was paid less for those goods and services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, North Jackson Pharmacy has also provided medically necessary, covered goods and services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those goods and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, North Jackson Pharmacy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 31 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 31. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31 and therefore denies those allegations.

32.     Plaintiff Jackson Medical Center, LLC is a general medicine and acute care hospital in Jackson, Alabama. During the relevant time period, Jackson Medical Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Jackson Medical Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Jackson Medical Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Jackson Medical Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 32 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 32.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32 and therefore denies those allegations.

33.     Plaintiff Evergreen Medical Center, LLC is a general medicine and acute care hospital in Evergreen, Alabama. During the relevant time period, Evergreen Medical Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Evergreen Medical Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Evergreen Medical Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Evergreen Medical Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 33 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the

allegations in the third, fourth, and fifth sentences in Paragraph 33. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33 and therefore denies those allegations.

34. Plaintiff Ivy Creek of Elmore, LLC d/b/a Elmore Community Hospital is a general medicine and acute care hospital in Wetumpka, Alabama. During the relevant time period, Elmore Community Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Elmore Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Elmore Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Elmore Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 34 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 34. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 34 and therefore denies those allegations.

35. Plaintiff Ivy Creek of Butler, LLC d/b/a Georgiana Medical Center is a general medicine and acute care hospital in Georgiana, Alabama. During the relevant time period, Georgiana Medical Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Georgiana Medical Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Georgiana Medical Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Georgiana Medical Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 35 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 35. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35 and therefore denies those allegations.

36. Plaintiff Ivy Creek of Tallapoosa, LLC d/b/a Lake Martin Community Hospital is a general medicine and acute care hospital in Dadeville, Alabama. During the relevant time period, Lake Martin Community Hospital provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Alabama pursuant to its in-network contract with BCBS-AL, and billed BCBS-AL for the same. Lake Martin Community Hospital was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Lake Martin Community Hospital has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Lake Martin Community Hospital has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 36 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 36. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 36 and therefore denies those allegations.

37. Plaintiff Robert W. Nesbitt, M.D. is an interventional pain medicine specialist and a citizen of Birmingham, Alabama. During the relevant time period, Dr. Nesbitt provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Nesbitt was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Nesbitt has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed

for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Nesbitt has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 37 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 37. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 37 and therefore denies those allegations.

38. Plaintiff Janine Nesin, P.T., D.P.T., O.C.S. is a physical therapist and a resident of Huntsville, Alabama. During the relevant time period, Dr. Nesin provided medically necessary, covered services to patients insured by BCBS-AL, or who are included in employee benefit plans administered by BCBS-AL pursuant to her in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Nesin was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Nesin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Nesin has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 38 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 38. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 38 and therefore denies those allegations.

39. Plaintiff Joseph D. Ackerson, PhD is a neuropsychologist located in Vestavia Hills, Alabama. During the relevant time period, Dr. Ackerson provided medically necessary, covered services to patients insured by BCBS-AL or who are included in employee benefit plans administered by BCBS-AL pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Ackerson was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Ackerson has also provided medically necessary,

covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Ackerson has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 39 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 39. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 39 and therefore denies those allegations.

40. Plaintiff Luis R. Pernia, M.D. is a plastic surgeon and a citizen of Tuscaloosa, Alabama. During the relevant time period, Dr. Pernia provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Alabama or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Alabama pursuant to his in-network contract with BCBS-AL, and billed BCBS-AL for the same. Dr. Pernia was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Pernia has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Pernia has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 40 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 40. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 40 and therefore denies those allegations.

41. Plaintiffs provide healthcare services and/or equipment and/or supplies, as well as facilities where medical or surgical procedures are performed, to patients who are insured by a Blue or who are included in an employee benefit plan administered by a Blue. Plaintiffs are entitled to payment for their services, equipment, supplies or for use of their facilities either pursuant to a contractual agreement with one of the Defendants or pursuant to assignments from

patients who are covered by a plan that is insured and administered by a Blue. All Plaintiffs have been paid less than they would have been paid absent Defendants' violation of the antitrust laws. All Plaintiffs have a right to bring these claims. But for Defendants' agreements not to compete, out-of-network providers would have been offered the ability to contract with the Blues at more competitive rates. Accordingly, all Plaintiffs have standing and all have sustained antitrust injury.

**ANSWER:**

BCBS-MI denies the allegations in the fifth sentence in Paragraph 41. The third, fourth, and sixth sentences in Paragraph 41 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and sixth sentences in Paragraph 41. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 41 and therefore denies those allegations.

42. Certain of the named Provider Plaintiffs in this action, Charles H. Clark III, M.D., Robert W. Nesbitt, M.D., and Luis R. Pernia, M.D. ("the Alabama *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the Defendants consummated in the Southern District of Florida before Judge Moreno. For purposes of this Complaint, those Providers who were members of the Settlement Classes listed above do not bring claims against any of the released parties in those Settlements. As this issue is currently being litigated in *Musselman v. Blue Cross Blue Shield of Alabama*, Case No. 1:13-cv-20050-FAM (S.D. Fla.); Case No. 13-14250-AA (11th Cir.), the Alabama *Love* Providers wish to allege here that:

a. they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those releases. Accordingly, those claims would be included in this Complaint but for the Defendants' insistence that if the claims are alleged here, they will immediately seek to have the Alabama *Love* Providers held in contempt of the injunctions entered by Judge Moreno. The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b. they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor;

c. they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed below) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were

previously released or are subject to any injunction in the Southern District of Florida.

**ANSWER:**

BCBS-MI admits that the named Provider Plaintiffs defined as "the Alabama *Love* Providers" were members of settlement classes in settlements with certain Defendants that were consummated in the Southern District of Florida before Judge Moreno. BCBS-MI admits that the Alabama *Love* Providers purport to bring this action under the Sherman Act, but denies that Plaintiffs can state any claim. The remaining allegations in Paragraphs 42, 42(a), 42(b), and 42(c) do not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the remaining allegations in Paragraphs 42, 42(a), 42(b), and 42(c).

43.     The list of Non-Released Blues (described above) includes: Blue Cross Blue Shield of Arizona, Arkansas Blue Cross and Blue Shield, Blue Shield of California, Highmark Blue Cross Blue Shield Delaware, Blue Cross of Idaho, Blue Cross and Blue Shield of Kansas, Blue Cross Blue Shield of Kansas City, Blue Cross Blue Shield of Nebraska, HealthNow, Noridian Mutual Insurance Co. d/b/a Blue Cross Blue Shield of North Dakota, Blue Cross and Blue Shield of Vermont, Blue Cross Blue Shield of Wyoming, and Premier Health, Inc. Additionally, while Excellus entered a settlement in New York state court, it did not obtain a release for any doctors other than those in New York, and that release does not affect the claims made in this amended complaint. Excellus is therefore also treated as a Non-Released Blue for purposes of this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to treat Excellus as a Non-Released Blue for purposes of their amended complaint. The remaining allegations in Paragraph 43 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the remaining allegations in Paragraph 43.

44.     As is noted in the Plaintiffs' allegations, at least one of the named Physician Provider Plaintiffs was not a member of the *Love* (and related) Settlement in Florida. Those non-Settling physician Plaintiffs pursue claims on behalf of the class against all of the Defendants who were released in *Love* action.

24

**ANSWER:**

The allegations in Paragraph 44 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 44.

45. The Agreements between various Defendants and some of the named Provider Plaintiffs contain what Defendants, including Blue Cross and Blue Shield of Alabama, will likely argue are binding arbitration provisions. Plaintiffs do not believe that these arbitration provisions can or would govern the claims brought in this lawsuit. Nevertheless, for purposes of this Complaint, those Plaintiffs with arbitration agreements covering the claims or parties at issue in this litigation expressly only bring suit against those Defendants who are not parties to the arbitration provisions in their agreements. For instance, a Provider with an arbitration provision in her contract with Blue Cross and Blue Shield of Alabama is not asserting claims against Blue Cross and Blue Shield of Alabama, but rather is only pursuing her Sherman Act Section 1 claims against all Defendants other than Blue Cross and Blue Shield of Alabama, none of whom are parties to her agreement.

**ANSWER:**

On information and belief, BCBS-MI admits that certain Agreements between Defendants and named Provider Plaintiffs contain binding arbitration provisions. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 45 and therefore denies those allegations.

## DEFENDANTS

46. Defendant Blue Cross and Blue Shield of Alabama is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names in Alabama. Blue Cross and Blue Shield of Alabama is by far the largest provider of healthcare insurance and administrative services for health plans in Alabama, providing coverage to more than three million people. The principal headquarters for Blue Cross and Blue Shield of Alabama is located at 450 Riverchase Parkway East, Birmingham, Alabama. Blue Cross and Blue Shield of Alabama is referred to as "Blue Cross and Blue Shield of Alabama" or "BCBS-AL" in this Complaint.

**ANSWER:**

BCBS-MI admits that BCBS-AL is licensed to use the Blue Cross and Blue Shield trademarks and trade names in the state of Alabama. BCBS-MI admits the allegations in the

fourth sentence in Paragraph 46. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46 and therefore denies those allegations.

47. Defendant Anthem, Inc. (formerly Wellpoint, Inc.) is an Indiana corporation with its corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. Anthem, Inc., its subsidiaries, including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and its health care insurance companies, are collectively referred to as "Anthem" in this Complaint. Anthem, the largest licensee within the BCBSA, is a publicly-traded, for-profit company. By some measures Anthem is the largest health benefits company in the nation with more than 37 million enrollees in its affiliated health plans. According to its website, one in nine Americans is an Anthem member, and Anthem is contracted with 93% of the physicians and 96% of hospitals nationwide through the Blue Card Program. Anthem, by and through its subsidiaries and affiliated companies, operates Blues in fourteen states, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.

## **ANSWER:**

BCBS-MI admits that Anthem, Inc. (formerly Wellpoint, Inc.) is a health plan that is licensed to use the Blue Cross and Blue Shield trademarks and trade names in Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Nevada, New Hampshire, Ohio, Wisconsin, portions of Virginia, portions of Missouri (excluding 30 counties), portions of New York (as Blue Cross Blue Shield in 10 counties, and as Blue Cross or Blue Cross Blue Shield in certain other counties) and California (as Blue Cross only). BCBS-MI admits the second sentence of Paragraph 47. BCBS-MI further admits that Plaintiffs purport to quote or summarize selected excerpts from Anthem's website. BCBS-MI refers to Anthem's website for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 47 and therefore denies those allegations.

48. Defendant Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, is an Illinois corporation with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601-5099. With more than 15 million enrollees, Health Care Service

Corporation is the largest customer-owned health insurer in the United States. Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana. In each of its five Blue service areas, Health Care Service Corporation exercises market dominance. Health Care Service Corporation, its subsidiaries and health care plans are collectively referred to as "HCSC" in this Complaint.

**ANSWER:**

BCBS-MI admits that HCSC does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas, and Blue Cross and Blue Shield of Montana. BCBS-MI admits the fourth sentence of Paragraph 48. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 48 and therefore denies those allegations. BCBS-MI admits Health Care Service Corporation is licensed to use the Blue Cross and Blue Shield trademarks and trade names in Illinois, Texas, Montana, Oklahoma and New Mexico. The remaining allegations in the fourth sentence of Paragraph 48 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the remaining allegations in the fourth sentence of Paragraph 48. BCBS-MI admits that Plaintiffs purport to include "subsidiaries and health care plans" of Defendant Health Care Service Corporation in each reference to "HCSC," but denies that Plaintiffs' characterization is accurate.

49. Defendant Cambia Health Solutions, Inc. is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Formerly known as The Regence Group, Inc., Cambia Health Solutions, Inc. officially changed its name in November 2011. Cambia Health Solutions, Inc. is the largest health insurer in the Northwest or Intermountain Region, serving more than 2 million enrollees through its subsidiaries and affiliated health plans. Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueCross BlueShield of Oregon, Regence BlueShield, Regence BlueCross BlueShield of Utah, and Regence BlueShield of Idaho, exercises market dominance as a Blue in its states of operation or within areas of those states. Cambia Health Solutions, Inc., its subsidiaries, and affiliated companies are collectively referred to as "Cambia Health" or "Cambia" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Cambia Health Solutions, Inc. in each reference to "Cambia Health" or "Cambia," but denies that Plaintiffs' characterization is accurate. The allegations in the fourth sentence of Paragraph 49 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fourth sentence of Paragraph 49. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 49 and therefore denies those allegations.

50. Defendant CareFirst, Inc. is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mills, MD 21117. With approximately 3.2 million enrollees, CareFirst, Inc., through its subsidiaries Defendants CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc., is the largest health care insurer in the Mid-Atlantic Region. Through its subsidiaries and affiliated companies, CareFirst, Inc. exercises market dominance as a Blue in Maryland, the District of Columbia, and Virginia, or within areas of those states. CareFirst, Inc., its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant CareFirst, Inc. in each reference to "CareFirst," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 50 and therefore denies those allegations.

51. Defendant Premera Blue Cross is a Washington corporation with its corporate headquarters located at 7001 220th SW, Building 1, Mountlake Terrace, WA 98043. Premera Blue Cross is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2 million enrollees in Alaska and Washington. Premera Blue Cross does business in Washington as Premera Blue Cross and in Alaska as Premera Blue Cross Blue Shield of Alaska. Premera Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Premera Blue Cross" or "Premera" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Premera Blue Cross in each reference to "Premera Blue Cross" or "Premera," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51 and therefore denies those allegations.

52. Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross with its principal place of business located at 3800 Centerpoint Drive, Suite 940, Anchorage, AK 99503. Premera Blue Cross Blue Shield of Alaska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Alaska" or "BCBS-AK" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Premera Blue Cross Blue Shield of Alaska in each reference to "Blue Cross Blue Shield of Alaska" or "BCBS-AK," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 52 and therefore denies those allegations.

53. Blue Cross Blue Shield of Arizona, Inc. is an Arizona corporation with its corporate headquarters located at 2444 W. Las Palmaritas Dr., Phoenix, AZ, 85021. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Arizona. Blue Cross Blue Shield of Arizona, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Arizona" or "BCBS-AZ" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross Blue Shield of Arizona, Inc. in each reference to "Blue Cross Blue Shield of Arizona" or "BCBS-AZ," but denies that Plaintiffs' characterization is

accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 53 and therefore denies those allegations.

54.     Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and
Blue Shield is an Arkansas corporation with its corporate headquarters located at 601 S. Gaines
Street, Little Rock, Arkansas 72201. It is the parent corporation of a number of subsidiaries that
provide health care financing to approximately 860,000 enrollees in various health care plans in
Arkansas, or approximately one-third of Arkansans, making it the largest health insurer in the
state. Arkansas Blue Cross and Blue Shield, its subsidiaries and affiliated companies are
collectively referred to as "Arkansas Blue Cross and Blue Shield" or "BCBS-AR" in this
Complaint.

**<u>ANSWER:</u>**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated

companies" of Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and

Blue Shield in each reference to "Arkansas Blue Cross and Blue Shield" or "BCBS-AR," but

denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 54

and therefore denies those allegations.

55.     Defendant Blue Cross of California d/b/a/ Anthem Blue Cross is a California
corporation with its corporate headquarters located at 21555 Oxnard Street, Woodland Hills, CA
91367. It is a subsidiary of Anthem Holding Corp., which is in turn a subsidiary of Defendant
Anthem. Blue Cross of California is the parent corporation of a number of subsidiaries that
provide health care financing to approximately 8.3 million enrollees in various health care plans
in California, more than any other carrier in the state. Blue Cross of California, its subsidiaries
and affiliated companies are collectively referred to as "Blue Cross of California" or "BC-CA" in
this Complaint.

**<u>ANSWER:</u>**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated

companies" of Defendant Blue Cross of California d/b/a Anthem Blue Cross in each reference to

"Blue Cross of California" or "BC-CA," but denies that Plaintiffs' characterization is accurate.

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 55 and therefore denies those allegations.

56.     Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California corporation with its corporate headquarters located at 50 Beale Street, San Francisco, CA 94105-1808. It is the parent corporation of a number of subsidiaries that provide health care financing to over 4 million enrollees in various health care plans in California. California Physicians' Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California in each reference to "Blue Shield of California" or "BS-CA," but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 56 and therefore denies those allegations.

57.     Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant Anthem and is a Colorado corporation with its corporate headquarters located at 700 Broadway, Suite 600, Denver, CO 80273. It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees through various health care plans in Colorado and Nevada.

**ANSWER:**

BCBS-MI admits Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado in Colorado and d/b/a Anthem Blue Cross and Blue Shield of Nevada in Nevada is a subsidiary of Defendant Anthem.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 57 and therefore denies those allegations.

58.     Defendant Anthem Blue Cross and Blue Shield of Colorado is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Colorado and its parent, Rocky Mountain Hospital and Medical Service, Inc., are subsidiaries of Defendant Anthem. Anthem Blue Cross and Blue Shield of Colorado, its subsidiaries and affiliated companies, which provide health care financing to more than 1.3 million enrollees, are

collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO" in this Complaint.

**ANSWER:**

BCBS-MI admits the allegations in the first sentence of Paragraph 58. BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Anthem Blue Cross and Blue Shield of Colorado in each reference to "Anthem Blue Cross and Blue Shield of Colorado" or "BCBS-CO," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 58 and therefore denies those allegations.

59.     Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut is a subsidiary of Defendant Anthem. It is a Connecticut corporation with its corporate headquarters located at 108 Leigus Road, Wallingford, Connecticut 06492 and is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.5 million enrollees in various health care plans in Connecticut. Anthem Blue Cross and Blue Shield of Connecticut, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT."

**ANSWER:**

BCBS-MI admits the allegations in the first sentence of Paragraph 59. BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut in each reference to "Anthem Blue Cross and Blue Shield of Connecticut" or "BCBS-CT," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 59 and therefore denies those allegations.

60.     Defendant Highmark, Inc. is a Pennsylvania corporation with its corporate headquarters located at Fifth Avenue Place, 120 Fifth Avenue, Pittsburgh, PA 15222. Highmark, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 5.2 million enrollees in Pennsylvania, West Virginia and Delaware. Highmark, Inc., its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Highmark Inc. in each reference to "Highmark," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 60 and therefore denies those allegations.

61. Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is a subsidiary of Highmark, Inc. It is a Delaware corporation with its corporate headquarters located at 800 Delaware Avenue, Wilmington, Delaware 19801. Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware. It became affiliated with Highmark, Inc. on December 30, 2011 and changed its name to Highmark Blue Cross and Blue Shield Delaware in July, 2012. Highmark Blue Cross and Blue Shield Delaware provides health care financing to approximately 397,000 enrollees in various health care plans in Delaware. According to 2007 HealthLeaders-Interstudy figures, the Blue held a 56% market share in the state of Delaware. Highmark Blue Cross and Blue Shield Delaware, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "BCBS-DE" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Highmark BCBSD, Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware in each reference to "Highmark Blue Cross and Blue Shield Delaware" or "BCBS-DE," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 61 and therefore denies those allegations.

62. Defendant Group Hospitalization and Medical Services, Inc. ("GHMSI") shares the business name CareFirst BlueCross BlueShield with fellow Defendant CareFirst of Maryland, Inc. and provides health care financing in the District of Columbia, Maryland and areas of Virginia. It is incorporated in the District of Columbia and is a subsidiary of CareFirst, Inc. Its principal place of business is located at 10455 Mill Run Circle, Owings Mills, MD 21117. Group Hospitalization and Medical Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "GHMSI" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Group Hospitalization and Medical Services, Inc. in each reference to "GHMSI," but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 62 and therefore denies those allegations.

63. Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida corporation with its corporate headquarters located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 7 million enrollees in various health care plans in Florida. Blue Cross and Blue Shield of Florida, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "BCBS-FL" in this Complaint. Under BCBSA's rules, BCBS-FL is allowed to contract with health care providers in Alabama counties adjacent to Florida.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Florida, Inc. in each reference to "Blue Cross and Blue Shield of Florida" or "BCBS-FL," but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63 and therefore denies those allegations.

64. Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, are subsidiaries of Defendant Anthem and are Georgia corporations with corporate headquarters located at 3350 Peachtree Road, N.E., Atlanta, Georgia 30326. According to a 2009 Center for American Progress study on health competitiveness, Blue Cross and Blue Shield of Georgia, by and through its subsidiaries, controls approximately 61% of the state's healthcare financing market. Blue Cross and Blue Shield of Georgia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 3.2 million enrollees in various health care plans in Georgia. Blue Cross and Blue Shield of Georgia, its affiliates, including Blue Cross Blue Shield Healthcare Plan of Georgia, Inc., subsidiaries and health care plans are collectively referred to as "Blue Cross and Blue Shield of Georgia" or "BCBS-GA" in this Complaint.

**ANSWER:**

BCBS-MI admits that Defendant Blue Cross and Blue Shield of Georgia, Inc. and its affiliated company, Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., are subsidiaries of Defendant Anthem. BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Georgia, Inc. in each reference to "Blue Cross and Blue Shield of Georgia" or "BCBS-GA," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 64 and therefore denies those allegations.

65. Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a Hawaii corporation with its corporate headquarters located at 818 Keeaumoku Street, Honolulu, Hawaii 96814. It is the parent corporation of a number of subsidiaries that provide health care financing to 722,000 enrollees in various health care plans in Hawaii. Hawaii Medical Service Association, its subsidiaries and affiliated companies are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii in each reference to "Hawaii Medial Service Association" and "BCBS-HI," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65 and therefore denies those allegations.

66. Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho corporation with its corporate headquarters located at 3000 E. Pine Avenue, Meridian, Idaho 83642. It is the parent corporation of a number of subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in Idaho. Blue Cross of Idaho Health Service, Inc., its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Idaho" or "BC-ID" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho in each reference to "Blue Cross Blue Shield of Idaho" or "BC-ID," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66 and therefore denies those allegations.

67. Regence BlueShield of Idaho, Inc. is a subsidiary of Defendant Cambia Health and is an Idaho corporation with its corporate headquarters located at 1602 21st Avenue, Lewiston, Idaho 83501. Regence BlueShield of Idaho is the parent corporation of a number of subsidiaries that provide health care financing to more than 150,000 enrollees in various health care plans in Idaho. Regence BlueShield of Idaho, Inc., its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield of Idaho" or "BS-ID" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Regence BlueShield of Idaho, Inc. in each reference to "Regence BlueShield of Idaho" or "BS-ID," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67 and therefore denies those allegations.

68. Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC with its principal place of business located at 300 East Randolph Street, Chicago, Illinois 60601. It is the parent of a number of subsidiaries that provide health care financing to over 7 million enrollees in various health care plans in Illinois. Blue Cross and Blue Shield of Illinois, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "BCBS-IL" in this Complaint.

**ANSWER:**

On information and belief, BCBS-MI admits that BCBS-IL is an unincorporated division of HCSC. BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Illinois in each reference to "Blue Cross

36

and Blue Shield of Illinois" or "BCBS-IL," but denies that Plaintiffs' characterization is

accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 68 and therefore denies those allegations.

69.     Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue
Shield of Indiana is a subsidiary of Defendant Anthem. It is an Indiana corporation with its
corporate headquarters located at 120 Monument Circle, Indianapolis, Indiana 46204. It is the
parent corporation of a number of subsidiaries that provide health care financing to enrollees in
various health care plans in Indiana. Anthem Insurance Companies, Inc. d/b/a Blue Cross and
Blue Shield of Indiana, its subsidiaries and affiliated companies are collectively referred to as
"Anthem Blue Cross and Blue Shield of Indiana" or "BCBS-IN" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated

companies" of Defendant Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue

Shield of Indiana in each reference to "Anthem Blue Cross and Blue Shield of Indiana" or

"BCBS-IN," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 69 and therefore denies those allegations.

70.     Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is
an Iowa corporation with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50309.
It is the parent of a number of subsidiaries that provide health care financing to 1.8 million
enrollees in Iowa. Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, its
subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue
Shield of Iowa" or "BCBS-IA" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated

companies" of Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa in

each reference to "Blue Cross and Blue Shield of Iowa" or "BCBS-IA," but denies that

Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in Paragraph 70 and therefore denies those allegations.

71.     Defendant Blue Cross and Blue Shield of Kansas is a Kansas corporation with its corporate headquarters located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629. Blue Cross and Blue Shield of Kansas is the parent corporation of a number of subsidiaries, including Premier Health, Inc., that provide health care financing to approximately 950,000 enrollees in various health care plans in Kansas. Blue Cross and Blue Shield of Kansas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Kansas, Inc. in each reference to "Blue Cross and Blue Shield of Kansas" or "BCBS-KS," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71 and therefore denies those allegations.

72.     Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield of Kentucky is a subsidiary of Defendant Anthem and is a Kentucky corporation with its corporate headquarters located at 13550 Triton Boulevard, Louisville, KY 40223. It provides health care financing in Kentucky. Anthem Health Plans of Kentucky, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Anthem Health Plans of Kentucky, Inc., in each reference to "Anthem Blue Cross and Blue Shield of Kentucky" or "BCBS-KY," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 72 and therefore denies those allegations.

73.     Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana corporation with its corporate headquarters located at

5525 Reitz Avenue, Baton Rouge, Louisiana 70809. It is the parent corporation of a number of subsidiaries that provide health care financing to more than 1.1 million enrollees in various health care plans in Louisiana. Louisiana Health Service & Indemnity Company, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Louisiana Health Service & Indemnity Company in each reference to "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 73 and therefore denies those allegations.

74.     Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine is a subsidiary of Defendant Anthem. It is a Maine corporation with its corporate headquarters located at 2 Gannett Drive, South Portland, Maine 04016. It is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maine. Anthem Health Plans of Maine, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Anthem Health Plans of Maine, Inc., in each reference to "Anthem Blue Cross and Blue Shield of Maine" or "BCBS-ME," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 74 and therefore denies those allegations.

75.     Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a subsidiary of Defendant CareFirst and is a Maryland corporation with its corporate headquarters located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117. CareFirst of Maryland, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in Maryland. CareFirst of Maryland, Inc., its

subsidiaries and affiliated companies are collectively referred to as "CareFirst of Maryland" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant CareFirst of Maryland, Inc., in each reference to "CareFirst of Maryland," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 75 and therefore denies those allegations.

76.     Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts corporation with its corporate headquarters located at 401 Park Drive, Boston, Massachusetts 02215. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in various health care plans in Massachusetts. Blue Cross and Blue Shield of Massachusetts, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Massachusetts, Inc., in each reference to "Blue Cross and Blue Shield of Massachusetts" or "BCBS-MA," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 76 and therefore denies those allegations.

77.     Defendant Blue Cross and Blue Shield of Michigan is a Michigan corporation with its corporate headquarters located at 600 E. Lafayette Blvd., Detroit, Michigan 48226. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 4.5 million enrollees in various health care plans in Michigan. Blue Cross and Blue Shield of Michigan, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.

**ANSWER:**

BCBS-MI admits the allegations in the first sentence in Paragraph 77. BCBS-MI admits that it and at least one of its subsidiaries provides health care financing to enrollees in Michigan. BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Michigan in each reference to "Blue Cross and Blue Shield of Michigan" or "BCBS-MI," but denies that Plaintiffs' characterization is accurate. BCBS-MI denies the remaining allegations in Paragraph 77.

78.     Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota corporation with its corporate headquarters located at 3535 Blue Cross Road, St. Paul, Minnesota 55164. BCBSM, Inc. is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 2.6 million enrollees in various health care plans in Minnesota. Blue Cross and Blue Shield of Minnesota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Minnesota in each reference to "Blue Cross and Blue Shield of Minnesota" or "BCBS-MN," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 78 and therefore denies those allegations.

79.     Defendant Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company, is a Mississippi corporation with its corporate headquarters located at 3545 Lakeland Drive, Flowood, Mississippi 39232. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1 million enrollees in various health care plans in Mississippi. Blue Cross and Blue Shield of Mississippi, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this Complaint. Blue Cross Blue Shield of Mississippi contracts with providers in counties in Alabama that are adjacent to Mississippi.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Mississippi in each reference to "Blue Cross Blue Shield of Mississippi" or "BCBS-MS," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 79 and therefore denies those allegations.

80. Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is a subsidiary of Defendant Anthem. It is a Missouri corporation with its corporate headquarters located at 1831 Chestnut Street, St. Louis, Missouri 63103. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.8 million enrollees in a various health care plans in Missouri. Defendant Anthem Blue Cross and Blue Shield of Missouri, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant HMO Missouri, Inc., in each reference to "Anthem Blue Cross and Blue Shield of Missouri" or "BCBS-MO," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 80 and therefore denies those allegations.

81. Defendant Blue Cross and Blue Shield of Kansas City, Inc. is a Missouri corporation with its corporate headquarters located at One Pershing Square, 2301 Main Street, Kansas City, Missouri 64108. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 900,000 enrollees in various health care plans in Kansas City and its suburbs in Kansas and Missouri. Blue Cross and Blue Shield of Kansas City, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas City or "BCBS – Kansas City" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Kansas City, Inc., in each reference to "Blue Cross and Blue Shield of Kansas City" or "BCBS-Kansas City," but denies that Plaintiffs'

characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 81 and therefore denies those allegations.

82. Defendant Blue Cross and Blue Shield of Montana is a division of Defendant HCSC with its principal place of business at 3645 Alice Street, Helena, Montana 59604-4309. It is the parent of a number of subsidiaries that provide health care financing to approximately 240,000 enrollees in various health care plans in Montana. Blue Cross and Blue Shield of Montana, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Montana" or "BCBS-MT" in this Complaint. For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Montana in each reference to "Blue Cross and Blue Shield of Montana" or "BCBS-MT," but denies that Plaintiffs' characterization is accurate. BCBS-MI admits that Plaintiffs purport to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc. in each reference to Blue Cross and Blue Shield of Montana, but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 82 and therefore denies those allegations.

83. Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana Inc. is a Montana corporation with its corporate headquarters located at 3645 Alice Street, Helena, Montana 59604-4309. When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83 and therefore denies those allegations.

84. Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska corporation with its corporate headquarters located at 1919 Aksarben Drive, Omaha, Nebraska 68180. It is

43

the parent corporation of a number of subsidiaries that provide health care financing to over 700,000 enrollees in various health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Nebraska in each reference to "Blue Cross and Blue Shield of Nebraska" or "BCBS-NE," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 84 and therefore denies those allegations.

85. Defendant Anthem Blue Cross and Blue Shield of Nevada is the trade name of Defendant Rocky Mountain Health and Medical Service, Inc., a Colorado corporation with its headquarters located at 700 Broadway, Denver, CO 80273. Anthem Blue Cross and Blue Shield of Nevada has a principal place of business in Nevada located at 9133 West Russell Rd., Suite 200, Las Vegas, NV 89148. Anthem Blue Cross and Blue Shield of Nevada and its parent, Rocky Mountain Hospital and Medical Service, Inc. are subsidiaries of Defendant Anthem that offer health care financing in Nevada. Anthem Blue Cross and Blue Shield of Nevada, its subsidiaries and affiliated companies, which provide health care financing to more than 300,000 enrollees, are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Anthem Blue Cross and Blue Shield of Nevada in each reference to "Anthem Blue Cross and Blue Shield of Nevada" or "BCBS-NV," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 85 and therefore denies those allegations.

86. Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire is a subsidiary of Defendant Anthem. It is a New Hampshire corporation with its corporate headquarters located at 3000 Goff Falls Road, Manchester, New Hampshire 03111. Anthem Health Plans of New Hampshire, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to over 600,000

enrollees in various health care plans in New Hampshire. Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Anthem Health Plans of New Hampshire, Inc., in each reference to "Anthem Blue Cross and Blue Shield of New Hampshire" or "BCBS-NH," but denies that Plaintiffs' characterization is accurate. BCBS-MI denies the remaining allegations in Paragraph 86. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 86 and therefore denies those allegations.

87. Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey is a New Jersey corporation with its corporate headquarters located at Three Penn Plaza East, Newark, New Jersey 07105. It is the parent corporation of a number of subsidiaries that provide health care financing to 3.6 million enrollees in various health care plans in New Jersey. Horizon Healthcare Services, Inc., its subsidiaries and affiliated companies are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Horizon Healthcare Services, Inc., in each reference to "Horizon Blue Cross and Blue Shield of New Jersey" or "BCBS-NJ," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 87 and therefore denies those allegations.

88. Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113. Blue Cross and Blue Shield of New Mexico is the parent of a number of subsidiaries that provide health care financing to 550,000 enrollees in various health care plans in New Mexico. Blue Cross and Blue Shield of New Mexico, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of New Mexico in each reference to "Blue Cross and Blue Shield of New Mexico" or "BCBS-NM," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 88 and therefore denies those allegations.

89. Defendant HealthNow New York, Inc. is a New York corporation with its corporate headquarters located at 257 West Genesee Street, Buffalo, NY 14202. HealthNow New York, Inc. does business as Blue Cross Blue Shield of Western New York, Inc. and Blue Shield of Northeastern New York. HealthNow New York, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York. HealthNow New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "HealthNow" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant HealthNow New York, Inc., in each reference to "HealthNow," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 89 and therefore denies those allegations.

90. Defendant BlueShield of Northeastern New York is a division of Defendant HealthNow with its principal place of business located at 40 Century Hill Drive, Latham, NY 12110. BlueShield of Northeastern New York is the parent of a number of subsidiaries that provide health care financing to enrollees in various health care plans in New York. BlueShield of Northeastern New York, its subsidiaries and affiliated companies are collectively referred to as "BlueShield of Northeastern New York" or "BS-Northeastern NY" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Shield of Northeastern New York in each reference to "Blue

Shield of Northeastern New York" or "BS-Northeastern NY," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90 and therefore denies those allegations.

91.     BlueCross BlueShield of Western New York, Inc. is a division of Defendant HealthNow with its principal place of business located at 257 West Genesee Street, Buffalo, NY 14202. BlueCross BlueShield of Western New York is the parent of a number of subsidiaries that provide health care financing to more than 800,000 enrollees in various health care plans in New York. BlueCross BlueShield of Western New York, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Western New York" or "BCBS-Western NY" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Shield of Northeastern New York in each reference to "Blue Shield of Northeastern New York" or "BS-Northeastern NY," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 and therefore denies those allegations.

92.     Defendant Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield is a subsidiary of Defendant Anthem. It is a New York corporation with its corporate headquarters located at One Liberty Plaza, New York, NY 10006. Empire HealthChoice Assurance, Inc. d/b/a Empire BlueCross BlueShield is the parent corporation of a number of subsidiaries that provide health care financing to nearly 6 million enrollees in various health care plans in New York. Empire BlueCross BlueShield, its subsidiaries and affiliated companies are collectively referred to as "Empire BlueCross BlueShield" or "Empire-BCBS" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Empire HealthChoice Assurance, Inc., in each reference to "Empire Blue Cross and Blue Shield" or "Empire-BCBS," but denies that Plaintiffs' characterization is

accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the

truth of the remaining allegations in Paragraph 92 and therefore denies those allegations.

93.     Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a
subsidiary of Lifetime Healthcare, Inc. and is a New York corporation with its corporate
headquarters located at 165 Court Street, Rochester, New York 14647. It is the parent
corporation of a number of subsidiaries that provide health care financing to approximately
1.5 million enrollees in various health care plans in the state of New York. Excellus Health Plan,
Inc., its subsidiaries and affiliated companies are collectively referred to as "Excellus BlueCross
BlueShield" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated

companies" of Defendant Excellus Health Plan, Inc., in each reference to "Excellus BlueCross

BlueShield," but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 93 and therefore denies those allegations.

94.     Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina
corporation with its corporate headquarters located at 4615 University Drive, Durham, North
Carolina 27707. It is the parent corporation of a number of subsidiaries that provide health care
financing to approximately 3.9 million enrollees in various health care plans in North Carolina.
Blue Cross and Blue Shield of North Carolina, Inc., its subsidiaries and affiliated companies are
collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this
Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated

companies" of Defendant Blue Cross and Blue Shield of North Carolina in each reference to

"Blue Cross and Blue Shield of North Carolina" or "BCBS-NC," but denies that Plaintiffs'

characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 94 and therefore denies those

allegations.

95.     Defendant Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota is a North Dakota corporation with its corporate headquarters located at 4510 13th Avenue South, Fargo, ND 58121. Noridian Mutual Insurance Company is the parent company of a number of subsidiaries that provide health care financing to nearly 500,000 enrollees in the midwestern and western United States. Blue Cross Blue Shield of North Dakota is the parent of a number of subsidiaries that provide health care financing to approximately 390,000 enrollees in various health care plans in North Dakota. Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "BCBS-ND" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Noridian Mutual Insurance Company in each reference to "Blue Cross Blue Shield of North Dakota" or "BCBS-ND," but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 and therefore denies those allegations.

96.     Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is a subsidiary of Defendant Anthem. It is an Ohio corporation with its headquarters located at 4361 Irwin Simpson Rd, Mason, OH 45040. Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is the parent corporation of a number of subsidiaries that provide health care financing to more than 3 million enrollees in various health care plans in Ohio. Community Insurance Co., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Community Insurance Company in each reference to "Anthem Blue Cross and Blue Shield of Ohio" or "BCBS-OH," but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 96 and therefore denies those allegations.

97.     Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located at 1400 South Boston, Tulsa, Oklahoma 74119. Blue Cross and Blue Shield of Oklahoma is the parent of a number of subsidiaries that provide health care financing to more than 835,000 enrollees in various health care plans in

Oklahoma. Blue Cross and Blue Shield of Oklahoma, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Blue Cross and Blue Shield of Oklahoma in each reference to "Blue Cross and Blue Shield of Oklahoma" or "BCBS-OK," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97 and therefore denies those allegations.

98.     Defendant Regence BlueCross BlueShield of Oregon is a subsidiary of Defendant Cambia Health. It is an Oregon corporation with its corporate headquarters located at 100 SW Market Street, Portland, OR 97201. Regence BlueCross BlueShield of Oregon is the parent corporation of a number of subsidiaries that provide health care financing to more than 750,000 enrollees in various health care plans in Oregon. Regence BlueCross BlueShield of Oregon, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Oregon" or "BCBS-OR" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" of Defendant Regence BlueCross BlueShield of Oregon in each reference to "Blue Cross Blue Shield of Oregon" or "BCBS-OR," but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98 and therefore denies those allegations.

99.     Defendant Capital BlueCross is a Pennsylvania corporation with its corporate headquarters located at 2500 Elmerton Avenue, Susquehanna Township, Harrisburg, PA 17177. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 1.3 million enrollees in various health care plans in Pennsylvania. Capital BlueCross, its subsidiaries and affiliated companies are collectively referred to as "Capital BlueCross" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Capital Blue Cross" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99 and therefore denies those allegations.

100. Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield is a subsidiary of Defendant Highmark and is a Pennsylvania corporation with its corporate headquarters located at 1800 Center Street, Camp Hill, Pennsylvania 17011. Highmark Health Services is the parent of a number of subsidiaries that provide health care financing to approximately 4.2 million enrollees in various health care plans in Pennsylvania. Highmark Health Services, its subsidiaries and affiliated companies are collectively referred to as "Highmark Health Services" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Highmark Health Services" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100 and therefore denies those allegations.

101. Defendant Independence Blue Cross is a Pennsylvania corporation with its corporate headquarters located at 1901 Market Street, Philadelphia, Pennsylvania 19103. It is the parent corporation of a number of subsidiaries that provide health care financing to 2.5 million enrollees in Pennsylvania and 6 million nationwide. Independence Blue Cross, its subsidiaries and affiliated companies are collectively referred to as "Independence Blue Cross" or "IBC" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Independence Blue Cross" or "IBC" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 101 and therefore denies those allegations.

102.    Defendant Triple-S Salud, Inc. is a subsidiary of Triple-S Management Company and is a Puerto Rico corporation with its corporate headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920. It is the parent corporation of a number of subsidiaries that provide health care financing to 1.6 million enrollees in Puerto Rico. Triple-S Salud, Inc., its subsidiaries and affiliated companies are collectively referred to as "Triple-S of Puerto Rico" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Triple-S of Puerto Rico" but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 102 and therefore denies those allegations.

103.    Defendant Blue Cross and Blue Shield of Rhode Island is a Rhode Island corporation with its corporate headquarters located at 500 Exchange Street, Providence, Rhode Island 02903. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 600,000 enrollees in various health care plans in Rhode Island. Blue Cross and Blue Shield of Rhode Island, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" but denies that Plaintiffs' characterization is accurate.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 103 and therefore denies those allegations.

104.    Defendant BlueCross BlueShield of South Carolina, Inc. is a South Carolina corporation with its corporate headquarters located at 2501 Faraway Drive, Columbia, South Carolina 29219. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately one million enrollees in various health care plans in South Carolina. BlueCross BlueShield of South Carolina, its subsidiaries and affiliated companies are

collectively referred to as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "BlueCross BlueShield of South Carolina" or "BCBS-SC" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 104 and therefore denies those allegations.

105. Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota corporation with its corporate headquarters located at 1601 W. Madison, Sioux Falls, South Dakota 57104. Wellmark of South Dakota, Inc. is a subsidiary of Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to 325,000 enrollees in South Dakota. Wellmark of South Dakota, its subsidiaries and affiliated companies are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Wellmark Blue Cross and Blue Shield of South Dakota" or "BCBS-SD" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 105 and therefore denies those allegations.

106. Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee corporation with its corporate headquarters located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402. It is the parent corporation of a number of subsidiaries that provide health care financing to nearly 3 million enrollees in various health care plans in Tennessee. BlueCross BlueShield of Tennessee, Inc., its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Tennessee" or "BCBS-TN" in this Complaint. BCBS-TN contracts with health care providers in Alabama counties adjacent to Tennessee.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "BlueCross BlueShield of Tennessee" or "BCBS-TN" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 106 and therefore denies those allegations.

107.    Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located at 1001 E. Lookout Drive, Richardson, Texas 75082. Blue Cross and Blue Shield of Texas is the parent of a number of subsidiaries that provide health care financing to 4.7 million enrollees in various health care plans in Texas. Blue Cross and Blue Shield of Texas, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Texas" or "BCBS-TX" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Blue Cross and Blue Shield of Texas" or "BCBS-TX" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107 and therefore denies those allegations.

108.    Regence BlueCross BlueShield of Utah is a subsidiary of Defendant Cambia Health and is a Utah corporation with its corporate headquarters located at 2890 E Cottonwood Parkway, Salt Lake City, UT 84121. Regence BlueCross BlueShield of Utah is the parent corporation of a number of subsidiaries that provide health care financing to more than 320,000 enrollees in various health care plans in Utah. Regence BlueCross BlueShield of Utah, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueCross BlueShield of Utah" or "BCBS-UT" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Regence BlueCross BlueShield of Utah" or "BCBS-UT" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 108 and therefore denies those allegations.

109.    Defendant Blue Cross and Blue Shield of Vermont is a Vermont corporation with its corporate headquarters located at 445 Industrial Lane, Berlin, Vermont 05602. It is the parent corporation of a number of subsidiaries that provide health care financing to approximately 200,000 enrollees in various health care plans within the state of Vermont. Blue Cross and Blue Shield of Vermont, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Blue Cross and Blue Shield of Vermont" or "BCBS-VT" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109 and therefore denies those allegations.

110.    Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc. is a subsidiary of Defendant Anthem. It is a Virginia corporation with its corporate headquarters located at 2015 Staples Mill Road, Richmond, Virginia 23230. Anthem Blue Cross and Blue Shield of Virginia, Inc. is the parent corporation of a number of subsidiaries that provide health care financing to approximately 2.2 million enrollees in various health care plans in Virginia. Anthem Blue Cross and Blue Shield of Virginia, Inc., its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Anthem Blue Cross and Blue Shield of Virginia" or "BCBS-VA" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 110 and therefore denies those allegations.

111.    Defendant Regence BlueShield in Washington is a subsidiary of Defendant Cambia Health and is a Washington corporation with its corporate headquarters located at 1800 9th Avenue, Seattle, WA 98101. Regence BlueShield in Washington is the parent corporation of

a number of subsidiaries that provide health care financing to 770,000 enrollees in various health care plans in Washington. Regence BlueShield in Washington, its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield (WA)" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Regence BlueShield (WA)" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 111 and therefore denies those allegations.

112. Defendant Highmark West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia is a subsidiary of Defendant Highmark and is a West Virginia corporation with its corporate headquarters located at 614 Market Square, Parkersburg, West Virginia 26101. Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, is the parent corporation of a number of subsidiaries that provide health care financing to nearly 493,000 enrollees in various health care plans in West Virginia and one county in Ohio. Highmark Blue Cross Blue Shield West Virginia, its subsidiaries and affiliated companies are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" in this Complaint. BCBS-WV exercises market dominance in the states of West Virginia and Ohio or within areas of those states.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Highmark Blue Cross Blue Shield West Virginia" or "BCBS-WV" but denies that Plaintiffs' characterization is accurate. The last sentence in Paragraph 112 contains legal conclusions to which no response is required. To the extent that a response is deemed required, BCBS-MI denies the allegations in the last sentence of Paragraph 112. BCBS-MI denies the remaining allegations in Paragraph 112. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 112 and therefore denies those allegations.

113. Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield of Wisconsin is a subsidiary of Defendant Anthem and is a Wisconsin corporation

with its corporate headquarters located at 401 West Michigan Street, Milwaukee, WI 53203. Blue Cross Blue Shield of Wisconsin, is the parent corporation of a number of subsidiaries, including Compcare Health Services Insurance Corporation, that provide health care financing to approximately 900,000 enrollees in various health care plans in Wisconsin. Blue Cross Blue Shield of Wisconsin, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Blue Cross Blue Shield of Wisconsin" or "BCBS-WI" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 113 and therefore denies those allegations.

114. Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its company headquarters located at 4000 House Avenue, Cheyenne, WY 82001. It is the parent corporation of a number of subsidiaries that provide health care financing to over 100,000 enrollees in various health care plans in Wyoming. Blue Cross Blue Shield of Wyoming, its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to include "subsidiaries and affiliated companies" in each reference to "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" but denies that Plaintiffs' characterization is accurate. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 114 and therefore denies those allegations.

115. Defendant BCBSA is a corporation organized in the State of Illinois and headquartered at 225 N. Michigan Avenue, Chicago, Illinois 60601. It is owned and controlled by 36 Blues that operate under the Blue Cross and Blue Shield trademarks and trade names. BCBSA was created by the Blues and operates as the licensor. Health insurance companies operating under the Blue Cross and Blue Shield trademarks and trade names provide health insurance coverage for nearly 105 million - or one in three - Americans. BCBSA itself does not provide health care financing and does not contract with health care providers, but it operates to create consistency and cooperation among its 36 members. It is owned and controlled by its members and is governed by a board of directors, two-thirds of which must be composed of

either plan chief executive officers or plan board members. The 36 Blues fund Defendant BCBSA.

**ANSWER:**

BCBS-MI admits the allegations in the first sentence of Paragraph 115.  BCBS-MI further admits that BCBSA licenses the Blue Cross and Blue Shield trademarks and trade names to 36 independent, community-based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto Rico, and that those licensees are governing members of BCBSA.  BCBS-MI admits that the 36 Blue Cross and Blue Shield plans collectively provide healthcare coverage to approximately 106 million (or nearly one in three) Americans in all 50 states, the District of Columbia, and Puerto Rico.  BCBS-MI admits that the CEO of each such licensee is eligible to serve on the Board of Directors of BCBSA.  BCBS-MI admits that its functions include facilitating consistency and cooperation among its 36 members.  BCBS-MI admits that BCBSA does not provide health care financing.  BCBS-MI denies the remaining allegations in Paragraph 115.

## FACTUAL ALLEGATIONS

### The Defendants

116.  Defendants are independent health insurance companies that operate and offer healthcare coverage in all 50 states, the District of Columbia and Puerto Rico, and cover nearly 105 million Americans. Defendants also operate the most extensive Provider Networks in the United States. According to the BCBSA, more than 96% of hospitals and 93% of professional providers contract with one of the Defendants nationwide – "more than any other insurer." Other Blues estimate even higher percentages.

**ANSWER:**

BCBS-MI admits that the Blue Plan Defendants are independent health plans that collectively provide healthcare coverage to approximately 106 million (or nearly one in three) Americans in all 50 states, the District of Columbia, and Puerto Rico.  BCBS-MI admits that BCBSA's website states that 93% of professional providers in the United States and more than

96% of hospitals in the United States contract with Blue Cross and Blue Shield plans. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 116 and therefore denies those allegations.

117. The Blues include many of the largest potentially competitive health insurance companies in the United States. Indeed, Anthem is the largest health insurance company in the country by total medical enrollment, with approximately 37 million enrollees. Health Care Service Corporation ("HCSC") is the largest mutual health insurance company in the country and the fourth largest health insurance company overall, with approximately 13 million enrollees. Similarly, 15 of the 25 largest health insurance companies in the country are Blues. Absent the restrictions that the independent Blue Cross and Blue Shield licensees have chosen to impose on themselves, discussed below, these companies would compete against each other in the markets for health care financing and health services.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, third, and fourth sentences of Paragraph 117 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 117.

118. Anthem is the Blue Cross and Blue Shield licensee for Georgia, Kentucky, portions of Virginia, California (Blue Cross only), Colorado, Connecticut, Indiana, Maine, Missouri (excluding 30 counties in the Kansas City area), Nevada, New Hampshire, New York (as Blue Cross Blue Shield in 10 New York City metropolitan and surrounding counties, and as Blue Cross or Blue Cross Blue Shield in selected upstate counties only), Ohio, and Wisconsin, and also serves customers throughout the country through its non-Blue brand subsidiary, UniCare. Anthem also operates in a number of additional states through its Medicaid subsidiary, Amerigroup. But for the illegal territorial restrictions summarized above, Anthem would be likely to offer its health care financing throughout the United States in competition with the other Blues, including in Alabama. In fact, in 2015 Anthem had approximately 127,000 enrollees in Alabama. Anthem has further demonstrated its desire to operate in Alabama through its offer to purchase CIGNA, by market share the seventh largest health insurance company in the country, which operates in Alabama. If Anthem did develop and operate a Provider Network in Alabama, it would provide increased competition, and such competition would result in higher payments to Providers. Anthem recently admitted its desire to compete nationwide, including in Alabama, in its trial brief supporting its attempt to merge with Cigna: "a prime reason for the proposed merger is to provide Anthem with Cigna's nationwide network so that Anthem may for the first time become a true nationwide competitor." Anthem Brief at 10. Anthem also stated that its membership in the Association "will not diminish Anthem's incentives to compete through the Cigna brand in the 36 states where Anthem does not hold a Blue license. Anthem will have powerful incentives to win business through Cigna in those states because the margins on such business far exceed any BlueCard fees to be earned if another Blue happens to win the business." *Id.* at 12.

**ANSWER:**

BCBS-MI admits that Anthem is a health plan that is licensed to use the Blue Cross and Blue Shield trademarks and trade names in Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Nevada, New Hampshire, Ohio, Wisconsin, portions of Virginia, portions of Missouri (excluding 30 counties), portions of New York (as Blue Cross Blue Shield in 10 counties, and as Blue Cross or Blue Cross Blue Shield in certain other counties) and California (as Blue Cross only). BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 118 and therefore denies those allegations.

119. HCSC, which operates BCBS-IL, BCBS-NM, BCBS-OK, BCBS-TX, and BCBS-MT, is the largest mutual health insurance company in the country and the fourth largest health insurance company overall. But for the illegal territorial restrictions summarized above, HCSC would be likely to offer its health care financing throughout the United States in competition with the other Blues, including in Alabama. In 2015 HCSC had approximately 92,000 enrollees in Alabama. Such competition would result in higher payments to Providers.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first or fourth sentences of Paragraph 119 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 119.

120. BCBS-MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its Service Area of Michigan. BCBS-MI already operates in other states on a limited basis through its Medicare subsidiary. But for the illegal territorial restrictions summarized above, BCBS-MI would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 BCBS-MI had approximately 30,000 enrollees in Alabama. Such competition would result in higher payments to Providers in those areas.

**ANSWER:**

BCBS-MI admits that it is a nonprofit mutual insurance company with enrollees in Michigan. BCBS-MI admits that it has enrollees in Alabama. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth sentence of

Paragraph 120 and therefore denies them. BCBS-MI denies the remaining allegations in Paragraph 120.

121. Highmark, Inc. is the eighth largest health insurer in the country by market share, with approximately 5.2 million enrollees. Its affiliated Blues include Highmark BCBS in Western Pennsylvania, Highmark BS throughout the entire state of Pennsylvania, BCBS-WV, and BCBS-DE. It has acquired Blue Cross of Northeastern Pennsylvania, causing it to move further into the top ten. But for the illegal territorial restrictions summarized above, Highmark would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 Highmark had approximately 40,000 enrollees in Alabama. Such competition would result in higher payments to Providers in those areas.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 118 and therefore denies those allegations.

122. Blue Cross and Blue Shield of Alabama is the thirteenth largest health insurer in the country by total medical enrollment, by some measures, with approximately 3.5 million enrollees. But for the illegal territorial restrictions summarized above, Blue Cross Blue Shield of Alabama would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions. Such competition would result in higher payments to Providers in those areas.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 122 and therefore denies those allegations.

BCBS-MI denies the remaining allegations in Paragraph 122.

123. CareFirst, which operates the Blues in Maryland, Washington, D.C., and parts of Virginia, is the fourteenth largest health insurer in the U.S. and the largest health care insurer in the Mid-Atlantic region, with approximately 3.33 million subscribers. But for the illegal territorial restrictions summarized above, CareFirst would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 CareFirst had approximately 5,000 enrollees in Alabama. Such competition would result in higher payments to Providers in those areas.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences of Paragraph 123 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 123.

124. BCBS-MA is the seventeenth largest health insurer in the country by total medical enrollment, with approximately 3 million enrollees in its service area of Massachusetts. But for the illegal territorial restrictions summarized above, BCBS-MA would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 BCBS-MA had approximately 5,000 enrollees in Alabama. Such competition would result in higher payments to Providers in those areas.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences of Paragraph 124 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 124.

125. BCBS-FL is the eighteenth largest health insurer in the country by total medical enrollment, with approximately 2.9 million enrollees in its service area of Florida. But for the illegal territorial restrictions summarized above, BCBS-FL would be likely to offer its health care financing in more regions across the United States in competition with the Blue in those regions, including in Alabama. In 2012 BCBS-FL had approximately 4,000 enrollees in Alabama. Such competition would result in higher payments to Providers in those areas.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences of Paragraph 125 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 125.

126. The Blues are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks or trade names and, but for agreements to the contrary, could and would compete with one another.

**ANSWER:**

BCBS-MI admits the Blue Plans are independent health plans that license the Blue Cross and/or Blue Shield trademarks or trade names.  BCBS-MI denies the remaining allegations in Paragraph 126.

127.   The BCBSA is a separate legal entity that purports to promote the common interests of the Blues. The BCBSA describes itself as "a national federation of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies." The BCBSA refers to the 36 Blue Cross and Blue Shield companies as Member Plans.

**ANSWER:**

The first sentence in Paragraph 127 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI admits that BCBSA is a non-profit organization formed under Illinois law that operates business initiatives in support of the Blue Cross and Blue Shield plans.  BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from BCBSA's website.  BCBS-MI refers to BCBSA's website for its contents and denies any characterization thereof.  BCBS-MI admits the 36 licensed Blue Cross and Blue Shield plans in the United States and Puerto Rico are referred to as Member Plans in the June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members.  BCBS-MI denies the remaining allegations in Paragraph 127.

128.   The BCBSA serves as the epicenter for Defendants' communications and arrangements in furtherance of their agreements not to compete. As BCBSA's general counsel, Roger G. Wilson, explained to the Insurance Commissioner of Pennsylvania, "BCBSA's 39 [now 36] independent licensed companies compete as a cooperative federation against non-Blue insurance companies." One Defendant admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a letter from Roger G. Wilson to the Insurance Commissioner of Pennsylvania, but denies that

Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to that letter for its contents and denies any characterization thereof. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unspecified Blue Plan's February 17, 2011 Form 10-K filing, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to that filing for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 128.

129.    Every Blue is a member of the BCBSA, every Blue CEO is on the Board of Directors of BCBSA and every Blue participates in numerous BCBSA Committees.

**ANSWER:**

BCBS-MI admits that each licensed Blue Plan in the United States and Puerto Rico is a member of BCBS-MI and is eligible to serve on BCBSA Committees. BCBS-MI further admits that the CEO of each such Member Plan is eligible to serve on the Board of Directors of BCBS-MI. BCBS-MI denies the remaining allegations in Paragraph 129.

130.    The Blues govern BCBSA. BCBSA is entirely controlled by its members, all of whom are independent health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names, and that, but for any agreements to the contrary, could and would compete with one another.

**ANSWER:**

BCBS-MI admits that BCBSA licenses the Blue Cross and Blue Shield trademarks and trade names to 36 independent, community-based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto Rico, and that those licensees are governing members of BCBSA. BCBS-MI further admits that the CEO of each such licensee is eligible to serve on the Board of Directors of BCBSA. BCBS-MI denies the remaining allegations in Paragraph 130.

131.    As at least one federal court has recognized, BCBSA "is owned and controlled by the member plans" to such an extent that "by majority vote, the plans could dissolve the Association and return ownership of the Blue Cross and Blue Shield names and marks to the

64

individual plans." *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989). The Blue Cross and Blue Shield licensees control the Board of Directors of BCBSA.

**ANSWER:**

BCBS-MI admits that BCBSA licenses the Blue Cross and Blue Shield trademarks and trade names to 36 independent, community-based and locally operated Blue Cross and Blue Shield plans in the United States and Puerto Rico, and that those licensees are governing members of BCBSA. BCBS-MI further admits that the CEO of each such licensee is eligible to serve on the Board of Directors of BCBSA. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from *Central Benefits Mut. Ins. Co. v. Blue Cross and Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989). BCBS-MI refers to that case for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 131.

132. In a pleading it filed during the *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n* litigation in the Northern District of Illinois, Civil Action No. 09-c-5619, BCBSA admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and BCBSA's own chief executive officer." The current Chairman of the Board of Directors, Daniel J. Hilferty, is also the President and CEO of Independence Blue Cross. The CEO of each of the Individual Blues serves on the Board of Directors of BCBSA. The Board of Directors of BCBSA meets at least annually.

**ANSWER:**

BCBS-MI admits that the Board of Directors of BCBSA meets at least annually and that the CEO of each Member Plan in the United States and Puerto Rico is eligible to serve on the Board of Directors of BCBSA. BCBS-MI admits that the current chairman of the Board of Directors of BCBSA is Daniel Hilferty of Independence Blue Cross. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from unspecified pleadings in *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* No. 09-c-5619 (N.D. Ill.

2011). BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 132.

133. BCBSA meetings provide a forum for representatives of Defendants to share information on management of Defendants and specific health insurance issues common to Defendants, and this information is disseminated to all 36 members, including reimbursement rates for providers. The BCBSA includes numerous committees governed by the Defendants and sponsors various meetings, seminars, and conferences Defendants attend. All of these activities are in furtherance of Defendants' conspiracies.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 133.

134. The Blues also control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine member Plan CEOs and three independent members. This Committee has the power to enforce the requirements of the license agreements.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 134.

135. The Blues control the entry of new members into BCBSA. In a brief it filed during litigation in the Sixth Circuit Court of Appeals, BCBSA admitted that "[t]o be eligible for licensure, [an] applicant . . . must receive a majority vote of [BCBSA's] Board" and that BCBSA "seeks to ensure that a license to use the Blue marks will not fall into the hands of a stranger the Association has not approved." *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, Brief of Appellee, 1997 WL 34609472, at *7, 21 (filed Jan. 9, 1997) (the "Sixth Circuit Brief").

**ANSWER:**

BCBS-MI admits that BCBSA licenses the Blue Cross and Blue Shield trademarks and trade names to Blue Cross and Blue Shield plans. BCBS-MI further admits that Plaintiffs purport to quote or summarize selected excerpts from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to the brief for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 135.

66

136.    The Blues control the rules and regulations that all members of BCBSA must obey. According to the Sixth Circuit Brief, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). *Id.* at n.4.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to paraphrase selected excerpts from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, but denies that Plaintiffs accurately paraphrase the selected excerpts. BCBS-MI refers to the brief for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 136.

137.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, a plan "agrees . . . to comply with the Membership Standards." In the Sixth Circuit Brief, BCBSA described the provisions of the License Agreements as something the member plans "deliberately chose," "agreed to," and "revised." The License Agreements explicitly state that the member plans most recently met to adopt amendments, if any, to the licenses on June 20, 2013.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the License Agreements. BCBS-MI refers to the License Agreements for their contents and denies any characterization thereof. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to the brief for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 137.

138.    The Guidelines state that the Membership Standards and the Guidelines "were developed by the [PPFSC] and adopted by the Member Plans in November 1994 and initially

67

became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members. BCBS-MI refers to the Guidelines for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 138.

139. The Blues themselves police the compliance of all members of BCBSA with the rules and regulations of BCBSA. The Guidelines state that the PPFSC "is responsible for making the initial determination about a Plan's compliance with the license agreements and membership standards. Based on that determination, PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." In addition, the Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards." In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to the Guidelines for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 139.

140. The Blues control and administer the disciplinary process for members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply - "Immediate Termination," "Mediation and Arbitration," and

"Sanctions" - each of which is administered by the PPFSC and could result in the termination of a member plan's license.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members. BCBS-MI refers to the Guidelines for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 140.

141.    The Blues likewise control the termination of existing members from BCBSA. The Guidelines state that based on the PPFSC's "initial determination about a Plan's compliance with the license agreements and membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan and Plan weighted vote." In its Sixth Circuit brief, BCBSA admitted that the procedure for terminating a license agreement between BCBSA and a member plan includes a "double three-quarters vote" of the member plans of the BCBSA: "In a double three-quarters vote, each plan votes twice – first with each Plan's vote counting equally, and then with the votes weighted primarily according to the number of subscribers."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to the Guidelines for their contents and denies any characterization thereof. BCBS-MI further admits that Plaintiffs purport to quote or summarize selected excerpts from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to the brief for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 141.

142.    A number of Blues also serve on the Inter-Plan Programs Committee ("IPPC"), which controls the national or Inter-Plan Programs of the Blues. BCBS-AL CEO and President

Terry Kellogg has been the Chairman of this Committee, and BCBS-AL Chief Administrative Officer Timothy Vines is currently a member. In each of their licensing agreements, the Blues agree to participate in the national programs and to comply with the terms established by the IPPC. Therefore, the Blues are collectively agreeing to the terms of the national programs and their implementation.

**ANSWER:**

BCBS-MI admits that the License Agreements and June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members require Member Plans to participate in certain national programs and comply with applicable Inter-Plan Programs policies. BCBS-MI refers to the License Agreements and June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members for their content and denies any characterization thereof. BCBS-MI admits that Terry Kellogg has been the Chairman of this Committee, and Timothy Vines is currently a member. BCBS-MI denies the remaining allegations in Paragraph 142.

143. The Blues are potential competitors that use their control of BCBSA to coordinate their activities. As a result, the rules and regulations imposed "by" the BCBSA on the member plans are in truth imposed by the member plans on themselves.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 143.

144. In addition, Blue Health Intelligence ("BHI"), a licensee of BCBSA, is managed by a Board of Managers entirely comprised of BCBS executives -- Highmark, BCBS-NC, BCBS-MI, BCBS-AL, BCBS-MA, BCBS-NE, HCSC, BCBSA, and IBC. www.bluehealthintelligence.com. BHI recently acquired Intelimedix, which licenses a claims database comprised of 140 million insureds' in-network pricing data contributed by BCBS companies. Designed to lower health care reimbursement to providers, Intelimedix explicitly states that "we all share information."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize selected information on Blue Health Intelligence's website. BCBS-MI refers to that website for its contents and denies any

characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 144 and therefore denies those allegations.

145. BHI receives its claims data from, among other sources, BCBSA, which in turn receives these data from each of its Blues Plan members. BHI uses the BCBSA claims data, called the BCBSA National Data Warehouse Core, to perform analytic reports for the benefit of Blues Plans. Prior to the time period in which Plans submitted claims data directly to BCBSA, Plans submitted data to BHI. Among those entities that BHI transmitted claims data to was Consortium. Thus, BHI operates as a mechanism for the sharing of claims data among all the Blues, which they use to lower reimbursements to Providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 145.

146. Each BCBSA licensee is an independent legal organization. The BCBSA has never taken the position that the formation of BCBSA changed the fundamental independence of the individual Blues. The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."

**ANSWER:**

The first sentence of Paragraph 146 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI admits each member Blue Plan is an independent legal organization. BCBS-MI further admits that Plaintiffs purport to quote from or summarize the License Agreements. BCBS-MI refers to the License Agreements for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 146.

147. In the Sixth Circuit Brief, BCBSA admitted that the Blues formed the precursor to BCBSA when they "recognized the necessity of national cooperation." 1997 WL 34609472, at *3. The authors of *The Blues: A History of the Blue Cross and Blue Shield System* describe the desperation of the Blue Cross and Blue Shield licensees before they agreed to impose restrictions on themselves:

> The subsidiaries kept running into each other - and each other's parent Blue Plans - in the marketplace. Inter-Plan competition had been a fact of life from the earliest days, but a new set of conditions faced the Plans in the 1980s, now in a mature and saturated market. New forms of competition were springing up at

every turn, and market share was slipping year by year. Survival was at stake. The stronger business pressure became, the stronger the temptation was to breach the service area boundaries for which the Plans were licensed . . . .

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize a selected excerpt from a brief BCBSA filed in the Sixth Circuit Court of Appeals, in *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Association*, but denies that Plaintiffs accurately quote the selected excerpt. BCBS-MI refers to this brief for its contents and denies any characterization thereof. BCBS-MI further states that the excerpt reads in full: "Despite their local focus, the Plans recognized the necessity of national cooperation and formed the precursors of the Blue Cross and Blue Shield Association. For their common benefit, the Plans transferred all of their interests in the Blue Marks to predecessor organizations in the 1950s." BCBS-MI also admits that Plaintiffs purport to quote or summarize selected excerpts from *The Blues: A History of the Blue Cross and Blue Shield System*. BCBS-MI refers to that book for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations of Paragraph 147.

148. BCBSA is simply a vehicle used by admittedly independent health insurance companies to conspire, coordinate, and enter into agreements that restrain competition. Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 148.

149. As detailed herein, the BCBSA not only enters into anticompetitive agreements with the Blues to allocate markets, but also facilitates the cooperation and communications between Defendants to suppress competition. BCBSA is a convenient organization through which the Defendants enter into illegal territorial restraints between and among themselves.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 149.

## The History of the Blues

*Before the Long-Term Business Strategy*

150.    At the time of their initial formation, Blue Cross plans and Blue Shield plans were separate and distinct and were developed to meet differing needs. The Blue Cross plans were designed to provide a mechanism for covering the cost of hospital care. The Blue Shield plans provided a mechanism for covering the cost of physicians. The plans were all nonprofit entities with limited purposes, and they acknowledged obligations to treat all healthcare providers fairly.

**ANSWER:**

BCBS-MI admits that at the time of their initial formation, the Blue Plans were non-profit entities.  BCBS-MI further admits that most Blue Cross plans initially were founded principally to offer prepaid hospital services and that most Blue Shield plans initially were founded principally to cover the cost of physician care.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 150 and therefore denies those allegations.

151.    In 1946, the Associated Medical Care Plans ("AMCP") was established as a national body intended to coordinate and "approve" the independent Blue Shield plans. The AMCP was controlled by the Blue Shield plans. When the AMCP proposed that the Blue Shield symbol be used to signify that a Blue Shield plan was "approved," the American Medical Association responded, "[i]t is inconceivable to us that any group of state medical society Plans should band together to exclude other state medical society programs by patenting a term, name, symbol, or product."

**ANSWER:**

BCBS-MI admits the Associated Medical Care Plans ("AMCP") was formed in 1946. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 151 and therefore denies those allegations.  BCBS-MI denies the remaining allegations in Paragraph 151.

152.    Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. During the early decades of their existence, there were no restrictions on the ability of a Blue Cross plan to compete with or offer coverage in an area already covered by a Blue Shield plan. Likewise, there were no restrictions on the ability of a Blue Shield plan to compete with or offer coverage in an area already covered by a Blue Cross plan.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 152.

153.    Despite BCBSA's attempt to suppress competition among the Blues, history shows that this competition has existed and can exist. By 1947, Blue Cross and Blue Shield plans coexisted in most states, setting the stage for competition between them as Blue Cross plans expanded their offerings to include insurance for medical services traditionally insured by Blue Shield plans, and Blue Shield plans expanded their offerings to include insurance for hospital services traditionally insured by Blue Cross plans. Competition in the same geographic areas under the Blue Cross name, as well as the Blue Shield name, has been a feature of the system since the 1930s, and it continues to this day. For example, the Durham and Chapel Hill plans competed with each other under the Blue Cross name from 1938 until 1968, and these plans continued to compete under the Blue Shield name for six years after that. Plans that are now part of Excellus and Anthem have been competing under the Blue Cross and Blue Shield names since 1947, and plans that are now part of HealthNow and Excellus have been competing under the Blue Cross and Blue Shield names since 1952. Cross-on-Cross competition, Shield-on-Shield competition, or both, exist or have existed in California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, Washington, and Wisconsin. Moreover, not all of this competition is based on historical practices; Premera and Regence Blue Shield of Idaho began competing under the Blue Shield name in Washington in 1995, and they continue to compete there.

**ANSWER:**

BCBS-MI admits that certain Blue Plans have been licensed at various times to use the Blue Cross or Blue Shield trademarks and trade names in the same geographic area, and specifically in the following states or portions thereof: California, Idaho, Illinois, Kentucky, Maryland, New York, North Carolina, Ohio, Virginia, Washington, and Wisconsin. BCBA admits that Premera BCBS and Regence Blue Shield of Idaho are currently both licensed to use the Blue Shield trademarks and trade names in a single county in Washington. BCBS-MI denies the remaining allegations in Paragraph 153.

154.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all Blues, to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed. One reason given for its failure was the AMA's opposition because of its fear that a restraint-of-trade action might result from such cooperation.

**ANSWER:**

BCBS-MI admits that in 1947 and 1948, the Blue Cross Commission and the AMCP considered, but did not implement, developing a national agency for all Blue Plans, to be called the Blue Cross and Blue Shield Health Service, Inc.  BCBS-MI denies the remaining allegations in Paragraph 154.

155.    According to an affidavit of C. Rufus Rorem, who was the Director of the Blue Cross Commission, a goal of the Commission was to "prohibit[] the operation of multiple Plans in a single service area to reduce health care costs." The manner of reducing health care costs was to eliminate competition among the Blue Cross plans to induce hospitals to participate with the plans at reimbursement rates favorable to the plans: "One of several Plans operating in the same area with an enrollment of only a small fraction of the area's eligible subscribers had substantially less influence with and therefore success in convincing the area's hospitals to participate in the Plan. ... The operation of only one Plan per service area helped the Plan obtain the participation of hospitals on terms which were favorable to the Plan and its subscribers, thereby enhancing the Plan's attractiveness in the marketplace."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified affidavit of C. Rufus Rorem.  BCBS-MI refers to that document for its contents and denies any characterization thereof.    BCBS-MI denies the remaining allegations in Paragraph 155.

156.    Despite the foregoing, to address competition from commercial insurers, including other Blues, and to ensure national cooperation among the different Blue entities, the Blues agreed to centralize the ownership of their trademarks and trade names.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 156.

157.    In 1954, the Blue Cross plans transferred their rights "to the words BLUE CROSS and the design of a blue cross, as service marks, for a prepayment plan for hospital care and related services ... to [the American Hospital Association]." (The "1954 Agreement".) Notably, the 1954 Agreement specifically acknowledged the limited scope of these service marks, stating that "the words BLUE CROSS and design of a Blue Cross are known and recognized in the United States and in foreign countries as designating plans for prepayment of hospital care and related services." The 1954 Agreement also noted limitations specifying that only "certain Individual Plans ... developed certain territorial rights with respect to the words BLUE CROSS

and the design of a blue cross in particular areas served by such PLANS" and that the plan had the right to use the license "within the area served by the INDIVIDUAL PLAN on the date of these presents."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a

1954 Agreement. BCBS-MI refers to that 1954 Agreement for its contents and denies any

characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 157.

158. The 1954 Agreement also placed an obligation on Plans to treat providers fairly. In this regard, the 1954 Agreement specified that a plan must comply with certain requirements as a condition of the grant of the license, including, among other things, that "[e]very qualified general hospital in the area served by the INDIVIDUAL PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the

1954 Agreement. BCBS-MI refers to the 1954 Agreement for its contents and denies any

characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 158.

159. Finally, the 1954 Agreement prevented the AHA from having control over the Blue Cross plans. In this regard, the agreement specified that the Blue Cross Plans needed only a majority vote to revoke the agreement, while the AHA could revoke it only prior to January 1, 1956, upon a three-fourths vote of the House of Delegates of the AHA.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to reference selected excerpts from the 1954

Agreement. BCBS-MI refers to the 1954 Agreement for its contents and denies any

characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 159.

160. With respect to the Blue Shield entities, the 1952 license agreement between the National Organization (the agreement's term for the AMCP) and its member medical care plans (the "1952 Agreement") was similarly limited in scope. That agreement specified that the words "'Blue Shield' and their accompanying symbol gradually acquired, in the areas in which used and elsewhere, a definite meaning, i.e. as identifying nonprofit prepayment medical care plans owned, controlled or sponsored by county medical societies or state, district, territorial or provincial medical associations." The 1952 Agreement further specified that "[e]ach member

76

plan that is a party hereto is entitled by virtue of its membership to use the words 'Blue Shield' in order to identify to the public its nonprofit medical care plan and its membership in the National Organization." In 1976, it again changed its name to the "Blue Shield Association." Throughout these name changes, the entity continued to be controlled by the Blue Shield plans.

**ANSWER:**

BCBS-MI admits the Associated Medical Care Plans ("AMCP") was formed in 1946 and changed its name in 1950 to Blue Shield Medical Care Plans. BCBS-MI admits that BSMCP changed its name in 1960 to the National Association of Blue Shield Plans, which in 1977 changed its name to the Blue Shield Association. BCBS-MI further admits that Plaintiffs purport to quote or summarize selected excerpts from the 1952 Agreement. BCBS-MI refers to the 1952 Agreement for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 160.

161. Notably, this agreement did not contain any provision relating to Plans developing certain territorial rights. Instead, this agreement provided that "[t]he National Organization hereby grants to each of its member plans that are parties to this Agreement, subject to the terms of this agreement, permission to use said service mark in commerce among the several states or in foreign commerce."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the 1952 Agreement. BCBS-MI refers to the 1952 Agreement for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 161.

162. In 1972, a new license agreement was entered into between the Blue Cross Association (the "BCA") and the Blue Cross Plans (the "1972 Agreement"). This agreement stated that, at that point in time, the BCA was "the owner of the term 'BLUE CROSS' and the design of a Blue Cross as service marks for prepayment plans for hospital care and related services ('BCA Marks')." The agreement then sought to expand the scope of the service marks by providing that the Blue Cross Plan "desires to use the BCA Marks and any revisions and variations hereafter developed (collectively called 'Licensed Marks')" and then grants such Plan the right to use the new Licensed Marks "as service marks, in the sale and advertising of programs for health care and related services operated on a non-profit basis." This agreement also provides that the "rights hereby granted are exclusive to [the] Plan within the geographical area served by the Plan on the effective date of this License Agreement."

**ANSWER:**

BCBS-MI admits that in 1972, the AHA assigned its rights in the Blue Cross trade names and trademarks to the Blue Cross Association. BCBS-MI also admits that Plaintiffs purport to quote or summarize selected excerpts from the 1972 Agreement. BCBS-MI refers to the 1972 Agreement for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 162.

163.    Notably, however, like the 1954 Agreement, the 1972 Agreement provided that a plan must treat providers fairly. In this regard, the 1972 Agreement continued to specify that a plan must comply with certain requirements as a condition of the grant of the license including, among other things, that "[e]very qualified general hospital in the area served by the PLAN shall have reasonable opportunity to become a contracting hospital" and "[p]rovision shall be made for benefits in qualified non-contracting hospitals."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the 1972 Agreement. BCBS-MI refers to the 1972 Agreement for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 163.

164.    In the 1970s, the Blue Cross Association and the Blue Shield Association began consolidating. By 1982, the process of the merger to form BCBSA had been completed.

**ANSWER:**

BCBS-MI admits that in 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. BCBS-MI denies the remaining allegations in Paragraph 164.

*The Long-Term Business Strategy and Assembly of Plans*

165.    In the early 1980s, the Blues fundamentally changed the way they conducted business. The Blues conspired through a work group organized by the BCBSA, created a set of mandates that became known as the "Long-Term Business Strategy." Edwin R. Werner, the President of Blue Cross and Blue Shield of Greater New York (now Defendant Empire Blue Cross, which is a part of Defendant Anthem), led the effort.

**ANSWER:**

BCBS-MI admits that the member Plans of BCBSA participated in a "Long-Term Business Strategy" in the early 1980s. BCBS-MI admits that former President of Blue Cross and Blue Shield of Greater New York Edwin R. Werner was involved in the Long-Term Business Strategy. BCBS-MI denies the remaining allegations in Paragraph 165.

166.    Prior to the Long-Term Business Strategy, each Blue Cross and Blue Shield Plan was an autonomous company with a local presence, but often with strategic plans to compete in other service areas—whether within a state or across state lines. Some plans saw the importance of national accounts and wished to compete for all of these accounts (notwithstanding their territorial basis). Competition across service areas was so common among the Blues that it had a name: "Blue Sharking." Some plans saw themselves as competing with other commercial health insurers who had as national presence and national provider networks. These plans in particular were not interested in other Blue plans and the BCBSA telling them what they could and could not do with their capital, that they must coordinate with anyone, and that they must cede any authority to an association. Yet this was the direct and lasting outcome of the Long-Term Business Strategy.

**ANSWER:**

BCBS-MI admits that each Blue Cross and Blue Shield Plan is an autonomous company with a local presence. BCBS-MI denies the remaining allegations in Paragraph 166.

167.    Werner presented the Long-Term Business Strategy to the Blues at the Blue Cross and Blue Shield Annual Meeting on November 11, 1982. In his presentation, Werner described the Long-Term Business Strategy as a "fundamental change" that would result in "a concentration of power." The Blues approved the Long-Term Business Strategy the next day.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a November 11, 1982 presentation by Edwin Werner. BCBS-MI refers to that presentation for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 167.

168.    According to the Long-Term Business Strategy itself, two of the three "measures of success" for the Blue Cross and Blue Shield organization were market share and profit. The mandates of the Long-Term Business Strategy were designed to further these goals in part by reducing competition among the Blues.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified Long-Term Business Strategy document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 168.

169.  Two of the mandates contained in the Long-Term Business Strategy reduced competition among the Blues by reducing the number of Blues who could compete with each other. So-called Proposition 1.1 required all Blue Cross plans and Blue Shield plans to become joint Blue Cross Blue Shield plans by the end of 1984, "except where the Association Board of Directors agrees that business needs dictate otherwise." Proposition 1.2 required further consolidation so that there would be only one Blue per state by the end of 1985, "except where the Association Board of Directors agrees that business needs dictate otherwise."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified Long-Term Business Strategy document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 169.

170.  When he presented these propositions, Werner described a "significant reduction in the number of corporations which make up our collective effort" as "wise," questioning why "it makes good business sense for four corporations in one state to chase a total market potential of 677,000 employed people." He asked, "Can we really justify 12 member corporations in one state – even though it is a large one?"

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts of unidentified statements made by Edwin Werner. BCBS-MI refers to those statements for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 170.

171.  Although the Blues approved these propositions, some Blue plans disagreed with this strategy as antithetical to competition and plan autonomy. William Flaherty, the President of Blue Cross Blue Shield of Florida sent a letter to Werner in 1982 expressing reservations about

portions of the Long-Term Business Strategy. With respect to the consolidation of plans, he said that "[t]he large market share of the system of plans would have precipitated anti-trust actions were it not for the insurance industry exemptions and the community-service orientation." Blue Cross of Central New York stated in a position paper, "Blue Cross of Central New York is opposed to statewide merger or consolidation. Such a move would destroy virtually everything our community leaders have built in our 10-county service area in the 47 years we have functioned as a community organization. . . . Home rule and local autonomy were the key reasons for the Plan's creation." Similarly, in 1983 the Presidents of Blue Cross of Western New York and Blue Shield of New York sent a letter to each of the Chief Executive Officers of the Blue plans voicing their dissent. They argued that the Long-Term Business Strategy was a threat to the autonomy of individual plans "and [to] transform Plans into branch offices," a disguised program to strengthen the BCBSA, and a concerted effort to establish a corporate entity."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a 1982 letter from William Flaherty to Edwin Werner, an unidentified position paper from Blue Cross of Central New York, and a 1983 letter from the Presidents of Blue Cross of Western New York and Blue Shield of New York.  BCBS-MI refers to those documents for their contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 171.

172.    The Blues carried out Propositions 1.1 and 1.2, dramatically reducing the number of Blues in the years after they adopted the Long-Term Business Strategy. In 1980 there were 114 Blues. By 1989 there were 75, and now there are 36. Competition between Blue Cross plans and Blue Shield plans ended in all but a few states.

**ANSWER:**

BCBS-MI admits that there are currently 36 Blue Plans.  BCBS-MI denies the remaining allegations in Paragraph 172.

173.    Another important mandate of the Long-Term Business Strategy was Proposition 3.4: "Launch an intensified program to retain, acquire and expand provider and professional payment differentials." "Differentials" referred to the difference between healthcare providers' billed charges and what the Blues paid, which was an advantage for the Blues because its competitors generally paid the providers' billed charges. (More recently, the Blues have sometimes used "differentials" to mean the difference between what the Blues pay a healthcare provider and what their competitors pay.) In other words, the Blues conspired to reduce the payments they were making to providers. Among the steps for implementing Proposition 3.4

was, "Association to survey all Plans by March 1, 1983, to determine status to their efforts to protect/secure payment differentials."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified Long-Term Business Strategy document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 173.

174. Proposition 3.4 was designed to acquire and maintain dominant market power for the Blues. Commenting on the Long-Term Business Strategy, Flaherty wrote to Werner, "[P]lans with cost-based reimbursement have evolved into dominant (virtually monopolistic) positions due to the rapid growth in the hospital differential." Flaherty also wrote, "The insurance industry believes it is 'closed out' of the markets for hospitalization when large differentials exist and has challenged them politically." Thus, the Blues were aware that by using their market power to secure large differentials, they could "close out" other insurers. Blue Cross and Blue Shield of Alabama is one of the Blues that secured a large differential by imposing cost-based reimbursement on hospitals.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified letter from William Flaherty to Edwin Werner. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 174.

175. Another mandate of the Long-Term Business Strategy was Proposition 1.4, "Continue study of Blue Cross and Blue Shield organization and make further recommendations for change." A Proposition 1.4 Work Group was established, and it wrote in 1985,

> One deterrent to Plan support for common cohesive effort was quickly identified and is the subject of the balance of this report. A common effort requires a common bonding. The bond in our case is the use of the Blue Cross and Blue Shield names and marks. Yet as we analyzed the current provisions of the basic agreements with plans, that bond seems unduly weak for the current environment. As will be developed, a strengthened license agreement is deemed essential.

The Proposition 1.4 Work Group identified as a problem the possibility that a plan could hold a license to use the Blue marks but not be a member of BCBSA, imperiling cooperation and coordination among plans. The solution was to tie the terms of the license agreement to membership in BCBSA.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified Long-Term Business Strategy document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 175.

176. The Proposition 1.4 Work Group also recommended a series of meetings among the Blues, known as the "Assembly of Plans." The Board of Directors of BCBSA approved this proposal in 1986. On April 4, 1986, an Assembly of Plans work group issued a report focusing on coordinated and unified action among Blues plans, including actions that plans should do collectively. In June 1986, John Larkin Thompson, the CEO of Blue Cross and Blue Shield of Massachusetts, agreed to Chair the Ad Hoc Committee on the Assembly of Plans, which was comprised of nine plan CEOs. The Committee's charge was to interview other CEOs and prepare a paper for discussion among each of the plan CEOs. This became known as the White Paper.

**ANSWER:**

BCBS-MI admits that the member Plans of BCBSA held an "Assembly of Plans" beginning in 1987. BCBS-MI admits that John Larkin Thompson, the CEO of Blue Cross and Blue Shield of Massachusetts, agreed to Chair the Ad Hoc Committee of the Assembly of Plans. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from unidentified Long-Term Business Strategy and/or Assembly of Plan documents. BCBS-MI refers to those documents for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 176.

177. The focus of the White Paper was "when it might be in a Plan's self-interest to forego some of its prerogatives in the name of the 'system' or to promote a common purpose," as well as "continued exclusive use of the service marks, service areas, and inter-Plan cooperative agreements." The White Paper advocated collective action among the Blues, as well as exclusive use of the Blue service marks within the plans' service areas. It acknowledged, however, that exclusive service areas were not essential to the Blue marks, and that they were subject to challenge under the antitrust laws:

> During the last few years, the exclusivity feature of the license agreements has come under sharp antitrust attack in several federal courts [citing *Sealy* and *Topco*]. . . . To date the Blue Cross and Blue Shield Association has devoted its efforts to defending exclusivity and expects to do so in the future. . . . Thus, an issue for the Assembly is whether to consider – at this time – alternatives which might be evaluated in the event exclusivity were to be struck down by the courts.

The White Paper recognized that "[a]s a legal matter, the service marks could be preserved even if the exclusive service areas were abandoned." As the author of a paper summarizing a meeting discussing the White Paper stated: "Isn't it too late to assume the continuance of exclusive areas in the future—shouldn't we be looking instead for other alternatives."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the Assembly of Plans White Paper. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 177.

178. During this process, it was clear that the reason for preserving exclusive service areas was to prevent competition that would otherwise arise among the Blues. According to an internal report about the Assembly of Plans, "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans. Otherwise there would be open warfare." And the result of reduced competition was lower payments to providers; according to same report, "By enjoying exclusive territories, Plans can bargain aggressively. In turn, national accounts enjoy local discounts." According to the internal Assembly of Plans report, exclusive service areas create "Larger market share because other Blues stay out and do not fragment the market. ... Stronger provider agreements for the same reason."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified Assembly of Plans document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 178.

179. Despite the significant legal problems with exclusive areas, the Assembly of Plans considered and rejected proposals to create non-exclusive "primary service areas" or to eliminate territorial allocation entirely.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 179.

180.    Ultimately, through nine meetings of the Assembly of Plans from 1987 through 1989, and despite open acknowledgement that a number of Plans were happily competing with each other outside their exclusive service areas, the Assembly of Plans issued its Final Report on February 8, 1990. It recommended to the BCBSA approval of new license agreements that would tie together licensure of the BCBS name and marks and membership in BCBSA (and its membership standards; prior to this a plan was not required to be a member of BCBSA to obtain a license to use the BCBS name and marks). When these license agreements were executed the result was BCBSA's ability to enforce exclusive service areas by membership restrictions in BCBSA, use of the BCBS name and marks, and monetary sanctions. This licensure mechanism, which did not exist prior to 1990, continues to the present day to preclude inter-plan competition, even where plans wish to compete with each other across assigned territories.

**ANSWER:**

BCBS-MI admits that BCBSA adopted new License Agreements, effective January 1, 1991.   BCBS-MI refers to those License Agreements for their contents and denies any characterization thereof.   BCBS-MI denies the remaining allegations in Paragraph 180.

### The Blues' Reached an Anticompetitive Agreement to Allow
### to a For-Profit Business Model, to Restrict Competition
### Even on a non-Blue Branded Basis, and as a Quid Pro Quo to
### Develop the Blue Card Program in an Inefficient Manner.

181.    Until 1986, the Blues were tax-exempt. The Tax Reform Act of 1986 revoked this exemption and added Section 833 of the Internal Revenue Code, which treats the Blues as taxable stock insurance companies. Since 1986, several of the Blues have converted to for-profit organizations. The largest, Anthem, reported a net income of $2.56 billion in 2015. As described in more detail below, many of the Blues that have remained nominally nonprofit behave like for-profit companies by building up unnecessarily high levels of surplus and paying outsized compensation to executives.

**ANSWER:**

BCBS-MI admits that the Tax Reform Act of 1986 provided that then-existing Blue Cross and Blue Shield organizations shall be taxable in accordance with that Act.   BCBS-MI refers to the Tax Reform Act of 1986 for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the

allegations in the fourth sentence of Paragraph 181 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 181.

182.    Although the Assembly of Plans eliminated the potential for BCBSA-sanctioned "Blue on Blue" competition in most states, it left open the possibility of competition from non-Blue subsidiaries of Defendants, an increasing "problem" that had caused complaints from many Blues. After the 1986 revocation of the Blues' tax-exempt status and throughout the early 1990s, the number of non-Blue subsidiaries of Blues increased. As quoted in *The Blues: A History of the Blue Cross and Blue Shield System*, former BCBSA counsel Marv Reiter explained in 1991, "Where you had a limited number of subsidiaries before, clearly they mushroomed like missiles. . . . We went from 50 or 60 nationally to where there's now 400 and some." These subsidiaries continued to compete with the other Blues. As a result, the member plans of BCBSA discussed ways to rein in such non-Blue branded competition.

**ANSWER:**

BCBS-MI admits that the Tax Reform Act of 1986 provided that then-existing Blue Cross and Blue Shield organizations shall be taxable in accordance with that Act. BCBS-MI refers to the Tax Reform Act of 1986 for its contents and denies any characterization thereof. BCBS-MI further admits that Plaintiffs purport to quote or summarize selected excerpts from *The Blues: A History of the Blue Cross and Blue Shield System*. BCBS-MI refers to that book for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 182.

183.    Subsequently, Defendants agreed to restrict the territories in which Defendants would operate under any brand, Blue or non-Blue, as well as the ability of non-members of BCBSA to control or acquire the Member Plans.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 183.

184.    Pursuant to the agreement of Defendants, the BCBSA has developed strict rules and regulations that all members of BCBSA must obey and guidelines proposed members must adhere to prior to joining the BCBSA. These rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"). Those regulations provide for amendment with a vote of three fourths of the Member Plans. These

agreements, which were revised or amended at least as of 2013, are the agreements at issue in this case.

**ANSWER:**

BCBS-MI admits that the License Agreements require licensees to comply with certain Membership Standards. BCBS-MI admits that the current License Agreements were amended in 2013, and at various other times. BCBS-MI refers to the License Agreements, Membership Standards and Guidelines for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 184.

185. These License Agreements depart from, and supersede, the historical licensing agreements. For example, the "whereas" clauses of the Blue Cross License Agreements provide that the Plan had the right to use the Licensed Marks "in its service area, which was essentially local in nature," and then state that the Plan "was desirous of assuring nationwide protection of the Licensed Marks," noting that "to better attain such end, the Plan and the predecessor of BCBSA in 1972 simultaneously executed the BCA License Agreement(s) and the Ownership Agreement."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts of the License Agreements. BCBS-MI refers to the License Agreements for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 185.

186. Significantly, however, the License Agreements provide that the "BCBSA and the Plan desire to super[s]ede said Agreement(s) to reflect their current practices and to assure the continued integrity of the Licensed Marks and of the BLUE CROSS system." In order to accomplish these objectives, these new License Agreements dramatically expand the scope of the license and newly defined Service Areas. The scope of the license is expanded to include the "right to use the Licensed Marks, in the sale, marketing and administration of health care plans and related services in the Service Area set forth and defined in paragraph 5 below." Paragraph 5 sets forth these new "Service Area[s]]" as "the geographical area(s) served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts of the

License Agreements. BCBS-MI refers to the License Agreements for their contents and denies

any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 186.

187. Despite the expanded scope of the license and the newly defined Service Areas, the License Agreements failed to include the provision, contained in both the 1954 and 1972 Agreements that required the Plan to treat providers fairly. To make matters worse, an exhibit to the Licensing Agreements limit contracting with providers by specifying that "[o]ther than in contracting with health care providers or soliciting such contracts in areas contiguous to a Plan's Service Area in order to serve its subscribers or those of its licensed Controlled Affiliate residing or working in its Service Area, a Control Plan may not use the Licensed Marks and/or Name, as a tag line or otherwise, to negotiate directly with providers outside its Service Area."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts of the

License Agreements. BCBS-MI refers to the License Agreements for their contents and denies

any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 187.

188. In 1990, Defendants developed an amended license agreement that continued to require that all Blue license holders be non-profit entities. At that point, Associated Insurance Companies of Indianapolis, which became Anthem, wished to be a for-profit company and refused to sign the amended license agreement, and it "bought the giant Dallas-based American General Insurance Company in 1990 . . . it was a 'Sputnik event' for the rest of the [Blue] Plans, according to M. Edward Sellers, a former BCBSA vice president who became president and CEO of Blue Cross and Blue Shield of South Carolina in 1987. Soon the Indiana Plan was competing under another brand name in many other Plans' home markets." The Blues: A History of the Blue Cross and Blue Shield System at 241. During the 1990s, in order to end the developing competition, the Defendants agreed to restrict non-Blue competition and to develop the Blue Card Program in a highly inefficient manner described elsewhere in this Amended Complaint.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from The Blues: A

History of the Blue Cross and Blue Shield System. BCBS-MI refers to that document for its

contents and denies any characterization thereof. BCBS-MI admits that the amended License

Agreements effective January 1, 1991 required that primary licensees be non-profit entities. BCBS-MI denies the remaining allegations in Paragraph 188.

189.    Under the License Agreements, each Blue agrees that neither it nor its subsidiaries will compete under the licensed Blue Cross and Blue Shield trademarks and trade names outside of a specifically designated geographic "Service Area," which is either the geographical area(s) served by the Plan on June 10, 1972, or the area to which the Blue has been granted a subsequent license.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts of the License Agreements.  BCBS-MI refers to the License Agreements for their contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 189.

190.    Under the Guidelines and Membership Standards that were developed in the early to mid-1990s, each Member Plan agrees that at least 80% of the annual revenue that it or its subsidiaries generate from within its designated Service Area (excluding Medicare and Medicaid) shall be derived from services offered under the licensed Blue Cross and Blue Shield trademarks and trade names. Each Defendant also agrees that at least two-thirds of the annual revenue generated by it or its subsidiaries from either inside or outside of its designated Service Area (excluding Medicare and Medicaid) shall be attributable to services offered under the Blue Cross and Blue Shield trademarks and trade names. The Guidelines provide that national enrollment can be substituted for annual revenue, making the alternative restriction that a plan will derive no less than 66.66% of its national enrollment from its Blue business. Both provisions directly limit the ability of each Blue to generate revenue from non-Blue branded business, and thereby limit the ability of each plan to develop non-Blue brands that could and would compete with other Blues.  The Defendants also agree that they will participate in Inter-plan Programs including Blue Card with the billions of dollars of access fees providing the *quid pro quo* for the agreements not to compete.

**ANSWER:**

BCBS-MI admits that the License Agreements require licensees to comply with certain Membership Standards.  BCBS-MI refers to the License Agreements, Membership Standards, and Guidelines for their contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 190.

191.    Therefore, Defendants have agreed that in exchange for having the exclusive right to use the Blue Cross Blue Shield brand and trademark within a designated geographic area, each Blue will derive none of its revenue from services offered under the Blue brand outside of that

area, and will derive at most one-third of its revenue from outside of its exclusive area using services offered under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts of the License Agreements. BCBS-MI refers to the License Agreements for their contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 191.

192. Anthem (then known as WellPoint), in its February 17, 2011 Form 10-K filed with the United States Securities and Exchange Commission, described the limitations on its business, stating that it had "no right to market products and services using the Blue Cross Blue Shield names and marks outside of the states in which we are licensed to sell Blue Cross Blue Shield products," and that "[t]he license agreements with the BCBSA contain certain requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined net revenue attributable to health benefit plans within its service area must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least 66 2/3% of a licensee's annual combined national revenue attributable to health benefit plans must be sold, marketed, administered or underwritten under the BCBS names and marks."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a February 17, 2011 Form 10-K filing. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies any remaining allegations in Paragraph 192.

193. The Defendants have long been aware that their limits on non-Blue business could constitute an unlawful restraint of trade. A "Blue Cross and Blue Shield Issue Summary" dated February 4, 1993, which "was assembled by asking several Blue Cross and Blue Shield Plan CEOs to identify issues that they believed were divisive to the Plans and BCBSA," cited unbranded competition as a divisive issue, and stated as one position that "[a]ny attempt to restrict competition between licensees using trademarks other than the Blue marks is a violation of federal and state antitrust laws and subject to criminal and civil penalties. Competition is good for the consumer and that is who we are obligated to serve. It makes the Plans more effective. No harm has ever been demonstrated. It would be impractical to regulate much less illegal."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a "Blue Cross and Blue Shield Issue Summary" document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 193.

194. Despite this concern, the Blues eventually imposed restrictions on non-Blue business with the stated purpose of restraining competition. In an April 30, 2001 memorandum to the Blue Plans, BCBSA expressed concern about Blues competing under non-Blue brand names. According to BCBSA, growth in non-Blue business came from "the offering, by Plans, of basic health products outside of their licensed service area. Now, Blue-based organizations are competing with each other for core health customers. Each success of an unbranded venture was a loss for a local Blue Plan." For example, "a Plan predominantly devoted to its own national [non-Blue] brand would appear to have incentives to favor that brand in competition with the Blues for a national account."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an April 30, 2001 memorandum. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 194.

195. In addition to being an agreement to allocate geographic markets, the restrictions on non-Blue competition facilitate the Blues' monopsonization and exercise of market power by making sure that each Blue brings more members, on a branded basis, to negotiations with providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 195.

196. The BCBS structure and the long-term relationship between the Blues create an environment that encourages tacit agreements that injure competition, in addition to the explicit agreements described above.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 196.

197. The Blues have reached agreements with each other not to compete in addition to the restrictions agreed to in the Licensing Agreements and the Guidelines and Membership

Standard. For example, under the Licensing Agreements, each Blue is allowed to contract one county into a contiguous or adjacent Defendant's territory. However, many of the Blues have entered into what they call "gentlemen's agreements" not to compete in those counties. For example, HCSC refused to enter into contracts with facilities in St. Louis, Missouri because it and WellPoint had agreed not to compete in each other's Service Areas, despite being allowed to do so by the Licensing Agreements.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 197.

198.    Other Blues have engaged in similar conduct to the detriment of providers, including Anthem's refusal to contract with hospitals in counties adjacent to Ohio, which is described below.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 198.

*The Blue Card and National Accounts Programs*

199.    In the 1940s and 1950s, the Blues used the development of employment-based health benefits to advance their bargaining power. As the demand grew over the next few decades for insurance and servicing of benefit plans that covered the employees of a single employer across many states, the Blues found a way to use maintain and enhance that bargaining power and market share by accessing each other's provider networks, and sharing the benefit of any differentials they had obtained.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 199.

200.    During the early to mid-1990s as part of their overall agreement to restrict competition, the Defendants agreed to develop the Blue Card Program as part of their Inter-Plan and National Accounts Program. Under the Blue Card/National Accounts Program, one, and only one, Defendant Blue may administer a national or multi-state employee benefit plan. In that instance, the Defendant Blue is the Control Plan while the other Defendant Blues are Participating Plans. The Defendant Blue where the national account is headquartered is the only Blue that may bid for the business of that national account unless that Defendant cedes the right to another Defendant, which is then the only Defendant that may bid for the business of the national account.  In other words, in this area and many others, the Defendants agree that they will not compete. The Defendants divide the proceeds derived from this anticompetitive scheme either through the Blue Card Program or through separate agreements they have entered into.

**ANSWER:**

BCBS-MI admits that for BlueCard, the Blue Plan administering a national or multi-state employee benefit plan may be referred to as the Control Plan while other Blue Plans may be referred to as Participating Plans. BCBS-MI denies the remaining allegations in Paragraph 200.

201. All of the Blues are required to participate in the Blue Card program, through which they process claims by a provider in one Service Area on behalf of a patient whose Blue plan is based in another Service Area. Within the Blue Card Program, the Blue through which the subscriber is enrolled is referred to as the "Home Plan," while the Blue located in the Service Area where the medical service is provided is referred to as the "Host Plan." Generally, when a provider treats a patient who is a member of a plan outside the provider's service area (the Home Plan), the provider submits the claim to the Host Plan, which is then transmitted to the Home Plan, often resulting in significant delays. The provider is paid based on the reimbursement rates or prices in his or her contract with the Host Plan, but in order to be paid, he or she must comply with the medical policy and other requirements of the Home Plan, to which he or she often does not have access. As a result of the Blue Card system, Providers must comply with 36 different variations of medical policies, creating inefficiencies, adding to administrative costs for Providers and the health care system, and resulting in many claim denials, in whole or part, based upon the lack of information available to the Providers.

**ANSWER:**

BCBS-MI admits that participation in BlueCard is a requirement of the License Agreement between BCBS-MI and each individual Blue Plan. BCBS-MI admits that through BlueCard, the Blue Plan located in the Service Area where the medical service is provided processes the claim on behalf of a subscriber whose Blue Plan is based in another service area. BCBS-MI admits that for the BlueCard program, the Blue Plan through which the subscriber is enrolled is referred to as the "Home Plan" and the Blue Plan located in the Service Area where the medical service is provided is referred to as the "Host Plan." BCBS-MI denies the remaining allegations in Paragraph 201.

202. All healthcare providers are required to participate in the Blue Card program as a condition of their participation with the Blue plan in their Service Area. As a result, a healthcare provider treating a patient who is enrolled in a Blue in another Service Area is not permitted to negotiate a separate agreement with the Blue in that Service Area. Instead, the Home Plan pays the healthcare provider the discounted rate the Host Plan has imposed on the provider. For example, many members of plans insured or administered by Defendants Empire, BCBS of

Illinois and BCBS of Michigan spend time in Florida during the winter months. Rather than being permitted to negotiate prices with these Defendants, however, healthcare providers in Florida must accept the prices paid by Defendant Blue Cross of Florida. Moreover, the Blues do not allow health care providers to have an escape clause to allow them to opt out of the national programs and contract separately with Blues.

**ANSWER:**

BCBS-MI admits that some of its members spend time in Florida during the winter months. BCBS-MI denies the remaining allegations in Paragraph 202.

203. The Blue Card and National Accounts programs are thus agreements to fix prices. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including the Provider Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices. In 2002, BCBSA reported that in 2001, the Blue Card program saved $9 billion. This figure represents the reduction in payments to healthcare providers that the Blues were able to obtain by fixing prices.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize selected excerpts from an unidentified 2002 BCBSA report. BCBS-MI refers to that report for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 203.

204. The Blues share the discounts they are able to impose through the Blue Card and National Accounts programs. In addition to an administrative fee that purports to cover the cost of processing claims through Blue Card, a standard Blue Card fee is the "access fee," which is a percentage of the Host Plan's discount that the Home Plan kicks back to the Host Plan. Some Blues pay each other based on other formulas, but the purpose is the same: for the Blues to reward each other for fixing their prices. For its self-funded accounts, BCBS-AL bills access fees to the account as a cost of the medical claim, even though the access fee is not paid to the provider.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 204 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 204.

205. The Blue Card program encourages the Blues to fix prices rather than compete, even in the limited contexts in which BCBSA Rules allow them to compete outside their Service

Areas. Because of the discounts that the Blues receive through the Blue Card program, they can lower their payments to providers in counties contiguous to their Service Areas by relying on Blue Card rather than negotiating and contracting with those providers directly.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 205.

206.     By way of example, since the 1980s, Blue Cross and Blue Shield of Alabama maintained agreements with healthcare providers, including hospitals, in contiguous counties of adjacent states such as Florida and Mississippi. These out-of-state hospitals were not subject to the same rules as the in-state Alabama hospitals, and were not required to submit the "Blue Cross Cost Study" that in-state Alabama hospitals are required to submit as part of their agreement with Blue Cross and Blue Shield of Alabama. Therefore, Blue Cross and Blue Shield of Alabama could not force these out-of-state hospitals to accept the lower outpatient payment methodology that it imposed on Alabama hospitals.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 206 and therefore denies those allegations.

207.     In 2013, Blue Cross and Blue Shield of Alabama terminated its contracts with all hospitals in contiguous counties. It ultimately terminated the contracts of twenty-nine hospitals in four states: Florida (nine hospitals), Georgia (five hospitals), Mississippi (nine hospitals), and Tennessee (six hospitals). Each of these hospitals remained in network with its in-state Blue. But Blue Cross and Blue Shield of Alabama could still leverage the Blue Card program to maintain access to these hospitals for its enrollees.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 207 and therefore denies those allegations.

208.     Blue Cross and Blue Shield of Alabama identified the "impetus" of the terminations as the significant reduction in payments it could make to these hospitals by taking advantage of the Blue Card program, rather than directly contracting with these hospitals. This was true, even net of the "access fees" it would be required to pay to utilize the Blue Card program.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 208 and therefore denies those allegations.

209.    In addition to lowering payments for providers, the national programs, including the Blue Card Program and the National Accounts Program, also impose numerous inefficiencies and burdens on them. While the amounts paid for medical services are dictated by the Host or Participating Plan, the medical policies, claims adjudication edits and coverage rules are determined by the Home or Control Plan. The Home or Control Plan's medical policies, claims edits, and coverage rules may differ and may not be known or be available to healthcare providers in the Host Plan's Service Area. Coverage rules include matters such as preauthorization and pre-notification requirements that must be satisfied before a Plan will pay for services provided to one of its members. For example, BlueCross BlueShield of South Carolina administers the benefit plan for employees of Winn Dixie Stores, many of whom live in Alabama and, accordingly, seek medical treatment here. For these patients, BlueCross BlueShield of South Carolina is the Home or Control Plan, while BCBS-AL is the Host or Participating Plan. BCBS-AL determines the price paid for services rendered by a healthcare provider in Alabama. However, the coverage rules, such as preauthorization or pre-notification requirements, are determined by BlueCross BlueShield of South Carolina. While the Alabama provider has access to the rules for preauthorization or pre-notification for BCBS-AL, because BlueCross BlueShield of South Carolina boycotts the Alabama providers from participating in its network as a part of its horizontal agreement with all the Blues, the provider does not have ready access to BlueCross BlueShield of South Carolina's rules. In this example, the Alabama healthcare provider can and does innocently fail to comply with the rules of BlueCross BlueShield of South Carolina and be paid nothing by BlueCross BlueShield of South Carolina, not even receiving the discounted amount that would result from the BCBS Price Fixing Conspiracy. When this happens, the healthcare provider has no recourse. Healthcare providers spend innumerable hours attempting to locate and understand Home Plan medical policies, claims edits and coverage rules, frequently to no avail despite the fact that the providers have made no agreement with the Home Plan. Moreover, the illustration includes only one Home or Control Plan, whereas, in reality, a healthcare provider may treat patients who are enrolled in various plans that are insured or administered by multiple Blues other than the Blue in the provider's Service Area. This is a longstanding problem in Alabama, where workers at U.S. Steel were covered by Highmark, workers at Southern Company have been covered by Anthem, Wal-Mart employees may be covered by Anthem, and Publix employees are covered by BlueCross BlueShield of South Carolina.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth, sixth, seventh, and eighth sentences of Paragraph 209 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 209.

210.    Further, Blues will even offer commercial health insurance across state lines to healthcare providers, through national accounts or other programs, even where they will not contract in their capacity as a healthcare provider. For example, at various times Defendant HCSC has provided Blue Branded commercial health insurance for Tenet Healthcare, the parent company of Brookwood Hospital. Despite this, because of Association rules, it is barred from contracting directly with Brookwood Hospital for its healthcare services. This is, of course,

because the arrangement allows BCBS-AL to use its combined market share to extract the maximum discount possible from Brookwood and other hospitals. This sort of approach is common.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in the second sentence of Paragraph 210, and therefore denies those

allegations.  BCBS-MI denies the remaining allegations in Paragraph 210.

211.    Many Blues have different medical records requirements and timing for those requirements that apply to providers including hospitals. Hospitals find their bills being reduced or denied because they comply with the Host or Participating Blue's requirements (those where the hospital is located and where the hospital is in network) but not with the Control or Home Blue's requirements. Since the hospitals are not in network with the Control or Home Blue, those hospitals do not have ready access to those medical records requirements. In an effort to address this highly inefficient process, hospitals in Florida, where there are many Blue Card and National Accounts subscribers, set up weekly telephone calls with Blues to try to learn the requirements of each of the plans for submitting medical records and other coverage requirements. The employees of the hospitals spent hours week after week for an extended time to try to learn those requirements. They would obtain inconsistent and incomplete answers to their inquiries. Despite spending significant resources of the hospitals to comply with the Blues' multiple coverage requirements, the hospitals continued to have claims reduced and denied when they innocently failed to comply with one of those requirements.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 211 and therefore denies those allegations.

212.    The national programs including the Blue Card and National Accounts Programs are so inefficient that the Defendants have established an adjacent county rule that allows them to contract with healthcare providers one county into the adjacent Blue's Service Area. However, the Defendants use and abuse the adjacent county rule to reinforce each other's market power. For example, when Highmark was attempting to force UPMC to accept lower reimbursement rates, UPMC asked Anthem Blue Cross of Ohio to contract with Harmot Hospital, which is in a county adjacent to Ohio. Anthem Blue Cross of Ohio refused to have discussions about a contract with Harmot Hospital. Plaintiffs allege that the refusal was part of a horizontal agreement under which the Defendant Blues attempt to reinforce each other's market power.

**ANSWER:**

BCBS-MI admits that under BCBSA's policies, Blue Plans are allowed to contract with certain health care providers in areas adjacent to each Plan's service area. The last sentence of Paragraph 212 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the last sentence of Paragraph 212. BCBS-MI denies the remaining allegations in Paragraph 212.

213. To facilitate the Conspiracies, the Defendant Blues that are partners along with the BCBSA have established and own National Account Service Company L.L.C. ("NASCO"), which assists the Blues in processing claims involved in National Accounts and other claims.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 213.

214. "In 1987 NASCO was formed through a partnership with major Blue Cross and Blue Shield Plans." It has been engaged in activity "for some of the largest Blue Cross and Blue Shield Plans for over 20 years." NASCO establishes "work groups composed of NASCO associates and customers." NASCO also works with the Blues to "ensure their compliance with Blue Cross and Blue Shield Association (BCBSA) mandates." http://www.nasco.com/PDFs/2010_MarketingBrochure.pdf.

**ANSWER:**

BCBS-MI admits that NASCO was formed in 1987 to provide an integrated membership and claims processing system for certain Blue Cross and Blue Shield Plans. BCBS-MI admits that Plaintiffs purport to quote or summarize selected portions of NASCO's website. BCBS-MI refers to that website for its contents and denies any characterization thereof.

215. To facilitate the Conspiracies, numerous Blues and the BCBSA have also established Consortium Health Plans, Inc. ("CHP"). CHP describes itself as a "national coalition of 21 leading BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination, for the Blue System among national accounts..." and "help[s] its founding Blue Cross Blue Shield Plans position themselves as the preferred choice for national accounts," (http://www.consortiumhealthplans.com, last visited Nov. 8, 2016). Through CHP, the Blues share claims data reflecting provider reimbursements on a nationwide basis. The Blues leverage that data and their collective market power to impose deep discounts on reimbursements to providers, which they then market to employer groups and other purchasers of health insurance.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected portions of CHP's website. BCBS-MI refers to that website for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 215.

216. For example, in a marketing brochure dated February 6, 2013 for CHP's "ValueQuest" analytical tool, CHP as much as admits that the Blues are able to use their shared claims data and collective market power to reduce reimbursement to providers to levels far below their competitors on the national level. In this regard, the brochure describes the ValueQuest tool as follows:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

https://consultant.chpinfo.com/c/document_library/get_file?uuid=331c3d60-7cff-4393-85c7-d4cb2f0a7b3f&groupId=10307, last visited Sept. 30, 2014. The brochure further explains that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally. The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected portions of CHP's website. BCBS-MI refers to that website for its contents and denies any characterization thereof. BCBS-MI denies any remaining allegations in Paragraph 216.

217. Another brochure sheds light on the extraordinary breadth of the claims data shared by the Blues through CHP. In this regard, the brochure makes the following claims, among others:

- "ClaimsQuest provides in-network and out-of-network data for all 50 states in three-digit zips and MSAs."

- "The ClaimsQuest methodology is the same for every Blue Cross Blue Shield Plan, and the same data criteria are applied across every state, every MSA, every zip code."

- "The ClaimsQuest model not only works effectively for every Plan in the Blue System, it also applies to other carriers. Applying the ClaimsQuest cost model to all carriers permits an 'apples-to-apples' comparison."

http://www.questanalyticsgroup.com/pdf/ClaimsQuest Brochure.pdf, last visited Sept. 30, 2014.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected portions of CHP's website. BCBS-MI refers to that website for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 217.

218. Thus, CHP harnesses claims data for the Blues in every state, MSA and zip code in the country and, using that data, allows the Blues to impose deep discounts on provider reimbursements in order to use the market power of the Blues to reduce the payments to providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 218.

*Protecting and Increasing "Differentials"*

219. The Defendants have aggressively protected and increased their differentials. In August 1983, the Defendants had established two projects aimed at increasing the differentials or reducing payments to providers. The first was to identify "priority plans" for increases in the differentials. According to a 1983 letter from the CEO of BCBSA to the CEOs of the Blues, "Every 1% increase in the differential in the priority Plans results in a systemwide increase of .12%. The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important. In addition there would be significant dollar impact in each Plan." The second project was "Project State Watch," which included Alabama and other states where there were "overt threats" to the large differentials. Project State Watch included a calculation of how much the overall Blue System differential would be reduced by a reduction in the differential in those states, including Alabama. In other words, all the Blues benefited by acting together to decrease provider payments in each state.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a 1983 letter from the CEO of BCBSA to the CEOs of the member Blue Plans. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 219.

220.    The Blues' efforts to establish, maintain, and increase their differentials continue to this day. The CHP brochure described above boasts that "Consultant feedback, client results and a Milliman study all suggest that Blue Cross Blue Shield has the lowest total cost of care." As support for this claim, the brochure elaborates upon the Milliman study as follows:

> Milliman and Consortium Health Plans (CHP) conducted a study that compared BCBS PMPM historical results to a PMPM benchmark of national competitors. ***Results of the most recent study show an 11.3% cost of care advantage for BCBS at the national level.*** This study is the first of its kind to analyze total cost of care among competing health plans based on historical claims data.

(Emphasis added.) Thus, according to CHP, the Blues pay healthcare providers less and therefore enjoy an enormous cost of care advantage over their national competitors. Indeed, as CHP itself says, ***"[n]o other carrier even comes close."*** (Emphasis added.) And while the brochure suggests that factors beyond discounts on provider reimbursements contribute to the Blues' advantage in this regard, it also acknowledges that these discounts are far and away the most significant factor. According to a presentation by Wellmark based on a CHP survey, "Provider discounts remain the #1 criteria of network value for National Accounts."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected portions of CHP's website and an unidentified presentation by Wellmark.  BCBS-MI refers to that website and presentation for their contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 220.

221.    Indeed, as demonstrated by a 2003 brochure for CHP's "ClaimsQuest" analytical tool, the Blues have long recognized that the "size of provider networks" and the "depth of discounts" imposed on the providers in those networks are the two most important factors in lowering their costs. http://www.questanalyticsgroup.com/pdf/ ClaimsQuest_Brochure.pdf, last visited Sept. 14, 2014, at 6.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected portions of CHP's website.  BCBS-MI refers to that website for its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 221.

222.    Despite its claims that it is simply a marketing agent, CHP acts, with the Association and the plans not just to measure and market discounts, but to conspire to actively

suppress the amounts paid to Providers in the name of "differentials." CHP regularly meets with the Association and with network contracting executives from plans to identify and develop "action plans" for "critical markets" to help with the Association's "corporate obj[ective]" of reducing Provider reimbursement and increasing "discounts." CHP's role is that of active participant in facilitating the Blues conspiracies, by actively allowing them to collaborate to reduce Provider reimbursements.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from an unnamed source.  BCBS-MI refers to that unnamed source for its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 222.

223.    Despite enjoying an advantage over its competitors in provider reimbursements, the Blues have higher administrative fees for self-funded plans than its competitors, even before accounting for the access fees the Blues charge as medical costs.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 223.

*Differences Between the Modern Blues and Other Insurers*

224.    The Blues' anticompetitive agreements make them very different from other insurers. If an insurer like UnitedHealthcare wants to establish a provider network, its value proposition to a provider includes its ability to steer its enrollees to that provider. And a provider who is thinking about leaving the network knows that the consequence is the inability to treat UnitedHealthcare's enrollees on an in-network basis. Each Blue, on the other hand, brings not only its own enrollees, but also the enrollees of every other Blue into negotiations with providers. ("Negotiation" is a bit of a misnomer, as the Blues can offer contracts on a take-it-or-leave it basis.) And a provider who is thinking about leaving the local Blue's network knows that the consequence is not just the inability to treat the local Blue's enrollees on an in-network basis, but the inability to treat all of the Blues' enrollees on an in-network basis. Thus, the Blues are able to use leverage against providers that is unavailable to their competitors.

**ANSWER:**

The first sentence of Paragraph 224 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first sentence of Paragraph 224.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of Paragraph 224

and therefore denies those allegations. BCBS-MI admits that BlueCard gives providers access to all Blue Plan subscribers. BCBS-MI denies the remaining allegations in Paragraph 224.

225. In addition, the Blues operate less efficiently than their competitors. BCBS-AL, for example, uses a 25-year-old claims system, and the rules associated with Blue Card create confusion for providers in a way that does not exist for other major insurers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 225.

<u>**The Blues Agreement that Prohibits Defendants from Contracting with**</u>
<u>**Providers in Other Blues' Service Areas Should be Enjoined,**</u>
<u>**the BlueCard Program Should be Reformed to Create**</u>
<u>**Competitive Market Conditions, and Blues Should be Allowed to**</u>
<u>**Use Non-Blue Rental Networks to Supplement Their Provider Networks.**</u>

226. The Defendants' agreement that they will not contract with providers in other Blues' service areas is obviously anticompetitive. That agreement prevents the development of provider networks and competition among provider networks. The agreement also prevents Blues from developing innovative and collaborative agreements with Providers that would be efficient, improve quality and lower health care costs. The agreement also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts. For example, Anthem, the first or second largest health insurer in the country, and HCSC, the fourth largest health insurer in the country, must each have national provider networks in order to compete for national accounts.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 226.

227. The Blue Card Program reinforces the agreements that the Defendants have made not to compete and it provides the quid pro quo in terms of billions of dollars in payments that are made to the Blues. The Blue Card Program is used largely in the administration of health care benefit plans including for national and regional employers. Those employers pay the Blue Card access and administrative fees, and the Blues pocket those payments. Currently, BCBS-AL is able to use its market power as the largest health insurer and administrator in Alabama to coerce healthcare providers in Alabama into participating in the Blue Card System. In order to remedy that coercion and abuse of market power, Providers should be allowed to opt-out of the Blue Card System with no threat of retaliation. In the long run, that opt-out right will restore market condition and encourage the positive development of the Blue Card System so that it functions in as efficient a manner as possible. To the extent that Providers wish to remain in the Blue Card Program, they can do so. In order to correct the adverse effects that the Defendants have had on the market, the Court should impose an affirmative obligation on all Defendants to bargain in good faith with Providers who wish to negotiate with them, and maintain that obligation until the adverse effects of the Defendants' conduct have been fully remedied.

**ANSWER:**

BCBS-MI admits that the BlueCard Program allows Blue Plans to administer health care benefit plans for national and regional employers. BCBS-MI denies the allegations in the first, third, and fourth sentences of Paragraph 227. The fifth, sixth, seventh, and eighth sentences of Paragraph 227 do not contain factual allegations to which a response is required. To the extent a response is required, BCBS-MI denies the allegations in the fifth, sixth, seventh, and eighth sentences of Paragraph 227. BCBS-MI denies the remaining allegations in Paragraph 227.

228. In addition, the Blues' current prohibition against the use of non-Blue rental networks should be enjoined. Other health insurers, including United, Aetna and Cigna used such rental networks to supplement their networks when necessary. Consumers and Providers should have the ability to access such non-Blue rental networks for Blues in Alabama just as they do for other health insurers.

**ANSWER:**

The first and third sentences of Paragraph 228 do not contain factual allegations to which a response is required. To the extent a response is required, BCBS-MI denies the allegations in the first and third sentences of Paragraph 228. BCBS-MI is without knowledge of information sufficient to form a belief as to the remaining allegations in Paragraph 228 and therefore denies those allegations.

## Examples of Defendants' Restrictions on Competition

### *Restricting Competition in Alabama*

229. The history of Blue Cross and Blue Shield of Alabama shows how competition could have developed in Alabama but for the Blues' anticompetitive agreements.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 229.

230. The National Labor Relations Act, which was enacted in 1935, and as ultimately interpreted provided the basis for the growth of employer-based health benefit plans. Health benefits for employees expanded enormously during World War II, as a method of increasing

competition without increasing wages or salaries because of wage freezes. This expansion continued in the post-war years.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations Paragraph 230 and therefore denies those allegations.

231.     During the period after World War II, Alabama was the most unionized state in the Southeast. Some of the largest employers in the State were in the steel industry, and the workers in that industry were represented by the United Steelworkers of America. After the United States Supreme Court and the National Labor Relations Board recognized fringe benefits including pensions and health care benefits as mandatory subjects of bargaining, in 1949 the United Steelworkers of America demanded that health care benefits be included in the new collective bargaining agreement. After a strike, the steel industry agreed to include health care benefits in the collective bargaining agreement, and designated Blue Cross of Western Pennsylvania, now Highmark, as the entity to coordinate those benefits. Because of the territorial restrictions that the Defendants had agreed to, Blue Cross of Western Pennsylvania would not provide those healthcare benefits to the many thousands of steelworkers in Alabama. If it had been able to do so, Blue Cross of Western Pennsylvania could have become a major health insurer in Alabama, developed a provider network and even sold health insurance in the State to compete with Blue Cross and Blue Shield of Alabama. Instead, Blue Cross and Blue Shield of Alabama used this event to become the dominant health insurer in the State of Alabama.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in the first, second, third, and fourth sentences of Paragraph 231 and therefore

denies those allegations.  BCBS-MI denies the remaining allegations in Paragraph 231.

232.     In The History of Blue Cross and Blue Shield of Alabama, written by Clarence Joseph Vance and copyrighted in 1978 by Blue Cross and Blue Shield of Alabama, the following statement appears: "The enrollment in Alabama in 1950 of the U.S. Steelworkers was a progressive milestone; in terms of increasing enrollment. It was a major breakthrough. Heretofore, Blue Cross Plans had become conditioned to limit their markets to the white-collar workers . . ." Id. at 88–89. "The first step toward national accounts business was taken when Abraham Oseroff convinced the U.S. Steel Corporation and the Congress of Industrial Organizations in Pittsburgh that his Pittsburgh Plan could serve as a syndicate head. Working with the Blue Cross Commission and with Mr. Thompson, the New York Plan's actuary, Mr. Oseroff put together the first syndicate, covering over 1 million steel workers, with an estimated 75,000 in Alabama" Id. at 98. As the book notes, this syndicate was still intact at the time of publication in 1978. "The Steel contract has been the most stable piece of business, both locally and nationally." Id.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from *The History of Blue Cross and Blue Shield of Alabama*. BCBS-MI refers to that book for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 232.

233. These "national accounts" were critical to Blue Cross of Alabama's growth. "Early in 1950, competing in the national market place with large commercial carriers became a crisis issue." Id. at 98. However, the individual plans were ill equipped to do this on their own. "The locally autonomous Plans could not reply [sic] upon their loose confederation. . . ."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from *The History of Blue Cross and Blue Shield of Alabama*. BCBS-MI refers to that book for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 233.

234. Blue Cross and Blue Shield of Alabama experienced a similar increase in enrollment from other unionized industries. For example, the auto workers at the Ford plant in Sheffield became enrolled with Blue Cross and Blue Shield of Alabama shortly before the Steelworkers, and they would have been covered by Defendant Blue Cross and Blue Shield of Michigan if it were not for the territorial restrictions agreed to by the Defendants. Thus, Blue Cross and Blue Shield of Michigan also would have become a meaningful competitor in Alabama if it were not for those restrictions. The addition of the Steelworkers and other unionized workers to Blue Cross and Blue Shield of Alabama's rolls resulted in its fastest growth in history. "The Corporation's enrollment at the end of the first decade (1946) had reached 160,000 members; however, at the end of the second decade (1947-56) enrollment has reached 668,000, or a 416 percent increase." Id. at 194–95. As employee benefit plans expanded, BCBS-AL and the other Defendants used those plans and their anticompetitive system to expand their market shares and market power.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 234 and therefore denies those allegations. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from *The*

*History of Blue Cross and Blue Shield of Alabama*.  BCBS-MI refers to that book for its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 234.

235.   Blue Cross and Blue Shield of Alabama also acted as a control plan for South Central Bell Telephone Company and International Paper's Southern Kraft Division, and aided other Defendants in developing their market shares and market power.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations preceding the comma in Paragraph 235 and therefore denies those allegations.

BCBS-MI denies the remaining allegations in Paragraph 235.

236.   Blue Cross and Blue Shield of Alabama's rapid growth in enrollment gave it increased market power when dealing with healthcare providers. As the copyrighted history states, "while the U.S. Steel breakthrough was an enrollment boon, it also brought with it reimbursement problems." Id. at 89. Blue Cross and Blue Shield of Alabama addressed those reimbursement problems by forcing hospitals in Alabama to accept a cost-based reimbursement system. That system is unique and has resulted in hospitals in Alabama receiving among the lowest reimbursement rates in the country. That system remains in place for hospitals in Alabama, and BCBSAL requires cost-based reimbursement for hospitals in Alabama each year including during years since 2008.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from *The History of Blue Cross and Blue Shield of Alabama*.  BCBS-MI refers to that book for its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 236.

237.   Today, hundreds of thousands of enrollees of non-Alabama Blues live and work in Alabama. As of 2012, Defendant Anthem had approximately 121,000 enrollees in Alabama (and 127,000 as of 2015), Defendant Highmark had approximately 40,000, Defendant HCSC had approximately 94,000, Defendant Blue Cross and Blue Shield of Michigan had approximately 30,000, and Defendant BlueCross BlueShield of Tennessee had approximately 31,000 (and 35,000 as of 2015). Yet the Blues' rules prevent Alabama providers who treat these patients from negotiating with those Blues; instead, they must accept the low reimbursement rates imposed by BCBS-AL. Moreover, BCBS-AL is free to set its low rates with the knowledge that Anthem, HCSC, and other are prohibited from competing for the business of BCBS-AL's enrollees or

negotiating with Alabama providers. BCBS-AL has taken advantage of its market power in a number of ways.

**ANSWER:**

BCBS-MI admits that it has members who reside in Alabama and who have been treated in Alabama. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence of Paragraph 237 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 237.

*BCBS-AL Stifled Competition Promoted by the*
*Alabama Health Care Council*

238. In 1985, the CEOs of several major corporations, including Alabama Power, Drummond Company, and SouthTrust Bank, formed the Alabama Health Care Council as a non-profit entity to help Alabama corporations improve the quality and cost of health care.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 238 and therefore denies those allegations.

239. In September 1995, in response to rising health care costs in Alabama, the council solicited health insurance proposals. It received bids from over twenty companies, and ultimately narrowed the bids to United Healthcare of Alabama and HealthPartners of Alabama, the former insurance arm of then-Baptist Health System. BCBS-AL did not initially submit a bid in response to the council's solicitation.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 239 and therefore denies those allegations.

240. BCBS-AL stood to lose the business of approximately 60,000 employees if the members of the council contracted with another insurer.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 240 and therefore denies those allegations.

241.     In an effort to maintain its market share and delay and block healthcare reforms in Alabama, BCBS-AL offered the council a twenty percent discount for the next three years, which the council accepted. Pursuant to its agreement with the council, BCBS-AL was further obligated to reduce the costs of health care for the council's members once the three-year guarantee expired by better managing the delivery of health care services and the administration of health benefit plans in Alabama.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 241 and therefore denies those allegations.

242.     Effectuating a twenty percent savings for the council's members would have required BCBS-AL to significantly change its methods of managing the delivery of health care services and administering health benefit plans in Alabama. Instead of making these changes, BCBS-AL financed these discounts by relying on its hundreds of millions of dollars in surplus and increased charges to other consumers.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 242 and therefore denies those allegations.

243.     As the three-year savings guarantee came to an end, the council's members learned that if they continued their relationship with BCBS-AL, their health care costs in the next year would increase by approximately thirty-five to forty-five percent.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 243 and therefore denies those allegations.

244.     In September 1999, Drummond Company terminated its contract with BCBS-AL. Drummond subsequently obtained health coverage for its employees through Select Care.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 244 and therefore denies those allegations.

245.     As a result of BCBS-AL's use of most-favored-nation clauses ("MFNs"), Drummond encountered significant problems in negotiating favorable rates with hospitals and physicians and establishing satisfactory hospital and physician networks. The best rates that

hospitals generally were able to offer Drummond was 15 percent greater than the rates received by BCBS-AL. This example illustrates how BCBS-AL used MFN's to preserve its market power and insulate itself from competition.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in the first and second sentences of Paragraph 245 and therefore denies those

allegations.  BCBS-MI denies the remaining allegations in Paragraph 245.

246.    In May 2000, Drummond filed suit against BCBS-AL in the Northern District of Alabama, in part challenging its use of MFNs. *See Drummond Co. v. Blue Cross & Blue Shield of Alabama*, Civil Action No. CV-00-AR-1354-S.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize *Drummond Co. v. Blue Cross &*

*Blue Shield of Alabama*, Civil Action No. CV-00-AR-1354-S.  BCBS-MI refers to that case for

its contents and denies any characterization thereof.

247.    In August 2001, the parties settled the action. As part of the settlement agreement, BCBS-AL agreed to cease the use of MFNs. Since 2001, BCBS-AL has, however, engaged in similar conduct that allows it to obtain larger discounts from its providers than its competitors can obtain.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize *Drummond Co. v. Blue Cross &*

*Blue Shield of Alabama*, Civil Action No. CV-00-AR-1354-S.  BCBS-MI refers to that case for

its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations

in Paragraph 247.

*BCBS-AL Uses Its Market Power to Extract Money*
*from Providers Through "Tiering"*

248.    BCBS-AL abuses its market power and the lack of competition in Alabama in other ways as well.

**ANSWER:**

Paragraph 248 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 248.

249. In a further effort to depress prices paid to hospitals and gain greater "differentials" BCBS-AL began its Hospital Tiered Network Program in 2006. Their stated goal was to "recognize hospitals that have taken action to improve healthcare quality and work with Blue Cross and Blue Shield of Alabama to reduce healthcare costs for our customers."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from an unidentified document. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 249.

250. In its Tiered Hospital Program, BCBS-AL ranks hospitals in various categories. BCBS-AL enrollees face higher out-of-pocket responsibility for treatment at hospitals that are ranked in lower tiers.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 250 and therefore denies those allegations.

251. Initially, the three primary categories of the Tiered Hospital criteria were fiscal, quality, and patient safety. BCBS-AL states in its program description that the program criteria is evaluated and enhanced each year in an effort to continually pursue high quality healthcare in the State of Alabama. In 2010, BCBSAL added a fourth category of patient experience.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 251 and therefore denies those allegations.

252. The Tiered Hospital Program has been based on a scoring system that allowed for a maximum of 100 points divided between the categories. To be a Tier 1 hospital you had to score between 80 and 100. For Tier 2 from 60 - 79 points and Tier 3, when there was a Tier 3 category, 59 or below.

111

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 252 and therefore denies those allegations.

253.    Despite any claims about concerns about quality or safety, since inception, the Fiscal category has always been the primary driver of the tier a particular hospital was placed in, and that that fiscal component is always based upon the hospital's acceptance of terms that reduced the amounts or rates that BCBS-AL paid to the hospital. Through 2011, the sole criteria that had to be met to receive any points in the fiscal category was to continue an annual POF/ASC contract whose only purpose was to reduce reimbursement for the hospitals ambulatory surgery center and other ambulatory services. BCBS-AL has made clear that "[h]ospitals scoring high in this category have entered into financial arrangements with Blue Cross and Blue Shield of Alabama to provide the most favorable discounts for their services."

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 253 and therefore denies those allegations.

254.    In particular, the Fiscal category through at least 2010, required each hospital to accept a reduction in their reimbursement to receive 25 points if it accepted the lower contract reimbursement and zero points for that category if it did not. Therefore, without "accepting" BCBS-AL's even lower fee schedule, a hospital could not qualify to be in Tier 1 in Alabama. A hospital could achieve every other point available under the Tiered Hospital Program and would still end up in Tier 2 if it refused to accept the lower reduced reimbursement from BCBS-AL.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 254 and therefore denies those allegations.

255.    The Quality, Patient Safety and Patient Experience categories are all measured by standard measures which are largely achieved by all the hospitals in the state. As shown above, quality, patient safety and patient experience are not what ultimately drive a hospital's tier.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 255 and therefore denies those allegations.

256.    In the current iteration of the Hospital Tiered Network, a facility's rank is determined based on its "Costs." A hospital's "costs" are compared to a particular percentage of

Medicare and scored for tiering purposes. As with the earlier iterations, it impossible to achieve a Tier 1 ranking without meeting BCBS-AL's lower "cost" thresholds. BCBS-AL itself notes that the new method puts even "greater emphasis on cost."

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 256 and therefore denies those allegations.

257. The new methodology placed 50% weight on "cost" with the thresholds of $ for "costs" under 130 percent of Medicare, $$ for "costs" between 130 and 140 percent of Medicare and $$$ for "costs" above 140 percent of Medicare. Hospitals in the state have sought information from BCBS-AL on how "costs" are determined but have been unable to match BCBS-AL's purported cost calculations or tie them off to the same Medicare percentages. BCBS-AL has refused to provide its internal calculations essentially treating them as a black box during the initial process.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 257 and therefore denies those allegations.

258. Further, BCBS-AL personnel have stated that the particular percentages of Medicare used for the "cost" thresholds are supported by a study or other work done for BCBS-AL. BCBS-AL refused to provide the basis for these particular percentages of Medicare as appropriate "cost" thresholds to the hospitals. Plaintiffs requested these documents in discovery and were told no such studies exist. Based on this, Provider Plaintiffs must conclude that there is no study that demonstrates that these percentages of Medicare are appropriate measures of costs. Therefore, these percentages of Medicare seem to be arbitrary thresholds designed to lower reimbursements paid by BCBS-AL or to extract payments from the hospitals as part of the Tiering process.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 258 and therefore denies those allegations.

259. Under the new method, 17 hospitals were pushed from Tier 1 to Tier 2.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 259 and therefore denies those allegations.

260. For instance, in 2016, UAB Hospital was placed in Tier 2. Since UAB Hospital is one of the premier and most advanced hospitals in the state, this relegation to a higher cost tier demonstrates that the quality of the facility is not the driving force behind BCBS-AL's Tier rankings

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 260 and therefore denies those allegations.

261. Plaintiffs Jackson Medical Center, LLC; Evergreen Medical Center, LLC; and Crenshaw Community Hospital all were placed in Tier 2.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 261 and therefore denies those allegations.

262. In 2016, Mobile Infirmary was also placed in Tier 2 originally. After negotiations with BCBS-AL, and after significant money was paid to BCBS-AL, in October 2016 was placed in Tier 1.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 262 and therefore denies those allegations.

263. In 2016, before the tiering decisions were made public, BCBS-AL told Decatur Morgan Hospital in Decatur that it would be Tier 2 when the rankings were released. The parties attempted to reach an agreement on payments to Blue Cross that would allow Decatur Morgan to regain Tier 1 status. Decatur Morgan and BCBS-AL were unable to reach an agreement. BCBS-AL took the tiering rankings public and pushed to the local media in Decatur that Decatur Morgan would be Tier 2 and patients would be subjected to higher patient responsibility at Decatur Morgan in hope of driving Decatur Morgan to make a deal. After the rankings were public, but before the tiering went into effect, Decatur Morgan and BCBS-AL reached an agreement whereby Decatur Morgan would pay BCBS-AL approximately 1.7 million dollars, and BCBS-AL would move Decatur Morgan back to Tier 1 status. Decatur Morgan was therefore moved back into Tier 1 before the new rankings went into effect.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 263 and therefore denies those allegations.

264. In addition to the general ability to force providers to continually lower costs, it is not clear to hospitals how BCBS-AL actually determines the "costs" its uses for tiering purposes or how it calculates the corresponding percentage of Medicare payment rates for purposes of the tiering exercise. Hospitals have asked for information on the calculations that drive these cost measures but are not allowed to see or confirm how these costs measures are actually derived. Essentially, the Tiering process is driven by a black box calculation that determines which hospitals will be favored for steerage by BCBS-AL.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 264 and therefore denies those allegations.

265. Further, under the tiering regime, BCBS-AL's initial cost determinations and Tier assignment are used to hold the Tier 2 hospital hostage. In order to regain Tier 1 status, a "negotiation" unfolds where BCBS-AL extracts certain concessions either with respect to the costs a hospital reported in earlier years, or by reductions in forward-looking reimbursement rates. In some cases, hospitals have been asked to cut checks of over a million dollars to BCBS-AL for cost adjustments from earlier years in order to regain their Tier 1 status.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 265 and therefore denies those allegations.

266. Being placed below Tier 1 is designed to cause extraordinary harm to a hospital. BCBS-AL acts to affirmatively steer patients away from these hospitals by imposing higher costs on enrollees and actively pushing its enrollees to Tier 1 Hospitals. Thus, when faced with the prospect of losing large portions of their patient base, or paying the ransom, hospitals have no choice but to accept lower rates and pay BCBS-AL so that they can continue to treat the high percentage of BCBS-AL enrollees in this state.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 266 and therefore denies those allegations.

*BCBS-AL Lowers Hospital Reimbursements Through*
*Onerous and Arbitrary "Cost Reporting" Requirements*

267. Along the same lines, BCBS-AL has required all participating hospitals to submit to cost reporting since 1957. This information has historically provided BCBSAL an informational competitive advantage over all other commercial insurers. In addition, this reporting requirement introduced a barrier to entry in the sense that every hospital would refrain

from negotiating a contract with another insurer since the related costs and revenues would be revealed to BCBSAL. Consequently, this cost reporting requirement acts, essentially, as a barrier to entry as well as a guarantee that BCBS-AL gets the best rates from hospitals in the State of Alabama.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 267.

268.    Regarding hospital outpatient services, BCBSAL pays each hospital a fixed percentage of its charges. At the end of the year, the hospitals report their costs and BCBS-AL will either true up or true down the payments they made over the course of the year based not on the contracted rates but on the actual costs of the hospitals plus a fixed percentage (11%).

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 268 and therefore denies those allegations.

269.    Blue Cross then either takes money back from the hospital if it feels it got charged too much or pays, late, amounts due to a hospital that should have been paid previously.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 269 and therefore denies those allegations.

270.    The process is time consuming, administratively inefficient, and difficult for the hospitals, often requiring them to submit to several rounds of auditing. From the hospitals' perspective, the process is costly and arbitrary, and BCBS-AL often relies on classifications of expenses that make no sense to the hospitals. In the end, it often simply becomes another way for BCBS-AL to utilize its market power and drive provider reimbursements lower.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 270.

271.    With regard to hospital inpatient services, BCBSAL pays each hospital a fixed per diem, regardless of the type of procedure performed (i.e., diagnosis related group). BCBSAL does not true up or down its payments for inpatient hospital stays. It does, however, change the per diem rates that it pays each hospital throughout the year. Plaintiffs are not aware of any other commercial health insurer in the country that requires hospitals to submit to this kind of cost reporting. This cost reporting requirement is a remarkable showing of the market dominance BCBS-AL has when compared to other commercial health insurers and relative to providers, even hospitals with whom the Blue purport to have difficulty negotiating.

116

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 271.

272.    In addition to these practices, BCBS-AL prohibits hospitals from using the rates that BCBS-AL pays in any other of the hospitals' contracts.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 272 and therefore denies those allegations.

*BCBS-AL Interfered with Competitive Bidding in Birmingham*

273.    BCBS-AL's interference with competitive bidding for health coverage for the City of Birmingham's employees is another illustration of BCBS-AL's use of its market dominance and political influence to obtain business which it would otherwise not have earned through fair competition and to exclude potential competition.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 273.

274.    In 2013, United Healthcare brought suit against the City of Birmingham, Alabama, alleging that the city wrongfully directed business away from United Healthcare to BCBS-AL. The lawsuit, *United Healthcare Services, Inc. v. City of Birmingham, Alabam*a, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.), alleged that, following a bid process, United Healthcare emerged as the lowest responsible bidder for a contract managing the city's employee health coverage. However, in an effort to avoid losing subscribers and allowing United Healthcare to increase its market share in Alabama, BCBS-AL approached the city and offered to provide additional services. The city awarded the contract to BCBS-AL.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize unidentified pleadings from *United Healthcare Services, Inc. v. City of Birmingham, Alabam*a, No. CV-13-0499-MGG (Cir. Ct. of Jefferson County, Ala.).  BCBS-MI refers to those pleadings for their contents and denies any characterization thereof.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 274 and therefore denies those allegations.

275.    A Jefferson County, Alabama Court sided with United Healthcare and determined that the city's actions violated Alabama's Competitive Bid Law. The Court ordered the city to restart the bid process and award the contract to the lowest responsible company.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize unidentified documents from

*United Healthcare Services, Inc. v. City of Birmingham, Alabam*a, No. CV-13-0499-MGG (Cir.

Ct. of Jefferson County, Ala.).  BCBS-MI refers to those documents for their contents and denies

any characterization thereof.  BCBS-MI is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 275 and therefore denies those

allegations.

*BCBS-AL Spends Heavily on Executive*
*Compensation and Lobbying*

276.    BCBS-AL's executives have profited handsomely from the lack of competition in Alabama. Prior to 2015, the compensation of BCBS-AL executives was publicly available through the Alabama Department of Insurance. In 2013, the last year for which information is available, the total compensation of top BCBS-AL executives was as follows: CEO and President Terry Kellogg, $4.84 million; Executive VP Timothy Kirkpatrick, $2.69 million; Chief Administrative Officer Timothy Vines, $1.9 million; Senior VP and Chief Marketing Officer Timothy Sexton, $1.7 million; Senior VP and CFO Cynthia Vice, $1.47 million; Senior VP and CIO Brian S. McGlaun, $1.45 million; Senior VP of Business Operations Dick Briggs III, $1.44 million; Senior VP of Health Care Networks Jeffrey Ingrum, $1.42 million; Senior VP of Enterprise Resources Vickie Saxon, $1.26 million; Senior VP and Chief Legal Officer Michael Patterson, $1.03 million.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize information filed with the Alabama

Department of Insurance.  BCBS-MI refers to those filings for their contents and denies any

characterization thereof.  BCBS-MI is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 276 and therefore denies those

allegations.

277.    These amounts are inconsistent with BCBS-AL's status as a non-profit entity and suggest that its executives' decisions are motivated by potential personal gain rather than the

benefit to BCBS-AL's customers. By point of comparison, BCBS-NC, also a nonprofit, has roughly 3.8 million customers compared to BCBS-AL's 3 million, and its 2013 annual revenue was $6.4 billion, compared to BCBS-AL's $4.1 billion 2013 annual revenue. In 2013, BCBS-NC's CEO, Brad Wilson, earned $2.9 million in total compensation.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 277 and therefore denies those allegations.

278.    In recognition of this inconsistency, BCBS-AL lobbied in support of legislation aimed at keeping its executives' compensation out of the public record. In 2015, the Alabama legislature amended Alabama Code 1975 § 27-2-24, designating the compensation of officers and employees of insurance companies confidential and privileged.

**ANSWER:**

The second sentence of Paragraph 278 contains legal conclusions to which no response is required.  To the extent a response is required, BCBS-MI denies the allegations in the second sentence of Paragraph 278. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 278 and therefore denies those allegations.

279.    The amendment was sponsored by Sen. Slade Blackwell. In 2013 and 2014, Blackwell received $53,250 in contributions from political action committees that in turn received $336,000 in contributions from BCBS-AL. BCBS-AL also makes payments to family members of legislators.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 279 and therefore denies those allegations.

### Allowing and Restricting Competition Among the Blues

280.    Despite the Blues' portrayal of Service Areas as essential to the functioning of the "Blue System," historical experience has shown that the BCBSA has allowed competition between Blues, especially when doing so would avoid a court decision about whether Service Areas violate the antitrust laws. As in Pennsylvania, Ohio, and Maryland, BCBSA could allow competition, but it chooses not to.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 280.

*Allowing and Restricting Competition in Pennsylvania*

281.    The Blues refuse to contract in an adjacent Blue's Service Area when the refusal benefits that Blue's market power, as demonstrated recently by Anthem Blue Cross and Blue Shield of Ohio's refusal to contract with a UPMC hospital in a county in Pennsylvania that borders on Ohio.

**ANSWER:**

Paragraph 281 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 281. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 281 and therefore denies those allegations.

282.    UPMC has developed a number of areas of health care where it has an outstanding reputation for excellence. For example, well-known people from Alabama have gone to UPMC for liver transplants when they could have gone anywhere in the world for the procedure. The Defendants' illegal Conspiracies will mean that when the contract between UPMC and Highmark terminates, other Blues including Blue Cross and Blue Shield of Alabama will not be permitted to enter into an in network relationship with UPMC, and the Blues' subscribers will not have access to UPMC using in network coverage. But for the illegal Conspiracies, Blue Cross of Alabama and other Blues would be able to negotiate in network relationships with UPMC.

**ANSWER:**

BCBS-MI denies the allegations in the third and fourth sentences of Paragraph 282. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 282 and therefore denies those allegations.

283.    In addition, there have been other side agreements not to compete. Highmark BCBS was formed from the 1996 merger of two Pennsylvania BCBSA member plans: Blue Cross of Western Pennsylvania, which held the Blue Cross license for the twenty-nine counties of Western Pennsylvania, and Pennsylvania Blue Shield, which held the Blue Shield license for the entire state of Pennsylvania.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 283 and therefore denies those allegations.

284.    Prior to this merger, Pennsylvania Blue Shield and Independence BC, the Blue
Cross licensee for the five counties of Southeastern Pennsylvania, had competed in Southeastern
Pennsylvania through subsidiaries: Keystone Health Plan East, an HMO plan that Pennsylvania
Blue Shield established in 1986 after Independence rejected its offer to form a joint venture
HMO plan in Southeastern Pennsylvania; and Delaware Valley HMO and Vista Health Plan
(also an HMO), which Independence BC acquired in response to Keystone Health Plan East's
entry into the market. In 1991, Independence BC and Pennsylvania Blue Shield agreed to
combine these HMOs into a single, jointly-owned venture under the Keystone Health Plan East
name, and Pennsylvania Blue Shield acquired a 50 percent interest in an Independence PPO,
Personal Choice. When Blue Cross of Pennsylvania and Pennsylvania Blue Shield merged to
form Highmark BCBS, Pennsylvania Blue Shield sold its interests in Keystone Health Plan East
and Personal Choice to Independence BC. As part of the purchase agreement, Pennsylvania Blue
Shield (now Highmark BCBS) and Independence BC entered into a decade-long agreement not
to compete. Specifically, Pennsylvania Blue Shield agreed not to enter Southeastern
Pennsylvania, despite being licensed to compete under the Blue Shield name and mark
throughout Pennsylvania.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 284.

285.    The conduct of Highmark and IBC demonstrates that the noncompetition
agreement remains in place, though it putatively expired in 2007. Instead of entering the
Southeastern Pennsylvania market at that time, Highmark BCBS announced that it and
Independence BC intended to merge. After an exhaustive review by the Pennsylvania Insurance
Department ("PID"), Highmark BCBS and Independence BC withdrew their merger application.
In commenting on this withdrawal, then-Pennsylvania Insurance Commissioner Joel Ario stated
that he was "prepared to disapprove this transaction because it would have lessened competition.
. . to the detriment of the insurance buying public."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote from or summarize a statement by

former Pennsylvania Insurance Commissioner Joel Ario.  BCBS-MI refers to that statement for

its contents and denies any characterization thereof.  BCBS-MI is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 285 and therefore denies those allegations.

286.  Capital Blue Cross presented an expert report from Monica Noether, Ph.D., in the merger proceeding before the Pennsylvania Insurance Department. Dr. Noether offered the following opinions:

- "Based on my review of historical data on attempted entry, it is my opinion that the Pennsylvania health insurance market has been difficult to enter successfully even by otherwise successful national firms. Moreover, there has been little or no expansion by the existing competitors of the Blues plans in the Commonwealth."

- "Highmark and IBC would have a post-merger market share in excess of 70 percent. As noted above, in a scenario where entry and expansion are difficult, a firm with as large a share as the combined Highmark-IBC will possess is likely to be able to exert market power. Indeed, it appears to be the case that the health insurance market in Pennsylvania is characterized by difficulties in entry and expansion."

- "The combination of Highmark and IBC would result in a combined entity with more than 70 percent of the fully- and self-insured commercial health business in the Commonwealth. This is significantly more than the 53 percent share cited by others, which itself is material and well above the safe harbor guideline of 35 percent established by the DOJ and FTC in the Merger Guidelines."

- "Highmark has competed in the past with IBC, could have been competing with IBC since 1997 but for a ten year non-compete agreement between them, and, in my opinion, is the best-positioned to enter Southeastern Pennsylvania to compete with IBC in the future, especially given the absence of successful entry by other insurers."

- "Highmark has competed successfully for business in Southeastern Pennsylvania previously, both as a competitor to IBC and in cooperation with IBC through a joint operating agreement to offer indemnity insurance."

- "Highmark and IBC fail to address or acknowledge that they could have been competing head-to-head in Southeastern Pennsylvania during the last ten years were it not for this ten-year non-compete agreement. As a result, I find their claims that this proposed consolidation is not anticompetitive because they do not compete to be misleading. Highmark and IBC do not compete because they chose not to compete."

- "Absent the proposed merger, it is likely that Highmark would have entered Southeastern Pennsylvania in competition with IBC. In fact, Highmark's CEO has made clear not only his desire for Highmark to compete statewide but also his desire for there to be one single statewide Blue provider in Pennsylvania. Thus, the proposed merger eliminates, in my opinion, the most successful potential entrant into Southeastern Pennsylvania to compete head-to-head with IBC."

- "[T]he national companies, which have enjoyed much success elsewhere, including Aetna, CIGNA, Coventry Health Care, and UnitedHealth Group, as well as a few local companies, appear to have struggled to enter and expand their shares of health insurance in Pennsylvania."

- "Under the PA IHCA, the relevant geographic market is generally considered to be the entire Commonwealth of Pennsylvania. While health care services are often consumed at a more local level, various factors suggest that a statewide analysis is relevant. For example, a statewide analysis is particularly appropriate for national account customers who may have employees residing outside the primary geographic region where the firm's headquarters are located."

- "Based on the history of Highmark's conduct (and its predecessor, Pennsylvania Blue Shield) and the statements made by Highmark representatives, it appears that: (1) Highmark seeks statewide coverage, (2) it prefers to obtain that coverage by eliminating competition from other Blue Cross plans via joint venture or acquisition, but (3) if it cannot do so, Highmark will expand to compete against the local Blue Cross plan by developing its own provider network. Indeed, as previously noted, Highmark's CEO has confirmed not only that Highmark seeks to do business in all parts of the state, but that Highmark's ultimate goal is to be the sole Blue provider in Pennsylvania. Past experience demonstrates Highmark's willingness to enter Southeastern Pennsylvania independently, but **even if Highmark did not immediately enter Southeastern Pennsylvania without this proposed consolidation, the actual or perceived potential competition from Highmark would likely induce IBC to behave more competitively in the already highly concentrated Southeastern Pennsylvania region."**

(emphasis added).

## **ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an expert report of Monica Noether, Ph.D filed with the Pennsylvania Insurance Department. BCBS-MI refers to that report for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 286.

287. Currently, despite its past history of successful competition in Southeastern Pennsylvania, despite holding the Blue Shield license for the entire state of Pennsylvania, despite entering Central Pennsylvania and the Lehigh Valley as Highmark Blue Shield and thriving, despite entering West Virginia through an affiliation with Mountain State Blue Cross Blue Shield (now Highmark Blue Cross Blue Shield West Virginia), despite entering Delaware through an affiliation with Blue Cross and Blue Shield of Delaware (now Highmark Blue Cross Blue Shield Delaware), and despite the supposed "expiration" of the non-compete agreement with Independence BC, Highmark BCBS has still not attempted to enter Southeastern

Pennsylvania. This illegal, anticompetitive agreement not to compete has reduced competition throughout the state of Pennsylvania. After the Pennsylvania regulator refused to approve the merger of IBC into Highmark, the two entities began engaging in more joint activity instead of competing. For example, IBC now pays Highmark to process its provider claims. By processing those claims, Highmark has access to the reimbursement rates that IBC uses to pay providers. In addition, Highmark Blue Shield has been involved in similar non-competition arrangements with other Pennsylvania Blues and has purchased Blue Cross of Northeastern Pennsylvania.

**ANSWER:**

BCBS-MI admits that Highmark Blue Shield is licensed to use the Blue Shield trademarks and trade names in Pennsylvania. BCBS-MI denies the remaining allegations in Paragraph 287.

288. In a large part of central Pennsylvania, Capital Blue Cross and Highmark Blue Shield compete. In that area and in others where Blues compete including with separate Provider Networks, reimbursement rates or prices are higher. The same would be true in Alabama if other Defendants competed with BCBS-AL including with Provider Networks. Capital Blue Cross has attempted to operate outside of its Service Area through its non-Blue branded for profit subsidiary, Avalon. When Defendant Highmark developed a dispute with the largest provider in its Service Area, the University of Pittsburgh Medical Center (UPMC), Capital Blue Cross through Avalon attempted to offer subscribers of the Blues a means to obtain treatment at UPMC on an in-network basis. Highmark objected, and BCBSA prohibited Capital Blue Cross from offering this arrangement. Defendant Highmark and Defendant BCBSA prevented competition from Defendant Capital in the Service Area of Highmark and Capital agreed to restrict its competition. The efforts by Capital Blue Cross through its non-Blue Avalon demonstrate that if it were not for the agreement not to expand outside of each Blue's Service Area, Capital would be operating in the Highmark Service Area.

**ANSWER:**

BCBS-MI admits that in certain counties in Pennsylvania, Capital Blue Cross has a license to use the Blue Cross Mark and Highmark Blue Shield has a license to use the Blue Shield Mark. BCBS-MI denies the remaining allegations in Paragraph 288.

*Allowing and Restricting Competition in Ohio*

289. The history of Blue Cross and Blue Shield in Ohio shows that not only is competition possible among the Blues, but also that it occurred with BCBSA's agreement and was seen as beneficial to consumers at the time.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 289.

290.    In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), a Blue Cross and Blue Shield licensee based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus. In September 1985, Community Mutual began operating in areas of Ohio outside its exclusive geographic area. BCBSA subsequently filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio. On October 18, 1985, that court denied the Association's motion for a preliminary injunction. *Blue Cross & Blue Shield Ass'n v. Cmty. Mut. Ins. Co.*, No. C-85-7872 (N.D. Ohio). This decision was affirmed on appeal. No. 85-3871 (6th Cir. 1985). Thereafter, all the Ohio plans began competing throughout the State of Ohio using the Blue marks, and there was competition among multiple Blue Cross licensees and multiple Blue Shield licenses.

**ANSWER:**

BCBS-MI admits that BCBSA filed a trademark infringement action against Community Mutual in the United States District Court for the Northern District of Ohio, that the Court denied BCBSA's motion for a preliminary injunction, and that the Sixth Circuit affirmed. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 213 and therefore denies those allegations.

291.    In 1986, the number of Ohio Blues went from four to three when Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 291 and therefore denies those allegations.

292.    In 1987, BCBSA agreed to settle its trademark infringement action, allowing all three remaining Blues to compete statewide until 1991. At least two of the Blue plans saw competition as beneficial to consumers. Following the settlement, an attorney for Community Mutual stated that by 1991, "all three Ohio companies should have enough clients across the state to make it impractical for the national association to renew its claim that it has a right to allocate exclusive marketing territories for carriers." Joe Hallett, Settlement Made Among Providers of Health Care, The Blade (Toledo), May 21, 1987, at 1. In response to an article in Cincinnati Magazine that incorrectly implied that there was only one Blue available in

Cincinnati, the Director of Sales and Marketing for Blue Cross and Blue Shield of Ohio wrote to the magazine's editor: "Since open competition is generally good for the consumer, I would appreciate your correcting the impression left in the article that there is only one Blue Cross and Blue Shield carrier." Paul T. Teismann, Letter to the Editor, Blue Cross Carriers, Cincinnati Magazine, June 1987, at 8.

**ANSWER:**

BCBS-MI admits that the trademark infringement action BCBSA filed against Community Mutual in the United States District Court for the Northern District of Ohio was settled in 1987. BCBS-MI admits that Plaintiffs purport to quote from or summarize various news articles regarding a trademark infringement action. BCBS-MI refers to those articles for their content and denies any characterizations thereof. BCBS-MI is without knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 292 and therefore denies those allegations.

293. Competition was not fatal to the Ohio Blues. Although they initially suffered losses when they began competing with each other, all of them had returned to profitability by 1990. Likewise, healthy competition among the Blues could exist in Alabama but for the Blues' conspiracies.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 293 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 293.

294. Although BCBSA could not get the district court or court of appeals to agree that it could stifle competition in Ohio through exclusive service areas, it did help end competition there. In the late 1980s or early 1990s, one of the three remaining Blues, Blue Cross of Central Ohio (which had changed its name to Community Benefits Mutual Insurance Company), decided to stop using the Blue marks, and it left BCBSA in 1993, leaving two Blues: Community Mutual, and Blue Cross and Blue Shield of Ohio. In 1995, Community Mutual merged with The Associated Group, an Indianapolis-based insurance and health care company, forming Anthem Blue Cross and Blue Shield. The next year, Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue marks to Columbia/HCA, a company that operates a number of hospitals. BCBSA refused to allow the deal, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. By 1997, competition among the Ohio Blues had ended, as a result of the Blues' concerted conduct.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 294 and therefore denies those allegations.

*Allowing and Restricting Competition in Maryland*

295.    As it did in Ohio, BCBSA capitulated when its horizontal territorial allocation
was challenged in Maryland, allowing two Blues to compete against each other statewide.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 295.

296.    As of 1984, BCBSA had divided Maryland between two Blues. Group
Hospitalization and Medical Services, Inc. ("GHMSI") operated in the Prince George's County
and Montgomery County suburbs of Washington, D.C., while Blue Cross and Blue Shield of
Maryland, Inc. ("BCBSM") operated in the remainder of the state.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief about the truth

of the allegations in Paragraph 296 and therefore denies those allegations.

297.    The State of Maryland filed suit in the U.S. District Court for the District of
Maryland against BCBSA, BCBSM, and GHI, alleging that their agreement to allocate territories
violates Section 1 of the Sherman Act, the same allegation that Plaintiffs have made in this case.
*Maryland v. Blue Cross & Blue Shield Ass'n*, 620 F. Supp. 907 (D. Md. 1985). The defendants
moved to dismiss Maryland's suit on the grounds that their agreement to allocate territory was
exempt from antitrust scrutiny under the McCarran Ferguson Act, 15 U.S.C. § 1012. Maryland
moved for summary judgment on the same issue. During discovery, BCBSM offered testimony
that its marketing department expressed interest from time to time in marketing across the
boundary separating it from GHMSI's territory, but its CEO determined not to do so in part
because it was prohibited by BCBSM's agreement with BCBSA.

**ANSWER:**

BCBS-MI admits that the State of Maryland filed suit in the U.S. District Court for the

District of Maryland against BCBSA, BCBSM, and GHI in *Maryland v. Blue Cross & Blue*

*Shield Association*, 620 F. Supp. 907 (D. Md. 1985), and that both parties filed motions

regarding the application of the McCarran Ferguson Act.  BCBS-MI refers to those filings for

their contents and denies any characterization thereof.  BCBS-MI admits that Plaintiffs purport to describe unidentified testimony provided in the litigation.  BCBS-MI refers to that testimony for its contents and denies any characterization thereof.  BCBS-MI denies any remaining allegations in Paragraph 297.

298.    The court denied the motion to dismiss and the motion for summary judgment. Describing the defendants' agreement as "horizontal market allocation among insurance companies," the court held that material disputes precluded a finding on whether the agreement constituted the "business of insurance" for purposes of the McCarran Ferguson Act.

**ANSWER:**

BCBS-MI admits that the Court in *Maryland v. Blue Cross & Blue Shield Association*, 620 F. Supp. 907 (D. Md. 1985), denied both parties' motions regarding the application of the McCarran Ferguson Act.  BCBS-MI refers to those filings for their content and denies any characterization thereof.  BCBS-MI admits that Plaintiffs purport to quote from or summarize unspecified portions of the Maryland District Court's opinion.  BCBS-MI refers to that opinion for its contents and denies any characterization thereof.  BCBS-MI denies any remaining allegations in Paragraph 298.

299.    Later in the case, shortly before the court was scheduled to rule on whether the case should be tried on a per se theory or under the rule of reason, the defendants settled the case. BCBSA allowed BCBSM and GHMSI to compete with each other throughout the state of Maryland until the later of January 1, 1991 or the completion of the Assembly of Plans. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

**ANSWER:**

BCBS-MI admits that the parties settled the action in *Maryland v. Blue Cross & Blue Shield Association*, 620 F. Supp. 907 (D. Md. 1985), before a ruling on whether the case should be tried on a per se theory or under the rule of reason.  BCBS-MI admits that Plaintiffs purport to quote a statement by former Maryland Attorney General Joseph Curran, Jr.  BCBS-MI refers to

that statement for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 299.

300.    As in Ohio, competition was not fatal. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHI's core business was profitable in 1992. (GHMSI had lost money overall, however, due to ill-considered investments outside its core business and spending by its executives on items such as travel to international resorts, repeated use of the Concorde supersonic jet, and vintage wine.) BCBSM reported in 1992 that it had been profitable for the previous three years, even though a Senate investigation found mismanagement of that company as well. GHMSI and BCBSM both continued to exist until they merged in 1998 to become CareFirst. The Blues' experience in Maryland again demonstrates that healthy competition among the Blues could exist in Alabama but for the Blues' conspiracies.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to refer to unidentified reports by the Superintendent of Insurance of the District of Columbia and BCBSM. BCBS-MI refers to those reports for their contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 300 and therefore denies those allegations.

*Improper Use of Trademarks to Restrict Competition for Providers*

301.    It has long been established that a trademark cannot be used as a device to circumvent the Sherman Act. The Trademark Act itself penalizes use of a trademark in violation of the antitrust laws. The agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic markets, and, therefore, are per se violations of Section 1 of the Sherman Act.

**ANSWER:**

Paragraph 301 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 301.

302.    Competition among the Blues does not threaten their marks by creating confusion. In California, Washington, Idaho, Pennsylvania, and New York, the Blues currently compete using the Blue marks, without consumer confusion. A 1987 BCBSA internal memorandum noted that "Blue Cross of Washington and Alaska is actively competing against every other plan in the state. Not only has Blue Cross written a strategic plan which targets the Blue Shield Plans, but it

has developed a full range of products to sell statewide. Yet, despite open competition, consumer confusion has remained minimal."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from an unidentified 1987 BCBSA memorandum. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI admits that in certain areas of California, Washington, Idaho, Pennsylvania, and New York, more than one Blue Plan is licensed to use the Blue Cross and/or Blue Shield Marks. BCBS-MI denies the remaining allegations in Paragraph 302.

303. Moreover, the Blues' enrollees carry membership cards that clearly identify the Blue that underwrites or administers that enrollee's plan. The Blues already allow hundreds of thousands of their Alabama enrollees to carry cards with the names of Anthem and other out-of-state Blues, indicating that the Blues do not believe that the presence of a Blue outside its Service Area will create confusion.

**ANSWER:**

BCBS-MI admits that Blue subscribers are provided with membership cards that identify that subscriber's home Blue Plan. BCBS-MI denies the remaining allegations in Paragraph 303.

304. The Blues' well-established and widely utilized practice of "ceding" the right to be the Control Plan for National Accounts when doing so will ensure that an account is gained or retained by the Blue system belies their position that their exclusive Service Areas are necessary to protect their local trademarks. For example, Blue Cross Blue Shield of Arkansas, which is the Control Plan for Wal-Mart, ceded substantial portions of the Wal-Mart business to both Blue Cross Blue Shield of Alabama and Blue Cross Blue Shield of Illinois to ensure that Wal-Mart remained a Blue account. Similarly, Anthem ceded its General Electric business to Blue Cross Blue Shield of Alabama. The Blues' practice of ceding national accounts demonstrates that consumer confusion does not result when a Blue plan other than the local Blue administers their health insurance plan.

**ANSWER:**

BCBS-MI admits that its Inter-Plan Program contains a policy regarding "Alternative Control Plan Licensees." BCBS-MI refers to the policy for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a

belief about the truth of the remaining allegations in Paragraph 304 and therefore denies those allegations.

305.    The possibility of confusion among the Blues is non-existent for Providers, who already deal with multiple Blues on a regular basis. If anything, allowing Blues to contract with Providers outside their Service Areas would reduce confusion. As described above, Providers must comply with the claim processing rules of Blues located outside their Service Area, often without easy access to those rules. If a Provider could contract with these Blues, they would be given those rules from the beginning of the contract and would likely have fewer claims denied for failure to follow the rules.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 305.

306.    The experience of BCBS-AL and North Mississippi Medical Center ("NMCC") further illustrates how the Blues' territorial allocation restrains competition for the services of healthcare providers and belies the Blues' arguments that their trademarks allow them to agree not to compete with each other.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 306.

307.    Beginning in the mid-1990s, BCBS-AL maintained a network agreement with NMCC. This agreement was in place for almost a decade. BCBS-AL maintained the agreement for many years "because of the [hospital's] proximity to many of our customers."

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 307 and therefore denies those allegations.

308.    NMCC is located in Tupelo which is located in Lee County, Mississippi. Lee County is not contiguous with any other state and is located two counties in from Alabama. BCBS-AL maintained this contract for several years even though it was not a "contiguous county" contract as allowed by the Blue Cross rules. BCBS-AL marketed this agreement to its North and West Alabama insureds who wanted to be able to seek treatment and the more convenient facility in Tupelo.



x

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 308 and therefore denies those allegations.

309.    In late 2003, BCBS-MS and NMCC were engaged in heated discussions over NMCC's network agreement. On November 20, 2003, did not renew its agreement with BCBS-MS in response to BCBS-MS's request for reimbursement rates which amounted to "excessive discounts." The non-renewal of this agreement did not affect NMCC's stand-alone contract with BCBS-AL in and of itself.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 309 and therefore denies those allegations.

310.    On the same day, BCBS-MS's CEO Richard J. Hale wrote to Roger G. Wilson, the General Counsel and Corporate Secretary of the BCBSA, and informed him that BCBS-AL's contract with NMCC was not in compliance with BCBSA Brand Regulations on "Contiguous Area" contracting. BCBS-MS indicated that it had been aware of the contract for some time, but had not objected until now.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a correspondence between Richard J. Hale and Roger G. Wilson. BCBS-MI refers to that correspondence for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 310 and therefore denies those allegations.

311. In Mr. Hale's letter, he noted that the contract violated BCBSA Brand Regulation 4.7 and 4.8 because NMCC was not located in a contiguous area to BCBS-AL's service area.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a correspondence between Richard J. Hale and Roger G. Wilson. BCBS-MI refers to that correspondence for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 311 and therefore denies those allegations.

312. In internal correspondence, BCBS-MS made clear to BCBS-AL that its contract with BCBS-MS was "hurting" BCBS-MS's "bargaining position" with NMCC and was likely to result in less favorable contract for BCBS-MS. Thus, BCBS-MS had to enforce the BCBSA Brand Regulations not because it was concerned about the marks or the brand, but because competition from BCBS-AL was empowering NMCC and hurting BCBS-MS.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from an unidentified correspondence. BCBS-MI refers to that correspondence for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 312.

313. In September 2004, and at the behest of the BCBSA and BCBS-MS, BCBS-AL was forced to terminate its agreement with NMCC and any other affiliated Lee County, MS providers. In correspondence with the hospital, BCBS-AL indicated that the BCBSA rules and not any unhappiness or disagreement with NMCC was the reason for the contract termination.

133

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 313 and therefore denies those allegations.

314.    The loss of this contract and competition from BCBS-AL not only hurt NMCC, but its hurt BCBS-AL's own customers who were now subject to higher rates and patient responsibility amounts due to NMCC's out-of-network status with BCBS-AL.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 314 and therefore denies those allegations.

315.    Not surprisingly, after BCBS-AL was forced to terminate its agreement, BCBS-MS and NMCC reached a new network agreement.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 315 and therefore denies those allegations.

316.    In summary, the Blues observe each other's trademark rights only when it is beneficial to them. When the Blues find it convenient or profitable, they do not enforce their trademark rights.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 316.

### The BCBS Market Allocation Conspiracy

317.    As described above, Defendants allocate geographic markets for health care financing and health care services by restricting each Defendant's activity outside of a designated geographic Service Area. Accordingly, these restrictions insulate each Defendant from competition by other Blues in each of their respective geographic Service Areas, and prevent providers from contracting with Blues in other Service Areas. These restrictions have no economic justification other than protecting Defendants from competition.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 317.

134

318. Defendants' anticompetitive practices and resulting market power permit Defendants to pay in-network and out-of-network providers less than what they would have paid absent these violations of the antitrust laws. Defendants pay in-network providers directly pursuant to provider agreements. Because of Defendants' market power and access to the more than one hundred million enrollees of the Blues through the national programs, providers wishing to join the Blue network must accept lower reimbursement rates. In many markets doctors and other healthcare providers are given offers by the Blues on a "take it or leave it" basis.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 318.

319. Numerous Blues and non-Blue businesses owned by Defendants could and would compete effectively in other Service Areas but for the territorial restrictions. The likelihood of increased competition is demonstrated in several ways. First, as set forth above, the restrictions were specifically put in place to eliminate "Blue on Blue" competition. If there were no likelihood of competition, the restrictions would have been unnecessary. In fact, as set forth above, the restrictions did not initially address competition by non-Blue businesses owned by Defendants; however, when it became evident that such competition was an "increasing problem" the restrictions were revised to address this as well. Second, in certain portions of five states, limited competition among two Defendants has been permitted. For instance, in California, Blue Cross and Blue Shield are both allowed to operate under Blue trade names and to engage in limited competition in California. Likewise, Highmark and Capital compete in Pennsylvania, with both operating effectively and successfully. In fact, the combined market share of Highmark and Capital is comparable to the market share of many individual Blues. The Blue Cross and the Blue Shield entities also compete in Washington and Idaho without any injury to their trademarks or trade names. Obviously, these markets are far from competitive due to the agreements of the other Defendants not to compete in these Service Areas. However, this competition demonstrates that competition among Blue Cross and Blue Shield licensees is not only possible but, in fact, does not undermine the Blue brand or trademark. Third, certain Blues have, in fact, expanded beyond their initial Service Areas by merging with other Blues. For example, WellPoint, which was initially the Blue Cross licensee for California, is currently the BCBSA licensee for fourteen states (under the name Anthem). Prior to its merger with WellPoint, Anthem, which was initially the BCBSA licensee for Indiana, had expanded to become the BCBSA licensee for eight states. Undoubtedly, absent the current restrictions, Anthem would readily compete in additional Service Areas and, in all likelihood, would compete nationally. Other Defendants, including HCSC, have, in fact, recently expanded into other areas and, in all likelihood, would compete nationally but for the restrictions described in this complaint. Fourth, various Defendants have demonstrated that, absent the restrictions that each of the Blues agreed to put into the licensing agreement, they would expand into other geographic areas and states. For example, Anthem has expanded into many states where it is not licensed to operate as a Blue entity first through Unicare and, more recently, through its purchase of Amerigroup. Anthem also operates Caremore Centers in Arizona despite the fact that Anthem is not the Blue Cross Blue Shield licensee in Arizona. In addition, Defendant Blue Cross of Michigan operates outside of Michigan through a subsidiary or division that provides Medicaid managed care services. Other Blues have likewise expanded into other Service Areas in a similar

manner. Of course, these expansions are currently extremely limited by the restrictions on competition. Fifth, the Blues' practice of "ceding" accounts, as well as their history of informally competing for National Accounts and accounts located in border areas, which the Association has attempted to eliminate by pressuring the Blues to work together through joint ventures and similar arrangements rather than compete, shows that they are ready and willing to do business outside their service areas when they are permitted to do so. While the Blues remain subject to the territorial restrictions of the Licensing Agreements, true competition cannot occur in the market for health care services.

## ANSWER:

BCBS-MI admits that BS-CA is a licensed health care service plan licensed to use the Blue Shield trademark and trade name in California. BCBS-MI admits that Highmark BCBS is a health plan corporation, hospital plan corporation, and professional health services plan corporation licensed to use the Blue Cross and Blue Shield trademarks and trade names in 29 counties of Western Pennsylvania and the Blue Shield trademark and trade name in the Commonwealth of Pennsylvania. BCBS-MI admits that Capital BC is a health plan licensed to use the Blue Cross trademark and trade name in central Pennsylvania. BCBS-MI admits that BC-WA is a health services contractor licensed to use the Blue Cross trademark and trade name in portions of Washington. BCBS-MI admits that BC-ID is a health plan licensed to use the Blue Cross trademark and trade name in Idaho. BCBS-MI admits that in 1996, WellPoint (now Anthem) obtained a license to use the Blue Cross trademark and trade name in California. BCBS-MI admits that Anthem currently holds licenses for fourteen Blue Plans and serves customers through its Medicaid subsidiary, Amerigroup. BCBS-MI admits that Anthem operates Caremore Centers in Arizona. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the twenty-first sentence of Paragraph 319 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 319.

320. Internally, the Blues have noted that Blue on Blue Competition has exactly the market effect that the Providers have noted. In particular, at least one Blue noted that in areas where more than one Blue competes "it is very difficult to obtain or maintain market share with

"premium" pricing levels" and that such competition creates "enormous downward pressure on premium price levels, and upward pressure on provider contracting."

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote an unnamed source. BCBS-MI refers to that unnamed source for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 320.

321. Absent competition, the Blues have achieved significant market power and domination in the markets in their Service Areas. The territorial restrictions have therefore barred competition from the respective commercial health insurance markets and the market for health care services.

**ANSWER:**

Paragraph 321 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 321. BCBS-MI denies the remaining allegations in Paragraph 321.

322. The BCBSA is tasked with policing compliance with Defendants' agreements and is empowered to impose harsh penalties on those that violate the territorial restrictions. According to the Guidelines, a licensee that violates one of the territorial restrictions could face "[l]icense and membership termination." If a Member's license and membership are terminated, it loses the use of the Blue brands, which BCBS admits on its website are "the most recognized in the health care industry." In addition, in the event of termination, a plan must pay a fee to BCBSA. According to WellPoint's February 17, 2011 Form 10-K, there was a "re-establishment fee" of $98.33 per enrollee.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from the June 20, 2013 Guidelines to Administer Membership Standards Applicable to Regular Members, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to the Guidelines for their contents and denies any characterization thereof. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from BCBSA's website. BCBS-MI

refers to its website for its contents and denies any characterization thereof. BCBS-MI denies

the remaining allegations in Paragraph 322.

323. Defendants' agreements to limit competition and not contract with providers based on geographic Service Areas are referred to in this complaint as the "BCBS Market Allocation Conspiracy."

**ANSWER:**

Paragraph 323 does not contain factual allegations to which a response is required. To

the extent a response is required, BCBS-MI denies the allegations in Paragraph 323.

324. The BCBS Market Allocation Conspiracy continues to this day and will continue into the future if the Court does not issue injunctive relief enjoining the conspiracy.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 324.

325. In an effort to enhance its market power and the market power of the Blues in general, Anthem attempted to purchase Cigna, one of the largest health insurance companies in the country and one of only four companies that competes in the administration of national accounts. After Anthem entered into the agreement with Cigna, the CEO of Anthem met with CEOs of various other Defendants in a private room in the luxurious Peninsula Hotel in Chicago, Illinois. In those private meetings, various Defendants conspired and developed a "Blue Bias Strategy" for the implementation of the agreed merger of Anthem and Cigna. The merger as planned by Anthem and its conspiring Blue Plans was enjoined because it would have been anti-competitive.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 325.

### The BCBS Price Fixing and Boycott Conspiracy

326. As a result of the Market Allocation Conspiracy, Defendants achieved market dominance and low pricing for healthcare provider services in each Service Area. As described above, Defendants have reached a horizontal agreement and implemented a Price Fixing and Boycott Conspiracy through the national programs in order to leverage the low provider pricing they have achieved in each Service Area to benefit all Blues. The horizontal Conspiracy also involves a concerted refusal to deal or collective boycott of healthcare providers outside of each Defendant Blue's Service Area. Under the License Agreements, every Blue agrees to participate in each national program adopted by the Members. Those national programs include: a) Transfer Program; b) Inter-Plan Teleprocessing System (ITS); c) Blue Card Program; d) National

Accounts Programs; e) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and f) Inter-Plan Medicare Advantage Program.

**ANSWER:**

BCBS-MI denies the allegations in the first sentence of Paragraph 326. BCBS-MI admits that Plaintiffs purport to summarize the License Agreements. BCBS-MI refers to the License Agreements for their contents and denies any characterization thereof. The remaining allegations in Paragraph 326 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the remaining allegations in Paragraph 326.

327.     The Blues commit that other than in contiguous areas, they will not contract, solicit or negotiate with providers outside of their Service Areas. In other words, each Blue agrees with all other Blues to boycott providers outside of their Service Areas.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 327.

328.     Defendants achieved the Price Fixing and Boycott Conspiracy by agreeing that all Defendants would participate in the national programs including the Blue Card and National Accounts Programs, which determine the price and the payment policies to be utilized when a patient insured by a Blue or included in an employee benefit plan administered by a Defendant receives healthcare services within the Service Area of another Blue.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 328.

329.     The Defendant Blues implement the Conspiracy collectively through the Inter-Plan Programs Committee ("IPPC") where a number of the Defendant Blues decide how the Blue Card Program along with other national programs are designed and implemented. The National Accounts Programs are implemented through horizontal agreements between the Blues as well as through the IPPC and the Blue Card Program.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 329.

330.     Each of the Defendant Blues either has market power or has otherwise taken anticompetitive action in furtherance of gaining market power. Through the national programs

the Defendant Blues control more than one hundred million patients, something no other health insurance company has access to. These more than one hundred million patients provide the Defendant Blues a substitute for market power when Defendant Blues are dealing with providers. In fact, in many places providers treat more patients through the national programs than through the direct subscribers of the local Defendant Blue. One example is in central North Carolina where a majority of the subscribers for Blues come through national programs as opposed to being subscribers of Blue Cross and Blue Shield of North Carolina. When Blue Cross and Blue Shield of North Carolina negotiates with providers in central North Carolina, it uses the many patients in the national programs (which expand its bargaining power and effective market share) to obtain rates that are below competitive rates, and remain low.

**ANSWER:**

The first and third sentences in Paragraph 330 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and third sentences in Paragraph 330. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and fifth sentences in Paragraph 330 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 330.

331. The national programs including the Blue Card and National Accounts Programs are implemented in a horizontal manner. For example, when a hospital in east Alabama billed other Defendant Blues directly for services provided to their subscribers, those Blues, including Blue Cross of Minnesota paid for those services at the rates that it normally pays, which are higher than the rates paid by Blue Cross of Alabama. When Blue Cross of Alabama learned of those payments, it then recouped the difference between those two rates. Based on information and belief, Plaintiffs allege that Blue Cross of Alabama and the other Blues divided the funds recouped under the procedures established by the Defendant Blues on the IPPC. Also based on information and belief, Plaintiffs allege that in making the recoupments, Blue Cross of Alabama was following the procedures established by the Defendant Blues through the IPPC to enforce the price fixing conspiracy.

**ANSWER:**

The allegations in the first sentence of Paragraph 331 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first sentence of Paragraph 331. BCBS-MI denies the allegations in the last sentence of Paragraph 331. BCBS-MI is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 331 and therefore denies those allegations.

332.    When one Blue has a contract dispute or issue with a healthcare provider the other Blues, as independent horizontal conspirators and as horizontal conspirators through the Defendant Association, act to reinforce the market power of each of the Blues. In the proceeding brought by Plaintiff Dr. Cain when Blue Cross and Blue Shield of Kansas retaliated against her for being a class representative and attempted to terminate her from being a participating physician after 16 years of service, Blue Cross and Blue Shield of Kansas City then refused to allow her into its Blue branded network. When Highmark refused to pay the University of Pittsburgh Medical Center ("UPMC") reasonable rates and instead was going to allow its contract with UPMC to expire, UPMC, one of the leading medical centers in the world, wrote to Blues throughout the country, requesting that they separately contract with UPMC. Some of the Blues, including Blue Cross of Alabama and Anthem Blue Cross of New Hampshire, responded directly and refused to negotiate. At the same time, the Defendant Association coordinated responses for a number of other Blues, and the Association communicated the refusal to negotiate for those other Blues. Other healthcare providers including one or more hospitals in North Carolina have attempted to negotiate contracts with Defendant Blues in other states but have received refusals from those Blues, while Blue Cross and Blue Shield of North Carolina continues to reimburse at subcompetitive rates.

**ANSWER:**

The allegations in the first sentence of Paragraph 332 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first sentence of Paragraph 332.  BCBS-MI denies the remaining allegations in Paragraph 332.

333.    Accordingly, Defendants have agreed to fix the prices for healthcare reimbursement within each Service Area. Healthcare providers providing services to patients insured by or included in employee benefit plans administered by a Blue from another Service Area, including Plaintiffs, receive significantly lower reimbursement than they would receive absent Defendants' agreement to fix prices. The Price Fixing Conspiracy is a per se violation of Section 1 of the Sherman Act. It is also a violation under a quick look or rule of reason analysis.

**ANSWER:**

Paragraph 333 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 333.

334.    As a result of their Price Fixing and Boycott Conspiracy, Defendants reduce their payments to healthcare providers by in excess of ten billion dollars every year. These reductions, of course, are the result of the depressed prices paid to healthcare providers, including Plaintiffs.

**ANSWER:**

Paragraph 334 contains legal conclusions to which no response is required.  To the extent

a response is deemed required, BCBS-MI denies the allegations in Paragraph 334.

335.    The Price Fixing and Boycott Conspiracy facilitates the Blues' monopsonization and exercise of market power by increasing the volume of patients each Blue brings to its negotiations with providers. A provider who does not accept the local Blue's terms loses the ability to treat on an in-network basis not only that Blue's enrollees, but all Blues' enrollees.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 335.

336.    The Blues' Price Fixing and Boycott Conspiracy does not constitute a joint purchasing agreement. The Defendants have already denied that they are engaged in joint purchasing. (Doc. No. 120 at 42–43.) Moreover, the Blues' model, in which the Home Plan pays only the rate agreed to by the provider and the Home Plan, is naked price-fixing, not joint purchasing. As the Department of Justice and Federal Trade Commission explained in their 1996 publication Statements of Antitrust Enforcement Policy in Health Care, "[a]n agreement among purchasers that simply fixes the price that each purchaser will pay or offer to pay for a product or service is not a legitimate joint purchasing arrangement and is a per se antitrust violation."

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 336.

337.    Even if the Blues were engaged in joint purchasing, which they are not, their activity would not fall within the "safety zone" that the DOJ and FTC have established in the context of joint purchasing arrangements among health care providers. The DOJ and the FTC have stated that they "will not challenge, absent extraordinary circumstances, any joint purchasing arrangement among health care providers where two conditions are present: (1) the purchases account for less than 35 percent of the total sales of the purchased product or service in the relevant market; and (2) the cost of the products and services purchased jointly accounts for less than 20 percent of the total revenues from all products or services sold by each competing participant in the joint purchasing arrangement." The following section of this Complaint lists dozens of markets in which the purchases among the Blues account for more than 35 percent of the market. And the cost of services purchased jointly would account for far more than 20 percent of each Host Plan's revenues, and possibly for some Home Plans as well.

**ANSWER:**

The first and third sentences of Paragraph 337 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and third sentences of Paragraph 337. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a Department of Justice and Federal Trade Commission publication. BCBS-MI refers to that publication for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 337.

338. The Blues' model also has none of the safeguards that the DOJ and FTC have identified as mitigating concerns associated with joint purchasing. "First, antitrust concern is lessened if members are not required to use the arrangement for all their purchases of a particular product or service." The Blues are required to use the Blue Card program for all purchases of health care services from providers with who their do not have a contract. "Second, where negotiations are conducted on behalf of the joint purchasing arrangement by an independent employee or agent who is not also an employee of a participant, antitrust risk is lowered." The Blues do not do this. "Third, the likelihood of anticompetitive communications is lessened where communications between the purchasing group and each individual participant are kept confidential, and not discussed with, or disseminated to, other participants." Because the Blues do not use a purchasing group, but instead extend the Host Plan's pricing to all Home Plans, this safeguard does not apply.

**ANSWER:**

The first and last sentences of Paragraph 338 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and last sentences of Paragraph 338. BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from a Department of Justice and Federal Trade Commission publication. BCBS-MI refers to that publication for its contents and denies any characterization thereof. BCBS-MI admits that, as part of the License Agreement between each Blue Plan and BCBS-MI, member Blue Plans must participate in BlueCard. BCBS-MI denies the remaining allegations in Paragraph 338.

## **Allegations Related to the Rule of Reason Claims**

339.    The Defendant Blues have market power in many markets over prices or payment rates for healthcare providers. Even in markets where Defendant Blues do not have high market concentrations, they have market power or have otherwise exploited anticompetitive actions, through the more than one hundred million subscribers of Blues involved in the Inter-Plan or national programs. This access provides market power beyond what might be suggested by the local enrollment share.

**ANSWER:**

Paragraph 339 contains legal conclusions to which no response is required.  To the extent

a response is deemed required, BCBS-MI denies the allegations in Paragraph 339.

340.    This case involves a number of product markets in which the Defendants participate. One is the market for the sale of commercial healthcare financing services (excluding Medicare Advantage and managed Medicaid), which includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified. The market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, including access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market. This relevant product market can be described as the market for the sale of commercial health insurance and includes both fully insured plans and Administrative Service Only (ASO) plans. The purchasers of commercial health insurance do not have reasonable alternatives, as described in more detail in Paragraphs 341–346. Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees. Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance. For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price, or SSNIP. The number of employers or other groups substituting away from commercial health insurance is likely to be insufficient to make the SSNIP unprofitable.

**ANSWER:**

Paragraph 340 contains legal conclusions to which no response is required.  To the extent

a response is deemed required, BCBS-MI denies the allegations in Paragraph 340. BCBS-MI is

without knowledge or information sufficient to form a belief at this time as to the truth of the

remaining allegations in Paragraph 340 and therefore denies those allegations.

341. Within the market for the sale of commercial health insurance, the Defendants participate in a number of submarkets. These submarkets are alleged in the alternative to be relevant product markets for purposes of Provider Plaintiffs' claims.

**ANSWER:**

Paragraph 341 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 341.

342. The first submarket is the sale of commercial health insurance to national accounts with 5,000 employees or more, who are spread over more than one state. The relevant submarket can be described as the sale of commercial health insurance to these national accounts and includes both fully-insured plans and ASO plans. There is no reasonable substitute for this product. Large multistate employers have unique needs when seeking commercial health insurance for their employees. They desire a national network, a high degree of plan customization, and sophisticated claims administration, customer service, and data reporting. If faced with a SSNIP, a national account would have only two alternatives: self-supply by handling all aspects of the insurance product themselves, or forgo the purchase of commercial health insurance altogether. Neither is a reasonable substitute. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP. Because other insurance products, such as those without national networks, do not meet the unique needs of national accounts, the substitution between commercial health insurance for national accounts and other health insurance products is low, as reflected in measures such as a low cross elasticity of demand. Moreover, "national account" is a well-understood term in the health insurance industry. Insurance brokers and benefits consultants generally consider national accounts to constitute a separate line of business. Many of the largest insurers in the country, including Defendant Anthem, manage national accounts separately from their other business. Cigna and Defendant Anthem both use 5,000 employees as the threshold for defining national accounts, and that figure is considered to be reasonable by insurance brokers and benefits consultants.

**ANSWER:**

Paragraph 342 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 342. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 342 and therefore denies those allegations.

343. The second submarket is the sale of commercial health insurance to large group employers. The relevant submarket can be described as the sale of commercial health insurance to large group employers and includes both fully insured plans and ASO plans. "Large group" is defined as an employer with more than 50 employees. This is the threshold established by the Affordable Care Act for "large employers." 42 U.S.C. § 18024(b)(1). Although the Affordable

Care Act gives states the option to change this threshold to 100 employees, Alabama has not done so. There is some overlap between this submarket and the submarket for the sale of commercial health insurance to national accounts. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. Large group insurance is subject to less stringent regulation, and it permits more customization and differentiation. Insurers can profitably target large groups—in other words, engage in price discrimination—because they can easily identify large groups; prices for large-group products are negotiated individually; and arbitrage is impossible. There are no reasonable substitutes for commercial health insurance sold to large groups. A large group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) somehow morph into small groups. Forgoing health insurance is not a reasonable substitute because virtually all large employers offer health coverage to their employees. Handling all aspects of the insurance product is impractical.  And large groups are not in a position to reduce their numbers of benefits-eligible employees below state-law thresholds. In other words, the substitution between large group insurance and other healthcare financing options is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market would likely raise prices above competitive levels by imposing at least a SSNIP.

**ANSWER:**

Paragraph 343 contains legal conclusions to which no response is required.  To the extent

a response is deemed required, BCBS-MI denies the allegations in Paragraph 343. BCBS-MI is

without knowledge or information sufficient to form a belief at this time as to the truth of the

remaining allegations in Paragraph 343 and therefore denies those allegations.

344.    The third submarket is the sale of commercial health insurance to small group employers. The relevant submarket can be described as the sale of commercial health insurance to small group employers and includes both fully insured plans and ASO plans. "Small group" is defined as an employer with 50 employees or fewer. This is the threshold established by the Affordable Care Act for "small employers." 42 U.S.C. § 18024(b)(2). Although the Affordable Care Act gives states the option to change this threshold to 100 employees, Alabama has not done so. The insurance industry recognizes a clear distinction between insurance for small groups (employers with 50 or fewer employees) and large groups because small group insurance is defined by state regulation and subject to state and federal statutes. There are no reasonable substitutes for small group insurance. A small group employer can respond to a SSNIP in one of three ways: (1) forgo the purchase of group health insurance for their employees; or (2) self-supply by handling all aspects of the insurance product themselves; or (3) hire enough new employees to become a large group. Forgoing health coverage is not a reasonable substitute because health coverage is considered to be an important benefit. Handling all aspects of the insurance product is impractical. And hiring more employees for the sole purpose of being able to purchase different insurance is impractical. In other words, the substitution between small

group insurance and other healthcare financing options is low, as reflected in measures such as allow cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a SSNIP.

**ANSWER:**

Paragraph 344 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 344. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 344 and therefore denies those allegations.

345. For the relevant product markets described above, the State of Alabama is a relevant geographic market. Sellers of commercial health insurance compete for the business of employers, in part, by offering attractive provider networks in the geographic areas where employers' employees live and work. Individuals tend to get their healthcare services in locations near to where they live and work. If the hypothetical monopolist of commercial health insurance in Alabama were to implement a SSNIP, employers in Alabama would not substitute commercial health insurance in other states because their employees in Alabama value access to providers in Alabama. For employers in Alabama, there are no reasonable substitutes to commercial health insurance in Alabama. Further, in response to a SSNIP, employers will not move their employees to other states. In other words, the substitution between commercial health insurance in Alabama and commercial health insurance outside Alabama is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in the State of Alabama would likely increase prices above competitive levels by imposing at least a SSNIP.

**ANSWER:**

Paragraph 345 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 345. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 345 and therefore denies those allegations.

346. In the alternative, for the relevant product markets described above, Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. "Core-Based Statistical Areas" is a term used by the United States Office of Management and Budget to encompass Metropolitan Statistical Areas and Micropolitan Statistical Areas. Metropolitan Statistical Areas especially are used in the ordinary course of business in the insurance industry when examining local markets. Defining markets for commercial health insurance as local is consistent with the desire of employers to provide health plans with networks of local providers, specifically providers located near where

their employees live and work. In other words, the substitution between commercial health insurance in an employer's local area and commercial health insurance outside the employer's local area is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopolist in these product markets in Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, likely would increase prices above competitive levels by imposing at least a SSNIP.

**ANSWER:**

Paragraph 346 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 346.  BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 346 and therefore denies those allegations.

347.    In addition to the market for commercial health insurance, the Defendants participate in the market for the purchase of goods and services from healthcare providers. Outside of payments by the government, the vast majority of those goods and services are paid through or by health insurance companies, with the 36 independent Blues being the largest collection of those companies. Of the goods and services of healthcare providers that are paid for by health insurance companies, the vast majority are provided through in-network contracts.

**ANSWER:**

Paragraph 347 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 347. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 347 and therefore denies those allegations.

348.    The purchase of goods and services from healthcare providers by commercial buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid) is a relevant product market. Prescription drugs are excluded from this relevant market because they are largely purchased indirectly, through pharmacy benefit managers. These commercial buyers are the companies in the business of selling commercial health insurance or administering commercial health plans for private employers or other groups. These companies have separate business units dedicated to contracting for the purchase of goods and services from healthcare providers. For healthcare providers, there is no reasonable alternative to contracting with these commercial buyers in order to be in-network providers for the health plans sold to private employers or groups. Sellers of healthcare goods and services are not in a position to forgo sales to commercial buyers, in favor of patients who pay out of pocket, a group that essentially does not exist. Nor can they obtain enough Medicare or Medicaid patients, insured either under the government's traditional programs or managed care programs,

148

to replace the volume they would lose from dropping commercial insurance. Further, the prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are lower than the prices paid for the commercial health plans of private employers or groups. In other words, for providers, the substitution between commercial buyers and other payors is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in this market likely would lower prices paid to providers below competitive levels by imposing at least a small but significant and non-transitory reduction in price (SSNRP). The prices paid to healthcare providers by the government programs, including Medicare Advantage and managed Medicaid, are different than the prices paid for the commercial health plans of private employers or groups. Also some healthcare providers have separate contracts for Medicare Advantage and managed Medicaid, and some insurers have separate contracting teams for these products.

**ANSWER:**

Paragraph 348 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 348. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 348 and therefore denies those allegations.

349. This market need not be segmented by the type of provider at issue. Healthcare providers participate in what is known as two-stage competition; first they compete for inclusion in the provider networks of insurers' plans, and then they compete for patients within a plan. This market relates to the first stage of that competition. For a healthcare provider in Alabama, the fundamental question in defining this product market is not, "Who will my patients be?" but "Who are the payors with whom I can contract?" In Alabama, where the Blues combine to make the vast majority of commercial insurance payments, the answer is the same, regardless of who the provider is—the Blues, the few non-Blue commercial insurers with a small presence in the state, and government programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid. All providers, regardless of their type, face these options. Moreover, multiple types of providers can form a "cluster market," a concept widely accepted in healthcare antitrust cases and scholarly economic analyses.

**ANSWER:**

Paragraph 349 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 349. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 349 and therefore denies those allegations.

350.    In the alternative, three submarkets within this market are relevant product markets. These are the purchase of goods and services from healthcare professionals, the purchase of goods and services from healthcare facilities, and the purchase of durable medical equipment (DME), all by commercial buyers of healthcare goods and services who are the companies in the business of selling commercial health insurance or administering commercial health plans (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid). The submarket for DME is limited to DME provided to Alabama residents. Practical indicia support the segmentation into three submarkets. For example, the industry recognizes distinctions among healthcare professional services, healthcare facility services, and DME, and insurers often differ in the reimbursement methodologies they employ for each of these groups. For example, many commercial buyers reimburse healthcare facilities for inpatient services based on diagnosis-related group codes instead of paying for each good or service individually. Commercial buyers' contracting teams and processes also differ among these submarkets. Nonetheless, providers of healthcare professional services and providers of healthcare facility services face the same options for the purchase of their goods and services described above in Paragraph 347-349. As a result, in each of these submarkets, the substitution between commercial insurance and other payors is low, as reflected in measures such as a low cross elasticity of demand.    Therefore, a profit-maximizing hypothetical monopsonist in these submarkets would likely lower prices paid to providers below competitive levels by imposing at least a SSNRP.

**ANSWER:**

Paragraph 350 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 350.  BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 350 and therefore denies those allegations.

351.    For the relevant product markets described in Paragraphs 342 to 350, other than DME, the State of Alabama is a relevant geographic market. Healthcare providers, who have built their patient base and have invested in physical assets located in Alabama, are unlikely to respond to a SSNRP by moving their practice out of the state. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the State of Alabama would likely reduce prices below competitive levels by imposing at least a SSNRP.

**ANSWER:**

Paragraph 351 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 351. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 351 and therefore denies those allegations.

352.    In the alternative, for the relevant product markets described in Paragraphs 342 to 350 (other than the market for DME), Alabama Core-Based Statistical Areas, and counties or combinations of counties not part of one of these areas, are relevant geographic markets. Healthcare professionals and healthcare facilities usually provide services to patients living or working in relatively close proximity to their offices or other facilities. Healthcare professionals and healthcare facilities have invested in physical capital in their local geographic areas and invested in their human capital (reputation and referral patterns) that is specific to their local geographic areas. Therefore, they are unlikely to respond to a SSNRP by moving their practice out of their local area. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because BCBS-AL has market power throughout Alabama, and Alabama providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the provider's local area makes little difference unless the provider is willing to leave the state entirely. In other words, in the product markets for the purchase of healthcare services, the substitution between commercial buyers in the local geographic markets  identified above and commercial buyers outside the local geographic markets identified above is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in these product markets in the geographic markets identified above would likely reduce prices below competitive levels by imposing at least a SSNRP.

## ANSWER:

Paragraph 352 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 352. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 352 and therefore denies those allegations.

353.    In the alternative, for the product market defined as the purchase of goods and services from healthcare facilities by commercial buyers (excluding prescription drugs their purchases for Medicare Advantage and managed Medicaid), Dartmouth Atlas Hospital Referral Regions and Dartmouth Atlas Hospital Service Areas are relevant geographic markets. The Dartmouth Atlas of Health Care is produced by the Dartmouth Institute for Health Policy and Clinical Practice. Hospital Referral Regions represent regional health care markets for tertiary medical care that generally requires the services of a major referral center. Hospital Service Areas are local health care markets for hospital care. Healthcare facilities, including hospitals, treat patients from these areas and have invested in physical capital and built goodwill in these areas. Therefore, they are unlikely to respond to a SSNRP by moving their facilities. The disincentive to moving is even more compelling in the real world than in the world of the hypothetical monopsonist because BCBS-AL has market power throughout Alabama, and Alabama providers cannot contract with out-of-state Blues except in limited circumstances due to the Blues' horizontal market allocation. Therefore, leaving the facility's Hospital Referral Region or Hospital Service Area makes little difference unless the facility is willing to leave the state entirely. In other words, the substitution in the relevant product markets between commercial buyers in these geographic markets and commercial buyers outside these geographic

markets is low, as reflected in measures such as a low cross elasticity of demand. Therefore, a profit-maximizing hypothetical monopsonist in this product markets in these geographic markets would likely reduce prices below competitive levels by imposing at least a SSNRP.

**ANSWER:**

Paragraph 353 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 353. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 353 and therefore denies those allegations.

354. Because DME can be shipped across state lines, the geographic market for DME is national.

**ANSWER:**

Paragraph 354 contains legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in Paragraph 354. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations in Paragraph 354 and therefore denies those allegations.

355. BCBS-AL's market power with respect to DME shipped to Alabama residents, however, is high because of the Blues' geographic market allocation and BCBS-AL's practice of offering contracts to DME providers that cover only shipments made from Alabama (or possibly from a contiguous county).

**ANSWER:**

Paragraph 355 contains legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in Paragraph 355. BCBS-MI denies the remaining allegations in Paragraph 355.

356. The Provider Plaintiffs reserve the right to further refine their definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

**ANSWER:**

Paragraph 356 does not contain factual allegations to which a response is required.  To

the extent a response is required, BCBS-MI denies the allegations in Paragraph 356.

357.    Defendant Blue Cross and Blue Shield of Alabama has market power throughout
the State of Alabama in the market for the sale of commercial health insurance and in every
geographic area within Alabama. In addition to the submarkets alleged above, BBS-AL also has
an overwhelming share of the number of Alabamians with individual insurance policies, which
further increases its market power over providers. It also has market power in the State of
Alabama and the markets in which it is a purchaser, which are described above. In Alabama,
BCBS-AL's market share in the entire state was 86% in the 2013 study and 83% in the 2016
study. Its lowest market share is in the Mobile Metropolitan Statistical Area ("MSA"): 82% in
the 2013 study and 78% in the 2016 study.  Its highest market share is in the Gadsden MSA:
94% in the 2013 study and 90% in the 2016 study. In addition, BCBS-AL has market power and
market share between 85% and 91% (2013 study) and 81% and 88% (2016 study) of the market
in the Anniston-Oxford, Auburn-Opelika, Birmingham-Hoover, Decatur, Dothan, Florence,
Huntsville, Montgomery and Tuscaloosa MSAs. According to a 2011 report for BCBS-AL by
the consulting firm Milliman, BCBS-AL's statewide market share was 89.8% for individual
policies, 97.2% for small groups, and 91.6% for large groups. Because the market in Alabama is
so concentrated, the Herfindahl–Hirschman Index for Alabama is 7,531 (2013 study) or 6,914
(2016 study). By comparison, the United States Department of Justice considers a market to be
highly concentrated when its Herfindahl–Hirschman Index exceeds 1,800.

**ANSWER:**

The first, second, third, and seventh sentences in Paragraph 357 contain legal conclusions

to which no response is required.  To the extent a response is deemed required, BCBS-MI denies

the allegations in the first, second, third, and seventh sentences in Paragraph 357.  BCBS-MI

admits that Plaintiffs purport to quote or summarize various unidentified reports.  BCBS-MI

refers to those sources for their contents and denies any characterization thereof.  BCBS-MI

denies the remaining allegations in Paragraph 357.

358.    As described above, the Blues have more enrollees than any health insurance or
managed-care company in the country. Two of the four largest health insurance companies in the
country, four of the largest ten, and 15 of the largest 25 are Blues. Attachment A is a listing of
the market share of the top four and top eight health insurance companies by state from 2004
through 2014 as reported by the National Association of Insurance Commissioners ("NAIC").
Evidence will be introduced that shows Anthem is prevented from crossing the Georgia line to
compete in Alabama, and other empirical evidence is consistent with all the other Blues agreeing
not to compete in Alabama in health insurance markets as well. If individual Blue plans were

allowed to enter and compete, the market share for the largest four health insurance companies in Alabama would likely become much less. Anthem and HCSC are already the third and fourth largest insurers in Alabama by covered lives (primarily because of their National Accounts), and they would be able to market their products directly to Alabama employers, and negotiate with Alabama providers, but for the Blues' conspiracies. It would also be expected that market power for any one company would diminish. Evidence will show that HCSC is prevented from crossing the Illinois state line to compete in Indiana and prevents Anthem from crossing the Indiana state line to compete in Illinois. Anthem also follows the same policy in other States including in Alabama, while it gets the benefit of the subcompetitive rates that BCBS-AL pays to Providers. If individual Blue plans were allowed to enter and compete, the market share for the four largest health insurance companies in Illinois and Indiana would by definition fall below 80%. The HHI Market Concentration Index calculated from the NAIC data places many states in the highly concentrated range based upon ratios used by the United States Department of Justice. But for the Blues' Market Allocation Conspiracy, the market shares of the top four health insurance companies, the market shares for the top eight insurance companies, and the HHI indices would likely be lower in every state.

**ANSWER:**

The allegations in the fifth, sixth, seventh, eighth, ninth, tenth, and twelfth sentences in Paragraph 358 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the fifth, sixth, seventh, eighth, ninth, tenth, and twelfth sentences in Paragraph 358.  BCBS-MI denies the remaining allegations in Paragraph 358.

359.    Having fewer competitors in any market generally gives the players in that market more access to market power, and a greater ability to use market power, all else being equal.

**ANSWER:**

Paragraph 359 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 359.

360.    The Blues engage in a number of anticompetitive practices to increase their market power and to ensure that any competitors that do exist are marginalized or is unable to effectively compete. Through the conspiracies alleged in this complaint, the Blues have exclusive access to more than one hundred million subscribers of all the conspiring Blues. The Blues use those subscribers to diminish the prices they pay in the markets that set prices for healthcare providers.

**ANSWER:**

The allegations in Paragraph 360 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 360.

361. As demonstrated in the preliminary injunction proceeding for Dr. Cain, healthcare providers have essentially no choice but to be part of the networks of the Blues in order to remain in business. The Blues have a general policy of refusing to honor assignments from subscribers to providers as a part of their overall effort to coerce providers to be in network. The Blues also structure and implement out of network benefits for subscribers in a way that discourages them from using those benefits. The Blues either eliminate or cap out of network benefits so that it costs subscribers significantly more to use their out of network benefits. If Providers attempt to limit the out of pocket costs of subscribers who use their out of network benefits, the Blues retaliate against those Providers. When Providers believe their patients are better served by using an out of network facility, the Blues retaliate by threatening to terminate the Providers from the Blue networks.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 361.

362. As Dr. Noether described in the submission by Defendant Capital Blue Cross, there are significant barriers to entry for the health care financing market and therefore to be a payor for healthcare goods, services and facilities in the markets where prices are determined for healthcare providers. One of the barriers is the development of a provider network.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 362.

363. Some of the Blues have imposed most favored nation clauses ("MFN") to create additional barriers to entry. An MFN is both an indicator of market power and a source of market power because it excludes competitors. Other Blues that do not have express MFNs in their contracts have the functional equivalent that operate in the same manner.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 363.

364. The Blues' restraints have anticompetitive effects. Service areas are anticompetitive on their face: they prevent the Blues from competing with each other.

**ANSWER:**

Paragraph 364 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 364.

365. The Blues' agreement to limit the amount of non-Blue business they may conduct in another Blue's service area is anticompetitive on its face.

- The agreement puts an artificial limit on competition.

- The agreement reduces the incentive for the Blues to develop business out of their Service Areas because they know that the potential for that business is limited.

**ANSWER:**

Paragraph 365 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 365.

366. The Blues would compete with each other but for the Market Allocation Conspiracy.

- Historically, Blue-on-Blue competition happened in certain places such as Ohio, North Carolina and Illinois.

- Blue Cross and Blue Shield organizations competed against each other for many years and still do in certain places, including California, Washington, Idaho, and Central Pennsylvania.

- The Ohio Blues litigation, *BCBSA v. Community Mutual Insurance Co.*, resulted from one Blue's desire to compete outside of its service area; BCBSA ultimately agreed to allow all of Ohio's Blues to compete with each other, which they did.

- BCBSA settled the Maryland Blues litigation by allowing the D.C.-area Blues to compete against each other.

- Blues compete against each other in a limited way with respect to health care providers in areas covered by the one-county rule.

- Anthem, HCSC, and other Blues have large numbers of enrollees in Alabama through their National Accounts.

- Many of the Blues, especially the larger ones, such as Anthem and HCSC, have expanded into other territories through their non-Blue business, but in a limited way because of the limits on that business.

156

- Anthem is attempting to acquire CIGNA, which would give Anthem non-Blue branded business in Alabama.

- The BCBSA prevents Blues from expanding into other Service Areas.

- The Blues administer National Accounts of companies headquartered outside their Service Areas through "ceding" arrangements.

**ANSWER:**

BCBS-MI admits that certain Blue Plans have been licensed at various times to use the Blue Cross or Blue Shield trademarks and trade names in the same geographic area. BCBS-MI admits that under its policies, Blue Plans are allowed to contract with certain health care providers in areas adjacent to each Plan's service area. BCBS-MI admits that the parties settled the action in *Maryland v. Blue Cross & Blue Shield Association*, 620 F. Supp. 907 (D. Md. 1985). BCBS-MI admits that some Blue Plans operate non-Blue businesses outside of their Blue Plan service areas. BCBS-MI admits that Anthem, Inc. and Cigna Corporation previously entered into an agreement where, if given regulatory approval, Anthem would acquire Cigna Corporation, but that regulatory approval was denied. BCBS-MI admits that its Inter-Plan Program contains a policy regarding "Alternative Control Plan Licensees." BCBS-MI refers to the policy for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 366.

367. The Price Fixing and Boycott Conspiracy and the national programs including the Blue Card Program and the National Accounts Programs as well as the Inter-Plan Medicare Advantage Program are anticompetitive because they prevent providers from negotiating with out-of-state Blues on the rate of reimbursement for treating their patients (e.g., BCBS-FL providers treating Empire subscribers).

**ANSWER:**

Paragraph 367 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 367.

368. Provider reimbursements are lower when the market for health care financing is highly concentrated.

**ANSWER:**

Paragraph 368 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 368.

369. The Blues' agreements not to compete with each other, in addition to the other unlawful means of suppressing competition described in this complaint, constitute an agreement to monopsonize the market for health care services. In some areas, the Blues have successfully monopsonized the market for health care services, while in others, the Blues have a dangerous probability of success.

**ANSWER:**

Paragraph 369 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 369.

370. Output of quality health care services is reduced when the market for health care financing is highly concentrated. For example, Alabama has the highest market concentration of any Blue in the country, and it also has the sixth smallest number of primary care physicians per 100,000 patients of any state in the country. This low ratio damages public health and consumer welfare in Alabama. The national shortage of primary care physicians and the even greater shortage in Alabama have resulted from the low reimbursements paid by Defendants. Since Blue Cross and Blue Shield of Alabama has the largest market share of any health insurance company in the country, it is able to reduce provider reimbursement rates even more than other Blues. Primary care physicians in Alabama have retired early and continue to retire early because the reimbursements paid by Blue Cross of Alabama are too low to make it worthwhile for them to continue practicing medicine. These early retirements have made and are making the shortage of primary care physicians even worse.

**ANSWER:**

The first sentence of Paragraph 370 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the first sentence of Paragraph 370. BCBS-MI denies the allegations in the fourth and fifth sentences of Paragraph 370. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 370 and therefore denies those allegations.

371.    The Blues' outrageous levels of capital show that they have used their market power to earn supracompetitive returns.

**ANSWER:**

Paragraph 371 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 371.

372.    The Blues' agreements contain enforcement mechanisms.

- A Blue that disobeys the restriction on competition can have its license revoked.

- Non-Blue companies that might favor competition effectively cannot buy a Blue because the BCBSA board must approve an applicant for a license.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 372.

373.    The Blues' restraints offer no procompetitive benefits.

**ANSWER:**

Paragraph 373 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 373.

374.    The BCBSA agreement does not create a new product.

- The Blues cannot define the "new product" as a "Blue system that competes with nationally integrated insurers," as they did in their motion to dismiss; in *American Needle*, the Supreme Court stated, "Members of any cartel could insist that their cooperation is necessary to produce the 'cartel product' and compete with other products."

- Many other insurers have figured out how to offer nationwide coverage to their subscribers without participating in territorial market allocation, price-fixing or boycott.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from *American Needle, Inc. v. National Football League*, 560 U.S. 183, 199 n.7 (2010), and Defendants' motion to dismiss.  BCBS-MI refers those documents for their contents and denies

159

any characterization thereof. The remaining allegations in Paragraph 374 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the remaining allegations in Paragraph 374.

375. The Blues do not need exclusive service areas to compete with national insurers.

- The Blues include several of the largest insurers in the country, which operate in several states and would operate more broadly including nationwide but for the Market Allocation Conspiracy.

- Other Blues, such as BCBS-AL, have more than held their own against national insurers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 375.

376. Exclusive service areas do not enhance efficiency by allowing the Blues to remain focused on their local areas.

- Without exclusive service areas, Blues could still focus on their local areas if they choose.

- BCBSA's actions undermine this argument; the Blues used to be more locally focused, but BCBSA required them to merge and operate statewide.

- The existence of large multi-state Blues like Anthem and HCSC belies this argument as well.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 376.

377. The Blues have argued that service areas prevent free riding, but there are less restrictive ways to prevent free riding, such as ensuring that all Blues comply with certain standards and invest in the development of the brand.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 377.

378. The Blues have argued that service areas prevent customer confusion, but Blues compete with each other in several parts of the country, and BCBSA allowed the Blues to compete in Ohio and Maryland when service areas were challenged there. Moreover, the restrictions on competition with health care providers have no relevance to consumer confusion.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 378.

379.    Limiting the Blues' ability to compete outside of their service areas without using the Blue marks has no plausible procompetitive benefit.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 379.

380.    MFNs offer no procompetitive benefits.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 380.

381.    The national programs including the Blue Card Program and National Accounts Programs result in many inefficiencies that increase costs to health care providers and reduce consumer welfare. The fact that the Home or Control Plans establish the coverage rules but then do not allow providers in Host or Participating States to be in-network providers create many of those inefficiencies as described in more detail above. Any alleged procompetitive effects of these Programs are far outweighed by the anticompetitive effects that they create. Moreover, there is no justification for the price fixing aspects of these Programs.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 381.

382.    The Blues do not need to engage in the Price Fixing and Boycott Conspiracy to offer health insurance or health care financing on a regional or national basis. Other health insurance companies or managed care companies offer health insurance or health care financing on a regional or national basis without engaging in such illegal conspiracies.

**ANSWER:**

BCBS-MI denies that Defendants engage in any price-fixing or boycott conspiracy.

BCBS-MI denies the remaining allegations in Paragraph 382.

### Other Abuses That Preserve the Blues' Enhanced Market Power

383.    In addition to the harms set forth above, healthcare providers are harmed in numerous other ways as a result of Defendants' abuse of the significant market power that has resulted from their conspiracy.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 383.

384. For example, a number of the Blues use MFNs with hospitals and other facilities. According to at least some defense counsel, Defendant BCBS-MI says that its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Although the Michigan legislature recently made MFNs unlawful, the statement of BCBS-MI also applies to other Blues. The Blues that use MFNs, as well as those that do not use explicit MFNs, put clauses in contracts with providers that prohibit the use of the price terms in any other contract. In its contracts with hospitals, BCBS-AL imposes the functional equivalent of an MFN when it, as the dominant health insurer, prohibits the hospitals from using the reimbursement rates of BCBS-AL in a contract with any other payor.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize an unidentified document authored by unidentified defense counsel. BCBS-MI refers to that document for its content and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 384 and therefore denies those allegations.

385. All or practically all of the Blues also include confidentiality clauses in their contracts with healthcare providers that prohibit the disclosure of price terms among providers, even if the disclosure is done in compliance with Statement Six of the Statement of Antitrust Enforcement Policy in Health Care issued by the U.S. Department of Justice and the Federal Trade Commission (August 1996). By preventing the full disclosure of price terms of the contracts, Defendants undermine competition.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 385 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 385.

386. In addition, Defendants, including CareFirst, require Plaintiffs to disclose the rates (prices) that other health insurance companies are paying to them, while Defendants refuse to disclose the rates that they pay to other providers. Defendants thereby create asymmetric information in the market for health care services, preventing the market from functioning competitively and giving Defendants an advantage in any bargaining that occurs between Defendants and providers.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 386 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 386.

387.    Finally, Defendants, specifically Defendant Highmark, have threatened to utilize their extraordinary and excessive surplus (almost $5 billion in the case of Highmark) to enter (and have already done so in some cases) the market as providers of healthcare services if providers do not acquiesce to the far below competitive rates offered in a market free from competition from other Blues. All of this is undertaken in an attempt to further drive down payments to providers and to raise barriers for competing firms to enter these markets. BCBS-AL has attempted to use its excess surplus to buy provider practices.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and last sentences of Paragraph 387 and therefore denies those allegations.  BCBS-MI denies the remaining allegations in Paragraph 387.

388.    The vast majority of Blues, including BCBS-AL, refuse to honor consumer or patient assignments of benefits to providers, except when required by state law, such as in Tennessee and New Jersey. BCBSA encourages this policy. For example, BCBSA's Electronic Claims Routing Process ("ECRP") system, which processes provider claims for reimbursement which are exempt from the Blue Card Program, defaults to paying the subscriber rather than the provider when the provider is out-of-network. Defendants refuse to honor assignments of benefits for the express purpose of making collection problematic and increasing accounts receivable for out-of-network providers, thereby discouraging providers from remaining out-of-network or going out-of-network. Defendants further leverage their refusal to honor assignments of benefits as a contracting tactic designed to coerce providers who attempt to be out-of-network into network at subcompetitive rates. Defendants also retaliate against providers who attempt to operate out-of-network. Various Blues, including Blue Cross and Blue Shield of Louisiana, have told providers that if they do not remain in network, the Blue will pay the patient the reimbursement check for the provider services and the provider will then have to chase the patient while he or she rides off in a new car or fishing boat. The refusal to honor assignments creates inefficiencies for consumers and providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 388.

## **Antitrust Injury**

389.    Defendants' illegal activities have resulted in antitrust injury and harm to competition.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 389.

390.    Through their violations of the antitrust laws, Defendants have agreed that they will not compete with each other. The effect is to prevent two of the largest four, four of the largest ten, and fifteen of the largest 25 health insurance or managed care companies from competing in other states, causing increased market concentration and reduced competition throughout the country.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 390.

391.    By definition, Defendants have harmed competition by virtue of their agreements in that they have agreed not to compete with one another in each of the Blues' Services Areas. For instance, competition in the state of Alabama has been and continues to be harmed in that the other 35 Blues agree not to enter the Alabama market to compete with Blue Cross Blue Shield of Alabama no matter the circumstances.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 391.

392.    The Defendants have created and increased barriers to entry for other health insurers, have kept other health insurers out of markets and have limited the ability of other health insurers to compete in other markets. The Defendants suppressed prices for provider goods, services and facilities and have injured competition depriving patients of choices in the marketplace for healthcare providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 392.

393.    Additionally, because most of the Blues are monopolists in the health care financing and health insurance markets, in addition to being monopsonists in the health services markets, it does not stand to reason that lower reimbursement rates necessarily lower consumers' premiums. R. Hewitt Pate, a former Assistant Attorney General of the Antitrust Division, in a 2003 statement before the Senate Judiciary Committee, remarked:

> A casual observer might believe that if a merger lowers the price
> the merged firm pays for its inputs, consumers will necessarily

164

benefit. The logic seems to be that because the input purchaser is paying less, the input purchaser's customers should expect to pay less also. But that is not necessarily the case. Input prices can fall for two entirely different reasons, one of which arises from a true economic efficiency that will tend to result in lower prices for final consumers. The other, in contrast, represents an efficiency-reducing exercise of market power that will reduce economic welfare, lower prices for suppliers, and may well result in higher prices charged to final consumers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 393.

394.    In the long run, the Blues' monopsony power gained by virtue of their unlawful agreements will harm consumers. Fewer healthcare professionals are practicing, especially in primary care, than would be practicing in a competitive market because of the lower-than-competitive prices the Blues pay. A number of reports conclude that the United States already faces a critical shortage of primary care and other physicians. "Doctor Shortage Getting Worse," CNBC.com (Mar. 13, 2013) (shortage of 16,000 primary care physicians); "Physicians Foundation Survey of American Physicians," available at http://www.physiciansfoundation.org/uploads/default/Physicians_Foundation_2012_Biennial_Survey.pdf (Sept. 21, 2012) (44,250 full-time equivalent physicians to be lost from the workforce over the next four years). Many providers are considering leaving the marketplace due to inadequate reimbursements paid by and other burdens created by Defendants. According to the 2012 Physician Practice Trends Survey, one-third of all physicians say they plan on leaving the practice of medicine over the next decade, blaming low compensation. According to the 2013 Annual Report of the American Association of Medical Colleges, there will be a shortage of 90,000 physicians across all specialties by 2020. Further, consumer choices have been reduced with regard to facilities where medical and surgical procedures are performed as a result of the Blues' low payments. Hospitals and other facilities are closing. In Alabama the harm has been particularly acute, seventeen hospitals have closed since the year 2000. Ten Alabama hospitals have closed in 2011, many of these in rural areas (such as Elba, Roanoke, and Hartselle). Eight rural hospitals in Alabama have closed. Still other facilities are reducing services offered to consumers. Still others that would otherwise expand are not doing so as a result of the Blues' low payments. The Blues' low reimbursements, particularly in Alabama, make it almost for these hospitals to continue providing all the services they would offer in a competitive market, leaving consumers to travel much further for care and no place for the most critically injured patients to receive care nearby or for those without transportation. The loss of these hospitals and other healthcare providers also affects these communities' ability to keep jobs and to attract new business and residents.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to reference a 2013 CNBC.com report, a 2012 Physician's Foundation report, a 2012 Physician Practice Trends survey, and a 2013 American

Association of Medical Colleges report.  BCBS-MI refers those materials for their contents and denies any characterization thereof.   BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second, eighth, ninth, tenth, eleventh, twelfth, and fifteenth sentence of Paragraph 394 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 394.

395.    This lack of providers affects Alabama especially heavily, which is no surprise given that by some measures, Alabama has the most concentrated market. According to the American Association of Medical Colleges' 2015 State Physician Workforce Data Book, Alabama has the sixth lowest number of active primary care physicians per capita.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize selected excerpts of a 2015 American Association of Medical Colleges document.  BCBS-MI refers to that document for its contents and denies any characterization thereof.   BCBS-MI denies the remaining allegations in Paragraph 395.

396.    Defendants, and especially BCBS-AL, have the power to control prices and exclude competition, and their agreements not to compete, along with the other actions described in this complaint, prevent or exclude competition. Defendants have harmed the competitive process, and by contributing to the lack of providers, have harmed consumers as well as providers.

**ANSWER:**

Paragraph 396 contains legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 396.  BCBS-MI denies any remaining allegations in Paragraph 396.

397.    Economic consensus has clearly found that consumer welfare is best protected by a competitive marketplace for purchasing provider services.

**ANSWER:**

BCBS-MI admits there is general economic consensus that interbrand competition can benefit consumer welfare.  BCBS-MI denies the remaining allegations in Paragraph 397.

398.    The agreements among the Blues have the effect of stifling innovation in the marketplace. For example, because of the agreements and the significant market share of BCBS-AL in the relevant markets, BCBS-AL has acted to stamp out innovation in the marketplace and affirmatively failed to innovate in ways that would have benefited providers and consumers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 398.

399.    Providers have requested that BCBS-AL switch its payment model for providers, in particular hospitals, to a value-based or risk-based approach in which the Providers are paid commensurate with the value they provide to the plan and share in the risk if they cannot effectively manage the patient population. This type of payment model can benefit efficient low-cost providers and can reward them for their efficiencies and higher quality care. Further, it can reward patients by rewarding more efficient and effective healthcare.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 399 and therefore denies those allegations.

400.    BCBS-AL has rebuffed requests by healthcare providers to provide for value-based or risk-based contracting. BCBS-AL has demonstrated that not only is it not interested in undertaking potential efficiency-creating methods of contracting, but that it is unwilling to innovate in this way. Because BCBS-AL faces no threat of competition from the Blues or others, it has no interest or incentive to innovate. Innovation does require some investment so there would be capital costs, however, the because of existing dominate market share there would not be additional members to help defray the costs [*sic*]. Consequently, BCBSAL has historically failed to failure to invest in its own data systems [*sic*]; it is using a primary claims data system that dates back over 25 years. Moreover, it chooses to maintain its current payment technologies and methodologies because it is the least costly option. Competition stimulates innovation; the lack of competition stifles innovation and Alabama provides a laboratory example of that axiom. There is no opportunity for providers to engage in more efficient health care management techniques such as population management unless BCBSAL choses to embrace such efficiency enhancing innovations.

**ANSWER:**

BCBS-MI denies the allegations in the third sentence of Paragraph 400.  The seventh

sentence of Paragraph 400 does not contain factual allegations to which a response is required.

To the extent a response is required, BCBS-MI denies the allegations in the seventh sentence of

Paragraph 400.  BCBS-MI is without knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 400 and therefore denies those allegations.

401.    BCBS-AL, and the other Blues have failed to innovate in other ways which would
benefit the market and consumers. Their extraordinary market power and lack of a significant
threat of competition in many markets has stifled their innovation and the development of new
payments models that would benefit providers, consumers, and the market in general strictly to
the benefit of their bottom line.

**ANSWER:**

The second sentence in Paragraph 401 contains legal conclusions to which no response is

required. To the extent a response is deemed required, BCBS-MI denies the allegations in the

second sentence of Paragraph 401.  BCBS-MI denies the remaining allegations in Paragraph 401.

402.    Plaintiffs suffer because agreements not to compete also restrict their choices in
the market. Because the other Blues agree not to compete in other Service Areas, providers are
not offered the opportunity to contract directly with any Blue other than the Blue in the
providers' Service Area. The exclusion of these potential participants in the health services
financing market has the effect of depressing payments in the market for health care services,
whether or not the provider is in-network with the local Blue.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 402.

403.    During the class period including after 2010, the Blues implemented new fee
schedules for providers, generally on an annual basis. Those new fee schedules are lower than
they would have been without the Defendants' anticompetitive conduct. The new fee schedules
have created incrementally larger antitrust injuries and damages for the health care providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 403.

404.    When the Blues face innovative competitors, they engage in anti-competitive
activity designed to take those competitors out of the market. For example, when Cigna
developed innovative programs with Providers that involved paying Providers higher
reimbursement rates than Anthem and other Blues pay but collaborating with Providers to reduce
the overall cost of healthcare, Anthem attempted to purchase Cigna and then after secret
meetings with the CEOs of other Blues in a private room in the luxurious Peninsula Hotel in
Chicago, Anthem and the other Blues developed the Blue Bias strategy to prevent the on-going
implementation of the innovative programs that Cigna had developed with Providers. Instead,
Anthem and the other Blues including BCBS-AL continue to follow their strategy of paying low

reimbursement rates to hospitals and other Providers to maintain their differentials between the Blues reimbursement rates and those paid by companies like Cigna, and those low reimbursement rates undermine and prevent efforts at innovation and collaboration with Providers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 404.

405. Defendants' illegal activities have resulted in harm to competition. Moreover, Defendants' activities have been undertaken with the aim of forcing Plaintiffs to choose between subcompetitive rates or being put out of business through coercion.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 405.

406. Defendants' illegal activities have also resulted in antitrust injury to Plaintiffs, including lost revenues resulting from decreased use of Plaintiffs' services and facilities and in threatened future harm to Plaintiffs' business and property.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 406.

407. If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 407.

### Defendants, Even Those Organized As Not For Profit, Enjoy Supracompetitive Profit

408. Defendants' anticompetitive practices have resulted in their collection of supracompetitive profits. Absent competition, Defendants have been able to pay healthcare providers much less for medical and surgical services provided to patients enrolled in plans they insure or administer. These tremendous savings have resulted in significantly higher profits and/or larger surpluses than Defendants could have realized in a competitive marketplace. As Defendant Blue Cross of Michigan has explained, its "medical cost advantage, delivered primarily through its facility discounts, is its largest source of competitive advantage." Indicia of supracompetitive profits include high underwriting margins and surpluses well above statutory requirements.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote from or summarize an unidentified statement by Blue Cross Blue Shield of Michigan. BCBS-MI refers to that statement for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 408.

409. Although the Blues were originally established as non-profits, they soon operated like for-profit corporations. In 1986, after Congress revoked Defendants' tax-exempt status, the Blues began to form for-profit subsidiaries. A number of the non-profit Blues then converted to for-profit status and still operate as such today. Those that have not officially converted are only nominally characterized as not-for-profit as they generate substantial earnings and surpluses, paying executives millions of dollars in salaries and bonuses.

**ANSWER:**

BCBS-MI admits that the Tax Reform Act of 1986, 28 U.S.C. § 833, provided that then-existing Blue Cross and Blue Shield organizations shall be taxable in accordance with that Act. BCBS-MI refers to the Tax Reform Act of 1986 for its contents and denies any characterization thereof. BCBS-MI admits that since the 1980s, some Blue Plans have converted from non-profit corporations to for-profit companies. BCBS-MI denies the remaining allegations in Paragraph 409.

410. The manner in which many of the formerly "charitable" Blues have been structured within complex holding company systems makes it difficult to detect excessive and unnecessary expenses.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 410.

411. Often these holding company systems include both "not-for-profit" and "for-profit" affiliates. The numerous affiliates have "cost sharing" arrangements that are often daunting and nearly impossible for auditors and regulators to unravel. Unlike for-profit companies that have shareholders, Defendants are often accountable to no one other than their officers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 411.

412.    Blues nationwide have many common threads that reach throughout their network. Officers share with each other their otherwise well-kept expense schemes. These shared schemes enable the officers to benefit from hidden increases to their salaries, bonuses, travel and even excess medical claim benefit perks. These perks offer nice privileges to management but also buttress the Blues' "expenses," which they use to benefit the officers of the corporation.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 412.

413.    Sometimes Blue executives make the task of scrutinizing excessive expenses more difficult by disguising the true nature of expenditures as if they are providing meaningful and benevolent services. Often, substantial campaign contributions or lobbying fees paid by Blues affiliated "charitable foundations" are designed only to perpetuate loose regulations.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 413.

414.    By way of example, the below are some of Defendants' actual expenses (despite Charter requiring maximum benefit at minimum costs):

- Around the world, 14-day, first-class junkets in five-star luxury lodging;

- Top executive salaries and bonuses effectively doubled by using affiliates with secret payrolls;

- Corporate aircraft used/misused to shuttle executives and politicians to undisclosed events;

- Affiliated "for-profit" entities charged "not-for-profit" Blue excessive and undocumented charges for rent, salaries and services;

- Cost Allocations not arms-length or fair and reasonable;

- Top executives and politicians had their medical claims paid at 100% (sometimes more than 100%) despite contractual limitations on such claims;

- The Blues caused their executives to make personal campaign contributions to regulators and simultaneously "grossed up" bonuses to the executives to cover the contributions and related income tax on the additional bonus.

171

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 414.

415.    The mazes of self-dealing and related and affiliated companies can make it nearly impossible for those dealing with Defendants to tell when they are being treated fairly or being taken advantage of by these "charitable non-profit" companies.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 415.

416.    For instance, Defendants often charge "hidden fees" to long time customers including "retained" amounts that are not used to cover medical claims, but rather are kept by the company or one of its affiliated entities. Blue Cross of Michigan was recently found liable for $5 million in damages for breach of its ERISA duties to one of its administered plans.

**ANSWER:**

BCBS-MI denies the allegations in the first sentence of Paragraph 416.  The remaining

allegations are too vague and ambiguous to permit a response, and therefore BCBS-MI denies

those allegations.

417.    In addition, despite claiming to be "not-for-profit," many of these Blues hold massive excess surplus levels built off the net income spread between the high premiums they charge customers and the subcompetitive payments to Providers. Those excessive surplus levels have come at the expense of higher premiums to consumers.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 417.

418.    Below is an illustration of the huge amounts of capital being held in excess of requirements by a number of not-for-profit Blues. As of Sept. 30, 2010, 33 "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by the BCBSA. The chart below details those excessive levels of surplus:

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC Ratio |
|---|---|---|---|---|
| Blue Cross Blue Shield of Arizona | $759,169,863 | $50,241,418 | 1,511% | $570,764,546 |

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC Ratio |
|---|---|---|---|---|
| Blue Cross and Blue Shield of Florida | $3,089,379,410 | $250,758,634 | 1,232% | $2,149,034,534 |
| Blue Cross and Blue Shield of Kansas City | $681,331,625 | $69,850,616 | 975% | $419,391,814 |
| Blue Cross and Blue Shield or Kansas | $657,756,002 | $68,392,066 | 962% | $401,285,756 |
| Blue Cross and Blue Shield of Louisiana | $1,060,702,152 | $94,426,785 | 1,123% | $706,601,707 |
| Blue Cross and Blue Shield of North Carolina | $1,732,704,038 | $153,706,313 | 1,127% | $1,156,305,366 |
| Blue Cross of Northeastern Pennsylvania | $489,132,680 | $72,974,803 | 670% | $215,477,169 |
| Blue Cross & Blue Shield of Rhode Island | $247,199,104 | $54,482,474 | 454% | $42,889,827 |
| BlueCross BlueShield of South Carolina | $1,811,174,723 | $194,431,399 | 932% | $1,082,056,976 |
| BlueCross Blue Shield of Tennessee | $1,235,082,852 | $118,031,970 | 1,046% | $792,462,965 |
| Blue Shield of California | $3,170,391,000 | $235,930,000 | 1,344% | $2,285,653,500 |
| Capital BlueCross | $1,182,747,208 | $208,224,574 | 568% | $401,905,057 |
| CareFirst BlueCross BlueShield (D.C., Md. and Va.) | $1,927,125,304 | $224,626,310 | 858% | $1,084,776,641 |
| Health Care Service Corp. (Ill., N.M., Texas and Okla.) | $7,701,653,731 | $749,191,427 | 1,028% | $4,892,185,878 |

173

| Blue Defendant | Total Capital Through Sept. 30, 2010 | Required Capital | Risk-Based Capital as of Sept. 30, 2010 | Cash in Excess of 375% RBC Ratio |
|---|---|---|---|---|
| Highmark Inc. | $4,771,186,547 | $705,802,706 | 676% | $2,124,426,401 |
| Horizon Blue Cross Blue Shield | $1,701,431,026 | $260,792,429 | 652% | $723,459,418 |
| Independence Blue Cross | $3,897,022,250 | $782,587,061 | 498% | $962,320,700 |

SOURCE: Citigroup Global Markets, based on data filed with the National Association of Insurance Commissioners. December 2010.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize information from a Citigroup Global Markets report dated December 2010 filed with the National Association of Insurance Commissioners. BCBS-MI refers to that document for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 418.

419. Many of the Blues understate their actual surplus substantially by citing only the surplus from the mainline company, but not the general surplus on the companies' combined reporting statements, which accounts for all lines of business.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 419 and therefore denies the allegations.

420. In South Carolina, for instance, BlueCross BlueShield of South Carolina's net income generated has increased considerably, while the number of members has increased only modestly, according to data provided by the state Department of Insurance."

**ANSWER:**

BCBS-MI is without information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 420 and therefore denies those allegations.

421.    Members of the Board of BlueCross BlueShield of South Carolina "made up of prominent lawyers, bankers and development and business leaders . . . earned between about $100,000 and $160,000 in 2010 for their board duties, documents show." They were required to do little but show up to the occasional meeting.

**ANSWER:**

BCBS-MI is without information or knowledge sufficient to form a belief as to the truth

of the allegations in Paragraph 421 and therefore denies those allegations.

422.    This is nothing compared to the compensation paid to high level executives of these "not-for-profit" companies. BlueCross BlueShield of South Carolina paid executives in the millions of dollars in 2010.

**ANSWER:**

BCBS-MI is without information or knowledge sufficient to form a belief as to the truth

of the allegations in Paragraph 422 and therefore denies those allegations.

423.    HCSC, a conglomerate of several Blues, including Blue Cross and Blue Shield of Illinois, posted over a billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011 and 2012. This net income does not even account for large blocks of plans it merely administers for the self-insured. "CEO Patricia Hemingway Hall's 2012 base salary was just $1.1 million, but the nurse-turned-executive garnered a $14.9 million bonus. The CEO of Chicago-based Health Care Service Corp. received $12.9 million in 2011." "Each of HCSC's 10 highest-paid executives got at least $1.2 million more in 2012 than they did in 2011. Executive Vice President and Chief Operating Officer Colleen Foley Reitan more than doubled    her    total    compensation    to    $8.7 million    in    2012." See http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selective excerpts from an

article in *Crain's Chicago Business* from April 2013, but denies that Plaintiffs accurately quote

the selected excerpts. BCBS-MI refers to that article for its contents and denies any

characterization thereof.  BCBS-MI is without knowledge or information sufficient to form a

belief as to the truth of the remaining allegations in Paragraph 423 and therefore denies those

allegations.

424.     Other Blues also pay excessive executive compensation. For example, when Anthem's CEO led the company through the ill-fated merger effort with Cigna that will cost the company a break fee of $1.85 Billion and perhaps more, Anthem's Board awarded him with a salary increase of 3 million dollars. http://nypost.com/2017/03/20/anthem-ceos-3m-salary-hike-draws-criticism-from-wall-street/ (accessed 4/8/2017).

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote from and provide a link to a nypost.com

article.  BCBS-MI refers to that article for its contents and denies any characterization thereof.

BCBS-MI denies the remaining allegations in Paragraph 424.

425.     BCBS-AL holds an extraordinary and unnecessary surplus created by its sub-competitive reimbursements to Providers. BCBS-AL's surplus is far in excess of any requirements under the law or BCBSA rules.

**ANSWER:**

The first sentence of Paragraph 425 contains legal conclusions to which no response is

required.  To the extent a response is required, BCBS-MI denies the allegations in the first

sentence of Paragraph 425.  BCBS-MI denies the remaining allegations in Paragraph 425.

426.     In addition to being larger than any required reserve, BCBS-AL's surplus has skyrocketed in recent years.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 426.

427.     In the year 2000, BCBS-AL held a surplus of $432,450,713. In 2008, as the class period began, BCBS-AL held a "surplus" of $656,360,820. Since the beginning of the class period, BCBS-AL has increased its "surplus" by $504,714,541, more than the entire surplus it held in the year 2000.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize selected excerpts from a

December 2010 Citigroup Global Markets report filed with the National Association of

Insurance Commissioners.  BCBS-MI refers to that document for its content and denies any

characterization thereof.  BCBS-MI denies any remaining allegations in Paragraph 427.

176

428.    As Figures 1-3 demonstrate, the BCBS-AL's surplus has risen dramatically since the turn of the century. Despite what BCBS-AL may say, its liabilities have not risen in lock step with its growing surplus. In fact, the increase in surplus far outpaces the percentage increase in total liabilities. The only recent reduction in BCBS-AL's surplus also demonstrates that these dollars are not meant to be a reflection of BCBS-AL's expected liabilities for claims. The substantial reduction in BCBS-AL surplus in 2014 was caused not by an unexpected increase in claims liabilities, but by a one-time charge related to BCBS-AL's own employee benefits, including funding pension obligations for its highly paid executives.

Figure 1



Figure 2

**Blue Cross & Blue Shield of AL**
**Growth of Unassigned Surplus**

| YEAR | Unassigned Surplus |
|------|--------------------|
| 2000 | $  432,450,713 |
| 2001 | $  433,655,157 |
| 2002 | $  452,263,593 |
| 2003 | $  514,617,342 |
| 2004 | $  554,350,269 |
| 2005 | $  587,153,526 |
| 2006 | $  694,586,920 |
| 2007 | $  744,453,976 |
| 2008 | $  656,360,820 |
| 2009 | $  649,034,983 |
| 2010 | $  855,801,660 |
| 2011 | $  991,060,251 |

| YEAR | Unassigned Surplus |
|------|-------------------|
| 2012 | $ 1,118,864,635 |
| 2013 | $ 1,243,929,650 |
| 2014 | $   997,070,082 |
| 2015 | $ 1,059,868,980 |
| Q2 '16 | $ 1,161,075,361 |

[Source: Sworn Annual Statements as Filed w/ NAIC]

**Figure 3**

| YEAR | Total Liabilities | % Up | Unassigned Surplus | % Up |
|------|------------------|------|-------------------|------|
| **2000** | $   1,008,824,717 | | $    432,450,713 | |
| **Q2 '16** | $   1,751,898,227 | **73.7%** | $  1,616,075,361 | **168.5%** |

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to summarize information filed with the National Association of Insurance Commissioners. BCBS-MI refers to those filings for their content and denies any characterization thereof. BCBS-MI denies any remaining allegations in Paragraph 428.

429.    If BCBS-AL's surplus was simply designed to cover its liabilities, like claim costs, that "surplus" would not be expected grow between 2 and 3 times faster than BCBS-AL's liabilities have over a 15 year period.

**ANSWER:**

Paragraph 429 does not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 429.

430.    Of course, BCBS-AL's surplus is not a reflection of its liabilities but of the supra-competitive profits it has accrued during the class period and before.

**ANSWER:**

Paragraph 430 contains legal conclusions to which no response is required. To the extent a response is required, BCBS-MI denies the allegations in Paragraph 430.

178

431.    While Defendants often claim these surpluses are designed as insurance reserves for future payments, they are more often used as strategic monies allowing acquisitions of competitors, market share or Provider practices.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 431.

432.    Likewise, large salary increases for executives with Blue Cross and Blue Shield of Alabama have recently been reported. Such salaries result in higher costs to consumers. The supracompetitive profits that feed the salary increases are built on the strength of Defendants' agreement not to compete, their price-fixing Blue Card regime and their market power, in particular their ability to force Providers to join their networks at subcompetitive rates. A spokeswoman for BlueCross BlueShield of South Carolina noted that the outrageous increases are priced "to reflect its superior networks." Thus, the market power of the Blues allows them to pay subcompetitive rates to Providers. This leads to huge surplus profits for companies supposedly organized as not for profit or charitable companies.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote from or summarize an unidentified statement of a spokesperson for BlueCross BlueShield of South Carolina, but denies that Plaintiffs accurately quote the selected excerpts. BCBS-MI refers to that statement for its contents and denies any characterization thereof. BCBS-MI denies the third sentence in Paragraph 432. The fifth and sixth sentences in Paragraph 432 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies those allegations. BCBS-MI is without information or knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 432 and therefore denies those allegations.

433.    If Defendants' actions are not enjoined, harm to competition and injury to Plaintiffs will continue.

**ANSWER:**

The allegations in Paragraph 433 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 433.

## Implementation of the Affordable Care Act

434.     When President Obama presented the Affordable Care Act to the Joint Session of Congress, he discussed the importance of competition among health insurers and cited BCBS-AL as a poster child for operating a concentrated market. The ACA created insurance exchanges to encourage competition among health insurers. The barriers to entry that the Blues have created and used to their advantage have prevented many other health insurers from being on the exchanges in many places. The Blues, including BCBS-AL, have used their market power and their anticompetitive activities to increase their market shares through the mechanisms created by the ACA.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 434 and therefore denies those allegations. BCBS-MI admits that Plaintiffs purport to describe one aspect of the Affordable Care Act in the second sentence of Paragraph 434.  BCBS-MI refers to the ACA for its content and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 434.

435.     In the first year of the ACA exchange in Alabama, BCBS-AL claimed a loss of approximately $135 million based almost entirely on losses in the individual market and ACA exchange. It is not clear how much of this "loss" is being subsidized through monies available to BCBS-AL under the ACA.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 435 and therefore denies those allegations. The allegations in the second sentence of Paragraph 435 are not factual allegations to which a response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the second sentence of Paragraph 435.

436.     In considering how to approach the ACA market, BCBS-AL internally expressed concern over increased consumer choice in Alabama as a result of entry into the individual market through the exchange. Their response to these concerns became clear in the aftermath of the loss. According to publicly available documents and media reports, "Blue Cross spends more on the health care costs of individual marketplace customers than it collects through copayments and premiums." Stated differently, BCBS-AL priced premiums below its actual health care costs for consumers in the individual exchange market.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote or summarize selected excerpts from unidentified "publicly available documents and media reports." BCBS-MI refers to those documents and reports for their contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 436 and therefore denies those allegations.

437. Shortly after, all other insurers (United and Humana) exited the Alabama exchange market, leaving only BCBS-AL offering products in the exchange market.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the allegations in Paragraph 437 and therefore denies those allegations.

438. BCBS-AL's response to being the only remaining competitor in the market should be not surprising. With its potential competition now out of the market, rather than continuing to price premiums below actual costs, BCBS-AL raised premiums in the market by approximately 40 percent.

**ANSWER:**

The allegations in the first sentence of Paragraph 438 are not factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 438. BCBS-MI denies the remaining allegations in Paragraph 438.

**The Blues Agreement that Prohibits Defendants from Contracting with
Providers in Other Blues' Service Areas Should be Enjoined,
the BlueCard Program Should be Reformed to Create
Competitive Market Conditions, and Blues Should be Allowed to
Use Non-Blue Rental Networks to Supplement Their Provider Networks**

439. The Defendants' agreement that they will not contract with providers in other Blues' service areas is obviously anticompetitive. That agreement prevents the development of provider networks and competition among provider networks. The agreement also prevents Blues from developing innovative and collaborative agreements with Providers that would be efficient, improve quality and lower health care costs. The agreement also prevents many of the largest health insurers in the country from developing networks that they could use in competing for national accounts. For example, Anthem, the first or second largest health insurer in the

country, and HCSC, the fourth largest health insurer in the country, must each have national provider networks in order to compete for national accounts.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 439.

440.    The Blue Card Program reinforces the agreements that the Defendants have made not to compete and it provides the *quid pro quo* in terms of billions of dollars in payments that are made to the Blues. Stated another way, the Blue Card Program is the glue that holds the Blues' anticompetitive system together. The Blue Card Program is used largely in the administration of health care benefit plans including for national and regional employers. Those employers pay the Blue Card access and administrative fees, and the Blues pocket those payments. Currently, BCBS-AL is able to use its market power as the largest health insurer and administrator in Alabama to coerce healthcare providers in Alabama into participating in the Blue Card System. In order to remedy that coercion and abuse of market power, Providers should be allowed to opt-out of the Blue Card System with no threat of retaliation. In the long run, that opt-out right will restore market condition and encourage the positive development of the Blue Card System so that it functions in as efficient a manner as possible. To the extent that Providers wish to remain in the Blue Card Program, they can do so. In order to correct the adverse effects that the Defendants have had on the market, the Court should impose an affirmative obligation on all Defendants to bargain in good faith with Providers who wish to negotiate with them, and maintain that obligation until the adverse effects of the Defendants' conduct have been fully remedied.

**ANSWER:**

BCBS-MI admits that the BlueCard Program allows Blue Plans to administer health care benefit plans for national and regional employers. BCBS-MI denies the remaining allegations in Paragraph 440.

441.    In addition, the Blues' current prohibition against the use of non-Blue rental networks should be enjoined. Other health insurers, including United, Aetna and Cigna used such rental networks to supplement their networks when necessary. Consumers and Providers should have the ability to access such non-Blue rental networks for Blues in Alabama just as they do for other health insurers.

**ANSWER:**

The first and third sentences of Paragraph 441 do not contain factual allegations to which a response is required. To the extent a response is required, BCBS-MI denies the allegations in the first and third sentences of Paragraph 441. BCBS-MI is without knowledge or information

sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph

441, and therefore denies those allegations.

### The Blues System Prevents Innovation, Especially in Markets
### Like Those in Alabama Where the Blues Enjoy a Monopoly/Monopsony,
### and the Lack of Innovation Reduces the Quality of Healthcare and Increases Its Costs.

442.    In 1935, the respected economist J.R. Hicks recognized that: "The best of all monopoly profits is a quiet life." J.R. Hicks, The Theory of Monopoly, Econometrica, Vol 3, No. 1 (Jan. 1935), pp. 1-20. Part of the quiet life that a monopolist enjoys is that it does not have to innovate. The Defendants' conduct in Alabama demonstrates the truth of Professor Hicks' writing more than 80 years ago.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote an excerpt from J.R. Hicks, The Theory

of Monopoly, but denies that Plaintiffs accurately quote the selected excerpts.  BCBS-MI refers

to that writing for its contents and denies any characterization thereof.  BCBS-MI denies the

remaining allegations in Paragraph 442.


443.    BCBS-AL is a monopolist in the sale of commercial health insurance and in the sale of administrative serves for health care plans in Alabama and in every market that one could possibly define in Alabama. This is described in detail in Provider Plaintiffs' market allegations Paragraphs 339-382. The other Defendants have agreed that they will not compete with BCBS-AL in the sale of commercial health insurance or in the sale of administrative services in Alabama. BCBS-AL is a monopsonist in the purchase of health care services by commercial insurers in Alabama and within every market one could possibly define in Alabama. By recent measure, it has over 83-86 percent of this market statewide. The other Defendants collectively represent the second largest purchaser of health care services by commercial insurers in Alabama, and they have reached an agreed with BCBS-AL to use its prices in those purchases and to allow BCBS-AL to use their market shares in setting its prices to pay Providers in Alabama. Under the law, the Defendants are unquestionably both a monopolist and a monopsonist.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 443.

444.    Innovation in healthcare is essential to preserve and improve quality and to limit and reduce costs. Collaboration between health insurers and providers is one way to encourage innovation in healthcare. When health insurers pay low reimbursement rates to Providers, they

discourage collaboration and innovation. The recent evidence and findings in the Anthem merger trial demonstrate the truth of the allegations in this paragraph. Representatives of Cigna, including its CEO, and others testified that the Blues such as Anthem pay providers lower reimbursement rates than Cigna, but that by encouraging collaboration and innovation Cigna was able to lower the cost of healthcare for employers and consumers while paying Providers higher reimbursement rates. Those witnesses also testified that if Cigna reduced its reimbursement rates to the rates paid by Anthem and other Blues, its ability to collaborate and innovate with Providers would be diminished.

**ANSWER:**

The first, second, third, and fourth sentences in Paragraph 444 do not contain factual allegations to which a response is required. To the extent a response is required, BCBS-MI is without knowledge or information sufficient to form a belief as to these allegations, and therefore denies those allegations. BCBS-MI admits that Plaintiffs purport to summarize information from *United States v. Anthem, Inc.*, No. CV 16-1493 (ABJ) (D.D.C. Feb. 21, 2017). BCBS-MI refers to the record in that case for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 444.

445. The conduct of the Defendants has discouraged innovation in healthcare in Alabama. One need go no further than one of the most recent edition of Health Affairs to understand how this is happening. "Organizations seeking to create innovative environments need to address a number of factors. These include making available sufficient resources – especially money and space . . .." D. Bates, A. Sheikh, D. Asch, "Innovative Environments in Health Care: Where and How New Approaches to Care Are Succeeding," Health Affairs, March 2017, 400, 401. The Defendants pay hospitals among the lowest reimbursement rates in the country. The hospitals in Alabama are therefore deprived of the resources to be able to innovate. One example of the cost of innovation is that tracking patients to make sure they are receiving the best healthcare possible requires expensive IT systems.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote "Innovative Environments in Health Care." BCBS-MI refers to that article for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegation in the last sentence of Paragraph 445 and therefore denies those allegations. BCBS-MI denies the remaining allegations in Paragraph 445.

446.    The authors in this article further recognized that: "part of the slow pace of innovation stems from the health care payment system." In Alabama, because the Defendants have enjoyed the quiet life of a monopolist they have refused to develop innovative payment systems. In the early 1980s, the Medicare Program changed from per diem reimbursement rates for hospitals to DRG rates in order to encourage efficiency.  In Alabama, BCBS-AL for itself and the other Blues with members being treated in hospitals in Alabama continued to use the archaic per diem rates until several years after this lawsuit was filed and only began implementing partial changes in the per diem rates approximately 35 years after Medicare. BCBS-AL has retained consultants who found that the result was longer stays in hospitals. In other words, the refusal of BCBS-AL as a monopolist/monopsonist to innovate has reduced the quality of healthcare in Alabama and to add to its expense.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote "Innovative Environments in Health Care."  BCBS-MI refers to that article for its contents and denies any characterization thereof. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third, fourth, and fifth sentences of Paragraph 446 and therefore denies those allegations.  BCBS-MI denies the remaining allegations in Paragraph 446.

447.    In order to achieve the best possible outcomes in health care at the most reasonable price, one must track the patients and well as the Providers, something that is highly inefficient in the Blues' system at least for members being treated under the Blue Card Program. One of the things that Cigna has been doing to improve healthcare at a lower price is to track both the patients who are its health plan members and their providers in its networks. In Alabama, Anthem has more than 120,000 members for whom Anthem maintains their patient healthcare information, and HCSC has more than 100,000 members for whom HCSC maintains their patient healthcare information. Those members and thousands of others who are members of other Blues are treated in Alabama by Providers in the BCBS-AL network, for whom BCBS-AL maintains the provider healthcare information. This characteristic of the Blue System makes innovative healthcare inefficient and often impossible. By contrast, if Anthem would contract with Alabama hospitals directly, it could combine healthcare information for its patients and providers so that innovative healthcare could be provided efficiently. Of course, this inefficiency adds current inefficiency in the Blues system where Providers must know and comply with the coverage and payment rules of 36 different Blue license holders while being in network with only one and generally only having ready access to that one Blue's rules.

**ANSWER:**

The fifth, sixth, and seventh sentences of Paragraph 447 do not contain factual allegations to which a response is required.  To the extent a response is required, BCBS-MI denies the

allegations in the fifth, sixth, and seventh sentences of Paragraph 447. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the allegations in the

second and third sentences of Paragraph 447 and therefore denies those allegations. BCBS-MI

denies the remaining allegations in Paragraph 447.

**The Defendants Have Created Anticompetitive Conditions**
**That Will Require Injunctive Relief, Reporting, and Judicial Oversight**
**for a Significant Period of Time to Remedy**

448.    The anticompetitive conduct of the Defendants over a significant period to time
will require meaningful injunctive relief. Even with that relief, the conduct and market
conditions created by the Defendants will not be remedied over-night. The Court will require
reporting and judicial oversight for a significant period of time to insure that the remedies are
adequate and effective. The Court should use the resources of the Special Master who has
developed expertise in this case and rapport with the parties to it to make sure that the remedies
are proceeding in an effective and efficient manner.

**ANSWER:**

The first, second, and third sentences of Paragraph 448 contains legal conclusions to

which no response is required. To the extent a response is required, BCBS-MI denies the

allegations in the first, second, and third sentences of Paragraph 448. The fourth sentence of

Paragraph 448 does not contain factual allegations to which a response is required. BCBS-MI

denies any remaining allegations in Paragraph 448.

**Class Action Allegations**

449.    For purposes of the streamlined action, the Alabama Plaintiffs bring this action on
behalf of themselves and on behalf of a class of Alabama healthcare providers. First, Alabama
Plaintiffs bring this action seeking injunctive relief pursuant to the provisions of Rule 23(a) and
Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of the following
Class (the "Alabama Injunction Class"):

> All healthcare providers in the State of Alabama, not owned or
> employed by any of the Defendants, who currently provide
> healthcare services, equipment or supplies within the State of
> Alabama.

186

**ANSWER:**

BCBS-MI admits that for purposes of the streamlined action, the Alabama Plaintiffs purport to bring an action seeking injunctive relief on behalf of a putative class as alleged in Paragraph 449, but denies that the Alabama Plaintiffs' claims are appropriate for class treatment or that the Alabama Plaintiffs are entitled to any relief. BCBS-MI denies any remaining allegations in Paragraph 449.

450. Further, Alabama Plaintiffs bring this action seeking damages pursuant to the provisions of Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Alabama Damages Class"):

> All healthcare providers, not owned or employed by any of the Defendants, in the State of Alabama, who provided covered services, equipment or supplies to any patient who was insured by, or who was a member or beneficiary of any plan administered by, a Defendant, and who have had a participation agreement with Blue Cross and Blue Shield of Alabama, within four years prior to the date of the filing of this action.

**ANSWER:**

BCBS-MI admits that the Alabama Plaintiffs purport to bring an action seeking damages on behalf of a putative class or classes as alleged in Paragraph 450, but denies that the Alabama Plaintiffs' claims are appropriate for class treatment or that the Alabama Plaintiffs are entitled to any relief. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 450 and therefore denies those allegations.

451. Plaintiffs also reserve the right to request class certification under Rule 23(c)(4), Federal Rules of Civil Procedure.

**ANSWER:**

Paragraph 451 does not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 451.

452. Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are represented by

counsel who are competent and experienced in the prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 452.

453.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members. The Class Members are so numerous that joinder of all members is impracticable.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 453.

454.    Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 454.

455.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 455.

456.    There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a.    Whether Defendants violated Section 1 of the Sherman Act;

b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d. Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e. Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f. Whether Defendants violated Section 2 of the Sherman Act;

g. Whether the Blues collectively or any particular Blue has market power in a particular market;

h. Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;

i. Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

j. Whether Defendants' conduct should be enjoined;

k. The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 456.

457. These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 457.

458. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 458.

459. This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 459.

## COUNT I

### Claim for Injunctive Relief, 15 U.S.C. § 26

460.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

461.   This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action to attempt to obtain injunctive relief against Defendants, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

462.   As explained in Counts II through VII, Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S. C. § 1 under a per se, quick look, or rule of reason analysis.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 462.

463.   As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 463.

464.   Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their illegal conspiracies and to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action to attempt to obtain injunctive relief against Defendants, but denies that Plaintiffs can state any claim, or that Plaintiffs are entitled to any of the requested relief. BCBS-MI denies the remaining allegations in Paragraph 464.

465. Plaintiffs reserve the right to seek preliminary injunctions as necessary.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action to attempt to obtain injunctive relief against Defendants, but denies that Plaintiffs can state any claim, or that Plaintiffs are entitled to any of the requested relief.

## COUNT II

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (The *Per Se* Market Allocation Conspiracy)

466. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

467. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to attempt to recover treble damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

468.     As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 468.

469.     Defendants have agreed to divide and allocate the geographic markets for the financing of health care into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined. By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare providers in violation of Section 1 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide. Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 469.

470.     As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 470.

## COUNT III

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(The *Per Se* Price Fixing and Boycott Conspiracy)**

471.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

472. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

473. The BCBS Price Fixing and Boycott Conspiracy operates in addition to and reinforces the Market Allocation Conspiracy. The Conspiracy alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a per se violation of the Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 473.

474. Through the Price Fixing and Boycott Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs. By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' price fixing agreement through the national programs is per se illegal under Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 474.

475. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 475.

476. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

## COUNT IV

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### Quick Look Claim for Market Allocation Conspiracy

477. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

478. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

479. Under a quick look analysis Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 479.

480. "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999). The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

194

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999). BCBS-MI refers to that opinion for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 480.

481. The Market Allocation Conspiracy prevents the Blues, including many of the largest participants in the relevant product markets defined above, from competing nationally, regionally, or in the relevant geographic markets defined above.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 481.

482. The Market Allocation Conspiracy has no pro-competitive effect. The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 482.

483. The Defendants have not offered any new product. Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 483.

484. Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 484.

485. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less,

having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 485.

486. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

## COUNT V

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### Quick Look Claim for Price Fixing and Boycott Conspiracy

487. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations above as if fully set forth herein.

488. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

489. Under a quick look analysis Defendants' Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 489.

490.    "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999).  BCBS-MI refers to that opinion for its contents and denies any characterization thereof.  BCBS-MI denies the remaining allegations in Paragraph 490.

491.    The Price Fixing and Boycott Conspiracy has the same effect and also results in price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from negotiating the price the goods and services in the relevant markets described above. *See Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 491.

492.    The Price Fixing and Boycott Conspiracy has no pro-competitive effect. The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 492.

493.    The Defendants have not offered any new product. Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 493.

494.    Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 494.

495. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 495.

496. Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

<u>COUNT VI</u>

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15
Rule of Reason Claims for Market Allocation Conspiracy**

497. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations above as if fully set forth herein.

498. Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

499.    Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 499.

500.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 500.

501.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that

Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the

requested relief.

## COUNT VII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### Rule of Reason Claims for Price Fixing and Boycott Conspiracy

502.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set

forth herein.

503.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, to attempt to recover threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

504.    Defendants Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 504.

505.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 505.

506.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

## COUNT VIII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Monopsonization)

507.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

508.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, to attempt to recover threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

509.    As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets described above. For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants. This monopsony power has been durable, lasting for decades.

**ANSWER:**

The allegations in Paragraph 509 contain legal conclusions to which no response is required.  To the extent a response to the allegations in Paragraph 509 is deemed required, BCBS-MI denies the allegations in Paragraph 509.  BCBS-MI denies any remaining allegations in Paragraph 509.

510.    These Defendants' creation of monopsony power was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsony power.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 510.

511.    By willfully creating or maintaining monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any

part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 511.

512.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 512.

513.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 513.

**COUNT IX**

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**(Attempted Monopsonization)**

514.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

515.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, to attempt to recover threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

516. As alleged more specifically above, the Defendants have engaged in conduct by which they have attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.

**ANSWER:**

The allegations in Paragraph 516 contain legal conclusions to which no response is required. To the extent a response to the allegations in Paragraph 516 is deemed required, BCBS-MI denies the allegations in Paragraph 516. BCBS-MI denies any remaining allegations in Paragraph 516.

517. These Defendants specifically intended to create monopsony power. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 517.

518. By attempting to create or maintain monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when the Defendants have not yet created or maintained monopsony power, their conduct has created a dangerous risk of success.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 518.

519. As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or

having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 519.

520.     As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 520.

## COUNT X

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Conspiracy to Monopsonize)

521.     Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set

forth herein.

522.     Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring claims under Section 4 of the Clayton

Act, 15 U.S.C. § 15, to attempt to recover threefold or trebled damages and interest, but denies

that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the

requested relief.

523.     As alleged more specifically above, the Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power. The Defendants specifically intended to create monopsony power. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power. All Defendants have taken overt acts in furtherance of this conspiracy by

signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 523.

524.    By conspiring to create or maintain monopsony power, the Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 524.

525.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 525.

526.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 526.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

a.    Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.    Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

d.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

e.    Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.    Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

g.    In particular with respect to the Blue Card Program request the following permanent injunctive relief be ordered by Court:

1)    The Defendants are enjoined from refusing to contract with Providers in Alabama even though those Providers are outside of the Defendants' service areas or adjacent counties thereto.  Providers in Alabama may request contract negotiations with any Blue Plan with members residing in Alabama, and the Blue Plan shall have a good fiath obligation to negotiate with the Provider.

2)    The Defendants are enjoined from refusing to contract with national and regional hospital chains with hospitals in Alabama to provide services to their members throughout the country, in the same manner that the Blue Plans are allowed to negotiate with national and regional pharmacy chains. The national and regional provider chains may request contract negotiations with any Blue Plan and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

3)    Defendants may continue to operate the BlueCard Program. However, each Provider in Alabama shall have the right to opt-out of the Blue Card Program for any Blue that is either a Home Plan or Control Plan for any subscribers in Alabama, while remaining in the networks of BCBS-AL, and those Home Plans and Control Plans will have a good faith obligation to negotiate with the Providers who opt-out of the BlueCard Program. The opt-out right will be on a Blue by Blue basis so that a Provider will have the right to opt-out with respect to one Blue Plan but remain in the BlueCard Program for another Blue Plan. The opt-out right shall  be exercised on a year by year basis.

4)    Providers who are out of network for BCBS-AL but who treat subscribers of any other Blue Plan may request contract negotiations with any such Blue Plan and any such Blue Plan shall have a good faith obligation to negotiate with the Provider.

> 5) The failure of a Provider to negotiate in good faith with a Defendant will be a defense to any compliance dispute brought by a Provider under the terms of this injunction.
>
> 6) Defendants' may use non-Blue rental networks to supplement their networks, and any prohibition against the use of such a rental network is enjoined.

h. Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

i. Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

j. Require on-going periodic reporting on compliance by the Defendants, monitoring by the Special Master and the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

k. Award Plaintiffs and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

l. Award costs and attorneys' fees to Plaintiffs;

m. Award prejudgment interest;

n. For a trial by jury; and

o. Award any such other and further relief as may be just and proper.

## ANSWER:

BCBS-MI denies each and every allegation in the Fourth Amended Provider Complaint except as expressly admitted and qualified above. BCBS-MI requests that the Fourth Amended Provider Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of BCBS-MI, and that the Court award BCBS-MI its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

## ALLEGATIONS RELEVANT TO THE NON-PRIORITIZED PROCEEDINGS

527.    The Provider Plaintiffs reallege the foregoing allegations.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

### Plaintiffs

528.    Plaintiff Corey Musselman, M.D. is a family practice physician and a citizen of Cary, North Carolina. During the relevant time period, Dr. Musselman provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to his in-network contract with BCBS-NC, and billed BCBS-NC for the same. Dr. Musselman was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Musselman has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Musselman has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 528 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 528.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 528 and therefore denies those allegations.

529.    Plaintiff Kathleen Cain, M.D. is a pediatrician and a citizen of Topeka, Kansas. During the relevant time period, Dr. Cain provided medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Kansas pursuant to her in-network contract with BCBS-KS, and billed BCBS-KS for the same. Dr. Cain was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Cain has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Cain has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 529 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 529. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 529 and therefore denies those allegations.

530.    Plaintiff John Clifton Crosby, M.D. is an anesthesiologist and a citizen of Baton Rouge, Louisiana. During the relevant time period, Dr. Crosby provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to his in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same. Dr. Crosby was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Crosby has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Crosby has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

BCBS-MI submits that the parties have filed a joint stipulation to dismiss all claims brought by John Clifton Crosby, MD and therefore denies the characterization of John Clifton Crosby, MD as a named plaintiff in this matter. The third, fourth, and fifth sentences in Paragraph 530 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 530. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 530 and therefore denies those allegations.

531.    Plaintiff Michael Dole, M.D. is a physician specializing in physical medicine and rehabilitation and pain management and a citizen of Alexandria, Louisiana. Dr. Dole has provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross

and Blue Shield of Louisiana pursuant to his in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same. Dr. Dole was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Dole has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Dole has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 531 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 531. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 531 and therefore denies those allegations.

532. Plaintiff Michael Dole, M.D., A.P.M.C. is a physical medicine and rehabilitation and pain management facility and physician's office located in Alexandria, Louisiana. During the relevant time period Michael Dole, M.D., A.P.M.C. provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to its in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same, until September 1, 2015. Michael Dole, M.D., A.P.M.C. was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief Michael Dole, M.D., A.P.M.C. has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Michael Dole, M.D., A.P.M.C. has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 532 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 532. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 532 and therefore denies those allegations.

533.    Plaintiff Michael Dole, M.D., L.L.C. is a physical medicine and rehabilitation and pain management facility and physician's office located in Alexandria, Louisiana. During the relevant time period Michael Dole, M.D., L.L.C. provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to its in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same, until September 1, 2015. Michael Dole, M.D., L.L.C. was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief Michael Dole, M.D., L.L.C. has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Michael Dole, M.D., L.L.C. has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 533 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 533.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 533 and therefore denies those allegations.

534.    Plaintiff Spine Diagnostic Center of Baton Rouge, Inc. is an interventional pain management facility located in Baton Rouge, Louisiana. During the relevant time period, Spine Diagnostic Center of Baton Rouge provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Louisiana or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Louisiana pursuant to its in-network contract with Blue Cross and Blue Shield of Louisiana, and billed Blue Cross and Blue Shield of Louisiana for the same. Spine Diagnostic Center of Baton Rouge was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Spine Diagnostic Center of Baton Rouge has also provided medically necessary, covered services to Defendants' enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Spine Diagnostic Center of Baton Rouge has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 534 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 534. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 534 and therefore denies those allegations.

535. Plaintiff Northwest Florida Surgery Center, L.L.C. is a multispecialty outpatient ambulatory surgery center located in Panama City, Florida. During the relevant time period, Northwest Florida Surgery Center provided facilities and medically necessary, covered services to enrollees of Blue Cross and Blue Shield of Florida pursuant to its in-network contract with BCBS-FL, and billed BCBS-FL for the same. Northwest Florida Surgery Center was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Northwest Florida Surgery Center has also provided facilities and medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those facilities and services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Northwest Florida Surgery Center has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 535 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 535. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 535 and therefore denies those allegations.

536. Plaintiff Roman Nation, M.D. is a family practice physician and a citizen of Lynn Haven, Florida. During the relevant time period, Dr. Nation has provided medically necessary services to Blue Cross Blue Shield of Florida and has billed BCBS-FL for these services outside of any contractual relationship. For these services, Dr. Nation has been paid less that he would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Nation has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Nation has been injured in his business or property as a result of Defendants'

212

violations of the antitrust laws. On information and belief, Dr. Nation was not a member of the *Love* Settlement classes.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 536 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 536. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 536 and therefore denies those allegations.

537. Plaintiff Wini Hamilton, D.C. is a chiropractor and a citizen of Seattle, Washington. During the relevant time period, Dr. Hamilton provided medically necessary, covered services to patients insured by Premera Blue Cross of Washington or who are included in employee benefit plans administered by Premera Blue Cross of Washington pursuant to her in-network contract with Premera, and billed Premera for the same. Dr. Hamilton was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hamilton has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Hamilton has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

BCBS-MI submits that the parties have filed a joint stipulation to dismiss all claims brought by Wini Hamilton, DC and therefore denies the characterization of Wini Hamilton, DC as a named plaintiff in this matter. The third, fourth, and fifth sentences in Paragraph 537 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 537. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 537 and therefore denies those allegations.

538. Plaintiff Neuromonitoring Services of America, Inc. ("NSOA") is a provider of Intraoperative Neurophysiological Monitoring services based in Colorado Springs, Colorado. During the relevant time period in Colorado, NSOA provided medically necessary, covered

services to enrollees of Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado pursuant to its in-network contract with Anthem Blue Cross and Blue Shield, and billed Anthem Blue Cross and Blue Shield for the same. NSOA was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. Also during the relevant time period, NSOA has provided medically necessary services to insured enrollees of the Blues in Alabama, Arizona, Arkansas, California, Illinois, Indiana, Iowa, Mississippi, Montana, North Dakota, Ohio, South Dakota, Tennessee, and Wisconsin, and has billed those Defendants for these services outside of any contractual relationship. On information and belief, NSOA has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through the Blue Card Program, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, NSOA has been injured in its business or property as a result of Defendants' violations of the antitrust and conspiracy laws.

**ANSWER:**

The third, fifth, and sixth sentences in Paragraph 538 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fifth, and sixth sentences in Paragraph 538. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 538 and therefore denies those allegations.

539. Plaintiff Cason T. Hund, D.M.D. is a general practitioner of dentistry and a citizen of Mt. Pleasant, South Carolina. During the relevant time period, Dr. Hund provided medically necessary, covered dental services to patients insured by BlueCross BlueShield of South Carolina, Inc. or who are included in the employee benefit plans administered by BlueCross BlueShield of South Carolina, Inc. pursuant to his in-network contract with BCBS-SC, and billed BCBS-SC for the same. Dr. Hund was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hund has also provided medically necessary, covered dental services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Hund has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 539 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 539. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 539 and therefore denies those allegations.

540.     Plaintiff ProRehab, P.C. is a group of physical therapy clinics with a corporate office in Evansville, Indiana. ProRehab, P.C. operates physical therapy clinics in the cities of Evansville, Haubstadt, Newburgh, Rockport and Vincennes in the State of Indiana. ProRehab also operates physical therapy clinics in the cities of Bowling Green, Henderson, and Madisonville in the Commonwealth of Kentucky. ProRehab, P.C. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, ProRehab provided medically necessary, covered services to patients insured by Anthem Insurance Companies, Inc. d/b/a Anthem Blue Cross and Blue Shield of Indiana and d/b/a Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant Anthem, or who are included in employee benefit plans administered by Anthem Blue Cross and Blue Shield of Indiana or Anthem Blue Cross and Blue Shield of Kentucky pursuant to its in-network contracts with BCBS-IN and BCBS-KY, and billed BCBS-IN and BCBS-KY for the same. ProRehab was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ProRehab has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, ProRehab has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

BCBS-MI admits that BCBS-KY is a subsidiary of Anthem.  The sixth, seventh, and eighth sentences in Paragraph 540 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the sixth, seventh, and eighth sentences in Paragraph 540.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 540 and therefore denies those allegations.

541.     Plaintiff Texas Physical Therapy Specialists, L.L.C. is a group of physical therapy clinics with eighteen locations in the State of Texas. Texas Physical Therapy Specialists operates physical therapy clinics in the cities of Austin, Dallas, Georgetown, Liberty Hill, New Braunfels, Round Rock, San Antonio, San Marcos, Schertz, Selma, and Spring Branch in the State of Texas. Texas Physical Therapy Specialists, L.L.C. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Texas Physical Therapy Specialists provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-

network contract with BCBS-TX, and billed BCBS-TX for the same. Texas Physical Therapy Specialists was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Texas Physical Therapy Specialists has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Texas Physical Therapy Specialists has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

On information and belief, BCBS-MI admits that BCBS-TX is an unincorporated division of HCSC. The fifth, sixth, and seventh sentences in Paragraph 541 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fifth, sixth, and seventh sentences in Paragraph 541. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 541 and therefore denies those allegations.

542. Plaintiff BreakThrough Physical Therapy, Inc. ("BreakThrough") is a group of physical therapy clinics with seven locations in the State of North Carolina. BreakThrough operates physical therapy clinics in the cities of Cameron, Fayetteville, Greensboro, Morehead City, and Winston-Salem in the State of North Carolina. BreakThrough brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Breakthrough provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same. Breakthrough was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Breakthrough has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Breakthrough has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The fifth, sixth, and seventh sentences in Paragraph 542 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies

the allegations in the fifth, sixth, and seventh sentences in Paragraph 542. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 542 and therefore denies those allegations.

543.    Plaintiff Dunn Physical Therapy, Inc. is a group of physical therapy clinics with four locations in the State of North Carolina. Dunn Physical Therapy operates physical therapy clinics in the cities of Cary, Raleigh, and Apex in the State of North Carolina. Dunn Physical Therapy, Inc. brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Dunn Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of North Carolina, Inc. or who are included in employee benefit plans administered by Blue Cross and Blue Shield of North Carolina, Inc. pursuant to its in-network contract with BCBS-NC, and billed BCBS-NC for the same. Dunn Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dunn Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Dunn Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The fifth, sixth, and seventh sentences in Paragraph 543 contain legal conclusions to

which no response is required.  To the extent a response is deemed required, BCBS-MI denies

the allegations in the fifth, sixth, and seventh sentences in Paragraph 543.  BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 543 and therefore denies those allegations.

544.    Plaintiff Gaspar Physical Therapy, P.C. is a physical therapy company with six physical therapy clinic locations in the State of California. Gaspar Physical Therapy operates physical therapy clinics in the cities of Carlsbad, Encinitas, Oceanside, and Solana Beach in the State of California. Gaspar Physical Therapy brings these claims for itself and for its member and/or employed physical therapists. During the relevant time period, Gaspar Physical Therapy provided medically necessary, covered services to patients insured by Blue Cross of California d/b/a Anthem Blue Cross, a subsidiary of Defendant Anthem, or who are included in employee benefit plans administered by Blue Cross of California pursuant to its in-network contract with BC-CA, and billed BC-CA for the same. Gaspar Physical Therapy was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Gaspar Physical Therapy has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for

those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Gaspar Physical Therapy has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

BCBS-MI admits that BC-CA is a subsidiary of Anthem.  The fifth, sixth, and seventh sentences in Paragraph 544 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the fifth, sixth, and seventh sentences in Paragraph 544.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 544 and therefore denies those allegations.

545.    Plaintiff Timothy H. Hendlin, D.C. is a chiropractor and a citizen of Kailua-Kona, Hawaii. During the relevant time period, Dr. Hendlin provided medically necessary, covered services to patients insured by Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Hawaii, and billed for those services. Dr. Hendlin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Hendlin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for those services, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Hendlin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 545 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 545.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 545 and therefore denies those allegations.

546.    Plaintiff Greater Brunswick Physical Therapy, P.A. ("GBPT") is a physical therapy company with four physical therapy clinic locations in the State of Maine. GBPT operates physical therapy clinic locations in the cities of Auburn, Bath, South Harpswell and Topsham in the State of Maine. GBPT brings these claims for itself and for its member and/or

employed physical therapists. During the relevant time period, GBPT provided medically necessary, covered services to patients insured by Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield of Maine ("BCBS-ME"), a subsidiary of Defendant Anthem, or who are included in employee benefit plans administered by BCBS-ME pursuant to its in-network contract with BCBS-ME, and billed BCBS-ME for the same. GBPT was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, GBPT has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, GBPT has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

BCBS-MI admits that BCBS-ME is a subsidiary of Anthem. The fifth, sixth, and seventh sentences in Paragraph 546 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fifth, sixth, and seventh sentences in Paragraph 546. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 546 and therefore denies those allegations.

547. Plaintiff Charles Barnwell, D.C. is a chiropractor providing services in Houston, Texas. During the relevant time period, Dr. Barnwell provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by Blue Cross and Blue Shield of Texas pursuant to its in-network contract with BCBS-TX, and billed BCBS-TX for the same. Dr. Barnwell was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Barnwell has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Barnwell has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

On information and belief, BCBS-MI admits that BCBS-TX is an unincorporated division of HCSC. The third, fourth, and fifth sentences in Paragraph 547 contain legal conclusions to which no response is required. To the extent a response is deemed required,

BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 547.

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 547 and therefore denies those allegations.

548. Plaintiff Brain and Spine, L.L.C. is a physician group medical practice specializing neurosurgery in Panama City, Florida. Brain and Spine, L.L.C. brings these claims for itself and for its member and/or employed physicians. During the relevant time period, Brain and Spine provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Florida, Inc. or who are included in employee benefit plans administered by BCBS-FL pursuant to its in-network contract with BCBS-FL and billed it for the same. Brain and Spine was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Brain and Spine has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Brain and Spine has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

## ANSWER:

The fourth, fifth, and sixth sentences in Paragraph 548 contain legal conclusions to which

no response is required. To the extent a response is deemed required, BCBS-MI denies the

allegations in the fourth, fifth, and sixth sentences in Paragraph 548. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

in Paragraph 548 and therefore denies those allegations.

549. Plaintiff Heritage Medical Partners LLC ("Heritage") is a physician group medical practice specializing in internal medicine in Hilton Head, SC. Heritage brings these claims for itself and for its member and/or employed physicians. During the relevant time period, Heritage provided medically necessary, covered services to patients insured by BCBS-SC, or who are included in employee benefit plans administered by BCBS-SC pursuant to its in-network contract with BCBS-SC and billed it for the same. Heritage was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Heritage has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Heritage has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

BCBS-MI submits that the parties have filed a joint stipulation to dismiss all claims brought by Heritage Medical Partners LLC and therefore denies the characterization of Heritage Medical Partners LLC as a named plaintiff in this matter. The fourth, fifth, and sixth sentences in Paragraph 549 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fourth, fifth, and sixth sentences in Paragraph 549. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 549 and therefore denies those allegations.

550. Plaintiff Judith Kanzic, D.C. is a chiropractor in Houston, TX. During the relevant time period, Dr. Kanzic provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-TX and billed BCBS-TX for these services outside of any contractual relationship. Dr. Kanzic was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. For these services, Dr. Kanzic has been paid less than she would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Kanzic has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Kanzic has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

On information and belief, BCBS-MI admits that BCBS-TX is an unincorporated division of HCSC. The third, fourth, fifth, and sixth sentences in Paragraph 550 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, fifth, and sixth sentences in Paragraph 550. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 550 and therefore denies those allegations.

551. Plaintiff Brian Roadhouse, D.C. is a chiropractor in Tulsa, Oklahoma. During the relevant time period, Dr. Roadhouse provided medically necessary, covered services to patients insured by Blue Cross and Blue Shield of Oklahoma, a division of Defendant HCSC, or who are included in employee benefit plans administered by BCBS-OK pursuant to its in-network contract with BCBS-OK and billed it for the same. Dr. Roadhouse was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Roadhouse has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Roadhouse has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

On information and belief, BCBS-MI admits that BCBS-OK is an unincorporated division of HCSC. The third, fourth, and fifth sentences in Paragraph 551 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 551. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 551 and therefore denies those allegations.

552. Plaintiff Julie McCormick, M.D., L.L.C., is a doctor of internal medicine and a citizen of Anchorage, Alaska. During the relevant time period, Dr. McCormick provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to her in-network contract with Premera, and billed Premera for the same. Dr. McCormick was paid less for those services than she would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. McCormick has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than she would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. McCormick has been injured in her business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 552 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 552. BCBS-MI is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 552 and therefore denies those allegations.

553.     Plaintiff Harbir Makin, M.D. is a doctor of internal medicine and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Makin provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same. Dr. Makin was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Dr. Makin has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Makin has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 553 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 553.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 553 and therefore denies those allegations.

554.     Plaintiff Saket K. Ambasht, M.D. is a doctor of gastroenterology and a citizen of Anchorage, Alaska. During the relevant time period, Dr. Ambasht has provided medically necessary services to Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") and has billed Premera for these services outside of any contractual relationship. For these services, Dr. Ambasht has been paid less that he would have been but for Defendants' anticompetitive conduct. On information and belief, Dr. Ambasht has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Dr. Ambasht has been injured in his business or property as a result of Defendants' violations of the antitrust laws. Dr. Ambasht was not a member of the *Love* Settlement classes.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 554 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the

allegations in the third, fourth, and fifth sentences in Paragraph 554. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 554 and therefore denies those allegations.

555. Hillside Family Medicine, LLC is a family medicine practice in Anchorage, Alaska. During the relevant time period, Hillside Family Medicine, LLC provided medically necessary, covered services to patients insured by Premera Blue Cross d/b/a Premera Blue Cross Blue Shield of Alaska ("Premera") or who are included in employee benefit plans administered by Premera pursuant to his in-network contract with Premera, and billed Premera for the same. Hillside was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Hillside has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, Hillside has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The third, fourth, and fifth sentences in Paragraph 555 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the third, fourth, and fifth sentences in Paragraph 555. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 555 and therefore denies those allegations.

556. Plaintiff Joseph S. Ferezy, D.C. d/b/a Ferezy Clinic of Chiropractic and Neurology ("FCCN") is a chiropractic office in Windsor Heights, Iowa. FCCN brings these claims for itself and for its member and/or employed chiropractors. During the relevant time period, FCCN provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to his in-network contract with Wellmark, and billed Wellmark for the same. FCCN was paid less for those services than he would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, FCCN has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than he would have been but for Defendants' anticompetitive conduct. As set forth herein, FCCN has been injured in his business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The fourth, fifth, and sixth sentences in Paragraph 556 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fourth, fifth, and sixth sentences in Paragraph 556. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 556 and therefore denies those allegations.

557. Plaintiff Snowden Olwan Psychological Services ("Snowden Olwan") is a psychology clinic located in Sioux City, Iowa. Snowden Olwan brings these claims for itself and for its member and/or employed psychologists. During the relevant time period, Snowden Olwan provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark") or who are included in employee benefit plans administered by Wellmark pursuant to its in-network contract with Wellmark, and billed Wellmark for the same. Snowden Olwan was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, Snowden Olwan has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, Snowden Olwan has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The fourth, fifth, and sixth sentences in Paragraph 557 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fourth, fifth, and sixth sentences in Paragraph 557. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 557 and therefore denies those allegations.

558. Plaintiff Ear, Nose & Throat Consultants and Hearing Services, P.L.C. ("ENT Consultants") is a medical practice located in Dakota Dunes, South Dakota. ENT Consultants brings these claims for itself and for its member and/or employed physicians. During the relevant time period, ENT Consultants provided medically necessary, covered services to patients insured by Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa ("Wellmark BCBS-IA"), Wellmark Blue Cross and Blue Shield of South Dakota ("Wellmark BCBS-SD"), and Blue Cross and Blue Shield of Nebraska ("BCBS-NE") or who are included in employee benefit plans administered by Wellmark BCBS-IA, Wellmark BCBS-SD, or BCBS-NE pursuant to its in-

network contracts with those Defendants, and billed those Defendants for the same. ENT Consultants was paid less for those services than it would have been but for Defendants' anticompetitive conduct and has been injured by Defendants' conduct as a result thereof. On information and belief, ENT Consultants has also provided medically necessary, covered services to other Blue Cross and Blue Shield Plan enrollees through national programs, has billed for same, and has been paid less for those services than it would have been but for Defendants' anticompetitive conduct. As set forth herein, ENT Consultants has been injured in its business or property as a result of Defendants' violations of the antitrust laws.

**ANSWER:**

The fourth, fifth, and sixth sentences in Paragraph 558 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the fourth, fifth, and sixth sentences in Paragraph 558. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 558 and therefore denies those allegations.

559. Certain of the named Provider Plaintiffs in this action, Corey Musselman, M.D., Heritage Medical Partners, L.L.C., Brain and Spine, L.L.C., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Hillside Family Medicine, LLC, John Clifton Crosby, M.D., Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D., ("the non-Alabama *Love* Providers"), all medical doctors, were members of the Settlement classes in class settlements with some of the Defendants consummated in the Southern District of Florida before Judge Moreno. For purposes of this Complaint, those Providers who were members of the Settlement Classes listed above do not bring claims against any of the released parties in those Settlements. As this issue is currently being litigated in *Musselman v. Blue Cross Blue Shield of Alabama*, Case No. 1:13-cv-20050-FAM (S.D. Fla.); Case No. 13-14250-AA (11th Cir.), the non-Alabama *Love* Providers wish to allege here that:

a.   they seek to preserve their claims against the Released Parties in those Settlements as they do not believe the claims alleged in this Complaint were released by those Settlements, because of the timing, scope or coverage of those releases. Accordingly, those claims would be included in this Complaint but for the Defendants' insistence that if the claims are alleged here, they will immediately seek to have the non-Alabama *Love* Providers held in contempt of the injunctions entered by Judge Moreno. The *Musselman* action has been undertaken in good faith and Plaintiffs believe that litigation will toll any applicable statute of limitations;

b.   they intend to amend to add claims against the Released Parties who are Defendants once the *Musselman* litigation is resolved in their favor;

      c.      they continue to pursue their Sherman Act claims against the "Non-Released Blues" (listed above) who were not Releasing Parties in the Southern District of Florida and for whom there is no argument that any class-wide claims were previously released or are subject to any injunction in the Southern District of Florida.

**ANSWER:**

BCBS-MI admits that the named Provider Plaintiffs defined as "the non-Alabama *Love* Providers" were members of settlement classes in settlements with certain Defendants that were consummated in the Southern District of Florida before Judge Moreno. BCBS-MI admits that the non-Alabama *Love* Providers purport to bring this action under the Sherman Act, but denies that Plaintiffs can state any claim. The second and third sentences of Paragraph 559 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the second and third sentences of Paragraph 559. The remaining allegations in Paragraphs 559, 559(a), 559(b), and 559(c) do not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the remaining allegations in Paragraphs 559, 559(a), 559(b), and 559(c).

### Allegations Relating to the Rule of Reason Claims

560. For the non-prioritized proceedings, the relevant product markets are the same as those alleged in Paragraphs 342 - 350. The relevant geographic markets are defined in the same way as the relevant geographic markets alleged in Paragraphs 351 - 352, except that the outer boundary of each Defendant's relevant geographic markets is the same as the boundary of that Defendant's service area. Additional detail on the Defendants' market power within their service area is given below.

**ANSWER:**

Paragraph 560 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 560. BCBS-MI denies the remaining allegations of Paragraph 560.

561. The figures in the paragraphs below are taken from the 2013 AMA Competition Study, which includes Kaiser Permanente ("Kaiser"). In most markets where Kaiser is active in the health care financing market, it owns hospitals and ambulatory surgery centers and contracts for doctor services only with the Permanente Medical Group and does not purchase nonemergency medical services from other healthcare providers. As a result, for most healthcare providers Kaiser is not a close or reasonable substitute for the Blues when those healthcare providers decide whether to contract with one of the Blues. This can cause the Blue's market share to be understated.

**ANSWER:**

Paragraph 561 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 561. BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the truth of the remaining allegations of Paragraph 561 and therefore denies those allegations.

562. Defendant Premera Blue Cross has market power throughout the State of Alaska in the health care financing market and in every market within Alaska. It also has market power in the State of Alaska and in every health services market. In Alaska, the Blue has a 60% market share in the entire state. Its lowest market share is 55% in the Anchorage area. Its highest market share is 67% in the Fairbanks area.

**ANSWER:**

The first and second sentences of Paragraph 562 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences of Paragraph 562. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 562 and therefore denies those allegations.

563. Defendant Blue Cross Blue Shield of Arizona has market power at least in certain areas in Arizona in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Arizona in the health services markets and may have market power in the entire state. For example, it has a 53% market share in the Flagstaff market and a 41% market share in the Prescott area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Arizona. The Blue uses those subscribers to increase its market power.

**ANSWER:**

The first, second, and fifth sentences of Paragraph 563 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, and fifth sentences in Paragraph 563. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 563 and therefore denies those allegations.

564. Defendant Arkansas Blue Cross and Blue Shield has market power at least in certain areas in Arkansas in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Arkansas in the health services markets and may have market power in the entire state. For example, it has a 56% market share in the Jonesboro market, a 52% market share in the Pine Bluff area, and a 40% market share in the Hot Springs area.

**ANSWER:**

The first and second sentences in Paragraph 564 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 564. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 564 and therefore denies those allegations.

565. Defendant Blue Cross of California d/b/a Anthem Blue Cross has market power at least in certain areas in California in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of California in the health services markets and may have market power in the entire state. For example, it has a 50% market share in the Chico area, a 43% market share in the Bakersfield area, a 58% market share in the El Centro area, a 45% market share in the Fresno area, a 61% market share in the Hanfor-Corcoran area, a 49% market share in the Madera area, a 58% market share in the Merced area, a 42% market share in the Oxnard-Thousand Oaks-Ventura area, a 58% market share in the Redding area, a 65% market share in the Salinas area, a 59% market share in the San Luis Obispo-Paso Robles area, a 51% market share in the Santa Barbara-Santa Maria area, a 49% market share in the Santa Cruz-Santa Maria area, a 58% market share in the Visalia-Porterville area, and a 70% market share in the Yuba City-Maryville area. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Blue Cross of California would be the largest health insurer in California and would have a market share of more than 50% in many other areas in California. These percentages are presented only for Defendant Blue Cross of California. Defendant Blue Shield of California has somewhat

lower market share percentages, but it and all of the other Blues are conspiring with Blue Cross of California. The analysis of market shares in this paragraph includes Kaiser. If Kaiser is excluded for reasons stated above, Blue Cross of California and Blue Shield of California will have much higher market share percentages in many areas in California. Discovery may also show that other Blues have market power in areas in California and reserve the right to present that evidence in the motion for class certification.

**ANSWER:**

The first, second, sixth, and ninth sentences in Paragraph 565 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, sixth, and ninth sentences in Paragraph 565. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 565 and therefore denies those allegations.

566. Defendant Anthem Blue Cross and Blue Shield of Colorado, a subsidiary of Defendant Anthem, has market power at least in certain areas in Colorado in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Colorado in the health services markets and may have market power in the entire state. In Colorado, Kaiser has a significant presence. If Kaiser is excluded from the economic analysis, the Anthem market share will increase significantly.

**ANSWER:**

The first and second sentences in Paragraph 566 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 566. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 566 and therefore denies those allegations.

567. Defendant Anthem Blue Cross and Blue Shield of Connecticut, a subsidiary of Defendant Anthem, has market power at least in certain areas in Connecticut in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Connecticut in the health services markets and may have market power in the entire state. For example, it has a 41% market share in the State of Connecticut generally, a 49% market share in the New Haven-Milford area, and a 49% market share in the Waterbury area. It also maintains market power in portions of the state of Rhode Island. Anthem maintains a 50% market share in the Norwich-New London CT-RI area.

**ANSWER:**

The first, second, and fourth sentences in Paragraph 567 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, and fourth sentences in Paragraph 567. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 567 and therefore denies those allegations.

568. Defendant Highmark Blue Cross and Blue Shield Delaware, a subsidiary of defendant Highmark, Inc., has market power throughout the State of Delaware in the health care financing market and in every market within Delaware. It also has market power in the State of Delaware and in every health services market. In Delaware the Blue has a 64% market share in the entire state. Its lowest market share is 51% in the Wilmington area. Its highest market share is 75% in the Dover area.

**ANSWER:**

The first and second sentences of Paragraph 568 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences of Paragraph 568. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 568 and therefore denies those allegations.

569. Defendant CareFirst, through Defendant GHMSI, has market power in the District of Columbia in the health care financing market and in every health services market. CareFirst has a 44% market share in the District of Columbia.

**ANSWER:**

The first sentence in Paragraph 569 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first sentence in Paragraph 569. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 569 and therefore denies those allegations.

570.    Defendant Blue Cross and Blue Shield of Florida, Inc. has market power at least in certain areas in Florida in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Florida in the health services markets and may have market power in the entire state. For example, it has a 56% market share in the Fort Walton Beach – Crestview – Destin area, a 40% market share in the Deltona-Daytona Beach-Ormond Beach area, a 61% market share in the Gainesville area, a 55% market share in the Ocala market, a 43% market share in the Naples-Marco Island, FL area, a 67% market share in the Panama City/Lynn Haven area, a 46 % market share in the Pensacola-Ferry Pass- Brent area, a 43% market share in the Port St. Lucie-Fort Pierce area, an 84% market share in the Tallahassee area, and a 57% market share in the Vero Beach area. Also, during the colder months of the year, many people who are subscribers of Blues in Northern states spend time in Florida. The Blue uses those subscribers to increase its market power.

**ANSWER:**

The first, second, and fifth sentences in Paragraph 570 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, and fifth sentences in Paragraph 570.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 570 and therefore denies those allegations.

571.    Defendant Blue Cross and Blue Shield of Georgia, Inc., a subsidiary of Defendant Anthem, has market power at least in certain areas in Georgia in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Georgia in the health services markets and may have market power in the entire state. For example, it has a 57% market share in the Warner-Robins area, a 46% market share in the Albany area, 42% market share in the Athens-Clarke County area, a 44% area share in the Columbus GA-AL area, a 47% market share in the Valdosta area, and a 56% market share in the Hinesville/Fort Stewart area. Kaiser has some presence in Georgia and exclusion of it will affect some of the market share percentages.

**ANSWER:**

The first and second sentences in Paragraph 571 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 571.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 571 and therefore denies those allegations.

572.   Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii has market power throughout the State of Hawaii in the health care financing market and in every market within Hawaii. It also has market power in the State of Hawaii and in every health services market. In Hawaii, the Blue has a 65% market share in the entire state and has a 67% market share in the Honolulu area. If Kaiser is excluded from the analysis, then its market share will be even greater.

**ANSWER:**

The first and second sentences in Paragraph 572 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 572.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 572 and therefore denies those allegations.

573.   Defendant Blue Cross of Idaho Health Service, Inc., d/b/a Blue Cross of Idaho, has market power throughout the State of Idaho in the health care financing market and in every market within Idaho. It also has market power in the State of Idaho and in every health services market. In Idaho, the Blue has a 54% market share. Its highest market share is 58% in the Pocatello area. It also maintains a 55% market share in the Boise-Nampa area, a 45% share in the Coeur d'Alene area, 53% market share in the Idaho Falls area, and a 45% share in the Lewiston ID-WA area. Idaho is one of the states where Blue Cross and Blue Shield compete with each other, and in many of these areas the second largest market share holder is fellow conspirator Regence BlueShield of Idaho.

**ANSWER:**

The first, second, and sixth sentences in Paragraph 573 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, and sixth sentences in Paragraph 573.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 573 and therefore denies those allegations.

574.   Defendant Blue Cross and Blue Shield of Illinois, a division of Defendant HCSC, has market power at least in certain areas in Illinois in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Illinois in the health services markets and may have market power in the entire state. For example, it has a 51% market share in the entire state. It also has a 58% market share in the Chicago/Naperville/Joliet area, a 48% share in the Bloomington-Normal area, a 57% market

share in the Decatur area, a 51% market share in the Kankakee/Bradley market, a 45% share in the Lake County-Kenosha County, IL-WI area, and a 51% market share in the Rockford area.

**ANSWER:**

The first and second sentences in Paragraph 574 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 574. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 574 and therefore denies those allegations.

575. Defendant Anthem Blue Cross and Blue Shield of Indiana, a subsidiary of Defendant Anthem, has market power throughout the State of Indiana in the health care financing market and in every market within Indiana. It also has market power in the State of Indiana and in every health services market. It has a market share of 51% in the entire state. Its highest market share is 68% in the Anderson area. It also maintains a 56% market share in the Bloomington area, a 57% share in the Columbus area, a 62% share in the Elkhart-Goshen area, a 43% share in the Evansville IN-KY area, a 56% share in the Fort Wayne area, a 44% share in the Gary area, a 49% share in the Indianapolis area, a 54% share in Kokomo, a 56% share in the Michigan City-LaPorte area, a 63% share in the Muncie area, a 41% share in the South Bend-Mishawaka, IN-MI area, a 66% share in the Terre Haute area.

**ANSWER:**

The first and second sentences in Paragraph 575 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 575. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 575 and therefore denies those allegations.

576. Defendant Wellmark Blue Cross and Blue Shield of Iowa has market power at least in certain areas in Iowa in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Iowa in the health services markets and may have market power in the entire state. For example, it has a 52% market share in the entire state. It also has 76% market share in the Iowa City area, a 60% market share in the Cedar Rapids area, a 42 % share in the Des Moines area, a 53% market share in the Ames area, a 47% share in the Sioux City IA-NE area, and a 50% market share in the Dubuque area.

**ANSWER:**

The first and second sentences in Paragraph 576 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 576. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 576 and therefore denies those allegations.

577. Defendant Blue Cross and Blue Shield of Kansas has market power at least in certain areas in Kansas in the health care financing market and may have market power in the entire state. Since Blue Cross and Blue Shield of Kansas and Blue Cross and Blue Shield of Kansas City have separate Service Areas within Kansas, the statewide market share percentages do not tell a complete story of market shares. It has market power at least in certain areas in the State of Kansas in the health services markets and may have market power in the entire state. For example, it has a 69% market share in the Topeka area (the home of Dr. Cain), a 45% share in the Wichita, Kansas and a 56% market share in the Lawrence area.

**ANSWER:**

The first and third sentences in Paragraph 577 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and third sentences in Paragraph 577. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 577 and therefore denies those allegations.

578. Defendant Anthem Blue Cross and Blue Shield of Kentucky, a subsidiary of Defendant Anthem, has market power at least in certain areas in Kentucky in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the Commonwealth of Kentucky in the health services markets and may have market power in the entire state. For example, it has a 66% market share in the Owensboro area, a 46% share in Elizabethtown area and a 63% market share in the Bowling Green area.

**ANSWER:**

The first and second sentences in Paragraph 578 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 578. BCBS-MI is without knowledge

235

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 578 and therefore denies those allegations.

579.     Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana has market power throughout the State of Louisiana in the health care financing market and in every market within Louisiana. It also has market power in the State of Louisiana and in every health services market. For example, it has a 57% market share in the entire state. Also, it has a 64% market share in the Alexandria area, a 59% market share in the Houma/Bayou Cane/Thibodaux and Monroe areas, a 56% market share in the Shreveport/Bossier City area, a 55% market share in the Lafayette area, a 52% market share in the Baton Rouge area, a 51% market share in the New Orleans/Metairie/Kenner area, and a 50% market share in the Lake Charles area.

**ANSWER:**

The first and second sentences in Paragraph 579 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 579.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 579 and therefore denies those allegations.

580.     Defendant Anthem Blue Cross and Blue Shield of Maine, a subsidiary of Defendant Anthem, has market power throughout the State of Maine in the health care financing market and in every market within Maine. It also has market power in the State of Maine and in every health services market. For example, it has a 53% market share throughout the state. It also has a 57% market share in the Bangor area, a 56% market share in the Lewiston/Auburn area, and a 53% market share in the Portland/South Portland area.

**ANSWER:**

The first and second sentences in Paragraph 580 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 580.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 580 and therefore denies those allegations.

581.     Defendant CareFirst, Inc., through Defendant CareFirst of Maryland has market power throughout the State of Maryland in the health care financing market and in every market

within Maryland. It also has market power in the State of Maryland and in every health services market. For example, it has a market share of 48% of the entire state of Maryland. It also has a market share of 70% in the Salisbury area, a 43% market share in the Bethesda-Gaithersburg-Frederick area, a 42% Cumberland MD-WV area and a market share of 54% in the Baltimore/Towson area.

**ANSWER:**

The first and second sentences in Paragraph 581 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 581. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 581 and therefore denies those allegations.

582. Defendant Blue Cross and Blue Shield of Massachusetts, Inc. has market power at least in certain areas in Massachusetts in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Massachusetts in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (46%) throughout the entire state. It also has a 57% market share in the Pittsfield area, a 50% market share in the Lynn/Peabody/Salem area, a 42% market share in the Barnstable Town area, a 43% share in the Boston-Cambridge-Quincy area, a 45% share in the Framingham area, a 45% share of the Brockton-Bridgewater-Easton area, a 42% share of the Lowell-Billerica-Chelmsford, MA-NH area, a 48% share of the New Bedford area, a 40% share of the Springfield area, and 48% market share of the Taunton-Norton-Raynham area.

**ANSWER:**

The first and second sentences in Paragraph 582 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 582. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 582 and therefore denies those allegations.

583. Defendant Blue Cross and Blue Shield of Michigan has market power at least in certain areas in Michigan in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Michigan in the health services markets and may have market power in the entire state. For example, it has a 67% market share in the entire state. It also has an 81% market share in the Lansing/East Lansing and

Niles/Benton Harbor areas, a 77% market share in the Battle Creek area, a 73% market share in the Bay City area, a 72% market share in the Ann Arbor area, a 71% market share in the Saginaw/Saginaw Township North area, a 69% market share in the Monroe and Warren/Farmington Hills/Troy areas, a 67% market share in the Jackson area, a 66% market share in the Kalamazoo/Portage area, a 64% market share in the Flint area, a 58% market share in the Muskegon/Norton Shores area, and a 53% market share in the Detroit/Livonia/Dearborn area.

**ANSWER:**

The first and second sentences in Paragraph 583 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 583. The remaining allegations in Paragraph 583 are too vague and ambiguous to permit a response, and therefore BCBS-MI denies those allegations.

584. Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota has market power at least in certain areas in Minnesota in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Minnesota in the health services markets and may have market power in the entire state where it has at least a 44% market share. For example, it has 56% market share in the Rochester area, a 46% share of the Duluth, MN-WI area and a 48% market share in the St. Cloud area.

**ANSWER:**

The first and second sentences in Paragraph 584 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 584. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 584 and therefore denies those allegations.

585. Defendant Blue Cross Blue Shield of Mississippi has market power at least in certain areas in Mississippi in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Mississippi in the health services markets and may have market power in the entire state. For example, it has a market share of almost half (45%) throughout the entire state. For example, it has a 52% market share in the Pascagoula area, a 44% market share of the Gulfport-Biloxi area, a 41% share of the Hattiesburg area, and a 48% market share in the Jackson area.

**ANSWER:**

The first and second sentences in Paragraph 585 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 585. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 585 and therefore denies those allegations.

586. Defendant Blue Cross and Blue Shield of Kansas City has market power at least in certain parts of the states of Missouri and Kansas and the Kansas City area for the health care financing market and may have market power in the entire area. It has market power at least in certain areas in the State of Kansas and Missouri in the health services markets and may have market power in the entire Kansas City area. For example, it has a 51% market share in the St. Joseph MO-KS area.

**ANSWER:**

The first and second sentences in Paragraph 586 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 586. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 586 and therefore denies those allegations.

587. Defendant Anthem Blue Cross and Blue Shield of Missouri, a subsidiary of Defendant Anthem, has market power at least in certain areas in Missouri in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Missouri in the health services markets and may have market power across the entire state. Discovery may also show that other Blues have market power in areas in Missouri and reserve the right to present that evidence in the motion for class certification.

**ANSWER:**

Paragraph 587 contains legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in Paragraph 587.

588. Defendant Blue Cross and Blue Shield of Montana, a division of Defendant HCSC, has market power at least in certain areas in Montana in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the

State of Montana in the health services markets and may have market power in the entire state. For example, it has a market share of 41% in the Great Falls area.

**ANSWER:**

The first and second sentences in Paragraph 588 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 588. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 588 and therefore denies those allegations.

589. Defendant Blue Cross and Blue Shield of Nebraska has market power throughout the State of Nebraska in the health care financing market and in every market within Nebraska. It also has market power in the State of Nebraska and in every health services market. For example, it has a 56% market share in the entire state. It also has 60% market share in the Lincoln area.

**ANSWER:**

The first and second sentences in Paragraph 589 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 589. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 589 and therefore denies those allegations.

590. Defendant Anthem Blue Cross and Blue Shield of Nevada, the trade name of Defendant Rocky Mountain Health and Medical Services, Inc., both subsidiaries of Defendant Anthem, has market power at least in certain areas in Nevada in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of Nevada in the health services markets and may have market power in the entire state. For example, it maintains a market share of 44% in the Carson City area.

**ANSWER:**

The first and second sentences in Paragraph 590 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 590. BCBS-MI is without knowledge

240

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 590 and therefore denies those allegations.

591.    Defendant Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield of New Hampshire, a subsidiary of Defendant Anthem, has market power at least in certain areas in New Hampshire in the health care financing market and may have market power in the entire state where it has a 44% market share. It has market power at least in certain areas in the State of New Hampshire in the health services markets and may have market power in the entire state. For example, it has a market share of 53% in the Rochester/Dover area, and a 44% market share in the Portsmouth, NH-ME area.

**ANSWER:**

The first and second sentences in Paragraph 591 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 591.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 591 and therefore denies those allegations.

592.    Defendant Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross and Blue Shield of New Jersey has market power at least in certain areas in New Jersey in the health care financing market and may have market power in the entire state. It has market power at least in certain areas in the State of New Jersey in the health services markets and may have market power in the entire state. For example, it has a 60% market share in the Atlantic City area, a 57% market share in the Ocean City area, and a 42% share of the Vineland-Milville-Bridgeton area.

**ANSWER:**

The first and second sentences in Paragraph 592 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 592.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 592 and therefore denies those allegations.

593.    Defendant Blue Cross and Blue Shield of New Mexico, a division of Defendant HCSC, has market power at least in certain areas in New Mexico in the health care financing market and may have market power in the entire state. It has market power at least in certain

areas in the State of New Mexico in the health services markets and may have market power in the entire state. For example, it maintains a 41% market share in the Santa Fe area.

**ANSWER:**

The first and second sentences in Paragraph 593 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 593. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 593 and therefore denies those allegations.

594. Defendant Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, a subsidiary of Lifetime Healthcare, Inc., has market power at least in certain areas in New York in the health care financing market. It has market power at least in certain areas in the State of New York in the health services markets. For example, it has a 56% market share in the Elmira area, 53% market share in the Syracuse area, a 43% market share in the Binghamton area, and a 41% market share in the Rochester area. Discovery may also show that other Blues have market power in areas in New York and reserve the right to present that evidence in the motion for class certification.

**ANSWER:**

The first, second, and fourth sentences in Paragraph 594 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, and fourth sentences in Paragraph 594. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 594 and therefore denies those allegations.

595. Defendant Blue Cross and Blue Shield of North Carolina has market power throughout the State of North Carolina in the health care financing market and in every market within North Carolina. It also has market power in the State of North Carolina and in every health services market. For example, it has a market share of almost half of the entire state. It also has a market share of 76% in the Goldsboro area, a market share of 75% in the Greenville area, a market share of 70% in the Rocky Mount area, a market share of 61% in the Hickory/Morganton/Lenoir area, a 47% market share in the Burlington area, a 44% market share in the Durham area, a 45% share in the Greensboro-High Point area, a 46% share in the Wilmington area, a 42% share of the Winston-Salem area, and a 51% market share in the Asheville area.

**ANSWER:**

The first and second sentences in Paragraph 595 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 595. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 595 and therefore denies those allegations.

596. Defendant Noridian Mutual Insurance Company, d/b/a Blue Cross Blue Shield of North Dakota has market power at least in certain areas in North Dakota in the health care financing market. It has market power at least in certain areas in the State of North Dakota in the health services markets. For example, it has a 56% market share in the entire state.

**ANSWER:**

The first and second sentences in Paragraph 596 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 596. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 596 and therefore denies those allegations.

597. Defendant Community Health Insurance Company, d/b/a Anthem Blue Cross and Blue Shield of Ohio, a subsidiary of Defendant Anthem, has market power at least in certain areas in Ohio in the health care financing market. It has market power at least in certain areas in the State of Ohio in the health services markets. It has a market share of 38% in the Cincinnati/Middletown area, but since that area borders on Kentucky where Defendant Anthem also has the Blue, it likely has market power through its combined operations.

**ANSWER:**

The first and second sentences in Paragraph 597 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 597. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 597 and therefore denies those allegations.

598.     Defendant Blue Cross and Blue Shield of Oklahoma has market power at least in certain areas in Oklahoma in the health care financing market. It has market power at least in certain areas in the State of Oklahoma in the health services markets. For example, it has a market share of nearly half of the entire state. It also has a market share of 49% of the Tulsa area and a 45% share of the Oklahoma City area.

**ANSWER:**

The first and second sentences in Paragraph 598 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 598.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 598 and therefore denies those allegations.

599.     Defendant Regence BlueCross BlueShield of Oregon, a subsidiary of Defendant Cambia Health, has market power at least in certain areas in Oregon in the health care financing market. It has market power at least in certain areas in the State of Oregon in the health services markets. If Kaiser is removed from the markets where the prices for non-Kaiser health care providers are determined, then Regence BlueCross BlueShield of Oregon would be the largest health insurer in Oregon and would have a market share of more than 50% in many areas in Oregon.

**ANSWER:**

The first and second sentences in Paragraph 599 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 599.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 599 and therefore denies those allegations.

600.     Defendant Hospital Service Association of Northeastern Pennsylvania d/b/a Blue Cross of Northeastern Pennsylvania has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 52% markets share in each of the Scranton/Wilkes-Barre and Williamsport areas. Defendant Highmark is in the process of purchasing Blue Cross of Northeastern Pennsylvania.

**ANSWER:**

The first and second sentences in Paragraph 600 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 600. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 600 and therefore denies those allegations.

601. Defendant Highmark, Inc., the parent of Defendant Highmark Health Services d/b/a Highmark Blue Cross Blue Shield and also d/b/a Highmark Blue Shield, has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 75% market share in the Johnstown area, a 73% market share in the Altoona area, a 69% market share in the Erie area, a 52% market share in the Pittsburgh area, a 45% share of the Harrisburg-Carlisle area, a 46% share of the Lebanon area, a 43% share of the Reading area, a 46% share of the State College area and a 42% of the York-Hanover area.

**ANSWER:**

The first and second sentences in Paragraph 601 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 601. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 601 and therefore denies those allegations.

602. Defendant Independence Blue Cross has market power at least in certain areas in Pennsylvania in the health care financing market. It has market power at least in certain areas in the Commonwealth of Pennsylvania in the health services markets. For example, it has a 58% market share in the Philadelphia area.

**ANSWER:**

The first and second sentences in Paragraph 602 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 602. BCBS-MI is without knowledge

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 602 and therefore denies those allegations.

603.     Defendant Triple-S of Puerto Rico has market power in the health care financing market or markets in Puerto Rico. It also has market power in the health service markets in Puerto Rico. While the AMA Study does not contain data on Puerto Rico, the data from the National Association of Insurance Commissioners shows a 90% market share for the top four health insurance companies, and Plaintiffs allege that Triple-S of Puerto Rico is a significant portion of that percentage.

**ANSWER:**

The first and second sentences in Paragraph 603 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 603.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 603 and therefore denies those allegations.

604.     Defendant Blue Cross and Blue Shield of Rhode Island has market power at least in certain areas in Rhode Island in the health care financing market. It has market power at least in certain areas in the State of Rhode Island in the health services markets. For example, it has a market share of 50% across the entire state.

**ANSWER:**

The first and second sentences in Paragraph 604 contain legal conclusions to which no response is required.  To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 604.  BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 604 and therefore denies those allegations.

605.     Defendant BlueCross BlueShield of South Carolina, Inc. has market power throughout the State of South Carolina in the health care financing market and in every market within South Carolina. It also has market power in the State of South Carolina and in every health services market. In South Carolina, the Blue has a 60% market share in the entire state. Its highest market share is 71% in the Sumter market. It also maintains a market share of 57% in the Greenville area, a 63% share in the Anderson area, a 62% share in the Charleston-North

Charleston area, a 61% share of the Columbia area, a 63% share of the Florence area, a 64% share of the Myrtle Beach area, and a 64% share of the Spartanburg area.

**ANSWER:**

      The first and second sentences in Paragraph 605 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 605. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 605 and therefore denies those allegations.

      606.    Defendant Wellmark of South Dakota, Inc., d/b/a Wellmark Blue Cross and Blue Shield of South Dakota has market power at least in certain areas in South Dakota in the health care financing market. It has market power at least in certain areas in the State of South Dakota in the health services markets. For example, Wellmark has a 41% market share of the Rapid City area.

**ANSWER:**

      The first and second sentences in Paragraph 606 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 606. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 606 and therefore denies those allegations.

      607.    Defendant BlueCross BlueShield of Tennessee, Inc. has market power at least in certain areas in Tennessee in the health care financing market. It has market power at least in certain areas in the State of Tennessee in the health services markets. For example, It has almost half of the market for the entire state of Tennessee. It also has a 51% market share of the Nashville-Davidson-Murfreesboro area, a 50% market share in the Jackson area, a 46% market share in the Chattanooga TN-GA area, a 44% share of the Cleveland area, a 46% share of the Johnson City area, and a 47% share of the Morristown area.

**ANSWER:**

      The first and second sentences in Paragraph 607 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the

247

allegations in the first and second sentences in Paragraph 607. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 607 and therefore denies those allegations.

608. Defendant Blue Cross and Blue Shield of Texas, a division of Defendant HCSC, has market power at least in certain areas in Texas in the health care financing market. It has market power at least in certain areas in the State of Texas in the health services markets. For example, it has a 78% market share in the Laredo area, a 75% market share in the Wichita Falls area, a 74% market share in the San Angelo area, a 66% market share in the Odessa area, a 65% market share in the McAllen/Edinburg-Mission area, a 62% market share in the Midland area, a 61% market share in each of the Brownsville/Harlingen and Tyler areas, a 59% market share in each of the Lubbock and Texarkana areas, a 56% market share in the Longview area, a 55% market share in the Waco area, a 53% market share in the College Station/Bryan and Corpus Christi areas, a 41% share of the Waco area, a 48% share of the Sherman-Denison area and a 51% market share in the Beaumont/Port Arthur area.

**ANSWER:**

On information and belief, BCBS-MI admits that BCBS-TX is an unincorporated division of HCSC. The first and second sentences in Paragraph 608 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 608. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 608 and therefore denies those allegations.

609. Defendant BlueCross BlueShield of Utah, a subsidiary of Defendant Cambia Health, has the Blue Service Area for Utah. Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring an action on behalf of themselves individually and on behalf of a putative class, but denies that Plaintiffs' claims are appropriate for class treatment or that Plaintiffs are entitled to any relief. The remaining allegations in

Paragraph 609 do not contain factual allegations to which a response is required. To the extent a response is required, BCBS-MI denies the remaining allegations in Paragraph 609.

610. Defendant Blue Cross and Blue Shield of Vermont has market power at least in certain areas in Vermont in the health care financing market. It has market power at least in certain areas in the State of Vermont in the health services markets. For example, it has a market share of 42% in the Burlington/South Burlington area.

**ANSWER:**

The first and second sentences in Paragraph 610 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 610. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 610 and therefore denies those allegations.

611. Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield of Virginia, Inc., a subsidiary of Defendant Anthem, has market power at least in certain areas in Virginia in the health care financing market. It has market power at least in certain areas in the State of Virginia in the health services markets. For example, it has an 85% market share in the Danville area, a 77% market share in the Blacksburg/Christianburg/Redford area, a 68% market share in the Harrisonburg area, a 67% market share in the Roanoke area, a 62% market share in the Lynchburg area, a 56% market share in the Winchester area, a 52% market share in the Virginia Beach/Norfolk/Newport News area, a 50% market share in the Richmond area, and a 47% share of the Charlottesville area. CareFirst has the Blue Service Area in the northern part of the state near Washington, D.C. Plaintiffs do not have data for the market share in that Service Area. If discovery demonstrates that CareFirst has market power in that area, then Plaintiffs will address the issue in their motion for class certification.

**ANSWER:**

The first and second sentences in Paragraph 611 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 611. BCBS-MI is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence in Paragraph 611 and therefore denies those allegations. The fourth and fifth sentences in Paragraph 611 do not contain factual allegations to which a response is required. To the extent a

response is deemed required, BCBS-MI denies the allegations in the fourth and fifth sentences in Paragraph 611. BCBS-MI denies any remaining allegations in Paragraph 611.

612. Defendant Premera Blue Cross has market power at least in certain areas in Washington in the health care financing market. It has market power at least in certain areas in the State of Washington in the health services markets. For example, it has a 69% market share in the Wenatchee area. Defendant Regence BlueShield also operates in Washington and has significant market shares in areas in Washington. Kaiser also has a significant presence in Washington, and as stated above, may need to be excluded from the analysis of whether Premera or Regence has market power over providers in Washington or markets for health care services in that state. There may also be other managed care companies or health insurance companies operating in Washington that should be excluded from the market power analysis. Especially if Kaiser is excluded, Regence has market power in markets for health care services in Washington. These issues will be further addressed and developed in the Plaintiffs' motion for class certification.

**ANSWER:**

The first, second, fourth, fifth, sixth, and seventh sentences in Paragraph 612 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first, second, fourth, fifth, sixth, and seventh sentences in Paragraph 612. BCBS-MI denies the allegations in the third sentence in Paragraph 612. The eighth sentence of Paragraph 612 does not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the eighth sentence of Paragraph 612. BCBS-MI denies any remaining allegations in Paragraph 612.

613. Defendant Highmark of West Virginia, Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, a subsidiary of Defendant Highmark, has market power at least in certain areas in West Virginia in the health care financing market. It has market power at least in certain areas in the State of West Virginia in the health services markets. For example, it has a market share of 41% in the entire state of West Virginia, 42 % of the Charleston, WV area, and a 40% share of the Morgantown area.

**ANSWER:**

The first and second sentences in Paragraph 613 contain legal conclusions to which no response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the first and second sentences in Paragraph 613. BCBS-MI is without knowledge

or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 613 and therefore denies those allegations.

614.    Defendant Blue Cross Blue Shield of Wisconsin, a subsidiary of Defendant Anthem, has the Blue Service Area for the State of Wisconsin. Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

**ANSWER:**

BCBS-MI admits that BCBS-WI is a subsidiary of Anthem and is a health plan licensed to use the Blue Cross and Blue Shield trademarks and trade names in Wisconsin. The second sentence of Paragraph 614 does not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the second sentence of Paragraph 614.

615.    Defendant Blue Cross Blue Shield of Wyoming has the Blue Service Area for the State of Wyoming. Plaintiffs will conduct discovery to determine whether it has market power in any health services markets and, if so, will include those markets in the motion for class certification.

**ANSWER:**

BCBS-MI admits that BCBS-WY is a health plan licensed to use the Blue Cross and Blue Shield trademarks and trade names in Wyoming. The second sentence of Paragraph 615 does not contain factual allegations to which a response is required. To the extent a response is deemed required, BCBS-MI denies the allegations in the second sentence of Paragraph 615.

### **Implementation of the Affordable Care Act**

616.    Of the 15 states where complete data on market share of the health insurance exchanges are available, Blues have obtained the greatest percentage of covered lives in 12 of those states. The 12 states (including the District of Columbia) are California, Colorado, Connecticut, Indiana, Virginia, the District of Columbia, Florida, Maryland, Michigan, Rhode Island, Vermont, and Washington. Plaintiffs allege that even though the data is not available in many other states including Alabama and Tennessee, the Blues have increased their market shares through the exchanges.

**ANSWER:**

BCBS-MI is without knowledge or information sufficient to form a belief as to the truth

of the allegations in the first and second sentences in Paragraph 616 and therefore denies those

allegations. BCBS-MI denies the allegations in the third sentence in Paragraph 616.

### Class Action Allegations

617. Plaintiffs bring this action on behalf of themselves and on behalf of a class of
healthcare providers. First, Plaintiffs bring this action seeking injunctive relief pursuant to the
provisions of Rule 23(a) and Rule 23(b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on
behalf of the following Class (the "Nationwide Injunction Class"):

> All healthcare providers, not owned or employed by any of the
> Defendants, who currently provide healthcare services, equipment
> or supplies in the United States of America.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring an action seeking injunctive relief on

behalf of a putative class as alleged in Paragraph 617, but denies that Plaintiffs' claims are

appropriate for class treatment or that Plaintiffs are entitled to any relief. BCBS-MI denies the

remaining allegations in Paragraph 617.

618. Further, Plaintiffs bring this action seeking damages pursuant to the provisions of
Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following
class (the "Nationwide Damages Class"):

> All healthcare providers, not owned or employed by any of the
> Defendants, in the United States of America, who provided
> covered services, equipment or supplies to any patient who was
> insured by, or who was a member or beneficiary of any plan
> administered by, a Defendant within four years prior to the date of
> the filing of this action.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring an action seeking damages on behalf of a

putative class or classes as alleged in Paragraph 618, but denies that Plaintiffs' claims are

252

appropriate for class treatment or that Plaintiffs are entitled to any relief.  BCBS-MI denies the

remaining allegations in Paragraph 618.

619.    For Plaintiffs' claims relating to violations of Section 1 of the Sherman Act under the rule of reason (Counts VI and VII), and claims relating to monopsonization and attempted monopsonization under Section 2 of the Sherman Act, (Counts VIII and IX), this class will have subclasses based on the geographic area in which each Plaintiff practices. In paragraphs 345-346; 351-354; 561-615, Plaintiffs have identified a number of geographic areas in which Defendants have market power. For Counts VI, VII, and IX, there is a subclass for each geographic area in which a Defendant has a market share of 40% or more, although Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis. For Count VIII, there is a subclass for each geographic area in which a Defendant has a market share of 70% or more although Plaintiffs reserve the right to adjust this percentage based upon discovery and expert analysis. Prior to class certification, Plaintiffs reserve the right to amend the definition of the subclasses if discovery into Defendants' market power warrants.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring an action seeking damages on behalf of a

putative class or classes and various subclasses as alleged in Paragraph 619, but denies that

Plaintiffs' claims are appropriate for class treatment or that Plaintiffs are entitled to any relief.

BCBS-MI is without knowledge or information sufficient to form a belief at this time as to the

truth of the remaining allegations in Paragraph 619 and therefore denies those allegations.

620.    Plaintiffs also reserve the right to request class certification under Rule 23(c)(4), Federal Rules of Civil Procedure.

**ANSWER:**

The allegations in Paragraph 620 are not factual allegations to which a response is

required.  To the extent a response is deemed required, BCBS-MI denies the allegations in

Paragraph 620.

621.    Plaintiffs' claims are typical of the claims of the other Class members, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class-action antitrust litigation. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 621.

622.    The anticompetitive conduct of Defendants alleged herein has imposed, and threatens to impose, a common antitrust injury on the Class Members. The Class Members are so numerous that joinder of all members is impracticable.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 622.

623.    Defendants' relationships with the Class Members and Defendants' anticompetitive conduct have been substantially uniform. Common questions of law and fact will predominate over any individual questions of law and fact.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 623.

624.    Defendants have acted, continue to act, refused to act, and continue to refuse to act on grounds generally applicable to Class Members, thereby making appropriate final injunctive relief with respect to Members of the Nationwide Injunctive Class as a whole.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 624.

625.    There will be no extraordinary difficulty in the management of this Class Action. Common questions of law and fact exist with respect to all Class Members and predominate over any questions solely affecting individual members. Among the questions of law and fact common to Class Members, many of which cannot be seriously disputed, are the following:

a.    Whether Defendants violated Section 1 of the Sherman Act;

b.    Whether Defendants participated in a contract, combination or conspiracy in restraint of trade as alleged herein;

c.    Whether Defendants engaged in a scheme to allocate the United States healthcare market according to an agreed upon geographic division and agreed not to compete within another plan's geographic area;

d.    Whether Defendants' agreements, including their Price Fixing Conspiracy, constitute *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act;

e.      Whether any pro-competitive justifications that Defendants may proffer for their conduct alleged herein do exist, and if such justifications do exist, whether those justifications outweigh the harm to competition caused by that conduct;

f.      Whether Defendants violated Section 2 of the Sherman Act;

g.      Whether the Blues collectively or any particular Blue has market power in a particular market;

h.      Whether the Blues conduct is anticompetitive as prohibited by the Sherman Act;

i.      Whether Class Members have been impacted or may be impacted by the harms to competition that are alleged herein;

j.      Whether Defendants' conduct should be enjoined;

k.      The proper measure of damages sustained by the Provider Class as a result of the conduct alleged herein;

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 625.

626.      These and other questions of law and fact are common to Class Members and predominate over any issues affecting only individual Class Members.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 626.

627.      The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 627.

628.      This Class Action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class Members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impractical for such Class Members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 628.

## COUNT I

### Claim for Injunctive Relief, 15 U.S.C. § 26

629.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

630.    This is a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action to attempt to obtain injunctive relief against Defendants, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

631.    As explained in Counts II through VII, Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy constitute violations of Section 1 of the Sherman Act, 15 U.S. C. § 1 under a per se, quick look, or rule of reason analysis.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 631.

632.    As explained in Counts VIII through X, Defendants' conduct constitutes violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 632.

633.    Defendants' unlawful conduct threatens to continue to injure Plaintiffs. Plaintiffs seek a permanent injunction prohibiting Defendants and all others acting in concert from continuing either of their illegal conspiracies and to take appropriate remedial action to correct and eliminate any remaining effects of either of the conspiracies.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action to attempt to obtain injunctive relief against Defendants, but denies that Plaintiffs can state any claim, or that Plaintiffs are entitled to any of the requested relief. BCBS-MI denies the remaining allegations in Paragraph 633.

634. Plaintiffs reserve the right to seek preliminary injunctions as necessary.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action to attempt to obtain injunctive relief against Defendants, but denies that Plaintiffs can state any claim, or that Plaintiffs are entitled to any of the requested relief.

**COUNT II**

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15
(The *Per Se* Market Allocation Conspiracy)**

635. Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

636. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to attempt to recover treble damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

637.    As alleged more specifically above, Defendants have engaged in a Market Allocation Conspiracy that represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C § 1.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 637.

638.    Defendants have agreed to divide and allocate the geographic markets for the finance of health care into a series of exclusive areas for each of the BCBSA members. Defendants have at the same time agreed to divide and allocate the geographic markets where provider reimbursement rates are determined. By so doing, the BCBSA members have agreed to suppress competition and to increase their profits by decreasing payments to healthcare providers in violation of Section 1 of the Sherman Act. Due to the lack of competition which results from Defendants' illegal conduct, healthcare providers who choose not to be in-network have an extremely limited market for the healthcare services they provide. Defendants' market allocation agreements are per se illegal under Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 638.

639.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 639.

## COUNT III

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (The *Per Se* Price Fixing and Boycott Conspiracy)

640.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

641.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

642.    The BCBS Price Fixing and Boycott Conspiracy operates in addition to and reinforces the Market Allocation Conspiracy. The Conspiracy alleged in this Count also represents a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act and is a per se violation of the Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 642.

643.    Through the Price Fixing and Boycott Conspiracy, the Blues have agreed to fix reimbursement rates for providers among themselves by reimbursing providers according to the "Host Plan" or "Participating Plan" reimbursement rate through the national programs. By so doing, Defendants have agreed to suppress competition by fixing and maintaining payments to healthcare providers at less than competitive levels in violation of Section 1 of the Sherman Act. Defendants' price fixing agreement through the national programs is per se illegal under Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 643.

644.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 644.

645.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

## COUNT IV

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### Quick Look Claim for Market Allocation Conspiracy

646.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

647.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

648.    Under a quick look analysis Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 648.

649.     "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999). The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to quote selected excerpts from *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999). BCBS-MI refers to that opinion for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 649.

650. The Market Allocation Conspiracy prevents the Blues, including many of the largest participants in the relevant product markets defined above, from competing nationally, regionally, or in the relevant geographic markets defined above.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 650.

651. The Market Allocation Conspiracy has no pro-competitive effect. The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 651.

652. The Defendants have not offered any new product. Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 652.

653. Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 653.

654. As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less,

having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 654.

655.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

**COUNT V**

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**Quick Look Claim for Price Fixing and Boycott Conspiracy**

656.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

657.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

658.    Under a quick look analysis Defendants' Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act.

**ANSWER:**

     BCBS-MI denies the allegations in Paragraph 658.

     659.   "[A]n observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). The arrangements also have an anticompetitive effect on health care providers and reduce output by health care providers.

**ANSWER:**

     BCBS-MI admits that Plaintiffs purport to quote selected excerpts from *California Dental Ass'n v. FTC*, 526 U.S. 756 (1999). BCBS-MI refers to that opinion for its contents and denies any characterization thereof. BCBS-MI denies the remaining allegations in Paragraph 659.

     660.   The Price Fixing and Boycott Conspiracy has the same effect and also results in price fixing because it prohibits any Blue Defendant but the Host or Participating Plan from negotiating the price of the goods and services in the relevant markets described above. *See Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

**ANSWER:**

     BCBS-MI denies the allegations in Paragraph 660.

     661.   The Price Fixing and Boycott Conspiracy has no pro-competitive effect. The restrictions that the Defendants have imposed on their relationships with health care providers are not related to the trademark rationales offered by the Defendants and have nothing to do with any issue related to consumer confusion.

**ANSWER:**

     BCBS-MI denies the allegations in Paragraph 661.

     662.   The Defendants have not offered any new product. Moreover, they would increase competition if they provided health care financing without the anticompetitive conspiracies that they are engaging in.

**ANSWER:**

     BCBS-MI denies the allegations in Paragraph 662.

     663.   Because a "quick look" shows that the Blues' arrangements are anticompetitive, no inquiry into market power is required.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 663.

664.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 664.

665.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

**COUNT VI**

**Claim for Threefold Damages and Interest, 15 U.S.C. § 15**
**Rule of Reason Claims for Market Allocation Conspiracy**

666.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

667.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

668.    Defendants' Market Allocation Conspiracy violates Section 1 of the Sherman Act under a rule of reason analysis and gives rise to damages to healthcare providers in markets throughout the country.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 668.

669.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 669.

670.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

## COUNT VII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Rule of Reason Claims for Price Fixing and Boycott Conspiracy)

671.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

672.    Plaintiffs bring these claims under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

673.    Defendants Price Fixing and Boycott Conspiracy violates Section 1 of the Sherman Act and gives rise to damages to health care providers in geographic markets throughout the country.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 673.

674.    As a direct and proximate result of Defendants' continuing violations of Section 1 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 674.

675.    Plaintiffs seek money damages from Defendants for their violations of Section 1 of the Sherman Act.

**ANSWER:**

BCBS-MI admits that Plaintiffs seek money damages from Defendants, but denies that Plaintiffs can state a claim under the Sherman Act, or that Plaintiffs are entitled to any of the requested relief.

## COUNT VIII

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Monopsonization)

676.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set

forth herein.

677.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton

Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can

state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

678.    As alleged more specifically above, the Defendants have engaged in conduct by which they have created or maintained monopsony power in the relevant product markets and geographic markets described above. For purposes of this Count, these Defendants are the ones identified as having a market share of 70% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants. This monopsony power has been durable, lasting for decades.

**ANSWER:**

The allegations in Paragraph 678 contain legal conclusions to which no response is

required.  To the extent a response to the allegations in Paragraph 678 is deemed required,

BCBS-MI denies the allegations in Paragraph 678.  BCBS-MI denies any remaining allegations

in Paragraph 678.

679.    These Defendants' creation of monopsony power was willful. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's monopsony power.

267

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 679.

680.    By willfully creating or maintaining monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 680.

681.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 681.

682.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 682.

## COUNT IX

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Attempted Monopsonization)

683.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

684.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

685.    As alleged more specifically above, the Defendants have engaged in conduct by which they have attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above. For purposes of this Count, these Defendants are the ones identified as having a market share of 40% or more in at least one geographic area, although Plaintiffs reserve the right to amend the list of Defendants subject to this Count if discovery into the Defendants' market power warrants.

**ANSWER:**

The allegations in Paragraph 685 contain legal conclusions to which no response is required.  To the extent a response to the allegations in Paragraph 685 is deemed required, BCBS-MI denies the allegations in Paragraph 685.  BCBS-MI denies any remaining allegations in Paragraph 685.

686.    These Defendants specifically intended to create monopsony power. An express purpose of the Defendants' conduct was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 686.

687.    By attempting to create or maintain monopsony power, these Defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well. Even when the Defendants have not yet created or maintained monopsony power, their conduct has created a dangerous risk of success.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 687.

688.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 688.

689.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 689.

## COUNT X

### Claim for Threefold Damages and Interest, 15 U.S.C. § 15
### (Conspiracy to Monopsonize)

690.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

**ANSWER:**

BCBS-MI repeats its responses to the allegations in all Paragraphs above as if fully set forth herein.

691.    Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

**ANSWER:**

BCBS-MI admits that Plaintiffs purport to bring a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest, but denies that Plaintiffs can state a claim under the Clayton Act, or that Plaintiffs are entitled to any of the requested relief.

692.    As alleged more specifically above, the Defendants have agreed to restrict competition among themselves in the relevant product markets and geographic markets described above, and thus to create monopsony power. The Defendants specifically intended to

270

create monopsony power. An express purpose of their agreements was to prevent the Defendants from competing with each other, and thus interfering with each other's attempts to create monopsony power. All Defendants have taken overt acts in furtherance of this conspiracy by signing the various agreements that restrict competition among them. This conspiracy has affected a substantial amount of interstate commerce.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 692.

693.    By conspiring to create or maintain monopsony power, the Defendants have conspired to violate Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Section 2 has been held to prohibit monopsonization as well.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 693.

694.    As a direct and proximate result of the Defendants' continuing violations of Section 2 of the Sherman Act, Plaintiffs have suffered and continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes the Defendants' conduct unlawful. These damages consist of having been paid less, having been forced to accept far less favorable rates and other contract terms, and/or having access to far fewer patients than they would have but for Defendants' anticompetitive agreement.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 694.

695.    As alleged above, the Defendants' use of their market power has also reduced the output of health care services.

**ANSWER:**

BCBS-MI denies the allegations in Paragraph 695.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

a.     Determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure and Appoint Plaintiffs as Class Representatives, and Counsel for Plaintiffs as Class Counsel;

b.     Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

c.    Adjudge and decree that Defendants have violated Section 2 of the Sherman Act;

d.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

e.    Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy.

f.    Permanently enjoin Defendants from utilizing challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

g.    In particular with respect to the Blue Card Program request the following permanent injunctive relief be ordered by Court:

    1)    The Defendants are enjoined from refusing to contract with Providers in Alabama even though those Providers are outside of the Defendants' service areas or adjacent counties thereto. Providers in Alabama may request contract negotiations with any Blue Plan with members residing in Alabama, and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

    2)    The Defendants are enjoined from refusing to contract with national and regional hospital chains with hospitals in Alabama to provide services to their members throughout the country, in the same manner that the Blue Plans are allowed to negotiate with national and regional pharmacy chains. The national and regional provider chains may request contract negotiations with any Blue Plan and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

    3)    Defendants may continue to operate the BlueCard Program. However, each Provider in Alabama shall have the right to opt-out of the Blue Card Program for any Blue that is either a Home Plan or Control Plan for any subscribers in Alabama, while remaining in the networks of BCBS-AL, and those Home Plans and Control Plans will have a good faith obligation to negotiate with the Providers who opt-out of the BlueCard Program. The opt-out right will be on a Blue by Blue basis so that a Provider will have the right to opt-out with respect to one Blue Plan but remain in the BlueCard Program for another Blue Plan. The opt-out right shall be exercised on a year by year basis.

    4)    Providers who are out of network for BCBS-AL but who treat subscribers of any other Blue Plan may request contract negotiations with any such Blue Plan and any such Blue Plan shall have a good faith obligation to negotiate with the Provider.

5) The failure of a Provider to negotiate in good faith with a Defendant will be a defense to any compliance dispute brought by a Provider under the terms of this injunction.

6) Defendants' may use non-Blue rental networks to supplement their networks, and any prohibition against the use of such a rental network is enjoined.

h. Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

i. Permanently enjoin Defendants from retaliating against any Plaintiff for participation in the litigation or enforcement of any remedy;

j. Require on-going periodic reporting on compliance by the Defendants, monitoring by the Special Master and the Court, and a process through which class members will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

k. Award Plaintiffs and the Damages Class or Classes damages in the form of three times the amount of damages suffered by Plaintiffs and members of the Class as proven at trial;

l. Award costs and attorneys' fees to Plaintiffs;

m. Award prejudgment interest;

n. For a trial by jury; and

o. Award any such other and further relief as may be just and proper.

## ANSWER:

BCBS-MI denies each and every allegation in the Fourth Amended Provider Complaint except as expressly admitted and qualified above. BCBS-MI requests that the Fourth Amended Provider Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of BCBS-MI, and that the Court award BCBS-MI its attorneys' fees, costs and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

BCBS-MI sets forth below its affirmative defenses. Each defense is asserted as to all claims against BCBS-MI. By setting forth these affirmative defenses, BCBS-MI does not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to the Plaintiffs. Nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to the Plaintiffs' allegations. BCBS-MI incorporates and re-alleges the factual allegations in the introduction to this answer as if fully set forth below.

As separate and distinct affirmative defenses, BCBS-MI alleges as follows:

1. Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations. The structure of the Blue Cross and Blue Shield Association and the Blue Plans has been a matter of public knowledge for decades. The exclusive service areas that Plaintiffs allege are anticompetitive have existed for more than half a century. Throughout this time, this system of exclusive service areas has been a matter of public knowledge, as they have been scrutinized by Congress, the Courts, the Federal Trade Commission, and the Department of Justice. Similarly, the current License Agreement has been in place for approximately fifteen years. Accordingly, Plaintiffs were on notice of any allegedly anticompetitive acts arising out of the exclusive service areas and License Agreement long before the applicable statute of limitations expired.

2. Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches. The structure of the Blue Cross Blue Shield Association and the Blue Plans has been a matter of public knowledge for decades. The exclusive service areas that Plaintiffs allege are anticompetitive have existed for more than half a century. Throughout this time, this system of exclusive service areas has been a matter of public knowledge, as they have been scrutinized by

Congress, the Courts, the Federal Trade Commission, and the Department of Justice. Similarly, the current License Agreement has been in place for approximately fifteen years. Accordingly, Plaintiffs became aware of any allegedly anticompetitive acts arising out of the exclusive service areas and License Agreement years ago.

3. Plaintiffs' claims are barred, in whole or in part, because the challenged conduct is ancillary to protecting the value of lawfully-acquired intellectual property rights and to licensure of those rights.

4. Plaintiffs' claims are barred, in whole or in part, because Plaintiffs do not have standing to raise those claims.

5. Plaintiffs' claims are barred, in whole or in part, because Defendants constitute a single entity with respect to the licensing and use of the nationwide Blue Cross and Blue Shield trademarks and trade names and are therefore incapable of conspiring under Section One of the Sherman Act.

6. Plaintiffs are barred, in whole or in part, from any recovery on the Fourth Amended Provider Complaint because Defendants' actions were privileged, justified, and/or excused.

7. Plaintiffs' claims are preempted and barred, in whole or in part, because Defendants' alleged conduct has implied or express immunity from the antitrust laws.

8. Plaintiffs' claims are barred, in whole or in part, by the McCarran-Ferguson Act. *See* 15 U.S.C. §§ 1011-1015.

9. Plaintiffs' claims are barred, in whole or in part, because they are preempted by the filed-rate doctrine and/or state action doctrine at both the federal and state levels.

10.     Plaintiffs' claims are barred, in whole or in part, because they are preempted and/or mooted by the Patient Protection and Affordable Care Act. *See* 42 U.S.C. § 18001 et seq.

11.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver due to Plaintiffs' own acts and omissions.

12.     Plaintiffs' claims are barred, in whole or in part, to the extent they conflict with contract provisions setting rates for reimbursement or limiting the period of time for which recovery can be obtained from Defendants.

13.     Plaintiffs' claims are barred, in whole or in part, by contractual arbitration provisions. Many contracts between a provider and a Blue Plan contain a mandatory arbitration provision. In fact, Plaintiffs admit that numerous Provider Plaintiffs have contracts with such arbitration provisions. *See supra* at ¶ 45. As these arbitration provisions are frequently included in the contracts Blue Plans have with providers, many of the claims for putative class members Plaintiffs seek to represent will similarly be subject to arbitration.

14.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel because, among other things, certain Plaintiffs' substantially equal participation in the alleged conduct.

15.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of res judicata and/or collateral estoppel.

16.     Plaintiffs' claims are barred, in whole or in part, because those claims have been settled and/or dismissed with prejudice in prior litigation.

17.     Plaintiffs' claims are barred, in whole or in part, because they have been released and/or waived.

18. Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs seek damages that would constitute duplicative recovery and/or offset.

19. Plaintiffs' claims are barred, in whole or in part, because any recovery would result in unjust enrichment to Plaintiffs.

20. Plaintiffs' claims are barred, in whole or in part, by their failure to mitigate, prevent, or avoid their alleged damages, if any, and therefore Plaintiffs' recovery, if any, should be reduced to the extent such damages could and should have been mitigated, prevented, or avoided.

21. BCBS-MI adopts by reference any defense, not otherwise expressly set forth herein, that is or will be pleaded by any other Defendant in this action.

## RESERVATION OF RIGHTS TO ASSERT ADDITIONAL DEFENSES

BCBS-MI has not knowingly or intentionally waived any applicable defenses, and it reserves the right to assert and rely upon other applicable defenses that may become available or apparent during discovery in this matter. BCBS-MI reserves the right to amend or seek to amend its answer and/or affirmative defenses.

## JURY DEMAND

BCBS-MI demands a trial by jury of all claims and defenses upon which it is entitled to a jury trial.

## PRAYER FOR RELIEF

BCBS-MI requests that the Amended Provider Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of BCBS-MI, and that the Court award BCBS-MI it attorneys' fees, costs, and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

Dated: July 12, 2017

Respectfully submitted,

/s/ Andrew P. Campbell
Andrew P. Campbell
Stephen Wadsworth
CAMPBELL, GUIN, WILLIAM, GUY &
GIDIERE LLC
505 North 20th Street, Suite 1600
Birmingham, AL 35203
205-224-0750
andrew.campbell@campbellguin.com
stephen.wadsworth@campbellguin.com

*Counsel for Blue Cross Blue Shield of Michigan*

278

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2017, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Andrew P. Campbell
Andrew P. Campbell