# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| against | ) ) ) | **JURY TRIAL REQUESTED** |
| BLUE CROSS BLUE SHIELD OF MICHIGAN, | ) ) ) ) | Civil Action No. Hon. |
| Defendant. | ) ) ) | |

# COMPLAINT

# TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................1

 A. BCBS-MI Uses Malicious Threats, Tortious Interference, and Duress to Force Anesthesiologists to Remain In-Network at Artificially Low Rates. ..................................................................3

 B. BCBS-MI's Conduct Also Violates the Federal Antitrust Laws. .........9

 C. BCBS-MI's Artificially Low Rate for Anesthesiology Is Harming Competition and Reducing the Number of Anesthesiologists in Michigan. ..................................................................12

 D. BCBS-MI Also Acquired and Maintained Monopoly Power Through Anticompetitive Most-Favored Nation Clauses. ...............................14

 E. BCBS-MI Also Acquired and Maintained Monopoly Power, and Unreasonably Restrained Trade, Through a Horizontal Conspiracy with Other Health Insurers. ..................................................................15

FACTUAL ALLEGATIONS ..................................................................17

 I. The Parties, Jurisdiction, and Venue ...................................................17

 II. The Anesthesiology Market ..................................................................20

  A. Compensation for Anesthesiology Services is Driven by Conversion Factors. ..................................................................22

  B. The Most Efficient Business Model for Anesthesiology is the Group Practice. ..................................................................27

 III. BCBS-MI Possesses Dominant Market Power in the Michigan Commercial Healthcare Market. ..........................................................31

  A. BCBS-MI Possesses Monopsony Power in the Commercial Market for Hospital Services. ..................................................................32

  B. BCBS-MI Possesses Monopsony Power in the Commercial Market for Anesthesiology Services. ..................................................................33

IV.   BCBS-MI Uses Malicious Threats, Tortious Interference, and Duress to Force A4 to Remain In-Network at Artificially Low Rates.....................35

    A.   After A4 Signals It May Leave BCBS-MI's Network, BCBS-MI Unlawfully and Maliciously Interferes with A4's Business, Including by Threatening to Boycott Hospitals that Work with A4. .................37

    B.   BCBS-MI Tortiously Interferes with A4's Contracts with Trinity Hospitals and A4's Employees. ..........................................................41

    C.   BCBS-MI Imposes Economic Duress on A4 by Willfully Breaching Its Contracts with A4's Part-Time Employees and Independent Contractors. ..........................................................................................46

    D.   In October 2020, BCBS-MI, in Concert with Trinity, Induces Trinity to Terminate Its Relationship with A4. ...............................................48

V.   BCBS-MI Has Engaged in Anticompetitive Acts to Reduce Competition, to Suppress the Price for Anesthesiology Services in Michigan, and to Acquire and Maintain Market Power. .......................................................48

    A.   BCBS-MI's Acts Against A4 Violate the Sherman Antitrust Act......48

    B.   BCBS-MI Uses Its Market Power Over Anesthesiology Services to Impose an Artificially Depressed Conversion Factor for Anesthesiology Services. ....................................................................50

    C.   BCBS-MI's Artificially Low Rate Is Reducing Output, Including by Restraining the Supply of Anesthesiologists and the Quality of Anesthesiology Services in Michigan..................................................54

    D.   BCBS-MI Also Acquired and Maintained Market Power Using Anticompetitive Most-Favored Nation Clauses.................................58

    E.   BCBS-MI Also Acquired and Maintained Market Power, and Unreasonably Restrained Trade, Through Exclusionary Horizontal Agreements with the Other Blues. ......................................................60

    F.   BCBS-MI Has Attained Market Power Through Its Interlocking Directorate with Trinity.....................................................................64

VI.  BCBS-MI's Anticompetitive Actions Are Unreasonable and Have
     Damaged A4. .................................................................................65

     A.  The Relevant Markets Involve the Sale of Commercial Health
         Insurance, the Sale of Commercial Hospital Services, and the Sale of
         Commercial Anesthesiology Services in Michigan. ..........................65

     B.  There is No Pro-Competitive Benefit Outweighing the Harms of
         BCBS-MI's Anticompetitive Conduct. ...............................................69

     C.  A4 Has Suffered Damages from BCBS-MI's Antitrust Violations....72

CLAIMS FOR RELIEF ............................................................................73

REQUEST FOR RELIEF ..........................................................................84

JURY DEMAND ......................................................................................85

Plaintiff Anesthesia Associates of Ann Arbor, PLLC, by and through its undersigned attorneys, alleges as follows, upon personal knowledge as to its own acts and status, and upon information and belief as to all other matters, for its Complaint against Defendant Blue Cross Blue Shield of Michigan:

## NATURE OF THE ACTION

1.      This action arises from a series of illegal actions taken by Defendant Blue Cross Blue Shield of Michigan ("BCBS-MI") that separately and in combination are destroying Plaintiff's business and unjustly enriching BCBS-MI. Defendant's illegal actions include: (a) malicious threats and duress concerning, and tortious interference with, plaintiff's contracts, business, and business partners; (b) contracts, combinations, and conspiracies in restraint of trade; and (c) monopolization and the abuse of monopoly power.

2.      Plaintiff Anesthesia Associates of Ann Arbor, PLLC ("A4") is one of the premier anesthesiology groups in Michigan.  Its anesthesiologists have undergone rigorous board certification, have introduced new procedures to Michigan hospitals, are professors at Wayne State University, and since the onset of the COVID-19 pandemic, have worked tirelessly, and at great personal risk to themselves, to perform life-saving intubations for those suffering from COVID-19. In any efficient market, A4 would be rewarded for its commitments to quality, innovation, and patient safety.  However, the tortious and anticompetitive conduct

of BCBS-MI has distorted Michigan's healthcare market and is destroying A4's business.

3.      Ordinarily, anesthesiologists negotiate with commercial health insurers over rates (the primary component of which is called the "conversion factor").  Including because of BCBS-MI's dominance of the commercial health insurance market in Michigan, there is no such negotiating with BCBS-MI. Instead BCBS-MI knowingly imposes an artificially low conversion factor that is, in BCBS-MI's own words, "uniform" across "anesthesiology practices in Michigan."  In 2018, BCBS-MI's "uniform" rate, according to data from the American Society of Anesthesiologists, ranked in the lower 25th percentile both nationally and regionally (*i.e.*, 75% of conversion factors nationally and regionally are higher).  BCBS-MI requires anesthesiologists to accept this low rate, despite acknowledging in a September 17, 2020 memorandum that Michigan specialist practitioners, including anesthesiologists, will suffer "***losses***" absent higher reimbursements from BCBS-MI.  (Emphasis added.)

4.      BCBS-MI's artificially low rate is itself anticompetitive and is leaving Michigan with a shortage of anesthesiologists.  BCBS-MI can impose this rate because, as its competitor Aetna has explained, "***BCBS-MI . . . are driving the market price for anesthesia***" in Michigan.  (Emphasis added.)  To impose its

artificially low rate and restrain competition, BCBS-MI relies on multiple tortious and anticompetitive schemes.

### A. BCBS-MI Uses Malicious Threats, Tortious Interference, and Duress to Force Anesthesiologists to Remain In-Network at Artificially Low Rates.

5.     BCBS-MI controls 67% or more of the commercial healthcare market in Michigan.  To eliminate competition from other commercial health insurers for anesthesiologists, BCBS-MI has exploited its market power over the facilities where anesthesia is administered—hospitals and medical centers. Anesthesiologists must be able to access these facilities to administer anesthesia. In April 2019, A4 told BCBS-MI that it could not continue to accept BCBS-MI's artificially low rate.  BCBS-MI immediately retaliated by maliciously interfering with A4's contracts, business, and business relationships, including by threatening to boycott the hospitals and medical facilities where A4 works, unless those facilities in turn boycotted A4 and/or forced A4 to comply with BCBS-MI's demands.

6.     On April 22, 2019, A4 learned of BCBS-MI's actions from one of A4's longtime partners, Trinity Health ("Trinity"), a national hospital network with nine hospitals in Michigan.  The news came from Trinity's chief executive officer for its Michigan hospitals, Rob Casalou, who also sits on BCBS-MI's board of directors.  Casalou wrote that he "spoke to BCBSM last Wednesday about" A4

possibly leaving BCBS-MI's network. BCBS-MI, he warned, was threatening "***to steer work away from facilities with A4***," *i.e.*, the medical facilities, including Trinity's hospitals, where A4 performs procedures. (Emphasis added.)

7.    Casalou explained that Trinity took BCBS-MI's boycott threat seriously. "BCBSM has a reputation for being ***the most aggressive*** of the payers in these situations," he cautioned, adding that if A4 even so much as sued BCBS-MI, "***the impact on our facilities and patients will eventually be felt***." (Emphasis added.)

8.    When Casalou sent that email, Trinity's Michigan hospitals and A4 had been working together for half a century. Just four years prior, A4 had been one of only four anesthesiology practices *in the nation* to be awarded Trinity's coveted "Preferred Provider" designation. Despite their long relationship, and despite Trinity lauding A4 as one of the best practice groups in the country, BCBS-MI had left Trinity with no choice. As Trinity would later explain, no hospital in Michigan can afford to lose BCBS-MI. In July 2019, Trinity, faced with a threat of boycott from Michigan's largest insurer, opted to terminate what it had called weeks earlier its "***long-standing and successful relationship with A4***." (Emphasis added.)

9.    At the same time, A4 was receiving nearly-identical warnings from its other hospital partner in Michigan, Beaumont Health ("Beaumont"), about what

BCBS-MI would do to Beaumont in retaliation for A4 going out of network.  As with Trinity, A4's anesthesiologists had worked in Beaumont's hospitals for years, with, for example, A4's cardiac anesthesiologists helping to bring improvements to Beaumont's Dearborn hospital.  But Beaumont could not risk losing BCBS-MI's business any more than Trinity could.  On July 5, 2019, BCBS-MI succeeded in causing Beaumont to send a termination notice to A4.

10.    BCBS-MI's unlawful and malicious threats had the purpose and effect of preventing A4 from practicing medicine if it went out of network with BCBS-MI.  BCBS-MI achieved that unlawful purpose when Trinity and Beaumont both announced their intent to terminate their long-term relationships with A4.

11.    Simultaneously with BCBS-MI's interference with A4's business relationships resulting from BCBS-MI's threat to boycott hospitals that worked with A4, BCBS-MI knowingly (i) coerced and induced Trinity's hospitals to breach non-solicit obligations they owed to A4 and (ii) conspired with Trinity to induce A4's employees to breach their non-compete obligations.

12.    A4 competes nationally for physicians and has made substantial investments in recruiting, training, and maintaining its team of anesthesiologists and clinical registered nurse anesthetists ("CRNAs").  To protect the investments in its practice, A4 has limited non-compete agreements with certain of its anesthesiologists and non-solicit agreements with the hospitals where its

5

anesthesiologists practice.  BCBS-MI knew of these non-compete and non-solicit obligations, including through Casalou.  Despite knowing of these agreements, beginning in or around June 2019, BCBS-MI acted through and in concert with Trinity's hospitals, to solicit and hire A4's anesthesiologists to work directly for Trinity, violating A4's contractual rights and causing damage to A4.

13.     Under pressure from BCBS-MI, and in conspiracy with BCBS-MI, Trinity in or around June 2019 solicited A4's doctors, promising that even if the doctors breached their agreements with A4, Trinity "***will indemnify the clinicians against any risk from the non-competes, if they agree to accept employment***" at Trinity's hospitals.  (Emphasis added.)  In making this offer, Trinity explicitly referenced the threat from BCBS-MI as motivating Trinity's attempt to hire A4's doctors.  Trinity's solicitation stated that Trinity was concerned with A4's "plan to depar[ticipate] with Blue Cross," because "***Blue Cross Blue Shield of Michigan has been very aggressive in the past in these types of situations***" and would potentially direct its insureds to "***alternative sites of care***."  (Emphasis added.)  Hence, "***if efforts to resolve this are unsuccessful . . . we will be prepared to approach A4 physicians and CRNAs about direct employment***."  (Emphasis added.)

14.     This solicitation also evidences the extent to which Trinity's actions were at the direction of, and in concert with, BCBS-MI.  For example, the

solicitation contains an unusual typo—it refers to A4 as "Ann Arbor Associates of Ann Arbor" instead of Anesthesia Associates of Ann Arbor; and a similar typo also appeared in BCBS-MI documentation from the same time. Within months, A4 had lost several physicians due to BCBS-MI's tortious interference.

15. Another prong of BCBS-MI's unlawful retaliation was economic duress aimed directly at A4, its part-time employees, and its independent contractors. A4 works with certain anesthesiologists and CRNAs who are independent contractors or part-time employees and who also provide services for other healthcare groups. These healthcare professionals have individual in-network contracts with BCBS-MI, covering the work they do with A4 and other providers. A4 did not require these individuals to go out of network with BCBS-MI, nor did they seek to do so. Nonetheless, BCBS-MI terminated the provider status of these independent contractors and part-time employees in July 2019, as punishment for working with A4. These terminations were without cause, without notice, and constituted breaches of BCBS-MI's contracts with the affected employees and CRNAs.

16. For A4's independent contractors and part-time employees, these terminations meant that even when they were working for other clients, they would not have in-network status, thereby jeopardizing their ability to work with other healthcare providers.

