Query     Reports      Utilities     Help    Log Out

# U.S. District Court
## Eastern District of Michigan (Detroit)
## CIVIL DOCKET FOR CASE #: 2:23-cv-11286-LVP-EAS

| | |
|---|---|
| Ford Motor Company v. Blue Cross Blue Shield of Michigan Mutual Insurance Company et al | Date Filed: 05/31/2023 |
| Assigned to: District Judge Linda V. Parker | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Elizabeth A. Stafford | Nature of Suit: 410 Anti-Trust |
| Cause: 15:1 Antitrust Litigation | Jurisdiction: Federal Question |

**Plaintiff**

**Ford Motor Company**                represented by   **Sunni R. Harris**
Dinsmore
801 Pennsylvania Ave, N.W.
Ste 610
Washington, DC 20004
202-372-9136
Email: sunni.harris@dinsmore.com
*ATTORNEY TO BE NOTICED*

**William A. Sherman**
Dinsmore
801 Pennsylvania Ave, NW
Ste 610
Washington, DC 20004
202-372-9117
Email: william.sherman@dinsmore.com
*ATTORNEY TO BE NOTICED*

**John T. Mihelick**
Dinsmore & Shohl
900 Wilshire Drive
Suite 300
Troy, MI 48084
248-203-1655
Email: travis.mihelick@dinsmore.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Blue Cross Blue Shield of Michigan Mutual Insurance Company**          represented by   **Alexandra C. Markel**
Bodman PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, MI 48226
313-393-7511
Email: amarkel@bodmanlaw.com

*ATTORNEY TO BE NOTICED*

**Rachel Mossman Zieminski**
Shearman & Sterling LLP
Shearman & Sterling LLP
2601 Olive St, 17th Floor
Dallas, TX 75201
214-271-5777
Email: rachel.zieminski@shearman.com
*ATTORNEY TO BE NOTICED*

**Sarah L. Cylkowski**
Bodman PLC
1901 St. Antoine Street
6th Floor at Ford Field
Detroit, MI 48226
313-392-1077
Email: scylkowski@bodmanlaw.com
*ATTORNEY TO BE NOTICED*

**Todd M. Stenerson**
Shearman & Sterling LLP
401 9th Street, NW
Suite 800
Washington, DC 20004-2128
United Sta
202-508-8093
Email: todd.stenerson@shearman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Blue Cross Blue Shield Association**            represented by   **Brian C. Summerfield**
Schenk & Bruetsch PLC
211 West Fort Street
Detroit, MI 48009
313-774-1000
Email: brian.summerfield@sbdetroit.com
*ATTORNEY TO BE NOTICED*

**Karin A. DeMasi**
Cravath, Swaine,
825 Eighth Avenue
New York, NY 10019
212-474-1000
Fax: 212-474-3700
Email: kdemasi@cravath.com
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Felix Brizuela**                                    represented by   **Felix Brizuela**
1103 Redoak Drive

Harrison City, PA 15636
724-205-4308
PRO SE

| Date Filed | # | Select all / clear | Docket Text |
|---|---|---|---|
| 05/31/2023 | 1 | ☐ | COMPLAINT filed by Ford Motor Company against Blue Cross Blue Shield of Michigan Mutual Insurance Company, The Blue Cross Blue Shield Association with Jury Demand. Plaintiff requests summons issued. Receipt No: AMIEDC-9367906 - Fee: $ 402. County of 1st Plaintiff: Wayne County - County Where Action Arose: Wayne County - County of 1st Defendant: Wayne County. [Previously dismissed case: No] [Possible companion case(s): N.D. Ala, 21-cv-01209-RDP; 22-cv-01256-RDP; 22-cv-00558-RDP, Judge R. David Proctor] (Mihelick, John) (Entered: 05/31/2023) |
| 06/02/2023 | 2 | ☐ | SUMMONS Issued for *Blue Cross Blue Shield of Michigan Mutual Insurance Company* (DAll) (Entered: 06/02/2023) |
| 06/02/2023 | 3 | ☐ | SUMMONS Issued for *The Blue Cross Blue Shield Association* (DAll) (Entered: 06/02/2023) |
| 06/02/2023 | | | A United States Magistrate Judge of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form is available for download at http://www.mied.uscourts.gov (DAll) (Entered: 06/02/2023) |
| 06/05/2023 | 4 | ☐ | NOTICE of Appearance by Todd M. Stenerson on behalf of Blue Cross Blue Shield of Michigan Mutual Insurance Company. (Stenerson, Todd) (Entered: 06/05/2023) |
| 06/05/2023 | 5 | ☐ | NOTICE of Appearance by Rachel Mossman Zieminski on behalf of Blue Cross Blue Shield of Michigan Mutual Insurance Company. (Zieminski, Rachel) (Entered: 06/05/2023) |
| 06/07/2023 | 6 | ☐ | WAIVER OF SERVICE Returned Executed. The Blue Cross Blue Shield Association waiver sent on 6/5/2023, answer due 8/4/2023. (Mihelick, John) (Entered: 06/07/2023) |
| 06/07/2023 | 7 | ☐ | WAIVER OF SERVICE Returned Executed. Blue Cross Blue Shield of Michigan Mutual Insurance Company waiver sent on 6/5/2023, answer due 8/4/2023. (Mihelick, John) (Entered: 06/07/2023) |
| 06/07/2023 | 8 | ☐ | STATEMENT of DISCLOSURE of CORPORATE AFFILIATIONS and FINANCIAL INTEREST by Blue Cross Blue Shield of Michigan Mutual Insurance Company (Stenerson, Todd) (Entered: 06/07/2023) |
| 06/15/2023 | 9 | ☐ | NOTICE of Appearance by Sunni R. Harris on behalf of Ford Motor Company. (Harris, Sunni) (Entered: 06/15/2023) |
| 06/15/2023 | 10 | ☐ | NOTICE of Appearance by William A. Sherman on behalf of All Plaintiffs. (Sherman, William) (Entered: 06/15/2023) |
| 06/16/2023 | 11 | | [STRICKEN PURSUANT TO 06/21/23 ORDER] MOTION to intervene by Felix Brizuela. (DPer) Modified on 6/21/2023 (DPer). (Entered: 06/20/2023) |

