# Exhibit 7A

A/R

# United States District Court
# Eastern District of Pennsylvania (Allentown)
# CIVIL DOCKET FOR CASE #: 5:25-cv-01156-JLS

TEMPLE UNIVERSITY HEALTH SYSTEM, INC. et al v. BLUE CROSS BLUE SHIELD ASSOCIATION et al
Assigned to: DISTRICT JUDGE JEFFREY L. SCHMEHL
related Case: 5:25-cv-01158-JLS
Cause: 15:1 Antitrust Litigation

Date Filed: 03/04/2025
Jury Demand: Plaintiff
Nature of Suit: 410 Other Statutes: Anti-Trust
Jurisdiction: Federal Question

### Plaintiff

**TEMPLE UNIVERSITY HEALTH SYSTEM, INC.**

represented by **SARAH O'LAUGHLIN KULIK**
DUANE MORRIS LLP
30 S. 17TH ST
PHILADELPHIA, PA 19103
215-979-1173
Email: sckulik@duanemorris.com
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
DUANE MORRIS LLP
30 SOUTH 17TH STREET
PHILADELPHIA, PA 19103
215-979-1947
Email: spmcconnell@duanemorris.com
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
DUANE MORRIS LLP
30 SOUTH 17TH ST.
PHILADELPHIA, PA 19103
215-979-1149
Email: sszabaneh@duanemorris.com
*ATTORNEY TO BE NOTICED*

### Plaintiff

**THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE CHILDREN'S HOSPITAL OF PHILADELPHIA**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN STATE HEALTH**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN HEALTH**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEISINGER HEALTH**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR HEALTH, INC.**                represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TOWER HEALTH**                represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DOYLESTOWN HOSPITAL**                represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GRAND VIEW HOSPITAL**                represented by **SARAH O'LAUGHLIN KULIK**
*doing business as*                (See above for address)
GRAND VIEW HEALTH                *ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HALIFAX HOSPITAL MEDICAL**                represented by **SARAH O'LAUGHLIN KULIK**
**CENTER**                (See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**

(See for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTERDON HEALTHCARE
SYSTEM, INC.**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEADVILLE MEDICAL CENTER**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. CLAIR HEALTH CORPORATION**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS HEALTHCARE,
INC.**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**

(See for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HOLY REDEEMER HEALTH SYSTEM**　　represented by　**SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S HEALTH NETWORK, INC.**
*doing business as*
ST. LUKE'S UNIVERSITY HEALTH NETWORK

represented by　**SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**INDEPENDENCE HEALTH SYSTEM**　　represented by　**SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EASTERN MAINE HEALTHCARE SYSTEMS**
*doing business as*
NORTHERN LIGHT HEALTH

represented by　**SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**

(See for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE UNIVERSITY HOSPITAL, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE FACULTY PRACTICE PLAN, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHH COMMUNITY HEALTH, INC.**
*doing business as*
TEMPLE HEALTH - CHESTNUT HILL HOSPITAL

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE INSTITUTE FOR CANCER RESEARCH**
*doing business as*
THE RESEARCH INSTITUTE OF FOX CHASE CANCER CENTER

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE AMERICAN ONCOLOGIC HOSPITAL**
*doing business as*
HOSPITAL OF THE FOX CHASE CANCER CENTER

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**FOX CHASE CANCER CENTER MEDICAL GROUP, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE UNIVERSITY HOSPITAL - JEANES CAMPUS**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE UNIVERSITY HOSPITAL - NORTHEASTERN CAMPUS**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE UNIVERSITY - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

*doing business as*
TEMPLE UNIVERSITY PHYSICIANS

**Plaintiff**

**TEMPLE HEALTH SYSTEM**
**TRANSPORT TEAM, INC.**
*doing business as*
TEMPLE TRANSPORT TEAM

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE PHYSICIANS, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHESTNUT HILL CLINIC COMPANY,**
**LLC**
*doing business as*
CHESTNUT HILL PHYSICIANS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TEMPLE UNIVERSITY HOSPITAL -**
**EPISCOPAL CAMPUS**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE UNIVERSITY OF**
**PENNSYLVANIA HEALTH SYSTEM**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HOSPITAL OF THE UNIVERSITY OF**
**PENNSYLVANIA**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HOME INFUSION THERAPY**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN STAR FLIGHT**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENNSYLVANIA HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN PRESBYTERIAN MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN PRESBYTERIAN MEDICAL CENTER**
*doing business as*
PENN CARE AT HOME

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN MEDICINE - PMA**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CLINICAL CARE ASSOCIATES OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CLINICAL PRACTICES OF THE UNIVERSITY OF PENNSYLVANIA**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LANCASTER GENERAL MEDICAL GROUP**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE HEART GROUP OF LANCASTER GENERAL HEALTH**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LANCASTER GENERAL HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LANCASTER GENERAL HEALTH - COLUMBIA CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHESTER COUNTY HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PRINCETON HEALTHCARE SYSTEM**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**PRINCETON HEALTHCARE
AFFILIATED PHYSICIANS**
*doing business as*
PRINCETON MEDICINE

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**PRINCETON HOUSE PROVIDER
GROUP LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**PRINCETON HEALTHCARE
PROVIDER GROUP LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CLINICAL HEALTH CARE
ASSOCIATES OF NEW JERSEY, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**WISSAHICKON HOSPICE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**THE NEUROSPINE CENTER, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**AFFILIA HOME HEALTH**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S ANESTHESIOLOGY
ASSOCIATES, LTD.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S ANESTHESIOLOGY
ASSOCIATES OF NEW JERSEY, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S HEALTH CARE ASSOCIATES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S HEALTH CARE ASSOCIATES OF NEW JERSEY, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S SURGICAL ASSOCIATES, LTD.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S SURGICAL ASSOCIATES OF NEW JERSEY, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**RADIOLOGY ASSOCIATES OF CHILDREN'S HOSPITAL, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHILDREN'S RADIOLOGY ASSOCIATES OF NEW JERSEY, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**THE CHILDREN'S HOSPITAL OF PHILADELPHIA PRACTICE ASSOCIATION**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**CHOP CLINICAL ASSOCIATES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**PENN STATE HEALTH COMMUNITY MEDICAL GROUP, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**THE MILTON S. HERSHEY MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

Plaintiff

**ST. JOSEPH REGIONAL HEALTH NETWORK**

represented by **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN STATE HEALTH HOLY SPIRIT
MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN STATE HEALTH LANCASTER
MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN STATE HEALTH HAMPDEN
MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. JOSEPH MEDICAL GROUP**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SPIRIT PHYSICIAN SERVICES INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENNSYLVANIA PSYCHIATRIC
INSTITUTE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN MEDICAL GROUP**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN HEARING CENTER, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN PHARMACY, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN SURGERY AND
REHABILITATION HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN CITYGATE SURGERY
CENTER, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN EMS, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN ENDOSCOPY CENTER,
LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WELLSPAN CHAMBERSBURG
ENDOSCOPY CENTER, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**APPLE HILL SURGICAL CENTER
PARTNERS L.P.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**APPLE HILL SURGICAL CENTER,
INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EPHRATA COMMUNITY HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVANGELICAL COMMUNITY
HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVANGELICAL REGIONAL MOBILE
MEDICAL SERVICES, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GOOD SAMARITAN PHYSICIAN
SERVICES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GSH HOME MED CARE, LLC**

represented by **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PHILHAVEN**                              represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**SUMMIT SURGERY CENTER, L.P.**           represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE CHAMBERSBURG HOSPITAL**             represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE GETTYSBURG HOSPITAL**               represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE GOOD SAMARITAN HOSPITAL**           represented by **SEAN ZABANEH**
**OF LEBANON, PENNSYLVANIA**               (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**VNA HOME HEALTH SERVICES**              represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**WAYNESBORO HOSPITAL**                   represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**YORK HOSPITAL**                         represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEISINGER MEDICAL CENTER**              represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEISINGER CLINIC**                      represented by **SEAN ZABANEH**
                                           (See above for address)
                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEISINGER WYOMING VALLEY MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**COMMUNITY MEDICAL CENTER**
*doing business as*
GEISINGER, COMMUNITY MEDICAL CENTER

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GEISINGER LEWISTOWN HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GEISINGER BLOOMSBURG HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GEISINGER MEDICAL CENTER MUNCY**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GEISINGER JERSEY SHORE HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GEISINGER - HM JOINT VENTURE, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**FAMILY HEALTH ASSOCIATES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**LACKAWANNA SURGERY CENTER LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**GEISINGER COMMUNITY HEALTH SERVICES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**MARWORTH TREATMENT CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WEST SHORE ADVANCED LIFE
SUPPORT SERVICES, INC.**
*doing business as*
GEISINGER EMERGENCY MEDICAL
SERVICES

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EVANGELICAL - GEISINGER, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SPIRIT PHYSICIAN SERVICES, INC.**
*doing business as*
GEISINGER HOLY SPIRIT MEDICAL
GROUP

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HOLY SPIRIT HOSPITAL OF THE
SISTERS OF CHRISTIAN CHARITY**
*doing business as*
GEISINGER HOLY SPIRIT HOSPITAL

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GEISINGER PHARMACY, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CARING COMMUNITY HEALTH
CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CAPITOL ENDOSCOPY, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CARDIOLOGY ASSOCIATES, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CASI**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

CHESAPEAKE CARDIOLOGY
ASSOCIATES, LLC

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

FRANKLIN SQUARE HOSPITAL
CENTER, INC.

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

HARBOR HOSPITAL, INC.

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

HOSPICE OF ST. MARY'S, INC.

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

MEDSTAR ENDOSCOPY CENTER AT
LUTHERVILLE, LLC

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

MEDSTAR FRANKLIN SQUARE
PHYSICIANS, LLC

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

MEDSTAR GEORGETOWN MEDICAL
CENTER, INC.

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

MEDSTAR GOOD SAMARITAN
PHYSICIANS, LLC

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

MEDSTAR HARBOR HOSPITAL
PHYSICIANS, LLC

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

MEDSTAR HEALTH ENDOSCOPY
CENTER - SILVER SPRING

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR HEALTH PHYSICAL THERAPY AT HOME, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR HEALTH VISITING NURSE ASSOCIATION, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR HEART INSTITUTE, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR MEDICAL GROUP ANESTHESIOLOGY, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR MEDICAL GROUP II, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR MEDICAL GROUP RADIOLOGY, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR MEDICAL GROUP SOUTHERN MARYLAND, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR MEDICAL GROUP - SOUTHERN MARYLAND, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR SOUTHERN MARYLAND HOSPITAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR SOUTHERN MARYLAND PHYSICIANS, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR SURGERY CENTER AT BRANDYWINE, LLC**

represented by **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR SURGERY CENTER AT LAFAYETTE CENTRE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR SURGERY CENTER AT TIMONIUM, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR SURGERY CENTER I, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR TOTAL ELDER CARE, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR UNION MEMORIAL PHYSICIANS, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDSTAR URGENT CARE, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MGMC, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MONTGOMERY GENERAL HOSPITAL, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NATIONAL REHABILITATION HOSPITAL, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NRH REGIONAL REHAB AT OLNEY, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ONE MEDSTAR PRIMARY CARE,
LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**PARKWAY VENTURES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**PHYSICIANS IMAGING OF
WASHINGTON HOSPITAL CENTER,
LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. MARY'S HOSPITAL OF ST.
MARY'S COUNTY, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**SUBURBAN/NRH MEDICAL
REHABILITATION SERVICES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**THE GOOD SAMARITAN HOSPITAL
OF MARYLAND, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**THE UNION MEMORIAL HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**WASHINGTON HOSPITAL CENTER
CORP.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**WASHINGTON HOSPITAL CENTER
PHYSICIAN GROUP LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**WASHINGTON HOSPITAL CENTER
CORPORATION**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*


**Plaintiff**

**BRANDYWINE HOSPITAL, LLC**

represented by **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHESTNUT HILL CLINIC COMPANY, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHESTNUT HILL HOSPITAL, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COATESVILLE CARDIOLOGY CLINIC, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COATESVILLE CLINIC COMPANY, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COVENTRY CLINIC COMPANY, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COVENTRY CLINIC, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNERSVILLE FAMILY MEDICINE, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNERSVILLE HOSPITAL, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PHOENIXVILLE CLINIC COMPANY, LLC**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PHOENIXVILLE HOSPITAL, LLC.**    represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PHOENIXVILLE ORTHOPEDIC SPECIALISTS, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**POTTSTOWN CLINIC COMPANY, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**POTTSTOWN HOSPITAL, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**READING HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SCHUYLKILL INTERNAL MEDICINE ASSOCIATES, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STC PEDIATRICS, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**STC OPCO, LLC**
*doing business as*
ST. CHRISTOPHER'S HOSPITAL FOR CHILDREN

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TOWER-DREXEL ACADEMIC MEDICAL GROUP, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TOWER HEALTH MEDICAL GROUP**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VILLAGE MEDICAL CENTER ASSOCIATES, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WEST GROVE CLINIC COMPANY, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WEST GROVE FAMILY PRACTICE, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE VILLAGE IMPROVEMENT ASSOCIATION OF DOYLESTOWN**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VIA AFFILIATES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DOYLESTOWN HOSPITAL**

represented by **SARAH O'LAUGHLIN KULIK**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN PATRICK MCCONNELL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DH PHYSICIANS AMBULATORY SERVICES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GRAND VIEW URGENT CARE, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HALIFAX HEALTHCARE SYSTEMS, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEDICAL CENTER OF DELTONA, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DAYTONA AREA SENIOR SERVICES**
*doing business as*
HALIFAX CARE AT HOME

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HALIFAX HOSPICE, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTERDON MEDICAL CENTER, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTERDON PRIMARY CARE, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTERDON SPECIALTY CARE, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTERDON URGENT CARE, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HUNTERDON FAMILY PRACTICE & OBSTETRICS, P.A.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MEADVILLE PHYSICIAN SERVICES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ORTHOPEDIC ASSOCIATES OF MEADVILLE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PRIMARY CARE SERVICES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TITUSVILLE AREA HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TITUSVILLE AREA HEALTH SERVICES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. CLAIR MEMORIAL HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. CLAIR ANESTHESIOLOGY ASSOCIATES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. CLAIR PROFESSIONAL SERVICES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. CLAIR MEDICAL SERVICES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HOLY REDEEMER AMBULATORY SURGERY CENTER LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HR PHYSICIAN SERVICES**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ORTHOPAEDIC SURGERY & REHABILITATION ASSOCIATES LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**REDEEMER CANCER CARE PHYSICIANS NETWORK LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**REDEEMER LIFE CARE**
*doing business as*
LITTLE FLOWER MANOR

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA**
*doing business as*
ST. LUKE'S HOSPITAL - BETHLEHEM CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA**
*doing business as*
ST. LUKE'S HOSPITAL - ALLENTOWN CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA**
*doing business as*
ST. LUKE'S HOSPITAL - SACRED HEART CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA**
*doing business as*
ST. LUKE'S HOSPITAL - LEHIGHTON CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA**
*doing business as*
THE SUMMIT AT BLUE MOUNTAIN NURSING & REHAB CENTER

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA**
*doing business as*
ST. LUKE'S ORTHOPEDIC HOSPITAL - WEST END CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S QUAKERTOWN HOSPITAL**
*doing business as*
ST. LUKE'S HOSPITAL - QUAKERTOWN CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S QUAKERTOWN HOSPITAL**
*doing business as*

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

ST. LUKE'S HOSPITAL - UPPER BUCKS
CAMPUS

**Plaintiff**

| | | |
|---|---|---|
| **CARBON-SCHUYLKILL COMMUNITY HOSPITAL, INC.**<br>*doing business as*<br>ST. LUKE'S HOSPITAL - MINERS CAMPUS | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **ST. LUKE'S HOSPITAL - ANDERSON CAMPUS** | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **ST. LUKE'S HOSPITAL - MONROE CAMPUS** | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **ST. LUKE'S HOSPITAL - EASTON CAMPUS** | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **ST. LUKE'S HOSPITAL - CARBON CAMPUS** | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **ST. LUKE'S WARREN HOSPITAL, INC.**<br>*doing business as*<br>ST. LUKE'S HOSPITAL - WARREN CAMPUS | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **PENN FOUNDATION INC.**<br>*doing business as*<br>ST. LUKE'S PENN FOUNDATION | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **VISITING NURSE ASSOCIATION OF ST. LUKE'S HOME HEALTH/HOSPICE, INC.**<br>*doing business as*<br>ST. LUKE'S HOME HEALTH | represented by | **SEAN ZABANEH**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**VISITING NURSE ASSOCIATION OF ST. LUKE'S HOME HEALTH/HOSPICE, INC.**
*doing business as*
ST. LUKE'S HOSPICE

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S HOMESTAR SERVICES, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S EMERGENCY & TRANSPORT SERVICES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S AMBULATORY SERVICES, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GSL HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SACRED HEART HOSPITAL OF ALLENTOWN**
*doing business as*
ST. LUKE'S HOSPITAL - SACRED HEART CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BLUE MOUNTAIN HOSPITAL**
*doing business as*
ST. LUKE'S HOSPITAL - BLUE MOUNTAIN CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BLUE MOUNTAIN HOSPITAL**
*doing business as*
ST. LUKE'S HOSPITAL - GNADEN HUETTEN CAMPUS

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BLUE MOUNTAIN HOSPITAL**
*doing business as*
THE SUMMIT AT BLUE MOUNTAIN NURSING & REHAB CENTER

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S PHYSICIAN GROUP, INC.**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ST. LUKE'S WARREN PHYSICIAN GROUP, P.C.**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**GSLPG, INC.**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS DUBOIS**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS CLEARFIELD**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS ELK**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS BROOKVILLE**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS SERVICES INC.**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS STATE COLLEGE**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS TYRONE**          represented by  **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TYRONE RURAL HEALTH CENTER**          represented by  **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**HOUTZDALE RURAL HEALTH CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS MEDICAL SERVICE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS JEFFERSON MANOR**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PINECREST MANOR**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**WRC PENNSYLVANIA MEMORIAL HOME**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS COMMUNITY NURSES HOME HEALTH & HOSPICE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENNSYLVANIA HIGHLAND HEALTH INC./DRMC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS LIFE'S JOURNEY**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS PROFESSIONAL GROUP - THE REHABILITATION CENTER OF PENN HIGHLANDS HEALTHCARE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**PENN HIGHLANDS CONNELLSVILLE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BUTLER HEALTHCARE PROVIDERS**            represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**BUTLER MEDICAL PROVIDERS**               represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**CLARION HOSPITAL**                       represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**EXCELA HEALTH PHYSICIAN                  represented by **SEAN ZABANEH**
PRACTICES, INC.**                                         (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**FRICK HOSPITAL**                         represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**LATROBE AREA HOSPITAL, INC.**            represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**WESTMORLAND REGIONAL                     represented by **SEAN ZABANEH**
HOSPITAL**                                                (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**EXCELA HEALTH HOME CARE &                represented by **SEAN ZABANEH**
HOSPICE**                                                 (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**BUTLER HEALTH SYSTEM, INC.**             represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**EXCELA HEALTH**                          represented by **SEAN ZABANEH**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*


**Plaintiff**

**PRIMARY CARE ASSOCIATES OF BUTLER, P.C.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BUTLER IMAGING AND INTERVENTIONAL ASSOCIATES, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BUTLER AMBULATORY SURGERY CENTER, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BHS FASTERCARE, PLLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**BHS FASTERCARE LAB, LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ACADIA HOSPITAL, CORP.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**ACADIA HEALTHCARE, INC.**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE BLUE HILL MEMORIAL HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CHARLES A. DEAN MEMORIAL HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EASTERN MAINE MEDICAL CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**INLAND HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Plaintiff**

**LAKEWOOD**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MAINE COAST REGIONAL HEALTH
FACILITIES**
*doing business as*
NORTHERN LIGHT MAINE COAST
HOSPITAL

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**M DRUG LLC**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MERCY HOSPITAL**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MRH CORP.**
*doing business as*
NORTHERN LIGHT MAYO HOSPITAL

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**NORTHERN LIGHT MEDICAL
TRANSPORT**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**SEBASTICOOK VALLEY HEALTH**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**THE AROOSTOOK MEDICAL
CENTER**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**VNA HOME HEALTH & HOSPICE**

represented by **SEAN ZABANEH**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**BLUE CROSS BLUE SHIELD
ASSOCIATION**

<u>Defendant</u>

**ANTHEM, INC.**
*formerly known as*
WELLPOINT, INC.
*doing business as*
ANTHEM BLUE CROSS LIFE AND
HEALTH INSURANCE COMPANY