7

17.    After learning of the terminations, A4 wrote to BCBS-MI, stating that the terminations must have been an error, and asking that the affected employees and independent contractors have their provider status reinstated.  But it was not an error.  BCBS-MI's subsequent communications made clear that BCBS-MI would continue to breach its agreements, and unlawfully treat these healthcare practitioners as terminated, unless (i) they stopped working with A4 or (ii) A4 went back in-network with BCBS-MI.

18.    Faced with the threat of being put out of business, including by losing its hospital relationships and employees, A4 agreed to go back in-network with BCBS-MI and to accept BCBS-MI's artificially low conversion factor for anesthesiology.

19.    On Thursday, October 22, 2020, A4 attempted to resolve A4's claims against BCBS-MI by inviting BCBS-MI to negotiate before A4 filed this lawsuit. The following Monday, October 26, 2020, BCBS-MI informed A4 that it was refusing to negotiate with A4 on these issues.  Instead, BCBS-MI, in concert with Trinity, induced Trinity to send a notice terminating its long-standing work with A4.  The very next morning, Tuesday, October 27, 2020, Trinity sent a notice to A4 stating that Trinity was terminating all of A4's relationships with Trinity's hospitals in Michigan, effective in 180 days.

8

20.     BCBS-MI's tortious actions—its unlawful and malicious threats; its tortious interference; and its breach of its contracts to cause economic duress— caused, and continue to cause, significant damages to A4.

**B.     BCBS-MI's Conduct Also Violates the Federal Antitrust Laws.**

21.     BCBS-MI's acts to exclude A4 from the Michigan healthcare market, in addition to being torts against A4, also constitute violations of the Sherman Antitrust Act.  As discussed above, BCBS-MI exploited its monopoly power over medical facilities and coerced those facilities into conspiring with BCBS-MI to exclude A4 from practicing medicine in Michigan, for as long as A4 remained out of network with BCBS-MI.  BCBS-MI's exclusionary tactics succeeded because (i) BCBS-MI's 67% dominance of the Michigan commercial health insurance market means that Michigan's hospitals have no choice but to work with BCBS-MI, and (ii) anesthesiologists require medical facilities, including hospitals, to practice medicine.[1]  BCBS-MI's acts were calculated to reduce competition among commercial health insurers in Michigan.

22.     Commercial health insurers compete to attract purchasers of insurance (be they individuals seeking personal health insurance or organizations, such as

---

[1] Anesthesiologists who solely practice pain management, and do not perform any of the surgical, respiratory, or obstetric procedures that anesthesiologists are called on to provide, might be able to practice without access to a medical facility.  A4's practice includes surgical, cardiac, respiratory, and obstetric procedures and therefore requires access to medical facilities.

employers, seeking health insurance for their members).  One way that commercial

health insurers differentiate themselves to potential customers is by having a large

network of medical facilities, including hospitals, where their insureds can receive

the types of treatments that involve anesthesia (*e.g.*, facilities offering surgical,

cardiac, respiratory, and/or obstetric care).  To be able to provide that offering to

their insureds, it is important for insurers to reach in-network agreements with the

various medical providers at those facilities—including the operators of the

facility, the surgeons or other specialists, and the anesthesiologists.  By investing

the necessary resources to reach in-network agreements with the providers,

including anesthesiologists, at a given facility, an insurance company can offer

their insureds coverage for all aspects of their care at that location.

23.	Ordinarily then, health insurers would compete to make sure that they

have in-network relationships with the anesthesia providers at the facilities where

the insurer wants to provide member benefits, including by paying competitive

rates for anesthesiology services.  If for example, an insurer is paying significantly

below the market price for anesthesiology services, anesthesiologists would be

unwilling to go, or stay, in-network with that insurer, and the insurer would have

difficulties in offering as complete a coverage offering as its competitors.

However, BCBS-MI's exclusionary tactics have meant that it no longer has to

compete with other commercial insurers to bring, and keep, anesthesiologists in-network.

24.     BCBS-MI's boycott threats have created a market where medical facilities are not as a practical matter able to work with anesthesiologists who are outside of BCBS-MI's network. As A4 experienced, going in-network with BCBS-MI has become a *de facto* requirement for practicing anesthesiology in Michigan. The result is that BCBS-MI need not compete with other insurers to have anesthesiologists join its network. Anesthesiologists who wish to work in Michigan hospitals lack a choice but to work with BCBS-MI and to accept its artificially low reimbursement rate.

25.     BCBS-MI's conduct has removed the ability of competing insurers to compete for in-network arrangements with anesthesiologists, to better serve their customers and compete with BCBS-MI. Even if a competing health insurer succeeded in contracting with anesthesiologists that were out of BCBS-MI's network, those anesthesiologists would, due to BCBS-MI's boycott threats, be unable to practice in Michigan. It would therefore be impossible for those anesthesiologists to serve the competing health insurer's customers, thus damaging competition and consumers.

26.     BCBS-MI's anticompetitive acts allow it to dominate the market for anesthesiologist services and to apply artificially low rates and restrain

competition.  When A4 asked one of BCBS-MI's competitors, Aetna, to increase

its rates, Aetna replied, "Your reimbursement concerns need to start with ***BCBS-***

***MI since they are driving the market price for anesthesia***."

27.     BCBS-MI has no pro-competitive justification for its anticompetitive

actions, which constitutes violations of both Section 1 and Section 2 of the

Sherman Antitrust Act.  A4 has suffered, and will continue to suffer, damages from

these torts and antitrust violations.  Those damages flow directly from the

anticompetitive nature of BCBS-MI's conduct.

**C.     BCBS-MI's Artificially Low Rate for Anesthesiology Is Harming Competition and Reducing the Number of Anesthesiologists in Michigan.**

28.     BCBS-MI has abused the market power it obtained through its

tortious and anticompetitive conduct to impose an anesthesiology rate in Michigan

that is itself anticompetitive.  BCBS-MI's state-wide anesthesiology conversion

factor is one of the lowest in the country, despite the fact that Medicare's

anesthesiology conversion factor for the Detroit area, where A4 provides

anesthesiology services, is one of the highest in the country.  Bureau of Labor

Statistics data from May 2019 shows that the annual mean wage for

anesthesiologists in Michigan *is lower than in Indiana, Illinois, Wisconsin, and*

*Pennsylvania* (data for Ohio was not available).

29.     BCBS-MI's artificially low rate is so low that it reduces output, including by restricting the supply of anesthesiologists in Michigan.  A4 has recently lost multiple doctors who left to practice in Toledo, Ohio, about an hour's drive south of Ann Arbor, Michigan.  Based on American Society of Anesthesiologists data, Ohio's average conversion factor for anesthesiology in 2018 was about $10 higher than BCBS-MI's.  Because of how anesthesiology billing is calculated, a $10 difference in the conversion factor can result in a *$40 per hour* difference or more in compensation.  A research brief by the RAND Corporation shows Michigan facing a shortage of both anesthesiologists and CRNAs.[2]

30.     BCBS-MI's artificially low conversion factor has not resulted in lower premiums for consumers.  Instead, Kaiser Family Foundation data shows that Michigan has some of the highest insurance premiums in the country.  BCBS-MI has no pro-competitive justification for imposing an artificially low rate for anesthesiology.  Its actions constitute a violation of Section 2 of the Sherman Antitrust Act.  A4 has suffered, and will continue to suffer, damages from these torts and antitrust violations.  Those damages flow directly from the anticompetitive nature of BCBS-MI's conduct.

---

[2] Lindsay Daugherty et al., *Is There a Shortage of Anesthesia Providers in the United States?*, RAND Corp. (2010), https://www.rand.org/pubs/research_briefs/RB9541.html.

**D. BCBS-MI Also Acquired and Maintained Monopoly Power Through Anticompetitive Most-Favored Nation Clauses.**

31. BCBS-MI has engaged in anticompetitive acts for more than a decade, and continuing today, to acquire and maintain the monopoly power it exploits to impose an artificially low rate for anesthesiology. BCBS-MI's anticompetitive acts include most-favored nation ("MFN") clauses that it imposed on Michigan hospitals. The purpose of these MFN clause was to keep the costs of BCBS-MI's competitors artificially high, thereby making it harder for them to compete with BCBS-MI. Beginning in approximately 2008, BCBS-MI had succeeded in using these clauses to harm competition. Eventually, BCBS-MI had MFN or similar clauses with over 70 hospitals in Michigan.

32. BCBS-MI used two types of MFN-clauses. In one type, the hospital had to promise that it would *charge BCBS-MI's competitors more than the hospital charged BCBS-MI* for the same services. Under the other type of MFN clause, the hospitals promised to charge BCBS-MI's competitors *at least as much* as the hospital charged BCBS-MI. These clauses suppressed competition and innovation in the market for hospital services, by creating an environment where BCBS-MI's competitors could not lower their costs.

33. BCBS-MI's scheme entrenched its market power at the cost of its competitors (who had artificially higher costs), consumers (who had artificially higher premiums), and other medical providers who did not have MFN agreements

14

with BCBS-MI (as higher payments to hospitals with MFN clauses meant that there was less money to pay providers).

34.     BCBS-MI has no pro-competitive justification for its MFN scheme, which constitutes violations of both Section 1 and Section 2 of the Sherman Antitrust Act.  A4 has suffered, and will continue to suffer, damages from these antitrust violations.  Those damages flow directly from the anticompetitive nature of BCBS-MI's conduct.

**E.     BCBS-MI Also Acquired and Maintained Monopoly Power, and Unreasonably Restrained Trade, Through a Horizontal Conspiracy with Other Health Insurers.**

35.     BCBS-MI has also acquired and maintained market power through a horizontal conspiracy with other Blue Cross Blue Shield insurers.  BCBS-MI entered into this conspiracy in discussions with other Blue Cross Blue Shield insurers (collectively, "Blues"), including discussions in June 2013.  The conspiracy is implemented in a so-called "amended license agreement" pursuant to which all of the Blues agree to multiple anticompetitive restraints.

36.     For example, the "amended license agreement" divides the country into geographic markets, referred to as service areas, in which BCBS-MI and the Blues will not compete with each other, even using trademarks other than the Blue Cross Blue Shield trademark.  Accordingly, BCBS-MI can operate in Michigan essentially free from competition from the other Blues and they in turn can operate

15

in their territories relatively free from competition by BCBS-MI.  This horizontal conspiracy requires BCBS-MI and the other Blues to restrict the amount of revenue generated by their non-Blue subsidiaries.  This output restriction thereby ensures that the Blues do not circumvent the geographic restrictions by competing under other brand names.

37.    The Blues are independent companies and would compete under normal market conditions.  However, the geographic and output restrictions in the "amended license agreement" allow BCBS-MI to insulate itself from the normal forces of competition, thereby keeping premiums up and provider reimbursements down.

38.    In addition, the "amended license agreement" requires the Blues, and BCBS-MI, to participate in the BlueCard program, a method by which the Blues fix prices and boycott healthcare providers outside of their respective service areas. Under the BlueCard program, if A4 provides medically necessary care to someone insured by the Blues in Ohio or Florida for example, A4 cannot enter into an agreement with those insurers.  Instead, A4 must submit the charges to BCBS-MI and accept BCBS-MI's rates.  This price fixing and boycott conspiracy further allows BCBS-MI to keep its provider reimbursements low, without having to worry about competition.

39.     BCBS-MI has no pro-competitive justification for its horizontal conspiracy, which constitutes violations of both Section 1 and Section 2 of the Sherman Antitrust Act.  A4 has suffered, and will continue to suffer, damages from these antitrust violations.  Those damages flow directly from the anticompetitive nature of BCBS-MI's conduct.

## FACTUAL ALLEGATIONS

### I.     The Parties, Jurisdiction, and Venue

40.     Plaintiff A4 is a professional limited liability company owned by anesthesiologists in Michigan and with a principal place of business in Ann, Arbor, Michigan.  Its employee-owners are board-certified anesthesiologists practicing in Michigan.  Originally founded as a professional corporation in 1968, A4 has grown into one of the largest and most respected anesthesiology practices in the state.  Its doctors work with some of the top physicians in Michigan performing state-of-the-art procedures.  A4's doctors have worked tirelessly on the front lines of the COVID-19 pandemic, performing the life-saving intubations required before a patient can go on a ventilator.  While A4 previously served patients in Grand Rapids, Michigan, as of 2019, BCBS-MI's anticompetitive acts have limited A4 to operating in Southeastern Michigan.

41.     Defendant BCBS-MI is the largest commercial health insurer in Michigan and the ninth largest insurer in the country.  Headquartered at 600 E.

Lafayette Blvd., Detroit, Michigan 48226, BCBS-MI provides private health insurance to over 4.5 million insureds in Michigan, and controls 67% or more of Michigan's commercial health insurance market. BCBS-MI has the privilege of being the only Michigan entity licensed to use Blue Cross Blue Shield branding, which is administered nationally by the Blue Cross Blue Shield Administration ("BCBSA"). While BCBS-MI is nominally a nonprofit mutual health insurance company, its chief executive officer received over $19 million in compensation in 2018, the highest among all Blue Cross Blue Shield insurance companies and higher than the CEOs of almost every Michigan *for-profit* company, including Ford and Fiat Chrysler.