| | | | |
|---|---|---|---|
| 06/21/2023 | 12 | ☐ | ORDER striking 11 Motion to intervene. Signed by District Judge Linda V. Parker. (DPer) (Entered: 06/21/2023) |
| 06/21/2023 | | | TEXT-ONLY CERTIFICATE OF SERVICE re 12 Order on Motion to Intervene mailed to: Felix Brizuela at 1103 Redoak Drive Harrison City, PA 15636 (AFla) (Entered: 06/21/2023) |
| 08/01/2023 | 13 | ☐ | NOTICE of Appearance by Sarah L. Cylkowski on behalf of Blue Cross Blue Shield of Michigan Mutual Insurance Company. (Cylkowski, Sarah) (Entered: 08/01/2023) |
| 08/01/2023 | 14 | ☐ | NOTICE of Appearance by Alexandra C. Markel on behalf of Blue Cross Blue Shield of Michigan Mutual Insurance Company. (Markel, Alexandra) (Entered: 08/01/2023) |
| 08/01/2023 | 15 | ☐ | STIPULATED ORDER TO EXTEND TIME TO ANSWER OR OTHERWISE RESPOND TO PLAINTIFF'S COMPLAINT ( **Response due by 8/24/2023**). Signed by District Judge Linda V. Parker. (AFla) (Entered: 08/01/2023) |
| 08/24/2023 | 16 | ☐ | ATTORNEY APPEARANCE: Brian C. Summerfield appearing on behalf of The Blue Cross Blue Shield Association (Summerfield, Brian) (Entered: 08/24/2023) |
| 08/24/2023 | 17 | ☐ | NOTICE of Appearance by Karin A. DeMasi on behalf of The Blue Cross Blue Shield Association. (DeMasi, Karin) (Entered: 08/24/2023) |
| 08/24/2023 | 18 | ☐ | STATEMENT of DISCLOSURE of CORPORATE AFFILIATIONS and FINANCIAL INTEREST by The Blue Cross Blue Shield Association (DeMasi, Karin) (Entered: 08/24/2023) |
| 08/24/2023 | 19 | ☐ | MOTION to Dismiss *Ford Motor Company's Complaint* by Blue Cross Blue Shield of Michigan Mutual Insurance Company. (Attachments: # 1 Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7) (Stenerson, Todd) (Entered: 08/24/2023) |
| 08/24/2023 | 20 | ☐ | MOTION to Dismiss *Plaintiff's Complaint* by The Blue Cross Blue Shield Association. (DeMasi, Karin) (Entered: 08/24/2023) |

View Selected

or

Download Selected

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| FORD MOTOR COMPANY | ) | CASE NO: |
| | ) | |
| Plaintiff | ) | JUDGE: |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| BLUE CROSS BLUE SHIELD OF | ) | |
| MICHIGAN MUTUAL | ) | |
| INSURANCE COMPANY | ) | **COMPLAINT** |
| | ) | |
| And | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| THE BLUE CROSS BLUE SHIELD | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................3

II. JURISDICTION AND VENUE ....................................................................6

III. THE PARTIES ...........................................................................................8

IV. HISTORY OF THE BLUE CROSS AND BLUE SHIELD PLANS OF BCBSA .......................................................................................................9

V. EXCLUSIVE SERVICE AREAS & OUTPUT RESTRICTIONS ............. 12

VI. RESTRAINT OF TRADE..........................................................................20

VII. MARKET DEFINITIONS .........................................................................22

VIII. BCBS LICENSEES' COLLECTIVE MARKET POWER...........................25

IX. DEFENDANTS' CONDUCT WAS NOT BENEFICIAL TO THE MARKET ..................................................................................................................29

X. PRODUCTS PURCHASED BY FORD .....................................................34

XI. TOLLING OF THE STATUE OF LIMITATIONS.....................................35

XII. SHERMAN ACT §1 VIOLATIONS .........................................................36

XIII. RELIEF REQUESTED ..............................................................................38

Plaintiff Ford Motor Company ("Ford"), for its complaint against Blue Cross Blue Shield of Michigan Mutual Insurance Company ("BCBS MI") and the Blue Cross Blue Shield Association ("BCBSA") (collectively "Defendants") hereby alleges as follows.

## I. INTRODUCTION

1.     The Defendants, as part of a larger conspiracy, have divided territory and fixed prices thereby increasing the cost of health services. Defendants reduced competition for their own gain resulting in astronomical profits and extraordinary salaries, all at the substantial expense of consumers.

2.     Defendants conspired – in violation of Section 1 of the Sherman Act – to restrict output and to allocate customers across the United States, which resulted in Ford being overcharged for the commercial health insurance products it purchased from certain Blue Cross Blue Shield ("BCBS") entities including Defendant BCBS MI, as well as Blue Cross and Blue Shield of Kansas City ("BCBS KC"); Blue Cross Blue Shield of Tennessee ("BCBS TN"); Elevance Health, Inc. f/k/a Anthem, Inc. f/k/a WellPoint, Inc., ("Anthem") and also doing business through its wholly-owned subsidiaries HMO Missouri, Inc. ("Anthem MO") and Community Insurance Company ("Anthem OH") ( collectively "Anthem"); and Health Care Services Corporation, doing business as Blue Cross and Blue Shield of Illinois ("BCBS IL," collectively "BCBS Entities").

3.      While not named as defendants in this complaint BCBS KC, BCBS TN, Anthem, Anthem MO, Anthem OH, and BCBS IL are separate and distinct legal entities each with their own board of directors, employees, and principal place of business.

4.      Ford's claims relate to the multi-district class action litigation styled, *In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, United States District Court for the Northern District of Alabama, No. 2:13-CV-20000-RDP ("MDL"), where claims against the named Defendants, as well as other licensees of the BCBS trademark, were alleged for violations of the Sherman Act.

5.      The MDL settled, in part, for approximately $2.7 billion dollars in 2020, and the settlement was approved by the MDL Court in 2022.

6.      Designated a class-member for purposes of settlement in the MDL, Ford timely exercised its right to opt out of the MDL settlement and chose to independently pursue its claims in the instant Complaint against Defendants.

7.      Ford purchased commercial insurance products offered by BCBS Entities, including Defendant BCBS MI. These products included, but were not limited to: (a) traditional insurance products in which Ford paid a premium in exchange for BCBS Entities insuring employee plan members against the cost of medical care, and (b) Administrative Services Only ("ASO") products, whereby Ford purchased

administrative services from BCBS Entities and an account funded by Ford (that is, a self-funded account) paid for or reimbursed the costs of medical care.

8.      BCBS Entities, including Defendant BCBS MI, are separate business and legal entities and potential competitors with each other, and potential competitors with all other entities that use the Blue Cross and Blue Shield trademark and licenses ("BCBS Licensees") (not listed herein). As BCBS Licensees, BCBS Entities, including Defendant BCBS MI, agreed with each other and Defendant BCBSA to allocate customers and refrain from competing against each other and all other BCBS Licensees when providing insurance products and services. Defendants successfully conspired with BCBS Licensees to, among other things, create Exclusive Service Areas ("ESAs") – geographic boundaries in which all other BCBS Licensees would not compete – making each individual BCBS Licensee the exclusive provider of certain insurance products and services in that territory. This, in turn, restrained competition between BCBS Licensees and reduced the overall number of insurers in any one region.