<u>Defendant</u>

**BLUE CROSS OF CALIFORNIA**

<u>Defendant</u>

**BLUE CROSS OF SOUTHERN
CALIFORNIA**

<u>Defendant</u>

**BLUE CROSS OF NORTHERN
CALIFORNIA**

<u>Defendant</u>

**BLUE SHIELD OF GEORGIA**

<u>Defendant</u>

**ANTHEM HEALTH PLANS, INC.**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF CONNECTICUT

<u>Defendant</u>

**ROCKY MOUNTAIN HOSPITAL &
MEDICAL SERVICE INC.**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF COLORADO

<u>Defendant</u>

**ANTHEM BLUE CROSS BLUE
SHIELD OF NEVADA**

<u>Defendant</u>

**ANTHEM INSURANCE COMPANIES,
INC.**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF INDIANA

<u>Defendant</u>

**ANTHEM HEALTH PLANS OF
KENTUCKY, INC.,**

*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF KENTUCKY

**Defendant**

**ANTHEM HEALTH PLANS OF
MAINE, INC.**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF MAINE

**Defendant**

**ANTHEM BLUE CROSS BLUE
SHIELD OF MISSOURI**

**Defendant**

**RIGHTCHOICE MANAGED CARE,
INC.**

**Defendant**

**HEALTHY ALLIANCE LIFE
INSURANCE COMPANY**

**Defendant**

**HMO MISSOURI INC.**

**Defendant**

**ANTHEM HEALTH PLANS OF NEW
HAMPSHIRE, INC.**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF NEW HAMPSHIRE

**Defendant**

**EMPIRE HEALTHCHOICE
ASSURANCE, INC.**
*doing business as*
EMPIRE BLUE CROSS BLUE SHIELD

**Defendant**

**COMMUNITY INSURANCE
COMPANY**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF OHIO

**Defendant**

**ANTHEM HEALTH PLANS OF
VIRGINIA, INC.**
*doing business as*
ANTHEM BLUE CROSS BLUE SHIELD
OF VIRGINIA

**Defendant**

**ANTHEM BLUE CROSS BLUE SHIELD OF WISCONSIN**

**Defendant**

**COMPCARE HEALTH SERVICES INSURANCE CORPORATION**

**Defendant**

**ELEVANCE HEALTH, INC.**

**Defendant**

**AWARE INTEGRATED AND BCBSM, INC.**
*doing business as*
BLUE CROSS BLUE SHIELD OF MINNESOTA

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF ALABAMA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF ARIZONA**

**Defendant**

**BLUE CROSS OF IDAHO HEALTH SERVICE, INC.**
*doing business as*
BLUE CROSS OF IDAHO

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF KANSAS CITY, INC.**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS**

**Defendant**

**BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY**

**Defendant**

**BLUE CROSS BLUE SHIELD OF MISSISSIPPI, A MUTUAL INSURANCE**

COMPANY

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF RHODE ISLAND**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA**

**Defendant**

**BLUE CROSS BLUE SHIELD OF TENNESSEE, INC.**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF VERMONT**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF WYOMING**

**Defendant**

**CALIFORNIA PHYSICIANS' SERVICE**
*doing business as*
BLUE SHIELD OF CALIFORNIA

**Defendant**

**CAMBIA HEALTH SOLUTIONS, INC.**
*AND ITS AFFILIATES AND/OR ASSUMED NAMES*

**Defendant**

**REGENCE BLUE SHIELD OF IDAHO**

**Defendant**

**REGENCE BLUE CROSS BLUE SHIELD OF OREGON**

**Defendant**

**REGENCE BLUE CROSS OF UTAH**

**Defendant**

**REGENCE BLUE SHIELD OF WASHINGTON**

**Defendant**

**CAPITAL BLUE CROSS**

**Defendant**

**CAREFIRST, INC.**
*AND ITS SUBSIDIARIES OR AFFILIATES*
*GROUP HOSPITALIZATION AND*
*MEDICAL SERVICES, INC.*

**Defendant**

**HOSPITALIZATION AND MEDICAL
SERVICES, INC.**

**Defendant**

**CAREFIRST OF MARYLAND, INC.**

**Defendant**

**CAREFIRST BLUE CHOICE, INC.**
*WHICH COLLECTIVELY D/B/A*
*CAREFIRST BLUECROSS BLUESHIELD*
*doing business as*
CAREFIRST BLUECROSS BLUESHIELD

**Defendant**

**GOODLIFE PARTNERS, INC.**

**Defendant**

**BLUE CROSS BLUE SHIELD OF
NEBRASKA**

**Defendant**

**GUIDEWELL MUTUAL HOLDING
CORPORATION**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC.**
*doing business as*
FLORIDA BLUE

**Defendant**

**HAWAII MEDICAL SERVICE
ASSOCIATION**
*doing business as*
BLUE CROSS AND BLUE SHIELD OF
HAWAII

**Defendant**

**HEALTH CARE SERVICE
CORPORATION, A MUTUAL LEGAL
RESERVE COMPANY**
*agent of*
BLUE CROSS AND BLUE SHIELD OF
ILLINOIS

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF MONTANA, INCLUDING ITS PREDECESSOR, CARING FOR MONTANANS**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF NEW MEXICO**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF OKLAHOMA**

**Defendant**

**BLUE CROSS AND BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORPORATION**

**Defendant**

**HEALTHYDAKOTA MUTUAL HOLDINGS AND NORIDIAN MUTUAL INSURANCE COMPANY**
*doing business as*
BLUE CROSS BLUE SHIELD OF NORTH DAKOTA

**Defendant**

**HIGHMARK, INC. AND HIGHMARK HEALTH**
*doing business as*
HIGHMARK BLUE SHIELD AND HIGHMARK BLUE CROSS BLUE SHIELD AND INCLUDING HIGHMARK INC. PREDECESSOR HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA F/D/B/A BLUE CROSS OF NORTHEASTERN PENNSYLVAN

**Defendant**

**HIGHMARK INC.**
*PREDECESSOR OF HOSPITAL SERVICE ASSOCIATION OF NORTHEASTERN PENNSYLVANIA*
*formerly doing business as*
BLUE CROSS OF NORTHEASTERN PENNSYLVANIA

**Defendant**

**HIGHMARK BLUE CROSS BLUE SHIELD DELAWARE INC.**

*doing business as*
HIGHMARK BLUE CROSS BLUE
SHIELD DELAWARE

**Defendant**

**HIGHMARK WEST VIRGINIA INC.**
*doing business as*
HIGHMARK BLUE CROSS BLUE
SHIELD WEST VIRGINIA

**Defendant**

**HIGHMARK BLUE SHIELD OF
NORTHEASTERN NEW YORK**
*formerly doing business as*
BLUESHIELD OF NORTHEASTERN
NEW YORK

**Defendant**

**HIGHMARK INC. AFFILIATES
HEALTHNOW NEW YORK INC. AND
HEALTHNOW SYSTEMS, INC.**
*doing business as*
HIGHMARK BLUE CROSS BLUE
SHIELD OF WESTERN NEW YORK
*formerly doing business as*
BLUECROSS BLUESHIELD OF
WESTERN NEW YORK

**Defendant**

**HORIZON HEALTHCARE SERVICES,
INC.**
*doing business as*
HORIZON BLUE CROSS BLUE SHIELD
OF NEW JERSEY

**Defendant**

**INDEPENDENCE HEALTH GROUP,
INC.**

**Defendant**

**INDEPENDENCE HOSPITAL
INDEMNITY PLAN, INC.**
*its subsidiary or division Independence Blue
Cross*

**Defendant**

**INDEPENDENCE BLUE CROSS**

**Defendant**

**QCC INSURANCE COMPANY**

**Defendant**

**LIFETIME HEALTHCARE, INC.**

<u>**Defendant**</u>

**EXCELLUS HEALTH PLAN, INC.**
*doing business as*
EXCELLUS BLUECROSS BLUESHIELD

<u>**Defendant**</u>

**LOUISIANA HEALTH SERVICES & INDEMNITY COMPANY**
*doing business as*
BLUE CROSS BLUE SHIELD OF LOUISIANA

<u>**Defendant**</u>

**PREMERA AND PREMERA BLUE CROSS**
*doing business as*
PREMERA BLUE CROSS BLUE SHIELD OF ALASKA

<u>**Defendant**</u>

**PREMERA AND PREMERA BLUE CROSS**
*doing business as*
PREMERA BLUE CROSS BLUE SHIELD OF WASHINGTON

<u>**Defendant**</u>

**TRIPLE-S MANAGEMENT CORPORATION**

<u>**Defendant**</u>

**TRIPLE S-SALUD, INC.**

<u>**Defendant**</u>

**USABLE MUTUAL INSURANCE COMPANY**
*doing business as*
ARKANSAS BLUE CROSS AND BLUE SHIELD
*doing business as*
BLUE ADVANTAGE ADMINISTRATORS OF ARKANSAS

<u>**Defendant**</u>

**WELLMARK, INC.**
*including its subsidiaries and/or divisions*

<u>**Defendant**</u>

**WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA**

**Defendant**

**WELLMARK OF SOUTH DAKOTA,
INC.**
*doing business as*
WELLMARK BLUE CROSS AND BLUE
SHIELD OF SOUTH DAKOTA

**Defendant**

**BLUE CROSS BLUE SHIELD OF
GEORGIA**
*ALSO DOING BUSINESS THROUGH ITS
SUBSIDIARIES OR DIVISIONS,
INCLUDING ANTHEM HEALTH PLANS,
INC. D/B/A ANTHEM BLUE CROSS BLUE
SHIELD OF CONNECTICUT*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/04/2025 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number APAEDC-18116866.), filed by TEMPLE UNIVERSITY HOSPITAL - JEANES CAMPUS, WELLSPAN CITYGATE SURGERY CENTER, LLC, PENN HIGHLANDS CLEARFIELD, MEDICAL CENTER OF DELTONA, INC., GEISINGER - HM JOINT VENTURE, LLC, CHILDREN'S SURGICAL ASSOCIATES, LTD., SUMMIT SURGERY CENTER, L.P., PENN HIGHLANDS HEALTHCARE, INC., LANCASTER GENERAL HOSPITAL, SPIRIT PHYSICIAN SERVICES INC., CHESTER COUNTY HOSPITAL, ST. CLAIR MEMORIAL HOSPITAL, MONTGOMERY GENERAL HOSPITAL, INC., WELLSPAN SURGERY AND REHABILITATION HOSPITAL, WASHINGTON HOSPITAL CENTER CORPORATION, FOX CHASE CANCER CENTER MEDICAL GROUP, INC., WELLSPAN CHAMBERSBURG ENDOSCOPY CENTER, LLC, PENN HIGHLANDS CONNELLSVILLE, THE AMERICAN ONCOLOGIC HOSPITAL, PENN HIGHLANDS PROFESSIONAL GROUP - THE REHABILITATION CENTER OF PENN HIGHLANDS HEALTHCARE, WEST GROVE FAMILY PRACTICE, LLC, GEISINGER LEWISTOWN HOSPITAL, PRINCETON HEALTHCARE SYSTEM, ORTHOPAEDIC SURGERY & REHABILITATION ASSOCIATES LLC, ST. CLAIR HEALTH CORPORATION, MEDSTAR SOUTHERN MARYLAND HOSPITAL CENTER, HUNTERDON PRIMARY CARE, P.C., RADIOLOGY ASSOCIATES OF CHILDREN'S HOSPITAL, INC., PHILHAVEN, CHOP CLINICAL ASSOCIATES, INC., PRINCETON HEALTHCARE PROVIDER GROUP LLC, CHARLES A. DEAN MEMORIAL HOSPITAL, CHILDREN'S ANESTHESIOLOGY ASSOCIATES, LTD., WEST GROVE CLINIC COMPANY, LLC, MEDSTAR ENDOSCOPY CENTER AT LUTHERVILLE, LLC, PENN HIGHLANDS STATE COLLEGE, ST. LUKE'S WARREN PHYSICIAN GROUP, P.C., SAINT LUKE'S HOSPITAL OF BETHLEHEM, PENNSYLVANIA, TITUSVILLE AREA HOSPITAL, ST. LUKE'S HOSPITAL - MONROE CAMPUS, PHYSICIANS IMAGING OF WASHINGTON HOSPITAL CENTER, LLC, DOYLESTOWN HOSPITAL, MEADVILLE MEDICAL CENTER, JENNERSVILLE HOSPITAL, LLC, CHESAPEAKE CARDIOLOGY ASSOCIATES, LLC, MEDSTAR HEALTH PHYSICAL THERAPY AT HOME, LLC, TEMPLE FACULTY PRACTICE PLAN, INC., CHESTNUT HILL HOSPITAL, LLC, PENN HIGHLANDS JEFFERSON MANOR, MEDSTAR FRANKLIN SQUARE PHYSICIANS, LLC, THE GETTYSBURG HOSPITAL, CARING COMMUNITY HEALTH CENTER, COVENTRY CLINIC COMPANY, LLC, LAKEWOOD, BHS FASTERCARE LAB, LLC, MEDSTAR SOUTHERN MARYLAND PHYSICIANS, LLC, TEMPLE UNIVERSITY HOSPITAL, INC., EPHRATA COMMUNITY HOSPITAL, MEDSTAR TOTAL ELDER CARE, INC., |

MEDSTAR UNION MEMORIAL PHYSICIANS, LLC, PENN PRESBYTERIAN MEDICAL CENTER, TOWER HEALTH, EVANGELICAL REGIONAL MOBILE MEDICAL SERVICES, LLC, HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, BLUE MOUNTAIN HOSPITAL, WELLSPAN HEALTH, TOWER-DREXEL ACADEMIC MEDICAL GROUP, LLC, EASTERN MAINE HEALTHCARE SYSTEMS, STC OPCO, LLC, PENN HIGHLANDS COMMUNITY NURSES HOME HEALTH & HOSPICE, FAMILY HEALTH ASSOCIATES, VNA HOME HEALTH & HOSPICE, COATESVILLE CLINIC COMPANY, LLC, ST. LUKE'S QUAKERTOWN HOSPITAL, MGMC, LLC, CARBON-SCHUYLKILL COMMUNITY HOSPITAL, INC., CHILDREN'S RADIOLOGY ASSOCIATES OF NEW JERSEY, P.C., PRINCETON HOUSE PROVIDER GROUP LLC, WESTMORLAND REGIONAL HOSPITAL, GEISINGER BLOOMSBURG HOSPITAL, THE CHAMBERSBURG HOSPITAL, VIA AFFILIATES, MEDSTAR MEDICAL GROUP - SOUTHERN MARYLAND, LLC, POTTSTOWN HOSPITAL, LLC, WELLSPAN EMS, LLC, CLARION HOSPITAL, WAYNESBORO HOSPITAL, WELLSPAN HEARING CENTER, INC., WASHINGTON HOSPITAL CENTER PHYSICIAN GROUP LLC, PENN STATE HEALTH COMMUNITY MEDICAL GROUP, LLC, HUNTERDON FAMILY PRACTICE & OBSTETRICS, P.A., ST. CLAIR ANESTHESIOLOGY ASSOCIATES, INC., CHESTNUT HILL CLINIC COMPANY, LLC, WISSAHICKON HOSPICE, EVANGELICAL COMMUNITY HOSPITAL, TEMPLE UNIVERSITY HOSPITAL - EPISCOPAL CAMPUS, HALIFAX HOSPITAL MEDICAL CENTER, CLINICAL PRACTICES OF THE UNIVERSITY OF PENNSYLVANIA, EASTERN MAINE MEDICAL CENTER, EXCELA HEALTH, PENN STAR FLIGHT, ST. LUKE'S HOMESTAR SERVICES, LLC, ACADIA HEALTHCARE, INC., POTTSTOWN CLINIC COMPANY, LLC, CHILDREN'S ANESTHESIOLOGY ASSOCIATES OF NEW JERSEY, INC., MAINE COAST REGIONAL HEALTH FACILITIES, TEMPLE UNIVERSITY HEALTH SYSTEM, INC., FRANKLIN SQUARE HOSPITAL CENTER, INC., GEISINGER MEDICAL CENTER MUNCY, MEDSTAR HEALTH ENDOSCOPY CENTER - SILVER SPRING, GSH HOME MED CARE, LLC, ST. CLAIR PROFESSIONAL SERVICES, INC., EXCELA HEALTH HOME CARE & HOSPICE, CHH COMMUNITY HEALTH, INC., PINECREST MANOR, LACKAWANNA SURGERY CENTER LLC, ST. JOSEPH MEDICAL GROUP, BUTLER AMBULATORY SURGERY CENTER, LLC, ACADIA HOSPITAL, CORP., PENN FOUNDATION INC., PRIMARY CARE SERVICES, MARWORTH TREATMENT CENTER, MEDSTAR HARBOR HOSPITAL PHYSICIANS, LLC, THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, PENN HIGHLANDS TYRONE, MEDSTAR SURGERY CENTER I, LLC, HALIFAX HEALTHCARE SYSTEMS, INC., PENNSYLVANIA HOSPITAL, BUTLER HEALTH SYSTEM, INC., GEISINGER HEALTH, TEMPLE HEALTH SYSTEM TRANSPORT TEAM, INC., APPLE HILL SURGICAL CENTER PARTNERS L.P., HUNTERDON URGENT CARE, P.C., JENNERSVILLE FAMILY MEDICINE, LLC, CLINICAL CARE ASSOCIATES OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, EXCELA HEALTH PHYSICIAN PRACTICES, INC., M DRUG LLC, ST. MARY'S HOSPITAL OF ST. MARY'S COUNTY, INC., CAPITOL ENDOSCOPY, LLC, THE GOOD SAMARITAN HOSPITAL OF MARYLAND, INC., THE VILLAGE IMPROVEMENT ASSOCIATION OF DOYLESTOWN, ST. LUKE'S HEALTH NETWORK, INC., EVANGELICAL - GEISINGER, LLC, PENN HOME INFUSION THERAPY, THE INSTITUTE FOR CANCER RESEARCH, MEDSTAR URGENT CARE, LLC, READING HOSPITAL, ST. LUKE'S PHYSICIAN GROUP, INC., APPLE HILL SURGICAL CENTER, INC., LATROBE AREA HOSPITAL, INC., INDEPENDENCE HEALTH SYSTEM, INLAND HOSPITAL, GEISINGER MEDICAL CENTER, MEDSTAR MEDICAL GROUP SOUTHERN MARYLAND, LLC, MEDSTAR MEDICAL GROUP ANESTHESIOLOGY, LLC, WRC PENNSYLVANIA MEMORIAL HOME, THE MILTON S. HERSHEY MEDICAL CENTER, BUTLER MEDICAL PROVIDERS, VNA HOME HEALTH SERVICES, MEDSTAR SURGERY CENTER AT TIMONIUM, LLC, PENN HIGHLANDS DUBOIS, THE NEUROSPINE CENTER, LLC, VILLAGE