42. Prior to 2013, BCBS-MI operated as a non-profit corporation, exempt from state and local (but not federal) taxation under Michigan law, but with regulatory requirements, including that it serve as the state's "insurer of last resort." However, in 2010, the Affordable Care Act was signed into law, which prohibits health insurers from refusing to cover a person or charging that person more because of a pre-existing condition. Subsequently in 2013, Michigan enacted legislation, pursuant to which BCBS-MI converted into a mutual nonprofit and, among other things, ceased being "the state's 'insurer of last resort.'"[3] Subsequent

---

[3] Jeff Karoub, *Gov. Snyder Signs Blue Cross Blue Shield Overhaul*, Oakland Press (Mar. 18, 2013), https://www.theoaklandpress.com/news/gov-snyder-signs-blue-cross-blue-shield-overhaul/article_3385072c-8ca8-5c14-80a3-58fc33adf27a.html.

to 2010, BCBS-MI and its co-conspirators substantially increased their anticompetitive restraints and their market power. These federal and state legislative enactments, and the responses to them by BCBS-MI and its co-conspirators, substantially changed the markets for commercial healthcare insurance in Michigan and related markets in Michigan.

43. BCBS-MI is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, BCBS-MI's artificially low rate for anesthesiology services has caused A4 to lose multiple anesthesiologists who left to work in Ohio. BCBS-MI's low rate for anesthesiology services has also made it more difficult for A4 to compete nationally to recruit anesthesiologists. BCBS-MI provides commercial health insurance that covers Michigan residents when they travel across state lines, purchases health care in interstate commerce when Michigan residents require health care out of state, and receives payments from customers located outside Michigan.

44. This Court possesses personal jurisdiction over BCBS-MI, because BCBS-MI is headquartered in and has its principal place of business in Detroit, Michigan. For the same reason, venue is proper in this District under Section 12 of the Clayton Act. 15 U.S.C. § 22.

19

45. This Court has subject matter jurisdiction over A4's Clayton Act claims and jurisdiction pursuant to 15 U.S.C. § 15, 28 U.S.C. § 1331, and/or 28 U.S.C. § 1337(a). BCBS-MI's antitrust violations have harmed A4 in this district and elsewhere. This Court has supplemental jurisdiction over A4's claims under Michigan law, pursuant to 28 U.S.C. § 1367 and principles of pendent jurisdiction.

## II. The Anesthesiology Market

46. Anesthesiology is one of the most vital specialties in medicine as well as one of the most physically and mentally demanding. The anesthesiologist is called on to perform a feat that to this day remains a miracle of medicine: keeping patients alive; safe; and in comfort; while they undergo invasive procedures.[4] Whether the procedure lasts 20 minutes or 20 hours, the anesthesiologist is called on to make split-second decisions and adjustments to ensure that the patient's airways, breathing, and circulation are functioning properly. Including because anesthesiologists are tasked with keeping patients safe when they are at their most vulnerable, anesthesiology is known as "one of the most intense physician–patient relationships in medicine."[5]

---

[4] "It is, quite literally, the physician anesthesiologist's job to keep patient's alive during invasive procedures." *Anesthesiology Specialty Description*, Am. Med. Assoc., https://www.ama-assn.org/specialty/anesthesiology-specialty-description (last accessed Oct. 9, 2020).

[5] *Id.*

47.    Anesthesiology covers a wide range of procedures, including cardiac anesthesiology, neuroanesthesiology, obstetric anesthesiology, and pediatric anesthesiology.  During the COVID-19 pandemic, the need for anesthesiologists has grown, as have the concomitant sacrifices they are called on to make for their patients.  COVID-19's tragic symptoms have led to a sharp increase in the use of ventilators, as increasing numbers of patients lose the ability to breathe on their own.  Before a patient can be placed on a ventilator, they must be intubated, and it is anesthesiologists who perform this life-saving procedure, one that that also puts the anesthesiologist directly at risk of infection.  As COVID-19 cases continue to grow, anesthesiologists, including the doctors at A4, are performing more and more intubations, putting themselves in harms' way to ensure that patients get the care they need.

48.    The unique role of anesthesiologists in medicine has shaped the market for anesthesiology services, leading to a compensation model that is different from all other medical specialties.  A4 below provides a brief background on the market for anesthesiology services to provide context for the harm BCBS-MI continues to exact upon that market, to the detriment of competition, anesthesiologists, and patients.

A.      **Compensation for Anesthesiology Services is Driven by Conversion Factors.**

49.     The compensation structure for anesthesiology has changed dramatically over the last century, with compensation today being largely driven by conversion factors.  In the 1940s, anesthesiologists were often compensated with a fixed percentage, around 20%, of the cost of each surgery where they administered anesthesia.[6]  This method was inefficient as it failed to tie compensation to the specific contributions anesthesiologists provide.  A relatively simple surgery might present complex issues for the anesthesiologist and vice versa.  *United States v. Am. Soc. of Anesthesiologists, Inc.*, 473 F. Supp. 147, 152 (S.D.N.Y. 1979) (hereinafter *ASA, Inc.*).

50.     In the 1950s, a new compensation model was pioneered in California, where the anesthesiologist would be paid based on multiple factors including the time spent and the complexity of the work.[7]  This system, referred to as the "Relative Value Guide," method has continued to evolve and is used to this day in various iterations across different payers, both public and private, including Medicare.  This time-based compensation system is unique to anesthesiologists among medical practitioners.

---

[6] Kenneth Y. Pauker, *A History of RBRVS as a Perspective on P4P – Part 1*, Cal. Soc. Anesthesiologists Bulletin 42, 44 (Spring 2006).

[7] *Pauker, supra* at 44.

51.     The basic inputs into compensation under the Relative Value Guide are four-fold: a base factor; modifiers; time; and a conversion factor.

52.     *Base Factors and Modifiers:* The base factor and modifiers are numerical units which vary, respectively, depending on the procedure being performed and the characteristics of the patient.  More complex procedures have higher base factors, and patients with complicating conditions are associated with higher modifiers.  Base factors are generally the same across the United States, with private insurers adopting the base factors used by Medicare.  While the specific types of modifiers and how much they affect base compensation can vary across anesthesiologists and payers, the relatively small size of the modifiers means that they tend not to drive large differences among anesthesiology compensation.

53.     *Time:* The next variable, time, reflects how long the anesthesiologist spent on the procedure, typically measured in 15-minute units from when the anesthesiologist begins preparing the patient to when the patient is placed safely under post-operative care.[8]  If an anesthesiologist spends 30 minutes on the procedure, that would equate to two time units.  Aside from variations on how to

---

[8] Peter DeSocio & Vijay Saluja, *Definition of Anesthesia Time*, Am. Soc. Anesthesiologists, https://www.asahq.org/quality-and-practice-management/managing-your-practice/timely-topics-in-payment-and-practice-management/2019-relative-value-guide-updates-include-anesthesia-time-and-field-avoidance (last accessed Oct. 10, 2020).

round to the nearest time unit and what the precise start and stop points are, the time factor is generally treated the same across anesthesiologists in the United States.

54.    *Conversion Factor:* the final variable, the conversion factor, is the one that varies the most across the United States.  Because the other three variables are generally the same across the country, commercial insurers compete to sign up anesthesiologists to their networks by offering higher conversion factors than their competitors.  The conversion factor is intended to take into account geographic differences, differences in cost of care, and the quality of the anesthesiologist.  All else being equal, a practitioner in a higher cost of living area will have a higher conversion factor than one in an lower cost of living area, and an anesthesiologist that delivers higher quality of care will charge a higher conversion factor than an anesthesiologist in the same area that delivers a lower quality of care.

55.    The conversion factor is multiplied by the base compensation, modifiers, and time to yield the total allowance for the anesthesiologist's work on a given procedure.

56.    In an efficient market, the conversion factor would vary considerably across different anesthesiologists and different locations, reflecting the different value propositions that anesthesiologists present and the different costs of care.  As

the *ASA, Inc.* court observed, "conversion factors often vary from physician to physician." 473 F. Supp. at 155.

57.     Even Medicare, which has the luxury of not having to follow market forces, varies its conversion factors widely both among and within states, to reflect changes in the cost of care. For example, Medicare has two different conversion factors for Michigan, with anesthesiologists in the Detroit area (including Macomb, Oakland, Washtenaw, and Wayne counties) being paid pursuant to a Medicare conversion factor of $23.07, one of the highest Medicare conversion factors in the country, ranking approximately 28th highest out of over 100 localities.

58.     If conversion factors did not vary by location, anesthesiologists would, as a practical matter, largely be pushed to practice in the lowest-cost locations. Geographic variance in conversion factors therefore ensures that patients in high-cost areas can receive needed medical care.

59.     The conversion factors paid by commercial health insurers tend to be much higher than Medicare conversion favors. Nationwide, the average Medicare conversion factor is about 29.1% of the average commercial conversion factor for anesthesiology.[9] The large gap stems from a Medicare decision in the early 1990s

---

[9] Stanley W. Stead & Sharon K. Merrick, *ASA Survey Results for Commercial Fees Paid for Anesthesia Services – 2018*, 82 ASA Monitor.

to increase compensation for general practitioners while reducing it for
anesthesiologists. Medicare rates for anesthesiology were cut by about 40%,
resulting in Medicare payments being much lower for anesthesiologists compared
to many other medical practitioners.[10] Since then, Medicare reimbursements for
anesthesiologists have remained depressed, to the point where Medicare payments
are not sufficient to cover the cost of practicing anesthesia. As a result,
anesthesiologists depend on payments from commercial payers to continue
operating.

60. Aside from the Relative Value Guide components, there is an
additional factor affecting how anesthesiology rates are calculated: CRNA
discounts. A CRNA is a certified registered nurse anesthetist. In Michigan, a
CRNA can assist the provision of anesthesiology services but cannot provide those
services absent the supervision of an anesthesiologist. In Michigan it is common
for hospitals to employ CRNAs. When an independent anesthesiologist works
with a hospital CRNA on a procedure, BCBS-MI takes the Relative Value Guide
compensation that otherwise would be due to the anesthesiologist and withholds
45% to pay the hospital. For example, when A4 performs a procedures on a

---

[10] *The Other Big Medicare Payment Problem – The Low, Low Anesthesia Conversion Factor*,
Anesthesia Bus. Consultants (May 3, 2010),
https://www.anesthesiallc.com/publications/anesthesia-provider-news-ealerts/428-the-other-big-
medicare-payment-problem-the-low-low-anesthesia-conversion-factor.

BCBS-MI customer at a Trinity hospital that employs its own CRNAs, A4 will get only 55% of the anesthesiology reimbursement and BCBS-MI will pay the hospital the other 45%. Hospitals have an interest in anesthesiologists negotiating competitive rates with insurers, including because the hospital gets to enjoy the benefit of those increased rates when it receives insurance compensation for the CRNAs it employs.

**B. The Most Efficient Business Model for Anesthesiology is the Group Practice.**

61. Just as anesthesiologist compensation changed over time, so too has the market for anesthesiology services. Anesthesia practitioners originally were considered hospital staff and lacked the independence, respect, and pay associated with other medical professionals. *ASA, Inc.*, 473 F. Supp. at 150. Under this model, the anesthesiologist's client was the hospital, not the patient. *Id.* After World War II, anesthesiologists would move away from the employee model and instead form collaborative practice groups. *See id.* By 1979, around 90% of all active anesthesiologists were working independently or in practice groups rather than receiving hospital salaries. *Id.*

62. The practice group model has multiple benefits for quality of care. It provides the anesthesiologist with a collaborative work environment aimed at honing and improving his or her craft, rather than simply pleasing one's immediate boss. It also provides flexibility so that surgeons can seek out anesthesiologist

with whom they have a rapport and develop long-lasting working relationships, even if they have separate employers.  Being independent also permits anesthesiologists to work at multiple hospitals, performing different types of procedures and dealing with different types of patients, all the while increasing the depth and breadth of their skills.

63.     From the hospital's perspective, the practice group model has benefits as well.  Trinity, which operates one of the largest hospital chains in Michigan, has explained:

> In order to be able to efficiently schedule anesthesia services for the wide range of surgeries and other procedures performed in hospitals, and in order to obtain the services of anesthesiologists to address administrative and quality issues related to those procedures, it is more efficient for hospitals not employing anesthesiologists to deal with a single group in an exclusive relationship.  These anesthesiologists may also serve in other roles at the hospital, including in leadership and on the medical faculty.[11]

64.     Thus, anesthesiology practice groups help ensure both efficiency and quality of care.

65.     The primary compensation source for independent anesthesiologists (whether working individually or in practice groups) is insurance reimbursements. In working with insurance payers (whether public or private), anesthesiologists must decide whether to be in-network or out-of-network.  In-network means that

---

[11] *Trinity Health v. Anesthesia Assoc. of Ann Arbor, PLLC*, No. 19-cv-12145-LVP-RSW, Complaint ¶ 36 (E.D. Mich. July 23, 2019).

the anesthesiologist has contracted with the insurance company to be compensated according to a specific formula when the anesthesiologist treats patients insured by that insurer.

66.     When an anesthesiologist is out-of-network with an insurance company, he or she does not have a pre-existing agreement on rates with the insurance company, and instead each bill is negotiated (and sometimes litigated) with the insurer on a case-by-case basis.  If the out-of-network insurer refuses to pay the amount requested by the anesthesiologist, the physician has two options: (1) suing the insurance company; or (2) billing the patient for the remainder.

67.     When A4 informed BCBS-MI in 2019 that it was considering going out of network with the insurer, A4 repeatedly confirmed to BCBS-MI and to the hospitals where A4 worked that A4 would not balance bill any of BCBS-MI's insureds.  Put differently, A4 confirmed that it would not charge BCBS-MI's insureds any more after A4 went out-of-network than A4 would have when it was in-network.