9.      As a result of this conspiracy, Ford paid higher premiums for traditional insurance products and higher fees and costs for ASO services. Defendants' horizontal conspiracy to divide geographic territory is the exact type of harm that Congress intended the Sherman Act to protect against.

10.     Ford seeks to recover treble the amount of actual damages as determined by the difference between the supra-competitive premiums and fees that Ford was charged as a result of the conspiracy, and what Ford would have paid absent Defendants' anticompetitive conspiracy in a free and competitive market. Finally, Ford seeks costs and attorney's fees as permitted by the Sherman Act and Clayton Act, and any other remedies (including injunctive relief) the court finds proper and just.

## II.     JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Ford brings its claims pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15) to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Ford from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

12.     This Court has personal jurisdiction over both Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the Michigan long-arm statute (Mich. Stat. Ann. 600) under one or more of the following.

    a. One of the named Defendants, BCBS MI, has a substantial presence within this District, including its principal place of business, corporate headquarters, and numerous employees.

b. Defendants BCBS MI and BCBSA transact substantial business within this District through contractual obligations within the state of Michigan, administration of claims, payment of premiums, and provision of insurance coverage.

c. Defendants BCBS MI and BCBSA conspired with each other and all other BCBS Licensees in a nationwide conspiracy which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

d. Upon information and belief, Defendants BCBS MI and BCBSA have minimum contacts within the state of Michigan due to an agreement made between the Defendants, which assigned an ESA to BCBS MI in the state of Michigan in furtherance of their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

e. Defendants BCBS MI and BCBSA have minimum contacts within the state of Michigan due to their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

f. Defendants BCBS MI and BCBSA have purposefully availed themselves of this court's jurisdiction due to their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

g. Defendants BCBS MI's and BCBSA's contacts within the state of Michigan and within this District are of a substantial, continuous, and systematic nature due to their willing and intentional participation in a nationwide conspiracy, which directly resulted in the restraint of trade and commerce within the state of Michigan and caused harm to Ford within this District.

13. Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and actions giving rise to the claim occurred within this District.

14. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## III. THE PARTIES

15. Plaintiff Ford is a Delaware corporation with its principal place of business in Dearborn, Michigan. Ford is one of the largest automobile manufacturers in the United States and has over 170,000 employees worldwide.

16.     BCBS MI is the exclusive health insurance plan operating under the BCBS trade names and trademarks in the state of Michigan. The principal headquarters for BCBS MI is located at 600 E. Lafayette Blvd., Detroit, MI 48226. BCBS MI does business in each county in Michigan.

17.     BCBSA is an Illinois corporation owned and controlled by thirty-six health insurance plans that operate under the BCBS trade names and trademarks, including Defendant BCBS MI. The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601. BCBSA was created and maintained by BCBS Licensees in furtherance of their unlawful conspiracy. Notwithstanding this ownership of BCBSA, Defendants are independent economic actors without common shareholders or ownership.

## IV.    HISTORY OF THE BLUE CROSS BLUE SHIELD PLANS AND BCBSA

18.     Historically, BCBS Licensees arose as independent non-profit insurance plans, but they jointly conceived of the Blue Cross Blue Shield trademarks ("Blue Brand") in a coordinated effort to create a national brand that each would operate within its local area. They quickly developed to dominate the market for health care coverage. Since the 1980s, the BCBS Licensees have increasingly operated as for-profit entities by formally converting to for-profit status, or by generating substantial

surpluses that have been used to fund multi-million dollar salaries and bonuses for their administrators.[1]

19.     In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota, using a poster featuring a nurse wearing a blue Geneva cross uniform as the symbol and the name "Blue Cross" for the plan. Soon, other prepaid hospital plans began independently using the Blue Cross symbol.[2]

20.     In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the American Hospital Association ("AHA").

21.     The Blue Cross hospital plans were developed in conjunction with the AHA (which represents hospitals), while the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

22.     The Blue Shield plans closely followed the development of the Blue Cross plans. Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and then proliferated as other plans adopted it.

---

[1] Andrew L. Wang, *Blue Cross parent CEO's compensation rockets past $16 million*, CHICAGO BUSINESS (April 11, 2013), http://www.chicagobusiness.com/article/20130411/NEWS03/130419970/blue-cross-parent-ceos-compensation-rockets-past-16-million; Bob Herman, *Big raises for CEOs of the big Blues plans*, AXIOS (Oct. 14, 2021), https://www.axios.com/2021/10/14/blue-cross-blue-shield-ceo-compensation-pay-pandemic.
[2] BCBSA HISTORY FACT SHEET, Communications Division of the Blue Cross and Blue Shield Association (March, 1997).

23.     In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent Blue Shield plans which would eventually become the Blue Shield Association.

24.     Historically, the Blue Cross plans and the Blue Shield plans were fierce competitors. Early on, there were no restrictions on the ability of any plans to compete with, or offer coverage in, an area already covered by another plan.

25.     By the late 1940s, however, the BCBS Licensees faced growing competition from both each other and third-party insurance companies.

26.     To address the increasing competition, the various BCBS Licensees agreed to centralize the ownership of their trademarks and trade names. In 1954, the Blue Cross plans transferred their rights in each of their respective Blue Cross trade names and trademarks to the AHA. In 1972, the AHA assigned its rights in these marks to the Blue Cross Association.

27.     Likewise, in 1952, the Blue Shield plans agreed to transfer their ownership rights in their respective Blue Shield trade names and trademarks to the Blue Shield Association.

28.     In 1982, the Blue Cross Association and the Blue Shield Association merged to form BCBSA. At that time, BCBSA became the sole owner of the various Blue Cross trade names and trademarks, and Blue Shield trade names and trademarks previously owned by the local plans.

29.     In November 1982, after heated debate, BCBSA's member plans, the BCBS Licensees, agreed to two "propositions" (Propositions Nos. 1.1 and 1.2): (a) by the end of 1984, all existing Blue Cross plans and Blue Shield plans would consolidate at a local level to form joint plans; and (b) by the end of 1985, all BCBS Licensees within a state would further consolidate, ensuring that each state would have only one BCBS Licensee. Proposition 1.2 was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively", including "decision-making" and "policy determination."[3]

## V.     EXCLUSIVE SERVICE AREAS AND OUTPUT RESTRICTIONS

30.     After the merger of Blue Cross and Blue Shield, a task force was created to advance the ability and willingness of the BCBS Licensees to work together. One suggestion was the creation of a common licensing agreement applicable to both the Blue Cross and Blue Shield marks. It was noted that this task was "complicated" by "antitrust matters." The United States Department of Justice ("DOJ") commenced an investigation into how the then-operative license agreements worked.[4]

31.     In order to provide "checks and balances" against "open competition," in April 1987, the BCBS Licensees, through the BCBSA, held an "Assembly of Plans"

---

[3] *See In Re Blue Cross Blue Shield Antitrust Litigation*, BCBSAL_0000022540-55 (N.D. Ala. 2020)
[4] *See, e.g. United States and State of Michigan v. Blue Cross Blue Shield of Michigan*, Civil Action No. 2:10-cv-14155 (E.D. Mich. 2013).