MEDICAL CENTER ASSOCIATES, LLC, DH PHYSICIANS AMBULATORY
SERVICES, ST. LUKE'S EMERGENCY & TRANSPORT SERVICES, INC., HOSPICE
OF ST. MARY'S, INC., HARBOR HOSPITAL, INC., PENN STATE HEALTH
LANCASTER MEDICAL CENTER, NORTHERN LIGHT MEDICAL TRANSPORT,
WELLSPAN MEDICAL GROUP, PENN HIGHLANDS MEDICAL SERVICE, GRAND
VIEW URGENT CARE, LLC, NRH REGIONAL REHAB AT OLNEY, INC.,
PENNSYLVANIA HIGHLAND HEALTH INC./DRMC, HOLY REDEEMER HEALTH
SYSTEM, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA,
PHOENIXVILLE HOSPITAL, LLC., GEISINGER CLINIC, PENN STATE HEALTH
HAMPDEN MEDICAL CENTER, MEDSTAR HEART INSTITUTE, LLC, REDEEMER
LIFE CARE, THE AROOSTOOK MEDICAL CENTER, COMMUNITY MEDICAL
CENTER, CHILDREN'S HEALTH CARE ASSOCIATES, INC., MRH CORP.,
SCHUYLKILL INTERNAL MEDICINE ASSOCIATES, LLC, THE UNION MEMORIAL
HOSPITAL, HOLY REDEEMER AMBULATORY SURGERY CENTER LLC,
PHOENIXVILLE ORTHOPEDIC SPECIALISTS, LLC, ST. CLAIR MEDICAL
SERVICES, INC., TYRONE RURAL HEALTH CENTER, ST. LUKE'S AMBULATORY
SERVICES, INC., GEISINGER COMMUNITY HEALTH SERVICES, ST. JOSEPH
REGIONAL HEALTH NETWORK, HUNTERDON SPECIALTY CARE, P.C., SPIRIT
PHYSICIAN SERVICES, INC., ST. LUKE'S HOSPITAL - CARBON CAMPUS, PENN
HIGHLANDS SERVICES INC., BRANDYWINE HOSPITAL, LLC, HALIFAX
HOSPICE, INC., VISITING NURSE ASSOCIATION OF ST. LUKE'S HOME
HEALTH/HOSPICE, INC., ORTHOPEDIC ASSOCIATES OF MEADVILLE,
GEISINGER JERSEY SHORE HOSPITAL, SUBURBAN/NRH MEDICAL
REHABILITATION SERVICES, INC., TEMPLE UNIVERSITY HOSPITAL -
NORTHEASTERN CAMPUS, CLINICAL HEALTH CARE ASSOCIATES OF NEW
JERSEY, P.C., MEDSTAR HEALTH, INC., PENN STATE HEALTH HOLY SPIRIT
MEDICAL CENTER, REDEEMER CANCER CARE PHYSICIANS NETWORK LLC,
GOOD SAMARITAN PHYSICIAN SERVICES, COATESVILLE CARDIOLOGY
CLINIC, LLC, CHILDREN'S SURGICAL ASSOCIATES OF NEW JERSEY, INC.,
SACRED HEART HOSPITAL OF ALLENTOWN, FRICK HOSPITAL, COVENTRY
CLINIC, LLC, YORK HOSPITAL, PENN HIGHLANDS ELK, WELLSPAN
ENDOSCOPY CENTER, LLC, GRAND VIEW HOSPITAL, HR PHYSICIAN SERVICES,
MEDSTAR GOOD SAMARITAN PHYSICIANS, LLC, DAYTONA AREA SENIOR
SERVICES, GSL HOSPITAL, PARKWAY VENTURES, INC., CARDIOLOGY
ASSOCIATES, LLC, PENN HIGHLANDS LIFE'S JOURNEY, WEST SHORE
ADVANCED LIFE SUPPORT SERVICES, INC., MEDSTAR MEDICAL GROUP II, LLC,
BUTLER IMAGING AND INTERVENTIONAL ASSOCIATES, LLC, PENN MEDICINE
- PMA, HUNTERDON MEDICAL CENTER, INC., WASHINGTON HOSPITAL CENTER
CORP., LANCASTER GENERAL HEALTH - COLUMBIA CENTER, AFFILIA HOME
HEALTH, BUTLER HEALTHCARE PROVIDERS, THE HEART GROUP OF
LANCASTER GENERAL HEALTH, GSLPG, INC., BHS FASTERCARE, PLLC,
CHILDREN'S HEALTH CARE ASSOCIATES OF NEW JERSEY, P.C., SEBASTICOOK
VALLEY HEALTH, ONE MEDSTAR PRIMARY CARE, LLC, WELLSPAN
PHARMACY, INC., MEDSTAR GEORGETOWN MEDICAL CENTER, INC., HOLY
SPIRIT HOSPITAL OF THE SISTERS OF CHRISTIAN CHARITY, ST. LUKE'S
WARREN HOSPITAL, INC., HOUTZDALE RURAL HEALTH CENTER, CASI,
MEDSTAR SURGERY CENTER AT LAFAYETTE CENTRE, THE BLUE HILL
MEMORIAL HOSPITAL, THE CHILDREN'S HOSPITAL OF PHILADELPHIA
PRACTICE ASSOCIATION, PRIMARY CARE ASSOCIATES OF BUTLER, P.C., ST.
LUKE'S HOSPITAL - EASTON CAMPUS, STC PEDIATRICS, LLC, PRINCETON
HEALTHCARE AFFILIATED PHYSICIANS, MEADVILLE PHYSICIAN SERVICES,
PENN HIGHLANDS BROOKVILLE, MEDSTAR MEDICAL GROUP RADIOLOGY,
LLC, GEISINGER PHARMACY, LLC, MEDSTAR SURGERY CENTER AT
BRANDYWINE, LLC, LANCASTER GENERAL MEDICAL GROUP, TITUSVILLE

| | | |
|---|---|---|
| | | AREA HEALTH SERVICES, INC., MERCY HOSPITAL, HUNTERDON HEALTHCARE SYSTEM, INC., THE GOOD SAMARITAN HOSPITAL OF LEBANON, PENNSYLVANIA, PENNSYLVANIA PSYCHIATRIC INSTITUTE, PHOENIXVILLE CLINIC COMPANY, LLC, THE CHILDREN'S HOSPITAL OF PHILADELPHIA, ST. LUKE'S HOSPITAL - ANDERSON CAMPUS, MEDSTAR HEALTH VISITING NURSE ASSOCIATION, INC., GEISINGER WYOMING VALLEY MEDICAL CENTER, TEMPLE PHYSICIANS, INC., PENN STATE HEALTH, TEMPLE UNIVERSITY - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, NATIONAL REHABILITATION HOSPITAL, INC., TOWER HEALTH MEDICAL GROUP. (Attachments: # 1 Civil Cover Sheet, # 2 Designation Form, # 3 Case Management Designation Form)(ZABANEH, SEAN) (Entered: 03/04/2025) |
| 03/05/2025 | 2 | Opt In Notice of Procedure to Consent to Random Magistrate Judge Assignment (Attachments: # 1 Consent)(sbt) (Entered: 03/05/2025) |
| 03/05/2025 | 3 | Summons Issued as to All Defendants. Forwarded To: Counsel on 3/5/25 (er) (Entered: 03/05/2025) |
| 03/07/2025 | 4 | NOTICE of Appearance by SEAN PATRICK MCCONNELL on behalf of DOYLESTOWN HOSPITAL, EASTERN MAINE HEALTHCARE SYSTEMS, GEISINGER HEALTH, GRAND VIEW HOSPITAL, HALIFAX HOSPITAL MEDICAL CENTER, HOLY REDEEMER HEALTH SYSTEM, HUNTERDON HEALTHCARE SYSTEM, INC., INDEPENDENCE HEALTH SYSTEM, MEADVILLE MEDICAL CENTER, MEDSTAR HEALTH, INC., PENN HIGHLANDS HEALTHCARE, INC., PENN STATE HEALTH, ST. CLAIR HEALTH CORPORATION, ST. LUKE'S HEALTH NETWORK, INC., TEMPLE UNIVERSITY HEALTH SYSTEM, INC., THE CHILDREN'S HOSPITAL OF PHILADELPHIA, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, TOWER HEALTH, WELLSPAN HEALTH with Certificate of Service(MCCONNELL, SEAN) (Entered: 03/07/2025) |
| 03/07/2025 | 5 | NOTICE of Appearance by SARAH O'LAUGHLIN KULIK on behalf of DOYLESTOWN HOSPITAL, EASTERN MAINE HEALTHCARE SYSTEMS, GEISINGER HEALTH, GRAND VIEW HOSPITAL, HALIFAX HOSPITAL MEDICAL CENTER, HOLY REDEEMER HEALTH SYSTEM, HUNTERDON HEALTHCARE SYSTEM, INC., INDEPENDENCE HEALTH SYSTEM, MEADVILLE MEDICAL CENTER, MEDSTAR HEALTH, INC., PENN HIGHLANDS HEALTHCARE, INC., PENN STATE HEALTH, ST. CLAIR HEALTH CORPORATION, ST. LUKE'S HEALTH NETWORK, INC., TEMPLE UNIVERSITY HEALTH SYSTEM, INC., THE CHILDREN'S HOSPITAL OF PHILADELPHIA, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, TOWER HEALTH, WELLSPAN HEALTH with Certificate of Service(KULIK, SARAH) (Entered: 03/07/2025) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 03/10/2025 22:43:51 | | | |
| **PACER Login:** | csmpacer | **Client Code:** | 12062-008-16317 |
| **Description:** | Docket Report | **Search Criteria:** | 5:25-cv-01156-JLS |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# Exhibit 7B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**Temple University Health System, Inc, The Trustees of the University of Pennsylvania, The Children's Hospital of Philadelphia, Penn State Health, WellSpan Health, Geisinger Health, MedStar Health, Inc., Tower Health, Doylestown Hospital, Grand View Hospital d/b/a Grand View Health, Halifax Hospital Medical Center, Hunterdon Healthcare System, Inc., Meadville Medical Center, St. Clair Health Corporation, Penn Highlands Healthcare, Inc., Holy Redeemer Health System, St. Luke's Health Network, Inc. d/b/a St. Luke's University Health Network, Independence Health System, Eastern Maine Healthcare Systems d/b/a Northern Light Health,**

**Temple University Hospital, Inc., Temple Faculty Practice Plan, Inc., CHH Community Health, Inc. d/b/a Temple Health - Chestnut Hill Hospital, The Institute for Cancer Research d/b/a The Research Institute of Fox Chase Cancer Center, The American Oncologic Hospital d/b/a Hospital of the Fox Chase Cancer Center, Fox Chase Cancer Center Medical Group, Inc., Temple University Hospital - Jeanes Campus, Temple University Hospital - Northeastern Campus, Temple University – Of The Commonwealth System of Higher Education d/b/a Temple University Physicians, Temple Health System Transport Team, Inc. d/b/a Temple Transport Team, Temple Physicians, Inc., Chestnut Hill Clinic Company LLC d/b/a Chestnut Hill Physicians, Temple University Hospital - Episcopal Campus,**

**The University of Pennsylvania Health System, Hospital of the University of Pennsylvania, Penn Home Infusion Therapy, Penn Star Flight, Pennsylvania Hospital, Penn Presbyterian Medical Center, Penn Presbyterian Medical Center d/b/a Penn Care at Home, Penn Medicine – PMA, Clinical Care Associates of the University of Pennsylvania Health System, Clinical Practices of the University of Pennsylvania, Lancaster General Medical Group, The Heart Group of Lancaster General Health, Lancaster General**

Civil Action No.: _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Provided by CourtAlert

www.CourtAlert.com

**Hospital, Lancaster General Health – Columbia Center, Chester County Hospital, Princeton HealthCare System, Princeton Healthcare Affiliated Physicians (d/b/a Princeton Medicine), Princeton House Provider Group LLC, Princeton Healthcare Group LLC, Clinical Health Care Associates of New Jersey, P.C., Wissahickon Hospice, The NeuroSpine Center, LLC, Affilia Home Health,**

**Children's Anesthesiology Associates, Ltd., Children's Anesthesiology Associates of New Jersey, Inc., Children's Health Care Associates, Inc., Children's Health Care Associates of New Jersey, P.C., Children's Surgical Associates, Ltd., Children's Surgical Associates of New Jersey, Inc., Radiology Associates of Children's Hospital, Inc., Children's Radiology Associates of New Jersey, P.C., The Children's Hospital of Philadelphia Practice Association, CHOP Clinical Associates, Inc.,**

**Penn State Health Community Medical Group, LLC, The Milton S. Hershey Medical Center, St. Joseph Regional Health Network, Penn State Health Holy Spirit Medical Center, Penn State Health Lancaster Medical Center, Penn State Health Hampden Medical Center, St. Joseph Medical Group, Spirit Physician Services Inc., Pennsylvania Psychiatric Institute,**

**WellSpan Medical Group, WellSpan Hearing Center, Inc., WellSpan Pharmacy, Inc., WellSpan Surgery and Rehabilitation Hospital, WellSpan CityGate Surgery Center, LLC, WellSpan EMS, LLC, WellSpan Endoscopy Center, LLC, WellSpan Chambersburg Endoscopy Center, LLC, Apple Hill Surgical Center Partners L.P., Apple Hill Surgical Center, Inc., Ephrata Community Hospital, Evangelical Community Hospital, Evangelical Regional Mobile Medical Services, LLC, Good Samaritan Physician Services, GSH Home Med Care, LLC, Philhaven, Summit Surgery Center, L.P., The Chambersburg Hospital, The Gettysburg Hospital, The Good Samaritan Hospital of Lebanon, Pennsylvania,**

VNA Home Health Services, Waynesboro
Hospital, York Hospital,

Geisinger Medical Center, Geisinger Clinic,
Geisinger Wyoming Valley Medical Center,
Community Medical Center d/b/a Geisinger,
Community Medical Center, Geisinger Lewistown
Hospital, Geisinger Bloomsburg Hospital,
Geisinger Medical Center Muncy, Geisinger
Jersey Shore Hospital, Geisinger-HM Joint
Venture, LLC, Family Health Associates,
Lackawanna Surgery Center LLC, Geisinger
Community Health Services, Marworth
Treatment Center, West Shore Advanced Life
Support Services, Inc. d/b/a Geisinger Emergency
Medical Services, Evangelical-Geisinger, LLC,
Spirit Physician Services, Inc. d/b/a Geisinger
Holy Spirit Medical Group, Holy Spirit Hospital
of the Sisters of Christian Charity d/b/a Geisinger
Holy Spirit Hospital, Geisinger Pharmacy, LLC,
Caring Community Health Center,

Capitol Endoscopy, LLC, Cardiology Associates,
LLC, CASI, Chesapeake Cardiology Associates,
LLC, Franklin Square Hospital Center, Inc.,
Harbor Hospital, Inc., Hospice of St. Mary's, Inc.,
MedStar Endoscopy Center at Lutherville, LLC,
MedStar Franklin Square Physicians, LLC,
MedStar Georgetown Medical Center, Inc.,
MedStar Good Samaritan Physicians, LLC,
MedStar Harbor Hospital Physicians, LLC,
MedStar Health Endoscopy Center - Silver
Spring, MedStar Health Physical Therapy at
Home, LLC, MedStar Health Visiting Nurse
Association, Inc., MedStar Heart Institute, LLC,
MedStar Medical Group Anesthesiology, LLC,
MedStar Medical Group II, LLC, MedStar
Medical Group Radiology, LLC, MedStar
Medical Group Southern Maryland, LLC,
MedStar Medical Group – Southern Maryland,
LLC,  MedStar Southern Maryland Hospital
Center, MedStar Southern Maryland Physicians,
LLC, MedStar Surgery Center at Brandywine,
LLC, MedStar Surgery Center at Lafayette
Centre, MedStar Surgery Center at Timonium,
LLC, MedStar Surgery Center I, LLC, MedStar

**Total Elder Care, Inc., MedStar Union Memorial Physicians, LLC, MedStar Urgent Care, LLC, MGMC, LLC, Montgomery General Hospital, Inc., National Rehabilitation Hospital, Inc., NRH Regional Rehab at Olney, Inc., One MedStar Primary Care, LLC, Parkway Ventures, Inc., Physicians Imaging of Washington Hospital Center, LLC, St. Mary's Hospital of St. Mary's County, Inc., Suburban/NRH Medical Rehabilitation Services, Inc., The Good Samaritan Hospital of Maryland, Inc., The Union Memorial Hospital, Washington Hospital Center Corp., Washington Hospital Center Physician Group LLC, Washington Hospital Center Corporation,**

**Brandywine Hospital, LLC, Chestnut Hill Clinic Company, LLC, Chestnut Hill Hospital, LLC, Coatesville Cardiology Clinic, LLC, Coatesville Clinic Company, LLC, Coventry Clinic Company, LLC, Coventry Clinic, LLC, Jennersville Family Medicine, LLC, Jennersville Hospital, LLC, Phoenixville Clinic Company, LLC, Phoenixville Hospital, LLC, Phoenixville Orthopedic Specialists, LLC, Pottstown Clinic Company, LLC, Pottstown Hospital, LLC, Reading Hospital, Schuylkill Internal Medicine Associates, LLC, STC OpCo, LLC d/b/a St. Christopher's Hospital for Children, STC Pediatrics, LLC, Tower-Drexel Academic Medical Group, LLC, Tower Health Medical Group, Village Medical Center Associates, LLC, West Grove Clinic Company, LLC, West Grove Family Practice, LLC,**

**The Village Improvement Association of Doylestown, VIA Affiliates, Doylestown Hospital, DH Physicians Ambulatory Services,**

**Grand View Urgent Care, LLC,**

**Halifax Healthcare Systems, Inc., Medical Center of Deltona, Inc., Daytona Area Senior Services d/b/a Halifax Care at Home, Halifax Hospice, Inc.,**

**Hunterdon Medical Center, Inc., Hunterdon Primary Care, P.C., Hunterdon Specialty Care, P.C., Hunterdon Urgent Care, P.C. Hunterdon Family Practice & Obstetrics, P.A.,**

**Meadville Physician Services, Orthopedic Associates of Meadville, Primary Care Services, Titusville Area Hospital, Titusville Area Health Services, Inc.,**

**St. Clair Memorial Hospital, St. Clair Anesthesiology Associates, Inc., St. Clair Professional Services, Inc., St. Clair Medical Services, Inc.,**

**Penn Highlands DuBois, Penn Highlands Clearfield, Penn Highlands Elk, Penn Highlands Brookville, Penn Highlands Services Inc., Penn Highlands State College, Penn Highlands Tyrone, Tyrone Rural Health Center, Houtzdale Rural Health Center, Penn Highlands Medical Service, Penn Highlands Jefferson Manor, Pinecrest Manor, WRC Pennsylvania Memorial Home, Penn Highlands Community Nurses Home Health & Hospice, Pennsylvania Highland Health Inc./DRMC, Penn Highlands Life's Journey, Penn Highlands Professional Group – The Rehabilitation Center of Penn Highlands Healthcare, Penn Highlands Connellsville,**

**Holy Redeemer Ambulatory Surgery Center LLC, HR Physician Services, Orthopaedic Surgery & Rehabilitation Associates LLC, Redeemer Cancer Care Physicians Network LLC, Redeemer Life Care d/b/a Little Flower Manor,**

**Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital – Bethlehem Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital – Allentown Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital - Sacred Heart Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital - Lehighton Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a The Summit at Blue Mountain Nursing &**

Provided by CourtAlert                                                      www.CourtAlert.com

Rehab Center, Saint Luke's Hospital of
Bethlehem, Pennsylvania d/b/a St. Luke's
Orthopedic Hospital - West End Campus, St.
Luke's Quakertown Hospital d/b/a St. Luke's
Hospital – Quakertown Campus, St. Luke's
Quakertown Hospital d/b/a St. Luke's Hospital –
Upper Bucks Campus, Carbon-Schuylkill
Community Hospital, Inc. d/b/a St. Luke's
Hospital – Miners Campus, St. Luke's Hospital -
Anderson Campus, St. Luke's Hospital - Monroe
Campus, St. Luke's Hospital - Easton Campus, St.
Luke's Hospital - Carbon Campus, St. Luke's
Warren Hospital, Inc. d/b/a St. Luke's Hospital –
Warren Campus, Penn Foundation Inc. d/b/a St.
Luke's Penn Foundation, Visiting Nurse
Association of St. Luke's Home Health/Hospice,
Inc. d/b/a St. Luke's Home Health, Visiting Nurse
Association of St. Luke's Home Health/Hospice,
Inc. d/b/a St. Luke's Hospice, St. Luke's
HomeStar Services, LLC, St. Luke's Emergency
& Transport Services, Inc., St. Luke's
Ambulatory Services, Inc., GSL Hospital, Sacred
Heart Hospital of Allentown d/b/a St. Luke's
Hospital – Sacred Heart Campus, Blue Mountain
Hospital d/b/a St. Luke's Hospital – Blue
Mountain Campus, Blue Mountain Hospital d/b/a
St. Luke's Hospital – Gnaden Huetten Campus,
Blue Mountain Hospital d/b/a The Summit at
Blue Mountain Nursing & Rehab Center, St.
Luke's Physician Group, Inc., St. Luke's Warren
Physician Group, P.C., GSLPG, Inc.,

Butler Healthcare Providers, Butler Medical
Providers, Clarion Hospital, Excela Health
Physician Practices, Inc., Frick Hospital, Latrobe
Area Hospital, Inc., Westmoreland Regional
Hospital, Excela Health Home Care & Hospice,
Butler Health System, Inc., Excela Health,
Primary Care Associates of Butler, P.C., Butler
Imaging and Interventional Associates, LLC,
Butler Ambulatory Surgery Center, LLC, BHS
FasterCare, PLLC, BHS FastERCare Lab, LLC,

Acadia Hospital, Corp., Acadia Healthcare, Inc.,
The Blue Hill Memorial Hospital, Charles A.
Dean Memorial Hospital, Eastern Maine Medical

Center, Inland Hospital, Lakewood, Maine Coast
Regional Health Facilities d/b/a Northern Light
Maine Coast Hospital, M Drug, LLC, Mercy
Hospital, MRH Corp. d/b/a Northern Light Mayo
Hospital, Northern Light Medical Transport,
Sebasticook Valley Health, The Aroostook
Medical Center, VNA Home Health & Hospice,

            **Plaintiffs,**

    **v.**

Blue Cross Blue Shield Association, Anthem, Inc.,
f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross
Life and Health Insurance Company, Blue Cross
of California, Blue Cross of Southern California,
Blue Cross of Northern California, and Blue
Cross Blue Shield of Georgia, also doing business
through its subsidiaries or divisions, including,
Anthem Health Plans, Inc. d/b/a Anthem Blue
Cross Blue Shield of Connecticut, Rocky
Mountain Health & Medical Service, Inc. d/b/a
Anthem Blue Cross Blue Shield of Colorado and
Anthem Blue Cross Blue Shield of Nevada,
Anthem Insurance Companies, Inc. d/b/a/
Anthem Blue Cross Blue Shield of Indiana,
Anthem Health Plans of Kentucky, Inc. d/b/a
Anthem Blue Cross Blue Shield of Kentucky,
Anthem Health Plans of Maine, Inc. d/b/a Anthem
Blue Cross Blue Shield of Maine, Anthem Blue
Cross Blue Shield of Missouri, RightCHOICE
Managed Care, Inc., Healthy Alliance Life
Insurance Company and HMO Missouri Inc.,
Anthem Health Plans of New Hampshire, Inc.
d/b/a Anthem Blue Cross Blue Shield of New
Hampshire, Empire HealthChoice Assurance, Inc.
d/b/a Empire Blue Cross Blue Shield, Community
Insurance Company d/b/a Anthem Blue Cross
Blue Shield of Ohio, Anthem Health Plans of
Virginia, Inc. d/b/a Anthem Blue Cross Blue
Shield of Virginia, Anthem Blue Cross Blue
Shield of Wisconsin, and Compcare Health
Services Insurance Corporation, Elevance Health,
Inc., Aware Integrated and BCBSM, Inc., d/b/a
Blue Cross Blue Shield of Minnesota, Blue Cross
and Blue Shield of Alabama, Blue Cross and Blue
Shield of Arizona, Blue Cross of Idaho Health

Service, Inc. d/b/a Blue Cross of Idaho, Blue
Cross and Blue Shield of Kansas, Inc., Blue Cross
and Blue Shield of Kansas City, Inc., Blue Cross
and Blue Shield of Massachusetts, Blue Cross
Blue Shield of Michigan Mutual Insurance
Company, Blue Cross Blue Shield of Mississippi, a
Mutual Insurance Company, Blue Cross and Blue
Shield of North Carolina, Blue Cross and Blue
Shield of Rhode Island, Blue Cross and Blue
Shield of South Carolina, Blue Cross Blue Shield
of Tennessee, Inc., Blue Cross and Blue Shield of
Vermont, Blue Cross and Blue Shield of
Wyoming, California Physicians' Service, d/b/a
Blue Shield of California, Cambia Health
Solutions, Inc., and its affiliates and/or assumed
names Regence Blue Shield of Idaho, Regence
Blue Cross Blue Shield of Oregon, Regence Blue
Cross of Utah, and Regence Blue Shield of
Washington, Capital Blue Cross, CareFirst, Inc.
and its subsidiaries or affiliates Group
Hospitalization and Medical Services, Inc.,
CareFirst of Maryland, Inc., and CareFirst Blue
Choice, Inc., which collectively d/b/a CareFirst
BlueCross BlueShield, GoodLife Partners, Inc.
and Blue Cross Blue Shield of Nebraska,
GuideWell Mutual Holding Corporation and Blue
Cross and Blue Shield of Florida, Inc. d/b/a
Florida Blue, Hawaii Medical Service Association
d/b/a Blue Cross and Blue Shield of Hawaii,
Health Care Service Corporation, a Mutual Legal
Reserve Company d/b/a Blue Cross and Blue
Shield of Illinois, Blue Cross and Blue Shield of
Montana, including its predecessor Caring for
Montanans, Blue Cross and Blue Shield of New
Mexico, Blue Cross and Blue Shield of Oklahoma,
and Blue Cross and Blue Shield of Texas, a
Division of Health Care Service Corporation,
HealthyDakota Mutual Holdings and Noridian
Mutual Insurance Company d/b/a Blue Cross
Blue Shield of North Dakota, Highmark, Inc. and
Highmark Health both d/b/a Highmark Blue
Shield and Highmark Blue Cross Blue Shield and
including Highmark Inc. predecessor Hospital
Service Association of Northeastern Pennsylvania
f/d/b/a Blue Cross of Northeastern Pennsylvania,
Highmark Blue Cross Blue Shield Delaware Inc.