68.     Because it is important for commercial insurers to offer their customers sufficient in-network coverage for anesthesiology services, more competition among insurers will generally result in higher in-network rates for doctors, including anesthesiologists.

69.     Whatever model an anesthesiologist decides to take—in-network, out-of-network, or employed by a hospital—one factor remains constant: with the exception of anesthesiologists who solely provide pain management, all practicing anesthesiologists, A4 included, depend entirely on medical facilities, such as Trinity, for work.  An anesthesiologist's role is to perform, and to keep patients safe during, medical procedures, be they surgical, respiratory, obstetric, or otherwise.  Without a medical facility for these procedures to take place, an anesthesiologist has no practice.  A patient cannot visit an anesthesiologist's office, receive anesthesia, and then walk down the street to undergo surgery.  Anesthesia must be administered at the site of, and contemporaneous with, the patient's medical procedure.  The simple and unavoidable fact of anesthesiology is that practitioners who administer anesthesia have no choice but to work with medical facilities, such as Trinity's hospitals.  As explained below, BCBS-MI would go on to exploit this fact as part of its ongoing efforts to reduce competition in Michigan's healthcare markets.

### III. BCBS-MI Possesses Dominant Market Power in the Michigan Commercial Healthcare Market.

70.     BCBS-MI dominates, by any measure, the commercial healthcare market in Michigan.  BCBS-MI describes itself as "[t]he largest health insurer in Michigan, serving 4.5 million people here and 1.6 million more in other states."[12]

71.     BCBS-MI has a 67% or greater share of the commercial health insurance market in Michigan.[13]  BCBS-MI has an even higher share of the market for preferred provider organization ("PPO") insurance plans.  Under PPO insurance, the insurer provides coverage of both in-network and out-of-network providers.  BCBS-MI has 78% or more of the PPO market in Michigan.[14]

72.     BCBS-MI's dominance is reflected in the heavy concentration in the commercial health insurance market in Michigan.  Under the Herfindahl–Hirschman Index ("HHI"), which the U.S. Department of Justice employs to measure market concentration, Michigan's commercial insurance market has a score of 4,648.[15]  HHI increases as competition goes down, and Michigan's 4,648 score is *almost double* the 2,500 point threshold at which markets are deemed

---

[12] *Fast Facts*, BCBS-MI, https://www.bcbsm.com/index/about-us/our-company/fast-facts.html (last accessed Oct. 10, 2020).

[13] *Competition in Health Insurance: A comprehensive study of U.S. markets*, Am. Med. Ass'n 14 (2019).

[14] *Id.*

[15] *Id.*

highly concentrated.[16]  Likewise, the American Medical Association in 2019 concluded that Michigan is one of the ten *least competitive* states for commercial health insurance.[17]

### A. BCBS-MI Possesses Monopsony Power in the Commercial Market for Hospital Services.

73.     BCBS-MI is the dominant commercial buyer of hospital services in Michigan.  BCBS-MI describes itself as "[t]he largest network of doctors and hospitals in Michigan: 152 hospitals, and more than 33,000 doctors."[18]  According to Trinity, no hospital in Michigan can afford to be out of network with BCBS-MI.

74.     One of Michigan's hospital systems, Beaumont, considered going out of network with BCBS-MI in 2011, because of BCBS-MI's attempt to impose a new rate structure on Beaumont.  In early 2012, Beaumont relented and agreed to remain in-network with BCBS-MI under a new rate structure.  In 2019, Trinity explained that one of the reasons it was concerned about BCBS-MI's aggressive response to A4's plan to go out of network was because BCBS-MI had reacted so aggressively to Beaumont in 2011.  Trinity circulated a document to A4's doctors

---

[16] *See Herfindahl-Hirschman Index,* Dep't of Justice (July 31, 2018), https://www.justice.gov/atr/herfindahl-hirschman-index.

[17] *Ten States With Least Competitive Health Insurance Markets*, Am. Med. Assoc. (Sept. 17, 2019). https://www.ama-assn.org/delivering-care/patient-support-advocacy/10-states-least-competitive-health-insurance-markets.

[18] *Fast Facts*, BCBS-MI, https://www.bcbsm.com/index/about-us/our-company/fast-facts.html (last accessed Oct. 10, 2020).

in or around June 2019, stating, "***We understand that Blue Cross Blue Shield of Michigan has been very aggressive in the past in these types of situations.  For example, when Beaumont threatened to departicipate in 2011, we understand from public sources that BCBSM sent mailings identifying alternative sites of care***."  (Emphasis added.)

75.     BCBS-MI's market power over hospitals in Michigan is also evidenced by the MFN clauses it imposed on hospitals.  According to the United States Department of Justice and the Michigan Attorney General, by October 2010, BCBS-MI had obtained "agreements containing MFNs or similar clauses with over half of Michigan's 131 general acute care hospitals, representing more than 40% of Michigan's acute care hospital beds."[19]

## B.    BCBS-MI Possesses Monopsony Power in the Commercial Market for Anesthesiology Services.

76.     BCBS-MI is also the dominant purchaser of anesthesiology services. One of BCBS-MI's competitors, Aetna, confirmed this market power when it wrote to A4, "[Y]our reimbursement concerns need to start with BCBS-MI since they are driving the market price for anesthesia."

77.     BCBS-MI's monopsony power is evident in its ability to impose a uniform conversion factor for anesthesiology across the entire state of Michigan,

---

[19] *United States v. Blue Cross Blue Shield of Michigan*, No. 10-cv-14155-DPH-MKM, Complaint ¶ 3 (E.D. Mich. Oct. 18, 2020).

despite the intrastate differences in cost of care.  As BCBS-MI itself stated in a "Network Update," dated July 10 2019, A4's attempt to refuse to accept BCBS-MI's rate set it "apart from other anesthesiology practices in Michigan which <u>all</u> accept the current uniform Blue Cross contracted payment as payment in full." (Emphasis in original.)  According to BCBS-MI, it had succeeded in imposing a "uniform" conversion factor for anesthesiology services across "<u>all</u>" anesthesiology groups in Michigan, aside from A4, which ultimately also was forced to accept this uniform rate.  (Emphasis in original.)  Even Medicare, by contrast, has two different conversion factors for Michigan: one for the Detroit area and one for the rest of Michigan.

78.    BCBS-MI is able to impose this conversion factor without negotiating with anesthesiology providers.  Instead, BCBS-MI in September 2020 convoked a meeting of some of the most prominent anesthesiologist groups in Michigan to discuss BCBS-MI's payments for anesthesiology services.  At the meeting, groups other than A4 expressed that BCBS-MI's anesthesiologist compensation is insufficient and making it more difficult to recruit anesthesiologists to work in Michigan.  While an ordinary market participant would be concerned about bringing together so many of its counterparties, BCBS-MI's market power is such that it can do so without any risk.

79.     BCBS-MI acquired and maintained its market power over hospitals and anesthesiologists in Michigan through tortious and anticompetitive acts.

**IV.     BCBS-MI Uses Malicious Threats, Tortious Interference, and Duress to Force A4 to Remain In-Network at Artificially Low Rates.**

80.     As discussed above, BCBS-MI is the dominant commercial buyer in Michigan of both hospital services and anesthesiology services. To attain that market power in the anesthesiology market, BCBS-MI exploited its market power over hospitals in Michigan.

81.     The market for hospital, or medical facility, services and the market for anesthesiology services are related, but distinct in key features. They are related in that anesthesiology services are performed at medical facilities; however, anesthesiologists such as A4 work in independent practice groups, and therefore negotiate their rates independently from hospitals. Additionally, the vast majority of anesthesiologist work is performed as part of elective procedures—as opposed to emergency procedures. Because the anesthesiology charge typically makes up only a small component of an overall treatment charge, patients can be more willing to accept an out-of-network anesthesiologist (if that is their surgeon's recommendation) than having every aspect of their procedure billed out-of-network. These factors make it easier for anesthesiologists to go out-of-network than hospitals.

82.     Additionally, it is not in hospitals' interests for anesthesiologists to be underpaid by commercial insurance companies.  Anesthesiology compensation generally comes from insurance payments and hospital stipends.  The higher the insurance payments are, the lower the hospital stipends need to be.  Accordingly, many hospitals outside of Michigan do not require anesthesiologists to work with particular insurers.  When hospitals outside of Michigan require anesthesiologists to go in-network with a particular insurer, it is often at the cost of offering a higher stipend to the anesthesiologist group than they would have paid absent the required participation.  This is because if an insurer knows that anesthesiologists at a particular facility are forced to do business with that insurer, the insurer would use that advantage to pay lower reimbursement rates, and the hospital would have to increase its stipends to the anesthesiologists to make up the difference.  Essentially it creates an indirect subsidy: the hospital would be paying more so that the insurer could pay less.

83.     BCBS-MI's domination of the commercial hospital services would therefore not, without more, lead it to dominate the market for commercial anesthesiology services as well.  BCBS-MI does dominate the latter market though.  To achieve that dominance it has, among other things, engaged in tortious acts against anesthesiologists that attempt to go out of network with it.

### A. After A4 Signals It May Leave BCBS-MI's Network, BCBS-MI Unlawfully and Maliciously Interferes with A4's Business, Including by Threatening to Boycott Hospitals that Work with A4.

84.     In the first quarter of 2019, A4 attempted to negotiate a higher conversion factor with BCBS-MI.  BCBS-MI had kept A4's anesthesiology conversion factor essentially the same for over five years, despite the cost of care increasing.  A4 sought an increase that would bring BCBS-MI's conversion factor more in line with market realities.

85.     When BCBS-MI refused to negotiate a higher rate, A4 informed BCBS-MI that it would be terminating its in-network status with BCBS-MI on 90-days' notice.  A4 assured BCBS-MI, and the hospital networks where A4 worked, that if A4 went out of network, it would not balance bill BCBS-MI's patients: A4 would leave any conflict over rates strictly between A4 and BCBS-MI, rather than involving patients.  Instead of coming to the negotiating table, BCBS-MI responded by maliciously interfering with A4's contracts, business, and business relationships, including by threatening to boycott the hospitals and medical facilities where A4 works, unless those facilities in turn boycotted A4 and/or forced A4 to comply with BCBS-MI's demands.

86.     On April 22, 2019, A4 received an email from Rob Casalou, who is both the CEO of Trinity's Michigan operations and a board member on BCBS-MI's board of directors.  Casalou wrote:

I spoke to BCBSM last Wednesday about this [A4's potentially going out of network with BCBS-MI] because the topic came up in a recent board meeting. I am very concerned about how the A4 de-participation strategy will impact our patients short and long term. ***BCBSM has a reputation for being the most aggressive of the payers in these situations***. I did learn that they will consider a new process that would require every BCBSM surgery booked in a facility with A4 to have pre-authorization from the surgeons as at least one change in the process. ***They will also look to steer work away from facilities with A4***.

87.     (Emphasis added.)  Casalou concluded his email with the ominous note that if A4 even so much as sued BCBS-MI, "***the impact on our facilities and patients will eventually be felt***. In such case, we will need to consider our options."  (Emphasis added.)

88.     Casalou's email set out an ultimatum from BCBS-MI: if A4 went out of network or tried to sue BCBS-MI, BCBS-MI would respond by boycotting the facilities that did business with A4, until they ceased doing business with A4 and/or forced A4 to go back in-network with BCBS-MI.

89.     On May 29, 2019, A4 sent BCBS-MI a notice reiterating that its in-network status would terminate BCBS-MI on July 15, 2019, and reminding BCBS-MI that it and A4 "still have time to negotiate in good faith in order to reach an alternative rate structure."  A4's letter explained that it was impossible for A4 to continue doing business under BCBS-MI's artificially low conversion factor, including because "A4 has had virtually the same rate for the last six (6) years, during which time the cost to provide medical care and services has markedly

increased.  A4 cannot afford to stay at this same rate." Before and after sending the letter, A4 continued to reiterate that even if it went out of network, it would continue to serve BCBS-MI's insureds and would not balance bill them.

90.     A4's promises to continue treating BCBS-MI insureds and not to balance bill them, meant that even if A4 went out of network, A4's patients at Trinity and Beaumont would continue to receive medical care from A4 and would not be charged any more by A4 than when A4's was in-network.  In a normal market, those assurances, combined with A4's record of success at Trinity and Beaumont, would have caused those hospitals to continue working with A4, even as it renegotiated with BCBS-MI.

91.     By 2019, Trinity's Michigan hospitals had been working with A4's anesthesiologists for over 50 years—essentially since A4's founding.  During that long relationship, A4 had been responsible for introducing anesthetic techniques to Trinity's Michigan hospitals, including certain kinds of nerve blocks.[20]  In 2015, just four years prior to Casalou's email, A4 had been one of only four anesthesiology practices *in the nation* to be awarded Trinity's coveted "Preferred Provider" designation.  After Casalou's email about BCBS-MI's threat, Trinity reiterated, in a document provided to A4's doctors in or around June 2019, that

---

[20] *Trinity Health v. Anesthesia Assoc. of Ann Arbor, PLLC*, No. 19-cv-12145-LVP-RSW, Complaint ¶ 104 (E.D. Mich. July 23, 2019).