– a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent health insurers and competitors agreed to maintain Exclusive Service Areas ("ESAs") when operating under the Blue Brand, thereby eliminating "Blue on Blue" competition.[5]

32.    More than one BCBS Licensee has publicly admitted the existence of these territorial market divisions. For example, a former BCBS Licensee in Ohio alleged that BCBS Licensees, through the BCBSA, agreed to include these restrictions in the Guidelines to Administer Membership Standards (the "Guidelines") in 1996 in an effort to block the sale of one member plan to a non-member that might present increased competition to another member plan.[6]

33.    The Government Accounting Office ("GAO") Report notes:

> To use the Blue Cross and Blue Shield names and trademarks, each [BCBS Licensee] must sign a license agreement with the [BCBSA]. The agreement does not constitute a partnership or joint venture, and the [BCBSA] has no obligations for the debts of [BCBS Licensees].
> The license agreement restricts [BCBS Licensees] from using the trademark outside their prescribed service area to prevent competition among plans using the [Blue Brand].[7]

34.    The "prescribed service area" is the ESA described above.

---

[5] ROBERT CUNNINGHAM III AND ROBERT M. CUNNINGHAM JR., THE BLUES: A HISTORY OF THE BLUE CROSS AND BLUE SHIELD SYSTEM (1997).
[6] *See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318 (6th Cir. 1997).
[7] Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 28.

35.    All BCBS Licensees must abide by the rules and regulations of the BCBSA.

36.    The BCBS Licensees control BCBSA's Plan Performance and Financial Standards Committee (the "PPFSC"). The PPFSC is a standing committee of the BCBSA Board of Directors that is composed of nine-member plan CEOs and three independent members.

37.    The BCBS Licensees also control the rules and regulations that all members of BCBSA must obey.

38.    According to a brief BCBSA filed during litigation in the Sixth Circuit Court of Appeals, these rules and regulations include the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines.[8]

39.    The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the [BCBS Licensees] and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, a BCBS Licensee "agrees . . . to comply with the Membership Standards." In its Sixth Circuit brief, BCBSA described the provisions of the License Agreements as something the BCBS Licensees "deliberately chose," "agreed to," and "revised."

---

[8] *See Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318 (6th Cir. 1997).

40. The License Agreement defines each BCBS Licensee's ESA as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."[9]

41. The BCBS Licensees recognized the legal risk of such a market allocation strategy. A 1987 report on interviews of BCBS CEOs that was sent to John Thompsons, Chairman of the Ad Hoc Committee of the Assembly of Plans, observed that most regard the ESAs as necessary to avoid chaos in the Blue Brand system; the report recognized that this issue may implicate antitrust laws (given court cases pending in Ohio and elsewhere) and took a view that the right to control name and market may not extend to the ability/right to enforce exclusivity.[10]

42. One internal memorandum from the CEO of the BCBS Licensee in Maryland frankly recognized the illegal and horizontal nature of the market allocation agreement, stating the feeling that the current licensing arrangements were illegal because BCBS Maryland was in the position of approving its own licenses as members of the association.[11]

43. In 1996, the independent BCBS Licensees approved a "Local Best Efforts Rule." It reads as follows: "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to health care plans and related services

---

[9] *See* Blue Cross License Agreement, https://www.sec.gov/Archives/edgar/data/1156039/000119312511039172/dex1014.htm (last visited March 10, 2023).
[10] *See In Re Blue Cross Blue Shield Antitrust Litigation*, BCBSA00083662-69.
[11] *See id.* at BCBSA00083755-59.

... offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names."[12]

44.     A "National Best Efforts Rule" was also approved by the independent BCBS Licensees. It is embodied in the following guideline: "[a]t least 66 2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to health care plans and related services ... must be sold, marketed, administered or underwritten under the Licensed Marks and Names. The percentage set forth in this paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph."[13]

45.     The independent BCBS Licensees also limited transfer rights by requiring prior BCBSA review and approval of the establishment of a successor BCBS Licensee.

46.     All of these additions to the BCBSA rules drastically limited the ability of the independent BCBS Licensees to compete with one another.

47.     The independent BCBS Licensees monitor all members' compliance with the rules and regulations of BCBSA.

48.     The independent BCBS Licensees similarly control the termination of existing members. The Guidelines state that based on the PPFSC's "initial determination

---

[12] Blue Shield Controlled Affiliate License Agreement, Standard 10, Guideline 2.1 (March 15, 2007) (hereinafter "2007 License Agreement").
[13] *Id.* at Guideline 2.2.

16

about a Plan's compliance with the license agreements and membership standards. . . . PPFSC makes a recommendation to the BCBSA Board of Directors, which may accept, reject, or modify the recommendation." However, according to the Guidelines, "a Plan's licenses and membership [in BCBSA] may only be terminated on a three-fourths or greater affirmative Plan weighted vote."[14]

49.    The independent BCBS Licensees discipline members of BCBSA that do not abide by BCBSA's rules and regulations. The Guidelines describe three responses to a member plan's failure to comply – "Immediate Termination," "Mediation and Arbitration," or "Sanctions" – each of which could result in the termination of a member plan's license.[15]

50.    A terminated BCBS Licensee would lose the right to use the Blue Brand through which it derived the majority of its revenue and would be required to fund the establishment of a competing Blue Brand health insurer in its ESA. This amounted to a powerful incentive to remain in the association, and a threat by the BCBSA and the other independent BCBS Licensees to put any entity that breached the territorial restrictions out of business.

51.    The independent BCBS Licensees are potential competitors that use BCBSA to coordinate their activities. As a result, the rules and regulations imposed by the

---

[14] *Id.* at Guideline 9(b).
[15] *See, e.g.* 2007 License Agreement at Standard 1(1): Guidelines Subject to Immediate Termination; *id.* at Standard 1(2): Guidelines Subject to Mediation/Arbitration; *id.* at Standard 1(3): Guidelines Subject to Sanctions.

BCBSA on the member plans are in truth imposed by the member plans on themselves and each other.