**d/b/a Highmark Blue Cross Blue Shield Delaware, Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a BlueCross BlueShield of Western New York, and Highmark Blue Shield of Northeastern New York f/d/b/a BlueShield of Northeastern New York, Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey, Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc., its subsidiary or division Independence Blue Cross, and QCC Insurance Company, Lifetime Healthcare, Inc. and Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield, Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, Premera and Premera Blue Cross, which also does business as Premera Blue Cross Blue Shield of Alaska, Premera and Premera Blue Cross d/b/a Washington, Triple-S Management Corporation and Triple S-Salud, Inc., USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas, Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of Iowa and Wellmark of South Dakota, Inc. d/b/a/ Wellmark Blue Cross and Blue Shield of South Dakota,**

**Defendants.**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..........................................................................................1

II. JURISDICTION AND VENUE ......................................................................4

III. THE PARTIES..............................................................................................6

    A. PLAINTIFF HOSPITALS AND HEALTH SYSTEMS ...................................... 6

    B. DEFENDANTS/CO-CONSPIRATORS ........................................................ 17

IV. RELEVANT MARKETS ..............................................................................38

V. HISTORY OF THE DEFENDANT INSURANCE COMPANIES AND BCBSA...........44

    A. DEVELOPMENT OF THE BLUE CROSS COMPANIES................................ 45

    B. DEVELOPMENT OF THE BLUE SHIELD PLANS......................................... 46

    C. CREATION OF THE BLUE CROSS AND BLUE SHIELD ASSOCIATION...................................................................................... 47

VI. OWNERSHIP AND CONTROL OF THE ASSOCIATION BY DEFENDANT INSURANCE COMPANIES............................................................................52

VII. LICENSE AGREEMENTS AND RESTRAINTS ON COMPETITION ........................56

VIII. THE HORIZONTAL AGREEMENTS NOT TO COMPETE.........................................58

IX. DEFENDANTS' CONDUCT HARMS COMPETITION THROUGHOUT THE UNITED STATES ..........................................................................................66

X. DEFENDANTS' CONDUCT HAS NO PROCOMPETITIVE JUSTIFICATIONS ........68

XI. TOLLING OF THE STATUTE OF LIMITATIONS......................................................69

XII. VIOLATIONS ALLEGED ..............................................................................70

XIII. RELIEF REQUESTED ..................................................................................75

## I.    INTRODUCTION

1.    Defendants colluded for decades to restrict competition for the purchase of healthcare services.  Defendants colluded for one reason:  to pay healthcare providers, including Plaintiffs, far less than they would have been paid in a competitive market.  Defendants' collusion violated federal antitrust laws.

2.    Plaintiffs seek damages and other relief caused by Defendants' continuing conspiracy to allocate territories, to restrict output, to fix prices, and to allocate customers in violation of Sections 1 and 3 of the Sherman Act, (15 U.S.C. §§ 1, 3) and causing damages under Sections 4 and 16 of the Clayton Act, (15 U.S.C. §§ 15, 26).

3.    The individual defendant insurance companies provide health insurance coverage for over 100 million—or one in three—Americans (collectively, "**Defendant Insurance Companies**" or "**Blues**," and each, individually, "**Defendant Insurance Company**" or "**Blue**").

4.    Each Defendant Insurance Company has agreed with each other Defendant Insurance Company and with the Blue Cross Blue Shield Association (the "**Association**") not to contract with healthcare providers, including Plaintiffs, outside of each Defendant Insurance Company's allocated geographic area and to fix prices paid to healthcare providers, including Plaintiffs.

5.    Defendant Insurance Companies conspired to implement output-reducing restraints on each other Defendant Insurance Company's ability to compete for the purchase of healthcare services.  Among other restrictive output-reducing agreements, the Defendant Insurance Companies and Association agreed to adhere to (1) a National Best Efforts Rule, which precludes each Defendant from earning more than 33% of its revenue from the sale of services that do not carry a Blue Cross or Blue Shield brand or trademark, and (2) a Local Best Efforts Rule, which requires that 80% of the revenue received by a Defendant Insurance Company from within an

exclusive service area comes from the sale of services using a Blue Cross and/or Blue Shield mark. The effect of these restraints is to ban or otherwise frustrate all competition for the purchase of healthcare services among Defendant Insurance Companies.

6.     Defendant Insurance Companies provide commercial health insurance services and contract with healthcare service providers in their respective allocated geographic territories (which together include all 50 states, the District of Columbia, and Puerto Rico), sell those insurance services across state lines, provide access and payments to providers for covered individuals when those persons travel across state lines, purchase healthcare in interstate commerce when covered individuals seek healthcare out-of-state, and receive payments from the employers, plan sponsors, plan administrators, trustees, and health plans located in other states on behalf of covered individuals.

7.     Commercial health insurers compete to attract purchasers of health insurance (or health insurance plan administration services, whether individuals, organizations, employers, or other plan sponsors).  Commercial health insurers differentiate themselves to potential customers by having a large network of healthcare services providers.  To ensure a broad network offering to potential customers, insurers enter into contracts with healthcare providers.  These contracted healthcare providers are referred to as "participating" or "in-network" providers.

8.     In a competitive market, health insurers would compete for the purchase (and contracting) of healthcare services from providers and would pay market rates for healthcare services.  If, for example, an insurer offers or pays below the market price for healthcare services, then providers would be unwilling to remain, or contract to become, "in-network" with that insurer. As a consequence, insurers would be unable to offer a provider network as broad as its competitors'

networks. Defendants' anticompetitive conduct restricts competition for providers of healthcare services.

9. The Defendant Insurance Companies' anticompetitive agreements distinguish them from other large commercial insurers. If an insurer wants to establish a provider network, then a value proposition an insurer can offer to a provider includes its ability to steer enrollees to that provider. A provider considering leaving the network appreciates the consequence of treating fewer of providers' enrollees. Each Defendant Insurance Company, on the other hand, brings not only its own enrollees, but also the enrollees of every other Defendant Insurance Company into negotiations with providers. A provider considering leaving the local Defendant Insurance Company's network knows that decision would cause it to lose the ability to treat local enrollees on an in-network basis *and* the ability to treat all Defendant Insurance Companies' enrollees on an in-network basis. The Defendant Insurance Companies use this leverage against providers.

10. Defendant Insurance Companies have agreed they will not compete, negotiate price terms, or contract with healthcare providers outside of their respective geographic territories. This agreed-upon constraint applies even when Defendant Insurance Companies have significant enrollees in another's territory.

11. If a healthcare provider treats a patient covered by a Defendant Insurance Company in another state, then the healthcare provider must submit its claim for payment to the local Blue, which transmits it to the out-of-state Blue for processing. The provider is paid based on the reimbursement rates in its contract with the local Blue—thereby fixing prices between the local Blue and the out-of-state Blue. Defendants refer to this arrangement as the Blue Card program.

12. The national programs including the Blue Card program lock in fixed, discounted reimbursement rates that each Defendant achieves through market dominance in its service area and makes those subcompetitive rates available to all other Defendant Insurance Companies.

13. Defendant Insurance Companies have also agreed not to contract with providers outside of their service area. This ensures a provider's only option for providing services to patients insured by Defendant Insurance Companies outside its service area is through the local Defendant Insurance Company, using the Blue Card program. Providers are therefore forced to accept the local Defendant Insurance Company's reimbursement rates when it provides healthcare services to any patients insured by any of the Defendant Insurance Companies, regardless of what those insurers' rates are.

14. Defendants' anticompetitive conduct caused Plaintiffs to be paid substantially less than they would have been paid in a competitive market for healthcare services.

## II.    JURISDICTION AND VENUE

15. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) because Plaintiffs bring their claims under §§ 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, and injunctive relief against the Defendants for the harm caused by Defendants' violations of §§ 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

16. This Court has personal jurisdiction over each Defendant pursuant to § 12 of the Clayton Act (15 U.S.C. § 22) and/or the Pennsylvania long-arm statute (42 Pa. C.S. § 5322), because:

        a.     The Association, the principal member of the accused conspiracy, does business in this District; contracts with other members of the conspiracy that operated in this District, coordinates the transfer of funds to and from

other members of the conspiracy in this District, which funds constitute a measure of the alleged underpayment; and enforces or threatens to enforce the alleged anticompetitive agreement that furthers the harm suffered by Plaintiffs in this District;

b.  Each Defendant Insurance Company engages in commerce in this District by operating in this District, by contracting with Plaintiffs in this District, by providing health insurance coverage for Defendant Insurance Companies' covered members located in this District, and by transmitting funds for services received by each Defendant Insurance Company's covered members to and for the benefit of providers in this District, including Plaintiffs, which funds constitute a measure of the alleged underpayment;

c.  One or more Plaintiffs have a substantial presence within this District, and each of the Defendants have adhered to and enforced an illegal agreement designed to cause harm to Plaintiffs within this District, including a joint agreement not to contract with Plaintiffs for the purchase of healthcare services;

d.  Each Defendant Insurance Company has received material amounts of funds derived from or in connection with the accused conspiracy in this District;

e.  Each Defendant has purposefully availed itself of the privilege of conducting business activities within this District (and has the requisite minimum contacts with the Commonwealth of Pennsylvania) because each

Defendant committed intentional acts that were intended to cause and did

cause injury within this District; and/or

f.      Each Defendant Insurance Company has purposefully availed itself of the

privilege of conducting business activities within this District (and has the

requisite minimum contacts with the Commonwealth of Pennsylvania)

because each Defendant Insurance Company transacts business within this

District by processing and/or paying healthcare claims for services provided

within this District.

17.     Venue is also proper in this District pursuant to §§ 4, 12, and 16 of the Clayton Act

(15 U.S.C. §§ 15, 22, and 26), and 28 U.S.C. § 1391.

## III.     THE PARTIES

### A.     Plaintiff Hospitals and Health Systems

18.     **Temple University Health System, Inc.** is a Pennsylvania nonprofit corporation

with its principal place of business in Philadelphia, Pennsylvania.  Temple University Health

System, Inc. and related entities, Temple University Hospital, Inc., Temple Faculty Practice Plan,

Inc., CHH Community Health, Inc. d/b/a Temple Health – Chestnut Hill Hospital, The Institute

for Cancer Research d/b/a The Research Institute of Fox Chase Cancer Center, The American

Oncologic Hospital d/b/a Hospital of the Fox Chase Cancer Center, Fox Chase Cancer Center

Medical Group, Inc., Temple University Hospital – Jeanes Campus, Temple University Hospital

– Northeastern Campus, Temple University – Of The Commonwealth System of Higher Education

d/b/a Temple University Physicians, Temple Health System Transport Team, Inc. d/b/a Temple

Transport Team, Temple Physicians, Inc., Chestnut Hill Clinic Company LLC d/b/a Chestnut Hill

Physicians, and Temple University Hospital – Episcopal Campus (together, the "**Temple Health**

**Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible

patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Temple Health Plaintiffs assert their claims against all Defendants.

19.     **The Trustees of the University of Pennsylvania** is a Pennsylvania nonprofit corporation with its principal place of business in Philadelphia, Pennsylvania. The Trustees of the University of Pennsylvania and related entities, The University of Pennsylvania Health System, Hospital of the University of Pennsylvania, Penn Home Infusion Therapy, Penn Star Flight, Pennsylvania Hospital, Penn Presbyterian Medical Center, Penn Presbyterian Medical Center d/b/a Penn Care at Home, Penn Medicine – PMA, Clinical Care Associates of the University of Pennsylvania Health System, Clinical Practices of the University of Pennsylvania, Lancaster General Medical Group, The Heart Group of Lancaster General Health, Lancaster General Hospital, Lancaster General Health – Columbia Center, Chester County Hospital, Princeton HealthCare System, Princeton Healthcare Affiliated Physicians (d/b/a Princeton Medicine), Princeton House Provider Group LLC, Princeton Healthcare Provider Group LLC, Clinical Health Care Associates of New Jersey, P.C., Wissahickon Hospice, The NeuroSpine Center, LLC, and Affilia Home Health  (together, the "**Penn Medicine Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies.  The Penn Medicine Plaintiffs assert their claims against all Defendants.

20.     **The Children's Hospital of Philadelphia** is a Pennsylvania nonprofit corporation with its principal place of business in Philadelphia, Pennsylvania.  The Children's Hospital of Philadelphia and related entities, Children's Anesthesiology Associates, Ltd., Children's Anesthesiology Associates of New Jersey, Inc., Children's Health Care Associates, Inc., Children's Health Care Associates of New Jersey, P.C., Children's Surgical Associates, Ltd.,

Children's Surgical Associates of New Jersey, Inc., Radiology Associates of Children's Hospital, Inc., Children's Radiology Associates of New Jersey, P.C., The Children's Hospital of Philadelphia Practice Association, and CHOP Clinical Associates, Inc. (together, the "**CHOP Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The CHOP Plaintiffs assert their claims against all Defendants.

21.     **Penn State Health** is a Pennsylvania limited liability company with its principal place of business in Hershey, Pennsylvania. Penn State Health and related entities, Penn State Health Community Medical Group, LLC, The Milton S. Hershey Medical Center, St. Joseph Regional Health Network, Penn State Health Holy Spirit Medical Center, Penn State Health Lancaster Medical Center, Penn State Health Hampden Medical Center, St. Joseph Medical Group, Spirit Physician Services Inc., and Pennsylvania Psychiatric Institute (together, the "**Penn State Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies.   The Penn State Health Plaintiffs assert their claims against all Defendants.

22.     **WellSpan Health** is a Pennsylvania nonprofit corporation with its principal place of business in York, Pennsylvania. WellSpan Health and related entities, WellSpan Medical Group, WellSpan Hearing Center, Inc., WellSpan Pharmacy, Inc., WellSpan Surgery and Rehabilitation Hospital, WellSpan CityGate Surgery Center, LLC, WellSpan EMS, LLC, WellSpan Endoscopy Center, LLC, WellSpan Chambersburg Endoscopy Center, LLC, Apple Hill Surgical Center Partners L.P., Apple Hill Surgical Center, Inc., Ephrata Community Hospital, Evangelical Community Hospital, Evangelical Regional Mobile Medical Services, LLC, Good Samaritan Physician Services, GSH Home Med Care, LLC, Philhaven, Summit Surgery Center,

L.P., The Chambersburg Hospital, The Gettysburg Hospital, The Good Samaritan Hospital of Lebanon, Pennsylvania, VNA Home Health Services, Waynesboro Hospital, and York Hospital, (together, the "**WellSpan Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The WellSpan Health Plaintiffs assert their claims against all Defendants.

23.     **Geisinger Health System** is a Pennsylvania nonprofit corporation with its principal place of business in Danville, Pennsylvania. Geisinger Health System and related entities, Geisinger Medical Center, Geisinger Clinic, Geisinger Wyoming Valley Medical Center, Community Medical Center d/b/a Geisinger, Community Medical Center, Geisinger Lewistown Hospital, Geisinger Bloomsburg Hospital, Geisinger Medical Center Muncy, Geisinger Jersey Shore Hospital, Geisinger-HM Joint Venture, LLC, Family Health Associates, Lackawanna Surgery Center LLC, Geisinger Community Health Services, Marworth Treatment Center, West Shore Advanced Life Support Services, Inc. d/b/a Geisinger Emergency Medical Services, Evangelical-Geisinger, LLC, Spirit Physician Services, Inc. d/b/a Geisinger Holy Spirit Medical Group, Holy Spirit Hospital of the Sisters of Christian Charity d/b/a Geisinger Holy Spirit Hospital, Geisinger Pharmacy, LLC, Caring Community Health Center (together, the "**Geisinger Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Geisinger Plaintiffs assert their claims against all Defendants.

24.     **MedStar Health, Inc.** is a Maryland nonprofit corporation with its principal place of business in Columbia, Maryland. MedStar Health, Inc. and related entities, Capitol Endoscopy, LLC, Cardiology Associates, LLC, CASI,  Chesapeake Cardiology Associates, LLC, Franklin

Square Hospital Center, Inc., Harbor Hospital, Inc., Hospice of St. Mary's, Inc., MedStar Endoscopy Center at Lutherville, LLC, MedStar Franklin Square Physicians, LLC, MedStar Georgetown Medical Center, Inc., MedStar Good Samaritan Physicians, LLC, MedStar Harbor Hospital Physicians, LLC, MedStar Health Endoscopy Center – Silver Spring, MedStar Health Physical Therapy at Home, LLC, MedStar Health Visiting Nurse Association, Inc., MedStar Heart Institute, LLC, MedStar Medical Group Anesthesiology, LLC, MedStar Medical Group II, LLC, MedStar Medical Group Radiology, LLC, MedStar Medical Group Southern Maryland, LLC, MedStar Medical Group – Southern Maryland, LLC, MedStar Southern Maryland Hospital Center, MedStar Southern Maryland Physicians, LLC, MedStar Surgery Center at Brandywine, LLC, MedStar Surgery Center at Lafayette Centre, MedStar Surgery Center at Timonium, LLC, MedStar Surgery Center I, LLC, MedStar Total Elder Care, Inc., MedStar Union Memorial Physicians, LLC, MedStar Urgent Care, LLC, MGMC, LLC, Montgomery General Hospital, Inc., National Rehabilitation Hospital, Inc., NRH Regional Rehab at Olney, Inc., One MedStar Primary Care, LLC, Parkway Ventures, Inc., Physicians Imaging of Washington Hospital Center, LLC, St. Mary's Hospital of St. Mary's County, Inc., Suburban/NRH Medical Rehabilitation Services, Inc., The Good Samaritan Hospital of Maryland, Inc., The Union Memorial Hospital, Washington Hospital Center Corp., Washington Hospital Center Physician Group LLC, Washington Hospital Center Corporation, (together, the "**Medstar Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies.  The MedStar Health Plaintiffs assert their claims against all Defendants other than CareFirst-DC and CareFirst-Maryland.

25.    **Tower Health** is a Pennsylvania nonprofit corporation with its principal place of business in West Reading, Pennsylvania. Tower Health and related entities, Brandywine Hospital,

LLC, Chestnut Hill Clinic Company, LLC, Chestnut Hill Hospital, LLC, Coatesville Cardiology Clinic, LLC, Coatesville Clinic Company, LLC, Coventry Clinic Company, LLC, Coventry Clinic, LLC, Jennersville Family Medicine, LLC, Jennersville Hospital, LLC, Phoenixville Clinic Company, LLC, Phoenixville Hospital, LLC, Phoenixville Orthopedic Specialists, LLC, Pottstown Clinic Company, LLC, Pottstown Hospital, LLC, Reading Hospital, Schuylkill Internal Medicine Associates, LLC, STC OpCo, LLC d/b/a St. Christopher's Hospital for Children, STC Pediatrics, LLC, Tower-Drexel Academic Medical Group, LLC, Tower Health Medical Group, Village Medical Center Associates, LLC, West Grove Clinic Company, LLC, and West Grove Family Practice, LLC (together, the "**Tower Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Tower Health Plaintiffs assert their claims against all Defendants.