"***Trinity Health Michigan has enjoyed a long-standing and successful***

***relationship with A4***."  (Emphasis added.)

92.     Despite this "long-standing and successful relationship," BCBS-MI's

threat of boycott led Trinity to decide to terminate that relationship.[21]  After A4 left

BCBS-MI's network on July 15, 2019, Trinity, sent a termination notice to A4.  As

Trinity would later explain, no hospital in Michigan can afford to lose BCBS-MI.

93.     Simultaneously, A4 was encountering the same problems with its

other hospital partner in Michigan, Beaumont.  As with Trinity, A4's

anesthesiologists had worked in Beaumont's Michigan hospitals for years,

specifically its Beaumont Dearborn, Beaumont Trenton, Beaumont Taylor, and

Beaumont Wayne hospitals, all in southeastern Michigan.  Also as with Trinity,

A4's work with Beaumont had been successful, including, for example, the

improvements A4's cardiac anesthesiologists helped bring to Beaumont

Dearborn's cardiac surgery department.  But A4 was receiving essentially the same

message from Beaumont that it had received from Casalou in his April 22, 2019

email: that BCBS-MI would steer work away from Beaumont in retaliation for A4

going out of network.  Beaumont could not risk losing BCBS-MI's business any

more than Trinity could.  On July 5, 2019, BCBS-MI succeeded in causing

Beaumont to issue A4 a notice of termination of their relationship.

---

[21] *Id.* ¶ 36.

**B.**   **BCBS-MI Tortiously Interferes with A4's Contracts with Trinity Hospitals and A4's Employees.**

94.    Along with pressuring Michigan hospitals to cease doing business with A4, BCBS-MI also tortiously interfered with A4's contracts with Trinity hospitals and A4's employees.  Specifically BCBS-MI (i) coerced and induced Trinity's hospitals to breach the non-solicitation obligations they owed to A4; and (ii) acted through, and in concert with, Trinity to tortiously interfere with the non-compete obligations owed to A4 by certain of A4's employees.

95.    A4 competes nationally for physicians and has made substantial investments in recruiting, training, and maintaining its team of medical practitioners.  To protect the investments in its practice, A4 has narrow non-compete agreements with certain of its anesthesiologists and non-solicit agreements with the hospitals where its anesthesiologists practice.

96.    For example, in 2019, A4 and one of Trinity's subsidiaries, Saint Joseph Mercy Health System ("SJMHS"), were working together pursuant to an agreement executed in February 2017 and amended in August 2018 (the "SJMHS Order").  The SJMHS Order covers A4's services at multiple Trinity hospitals within the SJMHS system: St. Joseph Mercy Hospital, Ann Arbor; St. Joseph Mercy Livingston Hospital, Saint Joseph Mercy Chelsea Hospital, and St. Mary Mercy Livonia Hospital.  The SJMHS Order provides, "During the term of this Order and/or the MSA [master services agreement between Trinity and A4] . . .

41

SJMHS shall not, either directly or indirectly solicit, hire contract with, or otherwise engage, in any capacity, any physician who provides Professional Services or Administrative Services under this Order or the MSA or who is otherwise an employee or independent contract of [A4] during the term of this Order or the MSA without [A4]'s advance written consent."  SJMHS Order § 13.

97.     A4 in 2019 also worked with another Trinity hospital in Michigan, Mercy Health Saint Mary's ("MHSM"), pursuant to an agreement dated September 1, 2016 (the "MHSM Order").  That agreement provides: "During the term of this Agreement and for one (1) year thereafter, MHSM will not, directly or indirectly, whether as an individual, advisor, employee, agent, or otherwise, take any action to induce any Member or employee to cease his or her employment with [A4]." MHSM Order § 11.3(b) (Sept. 1, 2016).

98.     A4 also has narrow non-compete obligations with both its shareholder-physicians (those employees who are also owners of A4) and its non-shareholder physicians.  These obligations are narrowly tailored with geographic, subject matter, and durational limits.  A4's contracts with its shareholder physicians state, in section 7.2(a), "For one year after the termination of Physician's employment hereunder, Physician shall not practice medicine with respect to anesthesiology or pain management at any healthcare facility within 15

miles of any health care facility where Physician provided services during the term of his or her employment with [A4]."

99.    A4's contracts with its non-shareholder physicians state, in section XIII(A), "Employee shall not, for a period of one (1) year after such termination, practice or perform anesthesiology or pain management services at said medical facilities, at any other facility where [A4] has practiced or performed anesthesiology or pain management services within the previous five (5) years, or any location within ten (10) miles of any facility at which [A4] practices or performs anesthesiology or pain management services."

100.    BCBS-MI was aware of these contracts as well as their respective non-solicit and non-compete obligations, including because of BCBS-MI's relationship with Casalou.  Casalou was then, and remains, CEO of Trinity's Michigan operations.  He executed the SJMHS Order, including its amendment, and was aware of the MHSM Order and its specific terms.  He was also aware of A4's non-compete rights vis-à-vis its employees.  In 2019, Casalou was, and remains, a board member on BCBS-MI's board of directors.  When A4 dealt with Casalou, it was evident that he did not wall off information he had learned in one role from the other role.

101.    Despite being aware of A4's contractual rights, BCBS-MI coerced and induced Trinity to breach and interfere with those rights.  In or around June

2019, while the SJMHS agreement was still in effect, SJMHS circulated a

document to A4's anesthesiologists promising that even if they breached their

agreements with A4, Trinity "***will indemnify the clinicians against any risk from***

***the non-competes, if they agree to accept employment***" at Trinity's hospitals.

(Emphasis added.)  In making this offer, Trinity explicitly referenced the threat

from BCBS-MI as motivating Trinity's attempt to hire A4's doctors.  The

solicitation states that Trinity was concerned with A4's "plan to depar[ticipate]

with Blue Cross," because "***Blue Cross Blue Shield of Michigan has been very***

***aggressive in the past in these types of situations***" and would potentially direct its

insureds to "***alternative sites of care***."  (Emphasis added.)  Hence, "***if efforts to***

***resolve this are unsuccessful . . . we will be prepared to approach A4 physicians***

***and CRNAs about direct employment***."  (Emphasis added.)

102.   This solicitation breached section 13 of the SJMHS Order, because it

"directly or indirectly solicit[ed]" A4's physicians.

103.   This solicitation also evidences the extent to which Trinity's actions

were at the direction of, and in concert with, BCBS-MI.  For example, the

solicitation contains an unusual typo—it refers to A4 as "Ann Arbor Associates of

Ann Arbor" instead of Anesthesia Associates of Ann Arbor—and a similar typo

also appeared in BCBS-MI documentation from the same time.

104.    A4 responded on July 2, 2019, by demanding that Trinity's hospitals cease breaching their non-solicitation obligations.  BCBS-MI, however, continued to coerce and induce Trinity's hospitals into breaching their non-solicit obligations owed to contractual obligations to A4.

105.    On or around July 23rd, 2019, Trinity offered A4's physicians at MSHM positions at that hospital, despite the MSHM Order, still being in effect. These solicitations breached the MSHM Order, because they involved MSHM "directly or indirectly . . . or otherwise, tak[ing] action to induce any Member or employee to cease his or her employment with" A4.  MSHM § 11.3(b).

106.    These solicitations not only breached the Trinity hospitals' obligations to A4, they also constituted inducements to A4's employees to breach their narrow non-compete obligations owed to A4.  Working through, and in concert with, Trinity, BCBS-MI ultimately succeeded in inducing breaches of these non-compete obligations, and caused A4 to lose several of its doctors to Trinity.

107.    On August 16, 2019, A4 sought, and obtained, a temporary restraining order against Trinity, MHSM, and Casalou from the Michigan Circuit Court for the County of Washtenaw.  The temporary restraining order prevented Trinity from continuing its breaches of contract and tortious actions against A4.

### C.   BCBS-MI Imposes Economic Duress on A4 by Willfully Breaching Its Contracts with A4's Part-Time Employees and Independent Contractors.

108.   Along with its unlawful threats and tortious interference, BCBS-MI also applied economic duress to A4 by breaching its contracts with A4's employees and independent contractors.  A4 works with certain anesthesiologists and CRNAs who are independent contractors or part-time employees and who also provide services for other healthcare groups.  These healthcare professionals have individual in-network contracts with BCBS-MI, covering the work they do with A4 and other providers.  A4 did not require these independent contractors to go out of network with BCBS-MI, nor did they seek to do so.

109.   These providers have contracts with BCBS-MI that do not permit BCBS-MI to terminate their provider status without either cause or notice. Nonetheless, after A4 informed BCBS-MI that it planned to go out-of-network, BCBS-MI retaliated shortly thereafter by unlawfully terminating the provider status of A4's independent contractor and part-time employee anesthesiologists and CRNAs.  These terminations were without cause, without notice, and constituted breaches of BCBS-MI's contracts with the affected employees and CRNAs.

110.    These unlawful terminations meant that these independent contractors and part-time employees would not have in-network status with BCBS-MI, even when working with entities other than A4.

111.    After learning of the terminations, A4 wrote to BCBS-MI, stating that the terminations must have been an error, and asking that the affected employees and independent contractors have their provider status reinstated.  But the termination, A4 would learn, was not an error.  BCBS-MI's subsequent communications made clear to A4 that BCBS-MI would continue to breach its agreements, and treat these healthcare practitioners as terminated, unless (i) they stopped working with A4 or (ii) A4 went back in-network with BCBS-MI.

112.    By breaching its agreements with A4's employees and independent contractors, BCBS-MI subjected A4 to unlawful economic duress.

113.    BCBS-MI's tortious actions—its unlawful and malicious threats; its tortious interference; and its breach of its contracts to cause economic duress—caused A4 significant damages.

114.    Faced with an existential threat from BCBS-MI, A4 acquiesced and went back in network with BCBS-MI in July 2019.  A4 subsequently entered into a mutual settlement with Trinity, pursuant to which it continues to provide services at SJMHS but is specifically required to remain in-network with BCBS-MI.  A4

lost its business with Trinity SHMS and subsequently with Beaumont's hospitals as well.

**D.    In October 2020, BCBS-MI, in Concert with Trinity, Induces Trinity to Terminate Its Relationship with A4.**

115.    On Thursday, October 22, 2020, A4 attempted to resolve A4's claims against BCBS-MI by inviting BCBS-MI to negotiate before A4 filed this lawsuit. The following Monday, October 26, 2020, BCBS-MI informed A4 that it was refusing to negotiate with A4.  Instead, BCBS-MI, in concert with Trinity, induced Trinity to send a notice terminating its long-standing work with A4.  The very next morning, Tuesday, October 27, 2020, Trinity sent a notice to A4 stating that Trinity was terminating all of A4's relationships with Trinity's hospitals in Michigan, effective in 180 days.

**V.    BCBS-MI Has Engaged in Anticompetitive Acts to Reduce Competition, to Suppress the Price for Anesthesiology Services in Michigan, and to Acquire and Maintain Market Power.**

**A.    BCBS-MI's Acts Against A4 Violate the Sherman Antitrust Act.**

116.    BCBS-MI's actions against A4 had the purpose and effect of reducing competition among commercial health insurers for anesthesiology services.  In a normal market, commercial health insurers would compete by investing resources toward building in-network relationships with the anesthesiologists performing services at the medical facilities where the insurers wish to offer in-network benefits.  Commercial insurers differentiate themselves when competing to sell

insurance by, among other things, the number and quality of facilities where patients can obtain medical services at in-network rates. A critical aspect of offering in-network benefits at a given medical facility is ensuring that, if anesthesia is provided at the facility, the anesthesiologists there are in-network as well. In an efficient market, if a commercial health insurer is not willing to pay reasonable commercial rates for anesthesiology, it would have difficulties in providing full in-network coverage at medical facilities, thereby putting it at a disadvantage to its competitors.

117. BCBS-MI undermined that competition by threatening to steer work away from hospitals that work with A4. BCBS-MI has created a situation where if an anesthesiologist attempts to leave BCBS-MI's network, that anesthesiologist will lose his or her ability to access the medical facilities that anesthesiologists need to practice their profession. As a result, anesthesiologist's who wish to practice in Michigan have no choice but to go in-network with BCBS-MI. This situation, which BCBS-MI created by exploiting its market power over Michigan hospitals, means that BCBS-MI need not compete with other insurers to have anesthesiologists join its network. Anesthesiologists who wish to work in Michigan hospitals lack a choice but to work with BCBS-MI and to accept its artificially low reimbursement rate.

118.   BCBS-MI's conduct has, as a practical matter, prevented other commercial insurers in Michigan from developing larger, or higher quality, offerings of facilities with in-network anesthesiologists, in order to better serve their customers and compete with BCBS-MI.  Even if a competing health insurer succeeded in contracting with anesthesiologists that were out of BCBS-MI's network, those anesthesiologists would, due to BCBS-MI's boycott threats, be unable to practice in Michigan.  It would therefore be impossible for those anesthesiologists to serve the competing health insurer's customers, thus damaging competing insurers, competition, and consumers.

119.   BCBS-MI's anticompetitive acts allow it to dominate the market for anesthesiologist services and to apply artificially low rates while suppressing competition.  When A4 asked one of BCBS-MI's competitors, Aetna, to increase its rates, Aetna replied, "Your reimbursement concerns need to start with ***BCBS-MI since they are driving the market price for anesthesia***."