52.    Each BCBS Licensee is an independent legal organization. In a pleading BCBSA filed during litigation in the Southern District of Florida, BCBSA admitted that the formation of BCBSA did not change each plan's fundamental independence. The License Agreements state that "[n]othing herein contained shall be construed to constitute the parties hereto as partners or joint venturers, or either as the agent of the other."[16]

53.    The independent BCBS Licensees include many of the largest commercial health benefit product companies in the United States.

54.    By some measures, Anthem is the largest commercial health benefit product company in the nation. Similarly, fifteen of the twenty-five largest commercial health benefit product companies in the country are BCBS Licensees. On its website, BCBSA states that its members together provide "coverage for nearly 100 million people – one-third of all Americans" and that, nationwide, "more than 96% of hospitals and 91% of professional providers contract with Blue Cross and Blue Shield companies – more than any other insurers."[17] Absent the restrictions that the independent BCBS Licensees have chosen to impose on themselves, discussed

---

[16] *Id.* at § 10: Joint Venture (June 16, 2006).
[17] BLUE CROSS BLUE SHIELD, ABOUT US, https://www.bcbs.com/about-us (last visited March 1, 2023).

below, these companies would compete against each other in the market for commercial health benefit products.

55.     In its Sixth Circuit brief, BCBSA admitted that the member plans formed the precursor to BCBSA when they "recognized the necessity of national coordination."[18]

56.     One BCBSA member plan admitted in its February 17, 2011 Form 10-K that "[e]ach of the [36] BCBS companies . . . works cooperatively in a number of ways that create significant market advantages . . . ."[19]

57.     No Defendant has or had any franchise agreement with another independent BCBS Licensee or the BCBSA during the relevant period.

58.     As the foregoing demonstrates, BCBSA is a vehicle used by independent commercial health benefit product companies to enter into agreements that restrain competition.

59.     Because BCBSA is owned and controlled by its member plans, any agreement between BCBSA and one of its member plans constitutes a horizontal agreement between and among the member plans themselves. As two economists stated to the FTC in 1978, "[t]he Blues collude almost perfectly. BCBS plans agree upon geographical market areas with the assistance of their national associations."[20]

---

[18] *Blue Cross & Blue Shield Mut.*, 110 F.3d at 318.

[19] Wellpoint, Inc. 10-K Annual report pursuant to section 13 and 15(d), 8 (Feb. 27, 2011).

[20] Federal Trade Commission, "Competition in the Health Care Sector: Past, Present, and Future," Mar. 1978, at 212, at https://www.ftc.gov/sites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf

## VI.   RESTRAINT OF TRADE

60.    Defendant BCBS MI entered into a License Agreement with Defendant BCBSA. All BCBS Entities, including Defendant BCBS MI, complied with and enforced the ESA restrictions required by the License Agreement from at least 2008 to the present.

61.    Defendants have allocated U.S. markets for commercial health benefit products by agreeing to limit their competition against one another when not using the Blue Brand. The Guidelines and Membership Standards, which the independent BCBS Licensees created, control, and enforce, and with which each licensee must agree to comply as part of the License Agreements, establish two key restrictions on BCBS Licensees.[21]

62.    First, the Local Best Efforts Rule directly limits the ability of each BCBS Licensee to generate revenue from non-Blue Brand business within its ESA. This provision thereby limits the ability of each BCBS Licensee to develop non-Blue Brands that could and would compete within the ESA. It discourages and disincentivizes each BCBS Licensee from developing any non-Blue Brand businesses.

63.    Second, the National Best Efforts Rule dictates that no BCBS Licensee may generate more than one-third of its total revenue from non-Blue Brand business

---

[21] *See* ¶¶ 31 and 32, *supra*.

outside of its ESA anywhere in the U.S., thereby further discouraging and disincentivizing each BCBS Licensee from developing substantial non-Blue Brand business outside of its ESA.

64.    The one-third cap on non-Blue Brand revenue arising from the National Best Efforts Rule provides a BCBS Licensee with minimal, if any, incentive to compete outside its ESA.

65.    In sum, each BCBS Licensees, including BCBS Entities, agreed with its potential competitors that it will exercise the exclusive right to use the Blue Brand within its designated geographic areas, derive *none* of its revenue from products and services offered under the Blue Brand outside of that area, and derive no more than one-third of its revenue from outside of its exclusive area, by offering products and services under a non-Blue Brand. The latter amount will be further reduced if the BCBS Licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue Brand.

66.    The foregoing restrictions on the ability of BCBS Licensees to generate revenue outside of their ESAs constitute agreements between competitors to divide and allocate geographic markets, and therefore are *per se* violations of Section 1 of the Sherman Act. Each Defendant abided by the foregoing restrictions from 2008 to the present.[22]

---

[22] The National Best Efforts rule was repealed in 2022 as part of the Subscriber Settlement in the Blue Cross Blue Shield Antitrust Litigation; however, the remaining restrictions are still in place. *See In re Blue Cross Blue Shield*

67.     Since entering the License Agreement, no BCBS Licensee competed under the Blue Brand outside of its designated ESA. Thus, while there are numerous BCBS Licensees, and non-Blue Brand businesses owned by such plans, that could and would compete effectively in each other's ESAs but for the territorial restrictions, almost none compete outside their ESAs under a non-Blue Brand.

## VII.   MARKET DEFINITIONS

68.     The BCBS Licensees offer a range of health insurance products to their customers. These customers, depending on their size, generally use one of two types of health insurance for their employees and plan participants: fully insured or self-insured. The BCBS Licensees sell insurance products to both fully insured plans and self-insured plans (typically offered by larger employers and plans).

69.     BCBS Licensees, other health insurers, and other third-party administrators generally classify customers as "small group" or "large group" employers. Within the "large group" category, BCBS Licensees and other insurance industry participants recognize large, multi-site employers or plans typically covering 5,000 or more employees as a distinct group that are referred to as "National Accounts." The sale of commercial health insurance services, including ASO services, to National Accounts is recognized as a distinct economic market by the BCBS Licensees and other health insurers, many of which have separate business units

---

*Antitrust Litig.*, MDL No. 2406, United States District Court for the Northern District of Alabama, No. 2:13-CV-20000-RDP, Document 2931.

dedicated to National Accounts. National Accounts are also recognized as a separate economic market by the consuming public, including by the National Accounts themselves. Sales of insurance services to National Accounts are not reasonably interchangeable with the sales of insurance services to smaller accounts, or do not exhibit a high degree of cross-elasticity of demand with such accounts. This market is referred to herein as the "National Account Health Insurance Services" market.