26.     **Doylestown Hospital** is a Pennsylvania nonprofit corporation with its principal place of business in Doylestown, Pennsylvania. Doylestown Hospital and related entities, The Village Improvement Association of Doylestown, Doylestown Health Foundation d/b/a Doylestown Health, DH Physicians Ambulatory Services, and VIA Affiliates, (together, the "**Doylestown Hospital Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Doylestown Hospital Plaintiffs assert their claims against all Defendants.

27.     **Grand View Hospital d/b/a Grand View Health** is a Pennsylvania nonprofit corporation with its principal place of business in Sellersville, Pennsylvania. Grand View Hospital d/b/a Grand View Health and related entity, Grand View Urgent Care, LLC, (together, the "**Grand**

View Health Plaintiffs") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Grand View Health Plaintiffs assert their claims against all Defendants.

28. **Halifax Hospital Medical Center** is a Florida nonprofit corporation with its principal place of business in Daytona Beach, Florida. Halifax Hospital Medical Center and related entities, Halifax Healthcare Systems, Inc., Medical Center of Deltona, Inc., Daytona Area Senior Services d/b/a Halifax Care at Home, and Halifax Hospice, Inc., (together, the "**Halifax Healthcare Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Halifax Healthcare Plaintiffs assert their claims against all Defendants.

29. **Hunterdon Healthcare System, Inc.** is a New Jersey nonprofit corporation with its principal place of business in Flemington, New Jersey. Hunterdon Healthcare System, Inc. and related entities, Hunterdon Medical Center, Inc., Hunterdon Primary Care, P.C., Hunterdon Specialty Care, P.C., Hunterdon Urgent Care, P.C. Hunterdon Family Practice & Obstetrics, P.A., (together, the "**Hunterdon Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Hunterdon Health Plaintiffs assert their claims against all Defendants.

30. **Meadville Medical Center** is a Pennsylvania nonprofit corporation with its principal place of business in Meadville, Pennsylvania. Meadville Medical Center and related entities, Meadville Physician Services, Orthopedic Associates of Meadville, Primary Care Services, Titusville Area Hospital, and Titusville Area Health Services, Inc., (together, the "**Meadville Medical Plaintiffs**") have either employed healthcare providers or provided

healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies.  The Meadville Medical Plaintiffs assert their claims against all Defendants.

31.    **St. Clair Health Corporation** is a Pennsylvania nonprofit corporation with its principal place of business in Pittsburgh, Pennsylvania.  St. Clair Health Corporation and related entities, St. Clair Memorial Hospital, St. Clair Anesthesiology Associates, Inc., St. Clair Professional Services, Inc., and St. Clair Medical Services, Inc., (together, the "**St. Clair Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The St. Clair Health Plaintiffs assert their claims against all Defendants.

32.    **Penn Highlands Healthcare, Inc.** is a Pennsylvania nonprofit corporation with its principal place in DuBois, Pennsylvania.  Penn Highlands Healthcare, Inc. and related entities, J.C. Blair Memorial Hospital d/b/a Penn Highlands Huntingdon, J.C. Blair Memorial Hospital d/b/a Penn Highlands State College, a campus of Penn Highlands Huntingdon, Tyrone Hospital d/b/a Penn Highlands Tyrone, Brookville Hospital d/b/a Penn Highlands Brookville, Highlands Hospital d/b/a Penn Highlands Connellsville, DuBois Regional Medical Center d/b/a Penn Highlands DuBois, Elk Regional Health Center, Inc. d/b/a Penn Highlands Elk, and Monongahela Valley Hospital, Inc. d/b/a Penn Highlands Mon Valley (together, the "**Penn Highlands Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Penn Highlands Plaintiffs assert their claims against all Defendants.

33.    **Holy Redeemer Health System** is a Pennsylvania nonprofit corporation with its principal place of business in Meadowbrook, Pennsylvania. Holy Redeemer Health System and

related entities, Holy Redeemer Ambulatory Surgery Center LLC, HR Physician Services, Orthopaedic Surgery & Rehabilitation Associates LLC, Redeemer Cancer Care Physicians Network LLC, Redeemer Life Care d/b/a Little Flower Manor (together, the "**Holy Redeemer Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Holy Redeemer Plaintiffs assert their claims against all Defendants.

34.     **St. Luke's Health Network, Inc. d/b/a St. Luke's University Health Network** ("**St. Luke's**") is a Pennsylvania nonprofit corporation with its principal place of business in Bethlehem, Pennsylvania. St. Luke's and related entities, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital – Bethlehem Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital – Allentown Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital – Sacred Heart Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital – Lehighton Campus, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a The Summit at Blue Mountain Nursing & Rehab Center, Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Orthopedic Hospital – West End Campus, St. Luke's Quakertown Hospital d/b/a St. Luke's Hospital – Quakertown Campus, St. Luke's Quakertown Hospital d/b/a St. Luke's Hospital – Upper Bucks Campus, Carbon-Schuylkill Community Hospital, Inc. d/b/a St. Luke's Hospital – Miners Campus, St. Luke's Hospital – Anderson Campus, St. Luke's Hospital - Monroe Campus, St. Luke's Hospital - Easton Campus, St. Luke's Hospital – Carbon Campus, St. Luke's Warren Hospital, Inc. d/b/a St. Luke's Hospital – Warren Campus, Penn Foundation Inc. d/b/a St. Luke's Penn Foundation, Visiting Nurse Association of St. Luke's Home Health/Hospice, Inc. d/b/a St. Luke's Home Health, Visiting Nurse Association of St. Luke's Home Health/Hospice, Inc. d/b/a St. Luke's Hospice, St. Luke's

HomeStar Services, LLC, St. Luke's Emergency & Transport Services, Inc., St. Luke's Ambulatory Services, Inc., GSL Hospital, Sacred Heart Hospital of Allentown d/b/a St. Luke's Hospital – Sacred Heart Campus, Blue Mountain Hospital d/b/a St. Luke's Hospital – Blue Mountain Campus, Blue Mountain Hospital d/b/a St. Luke's Hospital – Gnaden Huetten Campus, Blue Mountain Hospital d/b/a The Summit at Blue Mountain Nursing & Rehab Center, St. Luke's Physician Group, Inc., St. Luke's Warren Physician Group, P.C., GSLPG, Inc., (together, the "**St. Luke's Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies.   The St. Luke's Plaintiffs assert their claims against all Defendants.

35.     **Independence Health System** is a Pennsylvania nonprofit corporation with its principal place of business in Butler, Pennsylvania.  Independence Health System and related entities, Butler Healthcare Providers, Butler Medical Providers, Clarion Hospital, Excela Health Physician Practices, Inc., Frick Hospital, Latrobe Area Hospital, Inc., Westmoreland Regional Hospital, Excela Health Home Care & Hospice, Butler Health System, Inc., Excela Health, Primary Care Associates of Butler, P.C., Butler Imaging and Interventional Associates, LLC, Butler Ambulatory Surgery Center, LLC, BHS FasterCare, PLLC, BHS FastERCare Lab, LLC (together, the "**Independence Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies.  The Independence Health Plaintiffs assert their claims against all Defendants other than Highmark-PA.

36.     **Eastern Maine Healthcare Systems d/b/a Northern Light Health** is a Maine nonprofit corporation with its principal place of business in Brewer, Maine. Eastern Maine Healthcare Systems d/b/a Northern Light Health and related entities, Acadia Hospital, Corp.,

Acadia Healthcare, Inc., The Blue Hill Memorial Hospital, Charles A. Dean Memorial Hospital, Eastern Maine Medical Center, Inland Hospital, Lakewood, Maine Coast Regional Health Facilities d/b/a Northern Light Maine Coast Hospital, M Drug, LLC, Mercy Hospital, MRH Corp. d/b/a Northern Light Mayo Hospital, Northern Light Medical Transport, Sebasticook Valley Health, The Aroostook Medical Center, VNA Home Health & Hospice (together, the "**Northern Light Health Plaintiffs**") have either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies. The Northern Light Health Plaintiffs assert their claims against all Defendants.

37.     Each Plaintiff has either employed healthcare providers or provided healthcare services to eligible patients with healthcare coverage provided by one or more of the Defendant Insurance Companies and was paid less for the healthcare services rendered than each Plaintiff would have been paid in a competitive market free from Defendants' agreements not to compete. Each Plaintiff has been damaged by Defendants' conduct and has a right to bring these claims. Each Plaintiff has sustained antitrust injury.

38.     Each Plaintiff submitted a valid and timely exclusion request and is not a member of the Settlement Class. *See* December 4, 2025 Memorandum Opinion and Order Preliminarily Approving Provider Plaintiffs' Settlement and Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator at 51-52 (ECF No. 3225), *In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406) (Master File No. 2:13-CV-20000-RDP N.D. Ala.). The "Settlement Class" includes all Providers in the U.S. (other than Excluded Providers) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or was a Member of or a beneficiary of, any plan administered by any Settling

Provided by CourtAlert www.CourtAlert.com

Individual Blue Plan from July 24, 2008 to October 4, 2024. "Provider" means any person or entity that provides healthcare services in the United States, including but not limited to a physician, group practice, or facility. "Excluded Providers" are (i) Providers owned or employed by any of the Settling Defendants; (ii) Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs; (iii) Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.); or (iv) Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance. Any Provider that falls within the exclusion(s) set forth in clauses (i), (ii) or (iv) of this paragraph for only a portion of the Settlement Class Period is a Settlement Class Member that may recover in the Settlement.

### B. Defendants/Co-Conspirators

39. **Blue Cross and Blue Shield Association** (the "Association") is a not-for-profit corporation organized under the laws of the State of Illinois and headquartered in Chicago, Illinois. The Association was created and maintained by these companies in furtherance of their unlawful conspiracy under the guise of licensing themselves the marks that they claim were previously used by them.

40. The principal headquarters for the Association is located at 225 North Michigan Avenue, Chicago, IL 60601.

41.     The Association has contacts with all 50 states, the District of Columbia, and Puerto Rico by virtue of its agreements and contacts with the individual Defendant Insurance Companies. The Association has entered into agreements with Defendant Insurance Companies that control the geographic areas in which the individual Defendant Insurance Companies can compete.  These agreements and resulting conspiracy restrict output and allocate the market contracting with healthcare providers on a nationwide basis in violation of §§ 1 and 3 of the Sherman Act.

42.     Anthem, Inc., f/k/a WellPoint, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company, Blue Cross of California, Blue Cross of Southern California, Blue Cross of Northern California (Blue Cross of California, Blue Cross of Southern California and Blue Cross of Northern California are referred to herein, together, as "**Anthem-CA**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in California where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

43.     The principal headquarters for Anthem-CA is located at 21215 Burbank Blvd., Woodland Hills, California 91367.

44.     Rocky Mountain Hospital & Medical Service, Inc. d/b/a Anthem Blue Cross Blue Shield of Colorado ("**Anthem-CO**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Colorado where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

45.     The principal headquarters for Anthem-CO is located at 700 Broadway, Denver, Colorado 80203.

46.     Anthem Health Plans, Inc. d/b/a Anthem Blue Cross Blue Shield of Connecticut ("**Anthem-CT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Connecticut where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

47.     The principal headquarters for Anthem-CT is located at 370 Bassett Road, North Haven, Connecticut 06473.

48.     Empire HealthChoice Assurance, Inc. d/b/a Empire Blue Cross Blue Shield ("**Anthem-Empire**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Eastern and Southeastern New York where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

49.     The principal headquarters for Anthem-Empire is located at One Liberty Plaza, New York, New York 10006.

50.     Blue Cross Blue Shield of Georgia ("**Anthem-GA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Georgia where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

51.     The principal headquarters for Anthem-GA is located at 3350 Peachtree Road NE, Atlanta, Georgia 30326.

52.     Anthem Insurance Companies, Inc. d/b/a/ Anthem Blue Cross Blue Shield of Indiana ("**Anthem-IN**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Indiana where it, like many other Defendant

Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

53.     The principal headquarters for Anthem-IN is located at 120 Monument Circle, Indianapolis, Indiana 46204.

54.     Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross Blue Shield of Kentucky ("**Anthem-KY**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kentucky where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

55.     The principal headquarters for Anthem-KY is located at 13550 Triton Park Blvd., Louisville, Kentucky 40223.

56.     Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross Blue Shield of Maine ("**Anthem-ME**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maine where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

57.     The principal headquarters for Anthem-ME is located at 2 Gannett Drive, South Portland, Maine 04016.

58.     Anthem Blue Cross Blue Shield of Missouri, RightCHOICE Managed Care, Inc., Healthy Alliance Life Insurance Company and HMO Missouri Inc. (together, "**Anthem-MO**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Missouri, except for 32 counties in greater Kansas City and Northwest Missouri. Anthem-MO is the largest health insurer, as measured by number of subscribers, within its

exclusive, protected service area, which is defined as the State of Missouri, except the 32 counties in greater Kansas City and Northwest Missouri.

59.     The principal headquarters for Anthem-MO is located at 1831 Chestnut Street, St. Louis, Missouri 63103.

60.     Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross Blue Shield of New Hampshire ("**Anthem-NH**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Hampshire where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

61.     The principal headquarters for Anthem-NH is located at 3000 Goffs Falls Rd, Manchester, New Hampshire 03103.

62.     Anthem Blue Cross Blue Shield of Nevada ("**Anthem-NV**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nevada where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

63.     The principal headquarters for Anthem-NV is located at 9133 West Russell Rd. Suite 200, Las Vegas, Nevada 89148.

64.     Community Insurance Company d/b/a Anthem Blue Cross Blue Shield of Ohio ("**Anthem-OH**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Ohio where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

65.     The principal headquarters for Anthem-OH is located at 120 Monument Circle, Indianapolis, Indiana 46203.

66.     Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross Blue Shield of Virginia ("**Anthem-VA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in most of Virginia, with the exception of a small portion of Northern Virginia in the Washington, DC suburbs. Anthem-VA is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the State of Virginia, excepting a small portion of Northern Virginia in the Washington, DC suburbs.

67.     The principal headquarters for Anthem-VA is located at 2235 Staples Mill Road, Suite 401, Richmond, Virginia 23230.

68.     Anthem Blue Cross Blue Shield of Wisconsin, and Compcare Health Services Insurance Corporation (together, "**Anthem-Wisconsin**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wisconsin where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

69.     The principal headquarters for Anthem-WI is located at 120 Monument Circle, Indianapolis, Indiana 46204.

70.     **Elevance Health, Inc.** is the parent company of the Anthem-CA, Anthem-GA, Anthem-CT, Anthem-CO, Anthem-NV, Anthem-IN, Anthem-KY, Anthem-ME, Anthem-MO, Anthem-NH, Anthem-Empire, Anthem-OH, Anthem-VA, and Anthem-WI. Through its subsidiaries, Elevance Health, Inc. has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in California, Colorado, Connecticut, New

York, Georgia, Indiana, Kentucky, Maine, Missouri, New Hampshire, Nevada, Ohio, Virginia, and Wisconsin, where it is the largest or one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

71.     The principal headquarters for Elevance Health, Inc. is located at 220 Virginia Avenue, Indianapolis, Indiana 46204.

72.     Aware Integrated and BCBSM, Inc., d/b/a Blue Cross Blue Shield of Minnesota ("**Aware**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Minnesota where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

73.     The principal headquarters for Aware is located at 3535 Blue Cross Road, St. Paul, Minnesota 55164.

74.     Blue Cross and Blue Shield of Alabama ("**BCBS-AL**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the State of Alabama where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

75.     The principal headquarters for BCBS-AL is located at 450 Riverchase Parkway East, Birmingham, Alabama 35244.

76.     Blue Cross and Blue Shield of Arizona ("**BCBS-AZ**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arizona where it, like many other Defendant Insurance Companies in their allocated areas, is

the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

77.     The principal headquarters for BCBS-AZ is located at 2444 West Las Palmaritas Drive, Phoenix, Arizona 85021.

78.     Blue Cross and Blue Shield of Kansas City, Inc. ("**BCBS-KC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in the 32 counties of greater Kansas City and Northwest Missouri, plus Johnson and Wyandotte counties in Kansas. BCBS-KC is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as the 32 counties of greater Kansas City and Northwest Missouri, plus Johnson and Wyandotte counties in Kansas.

79.     The principal headquarters for BCBS-KC is located at 2301 Main Street, One Pershing Square, Kansas City, Missouri 64108.

80.     Blue Cross and Blue Shield of Kansas, Inc. ("**BCBS-KS**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Kansas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

81.     The principal headquarters for BCBS-KS is located at 1133 SW Topeka Boulevard, Topeka, Kansas 66629.

82.     Blue Cross and Blue Shield of Massachusetts ("**BCBS-MA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Massachusetts where it, like many other Defendant Insurance Companies in their allocated

Provided by CourtAlertwww.CourtAlert.com

areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

83.     The principal headquarters for BCBS-MA is located at 401 Park Drive, Boston, Massachusetts 02215.

84.     Blue Cross Blue Shield of Michigan Mutual Insurance Company ("**BCBS-MI**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Michigan where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

85.     The principal headquarters for BCBS-MI is located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.

86.     Blue Cross Blue Shield of Mississippi, a Mutual Insurance Company ("**BCBS-MS**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Mississippi where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

87.     The principal headquarters for BCBS-MS is located at 3545 Lakeland Drive, Flowood, Mississippi 39232.

88.     Blue Cross and Blue Shield of North Carolina ("**BCBS-NC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Carolina where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

89.     The principal headquarters for BCBS-NC is located at 5901 Chapel Hill Road, Durham, North Carolina 27707.

90.     Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey ("**BCBS-NJ**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Jersey where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

91.     The principal headquarters for BCBS-NJ is located at Three Penn Plaza East, Newark, New Jersey 07105.

92.     Blue Cross and Blue Shield of Rhode Island ("**BCBS-RI**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Rhode Island where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

93.     The principal headquarters for BCBS-RI is located at 500 Exchange Street, Providence, Rhode Island 02903.

94.     Blue Cross and Blue Shield of South Carolina ("**BCBS-SC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Carolina where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

95.     The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, South Carolina 29212.

96. Blue Cross Blue Shield of Tennessee, Inc. ("**BCBS-TN**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Tennessee where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

97. The principal headquarters for BCBS-TN is located at 1 Cameron Hill Circle, Chattanooga, Tennessee 37402.

98. Blue Cross and Blue Shield of Vermont ("**BCBS-VT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Vermont where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

99. The principal headquarters for BCBS-VT is located at 445 Industrial Lane, Berlin, Vermont 05602.

100. Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a BlueCross BlueShield of Western New York ("**BCBS-Western New York**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western New York where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as Western New York State.

101. The principal headquarters for BCBS-Western New York is located at 257 West Genesee Street, Buffalo, New York 14202.

102.      Blue Cross and Blue Shield of Wyoming ("**BCBS-WY**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Wyoming where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

103.      The principal headquarters for BCBS-WY is located at P.O. Box 2266, Cheyenne, Wyoming 82003.

104.      California Physicians' Service, d/b/a Blue Shield of California ("**California Physicians' Service**") has agreed to and participates in the Blue conspiracy using the Blue Shield trademark and trade name in California where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

105.      The principal headquarters for California Physicians' Service is located at 50 Beale Street, San Francisco, California 94105-1808.

106.      Cambia Health Solutions, Inc., and its affiliates and/or assumed name Regence BlueShield of Idaho ("**Cambia-ID**") has agreed to and participates in the Blue conspiracy using the Blue Shield trademark and trade name in Idaho where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

107.      The principal headquarters for Cambia-ID is located at 1602 21st Ave, Lewiston, Idaho 83501.

108.      Cambia Health Solutions, Inc., and its affiliates and/or assumed name Regence Blue Cross Blue Shield of Oregon ("**Cambia-OR**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oregon where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

109.    The principal headquarters for Cambia-OR is located at 100 SW Market Street, Portland, Oregon 97207.

110.    Cambia Health Solutions, Inc., and its affiliates and/or assumed name Regence Blue Cross of Utah ("**Cambia-UT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Utah where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

111.    The principal headquarters for Cambia-UT is located at 2890 East Cottonwood Parkway, Salt Lake City, Utah 84121.

112.    Cambia Health Solutions, Inc. and its affiliates and/or assumed name Regence Blue Shield of Washington ("**Cambia-WA**") has agreed to and participates in the Blue conspiracy using Blue Shield trademarks and trade names in Washington where it one of the largest health insurers, as measured by number of subscribers, within its allocated area.

113.    The principal headquarters for Cambia-WA is located at 1800 Ninth Avenue, Seattle, Washington 98111.

114.    Capital Blue Cross ("**Capital**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in central Pennsylvania where it is one of the largest health insurers, as measured by number of subscribers, within its within its allocated area, which is defined as the 21 counties that make up central Pennsylvania: Adams, Berks, Centre (Eastern portion), Columbia, Cumberland, Dauphin, Franklin, Fulton, Juniata, Lancaster, Lebanon, Lehigh, Mifflin, Montour, Northampton, Northumberland, Perry, Schuylkill, Snyder, Union, and York Counties.