**B.     BCBS-MI Uses Its Market Power Over Anesthesiology Services to Impose an Artificially Depressed Conversion Factor for Anesthesiology Services.**

120.   Through its numerous anticompetitive activities, BCBS-MI has attained the power to impose an artificially low conversion factor for anesthesiology services in Michigan.  As discussed above, BCBS-MI in July 2019 acknowledged that it had succeeded in imposing this "uniform" payment structure

on "<u>all</u>" "other anesthesiology practices in Michigan" apart from A4—who was then refusing to accept BCBS-MI's artificially low rate. (Emphasis in original.) Due to BCBS-MI's tortious and anticompetitive acts, A4 ultimately was forced to accept BCBS-MI's "uniform" rate as well.

121. The uniform rate that BCBS-MI imposes is artificially low. In 2018, BCBS-MI applied a statewide conversion rate of $58.65. That is over $17 less than the national average anesthesiology conversion rate in 2018 of $76.32.[22] In percentage terms, BCBS-MI's 2018 conversion factor was over 23% lower than the 2018 national average.

122. BCBS-MI's 2018 conversion factor is also significantly below the 2018 median national anesthesiology conversion factor of $71.81.[23] BCBS-MI's conversion factor was so low that it was in the 25th percentile nationwide according to the American Society of Anesthesiologists 2018 data.[24] Put differently, 75% of the commercial conversion factors for anesthesiology in 2018 across the country were higher than BCBS-MI's conversion factor. In what the American Society of Anesthesiologists classifies as the Eastern Midwest region (Michigan, Illinois, Indiana, Kentucky, and Ohio), BCBS-MI's 2018 rate was also in the 25th

---

[22] Stanley W. Stead & Sharon K. Merrick, *ASA Survey Results for Commercial Fees Paid for Anesthesia Services – 2018*, 82 Am. Soc'y of Anesthesiologists 72, 73 (Oct. 2018) [hereinafter "ASA Survey"].

[23] *Id.*

[24] *Id.*

percentile, *i.e.* 75% of the commercial conversion factors for anesthesiology in the region were higher than BCBS-MI's conversion factor.[25]

123.   In a September 2020 internal memorandum, BCBS-MI acknowledged that Michigan specialists, including anesthesiologists, would suffer "***losses***," absent higher reimbursements from BCBS-MI.  (Emphasis added.)

124.   BCBS-MI's low conversion factor cannot be explained by differences in the cost of care.  If BCBS-MI's low conversion factor merely reflected differences in the cost of care between Michigan and the rest of the country, then one would expect Medicare's conversion factors for Michigan, which also take into account the cost of care, to be significantly lower than Medicare rates for the rest of the country.  That is not the case.

125.   Instead, anesthesiologists in the Detroit area (including Macomb, Oakland, Washtenaw, and Wayne counties) have a 2020 Medicare conversion factor of $23.07, one of the highest Medicare conversion factors in the country, ranking approximately 28th highest out of over 100 localities, meaning it is in approximately the upper 75th percentile of Medicare conversion factors.  BCBS-MI's low rate thus cannot be explained by cost of care.  To the contrary, BCBS-MI imposes a low conversion rate where A4 operates, despite the high cost of care there.  It is also notable that Medicare has two different conversion factors in

---

[25] *Id.* at 74, 79.

Michigan, while BCBS-MI only has a single factor for the entire state. In an efficient market, one would expect there to be more price differentiation by commercial insurers than public insurers, not less.

126. BCBS-MI's conversion factor is also much lower than one would expect it to be given the applicable Medicare conversion factors. According to the American Society of Anesthesiologists, commercial conversion factors nationwide are on average about three and one-third times the applicable Medicare conversion factors.[26] Using that multiplier would mean that, based on Michigan's Medicare rates, the commercial conversion factor for the Detroit area should be about $79.56 and the conversion rate for the rest of Michigan should be about $75.29.

127. BCBS-MI's current rate is $63.76, significantly lower than commercial rates one would expect based on Michigan's Medicare rates for anesthesiology.

128. BCBS-MI's conversion factor is also much lower than the average and median factors in Ohio. Ohio and Michigan are similarly-sized Midwestern states located on the Great Lakes and with an industrial focus. Both have populations with an average age of around forty years old. One would expect similar conversion factors for anesthesiology. However, the average conversion

---

[26] ASA Survey at 72.

factor in 2018 in Ohio was \$69.16, over ten dollars higher than BCBS-MI's \$58.65.[27]

129.  In practice, BCBS-MI's artificially low conversion factor is even lower than its dollar amount suggests, because of the 45% discount that BCBS-MI imposes on anesthesiologists, including A4, when they perform services at a hospital that employs its own CRNAs.  In that situation, after the reimbursement is calculated, A4 will get 55% of the reimbursement from BCBS-MI and the hospital will get the other 45%.  This means that when A4 provides services at Trinity hospitals with their own CRNAs—as is often the case—its conversion factor is effectively reduced by about half.

## C.  BCBS-MI's Artificially Low Rate Is Reducing Output, Including by Restraining the Supply of Anesthesiologists and the Quality of Anesthesiology Services in Michigan.

130.  BCBS-MI's artificially low rate for anesthesiology services is lowering pay for anesthesiologists and reducing output, including by unreasonably restraining the supply of anesthesiologists.  Bureau of Labor Statistics data from 2019 shows that the "[a]nnual mean wage" for anesthesiologists in Michigan is in the *lowest band nationally* (out of four bands) and *is lower than every surrounding or nearby state for which there is data available: Wisconsin, Illinois, Indiana, Pennsylvania, Kentucky, West Virginia, and Missouri (data for Ohio was not*

---

[27] *Id.* at 79.

available).[28]  Because BCBS-MI is "driving the market price for anesthesia" in Michigan, the low annual mean wages for anesthesiologists in Michigan is attributable to BCBS-MI.

131.  A4 has recently lost multiple doctors who left to practice in Toledo, Ohio about an hour's drive south of Ann Arbor, Michigan.  As discussed above, Ohio's average conversion factor for anesthesiology is about $10 higher than BCBS-MI's.  Because of how anesthesiology billing is calculated using 15-minute units, a $10 difference in conversion factor can result in around a *$40 per hour* or more difference in compensation.  A research brief by the RAND Corporation shows Michigan facing a shortage of both anesthesiologists and CRNAs.[29]

132.  BCBS-MI's conduct is also endangering the practice group model of anesthesiology.  This conduct—including interfering with A4's business relationships and imposing an artificially low rate for anesthesiology services—is putting A4 in a position where, despite being a highly-respected anesthesiology practice group, it will no longer be able to remain in business.  If that were to occur, its anesthesiologists may have to leave the state or may end up working directly with hospitals in Michigan, as BCBS-MI's conduct is making it difficult

---

[28] *Occupational Employment and Wages, May 2019 29-1211 Anesthesiologists*, Bureau of Labor Stats. (May 2019), https://www.bls.gov/oes/current/oes291211.htm.

[29] Lindsay Daugherty et al., *Is There a Shortage of Anesthesia Providers in the United States?*, RAND Corp. (2010), https://www.rand.org/pubs/research_briefs/RB9541.html.

for independent practice groups, such as A4, to survive in Michigan. Independent practice groups are an efficient method of providing quality anesthesiology services, having superseded the old model whereby anesthesiologists were hospital employees, *ASA, Inc.*, 473 F. Supp. at 150.

133.    A reduction in independent anesthesiology practice groups would lead to a reduction in efficiency and quality in Michigan's healthcare market. For example, a 2014 study by professors at Stanford University came to the conclusion that "hospital ownership of physician practices leads to higher prices and higher levels of hospital spending."[30] Likewise, another 2014 study concluded, "From the perspective of the insurers and patients, between 2009 and 2012, hospital-owned physician organizations in California incurred higher expenditures for commercial HMO enrollees for professional, hospital, laboratory, pharmaceutical, and ancillary services than did physician-owned organizations."[31]

134.    BCBS-MI's actions are restricting not just the available quantity but also the quality of anesthesia care in Michigan. The current state of Beaumont illustrates this problem. A4 previously provided anesthesiology services for

---

[30] Laurence C. Baker et al., *Vertical Integration: Hospital Ownership of Physician Practices Is Associated with Higher Prices & Spending*, 33:5 Health Affairs 756, 763 (May 2014), https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2013.1279.

[31] James C. Robinson & Kelly Miller, *Total Expenditures per Patient in Hospital-Owned and Physician-Owned Physician Organizations in California*, JAMA Network (Oct. 2014), https://jamanetwork.com/journals/jama/fullarticle/1917439.

multiple Beaumont hospitals in Michigan, but Beaumont sent A4 a termination notice in 2019 after A4 attempted to get higher rates from BCBS-MI.  Although A4 eventually went back in network with BCBS-MI, the low conversion factor A4 was forced to accept from BCBS-MI made it uneconomical to continue providing services at Beaumont.  In 2020, Beaumont ultimately replaced A4 with an anesthesiology group apparently willing to accept the artificially low rates imposed by BCBS-MI.  The changeover has led to news of a reduced quality of anesthesia care.

135.   A4 and Beaumont had a successful relationship, which included improvements that A4 brought to the Beaumont Dearborn cardiac surgery department.  This success derived in part from the working relationship developed between Beaumont's cardiac surgeons and A4's cardiac anesthesiologists.  According to recent reporting, Beaumont appears to have been unable to replicate that success with the new anesthesiologists it has brought in.  A recent news story described an anesthesiologist showing up 45-minutes late for surgery and refusing to work on weekends.[32]   Faced with such problems, the majority of Beaumont's surgeons have declared that they lack confidence in Beaumont's leadership.[33]

---

[32] Eric Starkman, *Starkman: Beaumont Cardiac Leaders Warn Hospital Chairman of Compromised Patient Care*, Deadline Detroit (Sept. 18, 2020), https://www.deadlinedetroit.com/articles/26232/starkman_beaumont_cardiac_leaders_warn_hospital_chairman_of_compromised_patient_care.

[33] *Id*.

136. The reduction in quality of anesthesiology services at Beaumont affects *all of Beaumont's* patients, regardless of whether they are insured by BCBS-MI or some other insurer.

**D. BCBS-MI Also Acquired and Maintained Market Power Using Anticompetitive Most-Favored Nation Clauses.**

137. Beginning around 2008, BCBS-MI successfully suppressed competition by imposing most-favored nation ("MFN") clauses on Michigan hospitals. These agreements took two forms. Under the first type, "MFN-plus" contracts, BCBS-MI required hospitals to charge BCBS-MI's competitors higher prices than whatever BCBS-MI would pay for the same services. The second type, "MFN-equal" contracts, prohibited hospitals from charging BCBS-MI's competitors with lower rates than they charged BCBS-MI. If a hospital previously charged rates to a competitor of BCBS-MI that were lower than BCBS-MI's rates, the MFN would require the hospital to raise the rates charged to that competitor.

138. BCBS-MI entered into MFN-plus contracts with at least 22 hospitals in Michigan, obligating those hospitals to charge more to BCBS-MI's competitors, often calculated as a specific percentage increase over BCBS-MI's rates with that hospital. These 22 hospitals operated approximately 45% of Michigan's tertiary care hospital beds, *i.e.*, the beds through which a hospital provides a wide range of services. By prohibiting hospitals from offering the same (or lower) rates to BCBS-MI's competitors, the MFN-plus contracts severely impeded those

58

competitors from succeeding in the marketplace, thereby entrenching BCBS-MI as the dominant insurer.

139.   BCBS-MI also entered into the second category of MFN agreements, MFN-equal contracts, with over 40 hospitals.  These agreements served to increase the cost of healthcare: BCBS-MI agreed to pay more to hospitals in exchange for the hospitals agreeing to keep their rates to BCBS-MI's competitors artificially high.

140.   Altogether, BCBS-MI imposed MFN clauses of one form another on most of Michigan's 131 general acute care hospitals.  This MFN scheme is both an indicator of BCBS-MI's market power and a means by which it acquired and maintained market power.  BCBS-MI leveraged its dominant position in the commercial insurance market to get hospitals to agree to these clauses.  The MFNs were calculated to benefit BCBS-MI alone at the expense of Michigan's insured population and other medical providers.  BCBS-MI was increasing its payments to hospitals not to buy better quality of service but to obtain a guarantee that its competitor's rates would be propped up.  By artificially increasing the cost of hospital services both for itself and its competitors, BCBS-MI created a situation where insurers, including itself, would have to make up the difference either by increasing premiums charged to customers and/or by keeping down rates paid to

medical providers that were not part to these MFN clauses, including

anesthesiologists.

### E.   BCBS-MI Also Acquired and Maintained Market Power, and Unreasonably Restrained Trade, Through Exclusionary Horizontal Agreements with the Other Blues.

141.   BCBS-MI has also acquired and maintained market power through a

horizontal agreement to restrain trade with other Blues—commercial health

insurance companies licensing the Blue Cross Blue Shield brand.  BCBS-MI

entered into this conspiracy in discussions with other Blue Cross Blue Shield

insurers (collectively, "Blues"), including discussions in June 2013.

142.   Together, the Blues insure around 105 million Americans and have

provider networks including around 96% of hospitals and around 93% of

professional providers.  The conspiracy is implemented in a so-called "amended

license agreement" with the Blue Cross Blue Shield Association ("BCBSA").  The

BCBSA owns the Blue Cross Blue Shield branding and is in turn owned and

controlled by the Blues.  Pursuant to their "amended license agreement" with

BCBSA, the Blues agree to multiple anticompetitive restraints.