70.     The package of ASO services is considered a distinct line of commerce and its inclusion in the National Account Health Insurance Services market is proper. *See United States v. Grinnell Corp.*, 384 U.S. 563, 572-73 (1966); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 201 (D.D.C. 2017) (holding that traditional insurance for national accounts and ASO services for national accounts are part of the same market for evaluation under Clayton Act § 7).

71.     By virtue of their size and geographic dispersion, National Accounts have unique needs and characteristics that have led the health insurance industry to treat them as a separate product with distinct services and pricing. Insurers identify and target National Accounts based on these attributes, and many other participants in the insurance industry generally do not and cannot target National Accounts because of these attributes. Accordingly, only the BCBS Licensees, United HealthCare, Cigna, and Aetna are generally able to service the business of National Accounts. BCBS Licensees have a share of at least 50 percent of the National Account market.

72.     Many National Accounts self-insure. A majority of Ford's insurance has been self-insured since 2015. Self-insurance means Ford assumes the risk and cost of covered medical services used by their covered individuals. National Accounts facilitate this self-insurance coverage by purchasing ASO services pursuant to which third parties (such as BCBS Licensees) manage the day-to-day administration of customers' health plans and grant the covered individuals access to their medical provider network(s).

73.     Payments for services from self-insured National Accounts to insurers (such as BCBS Licensees) under ASO contracts are known as "ASO fees." ASO fees are a significant part of the negotiations between ASO service providers and National Accounts.

74.     Alternatively, some National Accounts continue to rely on traditional insurance plans. Traditional insurance plans rely on the insurance provider to pool the fund and administer premiums. Both the employer and the employee pay premiums to the insurance provider to contribute toward the pooled fund. These premiums are a significant factor in the negotiations between insurance providers and National Accounts. Ford continues to rely on traditional plans for some plants and regions.

75.     There is a relevant product market for the sale of commercial health insurance services to National Accounts.

76.     The relevant geographic market is the entire United States. *Anthem Inc.*, 236 F. Supp. 3d at 193-202 (finding that the relevant product market for consideration of the proposed Anthem/Cigna merger was the sale of commercial health insurance to National Accounts with 5,000 employees or more spread across two or more states).

77.     Defendants' unlawful conduct has also unreasonably restrained competition in the National Account market.

78.     Ford is a National Account as that term has been defined by the case law and as it is commonly used in the insurance industry and by Defendants.

79.     As owners of the BCBSA, BCBS MI and the other BCBS Licensees, agreed to allocate customers and markets, restrict output, and eliminate the ability of Defendants to compete against each other for the business of National Accounts.

## VIII.  BCBS LICENSEES' COLLECTIVE MARKET POWER

80.     The BCBS Licensees wield collective nationwide economic power. BCBSA's own factsheet admits this.[23]

81.     The 36 BCBS Licensees serve 106 million people – one out of every three Americans. The various BCBS Licensees service 88 of the Fortune 100 companies. They also service over seven million people who work for small employers. They are the number one choice for organized labor, serving 17 million organized workers, retirees, and their families. They offer coverage through Affordable Care Act

---

[23] BLUE FACTS, Blue Cross Blue Shield Association, https://www.bcbs.com/sites/default/files/file-attachments/page/BCBS.Facts__0.pdf (May, 2018).

insurance exchanges and service millions of Americans through government-supported healthcare programs. The BCBS provider network includes more than 90% of doctors and hospitals nationwide. More than 62 million BCBS enrollees across all 50 states have access to care from more than 342,000 providers.[24] As just described, the market shares of individual BCBS Licensees in various states are indicative of market power.

82.   In a letter written in February of 2016, the AHA summarized the market dominance of the BCBS Licensees (footnotes omitted) as follows:

   a. [BCBS Licensees] have the largest membership of any insurer. The Blues cover more than 105 million Americans. That is "nearly one in three Americans." Collectively, the [BCBS Licensees] are three times bigger than any other health plan.

   b. [BCBS Licensees] command the largest share of the commercial fully insured (FI) segment in at least 45 states and the District of Columbia (D.C.); in 35 states, a [BCBS Licensee] holds 50 percent or more FI market share; in some states, 85 percent of all FI members belong to a [BCBS Licensee].

   c. [BCBS Licensees] rank first in total membership in at least 43 states and D.C., with a high market share of 97 percent.

---

[24] *Id.*

d. In the Federal Employees Health Benefits Program, the [BCBS Licensees] command 66 percent of total membership, and control 50 to 90 percent of the membership in 48 states and D.C.

e. In the public exchanges, [BCBS Licensees] dominate. In at least one state, the [BCBS Licensee] enrolled 100 percent of the exchange membership in 2015, and other [BCBS Licensees] acquired membership shares in the forties through nineties in many states.

f. [BCBS Licensees] collectively are significantly larger than any of their rivals on a consolidated basis. Indeed, collectively [BCBS Licensees] had $244 billion in revenue in 2013, making them larger than all companies on the Fortune 500 except for Walmart and Exxon Mobil.

g. The [BCBS Licensees] of Alabama, Florida, Illinois, Kansas, Minnesota, Montana, Nebraska, New Mexico, North Dakota, North Carolina, Oklahoma, Texas and Wyoming through their jointly owned pharmacy benefit manager acknowledge their "market dominance."

h. [BCBS Licensees] dominate provider networks. In 32 states and D.C., [BCBS Licensees] have the largest provider networks and, in seven more states, [BCBS Licensees] have the second-largest provider networks.

      i. [BCBS Licensees] contract with 96 percent (more than 5,100) of U.S. hospitals and 92 percent of professional providers, which is more than any other insurer.[25]

83.    Moreover, the BCBS Licensees exercise market power in the market for National Accounts. As of September 2015, the BCBS Licensees served 85% of the Fortune 100 companies and 76% of Fortune 500 companies; a key indicator of the market share and market power the BCBS Licensees have in the market for National Accounts.[26]

84.    In litigation involving a prospective merger between Anthem and Cigna, a United States District Court held that market share and market power at the levels maintained by BCBS Licensees is anticompetitive. To this end, the court held that if Anthem were to increase its share of the market for National Accounts within its fourteen-state area from 40 to 48 percent, the merger would presumably lessen competition because the market would be too concentrated. Specifically, a market share increase from 40 to 48 percent would lead to a Herfindahl-Hirschman Index ("HHI") concentration increase from 641 to 3124, a number well above the HHI of 2500 used as a baseline to determine a highly concentrated market. *Anthem, Inc.,*

---

[25] American Hospital Association Letter to Hon. William Baer, Antitrust Division, U.S. Department of Justice (Feb. 29, 2016) ("AHA Letter"), at 7-9.
[26] Mark Farrah Associates, *Blue Cross and Blue Shield Share Snapshot 2015*, Healthcare Business Strategy (Jan =. 26, 2016), https://www.markfarrah.com/uploaded/mfa-briefs/Blue-Cross-and-Blue-Shield-Market-Share-Snapshot-2015.pdf.