115.    The principal headquarters for Capital is located at 2500 Elmerton Avenue, Harrisburg, Pennsylvania 17177.

116.     CareFirst, Inc., Group Hospitalization and Medical Services, Inc. and CareFirst Blue Choice, Inc. (together, "**CareFirst-DC**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Washington, DC and its suburbs where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

117.     The principal headquarters for CareFirst-DC is located at 10455 Mill Run Circle, Owings Mill, Maryland 21117.

118.     CareFirst, Inc. and its subsidiaries or affiliates Group Hospitalization and Medical Services, Inc., CareFirst of Maryland, Inc., and CareFirst Blue Choice, Inc., which collectively d/b/a CareFirst BlueCross BlueShield (CareFirst, Inc., CareFirst of Maryland, Inc. and CareFirst BlueChoice, Inc. are referred to herein, together, as "**CareFirst-MD**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Maryland where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

119.     The principal headquarters for CareFirst-MD is located at 10455 and 10453 Mill Run Circle, Owings Mill, Maryland 21117.

120.     Lifetime Healthcare, Inc. and Excellus Health Plan, Inc., d/b/a Excellus BlueCross BlueShield (together, "**Excellus**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in central New York where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area, which is defined as 31 counties in central New York.

121.    The principal headquarters for Excellus is located at 165 Court Street, Rochester, New York 14647.

122.    GoodLife Partners, Inc. and Blue Cross Blue Shield of Nebraska ("**GoodLife**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Nebraska where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

123.    The principal headquarters for GoodLife is located at 1919 Aksarban Drive, Omaha, Nebraska 68180.

124.    GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue ("**GuideWell**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Florida where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

125.    The principal headquarters for GuideWell is located at 4800 Deerwood Campus Parkway, Jacksonville, Florida 32246.

126.    Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii ("**Hawaii Medical**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Hawaii where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

127.    The principal headquarters for Hawaii Medical is located at 818 Keeaumoku Street, Honolulu, Hawai'i 96814.

128.    Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois ("**HCSC-IL**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Illinois where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

129.    The principal headquarters for HCSC-IL is located at 300 E. Randolph Street, Chicago, Illinois 60601.

130.    Blue Cross and Blue Shield of Montana, including its predecessor Caring for Montanans, ("**HCSC-MT**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Montana where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area. Defendant Health Care Service Corporation acquired Blue Cross and Blue Shield of Montana in 2012.  Health Care Service Corporation has assumed liability for claims involving Blue Cross and Blue Shield of Montana prior to the 2012 acquisition.

131.    The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena, Montana 59604-4309.

132.    Blue Cross and Blue Shield of New Mexico ("**HCSC-NM**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in New Mexico where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

133.    The principal headquarters for HCSC-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, New Mexico 87113.

134.    Blue Cross and Blue Shield of Oklahoma ("**HCSC-OK**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Oklahoma where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

135.    The principal headquarters for HCSC-OK is located at 1400 South Boston, Tulsa, Oklahoma 74119.

136.    Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company ("**HCSC-TX**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Texas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

137.    The principal headquarters for HCSC-TX is located at 1001 E. Lookout Drive, Richardson, Texas 75082.

138.    Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware ("**Highmark-DE**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Delaware where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

139.    The principal headquarters for Highmark-DE is located at 800 Delaware Avenue, Wilmington, Delaware 19801.

140.    Highmark Blue Shield of Northeastern New York f/d/b/a BlueShield of Northeastern New York ("**Highmark Northeastern NY**") has agreed to and participates in the

Blue conspiracy using the Blue Shield trademark and trade name in Northeastern New York where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area, which is defined as 13 counties in Northeastern New York.

141.    The principal headquarters for Highmark Northeastern New York is located at 257 West Genesee Street, Buffalo, New York 14202.

142.    Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield and including Highmark Inc. predecessor Hospital Service Association of Northeastern Pennsylvania f/d/b/a Blue Cross of Northeastern Pennsylvania ("**Highmark-PA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Western Pennsylvania and Blue Shield trademarks and trade names throughout the entire Commonwealth of Pennsylvania.  Highmark-PA is the largest health insurer, as measured by number of subscribers, within its allocated area, which is defined as the 29 counties of Western Pennsylvania:  Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Cameron, Centre (Western portion), Clarion, Clearfield, Crawford, Elk, Erie, Fayette, Forest, Green, Huntingdon, Indiana, Jefferson, Lawrence, McKean, Mercer, Potter, Somerset, Venango, Warren, Washington, and Westmoreland Counties.

143.    The principal headquarters for Highmark-PA is located at 120 Fifth Avenue Place, Pittsburgh, Pennsylvania 15222.

144.    Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia ("**Highmark-VA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in West Virginia where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

145.    The principal headquarters for Highmark-WV is located at 700 Market Square, Parkersburg, West Virginia 26101.

146.    Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho ("**Idaho Health**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in Idaho where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its allocated area.

147.    The principal headquarters for Idaho Health is located at 3000 East Pine Avenue, Meridian, Idaho 83642.

148.    Independence Health Group, Inc. and Independence Hospital Indemnity Plan, Inc., its subsidiary or division, Independence Blue Cross, and QCC Insurance Company Independence (together, "**Independence Blue Cross**") has agreed to and participates in the Blue conspiracy using the Blue Cross trademark and trade name in Southeastern Pennsylvania where it is the largest health insurer, as measured by number of subscribers, within its allocated area, which is defined as the five counties that make up Southeastern Pennsylvania:  Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

149.    The principal headquarters for Independence Blue Cross is located at 1901 Market Street, Philadelphia, Pennsylvania 19103.

150.    Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("**Louisiana Health**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Louisiana where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

151.   The principal headquarters for Louisiana Health is located at 5525 Reitz Avenue, Baton Rouge, Louisiana 70809.

152.   HealthyDakota Mutual Holdings and Noridian Mutual Insurance Company d/b/a Blue Cross Blue Shield of North Dakota ("**Noridian**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in North Dakota where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

153.   The principal headquarters for Noridian is located at 4510 13th Avenue South, Fargo, North Dakota 58121.

154.   Premera and Premera Blue Cross, which also does business as Premera Blue Cross Blue Shield of Alaska (together, "**Premera-AK**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Alaska where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

155.   The principal headquarters for Premera Blue Cross Blue Shield of Alaska is located at 2550 Denali Street, Suite 1404, Anchorage, Alaska 99503.

156.   Premera and Premera Blue Cross, which also does business as Premera Blue Cross Blue Shield of Washington ("**Premera-WA**") has agreed to and participates in the Blue conspiracy using Blue Cross trademarks and trade names in the State of Washington where it is one of the largest health insurers, as measured by number of subscribers, within its allocated area.

157.   The principal headquarters for Premera Blue Cross is located at 7001 220th Street SW, Mountlake Terrace, Washington 98043-4000.

158.    Triple-S Management Corporation and Triple S-Salud, Inc. ("**Triple-S**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Puerto Rico where it is one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected service area.

159.    The principal headquarters for Triple-S is located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.

160.    USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas ("**USAble**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Arkansas where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

161.    The principal headquarters for USAble is located at 601 S. Gaines Street, Little Rock, Arkansas 72201.

162.    Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of Iowa (together, "**Wellmark IA**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in Iowa where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

163.    The principal headquarters for Wellmark-IA is located at 1331 Grand Avenue, Des Moines, Iowa 50306.

164.    Wellmark, Inc., including its subsidiaries and/or divisions, Wellmark Blue Cross and Blue Shield of South Dakota (together, "**Wellmark SD**") has agreed to and participates in the Blue conspiracy using Blue Cross and Blue Shield trademarks and trade names in South Dakota

where it, like many other Defendant Insurance Companies in their allocated areas, is the largest health insurer, as measured by number of subscribers, within its exclusive, protected service area.

165.    The principal headquarters for Wellmark-SD is located at 1601 W. Madison, Sioux Falls, South Dakota 57104.

## IV.    RELEVANT MARKETS

166.    Defendant Insurance Companies, both among themselves and with the Association, agreed to allocate customers and markets, restrict output, and eliminate the ability of Defendant Insurance Companies to compete against each other to negotiate price terms, contract, and pay healthcare providers for provided healthcare services.    Defendant Insurance Companies' "Exclusive Service Areas" or "ESAs" and the output-reducing National Best Efforts Rule and Local Best Efforts Rule are enforced by the Association through the Association license and membership agreements.    Under those agreements, any Defendant Insurance Company that competes against one of its co-conspirators to contract for the purchase of healthcare services from a provider, including Plaintiffs, contrary to their agreement could lose its license to use the Blue trade name and/or trademarks and would have to pay substantial penalties to the other Defendant Insurance Companies through the Association.    Defendant Insurance Companies enforce their anticompetitive agreements through this mechanism.

167.    Each Defendant Insurance Company enters into a license agreement with the Association to use the Blue brand to sell commercial health insurance services and contract with healthcare providers in an Exclusive Service Area.    Under the rules agreed to by Defendants, with certain limited exceptions, the Defendant Insurance Company's allotted Exclusive Service Area is the only area the Defendant Insurance Company is allowed to provide insurance services and to contract with healthcare providers to purchase healthcare services.    Each Defendant Insurance Company also agrees in the Association license agreement it will not enter any Exclusive Service

Area to another Defendant Insurance Company and compete against that Defendant by offering Blue-branded insurance services to any account that is headquartered in that Exclusive Service Area or by purchasing healthcare services from a provider in that Exclusive Service Area. Even in the limited areas where the Exclusive Service Area of two Defendant Insurance Companies overlap, all other Defendant Insurance Companies are prohibited from selling health insurance services and negotiating price terms and contracting with healthcare providers in those Exclusive Service Areas. These agreements are customer or territorial allocations among actual or potential horizontal competitors that are intended to prevent, and do prevent, Defendant Insurance Companies from competing against each for the supply of healthcare services outside of their respective Exclusive Service Areas.

168. Defendant Insurance Companies participate in the market for the purchase services from healthcare providers. Outside of payments by the federal government and state governments in Medicare, Medicaid, and related government-sponsored non-employee programs, the vast majority of those services are paid through or by health insurance companies.

169. Healthcare providers compete for inclusion in the provider networks of insurers' plans. For a given healthcare provider, the question defining the product market is "Who are the payors with whom I can contract?" Where the Defendant Insurance Companies combine to make the vast majority of commercial insurance payments, the answer is the same, regardless of who the provider is—the Defendant Insurance Companies, the few non-Defendant Insurance Company commercial insurers with a small presence in the state, and government programs including traditional Medicare, Medicare Advantage, Medicaid, and managed Medicaid. All providers, regardless of their type, face these options.

170.    Defendant Insurance Companies' anticompetitive practices and market power permit Defendant Insurance Companies to pay in-network providers less than they would have paid absent these violations of the antitrust laws.  Defendant Insurance Companies pay in-network providers pursuant to provider agreements.  Precisely because of Defendant Insurance Companies' market power within each of their respective Exclusive Service Areas, providers wishing to join the Blue network—and to access the Blue-covered patient population—have limited bargaining power.  The terms of the provider agreements – including the offered payments for medical services – are often given on a "take it or leave it" basis.   As a general matter, even when negotiation of payment terms exists, it occurs within a narrow range dictated by the local Blue.

171.    The local Blue generally pays significantly less than other commercial payers.  Certain healthcare providers are required to publish contracted reimbursement rates pursuant to certain price transparency regulations promulgated within the last few years.   The price transparency disclosures by those Plaintiffs to whom the price transparency regulations apply demonstrate this pattern.

172.    Defendant Insurance Companies undertook a coordinated effort to allocate the market in which each of the Defendant Insurance Companies would operate free of competition from other Defendant Insurance Companies.  They did this through a pretextual licensing scheme that imposes geographic restrictions in the trademark licenses granted to each Defendant.

173.    Absent competition, the Defendant Insurance Companies have achieved significant market power and domination in the markets in their Exclusive Service Areas.  The geographic restrictions have barred competition from the respective commercial health insurance markets and the market for healthcare provider services.  Their illegal conduct has damaged and continues to damage Plaintiffs.

Provided by CourtAlert www.CourtAlert.com

174.     Each of the Defendant Insurance Companies is an independent economic actor. Defendant Insurance Companies do not have common shareholders or ownership.  Each has its own sales, revenue, and costs and makes its own profits and losses, which only benefit its own shareholders or stakeholders.  Each Defendant Insurance Company is an actual or potential competitor of every other Defendant Insurance Company, as they all sell similar products and services and—but for the illegal acts alleged herein—could and would enter into each other's Exclusive Service Area to compete for the purchase of healthcare services in each Exclusive Service Area.  As actual or potential competitors, each with its own profits and losses, the Defendant Insurance Companies, in the absence of the anticompetitive agreements alleged herein, each have an economic incentive to, and would, act as an independent center of economic decision-making.  Each would compete against the other Defendant Insurance Companies for providers to expand its network and increase its own sales and profits.  The anticompetitive agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition.  No Defendant Insurance Company has withdrawn from the agreements to engage in the alleged anticipative conduct and associated enforcement terms.

175.     But for the illegal agreements to restrict output and allocate customers, the Defendant Insurance Companies could and would use their Blue brands and non-Blue brands to compete with each other for the business of the Plaintiffs, which would have resulted in greater competition and would have increased prices paid to Plaintiffs for their healthcare services.

176.     At some point in 2021, the Association did away with the National Best Efforts Rule that limited the amount of revenue a Blue could earn outside a given Blue's Exclusive Service Area.  Dropping the Rule, however, has had no impact on the market for the purchase of healthcare

provider goods or services.  Since 2021, Plaintiffs have not observed any incremental, much less significant, market entry by Blues outside their respective Exclusive Service Areas.  Since 2021, Plaintiffs have generally not been approached by Blues from outside their Exclusive Service Area to negotiate in-network agreements covering their respective geographic areas.[1]

177.    For example, as measured by total enrollment, Anthem is the largest health insurer in the United States with approximately 45 million enrollees.  The Defendant Insurance Companies have allocated Anthem the geographic areas of all or part of 14 states.  Anthem also offers "green" insurance throughout the U.S. through its non-Blue subsidiary, UniCare.  Anthem also operates in a number of states outside of its Exclusive Service Area through its Medicaid subsidiary, Amerigroup.  Because Anthem is already operating outside of its Exclusive Service Area via UniCare and Amerigroup, Anthem could compete outside of its Exclusive Service Area but for the illegal territorial restrictions and output limitations alleged herein.  Anthem acquired UniCare (through a merger with WellPoint) in 2004 to compete as a non-Blue brand.  In 2006, however, Anthem froze UniCare expansion at the behest of and in agreement with the other Defendant Insurance Companies and by 2008 was considering selling UniCare to "[e]liminate[] source of friction with other Blues."

178.    Health Care Service Corporation likewise operates in many states.  It has an Exclusive Service Area of Illinois, New Mexico, Oklahoma, Texas, and Montana.  It is the fourth largest health insurance company in the United States.  Health Care Service Corporation could and would contract and/or negotiate price terms with healthcare providers outside of its Exclusive Service Area, but for the illegal territorial restraints and output restrictions alleged herein.

---

[1] This does not address instances in which a Plaintiff may have a facility in a county contiguous to a particular Defendant Insurance Company's Exclusive Service Area.

179.    The Antitrust Division of the Department of Justice defines a *per se* illegal allocation scheme as follows: "allocation schemes are agreements in which competitors divide markets among themselves.  In such schemes, competing firms allocate specific customers or types of customers, products, or territories among themselves.  For example, one competitor will be allowed to sell to, or bid on contracts let by, certain customers or types of customers.  In return, he or she will not sell to, or bid on contracts let by, customers allocated to the other competitors.  In other schemes, competitors agree to sell only to customers in certain geographic areas and refuse to sell to, or quote intentionally high prices to, customers in geographic areas allocated to conspirator companies."

180.    By creating and enforcing the Exclusive Service Areas and the other anti-competitive rules and agreements of the Association, including the restrictive provisions of their respective license agreements with the Association, Defendant Insurance Companies have entered into *per se* illegal agreements in the health insurance market and market for payment of healthcare providers.

181.    If the market allocation and/or output restrictions were eliminated, then Defendant Insurance Companies would also compete to a greater extent for healthcare providers in the relevant market.  This would reduce market concentration in the relevant market because the Defendant Insurance Companies would exercise their newfound ability to negotiate price terms and contract with providers in the Exclusive Service Area of other Defendant Insurance Companies.  Reimbursement prices paid to providers would increase and the market for payment of healthcare services would become much more competitive.  Eliminating the anticompetitive conduct would also improve quality by allowing providers to negotiate price terms and contract with Defendant Insurance Companies with superior and innovative services.

182.    The Defendant Insurance Companies collectively use their market power to achieve anticompetitive results in the relevant market for payment of healthcare providers as is demonstrated by their ability to limit provider choice, to fix prices below the competitive level, reimburse at below market rates, and to impose onerous terms on providers, all without losing market share.

183.    At a minimum, Defendant Insurance Companies have exercised their collective market power over the payment of healthcare providers, even as their illegal and anticompetitive horizontal restraints limit output and restrict the option of Plaintiffs to just one of the Defendant Insurance Companies in each Exclusive Service Area.

184.    The Defendant Insurance Companies have, at a minimum, profitably instituted a small but significant and non-transitory decrease in the price the Defendant Insurance Companies pay for healthcare services to providers without losing collective market share or causing their companies to be less profitable.

## V.    HISTORY OF THE DEFENDANT INSURANCE COMPANIES AND BCBSA

185.    The history of Blue Cross and Blue Shield demonstrates that the Defendant Insurance Companies arose independently and generically and, to the extent that the Defendant Insurance Companies used any Blue Marks at all, they did so without the need for allocating the market or restricting output.  Only after years of consolidation and a desire to avoid competition amongst themselves did Defendant Insurance Companies and various predecessors utilize the Blue Cross and Blue Shield marks in an effort to reduce competition with one another through market allocations and other output restrictions.

186.    The Association was created by the Defendant Insurance Companies and is the vehicle through which the Defendant Insurance Companies have combined and conspired in illegal restraint of competition.  Moreover, the history of the Association demonstrates that the territorial

-44-

and customer allocations in its purported trademark licenses facilitated a common plan to eliminate competition between the various Defendant Insurance Companies.

**A.  Development of the Blue Cross Companies**

187.    In 1934, an administrator named E.A. von Steenwyck helped develop a prepaid hospital plan in St. Paul, Minnesota.  In his effort to help sell the plan, he commissioned a poster that showed a nurse wearing a uniform containing a blue Geneva cross and used the symbol and the name "Blue Cross" to identify the plan.  This is believed to be the first use of the Blue Cross symbol and name as a brand for a healthcare plan.  Within the year, other prepaid hospital plans began independently using the Blue Cross symbol.  The St. Paul plan did not try to prevent other plans from using the Blue Cross symbol or to monitor the quality of the services offered by other plans.  To the contrary, the St. Paul plan acquiesced in and even encouraged other plans to use the Blue Cross symbol even if those plans were in geographic areas that the St. Paul plan could reasonably expand.  The St. Paul plan allowed other competing hospital plans to use the Blue Cross symbol in every bordering state—North Dakota, South Dakota, Wisconsin, and Iowa—without objection.

188.    In 1937, Blue Cross plan executives met in Chicago.  At that meeting, American Hospital Association ("AHA") officials announced that prepaid hospital plans meeting certain standards of approval would receive institutional membership in the AHA.  In 1938, the AHA's Committee on Hospital Service adopted a set of principles to guide its "approval" of prepaid hospital plans.  One such principle was that the plans would not compete with each other.  When the approval program went into effect, there were already 38 independently formed prepaid hospital plans with a total of 1,365,000 members.

189.    In 1939, the Blue Cross mark was adopted as the official emblem of those prepaid hospital plans that received the approval of the AHA.

190.     In 1941, the Committee on Hospital Service, which had changed its name to the Hospital Service Plan Committee, introduced a new standard:  approval would be denied to any plan operating in another plan's service area.  Despite this, the independently formed prepaid hospital plans, now using the generic Blue Cross name, engaged in fierce competition with each other and often entered each other's territories regardless of the new standard.

191.     In 1947 and 1948 the AHA applied for and received a federal registration for the Blue Cross marks.  The AHA did this without procuring an assignment from the first user—the St. Paul Plan.

**B.     Development of the Blue Shield Plans**

192.     The development of what became the Blue Shield plans followed, and it largely imitated the development of the plans using the Blue Cross mark.  Blue Shield plans were designed to provide a mechanism for covering the cost of physician care—just as the Blue Cross plans had provided a mechanism for covering the cost of hospital care.  Similar to the development of the Blue Cross hospital plans in conjunction with the AHA (which represents hospitals), the Blue Shield medical society plans were developed in conjunction with the American Medical Association ("AMA") (which represents physicians).

193.     Like the Blue Cross symbol, the Blue Shield symbol was developed by a local medical society plan, and it proliferated as other plans adopted it without the need for or obtaining any license.  The first use of the Blue Shield Service Mark was by the Western New York Plan in Buffalo, New York in 1939.  The Buffalo plan did not attempt to exclude other plans from using the Blue Shield service mark.  To the contrary, the Buffalo plan acquiesced in the use of the mark by other plans and even encouraged other plans to use the Blue Shield mark; and, from 1939 to 1947, the Blue Shield marks were used by various medical plans.

194.    In 1946, the AMA formed the Associated Medical Care Plans ("AMCP"), a national body intended to coordinate and "approve" the independent plans that had been using the Blue Shield mark.  In 1947, the successor to the AMCP, the Blue Shield Medical Care Plans (the "National Organization"), formally adopted the Blue Shield mark as the mark of the association. In 1950, the National Organization applied for federal registration of the Blue Shield mark.  In 1960, the AMCP changed its name to the National Association of Blue Shield Plans, which in 1976 changed its name to the Blue Shield Association.