143.   For example, the "amended license agreement" includes an agreement

to allocate geographic markets, referred to as "services areas," among the Blues,

pursuant to which Blues will refrain, with limited exceptions, from competing in

each other's service areas and will curtail competition involving their non-Blue affiliates.

144.    This horizontal conspiracy includes restrictions on (i) how much revenue a Blue can generate from non-Blue business in its designated service area and (ii) how much revenue a Blue can generate company-wide through businesses other than its Blue-branded business.  Under these so-called "Best Efforts" rules, a Blue license holder cannot receive more than 20% of its revenue from non-Blue business in its designated service area and cannot receive more than 33% of its company-wide revenue from non-Blue business.  These limits, which are output restrictions on non-Blue revenues, ensure that Blues will not circumvent the service area allocations by competing with each other using non-Blue subsidiaries.

145.    This horizontal conspiracy results in BCBS-MI enjoying less competition in Michigan both for selling commercial health insurance and for signing providers up to its network.  In exchange, BCBS-MI restricts its competition with the other Blues in their service areas.  By restraining competition with the other Blues and their affiliates, BCBS-MI is able to pay providers less than it otherwise would have, thereby lowering its costs and increasing its control of the Michigan commercial health insurance market.  These restrictions have no pro-competitive justification, and instead serve to protect BCBS-MI and the other

Blues from the normal market forces that drive competition and innovation, while harming competing health insurers, healthcare providers, and consumers.

146.   In addition, the "amended license agreement" also requires Blues to fix prices and boycott healthcare providers outside their service area (the "Price Fixing and Boycott" conspiracy).

147.   The Price Fixing and Boycott aspect of the license agreement involves the BlueCard program, which the "amended license agreement" requires the Blues to use.  The BlueCard program is a method through which BCBS-MI can process claims by a provider in its service area on behalf of a patient covered by another Blue plan, and vice versa.  Under the BlueCard program, the patient's Blue insurer is referred to as the "Home Plan," while the Blue located where the medical service is provided is the "Host Plan."  If a healthcare provider treats someone covered by a Blue plan in another state, the healthcare provider must submit their claim to the Host Plan, after which the claim is transmitted to the Home Plan for processing. The provider is paid based on the reimbursement rates in his or her contract with the Host Plan—thereby fixing prices between the Host Plan and the Home Plan.

148.   Adding to the administrative difficulties, the provider must comply with the medical policy and other requirements of the Home Plan, to which he or she often does not have access.  As a result of the BlueCard system, A4 is expected to comply with myriad different variations of medical policies, creating

inefficiencies, adding to administrative costs and resulting in many claim denials, in whole or part based upon the lack of information available about the various other Blue plans.

149. As part of the Price Fixing and Boycott conspiracy, BCBS-MI and the other Blues have also agreed not to contract with providers outside of their service area. This boycott means that A4's only option for providing services in Michigan to patients insured under other Blues is to do so through BCBS-MI, using the BlueCard program. A4 is therefore forced to accept BCBS-MI's anesthesiology rates when it covers patients insured by any of the Blues, regardless of what those insurers' rates are. This price fixing in turn keeps the anesthesiology rates in Michigan artificially suppressed.

150. For example, Blue Cross Blue Shield of Florida uses conversion rates of around \$70 - \$80, significantly higher than BCBS-MI's current statewide \$63.76 conversion rate. However, when A4 treats patients insured by Blue Cross Blue Shield of Florida, it must accept the lower \$63.76 rate.

151. There is no pro-competitive justification for the Price-Fixing and Boycott conspiracy. Together, these horizontal conspiracies to restrain competition, restrict output, fix prices, and boycott services providers all serve to restrain trade in Michigan and to increase BCBS-MI's market power, thereby

enabling BCBS-MI to pay anesthesiologists less than what BCBS-MI would have paid absent these violations of the antitrust laws.

### F. BCBS-MI Has Attained Market Power Through Its Interlocking Directorate with Trinity.

152. Beginning in or around 2019, Trinity and BCBS-MI have had a complex commercial relationship as both counterparties and competitors. It was then that Trinity's hospitals in Michigan began hiring anesthesiologists to work on salary. Since then Trinity has made clear to A4 on multiple occasions that it is interested in employing additional anesthesiologists for its Michigan hospitals. Trinity's hiring of anesthesiologists in Michigan brings it into competition with BCBS-MI for anesthesiology services, as anesthesiologists face a choice between working on salary directly for a hospital, or remaining independent and contracting with insurance companies. Despite their competition, BCBS-MI and Trinity share an interlocking directorate, whereby Casalou is both a member of BCBS-MI's board of directors and chief executive officer of Trinity's Michigan hospitals. This interlocking directorate permits BCBS-MI and Trinity to share information and coordinate in ways that would not otherwise be seen between hospitals and insurers, let alone between competitors.

153. Trinity's executives do not sit on the board of directors of CVS Health, the owner of Aetna, a competitor of BCBS-MI in Michigan. BCBS-MI's

interlocking relationship with Trinity provides it with market power in the markets for both hospital services and anesthesiology services in Michigan.

## VI. BCBS-MI's Anticompetitive Actions Are Unreasonable and Have Damaged A4.

154.   BCBS-MI's anticompetitive conduct has unreasonably harmed competition in the relevant product and geography markets without any pro-competitive justification.

### A. The Relevant Markets Involve the Sale of Commercial Health Insurance, the Sale of Commercial Hospital Services, and the Sale of Commercial Anesthesiology Services in Michigan.

155.   BCBS-MI's anticompetitive conduct spans multiple product markets.

156.   First, there is the market for the sale of commercial healthcare insurance (excluding Medicare and Medicaid programs).  This product market includes the various means of paying or reimbursing for healthcare goods and services other than the direct payment by individuals who are not insured or indemnified.  This market includes the sale of the full package of healthcare financing services, including insurance, as well as, for self-insured groups, the sale of other healthcare financing services, including access to a network of healthcare providers at reduced prices and the administration of healthcare-related employee benefit plans, which together form a relevant product market.  This relevant product market can be described as the market for the sale of commercial health insurance.

157.    The purchasers of commercial health insurance do not have reasonable alternatives.  Some employers are required by the Affordable Care Act to offer healthcare benefits to their employees.  Employers who are required to offer these benefits, as well as employers who are not required to offer these benefits but wish to do so, have no reasonable alternative but to purchase commercial health insurance.  For these employers, forgoing coverage or trying to self-supply, in other words managing all aspects of their employees' health benefits on their own, is not feasible.  Therefore, a profit maximizing hypothetical monopolist in this market likely would raise prices above competitive levels by imposing at least a small but significant and non-transitory increase in price.

158.    Second, there is the market for the sale of hospital goods and services to commercial payers (*i.e.* individuals and commercial health insurers, but not Medicare or Medicaid).  Prescription drugs are excluded from this relevant market because they are largely purchased indirectly, through pharmacy benefit managers.  For hospitals and medical facilities offering hospital-type services, there is no reasonable alternative to contracting with commercial health insurers to become in-network providers for those insurers.  Hospitals are not in a position to forgo sales to commercial buyers, in favor of patients who pay out of pocket.  Nor can they obtain enough Medicare or Medicaid patients, insured either under the government's traditional programs or managed care programs, to replace the

volume they would lose from dropping commercial insurance. Further, the prices paid to healthcare providers by government programs, including Medicare Advantage and managed Medicaid, are lower than the prices paid for the commercial health plans of private employers or groups. In other words, for hospitals or other medical facility providers, the substitution between commercial buyers and other payers is low.

159. Third is the market for anesthesiology services sold to commercial payers (*e.g.,* individuals, and commercial health insurers, but not Medicare or Medicaid). For providers of anesthesiology services in private or group practice, such as A4, there is no reasonable alternative to accepting payments from commercial health insurers. Because Medicare and Medicaid use conversion factors that are essentially below cost, an anesthesiology provider cannot limit his or her practice to those public payers. Likewise, an anesthesiologist cannot rely solely on out-of-pocket payments by patients.

160. For each of these product markets, the relevant geographic market is the state of Michigan. Michigan does not accept the medical licenses of other states and vice-versa. Therefore, a Michigan anesthesiologist is limited to practicing in Michigan unless he or she becomes licensed in another state. Even if a Michigan anesthesiologist were licensed in a neighboring state, the long hours associated with anesthesiology practice (often 60 hours a week) limit the amount

of time an anesthesiologist can spend commuting.  So while some Michigan anesthesiologists close to the Ohio border can and do travel to Ohio to take advantage of the higher conversion rates in that state, commuting is not an option generally available to Michigan anesthesiologists.  Services provided at hospitals, including anesthesiology services, are also, by their nature, primarily local, as people tend to visit hospitals close to where they live and work.

161.   In the alternative, the relevant geographic markets are the Michigan Core-based Statistical Areas, and counties or combinations of counties not part of one of these areas where A4 has practiced medicine, including the Detroit, Ann Arbor, and Grand Rapids, Michigan areas.  "Core-based Statistical Areas" is a term used by the United States of Office of Management and Budget to encompass Metropolitan Statistical Areas and Micropolitan Statistical Areas.  Metropolitan Statistical Areas especially are used in the ordinary course of business in the insurance industry when examining local markets.  Aside from the fact that anesthesiologists licensed to practice in one part of Michigan can legally practice in others parts of Michigan, all of the other factors limiting product substitution at the state-level, also limit substitution at the Core-based Statistical Area level.  For example, hospitals have to invest significantly in fixed assets and can no more easily move from Detroit to Lansing than they can from Detroit to Cleveland.

Likewise, the long-hours associated with anesthesia limit how far an anesthesiologist can commute for work within the state.

162. A4 reserves the right to further refine its definitions of the relevant product markets and relevant geographic markets as more data and expert analysis become available.

## B. There is No Pro-Competitive Benefit Outweighing the Harms of BCBS-MI's Anticompetitive Conduct.

163. As discussed above, BCBS-MI's conduct has reduced competition among commercial insurers in Michigan, reduced the compensation of anesthesiologists in Michigan, left Michigan with a shortage of anesthesiologists, threatened the viability of independent anesthesiology practice groups in Michigan, and resulted in reduced quality of anesthesia care in Michigan. In contrast to these multiple market harms, BCBS-MI's conduct has no pro-competitive benefits.

164. BCBS-MI cannot claim that its anti-competitive conduct has resulted in lower insurance premiums. According to the Kaiser Family Foundation, Michigan's employer-based health insurance is the *sixth most expensive in the nation* as measured by plans covering an employee plus one other person.[34]

---

[34] *Average Annual Employee-Plus-One Premium per Enrolled Employee For Employer-Based Health Insurance*, Kaiser Family Foundation, https://www.kff.org/other/state-indicator/employee-plus-one-coverage/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Total%20Annual%20Premium%22,%22sort%22:%22desc%22%7D (last accessed Oct. 11, 2020).

165.   It appears instead that BCBS-MI is keeping for itself and its executive compensation the savings from underpaying anesthesiologists.  BCBS-MI paid its chief executive officer over $19 million in compensation in 2018, more than any other Blue, and more than almost every other insurance company, healthcare or otherwise, for-profit or non-profit.

166.   Nor can BCBS-MI's exclusionary and retaliatory actions be justified as an attempt to prevent balance billing.  A4 had made repeatedly clear to BCBS-MI that it would not balance bill BCBS-MI's insureds and offered to enter into an enforceable agreement to that effect, while it negotiated rates with BCBS-MI. BCBS-MI refused to do so.  Thus, BCBS-MI could have avoided balance billing without imposing any harm to competition.

167.   Instead of negotiating with A4 in good faith while A4 continued to treat BCBS-MI's patients, BCBS-MI exploited its market power to force A4 to be in-network if it wanted to work with hospitals and medical facilities in Michigan, which is to say, if it wanted to work at all.  The requirement that a doctor be in-network with the same insurers at a given hospital is called "network matching." BCBS-MI's exploitation of its market power, and tortious acts, create forced network matching in Michigan.

168.   This forced network matching is not the default outside Michigan. Outside Michigan, many hospitals ask that anesthesiologists take reasonable efforts

or best efforts to go in-network with the same insurers that the hospital uses. These "best efforts" and "reasonable efforts" clauses are pro-competitive, because they retain negotiating leverage for anesthesiologists to go out of network when insurers seek to impose unreasonably low rates.

169.   By contrast, forced network matching has been criticized before Congress by both the American Hospital Association and the American College of Surgeons as handing essentially unchecked market power to health insurance companies.  As the American Hospital Association explained, network matching "essentially eliminate[s] any ability of physicians to negotiate fair contract terms with health plans, including, but not limited to, their reimbursement level."[35]  The American College of Surgeons similarly warned that where there is network matching, "clinicians must accept whatever payment rate offered in order to provide care in a specific facility."[36]  What the American Hospital Association and the American College of Surgeons warned against is exactly what BCBS-MI has achieved in Michigan through its tortious and anticompetitive acts.

---

[35] Testimony of the Am. Hosp. Assoc. (June 12, 2019), https://www.aha.org/testimony/2019-06-12-aha-testimony-no-more-surprises-protecting-patients-surprise-medical-bills.

[36] Statement of the Am. College of Surgeons 5 (May 21, 2019), https://www.facs.org/-/media/files/advocacy/federal/acs_statement_wm_hearing_surprise_billing.ashx.