236 F. Supp. 3d at 208-10. The court ultimately held that the proposed merger was impermissible under the antitrust laws. *Id* at 259.

85.    The BCBS Licensees' collective abuse of their market power in the market for National Accounts is also demonstrated by their ability to limit consumer choice, raise prices, and impose onerous terms without losing market share.

86.    The BCBS Licensees, collectively, demonstrate a dominant share in the market; whether viewed on a state-by-state basis, or through the entire United States, the BCBS Licensees dominate the insurance industry.

87.    As noted in the AHA summary, the BCBS Licensees are the largest insurer by revenue, and all together control 50 to 90 percent of the market in 48 states. This enormous and wide-ranging market influence granted the BCBS Licensees an almost-certain probability of succeeding in any conspiratorial undertaking to inflate prices and reduce competition, such as the ESAs.

88.    At a minimum, the BCBS Licensees have exercised their collective market power to maintain and increase their market share even as their illegal and anticompetitive restraints limit the choice of Ford to just one of the BCBS Licensees in each ESA.

## IX.  DEFENDANTS' CONDUCT WAS NOT BENEFICIAL TO THE MARKET

89.    But for the *per se* illegal territorial restrictions, all BCBS Licensees, including BCBS MI, would be free to sell their Blue Brand products and compete for National

Accounts throughout the United States irrespective of their ESAs. The market competition generated by BCBS MI, together with all other BCBS Licensees, would result in lower costs and thus lower premiums and ASO fees paid by their enrollees.

90.   The market allocation agreement eliminates competition between BCBS Licensees and evades free market competition between BCBS Licensees. If each BCBS Licensee's right to its exclusive service territory were lost or materially changed, such entities would experience increased competition from other BCBS Licensees.

91.   BCBS MI is the ninth largest health insurer in the country by total medical enrollment, with approximately 4.5 million enrollees in its ESA of Michigan. But for the ESAs, BCBS MI would likely offer its commercial health benefit services and products in more regions across the United States in competition with the individual BCBS plans in those regions. Likewise, other BCBS Licensees would likely offer their commercial health benefit services and products in Michigan in competition with BCBS MI. Such competition would result in lower health care costs paid by the other BCBS Licensees' enrollees, thereby increasing consumer choice and stimulating innovation in healthcare products and services.

92.   Anthem is the largest health insurer in the country by total medical enrollment with approximately 38.5 million enrollees. It has been allocated the geographic area of all or part of 14 states, and it also serves customers throughout the country

(including outside its 14 allocated states) through its non-Blue Brand subsidiary, UniCare. Anthem is already operating outside of its allocated area via UniCare. But for the illegal territorial restrictions and output limitations alleged herein, Anthem would compete for National Accounts outside of its ESA.

93.     BCBS Entities' anticompetitive conduct had no procompetitive justifications. More competitive insurance markets in each geographical area would exist without the horizontal allocation agreement. The anticompetitive agreement was not necessary to protect the Blue Brand, nor did it create productive cooperation in a free market or serve any other legitimate business need. To the contrary, the BCBS Entities' anticompetitive scheme was the direct cause of the reduction of competition within the ESAs, the realization of exorbitant profits, and an increase in market share for its participants.

94.     The MDL Court found as much when it stated: "Defendants cannot claim they produce a unique product. The market allocations at issue are not necessary to market, sell or produce health insurance[.]" *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1269-70.

95.     The ESAs eliminated competition among BCBS Licensees and, therefore, eliminated that downward pressure on premium and ASO contract price levels.

96.     As the AHA explained in the aforementioned 2016 AHA Letter (footnotes omitted):

31

A recent study looking at pricing changes on 34 state exchanges found that the "largest insurance company in each state on average increased their rates 75 percent more than smaller insurers in the same state," and increases did not appear to be related to higher medical costs. "In most states insurers with large market share [overwhelmingly BCBS Licensees] have proposed rate increases in excess of 20 percent for next year." These studies seem to suggest that [BCBS] premiums are higher in states where they are dominant and any network efficiencies they enjoy as a result do not translate into lower premiums for consumers.

- Illinois - the [BCBS Licensee] asked for an average increase of 29 percent for its HMO plan and 38 percent for its PPO plans.

- Kansas - the [BCBS Licensee] asked for average increases of 38 percent.

- Anthem requested exchange premium increases of more than 10 percent in California, Connecticut, Georgia, Kentucky, New York, and Virginia. Despite its higher premiums in the individual market and despite losing some share to lower-priced competitors, Anthem declared that "we will not chase price to buy membership.[27]

97.    In addition, despite claiming to be "not-for-profit," many of the BCBS Licensees hold massive excess surplus levels built off the net income derived from high premiums they charge customers and sub-competitive payments to health care providers. Those excessive surplus levels have come at the expense of higher premiums to consumers.

98.    As of September 30, 2010, 33 "not-for-profit" BCBS Licensees held more than $27 billion in capital in excess of the minimum threshold reserves required by the BCBSA.[28]

---

[27] AHA Letter at 18-19.
[28] *In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406), Provider Plaintiff's Executive Summary of Expert Report of Thomas D. Gober, 6 (N.D. Ala. 2019).

99.    Many of the BCBS Licensees understate their actual surplus by citing only the surplus from their BCBSA licensed line of business, but not the general surplus on the BCBS Licensees' combined reporting statements accounting for all lines of business.

100.    BCBS IL posted over one billion dollars in "net income," what most companies call profit, on its fully insured business alone in 2010, 2011, and 2012. This net income does not even account for large blocks of plans it administers for the self-insured plans.

101.    The BCBS Licensees often claim these surpluses are designed as insurance reserves for future payments, but they are more often used as strategic monies allowing acquisitions of competitors, or market share.

102.    Further, many of the executives at the BCBS Licensees take exorbitant bonuses at the cost of higher premiums and ASO fees. "CEO Patricia Hemingway Hall's base salary was just $1.1 million, but the executive garnered a $14.9 million bonus." "The CEO of [BCBS IL] received $12.9 million in 2011."[29]

103.    Ford was damaged by paying non-competitive premiums and ASO fees to BCBS Entities, including Defendant BCBS MI, in their exclusive service areas.

---

[29] Wang, *Blue Cross parent CEO's compensation rockets past $16 million, supra* n. 1.

104.     Ford's damages are the difference between the price Ford actually paid in non-competitive premiums and ASO fees, reduced by the price that would have been available to Ford but for BCBS Entities' antitrust violations.