### C.    Creation of the Blue Cross and Blue Shield Association

195.    Historically, the insurance companies using the Blue Cross and Blue Shield marks were fierce competitors.

196.    During the early decades of their existence, there were no restrictions on the ability of a plan using the Blue Cross or Blue Shield marks to compete with or offer coverage in an area already covered by another plan.   "Cross-on-Cross" and "Shield-on-Shield" competition also flourished.

197.    By the late 1940s, health insurance companies using a Blue mark faced growing competition not just from each other, but also from other insurance companies that had entered the market.  Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million.  While the insurance companies using the Blue marks remained dominant in most markets, this growth of competition was considered a threat.

198.    From 1947 to 1948, the Blue Cross Commission and the AMCP attempted to develop a national agency for all plans using a Blue mark to be called the Blue Cross and Blue Shield Health Service, Inc., but the proposal failed.  One reason given for its failure was the AMA's fear that an unlawful restraint of trade action might result from such coordination.

Provided by CourtAlert www.CourtAlert.com

199. To counter the increasing competition, the Defendant Insurance Companies agreed to centralize the purported ownership of Blue marks that they had all used and which had become generic by that time. In prior litigation, the Association has stated that the local plans transferred their rights in the Blue Cross and Blue Shield names and marks to the precursors of the Association because the plans, which were otherwise actual or potential competitors, "recognized the necessity of national cooperation." Of course, attempting to revive or register a mark for the purposes of violating Federal antitrust law invalidates the mark.

200. In 1954, the insurance companies using Blue Cross marks agreed to transfer any purported rights that they might have in each of the respective trade names and trademarks to the AHA. Yet, in many areas in the country, no Defendant Insurance Company ever owned exclusive common law rights that could be transferred to anyone. In 1972, the AHA assigned its purported rights in these marks to the Blue Cross Association. These assignments were contrary to public policy and done in furtherance of Defendant Insurance Companies' conspiracy to violate the antitrust laws.

201. Likewise, in 1952, the insurance companies using Blue Shield marks agreed to transfer any rights that they purported to have in the trade names and trademarks that they had all used and that had become generic by that time to the National Association of Blue Shield Plans, which in 1976 was renamed the Blue Shield Association. As with the Blue Cross marks, in many areas in the country, no Defendant Insurance Company had ever owned exclusive common law rights that could be transferred to anyone.

202. During the 1970s, Defendant Insurance Companies began merging with their competitors, including other BCBS companies, all over the U.S. By 1975, the executive committees of the Blue Cross Association and the National Association of Blue Shield Plans were

meeting four times a year. In 1978, the Blue Cross Association and the National Association of Blue Shield Plans (which was then called the Blue Shield Association) consolidated their staffs, although they retained separate boards of directors.

203.    In 1980, when the two associations were considering a joint National Government Market Strategy, it was noted that "[t]here is a continuing uneasiness among a number of us in the system regarding the antitrust aspects of what is being proposed, as well as the manner in which it is being considered."

204.    In 1982, the Blue Cross Association and the Blue Shield Association merged to form the Defendant, the Association. At that time, the Association became the sole owner of the putative Blue Cross and Blue Shield trademarks and trade names that purportedly had previously been transferred by Defendant Insurance Companies and their predecessor-competitors with whom they had merged or acquired.

205.    To provide "checks and balances" against "open competition," the members of the Blue conspiracy presented at the 1982 annual meeting a "Long-Term Business Strategy." At this meeting, the co-conspirators adopted several recommendations contained in the Long-Term Business Strategy, including Proposition 1.2, described below, which provided that there would be only one co-conspirator per state.

206.    In November 1982, after heated debate, the Association's member plans agreed to and promulgated two Association "propositions" (Proposition Nos. 1.1 and 1.2): (1.1) by the end of 1984, all existing insurance companies using a Blue mark would consolidate at a local level to form Blue Cross and Blue Shield plans; and (1.2) by the end of 1985, all insurance companies using a Blue mark within a state would further consolidate, ensuring that each state would have only one BCBS competitor. Proposition 1.2 was justified as "a concentration of power and

resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively," including "decision-making" and "policy determination." As a result of these propositions, the number of insurance companies using the Blue mark declined sharply from 114 in 1980, to 77 in 1990, and now less than half that amount.

207.    Even consolidation, however, did not end all competition between the coordinating insurance companies.

208.    In the early 1980s, for example, multiple insurance companies using Blue marks competed head-to-head in parts of New York.

209.    From 1981 to 1986, the Defendant Insurance Companies lost market share of the market for the sale of healthcare insurance (both individual and group) to other healthcare insurance carriers (including other Defendant Insurance Companies competing under their non-Blue brands) at a rate of approximately one percent per year. At the same time, the amount of competition among Defendant Insurance Companies, including their subsidiaries operating without a Blue mark, increased substantially.

210.    In April 1987, the member plans of the Association held an "Assembly of Plans"— a series of meetings held for the purpose of determining how they would and would not compete against each other. During these meetings, these independent economic actors/health insurers and competitors agreed to recognize and maintain Exclusive Service Areas when using the Blue brand, thereby eliminating "Blue on Blue" competition.

211.    However, the 1987 Assembly of Plans did not restrain competition by non-Blue branded plans of Defendant Insurance Companies—an increasing "problem" that caused complaints from many Defendant Insurance Companies.

212.     After the 1986 revocation of the Defendant Insurance Companies' tax-exempt status and throughout the 1990s, the number of non-Blue branded plans of Defendant Insurance Companies increased.

213.     These plans continued to compete with Blue-branded plans.

214.     As a result, the members/owners of the Association discussed ways to rein in the non-Blue branded output and resulting competition that was thwarting their market allocation scheme.

215.     In 1996, after recommendations by a Special Committee of the Association, the Defendant Insurance Companies voted to modify the Association rules to which the Association's members were subject by inserting a local "best efforts" requirement into the service mark licensing agreement that every Defendant Insurance Company entered into with the Association. The new requirement, which was agreed to by all of the Defendant Insurance Companies, reads as follows:  "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to healthcare plans and related services ... offered within the designated Service Area must be sold, marketed, administered or underwritten under the Licensed Marks and Names."

216.     The Defendant Insurance Companies also adopted and agreed to a restraint that required any Defendant Insurance Company that departed from the Association to pay an exit fee.

217.     The Defendant Insurance Companies also limited transfer rights by requiring prior Association review and facilitation of the establishment of a successor Blue Licensee.

218.     Defendant Insurance Companies then turned their attention to a national "best efforts" requirement.  A 51% national best efforts proposal, requiring that 51% of a Defendant Insurance Company's revenues come from the sale of Blue-branded services, was voted down in 2001.  But an even more restrictive rule was proposed and presented in 2004 and later accepted

and agreed to by the Defendant Insurance Companies and the Association.  This National Best Efforts Rule is embodied in the following unlawful rule:  "[a]t least 66-2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to health care plans and related services … must be sold, marketed, administered or underwritten under the Licensed Marks and Names.  The percentage set forth in this paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph."  After these ten years expired (and during the relevant time period), the Defendant Insurance Companies agreed that the National Best Efforts Rule would be continued.

219.    The aforementioned restraints are not ancillary to any pro-competitive agreement among the Defendant Insurance Companies and are unnecessary to effectuate any pro-competitive purposes.

## VI.    OWNERSHIP AND CONTROL OF THE ASSOCIATION BY DEFENDANT INSURANCE COMPANIES

220.    On its website, the Association calls itself "a national association of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies."  It "grants licenses to independent companies to use the trademarks and names in exclusive geographic areas."   The trademarks and trade names are the Blue Cross and Blue Shield trademarks, trade names and logos.

221.    The Defendant Insurance Companies are the members of the Association and collectively control and govern the Association, including its rules and the terms of the license agreements that the Association enters into with its members.  Each Defendant Insurance Company agrees with all other Defendant Insurance Companies and with the Association to adhere to the rules, regulations, and bylaws promulgated by the Association.

222.    The Defendant Insurance Companies are all independent health insurance companies that could and would compete with one another in the absence of the unlawful agreements alleged herein.  To prevent such competition, Defendant Insurance Companies use the collective control they purport to have over certain Blue marks and names that they then license to the Defendant Insurance Companies on terms to which the Defendant Insurance Companies agree.  The Association is not a single entity but is instead a combination or conspiracy composed of the Defendant Insurance Companies.  The Association's Board of Directors is comprised of one member from each of the Defendant Insurance Companies, plus the CEO of the Association.

223.    The Association "is owned and controlled by the member plans." *Central Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989). Accordingly, the Association lacks the characteristics of a single entity and is instead a cartel of competitors.

224.    The undisputed evidence shows that "the Blue Plans are 36 independent companies," each of which sells health insurance services; that each plan is "autonomous in its operations" and a "financially independent entit[y]" with its own profits and losses; and that Defendants are not "partners or joint ventures." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018).  In other words, each Defendant is a separate economic actor pursuing separate economic interests.

225.    The Rules of the Association are determined by a three-quarters weighted vote of its members and "each member Plan has agreed to be bound by the Association Rules." *Id.*  The "undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement" and that the Defendant Insurance Companies "vote on and approve amendments to the licensing agreements." *Id.* at 1267. Each Defendant Insurance Company has

entered into a license agreement with the collectively controlled Association. *Id.* at 1251.  In each

of those license agreements, the Association grants to each Defendant Insurance Company "an

exclusive 'service area' where a Member Plan may use the Blue Marks" and, critically, each

member is required to agree with collectively controlled and owned Association that "it may not

use the licensed Marks and Name outside the service area." *Id.*

226.    The determination of where an individual Defendant Insurance Company will

compete using a Blue mark and in what areas it will refrain from competing is not left to the

"independent decision-making" of each licensee or to the independent decision-making of a holder

of common-law trademark rights.  To the contrary, it is the Association that is composed of 36

separate economic entities, each with its own interest in preventing other members from directly

competing with it, that formulated the rules that govern where and with whom each Defendant

Insurance Company can compete.  Clearly, each Defendant Insurance Company is a separate

economic actor with its own economic interests to pursue who, by joining together with the

Association, collectively decides how and where the licensees will compete and have deprived the

marketplace of the independent centers of decision-making that competition requires.  As a result,

Defendant Insurance Companies do not, as a matter of law, qualify for single-entity treatment.

227.    The Government Accountability Office ("GAO") issued a detailed report on the

operations of the Association in 1994 that was prepared with the cooperation of the Association.[2]

The GAO's report described the governance structure of the Association as follows:

> As members of the Association, Blues plans collectively govern the Association's
> affairs pursuant to written bylaws.  Under these bylaws, the Association is governed
> by a board of directors.  The board of directors consists of the CEOs of most plans
> and the Association president.  Plan representatives to the membership meetings

---

[2]     Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak
Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 24,
http://archive.gao.gov/t2pbat3/151562.pdf.

may or may not be the plan CEO.  For practical purposes, meetings of the Association's board of directors and its membership comprise largely the same individuals.[3]

228.    Thus, the Defendant Insurance Companies control the Board of Directors of the Association.

229.    In a pleading it filed during litigation in the Northern District of Illinois, the Association admitted that its Board of Directors consists of "the chief executive officer from each of its Member Plans and the Association's own chief executive officer."

230.    The Board of Directors of the Association meets at least quarterly.  The Board of Directors—comprised of Defendant Insurance Company executives—possess the authority to amend or add rules, regulations, bylaws, and restraints on competition.

231.    The governance structure of the Association is set out in its bylaws, which were approved by a vote of the Defendant Insurance Companies.

232.    Defendant Insurance Companies may amend or repeal the bylaws and adopt new bylaws.  Likewise, they may revoke and return at any time the purported ownership of any marks or trade names registered to the Association.

233.    The GAO Report also described the voting process used by the Association:

Decisions on significant issues relevant to all plans are generally decided by a vote of the Association membership.  Examples of significant issues include the termination of a plan's membership license or the amendment of the Association's bylaws.  The membership voting process combines a straight vote—one member, one vote—and a weighted vote.  Under weighted voting, each member plan is entitled to one vote for each $1,000 of annual dues it pays to the Association.  Because dues are based on plan premium volume, the larger plans receive a greater number of weighted votes than smaller plans.

For a membership vote to pass, the bylaws generally require a majority of both the straight and weighted votes of the members.  However, this rule has exceptions.  For example, the termination of a plan's trademark license requires at least three-

---

[3]    *Id.* at 24-25.

fourths of the straight vote and three-fourths of the weighted vote rather than a simple majority. An amendment to the Association bylaws, on the other hand, requires one-half of the straight vote and two-thirds of the weighted vote.[4]

## VII.    LICENSE AGREEMENTS AND RESTRAINTS ON COMPETITION

234.    As described above, the Association requires each Defendant Insurance Company to execute a purported license agreement with respect to its use of Blue service marks or trade names.

235.    The GAO Report says that:

To use the Blue Cross and Blue Shield names and trademarks, each Blues plan must sign a license agreement with the Association. The agreement does not constitute a partnership or joint venture, and the Association has no obligations for the debts of member plans.

The license agreement restricts plans from using the trademark outside their prescribed service area to prevent competition among plans using the Blue Cross and Blue Shield names and trademarks.[5]

The "prescribed service area" is the "Exclusive Service Area" described above.

236.    This collective enforcement of trademark "rights" is not the equivalent of individual enforcement of common-law trademark rights. Common-law trademark rights give the holder the ability to exclude others from using the mark within a given territory. Defendant Insurance Companies, however, have gone far beyond granting that ability to each other. Defendant Insurance Companies collectively through the Association also extract a promise from each other that it will not venture beyond its borders and compete against other Defendant Insurance Companies outside of its territory. *In re Blue Cross Blue Shield Antitrust Litig.*, 308. Supp. 3d 1341, 1268-69 (N.D. Ala. 2018). Each Defendant Insurance Company even agreed with the group that it could be fined or lose its rights altogether if it tried to break out of its territory and compete

---

[4]       *Id.* at 25-26.

[5]       *Id.* at 28.

against another of the Defendant Insurance Companies. *Id.* In other words, Defendant Insurance Companies agreed that each Exclusive Service Area would not only be an exclusive territory, but also a cage—beyond which the Defendant Insurance Company agreed with all of the other Defendant Insurance Companies it would not venture. There are no comparable common-law trademark rights that allow a horizontal group of competitors to agree that none of them will go beyond their territory to compete against each other. Thus, the Association does not merely enforce previously owned individual common-law trademark rights. It organizes a horizontal group promise that confines each licensee to provide services only to entities that happen to be located in its own territory.

237. An individual common-law trademark holder can decide on its own to enforce (or not enforce) its common-law trademark rights, but it is precisely the abandonment of that individual decision-making in favor of collective decision-making by a group of competitors that becomes a horizontal agreement among competitors within the meaning of §§ 1 and 3 of the Sherman Act. Such a horizontal agreement that allocates territories among competitors using the same trademark is a *per se* violation of §§ 1 and 3 of the Sherman Act.

238. Defendant Insurance Companies as a group through the Association have decided by a 75% weighted vote (1) who will be allowed to use the Blue marks in exclusive territories and (2) that each Defendant Insurance Company must promise not to conduct business by using the BCBS marks and trade names beyond its own Exclusive Service Area.

239. If each individual Defendant Insurance Company still had its hypothesized common-law trademark rights, each one of them would independently decide for itself whether to enforce or not enforce those common-law rights. Just as actually happened, two insurance companies, each with an exclusive Blue territory, could enter each other's Exclusive Service Area,

but each independently decide not to object to the competition or to file suit. 308 F. Supp. 3d at 1253. Each might be happy to let the other into its territory so long as it could expand beyond its own borders. Different Defendant Insurance Companies exercising these purported individual common-law rights could make different independent decisions—some more aggressive, some less so. Different settlements between them could be struck, or the parties could pursue the dispute to a judicial conclusion and the asserted trademark and trade name rights could be found invalid or not infringed. All of these events would be determined by separate economic entities, each making its own independent decisions to best serve their individual economic interest. Defendant Insurance Companies, however, through their collective control of the Association have eliminated that individual decision-making and replaced it with group decision-making through the Association. Defendant Insurance Companies' conduct is not the codifying of individually owned common-law rights. It is the transfer of those rights to a collectively controlled horizontal group which eliminates the independent decision-making by competitors that is the essence of market competition.

240.    As the foregoing demonstrates and as set forth in detail below, the Association is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition.

## VIII.    THE HORIZONTAL AGREEMENTS NOT TO COMPETE

241.    Each Defendant Insurance Company is an independent legal entity.

242.    The restraints and regulations of the Association, including, but not limited to, the Blue Cross License Agreement and the Blue Shield License Agreement (together, the "License Agreements"), the Membership Standards Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"), constitute horizontal agreements between competitors, Defendant Insurance Companies, to limit

output and divide the geographic market for commercial healthcare insurance in the United States. As such, they are *per se* violations of §§ 1 and 3 of the Sherman Act.

243.    The Association is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition.  Because the Association is owned and controlled by the Defendant Insurance Companies, any agreement between the Association and a Defendant Insurance Company constitutes a horizontal agreement between and among the Defendant Insurance Companies themselves.  As two economists told the FTC, "[t]he Blues collude almost perfectly.  Blue Cross and Blue Shield plans agree upon geographical market areas with the assistance of their national associations."[6] This collusion later became even more pernicious with the advent of Exclusive Service Areas and the "best efforts" requirements outlined above.  As one legal scholar (Mark Hal of Wake Forest Law School) noted recently when referring to the structure of the Association and the various restraints at issue here, "[i]t's sort of antitrust law 101 that direct competitors can't agree to divvy up their territory."[7]

244.    Defendant Insurance Companies have divided the healthcare services market into Exclusive Service Areas assigned exclusively to distinct Defendant Insurance Companies such that only one of them can contract with the local healthcare providers.  Through the License Agreements, Guidelines, and Membership Standards, which the Defendant Insurance Companies created, control, and enforce, each Defendant Insurance Company agrees that neither it nor its subsidiaries will compete under Blue Cross and Blue Shield marks or names outside of a

---

[6]      *Competition in the Health Care Sector: Past, Present, and Future*, FEDERAL TRADE COMMISSION, 212 (Mar. 1978), https://www.ftc.gov/sites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf

[7]      Anna Wilde Mathews, *Antitrust Lawsuits Target Blue Cross Blue Shield*, THE WALL STREET JOURNAL (May 27, 2016), https://www.wsj.com/articles/antitrust-lawsuits-target-blue-cross-and-blue-shield-1432750106

designated Exclusive Service Area including for the purchase of healthcare services. The restraints and regulations imposed "by" the Association on the Defendant Insurance Companies are actually anticompetitive restraints and regulations negotiated by, and agreed to, by and amongst the Defendant Insurance Companies—all of which are or would be horizontal competitors but for the anticompetitive agreements alleged herein.

245.    Each Defendant Insurance Company entered into a License Agreement with the Association.

246.    All Defendants have enforced the Exclusive Service Areas provided by the License Agreement.

247.    The Defendant Insurance Companies police the compliance of each other with the restraints and regulations of the Association.

248.    The Defendant Insurance Companies control and administer the disciplinary process for any Defendant Insurance Company that does not abide by the Association's restraints and regulations.

249.    The Defendant Insurance Companies control the termination of each other from the Association, including the loss of the putative "license" to use the Blue marks and trade name.

250.    The Defendant Insurance Companies have abided by the Exclusive Service Areas and have refused to compete against each other to negotiate price terms and contract with healthcare providers.

251.    In addition to allocating geographic markets through their use of Exclusive Service Areas, Defendants have developed additional rules which place added restraints on the Defendant Insurance Companies' ability to compete, and not only with each other. The Guidelines and Membership Standards, which Defendant Insurance Companies created, control, and enforce, and

with which each must agree to comply as part of the License Agreements, establish two key output restrictions on non-Blue competition.

252.    First, in 1994, the Defendants adopted the Local Best Efforts Rule. Under this rule, each Defendant Insurance Company agrees at least 80% of Exclusive Service Area revenue will be from Exclusive Service Area services offered under Blue Cross and Blue Shield trademarks.

253.    Second, in 2005, the Defendants adopted the National Best Efforts Rule. Under this rule, each Defendant Insurance Company agrees that at least 66.7% of non-Exclusive Service Area revenue will be from services offered under Blue Cross and Blue Shield trademarks. The initial term of the National Best Efforts Rule lasted until 2015, at which point the Defendant Insurance Companies decided that they would agree to its continuation.

254.    These provisions place an output restriction on Defendant Insurance Companies' non-Blue business and limit the extent to which Defendant Insurance Companies can compete with other co-conspirator licensees under non-Blue marks, *i.e.* green competition. These output restrictions directly limit the ability of each Defendant Insurance Company to compete and generate revenue from non-Blue branded, *i.e.* green, business and thereby restrict each company's ability to develop non-Blue brands that could compete with Defendant Insurance Companies or non-Blue plans of the Defendant Insurance Companies and other insurance companies for provider business. These provisions further discourage and disincentivize each Defendant Insurance Company from developing and competing through any non-Blue branded businesses.