## C.  A4 Has Suffered Damages from BCBS-MI's Antitrust Violations.

170.  A4 has suffered significant and ongoing damages caused by BCBS-MI's tortious and anticompetitive misconduct.  By tortiously interfering with the non-solicit and non-compete obligations owed to A4 by Trinity's hospitals and A4's employees, BCBS-MI has caused A4 to lose employees and to incur increased costs of recruiting and retaining anesthesiologists.

171.  A4 has been paid less for anesthesiology services than it would have received absent BCBS-MI's violation of the antitrust laws.  But for BCBS-MI's anticompetitive conduct, A4 would be able to negotiate higher reimbursement rates for anesthesiology services from BCBS-MI.  BCBS-MI's conduct has also shut A4 out from working in facilities and parts of the state where A4's BCBS-MI's artificially low rates are insufficient to cover A4's costs.

172.  BCBS-MI's conduct is destroying A4's business, including by imposing an artificially low rate on A4 and by interfering with A4's relationships with hospitals.

173.  Absent an injunction against BCBS-MI's tortious and anticompetitive actions, A4 will continue to be harmed and will eventually have to cease doing business in Michigan.

## CLAIMS FOR RELIEF

### First Cause of Action

### Tortious Interference with Contract Under Michigan Law

174.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

175.   In 2019, A4 possessed contracts with MHSM and SJHMS that prevented them from soliciting A4's anesthesiologists to work for MHSM or SJHMS, respectively.

176.   BCBS-MI was aware of both of the contracts with MHSM and SJHMS and the non-solicit obligations in those contracts.

177.   While BCBS-MI was aware of those obligations, and without justification, BCBS-MI coerced and induced MHSM and SJHMS to breach their non-solicit obligations to A4.

178.   A4 suffered damages from those breaches of contract, including increased costs of recruiting and retaining employees, as well as the loss of employees.

### Second Cause of Action

### Civil Conspiracy to Commit Tortious Interference with Contract Under Michigan Law

179.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

180.   In 2019, A4 possessed contracts with certain of its anesthesiologists, which contracts included narrow non-compete restrictions.  These restrictions prevented A4's anesthesiologists from leaving A4 to work immediately and directly for the hospitals where that doctor was providing services as part of his or her employment with A4.

181.   BCBS-MI was aware of A4's contracts with its anesthesiologist employees and aware of the non-compete provisions in those contracts specifically.

182.   BCBS-MI, acting through and in concert with Trinity (including its MHSM and SJHMS hospitals), induced breaches of those non-compete provisions by causing A4 personnel to leave A4 for Trinity.

183.   A4 suffered damages from these breaches of contract, including from the loss of employees.

## Third Cause of Action

## Unlawful and Malicious Threats Under Michigan Law

184.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

185.   In retaliation for A4's decision to go out-of-network with BCBS-MI, BCBS-MI threatened Trinity and Beaumont that it would boycott their hospitals in Michigan, unless those facilities in turn boycotted A4 and/or forced A4 to comply

with BCBS-MI's demands.  In so doing, BCBS-MI threatened Trinity that it would be unable to work in Michigan, if it remained out-of-network.

186.   BCBS-MI's threats were unlawful under Michigan law and the Sherman Antitrust Act.  *See* Mich. Comp. Laws Ann. § 750.213 (no person "shall orally or by any written or printed communication maliciously threaten any injury to the person or property . . . of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will); Mich. Comp. Laws Ann. § 500.2012; 15 U.S.C. § 2.

187.   The acts which BCBS-MI threatened to do were unlawful under Michigan law and the Sherman Antitrust Act.  *See* Mich. Comp. Laws Ann. § 500.2012 (prohibiting "any concerted action committing, any act of boycott, coercion or intimidation resulting in or tending to result in unreasonable restraint of the business of insurance."); 15 U.S.C. §§ 1-2.

188.   BCBS-MI's threats were made with malicious intent.

189.   Trinity and Beaumont responded to BCBS-MI's threats by deciding to terminate their agreements with A4, thereby forcing A4 to go in-network with BCBS-MI to remain in business.

190.   Trinity's and Beaumont's actions against A4 were the intended and proximate result of BCBS-MI's unlawful threats.

191.   A4 has suffered harm as a result of BCBS-MI's threats, including increased costs of recruiting and retaining employees, the loss of those employees, lost profits, and reduced rates received for anesthesiology services.

## Fourth Cause of Action

## Duress Under Michigan Law

192.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

193.   In 2019, A4 had part-time employees and independent contractors who contracted individually as in-network providers with BCBS-MI.

194.   Pursuant to those contracts, BCBS-MI could not terminate those individuals' provider status without either cause or notice.

195.   When A4 went out of network with BCBS-MI in 2019, certain of these part-time employees and independent contractors chose to remain in-network.

196.   However, in response to A4's decision to leave BCBS-MI's network, BCBS-MI terminated the provider status of these employees and independent contractors without cause and without notice.

197.   BCBS-MI's terminations constituted breaches of its contracts with those part-time employees and independent contractors.

198. BCBS-MI subsequently made clear to A4 that BCBS-MI would remain in breach of those contracts unless either the individuals ceased working with A4 or A4 went in network.

199. BCBS-MI's willful breaches placed A4 under unlawful duress to go back in-network with BCBS-MI, by putting A4 in a position where if it remained out-of-network it risked losing its employees and independent contractors.

200. A4 has suffered harm as a result of BCBS-MI's duress, including the reduced rates received for anesthesiology services.

## Fifth Cause of Action

### Violation of Section 8 of the Clayton Act (15 U.S.C. § 19)

201. A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

202. Trinity competes with BCBS-MI to recruit anesthesiologists.

203. Trinity's chief executive officer for Michigan, Casalou, serves on BCBS-MI's board of directors.

204. As a result of this interlocking directorate, Trinity and BCBS-MI coordinate in the market for anesthesiology services where they would otherwise compete.

205.   A4 has suffered harm as a result of BCBS-MI's retention of Casalou on its board of directors, including the reduced rates received for anesthesiology services.

**Sixth Cause of Action**

**Violation of Section 1 of the Sherman Act (15 U.S.C § 1)**

206.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

207.   Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold, or trebled, damages and interest.

208.   As alleged more specifically above, BCBS-MI has worked together with Trinity (and its hospitals) to restrict competition in the market for anesthesiology services by, among other things, denying anesthesiologists access to medical facilities unless they go in-network with BCBS-MI.  This agreement has no pro-competitive effects, and to the extent any such effect exists, it is outweighed by the harms to competition from the agreement.

209.   BCBS-MI's actions together with Trinity represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

210.   As alleged more specifically above, BCBS-MI has entered into, as have the other Blues, an "amended license agreement," pursuant to which the

Blues have divided the country into geographic markets, referred to as service areas, in which BCBS-MI and the Blues will, with limited exceptions, not compete with each other. This horizontal conspiracy also requires BCBS-MI and the other Blues to restrict the amount of revenue generated by their non-Blue subsidiaries. This output restriction thereby ensures that the Blues do not circumvent the geographic restrictions by competing other under brand names. This agreement has no pro-competitive effect, and to the extent any such effect exists, it is outweighed by the harms to competition from the agreement. This agreement represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

211. As alleged more specifically above, the "amended license agreement" also includes an agreement to fix prices and to boycott out-of-service-area providers. This agreement has no pro-competitive effect, and to the extent any such effect exists, it is outweighed by the harms to competition from the agreement. This agreement represents a contract, combination, or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

212. As a direct and proximate result of BCBS-MI's continuing violations of Section 1 of the Sherman Act, A4 has suffered and continues to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBS-MI's conduct unlawful.

These damages include having been paid less for anesthesiology services, of losing employees who go to work for other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and in increased costs of recruiting and retaining anesthesiologists.

## Seventh Cause of Action

### Violation of Section 2 of the Sherman Act (15 U.S.C § 2) – Monopsonization

213.   A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

214.   Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

215.   As alleged more specifically above, BCBS-MI has engaged in conduct by which it has created or maintained monopsony power in the relevant product markets and geographic markets described above.

216.   BCBS-MI created or maintained monsopsony power willfully, through anticompetitive acts including: exclusionary MFN clauses with hospitals; imposing an artificially low anesthesiology conversion factor that reduces output; horizontal agreements with other Blues; threats to boycott facilities that work with A4 after it stated its intent to go out-of-network; and conspiring with hospitals to require forced network matching for anesthesiologists.

217. An express purpose of BCBS-MI's conduct was to reduce competition from other commercial health insurers.

218. By willfully creating or maintaining monopsony power, BCBS-MI has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States."

219. As a direct and proximate result of BCBS-MI's continuing violations of Section 2 of the Sherman Act, A4 has suffered and will continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBS-MI's conduct unlawful. These damages include having been paid less for anesthesiology services, of losing employees who go to work for other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and increased costs of recruiting and retaining anesthesiologists.

## **Eighth Cause of Action**

### **Violation of Section 2 of the Sherman Act (15 U.S.C § 2) – Attempted Monopsonization**

220. A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

221. Plaintiffs bring this claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest.

222.   As alleged more specifically above, BCBS-MI has engaged in conduct by which it has attempted to create or maintain monopsony power in the relevant product markets and geographic markets described above.

223.   BCBS-MI attempted to create or maintain monssopsony power willfully, through anticompetitive acts including: exclusionary MFN clauses with hospitals; imposing an artificially low anesthesiology conversion factor that reduces output; horizontal agreements with other Blues; threats to boycott facilities that work with A4 after it stated its intent to go out-of-network; and conspiring with hospitals to require forced network matching for anesthesiologists.

224.   An express purpose of BCBS-MI's conduct was to reduce competition from other commercial health insurers.

225.   By attempting to create or maintain monopsony power, BCBS-MI has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits monopolization of "any part of the trade or commerce among the several States." Even to the extent BCBS-MI has not yet created or maintained monopsony power, its conduct has created a dangerous risk of success.

226.   As a direct and proximate result of BCBS-MI's continuing violations of Section 2 of the Sherman Act, A4 has suffered and will continue to suffer injury and damages of the type that the federal antitrust laws were designed to prevent. Such injury flows directly from that which makes BCBS-MI's conduct unlawful.

These damages include having been paid less for anesthesiology services, of losing employees who go to work for other states where anesthesiology rates are higher than the artificially repressed rates in Michigan, and increased costs of recruiting and retaining anesthesiologists.

## Ninth Cause of Action

### Claim for Injunctive Relief under Section 16 of the Clayton Act (15 U.S.C § 26)

227. A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

228. As explained in the Fourth through Eighth Causes of Action, BCBS-MI is violating Sections 1 and 2 of the Sherman Act as well as Section 8 of the Clayton Act.

229. BCBS-MI's unlawful conduct threatens to continue to injure A4. A4 seeks a permanent injunction prohibiting BCBS-MI from continuing its violations and to take appropriate remedial action to correct those violations, including by eliminating any remaining effects of those violations.

## Tenth Cause of Action

### Claim for Injunctive Relief under Michigan Law

230. A4 re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs.

231.    As explained in the First through Fourth Causes of Action, BCBS-MI is tortiously interfering with A4's contracts; conspiring to commit tortious interference with A4's contracts; and making unlawful and malicious threats aimed at preventing A4 from exercising its rights; and imposing duress on A4.

232.    BCBS-MI's unlawful conduct threatens to continue to injure A4.  A4 seeks a permanent injunction prohibiting BCBS-MI from continuing its tortious conduct and to take appropriate remedial action to undo the damage from its actions, including by eliminating any remaining effects of its tortious conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff A4 respectfully requests that this Court:

A.    Permanently enjoin BCBS-MI from interfering with, or conspiring with others to interfere with, A4's agreements with any medical facility or A4 employee;

B.    Permanently enjoin BCBS-MI from threatening, directly or indirectly, to boycott or steer work away from any medical facility in retaliation for A4 leaving BCBS-MI's network;

C.    Permanently enjoin BCBS-MI from willfully breaching its agreements with A4's independent contractors or part-time employees to impose economic duress on A4;

D.    Permanently enjoin BCBS-MI from entering into, or from honoring or enforcing, any agreements that restrain competition among commercial health

providers in Michigan.

      E.     Permanently enjoining BCBS-MI from taking anticompetitive actions to create or maintain market power in the above product and geographic markets.

      F.     Permanently enjoin BCBS-MI from retaliating against A4 or any medical facility with which A4 works in response to A4's participation in this litigation or the enforcement of these remedies.

      G.     Award A4 damages for BCBS-MI's tortious conduct under Michigan law in an amount to be proven at trial;

      H.     Award A4 treble damages for BCBS-MI's violations of the Sherman Act and Clayton Act in an amount to be proven at trial;

      I.     Award costs and attorneys' fees to A4;

      J.     Award prejudgment interest;

      K.     Award punitive damages to A4 in an amount to be determined at trial; and

      L.     Award any such other and further relief as may be just and proper.

## JURY DEMAND

A4 demands a trial by jury on all issues so triable.

Date: October 29, 2020

RILEY SAFER HOLMES & CANCILA LLP

*/s/ Gregory L. Curtner*
Gregory L. Curtner (P12414)
Matthew Kennison (P79653)
121 W. Washington Street, Suite 402
Ann Arbor, MI 48104
(734) 773-4900
gcurtner@rshc-law.com
mkennison@rshc-law.com

Jonathan Schiller, Esq. (*admission forthcoming*)
David Barillari, Esq. (*admission forthcoming*)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(212) 446-2300
jschiller@bsfllp.com
dbarillari@bsfllp.com

*Counsel for Anesthesia Associates of Ann Arbor, PLLC*