## X.    PRODUCTS PURCHASED BY FORD

105.    From as early as 2009 through the present Ford has purchased insurance products and services including fully insured plans and ASO services from BCBS Entities, including Defendant BCBS MI.

106.    Ford has contracted with Defendant BCBS MI since at least 2009 through on or about 2013, to provide "fully-insured" products for its employees in designated service areas in Michigan, spending more than $500,000,000 in premiums.

107.    Ford has contracted with Defendant BCBS MI since on or about 2013 to provide ASO services, and continues to contract with BCBS MI, spending more than $150,000,000 in fees, and additional monies for claims paid.

108.    Ford has contracted with BCBS KC since at least 2009, and continues to contract with BCBS KC, to provide "fully-insured" products for its employees in designated service areas in Missouri, spending more than $500,000,000 in premiums.

109.    Ford has contracted with Anthem since at least 2009 through on or about 2011, to provide "fully-insured" products for its employees in designated service areas in Ohio and Missouri, spending more than $10,000,000 in premiums.

110.    Ford has contracted with Anthem since 2015, and continues to contract with Anthem, to provide ASO services in Ohio and Missouri, spending more than $3,000,000 in fees, and additional monies for claims paid.

111.    Ford has contracted with BCBS IL since 2009, and continues to contract with BCBS IL, to provide "fully-insured" products for its employees in designated service areas in Illinois, spending more than $100,000,000 in premiums, and additional monies in claims paid.

112.    Ford has contracted with BCBS TN since at least 2009 through 2012, to provide "fully-insured" products for its employees in designated areas in Tennessee, spending more than $25,000,000 in premiums.

113.    Ford has suffered actual damages because it paid Defendant BCBS MI and the above-named BCBS Entities more for these insurance products and services than it otherwise would have paid in a competitive market free from Defendants' anticompetitive contractual agreement not to compete.

## XI.    TOLLING OF THE STATUTE OF LIMITATIONS

114.    The statute of limitations as to the BCBS Entities' continuing antitrust violations alleged in this Complaint was tolled by the pendency of one or more class action complaints, including the original *Cerven* complaint,[30] and any amendments thereto.

---

[30] Complaint, *Cerven et al v. Blue Cross and Blue Shield of North Carolina et al*, 2:12-cv-04169, Dkt. 1.

115. The statute of limitation as to Defendant BCBS MI is tolled because Ford suffered continuing violations, including new, independent, and separately negotiated and executed yearly contracts and amendments executed with Defendant BCBS MI.

116. The statute of limitation as to Defendant BCBS MI was additionally tolled because Ford entered into a tolling agreement with BCBS MI related to Ford's claims extending the statute of limitation for an additional year.

## XII. SHERMAN ACT § 1 VIOLATIONS

117. Ford repeats, realleges, and incorporates the allegations in all numerical paragraphs above.

118. The agreements entered into, amongst and between Defendant BCBSA and BCBS Entities, including Defendant BCBS MI, represent horizontal agreements between competitors or potential competitors in the market for commercial health insurance products and services.

119. The agreements entered into and restraints imposed by BCBS Entities created an unreasonable contract, combination, and/or conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act.

120. Through these agreements and restraints, BCBS Entities allocated geographic territories for the exclusive sale of commercial health insurance products and services with the specific intent to restrain interstate trade in violation of Section 1

of the Sherman Act. This geographic allocation of markets is *per se* illegal under Section 1 of the Sherman Act and had unreasonable anticompetitive effects including but not limited to (a) reducing the number of BCBS Licensees competing with each other; (b) reducing the number of non-Blue Brand insurance providers competing with BCBS Licensees; (c) limiting the entry of competitor health insurance companies into the market; (d) allowing BCBS Entities, including BCBS MI, to maintain their market dominance; (e) allowing BCBS Entities, including BCBS MI, to charge supra-competitive prices; and (f) all other effects flowing from the lack of a free and open competitive market.

121. As a direct and proximate result of this conspiracy to allocate markets and restrain trade, Ford was deprived of, among other things, the opportunity to purchase health insurance products and services from a lower cost competitor and/or at a price set by the free market. Additionally, but for BCBS Entities' illegal conspiracy, Ford could and would have accessed a wider choice of insurance products and services.

122. Ford has suffered and continues to be threatened with suffering injury and damages in an amount to be proven at trial. These actual damages consist of (a) having paid artificially inflated, unreasonable, and supra-competitive prices to BCBS Entities, including BCBS MI, that were higher than Ford would have paid but for the Sherman Act violations; and (b) being deprived of the opportunity to purchase health insurance products and services from other BCBS Licensees and/or

non-**B**lue Brand insurance providers. Ford's damages consist of the difference between the artificially inflated prices and those that would have been available in a competitive market. These payments have occurred on a continuing basis (and no less than a monthly basis), and each payment to a BCBS Entity has caused injury to Ford.

123.    Defendants are jointly and severally liable to Plaintiff in treble the amount of actual damages suffered by Plaintiff plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by Section 4 of the Clayton Act. Plaintiff also seeks and is entitled to recover divisible and individualized injunctive relief that does not infringe on the indivisible injunctive relief previously awarded in the putative subscriber class action settlement in the MDL.

## XIII.  RELIEF REQUESTED

WHEREFORE, Ford respectfully requests that this Court:

      a.    Adjudge and decree that Defendants have violated Section 1 of the Sherman Act;

      b.    Find the Defendants jointly and severally liable for all damages caused to Ford as a result of BCBS Entities' violations of the Sherman Act and Clayton Act;

      c.    Award Ford treble damages as permitted by the Sherman Act and Clayton Act;

d.    Award costs and attorney's fees to Ford as permitted by the Sherman Act and Clayton Act;

e.    Award any and all injunctive relief to which Ford may be entitled;

f.    Award any such other relief as may be just and proper.


Dated: May 31, 2023                      Respectfully submitted,

                                         **DINSMORE & SHOHL LLP**


                                         /s/ J. Travis Mihelick
                                         J. Travis Mihelick (P73050)
                                         900 Wilshire Drive
                                         Suite 300
                                         Troy MI 48084
                                         (248) 203-1655 /(248) 647-5210 fax
                                         travis.mihelick@dinsmore.com
                                         *Attorneys for Plaintiff Ford Motor Company*

## JURY DEMAND

Plaintiff hereby demands trial by jury of all matters deemed so triable.

Dated: May 31, 2023

Respectfully submitted,

**DINSMORE & SHOHL LLP**

/s/ J. Travis Mihelick
J. Travis Mihelick (P73050)
900 Wilshire Drive
Suite 300
Troy MI 48084
(248) 203-1655 /(248) 647-5210 fax
travis.mihelick@dinsmore.com
*Attorneys for Plaintiff Ford Motor Company*