255.    The one-third cap on national non-Blue branded revenue reduces to a minimal level the incentive, if any, and the ability of each Defendant Insurance Company to compete outside of its Exclusive Service Area. To do so, the Defendant Insurance Company would have to buy, rent, or build a provider network under a non-Blue brand while ensuring that revenue derived from that

brand did not exceed the one-third as of its national revenue.  Thus, the potential upside of investing in developing business outside of a designated area is severely limited, which obviously discourages the investment needed to compete.

256.    Although Defendants abandoned the National Best Efforts rule in 2021, the Plaintiffs have observed no out-of-area Blue seeking to enter into commercial in-network agreements with them.

257.    Each Defendant Insurance Company also agreed that they would not develop a provider network outside of its Exclusive Service Area.

258.    These restrictions eliminate all Blue-branded competition among Defendant Insurance Companies and severely limit non-Blue branded (or green) competition between Defendant Insurance Companies.

259.    The foregoing restrictions on the ability of Defendant Insurance Companies to generate revenue outside of their Exclusive Service Area constitute agreements between competitors to both limit output and allocate geographic markets, and therefore are *per se* violations of §§ 1 and 3 of the Sherman Act.

260.    Each Defendant Insurance Company has abided by the foregoing restrictions on the ability of Defendant Insurance Companies to generate revenue outside of their Exclusive Service Area during the relevant time period.

261.    The largest Defendant Insurance Company, Anthem, Inc., is a publicly traded company and has acknowledged the restrictions to which it continues to agree.  In its Form 10-K filed February 20, 2019, Anthem stated that it had "no right to market products and services using the BCBS names and marks outside of the states in which we are licensed to sell BCBS products." Anthem has further stated that the "license agreements with the Association contain certain

requirements and restrictions regarding our operations and our use of the BCBS names and marks, including . . . a requirement that at least 80% . . . of a licensee's annual combined local net revenue, as defined by the Association, attributable to health benefit plans within its [Exclusive Service Area] must be sold, marketed, administered or underwritten under the BCBS names and marks" and "a requirement that at least two-thirds of a licensee's annual combined national net revenue, as defined by the Association, attributable to care plans and related services sold, marketed, administered or underwritten under the BCBS names and marks[.]"

262.    Likewise, in its Form 10-K filed March 1, 2019, Triple-S Management Corp., which has been allocated Puerto Rico, explained that "[p]ursuant to our license agreements with the Association, at least 80% of the revenue that we earn from health care plans and related services in [its Exclusive Service Area] and at least 66.7% of the revenue that we earn from (or at least 66.7% of the enrollment for) healthcare plans and related services both in [and outside its Exclusive Service Area], must be sold, marketed, administered, or underwritten through use of the BCBS" name and mark.  Further, Triple-S Management Corp. stated that the territorial restrictions "may limit the extent to which we will be able to expand our healthcare operations, whether through acquisitions of existing managed care providers or otherwise, in areas where a holder of an exclusive right to the BCBS names and marks is already present."

263.    Despite these public admissions, both the Association and the Defendant Insurance Companies have otherwise attempted to keep the territorial restrictions as secret as possible.

264.    The Defendant Insurance Companies have agreed amongst themselves and with the Association to impose harsh penalties on those that violate the territorial restraints or output restrictions.

265.     According to the Guidelines, a Defendant Insurance Company that violates one of the territorial restraints could face "[l]icense and membership termination."  If a Defendant Insurance Company's license and membership are terminated, it loses the use of the Blue brands. In addition, in the event of termination, the Defendant Insurance Company must pay a fee to other Defendant Insurance Companies through the Association.

266.     According to Anthem's February 20, 2019, Form 10-K filing, that "Re-establishment Fee," which was $98.33 per enrollee through December 31, 2018, would be used to "fund the establishment of a replacement Blue Cross and/or Blue Shield licensee in the vacated area [*i.e.* Exclusive Service Area]" and, were that amount applied to all of Anthem's enrollees in a Blue-branded plan as of December 31, 2018, Anthem would be assessed more than $3 billion.

267.     Similarly, in a published opinion, the United States District Court for the District of Columbia found that if Anthem were to fail to comply with the "best efforts" rule and had to pay the re-establishment fee, the cost would be "close to $3 billion."  *Anthem*, 236 F. Supp. at 259 n.41.

268.     The re-establishment fee is sufficiently large to dissuade Defendant Insurance Companies from violating their collectively set restraints on competition and facing possible loss of their licenses.

269.     In sum, a terminated Defendant Insurance Company would:  (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Defendant Insurance Company in its local area.  These penalties amount to a threat by the Association and Defendant Insurance Companies to put any individual Defendant Insurance Company that breaches the territorial restrictions out of business.

270.    The Defendant Insurance Companies would compete with each other to negotiate price terms and contract with healthcare providers but for the horizontal agreement not to do so. Historically, Defendant Insurance Companies and their predecessors competed, and to this day, some Defendant Insurance Companies compete against each other in certain limited areas that, while protected from much competition, are not exclusively allocated to a single Defendant Insurance Company.

271.    Furthermore, while there are numerous Defendant Insurance Companies, and non-Blue competitors owned by such companies, that could and would compete effectively in each other's Exclusive Service Area but for the output and territorial restrictions.

272.    Since entering the License Agreement and absent a ceding agreement or other exception, no Defendant Insurance Company has competed under a Blue mark and/or trade name outside of its designated Exclusive Service Area.

273.    The Defendant Insurance Companies do not need the Exclusive Service Areas to compete with national insurers.  In the absence of the Exclusive Service Areas, the Defendant Insurance Companies could still use the Blue Card program and access to each other's networks. In fact, several Defendant Insurance Companies already are some of the largest insurers in the country and otherwise compete with other insurers on a nearly nationwide basis via Medicaid programs.

274.    Furthermore, allowing all Defendant Insurance Companies to negotiate price terms and contract with healthcare providers existing in Exclusive Service Areas will not undermine the ability of Defendant Insurance Companies to service their local area.  The Defendant Insurance Companies would remain free to focus on their local areas, and the existence of the Exclusive Service Areas as provider networks does not enhance efficiency.  The very fact that the Defendant

Insurance Companies worked in tandem with the Association to merge and operate statewide or broader shows that the Defendant Insurance Companies are not focused, and need not be focused, on local areas, and this point is further bolstered by the existence of large, multi-state Defendant Insurance Companies like Anthem and HCSC.

275.     The Defendants do not need the Exclusive Service Areas or the best-efforts restrictions to identify the source of any trademarked services or avoid confusion as to the source of any trademarked services among consumers.  To the contrary, there are many significantly less-restrictive means to eliminate any potential confusion as to the source of ASO or other services, such as requiring that each Defendant use its actual name to identify the source of the services.

276.     The output and territorial restrictions agreed to by all Defendant Insurance Companies operate to restrain competition among the Defendant Insurance Companies with each other.  These prohibitions on competition apply no matter how favorable the efficiencies and economies of scale that might result from multiple Defendant Insurance Companies being able to negotiate and contract with local healthcare providers and no matter how much healthcare payments and reimbursements would increase if competition were permitted.  The result is that Defendant Insurance Companies fixed and reduced the amount of payments and reimbursements Plaintiffs would have been paid but for the unlawful conduct alleged herein.

## IX.     DEFENDANTS' CONDUCT HARMS COMPETITION THROUGHOUT THE UNITED STATES

277.     The individual Defendant Insurance Companies, as licensees, members, and parts of the governing body of the Association, have conspired with each other (the member plans of the Association) and with the Association to create, approve, abide by, and enforce the restraints and regulations of the Association, including the *per se* illegal territorial and output restrictions in the License Agreements, the Membership Standards, and the Guidelines. These agreements and

this conduct harm competition and consumers by limiting output, dividing the geographic market for commercial healthcare insurance in the United States, increasing market concentration, and reducing competition throughout the United States.

278.     But for these illegal agreements, many of the individual Defendant Insurance Companies would otherwise be significant competitors of each other for the purchase of healthcare services throughout the United States.  As alleged above, 15 of the 25 largest health insurance companies in the country are Defendant Insurance Companies:  if all of these companies, together with all other Defendant Insurance Companies, were able to compete with each other, the result would be significantly higher prices paid to Plaintiffs. Defendants' conduct has increased market concentration and increased barriers to entry for other health insurers, removing patient choice.

279.     During the relevant time period, Defendant Insurance Companies' illegal anticompetitive conduct has restrained competition for contracting and negotiating price terms with healthcare providers and significantly decreased prices paid for healthcare service by depriving providers of competition in the relevant market from one or more additional individual Defendant Insurance Companies at higher prices set by a competitive market that is free from the restraints imposed by the Defendants on the market. As a result of the decreased prices paid for healthcare services, Plaintiffs' ability to provide healthcare services has been harmed, and patient choice has been reduced.

280.     The illegal anticompetitive conduct of the Defendant Insurance Companies has also led to immense financial windfalls for the Defendant Insurance Companies and their executives. During the 1980s and afterwards, the Defendant Insurance Companies began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses.  In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

281.    In 1992, the Association ceased requiring Defendant Insurance Companies to be not-for-profit entities.  As a result, many Defendant Insurance Companies converted to for-profit status, leading to massive growth.  Anthem, for example, became the largest health insurance company in the country as measured by enrollment.

282.    Many of the individual Defendant Insurance Companies generate substantial earnings and surpluses, and they pay their senior administrators and officials substantial salaries and bonuses—often in the multi-million dollar range.

283.    For example, in its latest report on the topic, issued in June 2015, the Consumers Union of Consumer Reports found that nine non-profit Defendant Insurance Companies held excess reserves of over \$12 billion at the end of 2014.  *See* Dena Mendelsohn, *How Much is Too Much:  Nonprofit Insurer Surplus After the ACA*, CR CONSUMER REPORTS (June 2015), https://advocacy.consumerreports.org/research/how-much-is-too-much-nonprofit-insurer-surplus-after-the-aca/ (last accessed May 23, 2022).

284.    The anticompetitive conduct alleged herein has enabled the Association and the Defendant Insurance Companies to generate supracompetitive profits that resulted in reserves and other assets far in excess of (a) those required by applicable state statutes or state licensing authorities or (b) that would be expected in a competitive market and subject to the constraints imposed by the medical loss ratio regulatory requirements.

## X.    DEFENDANTS' CONDUCT HAS NO PROCOMPETITIVE JUSTIFICATIONS

285.    Because the alleged conduct is a *per se* violation of the applicable antitrust laws, Defendants may not justify their agreement to engage in anticompetitive conduct through purported pro-competitive justifications. They are simply irrelevant. Even so, the Exclusive Service Areas and the other rules that restrict competition for the purchase of healthcare services

are not needed to protect the Blue marks or enable productive cooperation. Rather, Defendants

employ them to reduce horizontal competition. Defendant Insurance Companies have admitted:

- "One CEO reported that 'Plans benefit from the exclusive services areas because it eliminates competition from other Blue Plans and that without service areas there would be open warfare.'" *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d at 253.

- "A summary of conversations with four Blue CEOs states 'the major advantage of an exclusive franchise area was seen in the lessening of competition….'" *Id.*

- "Plan CEOs stated that ESAs create larger market share because other Blues stay out and do not fragment the market." *Id.*

286.    The market allocation scheme does not further any new or unique product offering:

Defendants cannot claim they produce a unique product.  The market allocations at issue are not necessary to market, sell or produce health insurance….  The plan to go to ESAs constituted a new marketing/sales strategy, not a new product.  The products remain exactly the same—commercial insurance and insurance services.

*Id.* at 1269-70.

287.    The Exclusive Service Areas do not facilitate interbrand competition.  Although

Defendant Insurance Companies sometime use common trademarks, each is an independent

competing producer of insurance services.  *Id.* at 1267.  None of the Defendant Insurance

Companies simply distribute the products or services produced by others.  Their market allocation

scheme eliminates direct horizontal competition between firms that produce the service in

question, *i.e.*, paying or reimbursing healthcare services to providers.

## XI.    TOLLING OF THE STATUTE OF LIMITATIONS

288.    The statutes of limitation as to Defendants' continuing antitrust violations alleged

in this Complaint were tolled by the pendency of one or more class action complaints and any

amendments thereto, against Defendants for the alleged anticompetitive conduct alleged in this

Complaint.

## XII.   VIOLATIONS ALLEGED

### Count One
(*Per Se* Violations of §§ 1 and 3 of the Sherman Act)
(Asserted Against All Defendants)[8]

289.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

290.    The License Agreements, Membership Standards, Rules, and Guidelines agreed to by the individual Defendant Insurance Companies and the Association represent horizontal agreements entered into by and between the individual Defendant Insurance Companies, all of whom are actual competitors or potential competitors in the market for the pricing and reimbursement of healthcare services.

291.    Each of the License Agreements, Membership Standards, Rules, and Guidelines entered into between the Association and the individual Defendant Insurance Companies represents a contract, combination, and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act.

292.    Through the License Agreements, Membership Standards, Rules, and Guidelines, the Association and the individual Defendant Insurance Companies have combined, conspired, and agreed to limit price term negotiations and to allocate providers and geographic markets for the pricing and reimbursement of healthcare services.  In particular, the Defendants have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to:  (1) allocate geographic territories or customers among Defendant Insurance Companies and decide through collective action that they will not compete against each other by using the Blue trademarks or trade names; (2) adhere to the National Best Efforts Rule, which directly restricts

---

[8] The MedStar Plaintiffs assert Count One against all Defendants other than CareFirst-DC and CareFirst-Maryland.  The Independence Plaintiffs assert Count One against all Defendants other than Highmark-Pennsylvania.  All other Plaintiffs assert Count One against all Defendants.

the non-Blue output that each Defendant Insurance Company is allowed to offer to the market outside of its designated territory; and (3) adhere to the Local Best Efforts Rule, which directly restricts the non-Blue output that each Defendant Insurance Company can offer within its designated exclusive territory.

293.    Each of the horizontal agreements identified in this Complaint is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of §§ 1 and 3 of the Sherman Act.

294.    As a direct and proximate result of the individual Defendant Insurance Companies and the Association's continuing violations of §§ 1 and 3 of the Sherman Act described above, Plaintiffs have suffered antitrust injury in that they have been paid lower than competitive rates for rendered healthcare services.  Each payment from Defendants has caused injury to Plaintiffs.

295.    The Defendant Insurance Companies and the Association are jointly and severally liable to the Plaintiffs in treble the amount of the actual damages suffered by the Plaintiffs plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).

**Count Two**
(Rule of Reason Violations of §§ 1 and 3 of the Sherman Act)
(Asserted Against All Defendants)[9]

296.    Plaintiffs repeat and reallege the allegations in all Paragraphs above.

297.    The Defendant Insurance Companies have market power, *i.e.*, the power to lower the price paid to providers for healthcare services below the competitive level, in the payment of

---

[9] The MedStar Plaintiffs assert Count Two against all Defendants other than CareFirst-DC and CareFirst-Maryland.  The Independence Plaintiffs assert Count Two against all Defendants other than Highmark-Pennsylvania.  All other Plaintiffs assert Count Two against all Defendants.

U.S. healthcare services to healthcare providers, the relevant geographic and product market alleged herein, *i.e.* the healthcare pricing and reimbursement market.

298.     The License Agreements, Membership Standards, Rules, and Guidelines agreed to by and among the Defendant Insurance Companies represent horizontal agreements entered into between and among the individual Defendant Insurance Companies, all of whom are competitors or potential competitors in the market for pricing and reimbursement of healthcare services in the United States.

299.     Each of the License Agreements, Membership Standards, Rules, and Guidelines entered into between the Association and the Defendant Insurance Companies represents a contract, combination and/or conspiracy within the meaning of §§ 1 and 3 of the Sherman Act.

300.     Through the License Agreements, Membership Standards, Rules, and Guidelines, the Association and the Defendant Insurance Companies have agreed to and have, in fact, restricted price term negotiations and allocated providers, including the Plaintiffs, who provide healthcare services.  By so doing, Defendant Insurance Companies and the Association have unreasonably injured competition in the relevant market for negotiating prices and reimbursing healthcare services within the United States.  In particular, the Defendants' allocation of geographic areas and/or providers and the output restrictions the Defendants have imposed on the market through the National Best Efforts Rule and Local Best Efforts Rule have significantly decreased below the competitive level the price paid by Defendant Insurance Companies to Plaintiffs for healthcare service in the United States.  These output restriction agreements and market allocation agreements unreasonably injure competition within the meaning of §§ 1 and 3 of the Sherman Act.

301.     The output restrictions and market allocation agreements entered into among the individual Defendant Insurance Companies (executed through the Association License

Agreements and related Membership Standards and Guidelines) are not only *per se* illegal, but they are also unreasonably anticompetitive and violate the Rule of Reason.

302.    Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to the following:

  a. Allowing the Defendant Insurance Companies to artificially and unreasonably lower the prices paid to healthcare providers substantially below the competitive level;

  b. Substantially restricting output, especially with respect to non-Blue branded plans and competition; and

  c. Depriving the Plaintiffs and others of the benefits of free and open competition, including a greater provider choice, greater market entry, higher prices, and higher quality services.

303.    The challenged anticompetitive agreements do not provide any procompetitive benefits.  Furthermore, the anticompetitive agreements are neither ancillary nor necessary to any legitimate or procompetitive conduct or effect or to the ability of the Defendant Insurance Companies to negotiate and contract with healthcare providers under a Blue mark or name.

304.    In addition, any possible procompetitive effects that could conceivably result from the output restraint and market allocation agreements alleged herein are clearly and substantially outweighed by the anticompetitive effects detailed above.  Furthermore, any possible procompetitive effects could be achieved by significantly less restrictive measures.  The output restrictions and market allocation agreements in the License Agreements, Membership Standards, Rules, and Guidelines therefore are not only *per se* illegal, as set forth in Count I above, but also unreasonably restrain trade in violation of the Rule of Reason.  The combination of agreements to

restrict output, allocate markets, and restrain trade adversely affects Plaintiffs by depriving them, among other things, of the opportunity to contract with Defendant Insurance Companies for higher service prices set by a free market unencumbered by Defendants' anti-competitive agreements. As a result of the Defendants' market allocation agreement, National Best Efforts Rule and Local Best Efforts Rule the Defendant Insurance Companies have not competed against each other healthcare providers and have been precluded by such agreement and restraints from doing so.

305.    Likewise, the Defendant Insurance Companies have been precluded from competing for healthcare providers both inside and outside of their respective Exclusive Service Area under non-Blue brands. This has prevented entry of Defendant Insurance Companies into the market for healthcare provider services, and lowered the prices paid for such services substantially below what they would have been but for the illegal restraints.

306.    As a direct and proximate result of the Defendants' continuing violations of §§ 1 and 3 of the Sherman Act described in this Complaint, Plaintiffs have suffered antitrust injury and damages in an amount to be proven at trial. These damages consist of having been paid artificially deflated, unreasonable, and/or non-competitive and lower prices for healthcare services to Plaintiff providers than they would have but for the Defendants unlawful, anticompetitive agreements. These damages have accrued anew each time Plaintiffs have been paid such prices and have been denied the benefits of competition for their healthcare services.

307.    The Defendant Insurance Companies and the Association are jointly and severally liable to the Plaintiffs in treble the amount of the actual damages suffered by the Plaintiffs plus an award of the reasonable attorneys' fees and costs incurred in prosecuting this action, all as provided for by § 4 of the Clayton Act (15 U.S.C. § 15).

## XIII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs request that this Court:

a.   Hold the Defendants to be jointly and severally liable to the Plaintiffs and award Plaintiffs treble the amount of the damages they have sustained;

b.   Award Plaintiffs pre-judgment interest;

c.   Award Plaintiffs their costs and attorneys' fees;

d.   Award Plaintiffs such equitable and injunctive relief necessary to prevent future loss or harm;

e.   Adjudge and decree that the Association and Defendant Insurance Companies have violated §§ 1 and 3 of the Sherman Act;

f.   Adjudge and decree that the Association has used or is using the Blue Shield trademarks and the Blue Cross trademarks to violate the antitrust laws of the United States; and

g.   Award any such other and further relief as may be just and proper.

### TRIAL BY JURY DEMANDED

This the 4th day of March, 2025.

Respectfully submitted,

**DUANE MORRIS LLP**

By:   /s/ *Sean S. Zabaneh*
Sean S. Zabaneh (201085)
Sean P. McConnell (307740)
Sarah O'Laughlin Kulik (318534)
Jessica Priselac (208524)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1000
sszabaneh@duanemorris.com
spmcconnell@duanemorris.com

sckulik@duanemorris.com
jpriselac@duanemorris.com

and

Rebecca Bazan
DUANE MORRIS LLP
901 New York Avenue N.W., Suite 700 East
Washington, D.C. 20001
(202) 766-7800
rebazan@duanemorris.com

*Application for pro hac vice admission forthcoming*

and

**MCKOOL SMITH, PC**

Jon Corey
MCKOOL SMITH, PC
1717 K Street NW, Suite 1000
Washington, D.C. 20006
(202) 370-8300
jcorey@mckoolsmith.com

*Application for pro hac vice admission forthcoming*

John Briody
James Smith
MCKOOL SMITH, PC
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com

*Applications for pro hac vice admission
forthcoming*

Lew LeClair
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000
lleclair@mckoolsmith.com

Provided by CourtAlert                                                                    www.CourtAlert.com

*Application for pro hac vice admission forthcoming*